UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

--------------------------------------------------------- x

In re:                                    :     Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :     Case No.: 13-53846
                                          :
                            Debtor.       :     Hon. Steven W. Rhodes
                                          :

--------------------------------------------------------- x

## OBJECTION OF INTERNATIONAL UNION, UAW
## TO FIFTH AMENDED PLAN FOR THE
## ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America ("UAW") submits this objection to the Fifth

Amended Plan of Adjustment of Debts of the City of Detroit, as corrected [Docket

No. 6379] (the "City's Plan" or the "Corrected Fifth Amended Plan,") and states

for its objections as follows:[1]

## PRELIMINARY STATEMENT

UAW is the collective bargaining representative of certain current and

former employees of the City of Detroit, Michigan (the "City"). UAW-represented

_____

[1] UAW files this Objection under the terms of the Order Modifying Certain
Deadlines Established in the Fourth Amended Order and Fifth Amended Order
Establishing Procedures, Deadlines and Hearing Dates Related to the Debtor's Plan
of Adjustment [Docket No. 6363] extending UAW's time to file an objection to the
City's Plan.

employees and retirees are drawn from the following City bargaining units: civilian police investigators employed in the Police Department, City Law Department attorneys and paralegals, Water and Sewerage Department waste-water treatment operators and associated skilled trades workers. UAW has been party to successive collective bargaining agreements ("CBAs") with the City of Detroit for those persons employed in or retired from the Police, Law, and Water and Sewerage Departments. In addition, the UAW represents current and former employees of the Detroit Library Commission (the "DLC"), also known as the Detroit Public Library (the "Library"), a municipal corporation which is an entity separate and distinct from the City of Detroit under Michigan law, and which is not a chapter 9 debtor. UAW is currently a party to collective bargaining agreements with the DLC covering three Library bargaining units, the Association of Professional Librarians unit, the Professional Organization of Librarians unit and a Skilled Trades unit. The foregoing UAW-represented employees and retirees, both of the City and the DLC, are participants in the City of Detroit General Retirement System ("GRS").

Unless otherwise stated, all references to the City's Plan are to the Corrected Fifth Amended Plan and the Fourth Amended Disclosure Statement With Respect to the Fourth Amended Plan For the Adjustment of Debts of the City of Detroit [Docket 4391] ("Fourth Amended Disclosure Statement").

2

## SUMMARY OF OBJECTIONS

1. The City's Plan May Not Apply the Class 11
and Class 12 Cuts to the UAW-Represented
Employees or Retirees of the Detroit Public Library.

The Detroit Public Library is a separate and independent municipal corporation that is not part of the City's Chapter 9 Case, and employs (or formerly employed) several hundred UAW-Represented employees and retirees of the Library who work or formerly worked in bargaining units of librarians or skilled trades employees represented by the UAW.  The UAW's collective bargaining agreements ("CBAs") with the Library remain in full force and effect.  Even though the Library is separate from the City and is not a debtor and even though the City is not their employer, the City has included the UAW-represented librarians and others in the City's Plan, specifically, in Class 11, where the City has proposed cuts to accrued pension benefits, the ASF Recoupment, and modification of future pension accruals, and in Class 12, where the City has proposed to eliminate its obligations for OPEB benefits through the payment of certain notes to a new proposed VEBA.

The City's rationale for including the Library employees and retirees is that "to any extent the City [as distinct from the Library] has any obligations to the current or former employees of the" Library, because they participate alongside City employees and retirees in City benefit programs, "the City believes that *the*

*City's* obligations may be modified in the City's bankruptcy case." Fourth Amended Disclosure Statement at p. 14 (emphasis added). The City has not further explained the basis for including the Library employees and retirees in Classes 11 and 12, nor has it offered any quantification of its contingent obligation for the Library benefits that would justify including the Library people in the benefit reductions proposed in its Plan. At the same time, the City has acknowledged that *the Library's* obligations as the employer of the Library employees and former employees, are *not* being modified in the City's bankruptcy case, *id.* at pp. 14, 15.

The UAW submits that, as to the employees and retirees of the Library, the City's Plan improperly proposes a reduction in their benefits and, further, fails to classify, value and propose a treatment for the Library-related obligations *of the City* that the City seeks to adjust. Instead, the City simply, and improperly, proposes for the Library employees and retirees the same benefit reductions under Class 11 and Class 12 (including ASF Recoupment) as those proposed for the City's employees and retirees covered by Classes 11 and 12, even though the Library is not a Chapter 9 debtor and even though Article 9, Section 24 of the Michigan Constitution, and Michigan's state pension investment law, both of which continue to apply as to the Library and its employees and retirees, and prohibit the reduction of the accrued retirement benefits of those persons.

4

Accordingly, confirmation of the Plan should be denied to the extent the City seeks to subject the Library employees and retirees to the benefit reductions proposed in Classes 11 and 12.

2.  The Court Should Not Confirm the Plan to Any Extent that Employees and Retirees Remain Subject to Further Benefit Cuts Based on Non-Receipt of Outside Funding.

Under the City's Plan, acceptance of the Plan by Classes 10 and 11 is a condition of the Outside Funding under the State Contribution Agreement and the DIA Settlement[2] and triggers the lower, "Alternative A" pension cuts. The announced voting results show that Classes 10 and 11 are deemed to have accepted the Plan. The City's Plan nevertheless incorporates some risk that cuts greater than the "Alternative A" cuts could still be imposed. For example, the Plan provides that, if the "initial funding conditions" for the State Contribution are not met by the Confirmation Hearing, Classes 10 and 11 will be deemed to have voted to reject the Plan, despite having voted to accept the Plan. In addition, a subsequent failure of the conditions under either the State Contribution Agreement or the DIA Settlement could cause the cuts proposed under "Alternative A" to be increased.

The City's road through bankruptcy has been rocky and difficult for its employees and retirees, who are to contribute significantly to the City's

---

[2] Unless specified otherwise, defined terms refer to the terms as defined in the City's Plan and in the Fourth Amended Disclosure Statement.

revitalization from funds they otherwise expected would be their retirement security and—with the acceptance by Classes 10 and 11—potentially giving up significant rights to pursue full payment of their pensions. Uncertainties regarding the Outside Funding should not persist through the Confirmation Hearing and beyond. The Court should require the State to provide notification that the "initial funding conditions" have been fulfilled. In addition, assuming the Court finds that the City's Plan has otherwise met the requirements of the Bankruptcy Code for confirmation, the Court should deny the City the ability to automatically impose greater cuts based upon an alleged failure of the funding conditions in the future, and instead require that the City return to Court in the event the City believes that any alleged failure of the funding commitments has been triggered.

We also discuss certain other matters at pages 39-41, *infra*.

## ARGUMENT

I.     The City's Plan May Not Apply the Class 11 and Class 12 Cuts to the <u>UAW-Represented Employees or Retirees of the Detroit Public Library</u>.

