## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |
| _____ | ) |  |

### *CORRECTED* AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES COUNCIL 25 (AFSCME) OBJECTIONS TO THE FIFTH AMENDED PLAN OF ADJUSTMENT OF DEBTS, DUE TO IMPAIRMENT OF NON-CITY EMPLOYEES/RETIREES

Michigan AFSCME Council 25, by and through its counsel, files these *Corrected* objections to the *Corrected* Fifth Amended Plan for the Adjustment of Debts of the City of Detroit ("Fifth Plan", July 29, 2014) (Docket No. 6379), for the narrow purpose of objecting to the indication that non-City employees and retirees will have their benefits impaired improperly, and it states its objections below (filed per Stipulated Order, Docket no. 6413). The corrections remove clerical and drafting errors but do not alter the scope of relief sought:

### I.  INTRODUCTION – SUMMARY OF OBJECTIONS

AFSCME affiliated Locals 1259 and 1231 are the exclusive bargaining agents for many of the non-supervisory employees of the Detroit Public Library ("Library"). AFSCME Local 1220 is the affiliated local for some employees of the Detroit Regional Convention Facility Authority ("the Authority" or "Cobo Hall").

Specifically, AFSCME objects to the City's Fifth Plan to the extent that it impairs the benefits of employees and retirees of the Library and the Authority.[1] Both of these entities are independent of the City of Detroit, not part of the City's bankruptcy filing, and therefore not subject to the jurisdiction of this Honorable Court. Yet retirees and employees of the Library and Authority have benefits administered by the Detroit General Retirement System and its OPEB programs, and the Library and Authority pay for all liability incurred.

The Fourth Amended Plan For the Adjustment of Debts ("Fourth Plan"), filed on May 5, 2014, contained no reference to the Library or the Authority (Docket no. 4392). On July 25, 2014, the Debtor filed a Fifth Amended Plan of Adjustment, as revised by the *Corrected* Fifth Plan on July 29th, ("Fifth Plan"), which added a reference to the Library continuing to make contributions to the General Retirement System. (Docket no. 6379, Article II.B.3.r) This new Fifth Plan amended the definition of "GRS Pension Claims":

---

[1] There are several non-City entities which perform services and operations that were previously done by the City of Detroit: Eastern Market Corporation, Detroit Zoological Society, Historical Society, and the Detroit Institute of Arts. Many of the employees or retirees of these entities were previously employed by the City of Detroit, and therefore have benefits in Detroit's General Retirement System which were earned as Detroit employees. AFSCME is told that none of these employees earned service credits in the General Retirement System while working at these non-City entities, which means that any benefit reduction resulting from this bankruptcy would be an impairment in their retirement benefits which they accrued as City of Detroit employees. As such, these Objections do not include employees or retirees of these entities.

"'GRS Pension Claim' means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City **or any participants in GRS**, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City … for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS."

(amended language **emphasized**) (Docket no. 6379), Article I.A, ¶ 168) This amendment suggests that the holders of such claims are expanded beyond City employees or retirees to employees/retirees of non-City entities who merely have their benefits administered by the General Retirement System ("GRS"), for a fee charged by the GRS.

The Fourth Amended Disclosure Statement With Respect To The Fourth Amended Plan For The Adjustment Of Debts Of The City Of Detroit ("Disclosure Statement", Docket no. 4391), filed on May 5, 2014, provided some background information concerning the Library's structure and relationship to the City of Detroit. The chief reference to treatment of Library employees/retirees in the Disclosure Statement is the following: "To any extent the City has any obligations to the current or former employees of the Detroit Public Library (the "Library") by virtue of their participation in the GRS pension plan [or City's OPEB plans or programs], the City believes that the City's obligations may be modified in the City's bankruptcy case." (Docket no. 4391, Article II.A.2, pg 14-15) The City then

confirms that the Library's obligations to its own employees and retirees are separate from "any obligation the City may have". Thus, even in the Disclosure Statement, the City does not affirmatively assert that the City has obligations to Library employees or retirees, such that its employees/retirees should have their benefits impaired in Bankruptcy Court. The Disclosure statement is completely silent on the employees or retirees of the Authority.

