# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

---

## BRIEF OF THE DETROIT RETIREMENT SYSTEMS IN SUPPORT OF PROPOSED TREATMENT OF PENSION CLAIMS UNDER "ALTERNATIVE A" OF THE CORRECTED FIFTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT AND STATEMENT OF RESERVATIONS

The Police and Fire Retirement System of the City of Detroit (the "PFRS")

and the General Retirement System of the City of Detroit (the "GRS" and together

with the PFRS, the "Retirement Systems") hereby file this brief in support of the

proposed treatment of Pension Claims under "Alternative A" of the *Corrected*

*Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* (July 29,

2014) [Dkt. No. 6379] (the "Fifth Amended Plan" or the "Plan")[1], stating as

follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings
ascribed to them in the Fifth Amended Plan and the *Fourth Amended Disclosure
Statement With Respect to Fourth Amended Plan For The Adjustment of Debts of
the City of Detroit* [Dkt. No. 4391] (the "Disclosure Statement").

## PRELIMINARY STATEMENT

The pension benefits historically provided to the City's police, fire and general retirees were far from lavish. Before the bankruptcy, the average annual PFRS pension payment was about $30,000 (with no supplement from Social Security), and the average annual GRS pension payment about $18,000. Eligibility Op. at p. 9. *Any* material cuts from such modest levels will be hard for the City's retirees and employees (and their dependents and beneficiaries) to bear - - particularly for those retirees who will also have to bear the financial impact of the City's proposed drastic reductions in healthcare benefits under the Plan. But the cuts that will result under Alternative A in the Plan will be far less draconian than the cuts that would result from a potential cramdown of Alternative B on the Holders of Pension Claims in Classes 10 (PFRS) and 11 (GRS). Recognizing this and having engaged in a cost-benefit analysis relative to opposing the Plan and seeking other remedies, the Retirement Systems support confirmation of the Alternative A Plan, but not the Alternative B Plan.[2]

---

[2] The Retirement Systems would vigorously object to confirmation of the Alternative B version of the Plan, and reserve all rights to file objections thereto, if the City should change its course during the confirmation hearing. Indeed, pursuant to the Court's *Order Approving The First Amended Stipulation Modifying Certain Plan Discovery and Pleading Deadlines For Certain Non-Debtor Parties* entered June 20, 2014 [Dkt. No. 5482], on June 30, 2014, the Retirement Systems submitted to the Jones Day firm, as counsel to the City, their conditional objections

Footnote continued on next page

The Retirement Systems' decision to support the Alternative A Plan is the result of many months of intensive negotiations and represents a substantial compromise by the Retirement Systems and their beneficiaries. Alternative A requires, among other conditions, acceptance of the Plan by both creditor Classes 10 and 11, consisting of the Holders of Pension Claims of the PFRS and the GRS, respectively. In exchange for certain funds to be received by the Retirement Systems under the Plan and the Alternative A treatment of Pension Claims, the Retirement Systems have agreed to (among other things): (a) dismiss their pending appeal from the Court's Eligibility Opinion (defined below); (b) release certain claims against the City, State, and related entities; and (c) various governance changes at the Retirement Systems, including the creation of an independent Investment Committee for each System with substantial power and authority. In exchange for the Alternative A treatment of Pension Claims, the Holders of those Claims are required to agree to reductions in base benefits and COLAs (subject to potential restoration pursuant to the benefits restoration program) and, in the case of GRS participants, ASF Recoupment. If either of the two classes had voted against the Plan or if the other conditions are not satisfied at the time of confirmation, the Plan provides for the City to seek confirmation of the Alternative

Footnote continued from previous page
to Alternative B of the Fourth Amended Plan, in the event that the City pursued confirmation of Alternative B of that version of the Plan.

3

B Plan and the Alternative B treatment of these two classes, involving much more severe pension cuts.

On July 21, 2014, the City filed its report comprising the official tabulation of the Plan voting [Dkt. No. 6179], which shows that both Classes 10 and 11 have in fact voted to accept the Plan. The City has informed the Retirement Systems that, given the acceptance by both classes, it intends to proceed to seek confirmation of the Plan based upon Alternative A.

