**City of Detroit**

# OFFICE OF THE AUDITOR GENERAL

# Audit of the Detroit Police Department's Administration of the Police Authorized Towing Process

# December 2003



JOSEPH L. HARRIS, CPA, CIA
AUDITOR GENERAL
CITY OF DETROIT

COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 208
DETROIT, MICHIGAN 48226
PHONE 313•224•3101
FAX 313•224•4091
WWW.CI.DETROIT.MI.US

# MEMORANDUM

**DATE:** September 30, 2004

**TO:** Honorable City Council

**FROM:** Joseph L. Harris
Auditor General

**RE:** Audit of the Detroit Police Department's Administration of the Police-Authorized Towing Process

**C:** Mayor Kwame M. Kilpatrick
Chief Ella M. Bully-Cummings

---

Attached for your review is our first of several reports on the audit of the Detroit Police Department's (DPD) police-authorized towing process. This audit was initiated by the Office of the Auditor General to determine the validity of allegations of improprieties committed by DPD personnel and by police-authorized tow companies, and to determine the compliance with State laws, City ordinances, DPD towing procedures, and towing contracts.

Detroit's police-authorized towing process is complex. There are 30 towing companies authorized to tow on a rotational basis or as the designated abandoned vehicle tower. There are different processes for the various types of towing assignments, and there are multiple units within the Police Department, as well as personnel at each of the 13 precincts, that are involved in aspects of the process. To facilitate an understanding of the issues, we are presenting our findings in separate reports covering the following areas:

1. Administration of the Police-Authorized Towing Process

2. Compliance with the Impounded Vehicle Towing Process

3. Compliance with the Abandoned Vehicle Towing Process

4. Vehicle Auction Process

5. Evidence Vehicles

6. Accounting and Reporting System

7. Towing Companies' Compliance with the Towing Policies and Contracts

8. Best Practices & Recommendation.

This report on the Police Department's administration of the police-authorized towing process contains an executive summary; the audit purpose, scope, objectives, and



methodology applicable to this report; process overview; findings and recommendations; and the Detroit Police Department's response.

We greatly appreciate the cooperation extended to us by the employees and management of the Detroit Police Department and the police-authorized towing companies.

**Audit of the Detroit Police Department's**
**Administration of the Police- Authorized Towing Process**

**December 2003**

**Table Of Contents**

| | | Page |
|---|---|---|
| Executive Summary | | 1 |
| Audit Purpose, Scope, Objectives and Methodology | | 5 |
| Process Overview | | 6 |
| Audit Findings and Recommendations: | | |
| 1. | Former Deputy Chief of the Management Services Bureau Exceeded His Authority | 10 |
| 2. | Award of the November 2001 Towing Contracts Did Not Follow the City's Purchasing Ordinance | 12 |
| 3. | Expansion of Towing Companies Assigned to the Precinct Rotations Was Not Warranted | 14 |
| 4. | Towing Companies Were Treated Inequitably in the Award of Precinct Towing Positions | 16 |
| 5. | Transfer of Police-Authorized Towing Contracts Were Not Pre-Approved | 17 |
| 6. | Towing Companies with Commingled Assets, Owners and Management are Treated as Separate Companies for Towing Assignments | 19 |
| 7. | Towing Contracts' Related Business Conflict of Interest Clause is Not Enforced | 22 |
| 8. | The Management Services Bureau Has Been Willing to Accept DPD's Procedural and Towing Companies' Contractual Abuses | 24 |
| Agency's Response | | Attachment A |

## EXECUTIVE SUMMARY

The Office of the Auditor General initiated this audit in response to allegations of improprieties committed by police-authorized towing companies and Detroit Police Department (DPD) personnel. The purpose of the audit was to determine whether City Ordinances, DPD towing procedures and the terms of the towing contracts were being complied with and whether the allegations of improprieties were valid.

The DPD authorizes the towing of vehicles for evidence purposes, removal of abandoned vehicles, safeguarding recovered stolen vehicles, forfeiture of vehicles for various violations, removal of road hazards, parking violators, and other reasons. There are 30 police-authorized towing companies, each of which is assigned to one or more police precincts. The Management Services Bureau (MSB) is responsible for the administration of the towing process including selecting, contracting with, monitoring and terminating police-authorized towers. MSB also oversees complaint resolution.

The Towing Rate Commission of the City of Detroit is charged with reviewing towing rates at least once every two years and with submitting its recommendations to City Council by October 1st of the year of review. The most recent change in towing rates was in 1996 although a recommendation for changes in the towing rates, made to City Council in October 2003, has not been acted upon.

Based on information obtained during our audit, we have concluded that the police-authorized towing process is poorly managed with policies and procedures either circumvented or ignored by some towers and police officers. Specific findings related to the administration of the process follow.

### Finding 1 – Former Deputy Chief of the Management Services Bureau Exceeded His Authority

We found that the former Deputy Chief of the MSB exceeded his authority, by entering into contracts and making precinct assignments that were not in conformance with DPD policies and procedures. We could find no record that the procedural changes were approved by the Chief of Police or by the Board of Police Commissioners. The City's ordinance dictates that the Board of Police Commissioners promulgates the rules and regulations under which the towing companies are called for tows. These rules provide for equitable distribution of towing when practicable. DPD's General Procedures state that those towers authorized after May 1984 may only be assigned to one precinct, and that there be between two and four towing companies assigned to each precinct. The Police Authorized towing contracts entered into in November 2001, and the associated towing company assignments, circumvented the restrictions on precinct assignments.

We recommend that police-authorized towing contract terminology be reviewed by the Chief of Police and the Board of Police Commissioners prior to the contracts being signed to insure that the contract terms conform with the rules and regulations established by the Commissioners. We also recommend that the Board of Police Commissioners review the towing rules and regulations before each contract period to determine whether they are relevant. Any changes to the process or to the precinct assignments should be incorporated into the DPD's General Procedures and the towing contract.

1

## Finding 2 – Award of the November 2001 Towing Contracts Did Not Follow the City's Purchasing Ordinance

The DPD did not adhere to the City's purchasing ordinance in awarding the November 2001 police authorized towing contracts. The DPD classified the towing contracts as professional service contracts less than $25,000, and estimated that they would pay less than $5,000 per contract. However, each of the contracts has a value of over $25,000. The contracts grant the 30 authorized towing companies access to an estimated $3.9 to $5.4 million of towing business. Therefore, the contracts' approval should follow the ordinance.

We recommend that the DPD adhere to the City's purchasing ordinance, which provides assurance that the companies awarded contracts meet the contract requirements, are able to perform the contracted services, and have the required City clearances.

## Finding 3 – Expansion of Towing Companies Assigned to the Precinct Rotations Was Not Warranted

Additional towing companies were added to the precinct towing rotation in violation of the DPD's General Procedures for towing vehicles. The DPD's General Procedures stipulate that a minimum of two and a maximum of four towing companies will be assigned to each precinct's towing rotation. In conjunction with the November 2001 towing contracts, five towing companies were assigned to 12 of the 13 precincts, a net increase of 17 rotational towing positions. The additional assignments were made despite an internal study that showed that towing assignments were adequate to meet each precinct's demand for services.

