**City of Detroit**

# OFFICE OF THE AUDITOR GENERAL

# Audit of the
# Detroit Police Department's
# Compliance with the
# Impounded Vehicle
# Towing Process

# December 2003



JOSEPH L. HARRIS, CPA, CIA
AUDITOR GENERAL
CITY OF DETROIT

COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 208
DETROIT, MICHIGAN 48226
PHONE 313•224•3101
FAX 313•224•4091
WWW.CI.DETROIT.MI.US

## MEMORANDUM

**DATE:** November 23, 2004

**TO:** Honorable City Council

**FROM:** Joseph L. Harris
Auditor General

**RE:** Audit of the Detroit Police Department's Compliance with the Impounded Vehicle Towing Process

**C:** Mayor Kwame Kilpatrick
Chief Ella M. Bully Cummings

Attached for your review is our second of eight reports on the audit of the Detroit Police Department's (DPD) police-authorized towing process. Reports on the towing process will be issued as follows:

1. Administration of the Police-Authorized Towing Process (issued September 30, 2004)
2. Compliance with the Impounded Vehicle Towing Process
3. Compliance with the Abandoned Vehicle Towing Process
4. Vehicle Auction Process
5. Evidence Vehicles
6. Accounting and Reporting System
7. Towing Companies' Compliance with the Towing Policies and Contracts
8. Best Practices and Recommendation.

This audit was initiated by the Office of the Auditor General to determine the validity of allegations of improprieties by police-authorized tow companies and by DPD personnel, and to determine compliance with State laws, City ordinances, DPD towing procedures, and towing contracts.

This report focuses on the impound vehicle processes in the precincts, and contains our findings and recommendations specific to those processes. The report also includes the DPD response.

We recommend that the entire police-authorized towing process be reengineered. Our final report in this series will include our recommendations for consideration in developing the reengineered policies and procedures. The recommendations included

i



in this report are those that we believe should be immediately implemented to address serious problems until the reengineered process is developed.

Copies of all of the Office of the Auditor General's reports can be found on our web site at www.ci.detroit.mi.us/legislative/CharterAppointments/AuditorGeneral.

**Audit of the Detroit Police Department's
Compliance with the Impounded Vehicle Towing Process**

**December 2003**

**Table Of Contents**

Executive Summary                                                                      1

Audit Purpose, Scope, Objective, and Methodology                                       4

Impounded Vehicle Towing Process                                                       5

Findings:

    1.   Most Precincts are Not Distributing Towing Requests Equitably            8
          Among the Five Assigned Towing Companies

    2.   Precinct Officers are Not Always Reporting Towed Vehicles to the        11
          Telephone Crime Reporting Unit as Required

    3.   Incomplete Impound Cards Affect DPD's Ability to Assign                13
          Accountability for Vehicle Damage

    4.   Record of Precinct-Authorized Towing Assignments is Deficient          15

    5.   Payment of Precinct-Ordered Towing Assignments Made Without            17
          Supporting Authorization

Agency's Response                                                          Attachment A

# EXECUTIVE SUMMARY

The Office of the Auditor General initiated this audit in response to allegations of improprieties committed by police-authorized towing companies and Detroit Police Department (DPD) personnel. The purpose of the audit was to determine whether City Ordinances, DPD towing procedures and the terms of the towing contracts were being complied with and whether the allegations of improprieties were valid.

The Detroit Police Department, in accordance with the Michigan Vehicle Code, can order the removal of vehicles from public or private property to a place of safekeeping for a variety of reasons. The portions of this process that have been placed under the precincts' control are significant. They include:

- Authorizing that a vehicle be towed by someone other than the vehicle's owner;
- Maintaining a complete record of the vehicles authorized to be towed;
- Recording and reporting the vehicle's condition at the time of the tow;
- Providing information to update the law enforcement information network (LEIN); and
- Making the vehicle's location available to the vehicle owner.

Additionally, the precincts are tasked with assuring that the distribution of towing assignments is equitable through the use of the precincts' rotational towing process.

Overall, we found that the precincts have not taken their obligation for the performance of these functions seriously, and have abrogated their responsibilities. We believe the DPD should reengineer the entire police-authorized towing process. Our specific findings and recommendations relative to the impound vehicle process are summarized below.

## Finding 1 – Most Precincts are Not Distributing Towing Requests Equitably Among the Five Assigned Towing Companies

We found that patrol officers, at the precincts reviewed, often circumvent the rotational towing procedures by contacting the towing companies directly, rather than following DPD procedures and contacting the precinct tow desk for the rotational tow truck assignment. In most precincts, the rotational towing assignments are not equitably distributed among the five towing companies assigned. Favored towing companies are receiving a greater share of the precincts' towing business; companies are substituting for other companies on calls; and non-favored companies' towing business is suffering.

We recommend that the DPD's Management Services Bureau (MSB) regularly review the precinct tow books and the assignment of towing requests to identify instances where DPD's rotational towing procedures have not been followed. Officers who continue to circumvent the DPD's procedures should be disciplined.

1

## Finding 2 – Precinct Officers are Not Always Reporting Towed Vehicles to the Telephone Crime Reporting Unit as Required

We found many impound cards that did not contain proof that the officer requesting the tow contacted the Telephone Crime Reporting Unit (TCRU) to report the tow and the vehicle's condition. TCRU is required to update the Law Enforcement Information Network (LEIN) within 24 hours of the tow to conform to state law, notify vehicle owners that their vehicle has been impounded, and answer inquiries as to where a towed vehicle is located. The lack of proof of notification indicates that the towed vehicles are not reported at all, or that the vehicles are reported by the towing companies directly. The risk of towing companies reporting tow information directly is that they may be towing vehicles without police authorization or they can erroneously report a vehicle's condition.

We recommend that DPD take steps to ease the frustration associated with reporting towed vehicles to TCRU. Precinct officers should be equipped with the equipment needed to contact TCRU and the LEIN system. TCRU should be staffed appropriately to handle the volume of calls it receives. Officers found to be deliberately disobeying procedures should be disciplined. Towing companies reporting tows to TCRU should be suspended.

