## City of Detroit

# OFFICE OF THE AUDITOR GENERAL



# Audit of the Detroit Police Department's Police-Authorized Towing Contracts

## December 2003



# City of Detroit

**OFFICE OF THE AUDITOR GENERAL**
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 208
Detroit, Michigan 48226
Phone: (313) 224-3101
Fax: (313) 224-4091
www.ci.detroit.mi.us

**Joseph L. Harris, CPA, CIA**
Auditor General

**Sharon L. Gipson, CPA**
Deputy Auditor General

## MEMORANDUM

**DATE:** October 26, 2005

**TO:** Honorable City Council
Mayor Kwame Kilpatrick

**FROM:** Joseph L. Harris
Auditor General

**RE:** Audit of the Detroit Police Department's Police-Authorized Towing Contracts

**C:** Chief Ella M. Bully-Cummings

---

Attached for your review is our seventh of eight reports on the audit of the Detroit Police Department's (DPD) police-authorized towing process. Reports on the towing process are as follows:

1. Administration of the Police-Authorized Towing Process (issued September 30, 2004)

2. Compliance with the Impounded Vehicle Towing Process (issued November 23, 2004)

3. Compliance with the Abandoned Vehicle Towing Process (issued January 18, 2005)

4. Vehicle Auction Process (issued February 3, 2005)

5. Evidence Vehicle Process (issued October 21, 2005)

6. Accounting and Reporting System (A separate report will not be issued. The related findings have been incorporated into the other reports in this series.)

7. Police-Authorized Towing Contracts

8. Best Practices and Recommendations.

This audit was initiated by the Auditor General to determine the validity of allegations of malfeasance by police-authorized tow companies and DPD personnel, and to determine whether there was compliance with State laws, City ordinances, DPD towing procedures, and towing contracts.

This report focuses on the towing companies' compliance with the DPD's policies and procedures, and the terms of the towing contract. This report contains our findings and

i



recommendations specific to this process, and the DPD's response. Many of the issues detailed in this report continue because the longstanding causes underlying those conditions have not been remedied and therefore, still exist.

We recommend that the entire police-authorized towing process be reengineered. Our final report in this series will include our recommendations for consideration in developing reengineered policies and procedures. The recommendations included in this report are those that we believe should be immediately implemented to address serious problems until the reengineered process is developed.

Copies of all of the Office of the Auditor General's reports can be found on our web site at www.ci.detroit.mi.us/legislative/CharterAppointments/AuditorGeneral.

**Audit of the Detroit Police Department's Police-Authorized Towing Contracts**

**December 2003**

**Table of Contents**

| | | |
|---|---|---|
| EXECUTIVE SUMMARY | | 1 |
| AUDIT PURPOSE, SCOPE, OBJECTIVES AND METHODOLOGY | | 6 |
| OVERVIEW OF THE POLICE-AUTHORIZED TOWING CONTRACTS | | 7 |
| FINDINGS AND RECOMMENDATIONS: | | |
| 1. | DPD Awarded Contracts to Ineligible Towing Companies | 9 |
| 2. | Towing Companies Tow in Unauthorized Precincts | 12 |
| 3. | Towing Companies Move Vehicles Prior to Obtaining Police Authorization | 13 |
| 4. | Towing Companies' Storage Lots are Not Properly Secured | 15 |
| 5. | Towing Companies are Storing Vehicles on the Streets | 17 |
| 6. | Towing Companies are Not Open During Required Business Hours | 18 |
| 7. | Towing Companies are Not Allowing Access to Vehicles | 19 |
| 8. | Towing Companies Charge Improper Fees | 21 |
| 9. | Towing Companies' Records are Not Adequately Maintained | 24 |
| 10. | Towing Companies are Not Reporting Unclaimed Vehicles Monthly | 26 |
| 11. | DPD Did Not Require New Owners to Reapply for Towing Contracts | 28 |
| OTHER TOWING ISSUE: | | |
| 1. | Towing Companies Charge Higher Fees on Auto Theft Unit Recoveries | 29 |
| EXHIBIT A - SCOPE OF SERVICES | | ATTACHMENT A |
| AGENCY'S RESPONSE | | ATTACHMENT B |

# EXECUTIVE SUMMARY

The Auditor General initiated this audit in response to allegations of malfeasance committed by police-authorized towing companies and Detroit Police Department (DPD) personnel. The purpose of the audit was to determine whether State laws, City ordinances, DPD's established towing policies and procedures, and the terms of the towing contracts are being complied with and whether the allegations of improprieties are valid.

The subject of this report is the qualifications of the towing companies that were awarded police-authorized towing contracts, and compliance of the police-authorized towing companies and the DPD with the contracts' terms. Police-authorized towing company qualifications were stated on the application form and within the police-authorized towing contract. Procedures, that the towing companies and the DPD agreed to follow, are specified in the DPD's police-authorized towing contract.

Our first report in this series, "Audit of the Detroit Police Department's Administration of the Police-Authorized Towing Process," revealed that there were no checks and balances in the award of the towing contracts, and that the contracts were not approved by City Council. Titles of the related findings that are contained in the first report are listed below:

- Award of the November 2001 Towing Contracts Did Not Follow the City's Purchasing Ordinance;

- Towing Companies with Commingled Assets, Owners and Management are Treated as Separate Companies for Towing Assignments; and

- Towing Contracts' Related Business Conflict of Interest Clause is Not Enforced.

DPD's Management Services Bureau (MSB) does not proactively monitor the police-authorized towers' compliance with towing procedures and contract requirements due to a lack of personnel; therefore, police-authorized towers are not held accountable and there is no assurance that the towing companies are meeting their contractual obligations. The lack of monitoring increases the risk of public corruption of police officers; the risk of theft of vehicles, auto parts, and personal property; and the risk that excessive towing and storage charges to vehicle owners go undetected. Furthermore, neighborhoods are blighted by police-authorized tower storage yards that are not properly maintained or located within the proper zoning district.

We believe that the City should reengineer the entire police-authorized towing process. Following is a summary of our specific findings and recommendations relative to the award of and compliance with the police-authorized towing contract:

## Finding 1 – DPD Awarded Contracts to Ineligible Towing Companies

Some towing companies were awarded contracts even though they did not meet the DPD's eligibility requirements. We found that the MSB did not document a formal application review. Discrepancies between contract requirements and towing company files include: required certificates of insurance were not in the files; company resources were sometimes overstated, as the same storage lots, tow trucks, insurance policies, and employees were listed on two or more applications; property tax clearances granted

1

for towing companies were not based on all properties owned; storage lot security was not verified; zoning and permits necessary to operate abandoned vehicle storage yards and towing services were often lacking; and there was no documentation that criminal history checks were performed. Furthermore, there was no documentation of the companies' ownership at the time the contracts were awarded so that the extent of subsequent ownership changes can be determined.

We recommend that an agency independent of the DPD be involved in the awarding of the contracts and that the contracts be approved by City Council. The City-authorized towing contract application should be expanded to collect the additional information required to determine towing company eligibility. The City should perform and document a thorough application review to ensure that the assertions made by the applying companies meet the criteria specified in the City's towing ordinance and in the towing contract's terms and scope of service.

## Finding 2 – <u>Towing Companies Tow in Unauthorized Precincts</u>

Four towing companies tow vehicles in precincts they are not authorized to tow in. Three of the companies perform towing for prostitution stings, which is considered a non-impound towing assignment. Another company substitutes on a related company's rotational calls in the 8th precinct, which is a violation of the towing contract.

We recommend the City strictly enforce the terms of the police-authorized towing contracts and require towing assignments generated outside the precincts to use the towing companies assigned to those precincts. Towing in unauthorized precincts should not be tolerated.

## Finding 3 - <u>Towing Companies Move Vehicles Prior to Obtaining Police Authorization</u>

Towing companies are moving abandoned or stolen vehicles prior to obtaining police approval, which is in effect stealing the vehicle. Several drivers have been caught performing unauthorized towing. Complicating this issue is that the Michigan Auto Theft Prevention Authority (ATPA) funded auto theft units[1] occasionally order vehicles towed verbally, and then recover[2] the vehicles later at the towing companies' lots. Some towing companies use the auto theft unit's process to explain their unauthorized possession of stolen vehicles. Some towing companies have the auto theft units recover stolen vehicles that have already been moved to their lots.

---

[1] The Michigan ATPA was established to combine the efforts of law enforcement, communities and business against theft. The ATPA is funded by an annual $1 assessment on each insured non-commercial passenger vehicle. The ATPA awards grants to law enforcement agencies to prevent auto theft, catch auto thieves, and put the thieves in jail. Grant recipients, in addition to the DPD, that recover stolen vehicles in Detroit are the Michigan State Police (MSP) Western Wayne Team (WWATU), the MSP Downriver Team (DRATT), and the Macomb Sheriff's Macomb County Auto Theft Squad (MATS). Boulevard & Trumbull, B&G Towing, and Gene's Towing are used to tow stolen vehicles recovered by WWATU, DRATT and MATS in the City of Detroit.

