## City of Detroit

# OFFICE OF THE AUDITOR GENERAL



## Summary Report of the
## Police-Authorized Towing Process

### December 2005



# City of Detroit

**OFFICE OF THE AUDITOR GENERAL**
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 208
Detroit, Michigan 48226
Phone: (313) 224-3101
Fax: (313) 224-4091
www.ci.detroit.mi.us

**Joseph L. Harris, CPA, CIA**
Auditor General

**Sharon L. Gipson, CPA**
Deputy Auditor General

## MEMORANDUM

**DATE:**   December 2, 2005

**TO:**   Honorable City Council
Mayor Kwame Kilpatrick

**FROM:**   Joseph L. Harris
Auditor General

**RE:**   Summary Report of the Police-Authorized Towing Process

**C:**   Chief Ella M. Bully-Cummings

---

Attached for your review is our final report on the audit of the Detroit Police Department's (DPD) police-authorized towing process. Reports on the towing process are as follows:

1. Administration of the Police-Authorized Towing Process (issued September 30, 2004)
2. Compliance with the Impounded Vehicle Towing Process (issued November 23, 2004)
3. Compliance with the Abandoned Vehicle Towing Process (issued January 18, 2005)
4. Vehicle Auction Process (issued January 31, 2005)
5. Evidence Vehicle Process (issued October 21, 2005)
6. DPD's Police-Authorized Towing Contract (issued October 25, 2005)
7. Summary Report of the Police-Authorized Towing Process

This audit was initiated by the Auditor General to determine the validity of allegations of malfeasance by police-authorized towing companies and by DPD personnel, and to determine whether there was compliance with State laws, City ordinances, DPD towing procedures, and towing contracts.

This report focuses on the systemic problems within the DPD's police-authorized towing process, the impact of the recent state legislation on the towing process, and our recommendation to reengineer the process in the City of Detroit. Many of the issues detailed in this report continue because the longstanding causes underlying those conditions have not been addressed and, therefore, still exist.

i



We appreciate the assistance of the police-authorized towing companies, insurance company representatives, and police department personnel who contributed to our understanding of the towing process.

Copies of all of the Office of the Auditor General's reports can be found on our web site at www.ci.detroit.mi.us/legislative/CharterAppointments/AuditorGeneral.

**Summary Report of the Police-Authorized Towing Process**

December 2005

**Table of Contents**

EXECUTIVE SUMMARY 1

AUDIT PURPOSE, SCOPE, OBJECTIVES, AND METHODOLOGY 3

RESULTS OF THE AUDIT OF THE POLICE-AUTHORIZED TOWING PROCESS 4

IMPACT OF STATE LAW CHANGES ON THE DPD'S TOWING PROCESS 7

BENCHMARKING RESULTS – CITY OF CHICAGO'S TOWING PROCESS 11

RECOMMENDATION FOR AN IMPROVED CITY-AUTHORIZED TOWING PROCESS 15

PREVIOUS TOWING REPORT FINDINGS:

Administration of the Police-Authorized Towing Process ATTACHMENT A

Compliance with the Impounded Vehicle Towing Process ATTACHMENT B

Compliance with the Abandoned Vehicle Towing Process ATTACHMENT C

Abandoned Vehicle Auction Process ATTACHMENT D

Evidence Vehicle Process ATTACHMENT E

DPD's Police-Authorized Towing Contract ATTACHMENT F

## EXECUTIVE SUMMARY

The Auditor General initiated this audit in response to allegations of malfeasance committed by police-authorized towing companies and Detroit Police Department (DPD) personnel. The purpose of the audit was to determine compliance with City Ordinances, DPD's established towing policies and procedures, and the terms of the towing contracts; and the validity of the allegations of wrongdoing.

The State legislature amended both the Michigan Vehicle Code and the Natural Resources and Environmental Protection Act in December 2004. The amendments will hold vehicle owners accountable for abandoning their vehicles, and will transfer the responsibility for notifying vehicle owners of the police-authorized tow from the DPD to the Secretary of State.

Even considering the anticipated impact on the number of abandoned vehicles due to changes to state law, the DPD lacks the organization and resources to effectively manage its police-authorized towing process. As detailed in our previous audit reports, the DPD has little control over its current towing process. As a result, some police-authorized towing companies have taken advantage of the weaknesses to unfairly increase their respective shares of police towing, to overcharge for towing and storage services, and to improperly confiscate property, parts and even vehicles. Without adequate oversight of the police authorized towing process in the City, or adequate controls over vehicles taken into custody, there is a risk of continued overcharges and property theft.

The current DPD organization for the towing process is decentralized and fragmented throughout the Department. There are over 20 police officers dedicated to police-authorized towing, mainly towing abandoned vehicles. There is a lack of control at the operational level, and there is a lack of funding and personnel to effectively cope with abandoned, stolen, and impounded vehicles in the City. In addition, there are too many police-authorized towing companies and vehicle storage lots in the City for the City to effectively monitor.

The City of Chicago has centralized and civilianized most of its towing responsibilities in its Department of Streets and Sanitation Bureau of Traffic Services. A City of Chicago official indicated that the City receives sufficient revenue from towing to cover all of its towing expenses including the cost of its civilian staff who identify and tag abandoned vehicles and process them for towing.[1] Chicago receives an estimated $20 million in towing related revenues of which $15.5 million is generated from the services provided by the management company. Chicago has outsourced auto pound management and towing services for approximately 75% of its towing assignments, including the responsibility for the distribution of towing assignments to subcontracted towing companies and the auctions of unclaimed vehicles.

---

[1] The only revenues the City of Detroit earns from its towing programs are generated from the auction of abandoned vehicles. The proceeds generated, by type of tow and in total, are detailed below.

| | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Police-Authorized Tows | unknown | unknown | $286,206 | $283,401 | $355,408 |
| Parking Enforcement Tows | unknown | unknown | 115,425 | 172,767 | 259,280 |
| Total Auction Proceeds | $834,354 | $470,565 | $401,631 | $456,168 | $614,688 |

1

In Chicago, the City maintains control of the vehicles held by the management company. It pays the management company for each tow, and the City receives the revenues from the towing and storage fees on vehicles that are redeemed. After the requisite holding period that is established by Illinois state law, the City identifies the unredeemed vehicles that will be sold to the managing company at a pre-determined price. The management company is then free to dispose of the vehicles with salvage or rebuild titles. The management company's focus is on moving the vehicles through the system so the vehicles can be sold or scrapped at a profit. In contrast, in Detroit, the City does not receive revenues from vehicles it orders towed. Towing companies generate revenues through the towing and storage fees accumulated and paid by vehicle owners when they redeem towed vehicles. Some towing companies focus on maximizing the towing and storage fees on vehicles they expect to be redeemed or on vehicles they expect will be sold at auction. At times, their goal of maximizing towing revenue conflicts with the overall goal of efficiently returning vehicles to owners.

We recommend that the City of Detroit reengineer its towing process. The City should request proposals for the management of a City-authorized towing process that focuses on customer and owner satisfaction, permanently removes abandoned vehicles from the City's streets through the use of scrap or salvage titles, civilianizes the process to the extent possible, maintains City-control of towed vehicles, and allows for performance monitoring of the process. The request for proposal (RFP) should ask the respondent to: describe the best practices the City should employ, and recommend a new towing process for the City that would employ best practices, allow the City to recover its costs, and comply with state and local legal constraints, in order to meet the City's towing needs.

2

## AUDIT PURPOSE, SCOPE, OBJECTIVES, AND METHODOLOGY

**AUDIT PURPOSE:**
The Auditor General initiated this audit in response to allegations of malfeasance committed by police-authorized towing companies and Detroit Police Department (DPD) personnel involved in the police-authorized towing process.

**AUDIT SCOPE:**
The Office of the Auditor General conducted an audit of the DPD's towing process to determine the DPD's and the towing companies' compliance with City ordinances, DPD established towing policies and procedures, and the towing contracts' terms. The results of our audit have been published in six reports. The scope of this report is limited to reviewing the systemic problems reported in our previous reports, benchmarking Chicago's City-authorized towing process, analyzing legislative changes affecting the police-authorized towing process, and recommending matters to be considered in a reengineered City-authorized towing process.

Our audit was conducted in accordance with Government Auditing Standards issued by the Comptroller General of the United States, except that the OAG has not received an external peer review within the past three years and we have not included the views of responsible individuals of the audited entity on our overall recommendation.

**AUDIT OBJECTIVE:**
To identify:

- Best practices for police-authorized towing used by other cities, and

- Elements to incorporate into a recommendation to improve the police-authorized towing process in the City of Detroit.

