## City of Detroit

# OFFICE OF THE AUDITOR GENERAL



# Audit of the Detroit Police Department's Evidence Vehicle Process

## December 2003



# City of Detroit

**OFFICE OF THE AUDITOR GENERAL**
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 208
Detroit, Michigan 48226
Phone: (313) 224-3101
Fax: (313) 224-4091
www.ci.detroit.mi.us

**Joseph L. Harris, CPA, CIA**
Auditor General

**Sharon L. Gipson, CPA**
Deputy Auditor General

## MEMORANDUM

**DATE:**    October 21, 2005

**TO:**    Honorable City Council
Mayor Kwame Kilpatrick

**FROM:**    Joseph L. Harris
Auditor General

**RE:**    Audit of the Detroit Police Department's Evidence Vehicle Process

**C:**    Chief Ella M. Bully-Cummings

---

Attached for your review is our fifth of eight reports on the audit of the Detroit Police Department's (DPD) police-authorized towing process. Reports on the towing process are as follows:

1. Administration of the Police-Authorized Towing Process (issued September 30, 2004)

2. Compliance with the Impounded Vehicle Towing Process (issued November 23, 2004)

3. Compliance with the Abandoned Vehicle Towing Process (issued January 18, 2005)

4. Abandoned Vehicle Auction Process (issued February 8, 2005)

5. Evidence Vehicle Process (issued October 21, 2005)

6. Accounting and Reporting System (A separate report was not issued. The findings have been incorporated into the other reports in this series.)

7. DPD's Police-Authorized Towing Contracts

8. Best Practices and Recommendations.

This audit was initiated by the Auditor General to determine the validity of allegations of malfeasance committed by police-authorized tow companies and by DPD personnel, and to determine whether there was compliance with State laws, City ordinances, DPD towing procedures, and towing contracts.

This report focuses on the process of towing vehicles for evidence processing. Included in that process are: the centralized evidence lot lease, management of the evidence lot, and compliance with the rate schedule dictated by the DPD's policies and towing

i



contracts for vehicles towed and held by the DPD for evidence processing. This report contains our findings and recommendations specific to this process, and the DPD's response. Many of the issues detailed in this report continue because the longstanding causes underlying those conditions have not been remedied and therefore, still exist.

We recommend that the entire police-authorized towing process be reengineered. Our final report in this series will include our recommendations for consideration in developing the reengineered policies and procedures. The recommendations included in this report are those that we believe should be immediately implemented to address serious problems until the reengineered process is developed.

Copies of all of the Office of the Auditor General's reports can be found on our web site at www.ci.detroit.mi.us/legislative/CharterAppointments/AuditorGeneral.

**Audit of the Detroit Police Department's
Evidence Vehicle Process**

**December 2003**

**Table Of Contents**

EXECUTIVE SUMMARY                                                                   1

AUDIT PURPOSE, SCOPE, OBJECTIVES AND METHODOLOGY            5

EVIDENCE VEHICLE PROCESS                                                       6

FINDINGS AND RECOMMENDATIONS:

   1. Procurement Of The Evidence Lot Did Not Comply With City's          10
      Property Leasing Directives

   2. Erroneous Square Footage Results In Excessive Lease Payment       12

   3. Contracted Leasehold Improvements Have Not Been Completed      13

   4. Contracted Operating Services And Maintenance Have Not Been        15
      Performed

   5. No Contract Was Awarded For The Management of the Evidence       16
      Lot

   6. Vehicle Owners Are Improperly Charged While Vehicles Are Held    18
      For Evidence Processing

   7. Some Evidence Vehicles Are Not Towed Directly To The Evidence    21
      Lot

AGENCY'S RESPONSE                                                        ATTACHMENT A

iii

# EXECUTIVE SUMMARY

The Auditor General initiated this audit in response to allegations of malfeasance committed by police-authorized towing companies and Detroit Police Department (DPD) personnel. The purpose of the audit was to determine whether State laws, City ordinances, DPD's established towing policies and procedures, and the terms of the towing contracts are being complied with and whether the allegations of improprieties are valid.

To ensure adequate conditions for the processing of evidence, the DPD has centralized its processing and storage of evidence vehicles. Throughout the period that the DPD was consolidating the processing of evidence vehicles, the Towing Rate Commission[1], at the request of City Council, was researching a way to legally exempt crime victims from paying towing fees when their vehicles were towed for evidence processing. Because of the City Council's request, the Towing Rate Commission was apprised of and discussed planned procedural changes to the evidence vehicle towing process.

In our opinion, the actions of the Management Services Bureau (MSB) – including the review of its existing evidence facilities in 1999, the award of the evidence lot lease in July 2001, and the award of the management function of the evidence facility in 2001– were coordinated to award all aspects of the DPD's centralized evidence vehicle towing business to Gasper and Joan Fiore.[2]

The City now pays approximately $450,000 per year, in lease payments and towing fees for evidentiary vehicles, to Fiore-owned companies for centralized evidence vehicle processing. By managing the evidence lot, the Fiore's have been granted access to additional lucrative towing opportunities, as Mr. Fiore has stated that 75% of the owners of vehicles held for evidence request a second tow to a repair shop.

Over the ten-year term of the evidence lot lease, Mr. Fiore will likely overcharge the City and the public $1 million. The City will pay between $650,000 and $717,000 in excessive lease payments because the building square footage is overstated in the lease. Our analysis indicates that excessive storage fees, charged to owners of vehicles held for evidence processing by the police department, will approximate $300,000.

Following is a summary of our specific findings and recommendations relative to the centralized evidence vehicle lot and the evidence vehicle towing process.

---

[1] The Towing Rate Commission is charged with reviewing towing rates at least once every two years. The Commission is composed of the Auditor General as chairperson, the director of Consumer Affairs or a designated representative, the police chief or a designated representative, a member of the public appointed by the Mayor, and a representative of the towing industry appointed by City Council.

[2] Gasper and Joan Fiore own or control seven towing companies with City of Detroit police-authorized towing contracts – Boulevard & Trumbull, B&G, Citywide, E&G, Gene's Towing, Javion & Sams, and Troy Auto Bans. In addition, Mr. Fiore served as the towing industry representative on the Towing Rate Commission, and owns The Realty Company from whom the DPD leases its centralized evidence lot at 7770-7800 Dix Road. Mrs. Fiore owns Gene's Towing who manages the centralized evidence lot.

