UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
IN RE:  CITY OF DETROIT,      .       Docket No. 13-53846
        MICHIGAN,             .
                              .       Detroit, Michigan
                              .       August 6, 2014
                   Debtor.    .       9:00 a.m.
. . . . . . . . . . . . . . . .
```

HEARING RE. STATUS CONFERENCE RE. PLAN CONFIRMATION
PROCESS (#6376) SIXTH AMENDED ORDER ESTABLISHING
PROCEDURES, DEADLINES AND HEARING DATES RELATING TO
THE DEBTOR'S PLAN OF ADJUSTMENT
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  THOMAS CULLEN
                            GREGORY SHUMAKER
                       51 Louisiana Avenue, N.W.
                       Washington, DC  20001
                       (202) 879-3939

For National           Sidley Austin, LLP
Public Finance         By:  GUY NEAL
Guarantee Corp.:       1501 K Street, N.W.
                       Washington, DC  20005
                       (202) 736-8041

For Assured            Chadbourne & Parke, LLP
Guaranty Municipal     By:  ROBERT SCHWINGER
Corp.:                 30 Rockefeller Plaza
                       New York, NY  10112
                       (212) 408-5364

For the Official       Dentons US, LLP
Committee of           By:  SAM J. ALBERTS
Retirees:              1301 K Street, NW, Suite 600, East Tower
                       Washington, DC  20005
                       (202) 408-7004

APPEARANCES (continued:)

| | |
|---|---|
| For County of<br>Macomb, Michigan: | Dechert, LLP<br>By:  ALLAN S. BRILLIANT<br>1095 Avenue of the Americas<br>New York, NY  10036<br>(212) 698-3600 |
| For Syncora<br>Holdings, Ltd.,<br>Syncora Guarantee<br>Inc., and Syncora<br>Capital Assurance,<br>Inc.: | Kirkland & Ellis, LLP<br>By:  STEPHEN HACKNEY<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-2000 |
| For Financial<br>Guaranty Insurance<br>Company: | Weil, Gotshal & Manges, LLP<br>By:  EDWARD SOTO<br>1395 Bricknell Avenue, Suite 1200<br>Miami, FL  33131<br>(305) 577-3177 |
| For UAW: | Cohen, Weiss & Simon, LLP<br>By:  PETER DECHIARA<br>330 West 42nd Street<br>New York, NY  10036-6976<br>(212) 356-0216 |
| For the Detroit<br>Retirement<br>Systems: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward Avenue, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For U.S. Bank: | Waller Lansden Dortch & Davis, LLP<br>By:  HEATHER HUBBARD<br>Nashville City Center<br>511 Union Street, Suite 2700<br>Nashville, TN  37219<br>(615) 850-6024 |
| For Ad Hoc COPs: | Allard & Fish, PC<br>By:  DEBORAH FISH<br>2600 Buhl Building, 535 Griswold<br>Detroit, MI  48226<br>(313) 961-6141 |
| For Detroit<br>Retired City<br>Employees: | Silverman & Morris, PLLC<br>By:  THOMAS MORRIS<br>30500 Northwestern Hwy., Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330 |

APPEARANCES (continued):

| | |
|---|---|
| For the Detroit Fire Fighters Association and the Detroit Police Officers Association: | Erman, Teicher, Zucker & Freedman, P.C. By: BARBARA A. PATEK 400 Galleria Officentre, Suite 444 Southfield, MI 48034 (248) 827-4100 |
| For the State of Michigan: | Dickinson Wright By: STEVEN HOWELL 500 Woodward Avenue, Suite 4000 Detroit, MI 48226-3245 (313) 223-3033 |
| For T&T Management, HRT Enterprises, and the John and Vivian Dennis Trust: | Demorest Law Firm, LLP By: LISA OKASINSKI 322 West Lincoln Avenue Royal Oak, MI 48067 (248) 723-5500 |
| For County of Oakland, Michigan: | Young and Associates By: JAYE QUADROZZI 27725 Stansbury Blvd., Suite 125 Farmington Hills, MI 48334 (248) 353-8620 |
| For Deutsche Bank AG: | Katten Muchin Rosenman, LLP By: JOHN RAMIREZ 575 Madison Avenue New York, NY 10022 (212) 950-6435 |
| For Wilmington Trust: | Drinker, Biddle & Reath, LLP By: HEATH ROSENBLAT 1177 Avenue of the Americas, 41st Floor New York, NY 10036-2714 (212) 248-3248 |
| For Ad Hoc Water and Sewer Bondholders: | Kramer Levin Naftalis & Frankel, LLP By: CRAIG SIEGEL 1177 Avenue of the Americas New York, NY 10036 (212) 715-9432 |

APPEARANCES (continued):

For Martha Kopacz:    Squire Patton Boggs, LLP
                      By:  SCOTT KANE
                      4900 Key Tower
                      127 Public Square
                      Cleveland, OH  44114
                      (216) 479-8500

                      MARTHA E.M. KOPACZ
                      Phoenix Management Services
                      10 Post Office Square, Suite 605 N
                      Boston, MA  02109
                      (617) 600-3600

For AFSCME:           Lowenstein Sandler, LLP
                      By:  PHILLIP GROSS
                      65 Livingston Avenue
                      Roseland, NJ  07068
                      (973) 597-6246

                      Miller Cohen, PLC
                      By:  RICHARD MACK, JR.
                      6700 West Lafayette Blvd., 4th Floor
                      Detroit, MI  48226-3191
                      (313) 566-4787

For John Quinn:       JOHN QUINN
                      In pro per

Also Present:         Rice & Ravitch, LLP
                      By:  RICHARD RAVITCH
                      610 5th Ave., RM 420
                      New York, NY  10020
                      (212) 218-7880

Court Recorder:       Kristel Trionfi
                      United States Bankruptcy Court
                      211 West Fort Street, 21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Good morning.  Let's begin by getting

4  appearances on the record, please.

5      MR. SHUMAKER:  Good morning, your Honor.  Greg

6  Shumaker of Jones Day for the City of Detroit.

7      MR. CULLEN:  Thomas Cullen of Jones Day for the City

8  of Detroit.  Also with us at table are Heather Lennox of

9  Jones Day for Detroit and Robert Hertzberg for the City of

10  Detroit.

11      THE COURT:  Thank you, sir.

12      MR. HACKNEY:  Your Honor, good morning.  Stephen

13  Hackney on behalf of Syncora.

14      MR. NEAL:  Good morning, your Honor.  Guy Neal,

15  Sidley Austin, for National Public Finance Guarantee Corp.

16      MR. SCHWINGER:  Robert Schwinger from Chadbourne &

17  Parke for Assured Guaranty Municipal Corporation.

18      MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

19  from Dentons.  I'm here with my partner, Dan Barnowski, on

20  behalf of the Official Committee of Unsecured Creditors --

21  excuse me -- on behalf of the committee of -- the Official

22  Committee of Retirees.  Have to get my cases straight.

23      THE COURT:  Good idea.

24      MR. ALBERTS:  Thank you.

25      MR. SOTO:  Ed Soto, Weil, Gotshal & Manges.  I'm

1   here on behalf of FGIC.

2           MR. DECHIARA:  Peter DeChiara from the law firm of

3   Cohen, Weiss & Simon, LLP, for the UAW International Union.

4           MR. GORDON:  Good morning, your Honor.  Robert

5   Gordon, Jennifer Green, and Shannon Deeby of Clark Hill on

6   behalf of the Detroit Retirement Systems.

7           MS. HUBBARD:  Good morning.  Heather Hubbard at

8   Waller Lansden Dortch & Davis on behalf of U.S. Bank as

9   trustee.

10          MS. FISH:  Good morning, your Honor.  Deborah Fish

11  from Allard & Fish on behalf of the ad hoc COPs.

12          MR. MORRIS:  Good morning, your Honor.  Thomas

13  Morris of Silverman & Morris on behalf of the retiree

14  association parties.

15          MS. PATEK:  Good morning, your Honor.  Barbara

16  Patek, Erman, Teicher, Zucker & Freedman, on behalf of the

17  Detroit Police Officers Association and Detroit Fire Fighters

18  Association.

19          MR. HOWELL:  Good morning, your Honor.  Steven

20  Howell, Dickinson Wright, special assistant attorney general,

21  appearing on behalf of the State of Michigan.

22          MS. OKASINSKI:  Good morning, your Honor.  Lisa

23  Okasinski of Demorest Law Firm on behalf of T&T Management,

24  HRT Enterprises, and the John and Vivian Dennis Trust.

25          MS. QUADROZZI:  Good morning, your Honor.  Jaye

1    Quadrozzi, Young & Associates, on behalf of Oakland County.

2    Also here with Joe Fischer from Carson Fischer also on behalf

3    of the county.

4                MR. QUINN:  Good morning, your Honor.  My name is

5    John Quinn.  I'm an in pro per objector, a member of Class

6    11.

7                THE COURT:  Okay.  I published an agenda to you all.

8                MR. BRILLIANT:  Your Honor, this is -- I'm sorry.

9    This is Allan Brilliant on the phone.  Do you want

10   appearances from the phone?

11               THE COURT:  I do.  Thank you for reminding me of

12   that.  Go ahead, sir.

13               MR. BRILLIANT:  Allan Brilliant from Dechert, LLP,

14   on behalf of Macomb County by and through its public works

15   commissioner Anthony Marrocco and on behalf of the Macomb

16   Interceptor Drain Drainage District.

17               THE COURT:  Any others on the phone?

18               MR. RAMIREZ:  Good morning, your Honor.  John

19   Ramirez, Katten Muchin Rosenman, on behalf of Deutsche Bank

20   AG London.

21               MR. RAVITCH:  Dick Ravitch at the request of your

22   Honor.

23               MR. ROSENBLAT:  Good morning, your Honor.  Heath

24   Rosenblat of Drinker, Biddle & Reath on behalf of Wilmington

25   Trust National Association.

1          MR. SIEGEL:  Good morning, your Honor.  This is
2    Craig Siegel of Kramer Levin on behalf of Nuveen Asset
3    Management and BlackRock.
4          MR. KANE:  Scott Kane of Squire Patton Boggs for
5    Martha Kopacz and Phoenix Management.
6          MS. KOPACZ:  Marti Kopacz at your request.
7          THE COURT:  Any others on the phone, please?
8          MR. GROSS:  Phillip Gross, Lowenstein Sandler, for
9    AFSCME.
10          THE COURT:  Thank you.  Okay.  I published an agenda
11    for us for today.  Are there any items that anyone would wish
12    to add to the agenda?  Mr. Hackney.
13          MR. HACKNEY:  Yes, your Honor.  I had a number of
14    items that range from sort of nuts and bolts to maybe more
15    slightly philosophical questions that we had for the Court,
16    but I didn't know whether you wanted to triage some of those
17    forward or back after we handled your agenda, so I can do
18    whichever.
19          THE COURT:  Why don't you just bullet point them for
20    me now, and then --
21          MR. HACKNEY:  Yeah.
22          THE COURT:  -- we can see where to fit them in?
23          MR. HACKNEY:  You bet.  And I bullet pointed these
24    already for Mr. Shumaker yesterday so he could give some
25    thought to them and also Mr. Neal.

1          THE COURT:  Good.

2          MR. HACKNEY:  So kind of going maybe from the more

3  mundane to the more philosophical, whether the Court has a

4  problem with parties using video clips in the opening so long

5  it's as -- so long as the video clip is of otherwise

6  admissible deposition testimony, meaning rather than merely

7  using transcripts; whether the Court would mind just

8  approving now briefs in excess of the page limit on the post-

9  trial briefs and supplemental objections because we intend

10  them to be very substantive and evidence-based documents that

11  will save you a bunch of ex parte motions; confirming that

12  documents can be used for cross-examination even if they're

13  not on a witness list under the custom of the idea that you

14  don't know what you'll need to impeach a witness with, and it

15  may not be on your exhibit list.  I have thoughts for the

16  Court on how we might streamline the process of getting

17  exhibits into evidence, particularly on the subject of

18  authenticity.  I wanted to address with the Court motions in

19  limine and Daubert motions that we intend to file and get a

20  sense of both -- well, principally how you wanted to handle

21  them and when you wanted to hear them.  Deposition

22  designations are an important subject, your Honor, and I

23  wanted to discuss that with you.  Post-trial findings of fact

24  and conclusions of law are another one that's important.  A

25  more broad question, I think, I know that you noted was the

1   question of time allocation both in terms of total time but
2   also intracreditor time.

3          The last one, your Honor, goes a little bit more to
4   some of the issues we've raised before, for example, just
5   sort of the impact on the case of things like when we're
6   going to get the definitive documents on the DIA settlement,
7   the LTGO settlement.  I've raised those with you before.  The
8   ongoing DWSD issue, I want to discuss with you principally
9   how we're supposed to try that up to you and then the issue
10  of exit financing.  Those were my bullets, your Honor.

11         THE COURT:  Thank you.  Does anyone else have any
12  other items to add for the agenda today?

13         MR. DECHIARA:  Good morning, your Honor.  Peter
14  DeChiara for the UAW.  The UAW may have one additional item.
15  We have a discrete supplemental discovery request to the
16  city.  We've discussed it with the city.  The city may agree
17  to provide it to us, in which case there will be no need to
18  raise it with the Court.  We hope before the end of the
19  hearing today we'll hear from the city on that matter.  Thank
20  you.

