Jamie S. Fields (P-52808)\
Attorney-at-Law
555 Brush #2409
Detroit, Michigan 48226
313-570-3906
jeansartre@msn.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| City of Detroit, | Case No. 13-5384 |
| Debtor | Hon. Steven W. Rhodes |

**OBJECTIONS IN OPPOSITION TO THE FIFTH AMENDED PLAN FOR
THE ADJUSTMENTS OF DEBTS OF THE CITY OF DETROIT OF CREDITORS**

WILLIAM OCHADLEUS, SHELTON HAYES, SHIRLEY BERGER, RAYMOND YEE, JOHN CLARK, FREDERICK T. McCLURE JR., JIM BENCI, JANICE BUTLER, MORRIS WELLS, DEBORAH WARD, MELVIN F. WILLIAMS SR., SARAH GIDDENS, KIMBERLY ANN SANDERS, JACKIE FULBRIGHT, ED GAINES, CATHERINE TUTTLE, RITA SERRA, MARTIN TREADWELL, JOHN J. O'NEILL, BARBARA TRIPLETT-DECREASE, ROY MCCALISTER, POLLY MCCALISTER, JESSIE BANKS, HENRY ELLIS, GAIL WILSON TURNER, LOLETHA PORTER COLEMAN, AFFORD COLEMAN, LESTER COLEMAN, DEBORAH LARK, MOSES LARK, SHARON COWLING, MICHAEL COWLING, ROBERT JACKSON, RASHELLE PETTWAY, MICHAEL A. ADAMS, JOHN HAWKINS, LAURA ISOM, DUANE MCKISSIC, HERBERT MORELAND, CYNTHIAN DIANE MORELAND, KEITH JACKSON SR., DEBORAH ROBINSON, JAMES ALEXANDER JR., BRENDA GOSS ANDREWS, LAWRENCE PORTER, JAMIE FIELDS, RICARDO C. JENKINS, GREG JONES, JACQUELINE JACKSON, TOMMIE CARODINE, DEBRA J. FAIR, ROBBIN RIVERS, JAMES R. YOUNGER, JOE SMITH, ROSCOE MAYFIELD, CHARLES BARBIERI, JAMES JONES, CRAIG SCHWARTZ, REGGIE BARNES, GLENDA COLE-DIXON, WALTER LONG JR., GEORGE GRAVES, CALVIN ADKINS, JACK ALIOTTA, TERRANCE ANDERSON, DAVID ANDERSON, NANCY YOUNG FOWLER, GEORGE CHESTER, ANTHONY KLUKOWSKI JR, TODD KLUKOWSKI, ROGER KLUKOWSKI, MIKE FOLEY, LOIS KLUKOWSKI-HOGEN, ANDY SMITH, PATRICIA E. MCCABE, PATTI GRAVES, JEANNETTA WASHINGTON, STEVE LEGGATT, PAULA DAY, DEBORAH MCCREARY, GREG JONES, ANDREW WHITE, CHRISTINE MARIE JEPSEN, JOHN JEPSEN, ALICIA TERRY, JOYCE DANIEL, BRYAN GLOVER, TOBI ASCIONE YOUNG, GREG HUIZAR, LORI GALLMAN, BEVERLY HOFFMAN-NICHOLS, BARABARA STAFFORD, MICELLE PIERSON, SHELLEY I. FOY, PARRIE LEE HIGHGATE, RENEE ELLIS-SUMPTER, DAVID POMEROY, JIM LEMAUX, ERIC HECKMAN, SHELLEY HOLDERBAUM, KEITH OLENIACZ, EDGARDO APONTE, JON GARDNER, JUDITH NORWOOD, KENNETH EMERSON, PATRICIA LOFTON DANIEL P. ROOT, KAREN LESKIE, ROOSEVELT LAWRENCE JR., SONJA HOLLIS, WILLIAM ANDERSON, DEREK HICKS, MARSHA THOMPSON-KIDD, YVONNE WILLIAMS JONES, LULA MILLENDER, WILLIAM DAVIS, EVELYN OWEN SMITH, CECILY MCCLELLAN, BELINDA A. MYERS-FLORENCE, JESSE J. FLORENCE SR., PAULETTE BROWN, STEVE LEGGATT, LINDA WHITE, JO FULLER

