**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

------------------------------------------------------x
                                         :

In re                              :         Chapter 9
                                           :

CITY OF DETROIT, MICHIGAN,      :         Case No. 13-53846
                                         :

                         Debtor.     :         Hon. Steven W. Rhodes
                                         :

                                           :
------------------------------------------------------x

## COVER SHEET FOR MOTION TO USE CASH
## COLLATERAL OR TO OBTAIN CREDIT

       The debtor has filed a motion to obtain postpetition financing, which is attached to this Cover Sheet.  In accordance with LBR 4001-2(b) (E.D.M.), the debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ Yes<br><br>_X_ No | |

| | | |
|---|---|---|
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>__X_ No | |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | _____ Yes<br><br>__X__No | |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _____ Yes<br><br>___X__No | |
| (5) Provisions that prime any lien without that lienholder's consent. | ___X_ Yes<br><br>__ __ No | Page 19-20, ¶¶7-8 |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes<br><br>__X___ No | |

| | | |
|---|---|---|
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | _____ Yes<br><br>__X__ No | |
| (8) Provisions for the payment of prepetition debt. | __X__ Yes<br><br>____ No | Page 11, ¶F(ii) |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X__ No | |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br><br>__X__ No | |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | __X__ Yes<br><br>____ No | Page 30, ¶25 |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes<br><br>__X__ No | |

| | | |
|---|---|---|
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | _____ Yes<br><br>__X__ No | |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br><br>___X__ No | |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br><br>__X___ No | |
| (16) Provisions that purport to bind a subsequent trustee. | _____ Yes<br><br>__X_ No | |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X___ Yes<br><br>_____ No | Page 31, ¶27 |

Dated: August 11, 2014          Respectfully submitted,


                                /s/ Jonathan S. Green
                                Jonathan S. Green (MI P33140)
                                Stephen S. LaPlante (MI P48063)
                                MILLER, CANFIELD, PADDOCK AND
                                STONE, P.L.C.
                                150 West Jefferson
                                Suite 2500
                                Detroit, Michigan 48226
                                Telephone: (313) 963-6420
                                Facsimile: (313) 496-7500
                                green@millercanfield.com
                                laplante@millercanfield.com

                                David G. Heiman (OH 0038271)
                                Heather Lennox (OH 0059649)
                                JONES DAY
                                North Point
                                901 Lakeside Avenue
                                Cleveland, Ohio 44114
                                Telephone: (216) 586-3939
                                Facsimile: (216) 579-0212
                                dgheiman@jonesday.com
                                hlennox@jonesday.com

                                Brad B. Erens
                                David A. Hall
                                JONES DAY
                                77 West Wacker
                                Chicago, Illinois 60601
                                Telephone: (312) 782-3939
                                Facsimile: (312) 782-8585
                                bberens@jonesday.com


                                ATTORNEYS FOR THE CITY

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
                                             :

In re                                  :          Chapter 9
                                             :

CITY OF DETROIT, MICHIGAN,     :          Case No. 13-53846
                                           :

                      Debtor.        :          Hon. Steven W. Rhodes
                                           :

                                             :
-------------------------------------------------------x

## MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 <u>APPROVING SETTLEMENT OF CONFIRMATION OBJECTIONS</u>

# TABLE OF CONTENTS

**Page**

Background…………………………………………………………………..........3

I.    Treatment of Existing DWSD Bonds Under City's Plan of Adjustment.......................... 3

II.   Tender & Proposed Settlement ..................................................................................... 7

III.  Intended Use of Proceeds of the DWSD Revenue Financing........................................ 18

IV.   Summary of the Material Terms of the Financing......................................................... 21

      A.    Public Offering.................................................................................................. 21

      B.    Direct Purchase ................................................................................................ 26

V.    Necessary Approvals for Proposed DWSD Financing Transactions.............................. 32

Basis for Relief ………………………………………………………………………35

I.    DWSD Revenue and Revenue Refunding Financing .................................................... 35

      A.    Financing Consistent with State Law ............................................................... 39

      B.    Existing DWSD Bonds Are Adequately Protected............................................ 42

II.   The Settlement .............................................................................................................. 52

# TABLE OF AUTHORITIES

**Page**

CASES

Bard v. Sicherman (In re Bard),
    49 F. App'x 528 (6th Cir. 2002)......................................................................52, 53

Baybank–Middlesex v. Ralar Distributors, Inc.,
    69 F.3d 1200 (1st Cir. 1995)..................................................................................49

Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.),
    789 F.2d 1085 (4th Cir. 1986) ..............................................................36, 37, 38, 42

Case v. Los Angeles Lumber Prods. Co.,
    308 U.S. 106 (1939)..............................................................................................52

Engman v. Boyd,
    No. 09-CV-151, 2009 WL 1974460 (W.D. Mich. July 6, 2009) . Bankruptcy ......................52

Fishell v. Soltow (In re Fishell),
    47 F.3d 1168, 1995 WL 66622 (6th Cir. 1995) .......................................................53

Hindelang v. Mid-State Aftermarket Body Parts Inc. (In re MQVP, Inc.),
    477 F. App'x 310 (6th Cir. 2012)...........................................................................53

In re Ames Dep't Stores, Inc.,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)................................................................35, 42

In re Crouse Group, Inc.,
    71 B.R. 544 (Bankr. E.D. Pa. 1987) ......................................................................36

In re Dow Corning Corp.,
    192 B.R. 415 (Bankr. E.D. Mich. 1996).................................................................53

In re Drexel Burnham Lambert Grp., Inc.,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991)....................................................................53

In re Dunes Casino Hotel,
    69 B.R. 784 (Bankr. D. N.J. 1986) ...................................................................37, 38

In re Fodale,
    No. 10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013)......................53

In re Helionetics,
  70 B.R. 433 (Bankr. C.D. Ca. 1987) ........................................................................49

In re Hibbard Brown & Co.,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) .......................................................................54

In re Lee Way Holding Co.,
  120 B.R. 881 (Bankr. S.D. Ohio 1990) ....................................................................54

In re Mellor,
  734 F.2d 1396 (9th Cir.1984) ..................................................................................49

In re Ritz Theatres, Inc.,
  68 B.R. 256 (Bankr. M.D. Fla. 1987) .......................................................................49

In re Sky Valley, Inc.,
  100 B.R. 107 (Bankr. N.D. Ga. 1988) ..............................................................36, 38

In re Swedeland Dev. Group, Inc.,
  16 F.3d 552 (3d Cir. 1994) (en banc) ......................................................................38

LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.),
  841 F.2d 159 (7th Cir. 1987) ...................................................................................53

Lyndon Prop. Ins. Co. v. Katz,
  196 F. App'x 383 (6th Cir. 2006) .............................................................................52

Official Comm. of Unsecured Creditors v. James Talcott, Inc. (In re Int'l Distrib.
  Ctrs., Inc.),
  103 B.R. 420 (S.D.N.Y. 1989) .................................................................................54

Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC),
  728 F.3d 567 (6th Cir. 2013) ...................................................................................53

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
  Anderson,
  390 U.S. 414 (1968) .................................................................................................52

Rankin v. Dault (In re Rankin),
  396 B.R. 203 (E.D. Mich. 2008), aff'd on other grounds sub nom. Rankin v.
  Brian Lavan & Assocs., P.C. (In re Rankin), 438 F. App'x 420 (6th Cir. 2011) ....52

Reynolds v. Comm'r,
  861 F.2d 469 (6th Cir. 1988) ...................................................................................52

Shaw Indus., Inc. v, First Nat'l Bank of PA (In re Shaw Indus., Inc.),
300 B.R. 861 (Bankr. W.D. Pa. 2003) ....................................................................37

Stark v. Moran (In re Moran),
385 B.R. 799, 2008 WL 1766874 (B.A.P. 6th Cir. 2008), appeal dismissed for
lack of standing, 408 B.R. 698 (B.A.P. 6th Cir. 2009) ...........................................52

Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert
Grp., Inc.),
134 B.R. 499 (Bankr. S.D.N.Y. 1991) .....................................................................53

STATUTES

11 U.S.C. § 364(d)(2) ...........................................................................................................37

11 U.S.C. § 364(e) .................................................................................................................50

11 U.S.C. § 921(e) .................................................................................................................50

11 U.S.C. § 928.........................................................................................................................7

11 U.S.C. § 943(b) ...................................................................................................................7

11 U.S.C. § 943(b)(7) ..............................................................................................................7

11 U.S.C. § 1129(b)(2) .............................................................................................................6

28 U.S.C. §§ 157 and 1334 ......................................................................................................3

28 U.S.C. § 157(b)(2) ...............................................................................................................3

28 U.S.C. §§ 1408 and 1409 ....................................................................................................3

MCL § 141.121 ......................................................................................................................48

MCL § 141.1552(u) ...............................................................................................................32

MCL § 141.1559(1) ...............................................................................................................32

MCL § 141.1559(2) ...............................................................................................................33

**OTHER AUTHORITIES**

Administrative Consent Order No. ACO-000131 .........................................................19

Fed. R. Bankr. P. 1007(d) ...............................................................................................61

Fed. R. Bankr. P. 2002 (m) .............................................................................................61

Fed. R. Bankr. P. 9019.............................................................................................2, 3, 52

Fed. R. Bankr. P. 9019(a) ................................................................................................52

Fed. R. Bankr. P. 9019(a) ................................................................................................52

Local Rule 4001-1(b) .......................................................................................................25

Local Rule 4001-2(b) .......................................................................................................25

Local Rule 9014-1 ............................................................................................................60

Local Rule 9014-1(g) .......................................................................................................62

## **Introduction**

1. The City of Detroit, Michigan ("<u>Detroit</u>" or the "<u>City</u>"), as debtor in the above-captioned case, hereby moves the Court, pursuant to 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928, Rules 2002, 4001, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Local Rules</u>"), for a final order:

(a) authorizing the City and Detroit Water and Sewerage Department ("<u>DWSD</u>"), a department of the City, to (i) issue, via a public offering, direct purchase or a private placement, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds (collectively, the "<u>2014 DWSD Revenue and Revenue Refunding Bonds</u>") as described in the term sheets attached hereto collectively as <u>Exhibit 6</u> (the "<u>Financing Term Sheets</u>") and pursuant to an order substantially in the form attached hereto as <u>Exhibit 1</u> (the "<u>Proposed Order</u>") that, if approved, would provide DWSD with secured financing in an aggregate amount not to exceed $5,500,000,000 (the "<u>DWSD Revenue and Revenue Refunding Financing</u>"); and (ii) perform such other and further acts as may be contemplated by, or required in connection with the financing documentation to be executed in connection with the DWSD Revenue and Revenue Refunding Financing (the "<u>Financing Documents</u>");

(b) authorizing the granting of automatically attached and perfected security interests in and liens upon the Pledged Assets (as defined below) in the manner, and on the terms, described below and in the Financing Term Sheets, and as otherwise provided in the Proposed Order; and

(c) approving a settlement, to be effective if and when the Tender Offer Financing (as defined below) closes (the "<u>Settlement</u>"), by and among the DWSD Settlement Parties (as defined below)

(i) establishing the treatment of water and sewer bond claims under the City's plan of adjustment and (ii) resolving certain objections to the City's plan of adjustment on the terms and conditions set forth in the term sheet attached hereto as Exhibit 7 (the "Assured Insurance Commitment Term Sheet") as further described herein.

2.     The DWSD Revenue and Revenue Refunding Financing will consist of (a) an amount not to exceed $190,000,000 in capital improvement financing (the "DWSD Revenue Financing"), which will be used to make essential capital improvements to the City's sewage disposal system as required under state and federal law as more fully described below; and (b) a tender offer financing (the "Tender Offer Financing"), in an amount up to $5,310,000,000, which will be used to (i) finance the City's purchase for cancellation of certain water and sewer bonds that have been tendered and accepted in connection with a pending invitation to tender (the "Tender") to the holders of the City's outstanding water and sewer bonds and, potentially, (ii) refund through optional redemption certain outstanding water and sewer bonds of the City, all as described in greater detail below.

3.     In support of this Motion, the City has filed herewith the (a) Declaration of Lee Donner in Support of the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (the "Donner Declaration") attached hereto as Exhibit 5A; (b) Declaration of Nicolette

Bateson in Support of the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (the "Bateson Declaration") attached hereto as Exhibit 5B; and (c) Declaration of David Brownstein in Support of the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (the "Brownstein Declaration") attached hereto as Exhibit 5C.  In further support of this Motion, the City respectfully represents as follows:

## Jurisdiction

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

## I.      Treatment of Existing DWSD Bonds Under City's Plan of Adjustment

5.      Currently, DWSD has approximately $1.8 billion of outstanding senior lien sewer bonds and $945 million of outstanding second lien

sewer bonds. DWSD has approximately $1.8 billion of outstanding senior lien water bonds and $629 million of outstanding second lien water bonds.

6.    The City's existing water and sewer bonds (collectively, and excluding State Revolving Fund bonds, the "Existing DWSD Bonds") are secured, along with the State Revolving Funds bonds, by a statutory lien on DWSD's "Pledged Assets." "Pledged Assets" consist of: (i) Net Revenues;[1] (ii) the funds and accounts established by or pursuant to the Ordinances (as defined below) except for the Operation and Maintenance Fund and the Construction Fund (each as defined in the Ordinances) and any account thereof; (iii) investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and (iv) any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue. See Amended and Restated Ordinance No. 18-01 Sewer Ordinance at §II.1 (attached hereto as Exhibit 11); Amended and Restated Ordinance No. 01-05 Water Ordinance at §1 (attached hereto as Exhibit 12).

---

[1]    "Net Revenues" are "Revenues" except for those transferred to the Operation and Maintenance Fund (as defined in the Ordinances). See Amended and Restated Ordinance No. 18-01 at §II.1; Amended and Restated Ordinance No. 01-05 Water Ordinance at §1. "Revenues" are defined as revenues of the City derived from the systems, which include hedge receivables and income earned on investments. See id.

7.     The City's corrected fifth amended plan of adjustment (as it may be further amended, modified or supplemented, the "Plan") filed with this Court on July 29, 2014 [Docket No. 6379] currently classifies claims (each, an "Existing DWSD Bond Claim") arising with respect to the Existing DWSD Bonds into Classes 1A through 1C.

8.     Class 1A consists of 337 individual classes of Existing DWSD Bonds divided by CUSIP.  Claims classified in certain classes set forth on Exhibit I.A.121 to the Plan comprising Class 1A are impaired.  Claims classified in Classes 1B and 1C are unimpaired.  The direct economic savings to the City and DWSD if the City and DWSD are successful at impairing Class 1A claims under the Plan could be as high as approximately $225 million under certain circumstances on a present value basis over the remaining life of the impaired bonds (23 years).[2]

9.     The deadline for the holders of impaired claims to vote to accept or reject the Plan was July 11, 2014.  Holders of unimpaired claims in

---

[2]     These figures reflect only the savings DWSD would realize as a result of resetting interest rates in respect of certain impaired Existing DWSD Bonds under the Plan, the holders of which rejected the Plan.  These figures do not, however, reflect any savings that DWSD could realize as a result of the elimination of call protection under certain of the documents governing impaired Existing DWSD Bonds, and in particular, savings that could be generated from refinancing such bonds prior to their stated maturity at lower interest rates and without penalty.  These figures also do not reflect the incremental cost of future financings that would be incurred by DWSD pending a recovery of DWSD's credit rating.

Classes 1B and 1C were not entitled to vote on the Plan and were deemed to have accepted the Plan. The impaired classes in Class 1A, however, were solicited to vote, and most voted to reject the Plan.

10. Various parties (the "DWSD Objecting Parties") with an interest in Existing DWSD Bonds also raised objections to the Plan (the "DWSD Plan Objections"). The DWSD Plan Objections are as follows:

| Objecting Party | Docket Reference |
|---|---|
| U.S. Bank National Association as DWSD Bond Trustee | Docket No. 4647, supplemented by Docket No. 5705 |
| Berkshire Hathaway Assurance Corporation | Docket No. 4657 |
| National Public Finance Guarantee Corporation | Docket No. 4665, supplemented by Docket No. 5703 |
| Ad Hoc Committee of DWSD Bondholders | Docket No. 4671, supplemented by Docket No. 5705 |
| Assured Guaranty Municipal Corp. | Docket No. 4674, supplemented by Docket No. 5704 |
| Financial Guaranty Insurance Company | Docket No. 4660 |

11. Many of the DWSD Plan Objections asserted that the treatment of Existing DWSD Bond Claims under the Plan is not "fair and equitable" under 11 U.S.C. §1129(b)(2), in that the Plan does not give the bondholders the present value of their claims, impermissibly modifies the call protections of existing bonds, and does not provide the "indubitable equivalent" value mandated for such secured claims. Similarly, certain DWSD Plan Objections asserted that the Plan treatment

does not satisfy the "best interests of creditors" test under 11 U.S.C. §943(b)(7)

because bondholders do not receive under the Plan what they could reasonably

expect under the circumstances and that such bondholders could have enhanced

recovery outside of Chapter 9. Other DWSD Plan Objections argued that the Plan

impermissibly impairs or strips liens on special revenues in violation of

11 U.S.C. § 928. Additionally, certain DWSD Plan Objections claimed that the

Plan does not satisfy the requirements of 11 U.S.C. § 943(b) because the Plan

(a) requires the issuance of securities that do not comply with Michigan law, (b) is

not conditioned on requisite regulatory approvals, (c) violates Michigan law

regarding the use of DWSD's "Revenues" or (d) otherwise does not comply with

Michigan or federal bankruptcy law.[3]

## II.    Tender & Proposed Settlement

12.    On August 7, 2014, the City, acting through the DWSD,

launched the Tender for all Existing DWSD Bonds. The material terms of the

Tender are described in the invitations to tender, each dated August 7, 2014

(collectively, the "Tender Invitations"), sent to holders of Existing DWSD Bonds.

The Tender Invitations and their accompanying disclosure statements are

collectively attached hereto as Exhibits 8A and 8B, respectively.

---

[3]    This paragraph is a summary of certain arguments set forth in the DWSD Plan
Objections and is not inclusive of all arguments raised therein.

13.     Each series of Existing DWSD Bonds and related CUSIPs and the associated proposed tender purchase price are set forth on Schedule A to the applicable Tender Invitation.  The period to tender Existing DWSD Bonds closes at 5:00 p.m. (Eastern Time) on August 21, 2014 (the "Tender Expiration Date").

14.     The Tender is the result of negotiations among the City (including DWSD), providers of bond insurance for certain of the Existing DWSD Bonds (the "DWSD Bond Insurers"),[4] the Ad Hoc Committee of DWSD Bondholders (the "Ad Hoc Committee")[5] and U.S. Bank National Association ("DWSD Trustee"), as trustee for the Existing DWSD Bonds.  All of the foregoing parties except for National are collectively referred to herein as the "DWSD Settlement Parties".

15.     The Tender is an effort to achieve long-term savings for DWSD in connection with the Existing DWSD Bonds in a consensual manner in advance of any ruling on confirmation of the Plan.  The confirmation hearing is scheduled to commence on August 21, 2014.  The Tender and the DWSD Revenue and

---

[4]   The DWSD Bond Insurers include: Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"), Berkshire Hathaway Assurance Corp. ("BHAC"), Financial Guaranty Insurance Company ("FGIC") and National Public Finance Guaranty Corp. ("National")

[5]   The Ad Hoc Committee consists of Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisors, Inc. and Nuveen Asset Management.

Revenue Refunding Financing encompass a series of interrelated agreements and transactions among the parties that, when taken together and if accepted by the City, will result in a restructuring of DWSD's capital structure producing significant economic savings for DWSD and, upon closing of the Tender on the Settlement Date (defined below), the resolution of all of the DWSD Plan Objections (including the objection of National). The parties thus believe that the Tender and the Settlement will result in streamlining the upcoming confirmation hearing.[6]

16. In addition to the Tender itself, the Settlement consists of the following terms:

**Potential Acceptance of Tender**

— If, in the City's sole discretion, a sufficient amount of the Existing DWSD Bonds are tendered on or prior to the Tender Offer Expiration Date, such that DWSD will achieve economic savings from the tender acceptable to DWSD and the City, the City will accept the tender of such Existing DWSD Bonds (upon acceptance by the City, the "Tendered Bonds"), subject to receiving acceptable pricing in the market for the 2014 DWSD Revenue and Revenue Refunding Bonds;

— Each member of the Ad Hoc Committee will tender a significant portion of their respective impaired Existing DWSD Bonds;

---

[6] Oakland County [Docket No. 4627], Wayne County [Docket No. 4663] and Macomb County [Docket No. 4636] (the "County Objectors") have also filed DWSD-related objections to the Plan. The City submits that the County Objectors do not have standing to object to the Plan and that such objections otherwise have no merit.

— The other provisions of the Assured Insurance Commitment Term Sheet set forth on <u>Exhibit 7</u> will be implemented[7];

**Financing the Tender**

— To the extent that the City accepts the Tendered Bonds, and following entry of the Proposed Order as requested herein, the City will issue 2014 Revenue and Revenue Refunding Bonds either through a private placement or direct purchase (a "<u>Direct Purchase</u>") or a public offering (a "<u>Public Offering</u>") through the Michigan Finance Authority (the "<u>MFA</u>"), certain proceeds of which will be used by the City to finance the purchase or optional redemption of the Tendered Bonds (the date of such closing, the "<u>Settlement Date</u>");

— The City will request that the Court find that the pledge of DWSD "Net Revenues" as security for the 2014 DWSD Revenue and Revenue Refunding Bonds constitutes a "lien" on "special revenues" as contemplated by sections 101(37), 902(2), 922(d) and 928 of the Bankruptcy Code;

— On the Settlement Date (i) the City will file an amended Plan (the "<u>Amended Plan</u>") that renders unimpaired the Existing DWSD Bond Claims within the meaning of section 1124 of the Bankruptcy Code, and (ii) the DWSD Plan Objections will be deemed to be withdrawn;

**Plan of Adjustment Matters**

— The City and the DWSD Objecting Parties have agreed that, with respect to DWSD's contributions to the GRS pension plan: (i) DWSD shall pay as operation and maintenance expenses, to be allocated between the Sewage Disposal System and the Water Supply System, no more than the sum of (a) $24 million per annum; and (b) DWSD's allocable share of its annual "defined contribution" payments related to the DWSD employees; and (ii) DWSD shall pay the difference between the annual allocation of the Plan GRS pension contributions provided in the Plan and $24 million from a "pension liability

---

[7] To the extent there is any conflict between the relief requested herein or the Proposed Order and the Assured Insurance Commitment Term Sheet, the provisions of the Assured Insurance Commitment Term Sheet shall govern.

payment fund" that is funded after payments required to be made into the SRF Junior Lien Bond and Interest Redemption Fund established and defined in the Bond Documents and on a subordinated basis to the 2014 DWSD Revenue and Revenue Refunding Bonds and all other existing bond debt. All parties have agreed that this accounting treatment shall not constitute "impairment" of the Existing DWSD Bonds or the Existing DWSD Bond Claims in respect thereof;

— Following the filing of the Amended Plan, the City will not thereafter amend, supplement or otherwise modify the Amended Plan, or participate in, support or acquiesce to any such amendment, supplement or modification (including any motion for an order seeking such amendment, supplement or modification) of the Amended Plan that would result in the impairment of any Existing DWSD Bond Claim;

## New DWSD Bond Insurance

— Assured will commit to insure the 2014 DWSD Revenue and Revenue Refunding Bonds (the insurance policies to be issued, the "2014 DWSD Refunding Bonds Insurance Policies") in an amount not less than the principal amount of the outstanding Assured-insured Tendered Bonds. Specifically Assured has committed to insure:

(i) The portion of the 2014 DWSD Revenue and Revenue Refunding Bonds which are senior lien DWSD Sewage Disposal System Revenue Refunding Bonds in a principal amount not less than the principal amount of the outstanding Assured-insured senior lien DWSD Sewage Disposal System Revenue and Revenue Refunding Bonds tendered and refunded in conjunction with the tender offer contemplated by the Disclosure Statement Relating to Invitation to Tender Bonds $2,750,800,000, City of Detroit Michigan, Detroit Water and Sewerage Department Sewage Disposal System Bonds Consisting of $1,805,620,000 Revenue and Revenue Refunding Senior Lien Bonds and $945,180,000 Revenue Refunding Second Lien Bonds,

(ii) The portion of the 2014 DWSD Revenue and Revenue Refunding Bonds which are senior lien DWSD Water Supply System Revenue Refunding Bonds in a principal amount not less than the principal amount of the outstanding Assured-insured senior lien DWSD Water

Supply System Revenue and Revenue Refunding Bonds tendered and refunded in conjunction with the tender offer contemplated by the Disclosure Statement Relating to Invitation to Tender Bonds $2,433,140,000 City of Detroit Michigan, Detroit Water and Sewerage Department Water Supply System Bonds Consisting of $1,803,940,000 Revenue Refunding Senior Lien Bonds and $629,200,000 Revenue Refunding Second Lien Bonds, and

(iii) The portion of the 2014 DWSD Revenue and Revenue Refunding Bonds which are senior lien 2014 Sewer Refinancing Bonds in an amount not less than the principal amount of the outstanding Assured-insured junior lien Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue and Revenue Refunding Bonds tendered and refunded in conjunction with the tender offer;

## New DWSD Surety Policies

— Assured will agree to deliver debt service reserve fund ("DSRF") surety insurance policies (the "2014 DWSD Refunding Bonds Surety Policies" and together with the 2014 DWSD Refunding Bonds Insurance Policies, collectively, the "Assured Policies") as to reserve accounts that secure exclusively the Assured-insured 2014 DWSD Revenue and Revenue Refunding Bonds in a principal amount equal to the DSRF requirement (subject to a limit of $70 million of additional surety coverage). The coverage available as to each surety shall amortize ratably with the amortization of the series of 2014 DWSD Revenue and Revenue Refunding Bonds that it secures and shall also be reduced proportionately to the extent the series of 2014 DWSD Revenue and Revenue Refunding Bonds so secured by the DSRF policy is defeased or redeemed prior to scheduled amortization. Subject to the next sentence, Assured will charge as a premium for each 2014 DWSD Refunding Bonds Surety Policy 15% of the initial face amount of any DSRF surety, payable upon delivery. With respect to any 2014 DWSD Refunding Bonds Surety Policy for a DSRF with respect to any Assured-insured 2014 DWSD Revenue and Revenue Refunding Bonds the proceeds of which are applied to the payment of the tender price or refunding of DWSD bonds insured by BHAC (any such bonds tendered, the "Berkshire Bonds"), Assured's premium will be reduced from 15% by .75% for each $50 million of Berkshire Bonds that are tendered/refunded subject to a floor of 10%. Therefore,

if at least $50 million but less than $100 million of Berkshire Bonds are tendered the Assured surety premium will be 14.25%; if at least $100 million but less than $150 million of Berkshire Bonds are tendered, the Assured surety premium will be 13.50%; if at least $150 million but less than $200 million of Berkshire Bonds are tendered, the Assured surety premium will be 12.75%; if at least $200 million but less than $250 million of Berkshire Bonds are tendered, the Assured DSRF surety premium will be 12%; if at least $250 million but less than $300 million of Berkshire Bonds are tendered, the Assured surety premium will be 11.25%; if at least $300 million but less than $350 million of Berkshire Bonds are tendered, the Assured surety premium will be 10.50%; and if at least $350 million of Berkshire Bonds are tendered, the Assured surety premium will be 10.00%. In no event shall the premium for any 2014 DWSD Refinancing Bonds Surety Policy be less than 10% of the original face amount of the surety;

## Professional Fee Reimbursements

— DWSD will reimburse the professional fees and expenses (the "Resolved DWSD Fee Claims") of certain of the DWSD Settlement Parties[8] incurred in connection with the DWSD claims in the City's chapter 9 case, as follows:

(i)     To Assured, $3,000,000

(ii)    To the Ad Hoc Committee, $1,200,000

(iii)   To FGIC, $550,000[9]

---

[8]   The City has been unable to resolve the professional fee claims of National. The City will be filing a separate motion to establish procedures for resolving these claims. BHAC is not asserting a professional fee claim.

[9]   The amounts set forth in (i)-(iii) do not contain any "success fees" for any DWSD creditor financial advisor and DWSD has not agreed to pay any such success fees. If any financial advisor for a non-settling bond insurer is paid a success fee, FGIC reserves its right to request the same treatment for its financial advisor. The total fee claims asserted by all of the DWSD Objecting

(iv) With respect to the fee and expense claim (the "DWSD Trustee Fee Claim") of the DWSD Trustee, which includes its extraordinary fees and expenses as trustee and the fees and expenses of professionals engaged in connection with the extraordinary services it has performed, the parties have agreed to a range with respect to amount and a binding arbitration process that establishes the parameters for resolving the DWSD Trustee Fee Claim within that range.  In that regard, the City and DWSD Trustee have agreed as follows:

(a) The DWSD Trustee Fee Claim will be established in an amount not less than $2.25 million and not more than $5.75 million (the "DWSD Trustee Fee Claim Range"), inclusive of amounts received or held by the DWSD Trustee.  Fees and expenses incurred by the DWSD Trustee relating to the Tender as well as fees and expenses unrelated to the chapter 9 case are not included in the DWSD Trustee Fee Claim Range and will be paid in the ordinary course by DWSD to the DWSD Trustee.  Bankruptcy-related fees, that are not related to the Tender and that are incurred by the DWSD Trustee through the conclusion of the confirmation hearing set to commence on August 21, 2014, are subject to the DWSD Trustee Fee Claim Range.

(b) The DWSD Trustee Fee Claim will be resolved in binding arbitration (the "DWSD Trustee Fee Claim Arbitration").  The arbitrator will be selected by the parties no later than August 26, 2014 and is to be a person with experience in both municipal finance and bankruptcy.  If the parties cannot agree on an arbitrator, DWSD and the DWSD Trustee will each submit two individuals with the requisite experience to Judge Elizabeth Perris and Judge Gerald Rosen (the federal mediators in this case) who, in turn, will select the arbitrator.

---

Parties approximates $30 million to the best of the City's information and belief.

(c)     DWSD and the DWSD Trustee will evenly split the cost of the DWSD Trustee Fee Claim Arbitration.

(d)     Subject to the arbitrator's time and availability, the parties agree to conclude the DWSD Trustee Fee Claim Arbitration before November 30, 2014.  Upon entry of the fee award by the arbitrator, DWSD will promptly pay the amount of the award to the DWSD Trustee.

(e)     As part of the DWSD Trustee Fee Claim Arbitration, the City and DWSD will release the DWSD Trustee from any claims related to the fees and expenses incurred by the DWSD Trustee through the date of the DWSD Trustee Fee Claim Arbitration.

(f)     The DWSD Trustee Fee Claim Arbitration will be the exclusive means for DWSD to resolve disputes regarding the DWSD Trustee Fee Claim. The DWSD Trustee, its professionals, and the DWSD Trustee Fee Claim will no longer be subject to the Fee Review Order, dated September 11, 2013 [Docket No. 810], as amended by the Order Amending and Clarifying Fee Review Order of September 11, 2013 [Docket No. 5150], or the Order Appointing Fee Examiner, dated August 19, 2013 [Docket No. 383], as these orders may be further amended.  The parties and the Bankruptcy Court will accept, conclusively, the arbitrator's final award as reasonable and otherwise satisfactory to the requirements of Section 943(b)(3) of the Bankruptcy Code.  Neither DWSD nor the City will file a disgorgement motion or seek to litigate fees and costs in a manner that is inconsistent with the DWSD Trustee Fee Claim Arbitration.

17.     The City (through the Board of Water Commissioners and the Emergency Manager) will decide whether to accept for purchase and cancellation Tendered Bonds no later than August 22, 2014.  The City proposes to have this Motion heard by the Court on August 25, 2014 or as soon thereafter as the Court's

calendar permits. Assuming approval of this Motion on this time frame, the 2014

DWSD Revenue and Revenue Refunding Bonds will be priced in the public

market on or about August 26, 2014. The projected Settlement Date to close the

DWSD Revenue and Revenue Refunding Financing and the purchase of the

Tendered Bonds is September 4, 2014. The City would file the Amended Plan on

that date immediately prior to closing.

18. Based on preliminary feedback from certain large institutional

holders of Existing DWSD Bonds, the City is informed and, therefore, believes

that there is sufficient interest in the Tender among bondholders to achieve a

successful result. To the extent consummated, the Tender would facilitate a

consensual restructuring of DWSD's capital structure, while rendering unimpaired

all Existing DWSD Bond Claims and resolving the DWSD Bond Objections to

confirmation of the Plan.

19. Additionally, and perhaps just as importantly from the

perspective of DWSD's long-term liquidity position and capital structure, the

DWSD Revenue and Revenue Refunding Financing will allow DWSD to refinance

the Tendered Bonds with insured and uninsured public debt or, to the extent that

there is any shortfall, with direct purchase financing from Citibank, N.A., together

with one or more additional purchasers, as described below. DWSD will work to

achieve ratings of the 2014 DWSD Revenue and Revenue Refunding Bonds, and

DWSD believes that the 2014 DWSD Revenue and Revenue Refunding Bonds should be investment grade. Moreover, the ratings of the 2014 Revenue and Revenue Refunding Bonds will be further enhanced by the 2014 DWSD Refunding Bonds Insurance Policies and the 2014 DWSD Refunding Bonds Surety Policies. The long-term cost of capital for the publicly-financed bonds should be lower than that of the Existing DWSD Bonds, thus saving DWSD tens of millions of dollars in annual debt service payments in both systems combined.

20. Finally, bond documents for certain of the Existing DWSD Bonds currently require DWSD to maintain sureties and in some cases, significant sums of cash in debt service reserves to protect bondholders against a payment default by the City. In connection with the DWSD Revenue and Revenue Refunding Financing, certain of the existing sureties will be cancelled and certain cash reserves will be released, in an amount that DWSD currently estimates at approximately $50 million. Bateson Dec. ¶ 4. These funds will be applied in accordance with the applicable bond documents and applicable law as a part of the DWSD Revenue and Revenue Refunding Financing, effectively reducing the necessary size of the financing by the amount of released funds, net of the cost of reserve fund compliance under the Ordinances. See Bateson Dec. ¶ 4. These cost savings will also be facilitated by the issuance of the 2014 DWSD Refunding Bonds Insurance Policies and the 2014 DWSD Refunding Bonds Surety Policies

21.     Based on the foregoing, the City believes that approving the

Settlement and DWSD Revenue and Revenue Refunding Financing is in the best

interests of the City (including DWSD), its residents, other users of the water

supply system and sewerage disposal system and all parties in interest in this case.

## III.    Intended Use of Proceeds of the DWSD Revenue Financing

22.     The DWSD Revenue Financing will be used by DWSD to

complete critically needed investments in its sewage disposal system to assist in

keeping the City in compliance with applicable environmental laws and

regulations.  DWSD's long history of failing to comply with requirements of the

Environmental Protection Agency (the "EPA") under the Clean Water Act, 33

U.S.C. § 1251 *et seq.* (the "Clean Water Act") is well documented, most

comprehensively in the myriad of compliance orders (the "Compliance Orders")

issued by the Judge Cox in Case No. 77-71100, United States of America v. City

of Detroit (D. Ct. E.D. Michigan) (the "Oversight Litigation").  The Oversight

Litigation was initiated in 1977 by the federal government to remedy alleged

violations of federal environmental laws and regulations at the DWSD wastewater

treatment plants.

23.     Citing the Department's operational and compliance progress,

on March 27, 2013, the District Court issued an Order closing the Oversight

Litigation but retained limited jurisdiction to enforce the Compliance Orders as necessary.

24. DWSD now operates under NPDES Permit No. MI0022802 issued March 1, 2013 (the "Permit") and Administrative Consent Order No. ACO-000131 between DWSD and the Michigan Department of Environmental Quality, Water Resources Division, dated July 8, 2011 entered in the Oversight Litigation (the "ACO"). Both the Permit and the ACO contain operating, compliance, monitoring and implementation provisions and deadlines, all of which are designed to bring DWSD into compliance with state and federal law.

25. The failure to comply with the Permit and ACO, including key deadlines set forth therein, constitutes a violation of Michigan and, in some cases, federal law. Such violations can constitute grounds for enforcement actions, which can include termination of the Permit, denial of operating permit renewal, the imposition of fines under the ACO (running from $1,000 to $2,000, most of which accrue on a per diem, per violation basis) and the imposition of statutory or equitable remedies by the state and federal governments. Any of these remedies could have a significant and material impact on DWSD's ability to operate the City's sewage disposal system. The ACO is attached hereto for reference as Exhibit 9.

26.     The causes of the City's difficulties with respect to complying with its obligations under applicable law are varied and complicated. Nevertheless, an acute shortage of resources has been a primary contributing factor.  Toward that end, in December 2013, the Board of Water Commissioners for the City approved a five-year "Capital Improvement Plan" for the City's sewage disposal system (as amended on July 9, 2014, and as may be further amended from time to time, the "CIP"), which is intended to ensure that DWSD makes the necessary infrastructure and personnel investments over the life of the CIP in order to remain in compliance with the Permit and ACO.  The CIP is attached hereto as Exhibit 10.

27.     To date, the City has financed its ongoing CIP with proceeds of the Sewage Disposal System Revenue Bonds, federal and State grants and loans and revenues of the Sewage Disposal System.  Over the past ten years, the Department spent approximately $1.7 billion on capital improvements to the Sewage Disposal System.

28.     DWSD needs to continue carrying out the CIP, and the DWSD Revenue Financing is critical to that effort.  DWSD has entered into a number of contracts with vendors to provide certain system improvements, as set forth in the CIP, and construction is underway on many system improvement components. Pursuant to its contracts, DWSD is obligated to make payment for these

improvements pursuant to established contract milestones. Absent incremental financing, DWSD's capital budget will be perilously depleted beginning in October 2014, thus risking DWSD's continued efforts under the CIP to remain in compliance with the Permit and ACO. Failure to comply with the rigid compliance standards set forth in the ACO may result in significant penalties risking DWSD's ability to operate the sewage system for the benefit of the City's residents and other users of the sewerage disposal system.

## IV. Summary of the Material Terms of the Financing

### A. Public Offering

29. The DWSD Revenue and Revenue Refunding Financing will be structured as a Public Offering. Consequently, the pricing of the DWSD Revenue and Revenue Refunding Financing will be established at the time the financing is taken to market, and is not known at this time. Citigroup Global Markets Inc. has been hired by DWSD to act as senior managing underwriter for the transaction.[10] Citi and DWSD have agreed to a fee structure whereby Citi will be paid a fee of 0.1% of the principal amount of the Tendered Bonds to act as the dealer manager

---

[10] As noted, Citigroup Global Markets, Inc. has been hired by DWSD to act as senior managing underwriter for the transaction. Separately, as set forth below, Citibank, N.A. is agreeing to act as purchaser and arranger in the event the DWSD Revenue and Revenue Refunding Financing is to be structured as a Direct Purchase. For purposes of the Motion, the term "Citi" refers to Citigroup Global Markets Inc. or to Citibank, N.A., as the context requires.

in connection with the Tender and an additional fee of 0.3 to 0.4% of the issue amount as an underwriting fee.  <u>See</u> Brownstein Dec. ¶ 5.  Citi's proposed underwriter's discount is well below market averages for public offerings of municipal bonds on both an insured and uninsured basis based upon data compiled by Securities Data Corporation.  <u>See</u> Brownstein Dec. ¶ 6.  Citi's tender fee is well below fees Citi has charged on similarly situated public tender offers and lower than the fees charged by Citi in connection with the Jefferson County bankruptcy case.  <u>See</u> Brownstein Dec. ¶ 6.

30.    First Southwest Company ("<u>First Southwest</u>"), as financial advisor to the DWSD and MFA with respect to the transaction, has incurred fees in the amount of $395,000, charged as a flat rate, in connection with the Tender, and $590,000, charged as a flat rate, in connection with the DWSD Revenue and Revenue Refunding Financing.  First Southwest will also be reimbursed for actual expenses up to $45,000 incurred in respect of the Tender and $48,000 in connection with the DWSD Revenue and Revenue Refunding Financing.  Donner Dec. ¶ 4.

31.    The total fixed costs of fees and expenses expected to be incurred by DWSD in connection with the Tender is approximately $2,443,000. Donner Dec. ¶ 5.  The total fixed costs of fees and expenses expected to be incurred by DWSD in connection with the 2014 DWSD Revenue and Revenue

Refunding Financing is approximately $3,735,000. Donner Dec. ¶ 5. The variable costs of fees and expenses expected to be incurred by DWSD for each of the Tender and the 2014 DWSD Revenue and Revenue Refunding Financing are approximately $2.25 per $1,000 of Tendered Bonds and $3.72 per $1,000 of 2014 Revenue and Revenue Refunding Bonds issued, respectively. See Donner Dec. ¶ 5.

32.     Under the Public Offering, the 2014 DWSD Revenue and Revenue Refunding Bonds would be sold by DWSD to the MFA, and the MFA in turn would sell its bonds to the public market and use the proceeds thereof to purchase the 2014 DWSD Revenue and Revenue Refunding Bonds.

33.     Citi has advised DWSD that the effective interest rates on the 2014 DWSD Revenue and Revenue Refunding Bonds, including uninsured bonds, will not exceed 5.75% (the "Indicative Refunding Interest Rate"), but will likely be lower in light of the public nature of the offering and the bond insurance credit enhancement commitment. Brownstein Dec. ¶ 7. Such a pricing trend is consistent with historical market norms, as publicly offered debt is almost uniformly cheaper than privately placed debt of this type. Brownstein Dec. ¶ 7. The DWSD Revenue and Revenue Refunding Financing is expected to appreciably reduce the DWSD's cumulative debt service in the coming years. See Donner Dec. ¶ 6.

34. The other indicative material terms of the 2014 DWSD

Revenue and Revenue Refunding Bonds are as follows:

| | |
|---|---|
| Public Bond Issuer | Michigan Finance Authority |
| Obligor | Detroit Water and Sewerage Department |
| Purchaser of Obligor Bonds | MFA |
| Offering Method | Public Offering |
| Maximum Par | $5.5 Billion |
| Uses of Proceeds | The proceeds of the 2014 publicly offered bonds will be used to (i) purchase DWSD bonds tendered and accepted for purchase in the Tender Offer, (ii) refund certain other DWSD bonds, (iii) fund new money capital improvements of the sewage disposal system, (iv) fund required reserves, and (v) pay costs of issuance and other expenses. |
| Maturities | The bonds will mature at varying dates not later than 30 years from the date of issuance. The weighted average maturity of the 2014 bonds issued to fund the purchase of tendered bonds and to refund bonds is not expected to be materially longer or shorter than the weighted average maturity of such tendered and repurchased and refunded bonds. |
| Bond Insurance | A portion of the bonds will be insured by bond insurance policies provided by Assured on terms and conditions set forth in the Assured Insurance Commitment Term Sheet and potentially additional bond insurers. |
| Interest Rates | The bonds will bear interest at fixed rates of interest determined at the time of pricing. |

| | |
|---|---|
| Maximum Interest Rate | The bonds will bear interest rate coupons at rates less than or equal to 5.75%, including on uninsured bonds. |
| Reserve Funds | In connection with the issuance of the bonds, DWSD will fund debt service reserve funds at levels that meet the levels required by DWSD's bond indenture. A portion of this requirement is expected to be met by the provision of debt service reserve Surety policies provided by Assured on terms and conditions set forth in the Assured Insurance Commitment Term Sheet and potentially additional bond insurers. |
| Anticipated Pricing Date | August 26, 2014 |
| Anticipated Sale Date | August 27, 2014 |
| Anticipated Settlement Date | September 4, 2014 |

35.     Pursuant to Local Rule 4001-1(b), the Net Revenues of the City's water and sewer systems, collectively, were approximately $441 million in Fiscal Year 2013.  Based on preliminary, unaudited data, DWSD anticipates that Net Revenues in Fiscal Year 2014 will exceed $441 million.  The City believes this sum is a good faith estimate of the value of the Pledged Assets that serve as security for the 2014 DWSD Revenue and Revenue Refunding Bonds.[11]

---

[11]     Additionally, in compliance with Local Rule 4001-2(b), this Motion has been filed with a "Cover Sheet for Motion to use Cash Collateral or Obtain Financing," based on the form cover sheet located on this Court's website.

## B. Direct Purchase

36. Alternatively, to the extent that the City determines the Public Offering is not in the best interests of the City, the City is not satisfied with the participation in the Public Offering through the MFA, or if the Public Offering does not generate sufficient proceeds to purchase all of the bonds tendered, Citibank, N.A. has agreed to act as lead arranger for a direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds. The material terms of the Citi proposal are summarized as follows:

| Issuer | Michigan Finance Authority ("MFA") or City of Detroit (the "City"), through its Detroit Water and Sewerage Department ("DWSD" or "the Obligor") |
|---|---|
| Obligor | Detroit Water and Sewerage Department |
| Purchasers | Citibank, N.A. and other financial institutions to be determined |
| Purpose | Proceeds of the Floating Rate Note Facility ("Notes") to be used to (i) to provide financing for the tender and current refunding of certain outstanding DWSD bonds and an amount not to exceed $190 million new money sewer bonds and (ii) fund certain expenses, required reserves and costs of issuance associated with the Notes. (collectively, the "2014 DWSD Refinancing Bonds") |
| Security | The Notes will be structured on parity with outstanding indebtedness to be refunded under the DWSD Ordinances relating to the sewage disposal system bonds and the water supply system bonds (collectively referred to herein as the "Ordinance") to the maximum extent of capacity under the applicable ABT test and the remainder on a TBD subordinate basis |

| | |
|---|---|
| Proposal Expiration Date | September 30, 2014 unless accepted and closing occurs within 90 days hereof. |
| Maturity Date | Up to 30 years following the Delivery Date of the Notes. |
| Amortization | Proportionate to amortization on the proposed refunding bonds |
| Maximum Par Amount | Up to $5.5 billion to be purchased on the Delivery Date. Citi will serve as lead arranger and in such capacity, will agree to purchase up to $1.0 billion of the Notes, with the remainder to be syndicated. |
| Payment Frequency | Interest payments monthly on the first business day of the month; principal payments to be made annually |
| Interest Rate Calculation | Monthly; the interest rate on the Notes ("Note Interest Rate") will equal the 1 Month LIBOR Index plus a Margin no greater than the rates set forth below. |
| Margin | (see below) |

**Margin**

| Ratings (M/S/F) | Margin |
|---|---|
| A3/A-/A- or higher | 3.50% |
| Baa1/BBB+/BBB+ | 3.75% |
| Baa2/BBB-/BBB- or lower (or no rating) | 4.00% |

Margin will be determined, on a series by series basis, by the highest two of three ratings then in place for parity indebtedness of the Obligor.

The Margin will be adjusted by the following increments depending on the amount of time the Notes have been outstanding from the Delivery Date:

| Months | Margin |
|---|---|
| 0-3 | 0.00% |
| 3-6 | 2.00% |
| 6-12 | 4.00% |
| 12-Maturity | 10.00%, irrespective of ratings |

Upon the occurrence of an Event of Default, 10.00% ("Event

| | |
|---|---|
| | of Default Margin") |
| Maximum Rate | The Maximum Note Interest Rate shall be the lesser of i) 25% or ii) the maximum rate permitted by law. Excess interest shall be subject to recapture pursuant to a standard clawback provision. |
| Optional Redemption Provisions | The Notes shall be subject to optional redemption on any business day, in whole or in part, with no penalty upon at least 10 days' prior notice. |
| Extraordinary Margin Adjustment Events | i. The long term rating, if any, of the Notes, the 2014 DWSD Refinancing Bonds or any other indebtedness issued pursuant to the Ordinance on or after the Delivery Date of the Notes, is reduced to or below BB or BB by either S&P or Fitch, respectively, or any of the ratings of any indebtedness (excluding the Notes) issued pursuant to the Ordinance is withdrawn or suspended for any reason; provided that this provision will not take effect until the earlier of (A) the date that DWSD has obtained ratings from S&P and Fitch and (B) the date which is seven months after the Delivery Date of the Notes.<br><br>ii. Covenant default or failure to comply with other covenants under any Related Documents. For purposes herein, the term "Related Documents" shall mean documentation associated with any outstanding indebtedness, derivative transaction or any guaranty on any indebtedness or derivative transaction.<br><br>Upon the occurrence of an Extraordinary Margin Adjustment Event, the Margin will be adjusted to 10.00%. |
| Events of Default | a) The occurrence or existence of an event, default, event of default (other than a payment default) or other similar condition by the Obligor under any loan, credit facility, swap, hedge, or derivative which has resulted in such obligation becoming, or becoming capable at such time of being declared, due and payable under such agreement or instrument (or in the case of a swap, hedge or derivative, results in such agreement being terminated early or being capable of being terminated early); |

b) The occurrence or existence of a default by the Obligor in making one or more payments on the due date thereof under the Notes or any other obligation of the Obligor other than the Notes (including any loan, credit facility, swap, hedge or derivative), provided that any applicable grace period shall not apply;

c) Failure to perform or observe any term, covenant or agreement contained within the Agreement not covered in a) or b) above; subject to any applicable grace period;

d) At any time after the City's plan of adjustment shall have become effective or in the event the City's current pending bankruptcy case is dismissed, a bankruptcy or insolvency of the City or moratorium of payment of debt of the City or DWSD;

e) Any judgment for the payment of money in an amount equal to or greater than $20,000,000 shall be rendered against the Obligor;

f) Representations or warranties are inaccurate or incomplete in any material respect;

g) Invalidity or unenforceability of the Notes or any related documents or the Obligor's obligations thereunder or the Obligor contests or denies any such obligations;

h) Occurrence of any event or change which separately or in the aggregate with other events results in or could reasonably be expected to result in a material adverse change, as determined by the Purchasers;

i) Withdrawal or suspension of the rating on any obligations of the Obligor by either Moody's or S&P or Fitch (if applicable).

Upon the occurrence of an Event of Default, the Notes shall be immediately due and payable, and the applicable Margin

| | |
|---|---|
| | shall be the Event of Default Margin. |
| Ratings | Initially, no ratings are required for the Notes; however, if the Notes are outstanding for a period of six months after the Delivery Date, DWSD (and MFA, if applicable) will each use its best efforts to obtain one or more long-term ratings on the Notes from two or more rating agencies, as specified by the Purchasers and acceptable to DWSD and MFA (if applicable.) |
| Certain Covenants | Those customary for transactions of this nature, including, but not limited to:<br><br>Incorporation of covenants from related financing documents;<br><br>Continued existence;<br><br>Maintenance of trustee, paying agent, registrar (Purchaser approval of any subsequent substitution);<br><br>Maintenance of ratings at all times;<br><br>Standard yield protection, withholding and tax indemnification;<br><br>Information reporting, access to records and further assurance;<br><br>Limitation on documentation amendments (Purchaser approval of relevant documents)<br><br>No additional indebtedness shall be incurred without consent of the Purchasers<br><br>No debt may be redeemed other than by regularly scheduled payment prior to the repayment of the Notes<br><br>At the time of closing, delivery to the Purchasers of an opinion or opinions from counsel to the Obligor to the effect that (i) one or more Preliminary Official Statements posted with respect to the Sewage Disposal System Revenue |

| | |
|---|---|
| | Refunding Bonds and Water Supply System Revenue Refunding Bonds to be issued to provide financing for the tender and current refunding of certain outstanding DWSD bonds (the "Preliminary Official Statements") comply in all material respects with all applicable requirements of the federal securities laws and (ii) either (A) each Preliminary Official Statement does not, as of its date, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading or (B), in the event that no Preliminary Official Statement has been posted, the Invitations to Tender Bonds, as well as the Questions and Answers, the Disclosure Statements, the Letter from the City and the Bondholder's Instructions attached thereto, each dated August 7, 2014, with respect to certain outstanding DWSD bonds, did not, as of the date thereof, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; such opinion(s) to be subject to customary exceptions and shall be satisfactory in form and in substance to the Purchasers and their counsel.<br><br>The Bankruptcy Court shall have entered an order approving the financing in form and substance reasonably acceptable to the Purchasers and their counsel, which order shall not have been stayed or enjoined in any way (including being stayed pending appeal). |
| Legal Fees/Expenses | Reasonable legal fees and expenses shall be due and payable to the Citi or directly to its counsel, regardless of whether the transaction is successfully closed.[12] |

---

[12]  The current estimate of Citi's fees and expenses in connection with the Tender and the DWSD Revenue and Revenue Refunding Financing is approximately $500,000.

## V. Necessary Approvals for Proposed DWSD Financing Transactions

37.     The launch of the Tender was approved by resolution of the Board of Water Commissioners by resolution dated August 6, 2014.  The Emergency Manager ratified the resolution of the Board of Water Commissioners by order dated August 6, 2014.

38.     The terms of the DWSD Revenue and Revenue Refunding Financing were approved by the Emergency Manager pursuant to EM Order Nos. 7 and 8, each dated August 11, 2014.

39.     Pursuant to Section 12(u) of P.A. 436, the Emergency Manager may, subject to Section 19 of P.A. 436, "authorize the borrowing of money by" the City.  See MCL § 141.1552(u).  Section 19(1) of P.A. 436 provides that an emergency manager shall, prior to executing any action to borrow, submit his or her proposed action to the governing body of the local government for approval. See MCL § 141.1559(1).  Section 19(1) of P.A. 436 further provides the local governing body with 10 days from the date of submission to approve or disapprove the action proposed by the emergency manager.  See MCL § 141.1559(1).

40.     If the governing body of the local government disapproves the proposed action within 10 days, Section 19(2) of P.A. 436 requires the governing body of the local government, within 7 days of its disapproval, to submit to the local emergency financial assistance loan board (the "Emergency Loan Board") an

alternative proposal that "would yield substantially the same financial result as the action proposed by the emergency manager."  See MCL § 141.1559(2).  The Emergency Loan Board then has 30 days to review both the alternative proposal submitted by the governing body of the local government, as well as the proposal submitted by the emergency manager and approve the proposal that "best serves the interest of the public."  See MCL § 141.1559(2).

41.  The City anticipates submitting the material terms of the DWSD Revenue and Revenue Refunding Financing to the Detroit City Council ("City Council") on or around August 11, 2014 for approval.  The statutory review period for City Council under Section 19 of P.A. 436 will be completed on or around August 21, 2014.  If City Council approves the financing, the City will have the necessary authorizations under P.A. 436 to proceed with the DWSD Revenue and Revenue Refunding Financing at that time.  If City Council does not approve the financing, then it has until August 28, 2014 to propose an alternative to the Emergency Loan Board.  The City is coordinating with counsel for the State to ensure that an Emergency Loan Board meeting to consider this eventuality can be scheduled prior to the Settlement Date.

42.  In addition to the provisions of P.A. 436, pursuant to the Oversight Litigation, DWSD is authorized to approve the issuance of debt and to refinance debt upon the approval of the Board of Water Commissioners.  The

Board of Water Commissioners will meet on August 13, 2014 to consider adoption of resolutions authorizing the DWSD Revenue and Revenue Refunding Financing. Following approval by the Board of Water Commissioners, the Emergency Manager will ratify the board's actions with respect to the DWSD Revenue and Revenue Refunding Financing.

43. Additional approvals, including approvals of the MFA and the Michigan Department of Treasury, are needed before the City would be able to close on the DWSD Revenue and Revenue Refunding Financing. A Notice of Intent to borrow with respect to the 2014 Revenue Financing was published as required under Act 94 (and this is <u>not</u> required for the Tender Offer Financing). It is expected that the MFA will adopt its resolutions authorizing the issuance of bonds, certain proceeds of which will be used to acquire the 2014 DWSD Revenue and Revenue Refunding Bonds on August 12, 2014. The City submits that each of the required approvals will be obtained prior to the hearing on this Motion.

44. Finally, a notice of hearing will be published and a hearing will be held by DWSD pursuant to Section 147(f) of the Internal Revenue Code of 1986, as amended, with subsequent approval by an elected official prior to the Settlement Date, in order to afford tax exempt treatment for the 2014 Revenue Financing. No hearing is required for the Tender Offer Financing.

CHI-1939085v1
13-53846-tjt    Doc 6644    Filed 08/11/14    Entered 08/11/14 22:07:17    Page 45 of 422

## Basis for Relief

## I.    DWSD Revenue and Revenue Refunding Financing

45.    Pursuant to Bankruptcy Code section 901(a), sections 364(c), 364(d) and 364(e), among others, are applicable in cases proceeding under chapter 9 of the Bankruptcy Code.

46.    Bankruptcy Code section 364(c) provides that:

> If [a debtor] is unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

47.    The statutory requirement for obtaining postpetition financing under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtor is "unable to obtain unsecured credit allowable under §503(b)(1) [of the Bankruptcy Code] as an administrative expense." See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (holding that a debtor seeking secured credit under section 364(c) of the Bankruptcy Code must establish that it was unable to obtain unsecured credit under sections 364(a) or (b)

of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code).

48.     To show that postpetition financing is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. <u>Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." <u>Id</u>. at 1088. Moreover, where few lenders are likely to be able and willing to extend necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." <u>In re Sky Valley, Inc.</u>, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

49.     Bankruptcy Code section 364(d)(1) provides that:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> (A)     the trustee is unable to obtain such credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. §364(d)(1).

50.    Under section 364(d), the debtor has the burden of proof on the issue of adequate protection.  See 11 U.S.C. §364(d)(2).

51.    The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." See Shaw Indus., Inc. v, First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by "contacting numerous lenders" and was unable to obtain credit without a priming lien, it had met its burden under section 364(d)); In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

52.    To show that postpetition financing is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(d) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable." Id. at 1088. Moreover, where few lenders are likely to be able and willing to extend necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

53.     In addition, the secured creditors whose liens are being "primed" by a new postpetition lender must be provided with adequate protection of their interests in collateral. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); Dunes Casino, 69 B.R. at 793 (holding that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

54.     Arguably, with respect to the Tender Offer Financing, 364(d) is not applicable, as new bondholders will be effectively stepping into the shoes of existing bondholders, and in such case, new bondholders will not be priming existing bondholders with new debt. Thus, the Tender Offer Financing could be approved under the less exacting standards of section 364(c) of the Bankruptcy Code. Nevertheless, as set forth below, the Tender Offer Financing satisfies the standard for priming.

55. As further described below, Citi, Assured, the MFA and the holders of the 2014 DWSD Revenue and Revenue Refunding Bonds are providers of credit under sections 364(c) and 364(d) of the Bankruptcy Code, as applicable.

### A. Financing Consistent with State Law

56. Of the financing proposed herein, only the DWSD Revenue Financing consists of "new money" — in an amount not exceed $190,000,000. The priority of the liens securing the DWSD Revenue Financing is dependent on the results of the Tender, and in particular, an analysis of the junior lien and senior lien bonds that are tendered. Nevertheless, it is DWSD's intent to issue the DWSD Revenue Financing as senior secured sewer bonds, which will be senior to existing junior lien sewer bonds, and equal to existing senior sewer lien bonds. As set forth below, this financing is permitted under the existing Ordinance authorizing the issuance of sewer debt, and in particular, this additional senior debt is available under the "additional bonds test" set forth therein. See Amended and Restated Ordinance No. 18-01 at §21C(a).

57. The Tender Offer Financing will be structured as refunding bonds, which will take the place of the Tendered Bonds in DWSD's existing capital structure, with the same rank and priority as the Tendered Bonds.

58. With respect to the DWSD Revenue Financing, First Southwest has advised that if such financing were to be taken to market as a stand-alone

transaction in the context of the City's chapter 9 case and the current terms of the Plan, the DWSD Revenue Financing (a) could not be obtained on an unsecured basis, and (b) in all likelihood, could not be obtained on a junior lien basis. Donner Dec. ¶ 7. In fact, it is not customary for DWSD to issue unsecured debt, as most, if not all, of DWSD debt is secured. Donner Dec. ¶ 8; Brownstein Dec. ¶ 8. In any event, obtaining unsecured debt would be punitively expensive. Donner Dec. ¶ 8; Brownstein Dec. ¶ 8. Based on the forgoing, the City submits that financing on terms similar to the DWSD Revenue Financing could not be obtained on an unsecured basis. Donner Dec. ¶ 8; Brownstein Dec. ¶ 8.

59. Additionally, based on feedback from the market, obtaining DWSD Revenue Financing on a junior lien basis, as a stand-alone transaction in the context of the City's chapter 9 case and the current terms of the Plan, would be challenging. Donner Dec. ¶ 9; Brownstein Dec ¶ 9. While there is, at any given time, demand in the market place for high yield debt, the market for such debt is neither as broad nor as predictable as for highly rated debt, and demand can decline dramatically with little advance notice in accordance with macroeconomic factors. Donner Dec. ¶ 9; Brownstein Dec. ¶ 9. Thus, structuring the DWSD Revenue Financing as a junior secured financing creates risk that the offering, following the time required for necessary City and state approvals as well as approval by this

Court, and the closing of the Tender, may not have the same demand in the market place. Donner Dec. ¶ 10; Brownstein Dec. ¶ 9.

60.     In any event, junior lien water and sewer debt has always been, and certainly would be now, significantly more expensive than senior lien debt. Donner Dec. ¶ 11.  Thus, it is advantageous for DWSD to issue bonds that constitute new financing (as opposed to refunding bonds) on a senior lien basis to keep its cost of capital as low as possible, which will reduce the City's debt service costs and enhance the City's ability to issue additional water and sewer debt in the future.  Donner Dec. ¶ 11.  For the foregoing reasons, the City submits that the DWSD Revenue Financing, on the economic terms proposed herein, is not available on a junior lien basis.

61.     With respect to the Tender Offer Financing, new bonds will be issued, the proceeds of which will be issued to purchase or refund Existing DWSD Bonds that are tendered for purchase by the City.  Thus, the new holders of 2014 DWSD Revenue and Revenue Refunding Bonds will be "stepping into the shoes" of the holders of Tendered Bonds, in the same priority.  DWSD believes that no bondholders would commit to purchase 2014 DWSD Revenue and Revenue Refunding Bonds without the same lien priority and on effectively the same terms as the Existing DWSD Bonds that are tendered.  Donner Dec. ¶ 12.  Thus, the junior lien bonds under the Tender Offer Financing could not be issued on an

unsecured basis, and the senior lien bonds under the Tender Offer Financing could not be issued on a junior lien or unsecured basis.  Donner Dec. ¶ 12.

62.    Moreover, as part of the Settlement, Assured has agreed to provide the Assured Policies to insure the senior lien 2014 Revenue and Revenue Refunding Bonds and the Assured Policies will provide tangible economic benefit to DWSD.  Donner Dec. ¶ 13.  Assured's agreement to provide the Assured Policies is conditioned upon the structure of the 2014 Revenue and Revenue Refunding Bonds, including the priorities of debt, proposed herein.  Donner Dec. ¶ 13.  Thus, financing on substantially different terms was not available to DWSD.

63.    Based on the forgoing, the City has established that it is unable to obtain financing other than on the terms proposed herein.  In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) ("[section 364(d)] imposes no duty to seek credit from every possible lender before concluding such credit is unavailable."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that a debtor must make "a reasonable effort to seek other sources of credit.").

**B.    Existing DWSD Bonds Are Adequately Protected**

64.    Additionally, existing bondholders with liens in DWSD revenues are adequately protected.  Currently, DWSD has approximately $1.8 billion of outstanding senior lien sewer bonds (the "Senior Lien Sewer Bonds").

Bateson Dec. ¶ 5.  There is an additional $945 million of outstanding second lien sewer bonds (the "Second Lien Sewer Bonds").  Bateson Dec. ¶ 5.

65.    DWSD also has approximately $1.8 billion of outstanding senior lien water bonds (the "Senior Lien Water  Bonds" and together with the Senior Lien Sewer Bonds, the "Senior Lien Bonds").  Bateson Dec. ¶ 6.  There is an additional $629 million of outstanding second lien water bonds (the "Second Lien Water Bonds" and together with the Second Lien Sewer Bonds, the "Second Lien Bonds").  Bateson Dec. ¶ 6.

66.    The Senior Lien Bonds and Second Lien Bonds are governed by a myriad of authorizing and governing documents (the "Existing Bond Documents") as well as (i) Amended and Restated Ordinance No. 18-01 (the "Sewer Ordinance"), which governs the issuance of sewer bonds, a copy of which is attached hereto as Exhibit 11 and (ii) Amended and Restated Ordinance No. 01-05, attached hereto as Exhibit 12 (the "Water Ordinance" and together with the Sewer Ordinance, the "Ordinances"). [13]

67.    The Ordinances expressly contemplate and authorize the issuance of additional water or sewer bonds, as applicable, which bonds could be either additional Senior Lien Bonds or Second Lien Bonds, *subject to* the condition

---

[13]  The Settlement and this Motion do not modify the currently existing Bond Insurance Policies (as defined in the Plan).

that existing bondholders are protected in their collateral through the satisfaction of an additional bonds test ("Additional Bonds Test").  The Additional Bonds Test articulated under each Ordinance is substantially identical and is effectively a debt coverage ratio covenant that measures the ratio of DWSD net revenue to debt service.  Specifically, the Sewer Ordinance provides —

> The City may issue Securities of any Priority ("Additional Securities") for repairs, extensions, enlargements, and improvements to the System … refunding all or a part of any Outstanding Securities and paying the costs of issuing such Additional Securities … *if, but only if,* there is **Required Combined Coverage** under either the **Projected Net Revenues Test** … or the **Historical Net Revenues Test** ….

See Sewer Ordinance at §21C(a).

> 68.     The Water Ordinance provides —
>
> The City may issue Additional Securities of any Priority of Lien for repairs, extensions, enlargements, and improvements to the System …, refunding all or a part of any Outstanding Securities and paying the costs of issuing such Additional Securities … *if, but only if,* there is **Required Combined Coverage** under either the **Project Net Revenues Test** … or the **Historical Net Revenues Test** ….

See Water Ordinance at §20C(1).

69.     The coverage requirements for the Existing DWSD Bonds are as follows, and either the "Projected Net Revenues Test" or the "Historical Net Revenues Test" needs to be met for the issuance of "new money" bonds:

| Priority of Indebtedness | Percentage |
|---|---|
| Senior Lien Bonds | 120% |
| Second Lien Bonds | 110% |
| State Revolving Fund Bonds | 100% |

70.   The Additional Bonds Test analysis is summarized as follows:

|  | **Projected Net Revenues Test** | **Historical Net Revenues Test** |
|---|---|---|
| **Senior Lien Bonds** | Net Revenues of the System for the then current or next succeeding Fiscal Year, **divided by** the maximum composite Annual Debt Service in any Fiscal Year on Outstanding Senior Lien Indebtedness (including the additional securities to be issued) **must exceed** 120% of Outstanding Senior Lien Indebtedness. | Actual Net Revenues of the System for the immediately preceding audited Fiscal Year, **divided by** the maximum composite Annual Debt Service in any future Fiscal Year on Outstanding Senior Lien Indebtedness (including additional securities to be issued) **must exceed** 120% of Outstanding Senior Lien Indebtedness. |
| **Second Lien Bonds** | Net Revenues of the System for the then current or next succeeding Fiscal Year, **divided by** the sum of the maximum composite Annual Debt Service in any Fiscal Year on (1) Outstanding Senior Lien Indebtedness **plus** (2) Outstanding Second Lien Indebtedness (including the additional securities to be issued **must exceed** 110% of Outstanding Second Lien Indebtedness. | Actual Net Revenues of the System for the immediately preceding audited Fiscal Year, **divided by** the sum of the maximum composite Annual Debt Service in any future Fiscal Year on (1) Outstanding Senior Lien Indebtedness **plus** (2) Outstanding Second Lien Indebtedness (including the additional securities to be issued) **must exceed** 110% of Outstanding Second Lien Indebtedness. |

| State Revolving Fund Bonds | Net Revenues of the System for the then current or next succeeding Fiscal Year, **divided by** the sum of the maximum composite Annual Debt Service in any Fiscal Year on (1) Outstanding Senior Lien Indebtedness **plus** (2) Outstanding Second Lien Indebtedness **plus** (3) Outstanding SRF Indebtedness (including the additional securities to be issued) **must exceed** 100% of Outstanding SRF Indebtedness. | Actual Net Revenues of the System for the immediately preceding audited Fiscal Year, **divided by** the sum of the maximum composite Annual Debt Service in any future Fiscal Year on (1) Outstanding Senior Lien Indebtedness **plus** (2) Outstanding Second Lien Indebtedness **plus** (3) Outstanding SRF Indebtedness (including the additional securities to be issued) **must exceed** 100% of Outstanding SRF Indebtedness. |
|---|---|---|

71.     The Ordinances also provide, as an alternative to the Additional Bonds Test, that the City may issue additional water or sewer bonds without regard to the Additional Bonds Test when issuing bonds for purposes of refunding all or part of certain Existing DWSD Bonds if, but only if: (1) the combined annual debt service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the additional water or sewer bonds and (B) giving effect to the refunding, all Existing DWSD Bonds of equal and higher priority is less than (2) the combined annual debt service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all equal and higher priority bonds, without giving effect to the refunding (the "Alternative Refunding/Debt Service Savings Test").  See Sewer Ordinance at §21C; Water Ordinance at §20C.  In short, the

Alternative Refunding/Debt Service Savings Test is designed to allow for refunding bonds to be issued when the net effect is a reduction in DWSD's annual debt service obligations.

72.     The Proposed Order, as well as the Tender Invitations, specifically provides that the City will not close the DWSD Revenue and Revenue Refunding Financing if, and to the extent that, the Additional Bonds Test or the Alternative Refunding/Debt Service Savings Test, in each instance, individually calculated under each of the Ordinances, has not been satisfied at that time based on the actual pricing of the bonds.  See Exhibit 8A, Sewer Tender Invitation p. 8; Exhibit 8B, Water Tender Invitation p. 8.  DWSD believes that the DWSD Revenue Financing will likely satisfy the Additional Bonds Test and the Tender Offer Financing will likely satisfy the Alternative Refunding/Debt Service Savings Test (given that DWSD's annual debt service will be reduced as a result of the Tender and the Tender Offer Financing).

73.     Thus, under either of the Ordinances, and absent the City's pending bankruptcy case, the City would be entitled to issue the 2014 DWSD Revenue and Revenue Refunding Bonds, even in the face of opposition from the holders of the Existing DWSD Bonds.  This in and of itself is a form of adequate protection, where, under the present circumstances, existing bondholders lent into a

regulatory structure that allows for additional securities to be issued under circumstances that will have been satisfied.

74.     Bondholders in the capital structure are also protected in their interests by a rate covenant that will ensure that DWSD always has sufficient funds to service its debt.  The City is required to maintain the water supply system and sewage disposal system in good repair and working order and to make all needed and proper repairs, replacements, additions and betterments.  <u>See</u> MCL § 141.121; Water Ordinance at §9(B); Sewer Ordinance at §9(B).  Accordingly, the Ordinances contain a covenant to fix and revise rates for service from time to time as may be expected to be necessary to produce the greater of:

   a.   The amounts required to provide for: (i) the payment of the expenses for maintenance of the water supply system and sewerage disposal system as are necessary to preserve the same in good repair and working order; (ii) the payment of indebtedness coming due for the fiscal year of calculation; (iii) the creation and maintenance of reserves therefor as required by the Ordinances or any ordinance or resolution adopted in accordance with the terms thereof; and (iv) such other expenditures and funds for the water supply system and sewerage disposal system as the Ordinances may require; and

   b.   The required combined coverage, as described above (i.e., projected net revenues for the fiscal year of calculation are divided by the indebtedness coming due for such Fiscal Year).

<u>See</u> Water Ordinance at §9(B); Sewer Ordinance at §9(B).

75.     Rates are established by the Board of Water Commissioners.

<u>See</u> Water Ordinance at §8; Sewer Ordinance at §8.

76.     Moreover, with respect to the Tender Offer Financing, bondholders in the DWSD capital structure are no worse off than they were prior to the transaction because new bondholders will be taking the same position in the capital structure as the previous bonds, only with cheaper economic terms to the department.  Thus, there is no impairment to the interests of holders of Existing DWSD Bonds from the Tender Offer Financing.

77.     Under well settled bankruptcy jurisprudence, "adequate protection" can be established by showing sufficient equity in the underlying collateral such that the primed secured lender's interests are protected from any diminution in value.  See  Baybank–Middlesex v. Ralar Distributors, Inc., 69 F.3d 1200, 1203 (1st Cir. 1995) ("A sufficient equity cushion is itself a recognized form of adequate protection."); In re Mellor, 734 F.2d 1396 (9th Cir.1984); In re Ritz Theatres, Inc., 68 B.R. 256 (Bankr. M.D. Fla. 1987).

78.     In the present case, as set out above, the Additional Bonds Test more than establishes that the holders of Existing DWSD Bonds have an equity cushion in the Collateral to protect their interests.[14]

79.     The DWSD Revenue and Revenue Refunding Financing is in compliance with applicable laws and is being consummated consistent with the

---

[14]     See In re Helionetics, 70 B.R. 433 (Bankr. C.D. Ca. 1987) (20.4% equity cushion is adequate); In re Mellor, 734 F.2d 1396 (9th Cir.1984), (20% equity cushion is adequate).

terms of the Existing Bond Documents and the Ordinances. Additionally, the

DWSD Revenue and Revenue Refunding Financing will have the necessary

approvals, including under P.A. 436. The City submits that no further or additional

requirements need to be satisfied to approve the DWSD Revenue and Revenue

Refunding Financing.

     **C.**    **The Providers of Credit In Respect of the 2014 DWSD Revenue and Revenue Refunding Bonds are Entitled to the Protections of Section 364(e) and 921(e).**

     80.    Citi, Assured, the MFA and the holders of the 2014 DWSD

Revenue and Revenue Refunding Bonds are entitled to the full protections and

rights afforded by section 364(e) and 921(e) with respect to the 2014 DWSD

Revenue and Revenue Refunding Bonds.

     81.    Section 364(e) provides that "[t]he reversal or modification on

appeal of an authorization under this section to obtain credit or incur debt . . . does

not affect the validity of any debt so incurred . . . to an entity that extended such

credit in good faith . . . unless such authorization and the incurring of such debt . . .

were stayed pending appeal." 11 U.S.C. § 364(e). Section 921(e) provides that

"[t]he reversal on appeal of a finding of jurisdiction does not affect the validity of

any debt incurred that is authorized by the court under section 364(c) or 364(d) of

[the Bankruptcy Code]." 11 U.S.C. § 921(e).

82.     It is axiomatic that the purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, directly or indirectly, by the MFA and Citi (together with one or more purchasers in addition to Citi in the case of a Direct Purchase) is an extension of credit to the City made pursuant to arms' length, good faith negotiations as evidenced in the existing bond documents, the Ordinances, the other agreements discussed herein and applicable state law.  Accordingly, the MFA, Citi and the other purchasers in the case of a Direct Purchase are entitled to the protections of section 364(e) and 921(e) of the Bankruptcy Code.

83.     Assured is also entitled to the protections of section 364(e) and 921(e) because Assured is extending credit to the City in good faith by participating in the offering of the 2014 DWSD Revenue and Revenue Refunding Bonds.  Specifically, Assured has committed to issue the Assured Policies. Assured's commitment to issue the Assured Policies was negotiated by Assured and the City after lengthy and extensive good faith arm's-length negotiations as evidenced by the Settlement in respect of Assured described in detail below. Accordingly, the City submits that Assured is entitled to a finding of good faith and the protections of section 364(e) and 921(e) of the Bankruptcy Code.

## II.     The Settlement

84.     Settlements and compromises are "a normal part of the process
of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer
Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles
Lumber Prods. Co., 308 U.S. 106, 130 (1939)). As part of the restructuring
process, the Court "may approve a compromise or settlement" under Bankruptcy
Rule 9019(a). Fed. R. Bankr. P. 9019(a).

85.     A decision to approve or reject a proposed compromise or
settlement falls within the court's sound discretion. Engman v. Boyd, No. 09-CV-
151, 2009 WL 1974460, at *2 (W.D. Mich. July 6, 2009) ("The bankruptcy court
has wide discretion to approve or disapprove settlement agreements…."").
Bankruptcy Rule 9019 empowers a bankruptcy court, in its discretion, to approve
settlements that are "fair and equitable." See Reynolds v. Comm'r, 861 F.2d 469,
473 (6th Cir. 1988) (employing the "fair and equitable" standard).[15]

86.     In evaluating whether a proposed agreement is fair and
equitable, courts in the Sixth Circuit generally consider four factors: (a) the

---

[15]   See also Lyndon Prop. Ins. Co. v. Katz, 196 F. App'x 383, 387 (6th Cir. 2006)
(same); Bard v. Sicherman (In re Bard), 49 F. App'x 528, 530 (6th Cir. 2002)
(same); Stark v. Moran (In re Moran), 385 B.R. 799, 2008 WL 1766874, at *4
(B.A.P. 6th Cir. 2008) (same), appeal dismissed for lack of standing, 408 B.R.
698 (B.A.P. 6th Cir. 2009); Rankin v. Dault (In re Rankin), 396 B.R. 203, 209
(E.D. Mich. 2008) (same), aff'd on other grounds sub nom. Rankin v. Brian
Lavan & Assocs., P.C. (In re Rankin), 438 F. App'x 420 (6th Cir. 2011).

probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the interest of the creditors and a proper deference to their reasonable views. See Bard, 49 F. App'x at 530.[16]

87.     In applying these factors, "[a] bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement." Fishell v. Soltow (In re Fishell), 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. 1995) (quoting LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F.2d 159, 163 (7th Cir. 1987)).  Rather, to approve a compromise, the Court need only reach the conclusion that the City's proposed settlement generates a result that is above the lowest point in the range of reasonableness. See, e.g., In re Fodale, No. 10-69502, 2013 WL 663729, at *9 (Bankr. E.D. Mich. Feb. 21, 2013); In re Dow Corning Corp., 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (quoting In re Drexel Burnham Lambert Grp., Inc., 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991)).  The Court may "approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial." Vaughn v. Drexel

---

[16]  See also Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC), 728 F.3d 567, 575 n.6 (6th Cir. 2013) (reciting Bard factors); Hindelang v. Mid-State Aftermarket Body Parts Inc. (In re MQVP, Inc.), 477 F. App'x 310, 313 (6th Cir. 2012) (applying Bard factors).

Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

88.    Moreover, when considering a proposed settlement, a court should exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); In re Lee Way Holding Co., 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990) ("It is well established that compromises are favored in bankruptcy."). In fact, courts generally accord great deference to the recommendations of an estate representative when considering negotiated agreements. See, e.g., Official Comm. of Unsecured Creditors v. James Talcott, Inc. (In re Int'l Distrib. Ctrs., Inc.), 103 B.R. 420, 423 (S.D.N.Y. 1989).

89.    The Settlement generates a result that is well above the lowest point in the range of reasonableness.   Indeed, the Settlement and DWSD Revenue and Revenue Refunding Financing comprise a plan of finance and settlement that will ultimately restructure the DWSD capital structure, save the department millions of dollars in annual debt service, unlock nearly $50 million in cash reserves, resolve all of the DWSD Plan Objections and provide essential capital improvement financing to fund the City's continued efforts to keep the City's sewage disposal system in compliance with applicable state and federal law.  In that regard, the City has more than shown that the Settlement and DWSD Revenue

and Revenue Refunding Financing are in the best interests of all parties in interest in this chapter 9 case.

90.     While the City vigorously opposes the DWSD Plan Objections, and believes that ultimately it would prevail in any litigation regarding the merits of such objections, the legal and factual issues raised therein are indeed numerous, complex and uncertain.  The confirmation schedule established by this Court is driven in part by the complicated questions raised in the DWSD Plan Objections.

91.     Resolving the DWSD Plan Objections in connection with the Settlement will produce economic benefits to DWSD and ameliorate any negative indications from the rating agencies for future DWSD debt issuances as a result of the consensual nature of the tender process, while at the same time eliminating the uncertainty and extensive cost and time of litigating the issues raised therein.  In effect, the Settlement buys a "complete peace" among the parties with a cognizable interest in the treatment of Existing DWSD Bonds.

92.     Additionally, the City's agreement to reimburse the reduced fees and expenses of Assured, FGIC, the Ad Hoc Committee and the DWSD Trustee is justified in this case.

93.     Under the Ordinances, Assured and FGIC each assert that they have secured claims for their fees and expenses in connection with their insurance policies for the Existing DWSD Bonds.  Each Ordinance defines "Ancillary

Obligation Fees and Expenses" as "any fees and expenses in connection with any

… Financial Facility in the ordinary course of the transaction." <u>See</u> Ordinances at

Part II. A Financial Facility, in turn, is defined as, among other things, a "Credit

Enhancement," including any bond insurance. <u>See</u> Ordinances at Part II .

Ancillary Obligation Fees and Expenses is in turn included in the definition of

"Secured Obligations." <u>See</u> Ordinances at Part II. Under Section 6 of the

Ordinances, "Secured Obligations shall not be general obligations of the City and

shall be payable solely from Pledged Assets …." <u>See</u> Amended and Restated

Ordinance No. 18-01 at §6(a); Amended and Restated Ordinance No. 01-05 at

§6(a).

      94.    Assured and FGIC have both argued that their claim for fees

and expenses is a Secured Obligation of DWSD under the foregoing Ordinance

provisions. Assured has indicated that it has accrued approximately $9 million of

professional fees and expenses in this case to date, all of which it argues is

potentially secured pursuant to the Ordinances. Assured's reduced fee claim is

particularly justified because of the substantial contribution Assured has made in

structuring and executing the Settlement, including by providing its commitment to

issue the Assured Policies. Likewise, FGIC has asserted a total fee claim of

approximately $1.1 million, which it also has argued is potentially secured

pursuant to the Ordinances. In the Settlement, however, Assured has agreed to

settle its fee claim for $3 million and FGIC has agreed to settle its fee claim for $550,000. Thus, each of these respective fee claims has been substantially discounted in the Settlement.

95. Payment of the Ad Hoc Committee's reduced fee claim is also justified. The Ad Hoc Committee has provided significant assistance, support and advice to the City, DWSD and Citi in connection with the Tender, and in particular, its members will be serving as market movers for purposes of galvanizing interest among holders of Existing DWSD Bonds to participate in the Tender, thus greatly contributing to the success of any Tender. The resolution and payment of the DWSD Trustee Fee Claim in accordance with the arbitration procedures outlined above is justified. The Ordinances and Indentures set forth the rights, powers and duties of the DWSD Trustee, and provide in particular that "prior to any Default and after the curing of all Defaults which may have occurred, [the Trustee shall] perform such duties and only such duties of the Trustee as are specifically set forth in this Indenture." See Indentures at § 6.01(h).

96. In connection with the exercise of those rights, powers and duties, the DWSD Trustee is entitled to reimbursement of its fees and expenses. The DWSD Trustee's fees and expenses are payable from Net Revenues of the water and sewer systems in accordance with the Ordinances and Indentures.

97.     The Ordinances and the Indentures contain materially identical

provisions relating to the DWSD Trustee's fees and expenses, including those

provisions which are set forth in Section 6.02 of the Indentures as follows:

> The Trustee shall be entitled to payment and/or reimbursement for reasonable fees for its ordinary services rendered hereunder and any advances, counsel fees and other ordinary expenses reasonably made or incurred by the Trustee in connection with such ordinary services. If it becomes necessary that the Trustee perform extraordinary services, it shall be entitled to reasonable extra compensation therefor, and to reimbursement for reasonable extraordinary expenses in connection therewith . . . .
>
> All fees, costs and expenses of any legal proceedings that may be brought by the Trustee to enforce the duties and obligations of the City or the Department hereunder . . . shall be paid . . . in the first instance from the Net Revenues remaining, in the month of payment, after making the transfers and deposits required hereunder to all Interest and Redemption Funds (including the Reserve Account, if any, therein), and, to the extent that sufficient amounts are not available from the Revenues therefor, from general funds of the City.
>
> To the extent permitted by law, the City hereby agrees to indemnify and hold harmless the Trustee from and against any and all costs, claims, liabilities, losses or damages whatsoever (including reasonable costs and fees of counsel, auditors or other experts), asserted or arising out of or in connection with the acceptance or administration of the trusts established pursuant to the Indenture, including the reasonable costs and expenses (including the reasonable fees and expenses of its counsel) of defending itself against any such claim or liability in connection with its exercise or performance of any of its duties hereunder and of enforcing this indemnification provision, except costs, claims, liabilities, losses or damages resulting from the gross negligence or willful misconduct of the Trustee. The indemnifications set forth herein shall survive the termination of the Indenture and/or the resignation or removal of the Trustee.

See Indentures at § 6.02.

98.     Additionally, section 19 of the Water Ordinance provides:

(a) The City shall at all times maintain a Trustee in order to further assure prompt compliance with all of the requirements, duties and obligations of the City with respect to the System . . . . "

(b) All fees, costs, and expenses of any legal proceedings that may be brought by the Trustee to enforce the duties and obligations of the City hereunder . . . shall be paid by the City to the Trustee . . . in the first instance from the Net Revenues remaining, in the month of payment, after making the transfers and deposits required . . . to all Interest and Redemption Funds (including the Reserve Account, if any, therein), and, to the extent that sufficient amounts are not available from the Revenues therefor, from general funds of the City.

See Water Ordinances at § 19.[17]

99.    Thus, while DWSD disputes certain of the reimbursement claims asserted by the DWSD Trustee in connection with the DWSD Trustee Fee Claim, DWSD does not dispute some amounts are owed to the DWSD Trustee in respect of fees and expenses incurred during the course of this case.  The City submits that the proper figure within the DWSD Trustee Fee Claim Range will be established pursuant to arbitration and if so, the City will pay such claim without further delay or approval of this Court.

100.    Consequently, the City respectfully submits that the Settlement and DWSD Revenue and Revenue Refunding Financing should be approved as proposed herein, and on the terms set forth in the Proposed Order.

---

[17]    Sections 20(a) and (b) of the Sewer Ordinance are identical.

## Request Conditioned on Acceptance of Tender

101.    The relief requested in this Motion is expressly conditioned upon the City's acceptance of the Tendered Bonds for purchase.  The City, acting through DWSD's Board of Water Commissioners and the Emergency Manager, has reserved the right to accept or not accept the Tendered Bonds for purchase in its sole discretion.  To the extent that the Tendered Bonds are not accepted by the City for purchase on August 22, 2014 (unless the Tender is extended by the City), the City will withdraw this Motion.

## Requested Hearing Date

102.    In order to accommodate the compressed timeframe for the closing of the transactions described herein, as well as to avoid, to the greatest extent possible, unnecessary disruption to the confirmation hearing, the City respectfully requests that the Court schedule a hearing on this Motion on August 25, 2014, or as soon thereafter as the Court's calendar will permit.

103.    Concurrently herewith, the City has filed an ex parte motion seeking relief from Local Rule 9014-1 and scheduling an objection deadline with respect to the Motion on August 20, 2014 and establishing the City's response deadline on August 22, 2014.

## Notice

104.    Notice of this Motion has been given to the following (or their counsel, if known):  (a) the trustees, transfer agents or paying agents, as applicable,

for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) all entities that have requested notice pursuant to Bankruptcy Rule 2002, (m) counsel to Citi, (n) counsel to the DWSD Objection Parties, (o) counsel to the State Revolving Fund and (p) Trustee for the State Revolving Fund Bonds.  The City will also post this Motion and all exhibits to the EMMA website.  The City submits that no other or further notice need be provided.

## No Section 904 Waiver

105.   Except to the extent provided in the Proposed Order (i) the filing of this Motion shall not constitute a waiver of any right of the City to take any action without authorization or approval of the Court, (ii) nor shall the filing of this Motion be deemed to constitute the City's consent, pursuant to Section 904 of

CHI-1939085v1
-61-
13-53846-tjt    Doc 6644    Filed 08/11/14    Entered 08/11/14 22:07:17    Page 72 of 422

the Bankruptcy Code, to this Court's involvement in (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as provided in the Proposed Order.

## Statement of Concurrence

106.    Local Rule 9014-1(g) provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied." Local Rule 9014-1(g). Given the number of parties and potential parties involved in this particular matter and the lack of known opposing parties who would be adversely impacted by the relief requested herein, it would be impracticable (and, with regard to unknown parties, impossible) for the City to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein. Accordingly, the City submits that imposing the requirements of Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived.

## No Prior Request

107.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that this Court (a) enter an order, substantially in the form attached hereto as <u>Exhibit 1</u>, granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: August 11, 2014

Respectfully submitted,


 /s/  Jonathan S. Green
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com


David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com


Brad B. Erens
David A. Hall
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
dahall@jonesday.com


ATTORNEYS FOR THE CITY

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5A | Declaration of Lee Donner |
| Exhibit 5B | Declaration of Nicolette Bateson |
| Exhibit 5C | Declaration of David Brownstein |
| Exhibit 6 | Financing Term Sheets |
| Exhibit 7 | Assured Insurance Commitment Term Sheet |
| Exhibit 8A | Sewer Tender Offer Invitation and Disclosure Statement |
| Exhibit 8B | Water Tender Offer Invitation and Disclosure Statement |
| Exhibit 9 | Administrative Consent Order |
| Exhibit 10 | Capital Improvement Plan |
| Exhibit 11 | Amended and Restated Ordinance No. 18-01 |
| Exhibit 12 | Amended and Restated Ordinance No. 01-05 |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                         :       Chapter 9
:
CITY OF DETROIT, MICHIGAN,   :       Case No. 13-53846
:
               Debtor.     :       Hon. Steven W. Rhodes
:
:
-----------------------------------------------------x

## ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 <u>APPROVING SETTLEMENT OF CONFIRMATION OBJECTIONS</u>

THIS MATTER having come before the Court upon the motion (the "<u>Motion</u>") by the City of Detroit, Michigan (the "<u>City</u>"), as debtor in the above-captioned chapter 9 case (the "<u>Case</u>"), pursuant to Sections 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as amended (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan seeking entry of an order, *inter alia*:[1]

      (i)     authorizing the City and the Detroit Water and Sewer Department

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

("DWSD"), a department of the City, to:

    (a)   enter into and perform under:

        (1)   a Bond Purchase Agreement (the "Bond Purchase Agreement") by and among the Michigan Finance Authority (the "MFA") and Citigroup Global Markets, Inc., acting on behalf of itself and as representative of the other underwriters named therein (collectively, the "Underwriter"), attached hereto as Exhibit 1, to which is attached a Letter of Representation of the City and the DWSD and pursuant to which the MFA will issue certain bonds (the "MFA Bonds") to be underwritten and publicly offered by the Underwriter, the proceeds of which will be used by the MFA solely to purchase the 2014 DWSD Revenue and Revenue Refunding Bonds (as defined below);

        (2)   a bond purchase agreement between the MFA and the City (the "MFA Purchase Agreement"), attached hereto as Exhibit 2;

        (3)   a bond purchase agreement between the City and Citibank, N.A., together with one or more purchasers (collectively, the "Direct Purchasers") or, alternatively, between the MFA and the Direct Purchasers (the "Bond Purchase Agreement (Direct Placement)"), substantially in the form attached hereto as Exhibit 3;

        (4)   the Assured Insurance Commitment provided by Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"), attached hereto as Exhibit 4.

        (5)   the 2014 DWSD Refunding Bonds Insurance Policies in an amount not less than the principal amount of the outstanding Assured-insured Tendered Bonds, on the terms set forth in the Motion and the Assured Insurance Commitment; and

        (6)   the 2014 DWSD Refunding Bonds Surety Policies (and together with the 2014 DWSD Refunding Bonds Insurance Policies, collectively, the "Assured Policies") as to reserve accounts that secure exclusively the Assured-insured 2014

DWSD Revenue and Revenue Refunding Bonds (defined below) in a principal amount equal to the DSRF requirement (subject to a limit of $70 million of additional surety coverage) on the terms set forth in the Assured Insurance Commitment;

(b) issue, via a public offering or a private placement, one or more series of Sewage Disposal System Revenue Bonds, Sewage Disposal System Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds (collectively, the "2014 DWSD Revenue and Revenue Refunding Bonds");

(c) as it relates to the transactions contemplated by this Order, perform under:

(1) Act 94, Public Acts of Michigan, 1933, as amended ("Act 94") the relevant excerpts of which are attached hereto as Exhibit 5;

(2) Act 34, Public Acts of Michigan, 2001, ("Act 34") the relevant excerpts of which are attached hereto as Exhibit 6;

(3) Ordinance No. 18-01 adopted by the City Council of the Debtor on October 18, 2001 (the "Sewer Ordinance") attached to the Motion as Exhibit 11;

(4) Amended and Restated Bond Ordinance No. 01-05 adopted by the City Council of the Debtor on January 26, 2005 (the "Water Ordinance") attached to the Motion as Exhibit 12, (the Water Ordinance together with the Sewer Ordinance, the "Bond Ordinances");

(5) a Resolution Authorizing the Issuance and Sale of Sewage Disposal System Revenue and Revenue Refunding Bonds of the City of Detroit, adopted by the Board of Water Commissioners on [          ], 2014 (the "DWSD Bond Resolution (Sewer)") attached hereto as Exhibit 6 and approved by the Emergency Manager of the City on [ ], 2014 (the "EM Approval"), which such approval is attached hereto as Exhibit 7;

(6) a Resolution Authorizing the Issuance and Sale of Water Supply System Revenue Refunding Bonds of the City of

Detroit, adopted by the Board of Water Commissioners on [          ], 2014 (the "DWSD Bond Resolution (Water)") attached hereto as Exhibit 8 and approved by the EM Approval;

(7)  a Trust Indenture by and among the City, DWSD and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of June 1, 2012 (the "DWSD Sewer Indenture") and a Trust Indenture by and among the City, DWSD and the DWSD Trustee dated as of February 1, 2013 (the "DWSD Water Indenture" and together with the DWSD Sewer Indenture, collectively, the "DWSD Indentures") attached hereto as Exhibits 9A and 9B, respectively;

(8)  a form of Sale Order to be executed by the Director of the DWSD and approved by the Emergency Manager of the City (the "Bond Sale Order (Sewer)") attached hereto as Exhibit 10; and

(9)  a form of Sale Order to be executed by the Director of the DWSD and approved by the Emergency Manager of the City (the "Bond Sale Order (Water)") attached hereto as Exhibit 11 (the Bond Sale Order (Water) together with the Bond Sale Order (Sewer), the "Bond Sale Orders");[2]

(ii) authorizing the City, acting through DWSD, to pledge and secure, by

statutory lien created by the Bond Ordinances and Act 94 and the lien authorized

by Sections 364(c) and 364(d) of the Bankruptcy Code on the Net Revenues (as

defined in the Bond Ordinances) of the DWSD's Sewage Disposal System and

---

[2] The Bond Purchase Agreement, the MFA Purchase Agreement, the 2014 DWSD Revenue and Revenue Refunding Bonds, Act 94, Act 34, the Sewer Ordinance, the Water Ordinance, the EM Approval, the DWSD Bond Resolution (Sewer), the DWSD Bond Resolution (Water), the DWSD Indentures, the Bond Purchase Agreement (Direct Purchase), the Bond Sale Orders, the Assured Insurance Commitment, and the Assured Policies shall be collectively referred to herein as the "Transaction Documents".

Water Supply System and, to the maximum extent permitted by law, the other Pledged Assets (as defined in the Bond Ordinances), the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds in favor of the holders of the 2014 DWSD Revenue and Revenue Refunding Bonds (the "2014 DWSD Revenue and Revenue Refunding Bondholders") pursuant to the Bond Ordinances, Act 94 and Sections 364(c) and 364(d) of the Bankruptcy Code, in each case, as, to the extent, and subject to, the priorities described in the Transaction Documents and this Order;

(iii)    finding that the pledge of DWSD revenues as security for such 2014 DWSD Revenue and Revenue Refunding Bonds constitutes a "lien" on "pledged special revenues" as contemplated by sections 101(37), 902(2), 922(d) and 928 of the Bankruptcy Code;

(iv)    authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Transaction Documents, including (and to the extent applicable under the Transaction Documents), Assured's fees, the DWSD Trustee's and the Underwriter's fees, the actual fees and disbursements of the DWSD Trustee's and the Underwriter's attorneys, advisers, accountants, and other consultants, and the costs of issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the MFA Bonds, all to the extent provided in and in accordance with the terms of the Transaction Documents (as applicable) and

notwithstanding Sections 943 and 1129(a)(9)(A) of the Bankruptcy Code or the confirmation of any plan of adjustment in the Case; and

(v)     approving a settlement (the "Settlement"), to be effective if and when the Tender (as defined below) closes, by and among the DWSD Settlement Parties, (a) establishing the treatment of water and sewer bond claims under the City's plan of adjustment and (b) resolving the DWSD Plan Objections on the terms and conditions set forth in the Motion and in the Assured Insurance Commitment; and

The Court having considered the Motion, including the Transaction Documents, the Donner Declaration, Bateson Declaration and Brownstein Declaration, and the evidence and arguments submitted at the hearing on the Motion commencing on August __, 2014 (the "Hearing"), after due deliberation and consideration, and for good and sufficient cause appearing therefor;

AND BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     *Petition Date*. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court") commencing this Case. The order for relief in this Case was entered on December

5, 2013.

B.     _Jurisdiction and Venue_.  This Court has jurisdiction to consider this

Motion pursuant to 28 U.S.C. §§ 157 and 1334 and authority under 28 U.S.C. §

157 and Local Rule 83.50 of the United States District Court for the Eastern

District of Michigan over these proceedings and over the persons and entities

affected hereby.  Consideration of the Motion constitutes a core proceeding under

28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is

proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     _Notice_.  Notice of the Motion and the Hearing (1) was served by the

City on (a) the trustees, transfer agents or paying agents, as applicable, for the

City's secured and unsecured bonds; (b) the City's largest unsecured creditors as

identified on the list filed under Bankruptcy Rule 1007(d); (c) the Official

Committee of Retirees appointed in this case; (d) the unions representing certain of

the City's employees and retirees; (e) the four associations of which the City is

aware representing certain retirees of the City; (f) the City's pension trusts; (g) the

insurers of the City's bonds; (h) the insurers of the certificates of participation

issued with respect to the City's pension funds (the "COPs"); (i) certain significant

holders of the COPs; (j) the counterparties under the swap contracts entered into in

connection with the COPs (collectively, the "Swaps"); (k) the insurers of the

Swaps; (l) all entities that have requested notice pursuant to Bankruptcy Rule 2002,

(m) counsel to the Underwriter and the Direct Purchasers, (n) counsel to the DWSD Objecting Parties; (o) counsel to the State Revolving Fund and (p) Trustee for the State Revolving Fund Bonds. (2) was sufficient and proper under the circumstances; and (3) complies with Bankruptcy Rules 2002 and 4001(c) and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Michigan. No further notice is necessary or required.

D. *Authorization Appropriate*. The authorization granted herein will benefit the City and its citizens and is a sound exercise of the City's business judgment, is in the best interest of the City and its citizens, and is based on good, sufficient, and sound business purposes and justifications.

E. *The City's Stipulations*. The City stipulates and acknowledges that: (1) except as provided in this Order, the Transaction Documents as of the date of entry of this Order, the Pledged Assets are not subject to any pledge, lien or security interest other than the existing liens created under the Bond Ordinances and made statutory liens by Act 94 as security for all Secured Obligations (as defined in the Bond Ordinances) heretofore issued and hereafter permitted to be issued under the Bond Ordinances; (2) the City has taken or shall take or cause to be taken all actions to obtain under non-bankruptcy law (including, but not limited to, Act 94) and the Bond Ordinances, and has received or shall have received prior to the closing, all due authorizations for the approval of the Transaction

Documents, including for the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds secured by the pledge of the Pledged Assets as set forth in the Transaction Documents; (3) subject to a determination in a Supplemental Action (as defined in the Bond Ordinances) that there will be the Required Combined Coverage (as defined in the Bond Ordinances) upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds (and after giving effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds), the Required Combined Coverage will not be less than 120% for the Senior Lien Bonds, 110% for the Second Lien Bonds and 100% for the SRF Junior Lien Bonds (each as defined in the Bond Ordinances), in each case when calculated in the manner and by the means prescribed by the Projected Net Revenues Test and Historical Net Revenues Test set forth in Section 21(C)(b) and (c) of the Sewer Ordinance and Section 20(C)(2) and (3) of the Water Ordinance; and (4) the entry of this Order and the relief and orders granted herein is at the request, and upon the consent, of the City.

   F.   *Findings Regarding the Postpetition Financing*.

      (i)   *Credit Not Available on More Favorable Terms*.  The City is unable to incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds without the granting of a senior or equal lien on the Pledged Assets as set forth in the Transaction Documents.  The City has been

Documents, including for the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds secured by the pledge of the Pledged Assets as set forth in the Transaction Documents; (3) subject to a determination in a Supplemental Action (as defined in the Bond Ordinances) that there will be the Required Combined Coverage (as defined in the Bond Ordinances) upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds (and after giving effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds), the Required Combined Coverage will not be less than 120% for the Senior Lien Bonds, 110% for the Second Lien Bonds and 100% for the SRF Junior Lien Bonds (each as defined in the Bond Ordinances), in each case when calculated in the manner and by the means prescribed by the Projected Net Revenues Test and Historical Net Revenues Test set forth in Section 21(C)(b) and (c) of the Sewer Ordinance and Section 20(C)(2) and (3) of the Water Ordinance; and (4) the entry of this Order and the relief and orders granted herein is at the request, and upon the consent, of the City.

   F.   *Findings Regarding the Postpetition Financing*.

      (i)   *Credit Not Available on More Favorable Terms*.  The City is unable to incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds without the granting of a senior or equal lien on the Pledged Assets as set forth in the Transaction Documents.  The City has been

unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; credit secured by a lien on property of the City that is not otherwise subject to a lien; or credit secured by a junior lien on property of the City that is subject to a lien. Financing on a post-petition basis is not otherwise available without granting the DWSD Trustee (1) perfected liens, equal or senior to the existing liens on the Pledged Assets securing the Existing DWSD Bonds, as security for the 2014 DWSD Revenue and Revenue Refunding Bonds with the priorities set forth herein and in the Transaction Documents, and (2) the other protections set forth in the Transaction Documents and this Order.

(ii)    *Use of Proceeds of the DWSD Revenue and Revenue Refunding Financing.* The City has agreed that proceeds of the DWSD Revenue and Revenue Refunding Financing shall be used in a manner consistent with the terms and conditions of the Transaction Documents, solely for purposes permitted by law, including (a) to make essential capital improvements to the City's sewerage disposal system as required under state and federal law as more fully described in the Motion (the "DWSD Revenue Financing"); (b) to finance the City's obligations to purchase certain water and sewer bonds that have been tendered in connection with a pending invitation to tender (the "Tender") to the holders of the City's

outstanding water and sewer bonds (the "Existing DWSD Bonds"), also as described in greater detail in the Motion (the "Tender Offer Financing"); and (c) to pay the principal, interest, fees, expenses and other amounts payable under the Transaction Documents (to the extent applicable).

G. *Prudent Judgment and Jurisdictional Matters*. Good cause has been shown for the entry of this Order. The terms and conditions of the Transaction Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances; reflect the City's exercise of prudent judgment; are supported by reasonably equivalent value and fair consideration; are at the request, and with the consent, of the City; and, with that consent, are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code.

H. *Good Faith Under Section 364(e)*. In respect of the DWSD Revenue and Revenue Refunding Financing authorized under section 364 of the Bankruptcy Code, the City, the MFA, the Underwriter, the Direct Purchasers and Assured have acted in good faith, as that term in used in section 364(e) of the Bankruptcy Code, and the Transaction Documents are the result of good faith, arms-length negotiations among the City, the MFA, the Underwriter, the Direct Purchasers and Assured. As of the closing date, the City's issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the purchase thereof by (i) the MFA, the

MFA's issuance of the MFA Bonds pursuant to Executive Order 2010-2 and the Shared Credit Rating Act, Act 227, Public Acts of Michigan 1985, as amended, MCL 141.1051 *et seq*., the Underwriter's underwriting of the MFA Bonds and the purchase of the MFA Bonds in a public offering, thereby providing funds for the purchase by the MFA of the 2014 DWSD Revenue and Revenue Refunding Bonds and (ii) the Direct Purchasers in the event of a private placement or direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, and the issuance of the Assured Policies by Assured each represents an extension of credit in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. In addition, the grant by the City of a pledge and lien in the Pledged Assets to secure, and provide a source for the repayment of, the 2014 DWSD Revenue and Revenue Refunding Bonds and the MFA Bonds, is in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. The Transaction Documents will be entered into in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable non-bankruptcy law, and the transactions contemplated by the Transaction Documents are not prohibited by applicable bankruptcy or non-bankruptcy law. As such, the MFA (and its assignees and transferees), the Underwriter (and its assignees and transferees), each purchaser of the MFA Bonds (and their assignees and transferees) (each,

including its assignees and transferees, an "MFA Bondholder" and, collectively, the "MFA Bondholders"), each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), and Assured therefore qualify for the full protection and benefits of sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

I. *Act 94 Approval.* The City has duly authorized and approved the Transaction Documents pursuant to Act 94 (as described herein and in the Motion), except for the execution of the Bond Sale Orders by the Director of the DWSD and by the Emergency Manager of the City. The City is duly authorized to cause the execution of the Bond Sale Orders by the Director of the DWSD and by the Emergency Manager of the City upon the issuance of this Order.

J. *Adequate Protection of Existing Liens.* A determination in a Supplemental Action calculated in the manner and by the means prescribed by the Projected Net Revenues Test and the Historical Net Revenues Test set forth in the Bond Ordinances, that the resulting Required Combined Coverage, after giving effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, is not less than 120% for the Senior Lien Bonds, not less than 110% for the Second

Lien Bonds and not less than 100% for the SRF Junior Lien Bonds (the "Additional Bonds Test"), together with the Alternative Refund/Debt Service Savings Test and the City's rate covenants made in Section 9 of the Bond Ordinances (the "Rate Covenant"), satisfies the bargained-for terms of the Existing Bond Documents that are applicable to the subsequent issuance of Secured Obligations, such as the 2014 DWSD Revenue and Revenue Refunding Bonds. After taking into account the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the granting of the senior and equal liens in accordance with the Transaction Documents and the Bond Ordinances, under the circumstances and given that the Supplemental Action will support that the Additional Bonds Test and Alternative Refund/Debt Service Savings Test, as applicable, will meet or exceed the Required Combined Coverage required under the Bond Ordinances, the Court finds that the Additional Bonds Test, the Alternative Refund/Debt Service Savings Test and the Rate Covenant constitute adequate protection of the pre-petition liens securing the Existing DWSD Bonds for purposes of section 364(d)(1) of the Bankruptcy Code. Moreover, there is no impairment to the interests of holders of Existing DWSD Bonds from the Tender Offer Financing because new bondholders will be taking the same position in the DWSD capital structure as the holders of the Existing DWSD Bonds.

K.     *Special Revenues.*  Net Revenues, as defined in the Bond Ordinances,

constitute "special revenues" as that term is defined in Section 902(2) of the Bankruptcy Code, constitute "pledged special revenues" as that term is used in Section 922(d) of the Bankruptcy Code and are afforded the protections contemplated by Section 928 of the Bankruptcy Code, which have been validly pledged and become subject to a lien as defined in section 101(37) of the Bankruptcy Code and in accordance with Act 94 and the Bond Ordinances to secure the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds issued under the DWSD Indentures, as more fully set forth in the Transaction Documents.

L.    *Willingness to Provide Insurance*.    Assured has indicated a willingness to issue the Assured Policies subject to: (a) the entry of this Order; (b) the approval by this Court of the Settlement; and (c) the satisfaction of certain other commercially reasonable conditions precedent set forth in the Assured Insurance Commitment.

M.    *The Settlement*.  The Settlement was negotiated at arm's length and in good faith by the DWSD Settlement Parties and the settlements and compromises set forth in the Motion and the Assured Insurance Commitment are fair, equitable and reasonable.  The DWSD Settlement Parties are not "insiders" (as defined in the Bankruptcy Code) of the City.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     <u>Motion Approved</u>.  The Motion is GRANTED.

2.     <u>Objections Overruled</u>.   All objections to the Motion and to the Transaction Documents, to the extent not withdrawn, waived, or resolved by the terms hereof, and all reservations of rights included therein, are hereby denied and overruled on the merits, with prejudice.

3.     <u>Authorization of the Financing</u>.  Subject to the adoption of the Bond Sale Orders by the Director of the DWSD and by the Emergency Manager of the City, and subject to a determination in a Supplemental Action of the satisfaction of the Rate Covenant in accordance with the Bond Ordinances, the City is hereby authorized pursuant to sections 105(a), 364(c) and 364(d)(1) of the Bankruptcy Code, by and through DWSD, to enter into, incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds under, and perform pursuant to, the Transaction Documents, all of which that have been submitted to the Court are hereby approved, and to otherwise satisfy the requirements of Act 94, the Bond Ordinances, the DWSD Bond Resolution (Sewer), and the DWSD Bond Resolution (Water).    The City is expressly authorized, without further

authorization or approval of this Court, to perform all acts, make, execute and deliver all instruments and documents, which may be required for the performance by the City under the Transaction Documents and the creation and perfection of the liens described in and provided for by this Order and the Transaction Documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements, as applicable), and to pay all fees and expenses that may be required or reasonably necessary for the City's performance of its obligations under or related to the Transaction Documents. The Net Revenues, as defined in the Bond Ordinances, and all proceeds thereof shall be deposited and applied as required by the Transaction Documents. Upon execution and delivery, the Transaction Documents shall be valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4. <u>Authorization to Borrow</u>. Immediately upon the entry of this Order, the City is authorized to issue the 2014 DWSD Revenue and Revenue Refunding Bonds to the MFA or, in the event of a private placement or direct purchase, to the MFA or to the Direct Purchasers, as applicable, pursuant to the terms of the Transaction Documents and is authorized to enter into and incur the obligations under the Transaction Documents.

5. <u>2014 DWSD Revenue and Revenue Refunding Bonds</u>. The Transaction Documents and this Order shall evidence the validity and binding

effect of the 2014 DWSD Revenue and Revenue Refunding Bonds, which shall be effective as of the date of their issuance.  Upon entry of this Order, and effective as of the date of their issuance, the 2014 DWSD Revenue and Revenue Refunding Bonds will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing (in each case, however, solely in connection with the 2014 DWSD Revenue and Revenue Refunding Bonds (and not in connection with other indebtedness, obligations or debt issuances, whether subject to the Transaction Documents or otherwise)) by the City to the MFA, the Underwriter, the Direct Purchasers, the DWSD Trustee, or any of the MFA Bondholders under the respective Transaction Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts in respect of the 2014 DWSD Revenue and Revenue Refunding Bonds under the respective Transaction Documents.  The 2014 DWSD Revenue and Revenue Refunding Bonds shall be due and payable, without notice or demand, in accordance with the terms of the Transaction Documents and notwithstanding Sections 943 and 1129(a)(9)(A) of the Bankruptcy Code or the confirmation of any plan of adjustment in this Case.

6.    Liens.  During the pendency of the Case and prior to the effective date of a plan of adjustment in this Case, upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, this Order, Act 94 and the Transaction Documents

shall be conclusive evidence of the validity, perfection and priority of the liens granted by the City and encumbering the Pledged Assets to secure the 2014 DWSD Revenue and Revenue Refunding Bonds (the "Liens") under Act 94 and sections 101(37), 364(c) and 364(d) of the Bankruptcy Code without the necessity of (a) filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or (b) the taking of any other action (including taking possession or entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens.

7.    <u>Lien Priority - Sewage Disposal System Revenue Bonds</u>.  Pursuant to the Sewer Ordinance and the other relevant Transaction Documents, the Liens securing the Sewage Disposal System Revenue Bonds shall be equal to the existing senior liens securing the Senior Lien Bonds, senior in priority and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Sewer Indenture, other than the lien securing the Senior Lien Bonds.  Other than as set forth herein, the Transaction Documents and the Sewer Ordinance, the Liens securing the Sewage Disposal System Revenue Bonds shall not be made or become subject to or *pari passu* with any lien or security interest or otherwise and shall be valid, binding, fully perfected,

continuing and enforceable, including against the City under sections 921(e) and 364(e) of the Bankruptcy Code, and this Order shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

8. <u>Lien Priority - Revenue Refunding Bonds</u>. Pursuant to the Bond Ordinances and the Transaction Documents, the Liens securing the Sewage Disposal System Revenue Refunding Bonds and the Water Supply System Revenue Refunding Bonds (the "<u>Refunding Bonds</u>") shall be equal to the existing senior liens or existing second liens, as the case may be, securing Tendered Bonds that are Senior Lien Bonds and Tendered Bonds that are Second Lien Bonds, respectively. The Liens securing Refunding Bonds that are Senior Lien Bonds shall be senior in priority and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Indentures, other than the liens securing the Senior Lien Bonds. The Liens securing Refunding Bonds that are Second Lien Bonds shall be subordinate in priority to Senior Lien Bonds and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Indentures, other than the liens securing Second Lien Bonds and Senior Lien Bonds. Other than as set forth herein, the Transaction Documents and the Bond

Ordinances, the Liens securing the Refunding Bonds shall not be made or become subject to or *pari passu* with any lien or security interest or otherwise and shall be valid, binding, fully perfected, continuing and enforceable, including against the City under sections 921(e) and 364(e) of the Bankruptcy Code, and this Order shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

9. <u>No Obligation to Extend Credit</u>. None of the Direct Purchasers, the MFA or the Underwriter shall have any obligation to purchase any bond or make any other extension of credit under the Transaction Documents unless (a) all of the conditions precedent to the purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds and, in the case of a public offering, the purchase of the MFA Bonds and the extension of such credit provided thereby under the Transaction Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Transaction Documents and (b) no stay of this Order pending appeal shall have been obtained by any party from this Court or any other court.

10. <u>Amendment of the Transaction Documents</u>. The City is authorized, without further approval or authorization of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably

required to effect one or more amendments, modifications or supplements to any of the Transaction Documents if the amendments, modifications or supplements (a) are consistent with this Order; (b) in the good faith judgment of the City, are not amendments, modifications or supplements that are materially adverse to the interests of the holders of pre-petition liens securing the Existing DWSD Bonds under the Transaction Documents; (c) are otherwise permitted under the terms of the Bond Ordinances and the other Transaction Documents; and (d) are otherwise within the power of the City to effect without further order of the Court under Section 904 of the Bankruptcy Code or otherwise.

11. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. Based on the findings of fact and conclusions of law set forth in this Order and the record made during the Hearing, the City, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured have acted in good faith, as that term is used in section 364(e) of the Bankruptcy Code, in connection with the Transaction Documents, and their reliance on this Order is also in good faith. In accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed or modified on appeal, the MFA, the Underwriter, each holder of a 2014 DWSD

Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured are entitled to and hereby granted the protections provided in section 364(e) of the Bankruptcy Code. Any reversal or modification of this Order on appeal shall not affect the validity or enforceability of the 2014 DWSD Revenue and Revenue Refunding Bonds or any Lien, claim, or priority authorized or created hereby or the validity or enforceability of the Assured Policies. Any liens or claims granted to the MFA, the DWSD Trustee, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders or Assured hereunder arising prior to the effective date of any such reversal or modification of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

12.     <u>Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>. In accordance with section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed on appeal, the MFA, the DWSD Trustee, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and

transferees), the MFA Bondholders and Assured are entitled to the protections provided in section 921(e) of the Bankruptcy Code. Any such reversal shall not affect the validity or enforceability of the 2014 DWSD Revenue and Revenue Refunding Bonds or the Liens or priority authorized by this Order, or the validity or enforceability of the Assured Policies. Any Liens granted to the DWSD Trustee authorized hereunder arising prior to the effective date of any such reversal shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

13. _Special Revenues_. Any and all Net Revenues, as defined in the Bond Ordinances, shall be treated as "special revenues" as that term is defined in section 902(2) of the Bankruptcy Code and shall be treated as "pledged special revenues" as that term is used in section 922(d) of the Bankruptcy Code and are afforded all applicable protections under the Bankruptcy Code and applicable law, including the protections contemplated in section 928 of the Bankruptcy Code, which have been validly pledged and become subject to a lien under Act 94 to secure the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds issued under the DWSD Indentures, as fully set forth in the Transaction Documents.

14. _No Impairment_. All rights and remedies of the DWSD Trustee, MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their

respective assignees and transferees), the MFA Bondholders and Assured under the Transaction Documents, as they relate to the 2014 DWSD Revenue and Revenue Refunding Bonds, shall remain effective and, except as otherwise provided in the Transaction Documents, may not be modified, impaired, or discharged, notwithstanding the authority of the Emergency Manager of City to act on behalf of and bind the City, the dismissal of this Case, or the confirmation of, or failure to confirm, any plan of adjustment in this Case. All rights and remedies of the DWSD Trustee, MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured under this Order shall remain effective and may not, except as otherwise provided herein, be modified, impaired or discharged, notwithstanding the authority of the Emergency Manager of City to act on behalf of and bind the City, during the pendency of the Case and prior to the effective date of a plan of adjustment in this Case.

15. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the DWSD Trustee, the holders of Existing DWSD Bonds, the DWSD Bond Insurers, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not

limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders or Assured to seek any other or supplemental relief in respect of the City.

16.     No Modification of Order.  Following the closing date of the 2014 DWSD Revenue and Revenue Refunding Bonds and until and unless the 2014 DWSD Revenue and Revenue Refunding Bonds have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Transaction Documents that by their terms survive such discharge) or otherwise defeased, the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent (not to be unreasonably withheld) of (a) Assured, the DWSD Trustee, the Ad Hoc Committee and, if such action is to be taken after the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, the MFA, and (b) in the case of a direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, the Direct Purchasers, in each case, in the reasonable discretion of the DWSD Trustee, the MFA and the Direct Purchasers, as applicable, any modification, stay, vacatur or amendment to this Order or the order for relief in any manner.

17.     Exculpation.     Except to the extent expressly set forth in the Transaction Documents, nothing in this Order, the Transaction Documents, or any other documents related to the transactions contemplated hereby shall in any way

be construed or interpreted to impose or allow the imposition upon the DWSD Trustee, Assured, the holders of Existing DWSD Bonds, the MFA, the Underwriter, the Direct Purchasers or the MFA Bondholders any liability for any claims arising in connection with the 2014 DWSD Revenue and Revenue Refunding Bonds. In addition, with respect to the Pledged Assets (a) except as expressly set forth in the Transaction Documents, none of Assured, the DWSD Trustee, the holders of Existing DWSD Bonds, the MFA, the Underwriter, the Direct Purchasers or the MFA Bondholders shall, in any way or manner, be liable or responsible for (i) the safekeeping of the Pledged Assets, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Pledged Assets shall be borne by the City.

18. <u>Effect of Stipulations</u>. The stipulations and admissions contained in this Order shall be binding upon the City and the DWSD Objecting Parties.

19. <u>Order Controls (Transaction Documents)</u>. During the pendency of the Case and prior to the effective date of a plan of adjustment in this Case, in the event of any inconsistency between the terms and conditions of the Transaction Documents and this Order, the provisions of this Order shall govern and control.

20. <u>No Third Party Rights</u>. Except as explicitly provided for herein or in

the Transaction Documents, this Order does not create any rights for the benefit of any third party who is not expressly referenced in this Order, any creditor or any direct, indirect or incidental beneficiary.

21. <u>Survival</u>. The Liens and indebtedness incurred under the Transaction Documents authorized by this Order and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any subsequent order that may be entered: (a) dismissing the Case; or (b) pursuant to which this Court abstains from hearing the Case.

22. <u>No Waiver by Seeking Relief</u>. Except to the extent this Order provides otherwise, (i) neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the 2014 DWSD Revenue and Revenue Refunding Bonds, without authorization or approval of the Court, (ii) nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as provided herein.

23. <u>The Settlement</u>. The Settlement as described in the Motion is approved in its entirety and all of its terms are incorporated herein by reference as

if fully set forth herein, and the failure to specifically describe or include in this Order any particular provision of the Motion or the Assured Insurance Commitment shall not diminish or impair the effectiveness of any such provision. The settlements and compromises set forth in the Assured Insurance Commitment and in the Motion are fair and reasonable to, and in the best interests of, the City, its residents and its creditors, and in entering into the Settlement, the DWSD Settlement Parties have acted in a commercially reasonable manner and exercised their respective rights and powers, and used the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances.

24. <u>DWSD Contribution to GRS Pension Plan</u>. DWSD's contributions to the GRS pension plan set forth in the Amended Plan shall be accounted for as follows: (i) DWSD shall pay as operation and maintenance expenses, to be allocated between the Sewage Disposal System and the Water Supply System, no more than the sum of (a) $24 million per annum; and (b) DWSD's allocable share of its annual "defined contribution" payments related to the DWSD employees; and (ii) DWSD shall pay the difference between the annual allocation of the Plan GRS pension contributions provided in the Plan and $24 million from a "pension liability payment fund" that is funded after payments required to be made into the SRF Junior Lien Bond and Interest Redemption Fund established and defined in the Bond Documents and on a subordinated basis to the 2014 DWSD Revenue and

Revenue Refunding Bonds and all other existing DWSD bond debt.

25. <u>Amended Plan</u>. On the Settlement Date (i) the City shall file an amended Plan (the "<u>Amended Plan</u>") that renders unimpaired the Existing DWSD Bond Claims within the meaning of Section 1124 of the Bankruptcy Code, including, without limitation, those provisions that eliminate call protection or reduce the interest rates of the Existing DWSD Bonds, and (ii) the DWSD Plan Objections will be deemed to be withdrawn. The accounting treatment of DWSD's contributions to the GRS pension plan in Paragraph 24 hereof shall not constitute "impairment" of the Existing DWSD Bonds or the Existing DWSD Bond Claims in respect thereof.

26. <u>No Amendment</u>. Following the filing of the Amended Plan, the City shall not thereafter amend, supplement or otherwise modify the Amended Plan, or participate in, support or acquiesce to any such amendment, supplement or modification (including any motion for an order seeking such amendment, supplement or modification) of the Amended Plan that would result in (i) the impairment of any Existing DWSD Bond Claim; (ii) the alteration of the accounting treatment of DWSD's contributions to the GRS pension plan as set forth in Paragraph 24 of this Order or (iii) be inconsistent with this Order.

27. <u>Reimbursement of Certain Professional Fees and Expenses</u>. On the Settlement Date, the DWSD is authorized to and shall reimburse the professional

fees and expenses of certain of the DWSD Settlement Parties incurred in connection with the Case, as follows: (i) to Assured, $3,000,000; (ii) to the Ad Hoc Committee, $1,200,000; and (iii) to FGIC, $550,000. In addition, pursuant to the Assured Insurance Commitment, in the event that the City agrees, other than solely as a result of a court order or an arbitration award (i) to pay any of the DWSD Objecting Parties other than the DWSD Trustee an amount in excess of $3 million for DWSD-related bankruptcy fees, costs and expenses or (ii) with respect to the DWSD Trustee, to establish a floor for DWSD-related bankruptcy fees, costs and expenses in excess of $3 million, then DWSD shall be required to pay to Assured $3 million plus such amount that is the greatest amount paid to any DWSD Objecting Party in excess of $3 million. The City and the DWSD Trustee shall resolve the DWSD Trustee's fee claim in accordance with the DWSD Trustee Claim Arbitration as set forth in the Motion.

28.    <u>All Appropriate Actions</u>.  The City is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers, and to make all payments (including interest and fees, if any), and take any and all actions reasonably necessary or appropriate to consummate, complete, execute and implement the Settlement, and any actions taken heretofore in furtherance of these obligations are hereby ratified.

29.    <u>Order Controls (Settlement)</u>.  Unless otherwise agreed by the Parties,

to the extent of any inconsistency between (i) this Order and the Assured Insurance Commitment, the terms of this Order shall govern and (ii) this Order and the Assured Insurance Commitment, on the one hand, and any Plan confirmed in this chapter 9 case (other than a Specified Plan), on the other hand, the terms of this Order and the Assured Insurance Commitment, as applicable, shall govern.

30. <u>Survival.</u> The provisions and effect of this Order, any actions taken pursuant to this Order or the Settlement and the DWSD Settlement Parties' respective rights, obligations, remedies and protections provided for herein shall survive the dismissal or closing of this chapter 9 case, or confirmation of a plan or plans of adjustment, and the terms and provision of this Order and the Assured Insurance Commitment shall continue in full force and effect notwithstanding the entry of any such order.

31. <u>Binding Effect of Order</u>. This Order shall be immediately effective upon its entry. Immediately upon entry by this Court, the terms and provisions of this Order (including the Settlement) shall become valid and binding upon all parties in interest in this Case, including but not limited to, the City, the MFA, the Underwriter, the Direct Purchasers, the MFA Bondholders, the DWSD Settlement Parties, all other creditors of the City, the City's Emergency Manager, any committee appointed in the Case and all other parties in interest and their respective successors and assigns.

32. <u>Continuing Jurisdiction</u>.    This Court shall retain continuing jurisdiction through the effective date of a plan of adjustment in this Case with respect to all matters related to or arising from this Order and the relief granted herein, the implementation of the Transaction Documents, including but not limited to compliance with the Additional Bonds Test and enforcement of the Rate Covenants required under the Ordinances, and implementation and enforcement of the terms agreed to under the Settlement.

33. <u>Existing Bond Insurance Policies</u>.    Nothing in this Order impairs, modifies, affects or otherwise alters the rights of Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers (as those terms are defined under the Plan).

Form B20A(Official Form 20A)
12/1/10

## UNITED STATES BANKRUPTCY COURT
### Eastern District of Michigan

In re:

**CITY OF DETROIT, MICHIGAN,**

           **Debtor.**

**Chapter: 9**

**Case No.: 13-53846**

**Judge:  Hon. Steven W. Rhodes**

Address:  2 Woodward Avenue, Suite 1126
      Detroit, Michigan  48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any):  38-6004606

## NOTICE OF MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 APPROVING SETTLEMENT OF <u>CONFIRMATION OBJECTIONS</u>

       The City of Detroit, Michigan (the "<u>City</u>") has filed its Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections.

       <u>**Your rights may be affected.**</u>  **You should read these papers carefully and discuss them with your attorney, if you have one in this**

**bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the Court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **on or by August 25, 2014,** you or your attorney must:

1.          File with the court a written response or an answer, explaining your position at:[1]

**United States Bankruptcy Court**
211 W. Fort Street, Suite 2100
Detroit, Michigan  48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

You must also mail a copy to:

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Brad B. Erens
David A. Hall
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939

---

[1]          Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

Facsimile: (312) 782-8585

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

Ann Fillingham
DYKEMA
Capitol View
201 Townsend Street
Suite 900
Lansing, Michigan
Telephone: (517) 374-9100
Facsimile: (517) 517-374-9191

Debbie Sinclair Ruskin
KUTAK ROCK LLP
1101 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

2.      If a response or answer is timely filed and served, the Court will
schedule a hearing on the motion and you will be served with a
notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the Court may
decide that you do not oppose the relief sought in the motion and may
enter an order granting that relief.**

Dated: August 11, 2014          Respectfully submitted,


/s/  Jonathan S. Green
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com


David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com


Brad B. Erens
David A. Hall
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
dahall@jonesday.com


ATTORNEYS FOR THE CITY

**(Intentionally Omitted)**

CHI-1939085v1

# CERTIFICATE OF SERVICE

I, Jonathan S. Green, hereby certify that the foregoing Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections was filed and served via the Court's electronic case filing and noticing system on this 11th day of August, 2014.


/s/ Jonathan S. Green

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
:
In re                                        :                Chapter 9
:
CITY OF DETROIT, MICHIGAN,        :                Case No. 13-53846
:
                              Debtor.     :                Hon. Steven W. Rhodes
:
:
------------------------------------------------------x


## DECLARATION OF LEE DONNER IN SUPPORT OF MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT

I, Lee Donner, hereby declare, under penalty of perjury pursuant to

28 U.S.C. § 1746, as follows:

1.      I am a Managing Director at First Southwest Company, a

position I have held since 1999.  First Southwest is one of the country's top ranked

broker/dealer municipal financial advisory firms, which serves clients in various

industry specialties, including public sector entities in public finance, individual

and institutional investors in capital markets, and broker-dealers and investment

advisors in clearing services.  I have over thirty years experience in the investment

banking industry.

2.      In addition to a bachelor's degree from the University of Texas at Arlington, I hold a number of professional licenses from the Financial Industry Regulatory Authority.

These include:

(a) General Securities Principal, Series 24;
(b) General Securities Representative, Series 7;
(c) Municipal Securities Principal, Series 53;
(d) Uniform Securities Agent, Series 63; and
(e) Investment Banking Representative, Series 79.

3.      I submit this declaration in support of the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement Agreement (the "<u>Motion</u>").[1]  Except as otherwise indicated, all statements in this Declaration are (a) based upon my personal knowledge, (b) my review of relevant documents and/or (c) my opinion based upon my experience and knowledge of the capital markets, municipal bond markets and other financial markets, and the DWSD's operations and financial condition.  If called to testify, I could and would testify to each of the statements set forth herein based on such personal knowledge, review of documents and/or informed opinion.

---

[1]      Capitalized terms used but not defined herein have the meanings given to them in the Motion.

4.     First Southwest Company ("<u>First Southwest</u>"), as financial advisor to the DWSD and MFA with respect to the transaction, has incurred fees in the amount of $395,000, charged as a flat rate, in connection with the Tender, and $590,000, charged as a flat rate, in connection with the DWSD Revenue and Revenue Refunding Financing.  First Southwest will also be reimbursed for actual expenses up to $45,000 incurred in respect of the Tender and $48,000 in connection with the DWSD Revenue and Revenue Refunding Financing.

5.     The total fixed costs of fees and expenses expected to be incurred by DWSD in connection with the Tender is approximately $2,443,000. The total fixed costs of fees and expenses expected to be incurred by DWSD in connection with the 2014 DWSD Revenue and Revenue Refunding Financing is approximately $3,735,000.  The variable costs of fees and expenses expected to be incurred by DWSD for each of the Tender and the 2014 DWSD Revenue and Revenue Refunding Financing are approximately $2.25 per $1,000 of Tendered Bonds and $3.72 per $1,000 of 2014 Revenue and Revenue Refunding Bonds issued, respectively.

6.     The DWSD Revenue and Revenue Refunding Financing is expected to appreciably reduce the DWSD's cumulative debt service in the coming years.

7.     With respect to the DWSD Revenue Financing, First Southwest has advised that if such financing were to be taken to market as a stand-alone transaction in the context of the City's chapter 9 case and the current terms of the Plan, the DWSD Revenue Financing (a) could not be obtained on an unsecured basis, and (b) in all likelihood, could not be obtained on a junior lien basis.

8.     It is not customary for DWSD to issue unsecured debt. Most, if not all, of DWSD debt is secured. Obtaining financing similar to the DWSD Revenue Financing on an unsecured basis would be punitively expensive. Therefore, financing on terms similar to the DWSD Revenue Financing could not be obtained on an unsecured basis.

9.     Based on feedback from the market, obtaining DWSD Revenue Financing on a junior lien basis, as a stand-alone transaction in the context of the City's chapter 9 case and the current terms of the Plan, would be challenging. While there is, at any given time, demand in the market place for high yield debt, the market for such debt is neither as broad nor as predictable as for highly rated debt, and demand can decline dramatically with little advance notice in accordance with macroeconomic factors.

10.     Thus, structuring the DWSD Revenue Financing as a junior secured financing creates risk that the offering, following the time required for

necessary City and state approvals as well as approval by this Court, and the closing of the Tender, may not have the same demand in the market place.

11. Junior lien water and sewer debt has always been, and certainly would be now, significantly more expensive than senior lien debt. Thus, it is advantageous for DWSD to issue bonds that constitute new financing (as opposed to refunding bonds) on a senior lien basis to keep its cost of capital as low as possible, which will reduce the City's debt service costs and enhance the City's ability to issue additional water and sewer debt in the future.

12. With respect to the Tender Offer Financing, I believe that no bondholders would commit to purchase 2014 DWSD Revenue and Revenue Refunding Bonds without the same lien priority and on effectively the same terms as the Existing DWSD Bonds that are tendered. Thus, the junior lien bonds under the Tender Offer Financing could not be issued on an unsecured basis, and the senior lien bonds under the Tender Offer Financing could not be issued on a junior lien or unsecured basis.

13. As part of the Settlement, Assured has agreed to provide the Assured Policies to insure the senior lien 2014 Revenue and Revenue Refunding Bonds and the Assured Policies will provide tangible economic benefit to DWSD. Assured's agreement to provide the Assured Policies is conditioned upon the

structure of the 2014 Revenue and Revenue Refunding Bonds, including the priorities of debt, proposed in the Motion.

I, Lee Donner, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 11, 2014

By: /s/ Lee Donner
Managing Director
First Southwest Company

```
------------------------------------------------------x
                                     :
In re                                :          Chapter 9
                                     :
CITY OF DETROIT, MICHIGAN,           :          Case No. 13-53846
                                     :
                       Debtor.       :          Hon. Steven W. Rhodes
                                     :
                                     :
------------------------------------------------------x
```

**DECLARATION OF NICOLETTE BATESON IN SUPPORT OF MOTION
OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO
(I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928
(A) APPROVING POSTPETITION FINANCING AND (B) GRANTING
LIENS AND (II) BANKRUPTCY RULE 9019 APPROVING SETTLEMENT
AGREEMENT**

I, Nicolette Bateson, hereby declare, under penalty of perjury pursuant

to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Financial Officer for the Detroit Water and

Sewerage Department, a position I have held since February, 2013.  Prior to this

position, my career encompassed a variety of financial accounting and advisory

roles with both public and private entities.  These roles included employment as:

> (a) the Assistant City Manager, Finance Director, and Treasurer for a
> city in Michigan;

> (b) a visiting specialist for the State and Local Government Program
> with the Michigan State University Extension Service;

> (c) an audit supervisor with a national accounting firm; and

(d) an independent financial consultant.

2.      I am a certified public accountant. I hold a master's degree in government management from Eastern Michigan University as well as a bachelor's degree in professional accounting from the University of Michigan-Dearborn.

3.      I submit this declaration in support of the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement Agreement (the "Motion").[1] Except as otherwise indicated, all statements in this Declaration are (a) based upon my personal knowledge, (b) my review of relevant documents and/or (c) my opinion based upon my experience and knowledge of financial accounting, municipal finances and the DWSD's operations and financial conditions. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and/or informed opinion.

4.      In connection with the DWSD Revenue and Revenue Refunding Financing, certain existing sureties will be cancelled and certain cash reserves will be released, in an amount that DWSD currently estimates at approximately $50 million. These funds will be applied in accordance with the

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the Motion.

applicable bond documents and applicable law as a part of the DWSD Revenue and Revenue Refunding Financing, effectively reducing the necessary size of the financing by the amount of released funds, net of the cost of reserve fund compliance under the Ordinances.

5. Currently, DWSD has approximately $1.8 billion of outstanding Senior Lien Sewer Bonds. There is an additional $945 million of outstanding Second Lien Sewer Bonds.

6. DWSD also has approximately $1.8 billion of outstanding Senior Lien Water Bonds, and there is an additional $629 million of outstanding Second Lien Water Bonds.

I, Nicolette Bateson, declare under penalty of perjury that the foregoing is true and correct.

By: /s/ Nicolette Bateson
Chief Financial Officer
Detroit Water and Sewerage Department

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------x
:
In re                          :         Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :         Case No. 13-53846
:
             Debtor.    :         Hon. Steven W. Rhodes
:
:
-------------------------------------------------x

## DECLARATION OF DAVID BROWNSTEIN
## IN SUPPORT OF MOTION OF THE DEBTOR FOR A FINAL ORDER
## PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT

I, David Brownstein, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I am the Head of Public Finance for Citigroup Global Markets Inc. ("Citi").  Citi provides world-class products and financing solutions for corporations, governments, and institutional and retail investors through its underwriting, sales, trading and distribution capabilities.

2.     I have over thirty years experience in public finance.  In addition to a bachelor's degree from Beloit College, I hold a number of professional licenses from the Financial Industry Regulatory Authority.

These include:

(a) General Securities Principal, Series 24;
(b) General Securities Representative, Series 7;
(c) Municipal Securities Principal, Series 53;
(d) Municipal Securities Representative, Series 52.

3.        I am also the former chair of the Municipal Securities Division

of the Securities Industry and Financial Markets Association ("SIFMA").  For my

work in this role during the recent financial crisis, I was named a recipient of the

SIFMA 2012 Honor Roll Award.

4.        I submit this declaration in support of the Motion of the Debtor

for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902,

904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting

Liens and (II) Bankruptcy Rule 9019 Approving Settlement Agreement (the

"Motion").[1]  Except as otherwise indicated, all statements in this Declaration are (a)

based upon my personal knowledge, (b) my review of relevant documents and/or

(c) my opinion based upon my experience and knowledge of the capital markets,

municipal bond markets and other financial markets, and the DWSD's operations

and financial condition.  If called to testify, I could and would testify to each of the

facts set forth herein based on such personal knowledge, review of documents

and/or informed opinion.

---

[1]        Capitalized terms not otherwise defined herein have the meanings given to
them in the Motion.

5. Citigroup Global Markets Inc. ("Citi") has been hired by DWSD to act as senior managing underwriter for the DWSD Revenue and Revenue Refunding. Citi and DWSD have agreed to a fee structure whereby Citi will be paid a fee of 0.1% of the principal amount of the Tendered Bonds to act as the dealer manager in connection with the Tender and an additional fee of 0.3 to 0.4% of the issue amount as an underwriting fee.

6. Citi's proposed underwriter's discount is well below market averages for public offerings of municipal bonds on both an insured and uninsured basis based upon data compiled by Securities Data Corporation. Citi's tender fee is well below fees Citi has charged on similarly situated public tender offers and lower than the fees charged by Citi in connection with the Jefferson County bankruptcy case.

7. Citi has advised DWSD that the effective interest rates on the 2014 DWSD Revenue and Revenue Refunding Bonds, including uninsured bonds, will not exceed 5.75%, but will likely be lower in light of the public nature of the offering and the bond insurance credit enhancement commitment. Such a pricing trend is consistent with historical market norms, as publicly offered debt is almost uniformly cheaper than privately placed debt of this type.

8. It is not customary for DWSD to issue unsecured debt. Most, if not all, of DWSD debt is secured. Obtaining financing similar to the DWSD

Revenue Financing on an unsecured basis would be punitively expensive. Therefore, financing on terms similar to the DWSD Revenue Financing could not be obtained on an unsecured basis.

9.     Based on feedback from the market, obtaining DWSD Revenue Financing on a junior lien basis, as a stand-alone transaction in the context of the City's chapter 9 case and the current terms of the Plan, would be challenging. While there is, at any given time, demand in the market place for high yield debt, the market for such debt is neither as broad nor as predictable as for highly rated debt, and demand can decline dramatically with little advance notice in accordance with macroeconomic factors.

10.     Thus, structuring the DWSD Revenue Financing as a junior secured financing creates risk that the offering, following the time required for necessary City and state approvals as well as approval by this Court, and the closing of the Tender, may not have the same demand in the market place.

I, David Brownstein, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 11, 2014

By: /s/ David Brownstein
Managing Director
Citigroup Global Markets Inc.

**Public Offering Indicative Terms**

The definitive documentation governing the DWSD Revenue and Revenue Refunding Financing shall provide generally for the following terms:

| | |
|---|---|
| Public Bond Issuer | Michigan Finance Authority (the "MFA") |
| Obligor | Detroit Water and Sewerage Department ("DWSD") |
| Purchaser of Obligor Bonds | MFA |
| Offering Method | Public Offering |
| Maximum Par | $5.5 Billion |
| Uses of Proceeds | The proceeds of the 2014 publicly offered bonds will be used to (i) purchase DWSD bonds tendered and accepted for purchase in the Tender Offer, (ii) refund certain other DWSD bonds, (iii) fund new money capital improvements of the sewage disposal system, (iv) fund required reserves, and (v) pay costs of issuance and other expenses. |
| Maturities | The bonds will mature at varying dates not later than 30 years from the date of issuance. The weighted average maturity of the 2014 bonds issued to fund the purchase of tendered bonds and to refund bonds is not expected to be materially longer or shorter than the weighted average maturity of such tendered and repurchased and refunded bonds. |
| Bond Insurance | A portion of the bonds will be insured by bond insurance policies provided by Assured Guaranty and potentially additional bond insurers. |
| Interest Rates | The bonds will bear interest at fixed rates of interest determined at the time of pricing. |
| Maximum Interest Rate | The bonds will bear interest rate coupons at rates less than or equal to 5.75%, including on uninsured bonds. |
| Reserve Funds | In connection with the issuance of the bonds, DWSD will fund debt service reserve funds at levels that meet the levels required by DWSD's bond indenture. A portion of this requirement is expected to be met by the provision of debt service reserve Surety policies provided by Assured on terms and conditions set forth in the Assured Insurance Commitment Term Sheet and potentially additional bond insurers. |

| | |
|---|---|
| Anticipated Pricing Date | August 26, 2014 |
| Anticipated Sale Date | August 27, 2014 |
| Anticipated Settlement Date | September 4, 2014 |

CHI-1939097v1

# DETROIT WATER AND SEWER DEPARTMENT



**as of August 11, 2014**

Citibank, N.A. ("Citi") is providing the information contained in this document for discussion purposes only in anticipation of serving solely as a purchaser of the Notes referenced herein. The primary role of Citi, as a purchaser, is to purchase the Notes as an investor, in an arm's-length commercial transaction either between the Obligor and Citi or among MFA, the Obligor and Citi. Citi has financial and other interests that differ from those of the Issuer and of the Obligor. Citi is not acting as a municipal advisor, financial advisor or fiduciary to either the Issuer or the Obligor or any other person or entity. The information provided is not intended to be and should not be construed as "advice" within the meaning of Section 15B of the Securities Exchange Act of 1934. The Issuer and the Obligor should each consult with its own financial and/or municipal, legal, accounting, tax and other advisors, as applicable, to the extent it deems appropriate.  The Issuer and the Obligor should each consider whether to engage an advisor to act in a fiduciary capacity on its behalf in connection with this transaction.

**Detroit Water and Sewerage Department**
**Direct Purchase of Floating Rate Notes**
**Preliminary Terms and Conditions**

Note: This Proposal constitutes a brief summary of certain, but not all, transaction terms and conditions for discussion purposes only. The summary that follows is subject to credit approval and does not constitute an offer or commitment.

## I.  Summary of Transaction

| Parties | |
|---|---|
| Issuer | Michigan Finance Authority ("MFA") or City of Detroit (the "City"), through its Detroit Water and Sewerage Department ("DWSD" or "the Obligor") |
| Obligor (if MFA is Issuer) | Detroit Water and Sewerage Department |
| Purchasers | Citibank, N.A. and other financial institutions to be determined |
| Contacts | David M. Brownstein<br>Vice President, Citibank<br>david.m.brownstein@citi.com          (212) 723-5570<br><br>Mike Leffler<br>Vice President, Citibank<br>mike.leffler@citi.com          (212)723-4453<br><br>390 Greenwich St., 2nd Floor          (212)723-8642 fax<br>New York, NY 10013 |
| **Purpose** | Proceeds of the Floating Rate Note Facility ("Notes") to be used to (i) to provide financing for the tender and current refunding of certain outstanding DWSD bonds and an amount not to exceed $190 million new money sewer bonds and (ii) fund certain expenses, required reserves and costs of issuance associated with the Notes. (collectively, the "2014 DWSD Refinancing Bonds") |
| **Facility Description** | Agreement by the Purchasers to purchase the Notes, up to the Maximum Par Amount as described below, in one or more series or subseries from the MFA or DWSD. The Notes shall be issued as DTC-eligible securities with CUSIPs. |
| **Security** | The Notes will be structured on parity with outstanding indebtedness to be refunded under the DWSD Ordinances relating to the sewage disposal system bonds and the water supply system bonds (collectively referred to herein as the "Ordinance") to the maximum extent of capacity under the applicable ABT test and the remainder on a TBD subordinate basis. |
| **Credit Approval** | Subject to Credit Approval, Senior Business and Risk Approval, including approval of final documentation |
| **Proposal Expiration Date** | This term sheet shall expire on September 30, 2014 unless accepted and closing occurs within 90 days hereof. |

## II.  General Facility Features

| Delivery Date | Not later than 90 days from the date of this Proposal. |
|---|---|
| **Maturity Date** | Up to 30 years following the Delivery Date of the Notes. |
| **Amortization** | Proportionate to amortization on the proposed refunding bonds. |
| **Maximum Par Amount** | Up to $5.5 billion to be purchased on the Delivery Date. Citi will serve as lead arranger and in such capacity, will agree to purchase up to $1.0 billion of the Notes, with the remainder to be syndicated. |
| **Payment Frequency** | Interest payments monthly on the first business day of the month; principal |

| | |
|---|---|
| | payments to be made annually |
| **Day Count** | Actual/360 |
| **Interest Rate Calculation** | Monthly; the interest rate on the Notes ("Note Interest Rate") will equal the 1 Month LIBOR Index plus a Margin no greater than the rates set forth below.. |
| **Margin** | <table><tr><td align="center">**Ratings (M/S/F)**</td><td align="center">**Margin**</td></tr><tr><td align="center">A3/A-/A- or higher</td><td align="center">3.50%</td></tr><tr><td align="center">Baa1/BBB+/BBB+</td><td align="center">3.75%</td></tr><tr><td align="center">Baa2/BBB/BBB or lower (or no rating)</td><td align="center">4.00%</td></tr></table>Margin will be determined, on a series by series basis, by the highest two of three ratings then in place for parity indebtedness of the Obligor.<br><br>The Margin will be adjusted by the following increments depending on the amount of time the Notes have been outstanding from the Delivery Date:<br><br><table><tr><td align="center">**Months from Delivery Date**</td><td align="center">**Increase to Margin**</td></tr><tr><td align="center">0-3</td><td align="center">0.00%</td></tr><tr><td align="center">3-6</td><td align="center">2.00%</td></tr><tr><td align="center">6-12</td><td align="center">4.00%</td></tr><tr><td align="center">12-Maturity</td><td align="center">the Margin, irrespective of Ratings at the time will be 10%</td></tr></table> |
| | Upon the occurrence of an Event of Default, 10.00% ("Event of Default Margin") |
| **Maximum Rate** | The Maximum Note Interest Rate shall be the lesser of i) 25% or ii) the maximum rate permitted by law. Excess interest shall be subject to recapture pursuant to a standard clawback provision. |
| **Optional Redemption Provisions** | The Notes shall be subject to optional redemption on any business day, in whole or in part, with no penalty upon at least 10 days' prior notice. |

### III. Extraordinary Margin Adjustment Provisions

| | |
|---|---|
| **Extraordinary Margin Adjustment Events** | i. The long term rating, if any, of the Notes, the 2014 DWSD Refinancing Bonds or any other indebtedness issued pursuant to the Ordinance on or after the Delivery Date of the Notes, is reduced to or below BB or BB by either S&P or Fitch, respectively, or any of the ratings of any indebtedness (excluding the Notes) issued pursuant to the Ordinance is withdrawn or suspended for any reason; provided that this provision will not take effect until the earlier of (A) the date that DWSD has obtained ratings from S&P and Fitch and (B) the date which is seven months after the Delivery Date of the Notes. |
| | ii. Covenant default or failure to comply with other covenants under any Related Documents. For purposes herein, the term "Related Documents" shall mean documentation associated with any outstanding indebtedness, derivative transaction or any guaranty on any indebtedness or derivative transaction. |
| | Upon the occurrence of an Extraordinary Margin Adjustment Event, the Margin will be adjusted to 10.00%. |

## IV.    Events of Default

Customary for facilities of this nature, including, but not limited to:

|  | |
|---|---|
| | a) The occurrence or existence of an event, default, event of default (other than a payment default) or other similar condition by the Obligor under any loan, credit facility, swap, hedge, or derivative which has resulted in such obligation becoming, or becoming capable at such time of being declared, due and payable under such agreement or instrument (or in the case of a swap, hedge or derivative, results in such agreement being terminated early or being capable of being terminated early); |
| | b) The occurrence or existence of a default by the Obligor in making one or more payments on the due date thereof under the Notes or any other obligation of the Obligor other than the Notes (including any loan, credit facility, swap, hedge or derivative), provided that any applicable grace period shall not apply; |
| | c) Failure to perform or observe any term, covenant or agreement contained within the Agreement not covered in a) or b) above; subject to any applicable grace period; |
| | d) At any time after the City's plan of adjustment shall have become effective or in the event the City's current pending bankruptcy case is dismissed, a bankruptcy or insolvency of the City or moratorium of payment of debt of the City or DWSD; |
| | e) Any judgment for the payment of money in an amount equal to or greater than $20,000,000 shall be rendered against the Obligor; |
| | f) Representations or warranties are inaccurate or incomplete in any material respect; |
| | g) Invalidity or unenforceability of the Notes or any related documents or the Obligor's obligations thereunder or the Obligor contests or denies any such obligations; |
| | h) Occurrence of any event or change which separately or in the aggregate with other events results in or could reasonably be expected to result in a material adverse change, as determined by the Purchasers; |
| | i) Withdrawal or suspension of the rating on any obligations of the Obligor by either Moody's or S&P or Fitch (if applicable). |
| | Upon the occurrence of an Event of Default, the Notes shall be immediately due and payable, and the applicable Margin shall be the Event of Default Margin. |

## V.    Additional Requirements/Conditions

| Calculation Agent | The Obligor may be required to hire a Calculation Agent in order to calculate the rate of interest on the Notes. |
|---|---|
| Reporting Requirements | The Issuer/Obligor shall furnish to the Purchasers information reasonable and typical for this type of transaction. |
| Ratings | Initially, no ratings are required for the Notes; however, if the Notes are outstanding for a period of six months after the Delivery Date, DWSD (and MFA, if applicable) will each use its best efforts to obtain one or more long-term ratings on the Notes from two or more rating agencies, as specified by the Purchasers and acceptable to DWSD and MFA (if applicable.) |
| Other Covenants | Those customary for transactions of this nature, including, but not limited to:<br>a) Incorporation of covenants from related financing documents; |

b) Continued existence; however, the Purchasers are willing to agree to (i) the substitution of DWSD as Obligor on the Notes with a newly created regional water or water and sewer authority (the "Substitution") or (ii) accept new notes issued in exchange for the Notes (the "Exchange") from such newly created regional water or water and sewer authority (the New "RA"), provided that in connection with any such Substitution or Exchange, (A) no material modifications to the source of payment and security for the Notes or any outstanding DWSD bonds will be made, (B) there shall be delivered to the Purchasers an opinion of tax counsel as to the tax exempt status of interest on the Notes (if applicable) and any outstanding DWSD bonds (if applicable), (C) immediately after such Substitution or Exchange, the City could issue at least $1 of additional new money DWSD bonds in compliance with the additional bonds test set forth in the applicable bond documents and (D) ratings confirmation from any rating agency then rating the Notes or any DWSD bonds;

c) Maintenance of trustee, paying agent, registrar (Purchaser approval of any subsequent substitution);

d) Maintenance of ratings at all times;

e) Standard yield protection, withholding and tax indemnification;

f) Information reporting, access to records and further assurance;

g) Limitation on documentation amendments (Purchaser approval of relevant documents)

h) No additional indebtedness shall be incurred without consent of the Purchasers

i) No debt may be redeemed other than by regularly scheduled payment prior to the repayment of the Notes

j) At the time of closing, delivery to the Purchasers of an opinion or opinions from counsel to the Obligor to the effect that (i) one or more Preliminary Official Statements posted with respect to the Sewage Disposal System Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds to be issued to provide financing for the tender and current refunding of certain outstanding DWSD bonds (the "Preliminary Official Statements") comply in all material respects with all applicable requirements of the federal securities laws and (ii) either (A) each Preliminary Official Statement does not, as of its date, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading or (B), in the event that no Preliminary Official Statement has been posted, the Invitations to Tender Bonds, as well as the Questions and Answers, the Disclosure Statements, the Letter from the City and the Bondholder's Instructions attached thereto, each dated August 7, 2014, with respect to certain outstanding DWSD bonds, did not, as of the date thereof, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading; such opinion(s) to be subject to customary exceptions and shall be satisfactory in form and in substance to the Purchasers and their counsel.

| Other Conditions | The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Purchasers and their counsel, which order shall not have been stayed or enjoined in any way (including being stayed pending appeal): |

1.  approving the issuance of the Notes, the 2014 DWSD Refinancing Bonds, any 2014 DWSD Refinancing Bonds Insurance Policies and any 2014 DWSD Financing Bonds Surety Policies pursuant to sections 364(c), 364(d) and 364(e) of the Bankruptcy Code and finding that the pledge of DWSD revenues as security for the Notes and such 2014

| | |
|---|---|
| | DWSD Refinancing Bonds constitutes a "lien" on "pledged special revenues" as contemplated by sections 101(37), 902(2), 922(d) and 928 of the Bankruptcy Code; and |
| | 2.      approving the following compromise wih respect to DWSD's GRS pension contributions set forth in the City's Plan of Adjustment: (a) DWSD shall pay as operation and maintenance expenses, to be allocated between the Sewage Disposal System and the Water Supply System, no more than the sum of (i) $24 million per annum; and (ii) DWSD's allocable share of its annual "defined contribution" payments related to the DWSD employees; and (b) DWSD shall pay the difference between the annual allocation of the Plan GRS Pension Contributions provided in the City's amended Plan of Adjustment and $24 million from a "pension liability payment fund" that is funded after payments required to be made into the SRF Junior Lien Bond and Interest Redemption Fund established under the bond documents and on a subordinated basis to the 2014 DWSD Refinancing Bonds and Senior, Second Lien and SRF Junior Lien DWSD bonds. |
| **Parity Covenant Provision** | Each Purchaser shall be entitled to all covenants provided to creditors on parity obligations so that it shall never be deemed to have fallen to a subordinate security position. |
| **Assignment, Participation, Pledging, and Transfer** | Each Purchaser shall retain the right, on or before the Delivery Date or at any point thereafter, without the consent of the Issuer or the Obligor, to assign, pledge as security, participate or transfer the Notes to (i) any entity which is related to any such Purchaser or (ii) to any special purpose entity which issues certificates representing a beneficial interest in the Notes for an aggregate price that is not in excess of the stated amount of the Notes and solely to entities which are Qualified Institutional Buyers or (iii) to any entity qualified, in the judgment of such Purchaser, to purchase the Notes. |
| **Governing Law** | The Note Purchase Agreement and Supplemental Agreement shall be deemed to be a contract under, and together with any disputes or controversies arising out of or relating to such agreements, shall be governed by, and construed and interpreted in accordance with the laws of the State of New York, without reference to its choice-of-law rules other than New York General Obligations Law Section 5-1401 (or any successor statute); provided that the obligations, legal authority and capacity of the MFA, the City  and DWSD shall be governed by and construed in accordance with the laws of the State of Michigan. |
| **Waiver of Jury Trial** | MFA and DWSD, to the extent permitted by law, and the Purchasers will knowingly, voluntarily and intentionally waive any rights they may have to a trial by jury in respect to any litigation (whether as claim, counter-claim, affirmative defense or otherwise) based on, arising out of, under or in connection with the Notes, the Note Purchase and Supplemental Agreement and the transactions contemplated hereby or actions of MFA, DWSD  or the Purchasers relating to the Note Purchase and Supplemental Agreement, the Notes or the transactions contemplated thereby. |
| **Consent Rights** | Each Purchaser shall have full independent consent rights to any and all modifications to the Transaction Documents, regardless of whether or not the Purchaser is a minority participant or the sole Note holder. |
| **Sovereign Immunity** | Neither MFA nor the Obligor shall be entitled to claim the defense of sovereign immunity or statutory immunity in any action appropriately asserted in accordance with the Court of Claims Act, MCL 600-6401 et seq. and arising out of their respective obligations as set forth in the Notes or the Note Purchase and Supplemental Agreement. |
| **Documentation** | The Notes will be subject to the preparation, execution and delivery of mutually acceptable documentation, which will contain conditions precedent, representations and warranties, covenants, events of default and other provisions customary for facilities of this nature and as determined by the Purchasers, including, but not |

| | limited to those terms and conditions contained herein. |
|---|---|
| | At a minimum, such documentation shall include one or more Supplemental Ordinances, one or more Note Purchase and Supplemental Agreements all acceptable in form and substance to the Purchasers and their counsel, and Due Issuance Opinion, Enforceability Opinion and Bankruptcy Opinion, all acceptable in form and substance to the Purchasers and their counsel. |
| **EMMA and Rating Agency Disclosure** | Immediately following the Delivery Date, Citi shall deliver to the Issuer and Obligor the executed Note Purchase and Supplemental Agreement(s). Within 30 days of the Delivery Date, the Obligor shall cause such Agreement(s) to be posted on the MSRB's EMMA site. |
| **Change in Law/Increased Costs** | If any Purchaser determines that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive, or any change in the interpretation, implementation or administration thereof shall i) change the basis of taxation of payments to such Purchaser, ii) impose, modify or deem applicable any capital reserve, liquidity, special deposit, insurance premium, fee, financial charge, monetary burden or similar requirement in connection with the purchase of the Notes or iii) impose on such Purchaser any other condition, expense or cost regarding the Note Purchase and Supplemental Agreement, and the result shall be to increase the cost to such Purchaser of purchasing or holding the Notes or complying with any term of the Note Purchase an Supplemental Agreement or to reduce the amount of any sum received or receivable by the Purchaser hereunder, then, upon demand by such Purchaser, the Obligor shall pay such additional amount or amounts as will compensate such Purchaser for such increased costs or reductions in amount. |
| **Legal Fees/Expenses** | Reasonable legal fees and expenses shall be due and payable to Citi or directly to its counsel, regardless of whether the transaction is successfully closed |
| **Legal Counsel** | Debbie Sinclair Ruskin<br>Partner, Kutak Rock LLP<br>1101 Connecticut Avenue, N.W.<br> Suite 1000                (202) 828-2438<br>Washington, DC 20036-4374   (202) 828-2488 fax<br>debbie.ruskin@kutakrock.com<br><br>Paul Smith<br>Partner, Kutak Rock LLP<br>303 Peachtree St., Ste. 2750<br>Atlanta, GA  30308           (404) 222-4619<br>paul.smith@kutakrock.com |
| **Purchaser Fees/Expenses** | All Fees and Expenses incurred in the issuance of the Notes (CUSIP, etc.) shall be paid by the Obligor on or before the Delivery Date. |

This presentation has been prepared by individual personnel of Citigroup Global Markets Inc., Citigroup Global Markets Limited or their subsidiaries or affiliates (collectively, "Citi"). Such employees are not research analysts and are not subject to SEC or FSA rules designed to promote the independence of research and research analysts and accordingly may receive compensation related to securities or products to which these materials relate. These materials may contain general market commentary and excerpts of research; however they are not intended to constitute investment research, a research recommendation, research analysis or a research report for purposes of such rules.

**In connection with any proposed transaction, Citi will be acting solely as a principal and not as your agent, advisor, account manager or fiduciary. Citi has not assumed a fiduciary responsibility with respect to the proposed transaction, and nothing in this or in any prior relationship between you and Citi will be deemed to create an advisory, fiduciary or agency relationship between us in respect of a proposed transaction. You should consider carefully whether you would like to engage an independent advisor to represent or otherwise advise you in connection with any proposed transaction, if you have not already done so.**

Any terms set forth herein are intended for discussion purposes only and are subject to the final terms as set forth in separate definitive written agreements. This presentation is not a commitment to lend, syndicate a financing, underwrite or purchase securities, or commit capital nor does it obligate us to enter into such a commitment. By accepting this presentation, subject to applicable law or regulation, you agree to keep confidential the existence of and proposed terms for any contemplated transaction.

The provision of information in this presentation is not based on your individual circumstances and should not be relied upon as an assessment of suitability for you of a particular product or transaction. Even if Citi possesses information as to your objectives in relation to any transaction, series of transactions or trading strategy, this will not be deemed sufficient for any assessment of suitability for you of any transaction, series of transactions or trading strategy.

This presentation is provided for information purposes and is intended for your use only. Except in those jurisdictions where it is impermissible to make such a statement, Citi hereby informs you that this presentation should not be considered as an offer to sell or the solicitation of an offer to purchase any securities or other financial products. This presentation does not constitute investment advice and does not purport to identify all risks or material considerations which should be considered when undertaking a transaction. Citi makes no recommendation as to the suitability of any of the products or transactions mentioned. Any trading or investment decisions you take are in reliance on your own analysis and judgment and/or that of your advisors and not in reliance on us.

Certain transactions, including those involving swaps and options, give rise to substantial risk including the potential loss of the principal amount invested, and are not suitable for all investors. Citi does not provide investment, accounting, tax, financial or legal advice; however, you should be aware that any proposed indicative transaction could have accounting, tax, legal or other implications that should be discussed with your independent advisors. Therefore, prior to entering into any transaction, you should determine, without reliance on Citi, the economic risks or merits, as well as the legal, tax and accounting characteristics and consequences of the transaction and that you are able to assume these risks. By acceptance of these materials, you and Citi hereby agree that from the commencement of discussions with respect to any transaction, and notwithstanding any other provision in this presentation, Citi hereby confirms that no participant in any transaction shall be limited from disclosing the U.S. tax treatment or U.S. tax structure of such transaction.

This presentation is not intended to forecast or predict future events. Past performance is not a guarantee or indication of future results. Any estimates and opinions included herein constitute Citi's judgment as of the date hereof and are subject to change without any notice. This presentation may contain "forward-looking" information. Such information may include, but not be limited to, projections, forecasts or estimates of cash flows, yields or return, scenario analyses and proposed or expected portfolio composition. Any forward-looking information is based upon certain assumptions about future events or conditions and is intended only to illustrate hypothetical results under those assumptions (not all of which are specified herein or can be ascertained at this time). It does not represent actual termination or unwind prices that may be available to you. Actual events or conditions are unlikely to be consistent with, and may differ significantly from, those assumed. Illustrative performance results may be based on mathematical models that calculate those results by using inputs that are based on assumptions about a variety of future conditions and events and not all relevant events or conditions may have been considered in developing such assumptions. Accordingly, actual results may vary and the variations may be substantial. The products or securities identified in any of the illustrative calculations presented herein may therefore not perform as described and actual performance may differ, and may differ substantially, from those illustrated in this material. When evaluating any forward looking information you should understand the assumptions used and, together with your independent advisors, consider whether they are appropriate for your purposes.

Any securities or other financial products described herein may be subject to fluctuations of their mark-to market price or value. Such fluctuations may be substantial, depending on the type of securities or other financial products and the financial environment. In addition certain securities described in the presentation may provide for payments linked to or derived from prices or yields of one or more securities or other instruments or foreign currencies, and such provisions may result in negative fluctuations in the value of and the amounts payable with respect to such securities prior to or at redemption. You should consider the implication of such fluctuation with your independent accounting, tax and risk advisors.

Citi shall have no liability to you, the user or to third parties, for the quality, accuracy, timeliness, continued availability or completeness of the data nor for any special, direct, indirect, incidental or consequential loss or damage which may be experienced because of the use of the information in this presentation or otherwise arising in connection with this presentation, provided that this exclusion of liability shall not exclude or limit any liability under any law or regulation applicable to Citi that may not be excluded or restricted. These materials are intended for distribution solely to customers of Citi in jurisdictions where such distribution is permitted. The information contained herein is proprietary information of Citi and may not be reproduced or otherwise disseminated in whole or in part without Citi's prior written consent.

Citi often acts as (i) a market maker; (ii) an issuer of financial instruments and other products; and (iii) trades as principal in many different financial instruments and other products, and can be expected to perform or seek to perform investment banking and other services for the issuer of such financial instruments or other products. The author of this presentation may have discussed the information contained herein with others within or outside Citi and the author and/or such other Citi personnel may have already acted on the basis of this information (including by trading for Citi's proprietary accounts or communicating the information contained herein to other customers of Citi). Citi, Citi's personnel (including those with whom the author may have consulted in the preparation of this presentation), and other customers of Citi may be long or short the financial instruments or other products referred to in this presentation, may have acquired such positions at prices and market conditions that are no longer available, and may have interests different from or adverse to your interests.

Citi is required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with Citi. Citi will ask for your complete name, street address, and taxpayer ID number. Citi may also request corporate formation documents, or other forms of identification, to verify information provided.

Although Citibank, N.A. (together with its subsidiaries and branches worldwide, "Citibank") is an affiliate of Citi, you should be aware that none of the financial instruments or other products mentioned in this presentation (unless expressly stated otherwise) are (i) insured by the Federal Deposit Insurance Corporation or any other governmental authority, or (ii) deposits or other obligations of, or guaranteed by,Citibank or any other insured depository institution.

**IRS Circular 230 Disclosure**: Citi and its employees are not in the business of providing, and do not provide, tax or legal advice to any taxpayer outside of Citi. Any statements in this presentation regarding tax matters were not intended or written to be used, and cannot be used or relied upon, by any taxpayer for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

© 2012 Citigroup Global Markets Inc. Member SIPC. All rights reserved. Citi and Arc Design are trademarks and service marks of Citigroup Inc. or its affiliates and are used and registered throughout the world.



<u>**Term Sheet of the Assured Insurance Commitment (subject to conditions herein)**</u>[1]

This Term Sheet of the Assured Insurance Commitment is provided in the context of settlement discussions between Assured Guaranty Municipal Corp. and its affiliates (collectively, "Assured"), the City of Detroit, Michigan (the "City") and the Detroit Water and Sewerage Department (the "DWSD"). It is therefore protected from any use or disclosure by any party or person pursuant to the privilege for confidential mediation communications and Federal Rule of Evidence 408 and any other federal or state statute, rule or policy of similar import. This Term Sheet is for discussion purposes only and does not constitute an offer or other binding obligation of any party, including Assured, the City or the DWSD. No party shall be bound by the terms or conditions of this Term Sheet or the terms of the transactions contemplated herein. Any settlement is entirely contingent upon the completion of due diligence, the negotiation and execution of definitive documentation and satisfaction or waiver of all conditions contained in the definitive documentation.

<u>**Overview of Assured Insurance Commitment**</u>

1.    Assured will commit to insure senior lien DWSD Sewage Disposal System Revenue Refunding Bonds (the "2014 Sewer Refinancing Bonds") in a principal amount not less than the principal amount of the outstanding Assured-insured senior lien DWSD Sewage Disposal System Revenue and Revenue Refunding Bonds tendered and refunded in conjunction with the tender offer contemplated by the draft Disclosure Statement Relating to Invitation to Tender Bonds $2,750,800,000, City of Detroit Michigan, Detroit Water and Sewerage Department Sewage Disposal System Bonds Consisting of $1,805,620,000 Revenue and Revenue Refunding Senior Lien Bonds and $945,180,000 Revenue Refunding Second Lien Bonds (the "Sewer Tender Offer").

2.    Assured will commit to insure senior lien DWSD Water Supply System Revenue Refunding Bonds (the "2014 Water Refinancing Bonds," and, together with the 2014 Sewer Refinancing Bonds, the "2014 DWSD Refinancing Bonds")[2] in a principal amount not less than the principal amount of the outstanding Assured-insured senior lien DWSD Water Supply System Revenue and Revenue Refunding Bonds tendered and refunded in conjunction with the tender offer contemplated by the draft Disclosure Statement Relating to Invitation to Tender Bonds $2,433,140,000, City of Detroit Michigan, Detroit Water and Sewerage

---

[1]    All capitalized terms used by not defined herein shall have the meanings ascribed to them in the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014) [Docket No. 6379] (the "Plan").

[2]    Issuance by Michigan Finance Authority is preferred.

Department Water Supply System Bonds Consisting of $1,803,904,000 Revenue Refunding Senior Lien Bonds and $629,200,000 Revenue Refunding Second Lien Bonds (the "Water Tender Offer," and, together with the Sewer Tender Offer, the "Tender Offer").

3.      Additionally, Assured will commit to insure senior lien 2014 Sewer Refinancing Bonds in an amount not less than the principal amount of the outstanding Assured-insured junior lien Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue and Revenue Refunding Bonds tendered or refunded in conjunction with the Tender Offer (the insurance policies to be issued pursuant to Paragraphs 1, 2 and 3 herein, the "2014 DWSD Refinancing Bonds Insurance Policies").

4.      The debt structure of the 2014 DWSD Refinancing Bonds insured by Assured shall not result in a weighted average maturity materially shorter or longer than the weighted average maturity of the Assured-insured or Berkshire Hathaway Assurance Company-insured DWSD Bonds that are tendered and refunded through the Tender Offer (it being understood that a change of less than six months would not be a material change as contemplated by this Paragraph 4). The insurance premium will be (i) 1.20% of total debt service on insured bonds that have been assigned an unenhanced rating of at least "BBB-" by S&P; or (ii) 1.80% of total debt service on insured bonds that have been assigned an unenhanced rating of at least "BB" by S&P, payable up front upon delivery of the policy.

5.      Assured will agree to deliver debt service reserve fund ("DSRF") surety insurance policies (the "2014 DWSD Refinancing Bonds Surety Policies") as to reserve accounts that secure exclusively the Assured-insured 2014 DWSD Refinancing Bonds in a principal amount equal to the DSRF requirement (subject to a limit of $70 million of additional surety coverage). The coverage available as to each surety shall amortize ratably with the amortization of the series of 2014 DWSD Refinancing Bonds that it secures and shall also be reduced proportionately to the extent the series of 2014 DWSD Refinancing Bonds so secured by the DSRF policy is defeased or redeemed prior to schedule amortization. Subject to the next sentence, Assured will charge as a premium for each 2014 DWSD Refinancing Bonds Surety Policy 15% of the initial face amount of any DSRF surety, payable upon delivery. With respect to any 2014 DWSD Refinancing Bonds Surety Policy for a DSRF with respect to any Assured-insured 2014 DWSD Refinancing Bonds the proceeds of which are applied to the payment of the tender price or refunding of DWSD Bonds insured by Berkshire Hathaway Assurance Company or its affiliates (any such bonds tendered, "Berkshire Bonds"), Assured's premium will be reduced from 15% by .75% for each $50 million of Berkshire Bonds that are tendered/refunded subject to a floor of 10%. Therefore, if at least $50 million but less than $100 million of Berkshire Bonds are tendered the Assured surety premium will be 14.25%; if at least $100 million but less than $150 million of Berkshire Bonds are tendered, the Assured surety premium will be 13.50%; if at least $150 million but less than $200 million of Berkshire Bonds are tendered, the

2

Assured surety premium will be 12.75%; if at least $200 million but less than $250 million of Berkshire Bonds are tendered, the Assured DSRF surety premium will be 12%; if at least $250 million but less than $300 million of Berkshire Bonds are tendered, the Assured surety premium will be 11.25%; if at least $300 million but less than $350 million of Berkshire Bonds are tendered, the Assured surety premium will be 10.50%; and if at least $350 million of Berkshire Bonds are tendered, the Assured surety premium will be 10.00%. In no event shall the premium for any 2014 DWSD Refinancing Bonds Surety Policy be less than 10% of the original face amount of the surety.

6.    The Commitment shall expire on the earlier of the closing date of the issuance of the 2014 DWSD Refinancing Bonds (the "Closing Date") or September 30, 2014.

## Standard Conditions for Assured to Insure Refunding Bonds

7.    The Assured insurer provisions incorporated into the Bond Documents related to the existing Assured-insured senior lien DWSD Bonds shall also be included in the Bond Documents related to the 2014 DWSD Refinancing Bonds. For clarity of reference, these provisions relate to insurer remedy control, amendment and other consent rights and the mechanics for a draw upon the applicable sureties and policies. In addition, the DSRF surety provisions in the bond security agreement and the reimbursement agreement will be in form and substance the same as the DSRF surety reimbursement agreements currently in place at the senior sewer lien level.

8.    All provisions for the issuance of the 2014 DWSD Refinancing Bonds shall be fully met, including in particular the refunding bond issuance test contained in the existing DWSD Bond Documents. For purposes of determining "Annual Debt Service" and whether the "Required Coverage Requirement" has been met with respect to the issuance of the 2014 DWSD Refinancing Bonds, all calculations shall include supporting schedules that incorporate the proposed DWSD new money sewer financing of 2014 contemplated by the Michigan Department of Treasury, Michigan Finance Authority (on behalf of the City of Detroit and Detroit Water and Sewerage Department) Request for Proposal for Underwriting Services, dated as of March 12, 2014.

9.    All required approvals for the issuance of the 2014 DWSD Refinancing Bonds shall be obtained, which in all events will include approval of the Michigan State Treasurer and the Emergency Manager.

## Additional Conditions for Assured to Insure 2014 DWSD Refinancing Bonds

10.    Before release of formal insurer commitments, Assured shall have participated in a diligence meeting/call/briefing in which the City and the DWSD shall have confirmed that the status quo as to the membership of the contractual participants/customers in the respective systems is not expected to change.

3

11.     The Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to Assured, which order shall not have been stayed or enjoined in any way (including being stayed pending appeal):

    a.  approving the issuance of the 2014 DWSD Refinancing Bonds, 2014 DWSD Refinancing Bonds Insurance Policies and 2014 DWSD Refinancing Bonds Surety Policies pursuant to sections 364(c), 364(d) and 364(e) of the Bankruptcy Code and finding that the pledge of DWSD revenues as security for such 2014 DWSD Refinancing Bonds constitutes a "lien" on "pledged special revenues" as contemplated by sections 101(37), 902(2), 922(d) and 928 of the Bankruptcy Code; and

    b.  approving the following compromise with respect to DWSD's GRS pension contributions set forth in the Plan: (i) DWSD shall pay as operation and maintenance expenses, to be allocated between the Sewage Disposal System and the Water Supply System, no more than the sum of (a) $24 million per annum; and (b) DWSD's allocable share of its annual "defined contribution" payments related to the DWSD employees; and (ii) DWSD shall pay the difference between the annual allocation of the Plan GRS Pension Contributions provided in the amended Plan of Adjustment and $24 million from a "pension liability payment fund" that is funded after payments required to be made into the SRF Junior Lien Bond and Interest Redemption Fund established under the Bond Documents and on a subordinated basis to the 2014 DWSD Refinancing Bonds and Senior and Second Lien DWSD Bonds. For clarity's sake, the parties agree that this settlement shall not be considered "impairment" of the DWSD Bonds as referenced in Paragraph 13 below.

12.     Prior to the Closing Date, all bonds that are secured by first or second liens on pledged revenues of either the DWSD Water Supply System or the DWSD Sewage Disposal System (including the 2014 DWSD Refinancing Bonds) shall be structured to receive underlying ratings of investment grade, but in any event shall receive underlying ratings by S&P of no lower than "BB".

13.     The City shall have amended its plan of adjustment (the "Plan") on the Settlement Date (but before the closing) through an amendment in form and substance reasonably acceptable to Assured, which shall remove in all respects the impairment of interest rates and call protection proposed by the Plan in respect of all the existing DWSD Bonds and reclassify such existing DWSD Bonds as "unimpaired" under the Plan.

14.     Following the filing of the City's amended Plan, the City shall not thereafter amend, supplement or otherwise modify the Plan, or participate in, support or acquiesce to any such amendment, supplement or modification (including any

motion for an order seeking such amendment, supplement or modification) of the Plan, that would affect the treatment of the existing DWSD Bonds or 2014 DWSD Refinancing Bonds, the 2014 DWSD Refinancing Bonds Insurance Policies or the 2014 DWSD Refinancing Bonds Surety Policies in any manner.

15.     The 2014 DWSD Refinancing Bonds shall include a provision providing for an extraordinary optional redemption by the City, at the City's option, at par plus accrued interest upon the occurrence of a chapter 9 filing by the City.

16.     The Bond Documents relating to the 2014 DWSD Refinancing Bonds or any additional DWSD Bonds shall not permit accelerated amortization of the 2014 DWSD Refinancing Bonds unless, after giving effect to the payment of the accelerated amortization amount, the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable Bond Documents.  Net periodic payments under an interest rate swap arrangement may be on parity, but accelerated amortization of bank bonds and termination payments as to any derivative shall be subordinate.

17.     DWSD shall reimburse Assured for $3 million of Assured's DWSD-related bankruptcy fees, costs and expenses provided, however, in the event that the City agrees, other than solely as a result of a court order or an arbitration award (i) to pay any of the DWSD Objecting Parties other than the DWSD Trustee an amount in excess of $3 million for DWSD-related bankruptcy fees, costs and expenses, or (ii) with respect to the DWSD Trustee, to establish a floor for DWSD-related bankruptcy fees, costs and expenses in excess of $3 million, then DWSD shall be required to pay to Assured $3 million plus such amount that is the greatest amount paid to any DWSD Objecting Party in excess of $3 million.

18.     The City and DWSD through the (a) Invitation to Tender Bonds in the Aggregate Principal Amount of $2,750,800,000 City of Detroit, Michigan Detroit Water and Sewerage Department Sewage Disposal System Bonds and (b) Invitation to Tender Bonds in the Aggregate Principal Amount of $2,433,140,000 City of Detroit, Michigan Detroit Water and Sewerage Department Water Supply System Bonds shall target DWSD Bonds for tender solicitation by offering a tender price above the Citibank current market evaluation at par.

19.     The terms of the 2014 DWSD Refinancing Bonds shall not provide for any extension of final maturity date or weighted average life relative to the existing Assured-insured DWSD Bonds (or other insurer, if applicable) that have been tendered and are being paid and discharged with the proceeds of the 2014 DWSD Refinancing Bonds (it being understood that an extension of less than 6 months would not violate this Paragraph 19).

20.     All terms and conditions in respect of the transfer of the DWSD water and/or sewer systems to a new regional authority set forth in (a) any Bond Document or (b) any transaction document in respect of such a transfer whether (i) it substitutes the Obligor on the bonds under the current term of the bonds or (ii) new bonds are

5

issued, shall in any case include: (I) no material modifications to the source of payment and security for any DWSD Bonds; (II) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds; (III) the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable Bond Documents; and (IV) ratings confirmation of any rating agency then rating the DWSD Bonds.

21.     Assured will be provided with evidence of cancellation and defeasance of any existing Assured-insured DWSD Bonds that have been tendered/refunded and paid in accordance with the Tender Offer.

# INVITATION TO TENDER BONDS
## IN THE AGGREGATE PRINCIPAL AMOUNT OF
## $2,750,800,000
## CITY OF DETROIT, MICHIGAN
## DETROIT WATER AND SEWERAGE DEPARTMENT
## SEWAGE DISPOSAL SYSTEM BONDS

> **THIS INVITATION WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON AUGUST 21, 2014 UNLESS EARLIER TERMINATED OR EXTENDED.**

Pursuant to this Invitation to Tender Bonds (this "*Invitation*"), the City of Detroit, County of Wayne, State of Michigan (the "*City*"), upon authorization from (i) the Board of Water Commissioners (the "*BOWC*") of the Detroit Water and Sewerage Department ("*DWSD*") and (ii) Kevyn D. Orr, emergency manager of the City (the "*Emergency Manager*"), invites each owner (a "*Bondholder*") of those certain outstanding Sewage Disposal System bonds, in the aggregate principal amount of $2,750,800,000, as described more specifically on Schedule A attached to this Invitation (collectively referred to as the "*Tender Bonds*") to submit an offer (each, an "*Offer*," and collectively, the "*Offers*") to sell all or a portion of the Tender Bonds (the "*Offered Bonds*") held by such Bondholder to the City at the applicable purchase prices for the Tender Bonds set forth on Schedule A attached to this Invitation (the "*Purchase Price*"), subject to the conditions and upon the terms specified in this Invitation. Bondholders of the Tender Bonds that are purchased by the City will receive on the Settlement Date (as defined herein) the Purchase Price plus accrued interest on such Tender Bonds through the date immediately preceding the Settlement Date. The Settlement Date is scheduled to occur on September 4, 2014, but may be rescheduled as described herein.

To make an informed decision as to whether, and how, to offer its Tender Bonds, a Bondholder must read this Invitation and all of the Other Tender Materials (as defined herein) carefully and consult with its broker, account executive, financial advisor and/or other financial professional. This Invitation, the Other Tender Materials and other information with respect to this Invitation are available from the Dealer Manager and the Information and Tender Agent and at www.bondcom.com/DWSD.

Any Bondholder wishing to offer its Tender Bonds pursuant to this Invitation should follow the procedures more fully described herein. Institutional investors with questions about this Invitation should contact the Dealer Manager. Individual investors and their brokers, account executives, financial advisors and other financial professionals with questions about this Invitation should contact the Information and Tender Agent.

**All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission and may not be withdrawn except in the limited circumstances under "TERMS OF THIS INVITATION—Irrevocability of Offers Upon Submission" herein.**

| Key Dates and Times |
| --- |
| *All of these dates and times are subject to change. All times are New York City time.* |
| *Notices of changes will be sent in the manner provided for in this Invitation.* |
| Expiration Date ...............................................................................................................August 21, 2014, 5:00 p.m. |
| Announcement of Acceptance or Rejection of Offered Bonds..............................................August 22, 2014, 5:00 p.m. |
| Settlement Date. Payment made on all accepted Offered Bonds.........................................................September 4, 2014 |

*The Dealer Manager for this Invitation is:*

**Citigroup Global Markets Inc.**

390 Greenwich Street, 2nd Floor, New York, NY 10013

David M. Brownstein, 212-723-5570, david.m.brownstein@citi.com

Mike Leffler, 212-723-4453, mike.leffler@citi.com

Shai Markowicz, 212-723-5135, shai.markowicz@citi.com

*The Information and Tender Agent for this Invitation is:*

**Bondholder Communications Group**

30 Broad Street 46th Floor, New York, NY 10004

Attention: Denise Waters

Call Toll Free: (888) 385-BOND or (888) 385-2663

Web site: www.bondcom.com/DWSD   E-mail: Dwaters@bondcom.com

Date of this Invitation to Tender Bonds: August 7, 2014

4812-7889-6924.16

This Invitation has not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the fairness or merits of this Invitation or upon the accuracy or adequacy of the information contained in this Invitation. Any representation to the contrary is a criminal offense.

This Invitation is not being made to, and offers will not be accepted from or on behalf of, Bondholders in any jurisdiction in which this Invitation or the acceptance thereof would not be in compliance with the laws of such jurisdiction. In those jurisdictions whose laws require this Invitation to be made through a licensed or registered broker or dealer, this Invitation is being made on behalf of the City by the Dealer Manager.

No dealer, salesperson or other person has been authorized to give any information or to make any representation not contained in this Invitation and the Other Tender Materials and, if given or made, such information or representation may not be relied upon as having been authorized by the City.

The delivery of this Invitation and the Other Tender Materials shall not under any circumstances create any implication that the information contained herein and therein is correct as of any time subsequent to the date hereof or that there has been no change in the information set forth herein and therein or in any attachments hereto and thereto or materials delivered herewith and therewith or in the affairs of the City since the date hereof.

This Invitation and the Other Tender Materials contain statements relating to future results that are "forward-looking statements." When used in this Invitation and the Other Tender Materials, the words "estimate," "anticipate," "forecast," "project," "intend," "propose," "plan," "expect" and similar expressions identify forward-looking statements. Such statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. Any forecast is subject to such uncertainties. Inevitably, some assumptions used to develop the forecasts will not be realized and unanticipated events and circumstances may occur. Therefore, there are likely to be differences between forecasts and actual results, and those differences may be material.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................................1
General ...............................................................................................................................................1
Plan of Finance and Purpose of the Tender Offer.............................................................................3
Dealer Manager, Financial Advisor, Board Financial Consultant and Information and Tender
    Agent...........................................................................................................................................4
Brokerage Commissions and Bank Processing Fee ...........................................................................4
Purchased Bonds to be Cancelled .....................................................................................................4
Prevailing Time..................................................................................................................................4
TERMS OF THIS INVITATION ......................................................................................................4
Expiration Date; Offers Only Through ATOP System; Information to Bondholders ...............4
Provisions Applicable to all Offers ...................................................................................................5
Transmission of Offers by Financial Institutions; ATOP System....................................................6
Real Time Reporting ..........................................................................................................................6
Determinations as to Form and Validity of Offers; Right of Waiver and Rejection..................6
Irrevocability of Offers Upon Submission ........................................................................................7
Determination by the City of Offered Bonds to Accept for Purchase...............................................7
Notice of Acceptance or Rejection of Offered Bonds........................................................................8
Settlement Date; Purchase of Offered Bonds....................................................................................8
Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted .........................9
Conditions to Purchase......................................................................................................................9
Extension, Termination and Amendment of Offer; Changes to Terms ...................................10
Representations by Tendering Bondholders to the City and the DWSD ....................................11
DISCLOSURE STATEMENT .........................................................................................................11
ADDITIONAL CONSIDERATIONS ..............................................................................................11
CERTAIN FEDERAL INCOME TAX CONSEQUENCES ...........................................................12
BANK PROCESSING FEE; ELIGIBLE INSTITUTIONS ARE NOT AGENTS....................13
REIMBURSEMENT OF FINANCIAL INSTITUTION EXPENSES FOR FORWARDING
INVITATION AND OTHER TENDER OFFER MATERIALS.................................................13
DEALER MANAGER......................................................................................................................13
FINANCIAL ADVISOR ..................................................................................................................14
BOARD FINANCIAL CONSULTANT............................................................................................14
MISCELLANEOUS .........................................................................................................................14

TENDER BONDS AND PURCHASE PRICES ............................................................SCHEDULE A

QUESTIONS AND ANSWERS............................................................................... APPENDIX A
DISCLOSURE STATEMENT ................................................................................. APPENDIX B
CITY LETTER ......................................................................................................... APPENDIX C
BONDHOLDER'S INSTRUCTIONS...................................................................... APPENDIX D

[THIS PAGE INTENTIONALLY LEFT BLANK.]

**INVITATION TO TENDER BONDS**
**IN THE AGGREGATE PRINCIPAL AMOUNT OF**
**$2,750,800,000**
**CITY OF DETROIT, MICHIGAN**
**DETROIT WATER AND SEWERAGE DEPARTMENT**
**SEWAGE DISPOSAL SYSTEM BONDS**

## INTRODUCTION

**General**

Pursuant to this Invitation to Tender Bonds (this "*Invitation*"), the City of Detroit, County of Wayne, State of Michigan (the "*City*"), upon authorization from (i) the Board of Water Commissioners (the "*BOWC*") of the Detroit Water and Sewerage Department ("*DWSD*") and (ii) Kevyn D. Orr, emergency manager of the City (the "*Emergency Manager*"), invites each owner (a "*Bondholder*") of those certain outstanding Detroit Water and Sewerage Department Sewage Disposal System bonds, in the aggregate principal amount of $2,750,800,000, as described more specifically on Schedule A attached to this Invitation (collectively referred to as the "*Tender Bonds*") to submit an offer (each, an "*Offer*," and collectively the "*Offers*") to sell all or a portion of the Tender Bonds (the "*Offered Bonds*") held by such Bondholder to the City at the applicable purchase prices set forth on Schedule A attached to this Invitation (the "*Purchase Price*").

Each Bondholder is invited by the City to offer to sell to the City for cash all or any part of its beneficial ownership interests in the Tender Bonds (in any authorized denominations) at the applicable Purchase Price. *All of the Tender Bonds are held in book-entry form through banks and brokers that are participants in DTC. As a result, beneficial Bondholders may only offer their Tender Bonds through the financial institution account where their Tender Bonds are held at DTC.* See "TERMS OF THIS INVITATION" below for more information on how a Bondholder can offer its Tender Bonds.

The City will review, and may accept, the Offers in accordance with the procedures set forth in this Invitation.

To make an informed decision as to whether, and how, to offer its Tender Bonds, a Bondholder must read the following documents carefully and consult with its broker, account executive, financial advisor and/or other financial professional:

(1)     This Invitation,

(2)     The Questions and Answers dated August 7, 2014, attached hereto as Appendix A (the "**Questions and Answers**"),

(3)     The Disclosure Statement dated August 7, 2014, attached hereto as Appendix B (the "**Disclosure Statement**"),

(4)     The Letter from the City dated August 7, 2014, attached hereto as Appendix C (the "**City Letter**"), and

(5)     The Bondholder's Instructions, attached hereto as Appendix D (the "**Bondholder's Instructions**").

The Questions and Answers, the Disclosure Statement, the City Letter and the Bondholder's Instructions are collectively referred to herein as the "**Other Tender Materials.**"  This Invitation and the Other Tender Materials and such other information with respect to this Invitation are and will be available from the Information and Tender Agent at www.bondcom.com/DWSD or by calling toll-free at (888) 385-2663 or by emailing the Information and Tender Agent at Dwaters@bondcom.com.

**None of the City, the DWSD, the Emergency Manager, the Dealer Manager (as defined herein), the Financial Advisor (as defined herein), the Board Financial Consultant (as defined herein) or the Information and Tender Agent (as defined herein) makes any recommendation that any Bondholder tender or refrain from tendering all or any portion of its Tender Bonds or makes any representation that the Purchase Prices as set forth on Schedule A of this Invitation are indicative of market prices.  Each Bondholder must make these decisions and should read this Invitation and the Other Tender Materials and consult with its broker, account executive, financial advisor and/or other financial professional in making these decisions.**

Subject to satisfaction of the conditions described herein and in the Other Tender Materials, the Offered Bonds accepted by the City for purchase will be paid for on the "**Settlement Date**," which is scheduled to occur on September 4, 2014, but may be rescheduled to a date earlier or later than that date by the City in its sole discretion.  See "TERMS OF THIS INVITATION—Settlement Date; Purchase of Offered Bonds."

**All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission and may not be withdrawn except in the limited circumstances described under "TERMS OF THIS INVITATION—Irrevocability of Offers Upon Submission" herein.**

**The City is under no obligation to accept for purchase all or any of the Offered Bonds.  The City may decide to purchase less than all (or none) of the Offered Bonds.  See "TERMS OF THIS INVITATION—Determination of Amounts to be Purchased" for more information on the selection of Offered Bonds to be purchased, if any.**

**The City reserves the right to extend or amend this Invitation prior to the Expiration Date (as defined herein).  See "TERMS OF THIS INVITATION—Extension, Termination and Amendment of Offer; Changes to Terms."**

**Plan of Finance and Purpose of the Tender Offer**

The Plan of Adjustment currently pending before the United States Bankruptcy Court hearing the City's Chapter 9 bankruptcy case (the "***Bankruptcy Court***") would impair certain classes of the City's Water Supply System Revenue and Revenue Refunding Bonds (the "***DWSD Water Bonds***") and the City's Sewage Disposal System Revenue and Revenue Refunding Bonds (the "***DWSD Sewer Bonds,***" and collectively with the DWSD Water Bonds, the "***DWSD Bonds***"), including by eliminating the call protection or reducing the interest rates on such DWSD Bonds. The City is undertaking this Invitation as part of a plan of finance to reduce the debt service costs related to the Tender Bonds and remove the risk to DWSD's future costs by the impairment noted above on certain classes of the DWSD Bonds. See "**CITY OF DETROIT BANKRUPTCY MATTERS**" in the Disclosure Statement.

The City plans to purchase Offered Bonds only to the extent it can realize sufficient savings, with sufficiency to be determined in the City's sole discretion. An Invitation to Tender regarding the DWSD Water Bonds (collectively with this Invitation, the "***Invitations***") is also being issued concurrently with the issuance of this Invitation as part of the City's plan of finance. To provide funds to purchase all DWSD Bonds offered and accepted by the City pursuant to the terms of both Invitations, the City proposes to issue, via public offering or private placement, one or more series of the Sewage Disposal System Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds, including if necessary, interim financing bonds (collectively, the "***2014 DWSD Refinancing Bonds***"). The City has obtained a conditional commitment to purchase interim financing bonds, which commitment is subject to the negotiation and execution of definitive agreements and the satisfaction of certain closing conditions.

If the City in its sole discretion determines to accept for purchase DWSD Bonds offered by Bondholders pursuant to the Invitations, prior to the Settlement Date the City would request that the Bankruptcy Court enter an order (the "***Bankruptcy Order***") authorizing the City's issuance of the 2014 DWSD Refinancing Bonds to purchase the DWSD Bonds offered and accepted pursuant to the terms of the Invitations. In addition, on the Settlement Date, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would remove the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds. Under such amended Plan of Adjustment, all of the DWSD Bonds that are not purchased pursuant to the Invitations would be unimpaired.

To the extent the City elects, in its sole discretion, not to purchase DWSD Bonds pursuant to the Invitations, or the purchase of DWSD Bonds pursuant to the Invitations does not close for any reason, no amended Plan of Adjustment that unimpairs the DWSD Bonds would be filed, and the treatment of the DWSD Bonds under the Plan of Adjustment, as currently proposed, would continue to include an impairment of certain of the DWSD Bonds as identified on Schedule A.

In either event, there can be no assurance that the Plan of Adjustment that is confirmed by the Bankruptcy Court will ultimately impair or not impair any DWSD Bonds. There can also be no assurance that any Plan of Adjustment will be confirmed by the Bankruptcy Court. Moreover, any order of the Bankruptcy Court confirming the Plan of Adjustment may be appealed to a higher court. Even if confirmed, there can be no assurance if or when the Plan of Adjustment will become effective or ultimately be consummated.

The purchase of DWSD Bonds offered and accepted pursuant to the Invitations is conditioned upon receipt by the City of all legally required approvals to issue the 2014 DWSD Refinancing Bonds, the City completing the issuance of the 2014 DWSD Refinancing Bonds on terms satisfactory to it, with net proceeds sufficient to pay the Purchase Price of the DWSD Bonds to be purchased and other

3

conditions set forth in the Invitations. No assurances can be given that the 2014 DWSD Refinancing Bonds will be issued in an amount sufficient to pay the Purchase Prices of the DWSD Bonds offered and accepted pursuant to the Invitations or that the purchase of such DWSD Bonds will be completed. See "TERMS OF THIS INVITATION—Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted" and "—Conditions to Purchase" below.

*The 2014 DWSD Refinancing Bonds are not being offered for sale by this Invitation. The City expects to disseminate offering documents with respect to the 2014 DWSD Refinancing Bonds upon its acceptance of Offered Bonds pursuant to this Invitation.*

*By offering their Tender Bonds pursuant to this Invitation, Bondholders shall be deemed to have acknowledged and represented to the City that they have received, and have had the opportunity to review, this Invitation and the Other Tender Materials prior to making the decision as to whether or not they should submit an Offer.*

**Dealer Manager, Financial Advisor, Board Financial Consultant and Information and Tender Agent**

Citigroup Global Markets Inc. is acting as the Dealer Manager for this Invitation (the "Dealer Manager"). Institutional investors with questions about this Invitation should contact the Dealer Manager. The Dealer Manager or an affiliate thereof will also be the senior managing underwriter for or the purchaser of the 2014 DWSD Refinancing Bonds. Individual investors with questions about this Invitation should contact Bondholder Communications Group, which serves as Information and Tender Agent (the "Information and Tender Agent") for this Invitation. First Southwest Company is acting as Financial Advisor (the "Financial Advisor") to the DWSD in connection with this Invitation, and Ramirez Co., Inc. is acting as Financial Consultant to the BOWC (the "Board Financial Consultant") in connection with this Invitation.

**Brokerage Commissions and Bank Processing Fee**

Bondholders will not be obligated to pay any brokerage commissions or bank processing fees to the City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent in connection with this Invitation. However, Bondholders should check with their broker, account executive, bank, financial institution or financial advisor to determine whether they will charge any commissions or fees.

**Purchased Bonds to be Cancelled**

Any Offered Bonds which the City purchases pursuant to this Invitation will be cancelled.

**Prevailing Time**

All times in this Invitation are New York City time.

## TERMS OF THIS INVITATION

**Expiration Date; Offers Only Through ATOP System; Information to Bondholders**

This Invitation will expire at 5:00 p.m., New York City time, on August 21, 2014 unless earlier terminated or extended (the "*Expiration Date*"). Offers to sell any Tender Bonds received after 5:00 p.m., New York City time, on the Expiration Date will not be considered.

All of the Tender Bonds are held in book-entry-only form through the facilities of The Depository Trust Company ("*DTC*"). The City, acting through the Information and Tender Agent, has made arrangements with DTC to use DTC's Automated Tender Offer Program (the "*ATOP System*"). A Bondholder who is not a DTC participant must make Offers to sell its Offered Bonds by making arrangements with and instructing its broker, bank, account executive or other financial institution which maintains the account in which its Offered Bonds are held (each a "*Financial Representative*"), to submit the Bondholder's Offer through the ATOP System. To ensure a Bondholder's Offer is submitted via the ATOP System by 5:00 p.m., New York City time, on the Expiration Date, a Bondholder must provide instructions to its Financial Representative in sufficient time for the Financial Representative to submit Offers by this deadline. A Bondholder should contact its Financial Representative for information on when it needs the Bondholder's instructions in order to submit an Offer via the ATOP System by 5:00 p.m., New York City time, on the Expiration Date. See "—Transmission of Offers by Financial Institutions; ATOP System."

*The City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender Agent are not responsible for making or transmitting any Offer or for any mistakes, errors or omissions in the making or transmission of any Offer.*

The City may give information about this Invitation to the market and Bondholders by delivery of the information to the following institutions: Bloomberg Financial Market Systems, the Municipal Securities Rulemaking Board through its Electronic Municipal Market Access system ("*EMMA*") and DTC and by posting information to the Information and Tender Agent's website at www.bondcom.com/DWSD. These institutions and the Information and Tender Agent's website are collectively referred to herein as the "*Information Services*." Delivery by the City of information to the Information Services will be deemed to constitute delivery of this information to each Bondholder.

**The City, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender Agent have no obligation to ensure that a Bondholder actually receives any information given to the Information Services.**

**Provisions Applicable to all Offers**

A Bondholder should ask its broker, account executive, financial advisor or other financial professional for advice in determining whether to offer its Tender Bonds of any CUSIP number and the principal amounts thereof to offer. A Bondholder also should inquire as to whether its Financial Representative will charge a fee for submitting Offers or for purchases of the Offered Bonds. The City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender Agent will not charge any Bondholder for making an Offer or for purchase of Offered Bonds if its Offer is accepted.

Each Offer must include the CUSIP numbers and the principal amounts of the Offered Bonds (in authorized denominations for each CUSIP number). A Bondholder should consult its broker, account executive, financial advisor or other financial professional for instructions on making an Offer and refer to the form of Bondholder's Instructions attached hereto and posted at www.bondcom.com/DWSD.

"All or none" offers are not permitted.

*All Offers must be made through the DTC participants holding the Tender Bonds, who must transmit Offers through the ATOP System. The City will not accept any Offers that are not transmitted through the ATOP System.* See "—Transmission of Offers by Financial Institutions; the ATOP System."

A Bondholder may only offer to sell Tender Bonds it owns.  By submitting an Offer, a Bondholder warrants that it has, at the time of the Offer, and will have on the Settlement Date, full authority to transfer and sell such Tender Bonds, and that the transferee will acquire good title, free and clear of all liens, charges, encumbrances, conditional sales agreements or other obligations or adverse claims.  All tenders shall survive the death or incapacity of the tendering Bondholder.

A Bondholder who would like to receive information furnished by the City to the Information Services must make appropriate arrangements with its Financial Representative, financial advisor or other financial professional, the Information and Tender Agent or the Information Services.  All information furnished by the City to the Information Services may be retrieved at www.bondcom.com/DWSD.

### Transmission of Offers by Financial Institutions; ATOP System

Offers to sell Tender Bonds may only be transmitted to the City through the DTC participant holding the Tender Bonds.  Any financial institution that is a participant in DTC may transmit a book-entry offer of the Tender Bonds through the ATOP System in accordance with DTC's procedures.  Concurrently with such transmission of Tender Bonds through the ATOP System, an Agent's Message (as described below) must be received by the Information and Tender Agent through the ATOP System by not later than 5:00 p.m., New York City time, on the Expiration Date. The term "**Agent's Message**" means a message transmitted by DTC to, and received by, the Information and Tender Agent which states that DTC has received an express acknowledgment from the DTC participant on behalf of the beneficial Bondholder making an Offer of the Offered Bonds, stating the CUSIP number(s) and the principal amount(s) of the Offered Bonds that have been offered pursuant to this Invitation and to the effect that such participant (and beneficial Bondholder) agrees to be bound by the terms of this Invitation.

Bondholders who are not DTC participants can only make Offers by making arrangements with and instructing their Financial Representative to submit the Bondholders' Offer through the ATOP System.  To ensure a Bondholder's Offer is submitted through the ATOP System by 5:00 p.m., New York City time, on the Expiration Date, a Bondholder must provide instructions to its Financial Representative in sufficient time for the Financial Representative to submit its Offer via the ATOP System by this deadline.  Bondholders should contact their Financial Representative for information on how and when they need to submit instructions to the Financial Representative in order for such Financial Representative to transmit an Offer through the ATOP System by 5:00 p.m., New York City time, on the Expiration Date.

### Real Time Reporting Of Tender Results Via The BondCom Ticker

The Information and Tender Agent operates a real-time internet-based reporting system (the "**BondCom Ticker**") which delivers real-time reports of Offers received by the City aggregated by CUSIP numbers.  The BondCom Ticker is available free of charge to all Bondholders and the general public at **www.bondcom.com/DWSD**.

### Determinations as to Form and Validity of Offers; Right of Waiver and Rejection

All questions as to the validity, including the time of receipt of the Agent's Message by the Information and Tender Agent, eligibility and acceptance of any Offers will be determined by the City in its sole discretion and will be final, conclusive and binding.

The City reserves the right to waive any irregularities or defects in any Offer.  The City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender

Agent are not obligated to give notice of any defects or irregularities in Offers and they will have no liability for failing to give such notice.

**The City reserves the absolute right to reject any and all Offers, whether or not they comply with the terms of this Invitation and the Other Tender Materials.**

**Irrevocability of Offers Upon Submission**

**All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission via the ATOP System and may not be withdrawn, except in the limited circumstances described herein.**

If (a) the City amends the applicable Purchase Price with respect to any Tender Bond or (b) at any time prior to the Settlement Date, the City determines that a material event has occurred, the City will submit an amendment or supplement to this Invitation and the Other Tender Materials providing notice of such events to the Information Services (including by posting such amendment and supplement to the Information and Tender Agent's website at www.bondcom.com/DWSD). In connection with such notice, the City in its sole discretion may extend the Expiration Date to allow reasonable time for dissemination of such information to Bondholders and for Bondholders to respond.

Upon any such notice of such amendment or supplement, a Bondholder would have the opportunity to submit via the ATOP System to the Information and Tender Agent by not later than 5:00 p.m., New York City time, on the Expiration Date a request to withdraw an Offer that was submitted prior to the publication of such notice. Any such request must include the name of the beneficial Bondholder, the reason for the requested withdrawal and the contact information for the beneficial Bondholder. Upon completion of the withdrawal of such Offer, the beneficial Bondholder may cause an amended Offer to be transmitted via the ATOP System by not later than 5:00 p.m., New York City time, on the Expiration Date. An amended Offer must specify the CUSIP numbers and the principal amounts of the Offered Bonds (in authorized denominations).

*All notices of requests for withdrawal in the limited circumstances described above and amended Offers must be made through the ATOP System. The City will not accept notices of requests for withdrawal or any amended Offers that are not made through the ATOP System.* Bondholders who are not DTC participants can only withdraw their Offers in the limited circumstances described above by making arrangements with and instructing their Financial Representative to submit a request for withdrawal through the ATOP System. A Bondholder should consult its broker, account executive, financial advisor or other financial professional for instructions on withdrawing an Offer or making an amended Offer. All questions as to the eligibility and validity of a request for withdrawal (including the time of receipt) will be determined by the City in its sole discretion and will be final, conclusive and binding.

**Determination by the City of Offered Bonds to Accept for Purchase**

The City shall be under no obligation to accept for purchase any Offered Bond. The City will determine which Offered Bonds, if any, it will accept for purchase. The City, therefore, has the right to purchase all, some or none of the Offered Bonds. The City plans to accept Offered Bonds for purchase only to the extent it can realize sufficient savings, determined in its sole discretion. See "INTRODUCTION – Plan of Financing and Purpose of Tender Offer."

The purchase of Offered Bonds accepted by the City is subject to satisfaction of certain conditions. See "—Conditions to Purchase."

**Notice of Acceptance or Rejection of Offered Bonds**

The acceptance and rejection of Offered Bonds will be made by notification to the Information Services (including by posting such information to the Information and Tender Agent's website at www.bondcom.com/DWSD) by 5:00 p.m., New York City time, on the first business day after the Expiration Date. This notification will state the principal amounts and the CUSIP numbers (or Contra CUSIP numbers, as applicable) of the Offered Bonds that the City has accepted for purchase and the Offered Bonds that the City has declined for purchase. Promptly after the giving of any such notice, the City will instruct DTC to release to the offering Bondholders all Offered Bonds that were not accepted for purchase.

After accepting Offered Bonds, the City may determine to purchase only a portion of the Offered Bonds it previously accepted for purchase. See "—Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted" herein. In the event certain conditions to purchase Offered Bonds are not satisfied (or waived with respect to the City Conditions (as defined herein)), the Offered Bonds will not be purchased. See "—Conditions to Purchase."

**Settlement Date; Purchase of Offered Bonds**

Subject to the satisfaction of each of the conditions to purchase as described herein and in the Other Tender Materials, the Offered Bonds accepted by the City will be purchased on the Settlement Date. The Settlement Date is expected to be September 4, 2014. The City may, in its sole discretion, change the Settlement Date by giving notice to the Information Services (including by posting such information to the Information and Tender Agent's website at www.bondcom.com/DWSD) by 9:00 a.m., New York City time, on the previously scheduled Settlement Date, provided, however, the City will not change the Settlement Date to a date later than September 22, 2014, or such later date that the City determines to be necessary as described under "Offers are Irrevocable Upon Submission". If all conditions to the City's purchase of Offered Bonds are not satisfied and the City does not complete the purchase of the Offered Bonds by the Settlement Date (as the same may be changed by the City by giving notice in the manner described in the preceding sentence), the City will not have any liability or obligation to any Bondholder to purchase any Offered Bonds, and the City will release the Offered Bonds for transmission to Bondholders.

Subject to the satisfaction of each of the conditions to purchase as described herein and in the Other Tender Materials, payment by the City will be made in immediately available funds on the Settlement Date by deposit with DTC of the aggregate Purchase Price of and accrued interest on the Offered Bonds accepted for purchase. It is expected that, in accordance with DTC's standard procedures, DTC will credit the relevant portion of the aggregate Purchase Price and accrued interest to each of its participant financial institutions holding the Offered Bonds accepted for purchase on behalf of Bondholders, for credit to the accounts of the Bondholders. **The City, the Emergency Manager, the Dealer Manager, the Financial Advisor, Board Financial Consultant and the Information and Tender Agent have no responsibility or liability for the distribution of the Purchase Price plus accrued interest by DTC to the Bondholders.**

**Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted**

Notwithstanding the acceptance for purchase by the City of any amount of Offered Bonds and the notice thereof to the Bondholders (as described in "—Notice of Acceptance of Offered Bonds"), the purchase of any Offered Bonds accepted by the City pursuant to this Invitation is conditioned upon the City receiving sufficient proceeds from the 2014 DWSD Refinancing Bonds and other conditions set for in this Invitation. No assurances can be given that the 2014 DWSD Refinancing Bonds will be issued in

an amount sufficient to pay the Purchase Price of the Offered Bonds accepted by the City for purchase or that the purchase of the DWSD Bonds will be completed. See "INTRODUCTION – Plan of Financing and Purpose of Tender Offer."

After acceptance, the City will offer the 2014 DWSD Refinancing Bonds via public offering or private placement. The amount of the 2014 DWSD Refinancing Bonds to be sold by the City will be determined at the time of pricing thereof. The City in its sole discretion may determine to sell 2014 DWSD Refinancing Bonds in an amount that is less than that required to purchase all of the Offered Bonds previously accepted pursuant to this Invitation and therefore, purchase only a portion of such previously accepted Offered Bonds. In such case, the City in its sole discretion may choose to accept any of the Offered Bonds it previously accepted. Within a particular Offered Bond, the City may determine to accept for purchase only a pro-rata portion of such Offered Bond (rounded to the nearest authorized denominations).

Promptly upon such reduction in the Offered Bonds accepted for purchase by the City, notice of such reduction will be provided to the Information Services (including by posting such information to the Information and Tender Agent's website at www.bondcom.com/DWSD). Promptly after the giving of any such notice, the City will instruct DTC to release to the offering Bondholders those Offered Bonds that the City has determined not to purchase.

**Conditions to Purchase**

Notwithstanding any notice of acceptance for purchase of any Offered Bonds, the City will not be required to purchase any such Offered Bonds, and will incur no liability as a result, if, before payment for such Offered Bonds:

1.  On the Settlement Date, the City does not file with the Bankruptcy Court an amended Plan of Adjustment that would remove all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

2.  The Bankruptcy Court does not issue the Bankruptcy Order authorizing the City's issuance of the 2014 DWSD Refinancing Bonds to purchase the Offered Bonds;

3.  By 1:00 p.m., New York City time, on the Settlement Date, the City does not, for any reason, have sufficient funds from the proceeds of the 2014 DWSD Refinancing Bonds to pay for the purchase of such Offered Bonds;

4.  Litigation or another proceeding is pending or threatened which the City believes may, directly or indirectly, have an adverse impact on this Invitation or the expected benefits of this Invitation to the City or the Bondholders or the validity or enforceability of the Bankruptcy Order;

5.  A war, national emergency, banking moratorium, suspension of payments by banks, a general suspension of trading by the New York Stock Exchange or a limitation of prices on the New York Stock Exchange exists and the City believes this fact makes it inadvisable to proceed with the purchase of such Offered Bonds; or

6.  A material change in the business or affairs of the City which the City believes makes it inadvisable to proceed with the purchase of such Offered Bonds.

4812-7889-6924.16

The conditions described in paragraphs 1, 2 and 3 above (the "***Non-Waivable Conditions***") are conditions that cannot be waived by the City. If any of the Non-Waivable Conditions are not satisfied on or prior to the Settlement Date, the City will not purchase any Offered Bonds.

The conditions described in paragraphs 4, 5 and 6 above (the "***City Conditions***") are for the sole benefit of the City and may be asserted by the City, on or prior to the Settlement Date, regardless of the circumstances giving rise to any of the City Conditions or may be waived by the City in whole or in part at any time and from time to time in its discretion. The failure by the City at any time to exercise any of these rights with respect to the City Conditions will not be deemed a waiver of any of these rights, and the waiver of these rights with respect to particular facts and other circumstances will not be deemed a waiver of these rights with respect to any other facts and circumstances. Each of these rights will be deemed an ongoing right of the City which may be asserted at any time and from time to time prior to the Settlement Date. Any determination by the City concerning the events described in this paragraph will be final and binding upon all parties. If, on or prior to the Settlement Date, the City asserts any of its rights with respect to the City Conditions, the City will have the absolute right to cancel its obligations to purchase any Offered Bonds without any liability to any Bondholder.

If the Offered Bonds are not purchased on the Settlement Date, the City will promptly instruct DTC to release to the offering Bondholders all Offered Bonds.

**Extension, Termination and Amendment of Offer; Changes to Terms**

The City has the right to extend the Expiration Date of this Invitation, as to any or all of the Tender Bonds, to any date in its sole discretion, provided that a notice of any extension of the Expiration Date is given to the Information Services (including by posting such notice to the Information and Tender Agent's website at www.bondcom.com/DWSD) not later than 9:00 a.m., New York City time, on the second business day after the then scheduled Expiration Date.

The City also has the right to terminate this Invitation at any time by giving notice prior to the Expiration Date to the Information Services (including by posting such notice to the Information and Tender Agent's website at www.bondcom.com/DWSD) of such termination. The termination would be effective at the time specified in such notice.

The City also has the right to amend or waive the terms of this Invitation (other than the Non-Waivable Conditions) and at any time by giving notice to the Information Services (including by posting such notice to the Information and Tender Agent's website at www.bondcom.com/DWSD) of such amendment or waiver. Such amendment or waiver would be effective at the time specified in such notice.

If the City extends the Expiration Date of this Invitation, or amends the terms of this Invitation (including a waiver of any term other than the Non-Waivable Conditions) in any material respect, the City may (but is not required to) disseminate additional materials and/or extend the Expiration Date to the extent required to allow reasonable time for dissemination to Bondholders and for Bondholders to respond.

No extension, termination or amendment of this Invitation (or waiver of any terms of this Invitation) will change the City's right to decline to purchase any Offered Bonds without liability. See "—Conditions to Purchase."

4812-7889-6924.16

**Representations by Tendering Bondholders to the City**

By making Offers, Bondholders will be deemed to have represented to and agreed with the City that: (a) they have made their own independent decisions to make an Offer, as to the terms thereof, and whether their Offer is appropriate for them; (b) such decisions were based upon their own judgment and upon advice from such advisors as they have consulted; (c) they are not relying on any communication from the City as investment advice or as a recommendation to make an Offer, it being understood that the information from the City related to the terms and conditions of this Invitation shall not be considered investment advice or a recommendation to make an Offer; (d) they are capable of assessing the merits of and understanding (on their own and/or through independent professional advice), and do understand and accept, the terms and conditions of this Invitation; and (e) they have received, and have had the opportunity to review, this Invitation and the Other Tender Materials prior to making the decision as to whether or not they should offer their Tender Bonds.

## DISCLOSURE STATEMENT

Certain information regarding the DWSD, the Tender Bonds, the other DWSD Bonds and the plan of finance is set forth in the Disclosure Statement, which is attached hereto as Appendix B and is incorporated herein by reference. To make an informed decision as to whether and how to offer any Tender Bonds, a Bondholder is advised to read the entire Disclosure Statement, in addition to this Invitation and the Other Tender Materials.

## ADDITIONAL CONSIDERATIONS

In deciding whether to offer any Tender Bonds pursuant to this Invitation, each Bondholder should consider carefully, in addition to the other information contained in this Invitation and the Other Tender Materials, the following:

*The City May Redeem, Purchase or Exchange the Tender Bonds At More or Less Favorable Prices Than the Applicable Purchase Prices under this Invitation*. The City reserves the right to, and may decide to, redeem or acquire some or all of the Tender Bonds through optional redemptions, open market purchases, privately negotiated transactions, subsequent tender offers, exchange offers or otherwise, upon such terms and at such prices as it may determine, which may be more or less than the applicable Purchase Prices as set forth on Schedule A to this Invitation and could be for cash or other consideration. Any future redemptions, open market purchases, privately negotiated transactions, tender offers or exchange offers may be on the same terms or on terms that are more or less favorable to Bondholders of the Tender Bonds than the terms of this Invitation. The decision to enter into any future transactions and the terms of any such future transactions will depend on various factors existing at that time. There can be no assurance as to which of these alternatives, if any, the City will ultimately choose to pursue in the future.

*Market for the Tender Bonds*. The Tender Bonds are not listed on any national or regional securities exchange or reported on a national quotation system. To the extent that the Tender Bonds are traded, their prices may fluctuate greatly depending on the trading volume and the balance between buy and sell orders. Bondholders may be able to effect a sale of the Tender Bonds at prices higher than the applicable Purchase Prices described in this Invitation. **None of the City, the DWSD, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent makes any recommendation that any Bondholder tender or refrain from tendering all or any portion of its Tender Bonds or makes any representation that the Purchase Prices as set forth on Schedule A of this Invitation are indicative of market prices.**

*Treatment of the Tender Bonds Not Purchased*.  The Tender Bonds not offered and purchased pursuant to this Invitation will remain outstanding until maturity, redemption or defeasance.  If the City purchases any Tender Bonds or any DWSD Water Bonds pursuant to the Invitations, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would remove the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds.  Under such amended Plan of Adjustment, all of the DWSD Bonds that are not purchased pursuant to the Invitations would be unimpaired.  To the extent the City elects, in its sole discretion, not to purchase any DWSD Bonds pursuant to the Invitations, or the purchase of DWSD Bonds pursuant to the Invitation does not close for any reason, the treatment of the DWSD Bonds under the Plan of Adjustment, as currently proposed, would include an impairment of certain of the DWSD Bonds as identified on Schedule A.

*Certain Potential Adverse Effects of this Invitation on the Tender Bonds Not Purchased*.  The purchase by the City of any Offered Bonds could have adverse effects on owners of the Tender Bonds not purchased pursuant to this Invitation, including, among others, the principal amount of the Tender Bonds of that CUSIP number available to trade publicly will be reduced, which could adversely affect the liquidity and market value of the Tender Bonds of that CUSIP number that remain outstanding.

*Ongoing Mediation Regarding Creation of a Regional Water Authority.*  There is ongoing mediation involving the City and the Counties of Macomb, Oakland and Wayne with respect to the creation of a regional water authority.  No prediction can be made as to the outcome of such mediation or its effect on the DWSD Bonds, including the value thereof.  See "THE DEPARTMENT—Ongoing Discussion of Formation of Regional Water Authority" in the Disclosure Statement.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The City has been advised that sales by Bondholders pursuant to this Invitation will be taxable transactions for federal income tax purposes.  The tax consequences of a sale of the Tender Bonds pursuant to this Invitation may vary depending upon, among other things, the particular circumstances of the tendering Bondholder.  Bondholders should consult their tax advisor with respect to the proper tax treatment of any sale pursuant to this Invitation, in light of their individual tax situation.

Amounts paid to Bondholders tendering their Bonds for purchase may be subject to "backup withholding" ("*Backup Withholding*") by reason of the events specified by Section 3406 of the Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder (collectively, the "*Code*"), which include failure of a Bondholder to supply their Financial Representative with such Bondholder's taxpayer identification number certified under penalty of perjury.  Backup Withholding may also apply to Bondholders who are otherwise exempt from such Backup Withholding if such Bondholders fail to properly document their status as exempt recipients.

This federal income tax discussion (the "*General Federal Tax Discussion*") is included for general information only and should not be construed as a tax opinion nor tax advice by the City or any of its advisors or agents to Bondholders.  Bondholders are hereby notified that any discussion of federal income tax issues contained or referred to herein is not intended or written to be used, and cannot be used by Bondholders, for the purposes of avoiding penalties that may be imposed on them under the Code. The General Federal Tax Discussion does not purport to address all aspects of federal income taxation that may be relevant to particular Bondholders (e.g., a foreign person, bank, thrift institution, personal holding company, tax-exempt organization, regulated investment company, insurance company, or other broker or dealer in securities or currencies).  In addition to federal tax consequences, the sale or exchange of the Tender Bonds may be treated as a taxable event for other state and local and foreign tax purposes.

Bondholders should not rely upon the General Federal Tax Discussion and are urged to consult their own tax advisors to determine the particular federal, state or local tax consequences of offer of sales made by them pursuant to this Invitation, including the effect of possible changes in the tax laws.

## BANK PROCESSING FEE; ELIGIBLE INSTITUTIONS ARE NOT AGENTS

The City will pay or cause to be paid to any commercial bank or trust company having an office, branch or agency in the United States, and any firm which is a member of the Financial Industry Regulatory Authority, or of a registered national securities exchange (an "*Eligible Institution*"), the following bank processing fee for Offered Bonds purchased by the City from each of its retail customers: (1) $10.00 per $1,000 of principal amount of Offered Bonds for the first $50,000 of Offered Bonds purchased from each retail customer, (2) $5.00 per $1,000 of principal amount of Offered Bonds in excess of $50,000 and up to $250,000 of Offered Bonds purchased from such retail customer and (3) $2.50 per $1,000 of principal amount of Offered Bonds in excess of $250,000 and up to $5,000,000 purchased from such retail customer. A "*retail customer*" is an individual who manages his or her own investments and whose investments are not managed by an investment manager or bank trust department that holds the investments of that individual in a separate account in the name of that individual.

Eligible Institutions must submit requests for payment of bank processing fees online at www.bondcom.com/DWSD no later than 5:00 p.m., New York City time, on the fifth calendar day immediately following the Expiration Date, unless earlier terminated or extended. No payment of a bank processing fee will be made on requests received after this time. No bank processing fee will be paid on requests improperly submitted or for Offered Bonds not purchased by the City.

Eligible Institutions are not agents of the City for this Invitation.

## REIMBURSEMENT OF FINANCIAL INSTITUTION EXPENSES FOR FORWARDING INVITATION AND OTHER TENDER OFFER MATERIALS

The City will reimburse financial institutions their reasonable out-of-pocket expenses incurred in forwarding this Invitation and the Other Tender Materials to the Bondholders whose Tender Bonds they hold (and to the Bondholders' account executives), and in handling and forwarding Offers to tender Offered Bonds. The reimbursement for forwarding such materials will be at the amounts established by the New York Stock Exchange. Requests for reimbursement of out-of-pocket expenses must be made to the Information and Tender Agent, online at www.bondcom.com/DWSD no later than 5:00 p.m., New York City time, on the fifth calendar day immediately following the Expiration Date. No reimbursement will be made on requests received after this time.

## DEALER MANAGER

The City has retained Citigroup Global Markets Inc. to act on its behalf as Dealer Manager for this Invitation. The City will pay the Dealer Manager a fee of $1.00 for each $1,000 principal amount of the Offered Bonds purchased by the City pursuant to this Invitation. In addition, the City will pay the Dealer Manager its reasonable out-of-pocket costs and expenses relating to this Invitation. Any reference in this Invitation to the Dealer Manager is to Citigroup Global Markets Inc. in its capacity as the Dealer Manager.

The Dealer Manager may contact Bondholders of the Tender Bonds regarding this Invitation and may request brokers, dealers, custodian banks, depositories, trust companies and other nominees to forward this Invitation and the Other Tender Materials to beneficial owners of the Tender Bonds.

13

Citigroup Global Markets Inc. will also be acting as the senior managing underwriter of the 2014 DWSD Refinancing Bonds and will be paid an underwriting discount in its role as underwriter of the 2014 DWSD Refinancing Bonds. The Dealer Manager or an affiliate thereof may, if necessary, purchase the 2014 DWSD Refinancing Bonds as interim financing bonds.

The Dealer Manager and one or more of its affiliates together own $97,585,000 of the DWSD Bonds ($94,035,000 of DWSD Sewer Bonds and $3,550,000 of DWSD Water Bonds) which may be offered and purchased pursuant to the Invitations.

## FINANCIAL ADVISOR

First Southwest Company is acting as Financial Advisor to the DWSD in connection with the Invitations for the DWSD Bonds. The Financial Advisor's fee for services rendered with respect to the Invitations for the DWSD Bonds is $395,000.

## FINANCIAL CONSULTANT TO THE BOWC

Ramirez & Co., Inc. is acting as the Board Financial Consultant to the BOWC in connection with the Invitations for the DWSD Bonds. The Board Financial Consultant's fee for services rendered with respect to the Invitations for the DWSD Bonds is $153,000.

## MISCELLANEOUS

No one has been authorized by the City, DWSD, the BOWC, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent to recommend to any Bondholder whether to offer any amount of the Tender Bonds pursuant to this Invitation. No one has been authorized to give any information or to make any representation in connection with this Invitation other than those contained herein and in the Other Tender Materials. Any recommendations, information and representations given or made cannot be relied upon as having been authorized by the City, DWSD, the BOWC, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent.

None of the City, DWSD, the BOWC, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent makes any recommendation that any Bondholder tender or refrain from tendering all or any portion of the principal amount of such Bondholder's Bonds. Each Bondholder must make these decisions and should read this Invitation and the Other Tender Materials and consult with its broker, account executive, financial advisor and/or other financial professional in making these decisions.

Institutional investors with questions about this Invitation should contact the Dealer Manager. Individual investors and their brokers, account executives, financial advisors or other financial professionals with questions about this Invitation should contact the Information and Tender Agent. The contact information for the Dealer Manager and the Information and Tender Agent are as follows:

### Dealer Manager

**Citigroup Global Markets Inc.**
390 Greenwich Street, 2nd Floor, New York, NY 10013
David M. Brownstein, 212-723-5570, david.m.brownstein@citi.com

Mike Leffler, 212-723-4453, mike.leffler@citi.com
Shai Markowicz, 212-723-5135, shai.markowicz@citi.com

**Information and Tender Agent:**

Bondholder Communications Group
30 Broad Street 46th Floor New York, NY 10004
Attention: Denise Waters
Call Toll Free:  (888) 385-BOND or (888) 385-2663
Web site: www.bondcom.com/DWSD   E-mail: Dwaters@bondcom.com

CITY OF DETROIT, MICHIGAN

By _____/s/   Kevyn D. Orr_____
          Emergency Manager

DETROIT WATER AND SEWERAGE
DEPARTMENT

By _____/s/   Sue F. McCormick_____
          Director

15

## Schedule A: TENDER BONDS SUBJECT TO THE
## INVITATION TO TENDER AND PURCHASE PRICES
### Detroit Water and Sewerage Department – Sewer System

**Bonds Not Impaired Under Current Plan of Adjustment**

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | **1,469,485,000** | | | | | |
| 251237S95 | 1998A | Senior | 3,225,000 | 5.500% | 7/1/15 | | NPFG | 101.750 |
| 251237V26 | 1998B | Senior | 3,240,000 | 5.500% | 7/1/15 | | NPFG | 101.750 |
| 251237VN0 | 1999A | Senior | 8,725,000 | CAB | 7/1/15 | | NPFG | 97.000 |
| 2512376H1 | 2001C-1 | Senior | 600,000 | 5.250% | 7/1/15 | | AG | 100.750 |
| 2512374H3 | 2001C-2 | Senior | 325,000 | 4.000% | 7/1/15 | | NPFG / BHAC | 100.000 |
| 2512374J9 | 2001C-2 | Senior | 345,000 | 4.000% | 7/1/16 | | NPFG / BHAC | 103.000 |
| 2512374K6 | 2001C-2 | Senior | 365,000 | 4.000% | 7/1/17 | | NPFG / BHAC | 104.929 |
| 2512374L4 | 2001C-2 | Senior | 380,000 | 4.000% | 7/1/18 | | NPFG / BHAC | 105.450 |
| 2512374M2 | 2001C-2 | Senior | 400,000 | 4.000% | 7/1/19 | 7/1/18 | NPFG / BHAC | 104.000 |
| 2512374N0 | 2001C-2 | Senior | 4,090,000 | 4.500% | 7/1/27 | 7/1/18 | NPFG / BHAC | 100.678 |
| 251237WY5 | 2001D-2 | Second | 21,300,000 | Adj. | 7/1/32 | 9/2/14 | NPFG | 86.000 |
| 251237YM9 | 2003A | Senior | 275,000 | 3.650% | 7/1/15 | | AG | 99.500 |
| 251237K85 | 2003A | Senior | 3,325,000 | 5.000% | 7/1/15 | 9/2/14 | AG | 100.000 |
| 251237YN7 | 2003A | Senior | 11,880,000 | 5.500% | 7/1/15 | | AG | 101.000 |
| 251237YQ0 | 2003A | Senior | 190,000 | 3.700% | 7/1/16 | 9/2/14 | AG | 100.000 |
| 251237Q89 | 2003A | Senior | 10,000 | 5.000% | 7/1/16 | 9/2/14 | AG | 100.000 |
| 251237YT4 | 2003A | Senior | 250,000 | 3.800% | 7/1/17 | 9/2/14 | AG | 100.000 |
| 251237Q97 | 2003A | Senior | 3,200,000 | 5.000% | 7/1/17 | 9/2/14 | AG | 100.000 |
| 251237YW7 | 2003A | Senior | 535,000 | 4.000% | 7/1/18 | 9/2/14 | AG | 100.000 |
| 251237R21 | 2003A | Senior | 180,000 | 5.000% | 7/1/18 | 9/2/14 | AG | 100.000 |
| 251237YZ0 | 2003A | Senior | 300,000 | 4.000% | 7/1/19 | 9/2/14 | AG | 100.000 |
| 251237ZB2 | 2003A | Senior | 50,000 | 4.000% | 7/1/20 | 9/2/14 | AG | 100.000 |
| 251237ZD8 | 2003A | Senior | 4,795,000 | 5.000% | 7/1/21 | 9/2/14 | AG | 100.000 |
| 251237ZE6 | 2003A | Senior | 25,000 | 4.250% | 7/1/22 | 9/2/14 | AG | 100.000 |
| 251237ZF3 | 2003A | Senior | 5,440,000 | 5.000% | 7/1/22 | 9/2/14 | AG | 100.000 |
| 251237ZG1 | 2003A | Senior | 1,000,000 | 4.300% | 7/1/23 | 9/2/14 | AG | 100.000 |
| 251237ZH9 | 2003A | Senior | 7,935,000 | 5.000% | 7/1/23 | 9/2/14 | AG | 100.000 |
| 251237ZJ5 | 2003A | Senior | 18,215,000 | 5.000% | 7/1/24 | 9/2/14 | AG | 100.000 |
| 251237Y72 | 2003A | Senior | 13,210,000 | 5.000% | 7/1/25 | 9/2/14 | AG | 100.000 |
| 251237Y80 | 2003A | Senior | 9,005,000 | 5.000% | 7/1/26 | 9/2/14 | AG | 100.000 |
| 251237Y98 | 2003A | Senior | 19,485,000 | 5.000% | 7/1/28 | 9/2/14 | AG | 100.000 |
| 251237Z22 | 2003A | Senior | 38,290,000 | 5.000% | 7/1/32 | 9/2/14 | AG | 100.000 |
| 251237E58 | 2005A | Second | 490,000 | 3.700% | 7/1/15 | | NPFG | 100.000 |
| 251237E66 | 2005A | Second | 510,000 | 3.750% | 7/1/16 | 7/1/15 | NPFG | 101.500 |
| 251237E74 | 2005A | Second | 545,000 | 4.000% | 7/1/17 | 7/1/15 | NPFG | 101.886 |
| 251237E82 | 2005A | Second | 555,000 | 4.000% | 7/1/18 | 7/1/15 | NPFG | 101.796 |
| 251237E90 | 2005A | Second | 830,000 | 4.000% | 7/1/19 | 7/1/15 | NPFG | 101.600 |
| 251237F24 | 2005A | Second | 860,000 | 4.000% | 7/1/20 | 7/1/15 | NPFG | 100.718 |
| 251237F32 | 2005A | Second | 905,000 | 4.100% | 7/1/21 | 7/1/15 | NPFG | 99.805 |
| 251237F40 | 2005A | Second | 925,000 | 4.125% | 7/1/22 | 7/1/15 | NPFG | 98.239 |
| 251237F57 | 2005A | Second | 970,000 | 4.250% | 7/1/23 | 7/1/15 | NPFG | 97.367 |
| 251237F65 | 2005A | Second | 490,000 | 4.250% | 7/1/24 | 7/1/15 | NPFG | 95.721 |
| 251237Z55 | 2005A | Second | 19,415,000 | 5.000% | 7/1/30 | 7/1/15 | NPFG | 96.421 |
| 251237Z63 | 2005A | Second | 24,820,000 | 5.125% | 7/1/33 | 7/1/15 | NPFG | 92.909 |
| 251237G23 | 2005A | Second | 47,000,000 | 4.500% | 7/1/35 | 7/1/15 | NPFG | 84.602 |
| 251237F99 | 2005A | Second | 138,945,000 | 5.000% | 7/1/35 | 7/1/15 | NPFG | 90.642 |
| 251237G72 | 2005B | Second | 8,010,000 | 5.000% | 7/1/15 | | NPFG | 101.000 |
| 251237J38 | 2005C | Second | 4,345,000 | 5.000% | 7/1/15 | | NPFG | 101.000 |
| 251237J46 | 2005C | Second | 4,570,000 | 5.000% | 7/1/16 | 7/1/15 | NPFG | 103.512 |
| 251237J53 | 2005C | Second | 4,795,000 | 5.000% | 7/1/17 | 7/1/15 | NPFG | 103.461 |
| 251237J61 | 2005C | Second | 5,030,000 | 5.000% | 7/1/18 | 7/1/15 | NPFG | 103.240 |
| 251237J79 | 2005C | Second | 5,280,000 | 5.000% | 7/1/19 | 7/1/15 | NPFG | 103.360 |
| 251237J87 | 2005C | Second | 7,355,000 | 5.000% | 7/1/20 | 7/1/15 | NPFG | 103.309 |

## Bonds Not Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| 251237J95 | 2005C | Second | 7,720,000 | 5.000% | 7/1/21 | 7/1/15 | NPFG | 103.050 |
| 251237K28 | 2005C | Second | 6,345,000 | 5.000% | 7/1/25 | 7/1/15 | NPFG | 99.949 |
| 2512373Z4 | 2006A | Second | 123,655,000 | 5.500% | 7/1/36 | 7/1/18 | NPFG / BHAC | 96.102 |
| 251237M91 | 2006B | Second | 1,825,000 | 5.000% | 7/1/15 | | NPFG | 101.000 |
| 251237N58 | 2006B | Second | 7,515,000 | 4.500% | 7/1/22 | 7/1/16 | NPFG | 103.779 |
| 251237N66 | 2006B | Second | 6,540,000 | 4.250% | 7/1/25 | 7/1/16 | NPFG | 95.221 |
| 251237N74 | 2006B | Second | 24,400,000 | 5.000% | 7/1/33 | 7/1/16 | NPFG | 93.693 |
| 251237N82 | 2006B | Second | 40,000,000 | 4.625% | 7/1/34 | 7/1/16 | NPFG | 86.443 |
| 251237N90 | 2006B | Second | 156,600,000 | 5.000% | 7/1/36 | 7/1/16 | NPFG | 90.189 |
| 251237W66 | 2006D | Senior | 288,780,000 | Adj. | 7/1/32 | 9/2/14 | AG | 79.000 |
| 251250AB2 | 2012A | Senior | 6,005,000 | 5.000% | 7/1/15 | | N/A | 101.500 |
| 251250AS5 | 2012A | Senior | 50,000,000 | 5.000% | 7/1/39 | 7/1/22 | AG | 95.767 |
| 251250AR7 | 2012A | Senior | 292,865,000 | 5.250% | 7/1/39 | 7/1/22 | N/A | 96.116 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | **1,281,315,000** | | | | | |
| 251237T29 | 1998A | Senior | 3,540,000 | 5.500% | 7/1/16 | | NPFG | 104.875 |
| 251237T37 | 1998A | Senior | 3,660,000 | 5.500% | 7/1/17 | | NPFG | 106.840 |
| 251237T45 | 1998A | Senior | 3,885,000 | 5.250% | 7/1/18 | 7/1/17 | NPFG | 106.392 |
| 251237T52 | 1998A | Senior | 4,095,000 | 5.250% | 7/1/19 | 7/1/17 | NPFG | 106.614 |
| 251237T60 | 1998A | Senior | 7,415,000 | 5.250% | 7/1/20 | 7/1/17 | NPFG | 106.340 |
| 251237T78 | 1998A | Senior | 7,745,000 | 5.250% | 7/1/21 | 7/1/17 | NPFG | 106.815 |
| 251237T86 | 1998A | Senior | 12,585,000 | 5.250% | 7/1/22 | 7/1/17 | NPFG | 106.870 |
| 251237T94 | 1998A | Senior | 13,350,000 | 5.250% | 7/1/23 | 7/1/17 | NPFG | 106.891 |
| 251237V34 | 1998B | Senior | 3,455,000 | 5.500% | 7/1/16 | | NPFG | 104.875 |
| 251237V42 | 1998B | Senior | 3,575,000 | 5.500% | 7/1/17 | | NPFG | 106.840 |
| 251237V59 | 1998B | Senior | 3,895,000 | 5.250% | 7/1/18 | 7/1/17 | NPFG | 106.392 |
| 251237V67 | 1998B | Senior | 4,015,000 | 5.250% | 7/1/19 | 7/1/17 | NPFG | 106.614 |
| 251237V75 | 1998B | Senior | 7,330,000 | 5.250% | 7/1/20 | 7/1/17 | NPFG | 106.340 |
| 251237V83 | 1998B | Senior | 7,665,000 | 5.250% | 7/1/21 | 7/1/17 | NPFG | 106.815 |
| 251237V91 | 1998B | Senior | 12,600,000 | 5.250% | 7/1/22 | 7/1/17 | NPFG | 106.870 |
| 251237W25 | 1998B | Senior | 13,265,000 | 5.250% | 7/1/23 | 7/1/17 | NPFG | 106.891 |
| 251237VP5 | 1999A | Senior | 9,200,000 | CAB | 7/1/16 | | NPFG | 93.840 |
| 251237VQ3 | 1999A | Senior | 9,085,000 | CAB | 7/1/17 | | NPFG | 90.000 |
| 251237VR1 | 1999A | Senior | 9,100,000 | CAB | 7/1/18 | | NPFG | 86.000 |
| 251237VS9 | 1999A | Senior | 9,155,000 | CAB | 7/1/19 | | NPFG | 81.600 |
| 251237VT7 | 1999A | Senior | 8,720,000 | CAB | 7/1/20 | | NPFG | 77.000 |
| 251237VU4 | 1999A | Senior | 10,170,000 | CAB | 7/1/21 | | NPFG | 72.500 |
| 251237WV1 | 2001B | Second | 110,550,000 | 5.500% | 7/1/29 | | NPFG | 104.000 |
| 2512376J7 | 2001C-1 | Senior | 625,000 | 5.250% | 7/1/16 | | AG | 104.650 |
| 2512376K4 | 2001C-1 | Senior | 655,000 | 5.250% | 7/1/17 | | AG | 106.480 |
| 2512376L2 | 2001C-1 | Senior | 690,000 | 5.250% | 7/1/18 | | AG | 108.427 |
| 2512376M0 | 2001C-1 | Senior | 720,000 | 5.250% | 7/1/19 | | AG | 109.294 |
| 2512376N8 | 2001C-1 | Senior | 38,000,000 | 6.500% | 7/1/24 | 7/1/19 | N/A | 103.668 |
| 2512376P3 | 2001C-1 | Senior | 110,510,000 | 7.000% | 7/1/27 | 7/1/19 | AG | 117.790 |
| 2512374P5 | 2001C-2 | Senior | 21,600,000 | 5.250% | 7/1/28 | 7/1/18 | NPFG / BHAC | 107.000 |
| 2512374Q3 | 2001C-2 | Senior | 93,540,000 | 5.250% | 7/1/29 | 7/1/18 | NPFG / BHAC | 107.000 |
| 2512374R1 | 2001E | Second | 136,150,000 | 5.750% | 7/1/31 | 7/1/18 | FGIC / BHAC | 103.000 |
| 251237YR8 | 2003A | Senior | 12,535,000 | 5.500% | 7/1/16 | | AG | 105.125 |
| 251237YU1 | 2003A | Senior | 13,215,000 | 5.500% | 7/1/17 | | AG | 107.150 |
| 251237YX5 | 2003A | Senior | 13,950,000 | 5.500% | 7/1/18 | | AG | 109.190 |
| 2512376Q1 | 2003B | Senior | 150,000,000 | 7.500% | 7/1/33 | 7/1/19 | AG | 119.095 |
| 251237B77 | 2004A | Senior | 14,830,000 | 5.250% | 7/1/19 | | AG | 109.294 |
| 251237B85 | 2004A | Senior | 15,605,000 | 5.250% | 7/1/20 | | AG | 109.000 |
| 251237B93 | 2004A | Senior | 5,525,000 | 5.250% | 7/1/21 | | AG | 109.049 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| 251237C27 | 2004A | Senior | 5,545,000 | 5.250% | 7/1/22 | | AG | 108.300 |
| 251237C35 | 2004A | Senior | 5,835,000 | 5.250% | 7/1/23 | | AG | 107.300 |
| 251237C43 | 2004A | Senior | 6,145,000 | 5.250% | 7/1/24 | | AG | 105.900 |
| 251237G80 | 2005B | Second | 10,420,000 | 5.500% | 7/1/21 | | NPFG | 107.420 |
| 251237G98 | 2005B | Second | 10,990,000 | 5.500% | 7/1/22 | | NPFG | 106.700 |
| 251237N25 | 2006B | Second | 1,430,000 | 5.000% | 7/1/16 | | NPFG | 103.300 |
| 251237N33 | 2006B | Second | 1,505,000 | 5.000% | 7/1/17 | 7/1/16 | NPFG | 104.794 |
| 251237N41 | 2006B | Second | 1,590,000 | 5.000% | 7/1/18 | 7/1/16 | NPFG | 104.350 |
| 251237P31 | 2006C | Senior | 8,495,000 | 5.250% | 7/1/16 | | NPFG | 104.450 |
| 251237P49 | 2006C | Senior | 8,915,000 | 5.000% | 7/1/17 | 7/1/16 | NPFG | 104.690 |
| 251237P56 | 2006C | Senior | 9,150,000 | 5.000% | 7/1/18 | 7/1/16 | NPFG | 104.721 |
| 251250AC0 | 2012A | Senior | 8,880,000 | 5.000% | 7/1/16 | | AG | 104.230 |
| 251250AD8 | 2012A | Senior | 6,430,000 | 5.000% | 7/1/17 | | N/A | 100.714 |
| 251250AE6 | 2012A | Senior | 9,750,000 | 5.000% | 7/1/18 | | AG | 107.665 |
| 251250AF3 | 2012A | Senior | 19,930,000 | 5.000% | 7/1/19 | | N/A | 100.000 |
| 251250AG1 | 2012A | Senior | 13,925,000 | 5.000% | 7/1/20 | | N/A | 100.000 |
| 251250AH9 | 2012A | Senior | 9,845,000 | 5.000% | 7/1/21 | | N/A | 100.000 |
| 251250AJ5 | 2012A | Senior | 14,860,000 | 5.000% | 7/1/22 | | N/A | 100.000 |
| 251250AK2 | 2012A | Senior | 22,275,000 | 5.000% | 7/1/23 | 7/1/22 | N/A | 100.000 |
| 251250AL0 | 2012A | Senior | 23,630,000 | 5.500% | 7/1/24 | 7/1/17 | N/A | 101.229 |
| 251250AM8 | 2012A | Senior | 32,240,000 | 5.500% | 7/1/25 | 7/1/17 | N/A | 100.993 |
| 251250AN6 | 2012A | Senior | 13,170,000 | 5.250% | 7/1/26 | 7/1/22 | N/A | 101.098 |
| 251250AP1 | 2012A | Senior | 9,890,000 | 5.250% | 7/1/27 | 7/1/22 | N/A | 100.961 |
| 251250AQ9 | 2012A | Senior | 120,265,000 | 5.000% | 7/1/32 | 7/1/22 | N/A | 99.000 |

*Footnote for each Insurance Provider
    AG = Assured Guaranty
    NPFG = National Public Finance Guarantee
    FGIC = Financial Guaranty Insurance Company
    BHAC = Berkshire Hathaway
    N/A = Not Insured

## Derivative CUSIP

| Original CUSIP | Derivative CUSIP | Derivative CUSIP 2 |
|---|---|---|
| 251237F99 | 251237F99 | 2512373W1 |
| 251237G23 | 251237G23 | 2512375Z2 |
| 251237N74 | 251237N74 | 2512373Q4 |
| 251237N90 | 251237N90 | 2512373P6 |
| 251237N90 | 251237N90 | 2512373M3 |
| 251237N90 | 251237N90 | 2512373R2 |
| 251237P56 | 251237P56 | 2512373T8 |
| 251237T86 | 251237T86 | 2512375V1 |
| 251237WV1 | 251237WV1 | 251237XL2 |
| 251237WV1 | 251237WV1 | 251237XM0 |
| 251237WV1 | 251237WV1 | 2512373N1 |
| 251237WV1 | 251237WV1 | 2512373S0 |
| 251237Z55 | 251237Z55 | 2512376A6 |
| 251250AJ5 | 251250AJ5 | 251250AT3 |

**DISCLOSURE STATEMENT**
**RELATING TO**
**INVITATION TO TENDER BONDS**
**$2,750,800,000**
**CITY OF DETROIT, MICHIGAN**
**DETROIT WATER AND SEWERAGE DEPARTMENT**
**SEWAGE DISPOSAL SYSTEM BONDS**
**CONSISTING OF**
**$1,805,620,000 Revenue and Revenue Refunding Senior Lien Bonds and**
**$945,180,000 Revenue and Revenue Refunding Second Lien Bonds**

Pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation"), the City of Detroit, County of Wayne, State of Michigan (the "City"), upon authorization from (i) the Board of Water Commissioners (the "Board of Water Commissioners") of the Detroit Water and Sewerage Department (the "Department"), and (ii) the emergency manager of the City (the "Emergency Manager"), invites each holder (a "Bondholder") of those certain outstanding Detroit Water and Sewerage Department Sewage Disposal System Revenue and Revenue Refunding Bonds (the "Tender Bonds") described more specifically on the inside cover pages of this disclosure statement (the "Disclosure Statement") to submit offers to sell all or a portion of the Tender Bonds held by such Bondholder to the City at the applicable purchase price on the inside cover page of this Disclosure Statement (the "Purchase Price"), as well as accrued and unpaid interest, subject to the conditions and upon the terms specified in the Invitation.

Bondholders should read this Disclosure Statement, the Invitation and the other materials described in the Invitation carefully and consult with their broker, account executive, financial advisor and/or other financial professional in order to make an informed decision as to whether, and how, to offer their Tender Bonds. This Disclosure Statement, the Invitation and the other materials described in the Invitation are and will be available from the Dealer Manager and the Information and Tender Agent and at www.bondcom.com/DWSD.

None of the City, the Department, the Board of Water Commissioners, the Emergency Manager, the Dealer Manager (as defined herein), the Financial Advisor (as defined herein), the Board Financial Consultant (as defined herein) and the Information and Tender Agent (as defined herein) or any of their respective affiliates makes any recommendation as to whether or not Bondholders should tender all or any portion of the Tender Bonds pursuant to the Invitation. Bondholders must make their own decisions as to whether to tender the Tender Bonds and, if so, the amount of their Tender Bonds to tender.

Any Bondholder wishing to offer its Tender Bonds pursuant to the Invitation should follow the procedures more fully described in the Invitation. Institutional investors with questions about the Invitation should contact the Dealer Manager. Individual investors and their brokers, account executives, financial advisors and other financial professionals with questions about the Invitation should contact the Information and Tender Agent.

The Dealer Manager for the Invitation is:

Citigroup Global Markets Inc.

The Information and Tender Agent for the Invitation is:

Bondholder Communications Group

30 Broad Street, 46th Floor, New York, NY 10004

Attention: Denise Waters

Call Toll Free: 888-385-BOND or 888-385-2663

Website: www.bondcom.com/DWSD Email: Dwaters@bondcom.com

Date of this Disclosure Statement: August 7, 2014

**TENDER BONDS SUBJECT TO THE
INVITATION TO TENDER AND PURCHASE PRICES
Detroit Water and Sewerage Department – Sewer System**

**Bonds Not Impaired Under Current Plan of Adjustment**

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | **1,469,485,000** | | | | | |
| 251237S95 | 1998A | Senior | 3,225,000 | 5.500% | 7/1/15 | | NPFG | 101.750 |
| 251237V26 | 1998B | Senior | 3,240,000 | 5.500% | 7/1/15 | | NPFG | 101.750 |
| 251237VN0 | 1999A | Senior | 8,725,000 | CAB | 7/1/15 | | NPFG | 97.000 |
| 2512376H1 | 2001C-1 | Senior | 600,000 | 5.250% | 7/1/15 | | AG | 100.750 |
| 2512374H3 | 2001C-2 | Senior | 325,000 | 4.000% | 7/1/15 | | NPFG / BHAC | 100.000 |
| 2512374J9 | 2001C-2 | Senior | 345,000 | 4.000% | 7/1/16 | | NPFG / BHAC | 103.000 |
| 2512374K6 | 2001C-2 | Senior | 365,000 | 4.000% | 7/1/17 | | NPFG / BHAC | 104.929 |
| 2512374L4 | 2001C-2 | Senior | 380,000 | 4.000% | 7/1/18 | | NPFG / BHAC | 105.450 |
| 2512374M2 | 2001C-2 | Senior | 400,000 | 4.000% | 7/1/19 | 7/1/18 | NPFG / BHAC | 104.000 |
| 2512374N0 | 2001C-2 | Senior | 4,090,000 | 4.500% | 7/1/27 | 7/1/18 | NPFG / BHAC | 100.678 |
| 251237WY5 | 2001D-2 | Second | 21,300,000 | Adj. | 7/1/32 | 9/2/14 | NPFG | 86.000 |
| 251237YM9 | 2003A | Senior | 275,000 | 3.650% | 7/1/15 | | AG | 99.500 |
| 251237K85 | 2003A | Senior | 3,325,000 | 5.000% | 7/1/15 | 9/2/14 | AG | 100.000 |
| 251237YN7 | 2003A | Senior | 11,880,000 | 5.500% | 7/1/15 | | AG | 101.000 |
| 251237YQ0 | 2003A | Senior | 190,000 | 3.700% | 7/1/16 | 9/2/14 | AG | 100.000 |
| 251237Q89 | 2003A | Senior | 10,000 | 5.000% | 7/1/16 | 9/2/14 | AG | 100.000 |
| 251237YT4 | 2003A | Senior | 250,000 | 3.800% | 7/1/17 | 9/2/14 | AG | 100.000 |
| 251237Q97 | 2003A | Senior | 3,200,000 | 5.000% | 7/1/17 | 9/2/14 | AG | 100.000 |
| 251237YW7 | 2003A | Senior | 535,000 | 4.000% | 7/1/18 | 9/2/14 | AG | 100.000 |
| 251237R21 | 2003A | Senior | 180,000 | 5.000% | 7/1/18 | 9/2/14 | AG | 100.000 |
| 251237YZ0 | 2003A | Senior | 300,000 | 4.000% | 7/1/19 | 9/2/14 | AG | 100.000 |
| 251237ZB2 | 2003A | Senior | 50,000 | 4.000% | 7/1/20 | 9/2/14 | AG | 100.000 |
| 251237ZD8 | 2003A | Senior | 4,795,000 | 5.000% | 7/1/21 | 9/2/14 | AG | 100.000 |
| 251237ZE6 | 2003A | Senior | 25,000 | 4.250% | 7/1/22 | 9/2/14 | AG | 100.000 |
| 251237ZF3 | 2003A | Senior | 5,440,000 | 5.000% | 7/1/22 | 9/2/14 | AG | 100.000 |
| 251237ZG1 | 2003A | Senior | 1,000,000 | 4.300% | 7/1/23 | 9/2/14 | AG | 100.000 |
| 251237ZH9 | 2003A | Senior | 7,935,000 | 5.000% | 7/1/23 | 9/2/14 | AG | 100.000 |
| 251237ZJ5 | 2003A | Senior | 18,215,000 | 5.000% | 7/1/24 | 9/2/14 | AG | 100.000 |
| 251237Y72 | 2003A | Senior | 13,210,000 | 5.000% | 7/1/25 | 9/2/14 | AG | 100.000 |
| 251237Y80 | 2003A | Senior | 9,005,000 | 5.000% | 7/1/26 | 9/2/14 | AG | 100.000 |
| 251237Y98 | 2003A | Senior | 19,485,000 | 5.000% | 7/1/28 | 9/2/14 | AG | 100.000 |
| 251237Z22 | 2003A | Senior | 38,290,000 | 5.000% | 7/1/32 | 9/2/14 | AG | 100.000 |
| 251237E58 | 2005A | Second | 490,000 | 3.700% | 7/1/15 | | NPFG | 100.000 |
| 251237E66 | 2005A | Second | 510,000 | 3.750% | 7/1/16 | 7/1/15 | NPFG | 101.500 |
| 251237E74 | 2005A | Second | 545,000 | 4.000% | 7/1/17 | 7/1/15 | NPFG | 101.886 |
| 251237E82 | 2005A | Second | 555,000 | 4.000% | 7/1/18 | 7/1/15 | NPFG | 101.796 |
| 251237E90 | 2005A | Second | 830,000 | 4.000% | 7/1/19 | 7/1/15 | NPFG | 101.600 |
| 251237F24 | 2005A | Second | 860,000 | 4.000% | 7/1/20 | 7/1/15 | NPFG | 100.718 |
| 251237F32 | 2005A | Second | 905,000 | 4.100% | 7/1/21 | 7/1/15 | NPFG | 99.805 |
| 251237F40 | 2005A | Second | 925,000 | 4.125% | 7/1/22 | 7/1/15 | NPFG | 98.239 |
| 251237F57 | 2005A | Second | 970,000 | 4.250% | 7/1/23 | 7/1/15 | NPFG | 97.367 |
| 251237F65 | 2005A | Second | 490,000 | 4.250% | 7/1/24 | 7/1/15 | NPFG | 95.721 |
| 251237Z55 | 2005A | Second | 19,415,000 | 5.000% | 7/1/30 | 7/1/15 | NPFG | 96.421 |
| 251237Z63 | 2005A | Second | 24,820,000 | 5.125% | 7/1/33 | 7/1/15 | NPFG | 92.909 |
| 251237G23 | 2005A | Second | 47,000,000 | 4.500% | 7/1/35 | 7/1/15 | NPFG | 84.602 |
| 251237F99 | 2005A | Second | 138,945,000 | 5.000% | 7/1/35 | 7/1/15 | NPFG | 90.642 |
| 251237G72 | 2005B | Second | 8,010,000 | 5.000% | 7/1/15 | | NPFG | 101.000 |
| 251237J38 | 2005C | Second | 4,345,000 | 5.000% | 7/1/15 | | NPFG | 101.000 |
| 251237J46 | 2005C | Second | 4,570,000 | 5.000% | 7/1/16 | 7/1/15 | NPFG | 103.512 |
| 251237J53 | 2005C | Second | 4,795,000 | 5.000% | 7/1/17 | 7/1/15 | NPFG | 103.461 |
| 251237J61 | 2005C | Second | 5,030,000 | 5.000% | 7/1/18 | 7/1/15 | NPFG | 103.240 |
| 251237J79 | 2005C | Second | 5,280,000 | 5.000% | 7/1/19 | 7/1/15 | NPFG | 103.360 |
| 251237J87 | 2005C | Second | 7,355,000 | 5.000% | 7/1/20 | 7/1/15 | NPFG | 103.309 |

## Bonds Not Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| 251237J95 | 2005C | Second | 7,720,000 | 5.000% | 7/1/21 | 7/1/15 | NPFG | 103.050 |
| 251237K28 | 2005C | Second | 6,345,000 | 5.000% | 7/1/25 | 7/1/15 | NPFG | 99.949 |
| 2512373Z4 | 2006A | Second | 123,655,000 | 5.500% | 7/1/36 | 7/1/18 | NPFG / BHAC | 96.102 |
| 251237M91 | 2006B | Second | 1,825,000 | 5.000% | 7/1/15 | | NPFG | 101.000 |
| 251237N58 | 2006B | Second | 7,515,000 | 4.500% | 7/1/22 | 7/1/16 | NPFG | 103.779 |
| 251237N66 | 2006B | Second | 6,540,000 | 4.250% | 7/1/25 | 7/1/16 | NPFG | 95.221 |
| 251237N74 | 2006B | Second | 24,400,000 | 5.000% | 7/1/33 | 7/1/16 | NPFG | 93.693 |
| 251237N82 | 2006B | Second | 40,000,000 | 4.625% | 7/1/34 | 7/1/16 | NPFG | 86.443 |
| 251237N90 | 2006B | Second | 156,600,000 | 5.000% | 7/1/36 | 7/1/16 | NPFG | 90.189 |
| 251237W66 | 2006D | Senior | 288,780,000 | Adj. | 7/1/32 | 9/2/14 | AG | 79.000 |
| 251250AB2 | 2012A | Senior | 6,005,000 | 5.000% | 7/1/15 | | N/A | 101.500 |
| 251250AS5 | 2012A | Senior | 50,000,000 | 5.000% | 7/1/39 | 7/1/22 | AG | 95.767 |
| 251250AR7 | 2012A | Senior | 292,865,000 | 5.250% | 7/1/39 | 7/1/22 | N/A | 96.116 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | **1,281,315,000** | | | | | |
| 251237T29 | 1998A | Senior | 3,540,000 | 5.500% | 7/1/16 | | NPFG | 104.875 |
| 251237T37 | 1998A | Senior | 3,660,000 | 5.500% | 7/1/17 | | NPFG | 106.840 |
| 251237T45 | 1998A | Senior | 3,885,000 | 5.250% | 7/1/18 | 7/1/17 | NPFG | 106.392 |
| 251237T52 | 1998A | Senior | 4,095,000 | 5.250% | 7/1/19 | 7/1/17 | NPFG | 106.614 |
| 251237T60 | 1998A | Senior | 7,415,000 | 5.250% | 7/1/20 | 7/1/17 | NPFG | 106.340 |
| 251237T78 | 1998A | Senior | 7,745,000 | 5.250% | 7/1/21 | 7/1/17 | NPFG | 106.815 |
| 251237T86 | 1998A | Senior | 12,585,000 | 5.250% | 7/1/22 | 7/1/17 | NPFG | 106.870 |
| 251237T94 | 1998A | Senior | 13,350,000 | 5.250% | 7/1/23 | 7/1/17 | NPFG | 106.891 |
| 251237V34 | 1998B | Senior | 3,455,000 | 5.500% | 7/1/16 | | NPFG | 104.875 |
| 251237V42 | 1998B | Senior | 3,575,000 | 5.500% | 7/1/17 | | NPFG | 106.840 |
| 251237V59 | 1998B | Senior | 3,895,000 | 5.250% | 7/1/18 | 7/1/17 | NPFG | 106.392 |
| 251237V67 | 1998B | Senior | 4,015,000 | 5.250% | 7/1/19 | 7/1/17 | NPFG | 106.614 |
| 251237V75 | 1998B | Senior | 7,330,000 | 5.250% | 7/1/20 | 7/1/17 | NPFG | 106.340 |
| 251237V83 | 1998B | Senior | 7,665,000 | 5.250% | 7/1/21 | 7/1/17 | NPFG | 106.815 |
| 251237V91 | 1998B | Senior | 12,600,000 | 5.250% | 7/1/22 | 7/1/17 | NPFG | 106.870 |
| 251237W25 | 1998B | Senior | 13,265,000 | 5.250% | 7/1/23 | 7/1/17 | NPFG | 106.891 |
| 251237VP5 | 1999A | Senior | 9,200,000 | CAB | 7/1/16 | | NPFG | 93.840 |
| 251237VQ3 | 1999A | Senior | 9,085,000 | CAB | 7/1/17 | | NPFG | 90.000 |
| 251237VR1 | 1999A | Senior | 9,100,000 | CAB | 7/1/18 | | NPFG | 86.000 |
| 251237VS9 | 1999A | Senior | 9,155,000 | CAB | 7/1/19 | | NPFG | 81.600 |
| 251237VT7 | 1999A | Senior | 8,720,000 | CAB | 7/1/20 | | NPFG | 77.000 |
| 251237VU4 | 1999A | Senior | 10,170,000 | CAB | 7/1/21 | | NPFG | 72.500 |
| 251237WV1 | 2001B | Second | 110,550,000 | 5.500% | 7/1/29 | | NPFG | 104.000 |
| 2512376J7 | 2001C-1 | Senior | 625,000 | 5.250% | 7/1/16 | | AG | 104.650 |
| 2512376K4 | 2001C-1 | Senior | 655,000 | 5.250% | 7/1/17 | | AG | 106.480 |
| 2512376L2 | 2001C-1 | Senior | 690,000 | 5.250% | 7/1/18 | | AG | 108.427 |
| 2512376M0 | 2001C-1 | Senior | 720,000 | 5.250% | 7/1/19 | | AG | 109.294 |
| 2512376N8 | 2001C-1 | Senior | 38,000,000 | 6.500% | 7/1/24 | 7/1/19 | N/A | 103.668 |
| 2512376P3 | 2001C-1 | Senior | 110,510,000 | 7.000% | 7/1/27 | 7/1/19 | AG | 117.790 |
| 2512374P5 | 2001C-2 | Senior | 21,600,000 | 5.250% | 7/1/28 | 7/1/18 | NPFG / BHAC | 107.000 |
| 2512374Q3 | 2001C-2 | Senior | 93,540,000 | 5.250% | 7/1/29 | 7/1/18 | NPFG / BHAC | 107.000 |
| 2512374R1 | 2001E | Second | 136,150,000 | 5.750% | 7/1/31 | 7/1/18 | FGIC / BHAC | 103.000 |
| 251237YR8 | 2003A | Senior | 12,535,000 | 5.500% | 7/1/16 | | AG | 105.125 |
| 251237YU1 | 2003A | Senior | 13,215,000 | 5.500% | 7/1/17 | | AG | 107.150 |
| 251237YX5 | 2003A | Senior | 13,950,000 | 5.500% | 7/1/18 | | AG | 109.190 |
| 2512376Q1 | 2003B | Senior | 150,000,000 | 7.500% | 7/1/33 | 7/1/19 | AG | 119.095 |
| 251237B77 | 2004A | Senior | 14,830,000 | 5.250% | 7/1/19 | | AG | 109.294 |
| 251237B85 | 2004A | Senior | 15,605,000 | 5.250% | 7/1/20 | | AG | 109.000 |
| 251237B93 | 2004A | Senior | 5,525,000 | 5.250% | 7/1/21 | | AG | 109.049 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| 251237C27 | 2004A | Senior | 5,545,000 | 5.250% | 7/1/22 | | AG | 108.300 |
| 251237C35 | 2004A | Senior | 5,835,000 | 5.250% | 7/1/23 | | AG | 107.300 |
| 251237C43 | 2004A | Senior | 6,145,000 | 5.250% | 7/1/24 | | AG | 105.900 |
| 251237G80 | 2005B | Second | 10,420,000 | 5.500% | 7/1/21 | | NPFG | 107.420 |
| 251237G98 | 2005B | Second | 10,990,000 | 5.500% | 7/1/22 | | NPFG | 106.700 |
| 251237N25 | 2006B | Second | 1,430,000 | 5.000% | 7/1/16 | | NPFG | 103.300 |
| 251237N33 | 2006B | Second | 1,505,000 | 5.000% | 7/1/17 | 7/1/16 | NPFG | 104.794 |
| 251237N41 | 2006B | Second | 1,590,000 | 5.000% | 7/1/18 | 7/1/16 | NPFG | 104.350 |
| 251237P31 | 2006C | Senior | 8,495,000 | 5.250% | 7/1/16 | | NPFG | 104.450 |
| 251237P49 | 2006C | Senior | 8,915,000 | 5.000% | 7/1/17 | 7/1/16 | NPFG | 104.690 |
| 251237P56 | 2006C | Senior | 9,150,000 | 5.000% | 7/1/18 | 7/1/16 | NPFG | 104.721 |
| 251250AC0 | 2012A | Senior | 8,880,000 | 5.000% | 7/1/16 | | AG | 104.230 |
| 251250AD8 | 2012A | Senior | 6,430,000 | 5.000% | 7/1/17 | | N/A | 100.714 |
| 251250AE6 | 2012A | Senior | 9,750,000 | 5.000% | 7/1/18 | | AG | 107.665 |
| 251250AF3 | 2012A | Senior | 19,930,000 | 5.000% | 7/1/19 | | N/A | 100.000 |
| 251250AG1 | 2012A | Senior | 13,925,000 | 5.000% | 7/1/20 | | N/A | 100.000 |
| 251250AH9 | 2012A | Senior | 9,845,000 | 5.000% | 7/1/21 | | N/A | 100.000 |
| 251250AJ5 | 2012A | Senior | 14,860,000 | 5.000% | 7/1/22 | | N/A | 100.000 |
| 251250AK2 | 2012A | Senior | 22,275,000 | 5.000% | 7/1/23 | 7/1/22 | N/A | 100.000 |
| 251250AL0 | 2012A | Senior | 23,630,000 | 5.500% | 7/1/24 | 7/1/17 | N/A | 101.229 |
| 251250AM8 | 2012A | Senior | 32,240,000 | 5.500% | 7/1/25 | 7/1/17 | N/A | 100.993 |
| 251250AN6 | 2012A | Senior | 13,170,000 | 5.250% | 7/1/26 | 7/1/22 | N/A | 101.098 |
| 251250AP1 | 2012A | Senior | 9,890,000 | 5.250% | 7/1/27 | 7/1/22 | N/A | 100.961 |
| 251250AQ9 | 2012A | Senior | 120,265,000 | 5.000% | 7/1/32 | 7/1/22 | N/A | 99.000 |

*Footnote for each Insurance Provider
AG = Assured Guaranty
NPFG = National Public Finance Guarantee
FGIC = Financial Guaranty Insurance Company
BHAC = Berkshire Hathaway
N/A = Not Insured

## Derivative CUSIP

| Original CUSIP | Derivative CUSIP | Derivative CUSIP 2 |
|---|---|---|
| 251237F99 | 251237F99 | 2512373W1 |
| 251237G23 | 251237G23 | 2512375Z2 |
| 251237N74 | 251237N74 | 2512373Q4 |
| 251237N90 | 251237N90 | 2512373P6 |
| 251237N90 | 251237N90 | 2512373M3 |
| 251237N90 | 251237N90 | 2512373R2 |
| 251237P56 | 251237P56 | 2512373T8 |
| 251237T86 | 251237T86 | 2512375V1 |
| 251237WV1 | 251237WV1 | 251237XL2 |
| 251237WV1 | 251237WV1 | 251237XM0 |
| 251237WV1 | 251237WV1 | 2512373N1 |
| 251237WV1 | 251237WV1 | 2512373S0 |
| 251237Z55 | 251237Z55 | 2512376A6 |
| 251250AJ5 | 251250AJ5 | 251250AT3 |

Certain statements contained in this Disclosure Statement, including in the Appendices hereto, reflect not historical facts but forecasts and "forward-looking statements." Such forward-looking statements can be identified, in some cases, by the terminology used, such as "may," "will," "should," "expects," "intends," "plans," "anticipates," "believes," "estimates," "predicts," "potential," "illustrate," "example," and "continue," or the singular, plural, negative or other derivations of these or other comparable terms. Bondholders should not place undue reliance on forward-looking statements. All forward-looking statements included in this Disclosure Statement are based on information available to the City and the Department on the date hereof, and the City and the Department assume no obligation to update any such forward-looking statements. Actual results could differ materially from those discussed in such forward-looking statements.

The forward-looking statements included herein are necessarily based on various assumptions and estimates and are inherently subject to various risks and uncertainties, including, but not limited to, the risks and uncertainties described herein and risks and uncertainties relating to the possible invalidity of the underlying assumptions and estimates and possible changes or developments in geopolitical, military, social, economic, business, industry, market, legal or regulatory circumstances, and conditions or actions taken or omitted to be taken by third parties, including customers, suppliers, and business partners, and legislative, judicial, and other governmental authorities and officials. Accordingly, actual results may vary from the projections, forecasts and estimates contained in this Disclosure Statement and such variations may be material, which could affect the City and the Department's ability to fulfill some or all of their respective obligations under the Invitation or the Tender Bonds.

No party that has provided information for this Disclosure Statement has any obligation to update or otherwise revise any projections, forecasts and estimates, including any revisions to reflect changes in conditions or circumstances arising after the date of this Disclosure Statement, or to reflect the occurrence of unanticipated events. Assumptions related to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions of future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the City and the Department. Any of such assumptions could be inaccurate and, therefore, there can be no assurance that the forward-looking statements included in this Disclosure Statement will prove to be accurate. New factors emerge from time to time and it is not possible for the City or the Department to predict all of such factors. Further, the City and the Department cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

All projections, forecasts, assumptions, expressions of opinions, estimates, and other forward-looking statements are expressly qualified in their entirety by the foregoing and the other cautionary statements set forth in this Disclosure Statement.

# TABLE OF CONTENTS

Page

SUMMARY STATEMENT .................................................................................................................. S-1
INTRODUCTION ................................................................................................................................. 1
Purpose of this Disclosure Statement .................................................................................................. 1
Plan of Finance ................................................................................................................................... 1
Availability of Documents ................................................................................................................... 3
SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS ........................................ 3
Pledged Assets .................................................................................................................................... 4
Priority of Lien and Payment Status ................................................................................................... 5
Flow of Funds ..................................................................................................................................... 6
Priority of Funds and Accounts ........................................................................................................... 7
Certain Other Funds ............................................................................................................................ 8
Reserve Accounts and Reserve Requirements ..................................................................................... 9
Rate Covenant ..................................................................................................................................... 12
Enforceability of Rates ....................................................................................................................... 13
DWSD Additional Bonds .................................................................................................................... 13
Amendments Without Consent ............................................................................................................ 15
Amendments With Consent ................................................................................................................. 17
Remedies under the DWSD Indenture and the Bond Ordinance .......................................................... 17
CITY OF DETROIT BANKRUPTCY MATTERS ............................................................................. 18
RISK FACTORS ................................................................................................................................. 22
OUTSTANDING DEPARTMENT INDEBTEDNESS ...................................................................... 32
DEBT SERVICE REQUIREMENTS ................................................................................................. 34
THE DEPARTMENT .......................................................................................................................... 36
Organization ....................................................................................................................................... 36
Court Mandated Changes .................................................................................................................... 36
Application of Financial Stability Agreement to the Department ........................................................ 39
The Board of Water Commissioners .................................................................................................... 39
Management Team ............................................................................................................................... 41
Management Initiatives ....................................................................................................................... 44
Employees and Employee Bargaining Units ....................................................................................... 48
Ongoing Discussion of Formation of Regional Water Authority ........................................................ 49
THE CITY ........................................................................................................................................... 50
APPROVALS OF THE INVITATION ................................................................................................ 51
THE CAPITAL IMPROVEMENT PROGRAM ................................................................................. 51
General ............................................................................................................................................... 51
The CIP Funding ................................................................................................................................. 53
THE SEWAGE DISPOSAL SYSTEM ............................................................................................... 54
Service Area ........................................................................................................................................ 54
Historical Wastewater Volumes .......................................................................................................... 55
Retail and Other Billing ...................................................................................................................... 56
Wholesale Customers .......................................................................................................................... 56
The Plant ............................................................................................................................................. 61
Collection System ............................................................................................................................... 62
Environmental Matters ....................................................................................................................... 62
DEPARTMENT FINANCIAL PROCEDURES ................................................................................. 65
Budget and Accounting Matters .......................................................................................................... 65
Collections and Delinquencies ............................................................................................................ 67
Cash Management ............................................................................................................................... 70
Investment Policy ............................................................................................................................... 71
Rates ............................................................................................................................................. 71
Sewage Rate Comparison .................................................................................................................... 73
DEPARTMENT FINANCIAL OPERATIONS ................................................................................... 76
Summary of Historical Revenues and Expenses ................................................................................. 76

i

Fiscal Year 2009-2013 Operations ....................................................................................................... 77
Fiscal Year 2014 Estimate ................................................................................................................. 80
Fiscal Year 2015 Budget ................................................................................................................... 80
Projected Operations for Fiscal Year 2014 through 2019.................................................................. 81
Future Issuance of 2014 DWSD Refinancing Bonds.......................................................................... 84
PENSION PLAN CONTRIBUTIONS ................................................................................................ 85
PENSION-RELATED CERTIFICATES OF PARTICIPATION .......................................................... 89
OTHER POST-EMPLOYMENT BENEFITS...................................................................................... 90
FEASIBILITY CONSULTANT'S REPORT ........................................................................................ 94
SYSTEM EVALUATION REPORT .................................................................................................... 95
LITIGATION ...................................................................................................................................... 97
RATINGS............................................................................................................................................ 98
DEALER MANAGER ......................................................................................................................... 99
FINANCIAL ADVISOR .................................................................................................................... 100
FINANCIAL CONSULTANT TO THE BOARD OF WATER COMMISSIONERS ......................... 100
CONTINUING DISCLOSURE COMPLIANCE................................................................................ 100
OTHER MATTERS ........................................................................................................................... 100

APPENDIX A        FEASIBILITY CONSULTANT'S REPORT.................................................................. A-1
APPENDIX B        SYSTEM EVALUATION REPORT ............................................................................. B-1
APPENDIX C        DWSD AUTHORIZING DOCUMENTS ...................................................................... C-1
APPENDIX D        AUDITED FINANCIAL STATEMENTS OF THE SEWAGE DISPOSAL FUND OF
                  THE CITY OF DETROIT MICHIGAN AS OF AND FOR THE YEAR ENDED
                  JUNE 30, 2013 ..................................................................................................................D-1
APPENDIX E        CHARACTERISTICS OF THE SEWAGE DISPOSAL SYSTEM SERVICE AREA ........E-1
APPENDIX F        DISTRICT COURT ORDERS.........................................................................................F-1

# SUMMARY STATEMENT

*This Summary Statement is subject in all respects to more complete information contained in this Disclosure Statement, the Invitation and the other materials described in the Invitation, and should not be considered a complete statement of the facts material to making a decision with respect to tender. Readers should read the entire Disclosure Statement, the Invitation and the other materials described in the Invitation. Capitalized terms used in this Summary Statement and not otherwise defined shall have the meanings given such terms in the body of this Disclosure Statement.*

| | |
|---|---|
| **Overview** | Pursuant to the Invitation to Tender Bonds dated August 7, 2014, the City of Detroit, County of Wayne, State of Michigan, upon authorization from (i) the Board of Water Commissioners of the Detroit Water and Sewerage Department and (ii) Kevyn D. Orr, emergency manager of the City, invites each holder of those certain outstanding Sewage Disposal System Revenue and Revenue Refunding Bonds described more specifically in this Disclosure Statement to submit Offers to sell all or a portion of the Tender Bonds held by such Bondholder to the City at the applicable Purchase Price(s) set forth in the Invitation, as well as accrued and unpaid interest, subject to the terms specified in the Invitation. |
| **Ongoing City of Detroit Bankruptcy Proceedings** | As described herein under "CITY OF DETROIT BANKRUPTCY MATTERS," the City has filed a petition for relief under Chapter 9 of the Bankruptcy Code. The Invitation is being distributed during the pendency of the Bankruptcy Case. Accordingly, there is uncertainty as to the final outcome of the Bankruptcy Case. See "RISK FACTORS" herein. |
| **The Bankruptcy Plan of Adjustment** | Under the Bankruptcy Code, a Chapter 9 debtor has the exclusive right to file a Chapter 9 plan of adjustment. The City has prepared a Plan of Adjustment and filed the most recent Plan of Adjustment with the Bankruptcy Court on July 29, 2014. The Plan of Adjustment has not yet been confirmed by the Bankruptcy Court. See "CITY OF DETROIT BANKRUPTCY MATTERS" herein. |
| **The Bankruptcy Case, the Invitation and the Plan of Finance** | The Plan of Adjustment currently pending before the Bankruptcy Court would eliminate the call protection or reduce the interest rate on certain classes of outstanding DWSD Bonds. The City is undertaking its Invitation as part of a plan of finance, the purpose of which is to reduce the debt service costs related to the Tender Bonds and remove the risk to the Department's future costs posed by the impairment noted above on certain classes of the DWSD Bonds. |

If the City purchases (i) any Tender Bonds pursuant to the Invitation or (ii) any Water Supply System Bonds pursuant to the separate invitation related thereto, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would remove the provisions contained in the current Plan of Adjustment that would impair certain classes of DWSD Bonds. See "INTRODUCTION—Plan of Finance" herein.

The City plans to purchase the Tender Bonds only to the extent it can realize sufficient savings, with sufficiency determined in the sole discretion of the Board of Water Commissioners and the Emergency Manager.

**Current Governance of the Department and the City**

As described under "THE DEPARTMENT—Organization" and "THE DEPARTMENT—The Board of Water Commissioners" herein, the Department is governed by the Board of Water Commissioners. As described under "THE CITY" herein, the Emergency Manager has been appointed for the City under applicable State law.

**Approvals of the Invitation**

Both the Board of Water Commissioners and the Emergency Manager have approved the Invitation and the solicitation of Offers contemplated by the Invitation. See "APPROVALS OF THE INVITATION" herein.

**Certain Aspects of the Tender Invitation**

Pursuant to the Invitation, the City and the Department have invited Bondholders to submit Offers to sell all or a portion of the Tender Bonds held by the Bondholder at the Purchase Price(s) established in the Invitation. These are fixed Purchase Price(s).

Bondholders may find then current information concerning all of the Offered Bonds that have been submitted at www.bondcom.com/DWSD.

All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission and may not be withdrawn except in limited circumstances described in the Invitation. See "TERMS OF THIS INVITATION" under the Invitation.

To make an informed decision as to whether, and how, to offer its Tender Bonds, a Bondholder must read the Invitation, this Disclosure Statement and all other materials described in the Invitation, carefully and consult with its broker, account executive, financial advisor and/or other financial professional. None of the City, the Department, the Board of Water Commissioners, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Consultant and the Information and Tender Agent nor

any of their respective affiliates makes any recommendation as to whether or not Bondholders should tender all or any portion of the Tender Bonds pursuant to the Invitation. Bondholders must make their own decisions as to whether to tender the Tender Bonds and, if so, the amount of their Tender Bonds to tender.

**Conditions to Payment of Purchase Price**

The City is not required to purchase any Tender Bonds. As described in greater detail under "INTRODUCTION – Plan of Finance," if the City agrees to accept for purchase the Tender Bonds, prior to the purchase closing date, the City would request that the Bankruptcy Court enter an order authorizing the City's issuance, via public offering or private placement, of the 2014 DWSD Refinancing Bonds to purchase the Tender Bonds offered and accepted pursuant to the terms of the Invitation. In addition, on the purchase closing date, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would amend the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds to unimpair the DWSD Bonds.

The purchase of any of the Tender Bonds is conditioned upon the City receiving all legally required approvals to issue the 2014 DWSD Refinancing Bonds, the City completing the issuance of the 2014 DWSD Refinancing Bonds on terms satisfactory to it, with net proceeds sufficient to pay the Purchase Price, and other conditions set forth in the Invitation. The 2014 DWSD Refinancing Bonds are not being offered for sale by the Invitation or this Disclosure Statement.

**Risk Factors**

In making a decision whether to tender their Tender Bonds, Bondholders should consider certain risks and investment considerations that could affect the ability of the Department to pay debt service on its Tender Bonds or, if the tender is successfully completed, on any existing untendered DWSD Bonds remaining outstanding after consummation of the tender, including the potential 2014 DWSD Refinancing Bonds, and that could affect the marketability of or the market price for such bonds. These include risks related to the City's bankruptcy, the operations of the Department and the Sewage Disposal System and other matters. See "RISK FACTORS" herein.

# INTRODUCTION

*The following introductory statement is subject in all respects to the more complete information set forth in this Disclosure Statement, the Invitation and the other materials described in the Invitation. The descriptions and summaries of various documents hereinafter set forth do not purport to be comprehensive or definitive and are qualified in their entirety by reference to each document. Capitalized terms used in this Disclosure Statement that are not otherwise defined herein have the meanings set forth in Invitation.*

## Purpose of this Disclosure Statement

This Disclosure Statement, including the cover pages and the Appendices hereto, is provided to furnish information in connection with the Invitation to Tender Bonds (the "Invitation") by which the City of Detroit, County of Wayne, State of Michigan (the "City"), upon authorization from (i) the Board of Water Commissioners (the "Board of Water Commissioners") of the Detroit Water and Sewerage Department (the "Department" or "DWSD"), and (ii) the emergency manager of the City (the "Emergency Manager"), invites each holder (a "Bondholder") of those certain outstanding bonds issued by the City and described on the inside cover page of this Disclosure Statement (the "Tender Bonds") to submit offers (the "Offers") to sell all or a portion of the Tender Bonds held by such Bondholder to the City at the applicable purchase price on the inside cover page of this Disclosure Statement (the "Purchase Price"), as well as accrued and unpaid interest, subject to the conditions and upon the terms specified in the Invitation.

## Plan of Finance

The Plan of Adjustment (as defined herein) currently pending before the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") would eliminate the call protection or reduce the interest rates on certain classes of the DWSD Bonds (as defined herein). The City is undertaking its Invitation as part of a plan of finance, the purpose of which is to reduce the debt service costs related to the Tender Bonds and remove the risk to the Department's future costs posed by the impairment noted above on certain classes of DWSD Bonds.

The City plans to purchase the Tender Bonds only to the extent it can realize sufficient savings, with sufficiency determined in the sole discretion of the Board of Water Commissioners and the Emergency Manager. The City's plan includes the Invitation and the purchase of Tender Bonds (if any) tendered to the City by Bondholders. Concurrently with the Invitation, the City is inviting holders of the outstanding Water Supply System bonds to sell all or a portion of such bonds to the City.

To provide funds to purchase all DWSD Bonds offered and accepted by the City pursuant to the terms of the Invitation, the City proposes to, via public offering or private placement, issue one or more series of its Sewage Disposal System Revenue Refunding Bonds, including, if necessary, interim financing bonds (collectively, the "2014 DWSD Refinancing Bonds"). The City has obtained a conditional commitment to purchase the interim financing bonds, which commitment is subject to the negotiation and execution of definitive agreements and the satisfaction of certain closing conditions.

1

If the City agrees to accept for purchase (i) any Tender Bonds pursuant to the Invitation or (ii) any Water Supply System bonds pursuant to the separate invitation related thereto (the "Water Invitation" and, together with the Invitation, the "Invitations"), prior to the closing date of such purchase, the City would request that the Bankruptcy Court enter an order consented to by the City (the "Bankruptcy Order") authorizing the City's issuance of the 2014 DWSD Refinancing Bonds to purchase the Tender Bonds offered and accepted pursuant to the terms of the Invitation. In addition, on the closing date of such purchase, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would amend the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds. Under such amended Plan of Adjustment, all of the DWSD Bonds would be unimpaired.

Consummation of the purchase of the Tender Bonds pursuant to the Invitation is conditioned upon the entry of and the validity and enforceability of the Bankruptcy Order. No assurance can be given as to the entry of and the validity or enforceability of the Bankruptcy Order and the City's ability to consummate the purchase of any Tender Bonds pursuant to the Invitation.

To the extent the City elects, in its sole discretion, not to purchase Tender Bonds offered pursuant to the Invitation, or the purchase of Tender Bonds pursuant to the Invitation does not close for any reason, no amended Plan of Adjustment that unimpairs the DWSD Bonds would be filed, and the treatment of the Tender Bonds under the Plan of Adjustment, as currently proposed, would continue to include an impairment under the Plan of Adjustment of a material portion of the Tender Bonds. See "CITY OF DETROIT BANKRUPTCY MATTERS."

In either event, there can be no assurance that the Plan of Adjustment that is confirmed by the Bankruptcy Court will ultimately impair or not impair any DWSD Bonds. There can also be no assurance that any Plan of Adjustment will be confirmed by the Bankruptcy Court. Moreover, any order of the Bankruptcy Court confirming the Plan of Adjustment may be appealed to a higher court. Even if confirmed, there can be no assurance if or when the Plan of Adjustment will become effective or ultimately be consummated.

The purchase of any of the Tender Bonds is conditioned upon the City receiving all legally required approvals to issue the 2014 DWSD Refinancing Bonds, the City and the Department completing the issuance of the 2014 DWSD Refinancing Bonds on terms satisfactory to it, with net proceeds sufficient to pay the Purchase Price of the Tender Bonds being purchased, and other conditions set forth in the Invitation. No assurances can be given that the 2014 DWSD Refinancing Bonds will be approved by the Bankruptcy Court, or that such financing will be issued or obtained in amounts sufficient to pay the Purchase Price of the Tender Bonds selected for purchase or that the purchase of the Tender Bonds will be completed. In the event sufficient funds are not available, no Tender Bonds will be purchased through the Invitation.

The 2014 DWSD Refinancing Bonds are not being offered for sale by the Invitation or this Disclosure Statement. If the City determines to undertake a public offering of 2014 DWSD Refinancing Bonds, the City will disseminate one or more disclosure documents in connection

with any such offering. While no predictions can be made as to the information to be contained in any such disclosure documents, the City anticipates that, after giving effect to the issuance of one or more series of 2014 DWSD Refinancing Bonds, the financial disclosures made in such disclosure documents may be materially different from those set forth in this Disclosure Statement.

By tendering their Tender Bonds pursuant to the Invitation, Bondholders shall be deemed to have acknowledged and represented to the City that they have received, and have had the opportunity to review, this Disclosure Statement, the Invitation and the other tender materials prior to making the decision as to whether or not they should tender their Tender Bonds.

**Availability of Documents**

The descriptions and summaries of various documents set forth in this Disclosure Statement do not purport to be conclusive or definitive and reference is made to each such document for the complete details of all terms and conditions hereof. All references herein to the 2014 DWSD Refinancing Bonds and the DWSD Authorizing Documents, to the extent such documents have been prepared, are qualified in their entirety by such documents, copies of which are available from the Dealer Manager and may be examined or obtained at the expense of the person requesting the same at the corporate trust office of the Information and Tender Agent.

As described in greater detail in "CITY OF DETROIT BANKRUPTCY MATTERS" below, the City has filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code, which case is pending under case number 13-53846. Pursuant to Section 941 of the Bankruptcy Code, the City has filed with the Bankruptcy Court the Plan of Adjustment, as amended, and the accompanying Disclosure Statement to the Plan of Adjustment (the "Bankruptcy Disclosure Statement"). The Plan of Adjustment sets forth the manner in which all claims in the Bankruptcy Case will be treated if the Plan of Adjustment is confirmed by the Bankruptcy Court and becomes effective. For a complete understanding of the Plan of Adjustment, as it may be modified from time to time, Bondholders should read the Plan of Adjustment and Bankruptcy Disclosure Statement (including all supplements, exhibits and appendices attached thereto). Electronic copies of certain documents filed with the Bankruptcy Court, including among others, the current Plan of Adjustment and the Bankruptcy Disclosure Statement, may be found at *http://www.detroitmi.gov/EmergencyManager/BankruptcyChapter9.aspx*. This reference is for convenience only and the information on this website is not incorporated in, and shall not be incorporated in, and shall not be deemed a part of, this Disclosure Statement. There can be no assurance that any filed Plan of Adjustment will be reflective of the City's final plan of adjustment in the Bankruptcy Case, and there can be no assurance that any plan of adjustment will be confirmed by the Bankruptcy Court or become effective.

**SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS**

Pursuant to the provisions of Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"), all bonds issued, including the Tender Bonds, and to be issued by the City under Ordinance No. 18-01 adopted by the City Council of Detroit (the "City Council") on October 18, 2001 (the "Bond Ordinance") (collectively, the "DWSD Bonds") are payable solely from the Pledged Assets (as hereinafter defined), which include the Net Revenues of the Sewage Disposal System

and amounts available in certain funds and accounts established in accordance with the Bond Ordinance. The DWSD Bonds are secured by a statutory lien on Pledged Assets pursuant to Act 94 and the Bond Ordinance. In addition, the City and the Department have entered into a Trust Indenture with U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of June 1, 2012 (the "DWSD Indenture") to hold in trust the amounts required or permitted to be transferred by the City to certain funds and accounts under the Bond Ordinance for the payment of the DWSD Bonds. Funds and accounts held by the DWSD Trustee under the DWSD Indenture are administered by the DWSD Trustee, in specified circumstances upon the direction of the Department. Capitalized terms used under the heading "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS" that are not otherwise defined herein have the definitions ascribed to such terms in the Bond Ordinance.

In accordance with the City Charter of the City of Detroit (the "City Charter"), monies from fees collected for water, drainage or sewerage services are to be used exclusively for the payment of expenses incurred in the provision of these services, including the interest or principal of any obligations to finance the water supply or sewerage disposal facilities of the City, and shall be kept in separate funds.

**Pledged Assets**

"Pledged Assets" under the Bond Ordinance consist of:

- Net Revenues (defined below);

- the funds and accounts established by or pursuant to the Bond Ordinance except for the Operation and Maintenance Fund and the Construction Fund and any account thereof;

- investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and

- any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue.

"Revenues" are defined in the Bond Ordinance and the DWSD Indenture as the revenues of the City from the Sewage Disposal System (construed in accordance with Act 94) and include amounts received by the City under its hedge agreements with respect to its DWSD Bonds, including any termination payments, and income earned and gains realized from the investment of amounts in the various funds, accounts and sub-accounts established by the DWSD Indenture in accordance with the Bond Ordinance (other than the Construction Fund for any Fiscal Year that earnings on the Construction Fund are not credited to the Receiving Fund).

"Net Revenues" are defined in the Bond Ordinance and the DWSD Indenture as Revenues except for those credited to the Operation and Maintenance Fund.

**Priority of Lien and Payment Status**

DWSD Bonds are secured under the Bond Ordinance in accordance with their relative priorities by a statutory lien on Pledged Assets, as described below. The Bond Ordinance permits the City to secure Ancillary Obligations (as defined herein) by a lien on Pledged Assets having the same or a lower priority than the lien securing the particular DWSD Bonds to which the Ancillary Obligations relate. Ancillary Obligation Fees and Expenses (as defined herein) have a higher payment status than DWSD Bonds and Ancillary Obligations, as described below.

"Ancillary Obligations" are obligations incurred by the City with respect to particular DWSD Bonds and consist of Hedge Obligations and Reimbursement Obligations. Hedge Obligations are payment obligations under a hedge agreement, such as an interest rate swap, other than the fees and expenses to be paid in the ordinary course of the transaction. Reimbursement Obligations are repayment obligations under a credit enhancement or liquidity facility, other than the fees and expenses to be paid in the ordinary course of the transaction. The fees and expenses payable by the City in connection with any hedge agreement, credit enhancement or liquidity facility in the ordinary course of the transaction are referred to as the "Ancillary Obligation Fees and Expenses," and are treated separately under the DWSD Authorizing Documents from payments on DWSD Bonds.

- All Ancillary Obligation Fees and Expenses are paid from Revenues in the Operation and Maintenance Fund on the same basis as operating and administrative fees and expenses of the Sewage Disposal System, with the result being that they are paid before debt service on the DWSD Bonds, which are paid from Net Revenues, and before Ancillary Obligations.

- Senior Lien Sewage Disposal System Revenue Bonds ("Senior Lien DWSD Bonds") and related Ancillary Obligations are secured by a first lien on Pledged Assets and rank first in the order of payment from Net Revenues.

- Junior Lien Sewage Disposal System Revenue Bonds ("Junior Lien DWSD Bonds") include all DWSD Bonds issued under the Bond Ordinance other than Senior Lien DWSD Bonds. To date, the City has issued two priorities of Junior Lien DWSD Bonds:

  - Second Lien Sewage Disposal System Revenue Bonds ("Second Lien DWSD Bonds") and related Ancillary Obligations, which are secured by a lien on Pledged Assets that is senior to the liens securing all other Junior Lien DWSD Bonds and second only to the Senior Lien DWSD Bonds and their related Ancillary Obligations, and rank second in order of payment from Net Revenues; and

  - State Revolving Fund Junior Lien Sewage Disposal System Revenue Bonds ("SRF Junior Lien DWSD Bonds") and related Ancillary Obligations, which have the lowest priority lien on Pledged Assets, junior to the liens securing all other DWSD Bonds and their related Ancillary Obligations, and rank last in order of payment from Net Revenues.

5

**Flow of Funds**

*General*

In accordance with the requirements of Act 94, the City Charter and the Bond Ordinance, the City has established certain funds and accounts for the Sewage Disposal System under the DWSD Indenture to be held in trust by the DWSD Trustee. The DWSD Authorizing Documents permit the establishment of additional funds for additional priorities of DWSD Bonds.

*The Revenue Receipts Fund*

All Revenues of the Sewage Disposal System are deposited upon receipt or, if applicable, upon completion of credit card processing activities, in either the "Revenue Receipts Fund" or the "Receiving Fund" established under the DWSD Indenture. In general, Revenues from wholesale customers are directly deposited into the Receiving Fund. Since almost all Detroit retail customers receive both water and sewer services, revenues collected by the Department from these customers are initially deposited in the Revenue Receipts Fund. All Revenues collected and deposited into the Revenue Receipts Fund will be allocated by the DWSD Trustee, at the direction of the Department, to the Sewage Disposal System Receiving Fund and a Water Supply System Receiving Fund. The Revenues may be temporarily commingled with gross revenues of the Water Supply System. The DWSD Trustee will then transfer certain funds from the Sewage Disposal System Receiving Fund to the Operation and Maintenance Fund, the Senior Lien Bond Interest and Redemption Fund, the Second Lien Bond Interest and Redemption Fund, the Junior Lien Bond Interest and Redemption Fund and other System funds pursuant to the flow of funds under the Bond Ordinance and the DWSD Indenture.

*Flow of Funds*

In accordance with the terms of Act 94, the City Charter and the Bond Ordinance, all Revenues received by the City are set aside as collected and credited to the Receiving Fund, which shall be held by the DWSD Trustee in accordance with the DWSD Indenture. As of the first day of each month, amounts credited to the Receiving Fund are transferred seriatim into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been credited to the preceding fund or account:

First: to the Operation and Maintenance Fund held by a custodian, a sum identified by the Department, in its sole discretion, as sufficient to provide for the payment of the next month's expenses of administration and operation of the Sewage Disposal System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second: to the Senior Lien Bond Debt Service Account, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Senior Lien DWSD Bonds and related Ancillary Obligations of the same priority as of the first day of such month;

6

Third:  to the Senior Lien Bond Reserve Account, an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for Senior Lien DWSD Bonds;

Fourth:  to the Interest and Redemption Fund established for each priority of Junior Lien DWSD Bonds, beginning with the Second Lien DWSD Bonds and continuing in descending order of priority to, and including, the SRF Junior Lien DWSD Bonds, as follows:

> First:  to the Debt Service Account established for such priority, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Lien DWSD Bonds and related Ancillary Obligations of the same priority as of the first day of such month; and

> Second:  to the Reserve Account, if any, established for such priority an amount that, when added to all other amounts then on deposit therein, shall equal the Reserve Requirement for such priority of Junior Lien DWSD Bonds; and

Fifth: to the Extraordinary Repair and Replacement Reserve Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement to the extent that the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement, except that an amount withdrawn from such Fund and transferred to the Improvement and Extension Fund as provided in the DWSD Indenture, shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal.

In any month, funds on deposit in the Receiving Fund in excess of the requirements set forth above may, upon the direction of the Department, be transferred to the Improvement and Extension Fund (provided that no amount shall be deposited to the Improvement and Extension Fund or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid).

Amounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be credited to the Surplus Fund. For additional information on the use and application of amounts in the funds and accounts established by the DWSD Indenture, see the DWSD Indenture in APPENDIX C – DWSD AUTHORIZING DOCUMENTS.

**Priority of Funds and Accounts**

Pursuant to the Bond Ordinance, if amounts in the Receiving Fund are insufficient to provide for current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including the Reserve Account, if any, therein), then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and

Maintenance Fund and second, to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

If any principal (and redemption premium, if any) of or interest on DWSD Bonds of a priority or any related Ancillary Obligations become due (whether on a stated or scheduled date, by reason of call for redemption or otherwise), and there are insufficient amounts for the payment thereof in the Interest and Redemption Fund established for such priority of DWSD Bonds and Ancillary Obligations after applying payments in the Reserve Account, if any, established for such priority of DWSD Bonds, then there shall be applied to such payment amounts in each Interest and Redemption Account[1] established for each lower priority of DWSD Bonds, beginning with the lowest priority and proceeding seriatim in ascending order of priority, until such payments are made in full.

**Certain Other Funds**

*The Extraordinary Repair and Replacement Reserve Fund*

Amounts in the Extraordinary Repair and Replacement Reserve Fund may be used to pay costs of making major unanticipated repairs and replacements to the Sewage Disposal System which individually cost or are reasonably expected to cost in excess of $1 million. The Extraordinary Repair and Replacement Reserve Fund is funded by monthly transfers of Revenues in minimum amounts equal to 1/12 of 3% of the budgeted operation and maintenance expense of the Sewage Disposal System for the Fiscal Year, until the balance in such fund equals no greater than 15% of the budgeted operation and maintenance expense of the Sewage Disposal System for such Fiscal Year, less in any Fiscal Year any amount that is withdrawn from such fund for paying a major unanticipated repair or replacement, but only in the Fiscal Year that such amount is withdrawn. The DWSD Indenture authorizes the Department, on and after the first day of each Fiscal Year, to transfer not more than 50% of the balance in the Extraordinary Repair and Replacement Reserve Fund to the Improvement and Extension Fund, but only if in the month of such transfer the full amount of the minimum monthly transfer has been credited to the fund, and the amounts of all prior transfers from the fund to the Improvement and Extension Fund have been restored in full.

*The Improvement and Extension Fund*

Amounts in the Improvement and Extension Fund shall be used for improvements, enlargements, extensions or betterment to the Sewage Disposal System.

*The Rate Stabilization Fund*

The Bond Ordinance permits the creation of a Rate Stabilization Fund, the purpose of which is to enable the City to set aside Prior Revenues (as defined herein) to augment Revenues in future years in order to satisfy the requirements of the Bond Ordinance with respect to rate covenants related to DWSD Bonds.  See "—Rate Covenant" below for a description of the

---

[1] Although the Bond Ordinance refers to an "Interest and Redemption Account" in this particular section, the correct defined term is "Interest and Redemption Fund," as otherwise used in the Bond Ordinance.

restriction on use of transfers from the Rate Stabilization Fund in meeting the rate covenant's coverage requirements. Any funding of the Rate Stabilization Fund is at the sole discretion of the Board of Water Commissioners. To date, the City has not transferred any funds into the Rate Stabilization Fund.

Only Prior Revenues may be deposited in the Rate Stabilization Fund. "Prior Revenues" are Revenues or Net Revenues only to the extent they may be applied to any lawful purpose of the Sewage Disposal System, in effect limiting Prior Revenues to Net Revenues that, in the Fiscal Year of receipt, exceed the required deposits described above under "—Flow of Funds" and the amounts needed to meet the coverage requirements described below under "—Rate Covenant." The deposit of Prior Revenues into the Rate Stabilization Fund is limited in any Fiscal Year as described in APPENDIX C—DWSD AUTHORIZING DOCUMENTS—Rate Stabilization Fund. Except as taken into account in connection with a coverage determination, amounts on deposit in the Rate Stabilization Fund may be applied for any lawful purpose of the Sewage Disposal System.

*The Surplus Fund; Uses and Replenishments of Deficits in Other Funds*

Amounts from time to time on deposit in the Surplus Fund may, at the option of the Department, be withdrawn upon written request to the DWSD Trustee and used for any purposes related to the System. These purposes can include depositing such funds in the Receiving Fund and applying such funds pursuant to the Flow of Funds described above. If and whenever there is any deficit in the Operation and Maintenance Fund or in any Interest and Redemption Fund (including any Reserve Account therein), the DWSD Trustee shall transfer funds to the extent of any such deficit from the Surplus Fund to such funds in the order and priority described above.

**Reserve Accounts and Reserve Requirements**

Pursuant to the Bond Ordinance and the DWSD Indenture, there has been established a Senior Lien Bond Reserve Account and a Second Lien Bond Reserve Account. SRF Junior Lien DWSD Bonds are not secured by any Reserve Account. Amounts in a Reserve Account shall be used solely for the payment of the principal (and premium, if any) of and interest on the DWSD Bonds and Ancillary Obligations of the priority for which such Reserve Account was established, as to which there would otherwise be a default.

The Reserve Requirement for Senior Lien DWSD Bonds is the maximum Annual Debt Service on all Senior Lien DWSD Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Internal Revenue Code of 1986, as amended (the "Code"). "Annual Debt Service" means, for any Fiscal Year and with respect to Indebtedness of any particular priority, the amount of such Indebtedness due in such Fiscal Year in accordance with their respective terms. The Reserve Requirement for Second Lien DWSD Bonds is the average Annual Debt Service on all Second Lien DWSD Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code. If a Reserve Account is established for any other priority of Junior Lien DWSD Bonds, the Reserve Requirement for such other Junior Lien DWSD Bonds shall be the amount set forth in the supplemental action establishing such Reserve Account, and if no amount is set forth, shall be the average Annual

Debt Service on all Junior Lien DWSD Bonds of such priority then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code.

Concurrently with the issuance of DWSD Bonds of a priority for which a Reserve Account has been or is being established, the Bond Ordinance and the DWSD Indenture require there be credited to such Reserve Account the amount that, when added to the amount on deposit in such account or credited thereto, equals the Reserve Requirement for the DWSD Bonds then to be issued and all DWSD Bonds of the same priority then outstanding. As of the date of this Disclosure Statement, the funds on deposit in the Senior Lien Bond Reserve Account and Second Lien Bond Reserve Account were sufficient to meet or exceeded the Reserve Requirement for the outstanding Senior Lien DWSD Bonds and Second Lien DWSD Bonds, respectively. Pursuant to the Bond Ordinance, any Reserve Requirement with respect to variable rate bonds is calculated based on an interest cost assumption for unhedged variable rate debt of 125% of the 5-year average of the SIFMA Municipal Index.

The Bond Ordinance permits the use of Credit Enhancement to fund any Reserve Account or to substitute for amounts on deposit in a Reserve Account, if the provider is rated in the highest rating category of each Rating Agency then rating the DWSD Bonds having the benefit of such Reserve Account, and the City receives an opinion of nationally recognized bond counsel to the effect that such Credit Enhancement will not adversely affect the tax-exempt status of interest on any DWSD Bonds. There is no Bond Ordinance requirement that the rating of Credit Enhancement which has been properly credited to a Reserve Account be maintained.

The following table summarizes the funding of the Reserve Requirements for the Senior Lien Bond Reserve Account and Second Lien Bond Reserve Account as of June 30, 2014.

| | Senior Lien Bonds | Second Lien Bonds | Aggregate System |
|---|---|---|---|
| Reserve Requirement | $152,787,913 | $80,586,930 | $233,374,843 |
| Funding Amounts: | | | |
| Cash and Investments[1] | 76,492,103 | 29,170,577 | 105,662,680 |
| Credit Enhancement[2] | 77,139,555 | 51,421,379 | 128,560,934 |
| Total | $153,631,658 | $80,591,956 | $234,223,614 |

[1] Represents market value of amounts in cash and cash equivalents as of June 30, 2014.
[2] For series-specific policies represents the lesser of (a) the maximum amount of the policy or (b) the amount of Reserve Requirement allocated to the specific series covered by such policy.

Source: The Department

As of the date of this Disclosure Statement, the Reserve Requirement for the Senior Lien Bond Reserve Account is satisfied with Cash and Investments and Credit Enhancement in the form of the following surety or insurance policies:

(a) MBIA Insurance Corporation ("MBIA") policy unconditionally guaranteeing the payment of principal of and interest on the Series 1999-SRF2, Series 1999-SRF3 and Series 1999-SRF4 Bonds up to a maximum aggregate available amount of $7,482,000 and with a termination date equal to the earlier of October 1, 2022, or the

date on which the City has made all payments required to be made on the three series of related bonds. Because the applicable Reserve Requirement allocated to the specific series covered by the series specific surety is less than the maximum amount of the surety, the City is currently allocating $7,329,318 of the series specific surety to the Series 1999 SRF Bonds.

(b) Financial Guaranty Insurance Corporation ("FGIC") policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds Series 1999A, up to a maximum aggregate available amount of $17,301,095 and with a termination date of July 1, 2029.

(c) FGIC policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds Series 2001A, up to a maximum aggregate available amount of $3,618,077 and with a termination date of July 1, 2031.

(d) Financial Security Assurance Inc. ("FSA"), now known as Assured Guaranty Municipal Corp. ("Assured"), policy unconditionally guaranteeing the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $51,800,000[2] and with a termination date equal to the earlier of July 15, 2033, or the date on which the Series 2003(A) and 2003(B) Bonds are no longer outstanding.

As of the date of this Disclosure Statement, the Reserve Requirement for the Second Lien Bond Reserve Account is satisfied with Cash and Investments and Credit Enhancement in the form of the following surety or insurance policies:

(a) MBIA policy unconditionally guaranteeing the payment of the principal of and interest on the Series 2001(D) Bonds up to a maximum aggregate available amount of $7,379,761 and with a termination date equal to the earlier of July 1, 2032, or the date on which the City has made all payments required to be made on the Series 2001(D) Bonds (includes any bonds that are issued to refund the 2001(D) Bonds). Because the applicable Reserve Requirement allocated to the specific series covered by the series specific surety is less than the maximum amount of the surety, the City is currently allocating $5,817,054 of the series specific surety to the Series 2001(D) Bonds.

(b) FGIC policy unconditionally guaranteeing the payment of the principal of and interest on the Series 2001(E) Bonds up to a maximum aggregate available amount of $10,605,321 and with a termination date equal to July 1, 2031. The City is currently allocating the full value of the series specific surety to the Series 2001(E) Bonds.

(c) MBIA policy unconditionally guaranteeing the payment of the principal of and interest on any Second Lien DWSD Bonds up to a maximum aggregate available amount of $22,000,000 and with a termination date equal to the earlier of July 1, 2035 or the date on which the City has made all payments required to be made on the Series 2005(A), Series 2005(B) and Series 2005(C) Bonds.

---

[2] The FSA policy limit is the dollar amount of debt service reserve fund required to be maintained for the Series 2003(A) and Series 2003(B) Bonds by the related bond document from time to time, but in no event will the policy limit exceed $51,800,000 to July 15, 2029, $69,200,000 from July 15, 2029 to July 15, 2031, and thereafter $72,800,000 to the termination date.

(d)     FGIC policy unconditionally guaranteeing the payment of the principal of and interest on any Second Lien DWSD Bonds up to a maximum aggregate available amount of $17,000,000 and with a termination date of July 1, 2036.

As noted, certain of the Reserve Account requirements currently are satisfied through surety or insurance policies issued by MBIA, FGIC and FSA. Certain obligations of FGIC have been reinsured by National Public Finance Guarantee Corporation ("National"), pursuant to the restructuring by MBIA and the assignment of certain FGIC obligations to National by MBIA. National has confirmed that each of the FGIC debt service Reserve Account Credit Enhancements listed above is covered by such reinsurance pursuant to the FGIC Reinsurance Agreement.

Although the Bond Ordinance requires that Credit Enhancement used to fund a Reserve Account be rated in the highest rating category of each rating agency at the time of its acquisition, there is no requirement that such rating be maintained.  Accordingly, all Credit Enhancements are valued at their full face value for purposes of determining satisfaction of the applicable Reserve Account Requirement, regardless of the provider's rating.  If the Credit Enhancement were determined to have no value, as for example, if a court made such a determination in connection with the dissolution of the provider, then the City would be required to replenish the applicable Reserve Account with cash or through a replacement Credit Enhancement Policy, as described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS–Flow of Funds" and in APPENDIX C – DWSD AUTHORIZING DOCUMENTS.

## Rate Covenant

The Bond Ordinance contains a covenant to fix and revise rates for sewage disposal service from time to time as may be expected to be necessary to produce the greater of:

1.     The amounts required to provide for:

    a.     the payment of the expenses for maintenance of the Sewage Disposal System as are necessary to preserve the same in good repair and working order; and

    b.     the payment of Indebtedness coming due for the Fiscal Year of calculation; and

    c.     the creation and maintenance of reserves therefor as required by the Bond Ordinance or any ordinance or resolution adopted in accordance with the terms thereof; and

    d.     such other expenditures and funds for the Sewage Disposal System as the Bond Ordinance may require; and

2.     The Required Combined Coverage (i.e., with respect to the rate covenant, projected Net Revenues for the Fiscal Year of calculation, divided by the Indebtedness coming due for such Fiscal Year).  For purposes of the rate covenant, the coverage requirements for determining the Required Combined Coverage are the following percentages:

12

| Priority of DWSD Indebtedness: | Percentage: |
|---|---|
| Senior Lien DWSD Indebtedness | 120% |
| Second Lien DWSD Indebtedness (together with Senior Lien Indebtedness) | 110% |
| SRF Junior Lien DWSD Bonds (together with Senior and Second Lien Indebtedness) | 100% |

Rates are established by the Board of Water Commissioners.

The Bond Ordinance defines "Indebtedness" as (i) principal of and interest on DWSD Bonds outstanding in the Fiscal Year of calculation, (ii) Reimbursement Obligations, and (iii) amounts payable by the City under a Hedge by reason of the early termination thereof. The City may take into account transfers from the Rate Stabilization Fund in calculating compliance with the rate covenant, but the City shall also comply with the rate covenant by maintaining rate coverage percentages of at least 100% without taking into account any transfers from the Rate Stabilization Fund.

**Enforceability of Rates**

The Bond Ordinance and Act 94 provide that payment of charges for sewage disposal service or storm water disposal service to a premises may be enforced by discontinuing water service, sewage disposal service, storm water disposal service or any combination of such services to the premises. Further, the Bond Ordinance and Act 94 provide for the collection of delinquent charges for sewage disposal service by means of a lien on the respective premises of retail customers. Any such lien shall be enforced in the same manner as provided for the collection of taxes assessed upon the roll and the enforcement of tax liens. See "DWSD FINANCIAL PROCEDURES—Collections and Delinquencies." Act 94 provides that the rates charged for services furnished by any public improvement constructed under Act 94 shall not be subject to supervision or regulation by any State of Michigan ("State") bureau, board, commissioner or other like instrumentality or agency thereof.

**DWSD Additional Bonds**

The City may not incur any obligations payable from Pledged Assets except for DWSD Bonds, Ancillary Obligations and Ancillary Obligation Fees and Expenses, and no obligations of the City may be secured by a lien on Pledged Assets except as provided in the Bond Ordinance.

*Coverage Requirements*

The coverage requirements for determining the Required Combined Coverage (i.e., with respect to the DWSD Additional Bonds test described below, projected Net Revenues for the current or next succeeding Fiscal Year or historical Net Revenues for the immediately preceding audited Fiscal Year divided by the maximum Annual Debt Service) for the issuance of additional DWSD Bonds are as follows:

*[Remainder of Page Intentionally Left Blank]*

| Priority of DWSD Bonds: | Percentage: |
|---|---|
| Senior Lien Bonds | 120% |
| Second Lien Bonds (together with Senior Lien Bonds) | 110% |
| SRF Junior Lien Bonds (together with Senior Lien and Second Lien Bonds) | 100% |

*General Authority*

The City may issue DWSD Bonds of any priority (the "DWSD Additional Bonds") for repairs, extensions, enlargements, and improvements to the Sewage Disposal System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund), refunding all or a part of any outstanding DWSD Bonds and paying the costs of issuing such DWSD Additional Bonds, including deposits, if any, to be made to any Reserve Account established or to be established for such DWSD Additional Bonds or any other DWSD Bonds if there is Required Combined Coverage under either the Projected Net Revenues Test or the Historical Net Revenues Test (the "Additional Bonds Test"). See "DEPARTMENT FINANCIAL OPERATIONS—Summary of Historical Revenues and Expenses" and APPENDIX A—FEASIBILITY CONSULTANT'S REPORT.

*Projected Net Revenues Test*

For purposes of the Projected Net Revenues Test, the Required Coverage Requirement means the result produced by dividing the Net Revenues for the current or next succeeding Fiscal Year, by the maximum composite Annual Debt Service in any Fiscal Year on outstanding DWSD Bonds and the DWSD Additional Bonds to be issued.

Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the Sewage Disposal System to be paid for in whole or in part from the proceeds of the Additional Bonds. In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of sewage disposal systems.

"Annual Debt Service" is a defined term in the Bond Ordinance, and reference should be made to APPENDIX C – DWSD AUTHORIZING DOCUMENTS for the definition and the rules for determining Annual Debt Service. If any DWSD Additional Bonds are to be issued to refund outstanding DWSD Bonds, the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the DWSD Additional Bonds to be issued and not the Annual Debt Service on the DWSD Bonds to be refunded.

*Historical Net Revenues Test*

For purposes of the Historical Net Revenues Test, the Required Coverage Requirement means the result produced by dividing the actual Net Revenues for the immediately preceding audited Fiscal Year, by the maximum composite Annual Debt Service in any future Fiscal Year on outstanding DWSD Bonds and the DWSD Additional Bonds to be issued.

Instead of the immediately preceding audited Fiscal Year, the City may use any audited Fiscal Year ending not more than sixteen months prior to the date of delivery of such DWSD

Additional Bonds. If any change in the rates, fees and charges of the Sewage Disposal System has been authorized at or prior to the date of sale of such DWSD Additional Bonds, the Net Revenues for the particular preceding Fiscal Year shall be augmented by an amount reflecting the effect of such change had the Sewage Disposal System's billings during such Fiscal Year been at the increased rates.

Net Revenues for the particular preceding audited Fiscal Year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the Sewage Disposal System to be paid for in whole or in part from the proceeds of such DWSD Additional Bonds and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited Fiscal Year. With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of sewage disposal systems regarding the existence of such conditions.

*Alternate Test for Refundings*

The City may issue DWSD Bonds of any Priority without regard to the above tests for the purpose of refunding all or part of DWSD Bonds then Outstanding and paying costs of issuing such DWSD Additional Bonds, including deposits which may be made to any Reserve Account established or to be established for such DWSD Additional Bonds or any other DWSD Bonds if, but only if: (i) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the DWSD Additional Bonds to be issued and (B) giving effect to the refunding, all Outstanding unrefunded DWSD Bonds of equal and higher Priority, is less than (ii) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all DWSD Bonds of equal and higher Priority, without giving effect to the refunding.

**Amendments Without Consent**

The Bond Ordinance may be amended or supplemented from time to time by Act of Council or Supplemental Action,[3] without the consent of the Holders of DWSD Bonds:

- To issue DWSD Bonds of any Priority;

- To add to the covenants and agreements of the City in the Bond Ordinance contained, other covenants and agreements thereafter to be observed or to surrender, restrict or limit any right or power reserved to or conferred upon the City (including but not limited to the right to issue DWSD Bonds or incur other Secured Obligations of, in either case, any Priority);

---

[3] "Act of Council" is defined by the Bond Ordinance as a resolution or ordinance of the City Council. "Supplemental Action" is defined by the Bond Ordinance as an Act of Council or a sale order or other document signed by the Finance Director of the City pursuant to an Act of Council. The authority of the Finance Director of the City and City Council under the Bond Ordinance and the City Charter has been modified by the District Court Orders and the appointment of the Emergency Manager. For further information see "THE DEPARTMENT – Court Mandated Changes" and "THE CITY."

- To make such provisions for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions contained in the Bond Ordinance, or in regard to matters or questions arising under the Bond Ordinance, as the City may deem necessary or desirable;

- To increase the size or scope of the Sewage Disposal System; and

- To amend or supplement the Bond Ordinance in any respect with regard to one or more Priorities of DWSD Bonds so long as such amendment does not materially adversely affect the Holders of outstanding DWSD Bonds.

The Bond Ordinance provides that no Holders of a Priority of DWSD Bonds shall be "materially adversely affected" for the purposes of the Bond Ordinance by the change of any coverage percentage established for any other Priority of DWSD Bonds, and no amendment of or supplement to the Bond Ordinance that provides for or facilitates the issuance of DWSD Bonds or incurs Ancillary Obligations or Ancillary Obligations Fees and Expenses, in either case, of any Priority shall "materially adversely affect" the Holders of DWSD Bonds of any other Priority for the purposes of the Bond Ordinance so long as such amendment does not change any coverage percentage established for such Priority or is not an amendment that requires the consent of the Holder of such DWSD Bonds because it (i) reduces the applicable percentage of Holders of DWSD Bonds required to consent to an amendment to the Bond Ordinance, (ii) extends the fixed maturity of such Holder's DWSD Bonds or reduces the rate of interest thereon or extends the time of payment of interest, or reduces the amount of the principal or redemption premium thereof, or reduces or extends the time for payment of any premium payable on the redemption thereof or (iii) changes the Priority of Lien of such DWSD Bonds or deprives such Holder of the right to payment of such DWSD Bonds from Pledged Assets.

**Amendments With Consent**

With the consent of the Holders of not less than 51% in principal amount of Securities then Outstanding, the City may from time to time and at any time amend the Bond Ordinance in any manner by Act of Council; provided, that no such amendment shall:

- reduce the applicable percentage of Holders of Securities required to consent to an amendment to the Bond Ordinance without the consent of the Holders of all Securities then Outstanding, or

- without the consent of the Holder of each Security affected thereby:

  o extend the fixed maturity of such Security or reduce the rate of interest thereon or extend the time of payment of interest, or reduce the amount of the principal or redemption premium thereof, or reduce or extend the time for payment of any premium payable on the redemption thereof, or

  o change the Priority of such Security or deprive such Holder of the right to payment of such Security from Pledged Assets.

16

It shall not be necessary for the consent of the Security holders as described above to approve the particular form of any proposed Act of Council but it shall be sufficient if such consent shall approve the substance thereof. The consent of the Holder of a Security shall bind all Holders of any Security for which such Security was the predecessor.

For the purpose of acquiring consent for the purposes of the provision of the Bond Ordinance described above, the consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

Promptly after an Act of Council amending the Bond Ordinance has obtained the requisite consent, the Finance Director of the City shall cause the Transfer Agent to notify, by mail at their addresses shown in the Registry, or by publication, Holders of all Outstanding Securities affected by such amendment, of the general terms of the substance of such Act of Council. Filing notice pursuant to the continuing disclosure agreement in respect of such Securities shall constitute sufficient notice for the purposes of the Bond Ordinance.

*The City is considering soliciting consents to certain provisions of the Bond Ordinance. Any such solicitation would be implemented through a process separate and distinct from the Invitation. No consents are being solicited pursuant to the Invitation and this Disclosure Statement.*

**Remedies under the DWSD Indenture and the Bond Ordinance**

Under the DWSD Indenture, if there is a Default (as defined in the DWSD Indenture) on any DWSD Bond, the DWSD Trustee may pursue any remedy permitted by law and the Bond Ordinance to enforce the performance of or compliance with the provisions of the DWSD Indenture.

Upon the happening and continuance of a Default on any DWSD Bond, and if requested to do so by the Holders of at least 20% in aggregate principal amount of the Outstanding DWSD Bonds and the DWSD Trustee is indemnified as provided in the DWSD Indenture and the Bond Ordinance, the DWSD Trustee shall exercise such of the rights and powers as the DWSD Trustee shall deem most effective to enforce and protect the interests of the Holders.

The Holder or Holders of DWSD Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, shall have the right at any time, by a written instrument executed and delivered to the DWSD Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of the DWSD Indenture, or any other or any other proceedings under the DWSD Indenture; provided, that such direction shall not be otherwise than in accordance with the provisions of law and of the DWSD Indenture, and provided that the DWSD Trustee shall be indemnified to its satisfaction.

17

The Holder or Holders of DWSD Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the Sewage Disposal System and the proper application thereof. The statutory lien upon Pledged Assets, however, shall not be construed to compel the sale of the Sewage Disposal System or any part thereof.

If there is a Default in the payment of the principal (and premium, if any) of and interest on any DWSD Bonds, any court having jurisdiction in any proper action may appoint a receiver to administer and operate the Sewage Disposal System on behalf of the City and, under the direction of the court, perform all of the duties of the officers of the City more particularly set forth herein and in Act 94.

A Holder of DWSD Bonds shall have all other rights and remedies given by Act 94 and by law for the payment and enforcement of the DWSD Bonds and the security therefor. The rights and remedies of Bondholders and the enforceability of the DWSD Bonds, the DWSD Authorizing Documents, and Act 94 may be subject to and limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or similar laws affecting the enforcement of creditors' rights generally heretofore or hereafter enacted to the extent constitutionally applicable, and by the application of general principles of equity including those relating to equitable subordination and the enforcement of such rights and remedies may also be subject to and limited by the exercise of judicial discretion in appropriate cases.

## CITY OF DETROIT BANKRUPTCY MATTERS

**For a complete summary of events in the City's pending Chapter 9 bankruptcy case, please review the Corrected Fifth Amended Plan of Adjustment and the Fourth Amended Disclosure Statement filed by the City in its bankruptcy case, both of which are available free of charge from the internet at *http://www.kccllc.com/detroit*.**

Chapter 9 of the Bankruptcy Code provides for the court-supervised reorganization of a municipality's financial affairs. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), which case is pending under case number 13-53846 (the "Bankruptcy Case"). On December 5, 2013, the Bankruptcy Court issued its Order for Relief Under Chapter 9 of the Bankruptcy Code [Docket No. 1946] (the "Eligibility Order") ordering that the City was an eligible debtor under Chapter 9 of the Bankruptcy Code. The Eligibility Order has been appealed and those appeals are currently pending before the United States Court of Appeals for the Sixth Circuit (the "Court of Appeals").

A Chapter 9 debtor has the exclusive right to file a Chapter 9 plan of adjustment. A Chapter 9 plan of adjustment may provide for, among other things, the extension of a Chapter 9 debtor's debt maturities, the reduction of principal of or interest on its debts, the refinancing of its debt, in whole or in part, or other modifications to the debtor's debt obligations.

The City has prepared a Plan of Adjustment and filed the most recent corrected Plan of Adjustment with the Bankruptcy Court on July 29, 2014 (as may be further amended from time to time, the "Plan of Adjustment"). The Plan of Adjustment has not yet been confirmed by the Bankruptcy Court. On August 6, 2014, the Bankruptcy Court issued its Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (the "Seventh Amended Order"). Under the Seventh Amended Order, the hearing to consider confirmation of the Plan of Adjustment will commence on August 21, 2014. Additional confirmation hearing dates, as necessary, have been scheduled for August 22, August 25-29, September 2-5, September 8-12, September 15-19, and September 22-23, 2014. These dates, and the other dates set forth in the Seventh Amended Order, may be further modified by the Bankruptcy Court.

Sections 3(a) through 3(c) of the Plan of Adjustment set forth the proposed treatment of claims (the "Water and Sewer Bond Claims") arising from the existing water and sewer bonds which were outstanding as of the Petition Date (the "Existing Water and Sewer Bonds"). The Water and Sewer Bond Claims are classified in Classes 1A, 1B and 1C under the Plan of Adjustment. Bondholders should reference the Plan of Adjustment for a complete description of the proposed treatment of the Water and Sewer Bond Claims.

Numerous and varied objections (the "Water and Sewer Objections") have been filed with the Bankruptcy Court to the proposed treatment of the Water and Sewer Bond Claims in the Plan of Adjustment. The Water and Sewer Objections raise a myriad of legal and factual issues in opposition to the Plan of Adjustment. The Water and Sewer Objections include the following:[4]

| Objecting Party | Docket Reference |
|---|---|
| Oakland County | Docket No. 4627 |
| Macomb County | Docket No. 4636 |
| U.S. Bank National Association as DWSD Bond Trustee | Docket No. 4647 |
| Berkshire Hathaway Assurance Corporation | Docket No. 4657 |
| Wayne County | Docket No. 4663 |
| National Public Finance Guarantee Corporation | Docket No. 4665 |
| Ad Hoc Committee of DWSD Bondholders | Docket No. 4671 |
| Assured Guaranty Municipal Corp. | Docket No. 4674 |

A summary of the foregoing Water and Sewer Objections (and the City's responses) appears on Exhibit A to Docket No. 5034 in the City's Bankruptcy Case. The summary, and the complete Water and Sewer Objections are available for review free of charge from the internet at *http://www.kccllc.com/detroit*.

The parties filing the Water and Sewer Objections, including holders and insurers of existing bonds and certain counties within the Department's service areas, have retained

---

[4]     The summary of Water and Sewer Objections contained herein may not be an exhaustive listing of all objections put forth by parties in interest to the treatment of Water and Sewer Bonds Claims in the Plan of Adjustment. In that regard, reference should be made to the Bankruptcy Court docket in the City's Chapter 9 Bankruptcy Case.

numerous experts. Those experts have prepared reports raising a myriad of legal and factual claims regarding the Plan of Adjustment and raising various issues relating to the Department's operations, the Plan of Adjustment's treatment of the Department's General Retirement System ("GRS") pension liabilities, the sufficiency of the Department's approved capital improvement plan, the affordability of its rates, the accuracy of its historical and current forecasts and its current credit quality and its likely future bond ratings and cost of capital should the Plan of Adjustment be confirmed, among numerous other matters. These reports were served on parties to the Bankruptcy Case, but, in accordance with the procedures outlined by the Bankruptcy Court, have not been filed with the Bankruptcy Court. This Disclosure Statement may be inconsistent in some respects with one or more of these reports.

For a Chapter 9 plan of adjustment to become effective, it must be confirmed by order of a bankruptcy court. The requirements for confirming a Chapter 9 plan of adjustment are complex. Section 943(b) provides that a bankruptcy court shall confirm a Chapter 9 plan of adjustment if: (1) the plan complies with the provisions of the Bankruptcy Code made applicable in Chapter 9 cases by section 901 of the Bankruptcy Code; (2) the plan complies with the provisions of Chapter 9; (3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable; (4) the debtor is not prohibited by law from taking any action necessary to carry out the plan; (5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in Section 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim; (6) any regulatory or electoral approval necessary under applicable non-bankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and (7) the plan is in the best interests of creditors and is feasible.

Section 901 of the Bankruptcy Code incorporates Section 1129(a)(10) of the Bankruptcy Code into Chapter 9. Accordingly, for a Chapter 9 plan of adjustment to be confirmed, at least one class of impaired claims must vote to accept that plan of adjustment (without counting the votes of any "insiders" whose claims are classified within that class). A class of impaired claims has accepted a Chapter 9 plan of adjustment only when the holders of at least a majority in number and at least two-thirds in dollar amount of the allowed claims actually voting in that class vote to accept the plan of adjustment.

Section 901 of the Bankruptcy Code makes applicable in Chapter 9 the so-called "cramdown" provisions of Sections 1129(a)(8), 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code. Section 1129(b)(1) provides that, if one class of impaired claims accepts a Chapter 9 plan of adjustment, but other impaired classes do not, then the Chapter 9 debtor must demonstrate that its Chapter 9 plan of adjustment is "fair and equitable" and does not discriminate unfairly with respect to each impaired class that has not accepted the plan. With respect to a class of dissenting secured creditors, Section 1129(b)(2)(A) provides that a plan is "fair and equitable" to such dissenting secured creditors to the extent it provides:

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

The deadline for the City to mail voting solicitation packages to the various holders of claims classified under the Plan of Adjustment was May 12, 2014 for purposes of soliciting the votes of such holders on whether to accept or reject the Plan of Adjustment. Among the creditors solicited in connection with the Plan of Adjustment were the holders of the Water and Sewer Bond Claims classified in the classes of claims comprising Class 1A. Classes 1B and 1C are unimpaired under the Plan of Adjustment and are, therefore, deemed to have accepted the Plan of Adjustment and did not vote on the Plan of Adjustment. The deadline for the holders of claims to submit their votes to accept or reject the Plan of Adjustment was July 11, 2014. Voting results for each class of claims under the Plan of Adjustment are summarized in the Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit dated July 21, 2014, which appears at Docket No. 6179 in the City's Bankruptcy Case, and can be viewed free of charge from the internet at *http://www.kccllc.com/detroit.*

Section 944 of the Bankruptcy Code governs the effect of confirmation of a Chapter 9 plan of adjustment. Under that section, the provisions of a confirmed plan bind the debtor and any creditor, whether or not (1) a proof of such creditor's claim is filed or deemed filed under the Bankruptcy Code; (2) such claim is allowed under Section 502 of the Bankruptcy Code; or (3) such creditor has accepted the plan. Except as provided in Section 944(c) of the Bankruptcy Code, the debtor is discharged from all debts as of the time when (a) the plan is confirmed; (b) the debtor deposits any consideration to be distributed under the plan with a disbursing agent appointed by the court; and (c) the court has determined (i) that any security so deposited will constitute, after distribution, a valid legal obligation of the debtor; and (ii) that any provision made to pay or secure payment of such obligation is valid. Under Section 944(c), the debtor is not discharged from any debt (A) excepted from discharge by the plan or order confirming the plan; or (B) owed to an entity that, before confirmation of the plan, had neither notice nor actual knowledge of the case.

There can be no assurance that the City's Plan of Adjustment will ultimately conform to the Plan of Adjustment currently proposed by the City. There can also be no assurance that the Plan of Adjustment will be confirmed by the Bankruptcy Court, and, in particular, whether the Bankruptcy Court will overrule the Water and Sewer Objections or otherwise approve the proposed treatment of the Water and Sewer Bond Claims. Moreover, any order confirming the

Plan of Adjustment may be appealed to a higher court. Even if confirmed, there can be no assurance if or when the Plan of Adjustment will become effective or ultimately be consummated.

Once confirmed and consummated, however, the Water and Sewer Bond Claims will be discharged under the Plan of Adjustment in exchange for the treatment proposed thereunder. The provisions of the Plan of Adjustment, if confirmed and effectuated, are intended to alleviate many of the City's most significant financial problems. However, there can be no assurance that the City will not file another bankruptcy petition in the future pursuant to Chapter 9 of the Bankruptcy Code.

## RISK FACTORS

### Introduction

In making a decision whether to tender their Tender Bonds, Bondholders should consider certain risks and investment considerations which could affect the ability of the Department to pay debt service on its Tender Bonds or, if the tender is successfully completed, on any existing untendered DWSD Bonds remaining outstanding after consummation of the tender, including the potential 2014 DWSD Refinancing Bonds and which could affect the marketability of or the market price for such bonds. These risks and investment considerations are discussed throughout this Disclosure Statement. Certain of these risks and considerations are set forth in this section, but this section is not intended to be comprehensive or to be a compilation of all possible risks and investment considerations, nor a substitute for an independent evaluation of the information set forth in and presented in this Disclosure Statement, which each Bondholder should read in its entirety in order to make an informed investment decision.

Additional risks and uncertainties not currently known by the Department or the City, or that the Department or the City does not currently consider to be material, or that are generally applicable to all municipalities and their ability to repay obligations, may exist. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value or liquidity of the Tender Bonds. There can be no assurance that other risk factors not discussed below will not become material in the future. Bondholders are advised to consider the following risk factors, among others, and to review the other information incorporated by reference into this Disclosure Statement in evaluating whether to tender the Tender Bonds.

### General Economic and Political Risks

The financial performance of the City and the Department will be affected by, and will be subject to, general economic and political events and conditions that will change in the future to an extent and with effects that cannot be determined at this time. These general economic and political events and conditions include, among other things, decisions by communities and counties currently served by the Sewage Disposal System to exit the system, controversies regarding the Department's efforts to enforce payment of bills through shut-off of service and other available remedies, population declines and other demographic and employment changes and trends; periods of inflation or deflation; variable patterns of national and regional economic

growth, whether cyclical or structural in nature; disruptions in credit and financial markets; political gridlock concerning, among other matters, national tax and spending policies; economic, financial and political developments in the City and the State; budget and debt limit controversies, both nationally, at the State level and locally; and unusually large numbers of business failures and business and consumer bankruptcies and policy responses, or lack thereof, to the foregoing. See APPENDIX E – CHARACTERISTICS OF THE SEWAGE DISPOSAL SYSTEM SERVICE AREA.

**Potential for Issuance of Unsecured Obligations by the City**

While the issuance of DWSD Additional Bonds is limited by an Additional Bonds Test, the Bond Ordinance, the Resolution Authorizing the Invitation, adopted by the Board of Water Commissioners on August 6, 2014 and approved by the Emergency Manager (the "DWSD Resolution") and the DWSD Indenture (collectively, the "DWSD Authorizing Documents") do not prohibit the City from incurring other, additional debt, regardless of amount, that is not secured by the Pledged Assets. While this debt will not directly impact the debt service coverage on the Tender Bonds, if the City is unable to repay the principal of, and interest on, such unsecured debt, it might, in extreme circumstances or in combination with other adverse conditions (such as those which existed when the City filed the Bankruptcy Case), cause the City to have to file for relief under Chapter 9 again in the future. See "—Future Bankruptcy," below.

**Sewer Revenues**

There can be no assurance that the sewer revenues collected by the Department will remain at current levels since the current level of collections is dependent on many factors, including delinquencies, non-payment and a reduced customer base. The revenues of the Water Supply System do not secure any payments of DWSD Bonds.

**Rate Covenant and Limits on Future Rate Increases**

The Bond Ordinance contains a covenant that provides, so long as any DWSD Bonds are outstanding, sufficient rates for services furnished by the Sewage Disposal System shall be fixed and maintained. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—Rate Covenant." Notwithstanding this provision of the Bond Ordinance, under Michigan law, sewer rates established by the Department must be reasonable and nondiscriminatory and are subject to review by the courts in that regard. In establishing the rates, the actions of the Department are presumed by the courts to be reasonable, but the rates must not be arbitrary, discriminatory or excessive. Consequently, the rates established by the Department pursuant to the Bond Ordinance could be challenged as being arbitrary, discriminatory or excessive. The Department currently has affordability waivers in place with respect to certain aspects of environmental compliance to avoid excessive rate increases.

**Rate Covenant Not a Guarantee**

The ability to pay debt service on the Tender Bonds depends on the ability to generate Net Revenues that meet the levels required by the Bond Ordinance. Although the Bond

Ordinance contains a covenant to impose rates, fees and charges, as more particularly described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—Rate Covenant," and the Department expects that sufficient Revenues will be generated through the imposition and collection of such rates, fees and charges and other Revenues described herein, there is no assurance that such imposition of such rates, fees and charges or other Revenues will result in the generation of Net Revenues in the amounts required by the Bond Ordinance. The Bond Ordinance covenant does not constitute a guarantee that sufficient Net Revenues will be available to pay debt service on the Tender Bonds.

**Pending Bankruptcy Case**

As described above under "CITY OF DETROIT BANKRUPTCY MATTERS," the City is currently proceeding under Chapter 9 of the Bankruptcy Code. The City has filed a Plan of Adjustment and several amendments thereto. A condition to purchase of the Tender Bonds is that (i) DWSD Bonds identified as unimpaired in the Plan of Adjustment remain unimpaired during the period through and including confirmation of the Plan of Adjustment and (ii) DWSD Bonds currently identified as impaired under the Plan of Adjustment will, upon the closing of the tender and prior to and at the time of confirmation of the Plan of Adjustment, be treated under the Plan of Adjustment as unimpaired. To effectuate this condition to the purchase of the Tender Bonds, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would amend the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds.

Confirmation hearings are scheduled to begin on August 21, 2014. There can also be no assurance that once finalized, the City's Plan of Adjustment will be confirmed or become effective. Additionally, the City is currently projecting that, if the Plan of Adjustment is confirmed, it may exit from Chapter 9 bankruptcy protection in the fall of 2014. There is a risk that confirmation or exit may be delayed as a result of litigation or otherwise. Bondholders should consult with their legal advisors regarding the risks associated with any delay in the City's exit from Chapter 9 bankruptcy protection.

As described under "THE DEPARTMENT—Ongoing Discussion of Formation of Regional Water Authority," "—Potential DWSD Public-Private Partnership" and "CITY OF DETROIT BANKRUPTCY MATTERS," the Bankruptcy Case is still pending and during the pendency of the City's Bankruptcy Case, the discussions regarding potential private management and Bankruptcy Court ordered confidential mediations regarding a regional authority have occurred and are continuing to occur. The Bankruptcy Code and Act 436 (as defined herein) allow the Emergency Manager to take actions without regard to City Charter procedures. The outcome of ongoing discussions and confidential mediation, and the outcome of the Bankruptcy Case, and its impact on the Department, is uncertain, and could affect the Department and its operations, and accordingly the market price for Tender Bonds.

**Appeal of Eligibility Order**

As described above under "CITY OF DETROIT BANKRUPTCY MATTERS," the Eligibility Order is currently subject to multiple appeals. If the Eligibility Order were to be

reversed, or the City was otherwise not subject to Chapter 9 of the Bankruptcy Code, the City's ability to repay the DWSD Bonds could be adversely affected.

**Appeal of Bankruptcy Order**

Following entry by the Bankruptcy Court, the Bankruptcy Order may be subject to appeals. No prediction can be made as to whether the Bankruptcy Order will be appealed or, if appealed, the outcome of any such appeal. Consummation of the tender offer is conditioned upon the entry of and validity and enforceability of the Bankruptcy Order, that the Bankruptcy Order has not been stayed pending appeal, and the closing and funding of the 2014 DWSD Refinancing Bonds. With respect to any appeal of the Bankruptcy Order, Section 364(e) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." Nevertheless, no prediction can be made as to an appellate court's interpretation of Section 364(e) or of the outcome of any appeals of the Bankruptcy Order.

**Treatment of Water and Sewer Bond Claims If Tender Transaction Does Not Close**

Regardless of whether a Bondholder agrees to sell all or a portion of its Tender Bonds, there is risk that the City may be unable to close or consummate the tender offer. To the extent the tender offer does not close or is otherwise not consummated, the City would seek treatment of the Water and Sewer Bond Claims under the Plan of Adjustment, as currently proposed.

**Future Bankruptcy**

There can be no assurance that the City will not file another bankruptcy petition under Chapter 9. If, however, another Chapter 9 case were to be commenced by the City prior to the payment in full of the Tender Bonds, the rights and remedies of the Holders of the Tender Bonds would be subject to the provisions of Chapter 9.

**Five-Year Projections for Disclosure Statement Compared with Ten-Year Business Plan for Plan of Adjustment**

As part of the City's Chapter 9 proceeding, a ten-year business plan with forecasted results, referred to as the "DWSD Business Plan" is included as an Appendix to the Plan of Adjustment. In contrast, the projections included in this Disclosure Statement are based on a five-year period and were prepared subsequent to the DWSD Business Plan contained in the Plan of Adjustment. The five-year projections included in this Disclosure Statement assume successful consummation of the tender and amendment of the Plan of Adjustment to remove the provisions impairing certain of the Tender Bonds. Accordingly, the five-year Disclosure Statement projections include only those Plan of Adjustment provisions relating to the Department that will remain in the Plan of Adjustment after the bond impairment provisions

have been removed. These provisions are described more fully below. The five-year projections also include greater detail than the ten-year business plan.

Certain factors can affect the projections included in this Disclosure Statement following confirmation of the Plan of Adjustment, including: (i) if the Department remains a part of the City; (ii) if the operations of the Department are outsourced to a contractor; or (iii) if a regional authority is created to replace the Department.

**Financial Impacts of the Plan of Adjustment**

The financial projections presented in this Disclosure Statement were prepared in a dynamic environment. Although the City of Detroit's Chapter 9 Plan of Adjustment has not been confirmed, it was deemed reasonable to include certain elements of the Plan of Adjustment in the projections included in this Disclosure Statement.

The following scenarios described in the Bankruptcy Disclosure Statement are included in the assumptions for the financial projections for the purposes of this Disclosure Statement.

1. *Rates and Revenues* – The Department will maintain its Fiscal Year 2015 rate setting protocols for a minimum of five years, including a policy of setting its rates and charges at levels designed to achieve a 4% annual increase in revenues, subject to certain changes necessary to stabilize water and sewer revenues.

2. *Pension Funding Contribution* - The current Plan of Adjustment contemplates that the Department will contribute a total of $428.5 million to GRS over the nine-year period ending June 30, 2023. The Bankruptcy Disclosure Statement states that the payments to be made by the Department constitute its presently-calculated full allocable share of the GRS unfunded accrued actuarial liability remaining after taking into account the pension modifications contemplated by the current Plan of Adjustment and related administrative and restructuring costs. The amount of the payments has been determined as the amount necessary to fund, by June 30, 2023, the underfunded GRS liabilities allocable to the Department that had accrued as of June 30, 2014. The total amount of the payments to be made by the Department has been calculated based on an assumed investment rate of return of 6.75% and further assumes that the GRS pension plan has been frozen as of June 30, 2014, which has occurred. According to the current Plan of Adjustment, after the initial nine-year period ending June 30, 2023 is completed, the Department will remain responsible for its allocable share of GRS unfunded actuarial accrued liability ("UAAL") but is expected by the City to have only small contributions, if any, to make to the GRS on account of this liability.

3. *New B Notes (Allocable Share)* - The Plan of Adjustment provides, among other things, for the satisfaction of certain claims in exchange for the receipt of the "New B Notes" which are unsecured bonds to be issued by the City with a term of 30 years. As it relates to the Department, the New B Notes documents settle the City's other post-employment benefit ("OPEB") liability and citywide pension obligation

certificates ("POC").  The New B Notes include funding for settlement of other City claims that do not impact the Department.  The Department will be responsible for its allocable share of the New B Notes consistent with prior years' formulas for allocation of OPEB and POC liabilities.

The following potential scenarios described in the Bankruptcy Disclosure Statement are not reflected in the financial projections for the purposes of this Disclosure Statement.

1. A potential transaction involving the transfer to a third party (including, but not limited to, a lease) of a majority of the assets of, or the right to operate and manage, the City's water and/or sewage disposal systems currently operated by the Department in one or a series of related transactions.

2. The Plan of Adjustment contemplates an interest rate reset for certain impaired series of sewer system revenue bonds, which interest rate reset will be reflected in new bonds referred to in the Plan of Adjustment as the "New DWSD Bonds." If the tender is not accepted or if it does not close, the Department will exchange the New DWSD Bonds for those impaired DWSD Bonds as set forth in the Plan of Adjustment. The definitive documentation governing the New DWSD Bonds will be filed with a Plan of Adjustment supplement.

3. The Bankruptcy Disclosure Statement specifically addresses the status of negotiations regarding the potential formation of a regional authority. These negotiations remain in confidential Federal Court mediation. See "THE DEPARTMENT—Ongoing Discussion of Formation of Regional Water Authority" below.

In addition, the City may seek to implement a rate stability program for City residents, the purpose of which would be to (i) provide a source of funds to mitigate against rate increases, (ii) enhance affordability and (iii) provide a buffer against delinquent payments. The projections contained in this Disclosure Statement do not reflect the potential impact of such a program.

**Enforceability of Remedies**

The remedies available under the DWSD Authorizing Documents upon the occurrence of an event of default are in many respects dependent upon judicial actions, which are often subject to substantial discretion and delay.  Additionally, under State constitutional and statutory law and judicial decisions concerning remedies, certain of these remedies may be limited, or may not be readily available or enforceable. The enforceability of remedies or rights with respect to the DWSD Bonds also is limited by State and federal bankruptcy, reorganization, insolvency, sovereign immunity, moratorium and other similar laws regarding creditors' rights or remedies currently in effect and may be limited by such laws hereafter enacted.

**DWSD Additional Bonds**

DWSD Additional Bonds may be issued in accordance with the provisions of the DWSD Authorizing Documents, either as additional Senior Lien DWSD Bonds on a parity with the

currently outstanding Senior Lien DWSD Bonds, or as Junior Lien DWSD Bonds subordinate to the lien of the Senior Lien DWSD Bonds. The DWSD Additional Bonds would, in some cases, increase the debt service requirements to be serviced by the Pledged Assets. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—DWSD Additional Bonds."

**Limits on Future Borrowing**

In certain circumstances described herein, the Sewage Disposal Fund may be required to provide funds to pay the costs of capital improvements to the Sewage Disposal System. If the Sewage Disposal System does not generate sufficient revenues to pay for such capital improvements, or if other funds are not available, the City, through the Department, will have to borrow the funds. In order to issue DWSD Additional Bonds, certain conditions, including the Additional Bonds Tests, must be satisfied as described in greater detail above in "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—DWSD Additional Bonds."

It cannot be determined at this time whether the Sewage Disposal System will be able to satisfy the requirements for the issuance of DWSD Additional Bonds, and no assurance can be given that the Sewage Disposal System will be able to satisfy such requirements for a considerable period of time. If the Sewage Disposal System is able to satisfy these requirements, it is not possible to predict what terms such additional debt may contain or whether there will be a market for such additional debt. Likewise, if the Sewage Disposal System cannot satisfy the requirements for the issuance of DWSD Additional Bonds or if the Sewage Disposal System qualifies to issue DWSD Additional Bonds but is unable, due to market conditions or otherwise, to obtain funds through the issuance of DWSD Additional Bonds, no assurance can be given that the Sewage Disposal System will be able to obtain needed funds through the issuance of unsecured debt.

**Additional Capital Improvements**

In order to maintain the operations of the Sewage Disposal System over the terms of the DWSD Bonds, the Department will have to pay the costs of capital improvements to the Sewage Disposal System. As part of its Fiscal Year 2015-2019 CIP (as defined herein), the Department expects to spend $553,075,000 for capital improvements to the Sewage Disposal System. The exact source of funds to pay for all capital improvements included in the CIP, and to pay capital costs exceeding those included in the CIP, is not presently known. The Department uses an incremental method of capital project funding rather than funding all projects in advance. The Department's capital financing strategy is designed to align capital project financing sources with program requirements in a framework that balances multiple goals, including to: (i) recover the costs of capital investment over the useful lives of the capital assets; (ii) minimize the impact of the capital programs on sewerage rates; and (iii) protect and enhance the Department's financial position. The shortfall between total capital requirements in the CIP (as defined below) and funds available in advance to pay capital costs may be substantial. It is not certain that the Department's CIP will be adequate to meet the capital investment needs of the Sewage Disposal System or that the Department will be able to raise rates and/or access capital markets to borrow such funds or satisfy the requirements of the DWSD Authorizing Documents to issue DWSD

Additional Bonds at the time such improvements are required to be financed or made. See "THE CAPITAL IMPROVEMENT PROGRAM."

**Operating Risks**

As with any sewer system of its size and complexity, operation of the Sewage Disposal System could be affected by many factors, the nature and extent of which are not currently determinable, including the breakdown or failure of equipment or processes, inability to achieve expected levels of efficiency, failure to operate at design specifications, failure to operate in a manner that avoids violations of its environmental pollution elimination discharge permits and results in the incurrence of penalties and fines related to such violations, failure by third parties to perform their obligations under agreements with the Department (whether or not excused by force majeure), costs of supplies or services not under contract, changes in law or regulatory protocols, delays in receipt of or failure to obtain or maintain necessary permits or similar events.

The Sewage Disposal System is also at risk from catastrophic events such as an intervening act of God or public enemy, water shortage, drought, flooding, extreme or unusual weather conditions, earthquake or other natural disaster, war, act of terror, sabotage, civil commotions, interference by civil or military authorities, nuclear or other explosion, radioactive or chemical contamination, fire, subsurface condition, public disorder, epidemic, quarantine restriction, strike, labor dispute or other labor protest, stop-work order or injunction issued by a governmental authority or government embargo. The occurrence of such events could significantly reduce revenues and/or significantly increase the costs of operating the Sewage Disposal System, thereby jeopardizing the ability of the Sewage Disposal System to generate revenues sufficient to make timely payments of debt service on the Tender Bonds, to pay operating expenses of the Sewage Disposal System and/or to pay for necessary capital improvements to the Sewage Disposal System.

**Future Governmental Actions**

Federal, State and local statutory and regulatory requirements (including requirements to obtain permits or other governmental approvals) applicable to the operation of the Sewage Disposal System are subject to change, and no assurance can be given that the Department will be able to comply with such changes. The timing and impact of such future legislative or regulatory action cannot be predicted with certainty, and the impact of such action on the financial position of the Department currently cannot be determined. Delay in obtaining or failure to obtain and maintain in full force and effect any required permits or other governmental approvals may result in additional costs or reduced revenues, including fines, a moratorium on sewer extensions and/or connections and, in extreme circumstances, the complete shutdown of the Sewage Disposal System or a substantial portion thereof. Such a change in legal requirements could occur because (i) existing laws or regulations are revised or reinterpreted; (ii) new laws or regulations are adopted or become applicable to the Department; or (iii) a combination thereof. Further, there can be no assurance that the technology and equipment selected by the Department to comply with such revised or reinterpreted or new laws will be implemented in a timely fashion or will meet such changed requirements upon implementation. Consequently, any future revision or reinterpretation of existing laws or regulations or adoption

29

of new laws or regulations could materially increase the cost of operating the Sewage Disposal System, which could have a negative and material impact on the Department's ability to make timely payment of debt service on the Tender Bonds.

Any future revision or reinterpretation of existing laws or regulations or adoption of new laws or regulations could also impose significant capital costs on the Department. See "RISK FACTORS—Additional Capital Improvements" for a description of certain risks relating to the Department's ability to fund such additional capital costs.

**Rating Agency Actions**

Actions by the rating agencies, such as the recent downgrades of the credit ratings of DWSD Bonds to non-investment grade, could raise the Department's cost of borrowing, which could affect the Department's ability to borrow in the future and may have other adverse effects on the Department's financial condition. The market for non-investment grade securities is smaller and less liquid that the market for investment grade securities. As a result, it is possible that there may not be sufficient demand for the Department to issue any future bonds or notes in the amounts required by the Department or that the cost to the Department of borrowing could be substantially higher than if it were able to issue more highly-rated securities.

**Lack of Liquidity and Pricing**

There is no assurance that an active secondary market for DWSD Bonds will develop or be maintained, so holders of DWSD Bonds might not be able to sell such bonds in the future. If a secondary market does develop, prices of DWSD Bonds traded in the secondary market are subject to adjustment upward and downward in response to changes in the credit markets. From time to time it may be necessary to suspend indefinitely secondary market trading in selected issues of bonds as a result of the financial condition or market position of the broker dealer, prevailing market conditions, lack of adequate current financial information regarding DWSD Bonds, whether or not DWSD Bonds are in default as to principal and interest payments, and other factors which may give rise to uncertainty concerning prudent secondary market practices. As a result, holders of the DWSD Bonds may not be able to liquidate their investment quickly, at an attractive price, or at all.

**Environmental Regulation**

The operation of the Sewage Disposal System is subject to extensive and continuing environmental regulation. Federal, state and local standards and procedures that regulate the environmental impact of the Sewage Disposal System are subject to change. These changes may arise from continuing legislative, regulatory and judicial action regarding such standards and procedures. Additionally, the Department is subject to an Administrative Consent Order issued by the Michigan Department of Environmental Quality ("MDEQ") on July 8, 2011. Consequently, there is no assurance that facilities in operation will remain subject to the regulations currently in effect, will always be in compliance with further regulations or will always be able to obtain all required operating permits. An inability to comply with environmental standards could result in reduced operating levels and fines. Legislative,

regulatory, administrative or enforcement actions involving environmental controls could also adversely affect the operation of the facilities of the Sewage Disposal System. For example, if property owned or operated by the Department is determined to be contaminated by hazardous materials, the Department could be liable for significant clean-up costs even if it were not responsible for the contamination. See "THE SEWAGE DISPOSAL SYSTEM—Environmental Matters."

**Reliance on the Feasibility Report and Historical Financial Information**

In preparing the Feasibility Report, the Feasibility Consultant has relied upon certain assumptions and projections regarding future operating expenses, capital expenditure and debt service on the Tender Bonds, some of which are those of the Department or its consulting engineer. See "FEASIBILITY CONSULTANT'S REPORT." The Feasibility Consultant has also made other assumptions, including assumptions regarding population decline, rate increases, collection rates, usage of the Sewage Disposal System's services, weather patterns and the response customers of the Sewage Disposal System will have to the rate increases. Projected operating and financial performance of the Sewage Disposal System may not be indicative of future performance; actual results will differ from those included in the Feasibility Report, and such differences may be material. The Department cannot give any assurance that the events assumed will materialize or that actual results will match those projected, and any such differences may be material. In addition, the future policies, operations and financing decisions of the Department may not be the same as those assumed in the Feasibility Study. No representation is made or intended, nor should any representation be inferred, with respect to the likely existence of any particular future set of facts or circumstances, and Bondholders are cautioned not to place undue reliance upon the Feasibility Report or the revenue forecasts or other projections contained therein.

In addition, certain historical financial information is included in this Disclosure Statement. There can be no assurance that the financial results achieved by the City in the future will be similar to historical results, and the financial information is expressly qualified in its entirety by the disclaimers set forth in such financial information and the disclosure in this Disclosure Statement. Such future results will vary from historical results, and actual variations may be material. Therefore, the historical operating results of the Sewer Disposal System contained in this Disclosure Statement cannot be viewed as a representation that sufficient revenues will be generated in the future to make timely payment of principal of, redemption premium, if any, and interest on the DWSD Bonds.

**Forward-Looking Statements are Subject to Risks and Uncertainties**

If and when included in this Disclosure Statement, the words "expects," "forecasts," "projects," "intends," "anticipates," "estimates," "assumes" and analogous expressions are intended to identify forward looking statements and any such statements inherently are subject to a variety of risks and uncertainties that could cause actual results to differ materially from those that have been projected. Such risks and uncertainties include, among others, general economic and business conditions, changes in political, social and economic conditions, regulatory initiatives and compliance with governmental regulations, litigation and various other events,

conditions and circumstances, many of which are beyond the control of the Department.  These forward-looking statements speak only as of the date of this Disclosure Statement.  The parties disclaim any obligation or undertaking to release publicly any updates or revisions to any forward-looking statement contained herein to reflect any changes in the Department's expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.

### OUTSTANDING DEPARTMENT INDEBTEDNESS

The following table sets forth information with respect to outstanding DWSD Bonds as of July 15, 2014.

*[Remainder of Page Intentionally Left Blank]*

| Sewage Disposal System Revenue Bonds | | Original Principal Amount | | Outstanding as of July 15, 2014 |
|---|---|---|---|---|
| **Senior Lien Bonds** | | | | |
| Sewage Disposal System Revenue Bonds (Senior), Series 1993-B-SRF | | $ | 6,603,996 | $ 775,000 |
| Sewage Disposal System Revenue Bonds (Senior), Series 1997-B-SRF | | | 5,430,174 | 1,870,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 1998A | | | 67,615,000 | 59,500,000 |
| Sewage Disposal System Revenue Refunding Bonds, Series 1998B | | | 67,520,000 | 59,040,000 |
| Sewage Disposal System Revenue Bonds (Senior), Series 1999-SRF1 | | | 21,475,000 | 7,590,000 |
| Sewage Disposal System Revenue Bonds (Senior), Series 1999-SRF2 | | | 46,000,000 | 25,860,000 |
| Sewage Disposal System Revenue Bonds (Senior), Series 1999-SRF3 | | | 31,030,000 | 14,295,000 |
| Sewage Disposal System Revenue Bonds (Senior), Series 1999-SRF4 | | | 40,655,000 | 18,725,000 |
| Sewage Disposal System Revenue Bonds, Series 1999A | | | 302,995,178 [1] | 21,180,779 |
| Sewage Disposal System Senior Lien Revenue Refunding Bonds, Series 2001C1 | | | 154,870,000 [2] | 151,800,000 |
| Sewage Disposal System Senior Lien Revenue Refunding Bonds, Series 2001C2 | | | 122,950,000 [2] | 121,045,000 |
| Sewage Disposal System Senior Lien Revenue & Revenue Refunding Bonds, Series 2003A | | | 599,380,000 | 177,295,000 |
| Sewage Disposal System Senior Lien Revenue Bonds, Series 2003B | | | 150,000,000 | 150,000,000 |
| Sewage Disposal System Senior Lien Revenue Refunding Bonds, Series 2004A | | | 101,435,000 | 53,485,000 |
| Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2006C | | | 26,560,000 | 26,560,000 |
| Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2006D | | | 370,000,000 | 288,780,000 |
| Sewage Disposal System Revenue & Revenue Refunding Senior Lien Bonds, Series 2012A | | | 659,780,000 | 653,960,000 |
| | | $ | 2,774,299,348 | $ 1,831,760,779 |
| **Second Lien Bonds** | | | | |
| Sewage Disposal System Second Lien Revenue Bonds, Series 2001B | | $ | 110,550,000 | $ 110,550,000 |
| Sewage Disposal System Second Lien Revenue Bonds, Series 2001D2 | | | 72,450,000 | 21,300,000 |
| Sewage Disposal System Second Lien Revenue Bonds, Series 2001E | | | 136,150,000 | 136,150,000 |
| Sewage Disposal System Revenue Second Lien Bonds, Series 2005A | | | 273,355,000 | 237,260,000 |
| Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005B | | | 40,215,000 | 29,420,000 |
| Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2005C | | | 63,160,000 | 45,440,000 |
| Sewage Disposal System Revenue Second Lien Bonds, Series 2006A | | | 123,655,000 | 123,655,000 |
| Sewage Disposal System Revenue Second Lien Bonds, Series 2006B | | | 250,000,000 | 241,405,000 |
| | | $ | 1,069,535,000 | $ 945,180,000 |
| **SRF Junior Lien Bonds** | | | | |
| Sewage Disposal System Revenue Bonds, Series 2000-SRF1 | | $ | 44,197,995 | $ 21,947,995 |
| Sewage Disposal System Revenue Bonds, Series 2000-SRF2 | | | 64,401,066 | 36,051,066 |
| Sewage Disposal System Revenue Bonds, Series 2001-SRF1 | | | 82,200,000 | 54,145,000 |
| Sewage Disposal System Revenue Bonds, Series 2001-SRF2 | | | 59,850,000 | 39,430,000 |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF1 | | | 18,985,000 | 9,710,000 |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF2 | | | 1,545,369 | 865,369 |
| Sewage Disposal System Revenue Bonds, Series 2002-SRF3 | | | 31,549,466 | 19,189,466 |
| Sewage Disposal System Revenue Bonds, Series 2003-SRF1 | | | 48,520,000 | 34,215,000 |
| Sewage Disposal System Revenue Bonds, Series 2003-SRF2 | | | 25,055,370 | 15,205,370 |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF1 | | | 2,910,000 | 1,890,000 |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF2 | | | 18,353,459 | 11,008,459 |
| Sewage Disposal System Revenue Bonds, Series 2004-SRF3 | | | 12,722,575 | 7,622,575 |
| Sewage Disposal System Revenue Bonds, Series 2007-SRF | | | 167,565,000 | 145,765,000 |
| Sewage Disposal System Revenue Bonds, Series 2009-SRF | | | 16,785,000 | 11,355,062 |
| Sewage Disposal System Revenue Bonds, Series 2010-SRF | | | 4,899,000 | 3,655,763 |
| Sewage Disposal System Revenue Bonds, Series 2012-SRF | | | 14,950,000 | 14,950,000 |
| | | $ | 614,489,300 | $ 427,006,125 |
| **Total Sewerage Disposal System Revenue Bonds** | | $ | 4,458,323,648 | $ 3,203,946,904 |

[1] Amount includes $33,510,117.80 of Capital Appreciation Bonds.

[2] Original Principal Amount reflects par amount of most current remarketing.

SOURCE: The Department

## DEBT SERVICE REQUIREMENTS

The following table sets forth the annual principal and interest requirements for the outstanding Senior Lien DWSD Bonds, Second Lien DWSD Bonds, and SRF Junior Lien DWSD Bonds.

*[Remainder of Page Intentionally Left Blank]*

| Fiscal Year Ended June 30 [1] | Outstanding Senior Lien Debt Service [2] | Outstanding Second Lien Debt Service [3] | Outstanding SRF Junior Lien Debt Service [4] | Total System Debt Service |
|---|---|---|---|---|
| 2015 | $ 135,022,642 | $ 63,391,746 | $ 36,861,602 | $ 235,275,991 |
| 2016 | 142,779,242 | 54,504,616 | 37,383,924 | 234,667,783 |
| 2017 | 142,831,556 | 54,520,491 | 37,325,149 | 234,677,196 |
| 2018 | 142,876,800 | 54,513,691 | 37,277,237 | 234,667,728 |
| 2019 | 142,604,962 | 54,755,491 | 37,308,371 | 234,668,824 |
| 2020 | 140,787,412 | 56,518,591 | 37,367,296 | 234,673,299 |
| 2021 | 129,805,375 | 67,420,391 | 37,447,481 | 234,673,246 |
| 2022 | 138,122,387 | 58,878,386 | 37,671,656 | 234,672,429 |
| 2023 | 147,360,975 | 49,689,155 | 37,620,269 | 234,670,399 |
| 2024 | 140,885,762 | 64,235,193 | 29,548,223 | 234,669,177 |
| 2025 | 135,212,150 | 70,652,930 | 29,543,365 | 235,408,445 |
| 2026 | 152,545,950 | 67,182,530 | 14,982,514 | 234,710,994 |
| 2027 | 152,896,372 | 70,066,993 | 11,901,033 | 234,864,397 |
| 2028 | 154,009,080 | 69,133,593 | 11,889,074 | 235,031,746 |
| 2029 | 154,604,324 | 60,822,593 | 11,883,824 | 227,310,740 |
| 2030 | 122,749,722 | 100,686,243 | 11,889,992 | 235,325,956 |
| 2031 | 134,712,320 | 99,873,205 | 1,218,282 | 235,803,807 |
| 2032 | 152,985,899 | 53,300,530 | 949,500 | 207,235,929 |
| 2033 | 152,787,913 | 56,076,800 | 947,500 | 209,812,213 |
| 2034 | 19,345,413 | 186,233,275 | 949,938 | 206,528,625 |
| 2035 | 19,238,238 | 186,291,150 | 951,750 | 206,481,138 |
| 2036 | 19,122,638 | 186,344,000 | - | 205,466,638 |
| 2037 | 124,819,138 | - | - | 124,819,138 |
| 2038 | 124,817,288 | - | - | 124,817,288 |
| 2039 | 124,814,275 | - | - | 124,814,275 |
| 2040 | | | | - |
| 2041 | | | | - |
| 2042 | | | | - |
| 2043 | | | | - |
| 2044 | | | | |
| | $ 3,147,737,825 | $ 1,785,091,593 | $ 462,917,980 | $ 5,395,747,398 |

(1)    Amounts due July 1 are shown as debt service for the preceding Fiscal Year ending June 30 (the amounts actually required to be set aside in that Fiscal Year) For example, debt service payments due July 1, 2015, are shown in the Fiscal Year ending June 30, 2015. All figures are net of capitalized interest.

(2)    The interest rate on the Series 2006 D Bonds is assumed at 2.29%

(3)    The interest rate on the Series 2001 D 2 Bonds is assumed at 3.46%

(4)    Assumes all draws have been made and projects debt service at project completion.

Source:    The Department.

35

# THE DEPARTMENT

## Organization

The Department is established under the City Charter. The Department is governed by a seven-member board, known as the Board of Water Commissioners, which meets monthly. Four members of the Board of Water Commissioners (each being a resident of the City) are appointed by the Mayor of the City (the "Mayor"). Key executives of the Counties of Wayne, Oakland, and Macomb each nominate a member to the Board of Water Commissioners for appointment by the Mayor.

The Sewage Disposal System, which provides sewage disposal services to the residents of the City and to a substantial area outside the City, is owned by the City and is accounted for by the City as a separate enterprise fund (the "Sewage Disposal Fund") through the Department. The Department is empowered to supply sewage disposal services within and outside the City under the City Charter. The Sewage Disposal System is accounted for separate and apart from the Water Supply System.

The Department continues to implement a number of changes mandated by the United States District Court, Eastern District of Michigan, Southern Division (the "District Court") as part of a lawsuit filed by the United States Environmental Protection Agency (the "EPA") against the City in 1977, *United States v. City of Detroit*, et al., Case No. 77-71100 (E.D. Michigan). All of the changes are intended to separate many affairs of the Department from the City and give the Department greater authority and autonomy to manage and operate the Water Supply System and the Sewage Disposal System. See "—Court Mandated Changes" below.

## Court Mandated Changes

As a result of several decades of intermittent noncompliance with the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 (collectively, the "Clean Water Act") during the pendency of United States v. City of Detroit, the District Court mandated changes intended to rectify the root causes of noncompliance through a series of orders, including, but not limited to, the Stipulated Order dated February 11, 2011 (the "February 11, 2011 Stipulated Order"), the Order dated November 4, 2011 (the "November 4, 2011 Order"), the Order dated October 5, 2012 (the "October 5, 2012 Order") and the Order dated December 14, 2012 (the "December 14, 2012 Order" and, collectively, the "District Court Orders"). The District Court Orders were intended to provide for a more empowered and autonomous regional governing Board of Water Commissioners, as well as operational independence from the City in several key administrative areas.

The February 11, 2011 Stipulated Order required certain changes in the composition of the Board of Water Commissioners, to provide for more meaningful regional inclusion. Additionally, the February 11, 2011 Stipulated Order established minimum professional qualifications for members of the Board of Water Commissioners. Through a subsequent District Court Order, the District Court ordered that members of the Board of Water Commissioners could only be removed for cause, instead of serving at the pleasure of the Mayor. See "—The Board of Water Commissioners" below.

The November 4, 2011 Order required the Department to establish its own autonomous divisions of Purchasing, Human Resources, Law and Finance. The heads of the Department's new divisions are required to report to the Director of the Department, rather than to the directors of the other City departments.

The November 4, 2011 Order sets forth specific hiring and removal procedures for all future Directors of the Department. See "—Management Initiatives" below. The November 4, 2011 Order also provided that the Department shall develop its own Department-specific job titles and shall enter into its own collective bargaining agreements with unions that represent its employees instead of being a party to City-wide collective bargaining agreements. The November 4, 2011 Order also struck and enjoined certain provisions in the existing collective bargaining agreements that permit an employee from outside the Department to be transferred into the Department based on seniority and requires that future collective bargaining agreements adopt a seniority system that does not provide for transfer rights across City departments. When the existing collective bargaining agreements expire, the Department is required to have its own collective bargaining agreements that cover Department employees only. See "—Employees and Employee Bargaining Units" below.

Under the City Charter, the Board of Water Commissioners has the authority to establish rates for sewage disposal services. Prior to 2012, the City Council approved rates for water and sewage disposal services pursuant to Section 5e of Act 279 (as defined herein), which required rate approval by the governing body of a city for a municipal water or sewerage system that served more than 40% of the population of the State. The City Charter further provided for City Council approval of the Department's annual budgets as part of the City's overall authority over annual City budgets. The November 4, 2011 Order extended the Department's rate setting authority by giving the Board of Water Commissioners sole authority to establish revenue requirements for sewage disposal services and limiting the City Council's authority to the approval of retail rates charged to customers in the City. Thus, the City Council no longer has the authority to vote on rates charged to suburban wholesale customers. The November 4, 2011 Order also expanded the Board of Water Commissioners' budget authority by affording it sole authority to approve the Department's annual budgets, subject only to the City Council's approval authority with respect to inside-city rates. The November 4, 2011 Order also required the By-laws of the Board of Water Commissioners to be amended to reflect these changes in its authority and require a majority of five votes to approve rates and take certain other actions. The City Council, which previously approved all rates, now may vote only on retail rates charged to customers in the City, and no longer has the authority to vote on rates charged to suburban customers. The Board of Water Commissioners has sole authority to approve the budget for the Department, set revenue requirements for the Sewage Disposal System, and approve rates for wholesale customers. The By-laws were amended to reflect these changes on January 25, 2012. Almost a year into the implementation of the November 4, 2011 Order, pursuant to various motions filed by the Department, the District Court issued the October 5, 2012 Order and the December 14, 2012 Order, to clarify and supplement the provisions of the November 4, 2011 Order.

The October 5, 2012 Order granted several requests of the Department that were aimed at clarifying the particular functions that the Department would handle independently from the City. The October 5, 2012 Order provided, among other things, that (i) any City laws, ordinances, resolutions, executive orders, policies and regulations inconsistent with the District Court Orders were not applicable to the Department, (ii) the Department's General Counsel, rather than the City's Corporation Counsel, may provide legal advice to the Department regarding implementation of the District Court Orders, (iii) the Department is exempt from the application of City ordinances, resolutions, policies, orders and regulations and Civil Service Commission rules pertaining to payroll, employee benefits and employee and labor relations, and (iv) that the Department could establish its own finance policies and sub-units within its Finance Division to implement the November 4, 2011 Order.

The December 14, 2012 Order provided, among other things, that (i) the Department is only required to reimburse the City for actual costs, including indirect costs, of providing transition services to the Department, (ii) the Board of Water Commissioners is authorized to delegate to the Director of the Department or the Department's General Counsel final approval authority for the settlement of litigation and for the resolution of contract claims paid by the Department, (iii) the Department is authorized to establish its own self-insurance fund, and (iv) the Department is authorized to approve the issuance of debt and to refinance debt upon the sole approval of the Board of Water Commissioners unless the debt contains a full or partial general obligation pledge of the City, in which case City Council approval would be required prior to issuance.

Previously, certain contracting and policy-making powers of the Board of Water Commissioners were subject to approval or rejection by the City Council and approval or veto of the Mayor. The November 4, 2011 Order provides that, notwithstanding anything in the City Charter or state law, the Board of Water Commissioners shall have the authority to approve legal settlements, claims, collective bargaining agreements, budgets and contracts. The City Council's authority to approve Department contracts is now limited to personal services contracts over $150,000, goods or commodities contracts over $2,000,000, professional services contracts over $2,000,000 and construction contracts over $5,000,000.

The Department believes that the terms of the November 4, 2011 Order have resulted and will continue to result in greater efficiency in its operations. Citing the Department's operational and compliance progress, on March 27, 2013, the District Court issued an order closing the case (the "Order of Dismissal") and declining to address a recommendation for the further restructuring of the Department. In the Order of Dismissal, the District Court stated that it was satisfied that the District Court Orders had been substantially implemented and would remain in effect following dismissal of the case. Within the Order of Dismissal, the District Court retained limited jurisdiction to enforce the District Court Orders.

Twelve days after entry of the Order of Dismissal, the Court of Appeals issued an opinion reversing the District Court's denial in 2011 of a motion by a union representing certain Department employees to intervene in the case to challenge provisions of the District Court Orders affecting labor matters. The Court of Appeals' opinion and resulting mandate directed the District Court to permit limited intervention by the union to contest the District Court's rulings

on labor-related issues. The Court of Appeals' opinion did not address the Order of Dismissal, or address its procedural interaction with the Order of Dismissal. On May 22, 2013, the City filed a notice of appeal of, *inter alia*, the District Court Orders. Approximately two weeks after the City's notice of appeal, the District Court entered an order directing the parties to show cause why the District Court had not been divested of jurisdiction over the case by the filing of the City's appeal after the Court of Appeals had issued its mandate to the District Court. In response, the Department filed a brief expressing its agreement with the District Court's suggestion that it did not have jurisdiction to take action other than action necessary to enforce the prior District Court Orders. The union filed a brief asserting that the District Court had authority to consider its intervention and challenge to the District Court Orders. The District Court has taken no action since the issuance of its order to show cause. After the City filed the Bankruptcy Case, the Court of Appeals issued an order holding the City's appeal in abeyance pending resolution of the Bankruptcy Case. See "LITIGATION" and APPENDIX F – DISTRICT COURT ORDERS.

**Application of Financial Stability Agreement to the Department**

In April 2012, the City and the State entered into a Financial Stability Agreement which established an independent Financial Advisory Board for the City (the "Financial Stability Agreement"). In March 2014, the City, the State and the Financial Advisory Board amended and restated the Financial Stability Agreement to reflect the appointment of the City's Emergency Manager. Under the Financial Stability Agreement, as amended and restated, the Financial Advisory Board is empowered to monitor, assist, advise and support the City in a number of respects. The Financial Stability Agreement, as amended and restated, does not require the City or the Department to seek approval of the Financial Advisory Board to issue DWSD Bonds, and it is not anticipated that any action of the Financial Advisory Board will be requested in connection with the potential issuance of the 2014 DWSD Refinancing Bonds.

**The Board of Water Commissioners**

The seven-member Board of Water Commissioners is appointed by the Mayor to head the Department based on the geography of the Sewage Disposal System's service area. Four members are residents of the City, and three members are residents of Wayne, Oakland and Macomb Counties who are nominated by the Wayne County Executive, the Oakland County Water Resources Commissioner and the Macomb County Public Works Commissioner, respectively. Each member of the Board of Water Commissioners must be a citizen of the United States and a resident of the State of Michigan. Pursuant to a Stipulated Order of the District Court, members of the Board of Water Commissioners are also required to possess certain defined professional experience and qualifications. The members of the Board of Water Commissioners serve four-year terms which are staggered so that not more than two members' terms expire each year.

In order to more efficiently oversee the Department's operations, the Board of Water Commissioners has adopted a committee structure. Four committees were established: (i) Operations, Regulatory Compliance and Procurement; (ii) Management Development and Human Resources; (iii) Financial Management and Audit; and (iv) Legal.

The current members of the Board of Water Commissioners and the year of their original appointment to the Board of Water Commissioners are as follows:

*James Fausone, Chair (2011).* Mr. Fausone is a resident of Canton Township. He is a partner in the law firm of Fausone Bohn, LLP, of Northville, where he practices business law, municipal law, veterans' disability law and environmental law. He previously served as president of an environmental remediation, industrial service, and waste transportation company for three years. Mr. Fausone holds a Bachelor of Science in environmental engineering and a Bachelor of Science in oceanography from the University of Michigan and a Juris Doctorate degree from Gonzaga University Law School. He serves as a trustee of Schoolcraft College, Livonia, MI and Canton Public Library. He is a Director of the University of Michigan, College of Engineering – Civil and Environmental Engineering Board, and has served as a Director of the Livonia Chamber of Commerce, among other affiliations.

*Fred Barnes (2011).* Mr. Barnes is a registered professional engineer from Sterling Heights. He owns and operates Fred W. Barnes Associates Inc., a consulting engineering firm. Before starting his company, Mr. Barnes was a senior project engineer with Atwell-Hicks Inc., where he managed engineering projects and supervised engineers, planners, and designers. Mr. Barnes, a former Chief engineer for the Office of the Macomb County Public Works Commissioner, he was involved with the design, operation and maintenance of more than 700 county drains, supervision of two CSO facilities, as well as the review of residential and commercial developments for 24 years. He holds a Bachelor of Science in engineering from the U.S. Military Academy at West Point.

*Mary E. Blackmon (1989).* Mrs. Blackmon is a retiree of Ameritech, where she served as a director of public relations and associate director of urban and civic affairs. She is a current member of the Wayne County Regional Educational Service Agency Board of Education, where she has served since 1982. Mrs. Blackmon also served for 10 years as a member of the Detroit Board of Education. She has served on several committees for the Southeast Michigan Council of Governments, where she is a vice president and is a graduate of Leadership Detroit. Mrs. Blackmon is active in a number of civic and community organizations.

*Linda Forte (2011).* Ms. Forte, a senior vice president at Comerica Inc., brings more than 30 years of business, finance, and commercial banking expertise to the board. A member of Comerica's senior leadership team, she is responsible for defining and driving business strategies that establish Comerica as a leader in diversity and corporate responsibility practices. Ms. Forte holds a Bachelor of Science in education psychology and French from Bowling Green State University and a Master's of Business Administration in finance and accounting from the University of Michigan. She serves as a director of the Economic Development Corporation of the City of Detroit and serves on a number of other agency and organization boards as well.

*Bradley Kenoyer (2011).* Mr. Kenoyer brings more than a decade of cross-functional problem-solving experience in delivering customer-driven results to technical and service quality issues for Ford Motor. An honoree of the Ford/Massachusetts Institute of Technology/University of Detroit Mercy program for engineering excellence, Mr. Kenoyer holds a Bachelor of Science in mechanical engineering from Rensselaer Polytechnic Institute and a Master's of Science in

product development from the University of Detroit Mercy. He has served on the Board of Directors of Preservation Wayne and has volunteered at the Ruth Ellis Center, which provides residential safe space and support services for runway, homeless and at risk youth in Detroit and Southeastern Michigan.

*Conrad L. Mallett Jr.* (2014). Mr. Mallett is the Detroit Medical Center's Chief Administrative Officer and General Counsel. His assignment places him on the cutting edge of hospital organization re-design with a particular focus on physician and patient satisfaction, cost containment, and increased medical quality. Mr. Mallett holds a Juris Doctorate degree from the University of Southern California, a Master's in Public Administration, also from the University of Southern California, a Master's of Business Administration from Oakland University with a concentration in Healthcare Management, and a Bachelor of Arts degree with a major in English from the University of California, Los Angeles. He is a member of the Board of Directors of two publicly traded companies, Lear Corporation and Kelly Services.

*J. Bryan Williams (2011).* Mr. Williams is an attorney with the Dickinson Wright law firm. Mr. Williams, a resident of Birmingham, practices in the areas of corporate and municipal finance law. He has served as counsel to the Oakland County Water Resources Commissioner on municipal bond financings, and has significant experience providing counsel to both privately and publicly-held companies. He holds a Bachelor of Arts in economics from the University of Notre Dame and a Juris Doctorate degree from the University of Michigan. He is a member of the City of Birmingham Planning Board, and a past member of the Board of Directors of the Economic Club of Detroit. He is also a past vice chairman of the Detroit Regional Chamber of Commerce.

**Management Team**

The Department was recently reorganized into five operating groups: Operations, Customer Service, Financial Services, Administration and Compliance, and Executive. The Department is staffed so that cross-functional employee assignments provide services for both the Water Supply System and Sewage Disposal System.

The Department's key personnel and their qualifications are summarized below.

*Sue F. McCormick, Director*. Ms. McCormick was appointed by the Board of Water Commissioners as the Director of the Department on November 17, 2011, and assumed that position on January 3, 2012. Prior to joining the Department, Ms. McCormick was the Public Services Area Administrator for the City of Ann Arbor, Michigan, where she managed that city's entire physical infrastructure, including the water and sewer system. She joined Ann Arbor city government as Water Utilities Director in January 2001. Prior to that, she was employed for 22 years by the Lansing Board of Water and Light, serving as environmental chemist, environmental laboratory manager, manager of water and steam planning, water technical support manager and business development manager. Ms. McCormick holds a Bachelor of Science in biological science from Lyman Briggs College at Michigan State University. Ms. McCormick is active in the 58,000-member American Water Works Association ("AWWA"), a prominent international organization for water industry professionals. She has served as AWWA-Michigan Director and as an association Vice President.

*William M. Wolfson, Chief Administrative and Compliance Officer/General Counsel*. Mr. Wolfson joined the Department as the utility's first General Counsel in June 2012. His duties expanded to include those of Chief Operating and Compliance Officer in August 2013, and Chief Administrative and Compliance Officer in January 2014. Prior to joining the Department, Mr. Wolfson served the City of Detroit Law Department as an attorney from 1986 to 1998 under Mayors Young and Archer. In 1998, Mr. Wolfson was appointed Wayne County's Deputy Corporation Counsel by County Executive Edward McNamara. The succeeding County Executive, Robert Ficano, appointed Mr. Wolfson to the position of Assistant Deputy County Executive/Director of Legal Affairs. In that position, Mr. Wolfson was responsible for the day-to-day operations of county government and its 4,500 employees. In July 2009, Mr. Wolfson retired from his Wayne County position, went into private practice and contracted to serve as Wayne County's Interim Corporation Counsel. Mr. Wolfson is a graduate of the University of Michigan and the University of Minnesota Law School. He currently serves as Co-Chairman of the Detroit-Wayne County Stadium Authority, Vice Chairman of the Wayne County Zoological Authority, and is a member of the Detroit Zoological Society's Board of Directors.

*Darryl A. Latimer, Deputy Director and Chief Customer Service Officer*. Mr. Latimer was named Chief Customer Service Officer in January 2014 and has served as Deputy Director since February 15, 2010. Mr. Latimer served as Contracts and Grants General Manager since March 2003. Previously, he was the Head Governmental Analyst in Contracts and Grants, leading the Consultant and Local Economic Development Units. Mr. Latimer has been with the Department since 1989, and with the City of Detroit since 1985. Mr. Latimer holds a Bachelor of Science in general studies from Wayne State University and a Master's of Science in general business administration from Central Michigan University.

*Cheryl Porter, Chief Operating Officer*. Ms. Porter was named Chief Operating Officer in January 2014. Ms. Porter served as Assistant Director – Water Supply Operations since September 2008 and has been employed by the Department since March 1996. She holds a Bachelor of Science in chemistry from the University of Michigan, a Juris Doctor degree from the University of Detroit Mercy School of Law and a Master's of Business Administration with a concentration in human resources management from the Madonna University. She began her career with the Department as a junior chemist and has worked her way through the ranks at each level of the organization. Ms. Porter holds her F1 license for Water Treatment with the State of Michigan. Prior to joining the Department, Ms. Porter was an Analytical Chemist for Blue Planet Technologies and, earlier, a Research Assistant for the University of Michigan Department of Chemistry. Ms. Porter also participates in various community service activities, having served on the Board of Directors for Intense Mentoring, Inc., a local non-profit committed to attacking poverty through education, and mentoring young people throughout Southeastern Detroit.

*Nicolette Bateson, CPA, Chief Financial Officer, Financial Services*. Ms. Bateson, a certified public accountant, is the department's first CFO and began working for the Department in February 2013. Ms. Bateson has extensive financial experience. In the public sector, she served as both Assistant City Manager and Finance Director in local government. Ms. Bateson was an audit supervisor with a national accounting firm, an independent financial consultant, and most recently a visiting specialist for the State and Local Government Program at Michigan State

University Extension. As a visiting specialist, Ms. Bateson worked with state and local officials to address the needs of cities in fiscal stress. In addition, Ms. Bateson was involved with research, education, and writing related to public-sector financial challenges. Ms. Bateson has experience working with public agencies moving through substantial restructuring to attain operational and financial sustainability with reduced resources. Ms. Bateson earned a bachelor's of business administration degree in professional accounting from the University of Michigan-Dearborn and a Master's of Public Administration degree in government management from Eastern Michigan University.

*Dan Rainey, Information Technology Director*. Mr. Rainey came to the Department in March 2013 with more than 20 years of experience leading and transforming IT organizations – most recently including the City of Ann Arbor, the top-ranked digital city in its class. Mr. Rainey holds a master's degree in management with a specialization in strategic leadership from Walsh College and a bachelor's degree in computer science from Wayne State University. Mr. Rainey was recognized as a Computerworld Premier 100 Leader and was awarded the Michigan Excellence in Technology Leadership Award. Mr. Rainey previously served as Vice President for the Metropolitan Information Exchange, a national organization of local government Chief Information Officers. He is a member of the Society for Information Management and participates on various intergovernmental collaboration committees and advisory boards.

*Terri Tabor Conerway, Organizational Development Director*. Ms. Conerway was named Organizational Development Director in December 2013. She previously served as the Department's Process and Quality Control Manager since January 2006. Prior to that, Ms. Conerway served as the Department's Human Resource Manager. She has worked in various managerial positions since beginning her career with the City of Detroit in 1972. She holds a Bachelor of Science degree from Wayne State University in Psychology. Ms. Conerway is a certified Franklin Covey facilitator and is active in the International Public Management Association – Human Resources.

*W. Barnett Jones, Chief Security and Integrity Officer*. Chief Jones was appointed the Chief Security and Integrity Officer for the Department in May 2012. His extensive experience in law enforcement and security covers a 30-year career. Chief Jones is responsible for the Department's entire security posture that includes the physical security and safety of employees, facilities, and assets. In addition, Chief Jones has been pivotal in developing and implementing entity-wide integrity policies and procedures. Prior to his arrival at the Department, Chief Jones served as Chief of Police, Police Administrator, Captain, Lieutenant, and Deputy Sheriff with large local units of government in Michigan including the supervision of both police and fire personnel. Chief Jones earned a Master's degree in liberal studies from Eastern Michigan University and a bachelor's degree in general studies and human resources from the University of Michigan – Dearborn. He has been involved in many professional and civic organizations, including the Deputy Sheriffs' Association, the Crime Prevention Association of Michigan, and the Executive Board of the March of Dimes.

*Bill Johnson, Public Affairs Officer*. Mr. Johnson joined the Department in November 2013 after serving as CEO of the Bill Johnson Group, a media consulting, public affairs, public relations firm. Mr. Johnson is an award-winning freelance journalist and former Detroit News

editorial writer and columnist. He was press secretary/director of public information for Wayne County Executive Bill Lucas from 1983 until 1986, and later was director of administration for the Wayne County Commission. Mr. Johnson has been a frequent Detroit radio and television commentator and has won broadcast journalism awards for investigative reporting from the Associated Press and UPI. Mr. Johnson earned a bachelor's degree from Wayne State University and graduated Cum Laude.

**Management Initiatives**

As reported in the Director's Final Compliance Report in March 2013 and noted in the Order of Dismissal, the Department has made significant progress since the November 4, 2011 Order. To advance the Department's goals of regulatory compliance and long-term sustainability, primary management initiatives include restructuring, optimization, independence from the centralized primary government functions, financial stability measures and a commitment to collaborative relationships with regulators and customers. The Director reports the status of these initiatives to the Board of Water Commissioners on a monthly basis. The Director also reports to the public on these initiatives in the Director's Compliance Report, published monthly at www.dwsd.org.

*Restructuring*

The Department has established structural and management changes to align operations, customer service, finance, administration and compliance. Several key executive positions have been filled since February 2013, including the Chief Administrative and Compliance Officer, Chief Operating Officer, Chief Financial Officer, Chief Customer Service Officer and Chief Security and Integrity Officer. The Department has created an office of General Counsel and Organizational Development Division, as well as realigned its Financial Services and Information Technology Divisions towards an independent operating structure.

*Organizational Optimization*

In October 2012, the Board of Water Commissioners approved a contract with an organizational consultant to facilitate organizational optimization. In December 2012, five distinct employee teams began the work to evaluate over 50 business processes by focusing on three key operating elements: people, processes and technology. In March 2013, the employee teams reported their findings, which supported an optimized Department through job redesign, increased use of technology and the introduction of efficiencies to reduce the vehicle fleet and operating expenses.

In April 2013, the Department began implementing the new organizational design. Pilot programs of the new job and business process designs are in process throughout the wastewater, water, field services, information technology and customer service areas. The Department has drafted and published 57 new job classification descriptions replacing the prior, narrowly defined 257 job classifications. Since December 2013, the Department has been in the process of posting and filling the new job classifications. Employees not selected for the new positions may be assigned to special projects teams.

44

The Department has been meeting with its represented workforce to discuss the terms and conditions of employment to implement the new job designs as well as changes to employee healthcare and pensions ordered by the Emergency Manager.

Prior to and throughout this timeframe, the Department instituted a modified hiring freeze and some strategic separations. This has resulted in a system-wide downsizing of over 30% since July 1, 2011. The Department reduced its total staff from 2,102 employees at the end of July 2011 to 1,512 employees at the end of June 2014. In some areas of the Department, the reductions in staffing have been more rapid than projected. Contractual assistance is engaged when necessary to fill gaps and to assure continuity of successful operations. By the end of Fiscal Year 2019, it is estimated that the Department will have reduced its workforce to 1,000 employees. The following chart illustrates staff reductions since July 2011:

*[Remainder of Page Intentionally Left Blank]*



(a) Assumes average annual personnel costs of $75,000 per position

SOURCE: The Department

*Partial Independence from the Centralized Primary Government Functions*

Historically, the Department's Financial Services Group was a satellite department of the City. The District Court Orders permitted the Department to establish an independent finance function. In February 2013, the Department hired its first Chief Financial Officer, and has since made progress in separation of funds, accountability, analysis, treasury and procurement practices. "Finance Transformation" is the initiative underway to expand the capacity of the Department to professionally and independently manage its financial operations. This expanded initiative complements the Department-wide effort to optimize the deployment of people, redesign business processes, and invest in technology.

The Department remains dependent upon the centralized City information technology department to support many of its business processes, including finance, human resources, law, and risk management. The Department hired its first Information Technology Director in March 2013. The Department is now engaged in addressing its information technology governance process to ensure that updates, changes, selection of new applications and decisions to retire applications are made with an understanding of the impacts to the systems, support and staffing throughout the Department.

46

*Financial Stability*

The Department's long-term plan to build financial stability is founded upon (i) reallocating optimization savings to revenue financed capital, and (ii) rate model simplification that yields more stable and more predictable revenue and cash flow.

For many years, the Department relied on annual increases in rate revenues ranging from approximately 4% to more than 14% in order to meet its revenue requirements and maximized the issuance of debt to fund capital improvements. With increased authority for rate setting and debt management granted by the District Court Orders, the Board of Water Commissioners has maintained a 4% increase in revenue requirement for Fiscal Year 2014 and Fiscal Year 2015. The Department's management has expressed a commitment to moderate annual revenue requirement increases (currently set at 4%) as shown in the revenue projections, a focus on decreasing operational and maintenance costs through optimization, retiring debt, and, where appropriate, funding future capital needs of the Sewage Disposal System through revenues and cost containments rather than through maximized use of debt. Rates are set annually by the Board of Water Commissioners in accordance with its standard rate-setting protocols.

*Rate Simplification Initiative*

The Board of Water Commissioners' adoption of the Rate Simplification Initiative in December 2013 (the "Rate Simplification Initiative") may be the action that has the most significant, long-term positive financial impact on the Department's sewer revenue and cash flow. The Rate Simplification Initiative was designed to improve the efficiency, understanding and stability of the process of establishing sewerage rates. Under the new simplified structure, each wholesale customer's share of total sewer system costs is based on its historical average share of costs to operate and maintain the Sewage Disposal System. Rate simplification eliminates the volume variability in the rate model, moves from quarterly to monthly billing and collection, and eliminates an arduous sewer rate "look-back" process. It provides both the Department and its wholesale customers stability regarding revenues and cash flows. See "DEPARTMENT FINANCIAL OPERATIONS – Rates" and APPENDIX A – FEASIBILITY CONSULTANT'S REPORT.

*Collaborative Relationships with Customers and Regulators*

The Department maintains a wholesale customer outreach program which began in 1997. The effort encompasses a Water Technical Advisory Committee ("TAC"), a Wastewater Steering Committee (the "Steering Committee") and their related work groups that include staff from the Department, wholesale water and wastewater customers, the Southeast Michigan Council of Governments and MDEQ. The Steering Committee maintains several standing working groups to explore and work on issues of importance such as rates, industry best practices, public education and metering. This wholesale customer outreach program includes regular meetings and a wholesale customer portal that provides access to Department documents, as well as wholesale customer committee agendas, meetings and supporting materials.

To expand the Department's retail customer outreach program, the Board of Water Commissioners entered into its first consulting agreement in August 2013 to provide for a retail advocate. The consulting firm provides the retail customer perspective regarding changes to the rate model and related rate issues.

The Department provides office space at the wastewater treatment plant for personnel of MDEQ, the State's primary environmental regulatory agency. In addition, the Department and MDEQ communicate monthly to address operational matters, compliance, reporting and planning efforts.

**Employees and Employee Bargaining Units**

The total number of authorized positions for the Department in the budget for Fiscal Year 2015 was 1,674, consisting of 559 positions for the Sewage Disposal System and 1,115 for the Water Supply System. Of the 1,115 positions assigned to the Water Supply System, only 185 are entirely devoted to the Water Supply System. The other employees provide service to both the Sewage Disposal System and the Water Supply System, and costs for these positions are allocated appropriately. The budget necessarily contains more positions than are actually filled, as the budget is a planning document that must accommodate the job design restructuring, and cannot anticipate which positions will become vacant through attrition. As of June 30, 2014, the Department had 1,512 full time equivalent employees, of which approximately 1,333 were represented by the following unions:

- Association of Detroit Engineers;
- American Federation of State, County and Municipal Employees ("AFSCME"), Locals 207, 2394 and 2920;
- Association of Municipal Engineers;
- Association of Professional Construction Inspectors;
- Association of Professional and Technical Employees ("APTE");
- Building and Construction Trades Council;
- Building and Construction Trades Foreman;
- International Union of Operating Engineers, Local 324;
- Senior Accountants, Analysts, and Appraisers Association;
- Senior Water Systems Chemists Association;
- Teamsters;
- International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Locals 2200 and 2334; and
- Utility Workers of America ("UWA"), Locals 488, 504 and 531.

The Department's collective bargaining agreements reflect provisions of the District Court Orders, provide for a reopener by either side for economic issues followed by an intensive bargaining period of between 30 and 60 days, and the Department's ability to implement its last best offer at the end of the bargaining period. Collective bargaining agreements currently are in place for the following Department bargaining units: AFSCME Local 2920, Association of Professional Construction Inspectors, Building Trades Council, International Union of Operating Engineers, Senior Water Systems Chemists Association, UWA and Teamsters. The Department believes that, when its reorganization process is complete, these unions will represent the

majority of its represented workforce. The collective bargaining agreements with the United Auto Workers expired in June 2012 and the Department is currently discussing terms and conditions of employment with its remaining unions. The November 4, 2011 Order struck and enjoined certain provisions in the existing collective bargaining agreements that permit an employee from outside the Department to be transferred into the Department based on seniority and requires that future collective bargaining agreements adopt a seniority system that does not provide for transfer rights across City departments. See "THE DEPARTMENT – Organization," "LITIGATION" and APPENDIX F – DISTRICT COURT ORDERS. In addition, the November 4, 2011 Order requires the Department to have in place its own collective bargaining agreements for its employees by the time the existing collective bargaining agreements expire. The Department continues to put collective bargaining agreements in place with all unions representing its unionized work force. The Department has no knowledge of any planned interruption of service from the unionized work force.

After the Department negotiated initial collective bargaining agreements with many of its bargaining units, on August 20, 2013, the Emergency Manager advised the Department that obligations to bargain collectively were suspended pursuant to section 27(3) of Act 436. Thereafter, the Department began discussions of the terms and conditions of employment with its represented workforce to reflect changes to employee healthcare and pensions ordered by the Emergency Manager and to implement the new job classifications. To date, these discussions have resulted in agreements with seven unions, and discussions continue with the remaining unions.

**Ongoing Discussion of Formation of Regional Water Authority**

Since the fall of 2013, the Emergency Manager and the Department engaged in extensive negotiations with the Counties of Macomb, Oakland and Wayne (the "Counties") regarding the potential formation of, and transfer of the functions of the DWSD to, a regional water authority, which would have been created by agreement among the City and the Counties and incorporated as a part of the Plan of Adjustment in the City's Bankruptcy Case. Upon confirmation of the Plan of Adjustment, the regional water authority would have assumed operating control of most of the assets (including the physical plant and wholesale water and sewer service contracts) currently owned and operated by DWSD. These negotiations among the City, the Department and the Counties did not result in any agreement.

On April 10, 2014, Wayne County filed a motion (Docket No. 3945) requesting that the Bankruptcy Court refer all matters relating to the potential formation of a regional water authority to facilitative mediation. On April 17, 2014, the Bankruptcy Court entered an order (Docket No. 4156) referring to mediation (1) the matter of whether to create a regional water authority involving the City and the Counties and (2) all issues relating to DWSD and the Counties. This mediation is ongoing.

**Potential DWSD Public-Private Partnership**

Through the Emergency Manager, the City has been in contact with certain potentially interested parties regarding a request for information (the "DWSD RFI") for a transaction that would establish a public-private partnership with respect to the DWSD (the "Public-Private

Partnership"). The DWSD RFI provides that the Emergency Manager is considering the potential Public-Private Partnership for the operation and management of the water system and sewage disposal system currently operated by DWSD. The DWSD RFI states that the Public-Private Partnership could take the form of an operating and management agreement and would be effectuated in conjunction with confirmation of the Plan of Adjustment. The DWSD RFI further provides, however, that the Emergency Manager will also consider responses that contemplate alternative transaction structures, *e.g.*, a long-term lease and concession arrangement or a sale that meets the bid criteria incorporated in the DWSD RFI, while maximizing the value to the City, maintaining or enhancing the Water Supply System and Sewage Disposal System's operational viability and capital needs and complying with applicable law. The DWSD RFI requires that any Public-Private Partnership include a commitment to limit rate increases to no more than 4% per year for the first 10 years.

The Department would only enter into a potential agreement if it were compliant with the Bond Ordinance and the DWSD Indenture and it received an opinion of nationally-recognized bond counsel that the tax-exempt status of outstanding DWSD Bonds would not be impaired thereby.

The deadline for interested parties to submit indications of interest was April 7, 2014. The City received 13 indications of interest regarding the DWSD RFI, which the City is reviewing and analyzing. The Board of Water Commissioners will be asked to review and act upon any proposal that the Emergency Manager may recommend.

## THE CITY

Pursuant to the provisions of the State Constitution and Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), the City is a home rule city with significant independent powers.  In accordance with the City Charter, the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the legislative branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years unless a special election is required as provided for in the Charter.  The most recent regular election for the positions of Mayor and City Council members was on November 5, 2013, when Mike Duggan was elected for his first term as Mayor.

On March 14, 2013, Kevyn D. Orr was appointed to act as Emergency Financial Manager pursuant to the provisions of Act 72. Mr. Orr became the Emergency Manager of the City on March 27, 2013, pursuant to the provisions of Act 436, Public Acts of Michigan, 2012 ("Act 436").  Act 436 provides an emergency manager with broad powers and authority to take certain actions with respect to a local government that is in receivership under Act 436, notwithstanding any charter provision to the contrary. Act 436 provides that the governing body and the chief administrative officer of a local government in receivership under Act 436 shall not exercise any of the powers of those offices except as may be specifically authorizing in writing by the emergency manager or as otherwise provided for in Act 436 and are subject to any conditions required by the emergency manager.

50

On July 28, 2014, the Emergency Manager issued his Order No. 31, which supplemented Order No. 20 and conferred on the Mayor the power he would have had with respect to the Department and the Board of Water Commissioners, absent Act 436. The Emergency Manager has retained his authority under Act 436 over, among other things, the Invitation and the solicitation of Offers by the City, as well as the Department's financial restructuring, ability to seek and obtain financing.

## APPROVALS OF THE INVITATION

As described under "THE DEPARTMENT—Organization" and "—Court Mandated Changes" and "—The Board of Water Commissioners," the Department is governed by the Board of Water Commissioners. Pursuant to the District Court Orders, the Board of Water Commissioners has approved the Invitation and the solicitation of Offers contemplated by the Invitation.

As described under "THE CITY," an emergency manager has been appointed for the City. Pursuant to Act 436, the Emergency Manager has approved the action of the Board of Water Commissioners regarding the Invitation and the solicitation of Offers contemplated by the Invitation.

## THE CAPITAL IMPROVEMENT PROGRAM

**General**

The Department utilizes a five-year Capital Improvement Plan ("CIP") to maintain and improve the reliability of the Sewage Disposal System, meet regulatory standards as well as to achieve greater operating and maintenance efficiency. The Department annually updates the CIP based on continual monitoring and review of the needs of the Sewage Disposal System. In accordance with the terms of the February 11, 2011 Order, the CIP must be approved by a super majority of at least five members of the Board of Water Commissioners. The Department can modify individual projects within the CIP during the year to address changing costs and management decisions on specific project scope as long as the changes are within the basic framework approved by the Board of Water Commissioners.

The CIP is divided into the following major categories: Plant, Sewer Interceptor System, Combined Sewer System, Lateral Sewer Replacement, and Information Technology. The Plant category is further divided into sub-categories: Primary Treatment, Secondary Treatment, Solids Handling, Disinfection Facilities and General Purpose. The Department has financed its ongoing CIP with proceeds of the DWSD Bonds, federal and State grants and loans and revenues of the Sewage Disposal System.

The original Fiscal Year 2015-2019 CIP was approved by the Board of Water Commissioners in December 2013. In connection with potential issuance of new money bonds following the issuance of the 2014 DWSD Refinancing Bonds, the CIP was updated to reflect individual project activity subsequent to December 2013. An amended Fiscal Year 2015-2019 CIP was approved by the Board of Water Commissioners on July 9, 2014.

The CIP provides a framework for ensuring capital plans are consistent with overall organizational goals within a set of financial considerations including fiscal capacity, debt levels, impact on operating budgets and reserve levels. Actual project proposals are initiated and reviewed within the context of the CIP. Actual bid versus cost estimates, unforeseen cost-benefit scenarios and grant opportunities are examples of why deviations from the CIP would occur.

Over the past ten years, the Department spent approximately $1.9 billion on capital improvements to the Sewage Disposal System. One of the primary documents utilized in developing the CIP is the Needs Assessment for the collection system and the Plant. The Needs Assessment was originally developed over ten years ago as a comprehensive planning document for the wastewater treatment plant, and was expanded in 2013 to address the pumping stations and combined sewer overflow ("CSO") control facilities. The Needs Assessment is used to identify needs for the Plant to achieve a sustainable operating condition and provide for continued regulatory compliance. The Department has worked over the past few years to minimize capital spending by focusing on critical needs while still ensuring reliable service in compliance with environmental regulations. This has included working with MDEQ to focus on green infrastructure for wet weather control to significantly reduce the CSO expenditures. For more information, see APPENDIX B – SYSTEM EVALUATION REPORT.

The following tables detail the planned expenditures and the projected funding sources for the Fiscal Year 2015-2019 CIP.[5]

### Capital Improvement Program Estimated Expenditure Schedule

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| | *Fiscal Year Ended June 30,* | | | | | | |
| | $ | $ | $ | $ | $ | $ | $ |
| | *estimate* | | | | | | |
| **Plant** | | | | | | | |
| Primary Treatment | 5,326,000 | 6,998,000 | 12,225,000 | 12,525,000 | 4,047,000 | 0 | 41,121,000 |
| Secondary Treatment | 7,181,000 | 6,085,000 | 6,847,000 | 10,700,000 | 7,900,000 | 0 | 38,713,000 |
| Solids Handling | 45,665,000 | 112,398,000 | 51,580,000 | 13,628,000 | 1,968,000 | 0 | 225,239,000 |
| Disinfection Facilities | 3,496,000 | 3,201,000 | 1,589,000 | 4,950,000 | 10,200,000 | 29,000,000 | 52,436,000 |
| General Purpose | 23,178,000 | 29,843,000 | 15,973,000 | 18,100,000 | 21,760,000 | 17,200,000 | 126,054,000 |
| Subtotal Plant | 84,846,000 | 158,525,000 | 88,214,000 | 59,903,000 | 45,875,000 | 46,200,000 | 483,563,000 |
| | | | | | | | |
| Sewer Interceptor System | 1,280,000 | 5,005,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 26,285,000 |
| Combined Sewer System | 13,231,000 | 7,459,000 | 6,000,000 | 5,100,000 | 0 | 0 | 31,790,000 |
| Lateral Sewer Replacement | 9,280,000 | 14,772,000 | 11,000,000 | 25,000,000 | 24,000,000 | 20,000,000 | 104,052,000 |
| Information Technology | 5,015,000 | 7,923,000 | 3,599,000 | 1,500,000 | 1,500,000 | 1,500,000 | 21,037,000 |
| Subtotal | 28,806,000 | 35,159,000 | 25,599,000 | 36,600,000 | 30,500,000 | 26,500,000 | 183,164,000 |
| Total Capital Program | 113,652,000 | 193,684,000 | 113,813,000 | 96,503,000 | 76,375,000 | 72,700,000 | 666,727,000 |

SOURCE: The Department

---

[5] In this Disclosure Statement, estimated figures for Fiscal Year 2014 are shown as the first year of the forecast period. See "DEPARTMENT FINANCIAL OPERATIONS—Fiscal Year 2014 Estimate."

**The CIP Funding**

The current five-year CIP is estimated to cost $553,075,000 (excluding estimates for 2014). Of this amount, the Department expects that $335,000,000 (approximate net amount) will be financed with proceeds of DWSD Bonds and the balance with Sewage Disposal System revenues, draws on existing State Revolving Fund loans and funds on hand.

*[Remainder of Page Intentionally Left Blank]*

## Sewage Disposal System Capital Improvement Program
## Projected Funding Sources

| | Fiscal Year Ending June 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| Existing Improvement and Extension Funds[a] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Existing Construction Funds[a] | 162,645,600 | 0 | 0 | 0 | 0 | 0 | 162,645,600 |
| Current Revenues | 27,512,600 | 17,246,700 | 23,257,800 | 47,549,200 | 56,323,700 | 72,549,200 | 244,439,200 |
| | | | | | | | |
| Bond Proceeds | 0 | 163,175,000 | 209,750,000 | 0 | 0 | 0 | 372,925,000 |
|   Less: Defeasance Req'ts of Refunded Bonds | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|   Issuance Expenses[b] | 0 | (13,175,000) | (24,750,000) | 0 | 0 | 0 | (37,925,000) |
| Net Bond Proceeds Available | 0 | 150,000,000 | 185,000,000 | 0 | 0 | 0 | 335,000,000 |
| State Revolving Fund Loans | 3,000,000 | 3,000,000 | 1,520,000 | 0 | 0 | 0 | 7,520,000 |
| Total Funding Sources[d] | 193,158,200 | 170,246,700 | 209,777,800 | 47,549,200 | 56,323,700 | 72,549,200 | 749,604,800 |

(a)  Balance available June 30, 2013.  (Applies only to Fiscal Year 2014).

(b)  Includes net premium / original issue discount and other amounts and amount required from bond proceeds to fund maximum annual future debt service.

(c)  The difference between the total amount available to finance the capital program and the cost of the program represents funds

    available to finance the capital program after 2019.

SOURCE:  The Foster Group LLC

## THE SEWAGE DISPOSAL SYSTEM

      The major components of the Sewage Disposal System include the wastewater treatment plant (the "Plant"), a collection system within the City (including approximately 3,000 miles of trunk and lateral sewers), 11 pump stations and three interceptors in the City.  The Department believes that the Sewage Disposal System is adequate to meet the current needs of its retail and wholesale customers and to meet the current federal requirements of the EPA under the Clean Water Act.  The flow of wastewater is monitored and remotely controlled by the System Control Center, which allows the Department to remotely control most collection system facilities.  The Central Service Facility houses the majority of the Department's field maintenance equipment. Some repairs, replacements and major improvements are necessary to improve operations and ensure continued compliance with environmental standards.  These repairs, replacements and improvements are part of the Sewage Disposal System's CIP.  See "THE CAPITAL IMPROVEMENT PROGRAM."

### Service Area

      The Sewage Disposal System presently provides wholesale service through 21 contracts to 76 municipalities in the surrounding metropolitan area and retail service to the customers in the City.  Of the total service area of approximately 850 square miles, 138 square miles are in the

City. The Sewage Disposal System currently serves approximately 2.8 million people, or nearly 31% of the population of the State of Michigan, with suburban wholesale customers comprising approximately 75% of the total. See APPENDIX E – CHARACTERISTICS OF THE SEWAGE DISPOSAL SYSTEM SERVICE AREA. As a matter of general practice, the City does not contract with individual or corporate customers outside the City, but only with municipal entities and public sewage disposal districts or authorities.

Population in the service area has declined over the past decade, after remaining relatively stable in the prior 20 years. The population decline is largely attributable to the recent economic downturn, which has had an adverse effect on the Southeastern Michigan region. Approximately 54% of the Sewage Disposal System's estimated operating revenues for the Fiscal Year ended June 30, 2013, were derived from wholesale customers and the balance from retail customers and miscellaneous other income sources.

Over the past several years various legislative bills and resolutions have been introduced in the State legislature from time to time that have provided for, or suggested studying, changes in the composition of the Board, or have attempted to legislate changes in the management and control of the Water Supply System. At present, there are two bills pending in the Michigan House and Senate that could potentially impact the Department's operations. Senate Bill 9 was introduced in January 2013, and would subject the Department's rate setting to regulation by the Michigan Public Service Commission. House Bill 4009 was also introduced in January 2013, and would attempt to create a regional authority to take over the operations of the Department. Neither of these bills have proceeded beyond a first reading and referral to a committee.

**Historical Wastewater Volumes**

The treated wastewater volumes have not changed materially during the last fourteen years largely due to the fact that only about one-third of the treated wastewater volumes are related to sanitary volumes that result from customer water use. The majority of treated wastewater volumes are related to the infiltration into the sewer system, or the runoff into the combined sewer system, of wet weather flows. The volatility of wet weather events can dramatically affect the level of flow received at the Plant, irrespective of population levels or water use patterns. The billed wastewater volumes for wholesale customers are affected by wet weather events because billed volumes for the majority of these customers are based on metered wastewater volumes. Billed volumes for these customers will cease to exist starting in Fiscal Year 2014-2015, because the Rate Simplification Initiative provides that bills will be issued in equal monthly amounts, regardless of metered wastewater sales. Billed volumes for retail customers are based on metered water volumes. The following table shows estimated service population as well as treated and billed wastewater volumes during the past ten Fiscal Years, based on 2010 census figures that estimate the suburban municipal population at 2,093,000 and the Detroit retail population at 714,000.

*[Remainder of Page Intentionally Left Blank]*

**Sewage Disposal System**
**Treated and Billed Wastewater Volumes**

| Fiscal Year | Estimated Population Served | | | Annual Wastewater Treated (mg) | Billed Volume | | |
|---|---|---|---|---|---|---|---|
| | Suburban Municipal | Detroit Retail | Total | | Suburban Municipal (mg) | Detroit Retail (mg) | Total (mg) |
| 2005 | n/a | n/a | n/a | 227,200 | 115,200 | 36,800 | 152,000 |
| 2006 | n/a | n/a | n/a | 253,900 | 117,000 | 34,800 | 151,800 |
| 2007 | n/a | n/a | n/a | 244,800 | 117,500 | 32,400 | 149,900 |
| 2008 | n/a | n/a | n/a | 248,600 | 114,200 | 27,800 | 142,000 |
| 2009 | n/a | n/a | n/a | 265,200 | 123,200 | 29,600 | 152,800 |
| 2010 | n/a | n/a | n/a | 225,800 | 100,600 | 27,100 | 127,700 |
| 2011 | 2,093,000 | 714,000 | 2,807,000 | 257,900 | 112,700 | 28,000 | 140,700 |
| 2012 | 2,093,000 | 714,000 | 2,807,000 | 259,900 | 112,600 | 24,900 | 137,500 |
| 2013 | 2,093,000 | 714,000 | 2,807,000 | 225,000 | 99,400 | 23,100 | 122,500 |
| 2014 | 2,093,000 | 714,000 | 2,807,000 | 238,900 | 107,200 | 22,100 | 129,300 |

_____
mg = million gallons

SOURCE: The Department.

Historically, the Sewage Disposal System has expanded with the population increase in the municipalities surrounding the City. No expansion of the Sewage Disposal System's service area is expected in the near future.

**Retail and Other Billing**

The Department has been the sole provider of all sewage interception, treatment and disposal services in the City since 1940 and all sewage collection since 1964. The Department has full responsibility for billing and collection of charges for approximately 322,000 retail customer accounts. The Department proposes retail rate schedules for these customers for consideration by the City Council, which has ultimate responsibility for setting the retail rates. These customers are billed on a monthly basis and water and sewerage charges are included on the same bill. The Department also bills various governmental agencies, including the City, for service. Rate changes, once established, generally become effective the following July 1. For information regarding current billing and collection activities, see "FINANCIAL PROCEDURES—Collections and Delinquencies."

**Wholesale Customers**

The Sewage Disposal System receives wastewater from its wholesale customers at sewers owned by the City. The quantity of wastewater discharged by the wholesale customers into the Sewage Disposal System is measured with a sewage meter or estimated on the basis of water consumption and other factors. In all cases, wholesale customers and lower-tiered service providers are responsible for the construction and maintenance of their own internal sewerage systems for collecting the wastewater and delivering it to the Sewage Disposal System. Prior to 1968, wholesale customers were required to connect their systems to the Sewage Disposal System sewers. In 1968, the Department constructed an interceptor system known as the

Oakland Macomb Interceptor (the "OMI") to provide service to Macomb County and the Clinton-Oakland District of Oakland County. The Department owned and operated the OMI until 2009, when an agreement was reached to sell it to a new entity jointly managed by Macomb and Oakland Counties, known as the Oakland-Macomb Interceptor Drain Drainage District ("OMID"). See "Settlement Agreements" below.

In 2012, MDEQ determined that water from Highland Park's water treatment plant had a high rate of turbidity and requested that the Department supply water to Highland Park on a short term basis. At that time, Highland Park owed the Department approximately $10 million for wastewater services. In 2013, Highland Park ceased making payments. As of July 1, 2014, Highland Park owed approximately $20 million to the Department, including $18,357,188 for wastewater treatment and $1,169,386 for industrial waste treatment services. The Department filed an action in Wayne County Circuit Court to recover this debt and on July 31, 2014 was awarded judgment against Highland Park. The State has declared a fiscal emergency in Highland Park pursuant to Act 436 and, as a result, the Department and other creditors are currently participating in Act 436's Neutral Evaluation Process. The Department continues to supply water to Highland Park on an interim basis. See "DEPARTMENT FINANCIAL PROCEDURES—Collections and Delinquencies."

*Wholesale Contracts*

Each wholesale customer has executed a sewage disposal agreement with the City for an initial term ranging from ten years to an indefinite duration. The sewage disposal agreements without an indefinite duration are typically beyond the initial term, and most agreements provide for automatic renewal terms or renewal terms upon the consent of the parties. As reflected on the following table, certain wholesale contracts that require renewal upon the consent of the parties have not been formally renewed in writing, but the parties to such contracts continue to perform in accordance with the terms of the original contracts. The agreements have notice requirements for termination after the initial term of the contract, from six months to five years, for any reason and from sixty days to three months for cause. The agreements typically may also be terminated by mutual consent of the parties. Under the typical agreement, the City, subject to certain terms and conditions, is obligated to receive and provide treatment for the wastewater from the wholesale customers at designated points of connection. The wholesale customer is required to pay for treatment of all wastewater delivered to the Sewage Disposal System at rates related to the cost incurred in providing the service. The City intends to enter into standard agreements with the wholesale customers. Until such time as the standard agreements are executed, the existing agreements will govern the relationship between the City and the wholesale customers. See "—Model Contracts" below.

The agreements generally include other provisions required for orderly operation of the Sewage Disposal System such as: (i) restrictions on the collection of wastewater from outside the service area of the wholesale customer, without the consent of the City; (ii) metering for all new customers and for most other customers; and (iii) acceptance by wholesale customers of the State's water quality standards and of appropriate City ordinances for meeting the pollution control standards imposed by the State and federal government. Wholesale customers are billed on a monthly basis in accordance with the Rate Simplification Initiative.

With respect to the wholesale contracts, user classes can be determined based upon use of different facilities or differences in the degree of use but not differences in location. Specifically, each contract requires the establishment of rates based upon a methodology under which the same rate of return on capital asset rate base is charged to customers in and outside the City. Since Fiscal Year 1979, the City has been permitted to charge the wholesale customers, in the aggregate, $1,000,000 compounded at 5% annually for costs of indirect service to the Sewage Disposal System provided by the City. The Fiscal Year 2015 rates include charges to wholesale customers of their proportional share of approximately $5.8 million for such indirect service costs. Provision for surcharges for those discharging pollutants in excess of normal domestic sewage is also permitted. In all cases, the municipalities are responsible for the construction and financing of sewer mains in such municipalities required to connect with the Sewage Disposal System.

*Settlement Agreements*

At various times since 1975, several wholesale customers and industrial users have challenged the sewerage rates established by the Board of Water Commissioners. The City and certain municipal entities entered into settlement agreements in 1978, 1980, 1982, 1995 and 1999 (collectively, the "Settlement Agreements"). The Settlement Agreements generally set forth rate schedules to be effective during a specified period of time and established principles by which rates are to be developed. Pursuant to the Settlement Agreements and the Amended Consent Judgment (described herein under "Environmental Matters", below), all existing wholesale contracts were amended to incorporate certain rate schedules and rate making principles and to provide for observance of environmental controls. Contractual provisions regarding rate making methodology are also subject to EPA regulations prescribing the rate making principles which must be followed as a condition to participation in federal grant programs by the City. See "DEPARTMENT FINANCIAL OPERATIONS – Rates."

In 2009, an additional settlement agreement was negotiated to resolve several outstanding disputes between the Department and its wholesale customers (the "2009 Settlement Agreement"). The terms of the 2009 Settlement Agreement included a reimbursement of $27 million from the City to the Department for the cost of a City-wide 800 Mhz radio system that was largely financed by the Department, as well as the ownership transfer of the OMI to OMID. In connection with the transfer of the OMI, the OMID then signed a new 30-year service agreement with the Department. In addition, the other major suburban wholesale customers agreed to enter into new 30-year service agreements with the Department. Pursuant to the 2009 Settlement Agreement, the parties have actively and cooperatively sought federal funding assistance for several infrastructure projects in the region, including repairs to the OMI.

Pursuant to the Settlement Agreements and the wholesale contracts, the Board of Water Commissioners is responsible for providing treatment and disposal service as may be necessary to conform with all Federal, State and local laws and regulations. The customer is required to pay for such service at the rates established by the Board of Water Commissioners, subject to certain principles including (i) annual review and adjustment, if necessary, to maintain proportionate distribution of all costs among user classes and to generate sufficient revenue to pay the total costs of the Sewage Disposal System and (ii) revenue requirements based on experience and estimates of operating and maintenance expenses, the local share of capital costs,

58

debt service coverage and any obligations imposed by law, and a working capital allowance to cover lags in payments by the customers and by federal and State grant agencies. The Settlement Agreements require the Board of Water Commissioners to finance, to the maximum extent possible, the local share of capital costs of the Sewage Disposal System from bond proceeds.

The District Court entered a final Order to Incorporate Rate Settlement Agreements into Wastewater Contracts and Dismiss all Prior Rate Settlement Agreements, dated August 31, 2011 (the "Final Rate Settlement Order"). This Final Rate Settlement Order served multiple purposes. First, it clarified the thirty-three year history of various competing orders to compile the final terms of the Settlement Agreements into one document. Second, it included an exhaustive list of ratemaking terms required by prior consent judgments, rate settlement agreements and rate orders that remain applicable and relevant (the "Surviving Terms") and institutionalized the wholesale customer partnering process, which requires that the Department regularly interact and share information with its customers relating to the ratemaking process (the "Partnering Process"). Third, it required that the Department and each of its existing wholesale customers amend their current wastewater contracts within 180 days of the Final Rate Settlement Order to include the Surviving Terms and the Partnering Process, subject to the Surviving Terms and Partnering Process continuing in full force and effect until modified or terminated by agreement among the Department and its wholesale customers. Fourth, it required the Department to amend its model contract to incorporate the Surviving Terms and Partnering Process, subject to the Surviving Terms and Partnering Process continuing in full force and effect until modified or terminated by agreement among the Department and its wholesale customers. Finally, the Final Rate Settlement Order provided that future disagreements concerning rates would be resolved as a matter of contract law in State court, rather than continuing to maintain federal jurisdiction over rate disputes. The Department is currently finalizing negotiations with its wholesale customers to amend the existing wastewater contracts utilizing the standardized contract language of the new model wastewater contracts. See "—Model Contracts" below.

*Model Contracts*

As part of a partnering process, the Department worked with its wholesale customers over a period of several years to develop a new model contract with standardized contract language. This model contract will ensure that all wholesale customers are treated uniformly and equitably and will also provide the Department with the same rights and controls across all agreements. The model contract language addresses items such as monthly billing, contract term lengths, contract renewal, flow limitations, flow enforcement provisions, flow measurement, regulatory compliance, connection points and contract enforcement. Using this model contract as a basis, the Department established new contracts for the City of Center Line in 2008 and the OMID in 2009. In 2012, the Department and its wholesale customers began negotiations on the development of a new rate methodology referred to as the "Rate Simplification Initiative." In November 2013, the negotiations concluded and the model contract was amended to incorporate the new Rate Simplification Initiative terms. The Department is currently using the model contract, inclusive of the new Rate Simplification Initiative modifications, as it negotiates new contracts with its remaining wholesale customers.

*Longevity*

The Department believes that wholesale customers will continue to utilize the Sewage Disposal System because (i) the Plant has the capacity required to provide service to those under contract (ii) federal and State grant agencies have encouraged regional sewage treatment systems and wholesale customers desiring to leave the Sewage Disposal System may not have the benefit of federal grant funds covering a portion of the capital cost of eligible facilities, making such a move economically unfeasible, and (iii) long standing contractual relationships exist between the Sewage Disposal System and its wholesale customers, as described herein. Moreover, the Department believes that the principles pertaining to the establishment of rates contained in the Surviving Terms, the Partnering Process and the Rate Simplification Initiative, the Department's commitment to involve and inform the wholesale customers through a customer outreach process, and the February 11, 2011 and the November 4, 2011 Orders establishing, in relevant part, a new Board of Water Commissioners with enhanced wholesale customer representation and a more autonomous Department, should serve to eliminate certain factors which precipitated controversy and litigation in the past. Because of the complex nature of rate setting and cost allocation, however, there can be no assurance that various assumptions which are used in the formulation of future rate increases will not be the subject of controversy and possibly future litigation.

*Customer and Regional Water Quality Partnering*

Since 1995, the Department has entered into several "partnering" agreements with representatives of its suburban customer communities, establishing a framework for discussion of major issues among Detroit and all of its suburban wholesale customers. The partnering groups have established teams to explore a variety of topics, including flows in the Sewage Disposal System, operating plans and efficiencies, billing protocol, service contracts, sewer rates and communication strategies. The Sewer Rates Work Group reviews issues affecting rates and rate levels and attempts to reach consensus on these issues. Through the Sewer Contracts Work Group, the Department has created the new model contract with standardized contract language as described above.

*Wholesale Customer Information*

Approximately 54% of the Sewage Disposal System's estimated operating revenues for the Fiscal Year ended June 30, 2013, were derived from wholesale customers and the balance from retail customers and miscellaneous other income sources. The following table lists the Department's wholesale customers as of the date of this Disclosure Statement, the date of initiation of service with the Sewage Disposal System and various details of the contracts.

*[Remainder of Page Intentionally Left Blank]*

## Wholesale Sewage Treatment Contracts

| | Total Billed Flow Mcf FY 2013 | Total Billed Revenue FY 2013 [1] | Total Billed Flow Mcf FY 2014 | Total Billed Revenue FY 2014 [1] | Contract Date | Term of Contract |
|---|---|---|---|---|---|---|
| | Mcf | | Mcf | | | |
| Oakland Macomb Interceptor Drain Drainage District | 3,348,484 | $62,302,424 | 3,421,342 | $71,972,397 | 2009 | 30 Years |
| Wayne County - Rouge Valley | 2,792,997 | 44,972,847 | 3,236,511 | 51,181,360 | 1961 | [4][8] |
| Oakland County - George W. Kuhn Drainage District | 2,566,319 | 38,148,325 | 2,823,140 | 41,658,188 | 1962 | [4][8] |
| Oakland County - Evergreen Farmington Distrcit | 1,635,006 | 27,556,982 | 1,707,570 | 29,198,838 | 1958 | [4] |
| Wayne County - Northeast | 1,324,062 | 19,293,968 | 1,344,036 | 20,406,419 | 1961 | [4] |
| Dearborn East [2] | 421,187 | 7,014,200 | 450,602 | 7,174,438 | 1957 | [4][8] |
| Dearborn West | 510,176 | 6,995,894 | 598,452 | 7,668,651 | 1961 | [4][8] |
| Highland Park [2][3] | 105,589 | 5,007,724 | 109,927 | 6,887,428 | N/A [7] | |
| Hamtramck [2][3] | 62,447 | 3,586,927 | 61,725 | 3,941,094 | 1941 | [5] |
| Grosse Pointe Farms | 147,651 | 2,462,068 | 154,088 | 2,502,113 | 1941 | [5] |
| Grosse Pointe Park | 90,065 | 1,273,953 | 97,872 | 1,244,951 | 1940 | [5] |
| Melvindale | 75,107 | 1,165,444 | 82,489 | 1,275,075 | 1977 | [6][9] |
| Dearborn Northeast [2] | 30,127 | 1,155,095 | 28,485 | 1,425,457 | 1955 | [5] |
| Farmington District | 54,361 | 854,232 | 75,476 | 1,074,471 | 1956 | [6][8] |
| Center Line | 50,702 | 833,383 | 54,589 | 900,791 | 2008 | 15 years [10] |
| Grosse Pointe [2] | 25,594 | 758,053 | 30,007 | 711,784 | 1940 | [5] |
| Allen Park | 35,475 | 516,419 | 42,338 | 594,733 | 1974 | [5] |
| Harper Woods | 5,814 | 196,010 | 5,657 | 242,834 | 1958 | [5] |
| Wayne County Area #6 [2] | 3,292 | 127,713 | 3,076 | 138,114 | 1951 | [4] |
| Redford Township [2] | 1,692 | 107,509 | 1,546 | 118,755 | 1940 | [5] |
| Wayne County Area #3 [2] | 314 | 41,262 | 268 | 71,951 | 1950 | [4] |

Mcf = Thousand cubic feet.

(1) Billed revenue does not include surcharges to wholesale area industrial users for pollutant discharges in excess of the local ordinance limits or Industrial Waste Control charges.

(2) Billed flow does not include estimated storm drainage and infiltration.

(3) Account currently showing delinquent balances.

(4) Minimum term expired; automatic renewal may be canceled with one year's notice.

(5) Duration is indefinite with no initial term. Contracts with indefinite term are generally terminable either by mutual consent or within a specified period after a notice of termination has been given.

(6) Minimum term expired. Contracts are terminable by mutual consent, or by one party if violation of terms of the contract exist.

(7) 1982 Amendment indicates that the parties are guided in their legal relationship by a Michigan Supreme Court decision from 1949.

(8) Contract indicates that renewal is by mutual agreement of the parties. Although no formal written renewal is in place, the parties' course of conduct has been to recognize the continuing enforceability of the contract.

(9) May also be terminated by either party upon one year prior written notice to the other party.

(10) Automatically renews for additional 15 years unless notice given by either party. After the first 15 year renewal, the contract automatically renews year to year unless one year prior notice given.

Source: The Department

## The Plant

The Plant is one of the largest single site wastewater treatment plants in the United States. The Plant currently treats a daily wastewater flow that has averaged 670 MGD over the past five years. The Plant services the needs of 31% of the State's population within the City of Detroit and 76 other surrounding communities.

61

The Wastewater Master Plan dated October 2003 (the "Wastewater Master Plan") established that the current Plant and collection system has sufficient capacity to serve the existing service area and a modest amount of growth. Since the Wastewater Master Plan was completed in 2003, growth in Southeast Michigan has stagnated. Plant flows have been relatively steady, fluctuating based on climatological conditions.

Major treatment processes at the Plant include raw wastewater pumping and preliminary treatment (grit removal, screening and chemical addition) of the incoming wastewater; primary clarifiers, to remove material suspended in the wastewater; gravity thickening of the solids, solids dewatering using belt filter presses and centrifuges, and final solids disposal using a combination of incineration, landfilling and land application; and disinfection of the final effluent using chlorination to kill harmful bacteria followed by dechlorination to remove chlorine from the water prior to discharge.

**Collection System**

The wastewater collection system consists of a network of sewers and pumping stations which collect and transport wastewater to the Plant. During wet weather, additional wet weather capture and treatment facilities, called combined sewer overflow ("CSO") control facilities, are also utilized. The collection system currently has a total service area of approximately 850 square miles. Ninety-eight percent of the collection system located within the City consists of combined sewers, handling both sanitary sewage and stormwater drainage. The remaining 2% of the collection system contains separate sanitary and storm sewers. Outside the City limits, the Sewage Disposal System serves 76 suburban communities. In the suburban communities, the majority of the collection systems (approximately 80%) are separated.

There are seven major pumping stations in the regional collection system, with a capacity greater than 50 cubic feet per second. The pumping stations are used to lift the wastewater from the low points in the sewer system in order to convey it by gravity the rest of the way to the Plant. Pumping stations are normally controlled remotely from the Department's System Control Center via a telemetering system.

Consistent with the original design and common with wastewater systems using combined sewers, the interceptor system does not have sufficient capacity to handle peak storm flows. Therefore, the construction of CSO facilities, to store combined sewage prior to discharging it back into the Sewage Disposal System after flows subside or in larger wet weather events to treat combined sewage prior to discharging to the receiving waters of the Detroit and Rouge Rivers, became a major part of the Sewage Disposal System's Long-Term CSO Control Plan. The Sewage Disposal System currently has nine CSO facilities in operation, six retention treatment basins and three flow-through type facilities.

**Environmental Matters**

The operation of the System is subject to extensive regulation pursuant to the federal Clean Water Act, the Clean Air Act, the Safe Drinking Water Act, the Michigan Natural Resources and Environmental Protection Act, and the administrative rules and regulations that have been promulgated pursuant to these statutes. These programs affect many facets of the

System including the quality and quantity of wastewater discharged, monitoring and reporting requirements, the process for disposing biosolids, design, construction and operation of treatment and collection facilities, and the handling, storage, and management of hazardous materials.

Included in the regulatory framework established by the Clean Water Act is the National Pollutant Discharge Elimination System ("NPDES") permit program, which requires operation of wastewater treatment facilities according to discharge limitations, set forth in permits which are issued to each facility. The NPDES permit program is administered by the EPA through MDEQ. The NPDES permit sets forth requirements in four general classifications: (1) plant operation and discharge of pollutants, (2) management of the wastewater collection system, including various improvements to control CSO, (3) elements of the Industrial Pretreatment Program ("IPP"), and (4) residuals management to dispose of solids generated as byproducts of the treatment process. The System's current NPDES permit was reissued on May 1, 2013 and expires on October 1, 2017. The NPDES permit includes compliance schedules for several capital improvement projects relating to the control of CSOs consistent with the Department's Long-Term CSO Control Plan (the "CSO Control Plan"). The Department is generally in compliance with the permit deadlines.

Because the Plant is not designed to remove cadmium, copper, lead, PCBs, mercury, or other toxic materials to the levels required by MDEQ, the Department controls these substances primarily through the IPP. The NPDES permit incorporates requirements that the Department administer the IPP to control and regulate wastewater discharge to the Sewage Disposal System, including the adoption of local limits for various pollutants.

The Department is subject to a related Administrative Consent Order (the "Administrative Consent Order") entered into with MDEQ on July 8, 2011. The Administrative Consent Order requires the Department to implement certain corrective measures to provide reliable capacity to process and dispose of biosolids. The Administrative Consent Order also identifies a series of additional corrective measures to be undertaken by the Department. The Administrative Consent Order specifies the timetable for completing activities relating to dewatering, conveyance, disposal, maintenance and other related items. The Department is undertaking remedial measures consistent with the Administrative Consent Order. On March 27, 2013, after 35 years of federal oversight, the Honorable Sean F. Cox ruled that the Department had achieved "substantial compliance" with its NPDES permit and the Clean Water Act. Therefore, the District Court terminated the Second Amended Consent Judgment entered by the District Court on August 3, 2000, terminating all environmental litigation against the Department. In arriving at this conclusion, the District Court held that the existing Administrative Consent Order is a "sufficient mechanism" to address any future issues regarding compliance with the Department's NPDES permit and the Clean Water Act. In order to further long-term compliance with the Administrative Consent Order, the District Court held that the position of Chief Operating Officer/Compliance Officer originally created in the District Court's March 26, 2012 order, should continue until March 27, 2014. However, before or after that date, the Board of Water Commissioners is allocated the power to make this a permanent or temporary position and if permanent, determine the terms and conditions of employment for the position. In 2013, William Wolfson was named Chief Operating and Compliance Officer/General Counsel to

63

the Department, and he continues in that position. See "THE DEPARTMENT—Court Mandated Changes."

A small portion of the City is served by separate storm sewers that convey storm water runoff directly to receiving waters. The City's separated storm sewer tributary area is approximately 140 acres, which is less than 0.2% of the total area in the City. The City's storm water discharges to the Detroit River and Rouge River are authorized pursuant to the State of Michigan General Storm Water Discharge NPDES permit, and a Certificate of Coverage under this permit was issued to the Department on November 5, 2004. The City has developed and submitted a Storm Water Management Program Plan (the "SWMPP") as required by that permit, and updates to the SWMPP are prepared annually. The most recent SWMPP update dated November 2011 establishes the timetable for various pollution prevention activities, as well as monitoring and reporting on the progress being made to control discharges from the City-owned storm sewers.

The Department is undertaking two significant capital projects at the Plant in order to comply with federal emissions guidelines for existing sewage sludge incinerators, effective in March 2016, and to provide reliable, cost effective and environmentally sound means of disposing of biosolids. The first project includes upgrades to Complex II incinerators to ensure compliance with the federal emissions guidelines, and associated retirement of incinerator Complex I. The second project involves the construction of a new biosolids drying facility that will provide additional disposal capacity and disposal cost savings. Both projects are expected to be completed and in operation before March 2016.

*Affordability Waiver*

The median household income within the City of Detroit is approximately $27,000, and roughly 38% of the City's residents live below the poverty line. Although the City's rates for wastewater treatment are below the national average, the per household cost of wastewater treatment totals approximately 2.6% of the median Detroit household's income. The traditional guideline for affordability is 2% of the community's median household income.

MDEQ has granted the Department an affordability waiver under the NPDES permit issued in 2012 for the next two five-year permit cycles, thereby allowing flexibility in the schedule for implementing previously planned CSO construction. During these two permit periods, the Department and MDEQ have agreed to focus on implementation of "green infrastructure" solutions and use of operational flexibility to reduce untreated CSO discharges. Evaluations will be completed during the ten-year period to determine the next steps to address CSO solutions.

Additional details regarding these and other regulatory requirements applicable to the System are included in APPENDIX B–SYSTEM EVALUATION REPORT.

## DEPARTMENT FINANCIAL PROCEDURES

**Budget and Accounting Matters**

Pursuant to authority granted by the November 4, 2011 Order, the Board of Water Commissioners adopted a budget policy for the Department on September 26, 2012 which is independent of the City's budget policy. The Department's budget policy, which has been in place beginning with Fiscal Year 2014, is designed to be in alignment with the Department's rate setting cycle.

The budget cycle begins with a Board of Water Commissioners meeting on or before November 1 each year to review programs, services, and activities to be included in the upcoming budget and to receive public comment. Before the December meeting of the Board of Water Commissioners, the Director submits a proposed budget for presentation at the regularly scheduled December meeting. Prior to adoption of the budget, the Board of Water Commissioners conducts a public hearing on the proposed budget which may be conducted at the same meeting in which the Board of Water Commissioners adopts the budget. The Board of Water Commissioners adopts the budget as proposed or with modifications at a meeting on or before January 31 occurring prior to the Fiscal Year of the budget. If the Board of Water Commissioners fails to adopt a budget prior to that date, the proposed budget shall be deemed the adopted budget for the Department. If necessary, an amendment to the adopted budget shall be adopted by the Board of Water Commissioners in a manner permitted by governing law as presented by the Director. If the Board of Water Commissioners fails to act upon a proposed budget amendment within 30 days following submission by the Director to the Board of Water Commissioners, then that amendment shall be deemed a part of the adopted budget. See "THE DEPARTMENT—Court Mandated Changes" and "—Management Initiatives." The Fiscal Year 2015 budget has been developed and approved by the Board of Water Commissioners under the new structure. See "DEPARTMENT FINANCIAL OPERATIONS—Fiscal Year 2015 Budget."

The basis for preparation of the budget differs from preparation of the financial statements for a given period. The financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). Accordingly, the Department's financial statements reflect the accrual basis of accounting. Revenues from operations, investments, and other sources are recorded when earned. Expenses (including depreciation) of providing services to the public are accrued when incurred. The Department's budget basis of accounting recognizes revenues in a manner consistent with accrual basis of accounting. Certain expenses accrued under GAAP are not recognized or treated in the same manner on a budgetary basis. For example, depreciation of plant and equipment over the useful life of such capital asset is not recognized in the budget; instead, amounts which might be spent in the fiscal year are treated as an expense and the budget records equipment and other long-term purchases against the current period.

Generally, the Department pays for certain personnel costs, supplies and equipment that are shared between the Water Supply System and the Sewage Disposal System from Water Supply System operations. The Sewage Disposal System is then billed monthly based on actual operations, including the allocation of personnel costs and equipment usage.

Because the Sewage Disposal System is generally self-insured, the Department includes in its annual budget amounts estimated to be sufficient to pay various liability and workers' compensation claims. The financial statements record the expense for such claims in the period when the occurrence of the liability is probable and the amount can be reasonably estimated. In addition, the budget includes amounts necessary to establish and maintain an account designated the "Extraordinary Repair and Replacement Reserve Fund," which has been created for the purpose of providing funds for paying the costs of major unanticipated repairs and replacements to the Sewage Disposal System. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS – Flow of Funds."

The Department uses the City's Oracle financial management system that includes general ledger, purchasing, accounts payable, accounts receivables, project accounting and fixed asset applications. These Oracle core financial applications are integrated with third party Oracle-approved software providers for budget preparation, time and attendance management, work order and inventory applications.

Despite the independence of financial operations granted by the District Court Orders, the Department continues to be a department of the City for financial reporting purposes. Due to the nature of this relationship, the Department is not eligible to issue audited financial reports or reports of internal control independent from the City. This impacted the Department's ability to release audited June 30, 2013 financial statements. The City's audit report was delayed for a number of reasons, including the resolution of technical auditing and accounting matters related to the City's Chapter 9 proceeding. Ultimately, the City's auditor, KPMG LLP, issued an audit report for the City, including the Department on July 25, 2014.

The City's audited financial statements as of and for the year ended June 30, 2013, are available on the City's website, and include an unmodified independent auditors' report, with emphasis of matter paragraphs which state:

- the City has filed a voluntary petition under Chapter 9 of the Bankruptcy Code, which raises substantial doubt about the City's ability to continue as a going concern. The City's financial statements do not include any adjustments that might result from the outcome of that uncertainty;

- the City and the GRS and the Police and Fire Retirement Systems ("PFRS" and, together with GRS, the "Retirement Systems") included investments valued at $702,000,000 and $722,000,000, respectively, as of June 30, 2013, whose fair values have been estimated by management in the absence of readily determined fair values. Management's estimates are based on various methods, which may include information provided by investment managers, general partners, real estate advisors, and other means; and

- the Retirement Systems utilized different actuarial assumptions in calculating the unfunded actuarial accrued liability.

The independent auditors' opinion was not modified with respect to these matters.

The auditors will subsequently provide the City with a letter that highlights certain internal control material weaknesses and related recommended improvements to the City's internal control environment. The City and the Department take such recommendations seriously. In particular, the Department's financial transformation process is designed to address internal control matters noted by the auditors in the prior Fiscal Year.

*Independent Auditors*

The basic financial statements of the Sewage Disposal Fund, an enterprise fund of the City as of and for the year ended June 30, 2013, included in APPENDIX D of this Disclosure Statement, have been audited by KPMG LLP, independent auditors, as stated in their report therein, which includes emphasis of matter paragraphs that state:

- the City, including the Sewage Disposal Fund, has filed a voluntary petition under Chapter 9 of the Bankruptcy Code, which raises substantial doubt about the City and the Sewage Disposal Fund's ability to continue as a going concern. The Sewage Disposal Fund's basic financial statements do not include any adjustments that might arise from that uncertainty;

- the City and the GRS utilized different actuarial assumptions in calculating the unfunded actuarial accrued liability; and

- the basic financial statements present only the Sewage Disposal Fund; the statements of the Fund do not purport to, and accordingly do not, present fairly the financial position of the City as a whole as of June 30, 2013, the changes in its financial position, or, where applicable, its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

The independent auditors' opinion was not modified with respect to these matters.

**Collections and Delinquencies**

The Department accounts for its retail and wholesale customer account balances separately. As of July 1, 2014, active retail customer accounts receivable are approximately $127 million, for water and sewer services combined. Of that amount, approximately $89 million is 60 days past due from 46% of the approximately 200,000 total active retail customer accounts. As of July 1, 2014, there were two wholesale sewer customers out of a total of 21 with past due balances of approximately $17 million.

The collection methods for retail customers differ substantially from wholesale customers. The Department's effort to address delinquent accounts receivable are described below. It should be noted that the majority of the past due sewer wholesale receivable is due to one entity, the City of Highland Park. That customer has a past due balance of approximately $17.1 million out of a total sewer balance of $18.4 million as of July 1, 2014. Collection efforts for that account have resulted in legal action. See "—Wholesale Customers" below.

Despite the level of delinquencies, as of July 1, 2014, the Department has not experienced cash flow problems, as sufficient operating capital has been available to the Sewage Disposal System. The Department has been able to meet its obligations as they come due.

*Retail Customers*

The Department operates a computerized billing system which accounts for a total of approximately 322,000 retail customer accounts, of which approximately 200,000 are active accounts. Inactive accounts remain in the billing system while the Department pursues other means of collection. Retail customer account categories include residential, commercial, industrial and municipal. Based on the approved Fiscal Year 2015 retail rates, the typical monthly bill is approximately $71 for combined water and sewer service charges based on 600 cubic feet of water consumed per month. All retail customers are billed monthly and are allowed 20 days to pay, after which a one-time 5% late payment charge is applied.

In accordance with State law, the Department has a right to discontinue the supply of water to any premises for non-payment of water or sewer bills when due. It is the Department's policy that retail customers may have their service shut off for non-payment if the account is more than sixty days in arrears with a past due balance of $150 or more. Residential customers are notified of payment plan options and financial assistance programs if they indicate that their account is delinquent due to financial hardship. Residential customers may be subject to constitutional safeguards regarding due process, including notice and hearing requirements in the event of discontinuation of services.

The Department's collection efforts in the past, including shut-off for non-payment, had not kept pace with an increasing level of delinquency since 2007. This resulted in a significant number of accounts with past due balances. As of July 1, 2014, the average active residential account delinquency, which includes water and sewer charges, is $541, based on approximately 80,000 of 177,000 accounts with past due balances of 60 days or more. As of the same date, active commercial accounts, the next largest retail customer category, present approximately 10,000 of 18,000 accounts with a past due balance of 60 days or more with an average past due amount of $2,071, which includes water and sewer charges.

To address the growing delinquency issue, the Department initiated a program utilizing an outside contractor to expand the shut-off program to increase collections beginning in July 2013. The first three months of that program revealed a significant number of service connections that were shut-off where there was no request to restore service. From July through September 2013, 7,478 retail accounts were shut off, but only 2,366 customers contacted the Department for service to be restored. The Department believes this is due to: (i) abandoned properties where there was no contact with the Department to terminate service, and (ii) illegal turn-ons. Understanding these challenges affects the Department's collection strategy going forward. To address the abandoned property concern, the Department is cross-referencing its customer database with recently released data from the Detroit Blight Removal Task Force which has gathered property condition data for all 380,000 parcels in the City. To address illegal turn-ons, the Department has instituted a follow-up mechanism to detect illegal turn-ons and is working with law enforcement to curb this activity.

The shut-off program activity was reduced for most of the period from December 2013 through March 2014 to prevent frozen service lines. The program resumed in April 2014, and 14,766 retail accounts were shut-off during the period from April through June 2014. The Department collected approximately $1,200,000 during that time period, compared with approximately $492,000 for that same time period in the prior year for combined retail water and sewer account balances. In addition, the shut-off program has generated active engagement with customers whose service is preserved by participation in a payment plan program, as well as payment assistance programs for those who meet certain eligibility criteria. Funding for the assistance programs is provided by external sources.

A final barrier to active customer engagement has been the absence of customer names associated with residential retail accounts. Presently, most residential retail customer accounts are addressed to "Resident." This presents an impediment to other methods of delinquent account collection efforts. The Department has recently initiated a program to attach customer names to accounts to support more effective collection efforts.

In the event that an account remains delinquent for more than six months, the Municipal Water Lien Act, MCL 123.161 et seq., provides that the charges for water and sewage service furnished to a premises may become a lien on such premises when the service is provided, and the lien may be placed on the property tax roll. The lien may then be enforced in the same manner as the collection of property taxes and enforcement of a lien for property taxes (assuming proper statutory notice to the party responsible for the payment of the charges). The Department transmits delinquent accounts to the City Treasurer who places the delinquent amount on the winter tax bill. If the delinquent amounts are not collected by the City Treasurer by March 1 each year, the City transfers unpaid real property tax bills to Wayne County for collection in accordance with State law. The City receives payment for such taxes from Wayne County's delinquent tax revolving fund as of March 1 each year, which is funded by the issuance of Delinquent Taxes Anticipation Notes. If the delinquent real property taxes remain uncollected after three years, the County charges the respective amount of such taxes back to the City. Chargebacks in Fiscal Year 2013 totaled approximately $22 million. See "—Fiscal Year 2009-2013 Operations" below. In Fiscal Year 2013, the City Treasurer's Office collected $7.4 million on behalf of the Department for water and sewer charges combined. The Wayne County Treasurer collected $9.1 million.

*Wholesale Customers*

Wholesale customers maintain their own retail billing systems. Through June 30, 2014, wholesale customers paid the Department monthly or quarterly in accordance with contractual agreements. Beginning with services rendered as of July 1, 2014, wholesale customers are billed monthly. This monthly billing requirement was agreed to orally by the Department and each of its wholesale customers outside of the existing wastewater contracts, and the Department intends to memorialize the monthly billing requirement in the model contract that it is negotiating with its wholesale customers. The late payment charge for wholesale customers varies by individual contract, but generally is 5%. In the event of a wholesale customer delinquency, the Department has options available to it under the relevant contractual agreement with such wholesale customer, including the right to obtain a judgment against the wholesale customer. If a non-

municipal wholesale customer does not pay the judgment amount, such amount may be collected by placing a lien on the property tax roll of that wholesale customer.

Historically, the Sewage Disposal System has not experienced significant problems with wholesale delinquencies. Wholesale delinquencies typically arise from disputed billings, which often can be resolved through negotiation. However, as of the date of this Disclosure Statement, the City of Highland Park had a delinquent balance of approximately $20 million for sewer and water charges combined. Highland Park is experiencing financial difficulties and since Fiscal Year 2008 has been unable to currently satisfy amounts due to the Department. The State has declared a fiscal emergency in Highland Park pursuant to Act 436 and, as a result, the Department and other creditors are currently participating in Act 436's Neutral Evaluation Process. The City and the Department have filed suit against Highland Park in Wayne County Circuit Court. Both the City and Highland Park have filed and argued Motions for Summary Judgment in the case. The Circuit Court took the matter under advisement and a decision was issued on July 31, 2014 awarding judgment to the Department.

*Accounting*

The allowance for doubtful accounts reflected in the audited financial statements as of June 30, 2013 represents the Department's estimate of the amount of potential uncollectible accounts receivable. Increases in the reserve are netted against revenues reported on the financial statements. The amount reserved is determined based on a formula that takes into account the total amount of accounts receivable as well as specific items within the category, including reserves for disputed billings. Approximately $68.5 million was reserved as an allowance for doubtful accounts as of June 30, 2013, against a total accounts receivable of approximately $204.8 million. Estimates are not available as of June 30, 2014 due to the timing of the billing cycle and accounts receivable analysis. Annual increases in the allowance for doubtful accounts result in bad debt expense for that year, and are reflected as a reduction in revenue for the customer class associated with the reserve. See "DEPARTMENT FINANCIAL OPERATIONS—Fiscal Year 2009-2013 Operations." The Settlement Agreements stipulate that bad debt expense associated with a suburban wholesale customer is chargeable to the suburban wholesale class at large, and that bad debt expense associated with a City retail customer is chargeable to the City retail customers only. The Board of Water Commissioners currently practices a "bad debt" policy which requires a write off of any doubtful accounts older than three years.

**Cash Management**

In accordance with the City Charter, all funds and accounts of the Sewage Disposal System are separate and distinct from all other City funds. No Sewage Disposal System monies are commingled with general fund or other monies of the City.

All Revenues of the Sewage Disposal System are deposited upon receipt or, if applicable, upon completion of credit card processing activities, in either the "Revenue Receipts Fund" or the "Receiving Fund" established under the DWSD Indenture. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS – Flow of Funds" for information on these Funds and the flow of funds under the DWSD Indenture. The Operation and Maintenance

Fund is a custodial account that is controlled by the Department. It is not part of the Trust Estate under the DWSD Indenture.

The Department maintains a budget system that monitors and controls funding in accordance with actual funds available. This budget system includes annual budgeting and project specific budgeting and payables management activities designed to ensure that retainage, progress payments and final contract payments are properly aligned with funds on hand and investment activities.

**Investment Policy**

The Department's investment policy was adopted on January 21, 2014. Funds in excess of current Sewage Disposal System requirements are invested by the Department in accordance with State law. The Department may invest in direct obligations of the United States, obligations of an agency or instrumentality of the United States, repurchase agreements, mutual funds that invest solely in such government obligations and repurchase agreements, certain grades of commercial paper, bankers acceptances of United States banks, and certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation.

The investment policy purpose is to endeavor to accumulate a pool of assets sufficient to build capital for future use with the corresponding obligations to support near-term and long-term needs of the Department. The investment policy attempts to maintain and protect investment principal while striving to maximize total return on the portfolio consistent with risk limitations, pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended. The Department has not experienced material investment-related losses in any Department managed funds. As of June 30, 2014, the Sewage Disposal Fund held investments with a total market value of approximately $398,050,105, the longest investment had a maturity date of June 20, 2018.

**Rates**

Under the District Court Orders, the Board of Water Commissioners has the authority to establish rates for wholesale sewage disposal service. In accordance with Act 94 and the November 4, 2011 Order, the retail rates charged to customers in the City are subject to review by and concurrence of City Council. The Board of Water Commissioners has the sole authority to establish rates for the wholesale suburban customers. In accordance with the February 11, 2011 Order, a super majority of at least five Board of Water Commissioners member votes is required to approve the wholesale customer rates and recommend to the City Council the retail rates to be charged to the City retail customers. Certain of the wholesale contracts have specific notice requirements relating to rate changes, generally 90 or 120 days. At least one public hearing is required to be held prior to action on rate changes. No other statutory procedures are required as a condition precedent to a rate change. Rates, once established, generally become effective the July 1 following their establishment.

Under the Bond Ordinance, the City covenants that the rates shall be fixed and revised from time to time as may be expected to be necessary to produce the greater of (1) the sum of (a)

administrative and operation and maintenance expenses of the Sewage Disposal System, (b) debt service on Senior Lien DWSD Bonds, (c) creation and maintenance of a debt service reserve for Senior Lien DWSD Bonds, (d) debt service on Junior Lien DWSD Bonds, if any, including maintenance of a reserve therefor to the extent required by the Bond Ordinance, (e) creation and maintenance of an extraordinary repair and replacement reserve fund; and (f) to provide for such other expenditures and funds for the Sewage Disposal System as the Bond Ordinance and Act 94 require, and (2) an amount equal to the Required Combined Coverage where the numerator is the Net Revenues projected for the Fiscal Year of calculation and the denominator is the Indebtedness coming for such Fiscal Year. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS – Rate Covenant." The City has covenanted at all times to fix and maintain such rates for services furnished by the Sewage Disposal System as shall be sufficient to provide for the foregoing. As a matter of operating policy, the Department has established a debt service coverage policy of fixing rates so that net revenues exceed the debt service coverage requirements of the Bond Ordinance by at least 15 percentage points. This policy may be changed from time to time by the Board of Water Commissioners without approval of Bondholders or any other party.

Under Act 94, rates must be fixed and revised as necessary to comply with the Bond Ordinance. The contracts with wholesale customers typically provide that rates be reasonable in relation to the costs incurred. The Department maintains a small staff to review and make recommendations on rates for water and sewage service. The Department routinely retains outside consultants to supplement the efforts of its staff. Act 94 also provides that the rates charged by the Sewage Disposal System should not be subject to supervision or regulation by any State bureau, board, commission or like agency or instrumentality of the State. In addition, the November 4, 2011 Order specifies that the City Council, which previously approved all rates, has the authority to approve only rates charged to retail customers in the City, but has no authority to review or approve rates charged to wholesale suburban customers. See "THE DEPARTMENT – Organization."

Under the new, simplified rate-setting structure established by the Rate Simplification Initiative, each wholesale customer's share of total sewer system costs is based on its historical average share of the costs to operate and maintain the system. The Department and its direct wholesale contract customers reviewed information about shares in prior years and agreed on percentages representative of each customer's appropriate share of sewer system costs (the "Shares"). Outside of the written terms of the existing wastewater contracts, the Department and each of its wholesale customers orally agreed that the first rate period using the simplified rate-setting structure begins Fiscal Year 2015, and will be incorporated into the model contracts that the Department is negotiating with its wholesale customers. Shares are locked in for an initial three year period, and no customer's Share will be changed during this period. At the end of the three-year period, the Department and its customers will review the Shares to determine if changes are needed. Each wholesale customer's revenue requirement will be established by multiplying sewer system costs attributable to customers by the customer's Share. That revenue requirement will be billed in twelve equal installments. Wholesale customers are billed monthly, and all costs from wholesale customers are recovered via fixed monthly charges. The current sewage disposal rates became effective July 1, 2014, and were set at levels expected to generate 4% more revenue than the previous year's rates. As noted in the table below, the impact of the new rates on different customers and customer classes does not directly align with the overall 4%

72

impact on the Sewage Disposal System. Specific customer and customer class rate impacts are based on additional factors, including cost allocation results, changes in sales and revenue bases, and expected collection rates.

The Board of Water Commissioners has approved the new rate schedule for the suburban wholesale customers and the revenue requirement and the City Council has approved the rates for the City retail customers proposed by the Board of Water Commissioners. The new sewage disposal rates took effect on July 1, 2014. See "DEPARTMENT FINANCIAL OPERATIONS – Projected Operations for Fiscal Year 2015 through 2019." The following table presents a summary of the annual changes in the effective average sewage disposal rates charged by the Department for the last ten years.

### Change in Effective Sewage Disposal Rate[*]

| Date of Implementation | City Retail | Average Suburban Wholesale |
|---|---|---|
| 7/01/2003 | 8.9% | 7.8% |
| 7/01/2004 | 16.2 | 4.5 |
| 7/01/2005 | 5.9 | 3.0 |
| 7/01/2006 | 7.8 | 5.0 |
| 7/11/2007 | 7.6 | 0.0 |
| 9/03/2008 | 10.1 | 2.5 |
| 7/01/2009 | 15.8 | 8.2 |
| 7/01/2010 | 8.4 | 3.7 |
| 7/01/2011 | 11.0 | 11.0 |
| 7/01/2012 | 9.9 | 6.7 |
| 7/01/2013 | 4.2 | 3.7 |
| 7/01/2014 | 9.1 | 2.8 |

_____

[*] Data for this table originally reflected changes in the average unit charge per thousand cubic feet of billed volume (water sales for retail, metered wastewater for wholesale); includes sewage and storm drainage treatment charges. Due to Rate Simplification, such metric is not meaningful and data for recent years reflects change in revenue requirement compared to baseline pro forma revenue.

SOURCE: The Department.

Prior to rate simplification, the Department conducted an annual "look-back" adjustment to amounts billed to customers and customer classes. In concert with establishing the Rate Simplification Initiative, a final look-back adjustment for Fiscal Years 2008 through 2012 was computed, and was implemented through the current rates. The implementation amounts will remain in effect through Fiscal Year 2016. As part of the Rate Simplification Initiative, the look-back process has been eliminated.

### Sewage Rate Comparison

The following chart presents a comparison of the current charges for residential water supply and sewage disposal services in the 50 largest U.S. cities. Note that such comparisons are not always comparable as the elements included in charges for these services are often inconsistent amongst communities. For instance, several of these communities listed below

recover some portion of their sewage disposal services through other means, such as property taxes and special assessments. In addition, several of these communities (including the City) recover costs associated with stormwater drainage in their sewer rate schedules, while others either do not yet have such costs or recover them through other means. Investors are encouraged to review these survey reports in their entirety to fully understand the context of the comparisons.

As shown in the following chart, the survey indicates that current charges for residential sewage disposal services in the City are generally consistent with the average rates in effect in comparably sized cities. The average increase in charges for these communities since Fiscal Year 2001 has been over 6% annually (or more than two and a half times the rate of inflation) illustrating a trend in the industry requiring communities to address increased environmental and infrastructure challenges. The Department anticipates increasing rates as necessary to continue the funding of the CIP and expects that such increases will be comparable to those in other large metropolitan areas of the country that have wastewater systems of comparable age and are facing infrastructure challenges similar to those of the System.

*[Remainder of Page Intentionally Left Blank]*

## Comparison of Annual Residential Water and Sewage Charges in the 50 Largest U.S. Cities



| City | Charge |
|---|---|
| Atlanta | $194.42 |
| Seattle | $177.93 |
| San Francisco | $148.77 |
| Portland | $125.78 |
| New York | $123.54 |
| San Diego | $107.68 |
| Boston | $103.77 |
| Kansas City | $98.94 |
| Austin | $97.78 |
| Virginia Beach | $95.25 |
| Cleveland | $91.24 |
| Washington, D.C. | $89.43 |
| Oakland | $88.37 |
| Houston | $85.50 |
| Colorado Springs | $85.14 |
| Jacksonville | $80.41 |
| Columbus | $78.57 |
| Raleigh | $77.04 |
| Louisville | $76.80 |
| Baltimore | $74.96 |
| Los Angeles | $73.13 |
| Philadelphia | $72.79 |
| Indianapolis | $71.35 |
| DETROIT | $70.89 |
| Charlotte | $70.87 |
| Sacramento | $69.49 |
| Minneapolis | $69.30 |
| San Jose | $69.11 |
| Tucson | $69.06 |
| Milwaukee | $68.50 |
| Nashville | $67.31 |
| Tulsa | $66.61 |
| Dallas | $64.11 |
| Fort Worth | $62.46 |
| Omaha | $60.25 |
| Oklahoma City | $60.07 |
| Long Beach | $59.36 |
| San Antonio | $56.37 |
| Mesa | $56.05 |
| Arlington | $55.55 |
| Wichita | $52.97 |
| Denver | $50.14 |
| Miami | $49.62 |
| Albuquerque | $47.34 |
| Las Vegas | $46.80 |
| Fresno | $46.38 |
| Phoenix | $45.01 |
| Chicago | $41.40 |
| El Paso | $40.14 |
| Memphis | $27.46 |

Legend: Water, Sewer

*Assumes 7,500 gallons (or 1,000 cubic feet) monthly usage and a 5/8" (or nearest equivalent) meter size. Actual average use will vary by utility. Rates effective April 2, 2013*

Source: 50 LARGEST CITIES WATER/WASTEWATER RATE SURVEY, A Black & Veatch 2012/2013 Report

## DEPARTMENT FINANCIAL OPERATIONS

**Summary of Historical Revenues and Expenses**

The table below shows historical revenue and expenses of the Sewage Disposal System for each of the five Fiscal Years ended June 30, 2009 through June 30, 2013. Although Fiscal Year 2014 has been completed, actual financial data is not yet available. Estimated results for Fiscal Year 2014 are discussed below and included as the first year of the projection period. See "—Projected Operations for Fiscal Year 2014 through 2019" below. Net Revenues are derived from audited financial statements of the Sewage Disposal Fund for Fiscal Years ended June 30, 2009 through June 30, 2013. Financial statements and notes thereto for the Fiscal Year ended June 30, 2013, together with the auditors' report thereon, are included in APPENDIX D.

Act 94 defines "net revenues" as the revenues of a public improvement remaining after deducting the reasonable expenses of administration, operation, and maintenance of the public improvement. The Department's financial statements are prepared on an accrual basis in accordance with its financial reporting obligations. Accordingly, the results summarized in the following table follow a "modified cash" approach of depiction, designed to adjust financial statement based accrual accounting figures to more closely depict net revenues as defined under Act 94.

The results summarized in the following table follow a "modified cash" approach of evaluating revenues and revenue requirements. This approach attempts to align recognition of performance on a common service period basis. For instance, revenues for June 2013 generally reflect bills issued in July 2013, under the assumption that meters are read at the end of the month and billed early in the subsequent month. Operating expenses are reflected as incurred, but include accrual of amounts not yet paid. The "modified cash" approach does not include the accrual of longer term elements that are contained in the Department's accrual basis financial statements; nor does it generally reflect recognition of activity that was related to cash receipts or disbursements in prior years. Because many of these individual elements are derived from the accrual basis financial statements, the summary below will not present a precise cash basis statement.

*[Remainder of Page Intentionally Left Blank]*

## Summary of Historical Revenues and Expenses (Unaudited)
## Fiscal Years 2009-2013

|  |  | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|---|
|  |  | 2009 | 2010 | 2011 | 2012 | 2013 |
|  | Operating Revenues |  |  |  |  |  |
| 1 | Wholesale Service Revenue (a) | 205,234,773 | 171,694,402 | 219,126,517 | 245,449,282 | 219,727,266 |
| 2 | Retail Service Revenue (a) | 164,978,185 | 166,581,001 | 166,951,437 | 164,334,364 | 190,846,578 |
| 3 | Industrial Specific Service Revenue (a) | 15,837,847 | 21,847,675 | 20,732,217 | 22,747,141 | 26,665,498 |
| 4 | Subtotal Service Revenue | 386,050,805 | 360,123,078 | 406,810,172 | 432,530,787 | 437,239,342 |
| 5 | Miscellaneous Revenue | 4,075,593 | 5,414,313 | 3,908,904 | 5,124,102 | 3,623,918 |
| 6 | Non-Operating Revenue (b) | 20,833,718 | 5,881,982 | 3,248,513 | 6,816,034 | (200,179) |
| 7 | Total Revenue | 410,960,116 | 371,419,373 | 413,967,589 | 444,470,922 | 440,663,081 |
| 8 | Operation and Maintenance Expenses (c) | 195,530,393 | 197,304,096 | 230,810,741 | 217,023,586 | 209,785,082 |
| 9 | Net Operating Revenues | 215,429,723 | 174,115,277 | 183,156,847 | 227,447,336 | 230,877,999 |
|  | Debt Service Requirements |  |  |  |  |  |
| 10 | Senior Lien Bonds | 117,875,550 | 117,160,400 | 113,234,500 | 104,581,000 | 133,476,800 |
| 11 | Senior and Second Lien Bonds | 168,206,747 | 173,536,200 | 173,189,300 | 166,788,600 | 188,444,100 |
| 12 | All Bonds, Including SRF Junior Lien | 195,544,837 | 200,985,100 | 209,063,900 | 203,092,300 | 225,222,900 |
| 13 | Net Revenues After Debt Service | 19,884,886 | (26,869,823) | (25,907,053) | 24,355,036 | 5,655,099 |
| 14 | Pension Obligation Certificates | 5,190,100 | 5,481,500 | 5,896,300 | 6,232,100 | 6,568,200 |
| 15 | Net Available for Other Purposes | 14,694,786 | 14,694,786 | 14,694,786 | 14,694,786 | 14,694,786 |
|  | Debt Service Coverage (d) |  |  |  |  |  |
| 16 | Senior Lien Bonds | 1.83 | 1.49 | 1.62 | 2.17 | 1.73 |
| 17 | Senior and Second Lien Bonds | 1.28 | 1.00 | 1.06 | 1.36 | 1.23 |
| 18 | All Bonds, Including SRF Junior Lien | 1.10 | 0.87 | 0.88 | 1.12 | 1.03 |

*(a) Net of bad debt expense*
*(b) Excludes non-cash items such as changes in derivative values and capital contributions.*
*(c) Excludes Net OPEB obligation and other elements that do not impact net revenues as defined by the Ordinance. See below.*

| | *Operation and Maintenance Expense* | | | | | |
|---|---|---|---|---|---|---|
| 19 | *Normal annual "cash" operations* | *195,530,393* | *197,304,096* | *230,810,741* | *217,023,586* | *209,785,082* |
| 20 | *Net OPEB obligation* | *9,056,245* | *12,527,602* | *12,751,799* | *13,632,242* | *13,609,015* |
| 21 | *Nonrecurring capital asset adjustments* | *16,152,869* | *0* | *3,687,227* | *1,700,000* | *36,970,235* |
| 22 | *Total F/S Operating Expense* | *220,739,507* | *209,831,698* | *247,249,767* | *232,355,828* | *260,364,332* |

*(d) Computed consistent with Rate Covenant basis for rate determination purposes. Not applicable for purposes of Additional Bonds Test calculations.*

SOURCE: The Department

# Fiscal Year 2009-2013 Operations

The following information summarizes the financial operations of the Sewage Disposal System in Fiscal Years 2009 through 2013.

### Revenues

As indicated in the above table, Sewage Disposal System service revenues from rates and charges, net of bad debt expense, have increased approximately $51 million, or 13%, since Fiscal

Year 2009. This increase is primarily attributable to rate increases during that period, as "billable" wastewater volumes in Fiscal Year 2013 were approximately 20% lower than in Fiscal Year 2009, as well as the varying levels of bad debt expense throughout the period. Bad debt expense is recognized in the Department's financial statements based on an analysis of the size and age of accounts receivable and the expected ability of the Department to collect those receivables. Bad debt expense had the effect of decreasing revenues by $39 million in Fiscal Year 2013. A material portion of this amount, $22 million, is due to an increase in estimated chargebacks from Wayne County for uncollectible liens on property taxes from prior years, for which the City was given an advance. See "DEPARTMENT FINANCIAL PROCEDURES— Collections and Delinquencies." The Sewage Disposal System recorded a bad debt credit (which increased revenue) of approximately $3 million in 2009. Bad debt expense debit figures for Fiscal Years 2010, 2011 and 2012 had the impact of decreasing reported revenues of approximately $16 million, $25 million and $36 million, respectively.

Non-operating revenues experienced a significant decline during the same period, principally due to lower earnings rates on investments.

*Operation and Maintenance Expenses*

Total operation and maintenance expenses in the table do not include expenses associated with accruing liabilities for OPEB, which reflect future cash outlays, nor write-offs of amounts for capital assets that were originally capitalized in prior years (prior cash outlays). Rather these figures are intended to represent actual annual transfers to the Operation and Maintenance Fund to fund the costs of operating the System. These expenses were stable from Fiscal Year 2007 through 2010, before experiencing a significant increase in Fiscal Year 2011. This increase is primarily attributable to enhanced activities at the Plant to address compliance challenges, and a large increase in wet weather flow volumes that adversely affected variable costs of pumping, chemicals and similar charges. Operating expenses declined in both 2012 and 2013, primarily reflecting the initial impacts of the Department's optimization program. Overall, annual operation and maintenance expenses in Fiscal Year 2013 represent an average annual increase of 1.8% compared to those in Fiscal Year 2009. Fiscal Year 2013 operating expenses were over 9% lower than those experienced in Fiscal Year 2011, and the estimates for Fiscal Year 2014 are lower than Fiscal Year 2013. Footnote (c) to the table above reconciles the depiction of operating expenses for purposes of determining Net Revenues with the operating expenses reflected in the audited financial statements. For Fiscal Year 2013, the large "nonrecurring capital asset adjustment" is principally related to the cancellation in 2009 of work on a large CSO project on the Rouge River. After the project was initiated, the Department implemented alternative, less costly strategies to CSO control. The termination of the project led to capital write offs of expenditures related to the original work, with the final adjustments being reflected in Fiscal Year 2013. See "THE DEPARTMENT—Environmental Matters—Affordability Waiver."

The relatively stable cost levels are primarily attributable to the Department's optimization program. Personnel expenses experienced by the Department have declined significantly, consistent with the attrition-based decline in overall staffing levels. See "THE DEPARTMENT—Management Initiatives."

78

A portion of the annual variation in operation and maintenance expenses is associated with the allocation of costs for functions that provide service to both the water and sewer systems. These costs are assigned to the Water Supply System and Sewage Disposal System based on detailed labor distribution systems and overall management policy, and will naturally fluctuate based on where maintenance and related activities are focused. The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate this issue and that its financial accounting systems accurately report activity for this matter. See "DEPARTMENT FINANCIAL PROCEDURES—Budget and Accounting Matters."

### Non-Operating Revenue

The category "Non-Operating Revenues (Expenses)" reflected in the financial statements is a "net" amount and has historically represented relatively small amounts of non-operating income or certain non-cash write offs. In 2009, this category also included "contributions" of assets (including principal forgiveness on SRF Bonds augmented with ARRA funds) and other non-monetary amounts. This category also includes certain amounts related to changes in the net valuation of swap agreements from year to year. These amounts are not included in the analysis of current revenues and expenses (particularly for purposes of calculating coverage levels) as they generally do not have an effect on the amount of cash available for Sewage Disposal System operations or debt service. The presentation in the preceding table is intended to reflect cash elements only and does not reflect any non-cash Non-Operating Revenues (Expenses) elements.

### Debt Service Coverage

Debt service coverage levels have been lower than planned in recent years. Debt service coverage in Fiscal Years 2010 and 2011 was below 1.1 for Second Lien DWSD Bonds and below 1.0 for SRF Junior Lien DWSD Bonds. The lower than planned debt service coverage levels occurred as a result of, among other things, revenues falling short of targeted levels each year, lower than anticipated wet weather flows in Fiscal Year 2010 and higher than anticipated bad debt expense in Fiscal Year 2011. Operation and maintenance expenses in Fiscal Year 2011 were higher than budgeted as the Department initiated efforts to address compliance issues and experienced a large increase in wet weather flows. Debt service in Fiscal Years 2009 and 2010 was higher than planned as a result of the credit market crisis of 2008, which required adjustments to the Department's debt portfolio that increased the interest expense. Further, the absence of a look-back during this period resulted in a lost opportunity to augment revenues to meet coverage levels. Despite coverage levels of less than 1.0 in Fiscal Years 2010 and 2011, the Department made timely debt service payments by utilizing operating reserve funds.

Debt service coverage ratios improved in Fiscal Year 2012, and were sufficient to fund annual debt service requirements in Fiscal Year 2013. However, these amounts still did not achieve the Department's forecasted amounts, primarily due to continuation of some of the trends experienced in 2010 and 2011, although to a lesser extent. Debt service coverage for 2014 is expected to show continued improvement. See "—Fiscal Year 2014 Estimate" and "—Projected Operations for Fiscal Year 2014 through 2019."

*Performance Summary*

The Department has made adjustments to its financial planning approaches and assumptions to avoid future poor performance. The fact that suburban wholesale rates are comprised of fixed monthly charges under the Rate Simplification Initiative is a key element to assure stable revenue performance from these customers. For retail customers in the City of Detroit, projected sales volumes and bad debt expenses reflect more conservative assumptions. The Department continues to provide monthly financial summary reports to the Board of Water Commissioners. Beginning in April 2013, the Board of Water Commissioners Finance Committee (the "Finance Committee") began receiving an expanded monthly agenda binder with supporting financial and operational reports. The Finance Committee binder is distributed publicly through the wholesale customer outreach portal. Beginning in May 2013, the Finance Committee began presenting a written synopsis of the monthly Finance Committee meetings held during the regular Board of Water Commissioners meetings. Those reports are attached to the Director's compliance report, available on the Department's website. The Board of Water Commissioners actively reviews these materials to monitor the Department's performance. The management team utilizes this information to make any necessary changes during the year.

**Fiscal Year 2014 Estimate**

The Department has developed a forecast of estimated results for Fiscal Year 2014, which concluded on June 30, 2014 (the "Fiscal Year 2014 Estimate"). The forecast is based on a review of actual reported information regarding revenues, expenditures, and cash receipts and disbursements during the first ten months of the Fiscal Year. It also reflects estimated activity during the final two months of the Fiscal Year, derived from review of preliminary data and discussions with Department managers. The Fiscal Year 2014 Estimate follows the "modified cash" basis, consistent with the manner in which the historical revenues and expenses were presented. See "—Summary of Historical Revenues and Expenses" above. The Department has analyzed actual cash receipts and disbursements in developing the Fiscal Year 2014 Estimate.

Actual Fiscal Year 2014 revenues are estimated to be significantly below budgeted levels, due in part to lower than expected "billable" wastewater volumes and in part to higher than expected levels of bad debt expense. The Department estimates a negative revenue variance (compared to budget levels) of $54 million for Fiscal Year 2014.

The Fiscal Year 2014 actual operating expenses include a contingency allowance of $10 million for unidentified amounts. Even after including this contingency, operating expenses are estimated to be over $11 million under budget. Other specifics regarding the Fiscal Year 2014 Estimate are discussed in the projected operations summary and related exhibits. See "—Projected Operations for Fiscal Year 2014 through 2019."

**Fiscal Year 2015 Budget**

The Board of Water Commissioners adopted the Fiscal Year 2015 budget for the Sewage Disposal System on January 21, 2014, and it has been forwarded to the City to be included in the City's budget. The Fiscal Year 2015 budget contains expenditures or revenue requirements totaling $528.2 million, a decrease of approximately $1.9 million compared to the Fiscal Year

2014 budget. The budgeted operation and maintenance expenses for Fiscal Year 2015 actually reflect a decrease of almost $5 million when compared with the Fiscal Year 2014 budget. This decrease is principally related to continuation of the Department's optimization program and the accompanying attrition of employees and resulting lower personnel costs. The personnel cost savings are somewhat offset by increased budgets for contractual services and related activities to support the overall optimization program. The budgetary operating cost savings are somewhat offset by increased budgeted amounts for debt service requirements, which reflected an early estimate of the anticipated debt service on the potential 2014 DWSD Refinancing Bonds.

Despite an overall reduction in the budgeted revenue requirement, the budget also recognizes that revenues from sewage disposal services would be lower in Fiscal Year 2015 than anticipated by the Fiscal Year 2014 budget, due to more conservative estimates of sales to customers. The Fiscal Year 2015 budgeted revenues match the overall revenue requirements of $528.2 million. The Fiscal Year 2015 budget also reflects a decrease in miscellaneous and non-operating revenue. As a result, the Fiscal Year 2015 rates were designed to achieve an increase in revenue of 4% in Fiscal Year 2015 compared to the rates developed to support the Fiscal Year 2014 budget.

**Projected Operations for Fiscal Year 2014 through 2019**

The projected financial operations of the Sewage Disposal System shown in the table titled "Summary of Projected Revenues and Additional Revenue Requirements For Fiscal Years 2014-2019" below, include assumptions relating to inflation and to costs associated with the CIP, including debt service on additional bonds and additional operating costs associated with operating new facilities, all assuming application of current federal pollution control standards and compliance schedules and requirements under the Clean Water Act and the Clean Air Act. The projections in the accompanying table follow the "modified cash" basis. See "—Summary of Historical Revenues and Expenses" above. The Department has analyzed actual cash receipts and disbursements in developing these projections.

Subsequent to preparation and adoption by the Board of Water Commissioners of the Fiscal Year 2015 Budget, significant developments have occurred that will impact the Department's financial planning and results. These developments create the need to revisit the assumptions included in the Fiscal Year 2015 Budget to establish a more appropriate baseline to project future operations.

The projected revenues shown in the table anticipate normal weather conditions and are based on an analysis of recent historical trends, which indicate a leveling off of recent declines in billed wastewater volumes. In recent years, revenues from suburban wholesale customers have been quite variable, as the majority of the revenues for this class were based on commodity rates applied to the level of metered wastewater volumes. Since the Sewage Disposal System is largely a combined sewer system, the level of metered volumes is largely impacted by the occurrence of wet weather events. In dry periods, revenues from this class have always been lower than expected, and the opposite in wet periods. Recent periods have been dry. Under the Rate Simplification Initiative, metered volumes will not impact revenues. The entirety of the revenues for this class will be billed in equal fixed monthly charges, ensuring that the actual billed revenues will precisely match the budgeted billed revenues. The accompanying projections

of suburban wholesale revenue follow this principal, but also assume a bad debt expense equivalent to the amount owed to the Department by the city of Highland Park. See "DEPARTMENT FINANCIAL PROCEDURES—Collections and Delinquencies."

Projected revenues for retail customers reflect more conservative assumptions regarding sales of services to customers and the collectability of those sales. A significant portion of the revenues billed to retail sewer customers are related to commodity charges applied to metered water volumes. From February through April 2014, the Department continued a detailed review of billed volumes for the retail class, and determined that originally projected Fiscal Year 2015 sales levels were not likely to be achieved. As a result, the revised Fiscal Year 2015 retail sales volumes in the accompanying projections were reduced by over 5%. This figure establishes a baseline for future projections, which then assume an annual decline of 2.5% for the balance of the five-year projection period. The Department reviewed additional data regarding receivable collections from the retail class and modified assumptions on this element. The accompanying projections of revenue assume a bad debt expense equivalent to 17% of billed revenues throughout the five-year projection period.

The projected revenue required reflects the minimum additional amounts that are needed to meet the requirements of the Bond Ordinance and the policies enacted by the Board of Water Commissioners, given the various assumptions. The financial plan summarized by these projections is designed to enhance the Sewage Disposal System's balance sheet, reverse the erosion in net assets that has occurred in recent years, and improve the Sewage Disposal System's liquidity position. The Department has embraced this planning strategy, which will result in higher debt service coverage ratios, as indicated in the following table.

The operation and maintenance expense projection for Fiscal Year 2014 reflects the Fiscal Year 2014 Estimate. Even after considering the $10 million forecast contingency amount, the Department estimates that operation and maintenance expenses will reflect approximately 95% of the original budget. The Fiscal Year 2015 operation and maintenance expense estimate in the accompanying projections is based in part on the Fiscal Year 2015 Budget, but also reflects significant modifications in assumptions, many of which emerged in the development of the City's Plan of Adjustment.

The Fiscal Year 2015 estimated operation and maintenance expenses serve as a base for the remaining years. The projections include continued recognition of savings resulting from implementation of the Department's optimization program, including personnel cost savings through attrition and initial efficiencies. The projected operation and maintenance expenses reflect the modified treatment of pension contributions and reimbursement from the Sewage Disposal System to the City for certain other fringe benefits envisioned by the Plan of Adjustment. Specifically, the projected personnel operating expenses for the Sewage Disposal System reflect an accelerated repayment of pension reimbursement obligations, but also reflect a reduction to the budgeted fringe benefit rates. See APPENDIX A — FEASIBILITY CONSULTANT'S REPORT.

The total debt service includes the amounts due on all outstanding DWSD Bonds, estimated amounts on the potential 2014 DWSD Refinancing Bonds that are being issued to fund Fiscal Year 2015 expenditures in the CIP, and estimated amounts on a projected bond sale in

Fiscal Year 2016 to fund expenditures in the remaining years of the CIP. The projected Net Revenues are divided by the applicable debt service to show estimated coverage. The available balance is applied to non-operating expenses, including payments related to the System's share of the City's POCs (in Fiscal Year 2014) and thereafter, the Department's allocable share of amounts due on the New B Notes, as described in the Plan of Adjustment, renewals and replacements, operating reserves, the Extraordinary Repair and Replacement Reserve Fund and the portion of the CIP funded with revenue financed capital. See "RISK FACTORS—Financial Impacts of the Plan of Adjustment."

The projections set forth in the following table are intended as "forward-looking statements." The Department cautions that these projections may and often do differ materially from actual results. Some of the factors that could cause actual results to differ materially from those projected are the Department's ability to execute the CIP as scheduled and within budget, regional climate and weather conditions, and adverse legislative, regulatory or legal decisions (including environmental laws, regulations and the confirmation of the City's Plan of Adjustment) affecting the Department's ability to manage the Sewage Disposal System.

As noted previously, the projections summarized in the following table follow a "modified cash" approach of evaluating revenues and revenue requirements. In past years, at times significant variances between "modified cash" representations and actual cash flows for certain periods could occur, particularly within the suburban wholesale class. These differences occurred in part because of volatility in the commodity based revenue model, and in part because most of the large suburban customers were billed on a quarterly basis. The fixed monthly element of the Rate Simplification Initiative is expected to eliminate the variances experienced in the past and result in cash flow stability to the Sewage Disposal System.

*[Remainder of Page Intentionally Left Blank]*

## Summary of Projected Revenues and Additional Revenue Requirements
## For Fiscal Years 2014-2019

| | Fiscal Year Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| | *unaudited estimate* | | | | | |
| Operating Revenue Under Existing Rates (a) | 473,760,300 | 501,524,200 | 495,975,100 | 490,563,200 | 485,287,400 | 480,145,800 |
| Projected Revenue from Rate Increases (b) | | | | | | |
| FY 2016:   4.0% | | | 19,839,000 | 19,622,500 | 19,411,500 | 19,205,800 |
| FY 2017:   4.0% | | | | 20,407,500 | 20,188,100 | 19,974,200 |
| FY 2018:   4.0% | | | | | 20,995,400 | 20,773,000 |
| FY 2019:   4.0% | | | | | | 21,603,900 |
| Total Projected Revenue from Sewer Rates | 473,760,300 | 501,524,200 | 515,814,100 | 530,593,200 | 545,882,400 | 561,702,700 |
| Miscellaneous Operating Revenue | 3,929,400 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| Projected Non-Operating Revenue | 1,371,300 | 3,336,100 | 3,871,400 | 4,166,900 | 3,597,200 | 2,856,100 |
| Total Projected Revenue | 479,061,000 | 509,860,300 | 524,685,500 | 539,760,100 | 554,479,600 | 569,558,800 |
| Operation and Maintenance Expense (c) | 206,370,000 | 223,230,800 | 228,964,300 | 222,216,000 | 225,302,000 | 225,256,700 |
| Projected Net Operating Revenues | 272,691,000 | 286,629,500 | 295,721,200 | 317,544,100 | 329,177,600 | 344,302,100 |
| Senior Lien Debt Service (d) | 130,193,900 | 140,528,000 | 163,795,900 | 164,367,000 | 164,422,200 | 163,905,400 |
| Second Lien Debt Service (d) | 63,128,600 | 62,769,800 | 54,504,600 | 54,520,500 | 54,513,700 | 54,755,500 |
| SRF Debt Service (d) | 37,123,800 | 37,745,400 | 37,877,100 | 37,822,900 | 37,850,700 | 37,899,300 |
| Total Debt Service (d) | 230,446,300 | 241,043,200 | 256,177,600 | 256,710,400 | 256,786,600 | 256,560,200 |
| Projected Senior Lien Debt Service Coverage (e) | 209% | 204% | 181% | 193% | 200% | 210% |
| Projected Second Lien Debt Service Coverage (e) | 141% | 141% | 135% | 145% | 150% | 157% |
| Projected Total Debt Service Coverage (e) | 118% | 119% | 115% | 124% | 128% | 134% |
| Unrestricted Balance for CIP and Other Purposes | 42,244,700 | 45,586,300 | 39,543,600 | 60,833,700 | 72,391,000 | 87,741,900 |
| Projected Application of Balance | | | | | | |
| POC / Note B Non-Operating Payments | 6,232,100 | 5,073,900 | 1,826,000 | 1,826,000 | 1,826,000 | 1,826,000 |
| Allocated Professional Service Fees from BK | 0 | 12,500,000 | 0 | 0 | 0 | 0 |
| Deposits to Unrestricted Reserves | 0 | 2,265,700 | 5,789,800 | 2,615,100 | 5,221,000 | 4,366,800 |
| Available for Capital Improvements | 36,012,600 | 25,746,700 | 31,927,800 | 56,392,600 | 65,344,000 | 81,549,100 |

(a) Revenues for 2014 reflect rates in effect during 2014. Revenues for 2015 - 2019 reflect rates in effect as of July 1, 2015.

(b) Projected additional revenue is developed based upon both projected increases in operation and maintenance expense and debt service coverage and certain other requirements which must be met in order to issue bonds to finance the CIP.

(c) Assumes general inflation rate of 2.5% annually after Fiscal Year 2015.

(d) Does not assume any change in debt service associated with the 2014 DWSD Refinancing Bonds. Assumes bond sales in 2015 and in subsequent years at an annual interest rate of 5.5%. See "THE CAPITAL IMPROVEMENT PROGRAM: The CIP Funding" Although the Department may issue Additional Sewer System Bonds as Senior Lien or Second Lien Bonds, for purposes of this table future debt is assumed to be issued as Senior Lien Bonds.

(e) Computed consistent with Rate Covenant basis for rate determination purposes. Not applicable for purposes of Additional Bonds Test calculations.

SOURCE: THE FOSTER GROUP, LLC.

## Future Issuance of 2014 DWSD Refinancing Bonds

After the potential issuance of the 2014 DWSD Refinancing Bonds, the Department expects to issue DWSD Additional Bonds in Fiscal Year 2016 to secure approximately $185 million of proceeds to finance additional expenditures in the CIP. The Department may issue DWSD Additional Bonds beyond the Fiscal Year ending June 30, 2016, to provide for future capital needs of the Sewage Disposal System. See "THE CAPITAL IMPROVEMENT PROGRAM." The Department intends to adjust rates, as appropriate and consistent with the Bond Ordinance and the Board of Water Commissioners rate covenant policy. The Department continues to pursue plans to issue SRF Junior Lien DWSD Bonds to finance other CIP expenditures, which may reduce the projected issuance of other DWSD Bonds.

**PENSION PLAN CONTRIBUTIONS**

**Introduction**

As employees and retirees of a City department, Department employees and retirees participate in GRS with other non-uniformed City employees and retirees. The Department's historical financial information presented through June 30, 2013 includes the plan provisions and financial commitments of the Department under GRS. GRS consists of two components: (i) the benefits accrued under GRS in effect as of June 30, 2014 ("Prior GRS"), which benefits are substantially modified in the Plan of Adjustment, and (ii) the benefits accrued on and after July 1, 2014 ("New GRS"). Under New GRS, the rate of future benefit accruals is reduced from the rates under Prior GRS, Department employees are required to contribute toward the cost of their pension benefits, certain safeguards to prevent future underfunding of New GRS are put into place, and new governance provisions designed to protect the integrity of GRS going forward are adopted.

**Treatment of Prior GRS under the Plan of Adjustment**

The provisions of the Plan of Adjustment addressing GRS provide that, on the effective date of the Plan of Adjustment, the City will assume the obligations related to the already accrued benefits under GRS as those benefits will have been modified in the Plan of Adjustment (as described below). This means that the City will not seek to terminate GRS, although Prior GRS was closed to new participants effective June 30, 2014 and vested active employees will not continue to accrue additional pension benefits under the terms and conditions of the benefit formula in effect on that date (*i.e.*, Prior GRS was "frozen" effective June 30, 2014). It is contemplated that the City, including the Department, will make contributions to Prior GRS through June 30, 2023 to fund the payment of benefits accrued prior to July 1, 2014, as modified. The Department will continue to make contributions designed to fund its allocable share of the UAAL of Prior GRS through the period ending June 30, 2023 as described in more detail below. After June 30, 2023, the City and the Department will be required to contribute all amounts necessary to fund the modified accrued pensions of members regardless of the actual investment performance of the assets of GRS. The City will make the contributions from its available cash and, during the ten-year period from July 1, 2023 through June 30, 2033, from approximately $188 million in proceeds from the Detroit Institute of Arts settlement and State contributions as described in the Plan of Adjustment (the "Outside Funding"). The City estimates that it will be required to contribute approximately $442 million from its available cash during this 10-year period.

The benefits accrued under Prior GRS are significantly underfunded. In particular, as of June 30, 2013, the GRS reported that it was 70.0% funded with a UAAL of $1.084 billion out of $3.609 billion in accrued liabilities based upon an assumed rate of return of 7.9% and the actuarial value of assets held by GRS smoothed over a seven year period. The City believes that the 7.9% investment return rate assumption utilized by GRS was too high and the seven-year smoothing period was too long, thus, that GRS' actual funding is significantly less than the 70% reported by GRS. As part of the Plan of Adjustment, the City has developed the following approach to restructuring Prior GRS: (a) the City has set a goal of achieving by June 30, 2023 a 70% funded status for the benefits accrued under Prior GRS, based upon an assumed investment

rate of return (net of expenses) of 6.75% (rather than 7.9%) and the actual market value of assets (rather than a smoothed actuarial value of assets); and (b) the City has determined that it is necessary to cut pension benefits under Prior GRS.

The provisions of the Plan of Adjustment relating to GRS contemplate that, during the period beginning July 1, 2014 and ending June 30, 2023, contributions of over $700 million will be made to GRS. These contributions include the Department contributions and a portion of $816 million in Outside Funding. Because GRS participants accepted the Plan of Adjustment and on the assumption that all of the Outside Funding is made available, the cuts in pension benefits under Prior GRS are anticipated to include (a) a 4.5% reduction in current and future monthly pension payments, (b) the elimination of all cost-of-living adjustments ("COLAs"), and (c) recoupment of excess earnings allocated to members' annuity savings fund accounts between 2003 and 2013.

The pension benefit reductions discussed in the preceding paragraph may be restored, in whole or in part, if the funding level of Prior GRS significantly improves (that is, Prior GRS achieves a funding level of 75% or more). This restoration may occur if (a) the investment returns on Prior GRS assets are greater than certain specified thresholds or (b) other actuarially-determined factors contribute to improve the funding level of Prior GRS.

**Implications of the Changes to Prior GRS for the Department**

The provisions of the Plan of Adjustment relating to GRS provide that the Department (including the Water Supply System and Sewage Disposal System) will contribute the currently-calculated full amount of its allocated UAAL on a market value of assets basis over a nine year period, plus $2.5 million per year in administrative expenses. That is, the total accrued liabilities of Prior GRS, as modified by the Plan of Adjustment, was determined, then the amount of such reduced, accrued liabilities allocable to the Department were calculated, and the Department will pay this amount to Prior GRS over the nine-year period ending June 30, 2023. The amount to be paid by the Department is the amount determined to be necessary to fully fund, by June 30, 2023, all unfunded Prior GRS liabilities allocable to the Department that accrued through June 30, 2014, based on current actuarial calculations. The calculation of the Department's allocated UAAL is based on the June 30, 2013 GRS census data, which reported the following GRS members allocated to the Department: 1,567 active members, 454 terminated vested members, and 2,568 retired members, surviving spouses and dependents in pay status. The amount to be paid by the Department was calculated based on an assumed investment rate of return of 6.75% and takes into account the freeze of accrued benefits under the Prior GRS pension formula as of June 30, 2014.

Based upon level annual payments for the nine Fiscal Years beginning on July 1, 2014 and ending on June 2023, the annual Department contributions to Prior GRS are $42.9 million per year. With the addition of the $2.5 million per year in administrative expenses, the resulting Prior GRS contribution is a total of $408.6 million for the entire nine year period for both the Water Supply System and Sewage Disposal System. The Department will allocate these costs on a pro-rata basis between the Water Supply System and Sewage Disposal System. The Department historically has been expected to account for approximately 30 to 33% of the City's

total contributions to GRS. The required Department funding for Prior GRS under the Plan of Adjustment represents a substantial reduction in the Department's funding contribution. Although the Department will fund its allocable share of this accrued liability over nine years instead of a longer period, it will not pay any more than its actual, full, allocable share of the UAAL of Prior GRS. The contributions by the Department to Prior GRS contemplated by the Plan of Adjustment will be paid from rates that the Department will charge users of its Water Supply System and Sewage Disposal System during the period through June 30, 2023. After the initial nine-year period through June 30, 2023 is completed and certain Outside Funding is received by GRS, the Department will remain responsible for its allocable share of UAAL of GRS but is expected to make very small contributions, if any, to the Prior GRS on account of this liability.

**Relevant Terms of Prior GRS**

Prior GRS is a defined benefit retirement plan with a defined contribution plan feature. Prior GRS provides retirement, disability and survivor benefits to Department employees or former employees and their beneficiaries. As noted above, Prior GRS was closed to employees hired or rehired on or after July 1, 2014. In addition, no employees will earn any benefits under Prior GRS for services performed or compensation earned after June 30, 2014. Prior to July 1, 2014, active members earned benefits under a formula based on final average compensation, service credit and a benefit multiplier. Prior to July 1, 2014, pension benefits for all members of Prior GRS were increased annually by a COLA or "escalator" equal to 2.25% of the original pension amount. Members may retire with full benefits after attaining 30 years of service (25 years for EMS members); age 55 with 30 years of service (if hired after January 1, 1996); age 60 with 10 years of service; or age 65 with 8 years of service. Employees may retire after 25 years of service (and attainment of age 55 for employees hired after 1995) and collect an actuarially reduced retirement benefit.

Prior GRS provides for City and Department contributions at actuarially determined rates that are designed to accumulate sufficient assets to pay accrued benefits under Prior GRS when due. The recommended City and Department contribution rates are determined annually by GRS' consulting actuary using the entry age normal actuarial cost funding method. Significant actuarial assumptions used to compute the City and Department contribution requirements are the same as those used to compute the UAAL. City employees were not required to make contributions to Prior GRS to help pay for their pensions.

In addition, City employees could elect to contribute (a) 0%, (b) 3% of annual compensation up to the Social Security wage base and 5% of any excess over the wage base, (c) 5%, or (d) 7% of their after-tax compensation to an annuity savings fund account ("ASF Account"). Contributions were voluntary for all union and nonunion employees. Effective as of July 1, 2014, ASF Accounts are credited with earnings at the rate of return earned on assets held in GRS; however, the earnings rate credited to a member's ASF Account for any year will be not less than 0% nor greater than 5.25%.

Prior GRS is a mature plan in that there are more members who are retired and receiving benefits than active employee members. As of June 30, 2013, there were approximately 5,364

active GRS members, 12,089 retired GRS members receiving benefits, and 2,395 terminated GRS members entitled to, but not yet receiving, benefits.

**Relevant Terms of New GRS in Effect on and after July 1, 2014**

New GRS is a defined benefit pension plan. New GRS provides retirement and survivor benefits to Department employees or former employees and their beneficiaries. Active members of New GRS earn benefits under a formula based on final average base compensation, service credit for employment on and after July 1, 2014 and a benefit multiplier of 1.5%. Members are vested upon completion of 10 years of service (service with the City prior to July 1, 2014 is taken into account for this purpose). Vested members may retire with full benefits upon attainment of age 62 (with a limited transition period for employees who were age 53 or older as of June 30, 2014). Employees may retire at age 55 with 30 years of service and collect an actuarially reduced retirement benefit. No disability benefits are provided to employees under New GRS. Survivor benefits are payable to a member's spouse or other beneficiary. For each Fiscal Year beginning July 1, 2018 and later, the New GRS pension benefits of retirees who are at least 62 years old and have been receiving benefits for at least 12 months may be increased by a 2% COLA on the original pension amount, provided that the funding level of New GRS projected over a five year period is 100% or greater.

For the nine-year period ending June 30, 2023, the Department will be required to contribute an amount equal to 5% of its employees' base pay to New GRS. Based upon the Fiscal Year 2014 base pay of Department employees, the Department's annual contribution is anticipated to be approximately $3.2 million. A portion of each Department contribution will be credited to a rate stabilization fund established under New GRS which is designed to be used in the event the projected funding level of New GRS falls below 100%. Employees are required to contribute 4% of their base pay on a pre-tax basis to New GRS to fund the cost of their pension benefits.

Employees also may elect to make after-tax voluntary employee contributions of (a) 0%, (b) 3%, (c) 5%, or (d) 7% of their total pay to New GRS. Those contributions will be credited with earnings at the rate of return earned on assets held in GRS; however, the earnings rate credited to a member's voluntary employee contribution account for any year will not be less than 0% nor greater than 5.25%.

The funding objective of New GRS is to establish and receive employer and employee contributions during each Fiscal Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of credited service rendered by employees during the year (the normal cost requirements), and to amortize the unfunded actuarial costs of benefits under New GRS likely to be paid on account of credited service rendered on or after July 1, 2014 and before the first day of the Fiscal Year (the UAAL). In the event the funding level of New GRS projected over a five year period falls below 100%, the 2% COLA described above will not be provided to retirees, the amounts credited to the rate stabilization fund will be used to increase the funding level of New GRS, and employee mandatory contributions will be increased from 4% of base pay to 5% of base pay. Additional actions designed to improve the funding status of New GRS are required if the projected funding level of New GRS falls below 80%. None of

those steps would require the Department to make additional contributions to New GRS during the nine-year period ending June 30, 2023.

New GRS may not be amended by the City prior to July 1, 2023, other than as required to comply with (i) applicable federal law, or (ii) the Plan of Adjustment.

## PENSION-RELATED CERTIFICATES OF PARTICIPATION

The City funded certain UAAL of Prior GRS through creation of the Detroit General Retirement System Service Corporation (the "Service Corporation"). The City is a party to two Service Contracts, dated May 25, 2005 (the "2005 Service Contract") and June 7, 2006 (the "2006 Service Contract" and together with the 2005 Service Contract, the "Service Contracts"), with the Service Corporation. GRS is not a party to any of the Service Contracts.

In 2005, the Service Corporation created a funding trust, which issued Certificates of Participation (the "2005 COPs") evidencing undivided proportionate interests in the rights to receive certain payments to be made by the City under the 2005 Service Contract. A portion of the proceeds of the 2005 COPs was irrevocably paid to GRS, fully funding its UAAL at that time. In 2006, the Service Corporation created a new funding trust, which issued Certificates of Participation (the "2006 COPs" and, together with the 2005 COPs, the "COPs") evidencing undivided proportionate interests in the rights to receive certain payments to be made by the City under the 2006 Service Contract. A portion of the proceeds of the 2006 COPs was used to redeem certain outstanding 2005 COPs and to extend the amortization schedule for repayment of the UAAL obligations. The City also entered into certain interest rate exchange agreements (the "COP Swap Agreements") in conjunction with the issuance of the COPs.

Pursuant to the Service Contracts and the COP Swap Agreements, the City paid certain payments, service charges and other payments, excluding principal (collectively, the "Service Payments") to the Service Corporation. The Service Payments were calculated to be sufficient to allow the Service Corporation to make payments on the COPs. A proportionate share of the Service Payments, including those related to the COP Swap Agreements, was allocated to the Department. For Fiscal Years 2013 and 2014, the Department's share of the Service Payments was $6,945,171 and $5,321,518, respectively.

The Plan of Adjustment provides for the satisfaction in full of claims relating to the COPs in exchange for the receipt of notes denominated as the New B Notes. The definitive documentation governing the New B Notes will provide generally for the following terms:

- *Obligation*: The City's obligations with respect to the New B Notes will be a general and unsecured obligation of the City.

- *Initial Principal Amount*: $632.0 million.

- *Interest Rate*: 4.0% for the first 20 years; 6.0% for years 21-30.

- *Maturity*: 30 years.

- *Amortization*:  Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance.

- *Disclosure*:  The City will provide a continuing disclosure undertaking under 17 C.F.R. § 240.15c2-12 in connection with the delivery of the New B Notes.

As it relates to the Department, the New B Notes settle the COPs debt at a rate of 11.5%. The Department will be responsible for its allocable share of the New B Notes consistent with prior years' formulas for allocation of COP liabilities.

## OTHER POST-EMPLOYMENT BENEFITS

### Introduction

The City provides post-retirement health and death benefits – also known as OPEB benefits – to current and future retirees and their dependents.  The City provides OPEB benefits under two umbrella plans – the Health and Life Insurance Benefit Plan (the "Health/Life Benefit Plan") and the City of Detroit Employee Benefit Plan, which operates and administers the Employee Supplemental Death Benefit Plan (the "Supplemental Plan" and, together with the Health/Life Benefit Plan, the "OPEB Plans").

The City's estimated aggregate liability relating to UAAL associated with the OPEB Plans is approximately $5.718 billion.  This amount includes the present value of OPEB liabilities for active employees of the City not yet retired. The City and the Retiree Committee appointed by the Bankruptcy Court ("Retiree Committee") agreed that the allowed claim for the OPEB liability amount for former employees retired from the City and continuing to obtain retiree health and life insurance is approximately $4.303 billion.  In the aggregate, 99.6% of the City's OPEB liabilities were unfunded as of the date its Bankruptcy Case was filed.  As of June 30, 2011 (the date of the actuarial valuations used in the Fiscal Year 2012 and 2013 financial statements and for purposes of estimating OPEB), there were 19,389 retirees eligible to receive benefits under the City's OPEB Plans.  The number of retirees receiving benefits from the City is expected to increase over time.

The City's OPEB liabilities are significant due to, among other things: (i) the fact that, prior to March 1, 2014, retirees could choose from 22 different plan options with varying structures and terms, which created a high level of complexity and cost in benefit administration; (ii) the extremely generous benefit features of the programs, especially for dependent coverage, which create high costs to the City on a per retiree basis; (iii) the fact that health care plans have no age restrictions and early vesting ages; and (iv) increases in health care costs, particularly hospitalization costs.

### Health/Life Benefit Plan

The Health/Life Benefit Plan is a single-employer defined benefit plan that provides hospitalization, dental care, vision care and life insurance to all officers and employees of the City who were employed on the day preceding the effective date of the Health/Life Benefit Plan and who continue in the employ of the City on and after the effective date of the Health/Life

Benefit Plan. Prior to the modification of retiree benefits effective March 1, 2014, retirees were allowed to enroll in any of the group plans offered by the City to active employees. The City provided health care coverage for substantially all retirees in accordance with terms set forth in union contracts.

General City employees hired before 1995 were eligible for health care benefits if they satisfied any of the following criteria for an unreduced normal retirement benefit: (i) 30 years of creditable service (or 25 years of creditable service for an EMS member), (ii) 10 years of creditable service and attainment of age 60 or (iii) 8 years of creditable service and attainment of age 65. The health care benefit eligibility conditions for general City employees hired on or after 1995 were: (i) 30 years of creditable service and attainment of age 55, 60 or 65, as applicable, (ii) 10 years of creditable service and attainment of age 55, 60 or 65, as applicable or (iii) 8 years of creditable service and attainment of age 55, 60 or 65, as applicable. The City provided full health care coverage to general City employees who retired prior to January 1, 1984 (except for a "Master Medical" benefit that was added on to the coverage after that date). The City paid up to 90% of health care coverage for employees who retired after January 1, 1984; however, for employees who retired between January 1, 1984 and June 30, 1994, the retiree share had been reduced by 50% by appropriations from City Council. The City also paid health coverage for an eligible retiree's spouse that was married to the retiree as of the date of retirement, under the same formulas noted above, as long as the retiree continued to receive a pension, and for dependents. Dental and vision coverage also were provided for retirees, spouses and dependents.

The City also provided health care coverage to general City employees that opted for early retirement. For general City employees hired before 1995, the health care benefit eligibility conditions were 25 years of creditable service; for employees hired after 1995, the health care benefit eligibility conditions were 25 years of creditable service and attainment of age 55. The coverage began when the retiree would have been eligible for normal retirement. The City paid up to 90% of health care coverage for the retiree and any eligible spouse. Dental and vision coverage were also provided for these retirees, their spouses and dependents.

The City also provided health care coverage at reduced rates to general City employees who met certain health care benefit eligibility conditions and retired under the "Deferred Retirement Benefits (Vested)," the "Death-in-Service Retirement Benefits Duty and Non-Duty Related" and the "Disability Retirement Benefits Duty and Non-Duty Related" programs. In addition, health care coverage was provided by the City for those retirees that were Medicare eligible. Retirees who opted out of the retiree health care coverage could obtain coverage at a later date.

In addition to health care coverage, the City allowed its retirees to continue life insurance coverage under the "Group Insurance Protection Plan" offered to active employees. The basic life insurance coverage for general City employees was based on the employee's basic annual earnings rounded to the next higher thousand dollars. The life insurance benefit amounts ranged from $3,750 to $12,500.

The Health/Life Benefit Plan was financed entirely on a "pay-as-you-go" basis and is 0% funded. As of June 30, 2011, the City had $5,718,286,228 in actuarial liabilities under the Health/Life Benefit Plan. The cost to the City on account of retiree benefits provided under the

Health/Life Benefit Plan in Fiscal Year 2012 was $177,460,627. This contribution by the City was in addition to $23,516,879 contributed by retirees during Fiscal Year 2012.

**Supplemental Plan**

The Supplemental Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon the retiree's years of City service ranging from $1,860 (for 8 to 10 years of service) to $3,720 (for 30 years of service, with $93.00 per year added for each additional year of service beyond the 30th year). As of June 30, 2011, the City had $34,564,960 in actuarially accrued liabilities under the Supplemental Plan. As of July 18, 2013, the Supplemental Plan was 74.3% funded, with approximately $8.9 million in UAAL. In Fiscal Year 2012, the cost to the City on account of benefits provided under the Supplemental Plan was $131,116. This contribution by the City was in addition to $15,944 contributed by retirees during Fiscal Year 2012.

**Modification of Retiree Benefits**

Effective March 1, 2014, the City changed the health insurance coverage offered to retirees. As described in more detail below, the health benefits a retiree receives from the City effective March 1, 2014 depend upon whether the retiree is "Medicare eligible." Generally, a retiree is Medicare eligible if he or she is age 65 or older and has worked to earn Medicare coverage or has eligibility through a spouse. In addition, the City provided certain other benefits, effective as of March 1, 2014 through the remainder of the 2014 calendar year pursuant to the Retiree Health Care Settlement Agreement effective as of February 14, 2014 (the "Retiree Settlement Agreement") between the City, the Retiree Committee, the Detroit Retired City Employees Association, the Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees.

For coverage from March 1, 2014 through December 31, 2014, Medicare eligible retirees were able to select one of three Medicare Advantage insurance plans that included health and drug benefits for which the City pays most or all of the premium. Except for one of the Medicare Advantage Plan options (BCBSM Medicare Plus Blue PPO), the monthly premium cost to the Medicare eligible retiree was zero. These new options were available to all City retirees who were Medicare eligible. Pursuant to the Retiree Settlement Agreement, Medicare-eligible retirees who opted out of a City-sponsored Medicare Advantage Plan on or prior to February 7, 2014 were automatically enrolled in a City-sponsored Health Reimbursement Arrangement ("HRA"). The City provided each enrolled retiree with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties to the Retiree Settlement Agreement. In addition, retirees were provided an opportunity to opt out of a City-sponsored Medicare Advantage Plan after February 7, 2014 and before by June 20, 2014 and receive an HRA with credits for the months they were not covered under the City-sponsored Medicare Advantage Plan. If an individual was a Medicare eligible retiree, these were the only choices that the City offered for health coverage for 2014.

Effective March 1, 2014, non-Medicare eligible retirees were required to obtain their own health insurance coverage (for themselves, their spouses or their dependent family members).

Under the Patient Protection and Affordable Care Act (the "Affordable Care Act"), Health Insurance Marketplaces – also known as "exchanges" – were to be made available in every state, including Michigan. Non-Medicare eligible retirees were permitted to enroll in and obtain an individual insurance policy to cover the retiree and his or her family from the Health Insurance Marketplace that served the state where the retiree lived. A non-Medicare eligible retiree also may have been eligible to enroll in coverage offered by their current employer or their spouse's employer. For most non-Medicare eligible retirees, effective March 1, 2014, the City agreed to provide a stipend of $125 per month ($300 or $400 per month for duty disabled non-Medicare retirees, depending upon whether the disabled person was a uniformed retiree). Eligible retirees were permitted to use this stipend for any purpose, including to defray the cost of premiums for health insurance coverage acquired through a Health Insurance Marketplace, through the retiree's or the retiree's spouse's employer or through other available health insurance programs.

Pursuant to the Retiree Settlement Agreement, the City agreed to (a) increase the $125 stipend by $50 (capped in the aggregate at $3,000,000) for certain eligible retirees who purchased coverage through a Health Insurance Marketplace and whose household income was $75,000 or less; (b) pay an additional $125 stipend (capped in the aggregate at $2,500,000) for certain eligible retirees whose spouse purchased coverage through a Health Insurance Marketplace and whose household income was $75,000 or less; (c) increase the stipend to $300 per month for non-Medicare-eligible retirees age 65 or older; and (d) provide an increased stipend for retirees living in states that did not expand Medicaid whose household income is less than 100% of the federal poverty level. Under the Retiree Settlement Agreement, the City also agreed to make a Blue Cross Blue Shield of Michigan fully-insured group health plan available to Non-Medicare eligible retirees in 2014. The City agreed to provide a monthly stipend of $100 to each Retiree who enrolled in the City group plan, beginning with the May 1, 2014 payment. No other City subsidy or payment was available to a retiree enrolled in the City group plan unless either (a) the retiree qualified for a duty-disability stipend in which case he or she received the stipend available for duty-disabled retirees or (b) the retiree qualified for the $300 per month stipend available to non-Medicare eligible retirees who are age 65 and older, in which case he or she received the stipend available for such retirees.

The City no longer subsidizes dental and vision coverage, effective March 1, 2014, for any retirees. All retirees, regardless of age or Medicare eligibility, who wanted dental and vision coverage were required to pay the full cost of such coverage. The City offered Blue Cross Blue Shield of Michigan dental, Golden Dental, Inc. and two different Heritage Vision plan options. All other plan options were eliminated.

The revised coverages provided by the City will be in effect until December 31, 2014. The coverages added pursuant to the Retiree Settlement Agreement will be in effect through mid-2015.

**Citywide OPEB Settlement Under the Plan of Adjustment**

The Plan of Adjustment would settle all citywide OPEB claims. Under the Plan of Adjustment, from and after January 1, 2015, the City would no longer sponsor and maintain retiree health or death benefits programs ("Retiree Welfare Benefits") for existing retirees (meaning individuals who retired on or before December 31, 2014) and their surviving

beneficiaries, spouses and dependents. Instead, for these individuals who are GRS retirees ("VEBA Beneficiaries"), the City would establish a voluntary employees' beneficiary association ("Detroit General VEBA"). The City will establish a separate VEBA for PFRS retirees, with a separate funding source, which is not an obligation of the Department. The Detroit General VEBA would be a trust under the governance of a board of trustees that will be responsible for providing retiree health benefits beginning January 1, 2015 to VEBA Beneficiaries. On the effective date of the Plan of Adjustment, the City would provide the Detroit General VEBA with a portion of the New B Notes in the principal amount of $218 million. The Detroit General VEBA may also receive additional contributions from sources other than the City or the Department, including contingent additional distributions from the Disputed COP Claims Reserve, described in the Plan of Adjustment.

The Detroit General VEBA board of trustees would be responsible for, among other things, determining the level of and distributing Retiree Welfare Benefits to VEBA Beneficiaries. It is not anticipated that the funding will be sufficient to provide benefits at the same level of Retiree Welfare Benefits provided to GRS retirees and their beneficiaries during the period beginning March 2014.

**Implications of the Citywide OPEB Settlement for the Department**

The Department will be responsible for its allocable share of the portion of the New B Notes relating to settlement of OPEB claims, consistent with prior years' formulas for allocation of OPEB contributions on a pay-as-you-go basis. The 40 year projections indicate that the Department's total OPEB settlement payments, in the form of New B Notes, will be equal to $105 million. This represents a pro-rata share of the citywide settlement. If the City does not make the payments under the New B Notes, the Detroit General VEBA board of trustees will have the right to sue the City for payment.

**Other OPEB Liabilities**

As described above, under the Plan of Adjustment and effective as of January 1, 2015, the Detroit General VEBA is the sole source of Retiree Welfare Benefits for the VEBA Beneficiaries. Employees of the City and the Department who retire on or after January 1, 2015 may be eligible for Retiree Welfare Benefits, which benefits will be an obligation of the City and the Department. The terms of these benefits are the subject of ongoing negotiations between the City and various unions that represent City and Department employees.

## FEASIBILITY CONSULTANT'S REPORT

The Department has engaged The Foster Group, LLC to conduct an evaluation of the Sewage Disposal System, including information about the financial feasibility of completing the CIP. A copy of the report (the "Feasibility Report") summarizing the findings of the Feasibility Consultant's evaluation is included as APPENDIX A. Set forth below are the Feasibility Consultant's findings and conclusions with respect to the financial feasibility of the potential 2014 DWSD Refinancing Bonds. The Feasibility Consultant's Report should be read in its entirety for a complete understanding of the assumptions, considerations, estimates and calculations upon which these conclusions are based.

94

■ The Department's current wastewater rates are below the average of those in effect in comparably sized cities. While faced with additional capital expenditures to ensure reliability of service, the projected increases in the Department's wastewater rates through 2019 are expected to be comparable to what will be experienced in other large metropolitan areas.

■ In addition to the relatively low wastewater rates, the Department's current water rates are competitive with those in effect in comparably sized cities. The supply and price of water, coupled with the availability of wastewater treatment, should continue to be a positive factor in attracting and maintaining industry to the System's service area.

■ The Department's financial plan is sound, supported by gradual rate increases, and is expected to be sufficient to adequately fund the CIP and other programs necessary to meet System obligations.

■ The Department's current fiscal policies and plans are designed to result in continued improvements in the current financial position of the System, including reported debt service coverage and changes in net assets. Continued implementation of the optimization program, assisted by further implementation of the District Court Orders, should further enhance these policies.

■ The revenues pledged as security for the potential 2014 DWSD Refinancing Bonds are projected to be sufficient to comply with rate covenants required by the Bond Ordinance and the targets established by Board of Water Commissioners policy.

■ The coverage requirements contained in the Bond Ordinance authorizing the potential issuance of the 2014 DWSD Refinancing Bonds will be met so long as after issuance of the 2014 DWSD Refinancing Bonds, it can be demonstrated that (compared with the debt service schedules in existence prior to the issuance of the 2014 DWSD Refinancing Bonds) savings will result in each Fiscal Year thereafter until maturity.

## SYSTEM EVALUATION REPORT

The Department has engaged Orchard, Hiltz & McCliment, Inc. (the "Engineering Advisor") to conduct an evaluation of the physical condition of the Sewage Disposal System, determine whether the Sewage Disposal System is being operated and maintained in a manner to achieve their operating goals, and determine if the CIP appropriately addresses identified rehabilitation and repair needs. A copy of the report (the "System Evaluation Report") summarizing the findings of the Engineering Advisor's evaluation is included as APPENDIX B. Set forth below are the Engineering Advisor's opinions with respect to the evaluation. The System Evaluation Report should be read in its entirety for a complete understanding of the assumptions, considerations, estimates and calculations upon which these opinions are based.

■ The performance of the Department's wastewater treatment plan has improved considerably over the past few years. Since the start of 2012, only three violations of NPDES permit limits have occurred. All three violations were relatively

minor, which indicates that the Department has addressed the basic issues that led to the chronic violations experienced in prior years.

- The combined sewer overflow facilities are also reporting good compliance. Only three facilities have experienced a single fecal coliform violation since the start of 2012. Two facilities were unable to achieve the total residual chlorine goal for two events and five facilities were unable to achieve the total residual chlorine goal for one event. Considering that the operators are trying to minimize the total residual chlorine at the same time as achieving the fecal coliform kill, the results are very good.

- The current five-year CIP addresses the most critical needs in the system observed during the site visits. This assumes that the Northeast Pumping Station improvements will be handled by OMID rather than the Department.

- The condition at the various facilities varied, but all were rated either good or adequate. This reflects significant capital reinvestment in the facilities over the last 10 to 15 years.

- Due to the City Bankruptcy Case and the Department organizational optimization program, staff expressed concerns about uncertainty over their personal future. It is anticipated that many of the issues will be addressed in the next few months, but it is likely that staff anxiety will take a while to abate. In the short-run, staff concerns are likely to result in retirement of some experienced staff. The Department has historically been successful in dealing with similar issues utilizing personal service contracts and obtaining staffing services through consultant contracts. Therefore, it is expected that sufficient staff will be available to adequately staff the facilities.

- The Department pumping facilities were in good condition and the majority had emergency backup electric power supply. The pumping facilities which did not have emergency backup electric power supply had the option of a moveable power generator hook up. The Department has recently switched electrical power supply from Detroit Public Lighting Department to DTE, a more reliable electric power supply utility.

- The Department's wastewater treatment plant is in good condition and a number of upgrades are either completed or ongoing, to replace old equipment with new equipment and rehabilitate the facility. In the solids handling area of the Department's wastewater treatment plant dewatering and incineration facilities, a number of active projects indicate the Department is focusing on upgrading needed areas of Department's wastewater treatment plant to be in compliance.

- The Department's CSO facilities are in good condition and older facilities are being rehabilitated. Recently the Department started operating CSO facilities in coordination with the Department's wastewater treatment plant operation, as allowed for in the new permit, which has resulted in less discharge of undisinfected effluent at Department's wastewater treatment plant.

- In general it was observed that the Department is moving towards more automation of operations at the CSO facilities and the Department's wastewater treatment

plant. Pumping facilities are fully automated. It was observed that the Department has significantly more pumping and solids dewatering capacity than required, which makes the facilities more reliable in case of maintenance or outage of individual units.

## LITIGATION

The Department has not been served with any litigation, and to the best of the Department's knowledge, there is no threatened litigation against the Department seeking to restrain or enjoin the tender offer, the potential sale of the 2014 DWSD Refinancing Bonds, affecting the security pledged therefor or questioning or affecting the validity of the proceedings or authority under which the 2014 DWSD Refinancing Bonds were issued. Neither the creation, organization or existence of the Department, nor the title of any of the present members or other officers of the Department to their respective offices, is being contested. The Department has not been served with any litigation and, to the best of the Department's knowledge, there is no litigation threatened which in any manner questions the right of the Board of Water Commissioners to adopt the DWSD Resolution or any supplemental resolution or to secure the 2014 DWSD Refinancing Bonds in the manner provided in the DWSD Resolution and Act 94.

Except as noted in this section, the Department has not been served with any litigation which is expected to have a material impact on the Department's operations or revenues and, to the best of the Department's knowledge, there is no threatened litigation against the Department which is expected to have a material impact on the Department's operations or revenues. The Macomb Interceptor Drain Drainage District ("MIDDD") filed a lawsuit against the Department alleging breach of contract related to the Department's transfer of the Macomb Interceptor to MIDDD. After the City filed its Chapter 9 Bankruptcy Case, MIDDD filed a claim in the Bankruptcy Case, and has placed a value on this claim of $26 million. The Bankruptcy Court has determined that the claim shall be valued at $26 million for purposes of voting on the Plan of Adjustment only. [Docket No. 6162.] The City has objected to the allowance of this claim, and a hearing on such objection is scheduled for October 1, 2014. Prior to the filing of the Bankruptcy Case, the Department successfully defended a tort action by MIDDD based on similar facts.

Multiple appeals have been filed in *United States v. City of Detroit*. Most recently, the City filed a Notice of Appeal on May 22, 2013, challenging the District Court Orders and the Order of Dismissal (Appeal No. 13-1708). On July 30, 2013, the Court of Appeals for the Sixth Circuit issued an order holding the case in abeyance pending the City's Bankruptcy Case.

U.S. Bank National Association, as the DWSD Trustee, is currently withdrawing $300,000 per month from DWSD Indenture funds for extraordinary expenses related to the City's Chapter 9 proceeding. As of March 28, 2014, the DWSD had deducted a total of $2,300,000 from DWSD accounts in compensations for its and its counsel and advisor's fees and expenses. On April 4, 2014, the Department filed a Motion for Order, Pursuant to 11 U.S.C. § 105, Amending and Clarifying Fee Review Order Dated September 11, 2013 (the "Fee Review Order"), requesting that the Fee Review Order be amended to require that the fees and expenses of the DWSD Trustee, and its retained professionals be reviewed by the Fee Examiner and subject to the Fee Review Order. On May 29, 2014, the Bankruptcy Court entered its Order Amending and Clarifying Fee Review Order of September 11, 2013, declaring that the DWSD Trustee's fees and expenses are subject to the Fee Review Order. Furthermore, the DWSD

Trustee and the Department must confer with the Fee Examiner to establish a procedure for the expeditious review of all fees billed to date.

On July 20, 2014, a group of Detroit residents, along with several non-profit organizations, filed a complaint in the Bankruptcy Court seeking declaratory and injunctive relief with respect to the billing and collection policies of the Department. The plaintiffs contend the policies relating to notice of bills, the manner in which payments may be made and remedies for collection of accounts, including termination of services, violate various provisions of the United States and State Constitutions and provisions of the Bankruptcy Code. The plaintiffs seek, among other things, an injunction preventing further termination of service until new constitutional policies are in place and a water affordability plan, under which charges for Department services would be based on the income of the resident, is implemented. On July 30, 2014, an amended complaint was filed seeking essentially the same relief. Since this litigation has just commenced no response has been filed, but the Department strongly believes its policies are both legal and appropriate and intends to vigorously defend this lawsuit.

## RATINGS

**Rating Implications of Plan of Adjustment**

Prior to the City's filing of a Plan of Adjustment proposing the impairment of a portion of the DWSD Bonds, all of the DWSD Bonds were rated investment grade by Fitch Ratings ("Fitch"), Moody's Investor's Service ("Moody's") and Standard and Poor's Ratings Services ("S&P"). As of the date of this Disclosure Statement, Fitch, Moody's and S&P all have lowered their ratings of the DWSD Bonds to below investment grade as a result of the City's bankruptcy filing. In the event the Bankruptcy Court confirms the City's current Plan of Adjustment, including the current plan's provisions impairing the DWSD Bonds, the City anticipates that the rating agencies will take additional negative ratings actions, including imposition of a "D" rating or its equivalent on all impaired DWSD Bonds and an "SD" (selective default) rating or its equivalent on all other DWSD Bonds. There can be no assurance that any rating agency will agree to restore investment grade ratings to the Tender Bonds.

The table below shows a recent history of the ratings in effect for Senior Lien DWSD Bonds and Second Lien DWSD Bonds. Ratings reflect only the views of Fitch, Moody's and S&P and an explanation of the significance of such ratings may be obtained from Fitch, Moody's and S&P.

| At December 31 | Senior Lien DWSD Bonds | | | Second Lien DWSD Bonds | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| --- | --- | --- | --- | --- | --- | --- |
| 2010 | Aa3 | A+ | AA- | A1 | A | A+ |
| 2011 | A1 | A+ | A | A2 | A | A- |
| 2012 | Baa3 | A+ | A- | Ba1 | A | BBB+ |
| 2013 | B1 | BB- | BBB+ | B2 | BB- | BBB |
| Current | B1 | CCC | BB+ | B2 | CCC | BB |

98

**Potential for Distressed Exchange Ratings Treatment During Invitation Tender Offer Period**

The rating agencies may or may not apply their "distressed exchange" treatment to the ratings of the DWSD Bonds during the Invitation and Tender Offer Period. Such treatment, if applied, may result in a temporary reduction of the DWSD Bond ratings to a "DE" ("distressed exchange") or equivalent rating level for the duration of the Invitation's Tender Offer Period, until the tender offer has been consummated and potentially for a period of unknown duration thereafter. There can be no assurance that any rating agency will agree to restore investment grade ratings to the Tender Bonds.

**Ratings Requests to Restore Investment Grade Ratings on Outstanding DWSD Bonds and for the 2014 DWSD Refinancing Bonds**

In connection with the issuance of any 2014 DWSD Refinancing Bonds, the Department intends to request a restoration to investment grade levels of the ratings assigned by Fitch, Moody's and S&P to all of the Tender Bonds and the assignment of investment grade ratings to the 2014 DWSD Refinancing Bonds and, to that end, will provide certain information and materials to such rating agencies with respect to the 2014 DWSD Refinancing Bonds. There can be no assurance that any rating agency will agree to restore investment grade ratings to the Tender Bonds or assign ratings to the 2014 DWSD Refinancing Bonds or, if any or all agencies agree to assign such ratings, no prediction is made as to the level of such rating or ratings.

## DEALER MANAGER

The City has retained Citigroup Global Markets Inc. to act on its behalf as Dealer Manager for this Invitation. The City will pay the Dealer Manager a fee of $1.00 for each $1,000 principal amount of the Tender Bonds described in this Invitation. In addition, the City will pay the Dealer Manager its reasonable out-of-pocket costs and expenses relating to this Invitation. Any reference in this Invitation to the Dealer Manager is to Citigroup Global Markets Inc. in its capacity as the Dealer Manager.

The Dealer Manager may contact Bondholders of the Tender Bonds regarding this Invitation and may request brokers, dealers, custodian banks, depositories, trust companies and other nominees to forward this Invitation and the Other Tender Materials to beneficial owners of the Tender Bonds.

Citigroup Global Markets Inc. will also be acting as the senior managing underwriter of the 2014 DWSD Refinancing Bonds and will be paid an underwriting discount in its role as underwriter of the 2014 DWSD Refinancing Bonds.

The Dealer Manager or an affiliate thereof may, if necessary, purchase the 2014 DWSD Refinancing Bonds as interim financing bonds.

One or more affiliates of the Dealer Manager currently own $94,035,000 of the Tender Bonds which may be offered and purchased pursuant to the Invitation.

## FINANCIAL ADVISOR

First Southwest Company is acting as Financial Advisor (the "Financial Advisor") to the Department in connection with the Invitation. The Financial Advisor's fee for services rendered with respect to the Invitation is $197,500.

The Financial Advisor has provided the following statement for inclusion in this Disclosure Statement: The Financial Advisor has reviewed the information in this Disclosure Statement in accordance with, and as part of, its responsibilities to the Department, but the Financial Advisor does not guarantee the accuracy or completeness of such information.

## FINANCIAL CONSULTANT TO THE BOARD OF WATER COMMISSIONERS

Ramirez & Co., Inc. is acting as the Financial Consultant to the Board of Water Commissioners in connection with the Invitation ("Board Financial Consultant"). The Board Financial Consultant's fee for services rendered with respect to the Invitation is $76,500.

## CONTINUING DISCLOSURE COMPLIANCE

### Prior Continuing Disclosure Non-Compliance by the City

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Sewage Disposal System. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Sewage Disposal System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010. The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013. The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013. The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Sewage Disposal System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale in the secondary market of bonds issued by the

City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof.

**The Department's Disclosure Dissemination Agent**

In order to provide continuing disclosure with respect to the 2014 DWSD Refinancing Bonds in accordance with the Rule, the Department has entered into a Disclosure Dissemination Agent Agreement ("Disclosure Dissemination Agreement") with Digital Assurance Certification, L.L.C. ("DAC"), under which the Department has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent the Department has provided such information to the Disclosure Dissemination Agent as required by the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the content of any disclosures or notice made pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Financial Information, Audited Financial Statements, notice of the occurrence of reportable events or voluntary disclosures, or any other information, disclosures or notices provided to it by the Department and shall not be deemed to be acting in any fiduciary capacity for the Department, the Bondholders or any other party. The Disclosure Dissemination Agent has no responsibility for the Department's failure to report to the Disclosure Dissemination Agent a Notice Event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the Department has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the Department at all times.

## OTHER MATTERS

The summaries and explanations herein of provisions of Act 94, other public acts of Michigan, and other materials are brief summaries of certain provisions thereof. Such summaries do not purport to be complete and reference is made to such instruments, documents and other materials for full and complete statements of the provisions thereof.

The information contained in this Disclosure Statement has been compiled or prepared from sources deemed to be reliable and, while not guaranteed as to completeness or accuracy, is believed to be correct as of this date. Any statements involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

The attached Appendices are an integral part of this Disclosure Statement and must be read in their entirety together with all of the foregoing information.

CITY OF DETROIT, MICHIGAN


By     /s/  Kevyn D. Orr
          Emergency Manager


DETROIT WATER AND SEWERAGE
DEPARTMENT


By     /s/  Sue F. McCormick
          Director

102

# INVITATION TO TENDER BONDS
## IN THE AGGREGATE PRINCIPAL AMOUNT OF
## $2,433,140,000
## CITY OF DETROIT, MICHIGAN
## DETROIT WATER AND SEWERAGE DEPARTMENT
## WATER SUPPLY SYSTEM BONDS

**THIS INVITATION WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON AUGUST 21, 2014 UNLESS EARLIER TERMINATED OR EXTENDED.**

Pursuant to this Invitation to Tender Bonds (this "*Invitation*"), the City of Detroit, County of Wayne, State of Michigan (the "*City*"), upon authorization from (i) the Board of Water Commissioners (the "*BOWC*") of the Detroit Water and Sewerage Department ("*DWSD*") and (ii) Kevyn D. Orr, emergency manager of the City (the "*Emergency Manager*"), invites each owner (a "*Bondholder*") of those certain outstanding Water Supply System bonds, in the aggregate principal amount of $2,433,140,000, as described more specifically on Schedule A attached to this Invitation (collectively referred to as the "*Tender Bonds*") to submit an offer (each, an "*Offer*," and collectively, the "*Offers*") to sell all or a portion of the Tender Bonds (the "*Offered Bonds*") held by such Bondholder to the City at the applicable purchase prices for the Tender Bonds set forth on Schedule A attached to this Invitation (the "*Purchase Price*"), subject to the conditions and upon the terms specified in this Invitation. Bondholders of the Tender Bonds that are purchased by the City will receive on the Settlement Date (as defined herein) the Purchase Price plus accrued interest on such Tender Bonds through the date immediately preceding the Settlement Date. The Settlement Date is scheduled to occur on September 4, 2014, but may be rescheduled as described herein.

To make an informed decision as to whether, and how, to offer its Tender Bonds, a Bondholder must read this Invitation and all of the Other Tender Materials (as defined herein) carefully and consult with its broker, account executive, financial advisor and/or other financial professional. This Invitation, the Other Tender Materials and other information with respect to this Invitation are available from the Dealer Manager and the Information and Tender Agent and at www.bondcom.com/DWSD.

Any Bondholder wishing to offer its Tender Bonds pursuant to this Invitation should follow the procedures more fully described herein. Institutional investors with questions about this Invitation should contact the Dealer Manager. Individual investors and their brokers, account executives, financial advisors and other financial professionals with questions about this Invitation should contact the Information and Tender Agent.

**All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission and may not be withdrawn except in the limited circumstances under "TERMS OF THIS INVITATION—Irrevocability of Offers Upon Submission" herein.**

| Key Dates and Times | |
|---|---|
| *All of these dates and times are subject to change. All times are New York City time.* | |
| *Notices of changes will be sent in the manner provided for in this Invitation.* | |
| Expiration Date ................................................................................................................... | August 21, 2014, 5:00 p.m. |
| Announcement of Acceptance or Rejection of Offered Bonds.............................................. | August 22, 2014, 5:00 p.m. |
| Settlement Date. Payment made on all accepted Offered Bonds......................................... | September 4, 2014 |

*The Dealer Manager for this Invitation is:*

**Citigroup Global Markets Inc.**
390 Greenwich Street, 2nd Floor, New York, NY 10013
David M. Brownstein, 212-723-5570, david.m.brownstein@citi.com
Mike Leffler, 212-723-4453, mike.leffler@citi.com
Shai Markowicz, 212-723-5135, shai.markowicz@citi.com

*The Information and Tender Agent for this Invitation is:*

**Bondholder Communications Group**
30 Broad Street 46th Floor, New York, NY 10004
Attention: Denise Waters
Call Toll Free: (888) 385-BOND or (888) 385-2663
Web site: www.bondcom.com/DWSD E-mail: Dwaters@bondcom.com

Date of this Invitation to Tender Bonds: August 7, 2014

4834-7740-0092.4

This Invitation has not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the fairness or merits of this Invitation or upon the accuracy or adequacy of the information contained in this Invitation. Any representation to the contrary is a criminal offense.

This Invitation is not being made to, and offers will not be accepted from or on behalf of, Bondholders in any jurisdiction in which this Invitation or the acceptance thereof would not be in compliance with the laws of such jurisdiction. In those jurisdictions whose laws require this Invitation to be made through a licensed or registered broker or dealer, this Invitation is being made on behalf of the City by the Dealer Manager.

No dealer, salesperson or other person has been authorized to give any information or to make any representation not contained in this Invitation and the Other Tender Materials and, if given or made, such information or representation may not be relied upon as having been authorized by the City.

The delivery of this Invitation and the Other Tender Materials shall not under any circumstances create any implication that the information contained herein and therein is correct as of any time subsequent to the date hereof or that there has been no change in the information set forth herein and therein or in any attachments hereto and thereto or materials delivered herewith and therewith or in the affairs of the City since the date hereof.

This Invitation and the Other Tender Materials contain statements relating to future results that are "forward-looking statements." When used in this Invitation and the Other Tender Materials, the words "estimate," "anticipate," "forecast," "project," "intend," "propose," "plan," "expect" and similar expressions identify forward-looking statements. Such statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. Any forecast is subject to such uncertainties. Inevitably, some assumptions used to develop the forecasts will not be realized and unanticipated events and circumstances may occur. Therefore, there are likely to be differences between forecasts and actual results, and those differences may be material.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................................1
General .................................................................................................................................................1
Plan of Finance and Purpose of the Tender Offer .............................................................................3
Dealer Manager, Financial Advisor, Board Financial Consultant and Information and Tender
    Agent ...............................................................................................................................................4
Brokerage Commissions and Bank Processing Fee ...........................................................................4
Purchased Bonds to be Cancelled ......................................................................................................4
Prevailing Time ...................................................................................................................................4
TERMS OF THIS INVITATION .......................................................................................................4
Expiration Date; Offers Only Through ATOP System; Information to Bondholders .................4
Provisions Applicable to all Offers ....................................................................................................5
Transmission of Offers by Financial Institutions; ATOP System .....................................................6
Real Time Reporting ...........................................................................................................................6
Determinations as to Form and Validity of Offers; Right of Waiver and Rejection .....................6
Irrevocability of Offers Upon Submission .........................................................................................7
Determination by the City of Offered Bonds to Accept for Purchase ................................................7
Notice of Acceptance or Rejection of Offered Bonds .......................................................................8
Settlement Date; Purchase of Offered Bonds .....................................................................................8
Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted ..........................9
Conditions to Purchase .......................................................................................................................9
Extension, Termination and Amendment of Offer; Changes to Terms .................................10
Representations by Tendering Bondholders to the City and the DWSD .................................11
DISCLOSURE STATEMENT .........................................................................................................11
ADDITIONAL CONSIDERATIONS ..............................................................................................11
CERTAIN FEDERAL INCOME TAX CONSEQUENCES .............................................................12
BANK PROCESSING FEE; ELIGIBLE INSTITUTIONS ARE NOT AGENTS ...................13
REIMBURSEMENT OF FINANCIAL INSTITUTION EXPENSES FOR FORWARDING
INVITATION AND OTHER TENDER OFFER MATERIALS ........................................................13
DEALER MANAGER ......................................................................................................................13
FINANCIAL ADVISOR ..................................................................................................................14
BOARD FINANCIAL CONSULTANT ...........................................................................................14
MISCELLANEOUS .........................................................................................................................14

TENDER BONDS AND PURCHASE PRICES .............................................................. SCHEDULE A

QUESTIONS AND ANSWERS ...................................................................................... APPENDIX A
DISCLOSURE STATEMENT ......................................................................................... APPENDIX B
CITY LETTER ................................................................................................................. APPENDIX C
BONDHOLDER'S INSTRUCTIONS ............................................................................. APPENDIX D

[THIS PAGE INTENTIONALLY LEFT BLANK.]

**INVITATION TO TENDER BONDS
IN THE AGGREGATE PRINCIPAL AMOUNT OF
$2,433,140,000
CITY OF DETROIT, MICHIGAN
DETROIT WATER AND SEWERAGE DEPARTMENT
WATER SUPPLY SYSTEM BONDS**

**INTRODUCTION**

**General**

Pursuant to this Invitation to Tender Bonds (this "***Invitation***"), the City of Detroit, County of Wayne, State of Michigan (the "***City***"), upon authorization from (i) the Board of Water Commissioners (the "***BOWC***") of the Detroit Water and Sewerage Department ("***DWSD***") and (ii) Kevyn D. Orr, emergency manager of the City (the "***Emergency Manager***"), invites each owner (a "***Bondholder***") of those certain outstanding Detroit Water and Sewerage Department Water Supply System bonds, in the aggregate principal amount of $2,433,140,000, as described more specifically on Schedule A attached to this Invitation (collectively referred to as the "***Tender Bonds***") to submit an offer (each, an "***Offer***," and collectively the "***Offers***") to sell all or a portion of the Tender Bonds (the "***Offered Bonds***") held by such Bondholder to the City at the applicable purchase prices set forth on Schedule A attached to this Invitation (the "***Purchase Price***").

Each Bondholder is invited by the City to offer to sell to the City for cash all or any part of its beneficial ownership interests in the Tender Bonds (in any authorized denominations) at the applicable Purchase Price. _All of the Tender Bonds are held in book-entry form through banks and brokers that are participants in DTC. As a result, beneficial Bondholders may only offer their Tender Bonds through the financial institution account where their Tender Bonds are held at DTC._ See "TERMS OF THIS INVITATION" below for more information on how a Bondholder can offer its Tender Bonds.

The City will review, and may accept, the Offers in accordance with the procedures set forth in this Invitation.

To make an informed decision as to whether, and how, to offer its Tender Bonds, a Bondholder must read the following documents carefully and consult with its broker, account executive, financial advisor and/or other financial professional:

(1)     This Invitation,

(2)     The Questions and Answers dated August 7, 2014, attached hereto as Appendix A (the "*Questions and Answers*"),

(3)     The Disclosure Statement dated August 7, 2014, attached hereto as Appendix B (the "*Disclosure Statement*"),

(4)     The Letter from the City dated August 7, 2014, attached hereto as Appendix C (the "*City Letter*"), and

(5)     The Bondholder's Instructions, attached hereto as Appendix D (the "*Bondholder's Instructions*").

The Questions and Answers, the Disclosure Statement, the City Letter and the Bondholder's Instructions are collectively referred to herein as the "*Other Tender Materials.*"  This Invitation and the Other Tender Materials and such other information with respect to this Invitation are and will be available from the Information and Tender Agent at www.bondcom.com/DWSD or by calling toll-free at (888) 385-2663 or by emailing the Information and Tender Agent at Dwaters@bondcom.com.

**None of the City, the DWSD, the Emergency Manager, the Dealer Manager (as defined herein), the Financial Advisor (as defined herein), the Board Financial Consultant (as defined herein) or the Information and Tender Agent (as defined herein) makes any recommendation that any Bondholder tender or refrain from tendering all or any portion of its Tender Bonds or makes any representation that the Purchase Prices as set forth on Schedule A of this Invitation are indicative of market prices.  Each Bondholder must make these decisions and should read this Invitation and the Other Tender Materials and consult with its broker, account executive, financial advisor and/or other financial professional in making these decisions.**

Subject to satisfaction of the conditions described herein and in the Other Tender Materials, the Offered Bonds accepted by the City for purchase will be paid for on the "*Settlement Date*," which is scheduled to occur on September 4, 2014, but may be rescheduled to a date earlier or later than that date by the City in its sole discretion.  See "TERMS OF THIS INVITATION—Settlement Date; Purchase of Offered Bonds."

**All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission and may not be withdrawn except in the limited circumstances described under "TERMS OF THIS INVITATION—Irrevocability of Offers Upon Submission" herein.**

**The City is under no obligation to accept for purchase all or any of the Offered Bonds.  The City may decide to purchase less than all (or none) of the Offered Bonds.  See "TERMS OF THIS INVITATION—Determination of Amounts to be Purchased" for more information on the selection of Offered Bonds to be purchased, if any.**

**The City reserves the right to extend or amend this Invitation prior to the Expiration Date (as defined herein).  See "TERMS OF THIS INVITATION—Extension, Termination and Amendment of Offer; Changes to Terms."**

2

**Plan of Finance and Purpose of the Tender Offer**

The Plan of Adjustment currently pending before the United States Bankruptcy Court hearing the City's Chapter 9 bankruptcy case (the "***Bankruptcy Court***") would impair certain classes of the City's Water Supply System Revenue and Revenue Refunding Bonds (the "***DWSD Water Bonds***") and the City's Sewage Disposal System Revenue and Revenue Refunding Bonds (the "***DWSD Sewer Bonds***," and collectively with the DWSD Water Bonds, the "***DWSD Bonds***"), including by eliminating the call protection or reducing the interest rates on such DWSD Bonds. The City is undertaking this Invitation as part of a plan of finance to reduce the debt service costs related to the Tender Bonds and remove the risk to DWSD's future costs by the impairment noted above on certain classes of the DWSD Bonds. See "**CITY OF DETROIT BANKRUPTCY MATTERS**" in the Disclosure Statement.

The City plans to purchase Offered Bonds only to the extent it can realize sufficient savings, with sufficiency to be determined in the City's sole discretion. An Invitation to Tender regarding the DWSD Sewer Bonds (collectively with this Invitation, the "***Invitations***") is also being issued concurrently with the issuance of this Invitation as part of the City's plan of finance. To provide funds to purchase all DWSD Bonds offered and accepted by the City pursuant to the terms of both Invitations, the City proposes to issue, via public offering or private placement, one or more series of the Sewage Disposal System Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds, including if necessary, interim financing bonds (collectively, the "***2014 DWSD Refinancing Bonds***"). The City has obtained a conditional commitment to purchase interim financing bonds, which commitment is subject to the negotiation and execution of definitive agreements and the satisfaction of certain closing conditions.

If the City in its sole discretion determines to accept for purchase DWSD Bonds offered by Bondholders pursuant to the Invitations, prior to the Settlement Date the City would request that the Bankruptcy Court enter an order (the "***Bankruptcy Order***") authorizing the City's issuance of the 2014 DWSD Refinancing Bonds to purchase the DWSD Bonds offered and accepted pursuant to the terms of the Invitations. In addition, on the Settlement Date, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would remove the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds. Under such amended Plan of Adjustment, all of the DWSD Bonds that are not purchased pursuant to the Invitations would be unimpaired.

To the extent the City elects, in its sole discretion, not to purchase DWSD Bonds pursuant to the Invitations, or the purchase of DWSD Bonds pursuant to the Invitations does not close for any reason, no amended Plan of Adjustment that unimpairs the DWSD Bonds would be filed, and the treatment of the DWSD Bonds under the Plan of Adjustment, as currently proposed, would continue to include an impairment of certain of the DWSD Bonds as identified on Schedule A.

In either event, there can be no assurance that the Plan of Adjustment that is confirmed by the Bankruptcy Court will ultimately impair or not impair any DWSD Bonds. There can also be no assurance that any Plan of Adjustment will be confirmed by the Bankruptcy Court. Moreover, any order of the Bankruptcy Court confirming the Plan of Adjustment may be appealed to a higher court. Even if confirmed, there can be no assurance if or when the Plan of Adjustment will become effective or ultimately be consummated.

The purchase of DWSD Bonds offered and accepted pursuant to the Invitations is conditioned upon receipt by the City of all legally required approvals to issue the 2014 DWSD Refinancing Bonds, the City completing the issuance of the 2014 DWSD Refinancing Bonds on terms satisfactory to it, with net proceeds sufficient to pay the Purchase Price of the DWSD Bonds to be purchased and other

3

conditions set forth in the Invitations. No assurances can be given that the 2014 DWSD Refinancing Bonds will be issued in an amount sufficient to pay the Purchase Prices of the DWSD Bonds offered and accepted pursuant to the Invitations or that the purchase of such DWSD Bonds will be completed. See "TERMS OF THIS INVITATION—Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted" and "—Conditions to Purchase" below.

*The 2014 DWSD Refinancing Bonds are not being offered for sale by this Invitation. The City expects to disseminate offering documents with respect to the 2014 DWSD Refinancing Bonds upon its acceptance of Offered Bonds pursuant to this Invitation.*

*By offering their Tender Bonds pursuant to this Invitation, Bondholders shall be deemed to have acknowledged and represented to the City that they have received, and have had the opportunity to review, this Invitation and the Other Tender Materials prior to making the decision as to whether or not they should submit an Offer.*

## Dealer Manager, Financial Advisor, Board Financial Consultant and Information and Tender Agent

Citigroup Global Markets Inc. is acting as the Dealer Manager for this Invitation (the "Dealer Manager"). Institutional investors with questions about this Invitation should contact the Dealer Manager. The Dealer Manager or an affiliate thereof will also be the senior managing underwriter for or the purchaser of the 2014 DWSD Refinancing Bonds. Individual investors with questions about this Invitation should contact Bondholder Communications Group, which serves as Information and Tender Agent (the "Information and Tender Agent") for this Invitation. First Southwest Company is acting as Financial Advisor (the "Financial Advisor") to the DWSD in connection with this Invitation, and Ramirez Co., Inc. is acting as Financial Consultant to the BOWC (the "Board Financial Consultant") in connection with this Invitation.

## Brokerage Commissions and Bank Processing Fee

Bondholders will not be obligated to pay any brokerage commissions or bank processing fees to the City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent in connection with this Invitation. However, Bondholders should check with their broker, account executive, bank, financial institution or financial advisor to determine whether they will charge any commissions or fees.

## Purchased Bonds to be Cancelled

Any Offered Bonds which the City purchases pursuant to this Invitation will be cancelled.

## Prevailing Time

All times in this Invitation are New York City time.

## TERMS OF THIS INVITATION

## Expiration Date; Offers Only Through ATOP System; Information to Bondholders

This Invitation will expire at 5:00 p.m., New York City time, on August 21, 2014 unless earlier terminated or extended (the "*Expiration Date*"). Offers to sell any Tender Bonds received after 5:00 p.m., New York City time, on the Expiration Date will not be considered.

All of the Tender Bonds are held in book-entry-only form through the facilities of The Depository Trust Company ("**DTC**"). The City, acting through the Information and Tender Agent, has made arrangements with DTC to use DTC's Automated Tender Offer Program (the "**ATOP System**"). A Bondholder who is not a DTC participant must make Offers to sell its Offered Bonds by making arrangements with and instructing its broker, bank, account executive or other financial institution which maintains the account in which its Offered Bonds are held (each a "**Financial Representative**"), to submit the Bondholder's Offer through the ATOP System. To ensure a Bondholder's Offer is submitted via the ATOP System by 5:00 p.m., New York City time, on the Expiration Date, a Bondholder must provide instructions to its Financial Representative in sufficient time for the Financial Representative to submit Offers by this deadline. A Bondholder should contact its Financial Representative for information on when it needs the Bondholder's instructions in order to submit an Offer via the ATOP System by 5:00 p.m., New York City time, on the Expiration Date. See "—Transmission of Offers by Financial Institutions; ATOP System."

*The City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender Agent are not responsible for making or transmitting any Offer or for any mistakes, errors or omissions in the making or transmission of any Offer.*

The City may give information about this Invitation to the market and Bondholders by delivery of the information to the following institutions: Bloomberg Financial Market Systems, the Municipal Securities Rulemaking Board through its Electronic Municipal Market Access system ("**EMMA**") and DTC and by posting information to the Information and Tender Agent's website at www.bondcom.com/DWSD. These institutions and the Information and Tender Agent's website are collectively referred to herein as the "**Information Services**." Delivery by the City of information to the Information Services will be deemed to constitute delivery of this information to each Bondholder.

**The City, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender Agent have no obligation to ensure that a Bondholder actually receives any information given to the Information Services.**

**Provisions Applicable to all Offers**

A Bondholder should ask its broker, account executive, financial advisor or other financial professional for advice in determining whether to offer its Tender Bonds of any CUSIP number and the principal amounts thereof to offer. A Bondholder also should inquire as to whether its Financial Representative will charge a fee for submitting Offers or for purchases of the Offered Bonds. The City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender Agent will not charge any Bondholder for making an Offer or for purchase of Offered Bonds if its Offer is accepted.

Each Offer must include the CUSIP numbers and the principal amounts of the Offered Bonds (in authorized denominations for each CUSIP number). A Bondholder should consult its broker, account executive, financial advisor or other financial professional for instructions on making an Offer and refer to the form of Bondholder's Instructions attached hereto and posted at www.bondcom.com/DWSD.

"All or none" offers are not permitted.

*All Offers must be made through the DTC participants holding the Tender Bonds, who must transmit Offers through the ATOP System. The City will not accept any Offers that are not transmitted through the ATOP System.* See "—Transmission of Offers by Financial Institutions; the ATOP System."

A Bondholder may only offer to sell Tender Bonds it owns. By submitting an Offer, a Bondholder warrants that it has, at the time of the Offer, and will have on the Settlement Date, full authority to transfer and sell such Tender Bonds, and that the transferee will acquire good title, free and clear of all liens, charges, encumbrances, conditional sales agreements or other obligations or adverse claims. All tenders shall survive the death or incapacity of the tendering Bondholder.

A Bondholder who would like to receive information furnished by the City to the Information Services must make appropriate arrangements with its Financial Representative, financial advisor or other financial professional, the Information and Tender Agent or the Information Services. All information furnished by the City to the Information Services may be retrieved at www.bondcom.com/DWSD.

**Transmission of Offers by Financial Institutions; ATOP System**

Offers to sell Tender Bonds may only be transmitted to the City through the DTC participant holding the Tender Bonds. Any financial institution that is a participant in DTC may transmit a book-entry offer of the Tender Bonds through the ATOP System in accordance with DTC's procedures. Concurrently with such transmission of Tender Bonds through the ATOP System, an Agent's Message (as described below) must be received by the Information and Tender Agent through the ATOP System by not later than 5:00 p.m., New York City time, on the Expiration Date. The term "**Agent's Message**" means a message transmitted by DTC to, and received by, the Information and Tender Agent which states that DTC has received an express acknowledgment from the DTC participant on behalf of the beneficial Bondholder making an Offer of the Offered Bonds, stating the CUSIP number(s) and the principal amount(s) of the Offered Bonds that have been offered pursuant to this Invitation and to the effect that such participant (and beneficial Bondholder) agrees to be bound by the terms of this Invitation.

Bondholders who are not DTC participants can only make Offers by making arrangements with and instructing their Financial Representative to submit the Bondholders' Offer through the ATOP System. To ensure a Bondholder's Offer is submitted through the ATOP System by 5:00 p.m., New York City time, on the Expiration Date, a Bondholder must provide instructions to its Financial Representative in sufficient time for the Financial Representative to submit its Offer via the ATOP System by this deadline. Bondholders should contact their Financial Representative for information on how and when they need to submit instructions to the Financial Representative in order for such Financial Representative to transmit an Offer through the ATOP System by 5:00 p.m., New York City time, on the Expiration Date.

**Real Time Reporting Of Tender Results Via The BondCom Ticker**

The Information and Tender Agent operates a real-time internet-based reporting system (the "**BondCom Ticker**") which delivers real-time reports of Offers received by the City aggregated by CUSIP numbers. The BondCom Ticker is available free of charge to all Bondholders and the general public at **www.bondcom.com/DWSD**.

**Determinations as to Form and Validity of Offers; Right of Waiver and Rejection**

All questions as to the validity, including the time of receipt of the Agent's Message by the Information and Tender Agent, eligibility and acceptance of any Offers will be determined by the City in its sole discretion and will be final, conclusive and binding.

The City reserves the right to waive any irregularities or defects in any Offer. The City, the Dealer Manager, the Financial Advisor, the Board Financial Consultant and the Information and Tender

6

Agent are not obligated to give notice of any defects or irregularities in Offers and they will have no liability for failing to give such notice.

The City reserves the absolute right to reject any and all Offers, whether or not they comply with the terms of this Invitation and the Other Tender Materials.

### Irrevocability of Offers Upon Submission

All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission via the ATOP System and may not be withdrawn, except in the limited circumstances described herein.

If (a) the City amends the applicable Purchase Price with respect to any Tender Bond or (b) at any time prior to the Settlement Date, the City determines that a material event has occurred, the City will submit an amendment or supplement to this Invitation and the Other Tender Materials providing notice of such events to the Information Services (including by posting such amendment and supplement to the Information and Tender Agent's website at www.bondcom.com/DWSD). In connection with such notice, the City in its sole discretion may extend the Expiration Date to allow reasonable time for dissemination of such information to Bondholders and for Bondholders to respond.

Upon any such notice of such amendment or supplement, a Bondholder would have the opportunity to submit via the ATOP System to the Information and Tender Agent by not later than 5:00 p.m., New York City time, on the Expiration Date a request to withdraw an Offer that was submitted prior to the publication of such notice. Any such request must include the name of the beneficial Bondholder, the reason for the requested withdrawal and the contact information for the beneficial Bondholder. Upon completion of the withdrawal of such Offer, the beneficial Bondholder may cause an amended Offer to be transmitted via the ATOP System by not later than 5:00 p.m., New York City time, on the Expiration Date. An amended Offer must specify the CUSIP numbers and the principal amounts of the Offered Bonds (in authorized denominations).

*All notices of requests for withdrawal in the limited circumstances described above and amended Offers must be made through the ATOP System. The City will not accept notices of requests for withdrawal or any amended Offers that are not made through the ATOP System.* Bondholders who are not DTC participants can only withdraw their Offers in the limited circumstances described above by making arrangements with and instructing their Financial Representative to submit a request for withdrawal through the ATOP System. A Bondholder should consult its broker, account executive, financial advisor or other financial professional for instructions on withdrawing an Offer or making an amended Offer. All questions as to the eligibility and validity of a request for withdrawal (including the time of receipt) will be determined by the City in its sole discretion and will be final, conclusive and binding.

### Determination by the City of Offered Bonds to Accept for Purchase

The City shall be under no obligation to accept for purchase any Offered Bond. The City will determine which Offered Bonds, if any, it will accept for purchase. The City, therefore, has the right to purchase all, some or none of the Offered Bonds. The City plans to accept Offered Bonds for purchase only to the extent it can realize sufficient savings, determined in its sole discretion. See "INTRODUCTION – Plan of Financing and Purpose of Tender Offer."

The purchase of Offered Bonds accepted by the City is subject to satisfaction of certain conditions. See "—Conditions to Purchase."

7

**Notice of Acceptance or Rejection of Offered Bonds**

The acceptance and rejection of Offered Bonds will be made by notification to the Information Services (including by posting such information to the Information and Tender Agent's website at www.bondcom.com/DWSD) by 5:00 p.m., New York City time, on the first business day after the Expiration Date. This notification will state the principal amounts and the CUSIP numbers (or Contra CUSIP numbers, as applicable) of the Offered Bonds that the City has accepted for purchase and the Offered Bonds that the City has declined for purchase. Promptly after the giving of any such notice, the City will instruct DTC to release to the offering Bondholders all Offered Bonds that were not accepted for purchase.

After accepting Offered Bonds, the City may determine to purchase only a portion of the Offered Bonds it previously accepted for purchase. See "—Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted" herein. In the event certain conditions to purchase Offered Bonds are not satisfied (or waived with respect to the City Conditions (as defined herein)), the Offered Bonds will not be purchased. See "—Conditions to Purchase."

**Settlement Date; Purchase of Offered Bonds**

Subject to the satisfaction of each of the conditions to purchase as described herein and in the Other Tender Materials, the Offered Bonds accepted by the City will be purchased on the Settlement Date. The Settlement Date is expected to be September 4, 2014. The City may, in its sole discretion, change the Settlement Date by giving notice to the Information Services (including by posting such information to the Information and Tender Agent's website at www.bondcom.com/DWSD) by 9:00 a.m., New York City time, on the previously scheduled Settlement Date, provided, however, the City will not change the Settlement Date to a date later than September 22, 2014, or such later date that the City determines to be necessary as described under "Offers are Irrevocable Upon Submission". If all conditions to the City's purchase of Offered Bonds are not satisfied and the City does not complete the purchase of the Offered Bonds by the Settlement Date (as the same may be changed by the City by giving notice in the manner described in the preceding sentence), the City will not have any liability or obligation to any Bondholder to purchase any Offered Bonds, and the City will release the Offered Bonds for transmission to Bondholders.

Subject to the satisfaction of each of the conditions to purchase as described herein and in the Other Tender Materials, payment by the City will be made in immediately available funds on the Settlement Date by deposit with DTC of the aggregate Purchase Price of and accrued interest on the Offered Bonds accepted for purchase. It is expected that, in accordance with DTC's standard procedures, DTC will credit the relevant portion of the aggregate Purchase Price and accrued interest to each of its participant financial institutions holding the Offered Bonds accepted for purchase on behalf of Bondholders, for credit to the accounts of the Bondholders. **The City, the Emergency Manager, the Dealer Manager, the Financial Advisor, Board Financial Consultant and the Information and Tender Agent have no responsibility or liability for the distribution of the Purchase Price plus accrued interest by DTC to the Bondholders.**

**Funds for Purchase of Offered Bonds; Reduction of Offered Bonds Accepted**

Notwithstanding the acceptance for purchase by the City of any amount of Offered Bonds and the notice thereof to the Bondholders (as described in "—Notice of Acceptance of Offered Bonds"), the purchase of any Offered Bonds accepted by the City pursuant to this Invitation is conditioned upon the City receiving sufficient proceeds from the 2014 DWSD Refinancing Bonds and other conditions set for in this Invitation. No assurances can be given that the 2014 DWSD Refinancing Bonds will be issued in

an amount sufficient to pay the Purchase Price of the Offered Bonds accepted by the City for purchase or that the purchase of the DWSD Bonds will be completed. See "INTRODUCTION – Plan of Financing and Purpose of Tender Offer."

After acceptance, the City will offer the 2014 DWSD Refinancing Bonds via public offering or private placement. The amount of the 2014 DWSD Refinancing Bonds to be sold by the City will be determined at the time of pricing thereof. The City in its sole discretion may determine to sell 2014 DWSD Refinancing Bonds in an amount that is less than that required to purchase all of the Offered Bonds previously accepted pursuant to this Invitation and therefore, purchase only a portion of such previously accepted Offered Bonds. In such case, the City in its sole discretion may choose to accept any of the Offered Bonds it previously accepted. Within a particular Offered Bond, the City may determine to accept for purchase only a pro-rata portion of such Offered Bond (rounded to the nearest authorized denominations).

Promptly upon such reduction in the Offered Bonds accepted for purchase by the City, notice of such reduction will be provided to the Information Services (including by posting such information to the Information and Tender Agent's website at www.bondcom.com/DWSD). Promptly after the giving of any such notice, the City will instruct DTC to release to the offering Bondholders those Offered Bonds that the City has determined not to purchase.

**Conditions to Purchase**

Notwithstanding any notice of acceptance for purchase of any Offered Bonds, the City will not be required to purchase any such Offered Bonds, and will incur no liability as a result, if, before payment for such Offered Bonds:

1. On the Settlement Date, the City does not file with the Bankruptcy Court an amended Plan of Adjustment that would remove all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

2. The Bankruptcy Court does not issue the Bankruptcy Order authorizing the City's issuance of the 2014 DWSD Refinancing Bonds to purchase the Offered Bonds;

3. By 1:00 p.m., New York City time, on the Settlement Date, the City does not, for any reason, have sufficient funds from the proceeds of the 2014 DWSD Refinancing Bonds to pay for the purchase of such Offered Bonds;

4. Litigation or another proceeding is pending or threatened which the City believes may, directly or indirectly, have an adverse impact on this Invitation or the expected benefits of this Invitation to the City or the Bondholders or the validity or enforceability of the Bankruptcy Order;

5. A war, national emergency, banking moratorium, suspension of payments by banks, a general suspension of trading by the New York Stock Exchange or a limitation of prices on the New York Stock Exchange exists and the City believes this fact makes it inadvisable to proceed with the purchase of such Offered Bonds; or

6. A material change in the business or affairs of the City which the City believes makes it inadvisable to proceed with the purchase of such Offered Bonds.

The conditions described in paragraphs 1, 2 and 3 above (the "***Non-Waivable Conditions***") are conditions that cannot be waived by the City. If any of the Non-Waivable Conditions are not satisfied on or prior to the Settlement Date, the City will not purchase any Offered Bonds.

The conditions described in paragraphs 4, 5 and 6 above (the "***City Conditions***") are for the sole benefit of the City and may be asserted by the City, on or prior to the Settlement Date, regardless of the circumstances giving rise to any of the City Conditions or may be waived by the City in whole or in part at any time and from time to time in its discretion. The failure by the City at any time to exercise any of these rights with respect to the City Conditions will not be deemed a waiver of any of these rights, and the waiver of these rights with respect to particular facts and other circumstances will not be deemed a waiver of these rights with respect to any other facts and circumstances. Each of these rights will be deemed an ongoing right of the City which may be asserted at any time and from time to time prior to the Settlement Date. Any determination by the City concerning the events described in this paragraph will be final and binding upon all parties. If, on or prior to the Settlement Date, the City asserts any of its rights with respect to the City Conditions, the City will have the absolute right to cancel its obligations to purchase any Offered Bonds without any liability to any Bondholder.

If the Offered Bonds are not purchased on the Settlement Date, the City will promptly instruct DTC to release to the offering Bondholders all Offered Bonds.

## Extension, Termination and Amendment of Offer; Changes to Terms

The City has the right to extend the Expiration Date of this Invitation, as to any or all of the Tender Bonds, to any date in its sole discretion, provided that a notice of any extension of the Expiration Date is given to the Information Services (including by posting such notice to the Information and Tender Agent's website at www.bondcom.com/DWSD) not later than 9:00 a.m., New York City time, on the second business day after the then scheduled Expiration Date.

The City also has the right to terminate this Invitation at any time by giving notice prior to the Expiration Date to the Information Services (including by posting such notice to the Information and Tender Agent's website at www.bondcom.com/DWSD) of such termination. The termination would be effective at the time specified in such notice.

The City also has the right to amend or waive the terms of this Invitation (other than the Non-Waivable Conditions) and at any time by giving notice to the Information Services (including by posting such notice to the Information and Tender Agent's website at www.bondcom.com/DWSD) of such amendment or waiver. Such amendment or waiver would be effective at the time specified in such notice.

If the City extends the Expiration Date of this Invitation, or amends the terms of this Invitation (including a waiver of any term other than the Non-Waivable Conditions) in any material respect, the City may (but is not required to) disseminate additional materials and/or extend the Expiration Date to the extent required to allow reasonable time for dissemination to Bondholders and for Bondholders to respond.

No extension, termination or amendment of this Invitation (or waiver of any terms of this Invitation) will change the City's right to decline to purchase any Offered Bonds without liability. See "—Conditions to Purchase."

4834-7740-0092.4

**Representations by Tendering Bondholders to the City**

By making Offers, Bondholders will be deemed to have represented to and agreed with the City that: (a) they have made their own independent decisions to make an Offer, as to the terms thereof, and whether their Offer is appropriate for them; (b) such decisions were based upon their own judgment and upon advice from such advisors as they have consulted; (c) they are not relying on any communication from the City as investment advice or as a recommendation to make an Offer, it being understood that the information from the City related to the terms and conditions of this Invitation shall not be considered investment advice or a recommendation to make an Offer; (d) they are capable of assessing the merits of and understanding (on their own and/or through independent professional advice), and do understand and accept, the terms and conditions of this Invitation; and (e) they have received, and have had the opportunity to review, this Invitation and the Other Tender Materials prior to making the decision as to whether or not they should offer their Tender Bonds.

## DISCLOSURE STATEMENT

Certain information regarding the DWSD, the Tender Bonds, the other DWSD Bonds and the plan of finance is set forth in the Disclosure Statement, which is attached hereto as Appendix B and is incorporated herein by reference. To make an informed decision as to whether and how to offer any Tender Bonds, a Bondholder is advised to read the entire Disclosure Statement, in addition to this Invitation and the Other Tender Materials.

## ADDITIONAL CONSIDERATIONS

In deciding whether to offer any Tender Bonds pursuant to this Invitation, each Bondholder should consider carefully, in addition to the other information contained in this Invitation and the Other Tender Materials, the following:

*The City May Redeem, Purchase or Exchange the Tender Bonds At More or Less Favorable Prices Than the Applicable Purchase Prices under this Invitation*. The City reserves the right to, and may decide to, redeem or acquire some or all of the Tender Bonds through optional redemptions, open market purchases, privately negotiated transactions, subsequent tender offers, exchange offers or otherwise, upon such terms and at such prices as it may determine, which may be more or less than the applicable Purchase Prices as set forth on Schedule A to this Invitation and could be for cash or other consideration. Any future redemptions, open market purchases, privately negotiated transactions, tender offers or exchange offers may be on the same terms or on terms that are more or less favorable to Bondholders of the Tender Bonds than the terms of this Invitation. The decision to enter into any future transactions and the terms of any such future transactions will depend on various factors existing at that time. There can be no assurance as to which of these alternatives, if any, the City will ultimately choose to pursue in the future.

*Market for the Tender Bonds*. The Tender Bonds are not listed on any national or regional securities exchange or reported on a national quotation system. To the extent that the Tender Bonds are traded, their prices may fluctuate greatly depending on the trading volume and the balance between buy and sell orders. Bondholders may be able to effect a sale of the Tender Bonds at prices higher than the applicable Purchase Prices described in this Invitation. **None of the City, the DWSD, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent makes any recommendation that any Bondholder tender or refrain from tendering all or any portion of its Tender Bonds or makes any representation that the Purchase Prices as set forth on Schedule A of this Invitation are indicative of market prices.**

4834-7740-0092.4

*Treatment of the Tender Bonds Not Purchased*.  The Tender Bonds not offered and purchased pursuant to this Invitation will remain outstanding until maturity, redemption or defeasance.  If the City purchases any Tender Bonds or any DWSD Sewer Bonds pursuant to the Invitations, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would remove the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds.  Under such amended Plan of Adjustment, all of the DWSD Bonds that are not purchased pursuant to the Invitations would be unimpaired.  To the extent the City elects, in its sole discretion, not to purchase any DWSD Bonds pursuant to the Invitations, or the purchase of DWSD Bonds pursuant to the Invitation does not close for any reason, the treatment of the DWSD Bonds under the Plan of Adjustment, as currently proposed, would include an impairment of certain of the DWSD Bonds as identified on Schedule A.

*Certain Potential Adverse Effects of this Invitation on the Tender Bonds Not Purchased*.  The purchase by the City of any Offered Bonds could have adverse effects on owners of the Tender Bonds not purchased pursuant to this Invitation, including, among others, the principal amount of the Tender Bonds of that CUSIP number available to trade publicly will be reduced, which could adversely affect the liquidity and market value of the Tender Bonds of that CUSIP number that remain outstanding.

*Ongoing Mediation Regarding Creation of a Regional Water Authority.*  There is ongoing mediation involving the City and the Counties of Macomb, Oakland and Wayne with respect to the creation of a regional water authority.  No prediction can be made as to the outcome of such mediation or its effect on the DWSD Bonds, including the value thereof.  See "THE DEPARTMENT—Ongoing Discussion of Formation of Regional Water Authority" in the Disclosure Statement.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The City has been advised that sales by Bondholders pursuant to this Invitation will be taxable transactions for federal income tax purposes.  The tax consequences of a sale of the Tender Bonds pursuant to this Invitation may vary depending upon, among other things, the particular circumstances of the tendering Bondholder.  Bondholders should consult their tax advisor with respect to the proper tax treatment of any sale pursuant to this Invitation, in light of their individual tax situation.

Amounts paid to Bondholders tendering their Bonds for purchase may be subject to "backup withholding" ("*Backup Withholding*") by reason of the events specified by Section 3406 of the Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder (collectively, the "*Code*"), which include failure of a Bondholder to supply their Financial Representative with such Bondholder's taxpayer identification number certified under penalty of perjury.  Backup Withholding may also apply to Bondholders who are otherwise exempt from such Backup Withholding if such Bondholders fail to properly document their status as exempt recipients.

This federal income tax discussion (the "*General Federal Tax Discussion*") is included for general information only and should not be construed as a tax opinion nor tax advice by the City or any of its advisors or agents to Bondholders.  Bondholders are hereby notified that any discussion of federal income tax issues contained or referred to herein is not intended or written to be used, and cannot be used by Bondholders, for the purposes of avoiding penalties that may be imposed on them under the Code.  The General Federal Tax Discussion does not purport to address all aspects of federal income taxation that may be relevant to particular Bondholders (e.g., a foreign person, bank, thrift institution, personal holding company, tax-exempt organization, regulated investment company, insurance company, or other broker or dealer in securities or currencies).  In addition to federal tax consequences, the sale or exchange of the Tender Bonds may be treated as a taxable event for other state and local and foreign tax purposes.

12

Bondholders should not rely upon the General Federal Tax Discussion and are urged to consult their own tax advisors to determine the particular federal, state or local tax consequences of offer of sales made by them pursuant to this Invitation, including the effect of possible changes in the tax laws.

## BANK PROCESSING FEE; ELIGIBLE INSTITUTIONS ARE NOT AGENTS

The City will pay or cause to be paid to any commercial bank or trust company having an office, branch or agency in the United States, and any firm which is a member of the Financial Industry Regulatory Authority, or of a registered national securities exchange (an "*Eligible Institution*"), the following bank processing fee for Offered Bonds purchased by the City from each of its retail customers: (1) $10.00 per $1,000 of principal amount of Offered Bonds for the first $50,000 of Offered Bonds purchased from each retail customer, (2) $5.00 per $1,000 of principal amount of Offered Bonds in excess of $50,000 and up to $250,000 of Offered Bonds purchased from such retail customer and (3) $2.50 per $1,000 of principal amount of Offered Bonds in excess of $250,000 and up to $5,000,000 purchased from such retail customer. A "*retail customer*" is an individual who manages his or her own investments and whose investments are not managed by an investment manager or bank trust department that holds the investments of that individual in a separate account in the name of that individual.

Eligible Institutions must submit requests for payment of bank processing fees online at www.bondcom.com/DWSD no later than 5:00 p.m., New York City time, on the fifth calendar day immediately following the Expiration Date, unless earlier terminated or extended. No payment of a bank processing fee will be made on requests received after this time. No bank processing fee will be paid on requests improperly submitted or for Offered Bonds not purchased by the City.

Eligible Institutions are not agents of the City for this Invitation.

## REIMBURSEMENT OF FINANCIAL INSTITUTION EXPENSES FOR FORWARDING INVITATION AND OTHER TENDER OFFER MATERIALS

The City will reimburse financial institutions their reasonable out-of-pocket expenses incurred in forwarding this Invitation and the Other Tender Materials to the Bondholders whose Tender Bonds they hold (and to the Bondholders' account executives), and in handling and forwarding Offers to tender Offered Bonds. The reimbursement for forwarding such materials will be at the amounts established by the New York Stock Exchange. Requests for reimbursement of out-of-pocket expenses must be made to the Information and Tender Agent, online at www.bondcom.com/DWSD no later than 5:00 p.m., New York City time, on the fifth calendar day immediately following the Expiration Date. No reimbursement will be made on requests received after this time.

## DEALER MANAGER

The City has retained Citigroup Global Markets Inc. to act on its behalf as Dealer Manager for this Invitation. The City will pay the Dealer Manager a fee of $1.00 for each $1,000 principal amount of the Offered Bonds purchased by the City pursuant to this Invitation. In addition, the City will pay the Dealer Manager its reasonable out-of-pocket costs and expenses relating to this Invitation. Any reference in this Invitation to the Dealer Manager is to Citigroup Global Markets Inc. in its capacity as the Dealer Manager.

The Dealer Manager may contact Bondholders of the Tender Bonds regarding this Invitation and may request brokers, dealers, custodian banks, depositories, trust companies and other nominees to forward this Invitation and the Other Tender Materials to beneficial owners of the Tender Bonds.

Citigroup Global Markets Inc. will also be acting as the senior managing underwriter of the 2014 DWSD Refinancing Bonds and will be paid an underwriting discount in its role as underwriter of the 2014 DWSD Refinancing Bonds. The Dealer Manager or an affiliate thereof may, if necessary, purchase the 2014 DWSD Refinancing Bonds as interim financing bonds.

The Dealer Manager and one or more of its affiliates together own $97,585,000 of the DWSD Bonds ($94,035,000 of DWSD Sewer Bonds and $3,550,000 of DWSD Water Bonds) which may be offered and purchased pursuant to the Invitations.

## FINANCIAL ADVISOR

First Southwest Company is acting as Financial Advisor to the DWSD in connection with the Invitations for the DWSD Bonds. The Financial Advisor's fee for services rendered with respect to the Invitations for the DWSD Bonds is $395,000.

## FINANCIAL CONSULTANT TO THE BOWC

Ramirez & Co., Inc. is acting as the Board Financial Consultant to the BOWC in connection with the Invitations for the DWSD Bonds. The Board Financial Consultant's fee for services rendered with respect to the Invitations for the DWSD Bonds is $153,000.

## MISCELLANEOUS

No one has been authorized by the City, DWSD, the BOWC, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent to recommend to any Bondholder whether to offer any amount of the Tender Bonds pursuant to this Invitation. No one has been authorized to give any information or to make any representation in connection with this Invitation other than those contained herein and in the Other Tender Materials. Any recommendations, information and representations given or made cannot be relied upon as having been authorized by the City, DWSD, the BOWC, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent.

None of the City, DWSD, the BOWC, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Financial Consultant or the Information and Tender Agent makes any recommendation that any Bondholder tender or refrain from tendering all or any portion of the principal amount of such Bondholder's Bonds. Each Bondholder must make these decisions and should read this Invitation and the Other Tender Materials and consult with its broker, account executive, financial advisor and/or other financial professional in making these decisions.

Institutional investors with questions about this Invitation should contact the Dealer Manager. Individual investors and their brokers, account executives, financial advisors or other financial professionals with questions about this Invitation should contact the Information and Tender Agent. The contact information for the Dealer Manager and the Information and Tender Agent are as follows:

### Dealer Manager

**Citigroup Global Markets Inc.**
390 Greenwich Street, 2nd Floor, New York, NY 10013
David M. Brownstein, 212-723-5570, david.m.brownstein@citi.com

Mike Leffler, 212-723-4453, mike.leffler@citi.com
Shai Markowicz, 212-723-5135, shai.markowicz@citi.com

**Information and Tender Agent:**

Bondholder Communications Group
30 Broad Street 46th Floor New York, NY 10004
Attention: Denise Waters
Call Toll Free: (888) 385-BOND or (888) 385-2663
Web site: www.bondcom.com/DWSD   E-mail: Dwaters@bondcom.com

CITY OF DETROIT, MICHIGAN

By    /s/   Kevyn D. Orr
        Emergency Manager

DETROIT WATER AND SEWERAGE
DEPARTMENT

By    /s/   Sue F. McCormick
        Director

15

**Bonds Not Impaired Under Current Plan of Adjustment**

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | **1,476,465,000** | | | | | |
| 251255TP0 | 1993 | Senior | 12,910,000 | 6.500% | 7/1/15 | | NPFG | 102.500 |
| 251255XN0 | 1997A | Senior | 6,910,000 | 6.000% | 7/1/15 | | NPFG | 102.250 |
| 251255A21 | 2001A | Senior | 73,790,000 | 5.000% | 7/1/30 | 9/2/14 | NPFG | 100.000 |
| 2512556V2 | 2001C | Second | 365,000 | 4.250% | 7/1/15 | | FGIC / BHAC | 100.500 |
| 2512556W0 | 2001C | Second | 380,000 | 4.250% | 7/1/16 | | FGIC / BHAC | 103.000 |
| 2512556X8 | 2001C | Second | 390,000 | 4.250% | 7/1/17 | | FGIC / BHAC | 104.300 |
| 2512556Y6 | 2001C | Second | 415,000 | 4.250% | 7/1/18 | | FGIC / BHAC | 104.900 |
| 2512557L3 | 2001C | Second | 20,090,000 | 4.500% | 7/1/29 | 7/1/18 | FGIC / BHAC | 89.500 |
| 2512557K5 | 2001C | Second | 18,815,000 | 4.750% | 7/1/29 | 7/1/18 | FGIC / BHAC | 92.168 |
| 251255D77 | 2003A | Senior | 500,000 | 4.500% | 7/1/19 | 9/2/14 | NPFG | 100.000 |
| 251255D93 | 2003A | Senior | 250,000 | 4.700% | 7/1/21 | 9/2/14 | NPFG | 100.000 |
| 251255E27 | 2003A | Senior | 3,550,000 | 4.750% | 7/1/22 | 9/2/14 | NPFG | 100.000 |
| 2512555F8 | 2003A | Senior | 9,970,000 | 5.000% | 7/1/25 | 9/2/14 | NPFG | 100.000 |
| 251255K20 | 2003A | Senior | 20,955,000 | 5.000% | 7/1/26 | 9/2/14 | NPFG | 100.000 |
| 251255K38 | 2003A | Senior | 21,900,000 | 5.000% | 7/1/27 | 9/2/14 | NPFG | 100.000 |
| 251255E68 | 2003A | Senior | 121,660,000 | 5.000% | 7/1/34 | 9/2/14 | NPFG | 100.000 |
| 2512555H4 | 2003B | Second | 41,770,000 | 5.000% | 7/1/34 | 9/2/14 | NPFG | 92.750 |
| 251255J22 | 2003C | Senior | 2,120,000 | 4.250% | 7/1/15 | 9/2/14 | NPFG | 100.000 |
| 251255J30 | 2003C | Senior | 2,620,000 | 5.250% | 7/1/16 | 9/2/14 | NPFG | 100.000 |
| 251255J48 | 2003C | Senior | 2,655,000 | 5.250% | 7/1/17 | 9/2/14 | NPFG | 100.000 |
| 251255J55 | 2003C | Senior | 2,930,000 | 5.250% | 7/1/18 | 9/2/14 | NPFG | 100.000 |
| 251255J63 | 2003C | Senior | 2,790,000 | 5.250% | 7/1/19 | 9/2/14 | NPFG | 100.000 |
| 251255J71 | 2003C | Senior | 2,965,000 | 5.250% | 7/1/20 | 9/2/14 | NPFG | 100.000 |
| 251255J89 | 2003C | Senior | 4,580,000 | 5.000% | 7/1/21 | 9/2/14 | NPFG | 100.000 |
| 251255J97 | 2003C | Senior | 4,665,000 | 5.000% | 7/1/22 | 9/2/14 | NPFG | 100.000 |
| 2512552U8 | 2003D | Senior | 335,000 | 4.100% | 7/1/15 | | NPFG | 100.750 |
| 2512552V6 | 2003D | Senior | 350,000 | 4.200% | 7/1/16 | | NPFG | 103.096 |
| 2512552W4 | 2003D | Senior | 360,000 | 4.250% | 7/1/17 | 7/1/16 | NPFG | 102.800 |
| 2512552X2 | 2003D | Senior | 370,000 | 4.250% | 7/1/18 | 7/1/16 | NPFG | 102.380 |
| 2512553B9 | 2003D | Senior | 82,930,000 | 5.000% | 7/1/33 | 7/1/16 | NPFG | 97.412 |
| 2512553H6 | 2004A | Second | 4,475,000 | 5.250% | 7/1/15 | | NPFG | 101.250 |
| 2512553S2 | 2004A | Second | 14,505,000 | 4.500% | 7/1/25 | 7/1/16 | NPFG | 96.699 |
| 2512554B8 | 2004B | Senior | 90,000 | 4.000% | 7/1/15 | | NPFG | 100.500 |
| 2512554D4 | 2004B | Senior | 3,545,000 | 4.250% | 7/1/16 | | NPFG | 101.670 |
| 2512554F9 | 2004B | Senior | 350,000 | 4.250% | 7/1/17 | 7/1/16 | NPFG | 102.800 |
| 251255M93 | 2005A | Senior | 85,000 | 3.850% | 7/1/15 | | NPFG | 100.500 |
| 251255Q99 | 2005A | Senior | 2,145,000 | 5.000% | 7/1/15 | | NPFG | 101.500 |
| 251255N27 | 2005A | Senior | 95,000 | 3.900% | 7/1/16 | 7/1/15 | NPFG | 102.000 |
| 251255R23 | 2005A | Senior | 2,265,000 | 5.000% | 7/1/16 | 7/1/15 | NPFG | 103.512 |
| 251255N35 | 2005A | Senior | 125,000 | 4.000% | 7/1/17 | 7/1/15 | NPFG | 101.970 |
| 251255R31 | 2005A | Senior | 2,370,000 | 5.000% | 7/1/17 | 7/1/15 | NPFG | 103.461 |
| 251255N43 | 2005A | Senior | 20,000 | 4.000% | 7/1/18 | 7/1/15 | NPFG | 101.950 |
| 251255R49 | 2005A | Senior | 2,615,000 | 5.000% | 7/1/18 | 7/1/15 | NPFG | 103.410 |
| 251255N50 | 2005A | Senior | 2,790,000 | 5.000% | 7/1/19 | 7/1/15 | NPFG | 103.360 |
| 251255N68 | 2005A | Senior | 2,955,000 | 5.000% | 7/1/20 | 7/1/15 | NPFG | 103.309 |
| 251255N76 | 2005A | Senior | 3,030,000 | 5.000% | 7/1/21 | 7/1/15 | NPFG | 103.258 |
| 251255N84 | 2005A | Senior | 3,225,000 | 5.000% | 7/1/22 | 7/1/15 | NPFG | 103.208 |
| 251255N92 | 2005A | Senior | 3,430,000 | 5.000% | 7/1/23 | 7/1/15 | NPFG | 103.157 |
| 251255P25 | 2005A | Senior | 3,650,000 | 5.000% | 7/1/24 | 7/1/15 | NPFG | 103.107 |
| 251255P33 | 2005A | Senior | 3,790,000 | 5.000% | 7/1/25 | 7/1/15 | NPFG | 102.880 |
| 251255P41 | 2005A | Senior | 4,080,000 | 5.000% | 7/1/26 | 7/1/15 | NPFG | 101.493 |
| 251255P58 | 2005A | Senior | 4,290,000 | 5.000% | 7/1/27 | 7/1/15 | NPFG | 100.690 |

## Bonds Not Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| 251255P66 | 2005A | Senior | 4,615,000 | 5.000% | 7/1/28 | 7/1/15 | NPFG | 99.972 |
| 251255P74 | 2005A | Senior | 4,890,000 | 4.500% | 7/1/29 | 7/1/15 | NPFG | 94.103 |
| 251255P82 | 2005A | Senior | 5,145,000 | 4.500% | 7/1/30 | 7/1/15 | NPFG | 93.332 |
| 251255P90 | 2005A | Senior | 5,415,000 | 4.500% | 7/1/31 | 7/1/15 | NPFG | 92.575 |
| 251255Q24 | 2005A | Senior | 5,715,000 | 4.500% | 7/1/32 | 7/1/15 | NPFG | 91.830 |
| 251255Q32 | 2005A | Senior | 19,525,000 | 4.500% | 7/1/35 | 7/1/15 | NPFG | 90.661 |
| 2512557S8 | 2005B | Senior | 2,225,000 | 4.000% | 7/1/15 | | FGIC / BHAC | 100.000 |
| 2512557T6 | 2005B | Senior | 2,305,000 | 4.000% | 7/1/16 | | FGIC / BHAC | 103.000 |
| 2512557U3 | 2005B | Senior | 2,385,000 | 4.000% | 7/1/17 | | FGIC / BHAC | 104.929 |
| 2512558G3 | 2005B | Senior | 28,415,000 | 4.750% | 7/1/34 | 7/1/18 | FGIC / BHAC | 95.089 |
| 2512558J7 | 2005B | Senior | 57,500,000 | 5.250% | 7/1/35 | 7/1/18 | FGIC / BHAC | 99.697 |
| 251255S71 | 2005C | Senior | 9,735,000 | 5.000% | 7/1/15 | | NPFG | 101.500 |
| 251255S89 | 2005C | Senior | 17,545,000 | 5.000% | 7/1/16 | 7/1/15 | NPFG | 103.512 |
| 251255S97 | 2005C | Senior | 18,425,000 | 5.000% | 7/1/17 | 7/1/15 | NPFG | 103.461 |
| 251255T21 | 2005C | Senior | 18,700,000 | 5.000% | 7/1/18 | 7/1/15 | NPFG | 103.410 |
| 251255T39 | 2005C | Senior | 8,245,000 | 5.000% | 7/1/19 | 7/1/15 | NPFG | 103.360 |
| 251255T47 | 2005C | Senior | 8,655,000 | 5.000% | 7/1/20 | 7/1/15 | NPFG | 103.309 |
| 251255T54 | 2005C | Senior | 9,090,000 | 5.000% | 7/1/21 | 7/1/15 | NPFG | 103.258 |
| 251255T62 | 2005C | Senior | 9,540,000 | 5.000% | 7/1/22 | 7/1/15 | NPFG | 103.208 |
| 251255V44 | 2006A | Senior | 7,650,000 | 5.000% | 7/1/15 | | AG | 100.500 |
| 251255W84 | 2006A | Senior | 131,150,000 | 5.000% | 7/1/34 | 7/1/16 | AG | 100.000 |
| 251256AH6 | 2006B | Second | 100,000 | 4.000% | 7/1/15 | | AG | 100.250 |
| 251256AJ2 | 2006B | Second | 100,000 | 4.250% | 7/1/16 | | AG | 101.650 |
| 251256AK9 | 2006B | Second | 100,000 | 4.600% | 7/1/17 | | AG | 104.090 |
| 251256AL7 | 2006B | Second | 100,000 | 4.800% | 7/1/18 | | AG | 105.580 |
| 251255X91 | 2006C | Second | 3,725,000 | 5.000% | 7/1/15 | | AG | 101.000 |
| 251255Y74 | 2006C | Second | 32,045,000 | 5.000% | 7/1/29 | 7/1/16 | AG | 95.343 |
| 251255Y82 | 2006C | Second | 146,500,000 | 5.000% | 7/1/33 | 7/1/16 | AG | 92.270 |
| 251255Z99 | 2006D | Senior | 15,000 | 4.100% | 7/1/15 | | AG | 100.000 |
| 2512552A2 | 2006D | Senior | 15,000 | 4.200% | 7/1/16 | | AG | 102.850 |
| 2512552B0 | 2006D | Senior | 20,000 | 4.250% | 7/1/17 | 7/1/16 | AG | 103.100 |
| 2512552C8 | 2006D | Senior | 20,000 | 4.300% | 7/1/18 | 7/1/16 | AG | 102.750 |
| 2512552J3 | 2006D | Senior | 21,105,000 | 4.625% | 7/1/32 | 7/1/16 | AG | 94.442 |
| 2512552K0 | 2006D | Senior | 57,650,000 | 5.000% | 7/1/32 | 7/1/16 | AG | 100.000 |
| 251256BB8 | 2011A | Senior | 3,550,000 | 5.000% | 7/1/15 | | N/A | 101.500 |
| 251256BR3 | 2011A | Senior | 28,890,000 | 5.000% | 7/1/36 | 7/1/21 | N/A | 95.438 |
| 251256BS1 | 2011A | Senior | 224,300,000 | 5.250% | 7/1/41 | 7/1/21 | N/A | 95.781 |
| 251256AV5 | 2011B | Senior | 1,285,000 | 3.607% | 7/1/16 | | N/A | 98.500 |
| 251256CC5 | 2011C | Senior | 7,230,000 | 4.500% | 7/1/27 | 7/1/21 | N/A | 95.812 |
| 251256CB7 | 2011C | Senior | 44,630,000 | 5.000% | 7/1/41 | 7/1/21 | N/A | 92.495 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Contra CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | **956,675,000** | | | | | |
| 2512556Z3 | | 2001C | Second | 12,510,000 | 5.750% | 7/1/19 | 7/1/18 | FGIC / BHAC | 108.688 |
| 2512557A7 | | 2001C | Second | 13,235,000 | 5.750% | 7/1/20 | 7/1/18 | FGIC / BHAC | 108.725 |
| 2512557B5 | | 2001C | Second | 14,025,000 | 5.750% | 7/1/21 | 7/1/18 | FGIC / BHAC | 108.200 |
| 2512557C3 | | 2001C | Second | 14,865,000 | 5.750% | 7/1/22 | 7/1/18 | FGIC / BHAC | 107.620 |
| 2512557D1 | | 2001C | Second | 15,750,000 | 5.750% | 7/1/23 | 7/1/18 | FGIC / BHAC | 107.060 |
| 2512557E9 | | 2001C | Second | 16,690,000 | 5.750% | 7/1/24 | 7/1/18 | FGIC / BHAC | 106.520 |
| 2512557F6 | | 2001C | Second | 17,690,000 | 5.750% | 7/1/25 | 7/1/18 | FGIC / BHAC | 105.970 |
| 2512557G4 | | 2001C | Second | 18,735,000 | 5.750% | 7/1/26 | 7/1/18 | FGIC / BHAC | 105.000 |
| 2512557H2 | | 2001C | Second | 19,945,000 | 5.750% | 7/1/27 | 7/1/18 | FGIC / BHAC | 103.739 |
| 2512557J8 | | 2001C | Second | 4,000,000 | 5.750% | 7/1/28 | 7/1/18 | FGIC / BHAC | 102.311 |
| 2512552Y0 | | 2003D | Senior | 2,585,000 | 5.000% | 7/1/24 | 7/1/16 | NPFG | 104.661 |
| 2512552Z7 | | 2003D | Senior | 29,410,000 | 5.000% | 7/1/27 | 7/1/16 | NPFG | 101.760 |
| 2512553A1 | | 2003D | Senior | 23,920,000 | 5.000% | 7/1/28 | 7/1/16 | NPFG | 99.972 |

# Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Contra CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|---|
| 251255J2 | | 2004A | Second | 4,710,000 | 5.250% | 7/1/16 | | NPFG | 103.750 |
| 2512553K9 | | 2004A | Second | 4,955,000 | 5.250% | 7/1/17 | 7/1/16 | NPFG | 105.287 |
| 2512553L7 | | 2004A | Second | 5,215,000 | 5.250% | 7/1/18 | 7/1/16 | NPFG | 105.423 |
| 2512553M5 | | 2004A | Second | 5,490,000 | 5.250% | 7/1/19 | 7/1/16 | NPFG | 105.472 |
| 2512553N3 | | 2004A | Second | 5,780,000 | 5.250% | 7/1/20 | 7/1/16 | NPFG | 105.545 |
| 2512553P8 | | 2004A | Second | 6,085,000 | 5.250% | 7/1/21 | 7/1/16 | NPFG | 105.621 |
| 2512553Q6 | | 2004A | Second | 6,400,000 | 5.250% | 7/1/22 | 7/1/16 | NPFG | 105.659 |
| 2512553R4 | | 2004A | Second | 6,735,000 | 5.250% | 7/1/23 | 7/1/16 | NPFG | 105.677 |
| 2512554C6 | | 2004B | Senior | 10,000,000 | 5.000% | 7/1/16 | | NPFG | 104.000 |
| 2512554E2 | | 2004B | Senior | 13,925,000 | 5.000% | 7/1/17 | 7/1/16 | NPFG | 104.690 |
| 2512554G7 | | 2004B | Senior | 14,940,000 | 5.000% | 7/1/18 | 7/1/16 | NPFG | 104.721 |
| 2512554H5 | | 2004B | Senior | 15,810,000 | 5.000% | 7/1/19 | 7/1/16 | NPFG | 104.771 |
| 2512554J1 | | 2004B | Senior | 16,665,000 | 5.000% | 7/1/20 | 7/1/16 | NPFG | 104.840 |
| 2512554K8 | | 2004B | Senior | 16,085,000 | 5.000% | 7/1/21 | 7/1/16 | NPFG | 105.250 |
| 2512554L6 | | 2004B | Senior | 16,935,000 | 5.000% | 7/1/22 | 7/1/16 | NPFG | 104.947 |
| 2512554M4 | | 2004B | Senior | 6,280,000 | 5.000% | 7/1/23 | 7/1/16 | NPFG | 104.962 |
| 2512557V1 | | 2005B | Senior | 2,465,000 | 5.500% | 7/1/18 | | FGIC / BHAC | 110.250 |
| 2512557W9 | | 2005B | Senior | 2,575,000 | 5.500% | 7/1/19 | 7/1/18 | FGIC / BHAC | 109.600 |
| 2512557X7 | | 2005B | Senior | 2,690,000 | 5.500% | 7/1/20 | 7/1/18 | FGIC / BHAC | 109.237 |
| 2512557Y5 | | 2005B | Senior | 2,905,000 | 5.500% | 7/1/21 | 7/1/18 | FGIC / BHAC | 108.700 |
| 2512557Z2 | | 2005B | Senior | 3,025,000 | 5.500% | 7/1/22 | 7/1/18 | FGIC / BHAC | 108.100 |
| 2512558A6 | | 2005B | Senior | 3,145,000 | 5.500% | 7/1/23 | 7/1/18 | FGIC / BHAC | 107.550 |
| 2512558B4 | | 2005B | Senior | 3,270,000 | 5.500% | 7/1/24 | 7/1/18 | FGIC / BHAC | 107.000 |
| 2512558C2 | | 2005B | Senior | 3,490,000 | 5.500% | 7/1/25 | 7/1/18 | FGIC / BHAC | 106.450 |
| 2512558D0 | | 2005B | Senior | 3,620,000 | 5.500% | 7/1/26 | 7/1/18 | FGIC / BHAC | 105.900 |
| 2512558E8 | | 2005B | Senior | 3,850,000 | 5.500% | 7/1/27 | 7/1/18 | FGIC / BHAC | 105.350 |
| 2512558F5 | | 2005B | Senior | 3,980,000 | 5.500% | 7/1/28 | 7/1/18 | FGIC / BHAC | 104.800 |
| 2512558H1 | | 2005B | Senior | 57,365,000 | 5.500% | 7/1/35 | 7/1/18 | FGIC / BHAC | 107.000 |
| 251255V51 | | 2006A | Senior | 8,030,000 | 5.000% | 7/1/16 | | AG | 104.230 |
| 251255V69 | | 2006A | Senior | 8,430,000 | 5.000% | 7/1/17 | 7/1/16 | AG | 104.700 |
| 251255V77 | | 2006A | Senior | 8,855,000 | 5.000% | 7/1/18 | 7/1/16 | AG | 104.670 |
| 251255V85 | | 2006A | Senior | 9,295,000 | 5.000% | 7/1/19 | 7/1/16 | AG | 104.871 |
| 251255V93 | | 2006A | Senior | 9,760,000 | 5.000% | 7/1/20 | 7/1/16 | AG | 104.940 |
| 251255W27 | | 2006A | Senior | 10,250,000 | 5.000% | 7/1/21 | 7/1/16 | AG | 104.800 |
| 251255W35 | | 2006A | Senior | 10,760,000 | 5.000% | 7/1/22 | 7/1/16 | AG | 104.672 |
| 251255W43 | | 2006A | Senior | 11,300,000 | 5.000% | 7/1/23 | 7/1/16 | AG | 105.062 |
| 251255W50 | | 2006A | Senior | 11,865,000 | 5.000% | 7/1/24 | 7/1/16 | AG | 105.042 |
| 251255W68 | | 2006A | Senior | 12,460,000 | 5.000% | 7/1/25 | 7/1/16 | AG | 104.250 |
| 251255W76 | | 2006A | Senior | 13,080,000 | 5.000% | 7/1/26 | 7/1/16 | AG | 102.868 |
| 251256AM5 | | 2006B | Second | 100,000 | 5.000% | 7/1/19 | | AG | 105.800 |
| 251256AN3 | | 2006B | Second | 400,000 | 5.500% | 7/1/23 | 7/1/19 | AG | 105.607 |
| 251256AQ6 | | 2006B | Second | 62,100,000 | 6.250% | 7/1/36 | 7/1/19 | AG | 105.000 |
| 251256AP8 | | 2006B | Second | 56,600,000 | 7.000% | 7/1/36 | 7/1/19 | AG | 112.000 |
| 251255Y25 | | 2006C | Second | 3,795,000 | 5.000% | 7/1/16 | | AG | 103.500 |
| 251255Y33 | | 2006C | Second | 4,010,000 | 5.000% | 7/1/17 | 7/1/16 | AG | 104.000 |
| 251255Y41 | | 2006C | Second | 4,765,000 | 5.000% | 7/1/18 | 7/1/16 | AG | 104.300 |
| 251255Y58 | | 2006C | Second | 5,860,000 | 5.000% | 7/1/22 | 7/1/16 | AG | 103.522 |
| 251255Y66 | | 2006C | Second | 14,880,000 | 5.000% | 7/1/26 | 7/1/16 | AG | 99.250 |
| 2512552D6 | | 2006D | Senior | 2,650,000 | 5.000% | 7/1/19 | 7/1/16 | AG | 104.871 |
| 2512552E4 | | 2006D | Senior | 3,200,000 | 5.000% | 7/1/20 | 7/1/16 | AG | 104.940 |
| 2512552F1 | | 2006D | Senior | 20,135,000 | 5.000% | 7/1/23 | 7/1/16 | AG | 105.062 |
| 2512552G9 | | 2006D | Senior | 27,425,000 | 5.000% | 7/1/24 | 7/1/16 | AG | 105.042 |
| 2512552H7 | | 2006D | Senior | 9,955,000 | 5.000% | 7/1/25 | 7/1/16 | AG | 104.250 |
| 251256BC6 | | 2011A | Senior | 3,695,000 | 5.000% | 7/1/16 | | N/A | 100.941 |
| 251256BD4 | | 2011A | Senior | 3,845,000 | 5.000% | 7/1/17 | | N/A | 100.714 |
| 251256BE2 | | 2011A | Senior | 4,000,000 | 5.000% | 7/1/18 | | N/A | 100.074 |
| 251256BF9 | | 2011A | Senior | 3,160,000 | 5.000% | 7/1/19 | | N/A | 100.000 |
| 251256BG7 | | 2011A | Senior | 3,225,000 | 5.000% | 7/1/20 | | N/A | 100.000 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Contra CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|---|
| 251256BH5 | 25199ASV8 | 2011A | Senior | 4,215,000 | 5.000% | 7/1/21 | | N/A | 100.000 |
| 251256BJ1 | 25199ASW6 | 2011A | Senior | 4,195,000 | 5.250% | 7/1/22 | 7/1/21 | N/A | 100.000 |
| 251256BK8 | 25199ASX4 | 2011A | Senior | 4,170,000 | 5.250% | 7/1/23 | 7/1/21 | N/A | 100.359 |
| 251256BL6 | 25199ASY2 | 2011A | Senior | 4,140,000 | 5.250% | 7/1/24 | 7/1/21 | N/A | 100.688 |
| 251256BM4 | 25199ASZ9 | 2011A | Senior | 4,085,000 | 5.250% | 7/1/25 | 7/1/21 | N/A | 100.985 |
| 251256BN2 | 25199ATA3 | 2011A | Senior | 4,020,000 | 5.250% | 7/1/26 | 7/1/21 | N/A | 101.281 |
| 251256BP7 | | 2011A | Senior | 3,930,000 | 5.250% | 7/1/27 | 7/1/21 | N/A | 101.158 |
| 251256BQ5 | | 2011A | Senior | 14,665,000 | 5.000% | 7/1/31 | 7/1/21 | N/A | 99.000 |
| 251256BT9 | | 2011A | Senior | 49,315,000 | 5.750% | 7/1/37 | 7/1/21 | N/A | 103.144 |
| 251256AW3 | 25199ATE5 | 2011B | Senior | 3,760,000 | 5.000% | 7/1/21 | | N/A | 98.000 |
| 251256AX1 | 25199ATF2 | 2011B | Senior | 9,740,000 | 6.000% | 7/1/33 | 7/1/21 | N/A | 98.000 |
| 251256BV4 | | 2011C | Senior | 2,700,000 | 5.000% | 7/1/21 | | N/A | 100.000 |
| 251256BW2 | | 2011C | Senior | 9,965,000 | 5.250% | 7/1/23 | 7/1/21 | N/A | 100.359 |
| 251256BX0 | | 2011C | Senior | 10,490,000 | 5.250% | 7/1/24 | 7/1/21 | N/A | 100.688 |
| 251256BY8 | | 2011C | Senior | 11,035,000 | 5.250% | 7/1/25 | 7/1/21 | N/A | 100.985 |
| 251256BZ5 | 25199ATL9 | 2011C | Senior | 11,615,000 | 5.250% | 7/1/26 | 7/1/21 | N/A | 101.281 |
| 251256CA9 | | 2011C | Senior | 5,000,000 | 5.250% | 7/1/27 | 7/1/21 | N/A | 101.158 |

*Footnote for each Insurance Provider
AG = Assured Guaranty
NPFG = National Public Finance Guarantee
FGIC = Financial Guaranty Insurance Company
BHAC = Berkshire Hathaway
N/A = Not Insured

## Derivative CUSIP

| Original CUSIP | Derivative CUSIP | Derivative CUSIP 2 |
|---|---|---|
| 251255A21 | 251255A21 | 2512558V0 |
| 2512553B9 | 2512553B9 | 2512556H3 |
| 251255Y82 | 251255Y82 | 251256AC7 |
| 2512554G7 | 2512554G7 | 2512556J9 |
| 2512554H5 | 2512554H5 | 2512556K6 |
| 2512554K8 | 2512554K8 | 2512556G5 |

**DISCLOSURE STATEMENT**
**RELATING TO**
**INVITATION TO TENDER BONDS**
**$2,433,140,000**
**CITY OF DETROIT, MICHIGAN**
**DETROIT WATER AND SEWERAGE DEPARTMENT**
**WATER SUPPLY SYSTEM BONDS**
**CONSISTING OF**
**$1,803,940,000 Revenue and Revenue Refunding Senior Lien Bonds and**
**$629,200,000 Revenue and Revenue Refunding Second Lien Bonds**

Pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation"), the City of Detroit, County of Wayne, State of Michigan (the "City"), upon authorization from (i) the Board of Water Commissioners (the "Board of Water Commissioners") of the Detroit Water and Sewerage Department (the "Department"), and (ii) the emergency manager of the City (the "Emergency Manager"), invites each holder (a "Bondholder") of those certain outstanding Detroit Water and Sewerage Department Water Supply System Revenue and Revenue Refunding Bonds (the "Tender Bonds") described more specifically on the inside cover pages of this disclosure statement (the "Disclosure Statement") to submit offers to sell all or a portion of the Tender Bonds held by such Bondholder to the City at the applicable purchase price on the inside cover page of this Disclosure Statement (the "Purchase Price"), as well as accrued and unpaid interest, subject to the conditions and upon the terms specified in the Invitation.

Bondholders should read this Disclosure Statement, the Invitation and the other materials described in the Invitation carefully and consult with their broker, account executive, financial advisor and/or other financial professional in order to make an informed decision as to whether, and how, to offer their Tender Bonds. This Disclosure Statement, the Invitation and the other materials described in the Invitation are and will be available from the Dealer Manager and the Information and Tender Agent and at www.bondcom.com/DWSD.

None of the City, the Department, the Board of Water Commissioners, the Emergency Manager, the Dealer Manager (as defined herein), the Financial Advisor (as defined herein), the Board Financial Consultant (as defined herein) and the Information and Tender Agent (as defined herein) or any of their respective affiliates makes any recommendation as to whether or not Bondholders should tender all or any portion of the Tender Bonds pursuant to the Invitation. Bondholders must make their own decisions as to whether to tender the Tender Bonds and, if so, the amount of their Tender Bonds to tender.

Any Bondholder wishing to offer its Tender Bonds pursuant to the Invitation should follow the procedures more fully described in the Invitation. Institutional investors with questions about the Invitation should contact the Dealer Manager. Individual investors and their brokers, account executives, financial advisors and other financial professionals with questions about the Invitation should contact the Information and Tender Agent.

The Dealer Manager for the Invitation is:

Citigroup Global Markets Inc.

The Information and Tender Agent for the Invitation is:

Bondholder Communications Group

30 Broad Street, 46th Floor, New York, NY 10004
Attention: Denise Waters
Call Toll Free: 888-385-BOND or 888-385-2663
Website: www.bondcom.com/DWSD Email: DWaters@bondcom.com

Date of this Disclosure Statement: August 7, 2014

**TENDER BONDS SUBJECT TO THE**
**INVITATION TO TENDER AND PURCHASE PRICES**
**Detroit Water and Sewerage Department – Water System**

**Bonds Not Impaired Under Current Plan of Adjustment**

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | **1,476,465,000** | | | | | |
| | | | | | | | | |
| 251255TP0 | 1993 | Senior | 12,910,000 | 6.500% | 7/1/15 | | NPFG | 102.500 |
| 251255XN0 | 1997A | Senior | 6,910,000 | 6.000% | 7/1/15 | | NPFG | 102.250 |
| 251255A21 | 2001A | Senior | 73,790,000 | 5.000% | 7/1/30 | 9/2/14 | NPFG | 100.000 |
| 2512556V2 | 2001C | Second | 365,000 | 4.250% | 7/1/15 | | FGIC / BHAC | 100.500 |
| 2512556W0 | 2001C | Second | 380,000 | 4.250% | 7/1/16 | | FGIC / BHAC | 103.000 |
| 2512556X8 | 2001C | Second | 390,000 | 4.250% | 7/1/17 | | FGIC / BHAC | 104.300 |
| 2512556Y6 | 2001C | Second | 415,000 | 4.250% | 7/1/18 | | FGIC / BHAC | 104.900 |
| 2512557L3 | 2001C | Second | 20,090,000 | 4.500% | 7/1/29 | 7/1/18 | FGIC / BHAC | 89.500 |
| 2512557K5 | 2001C | Second | 18,815,000 | 4.750% | 7/1/29 | 7/1/18 | FGIC / BHAC | 92.168 |
| 251255D77 | 2003A | Senior | 500,000 | 4.500% | 7/1/19 | 9/2/14 | NPFG | 100.000 |
| 251255D93 | 2003A | Senior | 250,000 | 4.700% | 7/1/21 | 9/2/14 | NPFG | 100.000 |
| 251255E27 | 2003A | Senior | 3,550,000 | 4.750% | 7/1/22 | 9/2/14 | NPFG | 100.000 |
| 2512555F8 | 2003A | Senior | 9,970,000 | 5.000% | 7/1/25 | 9/2/14 | NPFG | 100.000 |
| 251255K20 | 2003A | Senior | 20,955,000 | 5.000% | 7/1/26 | 9/2/14 | NPFG | 100.000 |
| 251255K38 | 2003A | Senior | 21,900,000 | 5.000% | 7/1/27 | 9/2/14 | NPFG | 100.000 |
| 251255E68 | 2003A | Senior | 121,660,000 | 5.000% | 7/1/34 | 9/2/14 | NPFG | 100.000 |
| 2512555H4 | 2003B | Second | 41,770,000 | 5.000% | 7/1/34 | 9/2/14 | NPFG | 92.750 |
| 251255J22 | 2003C | Senior | 2,120,000 | 4.250% | 7/1/15 | 9/2/14 | NPFG | 100.000 |
| 251255J30 | 2003C | Senior | 2,620,000 | 5.250% | 7/1/16 | 9/2/14 | NPFG | 100.000 |
| 251255J48 | 2003C | Senior | 2,655,000 | 5.250% | 7/1/17 | 9/2/14 | NPFG | 100.000 |
| 251255J55 | 2003C | Senior | 2,930,000 | 5.250% | 7/1/18 | 9/2/14 | NPFG | 100.000 |
| 251255J63 | 2003C | Senior | 2,790,000 | 5.250% | 7/1/19 | 9/2/14 | NPFG | 100.000 |
| 251255J71 | 2003C | Senior | 2,965,000 | 5.250% | 7/1/20 | 9/2/14 | NPFG | 100.000 |
| 251255J89 | 2003C | Senior | 4,580,000 | 5.000% | 7/1/21 | 9/2/14 | NPFG | 100.000 |
| 251255J97 | 2003C | Senior | 4,665,000 | 5.000% | 7/1/22 | 9/2/14 | NPFG | 100.000 |
| 2512552U8 | 2003D | Senior | 335,000 | 4.100% | 7/1/15 | | NPFG | 100.750 |
| 2512552V6 | 2003D | Senior | 350,000 | 4.200% | 7/1/16 | | NPFG | 103.096 |
| 2512552W4 | 2003D | Senior | 360,000 | 4.250% | 7/1/17 | 7/1/16 | NPFG | 102.800 |
| 2512552X2 | 2003D | Senior | 370,000 | 4.250% | 7/1/18 | 7/1/16 | NPFG | 102.380 |
| 2512553B9 | 2003D | Senior | 82,930,000 | 5.000% | 7/1/33 | 7/1/16 | NPFG | 97.412 |
| 2512553H6 | 2004A | Second | 4,475,000 | 5.250% | 7/1/15 | | NPFG | 101.250 |
| 2512553S2 | 2004A | Second | 14,505,000 | 4.500% | 7/1/25 | 7/1/16 | NPFG | 96.699 |
| 2512554B8 | 2004B | Senior | 90,000 | 4.000% | 7/1/15 | | NPFG | 100.500 |
| 2512554D4 | 2004B | Senior | 3,545,000 | 4.250% | 7/1/16 | | NPFG | 101.670 |
| 2512554F9 | 2004B | Senior | 350,000 | 4.250% | 7/1/17 | 7/1/16 | NPFG | 102.800 |
| 251255M93 | 2005A | Senior | 85,000 | 3.850% | 7/1/15 | | NPFG | 100.500 |
| 251255Q99 | 2005A | Senior | 2,145,000 | 5.000% | 7/1/15 | | NPFG | 101.500 |
| 251255N27 | 2005A | Senior | 95,000 | 3.900% | 7/1/16 | 7/1/15 | NPFG | 102.000 |
| 251255R23 | 2005A | Senior | 2,265,000 | 5.000% | 7/1/16 | 7/1/15 | NPFG | 103.512 |
| 251255N35 | 2005A | Senior | 125,000 | 4.000% | 7/1/17 | 7/1/15 | NPFG | 101.970 |
| 251255R31 | 2005A | Senior | 2,370,000 | 5.000% | 7/1/17 | 7/1/15 | NPFG | 103.461 |
| 251255N43 | 2005A | Senior | 20,000 | 4.000% | 7/1/18 | 7/1/15 | NPFG | 101.950 |
| 251255R49 | 2005A | Senior | 2,615,000 | 5.000% | 7/1/18 | 7/1/15 | NPFG | 103.410 |
| 251255N50 | 2005A | Senior | 2,790,000 | 5.000% | 7/1/19 | 7/1/15 | NPFG | 103.360 |
| 251255N68 | 2005A | Senior | 2,955,000 | 5.000% | 7/1/20 | 7/1/15 | NPFG | 103.309 |
| 251255N76 | 2005A | Senior | 3,030,000 | 5.000% | 7/1/21 | 7/1/15 | NPFG | 103.258 |
| 251255N84 | 2005A | Senior | 3,225,000 | 5.000% | 7/1/22 | 7/1/15 | NPFG | 103.208 |
| 251255N92 | 2005A | Senior | 3,430,000 | 5.000% | 7/1/23 | 7/1/15 | NPFG | 103.157 |
| 251255P25 | 2005A | Senior | 3,650,000 | 5.000% | 7/1/24 | 7/1/15 | NPFG | 103.107 |
| 251255P33 | 2005A | Senior | 3,790,000 | 5.000% | 7/1/25 | 7/1/15 | NPFG | 102.880 |
| 251255P41 | 2005A | Senior | 4,080,000 | 5.000% | 7/1/26 | 7/1/15 | NPFG | 101.493 |
| 251255P58 | 2005A | Senior | 4,290,000 | 5.000% | 7/1/27 | 7/1/15 | NPFG | 100.690 |

## Bonds Not Impaired Under Current Plan of Adjustment

| CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|
| 251255P66 | 2005A | Senior | 4,615,000 | 5.000% | 7/1/28 | 7/1/15 | NPFG | 99.972 |
| 251255P74 | 2005A | Senior | 4,890,000 | 4.500% | 7/1/29 | 7/1/15 | NPFG | 94.103 |
| 251255P82 | 2005A | Senior | 5,145,000 | 4.500% | 7/1/30 | 7/1/15 | NPFG | 93.332 |
| 251255P90 | 2005A | Senior | 5,415,000 | 4.500% | 7/1/31 | 7/1/15 | NPFG | 92.575 |
| 251255Q24 | 2005A | Senior | 5,715,000 | 4.500% | 7/1/32 | 7/1/15 | NPFG | 91.830 |
| 251255Q32 | 2005A | Senior | 19,525,000 | 4.500% | 7/1/35 | 7/1/15 | NPFG | 90.661 |
| 2512557S8 | 2005B | Senior | 2,225,000 | 4.000% | 7/1/15 | | FGIC / BHAC | 100.000 |
| 2512557T6 | 2005B | Senior | 2,305,000 | 4.000% | 7/1/16 | | FGIC / BHAC | 103.000 |
| 2512557U3 | 2005B | Senior | 2,385,000 | 4.000% | 7/1/17 | | FGIC / BHAC | 104.929 |
| 2512558G3 | 2005B | Senior | 28,415,000 | 4.750% | 7/1/34 | 7/1/18 | FGIC / BHAC | 95.089 |
| 2512558J7 | 2005B | Senior | 57,500,000 | 5.250% | 7/1/35 | 7/1/18 | FGIC / BHAC | 99.697 |
| 251255S71 | 2005C | Senior | 9,735,000 | 5.000% | 7/1/15 | | NPFG | 101.500 |
| 251255S89 | 2005C | Senior | 17,545,000 | 5.000% | 7/1/16 | 7/1/15 | NPFG | 103.512 |
| 251255S97 | 2005C | Senior | 18,425,000 | 5.000% | 7/1/17 | 7/1/15 | NPFG | 103.461 |
| 251255T21 | 2005C | Senior | 18,700,000 | 5.000% | 7/1/18 | 7/1/15 | NPFG | 103.410 |
| 251255T39 | 2005C | Senior | 8,245,000 | 5.000% | 7/1/19 | 7/1/15 | NPFG | 103.360 |
| 251255T47 | 2005C | Senior | 8,655,000 | 5.000% | 7/1/20 | 7/1/15 | NPFG | 103.309 |
| 251255T54 | 2005C | Senior | 9,090,000 | 5.000% | 7/1/21 | 7/1/15 | NPFG | 103.258 |
| 251255T62 | 2005C | Senior | 9,540,000 | 5.000% | 7/1/22 | 7/1/15 | NPFG | 103.208 |
| 251255V44 | 2006A | Senior | 7,650,000 | 5.000% | 7/1/15 | | AG | 100.500 |
| 251255W84 | 2006A | Senior | 131,150,000 | 5.000% | 7/1/34 | 7/1/16 | AG | 100.000 |
| 251256AH6 | 2006B | Second | 100,000 | 4.000% | 7/1/15 | | AG | 100.250 |
| 251256AJ2 | 2006B | Second | 100,000 | 4.250% | 7/1/16 | | AG | 101.650 |
| 251256AK9 | 2006B | Second | 100,000 | 4.600% | 7/1/17 | | AG | 104.090 |
| 251256AL7 | 2006B | Second | 100,000 | 4.800% | 7/1/18 | | AG | 105.580 |
| 251255X91 | 2006C | Second | 3,725,000 | 5.000% | 7/1/15 | | AG | 101.000 |
| 251255Y74 | 2006C | Second | 32,045,000 | 5.000% | 7/1/29 | 7/1/16 | AG | 95.343 |
| 251255Y82 | 2006C | Second | 146,500,000 | 5.000% | 7/1/33 | 7/1/16 | AG | 92.270 |
| 251255Z99 | 2006D | Senior | 15,000 | 4.100% | 7/1/15 | | AG | 100.000 |
| 2512552A2 | 2006D | Senior | 15,000 | 4.200% | 7/1/16 | | AG | 102.850 |
| 2512552B0 | 2006D | Senior | 20,000 | 4.250% | 7/1/17 | 7/1/16 | AG | 103.100 |
| 2512552C8 | 2006D | Senior | 20,000 | 4.300% | 7/1/18 | 7/1/16 | AG | 102.750 |
| 2512552J3 | 2006D | Senior | 21,105,000 | 4.625% | 7/1/32 | 7/1/16 | AG | 94.442 |
| 2512552K0 | 2006D | Senior | 57,650,000 | 5.000% | 7/1/32 | 7/1/16 | AG | 100.000 |
| 251256BB8 | 2011A | Senior | 3,550,000 | 5.000% | 7/1/15 | | N/A | 101.500 |
| 251256BR3 | 2011A | Senior | 28,890,000 | 5.000% | 7/1/36 | 7/1/21 | N/A | 95.438 |
| 251256BS1 | 2011A | Senior | 224,300,000 | 5.250% | 7/1/41 | 7/1/21 | N/A | 95.781 |
| 251256AV5 | 2011B | Senior | 1,285,000 | 3.607% | 7/1/16 | | N/A | 98.500 |
| 251256CC5 | 2011C | Senior | 7,230,000 | 4.500% | 7/1/27 | 7/1/21 | N/A | 95.812 |
| 251256CB7 | 2011C | Senior | 44,630,000 | 5.000% | 7/1/41 | 7/1/21 | N/A | 92.495 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Contra CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | **956,675,000** | | | | | |
| 2512556Z3 | | 2001C | Second | 12,510,000 | 5.750% | 7/1/19 | 7/1/18 | FGIC / BHAC | 108.688 |
| 2512557A7 | | 2001C | Second | 13,235,000 | 5.750% | 7/1/20 | 7/1/18 | FGIC / BHAC | 108.725 |
| 2512557B5 | | 2001C | Second | 14,025,000 | 5.750% | 7/1/21 | 7/1/18 | FGIC / BHAC | 108.200 |
| 2512557C3 | | 2001C | Second | 14,865,000 | 5.750% | 7/1/22 | 7/1/18 | FGIC / BHAC | 107.620 |
| 2512557D1 | | 2001C | Second | 15,750,000 | 5.750% | 7/1/23 | 7/1/18 | FGIC / BHAC | 107.060 |
| 2512557E9 | | 2001C | Second | 16,690,000 | 5.750% | 7/1/24 | 7/1/18 | FGIC / BHAC | 106.520 |
| 2512557F6 | | 2001C | Second | 17,690,000 | 5.750% | 7/1/25 | 7/1/18 | FGIC / BHAC | 105.970 |
| 2512557G4 | | 2001C | Second | 18,735,000 | 5.750% | 7/1/26 | 7/1/18 | FGIC / BHAC | 105.000 |
| 2512557H2 | | 2001C | Second | 19,945,000 | 5.750% | 7/1/27 | 7/1/18 | FGIC / BHAC | 103.739 |
| 2512557J8 | | 2001C | Second | 4,000,000 | 5.750% | 7/1/28 | 7/1/18 | FGIC / BHAC | 102.311 |
| 2512552Y0 | | 2003D | Senior | 2,585,000 | 5.000% | 7/1/24 | 7/1/16 | NPFG | 104.661 |
| 2512552Z7 | | 2003D | Senior | 29,410,000 | 5.000% | 7/1/27 | 7/1/16 | NPFG | 101.760 |
| 2512553A1 | | 2003D | Senior | 23,920,000 | 5.000% | 7/1/28 | 7/1/16 | NPFG | 99.972 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Contra CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|---|
| 2512553J2 | | 2004A | Second | 4,710,000 | 5.250% | 7/1/16 | | NPFG | 103.750 |
| 2512553K9 | | 2004A | Second | 4,955,000 | 5.250% | 7/1/17 | 7/1/16 | NPFG | 105.287 |
| 2512553L7 | | 2004A | Second | 5,215,000 | 5.250% | 7/1/18 | 7/1/16 | NPFG | 105.423 |
| 2512553M5 | | 2004A | Second | 5,490,000 | 5.250% | 7/1/19 | 7/1/16 | NPFG | 105.472 |
| 2512553N3 | | 2004A | Second | 5,780,000 | 5.250% | 7/1/20 | 7/1/16 | NPFG | 105.545 |
| 2512553P8 | | 2004A | Second | 6,085,000 | 5.250% | 7/1/21 | 7/1/16 | NPFG | 105.621 |
| 2512553Q6 | | 2004A | Second | 6,400,000 | 5.250% | 7/1/22 | 7/1/16 | NPFG | 105.659 |
| 2512553R4 | | 2004A | Second | 6,735,000 | 5.250% | 7/1/23 | 7/1/16 | NPFG | 105.677 |
| 2512554C6 | | 2004B | Senior | 10,000,000 | 5.000% | 7/1/16 | | NPFG | 104.000 |
| 2512554E2 | | 2004B | Senior | 13,925,000 | 5.000% | 7/1/17 | 7/1/16 | NPFG | 104.690 |
| 2512554G7 | | 2004B | Senior | 14,940,000 | 5.000% | 7/1/18 | 7/1/16 | NPFG | 104.721 |
| 2512554H5 | | 2004B | Senior | 15,810,000 | 5.000% | 7/1/19 | 7/1/16 | NPFG | 104.771 |
| 2512554J1 | | 2004B | Senior | 16,665,000 | 5.000% | 7/1/20 | 7/1/16 | NPFG | 104.840 |
| 2512554K8 | | 2004B | Senior | 16,085,000 | 5.000% | 7/1/21 | 7/1/16 | NPFG | 105.250 |
| 2512554L6 | | 2004B | Senior | 16,935,000 | 5.000% | 7/1/22 | 7/1/16 | NPFG | 104.947 |
| 2512554M4 | | 2004B | Senior | 6,280,000 | 5.000% | 7/1/23 | 7/1/16 | NPFG | 104.962 |
| 2512557V1 | | 2005B | Senior | 2,465,000 | 5.500% | 7/1/18 | | FGIC / BHAC | 110.250 |
| 2512557W9 | | 2005B | Senior | 2,575,000 | 5.500% | 7/1/19 | 7/1/18 | FGIC / BHAC | 109.600 |
| 2512557X7 | | 2005B | Senior | 2,690,000 | 5.500% | 7/1/20 | 7/1/18 | FGIC / BHAC | 109.237 |
| 2512557Y5 | | 2005B | Senior | 2,905,000 | 5.500% | 7/1/21 | 7/1/18 | FGIC / BHAC | 108.700 |
| 2512557Z2 | | 2005B | Senior | 3,025,000 | 5.500% | 7/1/22 | 7/1/18 | FGIC / BHAC | 108.100 |
| 2512558A6 | | 2005B | Senior | 3,145,000 | 5.500% | 7/1/23 | 7/1/18 | FGIC / BHAC | 107.550 |
| 2512558B4 | | 2005B | Senior | 3,270,000 | 5.500% | 7/1/24 | 7/1/18 | FGIC / BHAC | 107.000 |
| 2512558C2 | | 2005B | Senior | 3,490,000 | 5.500% | 7/1/25 | 7/1/18 | FGIC / BHAC | 106.450 |
| 2512558D0 | | 2005B | Senior | 3,620,000 | 5.500% | 7/1/26 | 7/1/18 | FGIC / BHAC | 105.900 |
| 2512558E8 | | 2005B | Senior | 3,850,000 | 5.500% | 7/1/27 | 7/1/18 | FGIC / BHAC | 105.350 |
| 2512558F5 | | 2005B | Senior | 3,980,000 | 5.500% | 7/1/28 | 7/1/18 | FGIC / BHAC | 104.800 |
| 2512558H1 | | 2005B | Senior | 57,365,000 | 5.500% | 7/1/35 | 7/1/18 | FGIC / BHAC | 107.000 |
| 251255V51 | | 2006A | Senior | 8,030,000 | 5.000% | 7/1/16 | | AG | 104.230 |
| 251255V69 | | 2006A | Senior | 8,430,000 | 5.000% | 7/1/17 | 7/1/16 | AG | 104.700 |
| 251255V77 | | 2006A | Senior | 8,855,000 | 5.000% | 7/1/18 | 7/1/16 | AG | 104.670 |
| 251255V85 | | 2006A | Senior | 9,295,000 | 5.000% | 7/1/19 | 7/1/16 | AG | 104.871 |
| 251255V93 | | 2006A | Senior | 9,760,000 | 5.000% | 7/1/20 | 7/1/16 | AG | 104.940 |
| 251255W27 | | 2006A | Senior | 10,250,000 | 5.000% | 7/1/21 | 7/1/16 | AG | 104.800 |
| 251255W35 | | 2006A | Senior | 10,760,000 | 5.000% | 7/1/22 | 7/1/16 | AG | 104.672 |
| 251255W43 | | 2006A | Senior | 11,300,000 | 5.000% | 7/1/23 | 7/1/16 | AG | 105.062 |
| 251255W50 | | 2006A | Senior | 11,865,000 | 5.000% | 7/1/24 | 7/1/16 | AG | 105.042 |
| 251255W68 | | 2006A | Senior | 12,460,000 | 5.000% | 7/1/25 | 7/1/16 | AG | 104.250 |
| 251255W76 | | 2006A | Senior | 13,080,000 | 5.000% | 7/1/26 | 7/1/16 | AG | 102.868 |
| 251256AM5 | | 2006B | Second | 100,000 | 5.000% | 7/1/19 | | AG | 105.800 |
| 251256AN3 | | 2006B | Second | 400,000 | 5.500% | 7/1/23 | 7/1/19 | AG | 105.607 |
| 251256AQ6 | | 2006B | Second | 62,100,000 | 6.250% | 7/1/36 | 7/1/19 | AG | 105.000 |
| 251256AP8 | | 2006B | Second | 56,600,000 | 7.000% | 7/1/36 | 7/1/19 | AG | 112.000 |
| 251255Y25 | | 2006C | Second | 3,795,000 | 5.000% | 7/1/16 | | AG | 103.500 |
| 251255Y33 | | 2006C | Second | 4,010,000 | 5.000% | 7/1/17 | 7/1/16 | AG | 104.000 |
| 251255Y41 | | 2006C | Second | 4,765,000 | 5.000% | 7/1/18 | 7/1/16 | AG | 104.300 |
| 251255Y58 | | 2006C | Second | 5,860,000 | 5.000% | 7/1/22 | 7/1/16 | AG | 103.522 |
| 251255Y66 | | 2006C | Second | 14,880,000 | 5.000% | 7/1/26 | 7/1/16 | AG | 99.250 |
| 2512552D6 | | 2006D | Senior | 2,650,000 | 5.000% | 7/1/19 | 7/1/16 | AG | 104.871 |
| 2512552E4 | | 2006D | Senior | 3,200,000 | 5.000% | 7/1/20 | 7/1/16 | AG | 104.940 |
| 2512552F1 | | 2006D | Senior | 20,135,000 | 5.000% | 7/1/23 | 7/1/16 | AG | 105.062 |
| 2512552G9 | | 2006D | Senior | 27,425,000 | 5.000% | 7/1/24 | 7/1/16 | AG | 105.042 |
| 2512552H7 | | 2006D | Senior | 9,955,000 | 5.000% | 7/1/25 | 7/1/16 | AG | 104.250 |
| 251256BC6 | | 2011A | Senior | 3,695,000 | 5.000% | 7/1/16 | | N/A | 100.941 |
| 251256BD4 | | 2011A | Senior | 3,845,000 | 5.000% | 7/1/17 | | N/A | 100.714 |
| 251256BE2 | | 2011A | Senior | 4,000,000 | 5.000% | 7/1/18 | | N/A | 100.074 |
| 251256BF9 | | 2011A | Senior | 3,160,000 | 5.000% | 7/1/19 | | N/A | 100.000 |
| 251256BG7 | | 2011A | Senior | 3,225,000 | 5.000% | 7/1/20 | | N/A | 100.000 |

## Bonds Impaired Under Current Plan of Adjustment

| CUSIP | Contra CUSIP | Series | Lien | Par ($) | Coupon | Maturity | Call Date | Insurance* | Purchase Price (% of Par) |
|---|---|---|---|---|---|---|---|---|---|
| 251256BH5 | 25199ASV8 | 2011A | Senior | 4,215,000 | 5.000% | 7/1/21 | | N/A | 100.000 |
| 251256BJ1 | 25199ASW6 | 2011A | Senior | 4,195,000 | 5.250% | 7/1/22 | 7/1/21 | N/A | 100.000 |
| 251256BK8 | 25199ASX4 | 2011A | Senior | 4,170,000 | 5.250% | 7/1/23 | 7/1/21 | N/A | 100.359 |
| 251256BL6 | 25199ASY2 | 2011A | Senior | 4,140,000 | 5.250% | 7/1/24 | 7/1/21 | N/A | 100.688 |
| 251256BM4 | 25199ASZ9 | 2011A | Senior | 4,085,000 | 5.250% | 7/1/25 | 7/1/21 | N/A | 100.985 |
| 251256BN2 | 25199ATA3 | 2011A | Senior | 4,020,000 | 5.250% | 7/1/26 | 7/1/21 | N/A | 101.281 |
| 251256BP7 | | 2011A | Senior | 3,930,000 | 5.250% | 7/1/27 | 7/1/21 | N/A | 101.158 |
| 251256BQ5 | | 2011A | Senior | 14,665,000 | 5.000% | 7/1/31 | 7/1/21 | N/A | 99.000 |
| 251256BT9 | | 2011A | Senior | 49,315,000 | 5.750% | 7/1/37 | 7/1/21 | N/A | 103.144 |
| 251256AW3 | 25199ATE5 | 2011B | Senior | 3,760,000 | 5.000% | 7/1/21 | | N/A | 98.000 |
| 251256AX1 | 25199ATF2 | 2011B | Senior | 9,740,000 | 6.000% | 7/1/33 | 7/1/21 | N/A | 98.000 |
| 251256BV4 | | 2011C | Senior | 2,700,000 | 5.000% | 7/1/21 | | N/A | 100.000 |
| 251256BW2 | | 2011C | Senior | 9,965,000 | 5.250% | 7/1/23 | 7/1/21 | N/A | 100.359 |
| 251256BX0 | | 2011C | Senior | 10,490,000 | 5.250% | 7/1/24 | 7/1/21 | N/A | 100.688 |
| 251256BY8 | | 2011C | Senior | 11,035,000 | 5.250% | 7/1/25 | 7/1/21 | N/A | 100.985 |
| 251256BZ5 | 25199ATL9 | 2011C | Senior | 11,615,000 | 5.250% | 7/1/26 | 7/1/21 | N/A | 101.281 |
| 251256CA9 | | 2011C | Senior | 5,000,000 | 5.250% | 7/1/27 | 7/1/21 | N/A | 101.158 |

*Footnote for each Insurance Provider
AG = Assured Guaranty
NPFG = National Public Finance Guarantee
FGIC = Financial Guaranty Insurance Company
BHAC = Berkshire Hathaway
N/A = Not Insured

## Derivative CUSIP

| Original CUSIP | Derivative CUSIP | Derivative CUSIP 2 |
|---|---|---|
| 251255A21 | 251255A21 | 2512558V0 |
| 2512553B9 | 2512553B9 | 2512556H3 |
| 251255Y82 | 251255Y82 | 251256AC7 |
| 2512554G7 | 2512554G7 | 2512556J9 |
| 2512554H5 | 2512554H5 | 2512556K6 |
| 2512554K8 | 2512554K8 | 2512556G5 |

Certain statements contained in this Disclosure Statement, including in the Appendices hereto, reflect not historical facts but forecasts and "forward-looking statements." Such forward-looking statements can be identified, in some cases, by the terminology used, such as "may," "will," "should," "expects," "intends," "plans," "anticipates," "believes," "estimates," "predicts," "potential," "illustrate," "example," and "continue," or the singular, plural, negative or other derivations of these or other comparable terms. Bondholders should not place undue reliance on forward-looking statements. All forward-looking statements included in this Disclosure Statement are based on information available to the City and the Department on the date hereof, and the City and the Department assume no obligation to update any such forward-looking statements. Actual results could differ materially from those discussed in such forward-looking statements.

The forward-looking statements included herein are necessarily based on various assumptions and estimates and are inherently subject to various risks and uncertainties, including, but not limited to, the risks and uncertainties described herein and risks and uncertainties relating to the possible invalidity of the underlying assumptions and estimates and possible changes or developments in geopolitical, military, social, economic, business, industry, market, legal or regulatory circumstances, and conditions or actions taken or omitted to be taken by third parties, including customers, suppliers, and business partners, and legislative, judicial, and other governmental authorities and officials. Accordingly, actual results may vary from the projections, forecasts and estimates contained in this Disclosure Statement and such variations may be material, which could affect the City and the Department's ability to fulfill some or all of their respective obligations under the Invitation or the Tender Bonds.

No party that has provided information for this Disclosure Statement has any obligation to update or otherwise revise any projections, forecasts and estimates, including any revisions to reflect changes in conditions or circumstances arising after the date of this Disclosure Statement, or to reflect the occurrence of unanticipated events. Assumptions related to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions of future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the City and the Department. Any of such assumptions could be inaccurate and, therefore, there can be no assurance that the forward-looking statements included in this Disclosure Statement will prove to be accurate. New factors emerge from time to time and it is not possible for the City or the Department to predict all of such factors. Further, the City and the Department cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

All projections, forecasts, assumptions, expressions of opinions, estimates, and other forward-looking statements are expressly qualified in their entirety by the foregoing and the other cautionary statements set forth in this Disclosure Statement.

# TABLE OF CONTENTS

Page

SUMMARY STATEMENT .................................................................................................................. S-1
INTRODUCTION ................................................................................................................................... 1
Purpose of this Disclosure Statement ................................................................................................... 1
Plan of Finance ...................................................................................................................................... 1
Availability of Documents ..................................................................................................................... 3
SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS ........................................... 3
Pledged Assets ....................................................................................................................................... 4
Priority of Lien and Payment Status ..................................................................................................... 5
Flow of Funds ........................................................................................................................................ 6
Priority of Funds and Accounts ............................................................................................................. 7
Certain Other Funds ............................................................................................................................... 8
Reserve Accounts and Reserve Requirements ....................................................................................... 9
Rate Covenant ...................................................................................................................................... 12
Enforceability of Rates ........................................................................................................................ 13
DWSD Additional Bonds ..................................................................................................................... 13
Amendments Without Consent ............................................................................................................. 15
Amendments With Consent .................................................................................................................. 15
Remedies under the DWSD Indenture and the Bond Ordinance ......................................................... 17
CITY OF DETROIT BANKRUPTCY MATTERS .............................................................................. 18
RISK FACTORS .................................................................................................................................. 22
OUTSTANDING DEPARTMENT INDEBTEDNESS ......................................................................... 33
DEBT SERVICE REQUIREMENTS .................................................................................................. 34
THE DEPARTMENT ........................................................................................................................... 35
Organization ......................................................................................................................................... 35
Court Mandated Changes ..................................................................................................................... 35
Application of Financial Stability Agreement to the Department ........................................................ 38
The Board of Water Commissioners .................................................................................................... 38
Management Team ................................................................................................................................ 40
Management Initiatives ........................................................................................................................ 43
Employees and Employee Bargaining Units ........................................................................................ 46
Ongoing Discussion of Formation of Regional Water Authority ........................................................ 48
THE CITY ............................................................................................................................................ 49
APPROVALS OF THE INVITATION ................................................................................................. 49
THE CAPITAL IMPROVEMENT PROGRAM .................................................................................. 50
General .................................................................................................................................................. 50
The CIP Funding .................................................................................................................................. 52
THE WATER SUPPLY SYSTEM ....................................................................................................... 53
Service Area ......................................................................................................................................... 54
Master Plan and Master Plan Update ................................................................................................... 55
Wholesale Municipal Service .............................................................................................................. 56
Customer Outreach ............................................................................................................................... 59
Retail Service ....................................................................................................................................... 60
Physical Facilities ................................................................................................................................ 60
Environmental Matters ......................................................................................................................... 62
DEPARTMENT FINANCIAL PROCEDURES ................................................................................... 62
Budget and Accounting Matters ........................................................................................................... 62
Collections and Delinquencies ............................................................................................................. 65
Cash Management ................................................................................................................................. 68
Investment Policy ................................................................................................................................. 68
Rates ..................................................................................................................................................... 69
Water Rate Comparison ........................................................................................................................ 71
DEPARTMENT FINANCIAL OPERATIONS .................................................................................... 73
Summary of Historical Revenues and Expenses .................................................................................. 73

Fiscal Year 2009-2013 Operations ............................................................................................................ 74
Fiscal Year 2014 Estimate .................................................................................................................... 77
Fiscal Year 2015 Budget ...................................................................................................................... 77
Projected Operations for Fiscal Year 2014 through 2019 .................................................................... 78
Future Issuance of DWSD Bonds ......................................................................................................... 81
PENSION PLAN CONTRIBUTIONS ................................................................................................. 82
PENSION-RELATED CERTIFICATES OF PARTICIPATION .......................................................... 86
OTHER POST-EMPLOYMENT BENEFITS ...................................................................................... 87
FEASIBILITY CONSULTANT'S REPORT ......................................................................................... 91
SYSTEM EVALUATION REPORT .................................................................................................... 92
LITIGATION ........................................................................................................................................ 93
RATINGS .............................................................................................................................................. 95
DEALER MANAGER .......................................................................................................................... 96
FINANCIAL ADVISOR ....................................................................................................................... 96
FINANCIAL CONSULTANT TO THE BOARD OF WATER COMMISSIONERS ........................... 97
CONTINUING DISCLOSURE COMPLIANCE .................................................................................. 97
OTHER MATTERS .............................................................................................................................. 97

APPENDIX A          FEASIBILITY CONSULTANT'S REPORT .................................................................... A-1
APPENDIX B          SYSTEM EVALUATION REPORT .............................................................................. B-1
APPENDIX C          DWSD AUTHORIZING DOCUMENTS ...................................................................... C-1
APPENDIX D          AUDITED FINANCIAL STATEMENTS OF THE WATER FUND OF THE CITY
                    OF DETROIT MICHIGAN AS OF AND FOR THE YEAR ENDED JUNE 30, 2013 ........ D-1
APPENDIX E          CHARACTERISTICS OF THE WATER SUPPLY SYSTEM SERVICE AREA ................ E-1
APPENDIX F          DISTRICT COURT ORDERS ....................................................................................... F-1

## SUMMARY STATEMENT

*This Summary Statement is subject in all respects to more complete information contained in this Disclosure Statement, the Invitation and the other materials described in the Invitation, and should not be considered a complete statement of the facts material to making a decision with respect to tender. Readers should read the entire Disclosure Statement, the Invitation and the other materials described in the Invitation. Capitalized terms used in this Summary Statement and not otherwise defined shall have the meanings given such terms in the body of this Disclosure Statement.*

| | |
|---|---|
| **Overview** | Pursuant to the Invitation to Tender Bonds dated August 7, 2014, the City of Detroit, County of Wayne, State of Michigan, upon authorization from (i) the Board of Water Commissioners of the Detroit Water and Sewerage Department and (ii) Kevyn D. Orr, emergency manager of the City, invites each holder of those certain outstanding Water Supply System Revenue and Revenue Refunding Bonds described more specifically in this Disclosure Statement to submit Offers to sell all or a portion of the Tender Bonds held by such Bondholder to the City at the applicable Purchase Price(s) set forth in the Invitation, as well as accrued and unpaid interest, subject to the terms specified in the Invitation. |
| **Ongoing City of Detroit Bankruptcy Proceedings** | As described herein under "CITY OF DETROIT BANKRUPTCY MATTERS," the City has filed a petition for relief under Chapter 9 of the Bankruptcy Code. The Invitation is being distributed during the pendency of the Bankruptcy Case. Accordingly, there is uncertainty as to the final outcome of the Bankruptcy Case. See "RISK FACTORS" herein. |
| **The Bankruptcy Plan of Adjustment** | Under the Bankruptcy Code, a Chapter 9 debtor has the exclusive right to file a Chapter 9 plan of adjustment. The City has prepared a Plan of Adjustment and filed the most recent Plan of Adjustment with the Bankruptcy Court on July 29, 2014. The Plan of Adjustment has not yet been confirmed by the Bankruptcy Court. See "CITY OF DETROIT BANKRUPTCY MATTERS" herein. |
| **The Bankruptcy Case, the Invitation and the Plan of Finance** | The Plan of Adjustment currently pending before the Bankruptcy Court would eliminate the call protection or reduce the interest rate on certain classes of outstanding DWSD Bonds. The City is undertaking its Invitation as part of a plan of finance, the purpose of which is to reduce the debt service costs related to the Tender Bonds and remove the risk to the Department's future costs posed by the impairment noted above on certain classes of the DWSD Bonds. If the City purchases (i) any Tender Bonds pursuant to the Invitation or (ii) any Sewage Disposal System Bonds pursuant to the separate invitation related thereto, the City would file an amended Plan of Adjustment with the Bankruptcy Court that |

would remove the provisions contained in the current Plan of Adjustment that would impair certain classes of DWSD Bonds. See "INTRODUCTION—Plan of Finance" herein.

The City plans to purchase the Tender Bonds only to the extent it can realize sufficient savings, with sufficiency determined in the sole discretion of the Board of Water Commissioners and the Emergency Manager.

**Current Governance of the Department and the City**

As described under "THE DEPARTMENT—Organization" and "THE DEPARTMENT—The Board of Water Commissioners" herein, the Department is governed by the Board of Water Commissioners. As described under "THE CITY" herein, the Emergency Manager has been appointed for the City under applicable State law.

**Approvals of the Invitation**

Both the Board of Water Commissioners and the Emergency Manager have approved the Invitation and the solicitation of Offers contemplated by the Invitation. See "APPROVALS OF THE INVITATION" herein.

**Certain Aspects of the Tender Invitation**

Pursuant to the Invitation, the City and the Department have invited Bondholders to submit Offers to sell all or a portion of the Tender Bonds held by the Bondholder at the Purchase Price(s) established in the Invitation. These are fixed Purchase Price(s).

Bondholders may find then current information concerning all of the Offered Bonds that have been submitted at www.bondcom.com/DWSD.

All Offers by Bondholders to sell Tender Bonds are irrevocable upon submission and may not be withdrawn except in limited circumstances described in the Invitation. See "TERMS OF THIS INVITATION" under the Invitation.

To make an informed decision as to whether, and how, to offer its Tender Bonds, a Bondholder must read the Invitation, this Disclosure Statement and all other materials described in the Invitation carefully and consult with its broker, account executive, financial advisor and/or other financial professional. None of the City, the Department, the Board of Water Commissioners, the Emergency Manager, the Dealer Manager, the Financial Advisor, the Board Consultant and the Information and Tender Agent nor any of their respective affiliates makes any recommendation as to whether or not Bondholders should tender all or any portion of the Tender Bonds pursuant to the Invitation. Bondholders must make their own decisions as to whether to tender the Tender Bonds and, if so, the amount of their Tender Bonds to tender.

| | |
|---|---|
| **Conditions to Payment of Purchase Price** | The City is not required to purchase any Tender Bonds. As described in greater detail under "INTRODUCTION – Plan of Finance," if the City agrees to accept for purchase the Tender Bonds, prior to the purchase closing date, the City would request that the Bankruptcy Court enter an order authorizing the City's issuance, via public offering or private placement, of the 2014 DWSD Refinancing Bonds to purchase the Tender Bonds offered and accepted pursuant to the terms of the Invitation. In addition, on the purchase closing date, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would amend the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds to unimpair the DWSD Bonds. |
| | The purchase of any of the Tender Bonds is conditioned upon the City receiving all legally required approvals to issue the 2014 DWSD Refinancing Bonds, the City completing the issuance of the 2014 DWSD Refinancing Bonds on terms satisfactory to it, with net proceeds sufficient to pay the Purchase Price, and other conditions set forth in the Invitation. The 2014 DWSD Refinancing Bonds are not being offered for sale by the Invitation or this Disclosure Statement. |
| **Risk Factors** | In making a decision whether to tender their Tender Bonds, Bondholders should consider certain risks and investment considerations that could affect the ability of the Department to pay debt service on its Tender Bonds or, if the tender is successfully completed, on any existing untendered DWSD Bonds remaining outstanding after consummation of the tender, including the potential 2014 DWSD Refinancing Bonds, and that could affect the marketability of or the market price for such bonds. These include risks related to the City's bankruptcy, the operations of the Department and the Water Supply System and other matters. See "RISK FACTORS" herein. |

# INTRODUCTION

*The following introductory statement is subject in all respects to the more complete information set forth in this Disclosure Statement, the Invitation and the other materials described in the Invitation. The descriptions and summaries of various documents hereinafter set forth do not purport to be comprehensive or definitive and are qualified in their entirety by reference to each document. Capitalized terms used in this Disclosure Statement that are not otherwise defined herein have the meanings set forth in Invitation.*

**Purpose of this Disclosure Statement**

This Disclosure Statement, including the cover pages and the Appendices hereto, is provided to furnish information in connection with the Invitation to Tender Bonds (the "Invitation") by which the City of Detroit, County of Wayne, State of Michigan (the "City"), upon authorization from (i) the Board of Water Commissioners (the "Board of Water Commissioners") of the Detroit Water and Sewerage Department (the "Department" or "DWSD"), and (ii) the emergency manager of the City (the "Emergency Manager"), invites each holder (a "Bondholder") of those certain outstanding bonds issued by the City and described on the inside cover page of this Disclosure Statement (the "Tender Bonds") to submit offers (the "Offers") to sell all or a portion of the Tender Bonds held by such Bondholder to the City at the applicable purchase price on the inside cover page of this Disclosure Statement (the "Purchase Price"), as well as accrued and unpaid interest, subject to the conditions and upon the terms specified in the Invitation.

**Plan of Finance**

The Plan of Adjustment (as defined herein) currently pending before the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") would eliminate the call protection or reduce the interest rates on certain classes of the DWSD Bonds (as defined herein). The City is undertaking its Invitation as part of a plan of finance, the purpose of which is to reduce the debt service costs related to the Tender Bonds and remove the risk to the Department's future costs posed by the impairment noted above on certain classes of DWSD Bonds.

The City plans to purchase the Tender Bonds only to the extent it can realize sufficient savings, with sufficiency determined in the sole discretion of the Board of Water Commissioners and the Emergency Manager. The City's plan includes the Invitation and the purchase of Tender Bonds (if any) tendered to the City by Bondholders. Concurrently with the Invitation, the City is inviting holders of the outstanding Sewage Disposal System bonds to sell all or a portion of such bonds to the City.

To provide funds to purchase all DWSD Bonds offered and accepted by the City pursuant to the terms of the Invitation, the City proposes to, via public offering or private placement, issue one or more series of its Water Supply System Revenue Refunding Bonds, including, if necessary, interim financing bonds (collectively, the "2014 DWSD Refinancing Bonds"). The City has obtained a conditional commitment to purchase the interim financing bonds, which commitment is subject to the negotiation and execution of definitive agreements and the satisfaction of certain closing conditions.

1

If the City agrees to accept for purchase (i) any Tender Bonds pursuant to the Invitation or (ii) any Sewage Disposal System bonds pursuant to the separate invitation related thereto (the "Sewer Invitation" and, together with the Invitation, the "Invitations"), prior to the closing date of such purchase, the City would request that the Bankruptcy Court enter an order consented to by the City (the "Bankruptcy Order") authorizing the City's issuance of the 2014 DWSD Refinancing Bonds to purchase the Tender Bonds offered and accepted pursuant to the terms of the Invitation. In addition, on the closing date of such purchase, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would amend the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds. Under such amended Plan of Adjustment, all of the DWSD Bonds would be unimpaired.

Consummation of the purchase of the Tender Bonds pursuant to the Invitation is conditioned upon the entry of and the validity and enforceability of the Bankruptcy Order. No assurance can be given as to the entry of and the validity or enforceability of the Bankruptcy Order and the City's ability to consummate the purchase of any Tender Bonds pursuant to the Invitation.

To the extent the City elects, in its sole discretion, not to purchase Tender Bonds offered pursuant to the Invitation, or the purchase of Tender Bonds pursuant to the Invitation does not close for any reason, no amended Plan of Adjustment that unimpairs the DWSD Bonds would be filed, and the treatment of the Tender Bonds under the Plan of Adjustment, as currently proposed, would continue to include an impairment under the Plan of Adjustment of a material portion of the Tender Bonds. See "CITY OF DETROIT BANKRUPTCY MATTERS."

In either event, there can be no assurance that the Plan of Adjustment that is confirmed by the Bankruptcy Court will ultimately impair or not impair any DWSD Bonds. There can also be no assurance that any Plan of Adjustment will be confirmed by the Bankruptcy Court. Moreover, any order of the Bankruptcy Court confirming the Plan of Adjustment may be appealed to a higher court. Even if confirmed, there can be no assurance if or when the Plan of Adjustment will become effective or ultimately be consummated.

The purchase of any of the Tender Bonds is conditioned upon the City receiving all legally required approvals to issue the 2014 DWSD Refinancing Bonds, the City and the Department completing the issuance of the 2014 DWSD Refinancing Bonds on terms satisfactory to it, with net proceeds sufficient to pay the Purchase Price of the Tender Bonds being purchased, and other conditions set forth in the Invitation. No assurances can be given that the 2014 DWSD Refinancing Bonds will be approved by the Bankruptcy Court, or that such financing will be issued or obtained in amounts sufficient to pay the Purchase Price of the Tender Bonds selected for purchase or that the purchase of the Tender Bonds will be completed. In the event sufficient funds are not available, no Tender Bonds will be purchased through the Invitation.

The 2014 DWSD Refinancing Bonds are not being offered for sale by the Invitation or this Disclosure Statement. If the City determines to undertake a public offering of 2014 DWSD Refinancing Bonds, the City will disseminate one or more disclosure documents in connection

with any such offering. While no predictions can be made as to the information to be contained in any such disclosure documents, the City anticipates that, after giving effect to the issuance of one or more series of 2014 DWSD Refinancing Bonds, the financial disclosures made in such disclosure documents may be materially different from those set forth in this Disclosure Statement.

By tendering their Tender Bonds pursuant to the Invitation, Bondholders shall be deemed to have acknowledged and represented to the City that they have received, and have had the opportunity to review, this Disclosure Statement, the Invitation and the other tender materials prior to making the decision as to whether or not they should tender their Tender Bonds.

**Availability of Documents**

The descriptions and summaries of various documents set forth in this Disclosure Statement do not purport to be conclusive or definitive and reference is made to each such document for the complete details of all terms and conditions hereof. All references herein to the 2014 DWSD Refinancing Bonds and the DWSD Authorizing Documents, to the extent such documents have been prepared, are qualified in their entirety by such documents, copies of which are available from the Dealer Manager and may be examined or obtained at the expense of the person requesting the same at the corporate trust office of the Information and Tender Agent.

As described in greater detail in "CITY OF DETROIT BANKRUPTCY MATTERS" below, the City has filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code, which case is pending under case number 13-53846. Pursuant to Section 941 of the Bankruptcy Code, the City has filed with the Bankruptcy Court the Plan of Adjustment, as amended, and the accompanying Disclosure Statement to the Plan of Adjustment (the "Bankruptcy Disclosure Statement"). The Plan of Adjustment sets forth the manner in which all claims in the Bankruptcy Case will be treated if the Plan of Adjustment is confirmed by the Bankruptcy Court and becomes effective. For a complete understanding of the Plan of Adjustment, as it may be modified from time to time, Bondholders should read the Plan of Adjustment and Bankruptcy Disclosure Statement (including all supplements, exhibits and appendices attached thereto). Electronic copies of certain documents filed with the Bankruptcy Court, including among others, the current Plan of Adjustment and the Bankruptcy Disclosure Statement, may be found at *http://www.detroitmi.gov/EmergencyManager/BankruptcyChapter9.aspx*. This reference is for convenience only and the information on this website is not incorporated in, and shall not be incorporated in, and shall not be deemed a part of, this Disclosure Statement. There can be no assurance that any filed Plan of Adjustment will be reflective of the City's final plan of adjustment in the Bankruptcy Case, and there can be no assurance that any plan of adjustment will be confirmed by the Bankruptcy Court or become effective.

## SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS

Pursuant to the provisions of Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"), all bonds issued, including the Tender Bonds, and to be issued by the City under the Amended and Restated Bond Ordinance adopted by the City Council of Detroit (the "City Council") on January 26, 2005 (the "Bond Ordinance") (collectively, the "DWSD Bonds") are payable solely from the Pledged Assets (as hereinafter defined), which include the Net Revenues

of the Water Supply System and amounts available in certain funds and accounts established in accordance with the Bond Ordinance. The DWSD Bonds are secured by a statutory lien on Pledged Assets pursuant to Act 94 and the Bond Ordinance. In addition, the City and the Department have entered into a Trust Indenture with U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of February 1, 2013 (the "DWSD Indenture") to hold in trust the amounts required or permitted to be transferred by the City to certain funds and accounts under the Bond Ordinance for the payment of the DWSD Bonds. Funds and accounts held by the DWSD Trustee under the DWSD Indenture are administered by the DWSD Trustee, in specified circumstances upon the direction of the Department. Capitalized terms used under the heading "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS" that are not otherwise defined herein have the definitions ascribed to such terms in the Bond Ordinance.

In accordance with the City Charter of the City of Detroit (the "City Charter"), monies from fees collected for water, drainage or sewerage services are to be used exclusively for the payment of expenses incurred in the provision of these services, including the interest or principal of any obligations to finance the water supply or sewerage disposal facilities of the City, and shall be kept in separate funds.

**Pledged Assets**

"Pledged Assets" under the Bond Ordinance consist of:

- Net Revenues (defined below);

- the funds and accounts established by or pursuant to the Bond Ordinance except for the Operation and Maintenance Fund and the Construction Fund and any account thereof;

- investments of amounts credited to any fund, account or subaccount that is a Pledged Asset; and

- any income or gain realized from investments that are Pledged Assets to the extent that such income or gain is not a Net Revenue.

"Revenues" are defined in the Bond Ordinance and the DWSD Indenture as the revenues of the City from the Water Supply System (construed in accordance with Act 94) and include amounts received by the City under its hedge agreements with respect to its DWSD Bonds, including any termination payments, and income earned and gains realized from the investment of amounts in the various funds, accounts and sub-accounts established by the DWSD Indenture in accordance with the Bond Ordinance (other than the Construction Fund for any Fiscal Year that earnings on the Construction Fund are not credited to the Receiving Fund).

"Net Revenues" are defined in the Bond Ordinance and the DWSD Indenture as, for any period of time, all Revenues received during that period of time except for those transferred to the Operation and Maintenance Fund.

4

**Priority of Lien and Payment Status**

DWSD Bonds are secured under the Bond Ordinance in accordance with their relative priorities by a statutory lien on Pledged Assets, as described below.  The Bond Ordinance permits the City to secure Ancillary Obligations (as defined herein) by a lien on Pledged Assets having the same or a lower priority than the lien securing the particular DWSD Bonds to which the Ancillary Obligations relate.  Ancillary Obligation Fees and Expenses (as defined herein) have a higher payment status than DWSD Bonds and Ancillary Obligations, as described below.

"Ancillary Obligations" are obligations incurred by the City with respect to particular DWSD Bonds and consist of Hedge Obligations and Reimbursement Obligations.  Hedge Obligations are payment obligations under a hedge agreement, such as an interest rate swap, other than the fees and expenses to be paid in the ordinary course of the transaction.  Reimbursement Obligations are repayment obligations under a credit enhancement or liquidity facility, other than the fees and expenses to be paid in the ordinary course of the transaction.  The fees and expenses payable by the City in connection with any hedge agreement, credit enhancement or liquidity facility in the ordinary course of the transaction are referred to as the "Ancillary Obligation Fees and Expenses," and are treated separately under the DWSD Authorizing Documents from payments on DWSD Bonds.

- All Ancillary Obligation Fees and Expenses are paid from Revenues in the Operation and Maintenance Fund on the same basis as operating and administrative fees and expenses of the Water Supply System, with the result being that they are paid before debt service on the DWSD Bonds, which are paid from Net Revenues, and before Ancillary Obligations.

- Senior Lien Water Supply System Revenue Bonds ("Senior Lien DWSD Bonds") and related Ancillary Obligations are secured by a first lien on Pledged Assets and rank first in the order of payment from Net Revenues; provided that any lien securing Ancillary Obligations in respect of Senior Lien DWSD Bonds shall be subject to the rights of the holders of the City's outstanding Water Supply System Revenue Second Lien Bonds, Series 1995-A, except to the extent that such Ancillary Obligations arise in connection with a Financial Facility acquired to fund any portion of the Reserve Account or to be substituted for cash therein.

- Second Lien Water Supply System Revenue Bonds ("Second Lien DWSD Bonds") and related Ancillary Obligations secured on a parity therewith are secured by a lien on Pledged Assets second only to the Senior Lien DWSD Bonds and their parity Ancillary Obligations, and rank second in order of payment from Net Revenues; and

- Any other Junior Lien Water Supply System Revenue Bonds ("Junior Lien DWSD Bonds"), if issued, would have a lien subordinate to the lien of all Senior Lien DWSD Bonds and Second Lien DWSD Bonds and their parity Ancillary Obligations, and rank last in order of payment from Net Revenues.

5

**Flow of Funds**

*General*

In accordance with the requirements of Act 94, the City Charter and the Bond Ordinance, the City has established certain funds and accounts for the Water Supply System under the DWSD Indenture to be held in trust by the DWSD Trustee. The DWSD Authorizing Documents permit the establishment of additional funds for additional priorities of DWSD Bonds.

*The Revenue Receipts Fund*

All Revenues of the Water Supply System are deposited upon receipt or, if applicable, upon completion of credit card processing activities, in either the "Revenue Receipts Fund" or the "Receiving Fund" established under the DWSD Indenture. In general, Revenues from wholesale customers are directly deposited into the Receiving Fund. Since almost all Detroit retail customers receive both water and sewer services, revenues collected by the Department from these customers are initially deposited in the Revenue Receipts Fund. All Revenues collected and deposited into the Revenue Receipts Fund will be allocated by the DWSD Trustee, at the direction of the Department, to the Water Supply System Receiving Fund and a Sewage Disposal System Receiving Fund. The Revenues may be temporarily commingled with gross revenues of the Sewage Disposal System. The DWSD Trustee will then transfer certain funds from the Water Supply System Receiving Fund to the Operation and Maintenance Fund, the Senior Lien Bond Interest and Redemption Fund, the Second Lien Bond Interest and Redemption Fund, the Junior Lien Bond Interest and Redemption Fund and other System funds pursuant to the flow of funds under the Bond Ordinance and the DWSD Indenture.

*Flow of Funds*

In accordance with the terms of Act 94, the City Charter and the Bond Ordinance, all Revenues received by the City are set aside as collected and credited to the Receiving Fund, which shall be held by the DWSD Trustee in accordance with the DWSD Indenture. As received, amounts credited to the Receiving Fund are transferred seriatim into the following funds and accounts but only within the respective limitations and only if the maximum amount within such limitation has been transferred to the preceding fund or account:

First:  to the Operation and Maintenance Fund held by a custodian, a sum identified by the Department, in its sole discretion, as sufficient to provide for the payment of the next month's expenses of administration and operation of the Water Supply System (including Ancillary Obligation Fees and Expenses) and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order;

Second:  to the Senior Lien Debt Service Account, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Senior Lien DWSD Bonds and related Ancillary Obligations of the same priority as of the first day of such month;

6

Third: to the Senior Lien Bond Reserve Account, an amount that when added to all other amounts then on deposit therein shall equal the Reserve Requirement for Senior Lien DWSD Bonds;

Fourth: to the Interest and Redemption Fund established for each priority of Junior Lien DWSD Bonds, beginning with the Second Lien DWSD Bonds and continuing in descending order of priority to, and including, the priority of lien of Junior Lien DWSD Bonds, as follows:

> First: to the Debt Service Account established for such priority of lien, an amount that, when added to all other amounts then on deposit therein, shall equal the Debt Service Installment Requirement for Junior Lien DWSD Bonds and related Ancillary Obligations of the same priority of lien as of the first day of such month; and

> Second: to the Reserve Account, if any, established for such priority of lien an amount that, when added to all other amounts then on deposit therein, shall equal the Reserve Requirement for such priority of lien of Junior Lien DWSD Bonds; and

Fifth: to the Extraordinary Repair and Replacement Reserve Fund, the amount of the Extraordinary Repair and Replacement Minimum Requirement so long as the balance thereof is less than the Extraordinary Repair and Replacement Maximum Requirement, except that an amount withdrawn from such Fund and transferred to the Improvement and Extension Fund as provided in the DWSD Indenture, shall be deducted from the Extraordinary Repair and Replacement Maximum Requirement in the Fiscal Year of withdrawal.

In any month, funds on deposit in the Receiving Fund in excess of the requirements set forth above may, upon the direction of the Department, be transferred to the Improvement and Extension Fund (provided that no amount shall be deposited to the Improvement and Extension Fund or credited thereto for so long as a borrowing from the Extraordinary Repair and Replacement Reserve Fund remains unpaid).

Amounts remaining in the Receiving Fund as of the last day of each Fiscal Year shall be credited to the Surplus Fund. For additional information on the use and application of amounts in the funds and accounts established by the DWSD Indenture, see the DWSD Indenture in APPENDIX C – DWSD AUTHORIZING DOCUMENTS.

**Priority of Funds and Accounts**

Pursuant to the Bond Ordinance, if amounts in the Receiving Fund are insufficient to provide for current requirements of the Operation and Maintenance Fund and each Interest and Redemption Fund (including the Reserve Account, if any, therein), then any amounts or securities held in the Surplus Fund, the Improvement and Extension Fund and the Extraordinary Repair and Replacement Reserve Fund shall be credited or transferred, first, to the Operation and

Maintenance Fund and second, to the particular Interest and Redemption Fund, to the extent of the insufficiency therein from the aforesaid funds in the order listed.

If any principal (and redemption premium, if any) of or interest on DWSD Bonds of a priority or any related Ancillary Obligations become due (whether on a stated or scheduled date, by reason of call for redemption or otherwise), and there are insufficient amounts for the payment thereof in the Interest and Redemption Fund established for such priority of DWSD Bonds and Ancillary Obligations after applying payments in the Reserve Account, if any, established for such priority of DWSD Bonds, then there shall be applied to such payment amounts in each Interest and Redemption Account[1] established for each lower priority of DWSD Bonds, beginning with the lowest priority and proceeding seriatim in ascending order of priority, until such payments are made in full.

## Certain Other Funds

### *The Extraordinary Repair and Replacement Reserve Fund*

Amounts in the Extraordinary Repair and Replacement Reserve Fund may be used to pay costs of making major unanticipated repairs and replacements to the Water Supply System which individually cost or are reasonably expected to cost in excess of $1 million. The Extraordinary Repair and Replacement Reserve Fund is funded by monthly transfers of Revenues in minimum amounts equal to 1/12 of 3% of the budgeted operation and maintenance expense of the Water Supply System for the Fiscal Year, until the balance in such fund equals no greater than 15% of the budgeted operation and maintenance expense of the Water Supply System for such Fiscal Year, less in any Fiscal Year any amount that is withdrawn from such fund for paying a major unanticipated repair or replacement, but only in the Fiscal Year that such amount is withdrawn. The DWSD Indenture authorizes the Department, on and after the first day of each Fiscal Year, to transfer not more than 50% of the balance in the Extraordinary Repair and Replacement Reserve Fund to the Improvement and Extension Fund, but only if by the first day of the month of such transfer the full amount of the minimum monthly transfer has been credited to the fund, and the amounts of all prior transfers from the fund to the Improvement and Extension Fund have been restored in full.

### *The Improvement and Extension Fund*

Amounts in the Improvement and Extension Fund shall be used for improvements, enlargements, extensions or betterment to the Water Supply System.

### *The Rate Stabilization Fund*

The Bond Ordinance permits the creation of a Rate Stabilization Fund, the purpose of which is to enable the City to set aside Prior Revenues (as defined herein) to augment Revenues in future years in order to satisfy the requirements of the Bond Ordinance with respect to rate covenants related to DWSD Bonds. See "—Rate Covenant" below for a description of the

---

[1] Although the Bond Ordinance refers to an "Interest and Redemption Account" in this particular section, the correct defined term is "Interest and Redemption Fund," as otherwise used in the Bond Ordinance.

restriction on use of transfers from the Rate Stabilization Fund in meeting the rate covenant's coverage requirements. Any funding of the Rate Stabilization Fund is at the sole discretion of the Board of Water Commissioners. To date, the City has not transferred any funds into the Rate Stabilization Fund.

Only Prior Revenues may be deposited in the Rate Stabilization Fund. "Prior Revenues" are Revenues or Net Revenues only to the extent they may be applied to any lawful purpose of the Water Supply System, in effect limiting Prior Revenues to Net Revenues that, in the Fiscal Year of receipt, exceed the required deposits described above under "—Flow of Funds" and the amounts needed to meet the coverage requirements described below under "—Rate Covenant." The deposit of Prior Revenues into the Rate Stabilization Fund is limited in any Fiscal Year as described in APPENDIX C—DWSD AUTHORIZING DOCUMENTS—Rate Stabilization Fund. Except as taken into account in connection with a coverage determination, amounts on deposit in the Rate Stabilization Fund may be applied for any lawful purpose of the Water Supply System.

*The Surplus Fund; Uses and Replenishments of Deficits in Other Funds*

Amounts from time to time on deposit in the Surplus Fund may, at the option of the Department, be withdrawn upon written request to the DWSD Trustee and used for any purposes related to the System. These purposes can include depositing such funds in the Receiving Fund and applying such funds pursuant to the Flow of Funds described above. If and whenever there is any deficit in the Operation and Maintenance Fund or in any Interest and Redemption Fund (including any Reserve Account therein), the DWSD Trustee shall transfer funds to the extent of any such deficit from the Surplus Fund to such funds in the order and priority described above.

**Reserve Accounts and Reserve Requirements**

Pursuant to the Bond Ordinance and the DWSD Indenture, there has been established a Senior Lien Bond Reserve Account and a Second Lien Bond Reserve Account. Junior Lien DWSD Bonds are not secured by any Reserve Account. Amounts in a Reserve Account shall be used solely for the payment of the principal (and premium, if any) of and interest on the DWSD Bonds and Ancillary Obligations of the priority for which such Reserve Account was established, as to which there would otherwise be a default.

The Reserve Requirement for Senior Lien DWSD Bonds is the maximum Annual Debt Service on all Senior Lien DWSD Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Internal Revenue Code of 1986, as amended (the "Code"). "Annual Debt Service" means, for any Fiscal Year and with respect to Indebtedness of any particular priority, the amount of such Indebtedness due in such Fiscal Year in accordance with their respective terms. The Reserve Requirement for Second Lien DWSD Bonds is the maximum Annual Debt Service on all Second Lien DWSD Bonds then outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code. If a Reserve Account is established for any other priority of Junior Lien DWSD Bonds, the Reserve Requirement for such other Junior Lien DWSD Bonds shall be the amount set forth in the supplemental action establishing such Reserve Account, and if no amount is set forth, shall be the average Annual Debt Service on all Junior Lien DWSD Bonds of such priority then

outstanding for the current or any future Fiscal Year or the maximum amount permitted by the Code.

Concurrently with the issuance of DWSD Bonds of a priority for which a Reserve Account has been or is being established, the Bond Ordinance and the DWSD Indenture require there be credited to such Reserve Account the amount that, when added to the amount on deposit in such account or credited thereto, equals the Reserve Requirement for the DWSD Bonds then to be issued and all DWSD Bonds of the same priority then outstanding. As of the date of this Disclosure Statement, the funds on deposit in the Senior Lien Bond Reserve Account and Second Lien Bond Reserve Account were sufficient to meet or exceeded the Reserve Requirement for the outstanding Senior Lien DWSD Bonds and Second Lien DWSD Bonds, respectively. Pursuant to the Bond Ordinance, any Reserve Requirement with respect to variable rate bonds is calculated based on an interest cost assumption for unhedged variable rate debt of 125% of the 5-year average of the SIFMA Municipal Index.

The Bond Ordinance permits the use of Credit Enhancement to fund any Reserve Account or to substitute for amounts on deposit in a Reserve Account, if the provider is rated in the highest rating category of each Rating Agency then rating the DWSD Bonds having the benefit of such Reserve Account, and the City receives an opinion of nationally recognized bond counsel to the effect that such Credit Enhancement will not adversely affect the tax-exempt status of interest on any DWSD Bonds. There is no Bond Ordinance requirement that the rating of Credit Enhancement which has been properly credited to a Reserve Account be maintained.

The following table summarizes the funding of the Reserve Requirements for the Senior Lien Bond Reserve Account and Second Lien Bond Reserve Account as of June 30, 2014.

|  | Senior Lien Bonds | Second Lien Bonds | Aggregate System |
|---|---|---|---|
| Reserve Requirement | $146,897,434 | $64,475,419 | $211,372,853 |
| Funding Amounts: |  |  |  |
|    Cash and Investments[1] | 58,007,260 | 19,974,887 | 77,982,147 |
|    Credit Enhancement[2] | 93,653,288 | 45,815,645 | 139,468,933 |
| Total | $151,660,548 | $65,790,532 | $217,451,060 |

[1] Represents market value of amounts in cash and cash equivalents as of June 30, 2014.
[2] For series-specific policies represents the lesser of (a) the maximum amount of the policy or (b) the amount of Reserve Requirement allocated to the specific series covered by such policy.

SOURCE: The Department

As of the date of this Disclosure Statement, the Reserve Requirement for the Senior Lien Bond Reserve Account is satisfied with Cash and Investments and Credit Enhancement in the form of the following surety or insurance policies:

(a)   Financial Guaranty Insurance Company ("FGIC") surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien Bonds up to a maximum aggregate available amount of $16,729,163 and with a termination date of July 1, 2029.

10

(b)     FGIC surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien DWSD Bonds up to a maximum aggregate available amount of $15,954,125 and with a termination date of July 1, 2033.

(c)     MBIA Insurance Corporation ("MBIA") surety policy unconditionally guarantying the payment of the payment of principal of and interest on any Senior Lien DWSD Bonds up to a maximum aggregate available amount of $24,970,000 and with a termination date equal to the earlier of July 1, 2034 or the date on which the Series 2003(A) Bonds are no longer outstanding.

(d)     FGIC surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien DWSD Bonds up to a maximum aggregate available amount of $4,000,000 and with a termination date of July 1, 2035.

(e)     Assured Guaranty Municipal ("AGM," formerly Financial Security Assurance Inc.) surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien DWSD Bonds up to a maximum aggregate available amount of $3,000,000 and with a termination date equal to the earlier of July 1, 2034 or the date on which the Series 2006(A) and Series 2006(D) Bonds are no longer outstanding.

(f)     MBIA surety policy unconditionally guarantying the payment of principal of and interest on any Senior Lien DWSD Bonds up to a maximum aggregate available amount of $29,000,000 and with a termination date equal to the earlier of July 1, 2027 or the date on which the City has made all payments required on Senior Lien DWSD Bonds.

As of the date of this Disclosure Statement, the Reserve Requirement for the Second Lien Bond Reserve Account is satisfied with Cash and Investments and Credit Enhancement in the form of the following surety or insurance policies:

(a)     FGIC surety policy unconditionally guarantying the payment of principal of and interest on any Second Lien DWSD Bonds up to a maximum aggregate available amount of $6,815,645 and with a termination date of July 1, 2033.

(b)     MBIA surety policy unconditionally guarantying the payment of the payment of principal of and interest on any Second Lien DWSD Bonds up to a maximum aggregate available amount of $29,000,000 and with a termination date equal to the earlier of July 1, 2032 or the date on which the Series 2003(B) Bonds are no longer outstanding.

(c)     AGM surety policy unconditionally guarantying the payment of principal of and interest on any Second Lien DWSD Bonds up to a maximum aggregate available amount of $10,000,000 and with a termination date equal to the earlier of July 1, 2036 or the date on which the Bonds and Series 2006(C) Bonds are no longer outstanding.

As noted, certain of the Reserve Account requirements currently are satisfied through surety or insurance policies issued by MBIA, FGIC and AGM. Certain obligations of FGIC have been reinsured by National Public Finance Guarantee Corporation ("National"), pursuant to the restructuring by MBIA and the assignment of certain FGIC obligations to National by MBIA. National has confirmed that each of the FGIC debt service Reserve Account Credit

Enhancements listed above is covered by such reinsurance pursuant to the FGIC Reinsurance Agreement.

Although the Bond Ordinance requires that Credit Enhancement used to fund a Reserve Account be rated in the highest rating category of each rating agency at the time of its acquisition, there is no requirement that such rating be maintained. Accordingly, all Credit Enhancements are valued at their full face value for purposes of determining satisfaction of the applicable Reserve Account Requirement, regardless of the provider's rating. If the Credit Enhancement were determined to have no value, as for example, if a court made such a determination in connection with the dissolution of the provider, then the City would be required to replenish the applicable Reserve Account with cash or through a replacement Credit Enhancement Policy, as described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS–Flow of Funds" and in APPENDIX C – DWSD AUTHORIZING DOCUMENTS.

**Rate Covenant**

Pursuant to Act 94, the City has covenanted under the Bond Ordinance to maintain the Water Supply System in good repair and working order and to make all needed and proper repairs, replacements, additions and betterments so that the Water Supply System may at all times be operated properly and advantageously and so that the value and efficiency of the Water Supply System shall at all times be maintained.

The Bond Ordinance contains a covenant to fix and revise rates for water supply service from time to time as may be expected to be necessary to produce the greater of:

1. The amounts required to provide for:

   a. the payment of the expenses for maintenance of the Water Supply System as are necessary to preserve the same in good repair and working order; and

   b. the payment of Indebtedness coming due for the Fiscal Year of calculation; and

   c. the creation and maintenance of reserves therefor as required by the Bond Ordinance or any ordinance or resolution adopted in accordance with the terms thereof; and

   d. such other expenditures and funds for the Water Supply System as the Bond Ordinance may require; and

2. The Required Combined Coverage (i.e., with respect to the rate covenant, projected Net Revenues for the Fiscal Year of calculation, divided by the Indebtedness coming due for such Fiscal Year). For purposes of the rate covenant, the coverage requirements for determining the Required Combined Coverage are the following percentages:

| Priority of DWSD Indebtedness: | Percentage: |
|---|---|
| Senior Lien DWSD Indebtedness | 120% |
| Second Lien DWSD Indebtedness (together with Senior Lien Indebtedness) | 110% |
| SRF Junior Lien DWSD Bonds (together with Senior and Second Lien Indebtedness) | 100% |

Rates are established by the Board of Water Commissioners.

The Bond Ordinance defines "Indebtedness" as (i) principal of and interest on DWSD Bonds outstanding in the Fiscal Year of calculation, (ii) Reimbursement Obligations, and (iii) amounts payable by the City under a Hedge by reason of the early termination thereof. The City may take into account transfers from the Rate Stabilization Fund in calculating compliance with the rate covenant, but the City shall also comply with the rate covenant by maintaining rate coverage percentages of at least 100% without taking into account any transfers from the Rate Stabilization Fund.

**Enforceability of Rates**

The Bond Ordinance and Act 94 provide that payment of charges for water supply service to a premises may be enforced by discontinuing water service, sewage disposal service, storm water disposal service or any combination of such services to the premises. Further, the Bond Ordinance and Act 94 provide for the collection of delinquent charges for water supply and sewage disposal service by means of a lien on the respective premises of retail customers. Any such lien shall be enforced in the same manner as provided for the collection of taxes assessed upon the roll and the enforcement of tax liens. See "DWSD FINANCIAL PROCEDURES— Collections and Delinquencies." Act 94 provides that the rates charged for services furnished by any public improvement constructed under Act 94 shall not be subject to supervision or regulation by any State of Michigan ("State") bureau, board, commissioner or other like instrumentality or agency thereof.

**DWSD Additional Bonds**

The City may not incur any obligations payable from Pledged Assets except for DWSD Bonds, Ancillary Obligations and Ancillary Obligation Fees and Expenses, and no obligations of the City may be secured by a lien on Pledged Assets except as provided in the Bond Ordinance.

*Coverage Requirements*

The coverage requirements for determining the Required Combined Coverage (i.e., with respect to the DWSD Additional Bonds test described below, projected Net Revenues for the current or next succeeding Fiscal Year or historical Net Revenues for the immediately preceding audited Fiscal Year divided by the maximum Annual Debt Service) for the issuance of additional DWSD Bonds are as follows:

*[Remainder of Page Intentionally Left Blank]*

13

| Priority of DWSD Bonds: | Percentage: |
|---|---|
| Senior Lien Bonds | 120% |
| Second Lien Bonds (together with Senior Lien Bonds) | 110% |
| SRF Junior Lien Bonds (together with Senior Lien and Second Lien Bonds) | 100% |

*General Authority*

The City may issue DWSD Bonds of any priority (the "DWSD Additional Bonds") for repairs, extensions, enlargements, and improvements to the Water Supply System (including repaying amounts withdrawn from the Extraordinary Repair and Replacement Reserve Fund), refunding all or a part of any outstanding DWSD Bonds and paying the costs of issuing such DWSD Additional Bonds, including deposits, if any, to be made to any Reserve Account established or to be established for such DWSD Additional Bonds or any other DWSD Bonds if there is Required Combined Coverage under either the Projected Net Revenues Test or the Historical Net Revenues Test (the "Additional Bonds Test"). See "DEPARTMENT FINANCIAL OPERATIONS—Summary of Historical Revenues and Expenses" and APPENDIX A—FEASIBILITY CONSULTANT'S REPORT.

*Projected Net Revenues Test*

For purposes of the Projected Net Revenues Test, the Required Coverage Requirement means the result produced by dividing the Net Revenues for the current or next succeeding Fiscal Year, by the maximum composite Annual Debt Service in any Fiscal Year on outstanding DWSD Bonds and the DWSD Additional Bonds to be issued.

Projected Net Revenues may include 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the Water Supply System to be paid for in whole or in part from the proceeds of the Additional Bonds. In projecting Net Revenues, the City shall engage the services of and be guided by a consultant of national reputation for advising municipalities with respect to setting rates and charging for the use of water supply systems.

"Annual Debt Service" is a defined term in the Bond Ordinance, and reference should be made to APPENDIX C – DWSD AUTHORIZING DOCUMENTS for the definition and the rules for determining Annual Debt Service. If any DWSD Additional Bonds are to be issued to refund outstanding DWSD Bonds, the Annual Debt Service to be used for determining the Required Combined Coverage shall be the Annual Debt Service on the DWSD Additional Bonds to be issued and not the Annual Debt Service on the DWSD Bonds to be refunded.

*Historical Net Revenues Test*

For purposes of the Historical Net Revenues Test, the Required Coverage Requirement means the result produced by dividing the actual Net Revenues for the immediately preceding audited Fiscal Year, by the maximum composite Annual Debt Service in any future Fiscal Year on outstanding DWSD Bonds and the DWSD Additional Bonds to be issued.

Instead of the immediately preceding audited Fiscal Year, the City may use any audited Fiscal Year ending not more than sixteen months prior to the date of delivery of such DWSD

Additional Bonds. If any change in the rates, fees and charges of the Water Supply System has been authorized at or prior to the date of sale of such DWSD Additional Bonds, the Net Revenues for the particular preceding Fiscal Year shall be augmented by an amount reflecting the effect of such change had the Water Supply System's billings during such Fiscal Year been at the increased rates.

Net Revenues for the particular preceding audited Fiscal Year also may be augmented by 100% of the estimated increase in Net Revenues to accrue as a result of the acquisition of the repairs, extensions, enlargements and improvements to the Water Supply System to be paid for in whole or in part from the proceeds of such DWSD Additional Bonds and 100% of any acquisition, extension or connection which was made subsequent to the end of the particular preceding audited Fiscal Year. With respect to augmentation of Net Revenues, the City shall engage the services of and receive the certificate of a consultant of national reputation for advising municipalities with respect to setting rates and charges for the use of water supply systems regarding the existence of such conditions.

*Alternate Test for Refundings*

The City may issue DWSD Bonds of any priority without regard to the above tests for the purpose of refunding all or part of DWSD Bonds then Outstanding and paying costs of issuing such DWSD Additional Bonds, including deposits which may be made to any Reserve Account established or to be established for such DWSD Additional Bonds or any other DWSD Bonds if, but only if: (i) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on (A) the DWSD Additional Bonds to be issued and (B) giving effect to the refunding, all Outstanding unrefunded DWSD Bonds of equal and higher priority, is less than (ii) the combined Annual Debt Service coming due in the current Fiscal Year and each Fiscal Year thereafter until maturity on all DWSD Bonds of equal and higher priority, without giving effect to the refunding.

**Amendments Without Consent**

The Bond Ordinance may be amended or supplemented from time to time by Act of Council or Supplemental Action,[2] without the consent of the Holders of DWSD Bonds:

- To issue DWSD Bonds of any priority;

- To add to the covenants and agreements of the City in the Bond Ordinance contained, other covenants and agreements thereafter to be observed or to surrender, restrict or limit any right or power reserved to or conferred upon the City (including but not limited to the right to issue DWSD Bonds or incur other Secured Obligations of, in either case, any priority);

---

[2] "Act of Council" is defined by the Bond Ordinance as a resolution or ordinance of the City Council. "Supplemental Action" is defined by the Bond Ordinance as an Act of Council or a sale order or other document signed by the Finance Director of the City pursuant to an Act of Council. The authority of the Finance Director of the City and City Council under the Bond Ordinance and the City Charter has been modified by the District Court Orders and the appointment of the Emergency Manager. For further information see "THE DEPARTMENT – Court Mandated Changes" and "THE CITY."

15

- To make such provisions for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provisions contained in the Bond Ordinance, or in regard to matters or questions arising under the Bond Ordinance, as the City may deem necessary or desirable;

- To increase the size or scope of the Water Supply System; and

- To amend or supplement the Bond Ordinance in any respect with regard to DWSD Bonds of one or more Priorities of Lien so long as such amendment does not materially adversely affect the Holders of outstanding DWSD Bonds.

The Bond Ordinance provides that no Holders of DWSD Bonds of a priority of lien shall be "materially adversely affected" for the purposes of the Bond Ordinance by the change of any coverage percentage established for DWSD Bonds of any other priority of lien, and no amendment of or supplement to the Bond Ordinance that provides for or facilitates the issuance of DWSD Bonds or incurs other Secured Obligations of, in either case, of any priority of lien shall "materially adversely affect" the Holders of DWSD Bonds of any other priority of lien for the purposes of the Bond Ordinance so long as such amendment does not change any coverage percentage established for such priority of lien or is not an amendment that requires the consent of the Holder of such DWSD Bonds because it (i) reduces the applicable percentage of Holders of DWSD Bonds required to consent to an amendment to the Bond Ordinance, (ii) extends the fixed maturity of such Holder's DWSD Bonds or reduces the rate of interest thereon or extends the time of payment of interest, or reduces the amount of the principal or redemption premium thereof, or reduces or extends the time for payment of any premium payable on the redemption thereof or (iii) changes the priority of lien of such DWSD Bonds or deprives such Holder of the right to payment of such DWSD Bonds from Pledged Assets.

## Amendments With Consent

With the consent of the Holders of not less than 51% in principal amount of Securities then Outstanding affected thereby, the City may from time to time and at any time amend the Bond Ordinance in any manner by Act of Council; provided, that no such amendment shall:

- reduce the applicable percentage of Holders of Securities required to consent to an amendment to the Bond Ordinance without the consent of the Holders of all Securities then Outstanding, or

- without the consent of the Holder of such Security affected thereby:

  o extend the fixed maturity of such Security or reduce the rate of interest thereon or extend the time of payment of interest, or reduce the amount of the principal or redemption premium thereof, or reduce or extend the time for payment of any premium payable on the redemption thereof, or

  o change the priority of lien of such Security or deprive such Holder of the right to payment of such Security from Pledged Assets.

It shall not be necessary for the consent of the Securityholders as described above to approve the particular form of any proposed Act of Council but it shall be sufficient if such consent shall approve the substance thereof. The consent of the Holder of a Security shall bind all Holders of any Security for which such Security was the predecessor.

For the purpose of acquiring consent for the purposes of the provision of the Bond Ordinance described above, the consent of a Securityholder acquiring a Security in an offering remarketing in which the offering or remarketing circular or other disclosure document fully disclosed the terms of such amendment or supplement shall be considered obtained as if such consents were being solicited under this Section, but no actual consent shall be required, and no more than one such disclosure shall be required.

Promptly after an Act of Council amending the Bond Ordinance has obtained the requisite consent, the Finance Director of the City shall cause the Transfer Agent to notify, by mail at their addresses shown in the Registry, or by publication, Holders of all Outstanding Securities affected by such amendment, of the general terms of the substance of such Act of Council. Filing notice pursuant to the continuing disclosure agreement in respect of such Securities shall constitute sufficient notice for the purposes of the Bond Ordinance.

No amendment may be made under these provisions of the Bond Ordinance which affects the rights of the insurer or obligee of a Financial Facility or counterparty to a Hedge without its consent.

*The City is considering soliciting consents to certain provisions of the Bond Ordinance. Any such solicitation would be implemented through a process separate and distinct from the Invitation. No consents are being solicited pursuant to the Invitation and this Disclosure Statement.*

**Remedies under the DWSD Indenture and the Bond Ordinance**

Under the DWSD Indenture, if there is a Default (as defined in the DWSD Indenture) on any DWSD Bond, the DWSD Trustee may pursue any remedy permitted by law and the Bond Ordinance to enforce the performance of or compliance with the provisions of the DWSD Indenture.

Upon the happening and continuance of a Default on any DWSD Bond, and if requested to do so by the Holders of at least 20% in aggregate principal amount of the Outstanding DWSD Bonds and the DWSD Trustee is indemnified as provided in the DWSD Indenture and the Bond Ordinance, the DWSD Trustee shall exercise such of the rights and powers as the DWSD Trustee shall deem most effective to enforce and protect the interests of the Holders.

The Holder or Holders of DWSD Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, shall have the right at any time, by a written instrument executed and delivered to the DWSD Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of the DWSD Indenture, or any other or any other proceedings under the DWSD Indenture; provided, that such direction shall not be otherwise than in accordance with the

provisions of law and of the DWSD Indenture, and provided that the DWSD Trustee shall be indemnified to its satisfaction.

The Holder or Holders of DWSD Bonds representing in the aggregate not less than 20% of the entire principal amount thereof then Outstanding, may, by suit, action, mandamus or other proceedings, protect and enforce the statutory lien upon Pledged Assets, and may, by suit, action, mandamus or other proceedings, enforce and compel performance of all duties of the officers of the City, including the fixing of sufficient rates, the collection of Revenues, the proper segregation of the Revenues of the Water Supply System and the proper application thereof. The statutory lien upon Pledged Assets, however, shall not be construed to compel the sale of the Water Supply System or any part thereof.

If there is a Default in the payment of the principal (and premium, if any) of and interest on any DWSD Bonds, any court having jurisdiction in any proper action may appoint a receiver to administer and operate the Water Supply System on behalf of the City and, under the direction of the court, perform all of the duties of the officers of the City more particularly set forth herein and in Act 94.

A Holder of DWSD Bonds shall have all other rights and remedies given by Act 94 and by law for the payment and enforcement of the DWSD Bonds and the security therefor. The rights and remedies of Bondholders and the enforceability of the DWSD Bonds, the DWSD Authorizing Documents, and Act 94 may be subject to and limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or similar laws affecting the enforcement of creditors' rights generally heretofore or hereafter enacted to the extent constitutionally applicable, and by the application of general principles of equity including those relating to equitable subordination and the enforcement of such rights and remedies may also be subject to and limited by the exercise of judicial discretion in appropriate cases.

## CITY OF DETROIT BANKRUPTCY MATTERS

**For a complete summary of events in the City's pending Chapter 9 bankruptcy case, please review the Corrected Fifth Amended Plan of Adjustment and the Fourth Amended Disclosure Statement filed by the City in its bankruptcy case, both of which are available free of charge from the internet at *http://www.kccllc.com/detroit*.**

Chapter 9 of the Bankruptcy Code provides for the court-supervised reorganization of a municipality's financial affairs. On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), which case is pending under case number 13-53846 (the "Bankruptcy Case"). On December 5, 2013, the Bankruptcy Court issued its Order for Relief Under Chapter 9 of the Bankruptcy Code [Docket No. 1946] (the "Eligibility Order") ordering that the City was an eligible debtor under Chapter 9 of the Bankruptcy Code. The Eligibility Order has been appealed and those appeals are currently pending before the United States Court of Appeals for the Sixth Circuit (the "Court of Appeals").

A Chapter 9 debtor has the exclusive right to file a Chapter 9 plan of adjustment. A Chapter 9 plan of adjustment may provide for, among other things, the extension of a Chapter 9

debtor's debt maturities, the reduction of principal of or interest on its debts, the refinancing of its debt, in whole or in part, or other modifications to the debtor's debt obligations.

The City has prepared a Plan of Adjustment and filed the most recent corrected Plan of Adjustment with the Bankruptcy Court on July 29, 2014 (as may be further amended from time to time, the "Plan of Adjustment"). The Plan of Adjustment has not yet been confirmed by the Bankruptcy Court. On August 6, 2014, the Bankruptcy Court issued its Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (the "Seventh Amended Order"). Under the Seventh Amended Order, the hearing to consider confirmation of the Plan of Adjustment will commence on August 21, 2014. Additional confirmation hearing dates, as necessary, have been scheduled for August 22, August 25-29, September 2-5, September 8-12, September 15-19, and September 22-23, 2014. These dates, and the other dates set forth in the Seventh Amended Order, may be further modified by the Bankruptcy Court.

Sections 3(a) through 3(c) of the Plan of Adjustment set forth the proposed treatment of claims (the "Water and Sewer Bond Claims") arising from the existing water and sewer bonds which were outstanding as of the Petition Date (the "Existing Water and Sewer Bonds"). The Water and Sewer Bond Claims are classified in Classes 1A, 1B and 1C under the Plan of Adjustment. Bondholders should reference the Plan of Adjustment for a complete description of the proposed treatment of the Water and Sewer Bond Claims.

Numerous and varied objections (the "Water and Sewer Objections") have been filed with the Bankruptcy Court to the proposed treatment of the Water and Sewer Bond Claims in the Plan of Adjustment. The Water and Sewer Objections raise a myriad of legal and factual issues in opposition to the Plan of Adjustment. The Water and Sewer Objections include the following:[3]

| Objecting Party | Docket Reference |
|---|---|
| Oakland County | Docket No. 4627 |
| Macomb County | Docket No. 4636 |
| U.S. Bank National Association as DWSD Bond Trustee | Docket No. 4647 |
| Berkshire Hathaway Assurance Corporation | Docket No. 4657 |
| Wayne County | Docket No. 4663 |
| National Public Finance Guarantee Corporation | Docket No. 4665 |
| Ad Hoc Committee of DWSD Bondholders | Docket No. 4671 |
| Assured Guaranty Municipal Corp. | Docket No. 4674 |

A summary of the foregoing Water and Sewer Objections (and the City's responses) appears on Exhibit A to Docket No. 5034 in the City's Bankruptcy Case. The summary, and the complete Water and Sewer Objections are available for review free of charge from the internet at ***http://www.kccllc.com/detroit***.

---

[3]    The summary of Water and Sewer Objections contained herein may not be an exhaustive listing of all objections put forth by parties in interest to the treatment of Water and Sewer Bonds Claims in the Plan of Adjustment. In that regard, reference should be made to the Bankruptcy Court docket in the City's Chapter 9 Bankruptcy Case.

The parties filing the Water and Sewer Objections, including holders and insurers of existing bonds and certain counties within the Department's service areas, have retained numerous experts. Those experts have prepared reports raising a myriad of legal and factual claims regarding the Plan of Adjustment and raising various issues relating to the Department's operations, the Plan of Adjustment's treatment of the Department's General Retirement System ("GRS") pension liabilities, the sufficiency of the Department's approved capital improvement plan, the affordability of its rates, the accuracy of its historical and current forecasts and its current credit quality and its likely future bond ratings and cost of capital should the Plan of Adjustment be confirmed, among numerous other matters. These reports were served on parties to the Bankruptcy Case, but, in accordance with the procedures outlined by the Bankruptcy Court, have not been filed with the Bankruptcy Court. This Disclosure Statement may be inconsistent in some respects with one or more of these reports.

For a Chapter 9 plan of adjustment to become effective, it must be confirmed by order of a bankruptcy court. The requirements for confirming a Chapter 9 plan of adjustment are complex. Section 943(b) provides that a bankruptcy court shall confirm a Chapter 9 plan of adjustment if: (1) the plan complies with the provisions of the Bankruptcy Code made applicable in Chapter 9 cases by section 901 of the Bankruptcy Code; (2) the plan complies with the provisions of Chapter 9; (3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable; (4) the debtor is not prohibited by law from taking any action necessary to carry out the plan; (5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in Section 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim; (6) any regulatory or electoral approval necessary under applicable non-bankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and (7) the plan is in the best interests of creditors and is feasible.

Section 901 of the Bankruptcy Code incorporates Section 1129(a)(10) of the Bankruptcy Code into Chapter 9. Accordingly, for a Chapter 9 plan of adjustment to be confirmed, at least one class of impaired claims must vote to accept that plan of adjustment (without counting the votes of any "insiders" whose claims are classified within that class). A class of impaired claims has accepted a Chapter 9 plan of adjustment only when the holders of at least a majority in number and at least two-thirds in dollar amount of the allowed claims actually voting in that class vote to accept the plan of adjustment.

Section 901 of the Bankruptcy Code makes applicable in Chapter 9 the so-called "cramdown" provisions of Sections 1129(a)(8), 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code. Section 1129(b)(1) provides that, if one class of impaired claims accepts a Chapter 9 plan of adjustment, but other impaired classes do not, then the Chapter 9 debtor must demonstrate that its Chapter 9 plan of adjustment is "fair and equitable" and does not discriminate unfairly with respect to each impaired class that has not accepted the plan. With respect to a class of dissenting secured creditors, Section 1129(b)(2)(A) provides that a plan is "fair and equitable" to such dissenting secured creditors to the extent it provides:

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

The deadline for the City to mail voting solicitation packages to the various holders of claims classified under the Plan of Adjustment was May 12, 2014 for purposes of soliciting the votes of such holders on whether to accept or reject the Plan of Adjustment. Among the creditors solicited in connection with the Plan of Adjustment were the holders of the Water and Sewer Bond Claims classified in the classes of claims comprising Class 1A. Classes 1B and 1C are unimpaired under the Plan of Adjustment and are, therefore, deemed to have accepted the Plan of Adjustment and did not vote on the Plan of Adjustment. The deadline for the holders of claims to submit their votes to accept or reject the Plan of Adjustment was July 11, 2014. Voting results for each class of claims under the Plan of Adjustment are summarized in the Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit dated July 21, 2014, which appears at Docket No. 6179 in the City's Bankruptcy Case, and can be viewed free of charge from the internet at *http://www.kccllc.com/detroit*.

Section 944 of the Bankruptcy Code governs the effect of confirmation of a Chapter 9 plan of adjustment. Under that section, the provisions of a confirmed plan bind the debtor and any creditor, whether or not (1) a proof of such creditor's claim is filed or deemed filed under the Bankruptcy Code; (2) such claim is allowed under Section 502 of the Bankruptcy Code; or (3) such creditor has accepted the plan. Except as provided in Section 944(c) of the Bankruptcy Code, the debtor is discharged from all debts as of the time when (a) the plan is confirmed; (b) the debtor deposits any consideration to be distributed under the plan with a disbursing agent appointed by the court; and (c) the court has determined (i) that any security so deposited will constitute, after distribution, a valid legal obligation of the debtor; and (ii) that any provision made to pay or secure payment of such obligation is valid. Under Section 944(c), the debtor is not discharged from any debt (A) excepted from discharge by the plan or order confirming the plan; or (B) owed to an entity that, before confirmation of the plan, had neither notice nor actual knowledge of the case.

There can be no assurance that the City's Plan of Adjustment will ultimately conform to the Plan of Adjustment currently proposed by the City. There can also be no assurance that the Plan of Adjustment will be confirmed by the Bankruptcy Court, and, in particular, whether the Bankruptcy Court will overrule the Water and Sewer Objections or otherwise approve the

proposed treatment of the Water and Sewer Bond Claims. Moreover, any order confirming the Plan of Adjustment may be appealed to a higher court. Even if confirmed, there can be no assurance if or when the Plan of Adjustment will become effective or ultimately be consummated.

Once confirmed and consummated, however, the Water and Sewer Bond Claims will be discharged under the Plan of Adjustment in exchange for the treatment proposed thereunder. The provisions of the Plan of Adjustment, if confirmed and effectuated, are intended to alleviate many of the City's most significant financial problems. However, there can be no assurance that the City will not file another bankruptcy petition in the future pursuant to Chapter 9 of the Bankruptcy Code.

## RISK FACTORS

### Introduction

In making a decision whether to tender their Tender Bonds, Bondholders should consider certain risks and investment considerations which could affect the ability of the Department to pay debt service on its Tender Bonds or, if the tender is successfully completed, on any existing untendered DWSD Bonds remaining outstanding after consummation of the tender, including the potential 2014 DWSD Refinancing Bonds and which could affect the marketability of or the market price for such bonds. These risks and investment considerations are discussed throughout this Disclosure Statement. Certain of these risks and considerations are set forth in this section, but this section is not intended to be comprehensive or to be a compilation of all possible risks and investment considerations, nor a substitute for an independent evaluation of the information set forth in and presented in this Disclosure Statement, which each Bondholder should read in its entirety in order to make an informed investment decision.

Additional risks and uncertainties not currently known by the Department or the City, or that the Department or the City does not currently consider to be material, or that are generally applicable to all municipalities and their ability to repay obligations, may exist. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value or liquidity of the Tender Bonds. There can be no assurance that other risk factors not discussed below will not become material in the future. Bondholders are advised to consider the following risk factors, among others, and to review the other information incorporated by reference into this Disclosure Statement in evaluating whether to tender the Tender Bonds.

### General Economic and Political Risks

The financial performance of the City and the Department will be affected by, and will be subject to, general economic and political events and conditions that will change in the future to an extent and with effects that cannot be determined at this time. These general economic and political events and conditions include, among other things, decisions by additional communities and counties currently served by the Water Supply System to exit the system, controversies regarding the Department's efforts to enforce payment of bills through shut-off of service and other available remedies, population declines and other demographic and employment changes

and trends; periods of inflation or deflation; variable patterns of national and regional economic growth, whether cyclical or structural in nature; disruptions in credit and financial markets; political gridlock concerning, among other matters, national tax and spending policies; economic, financial and political developments in the City and the State; budget and debt limit controversies, both nationally, at the State level and locally; and unusually large numbers of business failures and business and consumer bankruptcies and policy responses, or lack thereof, to the foregoing. See APPENDIX E – CHARACTERISTICS OF THE WATER SUPPLY SYSTEM SERVICE AREA.

**Potential for Issuance of Unsecured Obligations by the City**

While the issuance of DWSD Additional Bonds is limited by an Additional Bonds Test, the Bond Ordinance, the Resolution Authorizing the Invitation, adopted by the Board of Water Commissioners on August 6, 2014 and approved by the Emergency Manager (the "DWSD Resolution") and the DWSD Indenture (collectively, the "DWSD Authorizing Documents") do not prohibit the City from incurring other, additional debt, regardless of amount, that is not secured by the Pledged Assets. While this debt will not directly impact the debt service coverage on the Tender Bonds, if the City is unable to repay the principal of, and interest on, such unsecured debt, it might, in extreme circumstances or in combination with other adverse conditions (such as those which existed when the City filed the Bankruptcy Case), cause the City to have to file for relief under Chapter 9 again in the future. See "—Future Bankruptcy," below.

**Water Revenues**

There can be no assurance that the water revenues collected by the Department will remain at current levels since the current level of collections is dependent on many factors, including assumed and actual delinquencies and non-payment, and may be adversely affected by the departure of wholesale customers from the Water Supply System. The revenues of the Sewage Disposal System do not secure any payments of DWSD Bonds.

As described under "THE WATER SUPPLY SYSTEM," the Master Plan for the Water Supply System has not been formally revised since 2004, the Department is transitioning its wholesale customers to new model contracts, and there have been recent changes in the Water Supply System's customer base. In addition, as described under "DEPARTMENT FINANCIAL PROCEDURES," water supply rates, collections and delinquencies have varied from year to year and rate schedules for customers, while calculated pursuant to a uniform methodology, vary based on volumes, peak demands and other demographic information contained in wholesale customer contracts. Accordingly, revenues can vary, both from year to year and between historic and actual projections.

**Rate Covenant and Limits on Future Rate Increases**

The Bond Ordinance contains a covenant that provides, so long as any DWSD Bonds are outstanding, sufficient rates for services furnished by the Water Supply System shall be fixed and maintained. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—Rate Covenant." Notwithstanding this provision of the Bond Ordinance, under

Michigan law, water rates established by the Department must be reasonable and nondiscriminatory and are subject to review by the courts in that regard. In establishing the rates, the actions of the Department are presumed by the courts to be reasonable, but the rates must not be arbitrary, discriminatory or excessive. Consequently, the rates established by the Department pursuant to the Bond Ordinance could be challenged as being arbitrary, discriminatory or excessive. The Department currently has affordability waivers in place with respect to certain aspects of environmental compliance to avoid excessive rate increases.

**Rate Covenant Not a Guarantee**

The ability to pay debt service on the Tender Bonds depends on the ability to generate Net Revenues that meet the levels required by the Bond Ordinance. Although the Bond Ordinance contains a covenant to impose rates, fees and charges, as more particularly described herein under "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—Rate Covenant," and the Department expects that sufficient Revenues will be generated through the imposition and collection of such rates, fees and charges and other Revenues described herein, there is no assurance that such imposition of such rates, fees and charges or other Revenues will result in the generation of Net Revenues in the amounts required by the Bond Ordinance. The Bond Ordinance covenant does not constitute a guarantee that sufficient Net Revenues will be available to pay debt service on the Tender Bonds.

**Pending Bankruptcy Case**

As described above under "CITY OF DETROIT BANKRUPTCY MATTERS," the City is currently proceeding under Chapter 9 of the Bankruptcy Code. The City has filed a Plan of Adjustment and several amendments thereto. A condition to purchase of the Tender Bonds is that (i) DWSD Bonds identified as unimpaired in the Plan of Adjustment remain unimpaired during the period through and including confirmation of the Plan of Adjustment and (ii) DWSD Bonds currently identified as impaired under the Plan of Adjustment will, upon the closing of the tender and prior to and at the time of confirmation of the Plan of Adjustment, be treated under the Plan of Adjustment as unimpaired. To effectuate this condition to the purchase of the Tender Bonds, the City would file an amended Plan of Adjustment with the Bankruptcy Court that would amend the provisions contained in the current Plan of Adjustment that impair certain classes of the DWSD Bonds, including, without limitation, those provisions which provide for the impairment of the interest rate and call protection in respect of the DWSD Bonds.

Confirmation hearings are scheduled to begin on August 21, 2014. There can also be no assurance that once finalized, the City's Plan of Adjustment will be confirmed or become effective. Additionally, the City is currently projecting that, if the Plan of Adjustment is confirmed, it may exit from Chapter 9 bankruptcy protection in the fall of 2014. There is a risk that confirmation or exit may be delayed as a result of litigation or otherwise. Bondholders should consult with their legal advisors regarding the risks associated with any delay in the City's exit from Chapter 9 bankruptcy protection.

As described under "THE DEPARTMENT—Ongoing Discussion of Formation of Regional Water Authority," "—Potential DWSD Public-Private Partnership" and "CITY OF

DETROIT BANKRUPTCY MATTERS," the Bankruptcy Case is still pending and during the pendency of the City's Bankruptcy Case, the discussions regarding potential private management and Bankruptcy Court-ordered confidential mediations regarding a regional authority have occurred and are continuing to occur. The Bankruptcy Code and Act 436 (as defined herein) allow the Emergency Manager to take actions without regard to City Charter procedures. The outcome of ongoing discussions and confidential mediation, and the outcome of the Bankruptcy Case, and its impact on the Department, is uncertain, and could affect the Department and its operations, and accordingly the market price for Tender Bonds.

**Appeal of Eligibility Order**

As described above under "CITY OF DETROIT BANKRUPTCY MATTERS," the Eligibility Order is currently subject to multiple appeals. If the Eligibility Order were to be reversed, or the City was otherwise not subject to Chapter 9 of the Bankruptcy Code, the City's ability to repay the DWSD Bonds could be adversely affected.

**Appeal of Bankruptcy Order**

Following entry by the Bankruptcy Court, the Bankruptcy Order may be subject to appeals. No prediction can be made as to whether the Bankruptcy Order will be appealed or, if appealed, the outcome of any such appeal. Consummation of the tender offer is conditioned upon the entry of and validity and enforceability of the Bankruptcy Order, that the Bankruptcy Order has not been stayed pending appeal, and the closing and funding of the 2014 DWSD Refinancing Bonds. With respect to any appeal of the Bankruptcy Order, Section 364(e) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." Nevertheless, no prediction can be made as to an appellate court's interpretation of Section 364(e) or of the outcome of any appeals of the Bankruptcy Order.

**Treatment of Water and Sewer Bond Claims If Tender Transaction Does Not Close**

Regardless of whether a Bondholder agrees to sell all or a portion of its Tender Bonds, there is risk that the City may be unable to close or consummate the tender offer. To the extent the tender offer does not close or is otherwise not consummated, the City would seek treatment of the Water and Sewer Bond Claims under the Plan of Adjustment, as currently proposed.

**Future Bankruptcy**

There can be no assurance that the City will not file another bankruptcy petition under Chapter 9. If, however, another Chapter 9 case were to be commenced by the City prior to the payment in full of the Tender Bonds, the rights and remedies of the Holders of the Tender Bonds would be subject to the provisions of Chapter 9.

**Five-Year Projections for Disclosure Statement Compared with Ten-Year Business Plan for Plan of Adjustment**

As part of the City's Chapter 9 proceeding, a ten-year business plan with forecasted results, referred to as the "DWSD Business Plan" is included as an Appendix to the Plan of Adjustment. In contrast, the projections included in this Disclosure Statement are based on a five-year period and were prepared subsequent to the DWSD Business Plan contained in the Plan of Adjustment. The five-year projections included in this Disclosure Statement assume successful consummation of the tender and amendment of the Plan of Adjustment to remove the provisions impairing certain of the Tender Bonds. Accordingly, the five-year Disclosure Statement projections include only those Plan of Adjustment provisions relating to the Department that will remain in the Plan of Adjustment after the bond impairment provisions have been removed. These provisions are described more fully below. The five-year projections also include greater detail than the ten-year business plan.

Certain factors can affect the projections included in this Disclosure Statement following confirmation of the Plan of Adjustment, including: (i) if the Department remains a part of the City; (ii) if the operations of the Department are outsourced to a contractor; or (iii) if a regional authority is created to replace the Department.

**Financial Impacts of the Plan of Adjustment**

The financial projections presented in this Disclosure Statement were prepared in a dynamic environment. Although the City of Detroit's Chapter 9 Plan of Adjustment has not been confirmed, it was deemed reasonable to include certain elements of the Plan of Adjustment in the projections included in this Disclosure Statement.

The following scenarios described in the Bankruptcy Disclosure Statement are included in the assumptions for the financial projections for the purposes of this Disclosure Statement.

1. *Rates and Revenues* – The Department will maintain its Fiscal Year 2015 rate setting protocols for a minimum of five years, including a policy of setting its rates and charges at levels designed to achieve a 4% annual increase in revenues, subject to certain changes necessary to stabilize water and sewer revenues.

2. *Pension Funding Contribution* - The current Plan of Adjustment contemplates that the Department will contribute a total of $428.5 million to GRS over the nine-year period ending June 30, 2023. The Bankruptcy Disclosure Statement states that the payments to be made by the Department constitute its presently-calculated full allocable share of the GRS unfunded accrued actuarial liability remaining after taking into account the pension modifications contemplated by the current Plan of Adjustment and related administrative and restructuring costs. The amount of the payments has been determined as the amount necessary to fund, by June 30, 2023, the underfunded GRS liabilities allocable to the Department that had accrued as of June 30, 2014. The total amount of the payments to be made by the Department has been calculated based on an assumed investment rate of return of 6.75% and further

26

assumes that the GRS pension plan has been frozen as of June 30, 2014, which has occurred. According to the current Plan of Adjustment, after the initial nine-year period ending June 30, 2023 is completed, the Department will remain responsible for its allocable share of GRS unfunded actuarial accrued liability ("UAAL") but is expected by the City to have only small contributions, if any, to make to the GRS on account of this liability.

3. *New B Notes (Allocable Share)* - The Plan of Adjustment provides, among other things, for the satisfaction of certain claims in exchange for the receipt of the "New B Notes" which are unsecured bonds to be issued by the City with a term of 30 years. As it relates to the Department, the New B Notes documents settle the City's other post-employment benefit ("OPEB") liability and citywide pension obligation certificates ("POC"). The New B Notes include funding for settlement of other City claims that do not impact the Department. The Department will be responsible for its allocable share of the New B Notes consistent with prior years' formulas for allocation of OPEB and POC liabilities.

The following potential scenarios described in the Bankruptcy Disclosure Statement are not reflected in the financial projections for the purposes of this Disclosure Statement.

1. A potential transaction involving the transfer to a third party (including, but not limited to, a lease) of a majority of the assets of, or the right to operate and manage, the City's water and/or sewage disposal systems currently operated by the Department in one or a series of related transactions.

2. The Plan of Adjustment contemplates an interest rate reset for certain impaired series of water system revenue bonds, which interest rate reset will be reflected in new bonds referred to in the Plan of Adjustment as the "New DWSD Bonds." If the tender is not accepted or if it does not close, the Department will exchange the New DWSD Bonds for those impaired DWSD Bonds as set forth in the Plan of Adjustment. The definitive documentation governing the New DWSD Bonds will be filed with a Plan of Adjustment supplement.

3. The Bankruptcy Disclosure Statement specifically addresses the status of negotiations regarding the potential formation of a regional authority. These negotiations remain in confidential Federal Court mediation. See "THE DEPARTMENT—Ongoing Discussion of Formation of Regional Water Authority" below.

In addition, the City may seek to implement a rate stability program for City residents, the purpose of which would be to (i) provide a source of funds to mitigate against rate increases, (ii) enhance affordability and (iii) provide a buffer against delinquent payments. The projections contained in this Disclosure Statement do not reflect the potential impact of such a program.

**Enforceability of Remedies**

The remedies available under the DWSD Authorizing Documents upon the occurrence of an event of default are in many respects dependent upon judicial actions, which are often subject to substantial discretion and delay. Additionally, under State constitutional and statutory law and judicial decisions concerning remedies, certain of these remedies may be limited, or may not be readily available or enforceable. The enforceability of remedies or rights with respect to the DWSD Bonds also is limited by State and federal bankruptcy, reorganization, insolvency, sovereign immunity, moratorium and other similar laws regarding creditors' rights or remedies currently in effect and may be limited by such laws hereafter enacted.

**DWSD Additional Bonds**

DWSD Additional Bonds may be issued in accordance with the provisions of the DWSD Authorizing Documents, either as additional Senior Lien DWSD Bonds on a parity with the currently outstanding Senior Lien DWSD Bonds, or as Junior Lien DWSD Bonds subordinate to the lien of the Senior Lien DWSD Bonds. The DWSD Additional Bonds would, in some cases, increase the debt service requirements to be serviced by the Pledged Assets. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—DWSD Additional Bonds."

**Limits on Future Borrowing**

In certain circumstances described herein, the Water Fund may be required to provide funds to pay the costs of capital improvements to the Water Supply System. If the Water Supply System does not generate sufficient revenues to pay for such capital improvements, or if other funds are not available, the City, through the Department, will have to borrow the funds. In order to issue DWSD Additional Bonds, certain conditions, including the Additional Bonds Tests, must be satisfied as described in greater detail above in "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS—DWSD Additional Bonds."

It cannot be determined at this time whether the Water Supply System will be able to satisfy the requirements for the issuance of DWSD Additional Bonds, and no assurance can be given that the Water Supply System will be able to satisfy such requirements for a considerable period of time. If the Water Supply System is able to satisfy these requirements, it is not possible to predict what terms such additional debt may contain or whether there will be a market for such additional debt. Likewise, if the Water Supply System cannot satisfy the requirements for the issuance of DWSD Additional Bonds or if the Water Supply System qualifies to issue DWSD Additional Bonds but is unable, due to market conditions or otherwise, to obtain funds through the issuance of DWSD Additional Bonds, no assurance can be given that the Water Supply System will be able to obtain needed funds through the issuance of unsecured debt.

**Additional Capital Improvements**

In order to maintain the operations of the Water Supply System over the term of the DWSD Bonds, the Department will have to pay the costs of capital improvements to the Water Supply System. As part of its Fiscal Year 2015-2019 CIP, the Department expects to spend

28

$673,805,000 for capital improvements to the Water Supply System. The exact source of funds to pay for all capital improvements included in the CIP, and to pay capital costs exceeding those included in the CIP, is not presently known. The Department uses an incremental method of capital project funding rather than funding all projects in advance. The Department's capital financing strategy is designed to align capital project financing sources with program requirements in a framework that balances multiple goals, including to: (i) recover the costs of capital investment over the useful lives of the capital assets; (ii) minimize the impact of the capital programs on water rates; and (iii) protect and enhance the Department's financial position. The shortfall between total capital requirements in the CIP (as defined below) and funds available in advance to pay capital costs may be substantial. It is not certain that the Department's CIP will be adequate to meet the capital investment needs of the Water Supply System or that the Department will be able to raise rates and/or access capital markets to borrow such funds or satisfy the requirements of the DWSD Authorizing Documents to issue DWSD Additional Bonds at the time such improvements are required to be financed or made. See "THE CAPITAL IMPROVEMENT PROGRAM."

**Operating Risks**

As with any water system of its size and complexity, operation of the Water Supply System could be affected by many factors, the nature and extent of which are not currently determinable, including the breakdown or failure of equipment or processes, inability to achieve expected levels of efficiency, failure to operate at design specifications, failure to operate in a manner that avoids violations of its environmental pollution elimination discharge permits and results in the incurrence of penalties and fines related to such violations, failure by third parties to perform their obligations under agreements with the Department (whether or not excused by force majeure), costs of supplies or services not under contract, changes in law or regulatory protocols, delays in receipt of or failure to obtain or maintain necessary permits or similar events.

The Water Supply System is also at risk from catastrophic events such as an intervening act of God or public enemy, water shortage, drought, flooding, extreme or unusual weather conditions, earthquake or other natural disaster, war, act of terror, sabotage, civil commotions, interference by civil or military authorities, nuclear or other explosion, radioactive or chemical contamination, fire, subsurface condition, public disorder, epidemic, quarantine restriction, strike, labor dispute or other labor protest, stop-work order or injunction issued by a governmental authority or government embargo. The occurrence of such events could significantly reduce revenues and/or significantly increase the costs of operating the Water Supply System, thereby jeopardizing the ability of the Water Supply System to generate revenues sufficient to make timely payments of debt service on the Tender Bonds, to pay operating expenses of the Water Supply System and/or to pay for necessary capital improvements to the Water Supply System.

**Future Governmental Actions**

Federal, State and local statutory and regulatory requirements (including requirements to obtain permits or other governmental approvals) applicable to the operation of the Water Supply System are subject to change, and no assurance can be given that the Department will be able to

comply with such changes. The timing and impact of such future legislative or regulatory action cannot be predicted with certainty, and the impact of such action on the financial position of the Department currently cannot be determined. Delay in obtaining or failure to obtain and maintain in full force and effect any required permits or other governmental approvals may result in additional costs or reduced revenues, including fines, a moratorium on extensions and/or connections and, in extreme circumstances, the complete shutdown of the Water Supply System or a substantial portion thereof. Such a change in legal requirements could occur because (i) existing laws or regulations are revised or reinterpreted; (ii) new laws or regulations are adopted or become applicable to the Department; or (iii) a combination thereof. Further, there can be no assurance that the technology and equipment selected by the Department to comply with such revised or reinterpreted or new laws will be implemented in a timely fashion or will meet such changed requirements upon implementation. Consequently, any future revision or reinterpretation of existing laws or regulations or adoption of new laws or regulations could materially increase the cost of operating the Water Supply System, which could have a negative and material impact on the Department's ability to make timely payment of debt service on the Tender Bonds.

Any future revision or reinterpretation of existing laws or regulations or adoption of new laws or regulations could also impose significant capital costs on the Department. See "RISK FACTORS—Additional Capital Improvements" for a description of certain risks relating to the Department's ability to fund such additional capital costs.

**Rating Agency Actions**

Actions by the rating agencies, such as the recent downgrades of the credit ratings of DWSD Bonds to non-investment grade, could raise the Department's cost of borrowing, which could affect the Department's ability to borrow in the future and may have other adverse effects on the Department's financial condition. The market for non-investment grade securities is smaller and less liquid that the market for investment grade securities. As a result, it is possible that there may not be sufficient demand for the Department to issue any future bonds or notes in the amounts required by the Department or that the cost to the Department of borrowing could be substantially higher than if it were able to issue more highly-rated securities.

**Lack of Liquidity and Pricing**

There is no assurance that an active secondary market for DWSD Bonds will develop or be maintained, so holders of DWSD Bonds might not be able to sell such bonds in the future. If a secondary market does develop, prices of DWSD Bonds traded in the secondary market are subject to adjustment upward and downward in response to changes in the credit markets. From time to time it may be necessary to suspend indefinitely secondary market trading in selected issues of bonds as a result of the financial condition or market position of the broker dealer, prevailing market conditions, lack of adequate current financial information regarding DWSD Bonds, whether or not DWSD Bonds are in default as to principal and interest payments, and other factors which may give rise to uncertainty concerning prudent secondary market practices. As a result, holders of the DWSD Bonds may not be able to liquidate their investment quickly, at an attractive price, or at all.

**Environmental Regulation**

The operation of the Water Supply System is subject to extensive and continuing environmental regulation. Federal, state and local standards and procedures that regulate the environmental impact of the Water Supply System are subject to change. These changes may arise from continuing legislative, regulatory and judicial action regarding such standards and procedures. Additionally, the Department is subject to an Administrative Consent Order issued by the Michigan Department of Environmental Quality ("MDEQ") on July 8, 2011. Consequently, there is no assurance that facilities in operation will remain subject to the regulations currently in effect, will always be in compliance with further regulations or will always be able to obtain all required operating permits. An inability to comply with environmental standards could result in reduced operating levels and fines. Legislative, regulatory, administrative or enforcement actions involving environmental controls could also adversely affect the operation of the facilities of the Water Supply System. For example, if property owned or operated by the Department is determined to be contaminated by hazardous materials, the Department could be liable for significant clean-up costs even if it were not responsible for the contamination. See "THE WATER SUPPLY SYSTEM—Environmental Matters."

**Reliance on the Feasibility Report and Historical Financial Information**

In preparing the Feasibility Report, the Feasibility Consultant has relied upon certain assumptions and projections regarding future operating expenses, capital expenditure and debt service on the Tender Bonds, some of which are those of the Department or its consulting engineer. See "FEASIBILITY CONSULTANT'S REPORT." The Feasibility Consultant has also made other assumptions, including assumptions regarding population decline, water use patterns, rate increases, collection rates and the response customers of the Water Supply System will have to the rate increases. Projected operating and financial performance of the Water Supply System may not be indicative of future performance; actual results will differ from those included in the Feasibility Report, and such differences may be material. The Department cannot give any assurance that the events assumed will materialize or that actual results will match those projected, and any such differences may be material. In addition, the future policies, operations and financing decisions of the Department may not be the same as those assumed in the Feasibility Study. No representation is made or intended, nor should any representation be inferred, with respect to the likely existence of any particular future set of facts or circumstances, and Bondholders are cautioned not to place undue reliance upon the Feasibility Report or the revenue forecasts or other projections contained therein.

In addition, certain historical financial information is included in this Disclosure Statement. There can be no assurance that the financial results achieved by the City in the future will be similar to historical results, and the financial information is expressly qualified in its entirety by the disclaimers set forth in such financial information and the disclosure in this Disclosure Statement. Such future results will vary from historical results, and actual variations may be material. Therefore, the historical operating results of the Water Supply System

contained in this Disclosure Statement cannot be viewed as a representation that sufficient revenues will be generated in the future to make timely payment of principal of, redemption premium, if any, and interest on the DWSD Bonds.

**Forward-Looking Statements are Subject to Risks and Uncertainties**

If and when included in this Disclosure Statement, the words "expects," "forecasts," "projects," "intends," "anticipates," "estimates," "assumes" and analogous expressions are intended to identify forward looking statements and any such statements inherently are subject to a variety of risks and uncertainties that could cause actual results to differ materially from those that have been projected. Such risks and uncertainties include, among others, general economic and business conditions, changes in political, social and economic conditions, regulatory initiatives and compliance with governmental regulations, litigation and various other events, conditions and circumstances, many of which are beyond the control of the Department. These forward-looking statements speak only as of the date of this Disclosure Statement. The parties disclaim any obligation or undertaking to release publicly any updates or revisions to any forward-looking statement contained herein to reflect any changes in the Department's expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based.

*[Remainder of Page Intentionally Left Blank]*

# OUTSTANDING DEPARTMENT INDEBTEDNESS

The following table sets forth information with respect to outstanding DWSD Bonds as of July 15, 2014.

| Water Supply System Revenue Bonds | Original Principal Amount | Outstanding as of July 15, 2014 |
|---|---|---|
| **Senior Lien Bonds** | | |
| Water Supply System Revenue & Revenue Refunding Bonds (Senior Lien), Series 1993 | $ 193,805,000 | $ 12,910,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 1997A | 215,300,000 | 6,910,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2001A | 302,485,000 | 73,790,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2003A | 234,805,000 | 178,785,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2003C | 46,355,000 | 25,325,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2003D | 142,755,000 [1] | 140,260,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2004B | 153,830,000 [1] | 114,625,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2005A | 105,000,000 | 86,265,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2005B | 195,000,000 | 185,210,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2005C | 126,605,000 | 99,935,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2006A | 280,000,000 | 252,885,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2006D | 146,590,000 | 142,190,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2011A | 379,590,000 | 367,400,000 |
| Water Supply System Revenue Senior Lien Bonds, Series 2011B | 17,195,000 | 14,785,000 |
| Water Supply System Revenue Refunding Senior Lien Bonds, Series 2011C | 103,890,000 | 102,665,000 |
| | $ 2,643,205,000 | $ 1,803,940,000 |
| **Second Lien Bonds** | | |
| Water Supply System Revenue Refunding Second Lien Bonds, Series 2001C | $ 190,405,000 [1] | $ 187,900,000 |
| Water Supply System Revenue Second Lien Bonds, Series 2003B | 172,945,000 | 41,770,000 |
| Water Supply System Revenue Refunding Second Lien Bonds, Series 2004A | 72,765,000 [1] | 64,350,000 |
| Water Supply System Revenue Second Lien Bonds, Series 2006B | 120,000,000 | 119,600,000 |
| Water Supply System Revenue Refunding Second Lien Bonds, Series 2006C | 220,645,000 | 215,580,000 |
| | $ 776,760,000 | $ 629,200,000 |
| **SRF Junior Lien Bonds** | | |
| Water Supply System Revenue Bonds, Series 2005-SRF-1 | $ 15,265,000 | $ 9,960,164 |
| Water Supply System Revenue Bonds, Series 2005-SRF-2 | 10,710,000 | 6,241,730 |
| Water Supply System Revenue Bonds, Series 2006-SRF | 5,180,926 | 3,715,926 |
| Water Supply System Revenue Bonds, Series 2008-SRF | 6,500,000 | 1,535,941 |
| | $ 37,655,926 | $ 21,453,761 |
| **Total Water Supply System Revenue Bonds** | $ 3,457,620,926 | $ 2,454,593,761 |

---

(1)  Original Principal Amount reflects par amount of most current remarketing.

SOURCE: The Department

## DEBT SERVICE REQUIREMENTS

The following table sets forth the annual principal and interest requirements for the outstanding Senior Lien DWSD Bonds, Second Lien DWSD Bonds, and SRF Junior Lien DWSD Bonds.

| Fiscal Year Ended June 30 [(1)] | Outstanding Senior Lien Debt Service | Outstanding Second Lien Debt Service | Outstanding SRF Junior Lien Debt Service | Total System Debt Service |
|---|---|---|---|---|
| 2015 | $ 140,159,649 | $ 43,031,713 | $ 1,773,543 | $ 184,964,904 |
| 2016 | 140,248,852 | 42,911,013 | 1,774,121 | 184,933,986 |
| 2017 | 140,199,029 | 42,923,588 | 1,759,212 | 184,881,828 |
| 2018 | 139,604,466 | 43,481,775 | 1,763,771 | 184,850,012 |
| 2019 | 130,126,431 | 51,912,300 | 1,757,683 | 183,796,415 |
| 2020 | 130,021,581 | 51,911,750 | 1,756,002 | 183,689,333 |
| 2021 | 130,480,219 | 51,940,538 | 1,758,621 | 184,179,377 |
| 2022 | 130,598,694 | 51,964,138 | 1,755,540 | 184,318,371 |
| 2023 | 130,293,056 | 51,984,150 | 1,761,705 | 184,038,912 |
| 2024 | 129,513,594 | 52,011,938 | 1,757,118 | 183,282,649 |
| 2025 | 129,220,569 | 52,055,088 | 1,756,830 | 183,032,487 |
| 2026 | 128,846,269 | 52,096,613 | 1,750,843 | 182,693,724 |
| 2027 | 128,444,731 | 52,223,725 | 1,742,052 | 182,410,508 |
| 2028 | 128,596,806 | 52,332,013 | 119,336 | 181,048,155 |
| 2029 | 128,328,506 | 51,787,125 | 117,390 | 180,233,022 |
| 2030 | 127,620,163 | 51,307,000 | - | 178,927,163 |
| 2031 | 127,519,619 | 51,300,875 | - | 178,820,494 |
| 2032 | 127,534,625 | 51,294,750 | - | 178,829,375 |
| 2033 | 127,842,600 | 51,284,375 | - | 179,126,975 |
| 2034 | 126,384,150 | 51,735,500 | - | 178,119,650 |
| 2035 | 149,947,538 | 7,870,375 | - | 157,817,913 |
| 2036 | 31,264,613 | 125,263,750 | - | 156,528,363 |
| 2037 | 74,232,863 | - | - | 74,232,863 |
| 2038 | 74,233,500 | - | - | 74,233,500 |
| 2039 | 74,231,625 | - | - | 74,231,625 |
| 2040 | 74,234,913 | - | - | 74,234,913 |
| 2041 | 72,929,488 | - | - | 72,929,488 |
| 2042 | - | - | - | - |
| 2043 | - | - | - | - |
| 2044 | | | | |
| | $ 3,172,658,146 | $ 1,134,624,088 | $ 23,103,767 | $ 4,330,386,000 |

(1)  Amounts due July 1 are shown as debt service for the preceding Fiscal Year ending June 30 (the amounts actually required to be setaside in that Fiscal Year) For example, debt service payments due July 1, 2015, are shown in the Fiscal Year ending June 30, 2015. All figures are net of capitalized interest.

Source:     The Department.

# THE DEPARTMENT

## Organization

The Department is established under the City Charter. The Department is governed by a seven-member board, known as the Board of Water Commissioners, which meets monthly. Four members of the Board of Water Commissioners (each being a resident of the City) are appointed by the Mayor of the City (the "Mayor"). Key executives of the Counties of Wayne, Oakland, and Macomb each nominate a member to the Board of Water Commissioners for appointment by the Mayor.

The Water Supply System, which provides water services to the residents of the City and to a substantial area outside the City, is owned by the City and is accounted for by the City as a separate enterprise fund (the "Water Fund") through the Department. The Department is empowered to supply water services within and outside the City under the City Charter. The Water Supply System is accounted for separate and apart from the Sewage Disposal System.

The Department continues to implement a number of changes mandated by the United States District Court, Eastern District of Michigan, Southern Division (the "District Court") as part of a lawsuit filed by the United States Environmental Protection Agency (the "EPA") against the City in 1977, *United States v. City of Detroit*, et al., Case No. 77-71100 (E.D. Michigan). All of the changes are intended to separate many affairs of the Department from the City and give the Department greater authority and autonomy to manage and operate the Water Supply System and the Sewage Disposal System. See "—Court Mandated Changes" below.

## Court Mandated Changes

As a result of several decades of intermittent noncompliance with the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 (collectively, the "Clean Water Act") during the pendency of United States v. City of Detroit, the District Court mandated changes intended to rectify the root causes of noncompliance through a series of orders, including, but not limited to, the Stipulated Order dated February 11, 2011 (the "February 11, 2011 Stipulated Order"), the Order dated November 4, 2011 (the "November 4, 2011 Order"), the Order dated October 5, 2012 (the "October 5, 2012 Order") and the Order dated December 14, 2012 (the "December 14, 2012 Order" and, collectively, the "District Court Orders"). The District Court Orders were intended to provide for a more empowered and autonomous regional governing Board of Water Commissioners, as well as operational independence from the City in several key administrative areas.

The February 11, 2011 Stipulated Order required certain changes in the composition of the Board of Water Commissioners, to provide for more meaningful regional inclusion. Additionally, the February 11, 2011 Stipulated Order established minimum professional qualifications for members of the Board of Water Commissioners. Through a subsequent District Court Order, the District Court ordered that members of the Board of Water Commissioners could only be removed for cause, instead of serving at the pleasure of the Mayor. See "—The Board of Water Commissioners" below.

The November 4, 2011 Order required the Department to establish its own autonomous divisions of Purchasing, Human Resources, Law and Finance. The heads of the Department's new divisions are required to report to the Director of the Department, rather than to the directors of the other City departments.

The November 4, 2011 Order sets forth specific hiring and removal procedures for all future Directors of the Department. See "—Management Initiatives" below. The November 4, 2011 Order also provided that the Department shall develop its own Department-specific job titles and shall enter into its own collective bargaining agreements with unions that represent its employees instead of being a party to City-wide collective bargaining agreements. The November 4, 2011 Order also struck and enjoined certain provisions in the existing collective bargaining agreements that permit an employee from outside the Department to be transferred into the Department based on seniority and requires that future collective bargaining agreements adopt a seniority system that does not provide for transfer rights across City departments. When the existing collective bargaining agreements expire, the Department is required to have its own collective bargaining agreements that cover Department employees only. See "—Employees and Employee Bargaining Units" below.

Under the City Charter, the Board of Water Commissioners has the authority to establish rates for water supply services. Prior to 2012, the City Council approved rates for water and sewage disposal services pursuant to Section 5e of Act 279 (as defined herein), which required rate approval by the governing body of a city for a municipal water or sewerage system that served more than 40% of the population of the State. The City Charter further provided for City Council approval of the Department's annual budgets as part of the City's overall authority over annual City budgets. The November 4, 2011 Order extended the Department's rate setting authority by giving the Board of Water Commissioners sole authority to establish revenue requirements for sewage disposal services and limiting the City Council's authority to the approval of retail rates charged to customers in the City. Thus, the City Council no longer has the authority to vote on rates charged to suburban wholesale customers. The November 4, 2011 Order also expanded the Board of Water Commissioners' budget authority by affording it sole authority to approve the Department's annual budgets, subject only to the City Council's approval authority with respect to inside-city rates. The November 4, 2011 Order also required the By-laws of the Board of Water Commissioners to be amended to reflect these changes in its authority and require a majority of five votes to approve rates and take certain other actions. The City Council, which previously approved all rates, now may vote only on retail rates charged to customers in the City, and no longer has the authority to vote on rates charged to suburban customers. The Board of Water Commissioners has sole authority to approve the budget for the Department, set revenue requirements for the Water Supply System, and approve rates for wholesale customers. The By-laws were amended to reflect these changes on January 25, 2012. Almost a year into the implementation of the November 4, 2011 Order, pursuant to various motions filed by the Department, the District Court issued the October 5, 2012 Order and the December 14, 2012 Order, to clarify and supplement the provisions of the November 4, 2011 Order.

The October 5, 2012 Order granted several requests of the Department that were aimed at clarifying the particular functions that the Department would handle independently from the

36

City. The October 5, 2012 Order provided, among other things, that (i) any City laws, ordinances, resolutions, executive orders, policies and regulations inconsistent with the District Court Orders were not applicable to the Department, (ii) the Department's General Counsel, rather than the City's Corporation Counsel, may provide legal advice to the Department regarding implementation of the District Court Orders, (iii) the Department is exempt from the application of City ordinances, resolutions, policies, orders and regulations and Civil Service Commission rules pertaining to payroll, employee benefits and employee and labor relations, and (iv) that the Department could establish its own finance policies and sub-units within its Finance Division to implement the November 4, 2011 Order.

The December 14, 2012 Order provided, among other things, that (i) the Department is only required to reimburse the City for actual costs, including indirect costs, of providing transition services to the Department, (ii) the Board of Water Commissioners is authorized to delegate to the Director of the Department or the Department's General Counsel final approval authority for the settlement of litigation and for the resolution of contract claims paid by the Department, (iii) the Department is authorized to establish its own self-insurance fund, and (iv) the Department is authorized to approve the issuance of debt and to refinance debt upon the sole approval of the Board of Water Commissioners unless the debt contains a full or partial general obligation pledge of the City, in which case City Council approval would be required prior to issuance.

Previously, certain contracting and policy-making powers of the Board of Water Commissioners were subject to approval or rejection by the City Council and approval or veto of the Mayor. The November 4, 2011 Order provides that, notwithstanding anything in the City Charter or state law, the Board of Water Commissioners shall have the authority to approve legal settlements, claims, collective bargaining agreements, budgets and contracts. The City Council's authority to approve Department contracts is now limited to personal services contracts over $150,000, goods or commodities contracts over $2,000,000, professional services contracts over $2,000,000 and construction contracts over $5,000,000.

The Department believes that the terms of the November 4, 2011 Order have resulted and will continue to result in greater efficiency in its operations. Citing the Department's operational and compliance progress, on March 27, 2013, the District Court issued an order closing the case (the "Order of Dismissal") and declining to address a recommendation for the further restructuring of the Department. In the Order of Dismissal, the District Court stated that it was satisfied that the District Court Orders had been substantially implemented and would remain in effect following dismissal of the case. Within the Order of Dismissal, the District Court retained limited jurisdiction to enforce the District Court Orders.

Twelve days after entry of the Order of Dismissal, the Court of Appeals issued an opinion reversing the District Court's denial in 2011 of a motion by a union representing certain Department employees to intervene in the case to challenge provisions of the District Court Orders affecting labor matters. The Court of Appeals' opinion and resulting mandate directed the District Court to permit limited intervention by the union to contest the District Court's rulings on labor-related issues. The Court of Appeals' opinion did not address the Order of Dismissal, or address its procedural interaction with the Order of Dismissal. On May 22, 2013, the City filed a

notice of appeal of, *inter alia*, the District Court Orders. Approximately two weeks after the City's notice of appeal, the District Court entered an order directing the parties to show cause why the District Court had not been divested of jurisdiction over the case by the filing of the City's appeal after the Court of Appeals had issued its mandate to the District Court. In response, the Department filed a brief expressing its agreement with the District Court's suggestion that it did not have jurisdiction to take action other than action necessary to enforce the prior District Court Orders. The union filed a brief asserting that the District Court had authority to consider its intervention and challenge to the District Court Orders. The District Court has taken no action since the issuance of its order to show cause. After the City filed the Bankruptcy Case, the Court of Appeals issued an order holding the City's appeal in abeyance pending resolution of the Bankruptcy Case. See "LITIGATION" and APPENDIX F – DISTRICT COURT ORDERS.

**Application of Financial Stability Agreement to the Department**

In April 2012, the City and the State entered into a Financial Stability Agreement which established an independent Financial Advisory Board for the City (the "Financial Stability Agreement"). In March 2014, the City, the State and the Financial Advisory Board amended and restated the Financial Stability Agreement to reflect the appointment of the City's Emergency Manager. Under the Financial Stability Agreement, as amended and restated, the Financial Advisory Board is empowered to monitor, assist, advise and support the City in a number of respects. The Financial Stability Agreement, as amended and restated, does not require the City or the Department to seek approval of the Financial Advisory Board to issue DWSD Bonds, and it is not anticipated that any action of the Financial Advisory Board will be requested in connection with the potential issuance of the 2014 DWSD Refinancing Bonds.

**The Board of Water Commissioners**

The seven-member Board of Water Commissioners is appointed by the Mayor to head the Department based on the geography of the Water Supply System's service area. Four members are residents of the City, and three members are residents of Wayne, Oakland and Macomb Counties who are nominated by the Wayne County Executive, the Oakland County Water Resources Commissioner and the Macomb County Public Works Commissioner, respectively. Each member of the Board of Water Commissioners must be a citizen of the United States and a resident of the State of Michigan. Pursuant to a Stipulated Order of the District Court, members of the Board of Water Commissioners are also required to possess certain defined professional experience and qualifications. The members of the Board of Water Commissioners serve four-year terms which are staggered so that not more than two members' terms expire each year.

In order to more efficiently oversee the Department's operations, the Board of Water Commissioners has adopted a committee structure. Four committees were established: (i) Operations, Regulatory Compliance and Procurement; (ii) Management Development and Human Resources; (iii) Financial Management and Audit; and (iv) Legal.

The current members of the Board of Water Commissioners and the year of their original appointment to the Board of Water Commissioners are as follows:

*James Fausone, Chair (2011)*. Mr. Fausone is a resident of Canton Township. He is a partner in the law firm of Fausone Bohn, LLP, of Northville, where he practices business law, municipal law, veterans' disability law and environmental law. He previously served as president of an environmental remediation, industrial service, and waste transportation company for three years. Mr. Fausone holds a Bachelor of Science in environmental engineering and a Bachelor of Science in oceanography from the University of Michigan and a Juris Doctorate degree from Gonzaga University Law School. He serves as a trustee of Schoolcraft College, Livonia, MI and Canton Public Library. He is a Director of the University of Michigan, College of Engineering – Civil and Environmental Engineering Board, and has served as a Director of the Livonia Chamber of Commerce, among other affiliations.

*Fred Barnes (2011)*. Mr. Barnes is a registered professional engineer from Sterling Heights. He owns and operates Fred W. Barnes Associates Inc., a consulting engineering firm. Before starting his company, Mr. Barnes was a senior project engineer with Atwell-Hicks Inc., where he managed engineering projects and supervised engineers, planners, and designers. Mr. Barnes, a former Chief engineer for the Office of the Macomb County Public Works Commissioner, he was involved with the design, operation and maintenance of more than 700 county drains, supervision of two CSO facilities, as well as the review of residential and commercial developments for 24 years. He holds a Bachelor of Science in engineering from the U.S. Military Academy at West Point.

*Mary E. Blackmon (1989)*. Mrs. Blackmon is a retiree of Ameritech, where she served as a director of public relations and associate director of urban and civic affairs. She is a current member of the Wayne County Regional Educational Service Agency Board of Education, where she has served since 1982. Mrs. Blackmon also served for 10 years as a member of the Detroit Board of Education. She has served on several committees for the Southeast Michigan Council of Governments, where she is a vice president and is a graduate of Leadership Detroit. Mrs. Blackmon is active in a number of civic and community organizations.

*Linda Forte (2011)*. Ms. Forte, a senior vice president at Comerica Inc., brings more than 30 years of business, finance, and commercial banking expertise to the board. A member of Comerica's senior leadership team, she is responsible for defining and driving business strategies that establish Comerica as a leader in diversity and corporate responsibility practices. Ms. Forte holds a Bachelor of Science in education psychology and French from Bowling Green State University and a Master's of Business Administration in finance and accounting from the University of Michigan. She serves as a director of the Economic Development Corporation of the City of Detroit and serves on a number of other agency and organization boards as well.

*Bradley Kenoyer (2011)*. Mr. Kenoyer brings more than a decade of cross-functional problem-solving experience in delivering customer-driven results to technical and service quality issues for Ford Motor. An honoree of the Ford/Massachusetts Institute of Technology/University of Detroit Mercy program for engineering excellence, Mr. Kenoyer holds a Bachelor of Science in mechanical engineering from Rensselaer Polytechnic Institute and a Master's of Science in product development from the University of Detroit Mercy. He has served on the Board of Directors of Preservation Wayne and has volunteered at the Ruth Ellis Center, which provides

39

residential safe space and support services for runway, homeless and at risk youth in Detroit and Southeastern Michigan.

*Conrad L. Mallett Jr.* (2014). Mr. Mallett is the Detroit Medical Center's Chief Administrative Officer and General Counsel. His assignment places him on the cutting edge of hospital organization re-design with a particular focus on physician and patient satisfaction, cost containment, and increased medical quality. Mr. Mallett holds a Juris Doctorate degree from the University of Southern California, a Master's in Public Administration, also from the University of Southern California, a Master's of Business Administration from Oakland University with a concentration in Healthcare Management, and a Bachelor of Arts degree with a major in English from the University of California, Los Angeles. He is a member of the Board of Directors of two publicly traded companies, Lear Corporation and Kelly Services.

*J. Bryan Williams (2011).* Mr. Williams is an attorney with the Dickinson Wright law firm. Mr. Williams, a resident of Birmingham, practices in the areas of corporate and municipal finance law. He has served as counsel to the Oakland County Water Resources Commissioner on municipal bond financings, and has significant experience providing counsel to both privately and publicly-held companies. He holds a Bachelor of Arts in economics from the University of Notre Dame and a Juris Doctorate degree from the University of Michigan. He is a member of the City of Birmingham Planning Board, and a past member of the Board of Directors of the Economic Club of Detroit. He is also a past vice chairman of the Detroit Regional Chamber of Commerce.

**Management Team**

The Department was recently reorganized into five operating groups: Operations, Customer Service, Financial Services, Administration and Compliance, and Executive. The Department is staffed so that cross-functional employee assignments provide services for both the Water Supply System and Sewage Disposal System.

The Department's key personnel and their qualifications are summarized below.

*Sue F. McCormick, Director*. Ms. McCormick was appointed by the Board of Water Commissioners as the Director of the Department on November 17, 2011, and assumed that position on January 3, 2012. Prior to joining the Department, Ms. McCormick was the Public Services Area Administrator for the City of Ann Arbor, Michigan, where she managed that city's entire physical infrastructure, including the water and sewer system. She joined Ann Arbor city government as Water Utilities Director in January 2001. Prior to that, she was employed for 22 years by the Lansing Board of Water and Light, serving as environmental chemist, environmental laboratory manager, manager of water and steam planning, water technical support manager and business development manager. Ms. McCormick holds a Bachelor of Science in biological science from Lyman Briggs College at Michigan State University. Ms. McCormick is active in the 58,000-member American Water Works Association ("AWWA"), a prominent international organization for water industry professionals. She has served as AWWA-Michigan Director and as an association Vice President.

*William M. Wolfson, Chief Administrative and Compliance Officer/General Counsel.* Mr. Wolfson joined the Department as the utility's first General Counsel in June 2012. His duties expanded to include those of Chief Operating and Compliance Officer in August 2013, and Chief Administrative and Compliance Officer in January 2014. Prior to joining the Department, Mr. Wolfson served the City of Detroit Law Department as an attorney from 1986 to 1998 under Mayors Young and Archer. In 1998, Mr. Wolfson was appointed Wayne County's Deputy Corporation Counsel by County Executive Edward McNamara. The succeeding County Executive, Robert Ficano, appointed Mr. Wolfson to the position of Assistant Deputy County Executive/Director of Legal Affairs. In that position, Mr. Wolfson was responsible for the day-to-day operations of county government and its 4,500 employees. In July 2009, Mr. Wolfson retired from his Wayne County position, went into private practice and contracted to serve as Wayne County's Interim Corporation Counsel. Mr. Wolfson is a graduate of the University of Michigan and the University of Minnesota Law School. He currently serves as Co-Chairman of the Detroit-Wayne County Stadium Authority, Vice Chairman of the Wayne County Zoological Authority, and is a member of the Detroit Zoological Society's Board of Directors.

*Darryl A. Latimer, Deputy Director and Chief Customer Service Officer.* Mr. Latimer was named Chief Customer Service Officer in January 2014 and has served as Deputy Director since February 15, 2010. Mr. Latimer served as Contracts and Grants General Manager since March 2003. Previously, he was the Head Governmental Analyst in Contracts and Grants, leading the Consultant and Local Economic Development Units. Mr. Latimer has been with the Department since 1989, and with the City of Detroit since 1985. Mr. Latimer holds a Bachelor of Science in general studies from Wayne State University and a Master's of Science in general business administration from Central Michigan University.

*Cheryl Porter, Chief Operating Officer.* Ms. Porter was named Chief Operating Officer in January 2014. Ms. Porter served as Assistant Director – Water Supply Operations since September 2008 and has been employed by the Department since March 1996. She holds a Bachelor of Science in chemistry from the University of Michigan, a Juris Doctor degree from the University of Detroit Mercy School of Law and a Master's of Business Administration with a concentration in human resources management from the Madonna University. She began her career with the Department as a junior chemist and has worked her way through the ranks at each level of the organization. Ms. Porter holds her F1 license for Water Treatment with the State of Michigan. Prior to joining the Department, Ms. Porter was an Analytical Chemist for Blue Planet Technologies and, earlier, a Research Assistant for the University of Michigan Department of Chemistry. Ms. Porter also participates in various community service activities, having served on the Board of Directors for Intense Mentoring, Inc., a local non-profit committed to attacking poverty through education, and mentoring young people throughout Southeastern Detroit.

*Nicolette Bateson, CPA, Chief Financial Officer, Financial Services.* Ms. Bateson, a certified public accountant, is the department's first CFO and began working for the Department in February 2013. Ms. Bateson has extensive financial experience. In the public sector, she served as both Assistant City Manager and Finance Director in local government. Ms. Bateson was an audit supervisor with a national accounting firm, an independent financial consultant, and most recently a visiting specialist for the State and Local Government Program at Michigan State University Extension. As a visiting specialist, Ms. Bateson worked with state and local officials

to address the needs of cities in fiscal stress. In addition, Ms. Bateson was involved with research, education, and writing related to public-sector financial challenges. Ms. Bateson has experience working with public agencies moving through substantial restructuring to attain operational and financial sustainability with reduced resources. Ms. Bateson earned a bachelor's of business administration degree in professional accounting from the University of Michigan-Dearborn and a Master's of Public Administration degree in government management from Eastern Michigan University.

*Dan Rainey, Information Technology Director*. Mr. Rainey came to the Department in March 2013 with more than 20 years of experience leading and transforming IT organizations – most recently including the City of Ann Arbor, the top-ranked digital city in its class. Mr. Rainey holds a master's degree in management with a specialization in strategic leadership from Walsh College and a bachelor's degree in computer science from Wayne State University. Mr. Rainey was recognized as a Computerworld Premier 100 Leader and was awarded the Michigan Excellence in Technology Leadership Award. Mr. Rainey previously served as Vice President for the Metropolitan Information Exchange, a national organization of local government Chief Information Officers. He is a member of the Society for Information Management and participates on various intergovernmental collaboration committees and advisory boards.

*Terri Tabor Conerway, Organizational Development Director*. Ms. Conerway was named Organizational Development Director in December 2013. She previously served as the Department's Process and Quality Control Manager since January 2006. Prior to that, Ms. Conerway served as the Department's Human Resource Manager. She has worked in various managerial positions since beginning her career with the City of Detroit in 1972. She holds a Bachelor of Science degree from Wayne State University in Psychology. Ms. Conerway is a certified Franklin Covey facilitator and is active in the International Public Management Association – Human Resources.

*W. Barnett Jones, Chief Security and Integrity Officer*. Chief Jones was appointed the Chief Security and Integrity Officer for the Department in May 2012. His extensive experience in law enforcement and security covers a 30-year career. Chief Jones is responsible for the Department's entire security posture that includes the physical security and safety of employees, facilities, and assets. In addition, Chief Jones has been pivotal in developing and implementing entity-wide integrity policies and procedures. Prior to his arrival at the Department, Chief Jones served as Chief of Police, Police Administrator, Captain, Lieutenant, and Deputy Sheriff with large local units of government in Michigan including the supervision of both police and fire personnel. Chief Jones earned a Master's degree in liberal studies from Eastern Michigan University and a bachelor's degree in general studies and human resources from the University of Michigan – Dearborn. He has been involved in many professional and civic organizations, including the Deputy Sheriffs' Association, the Crime Prevention Association of Michigan, and the Executive Board of the March of Dimes.

*Bill Johnson, Public Affairs Officer*. Mr. Johnson joined the Department in November 2013 after serving as CEO of the Bill Johnson Group, a media consulting, public affairs, public relations firm. Mr. Johnson is an award-winning freelance journalist and former Detroit News editorial writer and columnist. He was press secretary/director of public information for Wayne

County Executive Bill Lucas from 1983 until 1986, and later was director of administration for the Wayne County Commission. Mr. Johnson has been a frequent Detroit radio and television commentator and has won broadcast journalism awards for investigative reporting from the Associated Press and UPI. Mr. Johnson earned a bachelor's degree from Wayne State University and graduated Cum Laude.

**Management Initiatives**

As reported in the Director's Final Compliance Report in March 2013 and noted in the Order of Dismissal, the Department has made significant progress since the November 4, 2011 Order. To advance the Department's goals of regulatory compliance and long-term sustainability, primary management initiatives include restructuring, optimization, independence from the centralized primary government functions, financial stability measures and a commitment to collaborative relationships with regulators and customers. The Director reports the status of these initiatives to the Board of Water Commissioners on a monthly basis. The Director also reports to the public on these initiatives in the Director's Compliance Report, published monthly at www.dwsd.org.

*Restructuring*

The Department has established structural and management changes to align operations, customer service, finance, administration and compliance. Several key executive positions have been filled since February 2013, including the Chief Administrative and Compliance Officer, Chief Operating Officer, Chief Financial Officer, Chief Customer Service Officer and Chief Security and Integrity Officer. The Department has created an office of General Counsel and Organizational Development Division, as well as realigned its Financial Services and Information Technology Divisions towards an independent operating structure.

*Organizational Optimization*

In October 2012, the Board of Water Commissioners approved a contract with an organizational consultant to facilitate organizational optimization. In December 2012, five distinct employee teams began the work to evaluate over 50 business processes by focusing on three key operating elements: people, processes and technology. In March 2013, the employee teams reported their findings, which supported an optimized Department through job redesign, increased use of technology and the introduction of efficiencies to reduce the vehicle fleet and operating expenses.

In April 2013, the Department began implementing the new organizational design. Pilot programs of the new job and business process designs are in process throughout the wastewater, water, field services, information technology and customer service areas. The Department has drafted and published 57 new job classification descriptions replacing the prior, narrowly defined 257 job classifications. Since December 2013, the Department has been in the process of posting and filling the new job classifications. Employees not selected for the new positions may be assigned to special projects teams.

The Department has been meeting with its represented workforce to discuss the terms and conditions of employment to implement the new job designs as well as changes to employee healthcare and pensions ordered by the Emergency Manager.

Prior to and throughout this timeframe, the Department instituted a modified hiring freeze and some strategic separations. This has resulted in a system-wide downsizing of over 30% since July 1, 2011. The Department reduced its total staff from 2,102 employees at the end of July 2011 to 1,512 employees at the end of June 2014. In some areas of the Department, the reductions in staffing have been more rapid than projected. Contractual assistance is engaged when necessary to fill gaps and to assure continuity of successful operations. By the end of Fiscal Year 2019, it is estimated that the Department will have reduced its workforce to 1,000 employees. The following chart illustrates staff reductions since July 2011:

*[Remainder of Page Intentionally Left Blank]*



(a) Assumes average annual personnel costs of $75,000 per position

SOURCE: The Department

*Partial Independence from the Centralized Primary Government Functions*

Historically, the Department's Financial Services Group was a satellite department of the City. The District Court Orders permitted the Department to establish an independent finance function. In February 2013, the Department hired its first Chief Financial Officer, and has since made progress in separation of funds, accountability, analysis, treasury and procurement practices. "Finance Transformation" is the initiative underway to expand the capacity of the Department to professionally and independently manage its financial operations. This expanded initiative complements the Department-wide effort to optimize the deployment of people, redesign business processes, and invest in technology.

The Department remains dependent upon the centralized City information technology department to support many of its business processes, including finance, human resources, law, and risk management. The Department hired its first Information Technology Director in March 2013. The Department is now engaged in addressing its information technology governance process to ensure that updates, changes, selection of new applications and decisions to retire applications are made with an understanding of the impacts to the systems, support and staffing throughout the Department.

45

*Financial Stability*

The Department's long-term plan to build financial stability is founded upon (i) reallocating optimization savings to revenue financed capital, and (ii) rate model simplification that yields more stable and more predictable revenue and cash flow.

For many years, the Department relied on annual increases in rate revenues ranging from approximately 4% to more than 14% in order to meet its revenue requirements and maximized the issuance of debt to fund capital improvements. With increased authority for rate setting and debt management granted by the District Court Orders, the Board of Water Commissioners has maintained a 4% increase in revenue requirement for Fiscal Year 2014 and Fiscal Year 2015. The Department's management has expressed a commitment to moderate annual revenue requirement increases (currently set at 4%) as shown in the revenue projections, a focus on decreasing operational and maintenance costs through optimization, retiring debt, and, where appropriate, funding future capital needs of the Water Supply System through revenues and cost containments rather than through maximized use of debt. Rates are set annually by the Board of Water Commissioners in accordance with its standard rate-setting protocols.

*Collaborative Relationships with Customers and Regulators*

The Department maintains a wholesale customer outreach program which began in 1997. The effort encompasses a Water Technical Advisory Committee ("TAC"), a Wastewater Steering Committee (the "Steering Committee") and their related work groups that include staff from the Department, wholesale water and wastewater customers, the Southeast Michigan Council of Governments and MDEQ. The Steering Committee maintains several standing working groups to explore and work on issues of importance such as rates, industry best practices, public education and metering. This wholesale customer outreach program includes regular meetings and a wholesale customer portal that provides access to Department documents, as well as wholesale customer committee agendas, meetings and supporting materials.

To expand the Department's retail customer outreach program, the Board of Water Commissioners entered into its first consulting agreement in August 2013 to provide for a retail advocate. The consulting firm provides the retail customer perspective regarding changes to the rate model and related rate issues.

The Department provides office space at the wastewater treatment plant for personnel of MDEQ, the State's primary environmental regulatory agency. In addition, the Department and MDEQ communicate monthly to address operational matters, compliance, reporting and planning efforts.

**Employees and Employee Bargaining Units**

The total number of authorized positions for the Department in the budget for Fiscal Year 2015 was 1,674, consisting of 559 positions for the Sewage Disposal System and 1,115 for the Water Supply System. Of the 1,115 positions assigned to the Water Supply System, only 185 are entirely devoted to the Water Supply System. The other employees provide service to both the Sewage Disposal System and the Water Supply System, and costs for these positions are

allocated appropriately. The budget necessarily contains more positions than are actually filled, as the budget is a planning document that must accommodate the job design restructuring, and cannot anticipate which positions will become vacant through attrition. As of June 30, 2014, the Department had 1,512 full time equivalent employees, of which approximately 1,333 were represented by the following unions:

- Association of Detroit Engineers;
- American Federation of State, County and Municipal Employees ("AFSCME"), Locals 207, 2394 and 2920;
- Association of Municipal Engineers;
- Association of Professional Construction Inspectors;
- Association of Professional and Technical Employees ("APTE");
- Building and Construction Trades Council;
- Building and Construction Trades Foreman;
- International Union of Operating Engineers, Local 324;
- Senior Accountants, Analysts, and Appraisers Association;
- Senior Water Systems Chemists Association;
- Teamsters;
- International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Locals 2200 and 2334; and
- Utility Workers of America ("UWA"), Locals 488, 504 and 531.

The Department's collective bargaining agreements reflect provisions of the District Court Orders, provide for a reopener by either side for economic issues followed by an intensive bargaining period of between 30 and 60 days, and the Department's ability to implement its last best offer at the end of the bargaining period. Collective bargaining agreements currently are in place for the following Department bargaining units: AFSCME Local 2920, Association of Professional Construction Inspectors, Building Trades Council, International Union of Operating Engineers, Senior Water Systems Chemists Association, UWA and Teamsters. The Department believes that, when its reorganization process is complete, these unions will represent the majority of its represented workforce. The collective bargaining agreements with the United Auto Workers expired in June 2012 and the Department is currently discussing terms and conditions of employment with its remaining unions. The November 4, 2011 Order struck and enjoined certain provisions in the existing collective bargaining agreements that permit an employee from outside the Department to be transferred into the Department based on seniority and requires that future collective bargaining agreements adopt a seniority system that does not provide for transfer rights across City departments. See "THE DEPARTMENT – Organization," "LITIGATION" and APPENDIX F – DISTRICT COURT ORDERS. In addition, the November 4, 2011 Order requires the Department to have in place its own collective bargaining agreements for its employees by the time the existing collective bargaining agreements expire. The Department continues to put collective bargaining agreements in place with all unions representing its unionized work force. The Department has no knowledge of any planned interruption of service from the unionized work force.

After the Department negotiated initial collective bargaining agreements with many of its bargaining units, on August 20, 2013, the Emergency Manager advised the Department that

obligations to bargain collectively were suspended pursuant to section 27(3) of Act 436. Thereafter, the Department began discussions of the terms and conditions of employment with its represented workforce to reflect changes to employee healthcare and pensions ordered by the Emergency Manager and to implement the new job classifications. To date, these discussions have resulted in agreements with seven unions, and discussions continue with the remaining unions.

**Ongoing Discussion of Formation of Regional Water Authority**

Since the fall of 2013, the Emergency Manager and the Department engaged in extensive negotiations with the Counties of Macomb, Oakland and Wayne (the "Counties") regarding the potential formation of, and transfer of the functions of the DWSD to, a regional water authority, which would have been created by agreement among the City and the Counties and incorporated as a part of the Plan of Adjustment in the City's Bankruptcy Case. Upon confirmation of the Plan of Adjustment, the regional water authority would have assumed operating control of most of the assets (including the physical plant and wholesale water and sewer service contracts) currently owned and operated by DWSD. These negotiations among the City, the Department and the Counties did not result in any agreement.

On April 10, 2014, Wayne County filed a motion [Docket No. 3945] requesting that the Bankruptcy Court refer all matters relating to the potential formation of a regional water authority to facilitative mediation. On April 17, 2014, the Bankruptcy Court entered an order [Docket No. 4156] referring to mediation (1) the matter of whether to create a regional water authority involving the City and the Counties and (2) all issues relating to DWSD and the Counties. This mediation is ongoing.

**Potential DWSD Public-Private Partnership**

Through the Emergency Manager, the City has been in contact with certain potentially interested parties regarding a request for information (the "DWSD RFI") for a transaction that would establish a public-private partnership with respect to the DWSD (the "Public-Private Partnership"). The DWSD RFI provides that the Emergency Manager is considering the potential Public-Private Partnership for the operation and management of the water system and sewage disposal system currently operated by DWSD. The DWSD RFI states that the Public-Private Partnership could take the form of an operating and management agreement and would be effectuated in conjunction with confirmation of the Plan of Adjustment. The DWSD RFI further provides, however, that the Emergency Manager will also consider responses that contemplate alternative transaction structures, *e.g.*, a long-term lease and concession arrangement or a sale that meets the bid criteria incorporated in the DWSD RFI, while maximizing the value to the City, maintaining or enhancing the Water Supply System and Sewage Disposal System's operational viability and capital needs and complying with applicable law. The DWSD RFI requires that any Public-Private Partnership include a commitment to limit rate increases to no more than 4% per year for the first 10 years.

The Department would only enter into a potential agreement if it were compliant with the Bond Ordinance and the DWSD Indenture and it received an opinion of nationally-recognized

bond counsel that the tax-exempt status of outstanding DWSD Bonds would not be impaired thereby.

The deadline for interested parties to submit indications of interest was April 7, 2014. The City received 13 indications of interest regarding the DWSD RFI, which the City is reviewing and analyzing. The Board of Water Commissioners will be asked to review and act upon any proposal that the Emergency Manager may recommend.

## THE CITY

Pursuant to the provisions of the State Constitution and Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), the City is a home rule city with significant independent powers. In accordance with the City Charter, the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the legislative branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years unless a special election is required as provided for in the Charter. The most recent regular election for the positions of Mayor and City Council members was on November 5, 2013, when Mike Duggan was elected for his first term as Mayor.

On March 14, 2013, Kevyn D. Orr was appointed to act as Emergency Financial Manager pursuant to the provisions of Act 72. Mr. Orr became the Emergency Manager of the City on March 27, 2013, pursuant to the provisions of Act 436, Public Acts of Michigan, 2012 ("Act 436"). Act 436 provides an emergency manager with broad powers and authority to take certain actions with respect to a local government that is in receivership under Act 436, notwithstanding any charter provision to the contrary. Act 436 provides that the governing body and the chief administrative officer of a local government in receivership under Act 436 shall not exercise any of the powers of those offices except as may be specifically authorizing in writing by the emergency manager or as otherwise provided for in Act 436 and are subject to any conditions required by the emergency manager.

On July 28, 2014, the Emergency Manager issued his Order No. 31, which supplemented Order No. 20 and conferred on the Mayor the power he would have had with respect to the Department and the Board of Water Commissioners, absent Act 436. The Emergency Manager has retained his authority under Act 436 over, among other things, the Invitation and the solicitation of Offers by the City, as well as the Department's financial restructuring, ability to seek and obtain financing.

## APPROVALS OF THE INVITATION

As described under "THE DEPARTMENT—Organization" and "—Court Mandated Changes" and "—The Board of Water Commissioners," the Department is governed by the Board of Water Commissioners. Pursuant to the District Court Orders, the Board of Water Commissioners has approved the Invitation and the solicitation of Offers contemplated by the Invitation.

As described under "THE CITY," an emergency manager has been appointed for the City. Pursuant to Act 436, the Emergency Manager has approved the action of the Board of Water Commissioners regarding the Invitation and the solicitation of Offers contemplated by the Invitation.

## THE CAPITAL IMPROVEMENT PROGRAM

### General

The Department utilizes a five-year Capital Improvement Plan ("CIP") to maintain and improve the reliability of the Water Supply System, meet regulatory standards as well as to achieve greater operating and maintenance efficiency. The Department annually updates the CIP based on continual monitoring and review of the needs of the Water Supply System. In accordance with the terms of the February 11, 2011 Order, the CIP must be approved by a super majority of at least five members of the Board of Water Commissioners. The Department can modify individual projects within the CIP during the year to address changing costs and management decisions on specific project scope as long as the changes are within the basic framework approved by the Board of Water Commissioners. The Fiscal Year 2015-2019 CIP was approved by the Board of Water Commissioners in December 2013.

The CIP is divided into the major categories of Plant Replacement and Renovation, Metro Area Construction, Urban System Improvements, Mechanical Maintenance and Computer Systems. The Department has financed its ongoing CIP with proceeds of the DWSD Bonds, federal and State grants and loans and revenues of the Water Supply System.

The CIP provides a framework for ensuring capital plans are consistent with overall organizational goals within a set of financial considerations including fiscal capacity, debt levels, impact on operating budgets and reserve levels. Actual project proposals are initiated and reviewed within the context of the CIP. Actual bid versus cost estimates, unforeseen cost-benefit scenarios and grant opportunities are examples of why deviations from the CIP would occur.

In June 2013, the Department initiated an effort to prepare an updated master plan. This two-year project includes two phases: Phase I identifies priorities for Fiscal Years 2015-2020, and Phase II identifies priorities for Fiscal Years 2021-2035. The expanded timeline for Phase II is expected to support the Department's goal of extending the formal CIP planning period from five years to ten years. The current CIP is based in large part on preliminary findings emerging from the updated 2004 Master Plan (as defined below), and from other independent evaluations recently completed by the Department and representatives of its suburban wholesale customers.

Over the past ten years, the Department spent approximately $1 billion on capital improvements to the Water Supply System. For more information, see APPENDIX B – SYSTEM EVALUATION REPORT.

The following tables detail the planned expenditures and the projected funding sources for the Fiscal Year 2014-2019 CIP, as approved by the Board of Water Commissioners in

50

December 2013.[4] Expenditures in the early part of the CIP are primarily focused on rehabilitating the Springwells Water Treatment Plant, which currently produces the most water of any of the five plants, on construction of new transmission mains to ensure reliable delivery of water in certain segments of the System, and on rehabilitation of water infrastructure in the City.

*[Remainder of Page Intentionally Left Blank]*

---

[4] In this Disclosure Statement, estimated figures for Fiscal Year 2014 are shown as the first year of the forecast period. See "DEPARTMENT FINANCIAL OPERATIONS—Fiscal Year 2014 Estimate."

**Capital Improvement Program Estimated Expenditure Schedule**

| Category | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ |
| | *estimate* | | | | | | |
| Plant Replacement and Renovation | | | | | | | |
| General Plant | 6,989,000 | 14,931,000 | 17,680,000 | 10,900,000 | 3,900,000 | 1,000,000 | 55,400,000 |
| Water Works Park | 0 | 5,000,000 | 12,075,000 | 17,900,000 | 9,300,000 | 0 | 44,275,000 |
| Springwells | 8,392,000 | 23,236,000 | 32,660,000 | 30,654,000 | 46,850,000 | 37,084,000 | 178,876,000 |
| Northeast | 0 | 0 | 3,631,000 | 5,615,000 | 1,381,000 | 650,000 | 11,277,000 |
| Southwest | 2,584,000 | 10,000 | 160,000 | 6,985,000 | 15,189,000 | 14,000,000 | 38,928,000 |
| Lake Huron | 129,000 | 2,500,000 | 2,995,000 | 17,265,000 | 20,531,000 | 6,000,000 | 49,420,000 |
| Pumping Stations & Reservoirs | 2,114,000 | 1,385,000 | 6,547,000 | 8,770,000 | 5,257,000 | 3,105,000 | 27,178,000 |
| **Subtotal - Plant** | **20,208,000** | **47,062,000** | **75,748,000** | **98,089,000** | **102,408,000** | **61,839,000** | **405,354,000** |
| Metro Area Construction | 6,615,000 | 40,705,000 | 50,300,000 | 45,850,000 | 34,700,000 | 29,100,000 | 207,270,000 |
| Urban System Improvements | 8,450,000 | 30,615,000 | 13,765,000 | 10,000,000 | 10,000,000 | 10,000,000 | 82,830,000 |
| Mechanical Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computer Systems | 4,727,000 | 6,831,000 | 2,293,000 | 1,500,000 | 1,500,000 | 1,500,000 | 18,351,000 |
| **Subtotal** | **19,792,000** | **78,151,000** | **66,358,000** | **57,350,000** | **46,200,000** | **40,600,000** | **308,451,000** |
| **Total System** | **40,000,000** | **125,213,000** | **142,106,000** | **155,439,000** | **148,608,000** | **102,439,000** | **713,805,000** |

SOURCE: The Department

## The CIP Funding

The current five-year CIP is estimated to cost $673,805,000 (excluding the estimate for 2014).  Of this amount, the Department expects that $450,429,000 (approximate net amount) will be financed with proceeds of DWSD Bonds and the balance with Water Supply System revenues and funds on hand.

*[Remainder of Page Intentionally Left Blank]*

**Water Supply System Capital Improvement Program**
**Projected Funding Sources**

| | Fiscal Year Ending June 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2014 $ *estimate* | 2015 $ | 2016 $ | 2017 $ | 2018 $ | 2019 $ | Total $ |
| Existing Improvement and Extension Funds(a) | 6,260,800 | 0 | 0 | 0 | 0 | 0 | 6,260,800 |
| Existing Construction Funds(a) | 150,059,900 | 0 | 0 | 0 | 0 | 0 | 150,059,900 |
| Current Revenues | 14,522,900 | 13,921,000 | 22,994,500 | 28,497,300 | 26,067,800 | 35,859,500 | 141,863,000 |
| Bond Proceeds | 0 | 0 | 152,500,000 | 132,300,000 | 134,900,000 | 86,400,000 | 506,100,000 |
| less: Issuance Expenses(b) | 0 | 0 | (16,775,000) | (14,553,000) | (14,839,000) | (9,504,000) | (55,671,000) |
| Net Bond Proceeds Available | 0 | 0 | 135,725,000 | 117,747,000 | 120,061,000 | 76,896,000 | 450,429,000 |
| State Revolving Fund Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Funding Sources(d) | 170,843,600 | 13,921,000 | 158,719,500 | 146,244,300 | 146,128,800 | 112,775,500 | 748,612,700 |

(a) Balance available June 30, 2013. (Applies only to Fiscal Year 2014).

(b) Includes net premium / original issue discount and other amounts and amount required from bond proceeds to fund maximum annual future debt service.

(c) The difference between the total amount available to finance the capital program and the cost of the program represents funds available to finance the capital program after 2019.

SOURCE: The Foster Group LLC.

## THE WATER SUPPLY SYSTEM

The Water Supply System is one of the largest in the nation in terms of water produced and population served. The Water Supply System has been the sole provider of all water service in the City since commencement of water supply as a public service in the mid-nineteenth century. In addition, the Water Supply System began providing wholesale service to surrounding municipalities in about 1900. The Water Supply System draws its fresh water from the Great Lakes System which is naturally available, with Lake Huron to the north, the Detroit River to the south and Lake St. Clair to the east.

The Department believes the Water Supply System is adequate to meet the needs of its current retail and wholesale customers and to meet the current requirements of the U.S. Environmental Protection Agency under the Safe Drinking Water Act. The major components of the Water Supply System include three intake facilities, five treatment plants, an extensive conveyance system consisting of over 3,400 miles of transmission and distribution mains throughout the service area (complemented by 8,982 miles of connected transmission and distribution mains owned by wholesale municipal customers), 19 booster pumping stations and 32 water storage reservoirs (18 at the water treatment plants and 14 at booster stations) located throughout the Water Supply System. Water flow and pressure throughout the Water Supply System are monitored and controlled by a Systems Control Center housed in the Department's Central Services Facility.

53

**Service Area**

The Water Supply System is responsible for treatment and distribution of water to most of southeast Michigan. The Water Supply System presently serves an area of 981 square miles in Wayne, Oakland, Macomb, Lapeer, Genesee, Washtenaw, St. Clair, and Monroe Counties. The Department currently serves a population of 3.8 million based on the 2010 census, with consumers within the suburban wholesale customer area comprising approximately 80% of the total.

Except as noted below, the Department traditionally has experienced no material competition from other water supply systems in the Southeastern Michigan region. Recently, however, Genesee County and the City of Flint (along with other neighboring communities) formed the Karegnondi Water Authority (the "KWA"), which intends to sell raw water to communities in Michigan's "thumb" area. In 2013, the Department terminated its contract with Flint and in May 2014, Flint began operating its own water treatment plant utilizing the Flint River as its raw water source. Genesee County, which previously purchased water from the Department through the Flint contract, is now purchasing water directly from the Department while the parties negotiate a long-term service contract. However, it is anticipated that if the KWA becomes operational in mid-2017 as currently planned, Genesee County will no longer rely on the Department as its primary finished water supplier and will look to the Department primarily for emergency back-up water supply.

Several other small communities in the northern portion of the Water Supply System's service area have expressed various levels of interest in joining the KWA. As part of those discussions, in July 2014, the Department sent a Notice of Termination to the Greater Lapeer County Utilities Authority. In this communication, the Department indicated that it would like to retain those customers but alternative delivery mechanisms would need to be developed in the immediate future to ensure continuity and quality of service. Discussions are continuing in response to this communication with a goal of maintaining service agreements to ensure long-term stability in the service area. In total, the KWA communities account for approximately 6% of the Water Supply System's water use and revenue, with Flint having accounted for approximately half of that amount.

Even if all of the remaining potential KWA communities decided to leave the Water Supply System and join the KWA, the Department has evaluated and is undertaking contingency planning for management of the Water Supply System without those customers. However, the Department continues to believe that it is in the best interests of the region to maintain these customers as a part of the Water Supply System.

The following table shows historical estimates of water sales in thousands of cubic feet ("Mcf") for suburban wholesale customers, for City of Detroit retail customers and for the Water Supply System as a whole, together with total water production and non-revenue water. As is common for all large water systems, the Water Supply System experiences a differential between the quantity of water produced by the treatment plants during the Fiscal Year and the quantity of water billed to customers over the same period, and the difference is referred to as "non-revenue water." Non-revenue water results from a variety of factors such as the range of accuracy of

production and retail meters, losses due to leaks or major breaks in the transmission and distribution systems, unmetered water that is used for fire protection, and the accuracy of estimates for unmetered use. The Department believes that improvements in the accuracy of the reported production figures may reduce the level of non-revenue water, since studies conducted as part of the master planning process revealed that production at two of the five water treatment plants may be over-reported by as much as 20%. Production at some of the water plants is not metered, but rather is estimated based on pump curves. This data continues to be reviewed, and the Department has initiated efforts to measure production figures and refine production estimating techniques.

However, irrespective of the accuracy of the reported production figures, the data show an increase in the overall level of non-revenue water in recent years. The Water Master Plan Update addresses this issue in the current phase of the work, which is anticipated to be completed by June 2015.  Currently, the Department is considering  use of a systematic program to quantify water loss by subarea with prioritized follow-up.  In the meantime, the Department has begun to address non-revenue water with several other actions including the following: (i) creation of a mobile app so that citizens can report issues with running water on a vacant property or report other observed problems; (ii) implementation of an aggressive program to address non-payment by customers, which has resulted in a side benefit of locating vacant properties that have not been properly disconnected from water service; and (iii) questions have also been raised about the accuracy of the meters at the water treatment plants.  A study has recently been completed to evaluate alternatives for meter upgrades. Rehabilitation has generally been found to be effective and is also the least expensive alternative.  Rehabilitation work is proposed to be added to the capital improvement program.

**Water Sales and Non-Revenue Water**

|  | Water Sales | | | Total | Non-Revenue Water | |
|---|---|---|---|---|---|---|
|  | Suburban | Detroit | | Water | | As a % of |
|  | Wholesale | Retail | Total | Produced | Volume | Production |
|  | Mcf | Mcf | Mcf | Mcf | Mcf | |
| 2010 | 15,676,300 | 3,924,000 | 19,600,300 | 25,142,700 | 5,542,400 | 22.0% |
| 2011 | 16,094,700 | 4,176,600 | 20,271,300 | 26,513,000 | 6,241,700 | 23.5% |
| 2012 | 16,280,300 | 3,903,100 | 20,183,400 | 27,219,500 | 7,036,100 | 25.8% |
| 2013 | 15,684,900 | 3,660,300 | 19,348,200 | 26,832,800 | 7,484,600 | 27.9% |
| 2014 | 14,778,500 | 3,418,900 | 18,197,400 | 26,088,800 | 7,891,400 | 30.2% |

SOURCE: The Department

## Master Plan and Master Plan Update

In 2004, the Department completed a master planning study that evaluated the physical Water Supply System needs over the next 50 years (the "2004 Master Plan"). The 2004 Master Plan concluded that the demand for water within the region will most likely grow significantly over the next 50 years, but that this demand could generally be met from the existing treatment

facilities (with upgrades) and that no new water treatment plants would be necessary. The 2004 Master Plan primarily focused on investments in transmission and distribution facilities that will be necessary to ensure reliability of service to all customers.

Southeastern Michigan has experienced an economic downturn in the years following the 2004 Master Plan, contributing to declining population and water demands. Recent water use patterns have not met the demands anticipated by the 2004 Master Plan and the Department initiated a new project in 2013 to update the 2004 Master Plan in an effort to guide capital investments in the short-term and long-term future (the "Master Plan Update"). The Master Plan Update covers a shorter planning period of 20 years rather than 50 years. The Department believes that it may be feasible to take one or more of the five water treatment plants out of service and still meet the demands of the service area, thereby eliminating hundreds of millions of dollars of needed investment identified previously in the CIP.

The Master Plan Update has been structured to assess the feasibility of "downsizing" the Water Supply System's existing water treatment and production capacity and to identify improvements in the water transmission and distribution system that would be necessary to pursue that solution.

The Department has received the Phase 1 Interim Report for the Master Plan Update (the "Phase 1 Interim Report"), which includes findings, forecasts, alternatives and recommendations, and sets priorities for the first five years of the planning period, from July 1, 2015 to June 30, 2020. The Phase 1 Interim Report focused on the major engineering and planning analyses critical to early decision-making for plant capacity and transmission issues. The Department anticipates that the Phase 1 Interim Report's recommendations will be incorporated in the Fiscal Year 2016 CIP beginning in July 2015.

Water demand projections for the 20-year planning period are being prepared under the Master Plan Update and are expected to be completed by September 2014. The Department anticipates that the water demands will be much less significant than those in the previous study and will be stable for the period from 2015 to 2035.

A fundamental component of the Master Plan is an evaluation of the possibility of repurposing one or more water treatment plants to strategically align available capacity and service requirements. The CIP contains investment allowances for short-term improvements at the Northeast and Southwest plants in order to allow them to provide reliable service while their ultimate operating scenario is determined through the Master Plan. Identification of the most appropriate capacity levels for each of the five water treatment plants is the principal goal of the Master Plan.

**Wholesale Municipal Service**

The Water Supply System has provided wholesale service to an increasing number of surrounding municipalities since the 1940s. The growth period for wholesale municipal customers began in 1957 with the construction of a major transmission main to serve the area north of the City, and increased beginning in 1975 with the construction of a major transmission main to serve the area west of the City. In all cases, the municipalities being served are

responsible for the construction and maintenance of distribution and lateral water mains within their respective geographical boundaries to connect the customers of such municipalities to the transmission mains of the Water Supply System. In some cases, the municipal entities being served also own and maintain their own transmission mains.

The Water Supply System serves 127 municipalities through 86 wholesale contracts with municipal and other public entity customers. While Genesee County currently receives water service from the Department, it does not have a written contract for service. The water service agreements generally provide for (i) delivery of water by the Department to the wholesale customer at designated metered points at specified rates of flow and pressure and (ii) payment by the wholesale customer for all water supplied at reasonable rates established by the Department. The wholesale customer is solely responsible for distributing water from the points of delivery to its retail customers. Further details are set forth in "—Customer Outreach" below.

The Department is paid monthly by each wholesale customer, and payment is not contractually dependent upon collections by the wholesale customer from its respective retail consumers. Under the model contracts, the Department assesses a 1.5% late payment charge on bills not paid when due. While the Department has the legal right to discontinue water service to wholesale customers if not paid within 60 days, such a measure would not be practical, and wholesale customers collection problems have been resolved through negotiation or litigation. See "FINANCIAL PROCEDURES—Collections and Delinquencies."

The following table provides information about the contracts of the ten largest wholesale water supply customers. For fiscal year ended June 30, 2013, (the last fiscal year for which audited financial statements are available), these customers provided approximately 36% of the gross operating revenues of the Water Supply System, and accounted for 45% of billed revenue to wholesale water supply customers.

*[Remainder of Page Intentionally Left Blank]*

**Summary of Wholesale Water Supply Contracts[a]**

| | Total Billed Flow Mcf FY 2013 | Total Billed Revenue FY 2013 | Total Billed Flow Mcf FY 2014 | Total Billed Revenue FY 2014 | Contract Date |
|---|---|---|---|---|---|
| | *Mcf* | | *Mcf* | | |
| Flint[b] | 1,189,791 | $23,308,800 | 1,178,672 | $23,871,366 | 1967 |
| Southeast Oakland County Water Authority | 1,442,286 | 19,541,038 | 1,321,917 | 19,467,746 | 2009 |
| Sterling Heights | 678,000 | 12,089,582 | 614,039 | 12,015,093 | 2008 |
| Shelby Township | 431,034 | 10,824,461 | 399,123 | 10,770,614 | 2010 |
| Farmington Hills | 439,621 | 10,575,173 | 365,279 | 9,769,372 | 2009 |
| Livonia | 577,829 | 10,338,724 | 478,054 | 9,728,576 | 2009 |
| Warren | 747,777 | 9,945,794 | 759,661 | 9,060,112 | 2010 |
| West Bloomfield Township | 300,280 | 9,655,154 | 274,324 | 8,218,635 | 2008 |
| Rochester Hills | 343,656 | 9,529,341 | 324,443 | 9,600,373 | 2009 |
| Troy | 498,281 | 9,311,146 | 450,392 | 9,715,613 | 2008 |

Mcf = Thousand cubic feet.

(a) 10 largest in terms of billed revenue during FY 2013

(b) Flint contract terminated April 2013, but service provided through April 2014.

SOURCE: The Department

Although some wholesale customers have studied the option of establishing their own water systems, only one wholesale customer, Flint, has ceased taking water from the Water Supply System. In general, because (i) the geology of the area surrounding the City does not support a substantial water supply by subsurface wells, (ii) there is a natural supply of raw water coupled with the capital facilities of the Water Supply System in place, and (iii) there are longstanding municipal relationships extending contractually in most cases for many years, the Board believes that the wholesale customers will continue to be an integral part of the Water Supply System. See "—Service Area" above.

In 2012, MDEQ determined that water from Highland Park's water treatment plant had a high rate of turbidity and requested that the Department supply water to Highland Park on a short term basis. At that time, Highland Park owed the Department approximately $10 million for wastewater services. In 2013, Highland Park ceased making payments. As of July 1, 2014, Highland Park owed approximately $20 million to the Department, including $18,357,188 for wastewater treatment, $1,169,386 for industrial waste treatment services and $1,270,782 for water supply services. The Department filed an action in Wayne County Circuit Court to recover this debt and on July 31, 2014 was awarded a judgment against Highland Park. The State has declared a fiscal emergency in Highland Park pursuant to Act 436 and, as a result, the Department and other creditors are currently participating in Act 436's Neutral Evaluation Process. The Department continues to supply water to Highland Park on an interim basis. See "DEPARTMENT FINANCIAL PROCEDURES—Collections and Delinquencies" and "LITIGATION."

Over the past several years various legislative bills and resolutions have been introduced in the State legislature from time to time that have provided for, or suggested studying, changes in the composition of the Board, or have attempted to legislate changes in the management and control of the Water Supply System. At present, there are two bills pending in the Michigan House and Senate that could potentially impact the Department's operations. Senate Bill 9 was introduced in January 2013, and would subject the Department's rate setting to regulation by the Michigan Public Service Commission. House Bill 4009 was also introduced in January 2013, and would attempt to create a regional authority to take over the operations of the Department. Neither of these bills have proceeded beyond a first reading and referral to a committee.

**Customer Outreach**

The Department continues its significant outreach efforts with representatives of its wholesale customers. The Department and its wholesale customers have created a Technical Advisory Committee ("TAC"), which has established a framework for discussion of major issues between the Department and all of its suburban wholesale customers. The TAC has established multi-faceted teams to explore several issues on a variety of topics, including emergency preparedness, industry best practices, water rates, and communication strategies.

The most significant accomplishment of the TAC is the development of a new model contract with standardized contract language. This document was designed to ensure that all wholesale customers are treated equitably and similarly. It also provides the Department with the same rights and controls across all agreements. Standardized model contract language was developed to address items such as contract term lengths, contract renewal, flow limitations, flow enforcement provisions, flow measurement, regulatory compliance, connection points, and contract enforcement. The contracts have a term of 30 years and renew automatically for successive 10-year terms unless five years' notice of termination is provided. If a wholesale customer terminates the contract without cause during the initial 30-year term, the Department is entitled to early termination costs calculated by applying the applicable water rate to the minimum annual volume requirements under the contract for the remainder of the contract term. Wholesale customers may form or join a water authority for the sole purpose of collectively contracting with the Department or may be annexed or consolidated, in which case the contract is void without payment of early termination costs upon approval of a new water service contract by the Department.

The contracts formalize the TAC as the Department's outreach vehicle for the life of the contract. The contracts include other provisions required for the orderly operation of an integrated water supply and distribution system such as the following: (i) restrictions on redistribution outside the limits of the particular municipality or other public entity without the consent of the Department; (ii) measurement of water furnished by meters; (iii) the metered flow of water is the basis for billing; (iv) prohibition against combining of Water Supply System supplied water with water from any other source without prior written approval of the Department to ensure a uniform quality of water throughout the area; (v) municipal acceptance of the Department's standards for construction of distribution mains and Department approval of construction plans therefor to ensure a uniform standard throughout the area; (vi) Department commitments regarding notification of rate changes; (vii) payment and late payment terms; (viii) delineation of maintenance responsibilities; (ix) specific water pressure commitments by the

Department; and (x) maximum day, peak hour and annual volume commitments by the wholesale customer.

To date, new model contracts for 76 of the 86 wholesale customers have been negotiated, approved, and are in effect. These 76 contracts comprise 89% of total billed revenues from wholesale customers. Negotiations with the few remaining wholesale customers are ongoing. The TAC has made significant progress in creating greater understanding of the Department's water rate methodology and of issues impacting rates and rate levels. It has proved to be an excellent forum for communicating rate methodologies, exploring alternative approaches to allocating costs to customers, and building consensus regarding the development of water rates. The TAC is currently developing potential modifications to the water rate model that would be designed to utilize the best available technical information to improve the understanding of water rates, and the perceived equitability.

Representatives of the wholesale customers have expressed appreciation of the Department's willingness to sponsor these partnering programs and the opportunity to be involved in the process. The partnering groups have authored letters to Department management requesting that the partnering effort continue in its current form.

**Retail Service**

The Department has been the sole provider of all water services in the City. Retail service includes all water service customers of the City, including residential, commercial, industrial and municipal, among others. The Water Supply System also provides retail services on a very limited basis to certain customers outside the City. The Department has full responsibility for billing and collection of charges for approximately 322,000 retail customer accounts. The Department proposes retail rate schedules for these customers for consideration by the City Council, which has ultimate responsibility for setting the retail rates. These customers are billed on a monthly basis and water and sewerage charges are included on the same bill. The Department also bills various governmental agencies, including the City, for service. Rate changes, once established, generally become effective the following July 1. For information regarding current billing and collection activities, see "FINANCIAL PROCEDURES—Collections and Delinquencies." See "FINANCIAL PROCEDURES - Collections and Delinquencies."

**Physical Facilities**

*Intake Facilities*

The Water Supply System's three intake facilities are listed below and, in the opinion of the Department, are generally in adequate to good working order and repair.

- The Lake Huron intake, located in Lake Huron, approximately 5 miles north of Port Huron and 5 miles into the lake, was placed in operation in 1974. This intake supplies raw water through a tunnel to the Lake Huron water treatment plant.

- The Belle Isle intake, located at the eastern end of Belle Isle where Lake St. Clair flows into the Detroit River, was placed in operation in 1931. This intake supplies raw water to the Water Works Park, Springwells and Northeast water treatment plants.

- The Fighting Island intake and tunnel, located under the Detroit River on the Canadian side just west of the northern end of Fighting Island, was placed in operation in 1964. This intake supplies raw water to the Southwest water treatment plant.

*Water Treatment Plants*

Raw water from the intake facilities is treated at the Water Supply System's water treatment plants, which includes screening, filtering, bacteria control, and taste and odor control. Each of the five water treatment plants in the Water Supply System was constructed with the capability to treat the water in accordance with federal requirements under the Safe Drinking Water Act. In the opinion of the Department, based upon physical evaluations conducted by its consultants, no significant improvements to the treatment plants are presently required to meet such requirements. See "—Environmental Matters" below. In addition, each treatment plant is equipped with its own laboratory facilities for the examination of drinking water which are recertified periodically (every three years) by the Michigan Department of Public Health. The treatment plants are more particularly described in the following table. For capital improvements planned for each plant, see "THE CAPITAL IMPROVEMENT PROGRAM."

**Water Treatment Plants**

| Plant | Placed in Operation | Rated Capacity (Mgd) |
|---|---|---|
| Lake Huron | 1974 | 400 |
| Southwest | 1964 | 240 |
| Northeast | 1956 | 300 |
| Springwells[1] | 1931/1958 | 540 |
| Water Works Park | 2003 | 240 |

[1] A major addition was completed in 1959, doubling the capacity of such water treatment plant by adding a new reservoir, sedimentation basin and filtration facility. Filter upgrades at Springwells limit plant capacity to 300 mgd until construction is complete.

SOURCE: The Department

*Transmission and Distribution System*

The Department owns and maintains all distribution mains (less than 24 inches in diameter) and transmission mains (24 inches to 120 inches in diameter) within the City limits and certain transmission mains throughout the wholesale service area. The Water Supply System connects throughout the wholesale service area with the transmission and distribution mains owned and operated by the wholesale municipal customers.

The transmission system is laid out in an organized grid pattern to provide adequate pressures that are reinforced by use of booster stations and reservoirs as necessary. The transmission system is interconnected and flow of water can be controlled, particularly in

emergency conditions, to flow in either direction by opening or closing valves. Water pressures can be boosted to overcome any losses due to an emergency situation.

There is an ongoing program of replacement of distribution mains in the City, especially with respect to certain mains installed during the period 1923 to 1929. Because of certain pipe design and manufacturing deficiencies, these mains are coming to the end of their useful lives. This program of renovation and replacement was started in 1972 and is an ongoing, annual improvement program. In certain other areas within the City, distribution mains are being replaced with larger mains. With respect to the transmission system that serves the wholesale customers, the Capital Improvement Program includes a number of projects designed to improve service and reliability in areas outside the City.

*Monitoring Facilities*

The Water Supply System Control Center located in the Department's Central Services Facility controls and monitors the transmission and distribution of water throughout the Water Supply System. Operators in the Control Center can remotely control the pump stations at the treatment plants and the 19 booster stations to adjust flow and pressure requirements to meet the changing demands of customers. Recent improvements to the Control Center have been undertaken by the Department as part of a Department-wide instrumentation and computerization project included in the CIP.

**Environmental Matters**

The operation of the System is subject to extensive regulation pursuant to the federal Clean Water Act, the Clean Air Act, the Safe Drinking Water Act, the Michigan Natural Resources and Environmental Protection Act, and the administrative rules and regulations that have been promulgated pursuant to these statutes. These programs affect many facets of the System.

## DEPARTMENT FINANCIAL PROCEDURES

**Budget and Accounting Matters**

Pursuant to authority granted by the November 4, 2011 Order, the Board of Water Commissioners adopted a budget policy for the Department on September 26, 2012 which is independent of the City's budget policy. The Department's budget policy, which has been in place beginning with Fiscal Year 2014, is designed to be in alignment with the Department's rate setting cycle.

The budget cycle begins with a Board of Water Commissioners meeting on or before November 1 each year to review programs, services, and activities to be included in the upcoming budget and to receive public comment. Before the December meeting of the Board of Water Commissioners, the Director submits a proposed budget for presentation at the regularly scheduled December meeting. Prior to adoption of the budget, the Board of Water Commissioners conducts a public hearing on the proposed budget which may be conducted at the same meeting in which the Board of Water Commissioners adopts the budget. The Board of Water Commissioners adopts the budget as proposed or with modifications at a meeting on or

before January 31 occurring prior to the Fiscal Year of the budget. If the Board of Water Commissioners fails to adopt a budget prior to that date, the proposed budget shall be deemed the adopted budget for the Department. If necessary, an amendment to the adopted budget shall be adopted by the Board of Water Commissioners in a manner permitted by governing law as presented by the Director.  If the Board of Water Commissioners fails to act upon a proposed budget amendment within 30 days following submission by the Director to the Board of Water Commissioners, then that amendment shall be deemed a part of the adopted budget. See "THE DEPARTMENT—Court Mandated Changes" and "—Management Initiatives." The Fiscal Year 2015 budget has been developed and approved by the Board of Water Commissioners under the new structure.  See "DEPARTMENT FINANCIAL OPERATIONS—Fiscal Year 2015 Budget."

The basis for preparation of the budget differs from preparation of the financial statements for a given period. The financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). Accordingly, the Department's financial statements reflect the accrual basis of accounting. Revenues from operations, investments, and other sources are recorded when earned. Expenses (including depreciation) of providing services to the public are accrued when incurred. The Department's budget basis of accounting recognizes revenues in a manner consistent with accrual basis of accounting. Certain expenses accrued under GAAP are not recognized or treated in the same manner on a budgetary basis. For example, depreciation of plant and equipment over the useful life of such capital asset is not recognized in the budget; instead, amounts which might be spent in the fiscal year are treated as an expense and the budget records equipment and other long-term purchases against the current period.

Generally, the Department pays for certain personnel costs, supplies and equipment that are shared between the Water Supply System and the Sewage Disposal System from Water Supply System operations.  The Sewage Disposal System is then billed monthly based on actual operations, including the allocation of personnel costs and equipment usage.

Because the Water Supply System is generally self-insured, the Department includes in its annual budget amounts estimated to be sufficient to pay various liability and workers' compensation claims.  The financial statements record the expense for such claims in the period when the occurrence of the liability is probable and the amount can be reasonably estimated.  In addition, the budget includes amounts necessary to establish and maintain an account designated the "Extraordinary Repair and Replacement Reserve Fund," which has been created for the purpose of providing funds for paying the costs of major unanticipated repairs and replacements to the Water Supply System.  See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS – Flow of Funds."

The Department uses the City's Oracle financial management system that includes general ledger, purchasing, accounts payable, accounts receivables, project accounting and fixed asset applications.  These Oracle core financial applications are integrated with third party Oracle-approved software providers for budget preparation, time and attendance management, work order and inventory applications.

Despite the independence of financial operations granted by the District Court Orders, the Department continues to be a department of the City for financial reporting purposes. Due to the

nature of this relationship, the Department is not eligible to issue audited financial reports or reports of internal control independent from the City. This impacted the Department's ability to release audited June 30, 2013 financial statements. The City's audit report was delayed for a number of reasons, including the resolution of technical auditing and accounting matters related to the City's Chapter 9 proceeding. Ultimately, the City's auditor, KPMG LLP, issued an audit report for the City, including the Department on July 25, 2014.

The City's audited financial statements as of and for the year ended June 30, 2013, are available on the City's website, and include an unmodified independent auditors' report, with emphasis of matter paragraphs which state:

▪ the City has filed a voluntary petition under Chapter 9 of the Bankruptcy Code, which raises substantial doubt about the City's ability to continue as a going concern. The City's financial statements do not include any adjustments that might result from the outcome of that uncertainty;

▪ the City and the GRS and the Police and Fire Retirement Systems ("PFRS" and, together with GRS, the "Retirement Systems") included investments valued at $702,000,000 and $722,000,000, respectively, as of June 30, 2013, whose fair values have been estimated by management in the absence of readily determined fair values. Management's estimates are based on various methods, which may include information provided by investment managers, general partners, real estate advisors and other means; and

▪ the Retirement Systems utilized different actuarial assumptions in calculating the unfunded actuarial accrued liability.

The independent auditors' opinion was not modified with respect to these matters.

The auditors will subsequently provide the City with a letter that highlights certain internal control material weaknesses and related recommended improvements to the City's internal control environment. The City and the Department take such recommendations seriously. In particular, the Department's financial transformation process is designed to address internal control matters noted by the auditors in the prior Fiscal Year.

*Independent Auditors*

The basic financial statements of the Water Fund, an enterprise fund of the City as of and for the year ended June 30, 2013, included in APPENDIX D of this Disclosure Statement, have been audited by KPMG LLP, independent auditors, as stated in their report therein, which includes emphasis of matter paragraphs that state:

▪ the City, including the Water Fund, has filed a voluntary petition under Chapter 9 of the Bankruptcy Code, which raises substantial doubt about the City and the Water Fund's ability to continue as a going concern. The Water Fund's basic financial statements do not include any adjustments that might arise from that uncertainty;

the City and the GRS utilized different actuarial assumptions in calculating the unfunded actuarial accrued liability; and

the basic financial statements present only the Water Fund; the statements of the Fund do not purport to, and accordingly do not, present fairly the financial position of the City as a whole as of June 30, 2013, the changes in its financial position, or, where applicable, its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

The independent auditors' opinion was not modified with respect to these matters.

## Collections and Delinquencies

The Department accounts for its retail and wholesale customer account balances separately. As of July 1, 2014, active retail customer accounts receivable are approximately $127 million, for water and sewer services combined. Of that amount, approximately $89 million is 60 days past due from 46% of the approximately 200,000 total active retail customer accounts. As of July 1, 2014, there were three wholesale water customer out of a total of 86 with past due balances of approximately $1.7 million.

The collection methods for retail customers differ substantially from wholesale customers. The Department's effort to address delinquent accounts receivable are described below. It should be noted that the majority of the past due water wholesale receivable is due to one entity, the City of Highland Park. That customer has a past due balance of approximately $1.2 million out of a total water account balance of $1.4 million as of July 1, 2014. Collection efforts for that account have resulted in legal action. See "—Wholesale Customers" below.

Despite the level of delinquencies, as of July 1, 2014, the Department has not experienced cash flow problems, as sufficient operating capital has been available to the Water Supply System. The Department has been able to meet its obligations as they come due.

### Retail Customers

The Department operates a computerized billing system which accounts for a total of approximately 322,000 retail customer accounts, of which approximately 200,000 are active accounts. Inactive accounts remain in the billing system while the Department pursues other means of collection. Retail customer account categories include residential, commercial, industrial and municipal. Based on the approved Fiscal Year 2015 retail rates, the typical monthly bill is approximately $71 for combined water and sewer service charges based on 600 cubic feet of water consumed per month. All retail customers are billed monthly and are allowed 20 days to pay, after which a one-time 5% late payment charge is applied.

In accordance with State law, the Department has a right to discontinue the supply of water to any premises for non-payment of water or sewer bills when due. It is the Department's policy that retail customers may have their service shut off for non-payment if the account is more than sixty days in arrears with a past due balance of $150 or more. Residential customers are notified of payment plan options and financial assistance programs if they indicate that their

account is delinquent due to financial hardship. Residential customers may be subject to constitutional safeguards regarding due process, including notice and hearing requirements in the event of discontinuation of services.

The Department's collection efforts in the past, including shut-off for non-payment, had not kept pace with an increasing level of delinquency since 2007. This resulted in a significant number of accounts with past due balances. As of July 1, 2014, the average active residential account delinquency, which includes water and sewer charges, is $541, based on approximately 80,000 of 177,000 accounts with past due balances of 60 days or more. As of the same date, active commercial accounts, the next largest retail customer category, present approximately 10,000 of 18,000 accounts with a past due balance of 60 days or more with an average past due amount of $2,071, which includes water and sewer charges.

To address the growing delinquency issue, the Department initiated a program utilizing an outside contractor to expand the shut-off program to increase collections beginning in July 2013. The first three months of that program revealed a significant number of service connections that were shut-off where there was no request to restore service. From July through September 2013, 7,478 retail accounts were shut off, but only 2,366 customers contacted the Department for service to be restored. The Department believes this is due to: (i) abandoned properties where there was no contact with the Department to terminate service, and (ii) illegal turn-ons. Understanding these challenges affects the Department's collection strategy going forward. To address the abandoned property concern, the Department is cross-referencing its customer database with recently released data from the Detroit Blight Removal Task Force which has gathered property condition data for all 380,000 parcels in the City. To address illegal turn-ons, the Department has instituted a follow-up mechanism to detect illegal turn-ons and is working with law enforcement to curb this activity.

The shut-off program activity was reduced for most of the period from December 2013 through March 2014 to prevent frozen service lines. The program resumed in April 2014, and 14,766 retail accounts were shut-off during the period from April through June 2014. The Department collected approximately $1,200,000 during that time period, compared with approximately $492,000 for that same time period in the prior year for combined retail water and sewer account balances. In addition, the shut-off program has generated active engagement with customers whose service is preserved by participation in a payment plan program, as well as payment assistance programs for those who meet certain eligibility criteria. Funding for the assistance programs is provided by external sources.

A final barrier to active customer engagement has been the absence of customer names associated with residential retail accounts. Presently most residential retail customer accounts are addressed to "Resident." This presents an impediment to other methods of delinquent account collection efforts. The Department has recently initiated a program to attach customer names to accounts to support more effective collection efforts.

In the event that an account remains delinquent for more than six months, the Municipal Water Lien Act, MCL 123.161 et seq., provides that the charges for water and sewage service furnished to a premises may become a lien on such premises when the service is provided, and the lien may be placed on the property tax roll. The lien may then be enforced in the same

manner as the collection of property taxes and enforcement of a lien for property taxes (assuming proper statutory notice to the party responsible for the payment of the charges). The Department transmits delinquent accounts to the City Treasurer who places the delinquent amount on the winter tax bill. If the delinquent amounts are not collected by the City Treasurer by March 1 each year, the City transfers unpaid real property tax bills to Wayne County for collection in accordance with State law. The City receives payment for such taxes from Wayne County's delinquent tax revolving fund as of March 1 each year, which is funded by the issuance of Delinquent Taxes Anticipation Notes. If the delinquent real property taxes remain uncollected after three years, the County charges the respective amount of such taxes back to the City. Chargebacks in Fiscal Year 2013 totaled approximately $22 million. See "—Fiscal Year 2009-2013 Operations" below. In Fiscal Year 2013, the City Treasurer's Office collected $7.4 million on behalf of the Department for water and sewer charges combined. The Wayne County Treasurer collected $9.1 million.

*Wholesale Customers*

Wholesale customers maintain their own retail billing systems. Wholesale customers are billed monthly. The late payment charge for wholesale customers under the model contract is 1.5% per month for each month that a bill remains unpaid, and for the remaining contracts it varies by individual contract, but generally is 5%. In the event of a wholesale customer delinquency, the Department has options available to it under the relevant contractual agreement with such wholesale customer, including the right to early termination costs and to obtain a judgment against the wholesale customer. If a non-municipal wholesale customer does not pay the judgment amount, such amount may be collected by placing a lien on the property tax roll of that wholesale customer.

Historically, the Water Supply System has not experienced significant problems with wholesale delinquencies. Wholesale delinquencies typically arise from disputed billings, which often can be resolved through negotiation. However, as of the date of this Disclosure Statement, the City of Highland Park had a delinquent balance of approximately $20 million for sewer and water charges combined. Highland Park is experiencing financial difficulties and since Fiscal Year 2008 has been unable to currently satisfy amounts due to the Department. The State has declared a fiscal emergency in Highland Park pursuant to Act 436 and, as a result, the Department and other creditors are currently participating in Act 436's Neutral Evaluation Process. The City and the Department have filed suit against Highland Park in Wayne County Circuit Court. Both the City and Highland Park have filed and argued Motions for Summary Judgment in the case. The Circuit Court took the matter under advisement and a decision was issued on July 31, 2014 awarding judgment to the Department. The City of Inkster has recently defaulted on a payment agreement with the Department. If this default cannot be cured by Inkster, the Department will institute legal proceedings for collection of this debt. As of July 1, 2014, the total amount owed by the City of Inkster is approximately $836,000, of which $464,000 is past due.

*Accounting*

The allowance for doubtful accounts reflected in the audited financial statements as of June 30, 2013 represents the Department's estimate of the amount of potential uncollectible

accounts receivable. Increases in the reserve are netted against revenues reported on the financial statements. The amount reserved is determined based on a formula that takes into account the total amount of accounts receivable as well as specific items within the category, including reserves for disputed billings. Approximately $27 million was reserved as an allowance for doubtful accounts as of June 30, 2013, against a total accounts receivable of approximately $111 million. Estimates are not available as of June 30, 2014 due to the timing of the billing cycle and accounts receivable analysis. Annual increases in the allowance for doubtful accounts result in bad debt expense for that year, and are reflected as a reduction in revenue for the customer class associated with the reserve. See "DEPARTMENT FINANCIAL OPERATIONS—Fiscal Year 2009-2013 Operations." The Settlement Agreements stipulate that bad debt expense associated with a suburban wholesale customer is chargeable to the suburban wholesale class at large, and that bad debt expense associated with a City retail customer is chargeable to the City retail customers only. The Board of Water Commissioners currently practices a "bad debt" policy which requires a write off of any doubtful accounts older than three years.

**Cash Management**

In accordance with the City Charter, all funds and accounts of the Water Supply System are separate and distinct from all other City funds. No Water Supply System monies are commingled with general fund or other monies of the City.

All Revenues of the Water Supply System are deposited upon receipt or, if applicable, upon completion of credit card processing activities, in either the "Revenue Receipts Fund" or the "Receiving Fund" established under the DWSD Indenture. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS – Flow of Funds" for information on these Funds and the flow of funds under the DWSD Indenture. The Operation and Maintenance Fund is a custodial account that is controlled by the Department. It is not part of the Trust Estate under the DWSD Indenture.

The Department maintains a budget system that monitors and controls funding in accordance with actual funds available. This budget system includes annual budgeting and project specific budgeting and payables management activities designed to ensure that retainage, progress payments and final contract payments are properly aligned with funds on hand and investment activities.

**Investment Policy**

The Department's investment policy was adopted on January 21, 2014. Funds in excess of current Water Supply System requirements are invested by the Department in accordance with State law. The Department may invest in direct obligations of the United States, obligations of an agency or instrumentality of the United States, repurchase agreements, mutual funds that invest solely in such government obligations and repurchase agreements, certain grades of commercial paper, bankers acceptances of United States banks, and certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation.

The investment policy purpose is to endeavor to accumulate a pool of assets sufficient to build capital for future use with the corresponding obligations to support near-term and long-term needs of the Department. The investment policy attempts to maintain and protect investment principal while striving to maximize total return on the portfolio consistent with risk limitations, pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended. The Department has not experienced material investment-related losses in any Department managed funds. As of June 30, 2014, the Water Fund held investments with a total market value of approximately $415,551,782, the longest investment had a maturity date of December 27, 2018.

**Rates**

Under the District Court Orders, the Board of Water Commissioners has the authority to establish rates for wholesale water supply service. In accordance with Act 94 and the November 4, 2011 Order, the retail rates charged to customers in the City are subject to review by and concurrence of City Council. The Board of Water Commissioners has the sole authority to establish rates for the wholesale suburban customers. In accordance with the February 11, 2011 Order, a super majority of at least five Board of Water Commissioners member votes is required to approve the wholesale customer rates and recommend to the City Council the retail rates to be charged to the City retail customers. Certain of the wholesale contracts have specific notice requirements relating to rate changes, generally 90 or 120 days. At least one public hearing is required to be held prior to action on rate changes. No other statutory procedures are required as a condition precedent to a rate change. Rates, once established, generally become effective the July 1 following their establishment.

Under the Bond Ordinance, the City covenants that the rates shall be fixed and revised from time to time as may be expected to be necessary to produce the greater of (1) the sum of (a) administrative and operation and maintenance expenses of the Water Supply System, (b) debt service on Senior Lien DWSD Bonds, (c) creation and maintenance of a debt service reserve for Senior Lien DWSD Bonds, (d) debt service on Junior Lien DWSD Bonds, if any, including maintenance of a reserve therefor to the extent required by the Bond Ordinance, (e) creation and maintenance of an extraordinary repair and replacement reserve fund; and (f) to provide for such other expenditures and funds for the Water Supply System as the Bond Ordinance and Act 94 require, and (2) an amount equal to the Required Combined Coverage where the numerator is the Net Revenues projected for the Fiscal Year of calculation and the denominator is the Indebtedness coming for such Fiscal Year. See "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD BONDS – Rate Covenant." The City has covenanted at all times to fix and maintain such rates for services furnished by the Water Supply System as shall be sufficient to provide for the foregoing. As a matter of operating policy, the Department has established a debt service coverage policy of fixing rates so that net revenues exceed the debt service coverage requirements of the Bond Ordinance by at least 15 percentage points. This policy may be changed from time to time by the Board of Water Commissioners without approval of Bondholders or any other party.

Under Act 94, rates must be fixed and revised as necessary to comply with the Bond Ordinance. The contracts with wholesale customers typically provide that rates be reasonable in relation to the costs incurred. The Department maintains a small staff to review and make

recommendations on rates for water and sewage service. The Department routinely retains outside consultants to supplement the efforts of its staff. Act 94 also provides that the rates charged by the Water Supply System should not be subject to supervision or regulation by any State bureau, board, commission or like agency or instrumentality of the State. In addition, the November 4, 2011 Order specifies that the City Council, which previously approved all rates, has the authority to approve only rates charged to retail customers in the City, but has no authority to review or approve rates charged to wholesale suburban customers. See "THE DEPARTMENT – Organization."

Currently, rates are adjusted annually and are determined by the "utility basis" method, which is recommended by the American Water Works Association for municipally-owned utilities providing services to metropolitan areas and which the Water Supply System is required to use under Michigan law. Under this method, the revenue requirement is comprised of three elements of cost: operation and maintenance expenses, depreciation expense and a return on the rate base. The rate base reflects the value of property on which the Department is entitled to earn a return. In formulating rates, the Department recognizes the distinctions between retail customers and the various wholesale municipal customers based on the differences in the cost of serving each class of customer. The "utility basis" method has been upheld in litigation involving the Department's water rates.

The rate schedule for each of the 86 suburban wholesale customers served via contract consists of a fixed monthly charge and a commodity charge applied to monthly metered water sales. While the overall methodology used to determine rates for each customer is uniform, the rate schedule for each customer is unique, reflecting the specific volumes, peak demands, and other demographic information in their individual contracts. The current wholesale water rates continue to collect approximately 40% of the revenue requirement via fixed monthly charges, with the other 60% generated by commodity charges. In recent years, the structure of the wholesale rates has been modified to recover more costs through a fixed component of the rate structure. The Department believes that further increasing the portion recovered through fixed monthly charges will further improve the alignment between cost of service allocation and cost recovery, and has initiated conversations with representatives of the customer communities (through the TAC process) to explore this issue.

The rate schedule for retail customers in the City consists of fixed monthly charges that vary by the connection size to the Water Supply System, and a uniform commodity rate applied to all water sales. Prior to the current rates, the commodity rates reflected a declining block approach.

The current water supply rates became effective July 1, 2014, and were set at levels expected to generate 4% more revenue than the previous year's rates. As noted in the table below, the impact of the new rates on different customers and customer classes does not directly align with the overall 4% impact on the System. Specific customer and customer class rate impacts are based on additional factors, including cost allocation results, changes in sales and revenue bases, and expected collection rates.

See "DEPARTMENT FINANCIAL OPERATIONS – Projected Operations for Fiscal Year 2015 through 2019." The following table presents a summary of the annual changes in the

effective average retail and wholesale water rates charged by the Department for the last ten years.

**Change in Effective Water Supply Rates**

| Date of Implementation | City of Detroit Retail | Average Suburban Wholesale |
|---|---|---|
| 7/1/2003 | 8.9% | 9.1% |
| 7/1/2004 | 8.0% | 10.3% |
| 7/1/2005 | 0.4% | 4.0% |
| 7/1/2006 | 0.5% | 5.9% |
| 7/11/2007 | 6.8% | 5.1% |
| 9/3/2008 | 6.3% | 8.9% |
| 7/1/2009 | 5.2% | 6.4% |
| 7/1/2010 | 9.3% | 5.5% |
| 7/1/2011 | 9.0% | 9.1% |
| 7/1/2012 | 10.3% | 7.9% |
| 7/1/2013 | 4.4% | 3.9% |
| 7/1/2014 | 13.8% | 3.9% |

Note: Reflects change in effective average unit cost of service for each customer class at large.

SOURCE: The Department

**Water Rate Comparison**

The following chart presents a comparison of the current charges for residential water supply and sewage disposal services in the 50 largest U.S. cities. Note that such comparisons are not always comparable as the elements included in charges for these services are often inconsistent amongst communities. For instance, several of these communities listed below may recover costs associated with certain environmental program through water rates that are funded through other means in most cities. In addition, several of these communities may recover costs associated with water infrastructure through property taxes rather than water rates. Readers are encouraged to review these survey reports in their entireties to fully understand the context of the comparisons. The average increase in charges for these communities since 2005 has been almost 6% annually (or more than twice the rate of inflation) illustrating the trend in the industry necessary to address increased environmental and infrastructure challenges.

The Department anticipates increasing rates consistent with the overall financial planning philosophy, and as necessary to continue the funding of the CIP. Such increases are not anticipated to differ significantly from what will be experienced in other areas of the country having water systems of comparable age and facing infrastructure challenges similar to the Water Supply System. The Department believes the price and availability of water in the area should continue to be a positive factor in the attraction of industry to the area.

71

Comparison of Annual Residential Water and Sewage Charges in the 50 Largest U.S. Cities



| City | Amount |
|------|-------|
| Atlanta | $194.42 |
| Seattle | $177.93 |
| San Francisco | $148.77 |
| Portland | $125.78 |
| New York | $123.54 |
| San Diego | $107.68 |
| Boston | $103.77 |
| Kansas City | $98.94 |
| Austin | $97.78 |
| Virginia Beach | $95.25 |
| Cleveland | $91.24 |
| Washington, D.C. | $89.43 |
| Oakland | $88.37 |
| Houston | $85.50 |
| Colorado Springs | $85.14 |
| Jacksonville | $80.41 |
| Columbus | $78.57 |
| Raleigh | $77.04 |
| Louisville | $76.80 |
| Baltimore | $74.96 |
| Los Angeles | $73.13 |
| Philadelphia | $72.79 |
| Indianapolis | $71.35 |
| DETROIT | $70.89 |
| Charlotte | $70.87 |
| Sacramento | $69.49 |
| Minneapolis | $69.30 |
| San Jose | $69.11 |
| Tucson | $69.06 |
| Milwaukee | $68.50 |
| Nashville | $67.31 |
| Tulsa | $66.61 |
| Dallas | $64.11 |
| Fort Worth | $62.46 |
| Omaha | $60.25 |
| Oklahoma City | $60.07 |
| Long Beach | $59.36 |
| San Antonio | $56.37 |
| Mesa | $56.05 |
| Arlington | $55.55 |
| Wichita | $52.97 |
| Denver | $50.14 |
| Miami | $49.62 |
| Albuquerque | $47.34 |
| Las Vegas | $46.80 |
| Fresno | $46.38 |
| Phoenix | $45.01 |
| Chicago | $41.40 |
| El Paso | $40.14 |
| Memphis | $27.46 |

□ Water  ■ Sewer

*Assumes 7,500 gallons (or 1,000 cubic feet) monthly usage and a 5/8" (or nearest equivalent) meter size. Actual average use will vary by utility. Rates effective April 2, 2013*

Source: 50 LARGEST CITIES WATER/WASTEWATER RATE SURVEY, A Black & Veatch 2012/2013 Report

# DEPARTMENT FINANCIAL OPERATIONS

**Summary of Historical Revenues and Expenses**

The table below shows historical revenue and expenses of the Water Supply System for each of the five Fiscal Years ended June 30, 2009 through June 30, 2013. Although Fiscal Year 2014 has been completed, actual financial data is not yet available. Estimated results for Fiscal Year 2014 are discussed below and included as the first year of the projection period. See "— Projected Operations for Fiscal Year 2014 through 2019" below. Net Revenues are derived from audited financial statements of the Water Fund for Fiscal Years ended June 30, 2009 through June 30, 2013. Financial statements and notes thereto for the Fiscal Year ended June 30, 2013, together with the auditors' report thereon, are included in APPENDIX D.

Act 94 defines "net revenues" as the revenues of a public improvement remaining after deducting the reasonable expenses of administration, operation, and maintenance of the public improvement. The Department's financial statements are prepared on an accrual basis in accordance with its financial reporting obligations. Accordingly, the results summarized in the following table follow a "modified cash" approach of depiction, designed to adjust financial statement based accrual accounting figures to more closely depict net revenues as defined under Act 94.

The results summarized in the following table follow a "modified cash" approach of evaluating revenues and revenue requirements. This approach attempts to align recognition of performance on a common service period basis. For instance, revenues for June 2013 generally reflect bills issued in July 2013, under the assumption that meters are read at the end of the month and billed early in the subsequent month. Operating expenses are reflected as incurred, but include accrual of amounts not yet paid. The "modified cash" approach does not include the accrual of longer term elements that are contained in the Department's accrual basis financial statements; nor does it generally reflect recognition of activity that was related to cash receipts or disbursements in prior years. Because many of these individual elements are derived from the accrual basis financial statements, the summary below will not present a precise cash basis statement.

*[Remainder of Page Intentionally Left Blank]*

**Summary of Historical Revenues and Expenses (Unaudited)**
**Fiscal Years 2009-2013**

| | | 2009 $ | 2010 $ | 2011 $ | 2012 $ | 2013 $ |
|---|---|---|---|---|---|---|
| | | \multicolumn{5}{c}{Fiscal Year Ending June 30,} | | | | |

| | | 2009 $ | 2010 $ | 2011 $ | 2012 $ | 2013 $ |
|---|---|---|---|---|---|---|
| | Operating Revenues | | | | | |
| 1 | Wholesale Service Revenue (a) | 206,282,285 | 210,662,057 | 237,099,865 | 258,587,439 | 275,185,240 |
| 2 | Retail Service Revenue (a) | 65,360,449 | 65,580,546 | 74,810,362 | 71,540,060 | 75,653,762 |
| 4 | Subtotal Service Revenue | 271,642,734 | 276,242,603 | 311,910,227 | 330,127,499 | 350,839,002 |
| 5 | Miscellaneous Revenue | 2,452,729 | 9,227,823 | 4,091,974 | 6,002,446 | 4,688,757 |
| 6 | Non-Operating Revenue (b) | 13,810,360 | 6,992,496 | 4,063,773 | 7,792,561 | 5,563,781 |
| 7 | Total Revenue | 287,905,823 | 292,462,922 | 320,065,974 | 343,922,506 | 361,091,540 |
| 8 | Operation and Maintenance Expenses (c) | 158,856,470 | 138,458,592 | 146,880,420 | 165,080,448 | 151,204,343 |
| 9 | Net Operating Revenues | 129,049,353 | 154,004,330 | 173,185,555 | 178,842,058 | 209,887,197 |
| | Debt Service Requirements | | | | | |
| 10 | Senior Lien Bonds | 110,137,200 | 109,843,700 | 116,175,200 | 114,986,700 | 130,181,500 |
| 11 | Senior and Second Lien Bonds | 155,033,200 | 155,729,800 | 162,292,600 | 151,398,200 | 170,616,600 |
| 12 | All Bonds, Including SRF Junior Lien | 156,775,100 | 157,590,500 | 164,435,900 | 153,524,200 | 172,458,800 |
| 13 | Net Revenues After Debt Service | (27,725,747) | (3,586,170) | 8,749,655 | 25,317,858 | 37,428,397 |
| 14 | Pension Obligation Certificates | 4,579,800 | 4,837,300 | 5,203,400 | 5,499,700 | 5,796,300 |
| 15 | Net Available for Other Purposes | (32,305,547) | (8,423,470) | 3,546,255 | 19,818,158 | 31,632,097 |
| | Debt Service Coverage (d) | | | | | |
| 16 | Senior Lien Bonds | 1.17 | 1.40 | 1.49 | 1.56 | 1.61 |
| 17 | Senior and Second Lien Bonds | 0.83 | 0.99 | 1.07 | 1.18 | 1.23 |
| 18 | All Bonds, Including SRF Junior Lien | 0.82 | 0.98 | 1.05 | 1.16 | 1.22 |

(a) Net of bad debt expense
(b) Excludes non-cash items such as changes in derivative values and capital contributions.
(c) Excludes Net OPEB obligation and other elements that do not impact net revenues as defined by the Ordinance. See below.

*Operation and Maintenance Expense*

| | | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| 19 | Normal annual "cash" operations | 158,856,470 | 138,458,592 | 146,880,420 | 165,080,448 | 151,204,343 |
| 20 | Net OPEB obligation | 8,997,599 | 11,332,667 | 12,634,493 | 12,724,239 | 17,248,909 |
| 21 | Nonrecurring capital asset adjustments | 6,887,463 | 8,141,706 | 2,003,857 | 2,400,000 | 18,735,709 |
| 22 | Total F/S Operating Expense | 174,741,532 | 157,932,965 | 161,518,770 | 180,204,687 | 187,188,961 |

(d) Computed consistent with Rate Covenant basis for rate determination purposes. Not applicable for purposes of Additional Bonds Test calculations.

SOURCE: The Department

## Fiscal Year 2009-2013 Operations

The following information summarizes the financial operations of the Water Supply System in Fiscal Years 2009 through 2013.

*Revenues*

As indicated in the above table, Water Supply System service revenues from rates and charges, net of bad debt expense, have increased approximately $68 million, or 33%, since Fiscal Year 2009. This increase is primarily attributable to rate increases during that period, as well as the varying levels of bad debt expense throughout the period. Bad debt expense is recognized in

the Department's financial statements based on an analysis of the size and age of accounts receivable and the expected ability of the Department to collect those receivables. Bad debt expense had the effect of decreasing revenues by $16 million in Fiscal Year 2013. A portion of this amount, $4 million, is due to an increase in estimated chargebacks from Wayne County for uncollectible liens on property taxes from prior years, for which the City was given an advance. See "DEPARTMENT FINANCIAL PROCEDURES—Collections and Delinquencies." The corresponding bad debt expense figures for Fiscal Years 2009, 2010, 2011 and 2012 were approximately $8 million, $4 million, $9 million and $13 million, respectively.

Non-operating revenues experienced a significant decline during the same period, principally due to lower earnings rates on investments.

*Operation and Maintenance Expenses*

Total operation and maintenance expenses in the table do not include expenses associated with accruing liabilities for OPEB, which reflect future cash outlays, nor write-offs of amounts for capital assets that were originally capitalized in prior years (prior cash outlays). Rather these figures are intended to represent actual annual transfers to the Operation and Maintenance Fund to fund the costs of operating the System. These expenses have been stable throughout this period, and were $7.6 million (5%) lower in Fiscal Year 2013 than in Fiscal Year 2009, and the estimates for Fiscal Year 2014 are significantly lower than Fiscal Year 2013. The recent decline in operating expenses primarily reflects the initial impacts of the Department's optimization program. Footnote (c) to the table above reconciles the depiction of operating expenses for purposes of determining Net Revenues with the operating expenses reflected in the audited financial statements. For Fiscal Year 2013, the large "nonrecurring capital asset adjustment" is principally related to the cancellation in initial work on a project to extend a "second feed" to the City of Flint. Significant progress on study and design of that project was made prior to 2011. The unsuccessful negotiations to maintain Flint as a wholesale customer led to termination of the project, and to capital write-offs of expenditures related to the original work, with the final adjustments being reflected in Fiscal Year 2013.

Personnel expenses experienced by the Department have declined significantly, consistent with the attrition-based decline in overall staffing levels. See "THE DEPARTMENT—Management Initiatives."

A portion of the annual variation in operation and maintenance expenses is associated with the allocation of costs for functions that provide service to both the water and sewer systems. These costs are assigned to the Water Supply System and Sewage Disposal System based on detailed labor distribution systems and overall management policy, and will naturally fluctuate based on where maintenance and related activities are focused. The Department has made and continues to make significant efforts to ensure that financial plans accurately accommodate this issue and that its financial accounting systems accurately report activity for this matter. See "DEPARTMENT FINANCIAL PROCEDURES—Budget and Accounting Matters."

*Non-Operating Revenue*

The category "Non-Operating Revenues (Expenses)" reflected in the financial statements is a "net" amount and has historically represented relatively small amounts of non-operating income or certain non-cash write offs. In 2009, this category also included "contributions" of assets (including principal forgiveness on SRF Bonds augmented with ARRA funds) and other non-monetary amounts. This category also includes certain amounts related to changes in the net valuation of swap agreements from year to year. These amounts are not included in the analysis of current revenues and expenses (particularly for purposes of calculating coverage levels) as they generally do not have an effect on the amount of cash available for Water Supply System operations or debt service. The presentation in the preceding table is intended to reflect cash elements only and does not reflect any non-cash Non-Operating Revenues (Expenses) elements.

*Debt Service Coverage*

Debt service coverage levels have been lower than planned in recent years, but have improved in Fiscal Years 2012 and 2013. Debt service coverage in Fiscal Years 2009 and 2010 was below 1.1 for Second Lien DWSD Bonds and below 1.0 for SRF Junior Lien DWSD Bonds. The lower than planned debt service coverage levels in such years were primarily attributable to higher than planned debt service interest as a result of the credit market crisis of 2008, which required adjustments to the Department's debt portfolio that increased the interest expense. In addition, revenues were lower than planned levels. The Department's revenue goals are tied to the sales volumes reflected in wholesale customer contracts, which were overly optimistic in those years. Recent renegotiations of contract volumes have resulted in more realistic expectations, and recent revenue performance has been closer to targets, despite continued low peak demand periods. Despite coverage levels of less than 1.0 in Fiscal Years 2009 and 2010, the Department made timely debt service payments by utilizing operating reserve funds.

Debt service coverage ratios have shown steady improvement in Fiscal Years 2011, 2012 and 2013. Debt service coverage for 2014 is expected to decline moderately from Fiscal Year 2013 levels, primarily due to a very low demand period in the summer of 2013. See "—Fiscal Year 2014 Estimate" and "—Projected Operations for Fiscal Year 2014 through 2019."

*Performance Summary*

The Department has made adjustments to its financial planning approaches and assumptions to avoid future poor performance. As noted above, many of the of the originally established annual volumes in the wholesale customer contracts were based on pre-recession expectations and proved to be overly optimistic, resulting in revenue shortfalls. Recent negotiations with wholesale customers to reevaluate contract volumes have resulted in much more realistic expectations and revenue goals. Additionally, the Department is working with its suburban wholesale customers to further evaluate rate structure modifications to further align cost collection and cost recovery strategies and assure stable revenue performance. These strategies are expected to result in a larger portion of the revenue requirement being recovered through fixed monthly charges, and a commodity charge structure that is based on low demand expectations. These initiatives remain under review and development, and are anticipated to result in changes starting in Fiscal Year 2017.

For retail customers in the City of Detroit, projected sales volumes and bad debt expenses reflect more conservative assumptions. The Department continues to provide monthly financial summary reports to the Board of Water Commissioners. Beginning in April 2013, the Board of Water Commissioners Finance Committee (the "Finance Committee") began receiving an expanded monthly agenda binder with supporting financial and operational reports. The Finance Committee binder is distributed publicly through the wholesale customer outreach portal. Beginning in May 2013, the Finance Committee began presenting a written synopsis of the monthly Finance Committee meetings held during the regular Board of Water Commissioners meetings. Those reports are attached to the Director's compliance report, available on the Department's website. The Board of Water Commissioners actively reviews these materials to monitor the Department's performance. The management team utilizes this information to make any necessary changes during the year.

**Fiscal Year 2014 Estimate**

The Department has developed a forecast of estimated results for Fiscal Year 2014, which concluded on June 30, 2014 (the "Fiscal Year 2014 Estimate"). The forecast is based on a review of actual reported information regarding revenues, expenditures, and cash receipts and disbursements during the first ten months of the Fiscal Year. It also reflects estimated activity during the final two months of the Fiscal Year, derived from review of preliminary data and discussions with Department managers. The Fiscal Year 2014 Estimate follows the "modified cash" basis. See "—Summary of Historical Revenues and Expenses" above. The Department has analyzed actual cash receipts and disbursements in developing the Fiscal Year 2014 Estimate.

Actual Fiscal Year 2014 revenues are estimated to be significantly below budgeted levels, due in part to lower than expected water sales volumes and in part to higher than expected levels of bad debt expense. The Department estimates a negative revenue variance (compared to budget levels) of $42 million for Fiscal Year 2014.

The Fiscal Year 2014 actual operating expenses include a contingency allowance of $7 million for unidentified amounts. Even after including this contingency, operating expenses are estimated to be over $9 million under budget. Other specifics regarding the Fiscal Year 2014 Estimate are discussed in the projected operations summary and related exhibits. See "— Projected Operations for Fiscal Year 2014 through 2019."

**Fiscal Year 2015 Budget**

The Board of Water Commissioners adopted the Fiscal Year 2015 budget for the Water Supply System on January 21, 2014, and it has been forwarded to the City to be included in the City's budget. The Fiscal Year 2015 budget contains expenditures or revenue requirements totaling $405.4 million, an increase of approximately $9 million compared to the Fiscal Year 2014 budget. The budgeted operation and maintenance expenses for Fiscal Year 2015 actually reflect an increase of approximately $1.3 million when compared with the Fiscal Year 2014 budget. This increase is principally related to increased budgets for contractual services and related activities to support continued implementation of the Department's optimization program as it establishes systems to perform independently from the City. These increases are somewhat offset by lower personnel costs resulting from attrition related to the optimization program.

The Fiscal Year 2015 budget also recognizes that revenues from water supply services are expected to be lower in Fiscal Year 2015 than anticipated by the Fiscal Year 2014 budget, due to more conservative estimates of sales to customers. The Fiscal Year 2015 budgeted revenues match the overall revenue requirements of $405.4 million. The Fiscal Year 2015 budget also reflects a decrease in miscellaneous and non-operating revenue. As a result, the Fiscal Year 2015 rates were designed to achieve an increase in revenue of 4% in Fiscal Year 2015 compared to the rates developed to support the Fiscal Year 2014 budget.

**Projected Operations for Fiscal Year 2014 through 2019**

The projected financial operations of the Water Supply System shown in the table titled "Summary of Projected Revenues and Additional Revenue Requirements For Fiscal Years 2014-2019" below, include assumptions relating to inflation and to costs associated with the CIP, including debt service on additional bonds and additional needs for power and chemical purchases, all assuming application of current federal pollution control standards and regulations not yet developed pursuant to the 1996 amendments to the Safe Drinking Water Act and compliance schedules and requirements under the Safe Drinking Water Act. The projections in the accompanying table follow the "modified cash" basis, consistent with the manner in which the historical revenues and expenses were presented. See "—Summary of Historical Revenues and Expenses" above. The Department has analyzed actual cash receipts and disbursements in developing these projections.

Subsequent to preparation and adoption by the Board of Water Commissioners of the Fiscal Year 2015 Budget, significant developments have occurred that will impact the Department's financial planning and results. These developments create the need to revisit the assumptions included in the Fiscal Year 2015 Budget to establish a more appropriate baseline to project future operations.

The projected revenues shown in the table anticipate normal weather conditions and are based on an analysis of recent historical trends. As mentioned above, expected revenues from suburban wholesale customers are directly related to projected water purchases set forth in the model service contracts, which have been reevaluated in recent years.

Projected revenues for retail customers reflect more conservative assumptions regarding water sales and the collectability of those sales. A significant portion of the revenues billed to retail water customers are related to commodity charges. From February through April 2014, the Department continued a detailed review of billed volumes for the retail class, and determined that originally projected Fiscal Year 2015 sales levels were not likely to be achieved. As a result, the revised Fiscal Year 2015 retail sales volumes in the accompanying projections were reduced by over 5%. This figure establishes a baseline for future projections, which then assume an annual decline of 2.5% for the balance of the five-year projection period. The Department reviewed additional data regarding receivable collections from the retail class and modified assumptions on this element. The accompanying projections of revenue assume a bad debt expense equivalent to 17% of billed revenues throughout the five-year projection period.

The projected revenue required reflects the minimum additional amounts that are needed to meet the requirements of the Bond Ordinance and the policies enacted by the Board of Water Commissioners, given the various assumptions. The financial plan summarized by these projections is designed to enhance the Water Supply System's balance sheet, reverse the erosion in net assets that has occurred in recent years, and improve the Water Supply System's liquidity position. The Department has embraced this planning strategy, which will result in higher debt service coverage ratios, as indicated in the following table.

The operation and maintenance expense projection for Fiscal Year 2014 reflects the Fiscal Year 2014 Estimate. Even after considering the $7 million forecast contingency amount, the Department estimates that operation and maintenance expenses will reflect approximately 95% of the original budget. The Fiscal Year 2015 operation and maintenance expense estimate in the accompanying projections is based in part on the Fiscal Year 2015 Budget, but also reflects significant modifications in assumptions, many of which emerged in the development of the City's Plan of Adjustment.

The Fiscal Year 2015 estimated operation and maintenance expenses serve as a base for the remaining years. The projections include continued recognition of savings resulting from implementation of the Department's optimization program, including personnel cost savings through attrition and initial efficiencies. The projected operation and maintenance expenses reflect the modified treatment of pension contributions and reimbursement from the Water Supply System to the City for certain other fringe benefits envisioned by the Plan of Adjustment. Specifically, the projected personnel operating expenses for the Water Supply System reflect an accelerated repayment of pension reimbursement obligations, but also reflect a reduction to the budgeted fringe benefit rates. See APPENDIX A — FEASIBILITY CONSULTANT'S REPORT.

The total debt service includes the amounts due on all outstanding DWSD Bonds, estimated amounts on the projected annual bond sales starting in Fiscal Year 2016 to fund expenditures in the remaining years of the CIP. The projected Net Revenues are divided by the applicable debt service to show estimated coverage. The available balance is applied to non-operating expenses, including payments related to the System's share of the City's POCs (in Fiscal Year 2014), and thereafter, the Department's allocable share of amounts due on the New B Notes as described in the Plan of Adjustment, renewals and replacements, operating reserves, the Extraordinary Repair and Replacement Reserve Fund and the portion of the CIP funded with revenue financed capital. See "RISK FACTORS—Financial Impacts of the Plan of Adjustment."

The projections set forth in the following table are intended as "forward-looking statements." The Department cautions that these projections may and often do differ materially from actual results. Some of the factors that could cause actual results to differ materially from those projected are the Department's ability to execute the CIP as scheduled and within budget, regional climate and weather conditions, and adverse legislative, regulatory or legal decisions (including environmental laws, regulations and the confirmation of the City's Plan of Adjustment) affecting the Department's ability to manage the Water Supply System.

As noted previously, the projections summarized in the following table follow a "modified cash" approach of evaluating revenues and revenue requirements. In past years, at

79

times significant variances between "modified cash" representations and actual cash flows for certain periods could occur, depending on seasonal patterns of billed revenues and cash receipts.

*[Remainder of Page Intentionally Left Blank]*

**Summary of Projected Revenues and Additional Revenue Requirements**
**For Fiscal Years 2014-2019**

| | Fiscal Year Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| | *unaudited estimate* | | | | | |
| Operating Revenue Under Existing Rates(a) | 347,835,900 | 379,855,700 | 377,359,700 | 374,921,600 | 359,854,100 | 357,587,300 |
| Projected Revenue from Rate Increases(b) | | | | | | |
| FY 2016:    4.0% | | | 15,094,400 | 14,996,900 | 14,394,200 | 14,303,500 |
| FY 2017:    4.0% | | | | 15,596,700 | 14,969,900 | 14,875,600 |
| FY 2018:    4.0% | | | | | 15,568,700 | 15,470,600 |
| FY 2019:    4.0% | | | | | | 16,089,500 |
| Total Projected Revenue from Water Rates | 347,835,900 | 379,855,700 | 392,454,100 | 405,515,200 | 404,786,900 | 418,326,500 |
| Miscellaneous Operating Revenue | 3,835,100 | 4,750,000 | 4,750,000 | 4,750,000 | 4,750,000 | 4,750,000 |
| Projected Non-Operating Revenue | 2,302,600 | 3,663,000 | 3,486,600 | 3,873,700 | 3,834,200 | 3,979,300 |
| Total Projected Revenue | 353,973,600 | 388,268,700 | 400,690,700 | 414,138,900 | 413,371,100 | 427,055,800 |
| Operation and Maintenance Expense(c) | 140,500,000 | 166,979,300 | 171,339,900 | 172,739,900 | 174,328,100 | 172,325,200 |
| Projected Net Operating Revenues | 213,473,600 | 221,289,400 | 229,350,800 | 241,399,000 | 239,043,000 | 254,730,600 |
| Senior Lien Debt Service (d) | 140,204,600 | 140,159,600 | 148,636,400 | 155,863,000 | 155,268,500 | 153,561,200 |
| Second Lien Debt Service (d) | 40,450,000 | 43,031,700 | 42,911,000 | 42,923,600 | 43,481,800 | 51,912,300 |
| SRF Debt Service (d) | 1,789,000 | 1,788,800 | 1,777,900 | 1,777,900 | 1,774,800 | 1,772,300 |
| Total Debt Service (d) | 182,443,600 | 184,980,100 | 193,325,300 | 200,564,500 | 200,525,100 | 207,245,800 |
| Projected Senior Lien Debt Service Coverage (e) | 152% | 158% | 154% | 155% | 154% | 166% |
| Projected Second Lien Debt Service Coverage (e) | 118% | 121% | 120% | 121% | 120% | 124% |
| Projected Total Debt Service Coverage (e) | 117% | 120% | 119% | 120% | 119% | 123% |
| Unrestricted Balance for CIP and Other Purposes | 31,030,000 | 36,309,300 | 36,025,500 | 40,834,500 | 38,517,900 | 47,484,800 |
| Projected Application of Balance | | | | | | |
| POC / B Note Non-Operating Payments | 6,094,100 | 3,049,100 | 1,097,200 | 1,097,200 | 1,097,200 | 1,097,200 |
| Allocated Professionl Service Fees from BK | 0 | 7,500,000 | 0 | 0 | 0 | 0 |
| Deposits to Unrestricted Reserves | 2,913,000 | 4,339,200 | 4,433,800 | 3,740,000 | 3,852,900 | 3,028,100 |
| Available for Capital Improvements | 22,022,900 | 21,421,000 | 30,494,500 | 35,997,300 | 33,567,800 | 43,359,500 |

(a)  Revenues for 2014 reflect rates in effect during 2014. Revenues for 2015 - 2019 reflect rates in effect as of July 1, 2015.

(b)  Projected additional revenue is developed based upon both projected increases in operation and maintenance expense and debt service coverage and certain other requirements which must be met in order to issue bonds to finance the CIP.

(c)  Assumes general inflation rate of 2.5% annually after Fiscal Year 2015.

(d)  Does not assume any change in debt service associated with the 2014 DWSD Refinancing Bonds. Assumes bond sales in subsequent years at an annual interest rate of 5.5%.  See "THE CAPITAL IMPROVEMENT PROGRAM: The CIP Funding" Although the Department may issue Additional Water System Bonds as Senior Lien or Second Lien Bonds, for purposes of this table future debt is assumed to be issued as Senior Lien Bonds.

(e)  Computed consistent with Rate Covenant basis for rate determination purposes. Not applicable for purposes of Additional Bonds Test calculations.

SOURCE: THE FOSTER GROUP, LLC.

**Future Issuance of DWSD Bonds**

After the potential issuance of the 2014 DWSD Refinancing Bonds, the Department expects to issue DWSD Additional Bonds in remaining years of the CIP period to finance additional expenditures in the CIP.  See "THE CAPITAL IMPROVEMENT PROGRAM."  The Department intends to adjust rates, as appropriate and consistent with the Bond Ordinance and the Board of Water Commissioners rate covenant policy. The Department continues to pursue

plans to issue Junior Lien DWSD Bonds to finance other CIP expenditures, which may reduce the projected issuance of other DWSD Bonds.

## PENSION PLAN CONTRIBUTIONS

### Introduction

As employees and retirees of a City department, Department employees and retirees participate in GRS with other non-uniformed City employees and retirees. The Department's historical financial information presented through June 30, 2013 includes the plan provisions and financial commitments of the Department under GRS. GRS consists of two components: (i) the benefits accrued under GRS in effect as of June 30, 2014 ("Prior GRS"), which benefits are substantially modified in the Plan of Adjustment, and (ii) the benefits accrued on and after July 1, 2014 ("New GRS"). Under New GRS, the rate of future benefit accruals is reduced from the rates under Prior GRS, Department employees are required to contribute toward the cost of their pension benefits, certain safeguards to prevent future underfunding of New GRS are put into place, and new governance provisions designed to protect the integrity of GRS going forward are adopted.

### Treatment of Prior GRS under the Plan of Adjustment

The provisions of the Plan of Adjustment addressing GRS provide that, on the effective date of the Plan of Adjustment, the City will assume the obligations related to the already accrued benefits under GRS as those benefits will have been modified in the Plan of Adjustment (as described below). This means that the City will not seek to terminate GRS, although Prior GRS was closed to new participants effective June 30, 2014 and vested active employees will not continue to accrue additional pension benefits under the terms and conditions of the benefit formula in effect on that date (*i.e.*, Prior GRS was "frozen" effective June 30, 2014). It is contemplated that the City, including the Department, will make contributions to Prior GRS through June 30, 2023 to fund the payment of benefits accrued prior to July 1, 2014, as modified. The Department will continue to make contributions designed to fund its allocable share of the UAAL of Prior GRS through the period ending June 30, 2023 as described in more detail below. After June 30, 2023, the City and the Department will be required to contribute all amounts necessary to fund the modified accrued pensions of members regardless of the actual investment performance of the assets of GRS. The City will make the contributions from its available cash and, during the ten-year period from July 1, 2023 through June 30, 2033, from approximately $188 million in proceeds from the Detroit Institute of Arts settlement and State contributions as described in the Plan of Adjustment (the "Outside Funding"). The City estimates that it will be required to contribute approximately $442 million from its available cash during this 10-year period.

The benefits accrued under Prior GRS are significantly underfunded. In particular, as of June 30, 2013, the GRS reported that it was 70.0% funded with a UAAL of $1.084 billion out of $3.609 billion in accrued liabilities based upon an assumed rate of return of 7.9% and the actuarial value of assets held by GRS smoothed over a seven year period. The City believes that the 7.9% investment return rate assumption utilized by GRS was too high and the seven-year smoothing period was too long, thus, that GRS' actual funding is significantly less than the 70%

reported by GRS. As part of the Plan of Adjustment, the City has developed the following approach to restructuring Prior GRS: (a) the City has set a goal of achieving by June 30, 2023 a 70% funded status for the benefits accrued under Prior GRS, based upon an assumed investment rate of return (net of expenses) of 6.75% (rather than 7.9%) and the actual market value of assets (rather than a smoothed actuarial value of assets); and (b) the City has determined that it is necessary to cut pension benefits under Prior GRS.

The provisions of the Plan of Adjustment relating to GRS contemplate that, during the period beginning July 1, 2014 and ending June 30, 2023, contributions of over $700 million will be made to GRS. These contributions include the Department contributions and a portion of $816 million in Outside Funding. Because GRS participants accepted the Plan of Adjustment and on the assumption that all of the Outside Funding is made available, the cuts in pension benefits under Prior GRS are anticipated to include (a) a 4.5% reduction in current and future monthly pension payments, (b) the elimination of all cost-of-living adjustments ("COLAs"), and (c) recoupment of excess earnings allocated to members' annuity savings fund accounts between 2003 and 2013.

The pension benefit reductions discussed in the preceding paragraph may be restored, in whole or in part, if the funding level of Prior GRS significantly improves (that is, Prior GRS achieves a funding level of 75% or more). This restoration may occur if (a) the investment returns on Prior GRS assets are greater than certain specified thresholds or (b) other actuarially-determined factors contribute to improve the funding level of Prior GRS.

**Implications of the Changes to Prior GRS for the Department**

The provisions of the Plan of Adjustment relating to GRS provide that the Department (including the Water Supply System and Sewage Disposal System) will contribute the currently-calculated full amount of its allocated UAAL on a market value of assets basis over a nine year period, plus $2.5 million per year in administrative expenses. That is, the total accrued liabilities of Prior GRS, as modified by the Plan of Adjustment, was determined, then the amount of such reduced, accrued liabilities allocable to the Department were calculated, and the Department will pay this amount to Prior GRS over the nine-year period ending June 30, 2023. The amount to be paid by the Department is the amount determined to be necessary to fully fund, by June 30, 2023, all unfunded Prior GRS liabilities allocable to the Department that accrued through June 30, 2014, based on current actuarial calculations. The calculation of the Department's allocated UAAL is based on the June 30, 2013 GRS census data, which reported the following GRS members allocated to the Department: 1,567 active members, 454 terminated vested members, and 2,568 retired members, surviving spouses and dependents in pay status. The amount to be paid by the Department was calculated based on an assumed investment rate of return of 6.75% and takes into account the freeze of accrued benefits under the Prior GRS pension formula as of June 30, 2014.

Based upon level annual payments for the nine Fiscal Years beginning on July 1, 2014 and ending on June 2023, the annual Department contributions to Prior GRS are $42.9 million per year. With the addition of the $2.5 million per year in administrative expenses, the resulting Prior GRS contribution is a total of $408.6 million for the entire nine year period for both the

Water Supply System and Sewage Disposal System. The Department will allocate these costs on a pro-rata basis between the Water Supply System and Sewage Disposal System. The Department historically has been expected to account for approximately 30 to 33% of the City's total contributions to GRS. The required Department funding for Prior GRS under the Plan of Adjustment represents a substantial reduction in the Department's funding contribution. Although the Department will fund its allocable share of this accrued liability over nine years instead of a longer period, it will not pay any more than its actual, full, allocable share of the UAAL of Prior GRS. The contributions by the Department to Prior GRS contemplated by the Plan of Adjustment will be paid from rates that the Department will charge users of its Water Supply System and Sewage Disposal System during the period through June 30, 2023. After the initial nine-year period through June 30, 2023 is completed and certain Outside Funding is received by GRS, the Department will remain responsible for its allocable share of UAAL of GRS but is expected to make very small contributions, if any, to the Prior GRS on account of this liability.

**Relevant Terms of Prior GRS**

Prior GRS is a defined benefit retirement plan with a defined contribution plan feature. Prior GRS provides retirement, disability and survivor benefits to Department employees or former employees and their beneficiaries. As noted above, Prior GRS was closed to employees hired or rehired on or after July 1, 2014. In addition, no employees will earn any benefits under Prior GRS for services performed or compensation earned after June 30, 2014. Prior to July 1, 2014, active members earned benefits under a formula based on final average compensation, service credit and a benefit multiplier. Prior to July 1, 2014, pension benefits for all members of Prior GRS were increased annually by a COLA or "escalator" equal to 2.25% of the original pension amount. Members may retire with full benefits after attaining 30 years of service (25 years for EMS members); age 55 with 30 years of service (if hired after January 1, 1996); age 60 with 10 years of service; or age 65 with 8 years of service. Employees may retire after 25 years of service (and attainment of age 55 for employees hired after 1995) and collect an actuarially reduced retirement benefit.

Prior GRS provides for City and Department contributions at actuarially determined rates that are designed to accumulate sufficient assets to pay accrued benefits under Prior GRS when due. The recommended City and Department contribution rates are determined annually by GRS' consulting actuary using the entry age normal actuarial cost funding method. Significant actuarial assumptions used to compute the City and Department contribution requirements are the same as those used to compute the UAAL. City employees were not required to make contributions to Prior GRS to help pay for their pensions.

In addition, City employees could elect to contribute (a) 0%, (b) 3% of annual compensation up to the Social Security wage base and 5% of any excess over the wage base, (c) 5%, or (d) 7% of their after-tax compensation to an annuity savings fund account ("ASF Account"). Contributions were voluntary for all union and nonunion employees. Effective as of July 1, 2014, ASF Accounts are credited with earnings at the rate of return earned on assets held in GRS; however, the earnings rate credited to a member's ASF Account for any year will not be less than 0% nor greater than 5.25%.

84

Prior GRS is a mature plan in that there are more members who are retired and receiving benefits than active employee members. As of June 30, 2013, there were approximately 5,364 active GRS members, 12,089 retired GRS members receiving benefits, and 2,395 terminated GRS members entitled to, but not yet receiving, benefits.

**Relevant Terms of New GRS in Effect on and after July 1, 2014**

New GRS is a defined benefit pension plan. New GRS provides retirement and survivor benefits to Department employees or former employees and their beneficiaries. Active members of New GRS earn benefits under a formula based on final average base compensation, service credit for employment on and after July 1, 2014 and a benefit multiplier of 1.5%. Members are vested upon completion of 10 years of service (service with the City prior to July 1, 2014 is taken into account for this purpose). Vested members may retire with full benefits upon attainment of age 62 (with a limited transition period for employees who were age 53 or older as of June 30, 2014). Employees may retire at age 55 with 30 years of service and collect an actuarially reduced retirement benefit. No disability benefits are provided to employees under New GRS. Survivor benefits are payable to a member's spouse or other beneficiary. For each Fiscal Year beginning July 1, 2018 and later, the New GRS pension benefits of retirees who are at least 62 years old and have been receiving benefits for at least 12 months may be increased by a 2% COLA on the original pension amount, provided that the funding level of New GRS projected over a five year period is 100% or greater.

For the nine-year period ending June 30, 2023, the Department will be required to contribute an amount equal to 5% of its employees' base pay to New GRS. Based upon the Fiscal Year 2014 base pay of Department employees, the Department's annual contribution is anticipated to be approximately $3.2 million. A portion of each Department contribution will be credited to a rate stabilization fund established under New GRS which is designed to be used in the event the projected funding level of New GRS falls below 100%. Employees are required to contribute 4% of their base pay on a pre-tax basis to New GRS to fund the cost of their pension benefits.

Employees also may elect to make after-tax voluntary employee contributions of (a) 0%, (b) 3%, (c) 5%, or (d) 7% of their total pay to New GRS. Those contributions will be credited with earnings at the rate of return earned on assets held in GRS; however, the earnings rate credited to a member's voluntary employee contribution account for any year will not be less than 0% nor greater than 5.25%.

The funding objective of New GRS is to establish and receive employer and employee contributions during each Fiscal Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of credited service rendered by employees during the year (the normal cost requirements), and to amortize the unfunded actuarial costs of benefits under New GRS likely to be paid on account of credited service rendered on or after July 1, 2014 and before the first day of the Fiscal Year (the UAAL). In the event the funding level of New GRS projected over a five year period falls below 100%, the 2% COLA described above will not be provided to retirees, the amounts credited to the rate stabilization fund will be used to increase the funding level of New GRS, and employee mandatory contributions will be increased from

85

4% of base pay to 5% of base pay. Additional actions designed to improve the funding status of New GRS are required if the projected funding level of New GRS falls below 80%. None of those steps would require the Department to make additional contributions to New GRS during the nine-year period ending June 30, 2023.

New GRS may not be amended by the City prior to July 1, 2023, other than as required to comply with (i) applicable federal law, or (ii) the Plan of Adjustment.

## PENSION-RELATED CERTIFICATES OF PARTICIPATION

The City funded certain UAAL of Prior GRS through creation of the Detroit General Retirement System Service Corporation (the "Service Corporation"). The City is a party to two Service Contracts, dated May 25, 2005 (the "2005 Service Contract") and June 7, 2006 (the "2006 Service Contract" and together with the 2005 Service Contract, the "Service Contracts"), with the Service Corporation. GRS is not a party to any of the Service Contracts.

In 2005, the Service Corporation created a funding trust, which issued Certificates of Participation (the "2005 COPs") evidencing undivided proportionate interests in the rights to receive certain payments to be made by the City under the 2005 Service Contract. A portion of the proceeds of the 2005 COPs was irrevocably paid to GRS, fully funding its UAAL at that time. In 2006, the Service Corporation created a new funding trust, which issued Certificates of Participation (the "2006 COPs" and, together with the 2005 COPs, the "COPs") evidencing undivided proportionate interests in the rights to receive certain payments to be made by the City under the 2006 Service Contract. A portion of the proceeds of the 2006 COPs was used to redeem certain outstanding 2005 COPs and to extend the amortization schedule for repayment of the UAAL obligations. The City also entered into certain interest rate exchange agreements (the "COP Swap Agreements") in conjunction with the issuance of the COPs.

Pursuant to the Service Contracts and the COP Swap Agreements, the City paid certain payments, service charges and other payments, excluding principal (collectively, the "Service Payments") to the Service Corporation. The Service Payments were calculated to be sufficient to allow the Service Corporation to make payments on the COPs. A proportionate share of the Service Payments, including those related to the COP Swap Agreements, was allocated to the Department. For Fiscal Years 2013 and 2014, the Department's share of the Service Payments was $6,945,171 and $5,321,518, respectively.

The Plan of Adjustment provides for the satisfaction in full of claims relating to the COPs in exchange for the receipt of notes denominated as the New B Notes. The definitive documentation governing the New B Notes will provide generally for the following terms:

- *Obligation*: The City's obligations with respect to the New B Notes will be a general and unsecured obligation of the City.

- *Initial Principal Amount*: $632.0 million.

- *Interest Rate*: 4.0% for the first 20 years; 6.0% for years 21-30.

- *Maturity*: 30 years.

- *Amortization*: Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance.

- *Disclosure*: The City will provide a continuing disclosure undertaking under 17 C.F.R. § 240.15c2-12 in connection with the delivery of the New B Notes.

As it relates to the Department, the New B Notes settle the COPs debt at a rate of 11.5%. The Department will be responsible for its allocable share of the New B Notes consistent with prior years' formulas for allocation of COP liabilities.

## OTHER POST-EMPLOYMENT BENEFITS

### Introduction

The City provides post-retirement health and death benefits – also known as OPEB benefits – to current and future retirees and their dependents. The City provides OPEB benefits under two umbrella plans – the Health and Life Insurance Benefit Plan (the "Health/Life Benefit Plan") and the City of Detroit Employee Benefit Plan, which operates and administers the Employee Supplemental Death Benefit Plan (the "Supplemental Plan" and, together with the Health/Life Benefit Plan, the "OPEB Plans").

The City's estimated aggregate liability relating to UAAL associated with the OPEB Plans is approximately $5.718 billion. This amount includes the present value of OPEB liabilities for active employees of the City not yet retired. The City and the Retiree Committee appointed by the Bankruptcy Court ("Retiree Committee") agreed that the allowed claim for the OPEB liability amount for former employees retired from the City and continuing to obtain retiree health and life insurance is approximately $4.303 billion. In the aggregate, 99.6% of the City's OPEB liabilities were unfunded as of the date its Bankruptcy Case was filed. As of June 30, 2011 (the date of the actuarial valuations used in the Fiscal Year 2012 and 2013 financial statements and for purposes of estimating OPEB), there were 19,389 retirees eligible to receive benefits under the City's OPEB Plans. The number of retirees receiving benefits from the City is expected to increase over time.

The City's OPEB liabilities are significant due to, among other things: (i) the fact that, prior to March 1, 2014, retirees could choose from 22 different plan options with varying structures and terms, which created a high level of complexity and cost in benefit administration; (ii) the extremely generous benefit features of the programs, especially for dependent coverage, which create high costs to the City on a per retiree basis; (iii) the fact that health care plans have no age restrictions and early vesting ages; and (iv) increases in health care costs, particularly hospitalization costs.

### Health/Life Benefit Plan

The Health/Life Benefit Plan is a single-employer defined benefit plan that provides hospitalization, dental care, vision care and life insurance to all officers and employees of the

City who were employed on the day preceding the effective date of the Health/Life Benefit Plan and who continue in the employ of the City on and after the effective date of the Health/Life Benefit Plan. Prior to the modification of retiree benefits effective March 1, 2014, retirees were allowed to enroll in any of the group plans offered by the City to active employees. The City provided health care coverage for substantially all retirees in accordance with terms set forth in union contracts.

General City employees hired before 1995 were eligible for health care benefits if they satisfied any of the following criteria for an unreduced normal retirement benefit: (i) 30 years of creditable service (or 25 years of creditable service for an EMS member), (ii) 10 years of creditable service and attainment of age 60 or (iii) 8 years of creditable service and attainment of age 65. The health care benefit eligibility conditions for general City employees hired on or after 1995 were: (i) 30 years of creditable service and attainment of age 55, 60 or 65, as applicable, (ii) 10 years of creditable service and attainment of age 55, 60 or 65, as applicable or (iii) 8 years of creditable service and attainment of age 55, 60 or 65, as applicable. The City provided full health care coverage to general City employees who retired prior to January 1, 1984 (except for a "Master Medical" benefit that was added on to the coverage after that date). The City paid up to 90% of health care coverage for employees who retired after January 1, 1984; however, for employees who retired between January 1, 1984 and June 30, 1994, the retiree share had been reduced by 50% by appropriations from City Council. The City also paid health coverage for an eligible retiree's spouse that was married to the retiree as of the date of retirement, under the same formulas noted above, as long as the retiree continued to receive a pension, and for dependents. Dental and vision coverage also were provided for retirees, spouses and dependents.

The City also provided health care coverage to general City employees that opted for early retirement. For general City employees hired before 1995, the health care benefit eligibility conditions were 25 years of creditable service; for employees hired after 1995, the health care benefit eligibility conditions were 25 years of creditable service and attainment of age 55. The coverage began when the retiree would have been eligible for normal retirement. The City paid up to 90% of health care coverage for the retiree and any eligible spouse. Dental and vision coverage were also provided for these retirees, their spouses and dependents.

The City also provided health care coverage at reduced rates to general City employees who met certain health care benefit eligibility conditions and retired under the "Deferred Retirement Benefits (Vested)," the "Death-in-Service Retirement Benefits Duty and Non-Duty Related" and the "Disability Retirement Benefits Duty and Non-Duty Related" programs. In addition, health care coverage was provided by the City for those retirees that were Medicare eligible. Retirees who opted out of the retiree health care coverage could obtain coverage at a later date.

In addition to health care coverage, the City allowed its retirees to continue life insurance coverage under the "Group Insurance Protection Plan" offered to active employees. The basic life insurance coverage for general City employees was based on the employee's basic annual earnings rounded to the next higher thousand dollars. The life insurance benefit amounts ranged from $3,750 to $12,500.

The Health/Life Benefit Plan was financed entirely on a "pay-as-you-go" basis and is 0% funded. As of June 30, 2011, the City had $5,718,286,228 in actuarial liabilities under the Health/Life Benefit Plan. The cost to the City on account of retiree benefits provided under the Health/Life Benefit Plan in Fiscal Year 2012 was $177,460,627. This contribution by the City was in addition to $23,516,879 contributed by retirees during Fiscal Year 2012.

**Supplemental Plan**

The Supplemental Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon the retiree's years of City service ranging from $1,860 (for 8 to 10 years of service) to $3,720 (for 30 years of service, with $93.00 per year added for each additional year of service beyond the 30th year). As of June 30, 2011, the City had $34,564,960 in actuarially accrued liabilities under the Supplemental Plan. As of July 18, 2013, the Supplemental Plan was 74.3% funded, with approximately $8.9 million in UAAL. In Fiscal Year 2012, the cost to the City on account of benefits provided under the Supplemental Plan was $131,116. This contribution by the City was in addition to $15,944 contributed by retirees during Fiscal Year 2012.

**Modification of Retiree Benefits**

Effective March 1, 2014, the City changed the health insurance coverage offered to retirees. As described in more detail below, the health benefits a retiree receives from the City effective March 1, 2014 depend upon whether the retiree is "Medicare eligible." Generally, a retiree is Medicare eligible if he or she is age 65 or older and has worked to earn Medicare coverage or has eligibility through a spouse. In addition, the City provided certain other benefits, effective as of March 1, 2014 through the remainder of the 2014 calendar year pursuant to the Retiree Health Care Settlement Agreement effective as of February 14, 2014 (the "Retiree Settlement Agreement") between the City, the Retiree Committee, the Detroit Retired City Employees Association, the Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees.

For coverage from March 1, 2014 through December 31, 2014, Medicare eligible retirees were able to select one of three Medicare Advantage insurance plans that included health and drug benefits for which the City pays most or all of the premium. Except for one of the Medicare Advantage Plan options (BCBSM Medicare Plus Blue PPO), the monthly premium cost to the Medicare eligible retiree was zero. These new options were available to all City retirees who were Medicare eligible. Pursuant to the Retiree Settlement Agreement, Medicare-eligible retirees who opted out of a City-sponsored Medicare Advantage Plan on or prior to February 7, 2014 were automatically enrolled in a City-sponsored Health Reimbursement Arrangement ("HRA"). The City provided each enrolled retiree with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties to the Retiree Settlement Agreement. In addition, retirees were provided an additional opportunity to opt out of a City-sponsored Medicare Advantage Plan after February 7, 2014 and before by June 20, 2014 and receive an HRA with credits for the months they were not covered under the City-sponsored Medicare Advantage Plan. If an individual was a Medicare eligible retiree, these were the only choices that the City offered for health coverage for 2014.

Effective March 1, 2014, non-Medicare eligible retirees were required to obtain their own health insurance coverage (for themselves, their spouses or their dependent family members). Under the Patient Protection and Affordable Care Act (the "Affordable Care Act"), Health Insurance Marketplaces – also known as "exchanges" – were to be made available in every state, including Michigan. Non-Medicare eligible retirees were permitted to enroll in and obtain an individual insurance policy to cover the retiree and his or her family from the Health Insurance Marketplace that served the state where the retiree lived. A non-Medicare eligible retiree also may have been eligible to enroll in coverage offered by their current employer or their spouse's employer. For most non-Medicare eligible retirees, effective March 1, 2014, the City agreed to provide a stipend of $125 per month ($300 or $400 per month for duty disabled non-Medicare retirees, depending upon whether the disabled person was a uniformed retiree). Eligible retirees were permitted to use this stipend for any purpose, including to defray the cost of premiums for health insurance coverage acquired through a Health Insurance Marketplace, through the retiree's or the retiree's spouse's employer or through other available health insurance programs.

Pursuant to the Retiree Settlement Agreement, the City agreed to (a) increase the $125 stipend by $50 (capped in the aggregate at $3,000,000) for certain eligible retirees who purchased coverage through a Health Insurance Marketplace and whose household income was $75,000 or less; (b) pay an additional $125 stipend (capped in the aggregate at $2,500,000) for certain eligible retirees whose spouse purchased coverage through a Health Insurance Marketplace and whose household income was $75,000 or less; (c) increase the stipend to $300 per month for non-Medicare eligible retirees age 65 or older; and (d) provide an increased stipend for retirees living in states that did not expand Medicaid whose household income is less than 100% of the federal poverty level. Under the Retiree Settlement Agreement, the City also agreed to make a Blue Cross Blue Shield of Michigan fully-insured group health plan available to Non-Medicare eligible retirees in 2014. The City agreed to provide a monthly stipend of $100 to each Retiree who enrolled in the City group plan, beginning with the May 1, 2014 payment. No other City subsidy or payment was available to a retiree enrolled in the City group plan unless either (a) the retiree qualified for a duty-disability stipend in which case he or she received the stipend available for duty-disabled retirees or (b) the retiree qualified for the $300 per month stipend available to non-Medicare eligible retirees who are age 65 and older, in which case he or she received the stipend available for such retirees.

The City no longer subsidizes dental and vision coverage, effective March 1, 2014, for any retirees. All retirees, regardless of age or Medicare eligibility, who wanted dental and vision coverage were required to pay the full cost of such coverage. The City offered Blue Cross Blue Shield of Michigan dental, Golden Dental, Inc. and two different Heritage Vision plan options. All other plan options were eliminated.

The revised coverages provided by the City will be in effect until December 31, 2014. The coverages added pursuant to the Retiree Settlement Agreement will be in effect through mid-2015.

**Citywide OPEB Settlement Under the Plan of Adjustment**

The Plan of Adjustment would settle all citywide OPEB claims. Under the Plan of Adjustment, from and after January 1, 2015, the City would no longer sponsor and maintain

retiree health or death benefits programs ("Retiree Welfare Benefits") for existing retirees (meaning individuals who retired on or before December 31, 2014) and their surviving beneficiaries, spouses and dependents. Instead, for these individuals who are GRS retirees ("VEBA Beneficiaries"), the City would establish a voluntary employees' beneficiary association ("Detroit General VEBA"). The City will establish a separate VEBA for PFRS retirees, with a separate funding source, which is not an obligation of the Department. The Detroit General VEBA would be a trust under the governance of a board of trustees that will be responsible for providing retiree health benefits beginning January 1, 2015 to VEBA Beneficiaries. On the effective date of the Plan of Adjustment, the City would provide the Detroit General VEBA with a portion of the New B Notes in the principal amount of $218 million. The Detroit General VEBA may also receive additional contributions from sources other than the City or the Department, including contingent additional distributions from the Disputed COP Claims Reserve, described in the Plan of Adjustment.

The Detroit General VEBA board of trustees would be responsible for, among other things, determining the level of and distributing Retiree Welfare Benefits to VEBA Beneficiaries. It is not anticipated that the funding will be sufficient to provide benefits at the same level of Retiree Welfare Benefits provided to GRS retirees and their beneficiaries during the period beginning March 2014.

**Implications of the Citywide OPEB Settlement for the Department**

The Department will be responsible for its allocable share of the portion of the New B Notes relating to settlement of OPEB claims, consistent with prior years' formulas for allocation of OPEB contributions on a pay-as-you-go basis. The 40 year projections indicate that the Department's total OPEB settlement payments, in the form of New B Notes, will be equal to $105 million. This represents a pro-rata share of the citywide settlement. If the City does not make the payments under the New B Notes, the Detroit General VEBA board of trustees will have the right to sue the City for payment.

**Other OPEB Liabilities**

As described above, under the Plan of Adjustment and effective as of January 1, 2015, the Detroit General VEBA is the sole source of Retiree Welfare Benefits for the VEBA Beneficiaries. Employees of the City and the Department who retire on or after January 1, 2015 may be eligible for Retiree Welfare Benefits, which benefits will be an obligation of the City and the Department. The terms of these benefits are the subject of ongoing negotiations between the City and various unions that represent City and Department employees.

## FEASIBILITY CONSULTANT'S REPORT

The Department has engaged The Foster Group, LLC to conduct an evaluation of the Water Supply System, including information about the financial feasibility of completing the CIP. A copy of the report (the "Feasibility Report") summarizing the findings of the Feasibility Consultant's evaluation is included as APPENDIX A. Set forth below are the Feasibility Consultant's findings and conclusions with respect to the financial feasibility of the potential 2014 DWSD Refinancing Bonds. The Feasibility Consultant's Report should be read in its

entirety for a complete understanding of the assumptions, considerations, estimates and calculations upon which these conclusions are based.

- The Department's current water rates are below the average of those in effect in comparably sized cities. While faced with additional capital expenditures to ensure reliability of service, the projected increases in the Department's water rates through 2019 are expected to be comparable to what will be experienced in other large metropolitan areas.

- In addition to the relatively low water rates, the Department's current wastewater rates are competitive with those in effect in comparably sized cities. The availability and price of wastewater treatment, coupled with the supply and price of water, should continue to be a positive factor in attracting and maintaining industry to the System's service area.

- The Department's financial plan is sound, supported by gradual rate increases, and is expected to be sufficient to adequately fund the CIP and other programs necessary to meet System obligations.

- The Department's current fiscal policies and plans are designed to result in continued improvements in the current financial position of the System, including reported debt service coverage and changes in net assets. Continued implementation of the optimization program, assisted by further implementation of the District Court Orders, should further enhance these policies.

- The revenues pledged as security for the potential 2014 DWSD Refinancing Bonds are projected to be sufficient to comply with rate covenants required by the Bond Ordinance and the targets established by Board of Water Commissioners policy.

- The requirements contained in the Bond Ordinance authorizing the issuance of the 2014 DWSD Refinancing Bonds will be met so long as after issuance of the 2014 DWSD Refinancing Bonds, it can be demonstrated that (compared with the debt service schedules in existence prior to the issuance of the 2014 DWSD Refinancing Bonds) savings will result in each Fiscal Year thereafter until maturity.

## SYSTEM EVALUATION REPORT

The Department has engaged Orchard, Hiltz & McCliment, Inc. (the "Engineering Advisor") to conduct an evaluation of the physical condition of the Water Supply System, determine whether the Water Supply System is being operated and maintained in a manner to achieve their operating goals, and determine if the CIP appropriately addresses identified rehabilitation and repair needs. A copy of the report (the "System Evaluation Report") summarizing the findings of the Engineering Advisor's evaluation is included as APPENDIX B. Set forth below are the Engineering Advisor's opinions with respect to the evaluation. The System Evaluation Report should be read in its entirety for a complete understanding of the assumptions, considerations, estimates and calculations upon which these opinions are based.

- The Department has been providing potable water of excellent quality to Southeast Michigan for many years. The observed quality by its customers is confirmed in the Annual Water Quality Report test data that shows all regulated contaminants are well below the maximum levels allowed. Most are at least one order of magnitude less than allowed.

- The current five-year CIP addresses the most critical needs in the Water Supply System observed during site visits.

- The conditions at the facilities were generally rated as good based on the site visits. This reflects significant investment at the facilities over the last 10-15 years.

- The Water Supply System has more capacity than required. The Master Plan Update has looked at a variety of alternatives to more effectively match the system resources to the needs. Based on the preliminary analyses, the Northeast Water Treatment Plant will be repurposed so that it remains as a booster pumping station and reservoir, but not as a water treatment plant. This will minimize the need for significant capital investment in rehabilitation or replacement of equipment that otherwise would have been necessary at the Northeast Water Treatment Plant.

- A number of capital improvement projects had been put on hold due to the available excess capacity, pending the evaluation of the alternatives in the Master Plan Update. With completion of the Phase 1 Interim Report, a number of projects are being proposed to move forward. The projects are generally smaller than past projections, and more focused on specific equipment replacement needs.

- The drop in usage was also observed on the site visits. Despite high temperatures, the percentage of pumps operating was low. This indicates that extra redundancy is available in the pump units than would typically be expected.

- The Department made significant improvements in making power supply reliable to water facilities, first during the Y2K event and then after the 2003 power blackout. It appears the Department is not better prepared for any power supply emergency supply scenarios.

- Due to a continuous reservoir rehabilitation program in place, the Department reservoir appears to be well maintained.

- The Department is invested in automation. All the booster stations and reservoirs are being operated remotely in an effective manner.

## LITIGATION

The Department has not been served with any litigation, and to the best of the Department's knowledge, there is no threatened litigation against the Department seeking to restrain or enjoin the tender offer, the potential sale of the 2014 DWSD Refinancing Bonds, affecting the security pledged therefor or questioning or affecting the validity of the proceedings or authority under which the 2014 DWSD Refinancing Bonds were issued. Neither the creation,

organization or existence of the Department, nor the title of any of the present members or other officers of the Department to their respective offices, is being contested. The Department has not been served with any litigation and, to the best of the Department's knowledge, there is no litigation threatened which in any manner questions the right of the Board of Water Commissioners to adopt the DWSD Resolution or any supplemental resolution or to secure the 2014 DWSD Refinancing Bonds in the manner provided in the DWSD Resolution and Act 94.

Except as noted in this section, the Department has not been served with any litigation which is expected to have a material impact on the Department's operations or revenues and, to the best of the Department's knowledge, there is no threatened litigation against the Department which is expected to have a material impact on the Department's operations or revenues. The Macomb Interceptor Drain Drainage District ("MIDDD") filed a lawsuit against the Department alleging breach of contract related to the Department's transfer of the Macomb Interceptor to MIDDD. After the City filed its Chapter 9 Bankruptcy Case, MIDDD filed a claim in the Bankruptcy Case, and has placed a value on this claim of $26 million. The Bankruptcy Court has determined that the claim shall be valued at $26 million for purposes of voting on the Plan of Adjustment only. [Docket No. 6162.] The City has objected to the allowance of this claim, and a hearing on such objection is scheduled for October 1, 2014. Prior to the filing of the Bankruptcy Case, the Department successfully defended a tort action by MIDDD based on similar facts.

Multiple appeals have been filed in *United States v. City of Detroit*. Most recently, the City filed a Notice of Appeal on May 22, 2013, challenging the District Court Orders and the Order of Dismissal (Appeal No. 13-1708). On July 30, 2013, the Court of Appeals for the Sixth Circuit issued an order holding the case in abeyance pending the City's Bankruptcy Case.

U.S. Bank National Association, as the DWSD Trustee, is currently withdrawing $300,000 per month from DWSD Indenture funds for extraordinary expenses related to the City's Chapter 9 proceeding. As of March 28, 2014, the DWSD had deducted a total of $2,300,000 from DWSD accounts in compensations for its and its counsel and advisor's fees and expenses. On April 4, 2014, the Department filed a Motion for Order, Pursuant to 11 U.S.C. § 105, Amending and Clarifying Fee Review Order Dated September 11, 2013 (the "Fee Review Order"), requesting that the Fee Review Order be amended to require that the fees and expenses of the DWSD Trustee, and its retained professionals be reviewed by the Fee Examiner and subject to the Fee Review Order. On May 29, 2014, the Bankruptcy Court entered its Order Amending and Clarifying Fee Review Order of September 11, 2013, declaring that the DWSD Trustee's fees and expenses are subject to the Fee Review Order. Furthermore, the DWSD Trustee and the Department must confer with the Fee Examiner to establish a procedure for the expeditious review of all fees billed to date.

On July 20, 2014, a group of Detroit residents, along with several non-profit organizations, filed a complaint in the Bankruptcy Court seeking declaratory and injunctive relief with respect to the billing and collection policies of the Department. The plaintiffs contend the policies relating to notice of bills, the manner in which payments may be made and remedies for collection of accounts, including termination of services, violate various provisions of the United States and State Constitutions and provisions of the Bankruptcy Code. The plaintiffs seek, among other things, an injunction preventing further termination of service until new constitutional policies are in place and a water affordability plan, under which charges for

Department services would be based on the income of the resident, is implemented. On July 30, 2014, an amended complaint was filed seeking essentially the same relief. Since this litigation has just commenced no response has been filed, but the Department strongly believes its policies are both legal and appropriate and intends to vigorously defend this lawsuit.

## RATINGS

**Rating Implications of Plan of Adjustment**

Prior to the City's filing of a Plan of Adjustment proposing the impairment of a portion of the DWSD Bonds, all of the DWSD Bonds were rated investment grade by Fitch Ratings ("Fitch"), Moody's Investor's Service ("Moody's") and Standard and Poor's Ratings Services ("S&P"). As of the date of this Disclosure Statement, Fitch, Moody's and S&P all have lowered their ratings of the DWSD Bonds to below investment grade as a result of the City's bankruptcy filing. In the event the Bankruptcy Court confirms the City's current Plan of Adjustment, including the current plan's provisions impairing the DWSD Bonds, the City anticipates that the rating agencies will take additional negative ratings actions, including imposition of a "D" rating or its equivalent on all impaired DWSD Bonds and an "SD" (selective default) rating or its equivalent on all other DWSD Bonds. There can be no assurance that any rating agency will agree to restore investment grade ratings to the Tender Bonds.

The table below shows a recent history of the ratings in effect for Senior Lien DWSD Bonds and Second Lien DWSD Bonds. Ratings reflect only the views of Fitch, Moody's and S&P and an explanation of the significance of such ratings may be obtained from Fitch, Moody's and S&P.

| | Senior Lien DWSD Bonds | | | Second Lien DWSD Bonds | | |
|---|---|---|---|---|---|---|
| At December 31 | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| 2010 | Aa3 | A+ | AA- | A1 | A | A+ |
| 2011 | A1 | A+ | A | A2 | A | A- |
| 2012 | Baa3 | A+ | A | Ba1 | A | A- |
| 2013 | B1 | BB- | BBB+ | B2 | BB- | BBB |
| Current | B1 | CCC | BB+ | B2 | CCC | BB |

**Potential for Distressed Exchange Ratings Treatment During Invitation Tender Offer Period**

The rating agencies may or may not apply their "distressed exchange" treatment to the ratings of the DWSD Bonds during the Invitation and Tender Offer Period. Such treatment, if applied, may result in a temporary reduction of the DWSD Bond ratings to a "DE" ("distressed exchange") or equivalent rating level for the duration of the Invitation's Tender Offer Period, until the tender offer has been consummated and potentially for a period of unknown duration thereafter. There can be no assurance that any rating agency will agree to restore investment grade ratings to the Tender Bonds.

**Ratings Requests to Restore Investment Grade Ratings on Outstanding DWSD Bonds and for the 2014 DWSD Refinancing Bonds**

In connection with the issuance of any 2014 DWSD Refinancing Bonds, the Department intends to request a restoration to investment grade levels of the ratings assigned by Fitch, Moody's and S&P to all of the Tender Bonds and the assignment of investment grade ratings to the 2014 DWSD Refinancing Bonds and, to that end, will provide certain information and materials to such rating agencies with respect to the 2014 DWSD Refinancing Bonds. There can be no assurance that any rating agency will agree to restore investment grade ratings to the Tender Bonds or assign ratings to the 2014 DWSD Refinancing Bonds or, if any or all agencies agree to assign such ratings, no prediction is made as to the level of such rating or ratings.

## DEALER MANAGER

The City has retained Citigroup Global Markets Inc. to act on its behalf as Dealer Manager for this Invitation. The City will pay the Dealer Manager a fee of $1.00 for each $1,000 principal amount of the Tender Bonds described in this Invitation. In addition, the City will pay the Dealer Manager its reasonable out-of-pocket costs and expenses relating to this Invitation. Any reference in this Invitation to the Dealer Manager is to Citigroup Global Markets Inc. in its capacity as the Dealer Manager.

The Dealer Manager may contact Bondholders of the Tender Bonds regarding this Invitation and may request brokers, dealers, custodian banks, depositories, trust companies and other nominees to forward this Invitation and the Other Tender Materials to beneficial owners of the Tender Bonds.

Citigroup Global Markets Inc. will also be acting as the senior managing underwriter of the 2014 DWSD Refinancing Bonds and will be paid an underwriting discount in its role as underwriter of the 2014 DWSD Refinancing Bonds.

The Dealer Manager or an affiliate thereof may, if necessary, purchase the 2014 DWSD Refinancing Bonds as interim financing bonds.

One or more affiliates of the Dealer Manager currently own $3,550,000 of the Tender Bonds which may be offered and purchased pursuant to the Invitation.

## FINANCIAL ADVISOR

First Southwest Company is acting as Financial Advisor (the "Financial Advisor") to the Department in connection with the Invitation. The Financial Advisor's fee for services rendered with respect to the Invitation is $197,500.

The Financial Advisor has provided the following statement for inclusion in this Disclosure Statement: The Financial Advisor has reviewed the information in this Disclosure Statement in accordance with, and as part of, its responsibilities to the Department, but the Financial Advisor does not guarantee the accuracy or completeness of such information.

**FINANCIAL CONSULTANT TO THE BOARD OF WATER COMMISSIONERS**

Ramirez & Co., Inc. is acting as the Financial Consultant to the Board of Water Commissioners in connection with the Invitation ("Board Financial Consultant"). The Board Financial Consultant's fee for services rendered with respect to the Invitation is $76,500.

**CONTINUING DISCLOSURE COMPLIANCE**

**Prior Continuing Disclosure Non-Compliance by the City**

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Water Supply System. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Water Supply System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010. The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013. The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013. The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Water Supply System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale in the secondary market of bonds issued by the City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof.

**The Department's Disclosure Dissemination Agent**

In order to provide continuing disclosure with respect to the 2014 DWSD Refinancing Bonds in accordance with the Rule, the Department has entered into a Disclosure Dissemination Agent Agreement ("Disclosure Dissemination Agreement") with Digital Assurance Certification, L.L.C. ("DAC"), under which the Department has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent the Department has provided such information to the Disclosure Dissemination Agent as required by the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the content of any disclosures or notice made pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Financial Information, Audited Financial Statements, notice of the occurrence of reportable events or voluntary disclosures, or any other information, disclosures or notices provided to it by the Department and shall not be deemed to be acting in any fiduciary capacity for the Department, the Bondholders or any other party. The Disclosure Dissemination Agent has no responsibility for the Department's failure to report to the Disclosure Dissemination Agent a Notice Event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the Department has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the Department at all times.

## OTHER MATTERS

The summaries and explanations herein of provisions of Act 94, other public acts of Michigan, and other materials are brief summaries of certain provisions thereof. Such summaries do not purport to be complete and reference is made to such instruments, documents and other materials for full and complete statements of the provisions thereof.

The information contained in this Disclosure Statement has been compiled or prepared from sources deemed to be reliable and, while not guaranteed as to completeness or accuracy, is believed to be correct as of this date. Any statements involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

The attached Appendices are an integral part of this Disclosure Statement and must be read in their entirety together with all of the foregoing information.

CITY OF DETROIT, MICHIGAN


By     /s/  Kevyn D. Orr
         Emergency Manager


DETROIT WATER AND SEWERAGE
DEPARTMENT


By     /s/  Sue F. McCormick
         Director