# EXHIBIT   4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                                  Honorable Sean F. Cox

City of Detroit, *et al.*,                          Case No. 77-71100

      Defendants.

_____/

**OPINION & ORDER
DENYING WITHOUT PREJUDICE
THE CITY OF DETROIT'S MOTION TO DISMISS**

The United States Environmental Protection Agency ("EPA") initiated this action in 1977

against the City of Detroit ("the City") and the Detroit Water and Sewerage Department (the

"DWSD"), alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("the Clean

Water Act").  The violations, which are undisputed, involve the DWSD's wastewater treatment

plant ("WWTP") and its National Pollutant Discharge Elimination System ("NPDES") permit.

      For the more than 34 years during which this action has been pending, the City and the

DWSD have remained in a recurring cycle wherein the DWSD is cited for serious violations of

its NPDES permit, the City and the DWSD agree to a detailed remedial plan aimed at

compliance, but the DWSD is unable to follow the plan and is again cited for the same or similar

violations.  Although this Court has taken various measures, designed to eliminate the various

impediments to compliance that have been identified by experts and acknowledged by the City,

those measures have proven inadequate to achieve sustained compliance.

1

Upon taking office in May of 2009, Mayor Dave Bing inherited these now institutionalized problems at the DWSD and this action.   Beginning in September 2009, the DWSD was again unable to maintain compliance with its NPDES permit and was again cited for violations by the Michigan Department of Environmental Quality ("DEQ").

From the outset of his involvement, Mayor Bing expressed a strong desire to bring the DWSD into compliance and end this litigation.   In January of this year, he appointed a highly-qualified Chief Operating Officer who assumed the position of acting Director of the DWSD. During the past nine months, progress has been made at the DWSD and at the WWTP.   In addition, the City has been diligently working with the DEQ to develop another plan for compliance and has been working with Oakland County, Wayne County and Macomb County to resolve longstanding issues regarding the DWSD.

On July 8, 2011, the City and the DEQ entered into an Administrative Consent Order ("the ACO"), aimed at achieving long-term compliance with the DWSD's NPDES permit and the Clean Water Act.   After the ACO was executed, the City filed the instant "Motion to Dismiss and for Relief from the Second Amended Consent Judgment."   In this motion, the City asks this Court to order that the requirements set forth in the ACO are substituted for the requirements of the Second Amended Consent Judgment, find that the DWSD has made substantial progress toward achieving full compliance with its NPDES permit and the Clean Water Act, and dismiss this case.

As explained below, although this case is now in its fourth decade, the Court must DENY the City's Motion to Dismiss.   Notably, *after* executing the ACO on July 8, 2011, the DWSD has self-reported serious violations of its NPDES permit to the DEQ.   Thus, the City has not

2

established that the DWSD has achieved even short-term compliance with the ACO and the Clean Water Act. Moreover, this Court concludes that the record in this case establishes that, unless more fundamental corrective measures are taken to address the institutional and bureaucratic barriers to compliance, sustained compliance with the Clean Water Act and the ACO will simply not occur.

Although the City has had ample opportunity to propose solutions to the root causes of noncompliance that were identified early on in this case, to date, it has not proposed or implemented a plan that has sufficiently addressed those root causes.

To be fair, the City has been constrained in the measures it has proposed or implemented to date because the City is bound by various provisions of the City's Charter and ordinances, and by existing contracts, that prevent the City from making fundamental changes in the identified problem areas. This Court, however, has broad equitable power to order any relief necessary to achieve compliance with the Clean Water Act and this Court *is not* constrained by the provisions of the City's Charter or ordinances. Nevertheless, this Court is mindful that remedies that override state or local law should be narrowly tailored and that, to the extent possible, local officials should at least have the opportunity to devise their own solutions to remedy a violation of federal law.

Accordingly, the Court shall ORDER the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and a member of the current Board of Water Commissioners (to be chosen by the Board) to meet and confer and, within 60 days of the date of this order, devise a plan to address the root causes of non-compliance that are discussed in this Opinion & Order. In doing so, they *shall not* be constrained by any local

3

Charter or ordinance provisions, or by the provisions of union or other contracts. If these local officials fail to devise and propose a workable solution to remedy the underlying causes of the serious and recurrent violations of the Clean Water Act in this case, this Court will directly order a more intrusive remedy.

## BACKGROUND

On July 25, 2011, the City filed its "Motion to Dismiss and for Relief from the Second Amended Consent Judgment." (D.E. No. 2365). The City notes that the DEQ and the DWSD recently entered into the ACO and asks this Court to order that the requirements set forth in that ACO are substituted for the requirements of the August 30, 2000 Second Amended Consent Judgment. The City also asserts that the DWSD has made substantial progress toward achieving full compliance with its NPDES permit and the Clean Water Act and, as a result, the Court should dismiss this action.

Thereafter, this Court held a Status Conference/Settlement Conference with the parties on July 28, 2011, to discuss the pending motion.

Because many of the facts relevant to the pending motion are undisputed, this Court instructed the parties to meet and confer in order to present the Court with a statement of stipulated facts. After having met and conferred, the City of Detroit, the Counties of Wayne, Oakland and Macomb, and the State of Michigan on behalf of the DEQ, jointly filed a statement of stipulated facts. (D.E. No. 2395). In addition, as to any facts upon which the parties did not agree, the parties were permitted to file proposed findings of fact. (*See* D.E. Nos. 2388 & 2383).

Responses to the City of Detroit's Motion to Dismiss were filed by Oakland County (D.E. No. 2374) and Macomb County (D.E. No. 2375) on August 8, 2011.

4

The City filed a Reply Brief on August 19, 2011. (D.E. No. 2390).

After the City filed its Motion to Dismiss, the Court requested that the DEQ provide information to the Court regarding the DWSD's compliance during the past three months. The DEQ provided that information to the Court on September 7, 2011.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having considered the facts stipulated to by the parties, the evidence submitted by the parties, and all matters of record in this action, and having applied the governing legal principles, the Court makes the following findings of fact[1] and conclusions of law.

### FINDINGS OF FACT

On May 6, 1977, the EPA initiated this case against the State of Michigan, the City, and the DWSD. The action was originally assigned to the Honorable John Feikens. The State of Michigan was realigned as a party plaintiff because of the mutuality of interest in the subject matter of this case. (Joint Stmt. of Stipulated Facts at ¶ 1). By Order dated June 29, 1977, Judge Feikens joined as parties the 17 governmental entities that received wholesale sewerage services from the DWSD pursuant to written contracts (the "First Tier Customers"). By Order dated July 6, 1977, Judge Feikens joined as parties all communities whose wastewater was treated by the DWSD pursuant to either First Tier Customer contracts with the DWSD or contracts between such First Tier Customers and their constituent community customers. (Joint Stmt. of Stipulated Facts at ¶¶ 7 & 8).

The EPA's May 6, 1977 Complaint alleged, among other things, that the discharged

---

[1] The stipulated facts from the parties' Joint Statement of Stipulated Facts, D.E. No. 2395, will be identified as such below.

effluent from the DWSD's WWTP was in violation of the federal Clean Water Act. (Joint Stmt. of Stipulated Facts at ¶ 2). The Complaint further alleged that: "the number of personnel employed [at the WWTP] has not been sufficient, personnel are not adequately trained, and purchasing of necessary and required supplies and equipment has not been timely or at an acceptable level . . ." (Joint Stmt. of Stipulated Facts at ¶ 3).

The DWSD provides wastewater collection, treatment and disposal services for Detroit and approximately 76 municipal suburban communities. The DWSD also provides water service to approximately four million people in Detroit and neighboring Southeast Michigan communities. (Joint Stmt. of Stipulated Facts at ¶ 4).

The DWSD was created, operates and is managed as a unitary department – i.e., its water and wastewater systems are commonly managed and operated under the same City of Detroit Charter ("the Charter") authority. (Joint Stmt. of Stipulated Facts at ¶ 5). The DWSD is a department of city government, although managed as a separate enterprise fund. (D.E. No. 2374-9, Wastewater Master Plan Vol. 4).

Pursuant to Section 6-405 of the Charter, "[u]pon request, the corporation counsel shall give legal advice or opinions to the mayor, a member of the city council or the head of any agency."

Pursuant to Section 7-1501 of the Charter, the entire unitary DWSD is headed by a seven member board of water commissioners ("the Board"). Section 7-1501 of the Charter further provides that the "[B]oard shall appoint, with the approval of the mayor, a director and deputy director for the department. The director and deputy director serve at the pleasure of the [B]oard." (Section 7-1501 of the Charter).

6

The Board also has the authority to establish water and sewerage rates charged by the DWSD to its customers and direct the supply of water, drainage and sewerage services within and outside the City, pursuant to Section 7-1502 of the Charter.  (Joint Stmt. of Stipulated Facts at ¶ 5; Section 7-1502 of the Charter).

