# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

     Plaintiff,

v.                                    Honorable Sean F. Cox

City of Detroit, *et al.*,              Case No. 77-71100

     Defendants.

_____/

## **ORDER**

The United States Environmental Protection Agency ("EPA") initiated this action in

1977 against the City of Detroit ("the City") and the Detroit Water and Sewerage Department

(the "DWSD"), alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("the Clean

Water Act"). The violations, which are undisputed, involve the DWSD's wastewater treatment

plant ("WWTP") and its National Pollutant Discharge Elimination System ("NPDES") permit.

As set forth in this Court's September 9, 2010 Opinion & Order (Docket Entry No.

2397):

> For the more than 34 years during which this action has been pending, the
> City and the DWSD have remained in a recurring cycle wherein the DWSD is
> cited for serious violations of its NPDES permit, the City and the DWSD agree to
> a detailed remedial plan aimed at compliance, but the DWSD is unable to follow
> the plan and is again cited for the same or similar violations. Although this Court
> has taken various measures, designed to eliminate the various impediments to
> compliance that have been identified by experts and acknowledged by the City,
> those measures have proven inadequate to achieve sustained compliance.

(*Id.* at 1).

In September 2009, the DWSD was again unable to maintain compliance with its NPDES

1

permit and was again cited for violations by the Michigan Department of Environmental Quality ("DEQ"). In January of 2010, Detroit Mayor Dave Bing appointed a Chief Operating Officer who assumed the position of acting Director of the DWSD. Thereafter, the City worked with the DEQ to develop another plan for compliance and worked with Oakland County, Wayne County and Macomb County to resolve longstanding issues regarding the DWSD.

On July 8, 2011, the City and the DEQ entered into an Administrative Consent Order ("the ACO"), aimed at achieving long-term compliance with the DWSD's NPDES permit and the Clean Water Act. After the ACO was executed, the City filed a motion asking the Court to order that the requirements set forth in the ACO are substituted for the requirements of the Second Amended Consent Judgment, find that the DWSD has made substantial progress toward achieving full compliance with its NPDES permit and the Clean Water Act, and dismiss this case.

As explained in detail in this Court's September 9, 2010 Opinion & Order, this Court denied that motion. In doing so, this Court noted that *after* executing the ACO on July 8, 2011, the DWSD self-reported serious violations of its NPDES permit to the DEQ. Thus, the City had not established that the DWSD has achieved even short-term compliance with the ACO and the Clean Water Act. In addition, this Court concluded that the extensive record in this case establishes that, unless more fundamental corrective measures are taken to address the institutional and bureaucratic barriers to compliance, sustained compliance with the Clean Water Act and the ACO will simply not occur. This Court further explained:

> Although the City has had ample opportunity to propose solutions to the root causes of noncompliance that were identified early on in this case, to date, it

2

has not proposed or implemented a plan that has sufficiently addressed those root causes.

        To be fair, the City has been constrained in the measures it has proposed or implemented to date because the City is bound by various provisions of the City's Charter and ordinances, and by existing contracts, that prevent the City from making fundamental changes in the identified problem areas. This Court, however, has broad equitable power to order any relief necessary to achieve compliance with the Clean Water Act and this Court *is not* constrained by the provisions of the City's Charter or ordinances. Nevertheless, this Court is mindful that remedies that override state or local law should be narrowly tailored and that, to the extent possible, local officials should at least have the opportunity to devise their own solutions to remedy a violation of federal law.

(*Id.* at 2).

Accordingly, this Court ordered the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and a current member of the Board of Water Commissioners ("BOWC") (to be chosen by the BOWC) to meet and confer and, within 60 days of the date of this order, propose a plan that addresses the root causes of non-compliance that are discussed in this Opinion & Order. (*Id.* at 44). The Court directed that, in making such recommendations to the Court, these individuals *shall not* be constrained by any local Charter or ordinance provisions or by the provisions of any existing contracts. Finally, the Court cautioned that "[i]f the local officials fail to devise and propose a workable solution to remedy the underlying causes of the recurrent violations of the Clean Water Act in this case, this Court will order a more intrusive remedy on its own." (*Id.* at 43).

