# EXHIBIT 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

     Plaintiff,

v.                                                  Honorable Sean F. Cox

City of Detroit, et al.,                            Case No. 77-71100

     Defendants.

_____/

OPINION & ORDER
TERMINATING SECOND AMENDED CONSENT JUDGMENT
AND CLOSING THIS CASE

The United States Environmental Protection Agency ("EPA") initiated this litigation on

May 6, 1977, against the City of Detroit and the Detroit Water and Sewerage Department

("DWSD"), alleging violations of the Clean Water Act, 33 U.S.C. § 1251 et seq. ("the Clean

Water Act"). The violations alleged in this case, which are undisputed, involve the DWSD's

wastewater treatment plant ("WWTP") and its National Pollutant Discharge Elimination System

("NPDES") permit.

This case was originally assigned to the Honorable John Feikens. As explained below,

Judge Feikens presided over this case for decades, during which time he took various actions

aimed at allowing the DWSD to achieve short and long-term compliance with its NPDES permit

and the Clean Water Act. Although Judge Feikens took various measures, designed to eliminate

the impediments to compliance that have been identified by multiple experts and acknowledged

by the City, those measures proved inadequate and the violations continued.

1

This case was reassigned to this Court on November 29, 2010, following Judge Feikens's retirement. At that time, the Michigan Department of Environmental Quality ("MDEQ")[1] was addressing renewed permit violations with the DWSD and negotiating yet another remedial plan.

Effective July 8, 2011, the City, the DWSD, and the MDEQ entered into an Administrative Consent Order, setting forth a detailed remedial plan. Thereafter, the City filed a motion asking this Court to dismiss this action and close the case, asserting that the City had achieved substantial compliance.

This Court, however, denied that motion in a detailed Opinion & Order issued on September 9, 2011. This Court concluded that the DWSD had not achieved even short-term compliance with its NPDES permit, as it self-reported new violations shortly after signing the Administrative Consent Order. This Court further concluded that the record in this case establishes that, unless more fundamental corrective measures were taken to address the underlying root causes of non-compliance, the DWSD would remain in a recurring cycle where the DWSD is cited for permit violations, the DWSD and the MDEQ agree to a detailed remedial plan, but the DWSD is unable to follow it and is again cited for the same type of violations. Rather than order a remedy on its own, without input from City leaders, the Court took a somewhat unorthodox approach. This Court created a court-ordered committee ("the Root Cause Committee") to devise and propose a workable plan to address and remedy the underlying root causes of the DWSD's inability to comply with its NPDES permit and the Clean Water Act.

---

[1] In 1995, the Governor of the State of Michigan created the Michigan Department of Environmental Quality ("MDEQ") and transferred all of the statutory powers, duties and functions of the Michigan Department of Natural Resources relevant herein to the MDEQ. The name has changed several times throughout the years. For ease of reference, this Department will be referred to as MDEQ throughout this Opinion & Order.

2

On November 4, 2011, this Court adopted the Root Cause Committee's Plan of Action, and its proposed procurement policy, and ordered its implementation. Thereafter, the DWSD hired its first permanent Director since 2008, who began working on implementing the changes ordered.

Pursuant to the procedure set forth in the November 4, 2011 Order, this Court ordered the DWSD's Director to submit a Final Director's Report of Compliance. That report was filed on March 15, 2013, after several extensions.

Having reviewed the Final Director's Report of Compliance ("FDRC"), this Court is satisfied that the changes agreed to by the parties, and the changes ordered by this Court, have been substantially implemented. A more empowered Board of Water Commissioners has been established and it has made tremendous progress. The DWSD now has its own fully-functional, in-house, human resources department and the DWSD is now meeting the Administrative Consent Order's staffing requirements. The DWSD has a new and improved procurement policy and substantial progress as to other changes ordered by the Court has been made such that further Court intervention is not necessary.

The Court notes that the FDRC references a new, unsolicited proposal from the Root Cause Committee, asking this Court to order a regional authority and order or approve the transfer of the DWSD's assets to a regional authority. The Court shall deny any requests relating to this proposal because this Court lacks the authority to order the changes that are now being proposed. And even if this Court had such authority, it would decline to order the relief requested for a multitude of reasons.

The FDRC contains five requests for clarification or relief that the Court shall address.

3

First, this Court declines to modify the rate settlement agreements between the parties. If the

DWSD and it customer communities desire to modify those agreements, they are free to

negotiate any changes needed without the involvement of the Court. Second, to the extent that

the DWSD leadership has a real concern and is unable to resolve any issues with vendors who

demand adequate assurances regarding payment, such issues are more properly addressed to City

Administration. Third, the Court declines any further requests regarding the DWSD establishing

its own Defined Contribution Plan because that is an issue to be resolved between the DWSD

and the City. Fourth, the Court declines to exempt Board of Water Commissioner members from

the current City of Detroit Charter provision that provides that "[n]o member of the Board shall

be a City official or employee, or a principal or employee of contractor of the City." Fifth, the

Court declines to restrict who may negotiate on behalf of DWSD-specific unions.

Having reviewed the FDRC, and having held a status conference on March 21, 2013, this

Court finds that while the DWSD's compliance record is still not perfect, is it vastly improved,

especially in the historically problematic areas. The MDEQ recently issued a new NPDES

permit to the DWSD, with an effective date of May 1, 2013, and an expiration date of October 1,

2017. This Court concludes that the MDEQ, the environmental agency charged with issuing and

overseeing the DWSD's NPDES permit, will continue to work with the DWSD to resolve any

issues that may arise over time regarding that permit.

The Court concludes that, after more than thirty-five years of federal court oversight, the

DWSD has achieved substantial compliance with its NPDES permit and the Clean Water Act.

This Court shall therefore terminate the Second Amended Consent Judgment and close this case

because the existing Administrative Consent Order is a sufficient mechanism to address any

4

future issues regarding compliance with the DWSD's NPDES permit and the Clean Water Act.

I.     Background

This case, which is now in its fourth decade, has an exceptionally long history that is more fully set forth in this Court's September 9, 2011, Opinion & Order (D.E. No. 2397) and this Court's November 4, 2011, Order (D.E. No. 2410).   Below is a condensed summary.

A.     Actions Taken While Judge Feikens Presided Over This Case

The EPA initiated this action on May 6, 1977, against the City and the DWSD, alleging violations of the Clean Water Act.   The action was originally assigned to the Honorable John Feikens.   The State of Michigan was realigned as a party plaintiff because of the mutuality of interest in the subject matter of this case.[2]

The DWSD provides wastewater collection, treatment and disposal services for Detroit and approximately 76 municipal suburban communities.   The DWSD also provides water service to approximately four million people in Detroit and neighboring Southeast Michigan communities.

