UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN | Chapter 9 |
| Debtor | Hon. Steven W. Rhodes |

**SUPPLEMENTAL OBJECTION OF COUNTY OF MACOMB, MICHIGAN, BY AND THROUGH ITS COUNTY AGENCY, THE MACOMB COUNTY PUBLIC WORKS COMMISSIONER, AND THE MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**

Pursuant to the *Sixth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 6376], County of Macomb, Michigan, a Michigan Constitutional corporation, by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner ("Macomb"), and the Macomb Interceptor Drain Drainage District (the "MIDDD," and together with Macomb, the "Macomb Parties"), creditors and parties in interest in the above-captioned Chapter 9 bankruptcy case, hereby submit this supplemental objection (the "Supplemental Objection") to the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6379] (the "Plan") and, in support thereof, respectfully states as follows:

**SUPPLEMENTAL OBJECTION**

1. For the myriad reasons asserted in the Macomb Parties' original objection [Docket No. 4636] (the "Original Objection"), the Plan does not meet the requirements for confirmation. As discussed herein, discovery, plan changes, and voting results have made the Plan's deficiencies even more apparent, revealing additional grounds for denial of confirmation.

## I. The Plan Was Rejected By Every Non-Settling Unsecured Class.

2. According to the KCC voting declaration [Docket No. 6179], every class of impaired unsecured claims not granted preferred treatment by the Debtor through a settlement voted to reject the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4392] (the "Fourth Amended Plan").[1] This includes Class 14, in which MIDDD's general unsecured claim (the "MIDDD Claim") is classified.

## II. The Plan Unfairly Discriminates Against Class 14.

3. Because several impaired classes rejected the Plan, it cannot be confirmed unless it meets the "cramdown" requirements of section 1129(b)(1) of Bankruptcy Code, made applicable in Chapter 9 through section 901(a). To do so, the Debtor must show that the Plan "does not discriminate unfairly, and is fair and equitable" with respect to the rejecting classes, including Class 14. See 11 U.S.C. § 1129(b)(1). As asserted in the Original Objection, the Plan provides vastly more favorable treatment to pensioners in Classes 10 and 11 than creditors of the same priority in Class 14, and the Debtor cannot meet the standards necessary to show that the Plan does not discriminate unfairly in favor of the pension classes. See Original Objection at 22-23. Since the filing of the Original Objection, the Debtor amended the Fourth Amended Plan to provide an enhanced recovery to the Class 7 Limited Tax General Obligation Bond Claims ("LTGO Bond Claims") that is materially greater than Class 14's recovery. Thus, those amendments provide additional grounds for a finding of unfair discrimination.

4. The amendments to the Fourth Amended Plan reflect a settlement (the "LTGO Settlement") with Ambac Assurance Corporation ("Ambac") and BlackRock Financial Management, as insurers or holders of certain unsecured limited tax general obligation bonds

---

[1] Rejection of the Fourth Amended Plan is also a rejection of the Plan, which is the fifth amended plan filed by the Debtor.

2

(the "LTGO Bonds"). As part of the LTGO Settlement, the Debtor stipulated with the settling parties to change their votes on the Plan. See *Stipulation for an Order Authorizing Ambac Assurance Corporation and BlackRock Financial Management Inc. to Change their Votes on the City's Plan of Adjustment* [Docket No. 6260]. As a result, Class 7 converted from a rejecting class to an accepting class.

5. Pursuant to the LTGO Settlement, (i) the unsecured LTGO Bond Claims would be allowed in the aggregate amount of $163,544,770 and (ii) the holders of LTGO Bonds and Ambac (collectively, the "LTGO Parties"), on account of subrogation claims arising from its payment of interest on the LTGO Bonds, are to receive under the Plan (a) at the Debtor's option (x) $55 million in cash, or (y) new bonds with a principal amount of $55 million and (b) 20% of the New B Notes (as defined in the Plan) that may be distributed from the Disputed COP Claim Reserve (as defined in the Plan). See Plan at §§ II.B.3.n., II.B.3.p.iii.B. Thus, the LTGO Parties will receive no less than 33.6% of their allowed unsecured claims, plus the potential for a greater percentage depending on the distributions from the Disputed COP Claim Reserve. By contrast, the holders of Class 14 general unsecured claims are to receive New B Notes amounting to, at most, 10-13% of their claims[2] plus 15% of the New B Notes that may be distributed from the Disputed COP Claim Reserve (5% less New B Notes from that reserve than may be distributed to the LTGO Parties).

