```
---------------------------------------------------------------x
                                        :
 In re                                  : Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              : Case No. 13-53846
                                        :
                    Debtor.             : Hon. Steven W. Rhodes
                                        :
                                        :
---------------------------------------------------------------x
```

## SUPPLEMENTAL OBJECTION OF
## FINANCIAL GUARANTY INSURANCE COMPANY TO
## PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

Pursuant to the *Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment*, dated August 6, 2014 [Docket No. 6560] (the "**Scheduling Order**"),[1] Financial Guaranty Insurance Company ("**FGIC**") files this supplemental objection (the "**Supplemental Objection**") to the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014)* [Docket No. 62582] (as may be amended or supplemented, the "**Plan**").[2] This Supplemental Objection supplements the *Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit*, filed on May 12, 2014 [Docket No. 4660] (the "**Preliminary Objection**"). In support of this Supplemental Objection, FGIC respectfully states as follows:

---

[1] Paragraph 4 of the Scheduling Order provides that August 12, 2014 is the deadline for any party that filed a timely objection to the plan to file a supplemental objection, but only to the extent that additional or modified objections result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment. As set forth herein, subsequent to the original objection deadline, the City filed a revised version of the Plan, and certain of the amendments therein, as well as certain facts resulting from discovery, give rise to new objections.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

# FACTUAL BACKGROUND

1. On May 5, 2014, the City filed the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4392] (the "**Fourth Amended Plan**"). Pursuant to Section II.B.3.n.ii of the Fourth Amended Plan, each Holder of an Allowed Limited Tax General Obligation Bond Claim would receive, in full satisfaction of such Allowed Claim, an Unsecured Pro Rata Share of New B Notes. The City projected that the estimated percentage recovery to such Holders would be 10% (assuming Class 9 COP Claims are Allowed Claims in the amount of $1.473 billion). (Disclosure Statement § II.B, Ex. K 3.) This is the same treatment as was provided to Class 9 COP Claims, in the event they become Allowed Claims. (Fourth Amended Plan § II.B.3.p.iii.)

2. On July 21, 2014, the City filed the *Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes on, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6179] (the "**Vote Tabulation Declaration**"). In the Vote Tabulation Declaration, Mr. Paque confirmed that Class 9 voted to reject the Plan. (Vote Tabulation Declaration at ¶¶ 26-27.)

3. On July 29, 2014, the City filed the revised Plan, incorporating the LTGO Settlement Agreement, a proposed settlement agreement with the LTGO Insurer and the Uninsured Bondholder (as defined therein). (Plan Ex. I.A.198.) Pursuant to this resolution, the Plan now provides that each Holder of an Allowed Limited Tax General Obligation Bond Claim or the LTGO Insurer, as applicable, will receive, in full satisfaction of such Allowed Claim, at the City's option (i) $55 million in Cash or (ii) New LTGO Bonds, which will have an initial aggregate principal amount of $55 million (bearing interest at 5.65% per year, with a 23-year maturity). (*Id.* §II.B.3.n.ii; Ex. I.A.198, Sched. 1.) The City has projected that the estimated percentage recovery to such Holders will be 32%. (Plan of Adjustment – 40 year projections

(POA00706603) – (POA00706611) (the "**Forty-Year Projections**") 3.) Under the revised Plan, Holders of Class 9 COP Claims are still receiving (to the extent their Claims become Allowed Claims) their Unsecured Pro Rata Share of New B Notes for an alleged 10% recovery. (Plan § II.B.3.p.iii.; Forty-Year Projections 3.)

