IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**SUPPLEMENTAL OBJECTION OF
ASSURED GUARANTY MUNICIPAL CORP. TO
CONFIRMATION OF CORRECTED FIFTH AMENDED PLAN FOR THE
ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT (JULY 29, 2014)**

## TABLE OF CONTENTS

                                                                                   Page

PRELIMINARY STATEMENT ..................................................................................................1
BACKGROUND ..........................................................................................................................2
ARGUMENT ................................................................................................................................3
    I.        The Plan Impermissibly Charges Chapter 9 Professional Fees to the DWSD as "Necessary Operating Expenses" of the DWSD ....................................................3
       A.        The $20 Million Professional Fee Charge ..........................................................3
       B.        Because the DWSD Systems are Solvent, Section 928(b) Does Not Authorize Payment of Restructuring Professionals' Fees ....................................................4
       C.        The $20 Million Professional Fee Charge is Not Related to the DWSD.............8
CONCLUSION...........................................................................................................................10

# TABLE OF AUTHORITIES

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty., Ala.),
    482 B.R. 404 (Bankr. N.D. Ala. 2012) (In re Jefferson Cnty. II)........................5, 9

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty., Ala.),
    503 B.R. 849 (Bankr. N.D. Ala. 2013) (In re Jefferson Cnty. III)...........................6

**Statutes**

11 U.S.C. § 928....................................................................................................4

City of Detroit Sewer Bond Ordinance No. 18-01 ...............................................4

City of Detroit Water Bond Ordinance No. 01-05................................................4

**Other Authorities**

Hr'g Tr. (Apr. 17, 2014) .......................................................................................7

S. REP. NO. 100-506, 100th Cong., 2d Sess. (1988)............................................5

Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("Assured"),[1] a creditor and party in interest in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "City"), hereby files this supplemental objection (the "Supplemental Objection") to confirmation of the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014) [Docket No. 6379] (the "Plan") and respectfully states as follows:

## PRELIMINARY STATEMENT

1. In addition to the Plan's numerous flaws identified in the Assured Objection,[2] discovery has revealed that Plan impermissibly authorizes the City to charge the DWSD approximately $20 million for professional fees associated with the City's chapter 9 bankruptcy case. The City does not dispute that the DWSD Bond Documents do not permit such charges. Nor are such charges permissible as "necessary operating expenses" of the DWSD. Necessary operating expenses are *only* those that are required for a special revenue-financed system, such as the DWSD, to continue to operate. There is no dispute that the DWSD would have been able to continue to operate without this chapter 9 case and its associated costs.

---

[1] Assured is a monoline insurer that provides financial guarantees to the U.S. public finance market. Assured and its affiliates insure or reinsure approximately $2.24 billion in gross aggregate principal amount of outstanding bonds issued by the City, including water supply system bonds, sewage disposal system bonds, and unlimited tax general obligation bonds.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Objection of Assured Guaranty Municipal Corp. to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4674 (the "Assured Objection").

Accordingly, the City cannot charge the DWSD for the City's chapter 9 restructuring costs as contemplated by the Plan.

## BACKGROUND

2. On May 5, 2014, the City filed the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) [Docket No. 4392] and the corresponding disclosure statement (the "Disclosure Statement").

3. On May 12, 2014, Assured filed the Assured Objection.

4. On May 26, 2014, the City filed the *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 5034] (the "City Reply").

5. On July 25, 2014, the City filed the *Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 25, 2014)* [Docket No. 6257].

6. On July 29, 2014 the City filed the Plan.

7. On August 6, 2014, the Court entered the *Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 6560] (the "Procedures Order"), establishing August 12, 2014 as "the deadline for any party that filed a timely objection to the plan to filed a supplemental objection, but only to the extent that additional or modified objections result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment."

8. The City's Reply and discovery revealed additional information regarding the solvency of the DWSD Systems and the administrative and restructuring payments included in the DWSD GRS Pension Contributions that necessitated the filing of this Supplemental Objection in accordance with the Procedures Order.

