UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                              .        Detroit, Michigan
                              .        August 12, 2014
                Debtor.       .        9:36 a.m.
. . . . . . . . . . . . . . . .

        HEARING RE. STATUS CONFERENCE RE. SEVENTH AMENDED
     ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING
     DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
            BEFORE THE HONORABLE STEVEN W. RHODES
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                      By:  HEATHER LENNOX
                      222 East 41st Street
                      New York, NY  10017
                      (212) 326-3837

                      Jones Day
                      By:  GREGORY SHUMAKER
                      51 Louisiana Avenue, N.W.
                      Washington, DC  20001
                      (202) 879-3939

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  STEPHEN HACKNEY
Syncora Guarantee    300 North LaSalle
Inc., and Syncora    Chicago, IL  60654
Capital Assurance,   (312) 862-2000
Inc.:

For National         Sidley Austin, LLP
Public Finance       By:  GUY NEAL
Guarantee Corp.:     1501 K Street, N.W.
                     Washington, DC  20005
                     (202) 736-8041

APPEARANCES (continued):

```
For Assured            Chadbourne & Parke, LLP
Guaranty Municipal     By:  ROBERT SCHWINGER
Corp.:                      LAWRENCE LAROSE
                       30 Rockefeller Plaza
                       New York, NY  10112
                       (212) 408-5364

For the Official       Dentons US, LLP
Committee of           By:  SAM J. ALBERTS
Retirees:              1301 K Street, NW, Suite 600, East Tower
                       Washington, DC  20005
                       (202) 408-7004

For County of          Dechert, LLP
Macomb, Michigan:      By:  ALLAN S. BRILLIANT
                       1095 Avenue of the Americas
                       New York, NY  10036
                       (212) 698-3600

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  EDWARD SOTO
Company:               1395 Bricknell Avenue, Suite 1200
                       Miami, FL  33131
                       (305) 577-3177

                       Weil, Gotshal & Manges, LLP
                       By:  ALFREDO R. PEREZ
                       700 Louisiana, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

For UAW:               Cohen, Weiss & Simon, LLP
                       By:  PETER DECHIARA
                       330 West 42nd Street
                       New York, NY  10036-6976
                       (212) 356-0216

For the Detroit        Clark Hill, PLC
Retirement             By:  ROBERT D. GORDON
Systems:               151 South Old Woodward Avenue, Suite 200
                       Birmingham, MI  48009
                       (248) 988-5882

                       Clark Hill, PLC
                       By:  JENNIFER GREEN
                       500 Woodward Avenue, Suite 3500
                       Detroit, MI  48226
                       (313) 965-8274
```

APPEARANCES (continued):

For Three Ad Hoc         Mintz Levin Cohn Ferris Glovsky &
Water and Sewer             Popeo, PC
Bondholders              By:  WILLIAM KANNEL
Committee Members:       One Financial Center
                         Boston, MA  02111
                         (617) 348-1665

For the Detroit          Erman, Teicher, Zucker &
Fire Fighters               Freedman, P.C.
Association and          By:  BARBARA A. PATEK
the Detroit Police       400 Galleria Officentre, Suite 444
Officers Associa-        Southfield, MI 48034
tion:                    (248) 827-4100

For the Detroit          Legghio & Israel, PC
Fire Fighters            By:  CHRISTOPHER LEGGHIO
Association:             306 South Washington, Suite 600
                         Royal Oak, MI  48067
                         (248) 398-5900

For the State of         Dickinson Wright
Michigan:                By:  STEVEN HOWELL
                         500 Woodward Avenue, Suite 4000
                         Detroit, MI  48226-3245
                         (313) 223-3033

For County of            Young and Associates
Oakland, Michigan:       By:  JAYE QUADROZZI
                         27725 Stansbury Blvd., Suite 125
                         Farmington Hills, MI  48334
                         (248) 353-8620

For Deutsche             Katten Muchin Rosenman, LLP
Bank AG:                 By:  JOHN RAMIREZ
                         575 Madison Avenue
                         New York, NY  10022
                         (212) 950-6435

For Wilmington           Drinker, Biddle & Reath, LLP
Trust:                   By:  HEATH ROSENBLAT
                         1177 Avenue of the Americas, 41st Floor
                         New York, NY  10036-2714
                         (212) 248-3248

For Ad Hoc Water         Kramer Levin Naftalis & Frankel, LLP
and Sewer                By:  CRAIG SIEGEL
Bondholders:             1177 Avenue of the Americas
                         New York, NY  10036
                         (212) 715-9432

APPEARANCES (continued):

For AFSCME:              Miller Cohen, PLC
                         By:  RICHARD MACK, JR.
                         6700 West Lafayette Blvd., 4th Floor
                         Detroit, MI  48226-3191
                         (313) 566-4787

For Detroit Retired Lippitt O'Keefe, PLLC
City Employees           By:  RYAN C. PLECHA
Association,             370 East Maple Road, 3rd Floor
Retired Detroit         Birmingham, MI  48009
Police and Fire          (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For County of            Butzel Long, PC
Wayne, Michigan:         By:  MAX NEWMAN
                         Stoneridge West
                         41000 Woodward Avenue
                         Bloomfield Hills, MI  48304
                         (248) 258-2907

For Martha Kopacz:       Squire Patton Boggs, LLP
                         By:  SCOTT KANE
                              STEPHEN LERNER
                         4900 Key Tower
                         127 Public Square
                         Cleveland, OH  44114
                         (216) 479-8500

                         MARTHA E.M. KOPACZ
                         Phoenix Management Services
                         10 Post Office Square, Suite 605 N
                         Boston, MA  02109
                         (617) 600-3600

Court Recorder:          Kristel Trionfi/Jane Murphy
                         United States Bankruptcy Court
                         211 West Fort Street, 21st Floor
                         Detroit, MI  48226-3211
                         (313) 234-0068

Transcribed By:          Lois Garrett
                         1290 West Barnes Road
                         Leslie, MI  49251
                         (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Good morning.  Let's place appearances

4  on the record, please.

5      MR. SHUMAKER:  Good morning, your Honor.  Greg

6  Shumaker of Jones Day for the City of Detroit.  I'm here with

7  my partner, Heather Lennox, of Jones Day and Robert Hertzberg

8  of Pepper Hamilton also representing the city.

9      MR. HACKNEY:  Your Honor, good morning.  Stephen

10  Hackney on behalf of Syncora.

11      MR. SCHWINGER:  Robert Schwinger from Chadbourne &

12  Parke for Assured Guaranty Municipal Corporation, and my

13  associate, Nicholas Chandler is also in the courtroom with us

14  today.

15      MR. SOTO:  Ed Soto and my partner, Alfredo Perez, of

16  Weil, Gotshal & Manges on behalf of FGIC.

17      MS. PATEK:  Good morning, your Honor.  Barbara

18  Patek, Erman, Teicher, Zucker & Freedman, for the Detroit

19  Police Officers Association and the Detroit Fire Fighters

20  Association, and I believe Mr. Legghio is also on the phone

21  for the Fire Fighters.

22      THE COURT:  Mr. Legghio, are you there?

23      MR. LEGGHIO:  Correct, your Honor, I am.

24      THE COURT:  Thank you.

25      MR. DECHIARA:  Good morning, your Honor.  Peter

1  DeChiara from Cohen, Weiss & Simon, LLP, for the UAW.

2          MR. NEAL:  Good morning, your Honor.  Guy Neal,

3  Sidley Austin, for National Public Finance Guarantee

4  Corporation.

5          MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

6  and Dan Barnowski from Dentons on behalf of the Retiree

7  Committee.

8          MS. QUADROZZI:  Good morning, your Honor.  Jaye

9  Quadrozzi, Young & Associates, on behalf of Oakland County

10  also here with Joe Fischer from Carson & Fischer on behalf of

11  Oakland County.

12          THE COURT:  Thank you.

13          MR. HOWELL:  Good morning, your Honor.  Steven

14  Howell, Dickinson Wright, special assistant attorney general,

15  appearing on behalf of the State of Michigan.

16          MR. BRILLIANT:  Good morning, your Honor.  Allan

17  Brilliant on behalf of Macomb County by and through its

18  public agency, Anthony Marrocco, the Macomb County public

19  power commissioner, and also on behalf of Macomb Interceptor

20  Drain Drainage District.

21          MR. MACK:  Good morning, your Honor.  Richard Mack

22  with Miller Cohen with AFSCME.

23          MS. GREEN:  Good morning.  Jennifer Green, Clark

24  Hill, on behalf of the Retirement Systems, and I believe

25  Robert Gordon is joining us on the phone, and I have Shannon

1  Deeby in court with me today as well.

2          THE COURT:  Okay.  Thank you.

3          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

4  from Lippitt O'Keefe Gornbein on behalf of the retiree

5  association parties.

6          MR. NEWMAN:  Max Newman of Butzel Long on behalf of

7  Wayne County.

8          THE COURT:  Thank you.  Are there any attorneys on

9  the telephone who wish to place their appearance on the

10  record, please?

11          MR. LAROSE:  Good morning, your Honor.  Lawrence

12  Larose, Chadbourne & Parke, for Assured Guaranty.

13          MR. KANNEL:  Good morning, your Honor.  William

14  Kannel for three of the members of the ad hoc water and sewer

15  bondholder committee.

16          MR. GORDON:  Good morning, your Honor.  Robert

17  Gordon just confirming that I am on by phone for the Detroit

18  Retirement Systems.

19          MR. SIEGEL:  Good morning, your Honor.  This is

20  Craig Siegel of Kramer Levin on behalf of Nuveen Asset

21  Management and BlackRock.

22          MR. RAMIREZ:  Good morning, your Honor.  This is

23  John Ramirez of Katten Muchin Rosenman on behalf of Deutsche

24  Bank AG, London.

25          MR. LERNER:  Stephen Lerner and Scott Kane of Squire

1    Patton Boggs for Martha Kopacz.

2            MR. ROSENBLAT:  Good morning, your Honor.  Heath

3    Rosenblat of Drinker Biddle on behalf of Wilmington Trust.

4            MS. KOPACZ:  Marti Kopacz.

5            THE COURT:  Okay.  Thank you.  Let me review with

6    you my list of matters to be discussed today, and then we'll

7    see if there are any others from you all.  I want to give you

8    my decision regarding the counties' standing in this matter.

9    That was one of the legal issues that we argued previously,

10   and I thought it would be good to resolve that before our

11   trial.  We, of course, need to discuss our trial date and the

12   stipulation regarding the conduct of the plan confirmation

13   hearing that was filed last night.  We want to discuss the

14   city's motion for an expedited hearing on its financing

15   motion also filed last night, want to check the status of the

16   August 19th hearing on the legality of the UTGO settlement.

17   We need to set a date for a response to the pro se objectors'

18   issues as I outlined in what I filed yesterday, get a status

19   report on the Detroit Police Officers Association and Detroit

20   Fire Fighters Association negotiations, and I think

21   Ms. Kopacz needs some further direction regarding her

22   responsibilities here in the case.  So let's just begin with

23   that issue of the counties' standing.  I will give an opinion

24   regarding this at the conclusion of the confirmation hearing,

25   but for trial planning purposes, it's good to let you all

1  know that I've reached a decision on this, so I'm just going

2  to give you the decision now and give you the opinion in

3  support of it later, and the decision is that the counties do

4  have standing to assert their objections in the case.

5       Before we move to the issue of the timing of the

6  trial and the conduct of the trial, let's get an update on

7  the status of these two unions' negotiations, the Detroit

8  Police Officers Association and the Detroit Fire Fighters

9  Association.  Someone like to take the lead on that, please?

10       MS. PATEK:  Your Honor, Barbara Patek, and I will

11  let Mr. Legghio address specifically the Detroit Fire

12  Fighters Association.  I can tell the Court that the parties

13  are continuing to negotiate, that progress has been made.  As

14  the Court knows, the DPOA and the city entered another agreed

15  order giving us until Friday to get a ratified collective

16  bargaining agreement.  I did speak with Ms. Lennox this

17  morning, and we have a couple strategies to try to knock off

18  some of the issues that may be holding things up a little

19  bit, and I know there are some meetings for DPOA scheduled

20  this week.  And for DFFA I'd let Mr. Legghio address that.

21       THE COURT:  Okay.

22       MR. LEGGHIO:  With regard to the DFFA, your Honor --

23       THE COURT:  Don't leave yet.  I'm sorry, Mr.

24  Legghio.  Go ahead.

25       MR. LEGGHIO:  With regard to the DFFA, we have been

1    meeting regularly.  We are meeting twice this week.  We met

2    several days last week.  We are making clear progress.  I

3    would say we are cautiously optimistic.  We are actually

4    plowing through the agreement literally line by line and

5    getting sign-offs on those terms.  There are a few sticking

6    points which have not been resolved, but we see a path to a

7    contract provided everyone stays reasonable.

