**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

```
-------------------------------------------------- x
                                                   :
In re                                              :   Chapter 9
                                                   :
CITY OF DETROIT, MICHIGAN,                          :   Case No. 13- 53846
                                                   :
                            Debtor.                 :   Hon. Steven W. Rhodes
                                                   :
                                                   :
-------------------------------------------------- x
```

## CITY OF DETROIT'S MOTION FOR LEAVE TO SERVE THE SUPPLEMENTAL EXPERT REPORT OF CAROLINE SALLEE

On July 8, 2014, the City of Detroit served the expert report of Caroline Sallee. Ms. Sallee is a Manager in Ernst & Young's Quantitative Economics & Statistics practice and was responsible for creating the City's 10- and 40-year property tax and state revenue sharing projections. On July 25, 2014, the City was served with the expert report of Dr. Glenn Meyers, an expert retained by counsel to Syncora Guarantee, Inc., and a second report from Stephen Spencer, an expert retained by counsel to Financial Guaranty Insurance Company ("FGIC"). Dr. Meyers was deposed on August 1, 2014, and Mr. Spencer was deposed on August 7, 2014.

In their expert reports and depositions, Dr. Meyers and Mr. Spencer expressed novel theories regarding the ability of creditors to obtain payment on their debts if the chapter 9 case were dismissed. In particular, Dr. Meyers opined that the City's residents could bear a property tax increase that could be used to pay creditors. Dr. Meyers explained one source of authority for this tax increase would be the property tax levy required by Michigan law to pay judgments against the City. *See* Tr. of Videotaped Deposition of Glenn Meyers, at 36-38 (Aug. 1, 2014); *cf.* Section 6093 of the Michigan Revised Judicature Act of 1961, *codified at* Mich. Comp. Laws § 600.6093.

Moreover, both Dr. Meyers and Mr. Spencer opined that dismissal of the bankruptcy case would not have an adverse effect on the City. According to Dr. Meyers, "[t]he City's assumption that such tax measures as are contemplated here would have a substantial adverse effect on the local economy lacks a sound scientific basis." Expert Report of Dr. Glenn Meyers, at 4 (July 25, 2014). Similarly, Mr. Spencer opined that, after dismissal, "[t]he debtor would essentially continue functioning as it has during the bankruptcy proceeding with no imminent threat of fiscal or civic collapse," and that "[a] dismissal of the City's Chapter 9 proceeding is not likely to have any immediate impact on the City's tax base." Expert Report of Stephen Spencer, at 79, 87 (July 25, 2014).

The City believes that both opinions are misplaced as a matter of economic theory, the facts of this case, and the operation of Michigan law. However, rebutting the expert testimony of Dr. Meyers and Mr. Spencer will require the City to adduce expert testimony of its own. Ms. Sallee, an expert witness for the City, is prepared to testify in rebuttal of Dr. Meyers and Mr. Spencer's theories and has prepared a supplemental expert report, attached hereto as Exhibit 6.

In particular, Ms. Sallee would offer her opinion about the effect on property tax rates, property values, and property tax revenues if the bankruptcy case were dismissed and creditors were to exercise their remedies under state law. Assuming that unsecured creditors were able to obtain judgments against the City in the amount of their claims (about $9.1 billion), it is Ms. Sallee's opinion that the City would be required to raise property taxes by at least 20% in the first year, that property values will drop by 36-55% in the first year following the tax levy, and that property tax general operating fund revenues will fall by 23-45% over the following decade. These conclusions directly rebut the opinions of Dr. Meyers and Mr. Spencer that the City will experience no adverse effects from the additional property tax levy that would be required outside of bankruptcy.

There is no provision in the Court's latest scheduling order for the submission of supplemental reports, but the City believes that it is appropriate to

offer Ms. Sallee's supplemental report to prevent surprise to Syncora and FGIC, procedural delay in the confirmation hearing, and uncertainty as to whether the City will be permitted to offer Ms. Sallee's rebuttal opinions. Ms.Sallee's supplemental report is the only supplemental report the City intends to submit, and, because Ms. Sallee's testimony is at least two weeks away, objecting parties will not be prejudiced by submission of the supplemental report at this time.[1]

Pursuant to Local Rule 9014-1(g), on August 16, 2014, the City provided notice and sought the concurrence of Syncora and FGIC in this Motion, which was not obtained.

The City therefore respectfully requests leave to serve the Supplemental Report of Caroline Sallee upon parties to the hearing on plan confirmation.

---

[1] The City understands and intends to make Ms. Sallee available for another deposition regarding the opinions expressed in her supplemental report.

