UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

**RESPONSE IN OPPOSITION TO CITY OF DETROIT'S MOTION FOR LEAVE TO SERVE THE SUPPLEMENTAL EXPERT REPORT OF CAROLINE SALLEE**

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") submit this response in opposition to the City of Detroit's Motion for Leave to Serve the Supplemental Expert Report of Caroline Sallee. In support of this response, Syncora respectfully states as follows:

**INTRODUCTION**

1. Syncora vehemently objects to the City's request that it be allowed to back-and-fill the record with new expert opinions submitted 38 days *after* the deadline for the City's experts to submit their reports. The City has known for over 18 months that if it wanted to argue that increasing taxes would not provide an incremental source of revenue that it would need to provide expert testimony. For reasons known only to the City, it conducted no analysis of this question whatsoever during that time period. As the parties head into the most closely-watched Chapter 9 proceeding in modern history, it has now dawned on the City

that a gaping hole exists in its proof. By its motion, the City asks the Court to change the rules after the fact and allow the City to introduce hurried expert analysis performed by Caroline Sallee indicating that any increases in taxes would, counter-intuitively, erode revenues. Though casually styled as a mere "supplemental" report, Ms. Sallee's new opinions are a clear effort to fill an evidentiary hole in the City's case. There are no "novel theories" in the expert reports of Mssrs. Meyers and Spencer — they simply attempted to consider the basic and obvious question of the impact a tax increase would have the City. This question is something the City has known is a fundamental element of proof in any Chapter 9 proceeding. The Court should reject the new opinions because the City has not carried its burden to show extraordinary cause for an adjustment to the schedule and because creditors like Syncora will be prejudiced by the delay and expense that will attend upon the City's effort to create new expert testimony long after the deadline for disclosure had passed. The Court should deny the motion.

**THE BEST INTERESTS OF CREDITORS AND
FAIR AND EQUITABLE REQUIREMENTS**

2. Lurking in the background of the City's motion is one of the key pillars of bankruptcy law: the best interests of creditors test. That test is a staple of every single proceeding under Chapters 9 and 11. It requires a debtor to prove that the restructuring effort was worth the candle — that is, that creditors are <u>no worse off</u> because of the restructuring than they would have been without it.

2

3. In this case, the question is a hotly-disputed one. After all, the City through its Plan and actions proposes to (a) give its residents a tax break; (b) give its employees substantial raises; and (c) invest $1.5 billion in itself over the next ten years. Though there is no question that all of the foregoing steps are wonderful for the City, there is a very real question as to whether such steps are good for creditors.

4. In the Chapter 11 context, the best interests of creditors test is typically established by way of a liquidation analysis. But because cities cannot be liquidated, courts in the Chapter 9 context typically require a debtor to prove that creditor recoveries under the plan of adjustment exceed what creditors would get if the case were dismissed.[1] A dismissal analysis requires the debtor to evaluate a host of factors, including (a) its forecasted revenue if the case were dismissed; (b) creditor remedies upon dismissal; (c) the size of creditors' claims, including which have accelerated and which have not; (d) whether settlements struck during bankruptcy would survive dismissal; (e) which claimants the debtor would pay in the dismissal scenario and which it would not; and (f) the likelihood of increasing revenues, for example through increased tax levies, if the case were dismissed.

---

[1] *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999).

5. The City's <u>sole</u> expert on the question of the best interests of creditors test is its investment banker, Ken Buckfire. And while Mr. Buckfire is a well-respected and deeply credentialed restructuring expert, his expert report and deposition revealed that he had <u>not conducted any dismissal analysis</u> in reaching his opinions. Syncora has contemporaneously filed a motion under Rule 702 seeking to exclude Mr. Buckfire's three-paragraph best interests opinion. It reveals that Mr. Buckfire (a) did not do a dismissal analysis; (b) was unaware of, and had not seen, any forecast of the City's revenues if the case were dismissed; (c) had not evaluated the extent to which the City could rationalize operations at troubled enterprise funds like the Detroit Department of Transportation in a dismissal scenario to save money and pay creditors more; (d) had not evaluated the likelihood, or proceeds, of asset sales in the dismissal context; and (e) had generally done nothing in the way of actual work in generating his opinion.

6. Critically, on the subject of whether increased taxes imposed via a judgment levy under the Revised Judicature Act of 1961 would generate incremental revenue that could minimize creditor losses, Mr. Buckfire admitted that he had merely "assumed" that such a tax increase would counter-productively erode revenues — and that this assumption was based on work performed by Mr. Cline of Ernst & Young. The problem? Mr. Cline had done no such work. Nor had Ms. Sallee. Nor had Mr. Malhotra. Nor had John Hill — the City's Rule

4

30(b)(6) designee to Syncora's attempt to discover evidence relating to the City's "taxing capabilities…and studies regarding the same."[2] In short, no one at the City had done anything on one of the central issues of the case.

