## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|                                         |     |                           |
| --------------------------------------- | --- | ------------------------- |
|                                         | )   |                           |
| In re                                   | )   | Chapter 9                 |
|                                         | )   |                           |
| CITY OF DETROIT, MICHIGAN,              | )   | Case No. 13-53846         |
|                                         | )   |                           |
| Debtor.                                 | )   | Hon. Steven W. Rhodes     |
|                                         | )   |                           |

## MOTION TO EXCLUDE THE TESTIMONY OF KENNETH A. BUCKFIRE REGARDING CREDITOR RECOVERIES UPON DISMISSAL OF THE BANKRUPTCY CASE

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") submit this motion (the "Motion to Exclude") to exclude the expert testimony of Kenneth A. Buckfire, which was disclosed on July 8, 2014, in the Expert Report of Kenneth Buckfire In Support of City of Detroit's Plan of Adjustment (the "Buckfire Report" (Ex.6A)) and on July 16, 2014, in Mr. Buckfire's deposition (excerpted in Ex. 6B). In support of their motion, Syncora respectfully states as follows:

### INTRODUCTION

1.     To support confirmation of its plan, the City intends to call Mr. Buckfire as an expert to opine that the City's plan is in creditors' "best interests" because "[t]he City's creditors will be treated better under the City's plan of adjustment than if the bankruptcy case were dismissed." (Buckfire Report p 2.)

2. Mr. Buckfire's "best interests" opinions should be excluded because they are not based on a reliable methodology and represent the classic sort of "ipse dixit" opinion that Federal courts have rejected time and time again. When it comes to his best interests opinions, Mr. Buckfire's expert report is, to be kind, extremely sparse. The entirety of Mr. Buckfire's opinion is comprised of just three prose paragraphs. There are no work papers included with Mr. Buckfire's report and the report evidences no discernible effort to systematically evaluate what creditors could receive in a scenario where the City's bankruptcy case was dismissed. (*See* Ex. 6A.)

3. Mr. Buckfire's deposition quickly confirmed that he had done virtually no work at all in connection with his best interest opinion. Critically, Mr. Buckfire admitted repeatedly that he had <u>not</u> conducted a dismissal analysis of any kind in order to confirm his assumption that creditor recoveries are higher as a result of the City's plan than they would be upon a dismissal of the City's case. Specifically, Mr. Buckfire admitted the following:

- Mr. Buckfire testified repeatedly that he never performed any analysis of city revenue or creditor recoveries in a dismissal scenario. (Buckfire Dep. Tr. at 276:14–24, 280:11–15, 288: 14–21, 289:11–14.)

- Mr. Buckfire never saw, conducted, or requested any forecast of city revenue or creditor recoveries in a dismissal scenario. (Buckfire Dep Tr. at 236:8–15.)

- Mr. Buckfire testified that his opinion that the City's ability to raise taxes—a foundational and central element of any reliable analysis of creditor

2

recoveries in a dismissal scenario—is not based on his own analysis, but rather on something he claims to have been told by Robert Cline of Ernst & Young. (Buckfire Dep. Tr. at 239:22-240:24.) But Mr. Cline testified unambiguously under oath that <u>he was never asked to perform, did not perform and was not equipped to perform</u> any analysis of the City's ability to increase taxes. (Cline Dep. Tr. at 100:23–101:12.)

- Mr. Buckfire admitted that his opinion that a "race to the courthouse" would doom creditor recoveries upon a dismissal is not based on any analysis or relevant expertise, but instead is based purely on his belief that it is "obvious." (Buckfire Dep. Tr. at 179:2–179:17.)

4. Mr. Buckfire is a well-recognized and respected restructuring and finance expert who was perfectly capable of performing a dismissal analysis in order to test the expert opinion he was proposing to render. He inexplicably chose not to do so. Mr. Buckfire's best interests opinion is principally comprised of a collection of assumptions that he never attempted to study or verify, which he then strung together with an overarching opinion about creditor recoveries in a dismissal scenario he never analyzed.

5. Rule 702 and controlling Sixth Circuit and Supreme Court authority prohibit expert testimony that is unsupported by reliable data or analysis and is instead merely the expert's *ipse dixit*. Because Mr. Buckfire's opinion about creditor recoveries is entirely divorced from <u>any</u> reliable data or analysis, it is classic *ipse dixit* and should be excluded in its entirety.

