**Exhibit 6B**

**July 16, 2014 K. Buckfire Deposition Transcript**

## Page 1

```
 1       KENNETH BUCKFIRE, VOLUME 2
 2   IN THE UNITED STATES BANKRUPTCY COURT
 3     FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6
 7  In Re:            )  Chapter 9
 8
 9  CITY of DETROIT, MICHIGAN, )  Case No. 13-53846
10
11       Debtor.   )  Hon. Steven Rhodes
12  _____
13
14              VOLUME 2
15
16   The Videotaped Deposition of KENNETH BUCKFIRE,
17   a Rule 30(b)(6) witness,
18   Taken at 1114 Washington Boulevard,
19   Detroit, Michigan,
20   Commencing at 8:09 a.m.,
21   Wednesday, July 16, 2014,
22   Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

## Page 2

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2  APPEARANCES:
 3
 4  THOMAS F. CULLEN, JR., ESQ.
 5  Jones Day
 6  51 Louisiana Avenue, N.W.
 7  Washington, D.C. 20001
 8    Appearing on behalf of the Debtor.
 9
10
11
12  CORINNE BALL, ESQ.,
13  BENJAMIN ROSENBLUM, ESQ.
14  Jones Day
15  222 East 41st Street
16  New York, New York 10017
17    Appearing on behalf of the Debtor.
```

## Page 3

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2
 3
 4  CLAUDE D. MONTGOMERY, ESQ.
 5  Dentons US LLP
 6  1221 Avenue of the Americas
 7  New York, New York 10020
 8    Appearing on behalf of the Retirement Committee.
 9
10
11
12  JENNIFER K. GREEN, ESQ.
13  Clark Hill, PLC
14  500 Woodward Avenue, Suite 3500
15  Detroit, Michigan 48226
16    Appearing on behalf of the Retirement Systems for the
17    City of Detroit.
```

## Page 4

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2  ROBIN D. BALL, ESQ.
 3  Chadbourne & Parke, LLP
 4  350 South Grand Avenue, 32nd Floor
 5  Los Angeles, California 90071
 6    Appearing on behalf of Assured Guaranty Municipal
 7    Corporation.
 8
 9
10
11  GUY S. NEAL, ESQ.
12  Sidley Austin, LLP
13  1501 K Street, N.W.
14  Washington, D.C. 20005
15    Appearing on behalf of National Public Financing.
```

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 2 of 19

Page 177

KENNETH BUCKFIRE, VOLUME 2

Q. And so the substantial the creditors that you are referring to that have a more substantial claim than -- than my clients, who would be that?

A. Again we're talking about a dismissal scenario where you don't have the protection of Chapter 9, well obviously, the LTGOs, the UTGOs, one could argue even the pension and OPEB claim holders because they have executory contracts with the City. All those parties which have claims in the billions certainly swamp the claims of the COPs, and indeed, the question of the priority of the COPs claims because you're relying on the indirect credit of the City, I think would call into question whether in that scenario your clients would receive any value at you will.

Q. And so that's the basis of your opinion with respect to plans compared to treatment upon dismissal?

A. That's correct..

Q. Now, did you analysis the treatment under the plan and justification at a post it to the treatment upon dismissal which you just did here in this --

A. Mm-hmm.

Q. -- testimony when you came to this opinion?

A. Well, I'd also refer you to our June 2013 report where we showed that without intervention in this case

Page 178

KENNETH BUCKFIRE, VOLUME 2

intervention being the filing for bankruptcy protection, the percentage of City revenues being tasked to manage debt service obligations was growing to an unsustainable level. I believe the peak was 65 percent of total relevance including your clients' claims would absorb over 65 percent of all tax revenues, that's untenable, that's a liquidation scenario and the realty was that the City's experience prebankruptcy I think as a factual matter indicates that that scenario was having an enormously adverse consequence on the ability of the City to maintain itself, provide services, attract tax base and increase revenues.

Q. So now your testimony that you just gave, is it based on any analysis that was done by -- well, yourself, Miller Buckfire, or anyone else in connection with the City of what the recoveries for creditors would be outside of the Chapter 9? Did you do a full analysis saying this is what we anticipate would happen?

A. You mean a liquidation analyses?

Q. Yeah, an analysis of -- using your terms if the case were dismissed?

A. Cities don't liquidate, so we did not do that analysis.

Page 179

KENNETH BUCKFIRE, VOLUME 2

Q. And apart from a liquidation analysis did you do any analysis of well here's what we think would happen, here's the creditors we think would have a certain type of priority, here's the creditors we think would have a different type of priority here's how we think we testified yesterday the race to the courthouse might come out, did you do any analysis like that?

A. No.

Q. And why not?

A. We thought it was pretty obvious from the condition of the City prebankruptcy about how untenable the situation was and the fact that if you regard some level of City services as being the minimum requirement absorbing revenue there wouldn't be enough cash to pay our creditors, you can see that from the numbers.

Q. And breaking it down a little, did you consider even as to anyone particular group of creditors? Did you take any creditor type and sigh well here's a type of creditor that looking at this opinion might not do as badly in a dismissal scenario versus what they're getting in the bankruptcy.

A. Yes, we did that.

Q. And which creditor were you -- do you that for?

Page 180

KENNETH BUCKFIRE, VOLUME 2

A. Well, I've already testified to our work on a priority analysis, a so-called recovery analysis by creditor class and we came to a conclusion early on that the GO creditors might in fact have a better recovery in a liquidation scenario because they have the benefit of a tax pledge that might under southern scenarios give them a greater revenue from tax revenues albeit the claim, other than other GO creditors who had no specific revenue.

Q. Can you recall what the results were for any other class of creditors other than the GO? And you just mentioned the GO when you testified about that earlier.

A. Well, regrettably, I thought the recovery to COPs was likely to be zero in that scenario.

Q. And can you -- let me break that down a little. So the recovery to COPs you just said you thought might be zero. What factors went into that analysis?

A. Just my conclusion as to the status of their claims, relative to other claims against the City's revenues.

Q. So and by status, you mean priority and anything else?

A. Priority, lack of tax pledge, indirect nature of their claim against the City, the fact that they might not be classified as a general unsecured claim with other

Pages 177 to 180

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 3 of 19

## Page 181

KENNETH BUCKFIRE, VOLUME 2

claims that I would view as an economic matter you know our genuine secured claims with the comes forks the underfunded pension claim the healthcare claim they're all general unsecured claims as I understand that but it's certainly possible that you know some authority might take a different view that those claims require more dedication of revenues first ahead of the COPs.

Q. And so the analysis you did was to first of all prioritize the claims, secondly look within the priority and see well gee what is it they're claiming, what is their likelihood of having some kind of a security interest and things like you just mentioned and then you went through those factors and you applied them within each class. Is there a written report that does that?

A. No.

Q. And you did testify about this analysis yesterday, as well, circles incomes with the DWSD. Who would be the person within the City or -- whether it's Miller Buckfire who would be most knowledgeable about the specifics of that analysis, that recovery analysis?

A. Well, the development of the plan of reorganization, sorry plan of adjustment here was a collaborative

## Page 182

KENNETH BUCKFIRE, VOLUME 2

effort between ourselves, Ernst & Young, Conway MacKenzie. We took the lead in analyzing the claims' waterfall and the calculation of the series B notes and how that might be applied against those claims but the actual analysis of the City's plan was done by E & Y, and we contributed our analysis and our views on the balance sheet to their presentation which is now displayed in exhibits LA M of the POA.

Q. Okay, than analysis includes the analysis of the recoveries that you just testified about?

A. That's correct, which is also reflected in my expert report but in a different form.

Q. Okay, and if you can refer to your expert report, what are you referring to?

A. I think it's marked as attachment 1 which is actually a pro forma capitalization of the City it, it's not strictly by class but it does show from an equivalent gap presentation point of view what everyone's getting.

Q. And that would be titled that's the page for those of you who have it entitled City of Detroit pro forma capitalization July 2, 2014?

A. Correct.

Q. So looking at the debt obligations of the COPs that

## Page 183

KENNETH BUCKFIRE, VOLUME 2

are listed there, prepetition ballots, what is that a bill I don't know-four, a bill I don't know 473?

