# Exhibit 6C
# July 14, 2014 R. Cline Deposition Transcript

## Page 1

```
IN THE UNITED STATES BANKRUPTCY COURT
   FOR THE EASTERN DISTRICT OF MICHIGAN



In Re:          ) Chapter 9
CITY of DETROIT, MICHIGAN, ) Case No. 13-53846
   Debtor.      ) Hon. Steven Rhodes
_____


   The Videotaped Deposition of ROBERT CLINE,
        Taken at Jones Day
        51 Louisiana Avenue, NW
           Washington, DC
        Commencing at 9:05 a.m.
          Monday July 14, 2014,
     Before Marjorie Peters, RMR, CRR
```

## Page 2

APPEARANCES:
For the Debtor City of Detroit and the witness:
GEOFFREY S. STEWART, ESQ.,
SARAH A. HUNGER, ESQ.,
CHRISTOPHER DiPOMPEO, ESQ.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113


For the Official Committee of Retirees:
DAN BARNOWSKI, ESQ.
DENTONS US, LLP
1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005-3364

For Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.

DOUGLAS G. SMITH, P.C.
KIRKLAND & ELLIS, LLP
300 North LaSalle
Chicago, Illinois 60654


For Creditor Assured Guaranty:
LISA SCHAPIRA, ESQ.
CHADBOURNE & PARKE, LLP
30 Rockefeller Plaza
New York, New York 10112

## Page 3

For Creditor National Public Finance Guarantee Corp.

JEFFREY S. BEELAERT, ESQ.
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington D.C. 20005


For Creditor Financial Guaranty Insurance Company:
PRAVIN R. PATEL, ESQ.
WEIL GOTSHAL & MANGES, LLP
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131

Also Appearing:
Jonathan Perry, Videographer
Marguerette Hosbach, Ernst & Young, via telephone

## Page 4

I N D E X

| WITNESS | PAGE |
|---|---|
| Robert Cline | 6 |

| EXHIBITS | PAGE |
|---|---|
| Exhibit No. 1 | 112 |
| Exhibit No. 2 | 149 |
| Exhibit No. 3 | 164 |
| Exhibit No. 4 | 179 |
| Exhibit No. 5 | 278 |
| Exhibit No. 6 | 280 |
| Exhibit No. 7 | 281 |
| Exhibit No. 8 | 285 |
| Exhibit No. 9 | 292 |

Pages 1 to 4

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-8   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 2 of 5

## Page 93

R. CLINE

change of any underlying economics of the City of Detroit.

Q. But the City can take actions that would change the underlying economics without going into Chapter 9, correct?

A. I don't know the answer to that.

Q. Okay. As far as you're aware, though, your baseline scenario is not trying to forecast what would happen if the petition for bankruptcy was dismissed?

A. I would describe our baseline forecast as a continuation of the trends that have been affecting Detroit over the last 10 years to 20 years.

Q. And has anybody from the City told you that they're going to allow the trends that have continued to continue into the future?

A. I haven't had those conversations myself.

Q. I mean, do you have any understanding about why you have this baseline scenario in your report?

A. My understanding is that the baseline scenario reflects expected revenue streams under current law in a continuation of recent economics in the City of Detroit.

Q. Do you have any understanding of what activities the City will or will not perform in the baseline scenario?

## Page 94

R. CLINE

A. I do not.

Q. Do you have any understanding of what activities the City will or will not perform in the restructuring scenario?

A. I do not know the specifics of any alternatives.

Q. Would raising the income tax rate be a reasonable policy for the City of Detroit?

A. I can't comment on the policy options for Detroit. We were not asked to evaluate those as part of our analysis.

Q. And so, you're offering no opinion that raising the income tax rate or property tax rates or utility tax rates or wagering tax rates or any of the other rates would be inappropriate or unreasonable, correct?

A. We were not asked to evaluate any tax policy alternatives for the City of Detroit.

Q. So, you're not offering any opinion saying that raising tax rates would be unreasonable, correct?

A. I'm not commenting on policy options for the City of Detroit.

Q. So, you're not offering -- I'm just trying to get an idea of what opinions you're offering. So, you're

## Page 95

R. CLINE

not offering an opinion that raising tax rates would be unreasonable, correct?

A. I'm not commenting on any tax policy options available to the City of Detroit.

Q. You know that question -- there could be a yes or no answer to that question, right?

A. My perspective is that we were asked to do revenue forecasts of the major revenue sources under current law. We were not asked nor did I volunteer information on alternatives available to the City of Detroit.

