# Exhibit 6D
## July 22, 2014 K. Orr Deposition Transcript

```
 1         KEVYN ORR, VOLUME 2
 2    IN THE UNITED STATES BANKRUPTCY COURT
 3     FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6
 7   In Re:           )  Chapter 9
 8
 9   CITY of DETROIT, MICHIGAN, )  Case No. 13-53846
10
11       Debtor.   )  Hon. Steven Rhodes
12   _____
13
14              VOLUME 2
15
16    The Videotaped Deposition of KEVYN ORR,
17    in his personal capacity and as Rule 30(b)(6) witness,
18    Taken at 2 Woodward Avenue,
19    Detroit, Michigan,
20    Commencing at 9:10 a.m.,
21    Tuesday, July 22, 2014,
22    Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

```
 1         KEVYN ORR, VOLUME 2
 2   APPEARANCES:
 3
 4   GREGORY M. SHUMAKER, ESQ.,
 5   DAN T. MOSS, ESQ.
 6   Jones Day
 7   51 Louisiana Avenue, N.W.
 8   Washington, D.C. 20001
 9       Appearing on behalf of the Debtor.
10
11
12
13
14   ROBERT HERTZBERG, ESQ.
15   Pepper Hamilton, LLP
16   4000 Town Center, Suite 1800
17   Southfield, Michigan 48075
18       Appearing on behalf of Debtor.
```

```
 1         KEVYN ORR, VOLUME 2
 2   STEPHEN C. HACKNEY, ESQ.
 3   Kirkland & Ellis, LLP
 4   300 North Lasalle Street
 5   Chicago, Illinois 60654
 6       Appearing on behalf of Syncora.
 7
 8
 9
10   JEFFREY BEELAERT, ESQ.
11   Sidley Austin, LLP
12   1501 K Street, N.W.
13   Washington, D.C. 20005
14       Appearing on behalf of National Public Financing.
15
16
17
18   ERNEST J. ESSAD, JR., ESQ.
19   Williams, Williams, Rattner & Plunkett, P.C.
20   380 North Old Woodward Avenue, Suite 300
21   Birmingham, Michigan 48009
22       Appearing on behalf of Financial Guaranty Insurance
23       Company.
```

```
 1         KEVYN ORR, VOLUME 2
 2   ALFREDO R. PEREZ, ESQ.
 3   Weil, Gotshal & Manges, LLP
 4   700 Louisiana Street, Suite 1700
 5   Houston, Texas 77002
 6       Appearing on behalf of Financial Guaranty Insurance
 7       Company.
 8
 9
10
11   LISA SCHAPIRA, ESQ.
12   Chadbourne & Parke, LLP
13   30 Rockefeller Plaza
14   New York, New York 10112
15       Appearing on behalf of Assured Guaranty Municipal
16       Corporation.
```

Pages 162 to 165

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6787-9   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 2 of 6

## Page 338

1  KEVYN ORR, VOLUME 2
2  foundations, correct?
3  A. That is correct. You know, I may -- let me say this
4  generally. I may have had meetings with foundation
5  principals outside of the confines of the mediation,
6  just hail-fellow-well-met, saw them at an event, how
7  are you. There were no substantive conversations
8  about the contribution that did not occur outside of
9  the mediation order.
10 Q. And that's fine, because the only ones that I really
11    want to ask you about are ones that relate to the
12    Grand Bargain?
13 A. Right, right.
14 Q. And those would fall under the gambit of the
15    mediation?
16 A. Those would fall under the gambit of mediation.
17 Q. Now, if I asked you your state of mind based on what
18    you understood the foundations to be willing to do or
19    what you thought they would be willing to do, you
20    would also invoke the mediation order to the extent
21    his state of mind was created by communications of the
22    foundation, correct?
23         MR. SHUMAKER: I think that's right because
24    I don't see how he could give you his impressions or
25    his understanding without going into what was going on

## Page 339

1  KEVYN ORR, VOLUME 2
2  in the mediation.
3         MR. HACKNEY: Right, because he lacks
4  foundation to speak to what the foundations thought.
5  If I asked him what he understood them to have
6  thought, you'll take the position that it would be
7  based on what they told him?
8         MR. SHUMAKER: Correct, it all would have
9  been derived from the mediation discussions.
10         MR. HACKNEY: Okay, and so I'll just note
11  for the record, Mr. Shumaker, that this is the
12  position that Ms. Kofsky (ph.), a cop, took in a prior
13  deposition, and I understand the basis for it. I will
14  let you know that I don't necessarily agree with it
15  based on comments that Judge Rhodes made about how
16  state of mind might work in the mediation context, but
17  it doesn't matter because I feel like we're not going
18  to work that out today anyway.
