**Exhibit 6E**

**July 23, 2014 C. Moore Deposition Transcript**

1  CHARLES MOORE, CPA
2  IN THE UNITED STATES BANKRUPTCY COURT
3  FOR THE EASTERN DISTRICT OF MICHIGAN
4
5  In re:            Chapter 9
6  CITY OF DETROIT, MICHIGAN   Case No. 13-53846
7       Debtor.    Hon. Steven W. Rhodes
8  _____/
9
10 The Videotaped Deposition of CHARLES MOORE, CPA
11 Taken at 1114 Washington Boulevard,
12 Detroit, Michigan,
13 Commencing at 9:01 a.m.,
14 Wednesday, July 23, 2014,
15 Before Quentina Rochelle Snowden, CSR-5519.

1        CHARLES MOORE, CPA
2  APPEARANCES:
3
4  ROBERT W. HAMILTON, ESQ.
5  Jones Day
6  325 John H. McConnell Boulevard
7  Suite 600
8  Columbus Ohio 43215
9      Appearing on behalf of the Debtor.
10
11
12
13 LAIRD E. NELSON, ESQ.
14 Jones Day
15 222 East 41st Street
16 New York, New York 10017
17     Appearing on behalf of the Debtor.

1        CHARLES MOORE, CPA
2  APPEARANCES, CONTINUED:
3
4  EDWARD SOTO, ESQ.,
5  PRAVIN PATEL, ESQ.
6  Weil, Gotshal & Manges, LLP
7  1395 Brickell Avenue
8  Suite 1200
9  Miami, Florida 33131
10     Appearing on behalf of FGIC.
11
12
13
14 ROBERT A. SCHWINGER, ESQ.,
15 LISA SCHAPIRA, ESQ. (Telephonic)
16 Chadbourne & Parke, LLP
17 30 Rockefeller Plaza
18 New York, New York 10112
19     Appearing on behalf of Assured Guaranty
20     Municipal Corp.

1        CHARLES MOORE, CPA
2  APPEARANCES CONTINUED:
3
4  KATHLEEN HITCHINS, ESQ.
5  Sidley Austin, LLP
6  1501 K. Street, NW
7  Washington, DC 20005
8      Appearing on behalf of National Public
9      Finance Guarantee Corporation.
10
11
12
13 ANTHONY B. ULLMAN, ESQ.
14 Dentons US LLP
15 1221 Avenue of the Americas
16 New York, New York 10020
17     Appearing on behalf of Retiree Committee.

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6787-10  Filed 08/18/14  Entered 08/18/14 10:29:34  Page 2 of 4

|  |  |
|---|---|
| Page 89<br>1  CHARLES MOORE, CPA<br>2  Department?<br>3          MR. SOTO:  I'm talking about for the<br>4  Fire Department.  Thank you.<br>5          THE WITNESS:  The --<br>6  BY MR. SOTO:<br>7  Q  And I'm actually -- let me be more specific.  For<br>8     the Fire Department in connection with the plan of<br>9     adjustment.<br>10 A  All of the documents that I would have relied on are<br>11    in Exhibit 4.  There are many that relate to the<br>12    Fire Department.<br>13 Q  And that would involve any spending required<br>14    analysis?<br>15 A  Yes.<br>16 Q  And any cost reduction analysis?<br>17 A  Yes.<br>18 Q  Did it also involve any revenue generation analysis?<br>19 A  Yes.<br>20 Q  Did you perform any forecasts in connection with the<br>21    work you did on the City's plan of adjustment?<br>22 A  How do you define "Forecast"?<br>23 Q  Forecasts in connection with forecast of proposed<br>24    expenditures.  We've already discussed some<br>25    forecasts in your opinion one with respect to | Page 91<br>1  CHARLES MOORE, CPA<br>2  familiar with, there is a 40-year financial<br>3  projection, there's a 10-year financial projection.<br>4  There are the restructuring and reinvestment<br>5  initiatives.  There are the water and sewerage<br>6  projections.  Those are the ones that I can think of<br>7  offhand.<br>8          As it relates to the first two, the<br>9  40-year and the 10-year, those are documents that<br>10 Ernst and Young was the author of, however, Conway<br>11 MacKenzie provided inputs to both of those<br>12 documents.  The third one, the restructuring and<br>13 reinvestment initiatives, Conway MacKenzie was the<br>14 author of that document.  The water and sewerage<br>15 projections Conway MacKenzie was the author of that<br>16 set of projections.<br>17 Q  In connection with preparing those projections, did<br>18    you perform any financial projections or analysis<br>19    that assumed that that the City's Chapter 9 case was<br>20    dismissed?<br>21 A  No.<br>22 Q  Why not?<br>23 A  If you look at the work that we're doing, the work<br>24    that this -- the work that Conway MacKenzie is<br>25    focused on is, how should the departments be |
| Page 90<br>1  CHARLES MOORE, CPA<br>2  savings that might be expected and revenue that<br>3  might be expected with respect to blight removal.<br>4  That's what I'm referring to as forecasts.<br>5  A  Okay.  I'll use the term, "Financial projections".<br>6  Q  That's fine with me.<br>7  A  Yes.  We -- we certainly did in that the entire<br>8     Exhibit 5 -- well really Exhibits 5, 6, 7 and 8 to<br>9     my expert report are all of those projections.<br>10 Q  Now, let me step away from the expert report for a<br>11    second only to -- as I'm here representing a number<br>12    of other counsel who have asked me to ask questions<br>13    as well.<br>14         In connection with the plan of<br>15 adjustment, did you -- did you work on any financial<br>16 projections?<br>17 A  The financial projections that are included in the<br>18    plan of adjustment -- and when we say "Plan of<br>19    adjustment", just to be clear, I'm referring to the<br>20    fourth amended plan of adjustment filed around<br>21    May 5th.<br>22 Q  I agree with that.  I know there's one coming, but<br>23    we can only work with the ones we have.<br>24 A  Yes.  The financial projections that are included in<br>25    the plan, I'll just list off the ones that I'm | Page 92<br>1  CHARLES MOORE, CPA<br>2  operating and what is necessary to get them to that<br>3  point, regardless of in or out of Chapter 9.  So<br>4  while I have been involved in the Chapter 9 process,<br>5  the focus of our work is without regard to Chapter<br>6  9.<br>7  Q  So if the plan -- and let me see if -- I think I<br>8     understood what you just said, but let me make sure,<br>9     and you tell me if I'm wrong here.  If the plan of<br>10    adjustment in this matter were dismissed, is it your<br>11    position that those reinvestment expenses, those<br>12    reinvestment initiatives, the ones that are set<br>13    forth in the plan of adjustment, as well as the ones<br>14    that you opine on in your expert report, could go<br>15    forward?<br>16         MR. HAMILTON:  Object to form.  You<br>17 can answer.<br>18         THE WITNESS:  They -- they should<br>19 still go forward.<br>20 BY MR. SOTO:<br>21 Q  Forgive me, I'm just taking some time to get rid of<br>22    some questions here that I think you've already<br>23    answered.<br>24 A  No problem.  Take your time.  As many as you want to<br>25    get rid of that's fine with me. |

