# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------------x
                                        :
 In re                                  : Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              : Case No. 13-53846
                                        :
                        Debtor.         : Hon. Steven W. Rhodes
                                        :
                                        :
-------------------------------------------------------------x
```

## FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION TO EXCLUDE THE OPINION OF KENNETH BUCKFIRE REGARDING PLAN TREATMENT COMPARED TO TREATMENT UPON DISMISSAL

US_ACTIVE:\44540482\6\45259.0007

Financial Guaranty Insurance Company ("FGIC") respectfully submits this Motion to Exclude the Opinion of Kenneth Buckfire Regarding Plan Treatment Compared to Treatment Upon Dismissal, pursuant to Federal Rule of Evidence 702[1] and *Daubert*.

## PRELIMINARY STATEMENT

1. To support its argument that the Plan[2] satisfies the "best interest" test of 11 U.S.C. § 943(b)(7), the City intends to call Kenneth Buckfire as an expert to opine that "the City's creditors will be treated better under the City's plan of adjustment than if the bankruptcy case were dismissed" (the "Best Interests Opinion").[3] But Mr. Buckfire utterly failed to employ any type of discernible methodology in reaching this opinion, let alone the type of reliable methodology required by Rule 702 and *Daubert*. He made no attempt to systematically evaluate what creditors could or would receive in the event the City's bankruptcy case were dismissed, nor did he consider various factors relevant to creditors' recoveries in such a scenario.

2. Instead of providing a reliable foundation for his opinion, Mr. Buckfire made a handful of unsupported, generalized assumptions and then simply concluded that "all of the City's creditors" will fare better under the Plan than in a dismissal scenario. Buckfire Rep. ¶¶ 7-9. Indeed, many of the assumptions on which Mr. Buckfire relies either ignore critical evidence or are directly controverted by the evidence. Critically, Mr. Buckfire is admittedly not

---

[1] Federal Rule of Bankruptcy Procedure 9017 provides that "[t]he Federal Rules of Evidence … apply in cases under the Code."

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed May 12, 2014 [Docket No. 4660] and the Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed August 12, 2014 [Docket No. 6674].

[3] Kenneth's Buckfire's Expert Witness Report, dated July 8, 2014 ("Buckfire Rep.") (attached hereto as Ex. 8), at 2.

US_ACTIVE:\44540482\6\45259.0007

even qualified to assess one of the central assumptions underlying his opinion – that attempts to increase taxes in a dismissal scenario will not increase the City's revenue. Mr. Buckfire's failure to perform the type of analysis that could reliably substantiate a best interests opinion, coupled with his reliance on unsubstantiated and often counterfactual assumptions, render his testimony unreliable, unhelpful and inadmissible under Rule 702 and *Daubert*.

## JURISDICTION

3.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### I.     Legal Standard

4.      Federal Rule of Evidence 702 ("Rule 702"), which governs the admissibility of expert testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

5.      Rule 702 compels courts to act as "gatekeepers" over the admissibility of expert evidence to make certain that unreliable testimony does not reach the trier of fact. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). This gatekeeping function "applies to all expert testimony, not just testimony based in science." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999)). The proponent of the expert testimony "bears the burden of proving its admissibility." *E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014) (citation omitted).

3

US_ACTIVE:\44540482\6\45259.0007

6.    Pursuant to Rule 702, the Sixth Circuit has delineated that "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528-29.  First, a witness must "establish his expertise by reference to 'knowledge, skill, experience, training, or education.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (quoting Fed. R. Evid. 702).  "A witness is [not] an expert simply because he claims to be." *Id.*  Moreover, "the issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

7.    The second element of Rule 702 "requires a proffered expert to testify to scientific, technical, or other specialized knowledge … [which] serves to establish a standard of 'evidentiary reliability' or 'trustworthiness.'" *Pride*, 218 F. 3d at 577 (citing *Daubert*, 509 U.S. at 591).  The Sixth Circuit has explained that by requiring evidentiary reliability, "the *Daubert* Court instructed district courts that their primary function as gatekeepers is to determine whether the principles and methodology underlying the testimony itself are valid." *Id.*

8.    While there is no single criterion for determining reliability, "the *Daubert* Court identified several factors that a district court should consider when evaluating the [] validity of expert testimony, notably: the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community." *Id.*  As the Sixth Circuit noted in *Clay v. Ford Motor Co.*, "the specific *Daubert* factors – testing, peer review and publication, potential rate of error,

4

US_ACTIVE:\44540482\6\45259.0007

and general acceptance in the relevant community – may be considered by the district court even when the proffered expert testimony is not scientific." 215 F.3d 663, 667 (6th Cir. 2000).

9.       Finally, Rule 702 "requires that the expert's testimony assist the trier of fact." *Pride*, 218 F.3d at 578.  "Courts have framed the inquiry as 'whether expert testimony improperly addresses matters within the understanding or common knowledge of the [trier of fact].'" *Dow Corning Corp. v. Weather Shield Mfg.*, No. 09-10429, 2011 U.S. Dist. Lexis 67244, at *37 (E.D. Mich. June 22, 2011) (quoting *U.S. v. Thomas*, 74 F.3d 676, 684 n.6 (6th Cir. 1996)).  As stated by the Court in *Berry*, "[i]f everyone knows [something], then we do not need an expert because the testimony will not 'assist' the trier of fact to understand the evidence or to determine a fact in issue." 25 F.3d at 1350 (citation omitted).

## II.      Mr. Buckfire's Best Interests Opinion Should Be Excluded Because It Is Not Based on Any Reliable Methodology or Data

### A.      Mr. Buckfire's Opinion Lacks a Reliable Foundation

10.       In order to meet the requirement of reliability, an expert's proposed testimony "must be supported by appropriate validation – *i.e.*, good grounds based on what is known." *Daubert*, 509 U.S. at 590; *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-530.  Accordingly, an expert's opinions must "rest[] upon a reliable foundation." *Id.*; *see also Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 426 (6th Cir. 2009) ("an expert's opinion testimony must have a reliable basis in the knowledge and experience of his discipline") (citation omitted).  This ensures that the expert's opinions are not "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Both the Supreme Court and the Sixth Circuit have recognized that this requirement applies to all forms of expert testimony, not just scientific testimony. *Kumho*, 526 U.S. at 137; *Berry*, 25 F.3d at 1350.

5

US_ACTIVE:\44540482\6\45259.0007

11.     Mr. Buckfire's Best Interests Opinion is precisely the type of opinion that lacks the reliable foundation mandated by the Supreme Court and the Sixth Circuit.  To satisfy the best interests of creditors test in chapter 9, the debtor must show that creditors would fare better under the plan than outside of the plan.  *See In re Cnty. of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996).  In a chapter 9 case, this requires a comparison of creditor recoveries under the proposed plan against estimated creditor recoveries if the bankruptcy were dismissed. *Id*. (quoting 4 Collier on Bankruptcy ¶ 943.03(7)(a) (15th rev. ed. 1995) ("The courts must … apply the [best interests] test to require a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case.")).  Such a comparison necessarily requires a detailed analysis of a host of complex issues related to the dismissal scenario, including: the debtor's forecasted revenues subsequent to dismissal; the value of the debtor's assets and possible monetization of those assets; the remedies available to creditors under applicable state law; and how the debtor would use its revenues and other resources to satisfy creditor judgments. *See In re Barnwell County Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) (conducting a "best interests" analysis under § 943(b)(7), pursuant to which the Court considered the debtor's revenue in the absence of the proposed plan, the value of the debtor's assets in the absence of the proposed plan, and the likely distribution of assets to the creditors in the absence of the proposed plan).[4]

---

[4] It is instructive to consider the types of analyses that have been deemed acceptable in the context of the best interests test of chapter 11, which requires an evaluation of creditor recoveries in a liquidation compared to creditor recoveries under the debtor's proposed plan.  For instance, in *In re AbitibiBowater Inc*., the court upheld an expert's best interest opinion where the expert conducted a thorough liquidation analysis, including: (a) an estimation of liquidation proceeds; (b) an estimation of allowed claims against the debtor on a liquidation basis; and (c) a comparison of the net value available to unsecured creditors under liquidation versus under the plan of adjustment.  No. 09-11296, 2010 WL 4823839, at *11 (Bankr. D. Del. Nov. 22, 2010). As this Court is aware, it is customary in a chapter 11 case for the debtor to provide with its

6

12.     While Mr. Buckfire opines that "the City's creditors will be treated better under the City's plan of adjustment than if the bankruptcy case were dismissed," Buckfire Rep. 2, his report evidences no discernible effort to systematically evaluate creditor recoveries in the event the City's bankruptcy case were dismissed, whether through an estimated dollar or percentage amount, or some other numerical formula.   In fact, Mr. Buckfire repeatedly confirmed at his deposition that he and his team "**have not done a dismissal analysis**" of any kind in order to test his opinion, including any analysis as to: (a) the City's revenues and costs in a dismissal scenario, Buckfire Dep. 236:8-13, July 16, 2014 (attached hereto as Ex. 7); (b) the total value of claims that would be asserted against the City in a dismissal scenario, *id*. at 276:19-22; (c) how the City would use its surplus revenues to satisfy creditor claims in a dismissal scenario, *id*. at 280:11-16; and (d) the extent to which the City would monetize its assets in a dismissal scenario, including the DIA Assets, and how that monetization would impact creditor recoveries, *id*. at 194:19-195:5; 288:18-21; 294:25-295:18; 298:5-8.

13.     Critically, neither the City nor any of its representatives have filed, produced or otherwise provided such an analysis in any respect.  *See id.* at 236:8-25 ("Q. And no one else has [conducted an analysis of the City's revenues and costs in a dismissal scenario] either, correct?  A. Correct."); *id.* at 243:15-18 ("Q. . . . Ernst & Young, they did not do a forecast for the situation where the petition is dismissed, correct?  A. That's correct."); Malhotra Dep. 116:4-6, July 15, 2014 (excerpts of which are attached hereto as Ex. 9) ("we do not have a scenario of what happens if the City's bankruptcy proceedings are dismissed"); *id.* 144:9-25 (confirming that he has no opinion, and nobody has asked him to do an analysis, regarding how

proposed plan and disclosure statement a detailed liquidation analysis setting forth this information in numerical form, including the estimated percentage recovery to each class of creditors in an alternative liquidation.  This typically is prepared by a financial advisor with expertise in preparing such analyses.

7

much creditors would receive in a dismissal scenario); Moore Dep. 91:17-21, July 23, 2014 (excerpts of which are attached hereto as Ex. 10) ("Q. In connection with preparing those projections, did you perform any financial projections or analysis that assumed that the City's Chapter 9 case was dismissed?  A. No.").

14.     Only by systematically analyzing each of these issues (along with various other relevant factors) can an expert reliably estimate creditor recoveries in a dismissal scenario – and therefore reliably opine on how creditor recoveries in a dismissal scenario compare with recoveries under the Plan.  As courts have held in the context of the best interests test of chapter 11, the analysis "is to be based on evidence not assumptions."  *In re Multiut Corp.*, 449 B.R. 323, 345 (Bankr. N.D. Ill. 2011*); see also In re Adelphia Commc'n Corp.*, 361 B.R. 337, 366 (S.D.N.Y. 2007) (holding that in order to demonstrate that creditors will fare better under the plan than outside of the plan, "there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions").  Thus, where a debtor "provides very little in the way of a liquidation analysis" and "[other than conclusory testimony [] and assertions [], there is no actual evidence or analysis to indicate what creditors would receive in a Chapter 7 case versus a Chapter 11 case," the best interest analysis is insufficient.  *In re Multiut Corp.*, 449 B.R. at 346.

15.     Notably, the expert report of Stephen Spencer[5] stands in stark contrast with Mr. Buckfire's report.  In his report, Mr. Spencer engages in a detailed dismissal analysis, forecasting (among other things) the City's future cash flow in a dismissal scenario, COP Claim recoveries outside of chapter 9, the impact of dismissal on the City's tax base, and the potential for asset monetization.  *See* Spencer Rep. 57-61, 79-92.  Without having done such an analysis,

---

[5] Stephen Spencer's Expert Witness Report, dated July 25, 2014 (attached hereto as Ex. 11) ("Spencer Rep.").

8

US_ACTIVE:\44540482\6\45259.0007

Mr. Buckfire's opinion lacks a reliable foundation and is, instead, connected to existing data only by own his "*ipse dixit*." *Joiner*, 522 U.S. 136, 146. Certainly, concluding that creditors will do better under the Plan without having conducted any sort of detailed analysis as to how creditors will fare outside of the Plan is not a "best interests" methodology that has been tested, subjected to peer review or publication, has a known rate of error, or is generally accepted. *See Berry*, 25 F.3d at 1350 (applying the *Daubert* factors to non-scientific testimony and excluding the expert's opinion in part because it did not satisfy any of the factors). Given these shortcomings in his methodology, Mr. Buckfire's Best Interests Opinion fails to pass muster under *Daubert* and Rule 702. *See id.*; *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30.

**B. Mr. Buckfire Reaches His Opinion By Ignoring Facts and Relying on Unsupported Assumptions**

16. Rather than employing a reliable methodology by which to appropriately validate his Best Interests Opinion, Mr. Buckfire rests his testimony solely on a handful of generalized and largely unsupported assumptions, while ignoring a plethora of critical information. Rule 702 requires "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("no matter how good experts credentials may be, they are not permitted to speculate") (quotation marks and citation omitted); *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997) ("an expert's subjective belief or unsupported speculation will not … satisfy Fed. R. Evid. 702). Thus, any assumptions made by an expert "must be supported by evidence in the record." *Rose v. Truck Ctrs., Inc.*, 388 Fed. App'x 528, 535 (6th Cir. 2010); *see also McLean v. 988011 Ontario, Ltf.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."). An "expert opinion that assumes facts not supported by the record should be excluded." *Davison v. Cole Sewell Corp.*,

US_ACTIVE:\44540482\6\45259.0007

231 Fed. App'x 444, 449 (6th Cir. 2007) (citing *Shaw v. Strackouse*, 920 F.3d 1135, 1142 (3d Cir. 1990)); *see also Waskowski v. State Farm Mut. Auto Ins. Co.*, 970 F. Supp. 2d 714, 722 (E.D. Mich. Sept. 10, 2013) (finding that expert's report was not based on sufficient facts or data because the expert "resorted to assumptions, estimates, and representations from Plaintiff's counsel" that were not supported by the record in the case).

17. In addition, expert testimony is inadmissible when an expert "fail[s] to consider[] admittedly important information," because then the opinion "cannot be considered reliable." *Smelser*, 105 F.3d at 305 (reversing district court admission of an expert who failed to consider various facts that undermined the assumption underlying his opinion); *see also Brown v. Lewis*, 2014 U.S. Dist. Lexis 11867, at *9 (E.D. Mich. Jan. 31, 2014) (expert opinion that "does not address the factual allegations that do not comport" with the facts on which he relies is inadmissible because then the opinion "is not based on sufficient facts or data, and therefore [the] conclusions are not reliable"). Similarly, "expert testimony [] is inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999); *see also DeMerrell v. City of Cheboygan*, 206 Fed. App'x 418, 427 (6th Cir. 2006) (upholding the exclusion of an expert whose reports contained "premises that contradict the uncontroverted facts").

18. Mr. Buckfire's conclusion that the City's creditors will be treated better under the Plan than in a dismissal scenario rests, in large part, on his assumption that "creditor recoveries upon dismissal will be *de minimis*." Buckfire Rep. ¶ 7. But, as discussed in detail below, Mr. Buckfire reaches that assumption by ignoring numerous important facts (many of which he would have had to consider had he conducted a dismissal analysis), instead relying on a handful of subsidiary assumptions that he admittedly cannot substantiate.

i.     Mr. Buckfire Fails to Consider Whether City Assets Would be Sold to Satisfy Creditor Claims in a Dismissal Scenario

19.     A central assumption on which Mr. Buckfire relies in opining that creditor recoveries upon dismissal will be *de minimis* is his "understand[ing] that, in [a race to the courthouse] scenario, creditors are unable to compel the City to sell assets or to take a lien on public property." Buckfire Rep. ¶ 7. Mr. Buckfire testified that this assumption is based on advice conveyed to him by attorneys at Jones Day, and that he did not do any analysis to determine whether that advice was correct. Buckfire Dep. 282:4-16. Mr. Buckfire also testified that he did not consider the extent to which the City could or would independently sell assets in order to satisfy creditor claims in the event of a dismissal, and how such monetization would impact creditor recoveries. For instance, with respect to the DIA Assets, Mr. Buckfire testified as follows:

> Q. [H]ave you evaluated the likelihood that the City might choose to sell its art collection in a dismissal scenario?
> A. No.
> Q. And have you – I take it then you haven't evaluated the impact such a sale would have on creditor recoveries, correct?
> A. We have not done a dismissal analysis.

Buckfire Dep. 288:14-21. Mr. Buckfire confirmed the same lack of analysis with respect to the City's other assets. *See, e.g., id.* 298:5-8 ("Q. But like the other assets of the City, it's not one that you've studied to determine its impact on creditor recoveries correct? A. In a dismissal scenario, that's correct.").

20.     Critically, Mr. Buckfire admitted that the City has sold assets in the past to satisfy creditor claims. *Id.* 201:2-4 ("Q Do you know if in its history the City of Detroit has -- has done that [sold off assets to satisfy the claims of creditors]? A. Yes.").[6] Indeed, as

---

[6] *See also* Spencer Rep. 56 (discussing various instances in which the City has pursued asset monetization as a means to fund its operations and repay creditors).

11

US_ACTIVE:\44540482\6\45259.0007

discussed in more detail in Mr. Spencer's report, municipalities routinely sell assets to bolster liquidity and satisfy obligations to creditors. Spencer Rep. 53-55. Yet, Mr. Buckfire wholly failed to consider whether such monetization would or could occur here and the resulting impact on creditor recoveries. Because Mr. Buckfire ignored this important information in forming his assumptions, his opinion "cannot be considered reliable" under *Daubert*. *Smelser*, 105 F.3d at 305; *see also Brown*, 2014 U.S. Dist. Lexis 11867, at *9.

> ii.    Mr. Buckfire Fails to Consider the Extent to Which Increased Revenues Would Impact Creditor Recoveries in a Dismissal Scenario

21.    Mr. Buckfire's assumption that creditor recoveries upon dismissal would be *de minimis* also fails to take into account whether – and how – creditors could benefit from the City's future surplus revenues. If the City were to ultimately improve its current financial situation, the creditors in a dismissal scenario would – as Mr. Buckfire acknowledged – be entitled to any excess revenue. Buckfire Dep. 279:7-280:10; 238:2-239:12. Moreover, as Mr. Buckfire admitted, creditor remedies in a dismissal scenario would be *pari passu*. *Id.* at 278:19-23. Under the Plan, however, surplus revenue is a windfall for the City and will not enhance creditor recoveries (while certain unsecured creditors are receiving preferential treatment). But Mr. Buckfire testified that he never considered any of these facts and how they might impact his assumptions. *See* Buckfire Dep. 280:11-16 ("Q: Okay. But you haven't actually done the analysis, though, to see who would get any surplus revenue that exists above operating expenditures and secured debt, correct? A. You've already asked me this, we have not done a dismissal analysis."). His ignorance to these issues only further undermines the reliability of his opinions. *See, e.g., Smelser*, 105 F.3d at 305.

> iii.   Mr. Buckfire's Assumptions Regarding the Ability and Practicality of Raising Taxes Are Controverted by the Facts

US_ACTIVE:\44540482\6\45259.0007

22.     In assuming that creditor recoveries upon dismissal would be *de minimis*, Mr. Buckfire makes a subsidiary assumption that "in a dismissal scenario, the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue." Buckfire Rep. ¶ 17.  Mr. Buckfire speculates that: (a) the City would be "unable" to raise taxes because it is at or near statutory tax limits; and (b) it would be "impractical" to do so because increasing tax rates would have a negative effect on revenue as a result of delinquencies and mass exodus from the City.  *Id*. ¶¶ 7, 17.   However, Mr. Buckfire admitted at his deposition that statutory caps do not prevent the City from raising taxes to satisfy creditor judgments.  Buckfire Dep. 238:2-20 (testifying that it is his understanding "[t]hat it's under certain circumstances a creditor might seek a judgment requiring the City to raise taxes").   Indeed, the Revised Judicature Act of 1961, M.C.L. 600.6093, specifically provides that a court could compel the City to levy property taxes sufficient to satisfy a judgment, irrespective of limitations on property taxes imposed by the Michigan Constitution, the Home Rule Cities Act or the City Charter.  *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352 (2000).  Thus, the "facts upon which [Mr. Buckfire] bases his testimony contradict the evidence."  *Greenwell,* 184 F.3d at 497 (holding that expert testimony is inadmissible when it contradicts the evidence).

23.     As to Mr. Buckfire's assumption that tax increases would negatively impact future revenue generation by causing residents to leave the City and increasing delinquency rates, Mr. Buckfire admitted he never personally analyzed the issue:

> Q.  [D]id you ever attempt to quantify how delinquency rates would go up if taxes went up?
> A.  No.
> ….
> Q.   And you don't know whether there's a historical connection in Detroit between the income tax rate and the delinquency tax rate, correct?
> A.  That's correct.
> ….

13

US_ACTIVE:\44540482\6\45259.0007

Q. Have you conducted any analysis to determine how many people will leave under different scenarios where taxes are increased?
A. No.
….
Q. You have not conducted, however, any quantitative analysis assessing the relationship between tax rates and population levels over historical time periods in Detroit, correct?
A. Correct.

Buckfire Dep. 243:11-252:17.

24. As discussed in more detail in Section III, *supra*, Mr. Buckfire testified that he formed his assumption regarding the impracticality of raising taxes based on an analysis purportedly conducted by Mr. Cline of Ernst & Young. *See* Buckfire Dep. 240:3-242:3 ("A. [W]e did ask the tax experts at E&Y to do an analysis of the City's revenues and take into account the sensitivity of revenues to tax rates. Q. So you asked Mr. [Cline] at E&Y? A. I did…. Q. And did you rely on that information from Mr. [Cline] in reaching your conclusion about the fact that City's not going to generate additional revenue from raising taxes? A. Yes."). However, Mr. Cline testified that he has not rendered any opinions regarding the effect of potential tax increases, nor did he undertake any of the work necessary to form such opinions.

Q. And you haven't done any work that would allow you to testify that Detroit couldn't generate significant additional revenue by either adding new taxes or increasing tax rates?
A. We were not asked to look at policy options for the City of Detroit…. We did not – were not asked to and **did not provide forecasts under alternative policy options, whether it's a tax rate change or adoption of a new tax, or change, in the base of an existing tax.**
…
Q. You didn't do any work that would allow you to testify that by increasing tax rates, Detroit would not increase substantially its tax revenues?
A. **We did not run alternatives with our model at different tax rates.**
...
Q. Okay. But is it technically feasible for you to do an analysis like that?
A. We would have to do additional work compared to what we have done to this point, because as I mentioned, it's not just changing the rate, it's also understanding the behavioral response of the base in response to the change in the rate. **We are not set up to do that** in our current runs.

14

US_ACTIVE:\44540482\6\45259.0007

Q.  And you also haven't done the work that would allow you to testify that Detroit couldn't significantly increase revenues by adding new taxes, correct?
A.  We have not analyzed the addition of new revenue sources for Detroit.

Cline Dep. 96:6-98:2; 100:13-101:12, July 14, 2014 (excerpts of which are attached hereto as Ex. 12).[7]

25.    Thus, the entire basis for Mr. Buckfire's views regarding the practicality of raising taxes is based on his reliance on an analysis that Mr. Cline **never** performed and was not equipped to perform.  Accordingly, Mr. Buckfire's assumptions regarding the ability and practicality of raising taxes – an assumption that is central to his ultimate assumption regarding creditor recoveries in a dismissal scenario – are unsupported by the facts in the record, rendering his opinion excludable under *Daubert*.  *See, e.g.*, *Davison*, 231 Fed. App'x at 449; *DeMerrell*, 206 Fed. App'x at 427.

      iv.      There Is No Support for Mr. Buckfire's Assumptions Regarding a "Race to the Courthouse"

26.    Mr. Buckfire also assumes in his Report that creditor recoveries in a dismissal scenario will be *de minimis* in part because creditors would "race to the courthouse" to exercise their legal rights against the City, resulting in "chaos and inefficiency."  Buckfire Rep. ¶¶ 7-8.  But Mr. Buckfire engaged in no analysis whatsoever regarding the claims or sources of claims that would result in a "race to the courthouse," or the consequences of such a race on creditor recoveries:

---

[7] The City's other representatives have also confirmed that they have not performed such an analysis.  *See* Malhotra Dep. 115:25-116:4, July 15, 2014 ("Q You haven't been asked to do any analysis of the costs and revenues to the City if the bankruptcy petition is dismissed, correct?  A. We do not … have a scenario of what happens if the City's bankruptcy proceeds are dismissed."); Sallee Dep. 51:1-13, July 24, 2014 (excerpts of which are attached hereto as Ex. 13) ("Q.  So you're offering no opinion about whether the City can increase tax revenues, correct?  A.  I'm not offering an opinion about whether they can increase tax revenues…. Q. And you're not offering an opinion about how much revenue the City would have if the bankruptcy case is dismissed, correct?  A.  That's correct.").

US_ACTIVE:\44540482\6\45259.0007

Q. … [D]id you do any analysis of well here's what we think would happen, here's the creditors we think would have a certain type of priority, here's the creditors we think would have a different type of priority here's how we think … the race to the courthouse might come out, did you do any analysis like that?
A. No.

Buckfire Dep. 179:2–179:9.

27. Mr. Buckfire's response as to why no such analysis was performed was that "we thought it was pretty obvious." *Id.* at 179:10-17. Mr. Buckfire's assumptions regarding a race to the courthouse are therefore unmoored from any reliable data or analysis other than his own subjective presumptions. An opinion based on such presumptions is plainly impermissible under *Daubert*. *See, e.g., Smelser*, 105 F.3d at 303 ("an expert's subjective belief or unsupported speculation will not … satisfy Fed. R. Evid. 702").

     v.     There is No Support for Mr. Buckfire's Assumptions Regarding the Availability and Benefit of the Settlement Funds

28. Yet another assumption by Mr. Buckfire is that creditors would not have the benefit of "hundreds of millions of dollars" stemming from the "Grand Bargain" in a dismissal scenario. Buckfire Rep ¶ 8. But Mr. Buckfire never evaluated whether the City would be able to solicit funding from the Grand Bargain participants in a dismissal scenario:

Q. Have you evaluated the extent to which [the Grand Bargain] might be reconstituted in a dismissal?
A. That's speculation and I've already testified we haven't done a dismissal analysis.

Buckfire Dep. 289:11–14.

29. Moreover, Mr. Buckfire's Best Interests Opinion "extends to all of the City's creditors," yet Holders of COP Claims are not slated to receive **any** of the proceeds of the Grand Bargain under the Plan. Indeed, when questioned about this at his deposition, Mr. Buckfire testified that the Grand Bargain infuses money "[i]nto the City for the [] benefit of the

US_ACTIVE:\44540482\6\45259.0007

City's creditors, **which in this case happen to be the retirees**."[8]  Thus, even if the proceeds of the Grand Bargain were unavailable in a dismissal scenario (an assumption Mr. Buckfire could not confirm), that says nothing about the impact of dismissal on COP Claim recoveries.  The fact that Mr. Buckfire failed to acknowledge this in his Report while nevertheless extending his opinion to "all of the City's creditors," further demonstrates the unreliability of his testimony. *See, e.g., Smelser*, 105 F.3d at 305; *Davison*, 231 Fed. App'x at 449.

> vi.     Mr. Buckfire's Assumptions Regarding Reinvestment Initiatives Ignore the Relevant Facts

30.     Another one of Mr. Buckfire's assumptions is that the reinvestment initiatives proposed under the City's Plan are "necessary to provide adequate levels of municipal services," and in their absence the City will "further deplete the City's tax base."  Buckfire Rep. ¶17.  However, Mr. Buckfire never evaluated the extent to which the City would or could engage in these initiatives in a dismissal scenario.  *See* Buckfire Dep. 277:24–278:4 ("Q.  And so I take – so you have never personally evaluated the extent to which the City would undertake the restructuring reinvestment initiatives in the dismissal scenario, correct? A.  Correct.").  Indeed, Mr. Charles Moore, the City's expert with respect to reinvestment initiatives, testified that he saw no reason the City could not pursue these initiatives if the bankruptcy case were dismissed. Moore Dep. 92:7–19.  Mr. Buckfire's failure to consider this fact in relying on assumptions regarding the reinvestment initiatives further renders his opinion unreliable and inadmissible. *See, e.g., Smelser*, 105 F.3d at 305.

***

---

[8] Moreover, the City's Emergency Manager, testifying as a designee for the City, could not think of a way in which the Grand Bargain benefits Holders of COP Claims.  Orr Dep. at 341:8-10, July 22, 2014 (excerpts of which are attached hereto as Ex. 14).

17

US_ACTIVE:\44540482\6\45259.0007

31.     In sum, Mr. Buckfire has not employed any appropriate or recognizable methodology by which to validate his Best Interests Opinion.   Instead, just as the expert's opinion in *Tamraz,* Mr. Buckfire's opinion "contains not just one speculation but a string of them:  A suggests by analogy the possibility of B, which might also apply to C, which, if we speculate about D, could eventually trigger E."   620 F.3d at 672.   As was the case in *Tamraz,* however, "the train [is] too long to pull and the couplings too weak to hold the cars together." *Id.*   This is even truer here given that Mr. Buckfire's train of assumptions admittedly ignores numerous important facts.   Accordingly, Mr. Buckfire's Best Interests Opinion should be excluded as unreliable.

## III.     Mr. Buckfire's Best Interests Opinion Should Be Excluded Because He Is Not Qualified to Opine on a Central Assumption on Which His Opinion Is Based

32.     In expounding on the requirement that an expert be sufficiently qualified under *Daubert*, the Sixth Circuit held in *Berry* that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."   25 F.3d at 1351-52 (holding that a witness proffered as an expert "under the general label of 'police policies and practices'" was not qualified to testify on matters of police "discipline," in part because his testimony relied on various assumptions of which he knew nothing about).   Accordingly, circuit courts have excluded experts as unqualified when their opinion is predicated on an analysis conducted by a third party, but the witness "himself lacks the necessary expertise to determine whether the techniques [of the third party] were appropriately chosen and applied."  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp*., 285 F.3d 609, 615 (7th Cir. 2002).   The court in *Dura* observed that "a theoretical economist, however able, would not be allowed to testify to the findings of an

18

econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer." *Id.* at 614.

33.     The holdings of *Berry* and *Dura* are instructive in this instance.   As discussed above, one of the central assumptions underlying Mr. Buckfire's Best Interests Opinion is that "in a dismissal scenario, the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue."  Buckfire Rep. ¶ 17; *see also id*. ¶ 7. This informs his ultimate assumption that "creditor recoveries upon dismissal will be *de minimis*" and that the City's creditors will therefore be treated better under the Plan than if the bankruptcy were dismissed. *Id.* ¶ 7.  Yet, Mr. Buckfire admittedly lacks expertise in forecasting future revenues of a municipality.   Buckfire Dep. 244:12-15 ("Q. Now, is forecasting future revenues of a municipality something that falls within your area of expertise as an expert?  A. No.").   Thus, like the expert in *Berry*, Mr. Buckfire's expertise in financial restructuring does not qualify him to opine on the "specific question" of future revenue generation, rendering him unqualified to offer an opinion predicated on that question.  25 F.3d at 1351.

34.     Notably, Mr. Buckfire testified that he relied on an analysis purportedly conducted by Mr. Cline of Ernst & Young with respect to this issue:

A.  [W]e did ask the tax experts at E&Y to do an analysis of the City's revenues and take into account the sensitivity of revenues to tax rates.
Q.  So you asked Mr. [Cline] at E&Y?
A.  I did.
….
Q.   And did you rely on that information from Mr. [Cline] in reaching your conclusion about the fact that City's not going to generate additional revenue from raising taxes?
A.  Yes.
Q.  Did you take any steps to pressure test Mr. [Cline]'s advice to you that raising taxes would not yield marginal revenue?
A.  No, **I haven't done mathematical economics in a really long time** and he is a very well-qualified econometrician and so I relied on him.

19

US_ACTIVE:\44540482\6\45259.0007

Buckfire Dep. 240:3-242:3.[9]  As the Court made clear in *Dura*, Mr. Buckfire's lack of expertise in revenue generation prevents him from relying on an (alleged) analysis conducted by another "econometrician," especially because he admittedly was not qualified to determine whether Mr. Cline's "techniques were appropriately chosen and applied."  285 F.3d at 615.  Thus, because Mr. Buckfire is not qualified to conduct or assess the purported analysis informing his assumption that increasing taxes will decrease the City's future revenue, he is not qualified to render an opinion that is predicated on that assumption.  *See id*.

## IV.    Mr. Buckfire's Best Interests Opinion Should Be Excluded Because It Is Unhelpful to the Trier of Fact

35.    Under Rule 702, expert testimony is admissible only if it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The Sixth Circuit has made clear that "[i]t is not helpful to the [trier of fact] when expert testimony gives lay testimony interpreting the facts of the case or addressing matters that are equally within the competence of the [trier of fact] to understand and decide."  *Youngberg v. McKeough*, 534 Fed. App'x 471, 479 (6th Cir. 2013) (citation omitted); *see also Wendorf v. JLG Indus., Inc.*, No. 08-CV-12229, 2010 WL 148255, at *4 (E.D. Mich. Jan. 11, 2010) ("an expert ... must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the [trier of fact]") (citations omitted).  As the court in *Jones v. Pramstaller* articulated, "[i]t is well established that an expert witness's testimony is not helpful where the [trier of fact] has no need for an opinion because it easily can be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic."  874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) (citation omitted).  Similarly, expert testimony does not assist the trier of fact when it

---

[9] As discussed in Section II.B.iii, *supra*, Mr. Cline testified that he never actually performed, nor was he capable of performing, such an analysis.

US_ACTIVE:\44540482\6\45259.0007

"merely express[es] a legal conclusion." *DeMerrell*, 206 Fed. App'x at 426. Rather, expert testimony must "result[] from a process of reasoning which can be mastered only by specialists in the field." *U.S. v. White*, 492 F. 3d 380, 401 (6th Cir. 2007).

36. Certainly, to the extent Mr. Buckfire had engaged in a systematic dismissal analysis by reliably evaluating future revenue generation, potential asset monetization, the size of creditor claims, and the extent to which revenues could be used to satisfy creditor claims, then an expert opinion would be helpful to the trier of fact in this instance. But Mr. Buckfire admittedly performed no such analysis. Instead, he relied on a handful of generalized assumptions that do not "result[] from a process of reasoning which can be mastered only by specialists in the field." *Id.* Indeed, he admitted as much.[10] Certainly, that is not to say the trier of fact *would* use the same assumptions as Mr. Buckfire (on the contrary, for the reasons described herein, it should not), only that the trier of fact *could* understand and interpret those assumptions without Mr. Buckfire's assistance. Thus, given that Mr. Buckfire performed no actual expert analysis, but rather addressed matters that are well within the competence of this Court as the trier of fact to understand and decide, it is clear that his testimony is unhelpful and inadmissible. *See Youngberg*, 534 Fed. App'x at 479 (upholding exclusion of expert testimony because the trier of fact was "competent to determine" the issue on which the expert opined).

## STATEMENT OF CONCURRENCE SOUGHT

---

[10] For instance, when asked why he did not perform a detailed analysis with respect to how a "race to the courthouse" scenario would turn out, Mr. Buckfire testified it was because "[w]e thought it was pretty obvious." Buckfire Dep. 179:10-17. As to his assumptions regarding the impact of tax increases on future revenue generation, no expert analysis was actually conducted to evaluate that issue. And, with respect to his assumption regarding the sale of City assets, Mr. Buckfire relied solely on legal conclusions conveyed by the City's attorneys.

21

US_ACTIVE:\44540482\6\45259.0007

37. Pursuant to Local Rule 9014-1(g), on August 18, 2014, counsel for FGIC sought the concurrence of counsel for the City in the relief sought in the Motion. Counsel for the City has advised that they oppose the filing of the Motion.

WHEREFORE, FGIC respectfully requests that the Court enter an Order granting FGIC's Motion in its entirety and excluding the opinion of Kenneth Buckfire regarding Plan treatment compared to treatment upon dismissal.

DATED:     August 18, 2014

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com
– and –
Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3177
Email: edward.soto@weil.com
-and-
Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance Company.*

US_ACTIVE:\44540482\6\45259.0007

## **ATTACHMENTS**

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavit] |
| Exhibit 6 | None [No Documentary Exhibits] |
| Exhibit 7 | July 16, 2014 K.Buckfire Deposition Transcript |
| Exhibit 8 | July 8, 2014 K. Buckfire Expert Witness Report |
| Exhibit 9 | July 15, 2014 G. Malhotra Deposition Transcript (excerpted) |
| Exhibit 10 | July 23, 2014 C. Moore Deposition Transcript (excerpted) |
| Exhibit 11 | July 25, 2014 S. Spencer Expert Witness Report |
| Exhibit 12 | July 14, 2014 R. Cline Deposition Transcript (excerpted) |
| Exhibit 13 | July 24, 2014 C. Sallee Deposition Transcript (excerpted) |
| Exhibit 14 | July 22, 2014 K. Orr Deposition Transcript (excerpted) |

US_ACTIVE:\44540482\6\45259.0007

**Exhibit 1**

**Proposed Order**

US_ACTIVE:\44540482\6\45259.0007

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
----------------------------------------------------------------x
                                       :
In re                                  : Chapter 9
                                       :
CITY OF DETROIT, MICHIGAN,             : Case No. 13-53846
                                       :
                    Debtor.            : Hon. Steven W. Rhodes
                                       :
                                       :
----------------------------------------------------------------x
```

## ORDER EXCLUDING THE OPINION OF KENNETH BUCKFIRE REGARDING PLAN TREATMENT COMPARED TO TREATMENT UPON DISMISSAL

This matter having come before the Court on *Financial Guaranty Insurance Company's Motion to Exclude the Opinion of Kenneth Buckfire Regarding Plan Treatment Compared to Treatment Upon Dismissal* (the "**Motion**"), filed by Financial Guaranty Insurance Company ("**FGIC**"); and due and proper notice of the hearing to consider the relief requested therein (the "**Hearing**") having been given to all parties registered to receive electronic notices in this matter; and the Court having held the Hearing with the appearances of interested parties noted in the record of the Hearing; and upon the entire record of all the proceedings before the Court; and the legal and factual bases set forth in the Motion establishing just and sufficient cause to grant the relief requested therein;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      The opinion of Kenneth Buckfire regarding Plan treatment compared to treatment upon dismissal shall be excluded at the Confirmation Hearing.

It is so ordered.

US_ACTIVE:\44540482\2\645259.0007

**Signed on** _____, 2014

_____
**STEVEN RHODES**
**UNITED STATES BANKRUPTCY JUDGE**

US_ACTIVE:\44540482\6\45259.0007

**Exhibit 2**

**Notice**

US_ACTIVE:\44540482\6\45259.0007

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------------x
In re                                :
                                     :        Chapter 9
                                     :
CITY OF DETROIT, MICHIGAN,           :        Case No. 13-53846
                                     :
                    Debtor.          :        Hon. Steven W. Rhodes
                                     :
                                     :
-----------------------------------------------------------x
```

## NOTICE OF FINANCIAL GUARANTY
## INSURANCE COMPANY'S MOTION TO EXCLUDE THE
## OPINION OF KENNETH BUCKFIRE REGARDING PLAN
## TREATMENT COMPARED TO TREATMENT UPON DISMISSAL

Financial Guaranty Insurance Company has filed papers with the Court seeking entry of an order pursuant to Federal Rule of Evidence 702 to exclude the testimony and opinion of Kenneth Buckfire at the Confirmation Hearing regarding treatment of claims under the Plan of Adjustment compared to treatment upon dismissal (the "**Motion**").

**Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **within fourteen (14) days**, you or your attorney must:

    1.  File with the court a written response or an answer, explaining your position at:[1]

### United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, Michigan 48266

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

1

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

You must also mail a copy to:

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL  33131
Telephone: (305) 577-3177

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

   **If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.**

2

DATED:      August 18, 2014        Respectfully submitted,

_/s/  Alfredo R. Pérez_____

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com

– and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL  33131
Telephone: (305) 577-3177
Email:  edward.soto@weil.com

-and-

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
Email:  EJEssad@wwrplaw.com
Email:  mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance
Company*

## Exhibit 3

## None [Brief Not Required]

US_ACTIVE:\44540482\6\45259.0007

## Exhibit 4

## Certificate of Service [To be filed separately]

US_ACTIVE:\44540482\6\45259.0007

**Exhibit 5**

**None [No Affidavit]**

US_ACTIVE:\44540482\6\45259.0007

## Exhibit 6

**None [No Documentary Exhibits]**

US_ACTIVE:\44540482\6\45259.0007

**Exhibit 7**

**July 16, 2014 K. Buckfire Deposition Transcript**

## Page 1

1  KENNETH BUCKFIRE, VOLUME 2
2  IN THE UNITED STATES BANKRUPTCY COURT
3  FOR THE EASTERN DISTRICT OF MICHIGAN
4
5
6
7  In Re:            )   Chapter 9
8
9  CITY of DETROIT, MICHIGAN, )   Case No. 13-53846
10
11      Debtor.   )   Hon. Steven Rhodes
12  _____
13
14          VOLUME 2
15
16  The Videotaped Deposition of KENNETH BUCKFIRE,
17  a Rule 30(b)(6) witness,
18  Taken at 1114 Washington Boulevard,
19  Detroit, Michigan,
20  Commencing at 8:09 a.m.,
21  Wednesday, July 16, 2014,
22  Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25

## Page 2

1          KENNETH BUCKFIRE, VOLUME 2
2  APPEARANCES:
3
4  THOMAS F. CULLEN, JR., ESQ.
5  Jones Day
6  51 Louisiana Avenue, N.W.
7  Washington, D.C. 20001
8      Appearing on behalf of the Debtor.
9
10
11
12  CORINNE BALL, ESQ.,
13  BENJAMIN ROSENBLUM, ESQ.
14  Jones Day
15  222 East 41st Street
16  New York, New York 10017
17      Appearing on behalf of the Debtor.
18
19
20
21
22
23
24
25

## Page 3

1          KENNETH BUCKFIRE, VOLUME 2
2
3
4  CLAUDE D. MONTGOMERY, ESQ.
5  Dentons US LLP
6  1221 Avenue of the Americas
7  New York, New York 10020
8      Appearing on behalf of the Retirement Committee.
9
10
11
12  JENNIFER K. GREEN, ESQ.
13  Clark Hill, PLC
14  500 Woodward Avenue, Suite 3500
15  Detroit, Michigan 48226
16      Appearing on behalf of the Retirement Systems for the
17      City of Detroit.
18
19
20
21
22
23
24
25

## Page 4

1          KENNETH BUCKFIRE, VOLUME 2
2  ROBIN D. BALL, ESQ.
3  Chadbourne & Parke, LLP
4  350 South Grand Avenue, 32nd Floor
5  Los Angeles, California 90071
6      Appearing on behalf of Assured Guaranty Municipal
7      Corporation.
8
9
10
11  GUY S. NEAL, ESQ.
12  Sidley Austin, LLP
13  1501 K Street, N.W.
14  Washington, D.C. 20005
15      Appearing on behalf of National Public Financing.
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 36 of 364

```
1              KENNETH BUCKFIRE, VOLUME 2
2    PAUL S. DAVIDSON, ESQ.
3    Waller, Lansden, Dortch & Davis, LLP
4    511 Union Street, Suite 2700
5    Nashville, Tennessee 37219
6        Appearing on behalf of U.S. Bank National Association
7        as Trustee for the Water and Sewer Boards.
8
9
10
11   ROBERT A. WEISBERG, ESQ.
12   Carson Fischer, PLC
13   4111 Andover Road West
14   Second Floor
15   Bloomfield Hills, Michigan 48302
16        Appearing on behalf of Oakland County.
17
18
19   FARAYHA ARRINE, ESQ.
20   Dickinson Wright
21   500 Woodward Avenue, Suite 4000
22   Detroit, Michigan 48226
23        Appearing on behalf of the State of Michigan.
24
25
```

```
1              KENNETH BUCKFIRE, VOLUME 2
2
3    EDWARD SOTO, ESQ.,
4    COREY D. BERMAN, ESQ.
5    Weil, Gotshal & Manges, LLP
6    1395 Brickell Avenue, Suite 1200
7    Miami, Florida  33131
8        Appearing on behalf of FGIC.
9
10
11
12
13   CHRISTOPHER L. FILBURN, ESQ. (VIA TELEPHONE)
14   Paul, Weiss, Rifkind, Wharton & Garrison LLP
15   1285 Avenue of the Americas
16   New York, New York 10019
17        Appearing on behalf of UBS.
18
19
20
21
22
23
24
25
```

```
1              KENNETH BUCKFIRE, VOLUME 2
2    A.W. PHINNEY, III, ESQ. (VIA TELEPHONE)
3    Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
4    One Financial Center
5    Boston, Massachusetts 02111
6        Appearing on behalf of Fidelity, Franklin & Eaton
7        Vance as Members of the Ad Hoc Bondholders Committee
8
9
10
11   ALSO PRESENT:
12   John Schmitzer - Video Technician
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              KENNETH BUCKFIRE, VOLUME 2
2                 TABLE OF CONTENTS
3
4    WITNESS                           PAGE
5    KENNETH BUCKFIRE
6
7    EXAMINATION BY MR. BALL            12
8    EXAMINATION BY MR. SOTO            75
9    EXAMINATION BY MR. HACKNEY         220
10   EXAMINATION BY MR. BALL            315
11   EXAMINATION BY MR. WEISBERG        338
12   EXAMINATION BY MR. DAVIDSON        368
13   EXAMINATION BY MR. BALL            370
14
15                 EXHIBITS
16
17   EXHIBIT                           PAGE
18   (Exhibits attached to transcript.)
19
20   DEPOSITION EXHIBIT 22              29
21   DEPOSITION EXHIBIT 23              32
22   DEPOSITION EXHIBIT 24              55
23   DEPOSITION EXHIBIT 25              63
24   DEPOSITION EXHIBIT 26              65
25   DEPOSITION EXHIBIT 27              71
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2     DEPOSITION EXHIBIT 28          88
 3     DEPOSITION EXHIBIT 29         111
 4     DEPOSITION EXHIBIT 30         117
 5     DEPOSITION EXHIBIT 31         137
 6     DEPOSITION EXHIBIT 32         142
 7     DEPOSITION EXHIBIT 33         143
 8     DEPOSITION EXHIBIT 34         146
 9     DEPOSITION EXHIBIT 35         155
10     DEPOSITION EXHIBIT 36         192
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2     Detroit, Michigan
 3     Wednesday, July 16, 2014
 4     8:09 a.m.
 5
 6              VIDEO TECHNICIAN:  We are now on the
 7     record, this is the videotaped deposition of Ken
 8     Buckfire, Volume 2, being taken on Wednesday, July
 9     16th, 2014.  The time is now 8:09 a.m.  We are located
10     at 1114 Washington Boulevard, Detroit, Michigan.  We
11     are here In Re: City of Detroit Bankruptcy.  This is
12     case No. 13-53846 this matter is being held in
13     the United States Bankruptcy (sic) for the Eastern
14     District of Michigan.  My name is John Schmitzer,
15     video technician.
16              Will the court reporter swear in the
17     witness and the attorneys briefly identify themselves
18     for the record, please?
19              MR. BALL:  The witness is sworn.  You
20     understand, Mr. Buckfire, that you're still under oath
21     today?
22              THE WITNESS:  I do.
23              MR. BALL:  Okay, and -- but counsel should
24     still state their appearances for the record.  This is
25     Robin Ball for Chadbourne & Parke for Assured.
```

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2              MR. NEAL:  Guy Neal, Sidley Austin, for
 3     National Public Finance Guaranty.
 4              MR. WEISBERG:  Bob Weisberg, Carson
 5     Fischer, for Oakland County.
 6              MR. SOTO:  Ed Soto and Corey Berman from
 7     Weil, Gotshal, Manges, FGIC.
 8              MS. GREEN:  Jennifer Green from Clark Hill
 9     on behalf of the retirement systems.
10              MR. MONTGOMERY:  For the, Claude Montgomery
11     Dentons, U.S., for the Retiree Committee.
12              MR. DAVIDSON:  Paul Davidson, Waller
13     Lansden, for U.S. Bank.
14              MR. HACKNEY:  Steve Hackney, Kirkland &
15     Ellis for Sycora.
16              MR. ROSENBLUM:  Ben Rosenblum, Jones Day,
17     for the City.
18              MS. BALL:  Corinne Ball, Jones Day, for the
19     City.
20              MR. CULLEN:  Tim Cullen, Jones Day, for the
21     City.
22              MR. BALL:  And can we have counsel who are
23     on the phone identify themselves for the record,
24     please?
25              (Electronic Phone Announcement:  Chris
```

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2     Filburn, Paul Weiss, has left the conference.)
 3              THE WITNESS:  Well, that answers that.
 4              MR. BALL:  Is there anyone else?
 5              MR. PHINNEY:  A.W. Phinney of Mintz Levin,
 6     for Fidelity, Franklin & Eaton Vance as Members of the
 7     Ad Hoc Bondholders Committee.
 8              MR. BALL:  Is anybody else on the phone?
 9              EXAMINATION (CONTINUED)
10     BY MR. BALL:
11     Q.  Good morning, Mr. Buckfire, welcome back.
12     A.  Thank you.
13     Q.  And you, as you just said, understand that you're
14         still under oath.  Can you tell me did you do any
15         additional work last night after you left the
16         deposition related to your testimony in this matter?
17     A.  I went back and examined other things I might have
18         consulted in order to answer the questions that you
19         asked me yesterday.
20     Q.  Okay.  And a number of documents were served on us
21         last night.  Are those documents you found as a result
22         of that search?
23     A.  Yes.
24     Q.  Okay.  And is there anything else you relied upon
25         besides the documents that were produced last night
```

Pages 9 to 12

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 38 of 364

1      KENNETH BUCKFIRE, VOLUME 2
2    and the items that are identified in your report?
3    **A. The only thing that wasn't specifically identified in**
4       **those documents was the source of the information of**
5       **how we know that Detroit's the largest single customer**
6       **of the Water and Sewer Department, and I'd have to go**
7       **back and check again where we found this --**
8          (Electronic Phone Announcement: Chris
9          Filburn, Paul Weiss.)
10   **A. It wasn't in those particular documents --**
11         (Electronic Phone Announcement: Has joined
12         the conference.)
13   BY MR. BALL:
14   Q.   Sorry, I think your answer got cut off, interrupted by
15       the phone, so I apologize, but if you could start
16       over, I would appreciate it.
17   **A. The only -- the only information that was not in the**
18      **the documents served last night was related to the**
19      **question -- question of how we know Detroit was the**
20      **single largest customer of the Water and Sewer**
21      **Department.**
22   Q.   Okay.  And were you able to find any documentation
23       about that?
24   **A. We just haven't had a chance to identify the source**
25      **data of that.  We'll find it.**

1           KENNETH BUCKFIRE, VOLUME 2
2    Q.   Okay.  And the items --
3          MR. CULLEN:  If I may, counsel, sorry, it's
4       Exhibit L from the plan of disclosure.
5    BY MR. BALL:
6    Q.   All right.  If you can, I don't have a copy with me,
7       so if you can identify it, that's fine, but do you
8       know that it's Exhibit L in the plan of disclosure
9       counsel -- I mean Mr. Buckfire?
10   **A. Yes, but that Exhibit L was based on original source**
11      **of information.  I believe it was the financing**
12      **statements published by the department on a regular**
13      **basis, and I thought that's what you were asking me to**
14      **identify.**
15   Q.   Okay.  And the documents produced last night
16       include -- there are a number of documents, and I'm
17       not going to go through them all on the record, but
18       there was -- I understand from conversations with your
19       counsel that -- that included among those documents,
20       there was one document that you did not rely upon that
21       you're providing to us, a Bloomberg transcript.
22   **A. I'm sorry?  Did I review that?**
23   Q.   Had you -- did you rely upon that in preparing your
24       report?
25   **A. My staff did.**

1           KENNETH BUCKFIRE, VOLUME 2
2    Q.   Okay.
3    **A. But I hadn't seen it before last night.**
4    Q.   Okay.  So you believe your staff used it but that you
5       had not seen it before previously?
6    **A. That's right.**
7    Q.   Okay.  At the end of the day yesterday, I asked you a
8       couple of questions that you said you were too tired
9       to answer; do you recall that?
10   **A. I do.**
11   Q.   And one of the questions was about the tax advantages
12       of certain investors of premium coupon bonds, and are
13       you able to answer that question this morning?
14   **A. Yes.**
15   Q.   Okay.  Actually, before I get there, did you do any --
16       other than looking for additional reliance materials,
17       did you do any other work last night related to
18       this -- this matter?
19   **A. No.**
20   Q.   Did you have any discussions with anyone concerning
21       the subject matter of your testimony last night?
22   **A. I had a brief conversation with my partner, Mr. Doak,**
23      **about, you know, the reason we picked certain index**
24      **curves and whether there were any other choices**
25      **available and how we selected those curves.**

1           KENNETH BUCKFIRE, VOLUME 2
2    Q.   And why did you speak to Mr. Doak about that?
3    **A. Because I wanted to make sure I remembered correctly**
4       **what he had told me originally about how our team had**
5       **selected those curves.**
6    Q.   Okay.  And what was the content of your conversation
7       with Mr. Doak last night?
8    **A. He referred to other conversations that other members**
9       **of our team had had with Bloomberg and various market**
10      **participants about what curves they relied upon in**
11      **terms of pricing municipal debt.  They had directed us**
12      **to certain curves produced by Bloomberg, which we've**
13      **already testified to as what we relied upon, and he**
14      **explained to me that, in fact, one of those curves had**
15      **been modified by Bloomberg, I guess it was maybe in**
16      **April or May, and they had adopted a new curve to**
17      **replace an old curve, and so that way I asked.**
18   Q.   Okay.  Did you have any other -- was there anything
19       else you discussed with Mr. Doak, anything else he
20       told you?
21   **A. No.**
22   Q.   And the market participants, are those the same that
23       you referred to in your discussion with him?  Are
24       those the same market participants that you testified
25       about yesterday?

Pages 13 to 16

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 39 of 364

KENNETH BUCKFIRE, VOLUME 2

A. I testified about the market participants in several
different contexts. Which context are you now
referring to?

Q. So there are -- there was testimony yesterday about
market participants with whom you had -- your staff
had discussions about appropriate rate curves. Is it
the same market participants that you referred to in
your testimony yesterday?

A. Yes.

Q. And do you have anymore information about those market
participants than you provided to me yesterday?

A. No.

Q. Okay. So going back to the questions you were too
tired to answer, and the first one being the tax
advantages of premium coupon bonds, do you have an
understanding now of what the tax -- you said
certain -- for certain investors there are tax
advantages to premium coupon bonds. Can you explain
that now?

A. Yes. There are two broad categories of municipal bond
issuance. One category is tax exempt, one is taxable.
Let's set aside taxable bonds for the moment, let's
talk about bonds which are issued at a premium. Why
bonds are issued at a premium is because the market

KENNETH BUCKFIRE, VOLUME 2

tends to prefer higher coupons rather than lower
coupons, and they would rather pay a premium for those
bonds, which effectively results in a lower yield to
maturity than if they had simply set the coupon
correctly in the first place. There's more bond
market convention for this marketplace than you would
normally expect to see in the corporate world.

The premium, itself, under -- for certain
kinds of investors is amortized over the life of the
bonds, and because it's deemed to be a loss as a
deductible against other kinds of income, that makes
this kind of bond more attractive to taxable
investors, perhaps individuals, as opposed ato
institutional investors such as pension funds who
don't need the tax shield.

Q. And did you do any research about that issue last
night?

A. I got a good night's sleep.

Q. Okay. Did you discuss it with anybody?

A. No.

Q. The other question that you were unable -- well, first
of all, do you have an understanding about what impact
that has upon investor preferences of the bonds -- in
the municipal bond market?

KENNETH BUCKFIRE, VOLUME 2

A. I already testified to that. Investor preferences are
for higher coupons.

Q. Meaning premium coupon bonds?

A. Over and above the market, that's right.

Q. The -- second question I asked you that you were
unable to answer last night because you were too
fatigued, it had to do with how one would adjust from
the U.S. muni utility A curve if that curve involved
principally premium bonds, what adjustment you would
make to do an apples-to-apples comparison to par DWSD
bonds; do you recall that question?

A. I recall you asking it. You were referring to which
page of my expert report?

Q. I'm referring to the U.S. muni -- I'm referring to the
chart in your report --

A. Mm-hmm.

Q. -- where you compare the U.S. muni A curve -- I'm
sorry, U.S. muni utility A curve, to your POA proposed
curves.

A. Mm-hmm.

Q. And there was testimony yesterday about your
comparison of the curves you proposed to that curve
and to the BBB curve, the revenue BB -- BVAL curve,
and so my question is if you would -- if you're going

KENNETH BUCKFIRE, VOLUME 2

to do a comparison of those curves if you know what
adjustment one would have to make to the utility A
curve to make it truly an apples-to-apples comparison
to the DWSD par curve, par bonds?

A. Well, I'm not sure that question makes sense because
these are yields, which is irrelevant whether it was
bond was sold at a premium or not. These are the
actual market prices that are provided by market
participants to Bloomberg for the purpose of comparing
this curve. They don't distinguish between premium
bonds and discount bonds, it's simply the yield. The
yield is irrelevant to the price, so I'm not sure I
understand your question.

Q. So in your view, the content of the bonds -- whether
the bonds involved in the curve that are used to
construct the curve are principally premium bonds is
irrelevant to the comparison?

A. This is a yield curve; it's got nothing to do with
price.

Q. If we could go back in your report to the exhibit --
well, we spent some time yesterday, there are a couple
of questions I neglected to ask you that I want to.

A. Mm-hmm.

Q. On the selected financial information page --

KENNETH BUCKFIRE, VOLUME 2

2  A. Sure.
3  Q. -- that were in the attachments to and then on the
4     chart that is selected financial information. And I
5     only have a few questions about this, but one of them
6     is whether you evaluated as part of this analysis the
7     total debt service coverage ratios?
8  A. Well, we didn't display that here. This only shows
9     senior and second leads. You're asking me for the
10    combined ratio?
11 Q. Yes.
12 A. No, we didn't look at it for this analysis.
13 Q. Okay. Is that relevant to evaluating the credit
14    profile?
15 A. Well, all statistics are relevant; we just didn't
16    calculate that for this purpose.
17 Q. Do you know what importance rating agencies -- well,
18    we'll start with rating agencies attached to total
19    service debt coverage service ratios?
20 A. No.
21 Q. And do you know what importance buy side municipal
22    credit analysts attach to total debt service coverage
23    ratios?
24 A. I'm sure they look at it.
25 Q. Do you know anything beyond that?

KENNETH BUCKFIRE, VOLUME 2

2  A. No.
3  Q. There's a reference here to decreasing leverage, and I
4     would like you to understand -- explain to me what the
5     basis is for your analysis that they will achieve
6     decreasing leverage?
7  A. Well, this page is not a balance sheet page. This is
8     a -- more of a financial revenues based page. In
9     Exhibit L and M of the POA, we do have financial
10    projections and balance sheet information on this
11    department, which show that not only are we reducing
12    the legacy liabilities that will be allocated to DWSD
13    pursuant to the plan, which is a dramatic reduction in
14    liabilities, but also because the system will be
15    using revenue financed capital going forward as
16    opposed to the past, it will be borrowing relatively
17    less than it has in the past, which will result in
18    declining leverage over time.
19 Q. Okay. So that's an analysis that's not reflected on
20    this page --
21 A. Not on this page; it's in the POA.
22 Q. In the middle of the page under legacy liabilities
23    under pension, there's a DWSD contribution line; do
24    you see that?
25 A. I do.

KENNETH BUCKFIRE, VOLUME 2

2  Q. And there is for most years the contribution starting
3     in 2015 -- or after 2015 is $45.4 million, but in the
4     first year, it's 65.4 in 2015: do you see that?
5  A. I do.
6  Q. And I understand that the 45.4 is based upon a
7     Milliman analysis of UAAL and related expenses that
8     they -- that are projected to be paid by the DWSD
9     based on that. But there's an additional $20 million
10    in the DWSD contribution in 2015.
11 A. Right.
12 Q. Can you tell me what that consists of?
13 A. You know, I have to go back and check. You know, we
14    moved from between fiscal year to calendar year
15    statistics when we've done these analyses, and I don't
16    recall exactly where this 20 comes from; I'd have to
17    go back and check the plan.
18 Q. Who would know?
19 A. Mr. Moore would know. Mr. Gaurav Malhotra would know.
20 Q. Actually, Mr. Malhotra did not know was my
21    understanding, but do you have an understanding that
22    the $20 million relates to bankruptcy related
23    administrative expense?
24 A. I don't think that's the same $20 million.
25 Q. So do you have any understanding, as you sit here, of

KENNETH BUCKFIRE, VOLUME 2

2     what's included within the $20 million that's there?
3  A. No, I'd have to go back and check.
4  Q. And your best understanding is Mr. Moore would know
5     that?
6  A. He should probably know that.
7  Q. Do you know whether the 20 million includes any of the
8     fees for Miller Buckfire?
9  A. No. Yeah, I'd only be speculating on the 20 million
10    right now; I'd have to go back and check my plan.
11 Q. Okay. Do you have any understanding that you can
12    provide about what the 20 million consists of?
13 A. Well, it's -- because it's 2015, if they're using the
14    fiscal year ended June 30, that would pick up part of
15    the bankruptcy period, and it may be because some of
16    the contributions during the bankruptcy were greater
17    than the outgoing projected, I just don't remember,
18    but it's an odd year because of the fact that the
19    bankruptcy is projected to end halfway through fiscal
20    2015. And that may be part of it.
21 Q. All right. The -- let's go back to the rate curve
22    chart, the yield curve comparison page and attachment
23    3. I would like to ask you some questions about the
24    BBB revenue muni BVAL curve.
25 A. Right.

Pages 21 to 24

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 41 of 364

KENNETH BUCKFIRE, VOLUME 2

2  Q.  And my question to you about that -- and are you
3     looking for the chart that has the --
4  A.  The raw numbers.
5  Q.  I think it's 21.
6  A.  Looking at these charts, it's hard to figure out the
7     differences usually, I see some numbers here though.
8     Exhibit 21, right, that's helpful.
9  Q.  And so the -- my question is if you understand what
10     bonds are included within the BBB revenue muni BVAL
11     curve?
12  A.  You mean which specific issues?
13  Q.  What transactions?  What kinds of transactions are
14     included in it?  Have you done any analysis of that?
15  A.  Well, these are reported trans -- imported information
16     by market participants.  They're not going to tell you
17     what specific bonds you're trading.
18  Q.  Do they -- do you have any understanding about what
19     the nature of those bonds is that's included in this
20     curve?
21  A.  No.
22  Q.  Do you understand what it means that the curve is
23     built using a nonparametric fit of market data?
24  A.  My understanding of that is that a smooth linear
25     regression analysis would not apply here because there

KENNETH BUCKFIRE, VOLUME 2

1     are not enough observable data points, and, therefore,
2     they estimate the best fit they can based on the data
3     they get.
4  Q.  Okay.  So it's not statistically derived; it's a best
5     fit --
6  A.  Right.
7  Q.  -- approach?
8  A.  Which is probably the reason why it goes up so much in
9     the year 25.  I mean these numbers don't make any
10     sense when you get that far out, and that was part of
11     the explanation.  Not enough observable data points to
12     fit a curve.
13  Q.  Okay.  So you told us yesterday that you didn't --
14     that when you were asked, you weren't told an answer.
15     They didn't know why the B curve was at lower rates
16     than the A curve in the out years.  Is your testimony
17     now that you were told something about that?
18  A.  No, you were asking me what nonparametric fit means; I
19     know what that means.
20  Q.  Okay.  But you said -- the last part of your answer
21     was -- you said it's probably the reason it goes up so
22     much in the year 25, I mean these numbers don't make
23     any sense when you get that far out, and that was part
24     of the explanation, not observable data points to fit

KENNETH BUCKFIRE, VOLUME 2

1     a curve.  Whose explanation?
2  A.  Bloomberg's.
3  Q.  Okay.  So Bloomberg gave you an explanation of what
4     happened in the out years with the BBB data -- with
5     the BBB curve?
6  A.  Well, they gave my team the explanation.
7  Q.  Okay.  So when did they give you that explanation?
8  A.  Well, I asked my team why it went up so much when they
9     gave me this chart, and that was the explanation they
10     gave me.
11  Q.  Okay.  And you're referring to the -- which -- when
12     you say go up, what do you mean?
13  A.  Well, if you look at the utility A curves going up
14     from year 25 to 30 and you get the BBB BVAL curves,
15     more or less, stay flat--
16  Q.  Right.
17  A.  -- that's inconsistent with what should happen.
18  Q.  I agree with that and -- and so what is it that you're
19     saying goes up in the --
20  A.  The yields.
21  Q.  For who?  For which curve?
22  A.  The utility A curves.
23  Q.  Okay.  But the question was about -- we were
24     discussing the BBB curve --

KENNETH BUCKFIRE, VOLUME 2

1  A.  Mm-hmm.
2  Q.  -- and so I'm trying to understand your answer that
3     the lack of a statistical basis for the curve -- is
4     why the curve goes up when the B curve doesn't go up:
5     it's the A curve that goes up.
6  A.  Well, but the -- it's the same -- same statistical
7     problem would exist.  If you have a smooth BBB curve
8     out that far but you have an A curve going up, one
9     would assume the BBB curve should go up by more, and
10     the fact that they're inconsistent causes us to
11     question whether at the far right end of the curve
12     these curves can be relied upon.  Fortunately, we
13     didn't know to, but it does call into question what
14     their methodology, which is why when we found out
15     because my team asked, they're using a nonparametric
16     analysis, we understand what they were doing.
17         You do understand that in laymen's terms,
18     nonparametric means it's a guess.
19  Q.  I understand that.
20  A.  Okay.
21  Q.  And you understand it, as well, I take it?
22  A.  I do.
23  Q.  You understand that Bloomberg has other BBB revenue
24     muni curves?

1          KENNETH BUCKFIRE, VOLUME 2
2     **A.   That's my understanding.**
3     Q.   And in fact, in presentations to the Counties and
4          otherwise, Miller Buckfire used a different BBB muni
5          revenue curve, right?
6     **A.   We may have.**
7     Q.   All right.  Oh, I'm sorry.
8               MARKED FOR IDENTIFICATION:
9               DEPOSITION EXHIBIT 22
10              8:33 a.m.
11    BY MR. BALL:
12    Q.   Mr. Buckfire, you've been shown what has been marked
13         as Exhibit 22, and my first question to you about that
14         is that a presentation that Miller Buckfire prepared
15         on or about October 2nd, 2013?
16    **A.   Yes.**
17    Q.   And it was a presentation to counties in connection
18         with negotiations over the GLWA; is that fair?
19    **A.   Yes.**
20    Q.   And at pages -- page 29 and 30, you present
21         information about the indicative yield curves; do you
22         see that?
23    **A.   I do.**
24    Q.   And did you use in that presentation the U.S. muni
25         revenue BBB curve M635?

1          KENNETH BUCKFIRE, VOLUME 2
2     **A.   The designations changed between this report and the**
3     **later one.  I'm not sure which page you're referring**
4     **to.**
5     Q.   All right, if you look at the bottom of page 29 --
6     **A.   Mm-hmm.**
7     Q.   -- do you see the reference to the indicative -- under
8          the heading "Indicative Yield Curves"?
9     **A.   Yeah, I see that.**
10    Q.   Do you see the fourth curve down?
11    **A.   I do.**
12    Q.   And it's identified as U.S. Muni Revenue BBB curve
13         M635?
14    **A.   I do.**
15    Q.   Do you see that?  Do you know what U.S. Muni Revenue
16         BBB curve M635 is?
17    **A.   It's a curve reference based on the page that they use**
18    **in their service.**
19    Q.   Okay.  And do you know what the difference is between
20         that curve and the BS 1025 curve that you use in your
21         chart in your report in the yield curve comparison
22         chart?
23    **A.   This was done in October, this one was done in April.**
24    **I believe they changed their index and page references**
25    **in that period.  It may not be the same index.**

1          **KENNETH BUCKFIRE, VOLUME 2**
2     Q.   Okay.  So are you suggest -- do you know whether the
3          curve that you're using here is the same as the BS
4          1025 curve?
5     **A.   No.**
6     Q.   And do you know whether it's different?
7     **A.   I don't know.**
8     Q.   Do you know how the U.S. Muni Revenue BBB M635
9          curve -- if I just call it the M635 curve, will you
10         know what I'm talking about?
11    **A.   For this purpose, yes.**
12    Q.   Okay.  For the M635 curve, do you know how it's
13         constructed?
14    **A.   No.**
15    Q.   Okay.
16    **A.   Not specifically.**
17    Q.   And do you know why you were using it at the time of
18         the presentation to the counties?
19    **A.   I'd have to go back and ask my team.**
20    Q.   Okay.  Do you know why -- my understanding is it is a
21         different curve than the BS 1025 curve.  Do you know
22         why you used the BS 1025 curve instead of the M635
23         curve in the analysis you presented and in the --
24         well, strike that.
25              Do you know whether when you first

1          KENNETH BUCKFIRE, VOLUME 2
2          constructed the yield curves for the plan whether you
3          used the M635 curve or the BS 1025 curve?
4     **A.   No.**
5     Q.   Do you know when you began using the BS 1025 curve?
6     **A.   No.**
7     Q.   Do you know why you shifted from the M635 curve to the
8          BS 1025 curve?
9     **A.   No.**
10    Q.   Okay.  You do know that the curve, the M635 curve,
11         involved higher yields than the BS 1025 curve?
12    **A.   I don't know that.**
13    Q.   You produced -- let's mark this one.
14              MARKED FOR IDENTIFICATION:
15              DEPOSITION EXHIBIT 23
16              8:37 a.m.
17    BY MR. BALL:
18    Q.   Mr. Buckfire, one of the documents you produced last
19         night is a Bloomberg transcript, and this is the
20         document I believe that you and I discussed a few
21         minutes ago.
22    **A.   Yes.**
23    Q.   Okay, and it's been marked as Exhibit 23.  Do you see
24         that?
25    **A.   I do.**

KENNETH BUCKFIRE, VOLUME 2

2  Q.  And you had not reviewed this transcript before last

3      night: is that fair?

4  **A.  Yes.**

5  Q.  Have you read it now?

6  **A.  I looked at it briefly this morning.**

7  Q.  Okay. Did -- what did Mr. Herman tell you about this

8      transcript, if anything?

9  **A.  As I mentioned earlier, he did tell me he'd spoken to**

10  **Bloomberg about their indexes. I believe he was**

11  **referring to this conversation.**

12  Q.  All right. I'm -- when did you speak to Mr. Herman

13      about this? I'm sorry, I've confused Mr. Herman and

14      Mr. Doak. You spoke to Mr. Doak last night, not Mr.

15      Herman?

16  **A.  Correct.**

17  Q.  Okay. And so -- and you said that you had spoken to

18      Mr. Marken about the Bloomberg indexes. I don't

19      believe you'd previously told me that you'd spoken to

20      Mr. Herman about it. I may be incorrect but --

21  **A.  I may -- I confused which one of them told me**

22  **different things, they're both working on this, so I**

23  **might have been referring to Mr. Herman.**

24  Q.  All right. And do you know -- what do you recall Mr.

25      Herman telling you, if anything, about why -- about

KENNETH BUCKFIRE, VOLUME 2

2      the content of this discussion before last night?

3  **A.  Only that he had spoken to Bloomberg about -- he had**

4  **questions about their index.**

5  Q.  Okay, anything beyond that?

6  **A.  No.**

7  Q.  There's a discussion in this document about

8      differences between the M635 curve and the BS 1025

9      curve. Do you know anything about that beyond what

10      you read on the page?

11  **A.  No.**

12  Q.  Have you had any understanding from this document or

13      otherwise why you shifted from the M635 curve to the

14      BS 1025 curve?

15  **A.  I don't know.**

16  Q.  Okay. You do see that part of the discussion here on

17      the second page is Mr. Herman -- Mr. Herman raising

18      the issue that at 30 years, the 635 index trades near

19      7 percent, while the 30-year on the BVSC 1025 curve

20      trades near 4.5 percent?

21  **A.  Yes.**

22  Q.  And you used the 1025 curve which trades at near 4.5

23      percent instead of the M635 curve that trades near 7

24      percent; is that right?

25  **A.  Correct.**

KENNETH BUCKFIRE, VOLUME 2

2  Q.  And did you make any attempt to understand which of

3      those curves was more directly comparable to the

4      bonds -- the DWSD bonds that you were evaluating?

5  **A.  No.**

6  Q.  Do you know this conversation that's reflected in this

7      transcript, do you know when it occurred? There's no

8      date on it. I've looked and cannot figure out a date.

9  **A.  I -- I honestly don't recall.**

10  Q.  Do you know when he told you he had talked to

11      Bloomberg?

12  **A.  It must have been around the time I first looked at a**

13  **version of this chart because the far right side is**

14  **just so anomalous, I mean it just calls out for an**

15  **explanation.**

16  Q.  Okay. And by "this chart," you're referring to the

17      yield curve chart in your report?

18  **A.  Yes.**

19  Q.  And do you recall anything more about -- than you've

20      told me about why you shifted from the M6235 curve to

21      the BS 1025 curve? I just want to make sure there's

22      nothing that you haven't told me about that.

23  **A.  That's correct.**

24  Q.  You discussed the anomaly about in the "out" years

25      between the curve -- BBB curve you used and the A

KENNETH BUCKFIRE, VOLUME 2

2      curve that you used in this chart. Did you compare

3      the yields on the BBB bonds to the yields that you

4      show in the third chart in this section, the recent

5      MMA curve yields for AAA GO bonds?

6  **A.  What do you mean by compared?**

7  Q.  Well, my principal point is did you note that the

8      yield at 30 years on the BBB bond curve that you were

9      using is, in fact, lower than the yield at 30 years on

10      the AAA GO bonds?

11  **A.  We noticed that.**

12  Q.  And was that also an anomaly in your view?

13  **A.  No, market convention is they're revenue bonds,**

14  **they're deemed to have a lower risk, and they,**

15  **therefore, trade at lower yields than GO bonds.**

16  Q.  Than AAA GO bonds?

17  **A.  That's -- than GO bonds.**

18  Q.  Okay. My question is is it anomalous in your view

19      that the BBB revenue bonds traded at a lower rate than

20      the AAA -- the GO bonds, which you told me yesterday

21      were deemed a low risk market standard?

22  Q.  So you're asking me do I find it strange that the BBB

23      bonds trade at lower yields at 30-year maturities than

24      AAA bonds?

25  Q.  Than the AAA GO bonds, yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KENNETH BUCKFIRE, VOLUME 2

2 A. It's my understanding there are very few revenue BBB
3 bonds and that there are, therefore, very few data
4 points that far out that you can observe, which is why
5 the far right end of this curve is very suspect in my
6 opinion. And the AAA curves are what they are. So
7 I'm not sure you can interpret much from that
8 information.
9 Q. Do you know whether the data points on the BBB curve
10 that you used are thin at places other than the far
11 right end of the curve?
12 A. Well, if you look at this chart on Exhibit 21, you'll
13 notice that there were gaps in the information they
14 provided to us.
15 In other words, they couldn't give us or
16 provide data points for maturities, for example, 21,
17 22, 23, 24. They had one data point at year 25, and
18 they had no other data points till year 30. So that's
19 a thin observable set to use to create a curve, and
20 that's on Exhibit 21.
21 Q. Okay. So any of the dates where there are gaps in --
22 okay.
23 Your -- so tell me where you're referring
24 to in the BS 1020 -- are you looking at the BS 1025
25 column?

KENNETH BUCKFIRE, VOLUME 2

2 A. No, I'm looking at the ones on the right, which they
3 show the A curve, muni A curve and the GO BBBs; do you
4 see that?
5 Q. Yes.
6 A. So that it just basically calls into question how many
7 observable points you have. When you get over on the
8 left-hand side, even though they are reporting yields,
9 my banker told me that even they told him that there
10 were relatively few data points that they were using
11 to generate those yields.
12 Q. All right. So my understanding of what you just went
13 through as you were pointing out that there were no
14 entries for certain periods for the AAA utility -- for
15 the A utility curve --
16 A. Yes.
17 Q. -- and for this other curve that you didn't use, the
18 M631 curve --
19 A. Mm-hmm.
20 Q. -- and -- but that lack of data point is not
21 reflected, would you agree, in the columns for BS
22 1025?
23 A. Well, the problem again, according to my banker, is
24 when literally on these four curves on the right that
25 are put on this schedule, there are no data points at

KENNETH BUCKFIRE, VOLUME 2

2 all.
3 Q. So -- go ahead.
4 A. So there are no data points. When you get over to
5 these two other curves, 1025 and -- 1025, they have
6 data points, but we were told -- or he was told that
7 there are relatively few trades that are being
8 reported at those long maturities that would reflect
9 these yields.
10 Q. All right. So the lack of trades at those maturities
11 is not something reflected in this chart, correct?
12 It's something that your banker told you?
13 A. Correct. Which is what nonparametric fit means.
14 Q. Right.
15 A. There are not enough statistically relevant sets of
16 trades to use to come up with a correct yield.
17 Q. Okay, and --
18 A. One trade that generates a yield spread of 436 is not
19 terribly reliable.
20 Q. My question -- okay, so there are a couple questions I
21 want to ask you about that. Who's your banker that
22 you're talking about?
23 A. For this purpose, Mr. Herman and Mr. Marken.
24 Q. Okay.
25 A. They're working on this together.

KENNETH BUCKFIRE, VOLUME 2

2 Q. So your staff members, Mr. Herman and Mr. Marken, do
3 you know which of them told you this?
4 A. No.
5 Q. Okay. Do you know what their basis for their
6 statements are?
7 A. I asked them to look into it, and they did.
8 Q. Okay. Do you know what they did to look into it?
9 A. Well, they obviously spoke to Bloomberg. That was one
10 of the things they did.
11 Q. Okay. So by that are you referring to the exhibit
12 that was marked as 23?
13 A. Yes.
14 Q. Anything else that you know they did?
15 A. Not specifically.
16 Q. Okay. And then in terms of where on this curve for
17 BBB revenue muni -- where the data points are lacking,
18 right, so that it's a -- strike that.
19 Do you know for which tenors they had a
20 scarcity of data points? In other words, you've
21 answered as if those scarcity is entirely at the
22 outyear point, at the 30-year point, but do you see
23 anything here that tells you where along the curve the
24 scarcity of data is that you're talking about in this
25 information?

1        KENNETH BUCKFIRE, VOLUME 2
2   **A.  No, it was simply they were able to determine from**
3   **talking to Bloomberg.**
4   Q.  Okay.  And so do you know anything about the content
5   of their conversation with Bloomberg beyond what
6   you've told me?
7   **A.  No.**
8   Q.  Do you know whether the M635 curve that you previously
9   used suffers the same data paucity issues that the BS
10  1025 curves suffers?
11  **A.  Is that the curve you're referring to used on October**
12  **2nd?**
13  Q.  Yes.
14  **A.  I don't know.**
15  Q.  And do you know whether it's a nonparametric curve or
16  not?
17  **A.  I don't know.**
18  Q.  It's not referenced in your description of it there,
19  is it?
20  **A.  No, I was checking to see if we had, but the fact that**
21  **we didn't reference it may just simply mean that when**
22  **we want back and refined our thinking on this, we did**
23  **further analysis and found out it was nonparametric.**
24  Q.  You just don't know one way or the other?
25  **A.  I don't know.**

1        **KENNETH BUCKFIRE, VOLUME 2**
2   Q.  Did you have any discussion with Mr. Marken or Mr.
3   Herman or anyone else about the desirability of using
4   the BS 1025 curves because it had lower yields than
5   the M635 curve?
6   **A.  No.**
7   Q.  Okay.  If you look at paragraph 12-E of your report.
8   I just want to make sure there's not something else
9   reflected here than we've talked about, and it --
10  paragraph 12-B references discussions with capital
11  market participants.  Are you referring to any other
12  discussions with capital market participants besides
13  those we've discussed so far?
14  **A.  No.**
15  Q.  And in 12-C, you reference the valuation of comparable
16  situations such as recent issuances by the cities of
17  Philadelphia and Pittsburgh; do you see that?
18  **A.  I do.**
19  Q.  And then going back to the back of your chart again,
20  back to the rate curves section, you provide the
21  second yield curve comparison chart there includes
22  curves for Pittsburgh and Philadelphia; do you see
23  that?
24  **A.  I do.**
25  Q.  Okay.  Can you tell me why those situations were

1        KENNETH BUCKFIRE, VOLUME 2
2   comparable?  Is it -- start with Philadelphia.
3   **A.  It was a revenue bond backed by water -- the Water and**
4   **Sewer Department's revenues of a major urban city, a**
5   **large city which had multiple customers, that made it**
6   **relevant to Detroit which, obviously, is a large**
7   **system with many customers.  It was a recent issuance,**
8   **which was a helpful fact, January was pretty close,**
9   **and it was a large enough issuance to attract market**
10  **interest.**
11  Q.  Okay.  Are you aware of the coupon structure on the
12  deal?
13  **A.  Not specifically, no.**
14  Q.  Do you know whether it was all premium bonds?
15  **A.  I don't.**
16  Q.  Do you know what the call protection was on the deal?
17  **A.  No.**
18  Q.  Do you know whether it was ten years?
19  **A.  I don't.**
20  Q.  Do you know what adjustments would be appropriate to
21  do an apples-to-apples comparison to the Philadelphia
22  curve and the curve for the DWSD bonds to reflect
23  differences in call protection or premium versus par
24  status?
25  **A.  Well, these are rates, not coupons, so I don't**

1        **KENNETH BUCKFIRE, VOLUME 2**
2   understand your question.
3   Q.  Okay.  So the answer is you don't -- that's not
4   something you would do?
5   **A.  Well, this is a rate analysis, not a coupon analysis.**
6   **You're asking me a coupon question, I believe, which**
7   **is not what this is reflecting.**
8   Q.  If the -- and so these -- this chart does not reflect
9   yields?
10  **A.  This is a yield curve.**
11  Q.  All right.
12  **A.  You're asking me a coupon question.**
13  Q.  And do you know --
14          MR. CULLEN:  Object --
15  BY MR. BALL:
16  Q.  Right, and my question is --
17          MR. CULLEN:  Can you let the witness
18  finish, please?
19          MR. BALL:  Sure.
20  **A.  You were asking me about premiums and call protection.**
21  **Those are all functions of coupon and contract.  This**
22  **is yield to the buyer.  All of those factors you just**
23  **mentioned are assumed and part of the yield.**
24  BY MR. BALL:
25  Q.  So the answer is you would make no adjustment --

KENNETH BUCKFIRE, VOLUME 2

2  A.  That's correct.

3  Q.  -- based on those factors?

4  A.  That's right.

5  Q.  And if the deal had been priced with par coupons,

6      yields would be higher, wouldn't they?

7  A.  No, the yields are the yields.

8  Q.  So your view is in the market that par coupon bonds do

9      not require higher yields than premium coupon bonds?

10 A.  There -- you're asking me to compare a yield to a

11     coupon rate, they're not the same thing and never have

12     been.

13 Q.  All right, I'm asking you whether for premium bonds

14     because of factors such as the tax advantages that

15     we've discussed, whether the yields are lower than for

16     par bonds because they do not have the same tax

17     advantages that we discussed.

18 A.  All of those factors would be subsumed in the yield to

19     maturity --

20 Q.  So you --

21 A.  -- which is the basis for comparison of all fixed

22     income securities.  The question is premium, discount,

23     call protection are all subsumed in what the market

24     will pay as a yield to own that security.

25 Q.  Right.  So the answer is you would do no adjustment on

KENNETH BUCKFIRE, VOLUME 2

2      that basis to make the curves comparable, you believe

3      no adjustment's necessary.

4  A.  Insofar as I understand your question, that's correct.

5  Q.  Okay.  Do you know what the total par amount of the

6      Philadelphia deal was?

7  A.  I can't recall right now.

8  Q.  It was, as my understanding, is 123 million.  Do you

9      know whether that's large or -- considered large or

10     small as an issuance of the municipal bond market?

11 A.  I believe it's considered medium sized.

12 Q.  Okay.  Does the size of the issuance make a difference

13     in terms of the yield that one has to offer as an

14     issuer in the municipal bond market?

15 A.  Yes.

16 Q.  And how does it -- how does it matter?

17 A.  Larger issues will tend to trade with tighter spreads

18     over the curve than smaller issues.

19 Q.  So your view is, okay, that the higher issuances will

20     trade at lower yields?

21 A.  Relative to similarly situated issuers which issue

22     smaller amounts of debt because they'll be more

23     liquid.

24 Q.  Any other factors you're aware of that affect any --

25     the relation -- I'm sorry.

KENNETH BUCKFIRE, VOLUME 2

2      Is there any other relationship you're

3      aware of between the yield on bonds and the size of

4      the issuance in the municipal bond market?

5  A.  Larger issue -- larger issuances will generally trade

6      at tighter spreads than smaller issuances because the

7      market generally prefers issues which have greater

8      liquidity than issuers that don't.

9  Q.  Okay, anything other than that that you're aware of?

10 A.  No.

11 Q.  And I think we discussed yesterday that the

12     Philadelphia Water and Sewer System, which issued

13     these bonds, had not sought bankruptcy protection, nor

14     had the City of Philadelphia; is that right?

15 A.  That's correct.

16 Q.  And there had been no default on or impairment of

17     bonds by those entities, correct?

18 A.  That's right.

19 Q.  The Pittsburgh issuance that you referred to here, do

20     you know whether the yields were -- I'm sorry, do you

21     know whether a portion of the issuance was insured?

22 A.  No.

23 Q.  Okay.  Do -- do you know what the coupon structure was

24     on the deal?

25 A.  No.

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Do you know whether it was all premium?

3  A.  No.

4  Q.  Do you know what the call protection was on the deal?

5  A.  No.

6  Q.  Do those factors matter to you in any way in your

7      assessment of the comparison of those curves to the

8      curves that you've proposed?

9  A.  No.

10 Q.  And for the same reasons you answered with respect to

11     the City of Philadelphia?

12 A.  Correct.

13 Q.  And the total par amount on this deal was a little

14     over 200 million; were you aware of that?

15 A.  I think it was in that size range, yes.

16 Q.  And did you take that into consideration in assessing

17     the comparison of the City of Philadelphia -- the City

18     of Pittsburgh issuance to the yield curves you

19     proposed?

20 A.  Yes.

21 Q.  And in what way?

22 A.  Well, the City of Detroit would be contemplating

23     issuances in that range, if not larger, and therefore,

24     the size of the issuance to go with the size of the

25     underlying borrower made it relevant.

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Okay.  Now what issuances by the City of Detroit are
3     you referring to?
4  A.  **Well, specifically with regard to water and sewer as**
5     **we testified to yesterday, the City is in the process**
6     **of launching another revenue bond issue this summer,**
7     **which is being managed by the Michigan Finance**
8     **Authority.  That will be around 150 million, I**
9     **believe, and then as part of the exit financing from**
10    **the bankruptcy, it is on the table that we would raise**
11    **enough money to pay off the certain portion of our**
12    **existing bonds in lieu of giving them new planned**
13    **securities.**
14 Q.  Okay.  So as I understand your answer, in your
15    analysis, what was relevant was the creditworthiness
16    of City issuances not of the current bonds that we're
17    looking at but of future issuances; is that right?
18 A.  **I'm sorry, I don't understand that question.**
19 Q.  All right.  The issuances that were relevant to you in
20    your analysis --
21 A.  **Mm-hmm.**
22 Q.  -- in assessing what the creditworthiness and the rate
23    would be are the issuances that the City is
24    proposed -- proposing to undertake of the 150 million
25    currently and potential future issuances

KENNETH BUCKFIRE, VOLUME 2

2  postbankruptcy; is that right?
3  A.  **Well, we looked at these curves for the purpose of**
4     **understanding not just for purposes of the new planned**
5     **securities we thought where the right rates would be,**
6     **but also to make sure we understood if we were going**
7     **out and raising new financing to replace existing debt**
8     **with cash, what we might have to pay for that.**
9  Q.  Okay.  So you looked at -- the comparison was to those
10    two things, correct?
11 A.  **Among other things.**
12 Q.  What else?
13 A.  **The single A muni curve, the BBB curve, the MMA curve,**
14    **we looked at everything.**
15 Q.  But in terms of comparing the size of the issuance --
16 A.  **Mm-hmm.**
17 Q.  -- what was relevant to you was the potential sizes of
18    the issuance for the -- do you know what I'm talking
19    about when I say the 150 million or the currently
20    proposed DWSD financing?
21 A.  **Yes.**
22 Q.  Okay.  So that was relevant and potential issuances at
23    or post confirmation to buy out existing debt,
24    correct?
25 A.  **Correct.**

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Did you consider any other comparable situations
3     besides Philadelphia and Pittsburgh?
4  A.  **Not specifically.**
5  Q.  All right.  Any -- you discussed Jefferson County
6     yesterday, but you decided it was not comparable; is
7     that right?
8  A.  **Correct.**
9  Q.  And Guam you did not consider but you don't know why;
10    is that right?
11 A.  **Well, it's small and it's an island.  It's too small**
12    **to be relevant to a major municipal water and sewer**
13    **provider.**
14 Q.  Any other reason?
15 A.  **No.**
16 Q.  Mr. Buckfire, you've been involved on and off since
17    sometime last year in negotiations with the counties
18    over the creation of the new regional authority,
19    correct?
20 A.  **Correct.**
21 Q.  And -- is it okay if I call that the GLWA just for
22    sake of not having to go through the whole litany of
23    descriptions?
24 A.  **Or you can call it the authority if it takes less time**
25    **to say.**

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Okay.  And we discussed yesterday that -- that early
3     versions of the plan included proposed new GLWA bonds,
4     correct?
5  A.  **Yes.**
6  Q.  And you proposed the same rates for the GL -- interest
7     rate -- in their interest rate reset chart for the
8     GLWA bonds as for the new DWSD bonds, correct?
9  A.  **Correct.**
10 Q.  And those were the rates you thought were appropriate
11    for the new GLWA bonds, correct?
12 A.  **Yes.**
13 Q.  But you'd known at least since the summer or fall of
14    last year that the DWSD, if it remained part of the
15    City, would not be able to attain the same
16    creditworthiness as the proposed GLWA; correct?
17 A.  **That's not true.**
18 Q.  All right, and in fact, wasn't that one of the
19    principal purposes for the creation of the GLWA that
20    it would attain a -- be better able to attain higher
21    creditworthiness than the DWSD if it remained part of
22    the City?
23 A.  **My prior answer was it was not true.**
24 Q.  Okay.
25 A.  **My answer to your current question also is not true.**

1           KENNETH BUCKFIRE, VOLUME 2
2    Q.   Isn't that what you told the counties that the GLWA
3         would be able to attain better creditworthiness than
4         the DWSD if it remained part of the City?
5    A.   It's certainly true that creating an authority which
6         has been an objective of the political leadership of
7         this region for decades would be the optimal way of
8         main -- to gain the best credit rating.  However,
9         there are alternative ways to enhance the credit of
10        DWSD if it was to remain part of the City, which we
11        have chosen to do, so clearly if it remains part of
12        the City, it will still have much higher credit than
13        it had before.
14             It will not have the highest possible
15        credit standard while it would achieve if it becomes
16        an authority only because of the improvement of
17        governance.  That is the primary advantage of creating
18        an authority, which has already been partially dealt
19        with if it remains as a department because of the
20        consequences of the root cause order, which caused the
21        creation of the board of water commissioners.  So it's
22        not true that it's either/or.  In fact, it is a
23        spectrum of improved credit, and by remaining part of
24        the City, the department will have a far improved
25        credit profile, but it is true that the best case

1           KENNETH BUCKFIRE, VOLUME 2
2         would be to not only take that but add on top of it
3         improved governance.
4    Q.   Before the City filed the Chapter 9 proceeding --
5         well, strike that.
6             When you got involved with the -- with the
7         City -- strike that.
8             In the summer of 2013, the issue of
9         creating a new regional authority was already in play
10        as a result of the root cause committee report; is
11        that correct?
12   A.   It was in play long before that.
13   Q.   Okay.  And when you got involved in working for the
14        City, did you work hard to inform yourself about those
15        issues related to the formation of a regional
16        authority?
17   A.   Yes.
18   Q.   And did you attempt to learn the information that had
19        been provided to the other actors involved like the
20        DWSD or the Board of Water Commissioners about the
21        impact of the formation of a GLWA?
22   A.   I don't know what information you're referring to.
23   Q.   Did you attempt to understand what their views were or
24        what they had been told by market participants about
25        the impact of the creation of a GLWA?

1           KENNETH BUCKFIRE, VOLUME 2
2    A.   It was well understood by the people I spoke with that
3         creating an authority, which would have governance
4         controlled by a majority of the customers, would be
5         the desired outcome.
6             MARKED FOR IDENTIFICATION:
7             DEPOSITION EXHIBIT 24
8             9:05 a.m.
9    BY MR. BALL:
10   Q.   Mr. Buckfire, I'm showing you what's been marked as
11        Exhibit 24, which is a July 10th -- a document dated
12        July 10th, 2013, from Seibert, Brandford, Shank &
13        Company, L.L.C., entitled Updated Pro Forma and
14        Restructuring Analysis, Impact of New Regional Water
15        and Sewer Authority on Future Bond Issuance for the
16        Detroit Water & Sewerage Department, and my first
17        question is have you seen this document before?
18   A.   It looks familiar, but I've read literally dozens of
19        documents related to this matter over the last two
20        years, but -- and I've seen several presentations of
21        this kind to the department.  This may have been one
22        of them.
23   Q.   Okay.  And do you know who Seibert, Brandford, Shank
24        is?
25   A.   They're a municipal bond underwriter and adviser.

1           KENNETH BUCKFIRE, VOLUME 2
2    Q.   And were they advisors to the Board of Water
3         Commissioners?
4    A.   The board's been advised by numerous underwriters and
5         financial advisors; they may well have been one.
6    Q.   So the answer is they may have been, but you don't
7         know?
8    A.   Not specifically, no.
9    Q.   There's a reference on the -- so these handwritten
10        notes, I assume, are not yours?  This is a document
11        produced by Oakland County?
12   A.   It's not my notes.
13   Q.   Okay.
14   A.   I don't take notes.
15   Q.   Did you understand -- if you look at the page that is
16        Bates stamped, last four digits, of 3704, there's a
17        comparison there, and then on the next page --
18             MS. BALL:  Can you wait?
19   BY MR. BALL:
20   Q.   I'm sorry.
21   A.   I'm sorry, I'm not with you.
22   Q.   The Bates pages which are those OAK numbers.
23   A.   I don't -- oh, I see, I'm sorry.
24             MS. BALL:  Along the left-hand margin.
25   A.   I got it, I got it.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6826  Filed 08/18/14  Entered 08/18/14 15:57:22  Page 49 of 364

1    KENNETH BUCKFIRE, VOLUME 2
2  BY MR. BALL:
3    Q.  It's page 6 of the presentation if that helps.
4    A.  Just what's the Bates so I can follow?  707?
5    Q.  704.  Although, I'm going to look at 704 through 707.
6    A.  Okay, I got it.
7    Q.  So take a minute, just a minute to look at the 704 to
8        the 707.
9    A.  Yeah.  Okay.
10   Q.  All right, so you see that Seibert Brandford is doing
11       a comparison of their projections for future debt
12       issuance by -- for the water supply system and for the
13       sewage disposal system and for -- in each case,
14       they're doing a comparison of other projections for --
15           (Electronic phone announcement:  Has joined
16           the conference.)
17   BY MR. BALL:
18   Q.  Assuming that DWSD maintains its current structure --
19   A.  Mm-hmm.
20   Q.  -- and then assuming that a new authority is put in
21       place; do you see that?
22   A.  I do.
23   Q.  Okay.  And do you see that the assumed rating that
24       they've put in -- they have for the structure if the
25       DWSD remains part of the City is a B?

1    KENNETH BUCKFIRE, VOLUME 2
2    A.  That's their assumption, and I see that.
3    Q.  All right, and do you see that the assumption if a new
4        authority is put in place in November of 2013 is an A?
5    A.  I do.
6    Q.  And then improving after that?
7    A.  Yes.
8    Q.  All right.  And did you take into account the advice
9        that Seibert Brandford Shank was giving the Board of
10       Water Commissioners in doing your analysis of the
11       creditworthiness of the system's -- if DWSD remained
12       part of the -- part of the City?
13   A.  Well, this is of no relevance.  This is
14       apples-to-oranges, and you just told me the date of
15       this was July 10 of 2013.  So what relevance is that
16       to this?
17   Q.  And so the answer -- did you -- did you take it into
18       account is my question.
19   A.  No.
20   Q.  And the reason you think it's apples to oranges is
21       because of the date?
22   A.  No, it doesn't reflect any of the actions the City is
23       taking to improve the credit of DWSD.  So it's
24       irrelevant.
25   Q.  The actions the City has taken to improve the credit

1    KENNETH BUCKFIRE, VOLUME 2
2        of the DWSD, when did you begin to construct the
3        efforts to -- to do that?
4    A.  The fall of 2013.
5    Q.  Okay.  And so that was a process that was already
6        underway in the fall of 2013?
7    A.  Actually, long before that, but we didn't work on our
8        part of it until October.
9    Q.  Okay.  So in October of 2013, you were working on that
10       part?
11   A.  Right.  Once we received the OHM report which laid out
12       the capital improvement requirements of the system.
13   Q.  Okay.  So let's go back to your October 2nd
14       presentation, which I believe is -- what exhibit
15       number is that?
16   A.  Well, it's either 22 or 23, I think it's 22.  It's 22.
17   Q.  22.  If I can ask you to go to page 27 on that
18       presentation.  I'm sorry.
19           MR. HACKNEY:  Can I just jump in and ask
20       like, when we're planning on a hand over to COPs here?
21           MR. BALL:  I probably another 45 minutes.
22           MR. HACKNEY:  Oh, man, I don't think that's
23       going to work for us.  He's got a flight so...
24           MR. SOTO:  I mean is it something that we
25       could shorten?

1    KENNETH BUCKFIRE, VOLUME 2
2           MR. HACKNEY:  Or can we tack it on after we
3        are done, because we want to get to our questions.
4        Are you guys on, like, hour 8?
5           MR. BALL:  I don't know if we're on hour 8
6        but -- do you know how much time we've actually been
7        going all together?
8           COURT REPORTER:  No, but you could ask the
9        videographer.  Hey, John.
10          MR. HACKNEY:  An hour and three minutes.
11          MR. BALL:  Well, I'm not talking about
12       today, I'm talking about all told.
13          VIDEO TECHNICIAN:  Total?  Seven hours and
14       five minutes.
15          MR. BALL:  So I'm just -- just over, but I
16       can work to -- to pace -- to --
17          (Counsel confer off the written record at
18       9:13 a.m.)
19          MR. HACKNEY:  Well, guys, you can do
20       whatever you want after we get done, but like we're
21       definitely starting at 9:30.  I mean that's just the
22       deal, right?  We've already given up time here so.  I
23       thought maybe you guys were going to do an hour and we
24       would go and you were finish up after.  So, sorry
25       about this, Ken.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1           KENNETH BUCKFIRE, VOLUME 2
2        THE WITNESS: I'm here to serve.
3        MR. BALL: Thank you.
4        THE WITNESS: Under oath.
5        MR. HACKNEY: Don't you agree with me that
6  COPs should get going at 9:30?
7        MR. CULLEN: He's not agreeing with you
8  about anything.
9  BY MR. BALL:
10  Q. So if you could look at page 27 of that exhibit.
11  **A. The.**
12        MR. CULLEN: The one that's headed
13  "Overview of Future Financing Savings"?
14        MR. BALL: Yes, please.
15  **A. I see it.**
16  BY MR. BALL:
17  Q. And so one of the things you noted there is
18  uncertainty associated with the range of alternatives
19  presented in the emergency manager's proposal for
20  creditors dated June 14th, 2013, has led to several
21  agencies to further lower DWSD's credit ratings: do
22  you see that?
23  **A. I do.**
24  Q. And so that was one of the reasons that the credit
25  ratings were lowered in June of 2013; correct?

1           KENNETH BUCKFIRE, VOLUME 2
2  **A. That's right.**
3  Q. Okay. And then the next point is increased
4  independence from the City proposed and contemplated
5  transaction would likely lead to higher credit quality
6  and lower debt costs for DWSD's successor capital
7  structure: do you see that?
8  **A. I do.**
9  Q. And that was accurate at the time?
10  **A. That's correct.**
11  Q. And it's accurate now?
12  **A. It is.**
13  Q. And I note that on the next page you present to the
14  Counties reports from or rating -- information about
15  ratings from three different rating agencies,
16  including Fitch; is that right?
17  **A. That's right.**
18  Q. And you thought that was important to include here,
19  correct?
20  **A. They're data points; we included them.**
21  Q. And in this report, you project savings both on new
22  debt issuance and refinancing of existing debt based
23  on an improved credit quality associated with the
24  creation of a regional authority, correct?
25  **A. Correct.**

1        **KENNETH BUCKFIRE, VOLUME 2**
2        MARKED FOR IDENTIFICATION:
3        DEPOSITION EXHIBIT 25
4        9:16 a.m.
5  BY MR. BALL:
6  Q. Mr. Buckfire, I'm asking you to look at what's been
7  marked as Exhibit 25, which is a document dated
8  October 18th, 2013, entitled City of Detroit DWSD
9  Oakland County business issues memo, Conway/Miller
10  Buckfire response: do you see that?
11  **A. I do.**
12  Q. And is this a document that Miller Buckfire helped
13  prepare?
14  **A. Yes.**
15  Q. Okay. And if you would look with me and were you
16  involved in its preparation?
17  **A. I reviewed it but I didn't write it.**
18  Q. And you reviewed and approved it?
19  **A. Yes.**
20  Q. Okay. If you would look at the second page of
21  paragraph 4? And do you see the response to the
22  question that's posed in paragraph 4 that Miller
23  Buckfire and Conway MacKenzie gave?
24  **A. I do.**
25  Q. And it says we agree with the statement however, we

1           KENNETH BUCKFIRE, VOLUME 2
2  believe that if DWSD remained a City department, its
3  ability to achieve savings associated with such
4  refinancing would be low: do you see that?
5  **A. I do.**
6  Q. And that was true then?
7  **A. I believe it was true then, yes.**
8  Q. And it's true now, right?
9  **A. I wouldn't stipulate to that.**
10  Q. Okay. So you thought -- you thought then that its
11  ability to achieve those savings would be low,
12  correct?
13  **A. In October of 2013, yes, but not today.**
14  Q. To the extent -- the bullet following that says to the
15  extent that DWSD remained part of the City, we believe
16  that rating agencies would continue to rate it as a
17  derivative credit of the City: do you see that?
18  **A. I do.**
19  Q. And that was true then, and it's true now, correct?
20  **A. Probably true today.**
21  Q. And this is October 2013, you were already at work on
22  constructing what you called the improvements to the
23  DWSD's financial situation, correct?
24  **A. We were starting to think about that, that's right.**
25  Q. Let me ask you to look at tab 23. I'm sorry, that's

Pages 61 to 64

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 51 of 364

1    KENNETH BUCKFIRE, VOLUME 2
2  not going to do you any good.
3         MARKED FOR IDENTIFICATION:
4         DEPOSITION EXHIBIT 26
5         9:18 a.m.
6  BY MR. BALL:
7  Q.  Mr. Buckfire, can you -- you've been provided a copy
8  of what's been marked as Exhibit 26.  This is actually
9  one of the documents that we will produce -- was
10  produced to us last night, have been produced
11  previously so I take it this is one of the documents
12  that you relied upon in preparing your report?
13  A.  Yes.
14  Q.  Okay.  And this is a presentation by Barclays to
15  Miller Buckfire from January 2014, correct?
16  A.  Correct.
17  Q.  And the context of the presentation is it's a
18  discussion of the impact of a -- the creation of a new
19  regional authority, correct?
20  A.  Correct.
21  Q.  And one of the things they told you at the bottom of
22  page 1 is that postbankruptcy over time, DWSD could
23  make a strong case for upgrades; do you see that?
24  A.  I do.
25  Q.  And that if you look at page 7, they give you a number

1    KENNETH BUCKFIRE, VOLUME 2
2  of -- they give you a list of things which should be
3  done to achieve certain credit ratings; do you see
4  that?
5  A.  I do.
6  Q.  And that because it's in the context of the GLWA
7  transaction, one of the things they want are
8  transfers to the City, correct?  Which would be the
9  lease payment?
10  A.  That's correct.
11  Q.  And so about that, they say that to achieve our BBB
12  rating, you should make the structure modest, less
13  than 5 percent of revenues, stable formulated
14  transfers supported by customers; do you see that?
15  A.  I do.
16  Q.  And in terms of -- and then they give you two other
17  things.  One is they say you need to stabilize
18  financial metrics; do you see that?
19  A.  I do.
20  Q.  And the other thing they say is externalities that
21  need to eliminate concerns over City of Detroit
22  issues; do you see that?
23  A.  I do.
24  Q.  And so in order for a GLWA entity to achieve an AAA,
25  you would need to do all three of those things,

1    KENNETH BUCKFIRE, VOLUME 2
2  correct?
3  A.  Yeah, fortunately, our plan does address all of these
4  concerns, which I previously testified was one of the
5  things we were concerned when it became clear that the
6  creation of the authority might be delayed until post
7  emergence.  We've done -- we've dealt with all these
8  issues satisfactorily.
9  Q.  In the context of an entity that's part of the GLWA;
10  that's your testimony, right?
11  A.  Yeah, the only -- only caveat would be that the
12  governance of the department, even though it is
13  governed by the Board of Water Commissioners, which is
14  helpful, it's not perfect.  Perfect would be a
15  department controlled by a majority of the numbers.
16  We did not achieve that yet.
17  Q.  With the DWSD remaining part of the City --
18  A.  Yeah.
19  Q.  -- is it your testimony that you have eliminated
20  concerns over City of Detroit issues?
21  A.  Yes.
22  Q.  Completely, you have eliminated?
23  A.  Substantially eliminated.
24  Q.  But not eliminated altogether?
25  A.  I'm not sure you could ever achieve perfection.

1    KENNETH BUCKFIRE, VOLUME 2
2  Q.  And so do you know -- well, strike that.
3         Do you know what stabilization of financial
4  metrics they require -- that Bloomberg wanted -- not
5  Bloomberg, that Barclays wanted you to achieve?
6  A.  They wanted to see it going up rather than down.
7  Q.  And if you would look with me at the top of page 9, do
8  you see the statement that said generating stronger
9  financial metrics is an essential step to achieving
10  high ratings in reference to Moody's?
11  A.  I do.
12  Q.  Okay, and so did you undertake any analysis of why --
13  strike that.
14         I understand from your testimony yesterday
15  that you haven't undertaken any analysis opining
16  the -- the criteria employed by the rating agencies to
17  evaluate these things; is that right?
18  A.  I said we looked at it.  I didn't say we used it, but
19  if you look at my expert report where we talk about
20  coverage ratios, you'll notice by inspection that the
21  system is projected to consistently improve coverage
22  ratings over the next ten years and, obviously, beyond
23  2023 the coverages will grow dramatically because of
24  the elimination of the contribution to the pension
25  plan.

Pages 65 to 68

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 52 of 364

KENNETH BUCKFIRE, VOLUME 2

1  So unfortunately, cutting off after ten
2  years actually cheats the system of recognition of its
3  vastly improved credit beyond year ten.
4  Q.  So you're looking in the out years?
5  A.  Well, that's what projections are.
6  Q.  Right.  And my question is have you looked at them
7  or -- immediately postemergence?
8  A.  Well, these are immediately postemergence.
9  Q.  These are not yours, these are an analysis by
10  Barclays.  I'm talking about you.  Have you undertaken
11  an evaluation of those ratios upon post emergence?
12  A.  It's on page 233 of my expert report.
13  Q.  And the application of the criteria used by the credit
14  rating agencies?
15  A.  Some of my team members may have done it, I haven't
16  seen it.
17  Q.  One last thing about this is if you look on page 10,
18  do you see that Barclays is again presenting Fitch
19  data?
20  A.  Yes.
21  Q.  And Barclays is a market participant in your view?
22  A.  They're a minor market participant.
23  Q.  Do you recall that one of the issues in the GLWA
24  negotiations was the $47 million lease payment that

KENNETH BUCKFIRE, VOLUME 2

1  you were attempting to negotiate?
2  A.  And what's the source of that information?
3  Q.  Thousands of documents that have been introduced in
4  this case.
5  MR. CULLEN:  Do we have -- could you state
6  it again, please?
7  (The requested portion of the record was
8  read by the reporter at 9:25 a.m. as follows:
9  "Question:  Do you recall that one of the
10  issues in the GLWA negotiations was the $47
11  million lease payment that you were attempting
12  to negotiate? ")
13  Q.  And I'll restrict that to the period before -- up
14  until the mediation order in March.
15  A.  Are we okay on that?
16  Q.  The med -- it does -- in that order of the mediation
17  in March the negotiations with the County and [
18  produced a --
19  MR. CULLEN:  I'm just not sure that we have
20  produced that number in public, if you can -- if you
21  can --
22  MR. BALL:  It's ubiquitous.
23  A.  Well, I think the counties were pretty public with it,
24  but we never said it personal -- we never said it but

KENNETH BUCKFIRE, VOLUME 2

1  the public --
2  MS. BALL:  The counties.
3  A.  The counties produced it, but we never did.
4  MARKED FOR IDENTIFICATION:
5  DEPOSITION EXHIBIT 27
6  9:26 a.m.
7  BY MR. BALL:
8  Q.  Mr. Buckfire, there's a discussion here, an e-mail
9  exchange with -- a variety of parties involved in
10  those negotiations including Amanda Van Dusen; do you
11  see that?
12  A.  I do.
13  Q.  And who's Amanda Van Dusen?
14  A.  She is counsel -- she's with Miller Canfield and she
15  has been outside counsel to the City with respect to
16  this matter.
17  Q.  Okay.  And do you see -- you have to work up through
18  the e-mails, so if you work your way from the back
19  forward, do you see that one of the issues that
20  Counties were raising is why their proposal that the
21  $47 million lease payment be adjustable was not being
22  accommodated?
23  A.  Are you referring to some specific place?
24  Q.  Yes, if you look at the next to the last page, under

KENNETH BUCKFIRE, VOLUME 2

1  6-B, do you see where the heading it says 6 -- 6B?
2  A.  Mm-hmm.
3  Q.  And it says the intent of the deleted language was to
4  permit some flexibility --
5  A.  Right.
6  Q.  -- in structuring the stream of payments since this
7  would yield the same present value while it's deleted,
8  it would be very advantageous to have the lease
9  payment below 47 million and raise them over time
10  because of DWSD's present financial challenges, et
11  cetera.  Do you see that?
12  A.  I do.
13  Q.  And do you see on the page before that is the response
14  from Ms. Van Dusen.
15  A.  I'm sorry, I'm looking for the --
16  Q.  Okay.  So the page before that, you can see the
17  beginning of e-mail?
18  A.  Are you looking at 307 or 306?
19  Q.  The e-mail begins at the bottom of 306.
20  A.  Okay.
21  Q.  It goes on to 307?
22  A.  Okay, thank you.  Right.
23  Q.  All right, and do you see under the analysis of
24  liabilities, someone else will have to address but it

KENNETH BUCKFIRE, VOLUME 2

ties into 6B and the certainty we need for other
elements of the plan?

**A. Yes.**

Q. As you're aware, the City has been negotiating on many
fronts simultaneously. The negotiations with other
creditors require the City to count on 47 million per
year; do you see that?

**A. I do.**

Q. Now, do you -- have the City made commitments that
required cash flow in that amount?

**A. It had.**

Q. Okay. And ultimately there was no GLWA transaction,
correct?

**A. Correct.**

Q. In at least in the time before the current version of
the plan.

How did you fill the hole for the 47
million in required cash flow that's referenced there?

**A. We decided instead to have the department provide
catchup payments to recognize the fact that it had
been underfunding its obligations under the plan for
years, so in fact, instead of having this as a lease
payment, we characterized part of it as just the
catchup payments.**

KENNETH BUCKFIRE, VOLUME 2

Q. All right. So are you referring to the payments for
the UAAL that are contemplated under the plan?

**A. I am.**

Q. And when you say catchup payments, you say have been
underpaying. Do you know whether the department had
been paying the amounts calculated by the system and
its actuaries as the amounts due from the department
in those prior years?

**A. They were paying what they were being allocated to pay
by the City.**

Q. All right, so they were paid what they were told --
they paid what they were told to pay, correct?

**A. That's correct.**

Q. And so when you say it's an underpayment, it wasn't an
underpayment at the time: isn't that right?

**A. It was an underpayment relative to the underfunding of
the plan. A properly run pension plan would have been
charging --**

Q. Right.

**A. -- higher costs.**

Q. And your statement about it being a proper one,
pension plan charging higher costs, what's that based
on?

**A. It was an improperly run pension plan which was not**

KENNETH BUCKFIRE, VOLUME 2

charging the City of Detroit enough to fund its,
obligations which is why it was so underfunded in the
first place.

Q. And what is that based on? I'm understanding that
that's the claim you're making, I'm asking what is
that based on?

**A. It's based on all the analysis done by the City's
actuaries including Milliman, Gabriel Roeder, the
analysis done by E&Y, the analysis done by Conway, all
presented in the June 14 proposal of creditors.**

MR. HACKNEY: This is probably a good place
to break.

MR. BALL: All right, let's break.

VIDEO TECHNICIAN: The time is 9:30 a.m.
We are now off the record.

MR. CULLEN: We'll be back in about five
minutes. We'll answer questions from whoever's
sitting in that chair.

(Recess taken at 9:30 a.m.)

(Back on the record at 9:40 a.m.)

VIDEO TECHNICIAN: We're back on the
record, the time is 9:40 a.m.

EXAMINATION

BY MR. SOTO:

KENNETH BUCKFIRE, VOLUME 2

Q. Mr. Buckfire, my name is Ed Soto, I'm with Weil,
Gotshal & Manges, and I'm hearing representing FGIC.
We're the monoline insurers in this matter. I will
try to speak over this apparatus, and if there's any
time that you don't understand a question that I'm
asking you or you can't hear me or if there's anything
you don't understand about the question, just go ahead
and let me know, and I'll try to rephrase it and we'll
try to make sure we're on the same ground.

If I don't understand something you're
telling me, I'll be very quick to let me know and
maybe we can work through that, as well. I know
you've been deposed a number of times, and so I'll
spare you all the things about depositions, you've
been to plenty. If there's anything about going
forward with this deposition right now that you think
would hamper you from being able to give full and
complete answers, please let me know, and we'll work
with that, as well. Otherwise, we'll just go ahead
and begin, okay?

**A. Thank you.**

Q. Okay. So with respect to the COPs transactions -- and
I'll just refer to them as the COPs transactions, and
you understand what I'm referring to in that sense?

Pages 73 to 76

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 54 of 364

KENNETH BUCKFIRE, VOLUME 2

1
2  A.  I do.
3  Q.  And I'll talk about the City the way everybody else
4      has here today, and we'll assume then unless I say
5      something else, we're talking about the City of
6      Detroit, correct?
7  A.  Yes.
8  Q.  Okay.  With respect to the COPs issues, you've been
9      designated by the City as a 30(b)6 witness.  Do you
10     know what topics you've been designated to testify
11     about?
12 A.  It's a range of topics.  I can't specifically -- I
13     can't recall the list at this time.
14 Q.  It's not -- I'm not -- this is not a guessing game.
15     I'll go through them.  I was just going to ask if you
16     know, you can tell me them, but as I understand it,
17     and you tell me if I'm wrong, you've been designated
18     to address topic 10 which is the value and risks
19     associated with the new B notes?
20 A.  Yes.
21 Q.  And topic 11, which is the assistance that the State
22     of Michigan provided to the City to counteract the
23     City's financial instability and economic decline?
24 A.  Yes.
25 Q.  And topic 45, which is the City's use of a 5 percent

KENNETH BUCKFIRE, VOLUME 2

1
2      discount rate in the plan of adjustment and fourth
3      amended disclosure statement?
4  A.  Yes.
5  Q.  And topic 52, which is the City's effort to obtain
6      exit financing?
7  A.  Yes.
8  Q.  Are you prepared today to testify on those topics?
9  A.  Yes.
10 Q.  Did you do anything to get yourself ready to testify
11     on those topics?
12 A.  Well, I reviewed the material cited in my expert
13     report plus some additional documents that were
14     actually produced last night.
15 Q.  And I understand that you're also here testifying as
16     an expert witness, as well as a fact witness, but what
17     I am talking about in terms of these topics is your
18     testimony as a fact witness on those topics.  Did you
19     do anything in particular to prepare yourself to
20     testify on those topics as a fact witness?
21 A.  No.
22 Q.  And again, you'll see me going through a few pages
23     because you've been testifying for over eight hours,
24     and much what I was asking has already been asked.
25     I'll try my best not to repeat it.  If you do think

KENNETH BUCKFIRE, VOLUME 2

1
2      you've testified about something before that I'm
3      asking, let me know that, and maybe we can again work
4      around that, as well, or you can refresh my
5      recollection.
6  A.  Thank you.
7  Q.  Plus we have all these machines that could refresh our
8      recollection.
9          Can you describe for me Miller Buckfire's
10     responsibilities as the City's investment banker as it
11     relates to the COPs transactions?
12 A.  Well, let's be precise.  When you're talking about the
13     COPs transactions, are you referring to the original
14     transactions in 2005 and 2006 or the COPs transactions
15     pursuant to constructing their treatment under the
16     plan of adjustment?
17 Q.  I am talking about all of them, but let's start with
18     the original transactions --
19 A.  Okay.
20 Q.  -- with respect to 2005 and 2006 and work our way
21     through, but yes that -- that is what I'm talking
22     about.
23 A.  Okay.  So can we just break this down then --
24 Q.  Certainly.
25 A.  -- so I properly answer your question.

KENNETH BUCKFIRE, VOLUME 2

1
2  Q.  Okay.  So can you describe for me Miller Buckfire's
3      responsibilities as the City's investment banker as it
4      relates to the COPs transactions, as you put it, that
5      transpired in 2005 and 2006?
6  A.  Well, we were engaged by the City of Detroit as its
7      banker in -- officially in January of 2013 as part of
8      our many responsibilities, we undertook an analysis of
9      the City's liabilities, in particular, its funded debt
10     obligations in order to ascertain what their treatment
11     might be under a potential plan of adjustment, the
12     City's ability to repay those obligations and try to
13     accomplish some initial view as to what their relative
14     priorities might be.
15 Q.  And in doing that, you reviewed those COP
16     transactions --
17 A.  We did.
18 Q.  -- correct?
19 A.  We did.
20 Q.  And what was your assessment of those COP transactions
21     at the time in connection with that review?
22 A.  Well, our assessment as a financial matter was that
23     the structure of those transactions would likely mean
24     that the City's requirement to repay them in the event
25     of a default or bankruptcy would render those

KENNETH BUCKFIRE, VOLUME 2

1  obligations a lower priority than the LT, UT and other
2  obligations of the City.
4  Q.  And if you could, explain for me what you mean by
5  that, I would appreciate it.
6  A.  Well, the COPs were not direct obligations of the
7  City.  They were obligations of the so-called service
8  corporations which had been set up pursuant to the
9  original transactions.  The City was obligated to pay
10  a stream of income, revenues to those service
11  corporations and that was then used to repay the COPs,
12  the certificates of participation, issued by those
13  corporations to buyers.  So they were indirect
14  obligations to the City, and we believe those would
15  make them of lesser priority than other obligations
16  which were direct obligations of the City.
17  Q.  I understand that.  Is there anything else that -- any
18  other conclusions you made regarding those
19  transactions, the 2004 and 2005 transactions?
20      MR. CULLEN:  I'd admonish the witness to
21  restrict his answer to financial considerations as
22  opposed to reflecting it in any legal discussions that
23  he might have had with the City's counsel or been
24  involving with the City concerning the viability of
25  those transactions as a legal matter.

KENNETH BUCKFIRE, VOLUME 2

2  BY MR. SOTO:
3  Q.  And let me be very clear.  I'm asking you for your
4  knowledge based upon your participation as an
5  investment banker.  If at any time something you're
6  about to tell me is something that you were told by
7  your lawyer, certainly, you can address that with your
8  counsel and determine where you go from there, but
9  what I really want is your knowledge, your -- you have
10  been in this industry for quite sometime, and you have
11  an excellent resume.  I personally think you went to a
12  great business school, and at the end of the day, I'm
13  trying to figure out what you know, not what your
14  lawyers know.
15  A.  No, my conclusion was and still is that the relative
16  obligations represented by the COPs were lesser
17  priority than other obligations the City has incurred.
18  Q.  And again, separate and apart from any conversations
19  with your lawyers, did you make any other observations
20  regarding those transactions that you can recall at
21  this time?
22  A.  I recall discussing with my colleagues that because
23  the COPs issues were insured, it might be very
24  difficult as a matter of negotiation financially to
25  arrive at any kind of settlement with the COPs holders

KENNETH BUCKFIRE, VOLUME 2

2  as opposed to the insurance companies because of the
3  existence of insurance.
4  Q.  Were you familiar with deals like the COPs deal in
5  your experience as -- as an investment banker?
6  A.  We've seen many similar transactions in the corporate
7  world.  This is nothing new.  It was the first time, I
8  believe, a major municipality had tried it for which
9  they won awards, but it was a commonly used technique
10  in the corporate world.
11  Q.  When you reviewed them and this is again not a member
12  test if you don't remember, fine, let me know, but
13  when you reviewed them incomes with your retention as
14  an investment banker, were you aware that other
15  municipalities had done similar COPs transactions?
16  A.  Yes.
17  Q.  Did you prepare any -- and when I say you, I need to
18  be clear here, I'm asking you about you but I --
19  A.  You mean my firm.
20  Q.  Yeah.
21  A.  I understand.
22  Q.  Did you or Miller Buckfire prepare any analyses of the
23  COPs transactions?
24  A.  Only from a financial perspective.
25  Q.  And from a financial perspective, can you recall

KENNETH BUCKFIRE, VOLUME 2

2  anything else about that analysis?
3  A.  We looked at the obligations to understand their cash
4  flow characteristics, the City's obligation to repay,
5  both principal and interest, and then we looked at it
6  again through the perspective of what we would refer
7  to as recovery waterfall mechanics, which is where we
8  try to eventually identify based on the City's
9  available cash flow how it could apply that to its
10  various creditors and their levels of priority.
11  Q.  I'm -- only this question because I heard you make a
12  distinction yesterday.  Were you personally involved
13  in the analysis done of the COPs transactions that you
14  just referred to?
15  A.  Not personally.
16  Q.  Who in Miller Buckfire was?
17  A.  That was have been overseen by Mr. Herman and
18  Mr. Merken.
19  Q.  And Mr. Herman's first name?
20  A.  Kyle.
21  Q.  Kyle, and the second fellow?
22  A.  Sanjay.
23  Q.  Sanjay?
24  A.  S-a-n-j-a-y.
25  Q.  Okay.

1      KENNETH BUCKFIRE, VOLUME 2
2          THE WITNESS:  Am I slow enough now, court
3    reporter?
4          COURT REPORTER:  Yes.
5    BY MR. SOTO:
6    Q.  You made a distinction between, and I understood it
7        when you made it, between the 2005-2006 time period
8        and today with respect to the COPs.  Are you involved
9        of any analyses in connection with the current
10       treatment of the COPs transactions, in connection with
11       the plan, for example?
12   A.  Well, yes, we were obviously involved in determining
13       appropriate treatment for the COPs pursuant to the
14       plan.
15   Q.  And what was your involvement in that?
16   A.  My firm's involvement?
17   Q.  I was going to ask you and then go to the firm.
18   A.  Okay, well, I was the primary negotiator on behalf of
19       the City all during the period of time we were
20       actively trying to negotiate with the COPs holders and
21       the insurance companies that provided bond insurance
22       and I want to be careful because I think it was under
23       mediation.
24          MR. CULLEN:  Yeah, but that fact is not --
25          THE WITNESS:  Okay.

1      KENNETH BUCKFIRE, VOLUME 2
2          MR. CULLEN:  -- secret.
3    A.  All right, very actively involved in trying to arrive
4        at a settlement with those parties pursuant to the
5        plan.  I was also very actively involved in
6        determining since those negotiations did not result in
7        a settlement, appropriate proposed treatment for those
8        holders pursuant to the plan in terms of the relative
9        allowed claim, and the pro rata amount of B notes they
10       would receive.
11   BY MR. SOTO:
12   Q.  And you understood that the creditors involved in the
13       COPs transactions were -- were unsecured creditors?
14   A.  I am.
15   Q.  Okay.  In devising the plan, well, let me go back to
16       the question that you answered.  You -- you gave me an
17       answer of your participation.  Was there any
18       additional participation that you're aware of by
19       Miller Buckfire, your firm?
20   A.  Well, this has been a very important issue to the
21       City.  It's a large obligation, so other members of
22       Miller Buckfire were involved at different points in
23       time and the analysis of the settlement that we
24       proposed.  This is during the negotiation period, and
25       later on in determining the nature and status of the B

1      KENNETH BUCKFIRE, VOLUME 2
2        notes and then obviously how that would be factored
3        into the plan treatment.
4    Q.  And those other people, were those the same people you
5        had mentioned earlier?
6    A.  Including Mr. Doak, my partner.  His first name,
7        James.
8    Q.  So in devising the plan, did Miller Buckfire do any
9        analysis of what the City's unsecured creditors would
10       recover under the current proposed Chapter 9 plan of
11       adjustment?
12   A.  We did.
13   Q.  Did you personally do anything in connection with that
14       analysis?
15   A.  Well, there were probably literally dozens of
16       iterations, the calculations of the size of the
17       unsecured claims pool, and then an analysis of how
18       that claims pool would share in the value available,
19       which is primarily the so-called the B notes.  I've
20       reviewed multiple different versions of that including
21       the final version that went into the plan.
22   Q.  And again, if you don't know from memory, we could
23       find the document, how much are the unsecured
24       creditors' involvement of the class 9 creditors, how
25       much are they getting under the plan?

1      KENNETH BUCKFIRE, VOLUME 2
2    A.  Well, I know it's a memory test.  I do recall the
3        allowed claim for the COPs, we allowed 40 percent of
4        the principal note to go into the claims pool, and,
5        therefore, when you calculate their recovery, you have
6        to take into account it's only 40 percent that's being
7        allowed pursuant to the claim --
8    Q.  That's the beginning assumption --
9    A.  That's our beginning assumption, right.  So --
10   Q.  Okay.  Let me hand you a document so we can get these
11       facts into -- let me hand you to our court reporter
12       what we'll mark as Exhibit 1 to our deposition.  And I
13       believe it's a copy of the disclosure statements so
14       you can take a look at it and get some facts.
15          MR. CULLEN:  We're going to start over
16       again on the numbers?
17          MR. SOTO:  Well I don't want to do that if
18       we haven't been doing it, so if we haven't been doing
19       it --
20          MR. BALL:  I think we've been marking them
21       consecutively in this deposition.
22          MARKED FOR IDENTIFICATION:
23          DEPOSITION EXHIBIT 28
24          9:57 a.m.
25   BY MR. SOTO:

1    KENNETH BUCKFIRE, VOLUME 2
2  Q.  So I -- the questions that I'm going to ask are
3      related to, you know, just what various classes are
4      getting under the plan so we get that in the record,
5      and I think that starts somewhere around page 33 of
6      the disclosure statement.
7  A.  **Are you using the exhibit number or the page number of**
8      **the document?**
9  Q.  The page -- well, actually, that's a good point.  Just
10     the page number for now.  It's page 48 of the
11     document.
12         MR. CULLEN:  Counsel, do you have one or
13     not?
14         MR. SOTO:  We should.
15         MR. CULLEN:  That would be handy.
16         (Electronic telephone announcement:  Jim
17     Phinney of Mintz Levin has left the conference)
18         MR. CULLEN:  You may start, I'll catch up.
19  BY MR. SOTO:
20  Q.  Thanks.  So looking at this Exhibit 28, which is the
21     disclosure statement --
22  A.  **Mm-hmm.**
23  Q.  -- I believe it's on page 49 of 197 of the Exhibit
24     which happens to be page 34 of the-- of the document.
25  A.  **Yes, I'm with you.**

1    KENNETH BUCKFIRE, VOLUME 2
2  Q.  And I see that, I guess, class 7, the LTGOs, estimated
3      percentage of recovery is 10 to 13 percent: do you see
4      that?
5  A.  **I do.**
6  Q.  Do you know if that's going to change in any way based
7      on your work?
8  A.  **Well, this is subject to the negotiation, and we**
9      **haven't made it public yet.**
10  Q.  Okay.  Well, I don't want anything that's subject to
11     the court's orders on mediation or settlement, but --
12     so if you can't answer it, that's fine.
13         MR. HACKNEY:  Can I interject real quick?
14     When I asked about this, Tim --
15         MR. CULLEN:  Yes.
16         MR. HACKNEY:  When I asked Jeff Irwin if I
17     could get the terms of the ultimate GO deal, he
18     referred me to Ken's report, Exhibit A, which shows
19     the recovery on the unsecured portion of the LT GO,
20     so --
21         THE WITNESS:  Okay.
22         MR. HACKNEY:  -- I know you got to take my
23     word on that but there's a -- there's a number in your
24     expert report on that.  It's kind of a gray zone; I
25     acknowledge that --

1    KENNETH BUCKFIRE, VOLUME 2
2         THE WITNESS:  I know, that's why I'm being
3      careful; I don't know what --
4         MR. HACKNEY:  At least that part of it's
5      public, so --
6         THE WITNESS:  Yeah.
7         MR. HACKNEY:  -- I don't know if it's the
8      full extent.
9  BY MR. SOTO:
10  Q.  So then looking at class 8 on the same page, which is
11     the unlimited tax general obligation bond claims, or
12     what we refer to as the SEPG, can you tell me what the
13     estimated percentage of recovery is on that?
14  A.  **74 percent.**
15  Q.  Looking then at class -- I guess it's on page 51 of
16     197, 36 of the document, class 10, which is the PFRS
17     pension claims, can you tell me what the estimated
18     recovery is on those claims?
19  A.  **Without outside funding, 39 percent and with outside**
20     **funding, 59 percent.**
21  Q.  Can you explain for the Court and me what the
22     difference is there, what -- what outside funding.
23  A.  **One of the elements of recovery in this plan of**
24     **adjustment is the provision of outside funding from a**
25     **combination of the State of Michigan and foundations**

1    KENNETH BUCKFIRE, VOLUME 2
2      **to the Detroit Institute of Arts and that money is**
3      **being conveyed directly to the pension funds pursuant**
4      **to an overall compromise involving the unions, the**
5      **pension funds, the DIA, that is, the Detroit Institute**
6      **of Arts, and the City of Detroit.**
7  Q.  And that's what you're referring to?
8  A.  **As the outside funding, correct.**
9  Q.  Moving on to, I guess, class 11, which would be on
10     page 38 of the document page 53 of 197 of your
11     Exhibit 28, it refers to class 11, the GRS pension
12     claim.  Can you tell me what the estimated recovery is
13     for the class 11 GRS pension claims?
14  A.  **The estimated recovery without outside funding, is 48**
15     **percent.  And with outside funding is 60 percent.**
16  Q.  And the outside funding that's being referred to
17     there, is that what you just testified about a moment
18     ago?
19  A.  **Correct.**
20  Q.  As it relates to that?  And looking back then on I
21     guess it's page 35 of the document, page 50 of 197 of
22     the exhibit, with respect to class 9, the COPs claims;
23     do you see that?
24  A.  **I do.**
25  Q.  Can you tell me what the estimated percentage of

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    KENNETH BUCKFIRE, VOLUME 2
2    recovery is for the class 9 COPs claims?
3  **A.  Zero to 10 percent.**
4    Q.  Now you mentioned a little bit ago that the plan
5    contains various settlements in it, correct?
6  **A.  Correct.**
7    Q.  Okay.  I'm not going to go into the substance of -- of
8    all of them, and some of them you can't testify about,
9    as you've said earlier, but let me ask did Miller
10   Buckfire have a role on behalf of the City in any of
11   those settlements?
12 **A.  We had a role in all of the settlements?**
13   Q.  In all of them?
14 **A.  Yes.**
15   Q.  Without going into the substance of it, what was
16   Miller Buckfire's role in connection with the
17   settlement process?
18       MR. CULLEN:  You can describe what your
19   role was.
20       THE WITNESS:  In general?
21       MR. CULLEN:  In general.
22 **A.  Okay, we provided advice to the emergency manager and**
23 **the City of Detroit on the relative value of each**
24 **claim that need to be settled, the manner in which the**
25 **negotiations should be handled, constructing the**

1         KENNETH BUCKFIRE, VOLUME 2
2  **various offers to those creditors for settlement**
3  **purposes, assisting the emergency manager in**
4  **negotiations with creditors to arrive at acceptable**
5  **transactions.**
6  **We did substantial analysis of all**
7  **proposals provided to us by the different**
8  **constituencies and insured along with other**
9  **consultants to the City that the settlements in**
10 **totality would allow the City to propose a feasible**
11 **plan.**
12   Q.  Did Miller Buckfire have a role in developing the
13   proposed treatment of each of the classes of unsecured
14   claims that we just read about in the disclosure
15   statement?
16 **A.  Yes.**
17   Q.  And what was Miller Buckfire's role in that?
18 **A.  It's what I just testified to.**
19   Q.  The same?
20 **A.  Yes.**
21   Q.  Did you have a personal role in that?
22 **A.  In several of the negotiations, yes.**
23   Q.  And also in proposing the treatment of each of the
24   classes?
25 **A.  Yes.**

1    **KENNETH BUCKFIRE, VOLUME 2**
2    Q.  Was Miller Buckfire involved in the decision to
3    provide a greater percentage of recoveries to classes
4    10 and 11 as compared to class 9?
5        MR. CULLEN:  Objection, foundation, you can
6    address that if it makes sense to you.
7  **A.  I was -- and my firm was involved actively in all**
8  **analysis of all recoveries for all classes.**
9    BY MR. SOTO:
10   Q.  That included that comparison of 10, 11, and 9?
11 **A.  Correct.**
12   Q.  Do you recall the basis of the decision for the
13   differentiation of those classes, 10, 11, and 9?
14       MR. CULLEN:  I would caution the witness
15   not to talk about lawyer/client --
16       THE WITNESS:  Right.
17       MR. CULLEN:  -- issues or mediation issues
18   with respect to those.
19       MR. SOTO:  And that can be a standing,
20   you've been directed as such.
21       MR. CULLEN:  I understand.
22 **A.  And I'm just thinking about how I can frame my answer**
23 **give me a minute.**
24   BY MR. SOTO:
25   Q.  Please.

1         KENNETH BUCKFIRE, VOLUME 2
2  **A.  All right, would you please repeat the question?**
3    Q.  Sure, and maybe I can make it clearer.  What I'm
4    trying to determine and see if you have facts on --
5    facts on is the process and the elements that went
6    into distinguishing classes 10 and 11 as compared to
7    class 9 and the recoveries that they were going to
8    get?
9  **A.  I see.  Well, as a purely financial or banking matter,**
10 **it was our judgment that the status of the class 9**
11 **claims and the pension and so-called OPEB claims was**
12 **basically the same, that is they were general**
13 **unsecured claims of the City of lesser priority than**
14 **the general obligation claims, certain other claims of**
15 **the City.  And so that was the starting point of our**
16 **analysis and indeed was the basis for the City's**
17 **original proposal in June of '13 where all these**
18 **claims would be in the same pool and would share pro**
19 **rata.**
20 **It also became clear to us that as part of**
21 **our financial analysis that even though we believed**
22 **that the claims were general unsecured claims, the**
23 **fact that the COPs claims were indirect obligations of**
24 **the City and not direct obligations to the City had to**
25 **be given some consideration, and that is how we ended**

Pages 93 to 96

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 59 of 364

KENNETH BUCKFIRE, VOLUME 2

1  up recommending to the emergency manager that only 40
2  percent of the COPs claims be allowed because we were
3  uncertain about what their ultimate status would be
4  because again, I'm -- I'm making a legal conclusion,
5  but the claim of the COPs against the service
6  corporations would result in the service
7  corporation's claim being an asset of the COPs and
8  that was sufficiently in dispute as to a financial
9  matter as to what value would be, we felt 40 percent
10 was the appropriate allowed claim.
11          Then the distinction we had to draw with
12 the class 10 and 11 claims had to take into account
13 from a financial matter, the proposed treatment of
14 OPEB as a practical matter from the City's prospective
15 the financial obligations due to its retirees were
16 both pension and healthcare related and because we
17 were proposing to substantially impair or eliminate
18 our healthcare plans and in consideration for doing so
19 move our retirees to new insurance programs of much
20 lesser cost, that resulted in a very large claim, but
21 therefore, as a practical matter, rather than
22 throwing -- using the OPEB claim and the pension
23 claims to be pari passu with respect to recovery.
24 Part of the settlement discussion with the retiree --

KENNETH BUCKFIRE, VOLUME 2

1  I'm trying to be careful --
2          MR. CULLEN: Okay.
3  A.  -- from a financial prospective, we viewed those
4  claims as being part of the same pool for purposes of
5  arranging an overall recovery and therefore how that
6  recovery would be applied would be up to the
7  beneficiaries which is now reflected in the plan of
8  adjustment.
9  BY MR. SOTO:
10 Q.  Let me break that down.  That was a --
11 A.  Yeah.
12 Q.  -- pretty cool answer so --
13 A.  It's complicated.
14 Q.  So taking -- taking the first thing that you
15 highlighted, you highlighted the distinction between
16 direct and indirect claims and the class 9 claims you
17 viewed as indirect and there were other direct claims.
18 You said that led to you -- and again, if I'm saying
19 something wrong, you correct me, you said that allowed
20 to allowing only 40 percent of that claim.
21          So can you explain to me what analysis you
22 did of what analysis you did of what those claimants
23 you mentioned that they had claim -- it would result
24 in claims against the surface corporations is I think

KENNETH BUCKFIRE, VOLUME 2

1  how you put it, how would the fact that those clients
2  have claims against the service corporations
3  differentiate in their mind?
4  A.  Well, the City was not the direct obligor of the COPs
5  That was the whole point of the transactions, it was
6  an indirect obligor.
7  Q.  So you were taking into account the fact that the
8  service corporations would still be there to be able
9  pay those obligations?
10 A.  To the extent they had assets to do so, that's
11 correct.
12 Q.  Okay.  Did you take into account the fact that they
13 would only have assets, that the --
14          (Electronic telephone statement:  Chris
15 Filburn, Paul Weiss, has left the conference.
16 A.  I'm sorry, could you --
17          MR. CULLEN:  He'll be missed.
18 BY MR. SOTO:
19 Q.  Now I've lost it all, Chris.  Let's start again.
20          Did you take into account the fact that the
21 sources of revenue for the service corporations to pay
22 the COPs holders was also going to be affected by the
23 plan?
24 A.  Yes, I did.

KENNETH BUCKFIRE, VOLUME 2

1  Q.  So recognizing that if the service corporations had no
2  money to pay the COPs holders, you still took that as
3  a distinction in allowing only 40 percent?
4  A.  I did.
5  Q.  And were there any other factors that I missed in that
6  exchange?
7  A.  No.
8  Q.  Then you went on to talk about the proposed treatment
9  of OPEB, and I just want to make sure it's clear for
10 the record or at least I understand it.  So you took
11 into account the fact that here were another group of
12 unsecured creditors who were going to be impacted
13 because you were affecting their pensions and their
14 healthcare, correct?
15 A.  Correct.
16 Q.  Is there anything else you took into account?
17 A.  I'm not sure how I can answer this question.  Can I
18 just ask?
19 Q.  Sure, please.
20          (Counsel confers with the witness.)
21          MR. HACKNEY:  What was the last question?
22          MR. SOTO:  Anything else he took into
23 account other than the fact that there's a pension and
24 healthcare?

```
1            KENNETH BUCKFIRE, VOLUME 2
2   A.  I can't answer that question.
3   BY MR. SOTO:
4   Q.  And can you explain to the --
5            (Electronic telephone statement: Has joined
6        the conference)
7   A.  Well, because it wasn't strictly a financial
8       judgement.
9   BY MR. SOTO:
10  Q.  So it would involve an attorney-client privilege
11      judgment?
12  A.  Yes, that's correct.
13           MR. SOTO:  And are you directing him not to
14      answer that?
15           MR. CULLEN:  Yes.
16  BY MR. SOTO:
17  Q.
18  Q.  So you've been directed not to answer, but -- if I
19      were you, I wouldn't, but at the same time, we'll
20      reserve our rights to see if maybe we can find that
21      out another way.  Maybe the Court can intervene and
22      help us.
23           MR. CULLEN:  Page 41 is gone.
24           MR. SOTO:  Are we giving you partial
25      exhibits now?
```

```
1            KENNETH BUCKFIRE, VOLUME 2
2        You've answered these questions either
3       yesterday or today.
4   BY MR. SOTO:
5   Q.  Mr. Buckfire, are you familiar with the objections
6       that the various COPs holders have raised in
7       connection with the plan?
8   A.  Not intimately, but I'm generally aware of some of
9       their judgments.
10  Q.  Okay, okay.  I'll ask you something about your
11      awareness outside of context and we'll see if we can
12      take it from there, okay?
13  A.  Sure.
14  Q.  Do you understand that the objectors believe that the
15      plan fails the best interests case?
16  A.  I do.
17  Q.  And yesterday, we said already, I was very impressed
18      with your experience in this field, and so and I
19      presume too much.
20           As ab investment banker as a banker who's
21      worked in restructurings as long as you have, what is
22      your understanding of the best interests test?
23  A.  That the plan provides treatment for creditors which
24      is better than they would otherwise receive in a
25      liquidation scenario and that we've properly taken
```

```
1            KENNETH BUCKFIRE, VOLUME 2
2       into account all possibilities for the City to
3       maximize credit recoveries.
4   Q.  We can work with that.  Did you understand --
5   A.  I didn't go to law school I apologize.
6   Q.  You did better than someone who went to law school.
7        Do you understand that the objectors believe that the
8       plan is not fair and equitable?
9   A.  I do.
10  Q.  Do you understand -- well, let's stop and ask the same
11      question on that again, because of your experience in
12      the field what is your understanding of the plan to be
13      fair and equitable?
14  A.  That it doesn't discriminate between creditors that
15      have equal status.
16  Q.  Do you understand that the objectors believe that the
17      plan was not offered in good faith?
18  A.  I've heard that.
19  Q.  What is your understanding of that analysis of a plan
20      good faith standing?
21  A.  Well, I'll give you a banker's interpretation of that,
22      that a plan that's offered in good faith does not
23      unfairly discriminate against creditors for reasons
24      other than a relative priority that, in fact, the plan
25      is intended to provide everyone their maximum recovery
```

```
1            KENNETH BUCKFIRE, VOLUME 2
2       based on the relative priority to the extent possible.
3   Q.  Do you understand that the objectors also have or
4       believe that the plan is not feasible?
5   A.  I do.
6   Q.  And why does your understanding of the standing of
7       feasibility apply to plans of adjustment?
8   A.  The standard is normally meant to imply that the odds
9       of a City or company going back into bankruptcy
10      seeking protection within two to four years of
11      emergence is high.  We've always assumed from a
12      banking perspective that a plan -- start again -- that
13      a borrower upon emergence, should be able to access
14      the capital markets in the ordinary course, will have
15      sufficient liquidity available to it upon emergence to
16      fund its operations, and satisfy its obligations on a
17      postemergency basis for a reasonable period of time,
18      which as I indicated in a corporate setting, is two to
19      four years in this setting, we've taken a much longer
20      time period than at least ten years.
21  Q.  So just to give you some heads up, so I'm going
22      through these now, these sort of objections of what
23      your participation was and analyzing them and your
24      participation, so I'll start with the first one,
25      discussing the best interests issue first.
```

KENNETH BUCKFIRE, VOLUME 2

1    KENNETH BUCKFIRE, VOLUME 2
2        In the context of -- of the plan of
3    adjustment that is at issue in this matter now, I
4    understand it's going to be amended or at least we've
5    been told it is, but as it exists that you can testify
6    about, were you involved in analyzing how that plan
7    met the best interests tests from an investment
8    banker's standpoint?
9  A. Yes.
10 Q. And the "you" I was referring to there was Miller
11   Buckfire, but I'm going to ask you again, you
12   personally and Miller Buckfire, both?
13 A. Yes.
14 Q. Okay. What was your personal participation in that
15   analysis?
16 A. Well, I've reviewed proposed treatment of our
17   creditors consistently since last June, I've been
18   involved in discussions involving recommendations to
19   the emergency manager for proposed settlements to make
20   sure they were consistent with those provisions.
21 Q. Would you agree that a municipality in a chapter 9 in
22   connection with the best interests test should make
23   reasonable efforts to repay creditors?
24 A. Yes.
25 Q. And in -- and I understand that you're wearing two

1    KENNETH BUCKFIRE, VOLUME 2
2    hats here, and I'm going to ask you an opinion
3    question because you're an expert or being proffered
4    as an expert, as well. What constitutes a reasonable
5    effort to repay creditors in your opinion?
6  A. In a municipal context?
7  Q. In the context of this municipal bankruptcy.
8  A. Okay.
9  Q. Which is unique as you testified --
10 A. Yes.
11 Q. -- at length yesterday.
12 A. Well, recognizing that it is a unique bankruptcy in
13   many ways, we believe and advised the emergency
14   manager and indeed the State of Michigan from the
15   beginning of our engagement including, by the way, the
16   mayor of the City of Detroit, I should have said that,
17   too, that designing a plan that would take into
18   account the City's best ability to repay its creditors
19   had to start with the premise that the City was
20   effectively service insolvent and that whatever was
21   available to repay creditors from the cash flows of
22   the City, that is, the revenues of the City, was
23   really only available taking into account the
24   cost of the revitalization/rehabilitation of the City,
25   itself, and that was the beginning point of our

1    KENNETH BUCKFIRE, VOLUME 2
2    analysis which began last January which we were
3    intimately involved in along with Ernst & Young and
4    Conway MacKenzie.
5        So that leads you to first determine well
6    how much do you really have available once you take
7    into account that set of requirements to eliminate
8    service insolvency, that leaves you with a projected
9    stream of cash flow which is available for in this
10   context fixed and unfixed debt obligations and from
11   that, we then calculate what's available to satisfy
12   our creditors pursuant to the best interests test.
13 Q. And so you determined what services this is my
14   understanding of what you just said and tell me if I'm
15   wrong, you determine what services the City has to
16   give, ought to be giving, or isn't giving that it
17   should be giving, or is giving too many, you look at
18   the services that the City as a City; you start with
19   that?
20 A. Correct.
21 Q. And then once you determine, you know, what those are,
22   along with all these people that you mentioned
23   earlier, the mayor and everyone else, then you see,
24   well, what are the revenues that the City has to
25   address those?

1    KENNETH BUCKFIRE, VOLUME 2
2  A. Well, the revenue analysis on which our financial
3    conclusions are based is obviously very critical to
4    feasibility of the plan, itself. Once you understand
5    how confident you can be in the revenues of the City
6    on a projected very long basis then you have to apply
7    those revenues necessary costs to providing essential
8    services to the citizens of Detroit, and of course a
9    central element of the plan was effectively a new
10   program of the reinvestment to take into account the
11   severe underinvestment by the City in those services
12   for decades which had been a major factor, itself, in
13   the decline of the City by encouraging businesses and
14   citizens to leave.
15       So by reestablishing adequate services to
16   address the service insolvency issue, that had a
17   certain cost associated with it.
18 A. Once that cost is taken into account, then you have
19   whatever you have left over from revenues and that is
20   therefore available to satisfy our obligations to our
21   creditors.
22 Q. And I think you said it in a way that I understood, so
23   you start by figuring out what the basic services
24   should be in a plan that you think is going to work
25   that's going to be meeting the tests we talked about,

1      KENNETH BUCKFIRE, VOLUME 2
2  and after you determine the cost of that, and you
3  think the real revenues are, then you can decide well,
4  what's left over for the creditors?
5  A.  Correct.  And of course, we also look at whether there
6  are other sources of repayment.  Certain noncore
7  assets that might be monetizable, might not, all
8  disclosed in our original June 2013 report.
9          MR. CULLEN:  2014.
10         THE WITNESS:  No, June of '13.
11         MR. CULLEN:  I'm sorry.
12 BY MR. SOTO:
13 Q.  You mentioned the June 2013 report, and I have only
14    one question left that wasn't asked yesterday in some
15    way, and that is have you done an analysis of that
16    report since then to update it?
17 A.  Well, everything we've been doing has been based on
18    the conclusions we laid out in that report in June of
19    2013.  So it's been the roadmap and effectively the
20    strategy for the rehabilitation of the City since it
21    was first made public last year.  We haven't done a
22    further analysis because it has been superseded by the
23    analysis provided in the plan of adjustment and the
24    disclosure statement.
25 Q.  So the plan of adjustment disclosure statement is a

1      KENNETH BUCKFIRE, VOLUME 2
2  progeny of the June 13th plan?
3  A.  That's right.
4  Q.  Is there anything that you now look back on in seeing
5     that June '13 -- June 2013 plan that you think we were
6     wrong?
7  A.  The City was wrong?
8  Q.  Well, you as an investment banker, I don't attribute
9     all of that to the City.
10 A.  I thought we would have more cooperation from the
11    Counties in creating the authority than we did.
12 Q.  All right, let's -- anything else?
13 A.  No.
14 Q.  Let's go on to the next one.  So one of the other COPs
15    holders' objections is that the plan is not fair and
16    equitable and you -- you gave and you gave me your
17    understanding of what you understood that to mean.
18 Q.  Would you agree that the COPs holders' claims, the
19    class 9 creditors, are considered an impaired class?
20 A.  From a financial perspective, I would deem them
21    impaired.
22 Q.  Other than what you've testified about today and
23    yesterday, did you undertake an analysis to ensure
24    that the fair and equitable standard was -- was being
25    satisfied with respect to the treatment of the class 9

1      KENNETH BUCKFIRE, VOLUME 2
2  creditors?
3  A.  Not independent of what's been disclosed in the
4     disclosure statement and plan.
5  Q.  So in specifics, what do you believe was done to
6     ensure that the treatment of the class 9 creditors
7     was -- was fair and equitable?
8  A.  Well, leaving aside the legal issues, which I'm not
9     competent to speak to, the allowed claim of 40 percent
10    as being allowed to participate pro rata with all
11    other similarly situated claims with respect to B note
12    recovery, so I believe that satisfies the test.
13 Q.  And anything else other than that?
14 A.  No.
15 Q.  Moving on to the objection regarding good faith and
16    your understanding of it, let me hand you an exhibit.
17    We'll put this in context.
18         MARKED FOR IDENTIFICATION:
19         DEPOSITION EXHIBIT 29
20         10:27 a.m.
21 BY MR. SOTO:
22 Q.  Okay, Mr. Buckfire, you've been handed what has been
23    marked as Exhibit 29, and it is an e-mail from you,
24    Kenneth Buckfire, dated Tuesday, July 30th, 2013, to
25    Bennett Bruce -- or I guess that's Bruce Bennett and

1      KENNETH BUCKFIRE, VOLUME 2
2  David Heiman (ph.)?
3  A.  That's right.
4  Q.  And the subject is Christie's and the DIA.  Could you
5     take a few moments to take a look at that to refresh
6     your recollection of that if you need to?
7  A.  My recollection is refreshed.
8  Q.  Okay.  So I'm going to ask you some specific questions
9     but in general.  Do you remember this process?
10 A.  Yes.
11 Q.  What was this e-mail part of?
12 A.  Can I ask a question to my counsel for a second?
13 Q.  Sure, please.
14         (Counsel confers with witness .)
15 A.  Just wanted to make sure. Well, very early on in our
16    engagement with the City, I was made aware of the fact
17    that the Detroit Institute of Arts was effectively not
18    a separate institution but, in fact, was owned by the
19    City, although, it was operated by the DIA Trustee
20    Corporation, the building and collection was
21    technically owned by the City of Detroit.  We
22    recognized early on that that would require it under
23    certain scenarios to be valued as a potential noncore
24    asset and dealt with appropriately if it was
25    determined that the City would have to seek protection

1      KENNETH BUCKFIRE, VOLUME 2
2  under Chapter 9.
3      We, during the spring of 2013, had several
4  meetings with representatives of DIA to alert them to
5  this potential outcome and to explain to them that it
6  might be necessary to monetize or sell the collection
7  under certain scenarios. We then independently
8  determined that in order to satisfy the requirements
9  of the Bankruptcy Code because it would be deemed
10  potentially a noncore asset that we would have to do a
11  valuation of the assets to determine exactly what it
12  might be, because even though Miller Buckfire is an
13  investment bank, we are not experts in appraising art,
14  and have no expertise in that field.
15      There are, regrettably, only two
16  institutions in the world that have the professional
17  capacity to perform an appraisal of a encyclopedic
18  art museum, and by that I mean a museum that has a
19  collection covering a wide variety of genres, periods
20  of history, and countries, and those two institutions
21  are Sothebys and Christie's. We determined we could
22  not approach Sothebys because, unfortunately, a
23  director of Sotheby is also a trustee of the Detroit
24  Institute of Arts, and we viewed that as a potential
25  conflict.

1      KENNETH BUCKFIRE, VOLUME 2
2      So we had to approach Christie's, and I
3  asked them whether they would be willing to provide an
4  appraisal of, initially at least, the portion of the
5  collection that had been paid for by tax revenues of
6  the City of Detroit, and they agreed to do so pursuant
7  to a normal appraisal contract, which they provided to
8  me, I believe it was in June of 2013, which I then
9  provided to the emergency manager.
10      And unfortunately, the fact of that was
11  leaked to the press, and it was mischaracterized as
12  Christie's coming in to sell the collection when, in
13  fact, all they were asked to do was to appraise the
14  collection for purposes of the potential
15  reorganization of the City, and this has to do with
16  that process.
17  A. Correct. I should mention they tried to return their
18  fee several times but we refused to accept it.
19  Q. Let's -- let's look at page 4 of this e-mail that's
20  Bates stamped page No. 979?
21  A. I see that, yes.
22  Q. And so... and I know you reviewed this and had some
23  memory of it, but under the heading "Should We Be
24  Worried," Christie's called Detroit Museum about its
25  $2 billion collection by Jillian Steinhauer and then

1      KENNETH BUCKFIRE, VOLUME 2
2  under that, it's yesterday the City of Detroit filed
3  for bankruptcy, do you see that paragraph? Below
4  those two headings?
5  A. I do.
6  Q. Okay. If I'm reading this correctly, there's a
7  statement here the office of the state appointed
8  emergency manager, Kevyn Orr, says it did not initiate
9  the appraisal, but spokesman Bill Nolan offered these
10  words: do you see that?
11  A. I do.
12  Q. And he says, and I quote -- I am reading the quote
13  that they have here, let's assume it's correct, we
14  haven't proposed selling any asset but we haven't
15  taken any asset off the table. We can't. We cannot
16  negotiate in good faith with creditors by taking
17  assets off the table, and all our creditors have asked
18  about the worth of the DIA, and we've told them
19  they're welcome to find out, end quote: do you see
20  that?
21  A. I do.
22  Q. Do you know who Mr. Bill Nolan is?
23  A. Yes, he is the communications director for the
24  emergency manager's office.
25  Q. And were you familiar, did you talk to him about this

1      KENNETH BUCKFIRE, VOLUME 2
2  at that time?
3  A. I did.
4  Q. Do you agree with the statement there?
5  A. I do.
6  Q. Did you you did you communicate with anyone regarding this
7  issue regarding Mr. Nolan's statement?
8  A. I'm not sure I understand.
9  Q. Well, there's a bunch of press releases he keeps
10  talking about, so what I'm trying to find out is did
11  you have any statement to the press or did you -- were
12  you involved in preparing the statements for the
13  press, not privileged I'm not looking for that, with
14  respect to this issue?
15  A. Well, I never made a statement to the press about any
16  of these issues. I -- I was obviously keeping Mr. Orr
17  fully aware of all of our activities so it is true
18  that his office did not initiate the appraisal, but we
19  did and in turn whatever statements were made, but
20  this by Mr. Nolan was made after he's chatted with me
21  where we stood and what the purpose of this was, and
22  explained to him consistently that we had the
23  obligation to identify the value of any asset that
24  might be available pursuant to a plan.
25  Q. Let me hand you another.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1    KENNETH BUCKFIRE, VOLUME 2
2         MARKED FOR IDENTIFICATION:
3         DEPOSITION EXHIBIT 30
4         10:36 a.m.
5    BY MR. SOTO:
6    Q.   So this is Exhibit 30, and what I've handed you as
7         Exhibit 30 is what appears to be another e-mail from
8         Kenneth Buckfire, date -- time dated Wednesday,
9         October 23rd, 2013, to David Heiman, subject note from
10        Gargaro.
11            MR. MONTGOMERY: Counsel, could you
12        identify the document by Bates number if possible?
13            MR. NEAL: Absolutely. Possibly, it's POA
14        00040759.
15            MR. MONTGOMERY: Thank you.
16   BY MR. SOTO:
17   Q.   Are you familiar with this e-mail?
18   A.   I am.
19   Q.   Who is Mr. Gargaro?
20   A.   He was at the time, he may still be the chairman of
21        the Board of Trustees of the Detroit Institute of
22        Arts.
23   Q.   And how do you know him?
24   A.   I met him for the first time at a meeting in Detroit,
25        I believe in May of 2013 when we first became aware of

1    KENNETH BUCKFIRE, VOLUME 2
2    this issue, so in this e-mail on the second page,
3    which is page 760 in the Bates stamp, page 2 on the
4    e-mail, in the first full paragraph on that page, Mr.
5    Gargaro writes to you Ken, when you and I spoke last
6    Friday, October 11th, you asked me to follow up with
7    my key contacts in Wayne, Oakland, and Macomb Counties
8    to measure reactions for the possibility of special
9    additional millage, the proceeds of which could be
10   used by the EM, which I assume means emergency
11   manager --
12   A.   Yes.
13   Q.   -- in exchange for transferring the DIA to an
14        authority or a similar vehicle to protect it from any
15        future Detroit creditor exposure.  Do you recall
16        that --
17   A.   Yeah.
18   Q.   -- exchange?
19   A.   I do.
20   Q.   And did you respond to his inquiries regarding that
21        exchange?
22   A.   Not subsequent to these e-mails, no.
23   Q.   So in October, Mr. Gargaro was communicating with you
24        about taking an asset off the table, correct?
25   A.   In exchange for adequate compensation to the City for

1         KENNETH BUCKFIRE, VOLUME 2
2    doing so, yes.
3    Q.   And the adequate compensation was going to come in the
4         form of an additional millage was that what he was
5         proposing?
6    A.   That was one of the possibilities yes.
7    Q.   Were there other possibilities that he proposed?
8    A.   No, but that I proposed.
9    Q.   What were the other possibilities that you proposed?
10   A.   That they raise enough money from their trustees and
11        other community members to justify conveying the
12        collection into an authority which is indeed the path
13        they've taken and when you raised that back in October
14        of 2013, had you done an analysis of what the value
15        would have to be to justify that kind of an asset
16        being taken off the table.
17   A.   No, because the Christie's valuation wasn't available
18        at that time.
19   Q.   Was it being done at that time?
20   A.   Yes.
21   Q.   So you were awaiting the Christie's valuation?
22   A.   Correct.
23   Q.   Other than the Christie's valuation, were there any
24        other factors that you took into account in
25        determining what would be the proper value necessary

1         KENNETH BUCKFIRE, VOLUME 2
2    to transfer an asset like the DIA and its art the way
3    you just described?
4    A.   Well, it's an indirect value issue.  There is a
5         certain cost associated with operating a museum and
6         its collection, which is currently is -- currently
7         being funded by the existing special millage at the
8         three Counties listed here, Wayne, Oakland, and
9         Macomb, I believe, got passed in 2011 or '12.  That
10        cost would have to be borne by whatever entity took
11        over the operation, if the counties deemed that
12        whatever we had done would result in the cancellation
13        of the millage, and otherwise, that cost would be
14        directly have to be funded by the general fund of the
15        City, which was not being budgeted for in our plan.
16   Q.   Okay, so and correct me if I'm wrong in my assessment
17        of what you -- so in addition to taking into account
18        well, somebody's got to tell me what the value of this
19        art is, you were looking to Christie's because you
20        were not experts, you said that earlier, correct?
21   A.   Correct.
22   Q.   Additionally, you took into account he fact that they,
23        it costs money to run this thing, and there's a
24        millage that's being used already, whoever takes it
25        over is going to have to take over that cost?

KENNETH BUCKFIRE, VOLUME 2

2 **A. If the millage is not continued, correct.**
3 Q. Okay. And continuing the millage is a cost to the
4 City, correct?
5 **A. No, the millage, actually, is being paid for the**
6 **Tri-County area, Wayne, Oakland, and Macomb County.**
7 **It's an indirect benefit to the City because the City**
8 **is not picking up the cost of operating its museum;**
9 **it's been paid for by the County residents.**
10 Q. So your concern was making sure whoever's taking this
11 over understands that there's a cost?
12 **A. Correct.**
13 Q. It wasn't a concern that hey, the City's not making
14 payment, because the City wasn't paying for it in the
15 first place?
16 **A. And the City didn't have the capacity to pay it.**
17 Q. And it wasn't being paid for?
18 **A. It was being paid for by the special millage.**
19 Q. Any other factors besides those two that you were
20 thinking of?
21 **A. No.**
22 Q. In connection with your analysis of this proposed
23 transfer, taking off the table by -- I guess, here
24 it's Jim Gargaro -- was there any other analysis that
25 was being done by Miller Buckfire or you as part of

KENNETH BUCKFIRE, VOLUME 2

2 Miller Buckfire regarding the value of that asset to
3 the City?
4 **A. Not in October. We had, obviously, conversations with**
5 **Christie's about what other alternatives might be**
6 **available to create value for the City from this**
7 **collection, and I asked them to review those**
8 **possibilities as part of their public report when**
9 **their valuation was made public, which they did.**
10 Q. And as part of their report, they mentioned some other
11 alternatives?
12 **A. They did.**
13 Q. Can you recall what those were?
14 **A. One of them was putting certain elements of the**
15 **collection out on tour and getting, in effect, touring**
16 **fees for that or leasing parts of the collection to**
17 **other museums, we asked them to look at, you know,**
18 **taking parts of the collection that were never on**
19 **display and consider monetizing those. We tried to be**
20 **as open-minded as possible about all sources of cash**
21 **realization from the collection.**
22 Q. In connection with your retaining of Christie's, did
23 you tell them to be as open-minded as they could be?
24 **A. I did.**
25 Q. Let me hand you another exhibit, and I know we've been

KENNETH BUCKFIRE, VOLUME 2

2 going over an hour, and you've been going over two
3 hours. Let me know when you want to just take a break
4 and --
5 **A. That's fine.**
6 Q. -- because I'll be quick to let you know --
7 **A. You have a plane to catch.**
8 Q. -- I'm not going to make that plane, I can tell you
9 that already, but I don't want you to --
10 **A. We already have this exhibit.**
11 Q. Do we? Oh, good. Then I'll put it...
12 **A. It's Exhibit 13.**
13 Q. So let me ask you to look at Exhibit 13. Boy I'm glad
14 you've been here both days. You're essential.
15 So I'm not going to ask you the questions
16 you were asked with respect to the DWSD. Okay, we
17 marked all those out, but do you recall this proposal?
18 **A. I do.**
19 Q. Let me ask you to turn then to page 83, all right and
20 let me give you the you already have this one you --
21 page 83 is also Bates stamped page 0520, I think?
22 **A. Well, it's captioned Realization of Value of Assets.**
23 Q. Yes.
24 **A. And on the bottom is 15970.**
25 Q. Yeah you have a different one than I do, but that's

KENNETH BUCKFIRE, VOLUME 2

2 fine.
3 **A. Oh, okay.**
4 Q. So taking a look at that page 83, and that's the one
5 captioned "Realization of Value," you do have a little
6 83 on corner there, don't you?
7 **A. I see it, yes.**
8 Q. Okay, good, I just wanted to make sure we're on the
9 same page. The proposal that's presented here
10 presents to the City's major creditors the potential
11 for realization of value of the City's assets,
12 correct?
13 **A. Yes.**
14 Q. Is there anything in that proposal as we sit here
15 today that you disagree with?
16 MR. CULLEN: All of these pages?
17 MR. SOTO: Well, he testified about it at
18 length yesterday, but I didn't hear that question
19 asked. It's his June 14th, 2013, proposal that serves
20 as the basis for everything else.
21 BY MR. SOTO:
22 Q. So if you -- I mean if you know of something that you
23 can recall, I'm not -- I recognize no one's asking you
24 to review the entire thing right now, but if there's
25 something you know, hey, I've been working with this

KENNETH BUCKFIRE, VOLUME 2

1    thing for two years, I think -- I think we got this
2    right, I think maybe that would have been different, I
3    think that's the question.
4  A.  Well, we got the question of creating an authority
5    wrong, and we thought we'd have more cooperation than
6    we did, and that's very regrettable.  It doesn't mean
7    that there won't be an authority, but it will be
8    different than the one we originally tried to create.
9    Aside from that, in terms of realization of assets, I
10   don't think we've missed anything, I was somewhat
11   disappointed only because at the time we didn't
12   realize how little value was available to us that
13   there was nothing we could do with the Colman A. Young
14   Airport, and in fact, it has negative value, which is
15   unfortunate.
16          The tunnel, likewise, because of how it was
17   financed, has minimal value.  We had originally hoped
18   it would have more.  Belle Isle Park, we obviously
19   discussed that, was already a done deal before we got
20   involved, so no, I don't think there was anything in
21   here that we missed in terms of looking at all
22   potential noncore assets.
23          I think the realizations that were
24   available were disappointing for a variety of reasons.

KENNETH BUCKFIRE, VOLUME 2

1  Q.  And so you undertook in this plan to at least lay
2    out --
3  A.  Mm-hmm.
4  Q.  -- the steps you might try to take to maximize those
5    assets, correct?
6  A.  And we pursued each one of them.
7  Q.  So you pursued the steps with respect to the Colman A.
8    Young Airport?
9  A.  We did.
10 Q.  And that's what you just testified about, and you did
11   the same with respect to the tunnel?
12 A.  Right.
13 Q.  And then Belle Isle Park, as well?
14 A.  Correct.  We also -- everything else we looked at, we
15   talked about those things, we talked about DIA, we've
16   already, obviously, as part of the grand bargain, the
17   City is effectively the recipient of hundreds of
18   millions of dollars of value.  In exchange, you're
19   conveying the institute to an authority.  The land
20   issue, you know, obviously, the land, to some extent,
21   has negative value, as well.
22          That's why it's subject to $500 million
23   budget for blight removal.  Parking, that asset is on
24   track to be offered to the market imminently.  We

KENNETH BUCKFIRE, VOLUME 2

1    believe there is value in parking assets, and that
2    process should commence any day, and Joe Louis Arena,
3    there's -- it's minimal value so --
4  Q.  So let me, in terms of turning your attention then to
5    page 88 -- all right.  On page 88, the proposal to the
6    credit deals with City owned land, correct?
7  A.  Correct.
8  Q.  Reading from page 88, it says we conclude that the
9    vast majority of this property has limited current
10   commercial value?
11 A.  Correct.
12 Q.  Is that still your opinion today?
13 A.  It is.
14 Q.  What steps did you take to make that determination?
15 A.  We spent at the time this report was produced a lot of
16   time with other consultants related to the City, in
17   particular, Conway MacKenzie, which had more
18   involvement with this issue than we did.  We also
19   spent time with certain individuals in the City of
20   Detroit's executive office who were directly involved
21   with some of the entities that controlled this land.
22   There were, at the time, a number of places you could
23   go to find City owned land.  This is a more general
24   statement than the legal reality of it.

KENNETH BUCKFIRE, VOLUME 2

1          I mean some of the land was held, for
2    example, by the City itself.  Some was controlled by
3    Wayne County.  Some was controlled by the State of
4    Michigan.  So there was no organized group that
5    controlled all of it, and the people who had knowledge
6    of the land, therefore, were spread out across all of
7    these different government organizations.
8          So we spoke with all of them and also
9    reviewed some of the many studies that have been done
10   of the issue, particularly, the Detroit future cities
11   plan, the Kresge Foundation funded that, and it was
12   clear to us as a banking matter that given the very
13   large territory of the City, 140 square miles, the
14   serious service problems of the City and the fact that
15   even of the land that was quote/unquote vacant, a lot
16   of it was encumbered by blighted structures, it would
17   have limited commercial value?
18 Q.  Did -- was there a strategy put together to try to
19   increase the commercial value, to increase that asset
20   for the City?
21 A.  Well, that's been a subject of great discussion and a
22   lot of effort by the City since we've been involved,
23   but I have not been directly involved.
24 Q.  So Miller Buckfire didn't put together a plan to

1    KENNETH BUCKFIRE, VOLUME 2
2    monetize that property and sell it?
3    A.  Well, we looked at that issue of whether or not we
4        could find some large enterprise that had an interest
5        in basically buying all the land for the purposes of
6        redevelopment, and we did, I think, last summer speak
7        to a few people we thought might have an interest, and
8        everyone said no, they couldn't afford it, didn't see
9        the value, didn't think it would happen anytime soon,
10       and had no interest.
11   Q.  Do you recall any of the names of the folks you spoke
12       with?
13   A.  Yes, I spoke with Sam Zell, who is, obviously,
14       well-known as a real estate investor.  We spoke with
15       the real estate people at Blackstone.  Those are the
16       only two I specifically recall at the moment.
17            MR. CULLEN:  This might be a good point
18       to --
19            MR. SOTO:  Sure, no, it's very convenient.
20       And thank you, by the way.
21            MR. HACKNEY:  Taking a break?
22            MR. CULLEN:  Yeah.
23            VIDEO TECHNICIAN:  The time is 10:53 a.m.,
24       we are now off the record.
25            (Recess taken at 10:53 a.m.)

1    KENNETH BUCKFIRE, VOLUME 2
2            (Back on the record at 11:04 a.m.)
3            VIDEO TECHNICIAN:  We are back on the
4        record.  The time is 11:04 a.m.
5    BY MR. SOTO:
6    Q.  So during the break, someone asked me to make sure I
7        reminded you, which of course you've been reminded
8        several times, that you are continuing under oath and
9        no new oath had to be submitted because I was here to
10       hear your last one, and I know you have been doing
11       your best to adhere to that.
12   A.  So noted.
13   Q.  We're going to go through the DIA portion of this
14       report just to make sure I understand it.  So for --
15       if any of these questions -- I've tried to gray out
16       the questions that I thought you were asked yesterday.
17       If you've been asked these questions, tell me.  I'm
18       perfectly willing to go look at a transcript, but it
19       might be easier to let's see what we know.
20            So in this June 14th presentation to the
21       creditors, it also included the DIA, itself, as an
22       asset, as well as the art of the DIA as an asset,
23       correct?
24   A.  Correct.
25   Q.  In your previous testimony yesterday and maybe even

1    KENNETH BUCKFIRE, VOLUME 2
2    earlier because I had to read it, in connection with
3    the eligibility trial, also, just to give you context,
4    you testified -- and I'm quoting from that testimony,
5    well, back in January, when we first began our
6    engagement, we discovered we had not known this before
7    that the City of Detroit actually does own the
8    building and the art collection of the Detroit
9    Institute of Arts, which is operated by the City on
10   the City's behalf by the DIA Corp., which is the
11   Founder's Society as a contractor to the City, we
12   obviously were concerned about this and had to decide
13   whether or not this might be a source of value for the
14   City; do you recall that testimony?
15   A.  I do.
16   Q.  Was that -- that testimony was correct when you gave
17       it, correct?
18   A.  Yes.
19   Q.  And is it still correct today?
20   A.  It is.
21   Q.  How did you come to learn about the DIA's ownership,
22       you know, the way the DIA was set up and the way it
23       was altered?
24   A.  When we first met with City officials, at that time,
25       our primary contact was Jack Martin.  He mentioned to

1    KENNETH BUCKFIRE, VOLUME 2
2    us that as we were going through the list of possible
3    assets that we'd have to look at, he said would you
4    have to look at the Institute of Arts, too, and we
5    asked him why, and he explained its relationship to
6    the City.
7            We then looked at the publicly available
8    financial statements of the DIA which are on their
9    website and did indeed confirm that the DIA was
10   operated on behalf of the City by the founder's Corp.
11   trustee group, whatever it was so that is how we came
12   to learn of this issue.
13   Q.  Did you- dash was anybody assigned by you or anyone
14       else at Miller Buckfire to learn out everything they
15       could learn about the DIA?
16   A.  I assigned myself.
17   Q.  And then in connection with that assignment you
18       ultimately retained Christie's as well, correct?
19   A.  Correct.
20   Q.  In your learning process as best you can recall, what
21       did you learn about the DIA and its collection?
22            MR. CULLEN:  Before the Christie's report
23       came out or --
24            MR. SOTO:  Well, that's a good point, well
25       taken.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 68 of 364

1        KENNETH BUCKFIRE, VOLUME 2
2  BY MR. SOTO:
3    Q.  Chronologically, when you -- before Christie's, what
4      did you learn about DIA?
5    A.  Well, I learned from their public information the
6      breadth the and Department of their collection which
7      is public, I should mention I visited many times when
8      I was growing up here, so I was familiar with the
9      institution, any ways.  So I didn't need a lot of
10     learning about it.
11        We looked at the publicly available
12     information, their website's quite up to indicate date
13     and spans I have it does have financial statements and
14     annual reports and we began to study what we could
15     publicly available about this and it mentioned we did
16     not initially contact the DIA, I believe it was not
17     until April or May to let them know that as we were
18     progressing in our planning we wanted them to
19     understand that there was a risk that we would have to
20     recommend among other alternatives taking steps to
21     monetize the collection.
22    Q.  Did you come to any generalistic understanding of the
23      value of that asset pre-Christie's?
24    A.  No.
25    Q.  In connection with your learning curve on the DIA and

1        KENNETH BUCKFIRE, VOLUME 2
2      the art, itself, did you have any conversations with
3      the trustees?
4    A.  Only with Mr. Gargaro.
5    Q.  Did you have any conversations with any of the
6      managers of the DIA?
7    A.  We had several meetings with officials of the -- using
8      the general term trustees and management, I believe
9      Mr. Graham Beal attended, perhaps, one or two meetings
10     and the CFO of the museum attended one or two
11     meetings, all during that period.
12    Q.  And during that period, did any of those individuals,
13      the manager or the CFO, Mr. Beal, did they give you
14      any sense of what they thought the value of the DIA
15      and its art collection was?
16    A.  No.
17    Q.  Now, I noticed in the e-mail that we looked at before,
18      there was always this $2 billion memorandum in these
19      press releases, did anyone ever give that number to
20      you?
21    A.  No.
22    Q.  But you saw them in these press releases?
23    A.  They weren't press releases, they were news articles.
24    Q.  News articles?
25    A.  I don't know where they got that.

1        KENNETH BUCKFIRE, VOLUME 2
2    Q.  In connection with your analysis of the DIA as an
3      asset, other than meeting with Mr. Gargaro and --
4    A.  Mr. Beal.
5    Q.  -- Mr. Beal and the CFO, can you recall if you had any
6      other meetings with anyone else with respect to that?
7    A.  Well, they were at every meeting joined by counsel.
8      Mr. Alan Schwartz from the firm of Honigman Miller,
9      and then I think later Richard Levin from Cravath
10     (ph.) also attended, and of course I was at that
11     meeting with Mr. Bruce Bennett of Jones Day.
12    Q.  And were there any meetings where there was a State
13      representative involved, a State of Michigan
14      representative?
15    A.  Not that I recall.
16    Q.  Looking back, and I only ask you the questions that
17      you didn't answer already that I can tell.  I looked
18      at your testimony again in the eligibility trial, and
19      you made the following statement:  It is in the
20      interests of the trustees -- we're talking about the
21      DIA's trustees -- that the operator to try to secure
22      funding from whatever source they could to give the
23      City in exchange for a protective covenant, that that
24      would be a clever way of realizing short-term cash for
25      the City which would not necessarily require the

1        KENNETH BUCKFIRE, VOLUME 2
2      arduous process of trying to make the art and selling
3      it on a fire sale basis.  Do you recall that
4      testimony?
5    A.  I do.
6        MR. CULLEN:  Did you say "make" the art?
7        MR. SOTO:  Did I say make?  Probably I did.
8     I meant "take."
9        MR. CULLEN:  That would be really arduous.
10       MR. SOTO:  I agree.  For some of us even
11     more so.
12  BY MR. SOTO:
13    Q.  With that correction, do you recall making that
14      statement?
15    A.  I do.
16    Q.  Okay.  What was the context of that, what were you
17      involved in analyzing when -- when you talked to the
18      trustees about -- about that exchange?
19    A.  Well, referring to trustees, I mean Mr. Gargaro.
20    Q.  All right.
21    A.  I never met with anybody about him with respect to
22      this issue, aside from management of the itself and
23      their counsel.  No I mean as I've said before, clearly
24      trying to generate value from this asset which
25      belonged to the City, it would be easier done with the

1    KENNETH BUCKFIRE, VOLUME 2
2    cooperation of the operators and the trustees than
3    over their objections because they made it very clear
4    to us that they would fight us to the ends of the
5    earth if we touched the collection even though it
6    belonged to the City.
7    Q.   Let me -- let me give you an again this is related to
8        the DIA there's all going to be under that subheading.
9        This is an e-mail --
10               MARKED FOR IDENTIFICATION:
11               DEPOSITION EXHIBIT 31
12               11:14 a.m.
13   A.   This is a vacation.  I don't have to talk about DWSD
14       for a while.  This is great.
15   BY MR. SOTO:
16   Q.   Exhibit 31, and I will tell you the Bates number, it
17       is POA 00041062.  And it is an e-mail from -- from
18       Kenneth Buckfire to Gene Gargaro, dated Monday, April
19       29, 2013, subject, DIA visit.  Simple statement in it
20       and very consistent with your personality here in this
21       deposition, you say the DIA is an important cultural
22       asset and the board should be proposing something
23       dramatic, not just about refurbishing the parking
24       garage.  What did you mean by that?
25   A.   That's the first time I've laughed in two days.

1    KENNETH BUCKFIRE, VOLUME 2
2               MR. HACKNEY:  I was going to say we were
3        aligned with you on that one, Mr. Buckfire.
4    A.   I had a meeting with them, and they said well, what do
5        you think we should do?  I said well, you notice that
6        the parking garage is dilapidated and condemned
7        because nobody spent any money on it.  Why don't you
8        offer it as part of your proposal to spend the money
9        to renovate it so people will come visit your museum,
10       and they said oh, what a great idea, and I said no,
11       but you got to do more than that.
12   Q.   Okay.  So this was your meeting with Mr. Gargaro where
13       you were again discussing some alternatives with
14       respect to the maximization of that asset?
15   A.   Yeah, this was after our first meeting, actually, we
16       had a first discussion of the issues, and I had
17       urged them to think about doing something that would
18       justify conveying the collection into an authority.
19   Q.   And at this point, you didn't have -- you still or --
20       you know what, let me ask you the question instead of
21       answering it.
22              Did you have any idea in your head at this
23       point around April 2013, April 29, 2013, of, you know,
24       gee, what would be the right value that the City would
25       need to get in order to be able to convey that asset?

1    KENNETH BUCKFIRE, VOLUME 2
2    A.   No, we had no idea, just it would have to be a big
3        number.
4    Q.   When did the -- I know I have this somewhere in my
5        papers, but do you have in your head when Christie's
6        actually came out with its assessment?
7    A.   I think it was right -- right around the -- well, I
8        first learned of their range before it was published,
9        sometime in November, and then the published report, I
10       believe came out end of November, early December.
11   Q.   Of 2013?
12   A.   Yes.
13   Q.   Okay.  So -- and I think you might have already
14       answered this, did you have anything in particular in
15       mind when you used the word dramatic?
16   A.   A big number.
17   Q.   Okay.  This is -- these have become sort of favorite
18       phrases, I've been to just a few hearings on this
19       matter, but I've heard these questions asked, so I'm
20       going to ask you since I've heard other people ask
21       them.  Do you know if Miller Buckfire and you did
22       anything to find out what the 100 most valuable pieces
23       of art were in the DIA?
24   A.   Me personally?
25   Q.   Well, not just you personally, but you and/or Miller

1    KENNETH BUCKFIRE, VOLUME 2
2    Buckfire, did you guys undertake any other steps other
3    than undertaking Christie's?
4    A.   No, we're not experts in this field, we have no basis
5        upon which to make that judgement.
6    Q.   And I assume that the answer is still the same, but
7        I'll ask again.  Do you know if you or Miller Buckfire
8        took any steps to try to figure out which of the
9        pieces of art were valued at more than a million
10       dollars, you know, which -- or which were
11       considered -- let me strike that and start again.
12              Let's start it this way:  Do you know if
13       you or Miller Buckfire took any steps to find out what
14       the 100 most valuable pieces of art were within the
15       DIA collection?
16   A.   No, aside from retaining Christie's.
17   Q.   Do you know if you or anyone at Miller Buckfire took
18       any steps to determine which of the pieces of art
19       within the DIA had some restrictions on alienation or
20       use or transfer?
21   A.   No.
22   Q.   And again, you would have been relying on Christie's
23       for some of those things?
24   A.   Correct.
25   Q.   So as you sit here today, do you know if Christie's

Pages 137 to 140

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 70 of 364

KENNETH BUCKFIRE, VOLUME 2

1 did anything like that?

2

3 A. Well, we had directed them, this had been publicly

4 disclosed, to review the portion of the collection

5 paid for by Detroit City Tax revenues. That was the

6 initial mandate they had, that required them to

7 appraise, I think, several thousand individual

8 objects, and we decided to defer review of the gifted

9 items to a later stage if we ever got to that point.

10 Q. That's the distinction I've heard of where review the

11 ones that are owned by the City, you can get the

12 others later?

13 A. Paid for by the City.

14 Q. Paid for by the City?

15 A. Correct.

16 Q. Do you know if in the process of doing that that they

17 even of that group, did they -- did they pick, you

18 know, the 100 most valuable of that group, do you

19 know?

20 A. Well, they appraised several thousand objects. I

21 think if you go to their property, which is publicly

22 available, they do put out an appraisal by object, so

23 you can look at that and figure out that subset.

24 Q. I see.

25 A. You can figure out which of the hundred are most

---

1 KENNETH BUCKFIRE, VOLUME 2

2 valuable.

3 Q. If they have a value, you can figure that out?

4 A. Yeah, that's right.

5 Q. And so -- this is to make sure we get something in the

6 record that we're going to be using in another

7 deposition, and we won't be here long, but let me mark

8 as the next exhibit -- and it's, by the way P-- I'm

9 sure it's probably an exhibit here, it's POA 0000252.

10 MR. CULLEN: Oh, that one.

11 MR. SOTO: Got a good one.

12 BY MR. SOTO:

13 Q. It's entitled Christie's Appraisals, Inc. We'll mark

14 it as the next exhibit.

15 MARKED FOR IDENTIFICATION:

16 DEPOSITION EXHIBIT 32

17 11:21 a.m.

18 BY MR. SOTO:

19 Q. Another way of putting it was oh, that's my favorite.

20 A. You guys are guys are sick.

21 Q. You do this enough, you would be too.

22 COURT REPORTER: 32.

23

24

25

---

1 KENNETH BUCKFIRE, VOLUME 2

2 BY MR. SOTO:

3 Q. So Mr. Buckfire, I've handed you Exhibit 32, which has

4 on the top of it Christie's, there's a link, and it

5 has a date of 02 August 2013. Do you ever recall

6 seeing a document like this before in connection with

7 your retention of Christie's?

8 A. Yes.

9 Q. Is this the time of agreement that was ultimately

10 executed to retain Christie's by the City?

11 A. The City -- well, this is not signed. The one that we

12 signed with them, I believe, was an actual letter,

13 which was much more specific as to the scope of

14 services delivery of reports and the like. I believe

15 this was originally an exhibit to that letter, and it

16 may be superseded by it, but we never signed this.

17 Q. Let me hand you what will be our next exhibit, 33, and

18 it is Bates No. POA00000249.

19 MARKED FOR IDENTIFICATION:

20 DEPOSITION EXHIBIT 33

21 11:23 a.m.

22 BY MR. SOTO:

23 Q. And it's a letter dated -- take a moment to read it.

24 It's a letter dated August 4th, 2013, to Kenneth A.

25 Buckfire from Douglas M., as in Michael, Woodham?

---

1 KENNETH BUCKFIRE, VOLUME 2

2 A. Yes.

3 Q. Is this the letter you were just referring to?

4 A. I believe so.

5 Q. Okay, and so Exhibit 32 would have been attached as a

6 part of an Exhibit 33?

7 A. That's my recollection. This is their standard

8 identification and release agreement, but it's part of

9 the actual letter, itself.

10 Q. And to get it in the record, this Exhibit 33 was the

11 actual formal retention letter of Christie's on behalf

12 of the City?

13 A. Well, you don't have the signed contract. I know we

14 produced it, but I've seen this before. I'm not sure

15 which -- what exactly it ended up that the emergency

16 manager's office executed, but this is familiar to me.

17 Q. Well, that's helpful in its own right, so we should be

18 looking for one that's signed somewhere in the --

19 A. And we did sign one, because I remember seeing it.

20 Q. And we'll look for it, okay. Other than what is laid

21 out in that Exhibit 33 -- well, first of all, we're

22 not sure that Exhibit 33 is the signed one. Can you

23 tell me in your own terms first if you recall the

24 scope of Christie's engagement?

25 A. Well, I had negotiated the scope with them, so this is

---

Pages 141 to 144

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 71 of 364

KENNETH BUCKFIRE, VOLUME 2

1  the scope we negotiated. The only thing I think we
2  added to this.
3  Q. And by this, you're talking about Exhibit 33, correct?
4  A. Yes, I'm not sure whether we added to -- a final
5  version or I simply had an understanding with Doug
6  about the date about which we had to have the report
7  delivered to us.
8  Q. Okay.
9  A. I know we had many conversations about the fact that
10  we recognized this would take a tremendous amount of
11  work by them to do, but we had deadline and we had to
12  meet them.
13  Q. So who is Douglas Woodham?
14  A. He's the president of Christie's.
15  Q. And the purpose of the ultimate agreement is you
16  wanted to give them specific directions on what he was
17  to do, correct?
18  A. In terms of the number of objects and -- but you'll
19  notice this also clearly says tell us what it's worth,
20  and in a later discussion, I asked him to tell us how
21  we might be able to monetize this collection if we
22  chose to do so, what are the means available to us,
23  that's not included in this. Which is why I don't
24  think this is the final letter.

KENNETH BUCKFIRE, VOLUME 2

1  Q. Because you remember that being in it?
2  A. Well, I know we had that discussion, and I can't
3  remember whether or not we actually bothered to put it
4  in the letter or not, but I know the issue of deadline
5  and the final report was something we specifically
6  discussed, and that's why the final report does
7  include a discussion of means of monetization.
8  Q. Let me hand you an e-mail Bates stamped POA 00040952.
9           MARKED FOR IDENTIFICATION:
10          DEPOSITION EXHIBIT 34
11          11:27 a.m.
12  BY MR. SOTO:
13  Q. This e-mail seems to be consistent with your prior
14  testimony but I just want to --
15  A. Thank God for that.
16  Q. See if there's some additional factors that you're
17  asking for. So it's an e-mail dated August 25th,
18  2013, and it's to A. Wittig from you. Who's A.
19  Wittig?
20  A. Allison Wittig was, as I recall, the senior curator
21  managing this assignment for Christie's on a daily
22  basis. In other words, she was responsible for
23  coordinating the work of the curators and an appraisal
24  specialist for Christie's on this engagement.

KENNETH BUCKFIRE, VOLUME 2

1  Q. So in her e-mail to you --
2  A. I believe she also had a relationship with DIA. Some
3  of the curators at the museum were her friends which
4  is how she got picked for this particular assignment.
5  Q. She says she met with some people, and she says,
6  quote, do you want us to include works on the
7  appraisal that were purchased in part with donors'
8  funds knowing that there may be restrictions on
9  whether or not these can be sold? Answer, yes,
10  appraise all works purchased with City funds,
11  partially asked, but I assume is what you mean --
12  A. Yes.
13  Q. -- including partial purchases and identified as such.
14  A. Correct. We wanted them to be as expansive as
15  possible within the condition that it had to be
16  purchased with City funds in whole or in part.
17  Q. Do you know if in preparing the report they actually
18  also indicated whether there were any such
19  restrictions in their report, restrictions on
20  alienation or anything like that?
21  A. I don't recall that.
22  Q. Did you realize when setting those parameters that, in
23  effect, they would only be looking at a small
24  percentage of the art at the -- at the DIA?

KENNETH BUCKFIRE, VOLUME 2

1  A. We knew that.
2  Q. Did they come back and tell you look, we're only
3  looking at 4 percent of the art: is that really what
4  you want?
5  A. Well, they understood that we were looking at the
6  portion of the collection that in our view we might
7  have the, quote, greatest ability to sell because it
8  had been purchased by the City and they weren't gifts,
9  so that made sense to do it that way.
10          Secondly, in anecdotal conversations with
11  Christie's, they told us that much of the value of the
12  overall museum was actually resident in the portion
13  of the collection, so despite the fact that you had 50
14  to 60,000 items in the collection, most of them were
15  of very de minimis value, and in fact, the collection
16  on display, much of which had been purchased in whole
17  or in part with City funds, was, by far, the most
18  valuable aspect of the collection, itself. In other
19  words, there was very little on display that was not
20  purchased by the City that was of great value.
21  Q. Did that turn out to be the facts as far as Christie's
22  was concerned?
23  A. Well, they only were asked to appraise the portion of
24  the collection paid for in whole or in part by City

1        KENNETH BUCKFIRE, VOLUME 2
2   funds. They never looked at --
3   Q. The rest?
4   A. -- the gifted items, so I don't know what they thought
5      about those ultimately.
6   Q. But then again, going back to my question, do you
7      recall if anybody from Christie's got back to you and
8      said look, you realize we're only looking at a small
9      percentage of 4 percent? Did the parameters you have
10     set we're going to comply with, but it's really a
11     small percentage?
12   A. Well, no.
13         MR. CULLEN: The number of objects?
14 BY MR. SOTO:
15   Q. Of the number of objects, yes.
16   A. Well, we knew that.
17   Q. You knew that?
18   A. Yeah.
19   Q. So they didn't need to tell you, you knew it when you
20     --
21   A. (Witness nods.)
22   Q. Correct?
23   A. Correct. Well, the museum, itself, had told us that's
24      where they got the information.
25   Q. Okay. So now most recently, another valuation of the

1        KENNETH BUCKFIRE, VOLUME 2
2   art was done by the City on behalf of the City,
3   correct?
4   A. Correct.
5   Q. And it was done by an entity known as Artvest?
6   A. Correct.
7   Q. Were you or anyone else at Miller Buckfire involved in
8      retaining Artvest to do the most recent analysis?
9   A. No.
10   Q. Did you speak at all with anyone at Artvest with
11     respect to the analysis that they performed?
12   A. No.
13   Q. Have you analyzed or had a chance to review the
14     analysis done by Artvest?
15   A. No. It's a nice museum. You should visit while
16     you're in town.
17   Q. I have visited, and I can tell you it's more than a
18     nice museum. I... we'll have a conversation some
19     other... let's just say we don't have one like it.
20   A. I haven't visited it since I started --
21   Q. Off the record, we don't have one like it in Miami
22     yet.
23         MR. CULLEN: Great art scene, though.
24   A. You should have made an offer when you had the chance.
25 BY MR. SOTO:

1        KENNETH BUCKFIRE, VOLUME 2
2   Q. Yeah, all right. So let's switch gears now, and we're
3     going to go to the objection that relates to whether
4     or not the settlement is fair and equitable and
5     reasonable. So you are aware and I know you have
6     parameters and can testify about it, but you are aware
7     of a comprehensive settlement between the State of
8     Michigan, the City of Detroit, and the City's
9     pensioners that has been labeled The Grand Bargain,
10     correct?
11   A. I am.
12   Q. All right, and you, in fact, did some work to assist
13     in putting that Grand Bargain together, correct?
14   A. Correct.
15   Q. In fact, you did a lot of work in putting it together,
16     correct?
17   A. That's correct, yeah.
18   Q. Okay. And does the Grand Bargain have as one of its
19     elements the DIA settlement?
20   A. It does.
21   Q. Okay. And does it also have as another of its
22     elements the State contribution agreement?
23   A. It does.
24   Q. So we've talked about the DIA, let's talk about the
25     state contribution for a while.

1        KENNETH BUCKFIRE, VOLUME 2
2       What do you understand the terms of the
3     State contribution agreement to be?
4   A. Well, from an economic perspective, the state has
5     agreed to make a substantial contribution to the
6     pension funds of nearly $200 million in exchange for
7     the elimination of any litigation postbankruptcy on
8     certain issues against the state by the retirees.
9       It also assumes that all of that money goes
10     into the pension funds not available for anybody else
11     because the State is getting certain consideration for
12     providing that money, not just the elimination of
13     litigation, but also maintaining an important cultural
14     aspect to the southeastern Michigan region, which is
15     the museum, itself.
16   Q. So as you understood it --
17   A. I should mention also it requires contributions by
18     other parties, so it's not just they put the money in
19     and nobody else does. There's a lot of other money
20     coming into the new entity from not just the trustees
21     but also a large group of foundations that have agreed
22     to contribute to it.
23   Q. I'm going to ask you first if you were involved in any
24     of the conversations, and then we'll determine whether
25     or not you can discuss the substance of any of them.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 73 of 364

1  KENNETH BUCKFIRE, VOLUME 2
2  Were you involved in conversations with the
3  State in connection with the State contribution?
4  MR. CULLEN: You may answer.
5  A. Yes.
6  BY MR. SOTO:
7  Q. And were -- were all those conversations conversations
8  that you understood to be part of the mediation
9  process and covered by the judge's mediation order?
10  And just to give you a context, the mediation order
11  was entered in on August 13th of 2013, so you assumed
12  that it was discussed before that and then came to an
13  order?
14  A. Well there is one conversation prior to that order
15  being entered where I updated a member of the
16  governor's office as to our conversations with the DIA
17  trustees, and I -- I think I actually shared with him
18  the proposed term sheet by which a settlement, you
19  know, money could be conveyed to an authority in
20  exchange for the art being put into a different entity
21  because I wanted to make them aware of this because
22  clearly some of the board members were politically
23  active. I assumed that they would be calling the
24  governor to complain about how we're mistreating the
25  DIA and daring to ask for money, so I wanted to do

1  KENNETH BUCKFIRE, VOLUME 2
2  make sure they were properly informed about the
3  context in which we were having these discussions and
4  make them aware of the fact that there was an
5  alternative available which would require the payment
6  of value in exchange for protecting the collection
7  from sale risk but only if we got paid for it, and I
8  explained to him how that could be done.
9  So that was effectively the first term
10  sheet discussion we had to make them aware of
11  these issues. I did not ask the State for money at
12  that point, but I did point out to them that at a
13  minimum, maintaining the existing millage and possibly
14  increasing it would be a great thing because that
15  would be more value for the City and because any
16  discussion of the millage is a political one, I wanted
17  to do make sure they were aware of that element of our
18  thinking, which is also something I had raised with
19  Mr. Burke here.
20  Q. The person you were talking to at the State, do you
21  recall his name?
22  A. It was Dennis Muchmore, chief of staff.
23  Q. Was anybody else involved in those conversations?
24  A. In the governor's office?
25  Q. Yeah, I guess.

1  KENNETH BUCKFIRE, VOLUME 2
2  A. Well, there are several members of the governor's
3  staff that have been actively involved in all of
4  these, but I can't remember other than Dennis who
5  might have been on that call.
6  Q. Did you ever have a conversation with the governor
7  about this?
8  MR. CULLEN: Prior to?
9  A. I think I mentioned him at one of our meetings. We
10  were updating him on a range of issues that we had
11  suggested this alternative to the trustees.
12  BY MR. SOTO:
13  Q. You mentioned it to him, to the governor?
14  A. In a meeting which covered many other topics prior to
15  August 4th, I also recalled that I was asked why we
16  had to do an appraisal, and I explained the reasons
17  for that, and they accepted them.
18  Q. This may have been passed over. Wait a second here.
19  So let me hand you a document which we'll
20  mark into evidence. It's Bates stamped No. POA --
21  sorry -- POA 00000293, and it is an e-mail from --
22  COURT REPORTER: One moment, let me --
23  MARKED FOR IDENTIFICATION:
24  DEPOSITION EXHIBIT 35
25  11:39 a.m.

1  KENNETH BUCKFIRE, VOLUME 2
2  BY MR. SOTO:
3  Q. -- and it's an e-mail from you, Ken Buckfire, to Gene
4  Gargaro copying a number of people. The e-mail from
5  Gargaro to you suggests in a brief meeting today, I
6  expressed our appreciation to Governor Snyder for his
7  valued leadership during these challenging times and
8  thanked him for recognizing how important the DIA is
9  to the success of his revitalization strategy for
10  Detroit going forward. Governor Snyder also
11  appreciated the fact that our Honigman Miller legal
12  counsel continues to work together with Jones Day
13  lawyers from a historic perspective identify and solve
14  legal issues and help formulate a long-term
15  sustainability plan for Detroit and its great museum.
16  Do you recall receiving this e-mail from him?
17  A. I do.
18  Q. And you respond thank you for your note. I have
19  discussed this upcoming meeting with the governor when
20  we met last Friday. When can we expect a proposal
21  from the DIA?
22  So this is sort of dated May of 2013. Is
23  that the meeting with the governor you were referring
24  to earlier?
25  A. That was one of the meetings we had.

Pages 153 to 156

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 74 of 364

KENNETH BUCKFIRE, VOLUME 2

Q. Okay. Was the governor -- in your conversations with
him, did you express to the governor your duty to try
to maximize the value of assets for the City in
connection with an adjustment plan under chapter 9?

A. I did.

Q. And so he understood that you were trying to seek to
maximize the value of this asset, too, the DIA asset,
correct?

A. Correct.

Q. Did -- and you met with him a number of times, and
that was, again, before the mediation.

A. That's right. I should note that the meeting -- I'm
laughing about this because Mr. Gargaro met with the
governor for the specific purpose of getting us to
back off and leave his museum alone, and I had warned
the governor in advance that would be his agenda.

Q. When you first addressed the issue of the potential
transfer of the art to the authority, authority using
your word, was there any conversation with the
governor then about the pensions or anything like
that?

A. Not in this context, no.

Q. Okay. So we've talked about the State contribution
agreement and part of the Grand Bargain, and you

KENNETH BUCKFIRE, VOLUME 2

testified at length about the -- I don't have it, I
just skipped over, like, five pages of questions, but
in general terms, what was your understanding of the
DIA settlement that was going to be a part of the
Grand Bargain? And I'm not asking you to disclose
attorney-client privilege or mediation stuff.

A. Well, from a financial perspective, it incorporated
the following elements, first, that the millage which
funds a large part of the operating expenses of the
DIA would be maintained by the three counties which
originally had passed the legislation to impose it.
That's, of course, of material benefit to the City,
because it means we don't have to come up with 20 or
$25 million a year to pay for operating expenses; that
would be maintained.
        Second, that a -- a collection of local
foundations, the board of trustees, and the State
would contribute over time a very material amount of
capital to the plan, which would be consistent with
the valuation range of the Christie's report, which
from my perspective, was very important because until
we actually had an appraisal and we had facts on which
to assess any offer for the collection, we would not
know whether the offer was fair to the City, and

KENNETH BUCKFIRE, VOLUME 2

because the amount of money being offered was in the
high end of the range of their report, I was quite
comfortable, rather, that it was fair to the City.
        The amounts of money being provided by the
State by foundations and trustees was around $800
million, clearly, because those amounts can be
regarded as gifts because we haven't sold the
collection, the structure of it from a financial
perspective was to provide those moneys to the pension
funds directly, and what the State required was that
those parties, namely, the pension funds and the
retirees, dropped and -- or not proceed with any
litigation against the State post emergence, which
they viewed, that is, the State as a very material
consideration in exchange for funding solving. Those
are the principal economic elements.

Q. Okay. In connection with -- I appreciate your
testimony now, and then some things have transpired
since then, and for example, now there are additional
analyses done by the City of the art at the DIA
including art if he is and I know you testified that
you have and read it do you know if anybody at Miller
Buckfire is doing an analysis is undertaking an
analysis of whether or not that new art that's

KENNETH BUCKFIRE, VOLUME 2

appraisal or analysis whatever it is should affect,
you know whether or not the value that's being or the
the value of the Grand Bargain is recognizing the true
value, maximizing the true value of the DIA and the
art, I don't even think we've received a copy of it so
the answer is no.

Q. Is that something you would want to do in connection
with your assistance of the City as the investment
banker in connection with all the work you've done to
make sure this plan is the way --

A. Yes, it's simply because we just haven't had the time
to get to it that we haven't reviewed it yet but we
haven't even received a copy so...

Q. If you've testified about this, tell me and for some
reason it's seemed similar in my head, but do you
recall alternative -- alternative transactions that
you evaluated and considered that were alternatives to
the DIA settlement?

        MR. CULLEN: I believe he did testify to
some of those earlier.

BY MR. SOTO:

Q. That's what I'm wondering if he can --

A. Well, yes, we've reviewed with Christie's assistance
other alternatives that have been proposed by others

KENNETH BUCKFIRE, VOLUME 2

1          KENNETH BUCKFIRE, VOLUME 2
2    including touring fees, lease of the collection, art
3    loans, things of that sort, including outright sale
4    and we concluded that, you know, there was unlikely to
5    generate substantial value, an even in the case of an
6    outright sale, that was Christie's view which they've
7    publicly stated that it might take years to properly
8    monetize a collection because there are unlike the
9    corporate securities market where the or the municipal
10   securities impact relatively fewer buyers of art at
11   any given time and interest for fore to sell art and
12   achieve the proper value is not a simple process.  As
13   you sit here today, do you understand that various
14   creditors have objected that that the art is not held
15   in a charitable trust and therefore is transferable,
16   have you heard that.
17  **A.  I know there have been numerous objections to the**
18  **so-called Grand Bargain, I'm not aware of every**
19  **specific ones.**
20  Q.  What about that one, do you have a recollection of
21  that?
22  **A.  Not specifically.**
23  Q.  Did you undertake or -- and this time I'm truly
24  meaning you or anyone else at Miller Buckfire and I am
25  segregating away your lawyers and all the lawyers that

KENNETH BUCKFIRE, VOLUME 2

1          KENNETH BUCKFIRE, VOLUME 2
2    work with you, but Miller Buckfire and you, did you
3    guys undertake to determine, you know, the ownership
4    of the art at the DIA and whether it was held in a way
5    that it could be transferred or monetized?
6  **A.  No we limited ourselves to the source of funding that**
7  **was used to acquire these objects whether it was a**
8  **gift or purchased by the City.**
9  Q.  And that's not one of the factors you took into
10  account in determining well, gee, this is a fair
11  market?
12  **A.  No.**
13  Q.  So I think I gave you the disclosure statement
14  already.  Or you gave it?
15  **A.  I have it.**
16  Q.  And which one is that, Exhibit --
17  **A.  Twenty-eight.**
18  Q.  -- so in the disclosure statement if you'll turn to I
19  used 157, but it's also page 172 of 197 of the
20  exhibit?
21  **A.  Yes, I see it.**
22  Q.  This limited disclosure statement sort of the mid-page
23  it says on it, April 9, 2014, do you see that
24  paragraph?
25  **A.  I do.**

KENNETH BUCKFIRE, VOLUME 2

1          KENNETH BUCKFIRE, VOLUME 2
2  Q.  And I think you've answered this question before but
3  you are familiar with the disclosure statement,
4  correct?
5  **A.  I am.**
6  Q.  Could you take a moment or two just to review this
7  page with me and ask you to read it.
8        So looking at it, are you familiar with the
9  four indications of interest that are laid out there
10  on page 157 that start with this catalyst acquisitions
11  L.L.C. and the next one is art capital group L.L.C.,
12  the next one is Polly international auction company
13  limited and the next one is one management Hong Kong
14  limited?
15  **A.  All household names.**
16  Q.  I'm asking if you're familiar with those -- what was
17  presented by those entities?
18  **A.  Well, I've never been given the statements of**
19  **interest, the nonbinding proposals so I'm only**
20  **familiar with what's been reported here in the TOA.**
21  Q.  So it was closed in the disclosure statement simply to
22  let everybody know that it had happened?
23  **A.  That's correct.**
24  Q.  Did you follow up with any of these to determine
25  anything more about the work that they had done or

KENNETH BUCKFIRE, VOLUME 2

1          KENNETH BUCKFIRE, VOLUME 2
2  their level of interest?
3  **A.  No, in order err Houlihan never contacted me or any of**
4  **our bankers to give us any of the specifics about any**
5  **of these proposals, to my knowledge.**
6  Q.  Would you have been interested enter an alternate
7  proposals like the ones that are being laid out here?
8  **A.  Well, normally I would, but you know when you look at**
9  **the way they were captioned as nonbinding indications**
10  **of interest, I wouldn't put much value on such a**
11  **proposal.  That would call into question their**
12  **ultimate willingness to close on a transaction and**
13  **indeed their interest in the first place.  And they**
14  **were never provided to me either, so that tells me**
15  **that there's something straining about this whole**
16  **process.**
17  Q.  Did you reach out to Houlihan to say hey, guys, do you
18  have anything more than this?
19  **A.  They've never contacted us.**
20  Q.  I know I got that part of it, I was asking you if you
21  reached out to --
22  **A.  No, I haven't called.**
23  Q.  Did anyone else at Miller Buckfire call them to try to
24  find out anything about the deals?
25  **A.  Not to my knowledge.  But they're not deals; they're**

KENNETH BUCKFIRE, VOLUME 2

2    nonbinding indications of interest.

3    Q.   Okay.

4    A.   That's a long way from being an offer.

5    Q.   These nonbinding indications of interest, let me

6         correct?

7    A.   Correct.

8    Q.   So no one at Miller Buckfire ever asked about them

9         either?

10   A.   They're nothing more than what they say they are which

11        is maybe we'll buy it maybe for this price.

12   Q.   But is it true for an investment banker that's trying

13        to maximize an asset to not even call to try to find

14        out, well, gee, what are you guys proposing?  What is

15        this?

16   A.   Well, this is an effort undertaken by Houlihan Lokey

17        (ph.) which of course is a banker to certain creditors

18        of the City of Detroit.  We had assisted the emergency

19        manager in negotiating the so-called Grand Bargain,

20        which will generate demonstrable and concrete value

21        for this collection which is a fact plan to take into

22        account.  These are nothing more than nonbinding

23        indications of interest a long way from being a -- a

24        value that one could depend on for purposes as serious

25        as a plan of adjustment.

KENNETH BUCKFIRE, VOLUME 2

2    Q.   So then let me -- I understand that's your view.

3         Apart from these that are listed in this disclosure

4         statement, were there other entities, I mean did this

5         whet your appetite to think well, maybe there are

6         other entities who would really be interested in the

7         asset that we should contact to try to maximize the

8         value of it.  Recognize we're talking about these, did

9         you try to contact anybody who might be involved in

10        the art monetization world to try to see well, what do

11        you guys think about the DIA art?

12        MR. CULLEN:   Subsequent to the -- to

13        receiving or being made aware of these expressions of

14        interest.

15        MR. SOTO:  Well, I actually was going to

16        try to do it chronologically, so I --

17        MR. CULLEN:  Oh, okay.

18        MR. SOTO: I was going to say at all and

19        then the substance into it but first at all?

20   A.   No.

21   Q.   Yeah, I'm done with that although, I will be asking

22        some additional questions.

23        So under the plan of adjustment switching

24        gears now, the City is transferring the entire art

25        collection and the building in exchange for

KENNETH BUCKFIRE, VOLUME 2

2    contributions from a group of foundations in -- in the

3    DIA: is that correct?

4    A.   In exchange for fully committed financing those from

5         parties, that's correct.

6    Q.   Looking at the plan as I reviewed it, and I know

7         you're familiar with it more so than I am, the

8         foundations are contributing $366 million over a --

9         over a period of time, correct?

10   A.   Correct.

11   Q.   Do you recall the period of time?

12   A.   I'd have to go back and check it, I think it's a

13        ten-year period.  I know we've produced the consulting

14        agreement.

15   Q.   I'll tell you -- it's on page 158 or page 173, 197 and

16        I handed them to you earlier.

17   A.   It's a --

18   Q.   Which page are you talking about.

19   Q.   Page 158 the DIA settlement we looked at it very

20        quickly but it says in that first full paragraph last

21        sentence?

22   A.   I'm sorry, are you looking at the docket page or the

23        plan page?

24   Q.   Oh, I'm sorry the plan page?

25   A.   Ah.

KENNETH BUCKFIRE, VOLUME 2

2    Q.   The docket page is 197?

3         MR. CULLEN:  173 of 197.

4    BY MR. SOTO:

5    Q.   Oh, I'm sorry, 173, so I think if we get to the page

6         to the paragraph that says DIA settlement?

7    A.   Yes.

8    Q.   And that last settlement sentence of that first

9         paragraph as of the date of filing of this disclosure

10        statement the foundations had tentatively agreed to

11        pledge at least 366 million in foundation funds

12        payable or over a period of 20 years?

13   A.   Right.

14   Q.   In support of this agreement?

15   A.   That's right.

16   Q.   Do you know if that's changed at all in connection

17        with the plan?

18   A.   Not to my knowledge.

19   Q.   So it's 360 million over 20 years?

20   A.   Correct.

21   Q.   And in addition to the foundations, the DIA Corp. is

22        also committed to giving a hundred million over 20

23        years, correct?

24   A.   Correct.

25   Q.   And in determining whether or not you had maximized or

Pages 165 to 168

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 77 of 364

KENNETH BUCKFIRE, VOLUME 2

2 you were maximizing the value of that asset in
3 connection with this exchange, did you do calculations
4 to determine well, gee, what is the value of somebody
5 giving you 366 million over 20 years and somebody else
6 giving you a hundred million over 20 years, what does
7 that come out to in present terms, did you do that
8 work?
9 A. No.
10 Q. Do you know if anybody at Miller Buckfire did?
11 A. No. Well, yes, I'm sorry, yes, no one has done the
12 work.
13 Q. Okay. And can you -- can you tell me why -- wouldn't
14 you want to know you're taking the art today, what are
15 they giving you today?
16 A. Mm-hmm.
17 Q. Would you want to know that?
18 A. In certain circumstances I would, but one of the
19 elements of the Christie's valuation which you haven't
20 asked me yet is over what period of time they would
21 anticipate monetizing the collection to realize those
22 values if indeed we had directed them to do so so even
23 though they gave us a valuation range which is in the
24 POA, I don't believe they stipulated in this analysis
25 or this report how long it would take and what they

KENNETH BUCKFIRE, VOLUME 2

1 did tell us which I believe is in their original
2 report, it would take several years to quote monetize
3 the value of the art that they reflected in their
4 range so the range in and of itself is not present
5 value adjusted and for that reason we did not feel
6 necessary to calculate the present value of the
7 payment stream relative to the value of the art
8 because the art rate, itself, was perhaps not done
9 according to Black Sholes (ph.). It's a number but
10 it's a number with a lot of judgement around when you
11 would realize that. That also was a function of the
12 wide nature of range gap. I mean it's a pretty wide
13 range.
14 Q. So it's your understanding, and I want to make sure
15 what you said when Christie's gave these values, they
16 weren't saying that's the value of that piece of art
17 if you want to buy it today?
18 A. That's correct, they're saying when we go and properly
19 find the art and find the right buyer there might be
20 one buyer in the world for every piece, we believe
21 this is the price we'll get for you.
22 Q. And do you know where in their report they -- they
23 indicate that?
24 A. I'd have to go back and reread it, they certainly told

KENNETH BUCKFIRE, VOLUME 2

1 me that.
2 Q. And who at Christie's were you talking about, the same
3 lady, Alison --
4 A. No, Doug Woodham.
5 Q. Doug Woodham?
6 A. Yeah.
7 Q. If you were sitting here -- well you are sitting here
8 today, since you are sitting here today and they're
9 proffering you as an expert as well as you're an
10 intelligent factual witness can I ask you what
11 discount rate would you use if you were sitting there
12 and someone well what do you think the present value
13 is of this 360 -- well let's just add it together
14 because it's round numbers 466 million over 20 years
15 what do you think the present value of this is what
16 discount rate would you use?
17 A. Well, when you look at the quality of the funding
18 parties, I think it would be appropriate for example
19 with the State of Michigan since they are a double A
20 rated credit to use a very low discount rate
21 equivalent to their credit rating, standing to come to
22 a present value of their contribution. Like wise, all
23 the foundations because they are large, and are well
24 funded and have no, as I understand it, external debt,

KENNETH BUCKFIRE, VOLUME 2

1 would also merit a very low discount rate to reflect
2 the present value of their future contributions. I
3 can't speak to the discount rate with respect to the
4 individual members of the DIA board of trustees, but
5 my understanding is they're all very wealthy local
6 business people and other professionals who probably
7 would merit an equally low discount rate on their
8 contributions, that would lead me to conclude without
9 saying I've done the work because I haven't except for
10 the last 30 seconds that the discount rate I would use
11 would be probably somewhere between 2 to 4 percent
12 And that would only reflect the fact that the
13 contributions were coming in over four -- 20 years.
14 Q. And by that last statement, just to help me understand
15 what you meant by that, if it was over a shorter
16 amount of time you would change the discount rate?
17 A. I'd have had a much lower discount rate.
18 Q. And if it's longer --
19 A. You'd have to use a higher one.
20 Q. Thank you.
21 A. You're welcome.
22 Q. I'm going to switch gears if this is a good time for
23 you to break, we can, switch gears to your expert
24 reported I'm going to try like the first part not ask

Pages 169 to 172

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 78 of 364

KENNETH BUCKFIRE, VOLUME 2

1       KENNETH BUCKFIRE, VOLUME 2
2    questions that you've already been asked and just try
3    to hone in on this.
4        MR. SOTO: There's supposed to be lunch.
5    If lunch is served this would be a good time for a
6    break. If not, we can go another half hour and begin
7    the process, and not just sit around waiting for food.
8    Okay, so this is the time to break, so let's...
9        VIDEO TECHNICIAN: The time is 12:04 p.m.,
10    we are off the record.
11        (Recess taken at 12:04 p.m.)
12        (Back on the record at 1:04 p.m.)
13        VIDEO TECHNICIAN: We are back on the
14    record. The time is 1:04 p.m.
15    BY MR. SOTO:
16    Q. Mr. Buckfire, I'm still Ed Soto, and you're still
17    under oath, and we will continue where we were before
18    going into your expert report and I have just been
19    informed that it is Exhibit No. 4, so it's probably in
20    front of you under that pile towards the bottom. It
21    looks like this?
22    A. I know. I have it.
23    Q. Okay. Now we discussed in general terms the best
24    interest -- a little earlier and I want to circle back
25    for a second. Parted of the test is determining

KENNETH BUCKFIRE, VOLUME 2

1       KENNETH BUCKFIRE, VOLUME 2
2    whether the proposed plan would be better alternative
3    for creditors, than what they would have if the plant
4    weren't -- weren't -- if the plan weren't passed. So
5    part of that analysis that you have in your expert
6    report, of whether or not the creditors would be
7    better off that took into account some of the issues
8    you took into account in the best issues test,
9    correct?
10    A. Correct.
11    Q. So looking at your opinion which is opinion B, and
12    it's on page 2, and it says: Plan treatment compared
13    to treatment upon dismissal, the City's creditors
14    would be treated better under the City's plan of
15    adjustment than if the bankruptcy were dismissed, do
16    you see that?
17    A. I do.
18    Q. And you addressed the basis of that further on in your
19    opinion on page 5, correct?
20    A. Yes.
21    Q. Okay. So I'm going to be asking you questions that if
22    you want to take a moment to look at it or if you feel
23    you already have, we can go forward either way?
24    A. Just go ahead.
25    Q. So looking at page 5 where you are, what is the basis

KENNETH BUCKFIRE, VOLUME 2

1       KENNETH BUCKFIRE, VOLUME 2
2    then for your opinion that the City's creditors would
3    be treated better in the City's plan in the bankruptcy
4    case than if the bankruptcy case were dismissed?
5    A. Well, the most important factor is my judgment that
6    the City on a delevered basis with the ability to make
7    multi-year investments in rehabilitation and
8    revitalization and improvements of the City's services
9    will be able to maintain if not improve projected tax
10    revenues as opposed to a situation in which it could
11    not do so.
12    Q. So when you say as opposed to a situation where it
13    would not do so, what are you contemplating or what
14    are you thinking of?
15    A. If the petition was dismissed and it was not able to
16    use tax revenues to make multi-year commitments to
17    reinvestment programs, its ability to retain or
18    attract new residents and retain or attract new
19    businesses would be called in question.
20    Q. Okay. From the City's standpoint I understand that.
21    Now I'm going to ask and maybe I misunderstood your
22    answer correct me if I don't think ton that so I'm
23    going to ask the question from the standpoint of the
24    creditors and since you know who I represent we
25    represent FGIC so that would be one of the class 9

KENNETH BUCKFIRE, VOLUME 2

1       KENNETH BUCKFIRE, VOLUME 2
2    creditors so you can even aim at that if you are
3    predisposed to or you can even ask it in general if
4    you want to and we can get to that later but what I'm
5    asking for is what analysis, what went into your
6    thinking in your opinion that the City's creditors
7    would in your view be better off particularly class 9
8    creditors if the plan of adjustment were approved as
9    opposed to if it were dismissed?
10    A. Well, it's a complex question because you have to
11    consider the alternative, which is that the City
12    cannot undertake a rehabilitation program and maintain
13    or improve its tax revenues. The alternative and
14    likely true that in fact the City will begin to
15    liquidate itself, by that I mean the residents and
16    businesses will leave the tax revenues will decline
17    but the expense of the stiff with cannot be made to
18    decline as quickly, particularly if the petition is
19    dismissed, there will be enormous return to try to
20    sees or otherwise prevent the City from spending its
21    money on anything other than creditor claims and
22    because in the case of your clients there are
23    substantial creditors who have perhaps a better claim
24    against City tax revenues in your client, the likely
25    recovery to your clients would likely be zero.

Pages 173 to 176

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6826  Filed 08/18/14  Entered 08/18/14 15:57:22  Page 79 of 364

KENNETH BUCKFIRE, VOLUME 2

2   Q.  And so the substantial the creditors that you are

3      referring to that have a more substantial claim than

4      -- than my clients, who would be that?

5   A.  **Again we're talking about a dismissal scenario where**

6      **you don't have the protection of Chapter 9, well**

7      **obviously, the LTGOs, the UTGOs, one could argue even**

8      **the pension and OPEB claim holders because they have**

9      **executory contracts with the City.  All those parties**

10     **which have claims in the billions certainly swamp the**

11     **claims of the COPs, and indeed, the question of the**

12     **priority of the COPs claims because you're relying on**

13     **the indirect credit of the City, I think would call**

14     **into question whether in that scenario your clients**

15     **would receive revenue any value at you will.**

16   Q.  And so that's the basis of your opinion with respect

17      to plans compared to treatment upon dismissal?

18   A.  **That's correct..**

19   Q.  Now, did you analysis the treatment under the plan and

20      justification at a post it to the treatment upon

21      dismissal which you just did here in this --

22   A.  **Mm-hmm.**

23   Q.  -- testimony when you came to this opinion?

24   A.  **Well, I'd also refer you to our June 2013 report where**

25      **we showed that without intervention in this case**

KENNETH BUCKFIRE, VOLUME 2

2      **intervention being the filing for bankruptcy**

3      **protection, the percentage of City revenues being**

4      **tasked to manage debt service obligations was growing**

5      **to an unsustainable level.  I believe the peak was 65**

6      **percent of total relevance including your clients'**

7      **claims would absorb over 65 percent of all tax**

8      **revenues, that's untenable, that's a liquidation**

9      **scenario and the realty was that the City's experience**

10     **prebankruptcy I think as a factual matter indicates**

11     **that that scenario was having an enormously adverse**

12     **consequence on the ability of the City to maintain**

13     **itself, provide services, attract tax base and**

14     **increase revenues.**

15   Q.  So now your testimony that you just gave, is it based

16      on any analysis that was done by -- well, yourself,

17      Miller Buckfire, or anyone else in connection with the

18      City of what the recoveries for creditors would be

19      outside of the Chapter 9?  Did you do a full analysis

20      saying this is what we anticipate would happen?

21   A.  **You mean a liquidation analyses?**

22   Q.  Yeah, an analysis of -- using your terms if the case

23      were dismissed?

24   A.  **Cities don't liquidate, so we did not do that**

25      **analysis.**

KENNETH BUCKFIRE, VOLUME 2

2   Q.  And apart from a liquidation analysis did you do any

3      analysis of well here's what we think would happen,

4      here's the creditors we think would have a certain

5      type of priority, here's the creditors we think would

6      have a different type of priority here's how we think

7      we testified yesterday the race to the courthouse

8      might come out, did you do any analysis like that?

9   A.  **No.**

10   Q.  And why not?

11   A.  **We thought it was pretty obvious from the condition of**

12     **the City prebankruptcy about how untenable the**

13     **situation was and the fact that if you regard some**

14     **level of City services as being the minimum**

15     **requirement absorbing revenue there wouldn't be enough**

16     **cash to pay our creditors, you can see that from the**

17     **numbers.**

18   Q.  And breaking it down a little, did you consider even

19      as to anyone particular group of creditors?  Did you

20      take any creditor type and sigh well here's a type of

21      creditor that looking at this opinion might not do as

22      badly in a dismissal scenario versus what they're

23      getting in the bankruptcy.

24   A.  **Yes, we did that.**

25   Q.  And which creditor were you -- do you that for?

KENNETH BUCKFIRE, VOLUME 2

2   A.  **Well, I've already testified to our work on a priority**

3     **analysis, a so-called recovery analysis by creditor**

4     **class and we came to a conclusion early on that the GO**

5     **creditors might in fact have a better recovery in a**

6     **liquidation scenario because they have the benefit of**

7     **a tax pledge that might under southern scenarios give**

8     **them a greater revenue from tax revenues albeit the**

9     **claim, other than other GO creditors who had no**

10     **specific revenue.**

11   Q.  Can you recall what the results were for any other

12      class of creditors other than the GO?  And you just

13      mentioned the GO when you testified about that

14      earlier.

15   A.  **Well, regrettably, I thought the recovery to COPs was**

16     **likely to be zero in that scenario.**

17   Q.  And can you -- let me break that down a little.  So

18      the recovery to COPs you just said you thought might

19      be zero.  What factors went into that analysis?

20   A.  **Just my conclusion as to the status of their claims,**

21     **relative to other claims against the City's revenues.**

22   Q.  So and by status, you mean priority and anything else?

23   A.  **Priority, lack of tax pledge, indirect nature of their**

24     **claim against the City, the fact that they might not**

25     **be classified as a general unsecured claim with other**

Pages 177 to 180

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 80 of 364

1      KENNETH BUCKFIRE, VOLUME 2
2   claims that I would view as an economic matter you
3   know our genuine secured claims with the comes forks
4   the underfunded pension claim the healthcare claim
5   they're all general unsecured claims as I understand
6   that but it's certainly possible that you know some
7   authority might take a different view that those
8   claims require more dedication of revenues first ahead
9   of the COPs.
10  Q.  And so the analysis you did was to first of all
11      prioritize the claims, secondly look within the
12      priority and see well gee what is it they're claiming,
13      what is their likelihood of having some kind of a
14      security interest and things like you just mentioned
15      and then you went through those factors and you
16      applied them within each class.  Is there a written
17      report that does that?
18  A.  No.
19  Q.  And you did testify about this analysis yesterday, as
20      well, circles incomes with the DWSD.  Who would be the
21      person within the City or -- whether it's Miller
22      Buckfire who would be most knowledgeable about the
23      specifics of that analysis, that recovery analysis?
24  A.  Well, the development of the plan of reorganization,
25      sorry plan of adjustment here was a collaborative

1      KENNETH BUCKFIRE, VOLUME 2
2   effort between ourselves, Ernst & Young, Conway
3   MacKenzie.  We took the lead in analyzing the claims'
4   waterfall and the calculation of the series B notes
5   and how that might be applied against those claims but
6   the actual analysis of the City's plan was done by
7   E & Y, and we contributed our analysis and our views
8   on the balance sheet to their presentation which is
9   now displayed in exhibits LA M of the POA.
10  Q.  Okay, than analysis includes the analysis of the
11      recoveries that you just testified about?
12  A.  That's correct, which is also reflected in my expert
13      report but in a different form.
14  Q.  Okay, and if you can refer to your expert report, what
15      are you referring to?
16  A.  I think it's marked as attachment 1 which is actually
17      a pro forma capitalization of the City it, it's not
18      strictly by class but it does show from an equivalent
19      gap presentation point of view what everyone's
20      getting.
21  Q.  And that would be titled that's the page for those of
22      you who have it entitled City of Detroit pro forma
23      capitalization July 2, 2014?
24  A.  Correct.
25  Q.  So looking at the debt obligations of the COPs that

1      KENNETH BUCKFIRE, VOLUME 2
2   are listed there, prepetition ballots, what is that a
3   bill I don't know-four, a bill I don't know 473?
4   A.  For the COPs?
5   Q.  Yes.
6   A.  Yes, but I believe this balance includes prepetition
7       interest as well so the billion four seven at this
8       three includes accrued but unpaid interest.
9   Q.  And then under the column claim, reduction of claim,
10      what does that represent?
11  A.  That's just a deduction based on what the debt
12      obligations receiving pursuant to the plan and then
13      this is what they're not receiving so in case of the
14      COPs, the 1.473 billion of claim they'd be receiving
15      162 million of the series B note and the change, the
16      difference is $1,311,000,000.
17  Q.  So it's being reduced by 89 percent?
18  A.  That's right.  Which is comparable with the other
19      similar situated claims.  The notes, loans payables,
20      and other unsecured liabilities.
21  Q.  Is there a backup for this that analyzes it any -- any
22      further?
23  A.  Well, this is a summary of information contained in
24      the POA, so you have to go back to the POA and look
25      class by class to determine what treatment is

1      KENNETH BUCKFIRE, VOLUME 2
2   proposed.  Of course, in the POA itself, we would
3   stipulate that the COPs recovers zero for legal
4   reasons but not resulted to the pro rata claims
5   analysis that we had done.
6   Q.  And what we're talking about now is the pro rata
7       claims analysis that we've already referred to,
8       correct.
9   A.  That's right.
10  Q.  That separate and apart from any legal analysis --
11  A.  That's right, and of course the COPs as I mentioned
12      before, takes into account that we are only allowing
13      40 percent overall COPs claim, which is one of the
14      reasons that it is so used reduced.
15  Q.  So separate and apart from the plan of adjustment,
16      because I've reviewed the plan of adjustment, are
17      there any analyses other than those that are attached
18      to the plan of adjustment, referred to in the plan of
19      adjustment and attached as exhibits which you know
20      there are many?
21  A.  Mm-hmm.
22  Q.  Other than those do you know of any analysis regarding
23      the pro ratas on a recovery basis that you've just
24      referred to?
25  A.  No.

1         KENNETH BUCKFIRE, VOLUME 2

2 Q. And you know of no other cities -- strike that. You

3 know of no other analyses that were done on behalf of

4 the City that addressed that issue other than what

5 we've spoken to today?

6 MR. CULLEN: Just for clarity of the

7 record, can you define for us what you mean by that

8 issue, I think it's gotten a little swampy on us.

9 Q. That's probably right we've talked about an analyses

10 of the recoveries on a pro rata bays in the vent

11 there's a dismissal of the action, correct?

12 A. Yes.

13 Q. And you've testified about what you know exists with

14 respect to the analysis of that issue and we've just

15 discussed that, correct?

16 A. That's right.

17 Q. And you pointed out that in your opinion, you have a

18 summary --

19 A. Mm-hmm.

20 Q. -- which is Exhibit 1 and that it's a summary of the

21 items that are referred to in the plan of adjustment

22 and the attachments to the plan of adjustment; is that

23 correct?

24 A. That's right.

25 Q. And my question was and I'm clarifying it now,

1         KENNETH BUCKFIRE, VOLUME 2

2 hopefully, do you know of any other analyses of that

3 recovery, that type of recovery that we've just

4 discussed other than what's attached to the -- to the

5 plan of adjustment?

6 A. Mm-hmm.

7 Q. That you've referred to in your summary here?

8 A. Well, I know Miller Buckfire did not perform one. I

9 do recall might have been late December, early January

10 when the court initially denied the approval of the

11 postpetition financing and we thought we might have to

12 move to liquidate the City because we wouldn't have

13 adequate liquidity I discussed running a downside

14 scenario case with no rehabilitation with Conway and

15 E & Y, but as it turned out we ultimately did get

16 financing approved, so I don't know whether they

17 started the analysis or not, but I never saw the

18 results of it.

19 Q. And that was what you were referring to earlier when

20 you said E & Y did some analysis for the Court but you

21 don't know what it is?

22 A. Well, we talked about it, but I never saw the results,

23 and they may have shelved it because it became clear

24 we were going to get a smaller financing done but one

25 that would allow the City to operate.

1         KENNETH BUCKFIRE, VOLUME 2

2 Q. And the person that you think we should speak with at

3 E and Y if you have that name in your head who do you

4 think that would be?

5 A. Mr. Mahattra. But he may have never have done it

6 because, as I said, it was something we discussed and

7 within a matter of week we decided we probably didn't

8 have to worry about that.

9 Q. And to the best of your recollection, the OE analysis

10 that exists regarding what recoveries each of the

11 unsecured creditors would get if the case were

12 dismissed is part of a plan of adjustment, otherwise

13 it doesn't exist?

14 A. That's correct. Although just to be totally accurate,

15 go back to our June 2013 proposal. We had assumed

16 that all of our unsecured claims would be in the same

17 pool. At that time, I believe we assumed the COPs

18 would be treated period with all the unsecured claims

19 that was the only instance that we changed our view

20 but nobody like that plan so.

21 Q. So again adding to what you just said we can?

22 Q. You need to look at the June 23rd plan or the POA,

23 correct?

24 A. Correct.

25 Q. Do you recall why no one liked that June 2013 plan

1         KENNETH BUCKFIRE, VOLUME 2

2 with were all of them together?

3 A. Oh, yes. They all believed they were more special

4 than everybody else and, therefore, they should get

5 more than everybody else.

6 MR. CULLEN: Jen, do you want to weight in

7 here?

8 (Inaudible comment by Ms. Green.)

9 BY MR. SOTO:

10 Q. See, as I understand the analysis with respect to the

11 COPs the potential recovery is zero to 10 percent

12 maximum, correct?

13 A. Correct.

14 Q. And it's your opinion with respect to this second

15 opinion that the creditors would be better under the

16 City a plan of adjustment and if the City in the

17 bankruptcy case were dismissed that the COPs would get

18 -- potentially get zero if -- if the case were

19 dismissed?

20 A. I think that's a very real possibility.

21 Q. And you testified about that earlier. Did you ever do

22 an upside what they might get you know because you did

23 a zero to 10 under the plan I'm wondering if there is

24 no plan did you think well gee they could get zero but

25 they could get Y, did you ever do that analysis to be

1　　　　　KENNETH BUCKFIRE, VOLUME 2
2　　able to compare apples-to-apples?
3　　A.　Not directly, no.  But clearly the COPs holders have
4　　　　the benefit of your insurance so the bondholders
5　　　　themselves will do perhaps better than the City is
6　　　　proposing.
7　　Q.　And those bond hold he recalls are the creditors,
8　　　　correct?
9　　A.　They are.  Insured by your client.
10　　Q.　Who is also a creditor at some to some extent,
11　　　　correct?
12　　A.　Correct.
13　　Q.　Did you take that into account in your opinion that
14　　　　they -- let's just take the bondholders that the
15　　　　bondholders would do better?
16　　A.　I don't believe the bondholders will do
17　　　　better than this plan in any other scenario that we've
18　　　　presented.
19　　Q.　Were there any alternative scenarios other than a
20　　　　dismissal of the plan, were there any sort of
21　　　　alternative plans that you might have taken into
22　　　　account in determining whether or not they'd do better
23　　　　under this plan as opposed to the dismissal of this
24　　　　plan?  In other words, to be clear on the question,
25　　　　you're proposing a scenario where you either have this

1　　　　　KENNETH BUCKFIRE, VOLUME 2
2　　plan or you have a race to the courthouse, correct?
3　　A.　Correct.
4　　Q.　Were there any alternatives other than a race to the
5　　　　courthouse like maybe this plan or an alternate plan
6　　　　that you might have considered, for example, your June
7　　　　13th plan?
8　　A.　Well, we obviously proposed the June 13th plan
9　　　　first but no creditors wanted to consider it so it
10　　　　wasn't feasible.
11　　Q.　And -- other than that, anything else?  Any other
12　　　　plans that you might have considered?
13　　A.　Well, we obviously had many discussions with all of
14　　　　our creditors including your clients and with your
15　　　　institution pursuant to mediation so I don't know what
16　　　　-- where the line would be on what we considered to
17　　　　pursue.
18　　　　　　MR. CULLEN:  Anything that was discussed
19　　　　outside of mediation, you can discuss.
20　　A.　Oh.
21　　　　　　MR. CULLEN:  Anything that was generated
22　　　　outside of mediation or shared outside of mediation,
23　　　　you can discuss.
24　　A.　Well, the only thing that comes to mind, and again,
25　　　　there was no support for it by any creditor was our

1　　　　　KENNETH BUCKFIRE, VOLUME 2
2　　original provision in the June 2013 presentation for
3　　　　some, quote, upside sharing that if the City did
4　　　　better than its projections, there might be additional
5　　　　value to our creditors that could be there for a
6　　　　higher recovery call it the equity of the City
7　　　　approach.  But as I said, no creditor supported our
8　　　　original proposal so we dropped the idea.
9　　BY MR. SOTO:
10　　Q.　Did the City support it?
11　　A.　That's why we presented it, yes.
12　　Q.　And the upside sharing, do you recall the specifics of
13　　　　how that would -- how that would work?
14　　A.　Well, it was complicated because we wanted to make
15　　　　sure that it was properly calculated, we wanted to
16　　　　make sure it was just a one off, one-year improvement
17　　　　over the baseline, there's actually a full description
18　　　　of it in the June 2013 proposal.
19　　Q.　Is that the one in the June 13 proposal that had a
20　　　　capped $2 billion note?
21　　A.　I'd have to go back and check, with we had several
22　　　　different ways of doing it do you have a page
23　　　　reference.
24　　Q.　No, I don't but...
25　　　　　　(Counsel confer.)

1　　　　　KENNETH BUCKFIRE, VOLUME 2
2　　A.　I don't have the full proposal in front of me.
3　　BY MR. SOTO:
4　　Q.　And you know what we ought to give you the full
5　　　　proposal and have it marked as an exhibit otherwise so
6　　　　why don't we mark this -- it was -- the summary was
7　　　　13, the full one will become 36.
8　　　　　　MARKED FOR IDENTIFICATION:
9　　　　　　DEPOSITION EXHIBIT 36
10　　　　　　1:32 p.m.
11　　A.　Yes, this is what I was referring to, the terms of the
12　　　　note on page 107 of the June 2013 proposal.
13　　BY MR. SOTO:
14　　Q.　Which for those of you down there is Bates stamped No.
15　　　　POA 00110544.  Thank you very much.  In connection
16　　　　with any alternate plans did the City consider
17　　　　monetizing and selling any specific assets as an
18　　　　alternative to the current plan and a dismissal, any
19　　　　in between?
20　　A.　Well we discussed this earlier every asset that the
21　　　　City had that it could conceivably monetize was
22　　　　disclosed in the June 2013 plan that we did embark on
23　　　　a the City's behave a process of whether there was
24　　　　indeed realizable value from each of the assets so
25　　　　identified and pursued that aggressively on behalf of

Pages 189 to 192

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 83 of 364

KENNETH BUCKFIRE, VOLUME 2

1    the creditors of the City, and that was part of and is
2    part of the City's current POA.
4  Q.  And that's your testimony regarding the Coleman
5      Young Airport, the Belle Isle, the tunnel, and the
6      real estate and the DIA?
7  A.  And the parking garages.
8  Q.  And the parking garages?
9  A.  Correct.
10 Q.  And did you take that into account in arriving at your
11     opinion here regarding this opinion number B?
12 A.  I did.
13 Q.  And you can -- and when you did that, did you sort of
14     run pro formas, you could say okay we can't get much
15     for this airport but here's what we could get. We
16     can't get much for this tunnel but here's what we
17     can get, you can't get much for this parking garage,
18     but here's what you can get, did you run a pro forma
19     where you did a scenario where well, here's what we
20     get for a sale, and here's what would be left for
21     everybody under this plan, we just don't think it's
22     any good, but that's an analysis, did you do anything
23     like that?
24 A.  I've already testified to this, when you've looked at
25     each individual asset you just mentioned we looked at

KENNETH BUCKFIRE, VOLUME 2

1    it we an attempted to do a market check in each case
2    and what market values would be realizable and came to
3    the conclusion and decided from the Institute of Arts,
4    which I'll specify is a special case in a unique
5    bankruptcy, the only asset which has substantially
6    value are the parking garages, and we were about to
7    embark on a process of selling them.
8  Q.  So that's what I'm asking so you did testify to that,
9      but what I'm going to now is a little bit different.
10     It's your opinions so when you give an opinion that
11     says, as yours does, that look, you creditors would be
12     treated better under the City's plan of adjustment
13     than if the bankruptcy --
14 A.  Mm-hmm.
15 Q.  -- were dismissed, so sometimes when a bankruptcy's
16     dismissed --
17 A.  Mm-hmm.
18 Q.  -- then there are alternate plans that people come up
19     with.  In that analysis, I've asked you if you
20     prepared any alternate plans, and you don't me other
21     than the June 2013 plan that you didn't recall any,
22     but now I'm asking for okay you might never have done
23     an alternate plan but did you do an analysis that that
24     laid out some assets that said well, we could sell

KENNETH BUCKFIRE, VOLUME 2

1    these, we could monetize those, here's what we could
2    get for the City, you know, in that analysis, did you
3    do anything like that?
4  A.  No.
5  Q.  No.  Do you know if anybody else did?
6  A.  Not to my knowledge.  So.
7  Q.  So again other than the June 13th analysis, which is
8      part-- can't say that thing right to save my life.
9      Sorry, June 2013 analysis that is Exhibit 36 in its
10     full length and Exhibit 13 in summary, and the plan of
11     adjustment there was no other alternative plan that
12     you considered in arriving at your opinion that the
13     creditors would be better off under the plan than with
14     the dismissal?
15 A.  Correct.
16 Q.  Okay.  Because of the proffering you as an expert I'm
17     asking you this question in your expertise and I know
18     you're not a lawyer and if you don't have an answer
19     forget it?
20 A.  Find it in my heart to forgive you that.
21 Q.  Can I tell you something, you're for given I don't
22     know why my three of four sons didn't figure that out
23     but my fourth one did.
24         So I'm looking at this from a pure

KENNETH BUCKFIRE, VOLUME 2

1    standpoint of as a -- as a reorganization specialist
2    or I know that's one of your expertises, what -- when
3    you considered the alternatives for an unsecured
4    creditor what are some of the thoughts that go into
5    your head and for example when you were analyzing the
6    COPs you gave me some of them?
7  A.  Mm-hmm.
8  Q.  You mentioned them, correct me if I'm wrong, while
9      they were unsecured, you mentioned that and they would
10     at best be in a pot of unsecured that was under the
11     June 2013 plan.  You mentioned that there may not be
12     as direct in their claims as some of the other
13     unsecureds, did you think about well, gee, I wonder
14     what their the strength of their litigation claims
15     might be if -- if there was no payment?
16 A.  No.
17 Q.  Do you know if anybody else did?
18 A.  Yes.
19 Q.  And who did that?
20 A.  Jones Day.
21 Q.  Jones Day?  Okay.  Did you take their analysis into
22     account in your opinion?
23         MR. CULLEN:  It's is it reflected in the
24     range.

1    KENNETH BUCKFIRE, VOLUME 2
2    **A.  Yes.**
3    BY MR. SOTO:
4    Q.  The answer is yes?
5    **A.  Yes.**
6    Q.  And would you agree that that -- when you say yes you
7        mean it's reflected in the range that you put in your
8        opinion?
9    **A.  It reflected in the range provided in the plan of**
10   **adjustment as a potential recovery for class value.**
11   Q.  So from zero to 10 percent?
12   **A.  Correct I'm at 10 percent, somebody else might be at**
13   **zero.**
14   Q.  Okay.  Did you do the same analysis for the holders of
15       pension claims what their ultimate litigation claims
16       might be, in coming to the range that you came to for
17       them?
18   **A.  Well, there's a general unsecured claim.  My analysis**
19   **was almost driven by how that underfunding which**
20   **result in the claim was calculated, that's why I made**
21   **sure I understood a larger claim they had, not whether**
22   **the claim, it satisfy, could be presented and be**
23   **admitted as a perfected claim in the bankruptcy.**
24   Q.  So if I'm understanding what he says, look, I
25       understand they're an unsecured claim I looked at what

1    KENNETH BUCKFIRE, VOLUME 2
2        the larger claim might be because they're not getting
3        what they claimed they're owed so that gap, what
4        they're not getting that it would be a bigger amount
5        but what I'm asking is a little different.  I'm asking
6        did you do any analysis of what their legal action
7        might be outside of as an unsecured creditor outside
8        of bankruptcy?
9    **A.  I did not, no.**
10   Q.  Do you know if anybody did?
11   **A.  Yes.**
12   Q.  Again, would it be Jones Day?
13   **A.  It was.**
14   Q.  Did you take Jones Day' analysis into account in the
15       range of recovery that you ultimately recommended in
16       the plan of adjustment with respect to the pensioners?
17       MR. CULLEN:  I don't know the answer to
18       that one.
19   **A.  Okay.  Yes.  I did.**
20   Q.  Would you agree that outside of the Chapter 9 plan of
21       adjustment that the holders of pension claims would
22       have the same remedy as the holders of other unsecured
23       claims if they were coming to the City?
24   **A.  That would be my understanding as a financial matter**
25   **yes.**

1    **KENNETH BUCKFIRE, VOLUME 2**
2    Q.  But leaving aside the impact that would have on the
3        City's ability to operate because it's clearly the
4        pension rights are held by both active and -- active
5        employees and retirees so depending on how the City
6        had to manage its work force might have an impact on
7        how they decide to treat those claims even as a
8        factual matter they're the same they might have
9        treated because they've got to maintain the safety and
10       welfare of the City because there might be cooperation
11       of employees so there might be a different?
12   Q.  So there might be a desire to treat, you know, people
13       who are continuing working differently?
14   **A.  Correct.**
15   Q.  All right.  But from the standpoint of any other
16       aspect, for example, the contractual nature of the
17       claim or whatever claim they would have under their
18       agreements, they would all be unsecured creditors
19       approaching the City the same way?
20   **A.  That's how I would view it, yes.**
21   Q.  In coming to your -- and this may be a subset of what
22       I've already asked and if it is, just let me know.  In
23       coming to your opinion on this item B, what resources
24       of the City did you assume would you have to be
25       monetized to satisfy creditor claims in the case of a

1    KENNETH BUCKFIRE, VOLUME 2
2    dismissal scenario?
3    **A.  It was the same list of assets we've already discussed**
4    **relative to the June 2013 proposal and the City's**
5    **ongoing efforts to monetize those assets.**
6    Q.  So that would include as we already discussed, Coleman
7        Young Airport, that would include the tunnel, it would
8        include Belle Isle, it would include the parking
9        garages, it would include the DIA and the art, and it
10       would include other real estate?
11   **A.  The land.**
12   Q.  The land?
13   **A.  Correct.**
14   Q.  Are there any other assets that you think that are
15       included at this point?
16   **A.  No.**
17   Q.  I believe yesterday you testified about some of the
18       experiences that Miller Buckfire has in representing
19       distressed municipalities and your own, as well.  In
20       your prior experience either individually or as a --
21       as an officer of Miller Buckfire, are you aware of
22       other scenarios where the distressed municipalities
23       have sold off assets to satisfy the claims of
24       creditors?
25   **A.  I'm not.**

KENNETH BUCKFIRE, VOLUME 2

Q. Do you know if in its history the City of Detroit has
-- has done that?

A. Yes.

Q. And what are you thinking of, at this point?

A. The tunnel.

Q. And that was a deal that was done before you got
involved in this analysis here?

A. That's correct.

Q. You may have already testified about this and if you
have, we'll step through it quickly. On page 5 of
your opinion, in fact I know we've done this, you
addressed the issue and working with my colleague down
there as well of the ability to access capital markets
which was part of your opinion A yesterday?

A. Yes.

Q. And in your testimony yesterday in terms of the access
to capital markets, did you have any differing
opinions in connection with the access to capital
markets' analysis as it would have related to say for
example class 9 COPs holders type creditors as opposed
to DWSD?

A. You mean insofar as the COPs are an indirect claim as
a general fund as opposed to a claim of a revenue
based department?

KENNETH BUCKFIRE, VOLUME 2

Q. I actually don't see the distinction at all but that's
why I'm asking your testimony yesterday about the
access to capital markets doesn't -- when you analyze
it in connection than it did when you analyze with it
the DWSD, I'm not going to go through those questions
again if you does you think there's a distinction
we'll go through those questions again?

A. Only that the City -- ability of the City will be able
to access the capital markets upon emergence and later
but its capital -- their yield at which it will have
to pay for capital will, I believe, be higher than
what DWSD will have to pay because DWSD has the
ability to access the revenue bond market, and the
City will have to access a different marketplace. And
I believe that's the only difference.
        But their ability to attract capital will
not be questioned.

Q. Okay. So Mr. Hackney may have some more questions on
that issue later.
        So now I'm going to ask you some questions
that may seem familiar, but I'm going to ask them
under the context of a plan rather -- rather than your
opinion that we have sort of been going through in
your expert opinion.

KENNETH BUCKFIRE, VOLUME 2

        Under the plan, recovery on account of the
new B notes represent a zero to 10 percent for -- for
class 9 -- well, actually, for anybody who's under
that same line for the B notes, correct?

A. Correct.

Q. And that's based on the City's own projections,
correct?

A. Correct.

Q. And this includes the holders of the COPs claims,
correct?

A. That's right.

Q. And I think we've discussed this already, other than
what you've testified to up to now, if the recipients
of the new B notes are only recovering zero to 10
percent, why wouldn't they be better off outside of
the bankruptcy and where they would be treated equally
with the other unsecured creditors?

A. Well, I'm not sure I understood. First of all, class
9 is only COPs claims, there are no other claims in
class 9.

Q. Okay, I shouldn't say class 9.

A. And second of all, we're talking about the recovery to
the class, not the trading value or value of the B
note, which is what the City's going to issue to many

KENNETH BUCKFIRE, VOLUME 2

of its unsecured creditors pursuant to the plan.

Q. And explain to me if you can the distinction that you
just made, the value of the B note versus the
recovery.

A. Well, the value of the B note is what it represents as
the recovery to the class 9 class plus other classes
that are receiving as unsecured creditors their share
of that note. The note, in effect, is the value being
received in consideration of the claims.

Q. And you perceive that that note will be valued at a
greater than zero to 10 percent recovery?

A. Well, the zero to 10 percent recovery is what
percentage of the claim is represented by your
allocation of the B note. It has nothing to do with
the value of the B note.

Q. Right. So if you monetize the zero to 10 percent
based on what percentage of the claim that it
represents, do you believe the B note in its value is
greater than what you would get if you didn't do the
math?

A. I'm sorry?

Q. In other words, if you put a monetary number on zero
to 10 percent of whatever the allowable claims are and
you calculated that, is that somehow different than

KENNETH BUCKFIRE, VOLUME 2

1  the value of the B note, you're saying?
2
3  **A. The B note is the asset. The claim is the liability.**
4  Q. Right.
5  **A. It's their ratio.**
6  Q. Right, but the claim is a claim that is based on -- so
7     you have a claim that's based on a certain sum. You
8     take a percent of recovery, and you determine look, I
9     think you're only looking at zero to 10 percent of
10    that claim.
11 **A. Mm-hmm.**
12 Q. You can even adjust it further by saying I think that
13    that claim is only allowable to a certain percent, so
14    you come to a number, right?
15 **A. Mm-hmm.**
16 Q. That number, that's a value that someone might assess
17    that's the value of your claim. Is it your testimony
18    that the B notes are going to be worth something more
19    than the value of that claim as we've just -- in its
20    calculation?
21 **A. Okay. The claim that the class 9 has pursuant to the**
22    **plan is potentially $1.473 billion. That's the claim.**
23    **I've already testified that our plan presumes to only**
24    **allow a certain portion of that, and therefore, when**
25    **you work through all the calculations, the class 9**

KENNETH BUCKFIRE, VOLUME 2

1
2  **holder would receive for 1.473 billion $162 million**
3  **par amount of B notes; that's what they get.**
4  Q. You've answered my question. Well, let's turn back to
5     our expert report then. And that was 4. Would you
6     also refer -- you offer an opinion that the discount
7     rate used to estimate recoveries for classes 7, 9, 12,
8     13, and 14, is reasonable and appropriate. Are you
9     correct?
10 **A. Yes.**
11 Q. Okay. What is that discount?
12 **A. The discount rate that we determined would be**
13    **appropriate to estimate recoveries based on our**
14    **inspection of the publicly -- public market for the**
15    **municipal debt, both revenue and general obligation,**
16    **and determined that a 5 percent discount rate, which**
17    **is also roughly consistent with the cost of capital**
18    **paid historically by the City of Detroit for many**
19    **years, would be a good rate to use because it's in the**
20    **range of reasonableness in the situation of this kind,**
21    **which I will stipulate is unique and there are,**
22    **therefore, no comparables to look at that would give**
23    **us any guidance, but this rate, because it is actually**
24    **generous to our creditors to the point of view of**
25    **calculating cost of capital seems appropriate.**

KENNETH BUCKFIRE, VOLUME 2

1
2  Q. You say it's generous to creditors from the point of
3     view of calculating the cost of capital. Why?
4  **A. Because it's not too low a rate. If they've got a**
5     **lower coupon, the market might view that low coupon,**
6     **no matter how creditworthy, as requiring that the note**
7     **itself would create a discount to adjust to a proper**
8     **market yield. So we've used 5 percent to use for**
9     **purposes of plan calculation.**
10 Q. Is there any other reason why 5 percent was selected
11    other than what you just testified about?
12 **A. Nope.**
13 Q. And what risks does that 5 percent discount rate
14    represent again?
15 **A. Well, it represents in general time value of money**
16    **risk. That's the most important factor. The cities**
17    **are, by definition, long term and long duration**
18    **borrowers. The longer you borrow, the higher the**
19    **discount rate has to be. This does take that into**
20    **account.**
21    **Secondly, the City will be post emergence**
22    **in a very stable financial condition, albeit, will**
23    **have ten years in which to implement its**
24    **rehabilitation program. There, obviously, will be a**
25    **question in the market's mind about whether or not the**

KENNETH BUCKFIRE, VOLUME 2

1
2  **City will achieve the expected results of**
3  **rehabilitation, and, therefore, the discount rate**
4  **would be more reflective of what I would consider a**
5  **weaker municipal credit than one that has already**
6  **proven that is a healthy, growing city. Those kinds**
7  **of cities can borrow at much lower interest rates than**
8  **Detroit will probably be able to do for some time, but**
9  **it will not be a distressed credit because by**
10 **definition, we will have solved the solvency issues,**
11 **we will have given the City adequate liquidity with**
12 **which to implement its plan, and most importantly,**
13 **there will be no requirement in the City's plan to go**
14 **back to the capital markets for at least ten years for**
15 **any purpose which is unusual. Most cities are in the**
16 **market every year to either borrow to take care of**
17 **debt retirement systems or to fund new projects. The**
18 **City's plan does not require to do either. That**
19 **actually reduces the risk that our creditors,**
20 **particularly those that are receiving B notes, will**
21 **face.**
22 Q. In coming to the conclusion that the 5 percent
23    discounted rate was accurate based on the analysis
24    that you just testified about, did you speak with any
25    economists regarding that conclusion, regarding your

KENNETH BUCKFIRE, VOLUME 2

2  analysis?

3  **A. Economists? About interest rates?**

4  Q. Or about your analysis on the 5 percent discount rate.

5  **A. No, no economists.**

6  Q. And what about besides the people that you already

7     have within -- well, yeah, besides people you already

8     have within Miller Buckfire, did you speak with any --

9     any other finance professionals to see if oh, yeah, we

10    agree with you, that's probably the way we would go?

11 **A. Only in the -- with the general understanding of if**

12 **you had to compare Detroit post emergence to other**

13 **cities, how would you do it? I mean are these factors**

14 **which I've just testified to relevant to coming up**

15 **with the appropriate discount rate or not, and you**

16 **know, many of the market participants we spoke with**

17 **did highlight the fact that not having to go back to**

18 **the markets for ten years, actually, in their view,**

19 **was an improvement to the credit story, not a**

20 **negative.**

21 Q. Other than the terms that you've just testified about

22    including the ones you just mentioned just now, were

23    there any other terms that you considered in your

24    opinion that the 5 percent is an appropriate discount

25    rate?

KENNETH BUCKFIRE, VOLUME 2

2  **A. No.**

3  Q. Did you take into account the terms of the new B notes

4     other than, for example, this agreement that you

5     wouldn't be seeking, you know, additional, I guess,

6     additional bonds within ten years?

7  **A. I'm not sure I understand your question.**

8  Q. So the B notes you mentioned to me earlier are -- have

9     terms to them, right?

10 **A. That's correct.**

11 Q. Okay. Is one of the terms that an agreement that it

12    wouldn't seek additional financing for an additional

13    ten years other than the initial financing? I think

14    you just testified --

15 **A. That's not a term, that's simply an assumption that**

16 **the plan is based on.**

17 Q. So that's an assumption you made, it's not a promise

18    that anybody can hold the City to?

19 **A. There is no requirement in the pro forma balance sheet**

20 **of the City for it to go out and borrow new money for**

21 **the first ten years of the plan. There's no**

22 **stipulation, there's no covenant prohibiting the City**

23 **from doing so, but it is not required by any debt**

24 **maturities that would come due within that period of**

25 **time.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. And you took -- but you took that as a factor in your

3     analysis of why you thought 5 percent was the right

4     discount rate?

5  **A. Yes.**

6  Q. Any other factors or terms that you took into account?

7  **A. Obviously, we took into account the pro forma balance**

8  **sheet of the City, which is laid out in my expert**

9  **report.**

10 Q. Anything else?

11 **A. We were -- obviously, I was focused on revenue**

12 **stability as a risk factor. I think you can tell the**

13 **City determined that it, in fact, has the ability to**

14 **support growth and tax revenues. There is no risk**

15 **than other cities may face. And that's why we felt**

16 **that if we had to use a 5 percent discount rate, which**

17 **is, as I testified to, higher than a single A rated**

18 **municipality would have to pay, that wouldn't be an**

19 **appropriate rate based on the risks of revenues that**

20 **we see.**

21 Q. Based on your testimony just now, do you assume that

22    in exiting the chapter proceedings that Detroit will

23    be a single A rated municipality?

24 **A. No.**

25 Q. Why do you assume it won't be?

KENNETH BUCKFIRE, VOLUME 2

2  **A. I don't think they deserve it.**

3  Q. Say it again.

4  **A. I don't think Detroit will deserve a single A rating**

5  **as a general obligation bond holder until it has**

6  **proven that it can operate in a financially**

7  **responsible way that the tax base is improving and**

8  **that the general economic conditions of the area are**

9  **also improving.**

10    VIDEO TECHNICIAN: Five minutes left.

11    MR. SOTO: Why don't we go ahead and switch

12 it now?

13    VIDEO TECHNICIAN: The time is 1:59 p.m. We

14 are now off the record.

15    (Recess taken at 1:59 p.m.)

16    (Back on the record at 2:11 p.m.)

17    VIDEO TECHNICIAN: We are back on the

18 record, the time is 2:11 p.m.

19 BY MR. SOTO:

20 Q. Mr. Buckfire, thanks. As I mentioned off the record,

21    I think we have maybe ten more minutes of questions,

22    two areas that I -- well, one area that I don't

23    understand, and I want to get through and then another

24    question that just hit me as I was thinking about your

25    testimony earlier, so is it part of your opinion that

Pages 209 to 212

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6826  Filed 08/18/14  Entered 08/18/14 15:57:22  Page 88 of 364

KENNETH BUCKFIRE, VOLUME 2

1  the City will be able to access capital markets and
2  you opine, and I quote, that the City's revitalization
3  plan will also contribute to its ability to access
4  capital markets going forward; do you recall that
5  opinion?
6  A.  I do.
7  Q.  And what is the basis of that opinion there?
8  A.  Well, the City's ability to reinvest in public
9  services, particularly, safety services, should
10  contribute to making the city a safer and more
11  desirable place in which to live.  That should lead to
12  the maintenance for improvement in tax revenues,
13  particularly property and income tax revenues,
14  therefore, the investment in the City should lead over
15  time directly to an increase or stabilization of City
16  revenues.
17  Q.  And that analysis that you just laid out for me as the
18  basis for your opinion, did you do any deeper dive
19  analysis in terms of the ability of the City to access
20  markets other than what you've already -- in terms of
21  the improvement in tax revenues antic property and
22  income tax revenues?
23  A.  Well, that's all as laid out in page 9, paragraph 14,
24  what I considered.  When I -- when this refers to cash

KENNETH BUCKFIRE, VOLUME 2

1  flexibility, it's in there about three times, what do
2  you mean by that?
3  A.  By that, I mean and this was a statement that would
4  lead to any other similarly situated large institution
5  the more control you have over individual budget items
6  the more ability you have to honor contractual
7  commitments that you cannot change based on the
8  short-term, I'm referring here to the fact that else's
9  clear that any City, any corporation must allow for
10  cyclicality because the world is an uncertain place.
11  Cyclicality can cover in two forms, either it's
12  cyclical or it can be long term secular.  One could
13  argue the risks facing the City going forward are
14  cyclical because the City's ability to operate will
15  necessarily be affected by National, State, and local
16  economic decisions which might cause a short-term
17  decline in tax revenues, which you don't have much
18  money, what do you do when you're managing the City
19  and you have certain projects and certain contractual
20  obligations you have to maintain in order to promote
21  long-term revitalization?  The ability of the City to
22  look at it's new budget and not be bound to honor
23  automatic requirements, particularly under pension and
24  healthcare contracts, is a big benefit to the plan

KENNETH BUCKFIRE, VOLUME 2

1  flow projections, I'm referring to the City's cash
2  flow projections which include revenues which is the
3  beginning of that and netting out expenses which
4  include the reinvestment program, all those things are
5  considered.
6  Q.  Looking at the page 4 of your opinion where you say
7  you believe that the City's revitalization plan will
8  also contribute to its ability to access capital
9  markets going forward, the revitalization efforts are
10  assumed to attract new tax base in the city, in
11  addition to the City's revitalization efforts are
12  relatively flexible because of the timing because of
13  the flexible nature of much of the revitalization
14  efforts, the City has increased control of its
15  financial future and has flexibility to meet its
16  reduced debt service obligations going forward.
17      Do you see where I'm reading that?
18  A.  I do.
19  Q.  You still agree with those statements which are your
20  opinion, correct?
21  A.  I do.
22  Q.  And it's that, as to that, was there any specific
23  analysis you did?  For example, you continued to use
24  the word in this opinion flexible, flexible,

KENNETH BUCKFIRE, VOLUME 2

1  going forward.  It's a benefit to all our creditors
2  postemergence, and it's a benefit for the City to
3  obtain postfinancing.
4  Q.  And if I understand you correctly, in that access,
5  what you're saying as the City deals with issues right
6  now, it has specific deadlines on which it has
7  obligations, correct?
8  A.  Correct.
9  Q.  And under the plan of adjustment, there will also be
10  specific deadlines under which it will have certain
11  requirements, correct?
12  A.  Well, we'll have several contractual obligations post
13  emergence.  We'll have to honor, for example, series B
14  notes, its obligations under the pension program, its
15  obligation under the new healthcare programs, those
16  are new contractual obligations the City has to make
17  every effort to honor.  At the same time, it has to
18  manage its reinvestment program and revitalization
19  program.
20      So to be specific about it, again, this is
21  just my opinion.  If there was another recession,
22  which perhaps in our lifetime there will be one, and
23  it turned out the City's revenues declined by $50
24  million, but it's a short-term issue.  The City

KENNETH BUCKFIRE, VOLUME 2

1  logically should look at its revitalization programs
2  and decide which ones are so high priority it cannot
3  defer or delay that money and which ones can be
4  delayed for a year or six months or whatever it has to
5  be, that's the kind of flexibility I'm talking about.
6  Q.  Okay, I got it so you're not talking about flexibility
7  that means somehow after the plan you don't have to
8  live up to contracts you have to live up to contracts
9  before the plan and after the plan, correct?
10  A.  Correct.
11  Q.  You're talking about well, if it sets forth a series
12  of revitalization efforts, some would be prioritized
13  earlier than others, that's the flexibility you're
14  talking about?
15  A.  That's correct.
16  Q.  Now, in connection with revitalization, has any
17  analysis been done that does prioritize proposed
18  revitalization efforts?
19  A.  You mean a downside scenario?
20  Q.  No, I'm not even talking about a downside scenario,
21  I'm talking about specific priorities set forth in the
22  plan for certain revitalization efforts. Have they
23  been prioritized in a way that you just testified,
24  some that would be maybe we could, you know, delay

KENNETH BUCKFIRE, VOLUME 2

1  those.
2  A.  Well, not specifically the emergency manager has said
3  numerous times that restoration of public safety is
4  the number one priority of the restructuring process,
5  and I assume it will be the number one priority of
6  the City going forward.
7  Q.  So that's a revitalization effort that is pretty firm
8  it's got to --
9  A.  As part of our overall program, I would stipulate that
10  it's collecting what the public actors have said here
11  that should be the number one priority, whether it
12  turns out to be is not my judgment call.
13  Q.  And if it -- if it doesn't turn out to be does it
14  impact the viability of the plan post emergence?
15  A.  Yes, but we have built in strong institutional
16  protections to make sure the City stays on the track
17  that we have begun here, namely, the oversight
18  commission that was established by legislation, I
19  believe, the end of June.
20  Q.  And Mr. Hackney is going to address some of those
21  issues, so I'll move on from that. I took care of
22  that. I -- just one sort of question that was left on
23  my DIA plate. So when you had approached Christie's
24  and told them you wanted them to do an analysis of

KENNETH BUCKFIRE, VOLUME 2

1  subset of art, so to speak, correct?
2  A.  Correct.
3  Q.  Who did you go to to determine what was the City owned
4  art versus what was not the City owned art?
5  A.  Well, first of all, the published catalogs of the
6  collection often indicate source of the art, who will
7  pay for it, so it's actually fairly easy even as a
8  layperson to look at the catalogs because they always
9  stipulate whether it's a gift or paid for by the City
10  or paid for by donors.
11  Q.  So did Christie's make that determination
12  independently on its own or did --
13  A.  No they actually asked the DIA itself it had to
14  identify works that are paid for in whole or in part
15  by the City.
16  Q.  And the DIA was the same DIA that had called the
17  governor and didn't want to have anything to do with
18  this plan, correct?
19  A.  They did cooperate in the end.
20  Q.  Do you know if they were the ones who identified what
21  they thought was City owned and not City owned?
22  A.  I already testified that, I believe that Christie's
23  asked them to identify it.
24  Q.  And they did it?

KENNETH BUCKFIRE, VOLUME 2

1  A.  And they did it.
2       MR. SOTO:  Okay, I have no other questions
3  at this time, and I appreciate your patience with me.
4  Thank you.
5       THE WITNESS:  You're welcome.
6            EXAMINATION
7  BY MR. HACKNEY:
8  Q.  Mr. Buckfire, good afternoon, it's nice to see you
9  again.
10  A.  Nice to see you.
11  Q.  I have to tell you at the outset I have a hell of an
12  ear infection going on in my right ear, and I cannot
13  hear out of it, and so I'm doing the best I can, but
14  I'm struggling a little bit to hear. So if I ask you
15  a question five times in a row, it might be not only
16  because I didn't hear your answer, because I didn't
17  even hear my own question. I actually learned before
18  this deposition that Mr. Soto can't hear out of his
19  right ear just as a matter of course, anyway, but he's
20  used to it and I'm not so...
21       MR. SOTO:  That's why I always put my
22  special friends to my right.
23  BY MR. HACKNEY:
24  Q.  So it means you and I can say whatever we want about

Pages 217 to 220

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 90 of 364

KENNETH BUCKFIRE, VOLUME 2

1    KENNETH BUCKFIRE, VOLUME 2
2    Soto here.
3         I want to go back to some testimony that
4    you gave with Mr. Soto that was on the subject of
5    advice that you rendered about the recoveries of
6    classes 10, 11, and 12, vis-a-vis other general
7    unsecured creditors like COPs holders; do you remember
8    discussing that with him?
9    A.  I do, but can you be more specific?
10   Q.  Yeah, let me -- I'm going to ask you what I understood
11   you to say so you should listen carefully to whether I
12   get this right.
13   A.  Okay.
14   Q.  I heard you say that -- number one that you provided
15   advice to the EM on what different recoveries could be
16   amongst different classes; is that correct?
17   A.  Yes.
18   Q.  I --
19        (Electronic phone announcement:  Has joined
20        the conference.)
21   BY MR. HACKNEY:
22   Q.  I also heard you say that in deciding what recoveries
23   were appropriate for classes 10 and 11, which are the
24   pension classes, that you considered the fact that
25   many of the members of those classes were also members

1    KENNETH BUCKFIRE, VOLUME 2
2    of class 12, which is the OPEB class, and that you
3    considered all three classes together in evaluating
4    their total recovery: is that correct?
5    A.  Yes.
6    Q.  And that was advice that you gave to the EM that he
7    accepted, correct?
8    A.  I'm not sure whether he accepted it or not, but it was
9    my financial observation that the people who held the
10   pension claims were often the same people who held the
11   healthcare claims, so they would value money coming
12   from the City more or less in the same pot.
13   Q.  Okay, so your testimony is that as one of the people
14   that was playing an advisory role with respect to the
15   POA, this was how you looked at the appropriate
16   recoveries for classes 10, 11, and 12, correct?
17   A.  That's one of way of looking at it, yes.
18   Q.  And did you give the EM your advice on that subject?
19   A.  I did.
20   Q.  Do you -- do you know whether he accepted your advice?
21   A.  I believe it was one of the factors he took into
22   account in ultimately approving the plan.
23   Q.  Did you undertake an effort to determine the amount of
24   overlap between classes 10 and 12 on the one hand or
25   classes 11 and 12 on the other hand?

1    KENNETH BUCKFIRE, VOLUME 2
2    A.  That was not an analysis done by Miller Buckfire.
3    Q.  Do you believe that one of the other professionals did
4    that?
5    A.  I know we looked at this issue many months ago.  It's
6    an obvious question to address particularly between
7    actives and retirees, and if anybody did it it would
8    have been Ernst & Young.
9    Q.  You're saying if anyone did.  I take it from your
10   answer that you have never seen such an analysis,
11   correct?
12   A.  No, not on an individual basis, which is what I think
13   you're getting to.
14   Q.  Right.  So you have never seen on -- an individual
15   analysis of what individuals have claims in both
16   classes 10 and 12 or 11 and 12, correct?
17   A.  Correct, I've never seen it.
18   Q.  Have you ever seen it on a broader basis like
19   approximately 32 percent of class 10 members are also
20   in class 12, have you seen that type of analysis?
21   A.  No.
22   Q.  Were you aware of this concept of looking at these
23   three types of class in advance of the June 2013
24   proposal to creditors?
25   A.  Yes.

1    KENNETH BUCKFIRE, VOLUME 2
2    Q.  And you were obviously aware of it -- okay, strike
3    that.
4         I wanted to ask you, I saw yesterday that
5    you said that you have -- you have not authored any
6    publications in the last ten years, you testified to
7    that fact I think with counsel for the DWSD parties.
8    I read that quickly today; is that correct?
9    A.  To the best of my knowledge that's correct.
10   Q.  I was a little surprised by that, you're a fairly
11   well-known player in the field and I thought you
12   haven't written any op. ed. pieces, Wall Street
13   Journal, New York Times, TMA, any of those things
14   where you've written an article for any of those?
15   A.  That's correct.
16   Q.  Well, you got to do more writing then, I think.
17   A.  I try to keep a very low profile.
18   Q.  Well, you're not doing a good job of that in this
19   case.  Now, I wanted to ask you about your testimony
20   in -- as an expert in deposition or at trial in the
21   last four years.  Have you given any expert testimony
22   in a deposition or at trial in the last four years
23   other than in the Calpine, GGP, Dow Chemical, and City
24   of Detroit cases?
25   A.  Well, Calpine was 2008, so that's not the last four

Pages 221 to 224

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 91 of 364

KENNETH BUCKFIRE, VOLUME 2

2 years.
3 Q. That's even outside the four years?
4 **A. That's right.**
5 Q. Okay.
6 **A. I'd have to go back and refresh my recollection of**
7 **where my testimony was proffered because many of the**
8 **matters that we were involved with in the last four**
9 **years ultimately were fully consensual, did not**
10 **require my testimony or even my deposition.**
11 Q. Or even your deposition?
12 **A. So I have to go back and check, but I did proffer**
13 **testimony in a number of cases as an expert from an**
14 **evaluation perspective.**
15 Q. So you might have submitted an affidavit or something
16 in support for a financing motion or something like
17 that in cases other than GGP, Dow Chemical, and City
18 of Detroit?
19 **A. Correct.**
20 Q. Is Dow Chemical within the last four years?
21 **A. Let me think now, it might have been 2009.**
22 Q. Was that a litigation or a bankruptcy?
23 **A. I was in front of Delaware Chancery Court.**
24 Q. Oh.
25 **A. That was when Rohm & Haas --**

KENNETH BUCKFIRE, VOLUME 2

2 Q. Oh, yeah.
3 **A. -- was -- you remember that one now?**
4 Q. Yeah, I do. I wasn't on that, but other guys were.
5 **A. Yes, I know.**
6 Q. Okay, so I did want to make sure that I got kind of a
7 complete list of any depositions or trial testimony as
8 an expert in the last four years, so going back to
9 2010.
10 **A. There certainly are other examples besides the ones**
11 **we've already talked about, but I have to go back and**
12 **find out because the ones where I'm just proffered I**
13 **don't usually have them on the top of my mind.**
14 Q. Fair enough. Now, you understand that you've been
15 retained by the City to provide expert testimony in
16 this case?
17 **A. Yes.**
18 Q. And your opinions and the bases for your opinions are
19 contained in the report that has been marked I think
20 as Exhibit 4; is that correct?
21 **A. That's right.**
22 Q. And as you sit here today, I know that things can
23 change and they may very well change, but as you sit
24 here today you do not intend to offer any expert
25 opinion testimony outside of the opinions disclosed in

KENNETH BUCKFIRE, VOLUME 2

2 your report; is that correct?
3 MR. CULLEN: Can you qualify, do you mean
4 additional opinions?
5 MR. HACKNEY: Yeah, let's -- yeah, so I
6 said any expert opinion testimony outside of the
7 opinions disclosed in this report.
8 MR. CULLEN: Yeah, I said opinions because
9 obviously the report is not -- his direct testimony
10 will not be, I'm going to sit you down, Mr. Buckfire,
11 and I'm going to have you read through this piece of
12 paper. There will be additional detail, there will be
13 other things in that, but we don't anticipate any new
14 opinions.
15 BY MR. HACKNEY:
16 Q. Okay, so you don't anticipate any other top line
17 opinion testimony other than in this report?
18 MR. CULLEN: Right.
19 BY MR. HACKNEY:
20 Q. Is that correct?
21 **A. Yes.**
22 Q. And you have disclosed the bases for your opinion
23 testimony in the conclusions you've drawn in this
24 report, correct?
25 **A. Correct.**

KENNETH BUCKFIRE, VOLUME 2

2 Q. And you've also disclosed in this report all of the
3 data and facts that you considered in reaching your
4 opinions, correct?
5 **A. Yes, when -- especially when you take into account**
6 **attachment 1 and some of the modifications to that**
7 **since yesterday. Remember there's a list of exhibits**
8 **that I relied on?**
9 Q. Yeah, and you're talking about the e-mail that I got
10 from Ms. Nelson that had an additional number of
11 exhibits that should have been included in attachment
12 one?
13 MR. CULLEN: Precisely.
14 **A. Yes.**
15 BY MR. HACKNEY:
16 Q. Just real quickly, I reviewed those quickly last night
17 when I got them and from my vantage point they look
18 like they all related to DWSD, the postpetition
19 financing, and then maybe a little of the current exit
20 financing. Did I miss any? I guess we'd have to look
21 at them all but --
22 **A. No, I think that's right.**
23 Q. Okay. I take it the expert testimony services that
24 you're rendering here today are covered by the
25 retention agreement between Miller Buckfire and the

KENNETH BUCKFIRE, VOLUME 2

1
2 City?
3 **A. Yes.**
4 Q. And so the compensation you're being paid for these
5 services is part of the larger compensation you're
6 going to receive for your services in this case?
7 **A. Well, our -- our fee is our fee, it covers all**
8 **services provided at the request of the emergency**
9 **manager.**
10 Q. Okay. Are you able to attribute a portion of the fee
11 to the work you're doing as an expert?
12 **A. No, because everything I've done as an expert has been**
13 **integral with our overall representation of the City**
14 **since last January.**
15 Q. Okay.
16 **A. And I don't think you can separate out any of that**
17 **work from the rendering of this expert report.**
18 Q. The Miller Buckfire fee was the subject of some
19 discussions, let me see if I can sum it up and we can
20 move past it, but it could be as large as 28 million
21 all in considering amounts that you've already been
22 paid: is that right?
23 **A. No. The -- the fee is $28 million, that's it.**
24 **Whatever we've received up to date or to the end of**
25 **the case will be applied against that, so the final**

KENNETH BUCKFIRE, VOLUME 2

1
2 **payment to us will be the difference between all**
3 **payments received and $28 million.**
4 Q. That's what I was trying to say, I may not have said
5 it well, which is the most you can get is 28 million,
6 correct?
7 **A. Correct.**
8 Q. The 28 million is not incremental to amounts you've
9 already been paid?
10 **A. Correct.**
11 Q. Amounts you've already been paid will be deducted from
12 the 28 million?
13 **A. Correct.**
14 Q. And whether you get the 28 million or not is
15 contingent on whether there is a restructuring of the
16 City's -- of the City's securities in part; is that
17 correct?
18 **A. It's contingent upon the confirmation of the City's**
19 **plan of adjustment, which would assume restructuring**
20 **of the City's liabilities.**
21 Q. Better said. And if the City's petition is dismissed,
22 do you know whether or not you will be paid your fee?
23 **A. I assume I will not be paid my fee, our fee.**
24 Q. Now, you talked with Mr. Soto about your opinion that
25 creditors are doing better under the plan than they

KENNETH BUCKFIRE, VOLUME 2

1
2 would in a dismissal scenario; do you remember that
3 testimony?
4 **A. I do.**
5 Q. One of the things that you talked about evaluating was
6 the claims of COP holders; do you recall that
7 testimony?
8 **A. I do.**
9 Q. Did you ever evaluate the recoveries that the service
10 corporations would obtain in a dismissal scenario?
11 **A. Well, I discussed it with your colleagues. I mean, to**
12 **some extent it's a gray area for me because in**
13 **understanding those claims I had to consult with Jones**
14 **Day, so I'm not sure I did any independent evaluation**
15 **aside from a financial one regarding the status of the**
16 **service corporations.**
17 Q. It would be my expectation that once you offer an
18 opinion on this that most of the communications you
19 had with Jones Day that go into this opinion become
20 discoverable?
21        MR. CULLEN: That might be, you'll have to
22 file a paper to get there, though.
23        MR. HACKNEY: Okay, so you're going to
24 assert the privilege today?
25        MR. CULLEN: Absolutely.

KENNETH BUCKFIRE, VOLUME 2

1
2 BY MR. HACKNEY:
3 Q. Okay, so let's make sure that I have it right, which
4 is you believe you considered whether the service
5 corporations might have claims against the City?
6 **A. No, I didn't consider that.**
7 Q. You did not consider that?
8 **A. No, I considered the fact that the service**
9 **corporations relied upon a contract with the City by**
10 **which the City would provide cash flow to the service**
11 **corporations and the service corporations would**
12 **utilize that cash flow as the -- the collateral**
13 **against which to borrow. Which is how the COPs came**
14 **into existence.**
15 Q. Right.
16 **A. So from my perspective I was only interested in the**
17 **service corporations as where the unsecured claim that**
18 **would be pari passu with other City unsecured claims**
19 **would reside.**
20 Q. Okay, so maybe I can speed this up then which is it's
21 my understanding you did not evaluate what the service
22 corporations' recovery would be in a dismissal
23 scenario, correct?
24 **A. That's correct.**
25 Q. Now, you are aware that the service corporations'

KENNETH BUCKFIRE, VOLUME 2

1      KENNETH BUCKFIRE, VOLUME 2
2    claims against the City are pursuant to the service
3    contracts, correct?
4 **A. I am.**
5 Q.   And do you understand that those are direct claims
6    against the City?
7 **A. I do.**
8 Q.   Do you remember that there was conversation with
9    Mr. Soto about the fact that there is $162 million in
10    B notes, face value B notes going to the -- the class
11    9?
12 **A. I do.**
13 Q.   Is that the total amount that's going into the reserve
14    established for class 9 or is that the present value
15    of the total face value?   Because in my mind there is
16    -- something's not adding up there and so I want to
17    try and understand it.
18 **A. Well, when you say it's not adding up, what is it not**
19    **adding up to?**
20 Q.   So I thought that the way it worked was that a reserve
21    was set up --
22 **A. Mm-hmm.**
23 Q.   -- and that the reserve was on a nominal basis without
24    present valuing 15 percent of the total amount of COPs
25    in B notes, meaning approximately $210 million in B

KENNETH BUCKFIRE, VOLUME 2

1      KENNETH BUCKFIRE, VOLUME 2
2    notes -- and by the way, I could have this all wrong,
3    210 million in B notes go into the reserve in the
4    event the COPs all try to litigate their rights and
5    are all vindicated, they would actually get 15 cents
6    in nominal face value B notes, that the 40 percent
7    discounted face value is only applied to a settling
8    COP holder who decided not to take the risk of
9    litigation and said I would like what I can get today.
10    That's my understanding, whether it's right or not is
11    up to you to decide, but what I'm trying to understand
12    is what is that $162 million figure from your
13    attachment 1 or whatever that one is?
14 **A. That's our calculation of the share that the COPs**
15    **would have, the total amount of B notes the City is**
16    **going to issue pursuant to the plan, so again if you**
17    **look at attachment 1, and albeit this is a summary of**
18    **information contained in greater detail in the plan**
19    **itself, the City is going to be issuing approximately**
20    **$650 million of series B notes, present value.**
21 Q.   632 maybe?
22 **A. Well, you have -- yeah, because you have to deduct the**
23    **exit financing from the billion 249, you have to deduct**
24    **the UTGO bonds and the LTGO DSA series. That leaves**
25    **you with, you know, 632, 650.**

KENNETH BUCKFIRE, VOLUME 2

1      KENNETH BUCKFIRE, VOLUME 2
2 Q.   So is it your understanding that the reserve -- the
3    total amount of reserve on a nominal basis is 162
4    million in B notes?
5 **A. I'd have to go back and check the math against that.**
6    **That's my general recollection. But I have to go back**
7    **and verify it.**
8 Q.   Okay.
9 **A. I haven't looked at that in a while.**
10 Q.   Let me turn it around on you a bit and say do you know
11    whether -- take a look there at the pro forma
12    obligation, are any of those other numbers standing
13    out to you as ones that are present valued or
14    represent nominal amounts?   Like look at the OPEB
15    UAAL, is the 450 million -- do you remember, isn't
16    that 450 in face B notes?
17 **A. Yes.**
18 Q.   Okay, does that lead you to believe that the other
19    numbers you've represented on the pro forma are face
20    value B notes?
21 **A. Hold on a second. I'm just -- you want to know**
22    **whether these are present value numbers or nominal**
23    **numbers --**
24 Q.   Yeah.
25 **A. -- or par amount?**

KENNETH BUCKFIRE, VOLUME 2

1      KENNETH BUCKFIRE, VOLUME 2
2 Q.   Yeah.
3 **A. Oh, okay. These are the par amounts of the notes**
4    **being issued, okay? There's no present value**
5    **calculation of these notes, we have not actually done**
6    **a valuation of the notes from a market point of view**
7    **yet.**
8 Q.   Now, isn't it true that in coming to your opinion that
9    creditors do better under the plan than they would do
10    in a dismissal scenario you did not construct a
11    forecast of the City's revenues and costs in a
12    dismissal scenario, correct?
13 **A. Correct.**
14 Q.   And no one else has either, correct?
15 **A. Correct.**
16 Q.   Now, your opinion that creditors are doing better
17    under the plan than they would in a dismissal scenario
18    is based on in part on the assumption that the City
19    would be unable and it would be impractical for the
20    City to raise taxes without further eroding revenue;
21    is that correct?
22 **A. That's right.**
23 Q.   I quoted that from your report. Sound familiar?
24 **A. It does.**
25 Q.   Has a ring to it. So let me separate unable and

Pages 233 to 236

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 94 of 364

KENNETH BUCKFIRE, VOLUME 2

1  KENNETH BUCKFIRE, VOLUME 2
2  impractical, okay, Mr. Buckfire?  What is the basis
3  for your assumption that the City would be unable to
4  raise taxes in a dismissal scenario?
5  A.  Well, it's -- I'll take it as a fact because it was
6  reported in our June 2013 report that the City was
7  already at the state-allowed maximum property tax
8  millage rates, and therefore, has no further ability
9  to raise the rate for property tax point of view.  I
10  believe the income tax rate, itself, is already quite
11  high relative to neighboring communities, so that gets
12  to the question of both impracticability and
13  inability.
14  Q.  And I'm holding impracticability to one side, I'm
15  talking about inability now.
16  A.  Yes.  There's also the inability, and this is again a
17  fact, that prior to the bankruptcy -- and it's getting
18  better slowly, the City proved -- how should I say
19  this nicely, consistently unable to collect taxes due.
20  Which is a failure of the City administration in
21  executing its responsibilities to collect taxes that
22  have been assessed.  So even if you wanted to raise
23  the rate, you can't make people pay you, and if they
24  aren't going to pay you and you make no effort to
25  collect it's sort of irrelevant what the rate is.

KENNETH BUCKFIRE, VOLUME 2

1  KENNETH BUCKFIRE, VOLUME 2
2  Q.  Now, with respect to the caps that are imposed on the
3  City with respect to income taxes and property taxes,
4  did you evaluate whether or not those caps are
5  applicable to a party who gets a judgment against the
6  City?
7      MR. CULLEN:  Do you have a -- is that a
8  legal question?
9      MR. BALL:  It certainly is kind of a --
10  it's a mixed question of law and analysis that would
11  go -- we're already talking about legal matters when
12  we talk about caps, those are statutes, right, the
13  cap?
14      MR. CULLEN:  Do you have an understanding?
15  BY MR. HACKNEY:
16  Q.  Yeah.
17  A.  I have a general understanding.
18  Q.  What is your general understanding?
19  A.  It's that it's under certain circumstances a creditor might
20  seek a judgment requiring the City to raise taxes.
21  Q.  Okay.
22  A.  But whenever we -- I don't recall discussing this
23  issue, I was quickly reminded that the City already
24  has the highest property tax rates in the State of
25  Michigan and that even if we wanted to raise taxes and

KENNETH BUCKFIRE, VOLUME 2

1  KENNETH BUCKFIRE, VOLUME 2
2  could raise taxes, it would simply drive people out of
3  the City more quickly, so you might end up in a
4  situation that the higher you raise your rates the
5  less revenue you collect.
6  Q.  So if I understand your testimony, what you're saying
7  is if a creditor got a judgment against the City, it
8  might make it so that the City was able to impose
9  taxes above the statutory caps but the heightened tax
10  would not yield additional revenue because it is
11  impractical to raise taxes in any event --
12  A.  Right.
13  Q.  -- is that correct?
14  A.  Correct, otherwise known a Pyrrhic victory.
15  Q.  A Pyrrhic victory or you can't get blood --
16  A.  Blood from a stone, another way of saying it.
17  Q.  It's got to be turnip, I'm sure.  No one would ever
18  think you could get blood out of a stone, I think it's
19  water out of a rock.
20      MR. CULLEN:  Proverbs are various.
21  BY MR. HACKNEY:
22  Q.  Well, we should definitely get them all I think
23  straight, but I take it you did not undertake an
24  analysis of the amount of tax increase that could be
25  imposed via a creditor judgment against the City to

KENNETH BUCKFIRE, VOLUME 2

1  KENNETH BUCKFIRE, VOLUME 2
2  determine whether it would yield additional revenue?
3  A.  Not directly, but we did ask the tax experts at E&Y to
4  do an analysis of the City's revenues and take into
5  account the sensitivity of revenues to tax rates.
6  Q.  So you asked Mr. Klein at E&Y?
7  A.  I did.
8  Q.  And you asked Mr. Klein to study the question of what
9  would additional taxes yield in the way of revenue?
10  A.  Well, not that -- I asked him to identify what the
11  sensitivity of the City's revenues would be to changes
12  in tax rates because the change of tax rates relative
13  to surrounding communities will have an influence on
14  whether or not people want to live here or in
15  Southfield, Michigan or any neighboring suburb.
16  Q.  So you asked him to study the impact a tax increase or
17  a tax decrease would have on the tax base, correct?
18  A.  Correct, I did.
19  Q.  And what did he tell you?
20  A.  You know, I've reviewed his expert report and I've
21  talked to him over months about these issues.  His
22  conclusion was that because the City already has very
23  high tax rates, any further increase in rates would
24  certainly lead to a decline of revenue but that a
25  maintenance of rates was probably sustainable from a

KENNETH BUCKFIRE, VOLUME 2

1
2 revenue point of view, but that a decline of rates
3 would over time have the ability to improve overall
4 collections, but it would take a long time to
5 demonstrate that effect.
6 Q. And did you rely on Mr. Klein's opinion in reaching
7 your own opinion?
8 A. Yes, because his opinion underpins the revenue
9 projections and therefore the cash flow projections of
10 the City's plan.
11 Q. And did Mr. Klein also opine that increasing taxes
12 would not yield marginal revenue?
13 A. He certainly told me that, but again to be very
14 specific we're talking about property tax revenues.
15 Q. Yes.
16 A. Okay.
17 Q. Understood. And did you rely on that information from
18 Mr. Klein in reaching your conclusion about the fact
19 that City's not going to generate additional revenue
20 from raising taxes?
21 A. Yes.
22 Q. Did you take any steps to pressure test Mr. Klein's
23 advice to you that raising taxes would not yield
24 marginal revenue?
25 A. No, I haven't done mathematical economics in a really

KENNETH BUCKFIRE, VOLUME 2

1
2 long time and he is a very well-qualified
3 econometrician and so I relied on him.
4 Q. So with respect to your conclusion that it would be
5 impractical to raise taxes, have you told me
6 everything that you've done with respect to reaching
7 that conclusion?
8 A. Yes.
9 Q. Now, have you reviewed the testimony of Mr. Evanko,
10 the City's senior assessor?
11 A. No.
12 Q. Have you ever spoken to that man?
13 A. I have not.
14 Q. Did you speak to anyone in the treasury department
15 about your -- your findings with respect to the City's
16 -- the impracticality of the City's raising taxes to
17 generate marginal revenue?
18 A. Only in the context of could the state assist the City
19 in collecting income taxes. All right. I had several
20 conversations with former State Treasurer Dillon last
21 year, because it had been a proposal by the City for
22 many years to ask the state to do withholding of City
23 income tax on people who were working in the City but
24 not living in the City.
25 Q. Okay.

KENNETH BUCKFIRE, VOLUME 2

1
2 A. And I asked him specifically what the state could do
3 to assist the City in terms of collecting more
4 efficiently those kinds of income taxes.
5 Q. So other than the notion of collecting more
6 efficiently the taxes you're already assessing or
7 imposing, you did not discuss with the treasury
8 department whether increasing taxes would yield
9 marginal revenue, correct?
10 A. That's correct.
11 Q. Now -- and isn't it fair to say that you, yourself,
12 did not do any forecasting of future revenues in a
13 scenario where the petition was dismissed?
14 A. Correct, we relied on Ernst & Young.
15 Q. And I'll come back to that in just a second. Ernst &
16 Young, they did not do a forecast for the situation
17 where the petition is dismissed, correct?
18 A. That's correct.
19 Q. They did a forecast for the future ahead in the
20 absence of the restructuring, correct?
21 A. They did a forecast assuming the restructuring was
22 successful. Which forecast are you referring to?
23 Q. In the June 2000 --
24 A. Oh, I see.
25 Q. They did the so-called steady state forecast, right?

KENNETH BUCKFIRE, VOLUME 2

1
2 A. Yes, that was a just a roll forward of the City as
3 they see it at that point.
4 Q. As they found it?
5 A. Yeah.
6 Q. And you have never seen from them a forecast of what
7 would happen if the case were dismissed in the next
8 couple months, correct?
9 A. No.
10 Q. Am I correct?
11 A. That's right.
12 Q. Now, is forecasting future revenues of a municipality
13 something that falls within your area of expertise as
14 an expert?
15 A. No.
16 Q. It's not something that you could do if you wanted to?
17 A. I could probably do it, but I'm not an expert. That's
18 why we sought out Ernst & Young to provide that
19 service because Mr. Klein is uniquely qualified to do
20 it.
21 Q. Okay, and did you ever ask Mr. Klein to perform a
22 forecast of the City's performance if the petition
23 were dismissed?
24 A. No.
25 Q. Are you familiar with the Government Finance Officers

Pages 241 to 244

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 96 of 364

KENNETH BUCKFIRE, VOLUME 2

2    Association?
3  **A.  No.**
4    Q.  I take it it's fair to say that you did not consider
5      any of their forecasting techniques to consider City
6      revenues in the case the petition were dismissed?
7  **A.  No, once we brought on Ernst & Young to provide the**
8  **service we relied upon them.**
9    Q.  Okay, and you have not employed any econometric models
10     to determine the future revenues in the City in the
11     event different types of taxes were increased,
12     correct?
13 **A.  Correct.**
14   Q.  You did not conduct any time series analyses to
15     determine future revenues of taxes were increased,
16     correct?
17 **A.  Correct.**
18   Q.  You have not conducted linear multiple regression
19     analysis to evaluate future revenues if taxes were
20     increased, correct?
21 **A.  Correct.**
22   Q.  And nor has anyone else to the best of your knowledge,
23     correct?
24 **A.  That's correct.**
25   Q.  Now, you also say that material increases in taxes

KENNETH BUCKFIRE, VOLUME 2

2      will likely increase delinquency rates and cause
3      residents to leave the City: do you recall that
4      opinion from your report?
5  **A.  I do.**
6    Q.  What do you mean by a material tax increase?
7  **A.  Materiality is always subject to judgment, but it's**
8  **probably something greater than 10 percent.**
9    Q.  Okay.
10 **A.  That would be regarded as material particularly on the**
11 **property tax side.**
12   Q.  Okay.  Did you do any quantitative analysis to
13     determine the impact of a less than 10 percent tax
14     increase on City revenue?
15 **A.  No.**
16   Q.  Do you know what the City's current delinquency rates
17     are for property taxes?
18 **A.  I don't.**
19   Q.  Do you know what they are for income taxes?
20 **A.  No.**
21   Q.  Have you ever studied either of those questions?
22 **A.  I did last year at the time the June 2013 report was**
23 **being produced, but I haven't really looked at that**
24 **issue since then.**
25   Q.  And let me just tell you that I know that it is

KENNETH BUCKFIRE, VOLUME 2

2      described in the report but were you the one that
3      actually conducted the study to determine the answer
4      or did you just -- are you just saying that you saw it
5      in that report?
6  **A.  I say that in the report.  The work was done by Conway**
7  **MacKenzie and Ernst & Young.**
8    Q.  Okay, so you personally have not studied the question?
9  **A.  That's correct.**
10   Q.  And you have never done anything to pressure test
11     Conway MacKenzie's findings, correct?
12 **A.  Correct.**
13   Q.  Now, have you ever quantified how much delinquency
14     rates would increase in different scenarios where
15     taxes are increased?
16 **A.  You're asking me whether I pressure tested this a**
17 **different way.**
18   Q.  Well, the first -- when I was asking about that
19     pressure testing I was saying you never checked to see
20     what they found to be the delinquency rates, whether
21     that was correct?
22 **A.  That's correct.**
23   Q.  Okay, but this is a different question which is, did
24     you ever attempt to quantify how delinquency rates
25     would go up if taxes went up?

KENNETH BUCKFIRE, VOLUME 2

1  **A.  No.**
3    Q.  Are you aware of any data showing that increasing
4      taxes will increase delinquency rates in the City of
5      Detroit?
6  **A.  Only by inspection of the City's historical record as**
7  **tax rates went up, my understanding from City**
8  **officers, including Jack Martin with whom I discussed**
9  **this issue, was the delinquency rate went up, as well**
10   Q.  Ah, so you're -- you're under the impression that
11     there's historical evidence in the City of Detroit
12     that shows a connection between increasing tax rates
13     and increasing delinquency rates?
14 **A.  It was anecdotal at the time he told me that.**
15   Q.  So you were told that by Mr. Martin.  Did you ever
16     attempt to confirm that?
17 **A.  No.**
18   Q.  Do you know whether the incomes tax in the City has
19     gone up or down over the last 15 years?
20 **A.  Are you talking about the rate or the revenues**
21 **collected?**
22   Q.  The rate, sorry.
23 **A.  I don't.**
24   Q.  Do you know whether --
25 **A.  But I'm referring to property taxes.**

Pages 245 to 248

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 97 of 364

KENNETH BUCKFIRE, VOLUME 2

2  Q. So let's not miss each other, so separately you don't
3     know whether income taxes have gone down over the last
4     15 years, correct?
5  **A. I don't.**
6  Q. And you don't know whether there's a historical
7     connection in Detroit between the income tax rate and
8     the delinquency rate, correct?
9  **A. That's correct.**
10  Q. You've never studied that connection?
11  **A. No.**
12  Q. Now, you were saying that your conversation with
13     Mr. Martin was limited to the subject of property tax
14     rates, correct?
15  **A. Correct.**
16  Q. And that what he told you was that property tax rates
17     had increased, and as they had increased,
18     delinquencies had increased, correct?
19  **A. Correct, it was all part of the blight issue because**
20     **as they assess property taxes people would walk away**
21     **from their houses and that would become blighted and**
22     **that would be counted as a delinquent tax issue by the**
23     **City.**
24  Q. Have you attempted to the economic literature for
25     scholarly articles connecting tax rates and

KENNETH BUCKFIRE, VOLUME 2

2  delinquency rates?
3  **A. No.**
4  Q. Have you reviewed data from any other cities with
5     respect to their tax increases and their delinquency
6     rate increases for either income or property taxes?
7  **A. No.**
8  Q. Do you know whether the relationship between
9     increasing taxes of either property or income and the
10     delinquency rates associated with income or property
11     taxes is a linear relationship?
12  **A. I don't.**
13  Q. If property taxes are increased by 10 percent, which
14     is right at the threshold of materiality as you
15     identify it, what will the percentage increase in
16     delinquencies be?
17  **A. I don't know.**
18  Q. Do you believe that increasing the casino tax will
19     increase delinquencies in the City of Detroit?
20  **A. I don't see what the correlation would be.**
21  Q. I take it so that the answer is no?
22  **A. No.**
23  Q. And what about the utility users tax, if the utility
24     users tax goes up will delinquencies go up?
25  **A. I think it would have a minimal impact on that.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. I take it you have not studied the issue of whether
3     increases in either the casino tax or the utility
4     users tax would generate marginal revenue, correct?
5  **A. That's correct.**
6  Q. You also say that one of your assumptions is that an
7     increase in taxes will cause people to leave; is that
8     correct?
9  **A. Yes.**
10  Q. Have you conducted any analysis to determine how many
11     people will leave under different scenarios where
12     taxes are increased?
13  **A. No.**
14  Q. Do you know what the historical relationship between
15     tax increases and population levels is in the City of
16     Detroit?
17  **A. Well, it's not a simple correlation, there are many**
18     **other factors that have led to population loss.**
19     **Certainly increasing tax rates has been a contributing**
20     **factor to the population leaving the City but not the**
21     **only factor.**
22  Q. And what's your basis for that opinion?
23  **A. Just my knowledge of the City and, you know, looking**
24     **at the City's revenues, adjusted for population,**
25     **knowledge of the City's local economy and conditions**

KENNETH BUCKFIRE, VOLUME 2

2  here.
3  Q. Anything else?
4  **A. No.**
5  Q. There's obviously been a number of other things going
6     on in this area in addition to whatever tax policy has
7     been, correct?
8  **A. Which is what I just testified to.**
9  Q. Yeah, and I wanted to clear, so you've had significant
10     deindustrialization, correct?
11  **A. That has been a major factor of the deadline in**
12     **population in the City.**
13  Q. You have not conducted, however, any quantitative
14     analysis assessing the relationship between tax rates
15     and population levels over historical time periods in
16     Detroit, correct?
17  **A. Correct.**
18  Q. Do you know if Detroit raised property taxes by 30
19     percent how many people would leave?
20  **A. No.**
21  Q. What is the City's current millage rate on residential
22     homes; do you know?
23  **A. Not off the top of my head.**
24  Q. Do you know it approximately?
25  **A. I'd just be guessing, I don't -- I don't recall.**

Pages 249 to 252

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 98 of 364

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Okay, what about nonresidential properties?  What's
3      the millage rate on them?
4  A.  **I don't recall the rates.**
5  Q.  Do you know how the City's property taxes compare with
6      the surrounding municipalities' property taxes?
7  A.  **It was all disclosed in the June 2013 report.  We did**
8      **do a selected summary of total taxes paid by community**
9      **on that type, that was disclosed.**
10 Q.  Is that the extent of your knowledge on the subject?
11 A.  **Yes.**
12 Q.  And you didn't perform that data collection, correct,
13     you're just -- you just saw it, right?
14 A.  **That's right.**
15 Q.  So do you know whether it's accurate or not?
16 A.  **I don't.**
17 Q.  Okay.  You have not undertaken a comprehensive study
18     of what surrounding municipalities levy when it comes
19     to property taxes, correct?
20 A.  **Correct.**
21 Q.  Are you currently of the view that there is no
22     surrounding municipality that has higher property
23     taxes than the City of Detroit?
24 A.  **No.**
25 Q.  You're not of that view?

KENNETH BUCKFIRE, VOLUME 2

2  A.  **I don't know.**
3  Q.  Oh, there may be, there may not be, you don't know?
4  A.  **I don't know for a fact.**
5  Q.  Do you know how many cities in the metropolitan --
6      what does MSA stand for?
7  A.  **Metropolitan statistical area.**
8  Q.  There you go.  In the MSA -- showoff -- have a
9      population of more than 50,000?
10 A.  **Let's see, in this area, it would be Detroit,**
11     **Southfield, probably Troy, probably Dearborn, those**
12     **are the ones that I would assume would be in that**
13     **category.**
14 Q.  Do you agree that blight remediation will have a
15     positive impact on property values in Detroit?
16 A.  **Yes.**
17 Q.  And are you aware that property -- that certain blight
18     remediation will take place even if the petition is
19     dismissed?
20 A.  **Yes.**
21 Q.  And have you evaluated the extent to which that blight
22     remediation will have a positive impact on property
23     values in the City of Detroit?
24 A.  **No.**
25 Q.  Now, are you aware that the City recently reduced its

KENNETH BUCKFIRE, VOLUME 2

2      taxable value on assessed -- on properties in its
3      jurisdiction by approximately $1 billion?
4  A.  **I am.**
5  Q.  And what do you know about that, just that it
6      happened?
7  A.  **I know that it happened.**
8  Q.  And have you evaluated the extent to which that
9      decrease has an impact on property owners' ability to
10     withstand an increase in the rate?
11 A.  **Nope.**
12 Q.  Do you know the difference between taxable value and
13     state equalized value?
14 A.  **No.**
15 Q.  Do you agree that the City's property tax enforcement
16     mechanism has been ineffective in recent years?
17 A.  **Is that -- yes, I would agree with that statement.**
18 Q.  And what I mean by the enforcement mechanism is I mean
19     the folks at the City who are responsible either for
20     defending assessed values or for collecting property
21     taxes; is that what you understand --
22 A.  **It has been very ineffective.**
23 Q.  Okay, now, have you studied the question to see the
24     extent to which it is the broken enforcement mechanism
25     that is driving delinquencies as opposed to the tax

KENNETH BUCKFIRE, VOLUME 2

2      rates?
3  A.  **I've already testified to this that certainly the**
4      **City's inability to officially collect assessed taxes**
5      **has been a problem in terms of overall revenues being**
6      **generated by those taxes.**
7  Q.  And so the corollary of that is if you fix the
8      enforcement mechanism you'll see delinquencies go
9      down, correct?
10 A.  **Or you might see more foreclosures because people**
11     **really refuse to pay the taxes and they walk away from**
12     **their homes.**
13 Q.  And so do you understand, however, that the better you
14     are enforcing your mechanism the more of a signal
15     you're sending to the body politic that it needs to
16     pay its taxes?
17 A.  **Yes.**
18 Q.  And so better enforcement can lead to decreased
19     delinquencies, right?
20 A.  **I would hope so.**
21 Q.  But you did not study the extent to which improved
22     enforcement would reduce delinquency rates, correct?
23 A.  **Correct.**
24 Q.  Have you studied the impact -- and by the way, have
25     you reviewed the Plante Moran report?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 99 of 364

1              KENNETH BUCKFIRE, VOLUME 2
2    **A.** Which one?
3    Q.  The one they did on the assessor's office?
4    **A.** No.
5    Q.  Have you studied the impact that improvements to the
6    assessor's office will have on property tax
7    collections?
8    **A.** I haven't studied it, no.
9    Q.  Do you -- are you aware that some of those
10   improvements have already taken place?
11   **A.** Yes.
12   Q.  Okay, and do you know the extent to which they have
13   all already taken place?
14   **A.** No.
15   Q.  Have you studied the impacts that improvements to the
16   treasurer's office will have on the collection of
17   either income or property taxes?
18   **A.** No.
19   Q.  And do you know the extent to which there have already
20   been made improvements to the treasurer's office?
21   **A.** I know there were programmed improvements, yes.
22   Q.  You know some have -- have been made to date?
23   **A.** They were supposed to have been made.
24   Q.  And do you know the extent -- do you know the
25   percentage of the improvements that have already been

1              KENNETH BUCKFIRE, VOLUME 2
2    made to the ones that are anticipated to be made to
3    that office?
4         MR. CULLEN: Counsel, the percentage of
5    initiatives, of dollars, of -- percentage of what?
6    BY MR. HACKNEY:
7    Q.  Either way, just in terms of when it comes to
8    treasury --
9    **A.** Mm-hmm.
10   Q.  -- you know, how far are they along in their
11   restructuring the department in terms of what's been
12   done to date versus what's in the future?
13   **A.** No.
14   Q.  Now, you -- you state that the City's tax burden is
15   objectively very high; do you recall that in your
16   report?
17   **A.** I do.
18   Q.  What do you mean by objectively?
19   **A.** When you compare the taxes paid by a resident of
20   **Detroit relative to a resident of a surrounding**
21   **community, especially when adjusted for per capita**
22   **income, the City resident is paying a higher tax**
23   **burden than a resident, for example, of Southfield or**
24   **Dearborn.**
25   Q.  Now, did you take any steps to compare the total tax

1              KENNETH BUCKFIRE, VOLUME 2
2    burden, state, federal and city, of the average
3    Detroiter and compare it to residents of other cities?
4    **A.** No.
5    Q.  Do you know how Michigan income taxes compare to other
6    states?
7    **A.** In general, they are higher than some and lower than
8    **others.**
9    Q.  Okay, but do you have a sense of where they fall on
10   the 50 states?
11   **A.** They're toward the higher end.
12   Q.  They're towards the higher end?
13   **A.** Yes.
14   Q.  And what about sales tax?
15   **A.** Sales tax is also on the higher end.
16   Q.  Have you -- even if you haven't conducted it, have you
17   seen any analysis of the total tax burden on
18   Detroiters as compared to the total tax burden imposed
19   on citizens of other municipalities?
20   **A.** I recall looking at a study like that maybe two years
21   **ago, but I don't recall any more recent than that.**
22   Q.  Are you aware that the City of Atlanta increased
23   property taxes by 36 percent in 2009?
24   **A.** No.
25   Q.  Have you taken any effort to try and study either the

1              KENNETH BUCKFIRE, VOLUME 2
2    internet or published literature or anything to
3    determine whether there are other municipalities out
4    there that have made significant increases in a given
5    year to a particular type of tax like property taxes?
6    **A.** No, with the exception of Chicago.
7    Q.  All right, and the recent proposal?
8    **A.** Yes.
9    Q.  I'm certainly paying attention to that one.
10   **A.** I bet you are.
11   Q.  Actually, I live in Evanston but I think I'm covered
12   by the same taxing authority.
13         I take it you haven't conducted any
14   analysis of the impact that Atlanta's property tax
15   increase had on its economy, correct?
16   **A.** That's correct.
17   Q.  And are you aware that the City of Boston increased
18   property taxes by 15 percent in 2009?
19   **A.** No.
20   Q.  Haven't studied that either, correct?
21   **A.** That's right.
22   Q.  Have you undertaken a review of the economic -- of the
23   literature regarding the impact of increasing taxes on
24   economic growth?
25         MR. CULLEN: I think you asked him that

KENNETH BUCKFIRE, VOLUME 2

1 one, but it doesn't matter much.
2 BY MR. HACKNEY:
3 Q. I hope I didn't, I try to not, but I apologize if I
4 did.
5 A. I am generally familiar with the economic literature
6 on the impact of taxes on GDP growth rates but not
7 with respect to individual municipalities.
8 Q. Okay.
9 A. Okay.
10 Q. What is the sort of leading -- what are the three most
11 important articles in the economic literature on tax
12 increases and GDP?
13 A. I can't cite you the specific articles. There is a --
14   (Electronic phone announcement: Has left
15   the conference.)
16 A. -- general recognition in the economics field that
17 higher tax rates have the impact of retarding economic
18 growth and lower tax rates have the impact of
19 encouraging greater economic growth. There are
20 obviously important limitations and caveats to that
21 conclusion, but that's been a fairly fundamental tenet
22 of macroeconomic theory for a long time.
23 BY MR. HACKNEY:
24 Q. Are you familiar with the Headlee Amendment?

KENNETH BUCKFIRE, VOLUME 2

1 A. I've heard it have.
2 Q. What's your understanding of the impact the Headlee
3 Amendment has on a municipality's right to impose
4 taxes?
5 A. It imposes a cap on its ability to raise taxes.
6 Q. And have you considered the impact of the Headlee
7 Amendment on the City's recent decision to lower the
8 taxable value of properties located in the City?
9 A. No.
10 Q. Have you taken any advice on the subject of the City
11 of Detroit's legal ability to raise taxes
12 notwithstanding any limitations imposed by state law?
13 A. No.
14 Q. And I take it you haven't conducted any surveys of the
15 citizens of the City of Detroit to determine the
16 impact a tax increase would have on their willingness
17 to remain in the City, correct?
18 A. Correct.
19 Q. Have you ever heard of the Laffer Curve?
20 A. Yes.
21 Q. Is the Laffer Curve the point at which increasing tax
22 rates will, all other things being equal, actually
23 lead to a decrease in total revenues obtained from
24 those taxes?

KENNETH BUCKFIRE, VOLUME 2

1 MR. CULLEN: For what size entity, are we
2 talking municipalities here, sir?
3 BY MR. HACKNEY:
4 Q. Certainly qualify it as appropriate, I think the curve
5 is a general concept that applies to anything, but if
6 you need to qualify it, that's okay.
7 A. Well, I'm very familiar with this concept, it was
8 first promulgated in the 1970s and it attracted a lot
9 of attention at that time. It was I think in most
10 economists' views -- again, I'm not a professional
11 economist anymore, but it was something that was
12 discredited in the '80s because it was applied on a
13 national basis. It has turned out to have greater --
14 actually predictive value on a more local basis,
15 particularly when comparing tax rates between states
16 and countries in, for example, the European Union
17 because you have an issue where people are more easily
18 mobile between adjacent jurisdictions and they can
19 choose to live in a lower tax region than a higher tax
20 region they will on balance choose to do so, and
21 that's the fundamental incite of the Laffer Curve, but
22 it doesn't work on a national level.
23 Q. If I say the -- when I say you're on the wrong side of
24 the Laffer Curve, what I mean is you're on the

KENNETH BUCKFIRE, VOLUME 2

1 descending side where if you were to decrease tax
2 rates your tax revenue would go up. Do you understand
3 that concept of being on the wrong side of the Laffer
4 Curve?
5 A. I would call it the right side of the Laffer Curve,
6 tax rates go up -- tax rates go down, revenues go up,
7 that's a good thing.
8 Q. It's a happy place to be, I guess.
9 A. Why do you think it's the wrong place?
10 Q. Well, because it means your current tax policy is not
11 Pareto optimal?
12 A. I will agree to that.
13 Q. I just am trying to get the terminology down. When I
14 say the wrong side it means you're at a nonoptimal
15 point from the standpoint of tax policy?
16 A. Correct.
17 Q. Is it your opinion that the City of Detroit is on the
18 wrong side of the Laffer Curve?
19 MR. CULLEN: Your wrong, his right.
20 MR. HACKNEY: Yeah.
21 BY MR. HACKNEY:
22 Q. Is the City of Detroit on the side where its current
23 tax policy would yield additional revenue were it to
24 decrease tax rates?

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 101 of 364

KENNETH BUCKFIRE, VOLUME 2

2  A.  Over a long period of time, and assuming that other
3      conditions necessary for people to make the decision
4      to live here, yes.
5  Q.  Do you feel you've conducted an academic and
6      sufficiently sound study of that question to give that
7      opinion, sir?
8  A.  No.
9  Q.  Okay.
10 A.  You said Pareto optimal, not me.
11 Q.  Well, that was because you knew what MSA meant.  I
12     take it you don't know the extent to which the City
13     must decrease taxes to reach the point of the Laffer
14     Curve at which revenues will no longer increase by a
15     further decrease in the rate?
16 A.  Correct.
17 Q.  Now, are there any other cities of which you are aware
18     that are on the so-called wrong side of the Laffer
19     Curve?
20 A.  No.
21 Q.  You haven't studied that question, either, have you,
22     sir?
23 A.  No.
24 Q.  All right, do you know what the total tax burden of
25     Detroiters is today considering state, federal, and

KENNETH BUCKFIRE, VOLUME 2

2      local tax burdens?
3  A.  It's approximately 600, $650 million.
4  Q.  I was looking as percentage, sorry, I didn't ask
5      that -- let me ask that again.  Do you know what the
6      total tax burden of Detroiters is today considering
7      their state, federal, and local taxes as a percentage
8      of their income?
9  A.  Oh, I see.  I don't.
10 Q.  Okay.  Do you know if it's over 50 percent?
11 A.  No.
12 Q.  Have you studied the revenue forecasting techniques of
13     the State of Michigan?
14 A.  No.
15 Q.  Now, one of your opinions is that there would be a
16     race to the courthouse by creditors upon a dismissal,
17     correct?
18 A.  I think it will be a race everywhere.
19 Q.  I want to focus on the race to the courthouse if we
20     could.
21 A.  Okay.
22 Q.  That is one of your opinions, right?
23 A.  It is.
24 Q.  Why would there be a race?
25 A.  Every creditor would be as aggressive as possible in

KENNETH BUCKFIRE, VOLUME 2

2      trying to protect whatever rights or claims it thought
3      it had against the City and to force the City to take
4      action to deliver value to that particular creditor
5      pursuant to the rights abided in their contract.
6  Q.  And do you know -- why do people typically race to the
7      courthouse, is that within your area of expertise?
8  A.  Yes.
9  Q.  And why do they?
10 A.  They want to get there first.
11 Q.  Why though?
12 A.  Because they believe by being first in line they can
13     convince a judge to give them a claim or a right to an
14     asset or revenue stream before another creditor gets
15     there.
16 Q.  That's exactly right, right, isn't it the theory that
17     they'll be able to take their judgment and be able to
18     get a lien on the judgment debtor's property before
19     other parties?
20 A.  So I have been advised by counsel over the years.
21 Q.  Okay, that's where the whole concept of the race comes
22     from, correct?
23 A.  Correct.
24 Q.  But another one of your opinions is that creditors
25     cannot get liens in City property, correct?

KENNETH BUCKFIRE, VOLUME 2

2  A.  Correct.
3  Q.  Okay, so the typical mechanism that leads to the race
4      doesn't apply in the case of a municipality, correct?
5  A.  It would be a race to other jurisdictions for
6      satisfaction.
7  Q.  Okay.
8  A.  Including the courthouse.
9  Q.  Now, one of the things you have to do is you have to
10     determine who the racers to the courthouse are,
11     correct?
12 A.  Yes.
13 Q.  Now, did you take steps to determine who would be
14     racing to the courthouse upon the dismissal of the
15     bankruptcy case?
16 A.  Are you asking for a legal conclusion?
17 Q.  Well, this is going to your opinion where you're
18     envisioning these creditors racing to the courthouse,
19     so I'm trying to get at who you're envisioning racing?
20 A.  Well, I think the people who would be going to the
21     courthouse first would be the UT and LT bondholders.
22 Q.  Okay.
23 A.  They presumably would be looking to enforce their tax
24     liens and ask for court permission or rights to do
25     that, because they do have the tax pledge.  That would

KENNETH BUCKFIRE, VOLUME 2

2 have a very damaging impact on the City because the

3 City relies on the unpledged portion of those revenues

4 to operate the City, so that would be the first thing

5 I think would happen.

6          Secondly, it's not clear what the retirees

7 or the pension funds would do. I mean, they do have

8 claims that are very large. They have a constituency

9 which includes active employees of the City. I'm sure

10 they would use every means possible, including going

11 to the mayor and to the state house and maybe even to

12 the federal government asking for intervention on

13 their behalf.

14 Q. So maybe we can simplify this a little bit, though,

15 like do you agree that in order to race to the

16 courthouse a creditor would first need a cause of

17 action they could assert against the City?

18 A. I think in this circumstance they will assert all

19 sorts of things in order to bring a third party in to

20 intervene on their behalf, not just a court.

21 Q. Are you assuming in the race to the courthouse

22 scenario that people -- that included in the racers to

23 the courthouse will be people to whom the City is not

24 in breach of its obligations?

25 A. Absolutely.

KENNETH BUCKFIRE, VOLUME 2

2 Q. Okay, so is that informing your opinion?

3 A. I think everybody will race to wherever they can to

4 improve their position relative to all the other

5 creditors.

6 Q. Even people who don't have a present claim against the

7 City?

8 A. As we have seen already in this case.

9 Q. So do you consider that a reasonable assumption in

10 reaching your opinions that people that don't have a

11 claim against the City will race to the courthouse?

12 A. They will invent claims.

13 Q. I'm sorry?

14 A. They will invent claims.

15 Q. I take it the answer to I my question is yes?

16 A. Yes.

17 Q. Have you studied to the extent to which settlements

18 that have been struck in the bankruptcy will still

19 apply even if the petition is dismissed?

20 A. To my knowledge, the only settlement which might

21 survive is the swap termination settlement.

22 Q. Do you know if any others will survive?

23 A. No.

24 Q. And are you still assuming that the swap

25 counterparties would be racing to the courthouse?

KENNETH BUCKFIRE, VOLUME 2

2 A. Well, their agreement would be, I believe, enforceable

3 and we would be able to satisfy that pursuant to its

4 terms with new debt so they'd probably be the only

5 ones that might not race.

6 Q. Okay, and you haven't undertaken an assessment of all

7 the other settlements to determine whether or not that

8 party would have a claim for breach upon dismissal of

9 a petition, correct?

10 A. No.

11 Q. Am I correct that you have not done that?

12 A. I have not done that.

13 Q. Okay, now, let's also talk about the size of the

14 claims of the people that would be doing the racing.

15 Is your conclusion based on the assumption that the

16 pension claims would number in the billions of

17 dollars?

18 A. I do.

19 Q. And is your assumption that -- with respect to your

20 best interests finding that the size of the OPEB claim

21 would also be in the billions of dollars?

22 A. Yes.

23 Q. And have you undertaken a study whether or not those

24 claims provide for acceleration?

25 A. No.

KENNETH BUCKFIRE, VOLUME 2

2 Q. Okay, so you don't know whether those claims

3 accelerate as you sit here today, correct?

4 A. No, we have an ongoing cash obligation to fund

5 whatever we're supposed to fund, and I believe that

6 the pension funds and whoever ultimately controls the

7 healthcare contracts will do everything they can to

8 make sure the City performs on its annual obligations

9 to fund, which is a different issue than the ultimate

10 size of the claim.

11 Q. That's right, and whether or not the ultimate size of

12 the claim is in the billions of dollars upon dismissal

13 is something you don't know, correct?

14 A. Correct, but the cash flow requirements enforced on

15 the City is obviously a very material.

16 Q. And I take it, though, that in order to determine

17 whether the claims of the COPs would be swapped by the

18 other creditors you would have to know whether or not

19 their claims were accelerated, correct?

20 A. Eventually, yes.

21 Q. Have you ever considered the opposite possibility

22 which is that the claims of the service corporations,

23 and by extension the COPs, are actually the only

24 accelerated claims that exist against the City upon a

25 dismissal?

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 103 of 364

KENNETH BUCKFIRE, VOLUME 2

A. You're assuming we don't pay their interest when due
   or the contract revenues when due?

Q. You already have not done so, sir.

A. I know that.

Q. Yeah.

A. So upon dismissal you're assuming we would continue
   not paying those service contracts.

Q. I actually think it doesn't matter whether you do or
   not. I think the acceleration happened, but that's
   just my opinion.

A. I see. No, we never considered that.

Q. You have not considered that. And I take it you
   haven't considered whether the UTGO or LTGO are
   accelerated upon dismissal of the bankruptcy or have
   previously been accelerated?

A. No.

Q. As you sit here today, do you know what the amount of
   the pension trust claim against the City is? I mean
   in the dismissal scenario.

A. Well, if you terminate the plans, this is where I'm
   trying to -- there are two different scenarios on the
   pension side. One is which the plan continues but you
   don't fund it, in which case the unfunded benefit is,
   you know, a cost -- that is perhaps as little as 3

KENNETH BUCKFIRE, VOLUME 2

perhaps as much of $4 billion dollars of underfunding
as opposed to a termination of the plan, which would
actually have created larger underfunding, which is
one of the reasons that the City has taken the
position we don't terminate the plans we'd rather
freeze them. So in the dismissal scenario, which is
what you're referring to, and we assume that we're not
terminating the plans, I assume we would continue to
have the obligation to fund whenever we can afford to
fund; otherwise, we would be in default under our
payment obligations.

Q. Okay, and the amount of the claim that the pension
   system would have upon dismissal would be the amount
   of the outstanding annual amount for that year?

A. Which we haven't paid.

Q. Yes, which you have not paid, is that your --

A. That's my understanding.

Q. And similarly the OPEB claimants would have their
   right to receive payment for the healthcare that they
   were entitled to that year, correct?

A. Correct.

Q. Okay. What about with UTGO or LTGO, what would the
   size of their claim be against the City upon
   dismissal?

KENNETH BUCKFIRE, VOLUME 2

A. Well, they have, as I mentioned before, in theory the
   right to tax revenues because they have revenue
   pledges, correct? So they would have presumably the
   same status and they would move to enforce their
   rights to receive all those tax revenues and, I
   believe, ask for relief not to share those revenues
   with the City general fund.

Q. Did you evaluate whether the City is in breach of the
   CETs? Do you know what those are?

A. I do.

Q. The City Employment Terms?

A. Yes.

Q. Yeah, is the City in breach of the CETs?

A. I don't believe we are.

Q. And you know the City has struck a number of
   collective bargaining agreements recently?

A. Yes, which is why I don't believe we are in breach of
   the CETs because they have been replaced --

Q. Let's bring it up to the present. You're aware the
   City has struck collective bargaining agreements with
   all of its unions, correct?

A. Yes.

Q. Other than the one fire union?

A. Right, I am aware of that.

KENNETH BUCKFIRE, VOLUME 2

Q. To the best of your knowledge, is the City in
   compliance with all of these collective bargaining
   agreements that it just struck?

A. To my knowledge, yes.

Q. Okay, isn't it are your expectation that active
   employees would not be people that had claims against
   the City in the dismissal scenario?

A. So long as we honor the terms of their agreements.

Q. What conclusion did you reach regarding the total
   number of claims that would be asserted -- total
   dollar value of claims that would be asserted against
   the City in a dismissal scenario?

A. It would be the sum of all the funded debt
   obligations, which we've already discussed, which
   includes the COPs and the GO debt and the pension and
   OPEB claim holders, which presumably we could not
   satisfy on an ongoing basis.

Q. And I take it you've never sat down with a piece of
   paper and tried to work this out, right, in terms of
   what the total claim size would be, correct?

A. Correct, we've not done a dismissal analysis.

Q. Okay.

A. I testified to that previously.

Q. Yeah, and I -- fair enough. Is it your understanding

Pages 273 to 276

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 104 of 364

KENNETH BUCKFIRE, VOLUME 2

1 that the City would not be able to undertake the
2 restructuring and reinvestment initiatives if the
3 petition were dismissed?
4 **A. It could only do so if it suspended payments to as**
5 **many of its creditors as possible.**
6 Q. And have you made an assumption about what the City
7 would or would not do in the event the petition were
8 dismissed?
9 **A. Well, I've already testified that back in, this was**
10 **December or January when the court initially declined**
11 **to approve the postpetition financing, we gave**
12 **consideration to how we would operate the City in the**
13 **event that we lost access to our required cash. We**
14 **began to think about that problem at that point. I**
15 **asked Ernst & Young and Conway to start developing an**
16 **emergency plan in the case that we lost access to**
17 **that, which we ultimately never actually went ahead**
18 **and did because it turned out we did get access to**
19 **postpetition financing. It was only in that context**
20 **we ever examined a worst-case scenario in which the**
21 **City had to, you know, allocate its remaining capital**
22 **to essential projects.**
23 Q. And so I take -- so you have never personally
24 evaluated the extent to which the City would undertake

KENNETH BUCKFIRE, VOLUME 2

1 the restructuring reinvestment initiatives in the
2 dismissal scenario, correct?
3 **A. Correct.**
4 Q. Now, I think that you testified about this with
5 respect to Mr. Soto, but I was catching up a little
6 bit. Is it your understanding that in the dismissal
7 scenario, creditor recoveries would be on a pari passu
8 basis?
9 **A. Not all creditors.**
10 Q. Okay, which ones would be and which ones would not as
11 -- in your assumption?
12 **A. Well, the UT and LTGO bondholders would be, in my**
13 **judgment, at a higher priority than other creditors**
14 **because they have the benefit of a tax pledge. It's**
15 **my view that the other creditors to the City should be**
16 **thought of as general unsecured claim holders and**
17 **therefore treated roughly the same.**
18 Q. Okay, so the general unsecured claim holders would be
19 recovering on a pari passu basis in the dismissal
20 scenario, correct?
21 **A. That would be my assumption, which is consistent with**
22 **the June 2013 proposed treatment of those creditors.**
23 Q. So your estimation of COPs holder recoveries in the
24 dismissal scenario is that they would receive zero; is

KENNETH BUCKFIRE, VOLUME 2

1 that correct?
2 **A. I didn't say that.**
3 Q. I thought -- so what is your -- let me ask this then.
4 What is your estimation of what COPs holders would
5 recover in the dismissal scenario?
6 **A. I think they're likely to recover zero, not because of**
7 **their classification as a creditor, which is -- I want**
8 **to be very clear about that, but just because the City**
9 **will have little or no value to distribute because its**
10 **remaining cash flow, right, will not be sufficient**
11 **once you get through allocation to the GO bondholders**
12 **and provide for essential City services to provide any**
13 **discretionary cash flow available for future debt**
14 **service, which would include sharing that cash flow**
15 **with other general unsecured claim holders, because on**
16 **the map that we use -- and this goes back to the June**
17 **2013 report, the COPs claims are a billion four, at**
18 **the time we believed that we had perhaps as much as**
19 **$10 billion of other claims. So on a best-case basis**
20 **if the COPs share pro rata, they might get at best 15**
21 **cents of whatever we had available to the overall pool**
22 **of general unsecured claim holders, that's the best**
23 **they could do, but if we have nothing to give anybody,**
24 **that is, no security that would trade in the market at**

KENNETH BUCKFIRE, VOLUME 2

1 **anything close to a fair value, yeah, they could get**
2 **zero.**
3 Q. But that analysis assumes that all the other general
4 unsecured claims have accelerated, correct?
5 **A. Yes.**
6 Q. Now --
7 **A. Or have a claim on the cash flow of the City, which**
8 **further reduces the amount of value available to**
9 **accelerate the claims.**
10 Q. Okay. But you haven't actually done the analysis,
11 though, to see who would get any surplus revenue that
12 exists above operating expenditures and secured debt,
13 correct?
14 **A. You've already asked me this, we have not done a**
15 **dismissal analysis.**
16 Q. I'm sorry, I don't mean to go over and over, I just --
17 make sure I haven't asked it in a different way.
18 **A. Anxious to get the answer which I can't give you.**
19     MR. CULLEN: Some kind of turnip or dead
20 horse or something.
21 **A. Is there a metaphor we haven't turned up yet?**
22     MR. CULLEN: It's blood out of a stone.
23 Yeah, because you can't get blood out of a stone.
24     MR. HACKNEY: I can't -- I'm not going to

Pages 277 to 280

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 105 of 364

KENNETH BUCKFIRE, VOLUME 2

1  use them again. I shot the wad on all three of them,
2  although shot the wad is a good one.
3      MR. CULLEN: Gray area.
4      MR. HACKNEY: I'm sorry, I agree. Let's
5  move on, I'm sorry.
6  BY MR. HACKNEY:
7  Q.  These ad valorem taxes for the UTGO, you're familiar
8      with what those are?
9  A.  In general, yes.
10 Q.  Have you -- have you determined the extent to which in
11     a dismissal scenario a UTGO holder would be paid in
12     full?
13 A.  No.
14 Q.  So you don't know the answer to that question?
15 A.  Only in the -- only with respect to the revenues that
16     the City has been collecting relative to the millages
17     that applied to these UTGOs which have been
18     insufficient to cover the debt. You are aware that
19     for years the City was supposed to be collecting this
20     millage but did not do so, and therefore, the ultimate
21     resolution of the UTGO claim had to take recognition
22     of that fact, the revenues were not sufficient.
23 Q.  But you haven't studied the question of whether in a
24     dismissal scenario UTGO would get more than 74 cents

KENNETH BUCKFIRE, VOLUME 2

1  on the dollar, correct?
2  A.  That's right.
3  Q.  One of your assumptions is that in the race to the
4      courthouse scenario, creditors are unable to compel
5      the City to sell assets or to take a lien on public
6      property; is that correct?
7  A.  Yes.
8  Q.  And you say that you understand this to be true,
9      correct?
10 A.  I do.
11 Q.  Who told you that?
12 A.  Jones Day.
13 Q.  And did you do any analysis to test whether or not
14     that advice was correct?
15 A.  No.
16 Q.  Now, you're aware that PA 436 requires the emergency
17     manager to resolve the fiscal crisis facing the City
18     of Detroit, correct?
19 A.  Yes.
20 Q.  Have you evaluated the extent to which asset sales
21     might be required in a dismissal scenario by PA 436?
22 A.  No.
23 Q.  When you were talking about the flexibility of
24     spending associated with the restructuring and

KENNETH BUCKFIRE, VOLUME 2

1  reinvestment initiatives, you ended up answering the
2  question to Mr. Soto in the context of if there was a
3  recession that caused impact X, you could study the
4  restructuring and reinvestment initiatives and
5  determine which could not be deferred and which could;
6  do you remember that answer?
7  A.  I do.
8  Q.  Have you undertaken a study to determine which of the
9      restructuring and reinvestment initiatives are
10     flexible in that way?
11 A.  Not a study, but I have an opinion.
12 Q.  You have an opinion?
13 A.  Yes.
14 Q.  Is it an opinion based -- I mean, is it just a sense
15     or is it a formal opinion or --
16 A.  It's just my opinion.
17 Q.  Just your opinion. What is your opinion?
18 A.  That in that scenario the first thing I would advise
19     whoever was responsible to defer blight spending but
20     to maintain investment programs related to public
21     safety at all costs.
22 Q.  Okay, so in your view when you look at the
23     restructuring or reinvestment initiatives you see
24     public safety initiatives as being the ones that are

KENNETH BUCKFIRE, VOLUME 2

1  least flexible in terms of deferral and blight as
2  being the most flexible?
3  A.  On a very short-term basis.
4  Q.  On a very short term --
5  A.  If you had to defer spending on blight removal for six
6      months and come back six months later, you can do
7      that, the houses aren't going anywhere.
8  Q.  Now, have you undertaken to determine the total amount
9      of grant moneys the City has been awarded since the
10     June creditor proposal of last year?
11 A.  Not specifically, no.
12 Q.  Are you aware that the City has been awarded hundreds
13     of millions of dollars in grants since that time?
14 A.  I am.
15 Q.  And have you analyzed the extent to which the City
16     could use those grant moneys to fund restructuring and
17     reinvestment initiatives?
18 A.  No. It does accelerate the program, however. Having
19     more money allows them to take out more blight --
20 Q.  And I'm saying in a dismissal scenario have you
21     studied the extent to which the City could use the
22     grant moneys to fund restructuring and reinvestment
23     initiatives?
24 A.  No.

1    KENNETH BUCKFIRE, VOLUME 2
2  Q. Is the City going to be service delivery solvent upon
3     emergence from bankruptcy under the plan?
4  A. I would say they would approach that standard within
5     the first year of emergence.
6  Q. So you believe within a year of emergence the City of
7     Detroit will be providing the appropriate level of
8     municipal services?
9  A. No, I said they will approach that level.
10 Q. Okay.
11 A. Okay? You have --
12 Q. Now, I'm not sure who's the lawyer.
13 A. Well, no, it's a very complicated question -- it's a
14    complicated question --
15 Q. Okay.
16 A. -- because there are so many categories of service
17    delivery the City has to fix.
18 Q. All right, let's take a step back.
19 A. All right.
20 Q. Let's break it down. One of your opinions is that the
21    City is service delivery insolvent, correct?
22 A. It was service delivery insolvent upon the filing of
23    the bankruptcy.
24 Q. Filing of the bankruptcy, okay. One of your opinions
25    is that the City was service delivery insolvent at the

1    KENNETH BUCKFIRE, VOLUME 2
2     time it filed, correct?
3  A. Correct.
4  Q. Now let's ask about today, is the City service
5     delivery insolvent today?
6  A. Yes.
7  Q. Okay. Do you believe the City will be service
8     delivery insolvent as of the anticipated plan
9     confirmation date of September 30?
10 A. You know, it's a complicated question to answer and I
11    hesitate only because you have to look at it by
12    service delivery segment, safety services being the
13    most important, followed by public lighting, followed
14    by transportation services. The City has made
15    dramatic strides in all those areas to improve service
16    delivery, I'd have to go back and check because I'm
17    not totally up to speed on where they stand on those
18    programs. My understanding is that by the time the
19    City emerges they will have made very dramatic
20    improvements to public safety programs, so on those --
21    programs they may well be service solvent, I don't
22    have a similar opinion on DDOT, which is the
23    Department of Transportation, and I do know that the
24    program to relight the City is ongoing and is expected
25    to be completed next year, so on that element they're

1    KENNETH BUCKFIRE, VOLUME 2
2     probably insolvent but in terms of overall safety they
3     will probably be solvent by the time they emerge.
4  Q. That's a fair caveat. So what you're saying is there
5     has been enormous work -- there has been an enormous
6     amount of work done to date?
7  A. Yes.
8  Q. That work may have rendered certain areas of the City
9     service delivery solvent, correct?
10 A. Correct.
11 Q. Included in those areas would be an area like public
12    safety, correct?
13 A. Yes.
14 Q. Other areas may be on a path to service delivery
15    solvency that ranges in time?
16 A. Correct, and you should -- you should probably ask
17    Mr. Moore where the City stands on all these
18    programs --
19 Q. Sure.
20 A. -- because Conway MacKenzie's been managing most of
21    them.
22 Q. That's a good advice. We'll take you up on that, but
23    with respect to you --
24 A. You can thank him for me.
25 Q. What's that?

1    KENNETH BUCKFIRE, VOLUME 2
2  A. You can thank him for me.
3  Q. I will. I will. He's always glad to see me. So do
4     you have an opinion as you sit here today of what
5     areas where the City is service delivery insolvent or
6     close to it at least in your view? I know we can ask
7     Mr. Moore but --
8  A. I'm not really not current on that.
9  Q. So you don't know?
10 A. It's July, I haven't looked at this issue in a number
11    of months so I am not current.
12 Q. So you haven't studied the question?
13 A. That's correct.
14 Q. Now, have you evaluated the likelihood that the City
15    might choose to sell its art collection in a dismissal
16    scenario?
17 A. No.
18 Q. And have you -- I take it then you haven't evaluated
19    the impact such a sale would have on creditor
20    recoveries, correct?
21 A. We have not done a dismissal analysis.
22 Q. Okay. Have you considered the possibility that the
23    grand bargain might happen even if the petition were
24    dismissed?
25 A. Well, my understanding is that one of the principal

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 107 of 364

KENNETH BUCKFIRE, VOLUME 2

1  elements of that grand bargain is that the pension
2  retirees who have rights to sue the City would
3  presumably then have those rights restored and they
4  may well pursue those rights, in which case the
5  state's funding would go away.
6  Q.  Yeah, there's no question that the grand bargain as
7  it's currently drafted, if the plan is blown up
8  somehow, it goes away?
9  A.  Correct.
10 Q.  Have you evaluated the extent to which it might be
11    reconstituted in a dismissal?
12 A.  That's speculation and I've already testified we
13    haven't done a dismissal analysis.
14 Q.  Now, do you understand that two of the motivating
15    concerns of the grand bargain were to safeguard the
16    art from any future attempts to get at it by creditors
17    and to lessen the misery of pensioners in connection
18    with the cuts?
19          MR. CULLEN:  Objection, foundation.  Whose
20    motivations?
21 BY MR. HACKNEY:
22 Q.  Well, the people that are parties to the grand
23    bargain?
24 A.  Their motivations are their motivations.  The City's

KENNETH BUCKFIRE, VOLUME 2

1  motivation is to maximize the value of assets in a way
2  that's consistent with the rehabilitation of the City,
3  and the grand bargain does that.
4  Q.  Okay, by infusing hundreds of millions of dollars into
5    the City, correct?
6  A.  Into the City for the City's -- benefit of the City's
7    creditors, which in this case happen to be the
8    retirees.
9  Q.  But you understand that the two points I raised about
10    protecting the art and helping the pensioners are --
11    are considered to be two of the motivating factors for
12    the grand bargaining?
13 A.  That's my understanding.
14 Q.  And those would still apply in a dismissal scenario,
15    correct?
16 A.  That's speculation on my part.
17 Q.  Okay, so it's not something you've evaluated?
18 A.  No.
19 Q.  And I take it you have not independently assessed the
20    reliability of the City's forecast, correct?
21 A.  Correct.
22 Q.  Do you know -- do you understand that the City of
23    Detroit has above-average unemployment when compared
24    to the national employment rate?

KENNETH BUCKFIRE, VOLUME 2

1  A.  Yes.
2  Q.  And as a result of that, isn't it true that the City
3    does not have a problem with attrition in its active
4    employee ranks?
5  A.  I'm not sure there's a relationship between the
6    unemployment rate and attrition.  What are you
7    referring to?
8  Q.  Well, just that when unemployment is high it tends to
9    make people want to hold on to a good job.
10 A.  That's a general statement, I don't -- I do not know
11    how that applies to the case of Detroit.
12 Q.  You haven't studied problems that the City may have
13    either retaining active employees or attracting new
14    ones: is that correct?
15 A.  Only anecdotal.
16 Q.  Okay, you haven't conducted a systematic study?
17 A.  No.
18 Q.  And are you aware of anecdotal evidence that the City
19    is having trouble retaining employees?
20 A.  The City has had historically trouble retaining
21    qualified employees, they've had no trouble retaining
22    unqualified employees.
23 Q.  And that's just the anecdotal evidence you were
24    referring to earlier?

KENNETH BUCKFIRE, VOLUME 2

1  A.  And personal relationships with many of those same
2    City employees.
3  Q.  In a dismissal scenario will the City be able to
4    borrow money on a secured basis?
5  A.  I believe so.
6  Q.  Okay.  And would it be able to do so at reasonable
7    rates?
8  A.  I believe so.
9  Q.  In a dismissal scenario?
10 A.  Oh, I'm sorry, no.
11 Q.  I gave you a favor there --
12 A.  No.
13 Q.  -- because otherwise I'm crossing you later and you
14    were like what was I saying.  So let's do it again.
15    In a dismissal scenario can the City borrow on a
16    secured basis?
17 A.  Probably.
18 Q.  Okay, and would it be able to do so at reasonable
19    rates?
20 A.  Probably not.
21 Q.  Why not?
22 A.  I would assume any lender would look at the overall
23    situation of Detroit and given the tremendous
24    uncertainties facing the ultimate resolution of its

Pages 289 to 292

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 108 of 364

KENNETH BUCKFIRE, VOLUME 2

1 crippling liabilities would view that its position as
2 a lender might be at some point under attack by other
3 creditors, that it might find itself in a subsequent
4 Chapter 9, have to protect its rights to get repaid
5 pursuant to its pledge, and therefore they would want
6 to be paid for that risk. They would also probably
7 require that the terms of the loan be very short.
8 Q. The postpetition facility, however, was not one that
9 required plan confirmation, isn't that correct?
10 **A. That's correct.**
11 Q. And Barclays facility tolerates dismissal of the
12 petition, correct?
13 **A. That's right.**
14 Q. And you actually felt that that was a very favorable
15 rate, if I recall, correct?
16 **A. That's true.**
17 Q. Something on the order of 3-1/2 percent, correct?
18 **A. It is 3-1/2 percent.**
19 Q. But your testimony is that even though you were able
20 to secure that loan on a secured basis during the
21 midst of a at the time nonconsensual bankruptcy that
22 if the petition were dismissed that there would be a
23 material difference in the secured barring of the
24 City?

KENNETH BUCKFIRE, VOLUME 2

1 **A. Well, there were very different facts and**
2 **circumstances surrounding that. I don't believe that**
3 **in any way helps understand what the City would have**
4 **to do to borrow money in a dismissal situation, which**
5 **is what you're positing now.**
6 Q. Yeah, you're right. By the way, the exit financing
7 that you're currently working to line up, that's also
8 going to be on secured basis, correct?
9 **A. We have suggested to lenders that security is**
10 **available but we've also encouraged them to propose**
11 **unsecured financing facilities.**
12 Q. I think we've talked about this before, but when you
13 suggest things to the market they have a tendency to
14 not want less than that, right?
15 **A. Depends on the demand for the financing.**
16 Q. Do you think that the exit facility might be
17 unsecured?
18 **A. Ask me in a week.**
19 Q. Okay. I will. Have you assessed the abilities to
20 save money by --
21 **A. I know you will.**
22 Q. I'm going to call you and ask you.
23 **A. You have to call Tim first.**
24 Q. Yeah, I'll get permission. Have you assessed the

KENNETH BUCKFIRE, VOLUME 2

1 abilities of the City to save money by privatizing
2 DDOT?
3 **A. That issue has been studied.**
4 Q. Have you studied it?
5 **A. No.**
6 Q. Now, that's something that could be done in a
7 dismissal context as well, correct?
8 **A. In theory, yes.**
9 Q. Okay, and I take it you have not tried to factor in
10 the privatization of DDOT to what creditor recovery
11 should be in a dismissal scenario because you did not
12 do a dismissal analysis, correct?
13 **A. Yes.**
14 Q. And I take it you would give the same answer for any
15 other asset whether it was parking or Belle Isle or
16 the art collection, correct?
17 **A. Correct.**
18 Q. Now, isn't it true that the City's exploring whether
19 it can enter into a public-private partnership in
20 connection with DWSD?
21      MR. CULLEN: To the extent that that's
22 public knowledge, it's the subject of mediation.
23      MR. HACKNEY: I think the RFP was --
24 public. I mean, I read articles about the fact that

KENNETH BUCKFIRE, VOLUME 2

1 emergency manager was soliciting requests for
2 proposal.
3      MR. BALL: The RFP has been produced, it's
4 produced in the case.
5      MR. CULLEN: The RFP for which?
6      MR. BALL: For the public-private
7 partnership.
8 **A. Yes.**
9 BY MR. HACKNEY:
10 Q. Are you involved in that?
11 **A. Yes.**
12 Q. Okay. What is your expect -- so what is your
13 expectation regarding the structure of a PPP? And
14 what I mean is you remember how you had a conversation
15 earlier about the fact that regional authority
16 might entail a sale lease-back with a $47 million
17 annual revenue stream; do you remember that?
18 **A. I do.**
19 Q. Is there an analog in the PPP context where somehow
20 the City gets revenue out of the PPP agreement?
21      MR. CULLEN: This was not in the RFP and
22 this is part of the ongoing negotiations in the
23 mediation.
24 BY MR. HACKNEY:

KENNETH BUCKFIRE, VOLUME 2

Q. I won't ask for any specifics because I can imagine
that you're -- that's probably what you debate, I'm
just trying to understand it structurally. Let me put
it to you this way. Is the -- I could see a scenario
where you engage in a public-private partnership
simply to reduce the efficiency and cost of the system
and --

A. Improve the efficiency, not reduce --

Q. Yeah, improve the efficiency, right. Improve the
efficiency --

A. And lower the cost.

Q. -- lower the cost and then lower rates, I could see
that being one reason for why you might do it. I can
see a city like Detroit that's been through a
difficult process with the counties where it was
hoping to do a sale lease-back viewing a PPP as a
means of obtaining a revenue stream, and I just want
to know whether that is one of the goals of the PPP?
All right. Let's do it this way guys.

A. I'm sorry, I don't know what I can say.

Q. That's okay. That is a theoretical possibility with a
PPP, correct?

A. Yes, it is.

Q. Okay, and that theoretical possibility is one that you

KENNETH BUCKFIRE, VOLUME 2

could arguably pursue whether the plan is confirmed or
the petition is dismissed, correct?

A. Yes.

Q. But like the other assets of the City, it's not one
that you've studied to determine its impact on
creditor recoveries correct?

A. In a dismissal scenario, that's correct.

Q. With respect to access to the capital markets, isn't
it correct that you have found great enthusiasm for
people desiring to lend to Detroit?

A. Yes.

Q. In fact, investors are tripping over themselves when
it comes to lending to the City, correct?

A. I didn't say that.

Q. I know you didn't, other people have.

A. Who?

Q. Kevyn Orr.

A. I can only say what I've said, there's a lot of
enthusiasm for reviewing and potentially providing
financing for the City of Detroit.

Q. And you agree that Detroit has, if its plan is
confirmed, undergone a massive deleveraging of its
obligations, correct?

A. Yes.

KENNETH BUCKFIRE, VOLUME 2

Q. And it is that massive deleveraging that makes the
credit so attractive to potential lenders, correct?

A. That's one factor. The other factor is the oversight
commission and continued institutional oversight of
the City now provided for by the state legislation.

Q. That's right, so you view it as kind of, look, there's
a quantitative component, that's the massive
deleveraging, right?

A. Right.

Q. There's a qualitative component which is we're not
going to do this again, that's the oversight, correct?

A. And I would say that's an even more important credit
factor than the deleveraging of the City.

Q. Now, your opinion is actually that you'll be able to
obtain credit on reasonable terms, isn't that right?

A. Yes.

Q. What do you consider reasonable terms to be?

MR. CULLEN: You did go through --

BY MR. HACKNEY:

Q. You did go through -- it's longer than ten years and
what was the interest rate again?

A. Less than 5 percent.

Q. Less than 5 percent. At what point would you still
have access to credit on reasonable terms with a lower

KENNETH BUCKFIRE, VOLUME 2

percentage of deleveraging? So I think you postulate
a 70 percent deleveraging in your expert report; is
that correct?

A. That's right.

Q. Would the City still have access to credit on
reasonable terms if it only delevered 60 percent?

A. Well, it's not the right basis of comparison, you have
to look at the annual anticipated debt service and
legacy costs that are required to be funded by the
City over the next ten years, so the total amount of
liability reduction is of less relevance than that
calculation.

Q. Well, you understand that the deleveraging is being
accomplished by substituting B notes in many instances
for what used to be the claims of the creditors?

A. I do understand that.

Q. So there's a relationship in the sense that the B note
is what comes out at the end, right?

A. Well, but it's in the totality how much total leverage
the City will still have post emergence, which we've
laid out in this -- you know, in my expert report,
it's, you know, a billion two of total funded debt
when you include the reorganization securities given
to the GO bondholders and others and the exit

KENNETH BUCKFIRE, VOLUME 2

1    financing itself, and then you have of course the
2    annual obligations under the pension settlement and
3    the OPEB settlement so the annual cost of servicing
4    pension, OPEB, and debt service is what's relevant to
5    the credit markets, not so much the total present
6    value reduction of liability.
7    Q.  Fair enough.  Let me ask it a different way.  How much
8    could you in -- how much could you increase the number
9    of B notes and still have access to the credit markets
10   on reasonable terms?
11   A.  Well, it's a good question because in a theoretical
12   way, you probably could issue more notes if you had a
13   lower interest rate; in other words, it's all about
14   debt service, so we wanted to make sure these notes
15   would trade at par, that's the expectation.  That
16   means the interest rate has to be an appropriate rate
17   relative to the risk, which we think we've set, and
18   the way to make sure you've got that right is to look
19   at the projections of the City and make sure the City
20   maintains a minimum level of cash at all times
21   thinking of that as the cushion.  You never want to go
22   below enough cash to pay for six to eight weeks of
23   operating expense, so when we look at the
24   capitalization of the City, we really are looking to

KENNETH BUCKFIRE, VOLUME 2

1    the long-term financial projections that have been
2    produced by our colleagues at E&Y and Conway
3    MacKenzie, and basically stipulated that in no
4    situation could the City tolerate a balance sheet
5    which would result in the City having less than 80 to
6    a hundred million in cash over the next ten years on
7    hand, and that is how we backed into how much debt
8    capacity we had when you assume debt capacity also
9    includes the City's obligations to fund pension and
10   healthcare.
11   Q.  Starting in 2023 on the pension side?
12   A.  Starting in 2014 or '15 depending on the fiscal year
13   because those obligations begin immediately upon
14   emergence.
15   Q.  For active employees?
16   A.  Well, if -- we have an ongoing pension obligation
17   under the pension settlement, right, we have an
18   ongoing healthcare obligation to fund the move to
19   Obama care, and we have active employees who are
20   moving to a 401(k) plan.
21   Q.  Do you mean the pension obligation that the -- that is
22   being paid on the City's behalf by the grand bargain
23   participants?
24   A.  That's just one element of it.

KENNETH BUCKFIRE, VOLUME 2

1    Q.  That's what you're referring to when you say
2    immediately upon dismissal.
3    A.  Right, but clearly the fixed obligations of the City
4    include pension costs and contributions, healthcare
5    costs and contributions, as well as debt service.
6    Q.  So I'm not, you know, intimately conversant with the
7    forecast in terms of having it down to the dollar and
8    penny but what do the forecasts show in terms of
9    whether the City could issue more B notes and still
10   have the cushion that you discussed?
11   A.  Well, we'd have to go back and look at exhibits L and
12   M to the plan of adjustment which do have projections
13   included in those, and I believe you'll find -- and I
14   can't remember whether it's L or M, will show the
15   minimum cash that the City will maintain assuming this
16   balance sheet, and as I have testified before, we had
17   originally stipulated that we should not create a
18   balance sheet which on our current projections would
19   ever result in the City having less than 80 to a
20   hundred million in cash, and that's another way of
21   saying we don't have the ability to increase the
22   City's liabilities including issuing more B notes
23   because that has to have an impact on our cash.
24   Q.  So obviously now if the City's forecasts are unduly

KENNETH BUCKFIRE, VOLUME 2

1    conservative and the City will actually do better than
2    Ernst & Young is currently forecasting, if that were
3    correct -- and I understand that's an assumption you
4    haven't made and probably don't agree with, but if
5    that were correct that would imply an ability to carry
6    additional B note debt, correct?
7    A.  By definition, yes.
8    Q.  Mathematically it's true.  You were asked this
9    yesterday, I couldn't see in the transcript whether it
10   was limited, but have you reached a conclusion -- have
11   you studied the question of what the City's rating
12   will be upon emergence or do you have a formal opinion
13   on that?
14   A.  I do not.
15   Q.  Have you studied the comparable debt levels of other
16   municipalities to determine how a post emergence
17   Detroit will compare to them?
18   A.  Not yet.
19   Q.  Okay, you haven't done like, for example, a funded
20   debt to general fund revenue analysis or other types
21   of comparable ratio analysis?
22   A.  Not yet, no.
23   Q.  With respect to the calculation of the size of the
24   pension and OPEB claims, you relied on the 6.75

Pages 301 to 304

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 111 of 364

KENNETH BUCKFIRE, VOLUME 2

2    percent discount rate calculation; isn't that correct?

3    **A.  For purposes of the plan?**

4    Q.  Yes.

5    **A.  Yes.**

6    Q.  Well, let me put it this way.  You took the numbers

7    from the plan and those numbers are based on the 6.75

8    percent discount rate, correct?

9    MR. BALL:  I'm going to object, that

10   mischaracterizes the plan.

11   MR. CULLEN:  I couldn't hear you.

12   MR. BALL:  I'm going object, it

13   mischaracterizes the plan.

14   **A.  There are two different rates -- we use different**

15   **rates for PFRS and GRS, so which rate are you talking**

16   **about?**

17   Q.  Let's do it this way.  Let me see if I can speed it

18   up.  When you calculated the pension UAAL at 3.129

19   billion, for that you relied on the presentation in

20   the plan?

21   **A.  Yes.**

22   Q.  Similarly for OPEB UAAL you calculated that to be

23   4.303 billion and you similarly relied on its

24   presentation in the plan for that number, correct?

25   **A.  Yes.**

**KENNETH BUCKFIRE, VOLUME 2**

2    Q.  You haven't independently sought to assess the

3    accuracy of either of those two numbers, correct?

4    **A.  Correct.**

5    Q.  Did I hear you say that you have sent out the

6    solicitation letter for the exit financing?

7    **A.  Yes, it went out on Friday.**

8    Q.  It went out on Friday?

9    **A.  Yes.**

10   Q.  You were waiting on approval of the treasurer's office

11   before that went out?

12   **A.  That was -- yes.  First, we were waiting for the**

13   **legislation to pass in Lansing establishing an**

14   **oversight commission, and that was not done until June**

15   **20th I think it was, and then we wanted to make sure**

16   **that the state treasurer's office agreed with the**

17   **amount of borrowing the City was attempting to seek,**

18   **and of course the holiday intervened with that so it**

19   **didn't go out until last Friday.**

20   Q.  Got it.  Okay.  And you are following a similar

21   process to the one you did on the postpetition

22   financing which is to say that you send out a

23   solicitation letter and then you get back first

24   nonbinding indications of interest from potential

25   lenders and you evaluate them and then go to the next

KENNETH BUCKFIRE, VOLUME 2

2    stage?

3    **A.  Yes.**

4    Q.  And the first round in response to the solicitation

5    letter is where people give you, the investment

6    banker, nonbinding indications of interest, correct?

7    **A.  That's right.**

8    Q.  And then it's your job to follow up on those and see

9    who you can hammer into a firm commitment?

10   **A.  Correct.**

11   Q.  And if I asked you questions about who you're

12   approaching --

13   MR. CULLEN:  We've been through this.

14   MR. HACKNEY:  Did you cover this yesterday?

15   MR. CULLEN:  Yes.

16   MR. HACKNEY:  So because the exit financing

17   is an ongoing process you're asserting effectively a

18   commercial sensitivity privilege to --

19   MR. CULLEN:  Yes.

20   MR. HACKNEY:  -- questions relating to his

21   efforts in connection with the exit financing?

22   MR. CULLEN:  Yes.

23   MR. HACKNEY:  So I'll note for the record,

24   Mr. Cullen, what I could see -- I certainly see the

25   logic of it because it's ongoing, on the other hand we

KENNETH BUCKFIRE, VOLUME 2

2    are talking about an expert who has based his opinions

3    on access in part on it, so we may have to have a

4    conversation later about whether we revisit it with

5    him once he's gotten it done so --

6    MR. CULLEN:  Well, might make a lot of this

7    moot.

8    MR. HACKNEY:  That's probably true, maybe

9    we'll stand in awe of it.

10   MR. CULLEN:  The world will be different

11   once it's done.

12   THE WITNESS:  As I mentioned --

13   MR. HACKNEY:  I'm just going to reserve on

14   that so we can get past it.

15   MR. CULLEN:  No, and -- and --

16   MR. BALL:  As we have.

17   MR. CULLEN:  And Robin didn't roll over and

18   beg either so --

19   BY MR. HACKNEY:

20   Q.  I'm sorry.

21   **A.  I mentioned in my testimony -- my testimony yesterday**

22   **I did indicate that we'd already sent it out to 15**

23   **parties --**

24   Q.  Okay.

25   **A.  -- which we've been talking with for months and that**

KENNETH BUCKFIRE, VOLUME 2

we've asked for preliminary indications on the 24th of
July.

Q. Okay.

A. We do expect to send it out to more parties this week
only because we sent it out on Friday and a lot of
people have left for the weekend already, so we got
them yesterday.

Q. And so you think you're going to bring that thing
in before August 14, which is when we start the plan
trial?

A. That is our expectation.

Q. That's about 20 days after, that's about 21 days after
you get your --

A. Correct.

Q. -- responses?

A. But when we say bring in, I think we will bring in a
recommendation to the emergency manager and have
negotiated to a commitment letter stage, we will not
have recommended we close or execute any financing
documents until confirmation --

Q. That's fine. I was just curious about, I mean,
general experience within three weeks of getting
indications of interest is that fast, slow, or
reasonable?

KENNETH BUCKFIRE, VOLUME 2

A. In this situation I would say that's reasonable only
because we've been talking to market participants for
months, they're well aware of the plan, all of the
financial documents are out there, there's not much to
do from a diligence point of view, it's really a
question of structure and rate and interest.

Q. On page 4 of your report you say that the
revitalization efforts are assumed to attract a new
tax base for the City; do you remember that?

A. I do.

Q. And that means assumed by you, correct?

A. I believe it's assumed by the emergency manager and
all of his key advisors as well as leading public
officials of the state and community leadership.

Q. Okay, you have not independently accessed the accuracy
of that assumption, correct?

A. No.

Q. Am I correct?

A. It's an assumption.

Q. It is an assumption that you have not independently
assessed, correct?

A. Correct.

Q. Oh, you know, earlier you were talking about being
personally involved in mediating with the COPs

KENNETH BUCKFIRE, VOLUME 2

holders; do you remember that testimony?

A. Yes.

Q. And I know there's a mediation order that contains
within it a requirement of confidentiality, but is the
time frame that you're referring to on those
mediations in the fourth quarter 2013?

A. Yes.

Q. Was it in connection with the swap settlement motion?

A. No. Separate from that. Judge Perris was the
mediator, so I mean -- right?

Q. Yes. Were the COP insurers in those?

A. Yes. Yeah, it was absolutely. We spent weeks on it.

Q. You spent weeks negotiating with the COP insurers and
the COP holders on plan treatment?

MR. CULLEN: We were in the same courthouse
under the same egis, fumbling back and forth.

MR. HACKNEY: And in New York.

MR. CULLEN: And in New York.

MS. BALL: Negotiated settlement.

MR. HACKNEY: On plan treatment?

MS. BALL: A settlement.

A. Settlement.

BY MR. HACKNEY:

Q. Of the swap?

KENNETH BUCKFIRE, VOLUME 2

A. Not the swap, of the --

MS. BALL: The whole relationship.

A. -- the whole thing, the swaps, the COPs, everything.
We wanted to do a grand bargain to the benefit of the
COPs and insurer --

MR. CULLEN: He's --

BY MR. HACKNEY:

Q. I remember what you were talking about but that --
okay. Well, we're talking about the same thing in any
event so I just want to make sure. Do you have any
understanding of how the City valued its OPEB
obligations under the $4.3 billion number?

A. It's been months since I've looked at that so the
answer is no.

Q. Do you remember you talked about meeting with --
meeting Graham Beal early on in, if I remember, the
first half of 2013?

A. Yes.

Q. In any of your meetings with Graham Beal did you
suggest that he might be replaced?

A. No.

Q. Did you ever suggest that he should be fired?

A. No.

Q. Did you ever tell him that he might be fired if he

KENNETH BUCKFIRE, VOLUME 2

didn't go along with what the EM wanted to do?

**A. No.**

Q. With respect to Belle Isle, isn't it true that you never undertook a marketing process of Belle Isle as a real estate asset?

**A. Correct.**

Q. Okay, and do you know any of -- anyone else at the City who did?

**A. No.**

Q. Do you know if the City received any offers to develop Belle Isle?

**A. Only from press reports.**

Q. Yeah, I've read the same press reports. I actually read about a sizable offer that could have been a crackpot but it's also a very nice piece of property so I didn't -- I wanted to ask you whether you had an undertaken to investigate that?

**A. No.**

Q. Now, when we were talking about the land earlier, do you remember that part of the problem with the land in general is that because it's all spread out in a City that can't deliver services, among other things, you reached the conclusion that it wasn't very valuable; do you remember that testimony on the --

KENNETH BUCKFIRE, VOLUME 2

**A. That was part of my conclusion. The other part is that much of the land was encumbered with blighted structures or was otherwise abandoned or not maintained.**

Q. Or was held by different governmental entities?

**A. Ownership was in dispute --**

Q. Yeah.

**A. -- so for many reasons there was no value.**

Q. Okay, so that I understood. Now, Belle Isle is interesting because it suffers from none of those problems, right?

**A. Correct.**

Q. So it's a big, contiguous piece of land that the City definitely owns, correct?

**A. Correct.**

Q. And it's also beautiful, right?

**A. It is.**

Q. Okay. Do you have an estimation of the potential value of Belle Isle if you were to sell it?

**A. No.**

MR. HACKNEY: Mr. Buckfire, it's been nice to see you again. Thank you for your patience with me today, I'm going to -- I'm going to pass the mike back to the DWSD folks subject to some of the points we

KENNETH BUCKFIRE, VOLUME 2

made about, you know, the potential need to question further based on indication of different types of privileges and so forth, but thanks.

THE WITNESS: Thank you.

MR. BALL: Take a couple minutes break.

VIDEO TECHNICIAN: The time is 4:01 p.m. We are now off the record.

(Recess taken at 4:01 p.m.)

(Back on the record at 4:11 p.m.)

VIDEO TECHNICIAN: We are back on the record. The time is 4:11 p.m.

EXAMINATION

BY MR. BALL:

Q. Good afternoon, Mr. Buckfire.

**A. Good afternoon.**

Q. And I -- as we discussed a bit off the record, I have a few questions about Exhibit 8, which is the June 16th, 2014 amended and restated change order, just prompted because I'm concerned that a couple of the questions Mr. Hackney asked may have muddied the waters a little bit about how the $28 million fee works, and really it's just -- the questions are just about the fact that there are aspects of your compensation that are not credited towards the $28

KENNETH BUCKFIRE, VOLUME 2

million; is that right?

**A. That's correct.**

Q. And they are outlined in the fee schedule provisions on page 7 of Exhibit 8 and in particular include monthly fees paid before September 1, 2013; is that right?

**A. That's right.**

Q. And potentially monthly fees paid after -- on and after October 1, 2014, correct?

**A. Correct.**

Q. And are there other aspects of the fees that you're being paid that would be excluded from the 28 -- that would not be excluded from the 28 million?

**A. No.**

Q. So you can put that aside. Then I have questions about a number of the 30(b)6 topics that we haven't covered yet, I don't believe, and so the first set relates to --

**A. Are you referring to an exhibit?**

Q. Pardon me?

MR. CULLEN: Exhibit No. 2.

BY MR. BALL:

Q. It's Exhibit No. 2, it's --

**A. Okay.**

Pages 313 to 316

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 114 of 364

1     KENNETH BUCKFIRE, VOLUME 2
2  Q.  -- just a list of issues so you have it, my questions
3      are not -- it's just so that you know that that's one
4      of the topics you've designated for?
5  A.  Thank you.
6  Q.  The first set of topics I'm going to ask about relate
7      to -- principally to designation 1-A and the impaired
8      and unimpaired status of various bonds under the plan,
9      so under the fourth amended plan for the senior lien
10     bonds certain CUSIPs are impaired and certain CUSIPs
11     are not impaired.  Can you explain to me the basis on
12     which the decision was made to impair some CUSIPs but
13     not others?
14 A.  Yes, we went through a selection process that had a
15     number of components.  The first one was determining
16     whether or not the bonds had an interest rate less
17     than the yield curve that we were using, in which case
18     we left them alone because they were already at a very
19     favorable and fair rate to the City.  Then we excluded
20     bonds that by their terms were either callable
21     immediately or expected to be callable, I believe, by
22     the 26th month of emergence from the plan, and our
23     view on that issue was that it would be unlikely be
24     the City would need to or want to refinance bonds
25     immediately after emergence from bankruptcy, that it

1     KENNETH BUCKFIRE, VOLUME 2
2      would take its time to do so and, therefore, it was
3      likely that it would wait until sometime in 2016 to
4      effectively start retiring bonds that were too high
5      cost.  So any bonds maturing or noncallable prior to
6      -- I can't remember the date exactly, but it was
7      sometime in 2016, we just excluded because there was
8      no practical reason to impair them as part of the
9      plan.
10 Q.  So there were references in the plan to 26-month
11     period, is that your recollection?
12 A.  Yes, and I believe it's stipulated as of 26 months
13     after emergence which is why I believe that's -- and
14     again I want to caveat that's calendar '16, not fiscal
15     '16.
16 Q.  So whatever the reference -- I believe it's 26 months.
17 A.  It is 26 months, but I just want to make sure I have
18     the right year, which is always a bit of confusion.
19 Q.  And were there other criteria besides that that you
20     used in deciding which bonds to impair and which not
21     to impair for senior lien bonds?
22 A.  No, there was the question of rate of course, and we
23     assumed that the base rate -- and again, I'm using the
24     yield, was 5 percent, and then we adjusted that
25     further by 35 basis points to allow for implied

1     KENNETH BUCKFIRE, VOLUME 2
2      issuance costs, and therefore, concluded that we would
3      impair bonds that had a yield of 5.350 percent or
4      greater and met the callability requirements I've just
5      explained.  And that left us with a total I believe of
6      2.2 billion in bonds to be impaired out of the 5.5
7      billion in bonds the system currently has outstanding.
8  Q.  Okay, and are there any other criteria that you
9      employed in deciding which -- which CUSIPs for senior
10     lien bonds to impair or not to impair?
11 A.  No.
12 Q.  And what criteria -- just to understand, the point
13     you mentioned about the 35-basis point adjustment, was
14     that done as part of what you -- the step you first
15     discussed about the comparison of the interest rate to
16     the yield curve?  In other words, when you compared it
17     to the yield curve, did you make the 35-basis points
18     adjustment as part of that process or is that
19     something separate you did?
20 A.  They're related, I mean, they really are.
21 Q.  And did you employ a different basis for deciding
22     which junior lien bonds to impair and which ones not
23     to impair?
24 A.  Well, the criteria as to callability and call period
25     were the same.  I believe we used a slightly different

1     KENNETH BUCKFIRE, VOLUME 2
2      rate to reflect the fact that they were second lien
3      and not first lien.
4  Q.  So you had a separate yield curve for second lien
5      bonds and you used --
6  A.  Correct.
7  Q.  -- that yield curve instead, but otherwise was the
8      analysis the same?
9  A.  Yes.
10 Q.  And is there -- other than what you've told me, does
11     the City have a justification for the decision to
12     impair some senior lien bonds and leave junior lien
13     bonds unimpaired?
14 A.  It's a financial analysis to maintain the City's
15     financial flexibility to borrow at an appropriate cost
16     based on the improved credit of DWSD; in other words,
17     we did not want to design a plan in which creditors
18     received bonds it would trade to a premium, we felt
19     that was inappropriate.  Secondly, we wanted to make
20     sure that the bond -- scratch that.  We wanted to make
21     sure that the DWSD bonds by their terms would not be a
22     future impediment to the creation of a regional
23     authority if such an authority were to be created post
24     emergence from bankruptcy.
25 Q.  And how does the distinction -- the decision you made

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 115 of 364

KENNETH BUCKFIRE, VOLUME 2

2   about which senior lien bonds to impair and which
3   junior lien bonds to leave unimpaired, how does that
4   relate to the -- the preserving the viability of a
5   potential GLWA?
6   **A. Well, it's all about the existence of noncall bonds**
7   **with coupons and yields greater than what we view as**
8   **the appropriate yield, those bonds should be trading**
9   **at; in other words, if you have a bond which has a 7**
10   **percent yield, a noncall for 20 years that -- the**
11   **consent of that bondholder would be required to move**
12   **his assets to a regional authority and presumably that**
13   **bondholder would want to be paid for the privilege of**
14   **doing so, that would be a direct cost of the**
15   **transaction. The higher the transaction costs are the**
16   **less likely creation of a regional authority could be**
17   **deemed to be.**
18   Q. Are there any other justifications for the City's
19   proposal to impair some senior lien bonds while
20   leaving some junior lien bonds unimpaired?
21   **A. No.**
22   Q. And you understand that there are also revolver loans
23   that are junior to the first and senior-- there's
24   revolver debt that's junior to both the junior and
25   senior liens who are water and sewer bonds, correct?

KENNETH BUCKFIRE, VOLUME 2

2   **A. You're referring for the state revolver fund loans?**
3   Q. I am.
4   **A. Yes, I'm aware of them.**
5   Q. And that's been left unimpaired?
6   **A. That's correct, the rate's only 2 percent.**
7   Q. And is there a reason why the City has left the
8   revolver -- the plan proposes to leave the revolver
9   loans unimpaired while impairing senior debt?
10   **A. It's 2 percent money.**
11   Q. Any other reason?
12   **A. No.**
13   Q. Is the fact that the debt was -- is the role of the
14   state in connection with the revolver loans, does that
15   play any role in the decision or did it play any role
16   in the decision to leave the revolver loans
17   unimpaired?
18   **A. It was my recommendation to the emergency manager to**
19   **unimpair that facility because it represented the**
20   **cheapest capital being borrowed by DWSD.**
21   Q. So that was the only factor that you recommended --
22   but that was the basis for your recommendation?
23   **A. Correct.**
24   Q. Do you know whether that any other factors were taken
25   into account by the emergency manager or anyone else

KENNETH BUCKFIRE, VOLUME 2

2   in making the decision about whether to leave the
3   revolver loans unimpaired?
4   **A. I don't know.**
5   Q. All right, other than changes to interest rate and
6   call protection features as set forth in the plan,
7   will there be any differences between the terms and
8   conditions governing the existing DWSD bonds and the
9   new DWSD bonds?
10   **A. Not that I can recall.**
11   Q. Is there some proposal -- have you considered some
12   proposal to alter additional terms besides the
13   interest rate and the call protection?
14   **A. No, I just haven't read the actual note agreements**
15   **that are referred to by the new plan financings**
16   **recently so I can't tell you that word for word those**
17   **documents are exactly the same as the existing loans,**
18   **but my understanding is that no changes have been made**
19   **to the noneconomic terms, if that's what you're**
20   **referring to.**
21   Q. Other than restraining -- call protection I take it is
22   not -- whether that's an economic term, I don't know.
23   **A. It's an economic term.**
24   Q. So apart from those are you aware of any changes to
25   the -- to the terms of the bonds?

KENNETH BUCKFIRE, VOLUME 2

2   **A. No.**
3   Q. One of the categories that on which you have been
4   designated as the City's 30(b)6 designee is category
5   1-F and it's the extent to which all of the
6   representations, warranties, covenants, liens, rights,
7   and remedies related to the DWSD bonds under the
8   existing DWSD bond documents will be applicable to the
9   new DWSD bonds and/or the new existing rate DWSD bonds
10   and the extent to -- and to the extent any changes
11   from the terms the current governing DWSD bond
12   documents for the DWSD bonds are made the description
13   and impact of such changes: is that a topic you're
14   prepared to address?
15   **A. Yes.**
16   Q. And so is it your testimony that all of the existing
17   representations, warranties, covenants, liens, rights,
18   and remedies relating to the DWSD bonds under the
19   existing DWSD bond documents will remain unchanged
20   except for interest rate and call protection features?
21   **A. Yes.**
22   Q. How is the allowed amount calculated for the impaired
23   water and sewer bonds?
24   **A. Well, the department has been paying interest on all**
25   **of the revenue bonds through the bankruptcy matter at**

KENNETH BUCKFIRE, VOLUME 2

1  hand, therefore there are no accrued but unpaid
2  interest claim that normally you would expect on a
3  prepetition basis.  If it turns out that a bondholder
4  does not accept bond treatment where call protection
5  is eliminated but the interest rate stays the same, so
6  in other words in the case in which he accepts a bond
7  where he has the same interest rate will simply make
8  those interest payments in the ordinary course upon
9  emergence, so there will be no accrued issue there, as
10  well.  With respect to bond claims that reject that
11  offer and therefore receive the reset notes, I'm not
12  sure we've actually resolved -- figured out what we
13  would do with it, I would assume we would calculate
14  the claim up to the emergent state and then that claim
15  would be added to the bond principal amount.
16 Q.  Okay, so for -- and that is one of the issues I wanted
17     to address with you is how you're going to deal with
18     accrued but unpaid interest because my understanding,
19     like yours, is that interest is being paid currently,
20     but there will be some stub of a month for which
21     interest will not have been paid?
22 A.  Right.
23 Q.  And so my understanding of your answer is that for the
24     new existing rate bonds that you will make payments in

KENNETH BUCKFIRE, VOLUME 2

1  the ordinary course and that the payment immediately
2  after the plan will include all of the interest from
3  before and after confirmation; is that right?
4 A.  That's my understanding.
5 Q.  All right, and that for bonds, the new DWSD bonds --
6 A.  Mm-hmm.
7 Q.  -- that accrued but unpaid interest will be added to
8     the amount of principal?
9 A.  That's one possibility.  The other possibility is the
10     City pays that accrued interest claim under the old
11     rate up until the exit date and then moves to the new
12     rate.
13 Q.  And so do you -- is there -- do you understand how
14     that's going to be dealt with?
15 A.  I don't think we've actually made a decision on that
16     yet.
17 Q.  Okay, so I'm referring in particular to the topics
18     on -- that are 1 G and H in the designation --
19 A.  I see.
20 Q.  -- and is there anyone more knowledgeable than you
21     about the status of how payments will be made for
22     accrued but unpaid interest on the new DWSD bonds?
23 A.  On the new reset securities?
24 Q.  Right, and so not new existing rate but new DWSD

KENNETH BUCKFIRE, VOLUME 2

1  bonds.
2 A.  Right.
3 Q.  I understand that's how they're referred to in the
4     plan; is that your understanding?
5 A.  Yes.
6 Q.  Okay, so for the new DWSD bonds --
7 A.  Right.
8 Q.  -- which is not new existing rate bonds, how will --
9     is there anyone more knowledgeable than you about how
10     the accrued but unpaid interest will be dealt with for
11     those bonds?
12 A.  No.
13 Q.  And so the answer on behalf of the City is that hasn't
14     been decided?
15 A.  That's correct.
16 Q.  Do you know when it will be decided?
17 A.  It's on my list of things to do.
18 Q.  One other question I have about the allowed
19     calculation of the allowed amount of the claim --
20     first let me back up, you said yesterday in your
21     testimony that the ability to call the bonds going
22     forward was of value to the City; do you recall that?
23 A.  I do.
24 Q.  And the protection against the call was concomitantly

KENNETH BUCKFIRE, VOLUME 2

1  of value to bondholders, correct?
2 A.  Correct.
3 Q.  And have you done any valuation of the call protection
4     rights that would be impaired under the plan for
5     bondholders who receive new DWSD bonds?
6 A.  Which bonds?  There are two different series.
7 Q.  Okay, so for not the existing rate bonds because my
8     understanding is -- is -- I haven't asked about those
9     yet.  I'm asking about the new DWSD bonds, and I will
10     get to the second set --
11 A.  Right.
12 Q.  -- but for the new DWSD bonds.
13 A.  Well, the new DWSD bonds, which of course have the
14     lower interest rates, would also have call protection
15     embedded in their terms so that would give the
16     bondholders confidence that in fact we will not -- the
17     City will not in the near term further refinance those
18     bonds if that market opportunity exists to do so, that
19     is of course of value to those bondholders.
20 Q.  So that's a value of the new bond?
21 A.  Correct.
22 Q.  I'm asking the question whether you have valued the
23     call protections that have been impaired by the plan.
24 A.  Indirectly we have, yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Okay, and how have you done that?

3  A.  Well, it is the inverse -- it's obviously the same

4      value that would accrue to the ratepayers of the

5      system if you refinance the bonds at the lower

6      interest rates that we believe these bonds should

7      bear, the current projection is around $300 million of

8      value to be saved by the ratepayers through a reset

9      of the interest rates.  Now, that, of course, means

10     that if those bonds were reinstated, the value of

11     those bonds should include that $300 million to the

12     benefit of the bondholders.

13 Q.  Okay, and have you included that amount in -- or is

14     that amount going to be included in the allowed amount

15     of the claim?

16 A.  No, it's not their claim, their claim is par.

17 Q.  And so the allowed amount of the claim does not

18     include any amount allocable to the value of the call

19     protection being impaired by the -- by the plan: is

20     that right?

21 A.  That's correct.

22 Q.  All right, and so the allowed amount includes only the

23     par amount of the bond, and -- and to the extent you

24     decide to include it for new DWSD bonds, it includes

25     -- it would include accrued but unpaid interest,

KENNETH BUCKFIRE, VOLUME 2

2      correct?

3  A.  Correct.

4  Q.  And for new existing rate bonds, have the value -- the

5      value of the call protection for those bonds?

6  A.  Well, they don't have any call protection.

7  Q.  All right, for the impaired call protection, for the

8      -- for the bondholders who would be receiving new

9      existing rate bonds have you valued the -- the call

10     protection lost by those bondholders?

11 A.  No.

12 Q.  And those bonds are likewise being provided at par

13     without -- with the -- whatever adjustment, if any,

14     there's made to the -- for accrued but unpaid

15     interest, correct?

16 A.  Okay, let's be very clear.

17 Q.  Let's leave aside -- leaving aside the issue of

18     accrued but unpaid interest --

19 A.  Okay.

20 Q.  -- for those bonds the allowed amount will be the par

21     amount of the bond?

22 A.  Correct.

23 Q.  And for bondholders who purchased premium bonds, with

24     the associated yield, there will be no compensation

25     under the plan for the impairment of the premium bond?

KENNETH BUCKFIRE, VOLUME 2

2  A.  Correct.

3  Q.  What policies or practices control how expenses of the

4      DWSD are categorized as current operating or

5      maintenance expenses?

6  A.  Are you on 30(b)6 topics?

7  Q.  I am, it's 1 L.  So my question again is, what

8      policies or practices control how expenses of the DWSD

9      are categorized as current operating or maintenance

10     expenses?

11 A.  I'm prepared to testify to that.

12 Q.  You are?

13 A.  Yes.

14 Q.  Okay, but my question is what policies -- I was asking

15     the question --

16 A.  Oh, I'm sorry.  I thought --

17 Q.  -- assuming you were prepared, I was not asking are

18     you prepared to talk about it, I was assuming you are.

19 A.  Yes.

20 Q.  Of course I'm going to ask how you know, but the first

21     question is what are the policies or practices that

22     control how expenses of the DWSD are categorized as

23     current operating or maintenance expenses?

24 A.  Well, there are of course the rate-setting mechanisms

25     that DWSD has employed for decades in terms of setting

KENNETH BUCKFIRE, VOLUME 2

2      the rates, and those rates were set after a

3      calculation of the costs of running the system and how

4      they get allocated to customers.  The second thing, of

5      course, that I believe governs what they do is their

6      historical pass practices of how they allocate

7      expenses.

8  Q.  Okay, and again, I'm asking what those practices are

9      that control how their expenses are categorized as

10     current operating or maintenance expenses.  With

11     specificity can you tell me exactly what policies or

12     practices govern how DWSD -- DWSD expenses are

13     categorized as current operating or maintenance

14     expenses?

15 A.  Well, their practice has been, particularly with

16     respect to pension and OPEB costs, to categorize those

17     as operating expenses of the system and they are

18     expensed currently and have been for many years.

19 Q.  Okay.  And your basis for saying that is?

20 A.  Inspection of their financing documents, discussions

21     with the management of DWSD, and my general

22     understanding of how the rate second -- the

23     rate-setting mechanisms deal with these expenses in

24     general.

25 Q.  Do you know with specificity what policies or

1    KENNETH BUCKFIRE, VOLUME 2
2    practices the DWSD has historically followed for the
3    categorization of UAAL, and in particular, not just
4    its categorization as an operating or maintenance
5    expense but as a current operating or maintenance
6    expense; do you know how they've booked it
7    historically?
8    MS. BALL: I'm sorry. Did you understand
9    that?
10   **A. Well, they've -- they've taken the position that if**
11   **it's an expense currently they pay it.**
12   BY MR. BALL:
13   Q. Okay.
14   **A. That's how they've done it for a long time.**
15   Q. That's not exactly my question. I want to know as an
16   accounting matter how they book it, do they book it as
17   a current expense historically?
18   **A. As an accounting matter I'd have to review their**
19   **footnotes and see, I know from a cash flow perspective**
20   **they've always treated it as a current expense and**
21   **paid it currently.**
22   Q. Okay, so they've paid it currently --
23   **A. Yes.**
24   Q. -- which is a different thing than booking it as a
25   current expense; do you understand the difference?

1    KENNETH BUCKFIRE, VOLUME 2
2    **A. I do understand that difference, but I'd have to go**
3    **back and read the financing statements that they**
4    **published to see how they've actually done that from**
5    **an accounting point of view. As a practical matter I**
6    **worry more about cash flow than accounting principles.**
7    Q. And as a representative of bond insurers, I care to
8    some extent about the accounting treatment of the
9    expense as well. Do you know what the GASB rules are
10   that govern how such expenses are booked?
11   **A. No.**
12   Q. Do you know what they were two years ago?
13   **A. No.**
14   Q. Do you know what the current GASB rules are?
15   **A. No.**
16   Q. Do you know -- who would know that?
17   **A. Well, Sue McCormick would know and presumably --**
18   Q. Ms. Bateson?
19   **A. -- Ms. Bateson would know.**
20   Q. They have not been designated, I thought perhaps we
21   would have Ms. Bateson designated on this topic, she
22   was not. Do you know why you're designated on this
23   topic instead of her?
24   **A. Presumably because the issues have been about the**
25   **nature of OPEB and UAAL costs and where they get**

1    **KENNETH BUCKFIRE, VOLUME 2**
2    **allocated, whether they are above or, quote, below the**
3    **line with respect to debt service.**
4    Q. Whether they're above the water -- the debt service of
5    the waterfall or not?
6    **A. Right.**
7    Q. And that's certainly an issue, but I would like to
8    understand the accounting rules that govern it --
9    **A. Yes.**
10   Q. -- and that seems to be -- not to be an area that
11   you're prepared to address today; is that fair?
12   **A. I am not.**
13        (Electronic phone announcement: Has left
14        the conference.)
15   BY MR. BALL:
16   Q. Is it DWSD's policy to comply with GASB accounting
17   rules; do you know?
18   **A. Yes.**
19   Q. And do you know and yes, it is?
20   **A. They're expected to comply with municipal finance**
21   **accounting rules --**
22   Q. Okay.
23   **A. -- otherwise they wouldn't be able to get audited**
24   **statements.**
25   Q. So that is a policy of the DWSD to follow GASB rules?

1    KENNETH BUCKFIRE, VOLUME 2
2    **A. Yes.**
3    Q. And so far as you know, has -- well, do you know how
4    the 45.4 million in annual contributions the plan
5    contemplates that DWSD will make to the GRS on account
6    of UAAL -- UAAL be accounted for?
7    **A. No.**
8    Q. And so far as you know, has the City conducted any
9    analysis of how the GASB rules require accounting for
10   those amounts?
11   **A. No.**
12   Q. So the City has not, to your knowledge, undertaken any
13   such analysis?
14   **A. To my knowledge, that's correct.**
15   Q. What regulatory approvals does the City need to move
16   forward with the -- with the plan as it's been
17   approved, if any? Other than the approval of the
18   Bankruptcy Court, are there going to be regulatory
19   approvals that the City needs?
20   **A. I'm not aware of any.**
21   Q. Are there any that you've been told the City may need?
22   **A. No.**
23   Q. In connection with the proposed issuance of new debt
24   for the DWSD, how will DWSD meet the bond tests for
25   issuance of the new secured debt?

Pages 333 to 336

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 119 of 364

KENNETH BUCKFIRE, VOLUME 2

A. You mean in terms of its compliance with existing
covenant requirements?

Q. With the existing coverage covenants, yes.

A. I believe we'll be able to satisfy those tests.

Q. Okay, will DWSD take the position that the outstanding
loans are in default when it calculates its compliance
with those requirements?

A. No.

Q. That they're accelerated?

A. No.

Q. That they're unimpaired?

A. They'll be unimpaired.

Q. If the bonds were accelerated would they currently be
due and payable?

A. That's my understanding of acceleration.

Q. Okay, could DWSD pay them?

A. We would have to raise financing to do so.

Q. Would it be able to issue new secured bonds under the
existing indentures and ordinances if the bonds were
accelerated?

A. Probably with the cooperation of the Bankruptcy Court,
we could.

Q. Okay, except in a scenario where it's been approved by
the Bankruptcy Court would you be able to do it?

---

KENNETH BUCKFIRE, VOLUME 2

A. Probably not.

Q. One of the topics for which you've been designated is
1 K, which is how the trustee's fees and expenses
including fees of its counsel advisors and experts
will be paid and the source of the payment?

A. Yes.

Q. What can you tell me about that topic?

A. My understanding is to the extent that the trustee's
fees representing a secured party have been incurred
the City will ultimately have to pay them, the
department will have to pay them, not the City,
indirectly.

Q. And do you -- can you tell me -- what can you tell
me -- and so the source of the payment will be the
department?

A. Yes.

Q. Give me a moment, and I may be done.

MR. BALL: I will pass the witness. Do you
have questions?

MR. WEISBERG: I have a few.

MR. BALL: Thank you, Mr. Buckfire.

EXAMINATION

BY MR. WEISBERG:

Q. Mr. Buckfire, my name is Bob Weisberg, and I am

---

KENNETH BUCKFIRE, VOLUME 2

representing Oakland County, and I have a very few
questions for you today, and I appreciate the fact
that you've been here for two grueling days, and I'm
not going to take much more of your time than I have
to, but I do have a couple of questions.

I haven't been here for the entire two days
of your deposition, but I was there for most of
yesterday and for some of today. Is it fair to say
that during the course of your testimony today, that
you provided various questioners with any expert
opinions that you intend to offer in this Chapter 9
case?

A. Yes.

Q. Okay. Are there any expert opinions that either do
not appear in your report or that you have not
testified to in the two days of your depositions you
intend to offer as expert opinions in the Chapter 9
case?

A. No.

Q. Just as a quick follow-up to that, you are not
offering an expert opinion with respect to the
financial or operational viability of the DWSD; is
that correct?

A. Only with respect to the ability of the department to

---

KENNETH BUCKFIRE, VOLUME 2

borrow more cheaply post emergence and to support the
reduction of interest rates proposed by the plan.

Q. With the exception of that limited extent, you are not
offering any further expert opinion on the viability
of the DWSD; is that correct?

A. No.

Q. All right. In connection with the DWSD you are aware
that in the plan and in the projections associated
with the DWSD, there is a provision with respect to
moneys associated with the capital improvement plan or
a CIP?

A. Yes.

Q. Do you know what the genesis of that CIP is?

A. Yes.

Q. And what is the genesis of that CIP?

A. It was a multi-month study conducted by OHM, which is
a consulting firm retained by the City on behalf of
the DWSD back in -- I believe it was early July of
last year. They did a thorough review of the system
both on the water and sewer side, and they relied on
engineers who had many years of familiar --
familiarity with the system, and they produced the
capital improvement plan which was first delivered to
DWSD and to the Counties, I believe on October 1st.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 120 of 364

KENNETH BUCKFIRE, VOLUME 2

Q. And was that plan as articulated by OHM was that incorporated wholesale into projections for the DWSD under the plan of adjustment?

A. I believe so.

Q. All right. And who made the decision to incorporate that plan?

A. It was the decision made by Mr. Orr, the emergency manager following the recommendation from his advisors --

Q. Okay.

A. -- and consulting with DWSD, itself.

Q. So is it -- is your belief that someone at DWSD also advised Mr. Orr to utilize the OHM plan?

A. I didn't say that. I said that they were consulted and discussed it with them. My understanding is they raised no material objections in any way to the plan, itself, terms of how much it would cost and when it would cost to improve the system. So it is an analysis performed by OHM on behalf of the City which I reviewed, which others reviewed and we recommended to the emergency manager to be included.

Q. Do you know whether any studies were done to critique or evaluate the OHM plan beyond what it said on its face?

KENNETH BUCKFIRE, VOLUME 2

A. Well, I believe that Oakland County and other Counties retained its only consultants at our urging to review the OHM material. I never heard the results of that investigation.

Q. All right, but the City didn't retain any third-party consultant to evaluate the OHM plan; is that correct?

A. Not that I'm aware of.

Q. All right. And with respect to the, again, the incorporation of that plan as the CIP, if you will, in the projections for the DWSD, did someone affirmatively recommend to Kevyn Orr that that plan be incorporated, or did he make that decision on his own with, as you've suggested, some input or commentary from other parties?

A. I already answered that question.

MR. WEISBERG: What am I looking it?

BY MR. WEISBERG:

Q. I guess my question is this, and maybe I'm not being as articulate as I should be. I want to understand if someone affirmatively recommended to Mr. Orr that the OHM plan be incorporated, and if so, who was that person?

A. OHM was retained by the City to develop a CIP plan for

KENNETH BUCKFIRE, VOLUME 2

DWSD that could be relied upon for purposes of developing the long-term financial and operating forecasts of the City and DWSD. They did that and delivered their analysis on October the 1st. There was no basis that I'm aware of on which that report should have been rejected or not relied upon for purposes of financial projections by the City or by DWSD and, therefore, was included in the plan.

Q. I understand your point. My question is a little bit different, and what I'm getting at is are you aware of anybody within the City organization or within DWSD who recommended to Mr. Orr that that plan be the basis of the CIP in the projections in the plan?

A. Not in those terms, no.

Q. Okay. Would it have been Mr. Orr's decision unilaterally to incorporate the OHM plan?

MR. CULLEN: Objection, misstates his testimony.

BY MR. WEISBERG:

Q. It's a question. I'm suggesting you answer.

A. Mr. Orr, as the emergency manager, had ultimate executive authority for everything related to the plan of adjustment.

Q. And what persons, specifically by name, if you know,

KENNETH BUCKFIRE, VOLUME 2

advised Mr. Orr with respect to or provided him with commentary with respect to the incorporation of the OHM plan?

A. Well, it would have been individuals at Conway MacKenzie but probably Mr. Moore, myself, one of my colleagues, Kevin Haggard. I'm not sure anybody in AOI was really involved in this to any real extent.

Q. And you mentioned representatives of DWSD. Which people at DWSD would have provided him with recommendations or commentary?

A. Commentary would have been Ms. McCormick, Ms. Bateson, probably to a limited extent Mr. Wolfson.

Q. And I think you said that you don't know of anyone who affirmatively objected to the use of the OHM plan, correct?

A. Correct.

Q. All right. And would that include Ms. Bateson and Ms. McCormick?

A. Yes.

Q. Do you know whether either one of those persons, Bateson or McCormick, advocated the inclusion of the OHM plan?

A. No.

Q. All right. Do you know of any limitations with

KENNETH BUCKFIRE, VOLUME 2

1  respect to the OHM plan by its express terms in terms
2  of what it was an advocating needed to be done in
3  connection with the system?
4  **A.  The only caveat was and I testified to this yesterday**
5  **the system is not in complete compliance with the**
6  **Clean Water Act.  It operates under a hardship**
7  **exception.**
8  **My understanding of that in the very**
9  **beginning of our engagement with the City has been**
10  **that the costs of coming into compliance might be in**
11  **the billions.  So long as the hardship exemption is in**
12  **place, the City does not have to budget for the**
13  **capital required to come into compliance.  That was**
14  **not, therefore, looked at by OHM.**
15  Q.  Were there other limitations in connection with the
16  OHM plan?
17  **A.  Not that I'm aware of.**
18  Q.  Was the OHM recommendations limited in any way by way
19  of affordability?
20  **A.  Not that I'm aware of.**
21  Q.  Is it your belief that the -- that the DWSD must
22  remain as a viable operating division, if you will,
23  within the City in order for the plan to succeed?
24  **A.  That's one alternative.**

KENNETH BUCKFIRE, VOLUME 2

1  Q.  What's another alternative?
2  **A.  The creation of a regional authority.**
3  Q.  Fair enough, fair enough.  How does the payment of
4  the -- the nine-year amortization, if you will, of
5  moneys that the DWSD will contribute to payment of
6  certain pension obligations how does that fit in with
7  respect to the viability of the plan?  Is it an
8  essential element of the plan?
9  **A.  Yes, it's part of our overall settlements with our**
10  **creditors.**
11  Q.  So the -- you're saying that the payment by the DWSD
12  is part of the overall settlement with your creditors?
13  **A.  Well, you can't separate the elements out, and that's**
14  **not an essential element to the funding of the claims**
15  **that we have with our creditors, and this is one**
16  **source of where that money comes from, and there's**
17  **actually a -- an analysis of that in my expert report**
18  **if you'd care to look at it.**
19  Q.  And where would that be?
20  **A.  Actually, maybe it's Exhibit L or M, I think it's M.**
21  **If you go to the plan document, itself, you'll see an**
22  **analysis of the -- you'll see an analysis of the**
23  **projected cost of making the pension contribution**
24  **relative to historical levels and the impact on how**

KENNETH BUCKFIRE, VOLUME 2

1  **that's funded, so if you want to go back and look at**
2  **it, you'll see it.**
3  Q.  So I think what you're referring to, correct me if I'm
4  wrong, wait a minute here, would be -- is it the --
5  the selected financial information attached to your
6  report?
7  **A.  Yes, that's right.**
8  Q.  All right.  Can you turn to that --
9  **A.  Yep.**
10  Q.  -- on that subject?
11  **A.  As I mentioned, this is based on information on the**
12  **plan of adjustment.**
13  Q.  I understand.
14  **A.  Okay.**
15  Q.  So what you're referring to, I think, correct me if
16  I'm wrong, is that historically, at least through the
17  year 2012, when you combined various legacy
18  liabilities that the DWSD was -- was paying, they were
19  paying at a rate somewhere in the 40 to $50 million
20  range; is that correct?
21  **A.  That's right.**
22  Q.  And so your commentary is that when we look forward
23  into the year 2015 out to the year 2023, that with,
24  perhaps, the one exception of the year 2015, the

KENNETH BUCKFIRE, VOLUME 2

1  numbers are in a somewhat similar range?
2  **A.  That's right.**
3  Q.  All right.  Now, with respect to those gross numbers,
4  I agree with you, those are the same.  If you break
5  those numbers down and we look at, for example, the
6  DWSD contribution to pension only, those numbers do
7  not match up at all, am I correct?
8  **A.  No, they were undercontributing for decades.**
9  Q.  All right.  Let's talk about that for a minute.  You
10  said they were undercontributing for decades.
11  First of all, I think you testified
12  earlier, I think it was today, that the DWSD was
13  paying what it was directed to pay during those time
14  periods; is that correct?
15  **A.  That's right.**
16  Q.  That's your belief.  So when you say they were
17  underpaying, who were -- who was deciding that they
18  should pay less than they were obligated to pay in
19  your estimation?
20  **A.  The City.**
21  Q.  Okay, the City was making that determination.  And how
22  was the City implementing that determination?
23  **A.  My understanding is the City was setting their pension**
24  **contribution rate for all of the GRS at the lowest**

Pages 345 to 348

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 122 of 364

1    KENNETH BUCKFIRE, VOLUME 2
2    possible level despite the fact that the underfunding
3    of the plan was growing, not shrinking, and because of
4    that low contribution rate, DWSD, even though it had
5    the ability to fund at a higher level, because DWSD
6    had the ability to charge through the ratepayers their
7    appropriate expenses, was benefitting from the City's
8    own financial difficulties in a perverse way.
9    Q.    Was the contribution to the DWSD in these prior years
10          addressing any underfunding, was that calculated by
11          the City's actuaries?
12   A.    I believe so.
13   Q.    Do you know whether the City's actuaries were in
14          agreement with the amounts that were being contributed
15          by the City and or DWSD with respect to any
16          underfunding?
17   A.    My understanding was the minimum possible contribution
18          is what they were contributing.
19   Q.    All right, when you say minimum possible, minimum
20          compared to what?
21   A.    In pensions, whether they're corporate or public,
22          you're supposed to maintain them at a reasonable level
23          of funding so that you can meet your obligations as
24          they come due.
25                In the corporate world, we normally assume

1    KENNETH BUCKFIRE, VOLUME 2
2    that a plan that's funded 80 percent or more is
3    adequately funded.  A plan under 80 percent clearly
4    has issues because you're not contributing enough to
5    make up for the benefit expenses of that plan.
6                In the case of the Detroit plans, it was
7    clear after our initial analysis that they were
8    grossly underfunded, which implies that the pension
9    contribution rates were too low to provide adequate
10   resources of the pension plans to meet future benefit
11   costs.
12   Q.    Just so I'm clear, you're not an actuary --
13   A.    I am not.
14   Q.    -- correct?  And you're not providing an expert
15          opinion as an actuary in this case, are you?
16   A.    I'm not.
17   Q.    And you're not providing any opinion in this case as
18          to the adequacy or inadequacy of the funding of the
19          plan; is that right?
20   A.    Only to the extent that it's a fact that the plans
21          were severely underfunded and we reported that fact in
22          June of 2013.
23   Q.    There are a lot of plans out there that are
24          underfunded in the general commercial world; are there
25          not?

1    KENNETH BUCKFIRE, VOLUME 2
2    A.    No.
3    Q.    There are certainly some?
4    A.    There are always some.
5    Q.    This isn't the only one.
6    A.    This is not a commercial plan; it's a public plan.
7    Q.    There may be public plans that are underfunded out
8          there, as well?
9    A.    There are many worse than this one.  I'll be calling
10          them next.
11   Q.    Who determined the amount of these payments that will
12          be made by the DWSD to the pension plan?
13   A.    It was determined in a negotiation with the pension
14          fund and trustees, the retirees' committee, supported
15          by the City's own actuaries, consultants to the City,
16          and experts at Jones Day.
17   Q.    You say they were supported by actuaries to the City;
18          what do you mean by that?
19   A.    Well, the calculation of how much to contribute to get
20          to a target level of funding is something that an
21          actuary is typically employed to do.
22   Q.    Okay.  And my question isn't so much that as to
23          whether the amount of payment gets you to where you
24          want to get.  My question is who determined that it
25          would be paid over the period that it was -- that it's

1    KENNETH BUCKFIRE, VOLUME 2
2    being paid?
3    A.    It was negotiated.
4    Q.    All right.  It wasn't something that was recommended
5          by the City's actuaries; is that correct?
6    A.    No.
7    Q.    No, it was not?
8    A.    It was not.
9    Q.    In connection with this negotiation, was it also
10          determined that the City would not be contributing to
11          the -- the reduction of the underfunding through 2023?
12                MR. CULLEN:  Objection, I think we're
13          getting into the negotiations under the mediation
14          privilege, now we're getting into the terms of the
15          negotiation.  He was able to tell you that this was a
16          product of a negotiation.  Now you're asking him to
17          parse the negotiation, and that's beyond the pale.
18                MR. WEISBERG:  Not agreeing with it, but
19          we'll move on.
20                MR. CULLEN:  Okay.
21   BY MR. WEISBERG:
22   Q.    To what extent was -- were you or and/or Miller
23          Buckfire involved in connection with the underlying
24          assumptions that were used in order to calculate the
25          UAAL in connection with the plan of adjustment?

KENNETH BUCKFIRE, VOLUME 2

2  MR. CULLEN: I would just note for counsel
3  that you can answer -- ask the question, but on the
4  derivation of the -- what's been called the 428
5  figure, Mr. Moore was designated as the 30(b)6
6  witness.
7  MR. WEISBERG: Okay, and I'm not suggesting
8  that Mr. Buckfire wasn't so designated.
9  BY MR. WEISBERG:
10  Q. I'm just asking you if you were involved in that
11  determination?
12  A. No.
13  Q. You are with Miller Buckfire?
14  A. Correct.
15  Q. And in paragraph 3 of your expert report -- and you
16  can refer to that. You indicate that in the third --
17  third sentence starting with in addition, it says in
18  addition to other obligations, the City will have
19  addressed and brought greater certainty and
20  predictability with respect to its pension benefit and
21  OPEB obligations; do you see that?
22  A. I do.
23  Q. Okay, can you tell me what that means?
24  A. I answered this question yesterday.
25  Q. I'm sorry, I apologize. I might have missed

KENNETH BUCKFIRE, VOLUME 2

2  something. Could you give it to me again?
3  A. The City by action of the plan of adjustment is
4  eliminating $7 billion worth of present value of
5  liabilities, most of which was represented by unfunded
6  pension and healthcare benefit costs. The burden of
7  those costs upon the City have been that the
8  requirement to fund them currently with substantial
9  cash has often been outside of the City's control, as
10  it's been driven by independent factors, healthcare
11  plans, benefit costs, pension contribution levels.
12  By eliminating such a large amount of the
13  present value of these
14  remaining claims into a debt obligation stream
15  represented by the contribution by DWSD for catchup
16  and also by the series B notes, the City will have
17  much greater control over it's discretionary costs and
18  its ability to meet its remaining contractual
19  obligations when due.
20  Q. Well, okay, I certainly agree with you with respect to
21  through the years, the year 2023 that said you will
22  have virtually no obligation to pay in connection with
23  costs, correct?
24  A. Correct, that was an objective of our plan.
25  Q. So that's certainly predictable. But what about with

KENNETH BUCKFIRE, VOLUME 2

2  respect to; is that as predictable?
3  A. Ten years, twenty years, anyone's guess.
4  Q. Okay. All right. It also indicates here that in that
5  same paragraph, it says that the fact that such
6  obligations are driven by actuarial analyses and
7  assumptions, such obligations have traditionally
8  served as a significant obstacle in the City's
9  financial planning effort.
10  So I'm trying to connect up those two
11  concepts. What -- what is the connection between the
12  fact that these pension obligations are driven by
13  actuarial analyses and the fact that they create an
14  obstacle to the City's financial planning?
15  A. I already answered that question. Actuarial
16  assumptions --
17  Q. Indulge me, it's been a long two days.
18  A. Actuarial assumptions and analysis ultimately do drive
19  required pension contribution costs. There's a cash
20  cost associated with being required by an actuary to
21  make certain contributions. That is inherently
22  unpredictable because it does change relative to
23  market asset performance and benefit costs,
24  themselves. It's not something directly within the
25  City's control, and the larger the underfunding is,

KENNETH BUCKFIRE, VOLUME 2

2  the more of a projected burden that will be on the
3  City because at some point, that gap has to be closed,
4  and that makes it very difficult for a City to make
5  long-term financial plans knowing that at some point
6  in the next 10 or 20 years, it will have to satisfy
7  its pension obligations whether or not it has the
8  assets to do so.
9  Q. There's an actuarial component to what it's going to
10  have to pay down the road; is there not?
11  A. There is when you estimate today what your
12  contribution has to be to the pension fund but the
13  actual benefit costs, themselves, is something you
14  find out every year when people retire and register
15  for their claimant payments. So we're talking about
16  the funding problem -- the funding problem, not the
17  benefit cost problem that drives this.
18  I also note your earlier point that the
19  ten-year period of stability is crucial because we do
20  assume and we have every right to do so that the
21  City's ability to revitalize itself be successful and,
22  therefore, will have the ability to be a healthy
23  viable City beyond year ten, which means from a
24  capital market's perspective, the expectation should
25  be that it will have no difficulty raising capital

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

KENNETH BUCKFIRE, VOLUME 2

2 beyond year 10, particularly because much of the
3 pension costs related to GRS would have been taken
4 care of by the pension settlement, itself, in the
5 first ten years.
6          And if you were to look at the projections
7 in the plan for years 11 and later, you'll note that
8 the contribution costs of pension drop off to a very
9 de minimis amount because we have front-end loaded
10 those costs for the first ten years, which is a unique
11 position for any City to be in.
12 Q. Are you aware of the level of funding of the pension
13    plan in 2023 based on current projections?
14 A. Well, there are two plans, PFRS and GRS; which one are
15    you referring to?
16 Q. GRS.
17 A. I think the plan stipulates we have to get them to 70
18    or 75 percent.
19 Q. That -- that's your -- that's your assumption?
20 A. That's my recollection of what the numbers. I know we
21    had an objective of that, but I can't remember whether
22    it's PFRS or GRS, I apologize.
23 Q. Well, do you know -- what one was, do you know what
24    the other one was supposed to be?
25 A. No, but that's -- that is a reasonably adequate level

KENNETH BUCKFIRE, VOLUME 2

2 of funding for a plan of this kind and the view of the
3 actuaries and experts that were involved in this.
4 Q. At some point in your testimony over the last several
5    days, I think you had some discussion about water
6    rates. You're not a water rate expert, correct?
7 A. No.
8 Q. Do you believe that there's the ability of the DWSD to
9    impose unlimited increases in water rates either
10    legally or practically?
11 A. No.
12 Q. No, you do not believe that's their --
13 A. I do not believe they have the ability to do that.
14 Q. Okay. There's some limitation?
15 A. Both practically and legally.
16 Q. And so to the extent that there are not enough funds
17    in DWSD to satisfy existing operational issues, it
18    doesn't necessarily follow in your mind that that
19    shortfall will be able to be made up by way of
20    increased rates?
21 A. I didn't say that.
22 Q. Do you believe that? Can the shortfall be made up by
23    increased rates no matter how big the shortfall is?
24 A. Well, there's a practical limit to that. I meant -- I
25    don't understand your question.

KENNETH BUCKFIRE, VOLUME 2

2 Q. My question is if the DWSD has insufficient funds --
3 A. Mm-hmm.
4 Q. -- going forward to satisfy its operational needs,
5    there's some limit as to how much of that shortfall
6    can be made up by way of increased water and sewerage
7    rates; is that your understanding?
8 A. Well, there's always a limit to how high you can price
9    a service or a good.
10 Q. And no difference here notwithstanding the fact that
11    everybody needs water?
12 A. There's always a limit.
13 Q. All right. You indicated that -- well, strike that.
14          In connection with the selected financial
15    information in your report, wherein you identify what
16    you believe to be factors that indicate that the DWSD
17    going forward will be in a better financial position
18    than it has been historically, is what's reflected on
19    that exhibit the totality of the benefits that you
20    believe will be bestowed upon DWSD from a financial
21    perspective?
22 A. No.
23 Q. What other benefits do you believe will exist to the
24    DWSD?
25 A. Well, we didn't show it on this chart, but I did

KENNETH BUCKFIRE, VOLUME 2

2 testify earlier to the ability of the system going
3 forward to retain revenue financed capital to finance
4 the CIP, and that is now part of the operating plan
5 for DWSD that is not reflected on this chart. My
6 recollection is that that is an average $40 million a
7 year of revenue that can be retained for the purpose
8 of CIP, which means the system will not have to borrow
9 that amount, which means that the ratepayers will not
10 have to cover the interest expense for amortization of
11 borrowing that amount.
12          So even over this ten-year period, if
13 recollection serves $600 million of capital financed
14 through revenue, rather than borrowing costs, which
15 translates into over time lower leverage and a higher
16 quality system.
17 Q. So in terms of what is currently needed by the DWSD
18    consistent with the projections in the plan, is there
19    some cushion that's built into that projection? And
20    if so, what amount of cushion is built in?
21 A. It's the revenue finance capital.
22 Q. That's the $600 million?
23 A. You can think of it that way, yes.
24 Q. All right. What other risks are there with respect to
25    the DWSD performing consistent with the projections of

Pages 357 to 360

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 125 of 364

KENNETH BUCKFIRE, VOLUME 2

the plan?

**A. Governance.**

Q. Okay, you indicated earlier the regulatory issues, correct? That's also a risk if -- if they lose the grandfathering in with respect to the environmental; is that correct?

**A. That's a risk that all water utilities face. DWSD is not going to meet that in that regard.**

Q. Is there a risk with respect to whether there is sufficient CIP built into the plan in order to maintain the system?

**A. Of course.**

Q. Okay. And have you -- have you or has anyone quantified what the amount of that risk is plus or minus with respect to what's built into the CIP currently?

**A. No, we believe the CIP as currently understood is adequate to maintain the system safety and stability.**

Q. And I -- again, I don't necessarily know that you were designated on this topic, but did you or Miller Buckfire have involvement in terms of the creation of the ten-year plan for the DWSD in terms of the projections?

**A. Yes.**

KENNETH BUCKFIRE, VOLUME 2

Q. Okay. And what was the level of your involvement in those projections?

**A. Well, we worked closely with Conway MacKenzie, OHM and E & Y to develop the projections, proposals that were first actually delivered to the accountings on the October 2nd, which explained how we would deal with the legacy liabilities and to create a projection that would be the basis of discussion.**

Q. Now, as long as you brought up the negotiations with the Counties, what was your personal involvement in those negotiations? And by the way, I'm talking about prior to any court ordered mediation.

**A. I led the City's efforts to negotiate with the Counties' premediation.**

Q. And suffice it to say those negotiations did not result in any agreement with respect to a regional authority, correct?

**A. I don't know how to answer that.**

MR. CULLEN: Do you mean a consummated agreement, counsel?

MR. WEISBERG: Well, an agreement of any kind prior to -- prior to -- what does it say, prior to the court-ordered mediation.

MR. CULLEN: What I'm asking is the

KENNETH BUCKFIRE, VOLUME 2

ambiguity, and there might be a document that says agreement at the top of it, but it was never --

THE WITNESS: Okay.

MR. CULLEN: -- consummated.

MR. WEISBERG: Well, he can tell me that.

MR. CULLEN: Is that your -- is that your question or is you question was there are --

BY MR. WEISBERG:

Q. Obviously there wasn't a consummated agreement so what level of agreement was there, if any?

**A. I'm going to be very careful. We had fully negotiated an agreement with the participation of Wayne, Oakland, and Macomb counties. That at least one party indicated they were prepared to sign with the City. But we elected not to do so at that time.**

Q. So am I to take from that that there were two parties that did not agree to sign that agreement?

**A. I didn't say that. I said we had at least one party that was prepared to sign along with the City to create an authority.**

Q. Do you know whether there was more than one party that had the ability to sign?

**A. Yes.**

Q. Was there?

KENNETH BUCKFIRE, VOLUME 2

**A. There was.**

Q. And how many more were there?

MR. MONTGOMERY: Excuse me, you know, I'm objecting to this, but I don't know how you get into this without violating the mediation --

MR. CULLEN: I think --

MR. HACKNEY: It's premediation.

MR. BALL: Mediation for the DWSD does not start until March of this year.

MS. BALL: It's a very difficult line to draw between --

MR. MONTGOMERY: No, that's not true --

MS. BALL: -- it was the subject of other items that were in the mediation, although, the Counties were not yet in mediation.

BY MR. WEISBERG:

Q. You can draw the line wherever you want. We'll deal with whatever you draw the line on for purposes of today's discussion. So I'm not -- I'm not going to make you answer this question.

MR. CULLEN: I think we've given you what we're going to give you on the state of play on the eve of mediation.

BY MR. WEISBERG:

KENNETH BUCKFIRE, VOLUME 2

2 Q. All right. Let me ask you this question so I don't
3    spend a lot more time wasting yours and mine.
4 A. Right.
5 Q. Is there anything about the negotiations that took
6    place prior to the court ordered mediation among the
7    City and the Counties with respect to a regional
8    authority that you are prepared to discuss here today?
9    If there's not, I won't ask anymore questions.
10 A. No.
11 Q. No --
12 A. I just can't discuss it.
13 Q. Okay. Fair enough, fair enough.
14      A couple more things and I will be done.
15    With respect to the DWSD projections, have -- have
16    you, anybody at Miller Buckfire, or anybody that
17    you're aware of done any comparisons with respect to
18    recent run rates of the DWSD compared to what you
19    currently have in the plan?
20 A. What run rates are you referring to?
21 Q. The current performance. In other words, how is the
22    current performance of the DWSD compared to what you
23    have projected in the plan, positive, negative,
24    neutral?
25 A. You know, it's a monthly determination. They have

KENNETH BUCKFIRE, VOLUME 2

2    made strong efforts, which actually have publicly
3    reported to improve collections and turn off
4    delinquent accounts. That has led to a reduction of
5    the run rate from the point of view of revenues, but
6    it has, I believe, set the system up for improved
7    performance going forward.
8      So aside from the short-term noise around
9    that particular policy change, I'm not sure that the
10    run rate has changed at all relative to the plan.
11 Q. Okay. And we didn't talk about this earlier, but with
12    respect to risks to DWSD performance, is it considered
13    to be a risk by you if DWSD is not able to obtain
14    financing at the -- the levels that you've described
15    or based upon, you know, the quality of the debt
16    instruments that you've described that you think are
17    attainable?
18 A. When you speak of performance, are you speaking of its
19    ability to satisfy its customers' requirements for
20    water and sewer services?
21 Q. No, I'm talking about it's ability to borrow money --
22 A. Oh.
23 Q. -- at rates that you've described. If it can't borrow
24    at the rates you've indicated, that's another risk to
25    its performance going forward, correct?

KENNETH BUCKFIRE, VOLUME 2

2 A. No. I mean as long as they have access to capital,
3    they might have to pay a little more than they should,
4    but you know, they're looking at borrowing, I think,
5    on average around $200 million a year. So presumably
6    $200 million a year if they're paying 6 percent, not 4
7    percent.
8 Q. Within the level of borrowings that are projected,
9    you're saying, as they can do a higher rate if
10    necessary without significant adverse consequences?
11 A. Correct, particularly because we're programming in a
12    substantial amount of revenue financed capital, which
13    is a very important cushion they have not previously
14    had access to.
15 Q. Do you know whether the CIP as projected in the plan
16    has any inflation adjustment to it?
17 A. I don't recall.
18 Q. All right. In your view -- and I appreciate you're
19    not the -- water expert, per se, but in your view,
20    operationally, at least, in your view, do you believe
21    that the OHM plan addresses current identified needs
22    of the system?
23 A. I have no reason not to believe that.
24 Q. All right. And I think you said, correct me if I'm
25    wrong, that you were unaware of the results of any

KENNETH BUCKFIRE, VOLUME 2

2    County consultant report that may have been done
3    subsequent to the OHM plan?
4 A. Correct.
5 Q. All right. So to the extent that that -- that report
6    exists, and if it differs from the OHM plan, you're
7    not aware of that?
8 A. That's correct. It never provided it if one exists.
9      MR. WEISBERG: All right. Give me one
10    second and I'll wrap it up.
11      MR. DAVIDSON: Good afternoon, Paul
12    Davidson for U.S. Bank.
13      EXAMINATION
14 BY MR. DAVIDSON:
15 Q. Mr. Buckfire, are you aware that in May of this year,
16    Citibank told Mr. Doak that the rating agencies would
17    give the DWSD bonds a special default rating upon
18    emergence from bankruptcy?
19 A. I am.
20 Q. And what rating is that they would give?
21 A. D.
22 Q. And is -- do you have any knowledge about when that
23    rating might be released?
24 A. Upon emergence, upon emergence.
25 Q. It will be given that rating upon emergence?

KENNETH BUCKFIRE, VOLUME 2

1
2  **A.  That's my understanding.**
3  Q.  And how long would it hold that rate?
4  **A.  Oh, probably not very long.**
5  Q.  Any idea of how not very long?
6  **A.  A few months.**
7  Q.  And what -- on what basis do you --
8  **A.  My experience with the agencies over many years is**
9  **that they tend to follow the market, not lead.  They**
10  **don't buy bonds.**
11  **I have every expectation that the financing**
12  **for this system will be well received and that the**
13  **investors will not really be that concerned about the**
14  **default rating or other ratings applied by these**
15  **agencies.  My experience is in other financings is**
16  **that sophisticated investors pay little or no**
17  **attention to the agency's ratings.**
18  Q.  And what is that -- can you tell us what that
19  experience is based upon?
20  **A.  Many years of managing financings for clients emerging**
21  **from bankruptcy.**
22  MR. BALL:  I, obviously, have a couple of
23  questions because of that.  Can I have the microphone?
24  MR. CULLEN:  Is the other counsel done?
25  MR. BALL:  Are you done?

KENNETH BUCKFIRE, VOLUME 2

1
2  MR. WEISBERG:  Yes.
3  EXAMINATION (CONTINUED)
4  BY MR. BALL:
5  Q.  I asked you yesterday, Mr. Buckfire, whether there had
6  been communications with the rating agencies about the
7  rates, right?  And whether you or your staff had
8  such -- such discussions; do you recall that?
9  **A.  I do.**
10  Q.  And is there a reason why you didn't tell me then
11  about the communications you've just told
12  Mr. Johnson -- Mr. Davidson about?
13  **A.  He was referring to a conversation with Citibank, not**
14  **between Miller Buckfire and the rating agencies.**
15  Q.  All right, so are you aware of any -- so the
16  distinction you're drawing is Citibank was acting on
17  behalf of the DWSD when it had those communications,
18  correct?
19  **A.  No.**
20  Q.  It was behalf of the State of Michigan; is that the --
21  **A.  No.**
22  Q.  -- answer?  On whose behalf was it acting?
23  **A.  Its own.**
24  Q.  On its own, so Citibank has been retained as the
25  underwriter on the $150 million bond issuance; isn't

KENNETH BUCKFIRE, VOLUME 2

1
2  that correct?
3  **A.  I believe that occurred after April.**
4  Q.  Okay.  So this communication was in May?
5  **A.  Yes.**
6  Q.  All right.  And so are you saying at the time Citibank
7  had these communications it was not acting -- it had
8  not been retained as the underwriter at that point?
9  **A.  They might have been designated as the underwriter**
10  **but whether they were retained or not legally, I don't**
11  **know.**
12  Q.  All right, so you're not sure one way or the other
13  whether they have been designated as the underwriter
14  at the time you had those communications?
15  **A.  I don't recall the date.**
16  Q.  So you're aware, in any event, that Citibank, the
17  entity that was hired to be the underwriter on the new
18  issuance of the $150 million in debt had
19  communications with the rating agencies about the
20  likely ratings of the DWSD bonds upon emergence,
21  correct?
22  You're aware of those communications you
23  just described?
24  **A.  I remember hearing about it.**
25  Q.  Okay.  And so have you had -- are there any other

KENNETH BUCKFIRE, VOLUME 2

1
2  communications with rating agencies or municipal
3  ratings analysts that you haven't told me about that
4  you're aware of in which they discuss the rating that
5  will be applicable to or the creditworthiness of the
6  DWSD bonds upon emergence?
7  **A.  No.**
8  Q.  And the reason you didn't tell me yesterday about
9  these is you believed that wasn't responsive to the
10  questions I asked?
11  **A.  It's not relevant.  We didn't have the communication**
12  **Citibank did.  They told us what they said what the**
13  **agency said, that's hearsay.**
14  Q.  All right, you're an expert, right?
15  **A.  Yes, I am.**
16  Q.  And you've relied on a lot of things here that are
17  hearsay, correct?
18  **A.  I wouldn't characterize -- I wouldn't characterize**
19  **that as hearsay.  That -- that is hearsay.**
20  Q.  Okay.  So the -- you don't believe anything else
21  you've relied upon in your report is hearsay?
22  **A.  You're parsing words.**
23  MR. CULLEN:  Counsel, you asked him a
24  direct question; he gave you a direct answer.
25  BY MR. BALL:

1    KENNETH BUCKFIRE, VOLUME 2
2    Q. So Mr. Buckfire, are you aware of any other evidence
3    or information that's inconsistent with the
4    conclusions you've drawn about the creditworthiness of
5    the bonds that you haven't told me about?
6        MR. CULLEN: Objection, foundation, form.
7    The premise of your question -- that's a "Have you
8    stopped beating your wife" question. Ask him a direct
9    question.
10   BY MR. BALL:
11   Q. Apart from what you've told me about so far, if
12   anything, are you aware of any information about --
13   that is inconsistent with the opinions you've drawn
14   about the creditworthiness of the DWSD bonds?
15       MR. CULLEN: Object to foundation and form
16   of that one, too, but answer if you can make any sense
17   of it.
18   A. I don't understand the question.
19   BY MR. BALL:
20   Q. Excluding anything you've told me so far, whether
21   you've told me anything or not about that you believe
22   is inconsistent with the conclusions you've drawn
23   about the creditworthiness of the DWSD bonds, are you
24   aware of any other information that is inconsistent
25   with your opinions about the creditworthiness of the

1    KENNETH BUCKFIRE, VOLUME 2
2    DWSD bonds upon emergence?
3        MR. CULLEN: That's a completely
4    unanswerable question. Anything you think is
5    inconsistent?
6        MR. BALL: Anything he thinks is
7    inconsistent.
8    A. I don't even understand your question, I'm sorry.
9    BY MR. BALL:
10   Q. So you are not aware of any -- well, strike that.
11       Are you aware of any other information
12   about communications by rating agencies or credit --
13   municipal credit analysts concerning the
14   creditworthiness of the DWSD bonds upon emergence from
15   bankruptcy?
16   A. No.
17       MR. BALL: Anybody else? That's it. Thank
18   you, Mr. Buckfire.
19       THE WITNESS: Thank you.
20       VIDEO TECHNICIAN: This concludes today's
21   deposition. The time is 5:27 p.m., we are now off the
22   record deposition concluded.
23       (The deposition was concluded at 5:27 p.m.
24   Signature of the witness was not requested by
25   counsel for the respective parties hereto.)

1    KENNETH BUCKFIRE, VOLUME 2
2        CERTIFICATE OF NOTARY
3    STATE OF MICHIGAN )
4              ) SS
5    COUNTY OF MONROE )
6
7        I, LEISA PASTOR, certify that this
8    deposition was taken before me on the date
9    hereinbefore set forth; that the foregoing questions
10   and answers were recorded by me stenographically and
11   reduced to computer transcription; that this is a
12   true, full and correct transcript of my stenographic
13   notes so taken; and that I am not related to, nor of
14   counsel to, either party nor interested in the event
15   of this cause.
16
17
18
19
20       LEISA PASTOR, CSR-3500, CRR,
21       Notary Public,
22       Monroe County, Michigan
23       My Commission expires: 9/7/20
24
25

Pages 373 to 375

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6826  Filed 08/18/14  Entered 08/18/14 15:57:22  Page 129 of 364

**<u>Exhibit 8</u>**

**July 8, 2014 K. Buckfire Expert Witness Report**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
                                        :
In re                                   :          Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :          Case No. 13-53846
                                        :
                      Debtor.           :          Hon. Steven W. Rhodes
                                        :
                                        :
-------------------------------------------------------x

## EXPERT REPORT OF KENNETH BUCKFIRE
## IN SUPPORT OF CITY OF DETROIT'S PLAN OF ADJUSTMENT

Pursuant to F.R.Civ.P. 26(a)(2)(B), made applicable to this proceeding by

Bank. R. 7026, debtor the City of Detroit submits this report with respect to the

expected expert testimony of Kenneth Buckfire.

## Introduction

Kenneth Buckfire is President, Managing Director and Co-Founder of the

firm Miller Buckfire & Co. ("Miller Buckfire"). It is the City's intention to call

Mr. Buckfire to testify about the City's access to the capital markets (including

potential exit financing) and creditor recoveries under the City's proposed plan of

adjustment, including recoveries relating to the Detroit Water & Sewerage

Department ("DWSD"), a comparison of plan recoveries versus the alternative of

dismissal of the case, and the discount rate utilized by the plan of adjustment with respect to Classes 7, 9, 12, 13 and 14.

## I. Opinions

Mr. Buckfire will offer the following opinions:

**A. *Access to the Capital Markets.*** The City will likely obtain access to the capital markets, including exit financing, in the near future on reasonable terms.

**B. *Plan Treatment Compared To Treatment Upon Dismissal.*** The City's creditors will be treated better under the City's plan of adjustment than if the bankruptcy case were dismissed.

**C. *DSWD Existence Of An Efficient Market.*** An efficient market exists for debt similar to the debt at issue with respect to the impaired issues of Class 1A of the plan of adjustment.

**D. *DWSD Market Rate Interest.*** The City's proposed interest rates set forth in Exhibit I.A.168 for impaired issues of Class 1A of the plan of adjustment provides holders with payments of a present value equal to the allowed amount of their claims.

**E. *Appropriate Plan Discount Rate*.** The discount rate used to estimate recoveries for Classes 7, 9, 12, 13 and 14 is reasonable and appropriate.

2

## II.  Basis and Reasons for Opinions

### A.  *Access to the Capital Markets*

1.     Mr. Buckfire believes that the City will be able to obtain exit financing and continued access to the capital markets in the near term on reasonable terms.  He basis this belief on (a) the preliminary discussions with potential underwriters of the City's exit financing process, (b) the anticipated quantitative and qualitative characteristics of the City on a post-emergence basis, which in Mr. Buckfire's view, will make the City a much more attractive credit to potential lenders than before the bankruptcy, and (c) the City's ability to incur, and the favorable market response to, the City's post-petition financing.

2.     The City, through its advisors, has recently commenced a process for soliciting exit financing.  As of the date of this report, this process is still underway.  Based on the information available to date, Mr. Buckfire believes that the exit financing process is likely to be successful and that the City will have continued access to the capital markets.

3.     Upon consummation of the City's plan of adjustment, the City will have addressed and eliminated significant liabilities.  This, in turn, will facilitate the City's ability to access the capital markets.  In addition to other obligations, the City will have addressed and brought greater certainty and predictability with respect to its pension benefit and OPEB obligations.   Because of the significance

3

of these obligations, and the fact that such obligations are driven by actuarial analyses and assumptions, such obligations have traditionally served as a significant obstacle in the City's financial planning efforts. The elimination and treatment of the City's significant prepetition liabilities will in Mr. Buckfire's opinion improve the City's attractiveness as a borrower on a post-emergence basis.

4.      Mr. Buckfire believes that the City's revitalization plan will also contribute to its ability to access the capital markets going forward. The revitalization efforts are assumed to attract a new tax base for the City. In addition, the City's revitalization efforts are relatively flexible with respect to timing. Because of the flexible nature of much of the revitalization efforts, the City has increased control of its financial future and has flexibility to meet its reduced debt service obligations going forward. This differs markedly from the City's ability to manage its mandatory fixed legal obligations and other debt service prior to bankruptcy and serves as another significant consideration in Mr. Buckfire's analysis.

5.      The City and the State of Michigan have also taken steps to remedy governance concerns. Due to recent state legislation, there will be State oversight of the City upon emergence that will make sure that the City will be able to meet its debt obligations on a post-emergence basis. All of these factors, in Mr.

4

Buckfire's view, suggest that the City will be able to access the capital markets on reasonable terms in the near future.

6.     Mr. Buckfire also believes that the City's ability to access the capital markets, including with respect to exit financing, is further confirmed by the market's response to the City's post-petition financing facility.  The City's post-petition financing facility was fully syndicated without any need for "market-flex." Further, Mr. Buckfire believes that the significant number of traditional municipal market institutional investors that participated in the City's exit financing further confirms that the investing community is and will be available to the City on a post-emergence basis.

### B.  Plan Treatment Compared To Treatment Upon Dismissal

7.     The City's creditors will in Mr. Buckfire's view be treated better under the City's plan of adjustment than if the bankruptcy case were dismissed.   It has already been determined that the City does not have sufficient funds to satisfy its obligations and that the City is service delivery insolvent.  Nor, in Mr. Buckfire's opinion, will the City be able to access the capital markets in a dismissal scenario in order to timely meet creditor obligations.  Given the lack of ability to meet creditor obligations, in a dismissal scenario, the City's various creditors will undoubtedly each seek to exercise their legal rights against the City, thereby creating a "race to the courthouse."  Mr. Buckfire understands that, in this

scenario, creditors are unable to compel the City to sell assets or to take a lien on public property.  Mr. Buckfire also understands that the City is at or near statutory maximums with respect to many of its taxes, the tax rate for Detroiters is objectively very high as compared to the region and similar cities, and attempts to materially increase taxes will likely increase delinquency rates and cause residents to leave the City.   Accordingly, it is Mr. Buckfire's opinion that creditor recoveries upon dismissal will be *de minimis*.

8.     Mr. Buckfire also believes that confirmation of the plan of adjustment offers several advantages over dismissal of the case.   In his view, creditor distributions under the plan of adjustment benefit from the compromises reached by the City during the chapter 9 case, including significantly the "Grand Bargain" that infuses hundreds of millions of dollars into the City from state contributions, charitable foundations and the Detroit Institute of Arts.   If the plan of adjustment were not confirmed and the City's case were dismissed, hundreds of millions of dollars would be unavailable to creditors.  In addition, Mr. Buckfire believes that the order brought by and the protections of the Bankruptcy Code eliminate the chaos and inefficiency associated with a creditor "race to the courthouse."

9.     Based on the above, and the assumptions set forth below, Mr. Buckfire believes that creditors will do better under the proposed plan of adjustment—with the accompanying settlements and compromises—than in a

6

dismissal scenario that does not benefit from such compromises or the bankruptcy stay. His opinion extends to all of the City's creditors, including DWSD-creditors, which rely on ratepayers to fund the DWSD system in amounts sufficient to meet capital expenditure requirements and bond obligations. If the City's bankruptcy case is dismissed, in Mr. Buckfire's opinion the DWSD and its creditors will not be insulated from the City's financial chaos and ruin.

## C. DWSD Existence Of An Efficient Market

10. Mr. Buckfire believes that an efficient market exists for debt similar to the debt at issue with respect to the impaired issues of Class 1A of the plan of adjustment. To determine whether an efficient market existed, Mr. Buckfire examined the size and depth of the markets for debt similar to the debt at issue, the size and nature of the municipal debt markets as a whole, general economic factors, feedback from municipal underwriters, and his experience and expertise in the field. As part of his evaluation, Mr. Buckfire also examined trading and issuance levels of similar indebtedness, the availability of willing sellers and purchasers of such debt, and the existence of recent similar issuances.

## D. DWSD Market Rate Interest

11. Mr. Buckfire believes that the proposed interest rates set forth in Exhibit I.A.168 of the plan of adjustment for impaired issues of Class 1A of the plan of adjustment provide holders with payments of a present value equal to the

7

allowed amount of their claims. The plan in his opinion will provide such holders with payments of a present value equal to the allowed amount of the claims because the rates set forth in Exhibit I.A.168 of the plan of adjustment are market interest rates for the applicable debt.

12.     To arrive at a market interest rate, Mr. Buckfire (a) considered the nature of the debt at issue, including the nature, priority, type and revenue securing such debt, the degree of the open and well-developed market for municipal debt of this nature, and the principal amount of the debt, (b) reviewed DWSD's pro forma projections, restructured obligations and relevant prospective credit metrics, including leverage, coverage, the size of DWSD and the economic strength of the underlying communities, (c) evaluated comparable situations, such as recent issuances by the cities of Philadelphia and Pittsburgh, (d) reviewed available relevant published market indices and composite yield curves, specifically including the Bloomberg service's revenue-backed yield curve of municipal issuers and the revenue-backed yield curve for utility issuers with various investment grade ratings and (e) had discussions with capital market participants.

13.     Based on his experience and expertise in the capital markets, Mr. Buckfire and his team constructed a yield curve for the senior and subordinated indebtedness that, in his opinion, reflects a market yield curve for the applicable

debt. Once established, Mr. Buckfire applied the yield curve to the applicable debt maturities to arrive at market interest rates.

## E. *Appropriate Plan Discount Rate*

14.     Based on Mr. Buckfire's experience and expertise, the 5% discount rate used to estimate recoveries for Classes 7, 9, 12, 13 and 14 is reasonable and appropriate under the circumstances. In determining the appropriateness of the discount rate, Mr. Buckfire considered the City's projections, including cash flow projections, the anticipated credit-worthiness of the City upon emergence, and the terms of the New B Notes. He compared these factors against rates that would be applicable to other issuers in the market. Based on these considerations, he concluded that the 5% discount rate utilized for Classes 7, 9, 12, 13 and 14 is reasonable and appropriate under the circumstances.

## 2. Assumptions

15.     Mr. Buckfire has made certain significant assumptions with respect to one or more of the opinions rendered herein. Unless otherwise indicated, Mr. Buckfire's opinions are rendered as of the date hereof, and he has assumed that market conditions (including general economic conditions and conditions in the municipal debt markets) will not materially change prior to the confirmation of the City's plan of adjustment or the relevant event which is the subject of the particular opinion.

**A.**  *Access to the Capital Markets.*

16.     In addition to those general assumptions set forth above, in rendering his opinions with respect to the City's access to the capital markets, including access to exit financing, Mr. Buckfire has made the following two significant assumptions:  (a) the City's plan of adjustment is confirmed, all conditions precedent to its effectiveness are satisfied, and the plan has or will upon the closing of an exit facility become effective, and (b) there is no material change in the City's projections prior to the incurrence of such financing.

**B.** *Plan Treatment Compared To Treatment Upon Dismissal.*

17.     In addition to those general assumptions set forth above, in rendering his opinions regarding creditor recoveries upon dismissal, Mr. Buckfire has assumed (a) the City's projections, and all material assumptions underlying such projections, are materially correct in relevant respects, (b) the City is service delivery insolvent, (c) reinvestment initiatives are necessary to provide adequate levels of municipal services, (d) the absence of any reinvestment in the City will further deplete the City's tax base, (e) in a dismissal scenario, the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue, and (f) in a dismissal scenario there is no requirement to sell City assets to satisfy creditor claims, whether such assets are characterized as core or non-core.

## C. *DSWD Existence Of An Efficient Market.*

18.     In rendering his opinions regarding the existence of an efficient market for the DWSD-related debt, Mr. Buckfire's material assumptions are only those general assumptions set forth above.

## D. *DWSD Market Rate Interest.*

19.     In addition to those general assumptions set forth above, Mr. Buckfire has assumed that the City's projections with respect to the DWSD system, and all material assumptions underlying such projections, are materially correct in relevant respects.

## E. *Appropriate Plan Discount Rate*.

20.     In addition to those general assumptions set forth above, Mr. Buckfire has assumed that the City's projections, and all material assumptions underlying such projections, are materially correct in relevant respects.

## III.  Exhibits

21.     Attached as Exhibit A is a detail of the materials Mr. Buckfire considered in reaching his opinion and summary materials.  Mr. Buckfire also considered discussions he had with his team, City employees and elected officials, as well as the City's third-party consultants and contractors.  Mr. Buckfire also had available to him the expertise of, among others, Messrs. Malhotra and Moore.

## IV. Qualifications

22.     Mr. Buckfire's curriculum vitae is appended as Exhibit B.

## V. Prior Expert Testimony

23.     Mr. Buckfire has previously testified as an expert in this case with regard to the City's swap settlement and post-petition financing. Mr. Buckfire has previously testified as an expert in other cases, including Calpine Corporation, General Growth Properties and Dow Chemical.

## VI. Compensation

24.     Mr. Buckfire is not being separately compensated by the City for this Expert Report or his opinions expressed herein. Miller Buckfire receives at this time a $300,000 monthly advisory fee. Miller Buckfire will receive a $28 million restructuring fee, less a credit for certain amounts previously paid to Miller Buckfire, upon a recapitalization or restructuring of the City's debt securities and/or other indebtedness, obligations or liabilities, including a plan of adjustment.


Dated:  July 8, 2014                    Respectfully submitted,


                                        Kenneth Buckfire

12

**Exhibit A**

## Materials Considered:

- Financial Stability Agreement between the State of Michigan and the City of Detroit (April 2012), available at POA00213650-POA00213708
- Memorandum of Understanding regarding the City of Detroit Reform Program (November 2012), available at POA00232576-POA00232590
- Emergency Manager's Financial and Operating Plan (May 2013), available at POA00649726-POA00649769
- Emergency Manager's Financial and Operating Plan slidedeck (June 2013), available at POA00231448-POA00231468
- City of Detroit's Proposal for Creditors (June 2013), available at POA00215882-POA00216015
- Quarterly Report of the Emergency Manager for the Period April 2013 - June 2013 (July 2013), available at POA00111033- POA00111044
- Emergency Manager's Report (September 2013), available at POA00165156-POA00165283
- Quarterly Report of the Emergency Manager for the Period September 2013 - November 2013 (December 2013), available at POA00297491- POA00297543
- Quarterly Report of the Emergency Manager for the Period October 2013 - December (January 2014), available at POA00109594- POA00109608
- Quarterly Report of the Emergency Manager for the Period December 2013 - February 2014 (March 2014), available at POA00296194- POA00296251
- Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (with exhibits) (May 2014), available at (Docket No. 4391)
- Fourth Amended Chapter 9 Plan for the Adjustment of Debts of the City of Detroit (with exhibits) (May 2014), available at (Docket No. 4392)
- Quarterly Report of the Emergency Manager for the Period January 2014 - March 2014 (April 2014), available at POA00700417-POA00700433
- Transcript Syndication of $120,000,000 City of Detroit Financial Recovery Bonds (June 2014), available at POA00706616- POA00706688
- Draft 2013 Comprehensive Annual Financial Report (June 2014), available at POA00531266- POA00531512
- 10-Year Plan of Adjustment Restructuring and Reinvestment Initiatives Bridge (June 2014), available at POA00706448- POA00706448
- 40-Year Plan of Adjustment Financial Projections (July 2014), available at POA 00706603- POA706611
- 10-Year Plan of Adjustment Restructuring and Reinvestment Initiatives (June 2014), available at POA 00706449- POA00706518
- 10-Year Plan of Adjustment Financial Projections (July 2014), available at POA 00706519- POA706600
- 40-Year Plan of Adjustment Financial Projections Bridge (July 2014), available at POA00706601- POA00706602
- EMMA Statistical Data (July 2014), available at POA00706615
- Bloomberg Curve Indices (July 2014), available at POA00706612

- Bloomberg Issuance Data (July 2014), available at POA00706613
- Bloomberg MMA Curve (July 2014), available at POA00706614
- DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement, available at POA00673708- POA00674003
- DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement, available at POA00666470- POA00666795
- City of Detroit CAFR for the Fiscal Year Ended 6/30/2008, available at Dataroom Index No. 8.1.2.6
- City of Detroit CAFR for the Fiscal Year Ended 6/30/2009, available at Dataroom Index No. 8.1.2.6
- City of Detroit CAFR for the Fiscal Year Ended 6/30/2010, available at POA00663851- POA664087
- City of Detroit CAFR for the Fiscal Year Ended 6/30/2011, available at POA00664088- POA00664323
- City of Detroit CAFR for the Fiscal Year Ended 6/30/2012, available at POA00664324- POA00664568
- City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2010, available at POA00245432- POA00245467
- City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2011, available at POA00245468- POA00245503
- City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2012, available at POA00245504- POA00245541
- City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2010, available at POA00245620- POA00245655
- City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2011, available at POA00245656- POA00245692
- City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2012, available at POA00245693- POA00245728

## <u>Summary Materials:</u>

- City of Detroit - Pro Forma Capitalization Table (Attachment 1)
- DWSD Financial and Ratings Information (Attachment 2)
- Rate Curve Charts (Attachment 3)

# **Attachment 1**

# CITY OF DETROIT - PRO FORMA CAPITALIZATION

$ Millions

July 2, 2014

| | Pre-Petition Balance | Reduction of Claim $ | Reduction of Claim % | Cash Distributions for Claim | Pro Forma Obligation[1] |
|---|---|---|---|---|---|
| **Debt Obligations** | | | | | |
| COPS Swap | $290 [2] | ($205) | 71% | ($85) | - |
| COPS | 1,473 | (1,311) | 89% | - | 162 [3] |
| UTGO (2010-A DSA)[4] | 100 | - | - | - | 100 |
| UTGO (Non DSA) | 388 | (100) | 26% | - | 288 [5] |
| LTGO (2010 & 2012-C DSA)[4] | 379 | - | - | - | 379 |
| LTGO (Non DSA) | 164 | (109) | 66% | (55) | - |
| Notes/Loans Payable | 34 | (30) | 89% | - | 4 [3] |
| Other Unsecured Liabilities | 150 | (134) | 89% | - | 17 [3] |
| Exit Financing | - | - | - | - | 300 |
| **Total Debt Obligations** | **$2,978** | **($1,889)** | **63%** | **($140)** | **$1,249** |
| **Retiree Obligations** | | | | | |
| Pension UAAL | $3,129 | ($1,682) | 54% | - | $1,447 [6] |
| OPEB UAAL | 4,303 | (3,833) | 89% | (20) | 450 [3] |
| **Total Retiree Obligations** | **$7,432** | **($5,515)** | **74%** | **($20)** | **$1,897** |
| **Total Obligations** | **$10,410** | **($7,404)** | **71%** | **($160)** | **$3,146** |

| Type of Obligation | Pre-Petition Balance | % of Total Obligations | Pro Forma Obligations | % of Total Obligations | % Reduction / (Increase) |
|---|---|---|---|---|---|
| UTGO (DSA & Non DSA) | $488 | 5% | $388 | 12% | 20% |
| LTGO (DSA, Non DSA & New B Note) | 543 | 5% | 1,011 | 32% | (86%) |
| Retiree UAAL | 7,432 | 71% | 1,447 | 46% | 81% |
| Other | 1,947 | 19% | 300 | 10% | 85% |
| **Total** | **$10,410** | **100%** | **$3,146** | **100%** | **70%** |

Source: City of Detroit Plan of Adjustment - 40 year projections draft of June 30, 2014. Assumes chapter 9 exit on October 31, 2014.

(1) Funded obligation amounts represent face value of obligations.

(2) Claim amount as of settlement date April 15, 2014.

(3) $632 million pro forma B Note obligation is comprised of COPs ($162 million), Notes/Loans Payable ($4 million), Other Unsecured Liabilities ($17 million) and OPEB ($450 million).

(4) Secured by Distributable State Aid.

(5) Post emergence debt secured by Distributable State Aid.

(6) Pro forma pension UAAL of $1,447 million per Milliman letters for GRS ($847 million) dated April 25, 2014 and PFRS ($553 million) dated April 23, 2014.

MILLER BUCKFIRE

# Attachment 2




# Expert Report Reference Materials

July 1, 2014

# Historical Moody's Ratings

**Moody's downgrades of DWSD debt have resulted from concerns over the solvency of the City of Detroit**

- Commentary has not addressed the credit fundamentals of DWSD
- DWSD has maintained Moody's investment grade ratings with a significantly weaker credit profile



Historical Moody's Credit Ratings, 2008-Present

# HISTORICAL S&P RATINGS

**S&P downgrades of DWSD debt have resulted from the restructuring process of the City of Detroit**

- Commentary has not addressed the credit fundamentals of DWSD
- DWSD has maintained S&P investment grade ratings with a significantly weaker credit profile



Historical Standard & Poor's Credit Ratings, 2008-Present

MILLER BUCKFIRE
A Stifel Company

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 151 of 364

# SELECTED FINANCIAL INFORMATION [1] ($MM)

> **Post-restructuring, DWSD will have a dramatically improved credit profile**

- Debt service coverage ratios are forecasted to improve
- Legacy liabilities will be dramatically decreased and ongoing contributions reduced
- DWSD forecasts suggest the system will achieve rate stability while decreasing leverage

| | Historical [1] | | | | | Projected [2] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Coverage** [y] | | | | | | | | | | | | | | |
| Water Senior Lien | 1.86x | 1.25x | 1.33x | 1.49x | 1.67x | 1.63x | 1.78x | 1.73x | 1.77x | 1.82x | 1.99x | 2.03x | 2.04x | 2.05x |
| Water Second Lien | 1.35x | 0.89x | 0.94x | 1.07x | 1.27x | 1.27x | 1.37x | 1.35x | 1.39x | 1.43x | 1.50x | 1.54x | 1.56x | 1.59x |
| Sewer Senior Lien | 1.92x | 1.75x | 1.49x | 1.70x | 2.32x | 2.06x | 2.12x | 1.98x | 1.97x | 2.03x | 2.09x | 2.18x | 2.35x | 2.21x |
| Sewer Second Lien | 1.35x | 1.23x | 1.00x | 1.11x | 1.48x | 1.38x | 1.45x | 1.46x | 1.46x | 1.52x | 1.58x | 1.64x | 1.67x | 1.68x |
| **Legacy Liabilities** | | | | | | | | | | | | | | |
| *Pension* | | | | | | | | | | | | | | |
| DWSD Contribution [x] | 13.4 | 11.6 | 11.4 | 19.7 | 10.9 | 65.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 | 45.4 |
| GRS UAAL | 42.7 | (31.6) | 276.7 | 481.5 | 639.9 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| *OPEB* | | | | | | | | | | | | | | |
| DWSD Contribution | 18.0 | 15.6 | 16.4 | 19.1 | 19.9 | 3.6 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 |
| Total OPEB UAAL | 4,825.6 | 4,825.2 | 4,976.8 | 4,982.4 | 5,727.2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| *COPs/Swaps* | | | | | | | | | | | | | | |
| DWSD Contribution | 9.2 | 9.8 | 10.3 | 11.1 | 11.7 | 4.5 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Total DWSD Contribution | $40.7 | $37.0 | $38.1 | $50.0 | $42.4 | $73.5 | $48.3 | $48.3 | $48.3 | $48.3 | $48.3 | $48.3 | $48.3 | $48.3 |
| **Rate Increases** | | | | | | | | | | | | | | |
| *Water* | | | | | | | | | | | | | | |
| Retail | 6.9% | 6.3% | 5.2% | 9.4% | 9.0% | 4.0% | 6.0% | 7.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| Wholesale | 5.1% | 8.9% | 6.4% | 5.5% | 8.9% | 4.0% | 6.0% | 7.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | |
| *Sewer* | | | | | | | | | | | | | | |
| Retail | 1.8% | 14.8% | 16.1% | 10.2% | 8.9% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | |
| Wholesale | 2.5% | 0.0% | 8.2% | 3.7% | 11.8% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | |

(1) Source: City of Detroit CAFRs, DWSD audited financial statements and DWSD bond offering Official Statements.
(2) Source: Fourth Amended Disclosure Statement.
(y) Based on current debt service. Coverage may improve under POA terms.
(x) DWSD GRS contributions are projected to decrease materially post-2023, and may cease in their entirety depending on DWSD GRS funding levels.

3



Citations for Miller Buckfire DWSD Slide Deck dated July 1, 2014
Slide 3 (Historical Information Only)

- **Water Senior Lien Coverage**
  - <u>2008</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2009</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2010</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2011</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2012</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 50

- **Water Second Lien Coverage**
  - <u>2008</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2009</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2010</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2011</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 47
  - <u>2012</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 50

- **Sewer Senior Lien Coverage**
  - <u>2008</u>:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
  - <u>2009</u>:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55

- o <u>2010</u>:
  - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
- o <u>2011</u>:
  - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
- o <u>2012</u>:
  - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 60

- **<u>Sewer Second Lien Coverage</u>**
  - o <u>2008</u>:
    - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
  - o <u>2009</u>:
    - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
  - o <u>2010</u>:
    - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
  - o <u>2011</u>:
    - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 55
  - o <u>2012</u>:
    - ▪ DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 60

- **<u>DWSD GRS Pension Contribution</u>**
  - o <u>2008</u>:
    - ▪ City of Detroit CAFR for the Fiscal Year Ended 6/30/2008, page 116
  - o <u>2009</u>:
    - ▪ City of Detroit CAFR for the Fiscal Year Ended 6/30/2009, page 108
  - o <u>2010</u>:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2010, page 25 and
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2010 page 26
  - o <u>2011</u>:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2011, page 24 and
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2011 page 26
  - o <u>2012</u>:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2012, page 26 and

- ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2012 page 25

- **GRS UAAL**:
  - ○ 2008:
    - ▪ City of Detroit CAFR for the Fiscal Year Ended 6/30/2008, page 117
  - ○ 2009:
    - ▪ City of Detroit CAFR for the Fiscal Year Ended 6/30/2009, page 109
  - ○ 2010:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2010, page 26 or
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2010 page 27
  - ○ 2011:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2011, page 25 or
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2011 page 26
  - ○ 2012:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2012, page 27 or
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2012 page 26

- **DWSD OPEB Contribution**
  - ○ 2008:
    - ▪ City of Detroit CAFR for the Fiscal Year Ended 6/30/2008, page 120
  - ○ 2009:
    - ▪ City of Detroit CAFR for the Fiscal Year Ended 6/30/2009, page 112
  - ○ 2010:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2010, page 29 and
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2010 page 30
  - ○ 2011:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2011, page 28 and
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2011 page 30
  - ○ 2012:
    - ▪ City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2012, page 30 and
    - ▪ City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2012 page 29

- **OPEB UAAL**
  - <u>2008</u>:
    - City of Detroit CAFR for the Fiscal Year Ended 6/30/2008, page 120
  - <u>2009</u>:
    - City of Detroit CAFR for the Fiscal Year Ended 6/30/2009, pages 112 & 113
  - <u>2010</u>:
    - City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2010, page 30 or
    - City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2010 pages 30 & 31
  - <u>2011</u>:
    - City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2011, page 29 or
    - City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2011 pages 30 & 31
  - <u>2012</u>:
    - City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2012, pages 30 & 31 or
    - City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2012 page 30

- **DWSD COPs / Swaps Contribution**
  - <u>2008</u>:
    - City of Detroit CAFR for the Fiscal Year Ended 6/30/2007, page 109
  - <u>2009</u>:
    - City of Detroit CAFR for the Fiscal Year Ended 6/30/2008, page 109
  - <u>2010</u>:
    - City of Detroit CAFR for the Fiscal Year Ended 6/30/2009, page 101
  - <u>2011</u>:
    - City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2010, page 18 and
    - City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2010 page 18
  - <u>2012</u>:
    - City of Detroit Sewage Disposal Fund Basic Financial Statements for the year ended 6/30/2011, page 18 and
    - City of Detroit Water Fund Basic Financial Statements for the year ended 6/30/2011 page 18

- **Water Retail Rate Increases**
  - <u>2008</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45

- o <u>2009</u>:
  - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
- o <u>2010</u>:
  - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
- o <u>2011</u>:
  - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
- o <u>2012</u>:
  - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45

- **<u>Water Wholesale Rate Increases</u>**
  - o <u>2008</u>:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
  - o 2009:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
  - o 2010:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
  - o 2011:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45
  - o 2012:
    - DWSD Water Supply System Series 2011-C Senior Lien Bond Official Statement page 45

- **<u>Sewer Retail Rate Increases</u>**
  - o 2008:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - o 2009:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - o 2010:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - o 2011:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - o 2012:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52

- **<u>Sewer Wholesale Rate Increases</u>**
  - 2008:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - 2009:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - 2010:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - 2011:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52
  - 2012:
    - DWSD Sewage Disposal System, Series 2012-A Senior Lien Bond Official Statement page 52

# Attachment 3





# Expert Report Reference Materials

July 1, 2014

# YIELD CURVE COMPARISONS

- **BBB Revenue Muni BVAL Curve** - The curve represents the yield curve for tax-exempt revenue securities issued for the rating level. The yield curve is built using non-parametric fit of market data obtained from the Municipal Securities Rulemaking Board, new issues calendars, and other proprietary contributed prices.
- **US Muni Utility A Curve** - The curve is populated with US municipal bonds backed by utility revenues with an average rating of A by Moody's and S&P. The option-free yield curve is built using option-adjusted spread (OAS) model. The yield curve is comprised from contributed pricing from the Municipal Securities Rulemaking Board.



Muni Yield Curve Comparison

Legend:
- Muni A Utility Curve (7/1/14)
- Muni A Utility Curve (4/24/14)
- POA Senior Lien Curve (4/24/14)
- POA Second Lien Curve (4/24/14)
- Revenue Muni BVAL BBB Curve (7/1/14)
- Revenue Muni BVAL BBB Curve (4/24/14)

Curve labels (right side): POA Second (4/24/14); Utility A Curve (4/24/14); Utility A Curve (7/1/14); POA Senior (4/24/14); Revenue BBB BVAL (4/24/14); Revenue BBB BVAL (7/1/14)

Source: Bloomberg.

MILLER BUCKFIRE
A Stifel Company

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 161 of 364



**Indicative Rate Curves**

Legend:
- Philadelphia Water / Sewer Dept. (1/15/14)
- Pittsburgh Water / Sewer Dept. (12/12/13)
- Senior Lien Curve (4/24/14)
- Second Lien Curve (4/24/14)

Curve labels:
- POA Second Lien Curve
- POA Senior Lien Curve
- Pittsburgh
- Philadelphia

Source: Bloomberg.

# Recent MMA Curve Yields

■ **MMA Yield Curve** – Represents a survey of leading investment firms regarding benchmark AAA GO levels. The data represents a "par coupon" structure and a 10-year par call. The inputs from each firm are monitored and statistically scrubbed to remove outliers and ensure historical consistency. Data is collected through the MMA website, www.mma-research.com.



Source: Bloomberg.

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 163 of 364

**Exhibit B**

# KENNETH A. BUCKFIRE
## EDUCATIONAL AND PROFESSIONAL BACKGROUND

### Education

B.A., University of Michigan - 1980

M.B.A., Columbia University - 1987

### Employment

Miller Buckfire & Co., LLC
*Co-Founder, President and Managing Director* (July 2002 – present)

Dresdner Kleinwort Wasserstein (formerly Wasserstein Perella & Co.)
*Managing Director* (1996 – 2002)

Lehman Brothers
*Senior Vice President* (1991 – 1996)

Kidder Peabody & Co.
*Vice President* (1990)

Dillon Read & Co.
*Associate* (1987 – 1989)

Bridge Capital Partners
*Associate* (1984)

MONY
*Senior Investment Analyst* (1980 – 1983)

### Selected Transaction Experience

| | |
|---|---|
| Allegheny International | Mirant Corporation (Creditors' Committee) |
| Amoco Corporation | Niagara Mohawk Power |
| Cajun Electric | Northwest Power Enterprises |
| Calpine Corporation | Plantation Pipe Line |
| CenterPoint Energy | Reading & Bates |
| City of Detroit | Rowan Companies |
| City of Stockton, CA | Santa Fe International |
| Cleveland-Cliffs | Sedco |
| CMS Energy | Southland Royalty Co. |
| Dow Chemical | TECO Energy |
| EUA Power Corporation | Texas New Mexico Power Company |
| Excel Maritime | Texas Refining |
| Explorer Pipeline | Tosco Corporation |
| First Reserve Corporation | U.S. Generating Florida |
| Foamex | Williams Companies |
| General Growth Properties | |
| Horizon Natural Resources | |
| Imperial Sugar | |
| McDermott International | |

### Governance

Director: Neurophage Pharmaceuticals
Director (Prior): ARK Information Services, Bulldog Communications, Great Bay Power Corp., Van Camp Seafood Corp. and Webfacts
Trustee: New York Philharmonic
Trustee (Prior): Orpheus Chamber Orchestra and Browning School

### Selected Expert Witness Experience

| | |
|---|---|
| Calpine Corporation | Dow Chemical (Re: Rohm & Haas litigation) |
| The City of Detroit | |
| General Growth Properties | |

0


MILLER BUCKFIRE
A Stifel Company

## Exhibit 9

## July 15, 2014 G. Malhotra Deposition Transcript (excerpted)

1

2             UNITED STATES BANKRUPTCY COURT

3          FOR THE EASTERN DISTRICT OF MICHIGAN

4                       -    -    -

5     In Re:                    ) Chapter 9

6

7     City of Detroit, Michigan,  )

8

9          Debtor.               ) Hon. Steven Rhodes

10    _____

11

12

13

14              The videotaped deposition of GAURAV MALHOTRA

15              Taken at 51 Louisiana Avenue, N.E.

16              Washington, D.C.

17              Commencing at 9:09 a.m.

18              Tuesday, July 15, 2014

19              Before:  Gail L. Inghram Verbano

20              Registered Diplomate Reporter,

21              Certified Realtime Reporter,

22              Certified Shorthand Reporter-CA (No. 8635)

23

24

25

1              MALHOTRA

2      Q.   But, overall, you would have to make

3   changes to the baseline scenario to create a

4   scenario where you had the bankruptcy petition

5   dismissed; is that fair?

6      A.   I don't know.  I would have to look at

7   this.  It would be easier to have the baseline in

8   front of me.  I would have to look at it to say

9   whether we would have to change the entire

10  baseline or not.

11     Q.   There have been times where you received

12  reports of cash collections from the City that

13  were not properly categorized; correct?

14     A.   Yes.

15     Q.   And there have been times where you

16  received questionable reports regarding accounts

17  payable from the City; correct?

18     A.   When you say "questionable," it's -- I'm

19  just -- they were not -- they were not fully

20  complete.

21     Q.   And Ernst & Young still -- you haven't

22  audited the City's financial data; correct?

23     A.   That is correct.

24     Q.   Would it be possible to audit the City's

25  financial data?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 168 of 364

1          MALHOTRA

2          A.    You should ask KPMG that.

3          Q.    Are they responsible for auditing the

4    City's financial data?

5          A.    They are.

6          Q.    You don't dispute that the City could

7    continue to cut costs if the bankruptcy petition

8    were dismissed; correct?

9          A.    Could you ask me that again, please.

10         Q.    There are cost-cutting measures the City

11   could take if the bankruptcy petition were

12   dismissed; correct?

13         A.    Like what?

14         Q.    Well, it could reduce headcount.  That's

15   one; correct?

16         A.    Unlikely.  The City is already at a low

17   point in terms of the amount of headcount it

18   already has.

19         Q.    Well, here's some things that could

20   happen.  You could privatize some of the City

21   services if the bankruptcy petition were

22   dismissed; correct?

23         A.    I don't know about that.  Again, I mean,

24   I don't know if the City can cut more costs now.

25         Q.    You haven't been asked to do any

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 169 of 364

```
 1                    MALHOTRA
 2   analysis of the costs and revenues to the City if
 3   the bankruptcy petition is dismissed; correct?
 4        A.    We do not -- we do not have a scenario
 5   of what happens if the City's bankruptcy
 6   proceedings are dismissed; that is correct.
 7        Q.    Have you been party to any conversations
 8   with the City where there have been discussions
 9   about what might happen if the bankruptcy petition
10   is dismissed?
11        A.    Not directly, no.
12        Q.    Do you know if there's any contingency
13   planning by the City about what might happen if
14   the bankruptcy petition is dismissed?
15        A.    No.
16        Q.    Has the City already begun restructuring
17   efforts that fall within that restructuring and
18   reinvestment plan that your forecast is based on?
19        A.    Some of the initiatives that are a part
20   of the restructuring and reinvestment budget have
21   been started already.
22        Q.    What would those include?
23        A.    You would have to talk to Conway
24   MacKenzie about that, because there's a detailed
25   risk of the items that are already -- or John
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 170 of 364

```
 1                      MALHOTRA
 2   Hill, actually, of the items that are already
 3   underway.
 4        Q.   And would the costs and revenues from
 5   those activities be incorporated in both your
 6   baseline and your restructuring scenario or not?
 7        A.   No.  It's a part of the restructuring
 8   scenario.  We are operating as one scenario now
 9   that includes the restructuring and reinvestment
10   initiatives; so, yes, those costs and -- would be
11   a part of the restructuring and reinvestment
12   budget as laid out in the plan.
13        Q.   Okay.  But I'm wondering, did you update
14   the baseline scenario or not really?
15        A.   I would have to go back and check, if
16   any of the items would be reflective -- what
17   change in the baseline.  We are much more focused
18   on the overall restructuring scenario.
19        Q.   Okay.  So sitting here today, you don't
20   know whether or not you've incorporated costs from
21   restructuring activities that have already started
22   in the baseline scenario?
23        A.   I would have to go back and look at
24   that.
25        Q.   Okay.  Is that apparent on the face of
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 171 of 364

```
 1                    MALHOTRA
 2    the 10-year and 40-year forecasts?  Or do you have
 3    to go back to the Excel spreadsheets or some other
 4    source to figure that out?  Or is it something
 5    that Conway MacKenzie would have to tell you?
 6         A.   I'm just thinking.  I think the -- it
 7    would be in the overall restructuring and
 8    reinvestment scenario, because the timing of some
 9    of the expenses had changed.  So my guess is that
10    it would be reflective in the update, to the best
11    of our ability.
12         Q.   And -- but would it be in the update of
13    the baseline scenario?
14         A.   I don't think it would be in the
15    baseline cells, but we are -- like I said, we are
16    looking at this as one restructuring scenario.  It
17    continues to be the focus.
18         Q.   But your assumption in your forecast is
19    that there would be no restructuring or
20    reinvestment outside of chapter -- if the plan
21    were not confirmed; is that fair?
22         A.   Can you please repeat that.
23         Q.   Is one of the assumptions of your
24    forecast that there would be no restructuring or
25    reinvestment if the plan were not confirmed?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 172 of 364

1              CHARLES MOORE, CPA

2       IN THE UNITED STATES BANKRUPTCY COURT

3        FOR THE EASTERN DISTRICT OF MICHIGAN

4

5    In re:                    Chapter 9

6    CITY OF DETROIT, MICHIGAN   Case No. 13-53846

7              Debtor.       Hon. Steven W. Rhodes

8    _____/

9

10   The Videotaped Deposition of CHARLES MOORE, CPA

11   Taken at 1114 Washington Boulevard,

12   Detroit, Michigan,

13   Commencing at 9:01 a.m.,

14   Wednesday, July 23, 2014,

15   Before Quentina Rochelle Snowden, CSR-5519.

16

17

18

19

20

21

22

23

24

25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

# Exhibit 10

**July 23, 2014 C. Moore Deposition Transcript (excerpted)**

1               CHARLES MOORE, CPA

2       IN THE UNITED STATES BANKRUPTCY COURT

3        FOR THE EASTERN DISTRICT OF MICHIGAN

4

5   In re:                   Chapter 9

6   CITY OF DETROIT, MICHIGAN   Case No. 13-53846

7             Debtor.     Hon. Steven W. Rhodes

8   _____/

9

10  The Videotaped Deposition of CHARLES MOORE, CPA

11  Taken at 1114 Washington Boulevard,

12  Detroit, Michigan,

13  Commencing at 9:01 a.m.,

14  Wednesday, July 23, 2014,

15  Before Quentina Rochelle Snowden, CSR-5519.

16

17

18

19

20

21

22

23

24

25

```
 1                    CHARLES MOORE, CPA
 2          Department?
 3                    MR. SOTO:  I'm talking about for the
 4          Fire Department.  Thank you.
 5                    THE WITNESS:  The --
 6     BY MR. SOTO:
 7     Q    And I'm actually -- let me be more specific.  For
 8          the Fire Department in connection with the plan of
 9          adjustment.
10     A    All of the documents that I would have relied on are
11          in Exhibit 4.  There are many that relate to the
12          Fire Department.
13     Q    And that would involve any spending required
14          analysis?
15     A    Yes.
16     Q    And any cost reduction analysis?
17     A    Yes.
18     Q    Did it also involve any revenue generation analysis?
19     A    Yes.
20     Q    Did you perform any forecasts in connection with the
21          work you did on the City's plan of adjustment?
22     A    How do you define "Forecast"?
23     Q    Forecasts in connection with forecast of proposed
24          expenditures.  We've already discussed some
25          forecasts in your opinion one with respect to
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 176 of 364

1              CHARLES MOORE, CPA

2        savings that might be expected and revenue that

3        might be expected with respect to blight removal.

4        That's what I'm referring to as forecasts.

5    A   Okay.  I'll use the term, "Financial projections".

6    Q   That's fine with me.

7    A   Yes.  We -- we certainly did in that the entire

8        Exhibit 5 -- well really Exhibits 5, 6, 7 and 8 to

9        my expert report are all of those projections.

10   Q   Now, let me step away from the expert report for a

11       second only to -- as I'm here representing a number

12       of other counsel who have asked me to ask questions

13       as well.

14            In connection with the plan of

15       adjustment, did you -- did you work on any financial

16       projections?

17   A   The financial projections that are included in the

18       plan of adjustment -- and when we say "Plan of

19       adjustment", just to be clear, I'm referring to the

20       fourth amended plan of adjustment filed around

21       May 5th.

22   Q   I agree with that.  I know there's one coming, but

23       we can only work with the ones we have.

24   A   Yes.  The financial projections that are included in

25       the plan, I'll just list off the ones that I'm

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 177 of 364

1                    CHARLES MOORE, CPA
2        familiar with, there is a 40-year financial
3        projection, there's a 10-year financial projection.
4        There are the restructuring and reinvestment
5        initiatives.  There are the water and sewerage
6        projections.  Those are the ones that I can think of
7        offhand.
8                      As it relates to the first two, the
9        40-year and the 10-year, those are documents that
10       Ernst and Young was the author of, however, Conway
11       MacKenzie provided inputs to both of those
12       documents.  The third one, the restructuring and
13       reinvestment initiatives, Conway MacKenzie was the
14       author of that document.  The water and sewerage
15       projections Conway MacKenzie was the author of that
16       set of projections.
17    Q  In connection with preparing those projections, did
18       you perform any financial projections or analysis
19       that assumed that that the City's Chapter 9 case was
20       dismissed?
21    A  No.
22    Q  Why not?
23    A  If you look at the work that we're doing, the work
24       that this -- the work that Conway MacKenzie is
25       focused on is, how should the departments be

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 178 of 364

```
 1                    CHARLES MOORE, CPA
 2           operating and what is necessary to get them to that
 3           point, regardless of in or out of Chapter 9.  So
 4           while I have been involved in the Chapter 9 process,
 5           the focus of our work is without regard to Chapter
 6           9.
 7      Q    So if the plan -- and let me see if -- I think I
 8           understood what you just said, but let me make sure,
 9           and you tell me if I'm wrong here.  If the plan of
10           adjustment in this matter were dismissed, is it your
11           position that those reinvestment expenses, those
12           reinvestment initiatives, the ones that are set
13           forth in the plan of adjustment, as well as the ones
14           that you opine on in your expert report, could go
15           forward?
16                    MR. HAMILTON:  Object to form.  You
17           can answer.
18                    THE WITNESS:  They -- they should
19           still go forward.
20      BY MR. SOTO:
21      Q    Forgive me, I'm just taking some time to get rid of
22           some questions here that I think you've already
23           answered.
24      A    No problem.  Take your time.  As many as you want to
25           get rid of that's fine with me.
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 179 of 364

```
 1                    CHARLES MOORE, CPA
 2       Q   Me too.  Okay.  Regarding the work that you
 3           performed in connection with your engagement with
 4           the City -- I've already heard you testify about the
 5           numbers.  Did you have any interfacing with anyone
 6           at Miller Buckfire?
 7       A   Yes.
 8       Q   And who would that be?
 9       A   Ken Buckfire, Jim Doak, Kyle Herman, Kevin Haggard,
10           Sanjay Marken, Vlad -- and I can't recall Vlad's
11           last name.
12       Q   But it's not the Impaler.  It's --
13       A   Correct.  At least it did not seem to be.  I think
14           those were the primary individuals from Miller
15           Buckfire that I can think of, offhand.
16       Q   And what was the nature of your interaction with
17           them?
18       A   I interacted with Miller Buckfire on a number of
19           different items.  I interacted and Conway MacKenzie
20           interacted quite a bit with Miller Buckfire as it
21           relates to the Water and Sewerage Department.  The
22           ten-year business plan that we developed, and
23           options being considered for DWSD.  I interacted
24           with Miller Buckfire on the quality of life
25           financing, or the post-petition financing.  I've
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 180 of 364

# Exhibit 11

## July 25, 2014 S. Spencer Expert Witness Report



HOULIHAN LOKEY

# City of Detroit
## Expert Witness Report

July 2014

MERGERS & ACQUISITIONS
CAPITAL MARKETS
FINANCIAL RESTRUCTURING
FINANCIAL ADVISORY SERVICES

HL.com

| | Tab |
|---|---|
| **Roles, Qualifications and Requested Opinions** | **1** |
| **Unfair Discrimination Analysis** | **2** |
| Measuring the Extent of Disparate Treatment | A |
| Comparing Recovery Source Qualities | B |
| Assessment of Defined Benefit Replacement Plan | C |
| Lack of Transparency to Financial Creditors | D |
| Additional Financial Creditor Disadvantage | E |
| **Best Interests Analysis** | **3** |
| Examination of Ability to Pay | A |
| Does the Plan Realize Full Value For DIA Proceeds? | B |
| Dismissal Will Not Pose an Existential Threat | C |
| Dismissal Will Not Further Deplete the City's Tax Base | D |
| Impact of Dismissal on COP Option Value | E |
| Dismissal of Chapter 9 Will Re-Level Playing Field | F |
| **Feasibility Analysis** | **4** |
| **Appendix** | **5** |
| Illustrative June 2013 Proposal Limited Recourse Notes NPV Calculation | A |
| New B Notes NPV Calculation | B |
| Debt Service Coverage Ratio Calculation | C |

HOULIHAN LOKEY    1

| | Tab |
|---|---|
| Recent General Trend Toward Municipal Asset Monetization | D |
| Grand Bargain NPV Analysis | E |
| Contingent Valuation Methodology | F |
| Recent Significant Art Deaccessionings & Monetizations | G |
| Calculation of Pension UAAL in Disgorgement Scenario | H |
| Endnotes | I |



# Roles, Qualifications and Requested Opinions

## Introduction

- I have been retained by Weil, Gotshal & Manges LLP ("Weil") as an expert in financial restructuring, valuation and the sale of assets from distressed or bankrupt entities on behalf of Financial Guaranty Insurance Company ("FGIC") in connection with FGIC's interest in the City of Detroit's ("Detroit" or the "City") Fourth Amended Plan for the Adjustment of Debts (the "Plan")

- I am a Managing Director and partner at Houlihan Lokey ("Houlihan"), a private global investment bank specializing in financial restructuring, corporate finance and financial advisory services. I am a member of the firm's financial restructuring group and have led the firm's Municipal Restructuring group since January 2011. I also authored a case study ("Restructuring the Troubled Municipality," http://www.hl.com/email/pdf/muni_case_study_ch_jun2011.pdf) presenting a comprehensive framework for a successful restructuring of a distressed municipality. The case study is considered an important work in the field of municipal restructuring and has been presented to thousands of legal and financial professionals across the country

- Houlihan Lokey receives at this time a fee of $125,000 per month. In addition, Houlihan Lokey is entitled to receive: (i) upon the consummation of a commutation transaction, a commutation fee equal to 0.20% of the par amount of any commuted exposure under the FGIC insurance policies and (ii) upon the consummation of a restructuring transaction, a restructuring fee equal to 0.10% of the par amount of any of FGIC's guaranteed obligations that are restructured

## Qualifications – Corporate Restructuring

- I have approximately 20 years of relevant financial advisory expertise. For the last 13 years I have been employed at Houlihan. During my tenure at Houlihan, I have advised dozens of companies in all manner of restructuring transactions. I have particular expertise advising on out-of-court restructuring transactions involving consensual impairment of one or more creditor constituencies. Previous distressed consensual recapitalization transactions I have led include United Site Services, Inc., Network Communications Inc., Aquilex Services Corp. and Hutchinson Technology, Inc. I also advise companies executing bankruptcy-related reorganizations and/or distressed sale transactions. Notable Chapter 11 company advisory engagements I have led include the Aventine Renewable Energy Holdings, Inc., Genmar Holdings, Inc. and Polaroid Corp. transactions. In addition to my company advisory work, I have also advised creditors in executing restructuring transactions such as the recent successful reorganization of Hawker Beechcraft Corp., where I advised an ad hoc group of creditors with a majority ownership stake in Hawker Beechcraft's $1.7 billion senior secured credit facility

# Introduction (cont.)

## Qualifications – Municipal Restructuring

- In a municipal restructuring advisory context, outside of Detroit, I am currently involved in advising creditors in another Chapter 9 insolvency proceeding, the restructuring of a multi-billion dollar municipal infrastructure asset and the potential restructuring of municipal debt obligations for a U.S. territory. Beyond my current active municipal restructuring engagements, I have consulted and am presently consulting with municipalities and municipal creditors in numerous cities across the country

## Significant Relevant Transaction History

| | | | |
|---|---|---|---|
| Aventine | Premier Card Inc. | Foamex | Allegheny Energy |
| Puerto Rico | Genmar | Haynes Special Metals | Flag Telecom |
| San Bernardino | Polaroid | Syratech | McLeodUSA |
| Indiana Toll Road | Quebecor | Lindstrom Metric | BioFuel Energy |
| Applied Extrusion | White Energy | American Commercial Lines | Pioneer Chemicals |
| Aquilex | Star Tribune | Tiro | Orchids Paper |
| TruckPro | Corporacion Durango | Applied Extrusion | Minnesota Corn Processors |
| Hawker Beechcraft | Ziff Davis | Missota Paper | CMS Hartzel |
| Network Communications Inc. | Golden County | Distribution Dynamics | Patrick Industries |
| Hutchinson Technologies | Quality Electric | Weirton Steel | Northstar Computer Forms |
| USEC | Parsons Electric | Wam Net | United Site Services |
| North American Membership Group | AT&T Canada | Teleglobe/Bell Canada | |

HOULIHAN LOKEY  5

# Introduction (cont.)

## Recent Cases in Which I Provided an Expert Opinion

- Creative Memories
- Genmar
- Polaroid

## Requested Opinions

### In connection with my testimony, I have been asked to opine on the following questions:

1. What are the economic and non-economic disparities in recoveries between Class 9 claimants, on the one hand, and Classes 10 and 11 claimants, on the other?

2. To what extent does the City have assets that could be monetized – either within or outside of Chapter 9 – for the benefit of creditors?

3. Does the DIA Settlement maximize the value of the City's art collection?

4. What recovery could Class 9 claimants expect to receive if the Chapter 9 case were dismissed and Class 9 claimants pursued their claims outside of bankruptcy?

5. If the City is successful in its adversary proceeding to invalidate its obligations under the Service Contracts, and the Class 9 claimants then succeed in disgorging the proceeds of the COPs transactions from the Retirement Systems, will the City be able to fund contributions to the GRS and PFRS at the levels provided for in the Plan, and make the other payments required by the Plan?

## Summary of Conclusions

**1. What are the economic and non-economic disparities in recoveries between Class 9 claimants, on the one hand, and Classes 10 and 11 claimants, on the other?**

- On its face, the Plan provides a 59% recovery to Class 10 (PFRS pension) claimants, a 60% recovery to Class 11 (GRS pension) claimants and a 10% recovery to Class 9 (COP) claimants – essentially an economic disparity of 50 percentage points between COP and pension creditors

- Factoring in an appropriate New B Notes discount rate to reflect the riskiness of COP Plan consideration, this recovery disparity between COP and pension creditors rises to 54 percentage points

- Factoring in contingent value recovery opportunities for the pension creditors, this disparity rises to 94 percentage points

- Factoring in the City's most recent actuarial estimates (prior to the revised estimates presented in the Plan), this disparity rises to 494 percentage points between COP and PFRS claimant recoveries and 127 percentage points between COP and GRS claimant recoveries

- There are additional qualitative factors such as the diverse sources of recovery benefiting pension claimants that add to the disparate economic treatment of pension claimants relative to COP claimants under the Plan

**2. To what extent does the City have assets that could be monetized – either within or outside of Chapter 9 – for the benefit of creditors?**

- Conservative estimates of potential value realization for the City's major assets including the DIA, DWSD, City-owned land, the Coleman A. Young International Airport, the Detroit Windsor Tunnel, the Joe Louis Arena and the City parking structures suggest these City-owned assets could collectively generate multiple billions of dollars of incremental distributable value for the benefit of the City and its creditors

- Outside of bankruptcy, both distressed and non-distressed cities (including Detroit historically) routinely monetize assets as a means of dealing with temporary or more profound financial concerns or constraints

- Detroit could have monetized these assets either as part of its Plan or, like many other cities, outside of a Plan process

HOULIHAN LOKEY 7

## Summary of Conclusions (cont.)

### 3. Does the DIA Settlement maximize the value of the City's art collection?

- The "Grand Bargain" fails to maximize the value of the City's art collection
  - The actual value of the Grand Bargain is far less than the headline value the City has sought actively to promote
  - The actual value of the Grand Bargain is far less than the market value of the DIA's collection assets
  - The City has failed to explore a more comprehensive range of DIA transactional alternatives
  - The Grand Bargain burdens Detroiters with a large opportunity cost:
    - Because the DIA market value vastly exceeds both the Grand Bargain value and other measures of the DIA's value to the City, it imposes a significant opportunity cost on the City and its creditors
    - Instead of being allowed to monetize collection assets or explore other DIA transactional opportunities, the Grand Bargain accomplishes a form of regional expropriation of the DIA (for the benefit of public and private interests outside the City), thereby denying the City an opportunity to use DIA proceeds to catalyze recovery and settle claims
  - The Grand Bargain fails to resolve fundamental problems with the municipal ownership / funding structure that have plagued the DIA throughout its history and may impose future economic costs on the City

# Introduction (cont.)

## Summary of Conclusions (cont.)

**4. What recovery could Class 9 claimants expect to receive if the Chapter 9 case were dismissed and Class 9 claimants pursued their claims outside of bankruptcy?**

- If the Chapter 9 case were dismissed and Class 9 claimants pursued their claims outside of bankruptcy I believe they would recover significantly more than what has been proposed under the Plan

  - Dismissal of the Plan would prevent the City from cramming down the Class 9 claimants and instead pave the way for a pari passu (or at least more equitable) treatment of all unsecured claims as and when they come due

  - Dismissal of the Plan would force the City to conduct a more comprehensive assessment of its ability to pay, incorporating its legacy balance sheet assets instead of using Chapter 9 to significantly impair only financial creditors

  - Dismissal would also force the City to implement a more comprehensive and effective operational restructuring, thereby generating additional sources of cash flow

  - Both the real world experience and the theoretical modeling for creditors in a similar circumstance support dismissal of the Chapter 9 proceeding as the value maximizing outcome compared to a cram-down Plan that caps Class 9 claims at de minimis recovery levels, thereby precluding COP claimants from participating in the City's economic recovery

**5. If the City is successful in its adversary proceeding to invalidate its obligations under the Service Contracts, and the Class 9 claimants then succeed in disgorging the proceeds of the COPs transactions from the Retirement Systems, will the City be able to fund contributions to the GRS and PFRS at the levels provided for in the Plan, and make the other payments required by the Plan?**

- Using the City's own projections, if the net proceeds of the 2005 COPs transaction are disgorged and all of the City's other assumptions remain constant, the City will be unable to adequately fund its required amortization payments beginning in 2024 and will run out of cash by 2029

HOULIHAN LOKEY   9

**Respectfully submitted,**

Stephen Spencer
Managing Director
Houlihan Lokey

July 25, 2014



# Unfair Discrimination Analysis

# Unfair Discrimination Defined

■ For the purpose of this analysis, I have analyzed the Plan based on the criteria set forth in two alternative standards: (i) the "Aztec" test and (ii) the "Markell" rebuttable presumption test[1]

## "Aztec" Test

- **Definition**: According to the Debtor, the Aztec standard is a four-factor test that is a "comprehensive framework for evaluating all of the questions that may bear on the question of unfair discrimination"

- **Criteria**: The Aztec test considers:
  1. Whether the discrimination is supported by a reasonable basis;
  2. Whether the debtor can confirm and consummate a plan without the discrimination;
  3. Whether the discrimination is proposed in good faith; and
  4. The treatment of the classes discriminated against

## "Markell" Rebuttable Presumption Standard

- **Definition**: According to the Debtor, under the Markell test, a rebuttable presumption of unfair discrimination arises if three criteria are satisfied

- **Criteria**: A rebuttable presumption that a plan is unfairly discriminatory will arise when there is:
  1. A dissenting class;
  2. Another class of the same priority; and
  3. A difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution

- The presumption may only be rebutted by showing (i) outside of bankruptcy, the dissenting class would similarly receive less than the class receiving greater recovery; (ii) the preferred class infused new value into the restructuring, which offset its gain; or (iii) allocation of risk was consistent with the risk assumed by the parties pre-petition

# Unfair Discrimination – Summary of Findings

■ The Plan generates disparate recoveries for the reasons summarized in the following matrix and elaborated upon on the following pages of this report

| The Plan generates excessively disparate recovery outcomes favoring pensioners | |
|---|---|
| Factual Basis | ■ The Plan provides more than a 50 percentage point recovery differential between Class 10 and 11 creditors (i.e., pension claimants) and Class 9 claimants[2]<br>■ The Debtor substantially underestimates recoveries to Classes 10 and 11 through:<br>  1. Use of alternative actuarial assumptions to inflate pension plan funding deficiencies thereby lowering estimated recovery thresholds; and<br>  2. Not accounting for contingent value recovery mechanisms<br>■ The Debtor overstates the estimated recoveries for recipients of the New B Notes by selecting (and using) a below market discount rate |
| Discriminatory Implications | ■ **Plan qualifies as discriminatory under factor 4 of the Aztec test and factor 3(a) of the Markell standard** |

| The Plan directs superior sources of recovery to pensioners | |
|---|---|
| Factual Basis | ■ The third party monetary contributions being directed to pension claimants are from a diversity of parties which collectively constitute a source of payment that exhibits a superior credit and liquidity profile compared to the post-restructuring credit and liquidity profile of the City<br>■ The $632 million of New B Notes consideration is effectively structurally subordinate based on the Debtor's classification under the Plan, subjecting it to inherently greater risk of recovery from City cash flows |
| Discriminatory Implications | ■ **Plan qualifies as discriminatory under factor 4 of the Aztec test and factor 3(b) of the Markell standard** |

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 195 of 364

# Unfair Discrimination – Summary of Findings (cont.)

## The defined benefit replacement plan is comparatively generous

| | |
|---|---|
| **Factual Basis** | ▪ Under the Plan, City employees ("actives") will receive contributions to a 401(k)-style replacement plan that are comparatively generous relative to similar private and government sector plans including a plan for the benefit of Michigan's teachers<br>▪ The comparative generosity of the City's new defined contribution plan provides an effective counter-balance to potential motivational challenges in the City's workforce stemming from greater impairment of pensions under a potential alternative Plan of Adjustment proposal<br>▪ Pension benefits have been impaired to a greater degree in other cases where active employees are vital to continued operations<br>▪ The per-employee cost of enhanced pension recoveries is approximately $100,000 |
| **Discriminatory Implications** | ▪ **Plan qualifies as discriminatory under factor 1 and factor 2 of the Aztec test** |

## The Debtor contends financial creditors' greater underwriting resources are cause for disparate treatment

| | |
|---|---|
| **Factual Basis** | ▪ To support the lower recovery percentages being offered to financial creditors, the Debtor contends financial creditors are sophisticated investors with more abundant resources to assess risk than pensioners, and are therefore deserving of lower recoveries because of a failure to use these resources to their comparative advantage<br>▪ In the financial creditors' defense, it is notable that unlike corporate debt underwriting, the municipal debt underwriting process takes place at a distance, with complete reliance on City-produced financial data and no direct access to diligence City government operations<br>▪ Immediately prior to and during the bankruptcy proceeding, the Debtor disclosed previously unknown facts and data describing the severity of City government dysfunction and lack of primary data integrity which could not possibly have been known under the municipal debt underwriting model<br>▪ The Debtor also used specific assumptions, such as a lower pension discount rate, to materially advantage the recovery outcome of pensioners, which could not have been foreseen on a pre-petition basis |
| **Discriminatory Implications** | ▪ **Plan qualifies as discriminatory under factor 1 of the Aztec test** |

# "Markell" Rebuttable Presumption Standard

- The presumption of unfair discrimination may only be rebutted by showing that:

  i. Outside of bankruptcy, the dissenting class would similarly receive less than the class receiving greater recovery;

  ii. The preferred class infused new value into the restructuring, which offset its gain; or

  iii. Allocation of risk was consistent with the risk assumed by the parties pre-petition

| Rebuttal Criteria | Key Considerations | Criteria Satisfied? |
|---|---|---|
| **Outside of bankruptcy, dissenting class would similarly receive less than class receiving greater recovery** | ■ In the event that the City's bankruptcy case is dismissed, unsecured creditors would be able to assert their claims on a pari passu basis and would receive distributions based on their pro rata allocation of the total unsecured claims pool<br>■ A dismissal would allow unsecured claims to preserve the option value of their claims and participate in the City's future economic recovery, rather than cap recovery prospects for unsecured claims and crystallize losses<br>● Treatment of unsecured claims outside of bankruptcy is discussed further in the "Best Interests" section of this report | **NO** |
| **Preferred class infused new value into the restructuring which offset its gain** | ■ The preferred classes (i.e., the PFRS and GRS pension claimants) have not provided incremental value or funding beyond that which was already available to the Debtor | **NO** |
| **Allocation of risk was consistent with risk assumed by parties pre-petition** | ■ The City itself has acknowledged that all unsecured claims are pari passu<br>● In the City's June 2013 Proposal for Creditors (the "June 2013 Proposal"), the City contemplated a pro rata distribution of consideration to all unsecured claims[3]<br>● Judge Rhodes similarly acknowledged that pensions cannot be treated differently from other unsecured claims in his December 2013 eligibility ruling[4] | **NO** |

**Presumption of unfair discrimination has not been rebutted**

HOULIHAN LOKEY



# Unfair Discrimination Analysis
## Measuring the Extent of Disparate Treatment

# Primary Discrimination Mechanisms

## The Plan generates excessively disparate recovery outcomes favoring pensioners

■ The Plan provides an outcome to pension claimants that, in comparison to COP claimants, is even greater than the 50 percentage point recovery differential quantified in the Plan documentation. The Debtor uses two primary mechanisms to generate this disparate outcome

### I. Inflating the PFRS & GRS Claims

- Increasing PFRS and GRS estimated claim amounts materially above the most recent actuarially assessed values allows the City to show a smaller percentage recovery against a larger claim amount
- The net effect is to show the PFRS and GRS pension claimants getting only a 60% recovery on their claims when under the prior actuarial values, they would each be receiving over 100% recovery on their prior actuarial claims

### II. Not Accounting for Contingent Value Recovery Mechanisms

- Unlike other unsecured creditors, pension claimants also receive the benefit of recovery mechanisms in the form of (i) restoration payments in the event that pension investments exceed performance expectations and funding levels subsequently exceed targeted amounts and (ii) DWSD contingent value rights in the event that a qualifying DWSD transaction is consummated
- These recovery mechanisms allow for PFRS and GRS pension claimants to potentially recover in excess of 100% of their claim amounts, even when measured against the inflated claim amounts shown in the City's Plan

HOULIHAN LOKEY | 17

# Shifting Consideration to PFRS & GRS Pension Claims

- Total estimated creditor recoveries have increased significantly from approximately $1.4 billion in distributable value in the June 2013 Proposal (see Appendix A for further detail) to $2.8 billion in the Plan[1,2]

- While the June 2013 Proposal contemplated pari passu treatment between COPs and the PFRS and GRS pension claimants, the current Plan contemplates a highly skewed distribution to the PFRS and GRS pension claimants using the City's calculations

| Recovery Summary – Unsecured Creditors ($ in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | June 2013 Proposal [1] | | | Plan of Adjustment [2] | | | Recovery % |
| | Claim Amount | Estimated Recoveries | | Claim Amount | Estimated Recoveries | | Inc. / Dec. |
| | | ($) | (%) | | ($) | (%) | |
| PFRS Pension | $1,437 | $175 | 12% | $1,250 | $735 | 59% | 319% |
| GRS Pension | 2,037 | 249 | 12% | 1,879 | 1,118 | 60% | 350% |
| OPEB | 5,718 | 698 | 12% | 4,303 | 413 | 10% | -41% |
| Total Retiree Creditors | $9,192 | $1,122 | 12% | $7,432 | $2,267 | 30% | 102% |
| UTGO Claims | $369 | $45 | 12% | $388 | $288 | 74% | 540% |
| LTGO Claims | $161 | $20 | 12% | $164 | $52 | 32% | 167% |
| COP | 1,429 | 174 | 12% | 1,473 | 141 | 10% | -19% |
| Notes / Loans Payable | 34 | 4 | 12% | 34 | 3 | 10% | -21% |
| Other Unsecured Items | 265 | 32 | 12% | 150 | 14 | 10% | -55% |
| Other Unsecured Creditors | $1,727 | $211 | 12% | $1,657 | $159 | 10% | -25% |

Note: $1.4 billion creditor recoveries under June 2013 Proposal assumes a 5% discount rate and full repayment of the $2.0 billion principal amount. Note that per the terms of the Limited Recourse Participation Notes as described in the June 2013 Proposal, the City is not obligated to repay the principal amount. Plan recoveries for recipients of the New B Notes reflect (i) a 5% discount rate consistent with the rate used by the City to calculate New B Notes recoveries in its Plan and (ii) COP claims asserted at 100% of principal value

HOULIHAN LOKEY

# Pensions Profit Disproportionately

- Another way of illustrating the extent to which the pensions profited from bankruptcy negotiation is to show how much of the incremental Plan recovery value was captured by the PFRS and GRS pension claimants

- From the June 2013 Proposal to the Plan, the City's estimated Plan value distribution increased approximately $1.4 billion – almost all of which is captured by the pensions



**Distribution of Increase in Estimated Plan Recoveries ($ in millions)**

Note:   $1.4 billion creditor recoveries under June 2013 Proposal assumes a 5% discount rate and full repayment of the $2.0 billion principal amount. Note that per the terms of the Limited Recourse Participation Notes as described in the June 2013 Proposal, the City is not obligated to repay the principal amount. Plan recoveries for recipients of the New B Notes reflect (i) a 5% discount rate consistent with the rate used by the City to calculate New B Notes recoveries in its Plan and (ii) COP claims asserted at 100% of principal value

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 201 of 364

# Inflating PFRS & GRS Claims

- Under the Plan, the size of the estimated PFRS and GRS pension claims were increased by 750% and 125%, respectively, from the last actuarial valuation estimates[3,4]

- The increase in claims size has the effect of distorting recovery percentages – because the claim sizes have been increased so dramatically, the PFRS and GRS plans appear to be receiving less than full (or par) recovery

- If the respective PFRS and GRS Plan recovery values were applied to the most recent actuarial claims, the Plan recoveries would generate greater than par recoveries for both pension plans



\*      *Reflects a 6.75% assumed investment rate of return per the Plan*
\*\*     *Reflects an 8.00% assumed investment rate of return per the 2012 PFRS actuarial valuation*
\*\*\*   *Reflects a 7.90% assumed investment rate of return per the 2012 GRS actuarial valuation*

HOULIHAN LOKEY   20

# Lower Discount Rate Unsubstantiated

- A major factor inflating the PFRS and GRS pension claims is the City's use of a lower 6.75% discount factor in calculating the claim

- The Plan's lower discount rate is both materially lower than discount rates used by many other cities (as well as the state of Michigan), and also somewhat arbitrary

  - The City states that the decrease in discount rate was a negotiated result but provides little further support for the specific rate chosen

  - Additional support is critical because a modest increase (closer to the average of other cities) would materially reduce the PFRS and GRS pension claim amounts, thereby increasing recovery estimates

  - Moreover, because the chosen rate is materially lower than the average rate for comparable plans (as well as the City's previous discount rate assumptions of 8.0% and 7.9% for the PFRS and GRS plans, respectively), the change to a lower rate is not something other unsecured creditors could have reasonably expected on a pre-petition basis

| Selected Public Pension Plans – Public Safety[5] | | | Selected Public Pension Plans – General[5] | | |
|---|---|---|---|---|---|
| Pension Plan | Plan Discount Rate | Differential | Pension Plan | Plan Discount Rate | Differential |
| **Detroit PFRS** | **6.75%** | **-** | **Detroit GRS** | **6.75%** | **-** |
| DC Police & Fire | 7.00% | 0.25% | City of Austin ERS | 7.75% | 1.00% |
| Houston Firefighters | 8.50% | 1.75% | Denver Employees | 8.00% | 1.25% |
| Nevada Police Officer and Firefighter | 8.00% | 1.25% | LA County ERS | 7.75% | 1.00% |
| New Jersey Police & Fire | 8.25% | 1.50% | Minneapolis ERF | 6.00% | -0.75% |
| NY State & Local Police & Fire | 8.00% | 1.25% | New York City ERS | 8.00% | 1.25% |
| Ohio Police & Fire | 8.25% | 1.50% | Phoenix ERS | 8.00% | 1.25% |
| South Carolina Police | 8.00% | 1.25% | San Francisco City & County | 7.75% | 1.00% |
| **Average for Sample Set** | **8.00%** | **1.25%** | **Average for Sample Set** | **7.61%** | **0.86%** |
| | | | **Michigan SERS** | **8.00%** | **1.25%** |

Note:   Sample police, fire and general employee pension discount rates for various police, fire and general employee pension plans taken from most recent Public Plans Database maintained by the Center for Retirement Research at Boston College. Mean discount rate for entire 126 plan data set (which includes public safety, general employee and other pension plans) is 7.94%

HOULIHAN LOKEY   21

# Lower Discount Rate Unsubstantiated (cont.)

- Further to the point of reasonable market discount rate expectations, the comments of various market analysts on an earlier iteration of the Plan (when the assumed pension discount rate was 7%) are illustrative:

> *"Detroit's pension is actually well-funded, so what's all the fuss?"*

> *"Orr and others say the city's pension system represents $3.5 billion of that debt and the message since the July bankruptcy filing has been that the system is a big part of the problem. But the city's two pensions are actually a combined 91 percent funded (80 percent funded plans are considered financially healthy), according to Morningstar's combined 2011 valuation of the public employee pension and police / fire pension."*

> *"Orr's assumptions for the plan's unfunded liability uses a lower, more conservative market rate to value the assets and liabilities. That choice results in the plans having fewer assets and more liabilities when compared with the actuarial valuation given by the pension system."*

Liz Farmer,
**GOVERNING Magazine**[6]

> *"Using the market rate is not exactly standard practice. While using it is the correct method to identify a liability in a point in time…it does magnify fluctuations in the bond market. It presents a very drastically different point of view on the fundamental fiscal health of plans based on the actuarial method."*

Rachel Barkley,
**Morningstar Municipal Credit Analyst**[6]

## Detroit PFRS & GRS Liabilities – 2011 Actuarial Valuation vs. Plan Assumption ($ in millions)

|  | 2011 Actuarial Valuation[6] | | | Emergency Manager Assumptions[6] | | |
|  | Fiscal Year 2011 | | | Fiscal Year 2013 | | |
|  | PFRS | GRS | Aggregate | PFRS | GRS | Aggregate |
|---|---|---|---|---|---|---|
| Investment Return Assumption | 8.00% | 7.90% | - | 7.00% | 7.00% | - |
| Amortization Period | 30 Years | 30 Years | - | 15 Years | 18 Years | - |
| Unfunded Liability | $3.9 | $639.9 | $643.8 | $1,437.0 | $2,037.0 | $3,474.0 |
| Funded Ratio | 99.9% | 82.8% | 91.4% | 67.0% | 50.5% | 59.0% |

# Disparate Treatment of COP Claims

■ The City's Plan estimates COP holders will recover 10% of the value of their claim while PFRS and GRS pension claims are estimated to recover 59% and 60%, respectively[2]

■ While the discrepancy in estimated recoveries in the Plan is already large, the full extent of disparate treatment in favor of the PFRS and GRS pension plans could be even greater as various contingent value recovery mechanisms create an opportunity for full PFRS and GRS recovery over time[7]

■ The primary contingent value recovery mechanisms are: (i) restoration payments in the event that pension investments exceed performance expectations and funding levels subsequently exceed targeted amounts and (ii) DWSD contingent value rights in the event that a qualifying DWSD transaction is consummated



**Pension & COP Recovery Disparity**[2,7]

Pensions capture City upside

Note:  Recoveries for COP claims reflect (i) a 5% discount rate consistent with the rate used by the City to calculate New B Notes recoveries in its Plan and (ii) COP claims asserted at 100% of principal value

HOULIHAN LOKEY    23

# Actual Value of New B Notes Recoveries

## The City overstates the estimated recoveries for recipients of New B Notes

■ The $632 million New B Notes are subject to inherently greater risk of recovery from City cash flows, substantially diminishing the actual value to be received by recipients of the New B Notes

### The New B Notes Are Mispriced

- The interest rate of the New B Notes fails to reflect the risk inherent in the security
- Consequently the true value of the New B Notes is substantially less than what the City purports it to be
- The City itself acknowledges such a risk in its disclosure statement, stipulating that because of potentially limited market interest in the New B Notes, "potential purchasers may demand discounts to the par amount of obligations before a potential purchaser would be willing to purchase City debt of any kind"[8]

### Value of New B Notes Consideration is Overstated

- Because COP claimants' (and other unsecured financial creditors') recoveries are predicated entirely on the New B Notes, actual recoveries are considerably less than recoveries stated by the City in its Plan
- To align actual recoveries with stated recoveries for New B Notes recipients, the City would need to either:
  1. Increase the interest rate to reflect the appropriate discount rate (i.e., the expected yield of the New B Notes upon issuance); or
  2. Increase the initial principal amount to reflect the fact that the currently contemplated coupon, maturity and security will cause the New B Notes to trade at a significant discount to par

### Additional Features Considered to Price Note Accurately

- To determine an appropriate discount rate and thus value the New B Notes consideration, I considered the following factors:
  1. The credit rating of post-emergence Detroit, per established municipal credit analysis guidelines and criteria used by Moody's and S&P;
  2. The yield for an index of comparably rated securities; and
  3. An assessment of the City's projected debt service coverage over the 30-year term of the New B Notes

# Pricing of New B Notes

- Despite the fact that the 5% discount rate the City uses to value the New B Notes reflects a level of risk comparable to that of financially strong, high credit quality municipalities, the City's expert witness conceded in his deposition that upon emergence, Detroit should have a credit profile that is worse than that of an "A"-rated municipality[9]

> *"I don't think Detroit will deserve a single "A" rating as a general obligation bond holder [sic] until it has proven that it can operate in a financially responsible way, that the tax base is improving and that the general economic conditions of the area are also improving."*
>
> **Kenneth Buckfire – July 16, 2014[9]**

- As a critical determinant in the underwriting and subsequent investor pricing of debt securities, credit ratings are broadly accepted by the municipal bond market as a comprehensive assessment of the relative credit quality of an issuer

- I conducted an analysis of Detroit's post-emergence credit quality using general frameworks established by Moody's and S&P to evaluate U.S. municipal general obligation issuers, which are summarized on the following pages

- My analysis corroborates Mr. Buckfire's testimony that the credit rating of the New B Notes would fall near the high yield / investment grade cut-off

  - As such, in determining an appropriate discount rate, I examined yields of general obligation securities rated one notch above high yield or below

  - Additionally, it is important to consider that since the City has categorized the New B Notes to be no stronger than general obligations, the capital markets may actually deem them to be weaker obligations

# Moody's Credit Rating Considerations

| Moody's Rating Methodology[10] | | | |
|---|---|---|---|
| **Factors** | **Subfactors** | **Description** | **Weight** |
| **Economy/Tax Base (30%)** | ■ Tax base size ("full value") | ■ Market value of taxable property accessible to municipality | 10% |
| | ■ Full value per capita | ■ Tax base size divided by total population | 10% |
| | ■ Wealth | ■ Median family income as a % of U.S. median | 10% |
| **Finances (30%)** | ■ Fund balance | ■ Available fund balance as a % of operating revenues | 10% |
| | ■ Fund balance (5-year trend) | ■ Available fund balance in most recent year minus available fund balance 5 years earlier, as a % of most recent year's operating revenue | 5% |
| | ■ Cash balance (% of revenue) | ■ Operating funds net cash as a % of operating revenues | 10% |
| | ■ Cash balance (5-year trend) | ■ Cash balance in most recent year minus cash balance 5 years earlier, as a % of most recent year's operating revenue | 5% |
| **Management (20%)** | ■ Institutional framework | ■ Legal ability, per constitutionally and legislatively conferred powers, to match revenues with expenditures | 10% |
| | ■ Operating history | ■ 5 year average of operating revenues divided by operating expenditures | 10% |
| **Debt/Pensions (20%)** | ■ Debt to full value | ■ Net direct debt as a % of full value | 5% |
| | ■ Debt to revenues | ■ Net direct debt as a % of operating revenues | 5% |
| | ■ Moody's-adjusted net pension liability (3-year average) to full value | ■ 3 year average of adjusted net pension liability as a % of full value | 5% |
| | ■ Moody's-adjusted net pension liability (3-year average) to revenue | ■ 3 year average of adjusted net pension liability as a % of operating revenues | 5% |

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 208 of 364

# S&P Credit Rating Considerations

| S&P Rating Methodology[11] | | | |
|---|---|---|---|
| **Factors** | **Subfactors** | **Description** | **Weight** |
| Economy (30%) | ■ Total market value per capita | ■ Total market value of taxable property accessible divided by total population | 15% |
| | ■ Projected per capita effective buying income ("EBI") as a % of US projected per capita EBI | ■ EBI divided by total population | 15% |
| Financial Measures (30%) | ■ Liquidity | ■ Function of government available cash, as a % of both debt service funds and total expenditures | 10% |
| | ■ Budgetary performance | ■ Function of total government funds net result and general fund net result as a % of expenditures | 10% |
| | ■ Budgetary flexibility | ■ Available fund balance as a % of expenditures | 10% |
| Management (20%) | ■ Based on S&P's Financial Management Assessment ("FMA") score | ■ FMA score composed of seven measurements of performance ranging from long-term financial and capital planning to investment and debt management policies | 20% |
| Debt & Contingent Liabilities (10%) | ■ Net direct debt as a % of revenue | ■ Total debt as a % of total government revenues | 5% |
| | ■ Total debt service as a % of expenditures | ■ Total government debt service funds as a % of revenues | 5% |
| Institutional Framework (10%) | ■ Predictability of revenues and expenditures | ■ Ability to effectively forecast revenues and expenditures | 2.5% |
| | ■ Revenue and expenditure balance | ■ Ability to finance services provided (revenue raising capability) | 2.5% |
| | ■ Transparency and accountability | ■ Provision of timely and relevant financial information and frequent and timely audits | 2.5% |
| | ■ System support | ■ The extent to which local governments receive extraordinary support from the state government | 2.5% |

HOULIHAN LOKEY | 27

# Implied City Credit Rating

■ Using the Moody's and S&P credit rating frameworks, the post-emergence Detroit could be rated one notch below investment grade

| Illustrative Moody's Rating Scorecard | | | |
|---|---|---|---|
| **Factors** | **Initial Evaluation** | **Weight** | **Score** |
| **Economy/Tax Base** | | 30% | |
| Tax base size (full value) | ■ $7.3 billion | 10% | Aa |
| Full value per capita | ■ $10,426 | 10% | Ba |
| Wealth (median family income) | ■ 44% | 10% | Ba |
| **Finances** | | 30% | |
| Fund balance / revenue | ■ -19% | 10% | ≤B |
| Fund balance (5-year trend) | ■ -2%% | 5% | Baa |
| Cash balance / revenue | ■ 7% | 10% | A |
| Cash balance (5-year trend) | ■ -7% | 5% | Baa |
| **Management** | | 20% | |
| Institutional framework | ■ "Very Poor" | 10% | ≤B |
| Operating history | ■ 0.9x | 10% | Ba |
| **Debt/Pensions** | | 20% | |
| Debt / full value | ■ 23% | 5% | ≤B |
| Debt / revenue | ■ 1.4x | 5% | A |
| Adjusted net pension liability (3-year average) / full value | ■ "Moderate" | 5% | A |
| Adjusted net pension liability (3-year average) / revenue | ■ "Moderate" | 5% | A |
| **Implied Credit Rating** | | 100% | Baa3 |

| Illustrative S&P Rating Scorecard | | | |
|---|---|---|---|
| **Factors** | **Initial Evaluation** | **Weight** | **Score** |
| **Economy** | | 30% | |
| Total market value per capita | ■ $10,426 | 15% | B |
| Projected effective buying income | ■ 53% | 15% | B |
| **Financial Measures** | | 30% | |
| Liquidity | ■ 5%, 46% | 10% | B |
| Budgetary performance | ■ -26%, -30% | 10% | B |
| Budgetary flexibility | ■ 5% | 10% | B |
| **Management** | | 20% | |
| S&P's Financial Management Assessment | ■ "Very Weak" | 20% | B |
| **Debt & Contingent Liabilities** | | 10% | |
| Net direct debt / revenue | ■ 140% | 5% | B |
| Total debt service / expenditures | ■ 10% | 5% | B |
| **Institutional Framework** | | 10% | |
| Revenue and expenditure predictability | ■ "Weak" | 2.5% | BBB+ |
| Revenue and expenditure balance | ■ "Adequate" | 2.5% | A+ |
| Transparency and accountability | ■ "Strong" | 2.5% | AA |
| System support | ■ "Strong" | 2.5% | AA |
| **Implied Credit Rating** | | 100% | BB |

# New B Notes Yield Comparison

- The City's assumed discount rate of 5% implies that the credit risk of the New B Notes is similar to that of investment grade, secured municipal bonds

- Additionally, because the interest payments on the New B Notes are taxable, the New B Notes' 5% discount rate should be compared to tax equivalent yields, further highlighting the New B Notes' understated risk

- Given the note's narrow debt service coverage, unsecured and non-tax exempt status, I would expect the market to demand a coupon of at least 9%



**New B Notes Yield Comparison**

| | Yield | Tax Equivalent Yield |
|---|---|---|
| Comparable GO Bond Screen * | 6.71% | 10.33% |
| S&P High Yield Municipal Bond Index [12] | 6.44% | 9.91% |
| Restructured DWSD Bond Interest Rate ** | 5.50% | 8.46% |
| Bond Buyer 20-Year GO Bond Index [13] | 4.29% | 6.60% |

← *B Note Discount Rate: 5.00%*

Note: Dotted lines reflect the tax equivalent yield assuming a 35% tax rate. The conversion formula is: Tax Equivalent Yield = Tax Free Yield / [1 – Assumed Tax Rate]
\* Yields as of July 25, 2014. See following page for further detail
\*\* Reflects high range of DWSD bond interest rates

# Selected Municipalities Ratings Comparison

- Although a comparable assessment of municipalities and individual municipal security credit yields is not commonplace in the municipal capital markets, I nonetheless examined yields of securities in other municipalities hovering at or below the investment grade threshold[14]

- A review of a Bloomberg screen of relevant municipal debt obligations further supports the assertion that the New B Notes consideration is mispriced and would trade at a potentially substantial discount to reflect the appropriate risk

- Additionally, based on the fact that the New B Notes will be unsecured obligations of the City, I believe they are at least as risky as general obligation bonds and likely even more risky based on the Debtor's treatment and classification of general obligation debt versus general unsecured liabilities under the Plan

| Bloomberg Screen: High Yield General Obligation Bond Ratings Comparison | | | |
|---|---|---|---|
| *Total Bonds Evaluated: 40* | Coupon | Yield | Adjusted Yield* |
| **High** | ■ 8.0% | ■ 9.1% | ■ 14.0% |
| **Median** | ■ 5.8% | ■ 7.7% | ■ 11.9% |
| **Mean** | ■ 5.8% | ■ 6.7% | ■ 10.3% |
| **Low** | ■ 3.8% | ■ 3.5% | ■ 5.4% |

Note:    *Bloomberg screen as of July 25, 2014. Criteria consists of (i) general obligation debt; (ii) credit rating of one notch above high yield or below; (iii) maturities between 20 and 30 years; and (iv) total deal issuance size greater than $10 million*
*        *Reflects tax equivalent yield assuming a 35% tax rate*

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 212 of 364

# Debt Service Coverage Considerations

- A debt service coverage ratio is a metric used to examine an entity's ability to service its debt with cash flows from operations
  - Typically, the metric is calculated as net operating income divided by total debt service
- The City's projected debt service coverage indicates significant credit risk with respect to the City's ability to service its proposed UTGO, LTGO and New B Notes
- Similar to comparable issuer / security analysis, debt service coverage ratios have also not typically been used to evaluate and price risk associated with general obligation-type bonds
  - Historically, this has been due to an issuer's pledge, either unlimited or limited, to increase tax rates to the extent necessary to meet its debt obligations
  - The City has not provided a general obligation pledge with the proposed New B Notes[15]
  - It is expected that the New B Notes will be serviced solely by the City's forecasted General Fund cash flow available for debt service
- Because the Plan effectively elevates pensions (in priority of recovery) over both general obligation bondholders and other unsecured financial creditors alike, I have calculated cash flow available for debt service as General Fund operating revenues less the City's operating expenditures and other reinvestment and restructuring related expenditures which the City has deemed necessary
  - An abstract of the comprehensive ratio analysis in Appendix C reveals the City's projected debt service coverage ratio is very thin through the next 10 years with several years in which the ratio is below 1.0x

### City of Detroit – Illustrative Debt Service Coverage Ratio ($ in millions)[16]

| ($ in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | '14 - '23 | '24 - '33 | '34 - '43 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating cash flow available for debt service * | $129.0 | $25.1 | $99.8 | $143.6 | $158.7 | $148.3 | $139.1 | $138.8 | $152.8 | $170.7 | $1,305.9 | $1,717.2 | $1,419.5 |
| Total debt service | ($36.1) | ($166.2) | ($124.2) | ($124.2) | ($123.2) | ($149.7) | ($161.7) | ($158.5) | ($142.9) | ($137.1) | ($1,323.7) | ($1,012.3) | ($517.8) |
| Debt service coverage ratio | 3.6x | 0.2x | 0.8x | 1.2x | 1.3x | 1.0x | 0.9x | 0.9x | 1.1x | 1.2x | 1.0x | 1.7x | 2.7x |

*Fiscal Year Ended June 30* (columns 2014–2021); *10 Year Totals* (columns '14 - '23 through '34 - '43)

\*  *Excludes impact of financing proceeds, working capital, contributions to income stabilization fund and swap interest set-aside*

HOULIHAN LOKEY  31

# New B Notes Value Assessment

- A final element of risk with respect to the New B Notes is the back-end weighted nature of the repayment obligations with no principal amortization due in the first 10 years

- Reflecting all of the risk factors identified, I have selected a 9% tax equivalent discount rate to value the New B Notes

- While a higher rate (and lower corresponding New B Notes value) can be empirically justified, I have chosen to be conservative in valuing the New B Notes consideration at $353 million

| Implied Value of New B Notes | | | | |
|---|---|---|---|---|
| | Applicable Discount Rate / Yield | Tax Equivalent Rate* | Implied Value of Note | Implied Class 9 Recovery |
| **City's Discount Rate** | ▪ 5.00% | ▪ 5.00% | ▪ $564.8 million | ▪ 9.8% |
| **S&P High Yield Municipal Bond Index Yield** | ▪ 6.44% | ▪ 9.91% | ▪ $321.6 million | ▪ 5.6% |
| **Selected General Obligation Bond Average Yield** | ▪ 6.71% | ▪ 10.33% | ▪ $308.4 million | ▪ 5.4% |
| **Selected Discount Rate** | ▪ 5.85% | ▪ 9.00% | ▪ $353.1 million | ▪ 6.1% |

\* *Assumes a 35% tax rate*

# COP Recoveries vs. Pension Recoveries

- The total disparity in recovery percentages of Class 9 claimants and Classes 10 and 11 claimants is even greater than presented in the City's Plan after accounting for (i) appropriate pricing of the New B Notes using a higher discount rate and (ii) additional recoveries for pension claims from contingent value recovery mechanisms

  - While PFRS and GRS claims are projected to receive 59% and 60% recoveries, respectively, under the City's projections, contingent recoveries could allow pension claimants to recover in excess of 100% of their stated claim amounts

  - Conversely, while COPs claims are projected to receive a 10% recovery under the City's Plan, applying a more appropriate discount rate to price the New B Notes would lower recoveries for COPs claims to 6%



# COP Recoveries vs. Pension Recoveries (cont.)

- If the City's prior actuarial assumptions are used to calculate pension recoveries, the recovery differential between pension and COPs is even more skewed

- As indicated previously, under the City's most recent actuarial calculation, the pensions would be receiving well in excess of 100% recoveries on their calculated deficiency amounts

- In comparison to COP recoveries, this produces more than a 100% recovery differential



Pension Recoveries as % of Most Recent Actuarial Deficiencies ($ in millions)

\* COP recoveries reflect (i) a 9% discount rate to value the New B Notes Consideration and (ii) COP claims asserted at 100% of principal value



# Unfair Discrimination Analysis

## Comparing Recovery Source Qualities

# Quality of Cash Flow Recovery

## The Plan directs superior sources of recovery to pensioners

- Apart from the quantitative risk factors assessed on the preceding pages, there are two primary qualitative risk factors that render the New B Notes consideration inferior to the consideration being offered to both pension claims

  i. **Diversity of recovery sources** – As illustrated, pension recoveries are being provided by many more sources of recovery than just the City's debt service capacity

  > For example, pension claims will receive distributions (on an immediate as well as continuing basis) from Foundation, DIA and State proceeds, each of which have been acknowledged by the Debtor's expert as having a superior credit quality relative to the New B Notes

  > *"It would be appropriate…with the State of Michigan, since they are a double A rated credit, to use a very low discount rate…Likewise, all the foundations, because they are large, and are well funded and have no…external debt, would also merit a very low discount rate…The individual members of the DIA board of trustees…are all very wealthy local business people and other professionals who probably would merit an equally low discount rate on their contributions..."*
  >
  > **Kenneth Buckfire – July 16, 2014**[1]

  ii. **Contingent Value Participation** – The ability for pension claimants to receive incremental (up to par) recovery tied to future City financial performance is a major qualitative advantage over COP and other general unsecured claims, which remain static no matter how robust the City's financial recovery might be

| | Summary of Cash Flow Recovery Quality – Pension vs. New B Notes[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Claim** | **Source of Recovery** | | | | | **Restoration Payments** | **DWSD Contingent Value Rights** | **Timing of Payment** |
| | **New B Notes** | **State Settlement** | **Foundation Proceeds** | **DIA Contribution** | **Cash Payment** | | | |
| **PFRS & GRS** | No | Yes | Yes | Yes | Yes | Yes | Yes | Begins immediately |
| **COPs** | Yes | No | No | No | No | No | No | Over 30 years |

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 218 of 364



# Unfair Discrimination Analysis
## Assessment of Defined Benefit Replacement Plan

# Generous Defined Benefit Replacement Plan

## The defined benefit replacement plan is comparatively generous

- Under the Plan, City employees will receive contributions to a replacement 401(k)-style plan that are comparatively generous relative to similar private and government sector plans (including the plan for the benefit of Michigan's teachers), which provides an effective counter-balance to potential motivational challenges that may arise among the City's workforce if pension claims were further impaired
- A high level comparison to other municipal defined contribution plans indicates that the employer contribution contemplated by the City's new defined contribution pension plans that will supplement the frozen defined benefit plans exceeds the sample average (by a substantial margin in the case of the PFRS employer contribution)

### Average State Defined Contribution Plan[1]

| Plan Name | Type of Plan | Plan Year | Employee Contribution | Employer Contribution* | |
|---|---|---|---|---|---|
| Alaska PERS - DC | Defined Contribution | 2009 | 8.0% | 5.0% | |
| Alaska TRS - DC | Defined Contribution | 2009 | 8.0% | 7.0% | |
| Colorado PERA - PERAChoice | Defined Contribution | 2009 | 8.0% | 10.2% | |
| Florida RS - FRS Investment Fund | Defined Contribution | 2009 | NA | 9.0% | |
| Indiana PERF - Annuity Savings Account | Combination | 2009 | 3.0% | 0.0% | |
| Indiana TRF - Annuity Savings Account | Combination | 2009 | 3.0% | 0.0% | |
| Michigan Public Schools - DC | Combination | 2010 | 3.0% | 0.0% | |
| Michigan SERS - DC | Defined Contribution | 2009 | NA | 7.0% | |
| Montana PERS - DCRP | Defined Contribution | 2009 | 6.9% | 4.2% | |
| North Dakota - DCRP | Defined Contribution | 2009 | 4.0% | 4.1% | |
| Ohio PERS - Combined Plan | Combination | 2009 | 10.0% | 7.0% | |
| Ohio STRS - Combined Plan | Combination | 2009 | 10.0% | 13.0% | |
| Oregon PERS - IAP | Combination | 2009 | 6.0% | 0.0% | |
| South Carolina - Optional Retirement Program | Defined Contribution | 2009 | 6.5% | 5.0% | |
| Washington SERS 3 - DC | Combination | 2009 | 5.0%-15.0% | 0.0% | |
| Washington TRS 3 - DC | Combination | 2009 | 5.0%-15.0% | 0.0% | |
| Washington PERS 3 - DC | Combination | 2009 | 5.0%-15.0% | 0.0% | |
| West Virginia TRS - DC | Defined Contribution | 2009 | 4.5% | 7.5% | *Positive Variance to Average* |
| **Average Employer Contribution** | | | | **4.4%** | |
| City of Detroit - PFRS Active | Defined Contribution | 2015 | 6.0%-8.0% | 12.3% | +7.9% |
| City of Detroit - GRS Active | Defined Contribution | 2015 | 4.0% | 5.8% | +1.4% |

Note: Reflects most recent Public Plans Database maintained by the Center for Retirement Research at Boston College
* Includes maximum employer matching of employee contribution

HOULIHAN LOKEY | 38

# Municipal vs. Corporate Pension Impairments

- In cases where certain unsecured creditors receive a materially higher recovery than other general unsecured claims, these advantaged creditors typically have the ability to assert strong negotiating leverage over the debtor (relative to other unsecured claims) and as such, may be able to command a higher recovery

- Impairment of trade, pension and other union related claims in the corporate context occurs frequently, despite these claimants having the ability to assert significantly greater leverage than public unions (specifically non-active retirees) in the form of business interruption and threats to strike

### Case Study: A Comparison & Contrast To Airline Bankruptcies

- Airline bankruptcies are a prime example of situations where such creditors (primarily labor unions and specifically, pilots) have the ability to halt all business operations with a single strike. Yet despite this leverage, pension plans have still been terminated and benefits have still been impaired with resulting claims being treated pari passu with other general unsecured claims

  - In the 2005 case of United Airlines, the company's pension plans with nearly 124,000 vested participants and total claims of $7.4 billion were terminated[2]

  - Similarly, the cases of U.S. Airways in 2003 and Delta Air Lines in 2006 resulted in the termination of pension plans with total claim amounts of $2.8 billion and $1.6 billion, respectively[2]

- In reality, only active employees have the ability to assert leverage through business interruption and threats of strike. In the case of Detroit's active employees, such actions are not permitted under state law[3]

  - Furthermore, active employees comprise a relatively small percentage of the total number of pension claimants (approximately 28%) under the PFRS and GRS plans[4]

- Even if leverage meriting such a significant disparity in recovery existed for active employees, it makes little sense for such leverage to enhance the recovery of non-active pensioners whose negotiating leverage characteristics do not possess the same attributes

  - For the City to justify enhanced retiree recoveries by suggesting that active employees are "concerned about the extent of impairment of benefits for retired City employees, as active employees will become retirees at some point" is disingenuous and is comparable to suggesting that "critical vendors" receiving special treatment in a Chapter 11 context would be concerned about harsh treatment of other "non-critical" vendors because they too may be considered "non-critical" one day

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 221 of 364

# Municipal vs. Corporate Pension Impairments (cont.)

- It is not uncommon for local and even national municipalities to restructure and ultimately impair pension claims despite the perceived risk that such an action may result in loss of cooperation and motivation by the municipality's active employees
  - Municipalities such as Central Falls have used bankruptcy or other statutory powers to modify pension and post-employment benefits to achieve necessary cost savings[5]

- Detroit itself has implemented similar changes on a pre-petition basis for active employees through the implementation of City Employment Terms (or "CET").[6] I am not aware of any evidence to suggest that further modification of active employees' (or retired employees') pensions and benefits would suddenly result in a scenario where all active employees (including those without vested pension benefits) would refuse to cooperate and effectively stop working to provide essential services
  - What makes the likelihood of this scenario even more remote is the fact that Michigan law explicitly prohibits public employees from striking or even engaging in conduct that resembles a strike (i.e., absence from work or a failure to perform "in whole or in part from the full, faithful and proper performance of his or her duties…")[3]

- Beyond what I have observed in municipal bankruptcies, pensions benefits are impaired (and in many instances terminated) quite regularly in the corporate context where the threat of strikes and risks to employee cooperation and motivation is arguably greater than in the municipal context, especially with heavily unionized companies
  - From 1975 to 2011, approximately 4,300 PBGC-trusteed plans with aggregate claim amounts in excess of $45 billion were terminated[7]

- These corporate cases exhibit the same (and in some cases more) risk of employee defection, yet in each and every case the courts and / or the PBGC still provided for the termination of the plan
  - When compared to these corporate cases, Detroit's proposed modifications (especially when considering the generous replacement plan, lack of significant accrued benefit impairment and the presence of available contingent recovery mechanisms) are a far cry from an all-out termination, which suggest that additional cuts are unlikely to result in an across the board loss of employee motivation and cooperation

| PBGC Terminations & Claims (1975-2011)[7] | | | |
|---|---|---|---|
| Number of Plans Terminated | Total Claims | Vested Participants | Average Claim |
| 4,292 | $45,671,473,593 | 1,952,166 | $23,395 |

Houlihan Lokey

■ In the City's reply to Plan objections, it states that "by providing a relatively enhanced recovery to holders of Pension Claims, the City is helping to ensure the success of some of its most vital relationships going forward" and that "if the City is to recover from its decades-long downward spiral and to function properly, it must have a workforce that is incentivized and motivated to provide the services that the City needs to function and attract residential and commercial growth"[8]

■ Using the City's own recovery estimates under the Plan, I have calculated the level of "enhanced recovery" the City is providing to its Classes 10 and 11 claimants, at the expense of the recoveries of other unsecured claimants

■ This $956 million enhanced recovery that the City is providing to the Classes 10 and 11 claimants reflects the implied cost that is effectively borne by other unsecured creditors to "ensure the success of some of [the City's] most vital relationships going forward"[8]

● Put another way, this enhanced recovery represents a cost of approximately $100,000 per each of the City's 9,591 active employees[9]



**"Enhanced" Pension Recoveries Under City's Plan of Adjustment ($ in millions)**

~$956 million of "enhanced recovery" = **~$100,000 per active employee**

Plan Recovery: $1,854 / $913
Pari Passu Pro Rata Recovery: $898 / $1,868
Pension "Recovery Enhancement"

■ Recovery on Other Unsecured Claims  ■ Recovery on Pension Claims

*Note:    Recoveries from New B Notes reflect a 5% discount rate consistent with the rate used by the City in its Plan*

**HOULIHAN LOKEY**  41



# Unfair Discrimination Analysis

## Lack of Transparency to Financial Creditors

# City Justification For Disparate Financial Creditor Treatment

**The Debtor contends financial creditors' greater underwriting resources are cause for disparate treatment**

- Unlike corporate debt underwriting, the municipal debt underwriting process takes place at a distance, with complete reliance on City-produced financial data and no direct access to diligence City government operations

- Immediately prior to and during the bankruptcy proceeding, the Debtor disclosed previously unknown facts and data describing the severity of City government dysfunction and lack of primary data integrity which could not possibly have been known under the municipal debt underwriting model

### Operational Deficiencies Revealed in Bankruptcy

| | |
|---|---|
| **DDOT[1]** | - High employee absenteeism for bus operations (35% in January 2013) results in poor service and higher costs |
| **Information Technology Services[2]** | - Lack of cross-coordination of 150 contractual employees distributed across 13 departments impedes ability to monitor utilization and eliminate redundancies<br>- Poor employee attitude towards maintaining complete records hinders performance evaluation |
| **Grant Management[2]** | - Employees routinely ignore City reporting deadlines and submit inaccurate information |
| **Planning and Development Department[3]** | - Low employee morale results in lack of employee focus on broader welfare of City<br>- Certain core services employ twice as many people as necessary to perform functions |
| **Detroit Police Department[4,5]** | - Frequent turnover (five different police chiefs in five years) results in EM acknowledgment of extremely low efficiency (1 hour response time), effectiveness and employee morale |
| **Detroit Fire Department[4,5]** | - Staffing and equipment constraints result in as many as 12 of 52 facilities largely inoperational on any given day<br>- Extremely slow response time (7 minutes) relative to other cities |
| **Emergency Medical Services[5]** | - Frequently only one-third of City's ambulances in service at any given time<br>- Extremely slow response time (15 minutes) relative to other cities |
| **Assessor's Office[5]** | - Lacks state-required Level IV Assessor and no available candidates due to inadequate compensation<br>- Approximately 15,000 parcels per employee versus state recommendation of 4,000 parcels per employee |
| **Payroll System[5]** | - Extremely high cost to process payroll ($62 per paycheck) relative to comparable entities ($15 per paycheck)<br>- Process is highly manual and prone to human error, including erroneous payments to individuals |
| **Budgeting, Accounting & Financial Reporting Systems[5]** | - Approximately 70% of journal entries are booked manually<br>- Outdated financial reporting system is no longer supported by its manufacturer |

HOULIHAN LOKEY    43



# Unfair Discrimination Analysis
## Additional Financial Creditor Disadvantage

# Public Statements Advocating Disparate Treatment

## The City's actions put financial creditors at a disadvantage

- The public advocacy of the City for a plan which directs state and private funding exclusively to pensions resulted in a significantly disparate recovery outcome

- An examination of the case history reveals that significant statements and actions favoring pensions over financial creditors preceded substantial improvements in pension recoveries at the expense of financial creditors

  - It is reasonable to assume that these statements enhanced the negotiating leverage of pension representatives and were a key causal variable driving the disparate impairment of financial creditors

- A long history of restructuring plan confirmations in bitterly contentious insolvency proceedings supports the position that a more equitable and balanced Plan negotiation approach can yield a more equitable plan that is nonetheless confirmable

### Value of Pension Recoveries at Key Intervals





# Best Interests Analysis

# Best Interests Test Defined

■ For the purpose of this analysis, I have analyzed the Plan to determine if it satisfies the best interests test, as it must, for the Plan to be confirmable

■ In conducting my analysis, I have measured best interests compliance against the standard as it has been defined in three cases[1]

### In re Pierce Cnty. Hous. Auth.

- **Definition**: According to the Debtor, the best interests of creditors test has been described as a "floor requiring a reasonable effort at payment of creditors by the municipal debtor"

### Lorber v. Vista Irr. Dist.

- **Definition**: According to the Debtor, creditors receive "all they can reasonably expect in the circumstances"

### In re Sanitary & Improvement Dist., No. 7

- **Definition**: According to the Debtor, the best interest of creditors "simply requires the Court to make a determination of whether or not the plan as proposed is better than the [alternative to chapter 9, dismissal of the case]"

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 229 of 364

# Best Interest Compliance – Summary of Findings

- The Plan fails to satisfy the best interests test for the reasons summarized in this section and elaborated upon in the remaining sections of this report

| Dismissal Would Force a More Thoughtful Examination of Detroit's Ability to Pay | |
| --- | --- |
| Factual Basis | <ul><li>Outside of bankruptcy, both distressed and non-distressed cities routinely monetize assets as a means of dealing with temporary or more profound financial concerns or constraints</li><li>The City's Plan embraces a sentiment that the City's assets should be "[maintained] for a better day" by seeking to effect a cram-down of financial creditors in lieu of a more thoughtful monetization of City assets (both core and non-core) to yield higher creditor recoveries[2]</li><li>Dismissal of the Plan would force the City to conduct a more comprehensive assessment of its ability to pay, incorporating its legacy balance sheet assets instead of using Chapter 9 to significantly impair only financial creditors</li><li>Dismissal would also force the City to implement a more comprehensive and effective operational restructuring, thereby generating additional sources of cash flow[3]</li></ul> |
| Best Interests Implications | <ul><li>**The Plan fails the Pierce Cnty. Hous. Auth., Lorber V. Vista Irr. Dist. and Sanitary & Improvement District standards: the Debtor did not make a reasonable effort to repay creditors, creditors could reasonably expect to receive more and the Debtor has failed to show it is better than the alternatives**</li></ul> |

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 230 of 364

# Best Interest Compliance – Summary of Findings (cont.)

## The Plan Does Not Realize Full (or Realistic) Value for the DIA

| | |
|---|---|
| **Factual Basis** | ■ The "Grand Bargain" settlement, as a central feature of the Plan, is flawed in many ways:<br>1. The actual value of the Grand Bargain is far less than the headline value the City has sought actively to promote<br>2. The actual value of the Grand Bargain is far less than the market value of the DIA's collection assets<br>3. The City has failed to explore a more comprehensive range of DIA transactional alternatives<br>4. The Grand Bargain burdens Detroiters with a large opportunity cost:<br>  • Because the DIA market value vastly exceeds both the Grand Bargain value and other measures of the DIA's value to the City, it imposes a significant opportunity cost on the City and its creditors<br>  • Instead of being allowed to monetize collection assets or explore other DIA transactional opportunities, the Grand Bargain accomplishes a form of regional expropriation of the DIA (for the benefit of public and private interests outside the City), thereby denying the City an opportunity to use DIA proceeds to catalyze recovery and settle claims<br>4. The Grand Bargain fails to resolve fundamental problems with the municipal ownership / funding structure that have plagued the DIA throughout its history and may impose future economic costs on the City |
| **Best Interests Implications** | ■ **The Plan fails both the Pierce Cnty. Hous. Auth. and Lorber v. Vista Irr. Dist. standards: the Debtor did not make a reasonable effort to repay creditors and creditors could reasonably expect to receive more** |

## Dismissal Will Not Pose an Existential Threat

| | |
|---|---|
| **Factual Basis** | ■ Post dismissal, the City would continue to direct available cash to maintenance of critical services<br>■ Continued deferral of pension and financial creditor obligations would generate ample operating surplus<br>■ The City's pre- and post-petition conduct, as well as other real-world examples, illustrate that any period of potential post-dismissal disruption can and would be managed without significant detriment to the City<br>■ The lack of any catastrophic events in the wake of a Chapter 9 dismissal ensures COPs and other creditors will preserve a claim to the same base level financial recovery in the event the Plan is dismissed<br>■ The City of Harrisburg, PA offers a case study of a city implementing a more effective financial and operational restructuring after its Chapter 9 petition was rejected |
| **Best Interests Implications** | ■ **The Plan fails the Sanitary & Improvement District standard: the Debtor has failed to show it is better than the alternatives** |

HOULIHAN LOKEY | 49

# Best Interest Compliance – Summary of Findings (cont.)

## Dismissal Will Not Further Deplete the City's Tax Base

| | |
|---|---|
| **Factual Basis** | ■ Detroit's decades-long decline has been well documented and most recent signs suggest the decline has abated to the point where it may have finally reached an inflection point<br>■ The City is benefiting from a nascent urban infill phenomenon and, more substantively, from the sustained and concerted reinvestment initiatives of the City's private employers<br>■ The City's private employers are likely to continue advancing their privately-led revitalization initiative both as a defensive measure to protect the value of their large legacy investments and also as an opportunistic investment strategy, whether the bankruptcy is dismissed or not<br>■ In the event of a dismissal, resolution of the City's financial difficulties could still be achieved quickly by modifying elements of the existing Plan to reflect fair and equitable treatment of financial creditors |
| **Best Interests Implications** | ■ **The Plan fails the Sanitary & Improvement District standard: the Debtor has failed to show it is better than the alternatives** |

## Dismissal Would Allow for a Continuation of COP Option Value

| | |
|---|---|
| **Factual Basis** | ■ The effect of the City's Plan will be to forever cap the recovery prospects of the COP creditors at 6% of the value of their claim and eliminate the possibility that they might participate in the City's future economic recovery<br>■ Certain real-world examples prove it would be more economically advantageous for COP holders to forgo current payment in the interest of preserving the par amount of their claim<br>■ This concept is further supported by economic theory embedded in widely used and commonly accepted risk pricing models such as Black-Scholes<br>■ Both the real world experience and the theoretical modeling for creditors in a similar circumstance support dismissal of the Chapter 9 proceeding as the value maximizing outcome compared to a cram-down Plan that caps Class 9 claims at de minimis recovery levels, thereby precluding COP claimants from participating in the City's economic recovery |
| **Best Interests Implications** | ■ **The Plan fails the Sanitary & Improvement District standard: the Debtor has failed to show it is better than the alternatives** |

# Best Interest Compliance – Summary of Findings (cont.)

| | Dismissal Will Re-Level the Negotiation Playing Field |
|---|---|
| **Factual Basis** | ■ Subsequent to the City's Chapter 9 filing there have been two significant developments dramatically affecting the negotiating leverage of the COPs <br> 1. The court's eligibility ruling resolved the federalist versus state's rights question pertaining to the status of pensions that existed before the decision – more specifically, the court's ruling decided that pensions are subject to impairment under Chapter 9 like any other contractual obligation <br> 2. Despite the court's ruling, the City nevertheless provided preferential Plan treatment to the pensions <br> ■ Dismissal of the Chapter 9 case would allow COPs to re-engage in negotiation with the City and pension advisors to achieve a more equitable settlement outcome aided by the court's ruling on the unsecured status of the pensions – which would be reinforced by Plan dismissal <br> ■ There are numerous examples of such negotiations yielding efficient and equitable settlement resolutions |
| **Best Interests Implications** | ■ **The Plan fails the Sanitary & Improvement District standard: the Debtor has failed to show it is better than the alternatives** |



# Best Interests Analysis
## Examination of Ability to Pay

# A More Thoughtful Examination of Ability to Pay

## Dismissal Would Force a More Thoughtful Examination of Detroit's Ability to Pay

- Outside of bankruptcy, both distressed and non-distressed cities routinely monetize assets as a means of dealing with temporary or more profound financial concerns or constraints
- Because the City's Plan seeks to cram-down financial creditors in lieu of a more comprehensive monetization of City assets, which could yield higher creditor recoveries, a dismissal of the Plan would force the City to conduct a more honest assessment of its ability to pay, incorporating its legacy balance sheet assets instead of using Chapter 9 to significantly impair only financial creditors

### Municipalities Have Begun to Focus on Balance Sheet Assets to Support Their Finances

- Historically one of the key tenets underlying the generally strong credit quality in the municipal debt market was the presumption that issuers would use all available resources to repay their financial obligations
- While the commitment clearly extended to the requirement that municipalities raise taxes, in recent years municipalities across the credit spectrum have also focused on balance sheet assets (either implicitly or explicitly) to generate liquidity, finance investments, support credit quality, and in certain distressed circumstances to repay creditors
- Given the increasing use of balance sheet monetization strategies such as public-private partnerships, there is no doubt that if the City's bankruptcy proceeding were dismissed it would be forced to conduct a more thoughtful examination of the wealth of assets on its balance sheet as a source of enhancing creditor recoveries

### Several Factors Should Lead to a More Expansive Asset Monetization Process

- Outside of bankruptcy, it is a certainty that creditors would point to at least four key factors supporting efforts leading to more expansive municipal asset monetizations:
  1. Reliance on Michigan state law;
  2. The City's recent pre- and post-petition conduct;
  3. Recent municipal market precedent; and
  4. The significant value of the City's major assets

HOULIHAN LOKEY    53

# Recent Municipal Market Precedent

- It is important to recognize that exploring municipal asset monetizations as a means of dealing with financial distress isn't unique

- In assessing the adequacy of Detroit's asset monetization efforts, I examined recent significant asset monetizations for municipal and other government entities across the credit spectrum

### Muni Asset Monetization Research – Summary Conclusions

1. There are numerous examples where both core and non-core assets have been monetized (particularly among stressed or distressed municipalities)

2. Monetization strategies include both P3s and outright sales

3. P3 transaction volumes (wherein municipalities cede a majority of an asset's value under a long-term lease and concession agreement, but maintain asset ownership) have increased
   o "The increasingly complex nature of our national challenges, along with recent shifts in economic and social forces, are creating incentives for government and business to collaborate more frequently and in new ways that go well beyond traditional infrastructure investments"[1]
   – Deloitte University Press

4. Detail on use of proceeds is often difficult to ascertain, but the popularity of these transactions among distressed municipalities suggests a trend toward reliance on municipal balance sheet assets outside of bankruptcy to bolster municipal liquidity – and implicitly municipal debt service capacity

### Significant Recent Municipal Monetizations Transactions*

| Municipality | Asset | Transaction Type | Deal Size** |
|---|---|---|---|
| Harrisburg, PA[2] | Incinerator | Sale | $130 million |
| | Parking | P3 | $270 million |
| | City artwork | Sale | $4 million |
| Allentown, PA[3] | Water / wastewater system | P3 | $211 million |
| Indianapolis, IN[4,5] | Water / wastewater system | Sale | $425 million |
| | Parking | P3 | $20 million |
| Chicago, IL[6] | Parking | P3 | $1.2 billion |
| New York City, NY[7] | Office buildings | Sale | $250 million |
| California[8] | Office buildings | Sale-leaseback | $2.3 billion |
| Arizona[9] | Publically-owned buildings | Sale-leaseback | $1.0 billion |
| Hercules, CA[10] | Municipal utility | Sale | $10 million |

\* *Further detail is provided in Appendix D*
\*\* *Excludes any future revenue sharing consideration*

HOULIHAN LOKEY    54

- Michigan's EM legislation provides significant and very specific power to explore and effect monetizations of municipal assets
- Specifically, these powers are set forth in Public Act 436, which provide for the following:

| Public Act 436: City Asset Monetization Powers[11] |
|---|
| The EM may *"sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government, provided the use or transfer of assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of residents of the local government or unconstitutionally impair a bond, note, security, or uncontested legal obligation of the local government."* |

- As indicated by the excerpts below from a FGIC internal report, these powers were explicitly referenced and relied upon by FGIC in making its decision to insure the issuance of the City's COP obligations

| FGIC Asset-Related Underwriting Considerations[12] |
|---|
| ● *"We believe the likelihood of Detroit filing for bankruptcy is remote. Michigan has statutes in place that are designed to provide safeguards in case a local government is running into a fiscal crisis. An appointed EFM has significant powers to manage the city's finances. Several cities that were in fiscal distress in recent years have utilized an EFM to restore their finances without requiring a bankruptcy avenue."* |
| ● *"The emergency financial manager has broad and sweeping powers, including the power to sell or otherwise use the assets of the local government unit to meet past or current obligations so long it does not endanger the public health, safety or welfare of the residents and subject to any charter or other restrictions."* |

- The EM asset monetization powers are also consistent with the more traditional creditor protections established and commonly accepted in U.S. bankruptcy law that preclude debtors (both individual and corporate) from shielding assets in an effort to defraud creditors
- Because municipal asset monetizations are often politically unpopular, there is a moral hazard whereby cities may be tempted to seek Federal Court protection / sanction to implement an asset protection scheme to the detriment of creditors
- The Michigan EM legislation is tailor made to avoid such an aggressive interpretation of the Best Interests provisions in Chapter 9 and would allow for the City to conduct a more open, honest and effective asset monetization initiative as an integral component of reaching a comprehensive creditor settlement agreement

HOULIHAN LOKEY  55

# Overview of Detroit Asset Sales

■ The City has historically sold assets to fund its annual budget and repay creditors. Furthermore, the Emergency Manager has repeatedly maintained that all of Detroit's assets remain "on the table" as part of the City's restructuring process

● Despite past precedent and the Emergency Manager's continued verbal indications, the City's restructuring plan fails to capture the value of Detroit's numerous legacy assets in almost any meaningful way

**Timeline of City Actions & Commentary on Asset Monetizations**

**2005** ① ② ③ ④ ⑤ ⑥ ⑦ ⑧ ⑨ **2014**

1. <u>October 2005</u> – Detroit's Fiscal Analysis Director releases report analyzing the potential securitization of the Detroit-Windsor Tunnel[13]

2. <u>April 2006</u> – City approves sale of City-owned parking garage to the Greektown Casino for $32 million. Proceeds from the sale will be used to repay bond debt[14]

3. <u>April 2007</u> – Detroit's Fiscal Analysis Director issues recommendations on proposed sale of approximately $31 million of City-owned property[15]

4. <u>September 2010</u> – McKinsey releases report assessing potential P3 transactions for Detroit's numerous legacy assets. The report identifies DWSD, the Detroit-Windsor Tunnel, Coleman A. Young Municipal Airport, the DIA and Belle Isle as assets for "immediate [P3] consideration"[16]

5. <u>September 2012</u> – Detroit's Fiscal Analysis Director issues memo in favor of proposed Belle Isle lease with state of Michigan[17]

6. <u>March 2013</u> – Newly appointed Emergency Manager Kevyn Orr states that "everything is on the table" in response to a question regarding potential asset sales[18]

7. <u>June 2013</u> – The Emergency Manager releases his Proposal for Creditors identifying "generat[ing] value from City assets where it is appropriate to do so" as a key objective of Detroit's financial restructuring

● The Proposal lists DWSD, the DIA, City-owned land, the City's parking operations, the Detroit-Windsor Tunnel and Joe Louis Arena, among other assets, as potentially saleable assets[19]

8. <u>November 2013</u> – Michigan Emergency Loan Board approves 30-year Belle Isle lease with City which will allow City to avoid approximately $5 million of annual operating costs[20]

9. <u>March 2014</u> – City discloses that it has retained DESMAN Associates to assess potential sale-lease transaction or other monetization of Detroit's parking assets[21]

HOULIHAN LOKEY | 56

# Potential City Asset Monetization Opportunities

■ The table below highlights some of the assets owned by the City of Detroit that could potentially be monetized to fund operations or repay creditors

| Asset | Description |
|---|---|
| Detroit Institute of Arts | ■ The Detroit Institute of Arts is one of the largest municipally-owned museums in the country, with a 66,000-piece art collection valued at several billion dollars |
| City-Owned Land | ■ The City owns approximately 22 square miles of land and other real estate assets obtained with City funds or through the tax lien foreclosure process<br>■ These assets consist of thousands of discrete real estate parcel holdings with a dated "last transaction" aggregate property value assessment in excess of $1 billion, per the City's disclosures |
| Detroit Water and Sewerage Department | ■ The Detroit Water and Sewerage Department serves more than 40% of the state of Michigan's population over a service area of approximately 1,000 square miles. It is the third largest provider of water and wastewater treatment services in the U.S.<br>■ The system generates positive free cash flow and does not receive property tax subsidies from the City |
| Coleman A. Young Airport | ■ Coleman A. Young International Airport is a 263-acre general aviation airport located within and operated by the City<br>■ Approximately 225 corporate and private flights originate from or terminate at the airport daily |
| Detroit-Windsor Tunnel | ■ The Detroit-Windsor Tunnel is an automotive tunnel connecting Detroit and Windsor, Ontario. Approximately 2 million vehicles pass through the tunnel annually<br>■ The City owns the U.S. portion while the portion located in Canada is owned by the city of Windsor |
| Parking Operations | ■ The City's Municipal Parking Department ("MPD") manages nine parking garages containing a total of 8,688 spaces, and two public parking lots together containing 1,240 spaces<br>● The City owns certain of these parking facilities; others are owned by the Detroit Building Authority<br>■ MPD also operates 3,404 on-street metered parking spaces; tickets are collected through a private vendor |
| Joe Louis Arena | ■ Joe Louis Arena is an indoor arena located in downtown Detroit, Michigan and is the home to the Detroit Red Wings of the National Hockey League. Completed in 1979, the 20,058 seat arena is Detroit's largest indoor venue and regularly hosts professional sports, college hockey, concerts, ice shows, circuses and other entertainment |

HOULIHAN LOKEY    57

# Significant Value of City's Major Assets

- The City could generate significantly more value from certain asset categories than contemplated under the current Plan

- Under the Plan, the City raises only $455 million of value for the DIA assets, which is the sum total of City balance sheet related creditor recoveries*

- Conservative estimates of potential value realization for the other major City asset categories suggest these City-owned assets could collectively generate multiple billions of incremental distributable value for the benefit of the City and its creditors

| Incremental Plan Value Potential | | | |
|---|---|---|---|
| **Asset** | **Value Realization Under Plan** | **Potential Value Realization** | **Potential Incremental Value** |
| **DIA** | ■ $455 million* | ■ Victor Wiener's appraisal indicates a value of <u>$8.6 billion</u> may be realized by pursuing full monetization of the DIA collection [22] | **$8.1 billion** |
| **DWSD** | ■ Pending / TBD | ■ City advisor Miller Buckfire maintains substantial value exists in DWSD beyond value of existing debt and CIP / capex requirements<br>■ Process run in highly politicized environment may have compromised value realization<br>■ Value potential remains substantial but is unknown | **?** |
| **Land** | ■ None | ■ Substantial opportunity exists to realize land and real estate value<br>■ Requires resolution of current City / county operational impediments and implementation of a strategic plan<br>■ Source of unknown but potentially significant intermediate and longer term value realization | **?** |
| **Other** | ■ None | ■ Significant value may be realized from the numerous City-owned legacy assets that the Plan fails to utilize, including (i) Coleman A. Young International Airport, (ii) the Detroit-Windsor Tunnel, (iii) Joe Louis Arena and (iv) the City parking structures, among others | **?** |
| **Total** | | | **$8.1 billion +** |

*    *Reflects net present value of the Grand Bargain proceeds assuming a 6.75% discount (see Appendix E for further detail)*    HOULIHAN LOKEY    58

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 240 of 364

- On a present value basis, the distributable value the City expects to realize from the art under the proposed Plan is approximately $455 million

- The DIA's $8.6 billion in value indicated by Victor Wiener's appraisal suggests that $8.1 billion in incremental value could be realized through a full monetization of the art[22]

- While the City contends that litigation might encumber the sale of certain assets, and litigation costs would deduct from incremental distributable proceeds:

  - I find it unlikely these costs would come close to mitigating the incremental value the City might realize from its assets

  - I note that the estimated City professional fees for the entire Chapter 9 proceeding are projected to be in excess of $100 million[23]



**Illustrative Grand Bargain Opportunity Cost ($ in millions)**

$8,552 Million — Victor Wiener Appraisal

Grand Bargain Opportunity Cost = $8,097 Million

$455 Million — Grand Bargain Valuation

City Opportunity Cost = $8,479 Million

$73 Million — Detroit Citizen Valuation*

\* *See following section for explanation of calculation*

HOULIHAN LOKEY    59

# Incremental DWSD Value

- The amount of DWSD system value in excess of the approximately $5.5 billion in DWSD debt and the projected system CIP / capex requirements is effectively City equity available for use by the City to provide incremental recoveries to creditors

- From public disclosure, the process run by City advisors was highly politicized and appeared to be flawed in certain critical respects:

| Preliminary DWSD System Value Realization Impediments[24] |
|---|
| 1. Highly publicized concerns over magnitude of DWSD capex requirements |
| 2. Highly publicized concerns over system operational and cost controls |
| 3. An apparent one-off negotiating strategy with a potential regional authority that failed to maximize competitive tension by soliciting indications of interest from other parties too late in the process |

- At this point the value maximizing strategy would appear to be bolstering DWSD management, addressing operational and cost control concerns and substantiating system capex needs

- Dismissal of the Plan will actually provide needed and helpful incentive to address these impediments to value realization in the near term and allow the City to realize full and fair value for the system under a more organized process conducted in the intermediate timeframe

- Compared to the present DWSD-related creditor distributions under the Plan, which have been significantly compromised for the reasons indicated, there is a reasonable creditor expectation that DWSD value realization on Plan dismissal will be greatly enhanced

- The DWSD is a marquee regional infrastructure asset that would command highly competitive valuation interest from a growing universe of would-be acquirers as an alternative to a regional sewer water authority

HOULIHAN LOKEY   60

# Additional Land Value Details

■ While the City ascribes minimal value to its land holdings, the intermediate and long-term value realization prospects for these assets are significant, notwithstanding the rehabilitation costs and discontinuous (i.e. patchwork) nature of City-owned land

■ The City owns approximately 22 square miles of land and other real estate assets obtained with City funds or through the tax lien foreclosure process. These assets consist of thousands of discrete real estate parcel holdings with a dated "last transaction" aggregate property value assessment in excess of $1 billion, per the City's disclosures

● According to City records, the last sale value of real estate assets that the City owns as a result of foreclosing on various properties is approximately $720 million.[25] Furthermore, the City is able to foreclose on additional properties with total aggregate assessed and taxable values of approximately $510 million and $390 million, respectively[26]

■ Unfortunately, City property values have plummeted and these estimates likely overestimate City property values by a wide margin, particularly factoring in blight remediation costs

■ However, because Detroit remains an important regional hub for manufacturing, logistics, technology and other industries, the City's rehabilitation will drive longer term value appreciation for the City's vast land holdings

■ Recent home sales suggest a prospective resurgence in property values that could further increase value realization, substantiating the possibility that significant long-term value may be potentially realized in connection with the City's real estate holdings

● In May 2014, a Detroit home sold at auction for $135,000, marking the first time that a winning bid exceeded the $100,000 threshold[27]. An additional 30 homes have been sold for approximately $2 million[28]

● Also in May, Mayor Duggan announced that auctions have been expanded to include more neighborhoods in order to meet high demand. More than 6,000 people have registered for the auction since the City began the effort[28]

➤ The administration plans to sell an additional 300 homes by the end of 2014[29]

■ By remedying structural impediments and implementing a coordinated property value realization strategy, City-owned real estate is a source of material value recovery

| City-Owned Real Estate ($ in millions) | | |
|---|---|---|
| | | Last Sale Amount |
| City-Owned Properties Obtained Through Foreclosure | | $720.6 |
| | Current Taxable Value | Current Assessment |
| Properties City Can Foreclose On | $389.9 | $512.2 |
| | Value Esimate (Low) | Value Esimate (High) |
| Total City-Owned Real Estate | $1,110.5 | $1,232.8 |

Note:   Property values presented above do not reflect any potential tax payments owed to Wayne County and may represent a significant overstatement of market value for reasons indicated herein

HOULIHAN LOKEY    61



# Best Interests Analysis
## Does the Plan Realize Full Value For DIA Proceeds?

# Is the Grand Bargain Value Maximizing?

- Under the Plan, the City-owned art collection is the one asset that is being monetized for the benefit of certain creditors
- A crucial question is whether the monetization transaction (dubbed the "Grand Bargain") maximizes the value of the art
- In attempting to answer this question, my analysis falls into four primary categories:

| | |
|---|---|
| **I.** | **The value of the proposed "Grand Bargain" transaction** |
| **II.** | **The actual value of the museum** |
| **III.** | **The viability and impact of the transaction on the City** |
| **IV.** | **Other issues and considerations** |

# Value of the Grand Bargain

- The City has aggressively promoted the Grand Bargain transaction as providing $816 million dollars in proceeds for the benefit of Detroit's creditors

- Further examination reveals that proceeds of two components of the transaction – the $366 million Foundation contribution and the $100 million DIA contribution – are distributed over 20 years, whereas the $350 million State settlement component has already been discounted under the Plan to $195 million, using a 6.75% discount rate

  - When applying that same 6.75% discount rate to the Foundation contribution and DIA contribution, the aggregate present value discount to the City's "headline" number of $816 million is $361 million (a 44% reduction)

- Consequently, for purposes of determining whether the Grand Bargain maximizes value for the City's art, the applicable Grand Bargain value threshold is actually $455 million, as illustrated below



13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 246 of 364

# Actual Museum Value

- As a municipally owned and funded museum (a unique ownership and funding structure among major U.S. museums), the DIA's value and claim on public resources have been a contentious issue throughout the museum's history

- To assess the actual value of the museum, I have completed the following:

| | |
|---|---|
| **1.** | • A solicitation of third party indications of interest in acquiring, lending against or otherwise purchasing some beneficial interest in all or a portion of the DIA's collection assets |
| **2.** | • A review of the Christie's appraisal for a portion of the DIA collection assets |
| **3.** | • A review of the DIA's most recent survey information and other DIA produced data potentially relevant to the broader economic value of the museum and its assets |
| **4.** | • A review of the Grand Bargain proposal and relevant legislation |
| **5.** | • A literature review of various museum valuation methodologies |

HOULIHAN LOKEY | 65

# Actual Museum Value – Houlihan Lokey Solicitation Process

- In an effort to determine the value that interested parties might place on the DIA collection, I conducted a solicitation of potentially interested parties

- The process was conducted in manner consistent with other similar processes I have run in numerous other professional engagements[1]

## Key Process Observations

### Range of Competitive Interest

- Outreach process confirmed interest from a broad range of parties
- Interested parties fell into four primary categories: (i) alternative asset investors; (ii) private collectors; (iii) art intermediaries; and (iv) museums and museum authorities

### Level of Competitive Interest

- High degree of competitive interest
- Number of parties willing to advance formal indications of interest ("IOIs") would greatly exceed the four indications received if there were constructive process engagement by the City and the DIA
- Interested parties declining to advance formal IOIs expressed confusion / concern over City's "flip-flop" on potential third party transactional proposals
  - Interested parties cited City's initial apparent receptivity to third party proposals and later hostility

### Transaction Options

- Broad range of potential transactions available (e.g., art loan, limited deaccessioning, expansive deaccessioning, strategic partnership)

### Summary Process Related Value Conclusion

- $1.75 billion average valuation of bids received represents minimum value expectation
- Total value realization for DIA collection in open auction process would be much higher
- Range of transactional opportunities suggest museum could be preserved as vital cultural asset while generating more than $1 billion dollars in incremental value for the City and its creditors

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 248 of 364

# Actual Museum Value – Alternative Valuation Perspectives

## Tri-County Millage Support – Implied Museum Valuation

- Another perspective on DIA valuation is the Tri-County millage support for the DIA, which can be viewed as a Willingness to Pay (or "WTP") valuation of the museum as a whole
  - In effect, the millage support can be viewed as the value the citizens of Detroit ascribe to keeping the museum
- The WTP and closely related Contingent Value ("CV") valuation methodologies have broad support in the academic, legal, financial and government communities as preferred valuation approaches for cultural institutions such as the DIA (see Appendix F for additional detail)[2]
- Because the Tri-County millage support for the DIA is scheduled to terminate in 2023, I have used an expected value approach assigning a 50% probability to perpetual millage support at the current $23 million per year level
- Because City residents comprise 18% of the Tri-County population, the implied DIA valuation within the City of Detroit is $73 million

| Tri-County Resident Valuation of DIA | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Annual Millage Cash Flow | $23.0 | $23.0 | $23.0 | $23.0 | $23.0 | $23.0 | $23.0 | $23.0 | $23.0 |
| Discount Factor | 1.00 | 0.95 | 0.91 | 0.86 | 0.82 | 0.78 | 0.75 | 0.71 | 0.68 |
| Present Value | $23.0 | $21.9 | $20.9 | $19.9 | $18.9 | $18.0 | $17.2 | $16.3 | $15.6 |
| NPV of Millage Cash Flow | $171.7 | | | | | | | | |
| Terminal Value Calculation | | | | | | | | | |
| Discount Rate | 5% | | | | | | | | |
| Expected Probability of Renewal | 50% | | | | | | | | |
| Terminal Value | $230.0 | | | | | | | | |
| Total NPV and Terminal Value | $401.7 | | | | | | | | |
| Detroit Residents in Tri-County | 18% | | | | | | | | |
| Detroit Resident Valuation of DIA | $72.9 | | | | | | | | |

# Grand Bargain Opportunity Cost - Collective

- Compared to other indications of value for the DIA, the Grand Bargain imposes a large opportunity cost on the City and its creditors

- Both the Grand Bargain and the citizens of Detroit place a value on the DIA collection that is over $8 billion dollars less than Victor Wiener's appraisal for the DIA collection

- To put that opportunity cost in perspective, the value differential represents more than 8 times the City's entire reinvestment budget for the next 10 years



HOULIHAN LOKEY | 68

# Grand Bargain Opportunity Cost - Individual

- Just as the Grand Bargain can be measured on a collective basis, it can also be disaggregated and measured as an imposition of cost against individual pensioners or residents

- As illustrated, because these constituencies would be compelled to accept the Grand Bargain in lieu of a fair market value realization, an individual market cost can be calculated

- The data below reveal that by rejecting market value realization for the City's art assets:

  - The cost to each Detroit pensioner is $249,712

  - The cost to every man, woman and child in the City is $11,543

| Measuring Opportunity Cost – Individual | | |
|---|---|---|
| Constituency | Opportunity Cost per Person | |
| Per Pension Claimant*[3] | Grand Bargain Valuation | $14,032 |
| | Victor Wiener Appraisal | $263,743 |
| | Pension Claimant Opportunity Cost | $249,712 |
| Per City Resident** | Grand Bargain Valuation | $649 |
| | Victor Wiener Appraisal | $12,192 |
| | Detroit Resident Opportunity Cost | $11,543 |

\*      Reflects all 32,427 individuals entitled to benefits under the PFRS or GRS pension plans
\*\*     Reflects 2012 Detroit population of 701,475

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 251 of 364

# Valuation Disconnect – Explanatory Variables

- One possible reason for the comparatively large differential between the market value of the City's art collection, and the value of either the Grand Bargain or the value ascribed by Detroit residents, is the comparatively low DIA user rate among Detroiters

- As illustrated, when the annual per capita millage costs are compared to similar metrics for art museums, several observations are immediately apparent

  1. The implied willingness-to-pay ("WTP") for the museum among Detroit residents is far less than similar WTP measures for residents in other cities, suggesting it is not the essential or core cultural asset the City contends

  2. There is an observable positive correlation between WTP and museum user rates

| Contingent Valuation Summary Comparison | | | |
|---|---|---|---|
| Subject Museum(s) / Catchment Area | Average WTP | Average User Rate | Description |
| Detroit Institute of Arts (Detroit Tri-County Area) | $6.05 | 11% | Millage per annum approved by Detroit Tri-County area |
| Bolton's Museum Services (Bolton, U.K.)[4] | $36.06* | 40%** | Economic valuation of Bolton's three museums commissioned by Bolton Metropolitan Borough Council and conducted by Jura Consultants in 2005<br>Valuation estimated total annual value of museums to users and non-users to be approximately £4.5 million in aggregate |
| National Sculpture Museum (Valladolid, Spain)[5] | $49.18* | 78% | Economic valuation based on the general Valladolid public's willingness-to pay to preserve and maintain the museum |
| Quebec Museums (Quebec, Canada)[6] | $7.33* | 23%*** | Assessment of value of museums to Quebec residents<br>Valuation based on willingness-to-pay to support Quebec-area museums for residents 18 years of age and over |
| Napoli Musei Aperti (Naples, Italy)[7] | $11.94* | 57% | Assessment of value of a collection of local cultural, historic and artistic monuments to the general Naples public |
| General Art Patronage in the State of Kentucky[8] | $19.30**** | 48% | Assessment of value of the arts to average Kentucky household<br>Estimated mean willingness-to-pay to avoid 50% decline in arts performances to be $24.31 among Kentucky householders |

Note:       Comparison of per capita millage to other WTP and CV results is not, strictly speaking, methodologically appropriate but is nonetheless directionally appropriate and accurate
*           Figure adjusted to USD
**          Reflects approximately 83,000 users among total catchment area adult population of 208,000
***         Assumes percentage of Quebec visitors for all Quebec museums is equal to the percentage of Quebec visitors for the Musée de la civilisation
****        Reflects $24.31 mean WTP, grossed up to reflect 100% decline in performance and divided by average Kentucky household size of 2.5



- The vast majority of visitors to the DIA are from the greater Detroit Tri-County area rather than the City itself

- Although Detroit residents are not separately segmented in the specific illustration provided in the 2013 DIA Visitor Engagement Survey Report (as they are part of the Wayne County), the Detroit resident visitor percentage of 11% is set forth separately in the following text commentary:

  - "The percentage of Detroit residents (11%) among the overall museum audience is consistent with previous Spring periods"

- One troubling concern is that the Grand Bargain imposes a substantial opportunity cost on Detroiters and confers a benefit on a disproportionately suburban user constituency

- The cost-benefit asymmetry is striking and raises a legitimate question as to whether the Grand Bargain is a type of cultural expropriation at the expense of Detroiters



**DIA – Percentage of Visitors by Area – 2011 to 2013[9]**



**DIA – Percentage of Visitors from Detroit[9]**

# Deaccessioning – Challenging the Taboo

■ Deaccessioning, or the permanent removal and sale of a work of art from a museum's collection, has recently come under increasing scrutiny as museums have generated significant controversy by considering the sale of collection items to fund operating costs rather than the acquisition of other works of art

■ Professional associations such as the Association of Art Museum Directors (AAMD) and the American Alliance of Museums (AAM) expressly forbid this practice (which includes the payment of creditors) in their code of ethics and threaten violators with sanctions that include the suspension of art loans, shared exhibits and other collaborations with other museums, penalties that could force ostracized museums to cancel shows and lose substantial patronage[10,11]

● Because of the significant clout that these associations hold in the art community, most museums adhere to these "suggested" guidelines in their collections management policies rather than risk alienation

■ These deaccessioning policies have at times inspired controversy and been criticized as being overly inflexible even in extenuating circumstances, such as situations where a museum would otherwise be forced to close entirely (as was the case of the Delaware Art Museum and, to a lesser extent, the National Academy Museum)

■ Other institutions have argued that the proceeds, though not directly used to acquire art, are going to equally worthwhile causes which have been determined by board members to be in the best interest of the institution in question

● For example, following the AAMD's censure of the Maier Museum of Art at Randolph College, the college responded that the Maier is not a member of the AAMD and is thus not subject to its jurisdiction. Furthermore, its board members have a fiduciary obligation to preserve Randolph College as an educational institution[12]

## Deaccessioning Policies of Select Professional Museum Associations

"The disposal of collections through sale, trade or research activities is solely for the advancement of the museum's mission. Proceeds from the sale of nonliving collections are to be used consistent with the established standards of the museum's discipline, but in no event shall they be used for anything other than acquisition or direct care of collections."

American Alliance of Museums
*Ethics, Standards and Best Practices*

"In accordance with the AAMD's policy on deaccessioning and disposal, the director must not dispose of accessioned works of art in order to provide funds for purposes other than acquisitions of works of art for the collection."

Association of Art Museum Directors
*Professional Practices in Art Museums*

# Summary of Select Art Monetizations

- Despite the AAMD's generally oppositional stance against deaccessioning, I have found recent situations where deaccessionings or deaccessioning like transactions have occurred or are in the process of occurring

  - These situations are summarized below. Additional detail on each transaction is provided in Appendix G

| Institution | Deaccessioned Works | Proceeds | Use of Proceeds | Outcome / Reaction |
|---|---|---|---|---|
| Delaware Art Museum | "Isabella and the Pot of Basil" (William Holman Hunt) and 3 additional works to be disclosed (pending) | $30 million (expected) | Repay $19.8 million bond issuance / Replenish museum endowment | "Isabella" sold for $4.9 million / AAMD issued immediate sanctions while AAM voted unanimously to remove accreditation |
| Maier Museum of Art at Randolph College | "Men of the Docks" (George Bellows) and "Trovador" (Rufino Tamayo) / 2 additional works (pending) | $33 million (with incremental $3-$5 million if additional pending works are sold) | Fund school endowment / Support operating budget | AAMD censure following initial 2008 sale of "Trovador" / AAMD sanction following 2014 sale of "Men of the Docks" |
| Fisk University | 101 piece collection donated to the University by Georgia O'Keeffe | $30 million in exchange for a 50% ownership stake | Fund school endowment / Support operating budget | Deal finalized in 2011 by Tennessee Supreme Court after a legal battle with the O'Keeffe estate |
| Field Museum | 31 piece 19th century Western art collection by George Catlin | $17 million | Fund future acquisitions / Support staff salaries | Collection sold to private party in 2004 Sotheby's auction |
| Rose Art Museum at Brandeis University | Entire 7,000 piece Rose Art Museum collection | Collection valued at $350 million | Fund school endowment / Support operating budget | Group of museum donors/overseers filed lawsuit in 2009 to prevent a sale / Brandeis settled the case in 2011 |
| National Academy Museum | "Scene on the Magdalene" (Frederic Edwin Church) and "Mt. Mansfield" (Sanford Robinson Gifford) | $13.5 million | Renovation and painting conservation to allow more collection pieces to be exhibited / Fund contingency reserve | AAMD sanction (lifted after twenty months following overhaul of academy's governance structure and fundraising procedures) / Five year probation to expire in 2015 |
| Thomas Jefferson University | "The Gross Clinic" (Thomas Eakins) | $68 million | Fund school endowment / Support operating budget | Sold to two Philadelphia museums after the University provided local institutions the opportunity to match the National Gallery of Art's offer |
| Fresno Metropolitan Museum | Sale of entire collection | Undisclosed but artwork value estimated at $3 to $6 million | Repay creditors | All assets liquidated following steep operational and financial difficulties |
| Louvre | Art loan of 200-300 pieces over 10-year period to new museum in Abu Dhabi | $247 million for art loan (with additional $1 billion for branding rights, exhibitions, management advice and other considerations) | N/A | Deal has drawn criticism from art and academic communities, but not formal censure/sanctions from AAMD or other associations |

# Other Relevant Observations – Undercurrent of Deaccessioning Support

- Although the campaign to support the Grand Bargain has been effective, important views from a range of sources have legitimized calls for a more thoughtful and balanced approach

| Arguments For Deaccessioning | | |
|---|---|---|
| **Argument** | **Rationale** | **Public Commentary** |
| **Substantial Monetization Value** | ■ Detroit's artwork could be readily monetized to provide meaningful cash flow for the benefit of the City's reinvestment initiatives, retirees and financial creditors | ■ *"The Detroit Institute of Arts (DIA) is the second largest municipally owned museum in the United States and contains an encyclopedic art collection worth over one billion dollars."* – Irvin Corley, 2003-2004 Budget Analysis, City of Detroit |
| **Non-Core Asset** | ■ Art is not essential to the City's critical functions, particularly in comparison to assets used to provide services such as pensions, police, water, transportation or healthcare. Proceeds from the deaccessioning would be used in part to fund these essential services | ■ *"Let's get real: What sort of message would it send to current and future residents—not to mention current and future bondholders—if Detroit refuses to put everything on the table? You can't eat the DIA's "Still Life With Fruit, Vegetables, and Dead Game," no matter how well-rendered…"* – Nick Gillespie, *The Daily Beast*[13]<br>■ *"From a fiduciary point of view, [the Emergency Manager] has to give fair notice that these are assets of the city. It's about what's good for the citizens and the public…I'm letting Kevyn do his job as a practical matter."* – Rick Snyder, Michigan Governor[14] |
| **Increased Public Viewership Elsewhere** | ■ If the art were sold to a public museum with greater viewership, such as the Getty Museum or the Metropolitan Museum of Art, it would be exposed to and enjoyed by a larger audience, thereby increasing its cultural value | ■ *"Great artworks shouldn't be held hostage by a relatively unpopular museum in a declining region. The cause of art would be better served if they were sold to institutions in growing cities where museum attendance is more substantial and the visual arts are more appreciated than they've ever been in Detroit."* – Virginia Postrel, *Bloomberg*[15] |
| **Limited Deaccessioning or Alternative Monetization** | ■ The City could potentially deaccession artwork comprising substantial economic value while still retaining a substantial and culturally relevant collection. Additionally, the City could monetize artwork without directly selling any artwork | ■ *"We would like to highlight five potential alternatives [to a sale]: (1) the use of art as collateral for a loan; (2) leasing the art to a partnership museum; (3) creation of a "masterpiece trust"; (4) sale and permanent loan or gift to DIA; and (5) a traveling exhibition."* – Christie's, Letter to the Emergency Manager[16]<br>■ *"Instead of liquidating this great cultural asset, the DIA and its supporters should advocate for a subset of works in the collection being sent on a five- or 10-year tour of major museums around the world…The long-term value of the collection, both in financial and cultural terms, would probably rise."* – Michael Bennett, Law Professor, Northeastern University[17] |

HOULIHAN LOKEY

■ Even the Emergency Manager originally maintained that all assets, including the artwork of the DIA, were "on the table" as part of a comprehensive restructuring dialogue and that he had a fiduciary responsibility to explore all value realization scenarios in order to develop a solution that made sense for all of the City's stakeholders

● In the context of higher value alternatives, the Emergency Manager's comment on fiduciary responsibility appears inconsistent with the City's Plan



**Timeline of City Commentary on Sale of DIA Assets**

May 2013 ① ② ③ ④ ⑤ ⑥ ⑦ ⑧ ⑨ March 2014

1. <u>May 24, 2013</u> – EM spokesman Bill Nowling tells Detroit Free Press that DIA could face exposure to creditors in event of Chapter 9 filing, acknowledging that creditors can "really force the issue" and that art "is an asset of the City to a certain degree [and]…we've got a responsibility to rationalize all the assets of the City"[18]

2. <u>June 2013</u> – Christie's officials visit DIA at request of the EM's office. Nowling states that there was not a formal contract at that time between the City and the auction house[19]

3. <u>August 5, 2013</u> – Christie's formal engagement to appraise portion of DIA collection is announced. In a statement, Orr says that the City "must know the current value of all its assets, including the City-owned collection at the DIA" and that Christie's will advise the City on "non-sale alternatives" for realizing value from the collection (i.e., long-term loans or other sharing agreements with other art institutions)[20]

4. <u>August 29, 2013</u> – Orr states in deposition that although there are no specific plans to liquidate art "or any other asset in particular," deaccessioning remains a possibility, maintaining that "what I have said when I first took this job, and continue to say, [is that] all options are on the table"[21]

5. <u>October 3, 2013</u> – Speaking at the Detroit Economic Club luncheon, Orr reiterates his "fiduciary obligation to account for all the assets of Detroit" as well as his obligation to act unilaterally to "come up with a solution that makes sense both for the City and for the creditors" if other parties are unable to do so on their own[22]

● In his remarks, Orr stresses need for balanced resolution, imploring that desire to preserve institution be weighed against needs of retirees who are struggling to afford basic necessities like food and housing

● Orr also discloses that approximately 35,000 pieces of collection are owned "free and clear" by the City with "no bequest or limitation on them." Most of that art, Orr said, was purchased in 1920s and '30s with tax dollars[23]

6. <u>December 18, 2013</u> – Christie's limited appraisal valuing only 4% of total DIA collection is publically distributed

7. <u>January 13, 2014</u> – Detroit's chief mediator announces a DIA settlement involving $330 million in commitments from consortium of Foundations[24]

8. <u>February 21, 2014</u> – City files first Plan of Adjustment which contemplates DIA assets remaining in the City in perpetuity in exchange for $[816] million of nominal consideration

9. <u>March 25, 2014</u> – Orr, acknowledging that title to art is owned by the City "period, full stop," concedes that issue of DIA deaccessioning—"a yard sale of DIA art"—would stand front and center if the Grand Bargain were to fail[25]

# Other Relevant Observations – Museum Valuation Methodologies

- Supporters of the DIA have made the argument that preservation of the museum's collection is an essential or critically important part of the City's long-term recovery prospects

- In an effort to assess the legitimacy of these claims, I conducted a review of various efforts to assess the value of culture and cultural institutions

- More specifically, my review focused on finding and analyzing specific instances where a municipal art museum was valued – ideally for the purpose of guiding public policy decision making with respect to future investment in and administration of the museum

- My research revealed a number of highly relevant observations:

| Museum Valuation Observations[2,26] |
|---|

1. The conundrum of proving value in a way that can be understood by public policy decision makers is not unique to the DIA

2. A number of art institutions have used various valuation methodologies to value art museums in cities around the world

3. The resulting valuations are being used to guide municipal investment decisions in the institutions

4. Contingent valuation approaches (such as the WTP valuation previously developed in this report) are emerging as the prevailing or "right" methodological approach to valuing a museum such as the DIA (see Appendix F for additional detail)

5. Economic impact analyses tend to be more appropriate for events (such as the Detroit Auto Show) rather than museums which typically fail to bring a large influx of non-resident visitors to a community

   - The analysis is particularly inappropriate for the DIA, which attracts a small non-resident visitor population and lacks surrounding attractions where a multiplier spending effect can occur (see Appendix F)

Houlihan Lokey    76

# The Grand Bargain Doesn't Fix the Problem

- Jeffrey Abt's authoritative history of the DIA, *Museum on the Verge*, offers an extended treatise on how public funding of the DIA's operating expenditures has undercut the DIA's efforts to raise a sizeable private endowment fund – a critical stabilizing factor for more financially successful art museums[27]

- Unfortunately, the Grand Bargain continues an uncertain public funding status for the DIA, with the Tri-County millage for DIA operating support lapsing in 8 years, no assurance of any public financial support beyond its expiration, and the DIA compelled to commit $100 million of Grand Bargain contributions (money it could have used to supplement deficit endowment fund)

- While the Grand Bargain would transfer ownership of DIA assets from the City to public trust, legally precluding the City from monetizing the assets, it fails to solve the public funding problem and may subject the City to a potentially sizable future public funding burden



Comparison of DIA Endowment to Other Major Art Museums ($ in millions)[28,29]

*  *Reflects endowment for operations*

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 259 of 364



**Best Interests Analysis**
Dismissal Will Not Pose an Existential Threat

# Will COP and other Creditors Receive Any Recovery if the Plan is Dismissed?

## Dismissal Will Not Pose an Existential Threat

■ The Debtor's professionals depict a bleak scenario of universally suboptimal outcomes if the Chapter 9 case is dismissed. The depiction is wrong

■ The Debtor would essentially continue functioning as it has during the bankruptcy proceeding with no imminent threat of fiscal or civic collapse

### Continued Deferral of Financial Creditor Obligations Would Generate Ample Operating Surplus

• Post dismissal, the City would continue to direct available cash to maintenance of critical services

### Dismissal Can and Would Be Managed Without Significant Lasting Detriment to the City

• The City's pre- and post-petition conduct, as well as other real world examples, illustrate that any period of potential post-dismissal disruption can and would be managed without significant detriment to the City
• The lack of any catastrophic events in the wake of a Chapter 9 dismissal ensures COPs and other creditors will preserve a claim to the same base level financial recovery in the event the Plan is dismissed
• The City of Harrisburg, PA offers a case study of a city implementing a more effective financial and operational restructuring after its Chapter 9 petition was rejected

HOULIHAN LOKEY | 79

# Post-Dismissal Cash Flow Considerations

- The experience of the City before and during the bankruptcy demonstrates that a Chapter 9 dismissal would have limited, if any, impact on municipal service delivery

- In the wake of a dismissal of the Chapter 9 case, the City would simply continue avoiding contributions to the pension funds and payments to its financial creditors, a cash management strategy which the City effected in the period preceding its Chapter 9 bankruptcy and continued without any major disruptive impact on a post-petition basis

- By the City's own calculations (and experience), this cash management strategy would provide more than enough liquidity to continue paying City employees and vendors to ensure that municipal services would continue uninterrupted

- As illustrated using the City's own forecast, on a post-dismissal basis, the City will be able to generate average excess cash flow (after paying for all critical services) of over $200 million per year through 2016 – ample time to negotiate a more equitable financial restructuring among key affected creditors



**Illustrative Post-Dismissal Excess Cash Flow ($ in millions)[1]**

On average the City would be expected to generate a $211 million post-dismissal fiscal surplus

*Average Projected Fiscal Surplus: $211*

*Average Pre-Petition Fiscal Deficit: $81*

| 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ($124) | ($72) | ($57) | ($122) | ($32) | $259 | $208 | $165 |

**Historical Operating Deficit**       **Projected Operating Surplus***

- *Projected operating surplus calculated as net operating surplus less retiree health benefit expenditures. Excludes impact of pension and legacy debt obligations*

HOULIHAN LOKEY

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 262 of 364

# Sufficient Cash Flow to Implement Revitalization Expenditures

- The City has consistently outperformed its cash flow projections during the bankruptcy and would enter into a post-dismissal period having amassed a $235 million General Fund surplus through the 2014 fiscal year[1]

- Given the magnitude of the cash flow benefit from avoiding payment of the City's legacy benefit and financial obligation payments, the City should produce sufficient excess cash flow to pay a material portion of the City revitalization expenditures

- Clearly, with the settlement status of the City's benefit and financial obligations unresolved, the City will need to maintain a higher than average cash balance to finance a continuation of higher than average administrative expense burden; but even factoring in these costs, the City's own projections suggest it should have sufficient cash generation to execute a significant portion of its contemplated revitalization expenditures

- It will be up to the City to determine how to prioritize these expenditures. I assume the City will dedicate available resources to projects with the most immediate and favorable cash flow impact



Cash Flow Generated in Chapter 9[2]



Excess Operating Cash Flow vs. Net Reinvestment Spend[1]

# Municipal Service Delivery Will Not Be Negatively Impacted

- In addition to ensuring that the City will be able to provide all municipal services on a post-dismissal basis, the City will continue to benefit from (i) the fiscal and operational reforms executed on a pre-petition basis, (ii) certain additional reforms executed post-petition and (iii) avoidance of certain costs borne as a result of the petition

## City Will Benefit From Implementation of Reforms

✓ **Maintain Beneficial CBA Terms[3]**

- All of the labor costs, work-rule and other City employment terms effected on a pre-petition (and pre-Emergency Manager) basis will continue to bolster the City's cash flow and operational efficiency

✓ **Bankruptcy Related Reforms[4]**

- The dismissal of the Chapter 9 need not unwind positive financial and operational reforms negotiated and implemented during the bankruptcy – particularly to the extent that they have been shown to produce positive results and may boost the claim recoveries of the labor constituency who would be the most likely objectors

✓ **Continuation of Transactional Solutions**

- Dismissal of the Chapter 9 case shouldn't impact the City's ability to effect contemplated monetization transactions such as the DWSD transaction, privatization of parking and land sales

- While continued uncertainty over the City's financial status as a transactional counterparty may dampen some buyer / investor enthusiasm, the prospect of more constructive engagement with major creditors in such a process (which is the bankruptcy norm) versus the uncertainty of the appeals process and other potential COP-related litigation may actually enhance prospects for transaction implementation

✓ **Implementation of Further Reforms**

- Dismissal of the Chapter 9 case would provide added impetus for the City to accomplish further structural reform of City government (such as consolidation of various City government divisions) that are commonplace in other operational restructurings and may enhance City municipal service delivery

- Dismissal might also cause the City to undertake a more serious effort to regionalize certain municipal services such as the Detroit Department of Transportation in an effort to make certain areas of service delivery more effective

# Additional Operational Improvements Possible

- One of the criticisms of the City's conduct during bankruptcy is that it has failed to implement badly needed structural and operational reforms to improve the efficiency of city government

- As an example, the City will emerge with the exact same number of government offices it had when it entered bankruptcy – bucking a trend toward consolidation and regionalization of government evident elsewhere in Michigan and around the country

## List of City Government Offices and Departments

| Pre-petition | | Post-petition |
|---|---|---|

| | | |
|---|---|---|
| Administrative Hearings | Recreation | |
| Finance/Budget | Vital Records | |
| Fire | Auditor General | |
| General Services | Board of Zoning Appeals | |
| Human Resources | City Clerk | |
| Labor Relations | City Council | |
| Human Rights | Election Commission | |
| Human Services | Ombudsperson | |
| Law | Non-Departmental | |
| Mayor's Office | Airport | |
| Planning & Development | Buildings and Safety | |
| Police | Transportation | |
| Public Lighting | Municipal Parking | |
| Public Works | Blight | |

**Same**

## City Approach vs. Consolidation / Regionalization Trends

"Bay City, Michigan…merged both police and fire departments from top to bottom, cross-training police officers in police and some firefighter duties; 10 firefighters were laid off. The merger is expected to save the city $1.8 million by 2017. Three other major cities in Michigan -- Grand Rapids, Kentwood and Wyoming -- are considering the formation of a metropolitan public safety agency that would consolidate police and fire operations, cutting costs by $17 million per year."

Tod Newcombe,
**Senior Editor, *GOVERNING Magazine*[5]**

"If you think that things aren't moving that quickly in the arena of sharing of services among governments, consider this: More than half of county officials across the country either are participating in or delivering shared services or are in active discussions to do so."

John M. Kamensky
**Senior Fellow, IBM Center for the Business of Government[6]**

HOULIHAN LOKEY

# City of Harrisburg – Case Study

■ The relatively recent dismissal of Harrisburg, Pennsylvania's Chapter 9 petition offers a convenient case study for how such a dismissal is likely to have little to no impact on the provision of municipal services

## Background & Overview of Bankruptcy Dismissal

■ In 2003, Harrisburg approved a plan to retrofit the city's waste-to-energy incinerator for $120 million. At the time, the city still owed in excess of $100 million on the facility[7]

● By 2012, total debt on the facility had increased to more than $300 million as ongoing construction issues and budget overruns necessitated further borrowing

■ The state of Pennsylvania designated Harrisburg as financially distressed in October 2010 under the Pennsylvania Municipalities Financial Recovery Act (or "Act 47"), thus making the city eligible to receive state aid and paving the way for a potential Chapter 9 filing[8]

● The city's Act 47 coordinator submitted a detailed fiscal recovery plan which was rejected by Harrisburg's City Council, which claimed the plan was too generous to financial creditors at the expense of residents. Instead, the City Council favored a Chapter 9 filing[8]

● In response, the Pennsylvania General Assembly passed Act 26 in June 2011 which provided that no distressed Pennsylvania city could file a petition under U.S. bankruptcy law[8]

■ In October 2011, the City Council voted to file for Chapter 9 protection. Both the Mayor and the state of Pennsylvania opposed the filing[8]

■ Harrisburg's bankruptcy petition was dismissed in November 2011 on the grounds that the City Council, without the authorization of the Mayor or the state, was not authorized to file the city for Chapter 9. Instead, the city was placed into receivership[8]

## Financial & Operational Impact of Dismissal

- In lieu of a Chapter 9 plan of adjustment, a City receiver filed a recovery plan in accordance with Act 47 which was confirmed in March 2012[9]

- Despite its bankruptcy petition dismissal, Harrisburg was largely able to avoid any meaningful deterioration of municipal service delivery through restructuring initiatives that streamlined operations and redirected expenditures to focus on core services

  - For example, post dismissal, the city was budgeted to increase its police contingent by 16 officers in 2013 and 2014, respectively, and is currently training 13 new firefighters after a renegotiation of its fire contract that is expected to save Harrisburg at least $1 million annually[10]

- To fund core services, the city has implemented a series of cost cutting initiatives, including hiring restrictions, benefit and wage reduction and freezes, consolidation of employee duties, reorganization of departments and personnel and deferral of capital investments[10]

  - From January 2010 to December 2012, the city reduced its personnel count by 23%[10]

- Harrisburg also implemented several revenue enhancements including (i) an increase in the city's real estate tax rate by 0.8 mills, (ii) an increase in the parking tax rate from 15% to 20% and (iii) an increase in the earned income tax rate from 1% to 2%[10]

- The city's General Fund has reported five consecutive budget deficits from 2009 to 2013, though estimates for 2014 suggest that the city's restructuring initiatives are beginning to improve Harrisburg's financial health, despite the dismissal of the city's Chapter 9 petition[12]



| Municipal Services Delivery[10,11] | | |
|---|---|---|
| Service Delivered | 2011 | 2012 |
| Abandoned Properties Razed | 11 | 18 |
| Street Debris Removed | 785 tons | 779 tons |
| Potholes Repaired | 250 | 128 |
| Sinkholes Repaired | 11 | 13 |
| Sewers Cleaned | 438 | 451 |
| Residential Waste Collected | 28,922 tons | 27,607 tons |

| Revenue Enhancements[10] | | |
|---|---|---|
| Revenue Item | Expected Annual Revenue Impact | Effective Date |
| Real Estate Tax | $1.1 million | Jan. 1, 2012 |
| Parking Tax | $800,000 | Jan. 1, 2012 |
| Earned Income Tax | $6.8 million | Jan. 1, 2013 |

**Annual Reported Budget Deficit[12]**



# Best Interests Analysis

## Dismissal Will Not Further Deplete the City's Tax Base

## Dismissal Will Not Further Deplete the City's Tax Base

- A dismissal of the City's Chapter 9 proceeding is not likely to have any immediate impact on the City's tax base as these items are more dependent upon general economic trends, the impact of the City's restructuring initiatives and direct legislation than whether or not the Chapter 9 case is dismissed

> *"Although unpopular, governments with sufficient autonomy may raise taxes or cut services without seeing mass outmigration from the jurisdiction relative to the demand volume reduction faced by a company."*
>
> **S&P Local Governments General Obligation Ratings: Methodology and Assumptions[1]**

- The following matrix delineates the City's major sources of revenue and assesses the likely impact of a dismissal on each

| Revenue Source | Key Considerations | Impact |
|---|---|---|
| **Resident Income Tax** | ▪ Driven primarily by the number of employed residents and the average taxable income of such residents, neither of which would be directly affected by a dismissal of the case<br>▪ City has already increased its initial projections to reflect an improved employment outlook | Neutral |
| **Non-Resident Income Tax** | ▪ Driven primarily by the number of Detroit employed non-residents and the average taxable income of such residents, neither of which would be directly affected by a dismissal of the case | Neutral |
| **Residential and Commercial Property Tax** | ▪ Driven primarily by assessed property values (which the City sets), tax millage rates (which the City controls) and collection rates (which the City plans to improve with its reinvestment initiatives)<br>▪ Blight remediation and general real estate trends will be primary drivers of assessed and market values of real estate. Case dismissal unlikely to have any direct impact<br>▪ As illustrated, the City will have sufficient financial resources to undertake some portion of the contemplated blight remediation, offering a modest benefit | Neutral |
| **Wagering (Casino) Tax** | ▪ No impact from case dismissal. Wagering tax is driven by casino performance which is based primarily on competition from other nearby casinos and general economic trends | Neutral |
| **Sales and Charges for Services** | ▪ Driven primarily by non-discretionary fees and charges received for City services with no direct link to a case dismissal | Neutral |

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 269 of 364

# Impact of Dismissal on Private Investment

- A dismissal of Detroit's Chapter 9 case is unlikely to significantly impact the volume of reinvestment in the City by private sector investors, who have already committed substantial amounts of capital to Detroit and will likely continue to do so in order to preserve the value of their legacy investments

- A recent resurgence in downtown Detroit's real-estate market, led by investor Dan Gilbert, has resulted in an influx of investment capital into the City by private investors who are positioning themselves to benefit from the City's eventual recovery and the resulting rebound in property values and rent[2]

  - Since 2010, Quicken Loans has moved approximately 3,800 employees downtown and created another 6,500 jobs in Detroit. Other investors have funded hundreds of millions of dollars of commercial and residential development projects in downtown[3]

- Additionally, the region's resurgent automotive industry and the expansion of its medical community and nascent technology industry continue to fuel the City's revitalization

  - Detroit Medical Center is the City's largest employer, employing approximately 11,500 employees, while non-profits Henry Ford Health System and St. John Providence Health System employ 8,800 and 3,500 people, respectively

| Top 10 Largest Private Sector Employers in Detroit[4] | | | |
|---|---|---|---|
| 2013 Rank | Employer | FTEs Working in Detroit (2012) | FTEs Working in Detroit (2013) | Percent Change (2012 to 2013) |
| 1. | Detroit Medical Center | 12,398 | 11,497 | - 7% |
| 2. | Quicken Loans Inc. | 5,984 | 9,192 | + 54% |
| 3. | Chrysler Group LLC | 4,042 | 5,426 | + 34% |
| 4. | Blue Cross Blue Shield of Michigan / Blue Cross Network | 5,172 | 5,415 | + 5% |
| 5. | General Motors Co. | 3,947 | 4,327 | + 10% |
| 6. | DTE Energy Co. | 3,630 | 3,700 | + 2% |
| 7. | MGM Grand Detroit LLC | 2,598 | 2,551 | - 2% |
| 8. | MotorCity Casino Hotel | 2,124 | 1,973 | - 7% |
| 9. | Compuware Corp. | 1,918 | 1,912 | 0% |
| 10. | Detroit Diesel Corp. | 1,685 | 1,685 | 0% |

HOULIHAN LOKEY    88

- Dismissal will not impact the fundamental reasons that continue to make Detroit an important regional hub

> *"The belief in Detroit's imminent revival has spread far beyond Dan Gilbert and the skyscrapers of downtown. Out in the neighborhoods, there is a legion of mini-Gilberts, longtime Detroiters and recent transplants alike, who have united around a conviction that the city has fallen as far as it can go – that the time to buy in is at hand."*
>
> **New York Times Excerpt – July 11, 2014**[2]

- Dismissal of Chapter 9 will not impede the City's ability to effect a better financial and operational restructuring – as evidenced by the then-Connecticut attorney general's explanation of Bridgeport, Connecticut's failed chapter 9 filing and the plight of other distressed cities:

> *"The solutions offered by Chapter 9 – a restructuring of debt obligation – may help smaller cities or towns that face short term, totally unanticipated financial calamities, such as natural disaster or an unexpected exorbitant judgment from a lawsuit. However, the bankruptcy process provides no solution to a major city facing long term, endemic problems involving erosion of its tax base, loss of manufacturing jobs, and a decaying infrastructure, all which require, in addition to substantial cash, significant structural changes and long term programs that are well beyond the scope of Chapter 9."*
>
> **Richard Blumenthal – 1991**[5]

- Dismissal of Chapter 9 need not sacrifice the progress and negotiations that have occurred to date. As City spokesperson Bill Nowling acknowledged before the City entered into its Chapter 9 proceeding:

> *"[The June 2013 Proposal] represents the thinking of some of the best bankruptcy minds out there on how we can reach a consensual restructuring so we don't have to go to court because we don't think that's in anyone's best interest."*
>
> **Bill Nowling – June 7, 2013**[6]

**Houlihan Lokey** 89



# Best Interests Analysis

## Impact of Dismissal on COP Option Value

# Continuation of COP Option Value

## Dismissal Would Allow for a Continuation of COP Option Value

- The effect of the City's Plan will be to forever cap the recovery prospects of the COP creditors at 6% of the value of their claim and eliminate the possibility that they might participate in the City's future economic recovery
- Moreover, by preserving the par value of their claim, and the possibility of pari passu treatment with pensions and other creditors if the Plan is dismissed, the City could lose the vast majority of its recovery value (nearly $2 billion) before COPs would be negatively impacted compared to the current Plan
- As highlighted in the following quote, pari passu treatment is what was promised to COP holders in the 2005 Offering Circular:

> *"If the City were to fail to pay any COPs service payment when due, the contract administrator could file a lawsuit against the City to enforce that contractual obligation, a right that is available to all parties entering into valid enforceable contracts with the City. The City would be required to pay any resulting judgment against it, the same as any other. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes…without limit as to rate or amount. This is the same remedy that the retirement systems would have against the City if it failed to make its required annual payment to fund UAAL under the traditional funding mechanism"*

**2005 COPs Offering Circular[1]**

## Economically Advantageous for COP Holders to Preserve The Par Amount of Their Claims

- Certain real-world examples prove it would be more economically advantageous for COP holders to forgo current payment in the interest of preserving the par amount of their claim
- This concept is further supported by economic theory embedded in widely used and commonly accepted risk pricing models such as Black-Scholes
- Both the real world experience and the theoretical modeling for creditors in a similar circumstance support dismissal of the Chapter 9 proceeding as the value maximizing outcome compared to a cram-down Plan that caps Class 9 claims at de minimis recovery levels, thereby precluding COP claimants from participating in the City's economic recovery

**Houlihan Lokey**  91

# Impact of Dismissal on COP Recoveries

- The Plan's disparate treatment of unsecured creditors results in significant impairment of recoveries for COP claimants relative to impairment that may result outside of a Chapter 9 proceeding

- In the event of a dismissal, unsecured claimholders would participate in recoveries based on their pro rata allocation of the unsecured claims pool

  - Assuming that the City loses as much as $1 billion of unsecured creditor recovery value in the event of a dismissal, COP claimants would still receive significantly better treatment by being allowed to participate on a pari passu basis in unsecured creditor recoveries outside of bankruptcy versus treatment contemplated in the Plan

  - In fact, the City can lose in excess of $1.8 billion of recovery value in a dismissal and still provide COP claims (if asserted on a pari passu basis) with superior recoveries relative to their contemplated Plan treatment



**Illustrative COP Recovery Under Plan of Adjustment & Outside of Chapter 9 ($ in millions)**

| Plan Recoveries | Pari Passu Recoveries Outside Chapter 9 |
|---|---|

*Note:* *Plan recoveries reflect value of New B Notes based on a 5% discount rate consistent with the Plan*

- Argentina defaulted on approximately $82 billion of sovereign debt in 2001, the largest such default in history, following a severe economic depression and a sustained period of political instability

  - Restructurings have occurred in 2005 and 2010, with consideration given to bondholders in the form of a mixture of par, discount and index-linked bonds[2]

- In 2005, after failed attempts to achieve a consensual restructuring, Argentina unilaterally offered creditors a bond exchange worth approximately 30 cents on the dollar on a net present value basis

  - 76% of the debt was exchanged under the 2005 restructuring and brought out of default, with the remaining group of creditors refusing to tender their bonds, including hedge funds opting to instead litigate towards a more favorable outcome[2]

- In 2010, to address the remaining defaulted bonds and re-engage the credit markets, Argentina initiated a second bond exchange

  - 68% of the remaining $18.4 billion in bonds were exchanged, leaving approximately 9% of the original defaulted bonds as "holdouts"[2]

- Since then, Argentina has remained current on its obligations to the restructured bonds while choosing to ignore the holdout bonds. Although creditors have won judgments relating to treatment of the holdout bonds, the bonds remain unpaid and continue to be contested in U.S. courts[2]

- As illustrated, by preserving the par amount of their claim, Argentina's holdout bondholders have achieved a better economic outcome than bondholders consenting to impairment



**Trading Performance of Argentine Sovereign Bonds**

Holdout Bonds *        Restructured Bonds **

*Source:*   *Bloomberg data as of June 2, 2014*
*     *8.375% senior unsecured bonds due December 2003*
**    *8.28% senior unsecured bonds due December 2033. Par amount reduced by 70% per the estimated creditor recovery in the 2005 bond exchange*

**HOULIHAN LOKEY**    93

- The case of Argentina is a dramatic real-world illustration of basic mathematical relationships captured in the Black-Scholes options pricing model
  - Under the Black-Scholes model, a key independent variable affecting the value of an option is time
  - As illustrated below, the value of an option is positively correlated with an increase in the time an option can be held for
- In the case of Detroit, bondholders willing to forgo principal and interest for an extended period while maintaining the par amount of their claim can be expected to realize a better economic outcome than bondholders accepting material impairment on their claim
- By denying the opportunity for Detroit's bondholders to participate in the City's future recovery (even if such a recovery never materializes), the City is effecting greater impairment of bondholder claims than it might otherwise offer



**Relationship Between Option Value and Time**

Intrinsic Value: — $80  — $100  — $120

| Black-Scholes Assumptions | |
| --- | --- |
| Strike Price | $100 |
| Volatility | 40% |
| Risk-Free Rate* | 3.25% |

*    *Risk-free rate reflects 30-year U.S. Treasury rate as of July 22, 2014*

HOULIHAN LOKEY | 94

- The case of Harrisburg offers another real world example of the benefits to bondholders of providing debt service relief in the interests of preserving the par value of a claim and participating in a municipal (or sovereign) economic recovery

- Harrisburg owed creditors approximately $350 million of outstanding obligations, including approximately $150 million of debt issued in connection with a trash incinerator facility overhaul and expansion project that significantly underperformed

  - In March 2012, the city defaulted on $5.3 million of payments for its general bond obligations. The city had previously defaulted on its revenue bond obligations relating to the incinerator project in 2009[3]

- As part of a comprehensive restructuring agreement announced in August 2013, the city (i) sold its incinerator, (ii) leased its parking facilities and (iii) issued new debt[4,5]

- Had holders of Harrisburg's Series D and Series F general obligation bonds accepted material par impairment of their securities in the wake of the City's default, they would have failed to take part in the operational restructuring of the City that has contributed to the City's stronger financial performance

- In March 2014, the City resumed partial payment on the general obligation debt (with Ambac paying the residual debt service)



**Historical Pricing of Harrisburg General Obligation Bonds**

*Source: Bloomberg data as of June 7, 2014*

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 277 of 364

- In 2010, Greek sovereign debt was downgraded to junk bond status following rapidly deteriorating economic conditions and a widening deficit. Bond yields rose from a spread of 300 bps to nearly 900 bps over benchmark German bonds, effectively eliminating Greece's access to the bond markets[6]

  - In response, Greece requested assistance from the International Monetary Fund ("IMF") and other European governments and received approximately $150 billion in rescue financing to be paid out over three years, contingent on the implementation of fiscal adjustment measures, including a restructuring of Greek's bonds[6]

- In June 2011, Greece began discussions on potential bond exchange processes following statements by the German government urging initiation of the restructuring process and receipt of proposals from the Institute of International Finance ("IIF"), a coalition representing various banks and institutional investors[6]

  - In conjunction with nearly $100 billion in additional financing offered by the European Union and IMF, the IIF expressed willingness to participate in a voluntary debt exchange program in which creditors would have the option to choose between various different exchange terms[6]

    - The exchange proposal implied creditor losses of approximately 12 cents on the dollar

    - The 2011 financing offer ultimately failed as a result of a worsening recession and increased belief that a greater debt reduction would be necessary

- Following the Euro Summit in October 2011, eurozone leaders invited "Greece, private investors and all parties concerned to develop a voluntary bond exchange with a nominal discount of 50 percent on notional Greek debt held by private investors," pledging themselves to contribute up to approximately $40 billion, setting the stage for a new round of negotiations[6]

- In February 2012, Greece and its creditors agreed to a restructuring whereby the new bonds, consisting primarily of discount bonds and short term notes, would offer a recovery of approximately 47% of the par amount of bonds tendered[6]

  - Actual recoveries, as calculated based on trading prices of the new securities, were approximately 35%[6]

  - Approximately $260 billion, equating to 97% of the eligible debt, participated in the exchange, resulting in the elimination of approximately $140 billion in face value of debt[6]

  - Although Greece was able to achieve a high participation threshold, induced through a combination of political pressure, economic incentives and threat of non-payment, the remaining holdout bonds have thus far been paid in full[6]



**Best Interests Analysis**

Dismissal of Chapter 9 Will Re-Level Playing Field

# Re-leveling the Negotiation Playing Field

## Dismissal Will Re-Level the Negotiation Playing Field

■ Subsequent to the City's Chapter 9 filing there have been two significant developments dramatically affecting the negotiating leverage of the COPs:

### Court's Ruling on Pension Status

- The court's eligibility ruling resolved the question pertaining to the status of pensions that existed before the decision – more specifically, the court's ruling decided that pensions are subject to impairment under Chapter 9 like any other contractual obligation
- Despite the court's ruling, the City nevertheless provided preferential Plan treatment to the pensions

■ Dismissal of the Chapter 9 case would allow COPs to re-engage in negotiation with the City and pension advisors to achieve a more equitable settlement outcome aided by the court's ruling on the unsecured status of the pensions – which would be reinforced by Plan dismissal

■ There are numerous examples of such negotiations yielding efficient and equitable settlement resolutions

# Impact of Dismissal on Pension Reform

- The history of non-bankruptcy municipal pension reform gives rise to a reasonable expectation on the part of the City's financial creditors, particularly its COP claimants, that a more equitable plan of adjustment and a superior financial recovery might be achieved if the Chapter 9 case is dismissed

- As demonstrated by the cases below in which COLA benefits of state pension plans were reduced or eliminated, pension reform can be implemented outside of a Chapter 9 context

- In the majority of cases, COLA reductions were upheld by the courts, with the primary rationale for allowing the cut being that COLA benefits are not a contractual right and can be modified as necessary

  - For example, in Minnesota, the judge ruled that the COLA was not a protected core benefit and that the COLA modification was necessary to prevent the long-term fiscal deterioration of the pension plan

  - Similarly, in Colorado, the judge found that the plaintiffs could have no reasonable expectation of a specific COLA amount for life given that the General Assembly has changed the COLA formula numerous times over the past 40 years

| State | COLA Cut Upheld | Rationale | Court | Year |
|---|---|---|---|---|
| **Responses to COLA Cuts (2010-2014)[1]** | | | | |
| Colorado | Yes* | COLA not a contractual right | State District | 2011 |
| Florida | Yes | COLA not protected under applicable state law | State Supreme | 2013 |
| Maine | Yes | COLA not a contractual right | U.S. District | 2013 |
| Minnesota | Yes | COLA not a contractual right | State District | 2011 |
| Montana | Yes | Complaint dismissed*** | State District | 2013 |
| New Jersey | N/A | Complaint dismissed for lack of jurisdiction | U.S. District | 2012 |
| | Yes* | Complaint dismissed**** | State Superior | 2012 |
| New Mexico | Yes | COLA not a contractual right | State Supreme | 2013 |
| Rhode Island | Yes** | N/A | Mediation | 2014 |
| South Dakota | Yes | COLA not a contractual right | State Circuit | 2012 |
| Washington | No* | Illegal impairment of contract | State Superior | 2011 |

*    Case is currently on appeal
**   Mediation rejected
***  The court refused to issue a preliminary injunction, finding it was not clear that plaintiffs would be successful in proving that the COLA was protected as a contractual right
**** No written opinion

HOULIHAN LOKEY | 99



# Feasibility Analysis

# Is the Plan Even Feasible If COP Proceeds Are Disgorged from Pension Trusts?

## The Plan is Subject to Excessive Feasibility Risk

- If the City is successful in invalidating the COP transaction, the COP bondholders and insurers would bring various causes of legal action that could ultimately result in the disgorgement of the original COP proceeds from the City's pension trusts

- Because the Plan contemplates only modest pension impairment and requires the City to maintain significant ongoing pension funding obligations, the disgorgement could render the City insolvent from a future cash flow perspective

- The substantial risk that the City could become cash flow insolvent in the event of a disgorgement significantly threatens the feasibility of the Plan according to the definition provided by the City's expert witness in her report on feasibility

> "*Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default?*"
>
> *Definition of Feasibility*
> **Expert Report of Martha Kopacz Regarding the Feasibility of the City's Plan**

- As summarized on the following pages, the City, according to its own projections, would run out of cash in 2029 in a disgorgement scenario

# Analysis of Disgorgement Scenario

- The significant decline in funding status, coupled with the requirement that the City maintain mandated ongoing pension funding obligations, would place considerable negative pressure on the City's cash flows and create substantial risk that the City runs out of cash, notwithstanding significant liquidity benefit that may be realized from an indefinite deferral of all projected blight and capital investment expenditures

  - The City's own projections show a projected deficit of $62 million in 2028 which increases to $166 million in the following year, driven by the increased funding needs of the City's pension trusts in a disgorgement scenario

  - The City runs out of cash in 2029 and maintains a significant liquidity shortfall (projected to be as great as $1.7 billion) through the end of the projection period

- The City's 40-year Plan projections under a disgorgement scenario are shown on the following pages. The projections are based on the City's 40-year Plan with the following additional assumptions:

  - The GRS and PFRS pension plans' projected unfunded actuarial accrued liabilities as of June 30, 2023 have been increased to reflect the disgorgement of the COP proceeds, assumed to take place on December 31, 2015

    - In the event that proceeds from the COP transaction are disgorged from the pension trusts on that date, the GRS and PFRS pension plans' projected UAALs on June 30, 2023 would increase from $695 million to $1.9 billion and $681 million to $1.7 billion, respectively, assuming a 6.75% investment rate of return (see Appendix H for further detail)

  - COP claims have been eliminated and no longer receive any consideration under the Plan

  - The City continues to defer as much of its restructuring expenses as possible to provide liquidity relief. However, reinvestment deferrals have been capped at the cumulative total of "Capital investments" and "Blight" expenditures (i.e., the City cannot defer more expenses than the total expenses it was projecting to incur up until that point in time)

HOULIHAN LOKEY    102

# Analysis of Disgorgement Scenario (cont.)

■ The exhibits below and on the following page show the City's projected cash flows in the event that COP proceeds are disgorged from the City's pension trusts. In such a scenario, the City becomes cash flow negative in 2028 and runs out of cash the following year in 2029

## City of Detroit 40-Year Projections (2014-2033) – Illustrative Disgorgement Scenario ($ in millions)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | $1,111.3 | $1,345.6 | $1,135.6 | $1,075.9 | $1,084.4 | $1,080.8 | $1,095.5 | $1,097.1 | $1,099.6 | $1,112.0 | $1,127.8 | $1,140.3 | $1,155.9 | $1,177.6 | $1,199.0 | $1,215.5 | $1,237.4 | $1,258.4 | $1,281.3 | $1,304.9 |
| **Expenditures** | | | | | | | | | | | | | | | | | | | | |
| Total operating expenses | (817.0) | (773.9) | (781.0) | (761.1) | (776.2) | (787.2) | (798.4) | (810.7) | (828.0) | (840.7) | (856.4) | (875.0) | (894.1) | (913.7) | (933.6) | (954.1) | (975.1) | (996.5) | (1,018.4) | (1,040.9) |
| Restructuring: | | | | | | | | | | | | | | | | | | | | |
| Additional operating expenditures | (8.0) | (64.6) | (45.3) | (39.9) | (35.6) | (33.0) | (33.0) | (33.3) | (32.5) | (32.1) | (32.8) | (33.4) | (34.1) | (34.8) | (35.5) | (36.2) | (36.9) | (37.7) | (38.4) | (39.2) |
| Working capital | (39.8) | 15.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Secured debt service | (81.3) | (97.2) | (39.4) | (39.4) | (39.4) | (39.4) | (39.5) | (39.5) | (39.5) | (39.6) | (39.6) | (39.7) | (39.7) | (39.7) | (39.8) | (39.8) | (39.9) | (39.9) | (40.0) | (33.0) |
| Excess UTGO to pension (Income stabilization) | - | (2.5) | (2.3) | (2.3) | (2.2) | (2.1) | (2.1) | (2.0) | (1.3) | (1.1) | (0.9) | (0.5) | (0.3) | (0.3) | (0.3) | - | - | - | - | - |
| QOL / exit financing principal/interest payments | (0.7) | (13.4) | (18.0) | (18.0) | (18.0) | (46.6) | (59.1) | (56.6) | (54.0) | (51.4) | (48.9) | (46.3) | (15.1) | - | - | - | - | - | - | - |
| Reorganization (Capital investments) | (20.6) | (118.9) | (106.4) | (65.6) | (50.2) | (43.6) | (51.9) | (46.0) | (40.4) | (38.6) | (65.4) | (38.8) | (39.6) | (40.3) | (41.1) | (41.9) | (42.7) | (43.5) | (44.3) | (45.1) |
| Restructuring professional fees | (82.2) | (47.8) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Blight (excludes heavy commercial) | (2.0) | (100.0) | (46.0) | (40.0) | (43.0) | (48.0) | (52.0) | (45.0) | (25.0) | (19.0) | - | - | - | - | - | - | - | - | - | - |
| PLD decommission | - | (2.5) | (5.0) | (15.0) | (10.0) | (10.0) | (10.0) | (12.5) | (10.0) | - | - | - | - | - | - | - | - | - | - | - |
| Contingency | - | (13.5) | (11.4) | (10.8) | (10.8) | (10.8) | (11.0) | (11.0) | (11.0) | (11.1) | (11.3) | (11.4) | (11.6) | (11.8) | (12.0) | (12.2) | (12.4) | (12.6) | (12.8) | (13.0) |
| Reinvestment deferrals | - | 0.1 | 6.5 | 3.5 | (10.1) | 24.0 | 24.9 | 22.1 | (8.2) | (31.7) | 300.2 | 262.6 | 251.8 | 227.2 | 154.5 | 41.9 | 42.7 | 43.5 | 44.3 | 45.1 |
| Total expenditures | (1,051.7) | (1,219.0) | (1,048.1) | (988.5) | (995.6) | (996.8) | (1,032.1) | (1,034.4) | (1,049.9) | (1,065.3) | (755.0) | (782.6) | (782.7) | (813.3) | (907.8) | (1,042.3) | (1,064.2) | (1,086.6) | (1,109.6) | (1,126.1) |
| **Net operating cash flow** | 59.6 | 126.6 | 87.4 | 87.4 | 88.8 | 84.0 | 63.4 | 62.7 | 49.7 | 46.7 | 372.8 | 357.7 | 373.2 | 364.2 | 291.2 | 173.2 | 173.2 | 171.8 | 171.7 | 178.8 |
| **Additional Sources** | | | | | | | | | | | | | | | | | | | | |
| **Reimbursements from non-GF depts.** | - | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 1.2 | 1.2 | 1.1 | 1.1 | 1.1 | 1.1 | 1.0 | 1.0 | 1.0 | 1.0 |
| <u>Pension</u> reimbursements from Library | - | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 7.9 | 7.8 | 7.6 | 7.4 | 7.2 | 7.1 | 6.9 | 6.7 | 6.5 | 6.3 |
| **Revenue stream from DWSD** | - | 68.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 48.3 | 2.9 | 2.9 | 6.6 | 6.4 | 6.3 | 6.1 | 6.0 | 5.8 | 5.7 | 5.6 |
| **Hypothetical art proceeds** | - | 218.1 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 46.6 |
| **Fed monies for blight/GRS** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Sources** | 59.6 | 416.0 | 162.0 | 162.0 | 163.4 | 158.6 | 137.9 | 137.2 | 124.2 | 121.1 | 408.2 | 392.8 | 411.8 | 402.5 | 329.1 | 210.7 | 210.4 | 208.6 | 208.2 | 238.2 |
| **Uses** | | | | | | | | | | | | | | | | | | | | |
| **Hypothetical retiree payments** | | | | | | | | | | | | | | | | | | | | |
| OPEB payments - current retirees | (20.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PFRS payments | - | (114.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (18.3) | (172.5) | (168.6) | (164.8) | (160.9) | (157.1) | (153.2) | (149.4) | (145.5) | (141.7) | (137.8) |
| GRS payments | - | (188.2) | (76.9) | (76.9) | (76.8) | (76.6) | (56.5) | (56.5) | (55.2) | (54.9) | (191.8) | (187.6) | (183.3) | (179.5) | (174.7) | (170.4) | (166.1) | (161.9) | (157.6) | (153.3) |
| Subtotal: hypothetical retiree distributions | (20.0) | (302.5) | (95.2) | (95.2) | (95.1) | (94.9) | (74.8) | (74.8) | (73.5) | (73.2) | (364.3) | (356.2) | (348.1) | (339.9) | (331.8) | (323.7) | (315.5) | (307.4) | (299.3) | (291.2) |
| **Hypothetical notes** | | | | | | | | | | | | | | | | | | | | |
| Note A1 | - | (45.8) | (41.5) | (41.5) | (40.5) | (38.4) | (37.8) | (37.1) | (24.1) | (20.8) | (16.7) | (9.5) | (4.9) | (4.9) | (4.9) | - | - | - | - | - |
| Note A2 | - | (55.0) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Note B | - | (12.6) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (56.9) | (55.6) | (54.4) | (53.1) | (51.8) | (50.6) | (49.3) | (48.0) | |
| Subtotal: hypothetical notes | - | (113.4) | (66.8) | (66.8) | (65.8) | (63.7) | (63.0) | (62.4) | (49.4) | (46.1) | (42.0) | (34.7) | (61.8) | (60.5) | (59.2) | (53.1) | (51.8) | (50.6) | (49.3) | (48.0) |
| **Total Uses** | (20.0) | (416.0) | (162.0) | (162.0) | (160.9) | (158.6) | (137.9) | (137.2) | (122.9) | (119.3) | (406.3) | (390.9) | (409.8) | (400.4) | (391.0) | (376.8) | (367.4) | (358.0) | (348.6) | (339.2) |
| **Surplus / (deficit)** | 39.6 | - | - | - | 2.5 | - | - | - | 1.2 | 1.8 | 1.9 | 1.9 | 2.0 | 2.0 | (61.9) | (166.0) | (156.9) | (149.4) | (140.4) | (101.0) |
| **Cash** | 75.6 | 75.6 | 75.6 | 75.6 | 78.2 | 78.2 | 78.2 | 78.2 | 79.4 | 81.2 | 83.1 | 85.0 | 87.0 | 89.0 | 27.1 | (139.0) | (295.9) | (445.3) | (585.7) | (686.7) |

HOULIHAN LOKEY | 103

# Analysis of Disgorgement Scenario (cont.)

## City of Detroit 40-Year Projections (2034-2053) – Illustrative Disgorgement Scenario ($ in millions)

| | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 | 2053 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $1,328.5 | $1,352.6 | $1,368.7 | $1,392.2 | $1,417.9 | $1,444.1 | $1,470.9 | $1,499.3 | $1,527.3 | $1,555.9 | $1,585.4 | $1,615.6 | $1,646.5 | $1,678.0 | $1,710.2 | $1,743.1 | $1,776.8 | $1,813.3 | $1,848.5 | $1,884.5 |
| **Expenditures** | | | | | | | | | | | | | | | | | | | | |
| Total operating expenses | (1,065.3) | (1,090.3) | (1,115.9) | (1,142.1) | (1,169.0) | (1,196.6) | (1,224.9) | (1,253.8) | (1,283.6) | (1,314.0) | (1,345.3) | (1,377.3) | (1,410.1) | (1,443.8) | (1,478.4) | (1,513.8) | (1,550.1) | (1,587.4) | (1,625.7) | (1,664.9) |
| Restructuring: | | | | | | | | | | | | | | | | | | | | |
| Additional operating expenditures | (40.0) | (40.8) | (41.6) | (42.4) | (43.3) | (44.1) | (45.0) | (45.9) | (46.8) | (47.8) | (48.7) | (49.7) | (50.7) | (51.7) | (52.7) | (53.8) | (54.9) | (56.0) | (57.1) | (58.2) |
| Working capital | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Secured debt service | (29.5) | (29.5) | (8.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Excess UTGO to pension (Income stabilization) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| QOL / exit financing principal/interest payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reorganization (Capital investments) | (46.0) | (46.9) | (47.8) | (48.7) | (49.6) | (50.5) | (51.5) | (52.5) | (53.5) | (54.5) | (55.5) | (56.6) | (57.7) | (58.8) | (59.9) | (61.0) | (62.2) | (63.4) | (64.6) | (65.8) |
| Restructuring professional fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Blight (excludes heavy commercial) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PLD decommission | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contingency | (13.3) | (13.5) | (13.7) | (13.9) | (14.2) | (14.4) | (14.7) | (15.0) | (15.3) | (15.6) | (15.9) | (16.2) | (16.5) | (16.8) | (17.1) | (17.4) | (17.8) | (18.1) | (18.5) | (18.8) |
| Reinvestment deferrals | 46.0 | 46.9 | 47.8 | 48.7 | 49.6 | 50.5 | 51.5 | 52.5 | 53.5 | 54.5 | 55.5 | 56.6 | 57.7 | | | | 62.2 | 63.4 | 64.6 | 65.8 |
| Total expenditures | (1,148.0) | (1,174.1) | (1,179.3) | (1,198.4) | (1,226.5) | (1,255.2) | (1,284.6) | (1,314.7) | (1,345.7) | (1,377.3) | (1,409.8) | (1,443.1) | (1,477.3) | (1,512.3) | (1,548.2) | (1,585.0) | (1,622.8) | (1,661.5) | (1,701.2) | (1,742.0) |
| **Net operating cash flow** | 180.5 | 178.5 | 189.5 | 193.8 | 191.4 | 189.0 | 186.4 | 184.6 | 181.7 | 178.6 | 175.6 | 172.5 | 169.2 | 165.7 | 162.0 | 158.1 | 154.0 | 151.7 | 147.3 | 142.5 |
| **Additional Sources** | | | | | | | | | | | | | | | | | | | | |
| **Reimbursements from non-GF depts.** | 0.9 | 0.9 | 0.9 | 0.9 | 0.8 | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.4 |
| **Pension reimbursements from Library** | 6.2 | 6.0 | 5.8 | 5.6 | 5.5 | 5.3 | 5.1 | 4.9 | 4.8 | 4.6 | 4.4 | 4.2 | 4.0 | 3.9 | 3.7 | 3.5 | 3.3 | 3.2 | 3.0 | 2.8 |
| **Revenue stream from DWSD** | 5.4 | 6.1 | 5.8 | 5.6 | 5.4 | 5.2 | 5.0 | 4.7 | 4.5 | 4.3 | 4.1 | 3.9 | - | - | - | - | - | - | - | - |
| **Hypothetical art proceeds** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Fed monies for blight/GRS** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Sources** | 193.0 | 191.5 | 202.0 | 205.9 | 203.1 | 200.2 | 197.2 | 195.0 | 191.7 | 188.2 | 184.8 | 181.2 | 173.8 | 170.1 | 166.2 | 162.2 | 157.9 | 155.4 | 150.7 | 145.8 |
| **Uses** | | | | | | | | | | | | | | | | | | | | |
| **Hypothetical retiree payments** | | | | | | | | | | | | | | | | | | | | |
| OPEB payments - current retirees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PFRS payments | (134.0) | (130.1) | (126.3) | (122.5) | (118.6) | (114.8) | (110.9) | (107.1) | (103.2) | (99.4) | (95.5) | (91.7) | (87.8) | (84.0) | (80.1) | (76.3) | (72.4) | (68.6) | (64.7) | (60.9) |
| GRS payments | (149.0) | (144.7) | (140.5) | (136.2) | (131.9) | (127.6) | (123.3) | (119.1) | (114.8) | (110.5) | (106.2) | (101.9) | (97.7) | (93.4) | (89.1) | (84.8) | (80.5) | (76.3) | (72.0) | (67.7) |
| Subtotal: hypothetical retiree distributions | (283.0) | (274.9) | (266.8) | (258.6) | (250.5) | (242.4) | (234.2) | (226.1) | (218.0) | (209.9) | (201.7) | (193.6) | (185.5) | (177.3) | (169.2) | (161.1) | (153.0) | (144.8) | (136.7) | (128.6) |
| **Hypothetical notes** | | | | | | | | | | | | | | | | | | | | |
| Note A1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Note A2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Note B | (46.8) | (52.5) | (50.6) | (48.7) | (46.8) | (44.9) | (43.0) | (41.1) | (39.2) | (37.3) | (35.4) | (33.5) | - | - | - | - | - | - | - | - |
| Subtotal: hypothetical notes | (46.8) | (52.5) | (50.6) | (48.7) | (46.8) | (44.9) | (43.0) | (41.1) | (39.2) | (37.3) | (35.4) | (33.5) | - | - | - | - | - | - | - | - |
| **Total Uses** | (329.8) | (327.4) | (317.3) | (307.3) | (297.3) | (287.2) | (277.2) | (267.2) | (257.2) | (247.1) | (237.1) | (227.1) | (185.5) | (177.3) | (169.2) | (161.1) | (153.0) | (144.8) | (136.7) | (128.6) |
| **Surplus / (deficit)** | (136.8) | (135.8) | (115.3) | (101.4) | (94.2) | (87.0) | (80.0) | (72.2) | (65.5) | (59.0) | (52.4) | (45.9) | (11.7) | (7.2) | (3.0) | 1.1 | 4.9 | 10.6 | 14.0 | 17.2 |
| **Cash** | (823.5) | (959.3) | (1,074.6) | (1,176.1) | (1,270.2) | (1,357.2) | (1,437.2) | (1,509.4) | (1,574.9) | (1,633.9) | (1,686.3) | (1,732.2) | (1,743.8) | (1,751.0) | (1,754.0) | (1,752.9) | (1,748.0) | (1,737.5) | (1,723.5) | (1,706.3) |



# Appendix



**Appendix**

A. Illustrative June 2013 Proposal Limited Recourse Notes NPV Calculation

# June 2013 Proposal Limited Recourse Participation Notes NPV Analysis

- As set forth below, I estimate the net present value of the Limited Recourse Participation Notes proposed in the City's June 2013 Proposal to be approximately $1.4 billion, assuming a 5% discount rate commensurate with the discount rate used by the City to calculate the present value of the New B Notes under the Plan

  - Consistent with the terms set forth in the City's June 2013 Proposal, my calculation reflects (i) an Initial Participation Year that is the second full fiscal year following the Effective Date, (ii) a Final Participation Year that is the fiscal year beginning on the 20th anniversary of the first day of the Initial Participation Year and (iii) a Maturity Date that is the first September 30 following the Final Participation Year

    - For purposes of this calculation, the Initial Participation Year is assumed to be FY 2017, the Final Participation Year is assumed to be FY 2037 and the Maturity Date is assumed to be September 30, 2037

  - My analysis further assumes that the Limited Recourse Participation Notes amortize in equal annual payments from September 30, 2016 through September 30, 2037 (i.e., the Maturity Date)

    - Note that under the terms of the Limited Recourse Participation Notes as set forth in the City's June 2013 Proposal, the City may not repay the full (or any) principal amount of the $2.0 billion issuance if it fails to meet certain criteria

## Illustrative June 2013 Proposal Limited Recourse Participation Notes Net Present Value ($ in millions)

**Key Terms**

| | |
|---|---|
| Initial Principal Amount | $2,000 |
| Interest Rate | 1.5% |
| Assumed Initial Participation Year | FY 2017 |
| Assumed Final Participation Year | FY 2037 |
| Illustrative Discount Rate | 5.0% |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $2,000 | $2,000 | $1,909 | $1,818 | $1,727 | $1,636 | $1,545 | $1,455 | $1,364 | $1,273 | $1,182 | $1,091 | $1,000 | $909 | $818 | $727 | $636 | $545 | $455 | $364 | $273 | $182 | $91 |
| Less: Paydown | 0 | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) | (91) |
| Ending Balance | $2,000 | $1,909 | $1,818 | $1,727 | $1,636 | $1,545 | $1,455 | $1,364 | $1,273 | $1,182 | $1,091 | $1,000 | $909 | $818 | $727 | $636 | $545 | $455 | $364 | $273 | $182 | $91 | $0 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Interest Payment | $30 | $30 | $29 | $27 | $26 | $25 | $23 | $22 | $20 | $19 | $18 | $16 | $15 | $14 | $12 | $11 | $10 | $8 | $7 | $5 | $4 | $3 | $1 |
| Principal Payment | 0 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 |
| **Total Payment** | $30 | $121 | $120 | $118 | $117 | $115 | $114 | $113 | $111 | $110 | $109 | $107 | $106 | $105 | $103 | $102 | $100 | $99 | $98 | $96 | $95 | $94 | $92 |
| Discount Period | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 | 23.0 |
| Discount Factor | 0.95 | 0.91 | 0.86 | 0.82 | 0.78 | 0.75 | 0.71 | 0.68 | 0.64 | 0.61 | 0.58 | 0.56 | 0.53 | 0.51 | 0.48 | 0.46 | 0.44 | 0.42 | 0.40 | 0.38 | 0.36 | 0.34 | 0.33 |
| **Present Value** | $29 | $110 | $103 | $97 | $92 | $86 | $81 | $76 | $72 | $68 | $64 | $60 | $56 | $53 | $50 | $47 | $44 | $41 | $39 | $36 | $34 | $32 | $30 |

| | |
|---|---|
| NPV of Note | $1,398 |



# Appendix

## B. New B Notes NPV Calculation

# Value of New B Notes (5% Discount Rate)

■ As set forth below, I estimate the net present value of the New B Notes to be approximately $565 million when valued using a 5% discount rate, consistent with the discount rate used by the City to value the New B Notes under the Plan

## New B Notes NPV Calculation ($ in million)

| Key Terms | |
|---|---|
| Face Value | $632 |
| Interest (Years 1-20) | 4.0% |
| Interest (Years 21-30) | 6.0% |
| Amortization Period | 20 |
| Discount Rate | 5.0% |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $600 | $569 | $537 | $506 |
| Less: Paydown | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (32) | (32) | (32) | (32) | (32) |
| Ending Balance | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $600 | $569 | $537 | $506 | $474 |
| | | | | | | | | | | | | | | | |
| Interest Payment | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 24 | 23 | 21 | 20 |
| Principal Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 32 | 32 | 32 | 32 |
| Total Payment | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $57 | $56 | $54 | $53 | $52 |
| Discount Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Discount Factor | 0.95 | 0.91 | 0.86 | 0.82 | 0.78 | 0.75 | 0.71 | 0.68 | 0.64 | 0.61 | 0.58 | 0.56 | 0.53 | 0.51 | 0.48 |
| Present Value | $24 | $23 | $22 | $21 | $20 | $19 | $18 | $17 | $16 | $16 | $33 | $31 | $29 | $27 | $25 |

| | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $474 | $442 | $411 | $379 | $348 | $316 | $284 | $253 | $221 | $190 | $158 | $126 | $95 | $63 | $32 |
| Less: Paydown | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) |
| Ending Balance | $442 | $411 | $379 | $348 | $316 | $284 | $253 | $221 | $190 | $158 | $126 | $95 | $63 | $32 | $0 |
| | | | | | | | | | | | | | | | |
| Interest Payment | 19 | 18 | 16 | 15 | 14 | 19 | 17 | 15 | 13 | 11 | 9 | 8 | 6 | 4 | 2 |
| Principal Payment | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| Total Payment | $51 | $49 | $48 | $47 | $46 | $51 | $49 | $47 | $45 | $43 | $41 | $39 | $37 | $35 | $33 |
| Discount Period | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| Discount Factor | 0.46 | 0.44 | 0.42 | 0.40 | 0.38 | 0.36 | 0.34 | 0.33 | 0.31 | 0.30 | 0.28 | 0.27 | 0.26 | 0.24 | 0.23 |
| Present Value | $23 | $22 | $20 | $19 | $17 | $18 | $17 | $15 | $14 | $13 | $12 | $10 | $10 | $9 | $8 |

| NPV of New B Notes | $565 |
|---|---|

HOULIHAN LOKEY | 109

# Value of New B Notes (9% Discount Rate)

■ As set forth below, I estimate the net present value of the New B Notes to be approximately $353 million when valued using a 9% discount rate

## New B Notes NPV Calculation ($ in million)

| Key Terms | |
|---|---|
| Face Value | $632 |
| Interest (Years 1-20) | 4.0% |
| Interest (Years 21-30) | 6.0% |
| Amortization Period | 20 |
| Discount Rate | 9.0% |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $600 | $569 | $537 | $506 |
| Less: Paydown | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (32) | (32) | (32) | (32) | (32) |
| Ending Balance | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $632 | $600 | $569 | $537 | $506 | $474 |
| | | | | | | | | | | | | | | | |
| Interest Payment | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 24 | 23 | 21 | 20 |
| Principal Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 32 | 32 | 32 | 32 |
| Total Payment | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $57 | $56 | $54 | $53 | $52 |
| Discount Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Discount Factor | 0.92 | 0.84 | 0.77 | 0.71 | 0.65 | 0.60 | 0.55 | 0.50 | 0.46 | 0.42 | 0.39 | 0.36 | 0.33 | 0.30 | 0.27 |
| Present Value | $23 | $21 | $20 | $18 | $16 | $15 | $14 | $13 | $12 | $11 | $22 | $20 | $18 | $16 | $14 |

| | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $474 | $442 | $411 | $379 | $348 | $316 | $284 | $253 | $221 | $190 | $158 | $126 | $95 | $63 | $32 |
| Less: Paydown | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) |
| Ending Balance | $442 | $411 | $379 | $348 | $316 | $284 | $253 | $221 | $190 | $158 | $126 | $95 | $63 | $32 | $0 |
| | | | | | | | | | | | | | | | |
| Interest Payment | 19 | 18 | 16 | 15 | 14 | 19 | 17 | 15 | 13 | 11 | 9 | 8 | 6 | 4 | 2 |
| Principal Payment | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| Total Payment | $51 | $49 | $48 | $47 | $46 | $51 | $49 | $47 | $45 | $43 | $41 | $39 | $37 | $35 | $33 |
| Discount Period | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| Discount Factor | 0.25 | 0.23 | 0.21 | 0.19 | 0.18 | 0.16 | 0.15 | 0.14 | 0.13 | 0.12 | 0.11 | 0.10 | 0.09 | 0.08 | 0.08 |
| Present Value | $13 | $11 | $10 | $9 | $8 | $8 | $7 | $6 | $6 | $5 | $4 | $4 | $3 | $3 | $3 |

| NPV of New B Notes | $353 |
|---|---|

HOULIHAN LOKEY | 110



**Appendix**

**C. Debt Service Coverage Ratio Calculation**

# Debt Service Coverage Ratio

## City of Detroit – Illustrative Debt Service Coverage Ratio[1]

| ($ in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | '14 - '23 | '24 - '33 | '34 - '43 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Municipal income tax | $247.9 | $256.2 | $262.3 | $268.3 | $274.0 | $279.9 | $286.0 | $292.2 | $298.5 | $304.9 | $2,770.2 | $3,510.0 | $4,590.6 |
| State revenue sharing | 191.2 | 196.6 | 198.7 | 200.3 | 202.0 | 203.8 | 205.6 | 199.1 | 200.8 | 202.5 | 2,000.5 | 2,121.0 | 2,307.1 |
| Wagering taxes | 169.9 | 168.2 | 169.0 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.6 | 180.3 | 1,732.6 | 1,905.6 | 2,105.0 |
| Property taxes | 114.9 | 102.6 | 100.8 | 102.4 | 102.6 | 103.9 | 106.8 | 109.7 | 113.3 | 117.0 | 1,074.0 | 1,369.6 | 1,640.0 |
| Utility users' tax | 20.1 | 24.5 | 24.9 | 25.5 | 26.0 | 26.4 | 26.8 | 27.2 | 27.6 | 28.0 | 257.2 | 304.3 | 353.2 |
| Sales and charges for services | 131.5 | 118.0 | 115.8 | 113.6 | 111.4 | 109.2 | 107.0 | 104.4 | 103.3 | 104.0 | 1,118.0 | 1,161.2 | 1,415.5 |
| Other revenue | 79.8 | 86.6 | 78.7 | 67.3 | 66.0 | 66.3 | 66.6 | 66.9 | 67.2 | 67.5 | 712.8 | 753.5 | 918.5 |
| General Fund reimbursements | 29.8 | 42.9 | 41.7 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 264.1 | 238.8 | 291.1 |
| Transfers in for UTGO | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | 532.8 | 147.6 | 22.1 |
| Department revenue initiatives | 7.2 | 88.0 | 45.1 | 49.7 | 52.9 | 42.5 | 46.9 | 46.8 | 51.3 | 52.5 | 482.9 | 586.2 | 714.6 |
| **Total operating revenue** | **$1,058.8** | **$1,146.2** | **$1,094.8** | **$1,075.9** | **$1,084.5** | **$1,080.9** | **$1,095.4** | **$1,097.2** | **$1,099.7** | **$1,112.1** | **$10,945.1** | **$12,097.9** | **$14,357.6** |
| **Expenditures** | | | | | | | | | | | | | |
| Salaries - Public Safety | ($245.2) | ($263.3) | ($276.7) | ($277.5) | ($284.4) | ($291.5) | ($297.4) | ($303.3) | ($309.4) | ($315.6) | ($2,864.3) | ($3,524.5) | ($4,356.5) |
| Salaries - Non-Public Safety | (85.7) | (86.9) | (88.1) | (86.1) | (88.0) | (90.2) | (92.0) | (93.8) | (95.4) | (97.3) | (903.8) | (1,087.2) | (1,343.9) |
| Health benefits - active | (173.0) | (67.1) | (52.4) | (55.9) | (60.0) | (63.6) | (66.1) | (68.7) | (71.5) | (74.3) | (752.6) | (928.2) | (1,373.9) |
| OPEB payments - future retirees | (3.0) | (3.1) | (3.1) | (3.1) | (3.2) | (3.2) | (3.3) | (3.3) | (3.4) | (3.4) | (32.2) | (37.0) | (43.2) |
| Active pension plan | (18.8) | (33.3) | (34.1) | (34.9) | (35.8) | (36.7) | (37.4) | (38.2) | (38.9) | (39.7) | (347.9) | (443.6) | (547.8) |
| Other operating expenses | (291.3) | (320.1) | (326.5) | (303.5) | (304.8) | (302.0) | (302.2) | (303.3) | (309.4) | (310.3) | (3,073.2) | (3,437.4) | (4,190.1) |
| Additional operating expenditures | (8.0) | (64.6) | (45.3) | (39.9) | (35.6) | (33.0) | (33.0) | (33.3) | (32.5) | (32.1) | (357.5) | (359.1) | (437.7) |
| Reorganization (Capital investments) | (20.6) | (118.9) | (106.4) | (65.6) | (50.2) | (43.6) | (51.9) | (46.0) | (40.4) | (38.6) | (582.2) | (442.7) | (501.4) |
| Blight (Excludes heavy commercial) | (2.0) | (100.0) | (46.0) | (40.0) | (43.0) | (48.0) | (52.0) | (45.0) | (25.0) | (19.0) | (420.0) | 0.0 | 0.0 |
| PLD decommission | 0.0 | (2.5) | (5.0) | (15.0) | (10.0) | (10.0) | (10.0) | (12.5) | (10.0) | 0.0 | (75.0) | 0.0 | 0.0 |
| Contingency | 0.0 | (13.5) | (11.4) | (10.8) | (10.8) | (10.8) | (11.0) | (11.0) | (11.0) | (11.1) | (101.3) | (121.0) | (143.6) |
| Restructuring professional fees | (82.2) | (47.8) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (130.0) | 0.0 | 0.0 |
| **Total operating expenditures** | **($929.8)** | **($1,121.1)** | **($995.0)** | **($932.3)** | **($925.8)** | **($932.6)** | **($956.3)** | **($958.4)** | **($946.9)** | **($941.4)** | **($9,640.0)** | **($10,380.7)** | **($12,951.8)** |
| **Operating cash flow available for debt service** | **$129.0** | **$25.1** | **$99.8** | **$143.6** | **$158.7** | **$148.3** | **$139.1** | **$138.8** | **$152.8** | **$170.7** | **$1,305.9** | **$1,717.2** | **$1,405.8** |
| **Debt service** | | | | | | | | | | | | | |
| Secured debt | ($35.4) | ($39.4) | ($39.4) | ($39.4) | ($39.4) | ($39.4) | ($39.5) | ($39.5) | ($39.5) | ($39.6) | ($390.5) | ($391.0) | ($67.2) |
| Quality of life / Exit financing | (0.7) | (13.4) | (18.0) | (18.0) | (18.0) | (46.6) | (59.1) | (56.6) | (54.0) | (51.4) | (335.8) | (110.3) | 0.0 |
| Note A1 (UTGO) | 0.0 | (45.8) | (41.5) | (41.5) | (40.5) | (38.4) | (37.8) | (37.1) | (24.1) | (20.8) | (327.5) | (40.8) | 0.0 |
| Note A2 (LTGO) | 0.0 | (55.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (55.0) | 0.0 | 0.0 |
| Note B | 0.0 | (12.6) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (25.3) | (214.9) | (470.2) | (450.6) |
| **Total debt service** | **($36.1)** | **($166.2)** | **($124.2)** | **($124.2)** | **($123.2)** | **($149.7)** | **($161.7)** | **($158.5)** | **($142.9)** | **($137.1)** | **($1,323.7)** | **($902.0)** | **($517.8)** |
| **Debt service coverage ratio** | **3.6x** | **0.2x** | **0.8x** | **1.2x** | **1.3x** | **1.0x** | **0.9x** | **0.9x** | **1.1x** | **1.2x** | **1.0x** | **1.9x** | **2.7x** |

*Fiscal Year Ended June 30 / 10 Year Totals*

HOULIHAN LOKEY



# Appendix

## D. Recent General Trend Toward Municipal Asset Monetization

# Select Municipal Asset Monetizations

| Municipality | Description |
|---|---|
| Harrisburg, PA | ■ In 2013, Harrisburg sold its incinerator to the Lancaster County Solid Waste Management Authority for $130 million and leased its parking facilities to a private operator in a 40-year deal valued at approximately $270 million<br>   ● The asset sales were part of a comprehensive restructuring plan proposed to rid the city of $360 million of debt owed to creditors. The city entered receivership in 2011 after its bankruptcy petition was dismissed<br>■ Additionally, the city auctioned off approximately 8,000 artifacts collected by a former mayor as part of a planned museum that did not reach fruition. Harrisburg retained approximately $2.7 million of the estimated $3.9 million of proceeds generated |
| Hercules, CA | ■ In 2014, Hercules sold its municipal utility to Pacific Gas & Electric for $9.5 million<br>■ The city's cumulative operating loss on the utility from fiscal years 2003 through 2010 was approximately $3.8 million |
| New York City, NY | ■ In 2013, New York City sold two landmarked office buildings for approximately $250 million<br>   ● The former Emigrant Industrial Savings Bank was sold to the Chetrit Group for $89 million and will be converted to high-end residential units with public retail space on the ground floor. Approximately 30% of the building is currently empty or being used as storage space<br>   ● 364 Broadway, which is currently used by the New York City Criminal Court, was sold to the Peebles Corporation for $160 million and will be converted to condominiums and a boutique hotel |
| Allentown, PA | ■ In 2013, Allentown entered into a 50-year lease of its water and sewer systems to the Lehigh County Authority for $211 million<br>■ Proceeds from the transaction will be used to fund the city's pension obligations |
| Nassau County, NY | ■ In 2011, Nassau County sold its rights to collect rent for 30 years on 18 leases of county-owned commercial properties for a one-time payment of $37 million |
| Newark, NJ | ■ In 2010, Newark sold 16 publically-owned buildings (including the Newark Symphony Hall and the city's police and fire headquarters) to the Essex County Improvement Authority for $74 million<br>   ● The sale generated $40 million for the City's 2010 budget deficit of $80 million<br>■ The city leased back the buildings for approximately $125 million over the next 20 years |
| California | ■ In 2010, the state of California entered into a $2.3 billion sale leaseback agreement under which it sold 24 state office buildings to a consortium of investors<br>   ● The sale generated $1.2 billion for the state general fund and $1.1 billion to pay off bonds on the buildings |

HOULIHAN LOKEY    114

# Select Municipal Asset Monetizations (cont.)

| Municipality | Description |
|---|---|
| **Indianapolis, IN** | ■ In 2010, Indianapolis sold its water and wastewater systems to Citizens Energy Group for $425 million of consideration<br>　● Citizens Energy Group will make substantial capital investments in the systems over 20 years to improve reliability and bring the systems to compliance with federal mandated standards<br>■ Also in 2010, Indianapolis leased its parking meters to a private operator for an upfront payment of $20 million and revenue sharing rights over the 50-year term of the lease<br>　● Under the agreement, the city receives 20% of revenue up to $8.4 million annually and 55% of any revenue beyond that. The city's share of revenues is expected to range from $300 million to $600 million<br>■ Proceeds from both deals will fund various infrastructure improvement projects, including repairing the city's streets and sidewalks |
| **Arizona** | ■ In 2009, the state of Arizona entered into a sale leaseback agreement for 14 publically owned buildings (including the state capitol building) for approximately $735 million of consideration<br>　● Proceeds were used to plug the state's $3 billion budge shortfall and fund general government operations<br>■ Additionally, in 2010, the state entered into another sale leaseback for additional properties (including the Arizona Supreme Court building) for approximately $300 million. Proceeds will fund aid for Arizona's public schools |
| **Chicago, IL** | ■ In 2008, Chicago entered into a 75-year, $1.2 billion lease agreement with a consortium led by Morgan Stanley for 36,000 parking spaces<br>　● $400 million of proceeds will fund a long-term reserve, $325 million will fund the city's budget through 2010, $325 million will be used to stabilize the budget and $100 million will fund programs for low-income residents<br>■ Under the lease, the city will continue to collect parking fines and set rules and rates for its parking meters while handing over operations to the lessee, who will keep any revenues generated |
| **West New York, NJ** | ■ In 2008, West New York entered into a sale leaseback agreement of its public works garage to the Hudson County Improvement Authority for $8 million |

13-53846-tjt　　Doc 6826　　Filed 08/18/14　　Entered 08/18/14 15:57:22　　Page 297 of 364



# Appendix

## E. Grand Bargain NPV Analysis

# Grand Bargain NPV Analysis

- As set forth below, I estimate the net present value of the DIA Settlement component of the Grand Bargain to be $455 million, assuming a 6.75% discount rate (commensurate with the discount rate used by the City to calculate the present value of the State Settlement proceeds) and equal annual payments throughout the 20 year payment term

- Accordingly, the actual value obtained by the City with respect to the art is not only far below the value the City would be able to realize through an Alternative Transaction, but substantially lower than the nominal amount touted by the City as well

## Illustrative DIA Settlement Net Present Value ($ in millions)

| | Nominal Amount | Years |
|---|---|---|
| Foundation Contribution | $366.0 | 20 |
| DIA Contribution | 100.0 | 20 |
| State Contribution | 350.0 | 20 |
| Aggregate Contribution | $816.0 | 20 |
| Illustrative Discount Rate | 6.75% | |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Foundation Contribution | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 | $18.3 |
| DIA Contribution | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| State Contribution | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 |
| Aggregate Contribution | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 | $40.8 |
| | | | | | | | | | | | | | | | | | | | | |
| Discount Period | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 | 6.5 | 7.5 | 8.5 | 9.5 | 10.5 | 11.5 | 12.5 | 13.5 | 14.5 | 15.5 | 16.5 | 17.5 | 18.5 | 19.5 |
| Discount Factor | 0.97 | 0.91 | 0.85 | 0.80 | 0.75 | 0.70 | 0.65 | 0.61 | 0.57 | 0.54 | 0.50 | 0.47 | 0.44 | 0.41 | 0.39 | 0.36 | 0.34 | 0.32 | 0.30 | 0.28 |
| Present Value | $39.5 | $37.0 | $34.7 | $32.5 | $30.4 | $28.5 | $26.7 | $25.0 | $23.4 | $21.9 | $20.5 | $19.2 | $18.0 | $16.9 | $15.8 | $14.8 | $13.9 | $13.0 | $12.2 | $11.4 |

| | |
|---|---|
| NPV - Foundation Contribution | 204.3 |
| NPV - DIA Contribution | 55.8 |
| NPV - State Contribution | 195.3 |
| NPV - Aggregate Contribution | $455.4 |

Houlihan Lokey



# Appendix
## F. Contingent Valuation Methodology

- Beginning in the 1980s, something resembling a more rigorous and consistent approach to valuing cultural institutions (including museums) began to emerge[1]

- Both in the U.S. and abroad, changes in the government's funding of the arts in the 1980s and a more recent climate of increased budgetary austerity forced the development and application of valuation models for cultural institutions such as art museums

- As an example, in 2010, the U.K. Department of Culture, Media and Sport (DCMS) began developing and refining cultural valuation methodologies for use in the context of government cultural funding and economic decisions[2]

- The DCMS work builds on and complements cultural valuation techniques and recommendations advocated by the U.K. Treasury in its "Green Book" on policy appraisal and valuation released in 2003[2]

- The basis of the U.K.'s approach to valuing cultural institutions, which appears to be winning favor in certain other European countries, can be distilled from a December 2010 report to the DCMS as follows:

  - There has been a recognition, both within the central government and in parts of the publically funded cultural sector, of the need to more clearly articulate the value of culture using methods which fit in with central government's decision-making

  - Economic uses of value are grounded in individual utility and preference satisfaction as expressed in what people are willing to pay for a good or service

  - This understanding of value as the reflection of individual preferences is at the root of the U.K. government's conception of value for use in decision-making

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 301 of 364

# Museum Valuation Methodologies – Analysis of Specific Methodologies

- From a preliminary review of the relevant literature, there appears to be a consensus emerging around four primary valuation methodologies as the most useful and applicable tools for valuation of cultural institutions

- According to a 2012 report produced by BOP Consulting[2], these methodologies and their applicability can be summarized as follows:

| Valuation Methodology | Description | Primary Application |
|---|---|---|
| Economic Impact Analysis (EIA) | Assesses collateral economic impact of institution via:<br>• "Direct" spending on supplies;<br>• "Indirect" spending of visitors on restaurants, lodging and retail; and<br>• "Multiplied" effects of this spending on local economy | Broadly used analysis but best applied to festivals, events or shows such as the Detroit Auto Show which bring a large influx of visitors for a finite period of time |
| Economic Footprint Analysis (Size Analysis) | Compares the size of an organization's activities relative to the national economy as a whole, as determined primarily by two standard measures:<br>• Employment: The number of people who work for that organization<br>• Gross Value Added (GVA): Value generated for the national economy as a whole by the organization's activities | Analysis uses relatively standardized methodology but is better suited to large organizations such as National Public Radio |
| Contingent Valuation (Stated Preference Model) | Estimates the extent to which consumers benefit from a product or service, over and above the price they pay for it. This approach tries to estimate three types of value:<br>• Use Value: Value derived from direct use of a product or service<br>• Option Value: Value derived from service being available for use at some point in the future<br>• Existence Value: Value derived from service's existence, even if not actually used | Allows for a valuation of "non-monetary" goods (i.e., things or activities that do not have a conventional market price, such as visiting a free museum) |
| Social Return on Investment (SROI) | Measures the value of an organization's activities based on their effects on the organization's stakeholders and audiences, including social, cultural and environmental costs and benefits | Often used within the volunteer and community service sectors, where focus on social benefits is primary aim of many charities' activities |

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 302 of 364

# Museum Valuation Methodologies – Decision Tree

- In addition to describing and suggesting the applicability of the four primary valuation methodologies, BOP Consulting report offers a useful decision tree further suggesting contingent valuation as most appropriate for use by an art museum such as the DIA



**Valuation Methodology Decision Tree[2]**

# Museum Valuation Methodologies – Applicability of Contingent Valuation

- Beyond the BOP Consulting report, I conducted a broader review to corroborate the appropriateness of contingent valuation as a (or perhaps "the") preferred valuation approach for the DIA

| Additional Support for Contingent Value Methodology |
| --- |

- Contingent valuation appears to enjoy broad support as a preferred valuation technique for cultural institutions from within the academic and consultancy communities
- There are specific examples of the use of contingent valuation in real-world museum valuation projects such as the valuation of several museums in Bolton, U.K. and the Museo Patio Herreriano de Arte Contemporaneo Espanol in Valladolid, Spain
- Contingent valuation was formally recognized and used by the U.S. Supreme Court as a legitimate valuation methodology for estimating compensation to be paid by Shell in the wake of the Exxon Valdez oil spill in 1989[3]
- Contingent valuation appears to have broad support in the U.K. and other EU countries (whose public ownership and funding of museums is comparatively widespread) as a preferred valuation technique for a range of government entities and cultural institutions
  - In the U.K., contingent valuation is the recommended valuation technique for cultural institutions and is used by numerous government departments to assess funding support for these institutions, including the Departments of Communities and Local Government, Environment, Food, Rural Affairs, Business, Innovation and Skills and Transport. Contingent valuation is also a recommended valuation technique by the UK Department of Treasury
- The widespread acceptance and use of contingent valuation has provided templates to follow in constructing a preliminary contingent valuation assessment of the DIA
- The ability to construct and compare a preliminary contingent valuation of the DIA to contingent valuations of other art museums provides helpful additional valuation insight

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 304 of 364

# Museum Valuation Methodologies – Using Contingent Valuation to Value the DIA

■ The exhibit below summarizes the basic approach and methodology used in a classic contingent valuation model

| Contingent Valuation Process Summary |
|---|

1) Users and non-users are asked (via a formal survey) to state what they would be willing to pay to access a good or service, or conversely what they would be willing to accept as compensation for the cessation of a service

2) Large sample sizes are required to provide average willingness-to-pay factors that are then grossed up based on the actual number of users to provide the user value of the good or service

3) Through the survey process, non-users are also asked to indicate a value that they place on a service or good which they have never consumed

4) Again a large sample size is required to generate a representative non-user average which is then grossed up against the population of the museum catchment area

5) The grossed up aggregate values for both the user and non-user bases are then summed to provide a total value for the museum

Houlihan Lokey

123

Contingent Valuation
Methodology

# Museum Valuation Methodologies – Using Contingent Valuation to Value the DIA (cont.)

- Because the DIA has so far failed to either conduct (or produce) a contingent valuation assessment, I looked to the Tri-County millage as a proxy for total aggregate user and non-user DIA museum value

- I then divided this number by the number of residents in the Tri-County area to derive an average catchment area contingent value

  - Note that before performing this analysis, I found basic methodological support from other contingent valuation analyses that used populations of the cities, boroughs or counties surrounding the cultural institutions being evaluated as the natural geographic catchment area

- Having computed the average DIA catchment area contingent value, I then compared this value to identically derived values in comparable contingent valuation analyses

  - For illustrative purposes, the contingent valuation analyses for the catchment areas of the DIA as well as museums in Bolton, U.K. are compared below[4]

| Illustrative DIA Contingent Valuation Analysis | |
|---|---|
| $23,000,000 | Millage Per Annum |
| ÷ 3,800,000 | Detroit Tri-County Population |
| $6 per Resident | DIA Catchment Area Contingent Value |

| Illustrative Bolton Museums Contingent Valuation Analysis* | |
|---|---|
| $7,481,000 | Local Resident Population's Willingness to Pay For Museum Services |
| ÷ 208,000 | Bolton Adult Population (Age 15+ Years) |
| $36 per Resident | Bolton Catchment Area Contingent Value |

\*      *Figures adjusted to USD*



**Appendix**

G. Recent Significant Art Deaccessionings & Monetizations



*"Isabella and the Pot of Basil"*
*- William Holman Hunt*

- In March 2014, the Board of Trustees of the Delaware Art Museum in Wilmington announced the deaccessioning of select works of art to repay the institution's $19.8 million bond debt and renew its endowment fund[1]
  - The debt was issued in 2003 as part of a $24.8 million bond financing to fund the expansion and renovation of the museum's Kentmere Parkway building, which was completed in 2005
  - Repayment of the remaining $19.8 million balance was accelerated to October 2014 after the museum defaulted on performance covenants, prompting the trustees to pursue a deaccessioning[2]

- The trustees expect to raise $30 million through the sale of up to four works of art, including "Isabella and the Pot of Basil," an iconic pre-Raphaelite painting purchased by the museum in 1947
  - The museum has not released the names of the other works to be deaccessioned, citing a need to preserve the market for private sales. However, the museum has stated that it will not sell any works acquired through gift or bequest—representing approximately 90 percent of the museum's 12,500-piece collection[1]

- Prior to 2014, the museum had taken several steps to defray costs and pursue alternatives to a deaccessioning, including drastically cutting staffing levels, reducing funding for exhibitions and pursuing fundraising and refinancing strategies (i.e., short-term, high-interest bank loan)
  - The trustees also sought the guidance of the Association of Art Museum Directors and the American Alliance of Museums but were unable to develop a viable solution
  - The museum has stated that given that the only alternative to deaccessioning is to close the museum, the Board of Trustees' fiduciary duty supersedes the museum's policy against deaccessioning[2]

- The AAMD issued a response that it "firmly believes that there are viable alternatives to this course of action and that deaccessioning works from the collection is not necessary to sustain the Museum's operations" and that, should the museum carry out the deaccessioning, "AAMD will have no recourse but to consider taking the strongest possible response to this action, including the censure and, if necessary, the sanctioning of the Museum"[3]

- "Isabella" was sold at auction in June 2014. The buyer paid $4.9 million for the work, approximately $4.6 million of which will be recouped by the museum[4]
  - Following the sale, the AAM voted unanimously to remove the Delaware Art Museum's accreditation, while the AAMD advised its members to stop loaning works to the museum[5]

HOULIHAN LOKEY 126



*"Men of the Docks"*
- George Bellows



*"Trovador"*
- Rufino Tamayo

■ In October 2007, the Maier Museum of Art at Randolph College announced the deaccessioning of four paintings from its 3,500-piece collection to raise funds for the school's endowment and bolster its operating budget. The deaccessioning was expected to generate at least $32 million of proceeds[6]

● Following the announcement, the AAMD contacted the college to offer potential assistance in investigating possible alternatives to address the school's budgetary concerns[7]

● Additionally, 19 plaintiffs including former museum staff, students, alumni and college and museum donors filed a complaint in Lynchburg circuit court asking for a halt to the planned sale. The suit was dropped in 2008[8]

■ In May 2008, the college sold Rufino Tamayo's "Trovador" for $7.2 million at Christie's Latin American Evening Sale

● The AAMD responded by censuring Randolph College to signal its objection to the sale and discourage future deaccessionings[7]

■ In February 2014, the Maier sold George Bellows' 1912 "Men of the Docks" to the National Gallery of Art in London for $25.5 million. The painting had originally been purchased for $2,500 in 1920 by the museum directly from Bellows with proceeds raised by students

● As part of the sale, Randolph College would enter into a partnership with the National Gallery of Art in which curators would lecture at Randolph and loans of the Bellows back to the Maier would be possible

● The AAMD, of which the Maier is not a member, responded by imposing sanctions on the museum which "will include instructions to…members to suspend any loans of works of art to and any collaboration on exhibitions and programs with the Maier"[9]

■ The museum has additionally earmarked Edward Hicks' "A Peaceable Kingdom" and Ernest Hennings' "Through the Arroyo" for sale[8]

# Fisk University (Stieglitz Collection)



*"Radiator Building – Night, New York"*

*- Georgia O'Keeffe*

- In 2005, Fisk University, a small historically black college in Tennessee, took its Alfred Stieglitz Collection of Modern American and European Art off display and began exploring a potential sale, citing a significant operating deficit and an inability to afford the $131,000 in annual display costs[10]

  - The 101 piece collection consists of artwork donated to the University by Georgia O'Keeffe, including four significant paintings by the artist herself, in addition to works by Picasso, Renoir, Cezanne and Rivera. The University stated in 2009 that the collection was valued at $75 million, half of the University's total assets[11]

  - Prior to finalizing the sale of its artwork in 2012, the University had pursued other budget reduction actions including mortgaging several buildings and eliminating its entire athletics program

- The proposed sale was challenged by the Georgia O'Keeffe Museum in 2007, which, in representation of O'Keeffe's estate, asserted that the sale was in violation of the terms of the artist's bequest, which stated that the collection be kept intact, on display and never sold[11]

  - The Georgia O'Keeffe Museum further attempted to reclaim the entire collection, arguing that the artworks be turned over to the estate. However, in 2009, a Tennessee court ruled that the Georgia O'Keeffe Museum had no legal claim to the art[11]

  - The Tennessee attorney general also attempted to prevent a transaction, stating that the art should remain for the state's viewership

- In 2009, Fisk University proposed a deal in which it would sell a 50% stake in the collection to the Crystal Bridges Museum for $30 million. In exchange for the money, Crystal Bridges will display the collection two out of every four years and will have the right of first refusal should the remainder of Fisk University's ownership stake ever be available for sale

  - The University argued that such a transaction would generally satisfy the terms of the bequest by keeping the collection together as well as allow the University to afford the display costs

  - In April 2012, the legal battle ended with the Tennessee Supreme Court's approval of the sale to Crystal Bridges[10]

HOULIHAN LOKEY

128

# Field Museum



*"Wah-ro-née-sah, The Surrounder, Chief of the Tribe"*
*- George Catlin*

- In December 2004, the Field Museum sold a collection of 19th century Western art for $17.4 million to an anonymous buyer. The collection consisted of 31 George Catlin paintings, representing the bulk of the Field's Catlin collection[12]
  - Proceeds from the sale were used to bolster the Field's acquisition budget for the museum's scientific collections, as well as provide funding for staff salaries[13]
- Although the sale generated controversy among the museum trustees, patrons and the broader art community, museum management stated that the paintings, while significant works, did not fit in with the Field's core focus on anthropological artifacts
  - The Field had first begun reviewing its collection for non-core items for potential deaccessioning opportunities in 1998, with the Catlin paintings the only items that had any significant commercial value[14]
  - In December 2011, the Field sold its remaining 4 Catlin paintings through a Sotheby's auction for $4.6 million
- In 2012, the Field announced that it would consider selling additional work, partially to address ongoing financial difficulties resulting from a 2008 bond issuance

# Brandeis University (Rose Art Museum)



*"Saturday Disaster"*
*- Andy Warhol*

■ In January 2009, the Board of Trustees of Brandeis University announced its decision to authorize the sale of the entire 7,000 piece collection of the University-owned Rose Art Museum in order to shore up a shrinking endowment and fund the University's operations[15]

  ● The museum, founded in 1963, houses one of the most important collections of postwar art in the region, including seminal works by Robert Rauschenberg, Jasper Johns, Andy Warhol and Roy Lichtenstein. The collection was valued by Christie's in 2007 to be worth between $350 million and $400 million dollars[16]

  ● Then Brandeis-President Jehuda Reinharz stated that "Choosing between and among important and valued university assets is terrible, but our priority in the face of hard choices will always be the university's core teaching and research mission"

    ➤ The University further noted that if they were unable to sell the art, they would be forced to reduce faculty size by 30 percent

■ In addition to immediate backlash to the decision from the general public, Massachusetts government, the Museum's leadership, and others, four of the museum's most prominent donors filed a lawsuit in July 2009 to prevent the sale of the museum[17]

  ● The case was settled in June 2011 with the University stating that it had no further intention or plan to sell any artwork, and that the museum would remain a university museum open to the public. However, the University did not rule out potential alternative monetization strategies[17]

  ● As a result of the settlement, the state's attorney general dropped its investigation into the propriety of the University's actions



*"Scene on the Magdalene"*
*- Frederic Edwin Church*



*"Mt. Mansfield"*
*- Sanford Robinson Gifford*

- In December 2008, the National Academy sold two Hudson River School paintings for approximately $13.5 million. The proceeds were used to bolster the academy's operating deficit (estimated in 2008 to be around $1 million on a $4 million annual budget) and begin renovations to allow the academy to place more of its 7,000-piece collection on exhibit[18]
  - The pieces, by prominent American artists Frederic Edwin Church and Sanford Robinson Gifford, were sold to an undisclosed private foundation with the stipulation that they be displayed publicly
  - The sale was approved by a 181-1 vote of the academy's members, which had previously voted against selling the institution's six-story mansion on Fifth Avenue and relocating[19]

- The AAMD responded by sanctioning the academy, urging its members to cut off all loans to the academy and forgo any collaborations
  - Prior to the sanctions, the academy had recently withdrawn its membership from the AAMD, citing that it does not function as a traditional museum and does not buy works of art but rather only acquires them through donations from its members
  - Due to the sanctions, the academy could only arrange minor shows and had to cancel a major planned exhibition as a result of other museums withdrawing their promised works[20]

- The sanctions were lifted twenty months later in October 2010 by a unanimous vote of the AAMD's board after the academy changed its governance structure to include outsiders on its board and developed a long-term financial and strategic plan that expanded the fundraising capabilities of the institution
  - The academy is currently on a 5-year probation period set to expire in 2015 during which time its conduct is being closely monitored by the AAMD but loans and other forms of collaboration between the academy and AAMD members may resume[21]

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 313 of 364

# Thomas Jefferson University



*"The Gross Clinic"*
*- Thomas Eakins*

- In November 2006, Thomas Jefferson University's board voted to sell Thomas Eakins' "The Gross Clinic" for $68 million in order to fund the development of a new campus[22]

- The painting was originally purchased in 1878 by the school's alumni and was named by one art critic as the finest 19th century American painting

- The university cited its core purpose of educating students as justification in selling the artwork, noting that the money would be more useful for operational purposes[22]

- Although the National Gallery of Art and Crystal Bridges Museum were the original joint winning bidders, the university offered local museums an opportunity to match the price and retain the painting in Philadelphia
  - Following support from upset alumni and city residents, the Philadelphia Museum of Art and Pennsylvania Academy of the Fine Arts indicated that they would be able to jointly raise the necessary asking price, thereby matching the $68 million bid[23]

- In April 2007, shortly after the sale of "The Gross Clinic," the university sold a second Thomas Eakins painting to the Crystal Bridges Museum[24]
  - The purchase price was not disclosed, although the figure was estimated to be around $20 million
  - The decision to sell, while formally opposed by the school's alumni association, was supported by the school's faculty and staff

# Fresno Metropolitan Museum of Art and Science



*Fresno Metropolitan Museum of Art and Science*
Credit: Craig Kohlruss (Fresno Bee)

■ In January 2010, the Fresno Metropolitan Museum dissolved as a result of deteriorating financial performance and a default on $15 million of municipal debt incurred to finance an $28 million, 3-year building renovation project in 2005 [25]

■ Following its close, the museum auctioned off its artwork and other assets, valued initially at approximately $3 million to $6 million, in order to repay creditors $4 million of debt still owed after foreclosure of the building[26]

● Sotheby's conducted the majority of auction sales, raising approximately $2 million

● Total recoveries for unsecured creditors were approximately 80 cents on the dollar[25]

■ Prior to its decision to close, the museum considered filing for Chapter 11 bankruptcy, but after calculating potential costs and delays, instead chose to pursue a liquidation to benefit creditors[25]

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 315 of 364

# Louvre (Louvre Abu Dhabi)



*"Pyramid du Louvre"*

■ In March 2007, the French and Abu Dhabi governments entered into a 30-year, $1.3 billion branding, training and art exhibition agreement under which a new museum to be constructed in the Saadiyat Island Cultural District would bear the Louvre name and contain pieces loaned from the Louvre in Paris, among other considerations[27]

- The agreement, approved by the French Parliament in October 2007, is comprised of:

  ➤ $525 million paid to be associated with the Louvre name for 30 years;

  ➤ $247 million for loans from the Louvre over a 10-year period (expected to be approximately 200 to 300 pieces);

  ➤ $253.5 million for special exhibitions (4 exhibitions per year for 15 years);

  ➤ $214.5 million for management advice for 20 years; and

  ➤ $32.5 million as a donation from the city of Abu Dhabi to the Louvre to refurbish a wing for the display of international art

■ The approximately 300-piece list of works to be loaned from France's museums is currently being compiled and will likely include a broad range of various disciplines, cultures and time periods

■ The museum is expected to open in December 2015 as part of a planned cultural district which will also include a branch of New York's Guggenheim and a national museum

- In May 2009, the Louvre Abu Dhabi opened its first exhibition to the public containing the institution's first 19 acquisitions[28]

- A second exhibition opened in April 2013 featuring approximately 130 works acquired for the museum's permanent collection, including a previously unseen Picasso[29]



**Appendix**

H. Calculation of Pension UAAL in Disgorgement Scenario

# Pension Disgorgement UAAL Calculation

■ In the event that proceeds from the COP transaction are disgorged from the pension trusts on December 30, 2015, the GRS and PFRS pension plans' projected UAALs on June 30, 2023 would increase from $695 million to $1.9 billion and $681 million to $1.7 billion, respectively, assuming a 6.75% investment rate of return

## GRS

| Assumptions | |
| --- | --- |
| Net Transaction Proceeds | $739.8 |
| Disgorgement Date | 12/31/2015 |
| End Date | 6/30/2023 |
| Assumed Investment Rate of Return | 6.75% |

| | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 6/30/2023 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Incremental Funding Deficit | $739.8 | $789.7 | $843.0 | $899.9 | $960.7 | $1,025.5 | $1,094.8 | $1,168.7 | $1,207.5 |

| | |
| --- | --- |
| City Projected UAAL @ 2023 | $695.0 |
| Incremental UAAL Due to Disgorgement | 1,207.5 |
| Adjusted UAAL @ 2023 | $1,902.5 |

## PFRS

| Assumptions | |
| --- | --- |
| Net Transaction Proceeds | $630.8 |
| Disgorgement Date | 12/31/2015 |
| End Date | 6/30/2023 |
| Assumed Investment Rate of Return | 6.75% |

| | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 6/30/2023 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Incremental Funding Deficit | $630.8 | $673.4 | $718.9 | $767.4 | $819.2 | $874.5 | $933.5 | $996.5 | $1,029.6 |

| | |
| --- | --- |
| City Projected UAAL @ 2023 | $681.0 |
| Incremental UAAL Due to Disgorgement | 1,029.6 |
| Adjusted UAAL @ 2023 | $1,710.6 |

HOULIHAN LOKEY | 136



# Appendix

## I. Endnotes

1. City of Detroit, "Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit," May 26, 2014

2. City of Detroit, "Fourth Amended Disclosure Statement (p. 50)," May 5, 2014

3. City of Detroit, "Proposal for Creditors," June 14, 2013

4. Monica Davey, Bill Vlasic and Mary Williams Walsh, "Detroit Ruling on Bankruptcy Lifts Pension Protections," *New York Times*, December 3, 2013

1.   City of Detroit, "Proposal for Creditors," June 14, 2013

2.   City of Detroit, "Fourth Amended Disclosure Statement – Exhibits B-M (p. 174)," May 5, 2014

3.   "Independent Auditor's Report, Police and Fire Retirement System of the City of Detroit," June 30, 2012

4.   Gabriel Roeder Smith & Company, "The General Retirement System of The City of Detroit – 74th Annual Actuarial Valuation," June 30, 2012

5.   Public Plans Database, *Center for Retirement Research at Boston College*

6.   Liz Farmer, "Detroit's Pension Is Actually Well-Funded, So What's All the Fuss?" *GOVERNING*, November 26, 2013

7.   City of Detroit, "Fourth Amended Disclosure Statement (p. 66)," May 5, 2014

8.   City of Detroit, "Fourth Amended Disclosure Statement (p. 98)," May 5, 2014

9.   *Deposition of Kenneth Buckfire*, July 16, 2014

10.  *Moody's Investors Service*, "Rating Methodology – US Local Government General Obligation Debt," January 15, 2014

11.  *Standard & Poor's Ratings Services*, "U.S. Local Governments General Obligation Ratings: Methodology And Assumptions," September 12, 2013

12.  S&P Municipal Bond High Yield Index, *S&P Dow Jones Indices*, July 24, 2014

13.  20-Bond Index, *The Bond Buyer*, July 24, 2014

14.  Joe Mysak, *Encyclopedia of Municipal Bonds: A Reference Guide to Market Events, Structures, Dynamics, and Investment Knowledge*, Bloomberg Press, 2012

15.  City of Detroit, "Fourth Amended Disclosure Statement – Exhibit A (p. 187)," May 5, 2014

16.  City of Detroit, *40-Year Financial Projections*, July 16, 2014

1. *Deposition of Kenneth Buckfire*, July 16, 2014
2. City of Detroit, "Fourth Amended Disclosure Statement," May 5, 2014

1. Public Plans Database, *Center for Retirement Research at Boston College*

2. Emily Brandon, "The 10 Biggest Failed Pension Plans," *US News*, August 23, 2010

3. Public Employment Relations, Act 336 of 1947, *Legislative Council, State of Michigan*

4. City of Detroit, "Fourth Amended Disclosure Statement (p. 26)," May 5, 2014

5. Cate Long, "The real history of public pensions in bankruptcy," *Reuters*, August 8, 2013

6. City of Detroit, "Fourth Amended Disclosure Statement (p. 142)," May 5, 2014

7. Pension Benefit Guaranty Corp, *Fiscal Year Closing File*, September 30, 2011

8. City of Detroit, "Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit," May 26, 2014

9. City of Detroit, "Fourth Amended Disclosure Statement (p. 141)," May 5, 2014

# Lack of Transparency to Financial Creditors

1. "Detroit overhaul plan would boost fares, security," *Metro Magazine*, February 25, 2014

2. McKinsey Consulting Report, *Detroit Diagnostic Synthesis Template*, October 1, 2010

3. McKinsey Consulting Report, *Detroit Planning and Development Department Diagnostic*, October 2010

4. City of Detroit, "Financial and Operating Plan," *Office of the Emergency Manager*, May 12, 2013

5. City of Detroit, "Proposal for Creditors," June 14, 2013

# Additional Financial Creditor Disadvantage

1. City of Detroit, "Proposal for Creditors," June 14, 2013

2. John Gallagher and Mark Stryker, "$330M pledged to save pensions, DIA artwork from Detroit bankruptcy," *Detroit Free Press*, January 14, 2014

3. Paul Egan, Kathleen Gray and Mark Stryker, "Snyder expected to announce plan to guard Detroit pensions, DIA art," *Detroit Free Press*, January 21, 2014

4. City of Detroit, "Plan of Adjustment," February 21, 2014

5. Nathan Bomey, "Insurer solicits offers for DIA artwork; several billion-dollar bids received," *Detroit Free Press*, April 9, 2014

6. City of Detroit, "Fourth Amended Disclosure Statement – Exhibits B-M (p. 174)," May 5, 2014

7. Mark Stryker and John Gallagher, "Judge rules Detroit bankruptcy creditors can't remove art from DIA walls," *Detroit Free Press,* May 15, 2014

1. City of Detroit, "Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit," May 26, 2014

2. Neil Munshi and Vivianne Rodrigues, "Bankruptcy battle heats up over offers for Detroit art collection," *Financial Times*, April 9, 2014

3. *Expert Report of Martha E.M. Kopacz Regarding the Feasibility of the City of Detroit Plan of Adjustment*, July 18, 2014

1. *Business Trends 2013*, Deloitte University Press
2. Mary Williams Walsh and John Hurdle, "Harrisburg Sees Path to Restructuring Debts Without Bankruptcy Filing," *New York Times*, July 24, 2013
3. Chris Glynn, "No to water P3 for Pennsylvania municipality," *Infrastructure Investor*, May 23, 2013
4. City of Indianapolis, *Water & Wastewater System Transfer to Citizens Energy Group*, July 26 2010
5. City of Indianapolis, *Parking Modernization*, February 10, 2010
6. Caroline Porter, "Chicago Revises Parking-Meter Deal," *Wall Street Journal*, April 29, 2013
7. City of New York, "Mayor Bloomberg Announces Agreement to Sell Two City-owned Buildings to Reduce Office Space and Further Increase Efficiency of Government Operations," March 5, 2013
8. Nannette Miranda, "Judge OKs Sale of Calif Buildings in Early Ruling," abc11.com, December 10, 2010
9. Peter Carbonara, "Cash-Hungry States Are Putting Buildings on the Block," *New York Times*, May 4, 2010
10. Tom Lochner, "Hercules: Sale of municipal utility ends multimillion-dollar fiasco," *Contra Costa Times*, April 17, 2014
11. *Local Financial Stability and Choice Act*, Act 436 of 2012, Legislative Council, State of Michigan
12. FGIC, *Public Finance Credit Application, Detroit Retirement System Funding Trust 2006 Pension Obligation Certificates of Participation*, May 12, 2006
13. City of Detroit Fiscal Analysis Division, "Re: Securitization of the Detroit Windsor Tunnel Lease," October 14, 2005
14. Elizabeth Carvlin, "Michigan: Casino's Garage Sale," *The Bond Buyer*, April 12, 2006
15. City of Detroit Fiscal Analysis Division, "$30.6 Million Property Sale Proposals," April 3, 2007
16. McKinsey Consulting Report, *Public Private Partnerships in Detroit*, September 22, 2010
17. City of Detroit Fiscal Analysis Division, "Proposed Belle Isle Lease Agreement between the City of Detroit and the State of Michigan," September 17, 2012
18. Bankole Thompson, "Kevyn Orr: 'Everything is on the table,'" *Michigan Chronicle*, March 20, 2013
19. City of Detroit, "Proposal for Creditors," June 14, 2013
20. David Muller, "Detroit's Belle Isle becomes 102nd state park today," *MLive*, February 10, 2014

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 327 of 364

21. Christine Ferretti, "Orr urges public hearing on proposed parking fine hikes," *Detroit News*, April 7, 2014)
22. *Expert Report of Victor Wiener*, July 25, 2014
23. Brent Snavely, "Detroit's legal fees could top $100 million for a Chapter 9 bankruptcy," *Detroit Free Press*, July 10, 2013
24. Nick Carey, "Regional water deal elusive for Detroit emergency manager," *Reuters*, December 16, 2013
25. City of Detroit, "City Owned Properties from Foreclosure"
26. City of Detroit, "2013 City of Detroit Foreclosure Property List"
27. Matt Helms, "Boston-Edison home breaks record, bids reach $135k in city auction," *Detroit Free Press*, May 30, 2014
28. Christine Macdonald, "Detroit spends $8.7 million to flip 30 homes that bring in $2 million," *The Detroit News*, May 29, 2014
29. Monica Davey, "Detroit Tries to Sell Itself, One House at a Time," *New York Times*, May 12, 2014

1. *Motion to Direct City to Cooperate with Potential Bidders* (Docket #3925), April 9, 2014
2. BOP Consulting, *Measuring the economic benefits of art and culture*, May 2012
3. City of Detroit, "Fourth Amended Disclosure Statement (p. 26)," May 5, 2014
4. Jura Consultants, "Bolton's Museum, Library and Archive Services – An Economic Valuation," December 2005
5. Jose Sanz, Luis Herrero and Ana Maria Bedate, "Contingent Valuation and Semiparametric Methods: A Case Study of the National Museum of Sculpture in Valladolid, Spain," *Journal of Cultural Economics*, 2003
6. Fernand Martin, "Determining the Size of Museum Subsidies," *Journal of Cultural Economics*, 1994
7. Walter Santagata and Giovanni Signorello, "Contingent Valuation of a Cultural Public Good and Policy Design: The Case of "Napoli Musei Aperti," *Journal of Cultural Economics*, 2000
8. Eric Thompson, Mark Berger, Glenn Blomquist and Steven Allen, "Valuing the Arts: A Contingent Valuation Approach," *University of Nebraska – Lincoln*, 2002
9. *Spring 2013 DIA Visitor Engagement Survey Report*, Detroit Institute of Arts
10. *Professional Practices in Art Museums*, Association of Art Museum Directors
11. *Code of Ethics for Museums*, American Alliance of Museums
12. Lee Rosenbaum, "Fighting Words: Randolph College Responds to AAMD's Censure," *CultureGrrl*, June 29, 2011
13. Nick Gillespie, "Time to Sell the Family Jewels, Detroit," *The Daily Beast*, December 11, 2013
14. Kathleen Gray and Matt Helms, "Gov. Snyder: Detroit EM must consider everything – even DIA, Belle Isle – to fix city's finances," *Detroit Free Press*, May 29, 2013
15. Virginia Postrel, "Detroit's Van Gogh Would Be Better Off in L.A.," *Bloomberg*, June 6, 2013
16. Douglas Woodham, *Letter to the Emergency Manager*, Christie's Americas, December 3, 2013
17. Michael G. Bennett, "How Best To Spend The Detroit Institute of Arts' 15 Minutes of Fame," *Huffington Post*, August 23, 2013
18. Mark Stryker and John Gallagher, DIA's art collection could face sell-off to satisfy Detroit's creditors," *Detroit Free Press*, May 24, 2013
19. Mark Stryker, "Orr's office hires auction house Christie's to take 2nd look at DIA's art," *Detroit Free Press*, August 5, 2013
20. "Valuations Necessary Part of City's Restructuring Effort to Secure a Viable, Strong Detroit," *City of Detroit*, August 5, 2013

Endnotes

# Does the Plan Realize Full Value For DIA Proceeds? (cont.)

21. Khalil Al Hajal, "Highlights from Kevyn Orr deposition: EM talks DIA, federal aid and casino revenue," *MLive*, September 4, 2013

22. Alexis Wiley, "Kevyn Orr open to ideas on DIA collection," *myFOXDetroit.com*, October 4, 2013

23. Sarah Cwiek, "Kevyn Orr talks privatization, pensions, DIA art at forum," *Michigan Radio*, October 3, 2013

24. John Gallagher and Mark Stryker, "$330M pledged to save pensions, DIA artwork from Detroit bankruptcy," *Detroit Free Press*, January 14, 2014

25. Khalil Al Hajal, "Detroit EM Kevyn Orr: Millionaires wanted to buy DIA works, turn Belle Isle into gated community," *MLive*, March 25, 2014

26. Doug Noonan, "Contingent Valuation Studies in the Arts and Culture: An Annotated Bibliography," *The Cultural Policy Center at the University of Chicago*, February 2002

27. Jeffrey Abt, *A Museum on the Verge*, Wayne State University Press, 2001

28. Mark Stryker, "DIA in peril: A look at the museum's long, tangled relationship with Detroit politics and finances," *Detroit Free Press*, September 8, 2013

29. Rebecca Ruiz, "America's Richest Cultural Institutions – Slideshow," *The Financialist*, February 22, 2013

# Dismissal Will Not Pose an Existential Threat

1. City of Detroit, *10-Year Financial Projections*, July 16, 2014
2. City of Detroit, "Illustrative Cash Flow Forecast (Plan of Adjustment Scenario)," July 7, 2014
3. City of Detroit, "Proposal for Creditors," June 14, 2013
4. City of Detroit, "Fourth Amended Disclosure Statement," May 5, 2014
5. Todd Newcombe, "Are Police and Fire Department Mergers Catching on?" *GOVERNING*, August 8, 2013
6. John M. Kamensky, "The Accelerating Movement to Share Services," *GOVERNING*, December 6, 2012
7. John Buntin, "Harrisburg's Failed Infrastructure Project," *GOVERNING*, November 2010
8. John Rapisardi, "Harrisburg: A Case Study in State Law Barriers to Chapter 9," *Restructuring Review*, Cadwalader, January 4, 2012
9. Mary Williams Walsh and John Hurdle, "Harrisburg Sees Path to Restructuring Debts Without Bankruptcy Filing," *New York Times*, July 24, 2013
10. City of Harrisburg, Pennsylvania, *2012 Comprehensive Annual Financial Report*, November 8, 2013
11. City of Harrisburg, Pennsylvania, *2011 Comprehensive Annual Financial Report*, May 10, 2013
12. Dave Marcheskie, "Harrisburg City freezes hiring to manage budget deficit," abc27.com, April 28, 2014

# Dismissal Will Not Further Deplete the City's Tax Base

1. *Standard & Poor's Ratings Services*, "U.S. Local Governments General Obligation Ratings: Methodology And Assumptions," September 12, 2013
2. Ben Austen, "The Post-Post-Apocalyptic Detroit," *New York Times*, July 11, 2014
3. Matthew Dolan, "Billionaire's Detroit Buying Spree Starts to Spread," *Wall Street Journal*, December 17, 2013
4. City Employer Data, *Crain's Detroit Business*
5. Jamie S. Fields, "Objection of Jamie S. Fields to the City of Detroit's Fourth Amended Plan of Adjustment," May 5, 2014
6. Matt Helms, "Detroit to offer creditors pennies on the dollar in pitch to avoid bankruptcy," *Detroit Free Press*, June 7, 2013

1. Offering Circular for the $1,440,000,000 Taxable Certificates of Participation Series 2005 issued by the Detroit Retirement Systems Funding Trust 2005
2. J.F. Hornbeck, "Argentina's Defaulted Sovereign Debt: Dealing with the "Holdouts"," *Congressional Research Service*, February 6, 2013
3. Romy Varghese, "Harrisburg Default Underlines Lack of State Support: MMA," *Bloomberg*, September 12, 2013
4. Tim Stuhldreher, "Waste authority to acquire Harrisburg incinerator a week later," *LancasterOnline*, November 27, 2013
5. Emily Previti, "$270M+ Harrisburg parking deal clears state financing authority board," *Penn Live*, December 4, 2013
6. Jeromin Zettelmeyer, Christoph Trebesch and Mitu Gulati, "The Greek Debt Restructuring: An Autopsy," *Peterson Institute for International Economics*, August 2013

1. Alicia H. Munnell, Jean-Pierre Aubry, and Mark Cafarelli, "COLA Cuts in State/Local Pensions," *Center for Retirement Research at Boston College,* May 2014

1. City of Detroit, *40-Year Financial Projections*, July 16, 2014

1.  Doug Noonan, "Contingent Valuation Studies in the Arts and Culture: An Annotated Bibliography," *The Cultural Policy Center at the University of Chicago*, February 2002
2.  BOP Consulting, *Measuring the economic benefits of art and culture*, May 2012
3.  Richard T. Carson, "Contingent Valuation and Lost Passive Use: Damages from the Exxon Valdez Oil Spill," *Environmental and Resource Economics*, March 2003
4.  Jura Consultants, "Bolton's Museum, Library and Archive Services – An Economic Valuation," December 2005

# Recent Significant Art Deaccessionings & Monetizations

1. Marjorie Fishman, "Art museum names first painting to be sold," *The News Journal*, May 6, 2014
2. *Q & A*, Delaware Art Museum, May 6, 2014
3. Ashton Cooper, "AAMD 'Deeply Disturbed ' at Delaware Sale," *Blouin ARTINFO*, March 27, 2014
4. Margie Fishman, "Delaware Art Museum painting brings $4.25 million," *The News Journal*, June 18, 2014
5. Margie Fishman, "Delaware Art Museum loses accreditation," *The News Journal*, June 19, 2014
6. *Randolph College to Auction Four Paintings*, Randolph College, October 2, 2007
7. *Association of Art Museum Directors' Statement on Randolph College and Maier Museum of Art*, Association of Art Museum Directors, March 12, 2014
8. Eileen Kinsella, "Opponents of Randolph College Art Sale Sue to Halt Auction," *ARTnews*, November 13, 2007
9. Randy Kennedy, "College Art Museum Hit With Sanction After Sale of Bellows Work," *New York Times*, March 13, 2014
10. Jennifer Schuessler, "Court Approves Fisk University's Sale of Georgia O'Keeffe Collection," *New York Times*, April 24, 2012
11. Travis Loller, "Court: O'Keeffe Museum has no right to Fisk University art," *USA Today*, July 16, 2009
12. Stevenson Swanson, "Field Museum art sold for $17 million," *Chicago Tribune*, December 3, 2004
13. Cheryl Corley, "Chicago's Famed Field Museum Struggles To Dig Out Of A Hole," *NPR*, May 6, 2013
14. William Mullen, "History for sale," *Chicago Tribune*, October 24, 2004
15. Richard Lacayo, "Brandeis' Attempt to Turn Art into Assets," *Time*, February 5, 2009
16. Daniel Grant, "Is the University's Museum Just a Rose to Be Plucked?" *Wall Street Journal*, February 3, 2009
17. Randy Kennedy, "Brandeis Settles Suit Over Proposed Art Sale," *New York Times*, June 30, 2011
18. Robin Pogrebin, "Branded a Pariah, the National Academy Is Struggling to Survive," *New York Times*, December 23, 2008
19. Randy Kennedy, "National Academy Sells Two Hudson River School Paintings to Bolster its Finances," *New York Times*, December 6, 2008
20. Robin Pogrebin, "A Chastised Museum Returns to Life," *New York Times*, April 17, 2011

13-53846-tjt    Doc 6826    Filed 08/18/14    Entered 08/18/14 15:57:22    Page 337 of 364

21. Robin Pogrebin, "Sanctions Are Ending For Museum," *New York Times*, October 18, 2010
22. Carol Vogel, "Eakins Masterwork Is to Be Sold to Museums," *New York Times*, November 11, 2006
23. Michael Kimmelman, "In the Company of Eakins," *New York Times*, January 12, 2007
24. Stephan Salisbury, "2nd painting by Eakins sold," *The Inquirer,* April 12, 2007
25. Robin Pogrebin, "The Death of a Museum," *New York Times*, July 23, 2013
26. George Hostetter, "Hundreds attend auction for Met museum property," *Clovis Independent*, February 17, 2010
27. Alan Riding, "The Louvre's Art: Priceless. The Louvre's Name: Expensive." *New York Times*, March 7, 2007
28. Sara Hamdan, "After a Sputtering Start, the Louvre Abu Dhabi Project Gathers Pace," *New York Times*, September 26, 2012
29. Sara Taher, "Louvre Abu Dhabi," *TimeOut Abu Dhabi*, May 14, 2013

# Exhibit 12

**July 14, 2014 R. Cline Deposition Transcript (excerpted)**

1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3

4

5

6          In Re:              ) Chapter 9

7     CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

8          Debtor.             ) Hon. Steven Rhodes

9          _____

10

11

12      The Videotaped Deposition of ROBERT CLINE,

13           Taken at Jones Day

14           51 Louisiana Avenue, NW

15           Washington, DC

16           Commencing at 9:05 a.m.

17           Monday July 14, 2014,

18       Before Marjorie Peters, RMR, CRR

19

20

21

22

23

24

25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

                    R. CLINE

1

2      A.      I do not.

3      Q.      Do you have any understanding of what

4   activities the City will or will not perform in the

5   restructuring scenario?

6      A.      I do not know the specifics of any

7   alternatives.

8      Q.      Would raising the income tax rate be a

9   reasonable policy for the City of Detroit?

10     A.      I can't comment on the policy options for

11  Detroit.  We were not asked to evaluate those as part of

12  our analysis.

13     Q.      And so, you're offering no opinion that

14  raising the income tax rate or property tax rates or

15  utility tax rates or wagering tax rates or any of the

16  other rates would be inappropriate or unreasonable,

17  correct?

18     A.      We were not asked to evaluate any tax policy

19  alternatives for the City of Detroit.

20     Q.      So, you're not offering any opinion saying

21  that raising tax rates would be unreasonable, correct?

22     A.      I'm not commenting on policy options for the

23  City of Detroit.

24     Q.      So, you're not offering -- I'm just trying to

25  get an idea of what opinions you're offering.  So, you're

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 341 of 364

1                         R. CLINE

2     not offering an opinion that raising tax rates would be

3     unreasonable, correct?

4          A.      I'm not commenting on any tax policy options

5     available to the City of Detroit.

6          Q.      You know that question -- there could be a yes

7     or no answer to that question, right?

8          A.      My perspective is that we were asked to do

9     revenue forecasts of the major revenue sources under

10    current law.  We were not asked nor did I volunteer

11    information on alternatives available to the City of

12    Detroit.

13         Q.      Okay.  So, you haven't done any work that will

14    allow you to testify that raising tax rates would be

15    unreasonable or inappropriate, correct?

16         A.      I have not.

17         Q.      And you haven't done any work that says that

18    increasing tax revenues through increased collections

19    would be --

20              (Telephone interruption.)

21                   MR. STEWART:  Just hit one.  Thanks.

22    BY MR. SMITH:

23         Q.      -- inappropriate or not feasible, correct?

24         A.      He we have not evaluated tax policy

25    opportunities -- alternatives for Detroit.

```
 1                          R. CLINE
 2        Q.       And you haven't done any work that would allow
 3   you to testify that Detroit couldn't just add new taxes,
 4   correct?
 5        A.       We have not.
 6        Q.       And you haven't done any work that would allow
 7   you to testify that Detroit couldn't generate significant
 8   additional revenue by either adding new taxes or
 9   increasing tax rates?
10                 MR. STEWART:  Objection.
11                 MR. SMITH:   Correct?
12                 THE WITNESS:  We were not asked to look at
13        policy options for the City of Detroit.
14   BY MR. SMITH:
15        Q.       And so, you haven't done any work that would
16   allow you to testify that Detroit can't generate
17   significant increased revenue through either increasing
18   tax rates, increasing collections, or adding new taxes,
19   correct?
20                 MR. STEWART:  Objection.
21                 THE WITNESS:  I think there may have been a
22        double negative in there.  Could you repeat the
23        question?
24   BY MR. SMITH:
25        Q.       You haven't done any work that will allow you
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 343 of 364

```
 1                          R. CLINE

 2   to testify that Detroit can't significantly increase

 3   revenues by increasing tax rates or increasing tax

 4   collections or by adding new taxes, correct?

 5                MR. STEWART:  Objection.

 6                THE WITNESS:  We have done no analysis --

 7           excuse me.

 8                MR. STEWART:  Go ahead.

 9                THE WITNESS:  We have done no analysis on

10           tax policy options in Detroit.

11   BY MR. SMITH:

12       Q.    So, the answer is correct, correct?

13       A.    I am still having --

14                MR. STEWART:  Reread the question.

15                THE WITNESS:  Please, reread the question,

16           I think the double negative is still there.

17   (The record was read back by the reporter.)

18                THE WITNESS:  I believe the correct answer

19           to that question is, as I mentioned, we have looked

20           at the collection rate of the property tax.  We

21           calculated an effective collection rate, and we did

22           use that in our forecast.

23                We did not -- were not asked to and did not

24           provide forecasts under alternative policy options,

25           whether it's a tax rate change or adoption of a new
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 344 of 364

```
1                         R. CLINE

2          tax, or change, in the base of an existing tax.

3    BY MR. SMITH:

4          Q.    So, you -- Ernst & Young concluded that the

5    City could increase property tax revenues by increasing

6    collections, correct?

7          A.    In our forecast of the property tax revenues,

8    we did vary the collection rate over time.

9          Q.    And you increased the collection rate; is that

10   correct, or do you not know?

11         A.    From what I remember, we may have brought the

12   collection rate down, in the intermediate run, and then

13   brought it back up in the longer run.

14         Q.    Okay.  But you haven't -- you haven't done any

15   work that would allow you to testify that Detroit can't

16   significantly increase revenues by increasing tax rates,

17   correct?

18                   MR. STEWART:  Objection.

19                   THE WITNESS:  All of our revenue estimates

20         are based upon current law rates.

21   BY MR. SMITH:

22         Q.    So, the answer to my question is correct?  You

23   haven't done the work?

24                   MR. STEWART:  Objection.

25                   THE WITNESS:  Could you repeat the
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 345 of 364

1                          R. CLINE

2          question, please.

3     (The record was read back by the reporter.)

4                THE WITNESS:  We accepted the current law

5          tax rates as what was available to Detroit.  To the

6          extent that Detroit is at the maximum, and I

7          believe it may be the case for all of those tax

8          rates, it would imply that under current law, that

9          option is not available.

10    BY MR. SMITH:

11         Q.     But current law can change, correct?

12         A.     Correct.

13         Q.     And you would agree with me that if current

14    law changes, Detroit can increase tax revenue

15    significantly by increasing tax rates, correct?

16                MR. STEWART:  Objection.

17                THE WITNESS:  It is true that an increased

18         rate, with no offsetting decrease in the base,

19         could increase revenue, but if you were going to

20         forecast the increase of a tax rate in Detroit, you

21         would also have to forecast the potential decrease

22         in the tax base with mobile people and investment.

23    BY MR. SMITH:

24         Q.     And so, sitting here today, you haven't done

25    the work that would allow you to testify that increasing

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 346 of 364

```
 1                         R. CLINE
 2    tax rates wouldn't result in significant additional
 3    revenue for the City of Detroit, correct?
 4                   MR. STEWART:  Objection.
 5                   THE WITNESS:  As I believe I've answered
 6             several times, we did not evaluate alternative
 7             policies.  We is accepted current law as the
 8             foundation for our forecast.
 9    BY MR. SMITH:
10        Q.    Okay.  So the answer is correct, you didn't do
11    that work, correct?
12        A.    Would you rephrase the question.
13        Q.    You didn't do any work that would allow you to
14    testify that by increasing tax rates, Detroit would not
15    increase substantially its tax revenues?
16                   MR. STEWART:  Objection.
17                   THE WITNESS:  We did not run alternatives
18             with our model at different tax rates.
19    BY MR. SMITH:
20        Q.    That's something that you could have done,
21    right?  That's technically feasible for you to do,
22    correct?
23        A.    We were not asked to do that analysis.
24        Q.    Okay.  But is it technically feasible for you
25    to do an analysis like that?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 347 of 364

1                           R. CLINE

2      A.      We would have to do additional work compared

3    to what we have done to this point, because as I

4    mentioned, it's not just changing the rate, it's also

5    understanding the behavioral response of the base in

6    response to the change in the rate.  We are not set up to

7    do that in our current runs.

8      Q.      And you also haven't done the work that would

9    allow you to testify that Detroit couldn't significantly

10   increase revenues by adding new taxes, correct?

11     A.      We have not analyzed the addition of new

12   revenue sources for Detroit.

13     Q.      Okay.  The -- one potential new revenue source

14   would be imposing the commuter tax, correct?  That's a

15   reasonable --

16     A.      I don't know if it's legally available to

17   Detroit as an option.

18     Q.      Okay.  But imposing a commuter tax is

19   something that the City could either do by itself or in

20   conjunction with the State, correct?

21     A.      I don't know the answer to that.

22     Q.      Okay.  So, you haven't investigated whether

23   Detroit could add a commuter tax, correct?

24     A.      I have not.

25     Q.      All right.  Another potential -- that you know

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 348 of 364

```
 1                        R. CLINE
 2    that there's cities, though, that have commuter taxes,
 3    right?
 4         A.      There are selected cities that tax
 5    non-residents who are working in the city, as Detroit
 6    does.  Some at differential rates, some at the same rate.
 7         Q.      Okay.  And they do that through a variety of
 8    mechanisms, correct?
 9         A.      I believe they look basically like income
10    taxes.
11         Q.      And sometimes they're parking lot-type -- you
12    know, charges for fees for parking or other services that
13    might disproportionately fall on non-residents?
14                 MR. STEWART:  Objection.
15                 THE WITNESS:  I'm not familiar with the
16          details of those taxes.
17    BY MR. SMITH:
18         Q.      All right.  You know that some cities have a
19    city-only sales tax, correct?
20         A.      City-only sales tax.  I believe that is the
21    case.
22         Q.      And you haven't investigated whether Detroit
23    could increase revenues by adding a city-only sales tax,
24    correct?
25         A.      As I answered earlier, we did not analyze any
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 349 of 364

```
 1                        R. CLINE
 2   revenue options for the City of Detroit.
 3       Q.    Okay.  You only did the work that you were
 4   asked by the lawyers for the City to do, correct?
 5                MR. STEWART:  Objection.
 6                THE WITNESS:  We were given an assignment
 7           by Ernst & Young to provide a revenue estimate of
 8           the major tax sources for the City of Detroit over
 9           the next 10 years.  Then it was expanded to an
10           additional 30-year perspective.  That is the job
11           that we were asked to do, and that is what we did
12           and is reported on in the expert report.
13   BY MR. SMITH:
14       Q.    Who asked you to do that job?
15       A.    That was a -- we were retained by the Ernst &
16   Young team working in Detroit.
17       Q.    Okay.  So, it wasn't Mr. Malhotra that gave
18   you the scope of the work that you were to perform in
19   this case?
20       A.    I believe our initial discussions of the scope
21   of the work did come from him.
22       Q.    Would it be fair to say that you haven't done
23   any analysis of the full range of potential revenue
24   sources available to the City?
25                MR. STEWART:  Objection.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 350 of 364

## Exhibit 13

**July 24, 2014 C. Sallee Deposition Transcript (excerpted)**

1          UNITED STATES BANKRUPTCY COURT

2            EASTERN DISTRICT OF MICHIGAN

3    In re                      )

4                               ) Chapter 9

5    CITY OF DETROIT, MICHIGAN,  ) Case No. 13-53846

6         Debtor.               ) Hon. Steven W. Rhodes

7

8          The videotaped deposition of CAROLINE

9    SALLEE, called for examination pursuant to the

10   Rules of Civil Procedure for the United States

11   District Courts pertaining to the taking of

12   depositions, taken before GINA M. LUORDO, a notary

13   public within and for the County of Cook and State

14   of Illinois, at 77 West Wacker Drive, Suite 3500,

15   Chicago, Illinois, on the 24th day of July, 2014,

16   at the hour of 9:04 a.m.

17

18

19

20

21

22

23

24   Reported by:  Gina M. Luordo, CSR, RPR, CRR

25   License No.:  084-004143

1    inaccurate to say I don't know the formula because
2    there isn't a formula.
3        Q.   Let me re-ask my question then.
4             Would it be fair to say you don't know the
5    methodology used in setting the EVIP portion of the
6    state revenue sharing?
7        A.   I personally don't know why legislators
8    decide to allocate a certain amount of money to
9    Detroit.  There is a -- there are three components
10   to EVIP.  There's supposed to be -- they're
11   supposed to meet certain things in order to get the
12   revenue, but what the legislature decides year to
13   year to allocate is their discretion, so...
14       Q.   Basically the amount of revenue sharing,
15   would you agree, is a discretionary political
16   decision by the legislature?
17       A.   For EVIP, it is the discretion of the
18   legislature.
19       Q.   And it's a political decision.  The amount
20   of money that the legislature decides to give to
21   cities is decided by people who are elected and
22   make a political decision about how much money to
23   give, correct?
24       A.   People who are elected make that decision.
25       Q.   And the decision about how much money the

1    City gets in state revenue sharing is a decision

2    that's made in the political process, correct?

3         A.   I wouldn't say that because there are two

4    components.

5         Q.   The EVIP portion of the state revenue

6    sharing is generated by political process, correct?

7         A.   In that the legislature and the

8    legislature is part of the political process, yes.

9         Q.   And the EVIP portion is the largest

10   portion of the state revenue sharing, correct?

11        A.   For the City of Detroit?

12        Q.   Yes, for the City of Detroit.

13        A.   That's correct.

14        Q.   In your view, what are the biggest sources

15   of untapped revenue for the City of Detroit?

16        A.   I don't have an opinion on that.

17        Q.   Do you have an opinion about how the City

18   of Detroit could increase property tax revenues?

19        A.   I do not.

20        Q.   The City of Detroit has never asked you or

21   anyone else at Ernst & Young to use your expertise

22   to increase property tax revenues for them,

23   correct?

24        A.   Correct.  We don't do specific tax policy

25   recommendations.

1      Q.   Okay.  So you're offering no opinion about
2   whether the City can increase tax revenues,
3   correct?
4      A.   I'm not offering an opinion about whether
5   they can increase tax revenues.
6      Q.   And you're not offering an opinion about
7   whether the City can pay the creditors more money
8   in the bankruptcy, correct?
9      A.   I'm not offering an opinion on that.
10      Q.   And you're not offering an opinion about
11   how much revenue the City would have if the
12   bankruptcy case is dismissed, correct?
13      A.   That's correct.
14      Q.   I mean -- and in fact, Ernst & Young's
15   policy would prohibit you from offering opinions
16   about how much -- whether the City can generate
17   more tax revenue or increase tax rates or do other
18   things like that, correct?
19      A.   So Ernst & Young would not want us to make
20   specific recommendations on tax policy the City of
21   Detroit should pursue.  We just do the analysis.
22      Q.   And why doesn't Ernst & Young allow its
23   staff to make recommendations about tax policy like
24   that?
25      A.   So the bulk of our business is providing

1    auditing services, accounting services.  We do,

2    obviously, tax advisory.  We prepare tax

3    statements.  Our business is not to consult in the

4    policy realm in this way.  And so I didn't make

5    those decisions, but that's what I follow.

6        Q.    Okay.  So Ernst & Young is not in the

7    business of offering tax policy advice to

8    municipalities, correct?

9        A.    So the work that I do, I do not provide

10   specific policy recommendations.  I don't know if

11   other parts of EY offer, but I know as a whole, we

12   don't make, say, specific tax policy

13   recommendations.

14       Q.    In the past, have you made tax policy

15   recommendations to government in your other jobs?

16       A.    In my other job, I would do the analysis

17   around a policy change, and so I would provide my

18   opinion sometimes about the change.

19       Q.    I mean, you know that other cities have

20   increased taxes to address fiscal distress to raise

21   revenue, correct?

22       A.    Some cities have done that, yes.

23       Q.    And you're aware that cities have cut

24   services in order to address fiscal distress and

25   improve their fiscal situation?

1     A.   Some cities have done that, yes.

2     Q.   And you know that cities have added new

3   fees for services in order to raise revenue to

4   address fiscal distress, correct?

5     A.   I don't know anything specifically.

6     Q.   Do you know that other cities have imposed

7   new taxes to raise revenue for -- to address fiscal

8   distress?

9     A.   That could be possible.  I don't know of

10  any specific instance.

11    Q.   Do you know generally that there are a

12  number of cities in the country now because of the

13  recession we've had that are experiencing fiscal

14  distress?

15    A.   Yes, I'm aware of cities experiencing

16  fiscal distress.

17    Q.   In fact, you've worked for at least one

18  other city that's experiencing fiscal distress in

19  the state of Michigan, right?

20    A.   That's right.

21    Q.   And you know in the state of Michigan,

22  there are multiple cities that are under the

23  supervision of emergency managers because of fiscal

24  distress, correct?

25    A.   Correct.

## Exhibit 14

**July 22, 2014 K. Orr Deposition Transcript (excerpted)**

1                    KEVYN ORR, VOLUME 2

2            IN THE UNITED STATES BANKRUPTCY COURT

3            FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7   In Re:                 )      Chapter 9

8

9   CITY of DETROIT, MICHIGAN, )    Case No. 13-53846

10

11              Debtor.    )    Hon. Steven Rhodes

12   _____

13

14                       VOLUME 2

15

16      The Videotaped Deposition of KEVYN ORR,

17      in his personal capacity and as Rule 30(b)(6) witness,

18      Taken at 2 Woodward Avenue,

19      Detroit, Michigan,

20      Commencing at 9:10 a.m.,

21      Tuesday, July 22, 2014,

22      Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

```
1                    KEVYN ORR, VOLUME 2
2         in the mediation.
3              MR. HACKNEY:  Right, because he lacks
4         foundation to speak to what the foundations thought.
5         If I asked him what he understood them to have
6         thought, you'll take the position that it would be
7         based on what they told him?
8              MR. SHUMAKER:  Correct, it all would have
9         been derived from the mediation discussions.
10             MR. HACKNEY:  Okay, and so I'll just note
11        for the record, Mr. Shumaker, that this is the
12        position that Ms. Kofsky (ph.), a cop, took in a prior
13        deposition, and I understand the basis for it.  I will
14        let you know that I don't necessarily agree with it
15        based on comments that Judge Rhodes made about how
16        state of mind might work in the mediation context, but
17        it doesn't matter because I feel like we're not going
18        to work that out today anyway.
19             MR. SHUMAKER:  Understood.
20   BY MR. HACKNEY:
21   Q.   And I just want to understand you all's position on
22        it.  So just a couple big ones, if I ask you did you
23        ever ask the foundations to contribute money with no
24        strings attached you'll decline to ask answer that
25        question, correct?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6826  Filed 08/18/14  Entered 08/18/14 15:57:22  Page 360 of 364

```
 1                    KEVYN ORR, VOLUME 2
 2    A.   I think I have to.
 3    Q.   If I ask you did the foundations ever offer to
 4         contribute money without insisting on transfer of the
 5         art institute, you'll decline to answer that question,
 6         correct?
 7    A.   I think I have to.
 8    Q.   And if I ask you hey, who is it that imposed the
 9         condition on the Grand Bargain that the art institute
10         would be transferred, was it you, or was it them, or
11         was it Judge Rosen, you'll decline to answer those
12         questions, correct?
13    A.   I believe so.
14    Q.   Mr. Orr, has the Grand Bargain -- which you know what
15         I'm talking about, right?
16    A.   Yes, the money we talked about before, the 366 million
17         from the foundations, a $350 million value settlement
18         from the State, and $100 million from the DIA
19         benefactors as funneled through the Founders' Society.
20    Q.   Correct, in exchange for the art -- in connection with
21         the art being -- the DIA being conveyed into a public
22         trust, correct?
23    A.   Contributions targeted towards the two pension funds
24         with the condition that not one piece of art be sold
25         or de-assessed as a result of this process.
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 361 of 364

1                          KEVYN ORR, VOLUME 2

2    Q.   And the purpose of the transfer to a public trust is

3         to ensure that the art is never sold to satisfy the

4         claims of the City's creditors, correct?

5    A.   Yes, now and forever, yes.

6    Q.   Not only current creditors but future ones, as well?

7    A.   Correct.

8    Q.   So has the Grand Bargain, Mr. Orr, helped the COPs

9         holders to achieve a higher recovery?

10   A.   I don't think so.

11   Q.   Mr. Orr, what are the principal terms of the LTGO

12        settlement?

13   A.   The LTGO settlement centers around a dedicated millage

14        that's to extend for the next approximately 13 years,

15        and the terms of a settlement that roughly 26

16        percent -- oh, the LTGO, I'm sorry --

17   Q.   Yeah.

18   A.   Okay, I'm sorry, I'm going -- I thought you were just

19        talking about -- I'm doing it temporally --

20   Q.   That's okay.

21   A.   I'm sorry.

22   Q.   I'm hopping around.

23   A.   Okay.

24   Q.   Let's start over.

25   A.   Let's start over.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 362 of 364

1           KEVYN ORR, VOLUME 2

2    Q.   So let's set the stage.  The LTGO settlement has been

3         announced in the press, and there's some information

4         that's kind of available about it, but I actually

5         literally don't know --

6    A.   Right.

7    Q.   -- what the terms are, and there's been some

8         suggestion that it's the continued subject of

9         negotiations, so I want to give you a fair setup.

10   A.   Yeah, that's -- that's why I was -- I can talk about

11        UTGO...

12              MR. SHUMAKER:  You can discuss what's made

13        public.

14   A.   Okay.  The mediators issued a statement on the LTGOs,

15        we did not, my office did not, recognizing that there

16        was a settlement which, in part, dealt with a class of

17        creditors, I think 170-some-odd-million dollars of

18        claims, which would get an allowed claim in a certain

19        amount.  The -- I know from e-mails that I received as

20        late as last night that some of the final details are

21        still under discussion so I'm a little -- that was

22        done in the mediation, so I don't want to run afoul of

23        the mediation order as far as if you have a press

24        release, I'll be happy to discuss about what's in the

25        release but I don't know if I can discuss any more

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6826   Filed 08/18/14   Entered 08/18/14 15:57:22   Page 363 of 364

1        KEVYN ORR, VOLUME 2

2        than that.

3    BY MR. HACKNEY:

4    Q.   It's frankly been kind of confused on this, but I'll

5         tell you what I know.  First, it's my understanding

6         that you do not have a final agreement with the LTGO;

7         is that correct?

8    A.   I think that is correct.

9    Q.   What you have is what is loosely described as an

10        agreement in principal on some but not all of the

11        terms, correct?

12   A.   I think that's fair.

13   Q.   Now, the -- but the one thing I'm able to see, I'll

14        tell you, in the expert reports is that Mr. Buckfire

15        says that the $164 million of the unsecured portion of

16        LTGO is getting $55 million in value of some form,

17        okay?  I'll represent to you you can see that in the

18        exhibit.  I'll also represent to you that somehow in

19        Mr. Malhotra's work there is some implication that

20        that is paid in 2015 under the forecasts, okay?  I'm

21        less sure on that one, okay?

22   A.   Right.

23   Q.   What I will tell you is that 55 million on 164 million

24        of unsecured LTGO works out to a 34-cent recovery on

25        that, okay?  So -- and I'm -- this is going on and on,