# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------x
:
:
:
In re                           :      Chapter 9
                              :
CITY OF DETROIT MICHIGAN,   :      Case No.: 13-53846
                              :
                 Debtor.      :      Hon. Steven W. Rhodes
:
:
:
-------------------------------------------------x

## THE CITY OF DETROIT'S MOTION TO STRIKE IN PART SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S SECOND SUPPLEMENTAL <u>OBJECTION TO THE DEBTOR'S PLAN OF ADJUSTMENT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................1

I.   Syncora's Accusations of Bias and Undisclosed Conflicts in the
     Mediation Process Are False and Misleading ..................................4

     A.   Syncora's Accusation of an Undisclosed Conflict On the Part of
          Eugene Driker Is Entirely False ...........................................5

     B.   Syncora's Characterization of The Grand Bargain Is Grossly
          Misleading ..................................................................10

II.  Syncora's Attack on the Mediation Process Is Untimely and Improper ......16

III. The Grand Bargain Is an Exemplary Achievement of Municipal
     Restructuring, Not a "Fraudulent Transfer" ..................................18

CONCLUSION ......................................................................24

# TABLE OF AUTHORITIES

**Page**

CASES

Apperson v. Fleet Carrier Corp.,
  879 F.2d 1344 (6th Cir. 1989) .............................................................9

Estes v. Titus,
  481 Mich. 573, 751 N.W.2d 493 (2008)...........................................20

In re Fieger
  191 F.3d 451 (6th Cir. 1999) (unpublished) ........................................7

In re Greater Middle Missionary Baptist Church,
  463 B.R. 24 (Bankr. E.D. Mich. 2011)................................................8

In re Gregory Boat Co.,
  144 B.R. 361 (Bankr. E.D. Mich. 1992)...........................................17

In re Ruben,
  825 F.2d 977 (6th Cir. 1987) ...............................................................8

In re Smothers,
  322 F.3d 438 (6th Cir. 2003) ...............................................................7

Jones v. Continental Corp.,
  789 F.2d 1225 (6th Cir. 1986) .............................................................8

Nationwide Mut. Ins. Co. v. Home Ins. Co.,
  429 F.3d 640 (6th Cir. 2005) ...............................................................9

Nationwide Mut. Ins. Co. v. Home Ins. Co.,
  90 F. Supp. 2d 893 (S.D. Ohio 2000) ..................................................9

Questar Capital Corp. v. Gorter,
  909 F. Supp. 2d 789 (W.D. Ky. 2012)..................................................8

Steinberg v. Young,
    2010 U.S. Dist. LEXIS 31996 (E.D. Mich. Mar. 31, 2010)..............................22

Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.,
    304 F.3d 1331 (11th Cir. 2002) ............................................................................9

**STATUTES**

11 U.S.C. § 904...............................................................................................19

11 U.S.C. §§ 943(b)(7) and 1129(b)(1) ..................................................17

28 U.S.C. § 1927........................................................................................7, 24

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure Rule 11...............................................7, 24

Federal Rule of Civil Procedure Rule Rule 12 ...................................8, 24

# PRELIMINARY STATEMENT

In its Second Supplemental Objection, Syncora asserts for the first time that the City's bankruptcy plan is not proposed in good faith because it is the product of a conspiracy among the City and the bankruptcy mediators—including federal judges and leading members of the Michigan bar—who supposedly have "colluded" to defraud the City's creditors and subvert the purposes of the Bankruptcy Code. Desperation is seldom pretty, and here it is particularly ugly as it has led Syncora into a strategy of distortions, half-truths, and outright falsehoods.

Syncora falsely claims that one bankruptcy mediator committed an ethical breach by failing to disclose an alleged conflict. In fact, that exact disclosure was made to Syncora more than eleven months ago in an e-mail sent directly to five of the six attorneys who are signatories to Syncora's latest pleading. By making this false and defamatory accusation, it is Syncora that has crossed the line. As a result, the Court may wish to consider imposing sanctions and ordering Syncora to issue a formal apology. At the very least, this Court should strike the false and defamatory allegations from Syncora's pleading.[1]

---

[1] In this filing, the City addresses only those aspects of Syncora's Second Supplemental Objection [Dkt. No. 6651] that are so manifestly improper, false, and misleading as to warrant a motion to strike. The other aspects of Syncora's Second Supplemental Objection will be addressed in the ordinary course in the City's consolidated pretrial brief.

