**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |
| | | Related to Doc. No. 6379, 4215 |

**THE DETROIT RETIREMENT SYSTEMS' BRIEF IN OPPOSITION TO ADMISSIBILITY OF CERTAIN PORTIONS OF MARTHA KOPACZ'S EXPERT REPORT**

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (together, the "Retirement Systems") appreciate the Court's desire to admit the report issued by Martha Kopacz ("Kopacz") pursuant to her appointment as an independent expert under Fed. R. Evid. 706 (the "Report") in the interest of promoting judicial economy at the trial scheduled in connection with confirmation of the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* ("Plan Confirmation Trial") [Dkt. No. 6379]. Under the Federal Rules of Evidence, however, the Report should not be admitted because it is hearsay. Moreover, the Retirement Systems also object to admission of the portions of the Report that relate to pension issues on the grounds that those opinions: (a) exceed the scope of

201273220.2 14893/165083

Kopacz's appointment as set forth in the *Order Appointing Expert Witness* [Dkt. No. 4215, the "Appointing Order"]; (b) do not relate to her feasibility analysis; and (c) are inadmissible hearsay.[1] These objections to the content of the Report, coupled with those of other creditors, indicate that admitting the Report will *not* streamline the introduction of Kopacz's testimony but, in fact, will likely complicate the trial and create inefficiencies. Therefore, the Retirement Systems object to the admission of the Report at the Plan Confirmation Trial.

# I. BACKGROUND

## A. The Order Appointing Kopacz as an Independent Expert

On April 22, 2014, the Court appointed Kopacz as an independent expert pursuant to Fed. R. Civ. P. 706(a). [Dkt. No. 4215, the Appointing Order, p. 1, ¶

[1] On or before August 25, 2014, the Retirement Systems will also be filing a separate motion in accordance with the Court's *Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Dkt. No. 6699], seeking to exclude Kopacz's opinions and testimony that exceed the scope of her appointment as set forth in the Appointing Order, or alternatively, to exclude Kopacz's opinions that relate to certain pension issues under Fed. R. Evid. 702, because (i) Kopacz admits that she lacks special knowledge, training or education regarding pension issues; (ii) her conclusions on these issues will not assist the trier of fact to determine a fact in issue at trial, since she admits that these particular opinions are not relevant to her overall opinion on feasibility; and (iii) her pension-related conclusions are not based upon reliable facts or data nor has Kopacz independently verified the data she relied upon in forming her conclusions.

1]. The Order expressly limited the scope of Kopacz's expert witness testimony to two discrete issues:

> a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and
> b) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable.

[Dkt. No. 4215, p. 1, ¶ 2]. Under the Appointing Order, Kopacz is not authorized to investigate, reach conclusions on, or testify on any other topic: "Unless the Court orders otherwise, the matters in paragraph 2 above are the ***only*** matters that the Court's expert witness is authorized to investigate, reach a conclusion on, or testify about." *Id.* at ¶ 3 (emphasis added).

**B. The Pension-Related Opinions in Kopacz's Report**

Despite the limited scope of Kopacz's appointment, the Report includes numerous opinions relating to pension-specific issues that Kopacz admits have nothing to do with either feasibility or the City's cash flow projections. Instead, many of Kopacz's opinions have more to do with discussing alleged past actions and practices of the Retirement Systems that have no bearing on the current and future administration of the Retirement Systems, implemented by past trustees who are not members of the current boards and will not be trustees in the future. (See, e.g., Kopacz Report, pp. 127-129). For example, Kopacz opined in the Report

(putting aside for the moment her lack of qualifications to opine on these issues) that the Retirements Systems "utilized unrealistic rate of return assumptions," and "managed the pension plans in accordance with questionable investment strategies that resulted in considerable underfunding" of the respective plans. (Kopacz Report, p. 127).[2] Kopacz also concluded that amortization periods and smoothing mechanisms were used to "mask[] potential funding shortfalls" and that "aggressive annual rates of return" were adopted by the Systems. *Id.* at 127. She further opined that "also contributing to the increase of the UAAL [unfunded actuarial accrued liability] were a number of questionable activities engaged in by the retirement systems," and that "Retirement System officials have been accused and/or indicted of material fiduciary misconduct, allegedly draining the pension of necessary liquidity and contributing to the underfunding of the Retirement Systems." *Id.* at 128-29.[3]

---

[2] Per the Court's prior instructions, expert reports have not been filed on the docket. For this reason, the Retirement Systems are not filing a copy of the Kopacz Report as an exhibit to this Motion.

