United States Bankruptcy Court
Eastern District of Michigan
Southern Division

In re:
City of Detroit, Mi
Debtor

Chapter 9
Case No 13-53846
Hon. Steven W. Rhodes

Lucinda J. Darrah's Motion to Participate in the Confirmation Hearing

Topic 1
I wish to call the following witnesses to speak regarding the Detroit Water & Sewage Department. I wish to question witnesses brought by other parties.

Dennis Green – Head Water Systems Engineer DWSD from April 28, 1968 – April 8, 2008.   15 minutes

Mike Mulholland: Senior Sewage Plant Operator, President of Afscme Local 207   15 minutes

Saulius Simoliunas – Chemist at the Waste Water Treatment Plant and President of the DWSD's Chemist's Union.   15 minutes

Rich Thomas – Retired Drafting Technician for DWSD,   5 minutes

Lucinda J. Darrah - 7 minutes

This will not duplicate other discussion about water shutoffs, etc., but will likely look at the costs of mismanagement and political corruption and the lack of independent engineering input. This will attempt to find long term solutions that will put the rate payers' interests over the contractors' short term profits, and will protect our water now and for future generations.

*[signature]*
8/18/14

topic 2

I wish to call the following witnesses to speak regarding the health care VEBRA:

Yvonne Moore – Benefit Administrator for Retiree Health Care Benefits for the City of Detroit. 15 minutes

The Person Representing the City who chose the health care choices available to retirees. How were the contractors chosen. Why only one PPO choice for retirees who travel and need PPO?

I wish to question any witnesses called by other parties regarding health care.

*[signature]*
8/18/14

topic 3

I wish to call the head engineer for the Detroit Renewable Energy Plant. 15 minutes

My health is impacted and has been impacted negatively by the Detroit Trash incinerator.

Lucinda J. Darrah – 7 minutes

I met with Det. Renewable Energy representatives who acknowledged that dioxin & furans, both carcinogens were produced at their incinerator; The plant has inadequate controls to capture polychlorinated dioxins & furans. The company is proposing to build a $5 million bag house to control smell but this will not capture dioxins and furans. This unhealthy plant should (preferably) be shut down or rebuilt with good controls to ~~eliminate~~ trap cooled carbonized dioxins & furans in screens that are taken to toxic landfills.

Privitizing what no one wants to take responsibility for is not the answer.

We need citizen's reuse, recyling, and garbage residue to the land fill, not private companies whose main objective is the bottom line biggest profit;

# Exibits

Exibits will include:

Political Waters: The Long, Dirty, Contentious, Incredibly Expensive but Eventually Triumphant History of Boston Harbor — A Unique Environmental Success Story by Eric Jay Dolin, University of Massachusetts Press, Amherst, 356 pages, 2004.

Detroit River Combine Sewer Overflow Toxic Sampling Project, Phase 1 (one) (FY92) — Final Report ID No. CP995846-01-0, December 13, 1995. U.S. Dept. of Interior — Geological Survey, U.S. EPA, Michigan Dept of Environmental Quality, City of Detroit Water and Sewage Dept., Southeastern Mich. Council of Governments

Long Term CSO Plan (Combined Sewer Overflow) Control Plan for the Detroit and Rouge Rivers
10.06 A Collection System Rehabilitation
10.06 B Pump Stations "
Dennis Archer mayor, City Council, Detroit Water & Sewage Dept. Submitted to Mich. Dept. of Environmental Quality, July 1, 1996

The contract with New England Fertilizer Company to design, build, and operate for $683 million dollars, natural gas run sludge driers.

The DWSD contract with EMA;

The DWSD order for workers to reapply for their jobs.

A letter from Nancy Price regarding the failure of privatising the Sacremento, Calif. water dept.

A letter showing the failure of the privatization of the Atlanta, Georgia Water Department.

The EPA and the Michigan Environmental Water Quality and Water & Sewage Plant Standards.

The Michigan Employment Relations rules.

Waste Incineration and Human Health by National Research Council, National Academy Press, Copy Rite 2000 by National Academy of Scientists,

Departments: Book Reviews

Make a Comment

# The cleanup of Boston Harbor was surprisingly triumphant

BY: JOHN C. BERG
ISSUE: SUMMER 2004
DOWNLOAD PDF

August 01, 2004

## Not-so-dirty water

Political Waters: The Long, Dirty, Contentious, Incredibly Expensive but Eventually Triumphant History of Boston Harbor—A Unique Environmental Success Story
**By Eric Jay Dolin**
**University of Massachusetts Press, Amherst, 356 pages.**

Reviewed by John C. Berg
Summer 2004

At a recent Rappaport Institute panel at Harvard's Kennedy School of Government, former governor Michael Dukakis called the Boston Harbor cleanup a success "that nobody talks about," and he wished aloud that someone would study it. It turns out that somebody has.



