## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) **Re: Docket No. 6644** |

## OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 APPROVING SETTLEMENT OF CONFIRMATION OBJECTIONS

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this objection to *Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections* [Docket No. 6644] (the "Motion").[1] In support of this objection, Syncora respectfully states as follows:

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or in the *Corrected Fifth Amended Plan for the Adjustment of Debts for the City of Detroit* [Docket No. 6379] (the "Plan"), as applicable.

## Preliminary Statement

1. In the Motion, the City seeks approval of a highly complex financing transaction that it asserts will restructure the DWSD's capital structure with "significant economic savings" and will resolve certain Plan objections.[2] These are laudable ends. Even so, the City does not provide its creditors or this Court with the information necessary to fully evaluate the benefits and burdens of its proposal and, perhaps most importantly, that proposal's impact on the City's pending Plan. Should the Court decide to grant the Motion without such information and ahead of confirmation, the entry of the order should have no effect on the Debtor's burden with respect to Plan confirmation.

2. The DWSD transaction is monumental — it is a $5.5 billion funded debt refinancing. It may take varying forms, consummation of each of which is conditioned on the City's determination, in its sole discretion, that the transaction will achieve some undisclosed level of benefits. Yet, while the City states that the financing is in the best interests of all parties in interest, it recites the transaction's projected benefits only vaguely[3] and makes no effort to quantify the transaction's benefits under each of its possible forms. And the Court cannot give the City

---

[2] Motion ¶ 15.

[3] *Id.* ¶ 21.

unbridled discretion to green-light consummating the transaction at some undisclosed — and possibly deficient — level of benefits.

3. Additionally, the City has not detailed the process it employed to obtain the financing. The declarations of financial advisors attached to the Motion refer, without specificity, to "feedback from the market" to indicate that no preferable alternate transaction was available.[4] That is the extent of the City's proof regarding process.

4. What makes the City's effort to fast-track approval of the transaction doubly troubling is the possible impact of the transaction on the Plan. It is unclear whether the transaction constitutes a Qualifying DWSD Transaction.[5] But if it does, then Pension Claims stand to receive 50% of the net proceeds of the transaction.[6] The Motion does not disclose this amount, but surely it would put Pension Claim recovery—already above 100%[7]—through the stratosphere and

---

[4] *See, e.g.*, *Declaration of Lee Donner in Support of Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement Agreement* (the "Donner Declaration"), *Id.* Ex. 5A ¶ 9.

[5] *See* Plan at 10.

[6] *Id.* at 10, Art.II.B.3.r.ii.E, and Art.II.B.3.q.ii.E.

[7] *Expert Report of Stephen Rosen* (the "Rosen Report") at 4.

unquestionably solidify that the Plan unfairly discriminates against disfavored unsecured classes.

5. Also, historically, the DWSD made payments into the City's general fund to pay for COP principal and interest obligations.[8] Though solvent, the DWSD does not maintain its full obligation to COP Claims under the Plan. Now the DWSD stands to achieve "significant economic savings" and COP Claims are allocated none of the value.[9] For sure, this further solidifies that the Plan is not fair and equitable because it fails to meet reasonable creditor expectations. To the extent the Motion seeks for this Court to sanitize Plan confirmation violations, it cannot be approved.

6. For the reasons stated above, the Motion must fail.

## **Objection**

**A. Relevant Details About the DWSD Financing.**

7. The transaction purports to restructure approximately $5.174 billion of DWSD's funded debt, comprising approximately $1.8 billion of senior lien sewer bonds, $945 million of second lien sewer bonds, $1.8 billion of senior lien

---

[8] *Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4391] at 22.

[9] The Invitations to Tender state that "[t]he Department will be responsible for its allocable share of the New B Notes consistent with prior years' formulas for allocation of COP liabilities." Motion Ex. 8A at 90 and 8B at 87. But no reference is made to COP Claims obtaining any benefits from the savings the transaction may generate.

4

water bonds, and $629 million of second lien water bonds.[10] To restructure this debt, the City seeks Court authority to issue via a public offering, direct purchase, or private placement secured bonds in an aggregate amount not to exceed $5.5 billion.

