**EXHIBIT 1A**

**MICHIGAN FINANCE AUTHORITY**
**$_____**
**Local Government Loan Program Revenue Bonds, Series 2014D**
**(Detroit Water and Sewerage Department**
**Water Supply System Revenue Refunding Local Project Bonds)**

**BOND PURCHASE AGREEMENT**

**August [__], 2014**

Michigan Finance Authority
Richard H. Austin State Office Building
430 West Allegan Street
Lansing, Michigan 48922

Ladies and Gentlemen:

Citigroup Global Markets, Inc. (the "Representative"), on behalf of itself and J.P. Morgan Securities LLC, BMO Capital Markets, Loop Capital Markets LLC, [Barclays[, [PNC Capital Markets LLC], [Comerica Securities, Inc.], and [Jeffries] (collectively with the Representative, the "Underwriters"), hereby offers to enter into this Bond Purchase Agreement (this "Agreement") with the Michigan Finance Authority (the "Authority") which, upon the acceptance of this offer by the Authority acting pursuant to statutory authority, including Act 227 of the Public Acts of Michigan, 1985, as amended (the "Act"), will be binding upon the Authority and the Underwriters. This offer is made subject to written acceptance of this Agreement by the Authority at or before 12:00 p.m., Eastern Time, on August [__], 2014, and if not so accepted will be subject to withdrawal by the Representative upon notice delivered to the Authority at any time prior to the acceptance hereof by the Authority.

1.     Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein the Underwriters hereby agree to purchase from the Authority and the Authority agrees to sell to the Underwriters for $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus/plus net original issue discount/premium of $[_____]), all (but not less than all) of the following bonds issued by the Authority:

$_____        Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured)
                          (Detroit Water and Sewerage Department
                   Water Supply System Revenue Refunding Senior Lien Local Project Bonds)
           Type: DWSD Water Supply System Revenue Refunding Senior Lien Local Project Bonds (Insured)

$_____        Local Government Loan Program Revenue Bonds, Series 2014D-2
                          (Detroit Water and Sewerage Department
                   Water Supply System Revenue Refunding Senior Lien Local Project Bonds)
           Type: DWSD Water Supply System Revenue Refunding Senior Lien Local Project Bonds

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

$_____        Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Second Lien Local Project Bonds (Insured)

$_____        Local Government Loan Program Revenue Bonds, Series 2014D-4
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Second Lien Local Project Bonds

(collectively, the "Bonds"). The Bonds are being issued to finance the purchase by the Authority, pursuant to a Local Purchase Contract between the Authority and the City of Detroit, County of Wayne, State of Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), dated August [__], 2014 (the "Local Purchase Contract"), of the following bonds:

$_____        City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

$_____        City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

$_____        City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

$_____        City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D

(collectively, the "DWSD Obligations"), to be issued by the City (i) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Water Supply System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (ii) to pay the costs of issuance of the DWSD Obligations and the Bonds.

Payment of the principal of and interest on certain series of the Bonds (the "Insured Bonds") when due will be insured by municipal bond insurance policies (the "Bond Insurance Policies") to be issued by one or more bond insurers (the "Bond Insurers") simultaneously with the delivery of the Bonds.

The Underwriters intend to make an initial bona fide public offering of all of the Bonds at prices not in excess of the public offering prices set forth on the inside cover pages of the official statement, dated the date hereof, with respect to the Bonds (such official statement, together with the cover pages, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Official Statement") and may subsequently change such offering price without any requirement of prior notice. The Underwriters may offer and sell Bonds to certain dealers (including dealers depositing Bonds into investment trusts) and others at prices lower than the public offering price stated on the inside cover pages of the Official Statement. The

Underwriters agree to furnish to the Authority an issue price and yield certificate which will contain certifications necessary to determine the issue price and yield on the Bonds.

In the event that the Underwriters fail (other than for reasons permitted herein) to accept delivery of and pay for the Bonds at the Closing (as hereinafter defined in paragraph 7(a)), the parties hereto acknowledge that the damages that the Authority and the City may suffer as a result thereof shall be difficult to ascertain, and as a result, the parties hereby agree that as liquidated damages, and not as a penalty, for the Underwriters' failure, the Underwriters shall pay to the Authority, as liquidated damages to the Authority and to the City, an aggregate amount equal to the lesser of (i) 1% of the aggregate principal amount of the Bonds or (ii) $5,000,000. Payment of such liquidated damages to the Authority and acceptance by the Authority, on behalf of itself and the City, shall constitute a full release and discharge of all claims and damages for such failure of the Underwriters.

The Authority acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Agreement is an arm's-length commercial transaction between the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as the agents or fiduciaries of the Authority, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the Authority with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the Authority on other matters) and the Underwriters have no obligation to the Authority with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement, and (iv) the Authority has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the Authority's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the Authority's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

2. The Bonds shall otherwise be as described in the Resolutions (as hereinafter defined) and the Official Statement and shall be payable in lawful money of the United States as also described herein.

The Representative has been duly authorized to execute this Agreement and to act hereunder and on behalf of each Underwriter, each of whom represents that it has the legal capacity to enter into this Agreement and to carry out the transactions contemplated hereby.

The aggregate principal amount, the date, the dates of maturity, the interest rates per annum and the initial public offering prices of the Bonds are set forth in Item 1 of Exhibit A

attached hereto and made a part hereof. The Bonds shall in all other respects be the same Bonds as are described in the Official Statement.

3. The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re city of Detroit, Michigan, Case No. 13-53846, [a copy of which is attached hereto as [Exhibit C] (the "Bankruptcy Court Order"),] in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the this Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order. Based upon the Bankruptcy Court Order, the Underwriters have determined to enter into this Agreement.

