# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                    :
In re                               :        Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :        Case No. 13-53846
                                    :
                    Debtor.         :        Hon. Steven W. Rhodes
                                    :
                                    :
-----------------------------------------------------x
```

## NOTICE OF FILING OF REDLINED
## VERSION OF SIXTH AMENDED PLAN FOR THE
## <u>ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT</u>

### PLEASE TAKE NOTICE OF THE FOLLOWING:

1.     On May 5, 2014, the City of Detroit (the "<u>City</u>") filed the

Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket

No. 4392) (the "<u>Fourth Amended Plan</u>").

2.     Solicitation of votes to accept or reject the Fourth Amended

Plan was completed on May 12, 2014, and the deadline for such voting was

July 11, 2014.  On July 21, 2014, the City filed the Declaration of Michael J. Paque

Regarding the Solicitation and Tabulation of Votes on, And the Results of Voting

with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of

Detroit (Docket No. 6179).  On August 12, 2014, the City filed the Supplemental

Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of

Votes on, And the Results of Voting with Respect to, Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6665).

3.     On July 25, 2014, the City filed the Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6257) (the "Fifth Amended Plan").

4.     On July 29, 2014, the City filed the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6379) (the "Corrected Fifth Amended Plan").

5.     Contemporaneously herewith, the City has filed the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (the "Sixth Amended Plan").

6.     Attached hereto as Exhibit A is a redline of the Corrected Fifth Amended Plan against the Sixth Amended Plan.  Attached hereto as Exhibit B is a redline of the Fourth Amended Plan against the Sixth Amended Plan.  Attached hereto as Exhibit C is a redline showing changes made to certain exhibits to the Sixth Amended Plan since the filing of such exhibits with the Corrected Fifth Amended Plan and the Notice of Filing Plan Supplement: Exhibit I.A.103 (Form of DIA Settlement Documents) (Docket No. 6576).

7.     Exhibits that are not included in Exhibit C have not changed since their respective filings in the Corrected Fifth Amended Plan or the Notice of

Filing Plan Supplement: Exhibit I.A.146 (Principal terms of Exit Facility); Exhibit I.A.255 (Form of Restoration Trust Agreement); Exhibit II.D.5 (Schedule of Postpetition Collective Bargaining Agreements); Exhibit III.D.2 (Retained Causes of Action) (Docket No. 6674).

8.      Pursuant to section 942 of the Bankruptcy Code, the City "may modify the [P]lan at any time before confirmation," and "after the [City] files a modification, the [P]lan as modified becomes the [P]lan." 11 U.S.C. § 942. At the Confirmation Hearing, the City will seek a ruling that the amendments to the Fourth Amended Plan, as reflected in the Sixth Amended Plan, do not adversely affect any Holder of any Claim such that no re-solicitation of votes is required as a result of such amendments.

Dated: August 20, 2014

Respectfully submitted,

/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
-------------------------------------------------------------  x
                                                 :
In re                                            :          Chapter 9
                                                 :
CITY OF DETROIT, MICHIGAN,                        :          Case No. 13-53846
                                                 :
               Debtor.                           :          Hon. Steven W. Rhodes
                                                 :
                                                 :
-------------------------------------------------------------  x
```

~~CORRECTED FIFTH AMENDED PLAN~~
**SIXTH AMENDED PLAN** FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF
DETROIT
(~~July 29~~August 20, 2014)

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND
    COMPUTATION OF TIME.................................................................... 1

    A.      Defined Terms. ........................................................................... 1

    B.      Rules of Interpretation and Computation of Time........................ 2628

          1.      Rules of Interpretation.................................................... 2628

          2.      Computation of Time. ..................................................... 2628

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY
    CONTRACTS AND UNEXPIRED LEASES ....................................... 2729

    A.      Unclassified Claims. .................................................................. 2729

          1.      Payment of Administrative Claims. ................................. 2729

          2.      Bar Dates for Administrative Claims. .............................. 2729

    B.      Classified Claims. ...................................................................... 2830

          1.      Designation of Classes. .................................................. 2830

          2.      Subordination; Reservation of Rights to Reclassify Claims. .................. 2931

          3.      Treatment of Claims. ...................................................... 2932

    C.      Confirmation Without Acceptance by All Impaired Classes. ................ 4143

    D.      Treatment of Executory Contracts and Unexpired Leases. ................... 4144

          1.      Assumption. .................................................................... 4144

          2.      Assumption of Ancillary Agreements. ............................. 4144

          3.      Approval of Assumptions and Assignments. .................... 4144

          4.      Payments Related to the Assumption of Executory Contracts and
              Unexpired Leases. ........................................................... 4244

          5.      Contracts and Leases Entered Into After the Petition Date. .................. 4245

          6.      Rejection of Executory Contracts and Unexpired Leases. .................... 4245

          7.      Rejection Damages Bar Date. .......................................... 4245

          8.      Preexisting Obligations to the City Under Rejected Executory
              Contracts and Unexpired Leases. ..................................... 4245

          9.      Insurance Policies. .......................................................... 4345

ARTICLE III CONFIRMATION OF THE PLAN ....................................... 4346

    A.      Conditions Precedent to the Effective Date. ............................... 4346

    B.      Waiver of Conditions to the Effective Date. .............................. 4446

    C.      Effect of Nonoccurrence of Conditions to the Effective Date. ............. 4447

D. Effect of Confirmation of the Plan.........................................................4447

    1. Dissolution of Retiree Committee.........................................4447

    2. Preservation of Rights of Action by the City......................4447

    3. Comprehensive Settlement of Claims and Controversies.......4447

    4. Discharge of Claims...............................................................4548

    5. Injunction...............................................................................4548

    6. Exculpation............................................................................4649

    7. Releases................................................................................4749

E. No Diminution of State Power..................................................................4851

F. Effectiveness of the Plan........................................................................4851

G. Binding Effect of Plan.............................................................................4851

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN................................4952

A. DWSD......................................................................................................4952

    1. Rates and Revenues.............................................................4952

    2. DWSD CBAs...........................................................................4952

    3. The New DWSD Bonds and New Existing Rate DWSD Bonds......4952

    4. Potential DWSD Authority Transaction....................................52

B. The New B Notes and New LTGO Bonds................................................4952

C. The UTGO Settlement.............................................................................4953

D. The State Contribution Agreement..........................................................5053

    1. State Contribution.................................................................5053

    2. Income Stabilization Payments.............................................5053

    3. Conditions to State's Participation.........................................5054

    4. Release of Claims Against the State and State Related Entities.......5154

E. The DIA Settlement.................................................................................5154

    1. Funding Contributions...........................................................5155

    2. Transfer of DIA Assets..........................................................5155

    3. Conditions to the DIA Funding Parties' Participation..............5255

F. Contingent Payment Rights.....................................................................5255

    1. Special Restoration...............................................................5256

    2. General Restoration..............................................................5356

G. The OPEB Settlement.............................................................................5356

H. The LTGO Settlement.............................................................................5356

I.     Prosecution of COP Litigation.......................................................................53 57

     1.     Creation of Litigation Trust.............................................................53 57

     2.     Direction of COP Litigation.............................................................53 57

     3.     Payment of Fees and Expenses.........................................................54 57

     4.     Settlement of COP Litigation...........................................................54 57

J.     Issuance of the New Securities.....................................................................54 58

K.     Cancellation of Existing Bonds and, Bond Documents, COPs and COP Documents...................................................................................................55 58

L.     Release of Liens...........................................................................................55 58

M.     Professional Fees.........................................................................................55 59

     1.     Professional Fee Reserve..................................................................55 59

     2.     Fee Review Order..............................................................................56 59

     3.     Dismissal of the Fee Examiner.........................................................56 59

     4.     Potential Review of Fees Not Subject to Fee Review Order.............. 59

     45.     Court-Appointed Expert....................................................................56 60

N.     Assumption of Indemnification Obligations................................................56 60

O.     Incorporation of Retiree Health Care Settlement Agreement.......................56 60

P.     Payment of Workers' Compensation Claims................................................56 60

Q.     36th District Court Settlement.....................................................................57 60

R.     Payment of Certain Claims Relating to the Operation of City Motor Vehicles........................................................................................................57 60

S.     Payment of Tax Refund Claims...................................................................57 61

T.     Utility Deposits............................................................................................57 61

U.     Pass-Through Obligations............................................................................57 61

V.     Exit Facility.................................................................................................58 61

W.     Post-Effective Date Governance..................................................................58 61

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN............58 62

A.     Appointment of Disbursing Agent...............................................................58 62

B.     Distributions on Account of Allowed Claims...............................................58 62

C.     Certain Claims to Be Expunged..................................................................58 62

D.     Record Date for Distributions; Exception for Bond Claims........................58 62

E.     Means of Cash Payments.............................................................................59 62

F.     Selection of Distribution Dates for Allowed Claims....................................59 63

G.     Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. .......................................................... 5963

H.     City's Rights of Setoff Preserved. ................................................................ 5963

I.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......... 6063

    1.     Delivery of Distributions Generally. ...................................................... 6063

    2.     Delivery of Distributions on Account of Bond Claims. ........................... 6063

    3.     Delivery of Distributions on Account of COP Claims. ........................... 64

    34.     De Minimis Distributions / No Fractional New Securities. ...................... 6064

    45.     Undeliverable or Unclaimed Distributions. ............................................ 6064

    56.     Time Bar to Cash Payment Rights. ......................................................... 6064

J.     Other Provisions Applicable to Distributions in All Classes. .............................. 6164

    1.     No Postpetition Interest. ........................................................................ 6164

    2.     Compliance with Tax Requirements. ...................................................... 6165

    3.     Allocation of Distributions. ................................................................... 6165

    4.     Surrender of Instruments. ...................................................................... 6165

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................... 6266

A.     Treatment of Disputed Claims. ..................................................................... 6266

    1.     General. ................................................................................................ 6266

    2.     ADR Procedures. .................................................................................. 6266

    3.     Tort Claims. ......................................................................................... 6266

B.     Disputed Claims Reserve. ............................................................................. 6367

C.     Objections to Claims. .................................................................................... 6367

    1.     Authority to Prosecute, Settle and Compromise. .................................... 6367

    2.     Expungement or Adjustment of Claims Without Objection. .................... 6367

    3.     Extension of Claims Objection Bar Date. ............................................... 6467

    4.     Authority to Amend List of Creditors. ................................................... 6467

ARTICLE VII RETENTION OF JURISDICTION ................................................................ 6468

ARTICLE VIII MISCELLANEOUS PROVISIONS ............................................................. 6569

A.     Plan Supplements. ........................................................................................ 6569

B.     Modification of the Plan. ............................................................................... 6569

C.     Revocation of the Plan. ................................................................................. 6569

D.     Severability of Plan Provisions. ..................................................................... 6669

E.     Effectuating Documents and Transactions. .................................................... 6670

F.    Successors and Assigns.................................................................... ~~66~~70

G.    Plan Controls. ............................................................................... ~~66~~70

H.    Notice of the Effective Date. ........................................................ ~~66~~70

I.    Governing Law. ............................................................................. ~~66~~70

J.    Request for Waiver of Automatic Stay of Confirmation Order. ........................ ~~67~~70

K.    Term of Existing Injunctions and Stays. ....................................... ~~67~~70

L.    Service of Documents .................................................................... ~~67~~71

    1.    The City ................................................................................. ~~67~~71

    2.    The Retiree Committee .......................................................... ~~68~~71

# TABLE OF EXHIBITS

Exhibit I.A.~~69~~          Principal Terms of 36th District Court Settlement

Exhibit I.A.~~72~~84          Schedule of COP Swap Agreements

Exhibit I.A.~~89~~102          Form of Detroit General VEBA Trust Agreement

Exhibit I.A.~~93~~106          Form of Detroit Police and Fire VEBA Trust Agreement

Exhibit I.A.~~102~~118          Principal Terms of DIA Settlement

Exhibit I.A.~~103~~119          Form of DIA Settlement Documents

Exhibit I.A.~~121~~139          Schedule of DWSD Bond Documents & Related DWSD Bonds

Exhibit I.A.~~128~~147          Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds

Exhibit I.A.~~131~~150          Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds

Exhibit I.A.~~146~~172          Principal Terms of Exit Facility

Exhibit I.A.~~172~~198          Schedule of HUD Installment Note Documents & Related HUD Installment Notes

Exhibit I.A.~~182~~208          Interest Rate Reset Chart

Exhibit I.A.~~187~~213          Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds

Exhibit I.A.~~198~~224          Form of LTGO Settlement Agreement

Exhibit I.A.~~206~~232          Principal Terms of New B Notes

Exhibit I.A.~~207~~233          Form of New B Notes Documents

Exhibit I.A.~~209~~235          Principal Terms of New DWSD Bonds

Exhibit I.A.~~211~~237          Principal Terms of New Existing Rate DWSD Bonds

Exhibit I.A.~~212~~238.a          Form of New GRS Active Pension Plan

Exhibit I.A.~~212~~238.b          Principal Terms of New GRS Active Pension Plan

Exhibit I.A.~~216~~242.a          Form of New PFRS Active Pension Plan

Exhibit I.A.~~216~~242.b          Principal Terms of New PFRS Active Pension Plan

Exhibit I.A.~~244~~269          Prior GRS Pension Plan

Exhibit I.A.~~245~~270          Prior PFRS Pension Plan

Exhibit I.A.~~255~~279          Restoration Trust Agreement

Exhibit I.A.~~261~~285          Retiree Health Care Settlement Agreement

Exhibit I.A.~~270~~292          Schedule of Secured GO Bond Documents

Exhibit I.A.~~294~~318          State Contribution Agreement

Exhibit I.A.~~310~~334          Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds

Exhibit I.A.~~317~~341          Form of UTGO Settlement Agreement

Exhibit II.B.3.q.ii.A          Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits

Exhibit II.B.3.q.ii.C          Terms of PFRS Pension Restoration

Exhibit II.B.3.r.ii.A          Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits

Exhibit II.B.3.r.ii.C          Terms of GRS Pension Restoration

Exhibit II.D.5          Schedule of Postpetition Collective Bargaining Agreements

Exhibit II.D.6          Executory Contracts and Unexpired Leases to Be Rejected

Exhibit III.D.2          Retained Causes of Action

**INTRODUCTION**

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

**A.    Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.    "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.    "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.    "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.    "2014 DWSD Refinancing Obligations" means, collectively, the (i) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D, (ii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E, (iii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F, (iv) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014G, (v) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System

Revenue Refunding Senior Lien Bonds, Series 2014A, (vi) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B, (vii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C, and (viii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D.

6. "2014 Revenue and Revenue Refinancing Bonds" means, collectively, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds.

7. "2014 Revenue Refinancing Bonds" means, collectively, the Michigan Finance Authority's (i) Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (ii) Local Government Loan Program Revenue Bonds, Series 2014C-5 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iii) Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iv) Local Government Loan Program Revenue Bonds, Series 2014C-7 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (v) Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vi) Local Government Loan Program Revenue Bonds, Series 2014D-2 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vii) Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, and (viii) Local Government Loan Program Revenue Bonds, Series 2014D-4 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds.

58. "36th District Court" means the district court for the thirty-sixth judicial district of the State.

69. "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.69.

710. "Active Employee" means an active employee of the City on and after the Confirmation Date.

811. "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

12. "Ad Hoc Committee of DWSD Bondholders" means, collectively, Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

913. "Adjusted Pension Amount" means the GRS Adjusted Pension Amount or the PFRS Adjusted Pension Amount, as applicable.

1014. "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to

priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

~~11~~15.  "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

~~12~~16.  "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

~~13~~17.  "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

~~14~~18.  "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

~~15~~19.  "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

~~16~~20.  "Ambac" means Ambac Assurance Corporation.

~~17~~21.  "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

~~18~~22.  "Annuity Savings Fund Excess Amount" means the following~~, as calculated by the GRS~~:  (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return.

For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

~~19~~23.  "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.~~167~~193, plus the ASF Recoupment.

~~20~~24.  "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

~~21~~25.  "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

~~22~~26.  "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

~~23~~27.  "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

~~24~~28.  "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

~~25~~29.  "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

~~26~~30.  "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

~~27~~31.  "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

~~28~~32.  "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

~~29~~33.  "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

~~30~~34.  "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

~~31~~35.  "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

3236. "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.317341.

3337. "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

3438. "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

3539. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

3640. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

3741. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

3842. "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

3943. "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

4044. "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

4145. "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

4246. "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

4347. "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds or the Secured GO Bonds.

4448. "Bondholder" means any beneficial or record holder of a Bond.

4549. "Bond Insurance Policies" means those policies, surety policies or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

4650. "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

4751. "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

4852. "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

4953. "Cash" means legal tender of the United States of America and equivalents thereof.

5054. "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

5155. "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

5256. "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

5357. "City" means the City of Detroit, Michigan.

5458. "City Council" means the duly-elected City Council of the City.

5559. "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

5660. "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

5761. "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the latest of (a) 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

5862. "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

5963. "Class" means a class of Claims, as described in Section II.B.

6064. "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

61 65. "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

62 66. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

63 67. "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

64 68. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

69. "Contract Administration Agreement 2005" means the Contract Administration Agreement dated June 2, 2005, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2005, and the COP Contact Administrator.

70. "Contract Administration Agreement 2006" means the Contract Administration Agreement dated June 12, 2006, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2006, and the COP Contact Administrator.

71. "Contract Administration Agreements" means, together, the Contract Administration Agreement 2005 and the Contract Administration Agreement 2006.

65 72. "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

66. "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

73. "COP Agent" means a contract administrator, trustee, paying agent or similar Entity, as applicable, under the COP Documents.

67 74. "COP Claim" means a Claim under or evidenced by the COP Service Contracts. For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

75. "COP Contract Administrator" means Wilmington Trust, National Association, as successor to U.S. Bank, N.A.

76. "COP Documents" means, collectively, the COP Service Contracts, the 2005 COPs Agreement, the 2006 COPs Agreement and the Contract Administration Agreements.

77.    "COP Insurance Policies" means those certain polices or other instruments insuring the 2005 COPs issued under the 2005 COPs Agreement and the 2006 COPs issued under the 2006 COPs Agreement, including all ancillary and related documents that may obligate the City to pay any amount to a COP Insurer for any reason.

78.    "COP Insurance Policies Claim" means a Claim held by a COP Insurer arising under or in connection with a COP Insurance Policy.

79.    "COP Insurer" means any party, other than the City, that has issued a COP Insurance Policy.

6880.    "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

6981.    "COP Litigation Counsel" means counsel to the Litigation Trust in the COP Litigation.

7082.    "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

7183.    "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

7284.    "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.7284, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

7385.    "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

7486.    "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

7587.    "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

7688.    "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

7789.    "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

78 90. "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

79 91. "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

80 92. "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

93. "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

81 94. "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

82 95. "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

83 96. "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

84 97. "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

85 98. "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

86 99. "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OPEB Claim.

87 100. "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

88 101. "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

89 102. "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.89 102.

90103. "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

91104. "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

92105. "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

93106. "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.93106.

107. "Detroit Retirement Systems Funding Trust 2005" means the funding trust established pursuant to the 2005 COPs Agreement.

108. "Detroit Retirement Systems Funding Trust 2006" means the funding trust established pursuant to the 2006 COPs Agreement.

94109. "DIA" means The Detroit Institute of Arts, a museum and cultural institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

95110. "DIA Assets" means the "Museum Assets" as defined in the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102 Documents.

96111. "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

112. "DIA Direct Funders" means DIA Corp. and those DIA Funders whose commitments to contribute monies in furtherance of the DIA Settlement are made directly to the CFSEM Supporting Organization.

97113. "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments, whether before or after the Effective Date, to contribute monies in furtherance ofor otherwise secures contributions of monies in support of DIA Corp.'s payment obligations under the DIA Settlement, solely in their capacity as participants in the DIA Settlementwhether paid directly to the CFSEM Supporting Organization or to DIA Corp. for the purpose of supporting DIA Corp.'s payments to the CFSEM Supporting Organization.

98114. "DIA Funding Parties" means the Foundations, and the DIA Direct Funders and DIA Corp.

99115. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

100116. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

101117.        "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

102118.        "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.102118.

103119.        "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.103119, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.102118.

104120.        "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

105121.        "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

106122.        "Disclosure Statement Order" means the Order Approving the Proposed Disclosure Statement (Docket No. 4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

107123.        "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

108124.        "Disputed Claim" means any Claim that is not Allowed.

109125.        "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.A.

110126.        "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

111127.        "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

112128.        "Distribution Date" means any date on which a Distribution is made.

113129.        "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

114130.        "District Court" means the United States District Court for the Eastern District of Michigan.

115131.        "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

116132.        "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

117133.        "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

118134.        "DRCEA" means the Detroit Retired City Employees Association.

119135.        "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

136.        "DWSD Authority" means an authority that may be formed pursuant to a DWSD Authority Transaction to conduct many or all of the operations currently conducted by DWSD as described in Section IV.A.4.

137.        "DWSD Authority Transaction" means the potential formation (including the potential transfer of certain assets owned by DWSD) and operation of the DWSD Authority, as described in Section IV.A.4.

120138.        "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

121139.        "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.121139, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

122140.        "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.121139.

123141.        "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

142.        "DWSD Exculpated Parties" means, collectively, the DWSD Settlement Parties and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

124143.        "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

125144.        "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

126145.        "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

127146.        "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

128147.       "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.128147, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

129148.       "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.128147.

130149.       "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

131150.       "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.131150, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

132151.       "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.131150.

133152.       "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

153.       "DWSD Settlement Date" means the date prior to the Effective Date upon which each of (i) consummation of the purchase of the DWSD Tendered Bonds, (ii) issuance of the 2014 DWSD Refinancing Obligations and (iii) issuance of the 2014 Revenue Refinancing Bonds occurs, which date is identified as September 4, 2014 in the DWSD Tender Invitations (subject to rescheduling to a date earlier or later than that date by the City in its sole discretion).

154.       "DWSD Settlement Parties" means, collectively, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., Berkshire Hathaway Assurance Corp., Financial Guaranty Insurance Company (solely in its capacity as a DWSD Bond Insurer and solely if it provides any consents required to effectuate the DWSD Tender), the Ad Hoc Committee of DWSD Bondholders and U.S. Bank National Association, as trustee for the DWSD Bonds.

155.       "DWSD Tender" means the offers, subject to acceptance at the City's election and in its sole discretion, to purchase for cancellation some or all of the DWSD Bonds that have been tendered and accepted in connection with, and on the terms provided in, the DWSD Tender Invitations.

156.       "DWSD Tendered Bonds" means the DWSD Bonds that have been tendered for purchase or cancellation pursuant to the DWSD Tender.

157.       "DWSD Tender Invitations" means the invitations and accompanying disclosure statements sent by the City to holders of DWSD Bonds on August 7, 2014, in the form of those collectively attached as Exhibits 8A and 8B to the DWSD Tender Motion.

158.       "DWSD Tender Motion" means the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644), Filed by the City on August 11, 2014.

159.       "DWSD Tender Order" means the order of the Bankruptcy Court approving the DWSD Tender Motion.

134160. "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

135161. "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

136162. "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

137163. "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

138164. "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

139165. "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

140166. "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

141167. "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

142168. "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

143169. "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties and, (j) the UTGO Exculpated Parties and (k) the DWSD Exculpated Parties. For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

144170. "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

145171. "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed. The City reserves the

right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website. ~~For the avoidance of doubt, Exhibits I.A.103 and I.A.146 will be Filed only if the transactions related to or underlying such Exhibits are to be consummated by the City.~~

~~146~~172.  "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.~~146~~172.

~~147~~173.  "Exit Facility Agent" means the agent under the Exit Facility.

~~148~~174.  "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

~~149~~175.  "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

~~150~~176.  "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

~~151~~177.  "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

~~152~~178.  "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

~~153~~179.  "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

~~154~~180.  "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, (b) those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan and (c) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

~~155~~181.  "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

156182.        "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

157183.        "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

158184.        "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

159185.        "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

160186.        "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

161187.        "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102118.

162188.        "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

163189.        "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

164190.        "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

165191.        "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

166192.        "GRS" means the General Retirement System for the City of Detroit.

167193.        "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued

Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

~~168~~194.        "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

~~169~~195.        "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

~~170~~196.        "Holder" means an Entity holding a Claim.

~~171~~197.        "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

~~172~~198.        "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.~~172~~198, as the same may be been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~173~~199.        "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.~~172~~198.

~~174~~200.        "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

~~175~~201.        "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

~~176~~202.        "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such

year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

177203.        "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

178204.        "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

179205.        "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the 36th District Court Settlement.

180206.        "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

181207.        "Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

182208.        "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.182208.

183209.        "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

184210.        "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

185211.        "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

186212.        "Limited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

187213.        "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.187213, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

188214.     "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.187213.

189215.     "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

190216.     "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries or schedules may be amended, restated, supplemented or otherwise modified.

191217.     "Litigation Trust" means a trust to be established on the Effective Date to which the City will transfer all of its rights and interest in the COP Litigation.

192218.     "Litigation Trustee" means the trustee of the Litigation Trust, which shall be selected by the LTGO Insurer and the Retiree Committee and must be acceptable to the City.

193219.     "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

194220.     "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

195221.     "LTGO Independent Party" means an entity chosen by the Retiree Committee, the LTGO Insurer and the City to resolve certain disputes regarding the COP Litigation involving the City, VEBA Trust Representatives or the LTGO Insurer pursuant to the LTGO Settlement Agreement.

196222.     "LTGO Insurer" means Ambac, solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

197223.     "LTGO Litigation Parties" means, collectively, the LTGO Insurer, the VEBA Trust Representatives and the City.

198224.     "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.198224.

199225.     "Macomb County" means the County of Macomb, Michigan.

200226.     "Mayor" means the duly-elected mayor of the City.

201227.     "MFA" means the Michigan Finance Authority.

202228.     "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the MFA in accordance with the UTGO Settlement Agreement and applicable law.

203229.    "NPFG" means National Public Finance Guarantee Corporation.

204230.    "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

205231.    "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

206232.    "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.206232.

207233.    "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.207233.

208234.    "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New DWSD Bonds.

209235.    "New DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.209235.

210236.    "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds.

211237.    "New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.211237.

212238.    "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.212238.a and the material terms of which are attached hereto as Exhibit I.A.212238.b.

213239.    "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

214240.      "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

215241.      "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

216242.      "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.216242.a and the material terms of which are set forth at Exhibit I.A.216242.b.

217243.      "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final five or ten years of service, as set forth on Exhibit I.A.216242.b, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

218244.      "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes, the New LTGO Bonds and the Municipal Obligation.

219245.      "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

220246.      "Oakland County" means the County of Oakland, Michigan.

221247.      "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

222248.      "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

223249.      "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

224250.      "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims and Indirect Employee Indemnity Claims are included within the definition of Other Unsecured Claim.

225251.      "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

226252.         "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

227253.         "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

228254.         "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

229255.         "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

230256.         "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development Authority, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

231257.         "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

232258.         "Petition Date" means July 18, 2013.

233259.         "PFRS" means the Police and Fire Retirement System for the City of Detroit.

234260.         "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

235261.         "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any

other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

236262.    "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

237263.    "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

238.    [Paragraph intentionally left blank.]

239264.    "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.

240265.    "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement or Ordinance No. 05-09 of the City.

241266.    "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

242267.    "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

243268.    "Postpetition Financing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

244269.    "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.244269.

245270.    "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.245270.

246271.    "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

247272. "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.M.1.

248273. "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

249. [Paragraph intentionally left blank.]

250274. "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

251275. "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

252276. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

253277. "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations, DIA Funding PartiesCorp., the DIA Funders and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

254278. "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

255279. "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.255279.

256280. "Restructured UTGO Bonds" means the bonds to be issued by the MFA to the current Holders of Unlimited Tax General Obligation Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the MFA and shall be secured as more particularly described in the UTGO Settlement Agreement.

~~257~~281.        "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

~~258~~282.        "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

~~259~~283.        "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

~~260~~284.        "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

~~261~~285.        "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.~~261~~285.

~~262~~286.        "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

~~263~~287.        "Retirement Systems" means, collectively, the GRS and the PFRS.

~~264~~288.        "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

~~265~~289.        "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

~~266~~290.        "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

~~267~~291.        "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

~~268~~292.        "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

~~269~~293.        "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

~~270~~294.        "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.~~270~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~271~~295.        "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

~~272~~296.        "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

~~273~~297.        "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.~~270~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~274~~298.        "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid General Obligation Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

~~275~~299.        "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

~~276~~300.        "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.~~270~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~277~~301.        "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

~~278~~302.        "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

~~279~~303.        "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.~~270~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~280~~304.        "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

~~281~~305.        "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

282306.        "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.270292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

283307.        "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

284308.        "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

285309.        "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.270292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

286310.        "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

287311.        "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

288312.        "Settled COP Claims" means those Disputed COP Claims with respect to which the City enters into a settlement prior to the Effective Date.

289313.        "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.6⁹.

290314.        "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

291315.        "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.F.

292316.        "State" means the state of Michigan.

293317.        "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.

294318.        "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.294318.

295319. "State Related Entities" means, collectively: (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

296320. "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

297321. "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

298322. "Subject COP Litigation Action" means any of the following actions, if proposed to be taken by the Litigation Trustee: (a) replacing the COP Litigation Counsel with new counsel to the Litigation Trust in the COP Litigation; (b) a determination not to appeal an adverse decision on any claim or defense related to the COP Litigation; or (c) the voluntary dismissal of a substantive claim or counterclaim in the COP Litigation or termination by any other means of the COP Litigation.

299323. "Subject COP Litigation Settlement" means any settlement with a Holder or Holders of COP Claims ~~with respect to~~ that proposes to release from the Disputed COP Claims Reserve to such Holder(s) a Pro Rata share of New B Notes (or equivalent currency) based on 40% or more of the face amount of COP Claims held by such Holder(s) ~~that proposes to release a Pro Rata share of New B Notes (or equivalent currency) from the Disputed COP Claims Reserve to such Holder(s)~~.

300324. "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

301325. "Swap Insurance Policies" means those policies or other instruments insuring the COP Swap Agreements and obligations related thereto.

302326. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

303327. "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of: (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

304328. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

305329.    "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class. For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

306330.    "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

307331.    "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

308332.    "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

309333.    "Unlimited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

310334.    "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.310334, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

311335.    "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.310334.

312336.    "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

313337.    "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

314338.    "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

315339.    "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

316340.    "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

317341.        "UTGO Settlement Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.317341.

318342.        "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

319343.        "VEBA Trust Representatives" means (a) the chair of the board of trustees of the Detroit General VEBA and (b) the chair of the board of trustees of the Detroit Police and Fire VEBA.

320344.        "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

321345.        "Wayne County" means the Charter County of Wayne, Michigan.

**B.      Rules of Interpretation and Computation of Time.**

      **1.      Rules of Interpretation.**

            For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

      **2.      Computation of Time.**

            In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

            Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.      **Unclassified Claims.**

1.      **Payment of Administrative Claims.**

a.      **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.  No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

b.      **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

2.      **Bar Dates for Administrative Claims.**

a.      **General Bar Date Provisions.**

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.  The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

b.      **Ordinary Course Claims.**

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

c.      **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

### d. No Modification of Bar Date Order.

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## B. Classified Claims.

### 1. Designation of Classes.

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| *Secured Claims* | | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.~~121~~139) | If (a) the City accepts some or all of the DWSD Tendered Bonds for purchase and (b) the DWSD Settlement Date occurs: Unimpaired/Nonvoting or If (a) the City accepts none of the DWSD Tendered Bonds for purchase or (b) the DWSD Settlement Date does not occur: Unimpaired/Nonvoting or Impaired/Voting, as set forth on Exhibit I.A.~~121~~139 |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.~~128~~147) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.~~131~~150) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |

| CLASS | NAME | IMPAIRMENT |
|:---:|:---|:---|
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

2.      **Subordination; Reservation of Rights to Reclassify Claims.**

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a Holder of a Claim to enforce a subordination agreement against any Entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

3.      **Treatment of Claims.**

a.      **Class 1A – DWSD Bond Claims.**

i.      **Classification and Allowance.**

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.121 139, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.121 139.

ii.      **Treatment.**

A.      **Treatment if DWSD Tender Consummated.**

If (a) the City accepts some or all of the DWSD Tendered Bonds for purchase and (b) the DWSD Settlement Date occurs, then, on the Effective Date, each Holder of an Allowed DWSD Bond Claim shall have its Allowed DWSD Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim. In the event of such Reinstatement, all votes and elections previously delivered in Class 1-A shall not be counted and shall

be of no force and effect.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents arising in connection with such Allowed DWSD Bond Claims shall be paid in full in Cash once Allowed pursuant to the DWSD Tender Order, by agreement of the parties or by order of the Bankruptcy Court.  In addition, all claims for fees, costs and expenses authorized pursuant to or in accordance with the DWSD Tender Order shall be paid as provided therein.

### B. Treatment if DWSD Tender Not Consummated.

If (a) the City accepts none of the DWSD Tendered Bonds for purchase or (b) the DWSD Settlement Date does not occur, then:

### ~~A~~1. Unimpaired Classes.~~.~~

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as Unimpaired on Exhibit I.A.~~121~~139 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

### ~~B~~2. Impaired Classes.~~.~~

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as Impaired on Exhibit I.A.~~121~~139 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed by agreement of the parties or by order of the Bankruptcy Court.

Treatment Option for Classes that Accept the Plan:  Each Holder of an Allowed DWSD Bond Claim in an Impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

### b. Class 1B – DWSD Revolving Sewer Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.~~128~~147, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.~~128~~147.

#### ii. Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

c.        **Class 1C – DWSD Revolving Water Bond Claims**

i.        **Classification and Allowance.**

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.~~131~~150, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~131~~150.

ii.        **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

d.        **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

e.        **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

f.        **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

g.        **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h.        **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i.        **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have

its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

**j.      Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

**k.      Class 4 – HUD Installment Note Claims.**

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

**l.      Class 5 – COP Swap Claims.**

**i.      Allowance.**

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

**ii.      Treatment.**

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

**m.      Class 6 – Parking Bond Claims.**

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

**n.      Class 7 – Limited Tax General Obligation Bond Claims.**

**i.      Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,544,770.

####          ii.          Treatment.

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, (X) a Pro Rata share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions from the Disputed COP Claims Reserve in accordance with Section II.B.3.p.iii.B.

####          iii.          Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

###          o.          Class 8 – Unlimited Tax General Obligation Bond Claims.

####          i.          Allowance.

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

####          ii.          Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement. Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Stub UTGO Bonds, subject to Sections I.A.~~32~~36 and IV.C, which Stub UTGO Bonds shall be reinstated.

###          p.          Class 9 – COP Claims.

####          i.          Disputed.

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Litigation Trust. If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

####          ii.          Assignment.

Those COP Claims or portions thereof that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis on and as of the Effective Date, solely for purposes of facilitating Distributions under this Plan and for no other purpose. Each beneficial holder shall be deemed to receive such COP Claims or portions thereof in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs.

### iii. Treatment.

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

#### A. Disputed COP Claims Reserve.

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain: (a) an Unsecured Pro Rata Share of New B Notes calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs other than those giving rise to the Settled COP Claims (or such other amount as may be required by an order of the Bankruptcy Court); and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve. In addition, in the event any Holder of a Disputed COP Claim enters into a settlement of such Claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and distributed from the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.B.

#### B. Distributions From The Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the COP Agent shall be sent a Distribution on behalf of the Holders of such Allowed Claims ~~shall be sent a Distribution~~ from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of a Final Order resolving any objection to any Disputed COP Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for: (a) an amount of New B Notes or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed to the City, on the terms set forth in Section IV.I; and (b) following such distribution, the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (ii) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (iii) 15% to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14.

### iv. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### q. Class 10 – PFRS Pension Claims.

#### i. Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

### ii. Treatment.

#### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

#### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

#### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

#### D. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

#### E. Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

#### F. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### G. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### H. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii. Treatment.

##### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

##### B. Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Annuity Savings Fund Recoupment.

#### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2. ASF Distribution Recipients.

##### i. Monthly Deduction

For each ASF Distribution Recipient that does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated and converted into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, gender and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

##### ii. Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I. State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

s.        **Class 12 – OPEB Claims.**

i.        **Allowance.**

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

ii.        **Treatment.**

A.        **Detroit General VEBA.**

Establishment of Detroit General VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.89102, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees.  With respect to the initial appointment of the board of trustees, the DRCEA and the Retiree Committee will each appoint two board members, and the City will appoint three board members.  The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the City will fill board member vacancies created by the departure of members initially appointed by the City.  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

B.        **Detroit Police and Fire VEBA.**

Establishment of Detroit Police and Fire VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.  The Detroit Police and Fire VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.93106, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees.  With respect to the initial appointment of the board of trustees, the RDPFFA and the Retiree Committee will each appoint two board members, and the City will appoint three board members.  The RDPFFA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the RDPFFA, and the City will fill board member vacancies created by the departure of members initially appointed by the City.  Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA:  On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

### C.       No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

### t.       Class 13 – Downtown Development Authority Claims.

#### i.       Allowance.

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

#### ii.       Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

### u.       Class 14 – Other Unsecured Claims.

#### i.       Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, (A) on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes and (B) distributions from the Disputed COP Claims Reserve in accordance with Section II.B.3.p.iii.B.

### v.       Class 15 – Convenience Claims.

#### i.       Treatment.

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.6572) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

### w.       Class 16 – Subordinated Claims.

#### i.       Treatment.

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

i.       **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive:  (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

ii.       **Further Obligation of City, State and 36th District Court.**

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims.  Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

**C.       Confirmation Without Acceptance by All Impaired Classes.**

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

**D.       Treatment of Executory Contracts and Unexpired Leases.**

**1.       Assumption.**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.

**2.       Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

**3.       Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a

motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6.  The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case.  Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or

Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

**8. Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.**

Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

**9. Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

**ARTICLE III
CONFIRMATION OF THE PLAN**

**A. Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2. The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3. The Confirmation Order shall not be stayed in any respect.

4. All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

5. All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the LTGO Settlement Agreement.

6.     Any legislation that must be passed by the State legislature to effect any term of the Plan shall have been enacted.

7.     The MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

8.     The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

9.     The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.B.

10.    If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

11.    The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.     Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in Section III.A.7 and Section III.A.8, which conditions cannot be waived.

**C.     Effect of Nonoccurrence of Conditions to the Effective Date.**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

**D.     Effect of Confirmation of the Plan.**

**1.     Dissolution of Retiree Committee.**

On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

**2.     Preservation of Rights of Action by the City.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the

past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

**3. Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

**4. Discharge of Claims.**

**a. Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

**b. Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; provided that such discharge will not apply to (i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

**5. Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a. all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1.       commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);

2.       enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;

3.       creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;

4.       asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;

5.       proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

6.       taking any actions to interfere with the implementation or consummation of the Plan.

b.       All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.  Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

6.       **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement) and, (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement

Agreement or the Plan (as it relates to the UTGO Settlement Agreement) and (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order; provided, further, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan; provided, further, that this Section III.D.6 shall not affect any liability of any of the COP Swap Exculpated Parties to Syncora Guarantee Inc., Syncora Capital Assurance Inc. or Financial Guaranty Insurance Company in connection with the COP Swap Settlement.

       **7.**       **Releases**

       Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

       a.       each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

       i.       all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); and

       ii.       all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

       provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA

Funding Parties _that are such as of the commencement of the Confirmation Hearing,_ which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.      if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.  For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations.  Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.  For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims ~~or~~of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds.  _For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds._

E.      **No Diminution of State Power**

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

F. **Effectiveness of the Plan.**

The Plan shall become effective on the Effective Date. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

G. **Binding Effect of Plan.**

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan. The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A. **DWSD.**

1. **Rates and Revenues.**

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues. Rates will be determined by the Board of Water Commissioners. The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

2. **DWSD CBAs.**

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

3. **The New DWSD Bonds and New Existing Rate DWSD Bonds.**

DWSD shall, as necessary: (a) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.209235, and distribute the New DWSD Bonds as set forth in the Plan; and (b) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.211237, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

4. **Potential DWSD Authority Transaction.**

As a result of mediation or otherwise, it is possible that the City may enter into a DWSD Authority Transaction that includes the formation of the DWSD Authority to conduct many or all of the operations currently conducted by DWSD. Any such transaction would be subject to the approval of incorporating units and numerous other conditions. The timing of any such transaction, if it occurs at all, is not known. If any such transaction could occur, unless waived by the City in its sole discretion, the City will enter into such transaction only if Macomb County, Oakland County and Wayne County, and each of their municipal affiliates or related public corporations, withdraw with prejudice or shall have withdrawn with prejudice their objections to the Confirmation of the Plan.

Any DWSD Authority Transaction shall be on terms that are consistent with all other provisions of the Plan, applicable law and orders of the Bankruptcy Court. The City shall not enter into any binding agreement with respect to or consummate any DWSD Authority Transaction prior to the Effective Date without first obtaining an order of the Bankruptcy Court approving and authorizing such DWSD Authority Transaction.

All terms and conditions in respect of any DWSD Authority Transaction set forth in (a) any Bond Document or (b) any transaction document in respect of such a DWSD Authority Transaction shall in any case include: (i) no material modifications to the source of payment and security for any DWSD Bonds, New DWSD Bonds, New Existing Rate DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (ii) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds, New DWSD Bonds, New Existing Rate DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (iii) that the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable Bond Documents; and (iv) ratings confirmation of any rating agency then rating the DWSD Bonds, New DWSD Bonds, New Existing Rate DWSD Bonds and 2014 Revenue and Revenue Refinancing Bonds.

**B.**     **The New B Notes and New LTGO Bonds.**

On the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.~~206~~232, and distribute the New B Notes as set forth in the Plan; and (b) execute the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.~~198~~224, and distribute the New LTGO Bonds as set forth in the Plan.

**C.**     **The UTGO Settlement.**

On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement Agreement, a copy of which is attached hereto as Exhibit I.A.~~317~~341. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things: (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**D.**     **The State Contribution Agreement.**

Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.~~294~~318.

1. **State Contribution.**

    The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

2. **Income Stabilization Payments.**

    The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner. In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

    In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System. In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

3. **Conditions to State's Participation.**

    The payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following: (a) the Confirmation Order becoming a Final Order no later than December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution; (g) evidence satisfactory to the State of an irrevocable commitment by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents) to fund $366 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1.

    The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise

addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

### 4. Release of Claims Against the State and State Related Entities.

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### E. The DIA Settlement.

On the Effective Date, the City~~,~~ and the ~~Foundations and~~ DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties that are such as of the Effective Date have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.~~103~~119 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.~~102~~118. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

### 1. Funding Contributions.

The DIA Settlement will be funded as follows: (a) irrevocable commitments in an aggregate amount of at least $366 million by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents); and (b) in addition to its continuing commitments outside of the DIA Settlement, ~~an~~ irrevocable ~~commitment from DIA Corp. to raise at least~~commitments in an aggregate amount of $100 million from ~~its donors (~~the DIA Direct Funders (including the commitment of the Special Foundation Funders, as that term is defined in the DIA Settlement Documents, and subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to the "Agreed Required Minimum Schedule" and subject to the ~~Foundations' and the DIA Funders'~~ option at any time for the "Present Value Discount," as set forth in ~~Exhibit I.A.102~~the DIA Settlement Documents. Amounts committed by the Foundations and the DIA Direct Funders will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

### 2. Transfer of DIA Assets.

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

### 3. Conditions to the DIA Funding Parties' Participation.

The DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.~~102~~118; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries

upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities' obligations under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution; and (k) ~~the occurrence of the Effective Date no later than December 31, 2014; and (l)~~ the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

### F.     Contingent Payment Rights

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust.  The City shall issue the DWSD CVR to the Restoration Trust.  If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire.  The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities:  (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS.  If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made.  The DWSD CVR may not be transferred.

#### 1.     Special Restoration

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration.  In such case, the City will perform a Value Determination and arrive at the Discounted Value.  The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable.  In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.  In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored.  In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate.  In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction.  Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

#### 2.     General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of

funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## G.     The OPEB Settlement.

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## H.     The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I.     Prosecution of COP Litigation.

### 1.     Creation of Litigation Trust.

From and after the Effective Date, the City will remain a named plaintiff and defendant in the COP Litigation, but shall transfer all of its rights and interests in the COP Litigation to the Litigation Trust. The beneficiaries of the Litigation Trust, for the purpose of the COP Litigation, shall be the LTGO Litigation Parties and the Holders of Allowed Other Unsecured Claims. The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Insurer and the City.

### 2.     Direction of COP Litigation.

The Litigation Trustee shall follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein. The Litigation Trustee and VEBA Trust Representatives shall meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Litigation Parties, as requested, to discuss the COP Litigation. The Litigation Trustee shall provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the LTGO Litigation Parties. Upon request from a LTGO Litigation Party, the Litigation Trustee will provide to such LTGO Litigation Party drafts of court papers that will be Filed by the Litigation Trustee as early as practicable under the circumstances.

### 3.     Payment of Fees and Expenses.

The cost of all fees and expenses incurred by the Litigation Trustee in connection with the COP Litigation shall be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.A. The Litigation Trustee's fees shall be fixed and consented to by the LTGO Insurer and the VEBA Trustee Representatives.

The Litigation Trustee shall submit to the City on a monthly basis invoices for its fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees.

The City shall pay such invoices within 30 days of receipt of such invoices, pending reimbursement from the Disputed COP Claims Reserve. Reimbursement of the City from the Disputed COP Claims Reserve will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.

In the event that a Final Order is entered against the City or the Litigation Trust, as successor in interest to the City, in the COP Litigation such that the New B Notes in the Disputed COP Claims Reserve are subject to Distribution to the Holders of Allowed COP Claims in accordance with the Plan, the City will reimburse the Disputed COP Claims Reserve for any amounts withdrawn from the Disputed COP Claims Reserve prior to the date of such Final Order becoming a Final Order.

### 4. Settlement of COP Litigation.

The Litigation Trustee shall consult with the LTGO Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee shall provide the LTGO Litigation Parties with advance notice, as early as practicable under the circumstances, of any COP Litigation settlement negotiations, and the LTGO Litigation Parties and their counsel shall have the right to participate in such negotiations. Any potential settlement of the COP Litigation must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against any party. The Litigation Trustee will not take any Subject COP Litigation Actions without the consent of the LTGO Litigation Parties. The Litigation Trustee will not enter into a Subject COP Litigation Settlement without the consent of the LTGO Insurer.

In the event that, after consultation with the Litigation Trustee, (i) the LTGO Insurer does not consent to the Litigation Trustee entering into a Subject COP Litigation Settlement or (ii) the LTGO Litigation Parties do not consent to the Litigation Trustee taking a Subject COP Litigation Action, the Litigation Trustee or any LTGO Litigation Party may present the issue to the LTGO Independent Party for mediation and resolution. The LTGO Independent Party shall conduct a mediation to attempt to consensually resolve the issue. If a consensual resolution cannot be reached, the LTGO Independent Party shall resolve the issue or issues, which resolution will be binding on the LTGO Insurer or the LTGO Litigation Parties, as the case may be, and the Litigation Trustee. Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction in the COP Litigation. The City, the COP Litigation Counsel, the VEBA Trust Representatives and the LTGO Insurer shall take any steps that may be required to preserve applicable privileges of the City and the COP Litigation Counsel with regard to the COP Litigation.

### J. Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

### K. Cancellation of Existing Bonds and, Bond Documents, COPs and COP Documents.

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts pursuant to Section II.D), on the Effective Date, the Bonds and, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties to the City, as applicable, under the Bonds and, the Bond Documents, the COPs and the COP Documents shall be discharged; provided, however, that the Bonds and, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights

and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and, (iii) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City and (iv) as may be necessary to preserve any claim by (1) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer or (2) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such Bonds or, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers or (b) COPs Holders or for COP Claims Agent with respect to claims under applicable policies or other instruments insuring the COPs COP Insurance Policies and obligations related thereto. For the avoidance of doubt, except for the immediately preceding sentence, this Section IV.K shall not apply to any Bonds that are Reinstated pursuant to the Plan. Section II.B.3.a.ii.A.

**L.       Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.L.

**M.       Professional Fees**

**1.       Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks) and (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

**2.       Fee Review Order**

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order. For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review

Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

### 3. Dismissal of the Fee Examiner

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder. The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

### 4. Potential Review of Fees Not Subject to Fee Review Order

The City shall have the right to bring before the Bankruptcy Court a request to review and determine the reasonableness of the fees and expenses of any Fee Review Professional retained by a creditor of the City or any of its departments to the extent that such fees and expenses have not been either (a) approved pursuant to or in accordance with the DWSD Tender Order, (b) subject to court review or (c) subject to a Bankruptcy Court-approved or agreed upon process for binding arbitration.

### ~~4~~5. Court-Appointed Expert

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

### N. Assumption of Indemnification Obligations.

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.N shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.N.

### O. Incorporation of Retiree Health Care Settlement Agreement.

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.~~261~~285, are incorporated herein by reference and shall be binding upon the parties thereto.

### P. Payment of Workers' Compensation Claims.

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is

responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law. The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**Q.  36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.69. The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

**R.  Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows:  (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.R, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**S.  Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund or property tax refund.

**T.  Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**U.  Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**V.     Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**W.     Post-Effective Date Governance.**

Prior to or on the Effective Date, the Financial Review Commission shall be established pursuant to and in accordance with the Financial Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that promote more efficient and effective delivery of services to City residents. The City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

**ARTICLE V**
**PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN**

**A.     Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.     Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent, the Bond Agent or the COP Agent, as applicable, the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.     Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.     Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution

Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.      Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.      City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

**I.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.     Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

**2.     Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

**3.     Delivery of Distributions on Account of COP Claims.**

Distributions on account of the COP Claims shall (a) be made by the Disbursing Agent to the COP Agent under the applicable COP Documents for the benefit of Holders of COP Claims and (b) be deemed completed when made by the Disbursing Agent to the COP Agent as if such Distributions were made directly to the Holders of such Claims. The applicable COP Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable COP Documents and subject to the respective rights, claims and interests, if any, that the COP Agent may have under the applicable COP Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The COP Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

**3~~4~~.     De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

**4~~5~~.     Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled

and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

        **56.**       **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

**J.**       **Other Provisions Applicable to Distributions in All Classes.**

        **1.**       **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

        **2.**       **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

        **3.**       **Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### 4. Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make or preserve a claim under any applicable policies or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

### ARTICLE VI
### PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A. Treatment of Disputed Claims.

### 1. General.

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

### 2. ADR Procedures.

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

### 3. Tort Claims.

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder

that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

## B. Disputed Claims Reserve.

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

## C. Objections to Claims.

### 1. Authority to Prosecute, Settle and Compromise.

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

2.      **Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

3.      **Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

4.      **Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      Confirm the maturity date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law);

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.     Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.     Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

K.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

L.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

N.     Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

O.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.     Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**B.     Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

C.    **Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be: (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

D.    **Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

E.    **Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

F.    **Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

G.    **Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

H.    **Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

## I.     Governing Law.

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

## J.     Request for Waiver of Automatic Stay of Confirmation Order.

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

## K.     Term of Existing Injunctions and Stays.

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

## L.     Service of Documents

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

### 1.     The City

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226

Telephone: (313) 963-6420
Facsimile: (313) 496-7500

(Counsel to the City)

2.    **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801

(Counsel to the Retiree Committee)


Dated:  ~~July 29~~August 20, 2014          Respectfully submitted,

The City of Detroit, Michigan


By:      /s/  Kevyn D. Orr                                    
Name:  Kevyn D. Orr
Title:   Emergency Manager for the City of Detroit, Michigan

COUNSEL:


 /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

**EXHIBIT B**

**THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------- x
                                        :
In re                                   :        Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :        Case No. 13-53846
                                        :
           Debtor.                      :        Hon. Steven W. Rhodes
                                        :
                                        :
------------------------------------------------------- x
```

---

**~~FOURTH~~SIXTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT (~~May 5~~August 20, 2014)**

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**<u>TABLE OF CONTENTS</u>**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND
              COMPUTATION OF TIME ................................................................................. 1

    A.       Defined Terms. ...................................................................................................... 1

    B.       Rules of Interpretation and Computation of Time ............................................ 2428

           1.       Rules of Interpretation ............................................................................. 2428

           2.       Computation of Time ............................................................................... 2428

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY
              CONTRACTS AND UNEXPIRED LEASES .............................................. 2429

    A.       Unclassified Claims ............................................................................................. 2529

           1.       Payment of Administrative Claims. ........................................................ 2529

           2.       Bar Dates for Administrative Claims. ..................................................... 2529

    B.       Classified Claims. ............................................................................................... 2630

           1.       Designation of Classes. ........................................................................... 2630

           2.       Subordination; Reservation of Rights to Reclassify Claims. .................. 2731

           3.       Treatment of Claims. .............................................................................. 2732

    C.       Confirmation Without Acceptance by All Impaired Classes. ............................ 3743

    D.       Treatment of Executory Contracts and Unexpired Leases. ............................... 3744

           1.       Assumption. ............................................................................................. 3744

           2.       Assumption of Ancillary Agreements. .................................................... 3744

           3.       Approval of Assumptions and Assignments. .......................................... 3744

           4.       Payments Related to the Assumption of Executory Contracts and
                   Unexpired Leases. ................................................................................... 3844

           5.       Contracts and Leases Entered Into After the Petition Date. .................. 3845

           6.       Rejection of Executory Contracts and Unexpired Leases. ..................... 3845

           7.       Rejection Damages Bar Date. ................................................................. 3845

           8.       Preexisting Obligations to the City Under Rejected Executory
                   Contracts and Unexpired Leases. ........................................................... 3945

           9.       Insurance Policies. .................................................................................. 3945

ARTICLE III CONFIRMATION OF THE PLAN ................................................................ 3946

    A.       Conditions Precedent to the Effective Date ...................................................... 3946

    B.       Waiver of Conditions to the Effective Date. ..................................................... 4046

    C.       Effect of Nonoccurrence of Conditions to the Effective Date. ......................... 4047

D.     Effect of Confirmation of the Plan.................................................... 40 47

     1.     Dissolution of Retiree Committee. .......................................... 40 47

     2.     Preservation of Rights of Action by the City. ......................... 40 47

     3.     Comprehensive Settlement of Claims and Controversies. ........ 41 47

     4.     Discharge of Claims. .............................................................. 41 48

     5.     Injunction. ............................................................................. 41 48

     6.     Exculpation. ........................................................................... 42 49

     7.     Releases ................................................................................. 43 49

E.     No Diminution of State Power .......................................................... 43 51

F.     Effectiveness of the Plan. ................................................................. 44 51

G.     Binding Effect of Plan. .................................................................... 44 51

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ................................ 44 52

A.     DWSD. ............................................................................................ 44 52

     1.     Rates and Revenues. ............................................................... 44 52

     2.     DWSD CBAs. ........................................................................ 44 52

     3.     The New DWSD Bonds and New Existing Rate DWSD Bonds. 44 52

     4.     Potential DWSD Authority Transaction. ................................ 52

B.     The New B Notes and New LTGO Bonds. ....................................... 44 52

C.     The Plan COP UTGO Settlement. .................................................... 45 53

D.     The UTGO Settlement. ..................................................................... 45

E D.     The State Contribution Agreement. ................................................... 45 53

     1.     State Contribution. ................................................................. 45 53

     2.     Income Stabilization Payments. ............................................. 45 53

     3.     Conditions to State's Participation. ........................................ 46 54

     4.     Release of Claims Against the State and State Related Entities. ........... 46 54

F E.     The DIA Settlement. ........................................................................ 46 54

     1.     Funding Contributions. .......................................................... 46 55

     2.     Transfer of DIA Assets. ......................................................... 47 55

     3.     Conditions to the Foundations DIA Funding Parties' Participation. ........ 47 55

G F.     Contingent Payment Rights .............................................................. 47 55

     1.     Special Restoration. ............................................................... 47 56

     2.     General Restoration. .............................................................. 48 56

H G.     The OPEB Settlement. ...................................................................... 48 56

| | | | |
|---|---|---|---|
| H. | The LTGO Settlement. | | 56 |
| I. | Prosecution of COP Litigation. | | 57 |
| | 1. | Creation of Litigation Trust. | 57 |
| | 2. | Direction of COP Litigation. | 57 |
| | 3. | Payment of Fees and Expenses. | 57 |
| | 4. | Settlement of COP Litigation. | 57 |
| ~~I~~J. | Issuance of the New Securities. | | ~~48~~58 |
| ~~J~~K. | Cancellation of Existing Bonds ~~and,~~ Bond Documents, COPs and COP Documents. | | ~~48~~58 |
| ~~K~~L. | Release of Liens. | | ~~49~~58 |
| M. | Professional Fees | | 59 |
| | ~~L~~1. | Professional Fee Reserve | ~~49~~59 |
| | 2. | Fee Review Order | 59 |
| | 3. | Dismissal of the Fee Examiner | 59 |
| | 4. | Potential Review of Fees Not Subject to Fee Review Order | 59 |
| | 5. | Court-Appointed Expert | 60 |
| ~~M~~N. | Assumption of Indemnification Obligations. | | ~~49~~60 |
| ~~N~~O. | Incorporation of Retiree Health Care Settlement Agreement. | | ~~49~~60 |
| ~~O~~P. | Payment of Workers' Compensation Claims. | | ~~49~~60 |
| Q. | 36th District Court Settlement. | | 60 |
| ~~P~~R. | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | | ~~50~~60 |
| ~~Q~~S. | Payment of Tax Refund Claims. | | ~~50~~61 |
| ~~R~~T. | Utility Deposits. | | ~~50~~61 |
| ~~S~~U. | Pass-Through Obligations. | | ~~50~~61 |
| ~~T~~V. | Exit Facility. | | ~~50~~61 |
| ~~U~~W. | Post-Effective Date Governance. | | ~~51~~61 |
| ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN | | | ~~51~~62 |
| A. | Appointment of Disbursing Agent. | | ~~51~~62 |
| B. | Distributions on Account of Allowed Claims. | | ~~51~~62 |
| C. | Certain Claims to Be Expunged. | | ~~51~~62 |
| D. | Record Date for Distributions; Exception for Bond Claims. | | ~~51~~62 |
| E. | Means of Cash Payments. | | ~~52~~62 |

F.      Selection of Distribution Dates for Allowed Claims. ................................... ~~52~~63

G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. .............................................................................. ~~52~~63

H.      City's Rights of Setoff Preserved. .................................................... ~~52~~63

I.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......... ~~52~~63

        1.      Delivery of Distributions Generally. ........................................ ~~52~~63

        2.      Delivery of Distributions on Account of Bond Claims. ........................ ~~52~~63

        3.      Delivery of Distributions on Account of COP Claims. ..................... 64

        ~~3~~4.      De Minimis Distributions / No Fractional New Securities. .................... ~~53~~64

        ~~4~~5.      Undeliverable or Unclaimed Distributions. ................................. ~~53~~64

        ~~5~~6.      Time Bar to Cash Payment Rights. ........................................ ~~53~~64

J.      Other Provisions Applicable to Distributions in All Classes. ....................... ~~53~~64

        1.      No Postpetition Interest. ................................................... ~~53~~64

        2.      Compliance with Tax Requirements. ........................................ ~~54~~65

        3.      Allocation of Distributions. ................................................ ~~54~~65

        4.      Surrender of Instruments. .................................................. ~~54~~65

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ..................... ~~55~~66

A.      Treatment of Disputed Claims. ................................................ ~~55~~66

        1.      General. ................................................................. ~~55~~66

        2.      ADR Procedures. ........................................................ ~~55~~66

        3.      Tort Claims. ............................................................ ~~55~~66

B.      Disputed Claims Reserve. ..................................................... ~~56~~67

C.      Objections to Claims. ........................................................ ~~56~~67

        1.      Authority to Prosecute, Settle and Compromise. ............................. ~~56~~67

        ~~2.~~      ~~Application of Bankruptcy Rules.~~ ........................................ ~~56~~

        ~~3~~2.      Expungement or Adjustment of Claims Without Objection. .................. ~~56~~67

        ~~4~~3.      Extension of Claims Objection Bar Date. ................................... ~~56~~67

        ~~5~~4.      Authority to Amend List of Creditors. ...................................... ~~56~~67

ARTICLE VII RETENTION OF JURISDICTION .................................... ~~57~~68

ARTICLE VIII MISCELLANEOUS PROVISIONS ................................... ~~58~~69

A.      Plan Supplements. .......................................................... 69

~~A~~B.      Modification of the Plan. ..................................................... ~~58~~69

~~B~~C.      Revocation of the Plan. ....................................................... ~~58~~69

C.      Disclosure of Amounts to Be Paid for Chapter 9 Case Services. ............................. 58

D.      Severability of Plan Provisions. ................................................................. 58 69

E.      Effectuating Documents and Transactions. ................................................. 59 70

F.      Successors and Assigns. ............................................................................ 59 70

G.      Plan Controls. ........................................................................................... 59 70

H.      Notice of the Effective Date. ..................................................................... 59 70

I.      Governing Law. ........................................................................................ 59 70

J.      Request for Waiver of Automatic Stay of Confirmation Order. ................... 59 70

K.      Term of Existing Injunctions and Stays. ..................................................... 59 70

L.      Service of Documents ............................................................................... 60 71

        1.      The City ......................................................................................... 60 71

        2.      The Retiree Committee ................................................................... 60 71

**TABLE OF EXHIBITS**

Exhibit I.A.9               Principal Terms of 36th District Court Settlement

Exhibit I.A.6184           Schedule of COP Swap Agreements

Exhibit I.A.78102          Form of Detroit General VEBA Trust Agreement

Exhibit I.A.82106          Form of Detroit Police and Fire VEBA Trust Agreement

Exhibit I.A.91118          Principal Terms of DIA Settlement

Exhibit I.A.92119          Form of DIA Settlement Documents

Exhibit I.A.110139         Schedule of DWSD Bond Documents & Related DWSD Bonds

Exhibit I.A.117147         Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds

Exhibit I.A.120150         Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds

Exhibit I.A.135172         Principal Terms of Exit Facility

Exhibit I.A.159198         Schedule of HUD Installment Note Documents & Related HUD Installment Notes

Exhibit I.A.168208         Interest Rate Reset Chart

Exhibit I.A.173213         Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds

Exhibit I.A.224            Form of LTGO Settlement Agreement

Exhibit I.A.183232         Principal Terms of New B Notes

Exhibit I.A.184233         Form of New B Notes Documents

Exhibit I.A.186235         Principal Terms of New DWSD Bonds

Exhibit I.A.188237         Principal Terms of New Existing Rate DWSD Bonds

Exhibit I.A.189238.a       Form of New GRS Active Pension Plan

Exhibit I.A.189238.b       Principal Terms of New GRS Active Pension Plan

Exhibit I.A.191242.a       Form of New PFRS Active Pension Plan

Exhibit I.A.191242.b       Principal Terms of New PFRS Active Pension Plan

Exhibit I.A.214            Form of Plan COP Settlement Documents

Exhibit I.A.220269         Prior GRS Pension Plan

Exhibit I.A.221270         Prior PFRS Pension Plan

Exhibit I.A.279        Restoration Trust Agreement

Exhibit I.A.~~236~~285        Retiree Health Care Settlement Agreement

Exhibit I.A.~~244~~292        Schedule of Secured GO Bond Documents

Exhibit I.A.~~268~~318        State Contribution Agreement

Exhibit I.A.~~279~~334        Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds

Exhibit I.A.~~285~~        ~~Principal Terms~~341        Form of UTGO Settlement Agreement

Exhibit II.B.3.q.ii.A        Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits

Exhibit II.B.3.q.ii.C        Terms of PFRS Pension Restoration

Exhibit II.B.3.r.ii.A        Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits

Exhibit II.B.3.r.ii.C        Terms of GRS Pension Restoration

Exhibit II.D.5        Schedule of Postpetition Collective Bargaining Agreements

Exhibit II.D.6        Executory Contracts and Unexpired Leases to Be Rejected

Exhibit III.D.2        Retained Causes of Action

**INTRODUCTION**

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

**A.      Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.      "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.      "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.      "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.      "2014 DWSD Refinancing Obligations" means, collectively, the (i) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D, (ii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E, (iii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F, (iv) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014G, (v) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System

Revenue Refunding Senior Lien Bonds, Series 2014A, (vi) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B, (vii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C, and (viii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D.

6.    "2014 Revenue and Revenue Refinancing Bonds" means, collectively, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds.

7.    "2014 Revenue Refinancing Bonds" means, collectively, the Michigan Finance Authority's (i) Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (ii) Local Government Loan Program Revenue Bonds, Series 2014C-5 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iii) Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iv) Local Government Loan Program Revenue Bonds, Series 2014C-7 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (v) Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vi) Local Government Loan Program Revenue Bonds, Series 2014D-2 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vii) Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, and (viii) Local Government Loan Program Revenue Bonds, Series 2014D-4 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds.

58.    "36th District Court" means the district court for the thirty-sixth judicial district of the State.

9.    "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.9.

610.    "Active Employee" means an active employee of the City on and after the Confirmation Date.

711.    "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

12.    "Ad Hoc Committee of DWSD Bondholders" means, collectively, Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

813.    "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

914.    "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to

priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code ~~and/~~or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee ~~(other than the Retiree Committee)~~ or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

~~10~~15.  "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

~~11~~16.  "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

~~12~~17.  "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

~~13~~18.  "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

~~14~~19.  "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City.  "Allow" and "Allowing" shall have correlative meanings.

20.  "Ambac" means Ambac Assurance Corporation.

~~15~~21.  "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

~~16~~22.  "Annuity Savings Fund Excess Amount" means the following: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return.  For purposes of this

definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

~~17~~23. "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.~~154~~193, plus the ASF Recoupment.

~~18~~24. "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

~~19~~25. "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

26. "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

27. "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

28. "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

29. "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

30. "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

~~20~~31. "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

~~21~~32. "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

33. "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

34. "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

~~22~~35. "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

2336. "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Reinstated Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.285341.

37. "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

2438. "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

2539. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

2640. "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

2741. "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

2842. "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

2943. "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

3044. "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

3145. "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

3246. "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

3347. "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds and/or the Secured GO Bonds.

3448. "Bondholder" means any beneficial or record holder of a Bond.

3549. "Bond Insurance Policies" means those policies, surety policies and/or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

~~36~~50.    "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

~~37~~51.    "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

~~38~~52.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

~~39~~53.    "Cash" means legal tender of the United States of America and equivalents thereof.

~~40~~54.    "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

~~41~~55.    "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

~~42~~56.    "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

~~43~~57.    "City" means the City of Detroit, Michigan.

~~44~~58.    "City Council" means the duly-elected City Council of the City.

~~45~~59.    "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

~~46~~60.    "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

~~47~~61.    "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the ~~later~~latest of (a) ~~one year~~180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

~~48~~62.    "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

~~49~~63.    "Class" means a class of Claims, as described in Section II.B.

~~50~~64.    "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

5165.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

5266.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

5367.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

5468.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

69.    "Contract Administration Agreement 2005" means the Contract Administration Agreement dated June 2, 2005, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2005, and the COP Contact Administrator.

70.    "Contract Administration Agreement 2006" means the Contract Administration Agreement dated June 12, 2006, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2006, and the COP Contact Administrator.

71.    "Contract Administration Agreements" means, together, the Contract Administration Agreement 2005 and the Contract Administration Agreement 2006.

5572.    "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

73.    "COP Agent" means a contract administrator, trustee, paying agent or similar Entity, as applicable, under the COP Documents.

74.    "COP Claim" means a Claim under or evidenced by the COP Service Contracts.  For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to:  (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

75.    "COP Contract Administrator" means Wilmington Trust, National Association, as successor to U.S. Bank, N.A.

5676.    "COPsCOP Documents" means, collectively, the COP Service Contracts, the 2005 COPs andAgreement, the 2006 COPs Agreement and the Contract Administration Agreements.

77.    "COP Insurance Policies" means those certain polices or other instruments insuring the 2005 COPs issued under the 2005 COPs Agreement and the 2006 COPs issued under the 2006 COPs Agreement,

including all ancillary and related documents that may obligate the City to pay any amount to a COP Insurer for any reason.

5778. "COP Insurance Policies Claim" means a Claim held by a COP Insurer arising under or evidenced by the in connection with a COP Service Contracts Insurance Policy.

79. "COP Insurer" means any party, other than the City, that has issued a COP Insurance Policy.

5880. "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

81. "COP Litigation Counsel" means counsel to the Litigation Trust in the COP Litigation.

5982. "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

6083. "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

6184. "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.6184, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

6285. "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

6386. "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

6487. "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

6588. "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

6689. "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

90. "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

6791.  "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

6892.  "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

93.  "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

6994.  "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

70.  "Creditor Representative" means (a) if all Retiree Classes accept the Plan and the Retiree Committee supports the Plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 rejects the Plan, a person or committee of persons appointed by the Emergency Manager.

7195.  "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

7296.  "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

7397.  "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

7498.  "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

7599.  "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OBEBOPEB Claim.

76100.  "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

77101.  "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

78102.  "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.78102.

~~79~~103. "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

~~80~~104. "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

~~81~~105. "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

~~82~~106. "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.~~82~~106.

107. "Detroit Retirement Systems Funding Trust 2005" means the funding trust established pursuant to the 2005 COPs Agreement.

108. "Detroit Retirement Systems Funding Trust 2006" means the funding trust established pursuant to the 2006 COPs Agreement.

~~83~~109. "DIA" means The Detroit Institute of Arts, a museum and cultural ~~facility~~institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

~~84~~110. "DIA Assets" means the ~~assets identified on Exhibit A to the summary of the material terms of~~"Museum Assets" as defined in the DIA Settlement~~, which is attached hereto as Exhibit I.A.91, to the extent that the City holds title to any such assets as of the Effective Date~~ Documents.

~~85~~111. "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

112. "DIA Direct Funders" means DIA Corp. and those DIA Funders whose commitments to contribute monies in furtherance of the DIA Settlement are made directly to the CFSEM Supporting Organization.

~~86~~113. "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations ~~listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, and all additional persons, businesses, business affiliated foundations and any other foundations~~ from which DIA Corp. secures commitments, whether before or after the Effective Date, to contribute monies ~~in furtherance of~~or otherwise secures contributions of monies in support of DIA Corp.'s payment obligations under the DIA Settlement, whether paid directly to the CFSEM Supporting Organization or to DIA Corp. for the purpose of supporting DIA Corp.'s payments to the CFSEM Supporting Organization.

~~87~~114. "DIA Funding Parties" means the Foundations~~,~~ and the DIA Direct Funders~~ and DIA Corp~~.

~~88~~115. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.~~F~~E.1.

~~89~~116. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

90117. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

91118. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.FE and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.91118.

92119. "DIA Settlement Documents" means the definitive documentation, including grant award letters, to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.92119, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.91118.

93120. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

94121. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

95122. "Disclosure Statement Order" means the [_____]Order Approving the Proposed Disclosure Statement (Docket No. [_____]4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____]May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

96123. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

97124. "Disputed Claim" means any Claim that is not Allowed.

98125. "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.B.1A.

99126. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

100127.        "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

101128.        "Distribution Date" means any date on which a Distribution is made.

102129.        "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

103130.        "District Court" means the United States District Court for the Eastern District of Michigan.

104131.        "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

105132.	"Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

106133.	"Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

107134.	"DRCEA" means the Detroit Retired City Employees Association.

108135.	"DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

136.	"DWSD Authority" means an authority that may be formed pursuant to a DWSD Authority Transaction to conduct many or all of the operations currently conducted by DWSD as described in Section IV.A.4.

137.	"DWSD Authority Transaction" means the potential formation (including the potential transfer of certain assets owned by DWSD) and operation of the DWSD Authority, as described in Section IV.A.4.

109138.	"DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

110139.	"DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued and/or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.110139, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

111140.	"DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.110139.

112141.	"DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

142.	"DWSD Exculpated Parties" means, collectively, the DWSD Settlement Parties and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

113143.	"DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

114144.	"DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

115145.	"DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

116146.	"DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

117147.        "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.117147, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

118148.        "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.117147.

119149.        "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

120150.        "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted and/or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.120150, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

121151.        "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.120150.

122152.        "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

153.        "DWSD Settlement Date" means the date prior to the Effective Date upon which each of (i) consummation of the purchase of the DWSD Tendered Bonds, (ii) issuance of the 2014 DWSD Refinancing Obligations and (iii) issuance of the 2014 Revenue Refinancing Bonds occurs, which date is identified as September 4, 2014 in the DWSD Tender Invitations (subject to rescheduling to a date earlier or later than that date by the City in its sole discretion).

154.        "DWSD Settlement Parties" means, collectively, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., Berkshire Hathaway Assurance Corp., Financial Guaranty Insurance Company (solely in its capacity as a DWSD Bond Insurer and solely if it provides any consents required to effectuate the DWSD Tender), the Ad Hoc Committee of DWSD Bondholders and U.S. Bank National Association, as trustee for the DWSD Bonds.

155.        "DWSD Tender" means the offers, subject to acceptance at the City's election and in its sole discretion, to purchase for cancellation some or all of the DWSD Bonds that have been tendered and accepted in connection with, and on the terms provided in, the DWSD Tender Invitations.

156.        "DWSD Tendered Bonds" means the DWSD Bonds that have been tendered for purchase or cancellation pursuant to the DWSD Tender.

157.        "DWSD Tender Invitations" means the invitations and accompanying disclosure statements sent by the City to holders of DWSD Bonds on August 7, 2014, in the form of those collectively attached as Exhibits 8A and 8B to the DWSD Tender Motion.

158.        "DWSD Tender Motion" means the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644), Filed by the City on August 11, 2014.

159.        "DWSD Tender Order" means the order of the Bankruptcy Court approving the DWSD Tender Motion.

123160.    "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

124161.    "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

125162.    "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

126163.    "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continuedcontinue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

127164.    "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

128165.    "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

129166.    "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

130167.    "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

131168.    "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

132169.    "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors and, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties, (j) the UTGO Exculpated Parties and (k) the DWSD Exculpated Parties.  For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

133170.    "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

134171.    "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed.  The City reserves the

right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website. ~~For the avoidance of doubt, Exhibits I.A.92 and I.A.135 will be Filed only if the transactions related to and/or underlying such Exhibits are to be consummated by the City.~~

~~135~~172.    "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.~~135~~172.

~~136~~173.    "Exit Facility Agent" means the agent under the Exit Facility.

~~137~~174.    "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

~~138~~175.    "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

~~139~~176.    "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

~~140~~177.    "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

~~141~~178.    "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

~~142~~179.    "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

~~143~~180.    "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order ~~and,~~ (b) those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan and (c) the Fee Examiner Parties.  For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

~~144~~181.    "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

145182.          "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

146183.          "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

184.          "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

185.          "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, et seq.

147186.          "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year.  A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

148187.          "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, solely in their capacity as participants in the DIA Settlement118.

149188.          "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

150189.          "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

151190.          "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

152191.          "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

153192.          "GRS" means the General Retirement System for the City of Detroit.

154193.          "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be

paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

155194.        "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

156195.        "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

157196.        "Holder" means an Entity holding a Claim.

158197.        "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

159198.        "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.159198, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

160199.        "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.159198.

161200.        "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

162201.        "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

163202.        "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such

year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

~~164~~203.	"Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

~~165~~204.	"Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

~~166~~205.	"Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the ~~treatment accorded to any Allowed Other Unsecured Claims held by the~~ 36th District Court ~~pursuant to Section II.B.3.u.~~Settlement.

~~167~~206.	"Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification ~~and/~~or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

207.	"Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

~~168~~208.	"Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.~~168~~208.

~~169~~209.	"Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees ~~and/~~or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

~~170~~210.	"Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

~~171~~211.	"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

~~172~~212.	"Limited Tax General Obligation Bond ~~Claims~~Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

~~173~~213.	"Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.~~173~~213, as the same may be subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

174214.    "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.173213.

215.    "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

175216.    "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries and/or schedules may be amended, restated, supplemented or otherwise modified.

176.    "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible, but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

217.    "Litigation Trust" means a trust to be established on the Effective Date to which the City will transfer all of its rights and interest in the COP Litigation.

218.    "Litigation Trustee" means the trustee of the Litigation Trust, which shall be selected by the LTGO Insurer and the Retiree Committee and must be acceptable to the City.

219.    "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

220.    "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

221.    "LTGO Independent Party" means an entity chosen by the Retiree Committee, the LTGO Insurer and the City to resolve certain disputes regarding the COP Litigation involving the City, VEBA Trust Representatives or the LTGO Insurer pursuant to the LTGO Settlement Agreement.

177222.    "LTGO Insurer" means Ambac Assurance Corp., solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

223.    "LTGO Litigation Parties" means, collectively, the LTGO Insurer, the VEBA Trust Representatives and the City.

224.    "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.224.

178225.    "Macomb County" means the County of Macomb, Michigan.

179226.    "Mayor" means the duly-elected mayor of the City.

227.     "MFA" means the Michigan Finance Authority.

~~180~~228.          "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the ~~Michigan Finance Authority~~MFA in accordance with the UTGO Settlement Agreement and applicable law.

229.     "NPFG" means National Public Finance Guarantee Corporation.

~~181~~230.          "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

~~182~~231.          "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

~~183~~232.          "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.~~183~~232.

~~184~~233.          "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued ~~and/~~or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.~~184~~233.

~~185~~234.          "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued ~~and/~~or indentures to be executed with respect to the New DWSD Bonds.

~~186~~235.          "New DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.~~186~~235.

~~187~~236.          "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued ~~and/~~or indentures ~~to be executed ~~to be executed with respect to the New Existing Rate DWSD Bonds.

~~188~~237.          "New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.~~188~~237.

~~189~~238.          "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.~~189~~238.a and the material terms of which are attached hereto as Exhibit I.A.~~189~~238.b.

~~190~~239.          "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5%

multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

240. "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

241. "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

191242. "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.191242.a and the material terms of which are set forth at Exhibit I.A.191242.b.

192243. "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10five or ten years of service, as set forth on Exhibit I.A.242.b, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

193244. "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes, the New LTGO Bonds and the Municipal Obligation.

245. "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

194246. "Oakland County" means the County of Oakland, Michigan.

195247. "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

196248. "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

197249. "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

198250. "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a

GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims, and Indirect Employee Indemnity Claims and Indirect 36th District Court Claims are included within the definition of Other Unsecured Claim.

199251.       "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

200252.       "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

201253.       "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

202254.       "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

203255.       "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

204256.       "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development Authority, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

205.       "Patient Protection and Affordable Care Act" means Public Law 111-148, 111th Congress, 42 U.S.C. §§ 18001, et seq.

206257.       "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

207258.       "Petition Date" means July 18, 2013.

208259.       "PFRS" means the Police and Fire Retirement System for the City of Detroit.

209260.       "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension

benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

210261. "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

211262. "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

212263. "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

213. "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.iii.A and more definitively set forth in the Plan COP Settlement Documents.

214. "Plan COP Settlement Documents" means the definitive documentation to be executed in connection with the Plan COP Settlement, in substantially the form attached hereto as Exhibit I.A.214.

215264. "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order. A Plan Supplement or Plan Supplements containing Exhibits 189.a, 191.a, 220, 221 and II.D.6 will be Filed no later than five Business Days prior to the Voting Deadline. All other Plan Supplements will be Filed no later than ten days before the Confirmation Hearing.

216265. "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement and/or Ordinance No. 05-09 of the City.

217266. "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

218267. "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

219268. "Postpetition PurchaserFinancing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

220269.        "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.220269.

221270.        "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.221270.

222271.        "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

223272.        "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.L.M.1.

224273.        "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water and/or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

225274.        "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

226275.        "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

227.        "Reinstated Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,410,000 that, from and after the Effective Date, will remain outstanding and will be payable from the UTGO Bond Tax Levy, as more particularly described on Exhibit I.A.285.

228276.        "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

229277.        "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations, DIA Funding

~~Parties~~Corp., the DIA Funders and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

~~230~~278.     "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) ~~to~~ hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

279.     "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.279.

~~231~~280.     "Restructured UTGO Bonds" means the bonds to be issued by the ~~Michigan Finance Authority~~MFA to the current Holders of Unlimited Tax General Obligation ~~Bonds~~Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $~~287,500,000~~287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the ~~Michigan Finance Authority~~MFA and shall be secured as more particularly described ~~on Exhibit I.A.285~~in the UTGO Settlement Agreement.

~~232~~281.     "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

~~233~~282.     "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

~~234~~283.     "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

~~235~~284.     "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

~~236~~285.     "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.~~236~~285.

~~237.     "Retiree Health Plan" means the City of Detroit Retiree Health Plan, a welfare benefit plan sponsored and administered by the City, which, effective for the period beginning March 1, 2014 and ending December 31, 2014, provides health, dental and vision care benefits to retired officers and employees of the City who enrolled in the plan as of March 1, 2014.~~

~~238~~286.     "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS ~~and/~~or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

~~239~~287.     "Retirement Systems" means, collectively, the GRS and the PFRS.

~~240~~288.        "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

~~241~~289.        "Section 1983 Claim" means any ~~claim~~Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

~~242~~290.        "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

~~243~~291.        "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

~~244~~292.        "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

~~245~~293.        "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

~~246~~294.        "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.~~244~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~247~~295.        "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

~~248~~296.        "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

~~249~~297.        "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.~~244~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~250~~298.        "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

~~251~~299.        "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

~~252~~300.        "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit

I.A.~~244~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~253~~301.        "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

~~254~~302.        "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

~~255~~303.        "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.~~244~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~256~~304.        "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

~~257~~305.        "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

~~258~~306.        "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.~~244~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~259~~307.        "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

~~260~~308.        "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

~~261~~309.        "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.~~244~~292, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

~~262~~310.        "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

~~263~~311.        "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

~~264.        "Settling COP Claimant" means a beneficial holder of a COP Claim that elects to participate in the Plan COP Settlement as to some or all COP Claims held by or assigned to it and its Affiliates by so indicating on a timely-returned Ballot.~~

312.	"Settled COP Claims" means those Disputed COP Claims with respect to which the City enters into a settlement prior to the Effective Date.

313.	"Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.9.

314.	"Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

265315.	"Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.GF.

266316.	"State" means the state of Michigan.

267317.	"State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement. References to the "disbursement of the State Contribution" in the Plan shall be construed to refer to either the distribution of the discrete lump sum payments to GRS and PFRS or the payment of the first installment of the State Contribution to GRS and PFRS, as the case may be.

268318.	"State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.ED, in substantially the form attached hereto as Exhibit I.A.268318.

269319.	"State Related Entities" means, collectively: (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

270320.	"Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

321.	"Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

322.	"Subject COP Litigation Action" means any of the following actions, if proposed to be taken by the Litigation Trustee: (a) replacing the COP Litigation Counsel with new counsel to the Litigation Trust in the COP Litigation; (b) a determination not to appeal an adverse decision on any claim or defense related to the COP Litigation; or (c) the voluntary dismissal of a substantive claim or counterclaim in the COP Litigation or termination by any other means of the COP Litigation.

323.	"Subject COP Litigation Settlement" means any settlement with a Holder or Holders of COP Claims that proposes to release from the Disputed COP Claims Reserve to such Holder(s) a Pro Rata share of New B Notes (or equivalent currency) based on 40% or more of the face amount of COP Claims held by such Holder(s).

271324.        "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code and/or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

272325.        "Swap Insurance Policies" means those policies and/or other instruments insuring the COP Swap Agreements and obligations related thereto.

273326.        "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

327.        "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of:  (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

274328.        "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

329.        "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class.  For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

275330.        "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

276331.        "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

277332.        "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

278333.        "Unlimited Tax General Obligation Bond ClaimsClaim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

279334.        "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.279334, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related theretoBond Insurance Policies.

~~280~~335.        "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.~~279~~334.

~~281~~336.        "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

~~282~~337.        "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes ~~7,~~ 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

~~283~~338.        "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

339.        "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

~~284~~340.        "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

~~285~~341.        "UTGO Settlement~~" means the comprehensive settlement regarding Unlimited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, the principal terms of which are~~ Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.~~285 and described in Section IV.D~~341.

~~286~~342.        "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

343.        "VEBA Trust Representatives" means (a) the chair of the board of trustees of the Detroit General VEBA and (b) the chair of the board of trustees of the Detroit Police and Fire VEBA.

~~287~~344.        "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

~~288.        "Voting Record Date" means the record date fixed by the Bankruptcy Court in the Disclosure Statement Order establishing the Holders of Claims entitled to vote to accept or reject the Plan.~~

~~289~~345.        "Wayne County" means the Charter County of Wayne, Michigan.

**B.** **Rules of Interpretation and Computation of Time.**

**1.** **Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.** **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS; CRAMDOWN;**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

**A.** **Unclassified Claims.**

**1.** **Payment of Administrative Claims.**

**a.** **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

**b.** **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition ~~Purchaser~~Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

**2.** **Bar Dates for Administrative Claims.**

**a.** **General Bar Date Provisions.**

Except as otherwise provided in Section II.A.2.b Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City ~~pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order,~~ no later than ~~30~~45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

**b.** **Ordinary Course Claims**

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

**~~b~~c.** **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition ~~Purchaser~~Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

**~~c~~d.** **No Modification of Bar Date Order.**

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**B. Classified Claims.**

**1. Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| *Secured Claims* | | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.~~110~~139) | If (a) the City accepts some or all of the DWSD Tendered Bonds for purchase and (b) the DWSD Settlement Date occurs: Unimpaired/Nonvoting<br><br>or<br><br>If (a) the City accepts none of the DWSD Tendered Bonds for purchase or (b) the DWSD Settlement Date does not occur: Unimpaired/Nonvoting or Impaired/Voting, as set forth on Exhibit I.A.~~110~~139 |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.~~117~~147) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.~~120~~150) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |
| *Unsecured Claims* | | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

**2.  Subordination; Reservation of Rights to Reclassify Claims.**

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a Holder of a Claim to enforce a subordination agreement against any Entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law.  Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to ~~re-classify~~reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.  For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

**3.  Treatment of Claims.**

**a.  Class 1A – DWSD Bond Claims.**

**i.  Classification and Allowance.**

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.~~110~~139, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~110~~139.

**ii.  Treatment.**

**A.  Treatment if DWSD Tender Consummated.**

If (a) the City accepts some or all of the DWSD Tendered Bonds for purchase and (b) the DWSD Settlement Date occurs, then, on the Effective Date, each Holder of an Allowed DWSD Bond Claim shall have its Allowed DWSD Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.  In the event of such Reinstatement, all votes and elections previously delivered in Class 1-A shall not be counted and shall be of no force and effect.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents arising in connection with such Allowed DWSD Bond Claims shall be paid in full in Cash once Allowed pursuant to the DWSD Tender Order, by agreement of the parties or by order of the Bankruptcy Court.  In addition, all claims for fees, costs and expenses authorized pursuant to or in accordance with the DWSD Tender Order shall be paid as provided therein.

## B. Treatment if DWSD Tender Not Consummated.

If (a) the City accepts none of the DWSD Tendered Bonds for purchase or (b) the DWSD Settlement Date does not occur, then:

### 1. Unimpaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as ~~unimpaired~~Unimpaired on Exhibit I.A.~~110~~139 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

### 2. Impaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as ~~impaired~~Impaired on Exhibit I.A.~~110~~139 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed by agreement of the parties or by order of the Bankruptcy Court.

Treatment Option for Classes that Accept the Plan: Each Holder of an Allowed DWSD Bond Claim in an ~~impaired~~Impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

### b. Class 1B – DWSD Revolving Sewer Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.~~117~~147, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.~~117~~147.

#### ii. Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### c. Class 1C – DWSD Revolving Water Bond Claims

#### i. Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.~~120~~150, with each Class receiving the treatment set

forth below.  On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.~~120~~150.

### ii. Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### d. Class 2A – Secured GO Series 2010 Claims.

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### e. Class 2B – Secured GO Series 2010(A) Claims.

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### f. Class 2C – Secured GO Series 2012(A)(2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### g. Class 2D – Secured GO Series 2012(A2-B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### h. Class 2E - Secured GO Series 2012(B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### i. Class 2F – Secured GO Series 2012(B2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### j. Class 3 – Other Secured Claims.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### k. Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### l. Class 5 – COP Swap Claims.

#### i. Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

#### ii. Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, _provided_ that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, _provided_ that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

### m. Class 6 – Parking Bond Claims.

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### n. Class 7 – Limited Tax General Obligation Bond Claims.

#### i. Allowance.

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $~~163,543,187.86~~163,544,770.

#### ii. Treatment.

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed ~~Claim~~Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, ~~an Unsecured~~(X) a Pro Rata ~~Share of New~~share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions from the Disputed COP Claims Reserve in accordance with Section II.B ~~Notes.~~.3.p.iii.B.

### iii. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### o.    Class 8 – Unlimited Tax General Obligation Bond Claims.

#### i.    Allowance.

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

#### ii.    Treatment.

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds. ~~Such~~ as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement.  Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the ~~Reinstated~~ Stub UTGO Bonds, subject to Sections I.A.~~23~~36 and IV.~~D~~C, which Stub UTGO Bonds shall be reinstated.

### p.    Class 9 – COP Claims.

#### i.    Disputed.

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the ~~Creditor Representative~~Litigation Trust.  If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

#### ii.    Assignment.

~~Solely for purposes of facilitating Distributions under this Plan and for no other purpose, on and as of the Effective Date, those portions of~~Those COP Claims or portions thereof that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis~~, with each~~ on and as of the Effective Date, solely for purposes of facilitating Distributions under this Plan and for no other purpose.  Each beneficial holder shall be deemed to receive such ~~portions of~~COP Claims or portions thereof in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs.~~  Each beneficial holder of COPs may elect to participate in the Plan COP Settlement in respect of some or all of those portions of COP Claims that would be deemed assigned to it and its Affiliates in the event that the Effective Date occurs.~~

### iii. Treatment.

~~**A. Plan COP Settlement Option.**~~

~~Each beneficial holder of COPs may settle issues relating to allowance of the COP Claims that are deemed assigned to it and become a Settling COP Claimant as to some or all COPs held by it and its Affiliates by electing to participate in the Plan COP Settlement on a timely returned Ballot accepting the Plan. Each Settling COP Claimant shall have its COP Claims deemed to be Allowed Claims in an amount equal to 40% of the aggregate unpaid principal amount of COPs held by such Settling COP Claimant and shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.~~

~~**B. Non-Settling Holders.**~~

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

### ~~1~~A. Disputed COP Claims Reserve.

On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain ~~no less than:~~ (a) an Unsecured Pro Rata Share of New B Notes~~,~~ calculated as if such Disputed COP Claims were Allowed ~~(i)~~ in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs ~~not subject~~other than those giving rise to the ~~Plan~~Settled COP ~~Settlement or (ii) in~~Claims (or such ~~lesser~~other amount as may be required by an order of the Bankruptcy Court~~.~~); and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve. In addition, in the event any Holder of a Disputed COP Claim enters into a settlement of such Claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and distributed from the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.B.

### ~~2~~B. Distributions From The Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the COP Agent shall be sent a Distribution on behalf of the Holders of such Allowed Claims ~~shall be sent a Distribution~~ from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of ~~an order by the trial court having jurisdiction over the objections to the~~a Final Order resolving any objection to any Disputed COP ~~Claims resolving all objections to the Disputed COP Claims~~Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for~~, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows~~: (a) an amount of New B Notes ~~and/~~or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed to the City~~;~~, on the terms set forth in Section IV.I; and (b) following such distribution, ~~65% of~~the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; ~~and (c) following such distribution, the remaining New B Notes and distributions thereon shall revert to the City, provided that the City, in its sole discretion, may choose to distribute such remaining property~~(ii) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in ~~Classes~~Class 7~~, 13~~; ~~and/~~or (iii) 15% to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14.

### iv. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### q. Class 10 – PFRS Pension Claims.

#### i. Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

#### ii. Treatment.

##### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

##### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

##### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment. Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

##### D. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G.F.

### E.  Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

### F.  Governance.

On or as soon as reasonably practicable after the Effective Date, ~~PFRS shall establish~~ an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### G.  No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### H.  State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r.  Class 11 – GRS Pension Claims.

#### i.  Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii.  Treatment.

##### A.  Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A.  The exclusive sources for such contributions shall be certain ~~City sources,~~ pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution ~~and~~, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library.  After June 30, 2023, (1) certain DIA

Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

### B. Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F̶E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Annuity Savings Fund Recoupment.

#### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2. ASF Distribution Recipients.

##### i. Monthly Deduction

The̶For each ASF Distribution Recipient that does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated for each ASF Distribution Recipient, will then be̶and converted into monthly annuity amounts based on each̶common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy and other factors and will̶ gender and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

### ii. Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G̶E.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, G̶R̶S̶ ̶s̶h̶a̶l̶l̶ ̶e̶s̶t̶a̶b̶l̶i̶s̶h̶ an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described**

in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### I. State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms:  (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s. Class 12 – OPEB Claims.

#### i. Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii. Treatment.

##### A. Detroit General VEBA.

Establishment of Detroit General VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.  The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries.  The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.~~78~~102, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees.  ~~The~~With respect to the initial appointment of the board of trustees, the DRCEA and the Retiree Committee will each ~~be able to~~ appoint two board members ~~in equal numbers, and such appointees will constitute a majority of the initial Detroit General VEBA board;~~, and the City will appoint ~~the remaining~~three board members.  The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the City will fill board member vacancies created by the departure of members initially appointed by the City.  Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA:  On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.~~2.~~

##### B. Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA:  On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.  The Detroit Police and Fire VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the

level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.82106, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees. TheWith respect to the initial board members will beappointment of the board of trustees, the RDPFFA and the Retiree Committee will each appoint two board members, and the City will appoint three board members. The RDPFFA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the RDPFFA, and the City will fill board member vacancies created by the departure of members initially appointed by the City, the Retiree Committee and the RDPFFA. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2.

## C. No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

t. **Class 13 – Downtown Development Authority Claims.**

i. **Allowance.**

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

ii. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

u. **Class 14 – Other Unsecured Claims.**

i. **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, (A) on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes and (B) distributions from the Disputed COP Claims Reserve in accordance with Section II.B.3.p.iii.B.

v.     **Class 15 – Convenience Claims.**

i.     **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.~~55~~72) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

w.     **Class 16 – Subordinated Claims.**

i.     **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

x.     **Class 17 – Indirect 36th District Court Claims.**

i.     **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive:  (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

ii.     **Further Obligation of City, State and 36th District Court.**

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims.  Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

C.     **Confirmation Without Acceptance by All Impaired Classes.**

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

D.     **Treatment of Executory Contracts and Unexpired Leases.**

1.     **Assumption.**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a

party.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.

**2.     Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

**3.     Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

**4.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

**5.     Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6. **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7. **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) ~~30~~45 days after the Effective Date; or (b) ~~30~~45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8. **Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.**

~~Rejection~~Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall ~~not~~ constitute a breach of such contract or lease and not a termination ~~of preexisting~~thereof, and all obligations ~~owed~~owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9. **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

**ARTICLE III**
**CONFIRMATION OF THE PLAN**

**A.      Conditions Precedent to the Effective Date.**

                    The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

         1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

         2.      The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

         3.      The Confirmation Order shall not be stayed in any respect.

         4.      All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

         5.      All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the ~~UTGO~~LTGO Settlement Agreement.

         6.      Any legislation that must be passed by the ~~Michigan Legislature~~State legislature to effect any term of the Plan shall have been enacted.

         7.      The ~~Michigan Finance Authority~~MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

         8.      The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

         ~~8~~9.      The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.~~A~~B.

         ~~9~~10.      If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

         ~~10~~11.      The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.      Waiver of Conditions to the Effective Date.**

                    The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in Section III.A.7 and Section III.A.8, which conditions cannot be waived.

## C. Effect of Nonoccurrence of Conditions to the Effective Date.

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then ~~upon motion by the City made,~~ before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the ~~Confirmation Order will be vacated by~~City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section III.C: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

## D. Effect of Confirmation of the Plan.

### 1. Dissolution of Retiree Committee.

~~Following~~On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case~~, provided, however, that, if and only if the Retiree Committee is the Creditor Representative under the Plan, the Retiree Committee shall continue to exist solely for the purposes of objecting to or otherwise asserting the City's or its creditors' rights with respect to Disputed COP Claims pursuant to Section II.B.3.p.i. If the Retiree Committee is the Creditor Representative, it shall be disbanded upon the final resolution of all Disputed COP Claims or pursuant to an order of the Bankruptcy Court, which order may be sought by the City for good cause shown. All fees and expenses of the Creditor Representative shall be subject to the approval of the City. All disputes relating to the approval of fees and expenses shall be determined by the Bankruptcy Court. No party to any such dispute shall have any right to appeal an order of the Bankruptcy Court resolving any such dispute.~~.

### 2. Preservation of Rights of Action by the City.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans ~~and/~~or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court. A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 3. Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the

avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

    **4.**     **Discharge of Claims.**

        **a.**     **Complete Satisfaction, Discharge and Release.**

        Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

        **b.**     **Discharge.**

        In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all ~~Claims and other~~ debts ~~and Liabilities against~~of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged ~~Claim~~debt; provided that such discharge will not apply to (i) ~~Claims~~debts specifically exempted from discharge under the Plan; and (ii) ~~Claims~~debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

    **5.**     **Injunction.**

        **On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

        **a.**     **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties and their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

        **1.**     **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims,~~,~~ and (C) Indirect Employee Indemnity Claims);**

        **2.**     **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

        **3.**     **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

        **4.**     **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

**5.** proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

**6.** taking any actions to interfere with the implementation or consummation of the Plan.

**b.** **All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.**

**6.** **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided, however that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement) and (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order; provided, further, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan; provided, further, that this Section III.D.6 shall not affect any liability of any of the COP Swap Exculpated Parties to Syncora Guarantee Inc., Syncora Capital Assurance Inc. or Financial Guaranty Insurance Company in connection with the COP Swap Settlement.

7.      **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a.      each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i.      all Liabilities in any way relating to the City, the Chapter 9 Case~~,~~ (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such ~~entity~~holder has, had or may have against the City~~, its Related Entities, the State, the State Related Entities and the Released Parties (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code)~~, or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); and

ii.      all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; ~~provided further that this Section III.D.7.a shall not apply to any Exculpated Party;~~ and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; ~~and~~provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.    if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.  For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations.  Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees ~~and/~~or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law ~~and/~~or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.  For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds.  For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

**E.    No Diminution of State Power**

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the ~~State's~~State's exercise of such rights.

**F.    Effectiveness of the Plan.**

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**G.    Binding Effect of Plan.**

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the

compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    DWSD.

### 1.    Rates and Revenues.

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues.  Rates will be determined by the Board of Water Commissioners.  The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

### 2.    DWSD CBAs.

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

### 3.    The New DWSD Bonds and New Existing Rate DWSD Bonds.

DWSD shall, as necessary:  (a) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.186235, and distribute the New DWSD Bonds as set forth in the Plan; and (b) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.188237, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

### 4.    Potential DWSD Authority Transaction.

As a result of mediation or otherwise, it is possible that the City may enter into a DWSD Authority Transaction that includes the formation of the DWSD Authority to conduct many or all of the operations currently conducted by DWSD.  Any such transaction would be subject to the approval of incorporating units and numerous other conditions.  The timing of any such transaction, if it occurs at all, is not known.  If any such transaction could occur, unless waived by the City in its sole discretion, the City will enter into such transaction only if Macomb County, Oakland County and Wayne County, and each of their municipal affiliates or related public corporations, withdraw with prejudice or shall have withdrawn with prejudice their objections to the Confirmation of the Plan.  Any DWSD Authority Transaction shall be on terms that are consistent with all other provisions of the Plan, applicable law and orders of the Bankruptcy Court.  The City shall not enter into any binding agreement with respect to or consummate any DWSD Authority Transaction prior to the Effective Date without first obtaining an order of the Bankruptcy Court approving and authorizing such DWSD Authority Transaction.

All terms and conditions in respect of any DWSD Authority Transaction set forth in (a) any Bond Document or (b) any transaction document in respect of such a DWSD Authority Transaction shall in any case include: (i) no material modifications to the source of payment and security for any DWSD Bonds, New DWSD Bonds, New Existing Rate DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (ii) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds, New DWSD Bonds, New Existing Rate DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (iii) that the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable Bond Documents; and (iv) ratings confirmation of any rating agency then rating

the DWSD Bonds, New DWSD Bonds, New Existing Rate DWSD Bonds and 2014 Revenue and Revenue Refinancing Bonds.

**B.      The New B Notes and New LTGO Bonds.**

On the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.183232, and distribute the New B Notes as set forth in the Plan.

; and (b) execute C.      The Plan COP Settlement.

The City shall consummate the Plan COP Settlement on the Effective Datethe New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.214.  Settling COP Claimants shall receive the treatment described in Section II.B.3.p.iii.A.224, and distribute the New LTGO Bonds as set forth in the Plan.

**DC.      The UTGO Settlement.**

TheOn the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement on the Effective Date, substantially on the terms set forth onAgreement, a copy of which is attached hereto as Exhibit I.A.285341.  The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019.  The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things:  (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the Municipal Finance AuthorityMFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (45) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**ED.      The State Contribution Agreement.**

OnPrior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.268318.

**1.      State Contribution.**

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

2.		**Income Stabilization Payments.**

		The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State.  Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus.  The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner.  In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

		In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.  In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

3.		**Conditions to State's Participation.**

		The ~~State's~~ payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following:  (a) the Confirmation Order becoming a Final Order no later than ~~September 30~~December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than ~~December 31, 2014~~April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 ~~as it relates to the City~~ or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution~~, or equivalent assurances of finality of such litigation~~; (g) ~~a firm~~evidence satisfactory to the State of an irrevocable commitment by the Foundations ~~to contribute an aggregate amount of not less than $366 million to fund~~(excluding the Special Foundation Funders, as that term is defined in the DIA Settlement~~; (h) a firm~~ Documents) to fund $366 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to ~~raise at least~~fund $100 million ~~from its donors to fund~~(or the net present value thereof) as part of the DIA Settlement~~; (i) assurances that the State Contribution may only be used to fund payments to Holders of Pension Claims in accordance with the terms of the State Contribution Agreement; (j) assurances that the Retirement Systems must at all times during the 20 years following the Effective Date maintain an Investment Committee for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees and/or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement; (k) assurances that an income stabilization program will be operated; (l) assurances that the provisions of the State Contribution Agreement regarding governance of the Retirement Systems will be~~

approved; (m) the execution of the State Contribution Agreement acceptable in form and substance to the City and the State; and (n) the passage of legislation prior to Confirmation authorizing the State Contribution., as provided in Section IV.E.1.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

### 4. Release of Claims Against the State and State Related Entities.

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### FE. The DIA Settlement.

On the Effective Date, the City, and the Foundations and DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties that are such as of the Effective Date have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA Assets to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.92119 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.91.118. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

### 1. Funding Contributions.

The DIA Settlement will be funded as follows: (a) an irrevocable commitmentcommitments in an aggregate amount of at least $366 million by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents); and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at leastcommitments in an aggregate amount of $100 million from its donors (the DIA Direct Funders (including the commitment of the Special Foundation Funders, as that term is defined in the DIA Settlement Documents, and subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20- year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to anthe "Agreed Required Minimum Schedule" and subject to the option at any time for the "Present Value Discount," as set forth in Exhibit I.A.91the DIA Settlement Documents. Amounts committed by the Foundations and the DIA Direct Funders will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

### 2. Transfer of DIA Assets.

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3. **Conditions to the ~~Foundations~~DIA Funding Parties' Participation.**

The DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things, the following:  (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.~~F~~E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.~~F~~E.2; (e) ~~the existence of appropriate governance and oversight structures at DIA Corp. that include representation of the City, the DIA Funding Parties and other stakeholders~~approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.118; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the ~~existence of appropriate~~adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the ~~affirmation by County~~amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities ~~of certain existing funding~~' obligations ~~with respect~~under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution ~~in an aggregate amount of $350 million; (k) the occurrence of the Effective Date no later than December 31, 2014~~; and (~~l~~k) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

~~G~~F. **Contingent Payment Rights**

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust.  The City shall issue the DWSD CVR to the Restoration Trust.  If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire.  The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities:  (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS.  If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made.  The DWSD CVR may not be transferred.

1. **Special Restoration**

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration.  In such case, the City will perform a Value Determination and arrive at the Discounted Value.  The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable.  In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.  In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored.  In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate.  In the

event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

## 2. General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## ~~H~~G. The OPEB Settlement.

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims. The Plan reflects, the terms of ~~that~~which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## H. The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I. Prosecution of COP Litigation.

### 1. Creation of Litigation Trust.

From and after the Effective Date, the City will remain a named plaintiff and defendant in the COP Litigation, but shall transfer all of its rights and interests in the COP Litigation to the Litigation Trust. The beneficiaries of the Litigation Trust, for the purpose of the COP Litigation, shall be the LTGO Litigation Parties and the Holders of Allowed Other Unsecured Claims. The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Insurer and the City.

### 2. Direction of COP Litigation.

The Litigation Trustee shall follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein. The Litigation Trustee and VEBA Trust Representatives shall meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Litigation Parties, as requested, to discuss the COP Litigation. The Litigation Trustee shall provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the LTGO Litigation Parties.

Upon request from a LTGO Litigation Party, the Litigation Trustee will provide to such LTGO Litigation Party drafts of court papers that will be Filed by the Litigation Trustee as early as practicable under the circumstances.

### 3. Payment of Fees and Expenses.

The cost of all fees and expenses incurred by the Litigation Trustee in connection with the COP Litigation shall be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.A. The Litigation Trustee's fees shall be fixed and consented to by the LTGO Insurer and the VEBA Trustee Representatives.

The Litigation Trustee shall submit to the City on a monthly basis invoices for its fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees. The City shall pay such invoices within 30 days of receipt of such invoices, pending reimbursement from the Disputed COP Claims Reserve. Reimbursement of the City from the Disputed COP Claims Reserve will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.

In the event that a Final Order is entered against the City or the Litigation Trust, as successor in interest to the City, in the COP Litigation such that the New B Notes in the Disputed COP Claims Reserve are subject to Distribution to the Holders of Allowed COP Claims in accordance with the Plan, the City will reimburse the Disputed COP Claims Reserve for any amounts withdrawn from the Disputed COP Claims Reserve prior to the date of such Final Order becoming a Final Order.

### 4. Settlement of COP Litigation.

The Litigation Trustee shall consult with the LTGO Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee shall provide the LTGO Litigation Parties with advance notice, as early as practicable under the circumstances, of any COP Litigation settlement negotiations, and the LTGO Litigation Parties and their counsel shall have the right to participate in such negotiations. Any potential settlement of the COP Litigation must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against any party. The Litigation Trustee will not take any Subject COP Litigation Actions without the consent of the LTGO Litigation Parties. The Litigation Trustee will not enter into a Subject COP Litigation Settlement without the consent of the LTGO Insurer.

In the event that, after consultation with the Litigation Trustee, (i) the LTGO Insurer does not consent to the Litigation Trustee entering into a Subject COP Litigation Settlement or (ii) the LTGO Litigation Parties do not consent to the Litigation Trustee taking a Subject COP Litigation Action, the Litigation Trustee or any LTGO Litigation Party may present the issue to the LTGO Independent Party for mediation and resolution. The LTGO Independent Party shall conduct a mediation to attempt to consensually resolve the issue. If a consensual resolution cannot be reached, the LTGO Independent Party shall resolve the issue or issues, which resolution will be binding on the LTGO Insurer or the LTGO Litigation Parties, as the case may be, and the Litigation Trustee. Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction in the COP Litigation. The City, the COP Litigation Counsel, the VEBA Trust Representatives and the LTGO Insurer shall take any steps that may be required to preserve applicable privileges of the City and the COP Litigation Counsel with regard to the COP Litigation.

## I.J. Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

**~~J~~K.** **Cancellation of Existing Bonds ~~and~~, Bond Documents, COPs and COP Documents.**

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts pursuant to Section II.D), on the Effective Date, the Bonds ~~and~~, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties to the City, as applicable, under the Bonds ~~and~~, the Bond Documents, the COPs and the COP Documents shall be discharged; provided, however, that the Bonds ~~and~~, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution ~~and~~, (iii) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City and (iv) as may be necessary to preserve any claim by (1) a Bondholder ~~and~~/or Bond Agent under a Bond Insurance Policy or against any Bond Insurer or (2) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer.  Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such Bonds ~~and/or~~, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.  Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders ~~and~~/or Bond Agents with respect to claims under applicable Bond Insurance Policies ~~and~~/or against the Bond Insurers or (b) COPs Holders ~~of~~or COP ~~Claims~~Agent with respect to claims under ~~applicable policies and/or other instruments insuring the COPs~~COP Insurance Policies and obligations related thereto.  For the avoidance of doubt, except for the immediately preceding sentence, this Section IV.K shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii.A.

**~~K~~L.** **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property shall be fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City.  As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 ~~Termination Statements~~termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.~~K~~L.

**M.** **Professional Fees**

**~~L~~1.** **Professional Fee Reserve**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve.  ~~The Professional Fee Reserve shall be funded~~ from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds.  The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks) and (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any

disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

**2.** **Fee Review Order**

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order. For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

**3.** **Dismissal of the Fee Examiner**

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder. The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

**4.** **Potential Review of Fees Not Subject to Fee Review Order**

The City shall have the right to bring before the Bankruptcy Court a request to review and determine the reasonableness of the fees and expenses of any Fee Review Professional retained by a creditor of the City or any of its departments to the extent that such fees and expenses have not been either (a) approved pursuant to or in accordance with the DWSD Tender Order, (b) subject to court review or (c) subject to a Bankruptcy Court-approved or agreed upon process for binding arbitration.

**5.** **Court-Appointed Expert**

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

**~~M~~N.** **Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.~~M~~N shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, no indemnification provision in any loan document, bond

document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.~~M~~N.

**~~N~~O.      Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.~~236~~285, are incorporated herein by reference and shall be binding upon the parties thereto.

**~~O~~P.      Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law.  The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**Q.      36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.9.  The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

**~~P~~R.      Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

~~If the City determines to maintain self-insurance with respect to the operation of its motor vehicles in a notice Filed not less than ten days before the Confirmation Hearing, this Section IV.P will apply.  Subject to the foregoing, from~~From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows:  (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable).  ~~If this Section IV.P becomes effective, nothing~~Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1).  The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.~~P~~R, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**~~Q~~S.**      **Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund ~~and/~~or property tax refund.

**~~R~~T.**      **Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**~~S~~U.**      **Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**~~T~~V.**      **Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**~~U~~W.**      **Post-Effective Date Governance.**

Prior to or on the Effective Date, ~~a financial oversight board~~the Financial Review Commission shall be established pursuant to and in accordance with ~~State law now in effect or hereafter enacted~~the Financial Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that ~~should result in~~promote more efficient and effective delivery of services to City residents. The ~~financial oversight board shall be composed of individuals with recognized financial competence and experience and shall have the authority to, among other things, impose limits on City borrowing and expenditures and require the use of financial best practices.~~City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.**      **Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan. Any Disbursing Agent appointed by the City will serve without bond. Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.**      **Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent, the Bond Agent or the COP Agent, as applicable, the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act

may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.      Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.      Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.      Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court.

Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

## H.    City's Rights of Setoff Preserved.

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

## I.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### 1.    Delivery of Distributions Generally.

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

### 2.    Delivery of Distributions on Account of Bond Claims.

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### 3.    Delivery of Distributions on Account of COP Claims.

Distributions on account of the COP Claims shall (a) be made by the Disbursing Agent to the COP Agent under the applicable COP Documents for the benefit of Holders of COP Claims and (b) be deemed completed when made by the Disbursing Agent to the COP Agent as if such Distributions were made directly to the Holders of such Claims. The applicable COP Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable COP Documents and subject to the respective rights, claims and interests, if any, that the COP Agent may have under the applicable COP Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The COP Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

### 34.    De Minimis Distributions / No Fractional New Securities.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of

a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

### 4<u>5</u>. Undeliverable or Unclaimed Distributions.

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 5<u>6</u>. Time Bar to Cash Payment Rights.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

## J. Other Provisions Applicable to Distributions in All Classes.

### 1. No Postpetition Interest.

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

### 2. Compliance with Tax Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any

Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 and/or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

### 3.    Allocation of Distributions.

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### 4.    Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make and/or preserve a claim under any applicable policies and/or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds and/or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

### ARTICLE VI
### PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.    Treatment of Disputed Claims.**

### 1.    General.

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

2.      **ADR Procedures.**

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

3.      **Tort Claims.**

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction ~~selected by the City~~ that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

B.      **Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of

a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

**C.      Objections to Claims.**

**1.      Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

~~**2.      Application of Bankruptcy Rules.**~~

~~To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(e).~~

**~~3~~2.      Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

**~~4~~3.      Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**~~5~~4.      Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

**ARTICLE VII**
**RETENTION OF JURISDICTION**

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      ~~Enforce~~Confirm the ~~term (~~maturity~~)~~ date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, ~~notwithstanding any~~which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law~~to the contrary~~);

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.      Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.      Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

~~J~~K.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

~~K~~L.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

~~L~~M.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

M<u>N</u>.	Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

N<u>O</u>.	Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.**	**Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**A<u>B</u>.**	**Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**B<u>C</u>.**	**Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**C.**	**Disclosure of Amounts to Be Paid for Chapter 9 Case Services.**

No later than five days before the Confirmation Hearing, (1) the City shall File a statement of all amounts to be paid by it for services or expenses in the Chapter 9 Case or incident to the Plan; and (2) as applicable, all other persons shall File statements of all amounts to be paid by them for services or expenses in the Chapter 9 Case or incident to the Plan.  Pursuant to section 943(b)(3) of the Bankruptcy Code, the Bankruptcy Court must approve such amounts as reasonable as a condition to Confirmation.

**D.**	**Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.     Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City. On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.     Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

**G.     Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.     Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

**I.     Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.     Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.     Term of Existing Injunctions and Stays.**

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

L.      **Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.      **The City**

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green, Esq.
Stephen S. LaPlante, Esq.
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

(Counsel to the City)

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)


Dated:  ~~May 5~~August 20, 2014          Respectfully submitted,

                                         The City of Detroit, Michigan


                                         By:      /s/  Kevyn D. Orr
                                         Name:  Kevyn D. Orr
                                         Title:   Emergency Manager for the City of Detroit, Michigan

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

# EXHIBIT C

**EXHIBIT I.A.102**

FORM OF DETROIT GENERAL VEBA TRUST AGREEMENT

# ~~CITY OF DETROIT RETIREE~~CITY OF DETROIT GENERAL RETIREE HEALTH CARE TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") ~~and~~, [_____ — Bank] (the "Bank"), and the undersigned individual trustees ("Individual Trustees").

~~W I T N E S S E T H:~~

WITNESSETH:

WHEREAS, ~~the~~ Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit General Retiree Health Care Trust (the "Trust");

WHEREAS, the undersigned Individual Trustees constituting the Board of Trustees shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health Care Plan for General Retirees of the City of Detroit" (the "Plan"), through which all health care benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Board of Trustees is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Bank to serve in the capacity of the institutional trustee with respect to the Trust and to maintain custody of the Trust assets;

WHEREAS, the Bank is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Bank agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1    Bank.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by ~~Detroit~~the Board in accordance with Section 7.3.  Any corporation continuing as the result of any merger or consolidation to which the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed automatically to be continuing as the Bank.

Section 1.2    Board of Trustees or Board.  The Board of Trustees is the body described in Article VIII to which Detroit has delegated responsibility for:  (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided.  It shall be constituted and operated in accordance with Article IX.

Section 1.3    Code.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.4    Detroit General VEBA Beneficiary.  Has the meaning given to that term in the Plan of Adjustment.

~~Section 1.5    Detroit VEBA Contribution.  Has the meaning given to that term in the Plan of Adjustment.~~

Section ~~1.6~~1.5 Eligible Dependent.  ~~Means an~~An Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

Section ~~1.7~~1.6 Eligible Retiree Member.  ~~Means a~~A former employee of Detroit who is a Detroit General VEBA Beneficiary.

Section ~~1.8~~1.7 Investment Act.  ~~Means~~ Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.

Section ~~1.9~~1.8 Investment Manager.  An investment manager appointed by the Board or its successor in accordance with the provisions of Section 9.4 hereof.

Section ~~1.10~~1.9    New B Notes.  Has the meaning given to that term in the Plan of Adjustment.

Section ~~1.11~~1.10    OPEB Claims Notes.  ~~Means the~~The New B Notes the City is required to contribute~~d~~ to the Trust pursuant to the ~~Detroit VEBA Contribution~~Plan of Adjustment.

Section 1.11    Other Supporting Organization.  An organization other than the City, the Rate Stabilization Fund, or the Supporting Organization, having voluntarily contributed funds in excess of **[$500,000]** to the Trust on or after the Effective Date.

Section 1.12    Participant.  An Eligible Retiree Member or Eligible Dependent who is entitled to health care benefits pursuant to the terms of the Plan.

Section 1.13    Plan.  The Health Care Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Board, as specified herein, and which will provide health care benefits permitted to be provided by a VEBA under Code section 501(c)(9).

Section 1.14    Plan of Adjustment.  The Plan for the Adjustment of Debts of the City of Detroit.

Section 1.15    Rate Stabilization Fund.  The Rate Stabilization Reserves Fund maintained under the control of the Governing Board of the City of Detroit Employee Benefits Plan established pursuant to Title 9, Chapter VIII of the Charter of the City of Detroit for the exclusive purpose of providing hospital, surgical, and death benefits for current or former employees of the City.

Section 1.16    Supporting Organization.  The Foundation for Detroit's Future, a not for profit that is created to collect certain contributions and make an annual contribution to an escrow account as described in Section 3.2, or the successor to such not for profit.  The Supporting Organization was created to receive funds from organizations, including those listed in Exhibit B, and allocate such funds in the amounts described in Exhibit B, to, among other entities, this Trust Fund.

Section 1.15 1.17    Trust Agreement.  This agreement as it may be amended thereafter from time to time by the parties hereto in accordance with the terms hereof.

Section 1.16 1.18    Trust or Trust Fund.  The City of Detroit General Retiree Health Care Trust established by this Trust Agreement, comprising all property or interests in property held by the Bank from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established for the purpose of providing health care life, sickness, accident, and other similar benefits, directly or, through the purchase of insurance, or by reimbursement of expenses, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2    Receipt of Funds.  The Bank shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Bank shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Bank shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Notes.

Section 2.3     Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code section 501(c)(9) and the regulations promulgated thereunder.  In no event will the assets held in the Trust Fund revert to Detroit.  Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4     No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Notes or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Board or the Bank, on account of or as a result of the Trust Fund created hereunder.

Section 2.5     No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

### ARTICLE III
### CONTRIBUTIONS TO THE TRUST FUND

Section 3.1     Detroit Contributions.  The Bank will accept the City's contribution of the OPEB Claims Notes to the Trust Fund shall accept from Detroit the Detroit VEBA Contribution pursuant to the Plan of Adjustment.  Apart from the Detroit VEBA Ccontribution of the OPEB Claims Notes, contributions to the Trust Fund made within sixty (60) days of the Effective Date by the Rate Stabilization Fund in the amount of $[4.0] million, or from Other Supporting Organizations, and as otherwise provided in Section 3.2, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the Plan.

Section 3.2     Other Contributions.  The Bank will accept other contributions to the Trust Fund from Participants, from funds held in escrow by an escrow agent on behalf of the City that are received from the Supporting Organization, or from Other Supporting Organizations whether or not contributed through an escrow on behalf of the City.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Bank shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Board.

(b)    To the extent permitted by law, the Bank shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder.  The Bank may withhold all or any part of any payment as the Bank in the exercise of its reasonable discretion may deem proper, to protect the Bank and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability.  Any part of any such payment so withheld by the Bank that may be determined by the Bank to be in excess of any such liability will upon such determination by the Bank be paid to the person or entity from whom or which it was withheld.

Section 4.2    Method of Payments.  The Bank may make any payment required to be made by it hereunder, unless directed otherwise by the Board, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Board.  If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Bank may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Board, is settled by pursuant to written stipulation of the parties concerned instructions.

Section 4.3    Excessive Payments.  If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Bank or Bank's agent an administrator chosen by the Board of such excessive or improper payment upon the Bank's or administrator's request, the Bank shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Bank or Bank's agent, the amount of said excessive or improper payment shall not be included in any report by the auditor, the Bank, or the administrator as an asset of the Plan or the Trust Fund.

## ARTICLE V
## BANK POWERS AND DUTIES

Section 5.1    Powers of the Bank Generally.  The Bank has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Bank under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Bank.

Section 5.2    Powers Exercisable by the Bank in Its Discretion.  The Bank is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)    To cause any investment in the Trust Fund to be registered in, or transferred into, its name as the institutional trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Bank shall at all times show that all such investments are part of the Trust Fund, and the Bank shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;.

(d)    To deliver to the Board, or the person or persons identified by the Board, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3    Powers Exercisable by the Bank Only Upon the Direction of the Board. The Bank shall exercise the following powers only upon the direction of the Board (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager who has been conferred such power by the Board):

(a)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

(b)    To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)    To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)    To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be reasonably necessary and appropriate to fulfill its obligations under this Trust Agreement and to comply with the lawful instructions of the Board, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as the Bank hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

(h)     To act as the sole trustee in the event that the Board, by reason of death, resignation, or failure to appoint successor Individual Trustees, has fewer than three (3) members.

Section 5.4     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Bank or any institutional successor trustee under this Trust Agreement.

Section 5.5     General Duties and Obligations of Bank.

(a)     In accordance with Article II, the Bank shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Bank shall manage, invest and reinvest the Trust Fund following the directions of the Board or a duly appointed Investment Manager (who has been conferred such power by the Board), shall collect the income therefrom, and shall make payments or disbursements as directed by the Board.

(b)     Subject to the provisions of Articles VII and X, the Bank shall comply with any directive issued by the Board to withdraw and transfer all or any part of the Trust Fund to another institutional trustee, custodian or a funding agent.

(c)     The Board shall have responsibility for directing the Bank as to the voting (by proxy or in person) of any shares or other property held in the Trust.  Accordingly, the Bank shall deliver to the Board (or the person or persons identified by the Board), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Board to fulfill its responsibility.

The Bank may use agents to effect such delivery to the Board (or the person or persons identified by the Board).

(d)     The Bank shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Bank will be under no liability or obligation to anyone with respect to any failure of the Board to

perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Board.

Section 5.6     Determination of Rights.  The Bank shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7     Continuance of Plan; Availability of Funds.  Neither the Board, the Bank nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Bank's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

Section 5.8     Payment of Expenses.  The Bank shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Bank or the Board in connection with establishing, sponsoring, administering or operating the Trust or Plan.  The Board shall by written certificate provided to the Bank request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Bank may make the payment requested by the Board.  The expenses of the Bank shall constitute a lien on the Trust Fund.

Section 5.9     Bank Compensation.  The Bank will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates [set forth in Exhibit A].  The Bank's compensation shall constitute a lien on the Trust Fund.

Section 5.10    Reliance on Written Instruments.  The Bank shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

**ARTICLE VI**
**~~BANK ACCOUNTS~~BANK ACCOUNTS**

Section 6.1     Records.  The Bank shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Board or such person or persons as the Board may designate.

Section 6.2     Annual Audit.  The Trust Fund shall be audited annually by a firm of certified public accountants independent of the Bank, the members of the Board, and the City, and a statement of the results of such audit shall be provided to the Bank and the Board and also made available for inspection by interested persons at the principal office of the Trust.  Such audit must be completed no later than 120 days after the expiration of the calendar year, or after

expiration of the fiscal year if the Trust Fund is on a fiscal year other than a calendar year. The Board shall provide a copy of this statement to the Supporting Organization and any Other Supporting Organization no later than the May 15th immediately succeeding the last day of the year covered by such audited financial statements.

Section 6.3   No Interest by Participants.  In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants and~~or~~ beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Board or Bank may have allocated to any account or separate fund for accounting purposes.

Section 6.4   Furnishing Written Accounts.  The Bank shall file with the Board a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Board and the Bank have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Board and the Bank in writing.  Such written account shall be filed with the Board within thirty (30) days after the close of each calendar quarter.

Section 6.5   Accounting Year, Cash Basis.  The accounting year of the Trust shall be the calendar year.  All accounts of the Bank shall be kept on a cash basis.

Section 6.6   Judicial Proceedings.  If the Bank and the Board cannot agree with respect to any act or transaction reported in any statement, the Bank shall have the right to have its accounts settled by judicial proceedings in which only the Bank and the Board shall be necessary parties.  No Participant shall have any right to compel an accounting, judicial or otherwise, by the Bank.

**ARTICLE VII**
**PROCEDURES FOR THE BANK**

Section 7.1   Removal.  The Bank may be removed by ~~Detroit~~the Board at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Bank of the appointment of a successor institutional trustee or custodian in the manner set forth in Section 7.3 below.

Section 7.2   Resignation.  The Bank may resign by filing with ~~Detroit~~the Board a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor institutional trustee or custodian has been appointed by the Board.  In no event may the Bank's resignation take effect before a successor institutional trustee or custodian has been appointed. ~~ If Detroit~~ by the Board and such successor trustee has accepted the appointment.  If the Board fails to appoint a successor institutional trustee or custodian, the retiring Bank may seek the appointment of a successor entity in the manner set forth in Section 7.3.

Section 7.3    Successor Bank.

(a)    ~~Detroit~~The Board may appoint a successor institutional trustee or custodian by delivering to such successor an instrument in writing, executed by an authorized representative of ~~Detroit~~the Board, appointing such successor entity, and by delivering to the removed or resigning Bank an acceptance in writing, executed by the successor so appointed. Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

(b)    Alternatively, ~~Detroit~~the Board may appoint a successor institutional trustee or custodian by securing from such successor an amendment to this Trust Agreement, executed by both the successor and an authorized representative of ~~Detroit~~the Board, which replaces the current Bank with the successor institutional trustee or custodian, appointing such successor institutional trustee or custodian, and by delivering to the removed or resigning Bank an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

(c)    If no appointment of a successor institutional trustee or custodian is made by ~~Detroit~~the Board within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Bank, appoint a successor institutional trustee or custodian after such notice to ~~Detroit~~the Board and the retiring Bank, as such court may deem suitable and proper.

Section 7.4    Effect of Removal or Resignation of Bank.  Upon the removal or resignation of the Bank in accordance with Section 7.1 or 7.2 above, the Bank shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5    Merger or Consolidation of the Bank.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed to be continuing as the Bank.

## ARTICLE VIII
## ~~COMPOSITION OF AND~~COMPOSITION OF AND PROCEDURES FOR ~~THE BOARD OF TRUSTEES~~THE BOARD OF TRUSTEES

Section 8.1    Number and Appointment of Members.  The Board of Trustees shall consist of seven (7) Individual Trustees as voting members, who are selected ~~by the Mayor of Detroit and by the Eligible Retiree Members (directly or indirectly through a representative)~~ as provided below.

(a)    The Mayor of Detroit shall appoint ~~three~~one (~~3~~1) voting member~~s, both of whom shall be residents of the State of Michigan and neither of whom~~who may not be an employee~~, contractor, agent or~~ or employed by an affiliate of the City ~~or~~(for such purposes, a contractor of the City shall not be deemed an affiliate), or of any labor union representing employees of the City, or a member of any such labor union, or a Participant.  ~~At least one (1) of such independent~~Such member~~s~~ shall have expert knowledge or extensive experience with respect to economics, finance, ~~or~~institutional investments, ~~and at least one (1) of such~~



~~independent members shall have expert knowledge or extensive experience with respect to~~ administration of public or private health and welfare benefit plans, executive management, benefits administration or actuarial science. The ~~voting members of the~~ Board member selected by the Mayor to begin serving as of the Effective Date shall be [~~_____, _____ and _____.~~]Floyd Allen.

(b)     The ~~Eligible Retiree Members shall select four~~remaining six (~~4~~6) voting members ~~pursuant to procedures established by the Board; provided, however, that two~~shall be appointed as follows:  three (~~2~~3) such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan, and ~~two~~three (~~2~~3) such voting members shall initially be designated by the Detroit Retired City Employees Association ~~on behalf of such Eligible Retiree Members~~.  The members initially selected ~~on behalf of the Eligible Retiree Members are~~by the Official Committee of Retirees of the City of Detroit, Michigan shall be:  [_____, _____, _____] and Thomas Sheehan.  The members initially selected by the Detroit Retired City Employees Association shall be:  [_____, _____, and _____.]

Each Board member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2     <u>Term of Office</u>.  Each member of the Board shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  ~~In the event of a vacancy, the replacement~~A Board member ~~shall~~whose term has ended due to the passage of time may be re~~appointed as provided~~appointed to serve an additional four (4) year term pursuant to the procedures set forth in Section ~~8.1~~8.4 below.

Section 8.3     <u>Resignation</u>.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to ~~Detroit stating a~~the Board (and in the case of a Board member selected by the Mayor, to the Mayor, and in the case of a Board member selected by the Official Committee of Retirees or the Detroit Retired City Employees Association, to the Detroit Retired City Employees Association), which notice shall state the date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 8.4     Vacancies.  In the event of a vacancy, either by resignation, death, incapacity, expiration of term of office, or other reasons, the replacement Board member shall be appointed as provided below.

(a)     In the event of a vacancy of the seat previously filled by the appointee of the Mayor of Detroit, the replacement Board member shall be appointed as provided in Section 8.1(a).

(b)     In the event of a vacancy of a seat previously filled by an appointee of the Official Committee of Retirees or the Detroit Retired City Employees Association, the replacement Board member shall be appointed by the Detroit Retired City Employees Association.

Section 8.48.5 Fees and Expenses.  The Board members appointed by the Mayor shall each be paid a stipend.  For the 2015 and 2016 calendar year, this stipend shall be in the amount of [$12,000] per year (payable ratably on a monthly basis).  The Board members selected by the Eligible Retiree Members shall each be paid aBeginning with the 2017 calendar year and for each year thereafter, this stipend shall be in the amount of [$_____]6,000 per year (payable ratably on a monthly basis); provided, however, that the Board, by a vote of not less than six (6) out of seven (7) Board members, shall have the power to provide for a different amount for the stipend; and provided, further, that in no event shall such annual stipend exceed $12,000.  Each Board member may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of itshis or her duties.  Compensation payable to the Board members and all reimbursed expenses shall be payable out of the Trust.

Section 8.58.6 Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Mmember shall be entitled to one vote on each question before the Board.  Five (5) members shall constitute a quorum at any meeting.  AExcept as provided in Section 8.5 and Article X, a majority vote of the seven (7) members present at a meeting of the Board, at a meeting in which a quorum exists, shall be necessary for a decision by the Board.  Notwithstanding the foregoing, the voting members of the Board may act by unanimous written consent in lieu of a meeting.

## ARTICLE IX
## POWERS AND DUTIES OF THE BOARD OF TRUSTEESBOARD OF TRUSTEES

Section 9.1    General.  The Board shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein.  Subject to the provisions of this Trust Agreement, the Plan documents and applicable laws, the Board shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust.  The decisions of the Board will be final and binding on all Participants and all other parties to the maximum extent allowed by law.  In performing its duties hereunder, the members of the Board shall comply with the terms of the Trust, and shall discharge their duties for the exclusive purposes of providing benefits to participants and beneficiaries of the Plan and Trust and defraying reasonable expenses of the Plan and Trust, and with the care, skill, prudence, and diligence then prevailing that a prudent person acting in a like capacity – and familiar with such matters – would use in the conduct of an enterprise of like character and with like aims.

Section 9.2    Plan Design and Administration.

(a)    Adoption of Plan.  The Board shall adopt a Plan to offer health carelife, sickness, accident or other similar benefits to Participants.  All terms of the Plan shall be determined by the Board; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated thereunder.  The Board shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

(b)     Benefits.  The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing or reimbursements, that the Board from time to time determines appropriate or desirable in its sole discretion.  The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Board in its sole discretion.  In designing the Plan and the benefits to be provided thereunder, the Board may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund.  Benefits provided under the Plan shall be limited to those health care benefits permitted by Code Section 501(c)(9), and any Plan eligibility restrictions established by the Board shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.

(c)     Method of Providing Benefits.  Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Board from time to time in its sole discretion.  The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

(d)     Plan Documentation.  The Board shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

Section 9.3     Investment of the Trust.  The Board shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act, and the Bank shall comply with the proper written direction of the Board concerning those assets.  The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund.  Any outside advisors who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act.

Section 9.4     Appointment of Investment Managers.  The Board, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").  The Board shall determine that each Investment Manager satisfies the requirements of section 38.1133(11) of the Investment Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority.  If an Investment Manager is appointed, it shall have the authority of the Bank specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Bank's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager.  Provided that an Investment Manager is prudently selected and monitored by the Board, the Board shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any

loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5     Government Reports and Returns.  The Board shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6     Compromise or Settle Claims.  The Board may compromise, settle and release claims or demands in favor of or against the Trust or the Board on such terms and conditions as the Board may deem advisable.  The Board may at all times rely upon the advice of independent counsel in reaching such decisions.

Section 9.7     Appointment of Administrator.  The Board may appoint a~one or more third party~parties to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8     Employment of Assistance.  The Board has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation and administration of the Plan and Trust.  The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.  In accordance with the provisions of Section 5.3 hereof, the Board may direct the Bank to pay reasonable compensation therefor from the Trust Fund.  The Board may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9     Reliance on Written Instruments.  The Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10     No Individual Liability on Contracts.  The Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that neither the Board nor any of its members shall not~be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 9.11     Detroit Not Liable for Conduct of Board.  The Board is not in its capacity as Board an officer, agent, employee, or representative of Detroit.  In its capacity as Board, the Board is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, liability, debt, or undertaking of the Board or its officers, agents, or representatives.

Section 9.12     Liability Insurance.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust

Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13    Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not ~~primarily~~ responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 9.14    Subrogation and Reimbursement.  If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)      If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.  The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue, and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses.  If requested in writing by the Board, the Benefit Recipient shall take, through any representative designated by the Board, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient.  In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)      If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund.  If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Board may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)      The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and

regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust. Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund. The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)     By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents and do whatever else the Board deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents. By participating in the Plan, each Benefit Recipient also agrees (i) that he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds. The Benefit Recipient, directly or through his or her representatives, shall not do anything to impair the Trust Fund's rights. If the Board determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Board may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e)     This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys' fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason. The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received. Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Board's prior written authorization.

(f)     The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole. Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

# ARTICLE X
## AMENDMENT, TERMINATION AND MERGER

Section 10.1    Amendment.  The Trust Agreement may be amended at any time in writing by ~~Detroit~~the Board, by a vote of not less than six (6) out of seven (7) Board members, or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; provided further that no amendment shall in any way conflict with the terms of the Plan of Adjustment or a Court order confirming the Plan of Adjustment; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code. No amendment to the Trust Agreement shall modify the responsibilities of the Bank hereunder unless the Bank has first consented to such amendment.

Section 10.2    Termination.

(a)    The Trust and this Trust Agreement may be terminated at any time in writing by ~~Detroit~~action of the Board, acting by a vote of not less than six (6) out of seven (7) Board members, with a copy of such written instrument to be provided to the Bank, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Board in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder.  Neither Detroit nor any member of the Board shall have any beneficial interest in the Trust Fund, except to the extent an Individual Trustee is also a Participant in the Plan.  Any determination by the Board or an administrator to distribute assets of the Trust upon termination to an Individual Trustee who is also a Participant must have the written concurrence of the Bank.  The Trust Fund shall remain in existence until all assets have been distributed.

(b)    Upon termination, the Bank and the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3    Transfer of Assets and/or Liabilities.  To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Board be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Board may determine.

# ARTICLE XI
## MISCELLANEOUS

Section 11.1    Rights in Trust Fund.  No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Bank, the Board, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 11.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

Section 11.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 11.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 11.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 11.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

If to the Bank:

**[insert name and address]**

If to the Board:

**[insert 7 names and addresses]**

If to the Mayor:

**[insert name and address]**

If to the Supporting Organization:

**[insert name and address]**

If to the Other Supporting Organization:

**[insert name and address]**

If to the Detroit Retired City Employees Association:

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

_____     ~~Dated:~~ _____
~~[insert name]~~

**BANK**

By: _____
~~[_____ Bank]~~
~~By:~~ _____
_____

Print Name: _____
Title: _____
Date: _____

**CITY OF DETROIT**

By: _____
~~By:~~ _____
_____

Print Name: _____
_____
~~Title~~
~~Dated:~~ _____
Title: _____
Date: _____

**INDIVIDUAL TRUSTEES**

By: _____          By: _____
Name: _____        Name: _____
Date: _____        Date: _____

By: _____          By: _____
Name: _____        Name: _____
Date: _____        Date: _____

By: _____          By: _____
Name: _____        Name: _____
Date: _____        Date: _____

By: _____
Name: _____
Date: _____

**EXHIBIT A**

**Bank Compensation**

**EXHIBIT B**

**Supporting Organization Funding**

| Contributing Organization | Contribution Amount |
|---|---|
| Skillman Foundation | |
| | |
| | |
| | |

**EXHIBIT I.A.106**

FORM OF DETROIT POLICE AND FIRE VEBA TRUST AGREEMENT

# ~~CITY OF DETROIT POLICE AND FIRE RETIREE~~ CITY OF DETROIT POLICE AND FIRE RETIREE HEALTH CARE TRUST

THIS TRUST AGREEMENT, entered into effective_____, 2014, by and among, the City of Detroit ("Detroit" or the "City") ~~and~~, [_____ ___ Bank] (the "Bank"), and the undersigned individual trustees ("Individual Trustees").

~~W I T N E S S E T H:~~

## WITNESSETH:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit Police and Fire Retiree Health Care Trust (the "Trust");

WHEREAS, the undersigned Individual Trustees constituting the Board of Trustees shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health Care Plan for Police and Fire Retirees of the City of Detroit" (the "Plan"), through which all health care benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Board of Trustees is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Bank to serve in the capacity of the institutional trustee with respect to the Trust and to maintain custody of the Trust assets;

WHEREAS, the Bank is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Bank agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1    Bank.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by ~~Detroit~~the Board in accordance with Section 7.3.  Any corporation continuing as the result of any merger or consolidation to which the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed automatically to be continuing as the Bank.

Section 1.2    Board of Trustees or Board.  The Board of Trustees is the body described in Article VIII to which Detroit has delegated responsibility for:  (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided.  It shall be constituted and operated in accordance with Article IX.

Section 1.3    Code.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.4    Detroit Police and Fire VEBA Beneficiary.  Has the meaning given to that term in the Plan of Adjustment.

~~Section 1.5    Detroit Police and Fire VEBA Contribution.  Has the meaning given to that term in the Plan of Adjustment.~~

Section ~~1.6~~1.5 Eligible Dependent.  ~~Means an~~An Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

Section ~~1.7~~1.6 Eligible Retiree Member.  ~~Means a~~A former employee of Detroit who is a Detroit Police and Fire VEBA Beneficiary.

Section ~~1.8~~1.7 Investment Act.  ~~Means~~ Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.

Section ~~1.9~~1.8 Investment Manager.  An investment manager appointed by the Board or its successor in accordance with the provisions of Section 9.4 hereof~~.~~

Section ~~1.10~~1.9    New B Notes.  Has the meaning given to that term in the Plan of Adjustment.

Section ~~1.11~~1.10    OPEB Claims Notes.  ~~Means the~~The New B Notes the City is required to contribute~~d~~ to the Trust pursuant to the ~~Detroit Police and Fire VEBA Contribution~~Plan of Adjustment.

Section 1.11    Other Supporting Organization.  An organization other than the City, the Rate Stabilization Fund, or the Supporting Organization, having voluntarily contributed funds in excess of **[$500,000]** to the Trust on or after the Effective Date.

Section 1.12     Participant.  An Eligible Retiree Member or Eligible Dependent who is entitled to health care benefits pursuant to the terms of the Plan.

Section 1.13     Plan.  The Health Care Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Board, as specified herein, and which will provide health care benefits permitted to be provided by a VEBA under Code section 501(c)(9).

Section 1.14     Plan of Adjustment.  The Plan for the Adjustment of Debts of the City of Detroit.

Section 1.15     Rate Stabilization Fund.  The Rate Stabilization Reserves Fund maintained under the control of the Governing Board of the City of Detroit Employee Benefits Plan established pursuant to Title 9, Chapter VIII of the Charter of the City of Detroit for the exclusive purpose of providing hospital, surgical, and death benefits for current or former employees of the City.

Section 1.16     Supporting Organization.  The Foundation for Detroit's Future, a not for profit that is created to collect certain contributions and make an annual contribution to an escrow account as described in Section 3.2, or the successor to such not for profit.  The Supporting Organization was created to receive funds from organizations, including those listed in Exhibit B, and allocate such funds, in the amounts described in Exhibit B, to, among other entities, this Trust Fund.

Section ~~1.15~~1.17     Trust Agreement.  This agreement as it may be amended thereafter from time to time by the parties hereto in accordance with the terms hereof.

Section ~~1.16~~1.18     Trust or Trust Fund.  The City of Detroit Police and Fire Retiree Health Care Trust established by this Trust Agreement, comprising all property or interests in property held by the Bank from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1     Purpose.  The Trust is established for the purpose of providing ~~health care~~life, sickness, accident, and other similar benefits, directly ~~or~~, through the purchase of insurance, or by reimbursement of expenses, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2     Receipt of Funds.  The Bank shall accept all sums of money and other property contributed to the Trust ~~by Detroit~~pursuant to Article III.  The Bank shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Bank shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Notes.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code section 501(c)(9) and the regulations promulgated thereunder.  In no event will the assets held in the Trust Fund revert to Detroit.  Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4    No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Notes or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Board or the Bank, on account of or as a result of the Trust Fund created hereunder.

Section 2.5    No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Bank will accept the City's contribution of the OPEB Claims Notes to the Trust Fund shall accept from Detroit the Detroit Police and Fire VEBA Contribution pursuant to the Plan of Adjustment.  Apart from the Detroit Police and Fire VEBA Contribution contribution of the OPEB Claims Notes, contributions to the Trust Fund made within sixty (60) days of the Effective Date by the Rate Stabilization Fund in the amount of $[1.5] million, or from Other Supporting Organizations, and as otherwise provided in Section 3.2, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the Plan.

Section 3.2    Other Contributions.  The Bank will accept other contributions to the Trust Fund from Participants, from funds held in escrow by an escrow agent on behalf of the City that are received from the Supporting Organization, or from Other Supporting Organizations whether or not contributed through an escrow on behalf of the City.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1 <u>Payments from the Trust Fund</u>.

(a) Subject to paragraph (b) below, the Bank shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Board.

(b) To the extent permitted by law, the Bank shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder. The Bank may withhold all or any part of any payment as the Bank in the exercise of its reasonable discretion may deem proper, to protect the Bank and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability. Any part of any such payment so withheld by the Bank that may be determined by the Bank to be in excess of any such liability will upon such determination by the Bank be paid to the person or entity from whom or which it was withheld.

Section 4.2 <u>Method of Payments</u>. The Bank may make any payment required to be made by it hereunder, unless directed otherwise by the Board, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Board. If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Bank may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Board~~, is settled by~~ <u>pursuant to</u> written ~~stipulation of the parties concerned~~<u>instructions</u>.

Section 4.3 <u>Excessive Payments</u>. If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Bank or ~~Bank's agent~~<u>an administrator chosen by the Board</u> of such excessive or improper payment upon the Bank<u>'s or administrator</u>'s request, the Bank shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person. Until repaid to the Bank or Bank's agent, the amount of said excessive or improper payment shall not be included in <u>any report by the auditor, the Bank, or the administrator as an asset of the Plan or</u> the Trust Fund.

## ARTICLE V
## BANK POWERS AND DUTIES

Section 5.1 <u>Powers of the Bank Generally</u>. The Bank has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Bank under other provisions of this Trust Agreement. The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Bank.

Section 5.2    Powers Exercisable by the Bank in Its Discretion.  The Bank is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)    To cause any investment in the Trust Fund to be registered in, or transferred into, its name as the institutional trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Bank shall at all times show that all such investments are part of the Trust Fund, and the Bank shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States:.

(d)    To deliver to the Board, or the person or persons identified by the Board, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3    Powers Exercisable by the Bank Only Upon the Direction of the Board.  The Bank shall exercise the following powers only upon the direction of the Board (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager who has been conferred such power by the Board):

(a)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

(b)    To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)    To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)    To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be reasonably necessary and appropriate to fulfill its obligations under this Trust Agreement and to comply with the lawful instructions of the Board, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as the Bank hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

(h)     To act as the sole trustee in the event that the Board, by reason of death, resignation, or failure to appoint successor Individual Trustees, has fewer than three (3) members.

Section 5.4     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Bank or any institutional successor trustee under this Trust Agreement.

Section 5.5     General Duties and Obligations of Bank.

(a)     In accordance with Article II, the Bank shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Bank shall manage, invest and reinvest the Trust Fund following the directions of the Board or a duly appointed Investment Manager (who has been conferred such power by the Board), shall collect the income therefrom, and shall make payments or disbursements as directed by the Board.

(b)     Subject to the provisions of Articles VII and X, the Bank shall comply with any directive issued by the Board to withdraw and transfer all or any part of the Trust Fund to another institutional trustee, custodian or a funding agent.

(c)     The Board shall have responsibility for directing the Bank as to the voting (by proxy or in person) of any shares or other property held in the Trust.  Accordingly, the Bank shall deliver to the Board (or the person or persons identified by the Board), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Board to fulfill its responsibility.

The Bank may use agents to effect such delivery to the Board (or the person or persons identified by the Board).

(d)     The Bank shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Bank will be under no liability or obligation to anyone with respect to any failure of the Board to

perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Board.

Section 5.6    Determination of Rights.  The Bank shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7    Continuance of Plan; Availability of Funds.  Neither the Board, the Bank nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Bank's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

Section 5.8    Payment of Expenses.  The Bank shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Bank or the Board in connection with establishing, sponsoring, administering or operating the Trust or Plan. The Board shall by written certificate provided to the Bank request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Bank may make the payment requested by the Board.  The expenses of the Bank shall constitute a lien on the Trust Fund.

Section 5.9    Bank Compensation.  The Bank will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates set forth in Exhibit A.  The Bank's compensation shall constitute a lien on the Trust Fund.

Section 5.10    Reliance on Written Instruments.  The Bank shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

**ARTICLE VI**
**BANK ACCOUNTS**BANK ACCOUNTS

Section 6.1    Records.  The Bank shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Board or such person or persons as the Board may designate.

Section 6.2    Annual Audit.  The Trust Fund shall be audited annually by a firm of certified public accountants independent of the Bank, the members of the Board, and the City, and a statement of the results of such audit shall be provided to the Bank and the Board and also made available for inspection by interested persons at the principal office of the Trust.  Such audit must be completed no later than 120 days after the expiration of the calendar year, or after

expiration of the fiscal year if the Trust Fund is on a fiscal year other than a calendar year. The Board shall provide a copy of this statement to the Supporting Organization and any Other Supporting Organization no later than the May 15th immediately succeeding the last day of the year covered by such audited financial statements.

Section 6.3     No Interest by Participants. In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund. At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants and~~or~~ beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Board or Bank may have allocated to any account or separate fund for accounting purposes.

Section 6.4     Furnishing Written Accounts. The Bank shall file with the Board a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Board and the Bank have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Board and the Bank in writing. Such written account shall be filed with the Board within thirty (30) days after the close of each calendar quarter.

Section 6.5     Accounting Year, Cash Basis. The accounting year of the Trust shall be the calendar year. All accounts of the Bank shall be kept on a cash basis.

Section 6.6     Judicial Proceedings. If the Bank and the Board cannot agree with respect to any act or transaction reported in any statement, the Bank shall have the right to have its accounts settled by judicial proceedings in which only the Bank and the Board shall be necessary parties. No Participant shall have any right to compel an accounting, judicial or otherwise, by the Bank.

## ARTICLE VII
## PROCEDURES FOR THE BANK

Section 7.1     Removal. The Bank may be removed by ~~Detroit~~the Board at any time upon thirty (30) days' advance written notice. Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Bank of the appointment of a successor institutional trustee or custodian in the manner set forth in Section 7.3 below.

Section 7.2     Resignation. The Bank may resign by filing with ~~Detroit~~the Board a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor institutional trustee or custodian has been appointed by the Board. In no event may the Bank's resignation take effect before a successor institutional trustee or custodian has been appointed. ~~If Detroit~~ by the Board and such successor trustee has accepted the appointment. If the Board fails to appoint a successor institutional trustee or custodian, the retiring Bank may seek the appointment of a successor entity in the manner set forth in Section 7.3.

Section 7.3     Successor Bank.

(a)      ~~Detroit~~The Board may appoint a successor institutional trustee or custodian by delivering to such successor an instrument in writing, executed by an authorized representative of ~~Detroit~~the Board, appointing such successor entity, and by delivering to the removed or resigning Bank an acceptance in writing, executed by the successor so appointed. Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

(b)      Alternatively, ~~Detroit~~the Board may appoint a successor institutional trustee or custodian by securing from such successor an amendment to this Trust Agreement, executed by both the successor and an authorized representative of ~~Detroit~~the Board, which replaces the current Bank with the successor institutional trustee or custodian, appointing such successor institutional trustee or custodian, and by delivering to the removed or resigning Bank an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

(c)      If no appointment of a successor institutional trustee or custodian is made by ~~Detroit~~the Board within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Bank, appoint a successor institutional trustee or custodian after such notice to ~~Detroit~~the Board and the retiring Bank, as such court may deem suitable and proper.

Section 7.4      Effect of Removal or Resignation of Bank.  Upon the removal or resignation of the Bank in accordance with Section 7.1 or 7.2 above, the Bank shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5      Merger or Consolidation of the Bank.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed to be continuing as the Bank.

## ARTICLE VIII
## ~~COMPOSITION OF AND~~COMPOSITION OF AND PROCEDURES FOR ~~THE BOARD OF TRUSTEES~~THE BOARD OF TRUSTEES

Section 8.1      Number and Appointment of Members.  The Board of Trustees shall consist of seven (7) Individual Trustees as voting members and for the first four (4) years, one (1) non-voting, ex-officio member, who are selected ~~by the Mayor of Detroit and by the Eligible Retiree Members (directly or indirectly through a representative)~~as provided below.

(a)      The Mayor of Detroit shall appoint ~~three~~one (~~3~~1) voting member~~s, both of whom shall be residents of the State of Michigan and neither of whom~~who may not be an employee~~, contractor, agent or~~ or employed by an affiliate of the City ~~or~~(for such purposes, a contractor of the City shall not be deemed an affiliate), or of any labor union representing employees of the City, or a member of any such labor union, or a Participant.  ~~At least one (1) of the such independent~~Such member~~s~~ shall have expert knowledge or extensive experience with respect to economics, finance, ~~or~~institutional investments, ~~and at least one (1) of such independent members shall have expert knowledge or extensive experience with respect to~~ administration of public or private health and welfare benefit plans, executive management,

benefits administration or actuarial science.  The ~~voting members of the~~ Board member selected by the Mayor to begin serving as of the Effective Date shall be ~~[_____, _____ and _____.]~~ Floyd Allen.

(b)     The ~~Eligible Retiree Members shall select four~~ remaining six (~~4~~ 6) voting members ~~pursuant to procedures established by the Board; provided, however, that two~~ shall be appointed as follows:  three (~~2~~ 3) such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan, and ~~two~~ three (~~2~~ 3) such voting members shall initially be designated by the Retired Detroit Police and Fire Fighters Association ~~on behalf of such Eligible Retiree Members~~.  The members initially selected ~~on behalf of the Eligible Retiree Members are~~ by the Official Committee of Retirees of the City of Detroit, Michigan shall be:  [_____, ~~_____~~, _____ ~~and _____]~~], and Thomas Sheehan.  The members initially selected by the Retired Detroit Police and Fire Fighters Association shall be:  Al Grant, Greg Trozak, and Andrew Dillon.

(c)     The Retired Detroit Police Members Association shall appoint one (1) non-voting, ex-officio member who shall initially be:  [_____].  The non-voting member may attend any meeting of the Board, provide whatever opinion and recommendations he or she deems warranted, and receive all written product received by the full Board.  To the extent the Board appoints any committee or subcommittee, such non-voting member is also eligible to be appointed, in the full voting Board's discretion, as an ex-officio member of such committee/subcommittee, but if appointed would not vote as a committee/subcommittee member.

Each voting Board member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2     Term of Office.  Each member of the Board shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  ~~In the event of a vacancy, the replacement~~ A voting Board member ~~shall~~ whose term has ended due to the passage of time may be r~~e~~appointed ~~as provided~~ to serve an additional four (4) year term pursuant to the procedures set forth in Section ~~8.1~~ 8.4 below.

Section 8.3     Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to ~~Detroit stating a~~ the Board (and in the case of a Board member selected by the Mayor, to the Mayor; and in the case of a Board member selected by the Official Committee of Retirees or the Retired Detroit Police and Fire Fighters Association, to the Retired Detroit Police and Fire Fighters Association), which notice shall state the date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 8.4     Vacancies.  In the event of a vacancy, either by resignation, death, incapacity, expiration of term of office, or other reasons, the replacement Board member shall be appointed as provided below.

(a)     In the event of a vacancy of the seat previously filled by the appointee of the Mayor of Detroit, the replacement Board member shall be appointed as provided in Section 8.1(a).

(b)     In the event of a vacancy of a seat previously filled by an appointee of the Official Committee of Retirees or the Retired Detroit Police and Fire Fighters Association, the replacement Board member shall be appointed by the Retired Detroit Police and Fire Fighters Association.

(c)     In the event of a vacancy of the non-voting, ex-officio seat previously filled by the appointee of the Retired Detroit Police Members Association, the replacement Board member shall be appointed by the Retired Detroit Police Members Association; provided, however, that such seat shall terminate on December 31, 2018, and in no event shall a vacancy in this seat after December 31, 2018 be filled.

Section 8.48.5 Fees and Expenses. TheVoting Board members appointed by the Mayor shall each be paid a stipend.  For the 2015 and 2016 calendar year, this stipend shall be in the amount of [$12,000] per year (payable ratably on a monthly basis).  The Board members selected by the Eligible Retiree Members shall each be paid aBeginning with the 2017 calendar year and for each year thereafter, this stipend shall be in the amount of [$_____]6,000 per year (payable ratably on a monthly basis); provided, however, that the Board, by a vote of not less than six (6) out of seven (7) voting Board members, shall have the power to provide for a different amount for the stipend; and provided, further, that in no event shall such annual stipend exceed $12,000. Each voting Board member may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of itshis or her duties, and in the case of the non-voting member, he or she may be reimbursed for reasonable expenses properly and actually incurred in connection with attendance at Board or Board committee meetings.  Compensation payable to the Board members and all reimbursed expenses shall be payable out of the Trust.

Section 8.58.6 Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Mmember shall be entitled to one vote on each question before the Board.  Five (5) voting members shall constitute a quorum at any meeting. AExcept as provided in Section 8.5 and Article X, a majority vote of the seven (7) voting members present at a meeting of the Board at a meeting in which a quorum exists shall be necessary for a decision by the Board.  Notwithstanding the foregoing, the voting members of the Board may act by unanimous written consent in lieu of a meeting.

# ARTICLE IX
# POWERS AND DUTIES OF THE BOARD OF TRUSTEESBOARD OF TRUSTEES

Section 9.1     General.  The Board shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein.  Subject to the provisions of this Trust Agreement, the Plan documents and applicable law, the Board shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust.  The decisions of the Board will be final and binding on all Participants and all other parties to the maximum extent

allowed by law.  In performing its duties hereunder, the voting members of the Board shall comply with the terms of the Trust, and shall discharge their duties for the exclusive purposes of providing benefits to participants and beneficiaries of the Plan and Trust and defraying reasonable expenses of the Plan and Trust, and with the care, skill, prudence, and diligence then prevailing that a prudent person acting in a like capacity – and familiar with such matters – would use in the conduct of an enterprise of like character and with like aims.

        Section 9.2    <u>Plan Design and Administration</u>.

        (a)    <u>Adoption of Plan</u>.  The Board shall adopt a Plan to offer ~~health care~~life, sickness, accident or other similar benefits to Participants.  All terms of the Plan shall be determined by the Board; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated thereunder.  The Board shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

        (b)    <u>Benefits</u>.  The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing or reimbursements, that the Board from time to time determines appropriate or desirable in its sole discretion.  The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Board in its sole discretion.  In designing the Plan and the benefits to be provided thereunder, the Board may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund.  Benefits provided under the Plan shall be limited to those health care benefits permitted by Code Section 501(c)(9), and any Plan eligibility restrictions established by the Board shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.

        (c)    <u>Method of Providing Benefits</u>.  Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Board from time to time in its sole discretion.  The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

        (d)    <u>Plan Documentation</u>.  The Board shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

        Section 9.3    <u>Investment of the Trust</u>.  The Board shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act, and the Bank shall comply with the proper written direction of the Board concerning those assets.  The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund.  Any outside advisors who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act.

        Section 9.4    <u>Appointment of Investment Managers</u>.  The Board, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment

management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account"). The Board shall determine that each Investment Manager satisfies the requirements of section 38.1133(11) of the Investment Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority. If an Investment Manager is appointed, it shall have the authority of the Bank specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Bank's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager. Provided that an Investment Manager is prudently selected and monitored by the Board, the Board shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5    <u>Government Reports and Returns</u>.  The Board shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6    <u>Compromise or Settle Claims</u>.  The Board may compromise, settle and release claims or demands in favor of or against the Trust or Board on such terms and conditions as the Board may deem advisable. <u>The Board may at all times rely upon the advice of independent counsel in reaching such decisions.</u>

Section 9.7    <u>Appointment of Administrator</u>.  The Board may appoint a~~one or more~~ third ~~party~~parties to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8    <u>Employment of Assistance</u>.  The Board has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation and administration of the Plan and Trust. The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services. In accordance with the provisions of Section 5.3 hereof, the Board may direct the Bank to pay reasonable compensation therefor from the Trust Fund. The Board may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9    <u>Reliance on Written Instruments</u>.  The Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10    <u>No Individual Liability on Contracts</u>.  The Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts. Such claims and obligations shall be paid out of the Trust; provided, however, that <u>neither</u> the Board <u>nor any of its members</u> shall ~~not~~ be exempt from personal liability for

willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence, or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 9.11   Detroit Not Liable for Conduct of Board.  The Board is not in its capacity as Board an officer, agent, employee, or representative of Detroit.  In its capacity as Board, the Board is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, liability, debt, or undertaking of the Board or its officers, agents, or representatives.

Section 9.12   Liability Insurance.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13   Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 9.14   Subrogation and Reimbursement.  If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)    If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.  The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue, and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses.  If requested in writing by the Board, the Benefit Recipient shall take, through any representative designated by the Board, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient.  In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund.  If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Board may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)     The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust.  Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund.  The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)     By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents and do whatever else the Board deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents.  By participating in the Plan, each Benefit Recipient also agrees (i) that he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds.  The Benefit Recipient, directly or through his or her representatives, shall not do anything to impair the Trust Fund's rights.  If the Board determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Board may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e)     This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys'

fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason. The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received. Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Board's prior written authorization.

(f)     The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole. Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

## ARTICLE X
## AMENDMENT, TERMINATION AND MERGER

Section 10.1     Amendment. The Trust Agreement may be amended at any time in writing by ~~Detroit~~the Board, by a vote of not less than six (6) out of seven (7) voting Board members, or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; provided further that no amendment shall in any way conflict with the terms of the Plan of Adjustment or a Court order confirming the Plan of Adjustment; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code. No amendment to the Trust Agreement shall modify the responsibilities of the Bank hereunder unless the Bank has first consented to such amendment.

Section 10.2     Termination.

(a)     The Trust and this Trust Agreement may be terminated at any time in writing by ~~Detroit~~action of the Board, acting by a vote of not less than six (6) out of seven (7) voting Board members, with a copy of such written instrument to be provided to the Bank, or by Court order upon proper motion. Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Board in the following order of priority: (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder. Neither Detroit nor any member of the Board shall have any beneficial interest in the Trust Fund, except to the extent an Individual Trustee is also a Participant in the Plan. Any determination by the Board or an administrator to distribute assets of the Trust upon termination to an Individual Trustee who is also a Participant must have the written concurrence of the Bank. The Trust Fund shall remain in existence until all assets have been distributed.

(b)     Upon termination, the Bank and the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3    Transfer of Assets and/or Liabilities.  To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Board be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Board may determine.

# ARTICLE XI
# MISCELLANEOUS

Section 11.1    Rights in Trust Fund.  No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Bank, the Board, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

Section 11.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

Section 11.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 11.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered an original.

Section 11.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 11.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

If to the Bank:

[**insert name and address**]

If to the Board:

[**insert 8 names and addresses**]

If to the Mayor:

**[insert name and address]**

If to the Supporting Organization:

**[insert name and address]**

If to the Other Supporting Organization:

**[insert name and address]**

If to the Retired Detroit Police and Fire Fighters Association:

**[insert name and address]**

If to the Retired Detroit Police Members Association

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

_____         ~~Dated:~~ _____
~~[insert name]~~

**BANK**

~~By:~~ _____
~~[_____ Bank]~~
~~By:~~ _____
   _____
Print Name: _____
   ~~Title:~~ _____
   ~~Date:~~ _____

**CITY OF DETROIT**

~~By:~~ _____
   ~~By:~~ _____
   _____
Print Name: ___
   _____
~~Title:~~ _
   ~~Date:~~ _____

   ~~Title~~                              _
~~Dated:~~ _____
**INDIVIDUAL TRUSTEES**

~~By:~~ _____      ~~By:~~ _____
   ~~Name:~~ _____      ~~Name:~~ _____
   ~~Date:~~ _____      ~~Date:~~ _____

~~By:~~ _____      ~~By:~~ _____
   ~~Name:~~ _____      ~~Name:~~ _____
   ~~Date:~~ _____      ~~Date:~~ _____

~~By:~~ _____      ~~By:~~ _____
   ~~Name:~~ _____      ~~Name:~~ _____
   ~~Date:~~ _____      ~~Date:~~ _____

~~By:~~ _____
   ~~Name:~~ _____
   ~~Date:~~ _____

LAI-3221058v4

21

**EXHIBIT A**

**Bank Compensation**

## EXHIBIT B

### Supporting Organization Funding

| Contributing Organization | Contribution Amount |
|---|---|
| Skillman Foundation | |
| | |
| | |
| | |

**EXHIBIT I.A.119**

FORM OF DIA SETTLEMENT DOCUMENTS

**Form of Omnibus Transaction Agreement By and Among the City of Detroit, the Detroit Institute of Arts and Foundation for Detroit's Future**

# OMNIBUS TRANSACTION AGREEMENT

## BY AND AMONG

## THE CITY OF DETROIT

## THE DETROIT INSTITUTE OF ARTS

## AND

## FOUNDATION FOR DETROIT'S FUTURE

ARTICLE I Definitions ........................................................................................3
    **1.1**   **Definitions**.................................................................................3
    **1.2**   **Other Defined Terms**...............................................................5
ARTICLE II The Commitments ...........................................................................7
    **2.1**   **DIA Funding Obligation**.........................................................7
    **2.2**   **Foundation Funders Commitments to Supporting Organization.**...................8
    **2.3**   **Payments**................................................................................8
    **2.4**   **City Reporting and Conditions to Funding**.........................10
    **2.5**   **The City's Cure Right; Suspension or Cancellation of Funding.**...................12
    **2.6**   **Disputes and Remedies Regarding Conditions Precedent to Funding.** ..........13
    **2.7**   **Notification of Funding Conditions**.....................................13
    **2.8**   **Failures to Fund**....................................................................14
ARTICLE III Initial Funding; Closing ...............................................................15
    **3.1**   **Closing**.................................................................................15
    **3.2**   **Initial Funding**.....................................................................15
    **3.3**   **At the Closing**......................................................................16
ARTICLE IV Representations and Warranties; Covenants of The DIA and the Supporting Organization ....................................................................................16
    **4.1**   **DIA Representations, Warranties and Covenants**..............16
    **4.2**   **Supporting Organization Representations and Warranties.**............17
    **4.3**   **Supporting Organization Covenants as to Funding Agreements.**...................17
    **4.4**   **Reporting Obligations**..........................................................17
    **4.5**   **Supporting Organization Observer Right**...........................17
ARTICLE V Representations and Warranties; Covenants of the City......................17
    **5.1**   **City Representations and Warranties**..................................17
    **5.2**   **City Commitments Relating to Pensions.**.............................18
    **5.3**   **Other City Commitments**......................................................19
ARTICLE VI Indemnification .............................................................................19
    **6.1**   **Indemnification by The DIA**................................................19
    **6.2**   **Indemnification by the City.**.................................................20
    **6.3**   **Defense of Indemnity Claims**...............................................22
ARTICLE VII Miscellaneous ..............................................................................23
    **7.1**   **No Third Party Beneficiary**.................................................23
    **7.2**   **Choice of Law; Jurisdiction; Venue.**...................................23
    **7.3**   **Dispute Resolution**...............................................................23
    **7.4**   **Specific Performance**............................................................24
    **7.5**   **Amendment and Waiver**.......................................................24
    **7.6**   **Notices**..................................................................................24
    **7.7**   **Binding Agreement; Assignment**.........................................25
    **7.8**   **Severability**...........................................................................26
    **7.9**   **No Strict Construction**..........................................................26
    **7.10**   **Captions**................................................................................26
    **7.11**   **Entire Agreement**.................................................................26
    **7.12**   **Counterparts**.........................................................................26

## List of Exhibits

| | | |
|---|---|---|
| Exhibit A | - | Settlement, Conveyance and Charitable Trust Agreement |
| Exhibit B | - | Foundation FDF Agreement |
| Exhibit C | - | DIA Direct Funder FDF Agreement |
| Exhibit D | - | DIA FDF Agreement |
| Exhibit E | - | Closing Direction |

## List of Schedules

| | | |
|---|---|---|
| Schedule 1 | - | Wire Transfer Instructions for City Account |
| Schedule 2 | - | Examples of Calculation of The DIA's Payment Obligation |

THIS OMNIBUS TRANSACTION AGREEMENT (this "**Agreement**"), effective as of the Closing Date, is entered into by and among the City of Detroit, Michigan (the "**City**"), The Detroit Institute of Arts, a Michigan nonprofit corporation f/k/a Founders Society Detroit Institute of Arts **(**"**The DIA**"), and Foundation for Detroit's Future, a Michigan nonprofit corporation (the "**Supporting Organization**"). The City, The DIA, and the Supporting Organization are collectively referred to herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, The DIA currently manages and operates the museum that is now commonly referred to as the Detroit Institute of Arts (the "**Museum**") under an Operating Agreement for the Detroit Institute of Arts, made on December 12, 1997, between The DIA and the City (the "**Operating Agreement**")**;**

WHEREAS, on July 18, 2013, the City filed a petition under chapter 9 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**") captioned "*In re City of Detroit, Michigan*", Case No. 13-53846 (the "**Bankruptcy Case**");

WHEREAS, the City and The DIA are willing, on the terms and conditions set forth herein, to enter into a settlement (the "**DIA Settlement**") pursuant to which the City will convey all of its right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) to the Museum and the Museum Assets (as defined in the Charitable Trust Agreement) to The DIA in exchange for fair value by virtue of (i) the settlement of any dispute regarding the ownership of the Museum Assets, (ii) the commitment of The DIA to hold the DIA Assets in perpetual charitable trust and to operate the Museum primarily for the benefit of the residents of the City and the Tri-Counties and the citizens of the State and (iii) the contributions through the Supporting Organization by The DIA (and through it, DIA Indirect Funders), DIA Direct Funders and Special Foundation Funders of $100 million, by Foundation Funders (excluding Special Foundation Funders) of $366 million, and an additional contribution by the State of Michigan (the "**State**") of $350 million, which total $816 million (in each case and in the aggregate before applying any discount for early payment) (the "**Payment Amount**");

WHEREAS, the Payment Amount will be paid for the benefit of Pension Claims of the City;

WHEREAS, the Bankruptcy Court has entered an order confirming the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit, as it may be further amended and as modified prior to the Closing Date (the "**Plan of Adjustment**") which provides for the treatment of the Payment Amount and the conveyance and protection of the Museum Assets in a manner consistent with the DIA Settlement;

WHEREAS, all conditions to the Effective Date of the Plan of Adjustment (as defined therein) have been satisfied or waived;

WHEREAS, the City, the State, each of their Related Entities (as defined in the Plan of Adjustment) and each of the Indemnified Parties is the beneficiary of the release and exculpation provisions of the Plan of Adjustment;

WHEREAS, the Supporting Organization has been established by the Community Foundation for Southeast Michigan as a tax exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended, to accommodate the contribution and payment of moneys from The DIA, DIA Direct Funders and Foundation Funders (and certain other contributions and payments that are not related to the DIA Settlement);

WHEREAS, the Attorney General of the State has approved the DIA Settlement as being consistent with Michigan law and with Attorney General Opinion No. 7272;

WHEREAS, The DIA and the applicable Art Institute Authority in each of Macomb, Oakland and Wayne Counties, Michigan (the "**Tri-Counties**") have amended the applicable Art Institute Service Agreement for such county in a manner to provide that termination of the Operating Agreement will not affect the obligations of the Art Institute Authorities' obligations under such agreements to collect and pay millage proceeds (the "**Millage**") to The DIA;

WHEREAS, the Governor of the State, the Treasurer of the State, the applicable legislative bodies of the State, the Emergency Manager specified in the Local Financial Stability and Choice Act (PA 436), and the Detroit City Council, in each case, have approved the DIA Settlement and the Transfer;

WHEREAS, the board of directors of The DIA has, to the extent necessary, adopted the recommendations of the ad-hoc committee established by The DIA, comprised of representatives from Foundation Funders, the City, the State and a representative of the Tri-Counties, regarding the future governance and oversight of The DIA;

WHEREAS, the City has adopted the Combined Plan for the General Retirement System of the City of Detroit, Michigan ("**GRS**"), effective July 1, 2014, which provides for the establishment, membership, terms, operation and duties of the GRS Investment Committee ("**GRS Pension Governance Terms**"), as set forth in the GRS, attached as Exhibit I.A.212.a to the Plan of Adjustment;

WHEREAS, the City has adopted the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan ("**PFRS**"), effective July 1, 2014, which provides for the establishment, membership, terms operation and duties of the PFRS Investment Committee ("**PFRS Pension Governance Terms**," together with the GRS Pension Governance Terms referred to as the "**Pension Governance Terms**"), as set forth in the PFRS, attached as Exhibit I.A.216.a to the Plan of Adjustment;

WHEREAS, in accordance with the Pension Governance Terms, the initial independent members for the respective GRS and PFRS Investment Committees shall be selected by mutual agreement of the appropriate representatives of the State, the City and the respective Boards of Trustees of GRS and PFRS, in consultation with the Supporting Organization, and shall be named in the Plan of Adjustment; provided, however, that if one of more of the initial independent Investment Committee members for GRS and PFRS, respectively, are not selected

by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent members for the GRS and PFRS Investment Committees to five each;

WHEREAS, in accordance with the Pension Governance Terms and rules and procedures that may be adopted by the Investment Committees, successor independent members of the respective GRS and PFRS Investment Committees shall be recommended by a majority of the remaining independent members of the applicable Investment Committee and confirmed by the GRS Board or PFRS Board, as applicable, and the State Treasurer in consultation with the Supporting Organization; provided, however, that if the applicable Board and State Treasurer cannot agree on the successor independent member, the remaining independent members of the applicable Investment Committee shall appoint the successor independent member;

WHEREAS, the Emergency Manager has issued an order directing the City to comply with the covenants benefitting The DIA and the Museum incorporated in Section 5.3 of this Agreement; and

WHEREAS, the Michigan Settlement Administration Authority, the disbursement agent for the State, shall disburse to GRS and to PFRS the total contribution by the State of $194.8 million, which is the present value of $350 million paid in installments over twenty (20) years applying the discount rate of 6.75% per annum, in accordance with the terms and conditions of the State Contribution Agreement attached as Exhibit I.A.294 to the Plan of Adjustment.

NOW THEREFORE, in consideration of the covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I
### Definitions

**1.1** **Definitions**. As used in this Agreement:

"**AAM**" means the American Alliance of Museums.

"**Business Day**" means any day other than a Saturday, Sunday or "legal holiday" on which banks in the State of Michigan are closed for business.

"**Charitable Trust Agreement**" means that certain Settlement, Conveyance and Charitable Trust Agreement between the City and The DIA in the form of **Exhibit A** to this Agreement pursuant to which the DIA Settlement will be consummated, including by virtue of the Transfer, the termination of the Operating Agreement, and the other transactions contemplated therein, as the same may be amended or modified from time to time.

"**City Account**" means a segregated escrow account titled "City of Detroit, in Trust for Certain of Its Retirement Systems and Associated Accounts", established pursuant to that certain Escrow Agreement dated as of even date herewith by and among the City, the Supporting Organization and U.S. Bank National Association (the "**Escrow Agent**") with instructions that

the amounts contributed to this escrow account by the Supporting Organization, which except as otherwise provided in Section 6.3(e) of this Agreement and the payment of reasonable expenses of maintaining the City Account, shall be used only for the payment of contributions to GRS and PFRS in satisfaction of the City's obligation to contribute to the Prior GRS Pension Plan (attached as Exhibit I.A.244 to the Plan of Adjustment) (the "**Prior GRS Pension Plan**") and the Prior PFRS Pension Plan (attached as Exhibit I.A.245 to the Plan of Adjustment) (the "**Prior PFRS Pension Plan**") and which is shown separately on the City's books and records. For the avoidance of doubt, in addition to the contributions made hereunder, contributions to the City Account may be made by the Supporting Organization ~~may also~~to be used for the payment of contributions to the City of Detroit Retiree Health Care Trust, the City of Detroit Police and Fire Retiree Health Care Trust, the Section 401(h) Medical Benefits Account for Retirees in the Combined Plan for the General Retirement System of the City of Detroit, Michigan and the Section 401(h) Medical Benefits Account for Retirees in the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan ~~in the amounts and as specified in the Plan of Adjustment~~.

"**DIA Assets**" has the same definition contained in the Charitable Trust Agreement.

"**DIA Direct Funders**" means those DIA Funders whose commitments (whether made before or after the Effective Time) to contribute monies in furtherance of The DIA's payment obligations under this Agreement are made directly to the Supporting Organization pursuant to a DIA Direct Funder FDF Agreement.

"**DIA Funders**" means those persons, businesses, business-affiliated foundations and other foundations from which The DIA secures commitments (whether made before or after the Effective Time) to contribute monies or otherwise secures contributions of monies in support of The DIA's payment obligations under this Agreement and, for clarity, includes all DIA Direct Funders and all DIA Indirect Funders.

"**DIA Indirect Funders**" means those DIA Funders whose commitments (whether made before or after the Effective Time) to contribute monies or whose actual contributions in furtherance of The DIA's payment obligations under this Agreement are made directly to The DIA.

"**Effective Time**" has the same definition contained in the Charitable Trust Agreement.

"**Foundation Funder**" means a business-affiliated foundation or other foundation that has entered into a Foundation FDF Agreement.

"**Funder**" means a Foundation Funder, a DIA Direct Funder, a DIA Indirect Funder or The DIA (collectively, the "**Funders**").

"**Funding Agreements**" means, collectively, the Foundation FDF Agreement, the DIA Direct Funder FDF Agreement and the DIA FDF Agreement, as such written agreements may be amended or modified in writing from time to time in accordance with this Agreement.

"**Indemnified Parties**" means, as applicable, DIA Indemnified Parties or City Indemnified Parties.

"**Loss**" means any claim, liability, obligation, loss, damage, assessment, judgment, cost and expense (including, without limitation, actual out-of-pocket attorney fees and actual expenses incurred in investigating, preparing, defending against, or prosecuting any litigation or claim, action, suit, hearing, proceeding or demand) of any kind or character.

"**Museum Assets**" has the same definition contained in the Charitable Trust Agreement.

"**Payment Date**" means the later of (x) June 30 of each calendar year commencing June 30, 2016 and (y) thirty (30) days after receipt by the Supporting Organization of evidence for that year of the satisfaction of the conditions precedent to funding set forth in Sections 2.4(a) -(d) of this Agreement (subject to the City's right to cure in Section 2.5 of this Agreement).

"**Payment Period**" means the period commencing on the Closing Date and ending on June 30, 2034, subject to extension for any cure period in Section 2.5 of this Agreement.

"**Pension Claims**" means the Claims in Classes 10 and 11 of the Plan of Adjustment (as such terms are defined in the Plan of Adjustment).

"**Present Value Discount**" means the value of any amount that The DIA, a DIA Direct Funder or a Foundation Funder pays to the Supporting Organization as contemplated under this Agreement, discounted from the date that the Supporting Organization remits such payment to the City Account (on behalf of the Funder that paid the amount to the Supporting Organization) to the Closing Date at the rate of 6.75% per annum.

"**Related Parties**" means a person's or entity's Affiliates (as defined in the United States Bankruptcy Code), predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing, their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, members, attorneys, advisors, professionals, agents and consultants each acting in such capacity, and any entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors, professionals, agents and consultants).

"**Special Foundation Funders**" means the following Foundation Funders:  Max M. and Marjorie S. Fisher Foundation and the A. Paul and Carol C. Schaap Foundation.

"**Title Company**" means Title Source, Inc.

"**Transaction Documentation**" means the agreements and other transaction documents to be executed and delivered at the Closing under this Agreement and under the Charitable Trust Agreement.

"**Transfer**" has the same definition contained in the Charitable Trust Agreement.

**1.2**	**Other Defined Terms**.  The following capitalized terms shall have the meanings given to them in the Sections of this Agreement set forth opposite such term:

.pdf ............................................................................................................................ Section 7.12

AAA .................................................................................................... Section 7.3
Accountant ....................................................................................... Section 2.3(c)
Agreement ............................................................................................ Preamble
Bankruptcy Case ...................................................................................... Recitals
Bankruptcy Court ..................................................................................... Recitals
City ...................................................................................................... Preamble
City Event of Default ........................................................................ Section 2.4(d)
City Indemnified Parties ..................................................................... Section 6.2(a)
Closing .......................................................................................... Section 3.1
Closing Date ................................................................................... Section 3.1
Closing Direction ............................................................................. Section 3.1
Default Amount ............................................................................... Section 2.8(b)
Defaulted DIA Funder ....................................................................... Section 2.8(b)
DIA Direct Funder FDF Agreement ...................................................... Section 3.3(b)
DIA FDF Agreement ......................................................................... Section 3.3(c)
DIA Indemnified Parties .................................................................... Section 6.1(a)
DIA Settlement ....................................................................................... Recitals
Escrow Agent .................................................................................. Section 1.1
Extended Cure Period ....................................................................... Section 2.5(a)
Foundation FDF Agreement ................................................................ Section 3.3(a)
Funders .......................................................................................... Section 1.1
GRS ................................................................................................... Recitals
GRS Board ............................................................................... Section 2.4(a)(iv)(A)
GRS Investment Committee ........................................................ Section 2.4(a)(iv)(C)
GRS Pension Governance Terms ................................................................. Recitals
Indemnifying Party ........................................................................... Section 6.3(a)
Independent Audited Financial Reports ................................................. Section 2.4(b)(i)
Interim Reaffirmation ........................................................................ Section 2.4(c)
Millage ................................................................................................. Recitals
Museum ................................................................................................ Recitals
Non- funding Party ........................................................................... Section 2.8(b)
Operating Agreement ............................................................................... Recitals
Parties ................................................................................................ Preamble
Party ................................................................................................... Preamble
Payment Amount ................................................................................... Recitals
Pension Certificate ........................................................................... Section 2.4(b)(ii)
Pension Funds ............................................................................... Section 6.2(a)(vii)
Pension Governance Terms ........................................................................ Recitals
PFRS ................................................................................................... Recitals
PFRS Board ............................................................................... Section 2.4(a)(iv)(B)
PFRS Investment Committee ....................................................... Section 2.4(a)(iv)(D)
PFRS Pension Governance Terms ............................................................... Recitals
Plan of Adjustment ................................................................................ Recitals
Prior GRS Pension Plan ...................................................................... Section 1.1
Prior PFRS Pension Plan ..................................................................... Section 1.1
Quitclaim Challenge ......................................................................... Section 6.2(c)

6

State.................................................................................................................... Recitals
Supporting Organization.................................................................................... Preamble
Termination Date ....................................................................................Section 2.1(b)
The DIA ............................................................................................................. Preamble
Tri-Counties...................................................................................................... Recitals

## ARTICLE II
### The Commitments

**2.1**     **DIA Funding Obligation**.

(a)     Subject to the terms and conditions of this Agreement, including The DIA's guaranty obligations in Section 2.8(c) of this Agreement, The DIA hereby commits to pay to the Supporting Organization on the Closing Date and with respect to each Payment Date: (A) $5 million multiplied by the number of annual payments required before and with respect to the then current Payment Date (treating the Closing Date for such purpose as a Payment Date) minus (B) the sum of (i) the aggregate amounts previously paid by The DIA, all DIA Direct Funders and both Special Foundation Funders plus (ii) the amount to be paid in the aggregate by all DIA Direct Funders and both Special Foundation Funders on such Payment Date. The DIA may pay an amount in excess of its obligation in this Section 2.1(a) without penalty or premium in connection with any payment otherwise made with respect to a Payment Date.

(b)     Except for The DIA's guaranty obligations as provided in Section 2.8(c) of this Agreement, and taking into account the application of Sections 2.1(c) and (d) below, The DIA shall have no obligation to make any further payments and The DIA's obligations shall be entirely satisfied at such time (the "**Termination Date**") as: (A) the sum of (1) the remaining aggregate funding commitments of DIA Direct Funders to the Supporting Organization assuming such commitments are paid precisely in accordance with the funding schedule reflected in their individual DIA Direct Funder FDF Agreements plus, (2) the remaining aggregate funding commitments of both Special Foundation Funders to the Supporting Organization assuming such commitments are paid precisely in accordance with the funding schedule reflected in their individual Foundation FDF Agreements, plus (3) the aggregate amount theretofore paid by DIA Direct Funders, The DIA and both Special Foundation Funders to the Supporting Organization that is paid to the City Account is greater than or equal to (B) the sum of (i) $5 million paid on the Closing Date plus (ii) nineteen (19) payments of $5 million on each Payment Date thereafter, with each of the amounts in (A) and (B) being calculated with application of the Present Value Discount. The term "Termination Date" includes the date, if any, of the cancellation of the commitment of The DIA hereunder in accordance with Section 2.5(b) of this Agreement. Hypothetical examples of the calculation of The DIA's payment obligations pursuant to this Section 2.1 are attached as Schedule 2 to this Agreement.

(c)     For purposes of the calculations in Sections 2.1(a) and 2.1(b) of this Agreement, in the event of a City Event of Default during a particular fiscal year (July 1 through June 30) that results in the cancellation of a payment pursuant to Section 2.5(b) of this Agreement, The DIA, all DIA Direct Funders and both Special Foundation Funders shall, in each case, be deemed to have made the annual payment required by, with respect to The DIA, Section 2.1(a) of this Agreement and The DIA FDF Agreement, and with respect to DIA Direct Funders

and Special Foundation Funders by their respective Funding Agreements, on June 30 of such year notwithstanding such cancellation of such scheduled payment.

(d)     The DIA's payment obligations under Sections 2.1(a) and 2.1(b) above and Section 2.8(c) shall be reduced by (x) any litigation or defense costs, damages or settlement costs incurred by The DIA, any DIA Direct Funder or any Special Foundation Funder to the extent the City fails to meet its indemnity obligations set forth in Section 6.2 of this Agreement, and (y) to the extent of any litigation or defense costs, damages or settlement costs incurred by The DIA, any DIA Direct Funder or any Special Foundation Funder arising from the transactions contemplated by this Agreement and the other Transaction Documentation that are not otherwise covered by the City's indemnity obligations in Section 6.2 of this Agreement.

**2.2**     **Foundation Funders Commitments to Supporting Organization**.  Under their respective Foundation FDF Agreements, each Foundation Funder has committed to make an aggregate amount of payments to the Supporting Organization.  The obligation of each Foundation Funder to make such aggregate amount of payments to the Supporting Organization shall terminate at such time as, taking into account the application of Section 2.3(d), (A) the aggregate amount theretofore paid by that Foundation Funder to the Supporting Organization that is paid to the City Account is greater than or equal to (B) the aggregate amount of its commitment paid (i) on the Closing Date plus (ii) the nineteen (19) payments on each Payment Date thereafter, with each of the amounts in (A) and (B) being calculated with application of the Present Value Discount.  For purposes of the calculations in this Section 2.2, in the event of a City Event of Default during a particular fiscal year (July 1 through June 30) that results in the cancellation of a payment pursuant to Section 2.5(b) of this Agreement, all Foundation Funders shall be deemed to have made the scheduled payment under their respective Foundation FDF Agreements on June 30 of such year notwithstanding the cancellation of such scheduled payment.

**2.3**     **Payments**.

(a)     Subject to the terms and conditions of ARTICLE II, funding of the commitments shall be made by (i) each Foundation Funder pursuant to the terms and conditions of its Foundation FDF Agreement, (ii) The DIA pursuant to the terms and conditions of this Agreement and the DIA FDF Agreement, and (iii) each DIA Direct Funder pursuant to the terms and conditions of its DIA Direct Funder FDF Agreement.

(b)     Subject to the terms and conditions of this Agreement, on the Closing Date, and on an annual basis thereafter commencing in 2016, on each Payment Date the Supporting Organization will remit to the City Account pursuant to the wire transfer instructions on Schedule 1 to this Agreement: (x) the payments made by all Foundation Funders as described in Section 2.2 of this Agreement and any prepayments by Foundation Funders, plus (y) the payments made by The DIA pursuant to Section 2.1 of this Agreement and the DIA FDF Agreement and any prepayments by The DIA, plus (z) the payments made by all DIA Direct Funders pursuant to the DIA Direct Funder FDF Agreements and any prepayments by DIA Direct Funders.  No interest will be owed on any Funder's payments.  The Supporting Organization shall not have any obligation to remit funds to the City Account if it has not received scheduled payments from a Funder, except as provided in Section 2.8(c) of this

Agreement with respect to The DIA's guaranty of payment obligations with respect to a Defaulted DIA Funder. Further, the obligation of the Supporting Organization to remit payments to the City shall terminate upon the remittance in the aggregate of $466 million, comprised of $100 million from The DIA (including the commitments of DIA Direct Funders and Special Foundation Funders) and $366 million from Foundation Funders (excluding Special Foundation Funders), in each case, without interest and before applying any Present Value Discount, if applicable, or the equivalent of such amount, applying the Present Value Discount, payable $23.3 million at Closing and $23.3 million with respect to each Payment Date thereafter. For purposes of the calculations in this Section 2.3(b), (x) in the event of a City Event of Default during a particular fiscal year (July 1 through June 30) that results in the cancellation of a payment by any Funder pursuant to Section 2.5(b) of this Agreement, the Supporting Organization shall be deemed to have made the scheduled payment under this Agreement on June 30 of such year notwithstanding such cancellation of such scheduled payment and (y) the provisions of Section 2.3(d) shall, if applicable, be taken into account in such calculation.

(c)    Either the City or the Supporting Organization may deliver written notice to the other party that they have been unable to reach agreement upon the calculation of the amount of any prepayment by any Foundation Funder applying the Present Value Discount in accordance with the applicable Foundation FDF Agreement in advance of a particular Payment Date. In addition, the City may deliver a written notice of objection to the Supporting Organization regarding the calculation of the payment obligations of The DIA with respect to a particular Payment Date within sixty (60) days after the remittance of the funds by the Supporting Organization to the City on behalf of The DIA. Any such disputes regarding the calculation of any such payment obligations under this Agreement or the applicable Foundation FDF Agreement will be determined by an independent accounting firm of national or regional (Midwest) reputation; provided that no such firm may have a conflict of interest and such firm shall be required to maintain independence as those terms are defined by the AICPA Code of Professional Conduct (as of June 1, 2012) (the "**Accountant**"). The Accountant shall be agreed to by the City and the Supporting Organization with respect to a Foundation Funder or by the City and The DIA if the dispute relates to The DIA's payment obligations. If the applicable Parties cannot agree on the Accountant within fourteen (14) days after either Party issues written notice to the other Party of the existence of a dispute, then within seven (7) days after the end of such fourteen (14) day notice period, each of such Parties shall submit the names of two (2) accounting firms that meet the standards of the preceding sentence, within seven (7) days thereafter, either Party may strike one name submitted by the other Party and the Accountant shall be selected by lot from the remaining names. The City and the Supporting Organization or The DIA, as applicable, shall deliver their calculations of the amounts they assert are owing to the Accountant within fourteen (14) days after the selection of the Accountant. The Accountant shall deliver its determination of the disputed payment obligations under this Agreement within thirty (30) days after receipt of the written notice of calculations from the Parties, and when rendered in writing, shall be final and binding upon each of the Parties. The City and The DIA agree that the Supporting Organization shall not be responsible for any shortfall in the amount of funds remitted to the City Account on behalf of The DIA due to a dispute regarding the calculation of The DIA's payment obligations in accordance with the provisions of this Section 2.3(c) nor shall the Supporting Organization have any other liability as a result of any such dispute.

(d)     The obligation of the Foundation Funders under Section 2.2 of this Agreement and of the Supporting Organization to remit funds to the City Account under Section 2.3(b) above shall be reduced by (x) any litigation or defense costs, damages or settlement costs incurred by the Supporting Organization or the Foundation Funder to the extent the City fails to meet its indemnity obligations set forth in Section 6.2 of this Agreement, and (y) to the extent of any litigation or defense costs, damages or settlement costs incurred by the Supporting Organization or the Foundation Funder arising from the transactions contemplated by this Agreement and the other Transaction Documentation, that are not otherwise covered by the City's indemnity obligations in Section 6.2 of this Agreement.

**2.4     City Reporting and Conditions to Funding**.

(a)     Commencing in 2015, by December 31st of each year, the City shall, at its expense, provide an annual report (the "**Annual Report**") to the Supporting Organization containing the following information:

(i)     an annual reconciliation report of the City Account, performed at the City's expense, prepared by an independent external auditor, the selection of which is reasonably satisfactory to the Supporting Organization, certifying that the amounts transferred to the City Account by the Supporting Organization on each preceding Payment Date were used by the City in a manner consistent with the terms of the Transaction Documentation, including, without limitation, to make contributions to GRS and PFRS in satisfaction of the City's obligation to contribute to the Prior GRS Pension Plan and the Prior PFRS Pension Plan in accordance with the Plan of Adjustment, the payment of reasonable expenses of maintaining the City Account and consistent with Section 6.3(e) of this Agreement,

(ii)     certification by the City's Chief Financial Officer on behalf of the City that the City has complied with the covenants in Sections 5.2 and 5.3(a)-(d) of this Agreement through the date of the Annual Report,

(iii)     certification from the Escrow Agent that to its knowledge the amounts contributed to the GRS or PFRS from the City Account were unencumbered by the City or any other entity,

(iv)     information as of the date of the Annual Report about the current membership of the:

(A)     board of trustees of the GRS (the "**GRS Board**"),

(B)     board of trustees of the PFRS (the "**PFRS Board**"),

(C)     investment committee of the GRS (the "**GRS Investment Committee**"), and

(D)     investment committee of the PFRS (the "**PFRS Investment Committee**").

The information for this subsection (iv) should include the term of each member (where applicable), whether the person is a member of the GRS Board or PFRS Board by virtue of his or her position with the City, by appointment or by election, and, with respect to the independent members of the Investment Committees, such person's qualifications.

(v)     evidence from the Pension Funds reasonably necessary to show that the internal controls governing the Pension Funds are in compliance with the applicable provision of the Plan of Adjustment, and

(vi)     any additional information that is necessary to evidence that the City is in compliance with the terms of this Agreement as may be reasonably requested by the Supporting Organization from time to time.

(b)     Prior to the Closing Date, the City shall cause the Pension Governance Terms to be amended to provide that, commencing in 2015, no later than December 31 of each year, the GRS Investment Committee and the PFRS Investment Committee will provide the Supporting Organization with the following information:

(i)     a copy of the audited annual financial statement for each of the GRS and the PFRS, as applicable, for the fiscal period ending June 30 of that year, containing a non-qualified opinion of an independent external auditor to the GRS and the PFRS, as applicable (the "**Independent Audited Financial Reports**").

(ii)     a certification as of the date of the Annual Report from the respective Chair of each of the PFRS Investment Committee and the GRS Investment Committee on behalf of their respective Investment Committees in a form reasonably acceptable to the Supporting Organization (the "**Pension Certificate**") that:

(A)     the City is current in its obligation to contribute to the Prior GRS Pension Plan and the Prior PFRS Pension Plan in accordance with the Plan of Adjustment,

(B)     the operation of the respective Investment Committees is in accordance with the applicable Pension Governance Terms, and

(C)     the City has complied and is continuing to comply with the covenants in Section 5.2(a)-(c) of this Agreement,

(iii)     Commencing in 2016, before May 15th of each year, the GRS Investment Committee and the PFRS Investment Committee will provide the Chief Financial Officer of the City with the information required of the GRS and PFRS in Section 2.4(c) of this Agreement, and

(iv)     any additional information from the GRS Investment Committee or the PFRS Investment Committee that is necessary to evidence that the City is in

compliance with the terms of this Agreement as may be reasonably requested by the Supporting Organization from time to time.

(c)     Commencing in 2016, by May 15th of each year, the City shall provide (or with respect to the Pension Certificates cause to be provided) to the Supporting Organization a reaffirmation of the information and certifications provided by the City in the Annual Report which shall be executed by the Chief Financial Officer of the City (the "**Interim Reaffirmation**") and which shall confirm that as of the date of the Interim Reaffirmation there has been no impairment or modification of the information in the most recent Annual Report since the date of that Annual Report, and which shall include confirmation from the GRS Investment Committee and PFRS Investment Committee that as of the date of the Interim Reaffirmation there has been no impairment or modification of the information in the most recent Pension Certificates since the date of such Pension Certificates.    The Interim Reaffirmation shall include copies of the unaudited financial statements as of and for the most recent period prepared for each of the PFRS and the GRS.

To further confirm that the conditions precedent to funding are satisfied, the Supporting Organization reserves the right to make an onsite review and inspection of the City's records and financial information and may employ at its cost an outside agent or consultant to undertake that review.   The City will cooperate with any such onsite review and will provide those persons conducting the review adequate office space and assistance (without charge) to conduct that review.   The City specifically waives, in favor of the Supporting Organization, or its agent or consultant, any fee for a public record search, pursuant to MCLA 15.234.

(d)     The obligation of The DIA, a DIA Direct Funder and a Foundation Funder to make payment to the Supporting Organization of any portion of its commitment under this Agreement or any other Funding Agreement is conditioned upon the City's compliance with the covenants in Sections 5.2 and 5.3(a)-(d) of this Agreement, satisfaction of the conditions specified in Sections 2.4(a)-(c) above, the receipt of the Independent Audited Financial Reports and the Pension Certificate.   The City acknowledges that The DIA under this Agreement, and under the DIA FDF Agreement, and each DIA Direct Funder and Foundation Funder under its respective Funding Agreement, shall have no obligation to make any payment to the Supporting Organization, nor shall the Supporting Organization have any obligation to remit any funds to the City Account, until all material requisite conditions precedent to funding in Section 2.4 of this Agreement are met.   Failure of the City to meet the conditions to funding specified in this Section 2.4 in any material respect, including based on the Supporting Organization informing the City that the information provided in the Annual Report, the Independent Audited Financial Reports, the Pension Certificates or the Interim Reaffirmation is incomplete or unsatisfactory, shall be a "**City Event of Default**".

**2.5     The City's Cure Right; Suspension or Cancellation of Funding**.

(a)     The City shall have the opportunity to cure any City Event of Default by May 15th of the year following the date the Annual Report is due under Section 2.4(a) above (this being 135 days from the time conditions to funding were due to be met by the City) provided an issuance of written notice of a City Event of Default by the Supporting Organization was provided to the City by the Supporting Organization by January 31st of the year following

the year such Annual Report was due from the City under Section 2.4(a) above. Notwithstanding the foregoing, to the extent that the applicable City Event of Default cannot reasonably be cured by May 15th as specified above or if the Event of Default arises out of the Independent Audited Financial Reports, the Pension Certificates or the Interim Reaffirmation of that Annual Report, and as long as the City has commenced to cure, and diligently pursues the cure of such default in good faith, such cure period shall be extended in writing by a reasonable period of time (the "**Extended Cure Period**"), to permit the City to cure such City Event of Default; provided, however, such Extended Cure Period shall not extend beyond December 15th (being 346 days from the date the Annual Report was due under Section 2.4(a) above). The City's ability to receive the benefit of the Extended Cure Period shall be subject to the written approval of the Supporting Organization upon receipt of a written request from the City setting forth why the City believes that it will be able to meet the requirements set forth above within the requested Extended Cure Period, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)     All obligations of The DIA under this Agreement, and as acknowledged by the City, all obligations of The DIA under the DIA FDF Agreement and of DIA Direct Funders and Foundation Funders under their respective Funding Agreements, to make scheduled payments and of the Supporting Organization to remit funds to the City Account shall be suspended for the duration of the initial and any Extended Cure Period. The City acknowledges and agrees that, if the City fails to cure a City Event of Default during the initial and any Extended Cure Period, the scheduled payment of The DIA under this Agreement and under the DIA FDF Agreement and of all DIA Direct Funders and Foundation Funders under their respective Funding Agreements shall be cancelled, and the Supporting Organization shall have no obligation to remit any funds to the City Account with respect to such Payment Date. Further, the City acknowledges and agrees that if the City fails to cure a City Event of Default during the initial and any Extended Cure Period under this Agreement, The DIA, all DIA Direct Funders, Foundation Funders and the Supporting Organization shall have the right to cancel their respective remaining commitments under their respective Funding Agreements and this Agreement.

**2.6     Disputes and Remedies Regarding Conditions Precedent to Funding**. The DIA shall have the right to rely upon the determination of the board of directors of the Supporting Organization as to whether the conditions to a scheduled payment have been satisfied and, if not initially satisfied, whether any City Event of Default shall have been timely cured. The City acknowledges that each DIA Direct Funder and each Foundation Funder shall, pursuant to its respective Funding Agreement, similarly have the right to rely upon the determination of the board of directors of the Supporting Organization as to whether the conditions to a scheduled payment have been satisfied and, if not initially satisfied, whether any City Event of Default shall have been timely cured. The City shall have no claim (and not pursue any claim) against The DIA, any DIA Direct Funder or any Foundation Funder for such Funder's reliance upon the determination of the Supporting Organization. In the event that the Supporting Organization has determined that the conditions have not been satisfied (or the City Event of Default not timely cured) and the City disputes that determination, the City's only recourse shall be to dispute the Supporting Organization's determination in accordance with the provisions of Section 7.3 of this Agreement.

**2.7** **Notification of Funding Conditions**.  In the event it is determined by the Supporting Organization or through the dispute resolution provisions in Section 7.3 of this Agreement that the conditions to funding in Section 2.4 of this Agreement have been satisfied or a City Event of Default timely cured, the Supporting Organization shall within five (5) Business Days thereafter give written notification to each of The DIA, DIA Direct Funders and Foundation Funders.  The DIA, and pursuant to each Funder's respective Funding Agreement, each DIA Direct Funder and Foundation Funder, shall be required to make its respective payment to the Supporting Organization (without interest) within twenty (20) days after written notification of such determination is issued by the Supporting Organization.

**2.8** **Failures to Fund**.

(a)  If The DIA has made its payment required under Section 2.1 of this Agreement or a Foundation Funder or DIA Direct Funder has made its scheduled payment under its respective Funding Agreement, in each case, to the Supporting Organization, the City shall have recourse only to the Supporting Organization (and not to any such Funder that made its payment) for such payment.

(b)  If The DIA, a DIA Direct Funder or a Foundation Funder (the "**Non-funding Party**") has not within the twenty (20) day period specified in Section 2.7 of this Agreement made its payment to the Supporting Organization in accordance with this Agreement with respect to The DIA, or such DIA Direct Funder's or Foundation Funder's schedule reflected in its Funding Agreement, as applicable ("**Default Amount**"), the Supporting Organization shall notify the Non-funding Party that it must pay its Default Amount within thirty (30) days and if not so paid, that the Supporting Organization shall assign its right to enforce payment of the Default Amount to the City.  If the Non-funding Party does not pay its Default Amount within the thirty (30) day period, the Supporting Organization shall assign its right to enforce payment of the Default Amount to the City in full satisfaction of the Supporting Organization's obligation to make such payment to the City; provided that if the Non-funding Party is a DIA Direct Funder or a Special Foundation Funder (a "**Defaulted DIA Funder**") such assignment shall be made to The DIA and not the City.  Except with respect to the guaranty obligation of The DIA with respect to a Defaulted DIA Funder in accordance with Section 2.8(c) below, the annual payment amount due to the City from the Supporting Organization on the Payment Date will be reduced by the Default Amount.

(c)  In the case of a Defaulted DIA Funder, the Supporting Organization shall issue written notice to The DIA within two (2) days after the expiration of the twenty (20) day funding period specified in Section 2.7 of this Agreement of the name of the Defaulted DIA Funder and the Default Amount.  The DIA shall within five (5) Business Days of receipt of such notice pay to the Supporting Organization (x) the Default Amount if the Termination Date has occurred and (y) if the Termination Date has not occurred, such additional amount as is necessary, if any, such that The DIA's payment to the Supporting Organization with respect to such Payment Date is equal to the amount that The DIA is otherwise required to pay pursuant to Section 2.1 of this Agreement.  The DIA shall not, however, have any obligation pursuant to this Section 2.8(c) if The DIA's commitment has been cancelled as provided in Section 2.5 of this Agreement.  If the Supporting Organization thereafter collects the Default Amount from the

Defaulted DIA Funder, the Supporting Organization shall promptly pay such amount to The DIA.

(d)     The City agrees that, except for the guaranty obligation of The DIA in Section 2.8(c) of this Agreement with respect to a Defaulted DIA Funder, in no event will any Funder other than the Non-funding Party have any responsibility for the payment or obligations of such Non-funding Party, and the City will not have any right to collect any amounts from any Funder except as set forth in Section 2.8(b) of this Agreement.  No party other than the City (as provided in Section 2.8(b) of this Agreement), the Supporting Organization, or The DIA with respect to a Defaulted DIA Funder or a DIA Indirect Funder pursuant to any grant agreement directly with The DIA shall have the right to assert any claim against any Funder.  Without limiting the foregoing, the failure of The DIA, any DIA Direct Funder, any Foundation Funder or the Supporting Organization to make a scheduled payment shall only give rise to a claim by the City against such Non-funding Party (pursuant to Section 2.8(b) above)., or by the Supporting Organization, and not against any other Funder, the Supporting Organization, The DIA or the DIA Assets; provided, however, (x) The DIA will have its guaranty obligations under Section 2.8(c) of this Agreement and its rights under its applicable grant agreement with each DIA Indirect Funder and (y) the foregoing shall not preclude the City from asserting claims in satisfaction of an indemnity claim pursuant to Section 6.1(b) of this Agreement but only against cash, cash equivalents or cash receivables of The DIA (excluding any cash, cash equivalents or cash receivables that are restricted in use by the terms of the donation, gift, bequest or contribution of a third party or by restrictions imposed on the use of proceeds from the sale of art by the applicable standards or ethical guidelines of the AAM or the Association of Art Museum Directors (or such other organizations by which The DIA or the Museum or its Director is accredited in the future or of which they become members in accordance with then applicable art museum best practices).  Without limiting the foregoing, under no circumstances shall the City or the Supporting Organization have a claim against any DIA Indirect Funder.

(e)     The City will be responsible for all costs of its enforcement against the Non-funding Party or the Supporting Organization, as applicable, and will not seek reimbursement of costs of enforcement from any other Funder or the Supporting Organization. No other person or entity shall have the right to enforce payment of any commitments in connection with any Funding Agreement or any Transactional Documentation except as specifically set forth in this Agreement.

## ARTICLE III
## Initial Funding; Closing

**3.1     Closing**.  The closing of the transactions pursuant to this Agreement (the "**Closing**") will take place immediately following the written confirmation from an authorized representative of the City, the Supporting Organization and The DIA in the form of **Exhibit E** to this Agreement (the "**Closing Direction**"); provided, that the Closing hereunder shall in all events occur concurrently with the closing under the Charitable Trust Agreement.  The time and date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".

13-53846-tjt     Doc 6910     Filed 08/20/14     Entered 08/20/14 23:32:53     Page 240 of 399

**3.2** **Initial Funding**. On the Closing Date, subject to the satisfaction of the deliverables pursuant to Section 3.3 of this Agreement, the Supporting Organization shall remit to the City Account pursuant to the wire transfer instructions on Schedule 1 to this Agreement:

(i)     the aggregate payment by Foundation Funders (excluding Special Foundation Funders) of at least $18.3 million, and

(ii)     the aggregate payment by The DIA, DIA Direct Funders and Special Foundation Funders of at least $5 million.

**3.3** **At the Closing**. At the Closing, the Supporting Organization shall deliver, or cause to be delivered, to each of the other Parties fully executed copies of the following which, to the extent held by the Title Company in escrow, shall be deemed delivered by virtue of the release of such documents by the Title Company in accordance with escrow instructions previously delivered to the Title Company:

(a)     each grant agreement between a Foundation Funder and the Supporting Organization in substantially the form of **Exhibit B** to this Agreement (the "**Foundation FDF Agreement**").

(b)     each grant agreement between a DIA Direct Funder and the Supporting Organization in substantially the form of **Exhibit C** to this Agreement (the "**DIA Direct Funder FDF Agreement**").

(c)     the agreement between The DIA and the Supporting Organization in substantially the form of **Exhibit D** to this Agreement with respect to The DIA's payment obligations as set forth in Section 2.1 of this Agreement (the "**DIA FDF Agreement**").

## ARTICLE IV
## Representations and Warranties; Covenants of The DIA and the Supporting Organization

**4.1** **DIA Representations, Warranties and Covenants**.

(a)     The DIA represents and warrants that this Agreement and the DIA FDF Agreement have been duly executed and The DIA's obligations under this Agreement and under the DIA FDF Agreement are authorized, valid and binding commitments of The DIA, enforceable against it in accordance with their respective terms.

(b)     The DIA acknowledges that (x) Foundation Funders, DIA Funders and the Supporting Organization have no financial obligations other than, in the case of Foundation Funders, on a several basis, their individual commitments in their respective Foundation FDF Agreement, in the case of DIA Direct Funders, their respective commitments in each of their DIA Direct Funder FDF Agreements, and DIA Indirect Funders pursuant to any grant agreement directly with The DIA, and (y) that the Funders are not guaranteeing payment to the City of any amount committed by any other Funder (other than The DIA with respect to its obligations in Section 2.8(c) of this Agreement).

(c)    The DIA agrees not to amend or modify the DIA FDF Agreement, or release or waive any rights that it has under such Funding Agreement, in a manner that would reasonably be expected to adversely affect the timing or amount of the payments to be made thereunder without the consent of the City.

**4.2    <u>Supporting Organization Representations and Warranties</u>**.  The Supporting Organization represents that its obligations under this Agreement and under the applicable Funding Agreements have been duly executed and are authorized, valid and binding upon the Supporting Organization, enforceable against it in accordance with their respective terms.

**4.3    <u>Supporting Organization Covenants as to Funding Agreements</u>**.

(a)    The Supporting Organization agrees not to amend or modify any Funding Agreement, or release or waive any rights that it has under any Funding Agreement, in a manner that would reasonably be expected to adversely affect the timing or amount of the payments to be made thereunder (i) without the consent of the City and, (ii) with respect to any DIA Direct Funder FDF Agreement or Foundation FDF Agreement with a Special Foundation Funder, the consent of The DIA.

(b)    The Supporting Organization shall promptly after execution thereof deliver to The DIA and the City copies of any DIA Direct Funder FDF Agreement entered into after the Closing Date, or any modifications to any DIA Direct Funder FDF Agreement or Foundation FDF Agreement with a Special Foundation Funder executed at Closing, in the event that the commitments thereunder are increased or modified (with the consent of The DIA) after the Closing Date.

(c)    Concurrently with the remittance of payments to the City Account by the Supporting Organization, the Supporting Organization shall deliver to The DIA and the City a schedule which reflects all payments received in such year from DIA Direct Funders and Special Foundation Funders and shall denote thereon whether any such payment represents a prepayment in excess of the funding schedule under the applicable DIA Direct Funder FDF Agreement or Foundation FDF Agreement, as applicable, and the date on which such payment was remitted to the City Account.

**4.4    <u>Reporting Obligations</u>**.  The DIA will provide to the other Funders and the City, and/or their representatives, within 150 days after the end of each fiscal year during the Payment Period (i) annual financial statements of The DIA audited by an independent certified public accountant and (ii) the annual report of the Director of the Museum in the form provided to the board of directors of the Museum.

**4.5    <u>Supporting Organization Observer Right</u>**.  During the Payment Period, the Supporting Organization shall have the right to designate a representative to attend and participate in a non-voting observer capacity in the meetings of the Board of The DIA (or its successor entity) subject to such observer's compliance with the applicable policies regarding confidentiality, conflicts of interest and other similar matters as may reasonably be adopted from time to time by The DIA.

## ARTICLE V
## Representations and Warranties; Covenants of the City

**5.1** **City Representations and Warranties**.

(a) The City represents and warrants that this Agreement has been duly executed and the City's obligations under this Agreement are authorized, valid and binding commitments of the City, enforceable against it in accordance with its terms.

(b) The City acknowledges that (x) Foundation Funders, DIA Funders and the Supporting Organization have no financial obligations other than, in the case of Foundation Funders, on a several basis, each of their commitments in their individual Foundation FDF Agreements, in the case of DIA Direct Funders, their respective commitments in each of their DIA Direct Funder FDF Agreements, and DIA Indirect Funders pursuant to any grant agreement directly with The DIA, and (y) that the Funders are not guaranteeing payment to the City of any amount committed by any other Funder (other than The DIA with respect to its obligations in Section 2.8(c) of this Agreement). The City further acknowledges that it has no rights under any grant agreement between any DIA Indirect Funder and The DIA.

**5.2** **City Commitments Relating to Pensions**. The City covenants to The DIA and Supporting Organization as follows:

(a) For the twenty (20) year period following the effective date of the Plan of Adjustment, the City shall maintain the Pension Governance Terms reflected in the GRS and the PFRS, as applicable, without modification or amendment, except as required to comply with applicable federal law, including without limitation to maintain the tax qualified status of the GRS or PFRS under the Internal Revenue Code, or the Plan of Adjustment.

(b) The City acknowledges that, except as provided in Section 6.3(e) and to pay reasonable expenses of maintaining the City Account, all funds remitted by the Supporting Organization to the City Account in connection with this Agreement shall be used solely for the payment of contributions to GRS and PFRS, allocated as provided in the Plan of Adjustment, in satisfaction of the City's obligation to contribute to the Prior GRS Pension Plan and the Prior PFRS Pension Plan in accordance with the Plan of Adjustment. Except as provided in Section 6.3(e) and to pay reasonable expenses of maintaining the City Account, the City shall cause to be transferred from the City Account for payment of contributions to the Prior GRS Pension Plan and the Prior PFRS Pension Plan all amounts received from the Supporting Organization within not more than three (3) Business Days after such funds are deposited in the City Account.

(c) The City shall notify the Supporting Organization in writing prior to the selection of the initial and successor independent GRS Investment Committee and PFRS Investment Committee members and such notice shall include information regarding the identity and qualifications of the candidates under consideration by the State, the City and the GRS Board or PFRS Board, as applicable. In addition, upon the written request of the Supporting Organization, the City shall provide to the appropriate representatives of the State and the applicable Board any written comments or observations about the candidates that the Supporting Organization elects in its consulting role to provide to the City, provided that such written

comments or observations are received by the City no later than three (3) days after the City has provided notice to the Supporting Organization of the identity of the candidates under consideration.

(d)  The City shall provide written notification of any change to the wire transfer instructions to the City Account on <u>Schedule 1</u> to this Agreement at least ten (10) Business Days prior to the next Payment Date.

**5.3  Other City Commitments**.  The City covenants to The DIA and Supporting Organization as follows:

(a)  The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Museum, The DIA or museums within the City generally which charter, ordinance or other provision has a material adverse impact on the Museum or The DIA (it being understood that a "material adverse impact" shall include any adverse financial impact or any contradiction, or adverse impact on the enforceability, of the terms of the DIA Settlement or the Transaction Documentation), except pursuant to State-enabling legislation.

(b)  The City agrees that after the Effective Time the City of Detroit Arts Commission will have no oversight of The DIA, the Museum or the DIA Assets.

(c)  The City shall not impose any fee, tax or other cost on the Museum or The DIA that solely affects or primarily targets the Museum, The DIA, the DIA Assets or museums within the City generally.

(d)  The City shall provide (or cause to be provided) utilities, police, fire and other City services to The DIA at the same pricing and on the same terms upon which the City offers to provide utilities, police, fire and such other City services to arm's-length third parties generally.

(e)  The City agrees that, as of the date hereof, there are no further commitments from the Funders, the Supporting Organization, The DIA or the State relating to the Museum or the DIA Assets beyond those contained in this Agreement or the other Transaction Documentation.

**ARTICLE VI**
**Indemnification**

**6.1  Indemnification by The DIA**.  To the maximum extent permitted by law, The DIA shall indemnify, defend and hold harmless:

(a)  DIA Funders, Foundation Funders, the City and the Supporting Organization and each of their Related Parties (the "**DIA Indemnified Parties**") from, against, and with respect to any Loss arising out of or in any manner, incident, relating or attributable to, or resulting from The DIA's failure to perform any of its obligations under the Transaction Documentation; and

(b)     the City and its Related Parties from, against, and with respect to any Loss arising out of or in any manner, incident, relating or attributable to, or resulting from any claim brought by an employee of The DIA arising from or relating to his/her employment with The DIA which employment commenced at any time after the effective date of the Operating Agreement and prior to the Effective Time, including without limitation, wrongful termination, workers' compensation, unemployment compensation, discrimination, violation of federal or state labor or employment laws, ERISA, bodily injury, personal injury or defamation, but excluding any claim relating to pension benefits from the GRS to which such employee was or is entitled by virtue of having been employed by the City prior to the commencement of employment with The DIA (the "**Employee Liabilities**").

### 6.2     Indemnification by the City.

(a)     To the maximum extent permitted by law, the City shall indemnify, defend, and hold Foundation Funders, DIA Funders, The DIA and the Supporting Organization and their respective Related Parties (the "**City Indemnified Parties**") harmless from, against, and with respect to any Loss arising out of or in any manner incident, relating or attributable to, or resulting from the following (provided indemnification will not be available to an Indemnified Party to the extent resulting from such Indemnified Party's breach of contract, sole ordinary negligence, gross negligence or intentional wrongful acts):

(i)     Any claims by third parties or the City arising out of any action properly taken by a City Indemnified Party under the Transaction Documentation, including but not limited to, any payment or non-payment or performance of any other obligation of the City Indemnified Parties permitted thereunder;

(ii)     Any breach or failure of any representation or warranty of the City contained in the Transaction Documentation between the City and the City Indemnified Parties and/or other parties related to the transactions consummated pursuant to this Agreement or the Charitable Trust Agreement;

(iii)     Any failure by the City to perform, satisfy or comply with any covenant, agreement or condition to be performed, satisfied or complied with by the City under the Transaction Documentation with the City Indemnified Parties or under agreements with any third parties contemplated by this Agreement or the Charitable Trust Agreement;

(iv)     Reliance by the City Indemnified Parties upon any books or records of the City or reliance by them on any written information furnished by the City or any of the City's employees, officials or agents to them to the extent any such information should prove to be false or materially inaccurate or misleading (including, without limitation, by omission), but only to the extent that such books, records or written information was furnished by the City in connection with the City showing its compliance with the conditions to initial or future funding as set forth in this Agreement;

(v)     Any claim or objection made after the Effective Date of the Plan of Adjustment in the Bankruptcy Case or any other action brought against, or involving, the

City Indemnified Parties with respect to their participation in any transaction contemplated by the proposed or confirmed Plan of Adjustment;

(vi)     The transfer, assignment or sale by the City to The DIA of any assets or property (real or personal) and any rights, title and interests therein including but not limited to, the Museum and all of the Museum Assets;

(vii)    Any action or claim against the City Indemnified Parties made by the GRS or PFRS, including any successors or assigns and any plan participants, or their representatives, successors or assigns (collectively, the "**Pension Funds**"), as nothing under the Transaction Documentation is intended to, nor are they to be construed or interpreted to, make the City Indemnified Parties a party in privity with, or having an obligation in any capacity to the Pension Funds. By way of illustration and not limitation, the following statements apply:

First, the City Indemnified Parties have no responsibility for the operation or administration of the Pension Funds and have no fiduciary responsibility for the Pension Funds as plan sponsor, plan administrator, investment advisor or otherwise; and

Second, the City Indemnified Parties have no obligation to contribute towards the funding of the Pension Funds and are not a funding guarantor.

(viii)   Any action or claim brought by the City, The DIA, the Pension Funds or any other party concerning non-payment of the commitments pursuant to this Agreement (and the Funding Agreements) by the City Indemnified Parties due to the breach of the Transaction Documentation by the City, The DIA, the Pension Funds or any other party, so long as the City Indemnified Parties have made a good faith determination of the breach of the Transaction Documentation or payment condition.

(b)     The City shall not contest on any grounds the enforceability of its indemnification obligations hereunder.

(c)     Notwithstanding the foregoing, the Parties acknowledge that the City is not making any representations to The DIA regarding the City's title to the Museum Assets prior to the Effective Time and that The DIA will not be entitled to indemnification in connection with its defense of any claims by third parties after the Effective Time challenging The DIA's title to any Museum Asset to the extent that such claim is based on an allegation that the City did not have legal title to the particular Museum Asset prior to the Effective Time (a "**Quitclaim Challenge**"). To be clear, however, The DIA will be entitled to indemnification by the City under this Section 6.2 in connection with any challenges after the Effective Time to The DIA's title to Museum Assets that are in any way based upon a claim that the title that the City had to the Museum Assets prior to the Effective Time was not effectively conveyed to The DIA at and as a result of the closing under the Charitable Trust Agreement. For avoidance of doubt, in the event of a final determination by the Bankruptcy Court not subject to appeal or certiorari by a court of competent jurisdiction that the Museum Assets must be re-conveyed to the City, the

Losses for which The DIA may be indemnified shall not include the value of the Museum Assets but shall include all other Losses incurred by The DIA for which it is otherwise entitled to indemnification under this Agreement.

(d)     Notwithstanding the foregoing, the City's indemnification of an Indemnified Party shall be limited solely to Losses arising out of or related to the Indemnified Party's participation in any transaction contemplated by the DIA Settlement.

### 6.3     **Defense of Indemnity Claims**.

(a)     An Indemnified Party shall provide written notice to The DIA or the City, as applicable (the "**Indemnifying Party**") in a timely manner and in any event, within twenty-one (21) days of receipt of any claim, of any matters as to which the Indemnified Party is entitled to receive indemnification and shall set forth in such notice reasonable detail regarding specific facts and circumstances then known by the Indemnified Party which pertain to such matters. Failure or delay in providing such notice shall not relieve the Indemnifying Party of its defense or indemnity obligations except to the extent the Indemnifying Party's defense of an applicable claim against an Indemnified Party is actually prejudiced by such Indemnified Party's failure or delay.

(b)     To the extent the Indemnifying Party is notified of a claim for which it is required to indemnify an Indemnified Party, the Indemnifying Party shall be solely responsible at its expense for responding to or otherwise defending such claim.  In such event, the Indemnifying Party shall assume exclusive control of the defense of such claim at its sole expense using counsel of its sole choosing and may settle such claim in its sole discretion; provided, however, that (i) with respect to any claim that involves allegations of criminal wrongdoing, the City shall not settle such claim without the prior written approval of the City Indemnified Party, which approval may be withheld in such City Indemnified Party's sole discretion, and (ii) with respect to any other claim, the Indemnifying Party shall not settle such claim in a manner that requires the admission of liability, fault, or wrongdoing on the part of an Indemnified Party, that fails to include a release of all covered claims pending against the Indemnified Party, or that imposes any obligation on the Indemnified Party without the prior written approval of the Indemnified Party, which approval may be withheld in such Indemnified Party's sole discretion.

(c)     The Indemnifying Party will keep the Indemnified Party reasonably informed of the status of any negotiations or legal proceedings related to any claim, and the Indemnified Party shall be entitled to engage counsel (at its own expense) to monitor the handling of any claim by the Indemnifying Party.

(d)     Notwithstanding the foregoing, The DIA shall be entitled to defend on its own behalf any claims regarding title to, interest in or control of the Museum Assets or operation of the Museum (including with respect to a Quitclaim Challenge provided The DIA shall not be entitled to indemnification for a Quitclaim Challenge, as set forth above).  To the extent The DIA intends to exercise such right, the City and The DIA shall use their commercially reasonable efforts in good faith to coordinate a joint defense of such claim (including as to selection of joint counsel).  If the City and The DIA cannot agree on a joint defense of the claim, each Party shall

undertake its own defense, reserving all rights against the other for indemnification hereunder with respect to such claim, but, in such case, The DIA shall not be entitled to indemnification of its defense costs in connection therewith.

(e)     Notwithstanding anything to the contrary set forth in this Agreement or in the Charitable Trust Agreement, to the extent that the City is required to indemnify a City Indemnified Party hereunder, and the underlying claim being indemnified does not arise out of the City's breach of contract (including a City Event of Default), sole ordinary negligence, gross negligence or intentional wrongful acts and is not due to a claim brought by the City (including pursuant to Section 2.8(b) of this Agreement), the City may reimburse itself for the costs of such indemnity out of the City Account, in which case the amount payable by the City in satisfaction of the City's obligation to contribute to the Prior GRS Pension Plan and the Prior PFRS Pension Plan shall be reduced by the amount reimbursed to the City for such indemnity.

## ARTICLE VII
## Miscellaneous

**7.1     No Third Party Beneficiary**.  Except for the Indemnified Parties, each of whom is an express third-party beneficiary under this Agreement with respect to ARTICLE VI of this Agreement, and each Funder who is an express third-party beneficiary under Sections 2.3(d), 2.5(b), 2.6, 2.8(a), 2.8(d), 2.8(e), 4.1(b), 4.4, 5.1(b) and 5.3(e) of this Agreement, the terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors and permitted assigns, and nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the City, The DIA, and the Supporting Organization any third-party beneficiary rights or remedies.

**7.2     Choice of Law; Jurisdiction; Venue**.  This Agreement shall be construed in accordance with the laws of the State of Michigan without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that, except as to disputes regarding the calculation of the The DIA's payment obligations under this Agreement or of a Foundation Funder under a Foundation FDF Agreement which shall be determined in accordance with Section 2.3(c) of this Agreement, or any disputes that are subject to arbitration in accordance with Section 7.3 of this Agreement, any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, including a proceeding under Section 2.3(c) or Section 7.3 of this Agreement, shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan; and provided, further, that The DIA may bring a legal action, suit or proceeding in a state court to obtain a writ of mandamus to enforce the obligations of the City in Section 5.3 of this Agreement.  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and

determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

      **7.3**    <u>**Dispute Resolution**</u>.  Any controversy or claim arising out of or relating to the satisfaction of the conditions precedent to funding in <u>ARTICLE II</u> of this Agreement shall be settled by arbitration administered by the American Arbitration Association ("<u>**AAA**</u>") in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof in accordance with <u>Section 7.2</u> of this Agreement.  Any such controversy or claim shall be submitted to a panel of three (3) AAA arbitrators.  The place of the arbitration shall be within the Wayne County, Michigan. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all Parties to the arbitration.  The Parties may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved.  The Parties also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction in accordance with <u>Section 7.2</u> of this Agreement any interim or provisional relief that is necessary to protect the rights or property of that party, pending the establishment of the arbitral tribunal (or pending the arbitral tribunal's determination of the merits of the controversy).  Each Party shall bear its own costs and expenses and an equal share of the arbitrators' and administrative fees of arbitration.  With respect to any dispute as to a City Event of Default and a payment in connection with the same, the arbitration proceeding and its findings contemplated under this Section must be held and received by no later than the January 31st of the second calendar year after the year in which the Annual Report was due, as provided in <u>Section 2.4(a)</u> above, from the City to the Supporting Organization from which the disputed City Event of Default arose, regardless of whether the City Event of Default arises from the Annual Report or the Interim Reaffirmation of said report.  If the arbitration hearing findings cannot be received by that January 31st, the position of the Supporting Organization that the City Event of Default exists and has not been cured will be deemed a final determination for purposes of determining whether the conditions to funding have been satisfied.

      **7.4**    <u>**Specific Performance**</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, including, without limitation, seeking an order of the court having jurisdiction in accordance with <u>Section 7.2</u> of this Agreement requiring any Party to comply promptly with any of its obligations hereunder.

      **7.5**    <u>**Amendment and Waiver**</u>.  This Agreement may be amended and any provision of this Agreement may be waived; <u>provided</u> that any such amendment or waiver will be binding upon the Parties only if such amendment or waiver is set forth in a writing executed by all Parties during the Payment Period and, thereafter, by The DIA and the City.  No course of dealing between or among any persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement.

      **7.6**    <u>**Notices**</u>.  All notices, demands and other communications given or delivered under this Agreement shall be given in writing to the address indicated below (or such other

address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) Business Days after mailed by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient with telephonic confirmation by the sending party.

**The City of Detroit**
Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue, 5th Floor
Detroit, Michigan 48226
Telephone: (313)224-1352
Facsimile: (313)224-5505
Attention: Corporation Counsel

with a copy to (which will not constitute notice):

Office of the Mayor
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, Michigan 48226
Facsimile: (313)224-4128
Attention: Mayor

**The Detroit Institute of Arts**
5200 Woodward Avenue
Detroit, Michigan 48202
Facsimile:
E-mail:
Attention: Director and Chief Financial Officer

with a copy to (which will not constitute notice):

Honigman Miller Schwartz and Cohn LLP
2290 First National Bank Building
660 Woodward Avenue
Detroit, Michigan 48226-3506
Facsimile: (313)465-7575
E-mail: azschwartz@honigman.com
Attention: Alan S. Schwartz and
E-mail: jopperer@honigman.com
Attention: Joshua F. Opperer

**Foundation for Detroit's Future**
333 West Fort Street, Suite 2010
Detroit, Michigan 48226-3134
Facsimile: (313)961-2886

E-mail: rferriby@cfsem.org
Attention: Robin D. Ferriby

**7.7** **Binding Agreement; Assignment**.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party (by operation of law or otherwise) without the prior written consent of all the other Parties.  Any attempted assignment in violation of this Section 7.7 shall be null and void.

**7.8** **Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**7.9** **No Strict Construction**.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**7.10** **Captions**.  The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

**7.11** **Entire Agreement**.  This Agreement, including the Exhibits, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

**7.12** **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterpart.  The exchange of copies of this Agreement or of any other document contemplated by this Agreement (including any amendment or any other change thereto) and of signature pages thereof by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" ("**.pdf**") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of an original Agreement or other document for all purposes.  Signatures of the Parties transmitted by facsimile, by electronic mail in .pdf form or by any other electronic means referenced in the preceding sentence, or by any combination thereof, shall be deemed to be original signatures for all purposes.

13-53846-tjt    Doc 6910    Filed 08/20/14    Entered 08/20/14 23:32:53    Page 251 of 399

*[signature page follows]*

IN WITNESS WHEREOF, the parties have executed this Omnibus Transaction Agreement effective as of the Closing Date.

**THE CITY OF DETROIT**

By: _____
Name: _____
Title: _____

**THE DETROIT INSTITUTE OF ARTS**

By: _____
Name: _____
Title: _____

**FOUNDATION FOR DETROIT`S FUTURE**

By: _____
Name: _____
Title: _____

## EXHIBIT A

## SETTLEMENT, CONVEYANCE AND CHARITABLE TRUST AGREEMENT

**EXHIBIT B**

**FOUNDATION FDF AGREEMENT**

# EXHIBIT C

## DIA DIRECT FUNDER FDF AGREEMENT

C-1

**EXHIBIT D**

**DIA FDF AGREEMENT**

**EXHIBIT E**

**CLOSING DIRECTION**[1]

[_____], 2014

Title Source, Inc.
662 Woodward Avenue
Detroit, Michigan 48226-3422

      Re: <u>Certification of Release Conditions</u>

Ladies and Gentlemen:

      We refer to the Escrow Agreement, dated as of _____, 2014 (the "<u>Escrow Agreement</u>"), among each of you and the undersigned. Capitalized terms used herein shall have the meaning given in the Omnibus Transaction Agreement or Escrow Agreement, as applicable.

      By execution of this Certificate, each of the undersigned certifies that the conditions to the Closing under the Omnibus Transaction Agreement and to the Closing Release specified in <u>Section 2.1</u> of the Escrow Agreement have been satisfied and directs that you shall undertake the actions specified in <u>Section 2.1</u> of the Escrow Agreement.

*[signature pages follow]*

---

[1] For simplicity, this is a simple direction consistent with the Escrow Agreement. The certificate would be executed by a Representative authorized as specified in the Escrow Agreement.

**THE CITY OF DETROIT**

By: _____
Name: _____
Title: _____

**THE DETROIT INSTITUTE OF ARTS**

By: _____

Name:_____

Title:_____

**FOUNDATION FOR DETROIT'S FUTURE**

By: _____

Name: _____

Title: _____

**SCHEDULE 1**

**Wire Transfer Instructions for City Account**

## SCHEDULE 2

### Examples of the Calculation of The DIA's Payment Obligations

### Examples Illustrating The DIA's Payment Obligation
### under the Omnibus Transaction Agreement

**Example 1**

| Previous and Current Payment Dates | Payment Number | Aggregate Committed Payment | Previous DIA, DIA Direct Funder, and Special Foundation Funder Payments | DIA Direct Funder and Special Foundation Funder Scheduled Payments* | DIA Payment |
|---|---|---|---|---|---|
| Closing** | 1 | $5,000,000 | $0 | $0 | $5,000,000 |
| 6/30/16 | 2 | $10,000,000 | $5,000,000 | $2,000,000 | $3,000,000 |
| 6/30/17 | 3 | $15,000,000 | $10,000,000 | $5,000,000 | $0 |
| 6/30/18 | 4 | $20,000,000 | $15,000,000 | $5,000,000 | $0 |
| 6/30/19 | 5 | $25,000,000 | $20,000,000 | $5,000,000 | $0 |
| 6/30/20 | 6 | $30,000,000 | $25,000,000 | $5,000,000 | $0 |
| 6/30/21 | 7 | $35,000,000 | $30,000,000 | $5,000,000 | $0 |
| 6/30/22 | 8 | $40,000,000 | $35,000,000 | $5,000,000 | $0 |
| 6/30/23 | 9 | $45,000,000 | $40,000,000 | $5,000,000 | $0 |
| 6/30/24 | 10 | $50,000,000 | $45,000,000 | $5,000,000 | $0 |
| 6/30/25 | 11 | $55,000,000 | $50,000,000 | $5,000,000 | $0 |
| 6/30/26 | 12 | $60,000,000 | $55,000,000 | $5,000,000 | $0 |
| 6/30/27 | 13 | $65,000,000 | $60,000,000 | $5,000,000 | $0 |
| 6/30/28 | 14 | $70,000,000 | $65,000,000 | $5,000,000 | $0 |
| 6/30/29 | 15 | $75,000,000 | $70,000,000 | $5,000,000 | $0 |
| 6/30/30 | 16 | $80,000,000 | $75,000,000 | $5,000,000 | $0 |
| 6/30/31 | 17 | $85,000,000 | $80,000,000 | $5,000,000 | $0 |
| 6/30/32 | 18 | $90,000,000 | $85,000,000 | $5,000,000 | $0 |
| 6/30/33 | 19 | $95,000,000 | $90,000,000 | $5,000,000 | $0 |
| 6/30/34 | 20 | $100,000,000 | $95,000,000 | $5,000,000 | $0 |
| Total | | | $100,000,000 | $92,000,000 | $8,000,000 |

As of the Closing Date, $5 million multiplied by the single Payment Date (Closing) equals $5 million. The sum of previous payments by The DIA, DIA Direct Funders and Special Foundation Funders ($0) and the DIA Direct Funders' and Special Foundation Funders' scheduled payment at Closing ($0) equals $0. Therefore, at Closing, The DIA is obligated to pay $5 million less $0, which equals $5 million. The formula applies in an identical manner to the June 30, 2016 Payment Date (and the remaining Payment Dates). $5 million multiplied by the two (2) relevant Payment Dates (the Closing Date and June 30, 2016) equals $10 million. The sum of the previous payments by The DIA, DIA Direct Funders and Special Foundation Funders ($5 million) and the DIA Direct Funders' and Special Foundation Funders' scheduled payment ($2 million) equals $7 million. Therefore, on June 30, 2016, The DIA is obligated to pay $10 million less $7 million, which equals $3 million.

As of June 30, 2016, The DIA has satisfied its payment obligation under the Omnibus Transaction Agreement (other than its guarantee obligation). The Present Value Discount of the total payments made as of the end of the day June 30, 2016, plus the Present Value Discount of

the DIA Direct Funders' and Special Foundation Funders' remaining scheduled payments equals the Present Value Discount of $5 million paid at Closing and 19 annual payments of $5 million commencing as of June 30, 2016.

*DIA Direct Funder and Special Foundation Funder scheduled payments are assumed to be made on the Payment Date, as scheduled.

** All examples assume an October 31, 2014 Closing Date.

# Examples Illustrating The DIA's Payment Obligation
## under the Omnibus Transaction Agreement
## Example 2: DIA Payments and Present Value Discount Limitation

| Previous and Current Payment Dates | Payment Number | Aggregate Committed Payment | Previous DIA, DIA Direct Funder, and Special Foundation Funder Payments | DIA Direct Funder and Special Foundation Funder Scheduled Payments* | DIA Payment | DIA Prepayment |
|---|---|---|---|---|---|---|
| Closing | 1 | $5,000,000 | $0 | $10,000,000 | $0 | $0 |
| 6/30/16 | 2 | $10,000,000 | $10,000,000 | $10,000,000 | $0 | $0 |
| 6/30/17 | 3 | $15,000,000 | $20,000,000 | $10,000,000 | $0 | $0 |
| 6/30/18 | 4 | $20,000,000 | $30,000,000 | $10,000,000 | $0 | $0 |
| 6/30/19 | 5 | $25,000,000 | $40,000,000 | $10,000,000 | $0 | $0 |
| 6/30/20 | 6 | $30,000,000 | $50,000,000 | $10,000,000 | $0 | $0 |
| 6/30/21 | 7 | $35,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/22 | 8 | $40,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/23 | 9 | $45,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/24 | 10 | $50,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/25 | 11 | $55,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/26 | 12 | $60,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/27 | 13 | $65,000,000 | $60,000,000 | $0 | $5,000,000 | $0 |
| 6/30/28 | 14 | $70,000,000 | $65,000,000 | $0 | $5,000,000 | $0 |
| 6/30/29 | 15 | $75,000,000 | $70,000,000 | $0 | $4,316,096 | $0 |
| 6/30/30 | 16 | $80,000,000 | $74,316,096 | $0 | $     ** | $0 |
| 6/30/31 | 17 | $85,000,000 | $74,316,096 | $0 | $     ** | $0 |
| 6/30/32 | 18 | $90,000,000 | $74,316,096 | $0 | $     ** | $0 |
| 6/30/33 | 19 | $95,000,000 | $74,316,096 | $0 | $     ** | $0 |
| 6/30/34 | 20 | $100,000,000 | $74,316,096 | $0 | $     ** | $0 |
| Total | | | $74,316,096 | $60,000,000 | $14,316,096 | $0 |

As of the Closing Date, $5 million multiplied by the single Payment Date (the Closing Date) equals $5 million. The sum of previous payments by The DIA, DIA Direct Funders and Special Foundation Funders ($0) and the DIA Direct Funders' and Special Foundation Funders' scheduled payment at Closing ($10,000,000) is $10 million. Therefore, at Closing, The DIA is not obligated to make a payment. The same result occurs for each Payment Date up to June 30, 2027.

As of the June 30, 2027 Payment Date, $5 million multiplied by the 13 relevant Payment Dates equals $65 million. The sum of the previous payments by The DIA ($0) and DIA Direct Funders and Special Foundation Funders ($60 million) and the DIA Direct Funders' and Special Foundation Funders' scheduled payments on June 30, 2027 ($0), equals $60 million. Therefore, on June 30, 2027, The DIA is obligated to pay $65 million less $60 million, which equals $5 million. The same result would occur for each of the remaining Payment Dates, except the Present Value Discount limitation under Section 2.1(b) applies as of the June 30, 2029 Payment Date. On that Payment Date, the formula for the Present Value Discount will result in The DIA only needing to pay $4,316,096 in order for the Present Value Discount of the total payments made as of the end of that day, plus the Present Value Discount of the DIA Direct Funders' and Special Foundation Funders' remaining scheduled payments ($0) equaling the Present Value Discount of $5 million paid at Closing and 19 annual payments of $5 million commencing as of June 30, 2016.

*DIA Direct Funder and Special Foundation Funder scheduled payments are assumed to be made on the Payment Date, as scheduled.

**No payment due because of Present Value Discount limitation.

# Examples Illustrating The DIA's Payment Obligation
## under the Omnibus Transaction Agreement

### Example 3: DIA Prepayments and Present Value Discount Limitation

| Previous and Current Payment Dates | Payment Number | Aggregate Committed Payment | Previous DIA, DIA Direct Funder, and Special Foundation Funder Payments | DIA Direct Funder and Special Foundation Funder Scheduled Payments* | DIA Payment | DIA Prepayment |
|---|---|---|---|---|---|---|
| Closing | 1 | $5,000,000 | $0 | $10,000,000 | $0 | $0 |
| 6/30/16 | 2 | $10,000,000 | $10,000,000 | $10,000,000 | $0 | $0 |
| 6/30/17 | 3 | $15,000,000 | $20,000,000 | $10,000,000 | $0 | $0 |
| 6/30/18 | 4 | $20,000,000 | $30,000,000 | $10,000,000 | $0 | $0 |
| 6/30/19 | 5 | $25,000,000 | $40,000,000 | $10,000,000 | $0 | $0 |
| 6/30/20 | 6 | $30,000,000 | $50,000,000 | $10,000,000 | $0 | $0 |
| 6/30/21 | 7 | $35,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/22 | 8 | $40,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/23 | 9 | $45,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/24 | 10 | $50,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/25 | 11 | $55,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/26 | 12 | $60,000,000 | $60,000,000 | $0 | $0 | $0 |
| 6/30/27 | 13 | $65,000,000 | $60,000,000 | $0 | $5,000,000 | $4,683,841** |
| 6/30/28 | 14 | $70,000,000 | $69,683,841 | $0 | $ 316,159 | $3,726,128*** |
| 6/30/29 | 15 | $75,000,000 | $73,726,128 | $0 | $--------**** | $0 |
| 6/30/30 | 16 | $80,000,000 | $73,726,128 | $0 | $--------**** | $0 |
| 6/30/31 | 17 | $85,000,000 | $73,726,128 | $0 | $--------**** | $0 |
| 6/30/32 | 18 | $90,000,000 | $73,726,128 | $0 | $--------**** | $0 |
| 6/30/33 | 19 | $95,000,000 | $73,726,128 | $0 | $--------**** | $0 |
| 6/30/34 | 20 | $100,000,000 | $73,726,128 | $0 | $--------**** | $0 |
| Total | | $73,726,128 | | $60,000,000 | $5,316,159 | $8,409,969 |

The facts are the same as in Example 2, except that The DIA makes a $4,683,841 prepayment at the time of the June 30, 2027 Payment Date. For the June 30, 2028 Payment Date, The DIA is obligated to pay $316,159, calculated as follows: $5 million multiplied by 14 relevant Payment Dates equals $70 million, less previous payments of $69,683,841, equals $316,159. The DIA makes a $3,726,128 prepayment at the time of the June 30, 2028 Payment Date also. For the June 30, 2029 Payment Date, The DIA is not obligated to make any payment, notwithstanding the following calculation: $5 million multiplied by 15 relevant Payment Dates equals $75 million, less previous payments of $73,726,128, equals $1,273,872. However, under Section 2.1(b), the Present Value Discount of the payments made as of the end of the day on June 30, 2028 ($73,726,128, before discounting), plus the Present Value Discount of the DIA Direct Funders' and Special Foundation Funders' remaining scheduled payments ($0) equals the Present Value Discount of $5 million paid at Closing and 19 annual payments of $5 million commencing as of June 30, 2016. The DIA's prepayments at the time of the 2027 and 2028 Payment Dates results in The DIA not having a payment obligation in 2029 or thereafter.

*DIA Direct Funder and Special Foundation Funder scheduled payments are assumed to be made on the Payment Date, as scheduled.

**$4,683,841 is the discounted value of $5 million at a 6.75% discount rate for a one-year period.

\*\*\*$3,726,128 is the discounted amount that results in The DIA fulfilling its payment obligation on a present value basis as of June 30, 2028.

\*\*\*\*No payment due because of Present Value Discount limitation and no guarantee because there are no remaining commitments.

Schedule 2 – Example 3

# Examples Illustrating the DIA's Payment Obligation
## under the Omnibus Transaction Agreement

### Example 4: DIA Prepayments and Present Value Discount Limitation

| Previous and Current Payment Dates | Payment Number | Aggregate Committed Payment | Previous DIA, DIA Direct Funder, and Special Foundation Funder Payments | DIA Direct Funder and Special Foundation Funder Scheduled Payments* | DIA Payment | DIA Prepayment |
|---|---|---|---|---|---|---|
| Closing | 1 | $5,000,000 | $0 | $10,000,000 | $0 | $0 |
| 6/30/16 | 2 | $10,000,000 | $10,000,000 | $10,000,000 | $0 | $0 |
| 6/30/17 | 3 | $15,000,000 | $20,000,000 | $10,000,000 | $0 | $0 |
| 6/30/18 | 4 | $20,000,000 | $30,000,000 | $10,000,000 | $0 | $0 |
| 6/30/19 | 5 | $25,000,000 | $40,000,000 | $0 | $0 | $0 |
| 6/30/20 | 6 | $30,000,000 | $40,000,000 | $0 | $0 | $0 |
| 6/30/21 | 7 | $35,000,000 | $40,000,000 | $0 | $0 | $0 |
| 6/30/22 | 8 | $40,000,000 | $40,000,000 | $0 | $0 | $0 |
| 6/30/23 | 9 | $45,000,000 | $40,000,000 | $0 | $5,000,000 | $0 |
| 6/30/24 | 10 | $50,000,000 | $45,000,000 | $0 | $5,000,000 | $0 |
| 6/30/25 | 11 | $55,000,000 | $50,000,000 | $0 | $5,000,000 | $0 |
| 6/30/26 | 12 | $60,000,000 | $55,000,000 | $0 | $5,000,000 | $0 |
| 6/30/27 | 13 | $65,000,000 | $60,000,000 | $0 | $5,000,000 | $4,683,841** |
| 6/30/28 | 14 | $70,000,000 | $69,683,841 | $0 | $ 316,159 | $0 |
| 6/30/29 | 15 | $75,000,000 | $70,000,000 | $0 | $5,000,000 | $0 |
| 6/30/30 | 16 | $80,000,000 | $75,000,000 | $0 | $1,969,618*** | $0 |
| 6/30/31 | 17 | $85,000,000 | $76,969,618 | $0 | $0**** | $0 |
| 6/30/32 | 18 | $90,000,000 | $76,969,618 | $0 | $0**** | $0 |
| 6/30/33 | 19 | $95,000,000 | $76,969,618 | $5,000,000 | $0**** | $0 |
| 6/30/34 | 20 | $100,000,000 | $81,969,618 | $5,000,000 | $0**** | $0 |
| Total | | | $86,969,618 | $50,000,000 | $32,285,777 | $4,683,841 |

The facts are the same as in Example 3, except the DIA Direct Funders' and Special Foundation Funders' Scheduled Payment has been revised as set forth above and The DIA will be required to make payments for the Payment Dates in years 2023 through 2030. The DIA's prepayment of $4,683,841 at the time of the June 30, 2027 Payment Date and its payment obligation on the June 30, 2028 Payment Date remain the same as in Example 3. Under Section 2.1(a), The DIA has a $5 million payment obligation with respect to the June 30, 2029 Payment Date. On the June 30, 2030 Payment Date, The DIA pays $1,969,618, notwithstanding the following calculation: $5 million multiplied by 16 relevant Payment Dates equals $80 million, less previous payments of $75,000,000, equals $5,000,000. However, under Section 2.1(b), the Present Value Discount of the payments made as of the end of the day on June 30, 2030 ($76,969,618 before discounting), plus the Present Value Discount of the DIA Direct Funders' and Special Foundation Funders' remaining scheduled payments ($10,000,000, before discounting) equals the Present Value Discount of $5 million paid at Closing and 19 annual payments of $5 million commencing as of June 30, 2016. The DIA's aggregate payments as of the June 30, 2030 Payment Date result in The DIA not having a payment obligation in 2031 or thereafter.

*DIA Direct Funder and Special Foundation Funder scheduled payments are assumed to be made on the Payment Date, as scheduled.
**$4,683,841 is the discounted value of $5 million at a 6.75% discount rate for a one-year period.

Schedule 2 – Example 4

-Error! Bookmark not defined.

***$1,969,618 is the discounted amount that results in The DIA fulfilling its payment obligation on a present value basis as of June 30, 2030.

****No payment due because of Present Value Discount limitation, but The DIA guarantee applies if the 2033 and 2034 payments are not made or are not made on a timely basis.

**Form of Settlement, Conveyance and Charitable Trust Agreement
By and Between the City of Detroit and the Detroit Institute of Arts**

**SETTLEMENT, CONVEYANCE AND CHARITABLE TRUST AGREEMENT**

**BY AND BETWEEN**

**THE CITY OF DETROIT**

**AND**

**THE DETROIT INSTITUTE OF ARTS**

# TABLE OF CONTENTS

ARTICLE I Definitions ........................................................................................................2
    1.1.    Definitions. ......................................................................................................2
    1.2.    Other Defined Terms. .....................................................................................2
ARTICLE II Transfer of Assets ..........................................................................................3
    2.1.    Transfer. ..........................................................................................................3
    2.2.    Liabilities. .......................................................................................................3
ARTICLE III Effective Time; Deliverables .........................................................................4
    3.1.    Effective Time. ...............................................................................................4
    3.2.    Deliverables. ...................................................................................................4
ARTICLE IV Termination of the Various Agreements .........................................................4
    4.1.    Termination of the Operating Agreement. .....................................................4
    4.2.    Termination of the Licensing Agreement. .....................................................4
    4.3.    Release. ...........................................................................................................5
ARTICLE V Representations and Warranties .....................................................................5
    5.1.    Representations and Warranties of The DIA. ................................................5
    5.2.    Representations and Warranties of The City. ................................................5
    5.3.    Acknowledgement of No Further Representations and Warranties. ...............5
ARTICLE VI Covenants of the City ....................................................................................6
    6.1.    Further Assurances. ........................................................................................6
    6.2.    Remittance of Museum Assets .......................................................................6
    6.3.    NO RECOURSE. ...........................................................................................6
ARTICLE VII Covenants of The DIA ..................................................................................7
    7.1.    Charitable Trust. .............................................................................................7
    7.2.    State-wide Services. ........................................................................................7
    7.3.    Liquidation. .....................................................................................................8
    7.4.    City Board Representative. .............................................................................8
    7.5.    Enforcement of Certain of The DIA's Obligations. .......................................9
ARTICLE VIII Incorporation by Reference; Entire Agreement ..........................................9
    8.1.    Incorporation by Reference. ...........................................................................9
    8.2.    No Third Party Beneficiary. ...........................................................................9
    8.3.    Choice of Law; Jurisdiction; Venue. .............................................................9
    8.4.    Amendment and Waiver. ..............................................................................10
    8.5.    Entire Agreement. .........................................................................................10

## List of Exhibits

Exhibit A   –   Museum Assets

Exhibit B   –   Bill of Sale

Exhibit C   –   Intellectual Property Assignment

Exhibit D   –   Museum Quit Claim Deed

Exhibit E   –   Cultural Center Garage Quit Claim Deed

**SETTLEMENT, CONVEYANCE AND CHARITABLE TRUST AGREEMENT**

THIS SETTLEMENT, CONVEYANCE AND CHARITABLE TRUST AGREEMENT (this "**Agreement**"), effective as of the Effective Time, is entered into by and between the City of Detroit, Michigan (the "**City**") and The Detroit Institute of Arts, a Michigan nonprofit corporation f/k/a Founders Society Detroit Institute of Arts ("**The DIA**"). The City and The DIA are together referred to herein as the "**Parties**" and individually as a "**Party**". Capitalized terms used in this Agreement and not defined herein shall have the meaning ascribed thereto in the Omnibus Transaction Agreement among the City, The DIA and Foundation for Detroit's Future, a Michigan nonprofit corporation (the "**Omnibus Transaction Agreement**").

## RECITALS

WHEREAS, beginning in 1885 The DIA held the assets of the museum that is now commonly referred to as the Detroit Institute of Arts (the "**Museum**") in charitable trust for the benefit of the people of the City and the State of Michigan (the "**State**") and, beginning in 1919, the City began to hold certain of such assets in charitable trust, with museum assets acquired by either The DIA or the City, and assets contributed by other donors and the State, constituting additions to the trust corpus to the extent not expended for the ongoing conduct of the trust's charitable and educational activities;

WHEREAS, the Attorney General of the State has determined that the Museum collection is held by the City in charitable trust;

WHEREAS, The DIA asserts that the Museum and all Museum Assets are owned by the City in charitable trust, the co-trustees of which are the City and The DIA and subject to the protections of a public trust;

WHEREAS, the City acknowledges that certain creditors of the City and other interested persons have taken the position that the City has full legal and beneficial title to the Museum, including its art collection;

WHEREAS, this Agreement is being entered into as part of the DIA Settlement pursuant to the Omnibus Transaction Agreement whereby the City will convey all of its right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) to the Museum and all related assets to The DIA in exchange for fair value by virtue of (i) the settlement of any dispute regarding the ownership of Museum and the Museum Assets, (ii) the contributions through the Supporting Organization ~~of~~by The DIA (and through it, the DIA Indirect Funders), DIA Direct Funders and Special Foundation Funders of $100 million, of Foundation Funders (excluding Special Foundation Funders) of $366 million, and an additional contribution by the State of $350 million, which aggregate $816 million (in each case and in the aggregate before applying any discount for early payment), which amounts will be paid for the benefit of Pension Claims of the City, and (iii) the commitment of The DIA to hold the Museum Assets (as they may be augmented, replaced or disposed of consistent with the perpetual charitable trust and as otherwise permitted under this Agreement) (collectively, "**DIA Assets**") in perpetual charitable trust and to operate the Museum primarily for benefit of the residents of the City and the Tri-Counties and the citizens of the State;

WHEREAS, the allocation of responsibilities with respect to the charitable trust assets and the operation of the Museum has changed from time to time;

WHEREAS, The DIA currently operates the Museum and manages its assets under an Operating Agreement for the Detroit Institute of Arts, made on December 12, 1997, between The DIA and the City (the "**Operating Agreement**") whereby those responsibilities have been performed by The DIA as operator on the terms set forth therein;

WHEREAS, the City and The DIA currently are parties to that certain Licensing Agreement, dated December 12, 1997 (the "**Licensing Agreement**") under which the City licensed the use of certain intellectual property assets to The DIA, which will be terminated by the Parties pursuant to this Agreement;

WHEREAS, as part of the DIA Settlement and concurrently with the closing pursuant to the Omnibus Transaction Agreement, the Transfer shall occur, each of the Operating Agreement and the Licensing Agreement shall be terminated, and the other transactions and agreements reflected herein shall become effective; and

WHEREAS, the Transfer of the Museum and the Museum Assets is for fair value, for a public purpose and authorized by law.

NOW THEREFORE, in consideration of the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the Parties hereby agree as follows:

**ARTICLE I**
**Definitions**

**1.1.**   **Definitions**.  As used in this Agreement:

"**Museum Assets**" means the Museum art collection, operating assets, buildings, parking lots and structures, and any other assets that are used primarily in operating or servicing the Museum, including, without limitation, any item that is in the "City art collection" (as defined in the Operating Agreement but taking into account any additions to or subtractions from such collection over time) as of the Effective Time and including, without limitation, those items described in Exhibit A to this Agreement and all items conveyed pursuant to the Bill of Sale, Intellectual Property Assignment, Museum Quit Claim Deed and Cultural Center Garage Quit Claim Deed (each as defined below).

**1.2.**   **Other Defined Terms**.  The following capitalized terms shall have the meanings given to them in the Sections set forth opposite such term:

2

Agreement                                        Preamble
Assigned Intellectual Property                   Exhibit C
Bill of Sale                                     Section 3.2(i)
City                                             Preamble
Cultural Center Garage                           Section 3.2(iv)
Cultural Center Garage Quit Claim Deed           Section 3.2(iv)
DIA Assets                                       Recitals
Effective Time                                   Section 3.1
Intellectual Property Assignment                 Section 3.2(ii)
Licensing Agreement                              Recitals
Museum                                           Recitals
Museum Quit Claim Deed                           Section 3.2(iii)
Omnibus Transaction Agreement                    Preamble
Operating Agreement                              Recitals
Parties                                          Preamble
Party                                            Preamble
State                                            Recitals
The DIA                                          Preamble
Title Company                                    Section 3.2
Transfer                                         Section 2.1

## ARTICLE II
### Transfer of Assets

**2.1.**     **Transfer**.  As of the Effective Time, the City hereby irrevocably sells, transfers, conveys, assigns and delivers to The DIA, and The DIA hereby acquires, all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum and the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors (the "**Transfer**").  Subject to the provisions in this Agreement, from and after the Effective Time, The DIA shall have exclusive responsibility for and control over the Museum, Museum Assets, Museum operations, capital expenditures, collection management, and the purchase or sale of assets.

**2.2.**     **Liabilities**.  From and after the Effective Time, The DIA is assuming (i) the obligations arising prior to the Effective Time to pay operating expenses to third parties to the extent that any such obligation was an expense imposed on The DIA under the Operating Agreement prior to the Effective Time and (ii) the Employee Liabilities.  Except as provided in the preceding sentence, The DIA is not assuming or in any way becoming liable for any of the City's debts, liabilities or obligations, whether known, unknown, absolute, contingent, matured or unmatured, regardless of whether any of the foregoing relate to the Museum or the Museum Assets.

3

# ARTICLE III
## Effective Time; Deliverables

**3.1.** **Effective Time**.  This Agreement will become effective immediately following the written confirmation under the Omnibus Transaction Agreement that the Closing under the Omnibus Transaction Agreement shall be deemed to occur (the "**Effective Time**").

**3.2.** **Deliverables**.  The City hereby delivers or causes to be delivered to The DIA the following which, to the extent Title Source, Inc. **(the "Title Company")** shall be deemed delivered by virtue of the release of such documents by the Title Company in accordance with the escrow instructions previously delivered to the Title Company:

        (i)    the bill of sale substantially in the form of **Exhibit B** to this Agreement (the "**Bill of Sale**") duly executed by the City pursuant to which all tangible and intangible assets included in the Museum Assets (including those described on **Exhibit A** to this Agreement) and not otherwise conveyed by a distinct instrument delivered pursuant to this Section 3.2 shall be conveyed to The DIA, including, without limitation, all rights to donations, gifts, bequests, grants and contributions for the benefit of the Museum or The DIA;

        (ii)    the transfer agreement with respect to all Assigned Intellectual Property substantially in the form of **Exhibit C** to this Agreement (the "**Intellectual Property Assignment**") duly executed by the City;

        (iii)    a quitclaim deed substantially in the form of **Exhibit D** to this Agreement (the "**Museum Quit Claim Deed**") duly executed by the City with respect to the real estate referenced as the Museum building and grounds, the employee parking lot located at 5200 Woodward Avenue, Detroit, Michigan, and the Frederick Lot (Parcels 1-7 in **Exhibit A** to this Agreement);

        (iv)    a quitclaim deed substantially in the form of **Exhibit E** to this Agreement (the "**Cultural Center Garage Quit Claim Deed**") duly executed by the City with respect to the real estate referenced as the cultural center underground garages (Parcel 8 in **Exhibit A** to this Agreement being the "**Cultural Center Garage**").

# ARTICLE IV
## Termination of the Various Agreements

**4.1.** **Termination of the Operating Agreement**. As of the Effective Time, the Operating Agreement is terminated without any further action or notice by the Parties and without any further rights or obligations of any Party thereunder other than The DIA's indemnity obligation under Section J of the Operating Agreement (which shall survive in accordance with its terms).

**4.2.** **Termination of the Licensing Agreement**.  As of the Effective Time, the Licensing Agreement is terminated without any further action or notice by the Parties and without any further rights or obligations of any Party thereunder.

4

**4.3.** **Release**. Each of the Parties hereby fully and forever, knowingly, voluntarily, and irrevocably, releases, acquits, discharges and promises not to sue the other Party or its Related Parties from, including, without limitation, any and all claims, demands, damages, obligations, losses, causes of action, costs, expenses, attorneys' fees judgments, liabilities, duties, debts, liens, accounts, obligations, contracts, agreements, promises, representations, actions and causes of action, other proceedings and indemnities of any nature whatsoever arising from or in any way related to the Operating Agreement other than The DIA's indemnity obligation under Section J of the Operating Agreement (which shall survive in accordance with its terms), the Licensing Agreement, the Museum, the Museum Assets or any other matter of any kind or nature, whether accrued or contingent, known or unknown and whether based on law, equity, contract, tort, statute or other legal or equitable theory of recovery, whether mature or to mature in the future, which from the beginning of time of the world to the Effective Time, either Party had, now has, or may have against the other Party or its Related Parties; provided that the foregoing release shall not extend to, nor be deemed to modify in any respect, any right of any Party under this Agreement or any other Transaction Documentation.

## ARTICLE V
## Representations and Warranties

**5.1.** **Representations and Warranties of The DIA**. The DIA represents and warrants to the City that (a) it has the power and authority to execute and deliver this Agreement and each Exhibit to this Agreement to which it is a party and to perform its obligations hereunder and thereunder, (b) the execution, delivery and performance of this Agreement and each Exhibit to this Agreement to which it is a party have been duly authorized by all necessary action, (c) this Agreement and each Exhibit to this Agreement to which it is a party constitutes the valid and binding obligation of The DIA, enforceable in accordance with its respective terms, and (d) its performance under this Agreement and each Exhibit to this Agreement to which it is a party will not conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, any agreement or other instrument or any applicable law binding upon The DIA.

**5.2.** **Representations and Warranties of The City**. The City represents and warrants to The DIA that (a) it has the power and authority to execute and deliver this Agreement and each Exhibit to this Agreement to which it is a party and to perform its obligations hereunder and thereunder, (b) the execution, delivery and performance of this Agreement and each Exhibit to this Agreement to which it is a party have been duly authorized by all necessary action, (c) this Agreement and each Exhibit to this Agreement to which it is a party constitutes the valid and binding obligation of the City, enforceable in accordance with its respective terms, and (d) its performance under this Agreement and each Exhibit to this Agreement to which it is a party will not conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, any agreement or other instrument or any applicable law binding upon the City.

**5.3.** **Acknowledgement of No Further Representations and Warranties**. Except for the representations and warranties in Section 5.2 of this Agreement or as otherwise specifically set forth in the Transaction Documentation, the Museum Assets are being transferred by the City to The DIA without warranty or representation of any kind, including any warranty of merchantability or fitness for a particular purpose or any warranty or representation which might otherwise be inherent in a description or in specifications.

## ARTICLE VI
## Covenants of the City

**6.1.** **Further Assurances**.  In addition to the actions specifically provided for elsewhere in this Agreement, at any time and from time to time, at The DIA's reasonable request, the City shall (x) at its own expense (except as provided in subsection (y)), do, execute, acknowledge and deliver all and every such further acts, transfers, assignments, conveyances, powers of attorney, and assurances (including in recordable form) as The DIA reasonably may require to transfer, convey, assign and deliver the Museum and the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors and to confirm The DIA's title to the Museum and all of the Museum Assets and (y) at no cost or expense to the City, take such actions, including filing such releases, as may be necessary to remove any security interest, lien, encumbrance, claim or interest of the City or any of its creditors on the Museum or the Museum Assets.

**6.2.** **Remittance of Museum Assets**.  If after the Effective Time, the City receives (a) any monies for the benefit of The DIA or the Museum, including with respect to any existing or future (i) donations, liens, gifts, bequests, and contributions from individuals, corporations, foundations and trusts, if any, and (ii) federal, state, regional, county or local tax proceeds and grants from governmental or quasi-public entities, if any, other than proceeds or grants that are intended for the City for reimbursement for specific amounts that were previously advanced or funded by the City with the expectation of the City at the time of such advance or funding that such reimbursement would be received by the City, or (b) any art or other property that is, as designated by its grant, intended for the benefit of the Museum or The DIA, in each case, the City shall promptly pay or deliver such monies, art or other property to The DIA.

**6.3.** **NO RECOURSE**.  THE TRANSFER OF THE MUSEUM AND THE MUSEUM ASSETS IS FINAL AND IRREVOCABLE.  THE DIA SHALL RETAIN TITLE TO AND OWNERSHIP OF THE MUSEUM AND THE DIA ASSETS IN PERPETUITY AND THE CITY SHALL NOT HAVE RECOURSE TO ANY OF THE DIA ASSETS FOR ANY CLAIMS THE CITY MAY HAVE AGAINST THE DIA, ANY OTHER FUNDER, THE SUPPPORTING ORGANIZATION, THE STATE OR OTHERWISE, WHETHER ARISING NOW OR IN THE FUTURE, INCLUDING, WITHOUT LIMITATION, NONCOMPLIANCE BY THE DIA, ANY OTHER FUNDER OR THE SUPPORTING ORGANIZATION WITH ANY OF THE TERMS OR CONDITIONS OF THE OMNIBUS TRANSACTION AGREEMENT, THE TRANSACTION DOCUMENTS OR ANY RELATED DOCUMENTS; PROVIDED THAT THE FOREGOING SHALL NOT PRECLUDE THE CITY FROM ASSERTING CLAIMS IN SATISFACTION OF AN INDEMNITY OBLIGATION PURSUANT TO SECTION J OF THE OPERATING AGREEMENT OR SECTION 6.1(b) OF THE OMNIBUS AGREEMENT BUT ONLY AGAINST CASH, CASH EQUIVALENTS OR CASH RECEIVABLES OF THE DIA (EXCLUDING ANY CASH, CASH EQUIVALENTS OR CASH RECEIVABLES THAT ARE RESTRICTED IN USE BY THE TERMS OF THE DONATION, GIFT, BEQUEST OR CONTRIBUTION OF A THIRD PARTY OR BY RESTRICTIONS IMPOSED ON THE USE OF PROCEEDS FROM THE SALE OF ART BY THE APPLICABLE STANDARDS OR ETHICAL GUIDELINES OF THE AAM OR THE ASSOCIATION OF ART MUSEUM DIRECTORS (OR SUCH OTHER ORGANIZATIONS BY WHICH THE DIA OR THE MUSEUM OR ITS DIRECTOR IS ACCREDITED IN THE FUTURE OR OF WHICH THEY

6

BECOME MEMBERS IN ACCORDANCE WITH THEN APPLICABLE ART MUSEUM BEST PRACTICES).

## ARTICLE VII
## Covenants of The DIA

**7.1.** **Charitable Trust**.

(a) The DIA as trustee shall hold the DIA Assets in perpetual charitable trust. The primary purpose of the charitable trust shall be to provide for the primary benefit of the residents of the City and the Tri-Counties and the citizens of the State an art museum located in the City of Detroit, including the ownership, maintenance and operation of The Detroit Institute of Arts, and all the benefits that are derivative thereof.

(b) The DIA shall neither change the name of the Museum from "The Detroit Institute of Arts" nor relocate the primary situs of the Museum from its current location at 5200 Woodward Avenue, Detroit, Michigan, without the approval of the City; provided that nothing in this Agreement or in any other agreement included in the Transaction Documentation shall be deemed to otherwise restrict the ability of The DIA to lend or to otherwise allow art works to travel outside of the City or the State consistent with ordinary Museum operations.

(c) In its capacity as trustee of the perpetual charitable trust, The DIA shall operate the Museum as an encyclopedic art museum in the City, in accordance with changing future demands in the operation of such a Museum. The DIA shall not deaccession from its collection or sell, lease, pledge, mortgage, or otherwise encumber art that is accessioned to its permanent collection except in accordance with the code of ethics or applicable standards for museums published by the AAM, as amended or modified by the AAM. If the AAM ceases to exist or ceases to be generally regarded by leading American art museums as the preeminent American art museum accreditation organization, then the code of ethics or applicable standards (as may be amended or modified) of AAM's successor organization, or such other organization that is at that time generally regarded by leading American art museums as the preeminent American art museum accreditation organization, shall be substituted for such policies of the AAM.

**7.2.** **State-wide Services**. In addition to continuing to operate the Museum for the primary benefit of the residents of the City, the Tri-Counties and the citizens of the State, and continuing to provide the special services to the residents of the Tri-Counties during the balance of the ten (10) year millage period commencing in 2013 that are provided for in the agreements for the Millage, during the Payment Period The DIA will provide an array of art programs at no or discounted costs to the residents of the State. In determining which programs to offer, both the cost to The DIA of developing and operating these programs and The DIA's other fundraising obligations, including its need to raise funds for general operations and its stated goal of building endowment funds, as well as any fundraising obligation under the Omnibus Transaction Agreement, will be taken into account. As appropriate, The DIA will collaborate with its Michigan museum colleagues in the development of these programs. Given the length of the Payment Period, it is expected that these programs would be developed and adjusted over time. Such programs could include at the outset:

7

(i)    two exhibitions in each twelve-month period, with the first such period beginning six (6) months after the Closing, of objects from the Museum collection that will rotate through museums and art centers around the State on a schedule to be determined by The DIA and the recipient museums.  Each exhibition will be developed and organized by The DIA and will include installation and de-installation of the objects, a marketing package (logo and advertising template) and, possibly, input on programming and education opportunities,

(ii)    an annual professional development program coordinated with the Michigan Museums Association designed to strengthen museum professionals and introduce museum job opportunities to student audiences,

(iii)    an expansion of the Museum's popular Inside/Out program (during the tenure of the program), which places high-quality art reproductions in Southeast Michigan communities, to include two additional outstate locations annually, supporting tourism, cultural awareness and life-long learning,

(iv)    art object conservation services at a discounted rate to Michigan museums conducted in consultation with the Museum conservators and the curatorial staff of the requesting museum, and

(v)    the development of an educational program based on the Museum collection that supports National Common Core Standards, to be offered in two Michigan communities annually and to include follow-up support for educators.

7.3.    **Liquidation**.  In the event of a dissolution of, and liquidation of the assets and affairs of, The DIA in accordance with the Michigan Nonprofit Corporation Act, the DIA Assets will be conveyed to another nonprofit entity determined by the board of directors of The DIA, subject to the reasonable approval of the City and the Supporting Organization, if then in existence, and otherwise by majority vote of the City and any Foundation Funders who have remaining commitments under their Funding Agreements.  As a condition to receiving the conveyance, such successor entity must subject itself to the same conditions as set forth in this Agreement, including but not limited to, holding the DIA Assets in perpetual charitable trust for the primary benefit of the residents of the City and the Tri-Counties and the citizens of the State. For the purposes of determining the majority vote described above, and for the avoidance of doubt, the Parties agree that the City and each of the Foundation Funders who have remaining commitments under their Funding Agreements at the time of such dissolution or liquidation shall each have one vote with respect to any such approval.

7.4.    **City Board Representative**.  From and after the Effective Time, in perpetuity, the City shall have the right to appoint one director to the Board of The DIA (or its successor entity).  Such representative shall be designated in writing to The DIA by the Mayor of the City with approval by the City Council.  Such director shall be subject to removal by The DIA for cause.  The City shall have the right in accordance with this Section 7.4 to appoint a successor representative to any vacancy created by the removal of the City's representative for cause or otherwise.

**7.5.** **Enforcement of Certain of The DIA's Obligations**.  The Attorney General of the State and the Corporation Counsel of the City (on behalf of the City) (or their respective successors) shall have the exclusive rights to enforce the obligations of The DIA (x) to hold the DIA Assets in perpetual charitable trust and (y) under ARTICLE VII of this Agreement.  If the Corporation Counsel of the City (on behalf of the City) exercises its rights to enforce the obligations of The DIA pursuant to this Section 7.5 by means of a legal action or proceeding, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred by such prevailing party in such action or proceeding and in any appeal in connection therewith.  If such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorneys' fees and disbursements shall be included in and as a part of such judgment.

## ARTICLE VIII
## Incorporation by Reference; Entire Agreement

**8.1.** **Incorporation by Reference**.  The following provisions of the Omnibus Transaction Agreement are hereby incorporated by reference as if set forth in full herein *mutatis mutandis*:  Article I (Definitions), Article VI (Indemnification) with respect to the indemnification of the City by The DIA pursuant to Section 6.1 of the Omnibus Transaction Agreement and the indemnification of The DIA by the City pursuant to Section 6.2 of the Omnibus Transaction Agreement, subject to the limitations and procedural requirements otherwise set forth in Article VI of the Omnibus Transaction Agreement, Section 7.4 (Specific Performance), Section 7.6 (Notices) (with respect to the Parties hereto), Section 7.7 (Binding Agreement; Assignment), Section 7.8 (Severability), Section 7.9 (No Strict Construction), Section 7.10 (Captions), and Section 7.12 (Counterparts).

**8.2.** **No Third Party Beneficiary**.  Except for the Related Parties, each of whom is an express third-party beneficiary under this Agreement with respect to Section 4.3 of this Agreement, and the Attorney General of the State who is an express third party beneficiary under this Agreement with respect to Section 7.5 of this Agreement, the terms and provisions of this Agreement are intended solely for the benefit of the City and The DIA and their respective successors and permitted assigns, and nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity any third-party beneficiary rights or remedies.

**8.3.** **Choice of Law; Jurisdiction; Venue**.  This Agreement shall be construed in accordance with the laws of the State of Michigan without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that, subject to the exclusive rights of the Attorney General of the State and the Corporation Counsel of the City (on behalf of the City) as set forth in Section 7.5 of this Agreement, any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for so long as the Bankruptcy Court has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then (i) if such legal action,

9

suit or proceeding relates to or seeks to enforce the obligations of The DIA to hold the DIA Assets in perpetual charitable trust or the obligations of The DIA under Article VII of this Agreement, then such legal action, suit or proceeding shall be brought only in Wayne County Probate Court, or (ii) if such legal action, suit or proceeding involves any other matter relating to this Agreement not referenced in subsection (i), then it may be brought only in such other court of competent jurisdiction located in Wayne County, Michigan.  By execution and delivery of this Agreement, each of the City and The DIA irrevocably accepts and submits to the exclusive jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

   **8.4.** **Amendment and Waiver**.  This Agreement may be amended and any provision of this Agreement may be waived; <u>provided</u> that any such amendment or waiver will be binding upon the Parties only if such amendment or waiver is set forth in a writing executed by both Parties.  No course of dealing between The DIA and the City will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of either Party under or by reason of this Agreement.

   **8.5.** **Entire Agreement**.  This Agreement, including the Exhibits, together with the Omnibus Transaction Agreement, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

[<em>signature page follows</em>]

10

13-53846-tjt  Doc 6910  Filed 08/20/14  Entered 08/20/14 23:32:53  Page 284 of 399

IN WITNESS WHEREOF, the parties have executed this Settlement, Conveyance and Charitable Trust Agreement effective as of the Effective Time.

**THE CITY OF DETROIT**

By: _____
      Name: _____
      Title: _____

**THE DETROIT INSTITUTE OF ARTS**

By: _____
      Name: _____
      Title: _____

<u>**EXHIBIT A**</u>

<u>**Museum Assets**</u>

1.  The Museum building and grounds, and the employee parking lot located at 5200 Woodward Avenue, Detroit, Michigan, comprised of land and improvements bounded by Woodward Avenue as widened, existing John R Street, existing East Kirby Avenue and the South line of Farnsworth Avenue, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in Commitment for Title Insurance No. 58743275 revision 5, with an effective date of December 16, 2013, and Commitment for Title Insurance No. 58781215, with an effective date of December 26, 2013, (collectively, the "Title Commitment") issued by Title Source Inc., as follows:

    PARCEL 1:  Block A; together with the Northerly half of vacated Frederick Douglass Avenue adjacent thereto, of Ferry's Subdivision of Park Lot 40 and of Lots 1 to 18 inclusive of Farnsworth's Subdivision of Park Lots 38 and 39, according to the recorded plat thereof, as recorded in Liber 18 of Plats, Page 71, Wayne County Records.

    PARCEL 2:  Lots 43 through 78, both inclusive, together with the Southerly half of vacated Frederick Douglass Avenue adjacent to Lots 43 through 58, and the Northerly half of vacated Farnsworth Avenue adjacent to Lots 63 through 78, and together with vacated alleys appurtenant to said lots.

    PARCEL 3:  Lots 103 through 120, both inclusive, together with the Southerly half of vacated Farnsworth Avenue adjacent to Lots 103 through 118, and vacated portions of Farnsworth Avenue adjacent to the South of Lots 103 through 117 and Lot 120, and vacated alleys appurtenant to said lots, of Farnsworth Subdivision of Park Lots 38 and 39, according to the recorded plat thereof, as recorded in Liber 1, Page 16, Wayne County Records.

    PARCEL 4:  Lots 31 to 37 of Farnsworth Subdivision of Park Lots 38 and 39, together with the southerly half of vacated Frederick Douglass Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots, according to the recorded plat thereof, as recorded in Liber 1, Page 16, Wayne County Records.

    PARCEL 5:  Lots 79 and 80 of Farnsworth Subdivision of Park Lots 38 and 39, together with the Northerly half of vacated Farnsworth Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots, as recorded in Liber 1, Page 16 of Plats, Wayne County Records.

    PARCEL 6:  The East 5 feet of Lot 85 and Lots 86 and 87 and the West 16 feet of Lot 88, together with the Northerly half of vacated Farnsworth Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots of Farnsworth Subdivision of Park Lots 38 and 39, as recorded in Liber 1, Page 16 of Plats, Wayne County Records.

    PARCEL 7:  Lots 1 through 5, both inclusive, and Lots 10 through 14, both inclusive, Block 25, together with the Southerly half of vacated Frederick Douglass Avenue adjacent to Lots 1 through 5, Block 25, and the Northerly half of vacated Farnsworth Avenue adjacent to Lots 10 through 14, Block 25 and together with the vacated alley

1

appurtanant to said lots of Brush's Subdivision of that part of the Brush Farm lying between the North line of Farnsworth Street and South line of Harper Avenue, as recorded in Liber 17, Page 28 of Plats, Wayne County Records.

2.     The cultural center underground garages *i.e.,* the parking garage with all appurtenant utilities, equipment, drives, pedestrian and vehicular entrances and easements therefor, on the south side of the Museum building located at 40 Farnsworth, Detroit, Michigan, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in the Title Commitment as follows:

PARCEL 8: A parking structure in the City of Detroit occupying space under and on the following described parcel of land. Land in the City of Detroit, being a part of Lots 62 through 68 inclusive; parts of Lot 112 and 118 through 120 inclusive; all that part of Lots 113 through 117 inclusive not set aside as a part of Farnsworth Avenue, parts of public alleys and Farnsworth Avenue (60 feet wide) vacated by the Common Council on October 7, 1924 and January 11, 1927; all as platted in "Farnsworth's Subdivision of Park Lots 38 and 39, City of Detroit" recorded in Liber 1, Page 16 of Plats, Wayne County Records and also a portion of the Northerly 49 feet of Farnsworth Avenue (70 feet wide), which was opened as a public street by action of the Common Council on October 7, 1924. Being more particularly described as follows: Commencing at the intersection of the South line of Farnsworth Avenue 70 feet wide and the East line of Woodward Avenue as widened August 2, 1932, J.C.C. Page 1279, thence North 29 degrees 42 minutes 10 seconds West 22.17 feet, thence North 60 degrees 17 minutes 50 seconds East 6.00 feet to the point of beginning of this parcel, thence North 29 degrees 42 minutes 10 seconds West 248.16 feet; thence North 60 degrees ~~11~~17 minutes 50 seconds East 268.00 feet; thence South 29 degrees 42 minutes 10 seconds East 15.79 feet; thence North 60 degrees 17 minutes 50 seconds East 1.00 feet to a point of curve; thence 11.77 feet along the arc of a curve concave to the Northeast with a Radius of 14.00 feet, a Delta of 48 degrees 11 minutes 23 seconds with a Long Chord of 11.43 feet which bears South 53 degrees 47 minutes 52 seconds East to a point of reverse curve; thence 26.07 feet along the arc of curve concave to the Southwest, with a Radius of 31 feet, a Delta 48 degrees 11 minutes 23 seconds with a Long Chord of

2

25.31 feet which bears South 53 degrees 47 minutes 52 seconds East; thence South 29 degrees 42 minutes 10 seconds East 140.50 feet; thence 78.54 feet along the arc of a curve concave to the Northwest, with a Radius of 50.00 feet, a Delta of 90 degrees with a Long Chord of 70.71 feet which bears South 15 degrees 17 minutes 50 seconds West; thence South 60 degrees 17 minutes 50 seconds West 0.50 feet; thence South 29 degrees 42 minutes 10 seconds East 4.00 feet; thence South 60 degrees 17 minutes 50 seconds West 4.00 feet; thence South 29 degrees 42 minutes 10 seconds East 6.00 feet; thence South 60 degrees 17 minutes 50 seconds West 39.50 feet; thence North 29 degrees 42 minutes 10 seconds West 1.67 feet; thence South 60 degrees 17 minutes 50 seconds West 190 feet to the point of beginning.

The bottom floor of this structure is at elevation 129.10 feet as related to the City of Detroit Datum Plane; the structure has two (2) floors of vehicle parking with the top of the roof at elevation 149.34 feet. The structure has three (3) pedestrian exit buildings, four (4) air exhaust shafts and a vehicular ramp all of which extend upwards from the garage roof to the ground surface at elevations varying from 150.6 to 153.7 feet.

Together with the Easements created in Liber 20846, Page 762, Wayne County Records.

3.     The collection of works of art owned by the City and located primarily at the Museum, the Museum's off-site warehouse or the Josephine Ford Sculpture Garden located at or about 201 East Kirby Street, Detroit, Michigan (which included at the effective date of the Operating Agreement the items listed in Exhibit 2 to the Operating Agreement) or included in the Museum collection (whether or not accessioned), whether or not reflected on any inventory and irrespective of the manner in which acquired by the City.

4.     All assets of any kind located on or within the real estate described in items 1-4 above and used in the operations of the Museum, as well as any easements or other property rights benefiting such real estate.

5.     All intangible property solely to the extent used in connection with the Museum and its art collection, including trademarks, copyrights and intellectual property, whether or not related to collection pieces.

6.     All City records, books, files, records, ledgers and other documents (whether on paper, computer, computer disk, tape or other storage media) presently existing to the extent relating to the Museum, its art collection or its operations or to The DIA (other than those documents which are confidential to the City and not The DIA).

All monies held by the City that are designated for The DIA or the Museum or that were raised for the benefit of, or express purpose of supporting, The DIA or the Museum, including the approximately $900,000 balance of proceeds of bonds issued for the benefit of The DIA by the City in 2010.

# EXHIBIT B

## Bill of Sale

## EXHIBIT C

## Intellectual Property Assignment

**EXHIBIT D**

**Museum Quit Claim Deed**

**EXHIBIT E**

**Cultural Center Garage Quit Claim Deed**

# Form of Bill of Sale By the City of
# Detroit in Favor of the Detroit Institute of Arts

**BILL OF SALE**

**BY**

**THE CITY OF DETROIT**

**IN FAVOR OF**

**THE DETROIT INSTITUTE OF ARTS**

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**"), is effective as of the Effective Time, in favor of The Detroit Institute of Arts, a Michigan nonprofit corporation f/k/a Founders Society Detroit Institute of Arts ("**The DIA**"), by the City of Detroit, Michigan (the "**City**"). Capitalized terms not otherwise defined in this Bill of Sale will have the meanings given to them in the Charitable Trust Agreement (defined below).

## RECITALS

WHEREAS, the City and The DIA are parties to that certain Settlement, Conveyance and Charitable Trust Agreement (the "**Charitable Trust Agreement**") pursuant to which, as of the Effective Time, the City has irrevocably sold, transferred, conveyed, assigned and delivered to The DIA, to be held in perpetual charitable trust for the benefit of the citizens of the City and the State of Michigan (the "**State**"), all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors; and

WHEREAS, this Bill of Sale is being executed and delivered pursuant to the Charitable Trust Agreement to confirm and further effectuate the Transfer as of the Effective Time.

NOW, THEREFORE, for the consideration described in the Charitable Trust Agreement, the receipt and sufficiency of which are hereby acknowledged:

1.   <u>Conveyance</u>.  The City hereby irrevocably sells, transfers, conveys, assigns and delivers to The DIA, and The DIA hereby acquires, all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum Assets and not otherwise conveyed by a distinct instrument delivered pursuant to Section 3.2 of the Charitable Trust Agreement, including, without limitation, all rights to donations, gifts, bequests, grants and contributions, for the benefit of the Museum or The DIA, free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors.  All Museum Assets being transferred pursuant to this Bill of Sale shall be transferred on an "AS-IS, WHERE-IS" basis, and the City makes no representations or warranties with respect to the Museum Assets.  The DIA shall hold the Museum Assets in perpetual charitable trust for the benefit of the citizens of the City and the State in accordance with the terms of the Charitable Trust Agreement.

2.   <u>Construction</u>.  Nothing in this Bill of Sale, express or implied, is intended or will be construed to expand or defeat, impair or limit in any way the rights, obligations, claims or remedies of the Parties as set forth in the Charitable Trust Agreement.  To the extent that any term or provision of this Bill of Sale is deemed to be inconsistent with the terms of the Charitable Trust Agreement, the terms of the Charitable Trust Agreement shall control.

3.   <u>Dispute Resolution</u>.  Any dispute arising under or arising out of this Bill of Sale shall be adjudicated in accordance with and otherwise subject to the provisions of Sections 8.1 and 8.3 of the Charitable Trust Agreement.

4.	<u>Binding Agreement</u>.  This Bill of Sale and all of the provisions hereof will be binding upon, and inure to the benefit of, The DIA and the City and their respective successors and permitted assigns.

5.	<u>Counterparts</u>.  This Assignment may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same, instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other party; it being understood that both Parties need not sign the same counterpart.  The exchange of copies of this Assignment or of any other document contemplated by this Assignment (including any amendment or any other change thereto) and of signature pages thereof by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" ("**.pdf**") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of an original Assignment or other document for all purposes.  Signatures of the parties transmitted by facsimile, by electronic mail in .pdf form or by any other electronic means referenced in the preceding sentence, or by any combination thereof, shall be deemed to be original signatures for all purposes.

*[signature page follows]*

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale in favor of The DIA as of the Effective Time.

**THE CITY OF DETROIT**

By:_____
   Name:
   Its:


**THE DETROIT INSTITUTE OF ARTS**

By:_____
   Name:
   Its:

**Form of Intellectual Property Assignment By and
Between the City of Detroit and the Detroit Institute of Arts**

# INTELLECTUAL PROPERTY ASSIGNMENT

## BY AND BETWEEN

## THE CITY OF DETROIT

## AND

## THE DETROIT INSTITUTE OF ARTS

# INTELLECTUAL PROPERTY ASSIGNMENT

THIS INTELLECTUAL PROPERTY ASSIGNMENT ("**Assignment**"), is effective as of the Effective Time, by and between the City of Detroit, Michigan (the "**City**"), and The Detroit Institute of Arts, a Michigan nonprofit corporation f/k/a Founders Society Detroit Institute of Arts ("**The DIA**"). The DIA and the City are referred to individually as a "**Party**" and collectively, as the "**Parties**." Capitalized terms not otherwise defined in this Assignment will have the meaning given to them in the Charitable Trust Agreement (as defined below).

# RECITALS

WHEREAS, the City and The DIA are parties to that certain Settlement, Conveyance and Charitable Trust Agreement (the "**Charitable Trust Agreement**") pursuant to which, as of the Effective Time, the City has irrevocably sold, transferred, conveyed, assigned and delivered to The DIA, to be held in perpetual charitable trust for the benefit of the citizens of the City and the State of Michigan (the "**State**"), all of the City's right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors;

WHEREAS, included among the Museum Assets are certain Assigned Intellectual Property (as defined below) relating to the City Art Collection (as defined below);

WHEREAS, the City desires to convey, transfer, assign and deliver to The DIA, to be held in perpetual charitable trust for the benefit of the citizens of the City and the State, and The DIA desires to accept from the City, all of the City's right, title and interest in and to the Assigned Intellectual Property (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors; and

WHEREAS, this Assignment is being executed and delivered pursuant to the Charitable Trust Agreement to confirm and further effectuate the Transfer as of the Effective Time.

NOW, THEREFORE, for valuable consideration, including, without limitation, the consideration received by the City under the Charitable Trust Agreement, the receipt of which is hereby acknowledged, the City and The DIA hereby agree as follows:

1.     <u>Definitions</u>. As used in this Agreement:

"**Assigned Intellectual Property**" shall mean the City's entire right, title and interest throughout the world in and to the Copyrights, Trademark Rights, Patent Rights and Other Rights embodied in, related to, evidenced by or are or that were inherent in, associated with, or primarily used to develop, manage or exploit the City Art Collection or operation of the Museum, and specifically including, but not limited to, the rights: (a) to seek and obtain protection therefor (including, without limitation, the right to seek and obtain copyright registrations, trademark registrations, industrial design registrations, and design and utility patents and the like) in the United States and all other countries in The DIA's name (or otherwise

as The DIA may desire); (b) to sue for and collect damages and all other remedies for any current or past infringements, violations, or misappropriations of the same; and (c) to collect royalties, products and proceeds in connection with any of the foregoing.

"**City Art Collection**" shall mean the works of art owned by the City, and part of the collection of the Museum or otherwise under the auspices of the Museum (including, without limitation, any item that is still in the "City art collection" (as defined in the Operating Agreement but taking into account any additions to or subtractions from such collection over time) as of the Effective Time), the Museum's library, all related license rights and permissions in favor of the City and/or The DIA (to the full extent that they are subject to transfer), whether by (a) gift directly to The DIA or the City or to any third person or entity for the benefit of the Museum; (b) purchase; or (c) otherwise.

"**Copyrights**" shall mean the City's rights to all works of authorship under the copyright laws of the United States and all other countries and governmental divisions throughout the world for the full term or terms thereof (and including all copyright rights accruing by virtue of copyright treaties and conventions) including, but not limited to, all moral rights, all rights of attribution and integrity, any and all renewals, extensions, reversion or restoration of copyright now or hereafter provided by law and all rights to make applications for and receive copyright registrations therefor in the United States and all other countries.

"**Other Rights**" shall mean all intellectual property and proprietary rights in the United States and all other countries and governmental divisions throughout the world not otherwise included in the Copyrights, Trademark Rights and Patent Rights, and specifically including, but not limited to, worldwide rights in and to all trade secrets, trade dress, know-how, techniques, designs, concepts, confidential information and associated goodwill.

"**Patent Rights**" shall mean all patent applications and issued patents throughout the world in the United States and all foreign countries which have been or may be granted therefor and thereon, and any and all divisions, continuations, continuations-in-part, reexaminations, substitutions, reissues, extensions and renewals of such patents.

"**Trademark Rights**" shall mean all trademarks, service marks, trade names, trade dress, domain name registrations and other indicia of source, together with the goodwill associated with and symbolized by the same, including any applications, registrations, renewals and extensions thereof, and all other corresponding rights at common law or otherwise that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect.

2.    Assignment.  The City hereby irrevocably assigns, conveys, sells, grants and transfers to The DIA, and The DIA hereby acquires, the City's entire right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) throughout the world in and to the Assigned Intellectual Property free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors.  All Assigned Intellectual Property being transferred pursuant to this Assignment shall be transferred on an "AS-IS, WHERE-IS" basis, and the City makes no representations or warranties with respect to the Assigned Intellectual Property.  The DIA shall hold the Assigned Intellectual

2

Property in a perpetual charitable trust for the benefit of the citizens of the City and the State in accordance with the terms of the Charitable Trust Agreement.

3.  <u>Construction</u>.  Nothing in this Assignment, express or implied, is intended or will be construed to expand or defeat, impair or limit in any way the rights, obligations, claims or remedies of the Parties as set forth in the Charitable Trust Agreement.  To the extent that any term or provision of this Assignment is deemed to be inconsistent with the terms of the Charitable Trust Agreement, the terms of the Charitable Trust Agreement shall control.

4.  <u>Dispute Resolution</u>.  Any dispute arising out of this Assignment shall be determined in accordance with the provisions of Sections 8.1 and 8.3 of the Charitable Trust Agreement

5.  <u>Binding Agreement</u>.  This Assignment and all of the provisions hereof will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

6.  <u>Counterparts</u>.  This Assignment may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other party; it being understood that both Parties need not sign the same counterpart.  The exchange of copies of this Assignment or of any other document contemplated by this Assignment (including any amendment or any other change thereto) and of signature pages thereof by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Assignment as to the Parties and may be used in lieu of an original Assignment or other document for all purposes.  Signatures of the parties transmitted by facsimile, by electronic mail in .pdf form or by any other electronic means referenced in the preceding sentence, or by any combination thereof, shall be deemed to be original signatures for all purposes.

*[signature pages follow]*

3

IN WITNESS WHEREOF, each of the undersigned has executed this Assignment of Intellectual Property as of the Effective Time.

**THE CITY OF DETROIT**

By: _____
Name:
Title:

CITY OF DETROIT )
                                 ) SS
STATE OF MICHIGAN )

I, a Notary Public, certify that on the _____ day of _____, 2014 before me personally appeared _____, to me known and known to me to be of legal capacity and acknowledged his/her signature appearing on the foregoing instrument and ratified the same.

_____
Notary Public

My commission expires: _____

**THE DETROIT INSTITUTE OF ARTS**


By: _____
Name:
Title:


CITY OF DETROIT                  )
                                      ) SS
STATE OF MICHIGAN              )

       I, a Notary Public, certify that on the _____ day of _____, 2014 before me personally appeared _____, to me known and known to me to be of legal capacity and acknowledged his/her signature appearing on the foregoing instrument and ratified the same.


_____
Notary Public

My commission expires: _____

# Form of Foundation FDF Agreement

_____

<u>T E R M S  O F  G R A N T  A G R E E M E N T</u>

I.    <u>Acceptance of Grant</u>

The grant to your organization from the **[INSERT NAME OF FOUNDATION]** ("Foundation") is for the explicit purposes described below and is subject to your acceptance of the terms described herein.

To accept the grant, return a signed copy of this "Terms of Grant Agreement" to the Foundation. Keep the other copy for your files. Please refer to the grant number and title in all communications concerning the grant.

| | |
|---|---|
| **Grantee:** | **Date Authorized:** |
| **Foundation for Detroit's Future** | **[Insert Date]**, **2014** |
| **Grant Number:** | **Amount Granted:** |
| **#[Insert grant number]** | **$[Insert Grant Amount]** **(Conditional, multi-year)** |

II.    <u>Grant</u>

The purpose of this grant of $[INSERT GRANT AMOUNT] to the Foundation for Detroit's Future ("Grantee"), a supporting organization of the Community Foundation for Southeast Michigan, is to provide the funding, in part, for the proposed DIA Settlement found in the Corrected Fifth Amended Plan for the Adjustment of the Debts of the City of Detroit, as it may be further amended and as modified, and in a term sheet found in Exhibit I.A.102 of same, provided DIA Settlement provisions and said term sheet remain substantially unchanged ("Plan of Adjustment"). The grant and the payment of the grant installments will be conditioned upon the City of Detroit and the City of Detroit General Retirement System and Police and Fire Retirement System ("Pension Funds") being in compliance with (i) the conditions precedent for closing found in the Plan of Adjustment, and (ii) certain material grant conditions, of both an initial and ongoing nature, that are memorialized in the Omnibus Transaction Agreement ("OTA") to be entered into between the City of Detroit, the Detroit Institute of Arts, and the Grantee substantially in the form attached to this Terms of Grant Agreement as Exhibit A and incorporated herein by this reference, a copy of which will be provided to Foundation promptly following its execution. Any capitalized defined terms not defined herein will have the definitions found in the OTA.

This Terms of Grant Agreement is also known as a "Foundation FDF Agreement" under the OTA.

Grant payments will be made in equal annual installments over a twenty-year period, subject to those conditions and any terms and conditions of this Terms of Grant Agreement. The schedule of grant payments will be made as follows and subject to the following conditions:

a. Initial Grant Payment
   1. Payment amount and date. Foundation will make an initial grant payment to Grantee of $[INSERT 1/20 OF TOTAL GRANT AWARD] upon the later of (i) the return of this signed Terms of Grant Agreement by Grantee, and (ii) August 30, 2014.
   2. Payment Conditions.
      Grantee acknowledges that this initial grant payment is being made by Foundation in order to facilitate the ability of Grantee to provide, in part, the initial payment to the City of Detroit by Grantee due at Closing in the event that the DIA Settlement found in the Plan of Adjustment is approved, and both (i) the City of Detroit and the City of Detroit Pension Funds are in compliance with their material grant conditions, of both an initial and ongoing nature, that are memorialized in Article IV(E) of the Plan of Adjustment and (ii) the conditions to the Foundation's and Grantee's grant obligations set forth in the OTA and the Plan of Adjustment have been satisfied in all material respects.

      In the event that the Plan of Adjustment is not approved by the U.S. Bankruptcy Court, or the Closing is otherwise not consummated, by December 31, 2014, Grantee will return to Foundation all provided grant funds by January 31, 2015. The remaining grant installments under this Terms of Grant Agreement will likewise be cancelled and this Terms of Grant Agreement will terminate.

   3. Report on City of Detroit Compliance with Initial Grant Conditions
      Grantee will provide to Foundation a report within 45 days of the Closing Date documenting that the conditions precedent for Closing were met and that the initial grant payment contemplated by the OTA has been made by the Grantee to the City of Detroit.  In the event the Closing does not occur by December 31, 2014, a first and final report will be provided by January 31, 2015.

b. Annual Grant Payments
   1. Payment Amounts and Dates. Commencing in 2015 and continuing until 2033 (except as otherwise provided herein), Foundation will annually make a grant payment to Grantee of $[INSERT 1/20 OF TOTAL GRANT AWARD] by September 15 of that year.  Foundation intends Grantee to use these annual payments to fund, in part, the annual payments from Grantee to the City of Detroit, pursuant to and subject to the terms and conditions of the OTA, on a funding schedule commencing June 30, 2016, and each June 30 thereafter ending on June 30, 2034 (the payment dates to the City of Detroit being subject to possible extensions pursuant to the OTA).

      Foundation acknowledges that it has the right to, but is not required to, rely on any finding by the board of trustees of the Grantee that the City is in compliance with the Conditions for Funding found in Section 2.4 of the OTA and that as a result of such a finding the Foundation is obligated to make timely payment to Grantee as provided in Section 2.7 of the OTA.  Foundation will not unreasonably dispute any such finding by the board of the Grantee that the City is in compliance.  If (i) Foundation has failed to make an annual grant installment

payment to Grantee when due hereunder and Grantee has provided the Foundation the 30-day notice contemplated by Section 2.8(b) of the OTA, and (ii) the Foundation has not made the required grant payment by the expiration of such 30-day period, then Grantee will assign its right to enforce collection of the payment from the Foundation to the City and the City will have the right to pursue collection of that payment as provided in the OTA. Foundation will be responsible for its own costs and attorney fees in defending any action by Grantee or City to enforce payment from Foundation, unless those costs and attorney fees are otherwise indemnified or set-off on behalf of Foundation by the provisions of the OTA or the Plan of Adjustment.

2. <u>Annual Grant Payment Conditions</u>

Grantee agrees that any annual grant payment it receives from the Foundation will be used for the sole purpose of making the annual payments to be made by Grantee to the City of Detroit pursuant to Section 2.3 of the OTA.

In the event the Foundation has provided (i) an annual grant payment to the Grantee prior to the date Grantee has determined that the City has complied with Section 2.4 of the OTA for the year in which the annual grant payment is to be used, or (ii) Foundation, in its sole discretion, advances any future annual grant payment to Grantee, Grantee will maintain such grant balances in conservatively invested reserves to ensure that the monies provided are available to make payment to the City when conditions have been met. Any earnings on such early grant payments will be used to offset operational costs of Grantee relating to the purposes of this grant. If on December 31, 2034, there remains any earnings after payment of those operational expenses, Grantee, in its discretion, may use those excess earnings (i) to make grants and/or establish endowments that will support the ongoing revitalization, or maintain and expand the quality of life of the residents, of the City of Detroit and/or (ii) return those excess earnings ratably to the Foundation Funders.

In the event the City fails to meet the conditions for release of an annual payment to it under Section 2.4 of the OTA and all applicable cure periods available to the City pursuant to Section 2.5 of the OTA (including any periods of time necessary for dispute resolution as provided in the OTA) have expired, the Foundation may either request that the Grantee return that annual grant payment to the Foundation, at which time the Foundation's obligation to make such annual grant payment is automatically terminated and cancelled, or request that the Grantee retain the annual grant payment for application to a future annual grant payment due to the Grantee from the Foundation. Foundation and Grantee also acknowledge and agree that consistent with Section 2.5(b) of the OTA, the Foundation may cancel its remaining grant installments to Grantee if the City fails to meet the conditions for release of an annual payment to it under the OTA, and all applicable cure periods available to the City pursuant to Section 2.5 of the OTA (including any periods of time necessary for dispute resolution as provided in the OTA) have expired. If Foundation elects to cancel its remaining grant payments, the Foundation may either request that the Grantee return any pre-paid annual grant amount provided to Grantee that has not yet been paid or is not obligated to be paid to the City by Grantee and/or allow Grantee to retain some or all of such pre-paid grant installments to offset operational costs of Grantee relating to the purposes of this grant.

3. <u>Present Value Election</u>

Consistent with the OTA, Foundation has the right to elect to make early payment of any or all of its grant payment obligations to the Grantee and have its obligation under this Terms of Grant Agreement reduced by a present value discount rate of 6.75% as provided in the OTA. Grantee will transfer such early payment to the City of Detroit and elect that present value discount provided the requirements of the next paragraph are met.

Foundation agrees that it will only make the above mentioned present value election if (i) the Grantee receives confirmation from the City, in a form reasonably acceptable to Grantee, that the Grantee's future grant payment obligations to the City under the OTA will be properly reduced as a result of such present value election by Foundation, and (ii) Foundation and Grantee agree to reasonable arrangements to prevent such early payment election from Foundation jeopardizing the fiscal stability and operations of Grantee and its abilities to perform its obligations under the OTA.

III.    <u>Indemnification and Other Provisions</u>

Foundation and Grantee acknowledge that Foundation is a third-party beneficiary of certain provisions contained in the OTA and the contemplated order confirming the Plan of Adjustment. Foundation's rights as a third-party beneficiary include, but are not limited to, (i) indemnification by the City of Detroit as found in Section 6.2 of the OTA, (ii) set-offs on grant installments as a result of the City of Detroit failing to pay for defense and other costs (except that Foundation is not entitled to such set-off if the Grantee has, as a result of the City failing to pay all of the defense and other costs of the Foundation, incurred those costs on behalf of Foundation and Grantee), (iii) jurisdiction and choice of law provisions, and (iv) certain injunctive and other relief as found in the Plan of Adjustment as confirmed by court order. Foundation's obligation to make any installment payment under this Terms of Grant Agreement is expressly conditioned upon the existence of all such third-party benefits including, but not limited to, said indemnification provision, set-off provisions and injunctive relief.

This Terms of Grant Agreement, or any rights, obligations or funds awarded under this Terms of Grant Agreement, may not be assigned, unless otherwise expressly provided herein, without the prior written consent of the non-assigning party, and any purported assignment in violation of the foregoing will be void and of no effect. This Terms of Grant Agreement will be governed by and construed in accordance with the laws of the state of Michigan, with jurisdiction in the State and Federal Courts of Michigan (as more specifically provided in the OTA and the Plan of Adjustment).

IV.    <u>Review of Grant Activity</u>

Grantee will provide written annual reports to the Foundation each July 30 showing the use of the grant funds provided under this grant. Grantee may extend the date for any annual report to no later than January 30 of the following calendar year if Grantee is unable to obtain information from the City of Detroit necessary for completing the report. Foundation and Grantee agree that the reports to be provided will be of a standard format and content to be provided to all Foundation Funders. The content of the annual reports will include, without limitation:

- Information on the Grantee's progress toward meeting the terms of this grant
- A statement of determination by the board of Grantee regarding the City's compliance with the Conditions for Funding found in Section 2.4 of the OTA
- A statement of facts regarding the accounting treatment of the remaining payments due to Grantee by the Foundation for consideration by the Foundation in preparing its statements of financial position
- Copies of any and all evaluation or similar reports, if any, provided to any other Foundation Funder or any party to the OTA
- An explanation of any significant changes in the organizational leadership of the Grantee, such information to be provided promptly to Foundation if it occurs between the filing of an annual report

A final report is due by June 30, 2035.

In addition, Grantee will furnish the Foundation with any additional information reasonably requested by the Foundation from time to time. Without limiting the generality of the foregoing, Grantee will provide the Foundation (or its designated representatives) with reasonable access to Grantee's files, records and personnel for the purpose of making financial audits, evaluations or verification, program evaluations, or other verifications concerning this grant as the Foundation reasonably deems necessary during the term of this grant and for five years thereafter. The fees and expenses of any such representative that is designated by the Foundation to undertake these tasks, and any reasonable out-of-pocket costs actually incurred by the Grantee in complying with this request, will be paid by the Foundation.

V.   Standard Provisions

In accepting this grant, the Grantee agrees to the following and certifies the following statements:

a. Grantee will use the funds granted solely for the purpose stated and Grantee will repay any portion of the amounts granted which is not used for the purpose of the grant or not expended by the due date for the final report.
b. Grantee is and will at all times maintain its status as (i) a nonprofit corporation in good standing under the laws of the State of Michigan, and (ii) an organization described in Section 501(c)(3) and Section 509(a)(3) of the U.S. Internal Revenue Code ("Code") that is not a "private foundation" within the meaning of Section 509(a) of the Code because it is a Type-I supporting organization of the Community Foundation for Southeast Michigan.
c. Grantee will notify the Foundation immediately of any change in its tax status.
d. Grantee will return any unexpended funds if the Grantee loses its exemption from Federal income taxation as a 501(c)(3) nonprofit organization pursuant to Section 509(a)(1), 509(a)(2) or 509(a)(3) of the Code.
e. Grantee will maintain books and records adequate to verify actions related to this grant during the term of this grant and for five years thereafter.
f. Grant funds will only be expended for charitable, educational, literary or scientific purposes within the meaning of Section 501(c)(3) of the Code, and Grantee will comply with all applicable federal and state laws and regulations that govern the use

of funds received from private foundations. Grantee will in no event use grant funds or any income earned thereon to:

i. Carry on propaganda or otherwise to attempt to influence legislation (within the meaning of Section 4945(d)(1) of the Code).

ii. Influence the outcome of any specific public election or carry on, directly or indirectly, any voter registration drive (within the meaning of Section 4945(d)(2) of the Code).

iii. Make grants to individuals or to other organizations for travel, study or similar purpose that do not comply with the requirements of Section 4945(d)(3) or (4) of the Code.

iv. Undertake any activity other than for a charitable, educational, literary or scientific purpose specified in Section 170(c)(2)(B) of the Code.

v. Inure a benefit to any private person or entity in violation of Section 501(c)(3) and 4941 of the Code, including but not limited to any Foundation trustee, officer, employee, or his/her spouse, children, grandchildren, and great grandchildren or their respective spouses for any purpose.

vi. Support a use that is not in compliance with all applicable anti-terrorist financing and asset control laws, regulations, rules and executive orders, including but not limited to, the USA Patriot Act of 2001 and Executive Order No. 13224. Furthermore, Grantee agrees to ensure that no Foundation funds will be disbursed to any organization or individual listed on the United States Government's Terrorist Exclusion List or the Office of Foreign Assets Control (OFAC) Specially Designated Nationals & Blocked Persons List. In addition, Grantee takes reasonable steps to ensure that its board, staff and volunteers have no dealings whatsoever with known terrorist or terrorist organizations.

g. Grantee acknowledges and agrees that this Terms of Grant Agreement does not imply a commitment by the Foundation to continued funding beyond the express terms of this Terms of Grant Agreement.

h. Grantee represents that this grant will not result in the private benefit of any individual or entity, including, but not limited to, the discharge of any pledge or financial obligation of any individual or entity.

## VI.   Publicity

Communications regarding this grant, the OTA and the City's compliance with the ongoing conditions of the OTA will be coordinated and made by Grantee, in consultation with Foundation and other Foundation Funders. Foundation and Grantee will obtain the other's approval prior to making any public announcement about this grant. Foundation may include information on this grant in its period publications without the need for Grantee approval.

## VII.   Notices and Foundation Contact Information:

All notices, demands and other communications given or delivered under this Agreement will be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) Business Days after mailing by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient.

If to Grantee:        Robin D. Ferriby

Vice President, Philanthropic Services
Foundation for Detroit's Future
333 West Fort Street, Suite 2010
Detroit, MI 48226-3134
313-961-6675
rferriby@cfsem.org

If to Foundation:      [INSERT FOUNDATION CONTACT INFORMATION]

VIII.    <u>Power to Amend</u>

Grantee will (i) promptly advise Foundation in writing if Grantee enters into any agreement or amendment with any other Foundation Funder that could reasonably be expected to provide such other Foundation Funder with benefits or terms that are more favorable than those provided to the Foundation hereunder, and (ii) upon the Foundation's request, promptly amend this Terms of Grant Agreement to provide Foundation with any or all of such more favorable benefits or terms.  This Terms of Grant Agreement may be amended only by a written agreement signed by the parties.

For the **[INSERT NAME OF FOUNATION]**:

By: _____          _____
**[INSERT OFFICER NAME AND TITLE]**:                                    Date

For the Foundation for Detroit's Future:

By: _____          _____
Mariam C. Noland, President                                             Date

S:\DEVELOP\Robin\Private\Art Trust\Grant terms\20140806 Foundation FDF Agreement (clean).docx

**EXHIBIT I.A.279**

RESTORATION TRUST AGREEMENT

**CITY OF DETROIT PENSION RESTORATION TRUST**

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") acting by and through **[Kevyn Orr acting as the appointed Emergency Manager pursuant to PA 436, M.C.L. §141.1541 et seq./Mayor Michael E. Duggan]** and each member of the Board of Trustees named herein.

W I T N E S S E T H:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan, Case No. 13-53846 (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (as confirmed by the Court, the "Plan of Adjustment"), the City agreed to establish a trust upon the Effective Date of the Plan of Adjustment (i) to hold the DWSD CVR (as defined in the Plan of Adjustment) and enforce rights related to its terms, and to consult with the trustees and investment committee of the Police and Fire Retirement System for the City of Detroit ("PFRS") and the General Retirement System for the City of Detroit ("GRS"), respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR, each as defined below;

WHEREAS, Detroit hereby establishes this City of Detroit Pension Restoration Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for maintaining and administering this Trust and managing the property held by this Trust;

WHEREAS, the members of the Board of Trustees are willing to exercise the authority and rights of consultation granted to it herein with regard to the Trust; and

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the members of the Board of Trustees agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1     Board of Trustees or Board.  The Board of Trustees is the body described in Article VII to which Detroit has delegated responsibility for:  (i) maintaining and administering this Trust and managing the property held by this Trust; and (ii) exercising the duties and responsibilities of the Board of Trustees set forth in this Trust Agreement.  The Board of Trustees shall be constituted in accordance with Article VII and shall have the duties and authorities described in Article V.

Section 1.2     Code.  Means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.3     Beneficiaries.  Means the beneficiaries of this Trust, which beneficiaries shall be the GRS, the PFRS and the participants in GRS and PFRS entitled to the benefits of the Restoration Plan.

Section 1.4     DWSD CVR.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5     General Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment pursuant to the terms of the Restoration Plan.

Section 1.6     GRS.  Means the General Retirement System for the City of Detroit.

Section 1.7     Holder of Pension Claims.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.8     Plan of Adjustment.  Means the Plan for the Adjustment of Debts of the City of Detroit, as confirmed by order of the Court dated [---], a copy of which is attached hereto as Exhibit A.

Section 1.9     PFRS.  Means the Police and Fire Retirement System for the City of Detroit.

Section 1.10    Qualifying DWSD Transaction.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11    Restoration Plan.  Means the general rules governing pension benefit restoration to the PFRS and the GRS as set forth in Exhibit II.B.3.q.ii.C and Exhibit II.B.3.r.ii.C of the Plan of Adjustment.  A copy of the Restoration Plan is attached hereto as Exhibit B.

Section 1.12    Retiree Committee.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.13    Special Restoration.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment in connection with a Qualifying DWSD Transaction, as described in Section IV.F of the Plan of Adjustment.

Section 1.14    Trust Agreement.  This agreement as it may be amended hereafter from time to time by the parties hereto.

Section 1.15    Trust or Trust Fund.  The City of Detroit Pension Restoration Trust established by this Trust Agreement, comprising all property or interests in property held by, or under the custody and control of, the Board from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1     Purpose.  The Trust is established to receive and hold the DWSD CVR and enforce rights related to its terms, and to consult with the trustees and investment committee of the PFRS and the GRS, respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR.

Section 2.2     Receipt of Funds.  The Board shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Board shall hold, manage and administer the Trust Fund without distinction between principal and income.

Section 2.3     Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than distributing proceeds from the DWSD CVR in the manner described by Section IV.F of the Plan of Adjustment.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the Board from using the assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining and administering the Trust or to maintain a reserve of funds needed to pay reasonable fees and expenses expected to be incurred in the future.

Section 2.4     No Residual Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1     Detroit Contributions.  The Board will accept the City's contribution of the DWSD CVR to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the DWSD CVR (and any amounts payable to the Trust Fund pursuant to the terms of the DWSD CVR), Detroit shall have no further obligation to contribute to the Trust.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1     Payments from the Trust Fund.

(a)     Subject to paragraph (b) below, the Board shall within a reasonable time after receiving proceeds from the DWSD CVR distribute such proceeds (less the amount retained by the Trust Fund in the sole discretion of the Board to pay reasonable fees and expenses previously incurred or expected to be incurred to maintain and administer the Trust) directly to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

(b)     The Board may retain or withhold all or any part of any payment as the exercise of its reasonable discretion may deem proper, to protect the Board and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so retained or withheld, may discharge any such liability. Any part of any such payment so retained or withheld by the Board that may be determined by

the Board to be in excess of any such liability will upon such determination by the Board be paid to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

Section 4.2 <u>Excessive Payments</u>. If the payment of any distributions under the Trust is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Board or Board's agent of such excessive or improper payment upon the Board's request, the Board shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person. Until repaid to the Board or Board's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

# ARTICLE V
# BOARD POWERS AND DUTIES

Section 5.1 <u>Powers of the Board Generally</u>. The Board has whatever lawful powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Board under other provisions of this Trust Agreement. The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Board.

Section 5.2 <u>Powers Exercisable by the Board</u>. The Board is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a) To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement. Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b) To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c) To cause any investment in the Trust Fund to be registered in, or transferred into, the name of any institutional custodian appointed by the Board, or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Board shall at all times show that all such investments are part of the Trust Fund, and the Board shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form; and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

(d) To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article V;

(e)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets;

(f)     To make payments from the Trust Fund in accordance with Article IV and for the payment of expenses as provided in Section 5.5;

(g)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, legal counsel and other expert advisors as shall be necessary and appropriate, and to pay their reasonable expenses and compensation;

(h)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on income of the Trust, if any, out of the Trust Fund;

(i)     To file all reports and returns that are required to be made with respect to the Trust:

(j)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund; and

(k)     To accept, compromise or otherwise settle any obligations or liability due to or from the Trust as the Board hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Notwithstanding the foregoing, the Board shall not (i) assign, transfer, convey or sell its interest in the DWSD CVR except for an assignment due to the appointment of successors to members of the Board in accordance with Section 7.2; and (ii) invest any assets in real estate or real estate securities

Section 5.3     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Board.

Section 5.4     General Duties and Obligations of Board.

(a)     In accordance with Article II but subject to Section 4.1, the Board shall hold all property received by it and any income and gains thereupon.  In accordance with this Article, the Board shall manage, invest and reinvest the Trust Fund, shall collect the income therefrom, and shall make payments or disbursements in accordance with Section 4.1.

(b)     The Board shall confer with the trustees and investment committee of the GRS and PFRS, respectively, with respect to the Special Restoration and General Restoration; provided, however, that the Board shall not have any right to initiate any enforcement

proceedings against the trustees or investment committee of either GRS or PFRS with respect to Special Restoration or General Restoration.

(c)     The Board shall discharge its duties in the interests of the Beneficiaries and for the exclusive purpose of making distributions to the GRS and PFRS as provided in Section 4.1 and defraying reasonable expenses of administering the Trust and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.

Section 5.5     <u>Payment of Expenses</u>.  The Board shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Board in connection with maintaining and administering the Trust, including attendance at meetings related thereto.  The expenses of the Board shall constitute a lien on the Trust Fund.

Section 5.6     <u>No Board Compensation</u>.  Except as provided in Section 5.5, the members of the Board shall serve without compensation.

## ARTICLE VI
## BOARD ACCOUNTS

Section 6.1     <u>Records</u>.  The Board shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by interested persons at the principal office of the Trust.

Section 6.2     <u>Annual Audit</u>.  The Trust Fund shall be audited annually by an independent ~~audit~~ firm <u>of certified public accountants</u>, and a statement of the results of such audit shall be provided to the Board and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3     <u>No Interest by Beneficiaries</u>.  In no event shall any Beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Beneficiary, or class of Beneficiaries, and no Beneficiary shall have any right to any particular asset which the Board may have allocated to any account or separate fund for accounting purposes.

Section 6.4     <u>Accounting Year, Cash Basis</u>.  The accounting year of the Trust shall be the calendar year.  All accounts of the Board shall be kept on a cash basis.

**ARTICLE VII**
**COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES**

Section 7.1    Number and Appointment of Members. The Board of Trustees shall consist of five (5) voting members. The Retiree Committee has selected the following initial members of the Board of Trustees:[_____, _____, _____, _____, and _____.]

By execution of this Trust Agreement each Board member hereby acknowledges his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement.

Section 7.2    Term of Office. Each member of the Board shall serve a period of ~~seven (7)~~four years until the termination of the Trust, or if earlier, until his or her death, incapacity to serve hereunder, or resignation. In the event of a vacancy, the replacement Board member shall be appointed pursuant to procedures established by the Board.

Section 7.3    Resignation. A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the remaining Board Members stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 7.4    Operation of the Board; Quorum. The Board shall select from among its members a chair and a vice chair. The Board shall hold regular meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings. Each Board Member shall be entitled to one vote on each question before the Board. Three (3) members shall constitute a quorum at any meeting. A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

Section 7.5    Reliance on Written Instruments. Each member of the Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 7.6    No Individual Liability on Contracts. The members of the Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts. Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 7.7    <u>City Not Liable for Conduct of Board</u>.  The Board is not, in its capacity as the Board of Trustees, an officer, agent, employee, or representative of Detroit.  In its capacity as the Board of Trustees, the Board is a principal acting independently of the City, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Trust, the Board or its officers, agents, or representatives.

Section 7.8    <u>Liability Insurance</u>.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 7.9    <u>Reimbursement for Defense of Claims</u>.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board or, where required by applicable law, an independent fiduciary determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGER

Section 8.1    <u>Duration of the Trust</u>.  Unless terminated earlier pursuant to Section 8.3, this Trust Agreement shall terminate automatically on the earlier of:  (~~i~~a) the eighth anniversary of the Effective Date of the Plan of Adjustment if the City and the Board shall have agreed in writing that no Qualifying DWSD Transaction has occurred; or (~~ii~~b) the later of (~~A~~i) written notice from GRS and PFRS of the death of the last individual who was a participant in such pension plans on the Effective Date of the Plan of Adjustment or (~~B~~ii) the 90th anniversary of the effective date of this Trust Agreement.

Section 8.2    <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by the Board or by Court order upon proper motion by the Board or the City, provided, however, that no amendment may impose a contribution obligation on the City beyond that specified in Section 3.1.  No amendment to the Trust Agreement shall modify the responsibilities of the Board hereunder unless the Board has first consented to such amendment.

Section 8.3    Termination.

(a)    Notwithstanding Section 8.1, the Trust and this Trust Agreement may be terminated at any time in writing by the Board with a copy of such written instrument to be provided to the City, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund, if any, shall be paid out at the direction of the Board to the GRS and PFRS as provided in Section IV.F of the Plan of Adjustment.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  If the Trust Fund has assets at the time of its termination, it shall remain in existence only until all such assets have been distributed.

(b)    Upon termination of the Trust pursuant to Section 8.1 or 8.3, the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Rights in Trust Fund.  No Beneficiary or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Board, the Board, or Detroit, except as may be otherwise expressly provided in this Trust Agreement.

Section 9.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Beneficiary to any future distributions under the provisions of the GRS or PFRS shall not be subject to attachment or garnishment or other legal process by any creditor of any such Beneficiary, nor shall any such Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under GRS or PFRS.

Section 9.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 9.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 9.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 9.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar confirmed electronic communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business

day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the City:</u>

**[insert name and address]**

<u>If to the Board:</u>

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**CITY OF DETROIT**

By: _____

Print Name: _____

Title: _____

Date: _____

**MEMBERS OF THE BOARD OF TRUSTEES**

By: _____

Print Name: _____

Acknowledged by me on the _____ day of _____, _____

Signature_____

Printed name_____

Notary public, State of Michigan, County of _____

My commission expires_____

By: _____

Print Name: _____

Acknowledged by me on the _____ day of _____, _____

Signature_____

Printed name_____

Notary public, State of Michigan, County of _____

My commission expires_____

By: _____

Print Name: _____

Acknowledged by me on the _____ day of _____, _____

Signature_____

Printed name_____

Notary public, State of Michigan, County of _____

My commission expires_____

By: _____
Print Name: _____

       Acknowledged by me on the _____ day of _____, _____
       Signature_____
       Printed name_____

       Notary public, State of Michigan, County of _____
       My commission expires_____

By: _____
Print Name: _____

       Acknowledged by me on the _____ day of _____, _____
       Signature_____
       Printed name_____

       Notary public, State of Michigan, County of _____
       My commission expires_____

**EXHIBIT A**

**PLAN OF ADJUSTMENT**

# EXHIBIT B

# RESTORATION PLAN

82645430\V-2

14

CLI-2245193v3

**EXHIBIT C**

**CONFIRMATION ORDER**

82645430\V-2

CLI-2245193v3

**EXHIBIT II.B.3.q.ii.C**

TERMS OF PFRS PENSION RESTORATION

# ~~Terms of~~TERMS OF PFRS ~~Pension Restoration~~PENSION RESTORATION

## *Pension Restoration Process*

The following rules shall govern how accrued pensions, including COLA benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the Confirmation Order.  The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee of ~~each of~~ PFRS ~~or GRS, or except as may be otherwise provided in~~and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto.  This pension restoration program shall be deemed a part of Component II of the Combined Plan for the Police and Fire Retirement System, but in the event of any conflict between the language set forth herein and the Combined Plan the terms of this Pension Restoration Agreement will govern.

**GENERAL RESTORATION RULES**

**I.      PFRS RESTORATION**

1.      <u>Waterfall Categories</u>

There will be three Waterfall Classes:

a.  PFRS Waterfall Class 1 – Retirees in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries
b.  PFRS Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the PFRS Fiscal Year prior to the year in which the restoration decision is made
c.  PFRS Waterfall Class 3 – All retirees, surviving spouses, and beneficiaries in pay status and all other PFRS participants who as of June 30, 2014  are not in retirement benefit pay status

2.      <u>General PFRS Pension Restoration Through June 30, 2023</u>

Each year in conjunction with the annual actuarial valuation report, the PFRS actuary will project the PFRS ~~F~~funded ~~R~~ratio as of 2023 based upon the market value of plan assets relative to the actuarial accrued liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (administrative and investment), future employer contributions as set forth in the Plan of Adjustment (subject to conditions in the Plan of Adjustment), and such other actuarial assumptions

as utilized by the PFRS actuary. ~~The Projected Funded Level~~For purposes of PFRS Restoration through June 30, 2023, the Funding Target will be a 75% funded ratio, and the Restoration Target will be a 78% funded ratio, both projected to June 30, 2023. ~~If~~For purposes of calculating the funded ratio, the assets in the Restoration Reserve Account will be excluded. Each year, if the actuary projects that ~~the~~ Funded Level as of 2023 (excluding Restoration Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 78%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target. ~~Each year thereafter, additional assets will be credited to~~Once the Restoration Reserve Account is established, each year thereafter, Restoration Account assets will be credited with interest in an amount equal to the net return on plan investments but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses and any required transfer to the PFRS Pension Reserve Account as provided herein.

Actual restoration payments and restoration credits will work as follows: each year, in conjunction with the preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the PFRS actuary will determine whether there are sufficient funds in such account to restore COLA benefits in a minimum incremental amount of 10% or more. For ~~E~~example: If a retiree's then current COLA benefit is a 1.0% annual compounded COLA, the minimum incremental restoration would increase the COLA benefit to 1.225%. COLA restoration only will occur if the funding level in the Restoration Reserve Account can fund 100% of the COLA increase over the actuarially-projected lives of the eligible recipient PFRS Waterfall Class. If the actuary certifies that the Restoration Reserve Account as of the end of the prior PFRS fiscal year satisfies the required funding level for one or more increments of restoration, then in the next immediate PFRS fiscal year, actual COLA restoration payments will be made to PFRS Waterfall Class 1 members in such increments until an amount sufficient to fund 66% of the value of their future COLA payments (e.g., a 1.5% compound COLA, or as otherwise applicable) has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account ~~will~~would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), PFRS Waterfall Class 2 members will receive COLA restoration, until an amount sufficient to fund 66% of the value of their future COLA payments has been funded. At that juncture, and to the extent that additional assets in the Restoration Reserve Account ~~will~~would fully fund COLA restoration in at least one minimum 10% increment (i.e., amounts equal to 10% of the value of future COLA payments), PFRS Waterfall Class 3 members will receive COLA restoration on a pro-rata

basis. For PFRS Waterfall Class 3 members who are in pay status at that time of restoration, they will receive COLA payments; for active employees at the time of restoration, they will receive credits granting them a right upon retirement to receive COLA restoration equal to the 10% increments that are fully funded to PFRS Waterfall Class 3 members.  For Example: Assume there are sufficient assets credited to the Restoration Reserve Account as of the end of a fiscal year to fully fund 66% of the value of the COLA for all PFRS Waterfall Class 1 and Class 2 members for their actuarially projected lives.   To the extent additional assets ~~are available~~remain  in the Restoration Reserve Account~~,~~ to fully fund at least a 10% COLA increment~~,~~ for PFRS Waterfall Class 3 members for their actuarially projected lives, then (i) all retirees would receive a restoration payment of 76% of the value of their COLAs ~~and~~(their having already received by virtue of their membership in PFRS Waterfall Classes 1 and 2 an increase to 66% of the value of their COLAs) and also a 10% COLA increment would be credited to eligible active employees which would be included in their benefit payments upon retirement (thus causing their COLAs to increase in value from 45% to 55% ). Restoration amounts actually paid from the Restoration Reserve Account will be debited from such account.  Restoration payments will be calculated and paid on a prospective basis only.

Once restoration payments and credits begin, as long as the Restoration Reserve Account continues to have assets to fund 100~~%~~% of an incremental COLA restoration amount for such Waterfall Class for their actuarially projected lives, the restoration payments and credits will continue; provided, however, that in the event the ~~PFRS Funding~~Restoration Reserve Account, after having sufficient assets to fund 100% of two or more increments, falls below 100% for the second or greater increment, the annual amounts to pay such second or greater  increment can continue  until the Restoration Reserve Account lacks any assets to fund such additional increment.  For Example, assume a 10% increment in PFRS Waterfall Class 1 requires $10 million in assets to be fully funded for the PFRS Waterfall Class' actuarially projected lives, and that based on FY 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in FY 2019.  Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million(in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

If the PFRS Funded Level (excluding Restoration Reserve Assets) projected to 2023 falls below 76% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected PFRS Funded Level in 2023 is 76% or above,  further ~~allocations~~interest credits  to the notional Restoration Reserve

CLI-~~22092162~~2248078v1 ~~3~~

Account will cease notwithstanding the actual net PFRS investment returns for the fiscal year in question.  Furthermore, if the PFRS ~~f~~Funded ~~l~~Level projected to 2023 falls below the ~~Projected Funded Level (~~Funding Target (i.e., 75%) then restoration payments to retirees and credits to active employees in the following year will be modified in the following manner:  (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the PFRS Pension  Reserve  Account in sufficient amounts to restore the projected PFRS ~~f~~Funded ~~l~~Level in 2023 to 75%;  (2) ~~if~~following such transfer, the remaining assets in the Restoration Reserve Account ~~assets (if any) are sufficient to fully fund one or more COLA restoration increments  (i.e., 10% COLA values) to one or more PFRS Waterfall Class categories, then as to such increments, the~~ shall be applied to make restoration payments ~~shall continue~~ in accordance with and pursuant to the same mechanism described in the previous paragraph.

In connection with preparation of the actuarial report for FY 2023, the PFRS actuary will determine whether PFRS has satisfied the Permanent Restoration Target ~~of~~, which shall be 78%. Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers, the PFRS F~~f~~unded Level as of June 30, 2023 ~~is equal to or greater than~~has satisfied  the Permanent Restoration Target ~~of~~(i.e., 78%~~)~~, then the residual amounts, if any, in the Restoration Reserve Account ~~that~~(which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which  fully fund one or more increment~~al~~s of COLA restoration payments for a~~one or more PFRS Waterfall Classes for their actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2019,  and in the event that the projected Funded Level of PFRS as of 2023 is less than 76%, the PFRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years.   It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the PFRS Restoration Reserve Account than actually were transferred during such look back period, then the PFRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii)

the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 PFRS Funded Level to 76%.

3.  General PFRS Pension Restoration from July 1, 2023 to June 30, 2033.

If and to the extent that all COLA payments have not been restored pursuant to the permanent restoration feature as of June 30, 2023 described in the immediately preceding paragraph, then Dduring this period, the Projected Funded Level will be [85%] and for purposes of variable restoration, the Funding Target, the Restoration Target shall be [88%], the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be [86%] all as ofas set forth on Exhibit A hereto, all projected as of June 30, 2033. The same rules for restoration payments that applied during the period ending June 30, 2023 shall apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2033 PFRS Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption, and the then applicable actuarial assumptions as utilized in the annual actuarial valuation. , Further, the Plan actuary shall assume, merely for purposes of satisfyingdetermining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount of contributions necessary to fund the PFRS based upon an amortization of the actual 2023 UAAL (using the market value of assets) (with interest on the outstanding principal at the then investment return rate) over 30 years (hereinafter, the "2023 UAAL Amortization"). and in such manner that the resulting annual contribution stream would achieve the applicable PFRS' Funding Target (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded

To the extent that the City's actual contributions to the PFRS in any of the FYs 2024 (i.e., the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in PFRS called the Extra Contribution Account. In determining pension restoration during the period from FY 20232024 through

2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected ~~F~~funded ~~L~~level for the Restoration ~~Trigger~~Target or Permanent Restoration Target.  To the extent that the City's actual contributions to the PFRS in any of the FYs ~~2023~~2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the Restoration Reserve Account.

Each year, in addition to the crediting of assets ~~above~~that exceed the amount necessary to satisfy the Restoration Target, ~~additional~~ existing Restoration Account assets will be ~~allocated to the Restoration Reserve Account,~~credited with interest equal to the net return on plan investments, but capped at the then actuarial investment return assumption.  In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the annual actuarial valuation report for FY 2033, the PFRS actuary will determine whether PFRS has satisfied the applicable Permanent Restoration Target ~~of  [88%], as set forth on Exhibit A~~.  Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the funding level as of June 30, 2033 ~~is equal to or greater than the~~has satisfied the applicable Permanent Restoration Target ~~of  [88%]~~, then the residual amounts in the Restoration Reserve Account ~~that~~, if any (which will necessarily represent excess not  necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increment~~als~~ of  COLA restoration payments for ~~a~~one or more  PFRS Waterfall Class~~es,~~ shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for 2028,  and in the event that the projected Funded Level of PFRS as of 2033 is less than 79%, the PFRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years.   It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the PFRS Restoration Reserve Account than actually were transferred during such look back period, then the PFRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was

credited to the Restoration Reserve Account during the applicable look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the applicable look-back period); or (iii) the amount required to increase the projected 2033 PFRS Funded Level to 79%.

4.     <u>General PFRS Pension Restoration from July 1, 2033 to June 30, 2043</u>.

During this period, the Projected Funded Level will be [92%], the Restoration Target shall be [95%], and the Restoration Reserve Suspension Trigger shall be [93%]. The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply.

If and to the extent that all COLA payments have not been restored pursuant to the permanent restoration feature as of June 30, 2033 described in the immediately preceding paragraph, then during the period ending June 30, 2044 and for purposes of variable restoration, the Funding Target , the Restoration Target, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be as set forth on Exhibit A hereto. The same rules for restoration that applied during the period ending June 30, 2033 shall otherwise apply (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2043 PFRS Funded Level falls below the 2043 Funding Target), and shall be rolled forward. For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the PFRS actuary will determine whether PFRS has satisfied the applicable Permanent Restoration Target of [95%], as set forth on Exhibit A. Transfers from the Restoration Reserve Account for credit to the PFRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the funding PFRS Funded lLevel as of June 30, 2043 is equal to or greater than the applicable Permanent Restoration Target of [95%], then the residual amounts in the Restoration Reserve Account that, if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more incremental als of COLA restoration payments for aone or more PFRS Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the PFRS Pension Reserve Account and the applicable incremental COLA payments shall be permanently

restored for the applicable PFRS Waterfall Class and shall no longer be variable from year to year.

5.    Modification of the Pension Restoration Program

If any time after July 1, 2026, the PFRS Investment Committee (by vote of 5 of its 7 members), or the PFRS Board of Trustees (by a greater than 66% vote) determines that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a) materially harm the long-term economic interests of the City or Retirement System; or (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to full fund PFRS frozen liabilities is presumptively reasonable, but not irrebutably so).  The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of harm or impairment, but which also considers this Agreement's objective of providing pension restoration.  Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment.  Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote).  Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation.  If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation.  In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan.  The two selected mediators shall appoint a third neutral mediator from the approved list.  Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator.  Representatives of the Mayor and the Governor shall participate in such mediations.  If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, inter alia, whether or in what manner to amend this Agreement.

# EXHIBIT A

**PFRS -** The 2033 and 2043 Funding Targets shall be 3.0% and 6% higher than the actual 2023 Funded Level rounded to the nearest 10th decimal. The Restoration Target shall be 3.0% higher than the Funding Target but not less than 81% and 84% in 2033 and 2043, respectively.  The Permanent Restoration Targets shall be shall be equal to the Restoration Targets for all time periods. The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Projected Funding Target /Restoration Target | 2043 Projected Funding Target /Restoration Target |
|---|---|---|
| 78% | 81%/84% | 84%/87% |
| 77% | 80%/83% | 83%/86% |
| 76% | 79%/82% | 82%/85% |
| 75% | 78%/81% | 81%/84% |
| 74% or lower | 3% > than 2023 Funded Level %/81% | 3% > than 2023 Funded Level %/84% |

| 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|
| Same as 2033 Restoration Target | Same as 2043 Restoration Target |

CLI-22092162248078v1 9

**EXHIBIT II.B.3.r.ii.C**

TERMS OF GRS PENSION RESTORATION

# ~~Terms of~~TERMS OF GRS ~~Pension Restoration~~PENSION RESTORATION

## *Pension Restoration Process*

The following rules shall govern how accrued pensions, including COLA benefits, that are reduced as part of the Plan of Adjustment, shall be restored during the thirty year period following the Confirmation Order.  The pension restoration process shall be supervised, and restoration decisions undertaken by the Investment Committee of ~~each of PFRS or~~ GRS~~, or except as may be otherwise provided in~~ and in accordance with the pension governance provisions set forth in the State Contribution Agreement and exhibits thereto.  This pension restoration program shall be deemed a part of Component II of the Combined Plan for the General Retirement System of the City of Detroit, but in the event of any conflict between the language set forth herein and the Combined Plan the terms of this Pension Restoration Agreement will govern.

**GENERAL RESTORATION RULES**

**I.     GRS RESTORATION**

1.     Waterfall Categories

There will be three Waterfall Classes:

a.  GRS Waterfall Class 1 – Retirees, in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries
b.  GRS Waterfall Class 2 – Retirees, who entered into retirement benefit pay status after June 30, 2014, and their  surviving spouses~~,~~ and beneficiaries, and who are in pay status as of the end of the GRS Fiscal Year prior to the year in which the restoration decision is made
c.  GRS Waterfall Class 3 – All other GRS participants who as of June 30, 2014 are  not in retirement benefit pay status

2.     General GRS Pension Restoration Through June 30, 2023

Each year in conjunction with the annual actuarial valuation report, the GRS ~~Plan~~ actuary will project the GRS ~~F~~funded ~~R~~ratio as of 2023 based upon the market value of plan assets relative to  the ~~A~~actuarial ~~A~~accrued ~~L~~liabilities (the "Funded Level"). This projection will be further based upon a 6.75% assumed rate of investment return which is net of expenses (investment and administrative), future employer contributions as set forth in the Plan of Adjustment (subject to the conditions in the Plan of Adjustment) and such other actuarial assumptions as utilized by the GRS actuary. ~~The Projected Funded Level~~For purposes of GRS

Restoration through June 30, 2023, the Funding Target will be a 70% funded ratio, the Restoration Target will be a 75% funded ratio, and the Restoration Reserve Suspension Trigger will be a 71% funded ratio, all projected to June 30, 2023. If For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.  Each year, if the actuary projects that the projected Funded Level as of June 30, 2023 (excluding Restoration Account assets to avoid double counting) exceeds the Restoration Target (i.e., exceeds 75%), a credit of assets for bookkeeping purposes will be made into a new notional Restoration Reserve Account. The notional credit will be in an amount equal to the excess of assets above the amount projected to be needed to satisfy the Restoration Target.  Each year thereafter, additional assets will be credited to Once the Restoration Reserve Account, is established, each year thereafter, Restoration Account assets will be credited with interest  in an amount equal to the net return on plan investments, but capped at the actuarially assumed rate of investment return (i.e., 6.75% for the period through June 30, 2023). In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished  to reflect such losses and any required transfer to the GRS Pension Reserve Account.

Actual restoration payments and credits will work as follows: Each year in conjunction with preparation of the annual actuarial valuation report and following establishment of the Restoration Reserve Account, the GRS actuary will determine whether there are sufficient funds in such account to restore a portion of the 4.5% across the board pension cuts in one or more minimum incremental portions amounts equal to ½% of the monthly benefit for each member of GRS Waterfall Class 1 (i.e. reducing the initial across the board cut to 4.0%).  This restoration only occurs if the funded funding level in the Restoration Reserve Account can fund 100% of each incremental increase over the remaining actuarially projected actuarially projected lives of the eligible recipients in GRS Waterfall Class 1.  If the Restoration Reserve Account satisfies the required funding level, then in the next GRS fiscal year, actual restoration payments will be made to GRS Waterfall Class 1 members in amounts equal to the benefit associated with each increments that have been fully funded in the Restoration Reserve Account.  Once Waterfall Class 1 has sufficient assets in the GRS Restoration Reserve Account to fully fund and restore the 4.5% cut in their monthly benefits, and to the extent that additional assets in the Restoration Reserve Account remain and will fully fund at least ½% of the monthly benefit for each member of GRS Waterfall Class 2 over their remaining actuarially projected lives, then GRS Waterfall Class 2 members will receive pension restoration in minimum ½% benefit increments until an amount equal to the 4.5% cuts in their monthly benefits has been fully funded.  At that juncture, and to the extent that additional assets in the Restoration Reserve Account remain and will fund at least a minimum ½% of the monthly benefit of each member in GRS Waterfall Class 3 over their remaining actuarially projected lives, then each such member of the class shall receive a credit granting them a right upon

retirement to receive pension restoration equal to the benefit increments that are fully funded.  Restoration payments will be calculated and paid on a prospective basis only.

After the full 4.5% across the board pension cuts are restored for all three GRS Waterfall Classes, and to the extent there are additional assets in the Restoration Reserve Account to fully fund COLA benefits over the actuarially-projected lives of the eligible recipient GRS Waterfall Class, such assets will be used to fully fund and restore a portion of the COLA values that were eliminated as part of the POA Plan of Adjustment.  COLA will be restored in minimum 10% COLA value increments up to 50% of the future COLA values for each member of GRS Waterfall Class 1 (i.e., a 50% future COLA value will constitute a 1.25% simple COLA), then up to 50% of the future COLA values for each member of Waterfall Class 2, and then up to 50% of the future COLA values for each member of Waterfall Class 3 until all members of the three GRS Waterfall Classes have had 50% of the value of their COLAs fully funded and restored.  After 50% of the future values of COLA have been fully funded and restored, and to the extent there are additional assets in the Restoration Reserve Account for each of the three GRS Waterfall Classes, then a second 50% COLA restoration will be made, first to members of GRS Waterfall Class 1, then Waterfall Class 2, and then Waterfall Class 3.  Classes will be restored in minimum 10% COLA value increments.   Restoration payments will be calculated and paid on a prospective basis only.

If the amounts in the Restoration Reserve Account are sufficient to fully-fund the 4.5% across the board pension cuts for all three GRS Waterfall Classes and 100% COLA restoration for all three GRS Waterfall Classes, then any additional assets in the Restoration Reserve Account shall be used to increase the frozen accrued benefits of active and other GRS participants whose ASF accounts were diminished as part of the ASF Recoupment, such that they receive treatment equal to the 20% /20 CAP % ceiling applied to retirees in pay status under the Plan of Adjustment.  If after such pension restoration there are additional assets in the Restoration Reserve Account to fully fund benefit increments over their remaining actuarially projected lives, GRS Waterfall Class 1 members will receive pension restoration in ½% benefit increments of the reductions to their monthly pension due to ASF Recoupment, and once such pension benefits are restored, Waterfall Class 2 members will receive pension restoration in ½% benefit increments in connection with the reductions to their monthly pensions due to ASF Recoupment.  Restoration payments will be calculated and paid on a prospective basis only.

Once restoration payments to applicable retirees and restoration credits to active employees begin, as long as the Restoration Reserve Account continues to have assets sufficient to fund 100% of an incremental pension restoration amount for such GRS Waterfall Class members for their actuarially projected

lives, such restoration payments and credits will continue; provided, however, that in the event the Restoration Reserve Account , after having sufficient assets to fund 100% of two or more increments (over their actuarially projected lives), falls below 100% for the second or greater increment, the annual amounts to pay such second or other additional increment can continue until the Restoration Reserve Account lacks any assets to fund it.  For example, assume a ½%  increment in GRS Waterfall Class 1 requires $10 million in assets to be fully funded for the GRS Waterfall Class' actuarially projected lives, and that based on FY 2018 results the Restoration Reserve Account has assets of $22 million so as to fund two increments of restoration in FY 2019, i.e., a 1% pension increase.  Assume further that in the following year the Restoration Reserve Account drops in value to $17 million; in such event two increments could still be paid, and the second increment of ½% would cease being paid only if the value of assets in the Restoration Reserve Account dropped to or below $10 million (in the event they dropped below $10 million, the first increment also would cease being paid).  For purposes of restoration reduction, restoration increments will be taken away in reverse order in which they were granted (i.e. last in, first out).

In the event the GRS Funded Level (not including Restoration Reserve Assets) falls below the 71% (hereinafter, "Restoration Reserve Suspension Trigger"), then, until such time as the projected GRS Funded Level in 2023 is 71% or above, further interest credits to the notional Restoration Reserve Account will cease notwithstanding the actual net GRS investment returns for the fiscal year in question.  Furthermore, if the GRS fFunded lLevel  projected to 2023 falls below the Projected Funded Level (Funding Target  (i.e., 70%) then restoration payments and credits in the following year will be modified in the following manner:.  (1) funds previously credited  to the Restoration Reserve Account will be notionally transferred and credited to the GRS Pension  Reserve Account in sufficient amounts to restore the projected GRS funding Funded Level  in 2023 to 70%;  (2) if following such transfer, the remaining assets in the Restoration Reserve Account Assets (if any) are sufficient to fully fund one or more pension restoration increments  (e.g., a ½% monthly pension benefit) to one or more GRS Waterfall Class categories, then as to such increments the  shall be applied to make restoration payments shall continue in accordance with and pursuant to the same mechanism described in the previous paragraph.

In connection with preparation of the actuarial report for FY 2028, the GRS actuary will determine whether GRS has satisfied the Permanent Restoration Target of 75%.  Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If the GRS Funded Level as of June 30, 2028 is equal to or greater than the Permanent Restoration Target of 75%, then the amounts in the Restoration Reserve Account that fully fund incremental pension restoration payments for a GRS Waterfall Class shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve

~~Account and the applicable incremental~~ ~~COLA payments shall be permanently restored and shall no longer be variable.~~

Following receipt of the actuarial reports for 2019, and in the event that the projected Funded Level of GRS as of 2023 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years. It shall recalculate each such prior year's Funded Level projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2023, or (ii) an amount of annual administrative expenses until 2023 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return. If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2023 GRS Funded Level to 71%.

3. <u>General GRS Pension Restoration from July 1, 2023 to June 30, 2033</u>.

During this period, the ~~Projected Funded Level will be [82%]~~Funding Target, the Restoration Target ~~shall be [85%]~~, the Permanent Restoration Targets and the Restoration Reserve Suspension Trigger shall be ~~[83%]~~as set forth on Exhibit A hereto. The same rules for variable restoration payments and credits that applied during the period ending June 30, 2023 shall apply during the period ending June 30, 2033 (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger, and making Restoration Account asset transfers in the event the 2033 GRS Funded Level falls below the 2033 Funding Target), except as follows. For purposes of determining whether the 2033 Restoration Target has been satisfied, the Plan actuary shall project investment returns through June 30, 2033 at the then current investment return assumption and the applicable actuarial assumptions as utilized in the annual actuarial valuation. Further, the GRS Plan actuary shall assume, merely for purposes of ~~satisfying~~determining whether the Restoration Target is satisfied, that the annual City contribution amount shall be the annual amount ~~of contributions~~ necessary to fund the GRS based upon an amortization of the actual 2023 UAAL at market value ~~(with interest on the outstanding principal at the then investment return rate)~~over 30 years (hereinafter, the "2023 UAAL Amortization")~~.~~ and in such manner that the resulting annual contribution stream would achieve the GRS Funding Target (on Exhibit A) as of 2033. (Such projected, hypothetical contributions shall be for purposes only of making restoration determinations, and shall not necessarily be the actual contributions

made or required to be made by the City or recommended during such period; all of which shall be determined independent of the restoration calculation process.). For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded.

To the extent that the City's actual contributions to the GRS in any of the FYs 2024 (the year ending June 30, 2024) through 2033 are greater than the projected annual contribution under the 2023 UAAL Amortization, such amounts, and any investment earnings thereon, shall be notionally credited to a new bookkeeping account in GRS called the Extra Contribution Account. In determining pension restoration during the period from FY ~~2023~~2024 through 2033, none of the amounts in the Extra Contribution Account shall be considered for purposes of determining the projected ~~F~~funded ~~L~~level for the Restoration ~~Trigger~~Target or Permanent Restoration Targets. To the extent that the City's actual contributions in any of the FYs 2024 through 2033 are less than the projected annual contribution under the 2023 UAAL Amortization, such difference and any investment earnings thereon shall be notionally allocated to the ~~Restoration~~Pension Fund Reserve Account. ~~.~~

Each year, in addition to the credit of assets ~~above~~that exceed the amount necessary to satisfy the Restoration Target, ~~additional~~existing Restoration Account assets will be credited ~~to the Restoration Reserve Account,~~with interest equal to the net return on plan investments, but capped at the then investment return assumption. In the event of net losses, the credited asset value of the Restoration Reserve Account will be diminished to reflect such losses.

In connection with preparation of the actuarial report for FY 2028, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target, which shall be 75%. Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target. If following such transfers the GRS Funded Level as of June 30, 2028 has satisfied the Permanent Restoration Target(75%), then the amounts in the Restoration Reserve Account , if any (which will necessarily represent excess not necessary to satisfy the Permanent Restoration Target), and which fully fund one or more increments of restoration payments for one or more GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension Reserve Account and the applicable incremental payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year. Variable restoration payments will continue to be paid or credited during the period from July 1, 2028 through June 30, 2033 based on the applicable Restoration Target set forth in Exhibit A and otherwise in accordance with this restoration memorandum, notwithstanding whether the

Restoration Target during this period is less than the Permanent Restoration Target as of June 30, 2028 of 75%.

In connection with preparation of the annual actuarial valuation report for FY 2033, the GRS actuary will determine whether GRS has satisfied the Permanent Restoration Target ~~([83%])~~for 2033, as set forth on Exhibit A.  Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target .  If following such transfers the ~~funding~~GRS Funded ~~l~~Level  as of June 30, 2033 ~~is equal to or greater than the~~has satisfied the applicable Permanent Restoration Target ~~funded~~, then the amounts in the Restoration Reserve Account ~~that~~if any (which will necessarily represent  excess not necessary to satisfy the Permanent Restoration Target), and which  fully fund ~~at minimum~~ one or more incrementa~~ls~~l ~~pension~~of restoration payments for ~~a~~one or more  GRS Waterfall Classes over such GRS Waterfall Class members' actuarially projected lives, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension  Reserve Account and the applicable incremental ~~COLA~~ payments shall be permanently restored for the applicable GRS Waterfall Class and shall no longer be variable from year to year.

Following receipt of the actuarial reports for  2028,  and in the event that the projected Funded Level of GRS as of 2033 is less than 71%, the GRS actuary shall revisit the restoration calculations that it made during each of the prior 4 years.  It shall recalculate each such prior year's Funded Level  projection, this time by assuming the lesser of (i) $4.5 million in annual administrative expenses until 2033, or (ii) an amount of annual administrative expenses until 2033 equal to the average annual administrative expenses in the prior 4 years, in addition to a net 6.75% annual investment return.  If such retrospective recalculation indicates that fewer amounts would have transferred to the GRS Restoration Reserve Account than actually were transferred during such look back period, then the GRS Restoration Reserve Account shall be debited by the lesser of (i) this difference (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period or (ii) the dollars that were actually paid out in restoration payments during such look-back period (plus interest at a rate equal to the rate that was credited to the Restoration Reserve Account during the look-back period); or (iii) the amount required to increase the projected 2033 GRS Funded Level to 71%.

4.  General GRS Pension Restoration from July 1, 2033 to June 30, 2043.

During this period,  the ~~Projected Funded Level will be [90%]~~Funding Target, the Restoration Target ~~shall be [93%]~~, the Permanent Restoration Target and the Restoration Reserve Suspension Trigger shall be ~~[91%]~~as set forth on Exhibit A hereto.  The same rules for restoration that applied during the period ending

June 30, 2033 shall otherwise apply. (including ceasing interest credits in the event of a Restoration Reserve Suspension Trigger,  and making Restoration Account asset transfers in the event the 2043 GRS Funded Level falls below the 2043 Funding Target). For example, for purposes of determining whether the 2043 Restoration Target has been satisfied, the Plan actuary shall project annual contributions  using the same 2023 UAAL Amortization. For purposes of calculating the funded ratio, the assets in the Restoration Reserve account will be excluded, and no Extra Contribution Account assets shall be included for purposes of determining  whether the Funded Level meets the Restoration Target or Permanent Restoration Target, including any additions to such account after 2033.

In connection with preparation of the annual actuarial valuation report for FY 2043, the GRS actuary will determine whether GRS has satisfied the applicable Permanent Restoration Target [91%], as set forth on Exhibit A.  Transfers from the Restoration Reserve Account for credit to the GRS Pension Reserve Account may be made in such amounts as are necessary to satisfy the Permanent Restoration Target.  If following such transfers the fundingGRS Funded lLevel as of June 30, 2043 is s equal to or greater than the applicable Permanent Restoration Target , then the amounts in the Restoration Reserve Account thatif any (which will necessarily represent  excess not  necessary to satisfy the Permanent Restoration Target), and which  fully fund at minimumover their actuarially projected lives one or more incrementals pensionof restoration payments for aone or more  GRS Waterfall Classes, shall be transferred from the Restoration Reserve Account and credited to the GRS Pension  Reserve Account and the applicable incremental COLA payments for the applicable GRS Waterfall Class shall be permanently restored and shall no longer be variable.


5.   Modification of the Pension Restoration Program

If any time after July 1, 2026, the GRS Investment Committee (by vote of 5 of its 7 members), or the GRS Board of Trustees (by a greater than 66% vote)  determines  that a change in relevant circumstances has occurred, or there was a mutual mistake of fact in developing this Pension Restoration Agreement, such that the continued operation of this Agreement without amendment will: (a)  materially harm the long-term economic interests of the City or Retirement System; or (b) materially impair the City's ability to fully fund over a reasonable period the then existing frozen benefit liabilities, the Investment Committee or the Board, as the case may be, shall provide written notice to the other entity of such a determination and of the need to amend this Restoration Agreement (it being understood that the post-Chapter 9, 40-year amortization period (to 2053) to full fund GRS frozen liabilities is presumptively reasonable, but not irrebutably so).  The Investment Committee and the Board shall then meet to negotiate amendments to this Agreement that address the identified risk of

harm or impairment, but which also considers this Agreement's objective of providing pension restoration. Such negotiations shall take into account reasonable actions the City has pursued or could pursue to mitigate such harm or impairment. Any such amendments shall require the approval of a majority vote of the combined members of the Committee and Board (persons who sit on both the Board and Committee shall have one vote). Such parties shall consult with the Mayor, City Council and the Governor in connection with such negotiation. If the Board, acting through a majority, and the Investment Committee, acting through a majority, cannot agree to such amendments with the 90-day period following the provision of such notice by the determining party, then the Board and Investment Committee shall proceed to mediation. In this regard, within 30-days following expiration of the 90-day period the Board and the Investment Committee shall each select a mediator from the list of approved mediators for the United States District Court for the Eastern District of Michigan. The two selected mediators shall appoint a third neutral mediator from the approved list. Each party shall furnish a written statement to the mediators within 30 days of selection of the neutral mediator. Representatives of the Mayor and the Governor shall participate in such mediations. If following a 90-day mediation period following submission of the written statements the matter is not settled, then either the Investment Committee or the Board can file an action in the United Stated District Court for the Eastern District of Michigan asking it to declare, *inter alia*, whether or in what manner to amend this Agreement.

## EXHIBIT A

**GRS -** The 2033 and 2043 Funding Targets shall be equal to the actual 2023 Funded Level rounded to the nearest 10th decimal. The Restoration Target shall be 3.0% higher than the Funding Target but not less than 73%. The Permanent Restoration Targets shall be 75% in 2028, and 1% higher than the Restoration Targets in 2033 and 2024, but not less than 75%. The Restoration Reserve Suspension Trigger will be set 1% higher than the projected Funding Target for all time periods.

| 2023 Funded Level | 2033 Funding Target/Restoration Target | 2043 Funding Target/Restoration Target |
|---|---|---|
| 75% | 75%/78% | 75%/78% |
| 74% | 74%/77% | 74%/77% |
| 73% | 73%/76% | 73%/76% |
| 72% | 72%/75% | 72%/75% |
| 71% | 71%/74% | 71%/74% |
| 70% | 70%/73% | 70%/73% |
| 69% or lower | the % = to 2023 Funded Level %/73% | the % = to 2023 Funded Level %/73% |

| 2033 Permanent Restoration Target | 2043 Permanent Restoration Target |
|---|---|
| 75% ,or if greater, 1% more  than 2033 Restoration Target | 75%, or if greater, 1% more than 2043 Restoration Target |

CLI-2209218 2248166v1 9

CLI-~~2209218~~2248166v1 ~~10~~

**EXHIBIT II.D.6**

EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED

# Exhibit II.D.6

Executory Contracts and Unexpired Leases to be Rejected

In re City of Detroit, Michigan, Case No. 13-53846 (Bankr. E.D. Mich)

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| 151 W FORT ST ASSOCIATES LLC | 1075036 | 2635434 | | INFORMATION TECHNOLOGY SERVICES |
| 1600 ASSOCIATES LLC | 20396 | 2501191 | | MUNICIPAL PARKING DEPARTMENT |
| 3M CONTRACTING INC | 1107578 | 2809948 | | HUMAN SERVICES DEPARTMENT |
| 455 ASSOCIATES LLC | 19602 | 2600416 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| 455 ASSOCIATES LLC | 19602 | 2722656 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2604895 | | INFORMATION TECHNOLOGY SERVICES |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2809305 | | LAW DEPARTMENT |
| 660 WOODWARD ASSOCIATES LLC | 1117401 | 2866561 | | LAW DEPARTMENT |
| A & H CONTRACTORS | 1090249 | 2797590 | ICE RINK IMPROVEMENTS | RECREATION DEPARTMENT |
| A NEW BEGINNING II INC | 1010270 | 2626822 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| AARON L FORD | 1101801 | 2759870 | | HEALTH DEPARTMENT |
| ABAYOMI CDC | 1055088 | 2597193 | | FINANCE DEPARTMENT |
| ABBOT NICHOLSON | 1064317 | 2605132 | LEGAL SERVICES | LAW DEPARTMENT |
| ABRAMS AERIAL SURVEY CORPORATION | 21686 | 2511868 | CS 1253 SURVEY, PHOTOGRAPHY | WATER DEPARTMENT |
| ACCENTURE LLP | 19843 | 2582670 | | HUMAN SERVICES DEPARTMENT |
| ACHIEVEMENT RESOURCES LLC | 1075198 | 2640120 | | DEPARTMENT OF PUBLIC WORKS |
| ADAMS HOME REPAIR SERVICE INC | 1031652 | 2532093 | HOME REPAIR FOR LOW INCOME CITIZENS. | HUMAN SERVICES DEPARTMENT |
| ADULT WELL BEING SERVICES | 17259 | 2507595 | ADULT WELL BEING SERVICES | HEALTH DEPARTMENT |
| ADULT WELL BEING SERVICES | 17259 | 2501821 | EZ-PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| ADVANCED ENGINEERING SOLUTION INC | 1043861 | 2613331 | | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| AFFILIATED INTERNISTS CORPORATION | 1007088 | 2541129 | PROVIDE MEDICAL STAFF | HEALTH DEPARTMENT |
| AFL CIO COUNCIL | 9713 | 2505335 | | FINANCE DEPARTMENT |
| AFL CIO COUNCIL | 9713 | 2504234 | AFL/CIO COUNCIL-METRO COUNCIL | FINANCE DEPARTMENT |
| AGAR LAWN SPRINKLER SYSTEMS INC | 1019225 | 2871984 | FURNISH UNDERGROUND SPRINKLER MAINT. | GENERAL SERVICES DEPARTMENT |
| AIRGAS GREAT LAKES | - | 2754331 | PURCHASE ORDER FOR COMMERCIAL GASES | GENERAL SERVICES DEPARTMENT |
| AKT PEERLESS ENVIRONMENTAL SERVICES LLC | 1025663 | 2845810 | DEMOLITION OF PROPERTIES | BUILDINGS AND SAFETY DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2554416 | CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2572989 | | HEALTH DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2511247 | AUDITING SERVICES FY 98/99 FICS 78653 | HUMAN SERVICES DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2501399 | PROFESSIONAL SERVICES | FINANCE DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2507833 | AUDITING - ALAN C YOUNG | HEALTH DEPARTMENT |
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2515896 | AUDIT DRUG TREATMENT/AIDS PROGRAMS | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ALAN C YOUNG ASSOCIATES PC | 20513 | 2780084 | | HEALTH DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2588741 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2533139 | YOUTH PROGRAM | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2619692 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2804801 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2775178 | | HUMAN SERVICES DEPARTMENT |
| ALKEBU LAN VILLAGE | 1043877 | 2772580 | PROFESSIONAL SERVICES CONTRACT | RECREATION DEPARTMENT |
| ALLEN & ASSOCIATES APPRAISAL GROUP INC | 20517 | 2502141 | PROFESSIONAL SERVICES: CASINO APPRAISAL | LAW DEPARTMENT |
| ALLIANCE FOR A SAFER GREATER DETROIT | 1102712 | 2767089 | | POLICE DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625782 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625784 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA ELECTRIC INC | 1026028 | 2625780 | | PUBLIC LIGHTING DEPARTMENT |
| ALPHA KAPPA ALPHA FOUNDATION OF DETROIT | 19649 | 2592410 | | FINANCE DEPARTMENT |
| ALTERNATIVE FOR GIRLS | 16279 | 2503526 | TRANSITIONAL HOUSING | FINANCE DEPARTMENT |
| AMERICAN INDIAN HEALTH & FAMILY | 18997 | 2500866 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| AMERICAN TOWER ATC TOWER SERVICES INC | 1112343 | 2840423 | | WATER DEPARTMENT |
| AMERITECH | 20497 | 2506112 | | PUBLIC LIGHTING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501028 | PARKING SERVICES | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501362 | KENNEDY SQUARE PARKING SERVICES | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501356 | PARKING SERVICE FOR KENNEDY SQUARE | MUNICIPAL PARKING DEPARTMENT |
| AMPCO SYSTEM PARKING | 18489 | 2501789 | PARKING LOT MANAGEMENT | FINANCE DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2524825 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2525177 | LIHEAP | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2544432 | HOME WEATHERIZATION | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2607320 | | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2789077 | | HUMAN SERVICES DEPARTMENT |
| AMPRO CONSTRUCTION LLC | 1026137 | 2761179 | | HUMAN SERVICES DEPARTMENT |
| ANACAPA SCIENCE INC | 1012433 | 2507585 | | POLICE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2530372 | LEGAL SERVICES: DAVIS/WILLIAMS V CITY | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2634325 | | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2538079 | LEGAL SERVICES: TOMMIE THOMAS V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2561944 | LEGAL SERVICES: MICHELLE HARPER, ET AL | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2561936 | LEGAL SERVICES | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2501547 | LEGAL SERVICES: RYAN MULLINS V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2545467 | LEGAL SERVICES: BOSWELL V JORDAN/CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ANDREW J BEAN | 1003634 | 2505202 | LEGAL SERVICES | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2512646 | LEGAL SERVICES | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505710 | LEGAL SERVICES:  KEITH THORNTON V CITY | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2576673 | | LAW DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2505715 | LEGAL SERVICES | FINANCE DEPARTMENT |
| ANDREW J BEAN | 1003634 | 2574494 | | LAW DEPARTMENT |
| ANTHONY ALSTON | 1118989 | 2877720 | | WATER DEPARTMENT |
| ANTHONY WACHOCKI | 1116298 | 2859746 | | WATER DEPARTMENT |
| AON RISK SERVICES INC OF MICHIGAN | 17959 | 2506866 | AUDIT | AUDITOR GENERAL |
| APCOA INC | 18982 | 2504151 | COBO COMPLEX PARKINGMANAGEMENT SERVICES | MUNICIPAL PARKING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2546963 | PARTNERSHIP FOR ADULT LEARNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2563067 | WORK FIRST & WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2778448 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2797753 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2806229 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2775339 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2714444 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB AMERICAN & CHALDEAN COUNCIL | 19955 | 2717186 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2549478 | ENGLISH AS A SECOND LANGUAGE | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2519169 | JOB SEARCH AND TRAINING (WORK FIRST) | EMPLOYMENT AND TRAINING DEPARTMENT |
| ARAB COMMUNITY CENTER | 20424 | 2740257 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2778446 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2797751 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2800934 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARAB COMMUNITY CENTER FOR ECONOMIC SOCIAL SERVICES (ACCESS) | 1070466 | 2778768 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ARTHUR F SMITH ARCHITECTS | 19092 | 2500783 | CAMP MASTERPLAN | NO DEPARTMENT INDICATED |
| ASHPAUGH & SCULCO CPA PLC | 1026075 | 2506711 | RATE CONSULTANT | NON-DEPARTMENTAL |
| AVANCE COMMUNICATIONS INC | 1017277 | 2589125 | | DEPARTMENT OF TRANSPORTATION |
| AVANCE COMMUNICATIONS INC | 1017277 | 2544753 | COMMUNICATIONS | HUMAN SERVICES DEPARTMENT |
| B & B POOLS AND SPAS | 8897 | 2680662 | | RECREATION DEPARTMENT |
| B E I ASSOCIATES INC | 1002153 | 2500794 | PROFESSIONAL ENGINEERING SERVICES | DEPARTMENT OF PUBLIC WORKS |
| BABBIE DEVELOPERS | 1100891 | 2753822 | ROOF REPLACEMENT FORT WAYNE-QUARTERMASTER WAREHOUSE | RECREATION DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| BAPCO-SUBSTANCE ABUSE | 15997 | 2501510 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| BARNEY MCCOSKY BASEBALL LEAGUE | 17329 | 2540757 | 36-NTV-NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| BARTECH GROUP | 19194 | 2578539 | | FINANCE DEPARTMENT |
| BARTHEL CONTRACTING | 6174 | 2506716 | PAVEMENT RESURFACING, GROUP 95-3 | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2508554 | WIDENING & RESURFACING | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2508474 | PAVEMENT RESURFACING, GROUP 96-5 | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2630995 | | DEPARTMENT OF PUBLIC WORKS |
| BARTHEL CONTRACTING | 6174 | 2658806 | | DEPARTMENT OF PUBLIC WORKS |
| BDN INDUSTRIAL HYGIENE CONSULTANT | 19807 | 2502471 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| BDO SEIDMAN LLP | 1073285 | 2659484 | | LAW DEPARTMENT |
| BEACON ENERGY LLC | 1088904 | 2699766 | | SEWERAGE DEPARTMENT |
| BEACON ENERGY LLC | 1088904 | 2763942 | PROVIDE CONSULTING SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BEAL INC | 1104822 | 2786319 | | RECREATION DEPARTMENT |
| BEI ASSOCIATES INC | 19420 | 2586915 | | DEPARTMENT OF PUBLIC WORKS |
| BEI ASSOCIATES INC | 19420 | 2576869 | | PUBLIC LIGHTING DEPARTMENT |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2515001 | LEGAL SERVICES | FINANCE DEPARTMENT |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2502106 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| BELLANCA BEATTIE & DELISLE PC | 1002283 | 2618387 | LEGAL SERVICES | LAW DEPARTMENT |
| BELMARC INC | 1012648 | 2505560 | PROFESSIONAL SERVICES | LAW DEPARTMENT |
| BERG MUIRHEAD AND ASSOCIATES | 1051572 | 2758875 | | MAYOR'S OFFICE |
| ~~BEST AMERICAN INDUSTRIAL~~ | ~~17038~~ | ~~2500949~~ | ~~PC 728 SKILLED TRADES ASSISTANCE~~ | ~~WATER DEPARTMENT~~ |
| ~~BEST AMERICAN INDUSTRIAL~~ | ~~17038~~ | ~~2501707~~ | ~~PC 716B SKILLED TRADES ASSISTANCE~~ | ~~SEWERAGE DEPARTMENT~~ |
| BEST AMERICAN INDUSTRIAL | 17038 | 2501442 | SKILLED TRADES | NO DEPARTMENT INDICATED |
| BETTS MEDICAL GROUP LLC | 1030943 | 2531569 | PHYSICIAN SERVICES | HEALTH DEPARTMENT |
| BLACK & VEATCH | 20115 | 2501009 | PROFESSIONAL SERVICES | NO DEPARTMENT INDICATED |
| ~~BLACK & VEATCH~~ | ~~20115~~ | ~~2502233~~ | ~~PROFESSIONAL SERVICES~~ | ~~WATER DEPARTMENT~~ |
| ~~BLACK & VEATCH~~ | ~~20115~~ | ~~2513459~~ | ~~CS 1193 SPRINGWELLS WTP FILTERS REHAB~~ | ~~SEWERAGE DEPARTMENT~~ |
| BLACK CAUCUS FOUNDATION OF MICHIGAN | 18481 | 2501792 | | HEALTH DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2508726 | PROGRAM COORDINATION OF COOPER | FINANCE DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2506003 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2784374 | | HUMAN SERVICES DEPARTMENT |
| BLACK FAMILY DEVELOPMENT INC | 1012009 | 2761029 | | HUMAN SERVICES DEPARTMENT |
| BLOUNT ENGINEERS INC. | 13566 | 2500972 | PROFESSIONAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2507188 | LEGAL SERVICES | LAW DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2501800 | LEGAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2505006 | LEGAL SERVICES | LAW DEPARTMENT |
| BODMAN LONGLEY DAHLING LLP | 1000341 | 2501852 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| BONIFACE HUMAN SRVS | 19449 | 2501513 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| BOOK TOWER PROPERTIES | 17275 | 2501820 | | MUNICIPAL PARKING DEPARTMENT |
| BOOKER T WASHINGTON | 17389 | 2517857 | PUBLIC FACILITY REHABILITATION | FINANCE DEPARTMENT |
| BOOMER CO | 19949 | 2784930 | CITY OF DETROIT CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| BOOTH RESEARCH GROUP INC | 1058277 | 2585080 | | POLICE DEPARTMENT |
| BOOTH RESEARCH GROUP INC | 1058277 | 2759498 | DPD PROMOTIONAL EXAMINATION | POLICE DEPARTMENT |
| BRACEFUL & ASOCIATES PC | 1002357 | 2508823 | LEGAL SERVICES | FINANCE DEPARTMENT |
| BRACEFUL & ASOCIATES PC | 1002357 | 2507332 | LEGAL SERVICES:  TROMEUR V CITY | LAW DEPARTMENT |
| BRADY HATHAWAY PC | 20356 | 2505092 | LEGAL SERVICES:  VINES/CHILDS V CITY | LAW DEPARTMENT |
| BRIGHTMOOR COMMUNITY CENTER | 18407 | 2501479 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| C & H BUILDERS | 1025257 | 2544437 | HOME WEATHERIZATION | FINANCE DEPARTMENT |
| C & H BUILDERS | 1025257 | 2524574 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| C & H BUILDERS | 1025257 | 2543531 | LIHEAP-HOME WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| C & H BUILDERS | 1025257 | 2793400 | | HUMAN SERVICES DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2799257 | CPATTON PARK IMPROVEMENT | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2799260 | BELLE ISLE - TENNIS COURT RENOVATIONS | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2789963 | LITTLEFIELD PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| CAASTI CONTRACTING SERVICES INC | 1066086 | 2798602 | WINGLE PLAYLOT IMPROVEMENTS | RECREATION DEPARTMENT |
| CADILLAC TOWER MI LLC | 1117104 | 2810553 | | BUDGET DEPARTMENT |
| CAMP DRESSER & MCKEE | 23444 | 2502287 | | SEWERAGE DEPARTMENT |
| CAMP DRESSER & MCKEE | 23444 | 2500893 | CS-1285 COMBINED SEWER | SEWERAGE DEPARTMENT |
| CAMP DRESSER & MCKEE | 23444 | 2638915 | | WATER DEPARTMENT |
| CAPITAL ACCESS INC | 1033428 | 2536054 | CONSULTING AGREEMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| CAPITAL COMPUTER SOLUTIONS | 16316 | 2507466 | IMAGING SYSTEM  (FICS #76497) | HEALTH DEPARTMENT |
| CAPITAL COMPUTER SOLUTIONS | 16316 | 2760099 | | HEALTH DEPARTMENT |
| CARE GIVERS | 19339 | 2510116 | HOMELESSNESS PREVENTION | FINANCE DEPARTMENT |
| CAREERWORKS INC | 10310 | 2501469 | SUMMER PROGRAM | NO DEPARTMENT INDICATED |
| CAREERWORKS INC | 10310 | 2518192 | WORK FIRST JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2526127 | YOUTH SERVICES PROGRAM PY2000 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2539830 | FOOD STAMP - 10/01/00 - 9/30/01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2560643 | FOOD STAMP 2001-2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2553148 | WIA SUMMER COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2530117 | WIA SUMMER - MICROSOFT PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2536669 | WIA-ELECTRONICS & TELECOMMUNICATIONS | EMPLOYMENT AND TRAINING DEPARTMENT |
| CAREERWORKS INC | 10310 | 2740262 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CARNEGIE MORGAN PARTNERS | 18655 | 2600434 | | FINANCE DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2539246 | PUBLIC SERVICE FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2521565 | FOOD PROGRAM, EASTSIDE AND WESTSIDE | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2570923 | | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY SOCIAL SERVICES INC | 1057639 | 2775168 | | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY UNITED | 18514 | 2559508 | CASE MANAGEMENT AND COUNSELING | DEPARTMENT OF PUBLIC WORKS |
| CASS COMMUNITY UNITED | 18514 | 2515503 | WARMING CENTER FOR HOMELESS | HUMAN SERVICES DEPARTMENT |
| CASS COMMUNITY UNITED METHODIST | 7182 | 2588909 | | HUMAN SERVICES DEPARTMENT |
| CASS CORRIDOR NEIGHBORHOOD DEVELOPMENT CORP | 20452 | 2506844 | PRE-DEVELOPMENT ACTIVITIES | FINANCE DEPARTMENT |
| CATHOLIC SOCIAL SERVICES | 3536 | 2501515 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| CATHOLIC YOUTH ORGANIZATION | 1961 | 2501808 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| CC JOHNSON MALHOTRA PC | 16151 | 2500984 | DISINFECTION FACILITIES DWSD CS-1150 | SEWERAGE DEPARTMENT |
| CDL TRAINING SCHOOL LLC | 1064701 | 2804809 | | HUMAN SERVICES DEPARTMENT |
| CDL TRAINING SCHOOL LLC | 1064701 | 2775174 | | HUMAN SERVICES DEPARTMENT |
| CEI MICHIGAN LLC | 1104760 | 2785400 | EASTERN MARKET SHED NO. 3 RENOVATIONS | RECREATION DEPARTMENT |
| CEI MICHIGAN LLC | 1104760 | 2785393 | CONSTRUCTION CONTRACT FOR EASTERN MARKET SHED NO. 3 | RECREATION DEPARTMENT |
| CENTRAL MAINTENANCE SERVICE | 9209 | 2501782 | 36/LS - MANAGEMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CENTRAL UNITY METHODIST CHURCH | 5570 | 2503083 | PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| CENTURY CEMENT CO INC | 1393 | 2520066 | REPAIR OF DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| CENTURY CEMENT CO INC | 1393 | 2541213 | REPAIR OF DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| CHARFOOS & CHRISTENSEN | 19681 | 2599095 | LEGAL SERVICES | LAW DEPARTMENT |
| CHARLES MERZ | 19485 | 2501931 | BELLE ISLE PICNIC SHELTER | NO DEPARTMENT INDICATED |
| CHECKER CAB | 1002656 | 2533466 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2620877 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2775459 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 1002656 | 2803649 | | HUMAN SERVICES DEPARTMENT |
| CHECKER CAB | 6574 | 2743785 | | HUMAN SERVICES DEPARTMENT |
| CHILD CARE COORDINATING COUNCIL OF DETROIT | 18279 | 2751505 | | HUMAN SERVICES DEPARTMENT |
| CHILD CARE COORDINATING COUNCIL OF DETROIT | 18279 | 2774001 | | HUMAN SERVICES DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2516007 | EMPOWERMENT ZONE- PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2500872 | | NO DEPARTMENT INDICATED |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2554216 | EMPOWERMENT ZONE- PUBLIC SERVICES | FINANCE DEPARTMENT |
| CHILDREN & YOUTH INITIATIVE OF DETROIT | 18304 | 2532118 | EMPOWERMENT ZONE - PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CHILDRENS AID SOCIETY | 1002607 | 2618760 | | POLICE DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2620357 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2563913 | | FINANCE DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2740222 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1002607 | 2775157 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2614565 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2778775 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2778778 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS AID SOCIETY | 1049240 | 2800817 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2501646 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2535133 | HEAD START MENTAL CONSULTANT SERVICES | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2516136 | MENTAL HEALTH CONSULTANT SERVICES | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2569653 | | HUMAN SERVICES DEPARTMENT |
| CHILDRENS CENTER OF WAYNE COUNTY | 12390 | 2501812 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| CHRISTIAN GUIDANCE CENTER | 18739 | 2501814 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| CITY CONNECT DETROIT | 1082718 | 2796700 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ~~CITY OF WALLED LAKE~~ | ~~1022740~~ | ~~2520346~~ | ~~EXTENSION WATER MAIN~~ | ~~WATER DEPARTMENT~~ |
| CLARK & ASSOCIATES  PC | 1008458 | 2543328 | ADDICTION TREATMENT | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2539765 | TRAINING WORK FIRST PROGRAM | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2539650 | YOUTH DEPARTMENT SAFETY PROGRAM | HEALTH DEPARTMENT |
| CLARK & ASSOCIATES  PC | 1008458 | 2675311 | | HUMAN SERVICES DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2625022 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2504251 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518285 | CLARK MASTER - SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2588764 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2536507 | CLARK - MEDICAID | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2670290 | | HUMAN SERVICES DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2689636 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2534097 | SUBSTANCE ABUSE MASTER AGREEMENT | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2559955 | CLARK- MEDICAID | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518292 | CLARK MEDICAID-MASTER | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2518483 | CLARK - DRUG EDUCATION | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2506642 | EDUCATE FYE 6/30/99 CLARK/POLICE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2501252 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2557597 | CLARK MASTER - SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2625016 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2527241 | YOUTH DEPT. SAFETY ASSESSMENT PROG. | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2618554 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| CLARK ASSOCIATES INC | 15176 | 2502443 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2618552 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2700218 | | RECREATION DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2515854 | CLARK - CCA- FYE 6/30/00 SPO2515857 | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2797389 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2750134 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2747666 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779369 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2756507 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2805210 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2875766 | S.A.F.E.T.Y. PROGRAM | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2776664 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2779355 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2755767 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2801963 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2803778 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2786574 | | HEALTH DEPARTMENT |
| CLARK ASSOCIATES INC | 15176 | 2759243 | | HEALTH DEPARTMENT |
| CLARK HILL | 7778 | 2501937 | LEGAL SERVICES | LAW DEPARTMENT |
| CLARK HILL | 7778 | 2543385 | LEGAL SERVICES | LAW DEPARTMENT |
| CLARK HILL | 7778 | 2875313 | | WATER DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2679759 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2636522 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2713626 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2714063 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2715398 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2731184 | PARK & PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2709777 | | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2756725 | PARK & PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLARKS CONSTRUCTION | 1016952 | 2789767 | LAKER PLAYGROUND IMPROVEMENTS | RECREATION DEPARTMENT |
| CLAYTON ENVIRONMENTAL | 1002564 | 2519814 | EPA PERMITS & DEREGULATIONS | PUBLIC LIGHTING DEPARTMENT |
| CMTS INC | 18181 | 2501924 | FICS 074776 INSPECTION SERVICES | DEPARTMENT OF PUBLIC WORKS |
| COHL STOKER TOSKEY & MCCLINCHEY PC | 1081162 | 2661933 | | CITY COUNCIL |
| COMMUNITY & EDUCATIONAL SERVICES INC | 1059876 | 2777992 | EMERGENCY SHELTER SERVICES | HUMAN SERVICES DEPARTMENT |
| COMMUNITY DEVELOPMENT SOLUTIONS LLC | 1057282 | 2695015 | | RECREATION DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| COMMUNITY DEVELOPMENT SOLUTIONS LLC | 1057282 | 2675021 | | RECREATION DEPARTMENT |
| COMMUNITY HEALTH AWARENESS GROUP INC | 1051231 | 2571474 | | HEALTH DEPARTMENT |
| COMMUTER TRANSPORTATION | 15328 | 2510505 | SHUTTLE SERVICE | CIVIC CENTER DEPARTMENT |
| COMPREHENSIVE DATA PROCESSING | 11248 | 2502241 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| COMPUTECH CORPORATION | 1054040 | 2574424 | | NON-DEPARTMENTAL |
| COMPUTECH CORPORATION | 1054040 | 2620775 | | NON-DEPARTMENTAL |
| COMPUWARE CORPORATION | 1003122 | 2595111 | | NON-DEPARTMENTAL |
| COMPUWARE CORPORATION | 1003122 | 2607365 | | WATER DEPARTMENT |
| CONNOLLY RODGERS & SCHARMAN PLLC | 1089154 | 2703083 | | LAW DEPARTMENT |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2514647 | ELECTRICAL DESIGN-HIGHWAYS PROJECTS | DEPARTMENT OF PUBLIC WORKS |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2508478 | ENGINEERING | WATER DEPARTMENT |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2544911 | FICS CONTRACT # 064150, ELECTRICAL DESIGN | DEPARTMENT OF PUBLIC WORKS |
| CONSULTING ENGINEERING ASSOCIATES INC | 1806 | 2544914 | FICS CONTRACT 065783, ELECTRICAL DESIGN | DEPARTMENT OF PUBLIC WORKS |
| CORPORATE ASSET MANAGEMENT INC | 1022860 | 2607935 | | DEPARTMENT OF TRANSPORTATION |
| COUNCIL OF ACTION UNITED FOR SERVICE EFFORTS | 14189 | 2608202 | | FINANCE DEPARTMENT |
| COUNCIL OF ISLAMIC ORGANIZATIONS | 20305 | 2501825 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| COURRIER & I | - | 2506952 | | LAW DEPARTMENT |
| COUZENS LANSKY FEALK ELLIS ROEDER & LAZAR | 19705 | 2534094 | LEGAL SERVICES | LAW DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2614501 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2622827 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| COVENANT HOUSE OF MICHIGAN | 1049191 | 2563788 | SUPPORTIVE HOUSING | HUMAN SERVICES DEPARTMENT |
| CREEKSIDE COMMUNITY DEVELOPMENT CORPORATION | 1024525 | 2752940 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| CSFB 1998 P1 WOODWARD OFFICE LLC | 1074168 | 2652205 | | FINANCE DEPARTMENT |
| CUMMINGS MCCLOREY DAVIS | 19999 | 2502111 | LEGAL SERVICES: JANE DOE V P.O. JOURNEY | LAW DEPARTMENT |
| CUMMINGS MCCLOREY DAVIS | 19999 | 2502154 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| CURTIS & ASSOCIATES | 18886 | 2563163 | JOB SEARCH WORK FIRST/WTW 2001 | EMPLOYMENT AND TRAINING DEPARTMENT |
| CVS | 1026222 | 2782910 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| D A CENTRAL INC | 1020403 | 2860051 | SECURITY SURVEILLANCE SYSTEM | NO DEPARTMENT INDICATED |
| D C BYERS COMPANY DETROIT | 15847 | 2502244 | FORD RD RESERVOIR REHAB | WATER DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| D P VANBLARICOM INC | 1011787 | 2517238 | ESTATE OF LARRY BELL V CITY | LAW DEPARTMENT |
| DATA COMPRESSION TECHNOLOGY INC. | 1057080 | 2584759 | | FINANCE DEPARTMENT |
| DATA CONSULTING GROUP INC | 18268 | 2507857 | PARKING TICKETS | MUNICIPAL PARKING DEPARTMENT |
| DAVID ANDERSON & CATHY STULL | 16925 | 2500749 | | LAW DEPARTMENT |
| DBAKER SOLUTIONS | 1027729 | 2526961 | CONCESSIONS CONTRACT CONSULTANT | ZOO |
| DECISION CONSULTANTS INC | 14788 | 2502051 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| DELOITTE & TOUCHE LLP | 17837 | 2527977 | COMPENSATION/CLASSIFICATION PLANNING | WATER DEPARTMENT |
| DELOITTE & TOUCHE LLP | 17837 | 2592267 | | CITY COUNCIL |
| DEMARIA BUILDING COMPANY | 19428 | 2819183 | SKILLED TRADES REPAIR AND MAINTENANCE | GENERAL SERVICES DEPARTMENT |
| DEMARIA BUILDING COMPANY | 19428 | 2706154 | BELLE ISLE CONSERVATORY RENOVATIONS | RECREATION DEPARTMENT |
| DEMARIA BUILDING COMPANY | 19428 | 2832912 | EQUIPMENT PURCHASE AND INSTALLATION | WATER DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2803629 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2743788 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA AGENCY ON AGING | 10643 | 2775457 | | HUMAN SERVICES DEPARTMENT |
| DETROIT AREA HEALTH COUNCIL INC | 1069815 | 2619988 | | RECREATION DEPARTMENT |
| DETROIT ASSOC OF WOMENS CLUBS | 14566 | 2514218 | PUBLIC FACILITY REHAB-FICS #74834 | FINANCE DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2501915 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2502124 | | NO DEPARTMENT INDICATED |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2807055 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2761547 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ASSOCIATION OF BLACK ORGANIZATIONS | 16148 | 2740241 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2503530 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2508003 | EZ-PUBLIC SERVICE | FINANCE DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2516130 | DISABILITY SUPPORT TEAM | HUMAN SERVICES DEPARTMENT |
| DETROIT BOARD OF EDUCATION | 1569 | 2501369 | CAREER PREP PLANNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500796 | WINTER HOLDING & LIGHTING | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2510115 | DPD SECURITY SYSTEM UPGRADE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500859 | HUBER BUILDING RESTORE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2513351 | | INFORMATION TECHNOLOGY SERVICES |
| DETROIT BUILDING AUTHORITY | 9266 | 2593193 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2530203 | CENTER & SITE IMPROVE | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2526905 | FIRE DETECTION, ALARM & SUPRESSION | ZOO |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT BUILDING AUTHORITY | 9266 | 2501859 | EASTERN MARKET RENOVATIONS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2545275 | SECURITY SYSTEM UPGRADE | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2503827 | CUSTOMER SERVICE CENTER | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501051 | FIRESTATION RENOVATION PROGRAM | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2636298 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2508408 | BUILDING RENOVATIONS | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500748 | PARKING IMPROVEMENTS | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2540535 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2502360 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630384 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2514346 | INFRASTRUCTURE IMPROVEMENTS | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2516282 | FIRE SUPPRESSION AND DETECTION SYSTEM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501977 | ADAMS BUTZEL CENTER | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2506561 | COLEMAN A. YOUNG & ROBERTO CLEMENTE CENTERS IMPROVEMENTS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2560470 | 2001-02 CAPITAL IMPROVEMENT PROGRAM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500743 | BIRD & TIGER RENOVATION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2691117 | | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2506912 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501579 | MCCABE FIELD HOUSE SITE IMPROVEMENTS | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501961 | MADISON CTR IMPROVEMENTS | NO DEPARTMENT INDICATED |
| DETROIT BUILDING AUTHORITY | 9266 | 2653472 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2505570 | B.I. CANAL FICS CONTRACT# 073005 | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2594879 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2517916 | | HUMAN SERVICES DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2600472 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2544837 | PUBLIC IMPROVEMENTS AT WOODWARD | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2654364 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2532375 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2505579 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2536241 | COBO CENTERS CAPITAL PROGRAM | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2619410 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2688656 | | FIRE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2505726 | MINATURE RAILROAD RENOVATION | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2531292 | ARCHITECTURAL PROGRAMMING | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2561933 | CAPITAL IMPROVEMENTS | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2517985 | | HISTORICAL |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT BUILDING AUTHORITY | 9266 | 2638245 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2500762 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2545352 | | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2706199 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2767791 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630436 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2739330 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2726923 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2719133 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630388 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2501957 | CAPITAL PROJECTS | HEALTH DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2697790 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2630408 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2626704 | | HISTORICAL |
| DETROIT BUILDING AUTHORITY | 9266 | 2675809 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2550346 | GROUND CARE PROJECT | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2675818 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2583964 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2627766 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2653471 | | ZOO |
| DETROIT BUILDING AUTHORITY | 9266 | 2710513 | | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2651003 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2697809 | | CIVIC CENTER DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2560660 | DETENTION CENTERS/POLICE HEADQUARTERS | FINANCE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2796726 | | AIRPORT DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2865303 | | DETROIT OFFICE OF HOMELAND SECURITY |
| DETROIT BUILDING AUTHORITY | 9266 | 2749361 | | PUBLIC LIGHTING DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2568320 | | RECREATION DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2510335 | RENOVATION AT PRECINCTS 2, 5, 7, & 11 | POLICE DEPARTMENT |
| DETROIT BUILDING AUTHORITY | 9266 | 2510162 | | POLICE DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2855625 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2778107 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CATHOLIC PASTORAL | 18185 | 2554997 | NEW CONTRACT SET-UP | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT CENTRAL CITY COMMUNITY | 17253 | 2501790 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| DETROIT DISCOUNT DISTRIBUTORS INC | 1027457 | 2526361 | EMERGENCY FOOD | HUMAN SERVICES DEPARTMENT |
| DETROIT EAST COMMUNITY MENTAL | 1005394 | 2663209 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT EAST COMMUNITY MENTAL | 1005394 | 2719895 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT EAST INC | 13771 | 2520517 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2515604 | PROFESSIONAL ECONOMIC DEVELOPMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2784670 | ECONOMIC DEVELOPMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2753574 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2809284 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT ECONOMIC GROWTH CORPORATION | 7662 | 2725283 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT EDISON COMPANY | 5636 | 2501179 | | NO DEPARTMENT INDICATED |
| DETROIT ELECTRICAL SERVICES LLC | 1059639 | 2676228 | | WATER DEPARTMENT |
| DETROIT ENTREPRENEURSHIP INST | 1036516 | 2562737 | SELF EMPLOYMENT INITIATIVE | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT ENTREPRENEURSHIP INST | 1036516 | 2507446 | P&DD/PS FICS CONTRACT #75285 | FINANCE DEPARTMENT |
| DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | - | - | GRS SERVICE CONTRACT 2005, DATED MAY 25, 2005, BY AND BETWEEN THE CITY AND THE DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | NO DEPARTMENT INDICATED |
| DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION | - | - | GRS SERVICE CONTRACT 2006, DATED JUNE 7, 2006, BY AND BETWEEN THE CITY AND THE DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION, AS THEREAFTER AMENDED | NO DEPARTMENT INDICATED |
| DETROIT HISPANIC | 20401 | 2564466 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT HOUSING COMMISSION | 1033965 | 2801908 | FUNDING AGREEMENT | DEPARTMENT OF PUBLIC WORKS |
| DETROIT HOUSING COMMISSION | 1033965 | 2833063 | FUNDING AGREEMENT | DEPARTMENT OF PUBLIC WORKS |
| DETROIT HOUSING COMMISSION | 1033965 | 2669571 | | HOUSING DEPARTMENT |
| DETROIT LIGHT HOUSE PROGRAM | 1001492 | 2501736 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| DETROIT LIGHT HOUSE PROGRAM | 1001492 | 2515558 | SUBSTANCE ABUSE FYE 9/99 | HEALTH DEPARTMENT |
| DETROIT MEDICAL CENTER | 20097 | 2501916 | MEDICAL SERVICES | NO DEPARTMENT INDICATED |
| DETROIT METRO CONVENTION | 1027508 | 2615728 | | CIVIC CENTER DEPARTMENT |
| DETROIT NEIGHBORHOOD & FAMILY INITIATIVE | 1018914 | 2520602 | EMPOWERMENT ZONE - PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT NEIGHBORHOOD DEVELOPMENT CORP | 1035571 | 2539512 | NEIGHBORHOOD REVITALIZATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT NONPROFIT HOUSING CORPORATION | 10641 | 2514457 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | - | - | PFRS SERVICE CONTRACT 2005, DATED MAY 25, 2005, BY AND BETWEEN THE CITY AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | NO DEPARTMENT INDICATED |
| DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION | - | - | PFRS SERVICE CONTRACT 2006, DATED JUNE 7, 2006, BY AND BETWEEN THE CITY AND THE DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION, AS THEREAFTER AMENDED | NO DEPARTMENT INDICATED |
| DETROIT PUBLIC SCHOOLS | 1835 | 2587295 | | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2557062 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2532505 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2617076 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2657665 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2663934 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2571396 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2512549 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2771471 | | HUMAN SERVICES DEPARTMENT |
| DETROIT PUBLIC SCHOOLS | 1835 | 2767770 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RADIO TEAM | 1118437 | 2873778 | | WATER DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2502297 | PERMANENT SHELTER & SUPPORT | HEALTH DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2560689 | SUPPORTIVE SERVICES | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2619840 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2548291 | TRANSITIONAL HOUSING (FICS #076950) | FINANCE DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2501406 | SHELTER FOR THE HOMELESS (FICS #079045) | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2559511 | CASE MANAGEMENT AND COUNSELING | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2588816 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2751508 | | HUMAN SERVICES DEPARTMENT |
| DETROIT RESCUE MISSION MINISTRIES | 14618 | 2774007 | | HUMAN SERVICES DEPARTMENT |
| DETROIT SNAP INC | 19532 | 2501606 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| DETROIT SPECTRUM PAINTERS INC | 11290 | 2785384 | EASTERN MARKET RENOVATIONS | RECREATION DEPARTMENT |
| DETROIT TIGERS BASEBALL CLUB | 1036628 | 2575026 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DETROIT TRANSPORTATION CORP DN2 | 14896 | 2624573 | | DEPARTMENT OF TRANSPORTATION |
| DETROIT URBAN LEAGUE | 1587 | 2518492 | DHS EMERGENCY NEED SERVICES PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2504264 | CAREER DEVELOPMENT TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2620591 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2575580 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DETROIT URBAN LEAGUE | 1587 | 2563476 | WAGES AND MILEAGE WEATHERIZATION WORKERS | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2515009 | WEATHERIZATION SPECIALIST | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2512778 | WEATHERIZAITON INSPECTORS | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2672024 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2608694 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2557533 | JOB READINESS TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2557619 | EMERGENCY NEEDS PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2533037 | CAREER DEVELOPMENT PROGRAM | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2620874 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2535487 | EMERGENCY NEEDS PROGRAM. | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2518497 | PROVIDE COMPUTER SKILS TRAINING | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2588385 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2804820 | | HUMAN SERVICES DEPARTMENT |
| DETROIT URBAN LEAGUE | 1587 | 2775162 | | HUMAN SERVICES DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2693328 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2825805 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2738647 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2770051 | | BUDGET DEPARTMENT |
| DETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2714701 | | BUDGET DEPARTMENT |
| DDETROIT WAYNE JOINT BUILDING AUTHORITY | 19336 | 2800319 | | BUDGET DEPARTMENT |
| DETROIT WAYNE PORT AUTHORITY | 10780 | 2501783 | | NON-DEPARTMENTAL |
| DETROIT WORKFORCE NETWORK INC | 1071709 | 2623415 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2563727 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2597991 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2627616 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2658738 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2778452 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2725743 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DEVELOPMENT CENTER INC | 16686 | 2806231 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DFT SECURITY TEAM JV | 1081574 | 2658119 | | WATER DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2504635 | NEAL/WHITFIELD V ARCHER/JAMES | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2501914 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502116 | LEGAL SERVICES:  JOAN GHOGIAN V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2500792 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2501982 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502108 | NORDE JAMES V CHIEF ISIAH MCKINNON | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2504874 | LEGAL SERVICES:  CHILDS V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502115 | LEGAL SERVICES:  TAMARA HARMON V CITY | LAW DEPARTMENT |
| DICKINSON WRIGHT MOON VANDUSEN PLLC | 7769 | 2502105 | NAOMI CONAWAY V CITY OF DETROIT | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2522227 | ANALYSIS OF PA 374; ARCHER V STATE | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2553236 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2534973 | TIGER STADIUM MGMT AGREEMENT | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2546606 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2543718 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2803153 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2765485 | LEGAL SERVICES | LAW DEPARTMENT |
| DICKINSON WRIGHT PLLC | 1023465 | 2781254 | LEGAL SERVICES | LAW DEPARTMENT |
| DIVERSIFIED EDUCATIONAL SERVICE INC | 18910 | 2561519 | WORK FIRST/WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| DIVERSIFIED EDUCATIONAL SERVICE INC | 18910 | 2734876 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DOGWOOD BROOKSIDE NEIGHBORHOODS | 1103646 | 2781555 | SIDEWALKS, CURBS, AND APPROACHES | PLANNING AND DEVELOPMENT DEPARTMENT |
| DOMBROWSKI, ROBERT | 20565 | 2501542 | UNIFORM RELOCATION ASSTISTANCE | LAW DEPARTMENT |
| DON BOSCO HALL | 20026 | 2501185 | | NO DEPARTMENT INDICATED |
| DON BOSCO HALL | 20026 | 2595057 | | RECREATION DEPARTMENT |
| DON BOSCO HALL | 20026 | 2622063 | | RECREATION DEPARTMENT |
| DON BOSCO HALL | 20026 | 2778547 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DON BOSCO HALL | 20026 | 2801085 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DOPAR SUPPORT SYSTEMS INC | 21284 | 2713282 | | INFORMATION TECHNOLOGY SERVICES |
| DOWNTOWN DEVELOPMENT AUTHORITY | 17716 | 2770230 | LOWER WOODWARD IMPROVEMENT | DEPARTMENT OF PUBLIC WORKS |
| DOWNTOWN DEVELOPMENT AUTHORITY | 17716 | 2563708 | EQUIPMENT INSTALLLATION | PUBLIC LIGHTING DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2604131 | | FINANCE DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2770218 | | BUDGET DEPARTMENT |
| DTWR LLC C/O FARBMAN GROUP | 1066425 | 2738724 | | BUDGET DEPARTMENT |
| DUREN & ASSOCIATES | 20479 | 2658590 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2517349 | WASHINGTON, D.C. LEGISLATIVE SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2518125 | U.S. DEPT OF JUSTICE DOT INVESTIGATION | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2537039 | ANDRE YOUNG A/K/A DR. DRE V CITY | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2537005 | WASHINGTON D.C. LIAISON | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2501222 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2561984 | LEGAL SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2501872 | LEGAL SERVICES | LAW DEPARTMENT |
| DYKEMA GOSSETT PLLC | 22091 | 2550459 | EUGENE BROWN V CITY | LAW DEPARTMENT |
| ~~DYKEMA GOSSETT PLLC~~ | ~~22091~~ | ~~2500973~~ | ~~LEGAL SERVICES~~ | ~~SEWERAGE DEPARTMENT~~ |
| ~~DYKEMA GOSSETT PLLC~~ | ~~22091~~ | ~~2623896~~ | | ~~WATER DEPARTMENT~~ |
| DYNALECTRIC | 1103998 | 2765307 | CLOSED CIRCUIT TELEVISION FOR DOT | DEPARTMENT OF TRANSPORTATION |
| E L S CONSTRUCTION | 1098327 | 2785558 | EASTERN MARKET SHED NO. 3 RENOVATIONS | RECREATION DEPARTMENT |
| EARTH TECH INC | 20544 | 2500983 | BELT FILTER PRESSES | SEWERAGE DEPARTMENT |
| EARTH TECH INC | 20544 | 2502192 | CASINO SITE APPRAISALS | LAW DEPARTMENT |
| EARTH TECH INC | 20544 | 2510034 | ENVIRONMENTAL REAL ESTATE-FICS #71021 | FINANCE DEPARTMENT |
| ~~EARTH TECH INC~~ | ~~20544~~ | ~~2516972~~ | ~~CS-1126 WWTP 2 SFE PUMPS & REHAB~~ | ~~SEWERAGE DEPARTMENT~~ |
| EASTERN OIL CO. | - | 2809177 | LUBRICANT OIL | GENERAL SERVICES DEPARTMENT |
| EASTSIDE COMMUNITY RESOURCE | 1018050 | 2538974 | JOB ACCESS REVERSE COMMUTE | EMPLOYMENT AND TRAINING DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2502205 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2532107 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| EASTSIDE EMERGENCY CTR | 16519 | 2543569 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| EASTWOOD CLINICS CORP OFFICE | 1000451 | 2501528 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| EASTWOOD CLINICS CORP OFFICE | 1000451 | 2501826 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| EBI DETROIT | 1000452 | 2517413 | WW-529 SCREEN HOUSE REHABILITATION | WATER DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2515748 | PROFESSIONAL ECONOMIC DEVELOPMENT | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2764614 | FOX CREEK INFRASTRUCTURE PROJECT | DEPARTMENT OF PUBLIC WORKS |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2818723 | EAST RIVERFRONT IMPROVEMENT PROJECT | DEPARTMENT OF PUBLIC WORKS |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2641018 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2784665 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2753580 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| ECONOMIC DEVELOPMENT CORPORATION | 1000454 | 2809038 | ECONOMIC DEVELOPMENT SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 20423 | 2724428 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 1055746 | 2806233 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| EDUCATIONAL DATA SYSTEMS INC | 1055746 | 2778455 | | WORKFORCE DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| EDWARD C GEORGE | 9826 | 2502379 | | HUMAN SERVICES DEPARTMENT |
| EDWARD C LEVY CO DBA PLANT MAINTENANCE | 1020737 | 2502151 | BITUMINOUS SURFACE REMOVAL | DEPARTMENT OF PUBLIC WORKS |
| EJH CONSTRUCTION | 1020562 | 2808924 | | HUMAN SERVICES DEPARTMENT |
| ELECTRONIC DATA SYSTEMS CORPORATION | 1072382 | 2621839 | | WATER DEPARTMENT |
| ELEVATOR TECHNOLOGY | 1000471 | 2500082 | ELEVATOR MAINTENANCE SERVICE | GENERAL SERVICES DEPARTMENT |
| ELLIS DON OF MICHIGAN INC | 18631 | 2501492 | PURITAN/FENKELL | SEWERAGE DEPARTMENT |
| ELLIS DON OF MICHIGAN INC | 18631 | 2502278 | SEVEN MILE CSO DETENTION | SEWERAGE DEPARTMENT |
| ELMHURST HOME INC | 10998 | 2501829 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| ELMHURST HOME INC | 10998 | 2501729 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| EMERSON PROCESS MANAGEMENT POWER | 1016248 | 2847526 | GAS TURBINE UPGRADE AND REPAIR | PUBLIC LIGHTING DEPARTMENT |
| EMPCO INC | 1118906 | 2878252 | | MAYOR'S OFFICE |
| EMPOWERMENT ZONE DEVELOPMENT CORP | 19637 | 2513278 | ADMINISTRATIVE ACTIVITY | PLANNING AND DEVELOPMENT DEPARTMENT |
| EMPOWERMENT ZONE DEVELOPMENT CORP | 19637 | 2529275 | EMPOWERMENT ZONE - PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| EMPRESA | 1099489 | 2776404 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ENERGY GROUP INC | 1017472 | 2509158 | FICS CONTRACT 076115 - TREE TRIMMING | PUBLIC LIGHTING DEPARTMENT |
| ENGINE SUPPLY OF NOVI | 1994 | 2505264 | PARTS COMPLETE ENGINES (M80372) | FINANCE DEPARTMENT |
| ENOTA INC | 1092130 | 2717072 | | POLICE DEPARTMENT |
| ENTECH PERSONNEL SERVICES INC | 1000768 | 2544596 | CLERICAL ASSISTANCE | CITY CLERK |
| ENVIRONMENTAL CONSULTING & TECHNOLOGY | 1106148 | 2551431 | ENVIRONMENTAL SVCS/GREATER RIVERFRONT | PLANNING AND DEVELOPMENT DEPARTMENT |
| ENVIRONMENTAL TESTING & CONSULTING INC | 1003675 | 2502196 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| EPITEC GROUP INC | 1045979 | 2556386 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| EPITEC GROUP INC | 1045979 | 2573836 | | NON-DEPARTMENTAL |
| EPITEC GROUP INC | 1045979 | 2620773 | | NON-DEPARTMENTAL |
| ESTHER LYNISE BRYANT | 1019604 | 2508103 | IUOE/GIBSON V CITY | LAW DEPARTMENT |
| EVANS GROUP | 1019232 | 2515534 | JOSEPHINE MILLS V CITY | LAW DEPARTMENT |
| EVEREST SOLUTIONS LLC | 1000830 | 2503912 | CONVERSION OF YEAR 2000 | FINANCE DEPARTMENT |
| EVO ACCOUNTING & FINANCIAL SERVICES | 1070752 | 2761823 | | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2541124 | CASE MANAGMENT/COUNSELING SERVICES | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2508864 | P&DD PUBLIC SERVICE | FINANCE DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2559513 | ASE MANAGEMENT AND COUNSELING | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2597464 | | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| FAMILY SERVICE INC | 4010 | 2620491 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2588790 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2773997 | | HUMAN SERVICES DEPARTMENT |
| FAMILY SERVICE INC | 4010 | 2751502 | | HUMAN SERVICES DEPARTMENT |
| FARBMAN DEVELOPMENT GROUP INC | 1052543 | 2574590 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| FEDERLEIN KERANEN PC | 1001176 | 2502271 | BAILEY V DETROIT | WATER DEPARTMENT |
| FELIX J LIDDELL MD | 9742 | 2619048 | | HUMAN SERVICES DEPARTMENT |
| FELIX J LIDDELL MD | 9742 | 2771950 | | HUMAN SERVICES DEPARTMENT |
| FEMI TALABI & ASSOCIATES IINC | 1025786 | 2693989 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| FERGUSON ENTERPRISES INC | 1002829 | 2762820 | WATER SYSTEM IMPROVEMENTS | WATER DEPARTMENT |
| FERGUSON ENTERPRISES INC | 1002829 | 2708886 | | RECREATION DEPARTMENT |
| FIRST AMERICAN EQUITY LOAN SERVICES INC | 1053418 | 2572513 | | LAW DEPARTMENT |
| FIRST TEE OF DETROIT | 1106838 | 2509532 | JUNIOR GOLF PROGRAM | RECREATION DEPARTMENT |
| FLORISE E NEVILLE EWELL | 18953 | 2511634 | LAW DEPARTMENT CONTRACTS SECTION | FINANCE DEPARTMENT |
| FOCUS HOPE | 20156 | 2595470 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOCUS HOPE | 20156 | 2517834 | MACHINIST TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOCUS HOPE | 20156 | 2782889 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| FOLIA INDUSTRIES INC | 1078969 | 2647895 | | RECREATION DEPARTMENT |
| FORBES MANAGEMENT INC | 13713 | 2500738 | 8TH FL 2111 WOODWARD | NO DEPARTMENT INDICATED |
| FORBES MANAGEMENT INC | 13713 | 2500736 | | NO DEPARTMENT INDICATED |
| FORENSIC EXAMINATION SERVICE | 19765 | 2511601 | ESTATE OF CARA BELL JONES | LAW DEPARTMENT |
| FORT WAYNE CONSTRUCTION INC | 1002341 | 2508445 | EMER. REPAIR OF STORM DAMAGED SIDEWALKS | DEPARTMENT OF PUBLIC WORKS |
| FOSTER GROUP LLC | 1079032 | 2516733 | CS-1234 BOND CLOSING ASSISTANCE | WATER DEPARTMENT |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2562165 | WORK FIRST & WTW | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2629097 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| FOUNDATION FOR BEHAVIORAL RESOURCES | 1001251 | 2778457 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| FRANCES GREENEBAUM | 15339 | 2500958 | | HUMAN SERVICES DEPARTMENT |
| FRANCES GREENEBAUM | 15339 | 2500968 | | HUMAN SERVICES DEPARTMENT |
| FRANCES S GREENEBAUM | 1001353 | 2663660 | | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2557088 | 2001-2002 EARLY HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2532391 | EARLY HEAD START 2000-2001 | FINANCE DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2512564 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| FRANKLIN WRIGHT SETTLEMENTS INC | 1001261 | 2501500 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| FREEDOM HOUSE | 19860 | 2551708 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| G4S SECURE SOLUTIONS USA, INC. | 1116038 | 2741015 | SECURITY SERVICES | GENERAL SERVICES DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2525486 | ELIZABETH HURD, ET AL V CITY OF DETROIT | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2540460 | LEGAL SERVICES | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505197 | JOHNSON V JECZEN, ET AL | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2502158 | LEGAL SERVICES:  TROMEUR V ADKINS | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505077 | LEGAL SERVICES | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2574321 | | LAW DEPARTMENT |
| GARAN LUCOW MILLER PC | 1007550 | 2505187 | LEGAL SERVICES:  BERNICE MARTIN V CITY | FINANCE DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2623273 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2630629 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2623274 | | PUBLIC LIGHTING DEPARTMENT |
| GENESIS ENERGY SOLUTIONS LLC | 1059170 | 2625340 | | PUBLIC LIGHTING DEPARTMENT |
| GEORGE E SANSOUCY P E LLC | 1034071 | 2537262 | PROFESSIONAL SERVICES:  APPRAISALS | LAW DEPARTMENT |
| GEORGE JOHNSON & COMPANY | 1826 | 2754359 | | HUMAN SERVICES DEPARTMENT |
| GERALD K EVELYN | 1102554 | 2765473 | LEGAL SERVICES | LAW DEPARTMENT |
| GERALD K EVELYN | 1102554 | 2765475 | LEGAL SERVICES | LAW DEPARTMENT |
| GHAFARI ASSOCIATES LLC | 16840 | 2500978 | ADAMS ROAD IMPROVEMENTS | NO DEPARTMENT INDICATED |
| GHAFARI ASSOCIATES LLC | 16840 | 2520892 | ELECTRICAL SERVICES AT 2633 MICHIGAN AVE. | DEPARTMENT OF PUBLIC WORKS |
| GIORGI CONCRETE LLC | 1010405 | 2764704 | REPAIR OF WATER SYSTEM | WATER DEPARTMENT |
| GIRL SCOUTS OF METRO DETROIT | 7539 | 2588820 | | HUMAN SERVICES DEPARTMENT |
| GIRL SCOUTS OF METRO DETROIT | 7539 | 2775160 | | HUMAN SERVICES DEPARTMENT |
| GIS DATA RESOURCES INC | 1087473 | 2696020 | | POLICE DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2775453 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2803612 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2778130 | | HUMAN SERVICES DEPARTMENT |
| GLEANERS COMMUNITY FOOD BANK 1 | 16611 | 2746566 | | HUMAN SERVICES DEPARTMENT |
| GLEN OLIVACHE CPA PC | 1001562 | 2507371 | | FINANCE DEPARTMENT |
| GLOBEWIDE FAVOR CONSTRUCTION CO LLC | 1085092 | 2808926 | | HUMAN SERVICES DEPARTMENT |
| GLOBEWIDE FAVOR CONSTRUCTION CO LLC | 1085092 | 2793406 | | HUMAN SERVICES DEPARTMENT |
| GODFREY J DILLARD ESQ | 1103303 | 2779417 | | LAW DEPARTMENT |
| GOODMAN & HURWITZ PC | 1101745 | 2760433 | SPECIAL COUNSEL | CITY COUNCIL |
| GOODMAN MUSCAT INC | 1015305 | 2509737 | ORGANIZATIONAL ASSESSMENT | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2563438 | WORKFIRST/WTW JS/JR | EMPLOYMENT AND TRAINING DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2559919 | FOOD STAMPS | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2539285 | WORKFIRST JS/JP 10/01/00-9/30/01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2628317 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2797757 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2736042 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2782892 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2761556 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2740308 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2770617 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GOODWILL INDUSTRIES OF GREATER DETROIT | 14999 | 2770613 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| GRAY & GRAY PRODUCTIONS | 18090 | 2594537 | | RECREATION DEPARTMENT |
| GREAT LAKES CENTER FOR INDEPENDENT LIVING | 19673 | 2501926 | PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| GREATER DETROIT COMMUNITY OUTREACH CENTER INC | 19466 | 2501509 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| GREELEY & HANSEN LLC | 14794 | 2515106 | REHAB OF WATER RESERVOIR PHASE 2, 3 | WATER DEPARTMENT |
| GREEN GREEN ADAMS PALMER & CRAIG PC | 1014038 | 2508762 | LEGAL SERVICES | CITY COUNCIL |
| GREGORY TERRELL & COMPANY | 14501 | 2506562 | AUDIT | HUMAN SERVICES DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2527604 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2546243 | SANDRA MILLER V  EUGENE BROWN, ET AL | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2502429 | CHISHOLM, ET AL V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2550395 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2548219 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2632136 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2545753 | BRANDON BRYANT V EUGENE BROWN/CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2502093 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| GRIER & COPELAND PC | 11779 | 2502430 | LEGAL SERVICES:  MCHUGH, ET AL V CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| GRIER & COPELAND PC | 11779 | 2505089 | LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2597158 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2576025 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2708898 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2634211 | | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2649862 | CONTRACT FOR LEGAL SERVICES | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2688106 | DAREL DEON CHANCELLOR V CITY | LAW DEPARTMENT |
| GRIER & COPELAND PC | 11779 | 2551543 | WILLIE BRYANT V EUGENE BROWN | LAW DEPARTMENT |
| GS EQUITIES LLC | 1088912 | 2700328 | | LAW DEPARTMENT |
| ~~H & P TECHNOLOGIES INC~~ | ~~1029816~~ | ~~2787715~~ | ~~REBUILD ACTUATORS & VALVE ASSEMBLIES~~ | ~~WATER DEPARTMENT~~ |
| HALCROW INC | 1102933 | 2769474 | | MAYOR'S OFFICE |
| HALE CONTRACTING INC | 1025577 | 2757453 | VENTILATION SYSTEM | RECREATION DEPARTMENT |
| HALEY & ALDRICH INC | 1098676 | 2740779 | | WATER DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2507157 | BELLE ISLE MASTER PLAN | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2530873 | FARWELL FIELD ARCHITECTURAL SERVICES | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2508644 | BELLE ISLE'S LOITER WAY REFECTORY | RECREATION DEPARTMENT |
| HAMILTON ANDERSON ASSOCIATES | 18698 | 2563405 | BELLE ISLE'S MASTER PLAN | RECREATION DEPARTMENT |
| HAMPTON RIDGE PROPERTIES LLC | 1019230 | 2515341 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| HARBIN GROUP INC | 16607 | 2507665 | CASINO SITE APPRAISAL | FINANCE DEPARTMENT |
| HARPER HOUSE | 1003691 | 2501737 | | HEALTH DEPARTMENT |
| HARTFORD MEMORIAL BAPTIST CHURCH | 14442 | 2502480 | SENIOR CITIZENS MEALS | HEALTH DEPARTMENT |
| HAYES LAND DEVELOPMENT CORPORATION | 1106003 | 2613519 | | WATER DEPARTMENT |
| ~~HAZEN & SAWYER~~ | ~~14774~~ | ~~2669694~~ | | ~~WATER DEPARTMENT~~ |
| ~~HAZEN & SAWYER~~ | ~~14774~~ | ~~2500960~~ | ~~CHLORINE & HVAC MODIFICATION~~ | ~~WATER DEPARTMENT~~ |
| HEALTH MANAGEMENT SYSTEMS | 5654 | 2542966 | EMPLOYEE ASSISTANCE PROGRAM | HUMAN RESOURCES DEPARTMENT |
| HEALTH MANAGEMENT SYSTEMS | 1043088 | 2613135 | | HUMAN RESOURCES DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2504678 | TARGET CITIES FYE 9/30/99 | FINANCE DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2501833 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2568871 | | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2570277 | | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2504742 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| HEALTH SERVICES TECHNICAL ASSISTANCE | 9042 | 2512068 | SUBSTANCE ABUSE ASSESSMENT | HEALTH DEPARTMENT |
| HEAT & WARMTH FUND | 18570 | 2717114 | | WATER DEPARTMENT |
| HEIGHTS HEATING & COOLING INC | 1032472 | 2741890 | AIR CONDITIONING INSTALLATION | RECREATION DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2505277 | MEDICAL SERVICES | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2605168 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2574218 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| HENRY FORD HEALTH SYSTEM | 1012926 | 2621296 | | HEALTH DEPARTMENT |
| HENRY FORD HEALTH SYSTEM | 1012926 | 2752105 | | HEALTH DEPARTMENT |
| HERBERT REALTY & MANAGEMENT | 1018769 | 2559115 | | FINANCE DEPARTMENT |
| HERITAGE OPTICAL CENTER INC | 16451 | 2515148 | OPTOMETRIC SERVICES | HEALTH DEPARTMENT |
| HERITAGE OPTICAL CENTER INC | 16451 | 2530208 | | HEALTH DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2604598 | | FINANCE DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2761160 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2775593 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2757513 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2783105 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2761157 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2706006 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2804847 | | HUMAN SERVICES DEPARTMENT |
| HINES FINANCIAL SERVICES | 1059682 | 2744129 | | HUMAN SERVICES DEPARTMENT |
| HNTB MICHIGAN INC | 1025696 | 2589459 | | DEPARTMENT OF PUBLIC WORKS |
| HNTB MICHIGAN INC | 1025696 | 2800235 | PROFESSIONAL SERVICES | AIRPORT DEPARTMENT |
| HOUSING & COMMUNITY DEVELOPMENT CORP OF WAYNE COUNTY | 1021017 | 2518243 | HOUSING REHABILITATION SERVICES | FINANCE DEPARTMENT |
| HOWARD & HOWARD ATTORNEYS PC | 1013410 | 2773508 | LEGAL SERIVCES | LAW DEPARTMENT |
| HTC GLOBAL SERVICES INC | 1003630 | 2501175 | | INFORMATION TECHNOLOGY SERVICES |
| HUBBARD RICHARD COMMON COUNCIL | 9225 | 2501533 | | NO DEPARTMENT INDICATED |
| HUFFMASTER ASSOCIATES LLC | 1010540 | 2506275 | INVESTIGATIVE SERVICES | FINANCE DEPARTMENT |
| HUNGER ACTION COALITION OF MICHIGAN | 16897 | 2510332 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| HUNT ASSOCIATES 1 INC | 19746 | 2537045 | WIA OUT OF SCHOOL YOUTH | EMPLOYMENT AND TRAINING DEPARTMENT |
| HUNT ASSOCIATES 1 INC | 19746 | 2628062 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| HUTZEL HOSPITAL | 15175 | 2501837 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| HUTZEL HOSPITAL | 15175 | 2508866 | | HEALTH DEPARTMENT |
| IBM CORPORATION | 2865 | 2505095 | | INFORMATION TECHNOLOGY SERVICES |
| ICDS | 1003163 | 2501182 | | PUBLIC LIGHTING DEPARTMENT |
| IMAGE SCAN INC | 18157 | 2512900 | DATA ENTRY SOFTWARE | INFORMATION TECHNOLOGY SERVICES |
| IMPERIAL CONSTRUCTION CO | 12464 | 2746886 | | WATER DEPARTMENT |
| IMPERIAL CONSTRUCTION CO | 12464 | 2685161 | | WATER DEPARTMENT |
| IMPERIAL CONSTRUCTION CO | 12464 | 2679721 | | WATER DEPARTMENT |
| IN LAND WATERS POLLUTION | 14434 | 2502291 | REMOVAL OF STORAGE TANKS | DEPARTMENT OF PUBLIC WORKS |
| IN LAND WATERS POLLUTION | 14434 | 2502290 | UST UPGRADES | DEPARTMENT OF PUBLIC WORKS |
| INDUSTRIAL RELATIONS INC | 1027976 | 2527324 | PERFORMANCE MANAGEMENT SYSTEM | FINANCE DEPARTMENT |
| INDUSTRIAL RELATIONS INC | 1027976 | 2513432 | EMPLOYEE DEVELOPMENT PROGRAM | HUMAN RESOURCES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| INFRASTRUCTURE MANAGEMENT GROUP INC | 1061121 | 2634315 | | PUBLIC LIGHTING DEPARTMENT |
| INLAND WATERS POLLUTION CONTROL INC | 1055642 | 2556880 | UNDERGROUND STORAGE TANKS | DEPARTMENT OF PUBLIC WORKS |
| INTERCLEAN EQUIPMENT INC | 1011180 | 2504773 | INSTALLATION OF TRUCK WASH SYSTEMS | DEPARTMENT OF PUBLIC WORKS |
| INTERGRAPH CORPORATION | 6153 | 2516412 | 953625- COMPUTER RELATED PRODUCTS | INFORMATION TECHNOLOGY SERVICES |
| INTERNATIONAL INSTITUTE OF METROPOLITAN DETROIT INC | 9144 | 2521334 | | FINANCE DEPARTMENT |
| ISLANDVIEW VILLAGE DEVELOPMENT CORP | 20425 | 2509212 | SITE PREP/STREET IMPROVEMENT | FINANCE DEPARTMENT |
| ITW MORTAGE INVESTMENTS III INC | 1561 | 2501775 | | FINANCE DEPARTMENT |
| J & J YOUTH SERVICES | 1012849 | 2506553 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| J J ASSOCIATES | 17711 | 2589033 | | INFORMATION TECHNOLOGY SERVICES |
| J J ASSOCIATES | 17711 | 2502052 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| J J ASSOCIATES | 17711 | 2560948 | 2002 PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| J O A CONSTRUCTION CO INC | 1001666 | 2642903 | | RECREATION DEPARTMENT |
| JACKETS FOR JOBS INC | 1064297 | 2778459 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JACKETS FOR JOBS INC | 1064297 | 2754535 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JACKSON & KELLY PLLC | 1016929 | 2511861 | LEGAL SERVICES | LAW DEPARTMENT |
| JAMES C COBB JR PC | 10571 | 2504319 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| JAMES C COBB JR PC | 10571 | 2501780 | LEGAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2544158 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2513136 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2559396 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2508122 | DRUG TREATMENT PROGRAM PHYSICIAN | FINANCE DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2591486 | | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2746434 | | HUMAN SERVICES DEPARTMENT |
| JAMES HANEY MD | 1012073 | 2771944 | | HUMAN SERVICES DEPARTMENT |
| JAMES W BURDICK PC | 1101618 | 2760028 | | LAW DEPARTMENT |
| JEFFERSON WELLS INTERNATIONAL INC | 1032623 | 2546414 | PROFESSIONAL SERVICES | AUDITOR GENERAL |
| JEFFERSON WELLS INTERNATIONAL INC | 1032623 | 2534548 | INTERNAL AUDIT PARTNER | AUDITOR GENERAL |
| JENKINS CONSTRUCTION INC | 17037 | 2541121 | WS-621 WATER MAIN REPAIRS | WATER DEPARTMENT |
| JENKINS CONSTRUCTION INC | 17037 | 2501854 | CONSTRUCTION | DEPARTMENT OF PUBLIC WORKS |
| JENKINS CONSTRUCTION INC | 17037 | 2691365 | | WATER DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2559428 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2544148 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2508116 | DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| JESSE TOLBERT MD | 1012082 | 2513142 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| JESSE TOLBERT MD | 1012082 | 2591460 | | HUMAN SERVICES DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2797759 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2726449 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2777965 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 1015533 | 2778659 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2552853 | CASE MANAGEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2513901 | NO WRONG DOOR | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2550062 | PAL BASIC LITERACY | EMPLOYMENT AND TRAINING DEPARTMENT |
| JEWISH VOCATIONAL SERVICE | 11835 | 2538061 | WORK FIRST JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| JOHN KING | 1070289 | 2799418 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JOHN KING | 1070289 | 2781812 | | |
| JOHN PETER QUINN | 1088277 | 2751148 | | LAW DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2544130 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2559403 | MEDICAL DIRECTOR | HUMAN SERVICES DEPARTMENT |
| JOHN W HEAD JR DR | 1016367 | 2771947 | | HUMAN SERVICES DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2577160 | | LAW DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2600509 | | LAW DEPARTMENT |
| JOHNSON ROSATI LABARGE | 1012630 | 2508107 | LEGAL SERVICES | FINANCE DEPARTMENT |
| JORDAN CLINCS LIMITED PARTNERSHIP | 1098511 | 2770685 | | HEALTH DEPARTMENT |
| JOURNEY SECURITY MANAGEMENT | 1041657 | 2620593 | | WATER DEPARTMENT |
| JOWA ASSOCIATES | 7422 | 2501000 | UNIFORMED GUARD SERVICE | AIRPORT DEPARTMENT |
| JOWA ASSOCIATES | 7422 | 2513434 | GUARD SERVICE FOR DEPARTMENT CLINICS | HUMAN SERVICES DEPARTMENT |
| JOYFIELD CAREGIVERS | 1048950 | 2597503 | | FINANCE DEPARTMENT |
| JOYFIELD CAREGIVERS | 1048950 | 2563712 | 36-NTV-NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2575844 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2592232 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2597745 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| JVS DETROITS WORKPLACE | 1034682 | 2566265 | WORK FIRST JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2503637 | LEGAL SERVICES | FINANCE DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2531995 | WAYNE COUNTY V CITY OF DETROIT | LAW DEPARTMENT |
| KASIBORSKI RONANYRI FLASKA PC | 19685 | 2502453 | LEGAL SERVICES | FINANCE DEPARTMENT |
| KELLER THOMA SCHWARTZ | 1020326 | 2517263 | EMPLOYMENT-RELATED INVESTIGATIONS | LAW DEPARTMENT |
| KELLY SERVICES INC | 1000576 | 2583741 | | FINANCE DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760784 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2664187 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2706955 | | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2755384 | ROOF PLACEMENT | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2798610 | | RECREATION DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| KEO AND ASSOCIATES INC | 1040014 | 2733881 | BUTZEL PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2734358 | ACTIVITIES CENTER RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760999 | WISH-EGAN PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2761019 | MILAN PLAYFIELD RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2761662 | KRAINZ PARK RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2789769 |  | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2734388 | DRAINAGE/SEWER | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2731179 |  | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2712232 |  | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2760990 | OPTOMIST-STOUT RENOVATIONS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2762087 | 2008 PARK IMPROVEMENTS | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2711290 |  | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2712252 |  | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2714050 |  | RECREATION DEPARTMENT |
| KEO AND ASSOCIATES INC | 1040014 | 2807770 | REPAIRS AT HENDERSON MARINA | RECREATION DEPARTMENT |
| KIDSMART SOFTWARE COMPANY | 1072607 | 2781805 |  | WORKFORCE DEVELOPMENT DEPARTMENT |
| KIMLEY-HORN OF MICHIGAN INC | 1003415 | 2502474 | CASINO SITE APPRAISER | LAW DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2511508 | PASSALAQUA CHOP HOUSE V DETROIT | FINANCE DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2537217 | PROFESSIONAL SERVICES:  STILLMON V CITY | LAW DEPARTMENT |
| KOHN FINANCIAL CONSULTING | 1014434 | 2794993 | PROVIDE ADVICE ON SOLID WASTE FUND | BUDGET DEPARTMENT |
| KPMG CONSULTING, INC | 1028311 | 2529517 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG CONSULTING, INC | 1028311 | 2552186 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG LLP | 1440 | 2510105 | IMPLEMENT TIDEMARK COMPUTER SYSTEM | BUILDINGS AND SAFETY DEPARTMENT |
| KPMG LLP | 1440 | 2513477 | AUDITING SERVICES | AUDITOR GENERAL |
| KPMG LLP | 1440 | 2504566 | CONSULTING SERVICES | BUDGET DEPARTMENT |
| KVM DOOR SYSTEMS INC | 1099793 | 2785386 | EASTERN MARKET SHED NO. 3 RESERVATIONS | RECREATION DEPARTMENT |
| L D' AGOSTINI  & SONS INC | 1000677 | 2500927 | LATERAL SEWER REPLACEMENT | NO DEPARTMENT INDICATED |
| LACEY & ASSOCIATES | 1010869 | 2590826 |  | FINANCE DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2562865 | DPOA ACT 312 2001-2004 PROCEEDINGS | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2502300 | BLUE CROSS/BLUE SHIELD RESERVE FUND | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518960 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2534969 | KELLY FOREMAN V CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518952 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518964 | EDWARD LEWIS V P.O. STEVEN PEIL/CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2539980 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2520968 | LEGAL SERVICES:  KEMP  V NOETZEL & KEMP | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2539975 | LEGAL SERVICES:  MAURICE BROWN V CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518969 | MICHAEL MCHUGH V CITY OF DETROIT | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| LACEY & JONES LLP | 1013697 | 2518967 | JESSE WILLIAMS V CITY OF DETROIT | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2501959 | LEGAL SERVICES | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2518973 | BEAUCHAMP V OWENS/CITY | LAW DEPARTMENT |
| LACEY & JONES LLP | 1013697 | 2562836 | MAXIMILIAN ENGRAM, ET AL V CITY | LAW DEPARTMENT |
| LAKESHORE ENGINEERING SERVICE INC | 19808 | 2502201 | ABATEMENT ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| LAKESHORE ENGINEERING SERVICE INC | 19808 | 2828903 | | WATER DEPARTMENT |
| LAMONT TITLE CORPORATION | 1070200 | 2501595 | 36/LS - TITLE COMMITMENTS | PLANNING AND DEVELOPMENT DEPARTMENT |
| LAMONT TITLE CORPORATION | 1070200 | 2603572 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| LAMONT TITLE CORPORATION | 1070200 | 2723087 | | WATER DEPARTMENT |
| LANIER | 1012355 | 2533656 | EMERGENCY USE FOR POLICE PAYROLL | FINANCE DEPARTMENT |
| LANZO CONSTRUCTION CO | 13425 | 2613521 | | WATER DEPARTMENT |
| LARDNER ELEVATOR COMPANY | 24166 | 2507678 | ELEVATOR LOAD & NO-LOAD TEST | WATER DEPARTMENT |
| LASED | 11513 | 2560786 | WIA IN SCHOOL YOUTH PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| LASED | 11513 | 2501749 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| LASED | 11513 | 2740243 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LASED | 11513 | 2719927 | | DEPARTMENT OF TRANSPORTATION |
| LASED | 11513 | 2801087 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LASED | 11513 | 2778540 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| LATINO FAMILY SERVICES INC | 16339 | 2504667 | MEDICAID FYE 9/30/99 | HEALTH DEPARTMENT |
| LATINO FAMILY SERVICES INC | 16339 | 2501843 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| LAW OFFICES COLLINS EINHORN | 1049868 | 2765611 | | LAW DEPARTMENT |
| LAWTON SCHOOL | 1100766 | 2806424 | | HUMAN SERVICES DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502307 | LEGAL SERVICES: CRUMBIE V GUYTON, ET AL | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502427 | GAINES/HARRIS/HINES/HUGHES V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2539985 | SANDRA/DARREN MILLER V EUGENE BROWN | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2539983 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2536840 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2553151 | BERRY/CHENAULT/CROCKETT ET AL V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2553122 | KUE/WALKER/SMITH/WIGGINS V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2634333 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2655854 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2529631 | BRAZIL/PENA V CITY/HOOD | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2561951 | ALLEN/BATTLE/COOPER/GRIFFIN V CITY | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2600494 | | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2540873 | DWSD/DETROIT EDISON BOND FINANCED | WATER DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2774620 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2502303 | LEGAL SERVICES | LAW DEPARTMENT |
| LEWIS & MUNDAY PC | 12439 | 2641462 | | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| LEWIS & MUNDAY PC | 12439 | 2649874 | | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2500765 | LEGAL SERVICES: VELA V PRICE/CITY | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2539960 | LEGAL SERVICES | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2517379 | LEGAL SERVICES | LAW DEPARTMENT |
| LIEDEL GRINNAN & LIEDEL PC | 1007353 | 2548909 | LEGAL SERVICES | LAW DEPARTMENT |
| LIFE FITNESS INC | 1085199 | 2704235 | | RECREATION DEPARTMENT |
| LIONEL SAWYER COLLINS | 19940 | 2502230 | PROFESSIONAL SERVICES | CITY COUNCIL |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2562574 | PROFESSIONAL SERVICES | CITY COUNCIL |
| LOCAL INITIATIVES SUPPORT CORPORATION | 18595 | 2502034 | EMPOWERED ZONE | NO DEPARTMENT INDICATED |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2592262 | | FINANCE DEPARTMENT |
| LOCAL INITIATIVES SUPPORT CORPORATION | 1014122 | 2567588 | | FINANCE DEPARTMENT |
| LOOKING FOR MY SISTER | 1104410 | 2784890 | BLOCK GRANT PROGRAM | POLICE DEPARTMENT |
| LOUIS G REDSTONE ASSCS INC | 16448 | 2502006 | DESIGN FOR ROGELL GLF CRS | NO DEPARTMENT INDICATED |
| LUXURY SEDAN VAN SERVICE | 1015148 | 2570671 | | MUNICIPAL PARKING DEPARTMENT |
| MACDERMOTT ROOFING & SHEET METAL | 16537 | 2732369 | BELLE ISLE GARAGE - ROOF REPLACEMENT | RECREATION DEPARTMENT |
| MACDERMOTT ROOFING & SHEET METAL | 16537 | 2796454 | ROOF REPAIRS | RECREATION DEPARTMENT |
| MACK ALIVE INC | 19676 | 2801089 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MACK ALIVE INC | 19676 | 2778765 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ~~MAJOR CEMENT CO~~ | ~~22141~~ | ~~2500910~~ | ~~DWS-816 HARD SURFACE REPAIRS-EAST SIDE~~ | ~~SEWERAGE DEPARTMENT~~ |
| MAJOR CEMENT CO | 22141 | 2502189 | PW 7561 REPAIR DEMAGED | NO DEPARTMENT INDICATED |
| MAJOR CEMENT CO | 22141 | 2634038 | | DEPARTMENT OF PUBLIC WORKS |
| MARINERS INN | 5159 | 2509995 | WTW SUBSTANCE ABUSE COUNSELING | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARINERS INN | 5159 | 2549595 | CAREER INITIATIVES CENTER PROJECT | HUMAN SERVICES DEPARTMENT |
| MARJORIE R MALARNEY & ASSOCIATES | 12830 | 2500751 | LANSING LOBBYIST | LAW DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2589338 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2629691 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2595777 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE COLLEGE | 6279 | 2627961 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2507022 | FIC #76292 WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2512792 | ASSESSMENT CTR TITLES IIA/IIC & III | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2555328 | WIA ADULT & OUT-OF-SCHOOL YOUTH | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2529603 | ASSESS CTR MOD#1 | FINANCE DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2563669 | LEARNING RESOURCE CTR WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2571652 | | EMPLOYMENT AND TRAINING DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2777810 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2771650 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2740292 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2725976 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2740278 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MARYGROVE NONPROFIT CORPORATION | 1014543 | 2754537 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2512563 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2528270 | ENPOWERMENT ZONE- PUBLIC SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2541817 | PAROLEE EMPLOYMENT TRAINING PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2557083 | 2001-2002 HEAD START CONTRACT | HEALTH DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2502075 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2532520 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2501666 | JOB SEARCH AND PLACEMENT | NO DEPARTMENT INDICATED |
| MATRIX HUMAN SERVICES | 1584 | 2512181 | SHELTER FOR HOMELESS YOUTH | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2561392 | WORK FIRST & WTW. 2001-2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2606499 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2847169 | | HUMAN SERVICES DEPARTMENT |
| MATRIX HUMAN SERVICES | 1584 | 2767093 | | HUMAN SERVICES DEPARTMENT |
| MAYOR'S TIME | 1070618 | 2780286 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| METCALF & EDDY OF MI INC | 14015 | 2521208 | REHABLITATION OF LIFT PUMPS 1 & 2 | SEWERAGE DEPARTMENT |
| METCO SERVICES INC | 13250 | 2502148 | | DEPARTMENT OF PUBLIC WORKS |
| METCO SERVICES INC | 13250 | 2857212 | | SEWERAGE DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2557075 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2532514 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2505351 | | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2512558 | HEAD START SERVICES | HUMAN SERVICES DEPARTMENT |
| METROPOLITAN BAPTIST CHURCH HEAD START | 9004 | 2768826 | | HUMAN SERVICES DEPARTMENT |
| METRO EAST DRUG TREATMENT | 10996 | 2501534 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| METRO EMPLOYMENT SOLUTIONS | 1007722 | 2564007 | WORK FIRST & WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| METRO EMPLOYMENT SOLUTIONS | 1007722 | 2626981 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| METROPOLITAN ARTS COMPLEX INC | 1001141 | 2501630 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| METROPOLITAN ARTS COMPLEX INC | 1001141 | 2501857 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| METROPOLITAN CHILDREN & YOUTH INC | 1082096 | 2847163 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| METROPOLITAN DETROIT AFL-CIO | 1001142 | 2502169 | JOB SEARCH | NO DEPARTMENT INDICATED |
| METROPOLITAN DETROIT AFL-CIO | 1001142 | 2603384 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2530321 | ADVERTISING AND PROMTIONAL EXPERTISE | CIVIC CENTER DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2550871 | PROMOTION FOR COBO CENTER | CIVIC CENTER DEPARTMENT |
| METROPOLITAN DETROIT VISITORS | 21182 | 2767846 | PROFESSIONAL SERVICES CONTRACT | CIVIC CENTER DEPARTMENT |
| MGM LEGAL MGMT SOLUTIONS | 20133 | 2502235 | | NO DEPARTMENT INDICATED |
| MICHIGAN FISCAL STRATEGIES LLC | 1119174 | 2879518 | | WATER DEPARTMENT |
| MICHIGAN CONFERENCE SDA DETROIT/METRO | 1012847 | 2506682 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| MICHIGAN DEPARTMENT OF CAREER | 1016600 | 2511440 | EMPLOYMENT SERVICES | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN DEPARTMENT OF CAREER | 1016600 | 2620233 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2510495 | ADVANCE-TRAFFIC SIGNAL MODERNIZATION | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2517085 | BITUMINIOUS COLDMILLING WORK ALONG HWY M102 FROM HWY M53TO KELLY ROAD | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500761 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2518505 | COLDMILLING ALONG HWY. US-24 FROM HWY. M-5(GRAND RIVER) TO M-102 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501400 | RESURFACING | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501407 | RESCONSTRUCTION OF DECK | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2511603 | TRAFFIC SIGNALS AND PAVEMENT MARKINGS | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501807 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500758 | SCREENING | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2518522 | DECK REPLACEMENT | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500787 | REPLACE BRIDGES | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2512565 | CONCRETRE OVERLAY FOR STRUCTURE WHICH CARRIES PORTER ST. OVER I-75 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501877 | BRIDGE | NO DEPARTMENT INDICATED |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2521604 | DECK REPLACEMENT | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2524693 | PEDESTRAIN SCREENING FOR VARIOUS STRUCTURES | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2502178 | RECONSTRUCT HWY - I 75 SPRINGWELL | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2501411 | BRIDGE AND DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2567088 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2502469 | RESURFACE DECK | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2538766 | TRAFFIC SIGNALWORK AT DICKERSON ROAD | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2520074 | RECONSTRUCTION OF STRUCTURE WHICH CARRIES GREENFIELD ROAD OVER HWY. M-10 | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500781 | DECK REPLACEMENT | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2500779 | RESURFACING | NO DEPARTMENT INDICATED |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2622755 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2740688 | | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2517764 | DECK REPLACEMENT WORK ON BRIDGE | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN DEPARTMENT OF STATE HIGHWAYS & TRANSPORTATION | 2100 | 2511049 | BITUMINOUS RESURFACING AND CURB WORK ALONG LIVERNOIS | DEPARTMENT OF PUBLIC WORKS |
| MICHIGAN FOOD AND BEVERAGE ASSOCIATION | 1101727 | 2759218 | PERIOD SERVICES FOR METRO YOUTH DAY | RECREATION DEPARTMENT |
| MICHIGAN FOOD AND BEVERAGE ASSOCIATION | 1101727 | 2786573 | METRO YOUTH DAY | RECREATION DEPARTMENT |
| MICHIGAN HVAC VOCATIONAL | 17478 | 2512764 | RETRAINING SERVICES | EMPLOYMENT AND TRAINING DEPARTMENT |
| MICHIGAN STATE AFL-CIO HRDI | 1027005 | 2769866 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MICHIGAN STATE UNIVERSITY | 8167 | 2795800 | ACCIDENT INVESTIGATION COURSES | POLICE DEPARTMENT |
| MIDNIGHT GOLF PROGRAM | 1055952 | 2778544 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2540054 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2562793 | WORK FIRST PROGRAM | EMPLOYMENT AND TRAINING DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| MIDWEST CAREERS INSTITUTE | 1062863 | 2778461 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MIDWEST CAREERS INSTITUTE | 1062863 | 2806239 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MILWAUKEE INVESTMENT CO | 17041 | 2501818 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| MILWAUKEE INVESTMENT CO | 17041 | 2524249 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| MINERGY DETROIT LLC | 1098577 | 2740099 | | WATER DEPARTMENT |
| MIRO WEINER & KRAMER PC | 1039572 | 2665562 | | LAW DEPARTMENT |
| MISDEMEANOR DEFENDERS LAW CLINIC PC | 1009823 | 2534641 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| MITCHCO | 1022053 | 2553859 | GAS, COMPRESSED NATURAL | DEPARTMENT OF TRANSPORTATION |
| MOLLY LEVITT | 1951 | 2500956 | | HUMAN SERVICES DEPARTMENT |
| MOLLY LEVITT | 1951 | 2500955 | | HUMAN SERVICES DEPARTMENT |
| MOMS & BABES TOO MSSP/ISSP INC | 1013849 | 2508892 | 25-WIC 9/99 CERTIFICATION | HEALTH DEPARTMENT |
| MONTEZ GROUP | 1100889 | 2769654 | | MAYOR'S OFFICE |
| MOORE & ASSOCIATES INC | 1001299 | 2501402 | EMPOWERMENT ZONE PROJECT | RECREATION DEPARTMENT |
| MOORISH SCIENCE TEMPLE OF AMERICA | 1003703 | 2506282 | NOF PUBLIC SERVICE | FINANCE DEPARTMENT |
| MORGAN FRAZIER SPECIALIZED SERVICES | 1001308 | 2502273 | CONSULTANT NUISANCE ABATEMENT | BUILDINGS AND SAFETY DEPARTMENT |
| MOSAIC YOUTH THEATRE OF DETROIT | 1001332 | 2543835 | THEATRICAL TRAINING | RECREATION DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2581185 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2501432 | ELECTRICAL CONSTRUCTION PL 130 | NO DEPARTMENT INDICATED |
| MOTOR CITY ELECTRIC CO | 13102 | 2611714 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2611719 | | PUBLIC LIGHTING DEPARTMENT |
| MOTOR CITY ELECTRIC CO | 13102 | 2558810 | DWS-833 AS-NEEDED LOW VOLTAGE WIRING | WATER DEPARTMENT |
| MOTOR CITY ELECTRIC/METCO SERVICES AJV | 1033698 | 2537241 | FREQUENCY DRIVES AT WWTP'S INTERMEDIATE LIFT PUMP STATION #2 | SEWERAGE DEPARTMENT |
| MOTOR CITY PIPE | 1001344 | 2753399 | WING SEALS STAINLESS STEEL STRAPPING | GENERAL SERVICES DEPARTMENT |
| MOTOR CITY PIPE | 1001344 | 2763247 | PLUMBING & STEAM FITTING SUPPLIES | GENERAL SERVICES DEPARTMENT |
| NARDIN PARK DRUG ABUSE CENTER | 1706 | 2501540 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NARDIN PARK DRUG ABUSE CENTER | 1706 | 2506559 | SUBSTANCE ABUSE FYE9/98 NARDIN PARK | HEALTH DEPARTMENT |
| NATIONAL COUNCIL ON ALCOHOLISM | 16455 | 2501541 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEIGHBORHOOD DEVELOPMENT CORPORATION | 20509 | 2501589 | LAND ACQUISITION SITE PREPARATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| NEIGHBORHOOD RECONCILIATION CENTER INC | 1000268 | 2533307 | | HUMAN RIGHTS DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2547780 | WALK IN CENTER FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2532814 | 24 HOUR WALK IN CENTER | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2527949 | 963-STAY (HOMELESS HOTLINE) | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2501594 | SERVICES FOR THE HOMELESS | HUMAN SERVICES DEPARTMENT |
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2557085 | 2001-2002 HEAD START (HIPPY) CONTRACT | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| NEIGHBORHOOD SERVICE ORGANIZATION | 8118 | 2849011 | | HEALTH DEPARTMENT |
| NESS BORIS CORPORATION | 1087558 | 2693925 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| NETCOL ASSOCIATES INC | 1101173 | 2782059 | | HEALTH DEPARTMENT |
| NETCOL ASSOCIATES INC | 1101173 | 2756230 | | HEALTH DEPARTMENT |
| NETIMATION INC | 20384 | 2502117 | PROFESSIONAL SERVICES | NO DEPARTMENT INDICATED |
| NEW CENTER COMMUNITY | 19199 | 2502090 | | NO DEPARTMENT INDICATED |
| NEW DAY MULTI-PURPOSE COMMUNITY | 14872 | 2510758 | NUTRITIONAL MEALS, TRANSPORTATION | HUMAN SERVICES DEPARTMENT |
| NEW DAY MULTI-PURPOSE COMMUNITY | 14872 | 2533571 | SHELTER AND SUPPORTIVE SERVICES | HUMAN SERVICES DEPARTMENT |
| NEW DETROIT INC | 10869 | 2529859 | WIA CLASSROOM INSTRUCTION | EMPLOYMENT AND TRAINING DEPARTMENT |
| NEW DETROIT INC | 10869 | 2502172 | EZ-PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| NEW LIFE HOME FOR RECOVERING | 18726 | 2501457 | SUBSTANCE ABUSE COOR AGENCY 9-99 | HEALTH DEPARTMENT |
| NEW LIFE HOME FOR RECOVERING | 18726 | 2501621 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEW LIGHT RECOVERY CENTER INC | 1003695 | 2501638 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| NEW ST PAUL HEAD START AGENCY | 1048766 | 2620502 | | HUMAN SERVICES DEPARTMENT |
| NEW ST PAUL HEAD START AGENCY | 1048766 | 2587304 | | HUMAN SERVICES DEPARTMENT |
| NEW TECHNOLOGY LTD | 16280 | 2500969 | | SEWERAGE DEPARTMENT |
| NEYER TISEO & HINDO CONSULTANTS | 23847 | 2500895 | CS-1283 SEWER OVERFLOW PLAN | SEWERAGE DEPARTMENT |
| NITRO TELECOM COMMUNICATIONS SPECIALIST | 1012632 | 2582916 | | FINANCE DEPARTMENT |
| NOETIX CORPORATION | 1067921 | 2649928 | | NON-DEPARTMENTAL |
| NORTH CENTRAL COMMUNITY MENTAL HEALTH | 1003696 | 2501657 | | NO DEPARTMENT INDICATED |
| NORTHEAST HEALTH SERVICES INC | 1003700 | 2507303 | MEDICAID SERVICES | HEALTH DEPARTMENT |
| NORTHERN AREA ASSOCIATION | 19677 | 2509233 | HOME REPAIR TECHNICAL ASSISTANCE | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2565847 | PREDEVELOPMENT ACTIVITIES | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2536554 | 36/LS-CHDO OPERATING SUPPORT | FINANCE DEPARTMENT |
| NORTHSTAR COMMUNITY DEVELOPMENT CORP | 1018049 | 2517450 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| NORTHWEST COMMUNITY PROGRAMS INC | 1062722 | 2676860 | | HUMAN SERVICES DEPARTMENT |
| NORTHWEST COMMUNITY PROGRAMS INC | 1062722 | 2765500 | PROFESSIONAL SERVICES CONTRACT | RECREATION DEPARTMENT |
| NORTHWEST DETROIT NON-PROFIT | 12557 | 2510026 | PUBLIC FACILITY REHAB.-FICS #74895 | FINANCE DEPARTMENT |
| NOVA CONTRACTING CORPORATION | 14983 | 2504312 | ENLOADER / W OPERATOR (M-80754) | SEWERAGE DEPARTMENT |
| NOVA DEVELOPMENT GROUP DETROIT LLC | 1107544 | 2809435 | | HUMAN SERVICES DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2504056 | CONSULTING UGS TANKS | DEPARTMENT OF PUBLIC WORKS |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| NTH CONSULTANTS LTD | 16602 | 2501727 | ENVIRONMENTAL SERVICES-FICS #73837 | PLANNING AND DEVELOPMENT DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2502022 | GEO TECHNICAL ENG. SERVICES AM 1 250,000 | WATER DEPARTMENT |
| NTH CONSULTANTS LTD | 16602 | 2627188 | | RECREATION DEPARTMENT |
| OFFICE EXPRESS | 1105974 | 2731413 | | MAYOR'S OFFICE |
| O'LAUGHLIN CONSTRUCTION | 12053 | 2507308 | RENOVATION OF HYDRAULIC STRUCTURES | WATER DEPARTMENT |
| O'LAUGHLIN CONSTRUCTION | 12053 | 2574640 | PC-695 IN SYSTEM STORAGE | SEWERAGE DEPARTMENT |
| OLYMPIA ENTERTAINMENT | 1007150 | 2507725 | PARKING FACILITY MANAGEMENT SERVICES | MUNICIPAL PARKING DEPARTMENT |
| OMNICARE HEALTH PLAN | 1005707 | 2546137 | WIC CERTIFICATION | HEALTH DEPARTMENT |
| OMNICARE HEALTH PLAN | 1005707 | 2507763 | 25 WIC 1999 CERTIFICATION | HEALTH DEPARTMENT |
| OMNILEARN LLC | 1066579 | 2633220 | | NON-DEPARTMENTAL |
| ONYX ENTERPRISE INC | 1116187 | 2858656 | | WATER DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2519090 | BASIC SKILLS AND OCCUPATIONAL SKILLS | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2519079 | BASIC SKILLS AND OCCUPATIONAL SKILLS. | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2501939 | PUBLIC SERVICE EZ | NO DEPARTMENT INDICATED |
| OPERATION ABLE OF MICHIGAN | 17427 | 2797761 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2771757 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION ABLE OF MICHIGAN | 17427 | 2740218 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2550216 | TRANSITIONAL HOUSING | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2533044 | EMERGENCY NEED RESOURCES | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2518996 | EMERGENCY NEED RESOURCES | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2588310 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2557544 | FAMILY AND COMMODITY SERVICES | FINANCE DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2776867 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2746767 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2810794 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2775349 | | HUMAN SERVICES DEPARTMENT |
| OPERATION GET DOWN | 3347 | 2803609 | | HUMAN SERVICES DEPARTMENT |
| OPERATION HELP INC | 1442 | 2501652 | WF EMP SKILLS & JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| OPERATION HELP INC | 1442 | 2721152 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| OPERATION HELPING HAND INC | 19338 | 2511433 | EMERGENCY SHELTER | FINANCE DEPARTMENT |
| ORCHARDS CHILDRENS SERVICE | 1015406 | 2778756 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2557060 | 2001-2002 HEAD START CONTRACT | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2532503 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2512545 | HEAD START SERVICES | RECREATION DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2620494 | | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2502084 | | HUMAN SERVICES DEPARTMENT |
| ORDER OF THE FISHERMEN MINISTRY | 1057660 | 2797263 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ORGANIZATION & SYSTEMS CHANGE CONSULTANTS | 1101841 | 2779409 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PARK RITE | 18490 | 2504157 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2570673 | | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2504154 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2504153 | PROFESSIONAL PARKING MANAGEMENT | MUNICIPAL PARKING DEPARTMENT |
| PARK RITE | 18490 | 2501379 | EASTERN MARKET GARAGE | MUNICIPAL PARKING DEPARTMENT |
| PARKVIEW COUNSELING CENTER | 1003697 | 2501728 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| PARSONS BRINCKEROFF MICHIGAN INC | 1025586 | 2531875 | DEVELOP TRAFFIC MASTER PLAN | DEPARTMENT OF PUBLIC WORKS |
| PARSONS BRINCKEROFF MICHIGAN INC | 1025586 | 2666820 | | RECREATION DEPARTMENT |
| PARTRIDGE ENTERPRISES INC | 19090 | 2515024 | REMOVAL OF DEAD ANIMALS | HEALTH DEPARTMENT |
| PARTRIDGE ENTERPRISES INC | 19090 | 2773727 | | HEALTH DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2508834 | KUE/SWANGER/ WALKER/BOONE V CITY | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2509732 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2521163 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2521178 | LEGAL SERVICES | LAW DEPARTMENT |
| PATTERSON PHIFER | 1007814 | 2513517 | MAURICE BROWN V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| PATTERSON PHIFER & PHILLIPS | 17376 | 2505725 | LEGAL SERVICES | FINANCE DEPARTMENT |
| PATTERSON PHIFER & PHILLIPS | 17376 | 2505728 | LEGAL SERVICES | LAW DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2564267 | WORKFIRST/WTW, 10/1/01 - 9/30/02, JS/JR | EMPLOYMENT AND TRAINING DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2528278 | WIA BASIC EDUCATION AGES 14-18 | EMPLOYMENT AND TRAINING DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE | 7737 | 2740260 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2778463 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2801097 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PAYNE-PULLIAM SCHOOL OF TRADE AND COMMERCE | 1030662 | 2778760 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PCT SECURITY LLC | 1107205 | 2812357 | SURVEILLANCE EQUIPMENT INSTALLATION | WORKFORCE DEVELOPMENT DEPARTMENT |
| PEGGY YOUNG & ASSOCIATES INC | 7333 | 2502363 | APPRAISAL SERVICES | PLANNING AND DEVELOPMENT DEPARTMENT |
| PEGGY YOUNG & ASSOCIATES INC | 7333 | 2763958 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| PEOPLE'S COMMUNITY SERVICES OF METROPOLITAN DETROIT | 10686 | 2501460 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| PEOPLE'S CREATIVE ENSEMBLE | 14786 | 2501435 | PUBLIC SERVICE | NO DEPARTMENT INDICATED |
| PEPPER HAMILTON LLP | 1009412 | 2635807 | | LAW DEPARTMENT |
| PEPPER HAMILTON LLP | 1009412 | 2719996 | | LAW DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2559401 | DRUG TREATMENT PROGRAM PHYSICIAN | FINANCE DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2544150 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| PERRY MATHIS MD | 1012076 | 2508114 | DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| PERRY MATHIS MD | 1012076 | 2513140 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| PES GROUP PC | 1110552 | 2751356 | | SEWERAGE DEPARTMENT |
| PHARMACY EMPLOYMENT SERVICE | 1053611 | 2572655 | | HEALTH DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2537538 | LEGAL SERVICES:  SMITH/WIGGINS V CITY | LAW DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2537563 | LEGAL SERVICES:  WOODWARD/JEAN V CITY | LAW DEPARTMENT |
| PHIFER & WHITE PC | 1027627 | 2623900 | | LAW DEPARTMENT |
| PHILLIP G CRAMER MD | 1019205 | 2527982 | TB MEDICAL SERVICES | HEALTH DEPARTMENT |
| PHILLIP G CRAMER MD | 1019205 | 2579701 | | HEALTH DEPARTMENT |
| PHOENIX SERVICES UNLIMITED INC | 19496 | 2501351 | BATTERER'S SCHOOL | NO DEPARTMENT INDICATED |
| PHOENIX SERVICES UNLIMITED INC | 19496 | 2548814 | DOMESTIC VIOLENCE COUNSELING | POLICE DEPARTMENT |
| PIERCE MONROE & ASSOCIATES INC | 18223 | 2501044 | | FINANCE DEPARTMENT |
| PIERCE MONROE & ASSOCIATES INC | 18223 | 2502104 | | FINANCE DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2803604 | | HUMAN SERVICES DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2775345 | | HUMAN SERVICES DEPARTMENT |
| PIQUETTE MARKET INC | 1072282 | 2743795 | | HUMAN SERVICES DEPARTMENT |
| PLANNED PARENTHOOD | 1012848 | 2603682 | | FINANCE DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2527611 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2536997 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2590835 | | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2540467 | LEGAL SERVICES:  ADAMS, ET AL V CITY, ET AL | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2508813 | IRA LEE TODD V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2508816 | GRAZES/IVERZAI/SMITH, ET AL  V CITY | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2527406 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2538058 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2501702 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2538244 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2652076 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2502112 | LEGAL SERVICES | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2537223 | LORETTA BOOTH V CITY OF DETROIT | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2569755 | | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2570503 | | LAW DEPARTMENT |
| PLUNKETT & COONEY  PC | 10371 | 2774678 | | LAW DEPARTMENT |
| PMA CONSULTANTS LLC | 1001050 | 2525616 | CAPITAL IMPROVEMENT PROGRAM | WATER DEPARTMENT |
| PMA CONSULTANTS LLC | 1001050 | 2615907 | | WATER DEPARTMENT |
| PMA CONSULTANTS LLC | 1001050 | 2664835 | | WATER DEPARTMENT |
| POLICE ATHLETIC LEAGUE INC | 3703 | 2535838 | TENNIS PROGRAM | RECREATION DEPARTMENT |
| POPKIN SOFTWARE SYSTEMS | 20304 | 2518460 | SYSTEMS ARCHITECT AND OPTIONS | INFORMATION TECHNOLOGY SERVICES |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| POSEN CONSTRUCTION CO | 20208 | 2748229 | BELLE ISLE SCOTT FOUNTAIN LAGOON PIPELINE SYSTEM CLEAN-OUT | RECREATION DEPARTMENT |
| POSEN CONSTRUCTION CO | 20208 | 2584529 | | WATER DEPARTMENT |
| POSITIVE IMAGES | 19950 | 2501495 | | HEALTH DEPARTMENT |
| POSITIVE IMAGES | 19950 | 2501653 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| PR NETWORKS INC | 19552 | 2555369 | COMBINED SEWER OVERFLOW PLANNING | SEWERAGE DEPARTMENT |
| PR NETWORKS INC | 19552 | 2508487 | CSO PLANNING | WATER DEPARTMENT |
| PREMIER STAFFING SOURCE INC | 1118976 | 2877577 | TEMPORARY STAFFING SERVICES | HUMAN RESOURCES DEPARTMENT |
| PRISM SOLUTIONS LLC | 1051836 | 2610132 | | RECREATION DEPARTMENT |
| PROBE ENVIRONMENTAL INC | 19803 | 2502194 | ABATEMENT OF ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| PROJECT GET | 20363 | 2540814 | JOB SEARCH & PLACEMENT-WORK FIRST | EMPLOYMENT AND TRAINING DEPARTMENT |
| PROJECT GET | 20363 | 2563946 | JOB SEARCH & PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| PROJECT GET | 20363 | 2501733 | JOB SEARCH | NO DEPARTMENT INDICATED |
| PROJECT GET | 20363 | 2778465 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROJECT GET | 20363 | 2806247 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROJECT INNOVATIONS | 20068 | 2676527 | | WATER DEPARTMENT |
| PROJECT MANAGEMENT ASSOCATION INC | 16277 | 2508603 | CS-1242 THIRD PARTY SCHEDULING | WATER DEPARTMENT |
| PROJECT RESULTS LLC | 1119030 | 2878908 | | WATER DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778467 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778477 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2761554 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PROVIDENCE COMMUNITY SERVICES/ROSS IES | 1095234 | 2778661 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| PVS TECHNOLOGIES INC | 24231 | 2501270 | | SEWERAGE DEPARTMENT |
| R L WINIGER & COMPANY | 1033182 | 2506508 | INVESTIGATIVE SERVICES | FINANCE DEPARTMENT |
| RALPH CALDER & ASSOC | 20041 | 2502210 | PATTON PARK POOL/RECREATION FACILITY | RECREATION DEPARTMENT |
| RAM CONSTRUCTION SERVICES OF MICHIGAN | 1104845 | 2786314 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| RAMA RAO & ALFRED INC | 15030 | 2502274 | A/E SERVICES  WATER WORKS | NO DEPARTMENT INDICATED |
| RAMA RAO & ALFRED INC | 15030 | 2501613 | WWP-WTP SCREEN HOUSE REHAB | WATER DEPARTMENT |
| RAMA RAO & ALFRED INC | 15030 | 2500977 | BLUEHILL STATION ADDITIONS | NO DEPARTMENT INDICATED |
| RAMA RAO & ALFRED INC | 15030 | 2767688 | CONTRACT FOR PROFESSIONAL SERVICES | INFORMATION TECHNOLOGY SERVICES |
| RANDALL S LEVINE PC DBA LEVINE & LEVINE PC | 1017685 | 2513748 | LEGAL SERVICES | OMBUDSPERSON |
| RANDY LANE PC | 1070228 | 2879763 | CONTRACT FOR ACCOUNTING SERVICES | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| RAYMOND JONES MD | 10770 | 2513137 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2544138 | DRUG TREATMENT PROGRAM PHYSICIAN | HUMAN SERVICES DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2508115 | SERVICES FOR DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2559423 | PHISICIAN FOR DRUG TREATMENT PROGRAM | FINANCE DEPARTMENT |
| RAYMOND JONES MD | 10770 | 2591480 | | HUMAN SERVICES DEPARTMENT |
| REACH INC | 17260 | 2504789 | NOF-PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |
| REACH PROJECT INC | 1048827 | 2599632 | | HEALTH DEPARTMENT |
| REDSTONE ARCHITECTS | 1001648 | 2506677 | CAMPUS MARTIUS PARK DEVELOPMENT | RECREATION DEPARTMENT |
| REID & REID PC | 1012544 | 2633008 | | LAW DEPARTMENT |
| RENAISSANCE PROPERTIES INC | 1032580 | 2562053 | | FINANCE DEPARTMENT |
| RENAISSANCE PROPERTIES INC | 1032580 | 2534576 | | HUMAN SERVICES DEPARTMENT |
| RESOURCE DATA SYSTEMS CORP | 10349 | 2500772 | LAW DEPARTMENT COMPUTER SYSTEMS | LAW DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2560345 | JOB SEARCH AND PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2726455 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| RESOURCE NETWORK | 1007604 | 2778663 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| RESPONSE NETWORK | 1103012 | 2771949 | CUSTOM SOFTWARE DEVELOPMENT | POLICE DEPARTMENT |
| RIGHT ASSOCIATES /JANNOTTA BRAY & ASSOCIATES | 20383 | 2511677 | EXECUTIVE COACHING SERVICES | HUMAN RESOURCES DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623897 | | LAW DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623906 | | LAW DEPARTMENT |
| RILEY ROUMELL & CONNOLLY PC | 1060612 | 2623942 | | LAW DEPARTMENT |
| RLI INSURANCE COMPANY | 1099957 | 2765028 | | WATER DEPARTMENT |
| ROBERT C BIRKS MD PC | 7251 | 2578999 | | HUMAN SERVICES DEPARTMENT |
| ROBERT C BIRKS MD PC | 7251 | 2592085 | | HUMAN SERVICES DEPARTMENT |
| ROBERT MATHEWS & ASSOCIATES INC | 1059586 | 2620918 | | HUMAN SERVICES DEPARTMENT |
| ROBERT SEDLER | 9851 | 2769756 | CONSULTANT SERVICES | LAW DEPARTMENT |
| ROSE & ROSE | 15597 | 2500750 | LEGAL SERVICES | NO DEPARTMENT INDICATED |
| ROSS LEARNING INC | 10675 | 2562588 | WF WTW TIREMAN/GREYDALE PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2562593 | WF & WTW FORT WAYNE PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2554055 | BASIC LITERACY & COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2562407 | WF & WTW LTC PY 2002 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2549631 | WTW COMPETITIVE COORDINATION | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2537106 | WIA ITA IMPLEMENTATION PY 01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2540277 | WF & FOOD STAMP ITA PY 01 | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2572344 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2624160 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROSS LEARNING INC | 10675 | 2599059 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| ROY F WESTON INC | 16868 | 2512933 | ENVIRONMENTAL SERVICES - FICS #74431 | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| ROY F WESTON INC | 16868 | 2501574 | WATERFRONT RECLAMATION PROJECT | LAW DEPARTMENT |
| ROY F WESTON INC | 16868 | 2531736 | VARIOUS HEALTH AND SAFETY PROGRAMS | WATER DEPARTMENT |
| ROYAL ROOFING CO INC | 13119 | 2730710 | ROOF REPLACEMENT | RECREATION DEPARTMENT |
| S D HAMILTON GROUP | 1019484 | 2603327 | | FINANCE DEPARTMENT |
| SABRE CONTRACTING LLC | 1106108 | 2797979 | RENOVATIONS | RECREATION DEPARTMENT |
| SACRED HEART MAJOR SEMINARY | 1576 | 2501491 | FICS CONTRACT 078684 SPO 2510159 | HEALTH DEPARTMENT |
| SACRED HEART REHABILITATION CENTER, INC | 1013401 | 2507443 | MEDICAID S.A. FYE 9/99 SACRED HEART | HEALTH DEPARTMENT |
| SAFE CENTER INC | 19547 | 2501207 | | NO DEPARTMENT INDICATED |
| SAFE CENTER INC | 19547 | 2557542 | FAMILY SERVICES AND COUNSELING | FINANCE DEPARTMENT |
| SAFE CENTER INC | 19547 | 2533141 | EMERGENCY SERVICES | HUMAN SERVICES DEPARTMENT |
| SALVATION ARMY BOOTH SERVICES | 15401 | 2510155 | TRANSITIONAL HOUSING | FINANCE DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538824 | LEGAL SERVICES | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538789 | LEGAL SERVICES | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538820 | LEGAL SERVICES:  CLAUDE NELSON V CITY | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2505098 | LEGAL SERVICES | FINANCE DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538816 | BRADFORD ERVING V CITY/HAYWARD | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2538794 | EST. OF TOMMIE THOMAS V CITY | LAW DEPARTMENT |
| SANDERS & JOHNSON PLLC | 1003611 | 2534988 | PATRICK HATFIELD V CITY | LAW DEPARTMENT |
| SBC GLOBAL SERVICES | 1075635 | 2850826 | | WATER DEPARTMENT |
| SCHINDLER ELEVATOR CORPORATION | 6926 | 2558355 | MADISON CENTER ELEVATOR MAINTENANCE | NO DEPARTMENT INDICATED |
| SCHUMAKER & COMPANY INC | 1064547 | 2689171 | | BUDGET DEPARTMENT |
| SER CASA ACADEMY | 1025139 | 2589594 | EMPOWERMENT ZONE- PUBLIC SERVICE | PLANNING AND DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2528378 | YOUTH OPPORTUNITY GRANT  # 2 | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2519316 | YOUTH OPPORTUNITIES | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2622682 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2536987 | INDIVIDUAL TRAINING ACCOUNTS | EMPLOYMENT AND TRAINING DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2594584 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2501434 | PUBLIC FACILITY REHAB | NO DEPARTMENT INDICATED |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2778762 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2775948 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SER METRO DETROIT - JOB FOR PROGRESS | 3369 | 2761551 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SERCO INC | 16569 | 2568070 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2623557 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2548196 | PARTNERSHIP FOR ADULT LEARNING | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2561194 | JOB SEARCH AND JOB PLACEMENT (JSP) | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2561177 | JOB SEARCH AND PLACEMENT(DEC-2K) | EMPLOYMENT AND TRAINING DEPARTMENT |
| SERCO INC | 16569 | 2778471 | | WORKFORCE DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SERCO INC | 16569 | 2806253 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SFT INCORPORATED | 1033579 | 2536333 | FOR MISTERSKI POWER PLANT PROJECT | CITY COUNCIL |
| SHAR HOUSE | 11024 | 2501503 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SHAR HOUSE | 11024 | 2501501 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SHAR HOUSE | 11024 | 2564200 | WOMEN AND CHILDREN EXPANSION GRANT | HEALTH DEPARTMENT |
| SHAR HOUSE | 11024 | 2501642 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| SHARON B HARBIN | 1007355 | 2500897 | APPRAISAL SERVICES | WATER DEPARTMENT |
| SHARON RODDY MD | 1016242 | 2544065 | | HUMAN SERVICES DEPARTMENT |
| SHEVRIN CONSULTING SERVICES | 1081120 | 2658592 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| SIEMENS BUILDING TECHNOLOGIES INC | 1080147 | 2799544 | CONTROL SYSTEM IMPROVEMENTS | RECREATION DEPARTMENT |
| SIEMENS HEALTHCARE DIAGONSTICS | 1101501 | 2849348 | ON-SITE DRUG TESTING | HEALTH DEPARTMENT |
| SIGMA ASSOCIATES INC | 16676 | 2516544 | CS-1076 BELLE ISLE REHAB | SEWERAGE DEPARTMENT |
| SILVERI ARCHITECTS | 1031901 | 2549574 | EMPOWERMENT ZONE IMPROVEMENT | RECREATION DEPARTMENT |
| SIMON HOUSE | 18009 | 2541640 | PERMANENT HOUSING (FICS#074931) | FINANCE DEPARTMENT |
| SIMON HOUSE | 18009 | 2510640 | EMERGENCY SHELTER | FINANCE DEPARTMENT |
| SIMONE CONTRACTING CORPORATION | 1000476 | 2786501 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| SMITH BROS ELECTRIC INC | 1018473 | 2582919 | | FINANCE DEPARTMENT |
| SMITH BROS ELECTRIC INC | 1018473 | 2505208 | INSTALL VOICE AND DATA WIRING SERVICES | INFORMATION TECHNOLOGY SERVICES |
| SMITH GROUP JJR LLC | 1003317 | 2504102 | LONG TERM MANAGEMENT | FINANCE DEPARTMENT |
| SNELL ENVIRONMENTAL GROUP INC | 1000483 | 2502200 | ABATEMENT ASBESTOS | DEPARTMENT OF PUBLIC WORKS |
| SNELL ENVIRONMENTAL GROUP INC | 1000483 | 2500795 | ENGINEERING SERVICES FOR NEW BRIDGES | DEPARTMENT OF PUBLIC WORKS |
| SO DEEP INC | 1094716 | 2727176 | | WATER DEPARTMENT |
| SOBH PROPERTY MANAGEMENT LLC | 1018847 | 2515472 | | HEALTH DEPARTMENT |
| SOBRIETY HOUSE INC | 1797 | 2501505 | SUBSTANCE ABUSE COORDINATION AGENCY | HEALTH DEPARTMENT |
| SOBRIETY HOUSE INC | 1797 | 2501734 | MEDICAID SUBSTANCE ABUSE | HEALTH DEPARTMENT |
| SOCIETY OF ST VINCENT DE PAUL | 10460 | 2587915 | | FINANCE DEPARTMENT |
| SONDRA E JENKINS | 1013274 | 2507145 | JOINT L-M/QI PROJECT CONSULTANT | HUMAN RESOURCES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2587309 | | HUMAN SERVICES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2532516 | HEAD START PROGRAM | HUMAN SERVICES DEPARTMENT |
| SOUTHEAST CHILDREN AND FAMILY DEVELOPMENT HEAD START | 10372 | 2504138 | HEAD START PROGRAM 1998-99 | HUMAN SERVICES DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2593437 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501895 | HEALTHY START INIT 8/98 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2560866 | CPBC MASTER AGREEMENT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2516778 | FIDUCIARY SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538658 | HEALTHY START INITIATIVE PROGRAM | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2556341 | FIDUCIARY SERVICES FOR LEAD FREE DETROIT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2537516 | CPBC MASTER CONTRACT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501527 | EPSDT (HEALTHY KIDS) | NO DEPARTMENT INDICATED |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2625403 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2522514 | HEALTHY START INITIATIVE | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2507951 | HIV EMERGENCY RELIEF 2/00 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501918 | 25 STD CONTROL 9-98 AND 9-99 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2501498 | HOPWA-PERSONS W/AIDS HSG | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2505868 | 25 STD & TB PHYSICIAN SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2502007 | STD & TB PYHSICIAN | NO DEPARTMENT INDICATED |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2536778 | FETAL INFANT MORTALITY REVIEW GRANT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2516123 | EPSDT ( HEALTHY KIDS ) | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2528888 | SEMHA - CCA ADMINISTRATION | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538739 | HIV/AIDS PROJECT CPO | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2665698 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2587750 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2506174 | 25 TB/HIV CONTROL PROGRAM - 12/99 | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2510504 | LEAD FREE DETROIT PROJECT | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2581401 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2504657 | FISCAL MANAGEMENT SERVICES | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2614575 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2612915 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2619300 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2538646 | REFUGEE HEALTH SCREENING PROGRAM | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2613498 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2571721 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2766781 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2766314 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2793186 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2770373 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2753985 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2761660 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2788671 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2755765 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2784430 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2799776 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2796870 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2797934 | | HEALTH DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2797936 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2624694 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2799792 | | HEALTH DEPARTMENT |
| SOUTHEASTERN MICHIGAN HEALTH | 8092 | 2776660 | | HEALTH DEPARTMENT |
| SOUTHWEST COUNSELING | 1000589 | 2549618 | CAREER INITIATIVES CENTER PROJECT | HUMAN SERVICES DEPARTMENT |
| SOUTHWEST COUNSELING | 1000589 | 2593318 | | FINANCE DEPARTMENT |
| SOUTHWEST DETROIT BUSINESS ASSOCIATION | 19640 | 2548414 | | FINANCE DEPARTMENT |
| SOUTHWEST DETROIT COMMUNITY | 1067854 | 2606819 | | FINANCE DEPARTMENT |
| SPALDING DEDECKER ASSOCIATES INC | 1427 | 2632652 | | RECREATION DEPARTMENT |
| SPEC ASSOCIATES | 19262 | 2765376 | | HUMAN SERVICES DEPARTMENT |
| SPECTRUM HUMAN SERVICES | 20301 | 2501508 | SUBSTANCE ABUSE COORDINATION AGENCY | NO DEPARTMENT INDICATED |
| SPIEGEL & MCDIARMID | 19669 | 2501813 | LEGAL SERVICES | PUBLIC LIGHTING DEPARTMENT |
| ST GREGORY COMMUNITY CENTER | 16937 | 2511397 | P&DD PUBLIC SERVICE | FINANCE DEPARTMENT |
| ST PATRICKS SENIOR CENTER INC | 12493 | 2502481 | SENIOR CITIZENS MEAL | HEALTH DEPARTMENT |
| ST REGIS DETROIT PARTNERS LLC | 1102961 | 2770016 | | POLICE DEPARTMENT |
| STAR CENTERS INC | 1003699 | 2501619 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| STELLA B SEIDEN | 2398 | 2502097 | | NO DEPARTMENT INDICATED |
| STEVEN H SCHWARTZ & ASSOCIATES PLC | 1079707 | 2859743 | | WATER DEPARTMENT |
| STONE & WEBSTER MICHIGAN INC | 8561 | 2500914 | MISTERSKY PWR PLANT CONSULTING | PUBLIC LIGHTING DEPARTMENT |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2620837 | | NON-DEPARTMENTAL |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2767687 | CONTRACT FOR PROFESSIONAL SERVICES | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2681666 | | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2554729 | 2001/2002 CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| STRATEGIC STAFFING SOLUTIONS | 17268 | 2643900 | | INFORMATION TECHNOLOGY SERVICES |
| STROHL SYSTEMS GROUP INC | 19599 | 2514946 | 970259-COMPUTER - SOFTWARE LICENSE | INFORMATION TECHNOLOGY SERVICES |
| STS CONSULTANTS LTD | 1027626 | 2619993 | | RECREATION DEPARTMENT |
| SWORD SOLUTIONS INC | 1075932 | 2634531 | | HEALTH DEPARTMENT |
| SYNC TECHNOLOGIES INC | 1025602 | 2643904 | | INFORMATION TECHNOLOGY SERVICES |
| SYNC TECHNOLOGIES INC | 1025602 | 2681667 | | INFORMATION TECHNOLOGY SERVICES |
| SYNC TECHNOLOGIES INC | 1025602 | 2804856 | | HUMAN SERVICES DEPARTMENT |
| SYNC TECHNOLOGIES INC | 1025602 | 2686900 | | WATER DEPARTMENT |
| SYNCH SOLUTIONS | 1102866 | 2768084 | CONTRACT FOR TECHNOLOGY RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| SYSTEMS & SOFTWARE INC | 1075876 | 2640713 | | WATER DEPARTMENT |
| SYSTEMS CONSULTING GROUP LLC | 1021802 | 2537205 | CONSULTANT SERVICES | DEPARTMENT OF TRANSPORTATION |
| T & T BUILDERS | 1025258 | 2544439 | HOME WEATHERIZATION | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2524579 | WEATHERIZATION PROGRAM | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2525183 | | FINANCE DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| T & T BUILDERS | 1025258 | 2672030 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2607322 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2789080 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2732569 | | HUMAN SERVICES DEPARTMENT |
| T & T BUILDERS | 1025258 | 2761175 | | HUMAN SERVICES DEPARTMENT |
| TARA TUOMAALA | 1047262 | 2569166 | | CULTURAL AFFAIRS DEPARTMENT |
| TC SIMMONS VISITING MINISTRY | 18571 | 2510152 | SHELTER AND SERVICE | FINANCE DEPARTMENT |
| TECH TOWN | 1107416 | 2807786 | | HUMAN SERVICES DEPARTMENT |
| TEI ENVIRONMENTAL SOLUTIONS LLC | 1109309 | 2548181 | (UNIROYAL) INTERIM RESPONSE ACTIVITIES FOR EAST JEFFERSON AT BELLE ISLE | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| TEI ENVIRONMENTAL SOLUTIONS LLC | 1109309 | 2563252 | BROWNFIELD SAP PHASE I AND PHASE II | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| TETRA TECH MPS | 1030048 | 2633203 | | DEPARTMENT OF PUBLIC WORKS |
| THE ARTS PLACE | 20040 | 2643815 | | RECREATION DEPARTMENT |
| THE BARTECH GROUP | 1036576 | 2681675 | | INFORMATION TECHNOLOGY SERVICES |
| THE BARTECH GROUP | 1036576 | 2643893 | | INFORMATION TECHNOLOGY SERVICES |
| THERMO JARRELL ASH CORP | 23280 | 2502432 | MAINTENANCE | FINANCE DEPARTMENT |
| THOMAS E MARSHALL PC | 17881 | 2511456 | SHAUN NEAL, ET AL V CITY OF DETROIT, ET AL | LAW DEPARTMENT |
| THOMAS E MARSHALL PC | 17881 | 2513521 | LIGENS D. MOORE V CITY OF DETROIT | LAW DEPARTMENT |
| THOMAS J WALSH APPRAISAL CO | 20198 | 2502095 | CASINO SITE APPRAISER | LAW DEPARTMENT |
| ~~THOMPSON HINE LLP~~ | ~~1097967~~ | ~~2799254~~ | | ~~WATER DEPARTMENT~~ |
| TIBURON INC | 1072420 | 2614989 | | POLICE DEPARTMENT |
| TIBURON INC | 1072420 | 2637943 | | POLICE DEPARTMENT |
| TILLMAN & TILLMAN PC | 1018624 | 2515016 | WILLIAM GRAHAM V CITY/MANSON | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562545 | LEGAL SERVICES:  LYNN/BEAUCHAMP V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544381 | RYAN LACKIE V CITY OF DETROIT/FULKS | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2632190 | | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2534965 | ANDREOS COOPER  V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562570 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2508654 | SHANNON L. TROMEUR V JULIUS LIGE | HEALTH DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2502450 | LEGAL SERVICES:  WILLIAM BURKES V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544404 | TITO BURLEIGH V CITY/WILLIAMS | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2508661 | LEGAL SERVICES: TUCKER V CITY OF DETROIT | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562575 | HENRY BROWN V CITY/JULIUS TATE | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562563 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544430 | TOMMIE THOMAS V CITY, ET AL | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2562559 | TORI CARTER, ET AL V CITY | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2502452 | LEGAL SERVICES | LAW DEPARTMENT |
| TIMMIS & INMAN LLP | 19998 | 2544420 | RUPERT/HAYES/BOWERS V BROWN | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| TISEO BROTHERS INC | 18296 | 2501389 | VIRGINIA PARK PAVING | NO DEPARTMENT INDICATED |
| TODD PHILLIPS CHILDRENS HOME | 16998 | 2501778 | | NO DEPARTMENT INDICATED |
| TRAVELLERS AID SOCIETY OF DET | 15890 | 2501964 | EMERGENCY SHELTER | HUMAN SERVICES DEPARTMENT |
| TUCKER YOUNG JACKSON TULL INC | 15600 | 2507286 | CS 1264 WATER LOSS SURVEY | WATER DEPARTMENT |
| TUCKER YOUNG JACKSON TULL INC | 15600 | 2752501 | | WATER DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2563101 | WORKFIRST/WELFARE TO WORK | EMPLOYMENT AND TRAINING DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2550329 | OPERATION FAST BREAK/ PAL | EMPLOYMENT AND TRAINING DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2696181 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2803891 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2778474 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TWW & ASSOCIATES INC | 15821 | 2806255 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| TXU ENERGY SERVICE | 1021990 | 2525960 | CITY WIDE NATURAL GAS PURCHASE | PUBLIC LIGHTING DEPARTMENT |
| UNIGLOBE CONSTRUCTION CO | 19275 | 2793402 | | HUMAN SERVICES DEPARTMENT |
| UNITED COMMUNITY HOUSING COALITION | 9812 | 2510128 | HOMELESS ASSISTANCE PROGRAM | FINANCE DEPARTMENT |
| UNIVERSAL SYSTEM TECHNOLOGIES INC | 20223 | 2589037 | | INFORMATION TECHNOLOGY SERVICES |
| UNIVERSAL SYSTEM TECHNOLOGIES INC | 20223 | 2768088 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| UNIVERSITY FAMILY PHYSICIANS | 1045603 | 2541597 | ENV:  MEDICAL MONITORING SERVICES | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| UNIVERSITY OF DETROIT MERCY | 1051358 | 2722921 | | RECREATION DEPARTMENT |
| UNIVERSITY OF MICHIGAN | 8466 | 2500990 | EMERGENCY RESPONSE PLANNING | WATER DEPARTMENT |
| UNIVERSITY PHYSICIAN GROUP | 1093137 | 2799075 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2530120 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2595456 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2567920 | | HEALTH DEPARTMENT |
| UNIVERSITY WOMEN'S CARE | 1030044 | 2614558 | | HEALTH DEPARTMENT |
| UNLIMITED SOLUTIONS INC | 17906 | 2502050 | PROGRAMMING CODING | INFORMATION TECHNOLOGY SERVICES |
| UNLIMITED SOLUTIONS INC | 17906 | 2554534 | 2001/2001 CONTRACTUAL RESOURCES | INFORMATION TECHNOLOGY SERVICES |
| UPTOWN LAND  DEVELOPMENT CORP | 18833 | 2501758 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| URBAN MANAGEMENT CORP | 20310 | 2502173 | FLEET MAINTENANCE SERVICES | DEPARTMENT OF PUBLIC WORKS |
| URBANWERKS LLC | 1083053 | 2664787 | | RECREATION DEPARTMENT |
| URS CORPORATION | 1052537 | 2607949 | | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| URSO PALMER & ROSS PC | 1048532 | 2574335 | | CITY COUNCIL |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2506589 | PUBLIC SERVICE AND REHAB | FINANCE DEPARTMENT |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2584237 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| U-SNAP BAC NON-PROFIT CORP | 20364 | 2501597 | SITE IMPROVEMENTS HOUSING | NO DEPARTMENT INDICATED |
| V W PROPERTIES | 1084250 | 2531882 | | POLICE DEPARTMENT |
| V W PROPERTIES | 1084250 | 2509482 | | POLICE DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2505192 | LEGAL SERVICES:  DEWOLF, ET AL V CITY | LAW DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| VAN OVERBEKE & ASSOCIATES | 20121 | 2521182 | LYNN/BEAUCHAMP V CITY/RADFORD | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2505073 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2539172 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2515553 | LEGAL SERVICES: KIMBER V CITY/ADUROJA | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2521167 | LEGAL SERVICES: LONGSTREET V JORDAN | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2536310 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN OVERBEKE & ASSOCIATES | 20121 | 2511869 | LEGAL SERVICES | LAW DEPARTMENT |
| VAN SCOYOC ASSOCIATES INC | 1070940 | 2617193 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2594482 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2563075 | BLUE CROSS/BLUE SHIELD RESERVE FUND | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2544823 | LEGAL SERVICES | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2546318 | LEGAL SERVICES | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2591271 | | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2563068 | TOYIA MOODY/STEPHANIE BENNETT V CITY | LAW DEPARTMENT |
| VANOVERBEKE MICHAUD & TIMMONY P C | 1026688 | 2632746 | | LAW DEPARTMENT |
| VARNUM RIDDERING SCHMIDT | 17517 | 2502367 | TELECOMMUNICATIONS/FIBER OPTICS | LAW DEPARTMENT |
| VARNUM RIDDERING SCHMIDT | 17517 | 2514143 | LEGAL SERVICES | LAW DEPARTMENT |
| VENABLE BAETJER HOWARD LLP | 20054 | 2503723 | PROFESSIONAL SERVICES | CITY COUNCIL |
| VIRCHOW KRAUSE & CO LLP | 1099691 | 2746850 | | FINANCE DEPARTMENT |
| VIRGINIA PARK CITIZENS SERVICE | 16867 | 2719711 | | DEPARTMENT OF TRANSPORTATION |
| VISION INFORMATION TECHNOLOGIES | 1011855 | 2542788 | WEB DEVELOPMENT | INFORMATION TECHNOLOGY SERVICES |
| VOICE PRINT INTERNATIONAL INC | 1045791 | 2816063 | MAINTENANCE FOR VOICE SERVICES | POLICE DEPARTMENT |
| VORHIES ESTATE INC | 1005399 | 2517975 | | HUMAN SERVICES DEPARTMENT |
| VS VISUAL STATEMENT INC | 1076618 | 2796124 | | POLICE DEPARTMENT |
| W D LEE CENTER FOR LIFE MANAGEMENT | 1003687 | 2502211 | MEDICAID SUBSTANCE ABUSE | NO DEPARTMENT INDICATED |
| W-3 CONSTRUCTION COMPANY | 1022302 | 2796096 | LIGHTING IMPROVEMENTS | RECREATION DEPARTMENT |
| ~~WADE TRIM ASSOCIATES INC~~ | ~~16157~~ | ~~2514240~~ | ~~WASTEWATER SYSTEM IMPROVEMENT~~ | ~~SEWERAGE DEPARTMENT~~ |
| ~~WADE TRIM ASSOCIATES INC~~ | ~~16157~~ | ~~2635552~~ | | ~~WATER DEPARTMENT~~ |
| WALBRIDGE-ALDINGER CO | 2782 | 2588907 | | WATER DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2529880 | PRIMARY CLARIFIER NUMBERS 17 AND 18 | SEWERAGE DEPARTMENT |
| WALBRIDGE-ALDINGER CO | 2782 | 2517999 | SECONDARY CLARIFIER IMPROVEMENTS | SEWERAGE DEPARTMENT |
| WALSH CONSTRUCTION | 1003706 | 2540999 | CONNER CREEK PILOT CSO CONTROL FACILITY | SEWERAGE DEPARTMENT |
| WARM TRAINING CENTER | 1099138 | 2798140 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING CENTER | 1099138 | 2761360 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2637413 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2592885 | | FINANCE DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2746897 | | HUMAN SERVICES DEPARTMENT |
| WARM TRAINING PROGRAM INC | 1001814 | 2808870 | | HUMAN SERVICES DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WARM TRAINING PROGRAM INC | 1001814 | 2706004 | | HUMAN SERVICES DEPARTMENT |
| WARREN CONNER DEVELOPMENT COALITIONS | 1015379 | 2515838 | WARREN CONNER SA FYE 9/99 | HEALTH DEPARTMENT |
| WARREN CONNER DEVELOPMENT COALITIONS | 1015379 | 2736044 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE COUNTY | 18789 | 2560623 | WF/WTW JOB SEARCH AND JOB PLACEMENT | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE COUNTY | 18789 | 2574696 | | POLICE DEPARTMENT |
| WAYNE COUNTY | 18789 | 2772891 | | POLICE DEPARTMENT |
| WAYNE COUNTY COMMUNITY COLLEGE | 1008933 | 2782908 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE COUNTY COMMUNITY COLLEGE | 1008933 | 2782906 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539793 | | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539816 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539788 | TARGET CITIES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539821 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2516330 | WSU - UNIVERSITY CONSORTIUM | HUMAN RESOURCES DEPARTMENT |
| WAYNE STATE UNIVERSITY | 1015979 | 2539807 | PREVENTATIVE SERVICES | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2560543 | CITY/UNIVERSITY CONSORTIUM | HUMAN RESOURCES DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2532723 | WIA TITLE I OFFICE AUTOMATION TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2501980 | TITLE III OFFICE AUTOMATION TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2571280 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2552859 | OFFICE AUTOMATION & WORD PROCESSING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2519218 | WORD PROCESS TRAINING | EMPLOYMENT AND TRAINING DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2611249 | | POLICE DEPARTMENT |
| WAYNE STATE UNIVERSITY | 3116 | 2501174 | | NO DEPARTMENT INDICATED |
| WAYNE STATE UNIVERSITY | 3116 | 2765357 | | CITY COUNCIL |
| WAYNE STATE UNIVERSITY | 3116 | 2797492 | | HEALTH DEPARTMENT |
| WAYNE STATE UNIVERSITY COLLEGE | 19759 | 2502190 | | PLANNING AND DEVELOPMENT DEPARTMENT |
| WAYNE STATE UNIVERSITY COLLEGE | 19759 | 2500873 | EZ PROGRAM OPERATIONS | NO DEPARTMENT INDICATED |
| WCI CONTRACTORS | 17607 | 2681202 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2733883 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2762089 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2708713 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2731182 | | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2762091 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2729538 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2785381 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WCI CONTRACTORS | 17607 | 2799443 | CONSTRUCTION CONTRACT | RECREATION DEPARTMENT |
| WE CARE DEVELOPMENT CORP | 20361 | 2627183 | | WORKFORCE DEVELOPMENT DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| WEISS CONSTRUCTION CO | 16586 | 2500908 | DWS-805 SUBURBAN METER AUTOMATION | WATER DEPARTMENT |
| WEISS CONSTRUCTION CO | 16586 | 2501482 | DWS-800 SUBURBAN WATER METERS | WATER DEPARTMENT |
| WELLSPRING | 18110 | 2597175 | | FINANCE DEPARTMENT |
| WEST COAST LABOUR SYSTEMS CORP | 1117330 | 2868714 | | WATER DEPARTMENT |
| WEST DETROIT INTERFAITH | 1044949 | 2554192 | | FINANCE DEPARTMENT |
| WESTFIELD DETROIT LLC | 1021039 | 2517679 | | HUMAN SERVICES DEPARTMENT |
| WESTIN ENGINEERING INC | 14468 | 2767695 | PROFESSIONAL SERVICES CONTRACT | INFORMATION TECHNOLOGY SERVICES |
| WILDWOOD RANCH | 1012803 | 2547128 | DETROIT RESCUE MISSION | HUMAN SERVICES DEPARTMENT |
| WILDWOOD RANCH | 1012803 | 2516691 | SUMMER CAMPERSHIPS TO URBAN YOUTHS | HUMAN SERVICES DEPARTMENT |
| WILLA R WALKER LLC | 1071151 | 2618732 | | CULTURAL AFFAIRS DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501454 | GRAIMARK REHAB PROJ - FICS #79019 | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501725 | ENVIRONMENTAL STATUTES & REGULATIONS | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2505940 | LEGAL SERVICES-ENVIRONMENTAL | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2500981 | FICS #68652-MID-CITY REVITALIZATION | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2559971 | ERNEST MONROE V CITY OF DETROIT | WATER DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2623874 | | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2501539 | CASINO DEVELOPMENT PROJECT | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2553947 | BRUSH PARK PROJECT | PLANNING AND DEVELOPMENT DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2641654 | LEGAL SERVICES | LAW DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2593326 | LEGAL SERVICES | ENVIRONMENTAL AFFAIRS DEPARTMENT |
| WILLIAMS ACOSTA PLLC | 1049952 | 2512512 | LEGAL SERVICES | LAW DEPARTMENT |
| WILLIE L MAYO CPA | 1021915 | 2518939 | AUDIT TRAINING | HUMAN SERVICES DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2568507 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2618093 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2679478 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2566621 | | WATER DEPARTMENT |
| WILLIE MCCORMICK ASSOCIATES INC | 1001824 | 2673433 | | WATER DEPARTMENT |
| WINDHAM REALTY GROUP INC | 17474 | 2500986 | VIC PARK MANAGER | PLANNING AND DEVELOPMENT DEPARTMENT |
| WOMENS JUSTICE CENTER | 14689 | 2508100 | | HUMAN SERVICES DEPARTMENT |
| WOMENS JUSTICE CENTER/MY SISTER PLACE | 1031434 | 2535491 | DOMESTIC VIOLENCE SERVICES | POLICE DEPARTMENT |
| WORKBRAIN INC | 1087022 | 2688977 | | NON-DEPARTMENTAL |
| WTF COMPANY LLC | 1009825 | 2509611 | | POLICE DEPARTMENT |
| XEROX CORPORATION | 20143 | 2527583 | PHOTOCOPIER MAINTENANCE | COMMUNICATIONS AND CREATIVE SERVICES DEPARTMENT |
| YMCA OF METRO DETROIT | 17203 | 2502285 | PUBLIC FACILITY REHABILITATION | NO DEPARTMENT INDICATED |
| YMCA OF METROPOLITAN DETROIT | 1071155 | 2801079 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUNG & BASILE | 19641 | 2515451 | LS-1317 LEGAL MANCHAK VS DWSD | WATER DEPARTMENT |

| Name of Counterparty | Vendor # | Contract # | Description | City Department |
|---|---|---|---|---|
| YOUNG DETROIT BUILDERS | 1008086 | 2516595 | | EMPLOYMENT AND TRAINING DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2797765 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2775343 | | HUMAN SERVICES DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2743797 | | HUMAN SERVICES DEPARTMENT |
| YOUNG DETROIT BUILDERS | 1008086 | 2803602 | | HUMAN SERVICES DEPARTMENT |
| YOUTH CONNECTION | 1054883 | 2801091 | | WORKFORCE DEVELOPMENT DEPARTMENT |
| YOUTH LINKS USA | 1044013 | 2552463 | OPERATION FAST BREAK | EMPLOYMENT AND TRAINING DEPARTMENT |
| YWCA INTERIM HOUSE | 2143 | 2535474 | SERVICES WITH DOMESTIC VIOLENCE UNIT | POLICE DEPARTMENT |
| YWCA INTERIM HOUSE | 2143 | 2508609 | ESG CONTRACT FICS # 078503 | FINANCE DEPARTMENT |
| ZETA STORK'S NEST FOUNDATION | 13210 | 2508767 | NOF PUBLIC SERVICE CONTRACT | FINANCE DEPARTMENT |

All collective bargaining agreements that had expired prior to confirmation to the extent that they purported to, or would be determined by applicable law to, provide continuing contractual benefits to employees or former employees of the City

# CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Notice of Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 20th day of August, 2014.

/s/ Heather Lennox