UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        August 19, 2014
                Debtor.        .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ORDER IDENTIFYING LEGAL ISSUES,
ESTABLISHING SUPPLEMENTAL BRIEFING SCHEDULE AND
SETTING HEARING DATES AND PROCEDURES - HEARING
RE. LEGAL ISSUE 6
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:         Jones Day
                        By:  HEATHER LENNOX
                        222 East 41st Street
                        New York, NY  10017
                        (212) 326-3837

For Syncora             Kirkland & Ellis, LLP
Holdings, Ltd.,         By:  RYAN BENNETT
Syncora Guarantee       300 North LaSalle
Inc., and Syncora       Chicago, IL  60654
Capital Assurance,      (312) 862-2000
Inc.:

For National            Sidley Austin, LLP
Public Finance          By:  GUY NEAL
Guarantee Corp.:        1501 K Street, N.W.
                        Washington, DC  20005
                        (202) 736-8041

For Official            Dentons, US, LLP
Committee of            By:  CLAUDE D. MONTGOMERY
Retirees:               670 Fifth Avenue
                        New York, NY  10020
                        (212) 632-8390

For Assured             Chadbourne & Parke, LLP
Guaranty Municipal      By:  SAMUEL KOHN
Corp.:                  30 Rockefeller Plaza
                        New York, NY  10112
                        (212) 408-1060

APPEARANCES (continued):

For the State of          Dickinson Wright
Michigan:                 By:  STEVEN HOWELL
                          500 Woodward Avenue, Suite 4000
                          Detroit, MI  48226-3245
                          (313) 223-3033

For Ambac                 Arent Fox, LLP
Assurance                 By:  CAROLINE ENGLISH
Corporation:              1717 K Street, NW
                          Washington, DC  20036
                          (202) 857-6178


Court Recorder:           Kristel Trionfi
                          United States Bankruptcy Court
                          211 West Fort Street, 21st Floor
                          Detroit, MI  48226-3211
                          (313) 234-0068

Transcribed By:           Lois Garrett
                          1290 West Barnes Road
                          Leslie, MI  49251
                          (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1        THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3        THE COURT:  Good morning.  Appearances, please.

4        MS. LENNOX:  Good morning, your Honor.  Heather

5  Lennox of Jones Day on behalf of the city, and with me is my

6  partner, Thomas Cullen.

7        MR. BENNETT:  Good morning, your Honor.  Ryan

8  Bennett of Kirkland & Ellis on behalf of Syncora.

9        MR. MONTGOMERY:  Good morning, your Honor.  Claude

10  Montgomery, Dentons US, for the Retiree Committee.

11        MR. NEAL:  Good morning, your Honor.  Guy Neal,

12  Sidley Austin, for National Public Finance Guarantee

13  Corporation.

14        MR. KOHN:  Good morning, your Honor.  Samuel Kohn of

15  Chadbourne & Parke on behalf of Assured Guaranty Municipal

16  Corp.

17        MR. HOWELL:  Good morning, your Honor.  Steven

18  Howell, Dickinson Wright, special assistant attorney general,

19  appearing on behalf of the State of Michigan.  Thank you.

20        THE COURT:  Okay.  Let's proceed.  Who's going

21  first?

22        MR. BENNETT:  Good morning, your Honor.  Ryan

23  Bennett again on behalf of Syncora.  Your Honor, among our

24  objections to the debtor's plan, Syncora objected to the

25  settlement embodied in the plan among the debtor and the

1    majority UTGO unlimited tax general obligation bond insurers

2    and the -- and how that structure creates an impermissible

3    one under Michigan state law and, thus, violates 943(b)(4) of

4    the Bankruptcy Code.  The Court raised an initial issue of

5    standing as part of the briefing, and Syncora did brief that

6    issue.  In short, Syncora has constitutional, statutory, and

7    prudential standing to bring this objection.  Syncora is a

8    creditor each in its capacity as an insurer, a holder, and

9    subrogee of COP claims, UTGO claims, and holder of various

10   other general unsecured claims.  Each of these claims is

11   proposed to be materially compromised and nonconsensually so

12   under the debtor's plan.

13         Article III of the U.S. Constitution provides a

14   requirement that a personal -- that to have standing we have

15   a personal stake in the outcome of the controversy, and here

16   confirmation of the plan is that outcome, and we certainly

17   have a personal stake in that.  On a statutory basis, Section

18   1109(b) permits a party in interest in any case to be heard,

19   and then Section 1128 of the Bankruptcy Code provides that a

20   creditor may object to confirmation, which is precisely what

21   this argument is today.

