# Exhibit 6B
## July 16, 2014 K. Buckfire Deposition Transcript

## Page 1

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2    IN THE UNITED STATES BANKRUPTCY COURT
 3      FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6
 7  In Re:            )  Chapter 9
 8
 9  CITY of DETROIT, MICHIGAN, )  Case No. 13-53846
10
11       Debtor.  )  Hon. Steven Rhodes
12  _____
13
14              VOLUME 2
15
16   The Videotaped Deposition of KENNETH BUCKFIRE,
17   a Rule 30(b)(6) witness,
18   Taken at 1114 Washington Boulevard,
19   Detroit, Michigan,
20   Commencing at 8:09 a.m.,
21   Wednesday, July 16, 2014,
22   Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25
```

## Page 2

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2  APPEARANCES:
 3
 4  THOMAS F. CULLEN, JR., ESQ.
 5  Jones Day
 6  51 Louisiana Avenue, N.W.
 7  Washington, D.C. 20001
 8    Appearing on behalf of the Debtor.
 9
10
11
12  CORINNE BALL, ESQ.,
13  BENJAMIN ROSENBLUM, ESQ.
14  Jones Day
15  222 East 41st Street
16  New York, New York 10017
17    Appearing on behalf of the Debtor.
18
```

## Page 3

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2
 3
 4  CLAUDE D. MONTGOMERY, ESQ.
 5  Dentons US LLP
 6  1221 Avenue of the Americas
 7  New York, New York 10020
 8    Appearing on behalf of the Retirement Committee.
 9
10
11
12  JENNIFER K. GREEN, ESQ.
13  Clark Hill, PLC
14  500 Woodward Avenue, Suite 3500
15  Detroit, Michigan 48226
16    Appearing on behalf of the Retirement Systems for the
17    City of Detroit.
```

## Page 4

