# Exhibit 6C

**July 22, 2014 K. Orr Deposition Transcript**

## Page 162

```
                KEVYN ORR, VOLUME 2
        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN



In Re:              )   Chapter 9

CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

        Debtor.    )   Hon. Steven Rhodes
    _____


                    VOLUME 2

    The Videotaped Deposition of KEVYN ORR,
    in his personal capacity and as Rule 30(b)(6) witness,
    Taken at 2 Woodward Avenue,
    Detroit, Michigan,
    Commencing at 9:10 a.m.,
    Tuesday, July 22, 2014,
    Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

## Page 163

```
              KEVYN ORR, VOLUME 2
APPEARANCES:

GREGORY M. SHUMAKER, ESQ.,
DAN T. MOSS, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
    Appearing on behalf of the Debtor.




ROBERT HERTZBERG, ESQ.
Pepper Hamilton, LLP
4000 Town Center, Suite 1800
Southfield, Michigan 48075
    Appearing on behalf of Debtor.
```

## Page 164

```
              KEVYN ORR, VOLUME 2
STEPHEN C. HACKNEY, ESQ.
Kirkland & Ellis, LLP
300 North Lasalle Street
Chicago, Illinois 60654
    Appearing on behalf of Syncora.



JEFFREY BEELAERT, ESQ.
Sidley Austin, LLP
1501 K Street, N.W.
Washington, D.C. 20005
    Appearing on behalf of National Public Financing.



ERNEST J. ESSAD, JR., ESQ.
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
    Appearing on behalf of Financial Guaranty Insurance
    Company.
```

## Page 165

```
              KEVYN ORR, VOLUME 2
ALFREDO R. PEREZ, ESQ.
Weil, Gotshal & Manges, LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
    Appearing on behalf of Financial Guaranty Insurance
    Company.



