UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

**MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE RELATING TO (A) THE RECOVERIES OF CLASSES 10 AND 11 INDEPENDENT OF THE FUNDS FROM THE DIA FUNDING PARTIES AND THE STATE AND (B) THE TOPICS IDENTIFIED IN SYNCORA'S SUBPOENAS TO THE FOUNDATIONS**

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") hereby submit this motion *in limine* (the "Motion") to preclude the City of Detroit (the "City" or the "Debtor") from offering evidence relating to (a) the City's contention that funds received from the DIA Funding Parties[1] and the State are "outside the Plan" and should be excluded from the Court's unfair discrimination analysis; and (b) the topics in Syncora's subpoenas to the DIA Funding Parties. In support of their motion, Syncora respectfully states as follows:

## INTRODUCTION

1. In an effort to reduce the significant discrimination between Classes 9 and 14, on the one hand, and Classes 10 and 11, on the other, the City contends

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Dkt. No. 6379].

that the DIA Settlement proceeds the City will receive — which are earmarked exclusively for Classes 10 and 11 — should not be included in the Court's unfair discrimination analysis. *See* Consol. Reply [Dkt. No. 5034], ¶ 56. According to the City, the proceeds from the DIA Settlement are not "City funds" and would not otherwise be available to the City. *Id*. ¶ 54. Furthermore, the City claims that the "DIA Funding Parties receive nothing in exchange for their contributions." *Id.* Excluding the DIA Settlement proceeds from the recoveries of Classes 10 and 11 creates the optical illusion of reducing the percentage recoveries of those classes to 39% and 48%, respectively. *Id.* ¶ 56.

2. To obtain discovery and defend against the City's contentions regarding the DIA Settlement proceeds, Syncora issued subpoenas to each of the Foundations.[2] In response, the Foundations filed a Joint Motion to Quash, arguing that the subpoenas sought irrelevant information. The City filed a statement in support of the Foundations' motion to quash wherein it also argued against the relevance of the requested discovery.

---

[2] The foundations funding the DIA Settlement are the Community for Southeast Michigan, William Davidson Foundation, the Fred A. and Barbara M. Erb Family Foundation, Max M. and Marjorie S. Fisher Foundation, Ford Foundation, Hudson-Webber Foundation, The Kresge Foundation, W.K. Kellogg Foundation, John S. and James L. Knight Foundation, McGregor Fund, Charles Stewart Mott Foundation, and A. Paul and Carol C. Schaap Foundation. *See Fourth Am. Disclosure Statement* [Dkt. No. 4391], Exhibit I.A.91, Exhibit B ("Foundation Funders").

2

3. On June 26, 2014, the Court granted the Foundations' motion to quash. According to the Court, the discovery Syncora sought was not relevant to unfair discrimination or any other plan confirmation issue. With respect to the source of the funds, the Court explained — in accordance with well-established case law — that "the issue of unfair discrimination is based upon not where the money comes from but where the money goes to." (Ex. 6A, Hr'g Tr. at 40:4-5, June 26, 2014.) As to the remaining topics in Syncora's subpoena, the Court held that they were "not even arguably relevant to" plan confirmation analysis. (*Id.* at 126:23-127:5.)

4. In light of the Court's prior rulings regarding the relevancy of the topics in Syncora's subpoena, the City should not be permitted to introduce any evidence on those topics during the confirmation hearing. Specifically, the City should not be permitted to introduce evidence regarding the recoveries of Classes 10 and 11 independent of the DIA Proceeds. Nor should the City be able to introduce evidence regarding, *inter alia*, the negotiations surrounding the DIA Settlement, the Foundations' reasons for entering into the DIA Settlement, or the City's claim that the Foundations required that their funds go only to the City's retirees — all of which were topics contained in Syncora's subpoenas. According to the Court, none of these inquiries are relevant to the unfair discrimination analysis or any other plan confirmation issues. There is no doubt as to "where the

3

money goes to." Every penny of it goes to satisfy Class 10 and 11 claims. None of its goes to satisfy Class 9 and 14 claims.

