# Exhibit 6B

**July 2, 2014 M. Hall Deposition Transcript**

## Page 1

```
 1              MICHAEL HALL
 2    IN THE UNITED STATES BANKRUPTCY COURT
 3       FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6  In re            ) Chapter 9
 7  CITY OF DETROIT, MICHIGAN,   ) Case No. 13-53846
 8           Debtor.  ) Hon. Steven W. Rhodes
 9
10  _____
11
12
13       The Videotaped Deposition of MICHAEL HALL,
14       Taken at 1114 Washington Boulevard,
15       Detroit, Michigan,
16       Commencing at 8:57 a.m.,
17       Wednesday, July 2, 2014,
18       Before Kathryn L. Janes, CSR-3442, RMR, RPR.
```

## Page 2

```
 1              MICHAEL HALL
 2  APPEARANCES:
 3
 4  DEBORAH KOVSKY-APAP, ESQ.,
 5  LESLEY S. WELWARTH, ESQ.
 6  Pepper Hamilton LLP
 7  4000 Town Center
 8  Suite 1800
 9  Southfield, Michigan 48075
10      Appearing on behalf of the Debtor.
11
12
13
14
15
16  DAN BARNOWSKI, ESQ.
17  Dentons US LLP
18  1301 K Street, NW
19  Suite 600, East Tower
20  Washington, DC 20005-3364
21      Appearing on behalf of the Retiree Committee.
```

## Page 3

```
 1              MICHAEL HALL
 2  MICHAEL J. PATTWELL, ESQ.
 3  Clark Hill, PLC
 4  212 East Grand River Avenue
 5  Lansing, Michigan 48906
 6      Appearing on behalf of the Retirement Systems
 7      for the City of Detroit.
 8
 9
10
11  STEPHEN C. HACKNEY, ESQ.
12  Kirkland & Ellis LLP
13  300 North LaSalle
14  Chicago, Illinois 60654
15      Appearing on behalf of Syncora Guarantee Inc.
16      and Syncora Capital Assurance Inc.
```

## Page 4

```
 1              MICHAEL HALL
 2  VINCENT J. MARRIOTT, III, ESQ.
 3  Ballard Spahr LLP
 4  1735 Market Street
 5  51st Floor
 6  Philadelphia, Pennsylvania 19103
 7      Appearing on behalf of Hypothekenbank Frankfurt
 8      AG; Hypothekenbank Frankfurt International S.A.;
 9      and Erste Europaische Pfandbriefund
10      Kommunalkreditbank Aktiengelsellschaft in
11      Luxemburg S.A.
12
13
14
15  MARK R. JAMES, ESQ.
16  Williams, Williams, Rattner & Plunkett, P.C.
17  380 North Old Woodward Avenue
18  Suite 300
19  Birmingham, Michigan 48009
20      Appearing on behalf of the Financial Guaranty
21      Insurance Company.
```

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-8   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 2 of 5

Page 165

MICHAEL HALL
had received over 2,500 applicants in connection with a recent job posting; isn't that correct?
A. That's correct.
Q. Do you know how many applications per City opening the City has been getting on average since you started?
A. No.
Q. Is it fair to say that the City generally gets a sizeable response to any openings it does post?
A. It depends on the opening and the qualifications for those people.
Q. I take it, the more specialized positions, you don't see the thousands of applications --
A. That's correct.
Q. -- is that your point?
A. That's correct.
Q. Have you seen any change in the numbers of applications that you've been getting for similar types of positions during your tenure here or has it been fairly consistent?
A. During my tenure, it's been fairly consistent.
Q. Where do you -- and as far as you can tell, where do new City employees generally come from; are they coming from the private sector or are they

Page 166

MICHAEL HALL
coming from other cities?
A. Haven't done --
MS. KOVSKY-APAP: Objection. Could you just clarify, do you mean where do they live geographically?
BY MR. HACKNEY:
Q. Sorry, in their prior employer?
A. Okay. That would depend upon the jobs that these people are applying for.
Q. Okay. Do you have a sense of that or is it something that you've just not studied?
A. The majority of our jobs that we've hired for this year have been in my police and fire, EMTs, bus drivers. Those have been the majority of openings in seasonal workers, so most of those people are coming to us not from other municipalities but, you know, from the public sector.
Q. Oh, from --
A. Excuse me, from the cities, not employed by the cities, but just from the communities.
Q. Okay. Let me make sure I understand. They have been coming from cities --
A. From all around.
Q. From all around?

