# Exhibit 6D
## July 16, 2014 K. Buckfire Deposition Transcript

## Page 1

```
 1      KENNETH BUCKFIRE, VOLUME 2
 2   IN THE UNITED STATES BANKRUPTCY COURT
 3     FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6
 7   In Re:            )  Chapter 9
 8
 9   CITY of DETROIT, MICHIGAN, )  Case No. 13-53846
10
11         Debtor.   )  Hon. Steven Rhodes
12   _____
13
14              VOLUME 2
15
16   The Videotaped Deposition of KENNETH BUCKFIRE,
17   a Rule 30(b)(6) witness,
18   Taken at 1114 Washington Boulevard,
19   Detroit, Michigan,
20   Commencing at 8:09 a.m.,
21   Wednesday, July 16, 2014,
22   Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25
```

## Page 2

```
 1       KENNETH BUCKFIRE, VOLUME 2
 2   APPEARANCES:
 3
 4   THOMAS F. CULLEN, JR., ESQ.
 5   Jones Day
 6   51 Louisiana Avenue, N.W.
 7   Washington, D.C. 20001
 8      Appearing on behalf of the Debtor.
 9
10
11
12   CORINNE BALL, ESQ.,
13   BENJAMIN ROSENBLUM, ESQ.
14   Jones Day
15   222 East 41st Street
16   New York, New York 10017
17      Appearing on behalf of the Debtor.
18
19
20
21
22
23
24
25
```

## Page 3

```
 1       KENNETH BUCKFIRE, VOLUME 2
 2
 3
 4   CLAUDE D. MONTGOMERY, ESQ.
 5   Dentons US LLP
 6   1221 Avenue of the Americas
 7   New York, New York 10020
 8      Appearing on behalf of the Retirement Committee.
 9
10
11
12   JENNIFER K. GREEN, ESQ.
13   Clark Hill, PLC
14   500 Woodward Avenue, Suite 3500
15   Detroit, Michigan 48226
16      Appearing on behalf of the Retirement Systems for the
17      City of Detroit.
18
19
20
21
22
23
24
25
```

## Page 4

```
 1       KENNETH BUCKFIRE, VOLUME 2
 2   ROBIN D. BALL, ESQ.
 3   Chadbourne & Parke, LLP
 4   350 South Grand Avenue, 32nd Floor
 5   Los Angeles, California 90071
 6      Appearing on behalf of Assured Guaranty Municipal
 7      Corporation.
 8
 9
10
11   GUY S. NEAL, ESQ.
12   Sidley Austin, LLP
13   1501 K Street, N.W.
14   Washington, D.C. 20005
15      Appearing on behalf of National Public Financing.
16
17
18
19
20
21
22
23
24
25
```

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6979-10  Filed 08/22/14  Entered 08/22/14 16:11:42  Page 2 of 4

## Page 349

KENNETH BUCKFIRE, VOLUME 2

possible level despite the fact that the underfunding of the plan was growing, not shrinking, and because of that low contribution rate, DWSD, even though it had the ability to fund at a higher level, because DWSD had the ability to charge through the ratepayers their appropriate expenses, was benefitting from the City's own financial difficulties in a perverse way.

Q. Was the contribution to the DWSD in these prior years addressing any underfunding, was that calculated by the City's actuaries?

A. I believe so.

Q. Do you know whether the City's actuaries were in agreement with the amounts that were being contributed by the City and or DWSD with respect to any underfunding?

A. My understanding was the minimum possible contribution is what they were contributing.

Q. All right, when you say minimum possible, minimum compared to what?

A. In pensions, whether they're corporate or public, you're supposed to maintain them at a reasonable level of funding so that you can meet your obligations as they come due.

In the corporate world, we normally assume

## Page 350

KENNETH BUCKFIRE, VOLUME 2

that a plan that's funded 80 percent or more is adequately funded. A plan under 80 percent clearly has issues because you're not contributing enough to make up for the benefit expenses of that plan.

In the case of the Detroit plans, it was clear after our initial analysis that they were grossly underfunded, which implies that the pension contribution rates were too low to provide adequate resources of the pension plans to meet future benefit costs.

Q. Just so I'm clear, you're not an actuary --

A. I am not.

Q. -- correct? And you're not providing an expert opinion as an actuary in this case, are you?

A. I'm not.

Q. And you're not providing any opinion in this case as to the adequacy or inadequacy of the funding of the plan; is that right?

A. Only to the extent that it's a fact that the plans were severely underfunded and we reported that fact in June of 2013.

Q. There are a lot of plans out there that are underfunded in the general commercial world; are there not?

## Page 351

KENNETH BUCKFIRE, VOLUME 2

A. No.

Q. There are certainly some?

A. There are always some.

Q. This isn't the only one.

A. This is not a commercial plan; it's a public plan.

Q. There may be public plans that are underfunded out there, as well?

A. There are many worse than this one. I'll be calling them next.

Q. Who determined the amount of these payments that will be made by the DWSD to the pension plan?

A. It was determined in a negotiation with the pension fund and trustees, the retirees' committee, supported by the City's own actuaries, consultants to the City, and experts at Jones Day.

Q. You say they were supported by actuaries to the City; what do you mean by that?

A. Well, the calculation of how much to contribute to get to a target level of funding is something that an actuary is typically employed to do.

Q. Okay. And my question isn't so much that as to whether the amount of payment gets you to where you want to get. My question is who determined that it would be paid over the period that it was -- that it's

## Page 352

KENNETH BUCKFIRE, VOLUME 2

being paid?

