# Exhibit 6E

**July 22, 2014 K. Orr Deposition Transcript**

## Page 162

```
              KEVYN ORR, VOLUME 2
        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE EASTERN DISTRICT OF MICHIGAN



In Re:              )   Chapter 9

CITY of DETROIT, MICHIGAN, )  Case No. 13-53846

     Debtor.   )   Hon. Steven Rhodes
_____

              VOLUME 2

    The Videotaped Deposition of KEVYN ORR,
    in his personal capacity and as Rule 30(b)(6) witness,
    Taken at 2 Woodward Avenue,
    Detroit, Michigan,
    Commencing at 9:10 a.m.,
    Tuesday, July 22, 2014,
    Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

## Page 163

```
              KEVYN ORR, VOLUME 2
APPEARANCES:

GREGORY M. SHUMAKER, ESQ.,
DAN T. MOSS, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
    Appearing on behalf of the Debtor.




ROBERT HERTZBERG, ESQ.
Pepper Hamilton, LLP
4000 Town Center, Suite 1800
Southfield, Michigan 48075
    Appearing on behalf of Debtor.
```

## Page 164

```
              KEVYN ORR, VOLUME 2
STEPHEN C. HACKNEY, ESQ.
Kirkland & Ellis, LLP
300 North Lasalle Street
Chicago, Illinois 60654
    Appearing on behalf of Syncora.



JEFFREY BEELAERT, ESQ.
Sidley Austin, LLP
1501 K Street, N.W.
Washington, D.C. 20005
    Appearing on behalf of National Public Financing.



ERNEST J. ESSAD, JR., ESQ.
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
    Appearing on behalf of Financial Guaranty Insurance
    Company.
```

## Page 165

```
              KEVYN ORR, VOLUME 2
ALFREDO R. PEREZ, ESQ.
Weil, Gotshal & Manges, LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
    Appearing on behalf of Financial Guaranty Insurance
    Company.



LISA SCHAPIRA, ESQ.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10112
    Appearing on behalf of Assured Guaranty Municipal
    Corporation.
```

Pages 162 to 165

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6979-11  Filed 08/22/14  Entered 08/22/14 16:11:42  Page 2 of 9

## Page 182

KEVYN ORR, VOLUME 2

it's fair to say that they built on a lot of the other work that had been done in the prior almost year and a half.

Q. That may be true, but you agree that they had a huge amount of work to do in a short period of time.

MR. SHUMAKER: Object to form.

A. Yeah, I think that he had -- you know, the adjectives can change. I think they had a significant amount of work to do, but I think they built on a lot of work that had already been done.

BY MR. HACKNEY:

Q. And you agree they had a relatively short period of time to do it?

A. Relative -- and this is why I'm trying to relay the time frame. If you go back to 2011 and this is all a continuum of time, then no, that's not accurate. If you talk about solely from the formal retention of Conway MacKenzie till June, depending upon the amount of work that they had to do, I want to be very careful not to follow your characterization because the reality may be some of the work that they did was an extrapolation of work that had already been done.

Q. If Chuck Moore testified that Conway MacKenzie was drinking from a fire hose, would you have a basis to

## Page 183

KEVYN ORR, VOLUME 2

disagree with that characterization?

A. No.

MR. SHUMAKER: Object to form.

A. No, I think we all were.

BY MR. HACKNEY:

Q. Okay, what -- isn't it true that you negotiated the first swaps agreement in a two-week period in early June of 2013?

A. Yes, I think that's fair.

Q. Okay. That was the one where you agreed to pay something in the neighborhood of $265 million, correct?

A. Yeah, I -- I think that's about the right amount.

Q. Mr. Orr, do you agree that the bankruptcy and your appointment as emergency manager represent an historic opportunity for the City to revitalize itself?

A. Yeah, I think that's fair.

Q. Now, when the City went into bankruptcy, it had 13 units in 47 total bargaining -- 13 unions and 47 total bargaining unions -- units; is that correct?

A. Well, if you count the subunions and locals, it was significantly more than that, but that's -- that's approximately correct.

Q. Okay, and that's how many it will have when it comes

## Page 184

KEVYN ORR, VOLUME 2

out, correct?

