# Exhibit 6C

**July 22, 2014 K. Orr Deposition Transcript**

## Page 162

```
 1            KEVYN ORR, VOLUME 2
 2     IN THE UNITED STATES BANKRUPTCY COURT
 3       FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6
 7   In Re:              )   Chapter 9
 8
 9   CITY of DETROIT, MICHIGAN, )  Case No. 13-53846
10
11        Debtor.   )   Hon. Steven Rhodes
12   _____
13
14                VOLUME 2
15
16     The Videotaped Deposition of KEVYN ORR,
17     in his personal capacity and as Rule 30(b)(6) witness,
18     Taken at 2 Woodward Avenue,
19     Detroit, Michigan,
20     Commencing at 9:10 a.m.,
21     Tuesday, July 22, 2014,
22     Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

## Page 163

```
 1            KEVYN ORR, VOLUME 2
 2   APPEARANCES:
 3
 4   GREGORY M. SHUMAKER, ESQ.,
 5   DAN T. MOSS, ESQ.
 6   Jones Day
 7   51 Louisiana Avenue, N.W.
 8   Washington, D.C. 20001
 9        Appearing on behalf of the Debtor.
10
11
12
13
14   ROBERT HERTZBERG, ESQ.
15   Pepper Hamilton, LLP
16   4000 Town Center, Suite 1800
17   Southfield, Michigan 48075
18        Appearing on behalf of Debtor.
```

## Page 164

```
 1            KEVYN ORR, VOLUME 2
 2   STEPHEN C. HACKNEY, ESQ.
 3   Kirkland & Ellis, LLP
 4   300 North Lasalle Street
 5   Chicago, Illinois 60654
 6        Appearing on behalf of Syncora.
 7
 8
 9
10   JEFFREY BEELAERT, ESQ.
11   Sidley Austin, LLP
12   1501 K Street, N.W.
13   Washington, D.C. 20005
14        Appearing on behalf of National Public Financing.
15
16
17
18   ERNEST J. ESSAD, JR., ESQ.
19   Williams, Williams, Rattner & Plunkett, P.C.
20   380 North Old Woodward Avenue, Suite 300
21   Birmingham, Michigan 48009
22        Appearing on behalf of Financial Guaranty Insurance
23        Company.
```

## Page 165

```
 1            KEVYN ORR, VOLUME 2
 2   ALFREDO R. PEREZ, ESQ.
 3   Weil, Gotshal & Manges, LLP
 4   700 Louisiana Street, Suite 1700
 5   Houston, Texas 77002
 6        Appearing on behalf of Financial Guaranty Insurance
 7        Company.
 8
 9
10
11   LISA SCHAPIRA, ESQ.
12   Chadbourne & Parke, LLP
13   30 Rockefeller Plaza
14   New York, New York 10112
15        Appearing on behalf of Assured Guaranty Municipal
16        Corporation.
```

Pages 162 to 165

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6982-9   Filed 08/22/14   Entered 08/22/14 16:24:26   Page 2 of 6

## Page 198

1  KEVYN ORR, VOLUME 2
2  isn't that correct?
3  A. I believe that's correct.
4  Q. Now, you understand that one of the complexities of
5     the case has been that the retirees are -- are kind of
6     disbursed out there in the world, and as a practical
7     matter you've typically been dealing either with
8     retiree associations, retirement trusts, or the
9     official committee of retirees when it came to
10    negotiating plan treatment; is that a fair statement?
11 A. Yes. I think it's a fair statement to say we tried to
12    deal with representative organizations as opposed to
13    individual retirees.
14 Q. The general strategy was you deal with the
15    representative organizations and if you can strike
16    agreements with them, the hope is that they'll then
17    recommend approval of the plan and the retirees will
18    -- will vote consistently with that recommendation,
19    correct?
20 A. Yes, I think that's fair.
21 Q. Now, as of February 21st, 2014, you had just over
22    seven months left on your term; isn't that correct?
23 A. Yes, I think that's fair.
24 Q. Okay. And you said in the press at the time of the
25    first plan that it was quote/unquote crucial that the

## Page 199

1  KEVYN ORR, VOLUME 2
2  City reach an agreement with its creditors, correct?
3  A. Yes, I believe I said that.
4  Q. And in particular, you were referring to the
5     pensioners, correct?
6  A. I was referring to everyone.
7  Q. Okay. And you also said at that time: "We really do
8     not have time for a lot of acrimony and litigation."
9     Isn't that correct?
10 A. Yes, I probably said that.
11 Q. Okay. Now, you said that it was crucial that the City
12    reach agreement with its creditors in part because
13    time was short on your tenure as emergency manager,
14    correct?
15 A. I suppose you could say in part, but it was also that
16    the City needed to get out of a space that it had been
17    in effectively for almost two years, that we needed to
18    get to revitalization, and I said a bunch of other
19    things during that time about how important it was to
20    get out of this space.
