```
-------------------------------------------------------------x
                                                             :
In re                                                        : Chapter 9
                                                             :
CITY OF DETROIT, MICHIGAN,                                   : Case No. 13-53846
                                                             :
                        Debtor.                              : Hon. Steven W. Rhodes
                                                             :
                                                             :
-------------------------------------------------------------x
```

## FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION TO EXCLUDE THE EXPERT OPINION OF MICHAEL PLUMMER REGARDING DISCOUNT FACTORS

Financial Guaranty Insurance Corporation ("FGIC") submits this motion (the "Motion") to exclude certain portions of the expert testimony of Michael Plummer[1] pursuant to Federal Rule of Evidence 702[2] and *Daubert*.

### PRELIMINARY STATEMENT

1.  Retained by the City of Detroit (the "City")[3] and the Detroit Institute of Arts, a nonprofit Michigan corporation ("DIA Corp."), to provide a valuation as to the DIA Collection, Michael Plummer opines that the entire DIA Collection has an indicative value between $2.7

---

[1] The Expert Witness Report of Michael Plummer, dated July 8, 2014, is attached hereto as Exhibit 6A. The August 1, 2014 Deposition Testimony of Michael Plummer is attached hereto as Exhibit 6B.

[2] Federal Rule of Bankruptcy Procedure 9017 provides that "[t]he Federal Rules of Evidence … apply in cases under the Code."

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed May 12, 2014 [Docket No. 4660] and the Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed August 12, 2014 [Docket No. 6674].

billion (low estimate) and $4.6 billion dollars (high estimate). Plummer Rep. at 19, Table 2. Purporting to account for potential market and sale conditions, Mr. Plummer subsequently applies a variety of discount factors – for which he cannot justify the percentages applied – that significantly reduce his valuation of the DIA Collection to between $900 million and $1.8 billion dollars. Plummer Rep. at 37. As someone who spent the majority of his art career in the marketing department of an auction house, and lacks any training or certification as an appraiser, Mr. Plummer is patently unqualified to apply these discount factors. Moreover, his litigation-driven discount analysis is not supported by any reliable methodology. He admittedly cannot point to any studies or publications supporting his calculations. Nor does he articulate a reliable basis for the percentages applied. Instead, he bases his opinion on a variety of assumptions and his claimed experience, asking this Court to simply take his word for it. But *Daubert* requires more than the expert's mere *ipse dixit* to support a reliable opinion. His failure to offer any meaningful explanation as to how he derived his discounts, coupled with the absence of any studies or data to support his figures, renders his analysis unreliable under *Daubert* and Rule 702.

## JURISDICTION

2. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### I. Legal Standard

3. Federal Rule of Evidence 702 ("Rule 702"), which governs the admissibility of expert testimony, provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

4. Rule 702 compels courts to act as "gatekeepers" over the admissibility of expert evidence to make certain that unreliable testimony does not reach the jury. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). This gatekeeping function "applies to all expert testimony, not just testimony based in science." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (citing *Kumho*, 526 U.S. 137). The proponent of the expert testimony "bears the burden of proving its admissibility." *E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014).

5. Pursuant to Rule 702, the Sixth Circuit has delineated that "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528-529. First, a witness must "establish his expertise by reference to 'knowledge, skill, experience, training, or education.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing Fed. R. Evid. 702). "A witness is not an expert simply because he claims to be." *Id*. Rather, "the issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

6. The second inquiry under Rule 702 "requires a proffered expert to testify to 'scientific, technical or other specialized knowledge' … [which] serves to establish a standard of 'evidentiary reliability' or 'trustworthiness.'" *Pride*, 218 F.3d at 577 (citing Rule 702 and

*Daubert*, 509 U.S. at 591). The Sixth Circuit has explained that "by defining evidentiary reliability in terms of scientific validity, the *Daubert* Court instructed district courts that their primary function as gatekeepers is to 'determine whether the principles and methodology underlying the testimony itself are valid." *Id.* Accordingly, a court may exclude expert testimony "connected to existing data only by the *ipse dixit* of the expert," because there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

7. While there is no single criterion for determining reliability, "the *Daubert* Court identified several factors that a district court should consider when evaluating the scientific validity of expert testimony, notably: the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community." *Pride*, 218 F.3d at 577. As the Sixth Circuit noted in *Clay v. Ford Motor Co.*, "the specific *Daubert* factors – testing, peer review and publication, potential rate of error, and general acceptance in the relevant community – may be considered by the district court even when the proffered expert testimony is not scientific." 215 F.3d 663, 667 (6th Cir. 2000). "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Dow v. Rheem Mfg. Co.*, 527 F. App'x 434, 437 (6th Cir. 2013) (internal citation omitted).

