## Exhibit 6B

August 1, 2014 Michael Plummer Deposition Transcript

Michael Plummer

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re:                    ) Chapter 9

CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

Debtor.     ) Hon. Steven Rhodes

--------------------------x

Videotaped Deposition of MICHAEL PLUMMER
Taken at:  Weil, Gotshal & Manges, LLP
    767 Fifth Avenue
    New York, New York
Commencing at 9:03 a.m.
Friday August 1, 2014
Before Roberta Caiola

---

```
 1              Michael Plummer
 2   A P P E A R A N C E S :
 3
     EDWARD SOTO, ESQ.
 4   DEBORA A. HOEHNE, ESQ. (New York Office)
     Weil, Gotshal & Manges, LLP
 5   1395 Brickell Avenue, Suite 1200
     Miami, Florida 33131
 6       Appearing on behalf of Financial
         Guaranty Insurance Company
 7
 8   GEOFFREY S. IRWIN, ESQ.
     Jones Day
 9   51 Louisiana Avenue, N.W.
     Washington, D.C. 20001
10       Appearing on behalf of the Debtor
11       - and -
12   LAUREN BUONOME, ESQ.
     Jones Day
13       222 East 41st Street
         New York, New York 10017-6702
14       (Present Telephonically)
15       - and -
16   RICHARD LEVIN, ESQ.
     Cravath, Swaine & Moore LLP
17       Worldwide Plaza
         825 Eighth Avenue
18       New York, New York 10019-7475
         Appearing on behalf of the
19       DIA Corp.
20
21   ARTHUR T. O'REILLY, ESQ.
     Honigman Miller Schwartz and Cohn LLP
22       2290 First National Building
         660 Woodward Avenue
23       Detroit, Michigan 48226-3506
         Appearing on behalf of the
24       Detroit Institute of Arts
25
```

---

```
 1              Michael Plummer
 2   A P P E A R A N C E S :
 3
     ARTHUR H. RUEGGER, ESQ.
 4   Dentons US, LLP
     1301 K Street, N.W.
 5   Suite 600, East Tower
     Washington, D.C. 20005
 6       Appearing on behalf of the
         Retiree Committee
 7
 8   MICHAEL J. PATTWELL, ESQ.
     Clark Hill, PLC
 9   212 East Grand River
     Lansing, Michigan 48906
10       Appearing on behalf of the Retirement
         Systems for the City of Detroit
11       (Present Telephonically)
12
     HIRAM ARNAUD, ESQ.
13   Chadbourne & Parke, LLP
     30 Rockefeller Plaza
14   New York, New York 10112
         Appearing on behalf of Assured
15       Guaranty Municipal Corporation
         (Present Telephonically)
16
17   ALSO PRESENT:
     JOSE RIVERA - Video Technician
18
19
20
21
22
23
24
25
```

---

```
 1              INDEX
 2
     Witness      Examination By      Page
 3   Michael
     Plummer      Mr. Soto            7
 4
 5       E X H I B I T S
 6   Plummer      Description          Page
 7   Exhibit 1  Notice of Deposition        7
 8   Exhibit 2  Expert Witness Report of    96
         Michael Plummer
 9   Exhibit 3  Victor Wiener's Expert Report  214
         in this Chapter 9 proceeding
10   Exhibit 4  Article prepared by Zhang Yi  228
         entitled "Review of Expert
11       Witness Report of Michael
         Plummer, Artvest Partners,
12       Dated July 8, 2014"
     Exhibit 5  Article by Katherine Boyle   236
13       from the Washington Post,
         dated October 6, 2013,
14       entitled "Poor Detroit: What
         money giveth, It can taketh
15       away"
16
     (Original exhibits retained by the Court
17   Reporter to accompany the transcript)
18
     (*r)  DOCUMENTS REQUESTED:
19
         Page:  81    Line: 18
20       Page: 164    Line: 7
         Page: 169    Line: 5
21
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 2 of 82

Michael Plummer

1    THE VIDEOGRAPHER:  This is media
2
3 unit number 1 in the video deposition of Michael
4 Plummer, in the matter of In Re:  City of
5 Detroit Michigan, Debtor, in the United States
6 Bankruptcy Court for the Eastern District of
7 Michigan, Case Number 13-53846.
8    This deposition is being held at
9 Weil, Gotshal & Manges LLP, 767 Fifth Avenue,
10 New York, New York on August 1, 2014 at
11 approximately 9:03 a.m.
12    My name is Jose Rivera from the
13 firm of Elisa Dreier Reporting Corp., and I am
14 the legal video specialist.  The court reporter
15 is Roberta Caiola, in association with Elisa
16 Dreier Reporting Corp., located at 950 Third
17 Avenue, New York, New York.  For the record,
18 will counsel please introduce themselves.
19    MR. IRWIN:  Geoff Irwin, with Jones
20 Day, on behalf of the City of Detroit and the
21 witness.
22    MR. O'REILLY:  Arthur O'Reilly, on
23 behalf of the Detroit Institute of Arts.
24    MR. RUEGGER:  Arthur Ruegger, from
25 Dentons, on behalf of the Retirees Committee.

Michael Plummer

1
2    MR. SOTO:  I'm Ed Soto and this is
3 Debora Hoehne, we're here from Weil Gotshal &
4 Manges on behalf of FGIC.
5    THE VIDEOGRAPHER:  On the phone?
6    MR. SOTO:  Does anyone on the phone
7 want to make an appearance?
8    MR. PATTWELL:  Michael Pattwell,
9 Clark Hill, on behalf of the Detroit Retirement
10 Systems.
11    MS. BUONOME:  Lauren Buonome, of
12 Jones Day, on behalf of the City.
13    MR. ARNAUD:  Hiram Arnaud, from
14 Chadbourne & Parke, on behalf of Assured
15 Guaranty Municipal Corporation.
16    THE VIDEOGRAPHER:  Will the court
17 reporter please swear in the witness.
18    THE COURT REPORTER:  Raise your
19 right hand please.  Do you swear the testimony
20 that you are about to give will be the truth,
21 the whole truth, and nothing but the truth?
22    THE WITNESS: Yes, I do.
23 MICHAEL PLUMMER, having been duly sworn by the
24 Notary Public, Roberta Caiola, was examined and
25 testified as follows:

Michael Plummer

1
2 EXAMINATION BY MR. SOTO:
3    Q.    Mr. Plummer, my name is Ed Soto.
4 Could you please state your full name for the
5 record?
6    A.    Michael John Plummer.
7    Q.    Now I'm going to hand you what has
8 been marked as Exhibit 1.
9    (Plummer Exhibit 1, Notice of
10 Deposition, marked for identification.)
11    Q.    Which is a copy of the Notice of
12 Deposition that you were served with in this
13 matter.  Have you seen this before?
14    A.    Yes, I have.
15    Q.    Actually, I'm only giving it to you
16 because these exhibits were pre-marked, and if I
17 don't give it to you then one is out of sequence
18 and we have to re-mark them all.  You might want
19 to take a quick look at it and make sure it's
20 the same notice that you received?
21    A.    It looks to be the one.
22    Q.    Mr. Plummer, have you ever been
23 deposed before?
24    A.    No, I have not.
25    Q.    Typically the way it works is I

Michael Plummer

1
2 will ask you a question, the court reporter will
3 take it down, transcribe it in a magical way,
4 and then we'll wait for your answer, and she'll
5 also transcribe your answer.  It has to be done
6 verbally and linear so that if I am talking I
7 have to stop, then you get a chance to talk,
8 then when you stop I get a chance to talk.
9    If I cut you off let me know, tell
10 me.  I try to overcome that habit and I've done
11 a good job of it, but sometimes not, she can't
12 take two people down at the same time.
13    A.    I understand.
14    Q.    The other thing is I tend to be a
15 nodder, sort of a grunter and a nodder and a huh
16 guy, that's the way I naturally talk, but in
17 transcription you have to speak verbally, you
18 have to say yes, no, otherwise they won't take
19 the nod.
20    Sometimes good reporters will
21 actually say he nodded yes, at which point I
22 will say that looked like a no to me and that
23 creates the controversy, we don't want that, we
24 want a straight clean record.
25    If at any time I ask you a question

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 3 of 82

Michael Plummer

1  that you don't understand tell me. I am not an
2  expert in this area, you will soon see that, and
3  you are, or certainly purport to be. So there
4  may be some things that I am saying that you're
5  not understanding, say so, I will try to
6  rephrase it, we'll try to work at it. My goal
7  here today is to get a deeper understanding of
8  your expert report and your expert
9  qualifications and then move on from there.
10      If at any time you feel you want a
11  break you have a right to do that, just say so
12  and we'll be able to take a break, it's not a
13  marathon hopefully. It may be a marathon but it
14  certainly doesn't require no breaks. If you at
15  any time want to talk to your counsel you have a
16  right to do that as well.
17      Generally, I will ask you to finish
18  the question that's pending, but not always, so
19  just tell me if you have the urge to do that.
20  Finally, if there is anything that you find an
21  hour into the deposition well, you know, I
22  forgot a guy's name that I should have told you
23  before, feel free to say I thought about the
24  question you asked me an hour ago.

Michael Plummer

1      I will assume that you're answering
2  the questions based on your personal knowledge,
3  unless you tell me so. If you do tell me it's
4  not my personal knowledge I may choose to go on
5  on that basis; otherwise we'll be assuming that
6  you're answering questions based on your
7  personal knowledge.
8      Is there any reason that you can
9  think of that you wouldn't be able to give a
10  full and complete and truthful deposition here
11  today?
12      A.  No.
13      Q.  So throughout the deposition I'll
14  use certain terms, and I want to make sure that
15  we have sort of the same understanding of those
16  terms because some of them are fairly general,
17  and you wouldn't have that same understanding
18  unless you were embedded in this litigation like
19  some of us.
20      When I refer to the "City" I'm
21  probably going to be referring to the City of
22  Detroit. If I'm not I'll let you know I'm
23  referring to another city. In the questioning
24  when I talk about the City or the Debtor it will

Michael Plummer

1  be Detroit.
2      When I refer to the DIA or the
3  museum, I'll be referring to the Detroit
4  Institute of Art Museum that's owned by the City
5  of Detroit. When I refer to the DIA Corp.,
6  which I'm not sure I will, but if I do it's the
7  nonprofit DIA Corp. that runs the Detroit
8  Institute of Art.
9      Sometimes I'll refer to the art or
10  the art collection, and I know in your world
11  there are many arts and art collections, today
12  I'll be referring to the art and the art
13  collection that's stored at the DIA museum.
14      Do those make sense to you?
15      A.  Yes.
16      Q.  Let me get started with some
17  background on you. Where did you go to school,
18  college?
19      A.  The Wharton School at the
20  University of Pennsylvania.
21      Q.  That was for what degree?
22      A.  A B.S. in economics.
23      Q.  Did you have any other majors,
24  other than economics?

Michael Plummer

1      A.  I had a minor in English literature
2  concentration.
3      Q.  When did you get your degree from
4  Wharton?
5      A.  1980.
6      Q.  Did you receive any postgraduate
7  education?
8      A.  No, I did not.
9      Q.  Do you have any formal art
10  training?
11      A.  I studied art at Penn, but I do not
12  have no other formal training.
13      Q.  Do you have any formal art
14  appraisal training?
15      A.  No, I do not.
16      Q.  Are you a licensed or certified
17  appraiser?
18      A.  I am not.
19      Q.  Are there such things, licensed and
20  certified appraisers?
21      A.  There are; not licensed but
22  certified.
23      Q.  Do you have any other professional
24  licenses or certifications?

Michael Plummer

1
2      A.    I actually have a real estate
3  salesperson's license.
4      Q.    Are you a member of any
5  professional organization?
6      A.    I am a founder of the Art
7  Investment Council.
8      Q.    What is the Art Investment Council?
9      A.    The Art Investment Council is a
10  not-for-profit group that promotes best
11  practices in the art investment industry in art
12  investment.
13      Q.    When did you start?
14      A.    In 2010 I believe, some time in
15  that time frame.
16      Q.    Why did you start it?
17      A.    My business partner and I started
18  it because we felt that there was a need for
19  this because there was a lot of misinformation
20  about art investment, and we started it to
21  create a place to exchange knowledge and raise
22  the standard of practices and discussion about
23  art investment.
24      Q.    How many members does the art
25  investment council have?

Michael Plummer

1
2      A.    I don't remember exactly.  It may
3  be about 20 something.
4      Q.    Are these scattered around the
5  country?
6      A.    No, it's focused here in New York
7  City.
8      Q.    How often does the Art Investment
9  Council meet?
10      A.    We have not had meetings for about
11  a year because my partner and I have had other
12  obligations.
13      Q.    When you refer to your partner who
14  are you referring to?
15      A.    His name is Jeff Rabin who
16  co-founded Artvest Partners with me.
17      Q.    Have you through the Art Investment
18  Council promulgated any standards for art
19  investment?
20      A.    Promulgated standards, no; but we
21  have discussed issues like transparency and art
22  investment fund practices and other things.
23      Q.    Have you published anything through
24  the Art Investment Council?
25      A.    I don't believe so.

Michael Plummer

1
2      Q.    Do you have a site online or
3  anything like that?
4      A.    We do have a website.
5      Q.    What's that website?
6      A.    I think it is the
7  ArtInvestmentCouncil.com.
8      Q.    Do you believe that any of your
9  work with the Art Investment Council is relevant
10  in connection with your proposed testimony in
11  this action, the Detroit bankruptcy proceedings
12  that we're here on for this deposition?
13      A.    I think the experience that led to
14  my founding the Council is relevant.
15      Q.    In what way?
16      A.    In my knowledge of art investment
17  and my understanding of the art world and my
18  understanding of practices around that.
19      Q.    I think we'll get to that during
20  this deposition, if we don't we can come back to
21  it.
22      A.    Okay.
23      Q.    What about your employment history.
24  After college, where did you first work?
25      A.    I started at Sotheby's in the

Michael Plummer

1
2  treasury department.
3      Q.    What does the treasury department
4  at Sotheby's do?
5      A.    The treasury department extended
6  credit and approved buyers.  My job was an
7  account manager and I managed relationships with
8  dealers, meaning members of the trade and
9  clearing them for trade credit, collecting money
10  from them.
11      Q.    How long --
12      A.    Sorry, also managing an art loan.
13      Q.    That's interesting.  How does one
14  manage an art loan?
15      A.    You make interest calculations, you
16  manage the inventory, you make sure that
17  insurance payments are made by the dealers, you
18  manage sales of property to pay down principal,
19  you do inventories of the collection that are
20  held in-house.
21      Q.    How does it work, does a person get
22  a loan based on the art as collateral, is that
23  essentially it?
24      A.    Yes, correct.
25      Q.    Who holds the collateral?

Michael Plummer

1
2      A.    Generally speaking, in this case it
3  is the auction house or the lender.
4      Q.    So how long were you employed in
5  Sotheby's treasury department?
6      A.    I think probably about 3-1/2 years.
7      Q.    What department did you move on to
8  after that?
9      A.    I moved on to become being the
10 business manager for the Asian Art division.
11     Q.    What were your duties as the
12 business manager of the Asian Art division?
13     A.    Basically, there were many duties,
14 but the most important one was doing financial
15 forecasts for the company, for that area of the
16 company.  So I would work with the specialists
17 and get their estimates for upcoming sales, and
18 then work with them to set the values of those
19 sales on which the business would make its
20 decisions for operating expenditures and
21 financial forecasts.  It was not dissimilar to
22 working with a group of experts on an appraisal.
23     Q.    In connection with your work as the
24 business manager did you perform appraisals?
25     A.    No, I did not.

Michael Plummer

1
2      Q.    Did you work with people who
3  performed appraisals?
4      A.    I did.
5      Q.    Did you manage them?
6      A.    I did manage them, yes.
7      Q.    Was that your first experience
8  working with art appraisers?
9      A.    Well, as an account manager in the
10 treasury department I also had a close
11 relationship with the experts.  So I did work
12 with them in that capacity as well.
13           So, for instance, with that art
14 loan that was reliant on appraisal of that art,
15 and those appraisals had to be updated and I had
16 to get those appraisals from the experts.
17     Q.    The experts are the appraisers?
18     A.    Yes.
19     Q.    You call them the experts.  Is that
20 what they're called in the industry?
21     A.    Well, they used to be called that
22 and I still hold on to that old terminology;
23 they now call them specialists.
24     Q.    That's interesting, the experts.
25 Nobody calls me that.  Let's see, where were we.

Michael Plummer

1
2      So you were the business manager
3  overseeing the Asian Art for how long?
4      A.    I believe it was around three
5  years.
6      Q.    After your term as the business
7  manager of Asian Art what was your next job at I
8  guess Sotheby's?
9      A.    I moved over to the real estate
10 division and worked closely with the CEO and CFO
11 of Sotheby's to restructure the real estate
12 company.
13     Q.    What was the year you moved over to
14 the real estate division?
15     A.    I haven't looked at my resume for a
16 while, but I think it was maybe '88, somewhere
17 around there.
18     Q.    So working backwards, it would have
19 been about '85 that you began at Asian Art?
20     A.    Yeah.  Asian Art was not just Asian
21 Art, it was also books and manuscripts and other
22 departments, but it was called the Asian Art
23 division; it was a catchall for various
24 categories.
25     Q.    Those categories included what

Michael Plummer

1
2  forms of art?
3      A.    They included Asian Art, Ancient
4  Art, African Art, what was then called Arcade,
5  books and manuscripts, prints, photographs; so
6  it was a rather large part of the company.
7      Q.    What does Arcade include?
8      A.    Arcade was the low end sales area
9  of the business.
10     Q.    What does that mean, the low end
11 sales area?
12     A.    It was, you know, estate property
13 that was a catchall.  It was stuff that was not
14 put in dedicated specialist sales.
15     Q.    So then it would have been about
16 '82 when you were starting at the treasury
17 department?
18     A.    No, it was 1980.
19     Q.    So it was '80?
20     A.    The fall of 1980.
21     Q.    If that was '80, then it would have
22 been about '83 that you started in the Asian Art
23 division?
24     A.    Maybe towards the end of '83.
25     Q.    Okay.  Then you were there three

Michael Plummer

1 years so it could have been '87, '88 that you
2 started at Sotheby's?
3     A.    Yeah, that sounds about right.
4     Q.    What did you do in '87, '88 for the
5 real estate division?
6     A.    It was actually up through '91. I
7 worked, as I said closely, with the CFO and the
8 CEO of Sotheby's to restructure the real estate
9 company in preparation for Sotheby's going
10 public. It was critical that it be turned into
11 a profit-making company after many years of not
12 being successful.
13         So we were a small team that turned
14 it around and made it into a profitable venture,
15 and created the business model under which it
16 still operates today.
17     Q.    What is that business model?
18     A.    Well, I don't want to get into
19 revealing too much proprietary information, but
20 it was a restructuring of its licensing model
21 and its local brokerage operations and how they
22 function.
23     Q.    When you were with the real estate
24 division of Sotheby's from 1987 or '88 through

Michael Plummer

1 1991, did you work with art appraisers?
2     A.    During that period, no.
3     Q.    Did you do any art appraisal
4 yourself during that period?
5     A.    No.
6     Q.    So after 1991 and your work with
7 the real estate division of Sotheby's, what did
8 you do next?
9     A.    I then was recruited back to the
10 auction company to help them get control of
11 their expenses in marketing in light of the
12 recession that we were in, and I was ultimately
13 put in charge of marketing.
14     Q.    Did you call it the auction
15 division?
16     A.    Well, it was the auction company,
17 the auction subsidiary.
18     Q.    What was the role of the auction
19 subsidiary?
20     A.    To sell art. I was managing the
21 marketing department, initially certain aspects
22 of it and ultimately the entire department which
23 promoted the sales, the auction sales.
24     Q.    What were your duties when you went

Michael Plummer

1 back to the auction subsidiary in connection
2 with the marketing; what marketing functions did
3 you do?
4     A.    Managing sales, I'm sorry, managing
5 advertising, managing the production of
6 catalogs, managing the subscriptions, managing
7 promotion, managing marketing relationships with
8 all of the specialists and their plans for their
9 various auctions.
10     Q.    In connection with tasks that you
11 just described, the advertising, the catalogs,
12 the subscriptions, the promotion and the
13 marketing relationships with specialists; which
14 of those tasks would you say put you in closest
15 contact with appraisal of artwork?
16     A.    I did not -- that was -- appraising
17 was not part of my career at that point.
18     Q.    When you went back to the auction
19 company in '91, how long did you stay in the
20 management of the marketing of that department?
21     A.    Until the end 'of 95.
22     Q.    So from '91 to '95 you managed the
23 marketing department of the auction subsidiary?
24     A.    As I said, initially in '91 I

Michael Plummer

1 managed certain departments in marketing. By
2 '93 or so I was in charge of the division.
3     Q.    During that entire period of time,
4 those four years, you were not involved in any
5 art appraising, is that correct?
6     A.    No, I was not.
7     Q.    You didn't oversee any art
8 appraisers at that time?
9     A.    No, I did not.
10     Q.    During that period -- well, let's
11 keep going. What did you do next?
12     A.    Well, I mean what I did do was
13 oversee budgets related to the marketing and the
14 sales, and worked with the business managers of
15 which I was one, which was a critical part of
16 the cost control. It was very critical to that,
17 that I was on top of what the sales were and the
18 sales forecasting, because the marketing
19 expenses were closely related to the anticipated
20 sales results, which goes back to the forecasts
21 done with the experts. So I was working closely
22 with the experts and their valuations.
23     Q.    Their overarching evaluations?
24     A.    They are both overarching and also

1          Michael Plummer
2  on an individual basis, because individual works
3  of art can have a significant impact on the
4  sale.
5          You get one or two objects or a
6  certain collection and then you have to do
7  marketing around those collections based on the
8  values that are put on them.
9      Q.   Did you ever get involved in
10 directing a specialist, and again I'll use the
11 same terms you're using; but for the purposes of
12 this record whenever we use specialist or
13 sometimes experts we'll be referring to
14 appraisers, correct?
15         That works for me if that works for
16 you.
17     A.   I don't know.  Even at an auction
18 house I wouldn't refer to a specialist as an
19 appraiser.  They do appraisal work, but their
20 primary job is as a specialist filling sales.
21 So I'm not sure if that does work.
22     Q.   Okay.  Then maybe you can explain
23 it to me.  Are there below the specialists who
24 or working with the specialists, and I don't
25 know why I said below, it could be sideways,

1          Michael Plummer
2  upwards, I don't care.
3          Are there people who work with
4  specialists whose main job is the appraisal of
5  art?
6      A.   Both Sotheby's and Christie's have
7  appraisal departments that manage the
8  appraisals, and they often have generalists in
9  those departments that do preliminary appraisal
10 work, and then they take that work to the
11 specialists in the various departments and get
12 them to opine and final size valuations.
13     Q.   So, if I'm misunderstanding you let
14 me know.  So there would be a specialist in a
15 given genre of art, correct?
16     A.   Yes.
17     Q.   That specialist could go to someone
18 at Sotheby's, since we're working through your
19 period at Sotheby's so let's use that as an
20 example, someone at the Sotheby's appraisal
21 group?
22     A.   Right.
23     Q.   And say we're looking at a certain
24 piece of art in this genre, do you have a person
25 whose area of specialty in this genre to

1          Michael Plummer
2  appraise this art, is that how it would work?
3      A.   Take for example an antiquity
4  collection, there would be a generalist who
5  would have done some preliminary work in the
6  appraisals department, and then they would go to
7  the specialist in antiquities and then walk
8  those numbers, those items, item by item or
9  leave it on their desk and pick it up later,
10 depending on the situation and the relationship
11 with that specialist.
12     Q.   Would the generalist in your mind
13 be considered an appraiser?
14     A.   Yes, sometimes; sometimes not.
15     Q.   When would he be considered an
16 appraiser?
17     A.   Well, if he had done other
18 appraisals and had been hired for that purpose.
19 There might also be a junior person who might be
20 in training.
21     Q.   So if you went to the appraisal
22 department at Sotheby's and talked to a
23 generalist, would you consider that person an
24 appraiser?
25     A.   Possibly.

1          Michael Plummer
2      Q.   Again, what would the possibilities
3  be?
4          Sometimes they wouldn't be an
5  appraiser?
6      A.   Depending on who you're talking to
7  in the department it could be -- you have a
8  department that has different staffs so there
9  could be an administrator there, there could be
10 a secretary.
11     Q.   The specialists that you referred
12 to in your description, your example, so the
13 generalist may or may not be an appraiser and
14 then he goes and he talks to a specialist.  Is
15 that specialist an appraiser?
16     A.   Again, I think that I would refer
17 to them as a specialist, not an appraiser,
18 because their primary job is not doing
19 appraisals, it's filling a sale, but they do do
20 appraisal work.
21     Q.   The reason why you go to that
22 specialist is because they have specialized
23 knowledge about the value of that art?
24     A.   Correct.
25     Q.   The specialized knowledge of the

7 (Pages 25 to 28)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 8 of 82

Michael Plummer

1 value of that art would be used in forming the
2 appraisal, correct?
3    A.    Correct.
4    Q.    So you were in marketing and had
5 the relationships that you just described in
6 your marketing period of '91 to '95. What
7 happened next?
8    A.    I left Sotheby's to run the U.S. --
9 the sales area of the U.S. division of
10 Acoustiguide, which was at the time the leading
11 audio tour provider to museums like the
12 Metropolitan Museum of Art, MoMA, the Boston
13 Museum of Fine Arts.
14          All were clients of mine and I
15 developed relationships with all of those
16 museums and worked with them on their
17 exhibitions, their temporary exhibitions and
18 their tours for their permanent collections.
19    Q.    That was called Acoustiguide?
20    A.    Acoustiguide, yeah.
21    Q.    Can you spell that for the record?
22    A.    A-c-o-u-s-t-i-g-u-i-d-e.
23    Q.    So you worked with Acoustiguide for
24 how long, from '95 to '96?

Michael Plummer

1    A.    For one year.
2    Q.    During that year with Acoustiguide
3 did you do any art appraisal?
4    A.    No.
5    Q.    Did you work with any art
6 appraisers?
7    A.    No.
8    Q.    You mentioned that you had gotten
9 to know people at various museums.
10          Did you get to know anybody at the
11 Detroit Institute of Art?
12    A.    No, they were not a client.
13    Q.    So after '96 what did you do?
14    A.    I went to work with a group called
15 Carbone Smolan Agency that we did the -- they
16 had worked with -- I had hired them to do the
17 re-branding of Sotheby's, when I was running
18 marketing at Sotheby's, and I worked with them
19 on a number of branding projects for financial
20 firms, as well as re-branded Christie's.
21    Q.    Can you spell the name of that
22 company for the record he were?
23    A.    Carbone, C-a-r-b-o-n-e; Smolan,
24 S-o-m, sorry, S-m-o-l-a-n Agency.

Michael Plummer

1    Q.    How would you describe the work
2 that they do, are they just re-branding
3 specialists?
4    A.    Re-branding marketing and design
5 communications.
6    Q.    How long were you with them?
7    A.    Approximately three years.
8    Q.    So until about '99?
9    A.    Yeah, that sounds right.
10    Q.    During that period from '96 to '99,
11 or those three years, did you work on any art
12 appraisal projects?
13    A.    I did not, but I did work closely
14 with Christie's and Christie's senior
15 management.
16    Q.    What was your work with Christie's?
17    A.    I was working with them to help
18 them determine what identity they wanted for the
19 company and how they were re-envisioning the
20 company for the future. So I worked closely
21 with the CEO and president, and even at one
22 point the new owner, Mr. Pinault.
23    Q.    Can you spell his name for the
24 record?

Michael Plummer

1    A.    Pinault, P-i-n-a-u-l-t.
2    Q.    You mentioned the CEO and the
3 president. Who was the CEO?
4    A.    Christopher Davidge.
5    Q.    Who was the president?
6    A.    Patty Hambrecht.
7    Q.    Your work with them, did it involve
8 any art appraisals?
9    A.    No, it did not.
10    Q.    So we're now up to '99?
11    A.    Um-hum.
12    Q.    Where did you go after that?
13    A.    I became -- I was self-employed. I
14 founded a company to create an online trading
15 platform.
16    Q.    What was the name of that company?
17    A.    It was called -- ultimately it was
18 called Art Base, Inc.
19    Q.    How long did you do that?
20    A.    For about three years.
21    Q.    So until about 2002?
22    A.    2003.
23    Q.    2003. During your period of time
24 with Art Base, Inc. were you involved in any art

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1  Michael Plummer
2  appraisal projects?
3      A.    Well, I did do due diligence on an
4  appraisal company to buy it.  It was actually
5  founded by a member of the triple A and was
6  designed to create online appraisal businesses,
7  do online appraisals.  It was in financial
8  distress and it was brought to me as something
9  to buy.  So I got -- you know, did a lot of due
10 diligence on the appraisal industry at the time,
11 as well as that company in particular.
12     Q.    The name of that company was?
13     A.    Eppraisals.
14     Q.    E dash praisals?
15     A.    I can't remember, it's been a
16 while.
17     Q.    Eppraisals was a company that you
18 said was founded by a member of the triple A?
19     A.    I believe so.
20     Q.    And what's the triple A?
21     A.    The Appraisals Association of
22 America -- Appraisers Association of America.
23     Q.    The Appraisers Association of
24 America, is that involved in the appraisal of
25 art?

1  Michael Plummer
2      A.    Yes.
3      Q.    Is that strictly involved in the
4  appraisal of art?
5      A.    I believe so.
6      Q.    Did you end up buying Eppraisals?
7      A.    No, I did not.
8      Q.    How long did you do the due
9  diligence on that?
10     A.    Several months.
11     Q.    Would you say three to four months?
12     A.    Possibly.
13     Q.    Any more?
14     A.    I don't remember, it's a long time
15 ago.
16     Q.    So other than that three or
17 four-month due diligence with Eppraisals, did
18 you have anything to do with art appraisals in
19 connection with Art Base, Inc.?
20     A.    I do not have -- I did not work on
21 any appraisals, but I had a number of clients at
22 Art Base, Inc. who were collectors and dealers
23 with whom I was very involved in their
24 collections and their inventories.
25     Q.    So what was Art Base, Inc.; would

1  Michael Plummer
2  you try to sell art online, buy art online; what
3  would you do?
4      A.    That was its ultimate ambition.  It
5  was a software program that collectors and
6  dealers used, as well as a database of art
7  prices which was used by appraisers, which is
8  why the Eppraisals company was a logical fit, it
9  made sense logically.
10     Q.    Did you develop the software
11 program?
12     A.    No, I did not.
13     Q.    Who did?
14     A.    I don't remember.
15     Q.    When you formed the company did you
16 acquire the software program?
17     A.    Which software program are you
18 referring to?
19     Q.    I asked you what Art Base, Inc.
20 does and you said its goal was to buy and sell
21 art, but initially it was a software program?
22     A.    Yes.  Okay.  You're referring to
23 the Art Base software, I was not sure if you
24 were referring to that or Eppraisals.  I did not
25 write that software though.

1  Michael Plummer
2      Q.    Did Art Base, Inc. own the
3  software?
4      A.    It did, yeah.
5      Q.    What ultimately -- you said you
6  worked with collectors and dealers.  In your
7  work with collectors and dealers did you do any
8  appraisals for them?
9      A.    No, I did not.
10     Q.    Did you work on any appraisal
11 projects for them?
12     A.    No, I did not.
13     Q.    Did you ultimately sell Art Base,
14 Inc. or did it just close down?
15     A.    We made a deal with the founders to
16 return it back to them.
17     Q.    The founders of Art Base, Inc., was
18 that a company?
19     A.    Yes, it was a company.
20     Q.    What was that company, the
21 founders?
22     A.    Their company was originally called
23 Art Base without the ink.
24     Q.    Were they based here in New York?
25     A.    Yes.

Michael Plummer

1
2      Q.    Are they still in business?
3      A.    Yes, they are.
4      Q.    Do they have a website?
5      A.    Yes, they do.
6      Q.    Do you know the site?
7      A.    I think it's Art Base.  I don't
8  know, I haven't been there for years.
9      Q.    ArtBase.com?
10      A.    Probably, possibly.
11      Q.    After 2003 what did you do?
12      A.    In 2003 I joined a company called
13  Fernwood Art Investments as the chief operating
14  officer and president.
15      Q.    That's F-e-r-n-w-o-o-d.  So Exhibit
16  B to your report, your CV says that you were
17  there from 2003 to 2006?
18      A.    That sounds right, yes.
19      Q.    Were you the CEO?
20      A.    I was the president and COO.
21      Q.    Who was the CEO?
22      A.    A man by the name of Bruce Taub.
23      Q.    In your work as the president and
24  COO of Fernwood did you do any work in art
25  appraisals?

Michael Plummer

1
2      A.    No, we did not do art appraisals,
3  but we did some of the most I would say
4  pioneering work in analysis of the art sectors
5  and their behavior over the previous 25 years,
6  which was considered groundbreaking at the time.
7      Q.    By the way, just so you know, this
8  is her typing so I get to read it if I can't
9  remember exactly what you said.  There's no
10  special tool here other than her typing.
11          So when you refer to your
12  pioneering work and analysis in the art sectors,
13  what are you referring to?
14      A.    I'm referring to a report that we
15  issued with our in-house economist which
16  described the performance of the different
17  sectors of the art market, which I refer to in
18  my expert report, such as the American Art
19  sector, the Impressionist and Modern Art sector,
20  those various sectors, and their behavior over
21  time, their growth in value, their decrease in
22  value, their investment attributes, their
23  volatility, their performance against the stock,
24  the equity markets, the S&P, other such things,
25  and their viability as investments and their

Michael Plummer

1
2  volatility.
3      Q.    So in connection with that study,
4  the report that you just referred to in your
5  testimony, did you determine that there were
6  certain genres of art that were more volatile in
7  terms of --
8      A.    We did.
9      Q.    In terms of the nature of the
10  investment?
11          MR. IRWIN:  Let him finish his
12  question.
13      Q.    In doing that study or making that
14  determination, did you work with art appraisers?
15      A.    We worked with art specialists who
16  did appraisal work from time to time.
17      Q.    Those art specialists that did
18  appraisal work from time to time, what
19  information did they give you that was
20  ultimately used in your report?
21      A.    They helped us choose the artists
22  who are used as part of the indices that we
23  created; they validated the results of the
24  report; they were a sounding board and quality
25  check to the process.

Michael Plummer

1
2      Q.    In validating the results, what are
3  you referring to?
4      A.    Well, for example, we had signed up
5  as our expert team some of the leading dealers
6  in the industry.  Take for example David Nash
7  who was a -- is a leading impressionist and
8  modern dealer, we would share the information we
9  compiled and our analysis, and he had been in
10  the industry at that time, he had run the
11  department at Sotheby's for 30 some years, and
12  he would validate the conclusions that we were
13  coming to, as would various other specialists in
14  those various categories.
15      Q.    Would you consider David Nash a
16  specialist who you believe does appraisals?
17      A.    I think he has done appraisals from
18  time to time, but his core work is running his
19  gallery and selling art; but he is one of the
20  most knowledgeable people that I would turn to
21  for that sort of information.
22      Q.    In connection with your report on
23  volatility or your report in general, which
24  included some information on volatility; did you
25  update that report over the years?

Michael Plummer

1
2    A.    I did in a different form when I
3  moved to Christie's.  We used that work at
4  Christie's as the foundation for our work for
5  creating an art fund with Goldman Sachs and used
6  that work, shared that work with Goldman Sachs
7  who vetted it.
8    Q.    I'll get to that chronologically as
9  we move on.
10    A.    Sure.
11    Q.    The first report came out in what
12  year?
13    A.    Maybe 2004 or '05.
14    Q.    When did you update it?
15    A.    Probably 2007, '08.
16    Q.    So you updated it after you left
17  Fernwood?
18    A.    Yes.
19    Q.    In connection with the work you
20  just described that you did the Fernwood, you
21  created this pioneering report.  What else did
22  you do?
23    A.    We also structured two art funds
24  and I hired the specialist staff for Fernwood,
25  who were the advisors to Fernwood on -- would

Michael Plummer

1
2  have been for the purchases of art for the fund.
3    Q.    Let's break that down.  So you
4  structured two art funds?
5    A.    Right.
6    Q.    Let's just take them one at a time.
7  What was the first?
8    A.    The first was a sector fund which
9  was devised to invest across the different
10  sectors of the art market, from Old Master
11  paintings up through emerging contemporary art.
12    Q.    An art fund is essentially what, a
13  collection of funds that is intended to be
14  invested in art?
15    A.    They can take many forms, but in
16  this instance it was a fund devised to accept
17  investments at a minimum of $250,000 up to I
18  think 1 million.  That would be put into a pool,
19  that would be used to invest art and the art
20  would be held or was anticipated to be held for
21  about five to eight years.
22    Q.    And then to be sold off for profit?
23    A.    Correct.
24    Q.    How long did you say?  I should be
25  able to find it here, five to eight years?

Michael Plummer

1
2    A.    Yes.
3    Q.    Is that the typical cycle that you
4  need to hold art in order to make the kind of
5  profits you're looking for?
6    A.    Some would hold it for longer.
7  There were constraints on investor expectations
8  on getting returns, so we went out with five to
9  eight years for marketing purposes, but we had
10  the ability to extend the holding period to
11  maximize returns.
12    Q.    In your first art fund how much did
13  you raise?
14    A.    We didn't because the art fund ran
15  into trouble.
16    Q.    What was that?
17    A.    I uncovered malfeasance on the part
18  of the CEO, that he had taken investor funds
19  from the company and used them for his personal
20  means.
21    Q.    This is the company Fernwood?
22    A.    Yes.
23    Q.    So the first art fund you formed
24  didn't really get off the ground?
25    A.    No.

Michael Plummer

1
2    Q.    What about the second one?
3    A.    The company went under.  There two
4  funds at that time, we had gotten an approval
5  from Merrill Lynch and gone through due
6  diligence with them, but unfortunately I
7  uncovered the malfeasance on the part of the CEO
8  and collectively myself and the specialists
9  resigned from the company.
10    Q.    So neither of the art funds that
11  you formed really got off the ground?
12    A.    No.
13    Q.    You have to say more than nod?
14    A.    Okay.  No.
15         MR. SOTO:  We've been going about
16  an hour, do you want to take a break?
17         THE WITNESS:  Yes, sure.
18         THE VIDEOGRAPHER:  The time is 9:52
19  a.m., and we're going off the record.
20         (Off the record)
21         THE VIDEOGRAPHER:  The time is
22  10:03 a.m., and we are back on the record.
23  BY MR. SOTO:
24    Q.    Mr. Plummer, I was interested in
25  your description of the work that you had done.

Michael Plummer

1           Michael Plummer
2           Is there a way I can get a copy of
3   that report that you referred to, the pioneering
4   report?
5       A.   I don't know.  I'd have to look for
6   it, it's quite old.
7       Q.   It depends what you mean by old.
8   It should be somewhere around 2004 or 2005, so
9   it would be about a decade old maybe?
10      A.   Yeah, but a lot of the firm's stuff
11  is in storage or disappeared because it went out
12  of business.
13      Q.   So you didn't keep a copy of the
14  report?
15      A.   I may have a copy somewhere, I
16  would have to look for it.
17      Q.   If you could I would appreciate it,
18  and I'll contact Geoff to see if we can get a
19  copy of it.
20           Again, you said it was updated
21  sometime around 2008 when you were working with
22  Christie's, correct?
23      A.   Correct.
24      Q.   If you can't find the original one,
25  maybe if you can find a copy of the updated one?

1           Michael Plummer
2       A.   Well, the updated one was
3   Christie's information that was not issued
4   publicly, but used for its clients.
5       Q.   So we can probably ask someone at
6   Christie's to see if they have a copy of it,
7   correct?
8       A.   You could.  I'm not sure if they
9   kept records of that stuff.
10      Q.   Who did you work with when you were
11  at Christie's?
12      A.   I worked with Jane Chesworth who
13  was then the COO.  She has now left and Steven
14  Mendel who has also departed.
15      Q.   Did you ever work with an
16  individual named Paul Provost?
17      A.   At Christie's, yes.
18      Q.   Would he have been knowledgeable
19  about the updated report that you were referring
20  to in your testimony?
21      A.   I don't know.
22      Q.   So we will be sure to ask him.
23  Moving on.
24           So the two structured art funds
25  that didn't get off the ground were one thing

1           Michael Plummer
2   you did during your period at Fernwood.  What
3   else?
4       A.   As I said, I believe I said I hired
5   the specialist team that we were employing to
6   make the selections for the art investment, to
7   work with us.
8       Q.   That was when you started there in
9   2003 that you started to hire the team?
10      A.   Um-hum.
11      Q.   How many people were in that team?
12      A.   I believe it was around eight or
13  nine.
14      Q.   These eight or nine specialists as
15  I refer to them, were any of them appraisers?
16      A.   I think some of them did appraisal
17  work from time to time, but more importantly
18  they were transactional experts in that they
19  were deeply embedded in the industry and had a
20  lot of transactional experience, knew how to
21  establish values for investing in art.
22      Q.   When you say "establish values for
23  investing in art," what do you mean?
24      A.   I mean making sure that we were
25  purchasing art that was at the right price that

1           Michael Plummer
2   the works would appreciate and give a return to
3   investors.
4       Q.   How do you establish values for
5   investment in art, what's the first step that
6   you take?
7       A.   Well, it's very similar to the
8   appraisal process, you would look at
9   comparables.
10      Q.   So you would start by looking at
11  comparables.  Then what else would you do?
12      A.   You would, well you'd look at the
13  subject work and you would examine it closely to
14  determine if it was what it purported to be, or
15  reported to be.  Then you might have a
16  discussion, or might not depending on the
17  circumstances, with others in the industry about
18  information that might not be publicly
19  available.
20      Q.   What type of information?
21      A.   Other items that might be for sale
22  other places or on consignment, or might just
23  have been sold but not reported publicly.
24      Q.   So other sales?
25      A.   Other sales, other pending sales or

Michael Plummer

other consignments of similar works.

Q. When you use the word consignment
can you tell the Court what you're referring to?

A. Consignment is when a work of art
is given to a dealer or an auction house to be
sold, but the ownership of it is still retained
by the original owner and the title does not
pass until a bill of sale happens or an auction
occurs and the hammer falls.

Q. So in connection with establishing
value they would look at some comparables, they
would validate that the work is authentic I
assume is what you were saying?

A. Yes.

Q. And then they would look at other
sales that might not be public or other pending
consignments?

A. Correct.

Q. That's the work of the specialists
that you referred to?

A. Right.

Q. How would you distinguish that from
the work of an appraiser?

A. I don't know that there is much to

Michael Plummer

distinguish except that they're not issuing an
appraisal report, but they are doing a valuation
that is critical to making and spending money,
making an investment on a work of art.

What they're not doing is making
any distinctions between fair market value or
other such things.

Q. I see the distinction. So one of
the distinctions is they're not preparing an
actual appraisal report?

A. Correct.

Q. The other one would that they're
not making distinctions in a form of appraisal,
for example, a fair market value appraisal or an
auction estimate appraisal?

A. Correct.

Q. But other than that they're valuing
the art in similar fashion, correct?

A. They are actually establishing a
fair market value, they're just not labeling it
such and they're not issuing a report labeling
it as such.

Q. Understand. So we are somewhere in
2000, we're back at Sotheby's. Where are we, at

Michael Plummer

2003 maybe. No, 2006. You're done at Fernwood.
Where do we go in 2006?

A. In 2006 I had a certain number of
months off because Fernwood collapsed
unexpectedly, but then I was hired by
Christie's. They had been fascinated by -- the
CEO of Christie's had been fascinated by the
work I had been doing at Fernwood and they hired
me to bring that over to Christie's and develop
an art fund and an art lending business for
Christie's, because Christie's had not had an
art lending business prior to that even though
Sotheby's had.

Q. So in 2006 or so when you went to
Christie's they didn't have any art funds?

A. No.

Q. And they didn't have any art
lending business?

A. No. They did have some art loans,
but it was one-off situations and done for
client relations, but they did not have an art
lending business.

Q. So when you got to Christie's what
department did they put you in or what did you

Michael Plummer

do?

A. It was a new division that I was
hired to create and it was called Christie's
Financial Services, and I was made Senior Vice
President and Chief Operating Officer of the new
division.

Q. Senior VP and COO?

A. Um-hum.

Q. What were your responsibilities as
the senior VP and chief operating officer of
Christie's financial services?

A. I had two different branches of
responsibilities. One was to implement a best
practices for underwriting art loans, also
overseeing the adoption of KYC, know your client
practices, and developing relationships with
potential lending partners, other banks that
would provide credit to use for the loans.

Then on the other side I was -- the
other main division of responsibility was
developing an art fund or a series of art funds
for Christie's, in partnership with Goldman
Sachs.

Q. In terms of your first area of

13 (Pages 49 to 52)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 14 of 82

Michael Plummer

1 responsibility you mentioned implementing best
2 practices.
3
4          What were those best practices?
5     A.    Well, they were -- they were
6 understanding the art as collateral. Christie's
7 was used to using art for auctions, but it was
8 working with them and their appraisals
9 department and their specialists to develop the
10 right kind of approach to doing valuations for
11 art loans.
12          Because when an auction house does
13 an art loan they're doing it, what you would
14 call it's a non-recourse loan in effect; so they
15 have to be certain that they have setting the
16 right values on the property so that if they
17 have to liquidate it they won't take a loss.
18          It's a little bit different than
19 doing a general appraisal or an auction
20 estimate, because there is a higher level of
21 risk for the auction house.
22     Q.    The higher level of risk is that
23 you could sell the art; you might not get the
24 value of the loan and you have no recourse
25 against the individual?

Michael Plummer

1
2     A.    Correct.
3     Q.    So all of the loans that you were
4 working with were non-recourse to the individual
5 borrower?
6     A.    They might have recourse language
7 in them, but the effect is if they were
8 borrowing from an auction house, often the
9 reality is that it is non-recourse.
10     Q.    Because they don't have resources
11 to back anything, is that your point?
12     A.    Correct.
13     Q.    You say you worked with the
14 appraisal department and the specialists in
15 connection with formulating these best
16 practices.
17          What input did the appraisal
18 department or specialists have with respect to
19 the best practices?
20     A.    Well, we were more or less telling
21 them what we needed from them, how they needed
22 to be different. They weren't really giving
23 input back to us, except that they were worried
24 about their additional workload and staffing
25 needs, but we were telling them how we needed

Michael Plummer

1
2 them to do things for us.
3     Q.    What would you need from the
4 appraisal department for an art loan that was
5 different than, for example, what the appraisal
6 department would do for an auction?
7     A.    In terms of -- I think I just said
8 that it was -- they would need to consider the
9 fact that in their evaluation that they were
10 secure that they were giving a low and
11 conservative valuation in the event that if a
12 work defaulted or if the borrower defaulted that
13 Christie's would get its money back.
14     Q.    So, in essence, you were telling
15 them that look, in connection with the work you
16 were doing with us on art loans, you have to be
17 very conservative in your estimates?
18     A.    Correct.
19     Q.    Any other differences?
20     A.    Well, and if you think it won't
21 sell or it has potential to buy in we need to
22 know that, or a high potential to buy in.
23 Whereas, if Christie's is valuing property for
24 any auction house for a seller and that property
25 doesn't sell there is no risk to Sotheby's or

Michael Plummer

1
2 Christie's, it's the seller's risk. So it's --
3     Q.    So the first -- finish, I'm sorry.
4     A.    So it's just a different
5 consideration.
6     Q.    I want to make sure I understand.
7 So one of the differences is there's a higher
8 risk, and you wanted to make sure the appraisers
9 were being conservative in their estimates
10 because of the higher risk?
11     A.    Yes.
12     Q.    The other difference is if
13 appraisers had some information regarding the
14 marketability or the lack of marketability of a
15 given piece of art, that they needed to share
16 that because it was important that you would be
17 able to sell the art as collateral if you needed
18 to?
19     A.    Right. This is an instance where
20 BI considerations, bought-in considerations or
21 unsold considerations are taken into account,
22 when in general appraisal practices they are
23 not.
24     Q.    That's an interesting phrase that
25 I'm not familiar with. BI considerations, or

