UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------------------------------x
                                                 :
In re                                        : Chapter 9
                                                 :
**CITY OF DETROIT, MICHIGAN,**      : Case No. 13-53846
                                                 :
                Debtor.             : Hon. Steven W. Rhodes
                                                 :
                                                 :
------------------------------------------------------------x

## FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE OR TESTIMONY REGARDING MATTERS WITHHELD FROM DISCOVERY ON THE BASIS OF THE MEDIATION ORDER

Financial Guaranty Insurance Company ("**FGIC**")[1] hereby submits this motion in limine (the "**Motion**") for entry of an order precluding at the hearing (the "**Confirmation Hearing**") on the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6379] (the "**Plan**") the introduction of evidence or testimony that FGIC has heretofore been unable to discover because of this Court's Mediation Order, entered on August 13, 2013 [Docket No. 322] (the "**Original Mediation Order**" and, as amended or supplemented, the "**Mediation Order**"). In support of this Motion, FGIC respectfully represents as follows:

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed May 12, 2014 [Docket No. 4660] and the Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed August 12, 2014 [Docket No. 6674].

## Preliminary Statement

1. Over the past four months, the parties have actively engaged in discovery—taking over thirty depositions and reviewing tens of thousands of documents. Throughout this process, FGIC and the other objectors have been unable to elicit information surrounding the numerous settlements that make up the Plan, including the "Grand Bargain," because of claims of mediation confidentiality. It has become clear, however, that despite these claims of confidentiality, the City intends to rely at the Confirmation Hearing on evidence related to the negotiations that resulted in these settlements and/or evidence that FGIC cannot properly refute without conducting discovery related to the negotiations.

2. Critically, the Court has already made clear that this evidence is irrelevant to Plan confirmation issues. Moreover, FGIC will incur significant prejudice if evidence which has heretofore been withheld on the basis of mediation confidentiality is allowed at the Confirmation Hearing. FGIC has not had the opportunity to conduct discovery or prepare its witnesses on matters relating to mediation and thus will not be prepared to adequately address any such matters should they arise at the Confirmation Hearing. To the extent supporters of the Plan, including the City, are able to manipulate this Court's Mediation Order to their benefit by selectively relying on evidence that they previously withheld on the basis of confidentiality, they will effectively be using the asserted confidentiality as a "sword and a shield," a tactic the Sixth Circuit has repeatedly admonished.

## Jurisdiction

3. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Factual Background

4.      On August 13, 2013, the Court entered the Original Mediation Order which, among other things, outlines the procedures surrounding Court-ordered mediation and provides that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." Original Mediation Order ¶ 4. Since entering the Original Mediation Order, the Court has expressed a preference for resolutions adopted through mediation and thus has stressed the importance of the protections offered by the Mediation Order. *See*, *e.g.*, Hr'g Tr. 187:5-7, May 28, 2014 (Court: "[T]he best way to resolve this bankruptcy is through mediation and settlement, and any crack in the wall of confidentiality undermines that goal."). Indeed, on June 12, 2014, the Court entered a Supplemental Order Regarding Mediation Confidentiality [Docket No. 5294] (the "**Supplemental Mediation Order**"). FGIC has not had the opportunity to review the Supplemental Mediation Order, which was filed under seal, and, accordingly, is unable to ascertain what information is protected by that order.[2]

5.      Over the past few months, the City, the Foundations and other parties to mediations have relied on the Mediation Order in refusing to respond to requests for information. *See*, *e.g.*, Hr'g Tr. 10:13-24, June 26, 2014; *Brief in Support of Joint Motion of the Foundations to Quash Subpoenas Duces Tecum*, dated June 13, 2014 [Docket No. 5300] 10-11; *State of Michigan Privilege Log*, attached as Exhibit 6 to the Supplemental Order Motion. For example,

---

[2] On June 17, 2014, a number of creditors, including FGIC, filed the Motion of Creditors to View or, in the Alternative, Unseal Supplemental Order Regarding Mediation Confidentiality [Docket No. 5358] (the "**Supplemental Order Motion**"). The creditors reasoned that they should be permitted to view the Supplemental Mediation Order because, without knowing the parameters of that order, it would be impossible for creditors to know when a party's invocation of the Mediation Order's protection was warranted. The Court denied the Supplemental Order Motion, without hearing, on July 2, 2014 [Docket No. 5746].

