**Exhibit 6A**

**7/22/2014 Deposition Transcript of K. Orr (excerpted)**

```
 1                    KEVYN ORR, VOLUME 2

 2         IN THE UNITED STATES BANKRUPTCY COURT

 3          FOR THE EASTERN DISTRICT OF MICHIGAN

 4

 5

 6

 7  In Re:                    )    Chapter 9

 8

 9  CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

10

11              Debtor.     )    Hon. Steven Rhodes

12  _____

13

14                       VOLUME 2

15

16     The Videotaped Deposition of KEVYN ORR,

17     in his personal capacity and as Rule 30(b)(6) witness,

18     Taken at 2 Woodward Avenue,

19     Detroit, Michigan,

20     Commencing at 9:10 a.m.,

21     Tuesday, July 22, 2014,

22     Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25
```

Page 206

KEVYN ORR, VOLUME 2

A. Yes.

Q. And you understand that the pension class sizes were for the UAAL, correct?

A. Well, the pension class sizes were for the UAAL but they took into account that those funds had assets in them, as well, so you're trying to determine the unfunded actuarial liability, but when you try to determine the pension payments you also include the amount of assets in the funds.

Q. So the existence of assets in the retirement systems was something that you considered in your discrimination analysis, in your decision to propose a plan that discriminated?

A. In my decision to propose a plan that provided different payout levels for creditors, yes.

Q. And it weighed in favor of it?

A. It weighed in -- not so much in favor, I'm -- favor of what?

Q. Well, in favor of paying pensioners more than financial creditors?

A. The fact that there are assets in the funds assisted us in paying them more than financial creditors, yes.

Q. Okay. What information did you base that -- that decision to provide differing levels of recoveries on?

Page 207

KEVYN ORR, VOLUME 2

A. Well, there is a number of information. Generally, we would go through the expected debt service of the City, what anticipated revenue streams would be going forward, what the City would need for reinvestment and revitalization, what the funding levels of the pension funds were, amongst others, there was a number of information and -- and it was a very dynamic and fluid process as we examined a number of different potential outcomes and scenarios.

Q. I understand that there is an enormous amount of information that implicates what the City has to give to creditors at all, okay? And I heard your answer to relate to that subject, correct?

A. Right.

Q. I'm asking a more specific question, which is with respect to your decision to pay classes 10 and 11 more than financial creditors, what information did you rely on in making that decision? So this is more not how much money is there but who will get what money is available.

A. All of the information I just mentioned. I mean, there is a number of different factors that go into what we can potentially pay financial creditors, and we took all that information in on a number of

Page 208

KEVYN ORR, VOLUME 2

different scenarios and reduced.

Q. But what information did you rely upon in deciding how to allocate the money that could be paid in terms of whether it went to pensioners or whether it went to financial creditors?

A. I think we're discussing the same answer. We would look at information regarding the unfunded liability of the funds, the amount of anticipated revenue the City could take in and could expect to take in, the obligations that the City could afford, the potential obligations of the City going forward for retiree healthcare, for instance, as well as for current employee, active employee healthcare obligations, just a number of different information that we could provide, we could analyze to try to get at a determination of what we could pay different classes of creditors.

Q. But that tells you what the total size of the pie is, correct?

A. But it also tells us what we think we can pay.

Q. Right, to creditors?

A. Right, there's an analysis of the total debt load which we published in the June 14th proposal, and then there is analysis of the revenue streams that come

Page 209

KEVYN ORR, VOLUME 2

into the City that we could use to service those obligations, not just financial creditors but pensioners, and then there's an analysis of what we would need to do to take the revenue stream to address the unfunded actuarial liability and other obligations that we would have with financial creditors, and we would run different scenarios as to how that could be done --

Q. Okay.

A. -- in this environment.

Q. I'm looking -- I don't think -- we may not be communicating well, I'm sure I'm not asking my questions correctly, but once you've determined how much you have in theory to distribute to creditors there's a separate decision that has to be made as to which creditors should get what parts of that pie; do you agree with that statement?

A. Yes, I think that's fair.

Q. And I want to focus on the process of deciding which creditors get which part of the pie, and I want to understand what information you relied upon in deciding to give pensioners a larger slice of the pie than you gave financial creditors --

A. Yeah.

Pages 206 to 209

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6985-6  Filed 08/22/14  Entered 08/22/14 16:36:24  Page 3 of 19

## Page 210

KEVYN ORR, VOLUME 2

Q. -- in the first plan.

A. Yeah, let's do it this way: There are factors that you're considering, and I think what you're trying to get at is judgment, which is different than the factors that come in to what you have and who you can pay. And the judgment decisions about what we could pay took into account a number of these other factors regarding revenue streams, but ultimately in deciding what we could pay pensioners, there were, I would say, several different factors which really spurred that decision.

One was the amount of funds that were in the various pension funds. Two was the obligation to try to take into account the situation of these pensioners. Three was that at some point, it became apparent that there was going to be additional money coming in in the form of the Grand Bargain from third-party guarantors who were -- as a condition of those grants that they be dedicated solely to pension.

Three was that at some point, it became clear that the pension funds, themselves, were performing better over the year and had experienced better rate of returns than in prior years, and, in fact, the asset values went up. All of those factors

## Page 211

KEVYN ORR, VOLUME 2

went into the decision to decide how much we could pay pensioners.

Q. Any other factors than that?

A. Probably, but I don't recall them sitting here today.

Q. And when you say the obligation to take into account the pensioner situation, that's referring to the human dimension that we talked about earlier, correct?

A. Yes, I think that's fair.

Q. Now, let's go forward in time from the first plan of -- that we've just been talking about, which is February 21?

A. Yes, mm-hmm.

Q. Okay. Let's go forward in time to April 1, 2014, which is about 40 days later, okay? April Fools' Day.

A. I wasn't going to say that but --

Q. You know I picked it. Now, let's -- so put yourself back in your state of mind as of April 1, 2014, okay?

A. Right.

Q. As of that time, you still didn't have agreement with any of the retiree associations or committees or retirement systems with respect to the proposed pension cuts, correct?

A. The reason I'm not recalling whether or not that's accurate, at some point in the spring -- we did not

## Page 212

KEVYN ORR, VOLUME 2

have publicly announced agreements, I think that's fair.

Q. You didn't have any publicly announced agreements with anyone I don't believe until April 15th, 2014; is that correct?

A. When -- you may have information regarding -- when you say anyone, you mean any creditors?

Q. I mean any of these retiree representative --

A. Okay.

Q. -- bodies that --

A. Okay.

Q. -- or that I take to mean retiree associations, pension systems official committee.

A. Okay. And so you're taking out the swaps, for instance, you're not including --

Q. Oh, absolutely.

A. Okay.

Q. Yeah, I'm just talking about what the pensioners --

A. Okay, yes, I think that's fair.

Q. Okay. And just to get the record clear, as of -- your recollection as you sit here today is that as of April 1st, you did not have agreements with any of the retiree representative parties, correct?

A. Yes, I don't think we have formally announced

## Page 213

KEVYN ORR, VOLUME 2

agreements as of April 1st, to the best of my recollection.

Q. Now, on April 1st -- and the plan that was on file at that time still called for the 26 percent and 6 percent cuts that we discussed earlier, correct?

A. If -- I remember we filed a revised plan, I believe, in March, but I'll take you at your -- at your representation because it's just not -- I just don't remember it in front of me, but I think that's true.

