# Exhibit 6B

## 7/31/2014 Deposition Transcript of R. Rapson (excerpted)

RIP RAPSON

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In re ) Chapter 9

CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846

Debtor. ) Hon. Steven W. Rhodes

_______________________________

The Videotaped Deposition of RIP RAPSON,

Taken at 1114 Washington Boulevard,

Detroit, Michigan,

Commencing at 9:02 a.m.,

Thursday, July 31, 2014,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

00000000-0000-0000-0000-000000000000

Page 73

RIP RAPSON

contribute under the Detroit Future City plan in any way?
A. Ability to?
Q. Yes.
A. No.
Q. Could it?
A. No.
Q. Why is that?
A. The amount of money that we dedicated to the Grand Bargain is over and above our annual what's called payout. Every year a private foundation like Kresge is required to pay a certain percentage of its assets according to a complicated IRS formula.
We set that amount at the beginning of every year. So for 2015 we would say five percent of a three-and-a-half billion dollar asset base is approximately 150, 60 million dollars, add to that administrative expenses, that's what we're going to pay.
What we did with the Grand Bargain is to say this is an extraordinary circumstance, it has never come up before, therefore our contribution to the Grand Bargain will sit on top of that. It will not diminish in any way our existing commitments or

Page 74

RIP RAPSON

our existing budget items.
Q. To your knowledge, did anybody from the City that was involved with drafting the plan of adjustment review the Detroit City Future plan before they -- as part of drafting the City's plan of adjustment?
MR. SHUMAKER: Object to the form.
A. I don't know if it was a part of, but in my conversations with Kevyn Orr, when I've been in his office, the Detroit Future City plan sits on his desk, and he has gone out of his way a couple of times to thank us for the work and to convey that he believes that it is in many ways an investment blueprint for the future of the City. That he can adjust long-term debt, he can even help restructure municipal services, but at the end of the day, the kind of long-term investment plan that the City requires in order to return for health is at least, in part, provided by the Detroit Future City plan.
BY MR. MCCARTHY:
Q. Is it your opinion as you sit here today that the Detroit Future City plan will work hand-in-hand with the City's proposed plan of adjustment?
A. Yes.
Q. And has anyone from the -- and it's your opinion that

Page 75

RIP RAPSON

that's the view from the City, as well, is that fair?
A. Again, from the mayor or from Kevyn Orr?
Q. Let's break it up. Let's start with Mayor Bing.
A. Mayor Bing, he, he initially was very supportive, and for all sorts of complex political and interpersonal reasons found himself distancing from the plan, was one of the reasons that we took it outside of city hall. For a while it was inside city hall as his Detroit Works project. We took it out.
So I think his relationship to the plan was somewhat complex. I think he believed in its essential principles, but some of the, some of the interpersonal dynamics between his staff, and who was in control, and who was making decisions, and who was Toni Griffin, and why was she in such a position of influence, it was a lot of complex, not entirely productive interaction.
Q. And has that, that relationship stayed the same up through today?
A. No, no, no. Mayor Duggan has been extraordinarily supportive of the plan. His deputy, Tom Lewand, once said that he -- to me that he had memorized the entire economic development chapter of the plan, that he was that committed to it.

Page 76

RIP RAPSON

Q. Are you aware, one way or the other, whether anyone at Conway MacKenzie has reviewed the Detroit Future City plan?
A. I do not know.
Q. I want to talk about the Grand Bargain a little bit, with this caveat. I understand there's a mediation in order. Are you aware of the mediation order?
A. I have been made aware of that, yes.
Q. When did you become aware of that?
A. Most recently, yesterday. I just didn't know what the mediation order meant, and I still don't think I do know what it means.
Q. And with this entire conversation, the caveat, of course, goes with what I've said before, which is to the extent you and your personal lawyer, Kresge's lawyers had discussions even outside of the mediation, I don't want to get into the substance of those conversations.
But prior to yesterday, did you have any understanding with respect to whether or not the Kresge Foundation's involvement with the Grand Bargain, whether those conversations or that happened during the process leading up to the Grand Bargain --
A. I see.

RIP RAPSON

Q. -- were protected from disclosure?
A. I see, yes. A couple of months ago Judge Rosen conveyed that to a group of us. Someone raised the question of whether these, these conversations during the mediation and during the formulation of the Grand Bargain would then become a matter of public record, and he at that point explained that there was a mediation privilege that he felt would cover those conversations.
Q. And I don't, I do not want to get into any of those conversations that you feel as though are privileged by that mediation order or Judge Rosen's instructions to you. So to the extent I ask a question and that objection comes up or you feel as though you'd be violating that, please let me know. Is that fair?
A. Yes.
Q. Okay. Prior to any discussions with anyone who's involved with the bankruptcy currently, whether it be Judge Rosen, Judge Rhodes, the City, had the Kresge Foundation discussed getting involved in the bankruptcy in any way?
MR. KURZWEIL: When you say the Kresge Foundation, I assume you mean Mr. Rapson.
MR. MCCARTHY: I do, Mr. Rapson, and

