**Exhibit 6F**

**7/25/2014 Deposition Transcript of E. Jenkins (excerpted)**

## Page 1

```
                    EDSEL JENKINS
            UNITED STATES BANKRUPTCY COURT
         FOR THE EASTERN DISTRICT OF MICHIGAN
                   SOUTHERN DIVISION

In Re:

CITY OF DETROIT, MICHIGAN      Chapter 9
              Case No.13-53846
     Debtor.       Hon. Steven Rhodes
_____/

   The Videotaped Deposition of EDSEL JENKINS,
   Taken at 1114 Washington Boulevard,
   Detroit, Michigan,
   Commencing at 9:00 a.m.,
   Friday, July 25, 2014,
   Before Kathy Adkins, CRR, RMR, CSR-4697.
```

## Page 2

EDSEL JENKINS

APPEARANCES:

WILLIAM E. ARNAULT, ESQ.,
BRETT NERAD, ESQ.
Kirkland & Ellis, LLP
300 North LaSalle
Chicago, Illinois 60654
　　Appearing on behalf of Syncora Capital Assurance.

DEBORAH KOVSKY-APAP, ESQ.,
LESLEY S. WELWARTH, ESQ.
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, Michigan 48075
　　Appearing on behalf of the City of Detroit.

## Page 3

EDSEL JENKINS

SEAN GALLAGHER, ESQ.
Clark Hill, PLC
212 East Grand River Avenue
Lansing, Michigan 48906
　　Appearing on behalf of Police and Fire
　　Retirement System and Police and Fire General
　　Retirement System.

JEREMY M. MANSON, ESQ.
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward
Suite 300
Birmingham, Michigan 48009
　　Appearing on behalf of Financial Guaranty
　　Insurance Company.

## Page 4

EDSEL JENKINS

DANIEL MORRIS, ESQ.
Dentons US, LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005
　　Appearing on behalf of Official Committee of Retirees.

JACOB MARTINEZ, ESQ.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10112
　　Appearing telephonically on behalf of Assured
　　Guaranty Municipal Corp.

ALSO PRESENT:
William A. Dunbar - Video Technician

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 6985-11    Filed 08/22/14    Entered 08/22/14 16:36:24    Page 2 of 4

## Page 77

EDSEL JENKINS

Q. And at that point in time was that the ideal level of staffing?

MS. KOVSKY-APAP: Objection, form.

A. I would say no.

BY MR. ARNAULT:

Q. And what is -- do you know what the ideal level of staffing is?

A. Ideal would be to have at least 1,000 firefighters and at least 300 EMTs in addition to the other administrative staff.

Q. And that's as of today you would want 1,000 firefighters, 300 EMT, and then what was the other number? Sorry.

A. The other number would be the rest of the administrative staff.

Q. Do you know what the ideal staffing level would be for the rest of the administrative staff?

A. Off the top of my head, another maybe 200 people.

Q. And if we look down at the section C, this handles or talks about revenue, is that right?

A. Yes.

Q. What are the sources of revenue for DFD?

A. Sources of revenue for Fire Marshal division, that would be the annual permits for occupancy from the

## Page 78

EDSEL JENKINS

Fire Marshal, and also through inspections that are done by the fire inspectors.

Q. Any other sources of revenue?

A. That would be EMS generated from picking up patients and delivering them to the hospitals and for the services that the EMTs provide, and grants.

Q. And those are the federal, state and private grants that we talked about before, is that right?

A. That's correct.

Q. And if you wanted to complete an effective restructuring of DFD, you would want to understand the sources of revenue for DFD, is that right?

A. Yes.

Q. And what would you need to do to understand the sources of revenue for DFD?

A. I would look at how it's generated and look at the -- the rate in which it's generated in terms of billing, collection rate, and for grants opportunity.

Q. And who would you talk to to understand the revenue sources of DFD?

A. For that I would speak to the director of budget operations, the Fire Marshal, chief of EMS and now our grants manager.

Q. Anyone else that you would talk to?

## Page 79

EDSEL JENKINS

A. The commissioner.

Q. Section D says approximately 95 percent of costs within DFD are labor related, and we had briefly talked about this earlier, but when we were thinking about the costs within DFD and coming from labor, what exactly does that mean?

A. That means that 95 cents out of each dollar that is allocated to the Fire Department is for labor.

Q. What's labor comprise?

A. Salaries and ben -- wages and benefits.

Q. Is that for actives or is that just for actives?

A. Yes.

Q. So it doesn't comprise retirees?

A. No, they're handled by a separate entity.

Q. Right. And finally we have E and it talks about some of the ways that operations have been impacted, and we talked about little one, right? The older work force.

A. Yes.

Q. The second one is labor constraints due to work rules, seniority-based promotion, bumping, et cetera, is this referring to certain work rules within the CBAs?

