# Exhibit 6H

**7/29/2014 Deposition Transcript of D. Gilbert (excerpted)**

```
 1                        DAN GILBERT
 2           IN THE UNITED STATES BANKRUPTCY COURT
 3            FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6   In re:                       ) Chapter 9
 7   CITY OF DETROIT, MICHIGAN,   ) Case No. 13-53846
 8              Debtor.           ) Hon. Steven W. Rhodes
 9
10   _____
11
12
13        The Videotaped Deposition of DAN GILBERT,
14        Taken at 4000 Town Center, Suite 1800,
15        Southfield, Michigan,
16        Commencing at 9:46 a.m.,
17        Tuesday, July 29, 2014,
18        Before Cheri L. Poplin, CSR-5132, RPR, CRR.
19
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-13   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 2 of 5

## Page 126

1  DAN GILBERT
2  discussions with the mediators that have been
3  appointed in this case?
4  **A. Who are the mediators?**
5  Q. Okay. Well, let me ask a better question. Are you
6  aware that this -- in this bankruptcy the Court has
7  appointed mediators to help out?
8  **A. I think I've read that, yes.**
9  Q. Okay. Have you had -- and Judge Rosen is one of those
10  mediators?
11  **A. Yeah.**
12  Q. Okay. Have you had any conversations with Judge Rosen
13  about the Grand Bargain?
14  **A. Yeah. He called me up.**
15  Q. Okay.
16  **A. Well, let me see was it about the Grand Bargain. I**
17  **know he called me up and asked me to attend some**
18  **event. I can't recall whether it was about**
19  **specifically -- no. I don't -- I don't think he -- we**
20  **talked about the Grand Bargain actually.**
21  Q. Have you had any conversations with Judge Rosen about
22  the case in general?
23  **A. Yeah. In general. And that phone call when he called**
24  **me, how's it going, what do you think, you know, that**
25  **kind of thing.**

## Page 127

1  DAN GILBERT
2  Q. Okay. But he didn't ask you to donate to the Grand
3  Bargain?
4  **A. I don't believe so. No. Because I know he didn't**
5  **because that was -- the person who came in was the guy**
6  **that runs the -- well, he's the -- he doesn't run it.**
7  **He's the non-paid chairman. I don't know his name.**
8      THE WITNESS: Do you guys know his name?
9      MR. SHUMAKER: From the DIA?
10      THE WITNESS: Yeah.
11  **A. He came in. If I heard his name, I'd know it.**
12  BY MR. ARNAULT:
13  Q. I don't know. So this was --
14      MR. SHUMAKER: Gargaro?
15      THE WITNESS: No. It's not him. He
16  runs -- it's the other guy. The guy who's -- Gene --
17  the other Gene. Gene --
18  BY MR. ARNAULT:
19  Q. Driker?
20  **A. No, no, no. Maybe. I don't know. I've got to get --**
21  **I'm sorry.**
22  Q. That's all right.
23  **A. He's the -- he's like the -- he's like the chairman of**
24  **the board. He doesn't work there. He's like the**
25  **nonprofit chairman of the board guy.**

## Page 128

1  DAN GILBERT
2  Q. Okay.
3  **A. Might be Driker. I just don't know.**
4  Q. Okay.
5  **A. I don't think it is. I think this guy -- Driker is a**
6  **Wayne State guy. I think he -- he worked at Comerica**
7  **before this.**
8  Q. And do you know if you've had any conversations with
9  any of the other mediators besides that one
10  conversation with Judge Rosen?
11  **A. Who's the other mediators?**
12  Q. So as far as you know, no?
13  **A. Well, yeah. I've got to know their names so I can**
14  **tell you.**
15  Q. Okay. But it was never in -- to be honest, I don't
16  have them off the top of my head either. But as far
17  as you know, there were never any conversations with
18  mediators about the bankruptcy case; is that right?
19      MR. SHUMAKER: That he had?
20      MR. ARNAULT: Yeah. That he had.
21  **A. Yeah. You know, until I know the names of the people**
22  **I don't want to go on record and say that, so I**
23  **don't . . .**
24  BY MR. ARNAULT:
25  Q. Sure. That's fair. And who were you first contacted

## Page 129

1  DAN GILBERT
2  by about donating to the Grand Bargain?
