## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------------x
                                    :
 In re                              : Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          : Case No. 13-53846
                                    :
              Debtor.               : Hon. Steven W. Rhodes
                                    :
                                    :
------------------------------------------------------------x
```

## FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE OR TESTIMONY REGARDING CERTAIN MATTERS PREVIOUSLY DEEMED IRRELEVANT BY THE COURT OR THE CITY OF DETROIT

US_ACTIVE:\44537974\10\45259.0007

Financial Guaranty Insurance Company ("FGIC") respectfully submits this Motion in Limine (the "Motion") to preclude at the hearing (the "Confirmation Hearing") on the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* (July 29, 2014) [Dkt. No. 6379] (the "Plan") the introduction of evidence or testimony relating to the following matters previously deemed irrelevant by the Court and/or the City of Detroit (the "City"): (a) the validity of the COP Claims[1]; (b) the alleged needs and hardships of the Holders of Pension Claims; and (c) the terms and conditions of the settlement negotiations leading to the "Grand Bargain."

## PRELIMINARY STATEMENT

1.     Despite the fact that the Court and/or the City have previously deemed certain issues irrelevant to the confirmation of the Plan, the City now appears to be relying on those issues in support of confirmation.  Specifically, the Court previously ruled that the needs and hardships of the City's pensioners are irrelevant with respect to whether the Plan should be confirmed, a ruling with which the City indicated it agreed.  The Court also ruled that the terms and conditions of the settlement negotiations leading to the Grand Bargain are irrelevant to the confirmation of the Plan or approval of such settlement, a ruling with which the City also indicated it agreed.  Finally, the City previously represented to both the Court and the creditors that the validity of the COP Claims is irrelevant to Plan confirmation issues.  As a result of these rulings and representations, FGIC and other creditors have either withdrawn discovery or been denied discovery with respect to each of these issues.

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed May 12, 2014 [Docket No. 4660] and the Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit, filed August 12, 2014 [Docket No. 6674].

US_ACTIVE:\44537974\10\45259.0007

2.      In spite of the aforementioned, the City recently made clear that it has relied on these issues in justification of its position that the Plan does not unfairly discriminate against Class 9.  The Emergency Manager for the City, Kevin Orr (the "Emergency Manager"), testified as a designee for the City that the reasons the Plan discriminates against Class 9 include, among other things: (i) the purported invalidity of the COP Claims; (ii) compassion for individual pensioners and keeping the "covenant" the City made to provide them with pension payments for the rest of their lives; and (iii) the alleged fact that third parties required their contribution to the Grand Bargain be directed solely to the Retirement Systems.   Both the City and the Retirement Systems have also raised certain of these issues in briefs filed with the Court in support of confirmation.  As has been previously recognized, however, these factors do not provide a relevant justification for the discrimination against Class 9.  Nor are they relevant to any other confirmation standard.   Moreover, because FGIC has not had an opportunity to develop the facts and prepare its witnesses with respect to these issues, the introduction of evidence on these issues will result in significant, unfair surprise and prejudice.  Accordingly, the Federal Rules of Evidence compel the exclusion of this evidence for the purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved.[2]

## **JURISDICTION**

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409

---

[2] As discussed in Section IV, *infra*, the evidence is relevant and admissible for other narrow purposes.

US_ACTIVE:\44537974\10\45259.0007

<u>**ARGUMENT**</u>

**I.**     <u>**Legal Standard**</u>

4.      Motions in limine "ensure an evenhanded and expeditious trial" by permitting the court to decide evidentiary issues in advance. *Cincinnati Ins. Co. v. Becker Ulman Const., Inc.*, 12013185, 2013 WL 5797614, at *1 (E.D. Mich. Oct. 28, 2013); *see also Dow Corning Corp. v. Weather Shield Mfg., Inc.*, 09-10429, 2011 WL 4506167, at *2 (E.D. Mich. Sept. 29, 2011). "It performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented [] because they clearly would be inadmissable for any purpose.   The prudent use of the in limine motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

5.      "In analyzing a motion in limine, the trial court considers issues of relevance, admissibility, and prejudice." *Bar's Prods., Inc. v. Bar's Prods. Int'l, Ltd.*, 10-14321, 2014 WL 1922764, at *1 (E.D. Mich. May 14, 2014).   Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence;" and the fact is of consequence in determining the action.   Fed. R. Evid. 401.[3]   As the Sixth Circuit has noted, "[r]elevancy is the threshold determination in any decision regarding the admissibility of evidence; if evidence is not relevant, it is not admissible." *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 375 (6th Cir. 1983) (citing Fed. R. Evid. 402) ("Irrelevant evidence is not admissible").   Relevancy depends "not only on the character of the evidence

---

[3] Federal Rule of Bankruptcy Procedure 9017 provides that "[t]he Federal Rules of Evidence … apply in cases under the Code."

