<u>**Exhibit 6A**</u>

**July 22, 2014, Deposition Transcript of Kevyn Orr (excerpted)**

1              KEVYN ORR, VOLUME 2

2        IN THE UNITED STATES BANKRUPTCY COURT

3          FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7   In Re:                    )      Chapter 9

8

9   CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

10

11             Debtor.    )    Hon. Steven Rhodes

12   _____

13

14                    VOLUME 2

15

16        The Videotaped Deposition of KEVYN ORR,

17        in his personal capacity and as Rule 30(b)(6) witness,

18        Taken at 2 Woodward Avenue,

19        Detroit, Michigan,

20        Commencing at 9:10 a.m.,

21        Tuesday, July 22, 2014,

22        Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

```
 1                        KEVYN ORR, VOLUME 2

 2           wanted to be sure that we addressed the human

 3           dimension.

 4      Q.   And you didn't have -- is it -- are you referring to

 5           the fact that as of the first plan, you didn't even

 6           have an impaired assenting class?

 7      A.   I think it's fair to say that we did not have -- well,

 8           when was the date?

 9      Q.   Feb 21, 2014.

10      A.   I don't know if that's true because I don't recall the

11           dates that we may have reached agreements with the

12           financial creditors.

13      Q.   And when you're talking about the human dimension,

14           what are you talking about there?

15      A.   Very simply, and I think I've said this before, the --

16           the pensioners are people many of whom are in their

17           sixties, seventies, and eighties and don't have an

18           option.  They have worked for the City, most of them

19           have done nothing wrong.  They are -- the covenant

20           that the City had with its employees and retirees was

21           that if they perform work for the City that upon their

22           retirement they'd be taken care of for the rest of

23           their natural life, that some of this came as quite a

24           shock to them because they had planned their affairs

25           accordingly.  Many of them, like my own family members
```

```
 1                    KEVYN ORR, VOLUME 2

 2          or grandmother, wouldn't have options of going back

 3          into the job market to supplement income or make up

 4          for some of the cuts and that there were -- there was

 5          a real-world dimension impact to the people that were

 6          going to be affected by these cuts.

 7     Q.   Putting aside the human dimension, if you'd had an

 8          impaired assenting class do you believe that you could

 9          have crammed down the first plan on the pensioners?

10                    MR. SHUMAKER:  Object to the form.

11     A.   Yeah, I don't know, I'd have to consult with my

12          attorneys.

13     BY MR. HACKNEY:

14     Q.   Okay, and I mean back at the time.  Did you believe

15          you could or could not?

16     A.   To be honest with you Mr. Hartley (sic), I don't -- I

17          don't -- I don't really recall.  I don't really recall

18          that being the crux of the discussion, but it might

19          have been true.

20     Q.   Okay.  You may have thought you could cram them down,

21          you may have thought you couldn't, you just don't

22          know?

23     A.   I just don't remember.

24     Q.   Okay.  You previously called me Hartley --

25     A.   Did I call you Hartley?
```

```
 1                        KEVYN ORR, VOLUME 2
```

2   Q.   There is something in your brain --

3   A.   No, I --

4   Q.   -- that says Hartley when you see me.

5   A.   This is going to be surprising, I have a friend named

6       Hartley, and he reminds me of you.

7   Q.   And he's like a handsome, suave guy?

8   A.   Let's not get carried away.

9   Q.   Now, you did understand that the February 21st plan of

10      adjustment still discriminated in favor of retirees as

11      compared to COPs holders in terms of their respective

12      recoveries, correct?

13   A.   Yes, I understand that there were -- there were a lot

14      of reports and the financial community was taking the

15      position that there was discrimination in the plan.

16   Q.   But there was objectively discrimination in that first

17      plan, correct?

18   A.   There was a higher percentage recovery relative to

19      some of the financial creditors.

20   Q.   And you were aware of that discrimination at the time

21      you proposed that plan, correct?

22   A.   Yes.

23   Q.   And what was your basis for the level of

24      discrimination you proposed in the February 21st plan?

25   A.   Well, I believe at that point, we were looking at some

1                          KEVYN ORR, VOLUME 2

2          contribution from third parties, meaning the

3          foundations, the benefactors and others.  We were

4          looking, we had been admonished I believe by the court

5          on several occasions to be compassionate in our

6          treatment of individuals and retirees.  And unlike

7          financial creditors, the GRS and PFRS unlike some

8          financial creditors actually had assets in their

9          pension fund, so there was an existing basis by which

10          those assets would allow for a higher rate of recovery

11          ab initio, that is, from the start, as opposed to the

12          financial creditors to whom we owed money but did not

13          have a cache of money available to pay them.

14   Q.    So there -- let me break down what I heard.  You tell

15          me if I got it right.

16   A.    Mm-hmm.

17   Q.    I heard that the basis for the decision to

18          discriminate in the first plan was in part the

19          compassion for retirees, but it was also in part the

20          fact that there were assets in the retirement systems?

21   A.    Yes.

22   Q.    Okay, anything other than those two things?

23   A.    No, as I said, there are a number of other factors in

24          trying to incentivize a workforce, in trying to keep

25          the covenant that the City made, a number of other

1                          KEVYN ORR, VOLUME 2

2          factors, but generally those are the ones that seem to

3          be driving a sort of the treatment of those classes.

4     Q.   Okay, so I heard compassion, the fact that assets

5          exist in the retirement trust, trying to incentivize

6          City workers.  Anything else that justified that level

7          of discrimination?

8     A.   There may have been other things that I said in terms

9          of the level of different treatment, you call

10         discrimination.  That was reported out in the first

11         plan, but generally speaking, the principal driving

12         force was that the retirement systems had assets in

13         them and we were trying to bring levels down below to

14         the predictable funding level verse -- based upon the

15         unfunded actuarial liability of those funds.  You

16         start with a cache of money in those funds that are

17         available conceivably to pay pensions if you are able

18         to adjust the payment levels, whereas with financial

19         creditors, we didn't have a cache of money available

20         to them.  We're paying them out of existing City cash

21         flow going forward.

