UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-----------------------------------------------x
                             )
In re:                  )
                             )    Case No. 13-53846
CITY OF DETROIT, MICHIGAN  )    In Proceedings Under Chapter 9
                             )    Hon. Steven W. Rhodes
          Debtor.      )
-----------------------------------------------x

## OAKLAND COUNTY'S AMENDED MOTION TO EXCLUDE TESTIMONY OF MARTHA KOPACZ UNDER FED. R. EVID. 702 IN CONNECTION WITH CERTAIN OF HER EXPERT OPINIONS CONTAINED IN HER EXPERT REPORT

Now comes Oakland County, Michigan ("Oakland County"), contingent creditor and party-in-interest in this matter, and for its *Amended Motion to Exclude Testimony Of Martha Kopacz Under Fed. R. Evid. 702 In Connection With Certain Of Her Expert Opinions Contained In Her Expert Report*, and states that:

1.    On April 22, 2014, this Court appointed Martha Kopacz ("Kopacz") as an independent expert pursuant to Fed. R. of Evid. 706(a). (Docket No. 4215).

1

2.     Pursuant to her appointment, Kopacz filed her expert report under Fed. R. Evid. 706 (the "Report").

3.     Beginning on page 124 of the Report, Kopacz addresses various issues in connection with the City's pensions and offers opinions in connection therewith (the "Pension Related Opinions").[1]

4.     Notwithstanding Kopacz setting forth the Pension Related Opinions in her Report, Ms. Kopacz acknowledged in her deposition that her sole knowledge base for the Pension Related Opinions is information which she took from others, but either did not verify for herself or rigorously analyze such information in any "expert fashion."[2]

5.     Among other things, Ms. Kopacz has opined on the following pension related topics:

    a.     Practices contributing to a "significant funding shortfall" in the two pension plans.  Page 127 of the Report;

    b.     Use of unrealistic rate of return assumptions by the pension plans and questionable investment strategies. Pages 127, 139 of the Report;

    c.     The estimated UAAL.  Pages 128, 133 of the Report;

---

[1] The Pension Related Opinions are contained minimally on pages 124 – 156 of the Report.
[2] Kopacz Deposition transcript at pages 431, 436, 445, 448, 536 – 537, 538 – 539, 541, attached as Exhibit A.

d.    Questionable activities of the retirement system. Pages 128, 129 of the Report;

e.    Accrual of pension benefits. Page 130 of the Report;

f.    Required contributions of the GRS. Page 133 of the Report;

g.    Estimated funding levels for the GRS. Page 133 of the Report;

h.    DWSD's allocable share of the UAAL. Page 136 of the Report;

i.    Amounts to be received by pensioners under the revised plans. Page 140 of the Report;

j.    The discount rate for calculating liabilities of the GRS. Pages 145 – 147 of the Report;

k.    Calculation and use of appropriate rates of return for the GRS. Pages 147 – 151 of the Report;

l.    Effect of underfunding of a pension plan. Page 148 of the Report; and

m.    Disclosure requirements for pension plan. Page 156 of the Report.

6. Underscoring Kopacz's lack of pension expertise and/or proper testing of her conclusions, Kopacz testified at page 431 of her deposition transcript:

Q: And you have no prior – pension is not your expertise, is it?

A: I would now consider myself a pension expert.

7. On page 448 of her deposition transcript, Kopacz testified:

Q: Have you ever served as an actuary for a public pension fund?

A: No.

Q: Have you had any experience in actuarial science?

A: In terms of? Experience in actuarial science?

Q: Yes.

A: No.

Q: Do you have any qualification to offer an opinion on the proper rate of return to use for a public pension fund?

A: I don't think I have offered an opinion.

8. On page 539 of her deposition transcript, Ms. Kopacz testified:

Q: Do you have any understanding of what would be a typical smoothing period utilized by other public pension plans.

A: I don't.

Q: So, if someone from the retirement system told you that a seven (7) year smoothing period was used, you would have no basis to compare that with other plans to know if that was typical.

4

A: I would – I would have to undertake to research that, I wouldn't have my own independent knowledge of what that was.

Q: Same with amortization period utilized by public pension system. Would you have any basis to know whether a twenty (20) year amortization period versus a thirty (30) year amortization period?

