# Exhibit 6B

# Excerpts of July 18, 2014 J. Hill Deposition Transcript

## Page 1

```
 1            JOHN W. HILL
 2       UNITED STATES BANKRUPTCY COURT
 3     FOR THE EASTERN DISTRICT OF MICHIGAN
 4                  - - -
 5   In Re:           ) Chapter 9
 6
 7   City of Detroit, Michigan, )
 8
 9      Debtor.      ) Hon. Steven Rhodes
10   _____
11
12
13        The Videotaped deposition of JOHN W. HILL
14        Taken at 51 Louisiana Avenue, N.W.,
15        Washington, D.C.
16        Commencing at 9:03 a.m.
17        Friday, July 18, 2014
18        Before:  Gail L. Inghram Verbano
19        Registered Diplomate Reporter,
20        Certified Realtime Reporter,
21        Certified Shorthand Reporter-CA (No. 8635)
22
23
24
25
```

## Page 2

```
 1            JOHN W. HILL
 2   APPEARANCES:
 3
 4   FRANK J. GUADAGNINO, ESQ.
 5   CLARK HILL, PLC
 6   301 Grant Street, 14th Floor
 7   Pittsburgh, PA 15219
 8      Appearing on behalf of the Retirement Systems
 9      for the City of Detroit.
10
11
12
13   GEOFFREY S. STEWART, ESQ.,
14   DAN T. MOSS, ESQ.,
15   BENJAMIN FRIEDMAN, ESQ.
16   JONES DAY
17   51 Louisiana Avenue, Northwest
18   Washington, D.C. 20001
19      Appearing on behalf of the Debtor and the Witness.
20
21
22
23
24
25
```

## Page 3

```
 1            JOHN W. HILL
 2   DAN BARNOWSKI, ESQ.
 3   DENTONS US, LLP
 4   1301 K Street, N.W.
 5   Suite 600, East Tower
 6   Washington, D.C. 20005
 7      Appearing on behalf of the Retiree Committee.
 8
 9
10
11   DOUGLAS SMITH, ESQ.
12   KIRKLAND & ELLIS, LLP
13   300 North LaSalle
14   Chicago, Illinois 60654
15      Appearing on behalf of Syncora Guarantee, Inc.,
16      and Syncora Capital Assurance, Inc.
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1            JOHN W. HILL
 2   MICHAEL BHARGAVA, ESQ.,
 3   ANA VUCETIC (Law Clerk),
 4   MOLLY FEIDEN (law Clerk)
 5   CHADBOURNE & PARKE, LLP
 6   1200 New Hampshire Avenue, NW
 7   Washington, D.C. 20036
 8      Appearing on behalf of Creditor Assured
 9      Guaranty.
10
11
12
13   TELEPHONIC APPEARANCES:
14
15
16   BRENDA L. FUNK, ESQ.
17   WEIL, GOTSHAL & MANGES, LLP
18   700 Louisiana, Suite 1700
19   Houston, Texas 77002
20      Appearing on behalf of Financial Guaranty
21      Insurance Company.
22
23
24
25
```

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 2 of 14

## Page 13

1    JOHN W. HILL
2    actually being sued.
3        Q.  Okay.
4            You know that I'm going to ask you a
5    series of questions today.  Do you have that
6    understanding?
7        A.  Yes, I have that understanding.
8        Q.  And you'll let me know if you don't
9    understand any of my questions?
10       A.  Absolutely.
11       Q.  And you can take a break at any time.
12   You know that; right?
13       A.  Yes, I do.
14       Q.  Okay.  Could you state your current
15   position for the record.
16       A.  I am the CFO of the City of Detroit.
17       Q.  And how long have you been in that
18   position?
19       A.  Since the end of November.
20       Q.  Have you had any involvement in this
21   case so far other than preparing an expert report
22   and appearing for a deposition yesterday?
23       A.  I'm not sure what you mean by
24   "involvement."
25       Q.  Have you been at any of the hearings in

## Page 14

1    JOHN W. HILL
2    the case?
3        A.  No, I have not.
4        Q.  Have you submitted anything to the Court
5    in the case, like an affidavit or anything like
6    that?
7        A.  I have not.
8        Q.  Have you read -- reviewed any
9    depositions that have been given in this case, of
10   other people?
11       A.  No, I have not.
12       Q.  Have you had discussions with anyone to
13   prepare your expert opinions that are in the
14   expert report you submitted?
15       A.  With my attorneys, yes.
16       Q.  Are those the only people that you've
17   talked to to prepare your expert opinions?
18       A.  No.  They're not -- there are -- there
19   are other people.
20       Q.  Who are the other people?
21       A.  My staff, members of my staff.  And
22   representatives from DWSD.  I've had conversations
23   with Nicolette Bateson.  But other than that, no.
24       Q.  Okay.  You filed an expert report where
25   you talked about the consensus revenue

## Page 15

1    JOHN W. HILL
2    projections; is that correct?
3        A.  Yes, that's correct.
4        Q.  I take it you've never been an expert in
5    litigation before; is that correct?
6        A.  I have not.
7        Q.  What's your understanding of what being
8    an expert in litigation entails, if you have one?
9        A.  My understanding, you want me to define
10   what "expert" means?
11       Q.  What do you understand your role as an
12   expert to be in this case?
13       A.  Well, first and foremost, my role in
14   this case is to tell the truth of the things that
15   I know, which, of course, I will do.  And I
16   understand that there are specific aspects of this
17   case that relate to other experiences that I've
18   had and -- so as to bring all of my knowledge
19   about those other experiences and the current
20   situation in Detroit to bear to answer questions.
21       Q.  And what other experiences are those
22   that you're relying on?
23       A.  I was the executive director of the
24   Control Board that oversaw Washington, D.C.,
25   during its financial crisis.  And also prior to

## Page 16

1    JOHN W. HILL
2    that, I was GAO's chief witness before the
3    Congress on issues related to the review of the
4    District's financial crisis; and other financial
5    expertise.
6        Q.  And the District of Columbia was in a
7    financial crisis; correct?
8        A.  Yes, it was.
9        Q.  And you were one of the people that
10   helped the District respond to the financial
11   crisis; is that correct?
12       A.  Yes, that's correct.
13       Q.  And the GAO testimony, is that -- was
14   that before Congress or was that someplace else?
15       A.  That was before Congress.
16       Q.  Can you explain to me what methodology
17   you used in developing the expert opinions that
18   are in your report.  How did you go about doing
19   it?
20       A.  It's a kind of -- it's a vague question,
21   because each individual item in the report would
22   have had a different series of -- so I don't
23   really understand -- understand the question.
24       Q.  Okay.  How did go about putting together
25   your expert report, if you can tell me that.