Over three hundred current employees and over three hundred retirees of the Library participate in the GRS. *See* May 8, 2014 GRS's Responses to UAW's Interrogatories ("GRS Interr. Resps.") at 5-6 (Response to Interrogatory

#1).[3]  Many of these Library employees and retirees work or formerly worked in

bargaining units of librarians or skilled trades employees represented by the UAW.

For the reasons explained below, the City's Plan and any confirmation order

approving the Plan should expressly provide that the Class 11 and Class 12

benefits reductions applicable to holders of GRS Pension Claims and OPEB

Claims, respectively, shall not apply to Library employees and retirees.

A.    The Library is a Municipal Corporation Separate from the City.

The Detroit Public Library is an independent, municipal corporation

governed by a seven member Detroit Library Commission.  *See*

http://www.detroitpubliclibrary.org/detroit-library-commission (last visited on

August 1, 2014).  As the City acknowledges, the Library is "a statutory body

created by the State of Michigan that is legally separate from the City."  City's

May 6, 2014 Responses to UAW's Interrogatories ("City Interr. Resps.") at 11

(Response to Interrogatory #1).[4]  The City's charter makes clear that the Library is

not part of the City:  the charter nowhere mentions the Library among its listing of

_____

[3] In addition, about forty former Library employees who have not yet retired are
GRS participants, but for ease of reference, we refer here just to Library employees
and retirees.

[4] Act No. 314, Local Acts, 1881 provided for the Detroit Board of Education to
establish and maintain a district Library and, in its discretion to elect of Board of
Commissioners known as the Detroit Library Commission with the power to
manage and control the Library.  Thereafter, Act No. 359, Local Acts, 1901
provided for the incorporation of the Detroit Library Commission with all of the
powers of a unique corporate entity.

the City's departments and agencies. The charter's sole reference to the Library simply grants the City power to contribute to and aid the Library: "[t]he City may make appropriations to, and exercise its power in aid of, the Detroit Library Commission for the operation of libraries within the City." 2012 Detroit City Charter § 9-504.[5]

The Michigan Supreme Court recognized the separation between the City and the Library in *Kuhn v. Thompson*, 168 Mich. 511 (1912). There, the court addressed the question of whether bonds issued by the DLC and the Detroit Board of Education counted toward the ceiling on indebtedness permitted the City of Detroit. *Id.* at 516. In holding that they did not, the court accepted that the Detroit Board of Education and the DLC were "distinct and independent corporations." *Id.* at 515. The court explained that education has traditionally been a "distinctive function of state government" and that school boards have always been separate from cities, towns and villages, even if they cover the same territory and are closely allied with such municipal corporations. *See id.* at 518-19. The court reasoned that the analysis applicable to schools also applies to libraries, since

---

[5] That the Library is "within" but not part "of" the City finds support in the statute, MICH. COMP. LAWS § 397.401 (West 2014), that provides that the library commission in any city with a population of over 250,000 (*i.e.*, that of Detroit) shall have a territory of operation coextensive with the boundaries of that city. Had the Legislature considered the Library part of the City, it would not have needed to specify that its territory of operation was coextensive with the City.

13-53846-tjt    Doc 6464    Filed 08/01/14    Entered 08/01/14 18:55:42    Page 8 of 42

libraries "enlarge and supplement the work of schools" and are thus "part of the educational system of the state." *Id*. at 518. The court also noted that the commissioners of the DLC are chosen by the members of the Detroit Board of Education. *See id*.[6]

      *Kuhn* remains good law and its conclusion that the Library is separate and independent from the City remains valid. Indeed, as cited above, the Library describes itself as "an independent, municipal corporation." Ordinarily, six members of the Detroit Library Commission are appointed by the Detroit Board of Education and the seventh is the president of the Board of Education. *See* http://www.detroitpubliclibrary.org (last visited on August 1, 2014). None are appointed by the City.[7]

---

[6] *Jackson Dist. Library v. Jackson County No. 1*, 146 Mich. App. 392 (Mich. Ct. App. 1985), also supports the proposition that libraries in Michigan are distinct from other governmental entities. The court there held that a library had the legal capacity to sue the county in which it was located, to claim a share of certain tax revenue. The court explained that as an entity created by state law to conduct state business, the library was a "quasi-municipal corporation." *Id*. at 396-97. It concluded that "in light of the constitutional stature of libraries, it seems clear that a library is independent for purposes of suing one of its 'parent' governmental units over tax collections." *Id*. at 397. *Jackson* thus provides further support for the conclusion that the Library is separate and distinct from the City.

[7] The Library's revenues are also separate from those of the City. Most of the Library's revenues come from property taxes that, although levied and collected by the City, are specifically earmarked for the Library. *See* Fourth Amended Disclosure Statement at p. 95 (explaining that Detroit residents pay property taxes to a number of entities, including the Library). For the year ended June 30, 2012, property taxes for the Library were levied at 4.6307 mills ($4.6307 per $1,000

9

B.  Library Employees and Retirees Are Owed
Obligations for Pension and OPEB Benefits.

In 1938, the Detroit Common Council adopted a resolution providing that the employees of the Library, who had no pension program of their own, would participate in the pension system that had been established for the City's employees.  Since the inclusion of Library employees in the GRS, the Library has funded the GRS defined benefit pension plan for the pension benefits of its employees and retirees.  *See* GRS Interr. Resps. at 6-7 (Response #2) (for example, the Library contributed $4.2 million to the GRS for the year ended June 30, 2013); *see also* June 30, 2012 Financial Statements at 19, DETROIT PUBLIC LIBRARY, *available at* http://www.michigan.gov/documents/treasury/828011DetroitPublic Library20121214_406100_7.pdf (last visited August 1, 2014).  The Library's obligations to provide pension benefits for its UAW-represented employees and retirees and to fund those benefits by making pension contributions on behalf of employees and retirees from UAW-represented bargaining units are embodied in the Library's collective bargaining agreements with the UAW, to which the City is not a party.

---

assessed valuation).  *See* June 30, 2012 Financial Statements at 10, DETROIT PUBLIC LIBRARY, *available at* http://www.michigan.gov/documents/treasury/ 828011DetroitPublicLibrary20121214_406100_7.pdf (last visited August 1, 2014).

10

In addition to funding the pension benefits of its employees and retirees, the Library also has an obligation under its collective bargaining agreements with the UAW to furnish post-retirement medical and other benefits to retirees from UAW-represented bargaining units who are receiving a pension. While the City has administered these other post-retirement benefits for the Library, it is the Library that has funded them. *See* June 30, 2012 Financial Statements at 10, DETROIT PUBLIC LIBRARY, *available at* http://www.michigan.gov/documents/treasury/828011DetroitPublicLibrary201212 14_406100_7.pdf (last visited August 1, 2014).