The City did submit bankruptcy election ballots under Classes 11 and 12 to these Library employees/retirees, and to Authority employees/retirees as well.

Despite the "hedged" reference to non-City employees/retirees in the Disclosure Statement, and utter omission of these individuals in the Plan which creditors voted on, the City has required the impairment of Library retiree/employee benefits. It has done so without legal or financial justification. Indeed, as the City acknowledges, no portion of the City's finances are used to fund the wages or benefits of the Library employees or retirees. The City simply dictated that these Library employees/retirees would suffer impairment. Similarly, AFSCME understands the employees and retirees of the Authority are receiving an unjustified impairment as members of Classes 11 and 12, as the City's assets are not being used to fund the Authority retirement benefits.[2]

_____

[2] While nothing is contained in the Fifth Plan or the Disclosure statement concerning the employees and retirees of the Authority, with respect to their

With these Objections, AFSCME is objecting to the extent that Library and Authority employees are having their retirement benefits cut as members of Classes 11 and 12 in the Fifth Plan. AFSCME does not plan to call witnesses at this point, but AFSCME reserves the right to examine any called witnesses, and to call witnesses for rebuttal in the event necessary.

## II. STATEMENT OF FACTS

### A. Background

AFSCME Council 25 has two locals at the Detroit Public Library, Locals 1259 and Local 1231. In Local 1259 there are ninety-eight (98) members currently, and they serve in the positions of Library clerks, technical services assistants, customer support assistants, janitors and one mechanic. The average pay is around $32,000 per year, and they all work full time. Local 1231 is a mixture of full and part time employees, totaling 91 employees currently. All of these employees are customer support representatives. Their standard hourly wage is $11 per hour; the full time employees make $22,880 annually, and the part time employees make between $10,000 and $12,000 annually. There are approximately 100 to 150 retirees that retired out of both Library locals. (*See* attached Winston Johnson aff.)

The Detroit Public Library is a separate entity from the City of Detroit, and is independently responsible for the pensions of its employees and retired

---

benefits being cut as members of Classes 11 and 12, AFSCME is told that such cuts will take place.

employees. As the Disclosure Statement states, Detroit Public Library is an "Independent municipal corporation." (Disclosure Statement, pg 85) The Library is governed by a seven member Detroit Library Commission. Members are appointed by the Detroit Public Schools Board of Education. The 7th member, the current president of the Board of Education, is an ex-officio member. (*See* http://www.detroit.lib.mi.us/detroit-library-commission) (Disclosure Statement, pg 147) The funding for the Library is provided by an ad valorem tax in the City as well as grants and endowments from private organizations. (Disclosure Statement, pg 147). The Disclosure Statement reiterates that "the Library generally operates independently of the City." (Disclosure Statement, pg 147)

Library employees and retirees are included within the City of Detroit General Retirement System ("GRS") and within the City's OPEB Plans:

> In 1938, as permitted by state law, the Commission, with the concurrence of the City Council (then known as the "Common Council"), adopted a resolution providing for the inclusion of the employees of the Library within the GRS. The Library has contributed to the GRS at an actuarially determined rate. Similarly, in 1946, as permitted by state law, the Commission, with the concurrence of the City Council, adopted a resolution providing for the inclusion of the employees of the Library in the City's OPEB Plans. The Library reimburses the City for OPEB benefits paid by the City on behalf of retirees of the Library.