Confirmation of the Alternative A Plan is warranted based on, at a minimum, the reasons set forth herein. The Retirement Systems do, however, object on a limited basis and reserve their rights with respect to certain aspects of the Alternative A Plan, as discussed below.[3]

## ARGUMENT

## I.  THE PLAN DOES NOT DISCRIMINATE UNFAIRLY IN FAVOR OF CLASS 10 AND 11 PENSION CLAIMS

### A.  The Treatment of Pension Claims Under the Alternative A Plan

For purposes of voting, the primary focus of the Disclosure Statement, the Plain Language Insert, and Ballots for Classes 10 and 11 was the percentage by

---

[3] Pursuant to the Court's *Order Approving The First Amended Stipulation Modifying Certain Plan Discovery and Pleading Deadlines For Certain Non-Debtor Parties* entered June 20, 2014 [Dkt. No. 5482], on June 30, 2014, the Retirement Systems served the City with conditional objections to the Alternative A Plan.

4

which future monthly pension payments would be cut under Alternative A versus Alternative B. But the percentage cuts in accrued pension benefits - - or, more specifically, the percentage of preserved pension benefits - - is not a measure of recovery on Pension Claims and is not the relevant measure for purposes of determining whether the Plan treats all unsecured classes fairly. Existing assets of the Retirement Systems (*i.e.*, non-Debtor assets) and future income earned on those assets will play a significant role in funding those benefits, in addition to distributions under the Plan.

Rather, for purposes of evaluating the comparative treatment *of claims* of different classes of unsecured creditors, the focus with respect to Pension Claims is on the percentage of distribution to be made by the City on account of the Unfunded Actuarial Accrued Liability (the "UAAL") owed to Holders of Pension Claims under Classes 10 and 11, that is, the share of the actual *claim* amounts for the Class 10 and Class 11 Pension Claims that will be paid. And even more to the point, the analysis of differential treatment should compare only those distributions that are being made from the City's assets, not funded by third parties.

According to the Disclosure Statement, Holders of Class 10 PFRS Pension Claims will receive a total Estimated Recovery Percentage of 59%. *See* Disclosure Statement at II.B, p. 37. Class 11 GRS Pension Claims will receive a total Estimated Recovery Percentage of 60%. *Id.* at II.B, p. 39. However, these

5

percentages include distributions made from the $816 million in Outside Funding, *i.e.*, from non-City assets. *From City assets alone* – and thus excluding contributions from the State and the DIA Proceeds – **the respective percentage recoveries are 39% (not 59%) for Class 10 PFRS Pension Claims, and 48% (not 60%) for Class 11 GRS Pension Claims**. *See City's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 5034] (the "City's Consolidated Reply") at p. 33.

In addition, the City estimates that approximately 69% of the Holders of PFRS Pension Claims and 56% of the Holders of GRS Pension Claims also hold Class 12 OPEB Claims. *Id.* The City estimates that OPEB Claims will recover only 10-13% on their allowed amounts. *See* Disclosure Statement II.B at p. 41.

In determining what is fair or unfair discrimination, as well as what is fair and equitable among creditors (as discussed below), the impact of such severe OPEB cuts should certainly factor into any analysis of the fairness of the overall treatment of the Holders of Pension Claims under the Plan. The City estimates that the impact of the Plan's treatment of OPEB Claims will result in an additional 15-24% reduction in recovery by Holders of Pension Claims. *See* City's Consolidated Reply at p. 34. On a fully aggregate basis, the Pension Claims and OPEB Claims together will recover approximately 24%. *Id.*

6

## B. The Alternative A Plan Treatment of Pension Claims Compared to Other Unsecured Claims

In determining whether discrimination exists among classes under a plan, it is only appropriate to look to the distribution of the ***debtor's*** assets, not assets contributed by other creditors or third parties. *See In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *60-61 (Bankr. S.D.N.Y. Oct. 31, 2003) (where the source of a particular class's enhanced recovery is a party other than the debtor, the resulting differential in recoveries between classes is not "unfair discrimination"). In this case, the $816 million in Outside Funding is not coming from the City's assets, but rather from voluntary contributions by foundations and the State that are earmarked exclusively for paying the Pension Claims.

Indeed, for the first nine years of the Plan, the funds for distributions to Class 10 PFRS Pension Claims will come solely from approximately $96 million from the State Contribution and $164 million from DIA Proceeds – and ***nothing at all*** from the City. *See* Plan at II.B.3.q.ii.A.; Exhibit II.B.3.q.ii.A. No other class is utterly excluded from City payments during this initial Plan period. Class 11 GRS Pension Claims are supposed to receive certain funds from the City-owned DWSD and, to a very limited extent, the General Fund during this initial period, but a substantial portion of its distributions will also come from the Outside Funding. During the period starting in July 2023, additional Outside Funding contributions will be provided to the Retirement Systems on account of Class 10 and 11 Claims.