We recommend that the DPD evaluate the appropriate number of towing companies to be assigned to each precinct based on each precinct's towing requirements at contract renewal time, and use this information to make precinct towing assignments based on each precinct's requirements. The DPD's General Procedures should be updated if the DPD finds that the stipulation to assign between two and four towing companies is no longer adequate.

## Finding 4 – Towing Companies Were Treated Inequitably in the Award of Precinct Towing Positions

Ten of the 18 rotational towing positions that were filled in the precincts were awarded to six towing companies that are controlled by the same owners, managers or agents. Five towing companies, which previously did not have police-authorized towing contracts with the City, applied for rotational towing positions in 2001. Four companies were awarded one towing position each as stipulated in the DPD's General Procedures. The remaining company, associated with the controlled companies, was awarded three towing positions. When Gene's Towing was purchased in 2001, the new owner was awarded multiple towing slots in the next contract cycle. The previous owner had unsuccessfully tried to expand his towing business with the DPD. DPD procedures state that those companies authorized to tow after 1984 should be assigned to one precinct, the ordinance states that distribution of towing assignments should be as equitable as possible.

2

We recommend that the DPD follow its established procedures in awarding precinct towing assignments, and that each towing company be treated equitably. The award of precinct assignments due to an expansion of towing positions should be conducted in an equitable manner.

### Finding 5 – Transfer of Police-Authorized Towing Contracts Were Not Pre-Approved

Since 1997, DPD's police-authorized towing contracts have been transferred when companies were sold without the required DPD approval. The City's Law Department opined that the continued use of the new towing company to provide towing service gave tacit approval to the contract transfers. In most cases, the new owners have retained the previous company name. For those owners with control over multiple companies, DPD has not required that the contracts be consolidated under one name, thus allowing the development of towing conglomerates, and effectively altering the equitable distribution of tows in the City.

We recommend that the DPD continue to include the contract clause that was added to the 2001 towing contract that requires that the City be notified when a contract is transferred, and that the acquiring company apply for a new contract when more than 40% of the towing company's ownership changes. In addition, we recommend that the DPD establish procedures to address the purchase of multiple companies by a single owner or group.

### Finding 6 – Towing Companies With Commingled Assets, Owners and Management Are Treated as Separate Companies for Towing Assignments

Police-authorized towing contract applications for seven companies show there is a commingling of vehicles, storage facilities, company ownership, employees, insurance policies, and management. These companies were awarded separate police-authorized towing contracts, yet they substitute for each other in providing towing services. These companies have been awarded 20 of the 63 available rotational towing positions.

We recommend that the Board of Police Commissioners and DPD establish procedures to consider bids, and to award towing contracts to the owners of multiple companies that align with the City's ordinance requirement of providing an equitable distribution of tows among the authorized companies.

### Finding 7 –Towing Contracts' Related Business Conflict of Interest Clause is Not Enforced

While the towing contracts provided that no police-authorized tower shall have or acquire any interest that would conflict with the performance of the contract, 22 of the 30 police-authorized towers own or are associated with businesses, such as used car dealerships or parts businesses, which represent a potential conflict of interest.

3

We recommend that the DPD strictly enforce the conflict of interest clause contained in the police-authorized towing contracts. The DPD should not employ and sign a contract with a person or company having any interest, directly or indirectly, which would conflict in any manner or degree with the performance of the service under the contract.

### Finding 8 – The Management Services Bureau Has Been Willing to Accept DPD's Procedural and Towing Companies' Contractual Abuses

The DPD has acknowledged that there are widespread abuses of the towing process, perpetrated by both the towing companies and DPD personnel. These abuses, which will be detailed in subsequent reports, have been tolerated by the DPD.

We recommend that the DPD actively enforce its policies, procedures, and the towing contract provisions. A progressive system of notification and documentation should be implemented. Major offenses should result in disciplinary action or in termination of the towing contract.

4

## AUDIT PURPOSE, SCOPE, OBJECTIVES, AND METHODOLOGY

**Audit Purpose**
The Office of the Auditor General (OAG) initiated this audit in response to allegations of improprieties committed by Detroit Police Department (DPD) personnel and by police-authorized towers involved in the police-authorized towing process.

**Audit Scope**
The Office of the Auditor General conducted an audit of the Detroit Police Department's towing process to determine the DPD's and the towing companies' compliance with State laws, City ordinances, DPD towing policies, and towing contract terms and to identify industry best practices.

Our audit was conducted in accordance with Government Auditing Standards issued by the Comptroller General of the United States, except for the completion of an external quality review of the Office of the Auditor General within the last three years.

**Audit Objectives**
Our specific objectives were to determine:

- Whether changes to the police-authorized towing contracts and to the tow procedures were properly approved, including but not limited to a determination on whether towing contracts can be transferred without MSB's knowledge or approval.

- Whether the November 2001 precinct assignments were awarded in an impartial manner, whether the assignments met the department's policy of fair distribution of tows, whether the increase in the number of tow companies in each precinct was warranted, and whether the towing companies met all criteria for receiving a contract.

- Whether any police personnel and towing company relationships could be considered to be a conflict of interest.

- Whether towers have ownership interests in auto parts, auto repair, or used car businesses that could be considered a conflict of interest with performance of the towing contract duties and responsibilities.

**Audit Methodology**
To accomplish the audit objectives, our audit work included:

- Interviews with DPD management, police officers, towers, vehicle owners and others;

- Reviews of DPD towing procedures, City ordinances, and State laws for police-authorized towing;

- Reviews of tower precinct assignments and contracts;

- Reviews of tower corporate records and real estate records; and

- Reviews of the Board of Police Commissioners' minutes for the years 1999 to 2003.

## PROCESS OVERVIEW

The police-authorized towing process is performed under the laws of the State of Michigan, City of Detroit Ordinances, Detroit Police Department (DPD) policies and procedures, and the terms of the police-authorized towing contracts. The DPD is responsible for managing the towing process and for ensuring compliance with laws and regulations.

### Detroit Police Department

The Detroit Police Department authorizes the towing of vehicles for evidence, removal of abandoned vehicles, safeguarding of recovered stolen vehicles, forfeiture of vehicles for offers to engage (soliciting prostitution) and for narcotics violations, parking violations, removal of road hazards, and for other reasons, such as vehicles that represent hazards, arrests for driving under the influence, or when the vehicle owner is incapacitated.

The structure of the DPD towing process is decentralized with portions of the process being performed by many different members of the Department. DPD entities involved with the towing process include the following:

- **Management Services Bureau** - The Management Services Bureau (MSB) is responsible for the administration of the DPD towing process, including selecting, contracting, and monitoring towers; complaint resolution; and termination of police-authorized towing contracts.