## Finding 3 – Incomplete Impound Cards Affect DPD's Ability to Assign Accountability for Vehicle Damage

We observed many impound cards that were not fully completed. Specifically, the vehicle condition report was not marked on many cards and the form was not authorized by the officer requesting the tow. Towing companies are required to have a signed form authorizing the tow before they move any vehicle. An incomplete vehicle condition report makes it impossible to affix accountability to any party for damage done to the vehicle.

We recommend that the DPD instruct officers on the DPD's towing procedures and on the importance of completing the impound cards accurately. DPD should take steps to make the process less burdensome on the officer by creating a multi-copy form that needs to be completed only one time and issue cameras to aid in recording the vehicle condition. Further, officers that are not complying with DPD procedures should be disciplined.

## Finding 4 – Record of Precinct-Authorized Towing Assignments is Deficient

We found that many precincts' permanent records of their requested and authorized towing assignments are incomplete and the supporting documentation, form DPD 406, is not uniformly retained. License and vehicle data was frequently missing. It was difficult to reconcile between the impound cards and the tow book due to the missing information. All impound cards are unlikely to be accounted for because they are not sequentially numbered.

We recommend that form DPD 406 be revised to contain a sequential number. We further recommend that the DPD establish document retention and filing procedures in order to maintain the impound cards until the associated tow book can be audited.

2

## Finding 5 – Payment of Precinct-Ordered Towing Assignments Made Without Supporting Authorization

We found most precincts are not submitting form DPD 73 – Vehicles Towed by Private Companies, with the associated towing company invoices, to the Fiscal Section by the 10th of each month. Towing companies are submitting invoices directly to the Fiscal Section for payment. Of the 117 invoices reviewed, 24 contained questionable billings. Without a listing of the tows that have been authorized by each precinct, there is a high level of risk that the DPD will pay for services, at an incorrect price, that have not been authorized.

We recommend that the Fiscal Section reject all invoices that are submitted to it directly by the towing companies, and require that precinct commanders adhere to the tow slip procedures to submit form DPD 73 with the towing companies' invoices monthly. We further recommend that MSB establish standard rates for towing services that fall outside of the rates set by City Council.

3

# AUDIT PURPOSE, SCOPE, OBJECTIVE, AND METHODOLOGY

**Audit Purpose:**
The Office of the Auditor General (OAG) initiated this audit in response to allegations of improprieties carried out by police-authorized towers and Detroit Police Department (DPD) personnel involved in the police-authorized towing process.

**Audit Scope:**
The Office of the Auditor General conducted an audit of the Detroit Police Department's towing process to determine the DPD's and the towing companies' compliance with City ordinances, DPD towing procedures, and towing contract terms. Our audit was limited to the towing activities covered by the police-authorized towing contract and did not include a review of services provided by the towers for abandoned vehicle blitzes, nuisance abatements, special events, offers to engage, or other special towing services.

Our audit was conducted in accordance with Government Auditing Standards issued by the Comptroller General of the United States, except that the OAG has not received an external peer review within the past three years.

**Audit Objective:**
Specifically, we wanted to determine:

- Whether the Police Department is complying with its towing procedures, as they relate to impounding vehicles. Adherence to the abandoned vehicle towing process will be covered in a subsequent report.

**Audit Methodology**
To accomplish our audit objective, our audit included:

- Interviews with DPD management, police officers, towers, vehicle owners and others;
- Review of DPD towing procedures, City ordinances for police-authorized towing, and State laws;
- Review of tower precinct assignments and contracts;
- Review of DPD towing records, tow-books, and impound cards at the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, and 9th precincts and at the Management Services Bureau; and
- Review of tow slips submitted to DPD for payment.

4

# IMPOUNDED VEHICLE TOWING PROCESS

Section 55-15-1 of the City's Municipal Code defines a police-authorized tow as " the towing, carrying, pushing or otherwise transporting for a fee by a tower or towers summoned by the police, any motor vehicle, except trailers and truck tractors, that has been wrecked or disabled in any manner, or any vehicle subject to removal under division 4 of article VI [1] and article XIV [2] of this chapter, including but not limited to abandoned or illegally parked vehicles and vehicles interfering with emergency activities or impeding traffic from the traveled portion of a street highway or freeway."

In practice, the Detroit Police Department authorizes the towing of vehicles for evidence, removal of abandoned vehicles, safeguarding of recovered stolen vehicles, forfeitures of vehicles for offers to engage in prostitution (OTE) and narcotics violations, parking violations, removal of road hazards, and for other reasons, such as arrests for driving under the influence, or when the vehicle owner is incapacitated.

The towing companies providing police-authorized towing services are compensated for their services as follows:

- For vehicles that are ordered towed to a towing company's storage lot by the DPD, the towing and storage fees are paid by the vehicle owner when the vehicle is redeemed. Charges for these tows are to be at the rates established by City Council - $75.00 per tow plus $8.00 per day for storage. There is no charge for the first three days of storage.

- For vehicles towed to a DPD precinct, illegally parked vehicles, and services for which the vehicle owner is exempted by ordinance, the DPD will pay the towing company at rates established by City Council. These rates vary depending on the precinct. The towing company bills the DPD for the service.

- For vehicles towed to the evidence lot, the responding towing company is paid $50 to tow the vehicle to the centralized evidence lot by the managing tower. The managing towing company is paid $75 per vehicle by DPD.

The DPD has established its impound towing procedures to comply with State laws and in a manner that provides for the equitable distribution of towing assignments within each precinct. Towing companies are assigned to specific precincts, and towing requests are assigned on a rotational basis. The accompanying chart shows the towing companies that are assigned to each precinct.

| Precinct | Rotational Tower |
|---|---|
| 1 | Boulevard &Trumbull, Executive, and Gene's |
| 2 | DAR, Gilchrist, J & C, Murff, and Muscat |
| 3 | AC, Gene's, Javion & Sam's, Red's, and Washington |
| 4 | Boulevard &Trumbull, Citywide, E & G, Javion & Sam's, and Red's |
| 5 | B & G, Elite, H & B Land, Nationwide, and Wayne's |
| 6 | Citywide, DAR, J & C, MARS, and Muscat |
| 7 | B & G, Gene's, Hemphill, Nationwide, and Wayne's |
| 8 | B & G, DAR, J & C, Muscat, and V & F |
| 9 | B & G, Elite, Executive, LIJBS, and Wayne's |
| 10 | ABA, Area, Boulevard & Trumbull, Gilchrist, and Javion & Sam's |
| 11 | B & G, Executive, Seven D, Tri-County, and Wayne's |
| 12 | ABA, Bobby's, DAR, Tri-County, and Troy |
| 13 | AC, Area, Citywide, Gene's, and Hemphill |

---

[1] Abandoned Vehicles
[2] Impoundment of Vehicles

5

State law requires that the law enforcement agency perform a LEIN check on every vehicle that is suspected of being abandoned or that is removed for safekeeping. Once a stolen vehicle is identified, the police officer has the vehicle towed to a police-authorized tower's storage lot for safekeeping; or if the vehicle is in poor condition (burned, a shell, stripped, etc.) the vehicle can be left at the recovery scene and later towed as an abandoned vehicle.