[2] The term "recover," as used in the recovery of stolen vehicles refers to the process by which a found stolen vehicle's status is reported and updated in the Law Enforcement Information Network (LEIN) and National Crime Information Center (NCIC) computer systems. The recovery process determines the proper disposition of the recovered vehicle - whether the vehicle can be impounded by the recovering jurisdiction, held for evidence processing, or impounded for another jurisdiction.

2

We recommend that the City, the Michigan State Police, and the auto theft units coordinate stolen vehicle recovery efforts to curb the towing of vehicles prior to obtaining verifiable police permission. Processes should be understood so that these agencies can hold towing companies fully accountable for the stolen vehicles in their possession that have not been recovered.

## Finding 4 – <u>Towing Companies' Storage Lots are Not Properly Secured</u>

Most towing companies report at least some theft from their storage lots. One towing company estimated missing parts claims of $15,000 in 2002. Several towing companies keep inventories of frequently stolen parts to replace parts removed from vehicles when the vehicle owner complains, and to curb the number of claims submitted to their insurance companies. These "self insured" towing companies have no incentive to fully secure their storage lots, which increases the likelihood that theft of parts will occur.

We recommend that the City ensure that the vehicle condition reports are completed when a vehicle is towed, so that the towing company can be held accountable for parts while the vehicle is in the towing company's custody. The City should inspect the storage lots and require the towing companies to make changes in security if warranted.

## Finding 5 – <u>Towing Companies are Storing Vehicles on the Streets</u>

We observed towed vehicles sitting on the street outside two towing companies in violation of the provisions of the police-authorized towing contract.

We recommend that the City enforce the provisions of the towing contracts. Prior to the award of the next towing contracts, the City should reevaluate the storage lot space requirements necessary to meet the City's towing needs and make any necessary adjustments to the towing contracts.

## Finding 6 – <u>Towing Companies are Not Open During Required Business Hours</u>

Nine towing companies do not maintain the required hours of 7:00 a.m. to 7:00 p.m. in order to be available to release vehicles to owners. We observed one storage lot that was open to trespass and unattended. At the same lot, we observed a vehicle owner climbing the gate to leave after he had been locked in during the required business hours.

We recommend that the City enforce the storage lot hours stipulated in the towing contract.

## Finding 7 - <u>Towing Companies are Not Allowing Access to Vehicles</u>

Vehicle owners and insurance companies are being pressured to give up their rights or ownership in order to view a vehicle. We found that towing companies are requiring some vehicle owners to sign over the vehicle title before being allowed access to the vehicle. Some towing companies are requiring that insurance companies redeem the recovered stolen vehicle before seeing its condition. Towing companies allege they are taking these steps to minimize their costs; they want to be able to easily dispose of the

3

vehicle if the vehicle owner or the insurance company decides the vehicle is in such poor condition that they do not want it.

We recommend that the City ensure the owners access to their vehicles while the vehicles are in the possession of the towing companies.


**Finding 8 – <u>Towing Companies Charge Improper Fees</u>**

Some towing companies are charging vehicle owners for items, such as winching and labor, which are not authorized in the towing rates approved by City Council. Many towing companies are not waiving the storage fees for the first three days of storage, especially when vehicles are redeemed by auction companies or by insurance companies. Towing rates are not posted, so vehicle owners are not made aware of the amounts they should be paying for the towing service, and therefore are not aware that they are improperly charged.

We recommend that the City require towing companies to post rates so vehicle owners will be made aware of them, and suspend towing companies found to be overcharging vehicle owners, insurance companies, and others.


**Finding 9 – <u>Towing Companies' Records are Not Adequately Maintained</u>**

Towing companies were generally able to produce documents stating the reason the vehicle was towed, but were unable to produce documents indicating the vehicle's disposition. We found that several companies did not have a form DPD-131, authorizing the towing of the vehicle, for some vehicles on their storage lots. One company could not produce invoices for towed vehicles for a 14-month period.

We recommend that the City specify the records that the towing companies are required to maintain to satisfy its record keeping requirements and enforce the terms of the contracts, which require records be maintained for three years.


**Finding 10 – <u>Towing Companies are Not Reporting Unclaimed Vehicles Monthly</u>**

Towing companies are not submitting the Unclaimed Vehicle Report by the 10th of each month as required by the contracts. As a result, the DPD is unaware of vehicles towed to the towers' storage lots outside the police-authorized towing process, and is unaware of vehicles that have sat on a tower's lot, garnering storage fees, for long periods without being redeemed or auctioned.

We recommend that the City require that towing companies submit the monthly list of unclaimed vehicles, so the City is made aware of vehicles that have sat unclaimed and is able to process them appropriately.

4

## Finding 11 - <u>DPD Did Not Require New Owners to Reapply for Towing Contracts</u>

We found no indication that the MSB was notified of Boulevard & Trumbull's, E&G's, or Javion & Sam's ownership change in September 2002. As such, MSB did not require the new owner of these companies to reapply for the police-authorized towing contracts as is required.

We recommend that the City enforce this contract term.


### Other Towing Issue - <u>Towing Companies Charge Higher Fees on Auto Theft Unit Recoveries</u>

Some towing companies are charging vehicle owners towing and storage fees on stolen vehicles that are recovered by the Auto Theft Prevention Authority (ATPA) funded auto theft units[3] at rates substantially higher than those established for vehicles ordered towed by the DPD. The rates charged on the auto theft unit tows are not regulated, and vary between $135 and $175 per tow plus $12 per day storage beginning on the first day while rates charged on the DPD and the Michigan State Police ordered tows are $75 per tow plus $8 per day storage after the third day. In our opinion, the cost to the vehicle owner should not be dependent on which law enforcement agency happens to recover the stolen vehicle or order the vehicle towed.

We recommend, in the interest of protecting the public from inordinately high fees, that the auto theft units' contracts with the towing companies require the towing companies to charge the fees established by the City of Detroit on the vehicles recovered and ordered towed within the City. We also recommend that the City Council issue a resolution calling for the standardization of towing and storage fees on all law enforcement ordered tows within the City of Detroit.

---

[3] The Michigan ATPA was established to combine the efforts of law enforcement, communities and business against theft. The ATPA is funded by an annual $1 assessment on each insured non-commercial passenger vehicle. The ATPA awards grants to law enforcement agencies to prevent auto theft, catch auto thieves, and put the thieves in jail. Grant recipients, in addition to the DPD, that recover stolen vehicles in Detroit are the Michigan State Police (MSP) Western Wayne Team (WWATU), the MSP Downriver Team (DRATT), and the Macomb Sheriff's Macomb County Auto Theft Squad (MATS). Boulevard & Trumbull, B&G Towing, and Gene's Towing are used to tow stolen vehicles recovered by WWATU, DRATT and MATS in the City of Detroit.

# AUDIT PURPOSE, SCOPE, OBJECTIVES, AND METHODOLOGY

## AUDIT PURPOSE:
The Auditor General initiated this audit in response to allegations of malfeasance by police-authorized towing companies and Detroit Police Department (DPD) personnel involved in the police-authorized towing process.

## AUDIT SCOPE:
The Office of the Auditor General (OAG) conducted an audit of the DPD's towing process to determine the DPD's and the towing companies' compliance with State law, City ordinances, DPD established towing policies and procedures, and the towing contracts' terms.

The scope of work covered in this report was limited to a review of the qualifications of the towing companies that were awarded police-authorized towing contracts, and compliance of the police-authorized towing companies and the DPD with the contracts' terms.

Our audit was conducted in accordance with Government Auditing Standards issued by the Comptroller General of the United States, except that the OAG has not received an external peer review within the past three years.

## AUDIT OBJECTIVES:
Specifically, we wanted to determine whether:

- Companies receiving towing contracts were eligible;

- Towing companies and the DPD are complying with the contract terms; and

- Other issues should be addressed in subsequent towing contracts.

## AUDIT METHODOLOGY:
To accomplish our objectives, our audit included:

- Interviews with DPD management, police officers, towing companies, and others;

- Reviews of DPD towing procedures, and City ordinances;

- Reviews of contracts, applications and towing company files;

- Reviews of zoning documents, tax records, and clearances;

- Reviews of documents supporting the towing of vehicles located on ten towing companies' lots; and

- Reviews of records at all towing companies supporting their 2002 police-authorized tows.

6

## OVERVIEW OF THE POLICE-AUTHORIZED TOWING CONTRACTS

Chapter 55 of Detroit's City Ordinances entitled Traffic and Motor Vehicles and the State of Michigan's Motor Vehicle Code establish the City's framework for its police-authorized towing process. All of the requirements for police-authorized towing companies that are established by the ordinance are contained in the police-authorized towing contract except:

- The requirement that the towing company provide the vehicle owner or driver with a copy of the towing rate schedule approved by City Council. [Section 55-15-3 (b)]

- The requirement that the towing company report all wrecked or disabled vehicles removed from any freeway or from the scene of any accident in the city and which are being stored for the driver or owner within 24 hours. [Section 55-16-6 (a)]

- The requirement that any place at which wrecked or disabled vehicles are stored shall post the name, address and phone number of the operator of the place and the hours during which the place is open for business. [Section 55-16-6 (b)]

The agreements between the DPD and the police-authorized towing companies have evolved. Prior to 1998, the agreements between the DPD and the police-authorized towing companies were detailed in the form of a Letter of Understanding for the Private Authorized Tow Program. In 1998, the agreement became formalized in Police-Authorized Tower Contracts. In late 1999, the 1998 contracts were extended indefinitely, until new contracts could be crafted that would address towing of crime victims' vehicles, storage rates, and processing issues related to the timely release of vehicles. Towing companies and the MSB signed the current contracts in November 2001. The contracts were not sent to City Council for approval in violation of the City's Purchasing Ordinance. The contracts require the DPD to pay very little, yet they do allow the towing companies access to revenues from vehicle owners redeeming their cars and from auction sales. The more recent contracts were in effect until March 31, 2005. These contracts have been extended until March 31, 2006.