**AUDIT METHODOLOGY:**
To accomplish our audit objective, our audit included:

- Interviews with DPD management, police officers, towing companies, vehicle owners, City of Chicago personnel involved in the towing process, representatives from Chicago's auto pound management and towing services contractor, and others;

- Observation of the City of Chicago police-authorized towing process;

- Review of the City of Chicago Department of Streets and Sanitation's police-authorized towing procedures and contract for auto pound management and towing services;

- Review of Chicago's contractual auto pound procedures manual;

- Review of the towing process findings previously reported;

- Review of DPD towing procedures, City ordinances, and State laws, including the Michigan Vehicle Code, impacting police-authorized towing; and

- Review of the Illinois Vehicle Code.

3

# RESULTS OF THE AUDIT OF THE POLICE-AUTHORIZED TOWING PROCESS

The DPD lacks the organization and resources to effectively manage its towing process. As detailed in our previous reports, the DPD has little control over the current towing process, and as a result, some police-authorized towers have taken advantage of the weaknesses to unfairly increase their respective shares of police towing, improperly confiscate property, and overcharge vehicle owners for towing and storage services.

The DPD organization for the towing process is decentralized and fragmented throughout the Department. The DPD cannot adequately monitor the police-authorized towing companies and their storage lots due to a lack of resources and control at the operational level. The control weaknesses noted in the DPD's towing process are summarized below. A complete list of our findings and recommendations is located in Attachments A through F to this report.

We found that the DPD showed a disregard for the City's policies, procedures, and the public's well-being when it increased the number of towing companies in the precincts' rotations without justification or approval, contracted with the police-authorized towing companies, leased the centralized evidence lot, and obtained management services for the evidence lot. This has resulted in:

- Several towing companies receiving an inordinate share of the towing business;
- Ineligible towing companies receiving contracts;
- Overpayment for leased space, payment for improvements and maintenance the City has not received; and
- Payments for management services without a contract.

The DPD could not provide the number of vehicles ordered towed, or the number of vehicles redeemed. There are weaknesses in the logging of towed vehicles, the notification of vehicle owners, and the recording of redeemed vehicles. Therefore, there is no assurance that all vehicles that the DPD orders towed are properly processed and accounted for.

- Officers circumvent the tow desk and the rotational towing process when ordering a tow truck to impound a vehicle. Some precincts' towing books do not contain a complete list of the authorized tows.

- There is no assurance that the DPD's list of towed abandoned vehicles is complete because the DPD relies on the towing companies to report the vehicles they have taken into custody.

- There is no assurance that the Notification and Crime Reporting Section (NCRS) is notified of all impounded vehicles, or is notified of all vehicles that have been redeemed.

- There is no assurance that all abandoned vehicle owners are properly notified, because the DPD relies on the towing companies to identify the impounded vehicles that have been in custody long enough to be processed for sale at public auction, and complete the notification forms for the DPD.

- Unclaimed vehicle reports are not submitted to the DPD. Even if the reports were submitted, the DPD does not have the necessary resources to research

4

each vehicle that has remained on the towing companies' lots longer than 30 days.

- Abandoned vehicles are not auctioned promptly, which increases the starting bid price and reduces the number of sales, thereby allowing the towing companies to take ownership of the vehicles.

Many vehicles that are moved through the process are not done so efficiently. This is evidenced by the excessive storage fees accumulated on some vehicles when auctioned, missing parts claims that towing companies settle "on the side," and the fact that vehicles are often added to the auction sheet on the day of the auction. Weaknesses identified in the auction process are:

- There is no verification of vehicle condition prior to auction.

- Towing and storage fees are not verified, and overstated towing and storage fees are not detected.

- The Bill of Sale is not always properly completed, and there is no assurance that the change in ownership is recorded with the Secretary of State.

- Most vehicles are not sold, and are signed over to the towing companies in lieu of the City paying the accumulated towing and storage fees.

The current structure of the DPD's towing process makes it nearly impossible, especially with minimal staff and inadequate systems, to adequately manage and oversee the process. We noted the following control weaknesses:

- There is no management information system to track towed vehicles and towing company performance, on which management can rely, to make operational decisions for the towing process.

- There is no process to monitor DPD staff performance, and whether officers are adhering to the DPD's policies and procedures. The following items were noted as DPD deviations from the towing procedures:

  ➢ Precinct towing assignments are not distributed equitably.

  ➢ Recovered stolen vehicles are sometimes towed as abandoned vehicles, rather than being impounded.

  ➢ Some evidence vehicles are not sent directly to the evidence lot as required.

  ➢ The DPD does not always accurately note the vehicle's condition when the vehicle is towed.

  ➢ There is no assurance that NCRS is notified of all impounded vehicles.

  ➢ There is no assurance that abandoned vehicle owners are notified of the recovery of their vehicles.

- The DPD lacks a system and the appropriate resources to monitor and evaluate individual towing company performance and to hold towing companies accountable for complying with the Michigan Vehicle Code, the City's Police Authorized Towing Ordinance, and DPD's police-authorized towing contracts. Among the non-compliance areas noted in our audit reports are:

5

- ➢ Towing companies tow in precincts they are not authorized to tow in.
- ➢ Towing companies move vehicles prior to obtaining police authorization.
- ➢ Towing companies charge improper fees, including charging vehicle owners storage fees while the vehicles are held for evidence processing.
- ➢ Storage lots are not secure, and sometimes vehicles are stored on the streets.
- ➢ Owners are not allowed access to vehicles. Required business hours are not maintained.
- ➢ Towing company records are not adequately maintained.
- ➢ There is no formal contract for the management of the evidence lot, and there is no ongoing monitoring of the evidence lot management company's performance.

The City lacks the financial resources, personnel, and information system to properly manage the towing process. The process utilizes many uniformed police personnel to perform jobs that could be performed by non-uniformed City or contracted workers; and there are too many towing companies to effectively monitor. Rather than attempting to fix the current process, we recommend that the towing process be reengineered with the goal to fairly and efficiently return towed vehicles to owners and insurance companies. The new process should prevent abandoned vehicles from recycling through the process, only to be towed as abandoned again. Vehicles that will not be claimed through the towing process should be processed in a manner that will benefit both the City and the towing companies. The process should be such that towing companies are no longer motivated to accumulate towing and storage fees.

6

## IMPACT OF STATE LAW CHANGES ON THE DPD'S TOWING PROCESS

In December 2004, the Michigan Legislature amended the laws affecting towed vehicles. Much of the legislation adopted became effective on October 1, 2005. According to the Michigan Secretary of State's Office, the changes in the law will free up law enforcement agencies to concentrate on more serious crimes by giving municipalities the option of using a designated agent or company to oversee the towing of abandoned vehicles from public property, and will provide a savings to local communities struggling with limited staffing and resources by no longer requiring that abandoned vehicles be tagged.

Many people we interviewed during the audit believe that one reason Detroit has experienced so many abandoned vehicles has been the lack of a provision in the state law to require vehicle sellers to ensure the Secretary of State's records were updated with the title transfer information. This gap precluded holding the vehicle owner responsible for abandoned vehicles. Under the new legislation, the seller is responsible for ensuring the registered owner information is updated in the Secretary of State's records or for maintaining a record of the sale. With the ability to hold vehicle owners accountable for abandoning their vehicles, the number of abandoned vehicles should sharply decline.

The DPD's lack of a centralized database, containing a listing of the vehicles ordered towed, has been remedied. For those vehicles that are entered into the centralized database through the law enforcement information network (LEIN), our concerns of timely vehicle owner notification, vehicles lost within the process, and unverifiable towing and storage fees have been addressed. However, our concerns about the completeness of the database are still valid. The DPD has acknowledged that not all vehicles are entered into the LEIN system, and auto theft units have complained that the DPD does not perform timely updates of stolen vehicle recoveries in LEIN. Furthermore, there will be no assurance that the vehicles towed from private property will be reported to a police agency, and that the Secretary of State will be notified of their tow.

Towing companies have lamented that they were stuck with useless abandoned vehicles, for which they obtained little value from the scrapping process. Under the new law, towing companies are able to recover some of their administrative fees, and will be able to recoup towing and storage fees from the last registered vehicle owner for the difference between the vehicle's value and the towing and storage fees that have accrued up to a maximum $1,000. Our concern is that there continues to be an incentive for towing companies to accumulate towing and storage fees up to the $1,000 limit in order to collect the maximum amount from the owners of unredeemed vehicles. The goal should be to quickly dispose of vehicles in the system, not to maximize fees.