1

**Finding 1 – <u>Procurement Of The Evidence Lot Did Not Comply With City's Property Leasing Directives</u>**

The DPD did not comply with Finance Directive #131 when it leased the property at 7770-7800 Dix Road. The Finance Directive recognizes the need for centralized facilities management control, and requires that City agencies submit plans to the Finance Director prior to entering into any negotiations, involve the Finance Director in lease negotiations, and stipulates that the Finance Director sign all leases for the City. The DPD did not publicly announce its requirement for a centralized evidence lot, or actively seek alternative properties to house its evidence lot. There is no indication that the Finance Director was involved in obtaining or negotiating the lease, or that the DPD obtained the leased property at a fair price.

We recommend that the DPD comply with Finance Directive #131, and use the expertise of the Finance Department – Asset and Facilities Division to assist in defining its facility and operational needs, and in deciding whether it should renegotiate the lease for 7770-7800 Dix Road or seek an alternative property once the lease term has expired. We recommend that the City Council ask its Research and Analysis Division to review the City's compliance with Finance Directive #131, and the Asset and Facilities Division's progress in effectively utilizing the City's leased space, negotiating market-based terms for leases, and requiring landlords to upgrade properties before they are leased to the City.

**Finding 2 – <u>Erroneous Square Footage Results In Excessive Lease Payment</u>**

The square footage upon which the annual building rental rate is based is overstated by 8,773 square feet resulting in an annual lease payment that is $65,000 higher than it should be. The inaccurate square foot calculation will result in additional costs being charged to the City totaling between $650,000 and $717,000 over the life of the ten-year lease.

We recommend that the DPD utilize the Finance Department – Asset and Facilities Division's expertise when leasing future properties and facilities and when renegotiating current leases. We also recommend that the DPD seek the Law Department's opinion as to whether a monetary adjustment can be obtained from the landlord based on the erroneous square footage on which the current lease is based.

**Finding 3 – <u>Contracted Leasehold Improvements Have Not Been Completed</u>**

At the time of our fieldwork, 19 months after the lease was signed, the contracted leasehold improvements had not been fully completed. The lessor had not pulled the appropriate permits to perform the improvements, and had not received a certificate of occupancy for the building. Some of the improvements that had been made do not conform to the required improvements listed in the lease agreement. A new heating and cooling system was contracted; however, a used heating and cooling system was installed. The lockers installed in the men's and women's locker rooms were used lockers that had been provided by the DPD. The parking lot had not been paved, and the roof was not repaired. The DPD's lease did not stipulate when the required leasehold improvements should be completed although the lease payment for the entire term of the lease includes payment for all of the improvements.

2

We recommend that the DPD's Facilities Management Unit confirm that all improvements have been completed to its satisfaction, and that the DPD request a Law Department opinion as to whether a financial remedy should be sought for improvements that do not meet the agreed upon plans, and for the period of time the improvements were not satisfactorily complete.

### Finding 4 – Contracted Operating Services And Maintenance Have Not Been Performed

The lessor was not performing the contracted building maintenance and the facility was not secure. We observed that the offices were poorly cleaned, the water was lukewarm rather than hot, and some of the locker rooms and offices were poorly heated. The DPD paid for snow removal on two occasions which, according to the lease agreement, is the responsibility of the lessor. The battery-operated security gate was not working.

We recommend that the DPD hold the lessor to the terms of the lease and require a well-maintained and safe facility. The DPD should seek a monetary settlement to compensate for the lessor's default.

### Finding 5 – No Contract Was Awarded For The Management of the Evidence Lot

The DPD violated the City's Purchasing Ordinance when it granted Gene's Towing management responsibilities for the centralized evidence lot. The professional services required were not advertised, DPD did not actively seek competitive bids, a scope of services was not created, and the award was not subjected to the City's required approvals by the Budget, Law and Finance departments, and City Council. The DPD received only one proposal for management of the evidence lot. The proposal from Gene's Towing[3] was not detailed as to how the services would be provided. Because there is no formal contract or a detailed scope of services, the DPD has no measurable criteria to hold the managing company accountable for meeting DPD's service expectations.

We recommend that the DPD, with assistance from the Finance Department – Purchasing Division, develop a comprehensive scope of services for the management of the evidence lot, and procure a professional services contract with a managing company in accordance with the City's Purchasing Ordinance including approval by City Council.

### Finding 6 – Vehicle Owners Are Improperly Charged While Vehicles Are Held For Evidence Processing

The managing company is charging vehicle owners storage fees while the vehicle is held for evidence processing by the DPD, which conflicts with the terms of the DPD's police-authorized towing contract. We reviewed 11 invoices, and found excess storage fees of $2,320 had been charged. The managing company charged vehicle owners for 309 days of storage, when only nine days of storage should have been assessed. In two instances, fees were not waived when specifically requested by the releasing officer.

---

[3] Gene's Towing is one of the seven police-authorized towing companies owned by Gasper and Joan Fiore.

3

We recommend that the DPD update existing procedures and communicate to the managing company that all vehicles towed to the evidence lot are exempt from storage fees unless they are presented with written documentation approving the assessment of storage fees from authorized MSB or Telephone Crime Reporting Unit (TCRU) personnel. The managing company should be required to post the towing rates and the City's storage policy at the checkout, so that evidence vehicle owners are aware of the amount they should be required to pay. The DPD should update its property release forms to conform to the current procedures, and include both the Ombudsperson's and the Office of the Auditor General's (OAG) telephone numbers. The OAG should periodically audit the managing company's invoices to verify that the company is charging the correct amounts to the vehicle owner and to the City. The managing company should be considered in default if it fails to charge fees in accordance with established City policies and rates or fails to cooperate with the audit. The DPD should require the managing company to reimburse vehicle owners for any overcharges that are identified.

### Finding 7 – <u>Some Evidence Vehicles Are Not Towed Directly To The Evidence Lot</u>

Impounding officers are occasionally sending evidence vehicles to police-authorized towing companies' storage lots instead of to the centralized evidence lot. The City then incurs an additional towing charge when the evidence lot's managing company is required to pick up the vehicle and deliver it to the evidence lot.

We recommend that the MSB require DPD personnel to adhere to established procedures for impounding evidence vehicles.

4

# AUDIT PURPOSE, SCOPE, OBJECTIVES, AND METHODOLOGY

## AUDIT PURPOSE:
The Auditor General initiated this audit in response to allegations of malfeasance committed by police-authorized towing companies and Detroit Police Department (DPD) personnel involved in the police-authorized towing process.