21         THE COURT:  Mr. Gordon.

22         MR. GORDON:  Good morning, your Honor.  Just one
23  discrete item that kind of popped into my head this morning
24  really, and I thought it was more maybe in the nature of a
25  housekeeping matter, but since you're bringing this up now, I

1  just wanted to raise it.  I believe a couple of weeks ago in

2  the context of a motion to quash a subpoena by Syncora, the

3  Court asked in the middle of the hearing specifically about

4  whether evidence of individual hardship was even relevant for

5  purposes of the trial, and on the fly I think parties sort of

6  agreed that that wouldn't be relevant.  However, I was

7  concerned that maybe the record wasn't really clear because I

8  think that the case law supports the concept that hardship on

9  a more macroscopic level to the community, to individuals and

10  the community as a whole in a Chapter 9 case is something

11  that is relevant.  And I know that the city, in particular,

12  cited in its consolidated reply the Barnwell Hospital case

13  and the Corcoran Hospital case as well, so I wanted to make

14  sure that everyone was clear as to the ability to present

15  some evidence as to the hardship to the community as a whole

16  of certain, you know, potential scenarios in connection with

17  the plan and that those things could be relevant.

18        THE COURT:  Thank you.

19        MR. GORDON:  Thank you, your Honor.

20        THE COURT:  Any others?  I actually have a couple

21  myself.  I'm sorry, sir.  Were you standing?

22        MR. QUINN:  Yes, your Honor.  Your Honor, John

23  Quinn.  I think the Court should address the question of how

24  to provide an opportunity for individual objectors to cross-

25  examine witnesses and present evidence without extending the

1  trial unduly and causing confusion.

2      THE COURT:  All right.  We'll add that to the

3  agenda.  I actually have a couple of additions myself.  An

4  issue I've been struggling with is -- one second.  Chris, is

5  there a Bankruptcy Code here?  Yes, there is.  One second,

6  please.  An issue that I've been struggling with here and

7  that I'd like to discuss with you how to process is the issue

8  of the meaning of Section 943(b)(3) relating to fees and the

9  question of to what extent does that provision give the Court

10  jurisdiction over fees, whether it's fees of the city's

11  professionals or creditors' professionals or otherwise, so

12  let's put that on the agenda.  And, finally, probably at the

13  very end, I need to meet with the attorneys who I've been

14  working with on the site visit.  Okay.

15      So let's begin then with how to address Ms. Kopacz's

16  report and testimony.  The first question I raised is who

17  will discuss -- who will conduct Ms. Kopacz's direct

18  examination?  I had thought and assumed that I would actually

19  be the one doing that, and so I would ask whether anyone has

20  any objection to that.

21      MR. CULLEN:  No, your Honor.

22      THE COURT:  No objections?  All right.  Then let's

23  just presume that that's the direction we will proceed in.

24  Next question is at what point in the proceedings will she

25  testify, and on this point I welcome your thoughts, anyone.

1      MR. CULLEN:  May it please the Court, Thomas Cullen

2  for the city.  We had thought that the logical point was at

3  the end of the city's case and before the objectors put on

4  their direct case.  I don't know if others have had different

5  thoughts on that.  If it's sensible, your Honor, I could spin

6  down through the rest of your questions in number one, which

7  are a bunch of yeses.

8      THE COURT:  Well, let's take them one at a time.

9      MR. CULLEN:  All right.

10      THE COURT:  Does anyone else have any thoughts on

11  when Ms. Kopacz should testify?  Mr. Cullen, let me have a

12  discussion with you about that.

13      MR. CULLEN:  All right.

14      THE COURT:  For a long time I had assumed the same

15  answer as you, but now I'm wondering whether it wouldn't be

16  more expeditious for her to actually testify first, and let

17  me tell you my thoughts behind that exploration.  Her

18  testimony and her report raise several issues about

19  feasibility, and we're going to discuss some of those in a

20  little while here, and so I was wondering if it wouldn't make

21  more sense for her to discuss the issues she has regarding

22  feasibility so that they could be teed up for your

23  presentation and the presentation of any others who wish to

24  participate in this issue.

25      MR. CULLEN:  That was, of course, the other

1  contender, your Honor, in our mind, and what we were thinking

2  about was that one of the first questions that you would have

3  to Ms. Kopacz is based upon her activity and her work since

4  the report, anything to revise, extend, amend, et cetera, and

5  that if she were in a position to hear some of the testimony

6  that might be -- allow her to do that more easily, but I

7  think it's a perfectly rational way on the rationale

8  suggested to let her go first and then to let us deal with

9  that.  I don't know whether the Court would then foresee --

10  the Court can do what the Court wants, of course -- calling

11  her back, which might happen at the end -- might happen at

12  the --

13        THE COURT:  Possibly.

14        MR. CULLEN:  -- end of the case as a whole if the

15  Court felt the need or felt it would be helpful, but that

16  would be perfectly acceptable to us.  We would have no large

17  principal objection to leading off with her.

18        THE COURT:  Okay.  Any other thoughts from anyone

19  else on this?  Sir.

20        MR. HACKNEY:  Thank you, your Honor.  Stephen

21  Hackney on behalf of Syncora.  I think I came to court today

22  thinking what you initially thought, which is that she would

23  testify at the end of the city's case.  I've heard -- I hear

24  your view on that, but I actually still think that that may

25  make more sense because she is opining on a number of things

1    that the city will effectively be, you know, laying the

2    foundation for with respect to things like forecasts and

3    pensions, and I think it may be a little bit harder both for

4    any parties either to cross her or examine her until there's

5    been a little more of the sort of working familiarity that

6    comes with taking testimony from others on those issues.

7              THE COURT:  Um-hmm.

8              MR. HACKNEY:  So for what it's worth, I think my

9    view would still be to do her after the city has put all the

10   evidence in, but the --

11             THE COURT:  Does it address your concerns to make

12   her available for further or extended cross-examination after

13   the city's case?

14             MR. HACKNEY:  Yeah, it might.  I guess I was really

15   thinking not so much as a tactician from my own client's

16   narrow perspective but just more generally from the process

17   standpoint I think that I offer you that view.

18             THE COURT:  All right.  Well, let me think about

19   this one then without resolving it at this point.  Okay.  So

20   the next issue is the admissibility or the admission of her

21   report into evidence, and the reason why I would promote this

22   to you is that it seems logical that if her report is in

23   evidence, the direct examination of her will be much more

24   expeditious than if her report is not in evidence because if

25   her report is not in evidence, then the substance of it will

1  have to be brought out virtually entirely through

2  examination, whereas if the report is in evidence, I can just

3  focus on the questions I have for her, so can we have an

4  agreement to admit her report into evidence?

5          MR. CULLEN:  No objection from the city, your Honor.

6  I agree with the -- and I agree with the rationale that

7  otherwise we'd go through a long process.  The middle

8  alternative is she could offer the report, say, "Is this your

9  report?  Do you still stand by it?" et cetera, and then we

10  could do -- offer that into evidence on that basis, but I

11  think having it into evidence to start with simplify the

12  procedure a lot.

13          MR. HACKNEY:  So, your Honor, regrettably, we don't

14  share the view.  We're not able at this time to stipulate

15  either to her credentials or to the admission of her report,

16  but what I did want to suggest today was that I thought to

17  the extent you haven't already read her report -- I think it

18  sounds like that you have read her report, that you had a

19  copy of it.

20          THE COURT:  Oh, yes.

21          MR. HACKNEY:  Yes.  I do think it would be useful

22  for the Court to have read her report, as you have, and to

23  read her deposition, and we don't have an objection with the

24  Court reading her deposition.  The transcript is available,

25  and we can get it to you as soon as you'd like.

1          THE COURT:  Um-hmm.

2          MR. HACKNEY:  But we have questions about the

3    admissibility of her opinion testimony that I think we're

4    going to be raising with you, so I'm not able to stipulate to

5    that, and I apologize.  I understand it would be

6    streamlined --

7          THE COURT:  All right, but no apology necessary.

8    Okay.  So that answers Question D, which is in regard to the

9    stipulation to her qualifications as an expert; is that

10   right?  What were you going to say, sir?  I'm sorry.

11         MR. SOTO:  Your Honor, the same goes with respect to

12   FGIC.  We're considering some aspects of the report -- and,

13   again, it's highlighted in the testimony that Mr. Hackney is

14   referring to -- that may be portions of a motion in limine

15   and maybe even some other motions.  That's the reason why we

16   agree.

17         THE COURT:  Okay.

18         MR. CULLEN:  Your Honor, if I may, Cullen, again,

19   for the city.  It is possible -- we would stipulate the

20   report in, but it is possible if the Court is going to read

21   the deposition on which the challenge to her qualifications

22   and opinions might have rested and has already read the

23   report, it might be -- it might be more expeditious if it

24   can't be stipulated for the Court to just decide on that.  It

25   could be offered into evidence, and the Court could make a

1  decision on whether or not -- whether or not it would be
2  admitted into evidence based upon a short motion or something
3  like that.

4         THE COURT:  Well, let's process this logically.  If
5  there are objections to her qualifications or methodologies
6  or other Daubert kinds of issues, then those should be
7  processed before the issue of the admissibility of the report
8  itself.  I know there's a dispute in the case law on whether
9  reports of experts are inadmissible hearsay or are admissible
10 when the witness is available to be cross-examined on it at
11 trial, and I suppose I could ask you to brief those issues.
12 Mr. Hackney, was it your intent -- or let me just ask the
13 creditors generally.  Was it the intent of anyone to file a
14 Daubert motion in relation to Ms. Kopacz and her testimony?

15        MR. HACKNEY:  So that is something, your Honor -- as
16 you know, we have been doing a lot of different things
17 lately, and it's moving at quite a pace, but I will say
18 that's something that's under active consideration, so --

19        THE COURT:  Okay.  Well, we probably don't need an
20 answer to that question now, but the sooner the better.

21        MR. HACKNEY:  Yeah.  That's one of the --

22        THE COURT:  When is our final pretrial conference at
23 this point?

24        THE CLERK:  The 19th.

25        THE COURT:  The 19th, so that's in a little less

1  than a couple of weeks.

2          MR. HACKNEY:  I wonder if a way to stage this, your

3  Honor, is to sort of go in pieces, which is it seems like

4  there's a general agreement that you can read her report and

5  her deposition.  Then we can suss out whether we'll be

6  bringing motion practice against her that will allow you to

7  further refine your views on what she did, and then perhaps

8  that will feed into --

9          THE COURT:  Um-hmm.

10          MR. HACKNEY:  -- when you want her to testify and --

11          THE COURT:  Okay.

12          MR. HACKNEY:  -- how you'll resolve some of the --

13          THE COURT:  That's a good point.  Does anyone object

14  to the Court reviewing Ms. Kopacz's deposition at this point

15  in time?  All right.  Then I will accept your offer,

16  Mr. Hackney, to make that transcript available to me at your

17  earliest convenience.

18          MR. HACKNEY:  Someone listening on the phone is

19  going to send it.

20          MS. KOPACZ:  Your Honor, it's Marti Kopacz.  I

21  wanted to let the Court know as well as everybody at the

22  hearing I do intend to file a supplemental report -- it will

23  be very brief -- really for a couple of purposes.  One is at

24  the time that I issued my report, the fifth amended plan had

25  just been filed, and I did not have the opportunity to read

1  that plan prior to completing my report, and I didn't do it

2  before my deposition so as not to confuse my testimony, so I

3  will be reviewing that plan, and if there's anything in that

4  plan that causes me to feel like I need to modify anything in

5  my report, I will do that.  The one thing that I would also

6  tell the Court and the participants here is that the fifth

7  plan of adjustment did not include any change to the July 2nd

8  projections, so at this point, to the extent that the city

9  does not update its financial projections in the plan between

10  now and confirmation, there won't be a need for me or my team

11  to go through a detailed review of the updated projections,

12  but I would still, I guess, ask for permission -- if the city

13  modifies any of the financial projections, I would want the

14  opportunity to review those and supplement my report.

15        The other thing that will be part of the supplement

16  is an errata sheet which corrects a couple of typographical

17  errors and errors that are typographical, but they, without

18  being corrected, would leave the reader with an inaccurate

19  reading of my report, so -- but, like I said, it's going to

20  be very short, and I intend to do that within the next week.

21        THE COURT:  All right.  Ms. Kopacz, can you hear me

22  okay?

23        MS. KOPACZ:  I can.

24        THE COURT:  Let me ask you to pause for just a

25  moment before you commit to a supplemental report by any

1  particular date because one of our items on our agenda today

2  is whether and under what circumstances there may be yet

3  another amended plan, and --

4          MS. KOPACZ:  Okay.

5          THE COURT:  -- I don't want you to file a

6  supplemental report for every amended plan that comes in.

7  Okay?

8          MS. KOPACZ:  That's great.  You have much more

9  information than I do.

10         THE COURT:  Well, we'll see if I do or not, so I'm

11 going to ask you to stay on the line, and we will circle back

12 to you on what further work we do need from you after we

13 discuss that subject.  Okay?

14         MS. KOPACZ:  Okay.  Thank you.

15         THE COURT:  All right.  Okay.  So any further

16 thoughts or comments from anyone on this sort of procedural

17 issue regarding Ms. Kopacz's testimony and report?  All

18 right.  Let's move on then.