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT…………………………………………………........…....…..............…1

II. ARGUMENT……………………………………………………………………..…......…….........…......2

    A. SYNCORA'S CIRCULAR ARGUMENTS RELYING ON THEIR EXPERT'S
       FLAWED REASONING FAILS TO DEFEND THAT REASONING.....................................2

      1. Retirees were Denied Procedural Due Process when the Court Concluded as a
         Matter of Law that Pensions could be Impaired without Making any Findings of
         Fact and without taking any Evidence..................................................................................2

    B. THE COURT'S FEASIBILITY EXPERT'S REPORT IS WELL-REASONED
       AND ILLUSTRATES THE FUTILITY OF THE CITY'S PLAN WHICH
       RENDERS IT NON-CONFIRMABLE.................................................................................5

      1. Adequacy of Capital Structure and Availability of Credit...........................................6

      2. Earning Power of the City............................................................................................8

      3. Economic Conditions...................................................................................................9

      4. Ability of Management and Probability of Continuance of Same Management.....................9

      5. Related Matters that Affect the City's Ability to Perform the Plan..........................10

        a. The Kopacz Report Highlights the Challenged City of Detroit Workforce but
          Reducing Wages and Benefits are Unlikely to Yield Improvements......................................10

    B. MISCELLANEOUS.............................................................................................................13

      1. The Site Tour Provide the Court with Inaccurate Information................................................13

III. RESERVATION OF RIGHTS……………………………………………...……………..…............…14

IV. CONCLUSION……………………………………...…......………………………..….............................15

# TABLE OF AUTHORITIES
II

**Cases**           **Page**

*Allen v. Wright*, 468 U.S. 737 (1984)..................................................................................................3

*Arnett v. Kennedy*, 416 U.S. 134 (1974)..............................................................................................4

*Braley v. Campbell*, 8 *Connecticut v. Doehr*, 111 S. Ct. 2105 (1991)................................................4

*Connecticut v. Doehr*, 111 S. Ct. 2105 (1991)....................................................................................4

*In re Apex Oil Co.,* 118 B.R. at 708 (E.D. Mo. 1990).........................................................................9

*In re Clarkson,* 767 F.2d 417 (8th Cir. 1985).......................................................................................8

*In re Lapiana,* 909 F.2d 221 (4th Cir. 1990).......................................................................................4

*In re Linkous*, 990 F.2d 160 (4th Cir. 1993).......................................................................................3

*In re Prudential Energy,* 58 B.R. 857 (S.D.N.Y.1986).......................................................................5

*In re Ralph C. Tyler, P. E., P.S., Inc.,* 156 B.R. 995 (Bankr. N.D. Ohio 1993)...................................6

*In re Sagewood Manor Assoc., L.P.,* 223 B.R. 756 (D. Nev. 1998)....................................................9

*In re Schriock Constr., Inc.*167 B.R. 569 (D.N.D. 1994)....................................................................7

*In re Stanley,* 185 B.R. 417 (D. Conn. 1995).......................................................................................8

*In re Storberg*, 94 B.R. 144 (Minn. 1988)..........................................................................................2

*In re Timber Tracks,* 70 B.R. 773 (D. Mont. 1987).............................................................................6

*In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1989)..............................................................................5

*Matter of LaSalle St.* 126 F.3d 955 (7th Cir.1997).............................................................................5

*Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950).....................................................3

*Pan Am Corp. v. Delta Air Lines,* 175 B.R. 438 (1994).....................................................................5

**Statutes**

11 U.S.C. § 1129(a) (11)......................................................................................................................1

The forgoing City retirees, employees and beneficiaries hereby object to the *Fifth Amended Plan* (the "Plan") (Doc. 6257). This objection adopts by reference (Doc. 4404) and is limited to issues raised subsequent to the City's filing of its *Fourth Amended Plan* with this Court [the Stephen "Rosen Report" and the "Kopacz Report" (Doc. 4215)].