Although the Charter vests the authority to establish water and sewerage rates charged by DWSD with the Board alone, because of M.C.L. § 117.5e, during this action the Detroit City Council has also been required to approve rates.

M.C.L. § 117.5e provides that a municipal water or sewage system "which serves more than 40% of the population of the state" shall "[h]old at least 1 public hearing at least 120 days before a proposed rate increase is scheduled to take effect" and that "[a] final vote by the governing body of the city to implement a proposed rate increase shall not be taken until the hearings provided for in this subdivision are concluded and the results of those hearings are considered by the city's governing body."  M.C.L. § 117.5e(b).

According to the most recent census data collected by the U.S. Census Bureau, the City's population declined during the past decade.  This Court has not been provided with evidence to establish whether or not the DWSD currently serves more than 40% of Michigan's population.  If it no longer serves more than 40% of Michigan's population, then M.C.L. § 117.5e does not require the Detroit City Council to approve rates charged by the DWSD.

The DWSD's nature and function as a unitary department manifests itself in many ways. For example, the majority of DWSD employees perform services for both the water and wastewater systems, including the critically important functions of Department management and administration, procurement and contract management.  Moreover, many DWSD resources and

7

facilities directly serve both the water and wastewater systems.  (Joint Stmt. of Stipulated Facts at ¶ 6).

On September 14, 1977, Judge Feikens entered a Consent Judgment (the "1977 Consent Judgment") establishing a compliance schedule for the DWSD to address and correct the Clean Water Act violations.  The 1977 Consent Judgment required, among other things, that the DWSD prepare and implement a staffing program detailing its manpower needs, repair and maintain certain dewatering equipment, and prepare and implement a procurement plan to ensure that necessary procurements of supplies, materials and equipment were made.  (Joint Stmt. of Stipulated Facts at ¶¶ 9 & 10; 1977 Consent Judgment, Appendix to Opin. & Order[2] No. 1, at §§ III. A, D and E).

Less than a year after the Consent Judgment was issued, however, it became clear to Judge Feikens "that compliance would not be achieved easily or quickly."  (*See* D.E. No. 1872 at 3).

In 1978, testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment.  On November 21, 1978, Judge Feikens entered an Order appointing Professor Jonathan W. Bulkley as Court Monitor in this action, ordering him to study the operations of the WWTP and report his findings to the Court, and make recommendations to facilitate compliance with the Consent Judgment.  (D.E. No. 366, Appendix to Opin. & Order No. 2).

---

[2]Because this action was commenced in 1977, many of the docket entries are not accessible on the Court's Case Management / Electronic Case Files ("CM/ECF") System.  This Court has created an Appendix of such materials and other documents submitted to the Court ("Appendix to Opin. & Order").

8

On December 29, 1978, Dr. Bulkley submitted a written report to the Court ("Dr. Bulkley's 1978 Report"). (D.E. No. 381, Appendix to Opin. & Order No. 3). Dr. Bulkley's 1978 Report stated that several activities at the DWSD were not in compliance with the requirements of the 1977 Consent Judgment, including: 1) staffing; and 2) procurement.

As to the area of staffing, Dr. Bulkley's 1978 Report stated: 1) "[T]he current judgment states that on or before July 1, 1978, Detroit shall procure and maintain all persons required to operate and maintain the existing treatment program. The city is not in compliance with this critical portion of the consent judgment."; 2) "[I]t is clear that major shortfalls have been experienced in terms of experienced personnel in the operations group at the wastewater treatment plant."; 3) "The City has consistently failed to respond in terms of adequate staffing."; 4) "It is imperative that the city take action to obtain qualified personnel to fill the present vacancies above the entry level positions."; 5) "In addition to chronic and severe understaffing, the management of the wastewater treatment plant has been seriously hampered by inefficient city personnel practices."; 6) "Extensive delays of five months or more have been experienced in filling vacant positions above the entry level."; 7) "Inadequate staffing at the Detroit wastewater treatment plant has been an identified problem for more than four years."; 8) "[C]ritical vacancies currently exist at all levels above the entry level position."; 9) "All of these staffing problems are going to be compounded as the facility attempts to achieve the higher plant performance required by the effluent limitations" that are "scheduled to become operational 1 January 1980." (*Id.* at 58-64).

As to the area of procurement, Dr. Bulkley's 1978 Report stated that "[i]n practice excessive delays have occurred in the processing of purchase requisitions for critical replacement

and/or repair parts." The report then gave a specific example of necessary parts not being received until almost six months after the initial requisition was written. (*Id*. at 82). It further explained: "The ineffective procurement system contributes to operational problems at the plant. For example, if a particular equipment item is inoperative and parts are ordered to repair it, the long delay before the requisition parts arrive may result in maintenance crews acting to cannibalize the inoperable unit for spares to keep other units working. Accordingly, once the initial requisition of parts arrives, the unit is still inoperative." (*Id*. at 83). Dr. Bulkley concluded that "[i]t is essential that the city devise, design, implement, and maintain procurement procedures which are responsive to the reality of keeping the wastewater treatment plant fully operational. These procurement procedures must provide for the acquisition of equipment, service, spare parts, and other items on a timely and efficient basis." (*Id*. at 84). Dr. Bulkley also stated that "[t]he fact that the city had to implement the provisions of SPECIAL FINANCE DIRECTIVE* dated November 22, 1978 demonstrates the severity of the prior procurement procedure." (*Id*. at 84). The report attached that directive, which authorized the Director of Purchasing to process requisitions by the DWSD on an emergency basis and waive the City's requirements for competitive bid processes. (*Id*. at Attachment 6). Dr. Bulkley recommended that "[t]he emergency purchase provision of services, equipment, and materials specified in this Directive [ ] be extended until more responsive and effective procurement policies are adopted and implemented." (*Id*. at 84).

On March 21, 1979, after reviewing Dr. Bulkley's 1978 Report, and after consideration of evidence presented by the parties, Judge Feikens issued an order appointing the current mayor of the City of Detroit, Coleman A. Young, as Special Administrator of the DWSD. (*See* D.E. No.

10

1848-3).

Judge Feikens created the position of Special Administrator because he found that compliance with the Consent Judgment the parties had negotiated required the exercise of the Court's equitable powers. (Joint Stmt. of Stipulated Facts at ¶ 13; D.E. No. 1872). His Order gave the Special Administrator very broad powers to take various actions that otherwise would have been prohibited by the Charter, including bypassing the Board and the Detroit City Council on, *inter alia*, matters relating to the procurement of materials and services that DWSD needed to comply with the 1977 Consent Judgment. (*Id.*).

After testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment, an Amended Consent Judgment was entered on April 23, 1980 (the "Amended Consent Judgment"), that modified the schedule for achieving compliance with effluent limitations for the WWTP set forth in the DWSD's NPDES Permit. (Joint Stmt. of Stipulated Facts at ¶ 11). The Amended Consent Judgment required, among other things, that the DWSD maintain all personnel required to operate and maintain the WWTP, maintain certain dewatering equipment and submit a plan for improving dewatering capacity, and procure all materials needed to comply with the Amended Consent Judgment. (Joint Stmt. of Stipulated Facts at ¶ 12; Amended Consent Judgment, Appendix to Opin. & Order No. 4, at §§ III. A and D).

On August 25, 1983, after Detroit had achieved compliance with certain requirements of the Amended Consent Judgment, the State of Michigan Water Resources Commission issued a new NPDES permit to the DWSD. On June 8, 1984, Judge Feikens entered an Order that took judicial notice of the DWSD's NPDES permit and terminated those Amended Consent Judgment

provisions that the DWSD had satisfied. That Order also identified the Amended Consent

Judgment provisions with which the DWSD was still required to comply and provided that the

Court retained jurisdiction to ensure full compliance with the Amended Consent Judgment.

(Joint Stmt. of Stipulated Facts at ¶ 14).

The Michigan Water Resources Commission reissued NPDES permits to the DWSD

effective February 1, 1990, and December 1, 1992, respectively.[3]  On July 1, 1997, the DEQ

reissued a NPDES permit to the DWSD and reissued permits to the DWSD in September 2003;

on September 28, 2007 (as modified on March 10, 2010); and modified the permit on June 28,

2011. (Joint Stmt. of Stipulated Facts at ¶ 15).

In 1994, the DWSD commissioned an operational and organizational review (the "OOR

Report") of the department. (Joint Stmt. of Stipulated Facts at ¶ 16). The resulting OOR Report

was provided to the DWSD on March 24, 1995. (OOR Report, Appendix A to D.E. No. 1649,

Appendix to Opin. & Order No. 5). "A multi-disciplined team of four firms was selected by the

DWSD to perform the [OOR]." (*Id.* at 1-1). The OOR Report found, among other things, that:

1) "the City's personnel and procurement system" have "helped shape the current DWSD

management problem."; 2) "The City's personnel system, procurement system, and general City

policies do not necessarily recognize the different management requirements of a utility

enterprise . . ."; 3) the "primary obstacles are associated with a personnel system that may not be

based on current job descriptions."; 4) "There is no method to evaluate employees for

---

[3]In 1995, the Governor of the State of Michigan created the Michigan Department of
Environmental Quality ("DEQ") and transferred all of the statutory powers, duties and functions
of the Michigan Department of Natural Resources relevant herein to DEQ. The name has
changed several times throughout the years. For ease of reference, this Department will be
referred to as DEQ throughout.