Following this Court's September 9, 2010 Opinion & Order, the above individuals have been meeting and conferring in order to devise and propose a workable solution to remedy the underlying root causes of noncompliance ("the Root Cause Committee"). On November 2,

3

2011, the Root Cause Committee submitted a written proposed "Plan of Action" to the Special Master in this action, which the Special Master then submitted to the Court on that same date. (Docket Entry No. 2409).

## I.      The Court Adopts The Plan Proposed By The Root Cause Committee.

Having studied the Plan of Action proposed by the Root Cause Committee, the Court concludes that the Plan of Action adequately addresses the majority of the root causes of non-compliance that are outlined in this Court's September 9, 2011 Opinion & Order. As such, the Court **ADOPTS** the Plan of Action proposed by the Root Cause Committee (Ex. A to this Order), which includes a DWSD Procurement Policy (Ex. B to this Order), and **ORDERS** that the Plan of Action shall be implemented in order to remedy the recurring violations of the Clean Water Act in this case.

As the Committee noted in the Plan of Action, **the changes being ordered do not restructure the DWSD as a separate entity. The DWSD, and all of the assets of the DWSD, shall remain a department of the City of Detroit.**

## II.     The Court Concludes That The Plan Does Not Adequately Address CBA Issues And Orders Additional Relief Necessary For The DWSD To Achieve Short-Term And Long-Term Compliance.

DWSD employees are members of 20 different collective bargaining units, each of which has its own collective bargaining agreement ("CBA") that expires on June 30, 2012. (*See* Docket Entry No. 2409, Ex. C, Appx. 12). The Root Cause Committee reviewed the record in this case, and consulted with several outside sources, and concluded that "[i]t is evident from the various historical reports, and current conditions, that certain CBA provisions and work rules have limited DWSD from maintaining long-term environmental compliance." (Plan of Action at

4

3).  The Root Cause Committee agreed that certain changes to existing CBAs need to occur. Despite earnest efforts of all members, however, the Committee could not agree on how to achieve the necessary changes.

Based on the record in this case, the Court concludes that certain CBA provisions and work rules are impeding the DWSD from achieving and maintaining both short-term and long-term compliance with its NPDES permit and the Clean Water Act.  Given that the Committee was unable to agree on a proposed solution for remedying these impediments to compliance, this Court shall order its own remedy.

As the Root Cause Committee recognized, this Court may elect from several potential options in ordering a remedy to these impediments to compliance, including:

> (i) the approach provided in State legislation for emergency managers that would terminate all collective bargaining agreements; (ii) suspension of the duty to bargain for 5 years as provided in certain State emergency laws; (iii) establishing a regional authority as a new employer for DWSD employees; (iv) terminating the workforce so DWSD would start with a blank slate; (v) outsourcing plant operations so corporate representations or warranties of compliance could be enforced; and (vi) ordering that negotiations take place to address the various identified problems.

(Plan of Action at 3).  The Court has carefully considered all options and concludes that the least intrusive means of effectively remedying these impediments to compliance is to: 1) keep all current CBAs that cover DWSD employees in force, but strike and enjoin those current CBA provisions or work rules that threaten short-term compliance; and 2) Order that, in the future, the DWSD shall negotiate and sign its own CBAs that cover only DWSD employees, and prohibit future DWSD CBAs from containing certain provisions that threaten long-term compliance.

Specifically, the Court hereby **ORDERS** that:

5

1.  The Director of the DWSD, with the input and advice of union leadership, shall develop a DWSD employee training program, a DWSD employee assessment program, and a DWSD apprenticeship training program.

2.  Any City of Detroit Executive Orders imposing furlough days upon City employees shall not apply to DWSD employees.

3.  The DWSD shall act on behalf of the City of Detroit to have its own CBAs that cover DWSD employees ("DWSD CBAs"). DWSD CBAs shall not include employees of any other City of Detroit departments. The Director of the DWSD shall have final authority to approve CBAs for employees of the DWSD.

4.  The Court hereby strikes and enjoins any provisions in current CBAs that allow an employee from outside the DWSD to transfer ("bump") into the DWSD based on seniority. Future DWSD CBAs shall adopt a seniority system for the DWSD that does not provide for transfer rights across City of Detroit Departments (ie., does not provide for "bumping rights" across city departments).

5.  DWSD management must be able to explore all available means and methods to achieve compliance with its NPDES permit and the Clean Water Act. DWSD CBAs shall not prohibit subcontracting or outsourcing and the Court hereby strikes and enjoins any provisions in current CBAs that prohibit the DWSD from subcontracting or outsourcing.