The violations alleged in this case, which were undisputed, involve the DWSD's WWTP and its NPDES permit.   Although this action was initiated by the EPA, the MDEQ was later joined in the action and the MDEQ is the entity that now directly oversees the DWSD's NPDES permit.

The EPA's Complaint alleged that the discharged effluent from the DWSD's WWTP was

---

[2]By Orders dated June 29, 1977, and July 6, 1977, Judge Feikens also joined as parties various governmental entities that received wholesale sewerage services from the DWSD pursuant to written contracts and communities whose wastewater was treated by the DWSD pursuant to contract.

5

in violation of the Clean Water Act. It further alleged that the number of personnel employed at the WWTP has not been sufficient, personnel are not adequately trained, and purchasing of necessary and required supplies and equipment has not been timely or at an acceptable level. (EPA's Compl.).

On September 14, 1977, Judge Feikens entered a Consent Judgment establishing a compliance schedule for the DWSD to address and correct the Clean Water Act violations. The 1977 Consent Judgment required, among other things, that the DWSD prepare and implement a staffing program detailing its manpower needs, repair and maintain certain dewatering equipment, and prepare and implement a procurement plan to ensure that necessary procurements of supplies, materials and equipment were made.

This case, however, was not closed upon entry of the 1977 Consent Judgment. In November of 1978, Judge Feikens entered an Order appointing Professor Jonathan W. Bulkley as Court Monitor, ordering him to study the operations of the WWTP and report his findings to the Court, and make recommendations to facilitate compliance with the 1977 Consent Judgment. (D.E. No. 366). On December 29, 1978, Dr. Bulkley submitted his report ("Dr. Bulkley's 1978 Report"). (D.E. No. 381). It found that several activities at the DWSD were not in compliance with the requirements of the 1977 Consent Judgment, including: 1) staffing; and 2) procurement activities. (See D.E. No. 381 & D.E. 2397 at 9-10).

After receipt of Dr. Bulkley's 1978 Report, Judge Feikens issued an order appointing the current mayor of the City of Detroit, Coleman A. Young, as Special Administrator of the DWSD. (D.E. No. 1848-3). Judge Feikens created the position of Special Administrator because he found that compliance with the 1977 Consent Judgment required the exercise of the Court's

6

equitable powers. His Order gave the Special Administrator very broad powers to take various actions that otherwise would have been prohibited by the City of Detroit's Charter, including bypassing the Board of Water Commissioners and the Detroit City Council on, among other things, matters relating to procurement of material and services.

After testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment, an Amended Consent Judgment was entered on April 23, 1980, that modified the schedule for achieving compliance with effluent limitations for the WWTP set forth in the DWSD's NPDES Permit.

On August 25, 1983, after the City of Detroit had met certain requirements of the Amended Consent Judgment, the MDEQ issued a new NPDES permit to the DWSD. On June 8, 1984, Judge Feikens entered an Order that took judicial notice of the DWSD's NPDES permit and terminated those Amended Consent Judgment provisions that the DWSD had satisfied. That Order also identified the Amended Consent Judgment provisions with which the DWSD was still required to comply and provided that the Court retained jurisdiction to ensure full compliance with the Amended Consent Judgment.

NPDES permits were re-issued to the DWSD effective February 1, 1990, and December 1, 1992, respectively.

In 1994, the DWSD commissioned an operational and organizational review ("the OOR Report") of the department. That report found the same problems and issues identified by Dr. Bulkley in his 1978 Report. (Id.; D.E. No. 2397 at 12-13).

In 1997, the DWSD again fell out of compliance with its NPDES permit due to insufficient dewatering capacity, and in August 1997, the DWSD reported certain violations of

7

its NPDES permit to the MDEQ.  Thereafter, Judge Feikens appointed a committee, which included Dr. Bulkley, to investigate the cause of the renewed violations.  (See D.E. No. 1872, wherein Judge Feikens explained that he "appointed a committee to investigate why, after so many years of court oversight, the [WWTP] was not able to remain in compliance" with the Clean Water Act.).  The committee completed a report of the causes of the noncompliance in January 2000 (the "2000 Investigative Report").  (D.E. No. 1649).  It concluded that the "technical deficiencies [with dewatering equipment] and operating conditions at the plant level were caused by the deficiencies and ineffectiveness of four major DWSD and City Programs." (D.E. No. 1649 at 1).  These programs were capital improvements, finance, purchasing and materials management, and human resources.  (See D.E. No. 2397 at 14-15).  The 2000 Investigative Report noted that "[o]nly through actions taken by operations personnel that bypassed the impediments created by the City and DWSD policies and procedures for the procurement of materials and supplies has the plant returned to compliance.  If these extraordinary (and costly) stop-gap measures had not been taken, the WWTP would have remained in violation of its NPDES permit."  (D.E. No. 1649, Section 1 at 4).

The City of Detroit filed a written response to the 2000 Investigative Report, suggesting that another appointment of a Special Administrator for the DWSD was needed to achieve short-term compliance.  (D.E. No. 1650).  Thereafter, Judge Feikens entered an order appointing then-Mayor Dennis Archer as Special Administrator.  (D.E. No. 1848-4).

On August 30, 2000, Judge Feikens entered a Second Amended Consent Judgment that set forth yet another compliance schedule for the DWSD to address and correct the NPDES permit violations.  (D.E. No. 1688).  It incorporated by reference the Order Appointing Special

8

Administrator and "supplant[ed] and superced[ed] the Amended Consent Judgment entered on April 25, 1980." (D.E. No. 1688 at 13). The Second Amended Consent Judgment provides that it "shall terminate on the date a written Order of Termination is signed by the federal court." (Id. at 15).

This case, however, did not close upon the entry of the Second Amended Consent Judgment. Judge Feikens continued to oversee the DWSD.

On May 2, 2008, Judge Feikens issued an order requesting briefing regarding compliance. (D.E. No. 2122). In that order, he expressed concern regarding several problem areas, including staffing and human resources issues. He asked the DWSD to respond to concerns in writing, and directed it to go beyond the "boilerplate language" of the quarterly reports it had been submitting.

In response, the City retained Intrastructure Management Group, Inc. to prepare a report addressing various issues. (D.E. No. 2130). Like the reports submitted by others in the past, the report noted the same problems areas. It suggested that the long-standing systemic problems at the DWSD required structural changes. (See D.E. No. 2130-3).