---

[2] The percentage recovery to Class 14 is less than the 10-13% estimated recovery asserted by the Debtor in the *Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4391] (the "Disclosure Statement") because the $150 million in estimated aggregate Class 14 claims does not include the $26 million MIDDD Claim, see Disclosure Statement at 41, and because the New B Notes to be distributed to Class 14 (30-year maturity, interest-only for 10 years, 4% interest rate for the first 20 years) are not worth their face amount.

6. This material disparity of treatment between classes of the same priority[3] constitutes unfair discrimination against a dissenting class. See In re Dow Corning Corp., 244 B.R. 696, 701-03 (Bankr. E.D. Mich. 1999).[4] Accordingly, the Plan cannot be confirmed.

### III. The Plan Is Not in the Best Interests of Creditors.

7. According to the expert report of Michael Plummer, who was retained by law firms for the City and the Detroit Institute of Arts, the art collection belonging to The Detroit Institute of Art may be worth as much as $4.6 billion. See Plummer Report at 19. That figure is nearly $4 billion more than the total amount to be paid under the DIA Settlement over 20 years, which is lost value that creditors would be able to capture through reducing their claims to judgment and attaching the art assets outside of bankruptcy. Accordingly, the Plan is not in the best interests of creditors, as required by section 943(b)(7) of the Bankruptcy for confirmation, because it does not afford creditors more than what they could expect to receive if the case was dismissed. See, e.g., In re Cnty. of Orange, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (quoting 4 Collier on Bankruptcy ¶ 943.03(7) (15th ed. 1995)). Moreover, by not realizing the fair value of the art, the Plan fails the "best interests" test, as it does not "afford[] all creditors the potential for the greatest economic return from [the] Debtor's assets." In re Barnwell Cnty. Hosp., 471 B.R. 849, 869 (Bankr. D.S.C. 2012).

---

[3] Ambac has argued that the LTGO Bonds, although not secured by liens, are essentially secured obligations because they are "first budget obligations" pursuant to MCL § 141.2701. That argument is flawed because, among other thing, "state law cannot reorder the distributional priorities of the bankruptcy code." In re City of Detroit, 504 B.R. 97, 161 (Bankr. E.D. Mich. 2013). The treatment that the Plan purports to provide to the LTGO Parties essentially elevates the priority of the LTGO Claims above other unsecured creditors, which cannot be done.

[4] The Macomb Parties' pre-trial brief will contain further factual background and legal analysis of the applicable standards with respect to the Plan's unfair discrimination against Class 14. Of particular relevance here, the Macomb Parties will show in their pre-trial brief that the Debtor's settlement of a dispute regarding the priority of the LTGO Bonds does not provide justification for the disparate treatment of Classes 7 and 14.

**IV.     Discovery Confirms the DWSD Pension Payment is Too High.**

8.      The Plan improperly requires DWSD pay $428.5 million—including $386.1 million of GRS UAAL and 22.5 million in pension fund administrative expenses that the Debtor contends is allocable to the DWSD over 9 years rather than a longer period of time.  In the Original Objection, the Macomb Parties asserted that, due to the shortened payment period, such payments would result in an overpayment of DWSD pension obligations, thereby funding the pensions of non-DWSD employees in violation of state law and the City Charter requiring that moneys collected by DWSD from ratepayers be used exclusively for DWSD costs and expenses. See Original Objection at 12-15.  Although the Macomb Parties stated in the Original Objection that they contested the validity of the $428.5 million number, they did not have adequate information to fully do so at that time.  See Original Objection at 13.