4. FGIC filed two proofs of claim against the City in connection with the COPs – proofs of claim numbers 1195 and 1190 (the "**FGIC COPs Proofs of Claim**.") As explained in greater detail in the FGIC COPs Proofs of Claim, to the extent FGIC makes a payment of principal or interest on the COPs in accordance with the FGIC COPs Insurance Policies,[3] FGIC is subrogated to the rights of the holders of the COPs, including the right to receive the certain payments from the City under the COP Service Contracts. (FGIC COPs Proofs of Claim ¶ 13.)[4] As of February 14, 2014, when the FGIC COPs Proofs of Claim were filed, FGIC had made payments in the aggregate amount of $5,638,291.90 under the FGIC COPs Insurance Policies in connection with $33,166,422.91 of interest on the FGIC-insured COPs that is due and owing, but unpaid.[5] (*See Id.* ¶ 12.) Accordingly, in the FGIC COPs Proofs of Claim, FGIC asserted, among other things, (i) liquidated claims against the City in the aggregate amount

---

[3] The "**FGIC COPs Insurance Polices**" are comprised of Municipal Bond New Issue Insurance Policy Number 05010400, Municipal Bond New Issue Insurance Policy Number 06010249 and Municipal Bond New Issue Insurance Policy Number 06010250, collectively.

[4] In addition, FGIC's obligation to make payments under the FGIC COPs Insurance Policies is expressly conditioned on holders of the COPs assigning their COPs (or coupons thereof or rights to payments therein) to FGIC. (*See* FGIC COPs Proofs of Claim ¶ 16.)

[5] Pursuant to the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 (*available at* http://fgic.com/policyholderinformationcenter), all of FGIC's policies, including the FGIC COPs Insurance Policies, were modified to provide that FGIC will pay a certain percentage (the "**CPP**") of each permitted policy claim in cash, with the remainder of the permitted policy claim treated as a deferred payment obligation, paid if and to the extent excess cash becomes available. (*See* FGIC COPs Proofs of Claim ¶10.) As of February 14, 2014, the CPP was 17% (and it remains 17% today). *See* Notice of Effective Date and Initial CPP, dated August 19, 2013 (*available at* http://fgic.com/policyholderinformationcenter) ¶ 5.

of $5,638,291.90, equal to the amount FGIC had paid under the FGIC COPs Insurance Policies as of February 14, 2014,[6] (ii) contingent and/or unliquidated claims not to exceed $1,100,000,000, representing the aggregate principal amount of COPs covered by the FGIC COPs Insurance Policies that are currently outstanding and (iii) contingent and/or unliquidated claims for any interest on the COPs that FGIC is required to pay under the FGIC COPs Insurance Policies. (*Id.* ¶ 14.) In addition, FGIC asserted claims for reimbursement of fees and expenses, including (i) a liquidated claim in the amount of $1,111,442.51 for fees and expenses incurred prior to the Petition Date, (ii) a liquidated claim in the aggregate amount of no less than $4,290,219.49 for fees and expenses that had accrued from the Petition Date through February 14, 2014 and (iii) a contingent and/or unliquidated claim for any fees or expenses incurred after February 14, 2014. (*Id.* ¶¶ 20-21.) Since FGIC filed the FGIC COPs Proofs of Claim, FGIC has made additional payments in the aggregate amount of $2,869,100.25 in connection with an additional $16,877,060.34 of interest on the FGIC-insured COPs that is due and owing, but unpaid as of the date hereof. (*Order Approving Stipulation By and Between the City Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial*, dated July 14, 2014 [Docket No. 6002] ¶¶ p, q.)

    5.  On August 6, 2014, the Court issued an order granting FGIC's request to file counterclaims against the City in the COP Litigation. (Order Granting Financial Guaranty Insurance Company's Motion to File Counterclaims Pursuant to this Court's Order Granting Motions to Intervene with Limitations, *City of Detroit v. Detroit General Retirement System*

---

[6] In its capacity as a third party beneficiary to the COP Service Contracts, FGIC also asserted liquidated claims in the aggregate amount of $33,166,422.91, equal to the total amount of interest on the FGIC-insured COPs that is due and owing, but unpaid. (*See* FGIC COPs Proofs of Claim ¶¶ 18-19.)

*Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Aug. 6, 2014) (Docket No. 114) the "**Counterclaim Order**").)