## ARGUMENT

### I. The Plan Impermissibly Charges Chapter 9 Professional Fees to the DWSD as "Necessary Operating Expenses" of the DWSD

9. The Plan cannot be confirmed because it would improperly extract $20 million from the DWSD to pay the City's chapter 9 professional and legal fees (the "$20 Million Professional Fee Charge").

#### A. The $20 Million Professional Fee Charge

10. After the filing of the Assured Objection, the City revealed that it intends to allocate "about $20 million in overall restructuring costs related to this chapter 9 case" to the DWSD as part of the DWSD GRS Pension Contributions. City Reply, at ¶¶ 219, 231; see also Tr. of Deposition of Sue McCormick, at 277:16-23 (July 11, 2014); Tr. of Deposition of Charles Moore, at Vol. II., at 327:19-24 (July 24, 2014). Payment of such fees is to occur on a priority basis, ahead of payments to DWSD Bondholders. See Plan, at 36; Disclosure Statement, at 22, 62.

11. The revenues of the DWSD Systems are subject to the DWSD

3

Revenue Waterfall, which creates the DWSD Closed Loop. The DWSD Closed Loop ensures that all DWSD Revenues stay within the DWSD for the exclusive benefit of the DWSD Systems and their creditors.[3] It does not permit DWSD Revenues to be diverted to pay the City's restructuring professionals. The City does *not* dispute this point. Rather, the City incorrectly asserts that section 928(b) of the Bankruptcy Code allows the City's professional fees to be extracted from the DWSD Systems as "necessary operating expenses" of the DWSD. See City Reply, at ¶ 231. The City is mistaken—the $20 Million Professional Fee Charge is not a necessary operating expense of the DWSD Systems, and thus cannot be extracted from the DWSD Closed Loop pursuant to section 928(b) of the Bankruptcy Code.

> B. Because the DWSD Systems are Solvent, Section 928(b) Does Not Authorize Payment of Restructuring Professionals' Fees

12. Under Section 928 of the Bankruptcy Code, "special revenues" acquired by a municipal debtor postpetition remain subject to prepetition liens. See 11 U.S.C. § 928(a). There is only one exception: "[a]ny such lien on special revenues . . . derived from a project or system shall be subject to the *necessary operating expenses* of such project or system . . . ." 11 U.S.C. § 928(b) (emphasis added).

13. The $20 Million Professional Fee Charge, however, is not a necessary

---

[3] See Sewer Bond Ordinance, at § II.12(B); Water Bond Ordinance, at § 12(B); Sewer Trust Indenture § 2.03; Water Trust Indenture § 2.03.

operating expense of the DWSD Systems. "Necessary operating expenses" include *only*:

> those that are (1) expended to keep the system or project operating in the sense that the system or project is kept in good repair and generating the special revenues, not improvements or enhancements, (2) directly related to the project or system, not unrelated, (3) some, but not all operating expenses, which flow from § 928(b) being a minimum standard, and (4) being paid, which is different from those that may be incurred and paid in a later time period.

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty., Ala.), 482 B.R. 404, 437 (Bankr. N.D. Ala. 2012) ("Jefferson Cnty. II") (citations omitted).

14. Accordingly, not all expenditures qualify as necessary operating expenses. Necessary operating expenses are only those that are "necessary and directly related to the project or system generating the special revenues and are ***not the expenses of the municipality generally*** or for other systems or projects." S. REP. NO. 100–506, 100th Cong., 2d Sess., at 22 (1988) (emphasis added). Necessary operating expenses are *only* those expenses that must be incurred to "keep[] the system or project operating to generate monies to repay the lenders and to deliver the intended service to customers." Jefferson Cnty. II, 482 B.R. at 437 (citing H.R. REP. NO. 100–1011, at 8; S. REP. NO. 100–506, at 22).

15. The City clings to the fact that one court has held that professional fees incurred in connection with a chapter 9 bankruptcy case qualified as

5

"necessary operating expenses," of an insolvent special revenue-financed system where "those Professional Fees . . . are incurred to, hopefully, save a special revenue financed-system or project from economic collapse . . . ." Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty., Ala.), 503 B.R. 849, 901 (Bankr. N.D. Ala. 2013) ("Jefferson Cnty. III").