8            THE COURT:  City wish to add anything?

9            MS. LENNOX:  I don't think we have anything further

10   to add beyond what Ms. Patek and Mr. Legghio said, with which

11   we agree.

12           THE COURT:  I have to express to you my concern and,

13   frankly, my disappointment that this is taking this long.  We

14   have a trial right around the corner here, and it's important

15   to get all of these matters wrapped up before then.  Frankly,

16   I'm considering imposing upon you a deadline to conclude

17   these negotiations.  Any objections?

18           MR. LEGGHIO:  Your Honor, this is Chris Legghio on

19   behalf of the Fire Fighters.  I fully expected the Court

20   might set a drop dead time.  You know, as long as it's

21   humanly possible --

22           THE COURT:  We don't use that phraseology here, sir.

23           MR. LEGGHIO:  Well, okay, your Honor.

24           THE COURT:  We use the --

25           MR. LEGGHIO:  A deadline.

1        THE COURT:  Yes.

2        MR. LEGGHIO:  But, your Honor, you know, provided

3   there's some reasonableness to it.  I mean we're not looking

4   for long periods of time.  As I said, we're a good ways -- a

5   good, good ways into the agreement, an actual agreement, not

6   just simply a term sheet but actual terms agreed to.  So if

7   it's a reasonable deadline, obviously I expect we can meet it

8   or we're going to report to you that we can't get it done.

9        MS. PATEK:  I would concur with what Mr. Legghio

10   said, and the only other possibility would be to have the

11   parties caucus and to suggest to the Court a self-imposed

12   deadline.  We have -- the DPOA has the 15th, but I know what

13   the meeting schedule is, and I think that it's unlikely that

14   there's going to be a ratified agreement by the 15th.  They

15   may get to the point where they have an agreement, but --

16        THE COURT:  What is the process after an agreement

17   is reached to achieve ratification?

18        MS. PATEK:  For the D --

19        MR. LEGGHIO:  Your Honor, let me say this.  I can

20   speak for the DFFA.  Ms. Patek can speak for the DPOA.  I

21   think the ratification process with the membership is the

22   tail of the dog.  That can be done very quickly.

23        THE COURT:  What does "very quickly" mean?

24        MR. LEGGHIO:  Within a matter of days.  Within one

25   or two days the matter could be ratified.

1          THE COURT:  Okay.

2          MS. PATEK:  And the same would be true --

3          THE COURT:  Okay.

4          MS. PATEK:  -- for the DPOA.

5          THE COURT:  Okay.  City have any thoughts on this

6    issue of a deadline?

7          MS. LENNOX:  Your Honor, Heather Lennox of Jones Day

8    on behalf of the city.  I'm a firm believer in deadlines.  I

9    think they help parties focus and actually come to an

10   agreement, so I would be supportive of that.

11         THE COURT:  All right.  What's a reasonable deadline

12   given where we are in our confirmation process?

13         MS. PATEK:  I'd like to say Friday, the 15th, but I

14   know that's not going to work.  I would suggest the 19th.

15         THE COURT:  I guess we're talking about a deadline

16   for the union and the city to come to an agreement subject to

17   ratification.

18         MS. PATEK:  Subject to ratification, Monday, the

19   18th.

20         THE COURT:  Mr. Legghio.

21         MS. PATEK:  And one of the things, your Honor, we

22   would like if we can get to an agreement, we'd like to be in

23   a position to file something supporting the plan short and

24   sweet, and that's --

25         THE COURT:  Um-hmm.

1        MS. PATEK:  And we'd obviously like it to be done

2    before the trial.

3        THE COURT:  Um-hmm.  Mr. Legghio.

4        MR. LEGGHIO:  Your Honor, before I answer that, is

5    the Court working on the framework that it wants this matter

6    resolved before the hearing begins?

7        THE COURT:  I think that's important, don't you?

8        MR. LEGGHIO:  Well, that would be the optimal -- you

9    know, that would be the ultimate solution, but if we get an

10   approved agreement one or two days into the hearing, I don't

11   know that that's fatal, so if that's the prospect, I would

12   say next -- I would say by Wednesday or Thursday of next week

13   that would be the -- that should be the deadline.

14       THE COURT:  Why do you need that much time?

15       MR. LEGGHIO:  Your Honor, I don't know why we need

16   that much time, but --

17       THE COURT:  My understanding is -- my understanding

18   is -- and please correct me if I'm wrong -- and I don't even

19   know how I heard this; maybe it was in the newspapers -- that

20   both unions have come to agreement on the economic terms, and

21   what you're negotiating now are noneconomic terms perhaps

22   relating to work rules, et cetera.  Is that right?

23       MR. LEGGHIO:  No, your Honor, at least with the

24   DFFA, and I believe that the DPOA will raise this issue also,

25   is that you're correct, the economic issue -- what would

1    appear to be the most friction points of negotiation is not

2    in play here.  There is an issue on the terms of healthcare

3    for active employees.  There's a dispute as to the 80/20

4    split, what it actually means.  There's an agreement on the

5    concept, but there is some wobble now, we believe, from the

6    side of the EM in terms of what that actually means.  The

7    rest of it is -- and then there's the issue for the DFFA

8    regarding the pension issue.  We've indicated to the city

9    they are receptive to the ten-year arrangement provided we

10   can get to everything else in the agreement, and the rest of

11   it is relatively, you know, nonsignificant, noneconomic

12   issues.  When I say "nonsignificant," I mean not the type of

13   issues that should delay a contract being approved.

14          THE COURT:  Ms. Lennox.

15          MS. LENNOX:  Your Honor, I tend to favor Ms. Patek's

16   view on this.  I will say that the parties have been

17   negotiating and in discussions through mediation and

18   otherwise for several months now, so I think it's time to, to

19   the extent that we can -- and we're going to get there -- is

20   to decide that we're going to get there or we're not.

21          MR. LEGGHIO:  Your Honor, this is Chris Legghio.  I

22   hope that what I've said doesn't indicate to you that I'm not

23   in agreement with a deadline.  That's not what we're

24   suggesting.

25          THE COURT:  All right.  If I set a deadline, what's

1    the consequence if you don't meet it?

2              MS. PATEK:  Again, I think --

3              MR. LEGGHIO:  Well, your Honor, speaking on behalf

4    of the DFFA, I suppose one of the consequences will be that

5    the Court will issue an opinion on the objections that have

6    been filed, and that will certainly inform the parties in

7    terms of the resolution of the negotiation.

8              MS. PATEK:  Your Honor, to set a deadline and then

9    as close as these parties are to say that they simply have to

10   stop negotiating, I think if the Court sets a deadline we

11   just have to, you know, put our heads down and meet it at

12   this point and either say we're going to get there or we're

13   not.  And I'm with Mr. Legghio that there is, I think,

14   cautious optimism all the way around on these issues at this

15   point.

16             MS. LENNOX:  I would hope, your Honor, that a

17   deadline would hold firm because I find that work expands to

18   fit the time allotted, so if there's a deadline for people to

19   get it done, then people need to get it done.

20             THE COURT:  All right.  I'm going to take this

21   matter under advisement and consult with your mediator and

22   enter an order shortly.

23             MR. LEGGHIO:  Your Honor --

24             THE COURT:  Yes.

25             MR. LEGGHIO:  -- this is Chris.  This is Chris.  If

1   the Court has concluded this matter, with the Court's

2   permission, may I be permitted to --

3          THE COURT:  Yes.  Yes, sir.  You're excused from

4   further participation.  Thank you for taking your time this

5   morning.

6          MR. LEGGHIO:  Thank you, your Honor.

7          THE COURT:  Okay.  Let's talk about our trial date

8   set for August 21st.  Who wants to say anything on that

9   subject?

10         MR. SHUMAKER:  Good morning again, your Honor.  Greg

11  Shumaker of Jones Day for the city.  Your Honor, we've given

12  this a lot of thought in terms of how events since early

13  June, which is when I believe your Honor issued the fifth

14  amended scheduling order giving both sides 98 hours to

15  present their cases, was impacted by developments since then.

16  I believe that there have been three settlements that have

17  occurred since that time, the LTGO settlement, the DWSD

18  bondholder potential settlement with the tender, and the 36th

19  District Court settlement.  And as you look through our

20  witness lists and our evidence, I think it's fair to say that

21  we concluded that it has very little impact on the city's

22  case in chief, and the burden it must bear obviously remains

23  the same.  But if you go through -- we have probably 22 or 23

24  witnesses -- really nobody falls out because of the LTGO

25  settlement or the -- there's variant, and I know your Honor

1   wants to talk about the DWSD bondholders' stipulation, but
2   even there no one falls off of our list, and they're still
3   going to have to testify about, you know, for example, you
4   know, the financial projections.  We've got, you know -- and
5   the assumptions underlying the E&Y analysis, the four that
6   your Honor is very familiar with, Mr. Orr, Mr. Buckfire,
7   Mr. Malhotra, Mr. Moore.  All of them have large chunks of
8   testimony that they must provide to the Court.  We've got the
9   services' witnesses, Chief Craig, Fire Commissioner Jenkins,
10  and Beth Niblock, who's in charge of the city's IT function.
11  You know, DIA, we have three witnesses there, one of which is
12  an expert.  DIA is not going away.  You know, we have the
13  community and the civic leaders, the mayor, Ms. Jones of the
14  City Council, Mr. Penske, Mr. Gilbert, Mr. Rapson, some of
15  the community leaders.  All of them are still there.  We also
16  have the DWSD.  We have Ms. McCormick.  She's going to be
17  testifying about issues that will not go away with the DWSD
18  bondholders' stipulation or the tender offer.  And then we
19  have some pension and OPEB witnesses as well, Mr. Bowen, Ms.
20  Taranto, and Mr. Perry.  Nobody falls out, and, you know,
21  some of their testimony might be cut back, but then you push
22  there, and you get the pull where Mr. Orr will probably have
23  to testify a little bit more about the settlements and his
24  reasoning as to why they were good things for the city.  I
25  don't know whether that holds true for the objectors' side of

1    the case, and I'm not here petitioning the Court to give them

2    less time, but, you know, if the DWSD bondholders leave via

3    the tender, a big chunk of their -- you know, their witnesses

4    will go away.  That's really not the case with the city, and

5    so I think -- again, bottom line on the effect, I think the

6    city is about at 94.75 hours after the site visit and that

7    time being attributed to the city, but I don't -- our feeling

8    is that we're really -- we're talking -- you know, if we're

9    at 94-1/2 hours, that's about 2-1/2 weeks of court time, you

10   know, 13 to 14 days.  And if you start to go through the

11   witnesses and try to predict exactly how much time they're

12   going to take and then allotting for cross of the objectors'

13   various witnesses, we think that that's a good number.

14          Now, the stipulation that your Honor asked about,

15   what we've kind of agreed in principle and tried to reflect

16   in the stipulation, we would structure our case -- because of

17   the timing issues that your Honor knows about and the

18   September 4th date to get it all done, it's unclear as to

19   where we will be on September 4th, but we would be putting a

20   couple of our witnesses towards the back end of the

21   presentation, Mr. Buckfire, for example, and Mr. Bowen, and

22   then there will be a couple of witnesses that we would want

23   to call initially in the earlier stages of the trial, being

24   Mr. Moore and Mr. Malhotra, and they might have to come back

25   and testify -- I think they will have to -- those two will

```
1   have to testify about sort of the 428 million acceleration
2   there, so they would -- it would be a short time, but that's
3   how we've set it up so that it would allow the DWSD
4   bondholders to sit on the sideline while the tender offer
5   process is running its course, and then if it were to fall
6   through, then we would -- they would be afforded the
7   opportunity after September 4th to recall Mr. Moore and
8   Mr. Malhotra and cross them on -- not only on the issues that
9   might be specific to them like the interest rate reset chart,
10  that sort of thing, but also what they had testified earlier,
11  but we just don't see how else we could do it.  But, again,
12  that doesn't really impact --
13       THE COURT:  How else you can do it is to start the
14  trial after September 4th when you file your final plan.
15       MR. SHUMAKER:  Well, that's --
16       THE COURT:  Understand what you're asking the Court
17  to do.  You're asking the Court to hold a -- to start a
18  confirmation hearing on a plan you don't want confirmed
19  knowing you're going to file a plan two weeks later that you
20  do want confirmed.
21       MR. SHUMAKER:  I understand that, your Honor.
22       THE COURT:  That's very tough.
23       MR. SHUMAKER:  I understand that, your Honor, and we
24  beg your indulgence in dealing with it that way.  We are, you
25  know, committed to starting as promptly as we can next
```

1    Thursday, you know.  The parties are ready to go.  We've

2    completed all the -- almost all the depositions.  There are a

3    couple today and tomorrow, cleanup.  Parties, you know --

4    we're well on our way on the pretrial briefs and the pretrial

5    orders this week.  You know, the supplemental objections will

6    come in today, you know, for --

7        THE COURT:  You're asking me to insist that parties

8    file pretrial briefs relating to their positions, again, on a

9    plan that's on file but not the plan you want confirmed.