Dated: August 17, 2014

Respectfully submitted,

 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


ATTORNEYS FOR THE CITY OF DETROIT

## SUMMARY OF EXHIBITS

The following exhibits are attached to this motion, labeled in accordance with Local Rule 9014-1(b):

Exhibit 1          Proposed Order

Exhibit 2          Notice

Exhibit 3          None (Not Applicable)

Exhibit 4          Certificate of Service

Exhibit 5          None (Not Applicable)

Exhibit 6          Proposed Supplemental Report of Caroline Sallee

# EXHIBIT 1

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

```
------------------------------------------------------- x
                                                        :
In re                                                   :   Chapter 9
                                                        :
CITY OF DETROIT, MICHIGAN,                               :   Case No. 13- 53846
                                                        :
                                    Debtor.             :   Hon. Steven W. Rhodes
                                                        :
                                                        :
                                                        :
------------------------------------------------------- x
```

### ORDER GRANTING THE CITY OF DETROIT'S MOTION FOR LEAVE TO SUBMIT A SUPPLEMENTAL REPORT OF CAROLINE SALLEE

This matter having come before the Court on the City of Detroit's Motion for Leave to File the Supplemental Report of Caroline Sallee; the Court having reviewed the Motion; having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), and (iv) notice of the Motion was sufficient under the circumstances; having determined after due deliberation that the relief requested in the Motion is in the best interests of the Debtor and its creditors; and good and sufficient cause having been shown;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      IT IS FURTHER ORDERED that the City may serve, but not file, the Supplemental Report of Caroline Salle.

# EXHIBIT 2

**Notice**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

```
------------------------------------------------- x
                                                  :
In re                                             :  Chapter 9
                                                  :
CITY OF DETROIT, MICHIGAN,                        :  Case No. 13- 53846
                                                  :
                           Debtor.                :  Hon. Steven W. Rhodes
                                                  :
                                                  :
------------------------------------------------- x
```

## NOTICE OF MOTION AND OPPORTUNITY TO RESPOND

**PLEASE TAKE NOTICE** that on August 17, 2014, the City of Detroit filed the *City of Detroit's Motion for Leave to Serve the Supplemental Expert Report of Caroline Sallee* (the "**Motion**") in the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**"), seeking entry of an order granting leave for the City to file a supplemental expert report of Caroline Sallee regarding the likely effect on the City's property taxes if creditors were to exercise their remedies under state law outside of the bankruptcy case.

**PLEASE TAKE FURTHER NOTICE that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Bankruptcy Court to grant the City's Motion, or you want the Bankruptcy Court to consider your views on the Motion, within **17 days**[1] you or your attorney must:

---

[1] Concurrently herewith, the City has filed an *ex parte* motion to shorten notice of and expedite the hearing on the Motion (the "Motion to Expedite"). If the Court grants the Motion to Expedite, an order will be entered setting forth the shortened deadline to respond to the Motion.

1. File a written objection or response to the Motion explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:

**United States Bankruptcy Court**
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

**Jones Day**
51 Louisiana Ave. NW
Washington, D.C. 20001-2113
Attention: Gregory Shumaker

-and-

**Pepper Hamilton LLP**
Suite 1800, 4000 Town Center
Southfield, Michigan 48075
Attn: Robert Hertzberg and Deborah Kovsky-Apap

2. If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

**[signature page follows]**

Dated:  August 17, 2014

Respectfully submitted,

 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com


ATTORNEYS FOR THE CITY OF DETROIT

# EXHIBIT 3

**Brief (Not Applicable)**

# EXHIBIT 4

**Certificate of Service**

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing *City of Detroit's Motion for Leave to Serve the Supplemental Expert Report of Caroline Sallee* was filed and served via the Court's electronic case filing and noticing system on this 17th day of August, 2014.

/s/ David G. Heiman

# EXHIBIT 5

## Affidavits (Not Applicable)

# EXHIBIT 6

**Proposed Supplemental Report
of Caroline Sallee**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---------------------------------------------------  x
                                   :

In re                                  :          Chapter 9

                                   :

CITY OF DETROIT, MICHIGAN,     :          Case No. 13-53846

                                   :

                     Debtor.       :          Hon. Steven W. Rhodes

                                   :

                                   :

-------------------------------------------------x

## <u>SUPPLEMENTAL REPORT OF CAROLINE SALLEE</u>

Pursuant to Federal Rule of Civil Procedure 26, made applicable to this

proceeding by Federal Rule of Bankruptcy Procedure 7026, debtor the City of

Detroit submits this supplemental report with respect to the expected expert

testimony of Caroline Sallee.

1

# SUPPLEMENTAL REPORT OF CAROLINE SALLEE

## INTRODUCTION

I have previously been identified as an expert witness for the City of Detroit on the subjects of real and personal property taxes and state revenue sharing. I submitted an expert report setting forth my opinions on these subjects on July 8, 2014. I submit this supplemental report in rebuttal to the expert reports of Dr. Glenn Meyers and Stephen Spencer, which were submitted after my own report and which were explained in their depositions on August 1, 2014, and August 7, 2014, respectively.

Among other things, both Dr. Meyers and Mr. Spencer opined that dismissal of the bankruptcy case would be an appropriate measure and that the City could restructure its obligations and operations outside of bankruptcy. Dr. Meyers opined that the City's residents could bear a property tax increase if the bankruptcy case were dismissed, and he testified in his deposition that he understood Michigan law to authorize the imposition of additional property taxes to pay any judgments against the City obtained by creditors.[1]   Similarly, Mr. Spencer opined that, after dismissal, "[t]he debtor would essentially continue functioning as it has during the

---

[1] *See* Tr. of Videotaped Deposition of Glenn Meyers, at 36-38 (Aug. 1, 2014); Section 6093 of the Michigan Revised Judicature Act of 1961, codified at Mich. Comp. Laws § 600.6093.