7. Moreover, the fair and equitable standard requires the City show that the Plan provide its unsecured creditors with all that they can reasonably expect under the circumstances. Nevertheless, the City failed to assess its ability to increase taxes in an effort to pay creditors — another glaring flaw in the City's attempt to meet the fair and equitable standard.

8. The best interests of creditors and fair and equitable requirements are the basic food groups of bankruptcy. Indeed, the satisfaction of these standards is a requirement that any student of bankruptcy at an accredited law school would know is absolutely indispensable to a confirmable plan.

9. The instant motion is a desperate 13th-hour effort by the City to plug a gaping hole in its proof.[3] The City asks the Court to put a thumb on the scale and save the City from itself by allowing a rushed opinion from Ms. Sallee that increasing taxes under the Revised Judicature Act will devastate the City. Putting to one side the dubious proposition of having Ms. Sallee offer this opinion where

---

[2] Ex. 6A, City of Detroit's Second Amended Identification of Witnesses in Response to Syncora's Notice of Deposition Filed Pursuant to Fed. R. Civ. P. 30(b)(6), at 1.

[3] There are many other such holes that will be revealed at the upcoming trial.

5

she is not an economist and had previously disclaimed any effort to consider this question, the City's motion should be denied because, as shown below, the City has known for more than 18 months that expert testimony would be required *on this precise subject*, and thus cannot establish extraordinary cause. Moreover, Syncora and other creditors will be prejudiced by both the delay and expense that will attend re-opening discovery at this late date.

## ARGUMENT

### I. No Extraordinary Cause Exists to Allow the City to Generate New Expert Opinions.

10. There can be no dispute that the City has known since **January 2013** that it would have the burden to prove that it could not raise taxes (whether voluntarily or as part of a Revised Judicature Act judgment) to pay its creditors — and that it would require expert opinion testimony to make this proof. Indeed, in its initial pitch to the City on January 29, 2013, Jones Day explicitly stated that "a municipality must use its ability to raise taxes to the extent possible without triggering a 'death spiral" that would ultimately destroy the municipality."[4] As Jones Day also noted, "[t]raditionally, this question has been determined based upon **expert testimony**."[5]

---

[4] Ex. 6A, Jan. 2013 Jones Day *Presentation to the City of Detroit*, at 55-56.

[5] *Id*. (emphasis added). In addition, in a July 17, 2013 amendment to the Professional Services Contract between the City and Ernst & Young, one of the

6

11. To date, the City's experts and witnesses have uniformly testified that they did not analyze the City's ability to increase taxes and the attendant impact of such an increase on the City:

Mr. Cline

> Q. Would raising the income tax rate be a reasonable policy for the City of Detroit?
>
> A. I can't comment on the policy options for Detroit. We were not asked to evaluate those as part of our analysis.
>
> Q. And so, you're offering no opinion that raising the income tax rate or property tax rates or utility tax rates or wagering tax rates or any of the other rates would be inappropriate or unreasonable, correct?
>
> A. We were not asked to evaluate any tax policy alternatives for the City of Detroit.
>
> Q. So, you're not offering any opinion saying that raising tax rates would be unreasonable, correct?
>
> A. I'm not commenting on policy options for the City of Detroit.
>
> Q. So, you're not offering -- I'm just trying to get an idea of what opinions you're offering. So, you're not offering an opinion that raising tax rates would be unreasonable, correct?
>
> A. I'm not commenting on any tax policy options available to the City of Detroit.

---

services listed in the Scope of Services was "[p]reparing 10-year forecasts for alternative tax scenarios as reasonably requested by the City." Ex. 6G, Amendment No. 7 to Statement of Work, at 3.

7

Q. You know that question -- there could be a yes or no answer to that question, right?

A. My perspective is that we were asked to do revenue forecasts of the major revenue sources under current law. We were not asked nor did I volunteer information on alternatives available to the City of Detroit.

Q. Okay. So, you haven't done any work that will allow you to testify that raising tax rates would be unreasonable or inappropriate, correct?

A. I have not.

Q. And you haven't done any work that says that increasing tax revenues through increased collections would be --

. . . inappropriate or not feasible, correct?

A. He [sic] we have not evaluated tax policy opportunities -- alternatives for Detroit.

Q. And you haven't done any work that would allow you to testify that Detroit couldn't just add new taxes, correct?

A. We have not.

[. . .]

Q. You haven't done any work that will allow you to testify that Detroit can't significantly increase revenues by increasing tax rates or increasing tax collections or by adding new taxes, correct?

[. . .]

THE WITNESS: We have done no analysis on tax policy options in Detroit.

BY MR. SMITH:

8

Q. So, the answer is correct, correct?

[. . .]