## JURISDICTION

6.     The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7.     Syncora respectfully moves the Court to exclude testimony or opinions by Mr. Buckfire as to (a) the best interests of creditors test; (b) creditor recoveries upon dismissal of the bankruptcy case; (c) whether increasing taxes would erode revenue for the City of Detroit; (d) comprised or relating to the opinions contained in Part II.B of his expert report, and to enter an order substantially in the form of <u>Exhibit 1</u>, attached hereto..

## BASIS FOR RELIEF

**I.      Rule 702 Requires Expert Testimony Be Based On Facts, Data, and Reliable Analysis.**

8.     Rule 702 of the Federal Rules of Evidence, made applicable to this proceeding by Rule 1101 of the Federal Rules of Evidence, provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to . . . determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

4

9.     An expert's opinion is unreliable where "[t]here is 'too great an analytical gap between the data and the opinion proffered.'"  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675–76 (6th Cir. 2010) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  In assessing reliability, "[r]ed flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.,* 676 F.3d 521, 527 (6th Cir. 2012).  An opinion prepared solely for litigation should be subjected to heightened scrutiny.  *See Lawrence v. Raymond Corp.*, 501 F. App'x 515, 518 (6th Cir. 2012) (citing *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 434 (6th Cir.2007)).  The party propounding the expert bears the burden of proving the testimony's admissibility.  *See Jack Henry & Associates, Inc. v. BSC, Inc.*, 487 F. App'x 246, 255–56 (6th Cir. 2012).

10.     Under Rule 702, expert testimony is not admissible if it represents merely the *ipse dixit* of the expert.  *See Tamraz*, 620 F.3d at 671 ("The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion.") (quoting *Joiner*, 522 U.S. at 146).  Expert opinions must, therefore, have a reliable basis in data and a sound methodology.  *Id.*  Further, there must be a "nexus between [an expert's] credentials and the subject matter of his testimony." *In re Worldcom, Inc.,* 371 B.R. 33, 42 (Bankr. S.D.N .Y.2007).

11.    An expert may not act as a mouthpiece for another expert who is not testifying on the matter.  *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer."); *see also Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (an expert "must make some findings and not merely regurgitate another expert's opinion.").  An expert may not rely on another expert's opinion without attempting to verify the validity of that opinion.   *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732–33 (10th Cir.1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no familiarity with methods and reasons underlying the hearsay report); *see also In re TMI Litig.*, 193 F.3d 613, 715–16 (3d Cir.1999) (finding unsubstantiated reliance by expert on other expert opinions demonstrates flawed methodology).

## II.    Mr. Buckfire's Best Interests Opinion Is Inadmissible Because It Is Totally Divorced From Any Reliable Data or Analysis.

12.    To satisfy the best interests of creditors test, the debtor must show that the creditor would fare better under the Plan than outside of the Plan.  *See In re Cnty. of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (quoting 4 *Collier*

*on Bankruptcy* ¶ 943.03(7)(a) (16th rev. ed. 1995) ("The courts must . . . apply the [best interests] test to require a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case.")  The best interests test thus requires a comparison of creditor recoveries under the proposed plan against estimated creditor recoveries if the bankruptcy were instead dismissed.  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999) ("The "best interest" requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.").

13.    Unlike the best interests test in Chapter 11, which requires a straightforward analysis of creditor recoveries in a liquidation of the debtor's assets in comparison to a plan of reorganization, the best interests test in Chapter 9 requires an expert to analyze a host of complex issues and questions that would inform the dismissal scenario, including:

- What is the City's forecast of revenues in a dismissal scenario?

- What remedies are available to the City's creditors in a dismissal scenario?

- Which creditors' claims have accelerated and which have not?

- What agreements struck during the bankruptcy case would survive dismissal of the bankruptcy petition?

- Which of the City's liabilities are in default and which are not?

7

- Would general unsecured creditors recover on a *pari passu* basis upon dismissal?

- What impact would raising taxes pursuant to the Revised Judicature Act have on creditor recoveries?

- What amount of revenue will the City have available to distribute to unsecured creditors?

14.     It is impossible to estimate creditor recoveries in a dismissal scenario without conducting a dismissal analysis that accounts for the issues listed above. Offering a best interests opinion without conducting a dismissal analysis is a contradiction in terms.