A. For the COPs?

Q. Yes.

A. Yes, but I believe this balance includes prepetition interest as well so the billion four seven at this three includes accrued but unpaid interest.

Q. And then under the column claim, reduction of claim, what does that represent?

A. That's just a deduction based on what the debt obligations receiving pursuant to the plan and then this is what they're not receiving so in case of the COPs, the 1.473 billion of claim they'd be receiving 162 million of the series B note and the change, the difference is $1,311,000,000.

Q. So it's being reduced by 89 percent?

A. That's right. Which is comparable with the other similar situated claims. The notes, loans payables, and other unsecured liabilities.

Q. Is there a backup for this that analyzes it any -- any further?

A. Well, this is a summary of information contained in the POA, so you have to go back to the POA and look class by class to determine what treatment is

## Page 184

KENNETH BUCKFIRE, VOLUME 2

proposed. Of course, in the POA itself, we would stipulate that the COPs recovers zero for legal reasons but not resulted to the pro rata claims analysis that we had done.

Q. And what we're talking about now is the pro rata claims analysis that we've already referred to, correct.

A. That's right.

Q. That separate and apart from any legal analysis --

A. That's right, and of course the COPs as I mentioned before, takes into account that we are only allowing 40 percent overall COPs claim, which is one of the reasons that it is so used reduced.

Q. So separate and apart from the plan of adjustment, because I've reviewed the plan of adjustment, are there any analyses other than those that are attached to the plan of adjustment, referred to in the plan of adjustment and attached as exhibits which you know there are many?

A. Mm-hmm.

Q. Other than those do you know of any analysis regarding the pro ratas on a recovery basis that you've just referred to?

A. No.

Pages 181 to 184

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 4 of 19

Page 233

KENNETH BUCKFIRE, VOLUME 2

Q. claims against the City are pursuant to the service contracts, correct?

A. I am.

Q. And do you understand that those are direct claims against the City?

A. I do.

Q. Do you remember that there was conversation with Mr. Soto about the fact that there is $162 million in B notes, face value B notes going to the -- class 9?

A. I do.

Q. Is that the total amount that's going into the reserve established for class 9 or is that the present value of the total face value? Because in my mind there is -- something's not adding up there and so I want to try and understand it.

A. Well, when you say it's not adding up, what is it not adding up to?

Q. So I thought that the way it worked was that a reserve was set up --

A. Mm-hmm.

Q. -- and that the reserve was on a nominal basis without present valuing 15 percent of the total amount of COPs in B notes, meaning approximately $210 million in B

Page 234

KENNETH BUCKFIRE, VOLUME 2

notes -- and by the way, I could have this all wrong, 210 million in B notes go into the reserve in the event the COPs all try to litigate their rights and are all vindicated, they would actually get 15 cents in nominal face value B notes, that the 40 percent discounted face value is only applied to a settling COP holder who decided not to take the risk of litigation and said I would like what I can get today. That's my understanding, whether it's right or not is up to you to decide, but what I'm trying to understand is what is that $162 million figure from your attachment 1 or whatever that one is?

A. That's our calculation of the share that the COPs would have, the total amount of B notes the City is going to issue pursuant to the plan, so again if you look at attachment 1, and albeit this is a summary of information contained in greater detail in the plan itself, the City is going to be issuing approximately $650 million of series B notes, present value.

Q. 632 maybe?

A. Well, you have -- yeah, because you have to deduct the exit financing from the billion 249, you got to deduct the UTGO bonds and the LTGO DSA series. That leaves you with, you know, 632, 650.

Page 235

KENNETH BUCKFIRE, VOLUME 2

Q. So is it your understanding that the reserve -- the total amount of reserve on a nominal basis is 162 million in B notes?

A. I'd have to go back and check the math against that. That's my general recollection. But I have to go back and verify it.

Q. Okay.

A. I haven't looked at that in a while.

Q. Let me turn it around on you a bit and say do you know whether -- take a look there at the pro forma obligation, are any of those other numbers standing out to you as ones that are present valued or represent nominal amounts? Like look at the OPEB UAAL, is the 450 million -- do you remember, isn't that 450 in face B notes?

A. Yes.

Q. Okay, does that lead you to believe that the other numbers you've represented on the pro forma are face value B notes?

A. Hold on a second. I'm just -- you want to know whether these are present value numbers or nominal numbers --

Q. Yeah.

A. -- or par amount?

Page 236

KENNETH BUCKFIRE, VOLUME 2

Q. Yeah.

A. Oh, okay. These are the par amounts of the notes being issued, okay? There's no present value calculation of these notes, we have not actually done a valuation of the notes from a market point of view yet.

Q. Now, isn't it true that in coming to your opinion that creditors do better under the plan than they would do in a dismissal scenario you did not construct a forecast of the City's revenues and costs in a dismissal scenario, correct?

A. Correct.

Q. And no one else has either, correct?

A. Correct.

Q. Now, your opinion that creditors are doing better under the plan than they would in a dismissal scenario is based on in part on the assumption that the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue; is that correct?

A. That's right.

Q. I quoted that from your report. Sound familiar?

A. It does.

Q. Has a ring to it. So let me separate unable and

Pages 233 to 236

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 5 of 19

## Page 237

KENNETH BUCKFIRE, VOLUME 2

impractical, okay, Mr. Buckfire?  What is the basis for your assumption that the City would be unable to raise taxes in a dismissal scenario?

A. Well, it's -- I'll take it as a fact because it was reported in our June 2013 report that the City was already at the state-allowed maximum property tax millage rates, and therefore, has no further ability to raise the rate for property tax point of view.  I believe the income tax rate, itself, is already quite high relative to neighboring communities, so that gets to the question of both impracticability and inability.

Q. And I'm holding impracticability to one side, I'm talking about inability now.

A. Yes.  There's also the inability, and this is again a fact, that prior to the bankruptcy -- and it's getting better slowly, the City proved -- how should I say this nicely, consistently unable to collect taxes due.  Which is a failure of the City administration in executing its responsibilities to collect taxes that have been assessed.  So even if you wanted to raise the rate, you can't make people pay you, and if they aren't going to pay you and you make no effort to collect it's sort of irrelevant what the rate is.

## Page 238

KENNETH BUCKFIRE, VOLUME 2

Q. Now, with respect to the caps that are imposed on the City with respect to income taxes and property taxes, did you evaluate whether or not those caps are applicable to a party who gets a judgment against the City?

MR. CULLEN:  Do you have a -- is that a legal question?

MR. BALL:  It certainly is kind of a -- it's a mixed question of law and analysis that would go -- we're already talking about legal matters when we talk about caps, those are statutes, right, the cap?

MR. CULLEN:  Do you have an understanding?

BY MR. HACKNEY:

Q. Yeah.

A. I have a general understanding.

Q. What is your general understanding?

A. That it's under certain circumstances a creditor might seek a judgment requiring the City to raise taxes.

Q. Okay.

A. But whenever we -- I don't recall discussing this issue, I was quickly reminded that the City already has the highest property tax rates in the State of Michigan and that even if we wanted to raise taxes and

## Page 239

KENNETH BUCKFIRE, VOLUME 2

could raise taxes, it would simply drive people out of the City more quickly, so you might end up in a situation that the higher you raise your rates the less revenue you collect.

Q. So if I understand your testimony, what you're saying is if a creditor got a judgment against the City, it might make it so that the City was able to impose taxes above the statutory caps but the heightened tax would not yield additional revenue because it is impractical to raise taxes in any event --

A. Right.

Q. -- is that correct?

A. Correct, otherwise known a Pyrrhic victory.

Q. A Pyrrhic victory or you can't get blood --

A. Blood from a stone, another way of saying it.

Q. It's got to be turnip, I'm sure.  No one would ever think you could get blood out of a stone, I think it's water out of a rock.

MR. CULLEN:  Proverbs are various.

BY MR. HACKNEY:

Q. Well, we should definitely get them all I think straight, but I take it you did not undertake an analysis of the amount of tax increase that could be imposed via a creditor judgment against the City to

## Page 240

KENNETH BUCKFIRE, VOLUME 2

determine whether it would yield additional revenue?

A. Not directly, but we did ask the tax experts at E&Y to do an analysis of the City's revenues and take into account the sensitivity of revenues to tax rates.