Q. Okay. So, you haven't done any work that will allow you to testify that raising tax rates would be unreasonable or inappropriate, correct?

A. I have not.

Q. And you haven't done any work that says that increasing tax revenues through increased collections would be --

(Telephone interruption.)

MR. STEWART: Just hit one. Thanks.

BY MR. SMITH:

Q. -- inappropriate or not feasible, correct?

A. He we have not evaluated tax policy opportunities -- alternatives for Detroit.

## Page 96

R. CLINE

Q. And you haven't done any work that would allow you to testify that Detroit couldn't just add new taxes, correct?

A. We have not.

Q. And you haven't done any work that would allow you to testify that Detroit couldn't generate significant additional revenue by either adding new taxes or increasing tax rates?

MR. STEWART: Objection.

MR. SMITH: Correct?

THE WITNESS: We were not asked to look at policy options for the City of Detroit.

BY MR. SMITH:

Q. And so, you haven't done any work that would allow you to testify that Detroit can't generate significant increased revenue through either increasing tax rates, increasing collections, or adding new taxes, correct?

MR. STEWART: Objection.

THE WITNESS: I think there may have been a double negative in there. Could you repeat the question?

BY MR. SMITH:

Q. You haven't done any work that will allow you

Pages 93 to 96

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6787-8    Filed 08/18/14    Entered 08/18/14 10:29:34    Page 3 of 5

## Page 97

R. CLINE

1  to testify that Detroit can't significantly increase
2  revenues by increasing tax rates or increasing tax
3  collections or by adding new taxes, correct?
4          MR. STEWART: Objection.
5          THE WITNESS: We have done no analysis --
6      excuse me.
7          MR. STEWART: Go ahead.
8          THE WITNESS: We have done no analysis on
9      tax policy options in Detroit.
10 BY MR. SMITH:
11     Q.   So, the answer is correct, correct?
12     A.   I am still having --
13         MR. STEWART: Reread the question.
14         THE WITNESS: Please, reread the question,
15     I think the double negative is still there.
16 (The record was read back by the reporter.)
17         THE WITNESS: I believe the correct answer
18     to that question is, as I mentioned, we have looked
19     at the collection rate of the property tax. We
20     calculated an effective collection rate, and we did
21     use that in our forecast.
22         We did not -- were not asked to and did not
23     provide forecasts under alternative policy options,
24     whether it's a tax rate change or adoption of a new

## Page 98

R. CLINE

1  tax, or change, in the base of an existing tax.
2  BY MR. SMITH:
3      Q.   So, you -- Ernst & Young concluded that the
4  City could increase property tax revenues by increasing
5  collections, correct?
6      A.   In our forecast of the property tax revenues,
7  we did vary the collection rate over time.
8      Q.   And you increased the collection rate; is that
9  correct, or do you not know?
10     A.   From what I remember, we may have brought the
11 collection rate down, in the intermediate run, and then
12 brought it back up in the longer run.
13     Q.   Okay. But you haven't -- you haven't done any
14 work that would allow you to testify that Detroit can't
15 significantly increase revenues by increasing tax rates,
16 correct?
17         MR. STEWART: Objection.
18         THE WITNESS: All of our revenue estimates
19     are based upon current law rates.
20 BY MR. SMITH:
21     Q.   So, the answer to my question is correct? You
22 haven't done the work?
23         MR. STEWART: Objection.
24         THE WITNESS: Could you repeat the

## Page 99

R. CLINE

1  question, please.
2  (The record was read back by the reporter.)
3          THE WITNESS: We accepted the current law
4      tax rates as what was available to Detroit. To the
5      extent that Detroit is at the maximum, and I
6      believe it may be the case for all of those tax
7      rates, it would imply that under current law, that
8      option is not available.
9  BY MR. SMITH:
10     Q.   But current law can change, correct?
11     A.   Correct.
12     Q.   And you would agree with me that if current
13 law changes, Detroit can increase tax revenue
14 significantly by increasing tax rates, correct?
15         MR. STEWART: Objection.
16         THE WITNESS: It is true that an increased
17     rate, with no offsetting decrease in the base,
18     could increase revenue, but if you were going to
19     forecast the increase of a tax rate in Detroit, you
20     would also have to forecast the potential decrease
21     in the tax base with mobile people and investment.
22 BY MR. SMITH:
23     Q.   And so, sitting here today, you haven't done
24 the work that would allow you to testify that increasing