19         MR. SHUMAKER: Understood.
20 BY MR. HACKNEY:
21 Q. And I just want to understand you all's position on
22    it. So just a couple big ones, if I ask you did you
23    ever ask the foundations to contribute money with no
24    strings attached you'll decline to ask answer that
25    question, correct?

## Page 340

1  KEVYN ORR, VOLUME 2
2  A. I think I have to.
3  Q. If I ask you did the foundations ever offer to
4     contribute money without insisting on transfer of the
5     art institute, you'll decline to answer that question,
6     correct?
7  A. I think I have to.
8  Q. And if I ask you hey, who is it that imposed the
9     condition on the Grand Bargain that the art institute
10    would be transferred, was it you, or was it them, or
11    was it Judge Rosen, you'll decline to answer those
12    questions, correct?
13 A. I believe so.
14 Q. Mr. Orr, has the Grand Bargain -- which you know what
15    I'm talking about, right?
16 A. Yes, the money we talked about before, the 366 million
17    from the foundations, a $350 million value settlement
18    from the State, and $100 million from the DIA
19    benefactors as funneled through the Founders' Society.
20 Q. Correct, in exchange for the art -- in connection with
21    the art being -- the DIA being conveyed into a public
22    trust, correct?
23 A. Contributions targeted towards the two pension funds
24    with the condition that not one piece of art be sold
25    or de-assessed as a result of this process.

## Page 341

1  KEVYN ORR, VOLUME 2
2  Q. And the purpose of the transfer to a public trust is
3     to ensure that the art is never sold to satisfy the
4     claims of the City's creditors, correct?
5  A. Yes, now and forever, yes.
6  Q. Not only current creditors but future ones, as well?
7  A. Correct.
8  Q. So has the Grand Bargain, Mr. Orr, helped the COPs
9     holders to achieve a higher recovery?
10 A. I don't think so.
11 Q. Mr. Orr, what are the principal terms of the LTGO
12    settlement?
13 A. The LTGO settlement centers around a dedicated millage
14    that's to extend for the next approximately 13 years,
15    and the terms of a settlement that roughly 26
16    percent -- oh, the LTGO, I'm sorry --
17 Q. Yeah.
18 A. Okay, I'm sorry, I'm going -- I thought you were just
19    talking about -- I'm doing it temporally --
20 Q. That's okay.
21 A. I'm sorry.
22 Q. I'm hopping around.
23 A. Okay.
24 Q. Let's start over.
25 A. Let's start over.

Pages 338 to 341

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-9  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 3 of 6

## Page 342

KEVYN ORR, VOLUME 2

Q. So let's set the stage. The LTGO settlement has been announced in the press, and there's some information that's kind of available about it, but I actually literally don't know --

A. Right.

Q. -- what the terms are, and there's been some suggestion that it's the continued subject of negotiations, so I want to give you a fair setup.

A. Yeah, that's -- that's why I was -- I can talk about UTGO...

MR. SHUMAKER: You can discuss what's made public.

A. Okay. The mediators issued a statement on the LTGOs we did not, my office did not, recognizing that there was a settlement which, in part, dealt with a class of creditors, I think 170-some-odd-million dollars of claims, which would get an allowed claim in a certain amount. The -- I know from e-mails that I received as late as last night that some of the final details are still under discussion so I'm a little -- that was done in the mediation, so I don't want to run afoul of the mediation order as far as if you have a press release, I'll be happy to discuss about what's in the release but I don't know if I can discuss any more

## Page 343

KEVYN ORR, VOLUME 2

than that.

BY MR. HACKNEY:

Q. It's frankly been kind of confused on this, but I'll tell you what I know. First, it's my understanding that you do not have a final agreement with the LTGO; is that correct?

A. I think that is correct.

Q. What you have is what is loosely described as an agreement in principal on some but not all of the terms, correct?

A. I think that's fair.

Q. Now, the -- but the one thing I'm able to see, I'll tell you, in the expert reports is that Mr. Buckfire says that the $164 million of the unsecured portion of LTGO is getting $55 million in value of some form, okay? I'll represent to you you can see that in the exhibit. I'll also represent to you that somehow in Mr. Malhotra's work there is some implication that that is paid in 2015 under the forecasts, okay? I'm less sure on that one, okay?

A. Right.

Q. What I will tell you is that 55 million on 164 million of unsecured LTGO works out to a 34-cent recovery on that, okay? So -- and I'm -- this is going on and on,

## Page 344

KEVYN ORR, VOLUME 2

but I asked like Heather for this, Ms. Lennox, and she actually referred me to this information.

A. Right.

Q. But then I wasn't able to confirm that that was the whole deal and so that's why you have this big involved --

A. Right.

Q. -- lead-in, okay? So let's just start with, is it your understanding that -- let's do it this way. Is it your understanding that at least part of the deal that is part of the agreement in principal that is public is that they will get approximately 34 cents on their unsecured claim?