Pages 89 to 92

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-10   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 3 of 4

CHARLES MOORE, CPA

Q Me too. Okay. Regarding the work that you performed in connection with your engagement with the City -- I've already heard you testify about the numbers. Did you have any interfacing with anyone at Miller Buckfire?

A Yes.

Q And who would that be?

A Ken Buckfire, Jim Doak, Kyle Herman, Kevin Haggard, Sanjay Marken, Vlad -- and I can't recall Vlad's last name.

Q But it's not the Impaler. It's --

A Correct. At least it did not seem to be. I think those were the primary individuals from Miller Buckfire that I can think of, offhand.

Q And what was the nature of your interaction with them?

A I interacted with Miller Buckfire on a number of different items. I interacted and Conway MacKenzie interacted quite a bit with Miller Buckfire as it relates to the Water and Sewerage Department. The ten-year business plan that we developed, and options being considered for DWSD. I interacted with Miller Buckfire on the quality of life financing, or the post-petition financing. I've

CHARLES MOORE, CPA

interacted with Miller Buckfire as it relates to the exit financing. And I have interacted with Miller Buckfire on a variety of general restructuring topics.

Q In connection with your work with Miller and Buckfire on the quality of life financing, the post-petition financing, and the exit financing, do you expect to testify at the hearing on the plan of adjustment with respect to those items?

A I don't know.

Q So the quality of life financing interaction, what did -- what did that involve? What -- when you say quality of life financing, just so it's clear to the Court, what are you referring to?

A Sure. This is post-petition financing that the City obtained, in the amount of approximately $120 million. And the financing was used to fund a number of the reinvestment initiatives. That's why it's commonly referred to as quality of life financing.

Q And then you referred to separately as to post-petition financing. Was that the same thing?

A I actually -- if I did, that's not how I meant for it to be.

CHARLES MOORE, CPA

Q And you might not have.

A Yeah. Quality of life financing, or post-petition financing. Quality of life financing is post-petition financing.

Q Understood. And then the exit financing, what was your interaction with respect to that?

A The financing -- the exit financing just so we're clear, is financing that the City is intending to obtain as part of its exit from bankruptcy, which will, in part, refinance the quality of life financing, as well as provide some additional financing.

And my understanding -- my interaction was to understand the amount, the timing of that, so that the timing of the initiatives, restructuring or reinvestment initiatives could be timed appropriately.

Q Did you make recommendations regarding the amount of post -- of -- excuse me -- of exit financing?

A I wouldn't say that I made recommendations, but I provided input from the standpoint of the amount and the timing of the reinvestment initiatives.

Q So, if I'm understanding it, what you said -- what you're saying is, look, I -- I looked at the exit

CHARLES MOORE, CPA

financing and I looked at the reinvestment initiatives, I looked at the amount of the reinvestment initiatives, the cost of them, and when we think they're going to be needed, and I spoke with the people who were putting together the exit financing and told them, look, for the reinvestment initiatives here's the amount that we need and here's the timing; is that correct?

A I think that's a fair statement, yes.

Q Anything other than that?

A I don't believe so.

Q When you talk to someone about the amount you thought the reinvestment initiatives would -- would require, or the timing, did anyone say, "Well, that's just way too much, we just can't agree to that"?

A I'm sure that someone has said that at various points in time. Not anyone specific that I can recall, but that has been a -- a fairly consistent topic of discussion, which is how quickly can the City implement the various initiatives, the benefits that are received, how -- how -- obviously the City would like to receive the benefits as soon as possible, balanced against the sources of cash to

Pages 93 to 96

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6787-10   Filed 08/18/14   Entered 08/18/14 10:29:34   Page 4 of 4