1

Syncora's attack on the mediation process should also be struck because it does not arise from any new revelations, developments in the bankruptcy case, or changes in the City's plan. Instead, it is a transparent repackaging of Syncora's old objections in a sensationalized new form designed to generate maximum press coverage. It is nothing less than a desperate, last-ditch effort to use under-handed tactics to derail the Plan, a plan which numerous classes of creditors have already accepted—including classes of financial creditors.

As evidence of the allegedly "secretive" conspiracy between the City and the bankruptcy mediators, Syncora points without any hint of irony to a number of public statements and features of the publicly filed and broadly disseminated bankruptcy plan that the City has been openly defending in legal briefing. For example, Syncora distorts the public remarks of the chief bankruptcy mediator to accuse him of bias in favor of the City's retirees at the expense of other creditors. In fact, the alleged bias is illusory, and the remarks in question were nothing more than an endorsement of public features of the Grand Bargain and the City's bankruptcy plan that Syncora has known about for months. It is only now, after participating in the bankruptcy case for over a year, that Syncora seeks to confabulate a conspiracy.

Contrary to Syncora's name-calling, the Grand Bargain contains a perfectly legitimate settlement that is the product of arms-length negotiation among well-

2

represented adversaries. It brings in outside funding to produce remarkable benefits for the City and its retirees without causing harm to Syncora or anyone else. The test of the Grand Bargain's validity is whether it contains a legitimate settlement that meets the requirements of law. Likewise, the test of the Plan's validity is whether it meets the requirements of plan confirmation, including that it does not unfairly discriminate among creditors, and that it does not provide creditors with less recovery than they would reasonably expect, as measured by what they could otherwise achieve if the chapter 9 case were dismissed. The City has already explained why the Plan satisfies all of those factors, it will prove so in the confirmation hearing, and this Court will have an opportunity to pass judgment in due course.

Finally, Syncora goes far astray in its untimely assertion that the Grand Bargain is a "fraudulent transfer" because it establishes a public trust for the assets of the Detroit Institute of Arts (the "DIA") instead of selling them off to the highest bidder. Syncora's basic premise is false: According to Syncora, financial creditors have a rightful claim to the City's tangible assets, including even a priceless civic treasure like the DIA. In fact, however, chapter 9 protects the City's right to *preserve* its assets for the public benefit, and to *avoid* selling them off to satisfy creditor demands. Syncora simply ignores the fact that the Grand Bargain preserves virtually all of the civic value of the DIA by keeping it in the City and

safeguarding it for generations to come.  Also ignored is the significant value created for the City by putting to rest several claims, including one by the State Attorney General, asserting that the City does not have any right to transfer or monetize the DIA collection, because the City is already a constructive trustee and must maintain the collection for the public benefit.  In short, the Grand Bargain produces more than fair value for the City and leaves Syncora no worse off than if the City had simply decided to retain direct ownership of the DIA, as it is fully entitled to do.

I.     **Syncora's Accusations of Bias and Undisclosed Conflicts in the Mediation Process Are False and Misleading**

Syncora claims that the City's plan is proposed in bad faith because it is the product of "[a] secret combination, conspiracy, [and] concert of action" formed for a "deceitful purpose" to "defraud" creditors of their rights "by the forms of law." Syncora Second Supp. Obj. at 12 (citation and internal quotation marks omitted). On its face, this claim is not only wrong, but is built on a foundation of falsehoods and distortions that appear calculated to generate publicity and to inflict damage on those working to settle the bankruptcy case rather than to serve any real litigation purpose.

4

**A.      Syncora's Accusation of an Undisclosed Conflict On the Part of Eugene Driker Is Entirely False**

Syncora asserts that one of the bankruptcy mediators, Eugene Driker, committed an ethical breach by failing to disclose that his wife serves as an emeritus board member of the DIA.  Id. at 15.  In reality, this fact was expressly disclosed to Syncora on September 9, 2013, in a letter sent to all parties, including the individual e-mail addresses of five of the six attorneys who signed Syncora's latest pleading.  These attorneys are Ryan Bennett, James Sprayregen, and Stephen Hackney of the law firm of Kirkland & Ellis, as well as Stephen M. Gross and Joshua Gadharf of the law firm of McDonald Hopkins.  See Exhibits 6-A,  6-B.  In the disclosure letter sent to each of these attorneys on September 9, 2013, Chief Judge Gerald E. Rosen listed each of the bankruptcy mediators and specifically disclosed facts about them that might give rise to any perceived conflict.  See generally Exhibit 6-C.  In particular, the letter stated:

> Mr. Driker's wife, Elaine, served for a number of years as a member of the Board of Directors of the Detroit Institute of Arts.  Her term ended in 2011, but she was elected a Director Emerita in 2012, entitling her to attending Board meetings, without a vote.  Both Mr. and Mrs. Driker have been contributors to the DIA for many years.