[3] For ease of reference, these opinions will be collectively referred to as Kopacz's "Pension-Related" conclusions throughout this brief. The above examples are by way of way of example only, however, and are not exhaustive. Kopacz also opines about the new hybrid pension plans, the new proposed investment rate of return assumption, the restoration program, recommended pension plan reporting requirements, revised annual disclosures, and the like—all of which are far outside the scope of her expertise and her appointment. (Kopacz Report at pp. 132, 134, 142-144, 146, 151, 155, 156, 175, 177, 205-06).

Kopacz, however, was not charged with reviewing past practices of the Retirement Systems, nor was she retained to opine on the propriety of the Retirement Systems' actuarial and investment policies. Under Paragraph 3 of the Appointing Order, Kopacz is not authorized "to investigate, reach a conclusion on, or testify about" the Pension-Related issues and these portions of the Report should be excised. Furthermore, ***Kopacz acknowledged at her deposition that none of her conclusions relating to the Pension-Related issues impact her opinions on feasibility.*** (Exhibit A, Kopacz Dep. at 444, 545-46, 563, 566).[4]

Moreover, as will be explained in more detail in the Retirement Systems' forthcoming motion to exclude portions of Kopacz's testimony under *Daubert*,

---

4 For example, when asked whether "any of the pension risks that you cite in your report give you any pause with respect to the [P]lan," she answered: "The long-term risks associated with the City's pension obligations do not negatively impact my assessment for feasibility." (Ex. A, Kopacz Dep. at 444). She similarly testified that her conclusions about alleged historical problems within the Retirement Systems did not impact her feasibility analysis under the Plan:

> I am not talking about the systems today moving forward. I am talking about how did the systems get in this underfunded predicament. . . And what is important to me is the level of underfunding in the pension systems as of the filings and today and how that is going to be dealt with in the future. . . I really don't, at the end of the day, care about how they got underfunded. . . There is treatment in the Plan of Reorganization – Plan of Adjustment that I have to assess relative to feasibility. . . But I simply don't care about how they got there. I only care about where they are today and. . . what their treatment is in the Plan of Adjustment.

*Id.* at 545-46, 563, 566.

Kopacz admits to not being an expert on pension issues, and her sole knowledge base for the Pension-Related conclusions in her Report is second-hand information that she took from others (for example, the declaration of Charles Moore that was filed with the City's original bankruptcy petition) but did not verify for herself or rigorously analyze in any "expert" fashion. (See Exhibit A, Kopacz Dep. at 431, 436, 445, 448, 536-537, 538-39, 541). The law is clear that an expert report cannot be used as a conduit to short circuit hearsay rules, and for this reason, the Retirement Systems object to admission of the Report to the extent that it includes any of the Pension-Related issues identified above.

## II. ARGUMENT

The general rule followed in the Sixth Circuit is that expert reports are not admissible as exhibits at trial, because they are hearsay. *Engebretsen v. Fairchild Aircraft Corp*., 21 F.3d 721, 728-729 (6th Cir. 1994); *Finn v. Warren County*, 2012 U.S. Dist. LEXIS 104933, *11 (W.D. Ky. July 27, 2012) ("the Court notes that expert reports prepared in anticipation of trial are generally not admissible evidence at trial because they are considered hearsay"); *Smith v. United States*, 2012 U.S. Dist. LEXIS 58623, *49 (S.D. Ohio Apr. 26, 2012) ("reports by expert witnesses are not admissible as exhibits"); *CadleRock Joint Venture, L.P. v. Royal Indem. Co*., 2012 U.S. Dist. LEXIS 19202, *12 (N.D. Ohio Feb. 15, 2012) ("established Sixth Circuit law provides that expert reports are not admissible as

substantive evidence”).