Dukakis should be pleased with *Political Waters*, in which Eric Jay Dolin tells the story of the harbor cleanup, tells why it has been a success, and explains that it is not yet done. As the subtitle suggests, Dolin tells the story as one of heroism and triumph. The Boston Harbor cleanup was an engineering triumph, to be sure. A huge public works project delivered under budget and pretty much on time, it included the largest egg-shaped digesters of raw sewage built in North America and a 7.5-mile tunnel bored under the harbor floor (a feat that caused three deaths during construction). But still more it was a triumph of law and public administration, as a city solicitor, a state judge, a federal judge, and a federal administrator forced the state to take action on the raw sewage being dumped into the harbor. Ultimately, it was a political triumph as well. Political leaders were slow to face up to the problem, but once the courts forced their hand, state and local officials worked hard to settle disputes, solve problems, and meet crises as they arose.

Triumphs need heroes, and Dolin has them, beginning with William Golden, the Quincy city solicitor who sued the state after he found himself running through sewage on Wollaston Beach. Another was Paul Garrity, the Massachusetts Superior Court judge who used Golden's lawsuit, feats of judicial brinksmanship, and occasional grandstanding to force the state to turn water and sewer services for Greater Boston—then in the hands of the politically paralyzed Metropolitan District Commission—over to the Massachusetts Water Resources Authority (MWRA), a new quasi-public entity with the power to issue its own bonds and raise water rates as needed to cover the costs of the cleanup. Other notable figures include: Mike Deland, the federal district administrator of the Environmental Protection Administration, who filed his own lawsuit to move the case into federal court; David Mazzone, the federal judge who oversaw the construction of the new sewage treatment system with a firm

but flexible hand, leaving the practical decisions to those with expertise while using the power of the federal court to ensure that the process kept moving on schedule; and Paul Levy and Douglas MacDonald, the second and third executive directors of the MWRA, who guided the new agency past a series of major political and engineering obstacles to bring the project to completion.

In the first five (of eight) chapters, Dolin tells the history of Boston's sewage from 1634—when, shockingly, harbor pollution was first seen to be a problem—to 1982. For most of this period, everyone's favorite solution to sewage was to dump it into the harbor, where it was expected to be washed away by the tides, but seldom was. With the passage of the federal Clean Water Act in 1972, such dumping was made illegal, but it was not halted in Boston until September 6, 2000, when the new plant came fully online.

Dolin rightly concentrates on the politics more than the engineering, but it was hard to separate the two. The engineering solutions were brilliant, and the project workers justly proud, but the major problem was that elected officials could not see their way to solving what was an increasingly obvious mess. For most of the 20th century, Boston's sewage was given only what is known as "primary" treatment. Basically, this consists of holding raw sewage in containers and letting it stand. The pollutants settle to the bottom as sludge, while the liquid that remains, or "effluent," is drained off, either for further ("secondary") treatment, or for release into a body of water, in this case Boston Harbor. Primary treatment made the effluent cleaner, but the polluted sludge remained. At both of Boston's old treatment plants, on Nut Island and Deer Island, it was disposed of in what Dolin calls a "bizarre and counterproductive" way: The sludge, like the effluent, was deposited into the harbor, an action that "negated most if not all of the benefits of primary sewage treatment" (p. 55). In other words, after the effluent and the sludge were carefully separated from each other, both were dumped in the same place.

The Clean Water Act required secondary treatment of sewage water (basically, disinfection of the effluent by aeration), but states could apply for a waiver of that requirement when the effluent was to be released into a deep ocean with strong tidal currents. The waivers were intended for Pacific coast cities with sharp coastal drop-offs, but Massachusetts also applied for one. John Snedeker, commissioner of the Metropolitan District Commission in the late 1970s, argued that secondary treatment was not needed because, in conjunction with primary treatment, an extended outfall—that is, a pipe carrying the effluent past the harbor and into Massachusetts Bay—would allow for "ample water quality in the harbor for at least the next two or three decades."