8. Of that $5.5 billion, $190 million is earmarked for capital improvements to the City's sewage system as required by state and federal law. The remaining $5.31 billion will be used to (i) finance the City's purchase for cancellation of certain DWSD water and sewer bonds that have been tendered and accepted in connection with a pending invitation to tender to the holders of outstanding water and sewer bonds and (ii) refund through optional redemption other outstanding water and sewer bonds.

9. The Motion contains minimal disclosure as to the process by which the transaction came about. As described above, the City attaches declarations of certain City financial advisors who refer vaguely to "feedback from the market" indicating the financing could not be made on terms other than those proposed in the Motion.[11] Based on these general statements, the City asserts that the transaction could not be achieved without granting senior liens on pledged assets

---

[10] Motion ¶ 5.

[11] *See, e.g.*, Donner Declaration ¶ 9.

and that unsecured financing would be punitively expensive.[12] Yet these statements do not offer any substantiation of the City's assertions.

10. Pursuant to the terms of the transaction, the City, in its sole discretion, can determine whether "a sufficient amount of the Existing DWSD Bonds are tendered on or prior to the Tender Offer Expiration Date, such that DWSD will achieve economic savings from the tender acceptable to DWSD and the City," and thus that "the City will accept the tender of such Existing DWSD Bonds."[13] Nowhere in the Motion does the City specify the "acceptable" level of "economic savings" it will require before proceeding with the transaction.

11. Furthermore, if the City, again in its sole discretion, determines the results of a public offering are not satisfactory, the City may instead pursue a direct purchase of the bonds.[14] Notably missing from the Motion are any documents containing the proposed terms of such direct purchase. The Motion only includes a

---

[12] *Declaration of David Brownstein in Support of Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement Agreement* (the "<u>Brownstein Declaration</u>"), Motion Ex. 5C ¶ 8.

[13] Motion ¶ 16.

[14] *Id.* ¶ 36.

term sheet that "constitutes a brief summary of certain, but not all, transaction terms and conditions."[15]

12. As its justification for the financing, the City broadly asserts that the transaction "comprise[s] a plan of finance . . . that will ultimately restructure the DWSD capital structure, save the department millions of dollars in annual debt service,[16] unlock nearly $50 million in cash reserves[17] . . . and provide essential capital improvement financing to fund the City's continued efforts to keep the City's sewage disposal system in compliance with applicable state and federal

---

[15] *Id.* Ex. 6. Even the few terms provided in the Motion contain ambiguities. For example, the purchasers have not been solidified (purchasers will be "Citibank, N.A. and other financial institutions ***to be determined***.") *Id.* (emphasis supplied). And only ***up to*** $1 billion of the $5.5 billion amount presently is committed, which is committed to Citibank, N.A., the lead arranger for the direct purchase. *Id.* (emphasis supplied). Other details, such as regarding maturity, lien priority, and interest rates, are also not settled. *Id.*

[16] The Motion does not specify whether this is the case with respect to each of its various alternatives under the proposed transaction or how, if at all, the level of savings will change depending on the option the City chooses.

[17] The City inaccurately contends that unlocking $50 million in cash reserves constitutes a benefit of the transaction. The $50 million in cash relates to cash already on the City's balance sheet. Pursuant to the financing transaction, that cash will simply be reallocated. As noted in the Motion, "bond documents for certain of the Existing DWSD Bonds currently require DWSD to maintain . . . significant sums of cash in debt service reserves to protect bondholders against a payment default by the City. In connection with the DWSD Revenue and Revenue Refunding Financing . . . certain cash reserves will be released, in an amount that DWSD currently estimates at approximately $50 million. These funds will be applied in accordance with the applicable bond documents and applicable law as a part of the DWSD Revenue and Revenue Refunding Financing. . . ." *Id.* ¶ 20.