4. The Authority has authorized the execution of the Official Statement dated the date hereof and the use of such Official Statement by the Underwriters in connection with the public offering of the Bonds. The Authority has consented to the use in accordance with law by the Underwriters on or before the date hereof of the preliminary official statement with respect to the Bonds dated August [__], 2014 (such preliminary official statement, together with the cover page, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Preliminary Official Statement"), in connection with the public sale of the Bonds. The Authority deems the information set forth in the Preliminary Official Statement (other than the information set forth in the sections entitled [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE WATER SUPPLY SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion"), to be final as of its date, as provided in Rule 15c2-

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12. The City and the Department, in the Letter of Representations (as defined herein), has deemed the information set forth in the City and DWSD Portion of the Preliminary Official Statement final as of its date. The Authority has prepared a Continuing Disclosure Undertaking, to be dated on or before the Closing (the "Undertaking"), to provide or cause to be provided, certain annual financial information and operating data, and timely notice of the occurrence of certain material events with respect to the Bonds.

5    You hereby agree to supply, within the earlier of (i) seven business days of the date of acceptance hereof or (ii) sufficient time to accompany any confirmation requesting payment which the Underwriters might send to its customers with respect to the Bonds (which in any event shall be a time reasonably acceptable to both the Underwriters and the Authority), such number of copies of the Official Statement as to which the Underwriters will inform you prior to the printing of such Official Statement and which will not exceed [200] copies.

6.    You hereby agree that you will provide the Underwriters with information of which you have knowledge from any source concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as defined below. You further agree that you will cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters or the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. Except as provided in the last sentence of this paragraph, the expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the Authority) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the Authority. The cost of printing and delivery in excess of [200] copies of the amendment or supplement to the Official Statement shall be paid by the Underwriters. The Underwriters agree to amend or supplement the Official Statement at its own expense in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete.

The term "end of the underwriting period" as referred to in the preceding paragraph and elsewhere herein is the later of the delivery of the Bonds by you to the Underwriters or when the Underwriters no longer retain an unsold balance of the Bonds for sale to the public. The "end of the underwriting period" shall be deemed to be 25 days after the date of Closing, unless the Representative otherwise notifies you in writing prior to such date, to the best of its knowledge, that there exists an unsold balance of the Bonds. The deemed "end of the underwriting period" may be extended for additional periods of 25 days each upon receipt of an additional written notification from the Representative that, to the best of its knowledge, there exists an unsold balance of Bonds. The Representative agrees to file the Official Statement with the MSRB on or before the date of Closing.

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

7.     The Authority represents and warrants to, and agrees with, the Underwriters, as of the date of its acceptance of this Agreement and as of the date and time of the Closing, as follows:

(a)     The Authority, has, and at the time of the Closing will have, full legal right, power and authority (i) to enter into this Agreement and the Undertaking and (ii) to sell and deliver the Bonds to the Underwriters as provided herein, in the Resolutions (as hereinafter defined) and in the Official Statement; and the Authority has, and at the time of the Closing will have, duly authorized and approved the execution and delivery of, and performance by the Authority of its obligations contained in this Agreement;

(b)     No further authorization or approval of the Authority's Board of Directors (the "Board of Directors") is required for the execution and delivery of this Agreement or the Undertaking on behalf of the Authority, and this Agreement assuming due authorization, execution and delivery of the Agreement by the other party thereto, constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the Authority is not required to obtain any further authorization or approval for the sale and delivery of the Bonds to the Underwriters or the performance by the Authority of its obligations hereunder or under the Undertaking except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing;

(c)     The Authority, acting through the Board of Directors, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement as provided in Paragraph 3 hereof;

(d)     The Bonds are issued pursuant to that certain Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds adopted by the Authority on May 15, 2014 (the "General Resolution"), and the Supplemental Resolution by the Authority adopted by the Authority on August 12, 2014 (the "Supplemental Resolution" and together with the General Resolution, the "Resolutions"). The Supplemental Resolution has been duly adopted by the Authority, acting through its Board of Directors, and the Resolutions have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the Bonds and a valid, legally binding act of the Authority, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if

equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised;

(e)     When delivered to the Underwriters and paid for in accordance with the terms of this Agreement, the Bonds (i) will have been duly authorized, executed and issued by the Authority pursuant to the Resolutions, and (ii) will constitute valid, legally binding, limited obligations of the Authority; provided, however, that the Bonds and the interest obligation thereon shall never constitute a debt or liability of the State of Michigan (the "State") or any agency or employee thereof within the meaning of any constitutional or statutory provision or limitation or a general obligation of the Authority and shall never create or constitute any indebtedness, liability or obligation of the State or constitute a pledge of the faith and credit of the State or the general funds or assets of the Authority (including funds pertaining to other loans or activities) but shall be a limited obligation of the Authority payable solely from the Security, as defined in the Resolutions;

(f)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the Authority described in subparagraphs (a), (b), (c), (d) or (e) of this Paragraph 6 or the delivery of the Bonds to the Underwriters except for the filing of IRS form 8038-G (and the Authority hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith;

(g)     All legislation necessary to permit the Authority (i) to fulfill in all material respects its obligations under the Resolutions, this Agreement and the Undertaking, and (ii) to carry out the transactions contemplated in the Resolutions and the Official Statement is in full force and effect;

(h)     The execution and delivery of the Official Statement, this Agreement, and the Undertaking by the Authority, and the fulfillment of the terms and conditions of, and the carrying out of the transactions contemplated by the Resolutions, this Agreement, and the Undertaking, do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the Authority is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the Bonds or the ability of the Authority to pay the principal of and the interest on any of the Bonds;

(i)     The Preliminary Official Statement (other than the City and DWSD Portion), as of the date thereof, did not contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which they were made, not misleading;