22         For purposes of prudential standing, some courts

23   have limited a creditor's standing to object only to the

24   provisions of a plan that relate to that particular

25   creditor's interest.  Here, Judge, we're talking about the

1    UTGO settlement and the treatment of the UTGO claims.

2    Syncora is an UTGO claimholder as a subrogee and an insurer

3    of UTGO claims, and so it certainly is germane to Syncora's

4    interest for purposes of prudential standing.

5         We also, for purposes of prudential standing, also

6    have -- are the sole equity holder of a subsidiary that

7    actually pays property taxes in the City of Detroit, and

8    these property taxes among them include the actual UTGO tax

9    levy that is at issue here today.  So that's our position on

10   standing, sir.

11        As to the objection, as you're aware, Syncora has

12   filed a number of objections to the plan.  Today this issue

13   is whether the UTGO settlement and the plan's treatment of

14   UTGO claims violate Michigan's Unlimited Tax Election Act and

15   other applicable Michigan law.  We believe that it does.

16   Specifically, the settlement dictates that the plan provided

17   for in this Court's confirmation order dictate a bifurcation

18   of the original UTGO claim amount and so that where 74

19   percent of the UTGO claim -- of the original -- or 74 percent

20   of the UTGO claims are refinanced with new bonds and taken

21   out, so the UTGO claimholders are fully entirely satisfied

22   under the plan, and 26 percent of those original claims --

23   those original bonds are kept outstanding in so-called stub

24   bonds with the interest in those bond proceeds being assigned

25   on behalf of all holders and all insurers who may have rights

1    to dictate that outcome assigned away to -- for the benefit

2    of the Retirement Systems.

3            This forces two outcomes, Judge.  Number one, the

4    taxpaying citizens of Detroit are not required to continue to

5    pay a tax for something which they never approved as part of

6    the election process and the voting process.  And, number

7    two, Syncora's interest in that 26 percent is being

8    nonconsensually assigned away without our permission or

9    approval.

10            Now, Article IX, Section 6, of the Michigan

11   Constitution provides that the terms --

12            THE COURT:  How much in these bonds does your client

13   hold --

14            MR. BENNETT:  We insure --

15            THE COURT:  -- or insure?

16            MR. BENNETT:  We insure approximately 40 million,

17   and we hold outright through subrogation, I think, about 6 or

18   7 million.  So Article IX of the Michigan Constitution

19   provides that a municipality may impose taxes for the payment

20   of bonds approved by the electors.  All right.  And then

21   there's the statute that we've been referencing, the

22   Unlimited Tax Election Act, that provides the means by which

23   a municipality can seek approval of those taxes from its

24   electorate.  And that particular section says that a city's

25   voters, quote, "may make one or more binding unlimited tax

1    pledges for payment of one or more tax obligations referred

2    to in the ballot." All right. So when this went out for

3    vote, all right, it was the -- the obligation that was sought

4    through this ad valorem tax was to pay the UTGO bonds, the

5    original issue UTGO bonds, not 74 percent of the UTGO bonds

6    and 26 percent to the Retirement Systems but the UTGO bonds.

7    All right. So the -- and then there's an additional --

8            THE COURT: Right, but what in law, federal or

9    state, prohibits the assignment that the plan proposes?

10           MR. BENNETT: Two things. State law. The state law

11   in Michigan looks to the substance of a transaction, not the

12   form. Here what you've got is an attempt to -- a very

13   creative, albeit, attempt to sidestep the electoral process

14   and funnel money from the taxpayers of the city to a

15   recipient whom they never intended it to go -- to whom they

16   never intended it to go. Number two, from a federal law

17   standpoint, Judge, what's happening here is it's not just the

18   interest of the folks in the room who reached a settlement

19   agreement ex parte of Syncora, you know. It is Syncora's

20   interest also in this 26-percent proceeds that's being

21   assigned away.

22           THE COURT: Well, but let's go back to argument

23   number one --

24           MR. BENNETT: Yes, sir.

25           THE COURT: -- before we get to number two.

1        MR. BENNETT:  Um-hmm, sure.

2        THE COURT:  How does the assignment violate the

3   voters' rights because it's the bondholders' rights that are

4   being assigned?