```
 1        KENNETH BUCKFIRE, VOLUME 2
 2  ROBIN D. BALL, ESQ.
 3  Chadbourne & Parke, LLP
 4  350 South Grand Avenue, 32nd Floor
 5  Los Angeles, California 90071
 6    Appearing on behalf of Assured Guaranty Municipal
 7    Corporation.
 8
 9
10
11  GUY S. NEAL, ESQ.
12  Sidley Austin, LLP
13  1501 K Street, N.W.
14  Washington, D.C. 20005
15    Appearing on behalf of National Public Financing.
```

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6975-8  Filed 08/22/14  Entered 08/22/14 15:38:59  Page 2 of 4

## Page 217

KENNETH BUCKFIRE, VOLUME 2

logically should look at its revitalization programs and decide which ones are so high priority it cannot defer or delay that money and which ones can be delayed for a year or six months or whatever it has to be, that's the kind of flexibility I'm talking about.

Q. Okay, I got it so you're not talking about flexibility that means somehow after the plan you don't have to live up to contracts you have to live up to contracts before the plan and after the plan, correct?

A. Correct.

Q. You're talking about well, if it sets forth a series of revitalization efforts, some would be prioritized earlier than others, that's the flexibility you're talking about?

A. That's correct.

Q. Now, in connection with revitalization, has any analysis been done that does prioritize proposed revitalization efforts?

A. You mean a downside scenario?

Q. No, I'm not even talking about a downside scenario, I'm talking about specific priorities set forth in the plan for certain revitalization efforts. Have they been prioritized in a way that you just testified, some that would be maybe we could, you know, delay

## Page 218

KENNETH BUCKFIRE, VOLUME 2

those.

A. Well, not specifically the emergency manager has said numerous times that restoration of public safety is the number one priority of the restructuring process, and I assume it will be the number one priority of the City going forward.

Q. So that's a revitalization effort that is pretty firm it's got to --

A. As part of our overall program, I would stipulate that it's collecting what the public actors have said here that should be the number one priority, whether it turns out to be is not my judgment call.

Q. And if it -- if it doesn't turn out to be does it impact the viability of the plan post emergence?

A. Yes, but we have built in strong institutional protections to make sure the City stays on the track that we have begun here, namely, the oversight commission that was established by legislation, I believe, the end of June.

Q. And Mr. Hackney is going to address some of those issues, so I'll move on from that. I took care of that. I -- just one sort of question that was left on my DIA plate. So when you had approached Christie's and told them you wanted them to do an analysis of

## Page 219

KENNETH BUCKFIRE, VOLUME 2

subset of art, so to speak, correct?

A. Correct.

Q. Who did you go to to determine what was the City owned art versus what was not the City owned art?

A. Well, first of all, the published catalogs of the collection often indicate source of the art, who will pay for it, so it's actually fairly easy even as a layperson to look at the catalogs because they always stipulate whether it's a gift or paid for by the City or paid for by donors.

Q. So did Christie's make that determination independently on its own or did --

A. No they actually asked the DIA itself it had to identify works that are paid for in whole or in part by the City.

Q. And the DIA was the same DIA that had called the govern nor and didn't want to have anything to do with this plan, correct?

A. They did cooperate in the end.

Q. Do you know if they were the ones who identified what they thought was City owned and not City owned?

A. I already testified that, I believe that Christie's asked them to identify it.

Q. And they did it?

## Page 220

KENNETH BUCKFIRE, VOLUME 2

A. And they did it.

MR. SOTO: Okay, I have no other questions at this time, and I appreciate your patience with me. Thank you.

THE WITNESS: You're welcome.

EXAMINATION

BY MR. HACKNEY:

Q. Mr. Buckfire, good afternoon, it's nice to see you again.

A. Nice to see you.

Q. I have to tell you at the outset I have a hell of an ear infection going on in my right ear, and I cannot hear out of it, and so I'm doing the best I can, but I'm struggling a little bit to hear. So if I ask you a question five times in a row, it may be not only because I didn't hear your answer, because I didn't even hear my own question. I actually learned before this deposition that Mr. Soto can't hear out of his right ear just as a matter of course, anyway, but he's used to it and I'm not so...

MR. SOTO: That's why I always put my special friends to my right.

BY MR. HACKNEY:

Q. So it means you and I can say whatever we want about

Pages 217 to 220

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6975-8   Filed 08/22/14   Entered 08/22/14 15:38:59   Page 3 of 4

Page 221

KENNETH BUCKFIRE, VOLUME 2

Soto here.

I want to go back to some testimony that you gave with Mr. Soto that was on the subject of advice that you rendered about the recoveries of classes 10, 11, and 12, vis-a-vis other general unsecured creditors like COPs holders; do you remember discussing that with him?

A. I do, but can you be more specific?

Q. Yeah, let me -- I'm going to ask you what I understood you to say so you should listen carefully to whether I get this right.

A. Okay.

Q. I heard you say that -- number one that you provided advice to the EM on what different recoveries could be amongst different classes; is that correct?

A. Yes.

Q. I --

(Electronic phone announcement: Has joined the conference.)

BY MR. HACKNEY:

Q. I also heard you say that in deciding what recoveries were appropriate for classes 10 and 11, which are the pension classes, that you considered the fact that many of the members of those classes were also members

Page 222

KENNETH BUCKFIRE, VOLUME 2

of class 12, which is the OPEB class, and that you considered all three classes together in evaluating their total recovery; is that correct?

A. Yes.

Q. And that was advice that you gave to the EM that he accepted, correct?

A. I'm not sure whether he accepted it or not, but it was my financial observation that the people who held the pension claims were often the same people who held the healthcare claims, so they would value money coming from the City more or less in the same pot.

Q. Okay, so your testimony is that as one of the people that was playing an advisory role with respect to the POA, this was how you looked at the appropriate recoveries for classes 10, 11, and 12, correct?

A. That's one of way of looking at it, yes.

Q. And did you give the EM your advice on that subject?

A. I did.

Q. Do you -- do you know whether he accepted your advice?

A. I believe it was one of the factors he took into account in ultimately approving the plan.

Q. Did you undertake an effort to determine the amount of overlap between classes 10 and 12 on the one hand or classes 11 and 12 on the other hand?

Page 223

KENNETH BUCKFIRE, VOLUME 2

A. That was not an analysis done by Miller Buckfire.

Q. Do you believe that one of the other professionals did that?

A. I know we looked at this issue many months ago. It's an obvious question to address particularly between actives and retirees, and if anybody did it it would have been Ernst & Young.

Q. You're saying if anyone did. I take it from your answer that you have never seen such an analysis, correct?

A. No, not on an individual basis, which is what I think you're getting to.

Q. Right. So you have never seen on -- an individual analysis of what individuals have claims in both classes 10 and 12 or 11 and 12, correct?

A. Correct, I've never seen it.

Q. Have you ever seen it on a broader basis like approximately 32 percent of class 10 members are also in class 12, have you seen that type of analysis?

A. No.

Q. Were you aware of this concept of looking at these three types of class in advance of the June 2013 proposal to creditors?

A. Yes.

Page 224

KENNETH BUCKFIRE, VOLUME 2

Q. And you were obviously aware of it -- okay, strike that.

I wanted to ask you, I saw yesterday that you said that you have -- you have not authored any publications in the last ten years, you testified to that fact I think with counsel for the DWSD parties. I read that quickly today; is that correct?

A. To the best of my knowledge that's correct.

Q. I was a little surprised by that, you're a fairly well-known player in the field and I thought you haven't written any op. ed. pieces, Wall Street Journal, New York Times, TMA, any of those things where you've written an article for any of those?

A. That's correct.

Q. Well, you got to do more writing then, I think.

A. I try to keep a very low profile.

Q. Well, you're not doing a good job of that in this case. Now, I wanted to ask you about your testimony in -- as an expert in deposition or at trial in the last four years. Have you given any expert testimony in a deposition or at trial in the last four years other than in the Calpine, GGP, Dow Chemical, and City of Detroit cases?

A. Well, Calpine was 2008, so that's not the last four

Pages 221 to 224

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6975-8    Filed 08/22/14    Entered 08/22/14 15:38:59    Page 4 of 4