LISA SCHAPIRA, ESQ.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10112
    Appearing on behalf of Assured Guaranty Municipal
    Corporation.
```

Pages 162 to 165

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6975-9   Filed 08/22/14   Entered 08/22/14 15:38:59   Page 2 of 5

**KEVYN ORR, VOLUME 2**

be invoked?

MR. SHUMAKER: Assuming your question gets to communications between counsel and Mr. Orr, yes.

BY MR. HACKNEY:

Q. Well, I mean, did you -- did you -- in assessing the invalidity of the COPs as a factor justifying the level of discrimination, did you consider anything other than legal advice around the invalidity of the COPs? It seems like a legal question.

A. It's a legal question, but in an effort to be forthcoming and fair to you, I'd have to say yes, and I'll try to tell you, for instance, without discussing the -- and going afield of many discussions, legal opinions, analyses, meetings, written opinions, that I received from counsel.

So for instance, in looking at the COPs, in addition to those things, you know, I examined news reports about that transaction, I think I've even examined those -- some of those before I got here. Reports, for instance, by the auditor general that it questioned the propriety and validity of the COPs reports at that time when -- I think it was Auditor General Hart (ph.) back in 2005, City Council statements that were made. Statements made by the

**KEVYN ORR, VOLUME 2**

City treasurer back then that it was invalid and inappropriate to enter into the COPs and that it would make the City bankrupt and that the City should have declared bankruptcy in 2005.

So there's other data that I looked at to inform myself, just not the legal analyses about position of the COPs, and some of that data was contemporaneous with when they were initially entered into and some of that was subsequent to that.

Q. And you identified a number of individuals or reports that you had read; I didn't hear any lawyers in any of those things. Were there?

A. None of my lawyers were in those things, so there was -- there's, you know, document -- documentary evidence that is short of the legal opinions I got from my counsel.

Q. Okay, so but to tie it up, was the principal information that you relied upon legal advice conveyed to you by your lawyers about the invalidity of the COPs?

A. Yes.

Q. And I -- just so I understand the way the judge -- the factor plays through your judgment, you looked at the potential invalidity of the COPs and viewed that as

**KEVYN ORR, VOLUME 2**

one reason to pay the COPs on their best day 10 cents?

A. Yeah, I don't know -- I don't want to give the impression that it was that binary, you know, a number of issues, as I said before, went into what we could afford to pay --

Q. Yes.

A. -- the validity of the claim, which is pretty typical in bankruptcies, all that stuff, but I think that's a fair statement.

Q. Okay, I'm talking when you were deciding how to divide the pie, the COPs best day recovery was impacted by this factor of the potential invalidity of the COPs?

A. Yes.

Q. Now, with respect to the information in these four areas that we've just talked about, the information that relates to each of the four factors you identified --

A. Mm-hmm.

Q. -- was there a material change in this body of information between April 1 and April 15 of 2014?

A. I don't know, you say material change, what are you -- what do you mean?

Q. Is there anything that sticks out to you with respect to any of your four factors and the information

**KEVYN ORR, VOLUME 2**

associated with each that changed materially between April 1 and April 15?

A. To be frank with you, I can't -- I can't recall if there was, but I don't -- nothing jumps out at me.

Q. Okay. Now, in structuring the plan, did you take advice from Miller Buckfire?

A. Yes.

Q. And in deciding what levels of discrimination between creditors was appropriate, did you also take advice from Miller Buckfire?

A. Yes.

Q. And did you specifically take advice from Ken Buckfire?

A. I -- I would have regular restructions (sic) with Ken and other members of his team, so I think it's fair to say yes.

Q. Did Mr. Buckfire recommend to you that when it came to evaluating the recovery of the retirees that the City should consider the pension recoveries in combination with the OPEB recoveries in making a determination as to what the level of discrimination was?

MR. SHUMAKER: Object to the form.

BY MR. HACKNEY:

Q. Do you understand my question?

Pages 238 to 241

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6975-9   Filed 08/22/14   Entered 08/22/14 15:38:59   Page 3 of 5

KEVYN ORR, VOLUME 2

A. I understand your question and he may well have, I just don't recall a specific conversation. I have no reason to believe that he did not --

Q. Okay.

A. -- but I just don't recall whether or not he did.

Q. I guess what I'm trying -- let me put it into normal language. In evaluating the level of discrimination that you were approving, did you look at classes 10 and 11, which are the -- what I call the pension classes, and class 12 in conjunction with another to understand the combined rates of recovery and then evaluate that in comparison to the COPs holders?

A. Yeah, we -- we may have, I just don't recall with specificity doing it that way. I know that, as we've discussed here this morning, just a few minutes before the break, I said I looked at 10, 11, and 12. I don't know if it was as -- as calculated as you're suggesting I look at 10, 11 and 12 and then decide that, you know -- what is the COPs, 16 or 17 -- decide that because there's this recovery we should affirmatively drive this number down. I don't -- I don't recall it being that -- that designed, but it may have, I just don't recall.

Q. Okay, so I guess -- well, let me just -- you don't

KEVYN ORR, VOLUME 2

know whether you considered the combined recoveries of classes 10, 11, and 12 in analyzing the level of discrimination; is that correct?

A. No, what I'm saying is I don't recall. We may have, I just don't recall.

Q. Yeah, I think my question was you don't recall?

A. Yeah.

Q. Oh, I said you don't know.

A. Yeah.

Q. Okay. If Mr. Buckfire said that that's how he looked at it and recommended that that's how you look at it and that he understood that you accepted his recommendation, do you have a basis to disagree with that?

A. Absolutely --

MR. SHUMAKER: Object to the form.

A. No.

BY MR. HACKNEY:

Q. Now, with respect to any other classes of creditors, did you attempt to learn whether or not there were creditors who held claims in multiple classes in attempting to perform a recovery analysis?