5. Accordingly, Syncora respectfully requests that the Court bar the City from introducing evidence relating to (a) the City's contention that funds received from the DIA Funding Parties and the State are "outside the plan" and should be excluded from the Court's unfair discrimination analysis and (b) the topics in Syncora's subpoenas to the DIA Funding Parties.

## JURISDICTION

6. The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7. Syncora respectfully moves the Court to bar the City from introducing evidence relating to (a) the City's contention that funds received from the DIA Funding Parties and the State are "outside the plan" and should be excluded from the Court's unfair discrimination analysis and (b) the topics in Syncora's subpoenas to the DIA Funding Parties, and enter an order substantially in the form of Exhibit 1 attached hereto.

## BACKGROUND

8. On the face of the Plan, PFRS Pension Claims (Class 10) are set to receive 59% recoveries and GRS Pension Claims (Class 11) are set to receive 60%

4

recoveries. *See Fourth Am. Disclosure Statement* [Dkt. No. 4391], at 37, 39. Included in these recoveries are the funds that the City will receive in exchange for transferring its ownership of the DIA Assets. *Id.* at 37, 39, 66.

9. According to the City, the "DIA Settlement offers an unprecedented opportunity for the City to obtain significant value from third parties on account of its interests in the DIA Assets, while also ensuring that the DIA Assets will remain in Detroit." Consol. Reply [Dkt. No. 5034], ¶ 29. Pursuant to the terms of the DIA Settlement, "the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust." *Corrected Fifth Am. Plan* [Dkt. No. 6379], at 51. In exchange for the transfer of the DIA Assets, the City will receive $816 million from the Foundations, the State, and DIA Corp., all of which is earmarked for Classes 10 and 11. *Id.* at 52. The City claims that "[t]he Foundations have required that their funds be applied to fund the City's restructured legacy pension obligations" and that those funds would not otherwise be available to the City. *Fourth Am. Disclosure Statement* [Dkt. No. 4391], at 65.

10. In its reply, the City contends that the stated recoveries for Classes 10 and 11 are not as large as they appear because — notwithstanding the City's own admission that the proceeds are "on account of its interest in the DIA Assets" — the DIA Settlement proceeds "are not made with City funds and are not made on

5

account of claims against the City, they are 'outside the Plan' and, therefore, [are] properly excluded from the Court's unfair discrimination analysis." Consol. Reply [Dkt. No. 5034], at ¶ 51. According to the City, because the "DIA Funding Parties receive *nothing* in exchange for their contributions," *id.* ¶ 54 (emphasis added), "the effect of such funding on the aggregate recoveries of Class 10 and Class 11 claimants should be ignored for purposes of any unfair discrimination analysis." *Id.*

11. On June 4, 2014, Syncora issued deposition and document subpoenas to each of the Foundations requesting the following information:

30(b)(6) Deposition Topics

- The negotiations between You, the City, and any other parties (including other Foundations) regarding the DIA Settlement.
- The terms of the DIA Settlement.
- Your contribution to the DIA Settlement.
- Your involvement with the DIA.
- Your reasons for entering into the DIA Settlement.
- The purpose or mission of Your foundation.
- Your prior donations or contributions, including donations or contributions to the arts.
- The importance and value of the Detroit Institute of Arts and Collection.

(*See, e.g.,* Ex. 6B, John S. and James L. Knight Foundation Subpoena, Schedule A at 3.)

6

Document Requests

- All documents and communications relating to the DIA Settlement.

- All documents and communications relating to the negotiations surrounding the DIA Settlement.

- All documents and communications relating to the transfer of the Collection to the DIA Corp. pursuant to the DIA Settlement.

- All documents and communications describing the reasons for entering into the DIA Settlement.

- Documents sufficient to show the causes or charities You have previously supported or provided money to from January 1, 1990 to the present.

- Your mission statement.

- Documents sufficient to show Your current process for evaluating potential partners or causes.

- All communications between You and the DIA from January 1, 2001 to the present.

(*See, e.g., id.*, Schedule B at 6-7.)