Page 167

MICHAEL HALL
A. Right.
Q. Okay. But not from -- they've not been previously employed by other cities?
A. That's correct.
Q. Okay. With respect to City employees that have left the City, do you know generally whether they're leaving the City for other municipalities or for the private sector?
MS. KOVSKY-APAP: Objection, foundation.
A. Don't have the data to support an answer.
BY MR. HACKNEY:
Q. Okay. Don't know one way or the other?
A. That's correct.
Q. Did Detroit eliminate the residency requirements for police and fire employees?
A. Yes.
Q. When did it do that?
A. I don't recall the date.
Q. Since you've started?
A. Oh, no.
Q. Before?
A. Yes.
Q. Oh, it was something you -- you learned when you

Page 168

MICHAEL HALL
came to the job?
A. That's correct.
Q. Do you know if it had happened in 2013 or is this something that goes further --
A. Goes --
Q. -- back?
A. -- it goes back, further back.
Q. It goes before the EM even?
A. Before the EM.
Q. Oh, has anyone ever told you why that residency requirement was changed?
A. No.
Q. I just want to talk briefly about union negotiations if we could. Do you agree that the unions carry substantial influence in the city of Detroit?
MS. KOVSKY-APAP: Objection, form.
A. Yes.
BY MR. HACKNEY:
Q. You have personally negotiated with unions during your career both here and at GM; isn't that correct?
A. Correct.
Q. And you would agree that they fight hard for

Pages 165 to 168

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-8   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 3 of 5

MICHAEL HALL

their members in their negotiations with you, correct?

A. Correct.

Q. And you would agree they do a good job representing their membership's interests, correct?

A. They do.

Q. Isn't it true that the unions have been withholding their support for the grand bargain until they're able to strike a collective bargaining agreement with the city?

MS. KOVSKY-APAP: Objection, foundation and form.

A. Yes.

BY MR. HACKNEY:

Q. Okay. And so it's basically you can't get the unions to come out publicly for the grand bargain until you strike the collective bargaining agreement with them, correct?

MS. KOVSKY-APAP: Objection, calls for speculation.

And I would also caution you to the extent that this would call for disclosure of anything that's been discussed privately in

MICHAEL HALL

mediation, it needs to remain confidential, and I would direct you not to answer.

A. I can't answer the question.

BY MR. HACKNEY:

Q. Okay. Well, don't tell me what people said, okay, I want to just ask your understanding. Your understanding is that the unions will not come out in public support of the grand bargain until they have reached a new collective bargaining agreement with the City, correct?

MS. KOVSKY-APAP: Objection to the extent that what he understands is based on what he learned through the mediation process, it's covered by the mediation order.

I direct you not to answer.

MR. HACKNEY: Judge Rhodes has said on the record that state of mind of participants in the mediation is not protected by the mediation order. He said it to me at the pretrial conference when we were discussing the subject of how you could prove up different things about different aspects of the case. So he said on the record, well, I suppose the City could ask someone about their state of mind separate and apart from

MICHAEL HALL

the communications.

MS. KOVSKY-APAP: But his state of mind is --

MR. HACKNEY: I don't know what's informing his state of mind.

MS. KOVSKY-APAP: To the extent that his state of mind or what he understands about what the unions will or will not do is based on information that has been conveyed to him through the mediation process. Our position is that that is covered by the mediation order. That's not a state of mind, that's what is his understanding of the facts and the facts are conveyed through the mediation process.

MR. HACKNEY: I -- I disagree with you because I'm not asking about what created the state of mind, I'm asking about the state of mind, so it's a difference. It could be that he's wrongly assuming that, it could be that it's a coincidence that every time the union announces a collective bargaining agreement, they then support the grand bargain. But are you going to stick with this instruction?

MS. KOVSKY-APAP: To the extent that it

MICHAEL HALL

would require him to disclose and I appreciate that --

MR. HACKNEY: I'm not -- I'm not telling him to disclose anything.

MS. KOVSKY-APAP: -- to the extent that the only source of his understanding is what he has been told in mediation, I believe that that is problematic and I would -- I would ask that he not answer.

MR. HACKNEY: Okay.

BY MR. HACKNEY:

Q. So are you going to follow your counsel's instruction?

A. Yes, sir.

Q. Okay. So I take it, you will not tell me anything -- anything that you have communicated as part of the mediation, correct?