A. It was negotiated.

Q. All right. It wasn't something that was recommended by the City's actuaries; is that correct?

A. No.

Q. No, it was not?

A. It was not.

Q. In connection with this negotiation, was it also determined that the City would not be contributing to the -- the reduction of the underfunding through 2023?

MR. CULLEN: Objection, I think we're getting into the negotiations under the mediation privilege, now we're getting into the terms of the negotiation. He was able to tell you that this was a product of a negotiation. Now you're asking him to parse the negotiation, and that's beyond the pale.

MR. WEISBERG: Not agreeing with it, but we'll move on.

MR. CULLEN: Okay.

BY MR. WEISBERG:

Q. To what extent was -- were you or and/or Miller Buckfire involved in connection with the underlying assumptions that were used in order to calculate the UAAL in connection with the plan of adjustment?

Pages 349 to 352

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-10   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 3 of 4

## Page 353

1  KENNETH BUCKFIRE, VOLUME 2
2  MR. CULLEN: I would just note for counsel
3  that you can answer -- ask the question, but on the
4  derivation of the -- what's been called the 428
5  figure, Mr. Moore was designated as the 30(b)6
6  witness.
7  MR. WEISBERG: Okay, and I'm not suggesting
8  that Mr. Buckfire wasn't so designated.
9  BY MR. WEISBERG:
10 Q. I'm just asking you if you were involved in that
11    determination?
12 A. No.
13 Q. You are with Miller Buckfire?
14 A. Correct.
15 Q. And in paragraph 3 of your expert report -- and you
16    can refer to that. You indicate that in the third --
17    third sentence starting with in addition, it says in
18    addition to other obligations, the City will have
19    addressed and brought greater certainty and
20    predictability with respect to its pension benefit and
21    OPEB obligations; do you see that?
22 A. I do.
23 Q. Okay, can you tell me what that means?
24 A. I answered this question yesterday.
25 Q. I'm sorry, I apologize. I might have missed

## Page 354

1  KENNETH BUCKFIRE, VOLUME 2
2  something. Could you give it to me again?
3  A. The City by action of the plan of adjustment is
4     eliminating $7 billion worth of present value of
5     liabilities, most of which was represented by unfunded
6     pension and healthcare benefit costs. The burden of
7     those costs upon the City have been that the
8     requirement to fund them currently with substantial
9     cash has often been outside of the City's control, as
10    it's been driven by independent factors, healthcare
11    plans, benefit costs, pension contribution levels.
12        By eliminating such a large amount of the
13    present value and converting the balance of these
14    remaining claims into a debt obligation stream
15    represented by the contribution by DWSD for catchup
16    and also by the series B notes, the City will have
17    much greater control over it's discretionary costs and
18    its ability to meet its remaining contractual
19    obligations when due.
20 Q. Well, okay, I certainly agree with you with respect to
21    through the years, the year 2023 that said you will
22    have virtually no obligation to pay in connection with
23    those costs, correct?
24 A. Correct, that was an objective of our plan.
25 Q. So that's certainly predictable. But what about with

## Page 355

1  KENNETH BUCKFIRE, VOLUME 2
2  respect to post-2023; is that as predictable?
3  A. Ten years, twenty years, anyone's guess.
4  Q. Okay. All right. It also indicates here that in that
5     same paragraph, it says that the fact that such
6     obligations are driven by actuarial analyses and
7     assumptions, such obligations have traditionally
8     served as a significant obstacle in the City's
9     financial planning effort.
10        So I'm trying to connect up those two
11    concepts. What -- what is the connection between the
12    fact that these pension obligations are driven by
13    actuarial analyses and the fact that they create an
14    obstacle to the City's financial planning?
15 A. I already answered that question. Actuarial
16    assumptions --
17 Q. Indulge me, it's been a long two days.
18 A. Actuarial assumptions and analysis ultimately do drive
19    required pension contribution costs. There's a cash
20    cost associated with being required by an actuary to
21    make certain contributions. That is inherently
22    unpredictable because it does change relative to
23    market asset performance and benefit costs,
24    themselves. It's not something directly within the
25    City's control, and the larger the underfunding is,

## Page 356

1  KENNETH BUCKFIRE, VOLUME 2
2  the more of a projected burden that will be on the
3  City because at some point, that gap has to be closed,
4  and that makes it very difficult for a City to make
5  long-term financial plans knowing that at some point
6  in the next 10 or 20 years, it will have to satisfy
7  its pension obligations whether or not it has the
8  assets to do so.
9  Q. There's an actuarial component to what it's going to
10    have to pay down the road; is there not?
11 A. There is when you estimate today what your
12    contribution has to be to the pension fund but the
13    actual benefit costs, themselves, is something you
14    find out every year when people retire and register
15    for their claimant payments. So we're talking about
16    the funding problem -- the funding problem, not the
17    benefit cost problem that drives this.
18        I also note your earlier point that the
19    ten-year period of stability is crucial because we do
20    assume and we have every right to do so that the
21    City's ability to revitalize itself be successful and,
22    therefore, will have the ability to be a healthy
23    viable City beyond year ten, which means from a
24    capital market's perspective, the expectation should
25    be that it will have no difficulty raising capital

Pages 353 to 356

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6979-10  Filed 08/22/14  Entered 08/22/14 16:11:42  Page 4 of 4