A. Roughly the same, yes.

Q. You have not altered the City charter; isn't that correct?

A. I cannot alter the City charter.

Q. Okay, and the City does not have any specific proposed changes to the City charter that are to be implemented in the near term, correct?

A. Well, two things. The charter reformed process is extensive and expensive, the charter was just reformed in 2012, so that's difficult. The statute does -- 436 does provide me with the opportunity to recommend either charter reforms or adoption of model charter provisions, which we may do.

Q. Okay, you haven't as you sit here today, correct?

A. I can't, I can't make any charter changes.

Q. But you haven't made any proposed changes, correct?

MR. SHUMAKER: Object to the form.

BY MR. HACKNEY:

Q. You haven't proposed any changes?

A. I haven't formally proposed any changes.

Q. Okay, you haven't are disclosed to creditors your proposed changes?

A. That is true, yes, mm-hmm.

## Page 185

KEVYN ORR, VOLUME 2

Q. Okay, and you're not aware of any other proposed changes to the City charter that have been made public to the creditors?

A. Yes, I think that's true.

Q. At the outset of the bankruptcy you believe that a regional water authority was in the best interests of the City and the DWSD's customers, correct?

A. Yes.

Q. As things stand today, you have not been able to achieve that goal; isn't that correct?

A. As things stands today, yes, that's correct.

Q. Okay. And you have not had sufficient time to reach agreement on a regional water authority; is that a fair statement?

A. The -- I continue to believe that a regional water authority is in the best interests of the City and its customers, including the Counties. The issues regarding those negotiations are involved in mediation, so I want to be very careful --

Q. Yeah.

A. -- about where things -- but I think it is fair to say that as it stands here today we have not reached agreement on a regional water authority.

Q. You don't have to tell me what the discussions are at

Pages 182 to 185

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-11   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 3 of 9

## Page 186

1  KEVYN ORR, VOLUME 2
2  a specific level and I think you can't under the
3  mediation order --
4  A. Right.
5  Q. -- but is it fair to say that the -- that the concept
6  of a regional authority is currently the subject of
7  mediation and explains why you can't talk about it?
8      MR. SHUMAKER: I think that gets into the
9  content of the mediation and, therefore, I think falls
10  within the mediation --
11     MR. HACKNEY: I mean, I think that any --
12  any fair privilege invocation, which is what the
13  mediation order is like, typically involves a
14  disclosure of the general subject matter of the
15  mediation without the specific communications.
16     MR. SHUMAKER: Well, the question is
17  whether that's the only topic of the mediation or that
18  there are other alternatives. If -- if, for example,
19  that was the only thing going on, that would perhaps
20  reveal too much. You could -- you could say --
21     MR. HACKNEY: Okay.
22     MR. SHUMAKER: -- what different
23  alternatives are being considered.
24  BY MR. HACKNEY:
25  Q. That's fine. What different alternatives are being

## Page 187

1  KEVYN ORR, VOLUME 2
2  considered or being negotiated?
3  A. Let me be clear. We -- we have -- there is a common
4  interest privilege between my office and the City and
5  the State. There is the August 13th, 2013 order by
6  Judge Rhodes's mediation. There is an April 7th, 2013
7  order appointing Judge Sean Cox as the mediator, and
8  paragraph 4 of that order specifically obligates me to
9  keep those discussions confidential. And so I want to
10  state very clearly I intend to observe the
11  confidentiality, and the judge has since admonished
12  all parties to make sure they observe confidentiality
13  within those orders.
14     That being said, I think what I can say is
15  that the concept of a regional water authority and
16  discussions have been fairly widely reported in the
17  press, and so I have no reason to disagree. Those
18  reports, while they may be inaccurate, I have no
19  reason to disagree with the subject matter of those
20  reports.
21  Q. Do you remember that the prior theory around a
22  regional water authority was that it might both
23  improve governance and unlock a payment stream for the
24  City, correct? That was what was disclosed in the
25  June 2013 proposal to creditors?

## Page 188

1  KEVYN ORR, VOLUME 2
2  A. I think that's fair.
3  Q. Okay.
4  A. Mm-hmm.
5  Q. Does that remain a possibility as you stand here today
6  that the plan may include a regional water authority
7  that does those two things?