21 Q. And wasn't it also crucial that the retirees agree to
22    the first plan you proposed because you knew you
23    couldn't cram them down at the proposed pension cut
24    levels if they didn't agree?
25 A. There were other reasons, not just the issue regarding

## Page 200

1  KEVYN ORR, VOLUME 2
2  cramdown. We certainly wanted people that were going
3  to be impacted and severely affected by this process
4  to have some level of buy-in for -- for the future of
5  the City and for their interests, I don't want to give
6  the impression that we were merely looking at it from
7  a technical perspective, there is a human dimension
8  here that we were very concerned about, too.
9  Q. But as of the first plan the reason you were so
10    focused and in terms of saying it was crucial to reach
11    agreement, at least as we're talking about retirees,
12    it was because you knew that you couldn't cram them
13    down at the proposed plan levels, correct?
14 A. I knew that we could not cram them down at proposed
15    plan levels, but I think there are plenty of
16    statements out there by me importuning the retirees to
17    support the plan for a number of other reasons, as
18    well.
19 Q. And why couldn't -- why did you believe you couldn't
20    cram them down at the proposed plan levels in the
21    first plan?
22 A. Well, I didn't know if we could get in consultant -- I
23    won't into discussions we had with counsel, but we
24    were concerned that we might not be able to meet some
25    of the requirements in the code but also here again,

## Page 201

1  KEVYN ORR, VOLUME 2
2  wanted to be sure that we addressed the human
3  dimension.
4  Q. And you didn't have -- is it -- are you referring to
5     the fact that as of the first plan, you didn't even
6     have an impaired assenting class?
7  A. I think it's fair to say that we did not have -- well,
8     when was the date?
9  Q. Feb 21, 2014.
10 A. I don't know if that's true because I don't recall the
11    dates that we may have reached agreements with the
12    financial creditors.
13 Q. And when you're talking about the human dimension,
14    what are you talking about there?
15 A. Very simply, and I think I've said this before, the --
16    the pensioners are people many of whom are in their
17    sixties, seventies, and eighties and don't have an
18    option. They have worked for the City, most of them
19    have done nothing wrong. They are -- the covenant
20    that the City had with its employees and retirees was
21    that if they perform work for the City that upon their
22    retirement they'd be taken care of for the rest of
23    their natural life, that some of this came as quite a
24    shock to them because they had planned their affairs
25    accordingly. Many of them, like my own family members

Pages 198 to 201

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6982-9   Filed 08/22/14   Entered 08/22/14 16:24:26   Page 3 of 6

### KEVYN ORR, VOLUME 2

2  or grandmother, wouldn't have options of going back
3  into the job market to supplement income or make up
4  for some of the cuts and that there were -- there was
5  a real-world dimension impact to the people that were
6  going to be affected by these cuts.
7  Q. Putting aside the human dimension, if you'd had an
8  impaired assenting class do you believe that you could
9  have crammed down the first plan on the pensioners?
10  MR. SHUMAKER: Object to the form.
11  A. Yeah, I don't know, I'd have to consult with my
12  attorneys.
13  BY MR. HACKNEY:
14  Q. Okay, and I mean back at the time. Did you believe
15  you could or could not?
16  A. To be honest with you Mr. Hartley (sic), I don't -- I
17  don't -- I don't really recall. I don't really recall
18  that being the crux of the discussion, but it might
19  have been true.
20  Q. Okay. You may have thought you could cram them down,
21  you may have thought you couldn't, you just don't
22  know?
23  A. I just don't remember.
24  Q. Okay. You previously called me Hartley --
25  A. Did I call you Hartley?

### KEVYN ORR, VOLUME 2

2  Q. There is something in your brain --
3  A. No, I --
4  Q. -- that says Hartley when you see me.
5  A. This is going to be surprising, I have a friend named
6  Hartley, and he reminds me of you.
7  Q. And he's like a handsome, suave guy?
8  A. Let's not get carried away.
9  Q. Now, you did understand that the February 21st plan of
10  adjustment still discriminated in favor of retirees as
11  compared to COPs holders in terms of their respective
12  recoveries, correct?
13  A. Yes, I understand that there were -- there were a lot
14  of reports and the financial community was taking the
15  position that there was discrimination in the plan.
16  Q. But there was objectively discrimination in that first
17  plan, correct?
18  A. There was a higher percentage recovery relative to
19  some of the financial creditors.
20  Q. And you were aware of that discrimination at the time
21  you proposed that plan, correct?
22  A. Yes.
23  Q. And what was your basis for the level of
24  discrimination you proposed in the February 21st plan?