8. Finally, Rule 702 "requires that the expert's testimony assist the trier of fact." *Pride*, 218 F.3d at 578. "Testimony is unhelpful … when it merely deals with a proposition that is not beyond the ken of common knowledge." *Cao Grp., Inc. v. Fed.-Mogul Corp.*, 09-11354,

4

US_ACTIVE:\44540564\1\45259.0007

2011 WL 867723, at *4 (E.D. Mich. Mar. 10, 2011); *see also Jones v. Pramstaller*, 874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) ("It is well established that an expert witness's testimony is not helpful where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.") (internal citation omitted).

**II.     Mr. Plummer's Discount Factors Are Unreliable Because They Are Based on Unsupported Assumptions**

9.      Mr. Plummer opines that the indicative value of the entire DIA Collection is between $2.7 billion and $4.6 billion dollars. Plummer Rep. at 19. Despite this valuation, he states that an actual sale of the artworks likely would only net between $900 million and $1.8 billion dollars. *Id.* at 37. He vastly reduces the value of the collection by applying various discount factors to his low and mid estimates (while completely ignoring his high estimate) that purportedly reflect potential market sale conditions. Specifically, he considers the impact of: (1) an immediate liquidation or blockage discount, (2) unsold rates, (3) a sale through an auction house other than Sotheby's and Christie's, (4) market capacity, (5) a longer term sale process, (6) litigation, and (7) market disfavor and market crash. *See generally* Plummer Rep. These discount factors, however, are based on nothing more than speculation and unsupported assumptions, rendering his testimony as to those factors unreliable. *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) ("testimony may be excluded if it is fundamentally flawed or unsupported").

10.     To satisfy the reliability standard under *Daubert*, Mr. Plummer must offer more than his own *ipse dixit* to support his figures. *See Joiner,* 522 U.S. at 137. Indeed, the reliability prong under *Daubert* mandates that an expert's testimony be "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. "Although

5

some courts have stated that the factual basis on an expert opinion *generally* goes to the credibility of the testimony and not to its admissibility, those courts also acknowledge that the testimony may be excluded if it is fundamentally flawed or unsupported." *Ellipsis*, 428 F. Supp. 2d at 760 (emphasis in original). Thus, "[w]here an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (internal citation omitted); *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) ("no matter how good experts credential may be, they are not permitted to speculate") (internal quotation marks and citation omitted); *Coffey v. Dowley Mfg., Inc.*, 89 F. App'x 927, 932 (6th Cir. 2003) (expert's "guesstimations" warranted exclusion); *Smelser v. Norfold S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997) ("an expert's subjective belief or unsupported speculation will not … satisfy Fed. R. Evid. 702).

11.     As discussed in more detail below, Mr. Plummer has not employed any appropriate or recognizable methodology to validate his conclusions. His valuation conclusion is founded on a string of speculative discount figures, the effect of which render unreliable his opinion that the fair market value range of the DIA Collection is between $900 million and $1.8 billion. Plummer Rep. at 48; *see Tamraz*, 620 F.3d at 672. Accordingly, Mr. Plummer's discounted fair market valuation should be excluded.

   A.     <u>Mr. Plummer Speculates as to His Blockage and Liquidation Discounts Rates</u>

12.     Mr. Plummer first assumes that a sale of the DIA Collection would involve an immediate sale of the entire collection at once, and then opines that because this would result in the placement of a large number of items on the market at the same time, such sale would result in selling the collection at half its fair market value. Plummer Rep. at 26-27. He refers to this

effect as a blockage[4] or liquidation[5] discount and estimates that the loss factor is 50 percent. Plummer Rep. at 27. Regardless of whether this assumption about the sale process or the application of either discount is appropriate, Mr. Plummer provides no reliable basis to support his use of a 50 percent discount rate. For instance, he admittedly has no studies to support his figure:

> Q. …[W]ere there any other studies that you relied on for the 50 percent number?
> A. No. I'm saying that there were no studies.
> …
> Q. He gives me the data in his report, I've looked at that and I'm asking him if there's anything other than that, because in his report he doesn't have any studies, so I'm asking him if there are any studies.
> A. "I think studies are irrelevant. I have real-life experience…
> …
> Q. Again, do you have any studies to support the application of this discount rate and the blockage discount?
> A. No.