```
1              Michael Plummer
2    buy-in as you put it before?
3         A.   Right.
4         Q.   What does that mean?
5         A.   It means a certain percentage of
6    property in nearly every auction remains unsold,
7    and it can vary from as little as 10 or
8    15 percent up to 35 or 40 percent.
9         Q.   What happens with that property in
10   connection with an auction that's just given
11   back to the owner, correct?
12        A.   Sometimes.  Sometimes it's marked
13   down and resold because the owner doesn't want
14   it back.
15        Q.   But sold at a lower price?
16        A.   But sold at a lower price.
17        Q.   So the phrase "buy-in" means?
18        A.   Bought in.  It technically means
19   that the auction house is buying something back
20   in the auction on behalf of the seller at a
21   preset reserved price.
22        Q.   That's new information to me.  So
23   sometimes in connection with an auction, an
24   auction house will have a preset price at which
25   it will buy some of that art?
```

```
1              Michael Plummer
2         A.   No, no, no, that's not what I am
3    saying.  It is a -- a reserve price is a
4    pre-agreed upon price between the auction house
5    and the seller, at which the auction house will,
6    in their language, buy it back on behalf of the
7    seller.  Meaning that they will take it back,
8    they will not sell it to somebody else below
9    that price so they will --
10        Q.   Hold it for the seller?
11        A.   Hold it for the seller.
12        Q.   And then the seller just gets it
13   back?
14        A.   Or re-offers it.
15        Q.   Or re-offers it in another sale?
16        A.   Correct.
17        Q.   So that's what you meant when you
18   talked about the BI factor?
19        A.   Correct.  It's just auction
20   terminology.  It's confusing, but that's how
21   they refer to it.
22        Q.   Again, one of the differences is
23   that in connection with an art loan, you want to
24   be sure you can sell the art if you are taking
25   it as collateral, correct?
```

```
1              Michael Plummer
2         A.   Yes.
3         Q.   So other than being conservative
4    and getting more information on the
5    marketability or the salability of a given art,
6    was there any other difference, any other input
7    that you would get from the appraisal
8    department?
9         A.   I don't recall.
10        Q.   What about from the specialists;
11   other than those two things, did you get any
12   other information from the specialists?
13        A.   Well, the specialists, we were
14   working to get them to promote lending to their
15   clients.  So we were looking at them as sales
16   partners in building the business for us, and we
17   would meet sometimes with their clients and them
18   to, you know, propose art loans.
19        Q.   In connection with these best
20   practices, and I don't know if this was part of
21   the practice at Christie's or part of your
22   practice; would you create a best practice
23   manual saying this is the way that we are going
24   to prepare to make an art loan and this is the
25   information we need if we're going to make an
```