claims of mediation confidentiality were made during at least fourteen depositions, including the depositions of Kenneth Buckfire, Glenn Bowen, James Doak, Lee Donner, Mayor Michael Duggan, Annmarie Erickson, Bart Foster, Edsel Jenkins, Brenda Jones, Sue McCormick, Dennis Muchmore, Kevyn Orr, Rip Rapson and Brom Stibitz. As a result, these deponents were either instructed not to answer a specific question or a specific line of questioning or cautioned to restrict their answer to a specific question or a specific line of questioning. Further, two of the City's key witnesses asserted claims of mediation confidentiality over a combined 45 times during their depositions—the protections of the Mediation Order were invoked at least 35 times during the deposition of Kevyn Orr, the Emergency Manager for the City (the "**Emergency Manager**") (*see, e.g.,* Orr Dep. 336:10-340:13, 404:19-405:14, July 22, 2014) (excerpts of which are attached hereto as Ex. 6A), and at least 10 times during the deposition of Kenneth Buckfire (*see, e.g.,* Buckfire Dep., July 16, 2014) (*See FGIC's Motion to Exclude the Opinion of Kenneth Buckfire regarding Plan Treatment Compared to Treatment upon Dismissal*, filed on August 18, 2014 [Docket No. 6826], Ex. 7).

6. Information related to the "Grand Bargain" was withheld on the basis of mediation confidentiality by a variety of parties on a number of issues, including:

- the process for soliciting the Foundations to contribute funds to the City and what the Foundations were initially told about the purpose of the Grand Bargain, *see* Rapson Dep. 81:23-83:2, July 31, 2014 (excerpts of which are attached hereto as Ex. 6B) ("Q: When Judge – during your first conversation with Judge Rosen, where he proposed that the Kresge Foundation become involved in the process for the Grand Bargain, was it Judge Rosen who brought up that the involvement of the foundation should occur because it could soften the blow to the pensioners and help preserve the collection at the DIA? Mr. Shumaker: Objection. This calls for communications between Judge Rosen and Mr. Rapson. I believe this falls within the construct of the mediation order, and I would ask that the witness be instructed not to answer . . . Mr. Kurzweil: Under those circumstances, I'm going to instruct the witness not to answer.");

- communications between the City and the Foundations regarding the Grand Bargain, *see* Orr Dep. 337:12-338:3 ("Q: So I guess I want to make a record of something I understand from the City's position but it is the City's position that communications with the foundation are either part of or incidental to the mediation, correct? . . . A: That is correct.");

- discussions regarding monetization of the art through the Grand Bargain, *see* Orr Dep. 404:25-405:14 ("Q: . . . [W]hat steps did the City take to monetize the art? A: Putting aside any discussions we had in mediation, or the mediation process, about the art or the Grand Bargain, I think it's fair to say that we didn't take any steps to monetize the art. Q: So the Grand Bargain is it? A: Yes. Q: And that's the product of the mediation, so you can't talk about the efforts? A: Yes.");

- whether the Foundations would have contributed funds absent the transfer of the DIA, *see* Orr Dep. 340:3-7 ("Q: If I ask you did the foundations ever offer to contribute money without insisting on transfer of the art institute, you'll decline to answer that question, correct? A: I think I have to.");

- the basis for liability that the pensioners are asserting against the State, *see* Stibitz Dep. 84:19-85:17, August 4, 2014 (excerpts of which are attached hereto as Ex. 6C) ("Q: [W]hat is the State's understanding of the arguments that the pensioners are raising against the State . . . the basis for liability that the pensioners are, are asserting against the State. . . Ms. Nelson: Well, number one, that goes to the confidentiality of the mediation agreement, and I would have to instruct him not to answer on that ground.");

- why the State Contribution will be going to the pensioners as opposed to other creditors, *see* Muchmore Dep. 56:13-57:6, August 4, 2014 (excerpts of which are attached hereto as Ex. 6D) ("Q: Does the State have a view, to your knowledge, based on why it is that funding will be going to pensioners versus other creditors? Ms. Nelson: I'm going to object, because that invades the confidentiality of the mediation process, and I will instruct him not to answer that question.");