Q. My recollection is that the revisions to the plan changed the cut levels in the event that the plan was voted down so they made it more draconian if those classes rejected the plan --

A. Right.

Q. -- but that the top-level cuts, if the Grand Bargain approved, stayed the same?

A. Yeah, I think that's accurate, but the plan will speak for itself so --

Q. Okay.

A. -- I'll be bound by what the plan says.

Q. That's fine, I'm just trying to -- your best recollection as you sit here today is that I have it about right?

A. Yes.

Pages 210 to 213

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 4 of 19

Page 270

```
 1    KEVYN ORR, VOLUME 2
 2         There are some individual retirees that
 3    some people would characterize as helpless.  Some are
 4    disabled, some are of modest means, some are quite
 5    confused by the situation.  So I don't want to say
 6    that there are not individual retirees who anyone
 7    charitably would characterize as helpless, but there
 8    are organizations that are designed to represent their
 9    interests.
10  BY MR. HACKNEY:
11  Q.  I mean -- I guess what I mean is to say is you would
12    not characterize the retirees as helpless?
13  A.  Here again, there are organizations designed to
14    represent their interests, I am concerned about some
15    individual retirees who would be characterized as
16    helpless, yes.
17  Q.  So have you ever attempted to make a determination as
18    to which percentage of the retiree class 10 and 11 are
19    helpless retirees as opposed to not helpless?
20  A.  No, as I said, we tried to create a structure in place
21    there is someone we could talk to through the retiree
22    committee to make sure that retirees' interest was
23    represented.
24  Q.  Do you agree that during the history of the City of
25    Detroit, to the extent active employees were concerned
```

Page 271

```
 1    KEVYN ORR, VOLUME 2
 2    about the direction of the City of Detroit, they could
 3    leave their job and seek employment elsewhere?
 4  A.  Yeah, there was no involuntary servitude in the City
 5    of Detroit.  People could -- people could resign.
 6  Q.  And in fact, isn't it your testimony that certainly in
 7    the run-up to bankruptcy, you saw people leaving their
 8    jobs because of concern?
 9  A.  Well, that goes to your prior question about
10    attrition, but yes, we did.
11  Q.  Okay.  Now, we talked a little bit about the
12    expectations of retirees in connection with the --
13    some of the discussions we had about whether people
14    had relied on the covenant that we talked about?
15  A.  Yes.
16  Q.  Do you remember that?
17  A.  Yes, I do.
18  Q.  Is it fair to say that your analysis of information
19    relating to retiree expectations is based principally
20    on the conversations that you had with people about
21    their reliance on the City's promise?
22         MR. ALBERTS:  Objection.
23  A.  I think it's fair to say that between conversations
24    that I had, analysis, talking with their professionals
25    and advocates on their behalf, listening -- as I said,
```

Page 272

```
 1    KEVYN ORR, VOLUME 2
 2    listening to some of the statements that were made,
 3    looking at some of the representations that have been
 4    made by the City over the years, I think it's fair to
 5    say there is a number of different information that
 6    came in concerning the obligations to retirees.
 7  BY MR. HACKNEY:
 8  Q.  Now, did you -- did you attempt to determine what
 9    other creditors' expectations were vis-a-vis the City?
10  A.  Oh, I certainly heard from other creditors,
11    expectations from rating agencies, from financial
12    publications, from statements made in the press from
13    them, as well, that their expectation was that they
14    were going to be paid.
15  Q.  For example, did you talk to any of the -- of the COPs
16    holders to determine what their expectations were
17    about when they invested?
18  A.  I know I talked to some of their representatives.  I
19    don't know if I talked to any of the principals or any
20    of the individual holders.
21  Q.  Okay.  Fair to say that you haven't talked to any COPs
22    holder who told you that they expected not to be
23    repaid, correct?
24  A.  I think that's fair.
25  Q.  And you haven't talked to any other financial creditor
```

Page 273

```
 1    KEVYN ORR, VOLUME 2
 2    who told you that their expectation was that they
 3    would not be repaid, correct?
 4  A.  There was a conference in New York last fall where
 5    some creditors as identified who represented that they
 6    had interest in Detroit's debt said that they knew
 7    that the City probably would not be able to pay this
 8    debt but nonetheless they expected to be paid and they
 9    were going to punish the City.  They came up to me at
10    the conference with their finger in my face about
11    that.  But I can't -- I don't know -- I didn't take
12    their card, I don't know their name, but generally
13    speaking, I -- I was -- excluding conversations we've
14    had in mediation discussions, which are protected by
15    the order, I don't recall with specificity any
16    particular creditor principal coming up to me and
17    saying they did not expect to be paid.
18  Q.  I mean, let me try to tie it up this way.  By the way,
19    I can't believe that thing actually happened to you,
20    only in New York.
21  A.  No, it's happened to me many times --
22  Q.  No offense to New Yorkers --
23  A.  Oh, it was ugly.
24  Q.  We don't do that in Chicago but...
25         MR. PEREZ:  I thought you were a Michigan
```

Pages 270 to 273

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 5 of 19

Page 274

1  KEVYN ORR, VOLUME 2
2  boy.
3      MR. HACKNEY: I am, born and raised, but
4  I've actually lived in Chicago now --
5      THE WITNESS: Are you coming back? Are you
6  coming back?
7      MR. HACKNEY: No, no, I'm a Chicagoan.
8      THE WITNESS: Okay.
9      MR. HACKNEY: You lost me.
10 BY MR. HACKNEY:
11 Q. Let me see if I can tie it up this way. You did not
12    attempt to undertake a systematic analysis of what all
13    the creditors thought that they were going to get when
14    they made their respective investment decisions to
15    decide who should get what?
16 A. I did not poll all of the creditors regarding what
17    they thought they were going to get.
18 Q. Okay, and you didn't factor that into your conclusion,
19    correct?
20 A. No. Not at least that I can say -- I can't say what
21    discussions were made in mediation, but I -- publicly
22    the answer would be no.
23 Q. I am talking about, you know, your state of mind,
24    though. I'm saying that you didn't go and pick
25    winners and losers based on what people's expectations

Page 275

1  KEVYN ORR, VOLUME 2
2  were when they invested?
3  A. No, I don't view it as picking winners and losers
4     because I don't think anybody here has said to me that
5     they think of themselves as winners.
6         We tried to do an analysis of what we could
7     afford to pay based upon the factors we discussed
8     before with an understanding that $866 million was
9     coming in as a gift from grantors with specific
10    condition that that money would flow to pensioners as
11    opposed to any other creditor class and that we would
12    accept that gift with that condition when those
13    discussions were made.
14 Q. Understood, I'm just trying to say -- picking winners
15    and losers was a euphemism, I didn't mean to be
16    casual. You didn't set respective recovery levels
17    based on the fact that you thought some creditors
18    should be paid less based on their expectations when
19    they invested as opposed to others?
20 A. No, that really wasn't a factor. I mean, did I
21    personally believe that there may have been creditors
22    who were more capable of doing underwriting about the
23    City's debt condition has been -- as had been reported
24    in various publications that I'd read, yes, I
25    understood that but I didn't sit down and say, you

Page 276

1  KEVYN ORR, VOLUME 2
2  know, based upon your expectation of being paid, you
3  know, this is what we can pay. We generally drove the
4  determinations based upon the revenue stream and the
5  strengths and weaknesses and negotiations with any
6  particular creditor group?
7  Q. And I take it you did not, for example, go back and
8     review the due diligence materials that were provided
9     to the COPs creditors in the 2005 and 2006
10    transactions, correct?
11 A. I didn't do it personally but some of my advisors did.
12 Q. Okay. But, I mean, you don't know what was in those
13    due diligence materials?
14 A. No, some of those materials, I -- I did see some of
15    those materials and I saw some of the legal opinions
16    that were provided back then.
17 Q. In fact, the legal opinions that were provided back
18    then told COPs holders that the COPs were legal,
19    correct?
20 A. Some of them did, there was one law firm in the City
21    that refused to do the transaction because they opined
22    or at least informed people that they thought it was
23    illegal.
24 Q. And do you recall what the COPs holders were told
25    about the nature of the remedy that would exist if the

Page 277

1  KEVYN ORR, VOLUME 2
2  City failed to pay the service corps?
3  A. No.
4  Q. Do you know who the COPs holders were at the time of
5     the COPs offering?
6  A. There was a list of who they were, but sitting here
7     off the top of my head, no.
8         MR. HACKNEY: Let's mark this as our next
9  exhibit.
10      MARKED FOR IDENTIFICATION:
11      DEPOSITION EXHIBIT 21
12      11:29 a.m.
13 BY MR. HACKNEY:
14 Q. Mr. Orr, is this the offering memorandum that was put
15    out in connection with the 2005 COPs?
16 A. Without sitting here and reading through it, to the
17    best of my knowledge, this appears like a document
18    I've seen before as the offering document.
19 Q. And have you read this document before?
20 A. I have not read the document in total; I have read
21    pieces of it.
22 Q. Okay. You didn't just sit down and one day say, I
23    want to read the offering memorandum?
24 A. I did not read through the whole document.
25 Q. Now, if you look at page 8, I want to read you a

Pages 274 to 277

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 6 of 19

## Page 334

**KEVYN ORR, VOLUME 2**

A. Yes, I think Mr. Buckfire is an expert in that area.

Q. And in this subject matter we're discussing of likely rates of return, likely levels of risk, would you tend to defer to him in terms of his view?