RIP RAPSON

internal conversations within your foundation.
BY MR. MCCARTHY:
Q. Correct, I'm not asking a corporate representative-type question, that's fair.
A. Yeah, I think I understand. I'll try not to overthink the answer. One of the things that I'm reminded of is that three or four years ago we were in a meeting of a number of civic leaders and talking about how to be helpful to the Bing administration, and I remember one person in the room just sort of saying, you know, this is all fine and good, but the City is going to go into bankruptcy. And I remember at that time thinking, "Yeah, right," you know, "that's not going to happen."
So that aside, I think when the bankruptcy conversations began to hit the press and become more visible, I think we had conversations internally about how would that affect us. Would that in any way cause us to change course. Were we investing in the right kinds of things. Would the bankruptcy undo investments we had spent so much time and money and energy engaging in.
But there was -- that's -- it was just sort of a generalized anxiety, I think, about the effects of the bankruptcy and our work.

RIP RAPSON

Q. Let me be a little bit more specific with it. From the time that the bankruptcy filing occurred, Detroit bankruptcy occurred, and up until the time where you believe your conversations regarding the mediation, the mediation back and forth started --
A. Mmm-hmm.
Q. -- we're not talking about those, did you have any conversations with the folks -- did you have any conversations with anyone that you can remember regarding whether Kresge would get involved in the bankruptcy --
A. Oh, I see.
Q. -- in order to, one, preserve the collection at the DIA?
A. No, no.
Q. And prior to -- after the filing of the City of Detroit's bankruptcy and prior to the time that Kresge became involved in conversations back and forth regarding the Grand Bargain mediation, were you involved with any discussions regarding Kresge becoming involved in the bankruptcy to soften the blow to the pensioners?
A. No.
Q. When did, when did you first become aware of what's

RIP RAPSON

now become known as the Grand Bargain or the process leading towards the Grand Bargain?
A. I think it was at the time that Judge Rosen asked the group of foundations together and hear him out on an idea he had.
Q. So I take it that the way you and your organization became involved with the Grand Bargain was by Judge Rosen reaching out to you and not the opposite, you actually reaching out to Judge Rosen?
A. That's correct.
Q. And when did Judge Rosen reach out to you directly to get involved in the Grand Bargain?
A. I'm sorry, I don't recall what that date was, but it was, it was right at the same time that he was gathering -- I wasn't able to attend that first meeting, but I think -- didn't he gather people in his chambers? The foundation community in his chambers. I think that was really, it was in that time slot that I first became aware of it.
Q. And did Judge -- is the first time you considered becoming involved in the Grand Bargain, was that on a phone call where Judge Rosen contacted you personally?
A. No.
Q. When was it?

RIP RAPSON

A. It was in a, a dinner conversation I had with him.
Q. And during this dinner conversation, this is when Judge Rosen proposed that the Kresge Foundation become involved with the Grand Bargain, is that fair?
A. Yes.
Q. And I've reviewed on YouTube, of all places, a speech that you gave at Wayne State University -- maybe not a speech, but it certainly was a formal type speech, and do you remember that, that address?
A. I do.
Q. Okay. Do you remember when that was?
A. It was, what, I don't know, two-and-a-half months ago, I think.
Q. And during that address to the audience, you referenced your initial conversations with Mr. Rosen, is that fair, with Judge Rosen?
A. I don't recall, but if it's on YouTube, I'll take your word for it.
Q. And we thought about bringing it in and playing it for you.
A. Oh, that would have really been torture.
Q. Tell me if I'm right. When Judge -- during your first conversation with Judge Rosen, where he proposed that the Kresge Foundation become involved in the process

RIP RAPSON

for the Grand Bargain, was it Judge Rosen who brought up that the involvement of the foundation should occur because it could soften the blow to the pensioners and help preserve the collection at the DIA?

MR. SHUMAKER: Objection. This calls for communications between Judge Rosen and Mr. Rapson. I believe this falls within the construct of the mediation order, and I would ask that the witness be instructed not to answer.

If you have specific parts of the YouTube video or Mr. Rapson's statements you would want to ask him about, that's a different story. But I think when you get to the back and forth between Mr. Rapson and Judge Rosen, you are intruding into the area protected by the mediation order.

MR. KURZWEIL: Under those circumstances, I'm going to instruct the witness not to answer that specific question.

BY MR. MCCARTHY:
Q. And is it fair to assume that you will follow those instructions and not answer questions based on the mediation order with respect to your initial back-and-forth conversations with Judge Rosen at your initial meeting with him?

RIP RAPSON

A. Yes.
Q. Let me try to reframe it and see if we can do it that way. If not, I understand.

At 10 minutes and 45 seconds into the speech that you gave at Wayne State University on the topic of the bankruptcy, you noted to the audience that Judge Rosen asked you specifically to get involved within the Grand Bargain in order to, quote, soften the blow that pensioners might be forced to take.

Do you remember that?