A. Yes, labor constraints due to work rules. I know at the repair shop we have general mechanics that work a regular shift, and you have emergency mechanics, and

## Page 80

EDSEL JENKINS

those mechanics are only allowed to work on apparatus if they break down in the field, and they're on call 24 hours a day, and the apparatus superintendent would like to be able to have them do work while they're waiting on a call at the shop.

Q. And does that negatively impact operations then?

A. It slows down the repair of the apparatus.

Q. Creates certain inefficiencies?

A. Yes, and with seniority-based promotions, what we're moving to is testing, not only just waiting in line, seniority based, but testing, looking at your professional education, your performance evaluations before an individual is progressed up in rank.

Q. Okay. And I understand that there are ongoing negotiations with the labor unions about some of these work rules, is that right?

A. That's correct.

Q. And some of them are occurring in the mediation context, is that right?

A. Yes.

Q. And I just want to caution you, I'm sure your counsel will do the same, not to reveal anything that hasn't been completed yet that's still in ongoing mediation.

A. Um-hum.

Pages 77 to 80

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-11   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 3 of 4

Page 81

EDSEL JENKINS

    MS. KOVSKY-APAP:  And to clarify, by completed, you mean anything that has not actually been ratified by the union and approved and made public; so to the extent that anything is still short of the finish line, we're subject to the Court's order on mediation and can't discuss it.

    THE WITNESS:  Okay.  Everything is a work in process right now.

    MS. KOVSKY-APAP:  So might be best to just avoid this whole topic.

BY MR. ARNAULT:

Q.  Well, yeah, so I don't want to talk about what you're doing right now and what work rules you may or may not have improved or changed, but if we could just talk about work rules as of this date that you saw to be a problem.

    Sounds like you mentioned the bumping, the mechanics, the rules around mechanics, are there any other work rules that you saw as problems as of May of 2013?

A.  No, other than what I mentioned before, I would say no.

Q.  Nothing related to the grievance procedures?

A.  With the grievance, well, that's still under

Page 82

EDSEL JENKINS

negotiations too.  That's part of how that will be solved, so --

Q.  Right, but -- and I don't want to know about that, but at the time that this document was written, outside of the mediation context, did you see the grievance procedures that were in the CBAs as negatively impacting operations?

    MR. GALLAGHER:  Objection to form.

A.  I would say no.

BY MR. ARNAULT:

Q.  But changing work rules was something that was a focus of both you and Conway MacKenzie in May of 2013?

A.  Yes.

Q.  And then we've also, if we move down, it talks about aged and under-maintained facilities and equipment, and we've talked about that, right?

A.  Yes.

Q.  The fourth one, is blight significantly impacting service and response times, how did blight impact operations?

A.  Well, today there's approximately 60,000 vacant dangerous structures in the city of Detroit, and that's a fire load.  80, I would say 70 percent of our calls are to vacant structures.  That takes up time,

Page 83

EDSEL JENKINS

costs money, and also creates injury.

Q.  And puts more miles on the vehicles?

A.  Yes, it does, other than the men too, men and women too.

Q.  Yeah.  And I'm sure you understand that as part of the city-wide restructuring they will be remediating a certain amount of blight, is that right?

A.  Yes.

Q.  And will that have a positive effect on DFD?

A.  I believe so, yes, yes.

Q.  It will reduce the number of calls?

A.  The fire side, but it also will leave them, give them more opportunity to provide emergency medical response, so --

Q.  So it will reduce the number of calls; it will decrease the number of miles on the fleet and the people?

A.  Yes.

Q.  So the remediation of blight will actually save DFD money, would that be fair to say?

    MS. KOVSKY-APAP:  Objection, form and foundation.

A.  That's kind of soft right now because when you change one part of the equation, something else changes.

Page 84

EDSEL JENKINS

BY MR. ARNAULT:

Q.  Right.  I guess I'm thinking if you're making, if 70 percent of the calls are to blighted structures, and you remediate some of the blights, you're going to make fewer calls, is that fair?

A.  Fewer calls, yeah, and would allow them to perform more fire prevention activities.

Q.  Right, which is stuff that they, activities that they can't do now.

A.  That's correct.

Q.  And at the end of the day that's going to make DFD more efficient.

A.  Yeah, and make the city safer.

    MR. GALLAGHER:  Foundation, form.

BY MR. ARNAULT:

Q.  So that was the current situation, if you will, and then if we move down to number two, this is essentially some of the restructuring tasks, is that right?

A.  Yes.

Q.  And these are all areas that you think would need to be addressed for an effective restructuring?

A.  Yes.

Q.  And if we just look at little A, it says that CM

Pages 81 to 84

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-11   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 4 of 4