3  **A. Yeah. This was Gene -- I'm going to get you his name.**
4  Q. Okay. Yeah. Yeah.
5  **A. Want his name?**
6  Q. Sure.
7  **A. You can ask the que -- I'll just keep talking.**
8      MR. SHUMAKER: Is it Graham?
9  BY MR. ARNAULT:
10  Q. Was it Graham Beal?
11  **A. Yes. That's it.**
12  Q. All right. There we go.
13  **A. Did I say Gene?**
14  Q. Yeah.
15  **A. Graham.**
16  Q. Okay.
17  **A. Graham Beal.**
18  Q. So Graham Beal called you in about May 2014 asking you
19  to donate to the Grand Bargain?
20  **A. Yeah. He said to come into the -- he wanted to meet,**
21  **come to the office, and when he came to the office, he**
22  **talked about it, yes.**
23  Q. Okay.
24  **A. And Matt Cullen was in the meeting with me from my**
25  **office.**

Pages 126 to 129

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 6985-13    Filed 08/22/14    Entered 08/22/14 16:36:24    Page 3 of 5

Page 130

DAN GILBERT

Q. Okay. And what did he say about donating to the Grand Bargain when you had this meeting with him?

MR. SHUMAKER: I'm going to object because I believe that any of these discussions would have been covered by the mediation order, and, as you know, Judge Rhodes has indicated that there are not going to be communications revealed in connection with those mediations, and so I think this is off limits.

MR. ARNAULT: Okay. So your position is that Mr. Gilbert was part of the -- the mediation?

MR. SHUMAKER: Yes. I -- I believe that's correct.

MR. ARNAULT: Okay. And you're going to instruct him not to answer any questions about what was discussed during the meeting with Mr. Beal?

MR. SHUMAKER: His personal attorney can do that, but that is our position, yes.

MR. ARNAULT: Okay.

MR. SHUMAKER: The City's position.

BY MR. ARNAULT:

Q. After that meeting in May 2014, did you have any other meetings with the DIA or anyone about the Grand Bargain?

A. No.

Page 131

DAN GILBERT

Q. Did you agree at that meeting to donate to the Grand Bargain?

A. Yes.

Q. And I assume you were aware of that back in November or early 2013 when the Grand Bargain was first materializing? Were you aware of that?

MR. SHUMAKER: Object to the form.

A. Aware -- I don't understand the question.

BY MR. ARNAULT:

Q. Well, did you see any -- prior to the point in time when you donated, did you see any media reports about the -- the formation of the Grand Bargain and the fact that all these foundations were contributing?

A. I -- I really can't recall whether the meeting is the first time I heard it or I read it -- I'm sure it was all around the same time. I just can't recall.

Q. There was never a point in time when the media reports came out and you saw that all these foundations were donating and made the decision or decided not -- not to donate?

A. That -- that I made the decision not to donate?

Q. Yeah. Or you just -- you decided -- you didn't see that and say, well, maybe I should donate to the Grand Bargain?

Page 132

DAN GILBERT

A. No. I don't think so. I don't think I -- I can't tell you for sure, you know, recollection of dates. But I do believe that the meeting was likely the first time that I heard the specifics about it or, you know.

Q. And the first time that you were approached about it?

A. Yeah.

Q. Why did you decide to donate to the Grand Bargain?

A. Well, we -- we're heavily invested in the City of Detroit and its well-being and, you know, they're asking us to participate along with other businesses and foundations and -- and companies that if we could, you know, have a way where the -- these pensioners could get their -- you know, most of their pensions and we could also move the DIA outside of the assets of the City, as it probably should have been done a long time ago. You know, it's hard to sort of say no to that based on our position where we're at.

Q. So you understood when you agreed to donate that you would be helping to save the art in the DIA; is that right?

MR. MORRIS: Objection. Form.

A. First of all, my understanding reading this stuff, there may be zero legal authority, anyway, for -- for those assets to be subject to bankruptcy, so I'm not

Page 133

DAN GILBERT

sure that that's a great way to characterize it. We were saving -- the safer thing for sure would be to move it outside of the City.

BY MR. ARNAULT:

Q. Okay. So you understood that when you were donating, you were helping to transfer the assets in the DIA outside the City? Would that be a better way to put it?

MR. MORRIS: Objection. Form.

MR. SHUMAKER: Object to the form.