US_ACTIVE:\44537974\10\45259.0007

itself but on the purpose for which it is offered." Thus, "evidence which is not admissible for one purpose may be relevant and admissible for another." *U.S. v. Hughes*, 308 F. App'x 882, 887 (6th Cir. 2009).

6. Even if the Court finds evidence to be relevant, it should still exclude the evidence if the "probative value is substantially outweighed by a danger of … unfair prejudice, confusing of the issues … undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Paschal v. Flagstar Bank*, 295 F.3d 565, 577 (6th Cir. 2002). Courts have "broad discretion in determining potential prejudice based upon the full array of evidence." *In re Second Chance Body Armor, Inc.*, 421 B.R. 823, 840 (Bankr. W.D. Mich. 2010). "In connection with the underlying principle of this rule, the courts disfavor 'trials by ambush.'" *Jervis B. Webb Co. v. Kennedy Grp.*, No. 07-10571, 2008 U.S. Dist. Lexis 67941, at *4 (E.D. Mich. Sept. 5, 2008). Accordingly, "unfair surprise is a factor to be considered under Rule 403." *U.S. v. Price*, 13 F.3d 711, 719 (3d Cir. 1994).

## II.    The Court Should Exclude Evidence Relating to the Validity of the COP Claims

7. On January 31, 2014, the City commenced an adversary proceeding (the "Adversary Proceeding") in the Chapter 9 Case by filing a complaint alleging, among other things, that certain service contracts related to the COPs are illegal, void and of no effect. *See* Complaint for Declaratory and Injunctive Relief, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Jan. 31, 2014) [Dkt. No. 1]. At the May 28, 2014 hearing before this Court, however, the City represented that evidence regarding the validity or invalidity of the COP Claims would not be introduced at the Confirmation Hearing because validity issues are irrelevant to whether the Plan should be confirmed:

> Mr. Bennett: As to the first question, which relates to proof relating to factual issues on COPs validity, **we do not think that's part of the confirmation hearing**.… With respect to the COPs proposal to effectively bring to court a character witness for the COPs, we have said – first of all, that's the kind of thing that real time limits will eliminate because **it isn't germane to anything** – any of the business that we actually have to conduct at the confirmation hearing.

Hr'g Tr. 94:20-23; 231:4-9, May 28, 2014.  The City also articulated precisely why the validity of the COP Claims is irrelevant for purposes of determining whether the Plan should be confirmed:

> Mr. Bennett: We view the confirmation hearing insofar as it relates to the COPs as dealing with the adequacy of the reserves that are in the plan for the payment of the COPs in the event that they turn out to be valid, and that's why there are no fact issues in our statement relating to the COPs….  and we have said in an effort to be constructive, in an effort to narrow issues, that **we regard the issue as the adequacy of the claims reserve, which assumes that at the end of the day the COPs claims are allowed in full**… I think that it would be also fair to instruct the city that for purposes of confirmation the COPs are assumed to be an allowed claim…

Hr'g Tr. 94:23-95:3; 231:10-13; 231:25-232:2, May 28, 2014.

8.     The Court accepted these representations and, on that basis, indicated that the only way in which evidence related to the transactions pursuant to which the COPs were issued (the "COPs Transactions") might be allowed in at the Confirmation Hearing is to the extent the parties choose to "open the door" to the issue.  *See* Hr'g Tr. 175:7-177:23, May 28, 2014.  Accordingly, in light of the City's representations and the Court's admonitions, and in part to ensure that validity issues do not arise at the Confirmation Hearing, the parties negotiated a stipulation pursuant to which they agreed not call upon certain witnesses and to withdraw subpoenas related to the COPs Transactions.  *See* Stipulation By and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial, ¶¶ 5-6 [Dkt. No. 5984] ("COPs Stipulation").  The Court approved the COPs Stipulation on July 14, 2014.  *See* Order Approving Stipulation By and

Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial [Dkt. No. 6002].

9.     Despite the City's representations, and the resulting COPs Stipulation entered into by the parties, the Emergency Manager testified on July 22, 2014, that one of the bases for the Plan's discrimination against Class 9 is the alleged invalidity of the COP Claims. Specifically, when asked why the City decided to discriminate against Class 9 in favor of the Retirement Systems, the Emergency Manager responded that one of the reasons is the "legal arguments that have been made in the papers regarding the COPs that we believe they are void ab initio and that we have no obligation." Orr Dep. 223:16-224:10, July 22, 2014 (excerpts of which are attached hereto as Ex. 6A). Indeed, the Emergency Manager confirmed on numerous occasions during his deposition that the purported invalidity of the COP Claims was one of the considerations he took into account in deciding to propose a plan of adjustment that discriminates against Class 9:

> Q.  And then the last issue that you identified was the invalidity of the COPs; do you remember that?
> A. Yes.
> Q.   And that was something that you factored into your decision in terms of paying the COPs less than classes 10 and 11, correct?
> A. Yes.
> ….