22    Q.   But you understand that the amount of assets in the

23         pension systems, the difference between the amount of

24         assets and what is needed to fully fund pensions is

25         called the UAAL?

1               KEVYN ORR, VOLUME 2

2     A.    Yes.

3     Q.    And you understand that the pension class sizes were

4           for the UAAL, correct?

5     A.    Well, the pension class sizes were for the UAAL but

6           they took into account that those funds had assets in

7           them, as well, so you're trying to determine the

8           unfunded actuarial liability, but when you try to

9           determine the pension payments you also include the

10          amount of assets in the funds.

11    Q.    So the existence of assets in the retirement systems

12          was something that you considered in your

13          discrimination analysis, in your decision to propose a

14          plan that discriminated?

15    A.    In my decision to propose a plan that provided

16          different payout levels for creditors, yes.

17    Q.    And it weighed in favor of it?

18    A.    It weighed in -- not so much in favor, I'm -- favor of

19          what?

20    Q.    Well, in favor of paying pensioners more than

21          financial creditors?

22    A.    The fact that there are assets in the funds assisted

23          us in paying them more than financial creditors, yes.

24    Q.    Okay.  What information did you base that -- that

25          decision to provide differing levels of recoveries on?

```
 1                    KEVYN ORR, VOLUME 2

 2    A.    Well, there is a number of information.  Generally, we

 3          would go through the expected debt service of the

 4          City, what anticipated revenue streams would be going

 5          forward, what the City would need for reinvestment and

 6          revitalization, what the funding levels of the pension

 7          funds were, amongst others, there was a number of

 8          information and -- and it was a very dynamic and fluid

 9          process as we examined a number of different potential

10          outcomes and scenarios.

11    Q.    I understand that there is an enormous amount of

12          information that implicates what the City has to give

13          to creditors at all, okay?  And I heard your answer to

14          relate to that subject, correct?

15    A.    Right.

16    Q.    I'm asking a more specific question, which is with

17          respect to your decision to pay classes 10 and 11 more

18          than financial creditors, what information did you

19          rely on in making that decision?  So this is more not

20          how much money is there but who will get what money is

21          available.

22    A.    All of the information I just mentioned.  I mean,

23          there is a number of different factors that go into

24          what we can potentially pay financial creditors, and

25          we took all that information in on a number of
```

1                          KEVYN ORR, VOLUME 2

2           different scenarios and reduced.

3      Q.   But what information did you rely upon in deciding how

4           to allocate the money that could be paid in terms of

5           whether it went to pensioners or whether it went to

6           financial creditors?

7      A.   I think we're discussing the same answer.  We would

8           look at information regarding the unfunded liability

9           of the funds, the amount of anticipated revenue the

10          City could take in and could expect to take in, the

11          obligations that the City could afford, the potential

12          obligations of the City going forward for retiree

13          healthcare, for instance, as well as for current

14          employee, active employee healthcare obligations, just

15          a number of different information that we could

16          provide, we could analyze to try to get at a

17          determination of what we could pay different classes

18          of creditors.

19     Q.   But that tells you what the total size of the pie is,

20          correct?

21     A.   But it also tells us what we think we can pay.

22     Q.   Right, to creditors?

23     A.   Right, there's an analysis of the total debt load

24          which we published in the June 14th proposal, and then

25          there is analysis of the revenue streams that come

1                    KEVYN ORR, VOLUME 2

2         into the City that we could use to service those

3         obligations, not just financial creditors but

4         pensioners, and then there's an analysis of what we

5         would need to do to take the revenue stream to address

6         the unfunded actuarial liability and other obligations

7         that we would have with financial creditors, and we

8         would run different scenarios as to how that could be

9         done --

10    Q.   Okay.

11    A.   -- in this environment.

12    Q.   I'm looking -- I don't think -- we may not be

13         communicating well, I'm sure I'm not asking my

14         questions correctly, but once you've determined how

15         much you have in theory to distribute to creditors

16         there's a separate decision that has to be made as to

17         which creditors should get what parts of that pie; do

18         you agree with that statement?

19    A.   Yes, I think that's fair.

20    Q.   And I want to focus on the process of deciding which

21         creditors get which part of the pie, and I want to

22         understand what information you relied upon in

23         deciding to give pensioners a larger slice of the pie

24         than you gave financial creditors --

25    A.   Yeah.

1                          KEVYN ORR, VOLUME 2

2    Q.    -- in the first plan.

3    A.    Yeah, let's do it this way:  There are factors that

4          you're considering, and I think what you're trying to

5          get at is judgment, which is different than the

6          factors that come in to what you have and who you can

7          pay.  And the judgment decisions about what we could

8          pay took into account a number of these other factors

9          regarding revenue streams, but ultimately in deciding

10         what we could pay pensioners, there were, I would say,

11         several different factors which really spurred that

12         decision.

13                One was the amount of funds that were in

14         the various pension funds.  Two was the obligation to

15         try to take into account the situation of these

16         pensioners.  Three was that at some point, it became

17         apparent that there was going to be additional money

18         coming in in the form of the Grand Bargain from

19         third-party guarantors who were -- as a condition of

20         those grants that they be dedicated solely to pension.

21                Three was that at some point, it became

22         clear that the pension funds, themselves, were

23         performing better over the year and had experienced

24         better rate of returns than in prior years, and, in

25         fact, the asset values went up.  All of those factors

1                          KEVYN ORR, VOLUME 2

2          went into the decision to decide how much we could pay

3          pensioners.