A: Or a ten (10) or a five (5)? No, I would not.

9. On pages 538 – 539 of her deposition, Ms. Kopacz testified that her opinion, that there was an unrealistic rate of return assumption that was utilized by the retirement systems, came from discussions with others at a meeting wherein such discussion created "a perception or a reality of the underfunding of the plans."

10. Faced with a proffer of expert testimony, the trial judge must act as a gatekeeper and determine at the outset, whether the expert testimony (i) is based on scientific knowledge, and (ii) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts in issue. *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-593, 113 S. Ct. 2786, 2794-95, 125 L. Ed. 2d 469 (1993).

11.     The admissibility of expert testimony is governed by Fed. R. Evid. 702 which provides, in pertinent part, that a witness, qualified as an expert, may testify in the form of an opinion only if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. The proponent of the proposed expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *De Jager Constr. v. Schleinger*, 938 F. Supp. 446, 448 (W.D. Mich. 1996) [internal citations omitted]. Pursuant to Rule 702, "the trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Official Unsecured Creditors Comm. Of Valley-Volcan Mold Co. v. Ampco-Pittsburgh Corp. (In re: Valley-Volcan Mold Co.)*, 237 B.R. 322, 335 (B.A.P. 6th Cir. Ohio 1999), citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 139, 118 S. Ct. 512, 516, 139 L. Ed. 2d 508 (1997) (quoting *Daubert, supra* at 589).

12.     In making this determination, this Court must look to the reasoning or methodology employed by the expert, whether the reasoning or methodology has been tested or subjected to peer review, the known rate of error if one can be determined, and may also consider whether the

reasoning or methodology has been generally accepted within the relevant professional community. *In re Valley-Volcan Mold Co.*, 237 B.R. at 335, citing *Daubert*, 509 U.S. at 593-595. Also, the "expert testimony proffered in the case must be sufficiently tied to the facts of the case and that it will aid the jury (or in this case the judge) in resolving a factual dispute." *Daubert* at 591 (quoting *United States v. Downing*, 753 F. 2d 1224, 1242 (3d Cir. 1985)). Courts have referred to this requirement as "fit," meaning that the expert testimony must not only be based on reliable science but must also "fit" the particular facts of the case. *Concord Boat Corp. v. Brunswick Corp.*, 207 F. 3d 1039, 1055 (8th Cir. Ark. 2000), cert. denied, 531 U.S. 979, 148 L. Ed. 2d 436, 121 S. Ct. 428 (2000), citing *Daubert*. Nothing in either *Daubert* or the Federal Rules of Evidence permits this Court to admit or even hear opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. If there is simply too great an analytic gap between the data and the opinion proffered, the testimony must be precluded. *General Elec. Co. v. Joiner*, 522 U.S. at 146; *Tamrez v. Lincoln Elec. Co.*, 620 F. 3d 665, 675-76 (6th Cir. 2010) (quoting *General Elec. Co. v. Joiner*).

13. In assessing reliability, "[r]ed flags of caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation,

failure to consider other possible causes, lack of testing and subjectivity."
*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F. 3d 521, 527 (6th Cir. 2012).

14.     Under Fed. R. Evid. 702, expert testimony is not admissible if it represents merely the *ipse dixit* of the expert.  See *Tamraz, supra*, 620 F. 3d at 671.  Expert opinions must, therefore, have a reliable basis in data and a sound methodology.  Further, there must be a "nexus between (an expert's) credentials and the subject matter of his testimony."  *In re Worldcom, Inc.*, 371 B.R. 33, 42 (Bankr. S.D.N.Y. 2007).

15.     What is clear from the Kopacz Report and her testimony is that Ms. Kopacz does not have the expertise to offer the Pension Related Opinions nor has she subjected any of her opinions to the requirements for validating an expert opinion under *Daubert*.

16.     Ms. Kopacz's opinions are based merely on hearsay and not upon established facts or reliable principles and methods, and Ms. Kopacz has not applied principles and methods reliably to the facts of the case.

17.     Accordingly, Ms. Kopacz is not qualified as an expert to offer the Pension Related Opinions, and any Pension Related Opinions contained in her Report should not be admitted, nor should Ms. Kopacz be permitted to testify in connection with the Pension Related Opinions.