Pages 13 to 16

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 3 of 14

## Page 17

JOHN W. HILL

A. I can tell you in general how I went about doing it. Is that --

Q. That would be good.

A. Certainly reviewing certain documents associated with the issues that were laid out in the expert report and calling upon my experiences that I've had in the past and how similar situations may have been dealt with in those experiences.

Q. You know the City has other experts in this case; correct? Are you aware of that?

A. I'm aware that the City has other experts.

Q. Have you reviewed any of the City's other experts' reports?

A. Yes, I have.

Q. Whose reports have you reviewed?

A. I have read the reports from E&Y and Conway, and -- those are the ones that come to mind.

Q. Would it be fair to say that you're an expert in basically talking about your experience with responding to fiscal distress? Or how would you characterize your expertise?

## Page 18

JOHN W. HILL

MR. STEWART: Objection.

THE WITNESS: Which question do you want me to answer?

BY MR. SMITH:

Q. How would you characterize your -- you're being offered as an expert, and there are other experts in the case. And I'm trying to figure out how you fit in, you know, in the case compared to the other experts. And so what I'd like to understand is, What is your expertise that you're offering compared to other experts that might be in this case?

A. I can -- I'll list the -- there are a number of items that I feel that I have expertise in. One would be certainly responding to distressed cities. Because of the experience with the District of Columbia, that was -- so I would say responding to distressed cities.

Another would be the audit expertise that I have from various audits of both government and corporate entities, so financial accounting and also financial management.

Q. Are you holding yourself out as an expert on health benefits?

## Page 19

JOHN W. HILL

A. No, I'm not.

Q. Are you holding yourself out as an expert on blight reduction?

A. No, I'm not.

Q. Are you holding yourself out as an expert on tax policy?

A. No, I'm not.

Q. Are you holding yourself out as an expert on art valuation?

A. No, I'm not.

Q. Are you holding yourself out as an expert on pensions?

A. No.

Q. Are you holding yourself out as an expert on casinos or wagering revenue?

A. Not as an expert, no.

Q. Are you holding yourself out as an expert on economics?

A. No.

Q. Are you holding yourself out as an expert on information technology?

A. No.

Q. Are you holding yourself out as an expert in transportation systems?

## Page 20

JOHN W. HILL

A. No.

Q. Are you holding yourself out as an expert on government grants?

A. I do have knowledge on government grants.

Q. And do you have experience applying for grants for a city with various entities, such as the federal government?

A. Yes. I have been involved in that process.

Q. Are you holding yourself out as an expert on state revenue sharing?

A. Not as an expert, no.

Q. Have you ever done forecasting for a city?

A. Yes, I have done.

Q. And was that the District of Columbia?

A. Yes.

Q. Did you personally put together the -- or you or your staff, the consensus revenue forecasts that you discuss in your report; or was that somebody else that put together those forecasts?

A. That was our staff, my staff.

Pages 17 to 20

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6997-8    Filed 08/22/14    Entered 08/22/14 18:35:46    Page 4 of 14

## Page 21

1  JOHN W. HILL
2  Q. Are you holding yourself out as an
3  expert on restructuring?
4  A. Can you --
5  Q. I'll -- are you holding yourself out as
6  an expert on Chapter 9 bankruptcy?
7  A. No.
8  Q. And in your work for cities, have you
9  ever been involved with a city that was in
10 Chapter 9 bankruptcy?
11 A. Other than Detroit?
12 Q. Yeah.
13 A. No.
14 Q. And I take it you're not a lawyer, are
15 you?
16 A. I'm not a lawyer.
17 Q. You're not holding yourself out as a
18 legal expert?
19 A. No, I'm not.
20 Q. Have you ever had to forecast municipal
21 population levels before?
22 A. No, I have not.
23 Q. Have you ever forecast inflation rates
24 before?
25 A. No.

## Page 22

1  JOHN W. HILL
2  Q. Have you done any economic forecasting?
3  A. Not me personally, no.
4  Q. Have you ever forecast wage growth
5  rates?
6  A. No.
7  Q. Have you ever forecast income tax rates
8  or other tax rates?
9  A. Forecast income tax rates?
10 Q. Well, why don't I --
11 A. The rates are set.
12 Q. Okay. Why don't I ask another question.
13     Have you ever forecast tax revenues
14 before?
15 A. Yes.
16 Q. And was that at the City of -- the
17 District of Columbia?
18 A. Yes.
19 Q. Do you personally do the tax forecasting
20 for the City of Detroit?
21 A. Personally, no.
22 Q. Have you ever forecast wagering tax
23 revenues?
24 A. Outside of the City of Detroit?
25 Q. Yeah.