Effective March 1, 2014, the City implemented significant reductions to OPEB for City retirees, offering Medicare-eligible retirees the option of certain Medicare Advantage insurance plans and providing non-Medicare-eligible retirees a stipend towards health insurance coverage they find on their own. *See* Fourth Amended Disclosure Statement at pp. 149-50. These same OPEB reductions were imposed on the Library retirees in place of the coverage provided for in the Library-UAW CBAs. The UAW has asserted that these OPEB benefit reductions violate the Library's contractual obligation to provide for and fund OPEB for its present and future UAW-represented Library retirees.[8] While most City

---

[8] The UAW has asserted this position in grievances that it is prepared to file against the Library under the exclusive grievance-arbitration procedures of the UAW's collective bargaining agreements with the Library. Pursuant to a

employees are now subject to City Employment Terms ("CETs"), *see* Fourth

Amended Disclosure Statement at pp. 116-17, the Library's collective bargaining

agreements with the UAW remain in full force and effect, and are not subject to

modification or rejection since the Library is not a Chapter 9 debtor. Indeed, for

purposes of Michigan's public-sector collective bargaining law, *see* MICH. COMP.

LAWS § 423.215 (West 2014), the Library is a "public employer" separate from the

City; therefore, the City, its emergency manager and this Court have no authority

over collective bargaining relations between the Library and its unions.

<div style="margin-left: 2em">

C.     Classes 11 and 12 of the Plan Impair the Pension and
       <u>OPEB Benefits of UAW-Represented Employees and Retirees</u>.

</div>

The City's Plan defines "GRS Pension Claim" as, among other things,

> "any Claim (other than an OPEB Claim) whether
> asserted by current or former employees of the City, *or
> any participants in GRS* … against the City or any fund
> managed by the City (including, but not limited to, the
> General Fund, the water fund the sewage disposal fund,
> the Detroit General Retirement System Service
> Corporation fund or the pension funds) based upon,
> arising under or related to any agreement, commitment or
> other obligation … for (a) any pension, disability or other

---

continuing tolling agreement with the Library to allow for ongoing settlement
discussions, the UAW has to date refrained from filing the grievance while
settlement discussions continue. On June 29, 2014, the UAW filed grievances
against the Library over separate announced changes that were to be effective July
1, 2014 relating to pension benefits or pension service accruals of UAW-
represented Library employees and/or retirees. These grievances are also currently
being held in abeyance by agreement between the Library and the UAW pending
settlement discussions.

> post-retirement payment in respect of the employment of
> current for former employees or (b) the payment by the
> GRS to persons who at any time participated in, were
> beneficiaries of or accrued post-retirement pension or
> financial benefits under the GRS."

City's Plan, § I, No. 168 at p. 14 (emphasis added).[9] Class 11 of the City's Plan

provides that "the pension benefits payable to each Holder of a GRS Pension

Claim shall be equal to the GRS Adjusted Pension Amount for such Holder." The

"GRS Adjusted Pension Amount" includes the "Alternative A" across the board

cuts to pensions accrued as of July 1, 2014 (or, upon a rejection by Class 11 or

Class 10, the greater, "Alternative B" across the board cuts); the elimination of cost

of living increases after July 1, 2014, and the ASF Recoupment. In addition, for

post-July 1, 2014 service, Class 11 active employees will accrue pension service

under a modified arrangement known as the New GRS Active Pension Plan.

City's Plan, § II.B.3.r.ii.C, F, at pp. 36-37. The City does not differentiate between

City employees and retirees and Library employees and retirees in the proposed

---

[9] The phrase, "or any participants in GRS" (*i.e.*, whether or not they are current or former employees of the City) first appeared in the Fifth Amended Plan filed on July 25, 2014. The City also inserted a similar change to the definition in the Fifth Amended Plan of "new GRS Active Pension Plan," which is now defined, in relevant part, as the "terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City *or another entity that participates in GRS* in connection with employment service performed on or after July 1, 2014…." City's Plan, § I, No. 212 at p. 17 (emphasis added). Thus, the City intends that the new pension terms for active employees would apply to Library employees as well.

13

treatment of Class 11 claims even though the Library employees and retirees' pension benefits are funded by the Library and are required to be provided under the Library's CBAs.

For OPEB benefits, under the Plan, "OPEB Claim" means "any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB benefits, and any eligible surviving beneficiaries of such retiree." City's Plan, § I No. 222 at p. 18. Class 12 of the Plan purports to allow the "OPEB Claims" in the aggregate amount of $4,303,000,000. The City's Plan provides for the establishment of two VEBAs funded by VEBA New B Notes, as well as an additional, contingent distribution, beyond which the City's obligation for OPEB benefits would be discharged. For GRS participants, a "Detroit General VEBA" would be established "to provide health benefits to Detroit General VEBA Beneficiaries. A "Detroit General VEBA Beneficiary" is a Holder of an OPEB Claim who is a "Detroit General Retiree." The Plan defines a "Detroit General Retiree" as "a retired employees or surviving beneficiary of a retiree employee of *a department of the City*" who is not a Detroit Police and Fire Retiree and who retired on or before December 31, 2014 and "is a Holder of an OPEB Claim." City's Plan, § I, No. 86 at p. 8; § II.B.3.s.i, ii., at p. 38. Arguably, then, by not limiting the definition of an OPEB Claim to a claim by the City's own retirees, the City has defined "OPEB Claim" to include the Library

retirees but has defined the proposed treatment of OPEB Claims to *exclude* them, which suggests that the City proposes merely to divest itself of any obligation for OPEB, discontinue its own OPEB programs, and discharge such obligations as the City may have to the Library retirees with no recovery by them at all.

The Library employees and retirees should not be subject to the benefit reductions as Class 11 or 12 claimants since, among other things, they are employees or retirees of an entity that is distinct from the City and because their non-debtor employer—the Library—remains contractually obligated for pension and OPEB benefits, notwithstanding the City's bankruptcy case. Nonetheless, the City's Plan includes the Library active and retired employees in the proposed impairment of pension and OPEB benefits, citing as its only basis the participation by the Library employees and retirees in certain benefit programs established for the City's own employees and retirees. Because the City's Plan thus provides for impairment and diminishment of the pension and OPEB benefits of Library employees and retirees, the UAW opposes confirmation of the Plan as it now stands, for reasons that we will now further detail.

D. The City's Chapter 9 Case Cannot Alter the Pension or OPEB Obligations Owed to UAW-Represented Library Employees and Retirees.

Because the Library is a separate and distinct entity from the City, it is not a debtor, nor a part of the debtor, in the Chapter 9 Case. Fundamentally, then,

15

the obligations owed to the *Library's* employees and retirees, by virtue of their employment by the Library, cannot be modified through the City's Chapter 9 Case as part of the City's proposed modifications of the obligations owed to the City's own employees and retirees.