(Disclosure Statement, pg 147)[3] There is no disagreement about the fact that the Library, as an independent corporation, makes all necessary contributions for its employees' and retirees' pension and OPEB benefits. According to the Disclosure Statement, "[t]he Library has contributed to the GRS at an actuarially determined rate." Also, "[t]he Library reimburses the City for OPEB benefits paid by the City on behalf of the Library." (Page 147)

The City does not argue that it bears financial responsibility for Library employees or retirees. It asserts to the contrary. Instead, the City made the unilateral decision to impair the Library employee/retiree benefits to "hedge its bets". It stated the following in the Disclosure Statement:

> "To any extent the City has any obligations to the Library's current or former employees by virtue of their participation in the City's OPEB plans or programs, the City believes that the City's obligations may be modified in the City's bankruptcy case. The City, therefore, has provided Plain Language Supplements and Ballots to current and former Library employees. The Library's obligations to current and former employees for pension and OPEB benefits are separate from any obligation the City may have, however. Any vote on the City's Plan affects only any obligation the City may have and does not change the Library's obligations for OPEB benefits."

(Disclosure Statement, pg 14-15) Similar language is found in the Disclosure Statement for pension cuts borne by Library retirees.

---

[3] The Library website enhances this history, referencing the existence of libraries in Michigan's first constitution. http://www.detroit.lib.mi.us/library/about-us#field_mission

As to the Authority, the City makes no assertions in the Disclosure Statement or the Fifth Plan whatsoever. AFSCME Local 1220 has less than ten (10) employees and retirees of the Authority. Currently the AFSCME employees are operating under the extended, prior union contract. These employees and retirees hold (or held) the title Civic Center Facility Worker. The employees' average base pay is about $32,000 per year, with an hourly rate of about $15/hour. (*See* attached Gerald Thompson aff.)

The website of the Authority declares that it is separate from the City:

"The city's bankruptcy is not expected to have any effect on operations at Cobo Center and will not impact any convention or meeting business scheduled there, or hinder our ability to book future business.

Cobo Center was completely separated from city government in 2009 and placed in the hands of a regional authority.

Cobo receives no money from the city and the $279 million renovation under way now is fully funded, on time, on budget and 60 percent complete. The bonds for the project are A-rated.

Cobo Center is not a city asset that could be sold in connection with the bankruptcy."

(http://www.drcfa.org/cobo-center/frequently-asked-questions)

Both the Library and the Authority employees and retirees are participants in the City's General Retirement System and its OPEB programs. Both Library and Authority employees have annuity savings funds (ASF) maintained by the City's GRS as well. However, the Library and Authority are independent and solely responsible for their employees' and retirees' pension (including ASF) and OPEB

benefits. Both entities reimburse the City's systems for such benefits.

**B.      Objectionable Portions of the Fifth Plan**

The City's amendments to the Plan of Adjustment (Fifth Plan) arguably have included AFSCME-represented Library and Authority employees and retirees, specifically, in Class 11, which proposes cuts to accrued pension benefits, the Annuity Savings Fund ("ASF") Recoupment, and modification of future pension accruals, and in Class 12, which proposes the elimination of the City's obligations for OPEB benefits, replaced with the notes, and the establishment of a VEBA.

9

### 1. Class 11 – GRS Pension Claims

The City's Plan defines "GRS Pension Claim" as, among other things, any Claim (other than an OPEB Claim) whether asserted by current or former employees of the City, **or any participants in GRS**. . . against the City or any fund managed by the City…." (Fifth Plan, Art I, ¶ 168) (**emphasis** added). This definition refers to "any participants in GRS," whether or not they are current or former employees of the City, and even if the cuts impair earned benefits beyond City employment and benefits paid for by other employers. The definition of the "New GRS Active Pension Plan" similarly includes employees of entities other than the City. The "New GRS Active Pension Plan" applies to "active non-public safety employees of the City **or another entity that participates in GRS**." (Fifth Plan, Art I, No. 212) (**emphasis** added).

Class 11 of the Fifth Plan provides that "the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder." (Fifth Plan, Art II.B.3.r.ii.C) In addition, active employees will accrue additional pension benefit for service on or after July 1, 2014 under the terms of the New GRS Active Pension Plan. (Fifth Plan, Art II.B.3.r.ii.C and F) The Fifth Plan does not distinguish between City employees/retirees and Library or Authority employees/retirees.