7

Thus, the City will distribute, from its own assets, approximately 39% on PFRS Pension Claims and 49% on GRS Pension Claims, and after accounting for OPEB recoveries, about 24% in the aggregate on Pension and OPEB Claims. These recoveries are well within the range that other unsecured creditors stand to receive under the Plan, as summarized in the table below. *See* Disclosure Statement II.B at pp. 31-42.

| Class | Classes of Unsecured Claims | Estimated % Recovery (City Assets) | Comment | DS/Other Reference |
|---|---|---|---|---|
| 5 | COP Swap Claims | 30 | Settled | II.B, p. 33 |
| 7 | Limited Tax General Obligation Bond Claims | 34 | | Miller Buckfire Rpt (II.B, p. 34)[4] |
| 8 | Unlimited Tax General Obligation Bond Claims | 74 | Settled | II.B, p. 34 |
| 9 | COP Claims | 0-10 | Disputed | II.B, p. 35 |
| 10 | PFRS Pension Claims | 39 | Settled | II.B, p. 37 |
| 11 | GRS Pension Claims | 48 | Settled | II.B, p. 39 |
| 12 | OPEB Claims | 10-13 | Settled | II.B, p. 41 |
| | Aggregate Classes 10-12 | 24 | | City Consol. Reply, p. 34 |
| 13 | Downtown Dev. Auth. | 10-13 | | II.B, p. 41 |
| 14 | Other Unsecured Claims | 10-13 | | II.B, p. 41 |
| 15 | Convenience Claims | 25 | | II.B, p. 42 |

[4] While the Disclosure Statement estimates a 10-13% recovery on LTGO Claims, a July 8, 2014 report from Miller Buckfire & Co. puts their recovery much higher, at 34% as a result of a new settlement. *See* Expert Report of Kenneth Buckfire in Support of City of Detroit's Plan of Adjustment, Attachment 1, dated July 8, 2014. The Retirement Systems note that it is unclear whether the 34% recovery may rise even higher, based on the LTGOs' share of the Disputed COP Claims Reserve.

8

201210755.4 14893/165083
13-53846-tjt   Doc 6509   Filed 08/04/14   Entered 08/04/14 23:27:32   Page 8 of 31

As explained in the following section, any difference between the recovery from City assets by Holders of Pension Claims and Holders of other unsecured claims does not rise to the level of undue discrimination. To the extent of any differential recovery that favors Holders of Pension Claims, ample legal and equitable justifications support such discrimination.

## II. THE PLAN IS FAIR AND EQUITABLE AND DOES NOT DISCRIMINATE UNFAIRLY

No one has objected to the appropriateness of the separate *classification* of the Pension Claims and OPEB Claims into Classes 10, 11 and 12. Wage and benefit claims are separate and distinct on their face, and are commonly classified separately from loans or trade claims. *See, e.g., Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 584-87 (6th Cir. 1986) (permitting separate classification of union's claims, due to unique interest of its represented employees in debtor's ongoing business and to impact on future collective bargaining process). Indeed, the only complaint is that the Pension Claims will ultimately receive a higher percentage distribution than ***some, but not all***, of the other unsecured classes. As set forth below, however, that difference is well-justified under all of the circumstances here, and is not "unfair."

The basic standard for confirmation embodied in section 1129(b)(1) has been incorporated in chapter 9 pursuant to section 901(a). It prohibits confirmation

9

of a plan that is not fair and equitable or that discriminates unfairly against an impaired class of claims that has rejected the plan. By its terms, section 1129(b)(1) "prohibits only *unfair* discrimination, not all discrimination." *In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (emphasis added). Indeed, "[a] bankruptcy court can permit discrimination when the facts of the case justify it." *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980). The discrimination here is appropriate under all the circumstances.

## A. The Pension Claims Have Unique Characteristics That Warrant More Favorable Treatment

The Michigan state law protections for pensions are unique and justify more favorable treatment of the Pension Claims. The U.S. Supreme Court has "long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) (*quoting Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000)) (internal quotations omitted); *Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law"); *In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 695 (Bankr. D. Colo. 1995) ("Chapter 9 provides only a forum and a mechanism

201210755.4 14893/165083

for reorganization; state law establishes the eligibility and substantive requirements for and limitations upon reorganization").