- **Precinct Patrol Officers** - Precinct patrol officers determine the need for impounding vehicles. Officers are required to call the precinct tow desk to obtain the name of the next police-authorized tower in the rotation. Police officers are required to perform a Law Enforcement Information Network (LEIN) check to determine whether the vehicle is stolen. When the tower arrives, the officer is required to complete a DPD Form 406, "Impound Card," which includes vehicle identification information and a vehicle condition report. The officer is required to complete two impound cards and have the tower sign both cards acknowledging receipt of the vehicle and the vehicle's condition. One card is given to the tower. The officer fills out evidence tags for any vehicle or property to be held as evidence. The officer is required to notify the Telephone Crime Reporting Unit (TCRU) of the tow and to document the TCRU-issued number on the impound card. Officers turn in the impound cards to the precinct tow desk at the end of their shift.

- **Precinct Tow Desks** – Precinct tow desk officers assign police-authorized towers using a rotation system to ensure an equitable distribution of towing jobs among the assigned towing companies, and document the assignment. Upon receipt of the impound card from the precinct patrol officer, the precinct tow desk officer updates the tow book with the information from the card and files the card.

- **Abandoned Vehicle Officers** - Abandoned vehicle officers identify abandoned vehicles, either from citizens' complaints or while patrolling. They are required to perform LEIN system checks to determine whether the vehicle was stolen. They are required to prepare DPD Form 131, "Abandoned Vehicle Report," which documents vehicle information including vehicle condition, and tag the vehicle. The officer prepares a list of abandoned vehicles to be towed and notifies the

6

precinct's abandoned vehicle tower to tow the vehicles. Abandoned vehicle officers are required to enter towing information into the LEIN system within 24 hours of the tow. They are also required to prepare the TR-52, "Notice of Abandoned Vehicle," and send both the TR-52 and Form 131 to the Auction Unit.

- **Telephone Crime Reporting** - The Telephone Crime Reporting Unit (TCRU – 311) receives vehicle impound information from precinct patrol officers, which includes vehicle identification, the name of the tower, the location where the vehicle was recovered, and the location to which the vehicle was towed. TCRU personnel post data to the LEIN system including entering or canceling stolen vehicle information. The TCRU also notifies the owners of stolen vehicles that their vehicles have been recovered. TCRU maintains files on impounded vehicles. They also receive and investigate complaints against towers. TCRU personnel have the authority to order police-authorized towers to waive towing and storage fees.

- **Auction Unit** - The Auction Unit is responsible for mailing the TR-52 – "Notice of Abandoned Vehicle" to vehicle owners by certified mail within 7 days of towing. Auction Unit officers schedule auctions of abandoned vehicles if the owners have not responded to the notice in twenty days. They convert unclaimed impound vehicles into abandoned vehicles, and run LEIN system checks on the converted vehicles to determine whether they are stolen. Auction Unit officers are responsible for publicizing auctions in the Detroit Legal News, conducting the auction, and processing and depositing the proceeds from the auction. At auction, the TR-52 becomes the "Bill of Sale." The Auction Unit officers sign the TR-52 – "Bill of Sale" and deliver it to the buyer or to the police-authorized tower if the vehicle did not sell at auction. The Auction Unit is also responsible for inspecting the police-authorized towers' yards.

- **Commercial Auto Theft** - The Commercial Auto Theft (CAT) Unit investigates stolen and suspected stolen vehicles. CAT's responsibilities include checking vehicles at tow yards that are missing vehicle identification number (VIN) plates, and identifying the vehicles.

- **Environmental Officers** - Environmental Officers are responsible for inspecting tow yards for environmental issues and writing tickets for violations. They also are responsible for writing tickets for abandoned vehicles on private property.

## Police-Authorized Towers

The DPD does not perform any towing itself, but contracts with police-authorized towers for its towing needs. There are 30 police-authorized tow companies under contract with the City. Police-authorized towing applicants are investigated by the MSB, including a background check on the owner. Police-authorized towers are required to be Detroit-based businesses, as determined by payment of City income taxes and property taxes.

The police-authorized tow contracts include the following requirements:

- Police-authorized towers must respond to the towing site within 20 minutes of the DPD's call for service.

- Towers must maintain 24-hour service, seven days a week.

7

- Police-authorized towers' trucks must be clearly marked with the towers' name, address and phone number.
- Towers are required to have an employee available to release vehicles to owners between 7:00 a.m. and 7:00 p.m., seven days a week.
- Police-authorized towers are required to provide storage for a minimum of twenty vehicles at its principal place of business.
- Towers must secure proper zoning approval for their storage lot.
- Towers are required to submit, by the 10th of each month, a complete list of unclaimed vehicles authorized by the DPD to be impounded at their lot.
- Police-authorized towers are responsible for damage to and theft of any vehicle and the parts, accessories and equipment attached, installed or affixed, or any contents in the vehicle while in the towers' custody.
- Towers are required to possess insurance to indemnify and hold the City harmless for injury and damages resulting from a police-authorized tow or storage.
- Towers must obtain MSB approval to subcontract.
- Towers must notify MSB when more than 40% of the company ownership changes and must apply for a new contract.

By signing the towing contract, police-authorized towers covenant that there is no City employee or public official who has any function or responsibility in the review or approval of the undertaking or carrying out of the contract who has any personal or financial interest, direct or indirect in the contract or proceeds of the towing entity.

There are currently between three and five towers authorized to perform police tows in each precinct, as well as a designated primary and secondary abandoned vehicle tower. Until the 2001 contracts, authorized tow companies were allowed to tow in only one precinct unless they had been authorized to tow in more than one precinct prior to 1984.

The current police-authorized towers and their assigned precincts are listed below.

| Precinct | Rotational Tower | Primary Abandoned Vehicle Tower |
|---|---|---|
| 1 | Boulevard &Trumbull, Executive, and Gene's | Boulevard &Trumbull |
| 2 | DAR, Gilchrist, J & C, Murff, and Muscat | Gilchrist |
| 3 | AC, Gene's, Javion & Sam's, Red's, and Washington | Boulevard &Trumbull |
| 4 | Boulevard &Trumbull, Citywide, E & G, Javion & Sam's, and Red's | Javion & Sam's |
| 5 | B & G, Elite, H & B Land, Nationwide, and Wayne's | B & G |
| 6 | Citywide, DAR, J & C, MARS, and Muscat | MARS |
| 7 | B & G, Gene's, Hemphill, Nationwide, and Wayne's | Long |
| 8 | B & G, DAR, J & C, Muscat, and V & F | J & C |
| 9 | B & G, Elite, Executive, LIJBS, and Wayne's | Troy |
| 10 | ABA, Area, Boulevard & Trumbull, Gilchrist, and Javion & Sam's | Red's |
| 11 | B & G, Executive, Seven D, Tri-County, and Wayne's | B & G |
| 12 | ABA, Bobby's, DAR, Tri-County, and Troy | LIJBS |
| 13 | AC, Area, Citywide, Gene's, and Hemphill | Tri-County |

The police-authorized towers agree not to solicit towing business out of, or derived from, recovered stolen vehicles and agree to avoid probing into or tampering in any way with

8

automobiles suspected as stolen. Upon discovery of a stolen vehicle, the tower is required to immediately contact the DPD, and to apprise them of the vehicle's location and condition.