When a patrol officer determines that a vehicle should be impounded, DPD's procedures require the officer to call the precinct tow desk and request a tow truck. The patrol officer provides the tow desk with the make, license number, vehicle location, the reason for tow, and states any additional services that may be required. The tow desk should contact the next towing company on its rotation list to order a tow truck to the location required. If the tower cannot respond to the call, it is noted in the tow book, and the next towing company is contacted to respond.

Section 55-15-3 (a) of the City's Municipal Code states that no one can perform any police-authorized towing "without first having obtained written permission on forms approved by the city police department, from the driver or owner of the vehicle or until the police officer ..... shall have completed his investigation and has given written permission for the towing service. A copy of the completed permission form is given to the authorizing person."

Section 55-15-3 (c) states that when a vehicle is to be towed to the tower's storage yard "under section 55-15-1(4), the tower shall prepare and sign an inventory of the contents and equipment of the vehicle on a multi-copy form approved by the police department. The police officer in charge shall sign the completed form as witness to the inventory and the police department shall retain the signed original. The form shall indicate the location where the vehicle owner may reclaim the vehicle. The tower shall retain one copy of the signed form and mail one copy to the vehicle owner or driver within forty-eight (48) hours of the date the tow is performed."

In practice, the patrol officer is required to complete two original copies of form DPD 406 – Impound Card, which includes vehicle identification and towing information as well as noting the accessories on the vehicle (vehicle condition). The officer is required to have the tower sign both cards acknowledging receipt of the vehicle and the condition of the vehicle. The officer fills out evidence tags for any vehicle or property to be held as evidence. The officer is required to notify the Telephone Crime Reporting Unit (TCRU) of the tow and to document the TCRU issued number on the impound card. One card is given to the tower.

The officer turns the second impound card in to the precinct tow desk at the end of his / her shift. Upon receipt of the impound card from the precinct patrol officer, the precinct tow desk officer updates the tow book with the information from the card and files the card. Departmental procedures dictate the specific information that should be contained in the towed vehicle book. The officer requesting the towing service is responsible for the completion of the towing information in the tow book. If the requesting officer is not at the scene when the vehicle is towed, the tow company must notify the precinct of the location of the towed vehicle.

State law requires that the LEIN system be updated within 24 hours of the tow. Precinct patrol officers provide information to TCRU, which includes the vehicle identification number, the name of the towing company, and the location where the vehicle was towed, and TCRU updates the LEIN system. TCRU personnel post data to the LEIN system including entering or cancellation of stolen vehicle information. The TCRU also notifies the owners of stolen vehicles that their vehicles have been recovered.

6

When a vehicle is to be processed for evidence, the patrol officer completes an evidence tag and the vehicle is towed to the City's evidence lot.

Section 7.2, of the DPD's General Procedures, entitled Reporting Stolen Motor Vehicles, indicates that when a stolen vehicle is recovered, the department will attempt to contact the vehicle owner. The recovering officer can have the vehicle towed to a police-authorized tower's storage lot for safekeeping if it is thought that the vehicle might otherwise sustain further damage. If the vehicle is in poor condition (burned, a shell, stripped, etc.), the recovering officer can leave the vehicle at the scene. If the vehicle is not removed by the owner, or if the owner cannot be contacted, the recovered vehicle is processed in accordance with the abandoned vehicle laws.

A comparison of the City's Impounded Vehicle, Abandoned Vehicle, and Evidence Vehicle towing processes are shown in the following chart:

| | Impounded Vehicle Process | | Abandoned Vehicle Process | | Evidence Vehicle |
| | Impound | Stolen / Impound | Abandoned | Stolen / Abandoned | |
|---|---|---|---|---|---|
| Definition | Wrecked, disabled or towed for safekeeping | Recovered stolen vehicle that is impounded for safekeeping | Vehicle marked as abandoned that is not moved within 48 hours | Recovered stolen vehicle, in poor condition, that is not impounded for safekeeping | Vehicles involved in a crime that are towed for the purpose of collecting and processing evidence |
| Tower Assignment | Precinct rotation | Precinct rotation | Precinct abandoned vehicle tower | Precinct abandoned vehicle tower | Precinct rotation |
| TCRU Notified / LEIN System Updated | TCRU notified of tow at time of impound by patrol officer. Required to update LEIN within 24 hours of tow. | TCRU notified by recovering officer prior to tow. Required to update LEIN within 24 hours of tow. | Checked by abandoned vehicle officer prior to determining vehicle is abandoned. LEIN updated within 24 hours of vehicle being deemed abandoned. | TCRU is notified by recovering officer. Recovery entered in LEIN by TCRU prior to tow. | TCRU notified by recovering officer prior to tow to update LEIN within 24 hours of tow. |
| Forms Authorizing Tow | DPD 406 - Impound Card | DPD 406 – Impound Card with heading replaced with "Recovered Stolen Vehicle" | DPD 131 – Abandoned Vehicle Report DPD 115 – Abandoned Vehicles Recapitulation Report | DPD 131 – Abandoned Vehicle Report DPD 115 – Abandoned Vehicles Recapitulation Report | DPD 406 – Impound Card, plus a DPD evidence card |
| Vehicle Condition Noted | On back of DPD 406. Completed by patrol officer. Signed and dated by both tower and DPD officer. | On back of DPD 406. Completed by patrol officer. Signed and dated by both tower and DPD officer. | On back of DPD 131. Completed by the abandoned vehicle officer. | On back of DPD 131. Completed by the abandoned vehicle officer. | On back of DPD 406. Completed by patrol officer. Signed and dated by both tower and DPD officer. |
| Vehicle Owner Notified | Vehicle owner usually present when vehicle is towed. | TCRU calls for 3 days. Sends notice by certified mail if unable to reach. | DPD 114 affixed to vehicle for 48 hours prior to deeming vehicle abandoned and towing. | TCRU calls for 3 days. Send notice by certified mail if unable to reach. DPD 114 affixed to vehicle. | Investigating officer notifies owner when the vehicle is no longer needed. |
| When Vehicle Not Redeemed by Owner | TR-52 mailed by auction unit within 30 days of tow, notifying of right to auction after 20 days. | TR-52 mailed by auction unit within 30 days of tow, notifying of right to auction after 20 days. | TR-52 mailed by auction unit within 7 days of tow, notifying of right to auction after 20 days. | TR-52 mailed by auction unit within 7 days of tow, notifying of right to auction after 20 days. | TR-52 mailed by auction unit within 30 days, notifying of right to auction after 20 days. |