Highlights from the contracts include:

- The Contractor agrees to perform according to the terms of the contract, City ordinances, and Michigan law.

- The sole compensation that the Contractor will receive is payment from the owner or driver of the vehicle or from the proceeds of the abandoned vehicle auction. The City will only pay for towing services as required by law.

- The Contractor shall not charge fees in excess of those set by City Council.

- The Contractor is to maintain records reflecting operations related to the contract in accordance with generally accepted accounting principles for at least three years after the contract ends.

- The City can audit records and supporting data.

- The Contractor cannot have any interest that conflicts with the performance of the police-authorized towing service.

7

- The Contractor will comply with federal, state and local laws.

The contracts specify some of the Contractors' eligibility requirements:

- The Contractor must be a Detroit-based business.
- The Contractor must be approved for participation in the program.
- The Contractor represents, by signing the contract, that it has or will acquire the personnel, equipment and licenses necessary to perform the services assigned.
- The Contractor will not hire, contract or utilize persons with a theft or fraud criminal conviction.
- The Contractor shall maintain workers' compensation, employer's liability, commercial general liability, garage keeper's legal liability, and automobile liability insurance.
- The Contractor will not be or is not in arrears to the City on any obligation.

The contracts' Scope of Services includes 30 specific services to be performed. The scope of services is included as Attachment A to this report.

Two factors complicate the evaluation of the towing companies' provision of services and performance. First, the Michigan State Police and the Auto Theft Prevention Authority's grant funded auto theft units order "police" towing in the City of Detroit that does not fall under the DPD's police-authorized towing contract. Second, insurance companies are not specifically addressed in the contract. Insurance companies interact with towing companies because they may pay towing and storage fees. They can be involved with the recovery of stolen vehicles, and they can become the vehicle owner if the stolen vehicle's owner's claim has been settled.

8

# FINDINGS AND RECOMMENDATIONS

## 1.  DPD Awarded Contracts to Ineligible Towing Companies

Some towing companies did not meet the Detroit Police Department's (DPD) eligibility requirements for the 2001 police-authorized towing contract.  Results of a formal application review, demonstrating that the assertions made by the towing companies on the application had been verified or that the towing companies had met the eligibility criteria, were not contained in the Management Service Bureau's (MSB) towing company files.

Specifically:

- Companies were asked to provide proof of general liability, workers' compensation, employer's liability, commercial general liability, garage keeper's legal liability and automotive liability insurance at certain amounts; however:
  - ➢ Proof of insurance coverage was not contained in some towing companies' files.
  - ➢ Several of the towing companies' files did not contain proof of the required general liability insurance coverage.
  - ➢ Some of the insurance certificates had expired before the contract start date.
  - ➢ Some of the insurance certificates were issued in another company's name.
  - ➢ The requirement to name the "City of Detroit" as an additional insured was not always met.

- The towing companies were asked to provide information about company resources to insure that the company could provide the services required by the contract.  Towing companies were allowed to overstate their resources by claiming another company's storage lots, vehicles, employees, and insurance coverage as its own.

- Applying towing companies were asked to provide property tax and income tax clearances to show that they were not currently in arrears to the City on any debt, contract or obligation.  Property tax clearances granted by the City were based on the principal business address only, and did not include other properties owned by the companies or the business owners.  We reviewed 51 properties owned by the 30 towing companies and found that 4 of the towing companies had delinquent taxes at 6 properties.  We also found that several of the towing companies listed property addresses do not have property assessor's data in the City's database.

- The towing companies' contract files contained no documentation that the storage lots were inspected by the MSB, and that the assertions that the storage lots were fenced and secure and could store the number of vehicles indicated on the application were verified.

- The lots were not checked by the MSB for appropriate zoning and permits.  We asked the Building and Safety Engineering Department (BSED) to review a list of 52 properties owned by the towing companies.  They found that 24 of the

9

properties, owned by 17 towing companies, lacked the appropriate permits to be operated as police-authorized abandoned vehicle yards and towing services. In all, 12 towing companies lacked permits or zoning for police-authorized abandoned vehicle storage, or any other type of vehicle storage according to BSED records.

- The DPD had no documentation that criminal history checks were performed on towing company owners or employees.

- Documentation or certification of company ownership at the time the contract was let was not obtained, which makes it difficult to enforce the contract provision that towing contracts cannot be transferred, or that the towing company has to reapply if there is a change of ownership by more than 40%.

Eligibility criteria that towing companies must meet and maintain to become or continue as a police-authorized towing company were stated in the MSB's announcement that it was accepting applications for towing contracts. The stated criteria included:

- Proof of the required insurance coverage;

- Ability to provide fenced storage facilities for a minimum of twenty vehicles at the principal place of business;

- Ability to maintain 24-hour service, seven days per week;

- Ability to release vehicles to owners between the hours of 7:00 a.m. and 7:00 p.m.;

- Capability for flatbed or dolly tows;

- Company trucks that are clearly marked with the company's name and phone number, and that do not suggest they are police vehicles; and

- Possession of the required property and income tax clearances.

Additional requirements imposed on the towing companies by the police-authorized towing contract include the:

- Requirement that the company not be or become in arrears on City obligations including real, personal and income taxes;

- Agreement not to hire, employ or utilize persons with a criminal conviction involving theft or fraud;

- Agreement not to use a storage facility or additional storage lot without first securing proper zoning approvals; and

- Prohibition of transferring the towing contract.

Contracts were awarded to ineligible towing companies. Ineligible employees, inadequate resources, and insufficient insurance coverage put the City at risk. A towing company's inability to perform contracted services will ultimately have a negative impact on the vehicle owners' ability to redeem their vehicles in a timely manner. Inappropriately located storage lots, in locations without proper zoning, contribute to neighborhood blight. Moreover, these failures by the DPD and the towing companies

have put citizens at risk, and the need to resolve towing issues causes unnecessary inconvenience.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. An agency independent of the DPD be involved in the awarding of the police-authorized towing contracts, and the contracts be subjected to the normal City approval process including City Council approval.

b. The City expand the application for the towing contracts to require all towing contract applicants to:

- List all properties owned;

- List company ownership and the percentage each owner controls;

- Submit independent insurance policies for each towing company listing the City as an additional insured;

- Separate any shared resources so that each resource is listed only one time on all applications;

- List the number of spaces on its storage lot, excluding those needed to fulfill other towing contract requirements, that are available for City use;

- Certify that the owners and employees have no criminal record; and

- Submit up-to-date insurance certificates.

c. The City perform and document a thorough review of each application to determine whether the information submitted is accurate and is in conformance with eligibility criteria, and whether the towing company has adequate resources to perform the requirements of its police-authorized towing contract.

## 2. Towing Companies Tow in Unauthorized Precincts

We found that at least four companies - Area Towing, Gene's Towing, B&G Towing and Boulevard & Trumbull – are towing in precincts in which they are not authorized.

B&G Towing and Area Towing have been used to tow vehicles for prostitution stings in the 7th precinct, even though they are not authorized in that precinct. Area Towing is also used for prostitution stings in the 2nd and the 4th precincts, although it is not authorized in those precincts.

Gene's Towing substitutes for B&G Towing in the 8th precinct at B&G Towing's request. The impound cards reviewed at Gene's Towing indicate that B&G Towing is the towing company; however Gene's Towing is actually performing the tow.

Paragraph 1 (b) of the police-authorized towing contract states:

> If the Contractor is unable to respond to the scene within twenty minutes, the Contractor agrees to so inform the officer requesting the tow. If the Contractor has not arrived at the scene within twenty minutes of receiving notification, the requesting officer will notify the next company on the authorized list.

Paragraph 11 of the contract's Scope of Services states:

> The Contractor shall be authorized to tow only in a precinct or precincts for which it has been authorized as shown on Exhibit C.

Paragraph 21 states:

> Contractors may serve in all precincts for which they qualify and for which they have received an Authorized Police Tower contract which is in force at the time of the service.

Some towing companies aggressively pursue additional towing opportunities in the City, and, in the past, some non-impound towing assignments have not been assigned to a rotational towing company authorized in that precinct. One tower stated he tows in precincts in which he is not authorized, because he feels he was cheated when the extra rotational towers were added to the precinct rotation in 2001.