A synopsis of the legislative changes follow:

Affix accountability for abandoning a motor vehicle -

- Require a person who sold a vehicle either to accompany the purchaser to a Secretary of State (SOS) branch office to ensure transfer of the title, or maintain a record of the sale for at least 18 months in order to avoid liability for any subsequent damages or violation of law resulting from the vehicle's use by the purchaser; and prescribe a $15 civil fine for failure to do so. [Michigan Compiled Laws (MCL) Section 257.240]

7

- Expand the definition of litter to include an abandoned vehicle. [MCL Section 324.8901(a)]

- Require a violator, if court ordered, to pay the cost of removing the litter and/or perform community service in the form of gathering litter. If the litter consists of an abandoned vehicle, the violator would be subject to a civil fine of not less than $500 or more than $2,500. The fine for a repeat offender would be not less than $1,000 or more than $5,000. [MCL Section 324.8905a(4)]

- Hold the last registered vehicle owner accountable for an abandoned vehicle unless he or she can provide proof that the vehicle was sold. [MCL Section 257.252a(1)]

For vehicles abandoned on public property -

- Assess the last registered owner a $50.00 civil fine, if the vehicle is not redeemed by the registered owner prior to its disposition. [MCL Section 257.252a(1)]

- Allow a police agency to designate another party to determine whether the vehicle has been reported stolen, and to have the towing agency take the vehicle into custody. [MCL Section 257.252a(3) & (4)]

- Remove the requirement that a written notice be affixed to the abandoned vehicle for 48 hours prior to its tow. [MCL Section 257.252a(3)]

- Continue to require the police agency to recheck to determine whether the vehicle is stolen, and update the abandoned vehicle in the LEIN system within 24 hours of the tow. The Secretary of State's office will now be notified of the abandoned vehicle through the LEIN system. [MCL Section 257.252a(5)]

- Require the Secretary of State, rather than the police agency, to notify the vehicle owner within 7 days that the vehicle has been taken into custody as abandoned. [MCL Section 257.252a(5)]

- Require the Secretary of State to maintain a website for the public's use in locating abandoned vehicles. Data will be maintained for one year, or until the vehicle is disposed of. [MCL Section 257.252a(5)]

- Establish an additional fee of $40.00 that the vehicle owner must pay when redeeming his or her vehicle. The towing company (vehicle custodian) retains $15.00 of the fee to cover costs; $25.00 of the fee is forwarded to the Secretary of State's office to be deposited into the abandoned vehicle fund. [MCL Section 257.252a(6)]

- Require the police agency to continue to be responsible for offering the vehicle at public sale not less than 20 days after the date of the notice. [MCL Section 257.252a(16)]

- Require the Secretary of State's office to release the vehicle for disposition within 45 days after the vehicle has been entered into the LEIN system. [MCL Section 257.252a(18)]

8

For vehicles abandoned on private property -

- Require the owner or lessor of private property to post a notice meeting certain criteria before authorizing the towing or removal of a vehicle. [MCL Section 257.252k]

- Expand the definition of abandoned vehicle to include vehicles that have remained on private property without the consent of the owner. [MCL Section 257.252a(2)]

- Require the towing agency removing the vehicle to contact a police agency prior to the tow to determine whether the vehicle has been reported stolen, and enter the vehicle into LEIN as an abandoned vehicle. [MCL Section 257.252a(10)]

- Require that the Secretary of State's office and the vehicle owner be notified in the same manner as for abandoned vehicles towed from public property. [MCL Section 257.252a]

For vehicles impounded for safekeeping -

- Allow the towing company to charge a reasonable service fee for disconnecting a vehicle from the tow truck, prior to the vehicle being towed. [MCL Section 257.252d (2)]

- Continue to require the police agency to recheck to determine whether the vehicle is stolen, and update the abandoned vehicle in the LEIN system within 24 hours. [MCL Section 257.252d(3)]

- Follow the process for owner notification and auction that is established for abandoned vehicles. [MCL Section 257.252d(3)]

- Reduce the number of days, from 10 to 7, to notify the vehicle owner. [MCL Section 257.252d]

Notification of contested charges -

- Require that the court notify the towing service or the custodian of the vehicle, in addition to the owner and the police agency of the time and place of the hearing, if the owner contests the towing charges. [MCL Section 257.252f(1)]

Auction process -

- Require auctions of vehicles abandoned from public property or impounded to remain under the control of the police agency or the police agency's designee. [MCL Section 257.252a(16) and 257.252g(1)]

- Require public auction of vehicles abandoned on private property to be under the control of the custodian or the custodian's designee. [MCL Section 257.252a(16) and 257.252g(1)]

- Change the manner in which proceeds from the public sale are allocated. After the towing and storage fees, and the police agency or custodian fees are satisfied, the new $40.00 abandoned vehicle fee is collected. Any remaining proceeds are sent to the Department of Treasury's unclaimed property division. [MCL Section 257.252g(2)]

9

- Where the vehicle is not sold at auction and the vehicle is turned over to the towing company or custodian to satisfy accumulated towing and storage fees, allow the towing company or custodian of the vehicle to collect the difference between the accrued towing and storage fees and the vehicle's value from the last titled owner. [MCL Section 257.252g(3)]

- Require the last registered vehicle owner to pay towing and storage fees for abandoned vehicles. Cap the amount of storage fees that can be collected from an abandoned vehicle owner at $1,000. The cap does not apply to a commercial vehicle or a vehicle owned or leased by an entity other than an individual. [MCL Section 257.252i(2) & (3)]

- Require the police agency to not only cancel the entry in LEIN when the vehicle is disposed of, but also provide the Secretary of State with the vehicle's disposition and the name of the agency that disposed of it. [MCL Section 257.252g(5)]

10

## BENCHMARKING RESULTS – CITY OF CHICAGO'S TOWING PROCESS

The City of Chicago has centralized and civilianized most of its towing responsibilities in its Department of Streets and Sanitation, Bureau of Traffic Services. The City of Chicago maintains five auto pounds including one for its evidence vehicles. Chicago has outsourced management and towing services for three of its auto pounds, including the abandoned vehicle lot, and has transferred the associated responsibility for the distribution of towing assignments and auctions of unclaimed vehicles to the management company. City employees provide towing in the central business district and at the airport. Chicago officials estimate that 182,000 vehicles are towed per year; most of these are towed by the management company. In 2002, the management company towed an estimated 135,000 vehicles; 55,000 vehicles were redeemed by the owner or authorized agent and 79,000 were scrapped or sold at auction during the same period.[2] Chicago receives sufficient revenue from its towing activities to cover its towing expenses, including the civilian staff that identifies and tags abandoned vehicles and processes them for towing. It is estimated that Chicago generates $20 million in revenues from all of its towing programs, of which $15.5 million can be tracked to the vehicles towed by the management company.

Chicago's Department of Streets and Sanitation, Bureau of Traffic Services is responsible for the management of the City's auto pounds and monitoring the towing services contract. All tows are based on tow cases and requests that are prepared by City employees from the Police Department, the Department of Streets and Sanitation, and the Department of Revenue. Vehicle Tow Reports, which serve as an order form, are prepared and faxed to the management company. The management company is responsible for towing the vehicles within a specified time - 90 minutes for immediate tows (impounded vehicles) and 24 hours for abandoned vehicles.

The management company tows vehicles to one of the City lots it manages, and distributes towing orders to subcontractors who tow vehicles to the other two lots it manages. When the towing companies deliver vehicles to the City-owned storage lots operated by the management company, they are paid for the tows. The management company is required to meet the City's Minority (MBE) and Women Business Enterprise (WBE) requirements. They claim 40 towing subcontractors are MBE and WBE companies. Subcontracted towing companies are paid $30 - $50 per towed vehicle depending on the location of the company. The management company also tows abandoned boats and trailers.

---

[2] The DPD's records of the number of vehicles towed and redeemed are incomplete. The towing volumes shown below are from the Auction Detail's statistical reports.

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Total LEIN Transactions | 68,180 | 63,280 | unknown | unknown | unknown |
| Abandoned Vehicle Notifications Mailed | 45,991 | 48,760 | 37,697 | 33,563 | 35,755 |
| Vehicles Auctioned | 32,704 | 36,364 | 33,973 | 33,468 | 21,798 |
| Vehicles Sold | unknown | unknown | 530 | 1,116 | 1,033 |
| Vehicles Turned Over to Towing Companies | unknown | unknown | 33,443 | 32,352 | 20,765 |
| Auction Proceeds | $834,354 | $470,565 | $401,631 | $456,168 | $614,688 |

11

For impounded vehicles, Chicago police generate an identification number and also perform a vehicle inventory that is not shared with the management company. When the vehicle arrives at the lot, management company employees use a handheld device to enter the vehicle stock number into the management company's system, and to produce a bar code that is attached to the vehicle. A city employee performs a vehicle identification number (VIN) check. A management company employee performs an inventory of the vehicle with the handheld device. Information from the bar code system is immediately transmitted to the management company's vehicle tracking system. The management company electronically provides the City with a tow report, including an inventory, within 30 minutes of the impound. The management company's inventory system updates the City's system with all tows. The system interfaces to the 311 system and the City's web site, and helps the City prepare the required vehicle notifications.