## AUDIT SCOPE:
The Office of the Auditor General (OAG) conducted an audit of the DPD's towing process to determine the DPD's and the towing companies' compliance with State laws, City ordinances, DPD established towing policies and procedures, and the terms of the towing contracts. This report covers our review of the evidence vehicle towing process including the lease and management of the centralized evidence lot.

Our audit was conducted in accordance with Government Auditing Standards issued by the Comptroller General of the United States, except that the OAG has not received an external peer review within the past three years.

## AUDIT OBJECTIVES:
Specifically, we wanted to determine whether the:

- Lease for the evidence lot was properly obtained.

- Annual lease rate is fair.

- Lease terms are being followed.

- Management contract for the evidence lot was properly awarded.

- Owners of vehicles towed for the collection of evidence are assessed the appropriate charges.

## AUDIT METHODOLOGY:
To accomplish our objectives, our audit included:

- Interviews with DPD management, police officers, towing companies, and others;

- Reviews of DPD towing procedures, and City ordinances;

- Examinations of contracts and other documents related to the evidence lot;

- Inspection of the evidence lot, including a tour of the buildings, and observation of improvements and maintenance conditions; and

- Analyses of invoices and related towing and property release documents for vehicles held at the evidence lot.

5

## EVIDENCE VEHICLE PROCESS

The Detroit Police Department (DPD) has estimated that less than 10% of all of its police-authorized tows are for evidentiary purposes. Evidence vehicles are towed to an indoor facility so they may be processed for fingerprints, searched for evidence, or photographed. With the lease of the 7770-7800 Dix Road property and the signing of the November 2001 police-authorized towing contract, the DPD consolidated the processing and storage of vehicles towed for the processing of evidence. Prior to this contract, vehicles held for evidence were stored at 13 police-authorized towing companies' storage yards located throughout the City. The storage yards varied in their suitability for holding and processing evidence vehicles.

The DPD had expressed an interest in consolidating its evidence vehicles into one secure storage facility prior to 2001. In early 1998, the DPD drafted a request for proposal (RFP) for an evidence lot that was never issued. The RFP contained both operating and facility considerations, and indicated that a building of at least 60,000 square feet would be needed to handle the DPD's evidentiary requirements as well as to house the Commercial Auto Theft Section (CATS) and the Evidence Technicians Unit.

In the summer of 1999, a sergeant from the Evidence Technicians Unit visited each of the towing facilities holding evidence vehicles and assessed the suitability of each for storing evidence vehicles. The results of the assessment were detailed in a February 18, 2000 internal memo. The sergeant found that:

> Most of these locations offer minimal security and very poor conditions to properly collect evidence. For example, many of these indoor facilities have little or no lighting; crowded conditions; dogs and other animals running loose; leaking roofs; no 24-hour access; and little or no heat. (Heating is very important for it allows the vehicle to reach normal temperature so it can be adequately processed for latent prints.)

> Vehicle security at most locations runs the gamut from nonexistent to minimal. Most tow lots allow access by employees, mechanics, tow truck drivers, etc. At some locations (ABA Tow) the evidence storage area is also the collision shop/repair shop and evidence vehicles are frequently covered with sanding dust making them unsuitable for latent print processing.

The memo concluded that the only storage lot the sergeant found to be acceptable was a Road One[4] lot located at 7800 Dix Road with capacity for 75 to 100 vehicles.

No explanation is given as to why this property was included in the DPD's facility evaluation, as there was no documentation in the DPD towing files to show that Road One or the Fiores utilized the location on Dix Road as a storage facility for processing evidence vehicles at the time the evaluation was conducted. The Fiores did, however, own the adjacent property located at 7900 Dix Road.

On February 29, 2000, a commander from DPD's Management Services Bureau (MSB) Support Services Division, who was also the DPD's liaison to the Towing Rate

---

[4] At the time of our review, Boulevard & Trumbull, E&G, and Javion & Sams were owned by Road One / Miller Industries, a national towing company. Gasper and Joan Fiore, the former owners, managed the companies for Road One. In September 2002, the Fiores purchased these companies from Road One.

6

Commission, sent Gasper Fiore, at Boulevard and Trumbull Towing, a proposal for the lease of 7800 Dix Road for $317,697 annually.

On March 30, 2000, Boulevard & Trumbull Investments Inc., which is owned by Mr. Fiore, purchased 7770-7800 Dix Rd. from Nagaet Associates for an undisclosed amount. On the same day, Boulevard & Trumbull Investments obtained a five-year mortgage on the property in the amount of $675,000.

DPD records show that some negotiations occurred between the initial proposal letter and the time the lease agreement with The Realty Company was approved by City Council on July 18, 2001.

According to the lease:

- The property includes two facilities consisting of office and warehouse space totaling 62,487 square feet, and the surrounding property.

- The Realty Company is responsible for providing janitorial and maintenance services, as well as for providing utilities, grass cutting, and snow removal services.

- The Realty Company is responsible for making more than $700,000 in leasehold improvements.

- The Evidence Technicians Unit, Headquarters Surveillance, Carjacking Unit, and Commercial Auto Theft Unit commands were relocated to the facilities.

- The lease covers a ten-year term, for the period July 1, 2001 to July 13, 2011, for a total amount of $4,082,264, with two five-year renewal options. The lease also includes increases on the 2nd, 4th, and 6th year anniversaries of an amount equal to the increase in the consumer price index, but not to exceed 5%.

- Either the lessee or the lessor can terminate the lease for cause if the other party fails to cure a default of or violation of any term or obligation within 30 days of receipt of notice.

- Mr. Fiore signed the lease for The Realty Company, and MSB Deputy Chief John A. Clark,[5] whose MSB unit negotiated the lease, signed the lease for the DPD.

The DPD began occupying the buildings at 7770-7800 Dix Road in October 2001. In addition to the police units listed in the lease, the Armed Robbery and Sex Crimes Units have also relocated to the facility.

The lease covers the rental of the building and grounds and does not contain any provisions for the management of the evidence lot. On October 2, 2001, Gene's Towing, which was purchased by Mrs. Fiore in August 2001, submitted a proposal for the management and administration of the evidence garage. As justification of the need for a management company to oversee the lot, Gene's listed confusion and frustration for vehicle owners trying to claim their vehicles; no oversight in tracking and accounting for bills submitted by towers to MSB, and no inspection of vehicles for fresh damage or inventory of personal property. The process proposed by Gene's Towing included:

---

[5] Mr. Clark is reported to have begun working for Gasper Fiore, the owner of The Realty Company, the following year, after leaving employment with the City.