19         MR. KANE:  Your Honor, I do have one brief question

20 to ask on that front.  It's Scott Kane, Ms. Kopacz's counsel.

21 Is it your intention that if there is a motion challenging

22 her qualifications or methodology, that Ms. Kopacz would

23 respond individually to that, or will that just be left to

24 the parties?

25         THE COURT:  I think it may depend on what the

1   motion -- what the basis of the motion is, so we may have to

2   leave the answer to that question up in the air until we see

3   what does come in.  I know that's a little unsettling and

4   unsatisfactory, but I don't know how else to answer it at

5   this point in time.

6              MR. KANE:  I think that answer makes sense, your

7   Honor.

8              THE COURT:  All right.  Okay.  Now, I'd like to

9   review with everyone what I perceived to be the most

10  significant of the issues that I saw in Ms. Kopacz's report.

11  Before I dive into the specific questions, however, I want to

12  make a couple of disclaimers that are important really for

13  everyone to understand.  The first is that these questions

14  are just that.  They are only questions.  They reflect no

15  judgment or conclusion on my part to any extent whatsoever.

16  Stated more bluntly, the fact that I'm raising a question

17  does not mean whatsoever that I have come to a conclusion on

18  any of this.  I bring these questions up only to facilitate

19  and expedite the hearing to give the city and really all

20  parties some notice of the matters that concern me so that

21  all parties can be prepared to deal with these concerns as

22  best they can.  And actually, assuming that Ms. Kopacz is

23  eventually qualified as an expert on feasibility, it would be

24  my intent to actually script out my questions, as best I can,

25  in advance of the trial and to provide those questions not

1    only to Ms. Kopacz but to the parties.  Okay.  So here we go.

2              Number one, the report reflects a significant

3    concern that the forecasts and projections on which the plan

4    of adjustment is based are not harmonized with city budgets,

5    and so the question is does the city plan that kind of

6    harmonization, and what will it involve, and when will it be

7    done, and who will do it?  And this is discussed in

8    Ms. Kopacz's report, I believe, on pages 27 and 28 and 37 and

9    38 and page 204 of the report.  In this regard, the Court

10   would note that Ms. Kopacz does suggest some urgency to this

11   issue.

12             Ms. Kopacz raises questions about the exit

13   financing, but I want to hold those until we get to that in

14   the agenda.

15             Next question, the plan of adjustment appears to

16   make certain assumptions in its projections and forecasts

17   about state revenue sharing, so the question is what evidence

18   is there to support the reasonableness of those assumptions

19   and what assurances, if any, have the city received from the

20   state about revenue sharing looking years into the future?

21   This is discussed on pages 51 and 52 of the report.

22             The next question relates to the contingency.  The

23   legislation that the governor signed appears to require a

24   five-percent contingency in the budget of the City of

25   Detroit, and yet it appears that the city's plan provides

1    only for a one-percent contingency, so that difference needs

2    to be reconciled somehow.  If this reading of the law is

3    correct, then obviously the city will have to comply with it

4    and will have to adjust its budget plan and forecast

5    accordingly.  This is addressed in the report on pages 110,

6    122, and 201.

7         The next question, which may be related to the

8    contingency question, is in regard to the restructuring and

9    revitalization initiatives, the RRI's, I think it's fair to

10   say that the plan itself is less than fully specific about

11   the priority and timing of them as well as regarding how

12   they'll be paid for, so the question becomes then what will

13   be the process for prioritizing them and paying for them?  Is

14   this something that will be left to the mayor, and to what

15   extent is the mayor supportive of the initiatives in the

16   plan, or does he have his own priorities?  In this regard, I

17   will say less as a question and more as a suggestion to the

18   city that it is extremely important as a matter of

19   feasibility for the mayor to support whatever plan the city

20   wants confirmed.  I think I may have suggested that on the

21   record previously, and that suggestion goes to not just the

22   RRI's but all aspects of the plan.

23        The next questions relate to systems, controls, and

24   financial reporting, and there are several subissues here.

25   The first arises from Ms. Kopacz's concern that even though

1 the city admits of a significant deficiency in its financial
2 reporting capabilities, there does not appear to be any
3 budget to continue the work of Ernst & Young in managing that
4 process for the city, so that's a question.

5 In terms of the restructuring initiative to
6 implement a new and modern IT system for the city -- this is
7 in the plan -- and an expensive and multi-year project, it
8 would be helpful on the issue of feasibility to get as much
9 detail as to exactly what the priorities of that project are
10 and what its specifics are.

11 Finally, in this regard, Ms. Kopacz expresses
12 concern based on expert reports that she looked at that IT
13 initiatives on a scale like this carry with them inherent
14 risks regarding costs and time and effectiveness, and so I
15 need to know what initiatives the city will implement in
16 minimizing those risks and addressing those risks. These
17 issues are all discussed on pages 111 through 123 of the
18 report from Ms. Kopacz.

19 The next issue relates to the very sensitive issue
20 of pensions, and I think that rather than try to characterize
21 any of the issues that Ms. Kopacz raises regarding them, I
22 will simply refer the city and the other parties to that
23 portions of the report that deal with this on pages 125
24 through 156 and 205 to 206.

25 The next issue relates to the issue of human

1   resources and capital.  Here the questions raised relate to
2   the specifics of how the city is going to attract employees
3   with the skills it needs to not only implement the plan but
4   carry out its mission as a municipality, and more
5   specifically Ms. Kopacz raises questions about -- excuse
6   me -- fixing the HR Department specifically.  This is
7   discussed on pages 159 through 166 of her report.

8           Next, Ms. Kopacz raises concerns, questions about
9   certain aspects of the city's blight removal initiative.
10  She's concerned about whether it is sufficiently funded and
11  about whether it is being approached in the most economically
12  efficient way.

13          Finally, there are questions regarding the
14  operations of the financial review commission, and on these
15  questions it actually occurs to me that these may be
16  questions less for the city and more for the state.  I don't
17  know that, but, in any event, it would be good for someone to
18  address these questions.

19          The first question relates -- well, I've said before
20  or suggested before that some kind of post-confirmation
21  review of the city's financial operations is important to the
22  issue of feasibility, and it does appear to the Court that a
23  properly functioning financial review commission as the
24  legislation may foresee may be suitable for that purpose, but
25  it has to have the tools to function properly, and so the

1    questions relate mostly to that.  So one important question

2    is what staffing resources will this commission have in order

3    to carry out its very broad mandate under the statute?  This

4    issue of staffing is, it seems to the Court, very important

5    given the state of the city's own financial records.

6            Beyond that, I think it would be good to have some

7    evidence as to what the expectations of the city and the

8    state are as to specifically how the relationship between the

9    commission and the city will work on an ongoing basis and to

10   what extent the commission -- to what extent and how the

11   commission will actually exercise the broad powers that the

12   legislation appears to give it.

13           One second, please.  Give me just one second.  Okay.

14   So those are the questions regarding Ms. Kopacz's report.

15   Let's turn our attention then to the next item on the agenda,

16   status of exit financing.

17           MS. LENNOX:  Good morning, your Honor.  With respect

18   to where the exit financing stands, we had initial -- we put

19   out an RFP.  Initial proposals were due at the end of July.

20   We actually received quite a few of them.  We winnowed them

21   down.

22           THE COURT:  I'm sorry.  Did you say you refused a --

23   you received a few or quite a few?

24           MS. LENNOX:  Quite a few.

25           THE COURT:  Quite a few.

 1          MS. LENNOX:  We winnowed that down to sort of a

 2     smaller group.  We held interviews with those potential

 3     lenders yesterday.  Second round bids are going to be due

 4     soon.  I don't remember.  I don't know if they've set a

 5     specific date, but we're looking for second round bids soon

 6     based on the conversations we had yesterday.  We are hoping

 7     to pick a lead lender to negotiate with by next week with the

 8     goal of having a commitment -- a firm commitment by the

 9     commencement of the confirmation trial.

10          THE COURT:  Okay.  Is it the city's intention to ask

11     for court approval of the exit financing either in a motion

12     or as part of an amended plan?

13          MS. LENNOX:  I think we'd have to, your Honor.

14          THE COURT:  Well, okay.  Again, I would only stress

15     to you that since it's the mayor who's going to be

16     implementing this plan, that the mayor support not only any

17     specific proposal for exit financing but the concept in

18     general.

19          MS. LENNOX:  Yeah.  Understood, your Honor.  We're

20     coordinating with the city on that.

21          THE COURT:  So let's -- and let me just see if I can

22     pin you down a little more specifically on the timing of

23     this.  What do you foresee as the timing of this?

24          MS. LENNOX:  Well, we are asking for -- we want to

25     be able to select a lead lender to actually negotiate a

1    formal commitment with by next week, so we would expect that

2    second round bids would be due in the next few days so that

3    we can then pick that lender to negotiate the commitment

4    with, and we want to have the commitment done before the

5    commencement of the trial on the 21st, so we've got a lot of

6    work to do in the next couple of weeks.

7         THE COURT:  So when would you file a motion?

8         MS. LENNOX:  Well, without knowing exactly when

9    we're going to come to rest on the commitment, it may be a

10   motion.  It may be in the form of an amended plan.  I think

11   we have to think through that and discuss that with the

12   potential lender.  Exit financing is usually contained in the

13   plan.

14        THE COURT:  All right.  Well, this will be one of

15   probably several matters we'll have to discuss when we

16   discuss how to proceed on plan confirmation.

17        MS. LENNOX:  Thank you, your Honor.

18        MR. HACKNEY:  Yeah.  Your Honor, might I be heard

19   for a moment on this issue?

20        THE COURT:  Um-hmm.

21        MR. HACKNEY:  I just -- this is one I wanted to

22   frame just while it's fresh for you because the importance of

23   it is that, for example, Ms. Kopacz is of the opinion that

24   the plan is not feasible without exit financing, and, you

25   know, when we set dates for the trial to begin, there's an

1   enormous logistical thing that goes on behind the scenes --

2               THE COURT:  I know.  I know, and I'm very --

3               MR. HACKNEY:  -- like war rooms and --

4               THE COURT:  I'm very sensitive to that.

5               MR. HACKNEY:  So then it becomes a question like,

6   you know, do we just do it on the come and hope that it comes

7   in and so --

8               THE COURT:  I know, yeah, but it isn't just this.

9   There are several other --

10              MR. HACKNEY:  Right.

11              THE COURT:  -- potential discussion points.

12              MR. HACKNEY:  I know that there's a push-pull

13  between keeping dates so that things happen, but then the

14  pull on the other side is I think at some point it just

15  becomes a little too much, so --

16              THE COURT:  I know.

17              MR. HACKNEY:  -- I want to get to the trial, but if

18  it's not --

19              THE COURT:  I know.  All right.  Let's go to the

20  next item on the agenda, which is being segued here anyway.

21  And actually before we talk about 4(a) let's talk about 4(b),

22  impact of future settlements on the existing scheduling

23  order.  Let me ask the city, to the extent it can here on the

24  record, what the status of pending settlement discussions are

25  and what its hopes and expectations are and what impact that

1   might have on our current confirmation schedule?

2           MS. LENNOX:  So --

3           THE COURT:  Speak right into the microphone --

4           MS. LENNOX:  Thank you, your Honor.

5           THE COURT:  -- so everyone can hear you.

6           MS. LENNOX:  Excuse me.  We may in the next few days

7   have another significant settlement to announce.  We are

8   still -- the parties have been mediating that quite

9   vigorously.  Should that happen, we would know that in

10   relatively short order.  I would say in the next few days.

11   In that instance, it may, I think, affect some of the conduct

12   of the trial, perhaps not the length of at least the city's

13   case, but that is yet to be determined based on where we come

14   out.  It might, therefore, be prudent, should your Honor's

15   calendar permit it, to perhaps address another -- or schedule

16   another status conference perhaps in the early part -- early

17   to mid next week so that should this development come to

18   fruition, we can address it with more specificity at that

19   time.

20           THE COURT:  Fair enough.  Have you contemplated

21   whether if that settlement is reached --

22           MS. LENNOX:  Um-hmm.

23           THE COURT:  -- that would be presented to the Court

24   at all or if it would, it would be presented in the form of a

25   motion for approval or another amended plan?

1      MS. LENNOX:  We believe that it will be presented in
2  both fashions.  There would be a motion to explain what
3  happened or explain what's happening to seek approvals of
4  specific things.  It would also require, I think, at the end
5  of the day another amendment to the plan.

6      THE COURT:  And you would seek expedited
7  consideration of this motion?

8      MS. LENNOX:  Yes, we would, your Honor, but not too
9  expedited.  There will be sufficient time for parties to
10 review it.

11     THE COURT:  Okay.  Are there any other settlements
12 on the horizon besides the one you were just talking about,
13 whatever that one is?

14     MS. LENNOX:  Not that I'm aware of, your Honor,
15 although other discussions and other mediations are
16 continuing toward the end of this week, so perhaps something
17 fruitful will come of that, but I think that one might be a
18 little farther away.

19     THE COURT:  Okay.  Thank you.

20     MS. LENNOX:  Thank you, your Honor.

21     THE COURT:  Well, while I appreciate everyone's
22 concern and/or anxiety and/or lack of sleep over the issue of
23 how much time I'm going to give you to try this case, I think
24 it's actually best to reserve on that until we know what
25 we're trying, and we don't know that at this point.  Is that

1  okay with everyone?  Mr. Hackney, is that okay with you?