## I. PRELIMINARY STATEMENT

The proposed *Fifth Amended Plan of Adjustment of the Debts of the City of Detroit* is reminiscent of an old joke that defines *chutzpah* — the Yiddish word for brazen audacity — as murdering your parents and then begging the courts for mercy because you're an orphan.

The Emergency Manager has publicly suggested that Detroit's lenders in effect deserve to "lose their shirts" because they should have known the city was "openly and notoriously" driving itself into bankruptcy. Governor Snyder echoed those comments on "Face the Nation" stating:

> Realistically if you step back, if you were lending to the city of Detroit in the last few years, didn't you understand there were major issues and problems? And look at the yields they were paying compared to other bonds. They were getting a premium.

The same criticism applies to city and state officials, who for years knew, or should have known, that Detroit was rushing toward a fiscal cliff. Not only did they ignore countless warnings, but state officials actively played enabler to the City's fiscal malpractice. Specifically, the borrowing the Governor criticized, would not have occurred if not for a 2010 vote by the Legislature to grant Detroit special permission to authorize 250 million dollars in fiscal stabilization bonds to go deeper in debt just to pay its routine day-to-day operating expenses. Mayor Bing publicly touted this effort stating: "the recent bond sale was a sign the city is changing for the better" (Bond Buyer Magazine, 4-13-10). The City has the burden of proof in respect to plan feasibility under 11 U.S.C. § 1129(a) (11). The City cannot meet its burden.

## II. ARGUMENT

### A. SYNCORA'S CIRCULAR ARGUMENTS RELYING ON THEIR EXPERT'S FLAWED REASONING FAILS TO DEFEND THAT REASONING

Syncora relies in large measure on the nonsensical and circular argument that retirees are receiving an unwarranted recovery compared to bondholders and it is "unfair" discrimination. Congress anticipated some discrimination, otherwise separate classes would not be significant. It is only unfair discrimination that is prohibited," *In re Storberg*, 94 B.R. 144 (Minn. 1988).

Syncora also asserts that if the Plan used a more reasonable assumed investment rate of return, one more aligned with the median rate of return used by the majority of retirement systems in the country (7.72%), that they (Syncora), not the retirees, would be entitled to a greater recovery and that Syncora should be the beneficiaries of a healthier City pension system.

Under federal law, pension assets must be kept separate from the City's operating assets and held in trust, according to the United States Department of Labor. The City's retirement system, to the extent it's funded, is secure from other creditors. City retirees, are in actuality, receiving pensions that have already been largely pre-funded and are paid principally from their own monies (e.g., investments from 25 or more years of compounded returns). Syncora's oblique and delusory arguments that they are receiving disparate treatment is untrue.

1. <u>Retirees were Denied Procedural Due Process when the Court Concluded as a Matter of Law that Pensions could be Impaired without Making any Findings of Fact and without taking any Evidence.</u>

The Court's prophylactic ruling put the cart before the horse. By not addressing complex and pivotal issues (e.g., assumed rate and historical rates of return, system's funding levels, etc.), prior to ruling that pensions could be impaired and before discovery, is analogous to a car dealer telling a customer that they can't afford to buy a car without conducting a credit check.

2

Despite the City's caviling, neither its petition, its proposed Plan, nor the Court's ruling that pension benefits <u>could</u> be impaired either, singly or in combination, constitutes impairment. If within the meaning of state law merely the act of petitioning, or perhaps the act of petitioning plus proposing to adjust debts, were understood to constitute "impairment," then the governor's authorization to petition would be void as *ultra vires*. Regardless of whether the governor's authorization was valid, the City in respect to any creditor, is not empowered to set whatever terms of impairment it likes, expecting that the Court ratify its choices pro forma. There can be no impairment until the Court confirms a Plan. On August 26, 2013, the Court indicated:

> The Court fully recognizes and appreciates the extraordinary importance of the pension rights of the City employees and retirees in this case and how the City will ultimately propose to treat those rights. It is an important question not only to the City's employees, retirees and unions, but also to all of the parties in this case. However, the requirement of eligibility that the City desires "to effect a plan to adjust such debts" under 11 U.S.C. § 109(c) (4) does not obligate the City to prove that any particular plan that it might later propose is confirmable. Accordingly, the Court will not consider the issue of the treatment of pension rights when considering the eligibility objection . . . **The court fully preserves the opportunity of all parties to present their positions relating to the City's treatment of pension rights when the debtor requests confirmation of plan, or, perhaps in some other appropriate context** (emphasis added). The Court ruled that pensions could be impaired (December 5, 2013).