12

performance or advancement potential. The procurement system is not necessarily responsive to

the need for timely and quality procurement to meet regulatory and operational emergencies.

There is no strategic plan."; 5) "Administration of the procurement system within DWSD, in

combination with the City system, creates both delays and difficulties in securing equipment

needed to ensure both the water and wastewater systems function as required."; 6) "Equipment

and procedures acceptable to the City may not meet DWSD's basic regulatory compliance

needs."; and 7) "the utility neglects to continually invest in an adequate program of facility

maintenance and renewal . . .". (*Id.* at 1-4, 1-5, 1-6 & 3-4; *see also* Joint Stmt. of Stipulated

Facts at ¶ 16). The OOR Report's recommendations included: 1) "Revise and implement new

procurement procedures" and 2) "Develop and implement new staff selection, training and career

advancement personnel system with [City] Human Resources Staff." (*Id.*).

In 1997, the DWSD *again* fell out of compliance with its NPDES permit due to

insufficient dewatering capacity, and in August 1997, the DWSD reported certain violations of

its NPDES permit to DEQ. (Joint Stmt. of Stipulated Facts at ¶ 17). Thereafter, Judge Feikens

appointed a committee to investigate the cause of the renewed violations. (Joint Stmt. of

Stipulated Facts at ¶ 18; *see also* D.E. No. 1872, wherein Judge Feikens explained that he

"appointed a committee to investigate why, after so many years of court oversight, the [WWTP]

was not able to remain in compliance" with the Clean Water Act.). That committee consisted

of: 1) Dr. Bulkley, the Court Monitor; 2) Gary Fujita, the DWSD's Assistant Director; 3) Paul

Blakeslee, the DEQ's Chief of Field Operations - Surface Water Quality Division; 4)

Commissioner Marilyn Gosling, of the DWSD's Board of Water Commissioners; 5) Sarah Lile,

Director of the Department of Environmental Affairs for the City of Detroit; and 6) Frank Porta,

13

Senior Consultant with Water and Wastewater Utilities. (*See* D.E. No. 1649 at Section 14).

The court-appointed committee completed a report of the causes of the noncompliance in January 2000 (the "2000 Investigative Report"). (Joint Stmt. of Stipulated Facts at ¶ 18; D.E. No. 1649, Appendix to Opin. & Order No. 6).

The 2000 Investigative Report noted the severity and on-going nature of the DWSD's renewed violations:

> From August 1997 through March 1999, the DWSD's [WWTP] was in violation of suspended solids and related effluent limitations specified in its NPDES discharge permit, No. MI 0022802. These violations were caused by the inability of the WWTP to remove and dispose of sewage solids (termed "solids") in the incoming wastewater from its service area as well as solids contained in the recycle flows from treatment processes within the WWTP. The WWTP was unable to remove solids at a sustained rate equivalent to the rate solids were being concentrated and produced by the primary and secondary wastewater treatment processes. The failure to adequately remove these solids caused an over accumulation (back up) of solids in wastewater treatment plan processes. Ultimately, this accumulation of solids became so great that it was relieved via the plant's effluent outfalls to the receiving waters. This resulted in excessive concentration of the solids in the plant's effluent on an *on-going basis* that *significantly exceeded* permitted discharge limits and *violated the City's NPDES Permit during the period of August 1997 through March 1999.*

(*Id.* at Section 1, page 1) (emphasis added).

The 2000 Investigative Report found that DWSD leadership failed to take action, over a period of years, to avoid the violations, even though it was aware of numerous issues that if left unresolved would eventually result in violations of the NPDES permit. (Joint Stmt. of Stipulated Facts at ¶ 19). It concluded that the "techinical deficiencies [with dewatering equipment] and operating conditions at the plant level were caused by the deficiencies and ineffectiveness of four major DWSD and City Programs." (*Id.*) (quoting D.E. No. 1649 at 1). These programs were capital improvements, finance, purchasing and materials management, and human resources.

14

The Report noted that the human resources issues included a "chronic inability to adequately staff the skilled trades, engineers and other professional personnel" and a "failure to provide adequate programs for training, career development and succession planning." (Joint Stmt. of Stipulated Facts at ¶ 19) (quoting D.E. No. 1649). The Report noted that these failures were "symptoms of two institutional causes in areas of management and leadership and policy." The 2000 Investigative Report found, among other things, the following causes of the NPDES violations: "failure to replace aged and deteriorated sludge dewatering facilities," "failure to adequately maintain sewage solids dewatering equipment," and "inability to remove solids." It also attributed the problems, in part, to City processes and procedures: "The City's purchasing process[es] . . . are not executed timely and result in delays;" "Lack of staffing in the City's staff departments contributes to delays in provision of essential support services;" and "The City's personnel policies restrict the compensation, recruitment and prompt hiring of needed personnel to the City's norm versus what is needed to operate and maintain compliant operations and facilities." (Joint Stmt. of Stipulated Facts at ¶ 19) (quoting D.E. No. 1649).

The 2000 Investigative Report noted that "*[o]nly through actions taken by operations personnel that bypassed the impediments created by the City and DWSD policies and procedures for the procurement of materials and supplies has the plant returned to compliance.* If these extraordinary (and costly) stop-gap measures had not been taken, the WWTP would have remained in violation of its NPDES permit." (D.E. No. 1649, Section 1 at 4) (emphasis added). It further stated that "[t]his recovery may be short lived unless timely and decisive actions can be taken to fully support plant operations, and prioritize the responsibility to sustain compliance with the City's NPDES permit." (*Id.*).

15

The City of Detroit filed a written response to the 2000 Investigative Report.  (D.E. No.

1650).  Among other things, the City of Detroit stated that "[t]he report correctly identified

purchasing as a significant cause of violations at the Wastewater Treatment Plant."  (*Id.* at 10).

The City, in its conclusion section of the response, suggested that another appointment of a

Special Administrator for the DWSD was needed to achieve short-term compliance:

> It is the mission of the City of Detroit to operate and maintain its
> wastewater treatment plant in compliance with all applicable state and federal
> laws including the Amended Consent Judgment and its NPDES permits for the
> benefit of the public in general and specifically for the benefit of the customers
> which it serves, both inside and outside of the City of Detroit.  To that end, the
> Mayor of the City of Detroit, the Honorable Dennis Archer, has agreed, in the
> short term, to be appointed the Administrator of Operations of the [DWSD]
> should the Court decide to do so.
>     DWSD believes that the appointment of an Administrator of Operations
> empowered to manage, control and direct the procurement of all goods and
> services, the hiring, compensation and firing of personnel, entering into contracts,
> payment for services and the collection of receivables, and to do all things
> necessary to accomplish the same, would provide a short-term solution to
> contracting, purchasing and personnel issues.

(*Id.* at 24).

In light of the 2000 Investigative Report, Judge Feikens expressed concern about the

possibility of "renewed non-compliance," and as a result, the authority of the Special

Administrator was again delegated to the current mayor of the City of Detroit.  On February 7,

2000, with the consent of both DEQ and the City, Judge Feikens entered an Order appointing

Mayor Dennis Archer as Special Administrator.  (Joint Stmt. of Stipulated Facts at ¶ 20; D.E.

No. 1848-4 at 4).  In that order, Judge Feikens stated that "[t]he *nearly two-year period of non-*

*compliance as well as the prospect of renewed non-compliance, unless the causes of non-*

*compliance are corrected, presents a serious health, safety, and environmental risk* to the people

16

of Southeastern Michigan." (*Id.* at 3) (emphasis added). The Order stated that the actions that

had been taken by the City of Detroit "do not address the causes of non-compliance, and cannot

be sustained to provide reliable, compliant operation of the WWTP." (*Id.*). The Order appointed

Mayor Archer as "Special Administrator of the Detroit WWTP for the purposes of correcting the

causes of non-compliance as found by the Committee and the purposes of achieving long-term,

sustained compliance with the NPDES permit" and gave him broad powers over the DWSD:

> The Special Administrator, or his designee, the Chief Operations Officer, shall
> have full power and authority to control, manage, and operate the WWTP,
> including all functions and powers of the Detroit City Council, the Detroit Board
> of Water Commissioners, the DWSD, and any other departments, boards, or
> divisions of the City of Detroit to the extent that they affect the ability of the
> Special Administrator to meet the requirements of sustained compliance with the
> NPDES permit, the Supplemental Consent Judgment to be entered in this case, or
> the specific responsibilities of the Special Administrator outlined below.