6.  DWSD CBAs shall provide that excused hours from DWSD work for union activities are limited to attending grievance hearings and union negotiations, with prior notification to DWSD management. The Court strikes and enjoins any current CBA provisions to the contrary.

7.  DWSD CBAs shall include a three-year time period pertaining to discipline actions.

8.  The Director of the DWSD shall perform a review of the current employee classifications at the DWSD and reduce the number of DWSD employee classifications to increase workforce flexibility. Future DWSD CBAs

6

shall include those revised employee classifications.

9.    DWSD CBAs shall provide that promotions in the DWSD shall be at the
discretion of management and based upon skill, knowledge, and ability,
and then taking seniority into account.  The Court strikes and enjoins and
current CBA provisions to the contrary.

10.   Past practices on operational issues shall not limit operational changes
initiated by management with respect to DWSD CBAs.

11.   The Court strikes and enjoins any provisions in existing CBAs that
prevent DWSD management from assigning overtime work to employees
most capable of performing the necessary work within a classification, at
the discretion of management.  DWSD CBAs shall provide that
management has the discretion to assign overtime work to employees
most capable of performing the necessary work within a classification, at
the discretion of management.

12.   Any existing work rules, written or unwritten, or past practices that are
contrary to these changes are hereby terminated.

13.   The Court enjoins the Wayne County Circuit Court and the Michigan
Employment Relations Commission from exercising jurisdiction over
disputes arising from the changes ordered by this Court.  The Court also
enjoins the unions from filing any grievances, unfair labor practices, or
arbitration demands over disputes arising from the changes ordered by this
Court.

## III.   The Court Orders Further Study Regarding Concepts And Issues That Are Not Fully Developed At This Time.

In a section of the Plan of Action titled "Additional Considerations" (Plan of Action at 6),

the Root Cause Committee discussed the concepts of: 1) an "Efficient Compliance Payment;"

and 2) a Payment in Lieu of Taxes arrangement.  The Plan of Action also notes that the

implementation of the Plan of Action may result in a reduction in chargeback revenues to the

7

City of Detroit from the DWSD that will need to be addressed during the transition period.  The Committee stated that while it "believes these concepts are all important and that some combination of these concepts is critical to the long-term viability of this Plan, the Committee was unable to achieve consensus on a recommended path due to the complexity of the concepts under consideration and the amount of research required to complete this task in the time available." (*Id.*).

The Court **ORDERS** the Root Cause Committee to continue to meet and confer, and to gather necessary financial records, in order to make specific recommendations regarding how the reduction in chargeback issue should be addressed during the transition period.  Within 60 days of this Order (by January 4, 2012), the Root Cause Committee shall submit a written supplement to the Plan of Action to the Special Master regarding that issue and recommendations regarding same.

The Court further **ORDERS** that the Root Cause Committee shall continue to meet and confer in order to further study the concepts of an "Efficient Compliance Payment" and/or a Payment in Lieu of Taxes arrangement.  Within 90 days of this Order (by February 4, 2012), the Root Cause Committee may submit a written supplement to the Plan of Action to the Special Master regarding those concepts and any recommendations regarding same.

## IV.     The Court Orders Implementation Of The Adopted Plan Of Action And The Additional Relief Ordered By This Court.

The Court hereby **ORDERS** the following with respect to implementation of the Plan of Action, and the additional relief ordered by this Court:

1.     Implementation of the Plan of Action shall be the responsibility of the Mayor of the City of Detroit (or his designee) until such time as a

8

permanent Director of the DWSD has been hired.  Once a new Director of the DWSD has been hired, that new Director shall assume primary responsibility for implementing this Order and shall join the Root Cause Committee.

2.      Until the Plan of Action has been fully implemented, or this case has been dismissed, the Root Cause Committee shall meet at least once per month, at which time the individual vested with primary responsibility for implementing the Plan of Action shall apprise the Root Cause Committee of the status of the implementation.

3.      In order to facilitate prompt implementation, until the Plan of Action has been fully implemented, or this case has been dismissed, the BOWC member that was chosen by the BOWC to serve on the Root Cause Committee shall serve as interim Chair of the BOWC.