In September 2009, the DWSD again fell out of compliance with its NPDES permit. Judge Feikens then requested that Dr. Bulkley investigate the renewed violations. On June 15, 2010, Dr. Bulkley provided another written report to the Court (the "2010 Bulkley Report"). (D.E. No. 2296). It stated "[i]t is apparent that the current permit violations are similar to the problems that have occurred since the issuance of the original Consent Judgment in 1977." (Id. at 4). Dr. Bulkley continued by stating that "[t]he nine (9) causes identified in the January 12, 2000 Report of the Committee of Investigation are very similar to certain of the issues that appear to be contributing to the current Total Suspended Solids NPDES violations from the

9

DWSD's wastewater treatment plant." (Id.). As such, Dr. Bulkley attached a copy of the 2000 Investigative Report – which found serious problems with human resources, capital improvement, and purchasing in 2000 – to his 2010 report. The 2010 Bulkley Report concluded "[t]he changes implemented in 2000 were apparently insufficient to maintain compliance over the long term, as evidence by the recurring solids build up problem and the related permit violations. It may be appropriate to consider more fundamental corrective measures to address the institutional problems which are adversely impacting the performance of DWSD's wastewater treatment plant." (D.E. No. 2296).

Following the renewed violations in 2009, the Engineering Society of Detroit was also asked to assess and identify immediate emergency corrective steps and a sustainable, long-term remediation strategy for the DWSD. In July of 2010, its written report was submitted to the City, the Court, and the MDEQ. It too noted the same continuing problems with the City's practices, as they relate to the DWSD, in the areas of human resources and purchasing.

In response to the Second Notice of Violation dated April 14, 2010, on September 15, 2010, the DWSD filed a Corrective Action Plan ("CAP") dated August 31, 2010, which represented its "Roadmap for sustainable compliance." (D.E. No. 2309 at 7). The DWSD's CAP identified, as causes of the current violations, problems that had been identified as the causes of the previous violations in 1997, including: failed maintenance planning; lack of skilled trades and other key personnel; and significant shortcomings in the purchasing and procurement areas.

On October 13, 2010, MDEQ responded to the CAP, stating that although the CAP adequately addressed the immediate short term action items needed to achieve compliance, "it failed to adequately address the issues that are critical to ensuring long term compliance such as

10

staffing, purchasing, long term solids disposal and maintenance planning." (MDEQ's 10/13/10

Letter, Appendix to D.E. No. 2397, No. 9).

On November 29, 2010, after Judge Feikens retired, this case was reassigned to the

undersigned. (D.E. No. 2323).

B.      Actions Taken After This Case Was Reassigned

This case has now been pending before the undersigned for more than two years. Below

is a summary of what has been accomplished during that time.

1.      On February 11, 2011, The Parties Agreed To A Stipulated Order To
        Create A More Empowered Board Of Water Commissioners

After this action was reassigned, the Court held several conferences with the parties to

discuss the status of this case and the recent violations.

In February of 2011, the City, along with the counties of Wayne, Oakland and Macomb,

determined that a more empowered Board of Water Commissioners ("BOWC" or "the Board")

would enhance the DWSD's ability to comply with its NPDES permit and the Clean Water Act.

(See 2/11/11 Stipulated Order, D.E. No. 2334, at 1) ("[T]he parties agree that the DWSD's ability

to comply with environmental laws and its NPDES Permit will be enhanced by the Board's

exercise of its powers and authority to the fullest extent of the law.")

The Stipulated Order provides that BOWC members must have at least seven years of

experience in a regulated industry, a utility, engineering, finance or law and that the Board will

be compensated. (Id.). It further provides that the BOWC "will be supported by certain staff

having expertise in the fields of law, finance, and technology pertinent to DWSD operations (i.e.

engineering and/or water or wastewater operations)." (D.E. No. 2334 at 2). The Stipulated

11

Order further provides that "[w]ithin six months of the date of this Order, any party may file a motion with the Court to demonstrate that the [DWSD] is in substantial compliance with its NPDES Permit and the consent judgments of this Court. If the Court is satisfied that substantial compliance has been achieved, it shall dismiss this lawsuit." (Id.).

In compliance with the February 11, 2011 Stipulated Order (the "Stipulated Order"), on April 1, 2011, Mayor Bing appointed a new BOWC. The BOWC has since amended its by-laws, to incorporate the provisions of the Stipulated Order.

### 2.     The City/DWSD And The MDEQ Enter Into An ACO on July 8, 2011

During the first six months following reassignment, the City and the DWSD worked with the MDEQ to develop yet another plan for compliance. Effective July 8, 2011, the City, the DWSD and MDEQ entered into the Administrative Consent Order ("ACO"), aimed at achieving compliance with the DWSD's NPDES permit and the Clean Water Act. (D.E. No. 2365-1). The ACO sets forth a detailed remedial plan, to be accomplished over a substantial period of time, projected to extend to at least 2016. (Id. at 7).

It includes, among other things, that the DWSD would develop a written Staffing Plan to establish minium staffing levels that would be maintained in accordance with a defined schedule. (D.E. N. 2365-1 at 9-10). The MDEQ has since approved a written Staffing Plan for the DWSD.

### 3.     The City's July 25, 2011 Motion To Dismiss And The Court's Opinion & Order Denying It Without Prejudice

On July 25, 2011, the City filed a "Motion to Dismiss and for Relief from the Second Amended Consent Judgment." (D.E. No. 2365). In that motion, the City noted that the MDEQ and the DWSD had recently entered into the ACO and asked this Court to order that the

requirements set forth in that ACO are substituted for the requirements of the August 30, 2000

Second Amended Consent Judgment.  The City also asserted that the DWSD had made

substantial progress toward achieving full compliance with its NPDES permit and the Clean

Water Act and, as a result, the Court should dismiss this action.

Documentation provided to the Court by the MDEQ, however, reflected that after

executing the ACO on July 8, 2011, the DWSD self-reported new violations of its NPDES

permit to the MDEQ, which included the WWTP's total suspended solids (TSS).  In a letter

dated September 7, 2011, the MDEQ advised the DWSD that these violations of the DWSD's

"NPDES permit effluent limitations occurring after the effective date of the ACO, July 8, 2011

are violations of the ACO" and that stipulated penalties may be assessed for these new violations

under the ACO.  That letter further stated that the violations were expected to continue.

At the time that the City's Motion to Dismiss was filed, the DWSD had been without a

permanent Director since June 30, 2008.

This Court denied the City's Motion to Dismiss, without prejudice, in a forty-four (44)

page Opinion & Order issued on September 9, 2011.  (D.E. No. 2397).  In doing so, this Court

noted that shortly after executing the ACO on July 8, 2011, the DWSD self-reported serious

violations of its NPDES permit to the MDEQ.  Thus, this Court concluded that the City had not

established that the DWSD had achieved even short-term compliance with the ACO and the

Clean Water Act.