9.      Through discovery, the Macomb Parties have learned that the assumptions underlying the calculation of the UAAL allegedly allocable to the DWSD are woefully flawed, resulting in a significantly inflated number.  In particular, the 6.75% investment return assumption and discount rate for valuing liabilities is artificially depressed.  The result is that claim amounts are overstated and investment returns on assets are understated, necessitating a greater than necessary annual contribution amount.  Notably, the 6.75% rate is not the product of any actuarial analysis, but rather of negotiations between, among others, the Debtor and the Official Committee of Retirees.  See, e.g., Bowen Dep. at 350-52, 374-76, 412-13, and 483-84. The 6.75% investment return assumption is drastically lower than the 7.9% assumption used by the GRS since 1998 (see Thomas Dep. At 53-54), the initial November 2013 conclusion of Milliman (developed using its own capital market assumptions and methodologies) of 7.2% (Bowen Dep. At 66-75; November 4, 2013 Milliman Letter, POA00260258), and the assumption

5

used by 119 out of 126 of the nation's largest public retirement systems taking part in the Public Fund Survey as of July 3, 2014. See, e.g., Foria Report at 11.

10. Thus, that assumption is deliberately over-conservative in an attempt to make it appear that pensioners will receive a lower percentage recovery than they actually will, and to ensure that actual investment returns will restore all or a portion of the Plan's ostensible pension benefit cuts. Further, discovery has shown that the $428.5 million includes $20 million in restructuring fees improperly allocated to DWSD, not based on professional services devoted to DWSD matters, but based on an averaging methodology. See Moore Dep. 321:22-322:12, 356:21-357:15. The effect is that DWSD will pay substantially more than its allocable share of GRS pension obligations and restructuring expenses. The excess pension payments will not be returned to the DWSD, but will be used to fund the pensions of other GRS employees. Thus, through higher rates, suburban ratepayers will be paying for the pensions of non-DWSD employees, but will receive no benefit for doing so.

11. As the Macomb Parties will detail further in their pre-trial brief, based on the evidence, the proposed DWSD pension payments under the Plan result in the payment of non-DWSD obligations in violation of state law and the City Charter because, among other reasons, they are based on overly conservative assumptions. Accordingly, the Plan does not comply with law and does not meet the standard for confirmation under section 943(b)(4) of the Bankruptcy Code.

## V. The Plan Was Not Proposed In Good Faith.

12. As discussed above, discovery has shown that the Plan overstates the amount of pension claims and understates the expected return on the assets available to satisfy such claims. Among other things, this intentional failure to accurately state the value of claims indicates that

the Plan was not proposed in good faith.  See, e.g., In re Multiut Corp., 449 B.R. 323, 341 (Bankr. N.D. Ill. 2011).  Accordingly, the Macomb Parties hereby adopt and join in the arguments of Syncora regarding the Debtor's lack of good faith in *Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment* [Docket No. 4679] at pages 59-65.

13. For all of the reasons set forth in the Original Objection and in this Supplemental Objection, and to be further detailed in the Macomb Parties' pre-trial brief, the Macomb Parties request that the Court deny confirmation of the Plan.

## RESERVATION OF RIGHTS

The Macomb Parties hereby reserve and preserve all of their rights, remedies, and arguments in connection with their objections to the Plan and reserve all right(s) to supplement their objections and to be heard before the Court with regard to the arguments set forth in this objection, as well as reserve the right to make any other applicable arguments, including those raised in other objections and/or other joinders to the objections raised by other parties with respect to the Plan.

[*Remainder of Page Left Intentionally Blank*]

WHEREFORE, for the foregoing reasons, the Macomb Parties request that the Court deny confirmation of the Plan.

Dated: August 12, 2014

Respectfully submitted,

DECHERT LLP

By:     /s/ Allan S. Brilliant
Allan S. Brilliant
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

*Attorneys for County of Macomb, Michigan by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District*