6. The Plan defines "COP Claim" as "a Claim under or evidenced by the COP Service Contracts" and provides that:

> For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim; (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

(Plan § I.67.) This broad definition includes all of the Claims FGIC asserted against the City in the FGIC COPs Proof of Claim and any counterclaims FGIC files against the City in the COP Litigation. The Plan provides for the City to distribute to the Disputed COP Claim Reserve an Unsecured Pro Rata Share of New B Notes, calculated as if the COP Claims were Allowed in the total aggregate unpaid principal amount of COPs. (Plan. § II.B.3.p. iii.A.)

7. The Plan includes a broad exculpation provision, which shields from liability not only the City, the Retiree Committee and Retiree Committee members, but also, among others, the State, the State Related Entities, the Retirement Systems and their postpetition professional advisors, Gabriel, Roeder, Smith & Company, the COP Swap Exculpated Parties, the LTGO Exculpated Parties and the UTGO Exculpated Parties. (Plan §§ I.143, I.253, III.D.6.)

US_ACTIVE:\44529311\4\45259.0007

# THE COURT SHOULD DENY CONFIRMATION OF THE
# PLAN FOR CERTAIN ADDITIONAL REASONS RAISED BY THE
# DISCOVERY PROCESS AND RECENT AMENDMENTS TO THE PLAN[7]

## I. THE PLAN'S DISTRIBUTION TO THE DISPUTED COP CLAIM RESERVE IS INSUFFICIENT

8.  In addition to FGIC's other unfair discrimination arguments, the Plan further discriminates against Class 9 by failing to reserve an appropriate amount of New B Notes in the Disputed COP Claim Reserve in the event the COP Claims are allowed. FGIC has asserted Claims against the City with respect to not only the aggregate principal amount of COPs covered by the FGIC COPs Insurance Policies that are currently outstanding, but also (i) interest on the FGIC-insured COPs that is due and owing, but unpaid, (ii) interest on the COPs that FGIC will be required to pay in the future, and (iii) fees and expenses. (FGIC COPs Proof of Claims ¶¶ 20-21.) In addition, FGIC will be asserting counterclaims against the City in the COP Litigation. (Counterclaim Order.) Although the Plan includes all of these Claims in the definition of a COP Claim to be treated in Class 9, the Plan provides for the City to distribute to the Disputed COP Claim Reserve an Unsecured Pro Rata Share of New B Notes, calculated as if the COP Claims were Allowed only in the total aggregate unpaid principal amount of the COPs. (Plan. § II.B.3.p. iii.A.) Accordingly, to the extent FGIC's COP Claims against the City are Allowed in full (or in some amount greater than the total aggregate unpaid amount of the FGIC-insured COPs), the New B Notes in the Disputed COP Claim Reserve will be insufficient to provide even the 10% recovery the City is projecting. (Forty-Year Projections 3.) As will be

---

[7] The objections herein are in addition to the objections raised in FGIC's Preliminary Objection. FGIC reserves all rights to supplement or amend this Supplemental Objection, including, without limitation, pursuant to paragraph 5(c) of the Scheduling Order, which provides for parties to file pretrial briefs in respect of plan confirmation. FGIC reserves the right to make additional arguments (or join any arguments of other objecting parties) in support of its objections to confirmation of the Plan. In addition, FGIC is not presenting any evidence in support of this Supplemental Objection at this time, but will do so pursuant to its pretrial brief to be submitted in advance of the Confirmation Hearing and as part of the evidentiary record developed at such hearing.

argued in greater detail in pretrial briefing, this exacerbates the Plan's unfair discrimination against holders of COP Claims in Class 9.

## II. THE PLAN'S EXCULPATION PROVISION IS IMPERMISSIBLY BROAD

9. The exculpation provision in the Plan is overly broad because it includes multiple parties that have not served in the capacity of fiduciaries in the Chapter 9 Case. *See e.g. In re Washington Mutual, Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtor's directors and officers."). This is inappropriate and cannot be approved.