16. Jefferson Cnty. III's fact-bound holding, however, cannot be generalized to all chapter 9 cases involving municipalities that happen to have special revenue-financed projects or systems. In Jefferson County, the "major reason for and focus of the County's chapter 9" case was the adjustment of the debts of the County's failing special revenue-financed sewer system. Id. at 902. Unlike the sewer system at issue in Jefferson County, self-sustaining special revenue-financed systems are by definition able to pay bondholders, provide public services and "keep going" without the benefit of any legal services provided, and related costs incurred, in connection with a chapter 9 bankruptcy case of a related municipality. Thus, chapter 9 restructuring costs cannot be necessary operating expenses of self-sustaining special revenue-financed systems.

17. The City therefore errs in equating Detroit's imperfect but self-sustaining DWSD Systems with the enormously troubled sewer system that forced Jefferson County to file for chapter 9 bankruptcy relief. The City has repeatedly admitted that the DWSD Revenues are more than sufficient to pay all amounts that

6

will become due under the Existing DWSD Bonds. See, e.g., City Reply, at ¶ 176 n.70 ("the DWSD debt is collateralized by a line on revenues accounted for in the DWSD funds, *which collateral should be sufficient to pay the DWSD bonds in full* . . . .") (emphasis added).[4] Indeed, one of the City's proposed experts, Kenneth Buckfire, has now specifically confirmed that the DWSD Systems "can meet their debts when due." Tr. of Deposition of Kenneth Buckfire, at Vol. I., 155:25-156:2 (July 15, 2014).

18. Senior DWSD officials have likewise confirmed that the DWSD Systems are solvent and self-sustaining. According to Sue McCormick, director of the DWSD, the DWSD's leadership will be able to "manage the system . . . to meet our obligations," including continuing to provide all public services and making all required debt service payments. Tr. of Deposition of Sue McCormick, at 224:16-17 (July 11, 2014). Further, Nicolette Bateson, Chief Financial Officer of the DWSD, testified that the DWSD will have sufficient revenues to pay all operations and maintenance expenses, make all debt service payments, fund all reserves, and

---

[4] The City's financial projections also show that the City agrees with Assured that the pledged net revenues of the DWSD Systems are more than sufficient to pay debt service on the Existing DWSD Bonds. See Disclosure Statement, Exhibit L; Disclosure Statement Exhibit M; see also Disclosure Statement, at 100 ("During Fiscal Year 2013, the sewage disposal system received net system revenues of approximately $461.8 million versus expected debt service requirements of approximately $200.0 million. . . . During Fiscal Year 2013, the water system received net system revenues of approximately $370.1 million versus expected debt service requirements of approximately $153.4 million."). The City has also acknowledged on the record that the DWSD Bondholders are fully secured. See Hr'g Tr. at 143:3-6 (Apr. 17, 2014) ("The only part of that, part of the plan that we intend to seek cramdown on is with respect to the basic 1129(b) treatment of oversecured debt. . . .").

7

pay for capital improvement projects.  See Tr. of Deposition of Nicolette N. Bateson, at 59:2-16 (July 18, 2014).

19.    Indeed, the Plan and Disclosure Statement themselves demonstrate that the City has always believed that the DWSD Systems are not only currently self-sustaining, but would remain so even if significant DWSD Revenues were to be improperly extracted from the DWSD Systems.  See, e.g., Disclosure Statement, Exhibit M (depicting the City's projected financials if the Plan were implemented); see also Tr. of Deposition of Sue McCormick, at 224:4-17 (July 11, 2014) (explaining that the DWSD will continue to meet its public service and debt payment obligations even if $428.5 million is extracted from the DWSD Systems).