10        MR. SHUMAKER:  There are aspects, your Honor, yes,

11   that would be new, but the vast majority of the plan, I

12   think, has been obviously revealed and fleshed out greatly

13   through discovery, and what we would propose is dealing with

14   those aspects of it in the earlier part of the case and then

15   dealing with the DWSD bondholders.  Obviously we're all

16   hopeful that the tender is successful, and then it will help

17   matters.

18        THE COURT:  If we do get these two union contract

19   agreements in the meantime, how would they impact the plan?

20   I should say the process of the plan.

21        MR. SHUMAKER:  I don't believe we -- Ms. Lennox

22   would -- I would defer to her, your Honor, on the impact.  I

23   don't think we would be planning on filing an amended plan in

24   connection with that settlement, and I don't think that

25   settlement would have any appreciable impact on the amount of

1    trial time needed, at least from the city's standpoint.  It

2    obviously would affect DPOA and DFFA.

3              THE COURT:  Well, let me just ask the question more

4    broadly then.  The city has achieved a number of agreements

5    with a number of its unions; right?

6              MS. LENNOX:  I would say the vast majority of them.

7              THE COURT:  The vast majority.  Okay.  To what

8    extent will the city's presentation in support of its plan

9    focus on these collective bargaining agreements or you're

10   just carving that out from this process altogether?

11             MS. LENNOX:  If I may, your Honor --

12             THE COURT:  Yes.

13             MS. LENNOX:  -- the bargaining agreements will be --

14   there's an exhibit that we actually filed last night

15   listing --

16             THE COURT:  Right.

17             MS. LENNOX:  -- where we are on those exhibits.

18   They are sort of incorporated into the plan.  They are

19   reflected through really the financial numbers that you'll

20   hear about from Mr. Malhotra and perhaps a little bit from

21   Mr. Moore but really, I believe, it'll be Mr. Malhotra's

22   testimony because obviously the agreements that have been

23   agreed to obviously affect the finances and the assumptions

24   that we used for the business plan for the city, so I think

25   that's where it's going to come out.  I don't think we expect

1   to be going through chapter and verse of each of these

2   agreements, your Honor.

3          THE COURT:  Okay.  So I don't want to dive too deep

4   into the weeds of Mr. Malhotra's testimony here, but to what

5   extent did he make assumptions about these two unresolved

6   union contracts in whatever financial projections he has

7   produced so far?

8          MS. LENNOX:  My understanding, your Honor -- and

9   this is all subject to what Mr. Malhotra really says on the

10  stand, but my understanding, your Honor, is that the economic

11  deal in principle that we had reached with the DPOA that we

12  reported via stipulation to your Honor some weeks ago was

13  reflected in the numbers that we're using, and we assume the

14  same for the DFFA, so whatever agreements come out of where

15  we're going, it shouldn't change the projections materially,

16  if at all, is my understanding, but obviously negotiations

17  aren't concluded yet.

18         THE COURT:  All right, sir.  Anything further?

19         MR. SHUMAKER:  I think that's it, your Honor.

20         THE COURT:  Anyone else want to be heard on this?

21  Oh, wait.  Before you start, I do have a question for you,

22  sir.

23         MR. SOTO:  Yes, your Honor.

24         THE COURT:  It's a question I've asked before, but I

25  feel the need to reopen it.  To what extent is the urgency

1    that the city feels about beginning and ending this trial

2    motivated by the prospect of Mr. Orr's leaving his emergency

3    manager position and, if so, why?

4           MR. SHUMAKER:  Your Honor, I know we've gone back

5    and forth on this in the past, and I don't mean to punt, but

6    a lot of this has to do with implementation of the plan, so I

7    think Ms. Lennox might be in the best position to address you

8    on that if that's okay with your Honor.

9           THE COURT:  Absolutely.

10          MS. LENNOX:  I believe I've caught the punt, your

11   Honor.  At this point of the stage of the proceedings, it

12   does really impact more about what the plan does and the

13   current settlements we have and the timing for actually

14   getting those done more so than the issue that your Honor

15   posited, although that does factor into some of that, and

16   I'll get to it.  If the plan is going to be confirmed, there

17   are certain critical things that need to be happening in the

18   near term with respect to some of the settlements we reached,

19   and I will take your Honor through one example with which

20   your Honor may be familiar from past issues we've had in this

21   case, and that involves retiree healthcare.  So the

22   settlement that we reached with the Retiree Committee on

23   retiree healthcare back in April contemplates that at the end

24   of this year the city will exit the retiree healthcare

25   business and it will be taken up by two VEBAs.  Those VEBAs

1  have to appoint trustees.  They have to contract with
2  administrators and providers.  They have to develop a
3  program.  They have to notify the retirees of what's going to
4  happen all before January 1st of 2015, and that process takes
5  a few months.  We are coming up dangerously close on being
6  very tight on time on that to actually have an -- if a plan
7  is going to be confirmed, have an effective date, get the
8  trustees in place with authority to contract and do these
9  things.  Now, there is a lot of work being done.  We're not
10 sitting around waiting.  There's a lot of work being done,
11 but right now we don't have VEBAs officially.  We don't have
12 trustees up and running officially, and we can't if the plan
13 is going to be confirmed until an effective date.  In
14 addition, while -- to continue with this example, the VEBA is
15 going to be -- will have some seed money to fund to start
16 providing benefits immediately.  Under the plan what they get
17 are new B notes.  New B notes only throw off interest every
18 six months, so they wouldn't get an interest payment until
19 six months after the effective date unless they could sell
20 some notes in the market and monetize them for benefit
21 provision, so there are some real world timing issues for
22 this, and on the converse, if the plan is not going to be
23 confirmed, then the city and the Retiree Committee need to
24 start negotiating and figure out what's going to happen after
25 January 1st, so to me there are some very real world issues

1   based on settlements that we accomplished months ago that the
2   timing of the --

3          THE COURT:  Okay.  But that's an urgency that's
4   unrelated to Mr. Orr's transition out of his current
5   position.

6          MS. LENNOX:  There are in some instances -- again,
7   I'm going to punt a little bit because there are some
8   issues -- Mr. Orr has been appointed, and there's the state
9   statute under which he has been appointed, and there's not
10  much that Mr. Orr can do about that state statute.  And I do
11  believe that Mr. Howell may have some thoughts about what
12  might be being considered in that instance, but I will say
13  that with respect to the plan, there are settlements and
14  agreements in the plan that require powers under PA 436 and
15  orders under PA 436.  So, in addition to having a need to --

16         THE COURT:  Can you give me an example of one?

17         MS. LENNOX:  Well, for example, for the LT and the
18  UT settlements we did, that requires emergency orders, things
19  like that, emergency manager orders.

20         THE COURT:  And these are orders that can't be
21  entered until after confirmation?

22         MS. LENNOX:  Well, your Honor, I think that's
23  something that people are thinking about, and I think Mr.
24  Howell may be better to address that.  So I also think as a
25  general matter, I think there's a little uncertainty over

1   long-term revitalization projects unless we know whether this

2   plan is going to be confirmed or whether it won't be, and

3   that keeps a city of 700,000 people in suspense.  And I think

4   people need to know definitively whether that's going to go

5   forward or whether that's not, and we're on to Plan B.  It

6   would seem to me from our prior discussion with Mr. Legghio

7   and Ms. Patek that work will expand to fill the time

8   allotted, and if more time is given, then people will take

9   all that time to do whatever it is they think they need to

10  get done.  Again, I am a firm believer in deadlines for a

11  reason.  I think we are at the point where we need to get

12  this moving for a variety of reasons, some related to the

13  emergency manager's position and a lot that aren't, and I

14  think it's important to get that moving.  I do think with

15  respect to the stipulation that Mr. Shumaker is referring to,

16  I do believe it postpones things like having to file pretrial

17  briefs on issues to which the objecting parties perhaps are

18  no longer objecting, so we have tried to think through those

19  issues so we don't unduly burden the other parties, we don't

20  rack up their expense, we don't burden the Court with extra

21  paper it doesn't need to read until such time it becomes

22  clear that we don't need to read it.  And I do understand

23  that this is an unusual, to say the least, and highly

24  burdensome request that we are making on the Court, but we do

25  think it's workable.  We do think for a variety of reasons we

1    need to proceed, and we would respectfully ask to stay on the
2    path that we're on.  I don't know if Mr. Howell has anything
3    to add to answer your Honor's question.
4             THE COURT:  Mr. Howell, is there anything you'd like
5    to add here?
6             MR. HOWELL:  Thank you, your Honor.  Steven G.
7    Howell, Dickinson Wright, special assistant attorney general
8    for the State of Michigan.  Your Honor, the city and the
9    state agree that a speedy exit from bankruptcy is in the
10   city's and the state's best interest.  All the government
11   parties are highly aware of the importance of resolving the
12   situation in order to ensure that this Court's proceedings
13   will not be negatively affected by whatever actions are
14   taken.  There are active negotiations and discussions, active
15   discussions ongoing, and we are optimistic that a good
16   solution will be found in the near future, and we expect
17   those discussions to continue.
18            THE COURT:  Discussions regarding what?
19            MR. HOWELL:  Well, while we continue to be focused
20   on up until this point getting this done before so we don't
21   have to confront them, but there are issues that will arise,
22   and there will need to be a transition if we go beyond that
23   date, and if the trial is adjourned, the ongoing discussions
24   will need to intensify to ensure that this issue will not
25   impinge on Detroit's ability to exit bankruptcy as soon as

1    possible, but those issues to date are ongoing.

2            THE COURT:  All right.  Thank you, sir.  Now, thank

3    you.

4            MR. SOTO:  Your Honor, I'll be brief.  I was on a

5    flight when the filing last night was made, and I tried to

6    pull it down on my iPad, and the plane's thing didn't work.

7    And then when we landed, I was waiting for a cab for an hour

8    and a half, and then thankfully somebody from GM sent a bus

9    for all these GM people, and they scurried me on the bus not

10   knowing that I wasn't a GM person.  They were very, very kind

11   to take me to the hotel anyway, and so at 3:30 this morning I

12   thanked them all and got off the bus.  And so I believe

13   I'm -- I believe I'm able to change when change is necessary,

14   and in this context I first want to start by saying that I

15   applaud the efforts of my colleagues who put together what I

16   think is a very interesting settlement and one that I think

17   leads to judicial economy.  I count ten expert witnesses on

18   the DSW side that were just DSW experts that are no longer

19   necessary and twenty-seven fact witnesses, if I was counting

20   correctly, and so that has a significant impact on the

21   proceedings.  I also think that -- you know, I fully agree

22   that there are about 22 witnesses that I count that are on

23   the city's list that probably still remain viable for the

24   remainder of the trial, and some of them -- and this is the

25   rub -- and some of them remain viable whether there is a

1   settlement or whether there isn't, and that's where the

2   current procedure that, at least as I understand it, reading

3   it as early as I did -- and, again, without having the hard

4   paper in front of me, as I understand it, it's essentially a

5   bifurcated trial.  And so what will happen is that certain

6   witnesses that would have been witnesses in both proceedings

7   so that they would be witnesses in our COPs presentation or

8   cross-examination, and much of -- certainly this is true for

9   FGIC, and I'll let Mr. Hackney speak for Syncora, but a good

10  portion of our case is coming in through cross-examination.

11  We believe that is certainly true with respect to Mr.

12  Buckfire, Mr. Orr, Mr. Malhotra, and Mr. Moore, and so when

13  we look at the current process, our concern -- and it's not a

14  little one -- is that we will essentially be completed, but

15  the trial itself won't be completed.  And witnesses that we

16  will have cross-examined and hopefully successfully, at least

17  in our minds, will then be brought on again, and certainly

18  there's nothing to stop the city from, for example, if

19  Mr. Orr has to testify again in the second part of the

20  proceedings and there's no settlement or the example they

21  gave -- Mr. Moore, I guess, was one of them that would be.