2

bankruptcy proceeding with no imminent threat of fiscal or civic collapse," and that "[a] dismissal of the City's Chapter 9 proceeding is not likely to have any immediate impact on the City's tax base."[2]

## OPINIONS

It is my opinion that:

1.  If the City's creditors exercised their rights under the Michigan Revised Judicature Act of 1961 ("RJA") outside of chapter 9, the City would be required to impose a large and unprecented tax levy on property in the City.

2.  Imposition of these property tax increases would cause property values to drop by approximately 36-55% in the first year following the levy, depending upon the modeled scenario.

3.  Imposition of these tax increases would cause property tax revenues for the General Operating Fund to drop by 23-45% in the following decade compared to the City's July 2, 2014, forecast.

---

[2] Expert Report of Stephen Spencer, at 79, 87 (July 25, 2014).

3

## BASIS AND REASONS FOR OPINIONS

### I.  Legal Context

I am advised by counsel that:

1.  The City of Detroit is at its legal limit for its General Operating Fund property taxes.

2.  Section 6093 of the RJA, codified at Michigan Comp. Laws § 600.6093, provides an exception to the property tax limit.  Where applicable, section 6093 requires the assessing officer of the city or village to assess on the next tax roll the amount of the judgment for that year, including interest and costs, even if to do so would otherwise put a city above the statutory limit.  Under the RJA, the assessing officer is *required* to levy this additional property tax whenever presented with a judgment recovered against the City, and has no discretion not to do so.

3.  The unsecured creditors listed in Table 1 below could obtain judgments against the City in the following amounts, if the City's bankruptcy petition were dismissed.  There may be other creditors who could also obtain judgments against the City, and the amount of certain judgments could be higher if unmatured interest were recovered under state law.

4

**Table 1.  Judgments if Bankruptcy Petition Dismissed[3]**

| Creditor | Judgment Amount (in millions) |
|---|---|
| PFRS Pension | $1,250 |
| GRS Pension | $1,879 |
| OPEB | $3,771 |
| UTGO | $388 |
| LTGO | $164 |
| POC | $1,473 |
| Notes/Loans Payable | $34 |
| Other | $150 |
| | |
| **Total** | **$9,109** |

4.  The tax base for 2014 for purposes of the RJA is $7.7 billion.  This figure represents the taxable value of the City's *ad valorem* and special acts properties, as stated in the City of Detroit's Finance Officers Report, 2014 State Equalized Value and Taxable Value [POA00725823 – POA00725837].[4]

---

[3] Except for the amount of an OPEB judgment, the amounts in this table are drawn from Exhibit 2 of the City's 40-Year Projections.  *See* POA00706605.  The amount of the expected OPEB judgment represents the City's estimate of the aggregate amount its OPEB liabilities in the absence of the OPEB Settlement, as explained on page 152 of the Fourth Amended Disclosure Statement with Respect to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 4391].

[4] For purposes of this analysis, I have incorporated the taxable value from the City of Detroit Finance Officers Report 2014 State Equalized Value and Taxable Value.  However, it remains my opinion, as I detailed in my initial report, that property in the City is over-assessed.

5

5.  A court would have discretion to establish the payment of any judgment against the City in installments, but the court would be required to apply an interest rate of 1% plus the rate of a 5-year treasury bill.  *See* Mich. Comp. Laws §§ 600.6013, 600.6201.  As of August 11, 2014, I am advised that this interest rate is 2.622%.

## II.  Methodology and Assumptions

1.  My analysis comprises two scenarios.  Scenario A applies the assumptions that Dr. Meyers employed in his report and testified to during his deposition.  Scenario B varies certain assumptions based on my judgment and review of relevant economic literature.  The assumptions applied in each of the scenarios are listed in Table 2:

## Table 2. RJA Analysis Scenario Assumptions

|  | SCENARIO A | SCENARIO B |
|---|---|---|
| RJA levy amount (millions) | $9,109.0 | $9,109.0 |
| Repayment period (years) | 10 | 10 |
| Repayment amount each period (millions) | $1,047.4 | $1,047.4 |
| Tax capitalization rate | 100% | 75% |
| Property owners discount rate | 2.622% | 5.0% |
| Present value of RJA levy amount (millions) | $9,109 | $8,087.4 |
| Long-run growth in Capped Value | 2% | 2% |
| Property tax revenue collections rate | 75% | 75% |
| Reduction in collections rate (percentage point) | -5pp | -5pp |

2.  For each scenario, I applied the following methodology:

(a) *Calculate the Annual RJA Levy*:  I began with the assumption that after dismissal of the bankruptcy case, creditors could obtain judgments totaling at least $9.1 billion against the City, and that this amount would be the basis for a tax levy against the taxable value of property within the City under the RJA (the "RJA Levy").  I then calculated the amount of the annual payments required to satisfy the RJA Levy, assuming that the judgment would be paid in 10 equal annual installments with a 2.622% annual interest rate (the "RJA Payments").