THE WITNESS: I believe the correct answer to that question is, as I mentioned, we have looked at the collection rate of the property tax. We calculated an effective collection rate, and we did use that in our forecast. We did not -- were not asked to and did not provide forecasts under alternative policy options, whether it's a tax rate change or adoption of a new tax, or change, in the base of an existing tax.[6]

******************************************

Q. And you're not prepared to testify about what studies might have been done about the City's tax policy or taxing capabilities; is that fair to say?

A. I wouldn't use the word "prepare." We simply didn't look at the issue, so I can't answer questions applicable to that issue.[7]

Ms. Sallee

Q. In your view, what are the biggest sources of untapped revenue for the City of Detroit?

A. I don't have an opinion on that.

Q. Do you have an opinion about how the City of Detroit could increase property tax revenues?

A. I do not.

Q. The City of Detroit has never asked you or anyone else at Ernst & Young to use your expertise to increase property tax revenues for them, correct?

---

[6] Ex. 6C, Cline Dep. Tr. at 94:8-98:2.

[7] *Id.* at 278:15-278:20.

A. Correct. We don't do specific tax policy recommendations.

Q. Okay. So you're offering no opinion about whether the City can increase tax revenues, correct?

A. I'm not offering an opinion about whether they can increase tax revenues.

Q. And you're not offering an opinion about whether the City can pay the creditors more money in the bankruptcy, correct?

A. I'm not offering an opinion on that.

Q. And you're not offering an opinion about how much revenue the City would have if the bankruptcy case is dismissed, correct?

A. That's correct.[8]

********************************

Q. Do you know whether there are any formal studies that have been conducted to ascertain whether Detroit can raise taxes or increase revenue?

A. I don't know.[9]

Mr. Malhotra

Q. And there have been no -- you haven't attempted to forecast what would happen if tax rates increased; correct?

A. Which tax rates?

Q. Any of the tax rates. You haven't built in an increase for any tax rates in your forecasting model; correct?

---

[8] Ex. 6D, Sallee Dep. Tr. at 50:14-52:13.

[9] *Id.* at 55:5-9.

10

A. That is a policy question. Yes, we have not baked any increases in the tax rate, because I think they're already at the max in certain cases. But we have left tax rates where they are today.[10]

*****************************************

Q. You're not offering any opinion saying that the City can't raise taxes; correct?

A. That's a policy question. The City is on the highest end, likely, of its comparable tax rates, but I'm not offering an opinion on changes in tax policy.[11]

Mr. Hill

Q. You haven't done any study looking at the impact of increasing or reducing tax rates in the city; correct?

A. I have not.

Q. And you're not aware of the City -- anybody at the City doing that, are you?

A. I'm not aware of any study.[12]

*****************************************

Q. Do you know whether the City has looked at or investigated increasing any of the tax rates in the city?

A. No.[13]

---

[10] Ex. 6E, Malhotra Dep. Tr. at 138:8-18.

[11] *Id*. at 279:15-20.

[12] Ex. 6F, Hill Dep. Tr. at 149:19-25.

[13] *Id*. at 158:21-24.

11

12. Thus, while Mr. Cline suggested that Ernst & Young has the capability to do an analysis surrounding the increase of tax rates, he made clear that he was <u>never asked</u> to do so by the City. For its part, Ernst & Young has said that it has a policy which bars it from advising municipalities on tax policy.[14]

13. Apart from Mr. Buckfire, no other witness, including Ms. Sallee, offered any opinion on this subject. And, as demonstrated above, Mr. Buckfire's threadbare opinion is based on work Ernst & Young <u>never</u> did. The fact that the City performed no analysis on this issue is further corroborated by the testimony of the City's Rule 30(b)(6) witnesses on this topic — Mr. Hill and Mr. Malhotra — that is cited above. Ms. Sallee's effort to now generate an opinion that the City cannot raise taxes is therefore no mere "supplement" to her opinion. Rather, it represents entirely new opinions that she has previously disclaimed and, in fact, testified were contrary to Ernst & Young's internal policies. The City's attempt to style Ms. Sallee's expert report as a mere "supplement" is an attempt to cloak its real motives.

14. Nevertheless, the issue of creditor remedies is self-evidently relevant to the City's case —and one for which the debtor holds the burden of proof. For example, the Revised Judicature Act has been referenced in multiple hearings,

---

[14] Ex. 6D, Sallee Dep. Tr. at 51:14-52:12.

Syncora's objections, and in the underlying documents. Moreover, in its 252-page reply brief, the City took the position that increasing taxes would be "futile"[15] — a position it could not have taken without knowing that it would need supporting evidence and expert testimony.