15.     Mr. Buckfire's expert report is an effort to achieve that contradiction. He opines that, "The City's creditors will be treated better under the City's plan of adjustment than if the bankruptcy case were dismissed," (Buckfire Report p 2), but repeatedly testified that he performed no dismissal analysis or forecast of any kind:

> Q.   Now, isn't it true that in coming to your opinion that creditors do better under the plan than they would do in a dismissal scenario you did not construct a forecast of the City's revenues and costs in a dismissal scenario, correct?
>
> A.   Correct.
>
> Q.   And no one else has either, correct?
>
> A.   Correct.

(Buckfire Dep. Tr. at 236:8–15.)

> Q. And I take it you've never sat down with a piece of paper and tried to work this out, right, in terms of what the total claim size would be, correct?

A. Correct, we've not done a dismissal analysis.

(Buckfire Dep. Tr. at 276:19–22.)

Q. And so I take -- so you have never personally evaluated the extent to which the City would undertake the restructuring reinvestment initiatives in the dismissal scenario, correct?

A. Correct.

(Buckfire Dep. Tr. at 277:24–278:4.)

Q. Okay. But you haven't actually done the analysis, though, to see who would get any surplus revenue that exists above operating expenditures and secured debt correct?

A. You've already asked me this, we have not done a dismissal analysis.

(Buckfire Dep. Tr. at 280:11–16.)

Q. And have you -- I take it then you haven't evaluated the impact such a sale would have on creditor recoveries, correct?

A. We have not done a dismissal analysis.

(Buckfire Dep. Tr. at 288:18–21.)

Q. Have you evaluated the extent to which [the Grand Bargain] might be reconstituted in a dismissal?

A. That's speculation and I've already testified we haven't done a dismissal analysis.

(Buckfire Dep. Tr. at 289:11–14.)

Q. Okay, and I take it you have not tried to factor in the privatization of DDOT to what creditor recovery should be in a dismissal scenario because you did not do a dismissal analysis, correct?

A. Yes.

9

(Buckfire Dep. Tr. at 295:10–14.)

16.   Without making any effort to forecast or analyze the City's revenue position in a dismissal scenario, or the total creditor claims in a dismissal scenario, it is impossible for Mr. Buckfire to reliably opine on whether creditor recoveries would be higher or lower in a dismissal scenario versus the plan.   Mr. Buckfire's best interests opinion is nothing more than his gut feeling or say-so, which is inadmissible under Sixth Circuit law.  *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675–76 (6th Cir. 2010) (excluding expert testimony that contained mere statements of the opinion of an expert that conducted no actual analysis relevant to the opinion's subject matter).

17.   Mr. Buckfire's wholesale failure to perform any dismissal analysis renders his opinion unreliable and inadmissible, especially in view of ample evidence (none of which he considered) showing his opinion is simply wrong.  Mr. Buckfire admitted that creditors' remedies in a dismissal scenario would be *pari passu*,  (Buckfire Dep. Tr. at 278:19-23), and that creditor recoveries in a dismissal would depend on the City's ability to satisfy judgments either from excess operating revenues or from the imposition of additional taxes, (Buckfire Dep. Tr. at 279:7-280:10; 238:2-239:12.)  The City's own forecasts show operating surpluses totaling hundreds of millions of dollars annually.  (Fourth Amended Disclosure Statement, Ex. 2 to Ex. J.)  And if the City were to outperform its current forecasts,

10

the creditors in a dismissal scenario could obtain these excess amounts and increase their recovery. Under the plan, revenue from over-performance is simply a windfall for the City and will not affect creditor recoveries. But Mr. Buckfire never considered any of this. (Buckfire Dep. Tr. at 280:11–16.)

18. Moreover, Mr. Buckfire's opinion rests heavily on a number of critical assumptions he made. (*See* Ex. 6A at ¶ 17.) But in his deposition, he admitted that he had never analyzed his assumptions and could not say whether his assumptions were correct or incorrect. (Buckfire Dep. Tr. at 251:10-13; 280:11–16; 282:4–16; 310:8–23.)