Q. So you asked Mr. Klein at E&Y?

A. I did.

Q. And you asked Mr. Klein to study the question of what would additional taxes yield in the way of revenue?

A. Well, not that -- I asked him to identify what the sensitivity of the City's revenues would be to changes in tax rates because the change of tax rates relative to surrounding communities will have an influence on whether or not people want to live here or in Southfield, Michigan or any neighboring suburb.

Q. So you asked him to study the impact a tax increase or a tax decrease would have on the tax base, correct?

A. Correct, I did.

Q. And what did he tell you?

A. You know, I've reviewed his expert report and I've talked to him over months about these issues.  His conclusion was that because the City already has very high tax rates, any further increase in rates would certainly lead to a decline of revenue but that a maintenance of rates was probably sustainable from a

Pages 237 to 240

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 6 of 19

## Page 241

KENNETH BUCKFIRE, VOLUME 2

revenue point of view, but that a decline of rates would over time have the ability to improve overall collections, but it would take a long time to demonstrate that effect.

Q. And did you rely on Mr. Klein's opinion in reaching your own opinion?

A. Yes, because his opinion underpins the revenue projections and therefore the cash flow projections of the City's plan.

Q. And did Mr. Klein also opine that increasing taxes would not yield marginal revenue?

A. He certainly told me that, but again to be very specific we're talking about property tax revenues.

Q. Yes.

A. Okay.

Q. Understood. And did you rely on that information from Mr. Klein in reaching your conclusion about the fact that City's not going to generate additional revenue from raising taxes?

A. Yes.

Q. Did you take any steps to pressure test Mr. Klein's advice to you that raising taxes would not yield marginal revenue?

A. No, I haven't done mathematical economics in a really

## Page 242

KENNETH BUCKFIRE, VOLUME 2

long time and he is a very well-qualified econometrician and so I relied on him.

Q. So with respect to your conclusion that it would be impractical to raise taxes, have you told me everything that you've done with respect to reaching that conclusion?

A. Yes.

Q. Now, have you reviewed the testimony of Mr. Evanko, the City's senior assessor?

A. No.

Q. Have you ever spoken to that man?

A. I have not.

Q. Did you speak to anyone in the treasury department about your -- your findings with respect to the City's -- the impracticality of the City's raising taxes to generate marginal revenue?

A. Only in the context of could the state assist the City in collecting income taxes. All right. I had several conversations with former State Treasurer Dillon last year, because it had been a proposal by the City for many years to ask the state to do withholding of City income tax on people who were working in the City but not living in the City.

Q. Okay.

## Page 243

KENNETH BUCKFIRE, VOLUME 2

A. And I asked him specifically what the state could do to assist the City in terms of collecting more efficiently those kinds of income taxes.

Q. So other than the notion of collecting more efficiently the taxes you're already assessing or imposing, you did not discuss with the treasury department whether increasing taxes would yield marginal revenue, correct?

A. That's correct.

Q. Now -- and isn't it fair to say that you, yourself, did not do any forecasting of future revenues in a scenario where the petition was dismissed?

A. Correct, we relied on Ernst & Young.

Q. And I'll come back to that in just a second. Ernst & Young, they did not do a forecast for the situation where the petition is dismissed, correct?

A. That's correct.

Q. They did a forecast for the future ahead in the absence of the restructuring, correct?

A. They did a forecast assuming the restructuring was successful. Which forecast are you referring to?

Q. In the June 2000 --

A. Oh, I see.

Q. They did the so-called steady state forecast, right?

## Page 244

KENNETH BUCKFIRE, VOLUME 2

A. Yes, that was a just a roll forward of the City as they see it at that point.

Q. As they found it?

A. Yeah.

Q. And you have never seen from them a forecast of what would happen if the case were dismissed in the next couple months, correct?

A. No.

Q. Am I correct?

A. That's right.

Q. Now, is forecasting future revenues of a municipality something that falls within your area of expertise as an expert?

A. No.

Q. It's not something that you could do if you wanted to?

A. I could probably do it, but I'm not an expert. That's why we sought out Ernst & Young to provide that service because Mr. Klein is uniquely qualified to do it.

Q. Okay, and did you ever ask Mr. Klein to perform a forecast of the City's performance if the petition were dismissed?

A. No.

Q. Are you familiar with the Government Finance Officers

Pages 241 to 244

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6787-7    Filed 08/18/14    Entered 08/18/14 10:29:34    Page 7 of 19

1  KENNETH BUCKFIRE, VOLUME 2
2  Association?
3  A. No.
4  Q. I take it it's fair to say that you did not consider
5     any of their forecasting techniques to consider City
6     revenues in the case the petition were dismissed?
7  A. No, once we brought on Ernst & Young to provide the
8     service we relied upon them.
9  Q. Okay, and you have not employed any econometric models
10    to determine the future revenues in the City in the
11    event different types of taxes were increased,
12    correct?
13 A. Correct.
14 Q. You did not conduct any time series analyses to
15    determine future revenues of taxes were increased,
16    correct?
17 A. Correct.
18 Q. You have not conducted linear multiple regression
19    analysis to evaluate future revenues if taxes were
20    increased, correct?
21 A. Correct.
22 Q. And nor has anyone else to the best of your knowledge,
23    correct?
24 A. That's correct.
25 Q. Now, you also say that material increases in taxes

1  KENNETH BUCKFIRE, VOLUME 2
2     will likely increase delinquency rates and cause
3     residents to leave the City; do you recall that
4     opinion from your report?
5  A. I do.
6  Q. What do you mean by a material tax increase?
7  A. Materiality is always subject to judgment, but it's
8     probably something greater than 10 percent.
9  Q. Okay.
10 A. That would be regarded as material particularly on the
11    property tax side.
12 Q. Okay. Did you do any quantitative analysis to
13    determine the impact of a less than 10 percent tax
14    increase on City revenue?
15 A. No.
16 Q. Do you know what the City's current delinquency rates
17    are for property taxes?
18 A. I don't.
19 Q. Do you know what they are for income taxes?
20 A. No.
21 Q. Have you ever studied either of those questions?
22 A. I did last year at the time the June 2013 report was
23    being produced, but I haven't really looked at that
24    issue since then.
25 Q. And let me just tell you that I know that it is

1  KENNETH BUCKFIRE, VOLUME 2
2     described in the report but were you the one that
3     actually conducted the study to determine the answer
4     or did you just -- are you just saying that you saw it
5     in that report?
6  A. I say that in the report. The work was done by Conway
7     MacKenzie and Ernst & Young.
8  Q. Okay, so you personally have not studied the question?
9  A. That's correct.
10 Q. And you have never done anything to pressure test
11    Conway MacKenzie's findings, correct?
12 A. Correct.
13 Q. Now, have you ever quantified how much delinquency
14    rates would increase in different scenarios where
15    taxes are increased?
16 A. You're asking me whether I pressure tested this a
17    different way.
18 Q. Well, the first -- when I was asking about that
19    pressure testing I was saying you never checked to see
20    what they found to be the delinquency rates, whether
21    that was correct?
22 A. That's correct.
23 Q. Okay, but this is a different question which is, did
24    you ever attempt to quantify how delinquency rates
25    would go up if taxes went up?

1  KENNETH BUCKFIRE, VOLUME 2
2  A. No.
3  Q. Are you aware of any data showing that increasing
4     taxes will increase delinquency rates in the City of
5     Detroit?
6  A. Only by inspection of the City's historical record as
7     tax rates went up, my understanding from City
8     officers, including Jack Martin with whom I discussed
9     this issue, was the delinquency rate went up, as well
10 Q. Ah, so you're -- you're under the impression that
11    there's historical evidence in the City of Detroit
12    that shows a connection between increasing tax rates
13    and increasing delinquency rates?
14 A. It was anecdotal at the time he told me that.
15 Q. So you were told that by Mr. Martin. Did you ever
16    attempt to confirm that?
17 A. No.
18 Q. Do you know whether the incomes tax in the City has
19    gone up or down over the last 15 years?
20 A. Are you talking about the rate or the revenues
21    collected?
22 Q. The rate, sorry.
23 A. I don't.
24 Q. Do you know whether --
25 A. But I'm referring to property taxes.