## Page 100

R. CLINE

1  tax rates wouldn't result in significant additional
2  revenue for the City of Detroit, correct?
3          MR. STEWART: Objection.
4          THE WITNESS: As I believe I've answered
5      several times, we did not evaluate alternative
6      policies. We is accepted current law as the
7      foundation for our forecast.
8  BY MR. SMITH:
9      Q.   Okay. So the answer is correct, you didn't do
10 that work, correct?
11     A.   Would you rephrase the question.
12     Q.   You didn't do any work that would allow you to
13 testify that by increasing tax rates, Detroit would not
14 increase substantially its tax revenues?
15         MR. STEWART: Objection.
16         THE WITNESS: We did not run alternatives
17     with our model at different tax rates.
18 BY MR. SMITH:
19     Q.   That's something that you could have done,
20 right? That's technically feasible for you to do,
21 correct?
22     A.   We were not asked to do that analysis.
23     Q.   Okay. But is it technically feasible for you
24 to do an analysis like that?

Pages 97 to 100

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6787-8   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 4 of 5

Page 101

R. CLINE

A. We would have to do additional work compared to what we have done to this point, because as I mentioned, it's not just changing the rate, it's also understanding the behavioral response of the base in response to the change in the rate. We are not set up to do that in our current runs.

Q. And you also haven't done the work that would allow you to testify that Detroit couldn't significantly increase revenues by adding new taxes, correct?

A. We have not analyzed the addition of new revenue sources for Detroit.

Q. Okay. The -- one potential new revenue source would be imposing the commuter tax, correct? That's a reasonable --

A. I don't know if it's legally available to Detroit as an option.

Q. Okay. But imposing a commuter tax is something that the City could either do by itself or in conjunction with the State, correct?

A. I don't know the answer to that.

Q. Okay. So, you haven't investigated whether Detroit could add a commuter tax, correct?

A. I have not.

Q. All right. Another potential -- that you know

Page 102

R. CLINE

that there's cities, though, that have commuter taxes, right?

A. There are selected cities that tax non-residents who are working in the city, as Detroit does. Some at differential rates, some at the same rate.

Q. Okay. And they do that through a variety of mechanisms, correct?

A. I believe they look basically like income taxes.

Q. And sometimes they're parking lot-type -- you know, charges for fees for parking or other services that might disproportionately fall on non-residents?

MR. STEWART: Objection.

THE WITNESS: I'm not familiar with the details of those taxes.

BY MR. SMITH:

Q. All right. You know that some cities have a city-only sales tax, correct?

A. City-only sales tax. I believe that is the case.

Q. And you haven't investigated whether Detroit could increase revenues by adding a city-only sales tax, correct?

A. As I answered earlier, we did not analyze any

Page 103

R. CLINE

revenue options for the City of Detroit.

Q. Okay. You only did the work that you were asked by the lawyers for the City to do, correct?

MR. STEWART: Objection.

THE WITNESS: We were given an assignment by Ernst & Young to provide a revenue estimate of the major tax sources for the City of Detroit over the next 10 years. Then it was expanded to an additional 30-year perspective. That is the job that we were asked to do, and that is what we did and is reported on in the expert report.

BY MR. SMITH:

Q. Who asked you to do that job?

A. That was a -- we were retained by the Ernst & Young team working in Detroit.

Q. Okay. So, it wasn't Mr. Malhotra that gave you the scope of the work that you were to perform in this case?

A. I believe our initial discussions of the scope of the work did come from him.

Q. Would it be fair to say that you haven't done any analysis of the full range of potential revenue sources available to the City?

MR. STEWART: Objection.

Page 104

R. CLINE

THE WITNESS: We haven't done an analysis of any of the revenue options available to the City.

BY MR. SMITH:

Q. And that would include both tax and non-tax revenue options?

A. Correct.

Q. I mean, if you were advising a City in financial distress, what actions would you advise them to take to increase revenue or cut costs?

MR. STEWART: Objection.

THE WITNESS: We are very careful in all of our projects at Ernst & Young not to make policy recommendations to governments.

BY MR. SMITH:

Q. Okay. So, Ernst & Young -- is it that you don't have the qualifications to make policy recommendations to governments or is there some other reason that you don't do that?

A. We don't do that because those are political decisions. We don't make policy recommendations to individual units of government.

Q. So, ultimately, the amount of revenue available to the City of Detroit and the amount of costs

Pages 101 to 104

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-8   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 5 of 5