A. Yeah. Without having any intent to directly or indirectly violate the mediation order, I do not think it is unfair based upon published reports, but I do not recall that the mediation statement included the actual amount.

Q. It didn't.

A. Yeah, so I don't -- I don't want to necessarily go beyond what was included in that statement, I think the statement was generally there was a settlement of a certain amount and recognition of a claim. I'll stick with that. There is no reason for me to believe

## Page 345

KEVYN ORR, VOLUME 2

that mathematically that that 55 percent of roughly 100 --

Q. No, 34 percent.

A. No, 55 million of 170-some-odd million is equally equivalent to 34 percent.

Q. But like as you -- I mean, I'm trying to tell you that it's not just, you know, me -- it's like the debtor's counsel told me to look at these things to get at least some of the terms.

A. And like I said, I have no reason to dispute what you were told or what they did; I just don't want to do it, okay?

Q. Okay.

A. So I'm -- I'm trying to stay within -- I have been admonished before about possible breaches of the mediation privilege by -- by several judges now and I don't want to run afoul of that in any way.

Q. So is it fair to say, Mr. Orr, that I think you're declining to discuss the terms of the LTGO settlement based on caution about not knowing what is and what is not public?

A. I think that's fair.

Q. Okay. I guess what I will say then is I'm going to reserve my questioning on this, this is also a

Pages 342 to 345

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-9  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 4 of 6

1  KEVYN ORR, VOLUME 2
2  Q. That's exactly right, so the way to say it is when the
3     City is looking at its UAAL obligations to the GRS it
4     says to itself, well, part of this UAAL is
5     attributable to former or current DWSD workers, right?
6  A. Yes.
7  Q. And it figures out what that percentage is and then it
8     charges that percentage against the DWSD enterprise
9     fund, correct?
10 A. Yes.
11 Q. And it earmarks a request for money from the DWSD
12    enterprise fund to pay that percentage, correct?
13 A. Yes, I'm unsure if the direct mechanics of whether or
14    not that money is paid directly to the GRS fund or if
15    it comes into the City and goes to GRS as part of the
16    City's overall contribution but there is a percentage
17    relationship for DWSD's share of the GRS obligation.
18 Q. And when the COPs came along and ostensibly at least,
19    plugged the hole in the UAAL that existed back in the
20    time, the similar -- the City similarly employed the
21    same sharing mechanism with respect to interest and
22    principal expense for the COPs, right?
23 A. Was there an allocation of the COPs funding related to
24    GRS/DWSD employees?
25 Q. Right.

1  KEVYN ORR, VOLUME 2
2  A. Yes, I believe so.
3  Q. In fact, you and I have looked at that before, I
4     think, where we've seen one of those kind of
5     complicated allocations you see because remember when
6     you didn't pay the COPs in June --
7  A. Right.
8  Q. -- that had implications for, you know, your
9     appropriations from the DWSD?
10 A. Yeah, allocable -- allocable share --
11 Q. That's right.
12 A. -- allocable share, yes.
13 Q. And is it correct that the allocable share of the
14    DWSD, whether it's to UAAL or to COPs interest and
15    principal service, is approximately 11 percent?
16 A. I don't recall the exact percentage, but I think it's
17    in that range.
18 Q. Okay, I was wondering if you -- I tried to figure it
19    out --
20 A. Yeah.
21 Q. -- by looking at it and I couldn't and I wondered if
22    you knew?
23 A. At one point I probably did, but I just don't recall
24    right now.
25 Q. Now, you talked a lot with Mr. Neal the other day

1  KEVYN ORR, VOLUME 2
2     about this idea that the DWSD is supposed to be a
3     closed system; do you remember that?
4  A. Yes.
5  Q. And you do understand that -- that one of the notions
6     is that the reason the City believes it can charge the
7     DWSD for its fair share of either UAAL or COPs
8     principal and interest service is because those are
9     fairly considered overhead expenses of the system,
10    correct?
11        MR. SHUMAKER: Object to the form.
12 BY MR. HACKNEY:
13 Q. Because they relate to employees that worked for the
14    system and are part of the true cost?
15 A. Yeah, I think you could call it overhead, we -- you
16    know, I've always looked at it as just the City has a
17    whole number of employees, a certain number of them
18    are employed at an enterprise fund and there needs to
19    be a -- roughly equivalent payment relative to those
20    employees at that function at that department.
21 Q. But you also understand that the characterization of
22    it actually matters under, like, the bond documents,
23    right?
24 A. Right.
25 Q. Don't you?

1  KEVYN ORR, VOLUME 2
2  A. Yeah.
3  Q. It has to be characterized, I think, as overhead
4     expense in order to be fairly charged against the
5     system?