Id. at 7.  The letter further stated that "[a]ny concerns about these disclosures should be addressed to the particular mediator who is the subject of the concern,

with a copy to Chief Judge Rosen." Id. at 1. To the best of the City's knowledge, Syncora never objected—until now.

Syncora now asserts that "Neither Judge Rosen nor Mr. Driker ever disclosed any biases or conflicts of interest that might affect their ability to serve as impartial mediators in this case," and points specifically to Mr. Driker's wife as an alleged source of an undisclosed conflict. Syncora Second Supp. Obj. at 15. Mssrs. Bennett, Sprayregen, Hackney, Gross, and Gadharf have full knowledge that this accusation is unequivocally false. The assertion thus shows abject disregard for the professional reputation of Mr. Driker and Chief Judge Rosen, and for the integrity of the bankruptcy proceedings. It is both puzzling and disappointing. Could they have expected this misrepresentation to go undetected? It is flatly contradicted by the official disclosure letter, after all. Was it purely reckless, or was it intended to garner sensational press coverage, regardless of the cost to those who are honestly working to resolve the City's bankruptcy case? If that was the purpose, it arguably succeeded: within hours of Syncora's filing, its false and defamatory accusation was splashed across the pages of not only the local Detroit media, but also major national publications such as the *New York Times* and the *Wall Street Journal*.[2]

---

[2] See, e.g., Nathan Bomey, "Detroit bankruptcy mediators accused of 'naked favoritism' for pensioners, DIA," *Detroit Free Press* (Aug. 12, 2014), *available at* http://www.freep.com/article/20140812/NEWS01/308120096/Detroit-bankruptcy-

At the very least, the City asks this Court to act under Rule 12(f) to strike the "scandalous" allegations contained in Syncora's pleading for being reckless at best, if not willfully malicious. In addition, this Court may wish to consider ordering Syncora and its attorneys to issue a formal public apology to Mr. Driker and Chief Judge Rosen, whose conduct and reputations have been falsely impugned. <u>See</u> <u>In re Smothers</u>, 322 F.3d 438, 442 (6th Cir. 2003) (holding that federal courts' "inherent power to maintain respect and decorum grants courts the flexibility to equitably tailor punishments," including the power to order "[a]n apology on the record"); <u>In re Fieger</u>, 191 F.3d 451, 1999 WL 717991, at *1, *4 (6th Cir. 1999) (unpublished) (holding that it was "well within the court's discretion" to order an attorney to apologize formally to opposing counsel and the court for a Rule 11 violation). The Court may also wish to consider ordering Syncora's attorneys to show cause why their behavior does not merit other sanctions under Rule 11 of the Federal Rules of Civil Procedure, which requires counsel to make truthful

---

Syncora-mediation; Associated Press, "Detroit's Bankruptcy Plan Opposed by Creditor Syncora Guarantee," *Wall Street Journal* (Aug. 12, 2014), *available at* http://online.wsj.com/articles/detroits-bankruptcy-plan-opposed-by-creditor-syncora-guarantee-1407870333; Marry Williams Walsh, "Bond Insurer Syncora Claims Mediator Favors Detroit's Retirees," *New York Times* (Aug. 12, 2014), *available at* http://dealbook.nytimes.com/2014/08/12/big-bond-insurer-syncora-files-objection-to-detroits-bankruptcy-plan. One of Syncora's attorneys also repeated the allegations in a televised interview. <u>See</u> "Detroit vs. Wall Street: What Does Syncora Want?", *Bloomberg Business Week* (Aug. 13, 2014), *available at* http://www.businessweek.com/videos/2014-08-13/detroit-vs-dot-wall-street-what-does-syncora-want.