The rationale for this rule is as follows:

> Rule 702 permits the admission of expert opinion *testimony* not opinions contained in documents prepared out of court. Rule 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion. Rules 702 and 703 do not, however, permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible.

*Engebretsen*, 21 F.3d at 728 (internal citations omitted) (emphasis in original).[5] The *Engebretsen* court noted that Rules 702 and 703 only “carve out a narrow exception to the rule against the admission of hearsay.” *Engebretsen*, 21 F.3d at 729. In particular, “Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to *explain the basis of the expert’s opinion*” but if such inadmissible information upon which the expert relies is admitted for such “explanatory purposes,” the opposing party “is entitled to a limiting instruction to the jury that the evidence may be considered ‘solely as a

---

[5] Rule 703 governs the permitted bases for expert witness opinions and the admissibility of the underlying facts or data for the expert’s opinion. It provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

basis for the expert opinion and not as substantive evidence.'" *Id.* (citing *Paddack v. Dave Christensen, Inc*., 745 F.2d 1254, 1261-62 (9th Cir. 1984)) (emphasis added). Furthermore, "such materials should not be admitted if the risk of prejudice substantially outweighs their probative value." *Id.* (citing Fed. R. Evid. 403; *Nachtsheim v. Beech Aircraft Corp*., 847 F.2d 1261, 1270-71 (7th Cir. 1988)).

Based on these rules, the *Engebretsen* court concluded that the experts in that case "were entitled to testify as to their opinion, and rely on inadmissible evidence" but "[n]either their written opinions nor the materials on which they relied were admissible under Rules 702 and 703." *Engebretsen*, 21 F.3d at 729. "Thus, the District Court's conclusion that Rules 702 and 703 permit the admission of the reports was erroneous." *Id.*

As established above, courts are careful to limit the admissibility of expert reports due to hearsay concerns. This is true despite the fact that an expert can technically *rely* upon hearsay in formulating his opinions as long as that form of hearsay is of the type reasonably relied upon by experts in that particular field. See Fed. R. Evid. 703. In fact, Rule 703 was amended in 2000 to "emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the

opinion or inference is admitted." Fed. R. Evid. 703 Advisory Committee Note.[6]

Accordingly, the rule is clear that an expert is only permitted to disclose hearsay for limited purpose of explaining the basis for the expert's opinion, but not as general proof of underlying matter. *Engebretsen*, 21 F.3d at 729.

Further, the hearsay at issue actually has to have been relied upon by the proffered expert and utilized in forming an expert opinion, otherwise, courts will not permit an expert to serve as a mechanism for admitting otherwise inadmissible hearsay. *See United States v. Dukagjini*, 326 F.3d 45, 59 (2nd Cir. 2002) (noting Rule 703 "permits an expert to rely on hearsay evidence for the purposes of rendering an opinion based on his expertise, but in this case the expert was repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the [proffering party] to circumvent the rules prohibiting hearsay").

It is "inappropriate for experts to act as mere conduits for others' hearsay. . . or as vehicles for factual narrative." *Island Intellectual Prop. LLC v. Deutsche Bank AG*, 2012 U.S. Dist. LEXIS 21742, *8 (S.D.N.Y. Feb. 14, 2012) (citations omitted). "Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541

---

6 Thus, the amended version of Rule 703 does not change the *Engebretsen* holding.

(S.D.N.Y. 2004).