There are still experts who believe that secondary treatment was not needed in Boston, and this reviewer is in no position to judge the merits of this technical argument. But Massachusetts's attempt to avoid secondary treatment cost the state time and the ratepayers money. Deland called it "the most expensive public policy mistake in the history of New England." The failed quest for a waiver raised the cost of the project, by delaying planning and construction as prices rose, and it decreased the federal contribution to those costs because sewage construction grants under the Clean Water Act had expired by the time the MWRA would have been able to apply for them. Dolin argues that the second loss was illusory (Massachusetts got its full allotment of those grants, which simply went to other projects all over the state), but that is little consolation to ratepayers in the MWRA's service area.

For all its success, the cleanup was not without its problems. Michael Gritzuk, the first executive director of the MWRA, was selected for his engineering skills, but he proved to be politically tone-deaf. In his first few months, he aroused a furor by ordering expensive office furnishings—symbolized by marble ashtrays—for the new MWRA headquarters building, just when water rates were rising rapidly. He continued to arouse legislative hostility until he was replaced by Levy. A crisis of a more substantive nature involved the siting of a backup landfill for treated sludge, in the event that it could not be sold for fertilizer. Project managers and federal regulators believed that an out-of-state site was not acceptable, and that the best site was in Walpole. But residents of the town and their neighbors rallied support in the Legislature and from US Rep. Barney Frank, forcing a restudy of the issue and ultimately a deal to dispose of the sludge in North Dakota. Judge Mazzone exerted strong pressure on the parties to reach a settlement while leaving it to them to work out the details; without his active role, Dolin argues, the project might have foundered at this point.

Perhaps the most visible controversy associated with the harbor cleanup did not involve the project at all. During the 1988 presidential campaign, Vice President and Republican nominee George H.W. Bush charged Gov. Michael Dukakis, the Democratic nominee, with failing to clean up his own harbor. It was not exactly a cheap shot, but neither was it a clean one.

Dukakis was slow to turn his attention to harbor pollution, and the ill-fated secondary-treatment waiver application, though pursued mostly during the Edward King administration, dated back to the end of Dukakis's first term (1975-1979). However, in his second and third terms (1983-91), Dukakis played a leading role in creating the MWRA, and he strongly supported the harbor cleanup. By the time of Bush's attack, the cleanup was firmly in place. This book may not salvage Dukakis's reputation entirely, but it certainly sets the record straight.

The story is not over. The glare of publicity and the scrutiny of the federal court may have faded, but the new Deer Island plant still has to be maintained better than the old one ever was, and the MWRA has not yet solved the problem of combined sewer overflows, or emergency relief outlets that dump sewage into the harbor when heavy rains cause the system to back up. Wollaston Beach, which inspired the Quincy lawsuit, is still too contaminated for swimming several days each month. Some experts continue to believe that secondary treatment was a boondoggle, while others think that the pelletized sludge, now sold as fertilizer, contains dangerous levels of antibiotics. And perhaps someday it will seem just as short-sighted to dump effluent into Massachusetts Bay as dumping raw sewage into Boston Harbor seems to us now. Still, there is no doubt that the cleanup succeeded beyond what anyone dreamed of in the 1970s.

What can be learned from this success? Neither of the two obvious comparisons is quite fair. The city's other mammoth construction project, the Central Artery/Tunnel, was bigger, more complex, and not driven by a court order. Nor did the Turnpike Authority, however much its tolls have been dragooned into serving the Big Dig cause, have the MWRA's capacity to generate funds. In the case of Boston school desegregation, the other big court-ordered policy change, the federal court was forcing Boston to pursue a goal that many in the city—including a majority of the Boston School Committee—opposed, whereas the opposition to the harbor cleanup was not to the principle, but only to the cost.

That said, Dolin points to several features that contributed to the success of the project: good management (by Levy and MacDonald), the financial capability of the MWRA, the cooperation of the labor unions under a project labor agreement, and the power of the court. He also mentions the important role of the MWRA Advisory Board, and its director, Joseph Favolaro, in keeping the cost down to $3.8 billion, and helping maintain the grudging acquiescence of ratepayers.

Legislators were happy not to take the blame for water-rate increases.
Two of Dolin's four keys to success point out limitations in the politics of democracy. The Legislature created the MWRA explicitly to remove the issue of costs from the political arena, where it was a loser for elected officials if they stood tall for clean water and a loser for the public good if they caved in to the pocketbook pressure of their constituents. MWRA was able to issue bonds at a higher credit rating (and therefore lower interest) than the state itself would, because it had the ability to set rates to cover its costs. And no elected official would ever have to vote on a water-rate increase—and be pilloried for that vote by a future opponent. Similarly, the federal court was able to force agreement on the many controversies that arose; without its intervention, political pressure probably would have driven the parties apart.