7

law."[18] To support these claims, the Motion provides some detail about the various transaction scenarios, including information regarding the new bonds.[19] However, it makes no attempt to quantify or analyze for creditors how the transaction will benefit the City and its stakeholders depending on which course of action the City chooses and depending on its unspecified savings threshold. Moreover, not only are the City's expected savings ill-defined, they are also speculative as shown by the City's statement that "[t]he long-term cost of capital for the publicly-financed bonds *should be* lower than that of the Existing DWSD Bonds, thus saving DWSD tens of millions of dollars in annual debt service payments in both systems combined."[20]

13. Finally, the Motion contains no information regarding how the transaction will impact creditor recoveries under the Plan or the relevance of the

---

[18] *Id.* ¶ 89.

[19] For example, the Motion and its exhibits provide the maximum effective rate of the new bonds (5.75%), the maturities ("varying dates not later than 30 years from the date of issuance"), that some bonds will be insured, and lien priority for the new bonds. *Id.* ¶ 34. However, the Motion lacks complete details or necessary precision regarding the terms of the new bonds for proper modelling of the cost to the City of the new bonds. Conspicuously absent is the interest rate of the new bonds. The Motion does not disclose this because "[t]he DWSD Revenue and Revenue Refunding Financing will be structured as a Public Offering. Consequently, the pricing of the DWSD Revenue and Revenue Refunding Financing will be established at the time the financing is taken to market, and ***is not known at this time***." *Id.* ¶ 29 (emphasis supplied).

[20] *Id.* ¶ 19 (emphasis supplied).

transaction for purposes of the City satisfying confirmation requirements. Yet the City sought to push through approval of the transaction, with very limited disclosure, apart from and in advance of confirmation.

**B.     The Motion Suffers from a Number of Fundamental Flaws.**

14.     The Court has discretion under section 364 of the Bankruptcy Code to authorize certain postpetition credit transactions, but courts recognize that this discretion is "not unbridled."[21]  To obtain approval of the DWSD transaction, the City must demonstrate that the proposed financing is "necessary to preserve the assets of the estate" and that the terms of the transaction are "fair, reasonable, and adequate."[22]

15.     But the City has not met its burden.   First, the Motion fails to provide sufficient information to analyze the merits of the transaction or the process the City adopted in arriving at the transaction.[23]   Second, the Court should consider

---

[21]  *See* 11 U.S.C. § 364(c) (stating that the court "may authorize" certain credit transactions); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

[22]  *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (noting also that debtor must establish that it was unable to obtain alternative financing).

[23]  Courts consider the following factors, among others, to determine whether the terms of a postpetition financing transaction under section 364 of the Bankruptcy Code may be approved: (a) whether the proposed transaction is an exercise of the debtor's reasonable business judgment; (b) whether alternative financing is available on any other basis; (c) whether the proposed transaction is in the best interests of both the estate and its creditors; (d) whether any better

approval of the transaction only in the context of Plan confirmation given the transaction's implications for the Plan.

### 1. The City Has Failed to Provide Adequate Information to Evaluate the Proposed Transaction.

16. Syncora appreciates the City's efforts to reduce the DWSD's debt service payments and to make essential capital improvements to its sewage disposal system. However, Syncora cannot support any proposal — like the one at issue in the Motion — that lacks all of the information necessary to evaluate what exactly that proposal is.

17. The City has failed to provide many important details about the financing. Among other omissions, the City has not provided the following information:

- What, if any, process it conducted in arriving at the transaction;
- Whether alternative financing structures were considered;[24] and

---

offers, bids, or timely proposals are before the court; (e) whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business; (f) whether the terms of the proposed financing are fair, reasonable, and adequate given the circumstances; and (g) whether the proposed transaction was negotiated in good faith and at arm's length (collectively, the "Farmland Factors"). *In re Farmland Indus., Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying Farmland Factors).

[24] *See* 11 U.S.C. § 364(c) ("If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt . . . ."); *Crouse Grp.*, 71 B.R. at 549 (same).

10

- Any objective measure of the costs and benefits associated with the various options the City may pursue under its proposal.

18. While it may be true that the DWSD would benefit from a balance sheet restructuring and that certain capital improvements are necessary under state and federal law, this Court's approval of the financing requires the City to reveal certain information.[25] Notwithstanding that requirement, the City has not demonstrated how the financing benefits the City's stakeholders under its various forms or what benefits must be achieved for the transaction to move forward ***in the City's sole discretion***. As described above, the projected benefits of the transaction are speculative at best. The City should not be able to decide on its own what benefits justify the transaction.