(j)     The Official Statement (other than the City and DWSD Portion), does not, as of its date or will not as of the Closing, contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which it was made, not misleading;

(k)     The Bonds will conform to the terms thereof set forth in the Resolutions and described in the Official Statement; and the proceeds of the Bonds will be applied as described under the caption "THE SERIES 2014D BONDS—Sources and Uses of Funds for the Series 2014D Bonds" in the Official Statement;

(l)     Other than an appeal of the Bankruptcy Court Order, except as may have been disclosed in writing to the Underwriters before the date of this Agreement or as may be disclosed in the Official Statement, the Authority has not been served with any litigation (and to the knowledge of the Authority no litigation has been commenced or is threatened) against the Authority, in any court (i) seeking to restrain or enjoin the sale or delivery of the Bonds, or (ii) in any manner questioning the authority of the Authority to issue, or the issuance or validity of, any of the Bonds or any other indebtedness of the Authority, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the Bonds, or (iv) questioning any of the legislation referred to in subparagraph (g) of this Paragraph 6, or (v) questioning the validity or enforceability of the Resolutions or (vi) seeking to secure a lien on the Pledged Funds or the collection of the Revenues, as defined in the Resolutions, or other moneys, securities, funds and property pledged in the Resolutions that are a source of payment on the Bonds, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the Board of Directors to his or her office is being contested;

(m)     Any certificate or copy of any certificate signed by an official of the Authority and delivered to the Underwriters pursuant hereto or in connection herewith shall be deemed a representation by the Authority to the Underwriters as to the truth of the statements therein made;

(n)     Except as permitted by the Resolutions, from and after the time of Closing, the Authority will not create or permit the creation of, or issue any obligations or create any additional indebtedness secured by, a charge and lien on the Pledged Funds, as defined in the Resolutions, and other moneys, securities, funds and property pledged in the Resolutions;

(o)     To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds to be used directly or indirectly to acquire any securities or obligations, the acquisition of which would cause any Bond to be an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code of 1986 or any successor provision, act or statute, and the regulations from time to time promulgated or proposed thereunder (the "Code");

(p)     To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds or any other funds of the Authority to be used directly or indirectly in a manner which would result in the exclusion of any of the Bonds from the treatment afforded by Section 103(a) of the Code for any reason, including without limitation the classification of such Bonds as "private activity bonds" within the meaning of Section 141(a) of the Code or as obligations guaranteed by the United States of America, as provided in Section 149(b) of the Code; and the Authority will not take any action or omit to take any action which, by commission or omission, would cause interest on the Bonds to be includable in gross income for federal income tax purposes pursuant to Section 103 of the Code or cause such interest to be included in any alternative minimum tax other than an alternative minimum tax which applies to all tax exempt bonds generally;

(q)     Other than a nonmonetary default resulting from the City having filed a petition for relief under Title 11 of the United States Code, the Authority is not, and historically has not been, in default in the payment of principal of, or premium, if any, or interest on any bonds, notes or contract payments pledged for the payment of notes or bonds and has not entered into any contract or arrangement that might give rise to any lien or encumbrance on the Pledged Funds other than as provided in the Resolutions;

(r)     The Authority has complied with all continuing disclosure obligations under Rule 15c2-12 during the previous five years; and

(s)     The Authority will without any cost to the Authority cooperate with the Underwriters in the qualification of the Bonds for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Underwriters shall designate, provided that the Authority is not required to qualify as a foreign corporation or to consent to any general or special service of process in any jurisdiction.

It is acknowledged and agreed by the parties hereto that all covenants, representations and warranties made by the Authority herein and in any certificates given in compliance herewith, are made solely by the Authority and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.

8.     (a)     At 10:00 a.m., Eastern Time, on September [__], 2014, or such other time and date as shall be mutually agreed upon by the Authority and the Underwriters (the "Closing"), the Authority shall direct the Trustee to deliver the Bonds to the Underwriters at the offices of The Depository Trust Company, New York, New York, in definitive form, duly executed and authenticated by the Trustee.  Subject to the terms and conditions hereof, the Authority shall deliver at the offices of [Dickinson Wright PLLC, [location to be determined], the other documents and instruments to be delivered at the Closing pursuant to this Agreement (the "Closing Documents") and the Underwriters shall accept delivery of the Bonds and the Closing Documents and pay the purchase price for the Bonds as set forth in Item 2 of Exhibit A hereto by wire transfer to the Trustee, in Federal Reserve Funds immediately available, for the account of the Authority, or as the Authority shall direct.  The Bonds shall be registered in the name of Cede & Co., as nominee for The Depository Trust Company ("DTC") and there shall be one (1) typewritten Bond for each maturity as set forth in Item 1 of Exhibit A.  The Bonds shall be made

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

available to the Underwriters not less than 24 hours preceding the Closing for purposes of inspection.

(b)     If the Authority shall be unable to satisfy the conditions of the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, the respective obligations of the Authority and the Underwriters shall be as set forth in Paragraph 10 hereof.