5        MR. BENNETT:  Yes, but the bondholders via their

6   insurers who have the control are agreeing to take full and

7   complete satisfaction of their UTGO claim, their original

8   UTGO claim, and that was the claim that was subject to the

9   electorate's vote.  And so now that that claim is being

10  satisfied in its entirety via this refinancing equal to 74

11  percent of the claim amount, the tax should reflect that

12  satisfaction and the refinancing based on the 74 percent,

13  not -- and not continue to levy --

14       THE COURT:  Hold on.

15       MR. BENNETT:  -- the hundred percent.

16       THE COURT:  Yes.  We need a break.

17       MR. BENNETT:  Yes, sir.

18       THE COURT:  Can we just sit here, or do you want me

19  to actually leave?  Oh, all right.  All right.  We'll just

20  sit here.

21       MR. BENNETT:  All right.  No problem.

22       THE COURT:  Have a seat.

23       MR. BENNETT:  Okay.  Thanks.

24       THE COURT:  What should I say?  Motion granted?  Are

25  we all set?

1          UNIDENTIFIED SPEAKER:  Yes.

2          THE COURT:  Thank you.  So if I can try to summarize

3     your argument --

4          MR. BENNETT:  Um-hmm.

5          THE COURT:  -- because normally a creditor can gift

6     or assign its rights vis-a-vis the debtor to anyone at any

7     time; right?

8          MR. BENNETT:  Yeah.  That's correct, sir.

9          THE COURT:  That's not the problem.  What you're

10    arguing is that the satisfaction of the UTGO bonds by the

11    reissuance at 74 percent gives the voters the right to have

12    their tax reduced accordingly or proportionately or whatever.

13         MR. BENNETT:  Right, so in that --

14         THE COURT:  Is that the argument?

15         MR. BENNETT:  That is correct, sir, and that -- how

16    that works out under the Michigan law is there's the Uniform

17    Tax Election Act.  That speaks to what the voters approved

18    the levy for; right?  They approved it to pay the bonds,

19    not --

20         THE COURT:  Right.

21         MR. BENNETT:  -- the retirees.  Then there's this

22    other complementary act, which the language in the

23    confirmation order -- the proposed confirmation order

24    language that the settlement is asking you to enter says that

25    you're going to approve --

1          THE COURT:  Um-hmm.

2          MR. BENNETT:  -- you're going to say that this --

3    the settlement complies with, it's under the Revised

4    Municipal Finance Act.  And that says when any municipality

5    completes the retirement of a debt evidenced by a municipal

6    security, here the prior UTGO bonds, the county treasurer

7    shall no longer be required to recognize a levy for that

8    debt.  Okay.  So that's the statutory realization of the

9    conclusion you just kind of reiterated to me.

10         THE COURT:  Um-hmm.  Okay.

11         MR. BENNETT:  So taken together, these two statutes,

12   the UTEA and RMFA, provide that qualified electors may

13   approve unlimited tax levies of ad valorem taxes.  The city

14   cannot levy more taxes than necessary to pay the obligations

15   approved by the voters, and when sufficient funds have been

16   collected to retire the obligations, no further taxes will be

17   levied.  But the city's plan provides that on account of, you

18   know, the allowed 388 million original UTGO claim, the UTGO

19   holders in full satisfaction of those allowed claims shall

20   receive new bonds equal to that 74-percent amount we talked

21   about and -- but, however, under the Revised Municipal

22   Finance Act, the levy as to the 26 percent should cease.  If

23   they want to have a -- if they want to be able to roll the

24   levy over as to the 74 because they are unlimited tax bonds

25   and because they are the basis that the voters approved the

1  taxation under the UTEA, they can do that but not as to the

2  26 percent going over to the retirees. As I said, the city

3  has engineered and the UTGO insurers have engineered this

4  very creative clever form over substance argument, but courts

5  in the Sixth Circuit and in Michigan do not recognize form

6  over substance. They look to substance when it comes to this

7  type of argument, and the substance is that the taxpayers did

8  not approve a tax levy for the payment to the retiree

9  systems. They approved it for payment of the UTGO bonds, and

10 those bonds are being retired as part of the plan, the result

11 being that if the plan is confirmed, your Honor, the city

12 will be permitted, in fact, required to unlawfully tax its

13 property taxpayers where such taxation would not be permitted

14 under Michigan law, and this is why the plan violates

15 943(b)(4) and it's why the plan cannot be confirmed.

16        THE COURT: And just to clarify the record on one

17 point you made earlier, what is the property in the city that

18 Syncora or one of its affiliates owns or has an interest in

19 and pays property tax on?