A. Yeah, I -- I think there was analyses done about creditor classes, in particular, obviously, with the

KEVYN ORR, VOLUME 2

retirees and actives and OPEB claims, and we may have looked -- I'm trying to think. I think we did, I'm just not recalling specifically whether we looked at other unsecured classes, whether or not they held claims with any of the unsecured class or secured class. Obviously, some of the insurers, I think we looked at that.

BY MR. HACKNEY:

Q. As you sit here today, though, you can't remember for sure whether you looked at the composite recoveries of creditors --

A. Right.

Q. -- as opposed to classes?

A. Yeah, I don't remember.

Q. Okay, so for example, did you consider how many UTGO holders were also LTGO holders when evaluating their combined recovery?

A. Yeah, there may be some analysis, I just don't remember.

Q. Did you consider whether COPs holders were also holders of other claims and consider their combined recovery in deciding what level of discrimination should be applied?

A. I don't remember.

KEVYN ORR, VOLUME 2

Q. If you did, I take it that would be written analysis, it's not something you really do kind of in your head?

A. Well, nowadays, I don't write anything --

Q. I noticed.

A. -- lest it be discovered, so that would have been provided to me by my -- by my consultants.

Q. You do agree it would be a written analysis?

A. I believe it would -- in some form, it would have been written, yes.

Q. Okay, so to the extent there is written analysis of these things, we would ask for its production. I haven't seen anything --

MR. SHUMAKER: To the extent it hasn't been produced and that it exists --

MR. HACKNEY: Yeah.

MR. SHUMAKER: -- we'll look into it.

MR. HACKNEY: I appreciate that, Mr. Shumaker.

BY MR. HACKNEY:

Q. Mr. Orr, the City's director of labor relations and interim director of human relations is Michael Hall; is that correct?

A. Yes.

Q. And Mr. Hall was hired by you back in October of 2013;

Pages 242 to 245

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 6975-9    Filed 08/22/14    Entered 08/22/14 15:38:59    Page 4 of 5

Page 246

KEVYN ORR, VOLUME 2

1  isn't that right?
2  **A. I believe that's right.**
3  Q. And he's an individual with deep experience in the
4  area of human resources and labor relations, correct?
5  **A. I believe he's experienced in those areas.**
6  Q. Doesn't he have like three decades of experience with
7  GM?
8  **A. Yeah, I just -- I stay away from, you know, adjectives**
9  **but I believe he's experienced and qualified in those**
10 **areas.**
11 Q. Okay, I seem to recall some adjectives here or there
12 from you in your testimony. And is part of his core
13 function in human resources to monitor issues
14 affecting the retention and hiring of employees?
15 **A. I would say that's fair, but we -- you know, we all**
16 **are concerned about retention and hiring.**
17 Q. Okay.
18 **A. But yes, I think that's a function in HR.**
19 Q. And I take it you have confidence in Mr. Hall?
20 **A. I do.**
21 Q. And you have confidence in his judgment?
22 **A. I do.**
23 Q. Okay. Do you know that there are certain active
24 employees that are members of classes 10 and 11

Page 247

KEVYN ORR, VOLUME 2

1  because they have earned a pension to a certain
2  extent?
3  **A. Yes.**
4  Q. Okay. Whereas with respect to a prospective employee
5  to the City that the City hopes to attract, do you
6  understand that that person is unlikely to be a member
7  of class 10 or 11 unless they were in the unique
8  situation where they had previously worked for the
9  City and earned a pension?
10 **A. I -- I think that's fair.**
11 Q. Do you know what percentage of classes 10 and 11 are
12 active employees?
13 **A. Do I know which percentage?**
14 Q. Yes.
15 **A. Yeah, I believe there's an analysis of which ones are**
16 **active. Do I know it sitting here today?**
17 Q. Yes.
18 **A. No, I'd have to go look at documents to figure it out.**
19 Q. Do you think that someone wrote that down, though?
20 **A. I think I -- I've -- what percentage of 10 and 11 are**
21 **active employees? Yeah, I think we have that.**
22    MR. HACKNEY: Okay, that's something we
23 would definitely ask for --
24    THE WITNESS: Okay.

Page 248

KEVYN ORR, VOLUME 2

1    MR. HACKNEY: -- if it exists.
2    THE WITNESS: Okay.
3  BY MR. HACKNEY:
4  Q. Okay, and do you know what the percentage is?
5  **A. I don't -- I know there are ratios, and I forget**
6  **sitting here today, I think one is 3 to 1, roughly, if**
7  **you do the numbers of active employees at 9,800 FTEs.**
8  **I think one is roughly -- to retirees is 3 to 1, and I**
9  **think over on the PFRS side, it may be 5 to 1 or maybe**
10 **one way or the other, but yeah, I've seen that ratio**
11 **and seen those numbers before.**
12 Q. I take it you're uncertain as to whether -- what the
13 exact ratios are?
14 **A. Yeah, just sitting here, I just haven't reviewed it.**
15 **You know, it's been a week since I've reviewed it, so**
16 **I just haven't sat here today, but there is a ratio**
17 **and there are numbers that split up the difference**
18 **between active and retirees in classes 10 and 11.**
19 Q. The -- just so we have the ratios that you do kind of
20 recall correctly, the larger number, the 3 to 1 or the
21 5 to 1 is retirees over actives, correct?
22 **A. Oh, yeah, yeah, yeah. It's not actives. We don't**
23 **have 2,000 retirees --**
24 Q. If we did, we wouldn't have a problem.

Page 249

KEVYN ORR, VOLUME 2

1  **A. Yeah, we wouldn't have a problem, right --**
2  Q. Okay.
3  **A. -- if that's the ratio.**
4  Q. Now, do you know what percentage of the dollar amount
5  of recovery under the plan to classes 10 and 11 is
6  going to go into the pockets of active employees
7  bearing in mind that the percentage of the class is
8  not the same as the dollar size --
9  **A. Yeah.**
10 Q. -- of the class?
11 **A. I'm not sure we know that. I know the -- I know the**
12 **percentage of the class and I probably know the**
13 **percentage of the claim that voted, I don't know the**
14 **dollar amount because it depends upon the obligation**
15 **of any particular pension.**
16 Q. Right, right.
17 **A. Right.**
18 Q. So as you sit here today, you don't know the
19 percentage of dollars in the class 10 and 11
20 recoveries that are flowing to active employees,
21 correct?
22 **A. That is correct. Percentage of dollars?**
23 Q. The percentage --
24 **A. Sitting here today, I don't know that, that is**

Pages 246 to 249

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6975-9  Filed 08/22/14  Entered 08/22/14 15:38:59  Page 5 of 5