12. In response, the Foundations filed a Joint Motion to Quash the subpoenas on June 13, 2014. *See* Joint Mot. to Quash [Dkt. No. 5300]. The Foundations argued, *inter alia,* that the subpoenas sought irrelevant information. *Id.* at 7. On June 20, 2014, the City filed a Statement in Support of the Foundations' motion, arguing that the subpoenas sought "information that is *far afield* from what could reasonably be considered relevant in the upcoming confirmation hearing." Statement [Dkt. No. 5494], at 4 (emphasis added). The City further argued that "Syncora's deposition topics and requests for . . .

7

production of documents . . . [were] *fundamentally irrelevant* to the Court's task of assessing whether [the DIA Settlement] falls within the 'range of reasonableness.'"[3]  *Id.* at 6 (emphasis added).

13. On June 26, 2014, the Court heard argument on the Foundations' motion to quash. During that hearing, the Court explained that "the issue of unfair discrimination is based upon not where the money comes from but where the money goes to." (Ex. 6A, Hr'g Tr. at 40:4-5, June 26, 2014.) The Court concluded that hearing by granting the Foundations' motion and holding that:

> [N]one of the 30(b)(6) subjects and none of the documents that are sought from the foundations are ***relevant to or even arguably relevant*** to the issues of whether the plan is discriminatory or whether it is unfairly discriminatory, the best interest of creditors or even the extent to which the so-called grand bargain settlement protects the art of the city.

(*Id.* at 126:23-127:5 (emphasis added).)[4]

## BASIS FOR RELIEF

14. "The purpose of a motion *in limine* is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay and ensure an even-handed and expeditious trial and to focus the issues the [trier of fact] will

---

[3] Of course, Syncora sought this information principally in the context of the confirmation standards of section 1125 of the Bankruptcy Code.

[4] The Court held that "information relating to the foundations' ability to pay . . . is a relevant subject on which the Court would allow limited discovery." (Ex. 6A, Hr'g Tr. at 127:7-9, June 26, 2014.)

consider." *Goldman v. Healthcare Mgmt. Sys., Inc.,* 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citing *United States v. Brawner,* 173 F.3d 966, 970 (6th Cir. 1999)). Evidence that is not relevant is not admissible. FED. R. EVIDENCE 402.

15. In this case, the Court has already held that information relating to the topics identified in Syncora's subpoena is irrelevant. Accordingly, the City should not be permitted to introduce evidence relating to (a) its contention that funds received from the DIA Funding Parties and the State are "outside the Plan" and therefore should be excluded from the Court's unfair discrimination analysis and (b) the topics in Syncora's subpoenas to the DIA Funding Parties.

**I. The City Should Not Be Permitted to Introduce Evidence Regarding the Recoveries of Classes 10 and 11 That Do Not Include the Contributions from the DIA Funding Parties and the State.**

16. Based on its reply, it is clear that the City intends to introduce evidence regarding the recoveries of Classes 10 and 11 independent of the contributions of the DIA Funding Parties and the State. Pursuant to the Court's ruling, however, that evidence is not relevant and is therefore inadmissible.

17. *First*, as the Court explained, "the issue of unfair discrimination is based upon not where the money comes from but where the money goes to." (Ex. 6A, Hr'g Tr. at 40:4-5, June 26, 2014.) However, the City's argument that the contributions from the DIA Funding Parties and the State should be excluded from any unfair discrimination necessarily goes to the issue of "where the money comes

9

from." Indeed, in its reply, the City goes to great lengths to emphasize for the Court that "[t]hese distributions are <u>not</u> from the City and do <u>not</u> make use of City funds." Consol. Reply [Dkt. No. 5034], ¶ 54 (original emphasis). This argument is nonsensical of course — the City itself acknowledges the DIA Settlement proceeds are "on account of its interest in the DIA Assets." But the larger point is that — as this Court has clearly ruled — the relevant inquiry is not the source of the funds the City is receiving, but rather, where, and to what claims, the funds are being applied.