A. Repeat the question.

Q. You will not tell me any -- any communications you've had as part of the mediation, correct?

A. Correct.

Q. And you will also not tell me any thoughts that you've had as a result of the mediation; is that correct?

Pages 169 to 172

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6979-8  Filed 08/22/14  Entered 08/22/14 16:11:42  Page 4 of 5

1   MICHAEL HALL
2   A. That's correct.
3   Q. So to the extent I ask you about judgments that
4      you've drawn that -- that result in part from
5      communications in the mediation, you will not
6      tell them to me, correct?
7   A. That's correct.
8   Q. Okay.
9         MS. KOVSKY-APAP: I would just like to
10     clarify, if what you are asking from him is his
11     judgment that he has drawn that is separate and
12     independent of information conveyed to him
13     directly in mediation, I think that's a separate
14     issue, but we want to be cautious and mindful of
15     the Court's instruction that the mediation order
16     is an order that is not waivable.
17        MR. HACKNEY: Right, because the City
18     has been very scrupulous about observing the
19     mediation order and it just wants to continue that
20     track record of careful adherence to the terms of
21     the mediation order.
22        MS. KOVSKY-APAP: I don't think
23     that requires a response.
24        MR. HACKNEY: I guess my question to
25     you, Counsel, is to the extent that he has a

1   MICHAEL HALL
2   judgment that's based in part on things that were
3   told to him in the mediation, I take it, you will
4   also instruct him not to respond?
5         MS. KOVSKY-APAP: If you want to ask
6   him his state of mind as to whether he is
7   optimistic about a particular outcome or something
8   to that effect, a state of mind, but you're asking
9   him factual information as to what the unions will
10  or will not do, and the only possible source of
11  that information would be the mediation process.
12        MR. HACKNEY: But I just want to
13  clarify so I don't have to waste the witness's
14  time. If his state of mind is impacted in part by
15  something he was told in the mediation process,
16  you will direct him not to answer the question,
17  correct?
18        MS. KOVSKY-APAP: If he can separate
19  his own mental impressions and his own state of
20  mind from facts that were conveyed to him and
21  information that was conveyed to him in the
22  negotiations that took place under the scope of
23  the mediation order, then certainly, he can answer
24  to that extent. But to the extent that answering
25  would effectively reveal what he learned in

1   MICHAEL HALL
2   mediation and what was covered by mediation, then
3   I don't really see how he can, if he can't -- if
4   he can't separate those.
5   BY MR. HACKNEY:
6   Q. So let me go back, Mr. Hall, do you know what the
7      grand bargain is when I refer to the grand
8      bargain?
9   A. The grand bargain? Yes.
10  Q. You know that's the term that's used to describe
11     the -- the deal where the art and the Art
12     Institute is conveyed to a public trust and there
13     are monies that come in that are -- that go into
14     the -- the pensions?
15  A. Yes.
16  Q. Going into your negotiations with the unions,
17     prior to communicating with them, was it your
18     assumption that the unions would withhold their
19     support for the grand bargain until they were
20     able to strike a collective bargaining agreement
21     with the City?
22  A. I had no assumptions.
23  Q. Okay. So is your understanding with respect to
24     whether the unions will support the grand
25     bargain, you know, only after they've struck a

1   MICHAEL HALL
2   collective bargaining agreement, is that based
3   exclusively on things that were told to you by
4   the union negotiators?
5   A. All those conversations have been in the mediation
6      process.
7   Q. I understand that, but I just want to make sure
8      your understanding of what the unions will and
9      will not do when it comes to recommending the
10     grand bargain, that's based exclusively on things
11     you've learned in the mediation?
12  A. Correct.
13  Q. You are aware -- isn't it correct that there has
14     been no union that has come out publicly in
15     support of the grand bargain prior to reaching an
16     agreement in principle with the City; isn't that
17     correct?
18  A. I'm not sure.
19  Q. Do you agree that the unions' support of the
20     grand bargain is important to getting their
21     members to vote in favor of the Plan of
22     Adjustment --
23        MS. KOVSKY-APAP: Objection.
24  BY MR. HACKNEY:
25  Q. -- based on your experience with these unions?

Pages 173 to 176

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6979-8  Filed 08/22/14  Entered 08/22/14 16:11:42  Page 5 of 5