8  A. I think I need to be a little careful on those issues.
9  Q. Okay.
10  A. So I'm going to defer from answering that question.
11  Q. Okay. On the grounds of the mediation order or --
12  A. Yes.
13  Q. Okay. So you don't know or you can't answer?
14  A. I can't answer.
15  Q. Okay. You do know the answer to the question?
16  A. Yes.
17  Q. But you cannot provide the answer?
18  A. Yes.
19  Q. Okay. Now, isn't it true there has been no reduction
20  in the number of City departments from the time the
21  City went into bankruptcy to when it will come out,
22  correct?
23  A. I think that's true.
24  Q. There has been no reduction in the number of City
25  employees, correct?

## Page 189

1  KEVYN ORR, VOLUME 2
2  A. No, that is untrue.
3  Q. Okay, the number of City employees has gone down?
4  A. Yes.
5  Q. Isn't it true that the plan anticipates that the City
6  will increase the total number of City employees as
7  compared to the level when it filed for bankruptcy?
8  A. You -- generally speaking, that's true. There are
9  aspects in the plan that are speaking about optimum
10  staffing levels that may not have taken into account
11  the reduction of force, but generally that's true.
12  Q. Okay. Just to put it in plain English, the -- if the
13  plan is confirmed and the restructuring and
14  reinvestment initiatives are implemented as
15  anticipated, the City will have more employees
16  postconfirmation than it had when it went into
17  bankruptcy, correct?
18  A. I'm not sure that's accurate. I'd have to go back and
19  look at the numbers.
20  Q. Okay.
21  A. Okay.
22  Q. So --
23  A. I'm just not sure that's an accurate -- I have no
24  reason to believe that's an inaccurate statement.
25  Q. Well, that's okay, I'm not trying to sharp shoot you.

Pages 186 to 189

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-11   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 4 of 9

KEVYN ORR, VOLUME 2

A. Yes, I think Mr. Buckfire is an expert in that area.
Q. And in this subject matter we're discussing of likely rates of return, likely levels of risk, would you tend to defer to him in terms of his view?
A. I would certainly solicit his view. His view is very informed and very capable, but having been in the City now for over a year, I certainly would want to be informed but ultimately it's -- I'd have to make a call of keeping my own counsel.
Q. Would you agree that lenders are tripping over themselves to lend the City money?
   MR. SHUMAKER: Object to the form.
A. I think we've had -- you know, every time I use a literation (sic) or metaphor, you quote it back to me, so I'm going to say that I think we've had a healthy amount of interest, and some people might well characterize that as tripping over themselves.
BY MR. HACKNEY:
Q. And there's a great deal of enthusiasm that you're finding from both investors and lenders, correct?
A. That appears to be the case.
Q. And that's based on the substantial deleveraging that the City's achieving through this plan, correct?
A. I think that --

KEVYN ORR, VOLUME 2

Q. In part?
A. I think that is fair.
Q. You know, Mr. Orr, I've reached a good stopping point, I think.
   MR. SHUMAKER: Sure.
   MR. HACKNEY: There's a lot of people in the room, but I kind of defer to you.
   THE WITNESS: No, I'm good, but if you guys think that makes sense, we have a thing that we need to do.
   MR. HACKNEY: What time?
   MR. HERTZBERG: At 1:15 for 5 minutes.
   THE WITNESS: Okay.
   MR. HACKNEY: That will be perfect then, we'll take an hour for lunch, and then I'll see you at 1:30.
   THE WITNESS: Okay.
   VIDEO TECHNICIAN: The time is now 12:31 p.m., we are now off the record.
   (Recess taken at 12:31 p.m.)
   (Back on the record at 1:36 p.m.)
   VIDEO TECHNICIAN: The time is 1:36 p.m., we are back on the record.
BY MR. HACKNEY:

KEVYN ORR, VOLUME 2

Q. Mr. Orr, welcome back from lunch.
A. Thank you, Mr. Hackney.
Q. Okay. So Mr. Orr, you're aware that certain charitable foundations have agreed to contributed money to the City's pension obligations in exchange for the City conveying its art collection into a public trust; is that correct?
A. Yes.
Q. And I take it if I ask you questions about your communications with the charitable foundations in connection with their agreement to contribute this money, you will refuse to answer on the grounds of the mediation order's confidentiality provisions; is that correct?