25  A. Well, I believe at that point, we were looking at some

### KEVYN ORR, VOLUME 2

2  contribution from third parties, meaning the
3  foundations, the benefactors and others. We were
4  looking, we had been admonished I believe by the court
5  on several occasions to be compassionate in our
6  treatment of individuals and retirees. And unlike
7  financial creditors, the GRS and PFRS unlike some
8  financial creditors actually had assets in their
9  pension fund, so there was an existing basis by which
10  those assets would allow for a higher rate of recovery
11  ab initio, that is, from the start, as opposed to the
12  financial creditors to whom we owed money but did not
13  have a cache of money available to pay them.
14  Q. So there -- let me break down what I heard. You tell
15  me if I got it right.
16  A. Mm-hmm.
17  Q. I heard that the basis for the decision to
18  discriminate in the first plan was in part the
19  compassion for retirees, but it was also in part the
20  fact that there were assets in the retirement systems?
21  A. Yes.
22  Q. Okay, anything other than those two things?
23  A. No, as I said, there are a number of other factors in
24  trying to incentivize a workforce, in trying to keep
25  the covenant that the City made, a number of other

### KEVYN ORR, VOLUME 2

2  factors, but generally those are the ones that seem to
3  be driving a sort of the treatment of those classes.
4  Q. Okay, so I heard compassion, the fact that assets
5  exist in the retirement trust, trying to incentivize
6  City workers. Anything else that justified that level
7  of discrimination?
8  A. There may have been other things that I said in terms
9  of the level of different treatment, you call
10  discrimination. That was reported out in the first
11  plan, but generally speaking, the principal driving
12  force was that the retirement systems had assets in
13  them and we were trying to bring levels down below to
14  the predictable funding level verse -- based upon the
15  unfunded actuarial liability of those funds. You
16  start with a cache of money in those funds that are
17  available conceivably to pay pensions if you are able
18  to adjust the payment levels, whereas with financial
19  creditors, we didn't have a cache of money available
20  to them. We're paying them out of existing City cash
21  flow going forward.
22  Q. But you understand that the amount of assets in the
23  pension systems, the difference between the amount of
24  assets and what is needed to fully fund pensions is
25  called the UAAL?

Pages 202 to 205

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6982-9  Filed 08/22/14  Entered 08/22/14 16:24:26  Page 4 of 6

## Page 230

KEVYN ORR, VOLUME 2

information that you relied upon with respect to this first ground which are assets held in the trust that you relied on either financial information from the trusts about their assets or expert analysis relating to appropriate discount and other actuarial rates to be applied to those assets and liabilities?

A. Yes, I relied on things other than my own analysis from professionals who do this.

Q. But did I accurately describe kind of the body of information?

A. Yeah, you did. Yes, you did.

Q. Okay. Now, with respect to the human dimension that we talked about, with respect to the classes 10 and 11, what type of information did you rely upon in connection with that judgment?

A. Well, I think some of the information we just discussed is captured within that, as well as the representatives on the art -- on the retiree committee, the pension boards, as well, as well as individual meetings with individual employees and pensioners who recount their stories in detail, as well as statements made in court by the court itself as well as others. I listened to the September 19th, 2013 tape of the meeting of creditors. I listened to

## Page 231

KEVYN ORR, VOLUME 2

the blog of last -- was it last Monday or Tuesday's objectors meeting, general objectors meeting as well as far as the impact, and from time to time obviously I meet people on the street as well as hear their accounts and press reports.

Q. Is it fair to describe this body of information as, you know, oral testimonies to you about the personal hardship people will endure if there are -- if steeper cuts are imposed?

A. Yeah, I think it's fair to say oral testimony as well as, as I said, the actual analyses that are provided that, for instance, will tell you that general retirement system employees get an average of 19,400 approximately in their pension, whereas PFRS may be in the neighborhood of the mid-thirties. So it's actually analyses as well as oral testimony, oral statements, written statements, and press reports.

Q. Okay. So you relied on aggregate financial data about the approximate average size of pensions as well as oral testimonies to you about how steeper cuts would impose personal hardship on the pensioners?

A. Yeah, the approximate average size -- you know, included in this documentation for instance, I've reviewed rolls of information regarding the actual

## Page 232

KEVYN ORR, VOLUME 2

amount of pensions that thousands of pensioners have, which have been provided to me by professionals. So it's not just summary information, it's actually sometimes raw data discussions with -- with my advisors, including attorneys, as well as discussions with representatives including depositions of the -- of the -- some of whom are here today, representatives of the various funds.

Q. The financial data that you relied upon, though, was the -- was limited to the size of their pensions, whether it was aggregate or individual pensions, right?

A. No.

Q. You didn't review personal financial information of any of the retirees, did you?

A. No, we didn't review -- I didn't review financial statements of retirees but I did review reports as indexed by account number on the pensions of individual retirees.

Q. Yes.

A. Yeah. I did review things like that.

Q. I'm trying to say that when it came to the financial information you considered, it related to the size of the pensions, correct?