Plummer Dep. at 246:10-14; 252:25-253:9; 252:17-20.

13. In addition to his lack of studies or publications, Mr. Plummer could not identify any private or publicly available data regarding previous liquidations that supported his figure:

> Q. I'm asking for publicly available data on sale?
> A. I *think* if you would ask some of the banks about some of their liquidations you *might* find data.
> …
> Q. Is there any privately available data that you could point me to that in immediate sales sellers realize, generally speaking, 50 percent of the value of their art?
> A. I don't know what else I can point you to.

Plummer Dep. at 255:4-16; 256:4-9 (emphasis added).

---

[4] A blockage discount is applied "in the valuation of large groups of similar and like items, which, if sold during a limited period of time, would result in a depression of prices one might expect if sold separately in an ordinary market cycle." Plummer Rep. at 27.

[5] A liquidation discount is similar to a blockage discount and attempts to account for the sale of a large number of items in a short period of time. Plummer Rep. at 26-27.

14. At best, in his report, Mr. Plummer identifies the blockage discount applied by the IRS to "calculate estate taxes on artists' estates." Plummer Rep. at 27 ("a discounted number has ranged from 25% to 46%"). Yet, this number is not only far lower than the discount he applied to the facts of this case but it is also irrelevant as he testified that the blockage discount applied for tax purposes is different from the blockage discount applied to the sale of artworks. Plummer Dep. at 256:10-24. Further, he offered no explanation as to how a range of 25-46 percent lends support for his use of an even higher discount rate of 50 percent. *Smelser*, 105 F.3d at 303 ("an expert's subjective belief or unsupported speculation will not … satisfy Fed. R. Evid. 702").

15. Mr. Plummer also points to one example in his report – a case in which Sotheby's partnered with a gallery and acquired a Matisse collection at an estimated 45 percent discount – but this case was an art loan, not a liquidation. Plummer Rep. at 26-27. It is unclear (and Mr. Plummer did not explain) how such art loan valuations are analogous to liquidation or blockage discounts.[6] Indeed, Mr. Plummer testified that art loan valuations are generally more conservative than auction valuations, to account for lending risks. Plummer Dep. at 56:6-11. Yet, he applied the very same "conservative" lending approach to his liquidation scenario, even though he believes the DIA Collection would be sold at auction. Plummer Dep. at 291:10-292:6 (assuming that the DIA Collection would be sold at public auction).

> Q. So for collateral purposes, if they had to have a quick sale then they would assume they would only get 50 percent; and that's the point you're making, correct?
> A. Yes.
> Q. Then you extend that analysis and say so, if there had to be a quick sale of the DIA art, you would expect that the most you would get is 50 percent of what its value is; is that what you're saying?

---

[6] In any case, the 50 percent loan-to-value ratio contradicts case law in which such blockage discounts have been applied. Plummer Dep. at 246:4-9; *see*, *e.g.*, *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, No. 11 CIV 1237, 2014 WL 1468118, at *3 (S.D.N.Y. Apr. 15, 2015) (applying a 20 percent blockage discount to artworks).

A. That's what I'm saying…

Plummer Dep. at 248:4-14

Further note that in the Matisse example he relied upon, the 45 percent discount was just another "guesstimate." When questioned in deposition, Mr. Plummer admitted that the data was not available to analyze. Plummer Dep. at 249:20-250:4 (Q. In the Matisse example that you provided, that you were referring to earlier, do you know what the loss factor was there? A. I don't. That data wasn't available to me.).

16. In the absence of reliable data, Mr. Plummer bases his opinion on professed "real world experience." *See, e.g.*, Plummer Dep. at 246:22-247:4. Yet, he could not identify one real-life example in which a liquidation or blockage discount was applied at a fifty percent discount. Plummer Dep. at 254:7-19. Mr. Plummer continually relied on the value used by banks in art loan valuations, and although he may have participated in negotiating such loans, none actually came to fruition. Plummer Dep. at 43:12-44:12; 60:22-61:9; 64:19-65:7; 247:5-19; 253:10-12 (Q. So you have real-life experience for a number of the loans? A. No….). Such limited experience does not render Mr. Plummer's opinion reliable. *See United States v. Frazier*, 387 F.3d 1244, 1283 (11th Cir. 2004) ("When the expert's experiences have not alone been shown to be capable of providing a sufficient foundation for a particular opinion, corroboration from somewhere—whether in the opinions of other experience-based witnesses or in published, scientific studies—is necessary to establish the opinion's reliability.").