```
1              Michael Plummer
2    art loan?
3         A.   We had a very, very extensive
4    underwriting manual.
5         Q.   That underwriting manual would
6    include what you had helped to put together in
7    terms of the best practices to make an art loan?
8         A.   As I remember it, but I haven't
9    read it for five years, seven or six years now.
10        Q.   Did you help put together that
11   underwriting manual?
12        A.   Yes, I did.
13        Q.   Was there one when you got there?
14        A.   No, there wasn't.
15        Q.   And you don't happen to have a copy
16   of that underwriting manual?
17        A.   No, I don't.
18        Q.   You also said in connection with
19   the implementation of the best practices you
20   developed relationships with lending banks.
21   What does that entail?
22        A.   I was looking for lending partners
23   who would provide additional capital for the
24   loans so we wouldn't have to use Christie's
25   balance sheet exclusively.
```

15 (Pages 57 to 60)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 16 of 82

Michael Plummer

1
2      Q.    Were you able to find lending
3  banks?
4      A.    Yes.  There was one that was in
5  discussions with Christie's, deep in discussions
6  with Christie's by the time I left.
7      Q.    But before you left the
8  relationship hadn't finalized?
9      A.    It had not finalized.
10      Q.    So while you were there, to the
11  extent Christie's was making art loans it was
12  making it from its art capital?
13      A.    Yes.
14      Q.    The second thing you said you did
15  when you got to Christie's and helped form their
16  financial services department was develop a
17  series of art funds, correct?
18      A.    Yes.
19      Q.    How many art funds did you develop?
20      A.    We were working with Goldman Sachs
21  to initially develop four.  One similar to
22  the -- it was in essence an adaptation of what
23  we were doing at Fernwood.  The initial plan was
24  for four, one in the Impressionist and Modern
25  sector, one in the Post War sector and

Michael Plummer

1  Contemporary sector, and then one in the Old
2  Masters sector.
3
4              Then the fourth which we call the
5  Brick fund which was in emerging markets such as
6  Chinese art, Latin American Art, Russian and
7  Indian Art.
8      Q.    So you picked certain sectors of
9  art that you were going to try to create funds
10  for, correct?
11      A.    Correct.
12      Q.    Why did you pick those?  For
13  example, why would you pick Impressionist and
14  Post War and Old Masters and emerging markets?
15      A.    Well, as a selling strategy Goldman
16  was really going to be the distributor.  They
17  wanted to be able to have an array of products
18  to sell to their clients that had different risk
19  return attributes.
20              So, for instance, based on the work
21  that I had done at Fernwood we were able to
22  determine that based on that analysis of
23  volatility and risk and return we were able to
24  determine, for instance, that Old Masters were
25  less volatile than Contemporary and more stable,

Michael Plummer

1
2  but lower return.
3              And that Impressionist and Modern
4  fell somewhere in between Contemporary and Old
5  Masters, and that the Brick categories were much
6  higher risk, but potentially much higher return.
7  So like any kind of investment product, your
8  investor will choose which fit his investment
9  goals.
10      Q.    Did you start four art funds?
11      A.    Well, what ended up happening was
12  that that was -- the art fund projects began in
13  2007 in earnest, perhaps a little bit -- yeah,
14  in 2007.
15              As you may recall, in July of 2007
16  the financial credit market started seizing up
17  in July of 2007.
18      Q.    That would have been July of 2008,
19  and we know that date very well.
20      A.    No, no, no.  Actually, 2007 is when
21  the credit market started seizing up.  So we
22  went to -- let's see.  Then by 2008, July, of
23  course then the financial markets overall
24  started having an impact.
25              My now business partner and I who

Michael Plummer

1
2  were working at Christie's together on the art
3  fund went to the management of Christie's to
4  advise them to pull out of their guarantee
5  portfolio, because we predicted based on our
6  financial analysis that the market would crash
7  in the fall of 2008.
8              Unfortunately, we were disregarded
9  and Christie's had a very large guarantee
10  portfolio going into the fall of 2008.  It's a
11  matter of public record that the art market
12  crashed in the fall of 2008, along with the
13  seizing up of financial markets.
14              At that time we restructured the
15  art fund from being four funds to being one
16  fund, that would be an opportunistic fund based
17  on the realities of the current market
18  situation.
19      Q.    A very interesting period.  Again,
20  to make sure I get it right.  You began with
21  thoughts of having four art funds?
22      A.    Correct.
23      Q.    Structured along the lines of your
24  prior testimony and dealing with four different
25  genres of art based on the factors you testified

Michael Plummer

1  Michael Plummer
2  about earlier. You began that in 2007?
3      A.    Right.
4      Q.    But because of credit markets and
5  later financial markets; did you actually raise
6  the funds, the four funds?
7      A.    No. As I was saying, we dropped
8  the plan for the four funds and we restructured
9  it to be one fund.
10     Q.    You did that in about 2008?
11     A.    That would have been in January of
12  2009; December 2008, January 2009, and we went
13  to market in April -- late March, in March or
14  early April with the opportunity fund, the
15  distressed fund if you will, and we went to
16  Europe and met with leading investment firms in
17  Europe and, as you would say in the industry,
18  soft circled about a hundred million for that
19  fund.
20     Q.    What does soft circled mean?
21     A.    It means you have a verbal
22  expression of interest for a certain amount of
23  money without a signed agreement of funding.
24     Q.    So December, January you formed the
25  one fund?

Michael Plummer

1  Michael Plummer
2      A.    Right.
3      Q.    Were you still at Christie's?
4      A.    Yes.
5      Q.    You then went to market with that
6  one fund sometime in March or April of 2009?
7      A.    Correct.
8      Q.    Did you ever actually raise the
9  funds for that one fund?
10     A.    No, we did not, because Christie's
11  made a decision a few weeks after that or around
12  that time that they had sufficient problems in
13  their core business based on that guarantee
14  portfolio, that they had to cut back and could
15  not make the seed investment in the art fund
16  that was required for the art fund to proceed.
17     Q.    So beyond that, what else did you
18  do at Christie's Financial Services?
19     A.    The funds and the lending business,
20  those are my primary responsibilities.
21     Q.    Essentially, how many loans did you
22  bring to market for Christie's in the art
23  lending business?
24     A.    Well, there were four loans with
25  Christie's while I was there. Then in the

Michael Plummer

1  Michael Plummer
2  spring of 2009, Christie's withdrew from both
3  the lending business and the art fund business
4  because they contracted, as many firms did in
5  2009, and dropped many of their new initiatives.
6      Q.    Those four loans, do you recall the
7  size of those four loans?
8      A.    They were in the -- all in the
9  portfolio was -- you know, I think this is
10  proprietary information, I'm not sure I can
11  reveal this, but they were substantial.
12     Q.    When you say "substantial" are you
13  saying seven figures?
14     A.    More.
15     Q.    So without naming any names, can
16  you tell me the size of these loans?
17     A.    They were in the hundreds of
18  millions.
19     Q.    Do you know if these loans were
20  ever paid back?
21     A.    I heard that they were, yes.
22     Q.    Have we completed your description
23  of your work at Christie's?
24     A.    I believe so.
25     Q.    So in 2009 did you leave

Michael Plummer

1  Michael Plummer
2  Christie's?
3      A.    I did.
4      Q.    When in 2009?
5      A.    Around that time, around
6  April 2009.
7      Q.    Where did you go then?
8      A.    I then founded Artvest Partners, my
9  current company.
10     Q.    Since 2009 to the present, have you
11  been employed by or worked with Artvest
12  Partners?
13     A.    I am a principal of Artvest
14  Partners, it is my firm.
15     Q.    Have you worked with anybody else
16  during that period of time?
17     A.    No.
18     Q.    So your sole employment from 2009
19  to present has been with Artvest Partners?
20     A.    Correct.
21     Q.    Who else works with you at Artvest
22  Partners?
23     A.    I have my partner, Jeff Rabin, who
24  was part of this financial services group at
25  Christie's with me working on the art fund. He

Michael Plummer

1  came with me into this venture and we founded it
2  as co-principals and partners.
3      Q.   How many people do you employ?
4      A.   At the moment we have one, a
5  full-time employee.
6      Q.   What does that person do?
7      A.   She assists us with our analysis.
8      Q.   Would you call her a specialist?
9      A.   No.  I mean she actually had worked
10 in the specialist department at Sotheby's and
11 she has a graduate degree from the NYU program,
12 but she's not -- I would say her -- she wears
13 many hats, so I'm not sure that I would call her
14 a specialist.
15     Q.   Would you call her an appraiser?
16     A.   I would not call her an appraiser.
17     Q.   Is Mr. Rabin an appraiser?
18     A.   No, he is not an appraiser.
19     Q.   The full time employee that you
20 referred to, does she have a name?
21     A.   Yes.  Anya Bemis, A-n-y-a,
22 B-e-m-i-s.
23     Q.   Has Anya ever been involved in the
24 sale of a substantial collection of art like

Michael Plummer

1  the -- say the art that was appraised by
2  Christie's for the DIA?
3      A.   You know, I don't remember all of
4  Anya's experience.  She has worked on projects
5  for us and she worked in the specialist
6  department at Sotheby's years ago, so I would
7  imagine in that capacity she did have some
8  experience on working on some collections.
9      Q.   So the collection that was
10 appraised by Christie's, you're familiar with
11 it?
12     A.   I'm sorry, are you referring to the
13 appraisal of the DIA collection?
14     Q.   The collection of art at the DIA
15 that was appraised by Christie's, are you
16 familiar with that?
17     A.   I am familiar with it.
18     Q.   Did you handle that appraisal in
19 connection with the preparation of your expert
20 report?
21     A.   We reviewed it, yes.
22     Q.   That would be about 1,700 or so
23 works of art that they appraised, correct?
24     A.   That would be.  We did not review

Michael Plummer

1  all 1,700, but we reviewed a number of the
2  objects that we felt were important and
3  relevant.
4      Q.   Have you ever been involved in the
5  sale of a collection of art the size that we
6  were just referring to, the 1,700 works of art
7  at the DIA?
8      A.   No, I have not been involved in a
9  sale of that magnitude.
10     Q.   Do you know if Anya has?
11     A.   I do not know.
12     Q.   Do you know if Jeff Rabin has?
13     A.   I do not know.  He was involved in
14 sales in Sotheby's -- in Christie's wine
15 department before he came to Artvest and worked
16 in financial services, so he may have.
17     Q.   Sales of wine?
18     A.   Sales of wine in Christie's wine
19 department.
20     Q.   Is sales of wine the same as sales
21 of art?
22     A.   They require expertise and there
23 are a lot of similarities, yes.  It involves
24 condition, it involves authenticity.  There are

Michael Plummer

1  a lot of very strong, compelling overlaps.
2      Q.   Is Mr. Rabin in his work at Artvest
3  continuing to be involved in the sale of wine?
4      A.   He is not.
5      Q.   Can you describe the business of
6  Artvest Partners for me?
7      A.   We advise clients on buying and
8  selling art; we set values for them in buying
9  and selling art; we from time to time write
10 about the art market and the performance of the
11 art market; we broker loans for clients and
12 assist them in setting the values for those
13 loans.
14     We negotiate with the auction
15 houses on behalf of clients for selling their
16 art at auction and setting values for that art.
17 We work with members of the trade and broker
18 deals and sell property directly on behalf of
19 clients.
20     Lastly, we also have an ownership
21 interest in an art fair, a significant ownership
22 interest in an art fair, and we have close
23 relationships with members of the trade who are
24 our clients and keep abreast of market

18 (Pages 69 to 72)

Michael Plummer

1 conditions through those relationships.
2     Q.   So the first thing you mentioned,
3 and I want to make sure I'm understanding it as
4 well, is advising the clients in the buying and
5 self art, correct?
6     A.   Um-hum.
7     Q.   How would it work?  A person would
8 be an owner of art and then would say well, I'm
9 considering selling this art, and they would
10 want to work with someone who knows more about
11 the market and about the value of the market and
12 the way it's working, and then they would come
13 to you as a consultant and an advisor, correct?
14     A.   Um-hum.
15     Q.   Do you charge by the hour or is
16 there a commission?
17     A.   It depends on the situation.  We
18 may charge a fixed fee, we may charge by the
19 hour or we may charge a transaction fee, or we
20 may just charge a combination of both.
21     Q.   So you're like a law firm there
22 then?
23     A.   I would never say that I was like a
24 law firm.

*(Note: line numbering — lines continue as shown)*

---

Michael Plummer

1     Q.   I could understand why.  Now, in
2 terms of the fees, the different types of fees
3 that you're charging, would there be one type of
4 client that you would charge by the hour,
5 another a fixed fee, another something else?
6     A.   I would say it's more defined by
7 the project and the needs of the project; every
8 project is different.
9     Q.   The advice that you give if a
10 client comes to you with a piece of art that
11 they're considering selling, do you first try to
12 determine the value of that art?
13     A.   Um-hum.  Yes, sorry.
14     Q.   Please don't be sorry, I do it all
15 the time.  When I point like that you just give
16 your verbal answer.
17     The issue of setting that value,
18 would you do it in the way you described
19 earlier, by trying to determine what maybe
20 comparables were and then trying to determine
21 what the market situation is for that particular
22 type of art?
23     A.   Yes.  I would say we do sort of a
24 macro and a microeconomic review.  So you look

---

Michael Plummer

1 at the comparables in the market and then you
2 look at market conditions overall and whether
3 it's a good time to sell, a safe time to sell.
4     Whether or not, for instance, it
5 would be best to sell at auction or to sell
6 privately, whether or not the work is good
7 enough to negotiate a guarantee with the auction
8 houses, that sort of thing.
9     Q.   So you could even work with other
10 auction houses as you just mentioned to have the
11 art sold, and you might advise somebody that
12 look, this is the type of art that would best be
13 auctioned or this is the type of art that would
14 best be sold in a different way; is that how it
15 worked?
16     A.   Correct.
17     MR. IRWIN:  Sorry, did you have a
18 question about something?
19     THE WITNESS:  I wanted to ask if I
20 could have a bathroom break.
21     MR. SOTO:  Absolutely.
22     THE VIDEOGRAPHER:  The time is
23 10:42 a.m., and we're going off the record.
24     (Short break taken)

---

Michael Plummer

1     THE VIDEOGRAPHER:  This begins
2 media unit number 2, the time is 10:48 a.m., and
3 we're back on the record.
4 BY MR. SOTO:
5     Q.   Mr. Plummer, one of the questions I
6 meant to ask but forgot to.  In connection with
7 the four loans that you testified about that
8 were made by Christie's while you were there
9 overseeing the financial services department,
10 were any of those loans made to institutions?
11     A.   I don't think so.
12     Q.   So those were loans to private
13 individuals?
14     A.   Yes.
15     Q.   So the second thing you mentioned
16 in connection with the work you do at Artvest
17 was to set values?
18     A.   Um-hum.
19     Q.   Is that any different than what you
20 just testified about in terms of advising
21 clients and determining the value of their art?
22     A.   No, I don't believe so.  I'm not
23 sure I understand your question though.
24     Q.   Let me see if I can break it down.

1     Michael Plummer
2   You mentioned that you advised clients in the
3   buying and selling of art?
4       A.    Right.
5       Q.    The second thing that you listed,
6   at least the transcript said, was you also said
7   values.  I was trying to see, is there a
8   distinction between the way you would set values
9   and advising a client on the buying and selling
10  of art, and what you referred to in your prior
11  testimony generally as setting values?
12      A.    I would say we generally follow the
13  same methodology for advising clients on buying
14  and selling art and for setting values on art
15  when we set values.
16      Q.    That's what you just testified
17  about, correct?
18      A.    Yeah.
19      Q.    You said that you write regarding
20  the performance of art?
21      A.    Yes.
22      Q.    What would that include, would that
23  include published articles?
24      A.    It includes a piece written and
25  published in The Art Newspaper.  We use to issue

1     Michael Plummer
2   periodic market analysis which we sent out to
3   our distribution lists which were widely
4   acclaimed and much sought after, reviewing each
5   season and the outlook for the current season.
6           We did a special analysis of the
7   Asian market.  At one point we did a special
8   analysis of the Chinese market, much of which
9   became the foundation of the front page article
10  of The New York Times by Malcolm Bowley.  We
11  wrote on the Contemporary market; yeah, things
12  like that.
13      Q.    Malcolm Bowley, is that B-o-w-l-y?
14      A.    B-o-w-l-e-y.
15      Q.    Would we be able to find the
16  article that appeared in you called it The Art
17  Newspaper?
18      A.    Yeah, it was an editorial in The
19  Art Newspaper.
20      Q.    It would have your name attached to
21  it?
22      A.    Yes.  It has Jeff's and my name
23  attached to it.
24      Q.    What was that editorial about?
25      A.    It was -- let me make sure I get

1     Michael Plummer
2   the time right.  It was about the state of the
3   art market in I think it was 2009 and the
4   prospects for its recovery based on the
5   financial crisis.
6       Q.    Since that editorial five years ago
7   have you done any other publishing?
8       A.    Well, as I said, those reports that
9   I was talking about were done after that.
10      Q.    The periodic reports?
11      A.    Yeah.
12      Q.    The periodic market analysis that
13  you did, was that published publicly or is it
14  something privately?
15      A.    It was something that we at Artvest
16  published and distributed to our clients.
17      Q.    How often did you publish it?
18      A.    We published them about every six
19  months for an 18-month period; an 18-month to
20  2-year period.
21      Q.    You stopped publishing it now?
22      A.    Yes.
23      Q.    Why did you stop?
24      A.    We stopped because it was an
25  expensive undertaking.  We had many fans who

1     Michael Plummer
2   sought it out, but we found it to be -- we had
3   also made our mark in the industry, we were now
4   being sought out by clients and reporters to
5   express our opinion and we felt we didn't need
6   to continue making an investment; and it was a
7   costly endeavor.
8       Q.    The periodic analysis would include
9   your view of the values, again, of different
10  genres of art --
11      A.    Yes.
12          MR. IRWIN:  You should let him
13  finish his question.
14      Q.    -- and the volatility of different
15  values of art?
16      A.    Yes.
17      Q.    As well as the salability of
18  different genres of art, correct?
19      A.    Yes.  We would even get into
20  analyzing certain artists like Picasso and the
21  growth in value of certain works of art that
22  were coming back up at auction, and some
23  in-depth analysis of individual works.
24      Q.    Did you utilize any of that
25  information in arriving at any of the opinions

20 (Pages 77 to 80)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 21 of 82

Michael Plummer

1
2    that you state in your expert report that you
3    are giving here in connection with the Chapter 9
4    proceedings of Detroit?
5         MR. IRWIN:  It's a little vague,
6    you can answer the question.
7         A.    No.  I would say though that some
8    of the opinions and things that we expressed
9    then would be consistent with things that we
10   have expressed in this report, that certain
11   conditions perhaps remained the same or haven't
12   changed.
13        Q.    If I wanted to determine how
14   accurate your analysis was in connection with
15   these periodic market analyses that you
16   published, where can I obtain copies of them?
17        A.    I have copies.
18 (*r)      MR. SOTO:  Geoff, I would
19   appreciate it if we can get copies of those so
20   that I can look at them in connection with our
21   analysis of this expert.
22        MR. IRWIN:  Send me a note tallying
23   all this stuff up at the end and we'll talk to
24   you then.
25        Q.    So the next thing that is listed

Michael Plummer

1
2    here is that you brokered loans?
3         A.    Yes.
4         Q.    What does that mean?
5         A.    It means that clients come to us
6    looking for art loans and we would take them to
7    a bank or a lending institution to get the loan,
8    and we would match the right lender to the needs
9    of the borrower and the borrower's
10   qualifications.
11        Q.    In connection with your brokering
12   of loans, did you ever broker any loans for an
13   institution?
14        A.    You mean on behalf of an
15   institution as a client?
16        Q.    Yes, on behalf of an institution.
17        A.    No.
18        Q.    So for the most part, when you were
19   brokering loans it's on behalf of individual
20   clients?
21        A.    Yes.
22        Q.    The next thing you listed was set
23   value for loans?
24        A.    Yes.
25        Q.    What did you mean by that?

Michael Plummer

1
2         A.    It means we would establish the
3    value of the art and what the client was likely
4    to get as a loan for that art.  Then sometimes
5    even work with the lender in agreeing to the
6    values the lender was going to put on the art.
7         Q.    The next thing you mentioned was
8    you assisted clients in connection with their
9    work with auction houses, correct?
10        A.    Yes.
11        Q.    What would that entail?
12        A.    That would entail arranging the
13   deal with the auction house in terms of what the
14   financial terms were, what the marketing terms
15   were, and what the value that the auction house
16   was putting on the property.
17        Q.    You would help set the value?
18        A.    We would be engaged in the
19   discussion of the value with the auction house,
20   which would be usually a three-party discussion,
21   the auction house, the client and us.
22        Q.    In connection with -- let me finish
23   the list.  The next thing you said is you sold
24   property directly for clients?
25        A.    Yes.

Michael Plummer

1
2         Q.    What does that mean?
3         A.    Well, I would say directly we would
4    sell property, not so much that we would sell it
5    ourselves but we would sell -- instead of
6    selling through auction we would sell it through
7    a dealer.
8         Q.    So that would be a situation where
9    a client came to you, you felt it was best not
10   to go through an auction with this particular
11   client, but to go through a dealer directly?
12        A.    Yes.
13        Q.    You mentioned that Artvest has an
14   ownership interest in an art fair, correct?
15        A.    Correct.
16        Q.    What is that art fair?
17        A.    It's called Spring Masters New
18   York.
19        Q.    Where is it?
20        A.    It is held in May at the Park
21   Avenue Armory.
22        Q.    In connection with your ownership
23   of that interest in the art fair, do you perform
24   any appraisal services of any type in connection
25   with that work?

Michael Plummer

1
2      A.    No, in that capacity we do none.
3  We do have nearly weekly conversations with
4  dealers who are our clients about the state of
5  the art market and the state of their
6  businesses, so it's an important resource for
7  information.
8      Q.    So having an interest in the art
9  fair enables you to maintain contact with a
10  number of dealers, and a number of people who
11  will give you information that they have about
12  the market and about various genres of art,
13  correct?
14      A.    Or confirm information that we
15  already have.
16      Q.    So it helps you to keep up to
17  breast?
18      A.    Exactly.
19      Q.    That's what you meant when you said
20  that, to keep up to breast with market
21  conditions?
22      A.    Right.
23      Q.    In connection with the work that
24  you have described of Artvest for example, let's
25  just take the first one, advising clients.

Michael Plummer

1
2      Does Artvest ever hire or retain
3  the services of an appraiser in connection with
4  its work with its clients when it's advising
5  clients regarding buying and selling?
6      A.    We hired appraisers to work on the
7  DIA project.
8      Q.    Is that the only project that you
9  can recall that you hired appraisers for?
10      A.    I believe so.
11      Q.    Who were you retained by in
12  connection with your work on the DIA project?
13      A.    By Cravath and Jones Day.
14      Q.    Do you know who they represented in
15  connection with that project?
16      A.    Yes.
17      Q.    Who is that?
18      A.    Jones Day for the City and Cravath
19  for the DIA.
20      Q.    So ultimately your work was for the
21  City, and you were hired by Mr. Irwin's firm;
22  and also by the DIA you were hired by
23  Mr. Levin's firm?
24      A.    Correct.
25      Q.    In connection with your work under

Michael Plummer

1
2  Artvest, or as co-owner of Artvest, do you ever
3  advise clients on alternate forms of monetizing
4  art separate and apart from sales?
5      A.    We have advised clients on art
6  loans, which is a type of liquidation other than
7  selling.  We have never been hired to, but we
8  were engaged -- we were approached about setting
9  up a system for art loans for a fee, in terms of
10  lending works of art, but we found that to be
11  a -- not a viable option to pursue.
12      Q.    So I understand it.  The
13  distinction you're making between art loans that
14  you've been advised on, that you testified about
15  already, and art loans for a fee; what's the
16  difference?
17      A.    Well, I mean lending a work of art
18  to someone to hang on their wall; renting a work
19  of art is what I mean.
20      Q.    What has your experience been in
21  connection with, as you put it, renting a work
22  of art?
23      A.    As I said, we've been approached
24  more than once about this and we have declined
25  to pursue that because we feel it's not a viable

Michael Plummer

1
2  line of business or option.
3      Q.    It's not viable because it's
4  difficult to get a fee for it?
5      A.    There's really no audience for it.
6      Q.    The times that you were approached
7  for renting a work of art, was that by
8  individuals?
9      A.    It was by individuals who had
10  collections, who were looking to do it as a tax
11  strategy.
12      Q.    Other than those two forms of
13  monetization or alternatives to sale, has
14  Artvest worked with any other alternatives?
15      A.    Not that I can recall.
16      Q.    So you spent 16 years at Sotheby's,
17  correct?
18      A.    Correct.
19      Q.    And two years at Christie's,
20  correct?
21      A.    Correct.
22      Q.    During that time did you personally
23  conduct any appraisals?
24      A.    No.
25      Q.    During that time did you obtain any

22 (Pages 85 to 88)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 23 of 82

Michael Plummer

1 Michael Plummer
2 training in conducting an appraisal?
3     A.    No.
4     Q.    During that time did you
5 participate in auctioning artworks?
6     A.    How do you mean that question?
7     Q.    Actually in its broadest sense.
8 Did you participate in any way or were you
9 involved in any way of the auctioning of
10 artworks?
11     A.    Well, as a business manager I was
12 involved in the department's creation of a sale
13 and managing that sale and putting that sale on;
14 so yes, if you mean it in the broadest sense.
15     Q.    That would be in connection with
16 your work in marketing, correct, that you headed
17 the marketing department for Sotheby's and you
18 would have to know something about the auction
19 that was going to be held in order to market it,
20 correct?
21     A.    Well, that too; but I was referring
22 to my experience before that as a business
23 manager where I actually sat in the expert
24 department and worked with them as they were
25 putting the sale together for auction.

Michael Plummer

1 Michael Plummer
2     Q.    So that would have been your
3 initial work at Sotheby's, correct?
4     A.    That would have been my second job
5 at Sotheby's.
6     Q.    As the business manager, I see.
7 What was your first job at Sotheby's?
8     A.    Account manager.
9     Q.    Account manager, okay.  In
10 connection with your work as a business
11 manager -- well, I think we got that on
12 testimony already so I won't go over it again.
13          Other than that work that you just
14 described, your work as a business manager, and
15 also the marketing work that you described; was
16 there any other work that you did, again in its
17 broadest sense, that would put you in
18 participation with the auctioning of artworks?
19     A.    The business manager job, yes, and
20 the marketing position; and then I left
21 Sotheby's after that.  Then at Christie's I was
22 not involved in the auctioning of works of art.
23     Q.    The experience you did have at
24 Sotheby's that you just referred to, did it ever
25 involve the auctioning of an entire collection

Michael Plummer

1 Michael Plummer
2 of a museum, for example?
3     A.    No, I don't believe that such an
4 event has ever happened.
5     Q.    Did it ever involve the auctioning
6 of a portion of a collection say the size of the
7 1,700 works of art that Christie's appraised for
8 the DIA?
9     A.    There were various large
10 collections, I can't remember now what they
11 were, but some very large ones that came
12 through.  For example, I was involved in the
13 Jackie Onassis sale.
14     Q.    How many works of art did that
15 involve?
16     A.    I can't remember, but it was a
17 large collection and I wrote the marketing plan
18 for that and also designed the catalog cover for
19 it.
20     Q.    Have you ever prior to this
21 occasion where you have been retained as an
22 expert, have you ever been retained as an expert
23 witness in any other case?
24     A.    No.
25     Q.    Other than the expert report that

Michael Plummer

1 Michael Plummer
2 you prepared in connection with this Chapter 9
3 proceeding that we're here on today, have you
4 ever prepared an expert report for any other
5 case?
6     A.    No.
7     Q.    Other than the testimony you're
8 giving here today, have you ever given testimony
9 or proposed to give testimony as an expert in
10 any other case?
11     A.    No.  I was engaged about the time
12 of this engagement to be an expert witness, but
13 that has not taken place yet.
14     Q.    That's in another litigation?
15     A.    Another litigation unrelated to
16 this.
17     Q.    What is the subject matter of that
18 case?
19     A.    It's a tax-related estate issue.
20     Q.    And you haven't prepared a report
21 in that case yet?
22     A.    Nothing has happened yet.
23     Q.    In connection with this matter have
24 you been told that you will be requested to act
25 as a witness in connection with the planned

Michael Plummer

1               Michael Plummer
2  confirmation trial that's currently set to take
3  place in Detroit, I believe it's starting now
4  around August 21st?
5     A.   Yes.
6     Q.   We'll go through that in a
7  different fashion to see if we can get it
8  quicker.
9         Who have you spoken to regarding
10  your potential testimony in this matter, this
11  Chapter 9 proceeding?
12     A.   What do you mean by spoken to about
13  my potential testimony?
14     Q.   Who have you spoken to about the
15  fact that you're acting as an expert, or hoping
16  to act as an expert, and that you might be
17  testifying in this matter?
18     A.   Well, I guess numerous people
19  because it's a matter of public record now and
20  I've been asked about it, but I don't comment on
21  it.
22     Q.   So the numerous people who have
23  approached you, who have you spoken to?
24     A.   Well, they have asked me questions
25  and I don't talk about it, I just refer them to

Michael Plummer

1               Michael Plummer
2  my report.
3     Q.   You're talking about like
4  journalists or somebody who are calling you up
5  and asking you about --
6     A.   Or friends, family, that sort of
7  thing.
8     Q.   So you've certainly spoken with
9  Mr. Irwin, correct?
10     A.   Yes.
11     Q.   And with counsel in his office?
12     A.   Yes.
13     Q.   With Mr. Levin and maybe his
14  colleagues?
15     A.   Correct.
16     Q.   Have you spoken with Mr. O'Reilly?
17     A.   Yes.
18     Q.   Have you spoken with anyone at the
19  DIA?
20     A.   No.
21     Q.   Other than the counsel that I've
22  already mentioned, the attorneys that I've
23  already mentioned; have you spoken with anybody
24  else?
25     A.   No.

Michael Plummer

1               Michael Plummer
2     Q.   Can you tell me when you were
3  retained as an expert witness?
4     A.   It was around May 20th something.
5     Q.   Of 2014?
6     A.   2014, yeah.
7     Q.   Who initially contacted you
8  regarding your retention as an expert?
9     A.   Rich Levin.
10     Q.   Have you had previous dealings with
11  Mr. Levin?
12     A.   Well, we had spoken about this at
13  some period before that as a possibility for it,
14  but nothing had materialized until May.
15     Q.   What was the nature of your
16  assignment as explained to you by either the
17  City or the DIA?
18     A.   It's listed in my report, there are
19  four main bullets.  I wouldn't want to do it
20  from memory since it's actually in the report.
21     Q.   You can actually have a copy of
22  that report.  I think it's actually going to be
23  our next exhibit so why don't we go ahead and
24  mark it.  We give nothing but open book exams
25  here.

Michael Plummer

1               Michael Plummer
2     A.   That's good.  While we're doing
3  that may I have another quick break?
4     Q.   Absolutely.
5         THE VIDEOGRAPHER:  The time is
6  11:14 a.m., and we're going off the record.
7         (Off the record)
8         (Plummer Exhibit 2, Expert Witness
9  Report of Michael Plummer, marked for
10  identification.)
11         THE VIDEOGRAPHER:  The time is
12  11:26 a.m., and we're back on the record.
13  BY MR. SOTO:
14     Q.   Mr. Plummer, I have handed you what
15  we have marked as Exhibit 2 to this deposition.
16     A.   Yes.
17     Q.   Are you familiar with that?
18     A.   Yes, I am.
19     Q.   Take a moment to review it.  I will
20  ask you is this the report that you have
21  submitted as an expert witness in the City of
22  Detroit Chapter 9 proceeding?
23     A.   Yes, it is.
24     Q.   Now, we were just about to ask
25  about it and I told you it would be open book.

Michael Plummer

1                   Michael Plummer
2 You mentioned -- when I asked you what the
3 nature of your assignment was as it was
4 explained to you, you were referring to
5 something in your report, what was that?
6    A.    That was the list on page 4, number
7 2, that counsel had asked me to form an opinion
8 with respect to the following:
9           "The indicative value of the works
10 in the DIA collection.  The feasibility and
11 likely effects on the market and value
12 realization of a sale of the DIA collection
13 under a variety of market and sale conditions.
14 Creditor-proposed sales of the DIA's collection,
15 including analysis of certain third-party
16 indications of interest.
17           "Monetization alternatives
18 described in Christie's report to the City of
19 Detroit, and infirmities in any rebuttal expert
20 reports, which I will address in any
21 supplemental report as necessary."
22    Q.    What is your compensation
23 arrangement for providing testimony of those
24 topics?
25    A.    It was $112,500 for the report and

1                   Michael Plummer
2 6,000 per day for testimony and deposition, or
3 $3,500 for a half day.
4    Q.    We're not going to have to worry
5 about the half day, so we'll just keep going.
6 I'll try to get it done today, I think I'm under
7 a 17-hour limit again.
8           Do you know of anyone else from
9 Artvest who's going to be asked to testify?
10    A.    No.
11    Q.    Let me ask you then to look at page
12 48 of Exhibit 2.  It starts at the top of the
13 page with "Conclusion," do you see that?
14    A.    Um-hum.
15    Q.    So we're on the same page.  Is that
16 your signature at the bottom of that page?
17    A.    It is.
18    Q.    Can you tell me how long it took
19 you to put together this expert report.  You
20 said you were retained in May, when did you
21 start working on the report?
22    A.    We probably started doing
23 preparatory work in I would say the middle of
24 May.
25    Q.    From the middle of May through

1                   Michael Plummer
2 July 8th when this report is dated, is that the
3 amount of time it took?
4    A.    Yes.
5    Q.    You completed it just at the nick
6 of time and handed it in on July 8th?
7    A.    Yeah, we handed it in on July 8th
8 and we worked pretty much around the clock to
9 get it done.
10    Q.    Right up to the deadline?
11    A.    Yeah.
12    Q.    So on page 48, paragraph 79 A, you
13 state, I'll read it for you slowly:
14           "The indicative value of the works
15 in the DIA Collection at a gross valuation,
16 without any deduction for the value of the works
17 that are ultimately determined not to be subject
18 to sale, whether for legal or other reasons, and
19 before the application of discount factors
20 related to general market conditions or issues
21 specific to the DIA collection as a mid estimate
22 of $3,684,466,069 and a low estimate of
23 $2,760,978,432."
24           Did I read that correctly?
25    A.    Yes.

1                   Michael Plummer
2    Q.    What was the high estimate?
3    A.    The high estimate is in the report.
4 The high estimate was $4,607,953,704 on page 19
5 of the report.
6    Q.    Page 19?
7    A.    Page 19.
8    Q.    Let me turn there and catch up to
9 you.  So under Table 2, under "Total DIA
10 Collection" at the bottom, the column high
11 estimate, the final number going down the column
12 is $4,607,953,704.  That's the highest of it,
13 correct?
14    A.    Correct.
15    Q.    Have you done all the required work
16 that you think was required to reach the
17 opinions you reached in this case?
18    A.    Yes.
19    Q.    Or, asked another way, you have no
20 more work you think you need to do in order to
21 support these opinions, correct?
22    A.    Correct.
23    Q.    Is there any work that you wanted
24 to do, but you were unable to do before
25 rendering these opinions?

Michael Plummer

1
2      A.    No.
3      Q.    On page 48, in paragraph 79 B, you
4   state:
5            "The feasibility and likely effects
6   of and on the market and value realization of a
7   sale of the DIA collection under a variety of
8   market and sale conditions:  After the
9   application of various discount factors related
10  to these conditions, the range of value the DIA
11  collection will sell for, without any deduction
12  for the value of the works that are ultimately
13  determined not to be subject to sale, will be
14  between $1.1 billion for the present value of an
15  orderly liquidation after allowing" is that of?
16     A.    Of.
17     Q.    "Of an orderly liquidation after
18  allowing for the likely delay of litigation to
19  $1.8 billion in the highest value scenario, with
20  no litigation and an orderly selling plan."  Do
21  you see that?
22     A.    Yes.
23     Q.    Have you done all the work required
24  to reach this opinion in this case?
25     A.    Yes.

Michael Plummer

1
2      Q.    Is there any work that remains
3   undone or that you think is necessary to support
4   that opinion?
5      A.    No.
6      Q.    On page 48, this time paragraph 79
7   C, we'll take a look at that.  You state, and I
8   quote:
9            "My review of the practicality and
10  reasonableness of the monetization alternatives
11  described in Christie's preliminary report to
12  the City of Detroit:  They do not have a
13  reasonable expectation of either raising
14  meaningful money or exceeding even the $100
15  million the DIA has already committed as its
16  contribution to the Grand Bargain."  Do you see
17  that?
18     A.    Yes.
19     Q.    Again, have you done all the work
20  required, as far as you are concerned, to reach
21  this opinion in this case?
22     A.    Yes.
23     Q.    Is there any other work that you
24  think you would need to do in order to support
25  that opinion?

Michael Plummer

1
2      A.    I don't believe so.
3      Q.    The same page, 48 this time,
4   paragraph 79 D.  Do you see it there?
5      A.    Yes.
6      Q.    You state, and I'm quoting you:
7            "Creditor-proposed sales of the
8   DIA's collection, including analysis of certain
9   third-party indications of interest:  They are
10  either not plausible or not likely to net the
11  dollar values quoted."
12           Do you see that?
13     A.    Yes.
14     Q.    Have you done all the work
15  required, at least that you think is required,
16  to reach this opinion in this case?
17     A.    Yes.
18     Q.    Is there any other work that
19  remains undone or that you think is necessary to
20  support that opinion?
21     A.    No.
22     Q.    Let's begin by discussing the
23  appraisal process that you went through in order
24  to arrive at these opinions.
25           When did your team begin appraising

Michael Plummer

1
2   the art at the DIA that is the subject of this
3   expert opinion?
4      A.    We began pulling comparables in
5   May, so the process began in May.
6      Q.    How long did it take to complete
7   the appraisal?
8      A.    Up until the week before, the first
9   week -- up through the first week of July.
10           Wait.  Excuse me, you referred to
11  it as an appraisal, we referred to it as a
12  valuation.
13     Q.    Let's go back and ask the first
14  question again that I asked when you began
15  appraising the art; that would still be in May?
16     A.    We began evaluating the collection
17  in May.
18     Q.    You don't refer to it as an
19  appraisal?
20     A.    No.
21     Q.    Why not?
22     A.    Because we consider it an
23  evaluation of the value of the collection.
24     Q.    How do you distinguish that from an
25  appraisal of the value of the collection?

26 (Pages 101 to 104)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 27 of 82

Michael Plummer

1
2    A.    Because we consider factors that
3  are typically not considered in an appraisal,
4  such as market conditions, which we think are
5  critical to setting a value for this collection.
6    Q.    Will you tell the Court what
7  factors you are considering in an evaluation
8  that you believe are not considered in an
9  appraisal?
10    A.    We are considering the impact of
11  unsold rates.  We are considering the
12  overheatedness of the Contemporary market.  We
13  are considering the malaise, for lack of a
14  better word, in the American Art sector.  We are
15  considering the issues in the Old Masters sector
16  which is not a malaise, it's a cooler sector.
17        We are considering the differences
18  between the activity in the Impressionist and
19  Modern sector versus the Contemporary sector.
20  We're also considering the impact of litigation
21  and the delays based on other examples of that
22  litigation in terms of liquidating the property,
23  because it can't be sold with clear title.
24  We're considering the impact of taint which we
25  consider to be significant, most especially in

Michael Plummer

1
2  the American sector.
3        We think all of these are critical
4  considerations in establishing a value for the
5  liquidation, if there were to be a liquidation,
6  of the DIA collection.
7    Q.    So these are all factors that you
8  believe you considered that would not be
9  considered in an appraisal of the art, correct?
10    A.    Correct.
11    Q.    So unsold rates, what does that
12  mean?
13    A.    Unsold rate was what I was
14  referring to earlier as BI property, which is
15  property that does not sell.  In certain of the
16  sectors where, and particularly Old Masters
17  where the DIA has a very high concentration of
18  property, our subject are very high BI rates,
19  unsold rates.
20    Q.    That's what you were referring to
21  earlier in terms of unsold rates?
22    A.    Yes.
23    Q.    The next factor you mentioned was
24  overheatedness in contemporary art?
25    A.    Yes.

Michael Plummer

1
2    Q.    What are you referring to there?
3    A.    That market has become very hot and
4  is showing -- a number of people active in the
5  market such as myself are beginning to have
6  concerns about the stability of this market when
7  it is so heated as it is, and given its
8  volatility and the fact that it has crashed in
9  the past, as recently as 2008.
10    Q.    So in connection with your concern
11  or application of factors of unsold rates, did
12  you have a particular source that you were
13  referring to that you utilized in determining
14  how that unsold rate factor would apply to the
15  collection that you analyzed at the DIA?
16    A.    We used publicly available
17  information based on Sotheby's and Christie's
18  sales, on their unsold rates.
19    Q.    Anything else?
20    A.    No.
21    Q.    In connection with the
22  overheatedness, which you particularly mentioned
23  the Contemporary Art sector?
24    A.    Right.
25    Q.    What did you rely on in coming to

Michael Plummer

1
2  those conclusions and making that analysis?
3    A.    Our own internal analysis over the
4  last several years of --
5        MR. O'REILLY:  Why don't we break
6  for a moment?
7        MR. SOTO:  I don't need to.
8  They're going to finish that and they will be
9  out of here in 5 minutes.
10        MR. O'REILLY:  That's fine, you're
11  going to have a lot of noise on the video.  If
12  you're okay with that.
13  BY MR. SOTO:
14    Q.    It's up to you, are you being
15  distracted or are you okay?
16    A.    Okay.
17    Q.    Let's go.
18    A.    We used our own internal data
19  generally comparing and our own watching of the
20  sales which we do, sales results on a regular
21  basis, and in particular comparing how sales are
22  doing, auction sales are doing relative to their
23  estimates, and the sell-through rates or unsold
24  rates in that area as well.
25        As well as follow various press

27 (Pages 105 to 108)

```
 1            Michael Plummer
 2    accounts and anecdotal accounts that we have and
 3    discussions with dealers that represent the
 4    trade and their art specialties.
 5        Q.    The overheatedness unsold rates,
 6    would those be the same kinds of publicly
 7    available unsold information that you referred
 8    to earlier?
 9        A.    Yes.
10        Q.    So it would be the publicly
11    available unsold information listed on the
12    Contemporary Art sector, correct?
13        A.    Yes.
14        Q.    What about the malaise in American
15    Art, what are you referring to there?
16        A.    I'm referring to the fact that the
17    American Art sector has not recovered from the
18    2008 crash, it's at its highs in the spring of
19    2008. Let me add also that in the American Art
20    sector, as well as in the other sectors, we look
21    at art indices as well.
22        Q.    Anything else?
23        A.    At the moment I can't think of
24    anything else.
25        MR. SOTO:  They're going to bring
```

```
 1            Michael Plummer
 2    the food in, let's take a break.
 3        THE VIDEOGRAPHER:  The time is
 4    11:45 a.m., we're going off the record.
 5        (Off the record)
 6        THE VIDEOGRAPHER:  The time is
 7    11:52 a.m., and we're back on the record.
 8    BY MR. SOTO:
 9        Q.    Thank you for your patience here.
10    I think you had discussed the third factor that
11    you mentioned that you took into account which
12    was the malaise and American Art, correct?
13        A.    Correct.
14        Q.    Anything more on that issue?
15        A.    Yes, there's one more thing is that
16    in all of these sectors we have business
17    dealings and clients and firsthand experience of
18    sales, sales that are easy, sales that are hard,
19    so that's also important in our reading of the
20    market.
21        Q.    The next thing you mentioned,
22    factor 4, was the issues in the Old Masters
23    sector which you mentioned the DIA has a large
24    collection of, is that correct?
25        A.    Yes.
```

```
 1            Michael Plummer
 2        Q.    What did you mean by that?
 3        A.    By issues I meant that there is --
 4    that that market is losing collectors, that it
 5    has a high unsold rate and it has a problem with
 6    supply.
 7        Q.    What is that problem?
 8        A.    It's had an uneven supply of good
 9    property over the years, and there is a lot of
10    mediocre material in the market. That, in
11    addition to the fact that collectors are
12    defecting to -- and this affects the American
13    market as well and to some extent the
14    Impressionist and Modern market, collectors are
15    defecting en mass to the Contemporary sectors.
16        Or, in other words, young
17    collectors are going into Contemporary. Very
18    few young collectors are moving into these other
19    sectors, so they're dying out.
20        Q.    So when you say "uneven supply"
21    that would mean not enough or too many?
22        A.    It means that it's not enough
23    quality. But even if you were to have good
24    quality you still have the problem of not enough
25    collectors, so it's a two-sided problem.
```