- the State's view with respect to what the recovery of pensioners should be in the bankruptcy, *see* Muchmore Dep. 57:22-58:22 ("Q: [S]ince the mediation, does the State have a view, with respect to the priority that pensioners should be paid, vis-à-vis other creditors in the Detroit bankruptcy? . . . Ms. Nelson: . . . It invades the confidentiality of the mediation process."); and

- whether the DIA believed that it would be able to raise the $100 million it agreed to contribute to the Grand Bargain and when it agreed to raise such funds, *see* Erickson Dep. 183:13-184:17, July 22, 2014 (excerpts of which are attached hereto as Ex. 6E) ("Q: To the extent the DIA made statements within the course of the last year that it may have been impossible or very difficult to raise $100 million, am I fair to assume that those statements were made in part because ongoing settlement discussions were going on? . . . When did the DIA learn that it would – that it was agreeing to undertake a commitment to contribute $100 million to the settlement?

Mr. O'Reilly: I'm going to object. I think you're asking a time during – during the course of negotiations when they would have made some commitment. I think that's covered by the order.").

7. Claims of mediation confidentiality were also asserted with regard to a number of other issues including:

- certain of the bases for the City's discrimination against Class 9, *see* Orr Dep. 349:20-350:2 ("Q: [D]o you have any bases for discriminating other than those two things? . . . A: I think that's caught up in the mediation.");

- whether the City would be contributing to the reduction of certain pension underfunding, *see* Buckfire Dep. 352: 9-17 (Q: [W]as it also determined that the City would not be contributing to the – the reduction of the underfunding through 2023? Mr. Cullen: Objection, I think we're getting into negotiations under the mediation privilege."); and

- communications with the labor unions regarding the work rules. *See* Jenkins Dep. 80:15-81:11, July 25, 2014 (excerpts of which are attached hereto as Ex. 6F) ("Q: I understand that there are ongoing negotiations with the labor unions about some of these work rules, is that right? . . . Ms. Kovsky-Apap: . . . [T]o the extent that anything is still short of the finish line, we're subject to the Court's order on mediation and can't discuss it. The Witness: Okay. Everything is a work in process right now.").

8. Despite the numerous invocations of the Mediation Order during discovery, it has become clear that the City plans to use information related to mediation in the Confirmation Hearing. For example, the Emergency Manager, testifying in his capacity as the City's representative pursuant to Federal Rule 30(b)(6), stated that third-parties to the "Grand Bargain" conditioned their participation in the settlement on their funds being directed to pensioners.[3] *See* Orr Dep. 210: 16-20 ("[I]t became apparent that there was going to be

---

[3] This Court has previously held that conditions imposed by third-parties to the Grand Bargain are irrelevant to Plan Confirmation issues. *See Financial Guaranty Insurance Company's Motion in Limine to Preclude the Introduction of Evidence or Testimony Regarding Certain Matters Previously Deemed Irrelevant by the Court or the City of Detroit* ("**FGIC's Irrelevant Matters Motion in Limine**") at p. 15, filed contemporaneously herewith. Notwithstanding this ruling, the City has indicated that it plans to rely on the conditions imposed by third-parties to the Grand Bargain to justify the Plan's disparate treatment of creditors. *Id.*

additional money coming in in the form of the Grand Bargain from third-party guarantors who were – as a condition of those grants that they be dedicated solely to pension."); *see also* Orr Dep. 275:6-13.  For mediation confidentiality reasons, however, Orr refused to go into more detail about the City's discussions with the Foundations.  *See* Orr Dep. 336:10-21; 337:12-20; 338:10-339:9; 339:22-340:13; 439:13-17; 444:8-25 (declining to describe the process by which the Foundations were solicited for funding or answer questions about the way the Grand Bargain was structured, the DIA Corp. contributions, or the State Contribution on the basis of the Mediation Order).  The City also indicated in its "Plan Confirmation Factual Propositions," attached hereto as Ex. 6G, that it intends to rely on the alleged fact that the contributions by the State, DIA Corp. and Foundations were conditional and would not have been made if the funds were not passed through to the pensioners under the Plan.