A. I would certainly solicit his view. His view is very informed and very capable, but having been in the City now for over a year, I certainly would want to be informed but ultimately it's -- I'd have to make a call of keeping my own counsel.

Q. Would you agree that lenders are tripping over themselves to lend the City money?

MR. SHUMAKER: Object to the form.

A. I think we've had -- you know, every time I use a literation (sic) or metaphor, you quote it back to me, so I'm going to say that I think we've had a healthy amount of interest, and some people might well characterize that as tripping over themselves.

BY MR. HACKNEY:

Q. And there's a great deal of enthusiasm that you're finding from both investors and lenders, correct?

A. That appears to be the case.

Q. And that's based on the substantial deleveraging that the City's achieving through this plan, correct?

A. I think that --

## Page 335

**KEVYN ORR, VOLUME 2**

Q. In part?

A. I think that is fair.

Q. You know, Mr. Orr, I've reached a good stopping point, I think.

MR. SHUMAKER: Sure.

MR. HACKNEY: There's a lot of people in the room, but I kind of defer to you.

THE WITNESS: No, I'm good, but if you guys think that makes sense, we have a thing that we need to do.

MR. HACKNEY: What time?

MR. HERTZBERG: At 1:15 for 5 minutes.

THE WITNESS: Okay.

MR. HACKNEY: That will be perfect then, we'll take an hour for lunch, and then I'll see you at 1:30.

THE WITNESS: Okay.

VIDEO TECHNICIAN: The time is now 12:31 p.m., we are now off the record.

(Recess taken at 12:31 p.m.)

(Back on the record at 1:36 p.m.)

VIDEO TECHNICIAN: The time is 1:36 p.m., we are back on the record.

BY MR. HACKNEY:

## Page 336

**KEVYN ORR, VOLUME 2**

Q. Mr. Orr, welcome back from lunch.

A. Thank you, Mr. Hackney.

Q. Okay. So Mr. Orr, you're aware that certain charitable foundations have agreed to contributed money to the City's pension obligations in exchange for the City conveying its art collection into a public trust; is that correct?

A. Yes.

Q. And I take it if I ask you questions about your communications with the charitable foundations in connection with their agreement to contribute this money, you will refuse to answer on the grounds of the mediation order's confidentiality provisions; is that correct?

A. Yes, generally for most of them, I think that's correct.

Q. And just for the record, you didn't have any such conversations prior to the entry of the mediation order which was at some point in September of 2013?

A. Yes, that's correct.

Q. Okay.

A. Well, let me think. I think I had one meeting with Darren Walker at Ford Foundation, but it was not about a contribution, it was just a meet and greet.

## Page 337

**KEVYN ORR, VOLUME 2**

Q. Okay.

A. Okay?

Q. Yeah, I saw that in the documents, and there were some issues about the Ford Foundation and the building that they owned or something that --

A. I didn't even get into all that.

Q. Okay.

A. It was just hi, how are you, they were helping us with some grants, helping us stand up a grants administrator.

Q. So I guess I want to make a record of something I understand from the City's position but it is the City's position that communications with the foundation are either part of or incidental to the mediation, correct?

MR. SHUMAKER: I believe that's correct. Again, I think you could fish outside the contours of those mediation talks but my understanding is that all those talks were within the context of mediation.

BY MR. HACKNEY:

Q. Yeah, I mean, I don't want to ask a hundred questions today to establish what I think is relatively well established, which is that you're not, generally speaking, going to discuss your conversations with the

Pages 334 to 337

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 7 of 19

Page 338

KEVYN ORR, VOLUME 2

foundations, correct?

A. That is correct. You know, I may -- let me say this generally. I may have had meetings with foundation principals outside of the confines of the mediation, just hail-fellow-well-met, saw them at an event, how are you. There were no substantive conversations about the contribution that did not occur outside of the mediation order.

Q. And that's fine, because the only ones that I really want to ask you about are ones that relate to the Grand Bargain?

A. Right, right.

Q. And those would fall under the gambit of the mediation?

A. Those would fall under the gambit of mediation.

Q. Now, if I asked you your state of mind based on what you understood the foundations to be willing to do or what you thought they would be willing to do, you would also invoke the mediation order to the extent his state of mind was created by communications of the foundation, correct?

MR. SHUMAKER: I think that's right because I don't see how he could give you his impressions or his understanding without going into what was going on

Page 339

KEVYN ORR, VOLUME 2

in the mediation.

MR. HACKNEY: Right, because he lacks foundation to speak to what the foundations thought. If I asked him what he understood them to have thought, you'll take the position that it would be based on what they told him?

MR. SHUMAKER: Correct, it all would have been derived from the mediation discussions.

MR. HACKNEY: Okay, and so I'll just note for the record, Mr. Shumaker, that this is the position that Ms. Kofsky (ph.), a cop, took in a prior deposition, and I understand the basis for it. I will let you know that I don't necessarily agree with it based on comments that Judge Rhodes made about how state of mind might work in the mediation context, but it doesn't matter because I feel like we're not going to work that out today anyway.

MR. SHUMAKER: Understood.

BY MR. HACKNEY:

Q. And I just want to understand you all's position on it. So just a couple big ones, if I ask you did you ever ask the foundations to contribute money with no strings attached you'll decline to ask answer that question, correct?

Page 340

KEVYN ORR, VOLUME 2

A. I think I have to.

Q. If I ask you did the foundations ever offer to contribute money without insisting on transfer of the art institute, you'll decline to answer that question, correct?

A. I think I have to.

Q. And if I ask you hey, who is it that imposed the condition on the Grand Bargain that the art institute would be transferred, was it you, or was it them, or was it Judge Rosen, you'll decline to answer those questions, correct?

A. I believe so.

Q. Mr. Orr, has the Grand Bargain -- which you know what I'm talking about, right?

A. Yes, the money we talked about before, the 366 million from the foundations, a $350 million value settlement from the State, and $100 million from the DIA benefactors as funneled through the Founders' Society.

Q. Correct, in exchange for the art -- in connection with the art being -- the DIA being conveyed into a public trust, correct?

A. Contributions targeted towards the two pension funds with the condition that not one piece of art be sold or de-assessed as a result of this process.

Page 341

KEVYN ORR, VOLUME 2

Q. And the purpose of the transfer to a public trust is to ensure that the art is never sold to satisfy the claims of the City's creditors, correct?

A. Yes, now and forever, yes.

Q. Not only current creditors but future ones, as well?

A. Correct.

Q. So has the Grand Bargain, Mr. Orr, helped the COPs holders to achieve a higher recovery?

A. I don't think so.

Q. Mr. Orr, what are the principal terms of the LTGO settlement?

A. The LTGO settlement centers around a dedicated millage that's to extend for the next approximately 13 years, and the terms of a settlement that roughly 26 percent -- oh, the LTGO, I'm sorry --

Q. Yeah.

A. Okay, I'm sorry, I'm going -- I thought you were just talking about -- I'm doing it temporally --

Q. That's okay.

A. I'm sorry.

Q. I'm hopping around.

A. Okay.

Q. Let's start over.

A. Let's start over.

Pages 338 to 341

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 8 of 19

Page 342

1  **KEVYN ORR, VOLUME 2**
2  Q. So let's set the stage. The LTGO settlement has been
3     announced in the press, and there's some information
4     that's kind of available about it, but I actually
5     literally don't know --
6  A. Right.
7  Q. -- what the terms are, and there's been some
8     suggestion that it's the continued subject of
9     negotiations, so I want to give you a fair setup.
10 A. Yeah, that's -- that's why I was -- I can talk about
11    UTGO...
12        MR. SHUMAKER: You can discuss what's made
13    public.
14 A. Okay. The mediators issued a statement on the LTGOs
15    we did not, my office did not, recognizing that there
16    was a settlement which, in part, dealt with a class of
17    creditors, I think 170-some-odd-million dollars of
18    claims, which would get an allowed claim in a certain
19    amount. The -- I know from e-mails that I received as
20    late as last night that some of the final details are
21    still under discussion so I'm a little -- that was
22    done in the mediation, so I don't want to run afoul of
23    the mediation order as far as if you have a press
24    release, I'll be happy to discuss about what's in the
25    release but I don't know if I can discuss any more