MR. SHUMAKER: I'm going to object on the same line. You can ask whether he made that statement at Wayne State, but you cannot ask whether in fact that was something that Judge Rosen said to him.

MR. KURZWEIL: I'll instruct the witness not to answer that particular question.

BY MR. MCCARTHY:
Q. And you'll follow those instructions based on the mediation order?
A. Yes.
Q. Okay. Did you make the following statement at Wayne State in your address regarding, in part, the Detroit bankruptcy, quote: So he said, and he being Judge

RIP RAPSON

Rosen, what I want to propose is that the foundations come to the table with a solution that helps avoid having to litigate those two issues, and the solution, of course, that you all have become familiar with since then is sort of the Grand Bargain, or what he for a while was calling the art trust, in which we would try to identify an amount of money that would be sufficient to help soften the blow that the pensioners might be forced to take, and we would also try to figure out an amount that would be -- constitute sufficient consideration for the transfer of the art into a new non-profit and sort of take those issues off the table.

MR. KURZWEIL: Counsel, without asking to let me see a copy, are you representing that that's a complete recitation of the words spoken by the witness?

MR. MCCARTHY: I am, Counsel. We attempted to do our best to translate what was said at that YouTube in to this direct quote, and the direct quote was written for me from the good folks at my office.

MR. SHUMAKER: Then I would suggest that the witness can answer whether he recalls making the statement as Mr. McCarthy has articulated.

RIP RAPSON

A. I don't, I don't recall word-for-word, but that certainly sounds like my words.

BY MR. MCCARTHY:

Q. What did you do to prepare for your address at Wayne State, and specifically with respect to the statement that I just read? Did you do anything to prepare to make that particular statement?

A. If I recall correctly, I was working off of a series of schematic diagrams and I was talking to the diagrams. So I, I don't believe I was working from notes, and I know I was not working from a script.

Q. And those diagrams that you're referencing now, are those the diagrams you referenced that you reviewed in preparation for today's testimony?

A. Yes.

Q. And you mentioned you believe those diagrams have been produced in this case?

A. Yes.

Q. To the extent they haven't been, and I don't know, I've reviewed them, we'd ask that they be produced. We'll follow up with your counsel.

MR. SHUMAKER: I can state that they have been produced by the City.

MR. MCCARTHY: Okay.

RIP RAPSON

MR. SHUMAKER: At least I should say the schematics from Mr. Rapson have been produced. Whether they are in fact the exact same ones that he had at Wayne State, I do not know.

THE WITNESS: I think they are the same.

BY MR. MCCARTHY:

Q. Mr. Rapson, so that I can maybe streamline some of the additional questions I have, as you sit here today, will you -- and I don't want you to answer this question, I want to find out whether you believe these questions, line of questions is covered by the mediation privilege.

So to the extent I ask you about the back and forth with Mr. Rosen or any other parties who were involved with the mediation that took place after your initial meeting with Judge Rosen regarding the Grand Bargain, which was at a dinner, as you referenced, will you be able to answer those questions here today?

MR. SHUMAKER: I would be interposing an objection to all such questions, because I believe that back and forth would be covered by the mediation order entered by Judge Rosen.

MR. KURZWEIL: It's my intention upon request of counsel to instruct the witness not to

RIP RAPSON

answer.

BY MR. MCCARTHY:

Q. Is it fair to say that you will follow those instructions, Mr. Rapson?

A. To a tee.

Q. Prior to your meeting with Mr. Rosen that you've talked about here today, your initial meeting, did you have any opinion one way or the other whether softening the blow to the pensioners or transferring the art at the DIA to a new non-profit entity were issues that could tie up the bankruptcy?

A. Yes.

Q. And when did, when did you personally come to that realization?

A. There was so much writing in the, in the public press about the constitutional protection of the pensions and the likelihood that any diminution of their value would be litigated extensively, and that there were a series of issues surrounding the Detroit Institute's art collection, and whether they were held in trust or whether they were reachable by creditors, that whole suite of issues, that in turn appeared from the popular accounts to suggest that these would be issues that would be litigated for quite some time.

RIP RAPSON

It certainly struck me at a very lay person's level of understanding that those two issues were going to be tough issues to mud wrestle through the bankruptcy.

Q. Prior to your meeting with Judge Rosen, had you had any discussions with anybody regarding how the Kresge Foundation might get involved in the bankruptcy at all in order to help address either of those issues, that being softening the blow to the pensioners or preserving the collection at the DIA?

A. There were, there were no serious conversations about specific ideas to resolve either issue.

Q. So I take it, then, the point in time where you did meet with Judge Rosen regarding potentially getting involved with the Grand Bargain, that was the first time that you at the Kresge Foundation gave any serious consideration or had a serious conversation about how the Kresge Foundation might get involved with the bankruptcy in order to either soften the blow to the pensioners or preserve the collection at the DIA?

MR. SHUMAKER: Object to the form.

A. Yeah, or to expedite the resolution of the bankruptcy, yes, that was the first time.