A. Say -- say that again.

BY MR. ARNAULT:

Q. You understood that when you were donating money to the Grand Bargain that the money would be used to transfer the DIA assets out of the City? Would that be a fair way to put it?

MR. MORRIS: Same objection.

MR. SHUMAKER: Same objection.

A. Yeah. I think going -- I think the way it was presented was going forward in time and as part of this agreement and all the creditors and the judge, that that would be the case and the results of this would be that the museum would then sit outside going forward. Yeah.

Pages 130 to 133

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6985-13   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 4 of 5

## Page 134

DAN GILBERT

BY MR. ARNAULT:

Q. Okay. So you understood that the art in the DIA was part of the Grand Bargain; would that be fair?

A. I don't understand the question, if the art was part of it.

Q. Or that it was one of the components of the Grand Bargain?

A. Still -- I don't understand the question.

Q. Would you have entered into the Grand Bargain if one of the terms of the Grand Bargain was that -- actually strike that.

Would you have entered into the Grand Bargain if the art was not being transferred as part of the Grand Bargain?

MR. SHUMAKER: Object to the form.

MR. MORRIS: Object to form.

A. I don't know how to answer that question. The way it was presented to us was this is how it's all going to work, do you want to be in or out, and we said we'll -- yeah, we'll participate, so I can't speculate to possibilities of things.

BY MR. ARNAULT:

Q. Okay. It was essentially here's the structure, are you going to agree or not agree; is that right?

## Page 135

DAN GILBERT

A. Yeah. I mean, they didn't say it like -- you know, that way, but they said here's -- here's -- here's what we want to do here, here's how it's going to all work, here's who we think is going to participate, would you guys participate at this level, and we said yes.

Q. Did you propose any changes to the structure of the deal?

A. No.

Q. And did you understand that the money you provided would go directly to the retirees?

A. Yeah. I believe it was -- it was presented that way to us, that this will hel -- again, I can't recall the word for word, it was a verbal thing, but this would help save the majority of the -- the pensioners' pensions and they were at the same time moving forward forever, so if this -- you know, in the one in a million chance this happened again, it would -- you know, it wouldn't even be a question as to the assets being outside of the City.

Q. Would you have entered into the Grand Bargain if the money you contributed did not go directly to the retirees?

MR. SHUMAKER: Object to the form.

## Page 136

DAN GILBERT

MR. MORRIS: Object to form.

A. So where would it go? I mean, I guess I would ask the question if it wasn't there, I would say, okay, well, where -- where is it going to go to?

BY MR. ARNAULT:

Q. Would you have contributed money to the Grand Bargain if some of the money went to pay the debts of the City's other financial creditors?

MR. SHUMAKER: Object to the form.

MR. MORRIS: Objection. Form.

A. I'd have to understand who the creditors were and what -- I -- I guess there's thousands of creditors; right? I don't -- so I'd need to know more specifics for -- to answer that question.

BY MR. ARNAULT:

Q. Okay. Would you have contributed money to the Grand Bargain if some of the money went to pay the debts of the insurers who insure the City's Certificates of Participation?

MR. SHUMAKER: Object to the form.

MR. MORRIS: Objection. Form.

MR. SHUMAKER: Calls for hypothetical.

THE WITNESS: So do you want me to answer the question?

## Page 137

DAN GILBERT

MR. SHUMAKER: Go ahead.

A. No. You know, to think that sophisticated Wall Street insurance companies and investors who knew the City of Detroit was in dire financial straits for decades and took a risk in insuring those bonds and -- would I personally have invested money into a scheme that would get them part of the recovery? No. The answer is no.

BY MR. ARNAULT:

Q. Okay. And you say that sophisticated Wall Street banks and companies who invested in the City of Detroit.

A. Um-hmm.

Q. Do you know what information they were provided in connection with those investments?

A. No. I would assume that they were provided whatever is required by the law. I don't know.

Q. But you haven't looked at exactly what was provided?

A. No. No.

Q. And you don't know what representations were made by the City to those financial creditors?

A. No. I'm sure they did their due diligence, though.

Q. Would you have contributed money to the Grand Bargain if some of the money was earmarked to demolish blight

Pages 134 to 137

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6985-13   Filed 08/22/14   Entered 08/22/14 16:36:24   Page 5 of 5