> Q. And I – just so I understand the way the judge – the factor plays through your judgment, you looked at the potential invalidity of the COPs and viewed that as one reason to the pay the COPs on their best day 10 cents?
> A.  Yeah … I think that's a fair statement.
> Q.  Okay, I'm talking when you were deciding how to divide the pie, the COPs best day recovery was impacted by this factor of the potential invalidity of the COPs?
> A.  Yes.

Orr Dep. 237:5-11; 239:23-240:14.

US_ACTIVE:\44537974\10\45259.0007

10.    In addition to the Emergency Manager's testimony, the Retirement Systems argued in their brief in support of the Plan[4] that the Plan's discrimination is justified because "the legality of the claims of the COPs holders is subject to serious challenge, as described in the City's pending adversary proceeding.  So, to the extent that financial creditors have argued that all unsecured creditors would have the same remedies and ability to obtain a judgment for their claims outside of a chapter 9 proceeding, that argument is belied by the City's own suit…"  Retirement System's Brief, 23.

11.    Given the aforementioned, it appears likely that the City, the Retirement Systems, and/or other Plan supporters will seek to introduce evidence at the Confirmation Hearing relating to the validity of the COP Claims for purposes of justifying the Plan's discrimination against Class 9.  However, as the City previously represented, the terms of the Plan are neutral with respect to the validity of the COP Claims, reserving New B Notes in a Disputed Claims Reserve on behalf of Holders of Cop Claims until such time as it may be determined that such Holders have Allowed Claims against the City.  As such, any evidence relating to validity of the COP Claims has no bearing on whether the Plan should be confirmed, rendering such evidence irrelevant and inadmissible at the Confirmation Hearing.  *See U.S. v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) ("To be relevant, evidence need have some bearing on the probability of the existence of any fact that is of consequence to the determination of the action.") (citation and internal quotations omitted); *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 439 B.R. 786, 796-797 (D. Utah 2010) (affirming bankruptcy court's decision to exclude evidence that was irrelevant to the issues raised in connection with the confirmation of a plan of

---

[4] *See* Brief of the Detroit Retirement Systems in Support of Proposed Treatment of Pension Claims Under Proposed Treatment of Pension Claims Under "Alternative A" of the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit and Statement of Reservations [Dkt. No. 6509] ("Retirement System's Brief").

US_ACTIVE:\44537974\10\45259.0007

adjustment because the evidence would not have required the court to make a finding one way or another with respect to those issues).

12.     Even if evidence relating to the validity of the COP Claims is minimally relevant (it is not), FGIC will incur significant prejudice and unfair surprise to the extent such evidence is introduced for the purposes of demonstrating that the Plan should be confirmed. FGIC previously agreed to withdraw discovery and potential witness testimony in reliance on the City's representations that the validity of the COP Claims was not an issue relevant to Plan confirmation.  *See* COPs Stipulation, ¶¶ 5-6.  As a result, FGIC is not adequately prepared to present any evidence or testimony on the issue.  As the Ninth Circuit made clear in *Daly v. FESCO Agencies NA Inc.*, matters disclosed for the first time shortly before trial should be excluded "based on unfair surprise and prejudice" as "there ha[s] been no opportunity for discovery regarding [] those matters."  108 Fed. App'x 476, 479 (9th Cir. 2004); *see also C. Van Der Lely N.V. v. F Lli Maschi S.n.c*, 1983 U.S. Dist. Lexis 16430, at *36 (S.D. Ohio June 7, 1983) (where no discovery occurred with respect to a particular issue as a result of the defendant's representation "that it was dropping any claim or defense based on [that issue,]" the introduction of evidence at trial related to that issue would "greatly prejudice" the plaintiff because it would "permit the defendant to 'ambush' the plaintiff at trial").  Thus, in light of the significant prejudice that FGIC will otherwise incur, any evidence or testimony related to the validity of the COP Claims should be excluded for purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved.

## III.     The Court Should Exclude Evidence Relating to the Needs or Hardships of Creditors

13.     Both the Court and the City have previously made clear that evidence relating to the needs or hardships of the creditors – including Holders of Pension Claims – is not

US_ACTIVE:\44537974\10\45259.0007

a relevant factor in determining whether the City's Plan should be confirmed. The Court addressed the irrelevance of this issue on several occasions:

- Court: "I've never seen a case where in deciding whether to confirm a plan, whether we're talking about best interest test or talking about unfair discrimination or fair and equitable, where the hardship or the neediness of creditors was considered." Hr'g Tr. 102:3-7, June 26, 2014.

- Court: "[I]n the case law I'm familiar with where the issue is the business justification for whatever discrimination is in the plan is determined based on the business needs of the debtor, not the business or financial needs of the creditors." *Id.* at 104:2-6.

- Court: "I'm going to say here as unequivocally as I can that **as a matter of law, creditors' needs is not an issue when it comes to determining unfair discrimination**." *Id.* at 104:14-17.