4     Q.   Any other factors than that?

5     A.   Probably, but I don't recall them sitting here today.

6     Q.   And when you say the obligation to take into account

7          the pensioner situation, that's referring to the human

8          dimension that we talked about earlier, correct?

9     A.   Yes, I think that's fair.

10    Q.   Now, let's go forward in time from the first plan

11         of -- that we've just been talking about, which is

12         February 21?

13    A.   Yes, mm-hmm.

14    Q.   Okay.  Let's go forward in time to April 1, 2014,

15         which is about 40 days later, okay?  April Fools' Day.

16    A.   I wasn't going to say that but --

17    Q.   You know I picked it.  Now, let's -- so put yourself

18         back in your state of mind as of April 1, 2014, okay?

19    A.   Right.

20    Q.   As of that time, you still didn't have agreement with

21         any of the retiree associations or committees or

22         retirement systems with respect to the proposed

23         pension cuts, correct?

24    A.   The reason I'm not recalling whether or not that's

25         accurate, at some point in the spring -- we did not

```
 1                        KEVYN ORR, VOLUME 2

 2          have publicly announced agreements, I think that's

 3          fair.

 4     Q.   You didn't have any publicly announced agreements with

 5          anyone I don't believe until April 15th, 2014; is that

 6          correct?

 7     A.   When -- you may have information regarding -- when you

 8          say anyone, you mean any creditors?

 9     Q.   I mean any of these retiree representative --

10     A.   Okay.

11     Q.   -- bodies that --

12     A.   Okay.

13     Q.   -- or that I take to mean retiree associations,

14          pension systems official committee.

15     A.   Okay.  And so you're taking out the swaps, for

16          instance, you're not including --

17     Q.   Oh, absolutely.

18     A.   Okay.

19     Q.   Yeah, I'm just talking about what the pensioners --

20     A.   Okay, yes, I think that's fair.

21     Q.   Okay.  And just to get the record clear, as of -- your

22          recollection as you sit here today is that as of

23          April 1st, you did not have agreements with any of the

24          retiree representative parties, correct?

25     A.   Yes, I don't think we have formally announced
```

1                    KEVYN ORR, VOLUME 2

2          plan are different from the pension cuts we've been

3          discussing up until this point?

4     A.   Yes.

5     Q.   The pension cuts are reduced to 4-1/2 percent for GRS,

6          with the elimination of COLA, and 0 percent for PFRS

7          with the elimination of approximately 45 percent of

8          the COLA, correct?

9     A.   I think that's accurate.

10    Q.   There are also additional nuances with respect to the

11         possibility for restoration and ASF recoupment that

12         were parts of both of those deals, correct?

13    A.   ASF is part of GRS but restoration is part of GRS and

14         PFRS.

15    Q.   Okay, but I just want to basically get on the same

16         page with you that the deals that you ultimately got

17         the retiree representative groups to buy into were at

18         the 4-1/2 percent cut level on the GRS pension and the

19         0 percent cut level on the PFRS pension, correct?

20    A.   Yes.

21    Q.   And that represented a substantial improvement in the

22         deal from the prior proposed cuts of 26 percent and 6

23         percent, correct?

24    A.   I think that's fair.

25    Q.   And you understand that at the current proposed rates

1                     KEVYN ORR, VOLUME 2

2          of recovery in the plan that is currently on file,

3          classes 10 and 11 are being paid more than the COP

4          holders; isn't that correct?

5     A.   Yeah, are being paid more than as proposed to the COP

6          holders, yes.

7     Q.   Okay.  And they're being paid substantially more,

8          correct?

9     A.   I think it's a significant difference.

10    Q.   Okay.  Now, in fact, under the current plan, according

11         to the disclosure statement the GRS and PFRS classes

12         recover approximately 59 cents on the dollar, correct?

13    A.   Yeah, I think in the plan, obviously, there's a

14         schedule that shows percentage, but if that's the

15         schedule, yes.

16    Q.   I think it's actually technically 60 cents for GRS and

17         59 cents for PFRS?

18    A.   Yeah, that's --

19    Q.   That's about correct, right?

20    A.   That's about correct, maybe a little bit lower on the

21         PFR -- but that's about correct.

22    Q.   Okay, and the COPs recover at most 10 cents on the

23         dollar, correct?

24    A.   Yeah, there's a range of potential recovery for the

25         certificates of participation but it's stated at 10

```
 1                         KEVYN ORR, VOLUME 2

 2          percent.

 3     Q.   That's based, in part, on the fact that there is an

 4          invalidity lawsuit against the certificates and the

 5          potential to settle that as part of the plan, correct?

 6     A.   Yes, I think that's fair.

 7     Q.   The 10 cents that's in the disclosure statement

 8          represents the best the COPs can do if they are

 9          vindicated in the invalidity lawsuit, meaning that the

10          certificates are found to be valid?

11     A.   Well, no, that's why I said I think there's a range.

12          The --

13     Q.   I mean the 10 cents is the best they can do?

14     A.   Yeah, I -- okay, 10 cent -- the 10 cents is our

15          estimate of the best they could do.

16     Q.   Okay, so with respect to the plan that is on file, and

17          that you're seeking to confirm, with respect to

18          classes 10 and 11 on the one hand and the COPs holder

19          class on the other hand, why did you decide to

20          discriminate in favor of classes 10 and 11 as compared

21          to the COPs holders?  And by discriminate, I mean pay

22          them more recovery than you've paid to the COPs holder

23          class?

24     A.   Right.  As we said earlier this morning, in addition

25          to, you know, the assets that the retirement funds had
```

```
 1                    KEVYN ORR, VOLUME 2

 2         in them, which would mean we'd have less ground to

 3         make up as opposed to the liability of the

 4         certificates which is a -- an ongoing liability, as

 5         between the concerns that the obligations, the human

 6         dimension, the responsibility the City had to try to

 7         keep its covenant with its employees and retirees as

 8         opposed to legal arguments that have been made in the

 9         papers regarding the COPs that we believe they are

10         void ab initio and that we have no obligation and

11         probably a number of other factors that I'm just not

12         recalling as I sit here today, that resulted in us

13         proposing in the plan that the GRS and PFRS

14         beneficiaries receive a higher recovery than the COPs.

15    Q.   Okay.  So my question is trying to drive on the

16         factors that you considered in exercising your

17         judgment to discriminate between these two classes.

18    A.   Right.

19    Q.   Do you understand that?

20    A.   Yes.

21    Q.   And you identified four, the existence of assets held

22         in the trusts --

23    A.   Mm-hmm.

24    Q.   -- the human dimension that we've discussed earlier,

25         the City's covenant to pay retirees their pensions --
```