8

WHEREFORE, for the foregoing reasons, Oakland County requests that this Court enter an order precluding the admission of the Pension Related Opinions in Ms. Kopacz's Report and further preclude Ms. Kopacz from testifying on any matter in connection with the Pension Related Opinions, and award such other relief as is consistent with equity and good conscience.

*Respectfully Submitted,*

*CARSON FISCHER, P.L.C.*

By: /s/ Joseph M. Fischer
Joseph M. Fischer (P13452)
Robert A. Weisberg (P26698)
Christopher A. Grosman (P58693)
4111 Andover Road, West-2nd Floor
Bloomfield Hills, Michigan 48302
Telephone: (248) 644-4840
Email: jfischer@carsonfischer.com
      rweisberg@carsonfischer.com
      cgrosman@carsonfischer.com
*Counsel for Oakland County, Michigan*

*-and-*

YOUNG & ASSOCIATES

By: /s/ Sara K. MacWilliams
Sara K. MacWilliams (P67805)
Jaye Quadrozzi (P71646)
27725 Standsbury Blvd., Suite 125
Farmington Hills, Michigan 48334
Telephone: (248) 353-8620
Email: efiling@youngpc.com
      macwilliams@youngpc.com
      quadrozzi@youngpc.com
*Co-Counsel for Oakland County, Michigan*

## CERTIFICATE OF SERVICE

I Joseph M. Fischer, hereby certify that the forgoing *Oakland County's Amended Motion To Exclude Testimony Of Martha Kopacz Under Fed. R. Evid. 702 In Connection With Certain Of Her Expert Opinions Contained In Her Expert Report* was filed and served via the Court's electronic case filing and noticing system on this 22nd day of August, 2014.

    /s/ Joseph M. Fischer
Joseph M. Fischer

# Exhibit A

- MARTI KOPACZ - VOLUME II-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


In Re                          )  Chapter 9

CITY of DETROIT, MICHIGAN,      )  Case No. 13-53846

          Debtor.             )  Hon. Steven Rhodes


DATE:  August 1, 2014

TIME:  9:12 a.m.


VOLUME II

VIDEOTAPED DEPOSITION OF MARTI

KOPACZ, held at the offices of Squire Patton

Boggs, 30 Rockefeller Plaza, New York, New York,

pursuant to Order, before Hope Menaker, a

Shorthand Reporter and Notary Public of the State

of New York.

1           - MARTI KOPACZ - VOLUME II-

2    Gleason and Bob Childree.

3        Q.    I apologize if I repeat some of

4    Mr. Hackney's questions, but am I right you have

5    no experience with actuarial issues?

6        A.    That's correct.

7        Q.    And you have no prior -- pension is

8    not your area of expertise, is it?

9        A.    I would not consider myself a pension

10   expert.

11       Q.    Are the pension portions of your

12   report important to your conclusions?

13       A.    Yes.

14       Q.    And if the pension portions of your

15   report are factually or inaccurate -- factually or

16   analytically incorrect, would you agree with me

17   that undermines the conclusions you reached in

18   your report?

19       A.    I don't think they're factually

20   incorrect or analytically incorrect.

21       Q.    Right.  But if they are, would you

22   agree with me that that undermines the conclusions

23   in your report?

24       A.    I don't know that it would.  It

25   depends which -- what would be inaccurate?

13-53846-swr   Doc 6994   Filed 08/22/14   Entered 08/22/14 17:57:25   Page 13 of 22

1              - MARTI KOPACZ - VOLUME II-

2      return?

3          A.    In most years?

4          Q.    Yes.

5          A.    Should we count them?  All right.

6      One, two, three, four, five, six, seven, eight,

7      nine, ten -- in ten of the years on the general

8      retirement system, they did not reach the targeted

9      assumed rates and --

10         Q.    So that means -- let me just ask --

11     so that means in 15 years they exceeded, correct?

12         A.    If there are 15 years here.  There

13     are 25 years.

14         Q.    So, in most years --

15         A.    In 15 --

16         Q.    -- the GRS exceeded the targeted

17     rate, correct?