## Page 23

1  JOHN W. HILL
2  A. No.
3  Q. Do you agree that the wagering tax
4  revenues depend on a number of factors, such as
5  the level of gambling or the level of revenue from
6  the casinos and the wagering tax rate?
7  A. I know that there are a number of
8  factors that go into forecasting wagering taxes.
9  Q. And are there also a number of factors
10 that determine income tax revenues?
11 A. Yes, there are a number of factors.
12 Q. And are there a number of factors that
13 determine the tax revenues from all the taxes that
14 the City of Detroit collects?
15 A. Yes.
16 Q. How did you come about being the CFO for
17 Detroit?
18 A. The previous CFO resigned abruptly. And
19 I had known Kevyn Orr from other -- from work that
20 I was doing in Detroit before becoming CFO. And
21 he knew of my background with the Control Board in
22 D.C. and asked me if I would serve as CFO for the
23 remainder of his tenure.
24 Q. How did you know Kevyn Orr? Or what was
25 the work that you -- that brought you together in

## Page 24

1  JOHN W. HILL
2  D.C.?
3  A. I didn't know Kevyn Orr in D.C. I knew
4  him -- I knew of him, but I did not know Kevyn Orr
5  in D.C. I didn't actually meet Kevyn Orr until I
6  came to Detroit.
7  Q. Okay. So Kevyn Orr knew of your work in
8  D.C., and that's how he knew to contact you for
9  the CFO job? Is that --
10 A. That's not accurate.
11 Q. Maybe you can explain to me again what
12 exactly -- how was it -- the relationship, I'm
13 just trying to get at. It sounds like you didn't
14 know Kevyn Orr before you met him recently --
15 A. Yeah.
16 Q. -- is that right?
17 A. I did know Kevyn Orr before I came to
18 Detroit. But I came to Detroit to do a project on
19 Grants Management that was funded by a foundation,
20 and that -- Kevyn Orr's office was actually
21 involved in overseeing that contract.
22     And so that's where I met him. But he
23 knew of my reputation from Washington, D.C.
24 Q. What organization was that you were
25 working for?

Pages 21 to 24

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6997-8  Filed 08/22/14  Entered 08/22/14 18:35:46  Page 5 of 14

## Page 37

JOHN W. HILL

"agent" for me. But he was appointed by the Governor.

BY MR. SMITH:

Q. Does the emergency manager report to the State on an ongoing basis?

A. Yes.

Q. And do you report to the emergency manager?

A. I have a dual reporting.

Q. And do you report to the emergency manager and the Mayor?

A. Yes.

Q. And who do you -- who do you interact with more frequently, the emergency manager or the Mayor?

A. You mean directly, person to person?

Q. Yes.

A. The Mayor now. Early on, it was the emergency manager.

Q. And why has that changed?

A. For a number of reasons. One, the -- I am seen as a member of the Mayor's cabinet, so every cabinet meeting every Wednesday I'm in the Mayor's office. I have -- I have one, one meeting

## Page 38

JOHN W. HILL

a week, staff meeting with Kevyn Orr, and then email conversations.

It's -- we're moving into implementation of the Plan of Adjustment, and so there are operational considerations that I need to have discussions with the Mayor about.

Q. Were you appointed to the CFO position in November 2013?

A. Yes.

Q. What were you told about what you were supposed to be doing when you came into that position?

A. There were a number of different charges that were given to me. One was to restructure the financial operations; two, implement a financial management system was high on the list; make sure that the grants management process was implemented. And there were a number of other items that I was told.

Q. Would it be fair to say that when you arrived, the City's financial operations had been in poor shape?

A. There were issues.

Q. And what were the -- I mean, are there

## Page 39

JOHN W. HILL

still -- there's still ongoing issues with the City's collection of financial data; is that correct?

A. Yes. There's still ongoing issues with the City's financial condition.

Q. And what are the ongoing problems with the City's financial data?

MR. STEWART: Financial data?

THE WITNESS: Data?

MR. SMITH: Yes.

MR. STEWART: Okay. Go ahead.

THE WITNESS: That's -- that's pretty broad. There are different issues with different types of data.

BY MR. SMITH:

Q. Maybe you can list for me the -- some of the ongoing problems with the City's financial data.

A. You know, one of the chief issues is the City not being able to have the discipline to be able to close its books on a regular basis. That's an issue, because at points there are entries that may not be booked before other activity occurs.

## Page 40

JOHN W. HILL

So the City is operating on a financial management system that's very old and needs to be replaced. And the processes that the City -- the financial management processes leading up to the input into that system are also very old and need to be replaced. It's very paper driven right now, which takes a lot more time than some of the new systems that are out there that could help alleviate those issues.

Q. And have problems with the City's financial data caused the City to delay its CAFR?

A. No. I don't think that's -- that's not the main reason for the delay of the CAFR.

Q. What's the reason for the delay of the CAFR?

A. The bankruptcy and the continuing subsequent events that are associated with the bankruptcy.

Q. When do you think -- is there a date by which the CAFR is supposed to be filed now, or is there no date for that?

A. We expect that it should be filed within the next couple of weeks.

Q. Is there -- has there been a delay in

Pages 37 to 40

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 6 of 14

Page 77

1  JOHN W. HILL
2  really will depend on preparation for
3  confirmation.
4      But in general, whether or not the items
5  under the plan, that is, the restructuring
6  initiatives under the plan, specific restructuring
7  initiatives have the funding that's needed within
8  the plan in order to be able to have them
9  implemented over the time periods that are
10 indicated in the plan.
11     I would testify to that and would -- as
12 you know, the plan does not require any borrowings
13 other than the ones that -- the two that are in
14 the plan over the first 10 years.
15     And so the question is, are the -- are
16 the forecasts in the plans of revenues enough for
17 the City to operate under the plan and also have
18 enough funding to implement the -- the Plan of
19 Adjustment items that I'm specifically involved in
20 in the plan. So that's --
21     Q.  And do you agree that if inflation
22 increases, it will adversely impact the City's
23 ability to execute the restructuring and
24 reinvestment initiatives?
25     A.  No.