First, notwithstanding the City's bankruptcy case, the Michigan Constitution protects the accrued pension benefits of the Library employees and retirees. Article 9, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall *not be diminished or impaired* thereby." MICH. CONST. Art. IX, §24 (emphasis added). The constitutional clause further provides, in the second paragraph, that such benefits "shall be funded" each year. *Id.* The Michigan Supreme Court has interpreted Article 9, Section 24 as creating "the *firmly established right* of public employees to receive pension payments as those payments become due." *Kosa v. Treasurer of State of Mich.*, 292 N.W.2d 452, 460 (Mich. 1980) (emphasis added); *see also In re Request for Advisory Op. Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) (finding that "[t]he obvious intent" of Article 9, Section 24 was "to ensure that public pensions be treated as contractual obligations that, *once earned, could not be diminished*.") (emphasis added). We acknowledge that this Court has ruled that, because the City is a Chapter 9 debtor,

16

Article 9, Section 24 does not preclude the City from adjusting the pension benefits of City employees, but that ruling has no application to the Library's employees and retirees, since the Library is not a debtor in this bankruptcy case.[10]

Furthermore, for those Library employees and retirees from UAW-represented bargaining units, the Library has contractual obligations under its collective bargaining agreements with the UAW to provide accrued pensions and future pension accruals, and to provide promised OPEB benefits for present and future UAW-represented retirees.  Nothing in the City's Chapter 9 bankruptcy authorizes, or could authorize, any alternation in the contractual obligation to provide these benefits that is found in the Library's collective bargaining agreements with the UAW.

Nor does any basis exist to reduce the pension benefits of Library employees and retirees in the Chapter 9 Case merely because they are GRS participants and the benefits of GRS participants who are City employees and retirees assertedly may be reduced in the bankruptcy case.  The GRS defined

---

[10] The UAW has appealed the Court's ruling that the City was eligible for Chapter 9 bankruptcy despite its expressed intent to cut accrued pension benefits, and the Court's further ruling that it had the authority to reduce pension benefits notwithstanding Article 9, Section 24 of the Michigan Constitution.  *See In re Int'l Union, UAW*, Case No. 14-1213 (6th Cir.).  But whether or not those rulings stand, it is clear that, as a sovereign state, Michigan has not authorized the federal judiciary, acting under the United States Constitution's bankruptcy clause, to set aside Article 9, Section 24 with respect the accrued pension benefits of the Library employees and retirees.

benefit plan is simply the mechanism by which the pension benefits are administered and paid.[11]   In the case of the Library employees and retirees, their GRS-administered and paid benefits have been funded by their employer, the non-debtor Detroit Public Library.  Because the Library is not a debtor in this case and not within the scope of this Court's Eligibility Order, Article 9, Section 24 continues to apply to protect the Library participants' accrued benefits from impairment or diminishment and requires that those benefits be funded each year.

Similarly, in these proceedings no basis exists to diminish OPEB for Library retirees from UAW-represented bargaining units.  While the City administers OPEB for Library retirees, the Library pays for the OPEB and is contractually bound to provide OPEB pursuant to its collective bargaining agreements with the UAW.[12]

---

[11] Under Michigan's Public Employment Retirement System Investment Act ("PERSIA"), MICH. COMP. LAWS § 38.1132 *et seq*., annual contributions to the GRS are made by the "employer."  *See* MICH. COMP. LAWS § 38.1140m (describing the annual "required employer contribution" to the retirement system). There is no doubt that the Library is the employer, past and/or present, of its UAW-represented employees and retirees.

[12] Further, the Library and the UAW have agreed, in their CBAs, to mutually binding and final arbitration of their contractual disputes, including any disputes over pensions and OPEB.

E.   The City's Plan Has Not Defined a Claim and Has
     Offered No Value for the Adjustment of Any Obligation
     the City May Have for Library Pension or OPEB Benefits.

The City does not dispute that its Chapter 9 Case cannot modify the Library's obligations to its employees and retirees.  In its disclosure statement, the City asserts that the "Library's obligations to current and former employees for pension and OPEB benefits are separate from any obligation the City may have." Fourth Amended Disclosure Statement, at p. 15.  The City, however, claims that it can reduce the pension and OPEB benefits of the Library employees and retirees in its Chapter 9 Case "to any extent the City has any obligations" to them by virtue of their status as GRS pension plan participants or participation in the City's OPEB programs for the City's employees and retirees.  *Id*. at 14; *see also* City Interr. Resps. at 11-12 (Responses to Interrogatories ## 2, 3).

Similarly, the City solicited votes on its Plan from the Library employees and retirees, including among the Class 11 solicitation materials a notice which stated that "[y]our vote on the City's Plan affects only any obligation the City may have *and does not change the Library's obligations for pension benefits*."  *See* May 2, 2014 Notice of Final Exhibits in Connection With Corrected Motion of the City of Detroit for Entry of an Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment With Respect to Pension and OPEB Claims, Exhibit 6C2 [Docket No.

19

4378] ("Notice Regarding Proposed Changes to Pensions in the City's Plan of Adjustment and Your Right to Vote on the Plan") (emphasis added).  *See also id.*, Exhibit 6C3 ("Notice Regarding Proposed Changes to Post-employment Healthcare Benefits in the City's Plan of Adjustment") (incorporating the same notice to Library retirees with respect to OPEB Claims in Class 12).

Despite these statements, and the City's assertion that it may reduce Library pensions and OPEB "to any extent the City has any obligation" for such benefits, the City has failed to meet the most basic requirements for a plan of adjustment, which are that a debtor must designate a class of claims it has identified as claims subject to adjustment and then specify whether such claims are impaired, and, if so, specify the treatment for such claims.  *See* 11 U.S.C. §§ 1123(a)(1) (plan shall "designate, subject to section 1122 of this title, classes of claims…."); (2) (plan shall "specify any class of claims or interests that is not impaired under the plan"); (3) (plan shall "specify the treatment of any class of claims or interests that is impaired under the plan").  Instead, the City's Plan now plainly asserts that it includes *all* GRS participants in Class 11, whether or not City employees or retirees, and proposes pension cuts and other terms for Library pensions identical to those proposed for City employees and retirees, as if mere contingent ("to any extent") City liability for such Library pensions alone warrants such identical treatment, including a proposed injunction against any changes to

certain pension-related features of the Plan for 10 years.[13]  But this proposed

identical treatment ignores the fact of the Library's own separate obligation to fund

such pension benefits, an obligation the City itself acknowledges in its disclosure

materials.  Under these circumstances, no basis exists for subjecting the Library

employees and retirees to the same treatment proposed under Class 11 for the GRS

Pension Claims.[14]  The Library is already obligated for, and is paying for, Library

pension benefits and the City has identified no basis justifying the treatment

proposed in Class 11 for Library employees and retirees.[15]

The City's treatment of the Library OPEB is even more troubling:  if,

as the City's disclosure to the Library retirees makes clear, the Library retirees are

included in Class 12 even though the City has not specified the nature of any

---

[13] *See* City's Plan, § II.B.3.r.ii.H at p. 38 (enjoining the trustees of the GRS and "all other persons and entities" from any amendments to the GRS changing the benefit calculation, interest rate, City contribution terms, new pension accruals, or other terms through June 30, 2023).