Under the City's Plan, certain Holders of Class 11 GRS Pension Claims

would be subject to ASF Recoupment. (Fifth Plan, Art II.3.r.ii.D). Specifically, an amount will be deducted from the ASF accounts of both an ASF Current Participant and an ASF Distribution Recipient. Upon information and belief, the Recoupment from all Library employees (not just AFSCME) will be about $6,800,000 in value. The Authority ASF Recoupment is much smaller.

### 2. Class 12 – OPEB Claims

For OPEB benefits, under the Plan, "OPEB Claim" means "any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB benefits, and any eligible surviving beneficiaries of such retiree." (Fifth Plan, Art I. ¶ 222.) Class 12 of the Fifth Plan references a settlement between the City and the Retiree Committee. The City's Plan provides for the establishment of two VEBAs, a "Detroit General VEBA" and a "Detroit Police and Fire VEBA." "Detroit General VEBA" will be established "to provide health benefits to Detroit General VEBA Beneficiaries." A "Detroit General VEBA Beneficiary" is a Holder of an OPEB Claim who is a "Detroit General Retiree." The Plan defines a "Detroit General Retiree" as "a retired employee or surviving beneficiary of a retired employee of **a department of the City**" who is not a Detroit Police and Fire Retiree, who retired on or before December 31, 2014, and who is "is a Holder of an OPEB Claim." (Fifth Plan, Art I. ¶¶ 86 and 88; Art II.3ss.i and ii) One's interpretation of these terms will determine if Library or Authority

retirees will be subject to the impairment. Yet on March 1, 2014, the Library retirees had their OPEB benefits cut in a manner similar to City retirees.

## III. LAW AND ANALYSIS

### A. Michigan Libraries And The Authority Are Independent Entities

The Court only has jurisdiction over the City's property but not the Library's property. Property of the estate is separately and distinctly defined for purposes of chapter 9 municipal bankruptcy cases to mean property of the debtor. 11 U.S.C. § 902(1). Bankruptcy courts look to state law to define a municipal corporation's property interests. The Supreme Court held in *Butner v. United States*, 440 U.S. 48 (1979) that since Congress did not utilize its power to establish uniform laws on bankruptcy to define property interests of a debtor or the bankruptcy estate, the court uses state law to determine property interests:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from a windfall merely by reason of the happenstance of bankruptcy. The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

440 U.S. at 55 (citations omitted) (internal quotation marks omitted). See also *In re Jefferson County, Ala.*, 474 B.R. 228 (N.D. Ala. 2012), holding that the scope of exclusive jurisdiction over a debtor's property, in 28 U.S.C. § 1334(e)(1), is

reviewed by reference to Alabama law defining the County's property interests. *Id* at 248. The state laws here make clear that the Library and Authority are not property of the City.

### 1. Library

Under the Michigan Constitution, the legislature must provide for the establishment and support of public libraries. Michigan Constitution 1963, Section 9 provides:

> "The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state under regulations adopted by the governing bodies thereof. All fines assessed and collected in the several counties, townships and cities for any breach of the penal laws shall be exclusively applied to the support of such public libraries, and county law libraries as provided by law."

MI. Const., Art 8, Sec 9. Michigan law authorizes a city to establish and maintain a public library. The city council of each incorporated city may establish and maintain a public library for the use and benefit of the inhabitants of the city. MCL § 397.201. The city may levy a tax and deposit it in a fund to be known as the "library fund." MCL § 397.201.

The law enumerates the exclusive powers of a library's governing board, which includes controlling all funds, appointing a librarian and assistants, and fixing their compensation. MCL § 397.205 provides as follows:

**MCL 397.205. Board; election of officers; powers and duties; library fund, expenditures, accounting**

Sec. 5. The governing board of a library shall, immediately after appointment, meet and organize, by the election of 1 member as president, and by the election of other officers as necessary. The governing board shall make and adopt bylaws, rules, and regulations for its own guidance and for the government of the library and reading room, consistent with this act. The governing board has exclusive control of the expenditure of all money collected to the credit of the library fund, the construction of any library building, and the supervision, care, and custody of the grounds, rooms, or buildings constructed, leased, or set apart for that purpose. **All money received for the library shall be deposited in the treasury of the city to the credit of the library fund, shall be kept separate and apart from other money of the city, and drawn upon by the proper officers of the city upon the properly authenticated vouchers of the library board**. The governing board may purchase or lease grounds and occupy, lease, or erect an appropriate building or buildings for the use of the library; has the power to appoint a suitable librarian and necessary assistants and fix their compensation; and remove appointees. The governing board shall carry out the spirit and intent of this act in establishing and maintaining a public library and reading room.