With respect to the Pension Claims, as the Michigan Supreme Court has recognized, "pension obligations differ from nearly every other type of government spending insofar as they simply cannot be reduced or cut. . . . Michigan governmental units do not have the option . . . of not paying retirement benefits." *Musselman v. Governor of Mich.*, 533 N.W.2d 237, 243 (Mich. 1995), *aff'd on reh'g*, 545 N.W.2d 346 (Mich. 1996). Moreover, "the state may not reduce the pension benefit of any state employee or official, or local employee or official, once a pension right has been granted." *Seitz v. Probate Judges Ret. Sys.*, 474 N.W.2d 125, 130 (Mich. App. 1991), *appeal denied*, 482 N.W.2d 459 (Mich. 1992), *reconsideration denied*, 483 N.W.2d 898 (Mich. 1992).

Differential treatment among classes of unsecured claims based on different state law rights is permissible in reorganization plans. As recognized by the Sixth Circuit, even radically different treatment is permitted by the Bankruptcy Code when such distinctions are justified by fundamental differences in the claims' legal rights and attributes. *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 661-63 (6th Cir. 2002), *cert. denied*, 537 U.S. 816 (2002) (separate classification and treatment of foreign and domestic unsecured

11

tort claimants, resulting in a recovery differential of 35-60%, was proper because tort awards in other countries were significantly lower than U.S. tort awards).

In light of the foregoing, as the Court knows, the Retirement Systems (among others) have argued that, if the City is to be permitted to proceed with a chapter 9 bankruptcy, it can only do so by first recognizing that under the Michigan Constitution accrued public pension benefits may not be diminished or impaired (and are essentially a non-dischargeable debt under Bankruptcy Code section 944(c)).  No other class of creditors in this case could avail itself of this very important and weighty argument.  The Court rejected this argument in its *Opinion Regarding Eligibility* entered on December 5, 2013 [Dkt. No. 1945] (the "Eligibility Opinion").  However, the Retirement Systems and other parties were permitted to appeal directly to the Sixth Circuit Court of Appeals from the Eligibility Opinion and the accompanying Order for Relief, and those appeals are fully briefed and pending in that court.

Accordingly, the treatment of the Pension Claims under Alternative A of the Plan reflects a settlement of their asserted legal rights under the Michigan Constitution (including asserted rights against the State), which might otherwise bar any impairment.  The terms of the settlement were the subject of intense negotiation over many months.  Similarly, certain other classes, such as the Class 8 UTGO Claims and the Class 5 COP Swap Claims, have also settled their specific

12

state-law arguments against the City in exchange for more favorable treatment under the Plan.[5]

The disparate treatment of Pension Claims under the Plan also reflects other fundamental differences in the nature of these claims relative to other unsecured claims. The Holders of Pension Claims represent the current and retired workforce of the City, many of whom live, pay taxes, and consume goods and services in the City. How these individuals are treated will have an impact on workforce morale and the ability to retain valued employees. To the extent that retirees are left impoverished in the wake of this bankruptcy case, it will also place a tremendous social and economic burden on the City to nonetheless provide for the welfare of these individuals, which is a burden that does not aid the City's emergence from bankruptcy and revitalization. These considerations are not merely humanitarian in nature; they are properly a part of the business justification for the City treating these claimants more favorably than certain other unsecured creditors.

Another fundamental difference in the nature of Pension Claims, providing further legal justification for the disparate treatment of these Claims, is the fact that the Pension Claims represent nothing less than deferred compensation for services rendered by employees and retirees. These Claims arise out of the solemn

---

[5] The Retirement Systems reserve all rights to contest the reasonableness of any other settlements under the Plan in the event that Alternative A is not the version sought by the City to be confirmed by the Court.

201210755.4 14893/165083

agreement between labor and its governmental employer, that labor shall be rendered and paid for, and there was no assumption of risk by labor in this agreement. In contrast, bondholders and insurers have claims that arise out of *investments*. As such, there were inherent, known risks of non-payment assumed by each such creditor. *See also* City's Consolidated Reply at ¶¶ 71, 72.

As in chapter 11 cases, disparate classification and treatment of unsecured claims are also permitted in chapter 9 cases. *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (upholding separate classification and disparate treatment of, *inter alia*, employee benefit plan claims versus trade creditor claims); *Sanitary & Improvement Dist. 65 of Sarpy Cty., Neb. v. First Nat'l Bank of Aurora*, 79 B.R. 877 (D. Neb. 1987), *aff'd on other grounds*, 873 F.2d 209 (8th Cir. 1989) (upholding separate classification and treatment of bondholders versus warrantholders, due to different attributes and rights of repayment under state law).