For tows to private storage lots, police-authorized towers are compensated for towing impounded or abandoned vehicles when the vehicle owner or insurance company redeems the vehicle. Towers are compensated for their towing and storage fees for unredeemed vehicles from auction proceeds. If a vehicle is not sold at auction, the vehicle is turned over to the tower as compensation for towing and storage fees.

## Towing Rate Commission

The Towing Rate Commission is comprised of the Auditor General (Chairperson), the Director of Consumer Affairs or a designated representative, the Chief of Police or a designated representative, a public representative appointed by the Mayor, and a representative of the towing industry appointed by the City Council. The Towing Rate Commission is charged with reviewing towing rates at least once every two years and submitting its recommendation to City Council by October 1st for review. A modification of the towing rates was recommended by the Commission in October 2003; however, the City Council has not approved the recommendation. The last change in towing rates was in 1996. The rates apply to tows authorized by the DPD.

# FINDINGS AND RECOMMENDATIONS

## 1. Former Deputy Chief of the Management Services Bureau Exceeded His Authority

The Deputy Chief of the Management Services Bureau (MSB) has the responsibility to oversee and manage the police-authorized towing process. In that capacity, the Deputy Chief accepts and approves applications for police-authorized tow companies; establishes the precinct rotational tow company assignments; selects the abandoned vehicle tow company for each precinct; enters into contracts with the towing companies; resolves complaints involving towing companies; and oversees and manages the City's police-authorized towing process in accordance with applicable state laws, City ordinances, department policies and procedures and towing contracts.

The former Deputy Chief of the MSB entered into contracts with towing companies and made precinct-towing assignments that are contradictory to DPD policies and procedures. For example:

| DPD General Procedures | Changes Made in Conjunction with the November 2001 Police Authorized Tower Contract |
|---|---|
| Paragraph 13.0 states:<br>There shall be a minimum of two and a maximum of four authorized towers in each precinct. | • Additional towers were added to all precincts, which increased the number of assigned towing companies to five in 12 of the 13 precincts.<br>• See Finding 3. |
| Paragraph 13.9 (j) states that the Applicant will:<br>Be authorized in only one precinct, unless at the time of implementation of these standards [5/24/84], the company was already authorized in more than one precinct. | • Existing companies, with one or more precinct assignments, were expanded to more precincts.<br>• A newly authorized towing company was granted towing assignments in three precincts.<br>• See Finding 4. |

While the Deputy Chief of the MSB is granted the authority by the DPD to enter into contracts, he does not have the authority to change department policies or procedures. Authority to change the DPD's policies and procedures is reserved to the Chief of Police and the Board of Police Commissioners. We could find no evidence that the Chief of Police or the Board of Police Commissioners approved the former Deputy Chief's changes to the police-authorized tow process or to the police-authorized tower contracts as required by City Charter and by department policy.

The DPD's procedure for amending departmental policies and procedures are established in the City Charter and in the Department's General Procedure manual:

Section 7-1106 of the City Charter states in part:

The chief of police is the chief executive officer of the police department and shall administer the department under the policies, rules, and regulations established by the board and shall: ...

2. Recommend rules, regulations, and procedures to the board for its approval.

10

And, Section 7-1103, states in part:

> The board [Board of Police Commissioners] shall:
>
> 1. In consultation with the chief of police, and with the approval of the mayor, establish policies, rules and regulations.

These sections have been incorporated into the Department's manual, which states:

> Directives are in full force and effect until superseded or amended. The chief of police shall recommend rules, regulations and procedures (Directives) to the Board of Police Commissioners for their approval (City Charter 7-1106).

The DPD exercised inadequate oversight of the MSB's management of the police-authorized towing process.

Current towing contracts are in conflict with DPD policies and procedures. The Department's long-standing objective, as stipulated by the City's ordinance, of providing equal distribution of towing opportunities among the authorized towing companies is not being achieved.

**We recommend, that:**

1 a - The Deputy Chief of the Management Services Bureau's ability to enter into contracts be restricted. Contracts should be reviewed internally by the Chief of Police and the Board of Police Commissioners prior to the approval of the contract to insure that the contract terms, conditions, and precinct assignments meet the Department's objectives.

1 b - Prior to every new towing contract period, the Board of Police Commissioners, in conjunction with the Police Chief and the MSB, should review DPD's towing policies and procedures to determine whether they are still current and relevant. Any changes in the objective and/or policies should be formally incorporated into the City's ordinance and the DPD's procedures to insure that the towing process stays up to date.

11

## 2. Award of November 2001 Towing Contracts Did Not Follow the City's Purchasing Ordinance

The DPD's police-authorized towing contracts grant certain towing companies (currently 30) the authority to tow citizens' vehicles when requested by DPD. Overall, the police-authorized towing contracts allow access to approximately 65,000[1] towed vehicles annually. As a result of the contract award, the police-authorized towing companies are entitled to payments for towing services from vehicle owners, the owners' insurance companies, or from the DPD.

- Estimates of the gross revenues generated from the police-authorized towing contract range between $3.9 and $5.4 million[2] for calendar year 2002; an average of $130,000 to $180,000 per towing company.

- Between January and December 2002, the City made payments averaging $5,601 to 23 of the police-authorized towing companies through the City's financial system. Individual companies were paid between $54 and $37,679 during this time period.

The City's purchasing ordinance, Section 18-5-5 (a) stipulates in part that

> The following contracts and amendments thereto shall not be entered into without City council approval: goods and services over the value of Twenty-Five Thousand Dollars ($25,000.00); all contracts for personal services, regardless of the dollar value; all grant-funded contracts; all revenue contracts, regardless of dollar value, including contracts for services rendered by the City, its departments and agencies; and all purchases and sales of and other transfers of interest in municipal land.

Communication between the DPD, the Law Department, and Purchasing during the development of the 2001 towing contract indicates their decision that the request for quotation (RFQ) for towing services would be treated as the procurement of Professional Services under $25,000. Further, they anticipated that DPD's payments under each contract would be less than $5,000. The communication concluded that the contracts would therefore not require City Council approval.

The services provided by the towing contracts have a value in excess of $25,000 and the contracts should be subject to City Council approval. Because they were not treated as such, the City had no oversight of the towing contracts entered into between the former Deputy Chief of the MSB and the towing companies. Therefore, the City had no assurance that the companies awarded contracts met the contract requirements, were able to perform the contracted services, and had the required City clearances.

---

[1] The exact number of vehicles towed at the request of the DPD annually is not known. A review of towing company records indicated that 62,291 vehicles were towed in calendar year 2002. This figure did not include the abandoned vehicles towed by B&G. We believe this number is low, as the number of abandoned vehicles reported towed by DPD was 26% higher than the number reported by the towing companies, and did not include vehicles from three precincts.
[2] This estimate is based on the number of redeemed and auctioned vehicles provided by the towing companies, and assumes an average towing and storage charge between $75 and $125 for vehicles redeemed, and that all vehicles taken to auction were scrapped. This estimate is likely low.

12

**We recommend that:**

2 a - The DPD exercise due care to award towing contracts only to those companies that are qualified, honest, and reliable since the public is required to redeem their vehicles from those companies.

2 b - The DPD process towing contracts in accordance with the City's purchasing ordinance, including final approval by City Council.