7

# FINDINGS AND RECOMMENDATIONS

## 1. Most Precincts are Not Distributing Towing Requests Equitably Among the Five Assigned Towing Companies

Police-authorized towing requests for impounding vehicles are not equitably distributed among the towers assigned to each precinct. We found that precinct patrol officers are often calling the police-authorized towers directly for a tow truck, rather than going through the precinct's rotation system.

To test whether the rotation process was followed, we reviewed a sample of impound cards and tow book entries for the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, and 9th precincts for a one week period. To insure equitable distribution, officers are required to contact the precinct's tow desk for the next towing company on the rotational list and each tow request is entered into the logbook. When the officer calls the tower directly, the precinct is not contacted and an entry is not made in the book.

When the rotational system is used, there should not be any tows made by unauthorized tow companies, there should be an equal number of tows handled by each of the five assigned towing companies, and the percentage of tows made by the low and the high volume towing companies should be equal. The following chart summarizes the results of our review:

| Precinct | Cards Sampled | Tower Not Authorized | Distribution of Tows Among Towing Companies Authorized Towers From Low to High Number of Calls | | | | | Percentage of Tows to Authorized Towers Low | High | Direct Calls |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | | | |
| 2nd | 49 | 3 | 7 | 7 | 10 | 10 | 12 | 14% | 25% | 35% |
| 3rd | 61 | 9 | 6 | 8 | 9 | 14 | 15 | 10% | 25% | 17% |
| 4th | 71 | 2 | 0 | 1 | 1 | 30 | 37 | 0% | 52% | 87% |
| 5th | 36 | 2 | 2 | 5 | 6 | 7 | 14 | 6% | 39% | 40% |
| 6th | 37 | 0 | 4 | 5 | 5 | 8 | 15 | 11% | 41% | 22% |
| 7th | 50 | 0 | 0 | 1 | 6 | 9 | 34 | 0% | 68% | 84% |
| 8th | 55 | 4 | 8 | 8 | 10 | 12 | 13 | 15% | 24% | 6% |
| 9th | 79 | 0 | 9 | 12 | 14 | 16 | 28 | 11% | 35% | 39% |

Note: The chart shows the range of the number of calls received by the five authorized towing companies within a precinct. The specific towing companies associated with the numbers 1 to 5 vary from precinct to precinct.

## 2nd Precinct -
Based on our sample, Detroit Auto Recovery, Inc. received most of the tows, although the distribution of tows seemed fairly equitable. We could not find 35% of the impound cards in the tow book, indicating that officers were calling the towing company directly. Detroit Auto Recovery, Inc. and J & C Recovery, Inc. received most of these direct calls. The abandoned vehicle officer acknowledged that he calls Detroit Auto Recovery, Inc. directly for stolen vehicle recoveries, circumventing the precinct tow rotation system.

## 3rd Precinct -
In the 3rd Precinct, we could not find 17% of the impound cards in the tow book, indicating that the towers are being called directly. Boulevard & Trumbull towed nine of our sampled

tows. Boulevard & Trumbull is the abandoned vehicle tower, not an authorized rotational tower in this precinct, and should not be utilized in the regular impound rotation.

### 4th Precinct -
In the 4th Precinct, we found only 13% of our sample tows entered in the tow book, indicating that officers were calling the towers directly 87% of the time. The 4th Precinct has five authorized tow companies – Red's Towing Service and four companies (Boulevard & Trumbull, J & S, City Wide, and E & G) that are under the same ownership / management or control. Red's received 52% of the sampled tows, while Boulevard and Trumbull received 42%. The other three related companies received a total of two tows.

### 5th Precinct -
B & G Towing performed 38% of the tows in our sample, while Wayne's performed two tows. B & G is also the abandoned vehicle tower for the precinct. Officers are calling the tow companies directly 40% of the time. We noted 24 instances in the week reviewed where the rotation was not followed. Reasons noted included that the appropriate equipment was not available, the tower did not answer the telephone, or that the telephone was busy.

### 6th Precinct -
J & C Recovery received 41% of the calls for tows in our sample. Many of the impound cards not in the tow book were for tows done at night. Six of the eight direct calls went to J & C Recovery who, we were told, was the only reliable night tower. The 6th Precinct abandoned vehicle officer has Michigan Auto Recovery Service, the abandoned vehicle tower for the precinct, recover the stolen vehicles that he finds.

### 7th Precinct -
Officers in the 7th Precinct are calling towing companies directly 84% of the time. B & G was the favored tower in the precinct based on our sample, receiving 68% of the tows. The 7th Precinct abandoned vehicle officer stated that he used his authorized abandoned vehicle towing companies, Long and Sons and B & G Towing, to recover stolen vehicles.

### 8th Precinct -
Towing was distributed according to the rotation system, with towers called directly only 6% of the time. Detroit Auto Recovery and J & C Recovery received the highest number of tows. The abandoned vehicle officer has the abandoned vehicle tower, J & C Recovery, recover stolen vehicles.

### 9th Precinct -
Towing distribution is not equitable in the 9th Precinct. In our sample, Executive Towing was the preferred tower, receiving 35% of the tows. Officers were calling towers directly 39% of the time.