In addition to violating the police-authorized towing contract, towing companies operating in precincts for which they have not been authorized are stealing towing business that belongs to the rotational police-authorized towing companies authorized in that precinct.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City require DPD units and the precincts to adopt a strict interpretation of the police-authorized towing contract and award non-impound towing assignments to the rotational authorized towing companies. Towing in unauthorized precincts should not be tolerated.

## 3. Towing Companies Move Vehicles Prior to Obtaining Police Authorization

We noted several instances where police-authorized towing companies towed vehicles before obtaining police permission. Aside from being against the law, the risk is that the towing companies may not obtain police approval for the tow at all, resulting in police-authorized towing companies possessing undocumented vehicles on their storage lots that can be disposed of without anyone's knowledge.

Complicating this issue is that the towing procedures used by the Michigan Automobile Theft Prevention Authority's[4] (AFPA) auto theft units working to recover[5] stolen vehicles in the City differ from the procedures used by the DPD.

Instances where vehicles were towed prior to obtaining police permission include the following:

- A former 7th precinct abandoned vehicle officer allowed towing companies to tow stolen vehicles without police-authorization. A current abandoned vehicle officer informed us that he still receives calls from towing companies to recover stolen vehicles on their lots.

- A B&G Towing tow truck driver was stopped by a DPD officer on April 11, 2002 and found to be carrying two stolen vehicles without having obtained police permission to tow them. The tow truck driver claimed that the Macomb Auto Theft Squad (MATS) had given him permission to tow the vehicles. However, the police officer checked with MATS and found it was not so. A member of MATS stated they would never have B&G Towing tow recovered stolen vehicles unless they had inspected them first.

- A B&G Towing representative told us that most of the time the Michigan State Police (MSP) are at the site to recover a stolen vehicle before it is towed. But it has towed stolen vehicles into its Lynch Rd. lot without police presence at the recovery site. After the vehicle is towed, it will phone one of the auto theft units to ensure there are no holds on the vehicle, and to obtain verbal permission to tow the vehicles.

- MATS recovers vehicles stolen from Macomb County at the B&G Towing lot at 8100 Lynch. As a courtesy to DPD's Commercial Auto Theft Section (CATS), a representative of MATS said they will recover other stolen vehicles that B&G Towing has in its possession that have been stolen from Detroit. MATS will complete a vehicle inspection report, cancel the stolen status on the LEIN system, and call the insurance company to notify it of the recovery.

---

[4] The Michigan ATPA was established to combine the efforts of law enforcement, communities and business against theft. The ATPA is funded by an annual $1 assessment on each insured non-commercial passenger vehicle. The ATPA awards grants to law enforcement agencies to prevent auto theft, catch auto thieves, and put the thieves in jail. Grant recipients, in addition to the DPD, that recover stolen vehicles in Detroit are the Michigan State Police (MSP) Western Wayne Team (WWATU), the MSP Downriver Team (DRATT), and the Macomb Sheriff's Macomb County Auto Theft Squad (MATS). Boulevard & Trumbull, B&G Towing, and Gene's Towing are used to tow stolen vehicles recovered by WWATU, DRATT and MATS in the City of Detroit.

[5] The term "recover," as used in the recovery of stolen vehicles refers to the process by which a found stolen vehicle's status is reported and updated in the Law Enforcement Information Network (LEIN) and National Crime Information Center (NCIC) computer systems. The recovery process determines the proper disposition of the recovered vehicle - whether the vehicle can be impounded by the recovering jurisdiction, held for evidence processing, or impounded for another jurisdiction.

13

Section 257.252d of Michigan's Vehicle Code provides that

> (1) A police agency or a governmental agency designated by the police agency may provide for the immediate removal of a vehicle from public or private property to a place of safekeeping at the expense of the registered owner.

The Code does not require that the police agency make a written record of its request for vehicle removal to the towing company.

The City's Police-Authorized Towing Ordinance establishes when a vehicle can be towed. Section 55-15-3(a) of the City Code, states:

> No person shall perform any police authorized towing of any wrecked or disabled vehicle or any vehicle for safekeeping pursuant to MCLA 257.252d [MSA 9.1952(4)] without first having obtained written permission on forms approved by the City police department, from the driver or owner of the vehicle or until the police officer of the city investigating the wrecked or disabled vehicle or vehicle subject to removal shall have completed his investigation, and has given written permission to the towing service. A copy of the completed permission form shall be given to the authorizing person. Any person performing police authorized towing shall maintain a record of completed permission forms of all such towing for a period of six (6) months. Completed forms must show total fees charged for services rendered.

Some towers told us that they would tow stolen vehicles without police permission for safekeeping because if they wait for a police officer to recover the vehicle more damage will occur. Furthermore, towing immediately improves the value of the recovery for owners and the insurance companies.

Moving vehicles without the authorization of the vehicle owner or an authorizing police agency is, in effect, stealing the vehicle. Police agencies are unable to hold the towing companies accountable for vehicles that they are unaware have been towed, and unscrupulous towing companies or drivers could cause vehicles to disappear, without a trace, if authorization approving the tow is not properly documented.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City work with the MSP and the auto theft units to coordinate the stolen vehicle recovery efforts within the City, communicate concerns related to the towing companies' undocumented towing of stolen vehicles, and develop a unified procedure that will curb the problem and allow the police agencies to hold the towing companies accountable for vehicles in their possession.

b. The City prosecute drivers and/or towing companies to the full extent of the law when found moving vehicles without prior police permission.

14

## 4. Towing Companies' Storage Lots are Not Properly Secured

The towing companies' storage lots we visited lacked adequate security. As a result, auto parts and property were stolen from vehicles. Every towing company we interviewed reported a problem with the theft of parts from impounded vehicles. Some of their conditions are reported below:

- The owner of one towing company said they have had a security problem and parts have been stolen. He recently obtained a dog that has deterred theft from the lot.

- A representative of another towing company said that it pays claims for missing parts directly to the vehicle owner. It does not file a report with its insurance company, because it is afraid its premiums will go up. He estimated the towing company had paid $15,000 in missing parts claims in 2002. The manager said he reduces the financial impact of the claims by taking radios and speakers off vehicles that it obtains after auction. When vehicle owners claim their radio is missing, the representative offers them a radio from his collection.

- The owner of another towing company told us that he has a problem with thievery at his lots. He said he has caught people stealing, but the DPD doesn't respond to his calls. He also blamed the courts for not prosecuting the cases. Most of the vehicles we looked at were missing radiators. The owner told us that someone came into the lot and stole the radiators.

- A representative of another towing company reported that it also pays lost part claims directly to vehicle owners rather than filing insurance claims, because it is afraid its insurance premiums will increase. The manager told us that radios, speakers, CD players, and CDs are removed from vehicles it receives after the auction and it will offer these to vehicle owners who claim they lost property at the storage lot. The manager told us that the thefts at his and other towers' lots were most likely an internal problem. He said drivers and security personnel are probably involved in most of the thefts.

- A representative of another towing company reported a theft problem at one of its storage lots. It has a security guard, surveillance cameras, and lights; however, it still experiences theft. The representative reported they have caught people stealing radios from the cars.

- A representative of another towing company said that his lot is broken into by thieves jacking up the gates and crawling in.

Vehicle owners should be assured that towed vehicles are safe and secured from theft. The police-authorized towing contract, Exhibit A, Scope of Services, Section 3, requires in part:

> Outdoor parking and storage areas shall be fenced and secured.

In addition, Section 13 states:

> The Contractor shall be responsible for damage and theft to any vehicle and the parts, accessories and equipment attached, installed or affixed thereto, or any contents in said vehicle in its custody and to satisfy reasonable complaints for provable damages and losses.

The theft of parts from vehicles on storage lots has become an accepted aspect of the towing business. There is no incentive to make storage lots secure, when towing companies are able to satisfying vehicle owner's complaints of missing parts. Because storage lots are not secured, there is a high likelihood that the theft of parts will occur when a vehicle is in a towing company's custody.

Gene's Towing stores evidence vehicles that are still being held by the DPD in the same lot as non-evidence vehicles. There is potential for evidence to be tampered with. The mere potential for tampering can be used against the City in court.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City ensure that the vehicle condition reports are completed when a vehicle is towed, so that towing companies can be held accountable for parts removed from vehicles while they are in the towing companies' custody.

b. Towing companies take additional measures to safeguard the vehicles on their storage lots.

## 5. Towing Companies are Storing Vehicles on the Streets

Several towing companies are not holding all of their impounded vehicles in their storage lots. We observed impounded abandoned vehicles parked on West Chicago. Another towing company parked several abandoned vehicles on Westwood. The 6th Precinct has issued environmental tickets to a towing company for parking vehicles on the street at its Southfield Rd. location.

The police-authorized towing contract, Exhibit A, Scope of Services, Section II, paragraph 3, requires:

> The Contractor agrees to provide for the individual parking and storage of a minimum of 20 vehicles at the principal place of business. Outdoor parking and storage areas shall be fenced and secured. No vehicle will be parked or stored, even on a temporary basis, on the City streets, in alleys or easements.

Towing companies did not offer a reason for storing vehicles outside their storage lots. In one case, we observed that the storage lot was almost filled to capacity when the vehicles were parked on the street.