City of Chicago employees work at the managing company's auto pounds to: (1) collect towing and storage fees for the City; and (2) perform LEADS (similar to the City of Detroit LEIN) checks for stolen vehicles. The City obtained permission for civilian employees to access LEADS after they had training and signed confidentiality statements.

When a vehicle is redeemed, the management company generates an invoice, and a city worker receives the payment. Seaway Bank collects all cash and revenue from the auto pounds. The City collects all towing ($150) and storage ($10 per day for the first 5 days and $35 thereafter) fees and pays the managing company $95 ($75 for the tow and $20 for administrative work) for every non-abandoned vehicle tow.

The managing company has a goal of turning over all vehicles in the auto pound within 30 days of the impound either by owner redemption, auction sale, or scrapping.

Each day, the Department of Streets and Sanitation provides the management company with a contract sale list of vehicles that have been held longer than required by State law. The management company buys these vehicles, and then auctions the vehicles once a week. Under Illinois law, vehicle owners waive ownership rights to their vehicle when the date to redeem the vehicle is past. In August 2003, the contractor paid the City of Chicago $85[3] for every non-redeemed immediate tow and $15 for every abandoned vehicle tow.

The management company auctions the vehicles it obtains from the City to junk and salvage dealers. The buyers obtain a junk or salvage title, the only title allowed under these circumstances by Illinois law, so they can strip the car for parts and then scrap it. This prevents the vehicle from being resold and then abandoned again. Junkyards pay an average $150 per vehicle. They can then sell catalytic converters, radios, radiator cores, tires, windshields, and other parts. The management company makes an average of $120 per car scrapped. The management company told us they receive a higher rate for scrap metal than received in Detroit, because they control so many cars. The management company is the largest provider of scrap metal in Chicago.

---

[3] The price paid to the City of Chicago for unredeemed impound vehicles is based on the scrap metal prices in the "Iron Age Publication" and an average of 1.4 tons of ferrous metal per vehicle.

12

The management company claims the number of abandoned vehicles in Chicago has declined significantly since it was contracted in 1997. They used to tow 100,000 abandoned vehicles per year, now they tow around 40,000. The management company estimated that 33% of its immediate tows are sold to salvage yards, rebuilders, and junk dealers. It makes between $200 and $250 on each unredeemed immediate tow vehicle. The management company estimated that 20% of its abandoned vehicles are sold to salvage yards, rebuilders, and junk dealers. It makes between $100 and $125 on each abandoned vehicle. The management company does not sell any vehicles to the public.

The management company's electronic inventory system will, in "real time," simultaneously update its data management system regarding all vehicle releases, sell/auction, and crush/dismantle information through the use of handheld terminals equipped with bar code scanners. A management company representative bragged that it has 14,000 vehicles in auto pounds and it can tell you about every vehicle.

The City of Chicago has a comprehensive vehicle management system integrated with its management company that accounts for every impounded vehicle in the City. The system includes inquiry capability on the City's website for vehicle owners to find information on their impounded vehicle. The system produces reports on the number of: impounded vehicles; vehicles redeemed by owner, secured party, or insurance company; unclaimed vehicles sold at auction; and unclaimed vehicles remaining on the storage lot. The system produces an aging report on the length of time a vehicle has been impounded at the storage lot. The data is used to help City staff perform LEADS checks for stolen vehicles and produce notification forms to be sent to vehicle owners. The system ensures Chicago's 311 system is immediately updated with the impound data. Chicago's system provides assurance that all impounded vehicles are properly accounted for and that the State laws for vehicle notification are complied with. Also the system provides the City with reliable data to manage abandoned and impounded vehicles.

All tow lots and auto pounds are on city-owned property. The auto pounds are approximately 40 acres each, and have storage capacity for 12,000 vehicles. The management company, its owners, and its employees do not own any auto repair facilities, auto parts businesses, or used car dealerships and have no conflict of interest with the storing and disposal of impounded vehicles. The management company is subject to an outside audit. One performed several years ago produced no significant findings. Chicago has an abandoned vehicle hot line.

A representative of the Bureau of Traffic Services, responsible for managing the City of Chicago's towing process, was pleased with the process, which was designed and implemented by the management company who now provides similar services to other cities around the country.

However, Chicago's process is not perfect or free from criticism. There have been several print articles critical of the towing process, including a November 2004 series in the Chicago Sun Times titled, "TAKEN FOR A RIDE – THE SCANDAL OF CHICAGO'S TOWING PROGRAM." The major criticisms are outlined below:

- There were allegations that there was cronyism involved in the award of the multi-million dollar towing contract to the management company. Yet, another

article reported that the managing company's bid was "head and shoulders above the competitors."

- The articles criticized the City for selling unclaimed vehicles to the management company for $125.54 each, which then sells the vehicles for a "handsome profit."

- The City of Chicago paid $101,287, during a four-year period, in settlements to owners whose cars were wrongfully sold to the management company, which resold them.

- No background checks were performed, so criminals and ex-convicts work as tow truck drivers.

- City employees moonlight as subcontracted tow truck drivers, which is a conflict of interest.

- The use of a management company does not eliminate stealing by unscrupulous tow truck drivers. As the result of a sting operation, two tow truck drivers were arrested for stealing personal property from vehicles.

- The newspaper was critical of the City's boot and tow process for unpaid parking tickets, which they noted was entirely legal. When vehicle owners were unable to pay parking tickets plus the towing and storage fees in 15 days, their unclaimed vehicles were auctioned. Proceeds from the sale were not applied to the owner's outstanding bill, and the now former vehicle owners were left without a vehicle and still owing the City for the parking tickets and the towing and storage fees.

In answer to the criticism, a representative of the Streets and Sanitation Department was reported as saying that the City "chose 'guaranteed revenues, regardless of whether some of the cars had resale value or not' because it was determined to 'shift the risk'" to the management company. He also argued that retaining vehicles at the auto pounds would be turning the auto pounds into used car dealerships.

We noted that in Chicago's process, once the management company has ownership of the vehicles it is able to generate a large amount of revenues from the resale and scrapping of vehicles. In the new contract, any vehicle valued at $10,000 and up is excluded from the sale to the managing company. Because the management company also provides towing services there is the risk that it can receive an inequitable share of the towing business.

14

# RECOMMENDATION FOR AN IMPROVED CITY-AUTHORIZED TOWING PROCESS

Police-authorized towing is a revenue-generating activity and all costs associated with the process, including management and administrative overhead, should be recovered from the towing and storage fees charged, auction proceeds, and the salvage value of parts and scrap metal received from the disposal of the abandoned vehicles that were not sold.

An effective towing process requires competent leadership and management along with sufficient resources of personnel, funds, tow trucks, storage space, and equipment. An automated system to track, account for, and report on impounded vehicles, that can be used as the basis for making management decisions is an integral component of an effective towing process. Effective management of the towing process ensures that: towing contracts are fairly awarded to towing companies who have the appropriate resources to meet their contractual obligations; vehicles are towed promptly; the LEIN system is promptly updated; vehicles in custody are properly safeguarded; vehicle owners are promptly notified and are charged the correct towing and storage fees; the process is customer friendly; properly negotiated professional services are obtained at a fair price; towing assignments are fairly distributed; DPD personnel and towing companies are monitored and are held accountable for conforming to laws and rules governing the City's towing process; abandoned vehicle auctions are conducted efficiently and timely; and the process complies with the Michigan Vehicle Code, the City Police Authorized Towing Ordinance, and the DPD's towing contracts terms.

## We recommend that:

1 a - The City transfer primary responsibility for towing into a division of the Department of Public Works. This division should include the activities performed by the Auction Unit, abandoned vehicle personnel, DPD personnel responsible for police-authorized towing, DPD auto pound personnel, environmental officers and any other DPD units responsible for towing vehicles except the Commercial Auto Theft Unit. This division should manage and provide oversight to the towing process.

1 b - The City request proposals from management companies to provide recommendations for a reengineered City-authorized towing process. The reengineering proposal should consider the following:

- How the City can collect sufficient revenues from towing to pay its towing-related costs;

- The controls necessary for oversight of the towing process to be incorporated into the reengineered process. Consideration should be given to:

  ➤ Compliance with the Michigan Vehicle Code, City Police Authorized Towing Ordinance, City towing contracts, and City towing policies and procedures;

  ➤ Internal controls, including policies and procedures, essential to the towing process;

  ➤ Performance measures to hold City employees, the management company, and subcontracting towing companies accountable for the

15

towing process, and to determine the success of the reengineered process.

- ➢ Reports needed by the City to provide oversight of the towing process, to enable an accounting of all vehicles towed, and to provide a method to verify that the towing and storage fees charged to vehicle owners, secured parties, and insurance companies are valid and proper.

- The resources needed to efficiently handle the City of Detroit's towing needs, including:

  - ➢ The number and sizes of storage lots that are needed, and the location within the City.