- Vehicles would be received by a representative of Gene's Towing at its lot at 7900 Dix Road, who would inspect the vehicle and note the vehicle condition, before moving the vehicle to the evidence lot at 7770-7800 Dix Road.

- The police-authorized towing company delivering the vehicle would submit an invoice to Gene's for its services. Gene's would pay the towing companies weekly for services at the rate of $50.00 for each tow.

- After the vehicle had been processed for evidence, the vehicle would be released to Gene's Towing, which would then move the vehicle to Gene's storage lot at 7800 Dix Road.[6]

- Gene's Towing would notify the owner that the vehicle had been released and that it could be claimed. Gene's Towing would also notify the Telephone Crime Reporting Unit (TCRU) of the vehicle's release.

The current police-authorized towing contracts were signed in mid-November 2001. The contracts include a new provision for vehicles towed for the processing of evidence, and delineate the procedures for delivering the evidence vehicle to the evidence lot, and the towing companies' compensation. The contracts state that the police-authorized towing companies will be paid $50.00 per vehicle towed to the evidence lot by the managing towing company; while the managing towing company will be paid in accordance with the towing rates established by City Council.

Current MSB personnel could find no record that it had entered into a formal contract for the management of the evidence lot with Gene's Towing, however, its files did contain a copy of an Inter-Office Memo dated November 20, 2001 from the manager of Gene's Towing to the Dix Lot Security Guards. The memo states that Gene's Towing had been assigned management responsibility of the Police Evidence Garage at 7800 Dix Road effective November 19, 2001. The memo contains the following procedures:

- Evidence vehicles will be delivered to 7900 Dix Road (Gene's Lot).

- Once the vehicles have been checked and an invoice has been turned over, the driver, accompanied by a Security Guard, will take the vehicle to the building and drop it in the area reserved for evidence vehicles.

- If the Security Guard is working alone or has other duties, the driver may be asked to drop the vehicle in front of the trailer; the vehicle will be moved to the area reserved for evidence vehicles by a Gene's driver.

- Evidence processing is complete when the vehicle is moved from the evidence building to the storage lot.

Gene's procedures for respotting (moving) evidence vehicles, include:

- As a general rule, the police department will have processed impounded vehicles within four days of delivery to the evidence lot.

- When advised that the police department has completed evidence processing of a vehicle, that vehicle will be stored in Gene's lot.

---

[6] The letterhead on this Gene's Towing memorandum indicates that Gene's Towing is located at 7800 Dix Road, the same address as the evidence lot that the DPD leases from The Realty Company. It is not clear whether the author of this memo intended to state that the vehicles would be moved to the Gene's Towing storage lot at 7900 Dix Road, or whether Gene's intended to portion off a piece of the property leased by the DPD for Gene's separate storage area.

8

While the DPD was acquiring a centralized evidence lot, the Towing Rate Commission, at the request of City Council, was investigating how to exempt victims of crime from paying towing-related fees when their vehicles were towed for the processing of evidence. In December 2000, the Towing Rate Commission provided City Council with a summary of its recommendation for waiving towing fees for victims of crime. The summary indicated that the DPD had already adopted the following procedure:

> Vehicles that are towed for the purpose of collecting and processing evidence are transported and held for the collection of evidence without cost to the registered owner. The Police Department pays the cost of the tow fee. Funds to cover these costs are included in the Department's budget for the year.

The summary concluded that vehicles towed for victims of crime were a subset of vehicles towed for evidentiary purposes. Therefore, by addressing all evidentiary vehicles, crime victims were exempted from paying towing and storage fees.

9

## FINDINGS AND RECOMMENDATIONS

1. <u>**Procurement Of The Evidence Lot Did Not Comply With City's Property Leasing Directives**</u>

The Detroit Police Department's (DPD) process for leasing the evidence lot at 7770-7800 Dix Road did not conform to the City's Finance Directive #131 for leasing property, follow responsible government procurement practices, or even follow common-sense leasing practices. Although a request for proposal (RFP) was developed for a centralized evidence lot in 1998, it was not used to solicit facilities for the DPD's consideration.

The DPD did not actively seek suitable alternative properties on which to consolidate vehicles for evidence processing purposes prior to leasing the property at 7770-7800 Dix Road. Rather, the results of a review of tow facility conditions, as reported in a February 2000 inter-office memorandum, was used to support the selection of a site for the evidence lot. An Evidence Technicians Unit sergeant toured 14 facilities to assess their suitability for processing evidence vehicles. Facilities were rated on 24-hour access, heat, lighting, overall conditions (acceptable rating in three previous categories, plus security), and vehicle capacity.

- 13 of the facilities reviewed were being used at that time to store and process DPD evidence vehicles. One of the facilities, located at 7800 Dix Road, was not owned by a towing company or used to store or process evidence vehicles.

- Only 2 of the 14 facilities, 7800 Dix Road and 2042 W. Davidson, had adequate capacity to accommodate a centralized evidence lot, with stated capacity between 75 and 100 vehicles. The other facilities reviewed had vehicle capacities between 2 and 15 vehicles.

- The facility located at 7800 Dix Road was the only facility found to have acceptable conditions for processing evidence vehicles.

No other facilities, owned by towing companies or by others, were considered for use as the centralized evidence facility. Most towing companies were unaware that the DPD was looking for a site suitable for centralizing the processing of evidence vehicles, and thus could not submit alternate facilities for consideration.

Although some negotiation between the DPD and The Realty Company did occur, there is no indication that the Finance Director was aware of or was involved in these negotiations. Mr. Fiore signed the lease for The Realty Company, and Management Services Bureau (MSB) Deputy Chief John A. Clark[7] signed the lease for the DPD.

The City's Finance Directive #131, Lease or Purchase of Property or Space by City Agencies, dated September 1, 1994, which was in effect at the time the property was leased, recognized the need for central "facilities management" control to coordinate the City's space and property needs. Finance Directive #131 requires that City Departments submit plans to the Finance Director for leasing space prior to any negotiations. The Directive states that the Finance Director is to be involved in all lease transactions and must sign all lease agreements on behalf of the City.

---

[7] Mr. Clark is reported to have begun working for Gasper Fiore, the owner of The Realty Company, when his appointment as Deputy Chief was terminated.