2       MR. HACKNEY:  Absolutely, your Honor.  I'm always in

3  favor of reservations, but the -- I was going to -- I was

4  just going to say that we -- I thought we sort of had

5  reserved on it, but I think we arguably lost some trial days

6  at least out of the ones you've articulated, so I don't know

7  if when you articulated those you said these are the only

8  ones or if you said, look, here's what I've cleared out we're

9  going to start with, but I was going to ask the Court to at

10  least hold the ones it's got.

11       THE COURT:  Yeah.  All of that is subject to

12  renegotiation after we see what's happening.

13       MR. HACKNEY:  Great.  I definitely would like to

14  have a substantive conversation with you before we set that.

15  There's the independent issue that's out there, which is

16  intracreditor division --

17       THE COURT:  Right.

18       MR. HACKNEY:  -- which I'm concerned about, so --

19       THE COURT:  Right.

20       MR. HACKNEY:  -- this is a really important one for

21  planning.

22       THE COURT:  Yeah.  We will work through all of that.

23       MR. HACKNEY:  Thank you.

24       MR. SOTO:  Your Honor, I would also point out --

25  it's Ed Soto on behalf of FGIC.  I would also point out that

1  not only does the intercreditor timing relate to the issue

2  that we're tabling, which I think is perfectly reasonable,

3  but it also relates to some of the other issues that have

4  been raised here today.  If there is a significant settlement

5  that is going to change the structure of the trial, it also

6  relates to that.  Obviously, if there's some issue with exit

7  financing -- and all of this relates to, I guess, my plea to

8  the Court to remain open on the issue of when the trial

9  should start if all these happen just at the beginning, and

10  I'm not looking for a long --

11       THE COURT:  I appreciate that, sir.  Well, just so

12  the record is clear, I don't think that the record at this

13  point in time justifies a court order of adjournment, but it

14  does justify the necessity of keeping an open mind on that

15  subject should circumstances change with settlements, so I'm

16  perfectly willing to do that.

17       So let's talk about setting another interim status

18  conference before we get to what is presently scheduled as

19  our final pretrial conference, so hold on one second while I

20  open up my calendar here.  Ms. Lennox, were you thinking of

21  Tuesday or Wednesday of next week?

22       MS. LENNOX:  Yes, your Honor.  That would probably

23  be sensible.

24       THE COURT:  My preference would be for Tuesday, the

25  12th.  Is that okay with everybody?

1          MS. LENNOX:  Yes, your Honor.

2          THE COURT:  All right.  We'll do this Tuesday, the

3     12th, at nine o'clock, please.

4          MR. BRILLIANT:  Your Honor, this is Allan Brilliant

5     on behalf of Macomb County.  You know, Tuesday, the 12th, is

6     the day that, you know, any additional objections based on

7     voting and discovery are due.  You know, it may be that it's

8     better to have it, you know -- and I don't know your Honor's

9     schedule on the 13th, but the 13th so that we could have the

10    benefit especially if we're going to talk about hearing time

11    limits on what additional objections are being raised.

12         MR. SOTO:  Your Honor, this is Ed Soto on behalf of

13    FGIC.

14         THE COURT:  I need to get you by a microphone so

15    you'll be on the record.

16         MR. SOTO:  Try to hide back there, your Honor.

17         THE COURT:  No hiding in my courtroom.

18         MR. SOTO:  The 13th I have to be in a procedure in

19    Miami, and any other day would be perfect for me.

20         THE COURT:  I know.

21         MR. SOTO:  I don't ask for personal privileges, but

22    it relates to my neck, that thing that you saw.

23         THE COURT:  Well, I think it's in everyone's best

24    interest to see where the city is with this settlement that's

25    been obliquely referred to here as soon as possible, so let's

1   go on the 12th at nine o'clock, and we can actually hold on
2   the issue of who gets how much time for yet another day after
3   that if necessary.  Okay.

4        Now, the next item is the briefing schedule for
5   legal issues raised by pro se objectors.  We are compiling a
6   list of not only legal issues but factual issues that we have
7   culled out of the pro se objections, the hundreds of pro se
8   objections that were filed, and I think we're very nearly
9   done with that, so we will make that available.  We'll
10  probably just file it, but I want to give the city and really
11  any parties an opportunity to address those issues, to
12  respond to those issues in a brief, so I'll set a deadline
13  for that, you know.  On the one hand, I want to allow
14  obviously a sufficient time for you to deal with the issues
15  because it is a somewhat lengthy list, but we don't want to
16  take forever either, so I'm thinking of something in the
17  range of two to three weeks.  Do you have any thoughts on
18  that from either side?

19       MS. LENNOX:  That would be acceptable to us, your
20  Honor.  No objection.

21       THE COURT:  Okay.

22       MR. QUINN:  Your Honor, would you be providing an
23  opportunity for responses from the objectors?

24       THE COURT:  I hadn't actually considered doing that
25  because the objections themselves state what their grounds

1  are.

2        MR. QUINN:  Yes, your Honor, but not knowing what

3  the city's position is and how it supports its positions, it

4  would be helpful to have an opportunity to respond.

5        THE COURT:  I don't know.  At some point we have to

6  cut off endless rounds of briefing back and forth, so I'm

7  inclined to just cut it off at the city's response.

8        MR. QUINN:  Thank you, your Honor.

9        THE COURT:  Okay.  So we had really helpful oral

10  arguments on the legal issues that were raised, and it was my

11  intention to simply take those under advisement and resolve

12  them as part of the Court's ultimate resolution on

13  confirmation.  As I thought about it with a little more

14  specificity, it occurred to me that it might facilitate

15  confirmation to give you my decision on the two issues

16  relating to the 1983 claims and the Fifth Amendment takings

17  claims sooner than that.  Of course, I would wait for the

18  attorney general's brief, which I asked for by, I think,

19  August 13th, so, again, let me ask you what you think.  Would

20  that be helpful to you, give a decision on those two issues

21  sooner than later?

22        MS. LENNOX:  Your Honor, I think we had originally

23  assumed what your Honor had said and had stated on the record

24  at oral argument that you would rule at confirmation.  I

25  think, you know, we -- certainly your Honor can choose to do

1    what your Honor wants.  We don't really take a position on --

2            THE COURT:  Okay.

3            MS. LENNOX:  -- whether you do sooner rather than

4    later.  There may be one other issue.

5            THE COURT:  Well, I'll tell you specifically what my

6    thought was, and not to give you any prediction, but if it is

7    found that one or the other of these issues does result in

8    sustaining an objection, you might want to take that into

9    account in how you proceed in the case.

10           MS. LENNOX:  Understood, your Honor, and we

11   appreciate the guidance.  There was one other issue that we

12   thought might be helpful to have an earlier decision on

13   simply because it would directly impact the conduct of the

14   trial, and, you know, who's participating, the numbers of

15   witnesses and all that, and that would be the counties'

16   standing issue, but obviously that is, of course, up to your

17   Honor.

18           THE COURT:  Okay.

19           MS. PATEK:  Your Honor, Barbara Patek on behalf of

20   the Detroit Police Officers Association.  Our strong

21   preference would be to have the 1983 issue decided at the

22   time of trial because from having heard the oral arguments,

23   there are some issues especially related to indemnification

24   of our members that may result in our wanting to --

25           THE COURT:  When you say "at the time of the trial,"

1    do you mean resolved before trial?

2              MS. PATEK:  No, your Honor.

3              THE COURT:  At the end of the trial?

4              MS. PATEK:  Yes, your Honor.

5              THE COURT:  I want to be sure you understand that

6    the issue we're talking about is whether a municipality's

7    plan in Chapter 9 can constitutionally discharge a 1983

8    claim.

9              MS. PATEK:  Your Honor, I do understand that.

10             THE COURT:  Okay.

11             MS. OKASINSKI:  Your Honor, you stated you would

12   wait until the attorney general has an opportunity to respond

13   regarding the legal issues.  Would that also give the

14   creditors a chance to respond to the attorney general before

15   that decision is made?

16             THE COURT:  Can I get back to you on that?

17             MS. OKASINSKI:  Yeah.

18             THE COURT:  I say that because unless the attorney

19   general raises different arguments than the city made, it may

20   not be necessary.

21             MS. OKASINSKI:  Okay.  I understand.

22             THE COURT:  But if they come up with something new

23   or different, then it might be helpful to me to get your

24   response.

25             MS. OKASINSKI:  Okay.  I also had a related

1    something to bring up.

2              THE COURT:  Um-hmm.

3              MS. OKASINSKI:  With regards to that hearing, we had

4    asked about the treatment of -- or I think you had asked

5    about the treatment of condemnation claims for which the stay

6    had been lifted, and at that point the city didn't have a

7    response.  Can I follow up at this point and ask if a

8    response has been given to that regarding the treatment of

9    condemnation claims that the stay has been lifted for by the

10   city?

11             THE COURT:  You're asking whether the city has

12   provided a response?

13             MS. OKASINSKI:  At that hearing -- yeah.  At that

14   hearing, they didn't --

15             THE COURT:  Not that I'm aware of.

16             MS. OKASINSKI:  Okay.  Thank you.

17             THE COURT:  Yeah.  Okay.  Next on our agenda is the

18   status of a motion for permissive intervention by the

19   Unitarian Universalist Service Committee, Docket 6143.  I

20   think it's been fully briefed, and the only thing left to do

21   is have a hearing on it.  Am I right about that?

22             MS. LENNOX:  Your Honor, yes, I think you're right

23   on that.  The city filed an objection on August 1st.

24   Yesterday DWSD joined that.  I also want to report to the

25   Court that the parties are meeting in an attempt to resolve

1 the issues raised by the motions. I believe that meeting is
2 currently scheduled for August 12th.

3         THE COURT: August 12th?

4         MS. LENNOX: Yes.

5         THE COURT: Okay. All right. Well, let me open up
6 my calendar, and so that's next Tuesday.

7         MS. LENNOX: Yes, sir.

8         THE COURT: Okay. We're having an initial status
9 conference on Thursday in an adversary. How about if we
10 schedule this hearing for right after that?

11         MS. LENNOX: On Thursday, the 14th, your Honor?

12         THE COURT: Yes.

13         MS. LENNOX: Thank you.

14         THE COURT: All right. Chris, will you notify the
15 parties on that? Okay. Good. Okay. The next issue is the
16 extent of the Court's jurisdiction over the reasonableness of
17 fees under Section 943. Frankly, I find the language that I
18 read to you earlier anything but clear, and so I would invite
19 any help that anyone feels willing to give, willing and
20 capable of giving, so let me just give you a deadline to do
21 that, and you can either dive in or not in your discretion.
22 How about Monday, the 18th? Is that okay with everybody?

23         MS. LENNOX: Yes, your Honor.

24         THE COURT: And if for any reason our trial does get
25 adjourned, we can talk about adjourning this as well to ease

1  some of the pressure on you, but let's set that date for now.

2  Okay.  Next on the agenda is the list of matters that

3  Mr. Hackney raised, so let's go through those, sir.

4          MR. HACKNEY:  Your Honor, thank you very much.

5  Stephen Hackney on behalf of Syncora.  Some of these are

6  mundane, but we thought we'd get clarity just for planning

7  purposes.

8          THE COURT:  Sure.

9          MR. HACKNEY:  With respect to video clips in the

10  opening, one of the reasons that you take videos is so that

11  the Court can -- instead of having a cold record when you

12  look at a deposition transcript, you can actually see --

13          THE COURT:  So these are videos of the deposition?

14          MR. HACKNEY:  That's right.

15          THE COURT:  Okay.

16          MR. HACKNEY:  And I don't know if we're going to use

17  them, but for planning purposes, I really don't see a reason

18  why you shouldn't be able to.  It's admissible evidence just

19  like the dep transcript that you often see called out in an

20  opening is, but we -- it's sometimes a touchy issue for

21  whatever reason, and so I thought I would cover it with you.

22          THE COURT:  Does the city have a position on this?

23          MR. CULLEN:  Yes, your Honor.  With respect to

24  people that are going to be here live, I think it's more

25  expeditious to just have them here live than to be showing

1   video clips in opening.

2        THE COURT:  Well, let me ask, Mr. Hackney, what

3   would be the purpose for the video?

4        MR. HACKNEY:  So an opening statement, as you know,

5   typically previews the evidence for the Court that you're

6   going to hear in the trial, and it's very common to actually

7   show the testimony, the admissions that were obtained.  The

8   purpose of the video is so that you can see more than the

9   cold record.  You can see the way the person said what they

10  said.  It's almost universally viewed as a better way to

11  review testimony than the cold record.

12       THE COURT:  Yeah.  I like it.  I'll permit it.

13       MR. HACKNEY:  Thank you, your Honor.  Your Honor,

14  this is just something that I actually said --

15       THE COURT:  I assume that you won't take undue

16  advantage of this permission and have me watching TV for days

17  on end.