While not an abstract issue, there was no proposal before the Court at that time to reduce pensions. The Supreme Court stated "federal courts may exercise power only in the last resort, and as a necessity," *Allen v. Wright*, 468 U.S. 737 (1984). Due process commands that "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case," *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950), see also *In re Linkous*, 990 F.2d 160 (4th Cir. 1993) ("notice to a creditor of a confirmation hearing was insufficient to notify him that a valuation hearing would also be held).

3

In certain areas, preemption of state law is found to exist because the federal interest is so dominant that it precludes enforcement of state laws on the same subject. But just because state and federal law may regulate the same activity does not necessarily mean the state law is preempted. State law can coexist with or supplement federal law without conflict. There are numerous Code provisions where a creditor's state law rights are preserved under the federal law, such as state property exemptions. State courts frequently read their constitutions to secure more or different rights than analogous federal provisions.

For example, many state constitutions protect residents from "unreasonable searches and seizures," employing language identical to that of the Federal Constitution. Yet the courts of such a state may decide that although the Supreme Court has found in the words of the Federal Constitution a good-faith exception to the exclusionary rule, the identical provision in a state constitution implies nothing of the sort as a matter of state law.

Due process is conferred, not by legislative grace, but by constitutional guarantee. "While the legislature may elect not to confer a property interest . . . it may not constitutionally authorize the deprivation of such an interest once conferred, without appropriate procedural safeguards,'" *Arnett v. Kennedy*, 416 U.S. 134 (1974) ("we deprecate flaccid invocations of 'equity' in bankruptcy proceedings.....judges are not empowered to dissolve rights in the name of equity"), *In re Lapiana,* 909 F.2d 221 (4th Cir. 1990). Due process is a constitutional requirement and it cannot be ignored. Generally, a city cannot take a person's property without providing an opportunity for a hearing *in advance of the* taking...." *Connecticut v. Doehr*, 111 S. Ct. 2105 (1991). An opportunity to fully brief the issue satisfies due process, *Braley v. Campbell*, 832 F.2d 1504 (10th Cir. 1987) (en banc).

4

### B. THE COURT'S FEASIBILITY EXPERT'S REPORT IS WELL-REASONED AND ILLUSTRATES THE FUTILITY OF THE CITY'S PLAN WHICH RENDERS IT NON-CONFIRMABLE

The Court shall confirm a plan only if it is feasible. The components of the feasibility requirement are: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; and (5) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the plan, *In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1989).

Courts find Plans not feasible if the Debtor's projections are either insufficiently clear or overly optimistic, *In re Prudential Energy,* 58 B.R. 857 (1986) [("allowing Debtor's confirmation to be based on a hope against hope without some form of corroboration would go against a judge's (duty)...")]. The court may not rely on highly speculative and unduly optimistic assumptions and must base its findings of feasibility on the evidence presented, *Pan Am Corp. v. Delta Air Lines,* 175 B.R. 438 (1994), *cf.*, (City) "does not need to establish that the plan carries a guarantee of success." *Matter of LaSalle St.* 126 F.3d 955 (7th Cir.1997).

The City argues that the mere possibility of feasibility is enough. "But if metaphysical possibility of feasibility were sufficient, judges would be obligated to trade their robes for crystal balls," *In re Repurchase Corp.*, 332 BR 336 (N.D Ill. 2005). In the words of Justice Potter Stewart when asked to define pornography he stated "I know it when I see it and (this) is not that." Bankruptcy Courts recognize feasible plans when they see one, and the objectors respectfully submit, that the City's Plan is not that.