(*Id.* at 4). The Order then outlined various responsibilities of the Special Administrator,

including:

> G.     Human Resources
>    1.     The Special Administrator, or his designee, the Chief Operations
>           Officer is required to carry out the programs hereinafter set forth:
>       a.     Training:
>          i.     Perform an assessment of training needs to update
>                 the training curriculum.
>          ii.    Require WWTP training staff to train WWTP
>                 personnel exclusively.
>       b.     Hiring:
>          i.     Revisit existing union contracts and civil service
>                 rules so that people outside the civil service system
>                 are able to compete with those inside the system for
>                 advanced positions.
>          ii.    Shorten turn-around time on hiring decisions.
>       c.     Compensation:
>          i.     Implement the following recommendations:

17

a.   Rewrite job descriptions to make them compatible with those that exist in external job markets, i.e., both private and public;

b.   Undertake a total compensation study;

c.   Review existing union contracts and civil service rules and develop recommendations to make compensation and compensation increases similar to those that exist in the external market, including the use of performance evaluations in granting merit pay increases;

d.   Develop a methodology so that compensation stays competitive with the external market after the Special Administrator's tenure ends and after other compensation reforms are implemented;

e.   Develop recruiting strategies to attract employees from outside the civil service.

(*Id.* at 8-9).

On August 30, 2000, Judge Feikens entered a Second Amended Consent Judgment ("SACJ") that set forth yet another compliance schedule for the DWSD to address and correct the NPDES permit violations.  (Joint Stmt. of Stipulated Facts at ¶ 21; SACJ, D.E. No. 1688).  The SACJ incorporated by reference the Order Appointing Special Administrator and "supplant[ed] and superced[ed] the Amended Consent Judgment entered on April 25, 1980." (Joint Stmt. of Stipulated Facts at ¶ 21; D.E. No. 1688 at 13).

In December 2001, Judge Feikens entered an Order transferring authority of the Special Administrator to the newly elected mayor, Kwame Kilpatrick, effective January 1, 2002, noting that the position of Special Administrator had been created to prevent future violations of the DWSD's NPDES permit.  (Joint Stmt. of Stipulated Facts at ¶ 22; D.E. No. 1848-5).

By virtue of an Order issued on November 25, 2002, the Court ordered that the consulting firm Infrastructure Management Group, Inc. ("IMG"), selected by then-current DWSD Director

18

Victor Mercado, be retained by the DWSD to review contracts over the amount of $500,000.00. (D.E. No. 1742).  IMG's contracts were renewed by various court orders issued by Judge Feikens such that it performed those services from November 2002 through November 2010.  (*See, e.g.,* D.E. Nos. 1742 and 2308).

On September 26, 2005, Oakland County filed a "Motion To Replace DWSD's Court-Appointed Special Administrator, Mayor Kwame Kilpatrick, With A Joint Management Committee."  (D.E. No. 1848).  In an Opinion & Order entered on January 5, 2006, Judge Feikens terminated the Order appointing Mayor Kilpatrick as Special Administrator, concluding that the DWSD's record of compliance had improved in the last few years, and denied Oakland County's motion.  (D.E. No. 1872).

His belief that progress was being made, however, did not last long.  On May 2, 2008, Judge Feikens issued an "Order For Briefing Regarding Compliance."  (D.E. No. 2122).  The opening paragraph of that order explained:

> I am deeply concerned about the ability of the [DWSD] to sustain compliance. DWSD has a long history in this case of periods of remarkable progress and compliance, which have unfortunately often been followed by permit violations and amendments to the consent judgment to address the causes of that non-compliance.  As described below, I am concerned that history is about to repeat itself, and require briefing from the City of Detroit [ ] and the DWSD regarding a plan for addressing a number of issues that pose a real threat to continued compliance in the near future.

(*Id.* at 1-2).  In discussing his concerns, Judge Feikens noted that "[o]ne programmatic cause of failure identified by the Committee was the capital improvement program.  The Committee found the failure to replace aged and deteriorated capital equipment and to maintain solids dewatering facilities led to a failure to sustain compliance with the NPDES permit.  (Report at

19

1.).  In the monthly oversight meetings, the Director [of the DWSD] has repeatedly informed me

of his attempts to gain approval of the rates that support in part the capital improvement

programs.  To date, these attempts have not been successful."  Judge Feikens noted that failure to

approve rates adequate to fund necessary projects puts compliance at risk.  (*Id.* at 4).

Judge Feikens also stated that "Human resources is the greatest area of current concern in

terms of sustaining compliance."  (*Id.* at 5).  He noted:

> A recent study undertaken at my direction by [IMG] found that eight
> percent of the current management and lead operations positions at the WWTP are
> vacant, and 79 percent of the current staff in those positions will be eligible to
> retire with full pension benefits by the end of 2009.  The current WWTP
> operations staff eligible to retire with full retirement benefits rises to 83 percent by
> 2012.  The problem extends through the mid-level positions in WWTP operations,
> where 73 percent of the positions are filled by someone eligible to retire with full
> benefits in 2009 – and that number increases to 81 percent by 2012.
> There is a similar crisis brewing with the WWTP maintenance staff. Of the
> management and lead maintenance positions at the WWTP, 25 percent are
> currently vacant, and 100 percent of the current staff in those positions will be
> eligible to retire with full benefits by the end of 2009.  The senior maintenance
> staff ranks are facing a similar situation: 36 percent of the positions are currently
> vacant, and 63 percent of the current staff in those positions are eligible for full
> retirement benefits in 2009- the percentage increased to 88 percent by 2012.
> This problem is compounded by the fact that, as reported by [IMG], DWSD pays
> significantly below-market rates for a vast swath of positions.  Since the WWTP
> is the biggest facility of its kind in the county, and thus demands more than usual
> from its staff, this is especially glaring . . . Therefore, there is ample reason to
> believe that a wave of retirements will result in vacancies in positions that are
> vital to compliance.  Moreover, the current personnel levels and salaries assume
> the rates cover the costs of service.  Failure to adequately support the costs of
> providing the service through appropriate rate levels may very well exacerbate the
> personnel crisis that is brewing.

(*Id.* at 5-6).  Judge Feikens further stated:

> Next year will clearly be one that is incredibly challenging for DWSD: in 2009,
> approximately three-quarters or more of the upper and mid-level staff of the

WWTP will be gone or eligible to retire with a full pension, and any increased
failure to pass rate increases will likely start to impact compliance-mandated
projects. The Director of DWSD's contract also expires at the end of 2009. This
Court has concern, therefore, that just at the point that DWSD is facing financial
and human resource crises that are likely to have a negative impact on compliance
(as they have in the past), the experienced leadership needed to handle these
issues may not be present.

(*Id.* at 7). Judge Feikens ordered the City/DWSD to respond to the above concerns in writing

and further stated that "[s]uch briefing must go beyond the boilerplate language of the quarterly

progress reports" that the DWSD had been submitting to the Court. (*Id.* at 7).

In responding to that May 2, 2008 Order, the City stated that it had retained IMG to

prepare a report addressing various issues. (D.E. No. 2130). That report from IMG, titled

"DWSD Succession Plan Final Report, November 30, 2007," was attached as Exhibit A to the

City's brief. (D.E. No. 2130-3). Notably, in that report, IMG repeated its finding that it had

reported to Judge Feikens during the past year:

The physical improvements at the wastewater treatment plant and CSO stations,
which were required under Section II of the SACJ and identified as the remedies
to address and eliminate the technical causes of non-compliance in the
Committee's report, have either been completed or have been initiated and are
expected to be satisfactorily completed.

Other remedies that are more people related or that involve organizational and
governance issues continue to be troublesome and could possibly *jeopardize
sustained compliance.* Staffing elements including hiring, career development,
succession planning, and compensation remain partially unresolved. *Little has
been achieved in some of these areas due to the City of Detroit personnel
practices, bargaining unit agreements and civil service constraints.*

(*Id.* at 2) (emphasis added). IMG further stated that these "systemic problems" "need to be

addressed in the long term." (*Id.*).

21

The report found several problems in terms of human resources and staffing. IMG noted that there is "an alarmingly low number of certified operators for the size and complexity of the DWSD wastewater treatment plant, which is one of the largest wastewater treatment plants in the country." (*Id.* at 8). It also found that civil service rules and union rules and agreements compound the problems with recruiting and retaining qualified staff. (*Id.* at 10-11). It stated that "[i]n terms of governance, City Council maintains control over all employment matters. All employees of DWSD, with the exception of the Director and Deputy Director, fall under the City of Detroit Civil Service. Job descriptions, pay rates and classifications are all subject to input and approval by the Civil Service Commission (CSC)," and "[a]ny changes to job descriptions must also be reviewed by unions." (*Id.*) Because of these constraints, the DWSD has "limited control over who gets hired, what they get paid and job classification revisions."

The recommendations made in IMG's report included:

7. **Consider creating an independent DWSD HR Department**
It does not appear that the city HR department can adequately address the unique needs of DWSD. Water and wastewater utility workforce requirements may be better served by a dedicated department that would provide recruiting and workforce training.