4.      The BOWC shall amend its by-laws within 60 days of this Order (by January 4, 2012), to make them consistent with the adopted Plan of Action and this Order.

5.      Within 6 months from the date of this Order (by May 4, 2012), the Director of DWSD shall prepare a written Report of Compliance with the ACO that identifies any current or anticipated barriers to long-term compliance with the ACO and the Clean Water Act ("the Director's Report of Compliance").  The Director of the DWSD shall include within that report any additional recommendations or changes that are necessary to achieve long-term compliance.

6.      The Director's Compliance Report shall be provided to the BOWC, the Mayor of the City of Detroit, the Detroit City Council, the DEQ, and the Special Master.  The Director's Compliance Report shall request any comments, suggestions, or recommendations from the BOWC, the Mayor of the City of Detroit, the Detroit City Council, and the DEQ within 30 days.

7.      To provide adequate time for review and consideration of the comments, suggestions, and recommendations made, and to allow an opportunity to

make necessary changes, the Director of the DWSD shall submit, to the
Special Master, a final report to the Court on the status of compliance with
the ACO, any remaining barriers to long-term compliance, together with
proposed solutions, within 90 days of submission of the initial Director's
Report of Compliance.

8.    After receiving the final Director's Report of Compliance, the Court will
      determine whether it shall modify or amend this Order.  If the Court
      determines that this Order needs to be amended, the amended order will be
      issued within 30 days after the Courts receipt of the final Director's
      Report of Compliance.

9.    Thereafter, the DWSD may file a motion seeking to dismiss this case if it
      believes there has been substantial compliance with this Order (and any
      amendment of this order) and the July 8, 2011 ACO.

**IT IS SO ORDERED.**

                              S/Sean F. Cox
                              Sean F. Cox
                              United States District Judge

Dated:  November 4, 2011


I hereby certify that a copy of the foregoing document was served upon counsel of record on
November 4, 2011, by electronic and/or ordinary mail.

                              S/Jennifer Hernandez
                              Case Manager

10

November 2, 2011

<u>Hand Delivered</u>

David M. Ottenwess
Ottenwess Allman & Taweel, PLC
535 Griswold Street, Ste. 850
Detroit, MI 48226

      Re:    DWSD Root Cause Committee

Dear Mr. Ottenwess:

      Pursuant to Federal District Court Judge Sean Cox's Order of September 9, 2011, the undersigned met to develop a plan for the Detroit Water and Sewerage Department (DWSD) to comply with its NPDES permit and the Clean Water Act.

      The undersigned were the Committee members as identified in the Order or appointed as representatives. We met numerous times over the last sixty days. The Committee members conducted research into the root cause issues and solutions. Enclosed is our consensus Plan of Action, which includes a separate document consisting of the Committee's proposed broad-stroke DWSD Procurement Policy. Although it is not part of the Committee's Plan of Action, because it is referenced in the Plan of Action, we are also enclosing a copy of a report that the Acting Director of the DWSD provided to the Committee. We are asking you, as the special master in Case No. 77-71100, to transmit this letter and document to the Court on our behalf.

Chris Brown
City of Detroit Chief Operating Officer
Mayor's Office

James G. Fausone
DWSD
Board of Water Commissioners

Charles Pugh, President
Detroit City Council

Gary A. Brown, President Pro-Tem
Detroit City Council

## COMMITTEE'S PLAN OF ACTION
### November 2, 2011

### I. PREAMBLE

On September 9, 2011, the Court entered an Opinion and Order that created this Root Cause Committee to review barriers to short and long-term compliance. Pursuant to that order, this Committee was given sixty days to develop a plan and present that plan to the Court for its consideration. While the Committee was bound by a Confidentiality Order to its internal process, the members of the Committee were permitted to solicit and receive input from various sources with knowledge of the Detroit Water and Sewerage Department (hereinafter "DWSD" or "the Department") operations and utility operations more generally. Specifically, the Committee received input from the following sources:

- The Detroit City Council
- The Board of Water Commissioners
- DWSD Management Staff
- Union Representatives
- Management-side Labor Counsel
- Industry Professionals
- Current DWSD Vendors
- Rate Consultant
- Regulatory Agency Input