This Court explained that while enforcement actions typically result in a remedial plan,

the Court's powers extend beyond ordering remedial plans:

"[E]nforcement actions typically result, by consent or otherwise, in a remedial

13

order setting out a detailed schedule of compliance designed to cure the identified
violation of the Act." Weinberger, 456 U.S. at 318. Nevertheless, a district court
has broad equitable discretion in remedying violations of the Act and is not
limited to such orders. Id.; see also United States v. Metropolitan District
Commission, 930 F.2d 132, 135 (1st Cir. 1991) ("The law confers broad legal
authority upon a district court to choose appropriate remedies for violation of the
Clean Water Act.") (emphasis in original). The Clean Water Act permits "the
exercise of a court's equitable discretion" to "order relief that will achieve
compliance with the Act." Weinberger v. Romero-Barcelo, 456 U.S. 305, 320
(1982) (emphasis in original).

(D.E. No. 2397 at 35-36). This Court noted that, from the inception of this case, a collaborative

approach aimed at achieving compliance through consent judgments or other orders setting out a

remedial plan designed to cure the violations was attempted in this case:

> Rather than contest the violations, the City and the DWSD entered into a consent
> judgment that set out a detailed compliance plan designed to cure the violations.
> As the record reflects, however, that approach has not stopped the violations.
> Despite entering into a series of agreements containing detailed compliance plans,
> the DWSD has been unable to comply with those plans, resulting in repeated
> violations of the Clean Water Act. For the more than 34 years during which this
> action has been pending, the City and the DWSD have remained in a recurring
> cycle wherein the DWSD is cited for serious violations of its NPDES permit, the
> City negotiates and agrees to a detailed remedial plan for compliance, but the
> DWSD is unable to follow the plan and is again cited for the same or similar
> violations. Thus, although a collaborative approach employing detailed remedial
> plans has been attempted, that approach has not resulted in compliance with the
> Clean Water Act and the violations have continued.

(Id. at 37-38).

This Court also noted that, over several decades, Judge Feikens had also taken other

actions, in addition to remedial plans, aimed at achieving long-term compliance:

> Recognizing that a detailed remedial plan alone would not lead to sustained
> compliance, Judge Feikens took numerous actions, detailed in the preceding
> Findings of Fact, aimed at enabling the City and the DWSD to achieve long-term
> compliance with the DWSD's NPDES permit and the Clean Water Act.

14

    For example, Judge Feikens appointed a highly qualified[3] environmental
expert, Dr. Jonathan W. Bulkley, to act as Court Monitor.  He also used more
intrusive means designed to eliminate, at least temporarily, the institutional
impediments to sustained compliance, including successive appointments of
Detroit Mayors as Special Administrators, who were empowered to take actions
on behalf of the DWSD irrespective of the City's Charter, ordinances, policies and
contracts.
    Judge Feikens also had the DWSD use outside consultants to assist with
troubled areas such as contracting.  For example, from November 2002 through
November 2010, the consulting firm IMG was retained to examine and review
DWSD contracts over $500,000.00.  (See, e.g., D.E. Nos. 1742 & 2308).

(Id. at 38-39).

  In addition, and in this Court's view, most significantly, "Judge Feikens took additional

measures designed to help the DWSD attain sustained compliance by having Dr. Bulkley, and

various other experts, investigate the underlying root causes for the recurring cycle of violations.

The City and the DWSD had direct participation with those studies and the City commissioned

some of its own." (Id. at 39).  The record reflects that the underlying root causes of the DWSD's

non-compliance have been studied by experts ad nauseam (e.g., Dr. Bulkley's 1978 Report, done

after the City/DWSD failed to comply with the terms of the 1977 Consent Judgment; the 1994

Operational and Organizational Review of the DWSD; the 2000 Investigative Report, which was

done after the DWSD again fell out of compliance with its NPDES permit in 1997; the DWSD

Succession Plan Report, prepared by IMG in 2007; Dr. Bulkley's 2010 Report, done after

violations recurred again in 2009; and the Engineering Society of Detroit Consensus Action

Report in 2010, also done after violations recurred in 2009).

  Moreover, these experts that have studied the DWSD had consistently, over many years,

opined that the same root causes stand in the way of the DWSD being able to comply with its

---

   { See Appendix to Opin. & Order No. 13).

15

NPDES permit, the remedial orders agreed to in this case, and the Clean Water Act: "1) the DWSD having an insufficient number of qualified personnel at the WWTP; 2) excessive and unnecessary delays in hiring qualified personnel across all job positions at the DWSD; 3) the DWSD's required use of the City's Human Resources Department, resulting in significant delays in filling critical positions at the DWSD; 4) the City's personnel policies, civil service rules, and union rules and agreements, restricting the compensation, recruitment and prompt hiring of necessary personnel at the WWTP; 5) insufficient training of personnel at the DWSD and WWTP; 6) lack of a succession plan at the DWSD; 7) obsolete job descriptions and qualifications for various positions within the DWSD; 8) untimely and inadequate purchasing of necessary equipment and supplies for the WWTP; 9) excessive delays in the processing of purchase requisitions for critical repair and/or replacement parts; 10) the City's flawed purchasing practices and procedures; 11) the City's ineffective procurement system; 12) the approval process for purchases over $25,000, created by the City's Charter and/or ordinances, unnecessarily delaying contracts for essential parts, equipment, and services at the DWSD; 13) the City's bidding and certification requirements, delaying contract approvals; and 14) the DWSD's repeated failure to replace aged and deteriorated capital equipment and to maintain solids dewatering facilities at the WWTP." (Id. at 39-40). In addition to the above experts, since the inception of this case, the EPA and the MDEQ have also identified many of these same root causes as impeding compliance. This Court found that the above are the underlying "root causes behind the DWSD's inability to sustain compliance with its NPDES permit, the remedial orders in this case, and the Clean Water Act." (Id. at 41).

    This Court was then faced with the unenviable task of determining how to remedy the

ongoing and serious violations of the Clean Water Act, given the complex nature of the

underlying root causes of non-compliance and the fact that the rather extraordinary actions taken

over several decades proved inadequate.