## III. THE CITY'S USE OF THE MEDIATION ORDER RENDERS THE CITY UNABLE TO MEET ITS BURDEN OF PROVING THAT THE PLAN IS CONFIRMABLE

10. Although FGIC has been able to formulate many objections to the settlements incorporated in the Plan, these efforts have been severely hampered due to the City's reliance on this Court's *Mediation Order*, dated August 13, 2013 [Docket No. 322] (the "**Mediation Order**"), appointing Chief District Judge Gerald Rosen, United States District Court, Eastern District of Michigan, as judicial mediator for the Chapter 9 Case and ordering that "All proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." (¶¶ 2, 4.) Throughout the discovery process leading up to the Confirmation Hearing, the City has relied on the Mediation Order in refusing to provide any discovery into the process that led to, in particular, the so-called Grand Bargain, a multiparty resolution comprised of two interrelated settlement agreements – the DIA Settlement and the State Contribution Agreement. As a result, as will be discussed in greater detail in pretrial briefing, the City cannot meet its burden of proving (i) that the DIA Settlement is reasonable, as required by the standards governing approval of settlements

pursuant to a bankruptcy plan in the Sixth Circuit or (ii) that the Plan maximizes the value of the DIA Assets, as required by the best interests of creditors, fair and equitable and good faith confirmation standards. Further, creditors objecting to the Plan have been prejudiced by their inability to gain insight into the negotiations surrounding the Grand Bargain, particularly given the City's attempt to use aspects of such negotiations to justify the Plan's "very significant discrimination" in favor of holders of Pension Claims. (Hr'g Tr. 82:7-10 (Aug. 6, 2014).) The Court should not sanction the City's attempt to use the Mediation Order simultaneously as a sword and a shield.

### IV. THE CITY ENTERED INTO THE GRAND BARGAIN WITH THE INTENT TO HINDER AND DELAY CREDITORS

11. As FGIC has already argued, the Plan violates section 943(b)(4) of the Bankruptcy Code because the City is prohibited by Michigan fraudulent transfer law from transferring the DIA Assets pursuant to the Grand Bargain, in exchange for less than reasonably equivalent value. (Preliminary Objection ¶ 13.) The testimony offered and documents produced during the discovery process indicate that the City is further prohibited from consummating the Grand Bargain because it entered into the transaction "with actual intent to hinder, delay or defraud" creditors, in violation of M.C.L. § 566.34. (*See e.g.* Deposition of Kevyn D. Orr (July 22, 2014) 341:2-7 (confirming that the purpose of the transfer of the DIA Assets to a public trust is to ensure that the art is never sold to satisfy the claims of creditors "now and forever").)

### V. THE COURT SHOULD DENY CONFIRMATION OF THE PLAN BECAUSE IT UNFAIRLY DISCRIMINATES AGAINST CLASS 9 IN FAVOR OF CLASS 7

12. The revised Plan provides Class 9 a materially lower recovery percentage and materially riskier form of distribution than Class 7, a similarly situated Class, rendering the Plan unconfirmable because it unfairly discriminates against Class 9. Because Class 9 (among others) is an impaired Class that voted to reject the Plan, the Plan may only be confirmed if it

complies with the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code, including that the Plan not discriminate unfairly against Class 9. *See* 11 U.S.C. § 943(b)(1) (requiring that a chapter 9 plan comply with the provisions of title 11 made applicable by sections 103(e) and 901); *id.* § 901 (making (among others) sections 1129(a)(8), 1129(b)(1), and 1129(b)(2)(A) and (B) applicable in chapter 9 cases); *id.* § 1129(b)(1).