20.    The City thus does not dispute that the DWSD Systems will be able to meet their obligations and provide services to the public.  In short, the DWSD Systems would certainly have been able to "keep going" even had this chapter 9 case never been commenced  Accordingly, the costs of this chapter 9 case— including the $20 Million Professional Fee Charge—are not necessary operating expenses of the DWSD Systems and cannot be extracted from the DWSD Systems pursuant to section 928(b) of the Bankruptcy Code.

C.     The $20 Million Professional Fee Charge is Not Related to the DWSD

21.    Even if section 928(b) of the Bankruptcy Code permitted restructuring professionals' fees to be charged against solvent special-revenue financed systems,

8

the $20 Million Professional Fee Charge would still be impermissible because it has no direct connection with existing expenses of the DWSD Systems. As noted above, necessary operating expenses must be, among other things (a) "directly related to the project or system" and (b) "being paid, which is different from those that may be incurred and paid in a later time period." Jefferson Cnty. II, 482 B.R. at 437. The $20 Million Dollar Professional Fee Charge is neither.

22. According to Charles Moore, the City's designated witness on matters relating to the $428.5 million that the City seeks to extract from the DWSD Systems, the $20 Million Professional Fee Charge is not based on any issue directly related to the DWSD Systems. Rather, it is based on "four different potential allocation bases, head count, pension, OPEB, and Certificates of Participation." Tr. of Deposition of Charles Moore, at Vol. II., at 322:3-5 (July 24, 2014). The $20 million figure was arrived at by charging the DWSD the average of its purported share of *budgeted* costs associated each of these four allocation bases. See id. at 322:5-12.

23. Notably, no employee of the DWSD was even consulted to determine whether the $20 Million Professional Fee Charge accurately reflected expenses actually stemming from the DWSD. See Tr. of Deposition of Sue McCormick, at 277:16-278:16 (July 11, 2014) (noting that she does not know how the $20 Million Professional Fee Charge allocation was made and that Nicolette Bateson's

9

assignment is to follow up with the Emergency Manager's team regarding the allocation); Tr. of Deposition of Nicolette N. Bateson, at 130:2-14 (July 18, 2014) (stating that she was not consulted regarding the $428.5 million proposed pension payment from DWSD to the GRS, which includes the $20 Million Professional Fee Charge). Moreover, as Mr. Moore readily admitted, the City has not even incurred its full budgeted restructuring costs and, accordingly, the $20 Million Professional Fee Charge "takes into account fees to be earned and/or paid in the future." Tr. of Deposition of Charles Moore, at Vol. II., at 357:13-14 (July 24, 2014). In essence, the DWSD is to be charged for amounts that are neither directly related to it and that have not even yet been incurred by the City. Accordingly, the $20 Million Professional Fee Charge is not a necessary operating expense of the DWSD Systems and cannot be charged to the DWSD as required by the Plan.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Assured Objection, Assured respectfully requests that the Court enter an order denying confirmation of the Plan and granting such other and further relief as may be just and proper.

Dated: New York, New York
       August 12, 2014                     **CHADBOURNE & PARKE LLP**

                                                  By:  /s/ Lawrence A. Larose
                                                  Lawrence A. Larose
                                                  Samuel S. Kohn
                                                  Eric Daucher
                                                  30 Rockefeller Plaza
                                                  New York, NY 10112
                                                  Telephone: (212) 408-5100
                                                  llarose@chadbourne.com
                                                  skohn@chadbourne.com
                                                  edaucher@chadbourne.com

                                                  *Attorneys for Assured Guaranty*
                                                  *Municipal Corp.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

### Certificate of Service

I hereby certify that on this 12th day of August 2014, I caused the *Supplemental Objection of Assured Guaranty Municipal Corp. to Confirmation of Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014)* to be filed with the Clerk of the Court using the CM/ECF system, which provides electronic notification of such filing to all counsel of record.

Dated: New York, New York
August 12, 2014

**CHADBOURNE & PARKE LLP**

By: /s/ Lawrence A. Larose
Lawrence A. Larose
Samuel S. Kohn
Eric Daucher
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
llarose@chadbourne.com
skohn@chadbourne.com
edaucher@chadbourne.com

*Attorneys for Assured Guaranty Municipal Corp.*