22  So, from our perspective, that leaves us vulnerable in some

23  way, and the cases being tried to you -- you have, you know,

24  a lot that's going on.  You will hear facts and you will have

25  to address them.  I don't see how it's easy to pigeonhole,

1    okay, I heard that fact with respect to DSWD, but it wasn't

2    in with respect to, you know, the, you know, FGIC people or

3    something like that.  I think that's very difficult to do,

4    and so I would -- once again, as I only began to suggest last

5    week, we believe that given the nature of the settlement that

6    was announced and the importance of it, which we're in favor

7    of, we think a two-week recess to begin the trial on

8    September 4th when it's absolutely clear that the settlement

9    process is done and that the plan that's going to be proposed

10   is the plan that we're trying is the appropriate way to do

11   that.  I would only point out -- and, again, I don't have the

12   transcript in front of me, but many of the things that Mr.

13   Moore testified about with respect to revitalization --

14   because you asked, "Well, what are the pressing issues?" and,

15   frankly, on my part, I didn't hear any issue that said,

16   "Well, I can't wait two weeks.  That has to happen now."  I

17   mean I heard things that are important, but they can wait two

18   weeks and particularly in the context of a case as important

19   as this one and the change that could be wrought by the

20   settlement and, again, a positive change, so for

21   revitalization I remember Mr. Moore testifying at length that

22   there are many things that could be done now that can

23   continue to do even if there is no plan confirmed, so I don't

24   think anything has to wait on that score for us, but there

25   are other things that make sense to wait, especially when due

1   process is concerned.  Excuse me, your Honor.

2           THE COURT:  So I need you to articulate as

3   specifically as you can how your case might or would be

4   prejudiced if I go along with the city's agreement on holding

5   off on the DWSD issues till the end to see if the settlement

6   goes through.

7           MR. SOTO:  So the examples that I have in my mind --

8   and, again, they can't be specific examples.  We don't have

9   the testimony in front of us.  But there were a number of

10  things that -- I'll use Mr. Buckfire as an example,

11  although -- because I don't see how Mr. Buckfire is not

12  relevant to both parts of that case.  I know Malhotra is.

13          THE COURT:  Okay.

14          MR. SOTO:  I know Moore is, but just use Buckfire.

15          THE COURT:  Okay.

16          MR. SOTO:  There are many things that he testified

17  about that go to the heart of, well, "Did you consider these

18  alternatives?"  We have in two days of depositions seen two

19  different Buckfires, at least in my transcripts, and one

20  who -- because he was deposed two days, and one in which he

21  answered on the second day a little bit differently than the

22  first day.  What we're concerned about is that there -- if

23  there is no closure to our cross-examination of Mr. Buckfire

24  and he's able to testify again -- and he will be addressing

25  many of those same issues with respect to feasibility and

1   particularly with respect to best interest, and I think

2   there's just an opening that there's no reason for us to face

3   that for a two-week stay.  There just isn't.

4         THE COURT:  Thank you, sir.

5         MR. HACKNEY:  Your Honor, good morning.  Stephen

6   Hackney on behalf of Syncora.  I also had sort of a wild

7   night last night.  I spent more time in the car going from

8   the airport to the hotel than I did in the plane or in the

9   car going to the airport, so --

10        THE COURT:  Oh, my.

11        MR. HACKNEY:  And I didn't make it to the hotel, so

12   I lack Mr. Soto's intrepidness.  I think that I wanted to

13   start by saying that it's a bit perplexing sometime being in

14   my position and watching this all unfold because you see

15   Ms. Lennox get up and say things that I'm sure are true, like

16   there are all sorts of things that go into arranging the VEBA

17   that will fund the retiree healthcare, and some of those

18   dates are self-imposed by them, by the settlements that they

19   struck, so those are, you know, guns or clocks that they've

20   set themselves to stay away from the sort of martial stuff,

21   but the --

22        THE COURT:  Thank you.

23        MR. HACKNEY:  Yes.  I remember.  So the -- but at

24   the same time then, you know, two weeks before the biggest

25   trial in the history of Chapter 9, they decide you know what,

1   maybe we will just go do a $5 billion tender.  You know,
2   that's a lack of coordination in terms of their own strategy
3   that I think ultimately has real world consequences, and the
4   way I perceive it is there are always -- there's always an
5   attempt to externalize the costs of those decisions onto the
6   creditors in terms of, well, let's jury-rig the trial in this
7   fashion.  And I think I want to echo what Mr. Soto said,
8   which is the standard that's been set is has the city
9   established extraordinary cause to alter the deadlines that
10  are currently applicable to the creditors, and I don't see
11  what it is.  I think the notion of refinancing out the sewer
12  bonds, the city's only secured creditor, instead of going
13  hammer and tong with them and spending who knows what
14  fighting them only to come at the 11th hour and seek to take
15  them out, that can't be something that occurred to people
16  just recently, and so I don't think there's been a showing of
17  what the extraordinary cause is that's motivating the desire
18  to have you go against something that you said to me the
19  other day when I said, remember, let's talk about witnesses,
20  you know, can we examine them adversely, and you were very
21  emphatic and said witnesses are only going to testify once,
22  and that's efficient; right?  That's how you ran the swaps
23  trial.  That's how you run your trials.  It's because people
24  live lives, and you don't want them coming in and out.  But
25  now here the city comes in and says, well, no, let's actually

1  have witnesses come in once and come in again later, and so I

2  think the city is actually --

3        THE COURT:  Well, come in again maybe.

4        MR. HACKNEY:  Maybe, come in again maybe.  That's

5  right.  Fair point.  So I think at some point the city is

6  saying to you we'd like to start our case, but we won't know

7  whether we want to close our case, and I think that's going

8  to propose procedural problems for you with respect to

9  evaluating directed verdict motions and trying to do the type

10  of separation that Mr. Soto talked about.

11        Now, that being said and echoing Mr. Soto's comments

12  about the judicial efficiency of just waiting to get this

13  sorted, my focus remains on having adequate time to try the

14  case, and I wanted to talk, to the extent that you would like

15  to talk about the subject of how I see the trial mapping out

16  in terms of the actual time it will take to try the case --

17        THE COURT:  Well, I do want to discuss that, but

18  before we leave --

19        MR. HACKNEY:  Yeah.

20        THE COURT:  -- the subject of when to start and

21  whether to accept this stipulation --

22        MR. HACKNEY:  Yeah.

23        THE COURT:  -- I want to ask you the same question I

24  asked Mr. Soto, which is the prejudice question.  How does it

25  prejudice your presentation of your client's case --

1        MR. HACKNEY:  Yeah.

2        THE COURT:  -- either on cross or in your own case

3    if I accept the deal?

4        MR. HACKNEY:  Yeah.  So let's kind of do the three-

5    step that will inevitably happen, which is let's imagine that

6    Ken Buckfire testifies in the city's case in chief.  Let's

7    imagine that I cross-examine Ken Buckfire, and I just level

8    Ken Buckfire.  Okay.  We're only imagining, I know.  These

9    are the dreams of a --

10        THE COURT:  Okay.

11        MR. HACKNEY:  -- dreams of a trial lawyer.  Okay.

12    So the city is now looking at Ken Buckfire, and he has taken

13    on massive water on cross-examination, and they realize they

14    have a problem with the witness.  Okay.  We go through the

15    rest of the trial.  We don't close the trial because it turns

16    out the tender offer didn't work.

17        THE COURT:  Um-hmm.

18        MR. HACKNEY:  Okay.  But so then here comes

19    Mr. Buckfire on the backside, and he's got a bunch of new

20    things that he's going to do to plug all the holes that were

21    established in his cross-examination.  And the reason that's

22    of particular concern is because this is not a red light,

23    green light case.  Okay.  Once the witness says the light is

24    green, if they come in later and say, "Oh, you know what?  It

25    was red," you can impeach their credibility by changing their

1    testimony.  Problem with this trial, your Honor, is it's very

2    much a methodology case.  It's about the studies and

3    analysis, the data, the grounds for decisions that were made,

4    and it pervades almost everything.  So the reason that's

5    always a problem is there's always the potential for mischief

6    for experts who got hammered one day to go back and think and

7    do more work and then attempt to cast the hammering in a new

8    light.  Now, the response that the city can offer is, okay,

9    here's what we'll do.  We'll close the evidence with respect

10   to you but not with respect to the DWSD parties, and then we

11   engage the problem Mr. Soto was articulating, which is I mean

12   really, you know, can you really have the Court separate in

13   its mind --

14            THE COURT:  Um-hmm.

15            MR. HACKNEY:  -- and do we hang around and get up

16   and recross -- you know, these are the issues that we can

17   think of.  There are going to be a bunch that we're not smart

18   enough to think of and that we haven't thought of, but those

19   are patent, you know, and we're talking major.  We're talking

20   Orr, Buckfire, Malhotra, and Moore.  These are like --

21            THE COURT:  Um-hmm.

22            MR. HACKNEY:  -- material.  Okay.  I did want to add

23   an additional point, if I could, that Mr. Soto did not

24   address before I talk more specifically about the trial

25   mechanics, and that is don't forget that in the background

here behind the bonds is this important concept of a regional

authority that is still percolating, and you and I had a

colloquy on this when I was here last week, and I'm not sure

I did as well as I could have in terms of articulating the

importance of that because I actually -- I think that we can

all posit that a regional authority, even though it's subject

to the mediation and is confidential and secret, that it's

been discussed enough and our -- and the rationale behind it

has been articulated enough in the papers that there is a

material prospect that there could be a regional authority.

There is a material prospect that the effect of that regional

authority will generate revenue for the city's general fund

by way of some lawful mechanism that counts as overhead under

the bond indentures and all of the things that govern that

authority.  And don't take my word for it.  The plan says

this.  And what's interesting about the plan is it's already

decided to distribute 50 percent of that amount to the extent

there is a qualifying DWSD transaction, as I understand it,

to the retirees --

          MS. LENNOX:  That is true.

          MR. HACKNEY:  -- or a restoration -- I always have

to look over and make sure, so -- to a restoration trust, and

the other 50 percent I would say is somewhat uncommitted.  So

there's already an issue of there's some level of speculation

about what the retirees' actual recovery will be because you

1  don't know if this transaction is going to happen, and you
2  don't know the size.  There's also a question about the other
3  half and what the city will do with that because it is not
4  committing itself in any way, so you see a fair and equitable
5  issue sort of raise its head, which is I think we can
6  hopefully stipulate that it wouldn't be fair and equitable
7  for the city to close the transaction after the confirmation
8  and then say, you know, we've gone ahead and decided to keep
9  the other 50 percent for ourselves.  As we try the case
10  without the knowledge of what's happening with that
11  authority, you have to speculate about what will happen on
12  that, and that's what Ms. Lennox said to me last time,
13  Mr. Hackney is just speculating about whether or not there
14  will be an authority.  He's just tilting at windmills.  But I
15  say, well, if I'm speculating about whether it will happen, I
16  think you all are speculating about the idea that it will
17  not, and you have the burden of proof.  And so that's a
18  very -- I mean this is a material part of the future of the
19  city, and it's a material part of the economics of the plan,
20  and so the reason I want to raise it again is because as you
21  achieve economic savings around the bonds, I believe you take
22  a step towards an authority because I believe the economic
23  theory --
24          THE COURT:  Well, but don't the economic savings on
25  the bonds stay within the department?

1    MR. HACKNEY:  If you don't change the structure and
2   you just refi the bonds, yes, but there's a real world
3   implication of this that I'm trying to get at, your Honor,
4   which is I think that what's happening here is they're
5   basically having a conversation that goes something like
6   this.  Look, we will give up control so you counties can get
7   some control over the governance of this entity that impacts
8   so many of your citizens.  Okay.

9    THE COURT:  Um-hmm.

10    MR. HACKNEY:  That's point one.  Point two, we will
11   achieve economic savings by refinancing some of these bonds
12   at current market rates.  That will be an economic savings.
13   Point three, we will rationalize the operations of this
14   entity, and, yes, that may impact City of Detroit employees
15   who, you know, are part of that rationalization process, but
16   we will achieve efficiencies, and those efficiencies will
17   amount to "X" on a yearly basis.  And in exchange for all of
18   this, we will arrange a lease payment that is some portion of
19   "X" coming back to the general fund of the city.  That is how
20   I perceive the logic of it.

21    THE COURT:  Um-hmm.

22    MR. HACKNEY:  The only reason I'm bringing this up
23   is because the bonds represent a step down that path.  Now,
24   I'm just raising this issue because I think it's an important
25   issue.  I'm not saying, well --

1          THE COURT:  What if there's no lease payment?

2          MR. HACKNEY:  It would all depend on the deal.  I

3     think at some point if you're the city, you might just

4     restructure it just for the good of it.  You might.  I think

5     the clear thrust of that and the public-private partnership

6     that's been discussed -- and there's testimony to this from

7     Mr. Buckfire -- the theory is that there's money coming back

8     to the city from the general fund.  I'm not sure that you

9     transfer away this second largest asset --

10         THE COURT:  Money coming back to the city for the

11    general fund?