(b) *Calculate the Present Value of the RJA Levy*:  I next calculated the present value of the stream of RJA Payments using different discount rates. Scenario A uses the judgment interest rate of 2.622% so that the present value of the RJA Levy equals the judgment amount of $9.1 billion.  Scenario B uses a

7

higher discount rate of 5%, which lowers the cost in today's dollars of the RJA Levy to $8.1 billion.

(c) *Capitalize the RJA Levy*:  The concept of "tax capitalization" recognizes that a tax increase will lower the current value of property subject to the tax because of the increased future cost of owning the property.  While tax capitalization is well-recognized in academic literature, there is debate about the degree to which taxes are capitalized.  Dr. Meyers assumed that any new property tax would decrease property values by 100% of the present value of the additional tax in the first year the tax is levied.[5]  Scenario A incorporates this assumption. Scenario B, however, applies the assumption that in the first year, property values will decrease by only 75% of the present value of the new tax.  I selected this assumption based on my review of academic literature that finds high, but not full, rates of capitalization at lower discount rates.[6]

(d) *Calculate the Effect of the RJA Levy on the Taxable Value of Property Within the City*:  Capitalizing the present value of the $9.1 billion RJA Levy will cause the City's property values to fall dramatically in the first fiscal year in which it would be imposed (2015).  Both scenarios assume that property

---

[5] *See* Tr. of Videotaped Deposition of Glenn Meyers, at 45-47.

[6] For a review of this literature, see Naomi Feldman, A Reevaluation of Property Tax Capitalization:  The Case of Michigan's Proposal A (May 2010), and Oded Palmon and Barton A. Smith, New Evidence on Property Tax Capitalization, The Journal of Political Economy, Vol. 106, No. 5 (Oct. 1998).

8

would then be reassessed, as required by law, in the first year of the RJA Levy to account for this precipitous drop in market values. The scenarios also make the simplifying assumption that taxable value equals the new assessed value in the first year.[7] At this stage, however, another consideration appears. Michigan law limits the amount by which the taxable value of property may be increased to the lower of either 5% or the annual inflation rate.[8] This serves to place a cap upon the rate at which the taxable values of property could recover to the levels they had before the RJA Levy. In other words, although assessed property values could return to pre-RJA Levy levels as the RJA Levy is paid off, the taxable value of property that does not change hands would increase at a lower rate. This relationship is illustrated in the attached figure showing the effect of reduction in assessed value versus capped value. Scenarios A and B incorporate a 2% inflation rate, consistent with the rate of inflation used elsewhere in the City's July 2, 2014, projections.

---

[7] The "taxable value" of a property is the amount of the property's value against which the tax rate is applied. In Michigan, the taxable value of a property equals the lesser of (a) the assessed value of the property or (b) "capped value." Capped value is the property's taxable value limited in growth from year to year by the rate of inflation or 5%, whichever is lower. In other words, when assessed values increase, taxable values also increase, but at a capped growth rate.

[8] Taxable value may also increase or decrease with additions and losses to the tax base. The limit on growth applies to existing property that has not changed hands.

9

(e) *Calculate the Tax Rates Necessary to Generate the Payments Required to Satisfy the RJA Levy*: The RJA requires the City Assessor to assess the amount of the judgment on the tax rolls. To determine the tax, I divided the nominal amount of the RJA Payment by the taxable value to calculate the tax rate necessary to generate the RJA Payment. For purposes of simplicity, I assumed that the entirety of the RJA Payment was collected in every year it was imposed. However, I also modeled the effect of a 75% collections rate, with the uncollected amount applied to the following year's payment.

(f) *Calculate the Loss of Property Tax Revenues*: As noted above, the taxable value of City property would fall dramatically after imposition of the RJA Levy, and increases in the taxable value would be capped in subsequent years. However, because the City's General Operating Fund ("GO") property tax rate is already at its legal limit, this rate cannot be increased to make up for the decrease of the tax base. To calculate the total GO property tax revenues that would be lost from the RJA Levy, I multiplied the 1.9952% GO tax rate by the reduced taxable values of City property by the 75% collections rate and subtracted this amount from the City's July 2, 2014, baseline GO forecasts.

## CONCLUSIONS

If the City's creditors exercised their rights under state law outside of chapter 9, the City would be required to impose an unprecented tax levy on

10

property. This tax levy would cause property values to drop by approximately 36-55% in the first year following the levy and would decrease GO property tax revenues by 23-45% in the following decade, depending on the modeled scenario. Moreover, although not included in these scenarios, the application of such a large tax increase would likely cause additional negative effects on the City, including an increased rate of population decline, increased blight, and the loss of other tax revenues.

1. As demonstrated in Table 3, capitalization of the RJA levy causes the value of property in the City to fall by -55% in the first year after the tax is imposed (Scenario A). If property is reassessed to reflect these lower market values, a similar magnitude of reduction (-52%) in taxable value—i.e., the value of property within the City that is subject to taxation—can be assumed.