15. Given the City's knowledge of the importance of this issue, its knowledge of the need for expert testimony, and its knowledge that it had none, the City has not demonstrated the extraordinary cause necessary to change the Court's schedule. Because Ms. Sallee and the other City witnesses did not include the proposed new opinions in any of their expert reports, the City should not now be able to assert them in a "supplemental" expert report from Ms. Sallee.

**II.     Syncora will Suffer Prejudice if the City is Allowed to Introduce New Opinions After Discovery Has Concluded.**

16. If the Court allows the City to introduce new opinion testimony more than a month after the deadline for doing so — and nearly a week after the close of discovery — Syncora and other creditors will be prejudiced by the delay and expense that will occasion granting the City's motion. First, granting the City's motion will require the Court to further adjust a case management schedule that has already been adjusted seven previous times. Second, allowing new expert

---

[15] *Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 5034], ¶¶ 132-136.

opinions will impose expense in the form of discovery, document review, depositions, and new expert reports.

17. The Court will recall that its Fifth Amended Scheduling Order sensibly staggered the time for expert disclosures by the City and its creditors. The City's expert reports were due on July 18, 2014. Creditors' expert reports were due on July 29, 2014. This allowed an eleven day window for creditors to (a) understand the City's expert testimony; and then (b) respond with expert reports of their own. The City then had until August 5, 2014, to depose creditors' experts, a date that was later extended to August 11, 2014.

18. The City's attempt to add new opinions after the deadline for disclosing them (and indeed, after the close of all discovery) entirely frustrates the logic of this schedule. Granting the motion will require the Court, in fairness, to (a) delay the trial date; (b) allow creditors to obtain Ms. Sallee's reliance materials — which will presumably be extensive given the magnitude of the opinion she purports to offer; (c) allow creditors to depose Ms. Sallee; and (d) allow creditors to issue new expert reports in response to Ms. Sallee's newly disclosed opinions. Given the other infirmities in the City's evidence, this will only further delay the defeat of the City's Plan of Adjustment, which will in turn further delay the work needed to be done to achieve a Plan that is confirmable and treats all creditors

fairly. In addition, Syncora will also be prejudiced by the substantial expense that will go into addressing the City's new expert opinions.

19. The City's request is also in stark contrast to the City's repeated insistence that the case be hurried along — over the objection of many of the creditors. Indeed, just last week, counsel for the City again urged that delay would result in serious harm to the City, this time citing VEBA issues. However, now that the City has belatedly realized that it cannot establish an essential element of its case, the City is more than willing to burden the Court, the parties, and the citizens with an alteration to the case management schedule. Put simply, the fact that the City has been asleep at the switch on a core issue for over 18 months does not constitute "extraordinary cause."

**III.    How the Court Addresses the City's Motion Has Important Ramifications for the Case as a Whole.**

20. In proposing the current Plan of Adjustment, the City took a substantial gamble. It gambled that the Court would confirm the Plan notwithstanding its obvious legal and evidentiary infirmities because, according to the City, <u>not</u> to confirm it would lead to the total destruction of the City of Detroit. In short, the Plan will be confirmed because it <u>must</u> be confirmed.

21. The City has thus treated the development of evidence in support of the Plan of Adjustment as more or less an afterthought. After all, why spend time and money developing evidence supporting the Plan when you believe that the

Court has no choice but to confirm the Plan irrespective of what the evidence says? Mr. Buckfire's expert report is an example of the City's cavalier attitude towards its burden of proof and this Court's credibility. A three paragraph best interests opinion built entirely on work that was never done by anyone is not admissible in the Federal Courts of this district, nor anywhere else in this country.

22. The most recent motion represents additional evidence of the City's attitude. What possible basis could the City believe exists for adding new expert opinions on a question (the potential benefits of raising taxes) that is of obvious and fundamental importance to any municipal restructuring? The answer is written above: the City believes that the Court <u>has</u> to confirm the Plan. And because the Court <u>has</u> to confirm the Plan, the Court <u>has</u> to allow the City to fill the gaping holes in its proof — even where doing so violates fundamental rules of fairness that anyone can understand. The City's apparent belief that the Court would sanction the City's consistently-flawed approach to this bankruptcy and allow it to retroactively introduce an essential proof is disrespectful to the parties, the process and, above all else, the Court. By denying the City's motion, the Court will send a message to the City that its Plan must be proven on the merits — and that while the challenges faced by the City of Detroit invoke sympathy in even the hardest of hearts, that sympathy is no substitute for the fair application of legal principles and procedures to the evidence in the case.

16

13-53846-tjt    Doc 6782    Filed 08/18/14    Entered 08/18/14 07:25:27    Page 16 of 18

## CONCLUSION

23. For the foregoing reasons, Syncora respectfully requests that the Court deny the City's Motion for Leave to File Supplemental Expert Report of Ms. Caroline Sallee.

Dated: August 18, 2014                    Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: /s/ *Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*