19. <u>No Analysis Of City's Potential Revenue In Dismissal Scenario.</u> One of the two central factors in a dismissal analysis is the extent to which the City would be able to generate revenue to satisfy creditors (the other is size of creditor claims). The Buckfire Report assumes that "in a dismissal scenario, the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue." (Buckfire Report ¶ 17.) That assumption rests on two premises: that the City would be "unable" to raise taxes because it is at or near statutory tax limits, and it would be "impractical" to do so because the tax burden is already such that increasing tax rates would have a negative effect on revenue because it would cause delinquencies and mass exodus from the City. (Buckfire Report at ¶ 7, ¶16.)

20.    But Mr. Buckfire admitted at his deposition that statutory caps do not necessarily prevent the City from raising taxes to satisfy creditor judgments. (Buckfire Dep. Tr. at 238:2–20.)   Thus, his assumption that the City would be "unable" to raise property taxes in a dismissal scenario is wrong by his own admission.

21.    As for whether increased tax rates would generate negative or positive revenue, Mr. Buckfire admitted he never analyzed the issue, lacks the expertise to do so, and relied entirely on an analysis he asked Mr. Cline (of Ernst & Young) to perform:

> Q. Now, is forecasting future revenues of a municipality something that falls within your area of expertise as an expert?
>
> A. No.

(Buckfire Dep. Tr. at 244:12–15.)

> Q.   You have not conducted, however, any quantitative analysis assessing the relationship between tax rates and population levels over historical time periods in Detroit, correct?
>
> A.   Correct.

(Buckfire Dep. Tr. at 253:17–254:2.)

> [Mr. Buckfire:] I believe the income tax rate, itself, is already quite high relative to neighboring communities.
>
> . . . .
>
> Q.   Okay.   You have not undertaken a comprehensive study of what surrounding municipalities levy when it comes to property taxes, correct?

12

A.  Correct.

Q.  Are you currently of the view that there is no surrounding municipality that has higher property taxes than the City of Detroit?

A.  No.

Q.  You're not of that view?

A.  I don't know.

(Buckfire Dep. Tr. 237:10–11, 253:1–254:2.)

[Q.] . . . I take it you did not undertake an analysis of the amount of tax increase that could be imposed via a creditor judgment against the City to determine whether it would yield additional revenue?

A. Not directly, but we did ask the tax experts at E&Y to do an analysis of the City's revenues and take into account the sensitivity of revenues to tax rates.

Q. So you asked Mr. [Cline] at E&Y?

A. I did.

. . . .

Q. And what did he tell you?

A. You know, I've reviewed his expert report and I've talked to him over months about these issues. His conclusion was that because the City already has very high tax rates, any further increase in rates would certainly lead to a decline of revenue . . . .

(Buckfire Dep. Tr. at 239:22–240:24.)

22.  As noted above, one expert cannot blindly rely on another expert's work in generating an opinion.  *See Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009).  He must undertake to confirm the reliability of the

13

other expert's work before he incorporates it into his own. *See TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732–33 (10th Cir.1993).

23.   In this situation, the Court can know for certain that Mr. Buckfire did not test the reliability of Mr. Cline's opinions on changes to tax rates for one simple reason: Mr. Cline has not rendered any opinions regarding the effect of potential tax increases and did not undertake any of the work necessary to forming such opinions.  Contrary to Mr. Buckfire's testimony, Mr. Cline's report contains no analysis of whether increased tax rates would generate positive or negative revenue, and at his deposition Mr. Cline testified unambiguously that he had not undertaken any such analysis:

> Q.    You didn't do any work that would allow you to testify that by increasing tax rates, Detroit would not increase substantially its tax revenues?
>
> THE WITNESS:  We did not run alternatives with our model at different tax rates.

(Cline Dep Tr. at 100:13–18.)

> Q.    Okay.  But is it technically feasible for you to do an analysis like that?
>
> A.    We would have to do additional work compared to what we have done to this point, because as I mentioned, it's not just changing the rate, it's also understanding the behavioral response of the base in response to the change in the rate. ***We are not set up to do that*** in our current runs.
>
> Q.    And you also haven't done the work that would allow you to testify that Detroit couldn't significantly increase revenues by adding new taxes, correct?

14

A.    We have not analyzed the addition of new revenue sources for Detroit.

(Cline Dep. Tr. at 100:23–101:12)  (emphasis added).

Q.    Okay.  So, you haven't done any work that will allow you to testify that raising tax rates would be unreasonable or inappropriate, correct?