Pages 245 to 248

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-7  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 8 of 19

**KENNETH BUCKFIRE, VOLUME 2**

Q. So let's not miss each other, so separately you don't know whether income taxes have gone down over the last 15 years, correct?
A. **I don't.**
Q. And you don't know whether there's a historical connection in Detroit between the income tax rate and the delinquency rate, correct?
A. **That's correct.**
Q. You've never studied that connection?
A. **No.**
Q. Now, you were saying that your conversation with Mr. Martin was limited to the subject of property tax rates, correct?
A. **Correct.**
Q. And that what he told you was that property tax rates had increased, and as they had increased, delinquencies had increased, correct?
A. **Correct, it was all part of the blight issue because as they assess property taxes people would walk away from their houses and that would become blighted and that would be counted as a delinquent tax issue by the City.**
Q. Have you attempted to the economic literature for scholarly articles connecting tax rates and

KENNETH BUCKFIRE, VOLUME 2
delinquency rates?
A. **No.**
Q. Have you reviewed data from any other cities with respect to their tax increases and their delinquency rate increases for either income or property taxes?
A. **No.**
Q. Do you know whether the relationship between increasing taxes of either property or income and the delinquency rates associated with income or property taxes is a linear relationship?
A. **I don't.**
Q. If property taxes are increased by 10 percent, which is right at the threshold of materiality as you identify it, what will the percentage increase in delinquencies be?
A. **I don't know.**
Q. Do you believe that increasing the casino tax will increase delinquencies in the City of Detroit?
A. **I don't see what the correlation would be.**
Q. I take it so that the answer is no?
A. **No.**
Q. And what about the utility users tax, if the utility users tax goes up will delinquencies go up?
A. **I think it would have a minimal impact on that.**

**KENNETH BUCKFIRE, VOLUME 2**

Q. I take it you have not studied the issue of whether increases in either the casino tax or the utility users tax would generate marginal revenue, correct?
A. **That's correct.**
Q. You also say that one of your assumptions is that an increase in taxes will cause people to leave; is that correct?
A. **Yes.**
Q. Have you conducted any analysis to determine how many people will leave under different scenarios where taxes are increased?
A. **No.**
Q. Do you know what the historical relationship between tax increases and population levels is in the City of Detroit?
A. **Well, it's not a simple correlation, there are many other factors that have led to population loss. Certainly increasing tax rates has been a contributing factor to the population leaving the City but not the only factor.**
Q. And what's your basis for that opinion?
A. **Just my knowledge of the City and, you know, looking at the City's revenues, adjusted for population, knowledge of the City's local economy and conditions**

**KENNETH BUCKFIRE, VOLUME 2**
here.
Q. Anything else?
A. **No.**
Q. There's obviously been a number of other things going on in this area in addition to whatever tax policy has been, correct?
A. **Which is what I just testified to.**
Q. Yeah, and I wanted to clear, so you've had significant deindustrialization, correct?
A. **That has been a major factor of the deadline in population in the City.**
Q. You have not conducted, however, any quantitative analysis assessing the relationship between tax rates and population levels over historical time periods in Detroit, correct?
A. **Correct.**
Q. Do you know if Detroit raised property taxes by 30 percent how many people would leave?
A. **No.**
Q. What is the City's current millage rate on residential homes; do you know?
A. **Not off the top of my head.**
Q. Do you know it approximately?
A. **I'd just be guessing, I don't -- I don't recall.**

Pages 249 to 252

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-7  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 9 of 19

## Page 253

KENNETH BUCKFIRE, VOLUME 2

2 Q. Okay, what about nonresidential properties? What's
3 the millage rate on them?
4 A. I don't recall the rates.
5 Q. Do you know how the City's property taxes compare with
6 the surrounding municipalities' property taxes?
7 A. It was all disclosed in the June 2013 report. We did
8 do a selected summary of total taxes paid by community
9 on that type, that was disclosed.
10 Q. Is that the extent of your knowledge on the subject?
11 A. Yes.
12 Q. And you didn't perform that data collection, correct,
13 you're just -- you just saw it, right?
14 A. That's right.
15 Q. So do you know whether it's accurate or not?
16 A. I don't.
17 Q. Okay. You have not undertaken a comprehensive study
18 of what surrounding municipalities levy when it comes
19 to property taxes, correct?
20 A. Correct.
21 Q. Are you currently of the view that there is no
22 surrounding municipality that has higher property
23 taxes than the City of Detroit?
24 A. No.
25 Q. You're not of that view?

## Page 254

KENNETH BUCKFIRE, VOLUME 2

2 A. I don't know.
3 Q. Oh, there may be, there may not be, you don't know?
4 A. I don't know for a fact.
5 Q. Do you know how many cities in the metropolitan --
6 what does MSA stand for?
7 A. Metropolitan statistical area.
8 Q. There you go. In the MSA -- showoff -- have a
9 population of more than 50,000?
10 A. Let's see, in this area, it would be Detroit,
11 Southfield, probably Troy, probably Dearborn, those
12 are the ones that I would assume would be in that
13 category.
14 Q. Do you agree that blight remediation will have a
15 positive impact on property values in Detroit?
16 A. Yes.
17 Q. And are you aware that property -- that certain blight
18 remediation will take place even if the petition is
19 dismissed?
20 A. Yes.
21 Q. And have you evaluated the extent to which that blight
22 remediation will have a positive impact on property
23 values in the City of Detroit?
24 A. No.
25 Q. Now, are you aware that the City recently reduced its

## Page 255

KENNETH BUCKFIRE, VOLUME 2

1 taxable value on assessed -- on properties in its
2 jurisdiction by approximately $1 billion?
4 A. I am.
5 Q. And what do you know about that, just that it
6 happened?
7 A. I know that it happened.
8 Q. And have you evaluated the extent to which that
9 decrease has an impact on property owners' ability to
10 withstand an increase in the rate?
11 A. Nope.
12 Q. Do you know the difference between taxable value and
13 state equalized value?
14 A. No.
15 Q. Do you agree that the City's property tax enforcement
16 mechanism has been ineffective in recent years?
17 A. Is that -- yes, I would agree with that statement.
18 Q. And what I mean by the enforcement mechanism is I mean
19 the folks at the City who are responsible either for
20 defending assessed values or for collecting property
21 taxes; is that what you understand --
22 A. It has been very ineffective.
23 Q. Okay, now, have you studied the question to see the
24 extent to which it is the broken enforcement mechanism
25 that is driving delinquencies as opposed to the tax

## Page 256

KENNETH BUCKFIRE, VOLUME 2

2 rates?
3 A. I've already testified to this that certainly the
4 City's inability to officially collect assessed taxes
5 has been a problem in terms of overall revenues being
6 generated by those taxes.
7 Q. And so the corollary of that is if you fix the
8 enforcement mechanism you'll see delinquencies go
9 down, correct?
10 A. Or you might see more foreclosures because people
11 really refuse to pay the taxes and they walk away from
12 their homes.
13 Q. And so do you understand, however, that the better you
14 are enforcing your mechanism the more of a signal
15 you're sending to the body politic that it needs to
16 pay its taxes?
17 A. Yes.
18 Q. And so better enforcement can lead to decreased
19 delinquencies, right?
20 A. I would hope so.
21 Q. But you did not study the extent to which improved
22 enforcement would reduce delinquency rates, correct?
23 A. Correct.
24 Q. Have you studied the impact -- and by the way, have
25 you reviewed the Plante Moran report?