6  A. That's fair, if that's what you're getting at --
7  Q. Yeah.
8  A. -- as the nomenclature, yes.
9  Q. Because you can't just say I'd like some money from
10    the DWSD, right?
11 A. There has to be a reason within the terms of the
12    documents that would justify that allocation.
13 Q. That's right, and the reason we've discussed is the
14    fact that a certain percentage of the retirees are
15    former DWSD employees, right?
16 A. Yes.
17 Q. Okay. Now, if you charge the DWSD for its
18    contribution, isn't it fair to say that the City has
19    to actually use the money in the way that it tells the
20    DWSD it's going to use it?
21 A. Generally speaking, yes.
22 Q. I mean you can't, like, charge the DWSD for its
23    percentage of the COPs principal and interest service
24    and then take the money and go build a park with it?
25 A. Generally speaking, I think that's true.

Pages 370 to 373

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-9  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 5 of 6

KEVYN ORR, VOLUME 2

Q. Okay. Do you agree that if the petition -- the bankruptcy petition were dismissed, it's likely that at a minimum, the City could continue to get from the DWSD its share of the COPs principal and interest service?

A. I have no reason to believe that is not true.

Q. The DWSD is not insolvent; isn't that correct?

MR. SHUMAKER: Object to the form.

A. Yeah, I -- I -- there -- there may be -- I don't know if they are or they aren't.

BY MR. HACKNEY:

Q. In the -- in the postconfirmation time period, if the plan is confirmed, will the DWSD bear any of the interest expense associated with the B notes?

A. There are currently a series of mediations ongoing surrounding DWSD and its obligations. I don't want to bump up against the confidentiality provisions that I've been admonished not to -- not to breach. That being said, I think I can answer your question. Can you repeat your question?

Q. Let's try it this way, Mr. Orr.

A. Yeah.

Q. Let's try it this way.

A. Yeah.

KEVYN ORR, VOLUME 2

Q. There are forecasts that you've reviewed, right?

A. Right.

Q. And the forecasts include postconfirmation forecasts that assume the plan of confirmation, right?

A. Right.

Q. In those forecasts, does the City bear the entirety of the B note interest expense? That's a good way to back into it.

A. Okay, or is there some expense allocated to an enterprise --

Q. Exactly right.

A. I think your question -- that way of doing it, I think your question is fair. It does not bear the entirety of it; there is an allocation.

Q. Oh, there is an allocation?

A. I think that --

Q. Let's put it this way. The answer to that question should be found in the forecast? I literally don't know.

A. No, but I --

Q. I was literally asking you a discovery question.

A. Well, I'm trying -- there is an allocation of 428 million at DWSD that is supposed to go to help finance the note. I think I can speak to that.

KEVYN ORR, VOLUME 2

Q. Oh, I see.

A. Yeah.

Q. Because do the pensioners get -- I thought the pensioners don't get B notes, do they?

A. No, but I'm trying to -- I'm trying to --

Q. Because I thought that -- that was the nine-year payment that you matched up with the Grand Bargain, but that was cash money --

A. Yeah, that was --

Q. -- over the retirement --

A. That payment is year over year for nine years that's indexed to the possibility of restoration, that's why it's nine years. I'm not sure that goes into what 388 million B note but -- I'm trying to make sure that I don't bump up against any discussions that are going in -- that are ongoing.

Q. Okay. I mean, is it a fair summary to say you don't know whether the forecast allocated a percentage of the B note interest expense through the DWSD or not?

A. Yeah, I'd say that.

Q. Okay. Let's talk about the Grand Bargain some more if we could, Mr. Orr.

A. Sure.

Q. Do you know -- the Grand Bargain can also be -- is

KEVYN ORR, VOLUME 2

also known as the DIA settlement, correct?

A. Yeah, people call it different things, but I think it's fair that people call it either one of those.

Q. Okay, and so the way it works, we've talked about it, but the DIA settlement is the -- is the contributions of the charitable foundations and the DIA Corp. in connection with the art collection going into a public trust, correct?

A. Yes.

Q. And then the state contribution of its money has a number of bells and whistles to it but is, itself, conditioned on the DIA settlement?

A. Well, yes, it's conditioned on a settlement of claims against the State relating to that provision of the constitution, article 9, section 24 regarding pension rights and also in part for the DIA settlement and the art to be put into the trust.

Q. Yeah, and that's what I meant by the other bells and whistles. Like even if the retirees gave the State a waiver, that's actually not sufficient for the State contribution. You have to get the DIA settlement, as well?

A. Yes.

Q. When did you agree to the Grand Bargain? Let me put

Pages 374 to 377

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-9   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 6 of 6