7

statements based on "an inquiry [that is] reasonable under the circumstances," and to avoid pleadings "for any improper purpose."[3]

Sanctions also may be appropriate under 28 U.S.C. § 1927, which provides that any attorney "who so multiplies the proceedings in any case unreasonably or vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." A court may impose such sanctions "when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." Jones v. Continental Corp., 789 F.2d 1225, 1230 (6th Cir. 1986). Sanctions would be appropriate here because Syncora's filing "falls short of the obligations owed by a member of the bar to the court and [], as a result, causes additional expense to the opposing party." In re Ruben, 825 F.2d 977, 984 (6th Cir. 1987). The filing "so far exceed[s] zealous advocacy" that it constitutes the kind of "punishable aggressive tactics that . . . require or permit sanctions." In re Greater Middle Missionary Baptist Church, 463 B.R. 24, 27 (Bankr. E.D. Mich. 2011).

In any event, the explicit disclosure regarding Mr. Driker's wife completely defeats Syncora's claim of an undisclosed conflict. Even in the context of binding

_____

[3] This pleading serves as notice to Syncora that there may be grounds for Rule 11 sanctions unless Syncora withdraws its false and malicious statements. The City reserves the right to file a separate motion for sanctions.

8

arbitration, it is well established that once a disclosure is made, "a party cannot remain silent as to perceived or actual partiality or bias and then later object" to avoid an unfavorable result. Questar Capital Corp. v. Gorter, 909 F. Supp. 2d 789, 814 (W.D. Ky. 2012). Where a potential conflict is "clearly known to the parties" at the outset, they "cannot complain after the fact," but instead "must exercise due diligence in asserting any right [they might have] with respect to claims of bias or evident partiality." Nationwide Mut. Ins. Co. v. Home Ins. Co., 90 F. Supp. 2d 893, 903 (S.D. Ohio 2000). See also Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358-59 (6th Cir. 1989) (noting that, "as a general rule, a grievant must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts"); Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc., 304 F.3d 1331, 1340 (11th Cir. 2002) ("Of course, this, or any other instance of alleged partiality would be moot if [the arbitrator] had disclosed it to the parties. Had [the parties] failed to contest [the arbitrator's] status as an arbitrator at that time, they would have waived the right to object in the future.").

Here, as the Sixth Circuit has explained elsewhere, there can be no ethical violation on the part of the mediators because "this is not even a case of nondisclosure," as they "made full and timely disclosures" of the relevant information. Nationwide Mut. Ins. Co. v. Home Ins. Co., 429 F.3d 640, 648 (6th Cir. 2005). Syncora has long been aware of the supposed "conflict" it now asserts,

and never before raised the slightest objection.  Now, after participating in the

bankruptcy case for over a year and having failed to convince any court to grant it

substantive relief, Syncora is attempting to scuttle the entire bankruptcy by making

false charges to impugn the integrity of the process.  This type of destructive

gamesmanship should be discouraged, not rewarded.

> **B.** **Syncora's Characterization of The Grand Bargain Is Grossly
> Misleading.**

Continuing its pattern of accusations, Syncora claims that Chief Judge Rosen

and Mr. Driker acted with improper bias by "hatching" a plot and "developing a

master plan—the Grand Bargain," which, according to Syncora, favors the City's

retirees and the DIA at the expense of financial creditors.  Syncora Supp. Obj. at

16-17.  Not a single other creditor has made this allegation, and in fact several

financial creditors have used the mediation process to reach agreements with the

City that are now reflected in the Plan, thus underscoring the outlandish nature of

Syncora's charge.  The reality is that the Grand Bargain is an agreement reached

by adversaries negotiating at arm's length in the mediation process, based on all

the facts and circumstances.  The Grand Bargain makes use of outside funds and

charitable contributions that were available solely for the purposes of providing

relief to pensioners or preserving the DIA in a public trust, or both.  Because these

outside donations never would have been available for any other purpose,[4]
especially to bail out the City's financial creditors, the Grand Bargain does not
inflict any cognizable harm on Syncora or anyone else.  On the contrary, by
facilitating the infusion of hundreds of millions of dollars into the City and settling
numerous hotly disputed issues related to the bankruptcy, the Grand Bargain
preserves the City's assets from the costs and risks of litigation, and if anything
*enhances* the overall recovery available to Syncora and other creditors.

      Syncora's accusations are built on a litany of implausible claims and
mischaracterizations.  Syncora alleges that Chief Judge Rosen issued a misleading
press release that "made it seem as if the non-profit foundations were driving" the
Grand Bargain, when in fact Rosen and Mr. Driker are the ones who secretly
"hatched the idea." Id. at 17.  Syncora then attempts to spin this supposed
revelation as evidence of misconduct on the part of the mediators.  This is silly.
First, the "smoking gun" evidence of the purportedly secret conspiracy is a set of
innocent public statements made by Chief Judge Rosen himself, and by the officers
of the foundations that were supposedly in on the plot.  What this truly reveals, of
course, is that there was no secret plot, no hidden bias, and no unethical behavior.