For example, in *In re FiberMark, Inc*., 339 B.R. 321, 327 (Bankr. D. Vt. 2006), the debtors sought to admit a court-appointed fee examiner's report into evidence as an expert opinion, but the court only permitted the portions that constituted the examiner's "recommendations and conclusions" and denied the balance as "inadmissible hearsay." The court noted that the expert's status as an expert "does not change the fact that the factual portions of his report contain an abundance of statements that are the purest sort of hearsay." *Id.* at 322. Thus, while Rule 706 could be used to "justify the admission of the Examiner's conclusions, that rule does not permit the underlying rationale, or facts, of the Examiner to be introduced into evidence." *Id.* at 327. Further, the court noted that the hearsay rule is "premised on the theory that-out of-court statements are subject to particular hazards" and the expert's report in that case "represents the findings of his investigation into the affairs and motives of the members of the Committee and their professionals" and was a "one-sided presentation of the facts in that the people who were investigated did not have the opportunity to respond to [the expert's] findings." *Id*. While the Court noted that he "appointed an expert in whom it had confidence, an expert the parties respected as competent and disinterested," that still "does not make the facts, as he defines them, true. They are still hearsay." *Id*.

The same is true in this case. Kopacz's entire Report is hearsay and should not be admitted into evidence. While the Retirement Systems appreciate the Court's desire to admit the Report for purposes of judicial economy, in its current form, the Report is too laden with opinions that exceed the scope of Kopacz's appointment to be admissible, and further, Kopacz admits outright that many of the Pension-Related portions of her Report are mere hearsay, since she relied on near verbatim statements of others (e.g., Charles Moore's declaration) and simply incorporated those into her Report. (Exhibit A, Kopacz Dep. at 550-551; 554-55, "Rather than write our own language, we chose to use someone else's declaration which has been incorrectly cited."). In addition, Kopacz admitted that other Pension-Related portions of the Report are mere "factual narratives" which are not properly admitted under *In re Fibermark* and *In re Rezulin.* (See Exhibit A, Kopacz Dep. at 566-67, characterizing the information on pages 127-28 of her Report as a "recitation of what I believed at the time to be, arguably, facts. . . they are simply words to help the reader appreciate some of the reasons that the pension funds today are underfunded.").

Thus, the time it would take to cross-examine Kopacz to properly exclude portions of her Report will not likely result in any judicial economy, and certainly not to an extent that would warrant overriding the prevailing rule in this district of excluding admission of expert reports. For these reasons, the Retirement Systems

object to the Report's admission.[7]

Dated: August 18, 2014

Respectfully submitted,

CLARK HILL PLC

/s/ Robert D. Gordon

Robert D. Gordon (P48627)
Jennifer K. Green (P69019)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
sdeeby@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

[7] If Kopacz is amenable to redacting the Report prior to trial to delete the hearsay–laden portions and the portions that exceed her scope as an expert, then the Retirement Systems will reconsider their objection to the remainder of the Report being admitted into evidence. By Kopacz's own admission, the Pension-Related portions of the Report are irrelevant to her ultimate conclusions on feasibility. For this reason, the Pension-Related conclusions identified herein could easily be extracted from the Report while leaving the pertinent feasibility conclusions intact. The Retirement Systems have sought concurrence from Kopacz in this regard but no resolution has been achieved to date.

# EXHIBIT A

- MARTI KOPACZ - VOLUME II-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In Re ) Chapter 9

CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

Debtor. ) Hon. Steven Rhodes

DATE: August 1, 2014

TIME: 9:12 a.m.

VOLUME II

VIDEOTAPED DEPOSITION OF MARTI KOPACZ, held at the offices of Squire Patton Boggs, 30 Rockefeller Plaza, New York, New York, pursuant to Order, before Hope Menaker, a Shorthand Reporter and Notary Public of the State of New York.

Gleason and Bob Childree.

Q. I apologize if I repeat some of Mr. Hackney's questions, but am I right you have no experience with actuarial issues?

A. That's correct.

Q. And you have no prior -- pension is not your area of expertise, is it?

A. I would not consider myself a pension expert.

Q. Are the pension portions of your report important to your conclusions?

A. Yes.

Q. And if the pension portions of your report are factually or inaccurate -- factually or analytically incorrect, would you agree with me that undermines the conclusions you reached in your report?