We could see the resort to authorities and courts as a failure of civic institutions and of civic consciousness. But we can also see it as indicating that the public will is best expressed as a decision on general principles, rather than on their implementation, a point made more than 200 years ago by Jean-Jacques Rousseau. Either way, we have a lot to learn from the Boston Harbor cleanup, and *Political Waters* is worth reading on that count alone. That Dolin tells such a good story is a bonus.

*John C. Berg is professor and chair of the Government Department at Suffolk University.*

---

## ALSO CHECK OUT

### RELATED ARTICLES

No related articles currently available

### RELATED BLOG POSTS

No related articles currently available

**RELATED TOPICS**

Environment, Arts and Culture

**RELATED TOPICS**

234-5125

# Detroit River Combine Sewer Overflow Toxics Sampling Project
## PHASE 1 (FY92) - FINAL REPORT
### ID No. CP995846-01-0

December 13, 1995

SEMCOG... Planning For The Future Today

Southeast Michigan Council of Governments

  

# – Partners –
# Detroit River CSO Toxics Sampling Project



# City of Detroit



Volume 2

Dennis W. Archer,
Mayor

City Council

Detroit Water and
Sewerage Department

## Long Term CSO Control Plan for the Detroit and Rouge Rivers




**10.06 A  Collection System Rehabilitation**
**10.06 B  Pump Stations Rehabilitation**

Submitted to the Michigan Department of
Environmental Quality

July 1, 1996

13-53846-tjt   Doc 6857   Filed 08/18/14   Entered 08/19/14 09:18:21   Page 13 of 17

NATIONAL RESEARCH COUNCIL

# WASTE INCINERATION & PUBLIC HEALTH

NATIONAL RESEARCH COUNCIL

# WASTE INCINERATION & PUBLIC HEALTH

Committee on Health Effects of Waste Incineration

Board on Environmental Studies and Toxicology

Commission on Life Sciences

National Research Council

NATIONAL ACADEMY PRESS
Washington, D.C.

# THE NATIONAL ACADEMIES

National Academy of Sciences
National Academy of Engineering
Institute of Medicine
National Research Council

**The National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Bruce M. Alberts is president of the National Academy of Sciences.

**The National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. William A. Wulf is president of the National Academy of Engineering.

**The Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Kenneth I. Shine is president of the Institute of Medicine.

**The National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Bruce M. Alberts and Dr. William A. Wulf are chairman and vice chairman, respectively, of the National Research Council.

NATIONAL ACADEMY PRESS • 2101 Constitution Avenue, NW • Washington, DC 20418

NOTE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This project was supported by Grant No. EPA-R-822039 between the National Academy of Sciences and the U.S Environmental Protection Agency (EPA), and Grant No. DHHS-USO/ATU39903 from the Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, and U.S. Department of Energy. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the view of the organizations or agencies that provided support for this project.

**Library of Congress Cataloging-in-Publication Data**

Waste incineration and public health / Committee on Health Effects of Waste Incineration, Board on Environmental Studies and Toxicology, Commission on Life Sciences, National Research Council.
  p. cm.
Includes bibliographical references and index.
ISBN 0-309-06371-X (casebound)
1. Hazardous wastes—Incineration—Health aspects. 2. Health risk assessment. 3. Incineration—Health aspects. 4. Medical wastes—Incineration. 5. Pollution prevention. I. National Research Council (U.S.). Committee on Health Effects of Waste Incineration.
RA578.H38 W37 2000
363.72'87—dc21
                                          00-009914

*Waste Incineration and Public Health* is available from the National Academy Press, 2101 Constitution Ave. NW, Box 285, Washington, DC 20055 (1-800-624-6242 or 202-334-3313 in the Washington metropolitan area; Internet: http://www.nap.edu).

Copyright 2000 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

City of Detroit, Debtor.

CASE NO: 13-53846
CHAPTER: _____
JUDGE: _____

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2014 (date of mailing), I served copies as follows:

1. Document(s) served: Motion to Participate in Confirmation Hearing

2. Served upon [name and address of each person served]:

David Heiman
Jones Day
901 Lakeside Ave
Cleveland, OH 44114

FILED
2014 AUG 18 P 4:17
U.S. BANKRUPTCY COURT
ED. MICHIGAN DETROIT

3. By First Class Mail.

Dated: 8/18/14

(Signature of Debtor)
Print Name: Lucinda J. Darrah

(Signature of Co-Debtor)
Print Name: _____