19. The City also has not detailed the process behind the financing. As previously noted, the City's declarations in support of the Motion make vague references to "feedback from the market."[26] The City's declarants contend that, based on such feedback, structuring the financing on a junior lien basis "may not have the same demand in the market place."[27] One declarant further opines that "I believe that no bondholders would commit to purchase [the new bonds] without

---

[25] *See, e.g.*, *Ames Dep't Stores, Inc.*, 115 B.R. at 37 (requiring that the debtor demonstrate that it has satisfied section 364 requirements).

[26] Donner Declaration ¶ 9.

[27] *See, e.g.*, Brownstein Declaration ¶ 9.

11

the same lien priority and effectively the same terms as the Existing DWSD bonds that are tendered" and that financing could therefore not be obtained on a junior lien or unsecured basis.[28] These bare assertions shed no light on the process by which the City arrived at the proposed transaction or indicate that the City actually sought alternate junior lien or unsecured financing.

20. Without this information, it is impossible to assess the merits of the Motion and determine whether the financing was presented in good faith or whether it is in the best interest of creditors.[29] Put simply, it is not enough to say, without adequate supporting evidence, that the proposed financing will "save the department millions of dollars in annual debt service [and] unlock nearly $50 million in cash reserves,"[30] particularly when the benefits are a moving target and the City has the sole discretion to proceed with one or another transaction option based on some unknown criteria.[31]

---

[28] Donner Declaration ¶ 12.

[29] *See* the Farmland Factors.

[30] Motion ¶ 89; *Farmland Indus., Inc.*, 294 B.R. at 879 (stating that the debtor has the burden of proof with respect to the Farmland Factors).

[31] In the Motion, the City says that it could benefit from $225 million in "direct economic savings" if it is successful in impairing DWSD Claims under the current version of the Plan. Motion ¶ 8. The City notes that this figure reflects only the savings resulting from resetting interest rates of DWSD bonds impaired under the current version of the Plan. *Id.* n.2. It is unclear if the City is attributing that value to the proposed transaction, but the City may already obtain that value through a cramdown of DWSD bond holders under the Plan.

12

21. The City proposes a very complex transaction with lots of moving parts and no means for creditors to clearly ascertain the likely outcome of the City consummating the transaction.

**2. The City Has Failed to Provide Adequate Information to Understand How the Proposed Transaction Will Impact Creditor Recoveries under the Plan.**

22. The City must produce some evidence of the benefits and burdens of the proposed transaction. This is especially true where the proposed transaction may materially modify terms of the City's Plan and further support confirmation objections regarding the City's inability to satisfy the feasibility and the unfair discrimination, best interests, and fair and equitable tests. As noted above, Pension Claims are entitled to contingent value right certificates that represent the right to receive 50% of certain proceeds of a Qualifying DWSD Transaction.[32] Yet the Motion does not explain how the proposed financing transaction will affect Pension Claim treatment — which already provides Pension Claims greater than

---

[32] Plan at 10, Art.II.B.3.r.ii.E, and Art.II.B.3.q.ii.E. Under the Plan, a Qualifying DWSD Transaction "means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions." *Id.* at 10. It is unclear whether a "transfer" of "a majority of the assets" of the DWSD includes the pledging of those assets as contemplated by the proposed transaction or whether the proposed transaction may be integrated with, or is, or will be associated with, "one or a series of related transactions" that otherwise qualify as a Qualifying DWSD Transaction.

13

100% recovery.[33] Furthermore, the Motion does not clarify who will be the beneficiary of the projected DWSD savings under the financing transaction — though it appears clear that no savings will inure to the benefit of COP Claims despite the DWSD's historical commitment to pay COP principal and interest.[34] Without these details, the Court cannot know the implications of the transaction for approval of the Plan and, absent such information, should not consider approving the transaction outside of the confirmation context.

## Conclusion

23. For the foregoing reasons, Syncora respectfully respects that the Court deny the Motion.

---

[33] Rosen Report at 4.

[34] *See* n.8 *supra.*

Dated: August 20, 2014          /s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*