9.     The Underwriters have entered into this Agreement in reliance upon the representations and warranties and agreements of the Authority contained herein, upon the representations and warranties and agreements of the City contained in the Letter of Representations attached hereto as <u>Exhibit B</u> executed and delivered on behalf of the City on the date hereof (the "Letter of Representations") and in the Local Purchase Contract, and upon the representations and warranties of the Authority and the City to be contained in the Closing Documents, and upon the performance by the Authority of its obligations hereunder, upon the performance by the City of its obligations under the Letter of Representations and the Local Purchase Contract, both as of the date hereof and as of the date of Closing.  The Underwriter has received a letter from KPMG LLP, the independent accountants for the Department ("KPMG"), [in the form attached hereto as Exhibit __] [providing for its consent to the inclusion of the audited financial statements of the Water Fund for the year ended June 30, 2013 in the Preliminary Official Statement and in the Official Statement and describing agreed-upon procedures] (the "Accountant's Letter").  Accordingly, the Underwriters' obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds shall be subject to the performance by the Authority and the City of their obligations to be performed hereunder, under the Letter of Representations and the Local Purchase Contract, at or prior to the Closing, and shall also be subject to the following conditions:

(a)     The representations and warranties of the Authority contained herein shall be true, complete and correct in all material respects at the date hereof and as of the time of the Closing, as if made at and as of the time of the Closing, and the Authority shall be in compliance with each of the agreements made by it in this Agreement;

(b)     At the time of the Closing, the Official Statement shall not have been amended, modified or supplemented, except in such manner as may have been agreed to by the Underwriters;

(c)     The Underwriters shall have the right in their sole discretion (except where otherwise indicated below) to terminate their obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds by notifying the Authority of its election to do so, if after the acceptance hereof by the Authority and prior to the Closing:

(i)     any event shall occur which makes untrue or incorrect in any material respect, as of the time of such event, any statement or information contained in the Official Statement or which is not reflected in the Official Statement but should be reflected therein in order to make the statements contained therein not misleading in any material respect and, in either event, the Authority refuses to permit the Official Statement to be supplemented to supply such statement or information or the effect of the Official Statement as so

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

supplemented is, in the judgment of the Underwriter, to materially adversely affect the market for the Bonds or the sale, at the contemplated offering prices (or yields), by the Underwriter of the Bonds; or

(ii)     the market price of the Bonds or the marketability thereof shall (in the reasonable opinion of the Underwriters) have been materially adversely affected by reason of the fact that between the date hereof and the Closing,

(A) an amendment to the Constitution of the United States or to the Constitution of the State, shall have been adopted, or

(B) legislation shall have been enacted by the Congress or by the Legislature of the State, recommended to the Congress for passage by the President of the United States or the Legislature of the State by the Governor of the State, or introduced and favorably reported for passage to either House of the Congress or of the Legislature of the State by any Committee of such House to which such legislation has been referred for consideration or by a conference committee of both Houses of the Congress; or any statement or report in respect of legislation previously introduced or favorably reported or recommended for passage shall have been made or reported to have been made by the President, any member of the Cabinet or his representative, or any agency of the Federal government, including without limitation the Internal Revenue Service, or any member or members of either House of the Congress or the members or staff of any Committee of either House of the Congress or a conference committee of both Houses of the Congress, or

(C) a decision shall have been rendered by a court established under Article III of the Constitution of the United States, or the Tax Court of the United States, or any other Federal or State court, or an order, ruling or regulation (final, temporary or proposed) shall have been made by the Treasury Department of the United States or the Internal Revenue Service or by any other Federal or State agency affecting the tax status of the Authority or its obligations for borrowed money (including the Bonds) or the interest thereon (including any such event with the purpose or effect, directly or indirectly, of imposing Federal income taxation upon, or any taxation in the State upon, such interest as would be received by the holders of the Bonds); or

(iii)     a stop order, ruling, regulation, proposed regulation or statement by or on behalf of the SEC or any other governmental agency having jurisdiction of the subject matter shall be issued or made to the effect that the issuance, offering, sale or distribution of obligations of the general character of the Bonds is in violation or would be in violation of any provisions of the Securities Act of 1933, as amended (the "Securities Act"), the Exchange Act, or the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"); or

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(iv) legislation introduced in or enacted (or resolution passed) by the Congress or an order, decree or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary or proposed), press release, or other form of noticed issued or made by or on behalf of the SEC, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds, including any or all underlying arrangements, are not exempt from registration under or other requirements of the Securities Act, or that the Resolutions are not exempt from qualification under or other requirements of the Trust Indenture Act, or that the issuance, offering or sale of obligations of the general character of the Bonds, including any or all underlying arrangements, as contemplated hereby or by the Official Statement or otherwise, is or would be in violation of the federal securities law as amended and then in effect; or

(v) there shall have occurred an outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if, in the reasonable opinion of the Underwriters, the market price of the Bonds or the marketability thereof shall be materially adversely affected thereby; or

(vi) there shall have occurred a general suspension of trading, minimum or maximum prices for trading shall have been fixed and be in force or maximum ranges or prices for securities shall have been required on the New York Stock Exchange or other national stock exchange whether by virtue of a determination by that Exchange or by order of the SEC or any other governmental agency having jurisdiction or any national securities exchange shall have (A) imposed additional material restrictions not in force as of the date hereof with respect to trading in securities generally, or to the Bonds or similar obligations, or (B) materially increased restrictions now in force with respect to the extension of credit by or the charge to the net capital requirements of underwriters or broker-dealers such as to make it, in the judgment of the Underwriters, impractical or inadvisable to proceed with the offering of the Bonds as contemplated in the Official Statement; or

(vii) the declaration of a general banking moratorium by United States, New York or State authorities or a major financial crisis or a material disruption in commercial banking or securities settlement clearances services shall have occurred such as to make it, in the judgment of the Underwriter, impractical or inadvisable to proceed with the offering of the Bonds as contemplated by the Official Statement; or

(viii) the purchase of and payment for the Bonds by the Underwriters, or the resale thereof by the Underwriters, on the terms and conditions herein provided, shall be prohibited by any applicable law or governmental regulation or order of any court (other than by reason of the Underwriters' failure to comply with any applicable state blue sky or securities law); or

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(ix) the market price of the Bonds or the marketability thereof shall have been materially adversely affected by the occurrence of any event which in the reasonable opinion of the Underwriters requires or has required an amendment, modification or supplement to the Official Statement; or

(x) The Bankruptcy Court Order shall have been subsequently vacated, reversed or modified, in whole or in part, in any manner without the consent of the Underwriter and the Authority by the Bankruptcy Court or any other court of competent jurisdiction or is the subject of a stay pending appeal.