20        MR. BENNETT: I would have submitted this, but, you

21 know, it wasn't supposed to be evidentiary hearing, you know,

22 so I --

23        THE COURT: Just tell me. What is --

24        MR. BENNETT: But, yeah, but --

25        THE COURT: Tell me what it is.

1    MR. BENNETT:  For the Court's clarification, that

2    property is -- it's located on Atwater Street, so that's the

3    street that I believe runs into the Windsor Tunnel, so it's

4    right there at Jefferson and Atwater right by the Ren Cen.

5    It's a facility, and then it's also related to the tunnel

6    concession lease that we share.

7         THE COURT:  Thank you, sir.

8         MR. BENNETT:  Yeah, yeah.  Thank you, Judge.

9         THE COURT:  All right.  Anybody else in support of

10   the objection?  All right.  Ms. Lennox.

11        MS. LENNOX:  Thank you, your Honor.  Like Mr.

12   Bennett did, I'd like to start with standing.  We, too,

13   briefed this, and I think there are two components to this.

14   One is the traditional standing analysis, and another one is

15   what does the statute -- what do the statutes in Michigan

16   tell us.

17        With respect to the traditional standing analysis,

18   we argue that Syncora suffers no injury that all other Class

19   8 claimholders suffer, meaning the impairment of their claim,

20   so under the Lujan standard, we believe there's no

21   particularized injury to Syncora which would grant it

22   standing to pursue its argument.  And let's talk about the

23   argument because what Syncora is complaining about is not

24   what it's getting in the plan.  It's perfectly fine with the

25   74 percent that it's getting.  It's not objecting to that.

1   What it's objecting to is what it's not getting in the

2   compromise of the claims.  We argue that Syncora has no

3   legally protected interest under the UTEA or the RMFA; that

4   Syncora is raising arguments that belong to someone else,

5   someone else's statutory right, the taxpayers' right.  Under

6   Michigan law, only the Michigan Department of Treasury has

7   the right to enforce issues under the RMFA, and Michigan law

8   is pretty clear that when a statute creates a right or

9   imposes a duty and it contains comprehensive administrative

10  or other enforcement mechanisms or otherwise entrusts the

11  responsibility for upholding the law to a public official,

12  then there's no private cause of action.  Here Michigan

13  statute 141.2201 states that the Michigan Department of

14  Treasury is authorized and directed to protect the credit of

15  this state and its municipalities and to enforce the

16  provisions of this act, so the enforcement for this statute

17  rests with one body, and there's no private cause of action

18  that exists under Michigan for somebody like Syncora to come

19  and make these arguments to your Honor.

20          Now, I would also note that I think the subsidiary

21  they're referring to is American Roads, which operates part

22  of the tunnel.

23          THE COURT:  Is what?

24          MS. LENNOX:  American Roads, which operates part of

25  the tunnel.  Is that correct?

1      MR. BENNETT:  That's an affiliated name, yeah.  The

2   actual entity is Detroit Windsor Tunnel, LLC.

3      MS. LENNOX:  Detroit Windsor Tunnel, LLC, is a

4   separate corporate body.  It is not -- doesn't insure any of

5   our bonds.  It's not a creditor in this case.  And unless

6   Mr. Bennett would like to concede that Syncora Guarantee and

7   this LLC entity are one and the same, alter egos piercing the

8   corporate veil, the entity that might try to bring a private

9   cause of action is not before you, so under all of those

10  theories, we believe --

11     THE COURT:  And so the one entity that does have

12  standing is the State of Michigan?

13     MS. LENNOX:  Yes, sir.

14     THE COURT:  And what is the State of Michigan's

15  position on whether this settlement violates Michigan law?

16     MS. LENNOX:  Well, Mr. Howell can certainly

17  elucidate for himself, but the State of Michigan is well

18  aware of this settlement.  We've had many conversations with

19  it, particularly because in order to effect the provisions

20  under the plan, we have to go through the MFA for the

21  refunding bonds, and nary an objection has been raised, to my

22  knowledge, but --

23     THE COURT:  How do you deal with the argument that

24  even if Michigan law wouldn't give Syncora standing to

25  challenge this deal, the Bankruptcy Code itself does?

1          MS. LENNOX:  Again, this --

2          THE COURT:  And the specific provisions were cited.

3          MS. LENNOX:  What Syncora is doing here, again, is

4    not challenging its treatment under the plan.  It's fine with

5    its treatment under the plan.  Didn't even raise an unfair

6    discrimination argument with respect to it.  What it is

7    challenging is a right that's outside of this bankruptcy.