18. Indeed, this is a well-established principle in bankruptcy law. As one bankruptcy court has noted:

> "[o]utside the plan" is a phrase that has crept into the bankruptcy vernacular which is not only misleading but also falsely implies some substantive meaning that it does not actually have. A debtor's plan must specify how each creditor's claim will be treated and paid. Since all payments must be made according to the terms of the plan, there is really no such thing as payments being made outside the plan.

*In re Citrowske*, 72 B.R. 613, 615 (Bankr. D. Minn. 1987).

19. Further, contrary to the City's assertions, the DIA Settlement does not constitute a "gifting plan," such that the DIA Settlement proceeds and State contribution can be excluded from the Court's unfair discrimination analysis. *See* Consol. Reply [Dkt. No. 5034], at 30-31 (citing *See In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994); *In re MCorp. Fin., Inc.*, 160 B.R. 941 (S.D. Tex. 1993); *In re Worldcom, Inc.*, 02-13533,

10

2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)). "Gifting" occurs when "*senior secured creditors* voluntarily offer a portion of *their recovered property* [under a plan] to junior stakeholders." *In re DBSD N. Am., Inc.*, 634 F.3d 79, 97 (2d Cir. 2011) (emphasis added); *see also In re Armstrong World Indus., Inc.*, 320 B.R. 523, 538–40 (D. Del. 2005); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D. Del. 2001). Put simply, the DIA Funding Parties are not creditors and are not receiving a distribution under the Plan, and thus have no "gifts" to bestow.

20. In any event, the viability of the "gifting" doctrine is questionable. *See In re DBSD N. Am., Inc.*, 634 F.3d at 97 (holding that the gifting doctrine "does not square with the text of the Bankruptcy Code."). Specifically, the *DBSD* court held that "[t]he Code extends the absolute priority rule to 'any property' [and the] Code focuses entirely on who 'receives' or 'retains' the property." *Id.* This rule remains in force "regardless of whether other reasons might support the distribution." *Id.* at 98; *see also In re Armstrong*, 320 B.R. at 540 ("to the extent that *In re WorldCom* . . . [stands] for the unconditional proposition that 'creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the plan by other creditors are not impacted' without adherence to the

11

strictures of [the Bankruptcy Code], that contention is flatly rejected here"), *aff'd,* 432 F.3d 507 (3d Cir. 2005).

21.     *Second*, the premise underlying the City's argument — namely, that City is not making any contribution and the DIA Funding Parties are receiving nothing in exchange — is factually incorrect. To begin, as the City itself acknowledged, the City has agreed to transfer all of its interests in the DIA Assets — an essential element of the DIA Settlement. In exchange, the City will be receiving the $816 million from the DIA Funding Parties and the State. *See Notice of Filing Plan Supplement: Exhibit I.A.103 (Form of DIA Settlement Documents)* [Dkt. No. 6576], at 8 ("[T]he City will convey all of its right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds) to the Museum and the Museum Assets (as defined in the Charitable Trust Agreement) to The DIA in exchange for fair value by virtue of…(iii) the contributions through the Supporting Organizations by The DIA (and through it, DIA Indirect Funders, DIA Direct Funders and Special Foundation Funders of $100 million, by Foundation Funders (excluding Special Foundation Funders) of $366 million, and an additional contribution by the State of Michigan (the "**State**") of $350 million, which total $816 million …."); *Corrected Fifth Am. Plan* [Dkt. No. 6379], at 9 (noting that DIA Proceeds Payments are "amounts scheduled to be *paid to the City* in accordance with the DIA Settlement (emphasis

added)); *id.,* Ex.1.A.91 ("All payments by the Funders shall be made directly to the Supporting Organization which shall hold such payments in a segregated account pending *payment to the City*"); *id.* ("The Funders' obligations to continue to fund the settlement (and the Supporting Organization's obligation to continue to *pay funds provided by the Funders to the City*) are conditioned on the following . . ."); *id.*, Ex. B ("this will result in *an annual payment of $18,300,000 . . . to the City of Detroit*"); Consol. Reply [Dkt. No. 5034], ¶¶ 29-30.