A. Yes, generally for most of them, I think that's correct.
Q. And just for the record, you didn't have any such conversations prior to the entry of the mediation order which was at some point in September of 2013?
A. Yes, that's correct.
Q. Okay.
A. Well, let me think. I think I had one meeting with Darren Walker at Ford Foundation, but it was not about a contribution, it was just a meet and greet.

KEVYN ORR, VOLUME 2

Q. Okay.
A. Okay?
Q. Yeah, I saw that in the documents, and there were some issues about the Ford Foundation and the building that they owned or something that --
A. I didn't even get into all that.
Q. Okay.
A. It was just hi, how are you, they were helping us with some grants, helping us stand up a grants administrator.
Q. So I guess I want to make a record of something I understand from the City's position but it is the City's position that communications with the foundation are either part of or incidental to the mediation, correct?
   MR. SHUMAKER: I believe that's correct. Again, I think you could fish outside the contours of those mediation talks but my understanding is that all those talks were within the context of mediation.
BY MR. HACKNEY:
Q. Yeah, I mean, I don't want to ask a hundred questions today to establish what I think is relatively well established, which is that you're not, generally speaking, going to discuss your conversations with the

Pages 334 to 337

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-11   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 5 of 9

## Page 338

KEVYN ORR, VOLUME 2

foundations, correct?

A. That is correct. You know, I may -- let me say this generally. I may have had meetings with foundation principals outside of the confines of the mediation, just hail-fellow-well-met, saw them at an event, how are you. There were no substantive conversations about the contribution that did not occur outside of the mediation order.

Q. And that's fine, because the only ones that I really want to ask you about are ones that relate to the Grand Bargain?

A. Right, right.

Q. And those would fall under the gambit of the mediation?

A. Those would fall under the gambit of mediation.

Q. Now, if I asked you your state of mind based on what you understood the foundations to be willing to do or what you thought they would be willing to do, you would also invoke the mediation order to the extent his state of mind was created by communications of the foundation, correct?

MR. SHUMAKER: I think that's right because I don't see how he could give you his impressions or his understanding without going into what was going on

## Page 339

KEVYN ORR, VOLUME 2

in the mediation.

MR. HACKNEY: Right, because he lacks foundation to speak to what the foundations thought. If I asked him what he understood them to have thought, you'll take the position that it would be based on what they told him?

MR. SHUMAKER: Correct, it all would have been derived from the mediation discussions.

MR. HACKNEY: Okay, and so I'll just note for the record, Mr. Shumaker, that this is the position that Ms. Kofsky (ph.), a cop, took in a prior deposition, and I understand the basis for it. I will let you know that I don't necessarily agree with it based on comments that Judge Rhodes made about how state of mind might work in the mediation context, but it doesn't matter because I feel like we're not going to work that out today anyway.

MR. SHUMAKER: Understood.

BY MR. HACKNEY:

Q. And I just want to understand you all's position on it. So just a couple big ones, if I ask you did you ever ask the foundations to contribute money with no strings attached you'll decline to ask answer that question, correct?

## Page 340

KEVYN ORR, VOLUME 2

A. I think I have to.

Q. If I ask you did the foundations ever offer to contribute money without insisting on transfer of the art institute, you'll decline to answer that question, correct?

A. I think I have to.

Q. And if I ask you hey, who is it that imposed the condition on the Grand Bargain that the art institute would be transferred, was it you, or was it them, or was it Judge Rosen, you'll decline to answer those questions, correct?

A. I believe so.

Q. Mr. Orr, has the Grand Bargain -- which you know what I'm talking about, right?

A. Yes, the money we talked about before, the 366 million from the foundations, a $350 million value settlement from the State, and $100 million from the DIA benefactors as funneled through the Founders' Society.

Q. Correct, in exchange for the art -- in connection with the art being -- the DIA being conveyed into a public trust, correct?

A. Contributions targeted towards the two pension funds with the condition that not one piece of art be sold or de-assessed as a result of this process.

## Page 341

KEVYN ORR, VOLUME 2

Q. And the purpose of the transfer to a public trust is to ensure that the art is never sold to satisfy the claims of the City's creditors, correct?