## Page 233

KEVYN ORR, VOLUME 2

A. As opposed to the personal financial situation of each individual pensioner?

Q. Right.

A. No, I have seen no information like that.

Q. And you haven't seen that in the aggregate, either, correct?

A. Well, let's be careful with aggregate. I mean, you know, 14,000 approximately pensioners live within the City of Detroit and/or Wayne County, I believe, so a significant percentage live here, and when you look at aggregate demographic data, you know, 40 percent of our residents live at or below the poverty line per capita GDP, all of this, I have reviewed aggregate data, U.S. Census Bureau --

Q. But this is stuff -- sorry to interrupt you.

A. Yeah.

Q. This is stuff that relates generally to the population?

A. Right.

Q. It's not specific data to the retirees?

A. No, but there was aggregate data that I did review regarding retirees as a group but not their personal financial information.

Q. Right, the aggregate data on the retirees was with

Pages 230 to 233

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6982-9   Filed 08/22/14   Entered 08/22/14 16:24:26   Page 5 of 6

## Page 234

KEVYN ORR, VOLUME 2

respect to their mean pensions.

A. No, it was also with probable -- it wasn't just pensions, it also -- there was aggregate data regarding healthcare, there's aggregate data regarding an alternative savings fund recoupment. So I know you're focusing principally on pensions, but I looked at a number of data as a composite of what the impact would be to these pensioners from a human dimension.

Q. Okay, and evaluating the personal hardship they would suffer?

A. Correct.

Q. Okay. And that was -- was that one of the most important things that drove you in connection with this decision? It seems like it's moved you.

A. Well, I don't know if it's one of the most important, but it -- all of them are important, the amount of money, the Grand Bargain, the -- the grantors have given us $866 million we didn't have seven months ago so that's pretty important.

The human dimension certainly is something that you have to take into account. These are real people with real consequences. So all of it's fairly important to me.

Q. Okay. Now, you -- the third thing you talked about

## Page 235

KEVYN ORR, VOLUME 2

was the City's covenant, which I understood you to mean the City's promise that it would pay these people their pensions?

A. Yes.

Q. And I take it from that the information you would have relied upon was just the contract saying that folks were entitled to these pensions?

A. No, you know, we -- I also had access -- you know, I talked with some City employees, for instance, who currently work for the City, Gary Brown, who is a retired Detroit police officer but is on a personal service contract here in the City now, PSC, and I talked to him about the historical commitments that the City has made, he's a lifetime resident, been here a long time. Chief Craig, who was born here, for instance, and his parents have been in the City, I talked to him. I talked to individuals.

So it's not just an analysis of, say, raw data. I mean, I have communications with people on staff here in the City who will ask me if they can come in and talk to me, and I'll listen to them.

Q. I guess what I meant here is one of the factors you identified as -- as informing your judgment with respect to what to pay classes 10 and 11 versus COPs

## Page 236

KEVYN ORR, VOLUME 2

holders, you identified was the City's covenant.

A. Yes.

Q. And I took that to mean the fact that the City had a contractual obligation to pay these people?

A. Right, and what I'm trying to relay to you is it's not just a fact that the City had a contractual obligation; it is the commitment and reliance on that commitment behind that contractual obligation that various City employees and retirees will come and express to me in very real terms what this means to them.

Q. I see.

A. And so the covenant is not just a technical document, it is also an expectation, a reliance, a commitment the City has made, and employees and retirees express it to me in very -- sometimes very candid terms.

Q. I see. What you're saying is you relied not only the existence of the legal obligation to pay but also testimonies you got from people that they had relied on that?

A. Yes.

Q. And isn't it fair to say that this is another element of the human dimension, which is the unfairness of cutting the pensions of people who relied on the

## Page 237

KEVYN ORR, VOLUME 2

City's covenant in making decisions about how to allocate their work time?

A. You could say that.

Q. And then the last issue that you identified was the invalidity of the COPs; do you remember that?

A. Yes.

Q. And that was something that you factored into your decision in terms of paying the COPs less than classes 10 and 11, correct?

A. Yes.

Q. And I take it you relied upon legal analysis from your counsel about the potential invalidity of the COPs, correct?

A. Yes.

Q. And I know that there had been a lawsuit filed prior to the time of the current plan being filed, but I assume that if I asked you questions about what your attorneys had advised you with respect to the invalidity of the COPs you'll invoke the attorney-client privilege and decline to answer?

A. Yes.

Q. Okay, so I hope we can stipulate that if I ask a bunch of questions about how the COPs analysis factored into the decision that the attorney-client privilege will

Pages 234 to 237

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6982-9    Filed 08/22/14    Entered 08/22/14 16:24:26    Page 6 of 6