17. It appears as though Mr. Plummer plucked the 50 percent discount out of thin air and now asks this Court to simply take his word for it. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 137. Mr. Plummer's failure

9

to offer any meaningful explanation as to how he derived the blockage discount, coupled with the absence of any studies or data to support his figure, renders his analysis unreliable.

      B.    <u>There is No Reliable Support for Mr. Plummer's Unsold Rate</u>

18.    Mr. Plummer further discounted his valuation by taking into account an anticipated unsold rate – *i.e.*, the percentage of artworks that may remain unsold at action. Plummer Dep. at 57:5-8 ("It means a certain percentage of property in nearly every auction remains unsold, and it can vary from as little as 10 or 15 percent up to 35 or 40 percent."); Plummer Rep. at 27-28. Although he states in his report that "it is customary business practice to devalue a work by 20%," he applies a 26.20 percent discount rate to the facts of this case without further explanation. *Compare* Plummer Rep. at 28 *with* Plummer Rep. at 70-71. Mr. Plummer's failure to explain the basis for his reliance on an elevated discount factor renders this opinion unreliable. *Pride*, 218 F.3d at 578 ("*Daubert* and its progeny make clear that 'proposed expert testimony must be supported by appropriate validation.'") (internal citation omitted); *see also Oleg Cassini,* 2014 WL 1468118, at *8-9 (passing references to industry standards, without further insight, are unreliable).

      C.    <u>There is No Reliable Support for Mr. Plummer's Assumption that Christie's and Sotheby's Would Not Participate in a Sale</u>

19.    As another example of unsupported assumptions, Mr. Plummer opines that Christie's and Sotheby's "might refuse to sell due to the controversy surrounding a disposition and potential damage to their brand and relationships with the broader Museum community." Plummer Rep. at 29. As a result, he states that "[t]he impact of not selling through Sotheby's or Christie's is a *subjective number* to calculate…Nevertheless, I *estimate* that the impact of selling the DIA collection through an auction venue rather than these two houses would result, at minimum, of a loss value of 20% to 40%." Plummer Rep. at 29 (emphasis added). Other than

10

13-53846-tit    Doc 6983    Filed 08/22/14    Entered 08/22/14 16:27:25    Page 10 of 18

US_ACTIVE:\44540564\1\45259.0007

an off record conversation with a Christie's employee in a "social setting," the details of which Mr. Plummer refused to disclose, he did not speak to anyone at either auction house to substantiate the discount rate applied.[7] Plummer Dep. at 264:6-265:8; *see also id*. at 199:14-25 (Q. Did you speak with anyone at Sotheby's about this to determine whether they would – A. Hum, I did not...I avoided speaking to people at the auction houses about this project that I'm working on). Again, it appears as though he plucked this discount rate out of thin air. *See Joiner*, 522 U.S. at 146 (testimony "connected to existing data only by the *ipse dixit* of the expert" should be excluded because there is "too great an analytical gap between the data and the opinion proffered").

        D.      <u>There is No Reliable Support for Mr. Plummer's Long Term Sale Assumption</u>

        20.      Mr. Plummer "*feel[s]* it would be conservative to estimate" that any sale would require five to eight years to complete. Plummer Rep. at 31 (emphasis added). This timeframe is purportedly based on the length of time the British Rail Pension Fund required to sell its art portfolio. *Id*. In that case, however, it took three years to complete the sale. *Id*. Simply because the DIA Collection is larger than the British Pension Rail Fund portfolio, Mr. Plummer arbitrarily doubled the length of time expected to complete an orderly liquidation in this case, without relying on any analogous sales, studies or publications in support. Plummer Dep. at 268:17-21 (Q. Do you have any reliable sources or studies to support this? A. I do not have anything other than common investment fund practice.). Thus, Mr. Plummer's assumption that it

---

[7] Mr. Plummer often relied on such vague private conversations to substantiate his opinions. For example, he opines that "[w]ere the DIA collection to be sold in entirety or in part, few sales would be to other museums, [] because other museums are likely to boycott such sales…" Plummer Rep. at 25. But when asked to provide a basis for this opinion, Mr. Plummer testified only that he relied upon "comments made by other museum professionals." Plummer Dep. at 234:11-235:3 (Q. Can you recall which museums you spoke with about the potential sale of art at the DIA? A. I promised the people that I talked to that I would not reveal who they were."). It is impossible for the Court to examine the reliability of such amorphous opinions.