```
 1            Michael Plummer
 2        Q.    So that even if the work of the Old
 3    Masters that is part of the collection at the
 4    DIA is good quality, your point is --
 5        A.    There aren't enough collectors out
 6    there to absorb that volume of property.
 7        Q.    The next one you mentioned was
 8    different Impressionist -- the differences
 9    between the Impressionist and Modern sector
10    versus the Contemporary sector?
11        A.    Correct.
12        Q.    What did you mean by that?
13        A.    I have some examples in my report.
14    The Impressionist sector, there have been good
15    quality paintings that have come on the market
16    that have disappointed in their results.
17        Whereas, if the same caliber of
18    work had come on the market in the Post War --
19    or when the same caliber of art has come on the
20    market in the Post War sector it does far better
21    and it sometimes even exceeds the estimates.
22    Whereas, the others tend to fall short of the
23    estimates.
24        Q.    When you say Contemporary you also
25    used the phrase Post War, do you mean the same
```

28 (Pages 109 to 112)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 29 of 82

Michael Plummer

1  in both?
2      A.   They are often used
3  interchangeably.  Sotheby's uses only the term
4  Contemporary, Christie's uses Post War and
5  Contemporary.  I've fallen into the habit of
6  referring to them somewhat interchangeably
7  because I've worked at both houses.
8      Q.   In connection with your analysis of
9  the malaise of the American Art that you
10 referred to earlier, I believe you mentioned all
11 of the factors that you relied on, but you
12 didn't with respect to issues on Old Masters.
13         Is there anything that you relied
14 on for your analysis?
15     A.   The same for all the others.  I
16 relied on the same factors for all of the
17 sectors.
18     Q.   Those would be your knowledge
19 through conversations with people in the art
20 industry, correct?
21     A.   Right.
22     Q.   Would they also be your knowledge
23 of comparable sales?
24     A.   Yes.

Michael Plummer

1      Q.   Would it also be your knowledge of
2  more recent sales that you get through private
3  knowledge?
4      A.   Yes.  Indices, auctions performance
5  against their estimates; all of the things that
6  I've listed previously for all the other
7  sectors.
8      Q.   The indices and the auction
9  performance, those are publicly available
10 information, correct?
11     A.   Well, the indices you have to pay
12 to use, but if you paid money you can use them.
13 So I guess in essence they are the same.
14     Q.   The same with respect to the public
15 information regarding the results of auctions?
16     A.   Yes.  However, we compile a lot of
17 information manually and have to because there
18 is a manner in which the auction houses report
19 their information which distorts it.  So we
20 often compile and manually arrange it ourselves
21 so that we can decipher it more accurately than
22 how the auction houses report it.
23     Q.   How do the auction houses report it
24 that distorts it?

Michael Plummer

1      A.   Well, this is an issue we've gone
2  on record with the auction houses with in the
3  past.  Beginning in the downturn of the '90s,
4  Sotheby's took a policy and Christie's soon
5  followed, that because the sales results were
6  looking anemic they decided to start posting the
7  sales results with the buyer's premium and
8  comparing them to the estimates, low and high
9  estimates for the sale which don't include
10 buyer's premium.  So in essence they're goosing
11 up their results.
12         So when we do our analysis we go
13 back and manually extract the buyer's premium
14 when making comparisons against low and high
15 estimates so that we gather more accurate
16 results.
17         There are many sales that in the
18 press look like they've come in between the low
19 and high estimates, when in reality they will
20 have fallen short of the low estimate because
21 that buyer's premium is creating this
22 distortion.
23     Q.   What is the buyer's premium?  I had
24 about an hour conversation about this in our

Michael Plummer

1  last deposition and I still don't understand it.
2      A.   The buyer's premium, I will try to
3  make it straightforward and simple.  The buyer's
4  premium is a commission added on by the auction
5  house, and it's a tiered commission, and they've
6  now muddled with it so much that I don't have it
7  as part of my memory anymore.
8          Up to X number it's say 20 or
9  25 percent; up to X number it's the next
10 increment, it drops down to the next thing like
11 15 percent or something, and then after that
12 over 2 million or some such number it drops down
13 to I believe 12 percent.
14         So it can make a differential
15 depending on the value of the works of somewhere
16 around an average of 13 percent to up as high as
17 25 percent in the return.
18     Q.   In a real-life hypothetical example
19 using round numbers, let's assume there was a
20 piece of art or even a collection of art that
21 was valued at $100 million and it was sold at
22 auction, and assuming there was some tiered
23 commission; there would be commissions as you
24 had described for different tiers.  That

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 30 of 82

Michael Plummer

1  commission is paid by whom?
2  A.   It's paid by the buyer as part of
3  the purchase price.
4  Q.   So if the purchase price was 100
5  million, and just for rounding numbers that are
6  simple, and there was going to be a 10 percent
7  total commission would the buyer have to pay 110
8  million?
9  A.   Correct.
10  Q.   So your point is that the auction
11  houses started including that additional 10
12  million as part of the sale of the value of the
13  art, correct?
14  A.   Which is legitimate, except that
15  when they compare it to the pre-sale estimate
16  which doesn't include it that's buyer's premium.
17  So to use your example, if we said that the
18  estimate was 80 to, let's say the estimate was
19  100 to 120 million and it sold for 100 million
20  and they put on the buyer's premium, it really
21  sold at the low estimate, but once they put the
22  buyer's premium on they would say it sold in
23  between the low and high estimate, which is a
24  distortion of the health of the market.

Michael Plummer

1  Q.   Understood, and actually very
2  clear, thank you.  Just so the Court is aware of
3  the process.  Part of the process in an auction,
4  and using our hypothetical round numbers, would
5  be the buyer's premium, the buyer pays that.
6  So then there is this hundred
7  million.  From that hundred million, would that
8  go to the seller or would there be other costs
9  deducted before it goes back to the seller?
10  A.   If it were indeed a $100 million
11  item nothing would go back to the house from the
12  seller because they would have a fantastic deal.
13  But if it were an average item of lower value
14  then there would be a seller's commission
15  charged as well, again in the 20 percent range
16  or higher.
17  Q.   So the auction house is getting a
18  buyer's premium commission from the buyers and
19  at the same time would be getting a seller's
20  commission from the seller?
21  A.   Right.
22  Q.   That could be the equivalent of the
23  buyer's commission?
24  A.   It could be.

Michael Plummer

1  Q.   Is it typical in the industry that
2  it is?
3  A.   It depends on the sector, the
4  desirability of the property, the clout of the
5  client, the power of the client's negotiator or
6  agent.  There are instances when in highly
7  desirable situations, and we've written about
8  this, a seller gets back part of the buyer's
9  premium as a rebate.
10  Q.   So that the seller's commission is
11  lower then, or at least it gets a rebate on
12  that, correct?
13  A.   Well, no.  I'm saying that the
14  seller's commission might be zero or they might
15  get part of the buyer's premium.
16  Q.   As well?
17  A.   As well.
18  Q.   So it would increase the ultimate
19  return on the sale?
20  A.   Correct.
21  Q.   You mentioned the impact of the
22  litigation as another factor you took into
23  account?
24  A.   Yes.

Michael Plummer

1  Q.   What resources did you use as the
2  basis for that opinion?
3  A.   I used research into various other
4  examples that are mentioned in my report.  One
5  of the most relevant cases was the Fisk
6  Stieglitz collection, which was tied up in Court
7  for five years by the Attorney General of the
8  state of Tennessee.
9  Q.   Anything else?
10  A.   There were some other examples I
11  use in the report.  I can't remember right now
12  what they are, but they're outlined in the
13  report.
14  Q.   Other than the examples in the
15  report, was there anything else that you relied
16  on?
17  A.   I don't believe so, other than what
18  is in the report and what materials are
19  referenced in the report.
20  Q.   Have you had personal experience in
21  being part of a sale of a collection of art that
22  was held up in litigation?
23  A.   No, but I am familiar with the
24  importance of clear title in the selling of art

Michael Plummer

1  
2  at auction and the problems that result. I am  
3  very sensitive to that issue and aware of its  
4  relevance.  
5       Q.    In connection with applying this  
6  factor, did you do any research regarding the  
7  title of the art at the DIA?  
8       A.    It was in the data that was given  
9  to me by the DIA which is outlined in the  
10  report, the donors were listed with the items.  
11       Q.    In addition to the donors being  
12  listed, was there any information regarding the  
13  transferability and alienability of the art?  
14       A.    I did not research that.  
15       Q.    So in connection with your opinion  
16  regarding the impact of that litigation, you  
17  were assuming, for purposes of this opinion,  
18  that there might be some concern regarding the  
19  alienation of this art or the transferability of  
20  this art, and as such you're applying that  
21  factor, correct?  
22       A.    I would say that it's more than an  
23  assumption. I am fairly, certain based on my  
24  experience in the art market, that there will be  
25  litigation to stop the sale of art that has been  

Michael Plummer

1  
2  gifted to the museum.  
3       I should add in addition, I also in  
4  the course of researching this report did speak  
5  to various museum professionals on other matters  
6  such as the art lending and that sort of thing,  
7  and such issues came up in those conversations  
8  as well.  
9       Q.    When you say the museum  
10  professionals, you're talking about  
11  professionals at the DIA?  
12       A.    No, at other museums.  
13       Q.    In connection with your certainty  
14  that there would be litigation regarding the  
15  transfer of any of this art, did you talk to  
16  anybody at the DIA?  
17       A.    No.  
18       Q.    The next thing you mentioned was  
19  the impact of taint in the American sector.  
20  What does that mean?  
21       A.    I think that the sale of -- and I  
22  address this in several locations in my report,  
23  the sale of the collection of the DIA will be  
24  highly criticized and create an aura around  
25  works from the DIA and their sale that will  

Michael Plummer

1  
2  lower their value and/or lower their ability to  
3  be sold, and that a number of collectors will  
4  boycott sales.  
5       There's a practical matter that  
6  most collectors in America or around the world,  
7  but particularly in America, are on boards of  
8  directors -- are on the boards of other  
9  institutions, and it is hard to imagine many of  
10  those people bidding publicly or having agents  
11  bid on their behalf for works of art from the  
12  DIA, and not then have backlash within the  
13  institutions which they are supporting.  
14       Q.    Did you do any formal analysis in  
15  the form of any kind of a survey or attempt to  
16  do something of a -- some type of analysis of a  
17  review of various institutions or collectors to  
18  come to this conclusion?  
19       A.    No, I did not do a survey; but I  
20  certainly had many collectors and others who  
21  serve as collectors expressing those comments  
22  and those feelings.  
23       Q.    How many anecdotal expressions  
24  would you --  
25       A.    Well --  

Michael Plummer

1  
2       Q.    Excuse me. How many anecdotal  
3  expressions like that would you say you  
4  obtained?  
5       A.    20 to 30.  
6       Q.    Go on, you were going to say  
7  something.  
8       A.    What was I going to say.  
9       MR. IRWIN:  That's why you started  
10  your question.  
11       MR. SOTO:  I did not.  
12       MR. IRWIN:  You were talking about  
13  conversations you had.  
14       A.    Oh, yes. Also, one of my  
15  consulting specialists worked on the Larry  
16  Salander bankruptcy and she is responsible for  
17  liquidating that collection. Her own experience  
18  with the Larry Salander property is that it has  
19  a taint about it, and particularly around the  
20  high end it's difficult to sell.  
21       There is a general problem in the  
22  art market when there is -- when something sort  
23  of has a bad aura around, it can actually affect  
24  price and salability.  
25       Q.    I'm not familiar with the Larry

Michael Plummer

1 Michael Plummer
2 Salander situation that you're referring to.
3 What was the bad aura there?
4 A. Larry Salander is a bankruptcy case
5 of which there is a lot of public information
6 on. He had a large collection of property, I
7 think about 4,000 items, in most of the Old
8 Masters and 19th Century sectors.
9 Larry had enormous amounts of
10 property on consignment and he went bankrupt,
11 and he owed a lot of consigners money and it was
12 a very messy case. He I believe is in jail
13 because of it, there were criminal proceedings
14 against him.
15 Q. You don't expect that anyone in the
16 DIA is going to go to jail in connection with
17 this bankruptcy, do you?
18 A. I was not expecting that.
19 Q. Nobody at the DIA has put their art
20 on consignment as far as you know, have they?
21 A. I don't know.
22 Q. In connection with these seven
23 factors that we've gone through, do you start
24 with a basic appraised value and then apply
25 these seven factors as an additional factor in

1 Michael Plummer
2 what you're referring to as an evaluation
3 instead of an appraisal?
4 A. Could you ask that question again,
5 please?
6 Q. I had asked you if you had done an
7 appraisal and you said no, we did an evaluation?
8 A. Right.
9 Q. You gave me the seven factors as
10 factors that you think are part of an evaluation
11 that are not typically part of an appraisal,
12 right?
13 A. Correct.
14 Q. What I'm asking is -- I understand
15 your view on those seven factors. My next
16 question is do you also do an appraisal to begin
17 to understand the value of a piece of art and
18 then apply these additional factors?
19 A. I want to be careful about
20 terminology here because I think it can trip us
21 up. I created a fair market value by using
22 comparables, which is the industry standard
23 practice, on the -- which is outlined in the
24 report on the top 400 some works of art.
25 Then I combined that with the

1 Michael Plummer
2 Christie's appraisal and then did a calculation
3 to estimate the value of the remainder of the
4 collection, and added those numbers together to
5 come to an indicative value of the collection on
6 which I based the other rest of the analysis.
7 Q. I think that might answer my
8 question indirectly, but let me make sure. So
9 you certainly created, as your report says, what
10 you termed the fair market value analysis of the
11 top 400 works of art, and you did that by
12 looking to see if there were any comparables,
13 correct?
14 A. Right.
15 Q. You were looking for public data
16 that would otherwise tell you something about
17 the value?
18 A. Right.
19 Q. Then after you came to some sense
20 of that value you also then applied these seven
21 factors that you just referred to?
22 A. Yes, but we also looked at the art.
23 We visited the museum and looked at the art
24 which was an important factor.
25 Q. For all 400 pieces?

1 Michael Plummer
2 A. For most of the 400 pieces. There
3 were some that were not available to be seen,
4 but as many as we could.
5 Q. About 390 plus?
6 A. I don't remember the exact number,
7 but a substantial percentage of them.
8 Q. Would it be over half of it?
9 A. Well over half of it.
10 Q. So would it be close to maybe
11 75 percent of it?
12 A. I would say 75 percent is a fair
13 guesstimate.
14 Q. Let's assume you looked at
15 300 pieces of art, you did the comparables; in
16 addition to that you got other publicly
17 available data regarding the value of the art?
18 A. Right.
19 Q. You got publicly available data
20 regarding the market for that art?
21 A. Right.
22 Q. That's the beginning step. You
23 would then apply these additional seven factors
24 if they applied in coming to your valuation?
25 A. On a sector-by-sector basis, yes.

Michael Plummer

1     Q.    And that's why the information that
2  you got on those 400, you could also use the
3  information that Christie's did on its 1,700
4  works of art, correct?  Because it was a fair
5  market value analysis that included comparables
6  and public data, correct?
7     A.    Correct.
8     Q.    And you relied on that data?
9     A.    Yes, I did.
10    Q.    And then having taken Christie's
11 1,700 pieces of art and your additional 400
12 pieces, or was it an additional 400 or was it
13 part and parcel of the same?
14    A.    There were some -- we didn't do the
15 same pieces Christie's did, we did not overlap
16 with them.
17    Q.    For example, Christie's did
18 Bruegel?
19    A.    We did not do the Bruegel.
20    Q.    The next thing you did was you took
21 that body of information, 1,700 or 2,100 works
22 of art, and you extrapolate in some way to come
23 to an estimate of the remaining 61,000 pieces of
24 art, correct?

Michael Plummer

1     A.    Correct.  But there's an important
2  bit of data that we haven't discussed which is
3  of the universe of works that Christie's looked
4  at, about a third of it had no value.  That's an
5  important data point in extrapolating any kind
6  of value on the collection, that there is a
7  significant part of it that doesn't have value.
8     Q.    Let's again make sure we're
9  comparing apples and apples here.  The 1,700
10 that it did appraise had value?
11    A.    Um-hum.
12    Q.    It was asked to appraise some
13 additional art that it determined with the
14 assistance of the DIA had no value?
15        MR. O'REILLY:  Objection to form.
16    A.    No.  I would say that Christie's
17 was given a list of City of Detroit property
18 which was about 3,000 items.  Christie's
19 determined that of that list about a third of it
20 had no value.
21    Q.    So about a third of it had no value
22 which left you with 1,700 or so, correct?
23    A.    Correct.  The fact that a third of
24 it had no value was irrelevant to extrapolate on

Michael Plummer

1  the rest of the collection that a large part of
2  it had no value.
3     Q.    So you assumed in your estimates
4  that about a third of the remaining 61,000 had
5  no value?
6     A.    We extrapolated that yes, a portion
7  of the remaining collection had no value.
8     Q.    That proportion was consistent with
9  the proportion that Christie's did?
10    A.    Because we felt that the City of
11 Detroit property was a reasonable representative
12 sample of the entire collection.
13    Q.    So in a macro analysis if the City
14 of Detroit collection, if the collection at the
15 DIA has 62,000 pieces, your estimate is that
16 about a third of that or maybe 20 or 21,000
17 pieces have no value, and that the remaining 40
18 or 41,000 pieces have value, correct?
19    A.    Roughly.  I'll have to defer to my
20 report, to the actual numbers in the report.
21 The proportions are approximately correct.
22    Q.    So that's one of the factors that
23 you used in your extrapolation.  That is to say
24 that which was determined to have no value,

Michael Plummer

1  correct?
2     A.    Correct.
3     Q.    What other factors did you use in
4  your extrapolation?
5     A.    In the extrapolation we used the
6  Christie's data and broke it down by sector, and
7  then used the profile of the property in each
8  Christie's sector and applied that to each of
9  the DIA sectors.
10    Q.    In essence, and again I want to
11 make sure I'm understanding what you're saying;
12 if you looked at the Christie's appraisal of
13 what you call City of Detroit collection, that
14 would include all 3,300 that they were
15 originally asked to look at, correct?
16    A.    Correct.
17    Q.    So you would extrapolate a third of
18 them that had no value.  Then you would look at
19 okay, the remaining 1,700, of that remaining
20 1,700 what was the value of each sector?
21    A.    Right.
22    Q.    And then you would extrapolate that
23 the remaining art in that sector would have that
24 same extrapolation, correct?

Michael Plummer

1
2     A.    Correct.
3     Q.    So that's another factor.  You have
4  the no value factor, you have the value factor
5  that you just gave.  What other factors?
6     A.    At the moment I can't recall if I
7  did use other factors.
8          MR. SOTO:  It's about 12:20, why
9  don't we break, let everybody have some lunch,
10  then maybe you can think of those other factors
11  and then we'll buzz on from here.
12     A.    Can I add on to the record
13  something you asked me about.  When you asked me
14  about other people that I spoke to about the DIA
15  and the testimony and the project, it would of
16  course have been internally within my own team
17  and my consulting specialists.  I just want to
18  make sure that was on the record.
19     Q.    Of course, the specialists that you
20  referred to in your report?
21     A.    Right, right.
22     Q.    Absolutely.  I understood that.
23  Thank you for correcting that.
24          THE VIDEOGRAPHER:  The time is
25  12:19 p.m., and we're going off the record.

Michael Plummer

1
2          (Lunch recess taken)
3          THE VIDEOGRAPHER:  This begins
4  media unit number 3, the time is 1:20 p.m., and
5  we're back on the record.
6  BY MR. SOTO:
7     Q.    Mr. Plummer, how are you?
8     A.    I'm fine, thank you.
9     Q.    So just before the break I had
10  asked -- we had begun a series of questions
11  about the appraisal process and you corrected me
12  and said that you didn't do an appraisal, you
13  did an evaluation, correct?
14     A.    Correct.
15     Q.    So in connection with the
16  evaluation that was done by Artvest that is the
17  basis of your -- or at least one of the bases of
18  your expert report in the Chapter 9 proceeding
19  in Detroit, did Artvest do any appraisals of any
20  art at the DIA?
21     A.    We established a fair market
22  valuation of, as I mentioned earlier, several
23  hundred, I think it was around 400 or so items
24  using comparable pricing, and it was done by
25  people who are trained as appraisers, but we

Michael Plummer

1
2  called it a fair market valuation.
3     Q.    Was there anything that you as an
4  expert in the industry would consider a step
5  that is typical to an appraisal that Artvest or
6  its consultants and specialists didn't do on
7  those 400 or so pieces that you just testified
8  about?
9     A.    You're asking me if I feel that
10  there was something that an appraisal would have
11  that we didn't do?
12     Q.    With respect to those 400 pieces?
13     A.    I would say that we used industry
14  best practices for setting a fair market value
15  on those pieces.
16     Q.    Just to make it clear to the Court.
17  As I understood from some prior depositions I've
18  been in that you've probably read, there are a
19  number of types of appraisals?
20     A.    Correct.
21     Q.    In the art industry?
22     A.    Correct.
23     Q.    One of them is in fact called the
24  fair market value appraisal?
25     A.    Correct.

Michael Plummer

1
2     Q.    The other one is the auction
3  estimate appraisal?
4     A.    Correct.
5     Q.    In connection with the 400 pieces
6  of art that you were referring to just moments
7  ago that Artvest analyzed, is it your testimony
8  that on those 400 pieces of art, Artvest
9  completed a fair market value appraisal?
10     A.    We completed a fair market
11  valuation.
12     Q.    So not an appraisal?
13     A.    We called it a valuation.
14     Q.    I'm not even concerned about what
15  you call it.  I'm concerned about whether or not
16  we're comparing apples to apples, and when we
17  take your 400 pieces of art that you at Artvest
18  reviewed and add them to the 1,700 pieces of art
19  that Christie's reviewed, which you rely on in
20  your report, Christie's described its analysis
21  of those 1,700 pieces of art as a fair market
22  value appraisal; do you agree with that?
23     A.    Yes.
24     Q.    And you reviewed that?
25     A.    Correct.

Michael Plummer

1
2      Q.    You are talking about the
3  400 pieces of art that are being evaluated by
4  Artvest.
5          Is there something that Artvest
6  didn't do with those 400 pieces of art that
7  would mean that it is not a fair market
8  appraisal of those 400 pieces of art?
9      A.    There's nothing that we didn't do
10  that was different from Christie's that would
11  make it difficult or impossible to combine those
12  two items as similar numbers derived at with
13  similar methodologies.
14      Q.    Then maybe another way of me asking
15  this would be so if someone from Christie's
16  looked at what you did on those 400 pieces of
17  art and looked at what they did on their 1,700
18  pieces of art they'd say yeah, that's a fair
19  market value appraisal of those 400?
20          MR. IRWIN: Form.
21      A.    I don't know what they would say, I
22  can't speculate.  I think that they would see
23  the logic behind it and say that we used the
24  right logic to come up with a fair market value
25  on those pieces.

Michael Plummer

1
2          Betty was American Art.  Sabine was
3  Impressionist and Modern Art, Sabine Wilson, and
4  Kristin Gary who did Old Master paintings, who's
5  also a member of the Appraisers Association of
6  America, had worked previously at Colnaghi
7  Gallery years ago and is an active dealer and so
8  is very aware of current values, as is Sabine as
9  well; not a dealer, but very much involved in
10  the market.
11          Then Joe-Hynn Yang was an expert in
12  Asian Art at Sotheby's and Christie's, but also
13  has extensive knowledge of the decorative arts
14  and three dimensional objects and ancient art,
15  and he did the other objects, other
16  non-paintings.
17      Q.    Are any of those individuals, the
18  four individuals you've mentioned, Betty, Sabine
19  Kristin and Joe-Hynn?
20      A.    Yes.
21      Q.    Are they employees of Artvest?
22      A.    No.
23      Q.    So they were retained by Artvest to
24  do these services?
25      A.    Correct.

Michael Plummer

1
2      Q.    In Christie's report, Christie's
3  lists the factors that they considered in coming
4  up with their appraisal, correct?
5      A.    Yeah.
6      Q.    Are there any factors that they
7  considered that you did not consider at Artvest
8  in coming up with a valuation for the 400 pieces
9  of art?
10      A.    I don't have that list in front of
11  me so I can't recall what is exactly on that
12  list.  To the best of my knowledge, I don't
13  believe there is any.
14      Q.    So who conducted the evaluations as
15  you put it, using your term, let's stick with it
16  for now.
17          Who conducted the evaluations of
18  the 400 pieces of art that Artvest did?
19      A.    Betty Krulik who is President of
20  the Appraisals Association and a dealer in
21  American Art, who I have a high opinion of and
22  most in the industry have a high opinion of.
23  Sabine Wilson, who is also a member of the
24  Appraisers Association of America and is a very
25  talented appraiser.

Michael Plummer

1
2      Q.    I don't know if you mentioned it as
3  to the last one.  I know as to Ms. Krulik, Ms.
4  Wilson, is it Ms. Gary?
5      A.    Yes.
6      Q.    They are members of the American
7  Association of Appraisers Or Appraisal
8  Association of America, correct?
9      A.    Correct.
10      Q.    So they're qualified to do
11  appraisals, correct?
12      A.    Yes.
13      Q.    Is Joe-Hynn Yang an appraiser?
14      A.    He is not an appraiser by
15  profession, but he has 15 years experience and
16  has worked on numerous appraisals for Sotheby's
17  and Christie's, and actually worked on the --
18  was a critical participant in the driver of the
19  Albright-Knox appraisal, which was a museum sale
20  that is relevant to this, or irrelevant
21  depending on how the circumstances play out.
22      Q.    You said Albright-Knox?
23      A.    Albright-Knox, yeah.
24      Q.    Albright being one name with a
25  hyphen?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 36 of 82

Michael Plummer

1
2       A.      Yeah, it's referenced in the
3    report.
4       Q.      Why do you say that it's relevant
5    here?
6       A.      Well, it's relevant in the
7    differences in that sale for the sale of works
8    in the DIA collection, because that was a sale
9    which was for the replenishment of the
10   acquisition funds.  So, basically, property was
11   being sold to move the museum from one area into
12   another and it did very well, versus a sale
13   which was done to satisfy debt, such as the
14   Delaware Museum which has evidence of not doing
15   well; so they're very different animals.  Both
16   examples are in the report.
17      Q.      So on the Delaware, the distinction
18   you're making is in one it was a de -- is it
19   de-accession?
20      A.      Deaccession.
21      Q.      The one you're talking about in the
22   Albright-Knox, that was a deaccession?
23      A.      Albright-Knox was a deaccession,
24   yes.
25      Q.      And the other one was not a

Michael Plummer

1
2    deaccession?
3       A.      The other was a deaccession, but it
4    was a sale for the purpose of paying down debt,
5    rather than replenishing the collection of the
6    fund, the collection of the museum.
7       Q.      I thought deaccession meant you are
8    selling it in order to replenish the collection
9    with some other form of collection, or something
10   like that?
11      A.      It's my understanding deaccession
12   is part of the process of removing a work of art
13   from a collection, after which then steps are
14   taken to sell it.
15      Q.      So that can be sold for any number
16   of reasons, correct?
17      A.      It can be sold for any number of
18   reasons.
19      Q.      It's your theory that in the art
20   world if it's sold to retire debt, people don't
21   like those sales?
22      A.      It's not only my theory, it
23   actually runs into some real practical
24   obstacles, such as there are various sanctions
25   that are imposed against museums for doing that.

Michael Plummer

1
2    So it's not like frowned upon, but there are
3    sanctions in Russia now for what it's doing.
4            It's public approbation and there
5    are organizational approbations for doing such
6    things and the museum could lose its
7    certification as a museum.
8       Q.      How many museums are you aware of
9    that are owned by a city?
10      A.      I don't know.
11      Q.      In the process of being an expert
12   for this particular matter, did you take time to
13   determine how many museums in America are owned
14   by a city?
15      A.      I did not.
16      Q.      It is your understanding that the
17   DIA is owned by the City of Detroit, correct?
18      A.      It is my understanding.
19      Q.      Was the Delaware museum that you
20   are talking about owned by the City of Delaware?
21      A.      I don't believe that it is.
22      Q.      Or even the State of Delaware?  You
23   don't know?
24      A.      I don't believe it is.
25      Q.      Do you have any other examples

Michael Plummer

1
2    other than those two that you think are
3    relevant?
4       A.      I think there are some other
5    examples on my report.
6       Q.      That's why I asked that last part
7    that you think are relevant to this issue that
8    we're discussing today?
9       A.      I think those two and some other
10   examples in my report are relevant.
11      Q.      The four individuals that you
12   mentioned, I guess you already mentioned that
13   Mr. Yang is not a certified appraiser.  Are the
14   other three certified appraisers?
15      A.      The other three are certified
16   appraisers, but Mr. Yang has the equivalence of
17   what the Appraisers Association considers
18   certification.  He has significant auction house
19   experience similar to the experts at Christie's
20   who worked on the Christie's appraisal.
21      Q.      Did you personally conduct any
22   appraisals in connection with this expert
23   report?
24      A.      I did not personally.  I worked
25   with the specialists on their appraisals and

1        Michael Plummer
2 reviewed all of their numbers.
3    Q. When you say you worked with, what
4 does that mean?
5    A. I discussed it with them, I
6 reviewed it.
7    Q. Did you change any of their
8 opinions?
9    A. No, I did not change them and any
10 changes that were made, they made. I did not
11 change their numbers.
12    Q. Did you think any of their work was
13 incorrect?
14    A. To the extent that it was we had a
15 discussion about it and then any changes were
16 made.
17    Q. Can you recall any such instances?
18    A. There were some small adjustments
19 that were made. It wasn't a matter of
20 correction but more a matter of opinion, should
21 it be this much higher or that much lower, that
22 sort of thing, based on comps and different
23 things.
24    Q. Did anyone else other than the four
25 individuals you mentioned and yourself, did

1        Michael Plummer
2 anyone else assist in the appraisal process?
3    A. No.
4    Q. You mentioned different areas of
5 specialty with respect to the specialists that
6 you had referred to?
7    A. Right.
8    Q. How did you divide the appraisals,
9 or evaluations as you called them, among these
10 consultants?
11    A. Based on their expertise.
12    Q. After the specialists came up with
13 their valuations, I think you just testified
14 that you reviewed them?
15    A. Right.
16    Q. Did anyone else review them?
17    A. Well, we worked in a fashion that
18 we all worked off of a common document on Google
19 Documents, so they were open for review by the
20 others on the team.
21    Q. So that each person could comment
22 on the other person's work?
23    A. Yes, and in some instances there
24 were comments made and some consultations.
25 There are a couple of instances where there was

1        Michael Plummer
2 overlap, just like there might be a contemporary
3 piece that Betty might have expertise on, even
4 though she was dealing with America pre-1950,
5 and Sabine and Betty might confer on pieces.
6    Q. Other than the five of you, was
7 anyone else involved in that process?
8    A. No.
9    Q. How did you ensure quality control
10 of the process?
11    A. Well, we did the first round of
12 comps, first checks for them. We had a process
13 in place that we thought was sound. We did the
14 first round of comps for them. We then -- they
15 then either visited the museum or used high res
16 images or the website images enhanced, in most
17 cases did both.
18    Actually, all of our appraisers
19 visited the museum which we felt was rather
20 important to the process, except for one of
21 them, Betty, who actually had -- knew the
22 collection well and had visited the museum many
23 times previously, so she was already very
24 familiar with the paintings in the collection.
25    But Sabine, myself, Joe-Hynn Yang

1        Michael Plummer
2 and Kristin all visited the museum, and we feel
3 actually that our visit actually explains why
4 there are some discrepancies between our
5 appraisals and the other appraisals, because
6 those visits in the first-hand inspection
7 actually made a difference, and that was one of
8 the ways we ensured quality control.
9    Q. As I understand your testimony, the
10 way you ensured quality control is that you
11 visited the museum?
12    A. That was one way.
13    Q. What was the other way?
14    A. The other way was that we did the
15 first round of comps, then the specialists did
16 their own additional comps, and then they -- we
17 reviewed -- they put their logic in of how they
18 came to their conclusions and then we reviewed
19 those and came up with final numbers.
20    Q. When you say "we did the first
21 round of comps" who's the "we"?
22    A. Artvest, my team.
23    Q. That was you?
24    A. And Anya, and another woman who was
25 working for us on a temporary basis.

Michael Plummer

1
2    Q.    Who was that?
3    A.    Her name was Perry Silverman.
4    Q.    Perry?
5    A.    Perry.
6    Q.    P-e-r-r-y?
7    A.    Yes; and she had had experience in
8  searching for comps at Christie's.
9    Q.    Were you aware of the fact that
10 Christie's didn't -- not all of the specialists
11 who worked for Christie's analysis of the 1,700
12 visited the museum?
13   A.    No, I know all of them didn't, but
14 a number of them did.
15   Q.    So were you concerned in relying on
16 Christie's analysis that some of their
17 specialists didn't visit the museum?
18   A.    No, because I think the important
19 fact was that a core group of Christie's did.
20 It's not that each expert has to see each piece,
21 it's just that they are a representative from
22 the body doing the appraisal, visiting the
23 museum and seeing it.  They can then compare
24 notes, they can take a photograph and they can
25 talk to the other.

Michael Plummer

1
2    Q.    So is it your understanding that
3  the Christie's individuals who were doing the
4  Old Masters works visited the museum and reviewed the
5  other works?
6    A.    I don't remember which individual
7  experts visited the museum and which didn't, but
8  I know that a core group of Christie's
9  specialists did go to the museum and did examine
10 the works.
11   Q.    Right.  I heard you say that
12 before.  What I'm asking is different.  What I'm
13 asking is that core group, wouldn't they have
14 been involved in only reviewing the area of art
15 that they were interested in?
16        MR. IRWIN:  Form.
17   A.    No, not necessarily.
18   Q.    Do you know whether or not they
19 were or weren't?
20   A.    At this point I don't remember who
21 did which set of appraisals and who did not.
22   Q.    You don't know whether a person who
23 did a set of appraisals for American Art, for
24 example, also took the time to review the Old
25 Masters, do you?

Michael Plummer

1
2    A.    No, I don't.  I don't remember.
3    Q.    So when you say it's important to
4  have a core group but not all go, if not all
5  went it may be that some of the sectors were
6  simply not seen personally, correct?
7    A.    I don't remember which sectors were
8  seen.  I would be surprised if an important
9  sector such as Old Masters or American had not
10 been viewed, in particular because those sectors
11 are the largest sectors.
12   Q.    So visiting the museum you say is
13 important, correct?
14   A.    Seeing the subject work is
15 important.
16   Q.    Why is that?
17   A.    Because you see the physical nature
18 of the object.  You can miss things in
19 photographs.  Like, for instance, we put a much
20 higher value on a Daga that when you see it up
21 close -- than Winston did -- that when you see
22 it up close it's smudged and it's incomplete and
23 unfinished it's just a sketch; where Winston
24 didn't see it and they gave it a much higher
25 value because they thought it was a more

Michael Plummer

1
2  complete and finished picture.
3    Q.    Any other reason?
4    A.    Another reason would be size.  You
5  get a sense of a picture, its power on the wall,
6  and you're imagining something based on a
7  dimension.  But to actually see the picture and
8  see how it works on a wall is completely
9  different from just looking at it as a picture
10 on a piece of paper.
11   Q.    Anything else?
12   A.    Condition, you get a better sense
13 of condition.  Now, there may be good condition
14 notes that can offset that, but sometimes you
15 can see things that may not be captured by
16 another person who might have given the
17 condition report.
18   Q.    Anything else?
19   A.    There are other subjective
20 components that an expert would give you, just a
21 feeling about it subjectively by seeing it in
22 person that you can't convey in a photograph.
23   Q.    What would those be?
24   A.    You know, a feeling for whether
25 something was -- the shape of it, the look of it

Michael Plummer

1  Michael Plummer
2  in the third dimension, what it was,
3  particularly a sculpture, whether it was real or
4  fake, for example.  That it looked better in
5  person than it did in the photograph.
6  One of the arts of the auction
7  business is to make things look better in the
8  catalog than they actually do in real life, and
9  so that's one of the major talents.  Having run
10 marketing at Sotheby's I can tell you that we
11 had trained photographers who made things look
12 better than they really did, so a photograph can
13 do that.
14 Q.  These subjective elements as you
15 called them and these personal reviews that you
16 are referring to, they can cut both ways.
17 Somebody can look at a piece of art as you did
18 and say wow, that's more valuable than it looks
19 in the photo and somebody can look at it and say
20 that's less valuable, is that correct?
21 A.  Correct.
22 Q.  So in connection with the work that
23 you were doing you reviewed or your people
24 reviewed personally 400 works of art, correct?
25 A.  Correct.

1  Michael Plummer
2  Q.  You don't know how many works of
3  art were personally reviewed by Christie's you
4  testified about earlier?
5  A.  I don't.
6  Q.  You understand that even added
7  together, the Christie's and your art, you're
8  looking at maybe less than 5 percent or around
9  5 percent of the entire collection of the DIA,
10 correct?
11 A.  In terms of numbers, raw numbers,
12 yes.
13 Q.  Does it concern you that somebody
14 who looked at some significantly smaller
15 percentage of 5 percent is extrapolating to the
16 value of the entire collection of 62,000 pieces
17 of art.
18 Did you want those people to look
19 at more art?
20 MR. IRWIN:  Vague, form.
21 A.  I would not use the word
22 extrapolate.  We used a formula based by sector
23 using the Christie's sample to develop a value,
24 and we thought what we had was adequate for our
25 purposes.

1  Michael Plummer
2  Q.  What word would you use if you
3  didn't use extrapolate, what do you call what
4  you're doing?
5  A.  We made an analysis of the
6  collection and made a projection based on the
7  data by sector that Christie's had done, that
8  was a reasonable universe of sampling of the DIA
9  collection.
10 Q.  So in other words, you relied on
11 Christie's review, you looked at that percentage
12 for each sector, and then you applied the
13 formula that you just referred to to the entire
14 rest of the collection in that sector, correct?
15 A.  Right.
16 Q.  So that if indeed of the original
17 1/3 of the works of art that were deemed of too
18 little value to be appraised, if 10 percent of
19 those were Old Masters, then you apply that same
20 10 percent figure in your Old Masters as to what
21 was too little value to be appraised, correct?
22 A.  Correct.
23 Q.  You don't think that's an
24 extrapolation?
25 A.  You can use extrapolation, I use my

1  Michael Plummer
2  language.  I prefer to say that we made a
3  calculation or an analysis.
4  Q.  Do you have a word for that besides
5  what you just described?
6  MR. O'REILLY:  Form.
7  A.  The words I used.
8  Q.  All right.  On page 20 of your
9  report.  As you're turning to page 20, did you
10 have someone on your staff who was doing the
11 statistical analysis, running the sampling
12 analysis that you used for the process that you
13 described earlier?
14 A.  Yes.
15 Q.  Who was that?
16 A.  That would be Mr. Anya Bemis.
17 Q.  Is Anya Bemis a statistician so
18 that she would know what is an appropriate
19 sample of a given body of art to extrapolate
20 from?
21 A.  Anya Bemis is not a statistician.
22 Q.  Did you have a statistician so that
23 you could appropriately opine that looking at
24 some segment of 5 percent of the art at the DIA
25 enables you to extrapolate or to apply the

Michael Plummer

1           Michael Plummer
2 process that you described in the way that you
3 described to the rest of the art?
4     A.   We do not have a statistician.  It
5 was our opinion that that was -- our methodology
6 was sound.
7     Q.   You based that opinion on what?
8     A.   On my own professional experience
9 in the art market.
10     Q.   Again, are you a statistician?
11     A.   No, I am not a statistician.
12     Q.   Are you a sampler?
13     A.   I am not a sampler.
14     Q.   You are not an appraisers either,
15 correct?
16     A.   I am not an appraiser.
17     Q.   You mention on page 20 of your
18 report that you did not interact with the museum
19 staff directly, but rather communicated only
20 through DIA counsel in conducting the appraisal,
21 correct?
22     A.   Correct.
23     Q.   Would you normally communicate with
24 the museum staff when you were conducting an
25 appraisal or an evaluation, as you put it?

Michael Plummer

1           Michael Plummer
2     MR. O'REILLY:  Form.
3     A.   It depends on the circumstances.
4 Perhaps in a different circumstance I might, but
5 in this situation it did not feel appropriate.
6     Q.   Did this hinder your evaluation of
7 the art?
8     A.   No, it did not.
9     Q.   There wasn't anything you wanted to
10 ask the folks at the DIA about a given piece of
11 art, about maybe some of the subjective factors
12 that you mentioned earlier that you couldn't get
13 from your lawyers?
14     A.   There was nothing that we needed
15 that we couldn't get.
16     Q.   How many times have your lawyers
17 visited the DIA?
18     A.   I don't know.
19     Q.   You didn't ask?
20     A.   How many times did our lawyers
21 visit the DIA?
22     Q.   Yes.
23     A.   I don't understand its relevance.
24     Q.   Didn't you just say it's important
25 in assessing art that they should see it

Michael Plummer

1           Michael Plummer
2 personally?
3     A.   But our lawyers weren't involved in
4 the assessing of the art.
5     Q.   You didn't communicate with anybody
6 at the DIA who was involved in the art, did you?
7 You only communicated with your lawyers,
8 correct?
9     A.   Right; and any information that we
10 used in terms of the subjective issues of the
11 art we garnered ourselves from visiting the
12 museum.
13     Q.   That instance where you didn't
14 visit the museum, for example, the one person
15 who you said didn't, what did you rely on there?
16     A.   Betty Krulik.
17     Q.   Yes.
18     A.   Well, Betty had been to the museum
19 multiple times and was exceptionally familiar
20 with the collection and all the pieces that were
21 in it.  So she didn't need to because she had
22 already done so multiple times.
23     Q.   When you went to the museum were
24 you allowed to handle the art?
25     A.   No.

Michael Plummer

1           Michael Plummer
2     Q.   Is it customary to handle art in
3 connection with an appraisal?
4     A.   It is desirable to do so if you
5 can, but that would have been disruptive to the
6 museum and we did not do it.
7     Q.   Turning to page 17 of your report?
8     A.   Sure.
9     Q.   I'm looking at what's under the
10 label Group 1?
11     A.   Yes.
12     Q.   "High value COD works that were
13 appraised by Christie's for greater than
14 $750,000 (68 items)."
15     A.   Right.
16     Q.   Did you rely exclusively on
17 Christie's valuation of those high value pieces
18 of art?
19     A.   I'm not sure what you mean by that,
20 relied exclusively on them.
21     Q.   I guess what I'm trying to figure
22 out is did Artvest do an independent analysis of
23 any form in connection with the high value City
24 of Detroit works that were appraised by
25 Christie's as being greater than $750,000?

Michael Plummer

1
2     A.   We looked at their valuations and
3 reviewed them, but we did not separately set
4 values for them.  We reviewed them, we found
5 them to be accurate and reasonable and relied
6 upon them.
7     Q.   You didn't change them at all?
8     A.   We did not change them.
9     Q.   Did you find the wide range of
10 values that were provided by Christie's at all
11 unusual?
12    A.   It was not their normal practice.
13    Q.   So the answer is it was a little
14 bit out of the ordinary?
15    A.   It was a little bit out of the
16 ordinary, but it did not make them unusable.
17    Q.   Did you -- looking at page 17,
18 Group 2.  It includes City of Detroit or
19 actually "COD works" they call them City of
20 Detroit works, "appraised by Christie's of lower
21 value, that under $750,000 including property
22 for which they assigned limited or no value" and
23 the number is 1,654 with a value and 1,038 with
24 limited to no value, and 13 that were combined
25 in Phase III?

Michael Plummer

1
2     A.   Right.
3     Q.   That was the total COD appraised,
4 reviewed items by Christie's was 2,773, correct?
5     A.   Correct.
6     Q.   In this instance did you rely
7 exclusively on Christie's valuation for these
8 pieces?
9     A.   Yes, we did.
10    Q.   Were you satisfied with Christie's
11 valuation?
12    A.   Yes, we were.
13    Q.   Did you conduct any additional
14 analysis or appraisal of these pieces?
15    A.   We did not.
16    Q.   Looking on page 18, Group 3.
17 Includes "high value, non-COD works in the DIA
18 collection."  Do you see that?
19    A.   Yeah.
20    Q.   "Contained on a list provided by
21 the DIA of works that the DIA valued for
22 insurance purposes or otherwise of 1 million or
23 more, totaling 350 works."  Do you see that?
24    A.   Yes.
25    Q.   Specifically, what information did

Michael Plummer

1
2 the DIA provide you or Artvest with?
3     A.   They provided us with a report
4 which is mentioned in here which had an image,
5 the description, the provenance, the methodology
6 that it was -- sorry, what funds were used to
7 purchase it, and there was some other
8 information which I can't quite remember right
9 now.  Then we of course did additional research
10 to supplement what was given to us.
11    Q.   What's the provenance?
12    A.   Provenance is the ownership history
13 of a work of art.  So if it comes out of an
14 important family or a sequence of owners who are
15 prominent, it can raise the value of a work of
16 art.
17    Q.   What additional resources did you
18 look at to supplement what you got from the DIA?
19    A.   The DIA's own website, some of the
20 DIA's own publications and other publications
21 and catalog resumes, most of which are referred