9. Further, in its Motion to Strike Syncora's Second Supplemental Objection to the Plan, filed on August 18, 2014 [Docket No. 6845] ("**Mot. to Strike Syncora's Second Supp. Obj.**"), the City relies on the contention that the "outside funds" used in the Grand Bargain "were available *solely* for the purposes of providing relief to pensioners *or preserving the DIA in public trust*, or both" and that "these outside donations never would have been available for any other purpose."  Mot. to Strike Syncora's Second Supp. Obj. 10-11; *see also id.* at 12 ("[T]he outside funds [ ] were donated on the express condition of providing pension relief and establishing the DIA as a public trust."); *id.* at 20 "[T]he City has acted responsibly to establish the DIA as an independent public trust, in exchange for outside donations that are *specifically conditioned* on that purpose."); *id.* at 23 ("[T]he City has agreed to insert provisions in the DIA Settlement Agreement making clear that no creditor can have any claim against the DIA's assets now or in the future . . . . [This is] simply a reassurance to charitable donors, *who*

*expressly required the disclaimer* as a condition of their financial contributions.").[4] The City cites *solely* to selective testimony of Rip Rapson for this contention. *See* Mot. to Strike Synocra's Second Supp. Obj. 11n.4, 23n.16. However, when Mr. Rapson was further probed at his deposition, he was directed to not answer any further questions about the Foundations' contribution to the Grand Bargain on the basis of mediation confidentiality:

> Q: When Judge – during your first conversation with Judge Rosen, where he proposed that the Kresge Foundation become involved in the process for the Grand Bargain, was it Judge Rosen who brought up that the involvement of the foundation should occur because it could soften the blow to the pensioners and help preserve the collection at the DIA?
> Mr. Shumaker: Objection. This calls for communications between Judge Rosen and Mr. Rapson. I believe this falls within the construct of the mediation order, and I would ask that the witness be instructed not to answer . . .
> Mr. Kurzweil: Under those circumstances, I'm going to instruct the witness not to answer….
> ….
> Q: So to the extent I ask you about the back and forth with Mr. Rosen or any other parties who were involved with mediation that took place after your initial meeting with Judge Rosen regarding the Grand Bargain … will you be able to answer those questions here today?
> Mr. Shumaker: I would be interposing an objection to all such questions, because I believe that back and forth would be covered by the mediation order entered by Judge Rosen.
> Mr. Kurzweil: It's my intention upon request of counsel to instruct the witness not to answer.
> Q. Is it fair to say that you will follow those instructions, Mr. Rapson?
> A. To a tee.

---

[4] This argument is especially troubling. When, why and at whose request certain provisions were included in the DIA Settlement is the exact type of information that FGIC understood to be covered by the protections of the Mediation Order and that has been withheld from FGIC in discovery on the basis of mediation confidentiality. *See*, *e.g.*, Erickson Dep. 184:11-17 ("Q: When did the DIA learn that it would – that it was agreeing to undertake a commitment to contribute $100 million to the settlement? Mr. O'Reilly: I'm going to object. . . I think that's covered by the order."); Muchmore Dep. 56:18-56:24 ("Q: Does the State have a view, to your knowledge, based on why it is that funding will be going to pensioners versus other creditors? Ms. Nelson: I'm going to object, because that invades the confidentiality of the mediation process, and I will instruct him not to answer that question.").

Rapson Dep. 81:23-87:6.[5] City witnesses, including the Emergency Manager, have also refused to testify about any conditions imposed by the Foundations, DIA Corp. and the State on the basis of mediation confidentiality. *See supra* 4-6; Orr Dep. 378:10-379:8 (noting that the Emergency Manager had only accepted the provisions in the Grand Bargain to the extent they had been publicly reported in the Plan and refusing to provide a date that terms were accepted because of mediation privilege). Indeed, the Emergency Manager specifically refused to provide information on whether the Foundations would have contributed funds to the DIA Settlement absent the transfer of the DIA, an argument that the City relies heavily upon in its Motion to Strike Syncora's Supplemental Objection. *See* Orr Dep. 340:3-7 ("Q: If I ask you did the foundations ever offer to contribute money without insisting on transfer of the art institute, you'll decline to answer that question, correct? A: I think I have to."); Mot. to Strike Syncora's Supp. Obj. 10-12, 20.