Page 343

1  **KEVYN ORR, VOLUME 2**
2     than that.
3  BY MR. HACKNEY:
4  Q. It's frankly been kind of confused on this, but I'll
5     tell you what I know. First, it's my understanding
6     that you do not have a final agreement with the LTGO;
7     is that correct?
8  A. I think that is correct.
9  Q. What you have is what is loosely described as an
10    agreement in principal on some but not all of the
11    terms, correct?
12 A. I think that's fair.
13 Q. Now, the -- but the one thing I'm able to see, I'll
14    tell you, in the expert reports is that Mr. Buckfire
15    says that the $164 million of the unsecured portion of
16    LTGO is getting $55 million in value of some form,
17    okay? I'll represent to you you can see that in the
18    exhibit. I'll also represent to you that somehow in
19    Mr. Malhotra's work there is some implication that
20    that is paid in 2015 under the forecasts, okay? I'm
21    less sure on that one, okay?
22 A. Right.
23 Q. What I will tell you is that 55 million on 164 million
24    of unsecured LTGO works out to a 34-cent recovery on
25    that, okay? So -- and I'm -- this is going on and on,

Page 344

1  **KEVYN ORR, VOLUME 2**
2     but I asked like Heather for this, Ms. Lennox, and she
3     actually referred me to this information.
4  A. Right.
5  Q. But then I wasn't able to confirm that that was the
6     whole deal and so that's why you have this big
7     involved --
8  A. Right.
9  Q. -- lead-in, okay? So let's just start with, is it
10    your understanding that -- let's do it this way. Is
11    it your understanding that at least part of the deal
12    that is part of the agreement in principal that is
13    public is that they will get approximately 34 cents on
14    their unsecured claim?
15 A. Yeah. Without having any intent to directly or
16    indirectly violate the mediation order, I do not think
17    it is unfair based upon published reports, but I do
18    not recall that the mediation statement included the
19    actual amount.
20 Q. It didn't.
21 A. Yeah, so I don't -- I don't want to necessarily go
22    beyond what was included in that statement, I think
23    the statement was generally there was a settlement of
24    a certain amount and recognition of a claim. I'll
25    stick with that. There is no reason for me to believe

Page 345

1  **KEVYN ORR, VOLUME 2**
2     that mathematically that that 55 percent of roughly
3     100 --
4  Q. No, 34 percent.
5  A. No, 55 million of 170-some-odd million is equally
6     equivalent to 34 percent.
7  Q. But like as you -- I mean, I'm trying to tell you that
8     it's not just, you know, me -- it's like the debtor's
9     counsel told me to look at these things to get at
10    least some of the terms.
11 A. And like I said, I have no reason to dispute what you
12    were told or what they did; I just don't want to do
13    it, okay?
14 Q. Okay.
15 A. So I'm -- I'm trying to stay within -- I have been
16    admonished before about possible breaches of the
17    mediation privilege by -- by several judges now and I
18    don't want to run afoul of that in any way.
19 Q. So is it fair to say, Mr. Orr, that I think you're
20    declining to discuss the terms of the LTGO settlement
21    based on caution about not knowing what is and what is
22    not public?
23 A. I think that's fair.
24 Q. Okay. I guess what I will say then is I'm going to
25    reserve my questioning on this, this is also a

Pages 342 to 345

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6985-6  Filed 08/22/14  Entered 08/22/14 16:36:24  Page 9 of 19

## Page 346

KEVYN ORR, VOLUME 2

subject -- it was one of the drivers of our motion to continue, but in fairness like I really may need to come back and re-depose you on this when it's been public for at least some period of time because it was in flux.

A. Let me say this, like I said, whatever's public I have no reason to believe whatever's been made public is inaccurate, but I do know that they're continuing discussions regarding details of the settlement, so I just want to be very careful.

Q. And you're also -- fair to say you're unwilling to say that the 55 million I alluded to represents the full amount of what they're getting, correct?

A. I have no reason to believe that's not -- there is anything in addition to what you may have heard economically.

Q. Okay. But are they only getting 55 million or not?

A. I have no reason to believe there's anything more than that.

Q. Okay. Well --

A. Based upon published reports.

Q. What is the basis for paying the LTGO 34 cents and paying COPs holders 10 cents?

A. Now, I do think we are getting into the mediation

## Page 347

KEVYN ORR, VOLUME 2

order.

Q. Okay, so you're -- you'll decline to answer questions about your basis for discriminating between those two classes?

A. I think I have to.

Q. Okay.

MR. SHUMAKER: Well, you don't have to -- you don't have to reveal the terms of the settlement.

THE WITNESS: Right.

MR. SHUMAKER: But I think you could talk in abstract, in the abstract about comparing the LTGO settlement with the COPs holders, which I think is what Mr. Hackney is getting at.

A. Well, let's do this, see if I can talk about it generally and I'll try to just step it as we go through it to see. I mean, I think it's fair to say that that is a result of a negotiated solution in the mediation process. I think it's fair to say there was some give and take between the parties as to what potential claim was. I think it's been reported that there was an argument made that that particular class of creditors had a different status than just general unsecured, and that that status should have some level of recognition. I think that's about all I can say.

## Page 348

KEVYN ORR, VOLUME 2

BY MR. HACKNEY:

Q. Okay, you do agree that the City has classified the LTGO creditors as general unsecured?

A. I believe that's our last classification, yes.

Q. Okay, and that's the same classification as the COPs holders?

A. Yes.

Q. And you also agree that the LTGO bondholders are financial creditors like the COPs holders?

A. Yes, I believe there's financial creditors as opposed to pensioners, for instance, yes.

Q. Right, and in fact, many of them have monoline insurers standing behind the bond, correct?

A. Yes.

Q. So you would agree there are a lot of similarities between the COP holder and the LTGO correct?

A. There are a lot of perhaps superficial similarities but I think the allegations that have been made against the COP holders in the litigation raise other dissimilarities between them.

Q. And you're talking about the invalidity suit?

A. Yes.

Q. Okay, and you understand that the way the plan works is that the -- a reserve is set up for the COP holders

## Page 349

KEVYN ORR, VOLUME 2

that represents what their total recovery could be?

A. Yes.

Q. And that's what their total recovery could be if they prevail in the invalidity suit, correct?

A. Yes, a reserve over a period of time as opposed to a hundred-and-X-million dollars of cash, yes.

Q. Yeah. Well, it's actually a bunch of B notes that go into the reserve.

A. That's what I said time, time wise, yes.

Q. Okay, yeah. Now, are you aware of any other basis to distinguish the LTGO from the COPs other than the potential invalidity of the COPs and this argument that the LTGO have made that they are not an unsecured creditor?

A. Am I aware?

Q. Yeah.

THE WITNESS: Am I aware?

BY MR. HACKNEY:

Q. Or do you have any other basis for discriminating other than those two things?

MR. SHUMAKER: I think you can answer that.