- Court: "**[T]he retirees' hardships [i]s not at all relevant to issue of either unfair discrimination or fair and equitable**…. [A]s the Court stated earlier, it is unaware of any case law interpreting section 1129 that holds that it is appropriate to consider the relative hardships of creditors in evaluating the issues under that section of the Bankruptcy Code." *Id.* at 128:16-22.

- Court: "I do not want and don't think it relevant to consider a series of retirees or employees, for that matter, testifying about their individual hardship. In my view, **neither fair and equitable nor unfair discrimination has ever in any bankruptcy case considered the impact of a plan on a creditor**; that is to say, the adverse impact of a plan on a creditor. The issue always is the business justification for the treatment from the debtor's perspective." Hr'g Tr. 81:9-17, August 6, 2014.

14. In accordance with the Court's ruling at the June 26, 2014 hearing, council for the City stated that he "can affirm that the city is **not going to be standing on the personal hardship argument**." Hr'g Tr. 104:10-11, June 26, 2014. Accordingly, in reliance on the Court's holding and the City's representations, counsel for another creditor in Class 9 agreed to withdraw discovery requests related to this issue. *Id.* at 104:25-105:4. In fact, the Court recognized that the discovery requests were withdrawn precisely because of the Court's holding on the matter. *Id.* at 128:13-18 (Court: "The Court did state on the record earlier that it would find that Syncora had withdrawn this request [related to the retirees' personal information] based

US_ACTIVE:\44537674\1\45259.0007

on the Court's ruling that the retirees' hardships was not at all relevant to the issue of either unfair discrimination or fair and equitable."). However, despite the Court's unequivocal ruling, the City's representations, and the resulting withdrawal of discovery requests, the Emergency Manager testified that the needs and hardships of the City's pensioners was a primary factor for the City in discriminating against Class 9:

> Q. And what was your basis for the level of discrimination you proposed in the February 21st plan?
> A. We were looking, we had been admonished I believe by the court on several occasions to be compassionate in our treatment of individuals and retirees.
> …
> Q. I want to focus on the process of deciding which creditors get which part of the pie, and I want to understand what information you relied upon in deciding to give pensioners a larger slice of the pie than you gave financial creditors –
> A… in deciding what we could pay pensioners, there were, I would say several different factors which really spurred that decision…. Two was the obligation to try to take into account the situation of these pensioners.

Orr Dep. 203:23-204:6; 209:20-210:16, July 22, 2014.[5]

15. The Emergency Manager went on to explain that in determining the hardship to the City's pensioners, he considered "individual meetings with individual employees and pensioners who recount their stories in detail" and he met with "people on the street as well as hear[d] their accounts and press reports." *Id.* at 230:13-231:6.

16. The Emergency Manager also testified that he took into account what he termed "covenants" to the City's pensioners, which he described as "the commitment and reliance on that commitment behind the contractual obligation that various City employees and retirees will come and express to me in very real terms what this means to them." *Id.* at 236:8-

---

[5] This testimony is consistent with the arguments the City raised in its Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 5034] ("City's Reply to Confirmation Objections"), wherein it asserted "the personal hardship that pensioners will endure" as one of the justifications for the Plan's discrimination against Class 9. *See* City's Reply to Confirmation Objections, 45.

US_ACTIVE:\44537674\10\45259.0007

12. He agreed, however, that these "covenants" were simply another element of the situation and needs of the pensioners. *Id.* at 236:23-237:4 ("Q. And isn't it fair to say that this is another element of the human dimension, which is the unfairness of cutting the pensions of people who relied on the City's covenant in making decisions about how to allocate their work time? A. You could say that.").

17. Following the Emergency Manager's testimony, council for the Retirement Systems stated that, with respect to "evidence of individual hardship… [the] parties sort of agreed that that wouldn't be relevant." Hr'g Tr. 11:4-6, August 6, 2014. However, in an abrupt change of position from the representations made at the June 26, 2014 hearing, council for the Retirement Systems argued that "if there was, you know, broad impoverishment of retirees, for example, that's something that could be considered" with respect to justifying the Plan's discrimination against Class 9. *Id.* at 82:11-15. The Retirement System's Brief raised these same arguments, alleging that the Plan does not unfairly discriminate because the City's pensioners purportedly "depend on their accrued pension benefits – often exclusively – for their livelihoods" and because of the alleged need to "avoid[] wide-scale impoverishment of the City's retirees." Retirement System's Brief, 16-17.

18. In addition, it appears as if the Retiree Committee also intends to raise these same arguments. The Retiree Committee has disclosed their intention to rely on the expert testimony of Stuart Wohl. *See* Retiree Committee's Memorandum of Law in Support of Confirmation of the Plan, [Docket No. 6508], at 27 ("The Committee is prepared to support the settlement through the testimony of fact witnesses, and expert witnesses Howard Atkinson and Stuart Wohl of the Segal Company."). Mr. Wohl's expert report is focused almost exclusively on the risks and hardships the Plan will impose on retirees with respect to their healthcare

benefits, as well as the fact that any further reductions "would have been devastating to the Retirees." Stuart Wohl's Expert Witness Report, dated July 22, 2014 (excerpts of which are attached hereto as Ex. 6B), at 5. Mr. Wohl also testified at length to this issue in his deposition, confirming that – in his opinion – "significant cuts in benefits are hardships for retirees." Wohl Dep. 24:11-16, August 13, 2014 (excerpts of which are attached hereto as Ex. 6C).