1                    KEVYN ORR, VOLUME 2

2    A.    Mm-hmm.

3    Q.    -- and the invalidity of the COPs?

4    A.    Yeah, the legal position of the COPs, but there may

5          be -- there may be other factors that go into that

6          analysis.  I'm just trying to give you off the top of

7          my head sitting here today some of the factors that we

8          considered in terms of proposing the plan.

9    Q.    Well --

10   A.    There may be --

11   Q.    Oh, sorry.

12   A.    There may be factors having to do with negotiated

13         positions, with a number of other issues, so I don't

14         want to give you the impression that the only thing

15         are the factors you're writing down, there may be

16         other considerations we took into account.

17   Q.    Well, I guess I'll say understood, but you are the

18         decider, right?

19   A.    Yes, I am.

20   Q.    Okay, and so --

21   A.    I am the -- the decider has a different connotation to

22         it, so I'm the emergency manager.

23   Q.    You're talking what, the "W" connotation?

24   A.    Yeah.

25   Q.    Oh, okay.

1                          KEVYN ORR, VOLUME 2

2    A.   I don't want to --

3    Q.   How easy (ph.) do you think I'm going to get on cross?

4    A.   Yeah, yeah, I don't want to read in the paper Kevyn

5         Orr --

6    Q.   Okay.

7    A.   -- thinks he's the decider.

8    Q.   Kevyn Orr --

9    A.   I'm the emergency manager who's charged under 436 with

10        discharging certain obligations in a sole discretion

11        including making decisions regarding proposals to

12        classes of creditors.

13   Q.   You are the man.  No.  Okay.  They were ready to hang

14        up.

15                   (Whereupon conference phone makes noise.)

16   BY MR. HACKNEY:

17   Q.   I'm out of here, they said, okay, this deposition is

18        off the rails.  Hang up and...

19                   MR. ALBERTS:  Should we go off the record

20        for a minute?

21   BY MR. HACKNEY:

22   Q.   Hold on, let me just finish this.  It's just a couple

23        more questions, then perhaps we can take a break.

24        Then we can reconnect our friends on the phone and...

25                   Okay, so you are the emergency manager that

1                      KEVYN ORR, VOLUME 2

2          correct?

3     A.   Yeah, I don't want to give you the impression that,

4          you know, I say something, and next thing I know,

5          there's a discovery request well, prove that you

6          considered this or any -- there are many other factors

7          that went into the decision; those are the ones I can

8          remember sitting here today.

9     Q.   Okay.  But is it fair to say that you can remember all

10         of the important factors?

11    A.   Those are the ones that I can remember today, there

12         may be other ones that are important that I'm just

13         simply not remembering.

14    Q.   So there may be important factors that went into your

15         decision that you can't recall as you sit here today?

16    A.   As I sit here today.

17    Q.   Okay.  This is a good time to take a break, so

18         especially with this phone thing.

19    A.   I'm -- do you want to take?  I'm good to go.

20    Q.   No, I know you are, but I got to --

21    A.   Okay, you want to take a break, okay.

22                   MR. SHUMAKER:  Let's take a break.

23                   VIDEO TECHNICIAN:  The time is 10:16 a.m.,

24         we are now off the record.

25                   (Recess taken at 10:16 a.m.)

1                    KEVYN ORR, VOLUME 2

2              (Back on the record at 10:35 a.m.)

3              VIDEO TECHNICIAN:  The time is now 10:35

4       a.m., we are back on record.

5   BY MR. HACKNEY:

6   Q.   Mr. Orr, did you discuss your testimony with your

7        counsel at the break?

8   A.   No.

9   Q.   Okay, I want to talk about with respect to the four

10       grounds that you can recall, the information that you

11       relied upon with respect to each.

12  A.   Mm-hmm, yes.

13  Q.   And I wanted to start with the assets held in the

14       trusts.

15  A.   Mm-hmm.

16  Q.   That was the first ground you mentioned.  For that, I

17       take it you relied upon data from the retirement trust

18       regarding the various levels of their assets?

19  A.   We relied on data from the retirement trust including

20       reports by Gabriel Roeder, their actuary, as well as

21       their own documents but we also relied upon data from

22       Milliman, which was the actuary hired by the City, and

23       analyses prepared by E & Y, Miller Buckfire, and

24       Conway MacKenzie, as well.

25  Q.   Is it fair to say that to describe the body of

1                         KEVYN ORR, VOLUME 2

2           information that you relied upon with respect to this

3           first ground which are assets held in the trust that

4           you relied on either financial information from the

5           trusts about their assets or expert analysis relating

6           to appropriate discount and other actuarial rates to

7           be applied to those assets and liabilities?

8    A.     Yes, I relied on things other than my own analysis

9           from professionals who do this.

10   Q.     But did I accurately describe kind of the body of

11          information?

12   A.     Yeah, you did.  Yes, you did.

13   Q.     Okay.  Now, with respect to the human dimension that

14          we talked about, with respect to the classes 10 and

15          11, what type of information did you rely upon in

16          connection with that judgment?