18         A.    Yes.

19         Q.    Okay.  You can do the math for PFRS.

20         A.    Okay.  One, two -- three, four --

21     five.  In five of the PFRS years, they did not

22     reach the targeted return.

23         Q.    That's five out of how many?

24         A.    Fifteen.

25         Q.    So in most years, am I correct, the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 6994   Filed 08/22/14   Entered 08/22/14 17:57:25   Page 14 of 22

```
 1              - MARTI KOPACZ - VOLUME II-

 2        Q.      Okay.  Would you accept my

 3   representation that that's what you said?

 4              MR. KANE:  Objection.

 5        A.      Not really.

 6        Q.      Okay.  Well, is there any need to

 7   change the pension plan -- strike that.

 8              Is there any need to change the plan

 9   of -- the plan of adjustment on account of the

10   potential pension risks that you cite?

11        A.      I have no perspective or point of

12   view or opinion on changes to the plan of

13   adjustment.  That is not in my scope.  It is not

14   my task.

15        Q.      Do any of the pension risks that you

16   cite in your report give you any pause with

17   respect to the plan?

18        A.      The long-term risks associated with

19   the City's pension obligations do not negatively

20   impact my assessment for feasibility.

21        Q.      Did you look at the asset

22   distribution for the pension funds?

23        A.      I have seen a -- I have seen a

24   schedule that looks at the distribution of assets

25   in the pension fund.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 6994   Filed 08/22/14   Entered 08/22/14 17:57:25   Page 15 of 22

1          - MARTI KOPACZ - VOLUME II-

2          Q.     Do you have any quarrel with that

3     distribution?

4          A.     I am not an investment manager.

5          Q.     Is that another way of saying that

6     you don't have any quarrel?

7          A.     No.  It just says that I didn't -- I

8     accepted it as it was.

9          Q.     Well, I'm asking you today:  Do you

10    have any questions --

11         A.     I have not made that evaluation.

12         Q.     So the answer is no, you are not able

13    to cite any disagreement you have with the

14    distribution of assets, are you?

15         A.     I -- like I said, I have not looked

16    at that specifically to arrive at any conclusion.

17              MR. WAGNER:  Can you read back the

18         question.

19              (The question requested was read back

20         by the reporter.)

21         Q.    Can you answer the question?

22              Do you have any quarrel --

23         A.    I don't know.

24         Q.    Would you agree with me that it's

25    unreasonable to calculate the -- strike that.

```
 1              - MARTI KOPACZ - VOLUME II-
 2         Q.     Have you ever served as an actuary
 3    for a public pension fund?
 4         A.     No.
 5         Q.     Have you had any experience in
 6    actuarial science?
 7         A.     In terms of?  Experience in actuarial
 8    science?
 9         Q.     Yes.
10         A.     No.
11         Q.     Do you have any qualification to
12    offer an opinion on the proper rate of return to
13    use for a public pension fund?
14         A.     I don't think I have offered an
15    opinion.
16         Q.     My question --
17              MR. WAGNER:  Can you read back the
18         question.
19              (The question requested was read back
20         by the reporter.)
21         A.     I don't think I ever have.
22              MR. WAGNER:  Can you read it back one
23         more time, I'm sorry.
24              (The question requested was read back
25         by the reporter.)
```

13-53846-swr  Doc 6994  Filed 08/22/14  Entered 08/22/14 17:57:25  Page 17 of 22

1          - MARTI KOPACZ - VOLUME II-

2     A.     I do.

3     Q.     With respect to your contention that

4  the systems used questionable investment

5  strategies that resulted in considerable

6  underfunding, you don't cite any particular third

7  party in a footnote as you have in other sections.

8          Do you see that?

9     A.     There is no footnote related to that

10 paragraph.

11    Q.     Okay.  So what did you rely on in

12 reaching this conclusion?

13    A.     This -- a lot what -- the

14 conversation that I had with Mr. Clark -- we can

15 go back to my log and I -- I am sorry to say I

16 have forgotten all of the people were -- that were

17 at that meeting, but I was at a meeting with both

18 retirement systems, their counsel and their

19 lawyers at Clark Hill, very shortly after I was

20 retained in this matter.

21          And it was during that -- here it is

22 -- Robert Gordon, Joseph Turner, Ronald King,

23 Michael VanOverbeke, those individuals, I had a

24 meeting with them.

25          And then subsequently I know people