Page 78

1  JOHN W. HILL
2      Q.  Well, if the costs associated with
3  restructuring and reinvestment increased, do you
4  agree that the City's ability to execute the
5  initiatives will be adversely impacted?
6      A.  No. Inflation has two sides to it.
7  Inflation could also inflate property values which
8  may change the amount of tax revenue. So -- so I
9  can't say absolutely that inflation would only
10 have an impact on the expenses but not have a
11 positive impact on the revenue, so I can't answer
12 that.
13     Q.  So future inflation could increase
14 property values; correct?
15     A.  Could increase properties, it could
16 increase incomes. So -- so that's why I can't say
17 I agree with your statement.
18     Q.  And do you agree that if the City
19 increases wages above the amounts assumed in the
20 current plan that that would adversely impact the
21 City's ability to implement the restructuring and
22 reinvestment initiatives?
23     A.  If you increase wages within the plan,
24 you have to find a place to pay for it.
25     Q.  Yeah.

Page 79

1  JOHN W. HILL
2      A.  So all things being equal, increasing
3  wages without increasing some revenue source to
4  pay for them would, or reduce the number of
5  employees, would have a negative impact on the
6  plan. Whether that could be offset by other
7  things, I don't know.
8      Q.  The -- does the City do revenue or
9  expense forecasting currently?
10     A.  Yes. That was -- that's what the
11 consensus report was.
12     Q.  Okay. And the consensus report, does
13 that look at a period of three fiscal years?
14     A.  Yes.
15     Q.  And the consensus report, does it --
16 does it forecast both revenues and expenditures or
17 just revenues?
18     A.  It forecasts revenues.
19     Q.  But not expenditures?
20     A.  Expenditures are not forecasted in the
21 revenue forecast.
22     Q.  Okay. Does the City do any forecasting
23 of expenditures?
24     A.  Yes. Its budgets are forecasts of
25 expenditures.

Page 80

1  JOHN W. HILL
2      Q.  And are those one-year forecasts?
3      A.  No. Those are three-year budgets.
4      Q.  Okay. So the City -- the forecasting
5  the City does is it does a three-year forecast of
6  revenues and expenditures in its budget, and it
7  does a three-year forecast of revenues in the
8  consensus revenue estimate?
9      A.  That's not accurate. The City does a
10 three-year forecast of revenues in its -- in the
11 revenue consensus and then uses those revenues in
12 its budget and then does a forecast of
13 expenditures in the budget against those revenues.
14     Q.  And so the forecast that the City does
15 in the ordinary course of its business are limited
16 to three years; correct?
17     A.  The forecast in the budgets are, but
18 there's other forecasting that occurs on -- when
19 we look at the impact of certain items over time.
20     Q.  What other forecasting does the City do?
21     A.  There's forecasting that occurs around
22 specific projects that we're working on. For
23 instance, if the City is considering an
24 outsourcing, you would look at a forecast for
25 those expenditures, not just over the period of

Pages 77 to 80

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 7 of 14

Page 85

1  JOHN W. HILL
2  projections in the fourth-amended disclosure
3  statement and then an update in July of those
4  forecasts.  Do you recall that?
5     A.  Do you want to direct me to a page?
6     Q.  Well, on Page 2, at the bottom -- let's
7  see.  Let me just check something.
8        It's actually Page 3, Paragraph 6.  Do
9  you see that you reference some projection
10 statements as set forth in Exhibit J to the
11 disclosure statement as updated and then you cited
12 July 2nd, 2014, update?  Do you see that?
13    A.  Yes.
14    Q.  Do you have an understanding of what the
15 difference between the projections in the
16 disclosure statement and the update in July is?
17    A.  I know some of the differences.  I don't
18 know that I would know all of the differences.
19    Q.  What differences are you aware of?
20    A.  There were changes in the July update on
21 the -- on some of the reinvestment initiatives --
22 and I'm blanking on exactly which ones -- but
23 there were changes in those numbers.  But beyond
24 that, I really can't say.
25    Q.  Okay.  Would it be fair to say that you

Page 86

1  JOHN W. HILL
2  can't explain the details of the Ernst & Young
3  projections; I'd have to ask Ernst & Young about
4  that?
5     A.  Are you answering the question for me?
6     Q.  Well, I'm wondering if you can explain
7  the details of the Ernst & Young projections.
8     A.  No.  I generally understand the Ernst &
9  Young projections.  I also understand the
10 projections that the -- the finance office did
11 that were compared to the Ernst & Young
12 projections.
13    Q.  Okay.  But can you explain to me the
14 details of the Ernst & Young projections or their
15 methodology?
16    A.  No.
17    Q.  Do you -- do you know why there were
18 changes to the reinvestment numbers in the July
19 update of the Ernst & Young projections?
20    A.  I know -- I know that there were changes
21 in the update for a number of reasons, certainly
22 to reflect some of the settlements that might have
23 occurred between the previous update and that
24 update.
25        And as you know, the plan has been

Page 87

1  JOHN W. HILL
2  updated a number of times since the initial plan,
3  and so there's continued review of that as time
4  goes on.
5     Q.  Would it be fair to say you can't
6  explain all the assumptions in the Ernst & Young
7  projection?
8     A.  That's fair.
9     Q.  The -- do you recognize Mr. Scorsone as
10 an expert in the -- in his field?
11    A.  Yes.  He's been -- yes.
12    Q.  The -- if you look over at Page 4 of
13 your report, at the top, you say that the
14 conference participants also considered the City's
15 past revenue trash and collection rates in
16 addition to comparisons of past actual revenues
17 versus projections.
18        Do you see that?
19    A.  Yes.
20    Q.  And do you agree it's important to
21 consider collection rates in doing a projection of
22 revenues; correct?
23    A.  Yes, it is important.
24    Q.  And why is that important to consider
25 the collection rates and forecasting revenues?