[14] Given that the Library is obligated for pension and OPEB as the employer of the Library employees and former employees, which obligation is not subject to impairment in the City's Chapter 9 Case, by extending the Class 11 and Class 12 cuts to the Library employees on the same basis as the City employees and retirees, the City has clearly violated the Bankruptcy Code's requirement that a plan place a claim in a particular class "only if such claim [   ] is substantially similar to the other claims [   ] of such class." 11 U.S.C. § 1122(a)(1).

[15] The Corrected Fifth Amended Plan now identifies the Library as one of several sources of contributions to the GRS during the 10-year period ending June 30, 2023. City's Plan, § II.B.3.r.ii.A at p. 36.  But the fact that the Plan purports to require the Library to continue to fund GRS during that 10-year period offers no basis for cutting Library pensions. Just the opposite is true.

21

OPEB claim against the City, then, given the above-referenced plan provision defining who will benefit from the Class 12 VEBA, the City is offering the Library retirees nothing at all. It is discontinuing the OPEB program in which they participate (albeit at the Library's expense) and setting up a VEBA for which the Library retirees apparently will not qualify.

In sum, the City has improperly included the Library employees and retirees in Classes 11 and 12, intending to cut their accrued pensions and OPEB even though their employer—the Library—is not part of the bankruptcy. If the City wants to breach or discharge some obligation—contingent or otherwise—that it believes it may have for Library pensions and OPEB that is independent of the Library's obligation (and which does not affect the Library's obligation or cause the Library to violate the Michigan Constitution or its CBAs), then the City must go back to basics and define a claim that addresses that obligation, value it, and offer the Library employees and retirees a recovery.[16]

---

[16] That is not to say that the City or this Court are permitted to reduce accrued pension benefits at all, given the protections afforded such benefits under Article 9, Section 24 of the Michigan Constitution. In this regard, the UAW renews its argument, made during the eligibility trial, that Michigan Governor Snyder had no power to authorize the federal judiciary to set aside the protections afforded by Article 9, Section 24 of the Michigan Constitution, because neither the Governor nor the Michigan Legislature have the authority to amend, modify or waive the continued applicability of Michigan constitutional provisions; the authority to amend the state's constitution rests solely with the people of the State of Michigan. While the UAW raised this issue in the Eligibility trial, we submit that the

F.     The AFS Recoupment Terms Cannot Be
       Applied to the Library Employees or Retirees.

Under the City's Plan, certain Holders of Class 11 GRS Pension Claim would be subject to the ASF Recoupment.  *See* § II.B.3.r.ii.D at p. 36. Specifically, an ASF Current Participant and an ASF Distribution Recipient will have an Excess Amount deducted from their ASF accounts (in the case of a Current Participant), or (for a Distribution Recipient) annuitized and then deducted from monthly benefit checks, unless repaid in a lump sum.  The City's rationale for the ASF Recoupment, as alleged in the Plan, is that interest denoted as "excess" interest was credited to ASF accounts.  The City alleges that, as a compromise of its allegations that such practice diverted assets away from the funds available for defined benefit pensions and contributed to the underfunding of the GRS, a portion of the over-crediting should be recouped from ASF participants.  *See* Fourth Amended Disclosure Statement at p. 24.

The City cannot impose the ASF Recoupment on the Library employees and retirees merely because they are participants in the GRS.  First,

---

bankruptcy court did not directly address it in its Eligibility Order.  The UAW has also raised this issue in our pending eligibility appeal.

In Michigan, while the Legislature and the Governor may amend, modify and set aside statutory protections, the state constitution reserves to the people the authority to set aside protections of the constitution itself, such as Article 9, Section 24.  Thus, we have argued and continue to argue that neither the Michigan Legislature nor Governor can authorize the federal judiciary to set aside state constitutional provisions.  We urge this Court to directly address this issue.

even accepting the City's allegations at face value for purposes of its proposed compromise under the Plan, the basis for the Recoupment is the mitigation of *the City's* funding obligations to fund the pension obligations of the City's employees and retirees. The City relates that the ASF Recoupment "will permit the City to recover approximately $230 million of [ ] excess interest." Fourth Amended Disclosure Statement at p. 24. The City also disclosed that the ASF Recoupment is directly related to the level of across the board cuts the City proposed for Class 11. In designing the Plan, the City says it considered whether the Plan should propose higher across-the-board pension cuts and not try to recover a portion of the excess interest or recover the alleged excess and lower the proposed across-the-board cuts; the City chose the latter. Fourth Amended Disclosure Statement at p. 24. As discussed above, however, the City has not related its "to any extent" obligation to the Library employees and retirees to any *specific* value or treatment of such obligation.

For this same reason, the City's proposed ASF Recoupment rationale is inapplicable to the Library employees and retirees. In fact, by applying the ASF Recoupment to the Library employees and retirees, the City is, in effect improperly commandeering their ASF assets in order to reduce the City's funding obligation for pensions owed to City employees.

The City's desire to accomplish this end is not a legitimate basis for subjecting Library employees and retirees to ASF Recoupment through the mechanism of the City's Chapter 9 Plan. Moreover, state law impediments that the state has not even arguably set aside by a Chapter 9 authorization prohibit the impairment of the ASF benefits of the Library employees and retirees. First, whether "excess" or not, the interest has been credited to (and in many cases, already received by) the ASF Recipients and such amounts are, therefore, "accrued financial benefits" under Article 9, Section 24 of the Michigan Constitution. As such, these benefits cannot be "diminished or impaired." *See also* Detroit City Code Section 47-1-1 (providing that nothing in the City ordinance establishing the retirement system "shall be deemed to contradict the provisions of Article IX, Section 24 of the 1963 Michigan Constitution"). Unlike the impairment considered by the Court in the Eligibility Order, however, here the City proposes to invade the accounts of individuals who are not (and were not) City employees.

The rationale for the Recoupment that the City applies to the proposed cuts for its own employees and retirees is that, as noted above, it desires to have $230 million restored to the GRS to shore up GRS funding and reduce the pension bill for its own employees. But the Library employees and retirees are not City employees or retirees and are not subject to the adjustment of the City's obligations in the Chapter 9 Case. (Nor are the UAW-Library CBAs subject to rejection in

25

this Chapter 9 Case.)  Accordingly, whatever remedy the City believes it is entitled to from the City employees and retirees through the mechanism of the City's Plan, that remedy cannot extend to the Library employees and retirees.[17]

In sum, for the reasons stated above, the City's Plan cannot be confirmed to the extent the Library employees and retirees are subject to the pension and OPEB reductions proposed for Holders of GRS Pension Claims and OPEB Claims under Classes 11 and 12, including the ASF Recoupment.  The treatment of the Library employees and retirees in the Plan also violates Sections 1122(a) and 1123(a)(1), (2) and (3) by failing to separately define, classify and propose a treatment for any City obligation to Library employees and retirees as the City may intend to adjust under its Plan.[18]  The Plan also violates Section 1129 (a)(3), in that, as to the Library employees and retirees, the Plan has not been

---

[17] Moreover, because the Library employees and retirees did not receive the alleged excess interest as ill-gotten gains, the City cannot recoup from them under a restitution theory in any event.  *See Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 251 (2000) (Court noting that the "common law of trusts sets limits on restitution actions against defendants other than the principal 'wrongdoer.'  Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (assuming he has purchased for value) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust").  Similar concerns have been raised in the objection filed by Michael J. Karwoski which we discuss at page 39, *infra*.