(**emphasis** added) Thus, the funds used for the Library employees and retirees are not assets of the City. The Library's money is held by the City, but kept separately.

Act 359 of 1901 provided for the incorporation of the Detroit Library Commission. The history appears in *Common Council of City of Detroit v. Engel*, 202 Mich. 544, 547-548, 168 N.W. 465 (1918), addressing how the money of the Library comes from fines or is raised in taxes of the municipality, but not from the general fund of the City:

By the provisions of this legislation the money of this corporation aside from that received from fines comes from the common council and the board of estimates of the city of Detroit, and it is raised by taxation upon the taxable property of the city.

The law does not require any contributions from the City towards the library.[4]

Moreover, the City has no power to impair the benefits of Library employees or retirees, because these persons are not City employees. The city of Detroit *White Book* contains specific compensation ranges and classifications for all employment positions in the city of Detroit. As recounted by Michigan's Supreme Court, "[t]he attorney for the city council informed us at oral argument that, where a separate public agency is established, such as the library, positions unique to that agency are no longer included in the *White Book*." *AFSCME v City of Detroit*, 468 Mich. 388, 407, 662 N.W.2d 695 (2003).

Significantly, library bonds may exceed the limit of indebtedness specified in a city charter. Because libraries are valuable instruments in education, and because they enhance the function of school districts, they supplement and are a part of the educational system of the state. *Kuhn v. Thompson*, 168 Mich. 511, 134 N.W. 722 (1912). In *Kuhn v. Thompson* the library commission petitioned the

---

[4] The Property Tax Limitation Act provides for limits on tax rates. MCL § 211.203. An opinion of the Attorney General explained the procedure for increasing the tax levy on property for library purposes. To increase the tax levy on property within the City of Detroit from the current level, for library purposes, the Detroit Library Commission must schedule a tax rate limitation increase election under § 211.203, and qualified electors voting on the question must approve the proposal. Op.Atty.Gen.1984, No. 6224, 1984 WL 192565. Qualified electors within the City of Detroit may vote on a tax rate limitation increase for library purposes at an election to be scheduled, noticed and conducted in accordance with applicable provisions of § 211.201 et seq. and § 168.635 et seq. Op.Atty.Gen.1984, No. 6224, 1984 WL 192565.

court for a writ of mandamus to compel the city controller to advertise and sell its bonds. The issue was whether or not the bond would swell the gross debt of the city of Detroit beyond the 2 percent limit based on the assessed valuation of its real and personal property to which it was restricted by the city charter and the home rule act. The court held:

> Guided by the foregoing considerations, we are constrained to hold that the school bonds and library bonds of the city of Detroit were not intended to be, and are not, included in the 2 per cent limit of indebtedness for municipal purposes specified in the charter.

Id., at 525-526. *Kuhn v. Thompson* suggests that library expenses are not part of the City's debt.