## B. The Differences in Treatment Satisfy Either of the Oft-Cited Tests

Notwithstanding that reasonable discrimination among different classes of unsecured claims is consistent with the Bankruptcy Code and the law of this Circuit, several parties argue that the difference in treatment that Alternative A provides for holders of Pension Claims in Classes 10 and 11, compared to holders

201210755.4 14893/165083

of other unsecured claims, constitutes unfair discrimination.[6]  But Classes 10 and 11 are not in fact outliers here, especially when the external source of funding and the constitutional protections are factored into the analysis, and in the context of the treatment of the related Class 12 OPEB Claims.  Their treatment readily satisfies both of the tests commonly applied to determine whether a plan discriminates unfairly.

The two alternative tests used to determine unfair discrimination are the *Aztec* test and the "rebuttable presumption" test.  The "*Aztec*" test provides that an analysis of whether a plan discriminates unfairly should consider (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor could consummate the plan without the discrimination; (3) whether the discrimination is proposed in good faith and (4) the treatment of the class discriminated against.

---

[6] *See* Joinder of BlackRock Financial Management, Inc. in Ambac Assurance Corporation's Objection to the Fourth Amended Plan of Adjustment of Debts of the City of Detroit [Dkt. No. 4681]; Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment [Dkt. No. 4679]; Objection of Ambac Assurance Corporation to Fourth Amended Plan of Adjustment of Debts of the City of Detroit [Dkt. No. 4677]; Objection of Assured Guaranty Municipal Corp. to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) [Dkt. No. 4674]; Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 4660]; Joinder to Objection of Certain COPs Holders and Limited Objection of Wilmington Trust, National Association, as Successor Contract Administrator, to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt No. 4656]; COPs Holders' Objection to Confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 4653].

201210755.4 14893/165083

*Aztec*, 107 B.R. at 590; *In re Graphic Commc'ns, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996).

The objecting parties would have this court use the "rebuttable presumption" test, which creates a rebuttable presumption that discrimination is unfair if there is a material difference in treatment of two classes of the same priority. *In re BWP Transp., Inc.*, 462 B.R. 225, 231-32 (Bankr. E.D. Mich. 2011). To overcome a rebuttable presumption of unfair discrimination, the debtor must show that the differential treatment is consistent with what each class would obtain outside of bankruptcy, or that the greater recovery of one class is justified by its contribution to the reorganization. *Id.*

Under either test, the Plan does not discriminate unfairly in favor of Holders of Pension Claims.

### 1.    The Plan Satisfies the *Aztec* Test

The Plan satisfies the four-factor *Aztec* test and therefore does not discriminate unfairly.

*First*, the Plan's differential treatment of Pension Claims is supported by a reasonable basis. The distinctive relationship between the City and its employees justifies different treatment. The more than 32,000 active and retired employees of the City who participate in the Retirement Systems depend on their accrued pension benefits—often exclusively—for their livelihoods. Preserving the vital

16

relationship between the City and its workforce ensures that current City employees will continue to provide the services necessary to help the City effectuate the Plan. *See Aetna Cas. & Surety Co. v. Clerk (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (differential treatment of workers' compensation claims was justified to avoid unions' negative reactions which could be detrimental to the debtor's ability to operate); *In re Kliegl Bros. Universal Elec. Stage Lighting Co.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (higher recovery for unions was justified because the "[d]ebtor's ability to continue to operate a union shop [was] absolutely critical to its ability to function successfully in its industry."). Moreover, avoiding wide-scale impoverishment of the City's retirees will enable the City to be better positioned to attract new investment from outside the City and to avoid burdening its social welfare programs inordinately. And dollars that support people living, paying taxes, and consuming goods and services in the City can thus re-circulate in the local economy and support the City's rehabilitation.

*Second,* the City risks being unable to confirm a plan, absent the settlement embodied in the Alternative A treatment. The Pension Claims have a pending appeal that, if successful, would result in either dismissal of the case or a determination that these claims would have to be paid at 100%. Unlike the other classes of unsecured claims, the liabilities underlying the Pensions Claims are

201210755.4 14893/165083

expressly protected by the Michigan Pensions Clause. The Pensions Clause provides that the "accrued financial benefits of each pension plan and the retirement system of the state and its political subdivisions . . . shall not be diminished or impaired." Mich. Const. Art. IX, Sec. 24. The protections of the Pensions Clause are absolute.

Whether the Pensions Clause constrains the treatment of the Pension Claims in this case is disputed, but it is undisputed that, outside of bankruptcy, Michigan law expressly affords accrued pension benefits special status and special protection as a matter of State law. The Pension Clause flatly prohibits any impairment of accrued pension benefits. *See* Elig. Op. at pp.73-74 ("the State of Michigan cannot legally provide for the adjustment of pension debts of the City of Detroit . . . [as] a direct result of the prohibition against the State of Michigan . . . impairing the contractual obligations relating to accrued pension benefits in the Michigan Constitution"). Outside of bankruptcy, neither the State of Michigan nor any of its instrumentalities could disobey the clear dictates of the Pensions Clause. *Musselman*, 533 N.W.2d at 244-45. This in itself provides a reasonable basis for treating Pension Claims differently.