13

### 3. Expansion of Towing Companies Assigned to the Precinct Rotations Was Not Warranted

In November 2001, one or more additional towing companies were added to the call rotation in every precinct, increasing the number of towers assigned above the maximum of four in 12 of the 13 precincts. The expansion increased the number of rotational tow assignments by a total of 17 positions. One towing company no longer provides service in the 7th precinct, so a total of 18 rotational towing positions were filled.

The expansion of rotational towing positions was not based on increased towing requirements in the precincts. In fact, a Sergeant assigned to the Abandoned Vehicle Task Force conducted an evaluation of the number of towing companies each precinct required to meet its everyday needs. The results of the evaluation were detailed in an October 2000 Inter-Office Memorandum. In every precinct, except the 12th, the Sergeant reported that the precinct representatives stated, "They have not experienced any problems with delays for towing service." The evaluation indicated that the number of towing companies assigned to each precinct was adequate for the precincts' towing demands.

| Precinct | Number of Towers Assigned | | | |
| | Oct. 1990 | Apr. 1997 | Prior to 2001 Contract | Nov. 2001 |
|---|---|---|---|---|
| 1 | 2 | 2 | 2 | 3 |
| 2 | 4 | 4 | 4 | 5 |
| 3 | 4 | 4 | 3 | 5 |
| 4 | 4 | 4 | 3 | 5 |
| 5 | 3 | 3 | 3 | 5 |
| 6 | 3 | 3 | 4 | 5 |
| 7 | 4 | 4 | 4 | 5 |
| 8 | 4 | 4 | 4 | 5 |
| 9 | 4 | 3 | 4 | 5 |
| 10 | 4 | 3 | 4 | 5 |
| 11 | 3 | 4 | 4 | 5 |
| 12 | 4 | 3 | 3 | 5 |
| 13 | 3 | 4 | 4 | 5 |
| Total | 46 | 45 | 46 | 63 |

An objective of the procurement process is to match supply and demand to ensure that there is an appropriate level of goods and services to meet ongoing operational requirements. In the procurement of police-authorized towing companies, the DPD should endeavor to match its contracted towing resources to its anticipated towing requirements. However, that objective is superseded by Paragraph 13.0 of the General Police Procedures, which states "There shall be a minimum of two and a maximum of four authorized towers in each precinct."

Inadequate oversight of the MSB's management of the police-authorized towing process allowed additional towing companies to be assigned to the precincts' authorized towing company rotation beyond the number stipulated in the DPD's General Procedures, and beyond the number required to meet each precinct's demand.

The result of the addition of towing companies to the precinct rotation was to decrease the individual towing companies' business. Towing companies that were previously called 25% (1 in 4 calls) or 33% (1 in 3 calls) of the time, are now called 20% (1 in 5 calls) of the time. The addition of another towing company has reportedly had a deleterious financial impact on the smaller towing companies.

**We recommend that:**

3 a - The Police Chief and the Board of Police Commissioners conduct an evaluation to determine the appropriate number of towers in each precinct prior to the next contract renewal.

3 b - The analysis should determine any shortcomings in meeting each precinct's demands, if any, including the identification of towing companies that are not performing in compliance with the contract terms, and an evaluation of the number of trucks needed by each tow company to perform the required work. This information should then be used to assign the appropriate number of towing companies to each precinct, and to determine whether the towing companies have adequate resources to meet the precinct's demand.

### 4. Towing Companies Were Treated Inequitably in the Award of Precinct Towing Positions

Ten of the 18 towing positions that were opened in the precincts were awarded to six towing companies that are controlled by the same owners, managers, or agents, while eight independent towing companies were awarded the remaining eight positions.

Five towing companies, which previously did not have police-authorized towing contracts with the City, applied for rotational towing position prior to the award of the 2001 contracts. Four companies were awarded one towing position each as stipulated in the DPD's General Procedures. The remaining company was awarded three towing positions.

In most cases, the number of rotational precinct towing spots assigned to the acquired company in the next towing contract cycle was the same both before and after the sale. However, when Gene's Towing was purchased in 2001, the new owner was awarded multiple towing slots in the next contract cycle. The previous owner had unsuccessfully tried to expand his towing business with the DPD.

Procurement policies should provide for the fair and equitable treatment of all vendors through the standard application of purchasing procedures. The procedures should ensure that suppliers are reliable, financially stable, and are able to satisfy the contract demands. Furthermore, DPD procedures limit the newer police-authorized towers to one precinct. Paragraph 13.9 (j) of the Police Department Manual states that the Applicant will:

> Be authorized in only one precinct, unless at the time of implementation of these standards [5/24/84], the company was already authorized in more than one precinct.

Inadequate oversight of the management of the police-authorized tow process by the DPD allowed the expansion of the DPD precinct assignments and for the award of precinct towing positions in an inequitable manner. The dominant owner controls 32%, or 20 of the 63 rotational towing spots.

**We recommend that:**

4 a - The MSB establish procedures to award rotational towing spots in an equitable manner. The MSB, in conjunction with the Purchasing Department, should establish a bid review and approval process for awarding towing contracts that results in the equitable treatment of all towing companies that apply.

## 5. Transfer of Police-Authorized Towing Contracts Were Not Pre-Approved

Historically, the Police Department's towing agreements and contracts have expressly prohibited the unauthorized sale or transfer of the police-authorized towing contract. Since 1997, the DPD has allowed the transfer of 11 towing contracts, in some cases to the owners of competing towing companies. In most cases, the new owners have retained the previous company name. For those owners with control over multiple companies, DPD has not required that the contracts be consolidated under one name, thus allowing the development of towing conglomerates, and effectively altering the equitable distribution of tows in the City.

A summary of the transfers that have occurred since 1997 follow:

| Year | Old Towing Company / Old Owner | New Towing Company / New Owner | Number of Precincts Prior to Sale | Number of Precincts Following Sale |
|---|---|---|---|---|
| 1997 | Boulevard & Trumbull (G. Fiore, owner) | Boulevard & Trumbull (Road One, owner – G. Fiore, President) | 3 | 3 |
| 1997 | Javion & Sam's (S. Jolly, owner) | Javion & Sam's (Road One - Miller Industries, owner – J. Fiore, manager) | 3 | 3 |
| 1998 | Troy Auto Parts (Martin Osowski) | Troy Auto Parts (Keith Feagain) | 3 (Abandoned vehicle tower only) | 3 (Abandoned vehicle tower only) |
| 1999 | Troy Auto Parts (Keith Feagain) | Troy Auto Parts[3] (G. Fiore, owner) | 3 (Abandoned vehicle tower only) | 2 (One rotational and one abandoned vehicle) |
| 1999 | E & G (E. Dennis, owner) | E & G (Road One, owner – G. Fiore, President) | 1 | 1 |
| 1999 | B & G (B. McGuire, owner) | B & G (J. Fiore, owner) | 2 | 2 |
| 2001 | All American (J. Melville, owner) | Detroit Auto Recovery (J. Morton, owner) | 4 | 4 |
| 2001 | Gene's (E. Moultrie, owner) | Gene's Towing (J. Fiore – owner) | 1 | 4 |
| 2002 | Boulevard & Trumbull (Road One, owner – G. Fiore, President) | Boulevard & Trumbull (G. Fiore, President J. Fiore, Agent) | 3 | 3 |
| 2002 | Javion & Sam's (Road One - Miller Industries, owner – J. Fiore, manager) | Javion & Sam's (G. Fiore, President J. Fiore, Agent) | 3 | 3 |
| 2002 | E & G (Road One, owner – G. Fiore, President) | E & G (G. Fiore, President J. Fiore, Agent) | 1 | 1 |