Detroit's Municipal Code establishes the City's policy of equitable towing distribution.

The Municipal Code, Section 55-15-8 (a) states in part:

> The board of police commissioners shall also promulgate and publish the rules and regulations that it uses to determine which towers shall be called for tows under this chapter. Such rules shall as practicable, provide for equitable distribution of police-authorized towing to all towers on the list of qualified towers.

To further insure equitable distribution, DPD's General Procedures establish the methodology by which the equitable distribution will take place.

> Paragraph 13.10, Distribution of Tows, of the DPD General Procedures, states:
>
>> Precincts shall contact authorized police towers on a rotating basis when requesting service. If an authorized tower is called but is not available, the tower shall be placed at the end of the list and the next tower on the list shall be called.
>
> Paragraph 26, Exhibit A, Scope of Services, of the November 2001 police-authorized towing contract states:
>
>> The City agrees to utilize a fair and impartial system of assignment of vehicles to be towed based on the use of a rotating list by each precinct.

The inequitable distribution of tows is primarily due to the patrol officers bypassing the precinct's rotational towing process and contacting the towing companies directly. This infraction is allowed to go unchecked because the DPD does not perform a reconciliation between each precinct's towing book and the impound cards, and because there is no enforcement of the precinct's towing procedures.

The result of bypassing the precinct's rotational towing process is that the favored police-authorized towing companies are receiving an unfair portion of the precinct's impound towing jobs, and the other police-authorized towers are losing business.

**Until a reengineered police-authorized towing process is completed, we recommend that:**

The MSB implement procedures to regularly review the precinct towing assignments to verify that the rotational tow assignment process is followed. Instances of non-compliance with departmental towing procedures should be identified, and the appropriate disciplinary action should be taken.

## 2. Precinct Officers are Not Always Reporting Towed Vehicles to the Telephone Crime Reporting Unit as Required

The Telephone Crime Reporting Unit (TCRU) notifies vehicle owners of the recovery of their stolen vehicles, provides vehicle owners with the location of their impounded vehicle, and updates the Law Enforcement Information Network (LEIN) system. As shown in the following chart, DPD officers are not always notifying the TCRU when vehicles are impounded or if they are notifying TCRU, there is no assurance that the LEIN system is being updated with the tow information.

During our review of impound cards at the precincts:

- We noted numerous instances where the impound card did not contain information indicating that TCRU was notified of the tow by a precinct officer. The precinct officer records the TCRU issued complaint number and the TCRU officer's name on the upper right corner of the impound

| Precinct | No Complaint Number or TCRU Officer Listed on Impound Card | No Complaint Number Listed on Impound Card | Percentage of Impound Cards That May Not Be Entered in LEIN System |
|---|---|---|---|
| 2nd | 14% | 10% | 24% |
| 3rd | 2% | 5% | 7% |
| 4th | 11% | 4% | 15% |
| 5th | 14% | 25% | 39% |
| 6th | 22% | 5% | 27% |
| 7th | 4% | 10% | 14% |
| 8th | 11% | 4% | 15% |
| 9th | 3% | 8% | 11% |

card. The absence of the TCRU information indicates that the tow was not reported to the TCRU at all, or that the tow was reported to TCRU by the towing company.

- We also noted numerous instances where a TCRU officer's name was listed, but there was no computer number. The absence of the TCRU computer number indicates that the system was down at the time the tow was reported to TCRU.

DPD's procedures dictate that TCRU be notified when a vehicle has been towed.

The DPD General Procedures, Section 8.1, requires in part:

> When a stolen motor vehicle is recovered, the Telephone Crime Reporting Section shall be notified by the recovering officer. Telephone Crime Reporting Section personnel shall make the necessary computer entries to facilitate D.E.T.E.C.T.S., L.E.I.N. and N.C.I.C. requirements and forward the computerized official complaint record to the appropriate command. The Telephone Crime Reporting Section shall provide the recovering officer with the value of the vehicle. Recovering members shall place the vehicle information, complaint number and operator's name on their activity log.

The DPD General Procedures, Section 8.3 requires in part:

> When notifying the Telephone Crime Reporting Section of the recovery, members will advise this section that the vehicle has been towed and the location of the storage. The Telephone Crime Reporting Section shall enter any vehicle towed to a private towers' storage lot into the computer as a moved vehicle. The Telephone Crime reporting section shall notify the owner when a stolen motor

11

vehicle has been recovered except when otherwise indicated by the officer in charge of the case.

Similar requirements exist for DPD's reporting of impounded vehicles.

Precinct personnel acknowledged that the officers are not always notifying TCRU when a vehicle is impounded, or they may be letting the towing company call with the impound information. They also noted that sometimes TCRU does not properly update the system with the tow information, and that recovered vehicles are still shown as stolen.

A 1995 Inter-Office Memo addressed to then Chief of Police Isaiah McKinnon indicates that it usually takes officers several attempts to make contact with TCRU. Officers attempting to contact TCRU are frustrated, and that because TCRU has not notified vehicle owners, the towing companies have suffered financial losses. Following this memorandum, the 6th Precinct initiated a six-month pilot program whereby the towing companies would notify TCRU of vehicles towed, rather than the recovering officers. While the authorization of the pilot program expired in May 1997, precinct personnel acknowledge that towing companies in the 6th precinct have continued to report tows to TCRU directly, over seven years from the commencement of the six-month pilot program.

The purpose of DPD officers reporting tows to TCRU is to act as a control over the towing companies. Information provided by DPD provides an assurance that the recovery of stolen vehicles has been authorized by DPD and that the vehicle condition reported at the time of the tow is accurate. Police-authorized towers' reports of damage/missing parts on vehicles may differ from the officers' impound cards. Theft of parts or property, or damage to the vehicle can be covered up when police-authorized towers report the recovery of stolen vehicles to TCRU. The impound card loses its control value when towers report to TCRU, unless the precincts reconcile the impound cards to the tower notifications to TCRU, which is unlikely. In addition, correct and timely reporting of towed vehicles insures that vehicle owners are properly notified and that towing companies are able to collect the appropriate towing and storage fees.