Abandoned vehicles parked on City streets are traffic hazards, and contribute to urban blight. Vehicles stored outside the fenced storage lots are more susceptible to theft.


**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City enforce the towing contract clause that prohibits storage of vehicles outside the storage lots. The City should issue the offending towing companies a warning, and continue to pursue the issuance of environmental tickets to those violating the contract terms.

b. Prior to the next towing contract, the City should evaluate whether the current parking and storage requirement of space for 20 vehicles is adequate considering the current towing conditions. The City should require that the appropriate space be set aside for City tows and that any additional space required by the towing company for other towing contracts or obligations be in addition to the space required to meet the storage requirements for the City's authorized towing requests.

17

## 6. Towing Companies are Not Open During Required Business Hours

Many towing companies are not keeping their facilities open and accessible to the public between the hours of 7:00 a.m. and 7:00 p.m. as required, to allow vehicle owners to redeem their towed vehicles.

Five police-authorized towing companies' applications document that they are not open from 7:00 a.m. to 7:00 p.m. as required by the towing contract. They are Bobby's Towing, Citywide Towing, E&G Towing, Long & Sons, and Troy Auto-Bans.

Four additional towing companies are not maintaining the required hours. This includes J&C Recovery, V&F Collision, Detroit Auto Recovery, and Area Towing.

We observed that although a towing company's storage lot was open, it was unsecured. The gates were open, equipment was left running, but it was not attended. We were later told that the attendant, who was also a driver, had probably responded to a call. At the same lot, we observed a man, attempting to redeem his towed vehicle, who was locked in the storage yard when it closed during the required business hours. He had to throw his personal belongings over the gate and climb over it to leave.

The police-authorized towing contract, Exhibit A, Scope of Services, Section II, paragraph 6, requires full access to the towing companies' storage yards:

> The Contractor agrees to have an employee present from 7:00 a.m. to 7:00 p.m. seven days a week with the authority to release vehicles promptly to citizens.

Paragraph 7 requires:

> The Contractor agrees that access to its premises shall not be unreasonably denied to citizens or police officers because of the presence of locked or closed gates or presence of dogs.

An owner of a company that is not open until 7:00 p.m. told us that he thought it was too dangerous for employees to maintain late hours.

As a result, the public is not being properly served in accordance with the police-authorized towing contract. Vehicle owners are denied access to vehicles, and vehicles are being assessed additional storage charges in the process.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City require towing companies maintain the required hours and staff to allow vehicle owners access to their vehicles during the hours listed in the police-authorized towing contract.

## 7. Towing Companies are Not Allowing Access to Vehicles

The towing contract does not address situations where neither the vehicle owner nor the insurance company want to redeem the vehicle.

Some police-authorized towers require owners of recovered stolen vehicles to pay the towing and storage charges or sign over the vehicle's title before they are allowed access to their vehicle. Then, if the owner decides he does not want to pay the towing and storage fees owing on their vehicle, the towing company is able to take possession of the vehicle without going through the abandoned vehicle auction process.

We witnessed on March 12, 2003 a vehicle owner being told that she would have to sign over the title of her vehicle before she could see the vehicle in the towers lot. The towing company owner promised to return the title if the vehicle owner paid the towing and storage fees.

This practice is widespread.

- Detroit Auto Recovery (DAR) requires recovered stolen vehicle owners to sign over title to see the car.

- Michigan Auto Recovery (MAR) requires the owners of recovered stolen vehicles to sign over the title before they can see their vehicle.

- The owner of J&C requires the vehicle owners sign the title over before they look at the car, but he prefers that they settle the bill.

- Gene's Towing does not require the vehicle owner to sign over the title to see the vehicle, but they will request the title if the owner wants to abandon the vehicle.

Insurance companies are also not allowed access to the vehicles or told the vehicles condition until the vehicle is redeemed. A representative of one insurance company reported that he is required to bring cash, a notarized copy of the title, a notarized letter from the insurance company, and proof of workers' compensation insurance that is valid on the date the vehicle is claimed before he is able to redeem a vehicle. Towing companies claim they require the documents and payment to prevent the insurance companies from walking away from the junk vehicles without paying the towing and storage fees. The insurance companies claim the towing companies require an excessive number of documents to enable them to accumulate more storage fees.

Section 6.02 of the police-authorized towing contract specifies, in part:

> Contractor shall not charge fees in excess of rates set by resolution of City Council.

Paragraph 14, of the Scope of Services indicates that:

> The Contractor agrees to release the vehicle directly to its owner only when proper documentation of ownership and identification is presented. Contractor may release vehicles to insurance companies provided (1) a copy of title, accompanied by a hold harmless letter is presented or (2) a letter of authority is presented signed by the owner and accompanied by a hold harmless letter and copy of title.

19

We were told by police-authorized towers that many vehicle owners and even insurance companies will not pay the towing and storage fees when they see that their vehicle has been totaled. If the vehicle owner decides not to redeem his vehicle, the police-authorized towing company can sell or scrap the vehicle to recover all or part of its towing and storage fees without going through the abandoned vehicle process.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City ensure the owners access to their vehicles while the vehicles are in the possession of the towing companies.

## 8. Towing Companies Charge Improper Fees

Most police-authorized towing company records that we reviewed showed that the towing companies are charging excessive and improper towing and storage fees. Fees are charged for items that are excluded from the rates established by City Council, storage is charged for the first three days, indoor storage rates are charged when it has not been authorized, and high rates are charged for heavy-duty tows.

- At Michigan Auto Recovery (MAR) -
  - ➢ We noted some invoices had labor charges. The MAR owner said he charges labor on items requested by the customer. For example, MAR will charge labor for putting tires on a vehicle that has had its four tires stolen to protect the undercarriage. The ordinance does not allow a charge for labor.
  - ➢ We observed a MAR invoice for a Thunderbird, which had a $75 winching fee. The ordinance does not allow this additional fee.
  - ➢ MAR charged $25 per day storage for an Art Van truck. The ordinance specifies $15 per day storage for trucks.
- At Gene's Towing -
  - ➢ We found many invoices with charges for the first three days of storage.
  - ➢ We noted that Gene's is charging vehicle owners, insurance companies, auction companies, and repair shops storage fees for vehicles on hold by the DPD for evidence processing.
  - ➢ We found invoices where vehicle owners were charged $12 per day for indoor storage. We did not see any evidence that vehicle owners approved the indoor storage of their vehicle.
- At Detroit Auto Recovery (DAR) –
  - ➢ We found charges for the first three days of storage.
- At Boulevard & Trumbull –
  - ➢ We found indoor storage rates of $12 per day were charged even though there was no documentation to support that the vehicle owner authorized the indoor storage.
  - ➢ On two occasions, recovered stolen vehicles were towed directly to Auto Body #1[6], a collision shop. As the vehicle owner was not present, he could not have authorized the tow to a place other than a storage lot, or authorized the indoor storage.
  - ➢ Storage fees were not waived for the first three days on several invoices.
  - ➢ Labor charges of $50 were included on a couple of the invoices reviewed.
- Both B&G Towing and Boulevard & Trumbull charged $250 or more towing fee and $25 storage per day for trucks and Ford tractors. A representative from B&G Towing indicated that costs for towing trucks are variable. He said tows of trucks

---

[6] Gasper Fiore, the owner of Boulevard & Trumbull Towing incorporated Auto Body #1 in 1996, and is listed as the corporation's vice president on its 2001 and 2002 corporation filings. This information was left blank on the 1997, 1998, 1999, 2000, 2003, and 2004 corporation information updates.

involve labor. Trucks that roll on their sides require costly air bags and clean up costs are more expensive.

Insurance companies are being charged towing and storage fees that are not in accordance with the rates established by City Council. The most prevalent overcharge was the failure to waive storage for the first three days. We reviewed ten invoices and noted five instances where four towing companies overcharged the insurance company for the tow fee, or charged for mileage or labor.

In addition, none of the police-authorized towing companies we visited - J&C Recovery, Detroit Auto Recovery, ABA Impound, MAR, B&G Towing, Troy Auto-Bans, V&F Collision Shop, Gene's Towing, Boulevard & Trumbull Towing, and Executive Towing – posted the DPD towing and storage rates where the vehicle owners could see them.

Section 6.02 of the police-authorized towing contract specifies, in part:

> Contractor shall not charge fees in excess of rates set by resolution of City Council.

The rates in effect at the time of our audit include:

> (e) To private storage pursuant to 38-1-32.1 (a) (4), a flat rate of $75 for towing and storage of the vehicle for up to three days, shall be charged to, and paid for by the owner of the vehicle towed. This rate shall apply regardless of the time and equipment used during such tows. An additional $8.00 per day may be charged for each day of storage in excess of three days.
>
> (f) Storage rate for large trucks and semi-trailers commencing on the first day: $15.00 / day.
>
> (g) For indoor storage commencing on the first day when authorized by the owner/agent of the vehicle: $12.00 / day.

The City Code, Section 55-15-3 (b) specifies,

> The tower shall provide the vehicle owner or driver with a copy of the towing rate schedule approved by city council.