  - ➢ The number of towing companies required to provide a prompt response to the City's towing requests;

  - ➢ Components of an information system that will track and account for vehicles from the time of the tow to the disposition of the vehicle from the impound lot; and

  - ➢ Reliable access to the LEIN system by DPD personnel;

- And the following:

  - ➢ Assurance that the Secretary of State is notified via LEIN of every tow within 24 hours as required by the Michigan Vehicle Code;

  - ➢ The need for timely, frequent, and publicly announced auctions that make all qualified vehicles available for auction;

  - ➢ The proper handling of towing complaints;

  - ➢ Indemnification to the City for all losses and damages to the vehicles from towing companies and the custodian of the vehicle;

  - ➢ Training for City employees and towers; and

  - ➢ Compliance with environmental laws.

16

# PREVIOUS TOWING REPORT FINDINGS

Our previous audit reports included detailed findings that describe a City of Detroit police-authorized towing process that is inadequate. The City does not currently possess the financial and human resources to improve the existing process. The police-authorized towing process needs to be reengineered to correct the findings previously reported.

Listed below are our previous police-authorized towing audit reports and findings:

## Report 1 - Audit of the Detroit Police Department's Administration of the Police-Authorized Towing Process

- ### Finding 1 – Former Deputy Chief of the Management Services Bureau Exceeded His Authority

  We found that the former Deputy Chief of the MSB exceeded his authority, by entering into contracts and making precinct assignments that were not in conformance with DPD policies and procedures. We could find no record that the procedural changes were approved by the Chief of Police or by the Board of Police Commissioners. The City's ordinance dictates that the Board of Police Commissioners promulgates the rules and regulations under which the towing companies are called for tows. These rules provide for equitable distribution of towing when practicable. DPD's General Procedures state that those towers authorized after May 1984 may only be assigned to one precinct, and that there be between two and four towing companies assigned to each precinct. The Police Authorized towing contracts entered into in November 2001, and the associated towing company assignments, circumvented the restrictions on precinct assignments.

  We recommend that police-authorized towing contract terminology be reviewed by the Chief of Police and the Board of Police Commissioners prior to the contracts being signed to insure that the contract terms conform with the rules and regulations established by the Commissioners. We also recommend that the Board of Police Commissioners review the towing rules and regulations before each contract period to determine whether they are relevant. Any changes to the process or to the precinct assignments should be incorporated into the DPD's General Procedures and the towing contract.

- ### Finding 2 – Award of the November 2001 Towing Contracts Did Not Follow the City's Purchasing Ordinance

  The DPD did not adhere to the City's purchasing ordinance in awarding the November 2001 police authorized towing contracts. The DPD classified the towing contracts as professional service contracts less than $25,000, and estimated that they would pay less than $5,000 per contract. However, each of the contracts has a value of over $25,000. The contracts grant the 30 authorized towing companies access to an estimated $3.9 to $5.4 million of towing business. Therefore, the contracts' approval should follow the ordinance.

  We recommend that the DPD adhere to the City's purchasing ordinance, which provides assurance that the companies awarded contracts meet the contract

17

requirements, are able to perform the contracted services, and have the required City clearances.

- **Finding 3 – <u>Expansion of Towing Companies Assigned to the Precinct Rotations Was Not Warranted</u>**

  Additional towing companies were added to the precinct towing rotation in violation of the DPD's General Procedures for towing vehicles. The DPD's General Procedures stipulate that a minimum of two and a maximum of four towing companies will be assigned to each precinct's towing rotation. In conjunction with the November 2001 towing contracts, five towing companies were assigned to 12 of the 13 precincts, a net increase of 17 rotational towing positions. The additional assignments were made despite an internal study that showed that towing assignments were adequate to meet each precinct's demand for services.

  We recommend that the DPD evaluate the appropriate number of towing companies to be assigned to each precinct based on each precinct's towing requirements at contract renewal time, and use this information to make precinct towing assignments based on each precinct's requirements. The DPD's General Procedures should be updated if the DPD finds that the stipulation to assign between two and four towing companies is no longer adequate.

- **Finding 4 – <u>Towing Companies Were Treated Inequitably in the Award of Precinct Towing Positions</u>**

  Ten of the 18 rotational towing positions that were filled in the precincts were awarded to six towing companies that are controlled by the same owners, managers or agents. Five towing companies, which previously did not have police-authorized towing contracts with the City, applied for rotational towing positions in 2001. Four companies were awarded one towing position each as stipulated in the DPD's General Procedures. The remaining company, associated with the controlled companies, was awarded three towing positions. When Gene's Towing was purchased in 2001, the new owner was awarded multiple towing slots in the next contract cycle. The previous owner had unsuccessfully tried to expand his towing business with the DPD. DPD procedures state that those companies authorized to tow after 1984 should be assigned to one precinct, the ordinance states that distribution of towing assignments should be as equitable as possible.

  We recommend that the DPD follow its established procedures in awarding precinct towing assignments, and that each towing company be treated equitably. The award of precinct assignments due to an expansion of towing positions should be conducted in an equitable manner.

- **Finding 5 – <u>Transfer of Police-Authorized Towing Contracts Were Not Pre-Approved</u>**

  Since 1997, DPD's police-authorized towing contracts have been transferred when companies were sold without the required DPD approval. The City's Law Department opined that the continued use of the new towing company to provide towing service gave tacit approval to the contract transfers. In most cases, the new owners have retained the previous company name. For those owners with

18

control over multiple companies, DPD has not required that the contracts be consolidated under one name, thus allowing the development of towing conglomerates, and effectively altering the equitable distribution of tows in the City.

We recommend that the DPD continue to include the contract clause that was added to the 2001 towing contract that requires that the City be notified when a contract is transferred, and that the acquiring company apply for a new contract when more than 40% of the towing company's ownership changes. In addition, we recommend that the DPD establish procedures to address the purchase of multiple companies by a single owner or group.

- **Finding 6 – Towing Companies With Commingled Assets, Owners and Management are Treated as Separate Companies for Towing Assignments**

Police-authorized towing contract applications for seven companies show there is a commingling of vehicles, storage facilities, company ownership, employees, insurance policies, and management. These companies were awarded separate police-authorized towing contracts, yet they substitute for each other in providing towing services. These companies have been awarded 20 of the 63 available rotational towing positions.

We recommend that the Board of Police Commissioners and DPD establish procedures to consider bids, and to award towing contracts to the owners of multiple companies that align with the City's ordinance requirement of providing an equitable distribution of tows among the authorized companies.

- **Finding 7 –Towing Contracts' Related Business Conflict of Interest Clause is Not Enforced**

While the towing contracts provided that no police-authorized tower shall have or acquire any interest that would conflict with the performance of the contract, 22 of the 30 police-authorized towers own or are associated with businesses, such as used car dealerships or parts businesses, which represent a potential conflict of interest.

We recommend that the DPD strictly enforce the conflict of interest clause contained in the police-authorized towing contracts. The DPD should not employ or sign a contract with a person or company having any interest, directly or indirectly, which would conflict in any manner or degree with the performance of the service under the contract.

- **Finding 8 – The Management Services Bureau Has Been Willing to Accept DPD's Procedural and Towing Companies' Contractual Abuses**

The DPD has acknowledged that there are widespread abuses of the towing process, perpetrated by both the towing companies and DPD personnel. These abuses have been tolerated by the DPD.

We recommend that the DPD actively enforce its policies, procedures, and the towing contract provisions. A progressive system of notification and documentation should be implemented. Major offenses should result in disciplinary action or in termination of the towing contract.

**Report 2 - Audit of the Detroit Police Department's Compliance with the Impounded Vehicle Towing Process**

- <u>**Finding 1 – Most Precincts Are Not Distributing Towing Requests Equitably Among the Five Assigned Towing Companies**</u>

    We found that patrol officers, at the precincts reviewed, often circumvent the rotational towing procedures by contacting the towing companies directly, rather than following DPD procedures and contacting the precinct tow desk for the rotational tow truck assignment. In most precincts, the rotational towing assignments are not equitably distributed among the five towing companies assigned. Favored towing companies are receiving a greater share of the precincts' towing business; companies are substituting for other companies on calls; and non-favored companies' towing business is suffering.

    We recommend that the Management Services Bureau (MSB) regularly review the precinct tow books and the assignment of towing requests to identify instances where DPD's rotational towing procedures have not been followed. Officers who continue to circumvent the DPD's procedures should be disciplined.

- <u>**Finding 2 – Precinct Officers Are Not Always Reporting Towed Vehicles to the Telephone Crime Reporting Unit As Required**</u>

    We found many impound cards that did not contain proof that the officer requesting the tow contacted the Notification and Crime Reporting Section (NCRS) to report the tow and the vehicle's condition. NCRS is required to update the Law Enforcement Information Network (LEIN) within 24 hours of the tow to conform to state law, notify vehicle owners that their vehicle has been impounded, and answer inquiries as to where a towed vehicle is located. The lack of proof or notification indicates that the towed vehicles are not reported at all, or that the vehicles are reported by the towing companies directly. The risk of towing companies reporting tow information directly is that they may be towing vehicles without police authorization or they can erroneously report a vehicle's condition.