Those responsible for government procurement are charged with analyzing the entity's needs and creating specifications that satisfy the entity's requirements. When acquiring a facility, through lease or purchase, an analysis of the use of a facility, and the needs of those who will occupy the space should be performed. Government purchasing policies routinely require that a government entity competitively solicit bids in order to provide assurance that taxpayers' dollars are spent in the most efficient manner and that the government entity is not overpaying for goods and services. Public solicitation of proposals for services, and stated criteria for accepting services also assures that favoritism is not present in the award of contracts.

When entering into a lease for real property, the lessee should determine that the cost is reasonable and consistent with market values of any comparable leased properties that may be available. Market values or current appraisals should be used to determine whether the lease rate is justified. A determination should also be made as to whether it is more cost effective to lease rather than buy a facility.

Although Finance Directive #131 was in effect at the time the lease was approved, in practice, the Finance Directive was not followed and each agency director was responsible for negotiating the terms of its lease agreements. In our opinion, the DPD did not seek alternative properties in a competitive manner in order to award all aspects of its evidence vehicle processing business to Mr. Fiore.

Because the DPD did not actively solicit competing proposals to house its evidence lot, the DPD may have leased property and buildings that were not the best solution to its evidence processing needs. Because the DPD did not involve the Finance Department or other experts in negotiating its lease, the City may be paying a higher price for the property than would be required in a competitive market and the terms of the lease may not be in accordance with industry standards.

**We recommend that:**

a. The DPD adhere to Finance Directive #131, and involve the Finance Department - Asset and Facilities Division in analyzing the DPD's space needs for processing evidentiary vehicles, including both the facilities and the operations. In conjunction with the Asset and Facilities Division, the DPD should determine whether the lease for 7770-7800 Dix Road should be renegotiated when it expires or whether the DPD should seek an alternative site.

b. The City Council require its Research and Analysis Division to review the City's compliance with Finance Directive #131 and the Finance Department - Asset and Facilities Division's progress in effectively utilizing the City's leased space, negotiating market-based terms for leases, and requiring landlords to upgrade properties before they are leased by the City.

11

## 2. Erroneous Square Footage Results In Excessive Lease Payment

The lease payment for 7770-7800 Dix Road is excessive because the square footage asserted in the lease is overstated.

The evidence lot lease payment is based on a total of 62,487 square feet (39,904 square feet of warehouse space and 22,583 square feet of office space) at a blended rate of $6.53 per square foot. We measured the square footage of the building, along with officers from the DPD's Facilities Management Unit, and found that the square footage is overstated by 8,773 square feet. The incorrect building measurements resulted in an additional $65,534 lease payment in the first year of the lease, and could total as much as $717,000 over the life of the ten-year lease when contracted cost of living increases are taken into account.

|  | Square Footage Per Lease | Square Footage Measured by DPD | Amount Overstated | Rate per Square Foot | Excess Annual Lease Payment |
|---|---|---|---|---|---|
| Warehouse Space | 39,904 | 36,617 | 3,287 | $5.25 | $17,257 |
| Office Space | 22,583 | 17,097 | 5,486 | $8.80 | 48,277 |
| Total | 62,487 | 53,714 | 8,773 |  | $65,534 |

It is common practice when entering into a real estate transaction to verify the property owner's assertions. Property and building sizes, the building condition, and the classification of space should be independently corroborated when property is leased or purchased.

Since the beginning of 2002, when Finance Directive #131 was revised, the General Manager of the Finance Department - Asset and Facilities Division and the Law Department are required to be directly involved in property and space transactions. Since 2004, the City has contracted with a global real estate services company to locate properties, negotiate the City's new leases, and re-negotiate expiring leases.

Because the incorrect square footage was used in the calculation of the annual lease payment, the City is paying excess rental amounts for the evidence lot that are expected to total between $650,000 and $717,000 over the ten-year lease period.

**We recommend that:**
a. The DPD utilize the expertise of the Finance Department - Asset and Facilities Division when leasing property for its use in the future.

b. The DPD seek a Law Department opinion as to whether the City should pursue an adjustment to its annual lease payment, and compensation for past amounts paid due to the erroneous square footage contained in the evidence lot lease documents.

## 3. Contracted Leasehold Improvements Have Not Been Completed

We could not determine the extent to which the improvements detailed in the lease agreement had been made because The Realty Company failed to pull permits for the improvement work, which would have included a description of the work to be performed and an estimate of its value. Nevertheless, it is evident that several of the improvements stipulated in the lease have not been made.

We noted the status of the contracted building improvements in February 2003, 19 months into the lease term. Our observations are listed below:

| Contracted Improvement | Status |
|---|---|
| Install new heating and cooling system. | Installed a used furnace above the back office. |
| Paint garage area. | Complete. |
| Construct offices on 2nd floor balcony. | New offices were constructed. |
| Construct offices and workstations in 1st floor space. | New offices were constructed. |
| Replace floor tiles, ceilings, and paneling. | Substantially complete. Not all of the floor or ceiling tile had been replaced. |
| Construct men's locker room with 200 lockers. | Construction is complete. Used lockers, provided by the DPD, were installed. |
| Construct women's locker room with 50 lockers. | Construction is complete. Used lockers, provided by the DPD, were installed. |
| Install exterior perimeter fence and electronic security gate. | A fence separates Gene's from the DPD's evidence lot. The security gate is battery powered and does not always work. |
| Pave lots adjacent to buildings and area to be used for storage of vehicles towed for the processing of evidence. | The parking lot has not been paved. Parking lot needed grading. |
| Update plumbing. | Done. |
| Install additional outside lighting. | Status unknown. |
| Repair roof. | The roof was patched, and had not been repaired. |
| Replace or repair windows in the garage area and, to the extent necessary, in the rest of the building. | Complete. |
| Paint exterior building. | Complete. |

The City's Buildings and Safety Engineering Department (BSED) inspectors verified that some work had been done on the facility, as they issued written violations to The Realty Company for failing to obtain permits for plumbing, heating and cooling, and building renovations. In addition, a violation was issued to The Realty Company for failure to obtain a Certificate of Occupancy.

The lease agreement includes an estimated $701,500 in renovations to the leased premises, but it does not provide a timeline for the improvements to be completed. Payment for the leasehold improvements is included in the monthly lease payment at a rate of $1.12 per square foot.

The DPD has not enforced the terms of its lease. As a result, DPD has paid for improvements that have not been made. Because the required permits were not pulled for the improvements that have been made, property tax assessments for the property are understated.