18       MR. HACKNEY:  I won't.  I promise.  I never take

19  undue advantage.  Your Honor, the next issue that I had was

20  one out of concern for my iPhone, which was basically -- and

21  for your docket.  I just thought that because you might know

22  now that we tend -- we intend to file very substantive

23  pleadings that have the evidence in support on the pretrial

24  briefs, I thought we might say now that the 25-page limit

25  doesn't apply.  Otherwise you get this wave of ex parte

1   motions coming in, and you --

2          THE COURT:  Yeah.  I don't want a wave of ex parte

3   motions, so in concept I'm not opposed to this, but I wonder

4   if we can agree on a limit.

5          MR. HACKNEY:  I will tell you our brief is in

6   process.  I will tell you it's very long.  It's not a short

7   brief.  And I know --

8          THE COURT:  I wonder if we can agree on a limit.

9          MR. HACKNEY:  Yeah, right.  Well, in fairness,

10  just -- you know, the city sort of set the standard here.  I

11  think they had a 250- --

12         THE COURT:  They did.

13         MR. HACKNEY:  -- page reply, so I can't -- I

14  actually haven't seen the most recent draft.

15         THE COURT:  Well, but if they were filing individual

16  responses to all of the objections, each one would have been

17  less than 25 pages.

18         MR. HACKNEY:  Yeah, right.  Okay.  We would have had

19  to test that, but one thing I will say, you know, as

20  advocates, we do --

21         THE COURT:  Looking for a number.

22         MR. HACKNEY:  -- we do try and balance our

23  spending --

24         THE COURT:  I'm still looking for a number.

25         MR. HACKNEY:  Okay.

1    MR. SOTO:  I have a number, Steve.  We're looking at

2  filing about a 200-page brief, your Honor, and we are

3  narrowing it down.  We are culling and cutting, but I think

4  it will --

5    THE COURT:  I'm only one person.

6    MR. SOTO:  Well, we're coordinating with others.

7    MR. HACKNEY:  I think the hope is that the briefs

8  can serve as a reference brief as much as a prose speech for

9  you to read.  It's also a collection of the evidence so that

10  you say, you know, rather than reading a thousand pages in a

11  row, you say, okay, I want to focus on pensions.  You have

12  the document there to pick it up and see the record

13  citations, the explanation.  I don't want to underestimate

14  the complexity of these issues like I've been in these

15  depositions recently, and it is non-trivial, so be merciful,

16  your Honor, as you're considering this issue because if you

17  set a limit that's tight, then you get to a point where

18  you're --

19    THE COURT:  Are you talking about 200 pages per

20  objecting creditor?

21    MR. SOTO:  Well, your Honor, what we've done -- and

22  this, again, is Ed Soto on behalf of FGIC.  What we've done

23  is broken -- exactly what Mr. Hackney is saying.  We've taken

24  the issues that we think are critical on the objections, and

25  we have broken them down in themes.  We have the evidence

1    that we think is important for our charge.  It will give the

2    Court a preview of everything we're going to say, so we have

3    one brief that is the main overarching brief.  There will be

4    maybe a 25-page brief on one particular issue, but that's it

5    in a nutshell.  Those are our briefs.

6           THE COURT:  And the briefs we're talking about, just

7    so I'm clear -- excuse me -- these are the pretrial briefs.

8           MR. SOTO:  Yes.

9           THE COURT:  So how many 200-page briefs am I going

10   to get?

11          MR. HACKNEY:  I don't know if ours was that long,

12   your Honor, but I know that ours was in excess of a hundred

13   pages.

14          THE COURT:  How many am I -- raise your hand if

15   you're going to file a pretrial brief?  Well, I just need one

16   from Oakland County.  Thank you.  Please keep your hands up.

17          MR. BRILLIANT:  Your Honor, this is Allan Brilliant

18   on the phone for Macomb.  We intend to file a brief as well,

19   your Honor.

20          THE COURT:  Okay.  All right.  Thank you.

21          MS. LENNOX:  Your Honor, if I might be heard, in

22   addition to the burden that eight or nine or ten 200-page

23   briefs will put on the Court, the city under your schedule

24   has three days to respond to all of these pleadings.  We

25   would advocate --

1          THE COURT:  How much time would you need to respond

2     to eight or ten 200-page briefs?

3          MS. LENNOX:  It would be really wonderful to have

4     several weeks to do that.

5          MR. HACKNEY:  Although these are pretrial briefs.  I

6     guess I thought of the city more as filing contemporaneously

7     their view of the way the case would open up.  I know that

8     they have a little bit of a lag time.  I hadn't viewed it as

9     yet another reply, but --

10          MR. NEAL:  Your Honor, may I be heard?

11          THE COURT:  Sir.

12          MR. NEAL:  Yes.  Guy Neal for National Public

13     Finance Guarantee.  Although we've yet not reached a final

14     determination, the goal of the so-called DWSD parties, which

15     would include National, Assured, U.S. Bank, perhaps FGIC in

16     their water-sewer exposure, as well as Berkshire Hathaway,

17     would be to file a joint brief.  We're not envisioning 200 or

18     anything close to 200.  I mean we are thinking -- and I don't

19     want to commit, but we're thinking between, at most, 50 or 60

20     pages for all of those parties, number one, and, number two,

21     this ties into the potential for post-trial briefing, which

22     we would view as the more substantive brief because we'd be

23     able to cite to the record during the course of the trial

24     rather than cite to depositions.

25          THE COURT:  I'm not a fan of post-trial briefs.

1          MR. NEAL:  Okay.  I just wanted to get your reaction

2     to that.  Okay.  Well, very good then, your Honor.

3          MR. CULLEN:  Your Honor, if I may, Thomas Cullen for

4     the city.  I don't view a pretrial brief here as a substitute

5     for trying the case, and what they're outlining for you is a

6     substitute for trying the case, not an outline so we'll know

7     what's going on.

8          THE COURT:  I don't quite hear that.

9          MR. CULLEN:  200 pages, in my view, with all of the

10    substantive evidence for every point outlined in detail in

11    the pretrial brief, it sounds that way to me, and it sounds

12    like a lot of additional work when we're going to be here

13    trying the case in any case.  It won't narrow things, and I

14    think its function as a road map is far overdone at 200 pages

15    for whether it's --

16         THE COURT:  Well, but still given that I don't want

17    post-trial briefs, I don't want to undermine or detract from

18    the importance of this pretrial brief.

19         MS. QUADROZZI:  Your Honor, Jaye Quadrozzi on behalf

20    of Oakland County.  Just to be clear, I have not yet had a

21    communication with counsel for Wayne and counsel for Macomb,

22    but I know from our perspective we are looking at nowhere

23    near that length, probably something in the 35 pages.

24         THE COURT:  All right.  I'm going to set a 100-page

25    limit but, again, subject to a motion to expand that upon a

1  showing of good cause, and I certainly encourage and invite

2  joint briefs to the extent that suits the parties' needs.

3          MR. HACKNEY:  Thank you, your Honor.  Your Honor,

4  the next is a small point that a creditor asked me to

5  confirm, which is what I think is sort of a custom in trials,

6  which is that you can cross-examine someone for purposes of

7  impeaching their testimony with any document, even if it's

8  not on your exhibit list.  It's borne of the fact that you

9  may not know what you need to impeach with when you do the

10  exhibit list.

11          THE COURT:  Well, but are we agreed that the

12  document otherwise has to be admitted into evidence before

13  it's used for cross-examination?

14          MR. HACKNEY:  No, because typically impeachment

15  documents are not, but I think the price --

16          THE COURT:  Well, I guess it depends on what the

17  impeachment is.

18          MR. HACKNEY:  Yeah.  The price you would --

19          THE COURT:  All right.  No.  You're right.

20          MR. HACKNEY:  -- is you get the impeachment, but you

21  don't get the admission.

22          THE COURT:  Right.

23          MR. HACKNEY:  We have an incentive to have them all

24  on the exhibit list, but it's just --

25          THE COURT:  City have any thoughts on this question?

1      MR. CULLEN:  Your Honor, I agree with Mr. Hackney

2  that normally you can impeach with a document not in evidence

3  but subject to objection at that time that it's not proper

4  impeachment --

5      THE COURT:  Right.

6      MR. CULLEN:  -- or not properly authenticated.

7      THE COURT:  All right.  You can give that assurance

8  to whichever creditor it was that raised that issue.

9      MR. HACKNEY:  Thank you, your Honor.  Your Honor, on

10  the subject of exhibits, Mr. Shumaker and I have spoken, and

11  we had some thoughts for you about how to streamline the

12  process of the exhibits and their admission into evidence.

13  And there are two distinct issues here that I wanted to raise

14  with you, and I think Mr. Shumaker and I have ideas about

15  putting the burdens on different parties.  So the first issue

16  is the one of authenticity.  The vast majority of the

17  documents in this case are POA documents produced by the

18  city, Bates stamped POA.  There are also DIA documents.  That

19  comprises a lot of the documentary evidence you're likely to

20  see in this case.  It seems to me that once the parties have

21  submitted their exhibit lists, that we might ask the city to

22  put its hand up and the parties with respect to the city's

23  exhibit list to put their hands up with respect to any

24  specific authenticity questions they have so that we can turf

25  them up to you in advance of the hearing, and the reason for

1    that is there has been no practical ability, your Honor, to

2    establish authenticity of documents during the discovery

3    period because you don't know where there's a fight.  There's

4    too much to cover.  And so if we could get it down to, hey,

5    are there five or ten documents that people actually dispute

6    the provenance of them and maybe have a custodial deposition

7    or something at that point, that is how I would recommend

8    proceeding.  Given that the documents all came from the city

9    in the main, we don't think there should be a lot of

10   authenticity fights at trial.  We think we should specify

11   them in advance of trial, have a more streamlined way to

12   resolve them.

13         The other side of the evidential part of an exhibit

14   is the admissibility from the standpoint of its relevance and

15   hearsay, and that kind of comes with a bit of a dilemma

16   because you don't know how the person is offering it.  You

17   don't know the purpose that they're offering it for when

18   you're sitting there looking at their exhibit list.

19   Sometimes the documents are really big, and there are parts

20   of it that you'd think might not be admissible, but there are

21   other parts that are.  In that one we -- Mr. Shumaker and I

22   suggested to each other that the parties would put into their

23   exhibit lists objections with respect to whether they had a

24   problem with relevance or prejudice or hearsay in advance,

25   and then for run-of-the-mill documents that you really just

1    cannot see objecting to, if there isn't an objection, they

2    would all go into evidence at the start of the trial.  It's

3    my understanding this is how you handled this in connection

4    with eligibility.  We just wanted to confirm it.  Mr.

5    Shumaker can let you know if I didn't say that in the right

6    way.

7              THE COURT:  Sir.

8              MR. SHUMAKER:  That's correct, your Honor.  We were

9    thinking that with regard to the documents and the exhibits

10   that how we approached them in eligibility went well, and we

11   made that a part of the joint pretrial order.

12             THE COURT:  Right.

13             MR. SHUMAKER:  We listed all the exhibits.  We

14   listed the authentication objections, any of the other

15   relevance, whatnot, and then at the beginning of trial your

16   Honor recalls you admitted anything that was not objected to.

17             THE COURT:  Right.

18             MR. SHUMAKER:  And then we fought over the others as

19   they came up.

20             THE COURT:  Right; right.  Regarding authenticity, I

21   have to say that in my experience a genuine dispute regarding

22   whether a document is authentic is extremely rare, and I

23   don't want people to object to authenticity unless they have

24   a genuine good faith evidentiary basis to believe that the

25   document is not what it purports to be.

1         MR. HACKNEY:  Yeah.  I vehemently --

2         THE COURT:  I want to make that very clear up front.

3         MR. HACKNEY:  I vehemently agree with you because we

4 have historical documents here, and if you're the propounder

5 of the document and all of a sudden somebody puts their hand

6 up and says you haven't laid a foundation, then it's, you

7 know, sort of Katy bar the door in terms of, well --

8         THE COURT:  I know.

9         MR. HACKNEY:  So --

10         THE COURT:  We'll be here forever.

11         MR. HACKNEY:  So that would be very helpful if we

12 could follow that convention, your Honor.

13         THE COURT:  Yeah.

14         MR. HACKNEY:  Sounds like we can.

15         THE COURT:  Yeah.  On the broader issue, I strongly

16 encourage the parties to agree to the admissibility of

17 whatever documents they can reasonably agree to admit, and

18 they will be admitted at the final pretrial conference.  To

19 the extent you can't agree, then my order that sets forth the

20 contents of the final pretrial statement require the parties

21 to identify what the objections are for the documents that

22 are objected to.

23         MR. HACKNEY:  Now, I do want to say with respect to

24 hearsay and relevance and prejudice, I think there is

25 somewhat of a protective mechanism that comes into play a

1   little bit there.  When you're not sure how it's going to be
2   offered, you're very careful about stipulating to it coming
3   in for any purpose, and so we will be vigilant there.

4           THE COURT:  Well, but the answer to that, at least
5   in good part, is to have a discussion about that.

6           MR. HACKNEY:  Yes, yeah.  Fair enough.  There's a
7   lot going on, but we will try to do that, your Honor.

8           THE COURT:  And there's give and take, and there's
9   trading.  If you agree to this, I'll agree to that.