5

1. Adequacy of Capital Structure and Availability of Credit

The City's weaknesses in capital structure and its inability to execute the Plan makes it unconfirmable. The City's ability to obtain exit financing is a significant issue, *In re Timber Tracks,* 70 B.R. 773 (D. Mont. 1987), *In re Ralph C. Tyler, P. E., P.S., Inc.,* 156 B.R. 995 (N.D. Ohio 1993) (plan did not meet feasibility requirement where plan provided for exit financing but debtor provided no evidence of any commitment to provide such financing).

The Court has previously approved DIP financing ($180 million dollars). The Plan does not address if the exit financing will pay off the DIP loan. This is significant because it could increase the overall level of debt and impact the Plan's feasibility and creditor recoveries. Practically, on the eve of the confirmation hearing, exit financing in not in place. The terms of exit financing is material and may adversely affect retirees, who have already voted to accept the Plan, and they should be afforded an opportunity to change their vote. The Kopacz Report states:

> Miller Buckfire & Co. has been engaged to solicit respective parties' interest in the proposed $300 million financing. To date, an Exit Financing introductory letter and an Exit Financing Indicative Term Sheet have been released to prospective lenders. Phoenix has no visibility into the receptiveness of the financing sources to the proposed debt offering. To the degree the City is not able to procure the anticipated Exit Financing in the amount or at a reasonable interest rate will materially impact the City's cash flow liquidity at its emergence from bankruptcy. As of the date of this Report, it appears that the assumed interest rate of 6% could be low for a high yield instrument like the proposed Exit Financing.

Ms. Kopacz is correct, 6% may be too optimistic. In two Chapter 11 bankruptcies earlier this year, exit financing was secured at an 8% interest rate (Mi Pueblo Markets) and the W.R Grace secured over 1 billion in exit financing at 2.25% over LIBOR (4.70%) or a rate of almost 8%. Sans *any* discussion of the proposed terms of the financing, which has to be acceptable to the parties and the Court, creditors are left wholly unable to evaluate the feasibility of the Plan.

6

2. <u>Earning Power of the City</u>.

It's important that a City's revenue projections are reasonable and sound, *In re Schriock Constr., Inc.* 167 B.R. 569 (D.N.D. 1994). Winston Churchill said "*Those that fail to learn from history are doomed to repeat it."* Detroit has not had a balanced budget or has made year-end adjustments to balance its budget since the 1970's. The Kopacz Report, lacked the historical perspective of the objectors and the Plan, as constituted, is not feasible.

Mark Twain said "*Facts are stubborn things but statistics are more pliable*." This adage is omnipresent in Detroit government. A study of the financial distress of the City found its financial management was a core reason for its deterioration. Officials constantly overestimated the forthcoming revenues and underestimated fund reserves, and so they justified large spending that had no real connection to the City's actual economic base. Detroit faces an administrative crisis, not just a fiscal one. In the last six years its annual revenue estimates were off by an average of 25% and its spending estimates by 33%. The study concluded, therefore, that the accumulating municipal deficits resulted from accounting manipulations that local management perpetuated. (Joan Martin, "*Urban Financial Stress: Why Cities Go Broke*," 1982).

Detroit is the 18th most populous city in the country (budget close to 1 billion dollars). Fort Worth, Texas and Charlotte, North Carolina are respectively the 16th and 17th largest cities in the country, each having budgets of approximately 500 million dollars, or half of Detroit's annual budget. In addition, Fort Worth and Charlotte combined have over twice Detroit's population and almost quadruple its square miles. Post-bankruptcy, Detroit will have the fiscal wherewithal to provide adequate services *and* to annually fully fund pensions which are deferred wages and were fully funded as required by law until 2010. The City just does not want to.