(D.E. No. 2130-3 at 17) (emphasis in original). As to this recommendation made in IMG's November 30, 2007 report, the City of Detroit's May 23, 2008 brief stated that the "DWSD has discussed this option with the Mayor's office, which is reviewing it." (D.E. No. 2130 at 4). The City's brief also stated that the Mayor would appoint an interim Director of DWSD and would "initiate a national search for a qualified, permanent Director of DWSD." (*Id.* at 9).

The recommendations by IMG also included restructuring numerous civil service classifications at the DWSD. The report explained: "Many of the current job descriptions are

22

outdated, and do not reflect the current or future skills needs of DWSD" and that IMG recommended that the "job descriptions and qualifications" for 17 different types of job positions within the DWSD be redeveloped. (D.E. No. 2130-3 at 15). As to this recommendation made in IMG's November 30, 2007 report, the City of Detroit's May 23, 2008 brief stated that the DWSD Director had "forwarded two requests to the City of Detroit's Human Resources Department to create new job classifications" and that the "City of Detroit's Human Resources Department is reviewing DWSD's requests." (D.E. No. 2130 at 4).

The last time that the DWSD had a permanent Director was on June 30, 2008. (Joint Stmt. of Stipulated Facts at ¶ 48).

In May 2009, Oakland, Wayne, and Macomb Counties (the "Counties") and the City of Detroit agreed to a "global settlement" ("Global Settlement") that was intended to resolve many outstanding issues and legal claims. Among other things, the Global Settlement resolved: a) the Counties' claims with respect to the utilization of DWSD funds for the purchase and acquisition of the 800 MHZ Radio Communication System; b) the Macomb sewer collapse; c) certain sewer rate issues; and d) certain objections raised by the Counties regarding the contract procurement process of DWSD. (Joint Stmt. of Stipulated Facts at ¶ 25; Global Settlement, D.E. No. 2219).

As Judge Feikens had predicted, however, 2009 proved to be a difficult year for the DWSD and it again fell out of compliance.

In September 2009, the DWSD fell out of compliance with its NPDES permit. (Joint Stmt. of Stipulated Facts at ¶ 26). On November 12, 2009, DEQ issued a Notice of Violation to the DWSD for NPDES permit violations for exceeding the limits for discharge of Total Suspended Solids ("TSS") in the months of September and October 2009. (Joint Stmt. of

Stipulated Facts at ¶ 27).  In a certified letter to the DWSD's Director dated December 2, 2009,

the DEQ noted additional concerns and additional violations for the month of November.  (Joint

Stmt. of Stipulated Facts at ¶ 28).

Upon receipt of the December 2, 2009 Certified Letter, Judge Feikens requested that Dr.

Bulkley, the Court's appointed Monitor, investigate the renewed NPDES violations and report to

the Court.  (Joint Stmt. of Stipulated Facts at ¶ 29).

On April 14, 2010, DEQ issued a Second Notice of Violation to the DWSD which

alleged that the violations identified in the November 12, 2009 Violation were continuing: "Key

Indicator Reports submitted by DWSD indicate that, despite an increase in reported dewatering

capacity, solids inventories have increased since the Violation Notice was issued and currently

stand at roughly four times the desired amount."  (Joint Stmt. of Stipulated Facts at ¶ 30).  It

further stated that "the DWSD's inability to remove solids from the treatment process at a rate

that ensured proper operations and compliance with NPDES permit effluent limits is the same

issue that caused the violations that resulted in the need for the SAJC [Second Amended Consent

Judgment entered August 3, 2000]."  (Joint Stmt. of Stipulated Facts at ¶ 31) (Second Violation

Notice dated 4/14/10, Appendix to Opin. & Order No. 7).

On June 15, 2010, Dr. Bulkley provided a written report to the Court (the "2010 Bulkley

Report").  (D.E. No. 2296).  In that report, Dr. Bulkley stated that "DWSD has been cited for

significant violations for seven consecutive months (September, 2009 – March, 2010).  Most of

the violations relate to Total Suspended Solids, but exceedances have also been reported for

Mercury and PCB."  (Joint Stmt. of Stipulated Facts at ¶ 32) (quoting D.E. No. 2296 at 2).  Dr.

Bulkley further stated "[i]t is apparent that the current permit violations are similar to the

24

problems that have occurred since the issuance of the original Consent Judgment in 1977."

(Joint Stmt. of Stipulated Facts at ¶ 33) (quoting D.E. No. 2296 at 4).  He continued by stating

that "[t]he nine (9) causes identified in the January 12, 2000 Report of the Committee of

Investigation are very similar to certain of the issues that appear to be contributing to the current

Total Suspended Solids NDPES violations from the DWSD's wastewater treatment plant." (*Id.*).

As such, Dr. Bulkley attached a copy of the 2000 Investigative Report – which found serious

problems with human resources, capital improvement, and purchasing in 2000 – to his 2010

report.  The 2010 Bulkley Report concluded "[t]he changes implemented in 2000 were

apparently *insufficient to maintain compliance over the long term*, as evidence by the recurring

solids build up problem and the related permit violations. *It may be appropriate to consider*

*more fundamental corrective measures to address the institutional problems which are adversely*

*impacting the performance of DWSD's wastewater treatment plant.*"  (D.E. No. 2296) (emphasis

added).

　　　Following the renewed violations in 2009, the Engineering Society of Detroit was asked

to assess and identify immediate emergency corrective steps and a sustainable, long-term

remediation strategy for the DWSD.  On July 26, 2010, its written report, the "Engineering

Society of Detroit Consensus Action Report Detroit Water & Sewerage Department Waste Water

Treatment Plant: The Road To Compliance And Beyond" (the "Consensus Action Report") was

submitted to the City.  (Appendix to Opin. & Order No. 8).  The Consensus Action Report was

also provided to the Court, and to the DEQ, by the City. (*Id.* at 1).  It noted continuing problems

with the City's practices, as they relate to the DWSD, in the areas of human resources and

purchasing.

The Consensus Action Report stated "[a] critical problem facing DWSD and WWTP is lack of sufficient qualified personnel" and that this "stark reality" drives home the importance of human resources. (*Id.* at 7). Nevertheless, it found serious problems with existing human resources services provided to the DWSD, stating that the City of Detroit's Human Resources Department "has provided inconsistent or nonexistent services to DWSD in the past." (*Id.* at 8). It stated that there "is little, if any, on going training of plant supervision personnel" and "[t]here is no succession planning for plant supervision personnel." (*Id.* at 7). Further addressing human resources problems, it stated:

> Faced with its own staff reduction of over 34%, Human Resources fully understands the challenges. The current process barriers driven by real or perceived *requirements due to city ordinances, civil service rules and procedures, requisition practices and collection bargaining agreements have impacted the ability of the Human Resources Department to fill the personnel needs of DWSD and WWTP.* Workings between DWSD and HR are bureaucratic in nature and the process challenges each face in carrying out their responsibilities with the other have not been fully shared. Each has legitimate reasons why the process has not been successful, but joint problem-solving efforts have not yet occurred.
>
> Putting any fault assessment aside, the lack of an effective succession planning process has again resulted in workarounds that increase the risk of noncompliance due to lack of qualified personnel.

(*Id.* at 8) (emphasis added).

In addressing practices in purchasing, the Consensus Action Report noted "[t]he often needless labyrinth of process and procedures required to award a significant contract." (*Id.* at 9). It further stated, "[i]n a word, the City's Purchasing Department was in the dark, after the fact and out of the loop regarding much of DWSD's purchasing activities leading to formalistic and bureaucratic procedures that treated symptoms and not causes." (*Id.*). It further stated that "bidding procedures introduce problems, as well. There are significant difficulties in obtaining

26

clearances and certifications, and the number of levels of management approval needlessly

burdens the process.  What appeared missing was a management communication and process

linkage that could address the inefficiencies and hurdles to the timely and cost-effective purchase

of the staffing, parts and capital needs of DWSD and WWTP." (*Id.*).  It further stated:

> All of this is compounded by the overarching approval process relating to
> purchases over $25,000.  Essential DWSD purchases often exceed this amount.
> The process requirement sometimes results in over 17 steps with a resulting 6- to
> 12-month delay in the delivery of goods and services.  The sequential processing
> of contracts with original documents transferred from office to office exacerbates
> this condition.  With the likelihood that a part or piece of equipment over $25,000
> would fail at any time and shut down WWTP, it is no wonder that outsourcing
> under approved existing subcontracts has become the rule instead of the
> exception.  And, ironically, despite this dollar approval limitation, no WWTP
> purchasing request has, at least in collective recent memory of plant personnel,
> ever been rejected.

(*Id.* at 9) (emphasis added).  The Consensus Action Report also explained how these flawed

purchasing processes adversely impact operations at the WWTP:

> Aging filter belt presses, centrifuges, conveyor belts and incineration equipment
> result in 350 to 400 new maintenance work orders each week.  Staff can only
> complete approximately 50% of these work orders, often due to lack of parts.  As
> a result, little maintenance work is routine or without risk of adverse
> consequences to operations.