The Committee had available and reviewed the historical reports prepared on the Department's root cause issues. After careful study of the problems and based on our meetings, our review of the Findings of Facts by the Parties, by the Court through its own findings contained in its Opinion and Order of September 9, 2011 through our review of various studies and reports contained therein, the Committee has determined that there are essentially five root cause issues which must be addressed in order to allow DWSD to achieve accountability and long-term compliance with state and federal laws. The five areas of concern we will address with more specificity below include:

- Human Resources
- Procurement
- Law
- Finance
- Rates

It is important to note that the changes recommended by the Committee in these areas are significant, but critical to changing the environment of non-compliance at DWSD. It is equally important to note that **these changes do not contemplate DWSD becoming a separate entity.**

1

That is to say, **DWSD, and all of the assets of the DWSD, shall remain a department of the City of Detroit,** despite any changes in structure or governance recommended by this Committee.

This Committee's recommended Plan of Action ("the Plan") is organized into 3 main categories: Governance, Legal Barriers, and Transition Issues. In putting this Plan together, the Committee has attempted to respond to all known root causes and provide recommended solutions. However, in recognizing that the Court's judicial relief must be as minimally intrusive as possible to achieve long-term compliance, we believe that there may need to be additional changes made in the future, possibly through a second-phase plan once we have the ability to work with the implementation of this Plan.

## II. GOVERNANCE

The structure of DWSD is essentially a unitary department whose water and wastewater systems are currently managed and operated by the City of Detroit as a department of city government, although managed as a separate enterprise fund. The DWSD provides water service to less than four million people in Detroit and neighboring southeast Michigan communities. The DWSD also provides wastewater collection and treatment for Detroit and approximately 76 municipal suburban communities.

The combined functions of the DWSD are recommended to be broken into two divisions – operations and administration. We have examined these separate divisions in detail in order to make recommendations to address the long-term problems at DWSD and to streamline the function of both aspects of the Department.

The operations side of DWSD deals with the infrastructure and day-to-day operations of water treatment and sewage removal. The administrative component will include the functions of human resources, finance, legal and procurement services for the entire Department. These services are currently subject to the institutional procedures applied to City Departments. In general we conclude that operations can best be streamlined through recommendations in sub-paragraph (A). The administrative end of DWSD may be best addressed by streamlining the approval process in the above-mentioned key areas as outlined in sub-paragraph (C).

## A.   OPERATIONS

### (1) Divisional Structure within DWSD Administration

DWSD shall establish an autonomous administrative structure within the Department to provide for its own divisions of Purchasing, Human Resources, Law, and Finance. These divisions shall report to the Director of DWSD and shall not have any reporting requirements to the similar functions of the City of Detroit.

2

*(2) Procurement Policy for DWSD*

Since the Committee has determined that DWSD should be exempted from following the requirements of the City of Detroit's procurement ordinance in order to promote efficiency and ensure long-term compliance, the Committee has prepared the attached DWSD Procurement Policy to govern the procurement activities of DWSD. We recognize that the policy is a broad overview of a full procurement process and may need to be expanded to be fully implemented by the Department. At the same time, we understand that this policy will ultimately require formal adoption by the Board of Water Commissioners at a later time, consistent with the parameters we have laid out.

*(3) Immediate needs for Human Resources*

(a) Employees Covered by Collective Bargaining Agreements

The Committee reviewed the historical reports referenced earlier which discussed the root cause issues of non-compliance. It is evident from the various historical reports, and current conditions, that certain CBA provisions and work rules have limited DWSD from maintaining long-term environmental compliance. These issues, along with others, at least contribute to not achieving and maintaining long-term compliance by limiting manpower and workforce flexibility.

The Acting Director of DWSD submitted to the Committee a report on root cause problems and solutions. That report also provided recommendations for specific collective bargaining agreement (hereinafter "CBA") and work rules changes. The Department requested relief from specific items across all CBAs. In particular, Appendix 12 of the Plan was reviewed and discussed. The Appendix listed approximately 30 specific provisions and changes in the AFSCME CBA and seeks to apply similar changes to all the CBAs that apply to DWSD employees.

The Committee was aware that there are various approaches to addressing the concerns referenced in that report that fall along a scale of intrusiveness including: (i) the approach provided in State legislation for emergency managers that would terminate all collective bargaining agreements; (ii) suspension of the duty to bargain for 5 years as provided in certain State emergency laws; (iii) establishing a regional authority as a new employer for DWSD employees; (iv) terminating the workforce so DWSD would start with a blank slate; (v) outsourcing plant operations so corporate representations or warranties of compliance could be enforced; and (vi) ordering that negotiations take place to address the various identified problems.