Rather than order a remedy on its own, without input from the City, this Court considered

other options and ultimately decided to take an admittedly unique approach:

> [T]his Court concludes that, in order to achieve long-term compliance with
> the Clean Water Act, other less intrusive measures, over many years and many
> attempts, having proved unsuccessful, more fundamental and intrusive corrective
> measures are required.  The record in this case establishes that, unless more
> fundamental corrective measures are taken to address the institutional and
> bureaucratic barriers to sustained compliance that have been identified by experts
> and acknowledged by the City, the DWSD will remain in this recurring cycle and
> will never achieve sustained compliance with its NPDES permit, the ACO, and
> the Clean Water Act.
>
> The Court further concludes that an effective equitable remedy to achieve
> sustained compliance will require this Court to order structural changes regarding
> the DWSD that will likely override the City of Detroit's Charter, its local
> ordinances, and/or some existing contracts.
>
> This Court does not arrive at this conclusion lightly.  As noted above,
> Judge Feikens attempted several less intrusive measures, over several decades, but
> those less intrusive measures have not enabled the DWSD to achieve sustained
> compliance.  In addition, although the City has had ample opportunity to devise
> and implement its own solutions to the underlying causes of noncompliance that
> have been identified and discussed since the inception of this case, to date, it has
> not proposed or implemented a plan that has sufficiently addressed those root
> causes.
>
> To be fair, the City has been constrained in the measures it has proposed or
> implemented to date because the City is bound by various provisions of the City's
> Charter and ordinances, and existing contracts, that prevent the City from making
> fundamental changes in the identified problem areas.
>
> This Court, however, has broad equitable power to order any relief necessary to
> achieve compliance with the Clean Water Act and this Court is not constrained by the
> provisions of the City's charter or ordinances.  Weinberger, 456 U.S. at 318; Perkins, 47
> F.3d at 216.
>
> This Court appreciates that its broad equitable authority is to be "tempered
> by precepts of comity and federalism." Kendrick, 740 F.2d at 437.  As then-
> Judge (now Justice) Stephen Breyer explained in Metropolitan District

17

Commission,[4] considerations of comity and federalism, however, do not give a state or municipality the legal power to violate federal law or to continue violations of the Clean Water Act over a thirty-four year period.  United States v. Metropolitan District Commission, 930 F.2d at 136.  Maintaining the status quo is not an option.

Nevertheless, this Court is mindful that remedies that override state or local law should be narrowly tailored and that, to the extent possible, local officials should at least have the opportunity to devise their own solutions to remedy a violation of federal law.

Accordingly, the Court shall ORDER the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and a current member of the Board (to be chosen by the Board) to meet and confer and, within 60 days of the date of this order, propose a plan that addresses the root causes of non-compliance that are discussed in this Opinion & Order.  In making such recommendations to the Court, these individuals shall not be constrained by any local Charter or ordinance provisions or by the provisions of any existing contracts.  If the local officials fail to devise and propose a workable solution to remedy the underlying causes of the recurrent violations of the Clean Water Act in this case, this Court will order a more intrusive remedy on its own.

(Id. at 42-43).

4.    This Court's November 4, 2012 Order

Following this Court's September 9, 2010 Opinion & Order, the designated local leaders ("the Root Cause Committee") met and conferred in order to devise and propose a workable solution to remedy the underlying root causes of noncompliance.   On November 2, 2011, the Root Cause Committee (hereinafter referred to as the "RCC") submitted a written proposed "Plan of Action" to the Special Master in this action, which the Special Master then submitted to the Court on that same date.  (Docket Entry No. 2409).

In an Order issued on November 4, 2012 (D.E. No. 2410), this Court adopted the Plan of Action proposed by the RCC:

---

[4]United States v. Metropolitan District Commission, sometimes referred to as the Boston Harbor case, is another case involving Clean Water Act violations continuing over many years.

18

Having studied the Plan of Action proposed by the Root Cause
Committee, the Court concludes that the Plan of Action adequately addresses the
majority of the root causes of non-compliance that are outlined in this Court's
September 9, 2011 Opinion & Order. As such, the Court ADOPTS the Plan of
Action proposed by the Root Cause Committee (Ex. A to this Order), which
includes a DWSD Procurement Policy (Ex. B to this Order), and ORDERS that
the Plan of Action shall be implemented in order to remedy the recurring
violations of the Clean Water Act in this case.

(Id. at 4). This Court noted that although it was ordering rather significant structural changes to

the DWSD, the changes ordered by the Court "do not structure the DWSD as a separate entity."

(Id.). That is, the structural changes ordered by this Court did not alter the fact that the DWSD,

and all of the assets of the DWSD, are owned by the City of Detroit.

The Court concluded, however, that the Plan of Action did not adequately address

collective bargaining issues and ordered additional relief necessary for the DWSD to achieve

short-term and long-term compliance. (Id. at 4-7).

In a section of the RCC's Plan of Action titled "Additional Considerations" (Plan of

Action at 6), the RCC discussed the concepts of: 1) an "Efficient Compliance Payment;" and 2) a

Payment in Lieu of Taxes ("PILOT") arrangement. But the Plan of Action stated that the RCC

was unable to achieve consensus on a recommended path due to the complexity of the concepts

under consideration and time constraints. As such, the Court ordered that the RCC could

continue to meet and study those concepts and that it could submit a written supplement to the

Plan of Action to the Special Master regarding those concepts and any recommendations no later

than February 4, 2012. (D.E. No. 2410 at 8).[5]

---

[5]The RCC did not submit a written supplement to the Plan of Action regarding either of
those concepts by February 4, 2012; nor did it request an extension.

19

Finally, the Court ordered implementation of the adopted Plan of Action and the additional relief ordered by the Court. (Id. at 8-10).

Recognizing that it may take several months to implement the changes ordered by the Court, the November 4, 2011, Order set forth a procedure for the submission of a final compliance report to the Court, so that the Court could make any necessary modifications before closing this case:

5.      Within 6 months from the date of this Order (by May 4, 2012), the Director of DWSD shall prepare a written Report of Compliance with the ACO that identifies any current or anticipated barriers to long-term compliance with the ACO and the Clean Water Act ("the Director's Report of Compliance"). The Director of the DWSD shall include within that report any additional recommendations or changes that are necessary to achieve long-term compliance.

6.      The Director's Compliance Report shall be provided to the BOWC, the Mayor of the City of Detroit, the Detroit City Council, the MDEQ, and the Special Master. The Director's Compliance Report shall request any comments, suggestions, or recommendations from the BOWC, the Mayor of the City of Detroit, the Detroit City Council, and the MDEQ within 30 days.

7.      To provide adequate time for review and consideration of the comments, suggestions, and recommendations made, and to allow an opportunity to make necessary changes, the Director of the DWSD shall submit, to the Special Master, a final report to the Court on the status of compliance with the ACO, any remaining barriers to long-term compliance, together with proposed solutions, within 90 days of submission of the initial Director's Report of Compliance.

8.      After receiving the final Director's Report of Compliance, the Court will determine whether it shall modify or amend this Order. If the Court determines that this Order needs to be amended, the amended order will be issued within 30 days after the Court's receipt of the final Director's Report of Compliance.

(D.E. No. 2410 at 8-10).

20

5.    Implementation Of The November 4, 2011, Order

Thereafter, Sue McCormick was hired as the Director of the DWSD and began work on January 1, 2012. The RCC, which now includes Director McCormick, has been meeting regularly with respect to implementation of the November 4, 2011, Order.