13. As set forth in more detail in FGIC's Preliminary Objection, and as will be addressed at length in FGIC's pretrial brief, in the Eastern District of Michigan, the prevailing standard for determining whether a plan unfairly discriminates against a dissenting class is the presumption-based standard, first adopted in *In re Dow Corning Corp.*, 244 B.R. 696, 700 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002). Pursuant to this test, a presumption of unfair discrimination arises where there exists:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Dow Corning* 244 B.R. at 702 (*citing* Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 228 (1998)). Once established, the presumption of unfairness resulting from a significant recovery differential may only be rebutted by the plan proponent proving that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the preferred class had infused new value into the reorganization, which offset its gain. *Id.* A plan proponent may only overcome the presumption of unfair treatment based on different risk allocation by proving that such allocation was consistent with the risk assumed by parties prepetition. *Id.*

14. FGIC will prove that the facts here establish a presumption of unfair discrimination under the *Dow Corning* standard with respect to the Plan's new treatment of Class 9 as compared to Class 7: (1) Class 9 (COP Claims) rejected the Plan; (2) Class 7 Limited Tax General Obligation Bond Claims are unsecured claims and, thus, of the same priority as COP Claims; and (3) Class 9 is receiving under the Plan a materially lower percentage recovery than Class 7 and a materially riskier form of distribution. The City cannot rebut the presumption of unfairness because holders of COP Claims would not recover less, and did not take on more risk, than holders of Limited Tax General Obligation Bond Claims outside of chapter 9.[8] In fact, FGIC will prove that because, pursuant to the Revised Judicature Act of 1961, MCL 600.6093, the City would have been obligated to levy property taxes sufficient to satisfy any judgments obtained by holders of COP Claims outside of chapter 9, irrespective of constitutional, statutory or charter limitations on tax rates (*Am. Axle & Mfg. v. City of Hamtramck*, 461 Mich. 352 (2000)), in this scenario holders of COP Claims would have been in a position to recover more and would have shouldered less risk than holders of Limited Tax General Obligation Bond Claims, whose recourse to the City's tax revenues is subject to such limitations. (*See* Resolutions Adopted by City Council Authorizing the Issuance and Sale of Certain LTGO Bonds on May 26, 2004, May 6, 2005 and November 17, 2006 § 301.)

15. Even under the four-factor *Aztec* test that the City argues is applicable, the disparate treatment between Classes 7 and 9 constitutes unfair discrimination. Pursuant to this test from the chapter 13 context, courts consider the following factors to assess the fairness of discrimination:

(1) whether the discrimination is supported by a reasonable basis;

---

[8] The City has not asserted that Class 7 is providing new value to the City, offsetting the preferential treatment. To the extent the City raises this argument, FGIC reserves all rights to respond.

(2) whether the debtor can confirm and consummate a plan without the discrimination;

(3) whether the discrimination is proposed in good faith; and

(4) the treatment of the classes discriminated against.

*In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *In re Graphic Commcn's, Inc.* 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996) (the only reported Eastern District of Michigan case applying the four-factor *Aztec* test in the chapter 11 context). Here, FGIC will prove the discrimination is not supported by a reasonable basis, the City can confirm and consummate a plan without the discrimination, the discrimination is not proposed in good faith, and the treatment of Class 9 is such that Holders of COP Claims will not receive a meaningful recovery.

16. Based upon the foregoing, and for the reasons set forth in FGIC's Preliminary Objection and as will be addressed in more detail in FGIC's pretrial briefing and at the Confirmation Hearing, FGIC requests that the Court deny confirmation of the Plan and grant such other and further relief as the Court may deem just and proper.

Dated: August 12, 2014
       Houston, Texas

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance Company*

## CERTIFICATE OF SERVICE

  I hereby certify that on August 12, 2014 the *Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit* was filed and served via the Court's electronic case filing and noticing system to all registered users that have appeared in this Chapter 9 proceeding.

            */s/ Alfredo R. Pérez*
            Alfredo R. Pérez
            WEIL, GOTSHAL & MANGES LLP
            700 Louisiana Street, Suite 1600
            Houston, TX 77002
            Telephone: (713) 546-5000
            Facsimile: (713) 224-9511
            Email: alfredo.perez@weil.com

Dated: August 12, 2014
    Houston, Texas