12         MR. HACKNEY:  Yes.  That is the theory of the

13    transaction.  I'm not saying it has to be done that way.  I'm

14    saying that's the theory.  And I don't -- it would be

15    interesting if the city decided to create this authority and

16    transfer away what is by all accounts its, I believe, second

17    largest asset with nothing coming back to the general fund.

18    It might do that, but that itself would be, I think, the

19    subject of some debate.  I don't want to go --

20         THE COURT:  Well, but --

21         MR. HACKNEY:  Yeah.

22         THE COURT:  -- the city doesn't profit from the

23    water department at this point anyway.  It's prohibited by

24    law from that, isn't it?

25         MR. HACKNEY:  Yeah.  Profit -- that's correct.

1  Money certainly comes from the DWSD to the city.  You

2  wouldn't characterize it as profit.  It has an economic

3  impact on the city's general fund.

4          THE COURT:  Can you give me an example?

5          MR. HACKNEY:  Sure.  So the most obvious example

6  would be the COPs principal and interest payment.  DWSD is

7  assessed a percentage of the COPs principal and interest

8  payment, has always paid it and the testimony is would always

9  pay it even upon dismissal.  UAAL contributions for DWSD

10 employees is another classic example, certainly not a profit,

11 but it's money coming back.

12         THE COURT:  These are attributed to the water

13 department on account of the operations of the water

14 department.

15         MR. HACKNEY:  That's right.  That is right, as would

16 the lease that they enter into as part of a regional

17 authority because the lease would be an operating expense.

18 The regional authority has to pay its rent, and that's where

19 the fund -- the money comes back to the general fund because

20 there's no dispute the city owns the asset.

21         THE COURT:  Possibly.

22         MR. HACKNEY:  Oh, okay.  Maybe there's a dispute

23 about that.  I was not aware of a dispute, but --

24         THE COURT:  No, no, no.  I was saying "possibly" to

25 the prospect of money coming back.

1          MR. HACKNEY:  That's right, yeah.  I don't think
2     there's any dispute that the --
3          THE COURT:  Obviously the city owns the --
4          MR. HACKNEY:  Yes, yes.
5          THE COURT:  -- asset.
6          MR. HACKNEY:  It's possible as to whether it could
7     unlock money.  I don't think there's a real dispute that you
8     could structure it in a way that generated returns for the
9     city.  That's what the plan itself contemplates might happen.
10    I'm just making --
11         THE COURT:  Well, but that assumes that the
12    transaction that's agreed to is one of these qualified
13    whatever it's called --
14         MR. HACKNEY:  DWSD, yeah.
15         THE COURT:  -- transactions, yeah.
16         MR. HACKNEY:  No.  You're right, but --
17         THE COURT:  We don't know that even.
18         MR. HACKNEY:  No, we don't, but -- so, again, when
19    we go back to the speculation point, your Honor, that's where
20    I say -- I turn it around on the city, and I say I think the
21    speculation is bad for their case.  They have the burden.  If
22    I'm putting my hand up as an objector and saying, "Here's a
23    material part of the plan that's unresolved.  Here's a
24    material revenue stream that the city appears to contemplate
25    it may get that's not allocated," that is not fair and

1   equitable.  That's a fairly compelling one, two, three, and I

2   think the city is almost the one that should be saying, "You

3   know what, your Honor?  We've got this big piece out there

4   that's unsettled.  Maybe we better wait to have the plan

5   confirmation trial until that gets resolved."  My attitude is

6   if they want to go forward in the absence of certainty around

7   that, okay, but they have to know that we're raising this

8   again and again as an issue.  The only reason I'm raising it

9   with you again is because I didn't think I did a good job of

10  it last week, point one.  Point two, the bond refinance I

11  believe plays into it.  And point three, it does dovetail a

12  bit with what Mr. Soto was saying because that's another

13  piece of this that you may see percolate out if there's an

14  additional time.

15          I want to go back, your Honor, and give you the

16  mechanics of how I see the trial setting up, and what I did

17  here is I just imagine a world where it's the city versus the

18  COPs, okay, so -- as a simplifying assumption, and then --

19          THE COURT:  Okay.

20          MR. HACKNEY:  -- you can remember in your mind that

21  there are also the counties.  There is, as we stand here

22  today, the DFFA technically, and there is the UAW, and then

23  in theory there could be the sewer bonds coming back in.

24  Okay.  So put those to one side.  Now I'm just talking about

25  the COPs.  Mr. Shumaker is right that we estimate the city

1  will call 22 witnesses.  The COPs have seven expert witnesses
2  between them and three city fact witnesses that they will
3  call adversely that the city will not call in its case.  That
4  is a total of 32 witnesses.

5          Now, you have to use -- you can try and go witness
6  by witness and try and think about how you might cross and
7  direct, but I used the simplifying assumption.  I said if
8  there are two hours of direct and two hours of cross for each
9  witness, what does that yield?  Now, the only thing that you
10 can say for sure about that simplifying assumption is that it
11 will be wrong for everyone; right?  Okay.  But if you -- and
12 I'll give you some thought behind where this comes from, but
13 if I had to predict, I will tell you I think it's low.  It
14 always takes longer to put witnesses on than people remember.
15 If you do 32 witnesses at four hours, you end up with 128
16 hours of trial time.  If you allow ten hours of time for
17 opening and closings, if you allow ten hours of what I call
18 lost time -- and by "lost time" I mean court questioning,
19 examination of Ms. Kopacz, colloquies that are maybe not
20 fairly allocated to anyone -- I mean there -- in the course
21 of a 21-day trial, there can be a half an hour of time in the
22 day that is not clearly allocated to someone.  You can
23 quibble with that or not, but it's not like you just go
24 witness, witness, witness.
25          THE COURT:  Well, I'm going to ask you to pause

1  right there and say that if you do not stipulate to the
2  admission of Ms. Kopacz's report into evidence and if I find
3  that it's not admissible and we have to go through her entire
4  opinion in court in testimony, that's a lot of hours.

5        MR. HACKNEY: Understood. Understood. But if you
6  accept my math, your Honor, you end up with 148 hours of
7  trial time. And if you run a tight ship, as you are wont to
8  do, and did seven hours of trial time a day, which is also, I
9  think -- that's really going at a good clip because trial is
10 tiring, you know, and there is a little bit of a tendency to
11 say let's take the afternoon break, and let's do this one in
12 45 minutes, you know, so you end up with 21 seven-hour trial
13 days, and that's -- you cannot look at that estimate and say,
14 man, is there a lot of fat in there as he -- you know,
15 expanding it. Let me give you some backup on that. So let's
16 think back to the swaps trial one and two, okay, which is
17 what we call the first trial and then the one following the
18 effort to mediate. And that was on the discrete issue of
19 this one settlement, just the one deal. Kevyn Orr's direct
20 and cross there was three and a half hours. Jim Doak
21 testifying just on the DIP financing was two and a half
22 hours, direct and cross. Buckfire was an hour and three-
23 quarters, direct and cross. Malhotra was 2.3 hours, direct
24 and cross. That's for that first swap trial. That was on a
25 much more discrete issue than the full panoply of issues that

1  will impact plan confirmation, so I don't even want to commit

2  myself to the simplifying assumption that I've done of two

3  hours direct and cross.  I just want to show you that even at

4  148 hours, it's demanding I would say very extreme efficiency

5  from all the lawyers, and we haven't talked about the

6  counties or the DFFA.

7       So why am I bringing this all up and making you

8  watch me do math, which is always just painful for lawyers to

9  do math?  The answer is because I'm here to beseech you that

10  if you do consider Mr. Soto's request and the suggestion

11  that's been made that it's more efficient to wait till you

12  see what happens with the tender offer until you start your

13  trial, please do not cut any trial days.  We're going to need

14  all of them as things currently stand.  And the position I

15  have is kind of a nuanced one, which is I see the wisdom of

16  the judicial economy that comes from moving the trial but not

17  at the price of losing trial days.  If we were put to a

18  choice of it one way or the other, I don't think we have any

19  trial days to lose.  That was the point that I wanted to make

20  to you, your Honor.  Thank you.

21       Just as an aside, there are a couple other nuts and

22  bolts for you once we get through this issue.

23            THE COURT:  Okay.

24            MR. BRILLIANT:  Good morning, your Honor.  Allan

25  Brilliant on behalf of Macomb County and Macomb Interceptor.

1   Your Honor, we also think that the trial should be, you know,

2   put off for a couple weeks to the 4th, and we believe that we

3   will be severely prejudiced. Now, I represent two affiliated

4   clients that have two different issues in the case. MIDDD,

5   which we don't really talk about too much in connection with

6   this proceeding, has an unfair discrimination claim. It's in

7   Class 14. Class 14 gets ten to thirteen cents. LTGOs, the

8   pension creditors get substantially more, you know. The COPs

9   get a similar type of distribution. So we're in that part of

10   the case. The unfair discrimination case we're going to

11   file, you know, a supplemental objection today and join in

12   some of the other objections raised by the -- you know, the

13   COPs in connection, you know, with the plan and, in

14   particular, you know, raise some issues about unfair

15   discrimination with respect to LTGO. So the way they're

16   talking about bifurcating the trial, we would be involved in

17   the first half of the trial, and then, of course, as a

18   county, we are also objecting to the calculation of the UAAL.

19   You know, we believe that the interest rate discount rate

20   that is being used is unduly low, and, consequently, the

21   amount that DWSD is being required to pay is more than its

22   allocable share of the -- you know, of the UAAL. And, in

23   addition to that, we have feasibility, you know, issues, so

24   we would be in both the first part and the second part, you

25   know, of the trial. It's very unclear to us, you know, that

1   other than with respect to certain DIA issues and maybe some
2   of the issues about, you know, bringing in the local citizens
3   and the mayor and various other people that really don't have
4   to do, you know -- which have to do more with the
5   feasibility, you know, of the plan as it relates to the
6   general fund and doesn't really have to do with the unfair
7   discrimination issues and doesn't -- don't have to do with
8   the feasibility of DWSD, but the rest of the issues, your
9   Honor, if there's not -- you know, I could easily point to
10  cut them down the middle and just say one is DWSD issue, and
11  the clearest example of that, your Honor, is the issue of the
12  discount rate, the 6.75 percent.  We say in connection with
13  our argument that the DWSD plan is unlawful that 6.75
14  requires DWSD to pay more than its fair share, more than, you
15  know, the total amount of what it would be, you know,
16  required, you know -- you know, to pay under the plan and,
17  therefore, you know, violates, you know, state law.  The COPs
18  say that because the 6.75-percent number is too low, it
19  underappreciates the full distribution that the pension
20  parties are getting because it makes it look like their claim
21  is larger than it really is.
22          THE COURT:  What do you think the discount rate
23  should be?
24          MR. BRILLIANT:  Well, we think it definitely should
25  be somewhere, you know -- you know, north of seven, your

1    Honor.

2            THE COURT:  What do you think it should be?  What's

3    your number?

4            MR. BRILLIANT:  You know, I don't -- you know, I

5    don't personally, you know, have a number.

6            THE COURT:  It's not a personal question.  It's a

7    question of your evidence.

8            MR. BRILLIANT:  You know, somewhere between, you

9    know, 7.5 roughly, your Honor, somewhere around 7.5.

10           THE COURT:  You've got an expert?

11           MR. BRILLIANT:  We do not.  Oakland, you know, does,

12   your Honor.