2. Moreover, because there are limits placed on the growth of taxable value, taxable value will likely recover slowly over the next decade. Table 3 shows taxable value growing back at 2% to illustrate the effect of the cap on annual taxable-value growth in Michigan. A 2% growth rate was selected to be consistent with the inflation rates used in the City's July 2, 2014 forecasts.[9]

---

[9] Based on historical GDP price deflators published by the Bureau of Economic Analysis, the inflation rate for GDP averaged nearly 2% annually between 1993-2012. The Congressional Budget Office in their 2013 Long-term Budget Outlook uses GDP annual inflation rate of 2.2% from 2013 through 2023.

**Table 3.  Property Values, Assessed Values, and Taxable Values (Scenario A)**
*Dollars in millions*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **RJA Tax levy** | | **$1,047** | **$1,047** | **$1,047** | **$1,047** | **$1,047** | **$1,047** | **$1,047** | **$1,047** | **$1,047** | **$1,047** |
| *PV of tax payments* | | $1,021 | $995 | $969 | $944 | $920 | $897 | $874 | $851 | $830 | $809 |
| Property values | $16,638 | $7,529 | $8,721 | $9,910 | $11,096 | $12,282 | $13,466 | $14,650 | $15,834 | $17,019 | $18,206 |
| Assessed values | $8,319 | $3,765 | $4,360 | $4,955 | $5,548 | $6,141 | $6,733 | $7,325 | $7,917 | $8,510 | $9,103 |
| **% change assessed value** | | **-55%** | **16%** | **14%** | **12%** | **11%** | **10%** | **9%** | **8%** | **7%** | **7%** |
| | | | | | | | | | | | |
| **Taxable value (TV)** Detroit TV pre-RJA (BASELINE) | $7,773 | $7,516 | $7,337 | $7,191 | $7,054 | $6,832 | $6,831 | $6,874 | $6,919 | $7,154 | $7,397 |
| TV with RJA | $7,773 | $3,765 | $3,840 | $3,917 | $3,995 | $4,075 | $4,157 | $4,240 | $4,324 | $4,411 | $4,499 |
| TV growth rate | | -52% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| Loss of TV with RJA | | -$3,751 | -$3,497 | -$3,274 | -$3,059 | -$2,757 | -$2,674 | -$2,635 | -$2,594 | -$2,743 | -$2,898 |
| **% Reduction in TV (vs. BASELINE)** | | **-50%** | **-48%** | **-46%** | **-43%** | **-40%** | **-39%** | **-38%** | **-37%** | **-38%** | **-39%** |

     3.  The City is obligated under the RJA to assess a property tax sufficient to pay the amount of the judgments obtained by creditors.  Thus, a large drop in taxable *value* will result in a large increase in the property tax *rate* to achieve the required RJA payment.  As shown in Table 5, the RJA levy in Year 1 would require the imposition of an additional property tax of 28% in 2015 in Scenario A and 20% in Scenario B, for total City property tax rates of 30.9% (Scenario A) and 22.9% (Scenario B).  As demonstrated in Figure 4, such an unprecedented property tax increase far exceeds the current rate in Detroit and any other City in Michigan.  Such a large property tax rate would essentially be confiscatory.

---

(continued…)

*See* Congressional Budget Office, *The Budget and Economic Outlook:  Fiscal Years 2013 to 2023* (Feb. 2013).

12

## Figure 4. Detroit City Tax Rates Under RJA Levy Scenarios Compared to Actual Rates (2013)



Source: Michigan Department of Treasury, "2013 Ad Valorem Property Tax Report"; EY analysis

## Table 5. Additional Tax Rate Due to RJA Payments (Scenario A)
### *Dollars in millions*

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Taxable value with RJA | $3,765 | $3,840 | $3,917 | $3,995 | $4,075 | $4,157 | $4,240 | $4,324 | $4,411 | $4,499 |
| Collections Rate | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| RJA payment | $1,047 | $1,047 | $1,047 | $1,047 | $1,047 | $1,047 | $1,047 | $1,047 | $1,047 | $1,047 |
| **RJA tax rate** | **28%** | **27%** | **27%** | **26%** | **26%** | **25%** | **25%** | **24%** | **24%** | **23%** |
| Collections Rate | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| Amount uncollected (at 75% collections) | $262 | $327 | $344 | $348 | $349 | $349 | $349 | $349 | $349 | $349 |
| New RJA payment (prior year payment included) | $1,047 | $1,309 | $1,375 | $1,391 | $1,395 | $1,396 | $1,396 | $1,396 | $1,396 | $1,396 |
| **Tax rate with higher payment amount (RJA + unpaid)** | **28%** | **34%** | **35%** | **35%** | **34%** | **34%** | **33%** | **32%** | **32%** | **31%** |

4.  The sustained decrease in taxable value will also substantially affect the City's revenues from property taxes for its general operating and other purposes. Because the property tax *rate* is limited by law, and counsel has advised that additional millages could not be levied, the City's General Fund revenues would decline if the same tax rate is applied against a lower tax base. In other words, while the total property tax *burden* for City residents will greatly increase with the

13

imposition of the RJA Levy, the property tax *revenues* received by the City to fund

City services will greatly decline, as shown in Table 6. As a result, under the

assumptions of Scenario A, the City's General Fund would experience a decline of

more than 50% in revenue from property taxes available to fund City services

while property taxes for residents would increase by more than 10 times to pay

creditors under the RJA Levy.