A.    I have not.

Q.    And you haven't done any work that says that increasing tax revenues through increased collections would be . . . inappropriate or not feasible, correct?

A.    He we have not evaluated tax policy opportunities -- alternatives for Detroit.

Q.    And you haven't done any work that would allow you to testify that Detroit couldn't just add new taxes, correct?

A.    We have not.

Q.    And you haven't done any work that would allow you to testify that Detroit couldn't generate significant additional revenue by either adding new taxes or increasing tax rates?
. . .

THE WITNESS:  We were not asked to look at policy options for the City of Detroit.

(Cline Dep. Tr. at 95:13–96:13.)

24.    Thus, the entire basis for Mr. Buckfire's views regarding the practicality of raising taxes is based on reliance on an analysis that Mr. Cline never performed and was not equipped to perform.  Mr. Buckfire's "opinion" regarding

15

the impracticality of raising taxes in Detroit is an emperor that is not wearing any clothing.

25.   Throughout Mr. Buckfire's testimony he displayed a striking lack of analysis or knowledge regarding basic aspects of tax collection and delinquency in Detroit.  For example, Mr. Buckfire did not know whether the income tax in the City had gone up or down in the last 15 years, (Buckfire Dep. Tr. at 248:18-23), what the millage rate on residential and non-residential properties is (Buckfire Dep. Tr. at 252:21-253:4), or how the City's operational improvements in the assessor's office and treasury might affect tax collection and delinquency rates. (Buckfire Dep Tr. at 257:1-258:13.)   The same is true for Mr. Buckfire's understanding of the relationship between tax rates and delinquency rates, for which he states he relied entirely on anecdotal accounts and performed no independent analysis:

> Q.   Are you aware of any data showing that increasing taxes will increase delinquency rates in the City of Detroit?
>
> A.   Only by inspection of the City's historical record as tax rates went up, my understanding from City officers, including Jack Martin with whom I discussed this issue, was the delinquency rate went up, as well.
>
> Q.   Ah, so you're -- you're under the impression that there's historical evidence in the City of Detroit that shows a connection between increasing tax rates and increasing delinquency rates.
>
> A.   It was anecdotal at the time he told me that.

Q.  So you were told that by Mr. Martin.  Did you ever attempt to confirm that?

A.  No."

(Buckfire Dep Tr. at 248:3-17.)

26.  <u>No Analysis Of Creditor "Race to the Courthouse"</u>.  Mr. Buckfire opines in his report that creditors in a dismissal scenario undoubtedly would "race to the courthouse" to exercise their legal rights against the City, which would result in "chaos and inefficiency" that makes the City's Plan preferable.   (Buckfire Report ¶ 7.)   But Mr. Buckfire engaged in no analysis whatsoever regarding the claims or sources of claims that would result in a "race to the courthouse" or the consequences of such a race for creditor recoveries:

> Q: . . . [D]id you do any analysis of well here's what we think would happen, here's the creditors we think would have a certain type of priority, here's the creditors we think would have a different type of priority here's how we think we testified yesterday the race to the courthouse might come out, did you do any analysis like that?

> A.  No.

(Buckfire Dep. Tr. at 179:2–179:9.)  In short, Mr. Buckfire's view regarding a race to the courthouse (like the rest of his best interests opinion) is unmoored from any reliable data or analysis.  Moreover, a race to the courthouse by various creditors is not tantamount to a finding that those creditors would do worse.  It is the <u>outcome</u> of the assertion of creditor rights in the dismissal scenario that must be compared

17

to the City's plan.  But this is precisely the analysis Mr. Buckfire admits he did not do.

27.  <u>No Analysis Of Service Delivery Insolvency</u>.  One of the assumptions underlying Mr. Buckfire's best interests opinion is that the City is "service delivery insolvent."  (Buckfire Report ¶ 17.)   But when asked for an understanding of whether the City has achieved service delivery insolvency in some or all areas as a result of the last year's worth of restructuring efforts, Mr. Buckfire admitted he had not even studied the question:

> Q . . . So do you have an opinion as you sit here today of what areas where the City is service delivery insolvent or close to it at least in your view? . . .
>
> A. I'm not really not current on that.
>
> Q. So you don't know?
>
> A. It's July, I haven't looked at this issue in a number of months so I am not current.
>
> Q. So you haven't studied the question?
>
> A. That's correct.