Pages 253 to 256

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 10 of 19

Page 257

KENNETH BUCKFIRE, VOLUME 2

  A. Which one?
  Q. The one they did on the assessor's office?
  A. No.
  Q. Have you studied the impact that improvements to the assessor's office will have on property tax collections?
  A. I haven't studied it, no.
  Q. Do you -- are you aware that some of those improvements have already taken place?
  A. Yes.
  Q. Okay, and do you know the extent to which they have all already taken place?
  A. No.
  Q. Have you studied the impacts that improvements to the treasurer's office will have on the collection of either income or property taxes?
  A. No.
  Q. And do you know the extent to which there have already been made improvements to the treasurer's office?
  A. I know there were programmed improvements, yes.
  Q. You know some have -- have been made to date?
  A. They were supposed to have been made.
  Q. And do you know the extent -- do you know the percentage of the improvements that have already been

Page 258

KENNETH BUCKFIRE, VOLUME 2

made to the ones that are anticipated to be made to that office?
  MR. CULLEN: Counsel, the percentage of initiatives, of dollars, of -- percentage of what?
BY MR. HACKNEY:
  Q. Either way, just in terms of when it comes to treasury --
  A. Mm-hmm.
  Q. -- you know, how far are they along in their restructuring the department in terms of what's been done to date versus what's in the future?
  A. No.
  Q. Now, you -- you state that the City's tax burden is objectively very high; do you recall that in your report?
  A. I do.
  Q. What do you mean by objectively?
  A. When you compare the taxes paid by a resident of Detroit relative to a resident of a surrounding community, especially when adjusted for per capita income, the City resident is paying a higher tax burden than a resident, for example, of Southfield or Dearborn.
  Q. Now, did you take any steps to compare the total tax

Page 259

KENNETH BUCKFIRE, VOLUME 2

burden, state, federal and city, of the average Detroiter and compare it to residents of other cities?
  A. No.
  Q. Do you know how Michigan income taxes compare to other states?
  A. In general, they are higher than some and lower than others.
  Q. Okay, but do you have a sense of where they fall on the 50 states?
  A. They're toward the higher end.
  Q. They're towards the higher end?
  A. Yes.
  Q. And what about sales tax?
  A. Sales tax is also on the higher end.
  Q. Have you -- even if you haven't conducted it, have you seen any analysis of the total tax burden on Detroiters as compared to the total tax burden imposed on citizens of other municipalities?
  A. I recall looking at a study like that maybe two years ago, but I don't recall any more recent than that.
  Q. Are you aware that the City of Atlanta increased property taxes by 36 percent in 2009?
  A. No.
  Q. Have you taken any effort to try and study either the

Page 260

KENNETH BUCKFIRE, VOLUME 2

internet or published literature or anything to determine whether there are other municipalities out there that have made significant increases in a given year to a particular type of tax like property taxes?
  A. No, with the exception of Chicago.
  Q. All right, and the recent proposal?
  A. Yes.
  Q. I'm certainly paying attention to that one.
  A. I bet you are.
  Q. Actually, I live in Evanston but I think I'm covered by the same taxing authority.
     I take it you haven't conducted any analysis of the impact that Atlanta's property tax increase had on its economy, correct?
  A. That's correct.
  Q. And are you aware that the City of Boston increased property taxes by 15 percent in 2009?
  A. No.
  Q. Haven't studied that either, correct?
  A. That's right.
  Q. Have you undertaken a review of the economic -- of the literature regarding the impact of increasing taxes on economic growth?
     MR. CULLEN: I think you asked him that

Pages 257 to 260

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 11 of 19

Page 273

KENNETH BUCKFIRE, VOLUME 2

A. You're assuming we don't pay their interest when due or the contract revenues when due?

Q. You already have not done so, sir.

A. I know that.

Q. Yeah.

A. So upon dismissal you're assuming we would continue not paying those service contracts.

Q. I actually think it doesn't matter whether you do or not. I think the acceleration happened, but that's just my opinion.

A. I see. No, we never considered that.

Q. You have not considered that. And I take it you haven't considered whether the UTGO or LTGO are accelerated upon dismissal of the bankruptcy or have previously been accelerated?

A. No.

Q. As you sit here today, do you know what the amount of the pension trust claim against the City is? I mean in the dismissal scenario.

A. Well, if you terminate the plans, this is where I'm trying to -- there are two different scenarios on the pension side. One is which the plan continues but you don't fund it, in which case the unfunded benefit is, you know, a cost -- that is perhaps as little as 3

Page 274

KENNETH BUCKFIRE, VOLUME 2

perhaps as much of $4 billion dollars of underfunding as opposed to a termination of the plan, which would actually have created larger underfunding, which is one of the reasons that the City has taken the position we don't terminate the plans we'd rather freeze them. So in the dismissal scenario, which is what you're referring to, and we assume that we're not terminating the plans, I assume we would continue to have the obligation to fund whenever we can afford to fund; otherwise, we would be in default under our payment obligations.

Q. Okay, and the amount of the claim that the pension system would have upon dismissal would be the amount of the outstanding annual amount for that year?

A. Which we haven't paid.

Q. Yes, which you have not paid, is that your --

A. That's my understanding.

Q. And similarly the OPEB claimants would have their right to receive payment for the healthcare that they were entitled to that year, correct?

A. Correct.

Q. Okay. What about with UTGO or LTGO, what would the size of their claim be against the City upon dismissal?

Page 275

KENNETH BUCKFIRE, VOLUME 2

A. Well, they have, as I mentioned before, in theory the right to tax revenues because they have revenue pledges, correct? So they would have presumably the same status and they would move to enforce their rights to receive all those tax revenues and, I believe, ask for relief not to share those revenues with the City general fund.

Q. Did you evaluate whether the City is in breach of the CETs? Do you know what those are?

A. I do.

Q. The City Employment Terms?

A. Yes.

Q. Yeah, is the City in breach of the CETs?

A. I don't believe we are.

Q. And you know the City has struck a number of collective bargaining agreements recently?

A. Yes, which is why I don't believe we are in breach of the CETs because they have been replaced --

Q. Let's bring it up to the present. You're aware the City has struck collective bargaining agreements with all of its unions, correct?

A. Yes.

Q. Other than the one fire union?

A. Right, I am aware of that.

Page 276

KENNETH BUCKFIRE, VOLUME 2

Q. To the best of your knowledge, is the City in compliance with all of these collective bargaining agreements that it just struck?

A. To my knowledge, yes.

Q. Okay, isn't it are your expectation that active employees would not be people that had claims against the City in the dismissal scenario?

A. So long as we honor the terms of their agreements.

Q. What conclusion did you reach regarding the total number of claims that would be asserted -- total dollar value of claims that would be asserted against the City in a dismissal scenario?

A. It would be the sum of all the funded debt obligations, which we've already discussed, which includes the COPs and the GO debt and the pension and OPEB claim holders, which presumably we could not satisfy on an ongoing basis.

Q. And I take it you've never sat down with a piece of paper and tried to work this out, right, in terms of what the total claim size would be, correct?

A. Correct, we've not done a dismissal analysis.

Q. Okay.

A. I testified to that previously.

Q. Yeah, and I -- fair enough. Is it your understanding

Pages 273 to 276

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-7  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 12 of 19

## Page 277

1  KENNETH BUCKFIRE, VOLUME 2
2  that the City would not be able to undertake the
3  restructuring and reinvestment initiatives if the
4  petition were dismissed?
5  **A. It could only do so if it suspended payments to as**
6  **many of its creditors as possible.**
7  Q.  And have you made an assumption about what the City
8  would or would not do in the event the petition were
9  dismissed?
10 **A. Well, I've already testified that back in, this was**
11 **December or January when the court initially declined**
12 **to approve the postpetition financing, we gave**
13 **consideration to how we would operate the City in the**
14 **event that we lost access to our required cash. We**
15 **began to think about that problem at that point. I**
16 **asked Ernst & Young and Conway to start developing an**
17 **emergency plan in the case that we lost access to**
18 **that, which we ultimately never actually went ahead**
19 **and did because it turned out we did get access to**
20 **postpetition financing. It was only in that context**
21 **we ever examined a worst-case scenario in which the**
22 **City had to, you know, allocate its remaining capital**
23 **to essential projects.**
24 Q.  And so I take -- so you have never personally
25 evaluated the extent to which the City would undertake

## Page 278

1  KENNETH BUCKFIRE, VOLUME 2
2  the restructuring reinvestment initiatives in the
3  dismissal scenario, correct?
4  **A. Correct.**
5  Q.  Now, I think that you testified about this with
6  respect to Mr. Soto, but I was catching up a little
7  bit.  Is it your understanding that in the dismissal
8  scenario, creditor recoveries would be on a pari passu
9  basis?
10 **A. Not all creditors.**
11 Q.  Okay, which ones would be and which ones would not as
12 -- in your assumption?
13 **A. Well, the UT and LTGO bondholders would be, in my**
14 **judgment, at a higher priority than other creditors**
15 **because they have the benefit of a tax pledge. It's**
16 **my view that the other creditors to the City should be**
17 **thought of as general unsecured claim holders and**
18 **therefore treated roughly the same.**
19 Q.  Okay, so the general unsecured claim holders would be
20 recovering on a pari passu basis in the dismissal
21 scenario, correct?
22 **A. That would be my assumption, which is consistent with**
23 **the June 2013 proposed treatment of those creditors.**
24 Q.  So your estimation of COPs holder recoveries in the
25 dismissal scenario is that they would receive zero; is