      Contrary to Syncora's insinuation, there is no ethical guideline that prohibits
a mediator from proposing any settlement, which the parties may then take or leave

---

[4] See, e.g., Deposition of Rip Rapson ("Rapson Dep.") at 43:6-13, 46:6-11.

based on their independent interests.  That is exactly what happened here.  Chief Judge Rosen and the other mediators had no reason to cover up this fact, and their press release did not remotely deny it.  Syncora points to the language of the press release stating "that the foundations' agreement to participate is specifically conditioned upon all of their funds being committed to" pension relief and the preservation of the DIA in a public trust.  Id. at 17.  But that statement does not say or imply anything about who "hatched the idea" for the Grand Bargain.  More importantly, it is entirely irrelevant who came up with the ideas included in the Grand Bargain.  What matters is that the adversaries themselves *agreed* to the Grand Bargain through qualified representatives in arms-length negotiations, and that the agreement is fair and reasonable.  None of the applicable standards even refers to the origins of the blueprint for a settlement.

The mediators proposed the Grand Bargain as a possible solution that would bring in significant outside funding to help the City achieve a successful reorganization.  In the absence of the Grand Bargain, Syncora would not see a single cent more in recovery because it would have no hope of accessing the outside funds that were donated on the express condition of providing pension relief and establishing the DIA as a public trust.  The mediators thus deserve praise, not condemnation, for facilitating this win-win arrangement.

Syncora distorts the public remarks of Chief Judge Rosen to create the false impression that he expressed bias in favor of pensioners at the expense of other creditors. On June 9, 2014, Rosen spoke at a press conference to discuss the Grand Bargain, where he lauded outside donors for making charitable contributions to ease the blow to the City's pensioners. As Syncora points out, Rosen stated at that time that "none of this would be possible without all of us keeping a clear vision firmly in mind about who this is really about. It's about Detroit's retirees who have given decades and decades of their lives devoted to Detroit . . . . And that's what this is really all about."[5] He also stated that the Grand Bargain was "the very best deal that we could do for Detroit's retirees, to whom all of us here owe so much." Id. at 21. According to Syncora, these remarks "discarded any pretense of impartiality among the creditors" and instead reflected an illicit design "to pick winners and losers in the bankruptcy" at the expense of financial creditors. Id. at 18, 20.

Syncora's characterization is highly misleading. In context, Rosen was simply acknowledging that there were outside donors who were willing to make charitable contributions to the City, but only if the donations were specifically

---

[5] Syncora Second Supp. Obj. at 17 (quoting audio recording of Judge Rosen's public remarks, *available at* http://www.nextchapterdetroit.com/detroits-chief-mediator-judge-gerald-rosen-speaks-about-the-bankruptcy-process (the "Rosen Remarks"))

earmarked to provide relief to the City's pensioners. It is obvious on the face of Rosen's remarks that when he lauded the goal of helping pensioners and stated "that's what this is really all about," he was referring to the Grand Bargain and the outside charitable donations. He obviously was not suggesting that the entire bankruptcy or the mediation process was "all about" helping pensioners. Once again, the outside charitable donations never would have been available to enhance Syncora's recovery.[6] For that reason, any suggestion that Judge Rosen's remarks demonstrated bias in favor of pensioners *at the expense of other creditors* is entirely specious.

Finally, Syncora asserts that the DIA Settlement "is a settlement in search of a dispute" because there was "[n]ever a dispute about the . . . Museum Assets" or the City's ownership of them. Id. at 18. That is both false and irrelevant. It is irrelevant because the City wanted to maximize the value of the DIA while preserving the Museum Assets as a public trust, and the only way it could do so was through the Grand Bargain, with outside donors insisting on the terms of the DIA Settlement as a condition of their donations. Moreover, as the City has explained and will further demonstrate at trial, even if the City did want to sell the DIA, there *was* an intense dispute with both the non-profit corporation that operates the DIA (the "DIA Corp.") and the Michigan Attorney General over

---

[6] Rapson Dep. at 43:6-13, 46:6-11.