A. I don't think they're factually incorrect or analytically incorrect.

Q. Right. But if they are, would you agree with me that that undermines the conclusions in your report?

A. I don't know that it would. It depends which -- what would be inaccurate?

00000000-0000-0000-0000-000000000000

return?

A. In most years?

Q. Yes.

A. Should we count them? All right. One, two, three, four, five, six, seven, eight, nine, ten -- in ten of the years on the general retirement system, they did not reach the targeted assumed rates and --

Q. So that means -- let me just ask -- so that means in 15 years they exceeded, correct?

A. If there are 15 years here. There are 25 years.

Q. So, in most years --

A. In 15 --

Q. -- the GRS exceeded the targeted rate, correct?

A. Yes.

Q. Okay. You can do the math for PFRS.

A. Okay. One, two -- three, four -- five. In five of the PFRS years, they did not reach the targeted return.

Q. That's five out of how many?

A. Fifteen.

Q. So in most years, am I correct, the

00000000-0000-0000-0000-000000000000

- MARTI KOPACZ - VOLUME II-

Q. Okay. Would you accept my representation that that's what you said?

MR. KANE: Objection.

A. Not really.

Q. Okay. Well, is there any need to change the pension plan -- strike that.

Is there any need to change the plan of -- the plan of adjustment on account of the potential pension risks that you cite?

A. I have no perspective or point of view or opinion on changes to the plan of adjustment. That is not in my scope. It is not my task.

Q. Do any of the pension risks that you cite in your report give you any pause with respect to the plan?

A. The long-term risks associated with the City's pension obligations do not negatively impact my assessment for feasibility.

Q. Did you look at the asset distribution for the pension funds?

A. I have seen a -- I have seen a schedule that looks at the distribution of assets in the pension fund.

- MARTI KOPACZ - VOLUME II-

Q. Do you have any quarrel with that distribution?

A. I am not an investment manager.

Q. Is that another way of saying that you don't have any quarrel?

A. No. It just says that I didn't -- I accepted it as it was.

Q. Well, I'm asking you today: Do you have any questions --

A. I have not made that evaluation.

Q. So the answer is no, you are not able to cite any disagreement you have with the distribution of assets, are you?

A. I -- like I said, I have not looked at that specifically to arrive at any conclusion.

MR. WAGNER: Can you read back the question.

(The question requested was read back by the reporter.)

Q. Can you answer the question?

Do you have any quarrel --

A. I don't know.

Q. Would you agree with me that it's unreasonable to calculate the -- strike that.

00000000-0000-0000-0000-000000000000

Q. Have you ever served as an actuary for a public pension fund?

A. No.

Q. Have you had any experience in actuarial science?

A. In terms of? Experience in actuarial science?

Q. Yes.

A. No.

Q. Do you have any qualification to offer an opinion on the proper rate of return to use for a public pension fund?

A. I don't think I have offered an opinion.

Q. My question --

MR. WAGNER: Can you read back the question.

(The question requested was read back by the reporter.)

A. I don't think I ever have.

MR. WAGNER: Can you read it back one more time, I'm sorry.

(The question requested was read back by the reporter.)

00000000-0000-0000-0000-000000000000

A. I do.

Q. With respect to your contention that the systems used questionable investment strategies that resulted in considerable underfunding, you don't cite any particular third party in a footnote as you have in other sections.

Do you see that?

A. There is no footnote related to that paragraph.

Q. Okay. So what did you rely on in reaching this conclusion?

A. This -- a lot what -- the conversation that I had with Mr. Clark -- we can go back to my log and I -- I am sorry to say I have forgotten all of the people were -- that were at that meeting, but I was at a meeting with both retirement systems, their counsel and their lawyers at Clark Hill, very shortly after I was retained in this matter.

And it was during that -- here it is -- Robert Gordon, Joseph Turner, Ronald King, Michael VanOverbeke, those individuals, I had a meeting with them.