(d) The Authority shall not have defaulted under any of its covenants, agreements, representations or warranties under the Resolutions or this Agreement;

(e) The City shall have issued and delivered the DWSD Obligations to be purchased with the proceeds of the Bonds.

(f) At or prior to the Closing, the Underwriters shall have received each of the following documents (the "Closing Documents"):

(i) A copy of the Official Statement, signed on behalf of the Authority by its Chairperson or other member of the Authority or its Executive Director or other authorized officer;

(ii) The opinion of the Attorney General of the State of Michigan, dated the date of Closing, substantially in the form set forth in Appendix III to the Official Statement and the opinion of Dickinson Wright PLLC ("Bond Counsel"), dated the date of the Closing and addressed to the Authority, substantially in the form set forth in Appendix III to the Official Statement;

(iii) Supplemental opinions of Bond Counsel and the Attorney General of the State of Michigan, each dated the date of the Closing and addressed to the Underwriters, to the effect that (A) at the times of execution of this Agreement the Authority had, and on the date of the Closing has, full legal right, power and authority to execute and deliver this Agreement and to cause the Bonds to be delivered to the Underwriters as provided in this Agreement and in the Resolutions, and the Authority at the times of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in this Agreement, (B) no further authorization or approval not already obtained is required by the Authority in connection with the delivery of the Bonds to the Underwriters or entering into or performing its obligations under the Resolutions or this Agreement, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, this Agreement constitutes a legal, valid and binding obligation of the Authority enforceable against the Authority in accordance with its terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors'

rights, (C) the Authority has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and has duly authorized, approved and executed the Official Statement, (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement under the captions [TO BE UPDATED] ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY," "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014D BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES BONDS," "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices [_____], insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the Bonds are exempt from the registration requirements of the Securities Act, and the Resolutions are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement (other than the City or DWSD Portion) as of its date and as of Closing (other than the financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv)     An opinion, dated the date of the Closing and addressed to and solely for the benefit of the Underwriters, of Kutak Rock LLP, counsel to the Underwriters, in form and substance satisfactory to the Underwriters;

(v)     A non-arbitrage certificate, dated the date of the Closing, signed by the Chairperson of the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Underwriters;

(vi)     A certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems

appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the Bonds in all material respects to the description thereof in the Resolutions and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (F) other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices;

(vii)     A certified copy of each of the Resolutions comprising the Resolutions;

(viii)    A copy of the Bankruptcy Court Order, as described in Section 3 hereof;

(ix)     Satisfactory evidence that Standard and Poor's Ratings Services, Fitch Ratings and Moody's Investors Services shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn;

(x)     A copy of the fully executed Letter of Representations from the City and the Department;

(xi)     The opinion of Dykema Gossett PLLC ("DWSD Bond Counsel"), dated the date of the Closing and addressed to the Authority and the Underwriters, as to the validity and tax-exempt status of the DWSD Bonds, in form and substance satisfactory to the Underwriters;

(xii)    Opinions of DWSD Bond Counsel, Miller Canfield as counsel to the Emergency Manager of the City, and Jones Day as Bankruptcy Counsel to the City dated the date of the Closing and addressed to the Underwriters, to the effect, in the aggregate, that (A) at the times of execution of this Agreement the City had, and on the date of the Closing has, full legal right, power and authority to execute and deliver the Letter of Representations and the Local Purchase Contract and other transaction documents (the "DWSD Transaction Documents") and to cause the DWSD Obligations to be delivered to the Authority as provided in this Agreement and pursuant to the DWSD Authorizing Documents (as defined in the Letter of Representations), and the City at the time of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in the DWSD Transaction Documents, (B) no further authorization or approval not already obtained is required by the City in connection with the delivery of the DWSD Obligations to the Authority or entering into or performing its obligations under the DWSD Transaction Documents, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, the DWSD Transaction Documents constitute legal, valid and binding obligations of the City enforceable against the City in accordance with their terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the City has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and the Official Statement, (D) the City's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement in the [TO BE UPDATED] [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the DWSD Obligations are exempt from the registration requirements of the Securities Act, and the DWSD Authorizing Documents are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(xii)  Certificates of the City [, the Department and the Emergency Manager] dated as of the date of the Closing to the effect that the representations and warranties included in the Letter of Representations and Local Purchase Contract are true and correct in all material respects as of the date of the Closing and all obligations to be performed by the City under the Letter of Representations and the Local Purchase Contract referenced above on or prior to the date of closing have been performed;

(xiii)  A letter from Bond Counsel to the effect that the opinion referred to in clause (ii) of this subparagraph may be relied upon by the Underwriters as though such opinion was addressed to them;

(xiv)  An executed copy of the Authority's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xv)  An executed copy of the City and the Department's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xvi)  Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as required under the Local Purchase Contract;

(xvii)  [A letter from KPMG, dated the Closing Date, to the effect that it reaffirms as of the Closing Date the statements made in the Accountant's Letter (describing agreed-upon procedures and stating no material adverse change in the financial position or results of operations of the Water Fund except as set forth in or contemplated by the Official Statement or as described in such letter), in form and substance satisfactory to the Underwriters];

(xviii)  Immediately before the release of the Bonds, on the Settlement Date evidence satisfactory to Underwriters that the City has filed with the Bankruptcy Court an amended Plan of Adjustment of the City removing all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

(xix)  Certified copies of the Bond Insurance Policies issued by the Bond Insurers and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers and any other documents executed in connection therewith;

(xx)  An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Underwriters and in form and substance satisfactory to the Representative;

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(xxi)  A certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption ["Bond Insurance"] in the Official Statement is true and correct in all material respects, and that the specimen of the Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers; and

(xxii)  Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as the Underwriters may reasonably request to evidence the truth, accuracy and completeness, as of the date hereof and as of the date of the Closing, of the representations and warranties of the Authority and of the City contained herein and of the statements and information contained in the Official Statement and the due performance or satisfaction by the Authority and the City at or prior to the Closing of all agreements then to be performed and all conditions then to be satisfied by the Authority and the City.