8    It's trying to assert the right of a taxpayer when it is not

9    a taxpayer, and the Michigan statutes only give the right to

10   enforce that to the treasury, so this is -- this goes well

11   beyond a confirmation objection.

12         THE COURT:  Well, but it says it objects to the

13   plan.

14         MS. LENNOX:  Um-hmm.

15         THE COURT:  And the Bankruptcy Code says any party

16   may file an objection to the plan, and this is one of its

17   objections.

18         MS. LENNOX:  And the prudential standing -- or

19   prudential constitutional standing says you cannot assert a

20   right to object to a plan that is somebody else's right even

21   if it might affect you, and I would argue this doesn't affect

22   them at all, but even if it might affect you, you can only

23   assert in a confirmation objection objections to parts of the

24   plan that affect you personally.

25         THE COURT:  And what's your strongest case for that

1    proposition that you would rely on?

2         MS. LENNOX:  Hold on a minute, your Honor.  Well, I

3    think we -- well, certainly in the county briefing we cited

4    several of the cases, but there's Lehman Brother Holdings,

5    which is a Southern District of New York case out of 2012.

6    Mount Carbon Metropolitan District is a Chapter 9 case out of

7    the Bankruptcy District of Colorado from 1999.  We also have

8    Revco, which is a Second Circuit case coming out of 2007.  We

9    also have -- and I left it in -- I left it in my stack of

10   papers, but there's a JPMorgan versus I think it's Welsh case

11   that came out of the Sixth Circuit in I believe 2012 or 2013

12   all standing for the proposition that in order to bring a

13   case, you're the one that has to be injured.  You can't bring

14   somebody else's rights before the Court to be adjudicated.

15        THE COURT:  Okay.

16        MS. LENNOX:  So let's turn to the merits of this,

17   and you can only evaluate the merits of this if you actually

18   read the statute and read what the words say, and I think

19   what Syncora tries to do in their argument is to muddle

20   around the statute and conflate concepts in the statute and

21   how the statute actually works, so what I'd like to do, your

22   Honor, is actually parse the statute for you.  And before I

23   get into the statutory provisions, I do want to make clear --

24   and I don't think Syncora challenges this -- that in the plan

25   we -- by virtue of the plan, by virtue of refunding $287.5

1  million that will go to the bondholders, and that is their

2  sole treatment under the plan, and by retaining outstanding

3  the remainder stub UTGO bonds, we are not raising the amount

4  of taxes that were originally approved by the voters.  We are

5  not extending the maturity date, so they won't be taxed for

6  any longer period, and we are not taxing beyond what was

7  originally proposed by the voters, so we believe, in general,

8  that we satisfy Michigan statute 141.164(3), which says the

9  tax which may be levied shall not be excess of a rate or

10  amount sufficient for payment of the obligations.  We are not

11  paying more than the voters originally approved.

12       So let's talk about the statute.  First, the voters

13  approved the borrowing of money to satisfy debt obligations

14  for certain public projects.  Specifically, and we quote

15  these in our papers, Section 4.3 of the UTEA provides that,

16  quote, "Upon the approving vote of a majority of the

17  qualified electors of the public corporation voting on the

18  question, the public corporation may make 1 or more binding

19  unlimited tax pledges for the payment of 1 or more tax

20  obligations referred to in the ballot."  What the voters do

21  is they approve the issuance of bonds if the vote passes.

22  After the vote is approved, the city then levies a tax in

23  order for there to be money to repay the obligation, but the

24  voters vote to incur debt.  A different section of the UTEA

25  talks about notifying the electorate about the purpose of the

1    levee to be -- for which the bonds will be issued.  Section

2    5.3 of the UTEA states that, quote, "The notice of the

3    election shall set forth a brief general description of the

4    purpose of each unlimited tax pledge, a statement of the

5    estimated period of time over which the tax obligation is

6    expected to be issued, and other information as the

7    legislative body of the public corporation deems to be

8    necessary to adequately inform the electors."  In fact,

9    that's what happened.

10       THE COURT:  So your argument is what the voters

11   approve is the issuance of debt, not the incurrence of the

12   tax.  The incurrence of the tax is done separately by the

13   taxing authority.