22. In return for their contributions, the Foundations will receive "the certainty that the City will not attempt to sell the DIA Assets and that such assets will remain available for the enjoyment and benefit of the City and its residents in the future," Consol. Reply [Dkt. No. 5034], at ¶ 30, as well as a seat on the DIA's to-be-established Governance Committee. *Fourth Am. Disclosure Statement* [Dkt. No. 4391]*,* Exhibit I.A.91 at 17. The State, on the other hand, purportedly receives a release from the pension-holders for any claims they may have against the State and a seat on the DIA Governance Committee. *Id.*

23. In short, not only does the City mischaracterize the terms of the DIA Settlement, it also incorrectly argues that the Court can exclude the contributions from the DIA Funding Parties and the State as part of its unfair discrimination analysis. Thus, any evidence proffered by the City to show (a) that the DIA

13

Settlement proceeds are "not City funds," and (b) the recoveries of Classes 10 and 11 independent of these proceeds is irrelevant and inadmissible.

## II. The City Should Not Be Permitted to Introduce Evidence Regarding Any of the Topics in Syncora's Subpoena.

24. As noted above, Syncora's subpoena sought information and documents on a number of different topics. During the June 26, 2014 hearing, counsel for Syncora explained the types of evidence that it would be seeking from the Foundations:

- "Whether the foundations would have contributed the money if the City had not agreed to transfer its art collection." (Ex. 6A, Hr'g Tr. at 22:19-21, June 26, 2014.)

- "Whether the foundations were the ones that imposed on the city the requirement that all monies go to the retiree classes or whether the city was the one that proposed that to the foundations." (*Id.* at 22:22-25.)

- The importance of the DIA to the Detroit Community. (*Id.* at 23:10-11.)

- "[W]hat went into the deal and how it was structured. Could it have been structured differently in a way that allows either the art collection to be preserved as a city asset, or alternatively, monetized, or part of the art collection and/or whose idea was it that all your money had to go to the retirees?" (*Id.* at 23:19-25.)

25. Syncora's attempt to obtain discovery regarding the structure of the Grand Bargain arose, at least in part, out of the City's repeated assertions that the contributions from the Foundations and the State would not otherwise be available because the "Foundations have required that their funds be applied to fund the

14

City's restructured legacy pension obligations." *See Fourth Am. Disclosure Statement* [Dkt. No. 4391], at 65.

26. After Syncora articulated the evidence that it would be seeking from the Foundations, the Court subsequently granted the Foundations' motion to quash, finding that "none of the 30(b)(6) subjects…are relevant to or even arguably relevant to the issues of whether the plan is discriminatory or whether it is unfairly discriminatory, the best interest of creditors or even the extent to which the so-called grand bargain settlement protects the art of the city." (Ex. 6A, Hr'g Tr. at 126:24-127:5, June 26, 2014.)

27. Specifically, the City should not be able to introduce any evidence relating to its assertions or belief that the funds provided by the Foundations and the City would not otherwise be available to the City. By granting the Foundations' motion to quash, the Court prevented Syncora from testing this assertion via the depositions of the Foundations. Thus, were the City allowed to introduce evidence relating to this topic, Syncora would suffer prejudice given its inability to conduct any discovery.

28. Furthermore, the City has taken the position that the negotiations surrounding the Grand Bargain are covered by the Mediation Order. And, as explained in Syncora's *Motion in Limine Barring the City from Introducing Communications Protected by the Court's Mediation Order*, the City should not be

15

able to circumvent the Court's Mediation Order and introduce "state of mind" testimony relating to these negotiations.

29. Accordingly, in light of the Court's ruling, the evidence sought by Syncora's subpoena to the Foundations has been deemed to be irrelevant and, as a result, the City should be barred from offering any evidence related to those topics.

## **CONCLUSION**

30. For the foregoing reasons, Syncora respectfully requests that the Court bar the City from offering evidence relating to (a) the City's contention that funds received from the DIA Funding Parties and the State are "outside the Plan" and should be excluded from the Court's unfair discrimination analysis and (b) any of the topics identified by Syncora in its subpoenas to the Funding Parties.

[*Remainder of the Page Intentionally Left Blank*]

Dated: August 22, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: */s/ Stephen C. Hackney*
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*