A. Yes, now and forever, yes.

Q. Not only current creditors but future ones, as well?

A. Correct.

Q. So has the Grand Bargain, Mr. Orr, helped the COPs holders to achieve a higher recovery?

A. I don't think so.

Q. Mr. Orr, what are the principal terms of the LTGO settlement?

A. The LTGO settlement centers around a dedicated millage that's to extend for the next approximately 13 years, and the terms of a settlement that roughly 26 percent -- oh, the LTGO, I'm sorry --

Q. Yeah.

A. Okay, I'm sorry, I'm going -- I thought you were just talking about -- I'm doing it temporally --

Q. That's okay.

A. I'm sorry.

Q. I'm hopping around.

A. Okay.

Q. Let's start over.

A. Let's start over.

Pages 338 to 341

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6979-11   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 6 of 9

KEVYN ORR, VOLUME 2

subject -- it was one of the drivers of our motion to continue, but in fairness like I really may need to come back and re-depose you on this when it's been public for at least some period of time because it was in flux.

A. Let me say this, like I said, whatever's public I have no reason to believe whatever's been made public is inaccurate, but I do know that they're continuing discussions regarding details of the settlement, so I just want to be very careful.

Q. And you're also -- fair to say you're unwilling to say that the 55 million I alluded to represents the full amount of what they're getting, correct?

A. I have no reason to believe that's not -- there is anything in addition to what you may have heard economically.

Q. Okay. But are they only getting 55 million or not?

A. I have no reason to believe there's anything more than that.

Q. Okay. Well --

A. Based upon published reports.

Q. What is the basis for paying the LTGO 34 cents and paying COPs holders 10 cents?

A. Now, I do think we are getting into the mediation

KEVYN ORR, VOLUME 2

order.

Q. Okay, so you're -- you'll decline to answer questions about your basis for discriminating between those two classes?

A. I think I have to.

Q. Okay.

　　MR. SHUMAKER: Well, you don't have to -- you don't have to reveal the terms of the settlement.

　　THE WITNESS: Right.

　　MR. SHUMAKER: But I think you could talk in abstract, in the abstract about comparing the LTGO settlement with the COPs holders, which I think is what Mr. Hackney is getting at.

A. Well, let's do this, see if I can talk about it generally and I'll try to just step it as we go through it to see. I mean, I think it's fair to say that that is a result of a negotiated solution in the mediation process. I think it's fair to say there was some give and take between the parties as to what potential claim was. I think it's been reported that there was an argument made that that particular class of creditors had a different status than just general unsecured, and that that status should have some level of recognition. I think that's about all I can say.

KEVYN ORR, VOLUME 2

BY MR. HACKNEY:

Q. Okay, you do agree that the City has classified the LTGO creditors as general unsecured?

A. I believe that's our last classification, yes.

Q. Okay, and that's the same classification as the COPs holders?

A. Yes.

Q. And you also agree that the LTGO bondholders are financial creditors like the COPs holders?

A. Yes, I believe there's financial creditors as opposed to pensioners, for instance, yes.

Q. Right, and in fact, many of them have monoline insurers standing behind the bond, correct?

A. Yes.

Q. So you would agree there are a lot of similarities between the COP holder and the LTGO correct?

A. There are a lot of perhaps superficial similarities but I think the allegations that have been made against the COP holders in the litigation raise other dissimilarities between them.

Q. And you're talking about the invalidity suit?

A. Yes.

Q. Okay, and you understand that the way the plan works is that the -- a reserve is set up for the COP holders

KEVYN ORR, VOLUME 2

that represents what their total recovery could be?

A. Yes.

Q. And that's what their total recovery could be if they prevail in the invalidity suit, correct?

A. Yes, a reserve over a period of time as opposed to a hundred-and-X-million dollars of cash, yes.

Q. Yeah. Well, it's actually a bunch of B notes that go into the reserve.

A. That's what I said time, time wise, yes.

Q. Okay, yeah. Now, are you aware of any other basis to distinguish the LTGO from the COPs other than the potential invalidity of the COPs and this argument that the LTGO have made that they are not an unsecured creditor?

A. Am I aware?

Q. Yeah.

　　THE WITNESS: Am I aware?