11

would take at least five to eight years is unmoored from reliable data. *See, e.g.*, *Smelser*, 105 F.3d at 303 ("an expert's subjective belief or unsupported speculation will not … satisfy Fed. R. Evid. 702); *see also Oleg Cassini*, 2014 WL 1468118, at *8-9 (passing references to industry standards, without further insight are unreliable).

E. <u>There is No Reliable Support for Mr. Plummer's Litigation Assumptions</u>

21. Mr. Plummer assumes that any sale of the DIA Collection would be delayed due to "formidable legal obstacles and prolonged litigation," which he estimates will span a five to six year period. Plummer Rep. at 31-32. He further states that "court challenges are likely from the Michigan Attorney General, the DIA, the DIA corporation and numerous donors or their heirs." *Id*. at 32. But he engaged in no analysis whatsoever to support this opinion and his deposition testimony makes clear that his opinion is nothing more than speculation:

> Q. What is the basis of that? Have you spoken to somebody at the Michigan Attorney General's office?
> A. No. Based on what has happened to various sales in New York and other places, I would expect that the Attorney General and also the Attorney General has come out, yes, the Attorney General has come out as a matter of record and says that he opposes the sale. *So it would be logical to assume that he would bring action as Attorney General*, as other states have.

Plummer Dep. at 270:10-21 (emphasis added).

> Q. Where you say: "Heirs of former donors, as well as current donors, many still prominent leaders in the Detroit community, and the DIA corporation itself, are likely to pursue every legal option necessary to stop or delay the sale of any of the art potentially, leading to years of litigation." Do you see that?
> A. Um-hum.
> Q. You didn't talk to anyone else about that other than -- did you talk to anybody about it?
> A. No.

Plummer Dep. at 274:6-19.

> Q. …Is it your assumption that any litigation would be a five-year litigation?
> A. Based on the Fisk, yes.
> Q. So you're basing it on the Fisk litigation?

12

A. Yes.
Q. Again, you didn't do any analysis of the Fisk litigation?
A. No.

Plummer Dep. at 274:21-275:5

F.  Mr. Plummer's Litigation-Driven Discount Analysis is Unreliable

22. As the Ninth Circuit stated in *Daubert v. Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995), "[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *See also Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) ("the Ninth Circuit's reasoning is equally sound" in scientific and non-scientific contexts).

23. In the instant case, Mr. Plummer has little to no experience in art lending for institutions (*see* Section III below) and he was not retained until May 2014, *after* Christie's submitted their incomplete appraisal and *after* the City submitted the DIA Settlement for approval. Plummer Dep. at 95:2-6. As discussed above, Mr. Plummer applied discounts arbitrarily and without appropriate validation. Thus, his discount analysis was seemingly undertaken solely for the purpose of litigation – *i.e*., to reduce the value of the DIA Collection as much as possible to substantiate the minimal contributions pledged pursuant to the DIA Settlement. Accordingly, Mr. Plummer's fair market discount valuation should be excluded as unreliable under *Daubert* and Rule 702.

***

24. In short, Mr. Plummer has not employed any appropriate or recognizable methodology by which to validate his opinions. His string of assumptions regarding the proper discount factors to apply skews his ultimate conclusion as to the potential sale value of the DIA

13

13-53846-tjt    Doc 6983    Filed 08/22/14    Entered 08/22/14 16:27:25    Page 13 of 18
US_ACTIVE:\44540564\1\45259.0007

Collection. His results are even further biased because he only applied the discount factors to his low and mid estimates, ignoring the high estimate. He could not explain this oversight other than to state that the high estimate is irrelevant because he does not believe that it is possible to sell everything in the DIA Collection at this estimate. Plummer Dep. at 279:23-280:2; 285:6-9. Thus, Mr. Plummer's inability to substantiate the discount percentages applied and his complete failure to apply his discount factors to the high estimate (thus artificially deflating his ultimate value), evidences that his opinion is at best a guess, and at worst, suggests that he is working towards a desired diminished result. *Tamraz*, 620 F.3d at 670.