22 to in this document.
23    Q.   In your report?
24    A.   Yeah.
25    Q.   Anything other than what's referred

Michael Plummer

1
2 to in your report?
3     A.   I subsequently found six other
4 books that were referred to that were
5 inadvertently excluded, and I can supply that
6 list.
7 (*r)     MR. SOTO:  So when you supply me
8 with some of the other things like the
9 pioneering report and some other things like
10 that, I would love to have that list.
11    A.   Sure.
12    Q.   Who provided you the materials that
13 you got from the DIA?
14    A.   Counsel.
15    Q.   Did the DIA provide you with any
16 documentation as to appraisals that they
17 conducted previously on any of the art that you
18 were interested in?
19    A.   Later on in the process we received
20 a document that had values in it which we
21 thought might have been insurance values.  They
22 were, however, so whacky, for lack of a better
23 word, that we had trouble figuring out really
24 what they were because they didn't have, except
25 in a couple of instances, they didn't bear much

Michael Plummer

1             Michael Plummer
2 on reality.
3       I wouldn't say a couple of
4 instances, there were more than a couple of
5 instances; but in too many instances they were
6 unreliable and way off.
7     Q.    They were way off in which
8 direction, too valuable or too little?
9     A.    Every way; too little, too high.
10     Q.    Did you ever ask anyone at the DIA
11 what is this, who prepared this?
12     A.    No. It was -- it seemed not to
13 matter. We came to our opinions as to how it
14 might have happened but it didn't matter, it was
15 not usable.
16     Q.    What was your own opinion that you
17 arrived at?
18     A.    That curators were sticking numbers
19 on things for various reasons and they didn't
20 have the market experience to do that. They
21 were just sort of randomly assigning numbers
22 either based on personal bias or a lack of
23 either underestimating or overestimating.
24     Q.    Have you produced that information,
25 the whacky numbers that you got, in connection

Michael Plummer

1             Michael Plummer
2 with that report?
3     A.    Have I produced it?
4     Q.    Yes.
5     A.    No. It's listed here.
6     Q.    It's one of the items listed?
7     A.    I believe so.
8     Q.    If it's one of the items listed
9 it's produced with your report.
10       Did you know that, if it's listed
11 it was produced to me?
12     A.    I didn't know that.
13       MR. SOTO: That's right, Geoff?
14       MR. IRWIN: Yes, that specific item
15 was produced.
16       MR. SOTO: I'm assuming that if
17 it's listed as something that you based your
18 report on, we received it in a plethora of
19 materials that we received from the City and
20 DIA.
21       MR. IRWIN: So the answer to that
22 is yes, as far as I know.
23 BY MR. SOTO:
24     Q.    Did the DIA, as far as you know,
25 provide you with any documentation as to the

Michael Plummer

1             Michael Plummer
2 insurance values of the works of art?
3     A.    No. I mean other than that report
4 I told you which may have been insurance values
5 or may not, but there is no supplemental
6 information.
7     Q.    But you don't know whether it was
8 or wasn't?
9     A.    I don't know whether it was or
10 wasn't.
11     Q.    Got it. Did you obtain any
12 documents from the City of Detroit regarding the
13 value of the art?
14     A.    No. Wait, I don't think so. Let
15 me think for a moment. I don't.
16     Q.    So that it's clear, and I think you
17 may have said this earlier. Was each of these
18 350 items individually evaluated or appraised by
19 your team?
20     A.    Yes.
21     Q.    Each of them, appraisals or
22 evaluations as you call them, they may be
23 evaluations, documented in Exhibit G of your
24 report?
25     A.    I'm sorry, ask me that again.

Michael Plummer

1             Michael Plummer
2     Q.    Was each of these evaluations or
3 appraisals, however up want to say that
4 document, in Exhibit G of your report on page
5 72?
6     A.    Yes, but there are some additional
7 work notes that were not summarized here that
8 are available and can be supplied.
9     Q.    Turning to page 72. I see a blank
10 page that says "Exhibit G" there?
11     A.    Right.
12     Q.    Then it goes on actually from there
13 on, Exhibit G?
14     A.    Right.
15     Q.    In addition to what's there in your
16 report, which is the vast majority of the pages
17 in your report; in addition to that there are
18 some additional work pages that you have?
19     A.    Yes.
20     Q.    How many of those exist?
21     A.    It's a large file. One of my
22 appraisers did -- was uncomfortable putting the
23 appraisal logic into this report and she
24 compiled separate documents for each one because
25 that's how she prefers to work, so I have a file

Michael Plummer

1  Michael Plummer
2  for all those.
3      Q.   Which appraiser is that?
4      A.   Sabine Wilson.
5  (*r)      MR. SOTO:  Again counsel when we
6  make our request we will request that file,
7  we'll make copies and obviously give you back
8  the originals.
9      A.   We have it in electronic form.
10     Q.   That's even better.  Thanks.  What
11 is this Exhibit G, in your own description?
12     A.   This is our reasoning to come up
13 with a fair market valuation of these items.
14     Q.   Who prepared this Exhibit G?
15     A.   The appraisers that were described
16 to you earlier, as reviewed by me.
17     Q.   So they took the data that they had
18 collected and they input it in a form that you
19 guys had all agreed to use?
20     A.   A Google document, yeah.
21     Q.   A Google document, and that became
22 Exhibit G, is that correct?
23     A.   Yes.
24     Q.   With the exception of one person
25 who had additional information?

Michael Plummer

1  Michael Plummer
2      A.   Correct.
3      Q.   That additional information by
4  Sabine Wilson, did she also input at least some
5  of the information that's here in Exhibit G?
6      A.   The values were input, but the
7  summarization she did not.
8      Q.   So this spreadsheet identifies
9  specific works of art that includes high and low
10 estimated values for each, correct?
11     A.   Correct.
12     Q.   Recognizing that there are some
13 descriptions that may be missing that you're
14 going to supply in this additional
15 documentation, was every piece of art listed in
16 Exhibit G individually appraised?
17     A.   Yes.  It was individually reviewed
18 to arrive at a fair market valuation.
19     Q.   Were other pieces that are not
20 listed -- pieces of art at the DIA that are not
21 listed in your Exhibit G, were other pieces
22 appraised by folks at Artvest or who were
23 working for Artvest?
24     A.   We evaluated other pieces, they are
25 mentioned in that page as a sub group that we

Michael Plummer

1  Michael Plummer
2  identified 73 other pieces that we thought had
3  been missed in the list that we had been given
4  by the DIA.
5       It was our sort of double-check on
6  making sure that we were including and weren't
7  undercounting what we were reviewing.
8      Q.   You were reviewing pieces of art
9  worth?
10     A.   Over 750,000.  We photographed
11 those items while in the DIA and then went back
12 and researched them.  I put an estimate in here
13 at the time because that was rather late in the
14 process that we thought it might come in between
15 80 and 160 million, and that I would provide
16 supplemental information after the fact.
17      We have now finished that
18 evaluation and it has come in to 70 million to
19 122 million, so it's lower than -- a little bit
20 lower than the low and a good bit lower than the
21 high.
22     Q.   So of these 73 additional pieces of
23 art you're saying they came in at a low value of
24 70 million and a high value of 122 million?
25     A.   Correct.

Michael Plummer

1  Michael Plummer
2      Q.   Let me see if I understand the
3  process that you started with again.  So you got
4  a list of 350 or so pieces of art, correct?
5      A.   Right.
6      Q.   You got that from the DIA, correct?
7      A.   Well, actually it was a larger list
8  and the overlap -- there was an overlap with
9  Christie's, so that ended up netting down to
10 350.
11     Q.   This large list was supposed to be
12 works of art worth more than 750,000, correct?
13     A.   Correct.
14     Q.   Once you deducted the overlap you
15 had 350,000?
16     A.   350, Right.
17     Q.   How did you find the other 73?
18 What did you do to find the other 73?
19     A.   Walking through the museum and
20 selecting objects that we thought might possibly
21 be of higher value, and then coming back and
22 researching, and knowing that they weren't on
23 the list, cross-checking against the list then
24 assigning values to them.
25     Q.   Separate and apart from that

Michael Plummer

1
2 walk-through, did anyone at Artvest actually
3 look at the list of 62,9000 items of art, the
4 data that was given to you about that art,
5 including the images and the valuations and
6 everything else, to determine if the list that
7 the DIA had given you was incomplete in any
8 other way?
9      You did the walk-through, you found
10 out that it was incomplete, at least for 73
11 items. Did you then look at the list to find
12 out well look, there's a lot of pieces of art
13 here that are in storage, maybe there's more
14 pieces of art that are more valuable that we
15 should be considering as well?
16      MR. O'REILLY: Objection to form.
17   A.   We looked at the list, but we
18 determined that going to the museum was the best
19 process because the information on the list
20 didn't seem to be helpful enough for that
21 purpose.
22   Q.   Do you know if there are any pieces
23 of art that are being stored that are not in the
24 museum that are worth more than $750,000 at the
25 DIA, as you sit here today?

Michael Plummer

1
2   A.   Can you ask the question?
3   Q.   Do you know as you sit here today
4 whether or not there are any additional pieces
5 of art that are worth more than 750,000 that are
6 stored by the DIA, not being shown at the DIA
7 right now?
8   A.   I do not know whether there are or
9 not.
10   Q.   Does anyone else at Artvest know
11 that?
12   A.   No.
13   Q.   So looking at page 13 of your
14 spreadsheet. I think it's what you described to
15 me earlier but I want to make sure. It's a
16 column that doesn't have information in it so I
17 want to make sure that's what you were referring
18 to earlier.
19      MR. IRWIN: Is it the 13th page in
20 this document?
21      MR. SOTO: Yes.
22      MR. IRWIN: Okay. So we'll all get
23 to that.
24   Q.   It starts on the top with
25 paintings, Contemporary Art after 1950, and it

Michael Plummer

1
2 has Betty Krulik's name on it. Then going
3 across it talks about a 1985 oil on canvas,
4 Mitchell pieces are in, do you see that?
5   A.   I'm not sure where you are.
6      MR. IRWIN: Me neither.
7   Q.   It looks like this (indicating).
8      MR. IRWIN: Here, take mine, we'll
9 swap.
10   A.   Okay.
11   Q.   Do you see where it says "Summary
12 Not Provided"?
13   A.   Right.
14   Q.   It has several of them going down
15 the page and a few after that on the next page?
16   A.   Right.
17   Q.   Is that the instances that you were
18 referring to earlier where Sabine Wilson didn't
19 provide the information?
20   A.   Right.
21   Q.   And that's the information you're
22 going to provide to us later?
23   A.   Correct.
24   Q.   I just want to make sure. Turn to
25 page 18 of your report, that's 18 of 72. Do you

Michael Plummer

1
2 see Group 4, that's the additional?
3   A.   That's the additional 73 we
4 discussed previously.
5   Q.   Did you participate in that review,
6 the personal review at the museum?
7   A.   Yes.
8   Q.   You found some of those 73?
9   A.   Together with Joe-Hynn Yang, yes.
10   Q.   Was there anybody else with you?
11   A.   Just Joe and me.
12   Q.   When you were there, I think you
13 might have testified about this before, you
14 didn't talk to anybody at the museum to say hey,
15 what about these?
16   A.   No.
17   Q.   Had you ever visited the museum
18 before then?
19   A.   No, I never had.
20   Q.   Did anyone at the DIA escort you on
21 the visit?
22   A.   No.
23   Q.   Was it done during public opening
24 hours?
25   A.   Yes.

Michael Plummer
1
2     Q.    Did you ever ask anybody why these
3  73 works were not included in the original list
4  that you got?
5     A.    No.
6     Q.    Did you ask your counsel to ask?
7     A.    No.  To address that I would say
8  that we assumed, or concluded, or felt that it
9  was probably because of the randomness of the
10 numbers in some of their insurance lists that
11 these may have been similarly disregarded.
12    Q.    Did you ask anyone if you could
13 visit the museum's collection of stored art?
14    A.    No, we did not.
15    Q.    You didn't document or appraise any
16 of the stored art?
17    A.    We did not.
18    Q.    You mentioned the supplement.
19 Hadn't you supplemented your report yet?
20    A.    I did not.
21    Q.    Do you plan to?
22    A.    With that list, yes.
23    Q.    In any other way?
24    A.    At the moment I don't have plans
25 to, but that could change.

Michael Plummer
1
2     Q.    What would make that change?
3     A.    I haven't heard the deposition from
4  Mr. Wiener, certain things could arise with that
5  that would cause me to change.
6     Q.    Have you reviewed Mr. Wiener's
7  report?
8     A.    I have.
9     Q.    Does anything in his report lead
10 you to want to change your analysis or
11 supplement it in any way?
12    A.    He does not make me want to change
13 my analysis, no.
14    Q.    What about supplementing it?
15    A.    I'm not sure.  I take issue with
16 various things in his report and his
17 methodology.
18    Q.    We may get to that.  Group 5 on
19 page 19.  "Balance of the collection.  The
20 balance of the DIA's collection was evaluated by
21 sector using the sample valuation data of the
22 COD works appraised by Christie's with a low
23 value of at or below $750,000, and applying an
24 average price, sector by sector, based on that
25 data."  Do you see that?

Michael Plummer
1
2     A.    Yes.
3     Q.    So you didn't evaluate each of the
4  remaining items of the museum, correct?
5     A.    Correct.
6     Q.    When you say you applied an average
7  price, I just want to understand and I want the
8  Court to understand what you did, correct me if
9  I'm wrong.
10       So, for example, I'm just using a
11 hypothetical, assuming there was a value that
12 Christie's gave for the Old Masters of, just
13 using round numbers, 100 million, and that was
14 for so many pieces of art, you would find the
15 average value of those so many pieces of art,
16 correct?
17    A.    Yes.
18    Q.    And that's the average value you
19 would use on all the other pieces of art that
20 you didn't evaluate that were in that sector,
21 correct?
22    A.    Correct.
23    Q.    I use the word extrapolate.  You
24 extrapolated that out to the rest of the sector,
25 correct?

Michael Plummer
1
2     A.    We applied those values to the rest
3  of the sector.
4     Q.    Let's go back to page 17.  We
5  discussed earlier that there are different
6  methods of appraisal; for example, fair market
7  value, auction estimate, correct?
8     A.    Correct.
9     Q.    What method of appraisal did
10 Artvest utilize in analyzing Groups 1 and 2,
11 which are the works that Christie's previously
12 valued?
13    A.    We did not appraise these, I
14 thought we had established that.  We had -- we
15 reviewed their appraisal and concluded that
16 their numbers were good.
17    Q.    So, as you know, Christie's
18 conducted a fair market value appraisal,
19 correct?
20    A.    Yes.
21    Q.    In your words, what is a fair
22 market value appraisal?
23    A.    A fair market appraisal is an
24 appraisal arrived at where a ready, willing and
25 able seller reaches a price with a ready,

45 (Pages 177 to 180)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 46 of 82

1          Michael Plummer
2  willing and able buyer where there is no duress
3  or urgency to sell.
4       Q.    Are there particular projects in
5  which a fair market appraisal is best to use?
6  For example, this project that you're involved
7  in, is that the best method to use to appraise
8  this type of art?
9       A.    It is our opinion that a fair
10  market value, whether it's an appraisal or a
11  valuation, is the right approach for this
12  project, yes.
13       Q.    Why is that?
14       A.    Because you're determining --
15  you're trying to establish a value of the
16  collection to the City of Detroit in the
17  evaluation of this Court case, and to do that
18  one were to start with the fair market value of
19  the collection.
20       Q.    You are aware that Christie's
21  relied on the market data method in arriving at
22  its fair market valuation, correct?
23       A.    Correct.
24       Q.    What is the market data method?
25       A.    It's looking at comparable prices,

1          Michael Plummer
2  which is the same methodology we did.
3       Q.    Anything else?
4       A.    That's pretty much essentially it.
5       Q.    Is that a standard methodology
6  that's used in coming up with a fair market
7  value?
8       A.    That's pretty standard, yes.
9       Q.    Moving on to Groups 3 and 4 on page
10  18?
11       A.    Sir, can I have a quick bathroom
12  break?
13       Q.    Absolutely.
14          THE VIDEOGRAPHER:  The time is
15  2:16 p.m., and we're going off the record.
16          (Short break taken)
17          THE VIDEOGRAPHER:  The time is 2:27
18  p.m., and we are back on the record.
19  BY MR. SOTO:
20       Q.    We're going to try to go through
21  some of the stuff that will be different and
22  hopefully won't be repetitive.
23          Your prior testimony was that, in
24  fact, the evaluation done by Artvest was to come
25  up with a fair market value, correct?

1          Michael Plummer
2       A.    Correct.
3       Q.    Why did you choose that form of
4  valuation, a fair market value?
5       A.    Because we thought it was the most
6  appropriate for the circumstance.
7       Q.    Did you consider using an auction
8  appraisal value?
9       A.    No, because auction values are
10  designed to entice bidders to bid on something,
11  as I like to say, the low estimate appeals to
12  the greed of the buyer and the high estimate
13  appeals to the greed of the seller.  It's a
14  psychological estimate track that's not relevant
15  to this situation.
16       Q.    Very interesting, another added bit
17  of information.  So, for example, if I were
18  trying to put on an auction I would want
19  estimates to make people think boy, I'm going to
20  get a good value for that?
21       A.    Um-hum.
22       Q.    So there would be lower estimates?
23       A.    Um-hum.
24       Q.    I got it.  I'm not that
25  knowledgeable about this, but did you consider

1          Michael Plummer
2  applying the market cash value appraisal method?
3       A.    It did not seem appropriate either.
4       Q.    What is the market cash value
5  appraisal?
6       A.    It's deducting the seller's
7  commission and any other fees that would be
8  related to selling the art.  It's often used for
9  art loans and other things where you want to see
10  what your net cash is going to be for selling
11  something.
12       Q.    When would the market cash value
13  appraisal be used?
14       A.    You would use it for an art loan,
15  would be one example.
16       Q.    Because you would want to know
17  after netting it out this is what you have as
18  collateral?
19       A.    Yeah, but it's interestingly, as a
20  matter of common practice, the low estimate for
21  the auction house would work as well.  That's
22  often used by lenders rather than net cash
23  value.
24       Q.    So now what's the difference then
25  between the market cash value and the fair

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1          Michael Plummer
2   market value?
3       A.    The fair market value is higher, it
4   includes the buyer's premium as well.
5       Q.    The fair market value?
6       A.    Yeah.  The net cash market value is
7   not only missing the seller's commission, but
8   it's also missing the buyer's premium.
9       Q.    So it cuts out commissions and it
10  leaves what you're going to net out?
11      A.    Exactly.
12      Q.    We've mentioned a number of types
13  of appraisals.  Are there any other types of
14  appraisals that you are aware of that we haven't
15  spoken of yet?
16          We've talked about insurance
17  appraisals, we've talked about auction
18  estimates, we've talked about market cash values
19  and we've talked about fair market values; is
20  there anything else?
21      A.    There's a replacement value.
22      Q.    Would that be different than the
23  insurance value?
24      A.    It can be, but it's often used
25  interchangeably, but a replacement value is a

1          Michael Plummer
2   higher value, some people use it as -- some use
3   it as a retail value.  It presumes that there is
4   a time requirement involved in replacing
5   something so that a buyer would pay a premium to
6   replace it.
7       Q.    So it gives, generally speaking, a
8   higher value?
9       A.    Correct.
10      Q.    Are you familiar with the Uniform
11  Standards of Professional Appraisal Practice?
12      A.    I am.
13      Q.    What are they?
14      A.    Generally referred to as USPAP,
15  they're guidelines for conducting appraisals.
16      Q.    Did you review the USPAP at any
17  time while preparing the DIA evaluation that you
18  rely on in your expert report?
19      A.    I reviewed it and my appraisers are
20  USPAP-compliant appraisers, but as it's not --
21  USPAP is not required by law or any regulatory
22  body and is often not used by many appraisers, I
23  didn't think it was critical to this appraisal,
24  or this evaluation I should say.
25      Q.    Separate and apart from valuations

1          Michael Plummer
2   and appraisals, we talked about the market data
3   method of leading to an appraisal?
4       A.    Right.
5       Q.    Are there any other methods that
6   you're aware of, other than generally getting
7   market data that you described earlier?
8       A.    Well, I think that, you know,
9   market data can also mean data that's not
10  publicly available.  It can also be particularly
11  when you're dealing with primary market property
12  that you might need to call around to the
13  galleries that handle the artists because
14  they're not yet traded at auction or that the
15  highest prices are traded at auction.
16      Q.    Looking at page 18 again of your
17  report, paragraph B.  It says:
18          "Artvest conducted the initial
19  pricing research and created a source database
20  of comparables and other records, then shared
21  that with the consulting specialists who then
22  did supplemental price searches and other
23  research."
24      A.    Um-hum.
25      Q.    You've described earlier that you

1          Michael Plummer
2   used market data comparables and some additional
3   private information in coming up with what
4   Artvest called its source database, correct?
5       A.    Um-hum.
6       Q.    Do you know --
7       A.    Well that's not how I mean source
8   database.  No.  Okay.  You're correct, you're
9   correct.  Let's go back.
10      Q.    In what you're calling the source
11  database of comparables and other records, I
12  believe you testified earlier that included
13  market data that was available publicly about
14  the art?
15      A.    Right.
16      Q.    Comparables that you were aware of
17  both publicly, and some private comparables that
18  you were knowledgeable of?
19      A.    Right, right.
20      Q.    You mentioned some other indices
21  and other data that you received on this art.
22  That was the database that you prepared at
23  Artvest?
24      A.    Yeah, right.
25      Q.    You shared that with your

1        Michael Plummer
2  consultant specialist, correct?
3        A.    Correct.
4        Q.    But then you go on to say who then
5  supplemented price searches and other research.
6  Do you know what they did to supplement that
7  database?
8        A.    Yeah, they then did their own
9  searches on Artvest, on Asguard, on Sotheby's
10  and on Christie's websites in addition to what
11  we gave them, they sort of did their own
12  double-check.
13        Q.    Do you know if they came up with
14  additional information?
15        A.    They did, yes.
16        Q.    Did you include that additional
17  information in the information that you produced
18  as supporting?
19        A.    Those comparables are in the work
20  file that I have available to share, that
21  electronic document that I referred to earlier.
22        Q.    That you are going to send us
23  later?
24        A.    Yes.
25        Q.    Okay.  You mentioned on page 20 --

1        Michael Plummer
2  am I accurate in my assessment that not every
3  piece of work at the DIA had a comparable?
4        A.    Yes.
5        Q.    There are some that did not?
6        A.    Correct.
7        Q.    How did you value those?
8        A.    You would look at things that sold
9  in related categories.
10        Q.    You refer to them as once in a
11  lifetime pieces of art?
12        A.    Yeah.
13        Q.    How many works are sort of once in
14  a lifetime?
15        A.    In the DIA collection?
16        Q.    Yeah.
17        A.    I don't know that it's fair to put
18  a number off the top of my head on there.  Is it
19  eight, is it ten, is it five, I don't know.
20        Q.    Do you recall how many had no
21  comparables?
22        A.    I don't remember how many had none,
23  but the non-comparables isn't just to once in a
24  lifetime pieces, they're also smaller, less
25  expensive works that might not have comparables.

1        Michael Plummer
2        Q.    So for those where you didn't have
3  a comparable you tried to look at to create a
4  comparable of some form?
5        A.    Yes, the closest in another sector.
6        Q.    In connection with your evaluation,
7  is there a specific time period for which a
8  comparable is relevant?
9        A.    That's an interesting question.
10  The problem with the art market is that
11  sometimes you have to go back many years, even a
12  decade or so to find a comparable.  So when you
13  do that then you have to make an adjustment that
14  you think is suitable for the difference in
15  time, and the difference in the market then to
16  the difference in the market now.
17              In some instances actually the
18  price could have gone down because the market
19  might have been hotter for certain things a
20  decade or two ago.
21        Q.    Let's turn to page 19.  In Group 5
22  you state that the balance of the DIA's art
23  collection was evaluated by sector using the
24  sample valuation data of the City of Detroit
25  works appraised by Christie's with the low value

1        Michael Plummer
2  of at or below 750, and applying an average
3  price sector by sector based on the data,
4  correct?
5        A.    Um-hum.
6        Q.    So here again, just so it's clear
7  to the Court, for this lower value, if there was
8  ten pieces this lower value from the Christie's
9  collection that were in the Old Masters, you
10  took the average of those ten and that's the
11  average you applied for the remainder of that
12  sector, correct?
13        A.    Correct.
14        Q.    Is your entire analysis of the
15  Group 5 works contained here in this table 2?
16        A.    What do you mean my entire, do you
17  mean the results of the analysis?
18        Q.    Yes?
19        A.    Yes.
20        Q.    Again, the sectors that you
21  testified about earlier, those are all the
22  sectors that you have identified, correct?
23              When you say you did it sector by
24  sector you identified the Old Masters, the
25  Impressionist, Modernists, the Post War?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1
2  A.    There are other sectors.  There was
3  the prints and drawings, decorative arts,
4  silver, arms and armor.  The fact that there
5  were so many sectors gave us the feeling that it
6  was an appropriate approach to this correction.
7      Q.    Where can we find the most complete
8  list of the sectors that you divided them into?
9      A.    This is the listing of the sectors.
10     Q.    So indeed the separations in
11 Exhibit G are the sectors?
12     A.    Correct, correct.  I think there
13 are maybe eight, nine, ten, something like that.
14 Just to clarify, the DIA and Christie's
15 differentiate in how they classify things in
16 terms of sector.
17         It's really a commercial
18 distinction versus a curatorial distinction, and
19 where we needed to we made the juxtaposition
20 from one to the other so that they matched up.
21     Q.    Did you record the average prices
22 in each sector somewhere?
23     A.    Yes.
24     Q.    In the report?
25     A.    In this report, no.  It was part of

Michael Plummer

1
2  the calculation.
3      Q.    I'm trying to figure out how I'm
4  going to find the average prices in each sector.
5  Will it be in that thing you send me
6  electronically?
7      A.    I could put it in that thing that I
8  send you electronically.
9      Q.    That would be helpful in trying to
10 figure out what averages you used in making your
11 calculation.
12     A.    Sure.
13     Q.    Thank you.  Stepping back in a
14 hypothetical situation.  Aside from evaluating
15 each of the 62,000 pieces and coming up with a
16 number or applying the method that you did
17 apply, because I've heard about those two, you
18 testified about what you applied and obviously
19 the other one will take quite a while.
20         Is there any other way that you can
21 think of doing this kind of a valuation of this
22 large a collection?
23     A.    Yes, there was a methodology that
24 we examined and we rejected within about an
25 hour, which was using the average prices of

Michael Plummer

1
2  sales results of Sotheby's and Christie's.  We
3  had accumulated that data and we used it for
4  calculation of BIs.
5          Then we discarded using it for the
6  DIA collection because we felt there was no way
7  to make a logical connection between sales of
8  Sotheby's and Christie's and average prices, and
9  then using -- and the DIA's average price;
10 whereas we felt that using a sample of DIA's own
11 data would be relevant.
12         So I was surprised to see that
13 Wiener used the average prices from the
14 Sotheby's and Christie's data that we had
15 collected to use his valuation on the
16 collection.
17     Q.    So that's one of the things that
18 you disagree with what Mr. Wiener did, correct?
19     A.    Correct.
20     Q.    You mentioned that there were
21 others, what are they?
22     A.    I don't have his report in front of
23 me.  There are some ways in which he matched up
24 some different methodologies to come to a total
25 number that concerned me, and various other

Michael Plummer

1
2  things that I would have to have his report in
3  front of me and my notes to go into.
4      Q.    You state that to the extent this
5  methodology has a bias, this is again back on
6  your page 19, it is likely to overstate the
7  value of the DIA collection?
8      A.    Correct.
9      Q.    How?
10     A.    Because when we did the average
11 value by sector we got some large average values
12 in different sectors like African and others,
13 and drawings; then we just used an average value
14 based on a total average of the Christie's data.
15 We actually did an alternate cut and it dropped
16 it down from valuing that part of the collection
17 from 600 million to 1 something billion,
18 1.2 billion, to about I think it's 130 million
19 to 300 million or something hike that.
20         So we felt going into it that it
21 was a bias, and also because we considered the
22 DIA property to have been purchased
23 strategically and that it was property bought by
24 the City of Detroit for the museum to raise the
25 profile of the museum.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6983-7  Filed 08/22/14  Entered 08/22/14 16:27:25  Page 50 of 82

Michael Plummer

1
2      So it was more likely to be a
3  higher concentration of quality property, a
4  balance of property that was given to the
5  museum, which would include dregs along with
6  high quality of stuff, which often comes in
7  collections that are donated.
8      Q.   On page 19 you also state that for
9  property value "below 5,000 I attributed an
10  effective value of zero"?
11      A.   Yes.
12      Q.   Why?
13      A.   Because we felt that the cost of
14  handling that, and unlike the other property
15  where no commission would have been charged, we
16  felt that there would have been a commission
17  charged for the handling of that property
18  because it has a high nuisance value, and
19  Sotheby's and Christie's try not to sell or
20  value a property in that price range.
21      In fact, Sotheby's just went into a
22  new venture with eBay to try and find a way to
23  solve that problem.  So we felt that the cost of
24  handling it would net out to zero for the value
25  of it.

Michael Plummer

1
2      Q.   If you know, if someone were to
3  approach Sotheby's or Christie's, given your
4  experience with both enterprises, with a project
5  like the monetization of the art collection at
6  the DIA, well, let's ask that later.  Let me ask
7  the first question.  Strike that.
8      If someone were to approach
9  Sotheby's or Christie's, both enterprises that
10  you're familiar with, with a project to sell the
11  collection at the DIA, would that be the kind of
12  project that would be a pretty exciting project
13  to both entities, a very valuable collection,
14  well thought of?
15      A.   It's a valuable collection, it's
16  well thought of.  My business opinion after
17  being in this industry for 35 years and worked
18  at both houses, is that I don't think either
19  house would touch it with a 10-foot barge pole
20  because they -- both houses, just to explain,
21  have museum departments that cultivate
22  relationships with the museums.
23      Museum sales are important to their
24  business, curator's opinions are important to
25  their business, relationship with the museum

Michael Plummer

1
2  directors are important.  They spend a lot of
3  money making donations to museums and
4  cultivating those relationships.
5      If they were to sell this art they
6  would destroy their relationship with the museum
7  community in America and that is a high price to
8  pay, and it would do serious damage to their
9  brand.  I think that the fallout that Christie's
10  received after just doing the appraisal was
11  indicative of how much more magnified it would
12  be if they were to actually handle the sale of
13  the DIA property.
14      Q.   Did you speak with anyone at
15  Sotheby's about this to determine whether they
16  would --
17      A.   Hum, I did not --
18      Q.   That they would not touch it with a
19  10-foot barge pole.  Was it a 10-foot barge
20  pole?  I just want to be sure.
21      A.   A 10-foot barge pole.  I avoided
22  speaking to people at the auction houses about
23  this project that I'm working on.  I did hear
24  someone senior at one of the auction houses say
25  such a thing.  I am very aware of Sotheby's

Michael Plummer

1
2  long-standing commitment to the City of Detroit,
3  it used to be headquartered in Detroit.
4      Its largest shareholder for many
5  years was a donor to the museum and ran a
6  building fund.  He still has a close
7  relationship to the senior management of
8  Sotheby's.  He has a wing named after him in the
9  DIA.  I find it hard to imagine, knowing what I
10  know of the management of Sotheby's, that they
11  would do it.
12      Q.   So it's your view that if someone
13  were to agree to handle the sale of a collection
14  like that, that they would exclude from that the
15  works of art that are below 5,000 for which you
16  attribute an effective value of zero?
17      A.   I'm sorry, I'm not following the
18  collection.
19      Q.   What I'm trying to figure out is
20  you say they may be worth 5,000 or less, you
21  attributed zero, and when you testified about it
22  you said it's because it costs a lot of money to
23  handle that art and get it ready.
24      But in the context of an
25  overarching sale of an entire collection like

Michael Plummer

1    Michael Plummer
2  the City's collection at the DIA, would that
3  still be true, would they still be of no value
4  in your mind?
5        A.    Yes, I think it's going to be a
6  difficult property to get rid of because it's
7  thousands upon thousands upon thousands of items
8  which would require years to be sold.
9        Q.    How many works of art fall in this
10 category at the DIA, this below 5,000?
11       A.    I don't remember.
12       Q.    Do you have anything you can refer
13 to in your report that would refresh your
14 recollection?
15       A.    I don't have numbers, but I have
16 that 45.98 percent were between 1,000 and 5,000
17 in value.
18       Q.    45.89 percent of the overall DIA
19 collection?
20       A.    Right.
21       Q.    Did you review the publicly
22 available information for sales at Sotheby's and
23 Christie's to determine how many sales they've
24 had in the last year or so, two years or so of
25 art that's valued below $5,000?

Michael Plummer

1    Michael Plummer
2        A.    I did not, but I have been
3  involved -- I have not.
4        Q.    Moving on to Table 1 on page 18.
5  The figures in this table come from Christie's
6  evaluation, correct?
7        A.    Yes.
8        Q.    Are you aware that Christie's did
9  not actually appraise all 2,760 pieces?
10       A.    Yes, I am aware of that.
11       Q.    They didn't appraise 1,038 items,
12 correct?
13       A.    I believe that's -- well, what they
14 did was they decided that they were not of
15 sufficient value to appraise.
16       Q.    So they didn't appraise them,
17 correct?
18       A.    They did not appraise them, but
19 they did essentially assign them a value of
20 zero.
21       Q.    In your table you attribute no
22 value to them at all, correct?
23       A.    Correct.
24       Q.    Did you review any of those 1038
25 items to see if you agreed with Christie's that

Michael Plummer

1    Michael Plummer
2  they were of insignificant value?
3        A.    We had the data and we did look at
4  it, yes.
5        Q.    And you agreed with their
6  assessment?
7        A.    Yes.
8        Q.    Turning to Table 2.  The figures on
9  this table include Christie's valuations and
10 Artvest's additional valuations, correct?
11       A.    Yes, correct.
12       Q.    And you come to the conclusion that
13 the entire museum should have appraised or
14 evaluated the collection at between 2.7 billion
15 and $4.6 billion, correct?
16       A.    Correct.
17       Q.    In coming to this conclusion you
18 didn't inspect or value any of the remaining
19 57,181 works of art, did you?
20       A.    We did not.  We valued them by
21 virtue of the calculation we made, but we did
22 not inspect them.
23       Q.    On page 20 you exclude some works
24 thought to be by?
25       A.    Modigliani.

Michael Plummer

1    Michael Plummer
2        Q.    The G is silent?
3        A.    Yes.
4        MR. SOTO:  Every day I work as a
5  lawyer I learn something I didn't know the day
6  before.
7        Q.    Modigliani?
8        A.    Modigliani.
9        Q.    Why are you insinuating that the
10 works of art at the museum are not authentic?
11       A.    Because they are not in the Ceroni
12 catalogue resume, and there is a lot of
13 controversy in that market right now, and there
14 is a number of fakes around, and there is
15 alternate catalog resume out there that has
16 fakes in it.
17       So it's a hot controversial topic
18 and Christie's should stop selling works that
19 are not in Ceroni, and Sotheby's is reluctant to
20 do so as well.  So the common practice is to
21 give it a value of zero or a minimal value;
22 certainly not to value it as a real Modigliani.
23       Q.    How many works of art does a museum
24 have that are Modiglianis?
25       A.    I don't remember the total amount.

51 (Pages 201 to 204)

Michael Plummer

1    Michael Plummer
2 I think that Christie's did value one and I
3 believe there were two which we had took issue
4 with, if I remember correctly.
5    Q.    So they did one?
6    A.    And we had two.
7    Q.    You took issue with them both?
8    A.    I believe so, but I can't remember
9 for certain.
10    Q.    Do you know if the museum insured
11 those pieces?
12    A.    I don't remember.
13    Q.    Do you know if there was an
14 insurance value for any of those pieces?
15    A.    I don't remember.
16    Q.    You also excluded the Diego Rivera?
17    A.    Yes.
18    Q.    Why was that?
19    A.    It is -- according to the standards
20 of the Appraisers Association of America, and
21 Liz von Habsburg agreed with this analysis as
22 well, so it's two of us who came to the same
23 conclusion that if an important -- if a mural is
24 a part of a building and it would damage it to
25 remove it, it should be valued as part of the

Michael Plummer

1    Michael Plummer
2 real estate of the building and not separately
3 as a work of art, because it really is not
4 removable.
5         This is really particularly true of
6 the Diego Rivera murals because they are so
7 large that they would have to be sliced up in
8 the middle of the imagery in order to move them,
9 and that would cause one set of damage, plus the
10 active removal would cause another set of damage
11 so then they would require heavy restoration.
12 The damage would be an injury to the work and it
13 would -- it just -- it can't be valued as a
14 salable work of art.
15    Q.    Do you know how the DIA initially
16 acquired this work of art?
17    A.    It's my understanding that they
18 were a gift from Ansel Ford, if Ansel is
19 correct, and that they were painted by Diego
20 while he camped out there for a period of time
21 to complete them, and that actually just after
22 completing those he rushed up to New York to
23 paint the ones at Rockefeller Center that were
24 then subsequently painted over by Nelson
25 Rockefeller.  This is a masterpiece.

Michael Plummer

1    Michael Plummer
2    Q.    Did they have to remove the works
3 from Ansel Ford's site to the DIA?
4    A.    No, I was not aware of that.
5    Q.    So they were painted at the DIA?
6    A.    They were painted at the DIA.
7    Q.    That's what I'm trying to ask.  Is
8 it possible, do you know of murals of this type
9 that have been moved?
10    A.    There have been some smaller murals
11 moved from churches and things.
12    Q.    Did you consider the possibility of
13 doing that when you valued the Diego Rivera?
14    A.    As I said, we did consider it, and
15 we talked to a Diego Rivera expert as well.
16 It's as I said for the reasons I mentioned,
17 breaking them up and giving that kind of risk.
18    Q.    Looking at what has been called the
19 market issues affecting sales, we're going to go
20 to page 24.  Your report attempts to address
21 some market issues that may affect the value of
22 the collection, correct?
23    A.    Um-hum.
24    Q.    On page 24.
25         MR. O'REILLY:  Just verbal answers.

Michael Plummer

1    Michael Plummer
2    Q.    Whenever anybody wants to take
3 another break some time in the middle of the
4 afternoon to get some coffee or something,
5 whatever you want.
6    A.    Okay.  Thank you.
7    Q.    Paragraph 37 on page 24 says, "A
8 significant segment of DIA's collection is in
9 areas that have fallen out of favor with
10 collectors."  Correct?
11    A.    Correct.
12    Q.    The performing sectors that you
13 identify that have fallen out of favor, and you
14 mentioned some of them earlier, were American
15 Art pre-1950, Old Masters and 19th Century
16 European paintings?
17    A.    Um-hum.
18    Q.    And then also Impressionist and
19 Modern Art, correct?
20    A.    Correct.
21    Q.    What is the basis for this opinion?
22 How did you determine that these were
23 underperforming sectors?
24    A.    Well, I think the index here from
25 Mei-Moses points this out on page 24.  I think

Michael Plummer

1
2  that's a factual representation.  I would say
3  also every day of my business both with Artvest
4  and also with Spring Masters, working with
5  dealers and collectors in these areas, and just
6  this past week I had the same conversation with
7  five different dealers in these areas that said
8  the same thing that I'm saying here.
9       So this is borne out in everything
10 I experience.  So I would, you know, challenge
11 you to find a dealer out there who would
12 disagree with this, or an auction house expert.
13      Q.   Did you do any research to
14 determine what was the basis of this chart 18
15 that you have here, the 2003 index?
16      A.   I know how the Mei-Moses index is
17 completed.  I've known Michael Moses for ten
18 years, I've been studying indexes in the art
19 industry.  I actually helped construct one that
20 we used for a period of time several years ago.
21      I know he uses repeat sales index.
22 I know some people don't like that, I'm
23 perfectly fine with it because I think his
24 database is now complete enough to be
25 representative of the art market.  Ten years ago

Michael Plummer

1
2  I would have said not, but I think it is
3  absolutely fine now.
4       Q.   Ten years ago the difference would
5  have been what?
6       A.   Because he didn't have enough
7  samples in his database, but he's flushed it out
8  fully enough that when I compare it to other
9  indices it actually is comparable.
10      Q.   When you say he uses repeat sales
11 what does that mean?
12      A.   It means he gets -- he's gone back
13 to the 19th Century to get data from a property
14 that comes back up to auction and then he
15 measures the price of the same piece each time
16 it's auctioned and uses that as a data point.
17 The merits are that he's using a bucket of data
18 that is actually using identical pieces.
19      Q.   Did you consider using any
20 additional indices to support your conclusion
21 here, besides the Chart 18, Mei-Moses?
22      A.   I did, and I know they show very
23 similar thing.  Art Market Research has the
24 similar results, but I did not feel it necessary
25 to apply it here.

Michael Plummer

1
2       Q.   That is because?
3       A.   I thought this made the case in and
4  of itself.  Mei-Moses, except for a few people,
5  he is well regarded.
6       Q.   You're not concerned with the fact
7  that he uses repeat sales limits?
8       A.   No --
9       Q.   Excuse me, limits the database that
10 he's using?
11      A.   No, because I tracked it over ten
12 years and compared it to other indices I'm
13 perfectly comfortable with this.
14      Q.   The other indices that you referred
15 to earlier, are they consistent with this one in
16 the analysis of the value of these sectors?
17      A.   Yes.
18      Q.   Looking at your chart, it appears
19 as though all sectors declined in 2008, correct?
20      A.   Yes, 2008 was a bleak time for
21 everybody.
22      Q.   This was as you testified about
23 earlier, the financial crisis that you referred
24 to?
25      A.   Yes.

Michael Plummer

1
2       Q.   Isn't it also true that in a down
3  market that turnover falls because collectors
4  are less willing to sell at a depressed rate,
5  they would rather just hold on to it and sell
6  later?
7       A.   Yes, we had commented on that.
8       Q.   As the nation recovers would you
9  expect that the interest in those sectors would
10 also increase?
11      A.   Not necessarily, for a couple of
12 reasons.  One is that the art market is driven
13 by a global collector base, and if you're asking
14 about less recovers I don't think it's
15 necessarily a linear connection.
16      I also say perhaps more importantly
17 that the problem with these sectors is that
18 young collectors, new buyers are moving almost
19 exclusively into Post War, not into these other
20 sectors, so they're not getting the new blood
21 that they need.
22      Q.   Looking at your chart, it appears
23 that the Impressionist and Modern Art sector is
24 on the rise again, correct?
25      A.   From this Mei-Moses index?

Michael Plummer

1
2    Q.    Yes.
3    A.    No.  I wouldn't say that.  I would
4  say that the Modern sector is doing better than
5  the Impressionist part of the sector, and
6  benefits a little bit from spillover from the
7  Post War and Contemporary since it's the sector
8  just before that; but that sector is pretty
9  flat.
10   Q.    So these green lines here?
11   A.    The green lines, you can see it
12 came back in 2010, but it hasn't shown
13 noticeable appreciation between 2011 and 2013.
14 In fact, there have been some disappointing
15 sales in that area which are mentioned in this
16 document.
17   Q.    Are you familiar with Zhang Yi, an
18 author of the TEFAF?
19   A.    TEFAF.
20   Q.    T-E-F-A-F, TEFAF Art Market Report?
21   A.    I am familiar that he's contributed
22 to that report as a freelancer, but I actually
23 have a very close relationship with the woman
24 who actually writes the full report, Clare
25 McAndrew, that's who I tend to correspond with

Michael Plummer

1
2  and communicate with.
3    Q.    Looking at your report, tab 4?
4    A.    Table 4 you mean?
5    Q.    Let me hand you as Exhibit 3.
6        (Plummer Exhibit 3, Victor Wiener's
7  Expert Report in this Chapter 9 proceeding,
8  marked for identification.)
9  BY MR. SOTO:
10   Q.    As Exhibit 3 let me hand you a copy
11 of Victor Wiener's report.  Exhibit 3 is marked
12 here, it's Victor Wiener's Expert Report in this
13 Chapter 9 proceeding.
14       You testified earlier that you
15 reviewed that, correct?
16   A.    Correct.
17   Q.    You mentioned that there were a
18 number of things that you disagreed with,
19 correct?
20   A.    Correct.
21   Q.    You've mentioned a few of them
22 already, correct?
23   A.    Correct.
24   Q.    Take a few moments to take a look
25 at it and see if there are any other areas you

Michael Plummer

1
2  find particularly disturbing to you?
3        MR. O'REILLY:  Objection to the
4  form.
5    A.    I would say at the start that I
6  have my own notes and thoughts on this that I
7  can't summarize this fully in this exchange with
8  you.
9    Q.    You don't have to summarize them
10 fully, just things that are of major disturbance
11 to you that you find that are particularly in
12 error?
13   A.    I would say that the value of the
14 collection is in error.
15   Q.    Why is that?
16   A.    Because I think that it's grossly
17 overvalued.
18   Q.    Why?
19   A.    Because in his methodology, if you
20 look at his methodology step-by-step chart,
21 number 3, he's chosen 387 units, which we don't
22 know why he's chosen those that he's put a value
23 on, where he has put in a supplement based on
24 his assumption that the DIA sale is going to be,
25 as he puts it, a sale of the century.

Michael Plummer

1
2        He has not revealed what that
3  supplement is, but it appears to be a multiple