        10. As a result of the Mediation Order, FGIC has been denied access to information on, among other things, when these alleged conditions were imposed, why they were imposed, at whose request they were imposed, and whether they were necessary to consummate the Grand Bargain. *See*, *e.g.*, Orr Dep. 340:3-7, 340:8-13; 439:13-17; 444:8-25; *supra* 4-6.

---

[5] The deposition transcripts in this case are replete with situations like this, where the City inconsistently employs the protections of the Mediation Order by objecting to certain lines of questioning while allowing related lines of questioning to proceed. *Compare* Gilbert Dep. 130:2-26, July 29, 2014 (excerpts of which are attached hereto as Ex. 6H) ("Q: [W]hat did [Graham Beal] say about donating to the Grand Bargain when you had this meeting with him? Mr. Shumaker: I'm going to object because I believe that any of these discussions would have been covered by the mediation order.") *and* Rapson Dep. 81:23-83:2 (prohibiting Rapson from testifying about how the Grand Bargain was presented to him and what he was told about the goals of the Grand Bargain) *with* Gilbert Dep. 133:14-135:21 (allowing Gilbert to testify about how the Grand Bargain was presented to him and what he understood the Grand Bargain to accomplish); *compare* Orr Dep. 337:12-338:16 (acknowledging that the City's position with respect to the Mediation Order is that communications with the Foundations are either "part of or incidental to mediation") *with* Orr Dep. 275:6-13 (noting that, when considering how to treat various creditor classes, he considered conditions placed on contributions from grantors).

FGIC has thus been denied any and all opportunity to test the allegations made by the City with respect to this issue, including whether the parties who contributed funds to the Grand Bargain in fact indicated that they would have refused to provide such funding had it not been directed solely to pensioners.

11. Although the Court has acknowledged that the Mediation Order is a court order which cannot be waived, Hr'g Tr. 48:6-7, June 26, 2014, the Court has also recognized that the City cannot use the Mediation Order as both a sword and a shield; if the City violates the confidentiality of mediation, then the parties may be able to conduct discovery otherwise protected by the Mediation Order. Hr'g Tr. 183:12-17, May 28, 2014 (Court: "If the city breaches the confidentiality of mediation . . . then you're in, but I can't assume that. I have to assume the city in discovery and, most importantly, at trial will respect the confidentiality of mediation in all of its proofs.").

## Argument

### I. Legal Standard

12. Motions in limine "ensure an evenhanded and expeditious trial" by permitting the court to decide evidentiary issues in advance. *Cincinnati Ins. Co. v. Becker Ulman Const., Inc.*, No. 12013185, 2013 WL 5797614, at *1 (E.D. Mich. Oct. 28, 2013); *see also Dow Corning Corp. v. Weather Shield Mfg., Inc.*, No. 09-10429, 2011 WL 4506167, at *2 (E.D. Mich. Sept. 29, 2011). A motion in limine "performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented [] because they clearly would be inadmissible for any purpose. The prudent use of the in limine motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

13. When analyzing such motions, courts typically consider "issues of relevance, admissibility, and prejudice." *Bar's Prods., Inc. v. Bar's Prods. Int'l, Ltd.*, No. 10-14321, 2014 WL 1922764, at *1 (E.D. Mich. May 14, 2014). As the Sixth Circuit has noted, "[r]elevancy is the threshold determination in any decision regarding the admissibility of evidence; if evidence is not relevant, it is not admissible." *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 375 (6th Cir. 1983) (citing Fed. R. Evid. 402). Even relevant evidence, however, should be excluded if its probative value is outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *see also Paschal v. Flagstar Bank*, 295 F.3d 565, 577 (6th Cir. 2002). Indeed, motions in limine often involve "matters which ought to be excluded from . . . consideration due to some possibility of prejudice or as a result of previous rulings by the court." *Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 250 (E.D. Mich. 1997).