A. Yes.

BY MR. HACKNEY:

Q. What is it?

Pages 346 to 349

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 10 of 19

## Page 350

1  KEVYN ORR, VOLUME 2
2  A. I think that's caught up in the mediation.
3  Q. I'm not sure how that could be.
4  A. Well, as I think I've said, there were negotiations,
5     there were positions taken. The awareness of what
6     those other bases could be came about typically as a
7     result of the mediation and reports provided to me out
8     of the mediation so I want to be careful about talking
9     about them, because that, I think is covered by the
10    mediation order.
11 Q. Okay, so the two grounds that I identified, invalidity
12    and the arguable not unsecuredness of the LTGO are the
13    only two that you can publicly discuss?
14 A. I believe so.
15 Q. You would agree that the LTGO were not granted a lien
16    in any City property, correct?
17 A. I would agree that I have seen no documents
18    memorializing a lien.
19 Q. The difference between -- the difference that they
20    allege is relevant is that they are to be considered
21    quote/unquote a first budget item; isn't that correct?
22 A. Here again, I think now we're starting to bump up
23    against the mediation.
24 Q. So you're not able to answer that question either?
25 A. If -- I'd be happy to validate any public statements

## Page 351

1  KEVYN ORR, VOLUME 2
2     that you have, but I don't think I should be the one
3     speaking to that.
4  Q. It's the subject of a declaratory complaint and like a
5     pretty extensive motion to dismiss argument?
6  A. Yeah, but I haven't necessarily been involved in the
7     legal aspects of that argument. Most of my
8     information comes as a result of communications that
9     occur in the mediation.
10 Q. Okay. All right, so you have not followed the give
11    and take in the legal issue litigation?
12 A. As you might imagine I have not been keeping up with
13    the over, as I understand it, almost 8,000 documents
14    filed in the bankruptcy, but I have no -- let me ask
15    answer it this way. I have no reason to dispute the
16    allegations that are contained in the filings.
17 Q. By whom?
18 A. By any party, whatever their allegations are, they
19    are.
20 Q. Other than the reasons that you've put in your own
21    filings?
22 A. Yes, whatever -- whatever's a public record, I have no
23    reason -- in the bankruptcy case, there's no reason
24    for me to dispute that parties have taken those
25    positions, I just can't speak to it of my own

## Page 352

1  KEVYN ORR, VOLUME 2
2     independent knowledge once it comes as a result of the
3     mediation.
4  Q. Understood, and you also can't say as to whether or
5     not it's been a factor in your decision?
6  A. I -- I don't think I can other than what we've talked
7     about.
8  Q. Mr. Orr, how did the City arrive at the calculation of
9     the size of the OPEB claim that is contained in the
10    current plan?
11 A. As contained in the current plan? Well, we did --
12    well, the City and our advisors in conjunction with
13    the advisors of the -- of the funds did an analysis of
14    the potential liability for retiree healthcare based
15    upon a number of factors including actuarial rates,
16    longevity, objective factors such as anticipated rates
17    of healthcare spend as published by Michigan State
18    institutions and Federal Government institutions and
19    healthcare providers, number of objective criteria as
20    calculated with the number of retirees that we have
21    and anticipate will have in the future.
22 Q. And ultimately the ultimate number was the product
23    negotiation between the City and the retiree
24    representative parties, correct?
25 A. Correct.

## Page 353

1  KEVYN ORR, VOLUME 2
2  Q. Now, you know that in connection with the City's
3     bankruptcy petition that it stated that it had $5.7
4     billion in OPEB; do you remember that number?
5  A. Yes, I do.
6  Q. And do you agree that the $5.7 billion number includes
7     the present value of anticipated OPEB not only for
8     retirees but also for active employees, right?
9  A. Active employees who will retire.
10 Q. Right, it's sort of like it was the analog of the
11    pension UAAL --
12 A. Right.
13 Q. -- which is it looked not just at retirees but it also
14    looked at active employees, what their costs will be
15    when they retire?
16 A. And yes --
17    MR. ALBERTS: Objection to form.
18 A. In the out-years, so for instance, someone who is an
19    active employee today but will retire in 2015 will
20    become a retiree in the out-years, yes.
21 BY MR. HACKNEY:
22 Q. And that OPEB number was in the 5.7 billion?
23 A. I believe so.
24 Q. Does the City believe that its retirees have a vested
25    right to healthcare benefits?

Pages 350 to 353

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 11 of 19

## Page 374

KEVYN ORR, VOLUME 2

Q. Okay. Do you agree that if the petition -- the bankruptcy petition were dismissed, it's likely that at a minimum, the City could continue to get from the DWSD its share of the COPs principal and interest service?

A. I have no reason to believe that is not true.

Q. The DWSD is not insolvent; isn't that correct?

MR. SHUMAKER: Object to the form.

A. Yeah, I -- I -- there -- there may be -- I don't know if they are or they aren't.

BY MR. HACKNEY:

Q. In the -- in the postconfirmation time period, if the plan is confirmed, will the DWSD bear any of the interest expense associated with the B notes?

A. There are currently a series of mediations ongoing surrounding DWSD and its obligations. I don't want to bump up against the confidentiality provisions that I've been admonished not to -- not to breach. That being said, I think I can answer your question. Can you repeat your question?

Q. Let's try it this way, Mr. Orr.

A. Yeah.

Q. Let's try it this way.

A. Yeah.

## Page 375

KEVYN ORR, VOLUME 2

Q. There are forecasts that you've reviewed, right?

A. Right.

Q. And the forecasts include postconfirmation forecasts that assume the plan of confirmation, right?

A. Right.

Q. In those forecasts, does the City bear the entirety of the B note interest expense? That's a good way to back into it.

A. Okay, or is there some expense allocated to an enterprise --

Q. Exactly right.

A. I think your question -- that way of doing it, I think your question is fair. It does not bear the entirety of it; there is an allocation.

Q. Oh, there is an allocation?

A. I think that --

Q. Let's put it this way. The answer to that question should be found in the forecast? I literally don't know.

A. No, but I --

Q. I was literally asking you a discovery question.

A. Well, I'm trying -- there is an allocation of 428 million at DWSD that is supposed to go to help finance the note. I think I can speak to that.

## Page 376

KEVYN ORR, VOLUME 2

Q. Oh, I see.

A. Yeah.

Q. Because do the pensioners get -- I thought the pensioners don't get B notes, do they?

A. No, but I'm trying to -- I'm trying to --

Q. Because I thought that -- that was the nine-year payment that you matched up with the Grand Bargain, but that was cash money --

A. Yeah, that was --

Q. -- over the retirement --

A. That payment is year over year for nine years that's indexed to the possibility of restoration, that's why it's nine years. I'm not sure that goes into what 388 million B note but -- I'm trying to make sure that I don't bump up against any discussions that are going in -- that are ongoing.

Q. Okay. I mean, is it a fair summary to say you don't know whether the forecast allocated a percentage of the B note interest expense through the DWSD or not?

A. Yeah, I'd say that.

Q. Okay. Let's talk about the Grand Bargain some more if we could, Mr. Orr.

A. Sure.

Q. Do you know -- the Grand Bargain can also be -- is

## Page 377

KEVYN ORR, VOLUME 2

also known as the DIA settlement, correct?

A. Yeah, people call it different things, but I think it's fair that people call it either one of those.

Q. Okay, and so the way it works, we've talked about it, but the DIA settlement is the -- is the contributions of the charitable foundations and the DIA Corp. in connection with the art collection going into a public trust, correct?

A. Yes.

Q. And then the state contribution of its money has a number of bells and whistles to it but is, itself, conditioned on the DIA settlement?

A. Well, yes, it's conditioned on a settlement of claims against the State relating to that provision of the constitution, article 9, section 24 regarding pension rights and also in part for the DIA settlement and the art to be put into the trust.

Q. Yeah, and that's what I meant by the other bells and whistles. Like even if the retirees gave the State a waiver, that's actually not sufficient for the State contribution. You have to get the DIA settlement, as well?

A. Yes.

Q. When did you agree to the Grand Bargain? Let me put

Pages 374 to 377

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 12 of 19

KEVYN ORR, VOLUME 2

it to you this way. The first plan of February 21 contained within it statements to classes 10 and 11 that if you vote to approve and the moneys are received, you'll get X, and if you don't, you'll get Y?

A. Yeah.

Q. Do you remember that?

A. Yeah, it had the little box.

Q. Yeah. So can we start with that date? Had you agreed to the Grand Bargain as of Feb 21, 2014?

A. The only reason I'm hesitating is I believe that the values had been discussed but there may have been some other issues still ongoing in the mediation, but I think it's fair to say that to the extent we reported it out in the version of the plan that I had agreed to accept the Grand Bargain.

Q. Okay. You had made the decision to go with the Grand Bargain?

A. Yes.

Q. And you'd made that decision certainly by February 21st, when it's in the plan or at least the contours of it are?

A. Yes.

Q. But assuming that you didn't decide on, you know,

KEVYN ORR, VOLUME 2

midnight on February 20th, like when had you reached in your own mind the decision that you were going to go with the approach embodied in the Grand Bargain?

A. I don't recall. It was sometime prior to the 21st. I'm just trying to make sure that I don't trip over any of the discussions in the mediation but I think it was prior to the 21st, I think that would be fair.