19. Given the aforementioned, it appears likely that the City, the Retirement Systems, the Retiree Committee and/or other Plan supporters will seek to introduce evidence relating to the needs and hardships of the City's pensioners for purposes of justifying the Plan's discrimination against Class 9. The Court's prior ruling, however, dictates that this evidence is irrelevant and should be excluded from consideration at the Confirmation Hearing. *See Provident Life & Acc. Ins. Co. v. Adie Co.*, 176 F.R.D. 246, 250 (E.D. Mich. 1997 (motions in limine can "involve matters which ought to be excluded from … consideration … as a result of previous rulings by the court."). Moreover, the case law confirms that this evidence is irrelevant. *See In re Arn, Ltd. Ltd. P'ship*, 140 B.R. 5, 12 (Bankr. D.D.C. 1992) ("While the Debtors prefer to pay local businesses in full … at the expense of banks and other lenders, this treatment is not sanctioned by the Bankruptcy Code. The focus on a particular claim should not be the claimholder, but rather the legal nature of the claim… An unsecured claim is simply that, an unsecured claim.") (citation omitted); *cf. In re Graphic Commc'n, Inc.*, 200 B.R. 143, 149 (Bankr. E.D. Mich. 1996) (Rhodes, J.) ("[a]ntipathy toward a creditor is not proper basis for discrimination").

20. In addition, given that discovery requests related to the pensioners' needs were withdrawn in reliance on the Court's ruling and the City's representations, FGIC has not had an opportunity to take discovery or prepare its witnesses on the issue. As such, the

US_ACTIVE:\44537674\10\45259.0007

introduction of evidence relating to this issue would cause unfair surprise and prejudice to FGIC, further supporting the exclusion of the evidence for purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved. *See, e.g., Daly*, 108 Fed. App'x at 479; *C. Van Der Lely N.V. v. F Lli Maschi S.n.c*, *Schlossberg*, 1983 U.S. Dist. Lexis 16430, at *36.

21. Importantly, counsel for the Retirement Systems represented at the August 6, 2014 hearing that, in their view, evidence regarding hardships to the City's pensioners is relevant to demonstrating the "hardship on a more macroscopic level to…the community as a whole." Hr'g Tr. 11:6-11, August 6, 2014.[6] However, this position directly contradicts the Emergency Manager's testimony with respect to how the City gathered and considered information bearing on hardships to the City's pensioners. *See supra* ¶ 15. It is also an issue for which FGIC has not had an opportunity to fully develop the facts or prepare its witnesses. As such, even in this context, the evidence is both irrelevant and prejudicial, and should be excluded.[7]

## IV. The Court Should Exclude Evidence Relating to the Terms and Conditions of the Settlement Negotiations That Led to the Grand Bargain

22. The Court has made clear to the parties that "who said what to whom during the mediation that led to the successful settlement is irrelevant." Hr'g Tr. 49:11-14, June

---

[6] *See also id*. at 81:25-82:6 ("I just want to make sure that it was clear or understood by all parties that if there is information or an argument to be made as to the impact more broadly on retirees, not just as creditors but more specifically as a part of the entity that we are trying to rehabilitate, that that is relevant and fair game in the context of a Chapter 9.").

[7] If Plan supporters are ultimately allowed to raise the issue in this context at the Confirmation Hearing, it is critical that they be prohibited from doing so via anecdotal, episodic testimony from individual pensioners. Rather, any such evidence must be introduced solely through empirical data of sufficient magnitude in order to reduce the prejudicial impact of this evidence (even so, however, the evidence will remain prejudicial).

US_ACTIVE:\44537674\10\45259.0007

26, 2014. The Court has also articulated that "the issue of unfair discrimination is based upon not where money comes from but where money goes to." *Id.* at 40:4-5. Pursuant to these directions, the Court denied various discovery requests by creditors in Class 9 directed to the Foundations, including document requests and depositions relating to the terms of the DIA Settlement, the reasons for entering into the DIA Settlement, and the negotiations with the Foundations relating to the DIA Settlement (which is part of the Grand Bargain)[8]:

> Court: The Court concludes that none of the 30(b)(6) subjects and none of the documents that are sought from the foundations are relevant to or even arguably relevant to the issues of whether the plan is discriminatory or whether it is unfairly discriminatory, the best interest of creditors or even the extent to which the so-called grand bargain settlement protects the art of the city.