17   A.     Well, I think some of the information we just

18          discussed is captured within that, as well as the

19          representatives on the art -- on the retiree

20          committee, the pension boards, as well, as well as

21          individual meetings with individual employees and

22          pensioners who recount their stories in detail, as

23          well as statements made in court by the court itself

24          as well as others.  I listened to the September 19th,

25          2013 tape of the meeting of creditors.  I listened to

```
 1                    KEVYN ORR, VOLUME 2

 2        the blog of last -- was it last Monday or Tuesday's

 3        objectors meeting, general objectors meeting as well

 4        as far as the impact, and from time to time obviously

 5        I meet people on the street as well as hear their

 6        accounts and press reports.

 7   Q.   Is it fair to describe this body of information as,

 8        you know, oral testimonies to you about the personal

 9        hardship people will endure if there are -- if steeper

10        cuts are imposed?

11   A.   Yeah, I think it's fair to say oral testimony as well

12        as, as I said, the actual analyses that are provided

13        that, for instance, will tell you that general

14        retirement system employees get an average of 19,400

15        approximately in their pension, whereas PFRS may be in

16        the neighborhood of the mid-thirties.  So it's

17        actually analyses as well as oral testimony, oral

18        statements, written statements, and press reports.

19   Q.   Okay.  So you relied on aggregate financial data about

20        the approximate average size of pensions as well as

21        oral testimonies to you about how steeper cuts would

22        impose personal hardship on the pensioners?

23   A.   Yeah, the approximate average size -- you know,

24        included in this documentation for instance, I've

25        reviewed rolls of information regarding the actual
```

```
 1                    KEVYN ORR, VOLUME 2

 2         amount of pensions that thousands of pensioners have,

 3         which have been provided to me by professionals.  So

 4         it's not just summary information, it's actually

 5         sometimes raw data discussions with -- with my

 6         advisors, including attorneys, as well as discussions

 7         with representatives including depositions of the --

 8         of the -- some of whom are here today, representatives

 9         of the various funds.

10    Q.   The financial data that you relied upon, though, was

11         the -- was limited to the size of their pensions,

12         whether it was aggregate or individual pensions,

13         right?

14    A.   No.

15    Q.   You didn't review personal financial information of

16         any of the retirees, did you?

17    A.   No, we didn't review -- I didn't review financial

18         statements of retirees but I did review reports as

19         indexed by account number on the pensions of

20         individual retirees.

21    Q.   Yes.

22    A.   Yeah.  I did review things like that.

23    Q.   I'm trying to say that when it came to the financial

24         information you considered, it related to the size of

25         the pensions, correct?
```

```
1                          KEVYN ORR, VOLUME 2

2    A.   As opposed to the personal financial situation of each

3         individual pensioner?

4    Q.   Right.

5    A.   No, I have seen no information like that.

6    Q.   And you haven't seen that in the aggregate, either,

7         correct?

8    A.   Well, let's be careful with aggregate.  I mean, you

9         know, 14,000 approximately pensioners live within the

10        City of Detroit and/or Wayne County, I believe, so a

11        significant percentage live here, and when you look at

12        aggregate demographic data, you know, 40 percent of

13        our residents live at or below the poverty line per

14        capita GDP, all of this, I have reviewed aggregate

15        data, U.S. Census Bureau --

16   Q.   But this is stuff -- sorry to interrupt you.

17   A.   Yeah.

18   Q.   This is stuff that relates generally to the

19        population?

20   A.   Right.

21   Q.   It's not specific data to the retirees?

22   A.   No, but there was aggregate data that I did review

23        regarding retirees as a group but not their personal

24        financial information.

25   Q.   Right, the aggregate data on the retirees was with
```

```
 1                        KEVYN ORR, VOLUME 2

 2          respect to their mean pensions.

 3    A.    No, it was also with probable -- it wasn't just

 4          pensions, it also -- there was aggregate data

 5          regarding healthcare, there's aggregate data regarding

 6          an alternative savings fund recoupment.  So I know

 7          you're focusing principally on pensions, but I looked

 8          at a number of data as a composite of what the impact

 9          would be to these pensioners from a human dimension.

10    Q.    Okay, and evaluating the personal hardship they would

11          suffer?

12    A.    Correct.

13    Q.    Okay.  And that was -- was that one of the most

14          important things that drove you in connection with

15          this decision?  It seems like it's moved you.

16    A.    Well, I don't know if it's one of the most important,

17          but it -- all of them are important, the amount of

18          money, the Grand Bargain, the -- the grantors have

19          given us $866 million we didn't have seven months ago,

20          so that's pretty important.

21                The human dimension certainly is something

22          that you have to take into account.  These are real

23          people with real consequences.  So all of it's fairly

24          important to me.

25    Q.    Okay.  Now, you -- the third thing you talked about
```

1                          KEVYN ORR, VOLUME 2

2          was the City's covenant, which I understood you to

3          mean the City's promise that it would pay these people

4          their pensions?

5     A.   Yes.

6     Q.   And I take it from that the information you would have

7          relied upon was just the contract saying that folks

8          were entitled to these pensions?

9     A.   No, you know, we -- I also had access -- you know, I

10         talked with some City employees, for instance, who

11         currently work for the City, Gary Brown, who is a

12         retired Detroit police officer but is on a personal

13         service contract here in the City now, PSC, and I

14         talked to him about the historical commitments that

15         the City has made, he's a lifetime resident, been here

16         a long time.  Chief Craig, who was born here, for

17         instance, and his parents have been in the City, I

18         talked to him.  I talked to individuals.

19              So it's not just an analysis of, say, raw

20         data.  I mean, I have communications with people on

21         staff here in the City who will ask me if they can

22         come in and talk to me, and I'll listen to them.