```
 1            - MARTI KOPACZ - VOLUME II-
 2    in my firm met with a similar group of people of
 3    -- that represented the pension funds and we
 4    talked about -- they shared with me a history of
 5    the investments around the retirement systems, the
 6    investments that were made, and I believe it was
 7    during the during the Kwame administration into
 8    alternative -- what you would call alternative
 9    investment vehicles; the -- the smoothing that had
10    occurred and the stretching out of the unfunded
11    obligations over a relatively 30-year period.  But
12    the -- this really comes from that conversation.
13         Q.     Okay.  So, it is your testimony that
14    the retirement systems themselves told you that
15    they utilized an unrealistic rate of return
16    assumption?
17         A.     The people that I met with, I believe
18    it's in your offices at -- across the street from
19    the KMAK.
20         Q.     And who --
21         A.     Shared with me.
22         Q.     Someone specifically on behalf of
23    retirement system opined to you that they --
24         A.     Mr. Overbeke (sic) and Mr. -- and I
25    think it was -- the gentleman who was a lawyer,
```

1              - MARTI KOPACZ - VOLUME II-

2       but is also general counsel now for the funds.

3            Q.      Michael VanOverbeke?

4            A.      He's one of them --

5            Q.      Or Joe Turner?

6            A.      I think it's Joe Turner.

7            Q.      What I'm trying to get at, your

8       testimony is that during that meeting they

9       specifically told you --

10           A.      About --

11           Q.      -- that they believed --

12                   MR. KANE:  Wait for her to finish.

13           Q.      Let me finish the question.

14                   -- that there was an unrealistic rate

15      of return assumption that was utilized by the

16      system?  Or is that your extrapolation based on

17      what was said at the meeting?

18           A.      The -- we talked very specifically

19      about the recent history of losses, investment

20      losses at the retirement system; how they had used

21      a seven-year smoothing period to make the

22      shortfalls less obvious; how they had implied

23      amortization periods that were extended for

24      funding the unfundeds; and how all of that ended

25      up creating, you know, again, a perception or a

1          - MARTI KOPACZ - VOLUME II-
2      reality of the underfunding of the plans.  As well
3      as the 13 checks and those sorts of things.  We
4      talked about all of that.
5          Q.    Do you have any understanding of what
6      would be a typical smoothing period utilized by
7      other public pension plans?
8          A.    I don't.
9          Q.    So if someone from the retirement
10     systems told you that a seven-year smoothing
11     period was used, you would have no basis to
12     compare that with other plans to know if that was
13     typical?
14         A.    I would -- I would have to undertake
15     to research that.  I wouldn't have my own
16     independent knowledge of what that was.
17         Q.    Same with amortization period
18     utilized by public pension systems.  Would you
19     have any basis to know whether a 20-year
20     amortization period versus a 30-year amortization
21     period.
22         A.    Or a ten or a five.  No, I would not.
23         Q.    Okay.  So just to narrow it down, we
24     told you certain facts -- when I say "we," the
25     retirement systems gave you certain facts about

```
1              - MARTI KOPACZ - VOLUME II-
2      comptroller of the State of Alabama for 23 years
3      and the former president of the Government Finance
4      Officers Association for a number of years.  And I
5      believe he's -- he is a current advisor or recent
6      past advisor to the GASB, the Government
7      Accounting Standards Board on these matters.
8          Q.    Do you know -- I'm sorry -- do you
9      know if either one has any actuarial experience?
10         A.    I don't believe either has actuarial
11     experience.
12         Q.    Do you know if either has sat on a
13     board for a public pension system?
14         A.    I believe Mr. Childree has.
15         Q.    Do you know how long the meeting
16     between Mr. Gaul, Mr. Childree and the retirement
17     systems lasted?
18         A.    I don't.
19         Q.    In reaching your conclusion on Page
20     127, I believe you testified this morning that you
21     never looked at the investment policies for the
22     system.
23         A.    I did not.
24         Q.    Do you know if your team looked at
25     those?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 6994   Filed 08/22/14   Entered 08/22/14 17:57:25   Page 22 of 22