Page 88

1  JOHN W. HILL
2     A.  Because collection rates determine --
3  can determine the amount of revenue that is
4  actually taken in to "cash" in the City.
5     Q.  Okay.  The footnote on Page 4, you
6  mentioned that the revenue conference omitted
7  non-general fund grant revenues.
8        Do you see that?
9     A.  Yes.
10    Q.  And what exactly was omitted and why?
11    A.  There are other -- there are other
12 departmental-type revenues that are -- that are
13 shown in the plan that were discussed, but they
14 weren't really projected out in the -- by
15 conference report.  So they mostly dealt with the
16 largest categories of revenues in the City's
17 general fund.
18    Q.  So the consensus revenue estimate didn't
19 attempt to forecast all of the City's revenues; is
20 that correct?
21    A.  It did not.  That's correct.
22    Q.  And there were some other categories
23 here that were omitted:  Unlimited tax, general
24 bonds, obligation bonds, millage revenues and
25 proceeds from bond sales.  What exactly are those

Pages 85 to 88

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 8 of 14

## Page 89

1  JOHN W. HILL
2  items?
3  A. Those are the millages that might be
4  added potentially in the -- those -- the millage
5  is -- it doesn't include any additional
6  expectation of bond sales in the future. And it
7  doesn't include any millages that would be
8  associated with the sale of bonds. So that's just
9  a declarative sentence.
10  Q. I mean, isn't it possible that there
11  will be bond sales in the future that raise
12  revenue for the City?
13  A. There aren't any in the plan other than
14  the ones that -- that are -- the two that I
15  mentioned. So . . .
16  Q. But have there been discussions about
17  other possible bond sales over the next 10 years
18  other than what's in the plan?
19  A. Certainly, there have been discussions
20  of bonding potentially in conjunction with other
21  activities outside of the general fund.
22  Certainly, water and sewer, which is -- there have
23  been discussions of bond transactions in water and
24  sewer to support capital; so yes, there have been
25  other discussions.

## Page 90

1  JOHN W. HILL
2  Q. Other than water and sewer, what other
3  bond sales have been contemplated outside of the
4  plan?
5  A. I don't know of any outside of the plan.
6  Q. On Page 5, you reference a -- there's a
7  document -- there's a City of Detroit comparison
8  of assumptions, if I can find reference to it.
9  MR. STEWART: At the very top.
10  BY MR. SMITH:
11  Q. At the top. Do you see that reference?
12  A. Uh-huh.
13  Q. Who prepared that document?
14  A. Let me read that whole section.
15  Q. Okay.
16  A. That was prepared by our -- out budget
17  office.
18  Q. Is the budget office under your
19  supervision, or is that a separate department?
20  A. It's under my supervision.
21  Q. Okay. The -- Paragraph 8 of your
22  report, on Page 5, you say that certain of those
23  restructuring and reinvestment initiatives are
24  likely to increase the revenues the City receives
25  in the coming years.

## Page 91

1  JOHN W. HILL
2  You agree with that statement; correct?
3  A. Yes, I do.
4  Q. And then you mention some figures here
5  with a net revenue of over $250 million.
6  Do you see that?
7  A. Yes.
8  Q. Do you know who calculated that value?
9  A. It's a -- it's a mathematical
10  calculation from the plan.
11  Q. I mean, there are some numbers in here.
12  Can you explain to me how these revenue numbers
13  are calculated?
14  A. Which revenue numbers?
15  Q. Well, the 250 million. It gives
16  examples, such as 76 million in collections after
17  approximately 2.8 million in costs.
18  And then for additional fire marshal
19  inspections in EMS fleet, 23.5 million after
20  approximately 10.2 million in costs.
21  And it list other figures at the bottom
22  of Page 5 and the top of Page 6.
23  Do you see that?
24  A. Yeah. Those are -- those are coming
25  from the Plan of Adjustment, and they would have

## Page 92

1  JOHN W. HILL
2  been calculated by Conway MacKenzie -- because
3  it's in the restructuring part of the Plan of
4  Adjustment.
5  Q. Can you explain how the numbers on
6  Page 5 and 6 of your report were calculated?
7  A. I can explain some of the -- some of the
8  factors that are involved in the calculation; but
9  the exact calculation, no.
10  Q. For the 36th District Court, there's a
11  $76 million figure.
12  Do you see that?
13  A. Yes, I do.
14  Q. You know that the Court has hundreds of
15  millions of dollars that it hasn't collected from
16  various people; correct?
17  A. I know that there are receivables still
18  on the books that are very old.
19  Q. And there's hundreds of millions of
20  dollars of receivables that are still on the books
21  for the Court; is that correct?
22  A. Yes.
23  Q. Are you working with the Court to try to
24  collect the money that's outstanding or not?
25  A. My staff and I are working with the

Pages 89 to 92

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6997-8  Filed 08/22/14  Entered 08/22/14 18:35:46  Page 9 of 14

**JOHN W. HILL**

1 director.
2 Q. And one of the risks of the
3 implementation of the plan going forward is to be
4 able to hire the high-quality people you need to
5 implement the plan as contemplated under the plan;
6 is that correct?
7 A. That is a risk.
8 Q. And when salaries and wage growth is
9 restricted, that adds to the risk associated with
10 implementation of the plan; is that correct?
11 A. You'd have to be more specific in terms
12 of the positions and -- it's -- yeah.
13 Q. In order to attract high-quality people,
14 you need to pay them a good salary. Do you agree
15 with that?
16 A. Not necessarily. I would say we have
17 high-quality people in the City who are willing to
18 work for less than they might be able to get
19 elsewhere. And -- I mean, yeah, there are a
20 number of people who are of high quality in the
21 City now who are receiving lower-than-market
22 wages. So that's why I can't categorically agree
23 with that statement.
24 Q. Do you agree that one of the risks to