[18] In the absence of such classification and treatment, the Plan cannot meet the "best interest of creditors" test under section 934(b)(7) as to the Library employees and retirees.

proposed in good faith and violates the proscription against proposing a plan by any means "forbidden by law". First, the Plan purports to cut accrued pension benefits in violation of Article 9, Section 24 of the Michigan Constitution, which remains in force as to Library employees and retirees. Second, the terms of the Plan, including the ten-year prohibition against changes to pension-related features of the Plan, are also contrary to the in-force collective bargaining agreements between the UAW and the Library and their bargaining rights under Michigan law. Third, as to the Library employees and retirees, by requiring certain ASF Recipients to turn over ASF account funds (or reducing their future benefits for ASF Recoupment), the ASF Recoupment also violates Michigan's requirements under PERSIA that retirement system assets be maintained for the sole and exclusive benefit of participants and beneficiaries. *See* MICH. COMP. LAWS § 38.1133(8) (West 2014) ("the system shall be a separate and distinct trust fund and the assets of the system shall be for the exclusive benefit of the participants and their beneficiaries and of defraying reasonable expenses of investing the assets of the system"). *See also Wayne Cty. Emps. Ret. Sys. v. Wayne Cnty*, 836 N.W.2d 279, 296 (Mich. Ct. App. 2013) (ruling ordinance that diverted certain retirement system reserve assets to general system funds invalid, because diversion was intended to reduce County's pension contribution obligation, in "direct[ ] conflict[ ] with the exclusive-benefit rule"). Moreover, ASF interest once credited

to individual accounts, cannot be forfeited.  *See* Detroit City Code Section 47-4-1

("[t]he right of a person to pension, annuity or retirement allowance itself … and to

the monies in the various funds of the Retirement System shall not be assignable

and shall not be subject to execution, garnishment, attachment, the operation of

bankruptcy or insolvency law, or any other process of law whatsoever" except for

certain specified exceptions in the City Code).

In addition, the Plan violates the separate confirmation requirements

of chapter 9.  The Plan does not comply with the provisions of Title 11 made

applicable by Section 901, in violation of Section 943(b)(1), and also violates

Section 934(b)(2), to the extent that it purports to cause a reduction in accrued

pension benefits and OPEB established under the Library's collective bargaining

agreements where the Library is not a chapter 9 debtor.  The Plan additionally

violates Section 943(b)(4), in that the debtor would be prohibited by law from

implementing the pension cuts in violation of Article 9, Section 24 of the Michigan

Constitution, which continues to apply to the Library, as well as the statutory

requirements of PERSIA, and Michigan's public employee labor relations statutes,

which require employers to comply with their collective bargaining agreements.

II.     The Court Should Not Confirm the Plan to Any Extent
        That Employees and Retirees Remain Subject to Further
        <u>Benefit Cuts Based on Non-Receipt of the Outside Funding</u>.

        A.      The Outside Funding Arrangements Contain Many
                <u>Conditions to Their Respective Funding Commitments</u>.

        The City's Plan incorporates two alternatives under Class 11, the

Class covering Holders of GRS Pension Claims, described in the solicitation

materials as "Alternative A" and "Alternative B." Fourth Amended Disclosure

Statement at p. 17. Under "Alternative A" the reductions to accrued pension

benefits are lower: 4.5% across-the-board cuts, plus ASF Recoupment and the

elimination of COLA, with the prospect for Restoration of certain benefits in the

future as detailed in the Plan. The "Alternative B" cuts are larger: 27% across-

the-board cuts plus broader ASF Recoupment and the elimination of COLA. *See*

City's Plan, § I No. 154 (Definition of "GRS Adjusted Pension Amount") at p. 12.

        The lower, "Alternative A" reductions are based upon the negotiation

of agreements with the State of Michigan (the "State Contribution Agreement")

and with the Detroit Institute of Art (the "DIA Settlement") (collectively, with the

State Contribution Agreement, the "Outside Funding"). The Outside Funding

depends upon a number of conditions, some of which are interdependent. The

principal trigger for the availability of the Funding was an affirmative vote on the

City's Plan by Classes 10 and 11, the two classes of pension claims, a condition

which has now been fulfilled. For actives and retirees who submitted ballots, the

prospect of obtaining the Outside Funding for the lower, "Alternative A" cuts and avoiding the larger cuts under "Alternative B," was likely a significant factor in voting in favor of the Plan.

As the City's Plan relates (and based upon the form of the documents submitted as exhibits to the Plan), both the State Contribution Agreement and the DIA Settlement require the fulfillment of a number of conditions (in addition to the approval vote by the two pension classes) in order for the funding to be received. Absent receipt of the funding, the City could impose the "Alternative B" cuts notwithstanding the approval votes. Initially, when brought to the Court's attention, the Plan was amended to partially address the issue that creditors could be voting on the Plan without knowing that Outside Funding would be available. To address the voting issue, the Plan provides that the failure of certain funding conditions, known as "Initial Funding Conditions" would cause approval votes in the two pension classes to be deemed rejection votes instead, since the failure of these conditions would relieve the Outside Funding parties of the obligations to provide the funds. *See* Fourth Amended Disclosure Statement at p. 16 (notifying pension claimants that if they vote to accept the Plan and the Initial Funding Conditions are not satisfied or waived their vote "will be treated as a vote to reject the Plan because, in this circumstance, the Outside Funding will not be received").

Voting has now been completed and, while the fulfillment of certain conditions are now known (*e.g.*, the adoption of legislation appropriating funds for the State's Contribution), many conditions remain unfulfilled. For example, the State Contribution Agreement lists eight conditions precedent including confirmation of the Plan (and entry of a confirmation order incorporating several provisions including a release), approval of the DIA Settlement, approval of the UTGO settlement, "agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563" and evidence satisfactory to the State of "an irrevocable commitment" by the Foundations and the DIA Corp to fund their commitments. The State Contribution also requires that the Plan Effective Date occur on or before April 1, 2015. City's Plan, Exhibit I.A 294 at 5-6. The Plan lists additional conditions which also appear in the State Contribution Agreement, including assurances regarding the Retirement Systems' establishment of an Investment Committee and other governance terms. City's Plan, § IV.E.3 at p. 52.[19] The Agreement provides

_____

[19] Under the State Contribution Agreement, certain parties are also required to fulfill conditions related to the cessation of litigation and execution of releases and while there is no guarantee that all such parties will be in a position to fulfill their conditions, these conditions may pose less of a long-term concern as labor and retiree groups continue their settlement discussions in earnest and if—as is hoped—they reach resolution. However, other conditions require the negotiation and implementation of substantive agreements and lack definitive deadlines (other than the outside date of April 1, 2015) or are based on more subjective terms such as "cooperation" with the financial advisory board.