In *Bostedor v. City of Eaton Rapids*, 273 Mich. 426 (1935), the municipality acquired a building which had been owned by the library, and removed the library directors. The court held that statutes authorizing a municipal library board of directors to acquire a library building were not abrogated by the home-rule charter, which stated the library should remain the property of the City. Thus, the city commission acted without authority in selling the library building, since the title was with the library board. Id., at 429

Michigan case law has further clarified the status of libraries as independent quasi-municipal corporations. As a quasi-municipal corporation, a library may sue a county. In *Jackson District Library v. Jackson County*, 146 Mich. App. 392, 380 N.W.2d 112 (1986) the district library brought an action against the county,

seeking a share of single business tax revenues received by the county. The court held that the library was a quasi-municipal corporation with standing to sue the county. It accepted the definition of a quasi-municipal corporations as "governmental agencies constitutionally or statutorily authorized to operate 'for an about the business . . . of the State.'" 146 Mich. App. at 396, quoting *Attorney General ex rel Kies v. Lowrey*, 131 Mich. 639, 643, 92 N.W. 289 (1902). The court considered the constitutional stature of libraries and held that "a library is independent for purposes of suing one of its 'parent' governmental units over tax collections." *Id*. at 397.

Also, an independent library board is not bound by a City ordinance. The Michigan Court of Appeals held that "[b]oth the statute and the city charter envision[ed] an independent library board." *Benton Harbor Library Board v. City of Benton Harbor*, 99 Mich. App. 62, 297 N.W.2d 619 (1980). Since the statute and the city charter took precedence over the city ordinance, the library board was not subject to a residency requirement.

## 2. Detroit Regional Convention Facility Authority

Similarly, the Authority is a separate entity per state law. The Authority website best lays out its history:

"The Michigan Legislature passed Public Act. No. 63 of 2009 creating the Detroit Regional Convention Facility Authority (the Authority) and granting it power to assume operational control of Cobo Center for the purposes of improving and expanding the facility. The first steps in achieving the ultimate

goal of expansion were: to develop an organizational structure to govern the facility; to build an interim professional executive management team to manage the transition of facility's operations, finances, procurement and construction goals; to evaluate and assume all of the facility's existing contractual liabilities; and to hire employees to ensure a seamless transfer of the facility's operations on Sept. 15, 2009.

(http://www.drcfa.org/about-us/history-mission) The website addresses the five board members appointed to run the Authority, appointed from the state of Michigan, the city of Detroit, and Wayne, Oakland and Macomb counties. (Id) The employees of the City at Cobo Hall were transferred to the Authority.

The statute authorizing the Authority grants it powers to operate as an independent entity, MCLA § 141.1367, and clearly states that the liability of the City of Detroit shall not be borne by the Authority:

"(4) **An authority for a qualified metropolitan area shall not assume any unfunded obligations of a local government transferring or leasing a qualified convention facility under this section to provide pensions or retiree health insurance**. Upon request by the authority, the local government shall provide the authority with a statement of the amount of the unfunded obligations, determined by a professional actuary acceptable to the authority."

MCLA § 141.1369. The statute specifies the method for the transfer of City employees to the Authority, upon the Authority being created:

"(2) Transferred employees shall not by reason of the transfer have their accrued local government pension benefits or credits diminished. If a transferring employee is not vested in his or her local government pension rights at the time of transfer, his or her posttransfer service with the authority shall be credited toward vesting in any local government retirement system in which the transferring employee participated prior to the transfer, but posttransfer service with the authority shall not be credited for any other purpose under the local government's retirement system, except as provided in subsection (4).

(3) A transferred local government employee described in this section or a person hired by the authority as a new employee after the transfer date may remain or become a participant in the local government retirement system until the authority has established its own retirement system or pension plan. During the period the employee remains or is a participant in the local government system, the employee's posttransfer service with the authority and his or her posttransfer compensation from the authority shall be counted in determining both eligibility for and the amount of pension benefits that the employee will be eligible to receive from the local government system or plan.

(4) If the local government maintains a retirement system that provides for continuing participation and benefit accrual by local government employees who transfer their employment to another entity in conjunction with transfer of a local government function to that entity, then the transferred employee may elect to remain a participant in the local government retirement system in lieu of participation in any retirement system or pension plan of the authority. If the transferred employee elects to remain a participant in the local government system, the employee's posttransfer service with the authority and his or her posttransfer compensation from the authority shall be counted in determining both eligibility for and the amount of pension benefits that the employee will be eligible to receive from the local government system or plan. Any election to remain in a local government system or plan shall be made within 60 days following the date the authority has established its own retirement system or pension plan and shall be irrevocable. Employees eligible to make the election described in this subsection shall be those employees who immediately before their transfer date were participating in the local government system and who agree to make any employee contributions required for continuing participation in the local government system and also agree to meet all requirements and be subject to all conditions that, from time to time, apply to employees of the local government who participate in the local government system.