*Third*, the proposed settlement embodied in the Alternative A treatment has been entered into in good faith. The employees and pensioners reasonably relied upon their rights under Michigan law and had no "real opportunity to protect

themselves" in any other manner.  *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980).  Retirees can be treated differently from banks, hedge funds, commercial investors and bond insurers. Those financial institutions, with the benefit of sophisticated advisors, made calculated decisions on whether to extend credit to the City and on what terms.  In contrast, retirees provided many years – often decades – of their time and labor to the City in reliance on the constitutional promise that they would receive their fully earned and accrued pension benefits after retirement.

The Plan's treatment of Pension Claims is the result of a heavily negotiated settlement between the City, the Retirement Systems, the State, the Retiree Committee and other parties.  In exchange for the treatment of Pension Claims under the Plan, the Retirement Systems have agreed to withdraw their appeal of the Eligibility Opinion pending at the Sixth Circuit, conditioned upon, among other conditions, acceptance of the Plan by Classes 10 and 11 and confirmation of the Plan.  As the City has explained, the Plan's preferential treatment of Pension Claims was motivated not by bad faith or antipathy toward other unsecured creditors, but rather by the recognition of the special status afforded to accrued pension benefits under Michigan law, and by the importance of employee and retiree relations, and the settlement of litigation.  Moreover, such treatment was the

201210755.4 14893/165083

result of intensive mediation that included extensive good-faith, arms' length negotiations. *See* City's Consolidated Reply at 39-49.

Courts encourage settlements. In service of that goal, bankruptcy courts have held that creditors who settle with a debtor and agree to accept a plan or make other valuable concessions may receive more favorable treatment than non-settling creditors. *See In re Corcoran Hosp. Dist.*, 233 B.R. 449, 456-57 (Bankr. E.D. Cal. 1999) (disparate treatment of creditor was justified where that creditor had settled with the debtor, allowing the debtor to devote its resources to its operations and make plan payments rather than in continued litigation); *In re Western Real Estate Fund, Inc.*, 75 B.R. 580, 586 (Bankr. W.D. Okla. 1987) ("that those creditors which have reached an accommodation with the debtors . . . are to receive differing treatment from that of the remaining creditors[] does not constitute impermissible discrimination").

*Fourth*, as set forth above, the actual treatment of the Holders of Pension Claims is well within the range of reasonableness in light of all of the terms and the treatment of other classes.

> **2. The Alternative A Treatment Satisfies the "Rebuttable Presumption" Test**

As a threshold matter, the "rebuttable presumption" test requires a showing that claims "of the same priority" are being treated "materially" differently. Here, this test simply begs the question of whether Pension Claims are of the same

priority as the general unsecured claims of financial creditors. The Retirement Systems assert that the Pension Claims are not of the same priority due to the Pensions Clause, and the Plan reflects a settlement of that issue. Moreover, as discussed above and as the City amply discusses, there is significant reason to dispute that the Plan "materially" differs in its treatment of Pension Claims relative to other claims. *See* City's Consolidated Reply at 29-36, 55-59.

However, assuming there is a material difference in the treatment of claims of the same priority relative to the Pension Claims under the Plan, the rebuttable presumption test calls for comparison of the treatment of the various classes under the Plan with the treatment to which they would be entitled outside of bankruptcy. Here, the comparison is strikingly in favor of the Pension Claims. Under the Michigan Constitution, they would be entitled to 100% payment outside of bankruptcy – with no impairment or diminishment. None of the other classes of claims is similarly protected. Settling for a less than 60% recovery (even including the Outside Funding) reflects a significant discount. These circumstances satisfy the "rebuttable presumption" test, were it to be applicable in this case.