While there was correspondence in the DPD files documenting the sale of the aforementioned police-authorized towers and their contracts, we could not find any

---

[3] Currently operating as Troy Auto-Bans.

written DPD or other City approval authorizing the transfer of the police-authorized towing contracts. The only instance where the transfer was formally approved, after the fact, was the purchase of Troy Auto Parts. A recent Law Department opinion indicates that the City's continuation of towing services, subsequent to learning of the ownership transfer, tacitly approved the towing contract transfer to the new owner.

Prior to 2001, the letters of understanding dictating the towing terms between the DPD and the towing companies expressly forbid the sale or transfer of a police-authorized towing contract. The 2001 towing contract was changed to require the City's notification of a change in company ownership and the requirement that the contract be re-bid, as follows:

> This agreement is not transferable and may not be sold, leased, or assigned in any manner accept as provided herein. In the event that a corporate contractor is subject to a change of ownership equal to forty per cent or more of its controlling interests, it must notify the City of this circumstance and apply for a new contract.

Prior to the award of the towing contract, the towing company completes an application that indicates the location and capacity of its storage lot, equipment available to provide towing services, a list of employees, hours of operation, the required licenses and insurance policies, and other operational information. The award of the contract is based on the information provided and on the company's prior performance. When a contract is transferred, the DPD has no assurance that the resources indicated on the application form will be available for the performance of the contract. Alternate vehicle storage lots may be used, vehicle storage capacity may differ, employees may not be the same, and the trucks may vary in type and number, which could adversely affect the towing company's performance of the contracted services.

Because most of the towing contract transfers have been to the same purchaser, a dominant police-authorized towing conglomerate has emerged. The dominant owner controls 32%, 20 of the 63 rotational towing spots. Every third call requesting police-authorized towing services is now directed to a company controlled by the dominant owner.

**We recommend that:**

   5 a - The DPD continue to include the contract clause that was added to the 2001 towing contract that requires that the City be notified when a contract is transferred, and that the acquiring company apply for a new contract when more than 40% of the towing company's ownership changes. In addition, we recommend that the DPD establish procedures to address the purchase of multiple companies by a single owner or group.

## 6. Towing Companies With Commingled Assets, Owners and Management Are Treated as Separate Companies for Towing Assignments

A married couple have acquired control of many of the transferred towing contracts, and the seven companies they own, manage, or are employed by have been awarded an increasing number of rotational towing positions. While the towing companies are separately registered with the State, the awarding of towing contracts to the separate companies, in our opinion, is misleading as the companies' assets, activities, and control are commingled. DPD treated the companies as separate entities for the award of rotational towing positions, and has awarded the companies 20 of the 63 rotational towing positions.

Information from the police-authorized towing applications submitted for consideration in the award of the 2001 towing contracts, shows that:

- Individual companies were awarded separate contracts although they share resources including: storage lots, licenses, operational information, on-site equipment, employees, trucks to respond to tow requests, and insurance polices.

- One or both of the two owners are listed as employees on six of the seven police-authorized towing applications. An updated application form was not submitted for the seventh company subsequent to its purchase from the previous owner. The purchase was made between the application and award dates.

In addition,

- It is common for these companies to substitute for each other in providing services in precincts in which they are not authorized to tow. The towing contract states that unapproved subcontracting is prohibited.

- The company managing the DPD's Evidence Lot uses a related company's internally created abandoned vehicle forms, rather than forms containing its own name or the standard DPD form.

- The companies appear to have the same lawyer. Income tax clearance forms for six of the companies were faxed to the DPD by the same clerical staff.

- Towing records for three of the companies were so intermingled they had to be reviewed together, with the assistance of a company employee.

A summary of the information submitted on the towing contract application forms for the related companies is summarized in the chart on the following page.

| Towing Company | Storage Lot | Licenses | Operational Info | On-Site Equipment For Heavy Duty Towing | Employees | Active Fleet | Insurance |
|---|---|---|---|---|---|---|---|
| B & T | 2411 Vinewood<br><br>7900 Dix Rd. | MPSC - L-19335<br><br>USDOT – 803007<br><br>FHA – MC357231B | Room to store 4,500 vehicles<br><br>Business hours Etc. | 12 Types of Equipment Listed | 76 Employees Listed by Name | | |
| E & G | Same as B & T | Same as B & T | Same as B & T | Same as B & T | B & T List + Person identified as owner (77 total) | List of B&T Road One Active Fleet List | B&T Insurance Certificate Attached |
| B & G | 8100 Lynch Rd. | MPSC – L-27536<br><br>USDOT – 512986<br><br>FHA – MC372928B | Room to store 2,800 vehicles<br><br>Business hours Etc. | 7 Types of Equipment Listed | 10 Employees Listed by Name | 5 Trucks Owned<br><br>4 Trucks Brokered | Insurance Policy Lists City Wide as Insured |
| City Wide | 2760 West Warren | Same as B & G | Room to store 600 vehicles | Do not perform heavy duty towing | 7 Employees, Listed, 6 are on B & T's List | 3 Trucks Leased from B & G | Insurance Policy Lists B & G as Insured |
| Javion & Sam's | Same as B & T | MPSC – L-25599<br><br>USDOT – Same as B & T<br><br>FHA – Same as B & T | Same as B & T | Same as B & T | Same as B & T | | |
| Troy Auto-Bans | Same as B & G | Not Listed | Room to store 2,500 vehicles | Do not perform heavy duty towing | 3 Employees Listed, 3 Brokered Employees Hired for Job | Brokered employees provide own vehicles | Provided under Master Coverage of B&T policy |
| Gene's | Same as B & T | Previous Owner Completed Application | Previous Owner Completed Application | Previous Owner Completed Application | Previous Owner Completed Application | Previous Owner Completed Application | Previous Owner Completed Application |

Ordinance and procedures related specifically to towing, include:

City Ordinance 393-H, Chapter 38, Section 38-1-32.7 (a) states:

The Board of Police Commissioners shall also promulgate and publish the rules and regulations that it uses to determine which towers shall

20

be called for tows under this chapter. Such rules shall as nearly as practicable, provide for equitable distribution of police-authorized towing to all towers on the list of qualified towers.

Volume III. Chapter 11, Section 13.10, of the DPD's General Procedures entitled "Distribution of Tows," states:

Precincts shall contact authorized police towers on a rotating basis when requesting service. If an authorized tower is called but is not available, the tower shall be placed at the end of the list and the next tower on the list shall be called.

The City's towing ordinance does not address the distribution of towing assignments when one owner owns multiple companies.