**Until a reengineered police-authorized towing process is completed, we recommend that:**

a. Officers are provided with the technology and resources necessary to complete their jobs effectively and efficiently. This may include computers with access to the LEIN system in their vehicles, and telephones and radios to contact the precinct tow desks and TCRU as necessary.

b. The DPD insure that TCRU has the appropriate staffing level and resources to accommodate the demand for its services.

c. Procedures are implemented to train officers in all of the required steps to impound vehicles. Document instances of non-compliance with towing procedures, and discipline officers for failing to notify TCRU of vehicles towed.

d. Towing companies found to be notifying TCRU directly should be suspended.

12

### 3. Incomplete Impound Cards Affect DPD's Ability to Assign Accountability for Vehicle Damage

Officers are required to manually complete two original impound cards when a vehicle is towed for safekeeping. Sometimes only one card is filled out and it is given to the towing company. Sometimes the form is not fully completed – the condition of the vehicle is not noted or is vague, or the forms do not contain a DPD authorizing signature. On more than one card, the vehicle condition was recorded as "intact."

A summary of our review of sampled impound cards from eight precincts is contained in the accompanying table.

- Officers at five precincts were completing the inventory section of the impound card in nearly all instances; while officers at the three remaining precincts were not completing the inventory section between 16% and 32% of the time.

| Precinct | Vehicle Condition Not Complete | Card Not Signed by Police Officer |
|---|---|---|
| 2nd | 0% | 18% |
| 3rd | 2% | 18% |
| 4th | 0% | 24% |
| 5th | 28% | 31% |
| 6th | 16% | 27% |
| 7th | 0% | 22% |
| 8th | 0% | 29% |
| 9th | 32% | 35% |

- The impound card was not signed by the responsible police officer 18% to 35% of the time.

Additional conditions reported by the towing companies were:

- Sometimes only one card is completed, and the card is given to the towing company.
- Officers do not always complete the card, so the towers do so themselves.
- Officers promise to deliver the completed cards to the towers yard, and they do not.
- The information reported on the card by the officers is not correct.

The City Ordinance and the DPD's General Procedures governing the completion of the Impound Card are as follows:

The Municipal Code, Section 55-15-3 (c) states:

In the case of a vehicle to be towed to a private tower's storage lot, yard or garage under section 55-15-1(4), the tower shall prepare and sign an inventory of the contents and equipment of the vehicle on a multicopy form approved by the police department.

The police officer in charge shall sign the completed form as witness to the inventory and the police department shall retain the signed original. The form shall indicate the location where the vehicle owner may reclaim the vehicle. The tower shall retain one copy of the signed form and mail one copy to the vehicle owner within forty-eight (48) hours of the date the tow is performed.

Paragraph 8.3 of the DPD General Procedures, states that for disposition of recovered stolen vehicles:

13

> If the vehicle is to be towed to a police authorized towers' storage lot, recovering members shall complete two copies of the Impounded Vehicle Record, D.P.D. 406. ......... The recovering officer and tower shall both sign the inventory side of both impounding cards to verify the condition of the vehicle at the time of the tow.

Officers may not complete the form DPD 406 fully because it is time consuming to complete two original forms, they do not realize the importance of completing the form in full, or they are called away to respond to higher priority calls.

The form DPD 406 is the record that the DPD authorized the towing company to move the vehicle. It indicates vehicle-identifying information, where the vehicle is moved and by which company, as well as the condition of the vehicle at the time it is ordered towed. Inaccurate information on impound cards adversely impacts the ability of the DPD, the towing companies, vehicle owners and insurance companies to hold the appropriate party responsible for damage or missing property from impounded vehicles. Without documentation of the vehicle's condition before it is towed, the approximate time of vehicle damage cannot be established and the responsible party cannot be identified. Furthermore, the information contained on the form DPD 406 is used to update the precinct's tow book and should be retained as their record of the tow. It is important that the information contained therein be correct.

**Until a reengineered police-authorized towing process is completed, we recommend that:**

a.  The DPD take steps to ease the precinct officers' burden of recording the vehicle condition at the time the vehicle is towed. The form DPD 406 should be reissued in a multi-copy format so that the patrol officer must complete the form only one time.

b.  The DPD consider issuing the patrol officers digital cameras to provide a visual record of vehicle condition at the time the vehicle is towed.

c.  The DPD put procedures in place to document instances of non-compliance with DPD towing procedures and discipline officers for failing to properly complete the standard impound and vehicle condition reports.

14

## 4. Record of Precinct-Authorized Towing Assignments is Deficient

The precinct's tow book should be considered the permanent record of all towing assignments that have been requested and authorized by the precinct, and as such should be diligently maintained. Impound cards, supporting each entry, should provide additional detail and further document the authorization of each tow assignment. Therefore, there should be an impound card for every entry, and an entry for every impound card.

We noted the following conditions:

- Not all precincts were properly entering impound information into the tow book following the tow. Information such as the make and license number of the vehicle towed was often missing.

- It was very difficult to reconcile the impound cards to the tow books at some precincts because the impound cards are not sequentially numbered and the lack of data contained in the towed vehicle book impaired our ability to match the impound cards to the entries.

- Some impound cards were missing and the filing systems at some precincts were poor. Impound cards were not properly filed in the 4th, 5th, and 7th precincts; therefore we could not find many of the cards.

- The lack of sequentially numbered impound cards makes it impossible to know whether the tow book is a complete record of all of the tows authorized by the precincts' officers.

A summary of our review of the impound cards and tow books at the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, and 9th precincts is contained in the following chart:

| Precinct | Card Not Retained by Precinct | Tow Book Observations |
|---|---|---|
| 2nd | 17% | No discrepancies noted. |
| 3rd | 20% | Some cards may have been misfiled. Washington missed four rotations. In one case, the impound card showed Boulevard and Trumbull as the tower, while the tow book indicated that Red's was the tower. |
| 4th | 47% | Impound cards were not properly filed, and seven of the fifteen were missing. Vehicle descriptions were missing for several entries in our sample. |
| 5th | 18% | The 5th precinct threw out impound cards after a couple of months. The audit trail was not reliable. The 5th precinct relies on police-authorized towers to determine the status of vehicles recorded in the towed vehicle book and on the impound cards. Inactive impound cards are thrown away. |
| 6th | Unknown | Did not have all of the impound cards for the tow book entries. The tow book appeared to be properly filled out. |
| 7th | 63% | The precinct tow book was not properly filled out. It lacked make and license number of vehicle towed and name of officer present when the vehicle was towed. It was difficult to match the impound card to the tow book. Impound cards were poorly organized. |
| 8th | 8% | Four impound cards were not found of the 49 checked. Overall, they seemed to do a good job with the tow book and the impound cards. |
| 9th | Unknown | Tow book appears complete. |

DPD General Procedures establish the usage of the precinct tow book and the information that should be recorded therein.