The DPD does not monitor the rates the police-authorized towers charge the public for towing and storage fees. The only way the DPD is made aware of excessive charges is if the vehicle owner or the insurance company complains. Representatives of several towing companies mentioned that they think that insurance companies and criminals should not be entitled to three days of free storage.

Towing companies pad the bills to insurance companies, because they expect them to redeem the vehicle. If the insurance companies do not pay, the towing companies can auction the vehicles. Insurance companies will pay the excessive costs to prevent the vehicle from being auctioned. If the vehicle is auctioned, the insurance companies face a much higher payoff to the vehicle owner.

Towing companies can charge rates in excess of those set by City Council, as many vehicle owners are not aware of the appropriate rates and cannot readily discern that

22

they are being overcharged. Some vehicle owners and insurance companies are willing to pay the excessive fees assessed because they want to take possession of their vehicles rather than have their vehicles sold at public auction.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City require towing companies to inform vehicle owners of the applicable rates by requiring them to post towing and storage rate charts at a place that is visible to the vehicle owners redeeming their towed vehicles. Also posted should be a telephone number where vehicle owners can notify the City of any improper charges.

b. Towing companies found to be overcharging vehicle owners, insurance companies, and others should be suspended.

## 9. Towing Companies' Records are Not Adequately Maintained

Towing companies are not maintaining the records required to document that police authorization was obtained prior to towing vehicles and are not maintaining full and complete records reflecting operations under the contract.

At seven towing companies, we sampled supporting documentation for vehicles located on the storage lot and for vehicles that precinct records had shown were towed to the lot. Three police-authorized towing companies were unable to provide us with complete documentation for some of the vehicles towed.

- One company did not have a DPD-131 Impound Card or any other documentation evidencing DPD's written permission authorizing the impound for two of the five abandoned vehicles we observed on its storage lot.

- The owner of the same company prepared a DPD-131 form for one of the vehicles that we observed on the lot in the presence of an OAG auditor on March 27, 2003. The vehicle had been impounded on November 23, 2002.

- There was no DPD-131 form for two of the six vehicles checked at another towing company's lot.

- The manager of another company could not provide us with invoices prior to February 2003. He told us that his server crashed and that he had no backup and did not keep copies of his invoices.

At all of the police-authorized towing companies, we reviewed records to determine the number of vehicles towed under the DPD's police-authorized towing contract, the reason for the tow, and the disposition of the vehicle. As the DPD has no centralized record of the vehicles towed, we were unable to verify the records provided for completeness. Most of the towing companies were able to provide records substantiating the reason for the tow; however, many were not able to account for the disposition of the vehicle. Records for vehicles impounded were most often not incorporated with the records for abandoned vehicles. Some companies maintained logs – manual or electronic – listing all of the vehicles towed. These logs varied in their completeness and accuracy when compared with the source documents.

The City's Ordinance, Section 55-15-3 (a), states that a record of the permission form authorizing the towing service should be maintained for six months. The forms should include the total charged for the services rendered.

Further record keeping requirements are detailed in paragraph 6.04 of the police-authorized towing contract, which states:

> The Contractor shall maintain full and complete Records reflecting all its operations related to this Contract. The Records shall be kept in accordance with generally accepted accounting principles and maintained for a minimum of three (3) years from the Contract completion date.

One reason offered for the absence of authorizing records by one towing company owner was that his drivers would not inform the administrative staff that they brought in a vehicle. The owner would only find vehicles that lack documentation when he conducted a periodic inventory of the lot. The manager of the lot that was unable to provide

invoices stated they had no backup system and they did not keep a copy of their invoices.

Because record keeping requirements are not specific, towing companies are maintaining various documents that may not meet the objective of the record keeping requirements. When the impound cards are not properly completed by a police officer prior to the vehicle being towed, there is a lack of assurance that these vehicles were properly impounded. When invoices are not available for review, it is impossible to verify whether vehicle owners are charged the proper towing and storage fees. When records documenting vehicle disposition are not available there is no assurance that the vehicles have been properly redeemed by the vehicle owners or auctioned as is required by State law.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City enforce City ordinances and the terms of the contract, and require companies to maintain records for three years. Records that the City requires to be maintained should be specified in the contract.

## 10. Towing Companies are Not Reporting Unclaimed Vehicles Monthly

Most towing companies are not submitting the required monthly listing of vehicles that have remained on the tower's storage lot for more than 30 days.

As shown in the accompanying chart, only four of the 30 towing companies submitted unclaimed vehicle reports to the MSB in the fourth quarter of 2002. Only two companies submitted reports for each of the three months of the quarter as required by the police-authorized towing contract.

| Towing Company | Number of reports submitted October – December 2002 |
|---|---|
| Detroit Auto Recovery | 3 reports |
| Elite | 1 report |
| Murff & Son | 3 reports |
| Washington | 1 report |

The DPD police-authorized towing contract, Exhibit A (Scope of Services), paragraph II, 2, states:

> Contractor shall submit, by the 10th of the month a complete list of all police authorized tows to their lots that have not been claimed (including vehicles from previous lists). The list shall indicate which vehicles have been in the possession of the Contractor for 30 or more days and shall be submitted to the Support Services Division in Room 802 of Police Headquarters.

Towing companies gave the following reasons for not submitting the unclaimed vehicle report:

- B&G Towing maintains an unclaimed inventory report for its own use. The manager indicated that MSB does not want the report, because they do not use it.

- The manager of Gene's Towing is not preparing the unclaimed inventory report because he was told not to submit it. The manager indicated that he had 90 unclaimed vehicles in September 2002, and 122 unclaimed vehicles in October 2002.

- J&C 's owner indicated that he has not done an unclaimed vehicle report in nine years.

The absence of reports of vehicles remaining on the tower's storage lots allows towing companies to be unaccountable for the vehicles towed and still in their possession. Vehicles can be forgotten and accumulate storage fees, or vehicles can go missing. Moreover, it is indicative of the lack of accountability required by MSB.

During our audit, we noted the following vehicles that would have been brought to MSB's attention if the towing companies had submitted the Unclaimed Vehicle Report monthly.

- The OAG observed a recovered stolen vehicle that had been sitting on a company's storage lot for nearly seven months.

- Another towing company's reports showed three unclaimed vehicles from the year 2000.

26

- Another towing company complained it has evidence vehicles that have been in its lot for five to eight years that the DPD has never followed up on.

**Until a re-engineered City-authorized towing process is completed, we recommend that:**

a. The City require the towing companies complete the unclaimed vehicle reports and submit them by the 10th of the month.

b. The City follow-up on reported unclaimed vehicles to ensure they are expeditiously processed.

## 11. DPD Did Not Require New Owners to Reapply for Towing Contracts

The new owners of Boulevard & Trumbull, E&G, and Javion & Sams were not required to apply for police-authorized towing contracts as required by the police-authorized towing contract.

The Fiores sold Boulevard & Trumbull and Javion & Sams to Road One in 1997. E&G was sold to Road One in 1999. While Road One owned these companies, the Fiores managed them. The MSB was not notified of the Fiore's re-purchase of Boulevard & Trumbull, E&G, and Javion & Sams from Road One / Miller Industries on September 30, 2002. Although the MSB became aware of the ownership change later, the MSB did not require the new owners reapply for the police-authorized towing contracts as is required in the contract terms.

The DPD's conduct in accepting services from the new owners of the police-authorized towing companies is de facto authorization of the transfer.

Paragraph 22, of the DPD's towing contract Scope of Services prohibits the transfer of the police-authorized towing contract as follows:

> This agreement is not transferable and may not be sold, leased or assigned in any manner accept as provided herein. In the event that a corporate contractor is subject to a change of ownership equal to forty per cent or more of its controlling interests, it must notify the City of this circumstance and apply for a new contract.

There is the appearance that the owner's of Boulevard & Trumbull, E&G, and Javion & Sams have received preferential treatment from MSB.


**Until a re-engineered City -authorized towing process is completed, we recommend that:**

a. The City continue to enforce the contract terms that pertain to contract transfers.

28

# OTHER TOWING ISSUE

## 1. <u>Towing Companies Charge Higher Fees on Auto Theft Unit Recoveries</u>

Some towing companies are charging vehicle owners towing and storage fees on stolen vehicles that are recovered by the Auto Theft Prevention Authority (ATPA) funded auto theft units at rates substantially higher than those established for vehicles ordered towed by the DPD. The rates charged on the auto theft unit tows are not regulated, and vary between $135 and $175 per tow plus $12 per day storage beginning on the first day while rates charged on the DPD and the Michigan State Police ordered tows are $75 per tow plus $8 per day storage after the third day.

Several towing companies request that the auto theft units, rather than the DPD, recover stolen vehicles so they are able to charge vehicle owners higher towing and storage fees. The stolen vehicles the auto theft units are asked to recover may have been spotted on a street, or may have already been towed to the towing companies' storage lots without prior police permission.

Towing and storage fees charged on auto theft unit ordered tows are not regulated. Representatives from several of the auto theft units stated that they do not have formal contracts with the towing companies used in the City of Detroit, nor do they dictate the towing and storage fees that the towing companies charge vehicle owners. They were aware that the towing companies were charging higher rates on the tows they order than were being charged for the City of Detroit ordered tows.