    We recommend that DPD take steps to ease the frustration associated with reporting towed vehicles to NCRS. Precinct officers should be equipped with the equipment needed to contact NCRS and the LEIN system. NCRS should be staffed appropriately to handle the volume of calls it receives. Officers found to be deliberately disobeying procedures, should be disciplined. Towing companies reporting tows to NCRS should be suspended.

- <u>**Finding 3 – Incomplete Impound Cards Effect DPD's Ability to Assign Accountability for Vehicle Damage**</u>

    We observed many impound cards that were not fully completed. Specifically, the vehicle condition report was not marked on many cards and the form was not authorized by the officer requesting the tow. Towing companies are required to have a signed form authorizing the tow before they move any vehicle. An incomplete vehicle condition report makes it impossible to affix accountability to any party for damage done to the vehicle.

    We recommend that the DPD instruct officers on the DPD's towing procedures and on the importance of completing the impound cards accurately. DPD should

take steps to make the process less burdensome on the officer by creating a multi-copy form that needs to be completed only one time and issue cameras to aid in recording the vehicle condition. Further, officers that are not complying with DPD procedures should be disciplined.

- **Finding 4 – Record of Precinct-Authorized Towing Assignments is Deficient**

  We found that many precincts' permanent records of their requested and authorized towing assignments are incomplete and the supporting documentation, Form DPD 406, is not uniformly retained. License and vehicle data was frequently missing. It was difficult to reconcile between the impound cards and the tow book due to the missing information. All impound cards are unlikely to be accounted for because they are not sequentially numbered.

  We recommend that Form DPD 406 be revised to contain a sequential number. We further recommend that the DPD establish document retention and filing procedures in order to maintain the impound cards until the associated tow book can be audited.

- **Finding 5 – Payment of Precinct-Ordered Towing Assignments Made Without Supporting Authorization**

  We found most precincts are not submitting the Form DPD 73 – Vehicles Towed by Private Companies, with the associated towing company invoices, to the Fiscal Section by the 10th of each month. Towing companies are submitting invoices directly to the Fiscal Section for payment. Of the 117 invoices reviewed, 24 contained questionable billings. Without a listing of the tows that have been authorized by each precinct, there is a high level of risk that the DPD will pay for services, at an incorrect price, that have not been authorized.

  We recommend that the Fiscal Section reject all invoices that are submitted to it directly by the towing companies, and require that precinct commanders adhere to the tow slip procedures and submit Form DPD 73 with the towing companies' invoices monthly. We further recommend that MSB establish standard rates for towing services that fall outside of the rates set by City Council.

**Report 3 - Audit of the Detroit Police Department's Compliance with the Abandoned Vehicle Towing Process**

- ### Finding 1 – The DPD Does Not Process the City's Abandoned Vehicles in an Effective Manner

  We observed that precinct abandoned vehicle officers are often assigned to other duties, and lack the necessary equipment to perform their duties in an effective manner. Furthermore, the Auction Detail is understaffed. DPD Directives require that police officers complete Abandoned Vehicle Reports, check and update the LEIN system, and send notifications to vehicle owners within certain timeframes. The DPD has been unable to perform these tasks, and has allowed the towing companies to assume a portion of its responsibilities, thereby eliminating controls within the abandoned vehicle towing process.

  We recommend that the DPD ensure that the abandoned vehicle officers and the Auction Detail are provided with the appropriate resources to complete their job duties effectively, and to comply with State laws.

- ### Finding 2 – There is Not Always a Reliable Record of the Vehicle's Condition When the Abandoned Vehicle is Towed

  Form DPD 131 – Abandoned Vehicle Report, which should be completed by a DPD officer, includes a space to report on the abandoned vehicle's condition. The DPD does not complete the DPD 131 at the time the vehicle is towed. Furthermore, we noted that the vehicle condition report is frequently left blank or the abandoned vehicle towing company may complete the form. Completion of the form by the towing companies is a violation of the segregation of the record keeping and custody duties. Completion of the form by the DPD should provide for an independent verification of the vehicle condition at the time of the tow, and the information contained on the form should be used to hold towing companies accountable for any damage and thefts occurring while the vehicle is in the towing company's custody.

  We recommend that DPD personnel be held accountable for the completion of the form DPD 131, including the vehicle condition reports, for abandoned vehicles ordered towed and that any towing companies found to be completing the form for vehicles towed as abandoned be suspended. We recommend that the DPD update its procedures to insure that the recording of the vehicle condition occurs at the time the vehicle is taken into custody.

- ### Finding 3 – Recovered Stolen Vehicles are Routinely Towed by The Abandoned Vehicle Towing Companies

  We found that some abandoned vehicle officers are using the abandoned vehicle towing companies to tow recovered stolen vehicles, rather than impounding the vehicle as prescribed by DPD Directives. Recovered stolen vehicles that are towed as abandoned vehicles may not be reported to the Notification and Crime Reporting Section's (NCRS) Telephone Crime Reporting Unit when they are towed, and the vehicle owners may not be contacted as quickly as under the impound vehicle process. There is a risk that recovered stolen vehicles may not be held for evidence as required; and that insurance companies may pay claims on vehicles because they are unaware that the vehicles have been recovered.

22

Abandoned vehicle officers using the abandoned vehicle towing companies in this manner are steering towing business away from the precinct's rotational towing companies.

We recommend that the DPD enforce its procedures for towing recovered stolen vehicles.

- **Finding 4 – There is No Assurance That All Owners of Vehicles Considered Abandoned Have Been Appropriately Notified**

The DPD's Auction Detail relies on towing companies to complete and submit the form TR-52 – Michigan Department of State Notice of Abandoned Vehicle. The forms are not reconciled to supporting lists of unredeemed impounded vehicles and lists of towed abandoned vehicles to insure that the mailings are complete and that all vehicle owners are appropriately notified. The DPD is not monitoring whether the forms are submitted within the timeframe established by State law. Towing companies completing both the DPD-131 and the TR-52 could falsify information on the TR-52. Towing companies could run up towing and storage charges or keep a vehicle from auction without the DPD's knowledge.

We recommend DPD personnel reconcile between the TR-52s that are submitted and a master list of vehicles that require a form TR-52 to be mailed. We recommend that the DPD provide adequate resources for the form TR-52s to be completed and mailed by the DPD within the seven-day window that is required by State law.

23

**Report 4 - Audit of the Detroit Police Department's Abandoned Vehicle Auction Process**

- **<u>Finding 1 – Abandoned Vehicle Auctions Yield Little City Revenues</u>**

  We found that few vehicles are sold at auction and the proceeds to the City are insufficient to fund the costs of the abandoned vehicle officers and the Auction Detail. Unredeemed vehicles are not sold as promptly as they could be, which results in higher accumulated towing and storage fees at the time of the auction, and thus a higher starting bid. Towing companies occasionally overstate the towing and storage fees, which also drives up the starting bid. Auctions require cash payments, which discourages individuals as purchasers. Those familiar with the process know they can purchase unsold vehicles after the auction at a cheaper price.

  We recommend that the DPD reduce the amount of accumulated towing and storage fees at the time of the auction by auctioning vehicles as promptly as allowed by State law, and by preventing the overstatement of towing and storage fees. We recommend that the DPD utilize the scrap vehicle provisions of Michigan's law to dispose of junk vehicles without an auction. For the better quality vehicles, we recommend that the DPD gain title to the vehicles to sell following the auction for a higher price.

- **<u>Finding 2 – Abandoned Vehicles Are Not Auctioned Promptly</u>**

  We found that abandoned vehicle auctions are scheduled well after the time provided by the Michigan Vehicle Code, which results in the accumulation of additional storage fees. Additional storage fees are also accumulated when unredeemed impounded vehicles are not converted to abandoned status and processed for auction as quickly as they could be. Auction bidding starts at the accumulated towing and storage fees. The additional fees incurred due to the Auction Detail's inefficient process may result in vehicle prices that are too high to receive a bid.

  We recommend that until the entire process is reengineered, that the DPD create a database to track the status of all impounded vehicles to ensure that unredeemed vehicles are converted to abandoned status and processed for auction as promptly as allowed under the State law. We recommend that the DPD establish a goal to auction abandoned vehicles as quickly as allowed, and assign the appropriate staffing level to achieve the goal.