13

**We recommend that:**

a. The DPD's Facilities Management Unit confirm that all the contracted leasehold improvements have been completed and that the improvements conform to the plans that were mutually agreed upon by the lessor and the lessee.

b. If the improvements are found to be non-conforming, the DPD should obtain a Law Department opinion as to whether the non-conformance is sufficient to consider this a violation of the lease agreement.

c. The City seek a monetary settlement for the value of the lease improvements that were not completed for the entire lease term.

### 4. Contracted Operating Services And Maintenance Have Not Been Performed

We toured the premises on Dix Road and noted many issues with the maintenance of the property and security, as follows:

- The offices were poorly maintained.
- Water was lukewarm, not hot.
- The men's and women's locker rooms were not properly heated.
- The furnace had an improper intake on the second floor of 7800 Dix Road. Officers complained of fumes. It is possible that fumes from the garage are transferred to the offices.
- Some offices were not being used because they were too cold.
- We found two instances where the DPD paid invoices for snow removal.
- A MSB police officer stated that the light bill for the Dix Road location had not been paid and that Detroit Edison temporarily cut off the power in February 2003.

In addition, because this is the facility where DPD evidential material is held, there are security concerns.

- There was a broken window in the garage of 7800 Dix Road.
- The battery-operated gate at 7800 Dix Road was not working. As a result the grounds were not secured.

Terms of the lease require the lessor to pay the following building utilities and operating expenditures:

- Utilities, provided that they do not exceed $60,000 per year;
- Building insurance;
- Maintenance of the electrical, mechanical, heating, plumbing and air conditioning systems;
- Light bulb changes, grass cutting and snow removal;
- Removal of snow, ice, rubbish, dirt and obstructions from public areas;
- Janitorial service, not to exceed 30 hours per week; and
- Real property taxes.

The DPD has not required that the lessor uphold its contractual obligations to maintain the electrical, mechanical, heating, plumbing, and air conditioning in good order; to provide snow removal and janitorial services; and to keep and maintain the premises in good repair during the lease term. As a result, the City is paying for services that it is not receiving.

**We recommend that:**

a. The City seek a monetary settlement to compensate for the lessor's defaults.

**5. No Contract Was Awarded For The Management of the Evidence Lot**

The DPD violated the City's Purchasing Ordinance when it granted Gene's Towing the responsibility for managing the evidence lot without an approved professional services contract. In addition to there being no signed contract, the DPD did not develop a request for proposal containing the required specification of services, advertise its need for a company to manage its centralized evidence lot, or competitively seek proposals for the management of the evidence lot from multiple qualified vendors as is required by the City's Purchasing Ordinance. Furthermore, the professional services the DPD is obtaining from Gene's Towing were not subjected to the required approvals by the Purchasing, Budget, Finance, Law departments, and by City Council.

The only proposal the DPD received for management of the evidence lot was from Gene's Towing, the operator of the neighboring storage lot. The proposal was received in October 2001, nearly three months after the lease of the property was approved by City Council, and close to the time that the facilities were occupied by DPD. The Fiores purchased Gene's Towing in August 2001. The management proposal is not detailed, as it consists of a one-page memo with four bullet points.

The proposal from Gene's Towing was submitted to the MSB six weeks prior to the signing of the current police-authorized towing contracts. The towing companies that are not associated with the Fiores may not have been aware of the impending evidence towing process changes or aware of the DPD's need for a company to manage the operation of the new evidence lot. The Fiores were aware of the process changes due to the Fiore's lease of the evidence processing facility to the DPD, and the assistance of a Fiore employee in developing the centralized evidence vehicle process. In addition, Mr. Fiore influenced the Towing Rate Commission, of which he was a member, to recommend this arrangement to City Council.

Responsible government procurement practices dictate that all contracts for public goods and services be competitively bid to assure that services are objectively purchased from vendors providing a competent product at a fair price. Section 18-5-33, of Detroit's City Code entitled Procedure for Procurement of Professional Services dictates the procedures City agencies should follow when procuring professional services. The Code states, in part, that:

- Either Purchasing or the Department must maintain a file of professional service providers that is updated annually through an advertisement in the newspaper designated to print the City's official business and trade newspapers, if applicable.

- A request for proposal should be sent by the contracting department to all firms on file and other competent providers, or advertised.

- The request for proposal is to be in the Purchasing Department's standard form. Among the items required in the request for proposal are a description of the services required, a deadline for submitting proposals, and the criteria by which the proposals will be evaluated.

Section 18.5.5(a) of the City's Purchasing Ordinance requires that the following contracts should not be entered into without City Council agreement:

16

Goods and services over the value of twenty-five thousand dollars ($25,000.00); all contracts for personal services, regardless of the dollar value; all grant-funded contracts; all revenue contracts, regardless of dollar value, including contracts for services rendered by the city, its departments and agencies; and all purchases and sales of and other transfers of interest in municipal land.

The DPD estimated its cost to manage the centralized evidence lot to exceed $25,000. In 2000, a lieutenant from DPD's Forensic Services estimated that 1,205 vehicles were processed for evidence in 1999, and that the City's cost would have been $90,375 if it had paid for the vehicles to be towed.

Current MSB personnel do not know why the DPD did not enter into a written contract with Gene's Towing to manage the storage lot, contrary to the City's Purchasing Ordinance that requires competitive bidding, a formal contract, and City Council oversight and approval of all contracts over $25,000. In our opinion, the contract was not competitively bid to ensure that the management of the lot, and the associated lucrative towing opportunities, could be awarded to the Fiores.

The DPD violated the City's Purchasing Ordinance. Because the DPD did not define a scope of services to be provided, and contract for those services, the DPD has no measurable way of holding the managing company to DPD's required standards.

**We recommend that:**

a. The City, through the Finance Department – Purchasing Division, and following the City's Purchasing Ordinance, immediately begin the process to obtain a professional services contract with a company to manage the DPD's evidence lot.

## 6. Vehicle Owners Are Improperly Charged While Vehicles Are Held For Evidence Processing

Gene's Towing was improperly charging storage fees while vehicles were being held for evidence by the DPD. Also, fees, which the DPD specifically requested to be waived, were charged to the vehicle owners.

We reviewed 11 invoices for vehicles released from the evidence lot in December 2002, with the following results:

| | Towing | Storage | Second Tow | Total | Number of Storage Days Charged |
|---|---|---|---|---|---|
| Per Tower's Invoice | $825 | $2,472 | $800 | $4,097 | 309 |
| Correct Charge | 675 | 152 | 800 | 1,627 | 9 |
| Variance | $150 | $2,320 | $ 0 | $2,470 | 300 |

- The DPD's impound cards for seven of the vehicles stated that the vehicles were on hold, and could not be released.