10          MR. HACKNEY:  Yeah.

11          THE COURT:  You know, I expect you all to --

12          MR. HACKNEY:  Yeah.

13          THE COURT:  -- fully engage in that process.

14          MR. HACKNEY:  Yes.

15          THE COURT:  Let's talk about numbering for a second.
16  If I recall correctly, we had a little bit of confusion
17  regarding numbering at the eligibility trial.  I want to
18  avoid that at all costs here, and you all can divide up the
19  universe of numbers between one and a million, you know, and
20  figure it out like the city can take between, you know --
21  numbers between one and a thousand.  Now, that's not an
22  invitation to submit a thousand exhibits.  But then the next
23  creditor can take the next group of numbers, and the -- they
24  don't have to be sequential.

25          MR. HACKNEY:  Yeah.  That's how we did it for swaps.

1          THE COURT:  But we don't want any overlap of exhibit

2     numbers, and just use numbers, not letters.

3          MR. SHUMAKER:  We can work that out, your Honor.

4          MR. HACKNEY:  I call exhibit a million, but we will

5     definitively figure that out, so -- and we'll just create

6     broad ranges so that you know --

7          THE COURT:  Right.

8          MR. HACKNEY:  -- that you can get your exhibits

9     within it.  We did this for the swaps trial, so --

10         MR. SHUMAKER:  Definitely.

11         MR. HACKNEY:  Your Honor, I was going to go to the

12    next item I had here, which was I had -- I wanted to let you

13    know that we are going to file motions in limine that are not

14    lengthy.  They are important.  I anticipate filing four, and

15    they go to -- they are very important, but I've directed

16    people not to be too long in setting them up because it's

17    customary for motions in limine to get to the issue.  Daubert

18    briefs we are also anticipating filing.  I'm not certain how

19    many, but I know that we will file at least two very

20    substantive Daubert briefs.  I wanted to tell you that now,

21    and I wanted to get a sense from you of how you wanted to

22    handle that.  Did you want to set a deadline for them to be

23    filed?  Did you want to take argument on them in advance of

24    the hearing?  And I know you haven't seen them yet.

25         THE COURT:  I do want to set a deadline, and I would

1    ask you to suggest one.

2          MR. HACKNEY:  So the depositions, I think, have gone

3    to August 11th or 12th.  I think they've gone to next Monday

4    or Tuesday.  And I would ask that there be a date some point

5    after that.  I was going to propose August 15th.  That, I

6    believe, is a Friday.  Yeah.  That's a Friday.

7          THE COURT:  Um-hmm.

8          MR. HACKNEY:  I think I can make August 13th, but

9    maybe if someone -- if we can get cut a little slack if one

10   of them has to linger behind, that might help, but I was

11   hoping for August 13th, 14th, or 15th, the theory being that

12   would leave you enough time to respond before the trial, the

13   theory also being that we might be able to have a day before

14   trial where you actually take separate argument on Daubert.

15         THE COURT:  The challenge for the Court in dealing

16   with Daubert issues is that sometimes it's more efficient to

17   deal with them at the time of trial, and sometimes it's more

18   efficient to deal with them in the context of the witnesses'

19   testimony, so I'm not sure I'm going to be able to give you

20   an answer now without having seen what your objections are or

21   what your issues are, so I think we're just going to have to

22   hold off on the issue of scheduling -- scheduling a hearing,

23   I should say.

24         MR. HACKNEY:  Okay.  We'll at least get them briefed

25   then.

1          THE COURT:  But I'll accept your August 15th

2   deadline.  What responsive deadline would the city request?

3          MR. SHUMAKER:  Your Honor, if the trial starts on

4   the 21st, maybe -- and you're going to hear them before --

5          THE COURT:  Maybe.

6          MR. SHUMAKER:  -- perhaps the 19th.

7          THE COURT:  Okay.  The 19th for that.  Were there

8   anyone -- any attorneys other than Mr. Hackney who are going

9   to be filing Daubert issues?  Are those dates acceptable to

10  you all?

11         MR. NEAL:  Yes, your Honor.  Thank you.

12         THE COURT:  Okay.

13         MR. ALBERTS:  Your Honor --

14         THE COURT:  Sir.

15         MR. ALBERTS:  -- can I just ask a question?  Were

16  any of the Daubert challenges or motions in limine directed

17  to parties other than the city's witnesses?

18         MR. HACKNEY:  The short answer to that is no, but I

19  also don't think we've deposed your expert yet, but I don't

20  know if -- I don't know if we'll be Dauberting your expert --

21         MR. ALBERTS:  Okay.

22         MR. SHUMAKER:  And, your Honor, just so you're --

23         MR. HACKNEY:  -- or try to.

24         MR. SHUMAKER:  I'm sorry.  Just so we're clear, the

25  city may have its own Daubert motion as well.

1    THE COURT:  Okay.  Can you abide by those deadlines

2  then?

3    MR. SHUMAKER:  Yes, your Honor.

4    MR. HACKNEY:  Your Honor, I was going to go to the

5  next one here if that's all right.

6    THE COURT:  Um-hmm.

7    MR. HACKNEY:  So this is a subject that every judge

8  I've ever met hates talking about, and it's the subject of

9  deposition designations.

10    THE COURT:  Um-hmm.

11    MR. HACKNEY:  But I --

12    THE COURT:  I don't hate it.

13    MR. HACKNEY:  Okay.  Well, good.

14    THE COURT:  At least for the record I would deny it.

15    MR. HACKNEY:  Yeah, right.  That's a first for me.

16  So let me tell you the importance of the issue first, and

17  then I have a suggestion for the Court about how we might

18  handle it, but the importance of the issue is that there

19  was -- this is a municipal bankruptcy.  You want to take the

20  testimony of the debtor, and we did through extensive

21  30(b)(6) depositions.  We don't all want to read them into

22  the record.  That's super inefficient.  Everyone, I think,

23  agrees.  I hope I don't presume that you don't want to see me

24  reading deposition testimony into the record, so -- but we do

25  need to get it into the record.

1    Now, the question becomes how do you do that, and

2  where does the burden fall?  At the first blush, the burden

3  falls on the parties to designate testimony and to try to be

4  sensible as advocates about, you know, stripping the

5  depositions down so that it's not the full transcript, and we

6  do that.

7    THE COURT:  Right.

8    MR. HACKNEY:  And there are counter-designations.

9  And I think that we have some discussions ongoing about what

10 the schedule for that may be.  Once you have the designated

11 and counter-designated testimony, though, you then have the

12 question of how it goes into the record if it's not read in

13 on the record and how objections are resolved in the

14 transcript.  Now, given that you have evidenced a desire to

15 move this trial quickly I think is a fair thing to say, my

16 belief is that the way we almost have to handle it is that we

17 have to submit them in to you, and then you have to -- and

18 then move their admission, and then you have to read them,

19 resolve the objections in your own mind, and then decide

20 what's admitted and what's not.

21    Now, it imposes some burden on the Court, but I

22 don't know a better way to do it other than reading it on the

23 record live.  The other way to do it -- this dovetails a

24 little bit with findings of fact and conclusions of law,

25 which is the other way to do it is you can try to do it post-

1  trial after the parties have had a chance to sort of

2  synthesize the trial, and it may have an impact, although

3  it's not clear if it ever does, but it may have an impact in

4  further streamlining what they designate and then reducing

5  the burden on you, but that requires a lot of coordination by

6  the parties, so I think -- hopefully I'm not being

7  presumptuous, but if you want to go fast, I don't see a

8  better alternative than our putting them together in

9  pleadings and moving their admission to you acknowledging and

10  not presuming the burden it imposes on you because we don't

11  want to have to read them in.

12         THE COURT:  Um-hmm.  Let me suggest another

13  alternative.  First, I think we agree that each specific

14  witness' deposition transcript needs to have an exhibit

15  number on it and needs to be offered into evidence, and then

16  other parties have an opportunity, to the extent it's not

17  agreed, to object to the admissibility of the transcript on

18  whatever grounds.  And I would say that when that issue is

19  resolved and presuming that the transcript is admitted, any

20  party who wishes to continue to assert an objection to any

21  specific question in the transcript should have the burden of

22  bringing that issue to the Court's attention and getting a

23  ruling on that at that time.

24         MR. HACKNEY:  Yeah.  That's a good idea I hadn't

25  thought of because sometimes people lodge objections in the

1    deposition that maybe they didn't --

2          THE COURT: I think more than sometimes.

3          MR. HACKNEY: Yeah. I'll tell you it's not just

4    sometimes. And when you say "transcripts," you mean

5    designated portions of transcripts.

6          THE COURT: Designated portions, yes.

7          MR. HACKNEY: Okay. So just so I understand you,

8    the method we would use here is we would designate and

9    counter-designate each others' transcripts, and then we would

10   all have a deadline by which we subsequently identify for you

11   of the designated testimony where we've asserted an

12   objection, where we intend to stand on it and ask for a

13   ruling on it.

14         THE COURT: I'm not sure I would require that in

15   writing. I would just say that when that transcript and that

16   designation and counter-designation are offered into

17   evidence, the party who wants a ruling just should stand and

18   say, "Your Honor, I've made this objection on this page. We

19   stand by that objection and seek a ruling" --

20         MR. HACKNEY: Understood.

21         THE COURT: -- on the record in open court.

22         MR. HACKNEY: Okay.

23         THE COURT: And then I'll deal with them one by one

24   at that time.

25         MR. HACKNEY: That's helpful because it's my

1   assumption that most of the designations will be done by us

2   because many of -- much of the testimony would be admissions

3   by the city, and --

4           THE COURT:  Okay.

5           MR. HACKNEY:  -- that will likely await when we

6   begin to put our case into the record so that there's some

7   measure of time because Mr. --

8           THE COURT:  So if you're offering into evidence

9   transcripts of examinations that you have conducted, if

10  that's what you are offering, then if the city has made any

11  objections to your questions, the burden will be on the

12  city --

13          MR. HACKNEY:  Yeah.

14          THE COURT:  -- to stand by those objections and seek

15  a ruling on them --

16          MR. HACKNEY:  Understood.

17          THE COURT:  -- at the time that you offer it.

18  Otherwise I'll deem them waived.

19          MR. HACKNEY:  Okay.  That's a really good method.

20          MR. SHUMAKER:  And just for clarification, your

21  Honor, the other issue is timing --

22          MR. HACKNEY:  Right.

23          MR. SHUMAKER:  -- because in eligibility we did

24  this, as you'll recall, in connection with the joint pretrial

25  order.  I think what we're discussing here envisions not

1   until you offer the transcript into evidence during the
2   objectors' portion of their case, and then we would have the
3   dialogue that we're discussing.  Am I correct there?  And
4   obviously if the city is going to be offering --
5          THE COURT:  Okay.  And let me just offer this one
6   little modification to what you just said.  If the parties
7   agree to the admission of a transcript and agree to waive all
8   of the individual question objections, then you can just do
9   that as part of the final pretrial conference -- final
10  pretrial statement.
11         MR. SHUMAKER:  Certainly.
12         MR. HACKNEY:  So maybe we can talk after.
13         MR. SHUMAKER:  Right, yeah.
14         MR. HACKNEY:  Yeah.
15         MR. SHUMAKER:  Right.
16         MR. HACKNEY:  We're trying to figure out the
17  schedule for designating and counter-designating and the --
18         THE COURT:  All right.  You'll work that out among
19  yourselves.
20         MR. HACKNEY:  So thank you, your Honor.  I
21  appreciate that.  That was helpful.  I guess I had post-trial
22  findings of fact and conclusions on here.  Now, I'm a
23  little -- I will say I'm interested to hear -- to see you
24  shake your head negatively.  I've never seen that before from
25  you.

1          THE COURT:  Shocking, I know.

2          MR. HACKNEY:  The reason that I thought it was

3   interesting is because it does put a lot of burden on the

4   parties to synthesize the record for your benefit, and I was

5   interested --

6          THE COURT:  I like closing arguments.

7          MR. HACKNEY:  Okay.

8          THE COURT:  I want to hear from you --

9          MR. HACKNEY:  Okay.

10         THE COURT:  -- what you think your strong legal and

11  factual points are.

12         MR. HACKNEY:  Okay.  We'll take that --

13         THE COURT:  I always find -- it's just a personal

14  preference -- find that much more helpful and persuasive than

15  just reading --

16         MR. HACKNEY:  Yeah.

17         THE COURT:  -- about it in a brief.  I wouldn't do

18  both in any event, and I prefer the oral to the written.

19         MR. HACKNEY:  Your Honor, so noted, and we will do

20  what you ask.  I'm going to skip over time allocation.

21         THE COURT:  Yeah.  We're going to hold that for

22  another day.

23         MR. HACKNEY:  Yes, sir.  Now I'm going to go to what

24  I wrote down next to my notes with sort of the more -- some

25  of the more philosophical issues.  So there's a nuts and

1  bolts issue I think of the plan, which are, you know, the

2  definitive documents with respect to the DIA settlement, the

3  definitive documents with respect to the LTGO settlement.  We

4  raised this with you before.

5         THE COURT:  Well, and the definitive documents with

6  regard to any settlements that may come in in the meantime.