7

### 3. Economic Conditions

Feasibility should be evaluated in light of the economic conditions known as of the date of confirmation, *In re Stanley,* 185 B.R. 417 (D. Conn. 1995). The stock market is near all-time highs and in the last several years the City has witnessed a startling improvement in its economic trajectory. While many neighborhoods remain very much challenged, others have stabilized or showed a very marked improvement. Mayor Duggan stated he drives through city neighborhoods and "constantly sees people rehabilitating houses" (Flashpoint, 8-10-14). The However, the Plan contains no restoration provisions for retirees tied to any quantifiable data, should the City's upward trajectory continue, and the City continues to prosper and flourish.

### 4. Ability of Management and Probability of Continuance of Same Management

The court must look at the probability of *actual* performance of the proposed plan. "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises." *In re Clarkson,* 767 F.2d 417 (8th Cir. 1985).

The dedication and experience of a municipality's management can make a marginally feasible City feasible. Alternatively, the lack of qualified management is likely to doom a City's future prospects. Ms. Kopacz stated in her report "I can say, unequivocally, that without the positive and capable leadership of Mayor Duggan and the constructive relationship between the City Council and the Mayor, I would be unable to opine that the plan, as currently proposed, is feasible. ........The democratic system has put in place individuals who, at least for the next three years, can choose to continue the positive course for the City. I believe they will do so."

8

First and foremost, overwhelming confidence in a new mayor is the norm, but to stop there ignores the City's past. For example, during Mayor Kilpatrick's first inaugural speech in 2002 he stated "I will never stop working to support the city" and (that he) "anticipated better relations with the City Council." The Kopacz Report contains no references as to why Mayor Duggan's election was so comforting to her. The closest the Kopacz Report comes to explaining why she gave such a strong unabashed endorsement of Mayor Duggan's is her statement "given the real power is still held by the Emergency Manager," the "Mayor has created simple metrics around which he can measure the performance of his department heads daily and/or weekly."

In reviewing the Inauguration Addresses of newly elected Mayors over the past twenty years, one thing is abundantly clear, every newly elected mayor was unrepentant in their exuberance and unsparing in their resolve to fix the problems of city government. Now, with very little or no substantive evidence, the objectors are being asked to "trust" that the new administration can deliver on its promises.

It is not only the City's past performance that raises concerns but the current administration limited track record is also of concern. What masquerades as metrics, either in Mayor Duggan's "dashboard" or in the City's Disclosure Statement is simply output data—things such as "number of crimes" or "police clearance rates." As the Court's expert readily recognized, self-reported agency data often suffers from issues such as lack of capacity, inconsistent data quality, and inadequate systems. Detroit is "data rich but information poor." The solution is not more data. The solution is leadership, good judgment, *and* the ability of Mayor Duggan and other administrators to surround themselves with good quality people.

Warren Buffet once said, "in looking for people to hire, you look for three qualities: integrity, intelligence, and energy. And if you don't have the first, the other two will kill you." Many of Mayor Duggan's choices have a documented history of questionable integrity or underwhelming qualifications. Numerous high ranking Kilpatrick appointees are now Duggan appointees (e.g., former Director of Information Technology now occupies a similar position, close aide to Kilpatrick is now a department director for Mayor Duggan, the current Deputy Mayor was in charge of the DPD when an USDOJ investigation found that the DPD employed unconstitutional practices resulting in two consent decrees that have lasted over ten years, while another high ranking Duggan appointee oversaw a massive DPD promotional test cheating scandal). The Detroit News offered this opinion of Mayor's Duggan's new Chief of Staff "(she) displayed a profound misunderstanding of the city's debt structure," Long after the Kilpatrick "bloom was off the rose" and Mayor Kilpatrick was charged with criminal perjury Mayor Duggan gave the following interview to Detroit Fox 2 news.

> M.L. ELRICK: You were a key adviser to Kwame Kilpatrick right up to the end.
> MAYOR DUGGAN: Right.
> M.L. ELRICK: You provided him a lot of support, a lot of advice. What does that say about your judgment?
> MAYOR DUGGAN: It says that I believed in somebody and I was wrong.
> M.L. ELRICK: Do you feel like you owe Detroit an apology for Kwame Kilpatrick?
> MAYOR DUGGAN: No, I don't.