(*Id.* at 7).

In response to the Second Notice of Violation dated April 14, 2010, on September 15,

2010, the DWSD filed a Corrective Action Plan ("CAP") dated August 31, 2010, which

represented its "Roadmap for sustainable compliance."  (Joint Stmt. of Stipulated Facts at ¶ 35)

(quoting D.E. No. 2309 at 7).  In connection with the development of the CAP, the DWSD

undertook an "in-depth examination of the root causes that contributed to the solids violations in

27

the DEQ Second Notice of Violation" and "identified the steps necessary to achieve

compliance." (Joint Stmt. of Stipulated Facts at ¶ 35) (quoting D.E. No. 2309 at 7).  The

DWSD's CAP identified, as causes of the current violations, problems that had been identified as

the causes of the previous violations in 1997.  Among the causes identified in the CAP were:

failed maintenance planning (D.E. No. 2309 at 12); lack of skilled trades (*Id.*) and other key

personnel (D.E. No. 2309 at 24); and significant shortcomings in the purchasing and procurement

areas (D.E. No. 2309 at 25).  (Joint Stmt. of Stipulated Facts at ¶ 36).  The CAP also recognized

the existence of "systematic management issues that have affected compliance."  (Joint Stmt. of

Stipulated Facts at ¶ 37) (quoting D.E. No. 2309 at 22).  The CAP stated that the City intended to

create an Empowered Enterprise Change Office ("EECO") to serve "as both a unifier and an

enabler bringing together under one umbrella entity key representatives of the City, DWSD and

the WWTP" and that the EECO's mission is to oversee and drive the implementation of the

CAP.  (*Id.* at 5).

On October 13, 2010, DEQ responded to the CAP.  DEQ stated that, although the CAP

adequately addressed the immediate short term action items needed to achieve compliance, "it

failed to adequately address the issues that are critical to ensuring long term compliance such as

staffing, purchasing, long term solids disposal and maintenance planning." (Joint Stmt. of

Stipulated Facts at ¶ 38) (quoting DEQ's 10/13/10 Letter, Appendix to Opin. & Order No. 9).  It

further stated that "[i]n addressing DWSD's long term compliance issues the CAP is inadequate

and incomplete.  Schedules for long term actions to correct the critical issues contributing to the

current noncompliance are vague, open-ended, and assume that the EECO will have adequate

authority to effect change across City departments." (*Id.* at 7).

28

On November 29, 2010, after Judge Feikens retired, this case was reassigned to this Court. (D.E. No. 2323).

The following month, on December 15, 2010, a federal Grand Jury issued a thirty-eight count First Superseding Indictment against Kwame Kilpatrick, the former Mayor of Detroit and the former Special Administrator of the DWSD, along with Victor Mercado, the former Director of the DWSD, and others. It charges that, while Kilpatrick was the Mayor of Detroit, and during and after his appointment as the DWSD Special Administrator, Kilpatrick and Mercado extorted and rigged municipal contracts. The majority of the contracts alleged in the First Superseding Indictment were contracts paid for by the DWSD.[4] (*See* D.E. No. 20 in Criminal Case No. 10-20403).

In February of 2011, the City, along with the above counties, determined that a more empowered Board would enhance the DWSD's ability to comply with its NPDES permit and the Clean Water Act. (*See* 2/11/11 Stipulated Order, D.E. No. 2334, at 1) ("[T]he parties agree that the DWSD's ability to comply with environmental laws and its NPDES Permit will be enhanced by the Board's exercise of its powers and authority to the fullest extent of the law.")

The Stipulated Order provides that Board members must have at least seven years of experience in a regulated industry, a utility, engineering, finance or law and that the Board will be compensated. (*Id.*). It further provides that the Board "will be supported by certain staff having expertise in the fields of law, finance, and technology pertinent to DWSD operations (i.e.

---

[4]Although not relevant to this Court's rulings, the Court notes that this is not the first time that allegations of corruption have been made relating to DWSD contracts. *See e.g. United States v. Bowers*, 828 F.2d 1169 (6th Cir. 1987) (describing convictions and guilty pleas of a former DWSD Director and others relating to sludge-hauling contracts.).

29

engineering and/or water or wastewater operations)." (Joint Stmt. of Stipulated Facts at ¶ 41; D.E. No. 2334 at 2). The Stipulated Order further provides that "[w]ithin six months of the date of this Order, any party may file a motion with the Court to demonstrate that the [DWSD] is in substantial compliance with its NPDES Permit and the consent judgments of this Court. If the Court is satisfied that substantial compliance has been achieved, it shall dismiss this lawsuit." (*Id.*).

In compliance with the February 11, 2011 Stipulated Order (the "Stipulated Order"), on April 1, 2011, Mayor Bing appointed a new Board that the parties believe is equipped to lead the DWSD to achieve sustained compliance with the Clean Water Act. (Joint Stmt. of Stipulated Facts at ¶ 41). On July 27, 2011, the Board amended its by-laws, to incorporate the provisions of the Stipulated Order. (Appendix to Opin. & Order No. 10).

During the past six months, the City and the DWSD have been working with the DEQ to develop yet another plan for compliance.

Effective July 8, 2011, the City, the DWSD and DEQ entered into the ACO, aimed at achieving compliance with the DWSD's NPDES permit and the Clean Water Act. (D.E. No. 2365-1).

On July 25, 2011, the City filed a "Motion to Dismiss and for Relief from the Second Amended Consent Judgment." (D.E. No. 2365). In that motion, the City notes that the DEQ and the DWSD recently entered into the ACO and asks this Court to order that the requirements set forth in that ACO are substituted for the requirements of the August 30, 2000 Second Amended Consent Judgment. The City also asserts that the DWSD has made substantial progress toward achieving full compliance with its NPDES permit and the Clean Water Act and, as result, the

30

Court should dismiss this action.

Recent documentation provided to the Court by the DEQ, however, reflects that after executing the ACO on July 8, 2011, the DWSD self-reported new violations of its NPDES permit to the DEQ. (*See* Appendix to Opin. & Order No. 11). These new violations include the WWTP's total suspended solids (TSS). In a letter dated September 7, 2011, the DEQ advised the DWSD that these violations of the DWSD's "NPDES permit effluent limitations occurring after the effective date of the ACO, July 8, 2011 are violations of the ACO" and that stipulated penalties may be assessed for these new violations under the ACO. (*Id.* at 2-3). That letter further states that the violations are expected to continue: "[b]ased on the Outfall 050A TSS concentrations reported in July and the data for the first 15 days of August, it appears that DWSD will continue to be in violation of the TSS 30 discharge-day concentration limit at Outfall 050A for at least the next 30 discharge days." (*Id.*).

Section 9-510 of the Charter mandates that incentives be given to local firms in the competition for City contracts. This provision is implemented by Section 18-5-2 of the Detroit City Code. These local preferences are prohibited by the federal government when using federal funds under the EPA. (Joint Stmt. of Stipulated Facts at ¶ 45) (quoting Title 40, Chapter I, Subchapter B, 35.936-29(c)). These local preferences, in practice, have increased the cost of DWSD's procurement of goods and services and limited the pool of vendors bidding on various DWSD contracts.

Currently, many of the terms and conditions governing the relationship between the DWSD and its employees are governed by City-wide collective bargaining agreements. Collectively, DWSD employees are members of 21 collective bargaining units, most of which

31

include many non-DWSD employees. (Joint Stmt. of Stipulated Facts at ¶ 46). City-Wide collective bargaining agreements and other City requirements currently restrict the compensation that can be offered to prospective DWSD employees. (Joint Stmt. of Stipulated Facts at ¶ 47).

The DWSD has been without a permanent Director since June 30, 2008. The role of the DWSD Director is currently being filled by the Chief Operating Officer of the City of Detroit. (Joint Stmt. of Stipulated Facts at ¶ 48).

Since its inception in October 2010, the EECO has held approximately 11 monthly meetings. This Court's Special Master, David Ottenwess, attended several of those meetings and this Court was provided with minutes of several meetings.

The DWSD's November 1, 2010 Update Report was drafted soon after the EECO began meeting. (Appendix to Opin. & Order No. 12). It states that "[a]s of September 30, 2010, the WWTP had 537 Full Time Employees (FTE) staff positions filled. (*Id.* at 13). The Appendix then states that the average filled positions for the quarter was 68%. As to purchasing, its states that during the quarter "the Purchasing Division received 1,947 purchase requisitions Department-wide that were assigned to buyers, 677 (35%) of these assigned requisitions were processed into actual purchase orders." (*Id.* at 12).