The Committee spent considerable time discussing the option of negotiating the changes requested, or that may be necessary, with the 20 unions that represent the DWSD workforce.

3

The Committee agreed that all collective bargaining agreements that apply to DWSD workforce shall remain in force. However, the Committee agreed that certain changes to the CBAs need to occur. The Committee could not agree on how to achieve the desired changes.

The problem areas that were identified and require solutions are:

1. Effective employee training programs, employee assessment programs, and apprenticeship training programs should be developed and provided for by DWSD.

2. DWSD should act on behalf of the City of Detroit to have its own collective bargaining agreements after July 1, 2012. In other words, agreements with DWSD should not include employees of other City of Detroit departments.

3. DWSD should adopt a separate seniority system for the department that does not provide for rights across city of Detroit departments. This should also eliminate the confusion caused by bumping rights from other departments into DWSD.

4. Any prohibition on subcontracting or outsourcing should be eliminated from the CBAs. DWSD must be free to explore all available avenues to achieve long-term compliance.

5. Excused hours from work for union activities should be limited to attending grievance hearings and union negotiations, with prior notification to DWSD Management.

6. The timeline on use of past discipline should be three years.

7. The number of DWSD employee classifications should be reduced to the minimum identified by the Director to assure flexibility and long term compliance.

8. Promotions should be at the discretion of management and based upon the individual's skill, knowledge and ability, and then taking seniority into account.

9. Past practices on operational issues should not limit operational changes initiated by management.

10. Overtime should be assigned to employees most capable of performing work in a classification, at the discretion of management.

It was recognized that the provisions of all the CBAs would have to be modified with respect to each of the issues listed above, and ancillary provisions interpreted consistent with these changes. Any work rules, written or unwritten, which exist that are contrary to these changes would have to be terminated.

While the Committee was able to identify the above CBA and work rule challenges, it could not agree if the solution to these challenges could/should be left to negotiations or if Court ordered implementation was required.

4

(b) DWSD Executive Management Team

DWSD shall develop an Executive Management Team of exempt non-union, at-will positions. The members of the Executive Management Team, other than the Director of DWSD, shall serve at the pleasure of the Director of DWSD and may be removed with or without cause. The Executive Management Team cannot exceed ten percent (10%) of the total workforce of DWSD. This Executive Management Team is in addition to the three technical advisors to the BOWC, as outlined the Court's stipulated order of February 11, 2011. Nothing in this Plan will prevent the Director of DWSD from hiring non-employees of DWSD to perform some or all of the services of the Executive Management Team if that is deemed necessary to improve the operations of DWSD to ensure Long-Term Compliance.

The DWSD Executive Management Team should develop a formal succession plan to be presented to the BOWC for its review and approval.

**B.   RATES**

(1) Approval Authority

In the past, City Council has been required to approve water and sewerage rates charged by DWSD. The City Council assumed this responsibility pursuant to MCL §117.5e which provides that a municipal water or sewerage system:

> which serves more than 40% of the population of the state shall hold at least 1 public hearing at least 120 days before a proposed rate increase is scheduled to take effect and that [a] final vote by the governing body of the city to implement a proposed rate increase shall not be taken until the hearings provided for in this subdivision are concluded and the results of those hearings are considered by the city's governing body. M.C.L. § 117.5e(b).

According to the most recent census data collected by the U.S. Census Bureau, the City of Detroit has received documentation that DWSD does not service more than 40% of Michigan's population. As a consequence, City Council no longer need to approve water and sewerage rates for DWSD customers pursuant to State law, City Ordinance, or City Charter.

It is, however, the recommendation of the Committee that retail rates for the citizens of the City of Detroit shall still require City Council approval, only after a public hearing for City of Detroit residents. All wholesale rates will be fully and finally approved by the Board of Water Commissioners.

5

(2) Additional Considerations

The Committee spent a substantial amount of time discussing the need to create an incentive within Detroit and DWSD to support making difficult decisions that would promote improving the efficiency of DWSD. This Efficient Compliance Payment concept would allow for a calculation and cost sharing whereby the savings associated with a reduction in operating expenses is shared by DWSD, the City of Detroit, Staff of DWSD, and the customers of DWSD. This type of arrangement will help focus everyone's efforts on the ultimate goal of insuring long-term compliance, continually improving efficiency of operations, and ultimately reducing the administrative component[1] of the rate expense. The Acting Director of DWSD presented a detailed proposal on computing the Efficient Compliance Payment at Appendix 13 of the attached report.