On March 22, 2012, the RCC submitted a written request to the Special Master in this action, which was then submitted to the Court:

> The undersigned are the members of the Root Cause Committee originally appointed by the Hon. Sean F. Cox in his Order of September 9, 2011 with continued authorized responsibilities in his subsequent Order of November 4, 2011. The Root Cause Committee has met recently to address a number of serious issues facing the DWSD which involve matters of finance and internal structural changes originally mandated by the Court in its November 4 Order. Specifically, we have determined, based on the current level of activity required to implement the November 4th Order by the Board and the Director, it is appropriate and imperative that the DWSD management structure include the position of a Chief Operating Officer (COO) reporting to the Director. The COO should have significant experience in municipal law, municipal finance, and operations oversight which would include, human resources, procurement, finance and law. These are the four divisions DWSD must stand up to implement the November 4th Order and achieve short and long term compliance with environmental permits. We request the Court's issuance of an Order concerning the establishment of this position at DWSD.

(Ex. A to D.E. No. 2456). On March 26, 2012, this Court granted that request and ordered that "a Chief Operating Officer / Compliance Officer shall be hired at the DWSD and shall report to the Director of the DWSD." (D.E. No. 2456).

On May 4, 2012, Director McCormick submitted the Director's Compliance Report. (D.E. No. 2460). The report discussed the progress made in implementing the November 4, 2011 Order. For several reasons, however, the Director requested that the Court extend the deadline for the filing of the Director's Final Compliance Report from August 4, 2012, to October 4,

21

2012. This Court granted the requested extension. (D.E. No. 2461).

The DWSD then filed several motions, seeking interim relief from this Court regarding various matters. (See e.g., D.E. Nos. 2469, 2473, 2507). This Court has ruled upon all of those motions in a series of orders. (See, e.g., D.E. Nos. 2512, 2520, 2523). And, at the request of the DWSD, this Court granted additional requests for an extension of time for the filing of the Director's Final Compliance Report until March 15, 2013.

6.   The Final Director's Report Of Compliance

On March 15, 2013, Director McCormick submitted the Final Director's Report of Compliance ("FDRC") to the Special Master, which was then provided to the Court and filed on the docket. (D.E. No. 2526). The FDRC is a twenty-eight (28) page report that summarizes the progress made in implementing the changes ordered by this Court, addresses the status of environmental compliance, and seeks additional relief.

The FDRC also discusses, and attaches as an exhibit, a new proposal prepared by the RCC to create a court-ordered regional authority. The FDRC appears to ask this Court to either accept and order that new proposal or allow further study of it.

II.   Having Reviewed The FDRC, This Court Is Satisfied That The Changes Agreed To By The Parties, And The Changes Ordered By This Court, Have Been Substantially Implemented

Again, this Court took a unique approach to creating a plan to help ensure the DWSD's short-term and long-term compliance with its NPDES permit and the Clean Water Act. This Court created the RCC and allowed local leaders to develop a proposed plan back in September of 2011. This Court ultimately adopted that plan and, thereafter, the BOWC, the DWSD, the RCC, and this Court, have spent considerable time and effort in implementing that plan.

22

Moreover, as explained below, this Court is satisfied that the changes agreed to by the parties,

and the changes ordered by this Court, have been substantially implemented.

A.    A More Empowered BOWC Has Been Established And Has Made
      Tremendous Progress

By virtue of the February 11, 2011 Stipulated Order, the parties agreed that a more

empowered Board of Water Commissioners ("BOWC") would enhance the DWSD's ability to

comply with its NPDES permit and the Clean Water Act.  Through this regionally-cooperative

approach, the parties agreed that representatives of Wayne, Oakland, and Macomb Counties

could each nominate a BOWC member, and that the four remaining BOWC members would be

City of Detroit residents appointed by the Mayor of the City of Detroit.  The Stipulated Order

further provides that BOWC members have minimum qualifications, have professional support

staff, and receive compensation.  As the FDRC notes, the BOWC has put in an extraordinary

amount of time in learning about the DWSD's operations, establishing appropriate committees,

and improving the BOWC's practices and procedures.  The FDRC further acknowledges that the

BOWC has helped further an improved transparency of DWSD's operations and has helped

foster improved relationships with the DWSD's customer communities.

B.    The DWSD Now Has Its Own Fully Functional, In-House, Human Resources
      Department And The DWSD Is Meeting The ACO's Staffing Requirements

For the past four decades, human resources issues have impeded the DWSD's ability to

achieve sustained compliance with its NPDES permit and the Clean Water Act.  (See 9/9/11

Opinion & Order at 39-40, where this Court found that, as recognized by multiple experts and

acknowledged by the City, the primary causes of historical non-compliance include: "1) the

DWSD having an insufficient number of qualified personnel at the WWTP; 2) excessive and

23

unnecessary delays in hiring qualified personnel across all job positions at the DWSD; 3) the

DWSD's required use of the City's Human Resources Department, resulting in significant delays

in filling critical positions at the DWSD; 4) the City's personnel policies, civil service rules, and

union rules and agreements, restricting the compensation, recruitment and prompt hiring of

necessary personnel at the WWTP; 5) insufficient training of personnel at the DWSD and

WWTP; 6) lack of a succession plan at the DWSD; 7) obsolete job descriptions and

qualifications for various positions within the DWSD").

The FDRC reports that the "DWSD Human Resources Unit is fully operational." (FDRC

at 15). It further explains that:

> We are currently staffed at 6 HR Generalists and five HR Technicians, three
> trainers, two Safety Officers, one Assistant Safety Officer, and four clerical staff
> members under the leadership of HR Manager Terri Conerway. This staff is
> responsible for the day-to-day human resources operations of DWSD including
> labor negotiations, grievance and arbitration administration, EEOC complaints,
> investigations, and reporting, recruitment and selection, payroll correction
> monitoring, labor and employee relations, policy development, employment law
> compliance, training and implementation, EAP selection, roll out and monitoring
> and unemployment compensation administration. In addition, the training and
> safety components of HR are responsible for safety compliance, monitoring,
> inspection and reporting, environmental monitoring and maintenance; training
> throughout the department, including state regulated training and the
> corresponding record retention program.

(Id.). The FDRC further states that job redesign plans are underway and progressing well. And,

perhaps most significantly, the DWSD is actually exceeding the ACO's current minimum

staffing requirements. (FDRC at 8).

C.    The DWSD's Now Has A New And Improved Procurement Policy

For the past four decades, procurement problems have also impeded the DWSD's ability

to achieve sustained compliance with its NPDES permit and the Clean Water Act. (See 9/9/11

24

Opinion & Order at 40, where this Court found that, as recognized by multiple experts and acknowledged by the City, the primary causes of historical non-compliance include: "untimely and inadequate purchasing of necessary equipment and supplies for the WWTP"; "excessive delays in the processing of purchase requisitions for critical repair and/or replacement parts"; "the City's flawed purchasing practices and procedures"; "the City's ineffective procurement system"; "the approval process for purchases over $25,000, created by the City's Charter and/or ordinances, unnecessarily delaying contracts for essential parts, equipment, and services at the DWSD"; and "the City's bidding and certification requirements, delaying contract approvals".)