13           THE COURT:  All right.

14           MR. BRILLIANT:  Okay.  So, your Honor, there's --

15   you know, it's not clear, you know -- you know, how -- you

16   know, under their agreement that they have with the DWSD

17   parties how it would work.  In addition, your Honor, if the

18   case would be bifurcated like this, you know, at this point

19   in time on Friday we would have to file a brief basically on

20   two plans, one the plan that's on file now, one the plan that

21   may be on file in a couple of weeks.  We don't agree on

22   everything with the DWSD parties.  Whereas, you know, the

23   counties say that the plan is not feasible, the DWSD, you

24   know, parties say, well, there's enough cash flow at least to

25   pay us, you know, in full, so we would have to either

1  anticipate what their arguments are, plan our case as if
2  they're in it, plan our case as if they're -- you know,
3  they're out of it, and then with respect to feasibility, we
4  have to be prepared to argue, you know, both whether or not
5  the cash flows, as they may, you know, change pursuant, you
6  know, to the new, you know, bonds if they're sold, you know,
7  and it's not -- and I'm not saying -- you know, like
8  everybody else, your Honor, I got here late.  I'm not going
9  to complain.  I'm from New York.  We've had power outages.
10 We've had hurricanes.  We've had a terrorist attack, you
11 know.  You know, I feel bad for Detroit because of all the
12 water yesterday.  Hopefully not too many people got hurt or
13 inconvenienced too much, but, you know, I'm not going to
14 complain about it, but I haven't had an opportunity to review
15 their -- you know, their motion in any level of detail, you
16 know, to see whether or not there are cash flow savings and
17 whether they're savings throughout the whole period or cost
18 more in some periods and less in others, so we don't have
19 an -- haven't had an opportunity to look at that, but in
20 terms of dealing with our evidence for the feasibility of the
21 plan, we have to assume both ways, and we also have to make
22 assumptions as to what the interest rate is going to be on
23 the financing and what the terms are, which haven't been set
24 and won't be set until the bonds are priced, you know, next
25 week, so we're really in a position where we're not really

1    able to move forward, and from my client's perspective, we'd

2    be prejudiced because we think ultimately the trial will be

3    longer because some witnesses will testify twice, and that

4    takes more time.  We're not sure, based on what they're

5    suggesting, whether we're supposed to -- we're able to cross-

6    examine the witnesses on our DWSD issues, whether the COPs

7    are going to cross-examine, you know, the witnesses on the

8    interest rate issues or all that is going to be -- going to

9    be, you know, left to the back, but from our perspective,

10   assuming your Honor schedules a hearing the week of the 25th

11   that they request on the motion, we have to analyze, you

12   know, whether or not the settlement is fair, how it affects

13   the plan.  We have to in the short term file a brief on

14   Friday both making assumptions as to what we think the

15   pricing is going to -- is going to be and whether they're

16   going to -- whether the DWSD bondholders are going to be in,

17   whether they're going to be out, you know, both cases, and we

18   have -- and from my client's perspective, we have to be at

19   the whole part of the trial, so it's not like we can say,

20   okay, well, you guys can just monitor what's going on and

21   then just show up at the back end.  We've got to be there the

22   whole time, so it's just not, you know, appropriate at this

23   hour, your Honor, to throw all these additional burdens on,

24   you know -- you know, parties that have already been

25   stretched to the max at this point and were, you know,

1  straining to get to the point of being prepared to start, you

2  know, next week on the 21st.  I'm not so sure, your Honor,

3  that -- and I'm not suggesting we necessarily start on the

4  2nd, you know.  The impression I had from reading the papers

5  last night, I could be completely wrong since we were, you

6  know, not part of any of these negotiations or discussions,

7  and the first time, you know -- you know, we learned, you

8  know, about the terms was last night, but, you know, it may

9  be that we could start on the 2nd or the -- you know,

10 earlier.  The impression I got from reading it was the 4th is

11 kind of an outside date.  It's not necessarily, you know,

12 the -- you know, the date that everything -- that the closing

13 will occur, but I could be completely wrong about it, but my

14 sense is the same as Mr. Soto.  We're talking about a two-

15 week extension here.  We're not talking about pushing things

16 off, you know -- you know, months, and the city is not going

17 to be prejudiced at all by pushing, you know, this off a

18 couple weeks, but I believe that Macomb County and MIDDD will

19 be.

20       MS. QUADROZZI:  Good morning, your Honor.  Jaye

21 Quadrozzi on behalf of Oakland County.  I'm not going to

22 repeat what's been said, but I do want to address sort of a

23 practical concern that you haven't heard.  The stipulation

24 between the city and the DWSD bondholders purports to, as you

25 have heard, of course, move issues to the end.  It, however,

1    with respect to the DWSD bondholders, pushes back deadlines

2    for them, so they don't need to file their trial briefs, and

3    they don't need to file their portions of the pretrial order.

4    While it purports to deal with all of the issues relating to

5    DWSD, it does not do anything with respect to the county's

6    obligations there, and I raise this because last week your

7    Honor talked about -- I'm going to describe it as the horse

8    trading that goes on in terms of objecting to exhibits and

9    we're not going to object to this and we're going to let this

10   in.  Certainly a part of that negotiation that we expected

11   would take place would be not only including the city and the

12   counties but also the DWSD bondholders because they would

13   have some exhibits that we wouldn't need to put on our list

14   because they would be on their list, and it would just kind

15   of be a go-round there.  We now kind of don't know how that's

16   going to work.  I have obviously been working hard to pull

17   together my materials.  I haven't been contacted by anybody

18   from the city on how we're going to negotiate that.  I'm sure

19   they've been very busy dealing with these other issues, but I

20   just raise that as a practical problem that we are faced

21   with, as Mr. Brilliant said, both because now we have to put

22   in for contingent A and contingent B, but only with

23   negotiating with one of the people who might be involved in

24   that trial.  That is just a practical example of one of the

25   things that could be made much, much simpler with just

1   allowing enough time so that we can ensure that we know

2   exactly what we are trying, and that way we can put together

3   for your Honor a pretrial order that is sensible and

4   efficient and serves the goals of what the pretrial order is

5   supposed to do, which is to outline an efficient trial and

6   make it so that things run smoothly, so we would concur in

7   the request for a brief delay of this matter.

8           THE COURT:  Thank you.  Anyone else?

9           MR. ALBERTS:  Your Honor, Sam Alberts from Dentons

10  for the Official Committee of Retirees.  I wanted to echo but

11  really emphasize a point that was made by Ms. Lennox

12  concerning retiree healthcare and what is happening with the

13  plan process.  I cannot convey strongly enough how compressed

14  the schedule already is.  We have been trying to resolve

15  issues that have come up, some of which are out of our

16  control.  For example, the city has to appoint a VEBA

17  trustee.  It has yet appointed a VEBA trustee.  In fact, it

18  was originally supposed to appoint three.  It abandoned two.

19  We'd have to fill in the gaps.  We've been interviewing

20  third-party administrators, but the VEBA trustees who are

21  involved are wondering what do we do and what is going to be

22  handed off to us and how do we implement this starting

23  December 1st?  And so there's a lot of concern about the time

24  compression, and, in fact, the city and the committee

25  separately have gone to Judge Rosen to ask for some guidance.

1  And so our concern in this whole process is we don't --
2  whatever the Court decides, we appreciate both sides of the
3  argument.  We want confirmation, if it's going to occur, to
4  occur quickly within the span because we've got to deal with
5  retiree healthcare, and it's not just a momentary issue.
6  There are concerns that the way the notes are currently
7  structured, will they turn out enough money to keep that
8  promise going, and so we've got to get the professionals for
9  these VEBA trustees in place and moving, and, unfortunately,
10 any further delays just tightens that process even more, so,
11 your Honor, that was the point of why I wanted to rise.  I
12 thought you should know about that effect.  Thank you.
13          THE COURT:  Thank you, sir.  Anyone else?  Mr.
14 Shumaker.
15          MR. SHUMAKER:  Thank you, your Honor.  Just some
16 brief responses.  It's true that the city with the
17 stipulation with the DWSD bondholders is asking for the case
18 to be tried slightly differently.  From what I heard, it
19 seemed like we were asking for the second part to be tried
20 outside in the courtyard.  This is not a huge radical change.
21 You know, Mr. Hackney and Mr. Soto put forth the scenario
22 where they slayed Mr. Buckfire on cross-examination initially
23 and then he would get up and all of a sudden be born again
24 and have new testimony.  I think that's kind of silly.  The
25 Court is not going to allow duplicative testimony.

1  Mr. Buckfire is not going to be allowed to go over things

2  that he testified before surely, and just as they don't want

3  to have him, you know, have another opportunity at direct, I

4  can assure your Honor that I'm not thrilled about having him

5  go through another cross-examination. So I think that works

6  both ways, plus with Mr. Buckfire, in particular, he is

7  somebody that we think will come after September 4th in any

8  event, so that example goes out the door.

9       With regard to the other witnesses, Mr. Malhotra,

10 Mr. Moore, perhaps Mr. Orr, I mean we're talking, you know,

11 getting them back up on the stand and, you know, an hour max.

12 I mean it can't even be that. It is a segmented part of the

13 case, and it is different, but I would suggest to your Honor

14 that it is worth the risk here that it allows this settlement

15 to go through and the tender to be accepted hopefully.

16       THE COURT: You've asked the Court for a hearing

17 on -- I think it was August 25th.

18       MS. LENNOX: Greg -- yes, your Honor, on the tender

19 financing. That is correct.

20       THE COURT: Okay. If we start on the 21st, that

21 would be during the trial obviously.

22       MS. LENNOX: Correct.

23       THE COURT: How much time out of the trial would

24 that hearing take, do you foresee?

25       MS. LENNOX: Well, we certainly hope to get it done

1    within a day, your Honor.  Of course, we'd have to see what

2    objections come in, but I can't see it going more than two

3    days, but that would, you know, obviously alleviate the

4    burden on some of these confirmation issues if this hearing

5    falls in the middle of that process.

6              THE COURT:  Who would you foresee your witnesses

7    would be on that hearing?

8              MS. LENNOX:  I believe we're contemplating four

9    witnesses, your Honor, Ms. Bateson, who is the CFO of DWSD;

10   Mr. Donner, who served as -- from First Southwest, who served

11   as financial advisor; a witness from Citibank who is serving

12   as the dealer manager for this; and Mr. Orr briefly.

13             THE COURT:  So it's Mr. Orr and the three witnesses

14   who submitted declarations in support of the motion.

15             MS. LENNOX:  Correct, your Honor.

16             MR. SHUMAKER:  And, your Honor, just on

17   Mr. Hackney's point about, you know, this might be a step

18   forward to a -- the latest settlement with the bondholders is

19   a step forward towards a regional authority, you know,

20   there's always the possibility of another settlement.  I mean

21   the time has come, I think.  The deadlines have been set for

22   wonderful reasons.  You know, just because there's a

23   possibility that there could be more, if that was the test,

24   we'd just keep pushing the trial for a long time.  I don't

25   think that that makes a lot of sense because -- just because

1  there's another possibility of a settlement.  We've got to

2  get this going for the reasons that Ms. Lennox and Mr.

3  Alberts stated.

4        And then finally, with regard to Ms. Quadrozzi on

5  the horse trading prejudice, I'm not fully understanding

6  that.  We'll still be there to horse trade with her.  We'll

7  make sure that she's looped into the joint pretrial order

8  process.  I don't think there's going to be any impact on

9  getting a sensible and efficient pretrial order to your Honor

10  this week.

11        THE COURT:  Can you tick off the contingencies to a

12  successful water bond deal?

13        MR. SHUMAKER:  Heather, do you have a -- a little

14  help here, please.

15        MS. LENNOX:  So the contingencies, your Honor, are

16  based upon how many -- the biggest contingency, your Honor,

17  is based on how many people tender their bonds and are we

18  going to achieve sufficient savings compared to what the plan

19  would call for that even if it's less than what the --

20        THE COURT:  How do you define "sufficient savings"?

21        MS. LENNOX:  Well, it's --

22        THE COURT:  Magic number.

23        MS. LENNOX:  I don't want to put that on the record

24  now while the tender is in process because it may affect --

25        THE COURT:  Oh, all right.  Then don't.

1        MS. LENNOX:  -- people's decisions to tender, but,
2   you know, the issue that we will be comparing is what do we
3   get net net at the end of the day versus what do we think we
4   could get in the plan with all the risks that the plan
5   entails, so you have to weigh those risks as well, and is
6   this worth pursuing because it would be a consensual deal,
7   the market would perceive it favorably, and it resolves
8   objections.
9        THE COURT:  And when do you think you'll have that
10  analysis done?
11       MS. LENNOX:  So the process is this, your Honor.
12  The tender expires, meaning people have to tender their
13  bonds, by -- I believe it's 5 p.m. on August 21st, which is
14  the first day of trial.  The plan is that the Board of Water
15  Commissioners and the emergency manager would do the analysis
16  the next day and make a decision whether they are going to
17  accept the tender and move forward with it or not.
18       THE COURT:  But why not make it on an ongoing basis
19  in the meantime?
20       MS. LENNOX:  Because you have to see where you are
21  at the end of the day to make a final decision.  Now, we will
22  have real time understanding of whether the tender -- you
23  know, how the process is going with so many things, including
24  voting on a plan of adjustment.  Many things come in on the
25  very last day or two, so we won't know until --

1    THE COURT:  Well, but couldn't you decide like this
2  Friday that a sufficient number of bonds have come in to
3  justify going through with the deal because of the savings?
4    MS. LENNOX:  Your Honor, I would be speculating if I
5  could say because it all depends on what comes in.
6    THE COURT:  Well, right, but that's exactly the
7  point.
8    MS. LENNOX:  We may have a sense for where we're
9  going, but I don't know that --
10    THE COURT:  I mean suppose a hundred percent of the
11  bonds tender by Friday.
12    MS. LENNOX:  If a hundred percent of the bonds
13  tender by Friday --
14    THE COURT:  You're not going to wait a week to make
15  the decision, are you?
16    MS. LENNOX:  We're not going to wait a week to make
17  a decision.
18    THE COURT:  So that's my question.
19    MS. LENNOX:  But we don't think that that is going
20  to happen given the pricing that we're going out with, so --
21    THE COURT:  Okay.
22    MS. LENNOX:  -- I mean certainly, your Honor, we
23  will have a sense of it as we go on.  We want as many bonds
24  to tender as possible, of course, so we want to keep the --
25    THE COURT:  All right.  So issue one is do you get

1  sufficient savings, and you'll make that decision a week from

2  Friday.

3          MS. LENNOX:  Correct; correct.

4          THE COURT:  What else?

5          MS. LENNOX:  Then assuming we want to proceed

6  forward, we would have to come to your Honor and ask to

7  approve two potential sources of financing.  One is the

8  tender.  The reason the tender wouldn't close immediately is

9  because the department would like to go out to the public

10 market and sell long-term bonds at a public market because

11 the pricing is normally better than doing a short-term

12 public -- direct purchase or private placement deal.  We will

13 have the backup from Citibank to do a direct purchase private

14 placement if we have to use some or all of it, so we will

15 have the security of that, but we'd like to go to the market.