**Table 6. Change in City General Fund and RJA Taxes, 2014 – 2015**
*Dollars in millions*

|  | 2014 | 2015 | Ratio: 2015 to 2014 |
|---|---|---|---|
| Detroit General Fund | $102.6 | $47.1 | 0.5 |
| RJA tax for creditors | $0.0 | $1,047.4 | -- |
| **Total Taxes** | **$102.6** | **$1,094.5** | **10.7** |

5. Table 7 shows the decrease in property tax revenues the City can expect

throughout the next decade if taxable value is lowered by 50% in the first year and

then grows at the 2% inflation limit with a 75% collections rate. As shown below,

the City can expect a change in GO property tax revenues of between -41% and -

52% during that period compared to baseline forecasts. Using the assumptions of

Scenario A, over the decade, the City will lose -$422 million in General Fund

property tax revenues over the 10-year period, or -45%, when compared to the

City's July 2, 2014 forecasts. When the assumptions in Scenario B are used, the

reduction in City revenues during the 10-year RJA tax period is a loss of -$214

14

million in General Fund revenues or -23% compared to the City's July 2, 2014 forecasts. These losses, of course, are above and beyond the amounts the City's taxpayers would be paying to service the RJA Levy.

**Table 7. Estimates of GO Fund Revenue Losses with RJA (Scenario A)**
*Dollars in millions*

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| **GO Fund Revenue Impact** | | | | | | | | | | |
| GO Taxable value with RJA | $3,150 | $3,213 | $3,277 | $3,343 | $3,409 | $3,478 | $3,547 | $3,618 | $3,691 | $3,764 |
| GO Tax rate | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Collection rate: | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| GO property tax revenue w/ RJA | $47 | $48 | $49 | $50 | $51 | $52 | $53 | $54 | $55 | $56 |
| BASELINE GO revenue | $99 | $97 | $95 | $93 | $90 | $90 | $91 | $91 | $94 | $98 |
| **DIFFERENCE: LOSS IN GO TAXES** | **-$52** | **-$49** | **-$46** | **-$43** | **-$39** | **-$38** | **-$38** | **-$37** | **-$39** | **-$41** |
| **Reduction in GO taxes compared to baseline** | **-52%** | **-50%** | **-48%** | **-46%** | **-43%** | **-42%** | **-41%** | **-41%** | **-41%** | **-42%** |

6. Finally, the significant increase in the property tax rate required under the RJA, coupled with the corresponding decline in property values and tax revenues, will likely cause additional negative effects on the City. These effects will likely include, among other things, increased population decline, increased blight, decreased income tax revenues, and a decreased collections rate. In fact, the collections rate decreases that would be expected in such a scenario would likely lead to under-collection of the RJA judgment amount and an extension of the payment period or further increase in tax rate on the residents that remain in the City, as shown in Table 5. In other words, the negative effects modeled above, while unprecedented, likely *understate* the true negative effects that would be experienced by the City if the bankruptcy case were dismissed and creditors were able to exercise their remedies under state law.

15

## EXHIBITS

Attached as Exhibit A are exhibits Ms. Sallee will use to summarize or support her opinions.

## DOCUMENTS AND OTHER
## MATERIALS CONSIDERED IN REACHING OPINIONS

Attached as Exhibit B is a listing of documents and other materials Ms. Sallee considered in reaching her opinions. Ms. Sallee also considered those documents and materials that she listed in her initial report.

## QUALIFICATIONS

Ms. Sallee's curriculum vitae is appended to her July 8, 2014 expert report.

## PRIOR EXPERT TESTIMONY

Ms. Sallee has not previously testified as an expert.

## COMPENSATION

Jones Day retained Ernst & Young LLP on behalf of the City to provide expert witness services to the City in connection with *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.) (Rhodes, J.). The City compensates Ernst & Young LLP at an hourly rate of $550 for actual time incurred by Ms. Sallee, as well as reasonable out-of-pocket expenses. These fees are subject to a 10% hold-back contingent on plan confirmation by December 31, 2014.

16

Dated: August 17, 2014

Caroline Sallee

# EXHIBIT A

## Judgments If Bankruptcy Petition Dismissed

| Creditor | Judgment Amount |
|---|---|
| PFRS Pension | $1,250M |
| GRS Pension | $1,879M |
| OPEB | $3,771M |
| UTGO | $388M |
| LTGO | $164M |
| POC | $1,473M |
| Notes/Loans Payable | $34M |
| Other | $150M |
| **Total** | **$9,109M** |

*Source: Sallee Supplemental Report*

1

# RJA Analysis Scenario Assumptions

|  | Scenario A | Scenario B |
|---|---|---|
| **RJA Levy Amount** | $9,109M | $9,109M |
| **Repayment Period** | 10 yrs | 10 yrs |
| **Repayment Amount Each Period** | $1,047M | $1,047M |
| **Tax Capitalization Rate** | 100% | 75% |
| **Property Owners Discount Rate** | 2.622% | 5.0% |
| **Present Value of RJA Levy Amount** | $9,109M | $8,087M |
| **Long-run Growth in Capped Value** | 2% | 2% |
| **Property Tax Revenue Collections Rate** | 75% | 75% |
| **Reduction in Collections Rate (percentage point reduction)** | -5pp | -5pp |