(Buckfire Dep. Tr. at 288:3–13.)

28.  <u>No Analysis Of DWSD Contribution to COPs Obligation.</u>  Though Mr. Buckfire stated he believed the COPs may get "zero" in a dismissal scenario, (Buckfire Dep. Tr. at 180:15-16), Mr. Orr admitted that in a dismissal scenario the COPs holders could rely on the DWSD to fund its proportionate share of expenses

related to COPs principal and interest. (7/22/2014 Orr Dep. Tr. at 373:22-374:7.) This contribution would total approximately 15% of the amounts due, which substantially exceeds the COPs' paltry recoveries under the City's plan. (Orr Dep. Tr. at 371:13-17) (testifying that DWSD funds are approximately 11% of the COPs). Nevertheless, Mr. Buckfire engaged in no analysis regarding the impact of the DSWD (or any DWSD transaction or contribution) on creditor recoveries. (*See* Buckfire Dep. Tr. at 297:22-298:8.) ("Q. But like the other assets of the City, it's not one that you've studied to determine its impact on creditor recoveries correct? A. In a dismissal scenario, that's correct.").

    29. <u>No Analysis Of Grand Bargain Revenue In A Dismissal Scenario.</u> Mr. Buckfire's assumes the City would not have the benefit of "hundreds of millions of dollars" from the Grand Bargain in a dismissal scenario, (Buckfire Report ¶ 8), but he never evaluated whether the City would be able to solicit funding from the Grand Bargain participants in a dismissal scenario:

> Q. Have you evaluated the extent to which [the Grand Bargain] might be reconstituted in a dismissal?
>
> A. That's speculation and I've already testified we haven't done a dismissal analysis.

(Buckfire Dep. Tr. at 289:11–14.) Moreover, the utility of the Grand Bargain to COPs holders is entirely unclear, given that all of the proceeds resulting from the disposition of the DIA Art Collection are going to Classes 10 and 11. When asked

in his deposition if he could think of a way the Grand Bargain benefitted COPs holders, Mr. Orr was unable to do so. (Orr Dep. Tr. at 341:8–10.) Thus, the fact that the Grand Bargain might evaporate in the dismissal scenario says little about the impact on COPs holder recoveries from dismissal of the case.

30.  <u>No Analysis Of Reinvestment Initiatives In Dismissal Scenario.</u> Mr. Buckfire assumes in his report that the reinvestment initiatives proposed under the City's Plan are "necessary to provide adequate levels of municipal services," and in their absence the City will "further deplete the City's tax base." (Buckfire Report ¶17.) But Mr. Buckfire never evaluated the extent to which the City would engage in these initiatives in a dismissal scenario. (Buckfire Dep. Tr. at 277:24–278:4) ("Q. And so I take -- so you have never personally evaluated the extent to which the City would undertake the restructuring reinvestment initiatives in the dismissal scenario, correct? A. Correct.) Mr. Buckfire's opinion that the reinvestment initiatives could not be undertaken is not supported by the available evidence in light of Mr. Charles Moore's testimony that he saw no reason the City could not pursue these initiatives if the case were dismissed. (Moore Dep Tr. at 92:7–19.)

31.  The foregoing definitively shows that Mr. Buckfire's best interests opinion is unsupported by any reliable data, analysis, or relevant expertise. Labeling a witness an "expert" is not a license to spitball theories. Reliable expert

opinions require real work—applying sound analytical methods to reliable data—which is what Mr. Buckfire admittedly failed to do. Accordingly, the opinions Mr. Buckfire expresses in paragraphs 7–9 and 17 of his Report should be excluded for failure to meet the requirements of Rule 702. *See* Fed. R. Evid. 702 (allowing expert testimony only if it is based on reliable data and analysis); *Tamraz*, 620 F.3d at 671 ("The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion.") (quoting *Joiner*, 522 U.S. at 146); *Newell Rubbermaid, Inc. v. Raymond Corp.,* 676 F.3d 521, 527 (6th Cir. 2012) (same).

## CONCLUSION

32. For the foregoing reasons, Syncora respectfully requests that Mr. Buckfire's expert testimony regarding creditor recoveries in a dismissal scenario be excluded.

Dated:  August 18, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*