## Page 279

1  KENNETH BUCKFIRE, VOLUME 2
2  that correct?
3  **A. I didn't say that.**
4  Q.  I thought -- so what is your -- let me ask this then.
5  What is your estimation of what COPs holders would
6  recover in the dismissal scenario?
7  **A. I think they're likely to recover zero, not because of**
8  **their classification as a creditor, which is -- I want**
9  **to be very clear about that, but just because the City**
10 **will have little or no value to distribute because its**
11 **remaining cash flow, right, will not be sufficient**
12 **once you get through allocation to the GO bondholders**
13 **and provide for essential City services to provide any**
14 **discretionary cash flow available for future debt**
15 **service, which would include sharing that cash flow**
16 **with other general unsecured claim holders, because on**
17 **the map that we use -- and this goes back to the June**
18 **2013 report, the COPs claims are a billion four, at**
19 **the time we believed that we had perhaps as much as**
20 **$10 billion of other claims. So on a best-case basis**
21 **if the COPs share pro rata, they might get at best 15**
22 **cents of whatever we had available to the overall pool**
23 **of general unsecured claim holders, that's the best**
24 **they could do, but if we have nothing to give anybody,**
25 **that is, no security that would trade in the market at**

## Page 280

1  **KENNETH BUCKFIRE, VOLUME 2**
2  **anything close to a fair value, yeah, they could get**
3  **zero.**
4  Q.  But that analysis assumes that all the other general
5  unsecured claims have accelerated, correct?
6  **A. Yes.**
7  Q.  Now --
8  **A. Or have a claim on the cash flow of the City, which**
9  **further reduces the amount of value available to**
10 **accelerate the claims.**
11 Q.  Okay.  But you haven't actually done the analysis,
12 though, to see who would get any surplus revenue that
13 exists above operating expenditures and secured debt,
14 correct?
15 **A. You've already asked me this, we have not done a**
16 **dismissal analysis.**
17 Q.  I'm sorry, I don't mean to go over and over, I just --
18 make sure I haven't asked it in a different way.
19 **A. Anxious to get the answer which I can't give you.**
20      MR. CULLEN:  Some kind of turnip or dead
21 horse or something.
22 **A. Is there a metaphor we haven't turned up yet?**
23      MR. CULLEN:  It's blood out of a stone.
24 Yeah, because you can't get blood out of a stone.
25      MR. HACKNEY:  I can't -- I'm not going to

Pages 277 to 280

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 13 of 19

1  KENNETH BUCKFIRE, VOLUME 2
2  use them again. I shot the wad on all three of them,
3  although shot the wad is a good one.
4      MR. CULLEN: Gray area.
5      MR. HACKNEY: I'm sorry, I agree. Let's
6  move on, I'm sorry.
7  BY MR. HACKNEY:
8  Q. These ad valorem taxes for the UTGO, you're familiar
9     with what those are?
10 A. In general, yes.
11 Q. Have you -- have you determined the extent to which in
12    a dismissal scenario a UTGO holder would be paid in
13    full?
14 A. No.
15 Q. So you don't know the answer to that question?
16 A. Only in the -- only with respect to the revenues that
17    the City has been collecting relative to the millages
18    that applied to these UTGOs which have been
19    insufficient to cover the debt. You are aware that
20    for years the City was supposed to be collecting this
21    millage but did not do so, and therefore, the ultimate
22    resolution of the UTGO claim had to take recognition
23    of that fact, the revenues were not sufficient.
24 Q. But you haven't studied the question of whether in a
25    dismissal scenario UTGO would get more than 74 cents

1  KENNETH BUCKFIRE, VOLUME 2
2  on the dollar, correct?
3  A. That's right.
4  Q. One of your assumptions is that in the race to the
5     courthouse scenario, creditors are unable to compel
6     the City to sell assets or to take a lien on public
7     property; is that correct?
8  A. Yes.
9  Q. And you say that you understand this to be true,
10    correct?
11 A. I do.
12 Q. Who told you that?
13 A. Jones Day.
14 Q. And did you do any analysis to test whether or not
15    that advice was correct?
16 A. No.
17 Q. Now, you're aware that PA 436 requires the emergency
18    manager to resolve the fiscal crisis facing the City
19    of Detroit, correct?
20 A. Yes.
21 Q. Have you evaluated the extent to which asset sales
22    might be required in a dismissal scenario by PA 436?
23 A. No.
24 Q. When you were talking about the flexibility of
25    spending associated with the restructuring and

1  KENNETH BUCKFIRE, VOLUME 2
2  reinvestment initiatives, you ended up answering the
3  question to Mr. Soto in the context of if there was a
4  recession that caused impact X, you could study the
5  restructuring and reinvestment initiatives and
6  determine which could not be deferred and which could;
7  do you remember that answer?
8  A. I do.
9  Q. Have you undertaken a study to determine which of the
10    restructuring and reinvestment initiatives are
11    flexible in that way?
12 A. Not a study, but I have an opinion.
13 Q. You have an opinion?
14 A. Yes.
15 Q. Is it an opinion based -- I mean, is it just a sense
16    or is it a formal opinion or --
17 A. It's just my opinion.
18 Q. Just your opinion. What is your opinion?
19 A. That in that scenario the first thing I would advise
20    whoever was responsible to defer blight spending but
21    to maintain investment programs related to public
22    safety at all costs.
23 Q. Okay, so in your view when you look at the
24    restructuring or reinvestment initiatives you see
25    public safety initiatives as being the ones that are

1  KENNETH BUCKFIRE, VOLUME 2
2  least flexible in terms of deferral and blight as
3  being the most flexible?
4  A. On a very short-term basis.
5  Q. On a very short term --
6  A. If you had to defer spending on blight removal for six
7     months and come back six months later, you can do
8     that, the houses aren't going anywhere.
9  Q. Now, have you undertaken to determine the total amount
10    of grant moneys the City has been awarded since the
11    June creditor proposal of last year?
12 A. Not specifically, no.
13 Q. Are you aware that the City has been awarded hundreds
14    of millions of dollars in grants since that time?
15 A. I am.
16 Q. And have you analyzed the extent to which the City
17    could use those grant moneys to fund restructuring and
18    reinvestment initiatives?
19 A. No. It does accelerate the program, however. Having
20    more money allows them to take out more blight --
21 Q. And I'm saying in a dismissal scenario have you
22    studied the extent to which the City could use the
23    grant moneys to fund restructuring and reinvestment
24    initiatives?
25 A. No.