whether the City had full and unrestricted ownership of over the DIA assets, or

whether the DIA was already protected as a public or charitable trust.  In light of

that dispute, the Attorney General and the DIA Corp. were prepared to oppose any

sale and engage in protracted litigation that would have entailed substantial risk for

the City and millions of dollars in legal fees.[7]  Moreover, in order to sell the DIA

into private hands, the City also would have been required to undertake the

logistically arduous task of giving notice to a slew of benefactors who had placed

restrictions on their gifts to the DIA, many of whom would assert that they were

entitled to the return of their gifts or were entitled to receive the proceeds of any

sales.  The DIA Settlement eliminates all of those costs and risks while also

serving the City's legitimate purpose of preserving its cultural heritage by keeping

the art collection in Detroit as a public benefit for its residents.

To the extent Syncora alleges that any of the Grand Bargain's long-

publicized settlement terms are improper, that claim has already been fully briefed

and will be evaluated as part of the confirmation process.  The test for a legitimate

---

[7] See, e.g., Michigan Attorney General Opinion No. 7272 (June 13, 2013) at 1
(asserting that "[t]he art collection of the Detroit Institute of Arts is held by the
City of Detroit in charitable trust for the people of Michigan, and no piece of the
collection may thus be sold, conveyed, or transferred to satisfy the City's debts or
obligations"); DIA Statements Regarding the City of Detroit Bankruptcy, *available
at* http://www.dia.org/news/1511/DIA-Statements-Regarding-the-City-of-Detroit-
Bankruptcy.aspx (last visited August 13, 2014) ("[T]he DIA's art collection is not
subject to sale because it is protected by a public trust and, as recognized by the
attorney general, a charitable trust that dates back to 1885.").

settlement is whether it has been settled fairly and equitably, and whether it is truly the product of arms-length negotiation. See City's Consolidated Reply, at ¶¶ 7-15. Both the City and its objectors, including Syncora, have already had a chance to address those issues at length. Syncora's latest volley does not add anything beyond a sensationalized distraction from the merits.

## II. Syncora's Attack on the Mediation Process Is Untimely and Improper

Syncora's attack on the bankruptcy mediation process should also be struck because it violates this Court's order that supplemental objections should be submitted "only to the extent that [they] result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment."[8] None of those conditions is met here. Instead, Syncora's attack is a redundant assault on basic features of the City's bankruptcy plan that long have been public.

Although Syncora purports to be objecting to the supposed bad faith of the City and the bankruptcy mediators, Syncora Second Supp. Obj. at 12-30, its arguments are in fact addressed almost entirely to two other confirmation issues that were already asserted by Syncora (and others) and are now awaiting disposition at trial. *First*, Syncora repeatedly asserts that the City's plan is proposed in bad faith because it includes unfair discrimination against financial

---

[8] See Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment, Dkt. No. 6560 (Aug. 6, 2004), at 1.

creditors in favor of retirees. But in reality, the City openly and forthrightly disclosed the Plan's treatment of retiree claims and of Syncora's claims months ago and has explained in briefing why the Plan's differential treatment of retirees is legitimate and necessary to the City's reorganization. Good faith simply requires that the terms of the Plan be "reasonably necessary to the success of the debtor's reorganization," and as long "there is a sound business justification for the treatment, then the plan is proposed in good faith." In re Gregory Boat Co., 144 B.R. 361, 367 (Bankr. E.D. Mich. 1992). As the City has explained at length, it easily satisfies that test in the present case.[9] The mere fact that the City has proposed differences in the treatment of its creditors does not evince any bad faith on the City's part. If it did, then the Code's express allowance for *fair* discrimination among creditors would be a dead letter. At the end of the day, the proper test of Syncora's allegations of unfairness is simply whether the City's treatment of creditors truly amounts to unfair discrimination under the circumstances, which will be adjudicated soon enough. Discrimination that is not unfair will not defeat confirmation of the Plan.[10]

---

[9] See City's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan, Dkt. No 5034 (May 26, 2014) ("City's Consolidated Reply"), at ¶¶ 278-89.

[10] See City's Consolidated Reply at ¶¶ 39-102.

*Second*, Syncora repeatedly chastises the City for failing to liquidate the

DIA's art collection, which Syncora asserts should be used to collateralize a loan

the City has no ability to repay or sold off to maximize the recovery of Syncora

and other financial creditors.  Once again, however, this argument is properly

addressed under the separate confirmation factors of the "best interest of creditors"

and the "fair and equitable" tests of 11 U.S.C. §§ 943(b)(7) and 1129(b)(1).