And then subsequently I know people

in my firm met with a similar group of people of -- that represented the pension funds and we talked about -- they shared with me a history of the investments around the retirement systems, the investments that were made, and I believe it was during the during the Kwame administration into alternative -- what you would call alternative investment vehicles; the -- the smoothing that had occurred and the stretching out of the unfunded obligations over a relatively 30-year period. But the -- this really comes from that conversation.

Q. Okay. So, it is your testimony that the retirement systems themselves told you that they utilized an unrealistic rate of return assumption?

A. The people that I met with, I believe it's in your offices at -- across the street from the KMAK.

Q. And who --

A. Shared with me.

Q. Someone specifically on behalf of retirement system opined to you that they --

A. Mr. Overbeke (sic) and Mr. -- and I think it was -- the gentleman who was a lawyer,

but is also general counsel now for the funds.

Q. Michael VanOverbeke?

A. He's one of them --

Q. Or Joe Turner?

A. I think it's Joe Turner.

Q. What I'm trying to get at, your testimony is that during that meeting they specifically told you --

A. About --

Q. -- that they believed --

MR. KANE: Wait for her to finish.

Q. Let me finish the question.

-- that there was an unrealistic rate of return assumption that was utilized by the system? Or is that your extrapolation based on what was said at the meeting?

A. The -- we talked very specifically about the recent history of losses, investment losses at the retirement system; how they had used a seven-year smoothing period to make the shortfalls less obvious; how they had implied amortization periods that were extended for funding the unfundeds; and how all of that ended up creating, you know, again, a perception or a

reality of the underfunding of the plans. As well as the 13 checks and those sorts of things. We talked about all of that.

Q. Do you have any understanding of what would be a typical smoothing period utilized by other public pension plans?

A. I don't.

Q. So if someone from the retirement systems told you that a seven-year smoothing period was used, you would have no basis to compare that with other plans to know if that was typical?

A. I would -- I would have to undertake to research that. I wouldn't have my own independent knowledge of what that was.

Q. Same with amortization period utilized by public pension systems. Would you have any basis to know whether a 20-year amortization period versus a 30-year amortization period.

A. Or a ten or a five. No, I would not.

Q. Okay. So just to narrow it down, we told you certain facts -- when I say "we," the retirement systems gave you certain facts about

comptroller of the State of Alabama for 23 years and the former president of the Government Finance Officers Association for a number of years. And I believe he's -- he is a current advisor or recent past advisor to the GASB, the Government Accounting Standards Board on these matters.

Q. Do you know -- I'm sorry -- do you know if either one has any actuarial experience?

A. I don't believe either has actuarial experience.

Q. Do you know if either has sat on a board for a public pension system?

A. I believe Mr. Childree has.

Q. Do you know how long the meeting between Mr. Gaul, Mr. Childree and the retirement systems lasted?

A. I don't.

Q. In reaching your conclusion on Page 127, I believe you testified this morning that you never looked at the investment policies for the system.

A. I did not.

Q. Do you know if your team looked at those?

bell?

A. It does not.

Q. Would it be fair to say if I didn't see his name on any of the meeting lists or communications logs, that you did not consult with Mr. Bigelow prior to reaching a conclusions about the investment practices of the system?

A. That's probably correct.

Q. You testified earlier under questioning from Mr. Wagner that you had no particular quarrel with the asset mix and that you did not actually analyze the asset mix?

A. That's correct.

Q. Okay. So if you didn't look at the asset mix, what else did you base your opinion on that the systems investment strategy is questionable?

A. The representations that were made in the meeting that I personally had in your offices with the pension system representatives.

MR. KANE: Can I interject something similar to what I did yesterday. I don't quarrel with the term "opinion" as long as it's little O, recognizing her opinions are

specific ones that are set forth at the beginning of the report.

THE WITNESS: Right.