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Underwriters.

If the Authority shall be unable to satisfy the conditions to the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, or if the obligations of the Underwriters to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Agreement, this Agreement shall terminate and neither the Underwriters nor the Authority shall be under further obligation hereunder, except that the respective obligations of the Authority and the Underwriters set forth in Paragraphs 10 and 12 hereof shall continue in full force and effect.

10.     (a)     The Underwriters shall be under no obligation to pay, and the Authority shall pay, all expenses incident to the performance of the obligations of the Authority hereunder, including, but not limited to: (i) the cost of preparation and printing the definitive Bonds; (ii) the cost of the preparation and printing the Preliminary Official Statement, including the appendices and any amendments or supplements thereto; (iii) the fees and disbursements of the financial advisor and Bond Counsel to the Authority; (iv) the fees and disbursements of any consultants or advisors retained by the Authority; (v) fees charged by rating agencies in connection with the Bonds; (vi) the cost of preparation and printing of the Official Statement, up to the number of copies specified in Paragraph 4 hereof, including the appendices thereto; (vii) subject to the provisions of Paragraph 5 above, the cost of preparation of any amendment or supplement to the Official Statement and the costs of printing and delivery of up to [200] copies of any amendment or supplement to the Official Statement, including the reasonable fees and disbursements of counsel to the Underwriters and to the Authority with respect to any supplements or amendments to the Official Statement (all such costs to be paid by the Authority subject to the provisions of Paragraph 5 above); (viii) the fees and disbursements of counsel retained by the Underwriters; (ix) the fees of Digital Assurance Certification, L.L.C. for a continuing disclosure undertaking compliance review; (x) any

initial fees and charges of the Trustee and its counsel (including the first annual payment due the Trustee), the Bond Registrar, the Paying Agent and Co-Paying Agent, if any; and (xi) the fees and disbursements of the Bond Insurers and their counsel.

(b)    The Underwriters shall pay (i) the cost of preparation and reproduction of this Agreement and the other underwriting documents; (ii) all advertising expenses in connection with the offering of the Bonds; (iii) the cost of printing and delivering more than [200] copies of the Official Statement; (iv) the cost of printing and delivery of more than [200] copies of any supplement or amendment of the Official Statement; (v) the cost of amending or supplementing the Official Statement in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete; and (vi) all other expenses incurred by the Underwriters in connection with the Bonds.

11.    Any notice or other communication to be given to the Authority under this Agreement shall be given by delivering the same in writing to its address set forth above, and any notice or other communication to be given to the Underwriters under this Agreement shall be given by delivering the same in writing to Citigroup Global Markets, Inc., [390 Greenwich Street, New York, NY 10013], Attention: [_____], Telephone: [_____], Fax: [_____].

12.    This Agreement is made solely for the benefit of the Authority and the Underwriters (including the successors or assigns of the Underwriters); no other person shall acquire or have any right or liability hereunder or by virtue hereof.  All of the representations, warranties and agreements of the Authority contained in this Agreement and in the certificates delivered pursuant hereto shall remain operative and in full force and effect, regardless of (i) any investigations made by or on behalf of the Underwriters, (ii) delivery of and payment for the Bonds hereunder, and (iii) any termination of this Agreement.


**(Signatures on Next Page)**

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

13.    This Agreement shall become effective upon the acceptance hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance.  This Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

Very truly yours,

CITIGROUP GLOBAL MARKETS, INC., As Representative

By: _____
      [Name]
      [Title]

Accepted and Agreed to this
__th day of August, 2014

MICHIGAN FINANCE AUTHORITY

By: _____
      Joseph L. Fielek
      Executive Director

**EXHIBIT A**

Item 1 (a)  Aggregate principal amount of the Bonds:  $[_____]

     (b)  Date of the Bonds:  August __, 2014

     (c)  Years of maturities, interest rates, principal amounts and initial public offering prices:

Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014D-2
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
|  |  |  |  |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____% CUSIP† _____

Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 3
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

Local Government Loan Program Revenue Bonds, Series 2014D-4
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

(d)  The Bonds are subject to optional and mandatory redemption prior to maturity as described in the Official Statement.

Item 2.  Purchase Price.  The purchase price shall be $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus net original issue discount of $[_____]).

EXHIBIT B

LETTER OF REPRESENTATIONS

August [___], 2014

Citigroup Global Markets, Inc.
[Additional Underwriters]

Michigan Finance Authority

Ladies and Gentlemen:

The City of Detroit, Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), proposes to participate in the Michigan Finance Authority (the "Authority") Local Government Loan Program Revenue Bonds, Series 2014D (the "Authority Bonds") program (the "Program") by issuing, in the aggregate, $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds and Water Supply System Revenue Refunding Second Lien Bonds, in one or more series (the "DWSD Obligations"). Proceeds of the DWSD Obligations will be used (i) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Water Supply System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (ii) to pay the costs of issuance of the DWSD Obligations and the Bonds. The City will sell the DWSD Obligations to the Authority pursuant to a Local Purchase Contract between the Authority and the City dated August [___], 2014 (the "Local Purchase Contract"). The City's participation in the Program and execution of the Local Purchase Contract and other related documents have been approved by the City and the Bankruptcy Court Order (as defined below).