14       MS. LENNOX:  That is correct.  And I might also add,

15   as a matter of fact, that when the electors approved the

16   issuance of the bonds, the city then levied a tax to repay

17   the bonds, and, in fact, the proceeds of the bonds that the

18   city then received were actually used for the projects

19   disclosed in the ballots that Syncora attached to their

20   second supplemental objection, so the voters got their

21   projects.  The debt that they approved was issued.  The

22   projects -- the purposes for which the bonds were issued have

23   been fulfilled.  The projects were completed.  Step one in

24   the process of how the statute works is completed, so now we

25   move on to the plan, and that's step two.

1           Now the bonds are issued, and the city has to pay

2     for them.  The taxpayers are out of this equation now, so

3     here's where the plan comes in.  What the plan does is it

4     treats the claims of the holders of the bonds, the city's

5     repayment obligations to them on account of the bonds that

6     were issued, and it does so by saying -- by compromising

7     their claims in bankruptcy, which I don't think anybody

8     questions that that's what bankruptcy is for.  It does so by

9     giving them about 74 percent on a present value basis of the

10    bonds that were outstanding when the case was filed.  That's

11    their sole treatment.  That's what they get.  That's the

12    value of what they're going to receive from the city on

13    account of their claims.  Again, Syncora doesn't complain

14    about any of this.  It's perfectly happy with what it's

15    getting in the settlement.  I didn't see any complaints in

16    their objection papers about the actual treatment of the

17    Class 8 claims.  What they're complaining about is what

18    they're not getting.  Again, the stub UTGO bonds will remain

19    outstanding.  They represent the remainder of the original

20    issuance, and the payments that come from the taxes to the

21    city will be redirected pursuant to the plan to another

22    creditor group, to the income stabilization funds and to GRS

23    as part of their recovery under the plan.  So what Syncora is

24    trying to allege -- or actually, your Honor, what they state

25    in their second supplemental objection is, like the MF Global

1  case, we are somehow affecting their rights against third

2  parties.  We're not affecting -- there's no third-party claim

3  that is being assigned.  The UTGO claims are claims against

4  the city, not against a third party, so that whole MF Global

5  discussion in their objection is irrelevant as are the Dow

6  Corning factors because we are not affecting a third-party

7  release.  It doesn't matter that the city will continue to

8  repay certain of the bonds that will remain outstanding and

9  have those payments assigned to another creditor group.

10  Nothing -- your Honor asked what prevents it in state law.

11  Nothing in the UTEA or the RMFA prohibits this.

12          THE COURT:  Okay.  So how do you deal with the

13  statute -- with the state statute on which Syncora relies,

14  which says something like when the bonds are paid, the taxes

15  shall stop?

16          MS. LENNOX:  That's exactly what's happening here.

17  These bonds remain outstanding, and when the millage is

18  collected, those bonds will be retired.  That's exactly

19  what's happening here.

20          THE COURT:  Their argument -- yeah.  Their argument

21  is that the plan satisfies all the bonds by which --

22          MS. LENNOX:  That is not true.

23          THE COURT:  -- yeah -- by which I assume they mean

24  to include the stub UTGOs, by the payment of the -- of 74

25  percent on all of the bonds.

1    MS. LENNOX:  The plan does no such thing.  The plan

2  satisfies the Class 8 claimants' claims on account of the

3  bonds and compromises them at 74 percent present value of

4  their claims.  Those bonds that represent that, they will get

5  new bonds that represent that payment obligation going

6  forward.  The bonds themselves are not -- those bonds will be

7  converted into new bonds.  The stub bonds -- the plan is very

8  clear about this -- will remain outstanding.  Those bonds

9  aren't going anywhere.

10    THE COURT:  So the plan only satisfies 74 percent of

11  the outstanding bonds; is that right?

12    MS. LENNOX:  It satisfies 74 percent of the

13  outstanding claims by issuing new refunding bonds.  They get

14  a bond for a bond, and their recovery under the plan is 74

15  percent present valued.  We still have the other bonds that

16  are out there.  We could have canceled them.  We didn't.  We

17  are using those bonds, and -- as the voters already approved

18  a millage to pay for those bonds, and we are assigning the

19  proceeds to another creditor group.  The taxpayers are not

20  harmed.  The taxpayers are not paying a penny more than what

21  they originally voted to pay, and so simply it is a -- it is

22  a complicated structure.  Mr. Bennett is right.  But if you

23  parse through the statute, it works with the statute.  It is

24  not prohibited by the statute.  It is perfectly proper under

25  Michigan law, and we certainly haven't heard any objections

1   from the state to the contrary.  Thank you.