BY MR. HACKNEY:

Q. Or do you have any other basis for discriminating other than those two things?

　　MR. SHUMAKER: I think you can answer that.

A. Yes.

BY MR. HACKNEY:

Q. What is it?

Pages 346 to 349

Elisa Dreier Reporting Corp.　(212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt　Doc 6979-11　Filed 08/22/14　Entered 08/22/14 16:11:42　Page 7 of 9

## Page 350

KEVYN ORR, VOLUME 2

1  A. I think that's caught up in the mediation.
2  Q. I'm not sure how that could be.
3  A. Well, as I think I've said, there were negotiations, there were positions taken. The awareness of what those other bases could be came about typically as a result of the mediation and reports provided to me out of the mediation so I want to be careful about talking about them, because that, I think is covered by the mediation order.
4  Q. Okay, so the two grounds that I identified, invalidity and the arguable not unsecuredness of the LTGO are the only two that you can publicly discuss?
5  A. I believe so.
6  Q. You would agree that the LTGO were not granted a lien in any City property, correct?
7  A. I would agree that I have seen no documents memorializing a lien.
8  Q. The difference between -- the difference that they allege is relevant is that they are to be considered quote/unquote a first budget item; isn't that correct?
9  A. Here again, I think now we're starting to bump up against the mediation.
10 Q. So you're not able to answer that question either?
11 A. If -- I'd be happy to validate any public statements

## Page 351

KEVYN ORR, VOLUME 2

that you have, but I don't think I should be the one speaking to that.
Q. It's the subject of a declaratory complaint and like a pretty extensive motion to dismiss argument?
A. Yeah, but I haven't necessarily been involved in the legal aspects of that argument. Most of my information comes as a result of communications that occur in the mediation.
Q. Okay. All right, so you have not followed the give and take in the legal issue litigation?
A. As you might imagine I have not been keeping up with the over, as I understand it, almost 8,000 documents filed in the bankruptcy, but I have no -- let me ask answer it this way. I have no reason to dispute the allegations that are contained in the filings.
Q. By whom?
A. By any party, whatever their allegations are, they are.
Q. Other than the reasons that you've put in your own filings?
A. Yes, whatever -- whatever's a public record, I have no reason -- in the bankruptcy case, there's no reason for me to dispute that parties have taken those positions, I just can't speak to it of my own

## Page 352

KEVYN ORR, VOLUME 2

independent knowledge once it comes as a result of the mediation.
Q. Understood, and you also can't say as to whether or not it's been a factor in your decision?
A. I -- I don't think I can other than what we've talked about.
Q. Mr. Orr, how did the City arrive at the calculation of the size of the OPEB claim that is contained in the current plan?
A. As contained in the current plan? Well, we did -- well, the City and our advisors in conjunction with the advisors of the -- of the funds did an analysis of the potential liability for retiree healthcare based upon a number of factors including actuarial rates, longevity, objective factors such as anticipated rates of healthcare spend as published by Michigan State institutions and Federal Government institutions and healthcare providers, number of objective criteria as calculated with the number of retirees that we have and anticipate will have in the future.
Q. And ultimately the ultimate number was the product negotiation between the City and the retiree representative parties, correct?
A. Correct.

## Page 353

KEVYN ORR, VOLUME 2

Q. Now, you know that in connection with the City's bankruptcy petition that it stated that it had $5.7 billion in OPEB; do you remember that number?
A. Yes, I do.
Q. And do you agree that the $5.7 billion number includes the present value of anticipated OPEB not only for retirees but also for active employees, right?
A. Active employees who will retire.
Q. Right, it's sort of like it was the analog of the pension UAAL --
A. Right.
Q. -- which is it looked not just at retirees but it also looked at active employees, what their costs will be when they retire?
A. And yes --
  MR. ALBERTS: Objection to form.
A. In the out-years, so for instance, someone who is an active employee today but will retire in 2015 will become a retiree in the out-years, yes.
BY MR. HACKNEY:
Q. And that OPEB number was in the 5.7 billion?
A. I believe so.
Q. Does the City believe that its retirees have a vested right to healthcare benefits?

Pages 350 to 353

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6979-11  Filed 08/22/14  Entered 08/22/14 16:11:42  Page 8 of 9

## Page 442

1  KEVYN ORR, VOLUME 2
2  A. Yes.
3  Q. Okay. So it's fair to say that the Grand Bargain was
4     Judge Rosen's idea from your vantage point?
5     MR. SHUMAKER: Again, I think we're getting
6  into --
7     MR. HACKNEY: Well, but --
8     MR. SHUMAKER: -- the guts of the
9  mediation.