### III. Mr. Plummer is Unqualified to Render a Discount Analysis

25. "[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified." *Pride*, 218 F.3d at 578. As the Sixth Circuit stated in *Berry*, "the issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." 25 F.3d at 1351.

26. Here, Mr. Plummer attempts to opine as to the value of the DIA Collection yet, he admittedly has no education, certification, training or experience in conducting appraisals. Plummer Dep. at 12:14-19; 88:16-89:2. Nor did he obtain any degrees or certifications relating to art or art lending. Plummer Dep. at 12:7-13. Further, his CV evidences no articles or books written on valuations or the art lending business. Plummer Rep. at 51. *See Rosvold v. L.S.M. Sys. Eng'g, Inc.*, No. 04-75009, 2007 WL 3275107 (E.D. Mich. Nov. 6, 2007) (excluding expert whose resume failed to incorporate any professional experience in valuation analysis).

27. Mr. Plummer relied on his 16-year history with Sotheby's, but the majority of that time was spent in the marketing department. Plummer Rep. at 51 (Curriculum Vitae).

Marketing experience certainly does not render him qualified to issue opinions on art lending. And although he touted his post-Sotheby's experience with structuring art funds as the basis for his real-life experience, *see, e.g.*, Plummer Dep. at 253:10-20; 268:17-21, none of his projects "got off the ground."

> Q. In your first art fund how much did you raise?
> A. We didn't because the art fund ran into trouble.
> Q. What was that?
> A. I uncovered malfeasance on the part of the CEO…
> Q. So the first art fund you formed didn't really get off the ground?
> A. No.
> Q. What about the second one?
> A. That company went under…
> Q. So neither of the art funds that you formed really got off the ground?
> A. No.

Plummer Dep. at 43:12-44:12.

28. The same is true of Mr. Plummer's art lending experience while employed at Christie's:

> Q. …Again, to make sure I get it right. You began with thoughts of having four art funds?
> A. Correct.
> Q. Structured along the lines of your prior testimony and dealing with four different genres of art based on the factors you testified about earlier. You began that in 2007?
> A. Right.
> Q. But because of credit markets and later financial markets; did you actually raise the funds, the four funds?
> A. No…
> …
> Q. Essentially, how many loans did you bring to market for Christie's in the art lending business?
> A. Well, there were four loans with Christie's while I was there. Then in the spring of 2009, Christie's withdrew from both the lending business and the art fund business because they contracted, as many firms did in 2009, and dropped many of their new initiatives.

Plummer Dep. at 64:19-65:7; 66:21-67:5. Indeed, it appears Mr. Plummer has never witnessed an art fund come to fruition nor has he structured an art loan for an institution. Plummer Dep. at

US_ACTIVE:\44540564\1\45259.0007

76:6-15; 82:11-21; 76:6-15. Thus, it is unclear where his "common investment fund" practice stems from. *See Pride*, 218 F.3d at 577 ("a witness is [not] an expert simply because he claims to be") (internal citation omitted).

29. *Daubert* mandates that Courts act as gatekeepers in screening expert testimony. *Daubert*, 509 U.S. at 597. An essential element of that gatekeeping function is to probe beneath the surface of a so-called expert's credentials to determine whether the alleged expertise is in fact based on experience or is mere *ipse dixit*. A thorough examination of Mr. Plummer's credentials reveals that he is patently unqualified to render an opinion regarding the discounted fair market value of the DIA Collection.

## STATEMENT OF CONCURRENCE SOUGHT

30. Pursuant to Local Rule 9014-1(g), on August 18, 2014, counsel for FGIC sought the concurrence of counsel for the City in the relief sought in the Motion. Counsel for the City has advised that they oppose the filing of the Motion.

WHEREFORE, FGIC respectfully requests that the Court enter an Order granting FGIC's Motion in its entirety and excluding the opinion of Michael Plummer regarding discount factors.

DATED: August 22, 2014

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3177
Email: edward.soto@weil.com

-and-

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance Company.*

# ATTACHMENTS

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice of Motion and Opportunity to Object |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service [To be filed separately] |
| Exhibit 5 | None [No Affidavit] |
| Exhibit 6A | Expert Witness Report of Michael Plummer |
| Exhibit 6B | Expert Deposition of Michael Plummer |

US_ACTIVE:\44540564\1\45259.0007