4  of three or four or many times, and there
5  doesn't seem to be a clearly understandable
6  basis for that calculation.
7        Then he uses Christie's and my
8  appraisal values which he has criticized, but
9  yet he uses them.  I don't think he criticized
10 Winston's, but he uses theirs as well.  Then in
11 step 3 he has used the DIA values, insurance
12 values which we have already mentioned.  We did
13 an analysis of and found them to be irrelevant.
14   Q.    Are those the ones you described as
15 whacky?
16   A.    Yes.
17   Q.    So you're assuming those are the
18 insurance values?
19   A.    Yes.  Most likely, to the extent if
20 they are insurance values they would be
21 replacement values which, as I said, would be
22 the highest value.  Victor did a net cash
23 valuation for step 1.  He used our numbers,
24 Christie's, Artvest and Winston's which are fair
25 market value.

Michael Plummer

He then used a replacement value
methodology for step 3. Then he went back to
what would be the equivalent of fair market
value because he used Christie's and Sotheby's
data.

For step 4 he used my data to
basically get an average value based on sales of
Sotheby's and Christie's, which I told you we
rejected that methodology as being unsound, as
there not being any logical connection between
the property sold at Sotheby's and Christie's
from what's in the DIA. So he uses all of these
different methodologies and all of these
different values to arrive at 8 million 552.

Q.    Anything else that comes to mind as
you look at it?

A.    Well, he makes claims about my
process which he had no knowledge of, which are
untrue. There are other things.

Q.    Let me walk you through some that
you might have mentioned that I had while
everyone was eating?

A.    Sure.

Q.    Turn to page 21 of the report. I'm

Michael Plummer

pointing these out to you because you may have
mentioned something about it and I would be
interested on what your view is about this,
correct?

A.    Yes.

Q.    On page 21, the paragraph under
"Museum provenance" under "The Effects of
Selling Museum and Celebrity Art":

"It is apparent that works of fine
and decorative art, and other collectibles from
museums and other significant collections
perform much better at auctions than similar
objects lacking notable provenance."

Do you agree with that?

A.    In many instances, but not all.

Q.    How about in the context of the
collection at the DIA?

A.    I don't think it would apply to the
collection of the DIA, and I have reasons for
believing that.

Q.    And why is that?

A.    If the collection were sold it
would have the taint that I described. If
the -- now I'm wearing my hat as former head of

Michael Plummer

marketing at Sotheby's. He mentions the
celebratory effect of the Jackie O sale, as I
mentioned earlier. I worked at Sotheby's on
that sale so I have real world insight on that
kind of thinking and marketing.

To put on a show if you will, to
put on a promotional effort that we did at
Sotheby's for Jackie O, or that was even done
for the Albright-Knox property, there has to be
a positive feeling behind the celebrity or the
institution.

If there is taint you can't market
it that way, you can't do a big celebratory
sale, it works against you, it actually
backfires. So you couldn't do a big, splashy,
this is the DIA sale, that's not possible.

In fact, what is comparable to the
DIA sale is the Klimt paintings that were sold
in 2006 at Christie's, where they were Nazi
property that had been given to the Vienna
Museum and then restituted. Those paintings did
well, but they did well not because they were
property from the museum. In fact, the museum
provenance was hidden in the marketing. The

Michael Plummer

story that was told was about their restitution
to the owner.

So yes, it's true in certain
circumstances, museum provenance can be
meaningful and important, but it has to be the
right circumstance otherwise it can work against
you.

I take the case that I use in my
paper about the Delaware Museum. They went out
thinking they had $30 million worth of art to
sell, that has not gone well, they've been
sanctioned. They are now expecting that art to
bring in $19 million worth and they've had to
lower their expectations of what they will be
able to pay down.

MR. O'REILLY: Ed, I don't want to
interrupt your flow, do you mind if I take a
break?

MR. SOTO: Sure.

THE VIDEOGRAPHER: The time is
3:16 p.m., we're going off the record.

(Short break taken)

THE VIDEOGRAPHER: This begins
media unit number 4, the time is 3:27 p.m., and

Michael Plummer

1
2 we're back on the record.
3 BY MR. SOTO:
4     Q.    Mr. Plummer, looking at the report
5 before you, Exhibit 3, at page 44. Mr. Wiener
6 is commenting on your report there?
7     A.    Okay.
8     Q.    The paragraph you see:
9           "In brief, Dr. Barth opines that
10 most, if not all, the discounts applied by the
11 Artvest Report are unsustainable because of
12 reliance upon unsupported data. The Barth
13 Report goes through each discount the Artvest
14 Report applies and shows that the data is either
15 lacking or inconsistent with the conclusions
16 reached. As such, the Barth report concludes
17 that the Artvest Report is unreliable."
18           Do you see that?
19     A.    I see that.
20     Q.    Did you have a chance to review the
21 Barth report?
22     A.    I did.
23     Q.    What were your conclusions on that
24 report?
25     A.    I felt it was -- I disagreed with

Michael Plummer

1
2 her conclusions. She -- her experience and
3 education in the art world is a certificate at
4 Sotheby's works of art program, which actually I
5 used to oversee as part of my role at Sotheby's.
6           I think that she's speaking from a
7 place of not real art world experience and I am,
8 and I think that actually the conclusions are
9 supported, the data is supported, and I stand by
10 it.
11     Q.    Anything more than that?
12     A.    I probably have more, but I would
13 have to, you know, prepare for it.
14     Q.    In connection with the next
15 paragraph that starts:
16           "The Artvest Report also dismisses
17 all expressions of interest by three potential
18 purchasers," do you see that?
19     A.    Yes.
20     Q.    Did you read that purchase of it?
21     A.    Yes, I did.
22     Q.    Did you read the next paragraphs
23 that address those potential purchases?
24     A.    Which paragraph are you referring
25 to?

Michael Plummer

1
2     Q.    The first one is the first
3 paragraph on the potential "See Artvest Report,
4 39 to 40," do you see that? "The Artvest Report
5 also dismisses all expressions of interest"?
6     A.    Yes.
7     Q.    What is your opinion on that
8 conclusion?
9     A.    I reviewed the expressions of
10 interest and I stand by what I say in my report.
11 In fact, I'm not sure why they can disagree with
12 what I've said because it's pretty
13 straightforward.
14     Q.    The next paragraph talks about,
15 well, let's see:
16           While VWA did not have direct
17 access to the three potential purchasers,
18 according to Houlihan, Poly International
19 Auction House, who expressed interest in
20 purchasing all Chinese works for up to $1
21 billion, Yuan Capital, who also expressed
22 interest in purchasing 116 pieces for $895
23 million to $1.4 billion, and Catalyst
24 Acquisitions/Bell Capital Partners, who
25 expressed interest in purchasing the entire

Michael Plummer

1
2 collection for $1.7 billion."
3           Did you try to contact any of those
4 individuals in connection with the preparation
5 of your report?
6     A.    I did not. I am familiar with
7 Poly. I expressed in my report that I was
8 unfamiliar with the others. And, as I recall in
9 my report, I believe that I was talking about
10 whether or not the value of the collection would
11 measure up to what these people were interested
12 in buying, and as I read the documents
13 subsequently of what they offered as their
14 indications of interest, there is no binding
15 commitment there, and all of them allow an out
16 to provide a lower value offer if the collection
17 is lower or the section of the collection is
18 lower than what they're asking for. That's
19 pretty much all I said, except for with regard
20 to Ian Peck which is a different issue, and the
21 loan.
22     Q.    I was about to go to Ian Peck, but
23 before I do. Did you try to contact these
24 individuals or any other potential monetization
25 entities?

Michael Plummer

1
2      A.    I did not.
3      Q.    You were not asked to either?
4      A.    I was not asked to.
5      Q.    Now you were going on to Ian Peck.
6  What more did you have to say about his view?
7      A.    Well, it's interesting.  He says
8  that my expense calculations are inaccurate, yet
9  they are what is in his offer, not only in the
10 Houlihan Lokey document, but I read the details
11 of his indication of interest that he submitted
12 to Houlihan Lokey, and the numbers that I used
13 are the numbers that he has in his offering
14 documents.
15          So I'm surprised -- I'm not
16 surprised.  I am perplexed that he would say
17 that they are inaccurate, when actually the
18 documentation submitted supports what I said.
19     Q.    Anything else?
20     A.    With regard to the report?
21     Q.    Yes.
22     A.    We could go through it page by
23 page.  I have numerous objections to it, but I'm
24 not sure that's the best use of your time today.
25     Q.    We can certainly come back and do

Michael Plummer

1
2  that, but what I'm asking is a little bit
3  different.  I appreciate your willingness to do
4  that.
5          As you sit here today, are there
6  any things that you find particularly egregious
7  or inaccurate that you haven't testified about
8  already?
9      A.    I mentioned the ones that are top
10 of mind.  There are others, but I would have to
11 go through the report to find them.
12     Q.    Going back to -- we were talking
13 about your report page 6 of 72 in your report,
14 paragraph 23 which is actually on page 7,
15 paragraph 23 is on page 7.
16     A.    Okay.
17     Q.    You state that:
18          "Four sectors of the art market
19 constitute 98% of the value of the fine art
20 market: European, Modern Art, Impressionist and
21 Post-Impressionist Art, European Old Master
22 Paintings, and Post War and Contemporary Art.
23 Of those four sections, three have declined in
24 value since 2011."
25          Do you see that?

Michael Plummer

1
2      A.    Right.
3      Q.    Other than what you've already
4  testified about today, I know you've mentioned
5  this before, why do you believe those sectors
6  have declined?
7      A.    For the reason I stated, that
8  collectors are migrating into Contemporary Art
9  to the exclusion of other sectors.
10     Q.    Did you notice that the volume and
11 sales of those same three sectors in 2012 and
12 2013 exceeded previous session models?
13     A.    Yes.
14     Q.    Is it possible that the
15 Impressionist and Modern paintings sectors
16 declined because there were few high quality
17 works on the market during the depressed period?
18     A.    I think some people believed that,
19 but I think that it's a function of the reason
20 that I stated.  That, as I said, comes from not
21 only looking at the data but actually talking to
22 the dealers in the field, which I indicated
23 earlier, dealers and auction house specialists.
24     Q.    Going to paragraph 25 of your
25 report which is on page 9, looking at

Michael Plummer

1
2  subparagraph A.  You state that:
3          "Selling at or below the low
4  estimate is more the norm, and selling at the
5  higher end of the estimate range becomes an
6  anomaly."
7          Do you see that?
8      A.    Yes.
9      Q.    You point to the example from
10 Christie's evening auction as support for that,
11 right?
12     A.    Right.
13          (Plummer Exhibit 4, Article
14 prepared by Zhang Yi entitled "Review of Expert
15 Witness Report of Michael Plummer, Artvest
16 Partners, Dated July 8, 2014", marked for
17 identification.)
18     Q.    Let me hand you Exhibit 4.
19     MR. SOTO:  For the record,
20 Exhibit 4 is an article prepared by Zhang Yi,
21 which is Z-h-a-n-g, Yi, Y-i, two separate words
22 entitled "Review of Expert Witness Report of
23 Michael Plummer, Artvest Partners, Dated July 8,
24 2014."
25     Q.    Have you seen this before?

Michael Plummer

1
2    A.   I have, yes.
3    Q.   It's one of the supplements or one
4  of the exhibits to Mr. Wiener's report, correct?
5    A.   Correct.
6    Q.   Did you review this?
7    A.   I did.
8    Q.   Will you take a look at that report
9  in paragraphs 7 through 8?
10    A.   Yes.
11    Q.   He states that your analysis as to
12  Christie's evening sales was incorrect, I'm
13  quoting him:
14        "The Artvest Report is incorrect
15  about Christie's auction data for the evening
16  sales of Impressionist and Modern Art.  The
17  turnover of that section on May 6th was
18  $285.9 million, and the estimate was between
19  $244.5 million to $360.4 million."  Do you see
20  that?
21    A.   Right.
22    Q.   Did you check this man's data to
23  determine whether you were right or he was
24  right?
25    A.   I did.

Michael Plummer

1
2    Q.   What was the result?
3    A.   I was right.  What's curious is
4  that I have here the 172 is the hammer price,
5  and we say that that's the hammer price, and he
6  seems to be disregarding that because he's using
7  the price plus the buyer's premium which, as I
8  told you, distorts the market.  So he seems not
9  to be adjusting, making the proper adjustments
10  we are which shows the real activity in the
11  marketplace.
12    Q.   So the difference between the 285.9
13  number that Mr. Yi refers to you believe that it
14  includes the buyer's premium?
15    A.   It includes the buyer's premium,
16  but it looks like it includes something else.  I
17  checked the 172 million and that is the correct
18  price, or the hammer price.
19    Q.   Looking at paragraph 25 B in your
20  report, page 10.  Your analysis assumes that the
21  increase in international art purchases, and I'm
22  quoting here, is not likely to be repeated
23  over the next five years.  In fact, with growth
24  now concentrated almost exclusively in the Post
25  War Contemporary sector, I estimate that

Michael Plummer

1
2  excluding a price disruption in this sector,
3  growth of the art market will remain choppy over
4  the near to mid-term in all other sectors other
5  than Post War and Contemporary?
6    A.   Um-hum.
7    Q.   What's the basis for that opinion?
8    A.   The basis for that is, as I said,
9  all of the data that I talked to you before, all
10  of the conversations I talked to you about,
11  everything that I've mentioned up to now as to
12  my sources of information.
13        I should add that I used this in my
14  analysis for Citibank last year in the problems
15  that Christie's was facing going into the
16  future, and the activist investors, Dan Loeb and
17  the others, based their activity with Sotheby's
18  based on my analysis with Christie's.
19        So I would say that my theory is
20  not just something that I pulled out of the air,
21  but something that is grounded in real world
22  experience that others have taken action on,
23  financial action on.
24    Q.   Turn again to Mr. Yi's analysis in
25  your report, Exhibit 4.  Exhibit 4, page 6 of

Michael Plummer

1
2  that exhibit?
3        MR. IRWIN:  Did you say paragraph 6
4  or page 6?
5        MR. SOTO:  Page 6, paragraph 21.
6    Q.   Take a moment to read that.  I
7  assume you have read it before?
8    A.   Yes.  He's saying the opposite of
9  what I say.  As I said, he may not have
10  evidence, but he's not active in the art world
11  the way I am on a day-to-day basis.
12        Actually, and let me add that I
13  have actually had this conversation with Clare
14  McAndrew who writes the report that he's
15  purporting to actually represent, and she
16  actually has agreed with me.
17    Q.   Looking then back on the TEFAF
18  report that you rely on in your report.  It
19  states that:
20        "Emerging markets are increasing
21  their importance in the global wealth hierarchy
22  and have been growing at faster rates than more
23  developed markets, a trend that is expected to
24  continue."
25        Did you disagree with the TEFAF

Michael Plummer

1          Michael Plummer
2  report?
3     A.   No, I don't agree with that -- I
4  don't disagree with that.
5     Q.   Where is the disconnect then
6  between your view that this -- are they talking
7  about two different sectors of art, is that what
8  I'm missing here?
9        The TEFAF report says that emerging
10  markets will continue to grow, correct?
11     A.   They will continue to grow, but it
12  doesn't say by how much and at what pace.
13     Q.   It says at faster rates than
14  developed market?
15     A.   Still, it's not saying what that
16  impact will be on the larger art market and what
17  percentage. All I'm saying is it's not going to
18  be the kind of growth that happened from 2003 to
19  2012, some years will be up, some years will be
20  down. I'm not denying that there won't be
21  growth at all.
22     Q.   So your analysis is that there
23  won't be growth, it just might not be as fast as
24  it was before?
25     A.   It might not be as fast as it was

Michael Plummer

1          Michael Plummer
2  in the past.
3     Q.   Turning to page 25 of your report.
4  Under museum purchases you state that:
5       "Few sales would be to other
6  museums, both because other museums are likely
7  to boycott such sales, as well as because
8  funding constraints limit their participation in
9  the marketplace." Correct?
10     A.   Correct.
11     Q.   What is the basis for your
12  statement that museums are likely to boycott the
13  sale?
14     A.   Comments made by other museum
15  professionals to me.
16     Q.   Those were again not at the DIA,
17  but at other museums?
18     A.   At other museums.
19     Q.   I think you testified earlier you
20  spoke to about 20 people?
21     A.   People either in museums or
22  associated with museums.
23     Q.   Can you recall which museums you
24  spoke with about the potential sale of art at
25  the DIA?

Michael Plummer

1          Michael Plummer
2     A.   I promised the people that I talked
3  to that I would not reveal who they were.
4     Q.   Assuming for the moment that the
5  DIA did sell its collection, is it your opinion
6  that museums would refuse to bid on the, I think
7  you described it as once in a lifetime sale
8  artworks that you described earlier?
9     A.   I think there are a number of
10  obstacles in the bidding. I think that they
11  would be reluctant to, some of them would
12  boycott, some of them would have difficulty --
13  most of them would have difficulty coming up
14  with the funding of the magnitude of some of the
15  master works.
16     Q.   Let's take the example of "The
17  Wedding Dance"?
18      MR. IRWIN: Sorry, are you done?
19     Q.   I'm sorry.
20     A.   I'm not sure. For the moment I'm
21  done.
22     Q.   Take the example of "The Wedding
23  Dance" by Peter Bruegel. Is it your testimony
24  here that museums would -- if it was going to be
25  sold as a City work of art by the DIA, is it

Michael Plummer

1          Michael Plummer
2  your opinion that there would be no museums that
3  would bid on that once in a lifetime sale of
4  art?
5     A.   No, I didn't use any -- I never
6  used no or all or anything; I just said that it
7  would not be the solution that people might
8  think it is. I can't sit here and say that no
9  one would bid on anything, but I can sit here
10  and say that if you're liquidating 100 master
11  works that are worth, you know, a billion
12  dollars or $800 million, whatever it works out
13  to be, that the museum community is going to
14  come up with $800 million to be able to buy
15  those works of art.
16      (Plummer Exhibit 5, Article by
17  Katherine Boyle from the Washington Post, dated
18  October 6, 2013, entitled "Poor Detroit: What
19  money giveth, It can taketh away", marked for
20  identification.)
21  BY MR. SOTO:
22     Q.   Let me hand you Exhibit 5.
23  Exhibit 5 is an article by Katherine Boyle,
24  B-o-y-l-e, from the Washington Post, dated
25  October 6, 2013, it's entitled "Poor Detroit:

59 (Pages 233 to 236)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 60 of 82

Michael Plummer

1
2 What money giveth, It can taketh away."  Do you
3 see that?
4      A.   Yes.
5      Q.   Have you reviewed this article
6 before?
7      A.   I have, yes.
8      Q.   What occasioned your review of this
9 article?
10      A.   I read it when it came out.
11      Q.   The article discusses the potential
12 sale at the DIA, correct?
13      A.   Right.
14      Q.   Certainly read all of it.  If you
15 read it already I'm going to ask you some
16 questions on the second page where you're
17 quoted?
18      A.   Um-hum.
19      Q.   As saying:
20           "In situations where a museum is
21 deaccessioning important pieces, boycotts are
22 rare.  It's a market driven by opportunism, and
23 this would be an opportunity.  While one
24 collector sits on their hands, another won't."
25 Do you see that?

Michael Plummer

1
2      A.   Aha.
3      Q.   Did you still agree with that
4 statement?
5      A.   This is part of a much fuller
6 conversation which got distilled down into two
7 sound bites in this piece.  What I said was much
8 more nuanced, and I think is reflected in my
9 report which is, when I said that the taint
10 would happen in this collection I was
11 referring -- in terms of my numeric approach I
12 only applied it to the American sector, and the
13 reason for doing that is reflected -- this
14 comment reflects that.
15           I think outside of America the
16 buyers will be less impacted, they'll be less
17 concerned about whether it's from the Detroit
18 collection.  That kind of nuance gets lost in an
19 article in the Washington Post, they're just
20 trying to get a couple of sound bites out of
21 you, but I think it's better reflected in my
22 report.
23      Q.   In the Washington Post you were
24 essentially stating in your opinion that in a
25 more global market one collector might sit on

Michael Plummer

1
2 their hands, but another won't?
3      A.   Right.
4      Q.   You still agree with that, correct?
5      A.   And that applies to the
6 Impressionist sector and the Contemporary
7 sectors where I did not factor in a discount.
8 But in the American market, for reasons stated
9 in the report, I do think people would sit on
10 their hands and they would not be opportunistic.
11      Q.   Is it your view that people in the
12 global market are not interested in American
13 Art?
14      A.   Yes.  American Art is collected
15 almost exclusively by -- no, not almost, it is
16 collected exclusively by Americans.
17      Q.   You further state in this article:
18           "There's an enormous amount of
19 wealth in this country, and we have some of the
20 most active buyers at auction.  We shouldn't
21 immediately come to the conclusion that someone
22 from overseas would buy these works."
23           Do you remember making that
24 statement?
25      A.   I do.

Michael Plummer

1
2      Q.   There you're talking about the
3 wealth in America, correct?
4      A.   Right.  I was specifically refer to
5 the Post War and Contemporary sector where I did
6 not take a discount because, unlike the American
7 sector, I don't think the collectors in that
8 sector care much about the DIA and would be
9 quite -- could be voracious in going after some
10 of the works in that collection.
11      Q.   So the paragraph above the quote I
12 just read you says:
13           "It's also possible American Art
14 collectors would respond to keep the works in
15 this country.  Some of the most expensive works
16 purchased at auction have been sold to American
17 collectors:  Hedge fund manager Steven Cohen
18 bought Picasso's "Le Reve" for $155 million.
19 Billionaire financier Leon Black bought one of
20 Edward Munch's "The Scream" for $120 million.
21 It's possible that major museums could partner
22 with wealthy buyers to keep the most expensive
23 works in the United States."  Correct?
24      A.   I didn't say this, this is the
25 author's language.

Michael Plummer

1
2    Q.    Do you think that's correct?
3    A.    I don't know.  I don't know
4  because -- I don't want to speculate on these
5  individuals and the logic of this because I
6  don't necessarily agree with it.
7    Q.    There would be wealthy Americans
8  who might want to keep American Art in America,
9  correct?
10    A.    Well, American Art wouldn't --
11  there are no buyers for American Art outside of
12  America.  I'm saying American Art will be
13  difficult to sell at all because the collector
14  base would find the collection tainted.
15    Q.    Even private individuals, like
16  these wealthy hedge fund owners?
17    A.    Well, these hedge fund owners don't
18  buy American Art.
19    Q.    Is that your statement?
20    A.    Let me clarify.  We're talking
21  about American Art pre-1950; all of the examples
22  here are Contemporary Art or Modern Art.  Steve
23  Cohen does not buy American Art pre-1950, Leon
24  Black, to my knowledge, doesn't buy American Art
25  pre-1950, so I don't think that this is really

Michael Plummer

1
2  relevant to the point I'm making.
3         They do buy Contemporary Art, which
4  I mentioned earlier was a sector that I do think
5  that this logic -- the logic that buyers would
6  bid in that area.
7    Q.    Let's go to page 26 of your report.
8  Paragraph 39 you state:
9         "In this section, I anticipate and
10  quantify various different potential factors
11  that, based on either current market conditions
12  or historic precedent, are likely to have a
13  financial effect on the sale of the art from the
14  DIA collection.  Many of these factors are not
15  taken into account in any standard appraisal or
16  fair market situation.  I also apply the
17  discount factors for various sale scenarios."
18         Do you see that?
19    A.    Um-hum.
20    Q.    Now we've discussed some of these
21  issues before, correct?
22    A.    Um-hum.
23    Q.    Didn't you say that you conducted a
24  fair market value evaluation, correct?
25    A.    Correct.

Michael Plummer

1
2    Q.    So in addition to the fair market
3  value evaluation, you added additional elements
4  that you refer to as factors that are not taken
5  into account in the standard appraisal, correct?
6    A.    Correct.
7    Q.    Is there a reason why you wouldn't
8  have included those factors in your appraisal to
9  begin with, why those factors wouldn't be
10  included if you're really trying to get a fair
11  market value?
12         Doesn't that mean when you said
13  earlier what a willing seller would sell at and
14  what a willing buyer would buy at?
15         MR. IRWIN:  Form.
16    A.    I felt that the way to get the most
17  transparent and accurate -- the most transparent
18  and logical approach was to apply it en mass so
19  that the reasoning could be understood.  I'll
20  give you a counter-example which is that Wiener
21  approach provided a supplement, he did it piece
22  by piece, but it's not transparent.  So it's not
23  understandable what methodology he used and how
24  he applied it.  Here you can see my logic, you
25  can understand it and you can debate it.

Michael Plummer

1
2    Q.    Would you agree with me that some
3  appraisers, like even some you're familiar with,
4  would include some of the factors you used in
5  coming at an appraisal value?
6    A.    They might consider some of them
7  for certain pieces but not for others, some of
8  these they wouldn't consider the all.
9    Q.    Let me go through your opinions and
10  get some information on the basis other than
11  what might be here.  So on paragraph 41 which is
12  on page 26 you say:
13         "An immediate liquidation of the
14  art collection will result in selling the DIA
15  collection at a fraction of its fair market
16  value."
17         Do you see that?
18    A.    Um-hum.
19    Q.    What's the basis of that
20  conclusion?
21    A.    Well, I give examples below, or the
22  example below, the Matisse collection, which is
23  a classic example of that.  I think that you
24  could even look at the offers on the table for
25  that Houlihan Lokey brought forward as actually

Michael Plummer

1 examples of exactly that, that they are offers
2 to get a block of property below value and at a
3 serious discount.
4     Q.   So the reason why an immediate sale
5 would bring a fraction of it, other than the
6 examples you've given would be what, there's too
7 much art on the market at one time; is that it?
8     A.   There are actually various points
9 to support this.  One is this real-life example
10 of Acquavella.  Two is that if you put too much
11 of a certain thing on the market you will
12 depress prices, which is a blockage discount.
13 Three, there is the fact that I use as a rule of
14 thumb -- I mean, in the art market it is
15 standard practice that the loan to value ratio
16 for an art loan is 50 percent.
17     And the logic behind that, and this
18 is something that I -- when I mentioned to you
19 that I was setting up lending capacities with
20 banks at Christie's, this is a philosophy I got
21 into with great complexity with the underwriters
22 at various banks that the -- this is a
23 long-standing tradition in the art market,
24 because 50 percent is felt to be a -- the most

Michael Plummer

1 valid number for a fast sale of a work of art
2 which is why it is used in lending.
3     That is supported by the fact that
4 nearly every lender uses that number.  Now,
5 notwithstanding that, Art Capital Group used
6 20 percent in its offer to the DIA, but that's
7 an exceptional circumstance and an exceptional
8 offer.
9     Q.   So beyond your experience with
10 Citibank, were there any other studies that you
11 relied on for the 50 percent number?
12     A.   No.  I'm saying that there were no
13 studies. I'm saying that with my experience
14 with all the art -- I have a relationship with
15 all of the art lenders in the industry and
16 do business with most of them. I'm saying that
17 the practices amongst all of them, and including
18 Sotheby's and Christie's, and in developing the
19 art lending program at Christie's where we use
20 the same practice, it is 50 percent.
21     It is 50 percent because that has
22 been a long-standing custom, business custom in
23 the art world, that that is a value you can
24 expect to get from a work of art or a group of

Michael Plummer

1 works of art if they have sold quickly.  So I
2 didn't need to do a survey, this is based on
3 real world experience.
4     Q.   So in your experience, how many
5 loans have you participated in to date?
6     A.   I don't know, but many.
7     Q.   More than 10?
8     A.   More than 10.
9     Q.   More than 20?
10     A.   Possibly.  I haven't kept count.
11     Q.   More than 30?
12     A.   Possibly.  I don't remember.
13     Q.   What would be your outside number?
14     A.   I don't know.  There are not just
15 loans that have gone through, there are loans
16 that have been negotiated that have not gone
17 through.  There are multiple discussions for
18 things that don't come to fruition.
19     Q.   I'm trying to understand the basis
20 for your opinion.  Based on the experience that
21 you have just described, possibly more than 30
22 as you put it; you're saying that those loans
23 take the art as collateral under the assumption
24 that on a quick sale it would only get

Michael Plummer

1 50 percent of whatever the value is?
2     A.   Right.
3     Q.   So for collateral purposes, if they
4 had to have a quick sale then they would assume
5 they would only get 50 percent; and that's the
6 point you're making, correct?
7     A.   Yes.
8     Q.   Then you extend that analysis and
9 say so, if there had to be a quick sale of the
10 DIA art, you would expect that the most you
11 would get is 50 percent of what its value is; is
12 that what you're saying?
13     A.   That is what I'm saying.  I'm
14 saying that it's based on not just that loan
15 criteria, but also the real world experience of
16 Acquavella, and also the current offers on the
17 table for the DIA collection from Houlihan
18 Lokey.  I think that they reflect that kind of
19 thinking and valuation.
20     Q.   Why do you assume that there would
21 have to be a quick sale of the loan to the DIA
22 for its art?
23     A.   I'm not assuming there has to be.
24 I'm assuming that if this route were taken this

1          Michael Plummer
2    would be the outcome.
3        Q.   If there were a quick sale?
4        A.   If there were a quick sale. Which
5    is one of the reasons why I laid this out in
6    this manner, so that we could debate which
7    scenarios might take place. I'm not assuming
8    that one scenario or another would take place,
9    that's for the Court to decide, or the DIA to
10   decide, or the City of Detroit to decide; I'm
11   just describing what would happen in various
12   scenarios.
13       Q.   So then following your logic, if
14   there wasn't a quick sale then this factor
15   wouldn't apply; if there was a sale over time,
16   over a long period of time?
17       A.   I outlined that scenario later on
18   and I do not use a blockage discount in that
19   scenario.
20       Q.   In the Matisse example that you
21   provided, that you were referring to earlier, do
22   you know what the loss factor was there?
23       A.   I don't. That data wasn't
24   available to me.
25       Q.   Did you do the analysis?

1          Michael Plummer
2        A.   I count the numbers from Sotheby's
3    report. That data is internal Sotheby's data
4    and it's not available.
5        Q.   Let's turn to the blockage discount
6    again, page 27 of your report. You state that a
7    blockage discount is similar to an immediate
8    liquidation discount, correct?
9        A.   Correct.
10       Q.   But results from selling a large
11   group of similar items in a short time, correct?
12       A.   Correct.
13       Q.   That's what you describe as a
14   blockage discount?
15       A.   Right.
16       Q.   Is there anything else you would
17   describe as a blockage discount?
18          MR. IRWIN: Form.
19       A.   I don't know what you're really
20   asking me. I think this is sufficient for the
21   purposes here.
22       Q.   So this assumes that the pieces
23   would be sold in a short period of time again,
24   correct?
25       A.   Yes, it is.

1          Michael Plummer
2        Q.   What do you qualify as a short
3    period of time?
4        A.   I don't think I specified here, but
5    I would say anything other than an orderly
6    liquidation which is given, and the other
7    example would be a short period of time.
8        Q.   I have no idea what that means.
9    What would you say is an ordinary liquidation?
10       A.   Further on I do say what an orderly
11   liquidation is, five to eight years is what I
12   say.
13       Q.   So anything other than a five to
14   eight year sale would be a short period of time?
15       A.   Yes. I mean, I hadn't thought
16   about three, five years or whatnot; but I would
17   say if you sold it in a one to two-year period
18   you would be facing a liquidation issue.
19       Q.   Let me see if I get this right. A
20   one to two-year period you clearly would be
21   facing a blockage discount, correct?
22       A.   Or a liquidation discount.
23       Q.   Or a liquidation discount, but
24   maybe beyond that it would depend?
25       A.   Correct, it would depend.

1          Michael Plummer
2        Q.   So if the items were not sold in
3    the short period of time, then again this
4    blockage discount might not apply, correct?
5        A.   Correct.
6        Q.   What is the blockage discount that
7    you applied?
8        A.   In this instance I -- well, I
9    really treat it as liquidation discount, which
10   is 50 percent.
11       Q.   So you used that same 50 percent
12   number?
13       A.   Yeah, in the charts I didn't
14   differentiate, I only applied one discount, a
15   liquidation discount. I didn't differentiate
16   between blockage and liquidation.
17       Q.   Again, do you have any studies to
18   support the application of this discount rate
19   and the blockage discount?
20       A.   No. I rely on the data that I just
21   gave you on the liquidation discount.
22          MR. IRWIN: For clarification
23   purposes. When you're asking these questions do
24   you mean other than what's stated in the report?
25          MR. SOTO: No. He gives me the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 64 of 82

Michael Plummer

1  data in his report, I've looked at that and I'm
2  asking him if there's anything other than that,
3  because in his report he doesn't have any
4  studies, so I'm asking him if there are any
5  studies.
6
7      A.    I think studies are irrelevant.  I
8  have real-life experience and I've given you the
9  examples.
10     Q.    So you have real-life experience
11 for a number of the loans?
12     A.    No, I have real-life experience for
13 the number of lenders.  It is common policy
14 amongst all art lenders to use 50 percent.  It's
15 not just my experience with my loans, it's my
16 experience with knowing what Citibank does, what
17 JPMorgan does; and having conversations on a
18 regular basis with Citibank, with JPMorgan, with
19 Chase and HSBC, with Barclays, with all of these
20 institutions.
21     Q.    Do you think as an expert that that
22 makes it a more reliable factor, that a lender
23 which would want to have collateral for their
24 loan requires a 50 percent valuation of an item
25 they're taking in as collateral, that somehow

Michael Plummer

1  that's indicative of what the market would be?
2      A.    That is their view of a liquidation
3  value, and having worked through liquidations at
4  Sotheby's and Christie's that has turned out to
5  be generally a fair number to use in real life.
6      Q.    So that's what I was asking.  I'm
7  asking you for real-life examples; not what a
8  banker that wants to make a loan might want for
9  his collateral, but in fact what an immediate
10 sale brings in.
11         In your experience, how many
12 immediate sales did you work on at Sotheby's?
13     A.    At Sotheby's and Christie's, I
14 don't remember because that's a long time ago;
15 but there were a number of them that I either
16 worked on or reviewed in the prospect of setting
17 up the program at Christie's, and 50 percent was
18 a valid number to use.
19     Q.    So what you're saying is that in
20 your experience and this unknown number of
21 immediate sales, that what you would expect to
22 get for a valued piece of art is about
23 50 percent of whatever its value was?
24     A.    Correct.  I'm working on a

Michael Plummer

1  liquidation issue right now with a client who's
2  defaulted, and we are expecting 50 percent.
3      Q.    Is there any publicly available
4  data that we can review to determine the
5  validity of your opinion?
6      A.    No, but I would suggest if you
7  wanted to speak to some of the banks that I've
8  referenced, they would probably support my
9  opinion.
10     Q.    Right.  Again, the banks are
11 looking for collateral.  I'm asking for publicly
12 available data on sales?
13     A.    I think if you would ask some of
14 the banks about some of their liquidations you
15 might find data.
16         MR. IRWIN:  Outside of the report?
17 Outside of the example, the Acquavella example
18 that he gives in the report?
19         MR. SOTO:  Right.
20         MR. IRWIN:  So other than
21 Acquavella.
22         MR. SOTO:  We've already seen
23 Acquavella.  Acquavella doesn't come to
24 50 percent by the way, but that's a different

Michael Plummer

1  issue.
2  BY MR. SOTO:
3      Q.    Is there any privately available
4  data that you could point me to that in
5  immediate sales sellers realize, generally
6  speaking, 50 percent of the value of their art?
7      A.    I don't know what else I can point
8  you to.
9      Q.    You state that the IRS for tax
10 purposes uses a discount range between
11 25 percent and 46 percent?
12     A.    Yes.
13     Q.    That's a pretty wide range,
14 correct?
15     A.    Correct.
16     Q.    What is that rate based on?
17     A.    It's based on the precedence set in
18 the case in the estates of David Smith and
19 Georgia O'Keeffe, as I outlined here.
20     Q.    Would you agree with me that the
21 blockage discount applied for tax purposes is
22 different than that applied in a sale itself?
23     A.    Yes.
24     Q.    Looking at page 27 of your opinion.

Michael Plummer

1                Michael Plummer
2 We're on paragraph 44 where you talk about
3 unsold rates. Your report states, "Standard
4 appraisals and valuations do not take into
5 account auction unsold rates."
6         Do you see that?
7     A.    Yes.
8     Q.    Again, when you refer to "unsold
9 rates" are you referring to what you testified
10 about earlier, which is items that would have
11 been offered for sale at an auction, but didn't
12 actually sell?
13     A.    Correct.
14     Q.    Then those auctions would be --
15 those items would be then either given back to
16 the original owner or offered again at a lower
17 rate?
18     A.    Correct.
19     Q.    Is that it?
20     A.    Correct.
21     Q.    That's the unsold rate. Is it
22 possible, I mean I see your statement, but I'm
23 wondering is it even possible to factor this in
24 advance of a sale?
25         How do you know what's not going to

Michael Plummer

1                Michael Plummer
2 sell in advance of a sale?
3     A.    Well, you don't, but you can say
4 you're going to sell 100 percent of the property
5 is the point I'm making. So to take the full
6 valuation and expect that you're going to get
7 that valuation, and not account for unsold, is
8 an incorrect way to determine your value,
9 because you have a rather substantial amount
10 that's going to remain unsold. I think it's
11 particularly misleading in a situation like this
12 where decisions are being made on the ultimate
13 value.
14     Q.    Why is that?
15     A.    Well, because I think if you don't
16 include it, it overstates the value and
17 liquidity.
18     Q.    I see what you mean. Let me see if
19 I see what you mean. You mean it overstates the
20 value of the overall collection because there
21 will be some that won't be sold?
22     A.    And it also overstates the
23 liquidity, and the liquidity is something that
24 we write and talk about in the market a lot,
25 because the market is an extremely illiquid

Michael Plummer

1                Michael Plummer
2 market and the unsold rates are part of that
3 illiquidity problem.
4         So if you have an appraisal that
5 says that you have $100 million worth of
6 property, and you're expecting to get $100
7 million worth of cash when $20 million of that
8 isn't go to sell, you have a illiquid value of
9 $80 million, and that's a big variance.
10     Q.    You don't think you're taking the
11 unsold rate and discount it and factor it in
12 twice?
13         In other words, what you're saying
14 is the unsold rate is if you don't take it into
15 account you're distorting the overall value of
16 the collection because there's going to be
17 something that isn't sold.
18         Then you're also saying that in
19 addition to that, you're overstating the
20 liquidity and another factor has to be taken in?
21     A.    No.
22     Q.    It's that same factor?
23     A.    It's the same factor.
24     Q.    Okay. I just want to make sure.
25 You state that the average unsold rate is

Michael Plummer

1                Michael Plummer
2 20 percent, correct?
3         Again, let me ask you, what's the
4 source of those rates?
5     A.    It's in the back, it's an exhibit
6 in the back. It's the Christie's and Sotheby's
7 data actually which Wiener used for his own
8 estimates of the collection.
9     Q.    Your chart also lists the average
10 unsold rates for different sectors, correct?
11     A.    Yes.
12     Q.    That's because you're taking it
13 from the Christie's and Sotheby's data for
14 different sectors?
15     A.    Yes.
16     Q.    Why did you apply an average unsold
17 rate of 20 percent when the data that you
18 supplied you used an average rate of 20 percent?
19     A.    I'm sorry?
20     Q.    You applied an average unsold rate
21 of 25 percent for the DIA. Look at page 28,
22 Table 4?
23     A.    What page are you on?
24     Q.    Page 28 of your report, it's got a
25 table. Correct me if I'm reading this wrong.

Michael Plummer

1
2 You have your top four sectors listed, correct?
3     A.    Right.
4     Q.    Then you have a balance of
5 collection 20 percent, 25 percent.  So the
6 average you used, if I'm understanding it right,
7 it says here in D:
8          "It is important to note that much
9 of this unsold property could and would be sold
10 over time, but it is customary business practice
11 to devalue a work by 20% of the low estimate
12 after it has bought in."
13          So you're saying here's going to be
14 the average?
15     A.    Right.
16     Q.    I thought you were saying the
17 average unsold was 20 percent, so you do a
18 discount of 20 percent for the unsold.  You do a
19 discount of the entire valuation because
20 20 percent of it is going to be unsold, correct?
21     A.    I'm not discounting the collection
22 here, I'm just showing what the potential of the
23 BIs could be.  I actually do it differently in
24 the present value calculation, where I actually
25 do a more thorough analysis where I discount the

Michael Plummer

1
2 unsold and then I add them back in a few years
3 later after -- at a 20 percent valuation.
4          So that's more reflective of my
5 thinking on this.  This was just an illustrative
6 of the potential for unsold in different
7 categories.
8     Q.    So this is just illustrating the
9 potential into categories, but when you did the
10 calculation you did use a 20 percent discount
11 value?
12     A.    I did use the 20 percent discount
13 value.
14     Q.    That's what I'm trying to get at.
15 Page 28, paragraph 45.  In your report you state
16 that:
17          "The size of a liquidation of the
18 DIA collection would be beyond Christie's and
19 Sotheby's guarantee capacities."
20          What's the basis of that
21 conclusion?
22     A.    The basis of that is the Sotheby's
23 financial statement with their loan limitations,
24 which I dictate below.  I also, having been
25 inside Christie's and knowing their balance

Michael Plummer

1
2 sheet, and knowing their balance sheet
3 limitations, I know what they have to spend on
4 guarantees and what their limitations are.
5     Q.    So it's your assumption then that
6 if they wanted to participate in something like
7 this, they couldn't get any other financing to
8 be able to participate in it?
9     A.    I think that this would be a very
10 large level of risk, and in the past when
11 Sotheby's and Christie's were presented with
12 collections of this size they have chosen not to
13 go out and get a financing partner for it.  So
14 based on past experience I would say so.
15     Q.    But you don't know if that's a set
16 policy, correct?
17     A.    I don't know if it's a set policy.
18     Q.    It's been a while since you worked
19 for either Sotheby's or Christie's?
20     A.    It's been a while since I worked
21 for either Sotheby's or Christie's.
22     Q.    You state that on page 29,
23 paragraph 46 --
24     A.    We're assuming that Sotheby's and
25 Christie's would be wanting to sell them in the

Michael Plummer

1
2 first place.
3     Q.    I'm just asking the questions, I'm
4 not assuming what they would do.  Do you?
5     A.    No.
6     Q.    Paragraph 46, page 29.  You state
7 in your report that the auction houses may,
8 "refuse to sell due to the controversy
9 surrounding a disposition and potential damage
10 to their brand and relationships with the
11 broader Museum community"?
12     A.    Yes.
13     Q.    You testified about this earlier?
14     A.    Correct.
15     Q.    Do you have anything more to add to
16 that testimony that you recollect, now that
17 you're looking at your opinion here?
18     A.    No, I think I covered this, I
19 covered this earlier.
20     Q.    I didn't ask you earlier.  Did you
21 speak to anyone at Christie's about this
22 opinion?
23     A.    Someone at Christie's expressed
24 their opinion to me in a social setting.
25     Q.    Off the record?

66 (Pages 261 to 264)

Michael Plummer

1
2    A.    Off the record.
3    Q.    And you couldn't give me their name
4  because you promised not to?
5    A.    Yes.
6    Q.    What about Sotheby's?
7    A.    I did not have a conversation with
8  Sotheby's about it.
9    Q.    Christie's did complete and submit
10  their report that you relied on in your opinion,
11  correct?
12    A.    Um-hum.
13    Q.    So despite what you described
14  earlier as bad press they didn't back out of it,
15  they finished the work and they got it done,
16  correct?
17    A.    Correct.
18    Q.    You also note that the impact of
19  not selling through Sotheby's or Christie's
20  would reduce the sale value by 20 to 40 percent?
21    A.    Right.
22    Q.    Other than your subjective belief
23  that it would reduce it by 20 to 40 percent not
24  to sell it through Sotheby's and Christie's,
25  what is the basis of this discount factor?

Michael Plummer

1
2    MR. IRWIN:  Form.  Go ahead.
3    A.    The basis is I have samples of
4  others earlier in the report where the valuation
5  ranges in works of art by various artists are
6  off by a larger percentage than that.  So I felt
7  this was a conservative approach based on those
8  examples I gave, and my own personal experience
9  of buying in the marketplace on behalf of the
10  buyers and selling.
11    Q.    The examples you're referring to
12  are the examples in the report?
13    A.    In the report.
14    Q.    Any others?
15    A.    No.
16    Q.    Given the volume of the artworks at
17  the DIA, wouldn't it be wise to sell that many
18  artworks to a variety of sources, including
19  maybe a variety of auction houses?
20    A.    You could do it, I just believe
21  that if you sell other than at Sotheby's and
22  Christie's you won't get the prices.
23    Q.    Let me ask you to turn to page 31.
24  We're just flying through this thing, paragraph
25  49.  You state that:

Michael Plummer

1
2    "For a collection of the magnitude
3  of the DIA's, maximizing art asset value
4  requires selling over a minimum of five to eight
5  years."  Correct?
6    A.    Um-hum.
7    Q.    That's what you testified about
8  just a moment ago, correct?
9    A.    Correct.
10    Q.    What is that estimated time period
11  based on?
12    A.    Well, I mentioned much earlier in
13  the testimony that that is essentially the plan
14  of almost any art investment structure out
15  there, that it would be a six to eight year
16  period.  That's just a commonly held belief and
17  practice that the market can only absorb so much
18  material at a time, and if you're going to
19  maximize value you need to have a lengthy, a
20  long enough ramp time so that you can pick and
21  choose your seasons and your periods and put the
22  property in the right auctions.
23    Q.    I'm glad you clarified that,