## II. FGIC Will Be Severely Prejudiced if Previously Withheld Information is Introduced at the Confirmation Hearing

14. The Federal Rules of Evidence provide that even relevant evidence should be excluded if its "probative value is substantially outweighed by a danger of … unfair prejudice, confusing of the issues . . ., undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Paschal*, 295 F.3d at 577 (citing Federal Rule of Evidence 403). Given the prejudice and injustice that would otherwise result, courts routinely hold that "the failure of a party to allow pre-trial discovery of a confidential matter which that party intends to introduce at trial will preclude the introduction of that evidence." *Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla.*, 60 F.R.D. 177, 186 (M.D. Fla. 1973) (noting that "fundamental fairness and justice requires that if [a party] intends to waive the privilege at trial by the introduction of evidence within that privilege, then the [party] will be required to allow discovery with regard to matters material to that testimony"); *Baxter Travenol Labs., Inc. v.*

US_ACTIVE:\44534690\8\45259.0007

*Abbott Labs*, No. 84 C 5103, 1987 WL 10988, at *1 (N.D. Ill. May 12, 1987) ("Abbott's failure to allow pretrial discovery of the privileged material [] will preclude it from using that material at trial.").

15. Prejudice occurs where, as here, a party is barred from obtaining confidential or privileged information during discovery which ultimately is used by its opponent at trial. "To allow a plaintiff to shield information during discovery and then utilize the information at trial would result in manifest injustice" and "frustrate attempts by the opposition to prepare for trial." *Huzjak v. United States*, 118 F.R.D. 61, 64-65 (N.D. Ohio 1987); *see also Mariner v. Great Lakes Dredge & Dock Co.*, 202 F. Supp. 430, 434 (N.D. Ohio 1962) ("I cannot perceive how the interests of justice could be served by permitting plaintiff to stand on his privilege now and abandon it at trial."). Indeed, it is axiomatic that a party cannot use a claim of privilege or confidentiality "as a shield and a sword." *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) (citation omitted); *see also Ross v. City of Memphis*, 423 F.3d 596, 604-605 (6th Cir. 2005) ("A popular image is that the attorney-client privilege cannot at once be used as a shield and a sword. This image is meant to convey that the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.") (internal citation omitted); *Chevron Corp. v. Stratus Consulting, Inc.,* No. 10-CV-00047, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010) ("Where a party injects part of a communication as evidence, fairness demand[s] that the opposing party be allowed to examine the whole picture ... privilege cannot be used as both a sword and a shield.").

16. During the discovery process, FGIC has been repeatedly denied access to information on the basis of mediation confidentiality. *See supra* pp. 3-4. Indeed, as part of this process, the parties asserting mediation confidentiality have interpreted the Mediation Order's

protections broadly, claiming, for example, that *all* substantive conversations between the City and certain parties are confidential. *See* Orr Dep. 337:12-338:9. The City has even claimed that it cannot disclose to FGIC all of the reasons that Class 9 is discriminated against under the Plan. Orr Dep. 349:11-350:3.

17. Through discovery and motion practice it has become clear, however, that the supporters of the Plan, including the City, strictly apply the Mediation Order only when it benefits them and indeed are attempting to use the Mediation Order as both a sword and a shield. The City's selective use of Rip Rapson's deposition testimony in its Motion to Strike Syncora's Supplemental Objection is one example of this. The City allowed at his deposition, and now relies on, Mr. Rapson's testimony for the proposition that "outside donations would never have been available for any [ ] purpose" other than to benefit pensioners or preserve the DIA, Mot. to Strike Syncora's Second Supp. Obj. 11, 14, but cut off questioning on the basis of mediation confidentiality when FGIC asked Mr. Rapson about how and why these conditions were formulated. Rapson Dep. 81:23-85:3. The City cannot be permitted to rely on testimony that FGIC was not able to adequately explore. Notably, Mr. Rapson himself has made numerous public statements, including to the press, about mediation discussions. *See*, *e.g.*, Rapson Dep. 83:23-84:14; FGIC's Irrelevant Matters Motion in Limine 19. The City did not prohibit Mr. Rapson from making these public statements about the mediation at the time they were being made—statements which were clearly intended to promote, and garner public support for, the Grand Bargain—but objected, on the basis of the Mediation Order, to questions that FGIC asked about these very statements in the course of discovery.[6] *See* FGIC's Irrelevant Matters Motion

---

[6] Indeed, although Mr. Rapson had been involved in mediation with the City for over seven months at the time of his deposition, he was not aware of the Mediation Order until the *day before* he was deposed, in late July 2014. Rapson Dep. 76:8-13 ("Q: Are you aware of the

in Limine 19 (discussing statements made by Mr. Rapson to the press and at a Wayne State University conference, which is publicly available on YouTube); Rapson Dep. 83:13-16 ("Mr. Shumaker: I'm going to object on the same line. You can ask whether he made that statement [about a conversation with Judge Rosen] at Wayne State, but you cannot ask whether in fact that was something that Judge Rosen said to him."). The City's use of Mr. Rapson's deposition testimony in its Motion to Quash Syncora's Supplemental Objection exemplifies the type of inappropriate behavior that is prohibited in this Circuit as impermissibly using confidential information as both a "sword" and a "shield." *Ross*, 423 F.3d at 604-605.