Q. Are you able to dial it in with any more specificity than that, days or weeks or months?

A. No, it was evolving for a period of time from late 2013 until early 2014 and I just don't remember a specific date when I said this is something we'll go with.

Q. Now, the Christie's valuation was not given to you until on or about December 17th, 2013; is that right?

A. Yes, I believe that's accurate.

Q. Is it fair to say that you had not decided to go with -- that's -- I'm trying to use a euphemism for the Grand Bargain but --

A. Right, no, I know what you mean.

Q. You had not decided to go with the Grand Bargain prior to December 17th, 2013?

A. When you say go with, that is, that I had not had the full number of the 800 -- what do you mean by go with?

KEVYN ORR, VOLUME 2

Q. Yeah, I mean I guess what I will say is that I understand that the concept's out there and it's kind of building momentum and speed, but can we agree that as an earliest date, let's use the term agreed to.

A. Right.

Q. You had not agreed to the Grand Bargain on or about December 17th, 2013, which is the date that you got the Christie's valuation, you had not agreed to it?

A. I don't recall when you can say I had agreed to it. There had been --

Q. I'm trying to say a date that we know you hadn't?

A. Yeah, I know, and I'm trying to -- I don't recall -- I don't recall if that's true or not, I don't recall.

Q. Oh, so it's possible that you had agreed to the Grand Bargain prior to December 17, you just can't recall one way or the other?

A. I can't recall one way or the other.

Q. Okay, so whatever the time is that you agreed to the Grand Bargain, whatever that date is, that's how we're going to describe it since we don't have a date --

A. Okay.

Q. -- okay?

As of that time, had the City inventoried the artwork in the DIA collection?

KEVYN ORR, VOLUME 2

A. In connection with this process or just as a general principal of running DIA?

Q. Either.

A. Okay. I believe that the DIA maintained an inventory of the objet d'art that are at the art institute on a regular basis. In fact, I believe that some of that inventory is available via the website, so I think the DIA maintained an ongoing inventory of objects of art at the museum.

Q. Okay, let me separate for a moment the DIA from what I'll call the City.

A. Okay.

Q. Because the DIA is an entity that has an operating agreement with the City, correct?

A. There is the DIA Corp., which has an operating agreement starting in 1984 and most recently dated 1997, and then there is the Detroit Institutes of Art which is an enterprise with art in it, meaning the real estate and the art that is owned generally by the City, although there's some dispute about that. Generally the DIA Corp. works as a contractor on behalf of the City, but the art and its inventory including any -- any listing of inventory belonged to the City.

Pages 378 to 381

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 13 of 19

1  KEVYN ORR, VOLUME 2
2  Q. You're good. So 60,000 pieces at a thousand dollars
3     apiece is 60 million?
4  A. It could well be.
5  Q. And at 10,000, it would be 600 million?
6  A. Sure, you can do the math. At a hundred thousand, you
7     could go into the billions.
8  Q. And is --
9  A. You can do the math.
10 Q. Well, sure, but is $10,000 a fair average price of the
11    pieces that are in the collection?
12       MR. SHUMAKER: Object to the form.
13 A. Yeah, I don't know.
14 BY MR. HACKNEY:
15 Q. I take it you don't have a basis to agree or disagree
16    with that number?
17 A. Correct.
18 Q. If the -- do you think it's fair and equitable for the
19    City to exit bankruptcy with hundreds of millions of
20    dollars in art in storage?
21       MR. SHUMAKER: Object to the form.
22 A. I haven't testified that there's hundreds of millions
23    of dollars of art in value in storage.
24 BY MR. HACKNEY:
25 Q. That's right, because you don't know the value of it,

1  KEVYN ORR, VOLUME 2
2     correct?
3  A. Correct.
4  Q. Now, you remember the first time you and I met was at
5     your August 30 deposition in connection with the first
6     swap settlement. Do you remember that?
7  A. Yeah, I don't remember the date but I do think it was
8     over at the Book Cadillac in connection with the swap
9     settlement.
10 Q. It doesn't -- you didn't commit that date to memory
11    because you're so glad you met me?
12 A. I don't necessarily regret having met you, most of the
13    time.
14 Q. Nor do I.
15 A. Most of the time --
16 Q. That --
17 A. -- but I don't remember the date.
18 Q. Now, part of the reason I'm setting this up is it's
19    not my intention to trap you with these questions but
20    I'm about to remind you of testimony, okay? So as of
21    August 30th, the City was not giving active
22    consideration to using the art to alleviate the City's
23    liquidity crisis or otherwise fund the initiatives
24    described in the June 2013 creditor's proposal,
25    correct?

1  KEVYN ORR, VOLUME 2
2  A. Is that my testimony?
3  Q. That was your testimony as of August 30th, but I want
4     to confirm that it's correct.
5  A. Yeah, if that's my testimony, I'll stand by it.
6  Q. Okay, and in fact, as of August 30th, you would have
7     been speculating as to the value of the art
8     collection, correct?
9        MR. SHUMAKER: Object to the form. Object
10       to the form.
11 A. I had no objective assessment of the value of the art.
12 BY MR. HACKNEY:
13 Q. And you had made no effort to sell the art collection
14    as of August 30, 2014, correct?
15 A. That is correct.
16 Q. And you had made no effort to otherwise monetize it
17    either, correct?
18 A. That is correct.
19 Q. Okay. What efforts did the City take subsequent to
20    August 30, 2014 to monetize the art?
21       MR. ALBERTS: In 2013 or --
22       MR. HACKNEY: '13, God...
23       THE WITNESS: You mean '13.
24 BY MR. HACKNEY:
25 Q. Subsequent to August 30, 2013, what steps did the City

1  KEVYN ORR, VOLUME 2
2     take to monetize the art?
3  A. Describe what you mean by monetize. Getting some
4     value for the art?
5  Q. Yeah.
6  A. Putting aside any discussions we had in mediation, or
7     the mediation process, about the art or the Grand
8     Bargain, I think it's fair to say that we didn't take
9     any steps to monetize the art.
10 Q. So the Grand Bargain is it?
11 A. Yes.
12 Q. And that's the product of the mediation, so you can't
13    talk about the efforts?
14 A. Yes.
15 Q. And -- well, it follows, the City never conducted a
16    market test of any portion of the art collection,
17    correct?
18 A. Do you mean in auction or some other appraisal process
19    of particular pieces of art to get a valuation?
20 Q. I mean separate from an appraisal which an appraiser
21    does.
22 A. Okay.
23 Q. But I mean a market-oriented process by which you
24    allow potential buyers to assert their views of the
25    potential value of any portion of the art collection?

Pages 402 to 405

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6985-6  Filed 08/22/14  Entered 08/22/14 16:36:24  Page 14 of 19

KEVYN ORR, VOLUME 2

Q. ...
A. Yes, correct, like an auction with a reserve to try to get a real value of the market, yes.
Q. And it has never conducted a sale process with respect to any portion of the art collection, correct?
A. That is correct.
Q. It never put any portion of the art collection up for competitive bidding in an auction setting, correct?
A. That is correct.
Q. Now, the City has received inquiries from parties interested in buying the art collection or a portion thereof; isn't that correct?
A. I have seen reports that there were inquiries from parties to buy the art or a portion thereof, correct.
Q. Okay, and what -- you have seen reports -- oh, are you talking about the Houlihan Lokey?
A. Yes.
Q. Okay. So we're going to get to the Houlihan Lokey efforts. I'm talking about inbound inquiries to you and your team where you -- where Mr. Shumaker or someone comes in and says I've got an inquiry about buying the art.
A. No, I haven't received any.
Q. Didn't it get inquiries from Russian oligarchs and Brazilian millionaires?

KEVYN ORR, VOLUME 2

A. Those weren't -- those were statements that I made. Those were general statements that I had heard, but when you said inquiries, I thought you meant like a letter or an offer or an actual real statement, and we had just heard general chatter from time to time about people expressing interest but nothing formal.
Q. The City had not actually received inquiries from Russian oligarchs or Brazilian millionaires, correct?
A. No, I had heard from word of mouth that someone overseas was potentially interested in the art institute, but nothing firm.
Q. Okay, who did you hear that from?
A. That was at a -- one of these meetings that you go to and, you know, it was like the comments from the bondholders about how they're going to punish the City, that sort of thing, I don't even know their name.
Q. Okay, and I take you it you never followed up with that, whoever that person making that inquiry was?
A. No, that person was quite agitated, so I never followed up.
Q. Oh, they were saying that they were upset by the fact that they were hearing this?
A. Yes.