*Id.* at 126:23-127:5. The Court's ruling is consistent with the arguments raised by the City in support of the Foundation's motion to quash the discovery, wherein the City argued that the discovery sought "is far afield from what could reasonably be considered relevant in the upcoming confirmation hearing." *See* Statement in Support of Foundations' Mot. to Quash [Dkt No. 5494], at 4.

23.     In addition to the Court's aforementioned ruling, the Mediation Order entered on August 13, 2013 [Dkt. No. 322] has prevented FGIC from obtaining discovery related to the negotiations that took place during the mediation, including details surrounding the conditions allegedly imposed by the parties with respect to the recipients of the settlement proceeds. *See* FGIC's Motion in Limine to Preclude the Introduction of Evidence or Testimony Regarding Matters Withheld from Discovery Based on the Mediation Order at 4-6 [filed

---

[8] *See, e.g.,* John S. and James L. Knight Foundation Subpoena, Schedule A at 3 [Dkt No. 5224, at p. 521]. As noted at the hearing held with respect to these discovery requests, the types of evidence sought included "whether the foundations were the ones that imposed on the city the requirement that all monies go to the retiree classes or whether the city was the one that proposed that to the foundations." Hr'g Tr. 22:22-25, June 26, 2014.

US_ACTIVE:\44537674\10\45259.0007

concurrently herewith] (citing the deposition testimony of various witnesses who refused to provide this information pursuant to the Mediation Order).

24.     Nevertheless, the Emergency Manager testified that in discriminating against Class 9, the City took into account the purported fact that the parties who contributed funds to the Grand Bargain insisted that, as a condition to their contribution, the proceeds of this transaction be directed solely to the Retirement Systems:

> Q.  I want to focus on the process of deciding which creditors get which part of the pie, and I want to understand what information you relied upon in deciding to give pensioners a larger slice of the pie than you gave financial creditors?
> A. … in deciding what we could pay pensioners, there were, I would say, several different factors which really spurred that decision…. Three was that at some point, it became apparent that there was going to be additional money coming in in the form of the Grand Bargain from third-party guarantors who were – as a condition of those grants that they be dedicated solely to pension.
> …
> Q.  I am talking about, you know, your state of mind though.  I'm saying you didn't go and pick winners and losers based on what people's expectations were when they invested?
> A. … We tried to do an analysis of what we could afford to pay based upon the factors we discussed before with an understanding that $866 million was coming in as a gift from grantors with specific condition that that money would flow to pensioners as opposed to any creditor and that we would accept that gift with that condition when those discussions were made.

Orr Dep. 209:20-210:20, 274:23-275:13, July 22, 2014.

25.     Critically, the City has also relied on similar contentions in their Motion to Strike Syncora's Second Supplemental Objection to the Plan [Dkt. No. 6845] ("Mot. to Strike Syncora's Second Supp. Obj.").  Specifically, the City repeatedly alleged throughout the motion that "[t]he Grand Bargain makes use of outside funds and charitable contributions that were available **solely for the purposes** of providing relief to pensioners or preserving the DIA in a public trust, or both.  Because **these outside donations never would have been available for any other purpose** … the Grand Bargain does not inflict any cognizable harm on Syncora or anyone else."  Mot. to Strike Syncora's Second Supp. Obj. 10-11; *see also id.* at 13 ("Rosen was

simply acknowledging that there were outside donors who were willing to make charitable contributions to the City, but only if the donations were specifically earmarked to provide relief to the City's pensioners."); *id.* at 23 ("the outside donations received by the City were specifically earmarked for pension relief, and they never would have been forthcoming but for the satisfaction of that condition."); *id.* ("even if the City wanted to, it has no ability to redirect these donor-specified gifts").

26.    Given the aforementioned, it appears likely that the City and/or other Plan supporters will seek to introduce evidence relating to the conditions allegedly imposed by the parties during the settlement negotiations in support of confirmation.  The Court's prior ruling, however, dictates that this evidence is irrelevant and should be excluded from consideration at the Confirmation Hearing.  *See Provident Life & Acc. Ins.*, 176 F.R.D. at 250.

27.    More importantly, the City should not be allowed to rest on the allegation that parties would not have contributed funds to the Grand Bargain had those funds not been directed solely to the Retirement Systems, when FGIC has not had any opportunity to take discovery on that issue or test its truthfulness.  Indeed, because FGIC has been unable to obtain discovery related to this issue, it is impossible for it to further probe this issue to test its veracity and determine who decided, at what point it was decided, and why it was decided that the settlement proceeds would be directed exclusively to the Retirement Systems.

28.    Notably, the City cites **solely** to the testimony of Rip Rapson in support of their contention that the parties who contributed funds to the Grand Bargain would never have provided those funds had they not been directed to the pensioners.  *See* Mot. to Strike Syncora's Second Supp. Obj. 11 n.4, 23 n.16.  But FGIC has not had an opportunity to depose witnesses from **eleven** of the twelve Foundations that contributed funds to the Grand Bargain based on the

Court's ruling at the June 26, 2014 hearing.[9] As such, it is patently unfair for the City to make this contention without FGIC having had an opportunity to develop the facts through discovery.