23    Q.   I guess what I meant here is one of the factors you

24         identified as -- as informing your judgment with

25         respect to what to pay classes 10 and 11 versus COPs

```
1                     KEVYN ORR, VOLUME 2

2            holders, you identified was the City's covenant.

3    A.     Yes.

4    Q.     And I took that to mean the fact that the City had a

5           contractual obligation to pay these people?

6    A.     Right, and what I'm trying to relay to you is it's not

7           just a fact that the City had a contractual

8           obligation; it is the commitment and reliance on that

9           commitment behind that contractual obligation that

10          various City employees and retirees will come and

11          express to me in very real terms what this means to

12          them.

13   Q.     I see.

14   A.     And so the covenant is not just a technical document,

15          it is also an expectation, a reliance, a commitment

16          the City has made, and employees and retirees express

17          it to me in very -- sometimes very candid terms.

18   Q.     I see.  What you're saying is you relied not only the

19          existence of the legal obligation to pay but also

20          testimonies you got from people that they had relied

21          on that?

22   A.     Yes.

23   Q.     And isn't it fair to say that this is another element

24          of the human dimension, which is the unfairness of

25          cutting the pensions of people who relied on the
```

```
 1                        KEVYN ORR, VOLUME 2

 2           City's covenant in making decisions about how to

 3           allocate their work time?

 4      A.   You could say that.

 5      Q.   And then the last issue that you identified was the

 6           invalidity of the COPs; do you remember that?

 7      A.   Yes.

 8      Q.   And that was something that you factored into your

 9           decision in terms of paying the COPs less than classes

10           10 and 11, correct?

11      A.   Yes.

12      Q.   And I take it you relied upon legal analysis from your

13           counsel about the potential invalidity of the COPs,

14           correct?

15      A.   Yes.

16      Q.   And I know that there had been a lawsuit filed prior

17           to the time of the current plan being filed, but I

18           assume that if I asked you questions about what your

19           attorneys had advised you with respect to the

20           invalidity of the COPs you'll invoke the

21           attorney-client privilege and decline to answer?

22      A.   Yes.

23      Q.   Okay, so I hope we can stipulate that if I ask a bunch

24           of questions about how the COPs analysis factored into

25           the decision that the attorney-client privilege will
```

1                    KEVYN ORR, VOLUME 2

2          be invoked?

3                    MR. SHUMAKER:  Assuming your question gets

4          to communications between counsel and Mr. Orr, yes.

5    BY MR. HACKNEY:

6    Q.   Well, I mean, did you -- did you -- in assessing the

7          invalidity of the COPs as a factor justifying the

8          level of discrimination, did you consider anything

9          other than legal advice around the invalidity of the

10         COPs?  It seems like a legal question.

11   A.   It's a legal question, but in an effort to be

12         forthcoming and fair to you, I'd have to say yes, and

13         I'll try to tell you, for instance, without discussing

14         the -- and going afield of many discussions, legal

15         opinions, analyses, meetings, written opinions, that I

16         received from counsel.

17                   So for instance, in looking at the COPs, in

18         addition to those things, you know, I examined news

19         reports about that transaction, I think I've even

20         examined those -- some of those before I got here.

21         Reports, for instance, by the auditor general that it

22         questioned the propriety and validity of the COPs

23         reports at that time when -- I think it was Auditor

24         General Hart (ph.) back in 2005, City Council

25         statements that were made.  Statements made by the

```
 1                    KEVYN ORR, VOLUME 2

 2        City treasurer back then that it was invalid and

 3        inappropriate to enter into the COPs and that it would

 4        make the City bankrupt and that the City should have

 5        declared bankruptcy in 2005.

 6                    So there's other data that I looked at to

 7        inform myself, just not the legal analyses about

 8        position of the COPs, and some of that data was

 9        contemporaneous with when they were initially entered

10        into and some of that was subsequent to that.

11   Q.   And you identified a number of individuals or reports

12        that you had read; I didn't hear any lawyers in any of

13        those things.  Were there?

14   A.   None of my lawyers were in those things, so there

15        was -- there's, you know, document -- documentary

16        evidence that is short of the legal opinions I got

17        from my counsel.

18   Q.   Okay, so but to tie it up, was the principal

19        information that you relied upon legal advice conveyed

20        to you by your lawyers about the invalidity of the

21        COPs?

22   A.   Yes.

23   Q.   And I -- just so I understand the way the judge -- the

24        factor plays through your judgment, you looked at the

25        potential invalidity of the COPs and viewed that as
```

```
 1                    KEVYN ORR, VOLUME 2

 2         one reason to pay the COPs on their best day 10 cents?

 3    A.   Yeah, I don't know -- I don't want to give the

 4         impression that it was that binary, you know, a number

 5         of issues, as I said before, went into what we could

 6         afford to pay --

 7    Q.   Yes.

 8    A.   -- the validity of the claim, which is pretty typical

 9         in bankruptcies, all that stuff, but I think that's a

10         fair statement.

11    Q.   Okay, I'm talking when you were deciding how to divide

12         the pie, the COPs best day recovery was impacted by

13         this factor of the potential invalidity of the COPs?

14    A.   Yes.

15    Q.   Now, with respect to the information in these four

16         areas that we've just talked about, the information

17         that relates to each of the four factors you

18         identified --

19    A.   Mm-hmm.

20    Q.   -- was there a material change in this body of

21         information between April 1 and April 15 of 2014?

22    A.   I don't know, you say material change, what are you --

23         what do you mean?

24    Q.   Is there anything that sticks out to you with respect

25         to any of your four factors and the information
```

```
 1                        KEVYN ORR, VOLUME 2

 2          associated with each that changed materially between

 3          April 1 and April 15?

 4    A.    To be frank with you, I can't -- I can't recall if

 5          there was, but I don't -- nothing jumps out at me.

 6    Q.    Okay.  Now, in structuring the plan, did you take

 7          advice from Miller Buckfire?

 8    A.    Yes.

 9    Q.    And in deciding what levels of discrimination between

10          creditors was appropriate, did you also take advice

11          from Miller Buckfire?

12    A.    Yes.

13    Q.    And did you specifically take advice from Ken

14          Buckfire?

15    A.    I -- I would have regular restructions (sic) with Ken

16          and other members of his team, so I think it's fair to

17          say yes.

18    Q.    Did Mr. Buckfire recommend to you that when it came to

19          evaluating the recovery of the retirees that the City

20          should consider the pension recoveries in combination

21          with the OPEB recoveries in making a determination as

22          to what the level of discrimination was?

23                     MR. SHUMAKER:  Object to the form.

24    BY MR. HACKNEY:

25    Q.    Do you understand my question?
```