**JOHN W. HILL**

1 implementation of the plan is the constraints the
2 City has on the amount of money it can pay the
3 employees it needs to hire?
4 A. I think that's a risk -- I've said
5 that's a risk to the plan.
6 Q. Have you agreed to stay at the City for
7 a certain amount of time, or not?
8 A. Not for a certain amount of time. I've
9 told the Mayor that I am interested in staying.
10 I've told the Mayor that -- we have not worked out
11 the -- any of the specifics around that.
12     As you know, there's a new process that
13 goes into place after bankruptcy for the hiring of
14 the CFO. Has to be appointed by the Mayor,
15 confirmed by the Council, and confirmed by the
16 Control Board.
17     So no one knows the outcome of all of
18 those processes.
19     So I've expressed to the Mayor my
20 interest in continuing to help move Detroit
21 forward. I've not said how long that would be or
22 the end of his term or whatever --
23 Q. And right now you don't know whether
24 you'll be the CFO after the bankruptcy or not;

**JOHN W. HILL**

1 correct?
2 A. I have no idea. I don't know who the
3 CFO would be after the bankruptcy. There's a
4 whole process that determines that that hasn't
5 occurred yet.
6 Q. Is that why you have a nonemployment
7 position currently? Or there was some statement
8 in your report about having a contract that's not
9 in a -- is not an employment contract or something
10 like that.
11 A. Yeah. I have -- I have a personal
12 services contract with the emergency manager. And
13 the emergency manager could only provide a
14 contract for the period of time that the emergency
15 manager would expect to be there.
16     So since it's under the emergency
17 manager's authority, so --
18 Q. So when Mr. Orr leaves, you have to go
19 unless you get some other arrangement with the
20 City; is that correct?
21 A. My contract has a termination date, so
22 yeah, there has to be some -- there has to be some
23 action for me to stay beyond my contract time.
24 Q. Okay. And do you know when Mr. Orr is

**JOHN W. HILL**

1 going to leave or not?
2 A. No idea.
3 Q. Do you anticipate Mr. Orr will leave
4 this fall sometime?
5 A. I know what he said. I know he said
6 that he would leave sometime this fall. But you
7 never know what can happen.
8 Q. On Page 7 of your report you talk about
9 the accrued pension liabilities.
10     Do you see that section?
11 A. Uh-huh.
12 Q. You say you analyzed the financial
13 ability of the City to fund the accrued pension
14 liabilities.
15     What exactly did you do to analyze that?
16 A. We looked at what the accrued pension
17 liabilities would be and then looked at the
18 sources that the City would have available to it
19 as a function of the plan to satisfy those
20 liabilities.
21 Q. And in the past you're aware that the
22 City has deferred payments to the pension funds;
23 is that correct?
24 A. Yes.

Pages 109 to 112

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 10 of 14

## Page 121

1  JOHN W. HILL
2  after confirmation; correct?
3      MR. BARNOWSKI:  Object to form.
4      A.  As I've said before, any expenditure in
5  the plan could come in greater than was
6  anticipated in the plan.  That's the nature of the
7  plan.
8      So is there a risk?  Yes, there's a
9  risk; but it's all going to be in the context of
10 what happens on the revenue side as well.
11     So whether that has an impact on the
12 financial health of the City, that's the piece I
13 can't -- I can't connect to what you're laying
14 out.
15     I don't know.
16     I do know that the plan anticipates the
17 obligations that the City will have under the
18 new -- the obligations that it projects the City
19 will have under the new agreements with the unions
20 and that there are revenues that are in the plan
21 that are sufficient to meet those obligations as
22 projected.
23     So, again, it's all in the context of
24 the total plan.
25     Q.  What things could change after

## Page 122

1  JOHN W. HILL
2  confirmation that would increase the adverse
3  effect of pension obligations on the City?
4      A.  Let me answer the part of your question
5  that I -- that I agree with.
6      I haven't agreed that there's an adverse
7  effect of pension obligations on the City.
8      But -- so I don't agree with that piece
9  of your question.  I do believe that other
10 expenditures that could happen -- the financial
11 management system, we could go out and propose on
12 a financial management system and it ends up
13 costing more than we've projected in the plan.
14     So the real question is, will any of
15 those items be in excess of the contingencies that
16 are embedded in the plan?
17     So I would have to know that in order
18 to -- I have to know the magnitude of the
19 differences.
20     Q.  How could the costs of the pension
21 obligations increase in the future?
22     A.  There's a ceiling on some of the pension
23 obligations, but I'd have to look at the -- the
24 specific contract again to give you a detailed
25 answer.

## Page 123

1  JOHN W. HILL
2      Q.  The pension costs could increase over
3  time beyond what's projected in plan; is that
4  correct?
5      MR. BARNOWSKI:  Object to form.
6      THE WITNESS:  As I said, any expenditure
7  could.  That's the nature of a plan.  It's
8  not certainty.  It's the nature of the plan.
9  BY MR. SMITH:
10     Q.  And you can give the Court no guarantee
11 that the projected revenues and costs that the
12 City has provided are going to be accurate;
13 correct?
14     MR. STEWART:  Objection.
15     THE WITNESS:  Can you define "accurate."
16 BY MR. SMITH:
17     Q.  Will actually reflect actual values.
18     You can't give -- you can't tell the
19 Court that the projected values the City is giving
20 it will actually represent the actual values that
21 are going to be achieved in the future; correct?
22     A.  I can say whether it's reasonable, but I
23 can't say whether it's-- I can't tell the future.
24     Q.  So you can't say that they're going to
25 be accurate; correct?