that if the conditions are not met to the satisfaction of the State's funding authority and the Treasurer on or before April 1, 2015, "the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement." City's Plan, Exhibit I.A 294 at 6.[20]

The DIA Settlement encompasses an even more complex series of transactions and conditions. In addition to certain conditions that are more readily achieved or ascertainable (*e.g.*, the execution of settlement documents, the Plan voting results, the approval of the DIA settlement by the Attorney General, approval of the State Contribution Agreement), others appear to require significant additional efforts. For example, the Plan relates that one condition of the DIA Settlement is "the existence of appropriate prospective governance and financial oversight mechanisms for the Retirement Systems" and another requires the "existence of appropriate governance and oversight structures at DIA Corp that include representation of the City, the DIA Funding Parties and other stakeholders". City's Plan, § IV.E.3 at p. 52. *See also* Exhibit I.A. 102 at 14-15 (listing conditions for initial funding and for future funding and providing that closing shall occur upon satisfaction of all conditions for initial funding).

---

[20] The Agreement also provides that in the event of certain specified defaults by the Retirement System, then the money contributed by the State shall not be considered for purposes of determining whether the Restoration terms apply. City's Plan, Exhibit I.A. 294 at 6.

Moreover, as noted above, the conditions of the two Outside Funding arrangements are inter-related.  The State Contribution Agreement requires evidence satisfactory to the State of the irrevocable funding commitment by the Foundations and the DIA Corp., and the DIA Settlement terms require certain State contributions.

B.     Under the Plan, Non-Receipt of the Outside
       Funding Triggers the Larger "Alternative B" Cuts.

The Plan provides that the "Alternative A" reductions depend on approval votes by both pension classes and *receipt* of the DIA Settlement funding and the State Contribution Agreement funding.  *See* City's Plan, § I No. 154 at p. 12 (providing that "GRS Adjusted Pension Amount" means "(a) If Classes 10 and 11 vote to accept the Plan, and funding *is received* from the DIA Settlement and the State Contribution Agreement," 4.5% across the board reductions, elimination of COLA and ASF Recoupment, among other terms, and (b) "If Classes 10 and 11 do not vote to accept the Plan *or funding is not received* from the DIA Settlement and the State Contribution Agreement," 27% across the board cuts, elimination of COLA and ASF Recoupment among other terms, including, for active employees, a further, automatic reduction in the event that the GRS unfunded liabilities for the year ended June 30, 2014 are greater than unfunded liabilities for the year ended June 30, 2013)(emphasis added).[21]

---

[21] In the Fifth Amended Plan, the City changed the definition in subpart (b) from "and/or funding is not received" to "or funding is not received."

C.     In Conducting the Confirmation Hearing, the Court Should Require
       <u>Definitive Notification Regarding the Initial Funding Commitments</u>.

In order to determine whether the Class 10 and 11 votes will continue to be deemed to have accepted the Plan, the Court must be apprised whether the State considers the "Initial Funding Commitments" to have been met.  If the State declares otherwise, then the Class 10 and 11 votes may be deemed rejections, thus jeopardizing receipt of the Outside Funding.[22]  While we consider it highly unlikely that the State would place the receipt of the State's Funding (and, thereby, the funding under the DIA Settlement ) at risk in this manner, nevertheless, for the avoidance of doubt, the State should formally notify the parties and the Court that it considers such commitments either fulfilled or waived by the time of the commencement of the hearing.[23]

---

[22] In any event, any such declaration by the State should be subject to review by the Court.

[23] We are aware that parties have continued their dialogue with the State regarding the conditions involving litigation and related matters, and UAW has had similar communications with State representatives.  However, because these conditions were not specifically enumerated in the Plan, and therefore may not be obvious to all, we believe the better course is for the State to issue a notification and eliminate any uncertainty.  The Court and the parties, including the City, would want that assurance in relation to the hearing, since a deemed rejection of these classes could trigger the City's request under the Plan to proceed under Section 1129(b) with respect to a rejecting class.

34

D.    The Court Should Approve the Plan on the Basis of
Irrevocable Commitments of the Outside Funding,
and Require a Further Hearing Should the City Seek
to Impose the "Alternative B" Pension Cuts in the Future.

With respect to those Outside Funding conditions that may not be

capable of being fulfilled by the time of the Confirmation Hearing, such as those

that involve the development of governance or other oversight processes, or

transactions that may require time beyond the period of the Confirmation Hearing

to complete, we ask that the Court specify that any final approval of the Plan is

premised on the basis of irrevocable commitments of the Outside Funding (and

thus the "Alternative A" Plan treatment) and require notification satisfactory to the

Court that the conditions for funding under the State Contribution Agreement and

the DIA Settlement have been met.  The Court should further require that no

determination may be made that funding conditions have not been met (unless such

conditions are waived) without a review by the Court, and prohibit the City from

automatically imposing additional benefit cuts on the basis of non-receipt of

Outside Funding.  Instead, the City must return to this Court and make its case for

the imposition of any additional cuts to pensions proposed under the Plan.

These additional requirements would eliminate the possibility of

automatic imposition of the greater "Alternative B" cuts based upon a unilateral

determination by the City of non-receipt of the Outside Funding.  If the City

obtains approval of the Plan without these additional requirements, then the City

will have been permitted to make its case for confirmation without meeting the statutory requirements of a cram down and the Court will not have had the opportunity to consider legal arguments that parties (including UAW and parties who have already conditionally declared their support for the Plan) may wish the Court to consider.[24] Moreover, the City's Plan incorporates a ten-year injunction as part of the Class 11 treatment, during which certain pension-related terms set by the Plan cannot be altered.[25] Absent such additional safeguards, the Holders of Pension Claims could have no effective recourse for ten years if the City were to seek to impose the greater cuts during that time.

Given the announced votes on the Plan by Classes 10 and 11, UAW opposes confirmation of the Plan under a scenario that would permit the City to automatically impose the "Alternative B" cuts absent any hearing on the propriety of a determination that the Outside Funding conditions have failed, and in the absence of a full hearing on whether the "Alternative B" cuts should be permitted,

---

[24] For example, as the Disclosure Statement relates, while the Retirees Committee consented to the treatment of Pension Claims that contemplate the receipt of the Outside Funding, the Committee does not support the Plan if the Outside Funding is not received. *See* Fourth Amended Disclosure Statement at p. 153.