(5) **For each employee meeting the requirements of subsection (4) who elects to remain a participant in the local government retirement system, the authority shall, on a timely basis, contribute, as applicable, to the trustees of that retirement system an amount determined by the local government system's actuary to be sufficient to fund the liability for all of that employee's retirement and other postemployment benefits under the system on a current basis, as those liabilities are accrued from and after the transfer date**.

13-53846-tjt    Doc 6468    Filed 08/02/14    Entered 08/02/14 14:25:37    Page 19 of 26

MCLA § 141.1371 (**emphasis** added). As shown, the Authority must pay to the GRS and OPEB programs a sufficient amount of money to "fund the liability for all of [the Authority's] employee's retirement and other postemployment benefits under the system on a current basis".

### B. The Library and Authority Creditors Are Legally Entitled to Their Vested Pension and Healthcare Benefits

Library and Authority employees have a constitutional right to their retirement benefits. Const 1963, art 9, § 24 provides in part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Accrued financial benefits include pension payments or retirement allowances. *Studier v. Michigan Pub. School Employees' Retirement Bd.,* 472 Mich. 642, 654; 698 NW2d 350 (2005). In *In re Constitutionality of 2011 Pa. 38,* 490 Mich. 295, 806 N.W.2d 683 (2011), the Michigan Supreme Court stated, "The obvious intent of § 24, however, was to ensure that public pensions be treated as *contractual obligations* that, once earned, could not be diminished." *Id.* at 311, 806 N.W.2d at 693 (emphasis added).

The City cannot impose pension reductions or the ASF Recoupment on Library or Authority employees and retirees because the Michigan Constitution, Article 9, Section 24 prohibits such. Even if the law arguably permits the City to diminish or impair the benefits of its own employees and retirees in terms of its

Chapter 9 Plan[5], the law does not permit the same treatment of the Library's employees simply because they are participants in GRS.

Nor can the City lawfully modify the retiree health care obligations of the Library and Authority to its employees or retirees. An employer may not unilaterally modify a retiree's health care benefits provided for in a collective bargaining agreement (CBA). "Absent explicit contractual language to the contrary, a retiree's contractual rights [under a CBA] vest, if at all, at the time of retirement." *Butler v. Wayne County,* 289 Mich. App 664, 676; 798 NW2d 37 (2010). See also *Bender v. Newell Window Furnishings, Inc.,* 681 F 3d 253, 264 (CA 6, 2012) (where contract was silent as to duration of retiree medical benefits, those benefits must continue indefinitely and without cost). Here, Library and Authority retirees who were promised vested retiree healthcare upon retirement have a contractual right to those benefits. Indeed, impairment of those benefits violates the United States Constitution. See, *Welch v Brown*, 935 F.Supp.2d 875, 884-885 (E.D. Mich. 2013), affirmed 2014 WL 25641 (6th Cir. 2014)

The Library and Authority are also employers as defined under Michigan's state labor law, the Public Employment Relations Act. MCLA § 423.201, et seq ("PERA"). PERA prohibits employers from unilaterally modifying union-

---

[5] AFSCME contends it does not.

employee benefits, without bargaining to impasse. Sections 423.210, 423.215; *Detroit Police Officers Ass'n v. City of Detroit*, 391 Mich. 44 (1974)

### C.     The Debtor Falls Short of the Extreme Remedy of Extending Bankruptcy Protections to Non-Debtor, Vis-A Vis Its Creditors

It is well established that seeking to extend bankruptcy protections to benefit a non-debtor third party is an "extreme remedy" and is "exceedingly rare." *Saleh v. Bank of America*, 427 B.R. 415, 421 (Bankr. S.D. Ohio 2010). Such permits a third party to obtain the benefits of the bankruptcy process without being subjected to any of its burdens and safeguards. *Id.*