Some financial creditors argue that the Pensions Clause would not ensure full payment of Pension Claims if this case were dismissed because the Pension Claims have no better remedy than the financial creditors: all can obtain judgments, and all can place them on the tax rolls with equal priority. *See, e.g.,*

21

*Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment* [Dkt. No. 4679] at 38-39; *Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 4660] at 16. However, as a practical matter, if the City had no ability to satisfy all of those judgments and still provide essential services, and if the option of filing for chapter 9 bankruptcy was not an option (otherwise, the analysis becomes completely circular), then the only viable choice of the City and the State would likely be to pass legislation to permit the impairment of the financial creditors' claims (but not the Pension Claims, since the legislature cannot override the Michigan Constitution) under the State's taxing and police powers. *See, e.g., Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 512, 62 S.Ct. 1129, 1134-35 (1942) (finding constitutional a state statute for adjusting municipal debts, as an "exercise of [the State's] essential reserve power to protect vital interests of its people"). Imposing these changes solely on financial creditors would be permissible under the Michigan Constitution because, unlike the Pensions Clause which is absolute in its protection and cannot be circumvented by the legislature, the Contracts Clause is permeable and subject to the State's "essential reserve power." *Asbury Park*, 316 U.S. at 511, 62 S.Ct. at 1134 ("The necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation. . . .").

201210755.4 14893/165083

In addition, it should be kept in mind that the legality of the claims of the COPs holders is subject to serious challenge, as described in the City's pending adversary proceeding. So, to the extent that the financial creditors have argued that all unsecured creditors would have the same remedies and ability to obtain a judgment for their claims outside of a chapter 9 proceeding, that argument is belied by the City's own suit, which could continue to be litigated in state or federal court if this bankruptcy case were dismissed. Moreover, in its Consolidated Reply, the City indicates that the Holders of Class 10 and 11 Pension Claims may in fact have more effective remedies than other creditors outside of bankruptcy. Consolidated Reply at 89-91.

For the foregoing reasons, there is a strong argument that the Holders of Pension Claims would fare better than financial creditors outside of a chapter 9 proceeding, thus supporting the more favorable treatment of the Pension Claims under the Plan.

### 3. The Differential in Percentage Distributions from City Assets Is Not Grossly Disproportionate

The bottom line here is that the Plan does not impose a disproportionate burden on other unsecured creditors, and treats them as well as possible under the circumstances. The differential in recovery from the assets of the City between Pension Claims and the smallest estimated recovery for unsubordinated general unsecured claims is only 11-14% (using the aggregate treatment of Pension

23

Claims, exclusive of Outside Funding and inclusive of OPEB treatment) or 26-38% (excluding both Outside Funding and OPEB treatment) - - well within the parameters that the Sixth Circuit has approved. *See Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 661-63 (6th Cir. 2002), *cert. denied*, 537 U.S. 816 (2002) (separate classification and treatment of foreign and domestic unsecured tort claimants, resulting in a recovery differential of 35-60%, was proper because tort awards in other countries were significantly lower than U.S. tort awards). Even including the Outside Funding, the maximum differential is 46-50%, still within the boundaries of *Dow Corning* and the case law cited below. [7]

Courts have generally identified as "grossly disparate" recovery differentials in excess of 50%. *See In re Tribune Co.*, 472 B.R. 223, 243 (Bankr. D. Del. 2012) ("grossly disparate" treatment 50% or more differential in recovery); City's Consolidated Reply at p. 56 (citing cases). And in some cases, courts have accepted differentials in excess of 50%. *See Creekstone Apartments Assocs., L.P. v. Resolution Trust Corp. (In re Creekstone Apartments Assocs., L.P.)*, 168 B.R.

---

[7] In addition, the Retirement Systems wish to note that the proper discount rate to apply to the Systems' liabilities strictly for purposes of calculating each System's UAAL may be substantially lower than the 6.75% used by the City under the Plan. If a lower discount rate is used, the UAAL claim would increase substantially, thereby effectively reducing the percentage recoveries for Classes 10 and 11 under the Plan and reducing any differential vis-à-vis recoveries of other creditors. *See also* Consolidated Reply at ¶59.

201210755.4 14893/165083

639, 644-45 (Bankr. M.D. Tenn. 1994) (90% differential not unfair discrimination); *In re Kliegl Bros. Universal Elec. Stage Lighting Co.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (60% differential not unfair discrimination).

Finally, percentage recoveries are not the only measure of how a claim is being treated. Timing of payment is also relevant. With respect to holders of PFRS Pension Claims in Class 10, the Plan provides for no distributions from assets of the City until after June 30, 2023. *See* Plan at II.B.3.q.ii.A. Class 10 is thus the *only* non-subordinated class of unsecured claims for which the Plan provides *no* distributions from assets of the City during the first nine years.

Under all of the circumstances, the differences in treatment between Classes 10 and 11 compared with other classes of unsecured claims is reasonable, proportionate to the purposes of the Plan, and not unfair.[8]

## III.   THE RETIREMENT SYSTEMS' LIMITED OBJECTIONS TO CONFIRMATION AND RESERVATIONS OF RIGHTS

The Retirement Systems support the confirmation of the Alternative A Plan. However, certain elements of the Plan raise concerns that must be addressed before confirmation.