It appears that the owners of the related companies have manipulated the police-authorized towing process, specifically the use of the authorized towing list and the rotational procedures in order to secure a larger share of DPD's towing business. The seven companies, having common owners, management and employees, have been awarded 20 of the 63, or 32% of the precinct rotational towing positions. This does not result in the equitable distribution of the City's police-authorized towing business among the other 21 towing company owners. Smaller towing companies have experienced economic hardship due to the reduction in towing opportunities.

**We recommend that:**

6 a - The DPD consider the public policy objectives of the City's police-authorized towing process, and incorporate those objectives into the DPD towing procedures. Procedures on how the DPD should consider bids from the owner of multiple companies should also be included. Require that each company that is awarded a contract have sufficient resources to meet the terms of the contract it has been awarded.

6 b - The DPD should incorporate the public policy objectives into the new towing contracts and enforce compliance with contractual terms.

21

## 7. Towing Contracts' Related Business Conflict of Interest Clause is Not Enforced

Many police-authorized towers own or are associated with automobile repair businesses, auto parts businesses, and used car dealerships, which create a conflict of interest either in appearance or in fact. During our audit, we found that 22 of the 30 police-authorized towers are associated in some way with a business that could benefit from its police-authorized impounds.

Towing company involvement in repair shops, used part dealers and used vehicle dealers creates an environment where the police-authorized towing companies have an opportunity to manipulate the towing system to benefit their related businesses. Circumstances in which towers can manipulate the system include:

- The types of vehicles that are towed – newer, and in better condition – can impact whether the tower will be paid for the towing service or for the vehicle itself. Owners of newer vehicles are more likely to redeem the vehicle.

- Timing of the notification of the TCRU dictates the amount the vehicle owner will be charged for towing and storage fees. In some instances, the towing companies have assumed the DPD's job to notify TCRU of the tow.

- Accumulated towing and storage fees set the minimum bid at auction, and can determine whether the vehicle will be sold or whether the tower will receive the vehicle as compensation.

- Timing of the recovery of stolen vehicles can impact whether insurance companies will redeem the vehicle. Insurance companies usually settle with the owner of a stolen vehicle within 30 days of the vehicle theft.

- For vehicles needing repair, towing companies are in a position to recommend their related auto repair shops. The fee for the second tow is not subject to the City's approved fee schedule.

A conflict of interest is defined as any relationship that is or appears to be not in the best interest of the organization or the public, in this case the DPD and the citizens. A conflict of interest exists if such a relationship would prejudice an individual's ability to perform his or her duties and responsibilities objectively. Section 12 of the Police-Authorized Tower Contracts contains conflict of interest provisions. Section 12.01 follows:

> The Contractor covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of the Services under this Contract. The Contractor further covenants that in the performance of this Contract no person having any such interest shall be employed by it.

Vehicle owners and insurance companies are forced to pay higher towing and storage fees when they are not properly notified that their vehicle has been towed, or when towing companies add additional fees to the amount billed the customer. Citizens are forced to pay higher insurance premiums when recovered stolen vehicles go unreported.

**We recommend that:**

7 a - The DPD strictly enforce the conflict of interest clauses contained in the police-authorized towing contract. The DPD should not employ and sign a contract with a person or company having any interest, directly or indirectly, which would conflict in any manner or degree with the performance of the service under the contract.

7 b - The auction process should be changed so that unsold vehicles do not become the property of the towing companies, and unsold scrap vehicles should be required to be disposed of within 30 days.

### 8. The Management Services Bureau Has Been Willing to Accept DPD's Procedural and Towing Companies' Contractual Abuses

Anecdotal and documentary evidence indicates that there are widespread abuses of the towing process, perpetrated by both towing companies and DPD personnel. Among the specific abuses that will be detailed in subsequent reports are:

- Patrol officers call the towing companies directly, rather than use the precinct's tow company rotation.

- Towing companies have been caught towing stolen vehicles without the proper authorization.

- Stolen vehicles have been recovered on some towing companies' storage lots by auction unit officers.

- Both DPD and towing company personnel do not complete the vehicle condition section on the towing forms.

- Improper amounts are charged for towing and storage to owners redeeming their vehicles.

- Towing and storage fees are erroneously reported to the auction unit for vehicles to be auctioned.

These abuses are acknowledged by the DPD, and have been allowed to continue.

State law, DPD procedures, City ordinances and the towing contracts establish both the responsibilities of the towing companies and the DPD within the towing process. Sound management practice dictates that policies and procedures, in accordance with organizational objectives, be followed, and that corrective actions be taken to curb non-compliance.

The City's streets should be cleared of vehicles by the towing companies that have contracted to do so. The DPD rarely penalizes a towing company or an officer for failing to follow procedures.

Non-enforcement of compliance with policies and procedures has resulted in widespread abuses. Poor record keeping of vehicles towed and the vehicle condition, results in the inability to track individual vehicles, to determine whether damage has occurred while the vehicle is in the towing companies' possession, or whether vehicle owners are charged the correct amount for towing services. Vehicle owners and insurance companies are frequently overcharged for vehicles that are redeemed, and stolen vehicles are routinely discovered on towers lots that have not been properly reported.

**We recommend that:**

8 a - The DPD actively enforce its policies, procedures, and the towing contract provisions. A progressive system of notification and documentation should be implemented. Major offenses should result in disciplinary action or in the termination of the towing contract.



DETROIT POLICE DEPARTMENT
CHIEF ELLA M. BULLY-CUMMINGS

1300 BEAUBIEN, SUITE 303
DETROIT, MICHIGAN 48226
PHONE 313•596•1800
CHIEFOFPOLICE@DPDHQ.CI.DETROIT.MI.US

August 23, 2004

Mr. Joseph L. Harris
Office of the Auditor General
Coleman A. Young Municipal Center
2 Woodward Avenue, Room 208
Detroit, Michigan 48226

*SUBJECT:* **AUDIT OF POLICE AUTHORIZED TOWING PROCESS**

Dear Mr. Harris:

The Detroit Police Department is submitting the following responses to the draft findings and recommendations of the December 2003 *"Audit of the Detroit Police Department's Administration of the Police Authorized Towing Process,"* as prepared by the Office of the Auditor General.

### FINDING 1: DEPUTY CHIEF OF THE MANAGEMENT SERVICES BUREAU EXCEEDED HIS AUTHORITY.

**Response to Finding:** The current contracts were negotiated prior to my tenure as Chief of Police and also as Assistant Chief of Police of the Administrative Portfolio. Preliminary information received indicates that some concerns existed in this area. The former deputy chief was relieved of his position and retired.

**Response to Recommendations:**

**1a -** The department agrees, in part, with the recommendation. Henceforth, towing contracts will be reviewed prior to their signing by the Chief of Police to ensure contract terms and precinct assignments meet Department objectives. The City Charter does not provide that the Board of Police Commissioners is extended the authority to approve contracts. This approval is part of the Chief of Police's responsibility to facilitate the day to day operations of the Police Department and should remain under his/her purview. Information will be made available to the Board of Police Commissioners, as it is warranted.