15

Paragraph 13.2 of the DPD General Procedures, entitled Towed Vehicle Book, states:

> All tow requests shall be entered into a towed vehicle book. Each precinct shall maintain a towed vehicle book containing the following information:
>
> a. Time and date ordered;
>
> b. Name of towing company;
>
> c. Make and license number of vehicle towed;
>
> d. Location towed from and to;
>
> e. Reason for towing;
>
> f. Remarks column, which shall include details of tow, i.e., dolly tow, heavy duty tow truck, excessive time, etc.;
>
> g. Rank, name and assignment of officer authorizing tow;
>
> h. Rank, name and assignment of officer present when vehicle is towed; and
>
> i. Date and time towing was completed.

There is no oversight over the data contained in each precinct's tow book, and no monitoring to ensure that the data contained therein conforms to the DPD's General Procedures. There also appears to be no standard procedure for retaining the impound cards among the various precincts. Precincts with poor filing methods are allowed to continue unchecked.

Incomplete tow book entries reduce the accountability of officers to ensure an equitable distribution of the precinct's abandoned vehicle towing requests and for the impounding of vehicles. Poor record keeping of the impound cards impairs the accuracy and completeness of the tow book and impairs the vehicle owners' ability to locate their impounded vehicles.

**Until a reengineered police-authorized towing process is completed, we recommend that:**

a. The DPD revise form DPD 406 to include a sequential number which would facilitate the reconciliation of the impound cards to the tow book and would facilitate holding the patrol officers accountable for any impound vehicle entry in the tow book that is not completed.

b. Establish standardized procedures for precincts to follow to maintain impound cards until the associated tow book entry can be audited.

16

### 5. Payment of Precinct-Ordered Towing Assignments Made Without Supporting Authorization

DPD procedures for tow slips and invoicing by police-authorized towers are not being properly followed. Of the precincts we reviewed, we found that only the 7th precinct continues to process its tow slips according to DPD Procedures. Precincts are not submitting form DPD 73 – Vehicles Towed By Private Companies, which lists the towing jobs that were authorized, to MSB by the 10th of the following month. Presently, towing companies are submitting their tow slips and invoices directly to the Fiscal Section of the DPD for payment.

Some police-authorized towing companies are adding charges for storage, mileage, labor, and second tows, which are not allowable charges. In addition, towing companies are not using standard rates when billing for services that are outside the usual requested services, such as for moving the bomb squad trailer, or for towing boats and basketball hoops. Of the 117 invoices sampled, we found 24 invoices containing questionable charges. In addition, DPD's Fiscal Section is not paying invoices to police-authorized towers according to terms.

DPD General Procedures, Section 13.3, entitled Tow Slips, requires:

All private tow companies must, immediately upon completion of the tow, submit a tow slip to the officer in charge of the precinct station desk if the police department is responsible for payment of the tow. The department is not responsible for payment of tows to police authorized towers' storage lots.

The officer in charge of the precinct station desk to which the slip is submitted shall ensure that the tow slip indicates the time the tow started and the time the tow was completed, the make and license number of the vehicle towed, place towed from and to, and the reason for removal. If an officer was present at the time of the tow, the tow slip must bear the officer's signature. However, officers shall not sign blank tow slips. The completed tow slip shall be submitted through the officer present when the vehicle is towed. In cases where no officer is present or when the officer must leave the scene prior to the completion of the tow, the tow slip must be delivered to the precinct by the tower.

As each tow slip is received, the officer in charge of the precinct station desk shall reconcile the tow slip with the towed vehicle book entries. This reconciliation shall include an audit for appropriate tow charges and a check of the tow slip for the required information. If a tow slip is found not to have a corresponding tow book entry, an investigation shall be conducted to verify the legitimacy of the tow slip. If this investigation reveals any indication of possible fraud, the results shall be forwarded to the Deputy Chief, Management Services Bureau.

The commanding officer of each precinct shall ensure that the information from the tow slips is recorded on the List of Vehicles Towed by Private Tow trucks, D.P.D. 73, at the end of each month. These forms, together with all towing slips, shall be forwarded to the Fiscal Section by the tenth of the following month.

According to DPD personnel, the primary reasons the precincts are not processing the towing invoices are employee turnover and lack of training. Processing towing invoices is not a priority for the majority of the precincts. Because precinct commanders were not completing and submitting the form DPD 73 with the invoices for payment to MSB, towing companies started mailing invoices directly to MSB in order to get paid.

Because the precincts are not submitting the form DPD 73, there is no assurance that the towing companies' invoices are proper and that the towing services that were billed were actually authorized and received. Also, since the invoices are not approved by the precincts before they are submitted to the Fiscal Section, there is the risk that the DPD is paying for services that were not contracted, were not received, or were billed at improper rates.

**Until a reengineered police-authorized towing process is completed, we recommend that:**

a. The Fiscal Section reject all invoices that are submitted to them directly for payment, and require that all precinct commanders and towing companies follow the established procedure for the payment of the towing invoices for which DPD is responsible.

b. MSB establish a standard rate schedule for items that are frequently towed, but are not covered by the rates set by City Council.

c. The Fiscal Section should follow-up with precinct commanders when form DPD 73 and the associated invoices are not submitted by the monthly due date to insure that payments to towing companies are processed quickly and are paid according to terms.

18



November 23, 2004

Mr. Joseph L. Harris
Office of the Auditor General
Coleman A. Young Municipal Center
2 Woodward Avenue, Room 208
Detroit, Michigan 48226

*SUBJECT:* **AUDIT OF POLICE IMPOUND VEHICLE TOWING PROCESS**

Dear Mr. Harris:

The following represents the Detroit Police Department's responses to the second report of findings and related recommendations in the December 2003 *"Audit of the Detroit Police Department's Compliance with the Impounded Vehicle Towing Process,* as prepared by the Office of the Auditor General.