The result of the two-tiered rate structure used by the towing companies is that a person whose stolen vehicle is recovered by an auto theft unit in the City of Detroit will be charged much more for towing and storage fees than a person whose stolen vehicle is recovered by the DPD. The cost to the vehicle owner should not be dependent on which law enforcement agency happens to order his or her vehicle towed.

**We recommend that:**

a. In the interest of protecting the public from inordinately high fees, that the auto theft units' contract with the towing companies require the towing companies to charge the fees established by the City of Detroit on the vehicles they order towed within the City of Detroit that they anticipate will be redeemed by the vehicle owner.

b. That the City Council issue a resolution calling for the standardization of towing and storage fees on all law enforcement ordered tows within the City of Detroit.

# EXHIBIT A
## SCOPE OF SERVICES

### I. Notice to Proceed

(a) Notice to Proceed

The *Contractor* shall commence performance of this *Contract* upon receipt of the *City's* delivery of a written "Notice to Proceed".

(b) Fixed Expiration Date

The *Contractor* shall commence performance of this *Contract* on the date and in the manner specified in the Notice to Proceed. The *Contract* shall be completed on March 31, 2005.

### II. Services to be Performed

1. The Contractor agrees to promptly respond and remove a vehicle in accordance with the ordinances of the City of Detroit and the laws of the State of Michigan, upon request by the *City*.

(a) The Contractor shall be at the scene to tow the vehicle as requested by the City within twenty minutes of receiving notification.

(b) If the Contractor is unable to respond to the scene within twenty minutes, the Contractor agrees to so inform the officer requesting the tow. If the Contractor has not arrived at the scene within twenty minutes of receiving notification, the requesting officer will notify the next company on the authorized list.

2. *Contractor* shall submit, by the 10th of the month, a complete list of all police authorized tows to their lots that have not been claimed (including vehicles from previous lists). The list shall indicate which vehicles have been in the possession of the *Contractor* for 30 or more days and shall be submitted to the Support Services Division in Room 802 of Police Headquarters.

3. The Contractor agrees to provide for the individual parking and storage of a minimum of 20 vehicles at the principal place of business. Outdoor parking and storage areas shall be fenced and secured. No vehicle will be parked or stored, even on a temporary basis, on the City streets, in alleys or easements.

4. The Contractor agrees that all vehicles towed at the request of the City will be taken only to the Contractor's lot or other location as directed by the City.

*The Contracter agrees not to use a storage facility or additional storage lot—*

without first securing proper zoning approvals and obtaining approval from the Deputy Chief, Management Services Bureau, Detroit Police Department. Such requests shall be made in writing to the Deputy Chief, Management Services Bureau and shall include the zoning approval. Approval of the Contractor's request is at the sole discretion of the City, but shall not be unreasonably withheld.

5.      The Contractor agrees to maintain 24-hour service, seven days a week.

6.      The Contractor agrees to have an employee present from 7:00 a.m. to 7:00 p.m. seven days a week with the authority to release vehicles promptly to citizens.

7.      The Contractor agrees that access to its premises shall not be unreasonably denied to citizens or police officers because of the presence of locked or closed gates or presence of dogs.

8.      The Contractor agrees to provide direct telephone communication to the Contractor 24 hours a day, and each tow truck must have direct radio contact with the company's operation base.

9.      The Contractor agrees to be capable of a dolly tow.

10.     The Contractor agrees to maintain its company trucks so that they are clearly marked with the name, address and phone number of the business and the trucks bear no sign or words indicating or suggesting they are police vehicles.

11.     The Contractor shall be authorized to tow only in a precinct or precincts for which it has been authorized as shown on Exhibit C.

12.     The Contractor agrees to meet the requirements for independent contractors doing business with the City of Detroit.

13.     The Contractor shall be responsible for damage and theft to any vehicle and the parts, accessories and equipment attached, installed or affixed thereto, or any contents in said vehicle in its custody and to satisfy reasonable complaints for provable damages and losses.

14.     The Contractor agrees to release the vehicle directly to its owner only when proper documentation of ownership and identification is presented. Contractor may release vehicles to insurance companies or their representatives provided (1) a copy of title, accompanied by a hold harmless letter is presented or (2) a letter of authority is presented signed by the owner and accompanied by a hold harmless letter and copy of title.

The Contractor will release vehicles promptly to individuals in possession of a valid court order for release of the vehicle.

15.     The Contractor agrees to refer to the Support Services Division of the Police

Department all repossessions or cases involving a question of or contested ownership.

16.     The Contractor agrees to refer to the Support Services Division of the Police Department all disputes concerning the towing and/or storage rates, or the reason for the tow.

17.     If advised to do so by an officer of the Telephone Crime Reporting Section and/or the Support Services Division, the Contractor agrees that in the event a vehicle is towed to the Contractor's lot at the direction of a police officer and through mistake, negligence or any other reason the owner is not properly notified, the storage fees will be reduced to begin on the date that the owner was properly notified. Further, if the Court orders a return of the vehicle, the Contractor will do so upon being presented with the Court Order.

18.     The Contractor agrees not to solicit towing business out of or derived from recovered stolen automobiles and shall avoid probing into or tampering in any way with automobiles suspected as stolen. Further, that upon discovery of a suspected stolen automobile, the Contractor shall immediately contact the police, apprizing them of the automobile's location and condition. Further, Contractor shall not directly contact any owner of a suspected stolen vehicle prior to the police department's recovery of the vehicle and the department directing that the vehicle be towed. Once the vehicle has been ordered by the police department to the Contractor's lot, the Contractor is authorized to contact the owner, to inform the owner of the vehicle's location and status.

19.     The Contractor agrees to deal with members of the public and other Contractors in a courteous and professional manner.

20.     The City agrees to establish a system of assignments of towers as Contractors based on the needs of the City.

21.     Contractors may serve in all precincts for which they qualify and for which they have received an Authorized Police Tower contract which is in force at the time of the such service.

22.     This agreement is not transferable and may not be sold, leased or assigned in any manner accept as provided herein. In the event that a corporate contractor is subject to a change of ownership equal to forty per cent or more of its controlling interests, it must notify the *City* of this circumstance and apply for a new contract.

23.     The Contractor agrees to equip each tow vehicle with a broom, shovel, container and any other needed equipment to clean the street/area of any debris. Contractor will completely remove from the site of an accident all resulting wreckage or debris, including all broken glass, before leaving the site. If more than one Contractor is at a scene, each driver will share equally in the cleanup operation. All vehicle parts will be secured before leaving the site of any tow scene.

24.     If there is a valid police hold on a vehicle, the *Contractor* shall not charge a storage

fee for the period of the hold.

25.    The *Contractor* shall cooperate and provide additional services as deemed necessary by the Detroit Police Department during the City's various anti-abandoned vehicle efforts including but not limited to, the City's anti-arson initiatives, Operation Clean Sweep and similar programs.

26. The *City* agrees to utilize a fair and impartial system of assignment of vehicles to be towed based on the use of a rotating list by each precinct, wherein the last called tower will be put at the bottom of the list and will not be utilized until all other towers authorized for that precinct have been utilized or have been contacted and they either cannot be contacted or are unable or refuse to respond within twenty minutes for any reason.

27. It is specifically agreed that in view of the indemnity agreement included as Article 7 of this agreement it will constitute a default for any contractor to seek by complaint, motion or otherwise to involve the City in any litigation arising out of activities undertaken pursuant to this contract.

## 28  VEHICLES TOWED FOR THE PROCESSING OF EVIDENCE

For purposes of this section, *"designated authorized tower"* shall mean the tower authorized to receive vehicles towed for the processing of evidence safekeeping, or V.I.N. identification on behalf of the City when they are delivered to 7800 Dix.

For purposes of this section. *"authorized Tower"*, shall mean the original tower of the vehicle.

Vehicles towed for the processing of evidence shall be towed to 7800 Dix.  The *authorized tower* shall proceed to the *designated authorized tower* located at 7800 Dix.  The vehicle will be inventoried and inspected.  At the direction of the *designated authorized tower*, the vehicle will be delivered to the Evidence Technicians' garage for processing. The *authorized tower* will be compensated by the designated authorized tower in the amount of $50.00.  The *designated authorized tower* will be paid by the Department consistent with Exhibit B for all vehicles towed for the processing of evidence for the victims of the following crimes: Homicide, Carjacking, Criminal Sexual Conduct and Robbery. This will not apply to cases where it is determined that a false felony report was made.  The owner of the vehicles shall be responsible for the payment of the towing fee and any storage which occurs consistent with the current towing agreement.  If the owner or their representative abandons the vehicle, The *designated authorized tower* assumes the responsibility of processing the vehicle as an abandoned vehicle in accordance with the current procedures established in the authorized tower agreement.