- **<u>Finding 3 – Towing Companies Are Not Held Accountable for Damage Occurring While Vehicle is in Their Custody</u>**

  We found that the Auction Detail's process does not include a check of the vehicle's condition to verify that no additional damage is done or that parts are missing while the vehicle is in the towing companies' possession. Consequently, towing companies are not held accountable for additional damage that occurs. Parts can be stolen from vehicles, and the theft would not be detected unless the vehicle owner complains.

  We recommend that the DPD update its auction process to include the comparison of the vehicle's condition at the time of auction to the vehicle's condition when it is towed; that towing companies be held accountable for the

vehicle's condition while it is in their possession; and that those companies repeatedly incurring a high level of damage or missing parts from vehicles be suspended.

- **Finding 4 – Overstated Towing and Storage Fees Are Not Detected**

  At the time of auction, towing companies have the Auction Detail "correct" the accumulated towing and storage fees on some better-quality vehicles. It appears that the correction is made on those vehicles that are expected to sell at auction. Of the 34 vehicles reviewed with "corrected" towing and storage fees, the towing and storage fees were overstated by $30,108. The City received proceeds of $35,248 on these vehicles; it should have received $65,356.

  We recommend that the DPD revise its auction sales sheet to correctly calculate the accumulated towing and storage fees from the date the vehicle is towed, that the DPD recalculate to verify the amount of adjusted towing and storage fees presented by the towing companies before accepting the amount, and hold towing companies accountable for repeated submission of erroneous fees.

- **Finding 5 – Bill of Sale by Police Agency Not Always Properly Completed**

  We found that the Bill of Sale by Police Agency for Abandoned Vehicle is often incomplete. Some of the forms reviewed did not contain the purchaser's name; none of the forms contained the purchaser's address, some of the forms were not signed by the police agency representative, and none of the forms were signed by the purchaser. Failure to fully complete the Bill of Sale may result in there being no complete record of the change in vehicle ownership.

  We recommend that the DPD periodically audit the Bills of Sale maintained by the Auction Unit to ensure that the forms are fully completed and the ownership transfer is fully documented.

- **Finding 6 - No Assurance That Change in Vehicle Ownership is Recorded**

  We found that the DPD does not submit vehicle ownership transfer data to the Secretary of State's office following the vehicle auction. There is the risk that, if the title is not transferred by the vehicle purchaser, the Secretary of State will be unaware that the ownership has changed and the State's record of vehicle ownership will be incomplete.

  We recommend that the DPD work with the Secretary of State's office to create a process whereby the DPD can provide the Secretary of State's office with vehicle transfer information for the vehicles that it auctions.

**Report 5 - Audit of the Detroit Police Department's Evidence Vehicle Process**

- **Finding 1 – Procurement of the Evidence Lot Did Not Comply With City's Property Leasing Directives**

  The DPD did not comply with Finance Directive #131 when it leased the property at 7770-7800 Dix Road. The Finance Directive recognizes the need for centralized facilities management control, and requires that City agencies submit plans to the Finance Director prior to entering into any negotiations, involve the Finance Director in lease negotiations, and stipulates that the Finance Director sign all leases for the City. The DPD did not publicly announce its requirement for a centralized evidence lot, or actively seek alternative properties to house its evidence lot. There is no indication that the Finance Director was involved in obtaining or negotiating the lease, or that the DPD obtained the leased property at a fair price.

  We recommend that the DPD comply with Finance Directive #131, and use the expertise of the Finance Department – Asset and Facilities Division to assist in defining its facility and operational needs, and in deciding whether it should renegotiate the lease for 7770-7800 Dix Road or seek an alternative property once the lease term has expired. We recommend that the City Council ask its Research and Analysis Division to review the City's compliance with Finance Directive #131, and the Asset and Facilities Division's progress in effectively utilizing the City's leased space, negotiating market-based terms for leases, and requiring landlords to upgrade properties before they are leased to the City.

- **Finding 2 – Erroneous Square Footage Results In Excessive Lease Payment**

  The square footage upon which the annual building rental rate is based is overstated by 8,773 square feet resulting in an annual lease payment that is $65,000 higher than it should be. The inaccurate square foot calculation will result in additional costs being charged to the City totaling between $650,000 and $717,000 over the life of the ten-year lease.

  We recommend that the DPD utilize the Finance Department – Asset and Facilities Division's expertise when leasing future properties and facilities and when renegotiating current leases. We also recommend that the DPD seek the Law Department's opinion as to whether a monetary adjustment can be obtained from the landlord based on the erroneous square footage on which the current lease is based.

- **Finding 3 – Contracted Leasehold Improvements Have Not Been Completed**

  At the time of our fieldwork, 19 months after the lease was signed, the contracted leasehold improvements had not been fully completed. The lessor had not pulled the appropriate permits to perform the improvements, and had not received a certificate of occupancy for the building. Some of the improvements that had been made do not conform to the required improvements listed in the lease agreement. A new heating and cooling system was contracted; however, a used heating and cooling system was installed. The lockers installed in the men's and women's locker rooms were used lockers that had been provided by the DPD. The parking lot had not been paved, and the roof was not repaired. The DPD's

26

lease did not stipulate when the required leasehold improvements should be completed although the lease payment for the entire term of the lease includes payment for all of the improvements.

We recommend that the DPD's Facilities Management Unit confirm that all improvements have been completed to its satisfaction, and that the DPD request a Law Department opinion as to whether a financial remedy should be sought for improvements that do not meet the agreed upon plans, and for the period of time the improvements were not satisfactorily complete.

- **Finding 4 – Contracted Operating Services and Maintenance Have Not Been Performed**

The lessor was not performing the contracted building maintenance and the facility was not secure. We observed that the offices were poorly cleaned, the water was lukewarm rather than hot, and some of the locker rooms and offices were poorly heated. The DPD paid for snow removal on two occasions which, according to the lease agreement, is the responsibility of the lessor. The battery-operated security gate was not working.

We recommend that the DPD hold the lessor to the terms of the lease and require a well-maintained and safe facility. The DPD should seek a monetary settlement to compensate for the lessor's default.

- **Finding 5 – No Contract Was Awarded for the Management of the Evidence Lot**

The DPD violated the City's Purchasing Ordinance when it granted Gene's Towing management responsibilities for the centralized evidence lot. The professional services required were not advertised, DPD did not actively seek competitive bids, a scope of services was not created, and the award was not subjected to the City's required approvals by the Budget, Law and Finance departments, and City Council. The DPD received only one proposal for management of the evidence lot. The proposal from Gene's Towing[4] was not detailed as to how the services would be provided. Because there is no formal contract or a detailed scope of services, the DPD has no measurable criteria to hold the managing company accountable for meeting DPD's service expectations.

We recommend that the DPD, with assistance from the Finance Department – Purchasing Division, develop a comprehensive scope of services for the management of the evidence lot, and procure a professional services contract with a managing company in accordance with the City's Purchasing Ordinance including approval by City Council.

- **Finding 6 – Vehicle Owners are Improperly Charged While Vehicles are Held for Evidence Processing**

The managing company is charging vehicle owners storage fees while the vehicle is held for evidence processing by the DPD, which conflicts with the terms of the DPD's police-authorized towing contract. We reviewed 11 invoices, and found excess storage fees of $2,320 had been charged. The managing

---

[4] Gene's Towing is one of the seven police-authorized towing companies owned by Gasper and Joan Fiore.

company charged vehicle owners for 309 days of storage, when only nine days of storage should have been assessed. In two instances, fees were not waived when specifically requested by the releasing officer.

We recommend that the DPD update existing procedures and communicate to the managing company that all vehicles towed to the evidence lot are exempt from storage fees unless they are presented with written documentation approving the assessment of storage fees from authorized MSB or the Notification and Crime Reporting Section (NCRS) personnel. The managing company should be required to post the towing rates and the City's storage policy at the checkout, so that evidence vehicle owners are aware of the amount they should be required to pay. The DPD should update its property release forms to conform to the current procedures, and include both the Ombudsperson's and the Office of the Auditor General's (OAG) telephone numbers. The OAG should periodically audit the managing company's invoices to verify that the company is charging the correct amounts to the vehicle owner and to the City. The managing company should be considered in default if it fails to charge fees in accordance with established City policies and rates or fails to cooperate with the audit. The DPD should require the managing company to reimburse vehicle owners for any overcharges that are identified.

- **Finding 7 – Some Evidence Vehicles are Not Towed Directly to The Evidence Lot**

Impounding officers are occasionally sending evidence vehicles to police-authorized towing companies' storage lots instead of to the centralized evidence lot. The City then incurs an additional towing charge when the evidence lot's managing company is required to pick up the vehicle and deliver it to the evidence lot.

We recommend that the MSB require DPD personnel to adhere to established procedures for impounding evidence vehicles.