- The managing company's internally generated impound cards had a different hold status than the status noted on the DPD's impound card for seven of the vehicles.

- Property tags were not issued for three of the vehicles requiring evidentiary work.

- Two of the DPD's release forms indicated that the vehicle owners should not be charged towing and storage fees – one was a victim of crime, the other was a fee waiver. Towing and storage fees were charged to both vehicle owners.

- Although the vehicles were at the evidence lot for 295 days, and were released from hold status for a total of nine days, the managing company billed the vehicle owners for 309 days of storage.

Prior to the centralization of the evidence lot, the DPD's stated intention was that towing fees for vehicles towed to the evidence lot would be paid by the City of Detroit. The police-authorized towing contracts dictate the rates that the towing companies are required to charge vehicle owners. The rates should be applied differently when vehicles are ordered towed and held for the processing of evidence. Victims of certain crimes – homicide, criminal sexual conduct, robbery or carjacking - should not be charged towing fees; rather the DPD has instructed the towing companies that it will pay those fees. Owners, whose vehicles are towed for other evidentiary reasons, are responsible for paying both the towing and storage fees. However, as stated in paragraph 24 of Exhibit A, of the police-authorized tower contract:

> If there is a valid police hold on a vehicle, the Contractor shall not charge a storage fee for the period of the hold.

A June 2001 DPD inter-office memorandum included procedures for processing the tow bills for vehicles towed for the processing of evidence. The procedures, which were written prior to the consolidation of evidence vehicles in a centralized storage lot, indicate:

- The officer in charge notifies the registered owner and prepares the property (vehicle) release form. The officer in charge of the case shall indicate "**Vehicle Processed for Evidence.**" **(Do not indicate on this form that the tow fee is waived. The Department is actually paying the tow fee. Only Management Services Bureau and TCRU [Telephone Crime Reporting Unit] can waive tow fees.)**
- The registered owner picks up the property release form.
- The owner takes the property release form to the tow yard.
- The tow yard releases the vehicle at <u>no charge</u> to the owner.

Gene's procedures for the release of evidence vehicles do not address the payment or non-payment of fees by the vehicle owner. Gene's representative stated that the "bad guy" is charged all charges, even when the vehicle is held for evidence.

A representative of Gene's indicated that he is not always there to make sure his administrative staff properly charges fees. The DPD's forms for impounding and releasing evidence vehicles have not been updated to accommodate the centralized process and the payment of towing fees by the City for victims of crime. The managing company is asking evidence technicians to determine whether vehicle owners should be charged fees.

Evidence vehicle owners are erroneously charged and have paid towing fees and storage fees for the period vehicles are on hold. In our opinion, Gene's is receiving a significant amount of towing and storage fees for the period vehicles are being held by the DPD for evidence on a lot being leased by the DPD. Overcharges to vehicle owners could easily approach $300,000 over the ten-year term of the evidence lot lease.

**We recommend that:**

a. When vehicles are towed to the evidence lot, the vehicles should be considered exempt from storage fees unless the managing company is presented with written documentation approving the assessment of storage fees from authorized MSB or TCRU personnel.

b. The DPD procedures be updated to incorporate changes in the process due to the centralized lot. The DPD should update the property release form to indicate that owners of vehicles held for evidence processing should not be charged towing and storage fees while the vehicle is "on hold," and include both the Ombudsperson's and the OAG's telephone numbers.

c. The DPD require that the managing company notify the owners of evidence vehicles of the appropriate towing and storage fees by posting the fee schedule and a telephone number for owners to report any variances from the schedule.

d. The OAG periodically audit the managing company's invoices for evidence vehicles to insure that vehicle owners are not improperly charged. If the managing company fails to charge towing fees in accordance with the contract, the contract should be

considered in default, and the DPD should take the necessary steps to terminate the contract.

e. The City demand that all illegally collected fees be paid to the City; and that the City notify and reimburse all victims of the improper charges.

### 7. Some Evidence Vehicles Are Not Towed Directly To The Evidence Lot

Some police officers are not sending evidence vehicles to the evidence lot at 7770-7800 Dix Road. At times, towing companies are directed to hold evidence vehicles at their lots, rather than deliver them to the evidence lot. If a vehicle is towed to a location other than 7770-7800 Dix Road, Gene's Towing has to pick up the vehicle. The City is then charged for two tows - $50 for the original tow and $75 for Gene's Towing to pick up the vehicle and deliver it to 7800 Dix Road.

Exhibit A, Section 28 of the 2001 Police Authorized Tow contract indicates that:

> Vehicles towed for the processing of evidence shall be towed to 7800 Dix Road.

The manager of Gene's Towing attributed the towing of evidence vehicles to other storage lots to police or towing company error.

As a result of these errors, the City is incurring additional charges; the processing of evidence can be delayed; and evidence may be tainted.

**We recommend that:**

a. The DPD ensure that towing companies and DPD officers are aware that evidence vehicles should be towed directly to the centralized evidence lot.

21



DETROIT POLICE DEPARTMENT
CHIEF ELLA M. BULLY-CUMMINGS

1300 BEAUBIEN, SUITE 303
DETROIT, MICHIGAN 48226
PHONE 313•596•1800
CHIEFOFPOLICE@DPDHQ.CI.DETROIT.MI.U

October 12, 2005

Joseph L. Harris
Auditor General, City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Room 208
Detroit, Michigan 48226

SUBJECT:    **AUDIT OF THE DETROIT POLICE DEPARTMENT'S EVIDENCE VEHICLE PROCESS**

Dear Mr. Harris:

The following represents the Detroit Police Department's responses to the sixth report of findings and related recommendations in the December 2003 *"Audit of the Detroit Police Department's Evidence Vehicle Process"* as prepared by the Office of the Auditor General.

### Finding 1: PROCUREMENT OF THE EVIDENCE LOT DID NOT COMPLY WITH CITY'S PROPERTY LEASING DIRECTIVES

**Response to Finding:**  The department agrees that it may not have complied with finance directives when initially leasing the property located at 7770-7800 Dix in 2001. The contract was approved by the Budget, Finance and the Law Departments in 2001 and the City Council approved the contract on July 18, 2001.