7         MR. HACKNEY:  That's right, or the exit financing.

8  And so, you know, you found extraordinary cause existed to

9  move the trial back one week, and I wanted to put you on the

10  spot a little bit to say that it wasn't clear what the

11  extraordinary cause was.  I don't think I've done anything

12  extraordinary yet, so that was the first time, and I wanted

13  to know what it was, but the -- but I had a suggestion for

14  you, which is whatever it --

15         THE COURT:  Well, I will answer -- I'll answer your

16  question, and it wasn't anything you did.

17         MR. HACKNEY:  I'm reassured, your Honor.  I'm

18  reassured.

19         THE COURT:  Oh, by that I assume you don't want to

20  know actually what it was?  Okay.

21         MR. HACKNEY:  Yeah, right, as long as it wasn't

22  something I did.  No.

23         THE COURT:  No, no, no.

24         MR. HACKNEY:  It was -- do you want to put a date

25  around whatever it was?

1          THE COURT:  How would I find extraordinary cause to

2     grant an adjournment by a party based on something they did?

3          MR. HACKNEY:  Good point.

4          THE COURT:  A tough one.

5          MR. HACKNEY:  The argument, I guess, was the one we

6     were making, but I guess what was it that prompted you to

7     move the schedule, and does it make sense to include a date

8     by which whatever it was -- if it's something that's been

9     solved, you know --

10          THE COURT:  Well, I'll answer the question

11     because --

12          MR. HACKNEY:  Yeah.

13          THE COURT:  -- I was vague about it and deliberately

14     so, but since you've put me to it, it was the city's delay in

15     filing its plan at the time --

16          MR. HACKNEY:  And has that --

17          THE COURT:  -- which will give you a prediction of

18     what my concerns are on an ongoing basis.

19          MR. HACKNEY:  Yeah.  Because even the plan that was

20     filed doesn't have some of these things in it, and I do -- I

21     acknowledge --

22          THE COURT:  And wound up being corrected in a very

23     significant way.

24          MR. HACKNEY:  Yeah.  And I acknowledge there are

25     situations where, you know, if there's a period out of place

1   in the plan, right, I can still try the confirmation hearing,

2   but --

3           THE COURT:  Well, let's just put it to the city.

4   When are the definitive documents that Mr. Hackney is

5   concerned about going to be filed, please?

6           MS. LENNOX:  Well, your Honor, he's mentioned two,

7   the LTGO documents and the DIA settlement documents.  The

8   LTGO documents were filed with the plan on July 25th as

9   Exhibit I.A. 168 to the plan.

10          THE COURT:  Okay.

11          MS. LENNOX:  They were filed.

12          THE COURT:  So there aren't going to be any more

13  LTGO docs?

14          MS. LENNOX:  The DIA settlement documents I am

15  informed will be completed this week, and I believe under

16  your Honor's sixth amended scheduling order we have to file

17  our plan supplement by -- I believe it's the 12th.  I may

18  have that date wrong.  We could file them earlier or we will

19  file them with the plan supplement.

20          THE COURT:  Plan supplement?

21          MS. LENNOX:  Or other forms of documents that

22  weren't yet attached to the plan.

23          THE COURT:  You think these documents from the DIA

24  settlement will be done this week?

25          MS. LENNOX:  Yes, your Honor.

1          THE COURT:  Is it too much to insist that they be

2     provided on Monday?

3          MS. LENNOX:  Of course -- of course not.  We

4     certainly can.

5          THE COURT:  I guess that's the best we can do in the

6     circumstances, Mr. Hackney.

7          MR. HACKNEY:  Understood.

8          THE COURT:  Okay.

9          MR. HACKNEY:  Your Honor, just a couple more, and

10    then I'll pass the podium.  I don't mean to go on at length.

11    I did want to ask you about the DWSD issue because from the

12    start of the case it's had the potential if there was an --

13    the authority was struck, something that's important, I

14    think, to the citizens of the tri-county area, but it's also

15    potentially important to creditors like me because there was

16    hope that it might unlock revenue for the city depending on

17    the structure and material revenue, so as much as at times

18    $47 million a year.  That's a nontrivial sum.  The current

19    plan doesn't have, I don't believe, any projections for a

20    DWSD authority in it, and so as a -- both as a trial lawyer

21    and also as a quasi restructuring lawyer, I had a question to

22    you, which is, you know, how am I supposed to try the issue

23    up to you?  Is it just supposed to be -- I don't have

24    specifics of what's ongoing.

25          THE COURT:  Nor do I.

1           MR. HACKNEY:  It strikes me as -- it strikes me as
2   not fair and equitable if the city were to enter into an
3   authority the week after the plan that unlocked $47 million
4   of revenue for the city and for us to not have known that,
5   and so it's both a trial issue, but it's also just a
6   suggestion that is there not some prudence to seeing whether
7   that authority can be done and, if so, what it portends
8   before we finally try this plan.
9           THE COURT:  Well, what is your sense of how a
10  regional authority might unlock significant money for
11  creditors here?  What basis are you relying on for that?
12          MR. HACKNEY:  So I'm relying on principally the June
13  2013 proposal to creditors, and there are subsequent
14  documents that I can't quote to you chapter and verse that
15  articulate this concept.  There's been the suggestion that
16  there may be a sale leaseback as part of the authority, and
17  the sale leaseback would be of a long term that would
18  actually generate not just, you know, overhead within the
19  system.
20          THE COURT:  When you say "sale leaseback," do you
21  mean some kind of privatization deal?
22          MR. HACKNEY:  No.  Well, not necessarily.  I'm sure
23  there are people more knowledgeable than I about this, but my
24  understanding was that there would be a transaction with the
25  authority.

1          THE COURT:  Oh.

2          MR. HACKNEY:  And so I think there's a similar

3    concept involved in a public-private partnership, but this

4    goes back to that push-pull we talked a little bit about

5    before, which is using a schedule to drive agreements, and I

6    understand the rationale of it, but is there a point at which

7    the schedule itself becomes an impediment to something that

8    is material and important to a plan that might be able to

9    achieve consensual resolution or resolve other objections?  I

10   offer that for your consideration.

11         THE COURT:  I have to ask you one more time -- maybe

12   now isn't the right time -- what the link is between

13   regionalization and the potential for more money.

14         MR. HACKNEY:  So it is my understanding just --

15   maybe I didn't say it well, but it is my understanding that

16   there is a possibility that whether it's through a sale

17   leaseback or some other mechanism that I don't understand

18   that it generates a payment to the city general fund, meaning

19   not just rationalization of expenses within the authority

20   which would benefit the ratepayers, but that as part of the

21   deal there is money for the city general fund.  We can argue

22   it at --

23         THE COURT:  Well, but isn't the department a sort of

24   stand-alone entity where the rates are fixed based on

25   expenses --

1          MR. HACKNEY:  It's my understanding that the --

2          THE COURT:  -- so that it's not a profit center for

3    the city at all?  It's prohibited by law from being a profit

4    center for the city.

5          MR. HACKNEY:  I will be the first to tell you that I

6    am not the expert, and there are people in this room that are

7    on both sides of the issue, so what I will say is that to the

8    extent there's a valid lease entered into, for example, that

9    requires a payment to the landlord, it's my sort of lay

10   understanding that that's a valid expense of the system that

11   is paid to --

12         THE COURT:  That would go to the city.  I see.

13         MR. HACKNEY:  That happens to be the city.

14         THE COURT:  I see.  Okay.

15         MR. HACKNEY:  Now, to give you some sense of scale,

16   like when -- you know, this $47 million number is out there.

17   It's been out there, but, you know, on an annual basis,

18   that's a third of the gaming revenue.  Okay.

19         THE COURT:  And where does that number come from?

20   Do you recall?

21         MR. HACKNEY:  Well, it comes from the June --

22         THE COURT:  Anybody remember?

23         MR. NEAL:  Your Honor, in fairness -- this is Guy

24   Neal -- there's been extensive discovery, extensive document

25   production on the city's negotiations with the counties over

1  the formation of a regional authority starting in the summer

2  of 2013 and continuing through the discovery period of about

3  April 2014.  Post-April your Honor entered a mediation order

4  so that we have not been able to obtain discovery of what is

5  going on today, but at least what is in the historical record

6  are a series of exchanges, demands, and negotiations between

7  the city and the counties.  Many numbers were floated.  The

8  $47 million number was but one of the proposals the city

9  made --

10         THE COURT:  Um-hmm.  Okay.

11         MR. NEAL:  -- to the counties.

12         MR. HACKNEY:  My point is a simple one, which is

13  that there is a material chance that an authority would have

14  a material impact on the city's general fund, and I wanted to

15  ask you is not this one of the types of potential

16  developments that it makes more sense to see -- you know, to

17  see if it can happen first before we have the plan

18  confirmation?

19         THE COURT:  Well, I wonder if an alternative to

20  that -- not to invite more litigation, but I wonder if an

21  alternative is an objection on your part to the plan on the

22  grounds that it doesn't provide for the distribution of any

23  such income, revenue, to creditors --

24         MR. HACKNEY:  And I will tell you we do note that --

25         THE COURT:  -- on a contingent basis.

1          MR. HACKNEY:  For example, the forecasts admittedly

2     by the witnesses do not actually forecast all of the revenue

3     for the city, including DWSD and certain asset sales, so we

4     already have the position that the city is not distributing

5     all of the possible revenue that it could, so I agree with

6     you at large.  I just -- right now the way -- the only way

7     you can try it is you can say it's a material issue, your

8     Honor, and it really is not going to be fair to us creditors

9     if Mayor Duggan strikes the deal two weeks after you confirm

10    the plan without it and there hasn't at least been a

11    conversation about whether the city should keep all of that

12    money for itself or share some of it with us.

13         THE COURT:  So the question is is that an objection

14    to confirmation or is it grounds to hold off and see what

15    happens?

16         MR. HACKNEY:  Correct.  And I don't have anything --

17         THE COURT:  It isn't something we have to decide

18    today.

19         MR. HACKNEY:  It isn't, but I wanted to suggest it

20    today just because of how much goes into getting ready for a

21    trial date.  I wanted to give it to you --

22         THE COURT:  All right.

23         MR. HACKNEY:  -- for your consideration.  We've

24    already --

25         THE COURT:  Ms. Lennox, you wanted to respond to

1    this.

2         MS. LENNOX:  With some trepidation.  I think the

3    difficulty we have had with the concept of the authority from

4    the city's side from day one is that it's very difficult to

5    put anything into a plan, which is a very concrete document,

6    when we don't know what that is.

7         THE COURT:  Right.

8         MS. LENNOX:  And what Mr. Hackney is positing is

9    that if there is an authority and if there is any money that

10   comes into the general fund, which is a huge assumption

11   which, you know, we know nothing about right now, we should

12   somehow document this in the plan.  The problem is I don't

13   know what I'm documenting.  I don't know what he's objecting

14   to because, you know, there's nothing to document, so, you

15   know, unless, you know, your Honor wants to give the --

16        THE COURT:  Well, but plans do occasionally provide

17   for contingent distributions --

18        MS. LENNOX:  Well --

19        THE COURT:  -- depending on future events.

20        MS. LENNOX:  That absolutely is true, your Honor,

21   but when you do that, you normally have some sense about what

22   the magnitude of the issue you're talking about is.  It could

23   be -- in this case, it could be zero, it could be 47, it

24   could be a hundred, it could be -- it's very difficult to say

25   what you think should happen to a contingent potential asset

1  which doesn't even presently exist right now and say this is
2  what we would do with it in the plan.

3          THE COURT:  Okay.  That's fair enough, but if that's
4  true, doesn't that argue in favor of waiting to see what the
5  monetization might be?

6          MS. LENNOX:  Absolutely, your Honor, and the only
7  way -- that is definitely our point.  I don't think that it
8  makes sense to argue about anything or amend plans or do
9  anything until we know, first of all, if this is even going
10  to happen, and, secondly, if it happens, in what form it
11  happens.

12          THE COURT:  So you're saying we should hold off on
13  plan confirmation --

14          MS. LENNOX:  No.

15          THE COURT:  -- until we see whether regionalization
16  occurs?

17          MS. LENNOX:  I'm saying we should go forward with
18  plan confirmation, and should this arise, we can deal with it
19  if and when it arises.  Now, maybe your Honor wants to put a
20  deadline on the mediation process if this is a concern, which
21  also has it pitfalls, your Honor.

22          THE COURT:  Our mediators have strongly discouraged
23  me from doing that.

24          MS. LENNOX:  I completely understand, and I would
25  understand why, but the city shouldn't be -- there are a lot

1    of parties that are not the city in that mediation, and the

2    city in its confirmation process cannot be held up by that.

3    What I would propose is that when and if anything ever

4    happens, we deal with it in the context of where we are at

5    the time, and I don't think anybody needs to --

6              THE COURT:  Even if it's post-confirmation?

7              MS. LENNOX:  Well, if it's post-confirmation, then

8    they'll have to figure out how to get it done without -- you

9    know, without a plan of adjustment that facilitates it.

10             THE COURT:  Mr. Hackney says that's very unfair.

11             MS. LENNOX:  Mr. Hackney is assuming that if it gets

12   done, that there would be anything that would flow to the

13   general fund.  That's an assumption he cannot make.