The ability of management is often cited by courts as a factor in determining feasibility, *In re Apex Oil Co.,* 118 B.R. at 708 (E.D. Mo. 1990) (observing that in judging feasibility, courts often consider the ability of management). This is the archetypal case where the City's inability to manage in the past makes the Plan not feasible and indefensible.

5. Related Matters that Affect the City's Ability to Perform the Plan

Financial success can also be affected by the unexpected. A plan of reorganization that contemplates no "cushion" for unexpected cash outlays can make the plan subject to criticism on feasibility grounds, *In re Sagewood Manor Assoc., L.P.,* 223 B.R. 756 (D. Nev. 1998) (confirming plan which included enough cushion in debtor's projections to accommodate unforeseen setbacks). The City's past performance warrants *strict* oversight post-confirmation.

The Model of governmental oversight is North Carolina's state agency in charge of local finance, the Local Government Commission (LGC). In connection with its fiscal monitoring, the Commission pays special attention to seven financial indicators of North Carolina's local branches of government that provide warning signs for potential financial crises.

The most important indicator measures general fund balances. The LGC insists that cities have a general fund balance of at least 8% of their yearly expenditures (approximately one month's expenditures), and view a failure to meet this threshold as a sign of economic deterioration warranting state attention. Detroit's proposed "cushion" is 1% or slightly more than the annual 9.3 million that the City spends on telephone service for its facilities (pg. 82, Kopacz Report) and considerably less than the 250 million wasted between 2005-2012 in unnecessary phone lines at City facilities not occupied (Fox 2 Detroit, September 4, 2012).

    a. The Kopacz Report Highlights the Challenged City of Detroit Workforce but Reducing Wages and Benefits are Unlikely to Yield Improvements

The term "service insolvency," was first used *In re Stockton*, and is attributed to the City of Stockton's advisor, Management Partners Consultants. The City Manager of Stockton, Bob Deis who testified during the City's eligibility hearing, was hired prior to the city's confirmation trial by Management Partners as a "Special Advisor."

11

The Management Partners Report recognized "there are no minimum service standards (for cities)" And no court, even if minimum service standards were available, can mandate that a city hire x number of police officers, firefighters, payroll clerks, etc., or require a city to maintain a certain ratio of employees to residents. Labeling it "reinvestment" as the City of Detroit has, does not change that fact.

The Court will hear *ad nauseum* evidence of the poor state of the City's computer technology infrastructure (Kopacz Report). What this Court will not hear is that in the late 1990's the City committed $48 million to Oracle and IBM to overhaul its IT system. It was called the Detroit Resource Management System, or DRMS, commonly referred to as Dreams. It should have been called "nightmares."

The City spent more than $131 million dollars and never implemented the HR and payroll applications that were supposed to be the project's big payoff. It did allow the City to pay vendors more frequently. But that improvement had some unintended consequences. For instance, the City wrote too many checks for trivial amounts to some vendors; AT&T (then called Ameritech) alone received 100 checks from the City per month.

The City's sudden feigned interest in providing "adequate" services to residents is reminiscent of Shakespeare's Macbeth "full of sound and fury signifying nothing" and does not align in any meaningful way with its Plan. Delivery of services is just as much a question of administration as finance. Courts have no training in public administration, nor independent knowledge, in a distressed city, of conditions on the ground or government operations. Indeed, in Stockton's bankruptcy, the Court admitted that it drew its assessment of service insolvency from an analysis by the independent consultant hired by the city.

12

But when juxtaposing feasibility against service delivery, studies have shown that there is little or no nexus, between funding and the quality of public services. High crime, even if because of too few police officers cannot be reduced to a fiscal problem. It's about *management* decisions. Currently, Detroit has the lowest ratio of civilians of any major city in the country – no court nor any amount of capital infusion can "fix" the vast quantum and indicia of the City's poor management and oversight. What the Court can do is required that the City provides the most detailed and feasible plan possible to reasonably ensure enforcement and accountability.

Stockton's Mayor decried cutting salaries and benefits "This is of particular concern because of the deep cuts to employee compensation and benefits in recent years has left Stockton, for the most part, at the labor market average." Detroit, needing to improve services, with already one of the lowest paid workforces in the country, has a Plan to improve services - further reducing employee's wages and benefits.