The most recent Update Report received from the DWSD is its August 1, 2011 Update Report and it reflects that virtually no progress in terms of human resources and purchasing has been made since the EECO was formed. (D.E. No. 2383-7). It states that as of June 30, 2011, "the WWTP had 584 Full Time Employees (FTE) staff positions filled." (*Id.* at 13). The Appendix then states that the average filled positions was 66% for the second quarter and 70% for the third quarter of the year. As to purchasing, its states that during the quarter "the

32

Purchasing Division received 1,943 purchase requisitions Department-wide that were assigned to buyers, 774 (37%) of these assigned purchase requisitions were processed into actual purchase orders." (*Id.* at 11).

As demonstrated by the most recent violations, and shown by the quarterly reports filed by the DWSD during the past year, despite earnest efforts of those involved, the EECO has not been successful in remedying the longstanding purchasing or human resources problems at the DWSD that are impeding compliance.

The Court finds that human resources issues have been a chronic problem for the DWSD for the past 34 years.   Specifically:  1) having an insufficient number of qualified personnel at the WWTP has been a chronic problem for the DWSD;  2) there are excessive and unnecessary delays in hiring qualified personnel across all job positions at the DWSD; 3) the DWSD's required use of the City's Human Resources Department results in significant delays in filling critical positions at the DWSD; 4) the City's personnel policies, civil service rules, and union rules and agreements restrict the compensation, recruitment and prompt hiring of necessary personnel at the WWTP; 5) there is insufficient training of personnel at the DWSD and its WWTP; 6) the DWSD's WWTP has an insufficient number of certified operators for a wastewater treatment plant of it size and complexity; 7) the DWSD is currently facing a serious staffing crisis as a significant portion of its experienced workforce is ready to retire; 8) the City has failed to develop an adequate succession plan as to the DWSD and the WWTP; and  9) the job descriptions and qualifications for various positions within the DWSD are obsolete.

The above human resources issues have prevented the DWSD from achieving sustained compliance with its NPDES permit, the various remedial plans in this action, and the Clean

33

Water Act.

In addition, the DWSD's lack of a qualified, permanent Director is impeding compliance. Yet the DWSD is unlikely to attract and hire a highly qualified Director while the above institutional barriers to compliance exist and the DWSD is under federal court oversight.

The Court finds that the DWSD has also experienced chronic and serious problems in the areas of purchasing and procurement over the past 34 years.

Purchasing of necessary equipment and supplies for the WWTP has not been timely or at an acceptable level. There is a long history of excessive delays in the processing of purchase requisitions for critical repair and/or replacement parts. The City of Detroit's flawed purchasing practices and procedures impede preventative maintenance and adversely impact operations at the DWSD's WWTP.

The City's ineffective procurement system also causes and contributes to operational problems at the WWTP. The City lacks procurement procedures that are responsive to the reality of keeping the WWTP fully operational. Essential DWSD purchases often exceed the amount of $25,000. The approval process for purchases over $25,000, created by City's Charter and/or ordinances, unnecessarily delays contracts for essential parts, equipment, and services at the DWSD. The City's bidding and certification requirements also unnecessarily delay contract approvals.

The above purchasing and procurement problems have prevented the DWSD from achieving sustained compliance with its NPDES permit, the various remedial plans in this action, and the Clean Water Act.

The failure to replace aged and deteriorated capital equipment and to maintain solids

dewatering facilities is a also root cause of the continuing cycle of noncompliance at the DWSD. The failure to promptly approve rates adequate to fund necessary capital improvement projects at the DWSD, and adequate to support the costs of filling and retaining adequate staff at the WWTP, threatens compliance with the DWSD's NPDES permit, the ACO and the Clean Water Act.

## CONCLUSIONS OF LAW

The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982). "Section 301 of the CWA makes the discharge of pollutants into navigable waters unlawful, unless such discharge is authorized by permit." *Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1445 (1st Cir. 1992); 33 U.S.C. § 1311(a). The purpose of the Clean Water Act is to be achieved by compliance with the Act, which includes compliance with permit[5] requirements. *Weinberger*, 456 U.S. at 314.

"[E]nforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act." *Weinberger*, 456 U.S. at 318. Nevertheless, a district court has broad equitable discretion in remedying violations of the Act and is not limited to such orders. *Id.*; *see also United States v. Metropolitan District Commission*, 930 F.2d 132, 135 (1st Cir. 1991) ("The law confers broad

---

[5]Each National Pollutant Discharge Elimination System ("NPDES") permit sets out the specific conditions necessary to ensure that a permit holder's discharge of pollution will comply with the water standards mandated by the Clean Water Act. *Lake Carriers' Assoc. v. E.P.A.*, __ F.3d __, 2011 WL 2936926 (D.C. Cir. 2011); 33 U.S.C. § 1342(a)(2).

35

legal authority upon a *district* court to choose appropriate remedies for violation of the Clean

Water Act.") (emphasis in original). The Clean Water Act permits "the exercise of a court's

equitable discretion" to "order relief that will achieve *compliance* with the Act." *Weinberger v.*

*Romero-Barcelo*, 456 U.S. 305, 320 (1982) (emphasis in original).

A federal court's equitable power to remedy a violation of federal law is not constrained

by state or local law. Rather, once the court has found a violation of federal law, "a state law

cannot prevent a necessary remedy. Under the Supremacy Clause, the federal remedy prevails.

'To hold otherwise would fail to take account of the obligations of local governments, under the

Supremacy Clause, to fulfill the requirements that the Constitution imposes on them.'" *Perkins v.*

*City of Chicago Heights,* 47 F.3d 212, 216 (7th Cir. 1995) (quoting *Missouri v. Jenkins,* 495 U.S.

33, 57-58 (1990)); *see also United States v. Metropolitan District Commission,* 930 F.2d at 136

("Considerations of comity and federalism," do not give a state or municipality "the legal power

to violate the law, to continue violations that have taken place over a fifteen-year period, or to

place at risk a major compliance plan . . .").

Nevertheless, a district court's broad equitable authority "is tempered by precepts of

comity and federalism. As the Supreme Court has stated:

> [A]ppropriate consideration must be given to principles of federalism in
> determining the availability *and scope* of equitable relief.

*Kendrick v. Bland*, 740 F.2d 432, 437 (6th Cir. 1984) (emphasis in original) (Quoting *Rizzo v.*

*Goode*, 423 U.S. 362, 379 (1976)). Thus, "[r]emedies that override state law must be narrowly

tailored so as to infringe state sovereignty as minimally as possible." *Perkins,* 47 F.3d at 217

(citing *Jenkins*, 495 U.S. at 57-58). "Federal remedial powers can 'be exercised only on the basis

36

of a violation of the law and [can] extend no farther than required by the nature and extent of the violation.'" *Id.* (citing *General Bldg. Contractors v. Pennsylvania*, 458 U.S. 375, 399 (1982)); *Kendrick*, 740 F.2d at 437 (The federal equity court in fashioning a remedy must afford relief which is no broader than necessary to remedy the constitutional violation.).

In *Jenkins,* the Supreme Court "emphasized that although the 'remedial powers of an equity court must be adequate to the task, . . . they are not unlimited,'" and "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Jenkins,* 495 U.S. at 51. While "[b]y no means should a [federal] district court grant a local government *carte blanche*," the "local officials should at least have the opportunity to devise their own solutions" to remedy a federal violation. *Id.* at 52. In the event that a local government fails or is unable to avail itself of such an opportunity to correct the violations, however, a "federal court may implement a more intrusive remedy." *Kendrick,* 740 F.2d at 439.

Here, it is undisputed that, over the course of the past 34 years, the DWSD has had serious and recurring permit violations – which constitute violations of the Clean Water Act. The Court finds that the DWSD's violations of its NPDES permit and the Clean Water Act are serious and continuing and present a serious health, safety and environmental risk to the people of Southeastern Michigan.

As stated *supra,* "enforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act." *Weinberger,* 456 U.S. at 318. From its inception, that collaborative approach was attempted in this action. Rather than contest the violations, the City and the

DWSD entered into a consent judgment that set out a detailed compliance plan designed to cure the violations.   As the record reflects, however, that approach has not stopped the violations. Despite entering into *a series* of agreements containing detailed compliance plans, the DWSD has been unable to comply with those plans, resulting in repeated violations of the Clean Water Act.  For the more than 34 years during which this action has been pending, the City and the DWSD have remained in a recurring cycle wherein the DWSD is cited for serious violations of its NPDES permit, the City negotiates and agrees to a detailed remedial plan for compliance, but the DWSD is unable to follow the plan and is again cited for the same or similar violations. Thus, although a collaborative approach employing detailed remedial plans has been attempted, that approach has not resulted in compliance with the Clean Water Act and the violations have continued.

Recognizing that a detailed remedial plan alone would not lead to sustained compliance, Judge Feikens took numerous actions, detailed in the preceding Findings of Fact, aimed at enabling the City and the DWSD to achieve long-term compliance with the DWSD's NPDES permit and the Clean Water Act.