Additionally, the transition to a more autonomous DWSD will result in a substantial reduction in chargeback revenues to the City of Detroit from the operations of DWSD. This is the result of DWSD no longer reimbursing the City of Detroit for the cost of staff associated with City Departments within Finance, Procurement, Law, Human Resources, and Information Technology Services. Since the ability of DWSD to hire its own staff to fulfill these functions will be quicker than the City's ability to reduce its staff and expenses commensurate with those changes, a budget deficit will be created within the City that the Committee feels needs to be addressed. Therefore, the Committee discussed the need for a temporary, time-limited, transition payment to the City of Detroit to prevent the implementation of this plan from causing a deficit within the City of Detroit's General Fund. The Committee was unable to reach consensus on the amount and the number of years needed for the transition payment at this time.

Further, the Committee agreed that there was a need to explore Payment in Lieu of Taxes arrangements for DWSD that would mirror agreements in place with other public utilities throughout the State of Michigan.

While the Committee believes that these concepts are all important and that some combination of these concepts is critical to the long-term viability of this Plan, the Committee was unable to achieve consensus on a recommended path due to the complexity of the concepts under consideration and the amount of research required to complete this task in the time available.

## C.   ADMINISTRATIVE - APPROVAL AUTHORITY

In order to assist the City and DWSD in achieving substantial compliance, we have

---

[1] It is understood that wholesale rates consist globally of two components: Capital Expenditures and Operating Expenditures. Since Capital Expenditures are tied to investing in the core business of the utility, it is not helpful to the long-term interest of DWSD to provide an incentive to lower the Cap Ex commitment. Rather, the incentive should rest on reducing the administrative expenses which are solely under the control of DWSD management.

6

determined that there is a need to streamline the approval process for various activities within the DWSD operations and create a more direct culture of accountability within the staff at DWSD. To achieve this objective, the Committee has agreed to reduce, and in many instances, eliminate, redundant approval processes and provide for clearer lines of approval. The approval authority we propose is divided along two lines: final approvals to be housed within DWSD and final approvals to be held by the Detroit City Council. These approvals are outlined in greater detail below.

As previously stated, the DWSD will remain a department of the City of Detroit. Nevertheless, there is an efficiency of operations need to allow final approval authority to vest in the Director of DWSD with respect to the signing of several types of legal documents on behalf of DWSD's operations. Therefore, it is recommended that the Director of DWSD be vested with delegated authority to sign documents of the type referenced within this Plan and that the delegated authority shall include the right to bind the City of Detroit to the terms of the agreements contained therein.

In addition to all powers currently vested in DWSD pursuant to the City Charter, City Ordinances, State Law, and the By-Laws for the Detroit Water and Sewerage Department Board of Water Commissioners ("BOWC"), DWSD, acting through its Director upon authorization by the Board of Water Commissioners, shall have final authority to approve the following types of documents without any further approvals from other departments, board, agencies, or offices of the City of Detroit:

- Legal Settlements and Claims paid by DWSD;
- Collective Bargaining Agreements for employees of DWSD;
- Terms and Conditions of Employment for employees of DWSD;
- The Budget for DWSD (Subject to approval of Rates) as outlined above;
- Wage scales for DWSD employees, subject to City Council's veto rights as outlined below; and
- Those procurements not covered by the Board of Water Commissioners' and the Detroit City Council's approval outlined in the attached DWSD Procurement Policy.

The Committee also examined the process for the recruitment, hiring, and dismissal of the DWSD Director and believes that there is an opportunity to improve that process. At the same time, we recognize that efforts to fill the current vacancy in the Director position is well on its way to completion and that a new process for recruitment should not impact the current search. With this in mind, we recommend that the process be amended as follows:

(a) A Director search committee should be established that will include representation from the Mayor's office, a member of the Board of Water Commissioners selected by the Board and who is not a resident of Detroit, and a member of the Detroit City Council appointed by the President.
(b) The hiring of the Director should be unchanged from the current process.
(c) The removal of the Director should require either

7