In order to remedy these long-standing procurement problems, and expedite procurement of needed equipment and supplies for the DWSD, the RCC's plan included a separate procurement policy. That policy provides for three different levels of approval authority for various kinds of purchases. Contracts below a minimum threshold level, for example, contracts for goods that do not exceed $100,000, can be approved by the Director of the DWSD without the approval of the BOWC or the Detroit City Council. (See D.E. No. 2410-2 at 6-7). Other contracts, that exceed certain dollar values, also require approval of the BOWC or approval of the BOWC and the Detroit City Council.

In its November 4, 2011, Order, this Court adopted the proposed procurement policy. As the FDRC notes, the BOWC has formally adopted the proposed procurement policy. By expediting and improving the procurement process, the procurement policy addresses and remedies one of the underlying root causes of the DWSD's ability to achieve compliance with its NPDES permit and the Clean Water Act.

There is also a mechanism in place for the DWSD's procurement policies to be updated

25

and adjusted over time as required (see D.E. No. 2512 at 21) and the area of purchasing is one of the areas that the MDEQ continues to maintain control over, under the terms of the ACO.

D.     Other Changes

This Court ordered various other changes in it November 4, 2011, Order. Having reviewed the FDRC, the Court concludes that substantial progress has been made as to those changes and that no further involvement of the Court is required as implementation continues.

III.    This Court Will Not Order The Creation Of A Regional Authority; Nor Will This Court Order Or Approve The Transfer Of The DWSD's Assets To A Regional Authority

Although this Court neither sought nor authorized another proposal from the RCC, the FDRC attaches a new, fundamentally different proposal by the RCC. (Ex. 7 to FDRC).[6]

This new proposal would entail this Court ordering the creation of two regional authorities. Under this proposal, the City of Detroit would transfer all of the DWSD's assets to the first such proposed authority that would, in turn, enter into a lease agreement with a second newly-created authority. That second authority would then make annual PILOT payments to the City of Detroit. (Id.).

This Court's jurisdiction over this case is limited to taking those actions necessary to enable the DWSD to achieve substantial compliance with its NPDES permit and the Clean Water

---

[6]In addition, the FDRC reflects that on March 13, 2013, the BOWC received some kind of briefing from DWSD leadership on the RCC's "final plan of action" and voted to support the plan. (FDRC at 23).

26

Act. This Court has no intention of ordering the creation of a regional authority and has no intention of ordering or approving the transfer of the DWSD's assets to a regional authority. This Court lacks the authority to do so.

Moreover, even this Court had the authority to order what is being now being proposed, the Court would not do so for multiple reasons.

Without providing any financial analysis, the RCC asserts that the proposed PILOT payments to the City could be up to $70 million per year. This appears to be sheer speculation, based upon the hope that the DWSD's bond ratings would improve substantially upon the creation of the proposed authorities.

This Court is not in a position to understand or anticipate all of the potential ramifications that these proposed court-ordered actions could have on the City of Detroit. Arguably, if the Court were to order or approve the transfer of one of the City of Detroit's largest assets, at this juncture, that could potentially force the City into bankruptcy or have other highly undesirable consequences.

If the City of Detroit and/or its regional customer communities[7] wish to pursue the creation of a regional authority, they may do so through the political/legislative process. This Court's orders do not prevent the City of Detroit from selling or leasing the DWSD's assets and thus do not prevent exploration of this concept in the appropriate arena.[8] This Court is not the

--------------------------

[7]The FDRC asserts that letters of support for the proposal have been received from representatives of the customer communities. (FDRC at 23; Ex. 10 to same).

[8]The City of Detroit and its customer communities are also free to pursue enactment of the statutory trust legislation referenced in the FDRC, without the involvement of this Court, through the political/legislative process (see Ex. 11 to FDRC).

27

appropriate arena.

IV.   Other Issues/Requests Raised In The Director's Final Report Of Compliance

In addition to asking this Court to consider adopting the unsolicited proposal from the RCC, the FDRC also raises some other issues or requests that will be addressed below.

A.   Requests Regarding Rate Settlement Agreements

The FDRC appears to ask the Court to amend or void the existing rate settlement agreements between the DWSD/City of Detroit and its customer communities because the DWSD believes that those agreements: 1) prevent the PILOT payment concept from moving forward; and 2) are having an adverse impact on the DWSD's bond ratings.  (FDRC at 24).

The Court denies this request.  This Court will not void or alter the rate settlement agreements negotiated among the DWSD and its customer communities.  As the FDRC acknowledges, the DWSD has significantly improved its relationships with its customer communities during the past two years.  If the DWSD believes its would be beneficial to do so, it is free to negotiate changes or new agreements without the involvement of the Court.

B.   Demands For Adequate Assurances From Vendors

The FDRC states that "various DWSD vendors have raised concerns about DWSD's on-going ability to make payments for services rendered." (FDRC at 20).  Exhibit 6 to the FDRC contains a letter from a vendor who states that recent published articles stating that the City of Detroit may file for bankruptcy protection in the future have given it "grounds for insecurity with respect to the performance of the City" under its contract.  (Ex. 6 to FDRC at 1).

Such issues are not for this Court to resolve or address.  To the extent that DWSD leadership cannot sufficiently resolve such issues with its vendors,  the DWSD is hereby directed

to seek the advice and involvement of the City Administration.

      C.     Request Regarding Defined Contribution Plan

The FDRC asserts that the "Detroit General Retirement System (DGRS) has refused to implement the Defined Contribution Ordinance that was adopted by the Detroit City Council in 2000, and amended in 2002, upon receiving IRS approval." (FDRC at 24). The FDRC asks this Court to order, as requested in the unsolicited proposal from the RCC, that "the DWSD shall serve as its own plan administrator with respect to the establishment of Defined Contribution Plan." (Id. at 25).