16 So we have to go to the market immediately, have the bonds

17 priced in the market, and then see how many of them sell.  We

18 need to give them like a week -- at least a week to sell.  So

19 based on that, you know, that's when we would determine to

20 close it with a public offering and/or -- I know you hate

21 that term -- perhaps including part of a Citibank deal.  And,

22 again, we want to see -- the department wants to see how the

23 public bonds that we would take price in the market because

24 if they're going to price in the market too high, that would

25 erode the savings that we're expecting to have.  And that

1    kind of analysis all -- this is all about achieving debt

2    reduction and cost savings for the department, so until those

3    processes occur, you know, that analysis has to be done.  So

4    given the holiday weekend, if we expect the bonds to -- if we

5    can have a hearing early the week of the 25th -- and we

6    expect the bonds to price a day or two after that -- that

7    basically gives less than a week for the sale.  Now, this is

8    going to be very marketed and very -- it's very well-known,

9    so if people want to buy, we think they're going to buy,

10   which is why we've compressed the time between going to

11   market and closing.  We think we've compressed it as long as

12   we can possibly compress it and still achieve reasonable

13   savings to DWSD.  Everybody wants the tender to be

14   successful, so we've compressed it as much as we can without

15   jeopardizing the potential success of that tender process.

16   That's the timing, your Honor.

17          THE COURT:  Thank you.

18          MR. PEREZ:  Your Honor, may I just be heard on that

19   point?  Your Honor, Alfredo Perez on behalf of FGIC.  I agree

20   with Ms. Lennox except for to the extent that you get to the

21   financing depending on whether you go the private placement

22   route or the other route.  There are issues that arise

23   depending on which route you go, which are not totally within

24   the city's control, and I just wanted to mention that, so

25   you --

1          THE COURT:  What are you talking about?

2          MR. PEREZ:  Well, we have consent rights with

3     respect to some of the issues relating to a private

4     placement, so, your Honor, you have the contingency of --

5          THE COURT:  Okay.

6          MR. PEREZ:  -- did enough bonds tender.  You have

7     the contingency of is the financing sufficiently attractive,

8     and then once you get to the point of deciding which

9     financing you want to do, there are issues related to

10    depending on which financing.

11         THE COURT:  Okay.  Thank you.

12         MR. GORDON:  Your Honor --

13         THE COURT:  Yes.  Who is that?

14         MR. GORDON:  It's Robert Gordon, Clark Hill, on

15    behalf of the Detroit Retirement Systems.  If I may, I just

16    wanted to express that the silence of the Detroit Retirement

17    Systems on this discussion is certainly not meant to indicate

18    that all issues with the Detroit Retirement Systems have been

19    completed, but we're not weighing in on the discussion today

20    of when you should start the trial.  We do have a few issues

21    still outstanding.  I just wanted to mention that to the

22    Court.  And just in -- I don't necessarily see a decision by

23    the Court as to when it starts the trial as necessarily

24    prejudicing us in terms of finalizing those issues, but I did

25    want that to be -- the Court to be aware that we do have a

1   few issues, and if they become -- if they don't get resolved

2   in the near term, maybe we bring it back up at the status

3   conference next week, but I just wanted the Court to be

4   aware.

5           THE COURT:  Thank you, sir.

6           MR. GORDON:  Thank you.

7           MR. ALBERTS:  Your Honor, and I apologize in

8   advance.  Maybe it's the bankruptcy problem solver trying to

9   come out a little bit, but one thing I -- that wasn't

10  mentioned, and I do think it's important because they --

11  especially in light of your Honor's ruling last night in

12  terms of the issues to be addressed are the ad hoc objectors,

13  and there are a lot of issues there.  And one of the thoughts

14  that occurred to me is they obviously -- there is a desire by

15  those folks to participate in the trial, and maybe one way to

16  help resolve this issue is if those matters came first at the

17  21st, which would give some time to see how these other

18  issues, you know, flesh out a little bit more.  I don't think

19  that any of the other objectors here really are involved in

20  the ad hoc objectors.  We, as a committee, have been keeping

21  an eye on them because a lot of them are retirees, but that

22  may be something to at least consider in resolving what I

23  think is a difficult issue.

24          THE COURT:  Well, yes.  You've given me something to

25  think about here.  I set a deadline for those people to file

1  a motion to participate in the trial and identify who they

2  want to question, et cetera.  I expect some of them will want

3  to present their own witnesses, probably themselves, while

4  others will want to participate in the questioning of already

5  identified witnesses.  As to the latter group, they'll have

6  to wait until those witnesses are otherwise called, but if

7  they want to call their own witnesses, then you're right, you

8  know.  We do have an opportunity to schedule them in a way

9  that may solve other problems.

10       All right.  Anyone else want to be heard on this?

11  No?  All right.  I'm going to take this under advisement and

12  issue an order today.

13       Let's talk about the city's response to the pro se

14  objections that we identified.  Do you have a time frame in

15  mind to file a response?

16       MS. LENNOX:  Yes, your Honor.  As you know, there's

17  a lot of briefing going on this week.  I think we have not

18  only a pretrial brief but a response to all the objections

19  that were made today due on the 15th, so ideally we'd like --

20  since these are really just legal issues and further briefing

21  and don't really affect trial conduct, we'd like at least

22  three weeks to respond to these if that's acceptable to your

23  Honor.

24       THE COURT:  Yes.

25       MS. LENNOX:  Thank you.

1          MR. SHUMAKER:  Your Honor, I'm sorry to interrupt,
2     but in taking that issue under advisement, I just wanted to
3     remind the Court of Mr. Cline's situation, that he is the E&Y
4     person who we've got set for the 18th and into the 19th.
5          THE COURT:  Yeah.
6          MR. SHUMAKER:  I just didn't want to lose track of
7     that.
8          THE COURT:  I don't see any reason to change that at
9     all.
10          MR. SHUMAKER:  Wonderful.
11          THE COURT:  I think we'll go ahead with that
12     regardless.
13          MR. SHUMAKER:  Wonderful.  Thank you, your Honor.
14          THE COURT:  Yeah.  And, Ms. Kopacz, are you still on
15     the line?  Mr. Lerner, are you on the line?
16          MR. LERNER:  Yes.  I'm here, your Honor.  I'm
17     assuming Marti is on, but she may have muted her phone.
18          MS. KOPACZ:  I was on mute.  Sorry.
19          THE COURT:  Okay.
20          MS. KOPACZ:  Hit the button.
21          THE COURT:  I appreciate your patience in standing
22     by.  I know you are concerned, as I am, about what your
23     marching orders are from here.  I'm going to have to ask you
24     to be a little more patient, and I promise to give you the
25     guidance that you need hopefully by the end of the day.

1  Okay?

2         MS. KOPACZ:  I'm happy to stand by.

3         THE COURT:  All right.

4         MR. LERNER:  Thank you, your Honor.

5         THE COURT:  All right.  So I'm looking at my list

6  here.  Let me ask is there any objection to going ahead

7  with -- or with the Court granting the motion for an

8  expedited hearing and setting the hearing on October --

9  sorry -- August 25th?  August 25th.

10        MR. SHUMAKER:  No objection, your Honor.

11        MR. HACKNEY:  The only thing, your Honor, is I

12 haven't even read it, and so I can't -- I'm just not smart

13 enough on those issues to know, so could we have a day to let

14 you know or --

15        THE COURT:  Okay.

16        MR. HACKNEY:  I just don't know.

17        THE COURT:  All right.  And we also have scheduled

18 on August 19th the hearing on the legality of the UTGO

19 settlement.  Any thoughts on whether we should still proceed

20 on that on that date or change that date?

21        MS. LENNOX:  Well, your Honor, I was perfectly

22 prepared to go forward on that date, and there was no reason

23 to delay other than the fact that I think your Honor just

24 asked for additional briefing on it in the order you entered

25 yesterday.  I'm trying to look for it now, your Honor.

1    THE COURT:  Well, no.  This would be a hearing on

2 the specifics of -- I think it was Syncora's objection.

3    MS. LENNOX:  Correct, on Syncora's objection, but I

4 didn't know to the extent that what your Honor asked us to

5 brief, which I am looking for now --

6    THE COURT:  Well, if the pro se objector raised the

7 same issue, you can just incorporate your prior response by

8 reference.

9    MS. LENNOX:  Okay.

10    THE COURT:  Okay.

11    MS. LENNOX:  Okay.

12    THE COURT:  And that's true, by the way, for any of

13 those.

14    MS. LENNOX:  Okay.

15    THE COURT:  If you've already responded to them,

16 just say that.

17    MS. LENNOX:  Okay.  Very good, your Honor.

18    THE COURT:  So the fact that this issue may be there

19 or may not be is not a reason to put this off.

20    MS. LENNOX:  Okay.  Thank you, your Honor.

21    THE COURT:  Are you satisfied?

22    MR. HACKNEY:  At your leisure, your Honor, whether

23 you want to knock it out or couple it with the trial, either

24 way.

25    THE COURT:  No.  I'm satisfied to proceed --

1    MR. HACKNEY: Sounds good.

2    THE COURT: -- you know, get it done.

3    MR. HACKNEY: Yep.

4    THE COURT: Okay. All right. We'll stick with that

5  then. Okay. Was there something else to raise?

6    MS. LENNOX: No, your Honor.

7    THE COURT: You said you had something.

8    MR. HACKNEY: I did. I have a couple issues, your

9  Honor.

10    THE COURT: Go ahead.

11    MR. HACKNEY: Excuse me. Oh, so the DFOA -- the

12  DFFA -- I'm finally getting the acronyms down -- and the UAW,

13  both of their counsel have reached out to me and said, "We

14  have relatively discrete cases to put on to the extent we are

15  still objecting at trial. Is there a way that we can find

16  like a date certain that will be our day?"

17    THE COURT: Um-hmm.

18    MR. HACKNEY: "And that way we don't have to lose a

19  bunch of time seeing --

20    THE COURT: Um-hmm.

21    MR. HACKNEY: -- you go on and on in court."

22    THE COURT: Um-hmm.

23    MR. HACKNEY: And so I think I can speak generally

24  to say that I don't think there's an objection to that

25  concept, and so we wanted to let you know that as you --

1  whatever trial date you set in a -- they would like to have a

2  day late in the schedule after the city has closed its case

3  in chief that we will call DFFA-UAW day.

4          THE COURT:  Okay.

5          MR. HACKNEY:  And I wanted to make you aware of

6  that, and that's not to preclude Ms. Patek from doing cross-

7  examination during the city's case in chief.  It is -- this

8  is aimed at their witnesses on direct.

9          THE COURT:  Right.  Okay.  And that's fine.

10          MR. HACKNEY:  Thank you, your Honor.  The second

11  point that I had, your Honor, was I'd like to clarify on this

12  question of supporting parties, people that are supporting

13  the plan.  And correct me if I'm wrong, but the way I see the

14  time setting up right now is you have the city's case in

15  chief and you have the objectors.