*Source: Sallee Supplemental Report*

2

# Property Values, Assessed Values, and Taxable Values

## Scenario A

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RJA Tax Levy | | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M |
| PV of Tax Payments | | $1,021M | $995M | $969M | $944M | $920M | $897M | $874M | $851M | $830M | $809M |
| Property Values | $16,638M | $7,529M | $8,721M | $9,910M | $11,096M | $12,282M | $13,466M | $14,650M | $15,834M | $17,019M | $18,206M |
| Assessed Values | $8,319M | $3,765M | $4,360M | $4,955M | $5,548M | $6,141M | $6,733M | $7,325M | $7,917M | $8,510M | $9,103M |
| Percent Change Assessed Value | | -55% | 16% | 14% | 12% | 11% | 10% | 9% | 8% | 7% | 7% |
| **Taxable Value** | | | | | | | | | | | |
| Detroit Taxable Value Pre-RJA (Baseline) | $7,773M | $7,516M | $7,337M | $7,191M | $7,054M | $6,832M | $6,831M | $6,874M | $6,919M | $7,154M | $7,397M |
| Taxable Value with RJA | $7,773M | $3,765M | $3,840M | $3,917M | $33,995M | $4,075M | $4,157M | $4,240M | $4,324M | $4,411M | $4,499M |
| Taxable Value Growth Rate | | -52% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| Loss of Taxable Value with RJA | | -$3,751M | -$3,497M | -$3,274M | -$3,059M | -$2,757M | -$2,674M | -$2,635M | -$2,594M | -$2,743M | -$2,898M |
| Percent Reduction in Taxable Value (vs. Baseline) | | -50% | -43% | -46% | -43% | -40% | -39% | -38% | -37% | -38% | -39% |

*Source: Sallee Supplemental Report*

3

# Property Values, Assessed Values, and Taxable Values

## Scenario B

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **RJA Tax Levy** | | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M |
| PV of Tax Payments | | | $997M | $950M | $905M | $862M | $821M | $782M | $744M | $709M | $675M | $643M |
| Property Values | $16,638M | $10,573M | $11,547M | $12,505M | $13,447M | $14,375M | $15,291M | $16,194M | $17,088M | $17,972M | $18,848M |
| Assessed Values | $8,319M | $5,286M | $5,774M | $6,253M | $6,724M | $7,188M | $7,645M | $8,097M | $8,544M | $8,986M | $9,424M |
| **Percent Change Assessed Value** | | **-36%** | **9%** | **8%** | **8%** | **7%** | **6%** | **6%** | **6%** | **5%** | **5%** |
| **Taxable Value** | | | | | | | | | | | |
| Detroit Taxable Value Pre-RJA (Baseline) | $7,773M | $7,516M | $7,337M | $7,191M | $7,054M | $6,832M | $6,831M | $6,874M | $6,919M | $7,154M | $7,397M |
| Taxable Value with RJA | $7,773M | $5,286M | $5,392M | $5,500M | $5,610M | $5,722M | $5,837M | $5,953M | $6,072M | $6,194M | $6,318M |
| Taxable Value Growth Rate | | -32% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| Loss of Taxable Value with RJA | | -$2,229M | -$1,945M | -$1,691M | -$1,444M | -$1,110M | -$994M | -$921M | -$846M | -$960M | -$1,079M |
| **Percent Reduction in Taxable Value (vs.Baseline)** | | **-30%** | **-27%** | **-24%** | **-20%** | **-16%** | **-15%** | **-13%** | **-12%** | **-13%** | **-15%** |

*Source: Sallee Supplemental Report*

4

# Property Tax Increases Required Under the RJA

## Scenario A

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Taxable Value with the RJA Levy | $3,765M | $4,034M | $4,115M | $4,197M | $4,281M | $4,367M | $4,454M | $4,543M | $4,634M | $4,727M |
| Collections Rate | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| RJA Payment | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M |
| **RJA Tax Rate** | **28%** | **27%** | **27%** | **26%** | **26%** | **25%** | **25%** | **24%** | **24%** | **23%** |
| | | | | | | | | | | |
| Collections Rate | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| Uncollected Amount | $262 | $327 | $344 | $348 | $349 | $349 | $349 | $349 | $349 | $349 |
| RJA Payment (prior year uncollected included) | $1,047M | $1,301M | $1,375M | $1,391M | $1,395M | $1,396M | $1,396M | $1,396M | $1,396M | $1,396M |
| **RJA Tax Rate** | **28%** | **34%** | **35%** | **35%** | **34%** | **34%** | **33%** | **32%** | **32%** | **31%** |