Pages 281 to 284

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-7  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 14 of 19

Page 285

KENNETH BUCKFIRE, VOLUME 2

Q. Is the City going to be service delivery solvent upon emergence from bankruptcy under the plan?
A. I would say they would approach that standard within the first year of emergence.
Q. So you believe within a year of emergence the City of Detroit will be providing the appropriate level of municipal services?
A. No, I said they will approach that level.
Q. Okay.
A. Okay? You have --
Q. Now, I'm not sure who's the lawyer.
A. Well, no, it's a very complicated question -- it's a complicated question --
Q. Okay.
A. -- because there are so many categories of service delivery the City has to fix.
Q. All right, let's take a step back.
A. All right.
Q. Let's break it down. One of your opinions is that the City is service delivery insolvent, correct?
A. It was service delivery insolvent upon the filing of the bankruptcy.
Q. Filing of the bankruptcy, okay. One of your opinions is that the City was service delivery insolvent at the

Page 286

KENNETH BUCKFIRE, VOLUME 2

time it filed, correct?
A. Correct.
Q. Now let's ask about today, is the City service delivery insolvent today?
A. Yes.
Q. Okay. Do you believe the City will be service delivery insolvent as of the anticipated plan confirmation date of September 30?
A. You know, it's a complicated question to answer and I hesitate only because you have to look at it by service delivery segment, safety services being the most important, followed by public lighting, followed by transportation services. The City has made dramatic strides in all those areas to improve service delivery, I'd have to go back and check because I'm not totally up to speed on where they stand on those programs. My understanding is that by the time the City emerges they will have made very dramatic improvements to public safety programs, so on those -- programs they may well be service solvent, I don't have a similar opinion on DDOT, which is the Department of Transportation, and I do know that the program to relight the City is ongoing and is expected to be completed next year, so on that element they're

Page 287

KENNETH BUCKFIRE, VOLUME 2

probably insolvent but in terms of overall safety they will probably be solvent by the time they emerge.
Q. That's a fair caveat. So what you're saying is there has been enormous work -- there has been an enormous amount of work done to date?
A. Yes.
Q. That work may have rendered certain areas of the City service delivery solvent, correct?
A. Correct.
Q. Included in those areas would be an area like public safety, correct?
A. Yes.
Q. Other areas may be on a path to service delivery solvency that ranges in time?
A. Correct, and you should -- you should probably ask Mr. Moore where the City stands on all these programs --
Q. Sure.
A. -- because Conway MacKenzie's been managing most of them.
Q. That's a good advice. We'll take you up on that, but with respect to you --
A. You can thank him for me.
Q. What's that?

Page 288

KENNETH BUCKFIRE, VOLUME 2

A. You can thank him for me.
Q. I will. I will. He's always glad to see me. So do you have an opinion as you sit here today of what areas where the City is service delivery insolvent or close to it at least in your view? I know we can ask Mr. Moore but --
A. I'm not really not current on that.
Q. So you don't know?
A. It's July, I haven't looked at this issue in a number of months so I am not current.
Q. So you haven't studied the question?
A. That's correct.
Q. Now, have you evaluated the likelihood that the City might choose to sell its art collection in a dismissal scenario?
A. No.
Q. And have you -- I take it then you haven't evaluated the impact such a sale would have on creditor recoveries, correct?
A. We have not done a dismissal analysis.
Q. Okay. Have you considered the possibility that the grand bargain might happen even if the petition were dismissed?
A. Well, my understanding is that one of the principal

Pages 285 to 288

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 15 of 19

## Page 289

KENNETH BUCKFIRE, VOLUME 2

elements of that grand bargain is that the pension retirees who have rights to sue the City would presumably then have those rights restored and they may well pursue those rights, in which case the state's funding would go away.

Q. Yeah, there's no question that the grand bargain as it's currently drafted, if the plan is blown up somehow, it goes away?

A. Correct.

Q. Have you evaluated the extent to which it might be reconstituted in a dismissal?

A. That's speculation and I've already testified we haven't done a dismissal analysis.

Q. Now, do you understand that two of the motivating concerns of the grand bargain were to safeguard the art from any future attempts to get at it by creditors and to lessen the misery of pensioners in connection with the cuts?

MR. CULLEN: Objection, foundation. Whose motivations?

BY MR. HACKNEY:

Q. Well, the people that are parties to the grand bargain?

A. Their motivations are their motivations. The City's

## Page 290

KENNETH BUCKFIRE, VOLUME 2

motivation is to maximize the value of assets in a way that's consistent with the rehabilitation of the City, and the grand bargain does that.

Q. Okay, by infusing hundreds of millions of dollars into the City, correct?

A. Into the City for the City's -- benefit of the City's creditors, which in this case happen to be the retirees.

Q. But you understand that the two points I raised about protecting the art and helping the pensioners are -- are considered to be two of the motivating factors for the grand bargaining?

A. That's my understanding.

Q. And those would still apply in a dismissal scenario, correct?

A. That's speculation on my part.

Q. Okay, so it's not something you've evaluated?

A. No.

Q. And I take it you have not independently assessed the reliability of the City's forecast, correct?

A. Correct.

Q. Do you know -- do you understand that the City of Detroit has above-average unemployment when compared to the national employment rate?

## Page 291

KENNETH BUCKFIRE, VOLUME 2

A. Yes.

Q. And as a result of that, isn't it true that the City does not have a problem with attrition in its active employee ranks?

A. I'm not sure there's a relationship between the unemployment rate and attrition. What are you referring to?

Q. Well, just that when unemployment is high it tends to make people want to hold on to a good job.

A. That's a general statement, I don't -- I do not know how that applies to the case of Detroit.

Q. You haven't studied problems that the City may have either retaining active employees or attracting new ones; is that correct?

A. Only anecdotally.

Q. Okay, you haven't conducted a systematic study?

A. No.

Q. And are you aware of anecdotal evidence that the City is having trouble retaining employees?

A. The City has had historically trouble retaining qualified employees, they've had no trouble retaining unqualified employees.

Q. And that's just the anecdotal evidence you were referring to earlier?

## Page 292

KENNETH BUCKFIRE, VOLUME 2

A. And personal relationships with many of those same City employees.

Q. In a dismissal scenario will the City be able to borrow money on a secured basis?

A. I believe so.

Q. Okay. And would it be able to do so at reasonable rates?

A. I believe so.

Q. In a dismissal scenario?

A. Oh, I'm sorry, no.

Q. I gave you a favor there --

A. No.

Q. -- because otherwise I'm crossing you later and you were like what was I saying. So let's do it again. In a dismissal scenario can the City borrow on a secured basis?

A. Probably.

Q. Okay, and would it be able to do so at reasonable rates?

A. Probably not.

Q. Why not?

A. I would assume any lender would look at the overall situation of Detroit and given the tremendous uncertainties facing the ultimate resolution of its

Pages 289 to 292

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 16 of 19

Page 293

KENNETH BUCKFIRE, VOLUME 2

crippling liabilities would view that its position as a lender might be at some point under attack by other creditors, that it might find itself in a subsequent Chapter 9, have to protect its rights to get repaid pursuant to its pledge, and therefore they would want to be paid for that risk. They would also probably require that the terms of the loan be very short.

Q. The postpetition facility, however, was not one that required plan confirmation, isn't that correct?

A. That's correct.

Q. And Barclays facility tolerates dismissal of the petition, correct?

A. That's right.

Q. And you actually felt that that was a very favorable rate, if I recall, correct?

A. That's true.

Q. Something on the order of 3-1/2 percent, correct?

A. It is 3-1/2 percent.

Q. But your testimony is that even though you were able to secure that loan on a secured basis during the midst of a at the time nonconsensual bankruptcy that if the petition were dismissed that there would be a material difference in the secured barring of the City?

Page 294

KENNETH BUCKFIRE, VOLUME 2

A. Well, there were very different facts and circumstances surrounding that. I don't believe that in any way helps understand what the City would have to do to borrow money in a dismissal situation, which is what you're positing now.

Q. Yeah, you're right. By the way, the exit financing that you're currently working to line up, that's also going to be on secured basis, correct?

A. We have suggested to lenders that security is available but we've also encouraged them to propose unsecured financing facilities.

Q. I think we've talked about this before, but when you suggest things to the market they have a tendency to not want less than that, right?

A. Depends on the demand for the financing.

Q. Do you think that the exit facility might be unsecured?

A. Ask me in a week.

Q. Okay. I will. Have you assessed the abilities to save money by --

A. I know you will.

Q. I'm going to call you and ask you.

A. You have to call Tim first.

Q. Yeah, I'll get permission. Have you assessed the

Page 295

KENNETH BUCKFIRE, VOLUME 2

abilities of the City to save money by privatizing DDOT?

A. That issue has been studied.

Q. Have you studied it?

A. No.

Q. Now, that's something that could be done in a dismissal context as well, correct?

A. In theory, yes.

Q. Okay, and I take it you have not tried to factor in the privatization of DDOT to what creditor recovery should be in a dismissal scenario because you did not do a dismissal analysis, correct?

A. Yes.

Q. And I take it you would give the same answer for any other asset whether it was parking or Belle Isle or the art collection, correct?

A. Correct.

Q. Now, isn't it true that the City's exploring whether it can enter into a public-private partnership in connection with DWSD?

MR. CULLEN: To the extent that that's public knowledge, it's the subject of mediation.