Together, those tests ensure that any plan of adjustment will provide creditors with

all they can reasonably expect based upon alternatives actually available in the

absence of the chapter 9 case.[11]  The city and Objectors have already briefed that

question.  It is under that rubric that this Court should determine whether Syncora

has any reasonable expectation that the City must liquidate the DIA to maximize

Syncora's recovery instead of preserving the art collection in a charitable trust for

the public benefit.

## III.     The Grand Bargain Is an Exemplary Achievement of Municipal Restructuring, Not a "Fraudulent Transfer"

Syncora asserts that the Grand Bargain is contrary to state law and indeed

"tantamount to a fraudulent transfer" because it is a sinister attempt to move the

DIA art collection beyond the reach of creditors while squandering a major

municipal asset at a "rock-bottom price." <u>Syncora Supp. Obj.</u> at 24.  Once again,

this claim is untimely and improper because it is not based on any new

---

[11] <u>See</u> <u>City's Consolidated Reply</u> at ¶¶ 103-182.

18

information, but instead derives from features of the Grand Bargain that Syncora has known about for months without ever raising any such allegation.  In any event, Syncora's "fraudulent transfer" argument is confused at its core.  The Michigan state legislature explicitly authorized the Grand Bargain in a sweeping bipartisan vote.  The claim that the Grand Bargain somehow *violates* state law is thus extremely dubious as a matter of law and logic.[12]

At bottom, Syncora's objection to the Grand Bargain as a "fraudulent transfer" stems from its refusal to acknowledge that Detroit is not a commercial debtor, and that this is not a commercial bankruptcy.  As the City has explained elsewhere, the purpose of chapter 9 is not to maximize creditor recovery, but instead to restore distressed municipalities to their rightful place as sound, healthy, and vibrant centers of American culture and society.[13]  To achieve that purpose, chapter 9 expressly provides that cities are not required to sell off civic assets to the highest bidder to satisfy creditor demands, which would effectively mandate the privatization of some of the most precious items of America's public heritage.  See 11 U.S.C. § 904.  Under chapter 9, a bankrupt New York City would not be forced to sell off Central Park to cover its bond debt; Boston would not be

---

[12] The City will address the particular elements of Syncora's fraudulent-transfer arguments in its consolidated pre-trial brief.

[13] See City's Consolidated Reply at ¶¶ 103-182.

19

compelled to barter away the Common; Philadelphia would not have to auction off Independence Hall. On the contrary, in the unique context of municipal bankruptcy, creditors cannot reasonably expect cities to divest themselves of any civic assets, much less those that are part of the very fabric of municipal identity.

Chapter 9 and Michigan law protect the City's sovereign right to preserve the status of the DIA as a civic treasure for the public benefit instead of selling it off to satisfy creditors.[14] As the Michigan Supreme Court has made clear, fraudulent-transfer actions are inapplicable to transfers of property that are otherwise exempt from creditor claims. Simply put, "it is difficult to comprehend how disposing of property that a creditor cannot reach could 'defraud' that creditor." Estes v. Titus, 481 Mich. 573, 751 N.W.2d 493, 498 (2008).

If there is a benchmark for reasonable value of the DIA in the circumstances of this case, it is not what it would fetch at a series of private auctions, but instead the amount of proceeds it can generate, if any, consistent with its preservation for the public benefit. Under that metric, the City has acted responsibly to establish the DIA as an independent public trust, in exchange for outside donations that are specifically conditioned on that purpose. As a result, Syncora has no basis to complain: It never had any claim to the value of the DIA collection, which is

_____

[14] Michigan law specifically prevents the City's creditors from executing a judgment against any of the City's tangible assets. See MCL § 600.621.

20

shielded from private creditors not by any nefarious "fraudulent transfer," but *by the express terms of chapter 9 and Michigan law*.

Syncora asserts that the City has no standing to shield the DIA from liquidation because it "*chose* to monetize the Museum Assets," and because "the entire DIA Settlement is predicated on the notion that unsecured creditors (the pensioners) have at least a colorable claim against those assets." Syncora Second Supp. Obj. at 29. Once again, this is simply a misrepresentation of what the Grand Bargain does. It does not "monetize" the DIA at all. Instead, it preserves the DIA collection consistent with the City's legitimate municipal purpose of safeguarding the DIA for the public benefit of the City and its residents. In keeping with the express authorization of chapter 9, the City has pointedly chosen *not* to resort to an outright monetization of the DIA by selling it off to the highest bidder.