BY MS. GREEN:

Q. I guess what I'm trying to ask is, they told you certain facts about amortization periods, smoothing, things of that nature. You just stated you have no basis to compare those to anything. So my question --

A. I relied --

Q. -- is, how do you know they're questionable practices?

A. I relied on what the general counsel of the two systems told me.

Q. Your testimony is that he used the word "questionable practices" about his own client?

A. They are talking about the systems prior to when those people got involved.

Q. You're saying before they had any personal knowledge they were speaking of prior history?

A. My question was, how did the system get to this point? Okay? But I believe Mr.

00000000-0000-0000-0000-000000000000

- MARTI KOPACZ - VOLUME II-

Turner and Mr. Overbeke are new to the systems in their role as both lawyers and general counsel. Okay?

I am not talking about the systems today moving forward. I am talking about how did the systems get in this underfunded predicament.

Q. Do you understand generally that retirement systems were fully funded as of 2007?

A. I don't know when they were last fully funded.

Q. Did you know that according to, for instance, the general retirement system's annual actuarial report from June 30th, 2008, that it was 101 percent funded?

A. I don't know that.

Q. In 2008?

A. I don't care about that.

Q. Okay. Why wouldn't you care about when the time of underfunding occurred?

A. I care about the impact the underfunded systems have on the plan of adjustment and the City's obligations to fund pensions going forward.

Q. If you flip to the next page of your

00000000-0000-0000-0000-000000000000

A. I did not.

Q. Do you think that that would be relevant to your conclusion that questionable investment strategies were utilized by the systems, would that cause their underfunding?

A. I am -- as I said, before I am reciting information that I received from pension system people. Okay. And what is important to me is the level of underfunding in the pension systems as of the filings and today and how that is going to be dealt with in the future.

Q. And you understand that the underfunding as of the filing, if we look at this document --

A. Which document?

Q. Exhibit 4.

A. This doesn't give anything on underfunding.

Q. I understand that. You already stated you didn't know that it was fully funded in 2000 -- the end of 2007, correct?

A. I don't know one way or another. Okay?

Q. Okay. Did you review any data from

investment strategies are what caused their underfunding?

A. Ms. Green, with all due respect, okay, I really don't, at the end of the day, care about how they got underfunded. Okay? They are underfunded. There is treatment in the Plan of Reorganization -- Plan of Adjustment that I have to assess relative to feasibility.

I understand you and your client really don't like the verbiage that's in my report. Okay? I get that. But I simply don't care about how they got there. I only care about where they are today and what's going -- what their treatment is in the Plan of Adjustment.

So I am not going to have any opinion, any point of view, any perspective on anything that happened in 2008, 2007, 1997 or whatever.

Q. So would you agree with me that the portion of your report on pages 127 and 128 is largely irrelevant?

MR. KANE: Objection. You can answer.

A. It is a recitation of what I believed

00000000-0000-0000-0000-000000000000

- MARTI KOPACZ - VOLUME II-

at the time to be, arguably, facts.

Q. If we looked at the facts today that appear to not support what's in your report, and as Mr. Neal asked you previously, will you be reissuing a report or supplementing your report or changing any parts of your analysis based on new facts that you've learned either from --

MR. BLANCHARD: Objection.

A. I don't think so -- I don't believe that any of the items that are cited on Page 128 and 129 are significantly materially incorrect. Okay? And they are simply words to help the reader appreciate some of the reasons that the pension funds today are underfunded.

Q. Did you do an analysis of how much the City owes in unpaid annual employer contributions to each of the systems and how that impacted the underfunding?

A. I'm sorry. Could you repeat that?

(The requested question was read back by the reporter.)

A. I don't know the answer to that.

THE VIDEOGRAPHER: We have to change tape.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |
| | | Related to Doc. No. 6379 |

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 18, 2014, The Detroit Retirement Systems' Brief in Opposition to Admissibility of Certain Portions of Martha Kopacz's Expert Report was filed using the Court's CM/ECF system, which CM/ECF system will send notification of such filing to all parties of record.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
151 South Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: August 18, 2014

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*