The Authority Bonds will be sold by the Authority pursuant to a Bond Purchase Agreement dated the date hereof (the "Purchase Agreement") between the Authority and the Underwriters listed thereunder (the "Underwriters"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

The City acknowledges and agrees that (i) the purchase of the Authority Bonds pursuant to the Purchase Agreement, providing proceeds for the purchase of the DWSD Obligations are arm's-length commercial transactions among the City, the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as the agents or fiduciaries of the City, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract or the discussions,

undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the City on other matters) and the Underwriters have no obligation to the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract except the obligations expressly set forth in the Purchase Agreement, and (iv) the City has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the City's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the City's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The City acknowledges and agrees to the terms of the liquidated damages provision in Section 1 of the Purchase Agreement, including the full release and discharge of any claims by the City against the Underwriters upon any payment of liquidated damages pursuant thereto.

Section 1. <u>Representations and Warranties</u>. In order to induce the Underwriters and the Authority to enter into the Purchase Agreement and to sell the Authority Bonds, and to induce the Authority to enter into the Local Purchase Contract with the City, the City represents and warrants, and agrees with the Underwriters and the Authority as follows:

(a) The City has full right, power and authority to (i) execute and deliver the Local Purchase Contract and this Letter of Representations, and (ii) perform its obligations under, and carry out and consummate all other transactions described in the Purchase Agreement, the Local Purchase Contract and this Letter of Representations, all pursuant to Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"); Bond Ordinance No. 30-02, as amended and restated, adopted by the City Council of Detroit (the "City Council") on January 26, 2005, as thereafter amended (the "Bond Ordinance"); the Orders of the United States District Court in *United States v. City of Detroit, et al*., 77-71100, E.D. Michigan; the Resolution and Ordinance Authorizing the Issuance and Sale of Water Supply System Revenue Refunding Senior Lien Bonds of the City of Detroit and of Water Supply System Revenue Refunding Second Lien Bonds of the City of Detroit, adopted by the BOWC on August 13, 2014 and approved by the Emergency Manager on August 16, 2014 (the "DWSD Bond Resolution"); a Trust Indenture by and among the City, the Department and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of February 1, 2013 (the "DWSD Indenture"); and a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution, and the DWSD Indenture, the "DWSD Authorizing Documents"). The City has complied with or will comply with on or prior to the date of Closing all provisions of applicable law (specifically including, without limiting the generality of the forgoing, the Constitution and laws of the State of Michigan) and all matters relating to such transactions.

(b)     The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, a copy of which is attached as [Exhibit C to the Purchase Agreement] (the "Bankruptcy Court Order"), in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the Purchase Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order.

(c)     No further authorization or approval of the City's Emergency Manager, the City Council or the BOWC is required for the execution and delivery of the DWSD Obligations, this Letter of Representations, the Local Purchase Contract, the continuing disclosure undertaking (the "Undertaking") on behalf of the City, and any other transaction documents related thereto (collectively, the "DWSD Transaction Documents") and the DWSD Transaction Documents constitute a legal, valid and binding obligations of the City, enforceable against the City in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the City is not required to obtain any further authorization or approval for the sale and delivery of the DWSD Obligations to the Authority or the performance by the City of its obligations under the DWSD Transaction Documents except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing.

(d)     The City, acting through the BOWC and the Emergency Manager, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement.

(e)	The DWSD Obligations are issued pursuant to that Act 94 and the DWSD Authorizing Documents.  The DWSD Authorizing Documents have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the DWSD Obligations and a valid, legally binding act of the City, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised.

(f)	When delivered to the Authority and paid for in accordance with the terms of this Agreement, the DWSD Obligations (i) will have been duly authorized, executed and issued by the City pursuant to the DWSD Authorizing Documents, and (ii) will constitute valid, legally binding, limited obligations of the City.

(g)	No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the City described herein or the delivery of the DWSD Obligations to the Authority except for the filing of IRS form 8038-G (and the City hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith.

(h)	All legislation necessary to permit the City (i) to fulfill in all material respects its obligations under the DWSD Authorizing Documents and the DWSD Transaction Documents and (ii) to carry out the transactions contemplated in the DWSD Authorizing Documents and the DWSD Transaction Documents is in full force and effect.

(i)	The execution and delivery of the Official Statement, the DWSD Transaction Documents, and the fulfillment of the terms and conditions of and the carrying out of the transactions contemplated by the DWSD Transaction Documents, do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the City is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the DWSD Obligations or the ability of the City to pay the principal of and the interest on any of the DWSD Obligations.

(j)	The City has duly authorized the use of the information contained in [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE WATER SUPPLY SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN

CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion") of the Preliminary Official Statement and the Official Statement, to be used by the Underwriters in connection with the public sale of the Authority Bonds. The City has ratified and consented to such use of the Preliminary Official Statement and the Official Statement in accordance with law by the Underwriters in connection with the public sale of the Authority Bonds and the City deems the information set forth in the City and DWSD Portion of the Preliminary Official Statement to be "final" as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12.

(k)     The information set forth in the City and DWSD Portion of the Preliminary Official Statement and the Official Statement is true and correct in all material respects and the City and DWSD Portion of the Preliminary Official Statement and the Official Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(l)     The financial statements of the City's Water Fund as of June 30, 2013, including the notes thereof, included in Appendix II-D of the Official Statement, present fairly the financial position of the City's Water Fund as of the date indicated and the results of its operations and changes in fund balances and financial position for the year specified, and such financial statements have been prepared in the conformity with generally accepted accounting principles consistently applied in all material respects.