2          THE COURT:  Anyone else in support of the city's

3   position here?

4          MR. KOHN:  Your Honor, again, for the record, Samuel

5   Kohn of Chadbourne & Parke on behalf of Assured Guaranty

6   Municipal Corp., an insurer of several series of unlimited

7   tax obligation bonds issued by the City of Detroit.  Your

8   Honor, I don't rise to address the legal issues, but in

9   accordance with our obligations under the settlement

10  agreement on behalf of Assured, Assured supports the

11  treatment of Class 8 of the unlimited tax obligation bond

12  claims as set forth in the city's corrected fifth amended

13  plan dated July 29th, 2014.

14         THE COURT:  Okay.

15         MR. KOHN:  Thank you.

16         THE COURT:  Thank you, sir.

17         MR. NEAL:  Good morning again, your Honor.  Guy

18  Neal, Sidley Austin, for National Public Finance Guarantee in

19  its capacity as an insurer in this instance of the unlimited

20  tax general obligation bonds.  I haven't oft had to say this,

21  but I rise to join in the argument of the city.  We support

22  the settlement wholly.  It's the product of hard-fought

23  litigation at the outset and then extensive arm's length

24  mediation, so we are fully supportive of the settlement and

25  the arguments of the city today.  Thank you.

1          THE COURT:  Thank you.

2          MS. ENGLISH:  Excuse me, your Honor.

3          THE COURT:  Yes.  Who's on the phone?

4          MS. ENGLISH:  Hi there.  This is Caroline English

5    from Arent Fox on behalf of Ambac Assurance Corporation.

6          THE COURT:  Go ahead.

7          MS. ENGLISH:  Note for the record our appearance as

8    well and lend our voices in support of the plan and the

9    arguments made by Ms. Lennox.

10          THE COURT:  Thank you.  Anyone else on the phone

11   wish to be heard?  Okay.  Mr. Howell.

12          MR. HOWELL:  Thank you, your Honor.  Again, Steven

13   G. Howell, Dickinson Wright, appearing on behalf of the State

14   of Michigan.  Your Honor, we support the debtor's plan.  We

15   support the treatment that has been described here today, and

16   the state has no objection to the way this has been handled.

17          THE COURT:  So the state's position is that the plan

18   does comply with Michigan law?

19          MR. HOWELL:  Yes, your Honor.

20          THE COURT:  Thank you, sir.  Any rebuttal, sir?

21          MR. BENNETT:  Thanks, Judge.  Ryan Bennett on behalf

22   of Syncora.  Couple of things really quick.  On the standing

23   points, as the Court correctly noted, we're not here suing to

24   enforce the UTEA or the RMFA.  We're objecting to a plan

25   under 943(b)(4).  And that's -- you know, the issues about,

1    you know, our subsidiary and its taxing rights, I mean I

2    think they're -- we brought them forth because I think the

3    city said that we didn't have any interest, but we do.  We're

4    a sole equity holder, and to the extent our subsidiary is

5    forced to pay improper taxes, we're ultimately harmed as a

6    result of that improper payment, but the real driver here is

7    the fact that we're objecting to confirmation as a creditor,

8    as a participant in the UTGO class and as a party that's

9    subject to this forced assignment of our rights.  Ms. Lennox

10   cited the Mount -- was it the Mount Carbon -- yeah --

11   opinion.  We also cited that in our papers because, in

12   addition to what Ms. Lennox was referencing, I think, more

13   profoundly, the Mount Carbon opinion addresses how the Court

14   has its own independent obligation to assess the standards of

15   943, good faith, feasibility, whether the plan is lawful.

16   All right.  As this Court has recognized in the past in our

17   other hearings, the adversary process assists the Court in

18   processing that obligation, and we're here, you know, to

19   assist the Court in recognizing that.

20           THE COURT:  Well, and I accept and respect all of

21   that, but nothing in that argument by itself provides a party

22   with standing that otherwise wouldn't have it, does it?

23           MR. BENNETT:  Other than our primary point that we

24   are a creditor.  We're a holder of UTGO claims, an insurer of

25   UTGO claims, and all the points I made in my initial standing

1    argument.