10    MR. HACKNEY: I'm asking him about a public
11 statement that the mediator made.
12    MR. SHUMAKER: If you're asking did the
13 public statement reflect that, he can answer that.
14    MR. HACKNEY: I'm asking if the public
15 statement was true.
16    MR. SHUMAKER: Then that goes to what
17 actually occurred in the mediation and --
18    MR. HACKNEY: Well, Mr. Shumaker, now I
19 think you're being too selective about the mediation
20 order. I mean, you have the mediator standing up and
21 saying boom, and now I'm saying is that true, and
22 everyone says oh.
23    MR. SHUMAKER: And I'm fine with you asking
24 about the statements made in public by Judge Rosen.
25 What I have an issue with is then asking the witness

## Page 443

1  KEVYN ORR, VOLUME 2
2  whether it reflects what was occurring in the
3  mediation. There's a --
4     MR. HACKNEY: Okay.
5     MR. SHUMAKER: -- a clear divide there.
6  BY MR. HACKNEY:
7  Q. So are you going to decline to answer that?
8  A. Yes, and I would say I have no reason to dispute any
9     published reports and statements made by Judge Rosen.
10 Q. Okay, and Judge Rosen also described in that statement
11    that he had run into a member of -- of the -- a
12    foundation member in a deli near the courthouse; do
13    you remember that, too?
14 A. Yes, Miriam Nolan.
15 Q. Yes, and had talked to her about this idea, correct?
16 A. Yes, I believe he said that.
17 Q. Do you remember witnessing Judge Rosen saying that?
18 A. Yes.
19 Q. And Ms. Nolan has been quoted as saying that on the
20    basis of her conversation with Judge Rolan (sic), she
21    began to engage efforts to find whether other
22    foundations might contribute money, you're aware of
23    her statements?
24 A. Yes, I'm aware of those statements.
25 Q. Okay, do you have any reason to dispute those

## Page 444

1  KEVYN ORR, VOLUME 2
2  statements?
3  A. No.
4  Q. And do you remember that Judge Rosen also said that --
5     for example, that Shirley Lightsey was one of the
6     heroes of the bankruptcy?
7  A. Yes.
8  Q. If I ask for the specifics of -- with respect to the
9     foundations, who was approached, what they were asked,
10    which ones declined, which entities were approached,
11    who said yes, and the negotiations over the amount of
12    any contribution, is it correct that you would decline
13    to answer those questions on the basis of the
14    mediation order?
15 A. Yes.
16 Q. And if I asked you questions about the way the Grand
17    Bargain was structured, you'll similarly decline,
18    correct?
19 A. Yes.
20 Q. And that would also apply with respect to DIA Corp.
21    contributions, as well, correct?
22 A. Yes.
23 Q. And that also would apply to the State contribution
24    that is connected to the Grand Bargain, correct?
25 A. Yes, except for any public statements.

## Page 445

1  **KEVYN ORR, VOLUME 2**
2  Q. Have you ever visited the Charles H. Wright Museum
3     here in the City of Detroit?
4  A. Yes.
5  Q. Do you consider that museum critical to the economic
6     revitalization of the City?
7  A. I consider it critical to the cultural and historical
8     revitalization of the City, yes, I do.
9  Q. I was talking to the economic revitalization.
10 A. It might well include the economic revitalization.
11 Q. Is the DIA critical to the economic revitalization of
12    the City?
13 A. Yes, I believe it is.
14 Q. Okay, and which one's more important between the two,
15    the Charles H. Wright Museum or the DIA museum when it
16    comes to the economic revitalization of the City?
17 A. I don't -- I've done no analysis as to whether one is
18    more important than the other. I think they are both
19    important to the cultural and economic vitality of the
20    City.
21 Q. Which one has more visitors?
22 A. I think the DIA does.
23 Q. Has more than the Charles H. Wright?
24 A. Yes.
25 Q. Do you know if it has substantially more visitors?

Pages 442 to 445

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6979-11   Filed 08/22/14   Entered 08/22/14 16:11:42   Page 9 of 9