24  because I thought when you were testifying
25  earlier, that what you were saying is if you

Michael Plummer

1
2  were going to set up an investment fund you have
3  to hold the art for five to eight years before
4  you begin the process of selling, so that it has
5  some ability to increase in value; but you were
6  saying something different now?
7    A.    No, I'm not.  I'm saying the same
8  thing.  I'm saying that you would hold the art
9  for a couple -- you would sell the art from a
10  fund over a five to eight year period as well,
11  so I'm saying it's consistent.
12    Q.    You don't have to hold it for a
13  five to eight year period then begin to sell it,
14  just sell it over a five to eight year period?
15    A.    Sell it over a five to eight year
16  period.
17    Q.    Thank you.  Do you have any
18  reliable sources or studies to support this?
19    MR. IRWIN:  Form.
20    A.    I do not have anything other than
21  common art investment fund practice.  However, I
22  would say if you wanted to look at the offering
23  documents of most of the art investment funds
24  out there you would find that strategy
25  articulated.

Michael Plummer

1
2     Q.     Paragraph 32 -- page 32, paragraph
3  50.  Looking at number C.  You say, "Based on
4  other museum deaccessions to pay debts."  Do you
5  see that?
6     A.     Yes.
7     Q.     What other art museums do you know
8  that have had deaccessions to pay debts?
9     A.     The de Valera Museum.
10     Q.     Any others?
11     A.     Well, the Fisk was one that was
12  attempted but blocked, and then it went through,
13  but under the agreement of the Attorney General.
14     Q.     So you have Delaware and Fisk in
15  Tennessee, correct?
16     A.     Yes.
17     Q.     Anywhere else?
18     A.     Then there is also the attempted
19  sale of the Rose Museum by Brandeis, but that
20  sort of got stopped dead in its tracks.  It
21  didn't even make it to the point of sale because
22  of the public outcry.
23     Q.     The rose Museum by Brandeis
24  University?
25     A.     Yes.

Michael Plummer

1
2     Q.     Any others?
3     A.     Those are the only ones that I
4  report and those are the only ones that I am
5  aware of at the moment.
6     Q.     You say, "Court challenges are
7  likely from the Michigan Attorney General."  Do
8  you see that?
9     A.     Um-hum.
10     Q.     What is the basis of that?  Have
11  you spoken to somebody at the Michigan Attorney
12  General's office?
13     A.     No.  Based on what has happened to
14  various sales in New York and other places, I
15  would expect that the Attorney General and also
16  the Attorney General has come out, yes, the
17  Attorney General has come out as a matter of
18  record and says that he opposes the sale.  So it
19  would be logical to assume that he would bring
20  action as Attorney General, as other states
21  have.
22     Q.     When you say the Attorney General
23  has come out and said he opposes the sale, are
24  you basing that on the Attorney General's
25  opinion that the art is held in trust?

Michael Plummer

1
2     A.     Yes.
3     Q.     Is there anything else that you're
4  basing it on?
5     A.     And basing it on the activities of
6  the New York Attorney General of various sales,
7  and the Attorney General of the State of
8  Tennessee.
9     Q.     So assuming the situations in
10  Tennessee and New York are not the same because
11  they weren't dealing with a city-owned museum, a
12  publicly-owned museum; do you have any other
13  reason to think that a Michigan State Attorney
14  General would oppose the sale?
15        MR. IRWIN:  Form.
16     A.     That's not entirely true because
17  the Fisk example and the New York Attorney
18  General issues on other instances pertained to
19  the sale of property that was gifted; and we're
20  not just talking about the City of Detroit
21  purchase property, we're talking about gifted
22  property that was bequested and has
23  restrictions.
24        So it is not an assumption, or
25  illogical to assume, that the Attorney General

Michael Plummer

1
2  of Michigan would step in and block the sale of
3  property that had been gifted to as a bequest or
4  whatever.
5     Q.     Did you or anyone else at Artvest
6  do an analysis of the legal structure that
7  existed in Tennessee with respect to the Fisk
8  Museum?
9     A.     That was beyond the scope of our
10  job.
11     Q.     The answer is no then, correct?
12     A.     No.
13     Q.     Did you or anyone else at Artvest
14  do a legal analysis of the structure of the
15  legal position that was involved in the New York
16  example that you are giving?
17     A.     No.
18     Q.     Did you or anyone else at Artvest
19  do an analysis of the legal structure involved
20  in the Delaware Museum?
21     A.     No, we did not.
22     Q.     Did you retain anyone else to do
23  it?
24     A.     We did not.  May we take a break?
25        MR. SOTO:  Absolutely.

68 (Pages 269 to 272)

1          Michael Plummer
2          THE VIDEOGRAPHER:  The time is
3    4:26 p.m., and we're going off the record.
4          (Short break taken)
5          THE VIDEOGRAPHER:  The time is
6    4:40 p.m., and we're back on the record.
7    BY MR. SOTO:
8          Q.    Looking at page 32, paragraph 50 C.
9    Beyond what you've testified about already
10   regarding why you think litigation challenges
11   are possible, and what you have in your report;
12   beyond those two things, is there anything else
13   that you rely on to support that opinion?
14         A.    No.
15         Q.    So in your statement such as those
16   on page 39 of your report where you say, make
17   sure I'm quoting it right, "Heirs of former
18   donors as well as current donors are likely
19   to" --
20         MR. IRWIN:  Are you in the middle
21   of the page?
22         MR. SOTO:  Yes.  I'm trying to find
23   it myself.
24         A.    What page are you on?
25         MR. IRWIN:  He's on 39.

1          Michael Plummer
2          MR. SOTO:  I thought I was on 39.
3          MR. IRWIN:  You are, you were a
4    third of the way down.
5          MR. SOTO:  Paragraph C.
6          Q.    Where you say:
7          "Heirs of former donors, as well as
8    current donors, many still prominent leaders in
9    the Detroit community, and the DIA corporation
10   itself, are likely to pursue every legal option
11   necessary to stop or delay the sale of any of
12   the art potentially, leading to years of
13   litigation."
14         Do you see that?
15         A.    Um-hum.
16         Q.    You didn't talk to anyone else
17   about that other than -- did you talk to anybody
18   about it?
19         A.    No.
20         Q.    You didn't, okay.  Looking at your
21   table.  Is it your assumption that any
22   litigation would be a five-year litigation?
23         A.    Based on the Fisk, yes.
24         Q.    So you're basing it on the Fisk
25   litigation?

1          Michael Plummer
2          A.    Yes.
3          Q.    Again, you didn't do any analysis
4    of the Fisk litigation?
5          A.    No.
6          Q.    You don't know what was involved
7    this?
8          A.    No.
9          Q.    You know it didn't involve a
10   City-owned museum, correct?
11         A.    I know it did involve the intention
12   of the bequester, and that was at the heart of
13   the matter.
14         Q.    Did you do an analysis of the
15   intentions?  I think I asked you about this
16   earlier, but if I didn't I should ask it now,
17   and if I did let me know.
18         Did you do an analysis of any of
19   the restrictions that might exist on the
20   transfer of any of the art that's now part of
21   the DIA collection?
22         A.    I think you did ask it but I'll
23   answer it again, I did not.
24         Q.    Thanks for being patient with me.
25   In paragraph -- well it's page 36 of your

1          Michael Plummer
2    report, Table 6.
3          Here you apply the litigation
4    discount factor and reduce the value by an
5    additional 2 million, I think it's 2,539,108, do
6    you see that?
7          A.    Right.
8          Q.    Where did you come up with this
9    figure?
10         A.    It's in the table in the back, the
11   calculation is either 70 or 71.  I hopes this
12   matches the right table with the right
13   calculation.  So this would match to page 70.
14         Q.    So page 70 is Exhibit F, Table 8?
15         A.    Right.
16         Q.    The present value of orderly
17   liquidation?
18         A.    Right.
19         Q.    Where does the number come from?
20         A.    Which number are you asking where
21   does that number come from?
22         Q.    I was asking earlier where did you
23   come up with the 2,539,108 as a count for
24   litigation?
25         A.    That is the net effects of these

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 70 of 82

Michael Plummer

1  column-by-column calculations of no income until
2  year six, only the expense of carrying the
3  collection.  Then starting in year seven you
4  would sell 20 percent of the collection; year
5  eight, 20 percent; year 9, 20 percent; 15 in
6  year 10; 15 in year 11.
7         Taking out -- adding back the
8  unsold property we offer three years later, the
9  administrative expenses, and then bringing it
10  back to a discounted net present value.
11     Q.    So this table reflects under
12  scenario B, litigation Fisk, correct?
13     A.    Yes.
14     Q.    Under less average unsold loss
15  factor?
16     A.    Yes.
17     Q.    You reflect a 26.20 percent loss
18  factor, correct?
19     A.    Right.  Then it's added back.
20     Q.    Where is it added back?
21     A.    It's added back in year 10 and year
22  11.
23     Q.    So this is the add-back re-offered
24  unsold property?

Michael Plummer

1     A.    This table is cut off because this
2  goes out for another couple of years, it's just
3  cut off here.
4     Q.    So it goes beyond year 11?
5     A.    Yeah, it must go on to year 12.  I
6  don't remember because I don't have it front of
7  me.
8     Q.    Take a look and see if you're
9  looking at the same thing I'm looking at?
10     A.    Yeah.  I'm doing this from memory,
11  but I think it might go beyond year 11.
12     Q.    The one I got in the mail didn't.
13  So if you have one that does that might be
14  helpful?
15     A.    I could be wrong about this, I'm
16  doing this from memory.
17     Q.    Remember, there's no closed-book
18  test here, you can look at everything.  So now
19  looking at application of discount fees, page
20  37, paragraph 56.  You state:
21          "I conclude that the range of
22  values the DIA collection will sell for, using
23  the mid estimate value, values, would be between
24  1.1 billion for the present value of an orderly

Michael Plummer

1  sale after a prolonged litigation (the most
2  likely outcome, Scenario D) to $1.8 billion for
3  the present value of an orderly liquidation
4  without litigation, a less likely outcome."  Do
5  you see that?
6     A.    Yes.
7     Q.    In paragraph 56 you state that:
8          "Using the low estimate value of
9  about $2.7 billion, and assuming all of the
10  worst factors, including issues with extended
11  litigation and a discount for unsold items, the
12  value of the collection would sell for between
13  0.9 billion to 1.4 billion," correct?
14     A.    Correct.
15     Q.    And your analysis is documented on
16  Table 7, well I guess Table 6 and 7 on pages 36
17  and 37, correct?
18     A.    Correct.
19     Q.    You only apply the discount factors
20  to the low and mid estimates, correct?
21     A.    Correct.
22     Q.    Why didn't you apply them to the
23  high estimate?
24     A.    Because I don't think that the high

Michael Plummer

1  estimate is relevant to this case.
2     Q.    So you created a high estimate
3  though, didn't you?
4     A.    I did create a high estimate, yes.
5     Q.    You say it's not relevant for what
6  reason?
7     A.    Because of the fact of the areas
8  where the property is in, the controversy around
9  the collection, disagreeing with Wiener on the
10  ability to market it and promote it.  The high
11  estimate really is something that is reserved
12  for things that are really sort of untainted,
13  that is just stellar property in a hot area, and
14  a lot of the DIA property is not in a hot area
15  either.  So for all of the reasons that I've
16  outlined previously.
17     Q.    Let me see if your methodology is
18  what I think it is.  You first said you did a
19  valuation, correct?
20     A.    Um-hum.
21     Q.    And then you said separate and
22  apart from that valuation you applied factors to
23  what you valued that appraisers might not apply.
24  You gave all specific areas of them and we

1          Michael Plummer
2    testified at length about them today, or you
3    did, correct?
4         A.   Yes.
5         Q.   So even though you did an
6    evaluation that had a low range, a mid range and
7    a high range, you didn't apply any of those
8    seven factors to the high range, did you?
9         A.   No.
10        Q.   So in addition to taking discounts
11   for the seven factors that you say you took into
12   account that maybe an appraisal wouldn't, you
13   were also adding another factor, which is your
14   subjective view that gee, this high rate just
15   doesn't apply here?
16             MR. IRWIN:  Form.
17        Q.   This high evaluation just shouldn't
18   even be applied here, correct?
19        A.   I said in this particular instance
20   I didn't think that it applied.
21        Q.   So why -- how did you set the high
22   valuation to begin with?  What did you do to set
23   the high valuation to begin with?  You looked at
24   comparables, correct?
25        A.   Right.

1          Michael Plummer
2         Q.   You looked at all the market data
3    that was publicly available, correct?
4         A.   Right.
5         Q.   You looked at the indices that you
6    paid for from some other not publicly available
7    sources, correct?
8         A.   Right.
9         Q.   You talked to people that you knew
10   within Sotheby's and Christie's and others about
11   sales that others might not even know about,
12   correct?
13        A.   Right.
14        Q.   And you contacted individuals in
15   the industry that you have contact with on a
16   daily basis because of your position in the
17   industry, and because of your position as an art
18   fair owner and participant that other people
19   don't, correct?
20        A.   Right.
21        Q.   You took all that information into
22   account in deciding I think a low estimate would
23   be this, I think a high estimate would be this,
24   and I think a middle estimate would be this,
25   correct?

1          Michael Plummer
2              MR. IRWIN:  Form.
3         A.   The middle estimate is calculated
4    based off of a high estimate.  If I were to use
5    the high estimate I would be saying that of the
6    56,000 items, or whatever number it is, they
7    would all be selling for the high estimate.
8    That the average selling price of the entire
9    collection would be selling at the high
10   estimate.
11             What I've done is I've used the mid
12   estimate, because that assumes that you will be
13   getting halfway between the low and the high.
14   So I'm accounting for the high by a mid
15   estimate, that takes into account the high and
16   the low.  So the idea that the entire collection
17   would sell for at the high level is to me
18   inconceivable.
19        Q.   Let me see if I'm understanding
20   that.  You did a high estimate and a low
21   estimate?
22        A.   Right.
23        Q.   And the mid is just literally the
24   middle range?
25        A.   Correct.

1          Michael Plummer
2         Q.   So what you're doing in your
3    analysis, if I'm understanding it now, I may be,
4    is saying look, in calculating what discounts
5    I'm going to take after I do my evaluations,
6    I'll take the mid range valuation because in
7    your mind, having put together the valuations,
8    that's the most likely one.  Is that correct to
9    say?
10        A.   I'd say it is -- it and the low
11   estimate are likely scenarios.  I do not think
12   that the high estimate is the likely scenario
13   because that presupposes that everything would
14   come up a high estimate, or higher.
15        Q.   So your charts show the discounts
16   off the low estimates and the discounts off the
17   middle estimates, but they don't show the
18   discounts off the high estimates?
19        A.   Correct.
20        Q.   So with respect to your ultimate
21   conclusion, you've simply eradicated the high
22   estimate for purposes of coming to your
23   conclusion.
24             You have a conclusion as to the low
25   estimate with discounts and you have a

Michael Plummer

1 conclusion as to the mid range with discounts?
2 MR. IRWIN: Form.
3 A. I don't think that's an accurate
4 portrayal because the mid estimate is factored
5 by using the high estimate. All I am saying is
6 I don't think it is possible to sell everything
7 in this collection at an average value of the
8 high estimate.
9 Q. And you think that it's more likely
10 that everything will sell at the low estimate?
11 A. I think that it is possible that it
12 could sell at the low estimate. Oftentimes
13 things sell below the low estimate.
14 Q. Wouldn't you agree with me that if
15 you took your discounts off the high estimate
16 your conclusion would be a higher sale value,
17 correct?
18 MR. IRWIN: Form.
19 A. If I took my conclusions off of the
20 high estimate?
21 Q. Your discounts?
22 A. My discounts, yes, it would be a
23 higher valuation.
24 Q. And you didn't do that?

Michael Plummer

1
2 conclusion as to the mid range with discounts?
3 MR. IRWIN: Form.
4 A. I don't think that's an accurate
5 portrayal because the mid estimate is factored
6 by using the high estimate. All I am saying is
7 I don't think it is possible to sell everything
8 in this collection at an average value of the
9 high estimate.
10 Q. And you think that it's more likely
11 that everything will sell at the low estimate?
12 A. I think that it is possible that it
13 could sell at the low estimate. Oftentimes
14 things sell below the low estimate.
15 Q. Wouldn't you agree with me that if
16 you took your discounts off the high estimate
17 your conclusion would be a higher sale value,
18 correct?
19 MR. IRWIN: Form.
20 A. If I took my conclusions off of the
21 high estimate?
22 Q. Your discounts?
23 A. My discounts, yes, it would be a
24 higher valuation.
25 Q. And you didn't do that?

Michael Plummer

1
2 A. I did not do that.
3 Q. You didn't want to do that?
4 MR. IRWIN: Form.
5 MR. O'REILLY: Form.
6 A. I didn't think it was relevant to
7 do so.
8 Q. But it was relevant to value them,
9 as you suggested in your expert report you
10 valued them, correct?
11 It was relevant to get all that
12 information that we just went through, correct?
13 A. Correct.
14 Q. Based on all of that information
15 that was relevant to you, you do have a high
16 range, correct?
17 A. I do have a high range, yes. I
18 would also add that in the art industry, it is
19 generally common practice to base most decisions
20 off of low estimates; not mid or not high, but
21 low.
22 Q. What you're doing here is simply
23 basing your analysis on the mid and low.
24 There's no business decision here, it's just
25 your analysis, correct?

Michael Plummer

1
2 A. My analysis is based on my business
3 practices and the way I conduct my business.
4 Q. So when you did your valuations and
5 you did your comparables, and you did what all
6 that information was and you got information on
7 high valued estimates, didn't that take some of
8 the market factors into account for those
9 estimates?
10 A. I don't understand your question.
11 Q. So when you do comparables you come
12 up with some comparables that are higher and
13 some that are lower, correct?
14 A. Right.
15 Q. That's how you get the high
16 estimates and the low estimates, correct?
17 A. Right.
18 Q. That takes into account market data
19 and market information, right?
20 A. Right.
21 Q. So there must be some market data
22 that supports your high estimate, correct?
23 A. I'm not arguing that a high
24 estimate for a work is wrong. I'm arguing that
25 making an assumption that the entirety of the

Michael Plummer

1
2 collection would sell at the high estimate is
3 not a solid premise for doing this analysis.
4 Q. You don't have to do that to show
5 the actual discounts off the high estimate. You
6 can just have them there, then you can come to
7 whatever conclusion you think is appropriate to
8 apply to that.
9 You could, in fact, have submitted
10 a report to the Court that allowed the Court to
11 say I see what the discounts are on the high
12 estimate, I see what the discounts are on the
13 mid-estimate, and I see what the discounts are
14 on the low estimate. I'll say let's assume that
15 only half of it sells for the high and only half
16 of it sells for the low.
17 But you didn't do that in your
18 report. You didn't give the estimates for the
19 high one, did you?
20 MR. O'REILLY: Form.
21 A. No, I do not.
22 Q. So your calculation makes several
23 conclusions, doesn't it? Let's look back on
24 page 31.
25 First of all, on page 31, paragraph

72 (Pages 285 to 288)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6983-7   Filed 08/22/14   Entered 08/22/14 16:27:25   Page 73 of 82

Michael Plummer

1  49 C, right, you assume that it would take 18
2  months to two years to adequately catalog the
3  collection in the first place, correct?
4      A.   Yes.
5      Q.   What's the basis of that
6  assumption?
7      A.   Based on the preparations that went
8  into Albright-Knox and other sales. That you
9  have such a quantity of property that in order
10 to do the proper amount of research on its
11 salability, and how you want to sell it and plan
12 for the sale of it, plan for the marketing of
13 it, all of that would take an extended period of
14 time.
15     Q.   Are you aware of the fact that the
16 DIA has had on other occasions other people look
17 at its collection, that may indeed have done
18 some of the cataloguing that you're talking
19 about here?
20     A.   I know they've done the
21 cataloguing, that's not the same as the
22 cataloguing for sale. The cataloguing that's
23 already done would be used, but whoever was
24 selling it would want to evaluate it from the

Michael Plummer

1  lens of selling it, and look for various
2  information that may not be included in the
3  museum cataloguing.
4      Q.   So is it your --
5      A.   And additional scholarship.
6      Q.   Sorry, I didn't mean to interrupt.
7      A.   No, just an additional scholarship.
8      Q.   So is it your assumption then that
9  the DIA has not done prior cataloging for sale?
10     A.   They haven't done sale cataloging
11 which is different.
12     Q.   That's your assumption, correct?
13     A.   No, it's my -- I've seen some of
14 their cataloguing and I don't think it's the
15 same as cataloguing it for sale.
16     Q.   Did you speak to anyone at the DIA
17 about whether or not they had done other
18 cataloguing for sale prior to this?
19     A.   No, I have not talked to them about
20 that.
21     Q.   So you don't know that for a fact,
22 you are assuming that?
23          MR. IRWIN:  Form.
24     A.   I am assuming that, and I actually

Michael Plummer

1  say that it was an assumption.
2      Q.   That assumption is based on, again,
3  your review of whatever materials you had,
4  correct?
5      A.   Correct.
6      Q.   Because you haven't spoken to
7  anyone at the DIA, correct?
8      A.   Correct.
9      Q.   Your next one is you assume that
10 the sales would take place through a public
11 rather than private auction?
12     A.   Correct.
13     Q.   What's the basis of that
14 assumption?
15     A.   As I outlined elsewhere in the
16 report that most legal, court related, other
17 transactions or transparencies required are more
18 often than not done by auction, because if you
19 sell things privately there is a degree of
20 confidentiality involved that can allow for a
21 conflict of interest or a lack of transparency
22 on value.
23          If you sell something privately
24 your client is buying it privately because they

Michael Plummer

1  don't want the price disclosed. It's hard for
2  me to imagine that you could sell works from the
3  DIA privately, without disclosing the prices,
4  how that could be accomplished with City-owned
5  property.
6      Q.   You assume an annual expense of 6
7  million related to the storing and the
8  administering of the art collection, correct?
9      A.   Yes.
10     Q.   What's the basis of that
11 assumption?
12     A.   That's my assumption based on the
13 size of the museum, the size of the collection,
14 insurance costs, heat, humidity control, all of
15 that; and it decreases over time as the
16 collection is sold off.
17     Q.   Did you speak with anybody who's
18 currently involved in the storing and
19 administering of the art collection as to what
20 it's costing them to do it now?
21     A.   I did not, no.
22     Q.   Did you look at the publicly
23 available information on what those storage
24 costs are now?

Michael Plummer
1
2      A.    I did not.
3      Q.    You assume a discount rate of
4  12 percent based on the volatility of the
5  market, correct?
6      A.    Correct.
7      Q.    What's the basis of that
8  assumption?
9      A.    Going back to the art investment
10  topic and the art investment funds, generally
11  the 12 percent or higher number is expected by
12  investors in the art market to compensate for
13  the volatility of the market.
14      Q.    You reviewed the Barth report
15  previously, correct?
16      A.    Yes.
17      Q.    Did you dispute what she suggests
18  the closer percentage rate would be here for the
19  discount rate based on the volatility?
20      A.    I completely dispute it.  I don't
21  think she has sufficient experience to weigh in
22  on that matter.
23      Q.    Turn back to page 36 of your
24  report.
25      A.    Okay.  I would like to take a quick

Michael Plummer
1
2  break.
3          MR. SOTO:  Sure.
4          THE VIDEOGRAPHER:  The time is
5  5:01 p.m., and we're going off the record.
6          (Short break taken)
7          THE VIDEOGRAPHER:  This begins
8  media unit number 5, the time is 5:09 p.m., and
9  we're back on the record.
10  BY MR. SOTO:
11      A.    In your one of your last lines of
12  questioning I had forgotten and misspoke.  The
13  $6 million number was a number that I had gotten
14  from Rich that was done at the DIA, the cost of
15  holding the collection and storing it.
16      Q.    So $6 million was indeed something
17  that the DIA has estimated that would cost?
18      A.    Yes.  I made a mistake.
19      Q.    That's perfectly appropriate to
20  correct.  I think we were going to page 36.  Do
21  you see that, Footnote 1?
22      A.    Um-hum.
23      Q.    It says, "Unsold rates included in
24  present value calculation"?
25      A.    Um-hum.

Michael Plummer
1
2      Q.    On page 31, which contains your
3  present value calculation, if you go back to
4  that and take a look at it.
5          I don't see where it includes -- I
6  don't see where your present value calculation
7  mentions the unsold rates.  I'm trying to figure
8  out what unsold rates apply?
9          MR. IRWIN:  Form.
10          MR. O'REILLY:  Objection to the
11  form.
12      A.    I'm confused with what you're
13  asking me.
14      Q.    I'll start again.  The footnote
15  says, "Unsold rates are included in the present
16  value calculation"?
17      A.    Right.
18      Q.    Turn to page 31.  I'm trying to
19  understand it.
20      A.    Okay.  Page 31.
21      Q.    It contains your present value
22  calculation, correct?
23      A.    Right.
24          MR. IRWIN:  At page 31,
25  assumptions.

Michael Plummer
1
2      A.    49 C?
3      Q.    No, I'm beyond the assumptions.
4  Maybe I'm using the wrong page.
5      A.    If you're looking for the present
6  value charts they're in the back.  It's 70 or
7  71.
8      Q.    70 is the one you used before and
9  you have present value.  It should be 71 I think
10  for this one.  So again, it's Table 9, page 71
11  of 72.  I see a present value of 1 million?
12      A.    366?
13      Q.    Yes.
14      A.    And 850.
15      Q.    At the bottom.  So where is the --
16  I guess it's the?
17      A.    The unsold rate is the deduction
18  144, 144, 144 and then the add-back is 115,740,
19  115,740, so they're two different rows.
20      Q.    I see.  So the deductions are the
21  ones over here on the right, 7, 8, 9 and 10?
22      A.    Right.
23      Q.    And then the add-back is 010?
24      A.    Right.
25      Q.    So that explains that.  Thank you.

74 (Pages 293 to 296)

1      Michael Plummer
2  Going back to your assumptions on page 31.
3      Your calculations assume a discount
4  rate of 20 percent for not selling through
5  Christie's and Sotheby's, correct?
6      A.   Um-hum.
7      Q.   You testified about that earlier,
8  correct?
9      A.   Um-hum.
10     Q.   Then your calculations also assume
11 a discount rate of 50 percent for the market
12 disfavor of the American sector, correct?
13     MR. IRWIN:  Are we supposed to be
14 following somewhere in the document?
15     MR. SOTO:  Well yes, I was going
16 through the assumptions that start on page 31,
17 then I added to that the other assumptions that
18 he testified about earlier.
19     MR. IRWIN:  The impression was that
20 we were following along on the page and it's not
21 tracking.
22     MR. SOTO:  I'm sorry.  Let me start
23 again.
24     Q.   So in addition to the assumptions
25 that you list here in your chart, which is C:

1      Michael Plummer
2      "I use the following assumptions in
3  calculating present value discount."  You used
4  those, correct?
5      A.   Um-hum.
6      Q.   Beyond those present value discount
7  assumptions you also apply other discounts,
8  correct?
9      One that you testified about at
10 length was the fact that look, there's a
11 disfavor for the American sector, correct?
12     A.   I do not apply that in the present
13 value scenario.
14     Q.   You just applied that in general?
15     A.   No.  I applied that only in
16 scenario B, which is sort of just a straight
17 illustrative, illustration of application of
18 things; but I do not apply that in scenario C or
19 D.
20     Q.   In determining the present value
21 you did not apply the other discounts?
22     A.   No.
23     Q.   So you did not apply the discount
24 for the Sotheby's or Christie's --
25     A.   No.

1      Michael Plummer
2      Q.   You did not apply the discount for
3  the American sector disfavor?
4      A.   Correct.
5      Q.   You did not apply the discount for
6  the market crash?
7      A.   Correct.
8      Q.   Are you familiar with what has been
9  referred to as the grand bargain?
10     A.   Yes.
11     Q.   Are you aware that the DIA has
12 pledged a $100 million contribution to the
13 museum?
14     A.   Yes.
15     Q.   Maybe I should say the DIA Corp.
16 has pledged a $100 million contribution to the
17 museum?
18     A.   Yes.
19     Q.   Would you agree that your
20 valuation, without applying any discount
21 factors, far exceeds the 100 million
22 contribution?
23     MR. IRWIN:  Form.
24     A.   I don't know.  I am not following
25 your logic, nor do I understand what you're

1      Michael Plummer
2  asking.
3      Q.   The valuation you have, if you
4  don't apply your discounts to it; the valuation
5  you have of the art exceeds the $100 million
6  contribution that's being pledged by the DIA
7  Corp., correct?
8      A.   Yes.
9      Q.   Would you agree that even in the
10 worst-case scenario that you present, the value
11 of the DIA collection far exceeds the $100
12 million pledged by the DIA Corp.?
13     MR. O'REILLY:  Form.
14     A.   Yes.
15     Q.   Let's look at pages 39 and 40 of
16 your report.  On pages 39 and 40 you critique
17 the bids that were received by Houlihan for the
18 collection, correct?
19     A.   Correct.
20     Q.   What's the basis for your critique?
21     MR. O'REILLY:  Form.
22     A.   Looking at the -- what was in the
23 Houlihan Lokey materials in terms of what was on
24 offer.
25     Q.   I might have asked you this about

Michael Plummer

1  
2  some of them, but let me ask you about all.  Did
3  you contact any of the proposed bidders that
4  were included in the Houlihan report?
5      A.    No, I did not.
6      Q.    Let's turn to your critique of
7  Christie's recommendations that are on page 42.
8  Do you see that?
9      A.    Um-hum.
10     Q.    You say that Christie's was, by the
11 time they completed this section of their
12 report, dis-incentivized to develop this line of
13 argument fully, possibly due to market backlash
14 from the DIA and other market participants.  Do
15 you see that?
16     A.    Um-hum.
17     Q.    What's the basis for that
18 statement?
19     A.    As I said, the comment by someone
20 at Christie's who was off the record.
21     Q.    That's it?
22     A.    Well, and also my own reading of
23 those proposals and how flimsy they were and
24 un-flushed out, as I say here.  They didn't
25 really seem like they were given anything other

Michael Plummer

1  
2  than a passing thought.  There were no expenses,
3  no revenues, no timelines; it was just really a
4  cursory examination.
5      Q.    Did you speak with the person who
6  put that analysis together at Christie's to
7  discuss --
8      A.    I did not.
9          MR. IRWIN:  Let him finish.
10     Q.    -- to discuss with that person what
11 he was intending to do with these potential
12 alternatives?
13     A.    I did not.
14     Q.    Have you since you read their
15 report?
16     A.    I have not.
17     Q.    On page 42, paragraph 69, you state
18 further that Christie's "no longer has in-house
19 intellectual capital to conduct their
20 monetization analysis."  Do you see that?
21     A.    Um-hum.
22     Q.    What's the basis of that statement?
23     A.    I was an in-house at Intellectual
24 Capital and I am no longer with the firm, and my
25 business partner Jeff as well.

Michael Plummer

1  
2      Q.    So it's your position that in its
3  current iteration, Christie's does not have the
4  capability to do this analysis?
5      A.    Yes.
6      Q.    Did you talk to anybody at
7  Christie's about that opinion?
8          MR. O'REILLY:  Form.
9      A.    Let's just say I am aware of their
10 searches for staff and whatnot and know that
11 they are -- they do not have that capital,
12 intellectual capital.
13     Q.    Would you be surprised to find out
14 that they disagree with that statement?
15     A.    No, I'm not surprised at all.
16     Q.    You mentioned that Christie's
17 Financial Services Group was terminated in 2009,
18 correct?
19     A.    Correct.
20     Q.    And that's who you worked for,
21 correct?
22     A.    Correct.
23     Q.    Is there no one else at Christie's
24 capable of conducting an assessment of
25 monetization alternatives for a museum, in your

Michael Plummer

1  
2  opinion?
3      A.    I don't think that -- if there is,
4  they certainly didn't do it in this exercise.
5      Q.    So in terms of the alternative to
6  monetization schemes that you referred to, your
7  evaluation assumes they will be sold, correct?
8      A.    I'm sorry, can you ask that again,
9  please?
10     Q.    Your evaluation and all of your
11 values and your charts assume the art is going
12 to be sold, correct?
13         MR. IRWIN:  Form.
14     A.    I am not sure.  I can't answer that
15 question in that way that you asked it because
16 what I do is value the collection if it were to
17 be sold.  I'm not assuming that it's being sold.
18     Q.    Let me ask it differently then.
19 Your valuations are based on a proposed sale of
20 the art, correct?
21     A.    These are results that would be the
22 result of a sale, but I'm not assuming it will
23 be sold.
24     Q.    But they're based on a proposed
25 sale, correct?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1          Michael Plummer
2     A.    Correct.
3     Q.    Did you consider, aside from
4  critiquing Christie's alternatives to a sale;
5  did you consider alternatives to a sale ways to
6  monetize the art collection at the DIA, other
7  than a sale?
8     A.    I did not.
9     Q.    Have you or Artvest ever
10 participated in the collateralization of
11 artworks?
12    A.    What do you mean by that?
13    Q.    You talked about being involved in
14 loans before, art loans you called them?
15    A.    Right.
16    Q.    To me that means the art is being
17 used as collateral for a loan, correct?
18    A.    Correct.
19    Q.    So have you or Artvest ever
20 participated in the collateralization of any
21 artwork in any form, whether it's in a loan or
22 some other way?
23    A.    Are you asking me if I played a
24 role in art being used as collateral in a loan?
25    Q.    Yes.

1          Michael Plummer
2     A.    Yes, many times.
3     Q.    You've testified about -- you
4  guesstimated at a number, but you testified
5  about your work with art lenders during your
6  testimony today, correct?
7          MR. O'REILLY:  Form.
8     Q.    Correct?
9     A.    Correct.
10    Q.    How much would you advise the City
11 of Detroit it could get as a loan using the
12 DIA's entire collection as collateral?
13    A.    Well, I think that presupposes I
14 would advise them to do that.
15    Q.    No, it doesn't, I'm just asking you
16 the question.  Assuming there was going to be a
17 loan, how much would you advise the City of
18 Detroit it could get as a loan if it used the
19 DIA's collection as collateral?
20    A.    I can't answer that without knowing
21 where the funds would come from and how they
22 would be paid back.
23    Q.    You have the valuations that you
24 went through, correct?
25    A.    I understand that.

1          Michael Plummer
2     Q.    Is it your testimony that based on
3  those valuations, you think the most they could
4  get is 50 percent of those valuations because
5  it's a loan?
6          MR. O'REILLY:  Objection to the
7  form.
8     A.    Under standard lending practices
9  they would only be able to get 50 percent.
10 According to the offer from Art Capital Group
11 he's offering 20 percent, which is a really low
12 number in our practices.
13          Whenever a loan is discussed the
14 issue that I keep coming back to is who is going
15 to service the debt, which is substantial, and
16 who's going to pay off the loan, because I'm
17 working through a bankruptcy situation right now
18 with a client, if the loan isn't paid off the
19 lender gets to sell the art.
20          So, in effect, if you have a loan
21 for let's say half of the value of the
22 collection and you can't pay that back,
23 basically you have sold that collection to the
24 lender for half of the value of its worth.
25    Q.    Let me see if I'm understanding

1          Michael Plummer
2  your testimony here.  So what you're saying then
3  is if you were going to take a loan against the
4  art of the DIA, it's your view that you would
5  probably be limited to 50 percent of the
6  valuations that you gave, correct?
7          MR. IRWIN:  Asked and answered.
8     Q.    That's one of the parts of the
9  answer, correct?
10    A.    Correct.
11    Q.    The other part of the answer is you
12 would have to be able to put together some sort
13 of a plan to pay for the cost of that loan,
14 correct?
15    A.    Correct.
16    Q.    Both the interest on the loan and
17 ultimately to pay the loan back, correct?
18    A.    Correct.
19    Q.    So, in essence, if there were a
20 Plan of Adjustment that were put together for
21 the City of Detroit in connection with a Chapter
22 9 proceeding, that indeed took into account
23 whatever the cost of the loan would be, and the
24 repayment of the loan over whatever is the
25 appropriate period of time negotiated by the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6983-7  Filed 08/22/14  Entered 08/22/14 16:27:25  Page 78 of 82

Michael Plummer

1
2 parties, you would expect that they could then
3 possibly get a loan for 50 percent of the value
4 of the art as you've valued it, correct?
5        MR. IRWIN:  Form.
6        A.    Yeah, if they have a strategy that
7 accomplishes all of those things.
8        Q.    Give me a second because I think
9 you've answered a lot of this.  This is
10 something that I don't know that you testified
11 about but I'm not understanding, maybe you have.
12 On page 43, paragraph 71 G?
13        A.    70 G.
14        Q.    Oh, yeah, sorry.  It says, it seems
15 to say:
16        "Most asset-backed lenders have
17 extreme provisions for the lender in a situation
18 of default, levying both higher interest rates
19 and onerous "agency" fees to liquidate the
20 property."
21        So here all you're saying is look,
22 if there were a default, the typical asset-based
23 lender or art lender has these kinds of
24 provisions; that's all you're saying?
25        A.    Well, yes; but I perhaps could have

Michael Plummer

1
2 gone on to say more, which is that oftentimes
3 those default terms are vaguely written and
4 clients end up in default unknowingly or
5 unwillingly.
6        Q.    If there is going to be some kind
7 of a monetization of the art, like through a
8 loan or something like that, you should get
9 lawyers like the ones you have here for the DIA
10 to help them make sure that that doesn't happen,
11 correct?
12        A.    Or ones like you.
13        Q.    Have you or anyone else at Artvest
14 ever participated in the creation of a
15 masterpiece trust?
16        A.    No, I haven't.
17        Q.    On page 45 of your report you say
18 the creation of a Masterpiece Trust to be
19 accessed by members of a museum consortium is
20 too blue-sky.
21        Am I reading that right?  It says
22 too blue-sky to be substantively helpful?
23        A.    Yes.
24        Q.    What is the basis of that opinion?
25        A.    Well, because they did not describe

Michael Plummer

1
2 how long it would take, where the money would
3 come from.  The fact that most other
4 institutions having already very aggressive and
5 ambitious development plans which are outlined
6 below.
7        It was my opinion that this was an
8 idea that was not substantiated in any way,
9 shape or form and that also would take an
10 enormous amount of time to implement, and it
11 wasn't discussed how it could be done in an
12 expeditious way.
13        Q.    But you recognize that there are
14 many very young museums that have just been
15 created throughout the country, correct?
16        A.    Yes, but that doesn't mean they're
17 funded well enough to come up with the kinds of
18 moneys that you're talking about.
19        Q.    And also throughout the world, I
20 don't know why I limit it to the country --
21 we've board them, that's all right, I'm still
22 interested.
23        A.    There are.  But again, I think it's
24 an idea that is not flushed out well enough to
25 be taken seriously.

Michael Plummer

1
2        Q.    Are you aware of any meaningful
3 masterpiece trusts that have been put in place
4 by other museums?
5        A.    I am not.  That doesn't mean they
6 may not exist, but I am not.
7        Q.    Did you do any studies to determine
8 whether there were any other masterpiece trusts
9 being used by museums in the world to monetize
10 their art?
11        A.    I did not.
12        Q.    Have you or Artvest ever
13 participated in structuring long-term leases of
14 artwork?
15        A.    No.
16        Q.    What experience do you or Artvest
17 have in connection with structuring long-term
18 leases of artwork at all?
19        A.    We haven't, that's not in our line
20 of business.
21        Q.    On page 44, paragraph 71, you
22 state:
23        "This option would have the same
24 effect of depriving the DIA of some of its most
25 prized works, yet for far less of a financial

Michael Plummer

1  benefit.  Based on deals made with other partner
2  museums, Guggenheim Museum & Bilbao, Guggenheim
3  & Abu Dhabi and the Louvre & Abu Dhabi, such an
4  arrangement would be unlikely to net more than
5  20 million to 100 million in total for a 10 to
6  15 year deal and would result in the removal of
7  many high value works from the walls of the
8  DIA."
9      Do you see that?
10     A.  Yes.
11     Q.  What is the basis of that opinion?
12     A.  The situations I lay out below, A
13  through E.
14     Q.  Other than what you lay out in A
15  through E, is there anything else that you base
16  that opinion on?
17     A.  F through G.
18     Q.  Okay.  Other than A through G, is
19  there anything else?
20     A.  No.
21     Q.  So I read A through G, and I'm
22  wondering where did the calculations come from
23  that you used to come up with the numbers that
24  you have here, were they in some public

Michael Plummer

1  documents?
2      A.   They were in the documents
3  referenced here.  They're in several of the
4  press reports.
5      Q.   So other than what you sent us and
6  what you referenced, the press reports, that's
7  what you relied on?
8      A.   That's what I relied upon.
9      Q.   Have you or Artvest ever
10  participated in the sale and permanent loan of
11  artwork?
12     A.   That's a confusing question.  The
13  sale and permanent loan, are you meaning to
14  combine both as to one question?
15     Q.   I think what I'm referring to here
16  on page 46, Christie's recommendation 4?
17     A.   Yes.  I see what you're asking.
18  No, we have not.  I have not.
19     Q.   Did you conduct any analysis before
20  you arrived at the conclusion that you state in
21  paragraph 75?  And I'm reading it:
22      "It is hard to imagine how this
23  type of program would attract a new type of
24  donor who is not already supporting the

Michael Plummer

1  institution."
2      A.   Did I prepare any?
3      Q.   Did you do any analysis to support
4  that conclusion?
5      A.   I did not.
6      Q.   Did you speak to any donors --
7      A.   Let me correct that.  You threw me
8  off with the question.  As I said, I did talk to
9  several museum people, which I cannot divulge
10  because they were off-the-record conversations.
11     Q.   Did you speak to any donors
12  regarding their interest in a sale and permanent
13  loan program?
14     A.   I did not speak to any donors, but
15  I did speak to an expert on donors who was
16  responsible for many of the major gifts at
17  various museums and has a tremendous insight
18  into donor mentality.
19     Q.   Who was that?
20     A.   Again, it was an off-the-record
21  conversation.
22     Q.   So other than the off-the-record
23  conversation that you're referring to, did you
24  do any additional analysis?

Michael Plummer

1      A.   No, I did not.
2      Q.   Have you or Artvest ever
3  participated in coordinating, and you may have
4  because you worked with the fair, in
5  coordinating a traveling exhibition?
6      A.   In coordinating a traveling
7  exhibition?
8      Q.   Yes.
9      A.   No, we have not.
10     Q.   On page 46 of paragraph 76.  You
11  state:
12      "By Christie's own admission, this
13  a less than desirable alternative, as such
14  expositions are "costly to mount" and raise very
15  little relative to their total expense."  Do you
16  see that?
17     A.   Yes.
18     Q.   And it goes on to state "Such
19  revenues range from as little as 20,000 for
20  small exhibitions to 600,000 for blockbuster
21  exhibitions."
22      What is the basis of that
23  statement?
24     A.   The museum administrative officials

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1  that I referred to previously have handled the
2  budgets for such exhibits.
3      Q.   Is that someone that you can't
4  divulge at this point?
5      A.   It's in that same group of people I
6  mentioned before.
7      Q.   So you state that you have -- other
8  than that statement, you've had no experience
9  with any of these traveling, whatever they call
10 it, traveling exhibitions, correct?
11     A.   Back in my Acoustiguide days I
12 actually was dealing with the financial -- I was
13 working with the museums and their setting up of
14 those exhibitions, and their profits that they
15 expected to get from their audio tours and other
16 things, and their attendance numbers based on
17 the exhibition and that sort of thing. So I did
18 have experience back in that part of my career.
19     Q.   That would have been a long time
20 ago, correct?
21     A.   That would have been a long time
22 ago.
23     Q.   Counting for inflation and other
24 expenses, you're not aware of what they cost

Michael Plummer

1  now, are you?
2      A.   Yes, I am, because these numbers
3  came from talking to museum people this year,
4  just recently.
5      Q.   Is there any either publicly
6  available or privately available study or data
7  that you can refer to for the basis of your
8  calculation?
9      A.   No.
10     Q.   Other than the conversation you
11 had, correct?
12     A.   Correct.
13     Q.   Do you know what that person was
14 basing it on?
15     A.   They were basing it on their own
16 in-house experience of exhibitions.
17     Q.   So on page 48 of your report.
18 Looking at paragraph C:
19          "My review of the practicality and
20 the reasonableness of the monetization
21 alternatives described in Christie's preliminary
22 report to the City of Detroit: They do not have
23 a reasonable expectation of either raising
24 meaningful money or exceeding even the $100

Michael Plummer

1  million the DIA has already committed as its
2  contribution to the grand bargain." Do you see
3  that?
4      A.   Um-hum.
5      Q.   What's the basis for that
6  statement?
7      A.   What I've laid out in the report
8  thus far.
9      Q.   Other than what you've testified
10 about today and what you've laid out in your
11 report; is there any other source or information
12 you're relying on for that opinion?
13     A.   I have nothing supplemental to
14 provide here today.
15     Q.   Other than what you've testified
16 about today and what you referred to in your
17 report, you haven't done any additional
18 analysis?
19     A.   Not other than what is here and
20 I've testified to.
21     Q.   Were you asked to render an opinion
22 regarding the cultural impact of the museum, the
23 DIA, on the City of Detroit?
24     A.   No.

Michael Plummer

1      Q.   Looking at page 48, paragraph 78.
2  It says as I'm reading it:
3          "Rather than being a source of cash
4  to creditors or a burden on the current city, in
5  fact, the DIA is the single, most important
6  cultural asset the City currently owns for
7  rebuilding the vitality of the City." Do you
8  see that?
9      A.   I do.
10     Q.   Did you write that statement?
11     A.   I did.
12     Q.   What is the basis of that
13 statement?
14     A.   My opinion.
15     Q.   Your personal opinion?
16     A.   My personal opinion based on my
17 years of experience in the art industry.
18     Q.   That opinion isn't dealing with
19 anything to do with the art industry, it's
20 dealing with the cultural impact of the museum
21 on the City of Detroit, correct?
22     A.   It's dealing with the DIA as an art
23 institution and the impact of art institutions
24 in the city.