18. FGIC will be severely prejudiced if information that was previously withheld from FGIC—or that FGIC is unable to adequately address as a result of claims of confidentiality—is introduced at the Confirmation Hearing. FGIC has not had an opportunity to develop facts, prepare its witnesses, or develop a trial strategy with respect to any such evidence or to probe the truthfulness of related issues. If the parties who possess this information are permitted to introduce such evidence at the Confirmation Hearing, thereby manipulating this Court's Mediation Order to their benefit, FGIC will suffer severe injustice. Given the aforementioned, all evidence that has been withheld, or that cannot be adequately challenged, as a result of mediation confidentiality is highly prejudicial and must be excluded from the Confirmation Hearing. *See*, *e.g.*, *Baxter*, 1987 WL 10988, at *1.

### III. Settlement Negotiations are Irrelevant and Inadmissible

19. Notwithstanding the fact that any information that has been withheld on the basis of mediation confidentiality cannot be allowed at the Confirmation Hearing because it

---

mediation order? A: I have been made aware of that, yes. Q: When did you become aware of that? A: Most recently, yesterday. I just didn't know what the mediation order meant, and I still don't think I do know what it means.").

would substantially prejudice FGIC, such evidence is also largely irrelevant. Only relevant evidence is admissible at trial. Fed. R. Evid. 402; *Dow Corning*, 2011 WL 4506167, at *2. The Federal Rules of Evidence, made applicable to this proceeding by Rule 9017 of the Federal Rules of Bankruptcy Procedure, provide that evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. The Court has previously concluded that "who said what to whom during the mediation that led to the successful settlement is irrelevant." Hr'g Tr. 49:12-14, June 26, 2014; *see also* Hr'g Tr. 187:8-10, May 28, 2014 ("I remain unpersuaded that you can't do everything you need to do very effectively potentially without that breach [of the Mediation Order's protections]."). Accordingly, the introduction of **any** evidence related to the settlement negotiations should be precluded because the Court has already held that this information is irrelevant. *See Provident Life*, 176 F.R.D. at 250 (noting that motions in limine are appropriate where evidence ought to be excluded "as a result of previous rulings by the court").

## Notice

20. Notice of this Motion has been given to all parties registered to receive electronic notices in this matter. FGIC submits that no other or further notice need be provided.

## Statement of Concurrence Sought

21. Pursuant to Local Rule 9014-1(g), on August 22, 2014, counsel for FGIC sought the concurrence of counsel for the City in the relief sought in the Motion. Counsel for the City has advised that they oppose the filing of the Motion.

WHEREFORE, FGIC respectfully requests that the Court enter the Order, substantially in the form attached hereto as **Exhibit 1**, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

DATED: August 22, 2014
Houston, Texas

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3177
Email: edward.soto@weil.com

– and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance Company.*

# ATTACHMENTS

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavit] |
| Exhibit 6A | 7/22/2014 Deposition Transcript of K. Orr (excerpted) |
| Exhibit 6B | 7/31/2014 Deposition Transcript of R. Rapson (excerpted) |
| Exhibit 6C | 8/4/2014 Deposition Transcript of B. Stibitz (excerpted) |
| Exhibit 6D | 8/4/2014 Deposition Transcript of D. Muchmore (excerpted) |
| Exhibit 6E | 7/22/2014 Deposition Transcript of A. Erickson (excerpted) |
| Exhibit 6F | 7/25/2014 Deposition Transcript of E. Jenkins (excerpted) |
| Exhibit 6G | City of Detroit Plan Confirmation Factual Propositions |
| Exhibit 6H | 7/29/2014 Deposition Transcript of D. Gilbert (excerpted) |