KEVYN ORR, VOLUME 2

Q. Was it a DIA person?
A. No.
Q. Who was it that told you this?
A. It was some -- some individual at a meeting that I was at, I think in New York.
Q. But you can't remember who?
A. No, as you might imagine, a number of people come up to me on any given day with a number of different axes to grind about something I'm doing, to tell me either what I'm doing wrong or how they support something I'm doing right, and that includes how I dare -- there have been many people who have come up to me in many different venues in airports, on vacation, walking into my apartment about how I dare not sell the art, there are some people who are going to come and denude the City of all its assets.
Q. Okay, I take it that this person told you that they had heard that some foreign person was interested in the art?
A. Yes.
Q. The City, itself, never received such inquiries, though?
A. Not to the best of my knowledge.
Q. Okay. And you never engaged other museums to see what

KEVYN ORR, VOLUME 2

they might pay for the art collection, correct?
A. Other museums I think actually engaged us and said that they wouldn't do business with us if we tried to sell any art.
Q. My statement's, therefore, correct, right?
A. Yes.
Q. The City also has never attempted to borrow against the art collection as collateral, correct?
A. That is correct.
Q. Now, we alluded to this earlier, which is the Houlihan Lokey efforts, you were made aware of those, correct?
A. Yes.
Q. And you became aware that Houlihan Lokey had received a number of different indications of interest from certain parties with respect to the art, correct?
A. I became aware that I believe there were four different parties or groups of parties that I -- that Houlihan Lokey had gone out and in some fashion either solicited or received expression of interest from.
Q. And do you know the names of those four parties?
A. No, it's in the Artvest report and several other reports. I know that two are related to -- one is related to the Chinese government, another is related to an entity, there are two others and their exact

Pages 406 to 409

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 15 of 19

## Page 434

KEVYN ORR, VOLUME 2

New York and he'll pull me aside and ask me how's the family going, how are you doing, is there anything you need? More of a personal nature, but there are no discussions that we typically have outside -- substantive discussions that we typically have outside of the earshot of attorneys, and I think any of the discussions regarding what to do with the art were likely within the common interests and mediation privilege.

MR. HACKNEY: Is there a common interest agreement between the City and the State of Michigan?

MR. SHUMAKER: There is.

MR. HACKNEY: A written one?

MR. SHUMAKER: Yes.

MR. HACKNEY: And what does it relate to?

MR. SHUMAKER: The matters in the case.

MR. HACKNEY: Okay.

MR. SHUMAKER: In the bankruptcy case.

MR. HACKNEY: Hmm. Okay.

BY MR. HACKNEY:

Q. So I take it your testimony is that there were conversations but that they are covered by this privilege?

A. Yes.

## Page 435

KEVYN ORR, VOLUME 2

Q. And if I ask you about your conversations with the governor on the subject of what to do with the art, how to monetize it, whether it could be sold, etcetera, you will invoke the protections of this common interest privilege?

A. Yes.

Q. You were aware that the DIA was strongly opposed to selling the art; isn't that correct?

A. Yes.

Q. And you were aware of their position on that issue dating all the way back to April of 2013, correct?

A. At least, yes.

Q. They were not shy about letting the world know what their position was on this issue, correct?

A. Yes.

Q. Now, you agree with me that with respect to the DIA that you have said that you were deferring to the DIA to find a way to leverage money out of the art and save themselves, correct?

A. I believe I was encouraging them to find ways out of this problem and save themselves, yes.

Q. And isn't it -- it's fair to say that you were deferring to them to give them an opportunity to do that, correct?

## Page 436

KEVYN ORR, VOLUME 2

A. I was encouraging them to give them an opportunity to do that.

Q. Okay. And what level of -- what level did they have to reach to save themselves?

A. I didn't have a level in my mind of what they had to reach to save themselves, but my general thought was that they needed to raise some money to contribute to the effort that would justify, in my mind, a contribution so that we would not have to pursue a road of necessarily attempting to sell the art.

Q. Now, I want to talk about this notion of deferring. I'm happy to mark this if you'd like.

A. Sure.

Q. It's a Michigan Radio October 3, 2013, where they hit a number of different issues. It says:

"Citing the City's --" quote/unquote, 'obligation' to pay off its creditors, Orr said he's hopeful that the DIA's operators can, 'come up with a solution that makes sense both for the City and for the creditors,' but if not, he'll need to develop one himself. Asked whether there was a way for the DIA to monetize its assets without selling them off, Orr said --" quote/unquote, "Yes," but he

## Page 437

KEVYN ORR, VOLUME 2

wouldn't elaborate, saying he's deferring to the DIA to, 'save themselves.'"

Did that reporter inaccurately capture what you told him?

A. No, I just don't know if -- did I use the word "deferring" or did they --

Q. That's not in quotes, you said --

A. Yeah.

Q. -- but he wouldn't elaborate saying he's deferring?

A. Yeah, I don't know if I ever said I would defer, but I think it captures the essence of the sentiment that I had was that there had to be some contribution related to DIA as part of this effort.

Q. And that at least that you were giving the DIA the opportunity to take the lead on figuring that out?

A. Yes, I was saying they had to save themselves.

Q. But you hadn't decided what level they had to reach where you could say, ah, you've saved yourself?

A. That is correct.

Q. So how in your own mind if they came back and said, Mr. Orr, I think we've done it, we've saved ourselves, we've raised a million dollars, I'm assuming that you had a state of mind back in the fourth quarter of 2012 where you -- you would say, that's not what I meant by

Pages 434 to 437

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 16 of 19

KEVYN ORR, VOLUME 2

saving yourselves, so I'm trying to size what was in your mind when you were like this is what I -- this is what I mean by save yourself.

A. Mr. Hackney, I can't say that at that period of time I had a specific hold number in my mind, or anyway -- I was trying to encourage the institute and its benefactors to come up with a solution that would justify in my mind -- even though we weren't obligated to sell any art for the institute, to come up with a solution in my mind that would allow us to fairly say in my opinion that we have had provided a solution for DIA.

Q. Did you tell the DIA what you meant when you said that they needed to come up with something that would save themselves?

A. In terms of, like, giving them a number?

Q. Mm-hmm.

A. No.

Q. So you didn't say, guys, I'm going to give you a chance to save yourself and save yourself means ballpark X?

A. Yeah, I don't think we ever had a discussion like that.

Q. Did you even give them a range?

KEVYN ORR, VOLUME 2

A. I don't believe so.

Q. Did you direct any of your advisors to give them some parameters about what they were targeting?

A. I believe there was a meeting in May and then perhaps another one in the summer. I don't recall whether or not I had told them about a range.

Q. You may have, you may not have?

A. I don't recall just talking about a range.

Q. Did there come a time when you did communicate a range to them?

A. No.

Q. I take it if I asked you to describe the process by which the foundations were solicited for funding, you'll decline to answer on the basis of the mediation order.

A. I think that's correct.

Q. Did the City -- don't tell me about the communications -- did the City do the soliciting?

MR. SHUMAKER: I think that falls under the process of -- that's referred to and it's incident to mediation as the mediation orders articulate, so if --

BY MR. HACKNEY:

Q. I'm not asking you to say what it is you say --

MR. SHUMAKER: -- ideas, I think it is

KEVYN ORR, VOLUME 2

covered by the order.

BY MR. HACKNEY:

Q. But I guess putting aside disagreements about how the order works -- and I appreciate your position, Mr. Shumaker -- I guess my question, Mr. Orr, is did the City make direct contact with the foundations?

MR. SHUMAKER: Outside the context of the mediation?

MR. HACKNEY: No, in the mediation.

BY MR. HACKNEY:

Q. I'm just asking you for who drove the -- was it Mediator Rosen, was it the City, who was doing what, and don't tell me what they were doing.

A. Okay.

Q. I can read Mr. Rosen's press releases for that.

A. Yeah, I was going to say I think there are published reports about what efforts Chief Judge Gerald Rosen made as a mediator. And I think there are published reports about what meetings I may have had from time to time at various foundation boards, and meetings. Both here in the City and outside -- outside the City and outside the State. I think outside of those published reports that I probably should not characterize what was said to whom and whom was doing

KEVYN ORR, VOLUME 2

what.