29. Moreover, even as to Mr. Rapson himself, when further probed at his deposition with respect to the issue, Mr. Rapson was directed not to provide **_any_** additional details surrounding the conditions on which the Kresge Foundation purportedly insisted, based on the Mediation Order:

> Q: When Judge – during your first conversation with Judge Rosen, where he proposed that the Kresge Foundation become involved in the process for the Grand Bargain, was it Judge Rosen who brought up that the involvement of the foundation should occur because it could soften the blow to the pensioners and help preserve the collection at the DIA?
> Mr. Shumaker: Objection. This calls for communications between Judge Rosen and Mr. Rapson. I believe this falls within the construct of the mediation order, and I would ask that the witness be instructed not to answer . . .
> Mr. Kurzweil: Under those circumstances, I'm going to instruct the witness not to answer….
> ….
> Q: To the extent I ask you about the back and forth with Mr. Rosen or any other parties who were involved with mediation that took place after your initial meeting with Judge Rosen regarding the Grand Bargain … will you be able to answer those questions here today?
> Mr. Shumaker: I would be interposing an objection to all such questions, because I believe that back and forth would be covered by the mediation order entered by Judge Rosen.
> Mr. Kurzweil: It's my intention upon request of counsel to instruct the witness not to answer.
> Q. Is it fair to say that you will follow those instructions, Mr. Rapson?
> A. To a tee.

_See_ Rapson Dep. 81:23-87:6, 86:14-87:6, July 31, 2014 (excerpts of which are attached hereto as Ex. 6D).

---

[9] _See_ Order Regarding Foundations' Joint Motion to Quash (Dkt. #5300), entered on June 27, 2014 [Docket No. 5623] (granting motion to quash subpoenas seeking information from the twelve Foundations that contributed funds to the Grand Bargain). FGIC was ultimately allowed to depose Rip Raspon from the Kresge Foundation only because the City included him on their witness list.

US_ACTIVE:\44537674\10\45259.0007

30.     Mr. Rapson would not provide any additional testimony on this issue despite the fact that he admittedly made public statements regarding the settlement negotiations and how it came about that the Foundations would provide funds for the benefit of the pensioners.  *See id.* 83:23-85:3 (agreeing that he made statement regarding the settlement negotiations and the purpose of the settlement funding at a public address at Wayne State).   In fact, during that address at Wayne State – which has been made publicly available through a YouTube video –  Mr. Rapson emphasized that "the adjustment of long-term debt with all of the complexities of pensioners **and bondhonders** and health benefits and everything else" is "terribly important" to the bankruptcy.  *See Detroit Bankruptcy & Beyond – Rip Rapson*, YouTube, https://www.youtube.com/watch?v=z7nXphsL_QA (last visited Aug. 19, 2014).   In addition, Mr. Rapson sent numerous emails to the press describing various issues being addressed during the settlement negotiations, including for instance: (a) whether to form a new entity to receive DIA assets; (b) the Foundations' commitment to provide support for the City; (c) a proposed governance structure involving the Foundations and the DIA; (d) the need for a union contribution to the settlement; and, notably (e) the "motivations driving each of the parties."  *See* K001265-1266; 1272-1273 (attached hereto as Ex. 6E).   Nevertheless, when pressed at his deposition for further details regarding the settlement negotiations such that FGIC could test the veracity of his assertions, Mr. Rapson was directed not to provide any testimony on the issue.

31.     Moreover, as previously noted, numerous other witnesses also refused to provide details surrounding the conditions allegedly insisted on by the parties who contributed funds to the Grand Bargain.  *See, e.g.,* Muchmore Dep. 56:13-57:6, August 4, 2014 (excerpts of which are attached hereto as Ex. 6F) ("Q: Does the State have a view, to your knowledge, based

US_ACTIVE:\44537674\10\45259.0007

on why it is that funding will be going to pensioners versus other creditors? Ms. Nelson: I'm going to object, because that invades the confidentiality of the mediation process, and I will instruct him not to answer that question."); Orr Dep. 336:10-17 (Q. I take it if I ask you questions about your communications with the charitable foundations in connection with their agreement to contribute this money, you will refuse to answer on the grounds of the mediation order's confidentiality provisions; is that correct? A. Yes, generally for most of them, I think that's correct").[10] As a result, FGIC has been denied any and all opportunity to verify or test the allegations made by the City with respect to this issue, including whether the parties who contributed funds to the Grand Bargain in fact indicated that they would have refused to provide such funding had it not been directed solely to the Retirement Systems.