1                          KEVYN ORR, VOLUME 2

2              listening to some of the statements that were made,

3              looking at some of the representations that have been

4              made by the City over the years, I think it's fair to

5              say there is a number of different information that

6              came in concerning the obligations to retirees.

7       BY MR. HACKNEY:

8       Q.     Now, did you -- did you attempt to determine what

9              other creditors' expectations were vis-a-vis the City?

10      A.     Oh, I certainly heard from other creditors,

11             expectations from rating agencies, from financial

12             publications, from statements made in the press from

13             them, as well, that their expectation was that they

14             were going to be paid.

15      Q.     For example, did you talk to any of the -- of the COPs

16             holders to determine what their expectations were

17             about when they invested?

18      A.     I know I talked to some of their representatives.  I

19             don't know if I talked to any of the principals or any

20             of the individual holders.

21      Q.     Okay.  Fair to say that you haven't talked to any COPs

22             holder who told you that they expected not to be

23             repaid, correct?

24      A.     I think that's fair.

25      Q.     And you haven't talked to any other financial creditor

```
 1                    KEVYN ORR, VOLUME 2

 2        who told you that their expectation was that they

 3        would not be repaid, correct?

 4    A.  There was a conference in New York last fall where

 5        some creditors as identified who represented that they

 6        had interest in Detroit's debt said that they knew

 7        that the City probably would not be able to pay this

 8        debt but nonetheless they expected to be paid and they

 9        were going to punish the City.  They came up to me at

10        the conference with their finger in my face about

11        that.  But I can't -- I don't know -- I didn't take

12        their card, I don't know their name, but generally

13        speaking, I -- I was -- excluding conversations we've

14        had in mediation discussions, which are protected by

15        the order, I don't recall with specificity any

16        particular creditor principal coming up to me and

17        saying they did not expect to be paid.

18    Q.  I mean, let me try to tie it up this way.  By the way,

19        I can't believe that thing actually happened to you,

20        only in New York.

21    A.  No, it's happened to me many times --

22    Q.  No offense to New Yorkers --

23    A.  Oh, it was ugly.

24    Q.  We don't do that in Chicago but...

25                   MR. PEREZ:  I thought you were a Michigan
```

```
 1                    KEVYN ORR, VOLUME 2

 2         boy.

 3                    MR. HACKNEY:  I am, born and raised, but

 4         I've actually lived in Chicago now --

 5                    THE WITNESS:  Are you coming back?  Are you

 6         coming back?

 7                    MR. HACKNEY:  No, no, I'm a Chicagoan.

 8                    THE WITNESS:  Okay.

 9                    MR. HACKNEY:  You lost me.

10    BY MR. HACKNEY:

11    Q.   Let me see if I can tie it up this way.  You did not

12         attempt to undertake a systematic analysis of what all

13         the creditors thought that they were going to get when

14         they made their respective investment decisions to

15         decide who should get what?

16    A.   I did not poll all of the creditors regarding what

17         they thought they were going to get.

18    Q.   Okay, and you didn't factor that into your conclusion,

19         correct?

20    A.   No.  Not at least that I can say -- I can't say what

21         discussions were made in mediation, but I -- publicly

22         the answer would be no.

23    Q.   I am talking about, you know, your state of mind,

24         though.  I'm saying that you didn't go and pick

25         winners and losers based on what people's expectations
```

1                    KEVYN ORR, VOLUME 2

2         were when they invested?

3    A.   No, I don't view it as picking winners and losers

4         because I don't think anybody here has said to me that

5         they think of themselves as winners.

6              We tried to do an analysis of what we could

7         afford to pay based upon the factors we discussed

8         before with an understanding that $866 million was

9         coming in as a gift from grantors with specific

10        condition that that money would flow to pensioners as

11        opposed to any other creditor class and that we would

12        accept that gift with that condition when those

13        discussions were made.

14   Q.   Understood, I'm just trying to say -- picking winners

15        and losers was a euphemism, I didn't mean to be

16        casual.  You didn't set respective recovery levels

17        based on the fact that you thought some creditors

18        should be paid less based on their expectations when

19        they invested as opposed to others?

20   A.   No, that really wasn't a factor.  I mean, did I

21        personally believe that there may have been creditors

22        who were more capable of doing underwriting about the

23        City's debt condition has been -- as had been reported

24        in various publications that I'd read, yes, I

25        understood that but I didn't sit down and say, you

KEVYN ORR, VOLUME 2

2     know, based upon your expectation of being paid, you

3     know, this is what we can pay.  We generally drove the

4     determinations based upon the revenue stream and the

5     strengths and weaknesses and negotiations with any

6     particular creditor group?

7  Q.  And I take it you did not, for example, go back and

8     review the due diligence materials that were provided

9     to the COPs creditors in the 2005 and 2006

10    transactions, correct?

11 A.  I didn't do it personally but some of my advisors did.

12 Q.  Okay.  But, I mean, you don't know what was in those

13    due diligence materials?

14 A.  No, some of those materials, I -- I did see some of

15    those materials and I saw some of the legal opinions

16    that were provided back then.