## Page 124

1  JOHN W. HILL
2      MR. STEWART:  Objection.  Go ahead, I'm
3  sorry.  I didn't mean to interrupt you.
4      THE WITNESS:  I can say that -- I can't
5  say that the exact numbers that are in the
6  plan are going to come in exactly as the plan
7  has them.
8      I can say that it's -- that it's --
9  based on the projections, it's reasonable to
10 expect that the plan in its totality can move
11 forward in the way that it's currently
12 constructed.
13     There are risks, and I've admitted that
14 clearly there are risks.  And we're doing
15 everything we can to mitigate the risk of
16 implementation in the plan.
17 BY MR. SMITH:
18     Q.  And when you say that the forecasts are
19 reasonable.  Are there other forecasts that could
20 give different numbers that would also be
21 reasonable?
22     A.  I don't know of any.
23     Q.  When you say "the forecasts are
24 reasonable," what methodology are you basing that
25 on?

Pages 121 to 124

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 11 of 14

Page 125

JOHN W. HILL

A. I'm -- for the first -- for the first few years of the plan, I'm basing the reasonableness of the forecast of the revenues on the revenue estimation report and the work that was done that showed that the revenues that we were projecting came to within about 1 percent of the revenues that Ernst & Young had projected.

And then the other forecast in the plan, I'm relying on information from E&Y as an expert and also Conway MacKenzie in terms of restructuring.

Q. Have people at the City expressed criticisms or concerns about the plan?

MR. STEWART: Objection.

THE WITNESS: People at the City?

BY MR. SMITH:

Q. Yeah. I mean, there must have been discussions about the plan within the City, officials; correct?

A. Sure, there have been discussions.

Q. Have there been criticisms or concerns of the plan that have been expressed in discussions amongst City officials?

A. There have been explorations of various

Page 126

JOHN W. HILL

parts of the plan by City officials, absolutely.

Q. What concerns have been expressed by City officials with respect to the plan?

A. The plan as a whole?

Q. Or any aspect of the plan.

A. You know, there have been a number of detailed meetings with the Mayor and the Mayor's staff around the plan implementation. I think initially there were some misunderstandings by some of the department directors about what the initiatives really entailed, even though a number of them were involved in the construction of the initiatives.

And so I think it's a natural process of shifting from having a plan to implementing a plan, which is different than constructing it.

So I believe there have been -- there's been probing of various aspects of the plan in these meetings.

I wouldn't say general criticism of the plan. I would say probing around certain aspects of the plan.

Q. Have there been criticisms of specific aspects of the plan by City officials?

Page 127

JOHN W. HILL

A. Certain aspects of the plan have been probed by City officials, yeah.

Q. What aspects of the plan?

A. One of them was the -- an earlier plan, whether or not the subsidy number for the bus -- for Department of Transportation was an accurate number. And that was looked at, and the subsidy was increased as a result.

So the plan is and will -- the plan is a living -- has been a living document that gets reviewed and gets questioned internally, especially now that we're moving into an implementation phase. And so I would -- whether that's a criticism, it was an observation and then a change that occurred as a result.

Q. When did you start planning for implementation of the plan?

A. I've been planning for it since I got there.

Q. And that would be in November 2013?

A. Yeah.

Q. You just have to audibly give an answer.

A. Yeah, that's my -- that's my -- if you want to count the work that I did from a

Page 128

JOHN W. HILL

consulting standpoint for grants management, that was a part of the plan as well; so even during that period of time.

Q. Have there been any reviews of the Ernst & Young forecasts that have been done?

A. Can you define "reviews."

Q. Like any comment -- any written comments or evaluations of the Ernst & Young forecasts that have been done.

A. I know that there are a number of reviews of the forecasts that have occurred, so a lot of people have looked at it.

Q. Like who? Who has produced written reviews of the Ernst & Young forecast?

A. Written reviews?

Q. Yeah.

A. I haven't -- I haven't seen any written reviews of the forecast. I don't -- yeah. I haven't seen any written reviews.

Q. If you look at your report, you attach a revenue conference report dated March 18, 2004, as Exhibit 1.

A. Yes.

Q. It you turn to Page 1 of that document,

Pages 125 to 128

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6997-8   Filed 08/22/14   Entered 08/22/14 18:35:46   Page 12 of 14

Page 305

1  JOHN W. HILL
2  Do you see that?
3  A. Yes.
4  Q. And Ernst & Young, while it was working
5  on this bankruptcy case, was participating in the
6  discussions of the consensus revenue group; is
7  that correct?
8  A. They were in the room; yes.
9  Q. And the purpose of having Ernst & Young
10 in the room was to make sure that the revenue
11 estimates that Ernst & Young did -- to make sure
12 that the consensus group didn't adopt revenue
13 estimates that were materially different from
14 Ernst & Young's; correct?
15 A. No.
16 Q. What was the purpose of having Ernst &
17 Young, then?
18 A. To answer questions, if they had any
19 questions, of Ernst & Young. But it wasn't to
20 influence the group.
21 Q. And Mr. Naglick said, quote, "EY (Shavi)
22 takes part to keep the group on track with
23 comparisons to Plan of Adjustment. They try to
24 mainly listen to the point of view of the
25 participants, but then keep them from taking a

Page 306

1  JOHN W. HILL
2  totally different view from revenues in the plan."
3  Is that an accurate statement of Ernst &
4  Young's role?
5  A. Not exactly. They were to explain what
6  was in the plan so that -- Ernst & Young's role,
7  they were there to explain what was in the plan so
8  that they would be able to understand what
9  revenues were being projected as part of the plan
10 and what revenues were being projected as part of
11 the budget, because there were revenues in the
12 plan that weren't a part of the budget. So it was
13 more to explain what was in the plan.
14 Q. Well, if you go like down to the next
15 sentence -- the next email in the chain is from
16 you. Below that it says "Let's talk about this.
17 There are some good reasons to keep this process.
18 It keeps everyone in sync with what's in Plan of
19 Adjustment."
20 Do you see that?
21 A. Yes.
22 Q. And so from your view, was there a point
23 in time when having the consensus revenue
24 conference -- it might have been potentially
25 discontinued?