[25] *See* Corrected Fifth Amended Plan, § II.B.3.r.ii.H at p. 36 (enjoining the trustees of the GRS and "all other persons and entities" from any amendments to the GRS changing the benefit calculation, interest rate, City contribution terms, new pension accruals, or other terms through June 30, 2023 whether by agreement, statute, charter, ordinance, regulation, or otherwise by operation of law).

in that such cuts would be involuntarily imposed in derogation of the acceptance votes by the two classes of pension claims.[26]  Absent such additional safeguards, permitting the City to seek confirmation of the Plan on the basis of "Alternative A," including an implied (or even express) automatic authority to unilaterally impose the "Alternative B" cuts violates the confirmation requirement that a plan be proposed in good faith under Section 1129(a)(3).[27]

In addition, because the terms of the Plan permitting the impairment of accrued pension benefits, violate Article 9, Section 24 of the Michigan Constitution which protect such benefits from diminishment or impairment, the Court should independently (and notwithstanding the appeal of the Eligibility Order) consider whether the City may impair accrued pension benefits in the absence of the settlement reflected in the treatment of the Pension Claims under "Alternative A."

---

[26] In addition to its objection to the ten-year injunction as applied to the Library employees and retirees, the UAW separately opposes the proposed injunction in the absence of the safeguards proposed above, or similar protections that would provide the affected parties or their authorized representatives a full and fair hearing prior to the implementation of greater cuts based upon non-receipt of Outside Funding.

[27] In applying "good faith" under Section 1129(a)(3), courts have cited the debtor's fundamental fairness in dealing with creditors.  *See In re Gregory Boat Co*., 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992).  Among other things, the Court should consider the good faith implications of imposing the "Alternative B" cuts where creditors voted to accept "Alternative A" principally *to avoid* the more significant cuts.

As this Court "was compelled to comment" in the Eligibility Order,

> the Court emphasizes that it will not lightly or casually
> exercise the power under bankruptcy law to impair
> pensions.  Before the Court confirms any plan that the
> City submits, the Court must find that the plan fully
> meets the requirements of 11 U.S.C. 943(b) and the other
> applicable provisions of the bankruptcy code.  Together,
> these provisions of law demand this Court's judicious
> legal and equitable consideration of the interest of the
> City and all of its creditors, as well as the laws of the
> State of Michigan.

*In re City of Detroit, Michigan,* 504 B.R. 97, 154 (Bankr. E.D. Mich. December 5, 2013).

We argued in the Eligibility trial that Chapter 9 reflects a carefully integrated dual sovereignty regime designed to limit the power that can be exercised by the bankruptcy court and not infringe upon the sovereign power of state to exercise control over its political subdivisions.  *See e.g., In re N.Y. Off-Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) (noting that "[p]rinciples of dual sovereignty, deeply embedded in the fabric of this nation and commemorated in the Tenth Amendment of the United States Constitution, severely curtail the power of bankruptcy courts to act once a petition is approved"). As discussed above in our objections to the Plan regarding the Library employees and retirees, Article 9, Section 24 of the Michigan Constitution, reflects "the *firmly established right* of public employees to receive pension payments as those payments become due."  *Kosa v. Treasurer of State of Mich.*, 292 N.W.2d at 460

(emphasis added); *see also In re Request for Advisory Op. Regarding*
*Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) (finding that
"[t]he obvious intent" of Article 9, Section 24 was "to ensure that public pensions
be treated as contractual obligations that, *once earned, could not be diminished*")
(emphasis added).  The "Alternative A" reductions in accrued pensions reflect the
settlement embodied in the so-called "Grand Bargain," including the votes on the
Plan by Classes 10 and 11.  Accordingly, a determination *in the absence of a*
*settlement* regarding the imposed "Alternative B" treatment of the Pension
Claims—cuts the claimants cast votes to avoid—should reflect a full and fair
hearing on whether the City may impose such cuts consistent with the
requirements and limitations reflected in Chapter 9, giving due legal and equitable
consideration to the laws of the State of Michigan.[28]

III.    The Court Should Review ASF Recoupment.

As to the terms of the ASF Recoupment as applied generally to Class
11 Claimants, the objection filed by claimant Michael Karwoski to confirmation of
the City's Plan [Docket No. 5923] raises important issues that we believe merit the
Court's considered review, and we thus join Mr. Karwoski in seeking such review.

---

[28] Such review would include whether the additional proposed cuts comply with
the requirement that the Plan is proposed "in good faith and not by any means
forbidden by law," as required by Section 1129(a)(3) and meets the independent
requirement under Section 943(b)(4) that a plan may be confirmed "if the debtor is
not prohibited by law from taking any action necessary to carry out the plan."

39

Further, we believe that the City failed to adequately disclose to ASF Recipients who no longer have sufficient monies in their ASF accounts to pay their amount that they are being charged a 6.75% annual interest rate. This interest charge was not expressly cited in the City's Plan or its Disclosure Statement until its July 25, 2014 Fifth Amended Plan, well after the close of voting on the Plan.[29] The Court should in any case consider whether this is a sufficient basis for disapproval of the interest charge feature of the ASF Recoupment for certain Class 11 claims.[30]

IV.     The Court Should Not Permit a Waiver of the 14-Day Stay.

The City has asked the Court to waive the requirements of Fed. R. Bankr. P. 3020(e) providing that an order confirming a plan is stayed until the expiration of 14 days after entry of the order. City's Plan, § VIII.J. This Court will have concluded a lengthy and complex trial involving myriad issues raised by objecting parties, and will undoubtedly be required to issue a comprehensive decision addressing all aspects of the plan confirmation process. This is most certainly not a case where parties should be rushed to action following issuance of

_____

[29] *See* Corrected Fifth Amended Plan, § II.B.3.r.ii.D.2.i, at p. 39.

[30] The Recoupment provisions of the Plan also apply under "Alternative B" but without the application of the 15.5% cap that limits the Recoupment for those who have received their ASF distributions. The UAW's objection in section II above, in which we request additional safeguards against a future declaration of non-receipt of the Outside Funding, applies equally to the ASF Recoupment, which becomes more costly to the Recipient, and therefore more onerous by the application of "Alternative B," including its recovery terms, that are more onerous when applied in addition to deeper cuts in pension benefits.

40

an order and ruling by the Court approving the City's plan of adjustment.

Accordingly, the City's waiver request should be denied.

## CONCLUSION

UAW requests that the Court rule on confirmation of the City's Plan consistent with the foregoing objections.

Dated: August 1, 2014

Respectfully submitted,

By:  /s/ Babette A. Ceccotti
Cohen, Weiss and Simon LLP
Babette A. Ceccotti
Thomas N. Ciantra
Peter D. DeChiara
Joshua J. Ellison
330 West 42nd Street
New York, NY 10036-6976
T: (212) 563-4100
F: (212) 695-5436
bceccotti@cwsny.com
tciantra@cwsny.com
pdechiara@cwsny.com
jellilson@cwsny.com

-   and -

Niraj R. Ganatra (P63150)
8000 East Jefferson Avenue
Detroit, MI 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net

*Attorneys for International Union, UAW*

41

## CERTIFICATE OF SERVICE

I, Babette Ceccotti, hereby certify that the foregoing Objection of International Union, UAW to the Fifth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 1st day of August, 2014.

Dated: August 1, 2014

/s/ Babette A. Ceccotti
Babette A. Ceccotti