*In re Dow Corning Corp.,* 280 F.3d 648 (6th Cir. 2002), the Sixth Circuit assessed whether "a bankruptcy court has the authority to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan under Chapter 11 of the Bankruptcy Code." Id., at 656. That analysis is helpful in the instant situation, where the Debtor here is attempting to involuntarily extend the bankruptcy discharge protections to non-debtors (Library and Authority), by mandating impairment of creditors to the non-debtors (Authority and Library employees/retirees).

The *In re Dow Corning Corp.* the court determined that a bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor when the following seven factors are present:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id*. See also 11 U.S.C. § 1123(b)(6). The court determined that the factor analysis was necessary to comply with the "appropriate provisions" of Section 1123(b)(6) of the bankruptcy code. *Id.* The Court's analysis also relied upon 11 U.S.C. §105(a), giving the bankruptcy court powers to issue orders "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]" Id., at 657-658. Notably, these factors require that the creditor of the third party has an opportunity to recover in full. *Id.* at 658.[6]

Here, the *Dow Corning* factor analysis militates against the Library and Authority retirees/employees having their vested interests against the Library and Authority impaired. (1) First, a suit against the Library or Authority does not equate to a suit against the City. They are both independent entities, and not

---

[6] It may be noted that the *In re Dow Corning* decision cited to 11 U.S.C. § 524(e), which was not included in the Section 901 list of sections applicable to Chapter 9. 11 U.S.C. § 901. However, *Dow Corning* did not rely chiefly on Section 524(e), as was shown in its description of other cases which did. *Id.*

departments of the City. (2) Second, neither entity has contributed substantial assets to the reorganization. (3) Nor is the inclusion of these entities "essential" to the reorganization. Per state law, the City maintains the Library's and Authority's assets for a fee, which are held separately from the City's. Thus, impairment of Library and Authority creditors is irrelevant to the City's adjustment, as a matter of law. (4) The Class 11 and 12 claims were approved generally, yet the Library and Authority vote totals are unknown at the moment.

(5-6) In addition, and most notably, the plan does not provide a mechanism to pay for all, or substantially all, of the claims by each class affected by the inclusion of the third party non-debtor in the bankruptcy. (7) Finally, no findings have been made or sought concerning the relationship between the Authority/Library and the City.

In *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 767 (Bankr. D.S.C. 2011), the court confirmed a Chapter 9 plan. In the case, the court cited to and analyzed the *In re Dow Corning Corp.* test concerning the appropriateness of third party releases in the confirmation plan.

## IV. CONCLUSION

WHEREFORE and for the reasons stated above, Michigan AFSCME Council 25 respectfully asserts the above objections to the Fifth Plan, to the extent that they impair the vested benefits of non-City employees and retirees. The bankruptcy

election ballots issued to the Library and Authority employees/retirees should be discounted, and not used to improperly engraft these individuals into the bankruptcy process.

Dated: August 1, 2014

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 964-4454
Facsimile: (313) 964-4490
richardmack@millercohen.com

Sharon L. Levine
Philip J. Gross
LOWENSTEIN SANDLER LLP
65 Livingston Ave.
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-6247
slevine@lowenstein.com
pgross@lowenstein.com

Herbert A. Sanders
THE SANDERS LAW FIRM PC
615 Griswold St., Ste. 913
Detroit, MI 48226
Telephone: (313) 962-0099
Facsimile: (313) 962-0044
hsanders@miafscme.org

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |
| _____ | ) |  |

## PROOF OF SERVICE

The undersigned certifies that on August 1, 2014, the American Federation of State, County and Municipal Employees Council 25 (AFSCME) filed Objections to the Fifth Amended Plan of Adjustment of Debts, Due to Impairment of Non-City Employees/Retirees were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Boulevard, 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 566-4787
Facsimile: (313) 964-4490
richardmack@millercohen.com