---

[8]   The Retirement Systems also incorporate by reference herein, as applicable, their *Joinder of Detroit Retirement Systems in Certain Arguments of the Official Committee of Retirees and of the City of Detroit Regarding* Issue *Nos. 5, 9, and 10 From the June 5, 2014 Court Order Identifying Legal Issues [Dkt. No. 5235]* [Dkt. No. 5959].

25

## A.     The City Has Not Yet Provided Sufficient Evidence that the DIA Settlement Will Be Adequately Funded

A key element of the Plan relies upon the Outside Funding from all of the Funders under the DIA Settlement that will, in turn, fund the Retirement Systems as contemplated by the Grand Bargain.   Specifically, the City must provide evidence that the Foundations can and have irrevocably committed to fund a $366 million commitment over 20 years, the DIA has irrevocable commitments to fund $100 million over 20 years, and that the DIA has the financial wherewithal to support the DIA Guaranty.   That evidence has not yet been furnished to the Retirement Systems.   Unless evidence of the foregoing is firmly in hand, the DIA Settlement cannot properly be approved pursuant to Bankruptcy Rule 9019, and the Plan cannot be approved as feasible.   Moreover, in light of the proposed irrevocable transfer of the DIA's assets to a charitable or public trust, the failure to establish unequivocally the existence of such commitments and financial wherewithal would also render Plan confirmation not in the best interests of creditors.

## B.     The Benefits Restoration Program is Still Being Finalized

Plan Sections II.B.3.q.ii.C and II.B.3.r.ii.C refer to the benefits restoration program, which was a key deal point in achieving a settlement with the Retirement Systems and others regarding the principal terms of treatment of Pension Claims under Alternative A of the Plan, including specifically the investment return rate

201210755.4 14893/165083

assumption of 6.75%.  However, despite ongoing discussions, the terms of the benefits restoration program still have not been finally memorialized.  The Retirement Systems reserve all rights regarding the accurate incorporation of the benefits restoration program into the Plan, as negotiated in good faith by the Retirement Systems.

### C. Other Issues and Reservations Relative to the State Contribution Agreement, the Plan, and the Plan Confirmation Order

The Retirement Systems submit that, in light of (a) the Plan's explicit contemplation of funding levels at the Retirement Systems being potentially below 80% post-confirmation through July 1, 2023, at a minimum, by operation of the Plan, and (b) the agreement of the Retirement Systems under Alternative A to significant governance modifications and the formation of an Investment Committee overseeing investment management decisions of the Systems, the State Contribution Agreement and the Confirmation Order must include a provision eliminating or otherwise appropriately limiting the application of section 12(1)(m) of PA 436, M.C.L. § 141.1552(1)(m).  This issue has been raised by the Retirement Systems with the City and the State but has not been resolved to date. More broadly, the State Contribution Agreement itself and the accompanying Support and Release Agreement are still being finalized in certain other respects as well.  The Retirement Systems reserve all rights with respect to those documents and negotiations.

201210755.4 14893/165083

Pursuant to paragraph 3 of the *Sixth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Dkt. No. 6376-1], the Retirement Systems reserve the right to object to any changes incorporated into the Fifth Amended Plan or any successor Plan. In addition, the Retirement Systems have not received a copy of the proposed Confirmation Order and therefore generally reserve the right to object to the form and substance thereof.

## CONCLUSION

For the foregoing reasons, subject to the resolution of the Retirement Systems' limited objections described in section III above, the Plan's proposed treatment of Pension Claims under Alternative A is consistent with the Bankruptcy Code and the Court should confirm the Plan.

201210755.4 14893/165083

Dated:  August 4, 2014          Respectfully submitted,

CLARK HILL PLC

  /s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan  48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

-and-

ARNOLD & PORTER LLP
Lisa Hill Fenning
777 South Figueroa Street
44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
lisa.fenning@aporter.com


*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

201210755.4 14893/165083

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

_____

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 4, 2014, the *Brief of the Detroit Retirement Systems in Support of Proposed Treatment of Pension Claims under "Alternative A" of the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit and Statement of Reservations* was filed using the Court's CM/ECF system, which CM/ECF system will send notification of such filing to all parties of record.

CLARK HILL PLC

 /s/ Robert D. Gordon
Robert D. Gordon (P48627)
151 South Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
rgordon@clarkhill.com

Dated: August 4, 2014

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*