KWAME M. KILPATRICK, MAYOR



**1b -** The department agrees in part with this recommendation. The Deputy Chief of the Management Services Bureau shall be responsible for reviewing the current tow contract and relevant City policies or ordinances pertaining to the tow process. Additionally, the Deputy Chief of the Management Services Bureau will be responsible for recommending any departmental policy changes as it pertains to the tow process. The Deputy Chief of the Management Services Bureau shall be responsible for preparing a draft contract and any department policy change recommendations for review and approval of the Chief of Police. Department policy changes must be reviewed and approved by the Board of Police Commissioners.

**FINDING 2: TOWING CONTRACTS AWARDED WITHOUT CITY COUNCIL APPROVAL.**

**Response to Finding:** The department agrees that it appears the prior administration did not adhere to the City's purchasing ordinance, Section 18-5-5 (a).

**Response to Recommendations:**
    **2a -** The department agrees with this recommendation. The department will ensure that all companies are qualified as defined by the tow contract *"Scope of Services."*

    **2b -** The department will ensure that future tow contracts comply with the City's purchasing ordinance and are approved by City Council.

**FINDING 3: UNWARRANTED ADDITION OF TOWING COMPANIES TO THE PRECINCT TOWING ROTATION.**

**Response to Finding:** The department is currently examining the records giving rise to this finding to ensure that the number of towers allocated to each precinct is not excessive and sufficient to meet the needs of the community.

KWAME M. KILPATRICK, MAYOR



**Response to Recommendations:**

**3a -** The department agrees, in part, with this recommendation. Current policy provides that a minimum of two (2) towing companies are assigned to each precinct. However, the Management Services Bureau has begun the process of gathering statistical information to access the towing needs of each precinct for the next tow contract process. A recommendation will be forwarded to the Chief of Police for approval.

**3b -** The department agrees with this recommendation. As stated in 3a, the department is currently analyzing the towing needs of each precinct. A systematic approach has been developed that will fairly assess each precinct's towing requirements. This evaluation will be the basis for developing the tow contract *"Scope of Services."*

### Finding 4: Inequitable Treatment of New Towing Companies in the Award of Precinct Rotational Towing Spots.

**Response to Finding:** I will ensure that the department's policy and procedures which provide for impartial, equitable treatment of towing companies is strictly adhered to. Measures have begun to address this issue.

**Response to Recommendation:**

**4a -** The department agrees with this recommendation. The department's strategic technological plan includes an automated tow rotational module that will electronically award towing assignments in an equitable manner. The Deputy Chiefs of Management Services Bureau and the Science and Technology Bureau will collaborate on this project that is expected to become operational in the spring of 2005. The Deputy Chief of the Management Services Bureau will work closely with the Director of the Purchasing Department to ensure a fair and equitable tow bid process.

In the interim, the Management Services Bureau has been tasked to monitor department practice in this area to ensure compliance. Currently, the Precinct LEIN operator—overseen by the Officer in Charge of the Precinct Desk—is responsible for maintaining the assignments to



towers, on a rotational basis. The abandoned vehicle tower is an exception. Each precinct is assigned a primary and a secondary abandoned vehicle tower; after the lot of the primary tower is full, the secondary tower is assigned towing requests.

### FINDING 5: UNAPPROVED TRANSFER OF POLICE AUTHORIZED TOWING CONTRACTS.

**Response to Finding:** I will ensure that all transfers of police authorized towing contracts are addressed in accordance with guidelines.

**Response to Recommendation:**

**5a -** The department agrees with this recommendation. The current tow contract expires in March 2005. The Management Services Bureau will enforce the new contract terms and take the appropriate action as dictated by the contract when company ownership changes by 40% or more.

### FINDING 6: SEVEN COMPANIES AWARDED TOWING CONTRACTS ALTHOUGH TOWING ACTIVITIES AND RESOURCES ARE CLEARLY COMMINGLED.

**Response to Finding:** The department agrees that it appears as though, during the prior administration, towing activities and resources were commingled.

**Response to Recommendations:**

**6a -** The department agrees with this recommendation. The Management Services Bureau, as stated in 3a and 3b of this memorandum has begun the process of reviewing and assessing department towing needs, in addition to making policy recommendations to the Chief of Police regarding departmental towing procedures. The contract and bid process will require that each company operate independently and has the necessary resources to meet department needs.



**6b** - The department agrees with this recommendation. The contract will strictly prohibit the commingling of resources to circumvent the rotational process and will include specific language and sanctions for non-compliance of contract terms.

### FINDING 7: NON-ENFORCEMENT OF THE TOWING CONTRACT'S CONFLICT OF INTEREST CLAUSE.

**Response to Finding:** The department agrees that some abuses as reported in this audit may have occurred in the awarding of the 2001 contracts under the prior administration.

**Response to Recommendations:**
**7a** - The department agrees with this recommendation. In order to prevent a conflict of interest, a complete investigation of the prospective tow owner's assets will be required, prior to awarding towing contracts. Every prospective City of Detroit contracted tower shall be required to complete a disclosure statement. The disclosure statement will be incorporated within the towing contract and verified by the City of Detroit Purchasing Department and the Management Services Bureau. Failure to adhere to the disclosure clause, once the contract is awarded, may result in the termination of the contract or suspension of services as defined by the contract terms.

**7b** – In regard to the recommendation to re-engineer the auction process as it relates to ownership of unsold vehicles and a timeline for the destruction of unsold scrap vehicles, the department will have its legal team research State law on the possibility of instituting such guidelines, to ensure that the department falls within its authority.

### FINDING 8: WILLINGNESS TO ACCEPT DPD AND TOW COMPANY PROCESS ABUSES TO GET AUTOMOBILES TOWED.

**Response to Finding:** While the Detroit Police Department is committed to improving the quality-of-life for residents of the city of Detroit, removal of vehicles from neighborhoods continues to dominate the list of top 10



complaints, as reported in the City of Detroit Office of the Ombudsman's Budget Analysis Report, dated April 20, 2004. We have not abrogated our responsibility of dealing with abuses of the tow process by police personnel or tow companies because of the great demand to rid the streets of abandoned vehicles by ignoring these violations. The department is working diligently to meet the ever-increasing demands for removing vehicles that pose safety and environmental hazards.

**Response to Recommendation:**

**8a -** The department agrees with this recommendation. Our efforts to meet the administrative tasks associated with the tow process have been daunting and challenging. However, as recommended in your report, a progressive system of notification and documentation will be implemented in the forthcoming towing contracts, as well as in our technological plan that will improve the towing process.

We agree that many years of abuses and lack of management oversight has contributed to the current state of affairs. However, the current administration's recognition of these prior problems has triggered an analysis and evaluation that will enable the department to more effectively manage the tow process. Additionally, the Management Services Bureau has been charged to monitor current precinct operations, as they relate to towing procedures.

Should you have any concerns regarding this matter, please do not hesitate to contact me at 596-1800, Monday through Friday, 8:00 a.m. to 5:00 p.m.

Sincerely,

**ELLA M. BULLY-CUMMINGS**
Chief of Police

EMB-C/rb