### Finding 1: MOST PRECINCTS ARE NOT DISTRIBUTING TOWING REQUESTS EQUITABLY AMONG THE FIVE ASSIGNED TOWING COMPANIES

**Response to Finding:** The Detroit Police Department agrees that the distributions of tow requests are inequitable when members do not follow proper notification procedures.

**Response to Recommendations:**
**1a –** The Department agrees with the recommendation that the Management Services Bureau (MSB) ensure that a review of the precincts' tow books is conducted for any inequitable distributions of tow requests and assignments. Further, the department agrees that corrective measures will be taken to ensure that all members are in compliance with towing policies and procedures. Reviews of the tow books will be conducted monthly by Precinct Commanders.

### Finding 2: PRECINCT OFFICERS ARE NOT ALWAYS REPORTING TOWED VEHICLES TO THE TELEPHONE CRIME REPORTING UNIT AS REQUIRED

**Response to Finding:** The Department agrees, in part, with this finding that police officers are not contacting the Telephone Crime Reporting Unit (TCRU) as required by department towing procedures.

KWAME M. KILPATRICK, MAYOR



**Response to Recommendations:**
   **2a** – The current CRISNET system contains a vehicle impound module. Once CRISNET and the LEIN (Law Enforcement Information Network) are interfaced, the module will become operable and the information will go directly into LEIN. The MDC (mobile data computers) currently installed in the scout cars provide access to LEIN and officers are equipped with radios to contact the precinct tow desk and TCRU.

   **2b** – The Department agrees that TCRU should be appropriately staffed to accommodate the demand for their services, however with current budget constraints, we are unable to augment the TCRU staff at this time.

   **2c** – The Department provides training to all members, at the recruit level, on the rules, policies, and procedures, concerning Impound Cards, Inventory Searches, and TCRU notifications. Additionally, administrative messages are issued advising members of updates.

   **2d** – The Department will ensure that the practice of tow companies notifying TCRU directly is ceased.


### Finding 3: INCOMPLETE IMPOUND CARDS AFFECT DPD'S ABILITY TO ASSIGN ACCOUNTABILITY FOR VEHICLE DAMAGE

**Response to Finding:** The Department agrees that missing information on impound cards does affect the accountability for vehicle damage.

**Response to Recommendations:**
   **3a.** - The Department agrees that DPD Form 406 (Impound Card) should be reissued in a multi-copy form.

   **3b** - The Department disagrees with issuing digital cameras to provide a visual record of vehicle condition at the time the vehicle is towed. While such procedures may be preferred, presently, given fiscal concerns, they are cost prohibitive. In cases where a photograph would be prudent, the vehicle's condition can be captured and preserved utilizing the current in-car digital video camera system.

   **3c** – The Department agrees and currently disciplines officers according to the standards contained in the Detroit Police Department Policy Manual Directive 102.4 – Standard of Conduct.

KWAME M. KILPATRICK, MAYOR



## Finding 4: RECORD OF PRECINCT-AUTHORIZED TOWING ASSIGN- MENTS IS DEFICIENT

**Response to Finding:** The Department agrees that in some cases, the current policies concerning the completion of departmental towing records are not being properly followed.

**Response to Recommendation:**

**4a** – The Department disagrees with the recommendation that Impound Cards should be sequentially numbered. Sequentially numbering the Impound Cards will not assist in the tracking of impounded vehicles in the tow book; given that Impound Cards are issued to officers before they are utilized. However, the Department agrees that this form should be revised to include spaces for the impounding officer's signature and the recording notifications. Additionally, the CRISNET system will generate a *case number* which will assist in the tracking of impound vehicles.

**4b** –Standardized Procedures to retain Impound Cards already exist. According to the Detroit Police Policy Manual 101.11, the Department's current procedures require that the Impound Card DPD 406 be retained for five (5) years.

## Finding 5: PAYMENT OF PRECINCT-ORDERED TOWING ASSIGN- MENTS MADE WITHOUT SUPPORTING AUTHORIZATION

**Response to Finding:** The Department agrees in part that the current polices and procedures are not being followed. However, the finding that there is no police review of the tow slips and invoices prior to their payment by the Fiscal Operations Section of MSB is false.

**Response to Recommendation:**

**5a** - The Department agrees, in part, that the Fiscal Operations Section reject all invoices that are submitted to them directly by tow companies for payment. However, the Department disagrees with the recommendation that precinct commanders be responsible for submission of towing invoices for payment. Currently, all invoices are reviewed for accuracy by the Resource Management Division of MSB, prior to their payment by the Fiscal Operations Section. Upon implementation of the

Kwame M. Kilpatrick, Mayor



new towing contracts, changes in tow invoice reconciliation procedures will be made by the Resource Management Division staff.

**5b** – The Department disagrees with this recommendation that the MSB establish towing rates for non-vehicle items (boats, basketball hoops, etc.) that are frequently towed. As stated in Sections 55-15-5 and 55-15-2 of the City Code, the Towing Rate Commission "shall be charged with the duty of reviewing the towing rates at least once every two years and submitting its recommendation to City Council." City Council, "by resolution," establishes the rates and fees. The Department will prepare a recommendation regarding towing rates for frequently towed non-vehicle items to be considered by City Council for establishing rates and fees.

**5c** - The Department disagrees with this recommendation on the monthly submittal of towing invoices by precinct commanders to insure that payments to towing companies are processed "quickly". Currently, to ensure that payments are processed efficiently, all invoices are reviewed for accuracy by the Resource Management Division, prior to their payment by the Fiscal Operations Section.

Additionally, a Department teletype communication has been issued reminding officers of the proper procedures for impounding vehicles and making the proper notifications as outlined in the department's manual.

Should you have any concerns regarding this matter, please do not hesitate to contact me at 596-1800, Monday through Friday, 8:00 a.m. to 5:00 p.m.

Sincerely,

**ELLA M. BULLY-CUMMINGS**
Chief of Police

EMBC-ma

KWAME M. KILPATRICK, MAYOR