## 29 VEHICLES TOWED FOR THE SAFEKEEPING (STRAIGHT STEALS)

Upon direction of the Officer requesting the tow, vehicles towed for safekeeping, that may be investigated for defendant identification, shall be towed to 7800 Dix. The authorized tower shall tow the vehicle to the *designated authorized tower* located at 7800 Dix. The *authorized tower* will have the vehicle inventoried and inspected, when possible. At the direction of the *designated authorized tower*, the vehicle will be delivered to the Evidence Technicians' garage for processing. The *authorized tower* will be compensated by the *designated authorized tower* in the amount of $50.00. The owner of the vehicle or their representative shall be responsible for the payment of the towing fee to the *designated authorized tower* and any storage which occurs consistent with the current towing agreement. If the owner or their representative abandons the vehicle, the *designated authorized tower* assumes the responsibility of processing the vehicle as an abandoned vehicle in accordance with the current procedures established in the authorized tower agreement.

## 30 VEHICLES TOWED FOR V.I.N. IDENTIFICATION

Upon direction of the Officer requesting the tow, vehicles towed for V.I.N. identification shall be towed to 7800 Dix. The *authorized tower* shall tow the vehicle to the designated authorized tower. The *authorized tower* will have the vehicle inventoried and inspected, when possible. At the direction of the representative from the *designated authorized tower* the vehicle will be delivered to the Evidence Technicians' garage for processing. The authorized tower will be compensated by the *designated authorized tower* in the amount of $50.00. The owner of the vehicle or their representative will compensate the *designated authorized tower*. If the owner or their representative abandons the vehicle, The *designated authorized tower* assumes the responsibility of processing the vehicle as an abandoned vehicle in accordance with the current procedures established in the authorized tower agreement.



DETROIT POLICE DEPARTMENT
CHIEF ELLA M. BULLY-CUMMINGS

1300 BEAUBIEN, SUITE 303
DETROIT, MICHIGAN 48226
PHONE 313•596•1800
CHIEFOFPOLICE@DPDHQ.CI.DETROIT.MI.U

October 19, 2005

Joseph L. Harris
Auditor General, City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 208
Detroit, Michigan 48226

### SUBJECT: AUDIT OF POLICE AUTHORIZED TOWING PROCESS

Dear Mr. Harris:

The following represents the Detroit Police Department's responses to the seventh report of findings and related recommendations in the December 2003 ***"Audit of the Detroit Police Department's Compliance with the Impounded Vehicle Towing Process"*** as prepared by the Office of the Auditor General.

### Finding 1: DPD Awarded Contracts to Ineligible Towing Companies.

**Response to Finding:** The department agrees with the finding that in 2001 tow companies were awarded tow contracts even though they did not meet the eligibility requirements.

**Response to Recommendations:** The department has recommended that another city department(s) independent of the Detroit Police Department be involved in the tow contract award(s). As part of the award process, the Purchasing Department collects all required documentation to determine the tow companies' eligibility. The Law Department reviews the contract to ensure that the criteria, as specified in the City's towing ordinance, are captured in scope of services.

### Finding 2: Towing Companies tow in Unauthorized Precincts

**Response to Finding:** The department agrees that on occasion, some tow companies were utilized in precincts in which they are not authorized to tow. Further, the department agrees that there have been occasions where a tow company has substituted for a related company's rotational calls. Finally, the department agrees that towing companies are used for prostitution stings to impound vehicles. However, this finding seems to

KWAME M. KILPATRICK, MAYOR

imply that it is improper to impound vehicles used to solicit prostitutes, which the department disagrees with. The defendant must pay the required fines prior to the vehicle being returned to him.

**Response to Recommendations:** The department will ensure that all police commands are re-instructed that towing companies must be used on a rotating basis. Regarding companies towing in unauthorized precincts, this occurs when officers utilize companies that they are familiar with, rather than calling the precinct desk to order a tow as prescribed by department general orders. The department will re-instruct all commands on this issue and ensure that supervision monitors this practice.

**Finding 3: Towing Companies Move Vehicles Prior to Obtaining Police Authorization.**

**Response to Finding:** The department agrees that there have been occasions where tow companies have removed vehicles prior to obtaining police authorization.

**Response to Recommendations:** Department officers and tow companies will be re-instructed to obtain prior written approval, not verbal approval, to tow vehicles.

The department disagrees with the recommendation regarding coordination of stolen vehicle efforts with the Michigan State Police. The department has no jurisdiction over State Police activities. However, the department will forward a letter explaining that their policy of towing vehicles on verbal approval makes it difficult for Detroit Police Officers to determine if a tow is legitimate or not. The department also agrees with the recommendation that tow companies be held responsible for stolen vehicles in their possession that have not been recovered.

**Finding 4: Tow Company Storage Lots are not Properly Secured.**

**Response to Finding:** The department agrees that theft from vehicles occurs occasionally from tow lots.

**Response to Recommendation:** The department will ensure that officers complete a thorough vehicle condition report prior to the vehicle being towed and hold the tow companies liable for any theft to vehicles that occur while in their custody, as stated in the contract.

Although the tow contract does not give the department authority to require the tow company to make changes in security, the department will make recommendations for improvement to a company's security measures, where warranted.

**Finding 5:  Towing Companies are Storing Vehicles on the Streets.**

**Response to Finding:** The department agrees with the finding that due to a lack of space, some tow companies have store towed vehicles on the street in violation of the contract.

**Response to Recommendation:** The department agrees and recommends that the lot space needed for the city's towing requirements be reevaluated, and that increased storage capacity be required on future contracts.  Further, the department will thoroughly inspect and monitor tow companies to ensure that tow companies owners/operators are well informed of the companies contractual obligations.

**Finding 6:  Tow Companies are not Open During Required Business Hours.**

**Response to Finding:** The department agrees with the finding that some tow companies are not open during required business hours.

**Response to Recommendation:** The department agrees with the recommendation and will enforce the storage lot hours as stipulated in the contract.  In an effort to curtail this practice, the department will randomly inspect contracted towing facilities for compliance.

**Finding 7:  Towing Companies are Not Allowing Access to Vehicles.**

**Response to Finding:** The department agrees with the finding that some tow companies are impeding owner and insurance company access to vehicles in the tower's possession.

**Response to Recommendation:** The department disagrees with the recommendation that the City ensure that vehicle owners are permitted access to their vehicles on the basis that this issue is not fully addressed in the contract. As the Auditor General points out, paragraph 14 of the Scope of Services indicates that:

> The Contractor agrees to release the vehicle directly to its owner only when proper documentation of ownership and identification is presented.

However, there is no mention of payment for the vehicle. The contractor cannot be expected to release a vehicle prior to receiving payment. Therefore, the remaining issue is whether the owner shall be allowed access to the vehicle after documenting ownership, but prior to payment. This issue is not addressed in the contract. The Auditor General suggests the tow company sell or scrap the vehicle in the event the owner fails to redeem it. The contract does not require the tow company to resort to this action in lieu of requiring payment.

### Finding 8: Tow Companies Charge Improper Fees.

**Response to Finding:** The department agrees with the finding that several tow companies charge(d) excessive and improper towing and storage fees.

**Response to Recommendations:**

8a - The department agrees that tow companies shall be required to post, in conspicuous view of customers, all applicable rates as they appear in the contract.

8b - In the event a citizen makes a credible report of overcharges, the tow company will be required to refund the overcharges. The citizen also reserves the right to contest the overcharges in court.

### Finding 9: Tow Companies Charge Excessive Fees on Michigan State Police Auto Theft Unit Recoveries.

**Response to Finding:** The department agrees with the finding that the tow companies charge(d) excessive fees on vehicles towed in the city of Detroit on the authority of the Michigan State Police Auto Theft Unit, contrary to the rates indicated in the contract.

**Response to Recommendation:** The department will re-instruct all tow companies that City Ordinance regulates tow fees charged for recoveries in Detroit, regardless of the recovering police agency. The department will take enforcement action if the tow companies continue to violate the ordinance.

## Finding 10: Towing Companies Records are Not Adequately Maintained.

**Response to Finding:** The department agrees with the finding that tow companies are not maintaining the required records of police authorization prior to towing and are not maintaining complete records on their operations under the contract.

**Response to Recommendation:** The department will re-instruct tow companies on the specific documents that must be maintained for a three year period. The department will also conduct periodic inspections to ensure compliance until the issue can be addressed in the contract.

## Finding 11: Towing Companies are not Reporting Unclaimed Vehicles Monthly.

**Response to Finding:** The department agrees with the finding that in the 4th quarter of 2002, only four of 30 tow companies submitted the required monthly Unclaimed Vehicle Report.

**Response to Recommendation:** The department will ensure that all tow companies submit a list of unclaimed vehicles on a monthly basis, as required by the contract.

## Finding 12: DPD Did Not Require New Owners to Reapply for Towing Contracts.

**Response to Finding:** The department agrees that this finding existed in the past.

**Response to Recommendation:** The department has implemented the recommendation to enforce the provision of the contract that prohibits transfer to a new owner.

Joseph L. Harris
October 19, 2005
Page 6

Finally, the Detroit Police Department developed a proposal to re-engineer the towing process. The proposal is currently under review. We believe our proposal addresses all, if not most, of the findings contained in this audit report.

Should you have any additional questions or concerns regarding this matter, please feel free to contact me at 596-1800, Monday through Friday, 9:00 A.M. to 5:00 P.M.

Sincerely,

**ELLA M. BULLY-CUMMINGS**
Chief of Police

EMB-C/rc:dc