28

**Report 6 - Detroit Police Department's Police-Authorized Towing Contract**

- **Finding 1 – DPD Awarded Contracts to Ineligible Towing Companies**

  Some towing companies were awarded contracts even though they did not meet the DPD's eligibility requirements. We found that the MSB did not document a formal application review. Discrepancies between contract requirements and towing company files include: required certificates of insurance were not in the files; company resources were sometimes overstated, as the same storage lots, tow trucks, insurance policies, and employees were listed on two or more applications; property tax clearances granted for towing companies were not based on all properties owned; storage lot security was not verified; zoning and permits necessary to operate abandoned vehicle storage yards and towing services were often lacking; and there was no documentation that criminal history checks were performed. Furthermore, there was no documentation of the companies' ownership at the time the contracts were awarded so that the extent of subsequent ownership changes can be determined.

  We recommend that an agency independent of the DPD be involved in the awarding of the contracts and that the contracts be approved by City Council. The City-authorized towing contract application should be expanded to collect the additional information required to determine towing company eligibility. The City should perform and document a thorough application review to ensure that the assertions made by the applying companies meet the criteria specified in the City's towing ordinance and in the towing contract's terms and scope of service.

- **Finding 2 – Towing Companies Tow in Unauthorized Precincts**

  Four towing companies tow vehicles in precincts they are not authorized to tow in. Three of the companies perform towing for prostitution stings, which is considered a non-impound towing assignment. Another company substitutes on a related company's rotational calls in the 8th precinct, which is a violation of the towing contract.

  We recommend the City strictly enforce the terms of the police-authorized towing contracts and require towing assignments generated outside the precincts to use the towing companies assigned to those precincts. Towing in unauthorized precincts should not be tolerated.

- **Finding 3 - Towing Companies Move Vehicles Prior to Obtaining Police Authorization**

  Towing companies are moving abandoned or stolen vehicles prior to obtaining police approval, which is in effect stealing the vehicle. Several drivers have been caught performing unauthorized towing. Complicating this issue is that the Auto Theft Prevention Authority[5] (ATPA) funded auto theft units occasionally order

---

[5] The Michigan ATPA was established to combine the efforts of law enforcement, communities and business against theft. The ATPA is funded by an annual $1 assessment on each insured non-commercial passenger vehicle. The ATPA awards grants to law enforcement agencies to prevent auto theft, catch auto thieves, and put the thieves in jail. Grant recipients, in addition to the DPD, that recover stolen vehicles in Detroit are the Michigan State Police (MSP) Western Wayne Team (WWATU), the MSP Downriver Team (DRATT), and the Macomb Sheriff's Macomb County Auto Theft Squad (MATS). Boulevard & Trumbull, B&G, and Gene's Towing are used to tow stolen vehicles recovered by WWATU, DRATT and MATS in the City of Detroit.

vehicles towed verbally, and then recover6 the vehicles later at the towing companies' lots. Some towing companies use the auto theft unit's process to explain their unauthorized possession of stolen vehicles. Some towing companies have the auto theft units recover stolen vehicles that have already been moved to their lots.

We recommend that the City and the Michigan State Police auto theft units coordinate stolen vehicle recovery efforts to curb the towing of vehicles prior to obtaining verifiable police permission. Processes should be understood so that these agencies can hold towing companies fully accountable for the stolen vehicles in their possession that have not been recovered.

- ### Finding 4 – Towing Companies' Storage Lots are Not Properly Secured

  Most towing companies report at least some theft from their storage lots. One towing company estimated missing parts claims of $15,000 in 2002. Several towing companies keep inventories of frequently stolen parts to replace parts removed from vehicles when the vehicle owner complains, and to curb the number of claims submitted to their insurance companies. These "self insured" towing companies have no incentive to fully secure their storage lots, which increases the likelihood that theft of parts will occur.

  We recommend that the City ensure that the vehicle condition reports are completed when a vehicle is towed, so that the towing company can be held accountable for parts while the vehicle is in the towing company's custody. The City should inspect the storage lots and require the towing companies to make changes in security if warranted.

- ### Finding 5 – Towing Companies are Storing Vehicles on the Streets

  We observed towed vehicles sitting on the street outside two towing companies in violation of the provisions of the police-authorized towing contract.

  We recommend that the City enforce the provisions of the towing contracts. Prior to the award of the next towing contracts, the City should reevaluate the storage lot space requirements necessary to meet the City's towing needs and make any necessary adjustments to the towing contracts.

- ### Finding 6 – Towing Companies are Not Open During Required Business Hours

  Nine towing companies do not maintain the required hours of 7:00 a.m. to 7:00 p.m. in order to be available to release vehicles to owners. We observed one storage lot that was open to trespass and unattended. At the same lot, we observed a vehicle owner climbing the gate to leave after he had been locked in during the required business hours.

  We recommend that the City enforce the storage lot hours stipulated in the towing contract.

---

[6] The term "recover," as used in the recovery of stolen vehicles refers to the process by which a found stolen vehicle's status is reported and updated in the Law Enforcement Information Network (LEIN) and National Crime Information Center (NCIC) computer systems. The recovery process determines the proper disposition of the recovered vehicle - whether the vehicle can be impounded by the recovering jurisdiction, held for evidence processing, or impounded for another jurisdiction.

- **Finding 7 - Towing Companies are Not Allowing Access to Vehicles**

  Vehicle owners and insurance companies are being pressured to give up their rights or ownership in order to view a vehicle. We found that towing companies are requiring some vehicle owners to sign over the vehicle title before being allowed access to the vehicle. Some towing companies are requiring that insurance companies redeem the recovered stolen vehicle before seeing its condition. Towing companies allege they are taking these steps to minimize their costs; they want to be able to easily dispose of the vehicle if the vehicle owner or the insurance company decides the vehicle is in such poor condition that they do not want it.

  We recommend that the City ensure the owners access to their vehicles while the vehicles are in the possession of the towing companies.

- **Finding 8 – Towing Companies Charge Improper Fees**

  Some towing companies are charging vehicle owners for items, such as winching and labor, which are not authorized in the towing rates approved by City Council. Many towing companies are not waiving the storage fees for the first three days of storage, especially when vehicles are redeemed by auction companies or by insurance companies. Towing rates are not posted, so vehicle owners are not made aware of the amounts they should be paying for the towing service, and therefore are not aware that they are improperly charged.

  We recommend that the City require towing companies to post rates so vehicle owners will be made aware of them, and suspend towing companies found to be overcharging vehicle owners, insurance companies, and others.

- **Finding 9 – Towing Companies' Records are Not Adequately Maintained**

  Towing companies were generally able to produce documents stating the reason the vehicle was towed, but were unable to produce documents indicating the vehicle's disposition. We found that several companies did not have a form DPD-131, authorizing the towing of the vehicle, for some vehicles on their storage lots. One company could not produce invoices for towed vehicles for a 14-month period.

  We recommend that the City specify the records that the towing companies are required to maintain to satisfy its record keeping requirements and enforce the terms of the contracts, which require records be maintained for three years.

- **Finding 10 – Towing Companies are Not Reporting Unclaimed Vehicles Monthly**

  Towing companies are not submitting the Unclaimed Vehicle Report by the 10th of the month as required by the contracts. As a result, the DPD is unaware of vehicles towed to the towers' storage lots outside the police-authorized towing process, and is unaware of vehicles that have sat on a tower's lot, garnering storage fees, for long periods without being redeemed or auctioned.

  We recommend that the City require that towing companies submit the monthly list of unclaimed vehicles, so the City is made aware of vehicles that have sat unclaimed and is able to process them appropriately.

- **Finding 11 - DPD Did Not Require New Owners to Reapply for Towing Contracts**

  We found no indication that the MSB was notified of Boulevard & Trumbull's, E&G's, or Javion & Sam's ownership change in September 2002. As such, MSB did not require the new owner of these companies to reapply for the police-authorized towing contracts as is required.

  We recommend that the City enforce this contract term.

- **Other Towing Issue - Towing Companies Charge Higher Fees on Auto Theft Unit Recoveries**

  Some towing companies are charging vehicle owners towing and storage fees on stolen vehicles that are recovered by the Auto Theft Prevention Authority funded auto theft units at rates substantially higher than those established for vehicles ordered towed by the DPD. The rates charged on the auto theft unit tows are not regulated, and vary between $135 and $175 per tow plus $12 per day storage beginning on the first day while rates charged on the DPD and the Michigan State Police ordered tows are $75 per tow plus $8 per day storage after the third day. In our opinion, the cost to the vehicle owner should not be dependent on which law enforcement agency happens to recover the stolen vehicle or order the vehicle towed.

  We recommend, in the interest of protecting the public from inordinately high fees, that the auto theft units' contracts with the towing companies require the towing companies charge the fees established by the City of Detroit on the vehicles recovered and ordered towed by all law enforcement agencies within the City. We also recommend that the City Council issue a resolution calling for the standardization of towing and storage fees on law enforcement ordered tows within the City of Detroit.

32