**Response to Recommendations:** The department has been working with the city's real estate agent, *Jones Lang LaSalle* since the spring of 2005 to assist the department on all future lease negotiations. This agency maintains a list of all department facility leases with their expiration dates. The department will solicit the aid of *Jones Lang LaSalle* realtors, or whomever the Finance Department designates for property management to renegotiate the lease or seek alternative properties, when the lease on the Dix properties expires in July 2009.

KWAME M. KILPATRICK, MAYOR

## Finding 2: ERRONEOUS SQUARE FOOTAGE RESULTS IN EXCESSIVE LEASE PAYMENT

**Response to Finding:** The department agrees that the square footage may be overstated which may result in higher lease payments.

**Response to Recommendations:** The department will have *Jones Lang LaSalle* calculate the square footage at this property and give an estimate of what the annual lease payment should be based upon their calculation. The department will seek the opinion of the Law Department once the analysis has been completed by the realtor.

## Finding 3: CONTRACTED LEASEHOLD IMPROVEMENTS HAVE NOT BEEN COMPLETED

**Response to Finding:** The department agrees that at the time of the audit inspection in the early months of 2002, that some of the leasehold improvements may have not been fully completed. In February 2003, the landlord received violation notices from the City of Detroit, Buildings and Safety Engineering Department (Notice No. BB-03-17315-B). On March 7, 2003, Stephen Morgan, Assistant Corporation Counsel, City of Detroit Law Department sent a *"Notice of Default of Lease Agreement"* to the landlord regarding the violations.

Additionally, Deputy Chief Brenda Goss Andrews, Management Services Bureau, sent the landlord a letter on March 12, 2003, *"Notice of Termination"*. This letter served as formal notification to the landlord to cure all deficiencies cited within thirty (30) days of receipt of the letter. The Facilities Management Section, of the Management Services Bureau, continued to monitor this property for compliance to ensure these defaults were corrected.

As a result, on July 2, 2003, the City of Detroit, Department of Buildings and Safety Engineering sent the landlord a *"Certificate of Occupancy and Compliance" (Permit No. 63832)* stating that building code violations had been corrected.

**Response to Recommendations:** Since the improvements have been made, the department does not feel that a Law Department opinion is warranted in this matter.



## Finding 4: CONTRACTED OPERATING SERVICES AND MAINTENANCE HAVE NOT BEEN PERFORMED

**Response to Finding:** The department agrees that at the time of the audit, the landlord may not have been maintaining the property as required, or that prior to this audit the department may not have monitored the conditions of the property to ensure contract compliance.

**Response to Recommendations:** Since its' inception in July 2002, the Facilities Management Section of the Management Services Bureau, has worked diligently to monitor the department's property leases to ensure compliance to contract terms. Landlords have received deficiency letters when they failed to uphold the terms of their contract. The Management Services Bureau has been able through this aggressive approach to force landlords to make leasehold improvements as required in their contract.

The department will research to ascertain if payments were paid that should have been the responsibility of the lessor. If this is accurate, the department will seek compensation for this default.

The Facilities Management Section will continue to monitor all leased properties for compliance to contract terms.

## Finding 5: NO CONTRACT WAS AWARDED FOR THE MANAGEMENT OF THE EVIDENCE LOT

**Response to Finding:** The department agrees that the city's purchasing ordinance may have been circumvented in 2001.

**Response to Recommendation:** The department will seek the advice of *Jones Lang LaSalle* in developing a scope of services for the management of the evidence lot and will abide by all city purchasing ordinances in procuring a professional services contract.

## Finding 6: VEHICLE OWNERS ARE IMPROPERLY CHARGED WHILE VEHICLES ARE HELD FOR EVIDENCE PROCESSING

**Response to Finding:** The department agrees that in some cases vehicle owners may have been improperly charged storage fees while their vehicle was being held for evidence processing.

Joseph L. Harris
October 12, 2005
Page 4

**Responses to Recommendations:**

a. The Officer-in-Charge of the case, in addition to Management Services Bureau and Telephone Crime Reporting (TCRU) personnel are able to waive fees if the nature of the crime warrants exemption.

b. The department's Resource Management will review the current property release forms to determine the feasibility and costs of printing new forms to include the information recommended by the Office of the Auditor General (OAG).

c. Resource Management made site visits to tow companies to ensure they had an accurate fee schedule posted in prominent view of the public. Those companies not in compliance were required to update and post fee schedules. In previous audit finding reports, the OAG has made reference to the fact that the department lacked the necessary personnel to oversee and monitor close to 30 companies. The department continues to agree with this assessment. However, with limited personnel, the department continues to monitor tow companies and take necessary action when required.

d. The department agrees that the OAG should periodically audit evidence vehicle invoices to ensure that vehicle owners were not improperly charged. Once notified by the OAG's office of any irregularities commensurate with this audit, the department will take the necessary steps to sanction the tow lot up to and including termination of the contract, if warranted.

e. The OAG's audit indicated that some vehicle owners were improperly charged. Once the OAG presents the necessary information to the department with the names of vehicle owners, addresses, dates and amounts of overcharges, the department will conduct an investigation and pursue reimbursement to these owners, if warranted.

**Finding 7: ALL EVIDENCE VEHICLES ARE NOT TOWED DIRECTLY TO THE EVIDENCE LOT**

**Response to Finding:** The department agrees that in **some** instances evidence vehicles may have been towed improperly.



DETROIT POLICE DEPARTMENT
CHIEF ELLA M. BULLY-CUMMINGS

**Response to Recommendation:** It should however, be noted that the audit failed to point out that in some cases a vehicle is towed for an initial crime, but through further research and investigation it might be discovered that the vehicle was involved in another crime that necessitates evidence collection, hence an additional tow is required. In all other cases, department members are aware that evidence vehicles should be towed directly to the centralized evidence tow lot.

In conclusion, the department has worked diligently with limited staff to oversee the mammoth task of monitoring close to 30 tow companies. The department realized, as far back as mid 2002, that the Detroit Police Department should not be in the tow business. As such, in April 2005, a recommendation was made that, 1) the tow process no longer be a function of the police department; 2) that an outside vendor be contracted to manage the entire tow process; 3) that another city agency be tasked with this function so that the department could realize additional police response units; 4) that the department and the City of Detroit realize for the first time, revenues from the tow process.

Should you have any questions or concerns regarding this matter, please feel free to contact me at 596-1800, Monday through Friday, 9:00 a.m. to 5:00 p.m.

Sincerely,

**ELLA M. BULLY-CUMMINGS**
Chief of Police

EMB-C:bga

KWAME M. KILPATRICK, MAYOR