14             THE COURT:  Yeah.  And he's assuming that that's

15   unfair --

16             MS. LENNOX:  Well, your Honor --

17             THE COURT:  -- or arguing that that's unfair.

18             MS. LENNOX:  I don't believe that's unfair because,

19   you know, the city has a lot of ways in which it could use

20   its money, and it may not be -- if it got any money from any

21   transaction that might happen, which we don't know whether it

22   will, I don't know that that's necessarily a prejudice to the

23   creditors given the city --

24             THE COURT:  Well, but he's entitled to litigate the

25   issue -- the best interest issue, isn't he?

1     MS. LENNOX:  I don't know that this is a best

2   interest issue, your Honor.  I don't think this has

3   anything --

4           THE COURT:  Or fair and equitable.  Whatever

5   pigeonhole you put this in, he's entitled to a court ruling

6   on it --

7           MS. LENNOX:  Well, again, your Honor, unless --

8           THE COURT:  -- which won't happen if we wait till

9   after confirmation.

10          MS. LENNOX:  Unless your Honor would order an end

11  date to the mediation, I don't know that there is a way to

12  resolve this issue.

13          THE COURT:  All right.  I'll reopen that issue with

14  my District Court mediators and see how far I get.

15          MS. LENNOX:  Thank you, your Honor.

16          THE COURT:  Mr. Hackney --

17          MR. HACKNEY:  Yes, sir.

18          THE COURT:  -- was there anything further on your

19  list?

20          MR. HACKNEY:  No, sir.

21          MR. NEAL:  Good morning again, your Honor.  Guy

22  Neal.  And just to preserve our objection, you are correct.

23  DWSD is not a profit center for the general fund, but that

24  is -- I would suggest that Mr. Hackney stick to the art and

25  not the DWSD, but that's for another -- that's for another

1   day.  He has his strengths.  He knows them.

2          Couple housekeeping matters.  This goes back to the

3   joint pretrial order that is presently due August 15th; also

4   had communications with Mr. Shumaker.  There are some

5   idiosyncracies in the form of the order.  Mr. Shumaker

6   directed me to the eligibility joint pretrial as a template.

7   There are statement of claims of the parties, number one.

8   Then there are issues of fact and then legal issues.  Our

9   proposal -- my proposal would be for the respective objectors

10  to make reference to by docket item number their plan

11  objections, any briefing that they may have filed for the

12  legal issues, and then any post-trial briefing that they file

13  rather than recite at length each and every statement of

14  claim, so to speak, or factual issue or legal issue.

15         THE COURT:  That's fine.

16         MR. NEAL:  Great.  That's all I have.  Thank you.

17         THE COURT:  Okay.  Okay.

18         MR. SOTO:  Your Honor, Ed Soto on behalf of FGIC.

19  And to be totally candid with the Court, so when we get the

20  DIA settlement, we are the party charged with drafting the

21  briefs that direct the Court's attention to our arguments

22  regarding the DIA, and so I'm going to reserve the right to

23  file one of those motions for extended pages with respect to

24  the DIA --

25         THE COURT:  Um-hmm, sure.

1      MR. SOTO:  -- portion until we see that aspect of

2  it.  We will have another brief that will meet your limits

3  that deal with the other objections.

4      THE COURT:  Okay.  There was a request -- yes, sir.

5  I was going to get to you next.

6      MR. DECHIARA:  Peter DeChiara for the UAW.  Your

7  Honor, I'm pleased to announce that the UAW has resolved

8  its --

9      THE COURT:  Okay.

10      MR. DECHIARA:  -- discovery issue with the city that

11  I raised earlier today.  I did have a scheduling question or

12  looking for some guidance from the Court.  The UAW's case we

13  presume would take less than a day, a fraction of a day to

14  put on its case in chief.  The trial, I presume, will go on

15  for a number of weeks.  Can the Court give any guidance as to

16  the sequencing --

17      THE COURT:  Um-hmm.

18      MR. DECHIARA:  -- in which the creditors will put on

19  their case?  It would be inefficient for my client --

20      THE COURT:  Yeah.

21      MR. DECHIARA:  -- to have me or my --

22      THE COURT:  Yeah.  I want to -- I want to be very

23  sensitive to all those kinds of issues.  I don't think it's

24  anything we can accomplish today, but perhaps at the final

25  pretrial conference you'll be sure that that gets on the

1  agenda.

2          MR. DECHIARA:  Thank you.

3          THE COURT:  Before you go, sir, I think it was your

4  client and maybe AFSCME or one other client -- creditor -- I

5  can't remember -- raised an objection recently about the plan

6  impairing the claims of noncity employees.

7          MR. DECHIARA:  That would be the UAW.  Our claim is

8  that the plan impairs the accrued pension benefits of

9  retirees and employees of the library, which is a legally

10 separate --

11         THE COURT:  Yeah.

12         MR. DECHIARA:  -- entity, and that's essentially the

13 gist of our case, that we believe that that's improper,

14 that --

15         THE COURT:  Um-hmm, but wasn't there another

16 objection from another creditor that came in?

17         MR. DECHIARA:  There may have been, but I can't

18 speak to that.

19         THE COURT:  Sir.

20         MR. MACK:  Yes, your Honor.  Richard Mack with

21 AFSCME.  We joined the -- or we've also filed the same

22 objection for noncity employees at the library.  We also have

23 eight, I think it is -- five, rather, employees of the Cobo

24 Hall Regional Authority, so --

25         THE COURT:  Oh, yes.  That was it.  Thank you.  All

1  right.  So this is an issue that I'll want the city to
2  address at some point.  Maybe we'll include it on our list of
3  issues for you to brief.
4          MS. LENNOX:  Yes.  We're prepared to do that, your
5  Honor.
6          THE COURT:  Okay.  Mr. Gordon.
7          MR. GORDON:  Yes, your Honor.
8          THE COURT:  You raised, you know, the very
9  interesting issue of community hardship.  I do not want and
10 don't think it relevant to consider a series of retirees or
11 employees, for that matter, testifying about their individual
12 hardship.  In my view, neither fair and equitable nor unfair
13 discrimination has ever in any bankruptcy case considered the
14 impact of a plan on a creditor; that is to say, the adverse
15 impact of a plan on a creditor.  The issue always is the
16 business justification for the treatment from the debtor's
17 perspective.  Now, to the extent that issue encompasses
18 consideration of hardship, I would leave it to the proponents
19 of the plan to argue and prove that, but that's a much -- I
20 don't know -- broader and differently focused question than
21 just plain hardship to retirees.
22         MR. GORDON:  Yes, your Honor, and I would agree with
23 you that the colloquy at that status conference a few weeks
24 ago was focused on much more granular individual data and
25 obtaining that data.  I just wanted to make sure that it was

1  clear or understood by all parties that if there is

2  information or an argument to be made as to the impact more

3  broadly on retirees, not just as creditors but more

4  specifically as a part of the entity that we are trying to

5  rehabilitate, that that is relevant and fair game in the

6  context of a Chapter 9.

7       THE COURT:  Right.  The city will bear the burden of

8  showing why its very significant discrimination in favor of

9  retirees and against the financial creditors here in this

10  case is not unfair.  It knows that.

11       MR. GORDON:  Agreed, your Honor, and I just wanted

12  to make clear that that would be one of the things that could

13  be identified is if there was, you know, broad impoverishment

14  of retirees, for example, that's something that could be

15  considered.

16       THE COURT:  All right.

17       MR. GORDON:  Thank you, your Honor.

18       THE COURT:  Okay.  That was all I had for my agenda

19  on the record here.  Is there anything that anyone else would

20  like to bring up before I handle some matters off the record?

21  Oh, yes.  There was your issue, sir.  Thank you for reminding

22  me.  Your name again, sir?

23       MR. QUINN:  John Quinn, your Honor.

24       THE COURT:  Yes.  Mr. Quinn raised the issue of

25  individual creditors, and by that I assume he means

1  unrepresented creditors --

2          MR. QUINN:  Yes.

3          THE COURT:  -- having an opportunity to either

4  present evidence or cross-examine witnesses.  Anyone have any

5  thoughts on this question?

6          MR. HACKNEY:  I do.  I do, your Honor.

7          THE COURT:  Go ahead.

8          MR. HACKNEY:  And first let me just express my

9  personal admiration for Mr. Quinn for coming in here and

10  standing up for himself.

11          THE COURT:  Of course.

12          MR. HACKNEY:  There is the balance that has to be

13  struck, I think, in terms of protecting people's rights, on

14  the one hand, and then allowing for an orderly trial, on the

15  other hand, and what it seems to me might be a good first

16  step would be to get a sense of how many people there are

17  that are like Mr. Quinn that actually intend to cross-examine

18  or introduce evidence, start there and then perhaps engage

19  the concept of amongst those creditors, much like other

20  creditors have been required to coordinate and utilize lead

21  examination methodologies, a steering committee of sorts for

22  them and a consideration of what time allotment is

23  appropriate for them --

24          THE COURT:  Um-hmm.

25          MR. HACKNEY:  -- but that would be a way to try to

1  bring order out of the potential chaos, no disrespect

2  intended, of --

3            THE COURT:  Right.

4            MR. HACKNEY:  -- different people coming in.

5            THE COURT:  Right.

6            MR. CULLEN:  May I, your Honor?

7            THE COURT:  Sir.

8            MR. CULLEN:  I'm assuming that most of the

9  individuals involved will be objectors to the plan if they're

10  coming in to cross-examine.  If that's so, I think that this

11  is a subset of the intercreditor issue that Mr. Hackney

12  raised earlier, and I think that if the objectors to the plan

13  are going to organize how this is done, I think that it

14  should be within the bailiwick of those objectors to try and

15  do some of that organization with Mr. Quinn and with some of

16  the others.  It's their end of the case, after all, and if

17  we're going to impose some order on it and if it's going

18  to -- if there's going to be an allocation of time between

19  the city and the objectors, they're on the objectors' side

20  and will be part of the creditors' time to be allotted, and

21  maybe some of those individual objectors could be satisfied

22  that Mr. Hackney or someone else was covering the ground.

23  Maybe not, but that's --

24            THE COURT:  Yeah.

25            MR. CULLEN:  -- what I would propose.

1          THE COURT:  Mr. Quinn.

2          MR. QUINN:  Your Honor, I agree that this is a

3    serious issue of trial efficiency.  Of course, it's also an

4    issue of due process, and those things have to be balanced.

5    I think one step that might help a great deal would be for

6    the Court to take a look -- the Court has already indicated

7    it's cataloging all these objections and cataloging as to

8    which are straightforward issues of law and which involve

9    fact questions.  As to those that can be fully decided as a

10   matter of law, I would suggest it might be prudent to decide

11   those issues before the trial begins because that takes that

12   off the table for trial, and there's no reason for that

13   particular objector to be allowed to participate in the

14   trial.  And I think it would be wise to -- either in the

15   pretrial order or in a separate order to give the individual

16   objectors some guidance.  For example, each objector should

17   be limited to presenting evidence or cross-examining on the

18   issues raised by that objector.  I agree the objectors should

19   be encouraged in one way or another to consolidate their

20   efforts so that you don't have a lot of repetition, the

21   same -- several objectors raising the same issues.  I think

22   objectors could be required to provide notice prior to trial,

23   first of all, explaining why they're not adequately

24   represented by a committee or by another creditor with

25   similar interests.  If they want to offer evidence, they

1  should be required to specify witnesses and exhibits and make

2  an offer of proof, show exactly what it is they intend to

3  prove.

4        Now, perhaps the most difficult part is cross-

5  examination being conducted by people who lack the training

6  and experience to do it efficiently, and, again, I would

7  think the Court, in its order, could strongly encourage that

8  the creditors choose among themselves -- some are lawyers --

9  someone who can handle that in an efficient manner, and, of

10  course, the Court can impose reasonable time limits on how

11  much time each creditor gets.  Those are just some

12  suggestions as to how to handle it.

13        THE COURT:  All right.  Thank you.  I'll devise an

14  appropriate process to facilitate this in a way that does

15  balance the interests of the parties in having their

16  positions presented to the Court with the necessity for an

17  orderly process.

18        MR. QUINN:  Thank you, your Honor.

19        MR. KANE:  Your Honor, it's Scott Kane.  One other

20  very minor issue before you go off the record and presumably

21  we drop off.  Earlier in this call we tabled any deadline for

22  Ms. Kopacz to file a supplemental report, so my question is,

23  one, should we keep that issue open until the next status

24  conference you set, and, two, do you desire that Ms. Kopacz

25  be part of that next status conference?

1          THE COURT:  The answer to both questions is yes.

2          MR. KANE:  Thank you.  That's what I expected.

3          THE COURT:  Okay.  All right.  Anything else on the

4    record -- on the record here at this time?  All right.  I'm

5    going to -- I'm going to conduct two conferences off the

6    record.  First, raise your hand if you're involved in the

7    DWSD negotiations.  All right.  I want to see all of you in

8    the Court's jury room at 11:30.  And I want to see the people

9    involved in the site visit in chambers here right now.  And

10   we'll be in recess.

11         THE CLERK:  All rise.  Court is adjourned.

12       (Proceedings concluded at 11:10 a.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett              August 7, 2014
_____      _____
Lois Garrett