In 1990 when the City's population was 1.2 million there were 615 homicides or a higher per capita rate than in 2013. The City had over a 60% greater population and a police department that had 80% more officers than currently. There were 113% more City employees and the City budget was 1.9 billion dollars or almost twice as much as today. In 1990 the City of Detroit had a budget deficit of 182 million (Detroit News, April 26, 1990). Chapter 9 only offers fiscal relief through debt adjustment. It's not designed to enact structural reform of city government.

The concepts of fiscal insolvency and service insolvency may overlap, but they're not equivalent. If they were, every problem could be solved through increased government spending. But even if they were equivalent, the law rarely provides positive rights, at least not ones that are constitutionally protected.

There is no legal basis for residents claiming an entitlement to a certain number of officers or fire-fighters per citizens. As morally compelling are residents "right" to adequate services even with an agreed upon meaning courts are powerless to act. In order to fund improved public services, the City cannot be forced to sell assets no matter how "non-core." However, the public outrage of allowing debtors to maintaining opulent homesteads while not paying legal entitled creditors led to the state of Florida reworking their property exemption statute which provided an unlimited homestead exemption. Among the many well publicized abuses was actor Burt Reynolds who was able to keep his 2.5 million dollar home while his creditors received 20 cents on the dollar. It is irreconcilable with feasibility, to allow the City to retain "non-core" assets that are not being monetized or the value of which is not being maximized. This is the same peril that the City faces if they fail to fully monetize valuable assets that would otherwise inure to the benefit of both City creditors and residents.

While the objectors are reluctant to see, the DIA, one of the finest assets of the city lost, and with it, some of the City's potential to attract reinvestment and revival, it is more painful to watch how many people outside of the City seem to care more about losing the art than the general condition of the City or the number of children living in poverty. One letter to an op-ed page put it this way: "It's 2013, and there are Whistlers, Van Goghs and Caravaggios' in Detroit. A few of them are hanging in a trophy case called the Detroit Institute of Arts. But many more are sleeping in a kindergarten classroom because they didn't eat breakfast."

14

The moral hazard of punishing creditors, that loaned the City money expecting a return and retirees who labored for years based on promises the City is now attempting to default on, is that when a City financially fails due to its own ineptness, a bankruptcy where the City is enabled to keep valuable assets and is bailed out by its retirees is morally reprehensible because it rewards the City for its own failures.

On the most superficial level, the City has failed to establish the feasibility of the Plan because both its projected future revenues and projected future expenses are tenuous, obtuse and the does not remedy, and in fact is a continuation, of the City's last thirty years of insidious mismanagement and "worse practices." The City's Plan has failed to establish feasibility.

**C. MISCELLANEOUS**

1. <u>The Site Tour Provide the Court with Inaccurate Information</u>

At the 21:11 time mark on the video-recording, the bus turns onto Trinity from Pickford and the narrator says we are now in Brightmoor. This was several miles away from the nearest "Brightmoor" boundary. When the bus turned on Burt Road at 8 Mile, the narrator stated "we are almost to Brightmoor." At that point the bus was approximately 3 miles from the northern-most border of Brightmoor. This reinforces the previous objection filed that the tour would be out of context and more prejudicial than probative. Since much of it was not captured either by the video or narration (e.g., 50 minutes edited of a three hour tour) it is impossible to tell what other misinformation was provided to the Court.

**III. RESERVATION OF RIGHTS**

The objectors reserve all rights to object to the Plan on any and all grounds, including, without limitation, those not mentioned in this Objection.

15

## IV. CONCLUSION

For all of the foregoing reasons, the objectors request that the Court deny confirmation of the Plan, or grant such other and further relief that protects the objector's substantive and procedural rights or that the Court deems appropriate under the circumstances.

/s/ Jamie S. Fields
Jamie S. Fields (P-52808)
555 Brush #2409
Detroit, Mich. 48226
(313) 570-3906

Date: August 11, 2014