For example, Judge Feikens appointed a highly qualified[6] environmental expert, Dr. Jonathan W. Bulkley, to act as Court Monitor.  He also used more intrusive means designed to eliminate, at least temporarily, the institutional impediments to sustained compliance, including successive appointments of Detroit Mayors as Special Administrators, who were empowered to take actions on behalf of the DWSD irrespective of the City's Charter, ordinances, policies and contracts.

---

( *See* Appendix to Opin. & Order No. 13).

Judge Feikens also had the DWSD use outside consultants to assist with troubled areas such as contracting. For example, from November 2002 through November 2010, the consulting firm IMG was retained to examine and review DWSD contracts over $500,000.00. (*See, e.g.,* D.E. Nos. 1742 & 2308).

Most significantly, Judge Feikens took additional measures designed to help the DWSD attain sustained compliance by having Dr. Bulkley, and various other experts, investigate the underlying root causes for the recurring cycle of violations. The City and the DWSD had direct participation with those studies and the City commissioned some of its own. The record is replete with detailed reports from such investigations:

1)  Dr. Bulkley's 1978 Report, which was done after the City/DWSD failed to comply with the terms of the 1977 Consent Judgment;

2)  The 1994 Operational and Organizational Review of the DWSD;

3)  The 2000 Investigative Report, which was done after the DWSD again fell out of compliance with its NPDES permit in 1997;

4)  The DWSD Succession Plan Report, prepared by IMG in 2007;

5)  Dr. Bulkley's 2010 Report, done after violations recurred again in 2009; and

6)  The Engineering Society of Detroit Consensus Action Report in 2010, also done after violations recurred in 2009.

These experts that have studied the DWSD have consistently, over many years, opined that the same root causes are an obstacle to compliance with the DWSD's NPDES permit, the remedial orders agreed to in this case, and the Clean Water Act: 1) the DWSD having an insufficient number of qualified personnel at the WWTP; 2) excessive and unnecessary delays in hiring qualified personnel across all job positions at the DWSD; 3) the DWSD's required use of

39

the City's Human Resources Department, resulting in significant delays in filling critical

positions at the DWSD; 4) the City's personnel policies, civil service rules, and union rules and

agreements, restricting the compensation, recruitment and prompt hiring of necessary personnel

at the WWTP; 5) insufficient training of personnel at the DWSD and WWTP; 6) lack of a

succession plan at the DWSD; 7) obsolete job descriptions and qualifications for various

positions within the DWSD; 8) untimely and inadequate purchasing of necessary equipment and

supplies for the WWTP; 9) excessive delays in the processing of purchase requisitions for critical

repair and/or replacement parts; 10) the City's flawed purchasing practices and procedures; 11)

the City's ineffective procurement system; 12) the approval process for purchases over $25,000,

created by the City's Charter and/or ordinances, unnecessarily delaying contracts for essential

parts, equipment, and services at the DWSD; 13) the City's bidding and certification

requirements, delaying contract approvals; and 14) the DWSD's repeated failure to replace aged

and deteriorated capital equipment and to maintain solids dewatering facilities at the WWTP.

The EPA and the DEQ have also identified many of these same root causes as impeding

compliance.   Notably, from the inception of this case in 1977, the EPA voiced its concerns

regarding these very same issues.  (*See, e.g.*, D.E. No. 1 at ¶ 26) ("the number of personnel

employed [at the WWTP] has not been sufficient, personnel are not adequately trained, and

purchasing of necessary and required supplies and equipment has not been timely or at an

acceptable level . . .").   The DEQ has also identified these same root causes of noncompliance.

(*See, e.g.*, DEQ's 10/13/10 Response To CAP) (Stating that CAP "failed to adequately address

the issues that are critical to ensuring long term compliance such as staffing, purchasing, long

term solids disposal and maintenance planning.").

40

The Court agrees that these are the root causes behind the DWSD's inability to sustain

compliance with its NPDES permit, the remedial orders in this case, and the Clean Water Act.

While the DWSD has achieved short-term compliance with its NPDES permits at various

times during the course of this action, it has only been able to do so because Judge Feikens used

the Court's equitable powers to take actions to temporarily suspend institutional barriers. But

even those measures have resulted in what experts have accurately characterized as a "sine curve

of compliance and violation[s]." (Consensus Action Report at 6). This is demonstrated by the

most recent events in this action.

During the past six months, the City has been diligently working with the DEQ to

develop yet another plan for compliance. On July 8, 2011, the City and the DEQ entered into an

Administrative Consent Order, aimed at achieving compliance with the DWSD's NPDES permit

and the Clean Water Act. After the ACO was executed, the City filed the instant "Motion to

Dismiss and for Relief from the Second Amended Consent Judgment." (D.E. No. 2365).

Although this case is now in its fourth decade, the Court must DENY the City's Motion

to Dismiss. Notably, *after* executing the ACO on July 8, 2011, the DWSD self-reported new

violations of its NPDES permit to the DEQ. (*See* Appendix to Opin. & Order No. 11). These

new violations include the WWTP's total suspended solids (TSS) and are the same kinds of

violations that have been occurring throughout this action. These new violations of the DWSD's

NPDES permit effluent limitations, that occurred after the effective date of the ACO, constitute

violations of the ACO and the Clean Water Act. Accordingly, the City has not shown that the

DWSD has achieved even *short-term* compliance with its NPDES permit, the July 8, 2011 ACO,

or the Clean Water Act.

41

Moreover, this Court concludes that, in order to achieve *long-term* compliance with the Clean Water Act, other less intrusive measures, over many years and many attempts, having proved unsuccessful, more fundamental and intrusive corrective measures are required. The record in this case establishes that, unless more fundamental corrective measures are taken to address the institutional and bureaucratic barriers to sustained compliance that have been identified by experts and acknowledged by the City, the DWSD will remain in this recurring cycle and will never achieve sustained compliance with its NPDES permit, the ACO, and the Clean Water Act.

*The Court further concludes that an effective equitable remedy to achieve sustained compliance will require this Court to order structural changes regarding the DWSD that will likely override the City of Detroit's Charter, its local ordinances, and/or some existing contracts.*

This Court does not arrive at this conclusion lightly. As noted above, Judge Feikens attempted several less intrusive measures, over several decades, but those less intrusive measures have not enabled the DWSD to achieve sustained compliance. In addition, although the City has had ample opportunity to devise and implement its own solutions to the underlying causes of noncompliance that have been identified and discussed since the inception of this case, to date, it has not proposed or implemented a plan that has sufficiently addressed those root causes.

To be fair, the City has been constrained in the measures it has proposed or implemented to date because the City is bound by various provisions of the City's Charter and ordinances, and existing contracts, that prevent *the City* from making fundamental changes in the identified problem areas.

*This Court*, however, has broad equitable power to order any relief necessary to achieve

42

compliance with the Clean Water Act and this Court *is not* constrained by the provisions of the

City's charter or ordinances. *Weinberger,* 456 U.S. at 318; *Perkins,* 47 F.3d at 216.

This Court appreciates that its broad equitable authority is to be "tempered by precepts of

comity and federalism." *Kendrick* , 740 F.2d at 437.   As then-Judge (now Justice) Stephen

Breyer explained in *Metropolitan District Commission,*[7] considerations of comity and federalism,

however, do not give a state or municipality the legal power to violate federal law or to continue

violations of the Clean Water Act over a thirty-four year period. *United States v. Metropolitan*

*District Commission*, 930 F.2d at 136.   Maintaining the status quo is not an option.

Nevertheless, this Court is mindful that remedies that override state or local law should

be narrowly tailored and that, to the extent possible, local officials should at least have the

opportunity to devise their own solutions to remedy a violation of federal law.

Accordingly, the Court shall ORDER the Mayor of the City of Detroit (and/or his

designee), the City Council President and President Pro Tem, and a current member of the Board

(to be chosen by the Board) to meet and confer and, within 60 days of the date of this order,

propose a plan that addresses the root causes of non-compliance that are discussed in this

Opinion & Order.   In making such recommendations to the Court, these individuals *shall not* be

constrained by any local Charter or ordinance provisions or by the provisions of any existing

contracts.   If the local officials fail to devise and propose a workable solution to remedy the

underlying causes of the recurrent violations of the Clean Water Act in this case, this Court will

order a more intrusive remedy on its own.

---

[7]*United States v. Metropolitan District Commission*, sometimes referred to as the Boston
Harbor case, is another case involving Clean Water Act violations continuing over many years.

CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that the City of Detroit's Motion to Dismiss is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and one current member of the Board (to be chosen by the Board) shall meet and confer, in person, in order to devise a plan for remedying the root causes of non-compliance discussed in this Opinion & Order. In making such recommendations to the Court, these individuals *shall not* be constrained by any local Charter or ordinance provisions or by the provisions of any existing contracts.

IT IS FURTHER ORDERED that **on November 4, 2011 at 8:30 a.m., the above individuals shall appear at a Status Conference in this matter, with their plan.**

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: September 9, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 9, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager

44