While this Court has encouraged the City and the DWSD to discuss this concept, to see if they could come to an agreement as to whether DWSD should, or could, have its own Defined Contribution Plan, this remains an issue between the City of Detroit and the DWSD. This Court's jurisdiction is limited to taking those actions necessary to allow the DWSD to achieve substantial compliance with its NPDES Permit and the Clean Water Act. The DWSD establishing its own Defined Contribution Plan is not necessary for such compliance.[9]

      D.     BOWC Conflict Issue

The FDRC notes that Section 7-1201 of the current Charter of the City of Detroit states that "[n]o member of the Board shall be a City official or employee, or a principal or employee of contractor of the City." (Charter of the City of Detroit, § 7-1201). The commentary to Section 7-1201 explains that "Former section 7-1501 under the 1997 Charter has been revised to prohibit city officials, city employees and employees or principals of contractors from serving as

---

     [9]It strains credulity to assert that, given the current economic climate and local job market, the DWSD cannot hire and attract qualified staff unless the DWSD has its own Defined Contribution Plan. (See FDRC at 21 &25).

members of the Water and Sewerage Board." Id.  The FDRC states that it "has been assumed"

that this Court's orders "trumped this provision, but upon further reflection, the Board of Water

Commissioners and I felt it was prudent to seek further clarification from the Court on this

point." (FDRC at 27).

No order issued by this Court overrides the provision in Section 7-1201 that "[n]o

member of the Board shall be a City official or employee, or a principal or employee of

contractor of the City" or exempts anyone from the provision.  To the extent that the DWSD asks

this Court to do so now, the request is denied.

E.      Request Regarding Restriction On Negotiating Teams

The FDRC asks the Court to rule or clarify that non-DWSD City of Detroit employees

may not serve on the negotiating teams for DWSD contract negotiations concerning collective

bargaining agreements.  (FDRC at 26).

With respect to collective bargaining agreements ("CBAs"), this Court ordered the

following in its November 4, 2011 Order:

> 3.      The DWSD shall act on behalf of the City of Detroit to have its own CBAs
> that cover DWSD employees ("DWSD CBAs").  DWSD CBAs shall not
> include employees of any other City of Detroit departments.  The Director
> of the DWSD shall have the final authority to approve CBAs for
> employees of the DWSD.

(D.E. No. 2410 at 6, ¶ 3).  As explained by this Court in subsequent orders, that "paragraph was

intended to sever DWSD employees from existing bargaining units that were comprised of both

DWSD and non-DWSD employees, thereby establishing separate DWSD bargaining units that

cover only DWSD employees."  (See, e.g., D.E. No. 2470 at 1).

None of the orders issued by this Court, however, were intended to restrict who may

30

negotiate on behalf of DWSD-specific unions.  To the extent that the DWSD asks the Court to do so now, the request is denied.

V.    This Court Shall Terminate The Second Amended Consent Judgment And Close This Case Because The DWSD Has Achieved Substantial Compliance With Its NPDES Permit And The Clean Water Act, And The Existing ACO Is A Sufficient Mechanism To Ensure Sustained Compliance

Effective July 8, 2011, the City, the DWSD and MDEQ entered into the ACO, aimed at achieving compliance with the DWSD's NPDES permit and the Clean Water Act.  (D.E. No. 2365-1).  The ACO sets forth a detailed remedial plan.  As noted in the FDRC, the ACO has since been re-negotiated as needed with the MDEQ.  The Court finds that the MDEQ and the DWSD have a cooperative relationship and will be able to negotiate any further changes that are needed over time.

Although the DWSD's compliance record is still not perfect, the Court finds that it is vastly improved, especially in the historically problematic areas.  The MDEQ recently issued a new NPDES permit to the DWSD, with an effective date of May 1, 2013, and expiring on October 1, 2017.  (Ex. 4 to FDRC).  This Court concludes that the MDEQ, the environmental agency charged with issuing and overseeing the DWSD's NPDES permit, will continue to work with the DWSD, as it does with all other permit holders, to resolve any issues that may arise over time concerning the permit.

The Court concludes that, after more than thirty-five years of federal court oversight, the DWSD has achieved substantial compliance with its NPDES permit and the Clean Water Act.  This Court shall therefore terminate the Second Amended Consent Judgment and close this case because the existing ACO is a sufficient mechanism to address any future issues regarding compliance with the DWSD's NPDES permit and the Clean Water Act.

31

Before closing this case, however, the Court must address one final outstanding issue. In this Court's March 26, 2012, Order (D.E. No. 2456), this Court concluded that given the volume and nature of the work entailed to implement this Court's November 4, 2011Order, and comply with the ACO, the creation of a new position at the DWSD was warranted and appropriate. This Court therefore granted the RCC's request and ordered that "a Chief Operating Officer / Chief Compliance Officer shall be hired at the DWSD and shall report to the Director of the DWSD." (Id. at 4). The Court ordered the Mayor of the City of Detroit, after meeting and conferring with the RCC, to hire a Chief Operating Officer / Compliance Officer at the DWSD. (Id.). Thereafter, that position was filled and the current Chief Operating Officer / Compliance Officer at the DWSD, Matt Schenk, was hired.

This Court's March 26, 2012, Order, however, did not address how long that position would exist. And, unlike the RCC's Plan of Action, adopted by the Court, which specifies the processes for hiring and removal as to the Director position, the Court's order set forth no such procedures as to this new position.

As stated above, this Court concludes that the changes ordered by this Court have been substantially implemented and that implementation can proceed without further involvement of the Court. The Court also concludes that the DWSD has achieved substantial compliance with its NPDES permit and the Clean Water Act. The Court is therefore terminating the Second Amended Consent Judgment and closing this case because the ACO is a sufficient mechanism to address any future issues regarding compliance. Nevertheless, in order to further long-term compliance with the current ACO, the Court concludes that the position of Chief Operating Officer / Compliance Officer should continue to exist for one year following that date of this

32

Order. Before or after that time, the BOWC may decide whether to make the position permanent and, if so, determine the terms and conditions of employment for the Chief Operating Officer / Compliance Officer.

## CONCLUSION & ORDER

For the reasons stated above, the Court hereby ORDERS that the Second Amended Consent Judgment in this action is hereby TERMINATED.

IT IS FURTHER ORDERED that the position of Chief Operating Officer / Compliance Officer shall continue for one year following the date of this Opinion & Order and that, before or after that time, the BOWC may decide whether to make the position permanent and, if so, determine the terms and conditions of employment for the Chief Operating Officer / Compliance Officer.

IT IS FURTHER ORDERED that the existing ACO is a sufficient mechanism to ensure sustained compliance with the DWSD's NPDES permit and the Clean Water Act and this Court shall therefore close this case, and remove it from the Court's active docket for statistical purposes.[10]

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: March 27, 2013

---

[10]This Court shall retain limited jurisdiction for the purpose of enforcement of its orders issued on September 9, 2011, November 4, 2011, October 5, 2012, and December 14, 2012.

33

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                              Honorable Sean F. Cox

City of Detroit, et al.,            Case No. 77-71100

      Defendants.
_____/

PROOF OF SERVICE

    I hereby certify that a copy of the foregoing document was served upon counsel of record on March 27, 2013, by electronic and/or ordinary mail.

                          S/Jennifer McCoy
                          Case Manager

34