16          THE COURT:  Um-hmm.

17          MR. HACKNEY:  And to the extent the supporting

18  parties want to work their way into the city's case in chief,

19  they need to do so by the city updating its will call witness

20  list, and I wanted to -- so that we know that they're

21  testifying as part of the city's case in chief.  I mean if

22  the -- I'm saying --

23          THE COURT:  Well, I would phrase it slightly

24  differently although I think with the same ultimate effect.

25  If any supporting parties want to call witnesses that are not

1 on the city's list, they need to file a witness list that
2 says that, but having said that, whatever time is allocated
3 for the city, whatever that number of hours is, that includes
4 supporting parties.

5 MR. HACKNEY: Absolutely. That's fine. So you said
6 it -- you said it about -- you said it in a more nuanced way,
7 but you were getting at the concept I wanted, which is the
8 supporters and the city have to put on a unified case in
9 terms -- from a time standpoint, but it is most important to
10 me in terms of the creation of the will call list because
11 we've been working off the city's will and may call list. We
12 now have new may call lists from the supporters. Not
13 everyone has been deposed. So I think if somebody -- if some
14 retiree person now goes onto a will call list, I hope the
15 Court will consider the possibility that we take a deposition
16 of them at some point because presently speaking they are not
17 listed as will or may call.

18 THE COURT: Well, let me just ask. Is there anyone
19 on the supporting side who is going to call a witness that
20 hasn't been identified and who hasn't been deposed?

21 MR. ALBERTS: I think we've identified everybody,
22 but I don't think everybody has been deposed.

23 THE COURT: Okay. Can you identify who has not been
24 deposed for Mr. Hackney at this point?

25 MR. ALBERTS: Well, Mr. Hackney is aware of our

1    experts, which are going to be deposed tomorrow.

2              THE COURT:  Okay.

3              MR. ALBERTS:  And there are a couple fact witnesses

4    which have been listed which have not been scheduled for --

5              THE COURT:  And who are they?

6              MR. ALBERTS:  Terri Renshaw, who's the chair of the

7    committee, and we have maybes for Ron Bloom.

8              THE COURT:  Well, but how can there be any

9    uncertainty in your mind here two weeks before trial as to

10   who you're going to call?

11             MR. ALBERTS:  Depends on what the city puts on in

12   its case.  We are a supporter, so we look at --

13             THE COURT:  The city has made a full disclosure of

14   what its case is going to be.

15             MR. ALBERTS:  That's correct, your Honor, and we

16   have attempted to coordinate with the city in terms of our

17   case, and, you know, we had already one discussion with them

18   about the issues, and they have come back to us and said we

19   need --

20             THE COURT:  I can't deal with this.  Ron Bloom and

21   who else?

22             MR. ALBERTS:  Terri Renshaw, your Honor, who's the

23   chair of the committee.

24             THE COURT:  And those are the only two maybe fact

25   witnesses who you have not identified as will call?

```
 1          MR. ALBERTS:  They've been identified.  We
 2   identified them as --
 3          THE COURT:  You identified them as maybe call.
 4          MR. ALBERTS:  Right.
 5          THE COURT:  May call.
 6          MR. ALBERTS:  Right.
 7          MR. HACKNEY:  I mean -- yeah.
 8          THE COURT:  All right.  So you need a decision.
 9          MR. HACKNEY:  Well, the problem is that like I think
10   there were a total of six, seven, eight will, may call
11   witnesses that came in from the retirees like late in the
12   deposition period, and so I kind of had to look at it and
13   just make a call.  And so what we did is we made room to do
14   their experts, which is happening like right now, right at
15   the tail end, but, you know, not having clarity in my mind, I
16   just couldn't devote the resources to --
17          THE COURT:  Right.
18          MR. HACKNEY:  -- rushing through these deps, and so
19   I'm trying to be practical.
20          THE COURT:  Can you make a decision by tomorrow?
21          MR. ALBERTS:  Yes, we can, but so the record is
22   clear, your Honor, we disclosed them long ago on our list,
23   but none of this --
24          THE COURT:  Well, you disclosed them as may call,
25   and I understand why Mr. Hackney -- no?
```

1      MR. ALBERTS:  That's not true, your Honor.  The

2  experts were will call.

3      THE COURT:  Right.

4      MR. ALBERTS:  We were very clear on that.

5      THE COURT:  Yeah.

6      MR. ALBERTS:  And we did not get the deposition

7  notice until last week, and yet we accommodated Mr. Hackney's

8  request to do it after the deadline, so I --

9      THE COURT:  Did you ever identify Mr. Bloom and Mr.

10  Renshaw as --

11      MR. ALBERTS:  Ms. Renshaw.

12      THE COURT:  -- Ms. Renshaw as will calls?  You did?

13      MR. ALBERTS:  Yes, your Honor.

14      THE COURT:  When?

15      MR. ALBERTS:  They were all on our witness list,

16  but, again, we're using the phrase "will call" and "may call"

17  based on what we felt on Friday.  They will be listed as will

18  call or may call in the joint pretrial order, but they had

19  been disclosed as witnesses for months now amongst the --

20      MR. HACKNEY:  I thought it was just one conditional

21  call list that we got, so --

22      THE COURT:  Well, all right.  All right.  Let's

23  break through all this.  Tomorrow they will tell you whether

24  they're going to call these two additional witnesses.

25      MR. HACKNEY:  Work through it.

1    THE COURT:  And you can or cannot -- you may or may

2  not take their depositions after that as you see fit.

3    MR. HACKNEY:  We'll work through it.  If we have a

4  problem, we'll let you know.

5    THE COURT:  All right.

6    MR. HACKNEY:  Last issue is --

7    THE COURT:  And if there are any other supporters

8  with any fact witnesses or experts, for that matter, you

9  know, we need to know this tomorrow.

10    MR. HACKNEY:  Yeah.

11    THE COURT:  And that's true whether we're going to

12  trial on the 21st or some other date.

13    MR. HACKNEY:  Agree, your Honor.  Thanks very much.

14  Your Honor, we've had a little bit of a breakdown on the DTEC

15  because of Mr. Neal's sort of -- see how he just gets as far

16  away as he can from Syncora as soon as he gets his tender

17  offer.  But I just want to -- I wanted to note on the record

18  that we got -- we've gotten kind of discombobulated on that

19  front because he was doing a great job coordinating, and I

20  basically was going to say to the city that, you know, I

21  would volunteer to sort of coordinate going forward.  I don't

22  think there will probably be an objection to that, but I

23  would be happy if there was one, and -- but we need to sort

24  of reconstitute a little bit.

25    THE COURT:  The objector has to volunteer

1    themselves?

2         MR. HACKNEY:  Yeah, right, yeah.  So I wanted to put

3    that on the record and just say that that's why --

4         THE COURT:  All right.  Thank you for that service,

5    sir.

6         MR. HACKNEY:  -- Ms. Quadrozzi didn't hear about the

7    exhibits, so thank you.

8         THE COURT:  All right.

9         MR. SCHWINGER:  Your Honor, Robert Schwinger for

10   Assured Guaranty.  Just one small point as your Honor is

11   going to be deciding, I guess, later today on what's going to

12   be done regarding the trial date or the stipulation.  Just in

13   any event, because we have deadlines coming up for the DWSD

14   parties, we'd ask that those dates be put off.  We think for

15   the purposes of what's going on with that transaction, it

16   would be a good thing if things not be filed on those various

17   issues, so we'd ask that, in any event, those dates be put

18   off for those parties for the filings this week.

19        THE COURT:  Um-hmm.

20        MR. SCHWINGER:  Thank you, your Honor.

21        THE COURT:  Yes.  I get that.

22        MR. DECHIARA:  Good morning, your Honor.  Peter

23   DeChiara for the UAW.  We appreciate the Court's apparent

24   willingness to allow the UAW to put on its case on a date

25   certain since we do have a very discrete case which we think

1   we could put on in substantially less than a day.

2           THE COURT:  Um-hmm.

3           MR. DECHIARA:  I would ask in terms of scheduling

4   that the UAW's date certain be towards the end of the trial

5   after the other objectors, and I do have two dates that I

6   have conflicts.  I'm going to be the one putting on the UAW's

7   case.  I would respectfully ask the Court not schedule the

8   UAW's case for either September 9th or September 17th.  Thank

9   you.

10          THE COURT:  All right.  Chris, would you make a note

11  of that, please?

12          MR. MACK:  Just briefly, your Honor.  Richard Mack

13  with AFSCME.  We filed the same discrete objections with

14  respect to the library issue.  We did not list any particular

15  witnesses.  We think it's chiefly a legal issue, but we'd

16  reserve the right to, in the event necessary, call rebuttal

17  witnesses.  So we would be joining with Mr. DeChiara --

18          THE COURT:  Okay.

19          MR. MACK:  -- on that issue.  Thank you.

20          MR. SHUMAKER:  Your Honor, a housekeeping issue that

21  affects this week.  Last week we had a discussion about

22  deposition designations, that exciting topic again, and in

23  your -- there was a back and forth, and Mr. Hackney and I had

24  talked about working that out.  Your Honor's order, the

25  seventh amended order, indicates that both -- on this coming

1  Friday that you would like both designations and counter-
2  designations.  With all that was going on, your Honor, we
3  were wondering whether it might be possible for the parties
4  just to submit their designations and then we -- each party
5  have a week to do their counters.  I don't think it would
6  affect any offer of that evidence into the record.
7          THE COURT:  Okay.  Why don't you submit a
8  stipulation that says that?
9          MR. SHUMAKER:  Okay.  Thank you, your Honor.
10         THE COURT:  Anything else from anybody?
11         MS. LENNOX:  Briefly, your Honor, just, again, in
12  the vein of housekeeping.  On the -- your Honor was gracious
13  enough to give us three weeks to brief the pro se issues.  I
14  was hoping that three weeks could start after this Friday
15  given all the briefing we're doing this week, so three weeks
16  from the 15th when our pretrial --
17         THE COURT:  What's the date?  Let's just set a date.
18         MS. LENNOX:  Okay.
19         THE CLERK:  September 5th.
20         MS. LENNOX:  Perfect.  Thank you.
21         THE COURT:  I'm sorry.  What was it?
22         THE CLERK:  September 5th.
23         THE COURT:  Okay.  September 5th.
24         MS. LENNOX:  Thank you, Ms. Sikula.  And then also
25  with respect, again, to your seventh amended order that your

1   Honor entered last week, you had set a pretrial brief

2   deadline -- or limit of a hundred pages, but you permitted

3   the city to file a combined pretrial plus response.  I'm

4   assuming -- I could file a motion to extend that page limit,

5   but I'm assuming since it's combined it could exceed a

6   hundred pages or would your Honor prefer to see a motion?

7           THE COURT:  File a motion.

8           MS. LENNOX:  We'll do that.  We'll do that.  Thank

9   you, your Honor.

10          MR. SHUMAKER:  Your Honor, I'm sorry.  One last

11  thing.  For UAW and DPOA, DFFA, I'm not sure whether the

12  UAW -- their witness list came in in the last few days.  I

13  think it was August 1st.  I don't know if that was a will or

14  a may call, but if there -- if the will call edict could

15  apply to the UAW and the DPOA --

16          THE COURT:  Yeah.  I mean it for everybody.

17          MR. SHUMAKER:  Okay.  Thank you, your Honor.

18          THE COURT:  In the meantime, let me just ask are you

19  engaging in any negotiations on these issues with the UAW?

20  It seems to me that it's an issue of small enough scale that

21  you ought to just try to resolve it.

22          MS. LENNOX:  Those discussions have been ongoing,

23  your Honor.  In fact, at one point they got moved into

24  mediation, so I think it's still in mediation right now.  It

25  also -- and this really is not an issue so much between the

1   UAW and the city as it is between the UAW and the library

2   where the city has a bit of an interest in what happens

3   there, so those discussions have been ongoing.  In fact, I've

4   just reached out today earlier to the mediators to see how we

5   can move that along a little bit.

6           THE COURT:  Why don't we just assume the same

7   deadline?

8           MS. LENNOX:  I'm sorry, your Honor.

9           THE COURT:  The same deadline that I'm going to set

10  for the police and fire.

11          MS. LENNOX:  Understood, your Honor.  Thank you.

12          THE COURT:  Something further?

13          ATTORNEY:  Your Honor, when is that deadline?

14          THE COURT:  To be set after I consult with your

15  mediators.  All right.  Anybody have anything further?  All

16  right.  I'll try to issue a revised scheduling order, if

17  necessary, later today, and we'll be in recess.

18          MR. SHUMAKER:  Thank you, your Honor.

19          THE CLERK:  All rise.  Court is in recess.

20      (Proceedings concluded at 11:21 a.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett              August 14, 2014
_____       _____
Lois Garrett