Source: Sarlee Supplemental Report

5

# Property Tax Increases Required Under the RJA

## Scenario B

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Taxable Value with the RJA Levy** | $5,286M | $5,392M | $5,500M | $5,610M | $5,722M | $5,837M | $5,953M | $6,072M | $6,194M | $6,318M |
| Collections Rate | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| RJA Payment | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M | $1,047M |
| **RJA Tax Rate** | **20%** | **19%** | **19%** | **19%** | **18%** | **18%** | **18%** | **17%** | **17%** | **17%** |
| | | | | | | | | | | |
| Collections Rate | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| Uncollected Amount | $262 | $327 | $344 | $348 | $349 | $349 | $349 | $349 | $349 | $349 |
| RJA Payment (prior year uncollected included) | $1,047M | $1,301M | $1,375M | $1,391M | $1,395M | $1,396M | $1,396M | $1,396M | $1,396M | $1,396M |
| **RJA Tax Rate** | **20%** | **24%** | **25%** | **25%** | **24%** | **24%** | **23%** | **23%** | **23%** | **22%** |

*Source: Sallee Supplemental Report*

6



Source: 2013 Statutory City Tax Rates from MI Treasury Department; Sallee Supplemental Report

# Change in City General Fund and RJA Taxes 2014-2015
**(Dollars in Millions)**

## Scenario A

| | 2014 | 2015 | Ratio: 2015 to 2014 |
|---|---|---|---|
| Detroit General Fund | $102.6M | $47.1M | 0.5 |
| RJA for Creditors | 0.0 | $1047.4 M | -- |
| Total Taxes | $102.6M | $1094.5M | 10.7 |

Source: Sallee Supplemental Report

8

# Estimates of Revenue Losses with RJA

## Scenario A

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| **General Operating (GO) Fund Revenue Impact** | | | | | | | | | | |
| GO Taxable Value with RJA | $3,150M | $3,213M | $3,277M | $3,343M | $3,409M | $3,478M | $3,547M | $3,618M | $3,691M | $3,764M |
| GO Tax Rate | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| Collection Rate: | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| GO Property Tax Revenue with RJA | $47M | $48M | $49M | $50M | $51M | $52M | $53M | $54M | $55M | $56M |
| Baseline GO Revenue | $99M | $97M | $95M | $93M | $90M | $90M | $91M | $91M | $94M | $98M |
| **Difference: Loss in GO Taxes** | **-$52M** | **-$49M** | **-$46M** | **-$43M** | **-$39M** | **-$38M** | **-$38M** | **-$37M** | **-$39M** | **-$41M** |
| **Reduction in GO Taxes Compared to Baseline** | **-52%** | **-50%** | **-48%** | **-46%** | **-43%** | **-42%** | **-41%** | **-41%** | **-41%** | **-42%** |

*Source: Saltee Supplemental Report*

9

# Estimates of Revenue Losses with RJA

## Scenario B

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| **General Operating (GO) Fund Revenue Impact** | | | | | | | | | | |
| GO Taxable Value with RJA | $4,424M | $4,512M | $4,602M | $4,694M | $4,788M | $4,884M | $4,982M | $5,081M | $5,183M | $5,287M |
| GO Tax Rate | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| Collection Rate: | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| GO Property Tax Revenue with RJA | $66M | $68M | $69M | $70M | $72M | $73M | $75M | $76M | $78M | $79M |
| Baseline GO Revenue | $99M | $97M | $95M | $93M | $90M | $90M | $91M | $91M | $94M | $98M |
| **Difference: Loss in GO Taxes** | **-$33M** | **-$29M** | **-$26M** | **-$23M** | **-$19M** | **-$17M** | **-$16M** | **-$15M** | **-$17M** | **-$19M** |
| **Reduction in GO Taxes Compared to Baseline** | **-33%** | **-30%** | **-27%** | **-25%** | **-21%** | **-19%** | **-18%** | **-17%** | **-18%** | **-19%** |

*Source: Sallee Supplemental Report*

10



# EXHIBIT B

## List of Documents and Other Materials Considered

1.  City of Detroit Finance Officers Report 2014 State Equalized Value and Taxable Value [POA00725823 – POA00725837].

2.  City of Detroit, Ten-Year Financial Projections (July 2, 2014), *available at* POA00706519 – POA00706600.

3.  City of Detroit, Ten-Year Plan of Adjustment, Restructuring and Reinvestment Initiatives (July 2, 2014), *available at* POA00706449 – POA00706518.

4.  City of Detroit, Plan of Adjustment – 40-Year Projections (July 2, 2014), *available at* POA00706603 – POA00706611.

5.  Congressional Budget Office, *The Budget and Economic Outlook: Fiscal Years 2013 to 2023* (Feb. 2013), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/43907-BudgetOutlook.pdf.

6.  Expert Report of Dr. Glenn Meyers (July 25, 2014).

7.  Expert Report of Stephen Spencer (July 25, 2014).

8.  FY 2013 City of Detroit Comprehensive Annual Financial Report (CAFR)

9.  Naomi Feldman, A Reevaluation of Property Tax Capitalization: The Case of Michigan's Proposal A (May 2010).

10. Native Files of Dr. Glenn Meyers sent on August 1, 2014.

11. Oded Palmon and Barton A. Smith, New Evidence on Property Tax Capitalization, The Journal of Political Economy, Vol. 106, No. 5 (Oct. 1998).

12. State of Michigan, Department of Treasury, Interest Rates for Money Judgments, available at http://www.michigan.gov/treasury/0,4679,7-121-44402_44404-107013--,00.html.

13. Transcript of the Deposition of Dr. Glenn Meyers taken on August 1, 2014.