MR. HACKNEY: I think the RFP was -- public. I mean, I read articles about the fact that

Page 296

KENNETH BUCKFIRE, VOLUME 2

emergency manager was soliciting requests for proposal.

MR. BALL: The RFP has been produced, it's produced in the case.

MR. CULLEN: The RFP for which?

MR. BALL: For the public-private partnership.

A. Yes.

BY MR. HACKNEY:

Q. Are you involved in that?

A. Yes.

Q. Okay. What is your expect -- so what is your expectation regarding the structure of a PPP? And what I mean is you remember how you had a conversation earlier about the fact that the regional authority might entail a sale lease-back with a $47 million annual revenue stream; do you remember that?

A. I do.

Q. Is there an analog in the PPP context where somehow the City gets revenue out of the PPP agreement?

MR. CULLEN: This was not in the RFP and this is part of the ongoing negotiations in the mediation.

BY MR. HACKNEY:

Pages 293 to 296

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 17 of 19

## Page 297

KENNETH BUCKFIRE, VOLUME 2

Q. I won't ask for any specifics because I can imagine that you're -- that's probably what you debate, I'm just trying to understand it structurally. Let me put it to you this way. Is the -- I could see a scenario where you engage in a public-private partnership simply to reduce the efficiency and cost of the system and --

A. Improve the efficiency, not reduce --

Q. Yeah, improve the efficiency, right. Improve the efficiency --

A. And lower the cost.

Q. -- lower the cost and then lower rates, I could see that being one reason for why you might do it. I can see a city like Detroit that's been through a difficult process with the counties where it was hoping to do a sale lease-back viewing a PPP as a means of obtaining a revenue stream, and I just want to know whether that is one of the goals of the PPP? All right. Let's do it this way guys.

A. I'm sorry, I don't know what I can say.

Q. That's okay. That is a theoretical possibility with a PPP, correct?

A. Yes, it is.

Q. Okay, and that theoretical possibility is one that you

## Page 298

KENNETH BUCKFIRE, VOLUME 2

could arguably pursue whether the plan is confirmed or the petition is dismissed, correct?

A. Yes.

Q. But like the other assets of the City, it's not one that you've studied to determine its impact on creditor recoveries correct?

A. In a dismissal scenario, that's correct.

Q. With respect to access to the capital markets, isn't it correct that you have found great enthusiasm for people desiring to lend to Detroit?

A. Yes.

Q. In fact, investors are tripping over themselves when it comes to lending to the City, correct?

A. I didn't say that.

Q. I know you didn't, other people have.

A. Who?

Q. Kevyn Orr.

A. I can only say what I've said, there's a lot of enthusiasm for reviewing and potentially providing financing for the City of Detroit.

Q. And you agree that Detroit has, if its plan is confirmed, undergone a massive deleveraging of its obligations, correct?

A. Yes.

## Page 299

KENNETH BUCKFIRE, VOLUME 2

Q. And it is that massive deleveraging that makes the credit so attractive to potential lenders, correct?

A. That's one factor. The other factor is the oversight commission and continued institutional oversight of the City now provided for by the state legislation.

Q. That's right, so you view it as kind of, look, there's a quantitative component, that's the massive deleveraging, right?

A. Right.

Q. There's a qualitative component which is we're not going to do this again, that's the oversight, correct?

A. And I would say that's an even more important credit factor than the deleveraging of the City.

Q. Now, your opinion is actually that you'll be able to obtain credit on reasonable terms, isn't that right?

A. Yes.

Q. What do you consider reasonable terms to be?

MR. CULLEN: You did go through --

BY MR. HACKNEY:

Q. You did go through -- it's longer than ten years and what was the interest rate again?

A. Less than 5 percent.

Q. Less than 5 percent. At what point would you still have access to credit on reasonable terms with a lower

## Page 300

KENNETH BUCKFIRE, VOLUME 2

percentage of deleveraging? So I think you postulate a 70 percent deleveraging in your expert report; is that correct?

A. That's right.

Q. Would the City still have access to credit on reasonable terms if it only delevered 60 percent?

A. Well, it's not the right basis of comparison, you have to look at the annual anticipated debt service and legacy costs that are required to be funded by the City over the next ten years, so the total amount of liability reduction is of less relevance than that calculation.

Q. Well, you understand that the deleveraging is being accomplished by substituting B notes in many instances for what used to be the claims of the creditors?

A. I do understand that.

Q. So there's a relationship in the sense that the B note is what comes out at the end, right?

A. Well, but it's in the totality how much total leverage the City will still have post emergence, which we've laid out in this -- you know, in my expert report, it's, you know, a billion two of total funded debt when you include the reorganization securities given to the GO bondholders and others and the exit

Pages 297 to 300

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-7  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 18 of 19

## Page 309

KENNETH BUCKFIRE, VOLUME 2

we've asked for preliminary indications on the 24th of July.

Q. Okay.

A. We do expect to send it out to more parties this week only because we sent it out on Friday and a lot of people have left for the weekend already, so we got them yesterday.

Q. And so do you think you're going to bring that thing in before August 14, which is when we start the plan trial?

A. That is our expectation.

Q. That's about 20 days after, that's about 21 days after you get your --

A. Correct.

Q. -- responses?

A. But when we say bring in, I think we will bring in a recommendation to the emergency manager and have negotiated to a commitment letter stage, we will not have recommended we close or execute any financing documents until confirmation --

Q. That's fine. I was just curious about, I mean, general experience within three weeks of getting indications of interest is that fast, slow, or reasonable?

## Page 310

KENNETH BUCKFIRE, VOLUME 2

A. In this situation I would say that's reasonable only because we've been talking to market participants for months, they're well aware of the plan, all of the financial documents are out there, there's not much to do from a diligence point of view, it's really a question of structure and rate and interest.

Q. On page 4 of your report you say that the revitalization efforts are assumed to attract a new tax base for the City; do you remember that?

A. I do.

Q. And that means assumed by you, correct?

A. I believe it's assumed by the emergency manager and all of his key advisors as well as leading public officials of the state and community leadership.

Q. Okay, you have not independently accessed the accuracy of that assumption, correct?

A. No.

Q. Am I correct?

A. It's an assumption.

Q. It is an assumption that you have not independently assessed, correct?

A. Correct.

Q. Oh, you know, earlier you were talking about being personally involved in mediating with the COPs

## Page 311

KENNETH BUCKFIRE, VOLUME 2

holders; do you remember that testimony?

A. Yes.

Q. And I know there's a mediation order that contains within it a requirement of confidentiality, but is the time frame that you're referring to on those mediations in the fourth quarter 2013?

A. Yes.

Q. Was it in connection with the swap settlement motion?

A. No. Separate from that. Judge Perris was the mediator, so I mean -- right?

Q. Yes. Were the COP insurers in those?

A. Yes. Yeah, it was absolutely. We spent weeks on it.

Q. You spent weeks negotiating with the COP insurers and the COP holders on plan treatment?

MR. CULLEN: We were in the same courthouse under the same egis, fumbling back and forth.

MR. HACKNEY: And in New York.

MR. CULLEN: And in New York.

MS. BALL: Negotiated settlement.

MR. HACKNEY: On plan treatment?

MS. BALL: A settlement.

A. Settlement.

BY MR. HACKNEY:

Q. Of the swap?

## Page 312

KENNETH BUCKFIRE, VOLUME 2

A. Not the swap, of the --

MS. BALL: The whole relationship.

A. -- the whole thing, the swaps, the COPs, everything. We wanted to do a grand bargain to the benefit of the COPs and insurer --

MR. CULLEN: He's --

BY MR. HACKNEY:

Q. I remember what you were talking about but that -- okay. Well, we're talking about the same thing in any event so I just want to make sure. Do you have any understanding of how the City valued its OPEB obligations under the plan, the $4.3 billion number?

A. It's been months since I've looked at that so the answer is no.

Q. Do you remember you talked about meeting with -- meeting Graham Beal early on in, if I remember, the first half of 2013?

A. Yes.

Q. In any of your meetings with Graham Beal did you suggest that he might be replaced?

A. No.

Q. Did you ever suggest that he should be fired?

A. No.

Q. Did you ever tell him that he might be fired if he

Pages 309 to 312

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-7   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 19 of 19