Syncora claims that the Grand Bargain actually *harms* the City by wasting "significant assets that could be used in the future to satisfy the City's obligations." Id. at 30. What Syncora really means, apparently, is that it would better serve the City's interests to liquidate a unique aspect of its cultural heritage to satisfy the demands of its holdout financial creditors. The City disagrees. In the City's view, it is not squandering a financial asset but preserving the DIA as part of Detroit's public heritage, which will make a vital contribution to its recovery as a vibrant American metropolis, benefiting its residents for generations to come. In

21

preserving that vital municipal interest, the City flatly rejects the notion that it is receiving "less than reasonably equivalent value" of the DIA by preserving it in a charitable trust. Cf. Steinberg v. Young, No. 09-11836, 2010 U.S. Dist. LEXIS 31996 (E.D. Mich. Mar. 31, 2010) (emphasizing that the test for reasonably equivalent value takes into account "what the debtor gave up," and incorporates the residual value that the debtor has "preserve[d]").

In technical terms, the transfer of the DIA into a public trust as part of the Grand Bargain produces reasonably equivalent value for the City for three reasons. First, it brings in hundreds of millions of dollars in outside contributions for the City. Second, it preserves the DIA's incalculable public benefit for the residents of Detroit by keeping the art collection in the City as a public trust instead of selling it off into private hands.[15] And third, it settles claims from persons and entities such as the State Attorney General and the DIA Corp., who have asserted that the City was already obligated to keep the DIA in trust for the public benefit.

Contrary to Syncora's claims, Syncora Second Supp. Obj. at 29, the City has not remotely conceded that pensioners or other creditors have any rightful claim against the DIA's assets. Instead, the City has simply acknowledged that defending its legal position would carry some risks and costs, and has accepted outside donations to benefit pensioners without disadvantaging any other creditor.

---

[15] See, e.g., Deposition of Mayor Mike Duggan at 174:2-18.

To be sure, as Syncora points out, ibid., the City has agreed to insert provisions in the DIA Settlement Agreement making clear that no creditor can have any claim against the DIA's assets now or in the future. But that disclaimer is not a concession of any existing valid claim against the DIA assets. It is simply a reassurance to the charitable donors, who expressly required the disclaimer as a condition of their financial contributions.

Syncora complains that the Grand Bargain's outside charitable donations "flow to pensioners" instead of to financial creditors like Syncora, id. at 27, but that complaint is groundless for two reasons. First, the outside donations received by the City were specifically earmarked for pension relief, and they never would have been forthcoming but for the satisfaction of that condition.[16] Accordingly, these outside donations simply help to provide relief for retirees without making Syncora any worse off than if the Grand Bargain had never been made. In fact, even if the City wanted to, it has no ability to redirect these donor-specified gifts. And second, even on the flawed assumption that the City must somehow treat the outside donations as if they were available for distribution to all creditors in general, the City has separately explained why the differential recovery for retirees does not amount to unfair discrimination.

---

[16] See, e.g., Rapson Dep. at 43:6-13, 46:6-11.

For all of these reasons, there is no basis to attack the Grand Bargain as a "fraudulent transfer" that contravenes the purposes of the Bankruptcy Code. In fact, the Grand Bargain represents a remarkable achievement that is the product of an exemplary mediation process. It provides significant benefits to the City and its creditors by preserving the City's cultural heritage, settling acrimonious disputes, and creating a significant infusion of outside funding without inflicting the slightest harm on Syncora or any other creditor. This path-marking achievement deserves to be studied and emulated, not disparaged.

## CONCLUSION

For the reasons set forth herein, the City submits that the aforementioned false and malicious allegations as well as the untimely and redundant submissions contained in Section I of Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Debtor's Plan of Adjustment [Dkt. No. 6651] should be struck under Federal Rule of Civil Procedure 12(f).[17]

---

[17] In accordance with Local Rule 9014-1(b), the City sought but did not obtain Syncora's concurrence in the requested relief.

Dated:     August 18, 2014                     Respectfully submitted

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice of Motion |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavits Filed Specific to This Motion] |
| Exhibit 6-A | Disclosure E-mail |
| Exhibit 6-B | Disclosure Followup E-mail |
| Exhibit 6-C | Disclosure Letter |