(m)     Except as set forth in the Preliminary Official Statement and the Official Statement, subsequent to the respective dates of which information is given in the Preliminary Official Statement and the Official Statement, the City has not incurred any liabilities, direct or contingent, or entered into any transactions, not in the ordinary course of business, that are material to the business and affairs of the City and there has not been any material change in the condition, results of operation or general affairs of the City (financial or otherwise).

(n)     Except as disclosed in the Preliminary Official Statement and the Official Statement, and other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, there is no action, suit, proceeding, inquiry or investigation at law or in equity by or before any court or public board or body pending or threatened against or affecting the City (or, the knowledge of the City, any basis therefor) (i) seeking to restrain or enjoin the sale or delivery of the DWSD Obligations, or (ii) in any manner questioning the authority of the City to issue, or the issuance or validity of, any of the DWSD Obligations or any other indebtedness of the City, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the DWSD Obligations, or (iv) questioning any of the DWSD Authorizing Documents or Act 94, or (v) questioning the validity or enforceability of the DWSD Authorizing Documents or (vi) seeking to secure a lien on the Pledged Assets or the collection of the Net Revenues, as defined in the DWSD Authorizing Documents, or other moneys, securities, funds and property pledged in the

DWSD Authorizing Documents that are a source of payment on the DWSD Obligations, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the BOWC to his or her office is being contested;

(o)    Other than as a result of the of the City's chapter 9 bankruptcy proceedings, the City is not in breach of or in default under any existing law, court or administrative regulation, decree, order, agreement, indenture, mortgage, lease, sublease or other instrument to which they are a party or by which they are bound, and no event has occurred or is continuing which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default thereunder, except as set forth in the Preliminary Official Statement and the Official Statement and except (in each case) for such minor breaches, defaults or potential defaults or event of default, if any, which individually and in the aggregate would have no material adverse effect on the City's financial condition, operations or properties.

(p)    The City has provided the following statement to the Authority for use in the Preliminary Official Statement and the Official Statement relating to the requirements described in Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission:

"*Prior Continuing Disclosure Non-Compliance by the City*

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Water Supply System. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Water Supply System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010. The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013. The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013. The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Water Supply System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale in the secondary market of bonds issued by the City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof."

(q)     Any certificate signed by an authorized officer of the City delivered to the Underwriters and the Authority shall be deemed a representation and warranty by the City to such parties as to the statements made therein.

Section 2.  Special Covenants.  The City covenants and agrees with the Underwriters and the Authority as follows:

(a)     The City will provide the Underwriters with information concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as described in Section 6 of the Purchase Agreement.  The City agrees to cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters and the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12.  The expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the City) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the City.

(b)     Between the date hereof and the date of the Closing, the City will not take any action which would cause the representations and warranties contained in Section 1 to be untrue on the date of the Closing.  On the date of the Closing, the City shall deliver or cause to be delivered all opinions, certificates and other documents to be delivered by it or on its behalf as provided for in the Purchase Agreement and the Local Purchase Contract and to deliver such additional certificates and other documents as the Underwriters may reasonably request to evidence performance of or compliance with the provisions of the Purchase Agreement and the DWSD Transaction Documents, all such certificates and other documents to be satisfactory in form and substance to the Underwriters.

Section 3.  Survival of Representations and Warranties.  All representations, warranties, covenants and agreements contained in this Letter of Representations or contained in certificates of officers of the City submitted pursuant hereto or pursuant to the Purchase Agreement, or the Local Purchase Contract at the dates made shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriters or any other person, and shall survive (i) delivery of the Authority Bonds to the Underwriters and payments by the Underwriters therefor pursuant to the Purchase Agreement, (ii) any termination of the Purchase Agreement by the Underwriters pursuant to the provisions thereof or (iii) any failure on the part of the City by the Authority to satisfy any condition to the obligations of the Underwriters specified in the Purchase Agreement, which failure results in a refusal by the Underwriters to purchase and pay for the Authority Bonds.

Section 4.  Parties in Interest.  This Letter of Representations shall be binding upon the City and shall inure solely to the benefit of the Underwriters and the Authority and, to the extent set forth herein, officers, directors and employees of and persons controlling the Underwriters and the Authority, and their respective personal representatives, successors and assigns, and no other person or firm shall acquire or have any right under or by virtue of this Letter of Representations.

Section 5.  Indemnification. The City agrees to indemnify and hold harmless the Underwriters, the directors, officers, employees and  agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Securities Act or the Exchange Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any them may become subject under the Securities Act, the Exchange Act or other Federal or State statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Official Statement, the Final Official Statement (or in any amendment or supplement thereto), or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. This indemnity agreement will be in addition to any liability which the City may otherwise have.

Promptly after receipt by an indemnified party of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have

the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

In the event that the indemnity provided herein is unavailable or insufficient to hold harmless an indemnified party for any reason, the City and the Underwriter agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) to which the City and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the City on the one hand and by the Underwriters on the other from the offering. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the City and the Underwriters shall contribute in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the City on the one hand and of the Underwriters on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. In no case shall any Underwriter (except as may be provided in any agreement among the Underwriters relating to the offering) be responsible for any amount in excess of the purchase discount or fee applicable to the Authority Bonds purchased by such Underwriter hereunder. Benefits received by the City shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total purchase discounts and commissions in each case set forth on the cover of the Final Official Statement. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the City on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, information and opportunity to correct or prevent such untrue statement or omission. The City and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph, no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f)

of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Each person who controls an Underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the City within the meaning of either the Securities Act or the Exchange Act and each official, director, officer and employee of the City shall have the same rights to contribution as the City, subject in each case to the applicable terms and conditions of this paragraph.

Very truly yours,

CITY OF DETROIT, MICHIGAN

By: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____