2            THE COURT:  Okay.

3            MR. BENNETT:  Let's see.  What other points did I

4    want to make here?  You know, additionally, you know, as far

5    as standing, Ms. Lennox also said that, you know, we're not

6    happy with -- you know, we're fine with what we're getting as

7    far as our treatment is as an UTGO claimant, but we're upset

8    with what we're not getting.  I don't know how that works;

9    right?  I mean, you know, let's say we're getting five cents

10   on the dollar; right?  Well, we're fine with that five cents,

11   but we're upset about the 95 cents that we're not getting?  I

12   don't -- that argument doesn't make logical sense to me as an

13   objector, so I mean we -- you know, we're challenging this

14   unlawful assignment.  We're at 26 percent of value being

15   transferred away without our consent, and we did not agree to

16   that unlike the other UTGO insurers that stood up here today.

17           There was some talk about -- you know, as to the

18   substance, there was talk about the ballots and this notion

19   of like debt, you know, do they speak to the incurrence of

20   debt or do they speak to the actual projects.  And if you

21   look at the ballots that we attached to our filing, which are

22   examples of UTGO ballots that went out to the electorate,

23   they actually speak to the projects, to the acquisitions, the

24   construction of a jail, of parks, of -- you know, and they

25   don't speak to the incurrence of debt, period.  They speak

1  to, you know -- they speak to the actual projects.  There is

2  nothing -- there's no ballot that exists out there, Judge,

3  that says for the Retirement Systems on account of income

4  stabilization.

5          THE COURT:  Well, assuming that's true, is it also

6  true, as the city asserts, that the ballot does not -- the

7  approval of the ballot by itself does not constitute a tax

8  levy?  That's done by the local taxing authorities after the

9  debt is issued; right?

10          MR. BENNETT:  But it has to -- but that levy has to

11 be performed underneath these laws, the Uniform Tax Election

12 Act, which requires the tax to be levied for the purpose of

13 the ballot, for the purpose --

14          THE COURT:  Right, but your argument is based on the

15 premise that because the voters approved the levy, the voters

16 have a right to see that the levy they have approved is used

17 for the purpose that they have approved it for.  The city

18 argues that the electors don't approve the levy at all.  All

19 they approve is the issuance of the debt.

20          MR. BENNETT:  And once that debt is paid in full,

21 the levy shall cease under the Revised Municipal Finance Act,

22 so the --

23          THE COURT:  Well, but to that the city says, and how

24 do you respond, that there will be bonds out there.  What's

25 the matter?

1    MR. BENNETT:  No.  I was like -- I stumbled on

2   municipal, so I was just saying it over again.  Sorry.

3    THE COURT:  Practicing?  Okay.  So the city says

4   that after the plan is approved, if it is, there will be

5   bonds out there unsatisfied, the so-called stub UTGOs, as to

6   which nothing in Michigan law prohibits the continued levy.

7    MR. BENNETT:  Right, and that's -- that was my final

8   point actually --

9    THE COURT:  Okay.

10    MR. BENNETT:  -- Judge, is that I think when

11   Ms. Lennox said earlier in response to the colloquy was that

12   only 74 percent of the claims are being satisfied, well,

13   that's not true.  It's a hundred percent of the UTGO claims,

14   the claims of the UTGO holders are being satisfied under the

15   plan.  Seventy-four percent of the bonds are being refinanced

16   as a means of satisfying that hundred percent of claims, but

17   the actual claims, the debt that was incurred for the purpose

18   on the ballot are being satisfied in their entirety.  And as

19   a result of that hundred percent satisfaction -- I mean the

20   language of the plan is very clear on the point -- that --

21   let me just read it to you, Judge -- "each holder of an

22   allowed UTGO bond claim, in full satisfaction of such Allowed

23   Claim, the treatment of claims under the plan will be in

24   exchange for and in complete satisfaction, discharge and

25   release of all claims arising on or before the Effective

1   Date," so the treatment of these claims -- the receipt of the
2   74 percent refinanced bonds completely satisfies the debt
3   which was raised for the purpose on the ballot, and,
4   therefore, that levy must terminate under Michigan law.
5           THE COURT:  Thank you.
6           MR. BENNETT:  All right.  Thank you, Judge.
7           THE COURT:  Ms. Lennox, anything further?
8           MS. LENNOX:  No.  Thank you, your Honor.
9           THE COURT:  All right.  The Court will take this
10  matter under advisement.  Would anyone else like to raise
11  anything else here this morning?  All right.  We're in
12  recess.
13          THE CLERK:  All rise.  Court is adjourned.
14      (Proceedings concluded at 9:41 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    August 21, 2014
_____           _____
Lois Garrett