```
 1            Michael Plummer
 2      Q.    What experience do you have in
 3  valuing cultural assets like the statement you
 4  made there?
 5      A.    I don't have experience.
 6            MR. SOTO:  I don't have any other
 7  questions.  I thank you very much Mr. Plummer
 8  for your patience with me.  Any other questions
 9  from anyone?
10            MR. O'REILLY:  No questions.
11            MR. SOTO:  Anyone on the phone?  In
12  which case this concludes our deposition.  You
13  have a right to review the testimony, and in
14  reviewing it you can certainly fix grammatical
15  errors, things that you see as misspellings or
16  things like that, things that you think might
17  have been taken down wrong.
18            You don't get to substantively
19  change your testimony, unless of course you say
20  no I meant not, and there's no not in there,
21  then that's a different issue.  So you'll get a
22  chance to do that and you can coordinate that
23  with your counsel.
24            THE WITNESS:  Okay.
25            THE VIDEOGRAPHER:  The time is 5:45
```

```
 1            Michael Plummer
 2  p.m. August 1, 2014, this completes today's
 3  video deposition of Michael Plummer.
 4            (Time Noted:  5:45 p.m.)
 5
 6       ---------------------------
 7            MICHAEL PLUMMER
 8
 9  Subscribed and sworn to before me
10  this     day of        , 2014.
11
12  ----------------------------------
13            Notary Public
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1            ERRATA
 2       I, MICHAEL PLUMMER, wish to make the
    following changes, for the following reasons:
 3
 4  PAGE LINE
 5  ____ ____ CHANGE: _____
 6            REASON: _____
 7  ____ ____ CHANGE: _____
 8            REASON: _____
 9  ____ ____ CHANGE: _____
10            REASON: _____
11  ____ ____ CHANGE: _____
12            REASON: _____
13  ____ ____ CHANGE: _____
14            REASON: _____
15  ____ ____ CHANGE: _____
16            REASON: _____
17  ____ ____ CHANGE: _____
18            REASON: _____
19
20  _____  _____
21  WITNESS' SIGNATURE            DATE
22
23
24
25
```

```
 1            C E R T I F I C A T E
 2
 3       I, Roberta Caiola, a Shorthand
 4  Reporter and Notary Public within and
 5  for the State of New York, do hereby
 6  certify:
 7
 8       That the statements, colloquy
 9  and testimony contained herein is a
10  true record of the proceedings in this
11  matter.
12
13       I further certify that I am
14  not related to any of the parties
15  involved in this proceeding, and that
16  I am in no way interested in the
17  outcome of this matter.
18
19
20       ---------------------------
21            ROBERTA CAIOLA
22  Dated:  August 3, 2014
23
24
25
```