Q. You were at the press conference at the DIA announcing the -- I think that's where there was the rollout of the legislation approval, correct?

A. Yeah, and some announcement regarding the funding level and that's one of the press reports to which I'm referring.

Q. Yeah, you were actually there --

A. I was there.

Q. And that was a press conference that Mr. -- that Judge Rosen participated in, correct?

A. Yes.

Q. And do you recall during that press conference that he said that the Grand Bargain was an idea that he and Gene Driker spun out together?

A. Whatever he said at that conference, I was there and I heard.

Q. And do you remember him saying that?

A. Yes, generally speaking, I remember him saying that, yeah.

Q. Okay, that it was an idea that he and Gene Driker spun out together?

A. Yes, I generally remember that.

Q. Is that statement by Judge Rosen true?

Pages 438 to 441

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 17 of 19

KEVYN ORR, VOLUME 2

A. Yes.

Q. Okay. So it's fair to say that the Grand Bargain was Judge Rosen's idea from your vantage point?

MR. SHUMAKER: Again, I think we're getting into --

MR. HACKNEY: Well, but --

MR. SHUMAKER: -- the guts of the mediation.

MR. HACKNEY: I'm asking him about a public statement that the mediator made.

MR. SHUMAKER: If you're asking did the public statement reflect that, he can answer that.

MR. HACKNEY: I'm asking if the public statement was true.

MR. SHUMAKER: Then that goes to what actually occurred in the mediation and --

MR. HACKNEY: Well, Mr. Shumaker, now I think you're being too selective about the mediation order. I mean, you have the mediator standing up and saying boom, and now I'm saying is that true, and everyone says oh.

MR. SHUMAKER: And I'm fine with you asking about the statements made in public by Judge Rosen. What I have an issue with is then asking the witness

KEVYN ORR, VOLUME 2

whether it reflects what was occurring in the mediation. There's a --

MR. HACKNEY: Okay.

MR. SHUMAKER: -- a clear divide there.

BY MR. HACKNEY:

Q. So are you going to decline to answer that?

A. Yes, and I would say I have no reason to dispute any published reports and statements made by Judge Rosen.

Q. Okay, and Judge Rosen also described in that statement that he had run into a member of -- of the -- a foundation member in a deli near the courthouse; do you remember that, too?

A. Yes, Miriam Nolan.

Q. Yes, and had talked to her about this idea, correct?

A. Yes, I believe he said that.

Q. Do you remember witnessing Judge Rosen saying that?

A. Yes.

Q. And Ms. Nolan has been quoted as saying that on the basis of her conversation with Judge Rolan (sic), she began to engage efforts to find whether other foundations might contribute money, you're aware of her statements?

A. Yes, I'm aware of those statements.

Q. Okay, do you have any reason to dispute those

KEVYN ORR, VOLUME 2

statements?

A. No.

Q. And do you remember that Judge Rosen also said that -- for example, that Shirley Lightsey was one of the heroes of the bankruptcy?

A. Yes.

Q. If I ask for the specifics of -- with respect to the foundations, who was approached, what they were asked, which ones declined, which entities were approached, who said yes, and the negotiations over the amount of any contribution, is it correct that you would decline to answer those questions on the basis of the mediation order?

A. Yes.

Q. And if I asked you questions about the way the Grand Bargain was structured, you'll similarly decline, correct?

A. Yes.

Q. And that would also apply with respect to DIA Corp. contributions, as well, correct?

A. Yes.

Q. And that also would apply to the State contribution that is connected to the Grand Bargain, correct?

A. Yes, except for any public statements.

**KEVYN ORR, VOLUME 2**

Q. Have you ever visited the Charles H. Wright Museum here in the City of Detroit?

A. Yes.

Q. Do you consider that museum critical to the economic revitalization of the City?

A. **I consider it critical to the cultural and historical revitalization of the City, yes, I do.**

Q. I was talking to the economic revitalization.

A. **It might well include the economic revitalization.**

Q. Is the DIA critical to the economic revitalization of the City?

A. **Yes, I believe it is.**

Q. Okay, and which one's more important between the two, the Charles H. Wright Museum or the DIA museum when it comes to the economic revitalization of the City?

A. **I don't -- I've done no analysis as to whether one is more important than the other. I think they are both important to the cultural and economic vitality of the City.**

Q. Which one has more visitors?

A. **I think the DIA does.**

Q. Has more than the Charles H. Wright?

A. **Yes.**

Q. Do you know if it has substantially more visitors?

Pages 442 to 445

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 18 of 19

KEVYN ORR, VOLUME 2

A. I don't know offhand.

Q. Do you know how many visitors the DIA has in a given year?

A. There have been discussions about several hundred thousand, but sitting here today, I don't know the exact number.

Q. Is there any museum in the City that isn't critical to the economic revitalization of the City?

A. None in my opinion.

Q. They're all critical?

A. I think they are all critical.

Q. And I am driving on the economic revitalization of the facility, you understand that?

A. Yes.

Q. Do you understand that Christie's was retained, putting apart what they actually appraised, they were initially retained to appraise all of the art that was purchased with City-owned funds, at least in part, correct?

A. Yes, either outright or in part. I think they appraised something like 2,700 of the roughly 60,000 pieces of art.

Q. And is it correct that approximately 35,000 pieces in the collection are believed to have been purchased

KEVYN ORR, VOLUME 2

with City-owned funds in whole or in part?

A. I believe that's the approximate amount.

Q. And that was the aggregate amount that was subject to the Christie's of retention, they ended up focusing on doing proper valuations of just 2,700, correct?

A. Yes.

Q. And do you agree that the property that was the subject of the Christie's appraisal, the subject of the retention letter, was property that the City had free, clear, and marketable title to?

A. I agree that it appeared that the City had clear, free, and marketable title to that property.

Q. And you, in fact, represented to Christie's that the City did, correct?

A. Well, I don't know if I personally represented, but we instructed them to review the properties to which the City owned.

Q. And in fact, you told Michigan Radio that the City owns 35,000 of the DIA works quote/unquote free and clear; isn't that correct?

A. Yes, but I may not have meant that in a technical legal sense but I probably said that.

Q. Okay. Now, it's fair to say that you knew that the DIA was strongly opposed to selling the art collection

KEVYN ORR, VOLUME 2

back in April of 2013, correct?

A. Yes.

Q. And you're aware that the attorney general issued his art-related opinion on June 13th, 2013, which was actually the day before your proposal to creditors meeting?

A. Yeah, I didn't recall the exact date, but I remember that the Attorney General Schute issued his opinion approximately around that time, and if you tell me it's June 13th, I'll take it on face.

Q. Yeah, that's okay. I thought you might remember it because I thought you might be getting ready for the June 14th creditor proposal and then somebody comes in and goes hey, by the way.

A. Yeah, that -- there were --

Q. Do you remember if it was contemporaneous to --

A. I remember it was -- the week was June 10th, Monday was the meeting, the first public meeting, in preparing for the proposal for creditors and I remember it was sometime in that time frame, if you'd asked me if it was before or after, I didn't remember, but I do remember when he issued it.

Q. Got it. Were you aware that it was coming?

A. I may have been.

KEVYN ORR, VOLUME 2

Q. Okay. You don't recall whether you were or not given a heads up?

A. Well, I don't recall whether or not I was aware there was an opinion coming but I -- I have met Attorney General Schute several times and I recall in one meeting him stating he would have to discharge his duties as he saw fit and that, you know, he would assume that I understood this wasn't a personal assault on what I was trying to achieve or something like that.

Q. Was it about the art or was it about the pensions?

A. No, it could have been -- I don't recall it being about the art specifically or about the pensions. It was just sort of a meet and greet, that I'm going to handle things as I see appropriate under my office as a constitutional official.

Q. Prior to getting the opinion, whenever you got it --

A. Right.

Q. -- did you know that the DIA and its counsel were communicating with the attorney general on the subject of that opinion?

A. No, I didn't know until you just said that.

Q. Oh, you didn't know it even as you sit here today?

A. Even as I sit here today.

Pages 446 to 449

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-6   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 19 of 19