32. As the court in *International Tel. & Tel. Corp. v. United Tel. Co. of Florida* articulated, "the failure of a party to allow pre-trial discovery of confidential matter which that party intends to introduce at trial will preclude the introduction of that evidence." 60 F.R.D. 177, 186 (M.D. Fla. 1973); *see also Baxter Travenol Labs., Inc. v. Abbott Labs.,* No. 84 C 5103, 1987 WL 10988 (N.D. Ill. May 12, 1987) ("Abbott's failure to allow pretrial discovery of the privileged material [] will preclude it from using that material at trial."). The court in *International Tel. & Tel. Corp*. aptly noted that "fundamental fairness and justice requires that if [a party] intends to waive the privilege at trial by the introduction of evidence within that privilege, then the [party] will be required to allow discovery with regard to matters material to that testimony." 60 F.R.D. at 186. Because FGIC has been denied discovery time and time again with respect to the settlement negotiations, including the conditions on which the parties

---

[10] *See also* FGIC's Motion in Limine to Preclude the Introduction of Evidence or Testimony Regarding Matters Withheld from Discovery Based on the Mediation Order at 4-5 (filed concurrently herewith).

insisted during those negotiations, "fundamental fairness and justice" requires that such evidence be excluded to the extent it is introduced for purposes of demonstrating that the Plan should be confirmed or that the settlements therein should be approved. *Id.*

## V.     The Evidence is Relevant and Admissible for Other Limited Purposes

33.     It is well settled that evidence "which is not admissible for one purpose may be relevant and admissible for another." *Hughes*, 308 F. App'x at 887 (holding that the district court did not err in excluding evidence for purposes of negating claims that the defendant acted wilfully, while admitting the same evidence for purposes of impeachment). As the Sixth Circuit recognized in *Shanklin v. Norfolk*, "it is preferable to admit a relevant [piece of evidence] for a limited purpose with appropriate instructions, rather than exclude admissible evidence altogether." 369 F.3d 978, 989 n. 7 (6th Cir. 2004) (holding that certain materials could not have been admitted for the purpose of establishing the defendant's duty, but were useful and admissible "for the limited purpose of establishing notice.").

34.     As discussed, evidence bearing on the validity of the COP Claims, the potential hardships of the creditors, and the terms of the settlement negotiations is irrelevant with respect to demonstrating that the Plan should be confirmed or that the settlements therein should be approved, and it should be excluded for those purposes. However, the fact that the City relied on these factors in deciding to discriminate against Class 9 is highly relevant for the purpose of demonstrating that the Plan's discrimination is unfair under 11 U.S.C. § 1129(b). *See In re Graphic Commc'n, Inc.*, 200 B.R. at 149 (where debtor relied on an improper basis for discrimination – antipathy towards the creditor – there was no justification for the disparate treatment between two classes and confirmation of debtor's plan was therefore denied). Importantly, unlike the purpose for which the City and/or other Plan supporters would seek to introduce the evidence, simply demonstrating that the City relied on these factors does not

US_ACTIVE:\44537674\10\45259.0007

(pursuant to the City's own admissions) require any additional discovery or witness preparation. As such, the evidence should be admitted for this limited purpose.

## <u>STATEMENT OF CONCURRENCE SOUGHT</u>

35.     Pursuant to Local Rule 9014-1(g), on August 18, 2014, counsel for FGIC sought the concurrence of counsel for the City in the relief sought in the Motion.  Counsel for the City has advised that they oppose the filing of the Motion.

WHEREFORE, FGIC respectfully requests that the Court enter an Order granting FGIC's Motion in its entirety and excluding any evidence or testimony related to the following matters previously deemed irrelevant by the Court and/or the City: (a) the validity of the COP Claims; (b) the alleged needs and hardships of the Holders of Pension Claims; and (c) the terms and conditions of the settlement negotiations leading to the Grand Bargain, to the extent such evidence is introduced for the purpose of demonstrating that the Plan meets the requirements for confirmation under Section 1129 of the Bankruptcy Code.

DATED:      August 22, 2014

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com
– and –
Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL  33131
Telephone: (305) 577-3177
Email:  edward.soto@weil.com
-and-
Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
Email:  EJEssad@wwrplaw.com
Email:  mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance Company.*

23

13-53846-tjt    Doc 6990    Filed 08/22/14    Entered 08/22/14 17:03:01    Page 23 of 24
US_ACTIVE:\44537674\10\45259.0007

## ATTACHMENTS

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavit] |
| Exhibit 6A | July 21-22, 2014, Deposition Transcript of Kevyn Orr (excerpted) |
| Exhibit 6B | July 22, 2014 Expert Witness Report of Stuart Ira Wohl (excerpted) |
| Exhibit 6C | August 13, 2014 Deposition Transcript of Stuart Ira Wohl (excerpted) |
| Exhibit 6D | July 31, 2014 Deposition Transcript of Rip Rapson (excerpted) |
| Exhibit 6E | Emails (K001265-1266; 1272-1273) |
| Exhibit 6F | August 4, 2014 Deposition Transcripts of D. Muchmore (excerpted) |

US_ACTIVE:\44537674\10\45259.0007