17 Q.  In fact, the legal opinions that were provided back

18    then told COPs holders that the COPs were legal,

19    correct?

20 A.  Some of them did, there was one law firm in the City

21    that refused to do the transaction because they opined

22    or at least informed people that they thought it was

23    illegal.

24 Q.  And do you recall what the COPs holders were told

25    about the nature of the remedy that would exist if the

1                    KEVYN ORR, VOLUME 2

2           City failed to pay the service corps?

3    A.   No.

4    Q.   Do you know who the COPs holders were at the time of

5         the COPs offering?

6    A.   There was a list of who they were, but sitting here

7         off the top of my head, no.

8                    MR. HACKNEY:  Let's mark this as our next

9         exhibit.

10                   MARKED FOR IDENTIFICATION:

11                   DEPOSITION EXHIBIT 21

12                   11:29 a.m.

13   BY MR. HACKNEY:

14   Q.   Mr. Orr, is this the offering memorandum that was put

15        out in connection with the 2005 COPs?

16   A.   Without sitting here and reading through it, to the

17        best of my knowledge, this appears like a document

18        I've seen before as the offering document.

19   Q.   And have you read this document before?

20   A.   I have not read the document in total; I have read

21        pieces of it.

22   Q.   Okay.  You didn't just sit down and one day say, I

23        want to read the offering memorandum?

24   A.   I did not read through the whole document.

25   Q.   Now, if you look at page 8, I want to read you a

```
 1                      KEVYN ORR, VOLUME 2

 2   Q.   In part?

 3   A.   I think that is fair.

 4   Q.   You know, Mr. Orr, I've reached a good stopping point,

 5        I think.

 6                   MR. SHUMAKER:  Sure.

 7                   MR. HACKNEY:  There's a lot of people in

 8        the room, but I kind of defer to you.

 9                   THE WITNESS:  No, I'm good, but if you guys

10        think that makes sense, we have a thing that we need

11        to do.

12                   MR. HACKNEY:  What time?

13                   MR. HERTZBERG:  At 1:15 for 5 minutes.

14                   THE WITNESS:  Okay.

15                   MR. HACKNEY:  That will be perfect then,

16        we'll take an hour for lunch, and then I'll see you at

17        1:30.

18                   THE WITNESS:  Okay.

19                   VIDEO TECHNICIAN:  The time is now 12:31

20        p.m., we are now off the record.

21                   (Recess taken at 12:31 p.m.)

22                   (Back on the record at 1:36 p.m.)

23                   VIDEO TECHNICIAN:  The time is 1:36 p.m.,

24        we are back on the record.

25   BY MR. HACKNEY:
```

```
1                    KEVYN ORR, VOLUME 2

2   Q.   Mr. Orr, welcome back from lunch.

3   A.   Thank you, Mr. Hackney.

4   Q.   Okay.  So Mr. Orr, you're aware that certain

5        charitable foundations have agreed to contributed

6        money to the City's pension obligations in exchange

7        for the City conveying its art collection into a

8        public trust; is that correct?

9   A.   Yes.

10  Q.   And I take it if I ask you questions about your

11       communications with the charitable foundations in

12       connection with their agreement to contribute this

13       money, you will refuse to answer on the grounds of the

14       mediation order's confidentiality provisions; is that

15       correct?

16  A.   Yes, generally for most of them, I think that's

17       correct.

18  Q.   And just for the record, you didn't have any such

19       conversations prior to the entry of the mediation

20       order which was at some point in September of 2013?

21  A.   Yes, that's correct.

22  Q.   Okay.

23  A.   Well, let me think.  I think I had one meeting with

24       Darren Walker at Ford Foundation, but it was not about

25       a contribution, it was just a meet and greet.
```

```
1                    KEVYN ORR, VOLUME 2

2    Q.   Okay.

3    A.   Okay?

4    Q.   Yeah, I saw that in the documents, and there were some

5         issues about the Ford Foundation and the building that

6         they owned or something that --

7    A.   I didn't even get into all that.

8    Q.   Okay.

9    A.   It was just hi, how are you, they were helping us with

10        some grants, helping us stand up a grants

11        administrator.

12   Q.   So I guess I want to make a record of something I

13        understand from the City's position but it is the

14        City's position that communications with the

15        foundation are either part of or incidental to the

16        mediation, correct?

17             MR. SHUMAKER:  I believe that's correct.

18        Again, I think you could fish outside the contours of

19        those mediation talks but my understanding is that all

20        those talks were within the context of mediation.

21   BY MR. HACKNEY:

22   Q.   Yeah, I mean, I don't want to ask a hundred questions

23        today to establish what I think is relatively well

24        established, which is that you're not, generally

25        speaking, going to discuss your conversations with the
```

```
 1                      KEVYN ORR, VOLUME 2

 2        foundations, correct?

 3   A.   That is correct.  You know, I may -- let me say this

 4        generally.  I may have had meetings with foundation

 5        principals outside of the confines of the mediation,

 6        just hail-fellow-well-met, saw them at an event, how

 7        are you.  There were no substantive conversations

 8        about the contribution that did not occur outside of

 9        the mediation order.

10   Q.   And that's fine, because the only ones that I really

11        want to ask you about are ones that relate to the

12        Grand Bargain?

13   A.   Right, right.

14   Q.   And those would fall under the gambit of the

15        mediation?

16   A.   Those would fall under the gambit of mediation.

17   Q.   Now, if I asked you your state of mind based on what

18        you understood the foundations to be willing to do or

19        what you thought they would be willing to do, you

20        would also invoke the mediation order to the extent

21        his state of mind was created by communications of the

22        foundation, correct?

23              MR. SHUMAKER:  I think that's right because

24        I don't see how he could give you his impressions or

25        his understanding without going into what was going on
```