Page 307

1  JOHN W. HILL
2  A. There was a point in time when people
3  questioned whether or not we had it, and it was my
4  decision to have it.
5  Q. Okay. So people -- there were people at
6  the City that questioned whether it was a good
7  idea to have the consensus revenue conference;
8  correct?
9  A. Yes.
10 Q. And you wanted to continue the
11 conference so that you could make sure that it was
12 consistent with what the revenue estimates were in
13 the Plan of Adjustment?
14 A. No.
15 Q. What was your reason for continuing the
16 conference?
17 A. To make sure that the -- if there were
18 major differences between the Plan of Adjustment
19 and what the conference was projecting, then that
20 we would be able to make changes in the plan. I
21 wasn't -- I wasn't -- I tried very hard not to
22 influence the process at all, because I wanted
23 them to dig into those revenues. And I wanted
24 them to feel free to come up with differences,
25 because it's better to know that now than to have

Page 308

1  JOHN W. HILL
2  a revenue number that's there that you don't
3  expect to have happen.
4  Q. The consensus conference only looked at
5  revenues for three years; correct?
6  A. Right.
7  Q. You never asked the consensus conference
8  to check the revenue estimates that were in the
9  E&Y forecasts beyond three years; correct?
10 A. The purpose of the revenue conference
11 was to come up with the revenues to be included in
12 the budget. And that's -- yeah. That's what I
13 asked them to do.
14 Q. So the revenue conference, you never
15 asked them to look at the E&Y estimates for the --
16 going out ten years or 40 years to evaluate
17 whether those estimates were reliable; correct?
18 A. No, I never asked them to do that.
19 Q. Conway MacKenzie also participated in
20 the consensus revenue group; correct?
21 A. I believe at some of the meetings --
22 because there were a number of meetings they were
23 there. I wasn't -- I wasn't in all of the
24 meetings myself, but there were some that they
25 were there.

Pages 305 to 308

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6997-8  Filed 08/22/14  Entered 08/22/14 18:35:46  Page 13 of 14

## Page 309

1  JOHN W. HILL
2  Q.  Were there other advisers involved in
3  the litigation that were present at the revenue
4  conference proceedings --
5      MR. STEWART:  Objection -- objection.
6  BY MR. SMITH:
7  Q.  -- other than Conway MacKenzie and
8  Ernst & Young?
9  A.  Conway MacKenzie and Ernst & Young were
10  involved.  I don't know of other consultants that
11  were involved.
12      (Exhibit Hill-22 was marked for
13      identification.)
14  BY MR. SMITH:
15  Q.  I'm going to hand you what's been marked
16  as Exhibit 22, a copy of a judgment.  Can you tell
17  me anything about that judgment?  Or do you have
18  no information about it?
19  A.  I don't know anything about this
20  judgment.
21      (Exhibit Hill-23 was marked for
22      identification.)
23  BY MR. SMITH:
24  Q.  And I'm going to hand you a copy of
25  Exhibit 23.  Can you let me know if you have

## Page 310

1  JOHN W. HILL
2  any --
3      MR. MOSS:  Sorry.  Exhibit what?
4      MR. SMITH:  Exhibit 23.
5  BY MR. SMITH:
6  Q.  Can you let me know if you have any
7  information about that judgment.
8      MR. STEWART:  You gave me one that
9      has -- it's highlighted.  Not that I object,
10      but I don't know if you gave me your copy.
11      MR. SMITH:  My highlighting will be
12      fascinating.
13      (Simultaneous cross-talk.)
14      MR. STEWART:  I didn't want to get one
15      that had any of your work product on it.
16  BY MR. SMITH:
17  Q.  Mr. Hill, can you tell me anything about
18  the judgment in Exhibit 23?
19  A.  I don't know these judgments
20  specifically, I mean, the purpose of the
21  judgments.
22  Q.  Do you know anything about these
23  judgments?
24  A.  I believe that these are the judgments
25  that -- where there was a demand payment.

## Page 311

1  JOHN W. HILL
2  Q.  And are those the judgments --
3  Exhibit 22 and 23, are those the judgments where
4  the City ended up raising property tax to pay
5  them?
6  A.  Yes.  I believe they are.
7  Q.  You see, for example, Exhibit 23 was for
8  $74 million?
9  A.  Yes.
10  Q.  And how much was the other one?
11  A.  This was the 111 million.
12  Q.  111 million; is that correct?
13      MR. STEWART:  Is it 22 or 23?
14      MR. SMITH:  22.
15      THE WITNESS:  I don't know this one.
16  BY MR. SMITH:
17  Q.  Mr. Hill, do you use your private email
18  for work-related matters?
19  A.  No.  There may have been occasions
20  where, because I'm using my phone, that I might be
21  typing an email.  On the iPhone, you flip through
22  the email accounts before you send it.  So there
23  may have been an occasion where I've used it.  But
24  I don't routinely use my private email.
25  Q.  You've got an email account that's

## Page 312

1  JOHN W. HILL
2  jhill@hillgroup.com?
3  A.  Yes.
4  Q.  And don't you use that for work-related
5  matters?
6  A.  I have -- I've used that mostly when I
7  was on -- when I was doing the work as a
8  consultant, so there may be some emails in there.
9  I've tried to use my Detroit email only for
10  business as CFO.
11  Q.  And you've got another personal email
12  account; is that correct?
13  A.  I have several other personal email
14  accounts.
15  Q.  Okay.  Have any of your personal email
16  accounts been searched for relevant documents in
17  this case?
18  A.  I don't know what's been searched.  I
19  don't know.
20  Q.  Were there any other relevant aspects of
21  the Washington, D.C., experience that we haven't
22  talked about?
23      MR. STEWART:  Objection.
24      THE WITNESS:  Yes.
25  BY MR. SMITH:

Pages 309 to 312

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt  Doc 6997-8  Filed 08/22/14  Entered 08/22/14 18:35:46  Page 14 of 14