# **EXHIBIT A**

Current Order

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

------------------------------------------------------x
        :

In re                          :        Chapter 9
        :

CITY OF DETROIT, MICHIGAN,    :        Case No. 13-53846
        :

              Debtor.     :        Hon. Steven W. Rhodes
        :
        :

------------------------------------------------------x

## ORDER PURSUANT TO (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 AND 928 (A) APPROVING POSTPETITION FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY RULE 9019 <u>APPROVING SETTLEMENT OF CONFIRMATION OBJECTIONS</u>

THIS MATTER having come before the Court upon the motion (the "<u>Motion</u>") by the City of Detroit, Michigan (the "<u>City</u>"), as debtor in the above-captioned chapter 9 case (the "<u>Case</u>"), pursuant to Sections 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Rules for the United States

CHI-1940093v3

Bankruptcy Court for the Eastern District of Michigan seeking entry of an order, *inter alia*:[1]

    (i)    authorizing the City and the Detroit Water and Sewer Department ("DWSD"), a department of the City, to:

        (a)   enter into and perform under:

            (1)  a Bond Purchase Agreement (the "Water Bond Purchase Agreement") for water supply system bonds by and among the Michigan Finance Authority (the "MFA") and Citigroup Global Markets, Inc., acting on behalf of itself and as representative of the other underwriters named therein (collectively, the "Underwriter"), attached hereto as Exhibit 1A, to which is attached a Letter of Representation of the City, and pursuant to which the MFA will issue certain bonds (the "Water MFA Bonds") to be underwritten and publicly offered by the Underwriter, the proceeds of which will be used by the MFA solely to purchase the 2014 DWSD Revenue and Revenue Refunding Bonds;

            (2)  a Bond Purchase Agreement (the "Sewer Bond Purchase Agreement" and together with the Water Bond Purchase Agreement, the "Bond Purchase Agreements") for sewage disposal system bonds by and among the MFA and the Underwriter, attached hereto as Exhibit 1B, to which is attached a Letter of Representation of the City, and pursuant to which the MFA will issue certain bonds (the "Sewer MFA Bonds" and together with the Water MFA Bonds, the "MFA Bonds") to be underwritten and publicly offered by the Underwriter, the proceeds of which will be used by the MFA solely to purchase the 2014 DWSD Revenue and Revenue Refunding Bonds (as defined below);

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

(3)    a purchase contract for water supply system bonds between the MFA and the City (the "<u>Water MFA Purchase Agreement</u>"), attached hereto as <u>Exhibit 2A</u>;

(4)    a purchase contract for sewage disposal system bonds between the MFA and the City (the "<u>Sewer MFA Purchase Agreement</u>" and together with the Water MFA Purchase Agreement, the "<u>MFA Purchase Agreements</u>") attached hereto as <u>Exhibit 2B</u>;

(5)    a bond purchase and supplemental agreement for water supply system bonds by and among the MFA, DWSD, Citibank, N.A. and certain other banks to be named, together with one or more purchasers (collectively, the "<u>Water Direct Purchasers</u>") (the "<u>Water Bond Purchase Agreement (Direct Placement)</u>"), substantially in the form attached hereto as <u>Exhibit 3A</u>;

(6)    a bond purchase and supplemental agreement for sewage disposal system bonds by and among the MFA, DWSD, Citibank, N.A. and certain other banks to be named, together with one or more purchasers (collectively, the "<u>Sewer Direct Purchasers</u>" and together with the Water Direct Purchasers, the "<u>Direct Purchasers</u>") (the "<u>Sewer Bond Purchase Agreement (Direct Placement)</u>" and together with the Water Bond Purchase Agreement (Direct Placement), the "<u>Bond Purchase Agreements (Direct Placement)</u>"), substantially in the form attached hereto as <u>Exhibit 3B</u>;

(7)    the Assured Insurance Commitment provided by Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc. ("<u>Assured</u>") on substantially the terms set forth in the term sheet attached to the Motion as <u>Exhibit 7</u>;

(8)    the 2014 DWSD Refunding Bonds Insurance Policies in an amount not less than the principal amount of the outstanding Assured-insured Tendered Bonds, on the terms set forth in the Motion and the Assured Insurance Commitment; and

3

(9) the 2014 DWSD Refunding Bonds Surety Policies (and together with the 2014 DWSD Refunding Bonds Insurance Policies, collectively, the "<u>Assured Policies</u>") as to reserve accounts that secure exclusively the Assured-insured 2014 DWSD Revenue and Revenue Refunding Bonds (defined below) in a principal amount equal to the DSRF requirement (subject to a limit of $70 million of additional surety coverage) on the terms set forth in the Assured Insurance Commitment;

(b) issue, via a public offering or a private placement, one or more series of Sewage Disposal System Revenue Bonds, Sewage Disposal System Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds (collectively, the "<u>2014 DWSD Revenue and Revenue Refunding Bonds</u>");

(c) as it relates to the transactions contemplated by this Order, perform under:

(1) Act 94, Public Acts of Michigan, 1933, as amended ("<u>Act 94</u>") the relevant excerpts of which are attached hereto as <u>Exhibit 4</u>;

(2) Act 34, Public Acts of Michigan, 2001, ("<u>Act 34</u>") the relevant excerpts of which are attached hereto as <u>Exhibit 5</u>;

(3) Ordinance No. 18-01 adopted by the City Council of the Debtor on October 18, 2001 (the "<u>Sewer Ordinance</u>") attached to the Motion as <u>Exhibit 11</u>;

(4) Amended and Restated Bond Ordinance No. 01-05 adopted by the City Council of the Debtor on January 26, 2005 (the "<u>Water Ordinance</u>") attached to the Motion as <u>Exhibit 12</u>, (the Water Ordinance together with the Sewer Ordinance, the "<u>Bond Ordinances</u>");

(5) a Trust Indenture by and among the City, DWSD and U.S. Bank National Association, as trustee (the "<u>DWSD Trustee</u>") dated as of June 1, 2012 (the "<u>DWSD Sewer Indenture</u>") and a Trust Indenture by and among the City, DWSD and the DWSD Trustee dated as of February 1, 2013 (the "<u>DWSD Water Indenture</u>" and together with the

4

DWSD Sewer Indenture, collectively, the "DWSD Indentures") attached hereto as Exhibits 6A and 6B, respectively;[2]

(ii) authorizing the City, acting through DWSD, to pledge and secure, by statutory lien created by the Bond Ordinances and Act 94 and the lien authorized by Sections 364(c) and 364(d) of the Bankruptcy Code on the Net Revenues (as defined in the Bond Ordinances) of the DWSD's Sewage Disposal System and Water Supply System and, to the maximum extent permitted by law, the other Pledged Assets (as defined in the Bond Ordinances), the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds in favor of the holders of the 2014 DWSD Revenue and Revenue Refunding Bonds (the "2014 DWSD Revenue and Revenue Refunding Bondholders") pursuant to the Bond Ordinances, Act 94 and Sections 364(c) and 364(d) of the Bankruptcy Code, in each case, as, to the extent, and subject to, the priorities described in the Transaction Documents and this Order;

(iii)   finding that the pledge of DWSD revenues as security for such 2014 DWSD Revenue and Revenue Refunding Bonds constitutes a "lien" on "pledged special revenues" as contemplated by sections 101(37), 902(2), 922(d) and 928 of

---

[2] The Bond Purchase Agreements, the MFA Purchase Agreements, the 2014 DWSD Revenue and Revenue Refunding Bonds, Act 94, Act 34, the Sewer Ordinance, the Water Ordinance, the DWSD Indentures, the Bond Purchase Agreements (Direct

the Bankruptcy Code;

(iv)    authorizing the City to pay the principal, interest, fees, expenses and other amounts payable under the Transaction Documents, including (and to the extent applicable under the Transaction Documents), Assured's fees, the DWSD Trustee's and the Underwriter's fees, the actual fees and disbursements of the DWSD Trustee's and the Underwriter's attorneys, advisers, accountants, and other consultants, and the costs of issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the MFA Bonds, all to the extent provided in and in accordance with the terms of the Transaction Documents (as applicable) and notwithstanding Sections 943 and 1129(a)(9)(A) of the Bankruptcy Code or the confirmation of any plan of adjustment in the Case; and

(v)    approving a settlement (the "Settlement"), to be effective if and when the Tender (as defined below) closes, by and among the DWSD Settlement Parties, (a) establishing the treatment of water and sewer bond claims under the City's plan of adjustment and (b) resolving the DWSD Plan Objections on the terms and conditions set forth in the Motion and in the Assured Insurance Commitment; and

The Court having considered the Motion, including the Transaction

---

Purchase), the Assured Insurance Commitment, and the Assured Policies shall be

Documents, the Donner Declaration, Bateson Declaration and Brownstein Declaration, and the evidence and arguments submitted at the hearing on the Motion commencing on August 25, 2014 (the "<u>Hearing</u>"), after due deliberation and consideration, and for good and sufficient cause appearing therefor;

AND BASED UPON THE RECORD ESTABLISHED AT THE HEARING ON THE MOTION AND ALL PLEADINGS AND DOCUMENTS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Court</u>") commencing this Case. The order for relief in this Case was entered on December 5, 2013.

B. *Jurisdiction and Venue*. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and authority under 28 U.S.C. § 157 and Local Rule 83.50 of the United States District Court for the Eastern District of Michigan over these proceedings and over the persons and entities affected hereby.

---

collectively referred to herein as the "<u>Transaction Documents</u>".

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *Notice*. Notice of the Motion and the Hearing (1) was served by the City on (a) the trustees, transfer agents or paying agents, as applicable, for the City's secured and unsecured bonds; (b) the City's largest unsecured creditors as identified on the list filed under Bankruptcy Rule 1007(d); (c) the Official Committee of Retirees appointed in this case; (d) the unions representing certain of the City's employees and retirees; (e) the four associations of which the City is aware representing certain retirees of the City; (f) the City's pension trusts; (g) the insurers of the City's bonds; (h) the insurers of the certificates of participation issued with respect to the City's pension funds (the "COPs"); (i) certain significant holders of the COPs; (j) the counterparties under the swap contracts entered into in connection with the COPs (collectively, the "Swaps"); (k) the insurers of the Swaps; (l) all entities that have requested notice pursuant to Bankruptcy Rule 2002, (m) counsel to the Underwriter and the Direct Purchasers, (n) counsel to the DWSD Objecting Parties; (o) counsel to the State Revolving Fund and (p) Trustee for the State Revolving Fund Bonds. (2) was sufficient and proper under the circumstances; and (3) complies with Bankruptcy Rules 2002 and 4001(c) and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Michigan.

No further notice is necessary or required.

D.    *Sixth Amended Plan*.   On August 20, 2014, the City filed the Sixth Amended Plan (the "Amended Plan"), which provides that, if the City accepts some or all of the Tendered Bonds for purchase and the Settlement Date[3] occurs, the Existing DWSD Bond Claims will be unimpaired within the meaning of Section 1124 of the Bankruptcy Code, meaning that the Amended Plan shall, among other things, not eliminate call protection or reduce the interest rates of the Existing DWSD Bonds.

E.    *Authorization Appropriate*.   The authorization granted herein will benefit the City and its citizens and is a sound exercise of the City's business judgment, is in the best interest of the City and its citizens, and is based on good, sufficient, and sound business purposes and justifications.

F.    *The City's Stipulations*.   The City stipulates and acknowledges that: (1) except as provided in this Order, the Transaction Documents as of the date of entry of this Order, the Pledged Assets are not subject to any pledge, lien or security interest other than the existing liens created under the Bond Ordinances and made statutory liens by Act 94 as security for all Secured Obligations (as defined in the

---

[3] "Settlement Date" shall have the same meaning as the term "DWSD Settlement Date" set forth in the Amended Plan.

Bond Ordinances) heretofore issued and hereafter permitted to be issued under the Bond Ordinances; (2) the City has taken or shall take or cause to be taken all actions to obtain under non-bankruptcy law (including, but not limited to, Act 94) and the Bond Ordinances, and has received or shall have received prior to the closing, all due authorizations for the approval of the Transaction Documents, including for the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds secured by the pledge of the Pledged Assets as set forth in the Transaction Documents; (3) subject to a determination in a Supplemental Action (as defined in the Bond Ordinances) that there will be the Required Combined Coverage (as defined in the Bond Ordinances) upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds (and after giving effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds), the Required Combined Coverage will not be less than 120% for the Senior Lien Bonds, 110% for the Second Lien Bonds and 100% for the SRF Junior Lien Bonds (each as defined in the Bond Ordinances), in each case when calculated in the manner and by the means prescribed by the Projected Net Revenues Test and Historical Net Revenues Test set forth in Section 21(C)(b) and (c) of the Sewer Ordinance and Section 20(C)(2) and (3) of the Water Ordinance; and (4) the entry of this Order and the relief and orders granted herein is at the request, and upon the consent, of the City.

      G.    *Findings Regarding the Postpetition Financing.*

CHI-1940093v3

(i)     *Credit Not Available on More Favorable Terms*.  The City is unable to incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds without the granting of a senior or equal lien on the Pledged Assets as set forth in the Transaction Documents.  The City has been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; credit secured by a lien on property of the City that is not otherwise subject to a lien; or credit secured by a junior lien on property of the City that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the DWSD Trustee (1) perfected liens, equal or senior to the existing liens on the Pledged Assets securing the Existing DWSD Bonds, as security for the 2014 DWSD Revenue and Revenue Refunding Bonds with the priorities set forth herein and in the Transaction Documents, and (2) the other protections set forth in the Transaction Documents and this Order.

(ii)     *Use of Proceeds of the DWSD Revenue and Revenue Refunding Financing.*  The City has agreed that proceeds of the DWSD Revenue and Revenue Refunding Financing shall be used in a manner consistent with the terms and conditions of the Transaction Documents, solely for purposes permitted by law, including (a) to make essential capital improvements to the City's sewerage disposal

11

system as required under state and federal law as more fully described in the Motion (the "DWSD Revenue Financing"); (b) to finance the City's obligations to purchase certain water and sewer bonds that have been tendered in connection with a pending invitation to tender (the "Tender") to the holders of the City's outstanding water and sewer bonds (the "Existing DWSD Bonds"), also as described in greater detail in the Motion (the "Tender Offer Financing"); and (c) to pay the principal, interest, fees, expenses and other amounts payable under the Transaction Documents (to the extent applicable).

H. *Prudent Judgment and Jurisdictional Matters*. Good cause has been shown for the entry of this Order. The terms and conditions of the Transaction Documents and the fees to be paid thereunder are fair, reasonable, and the best available to the City under the circumstances; reflect the City's exercise of prudent judgment; are supported by reasonably equivalent value and fair consideration; are at the request, and with the consent, of the City; and, with that consent, are within the jurisdiction and powers of the Court pursuant to Section 904 of the Bankruptcy Code.

I. *Good Faith Under Section 364(e)*. In respect of the DWSD Revenue and Revenue Refunding Financing authorized under section 364 of the Bankruptcy Code, the City, the MFA, the Underwriter, the Direct Purchasers and Assured have acted in good faith, as that term in used in section 364(e) of the Bankruptcy Code,

and the Transaction Documents are the result of good faith, arms-length negotiations among the City, the MFA, the Underwriter, the Direct Purchasers and Assured. As of the closing date, the City's issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the purchase thereof by (i) the MFA, the MFA's issuance of the MFA Bonds pursuant to Executive Order 2010-2 and the Shared Credit Rating Act, Act 227, Public Acts of Michigan 1985, as amended, MCL 141.1051 *et seq*., the Underwriter's underwriting of the MFA Bonds and the purchase of the MFA Bonds in a public offering, thereby providing funds for the purchase by the MFA of the 2014 DWSD Revenue and Revenue Refunding Bonds and (ii) the Direct Purchasers in the event of a private placement or direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, and the issuance of the Assured Policies by Assured each represents an extension of credit in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. In addition, the grant by the City of a pledge and lien in the Pledged Assets to secure, and provide a source for the repayment of, the 2014 DWSD Revenue and Revenue Refunding Bonds and the MFA Bonds, is in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. The Transaction Documents will be entered into in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable non-bankruptcy law, and the transactions contemplated by the Transaction

Documents are not prohibited by applicable bankruptcy or non-bankruptcy law. As such, the MFA (and its assignees and transferees), the Underwriter (and its assignees and transferees), each purchaser of the MFA Bonds (and their assignees and transferees) (each, including its assignees and transferees, an "MFA Bondholder" and, collectively, the "MFA Bondholders"), each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), and Assured therefore qualify for the full protection and benefits of sections 364(e) and 921(e) of the Bankruptcy Code and this Order and shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

J. *Act 94 Approval.* The City has duly authorized and approved the Transaction Documents pursuant to Act 94 (as described herein and in the Motion). The City is duly authorized to cause the execution of bond sale orders by the Director of the DWSD and by the Emergency Manager of the City upon the issuance of this Order.

K. *Adequate Protection of Existing Liens.* A determination in a Supplemental Action calculated in the manner and by the means prescribed by the Projected Net Revenues Test and the Historical Net Revenues Test set forth in the Bond Ordinances, that the resulting Required Combined Coverage, after giving

effect to the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, is not less than 120% for the Senior Lien Bonds, not less than 110% for the Second Lien Bonds and not less than 100% for the SRF Junior Lien Bonds (the "Additional Bonds Test"), together with the Alternative Refund/Debt Service Savings Test and the City's rate covenants made in Section 9 of the Bond Ordinances (the "Rate Covenant"), satisfies the bargained-for terms of the Existing Bond Documents that are applicable to the subsequent issuance of Secured Obligations, such as the 2014 DWSD Revenue and Revenue Refunding Bonds. After taking into account the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds and the granting of the senior and equal liens in accordance with the Transaction Documents and the Bond Ordinances, under the circumstances and given that the Supplemental Action will support that the Additional Bonds Test and Alternative Refund/Debt Service Savings Test, as applicable, will meet or exceed the Required Combined Coverage required under the Bond Ordinances, the Court finds that the Additional Bonds Test, the Alternative Refund/Debt Service Savings Test and the Rate Covenant constitute adequate protection of the pre-petition liens securing the Existing DWSD Bonds for purposes of section 364(d)(1) of the Bankruptcy Code. Moreover, there is no impairment to the interests of holders of Existing DWSD Bonds from the Tender Offer Financing because new bondholders will be taking the same position in the DWSD capital structure as the holders of the Existing DWSD

15

Bonds.

L.      *Special Revenues.*  Net Revenues, as defined in the Bond Ordinances, constitute "special revenues" as that term is defined in Section 902(2) of the Bankruptcy Code, constitute "pledged special revenues" as that term is used in Section 922(d) of the Bankruptcy Code and are afforded the protections contemplated by Section 928 of the Bankruptcy Code, which have been validly pledged and become subject to a lien as defined in section 101(37) of the Bankruptcy Code and in accordance with Act 94 and the Bond Ordinances to secure the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds issued under the DWSD Indentures, as more fully set forth in the Transaction Documents.

M.      *Willingness to Provide Insurance.*  Assured has indicated a willingness to issue the Assured Policies subject to: (a) the entry of this Order; (b) the approval by this Court of the Settlement; and (c) the satisfaction of certain other commercially reasonable conditions precedent set forth in the Assured Insurance Commitment.

N.      *The Settlement.*  The Settlement was negotiated at arm's length and in good faith by the DWSD Settlement Parties and the settlements and compromises set forth in the Motion and the Assured Insurance Commitment are fair, equitable and reasonable.  The DWSD Settlement Parties are not "insiders" (as defined in the Bankruptcy Code) of the City.

16

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1. <u>Motion Approved</u>.  The Motion is GRANTED.

2. <u>Objections Overruled</u>.  All objections to the Motion and to the Transaction Documents, to the extent not withdrawn, waived, or resolved by the terms hereof, and all reservations of rights included therein, are hereby denied and overruled on the merits, with prejudice.

3. <u>Authorization of the Financing</u>.  Subject to the adoption of bond sale orders by the Director of the DWSD and by the Emergency Manager of the City, and subject to a determination in a Supplemental Action of the satisfaction of the Rate Covenant in accordance with the Bond Ordinances, the City is hereby authorized pursuant to sections 105(a), 364(c) and 364(d)(1) of the Bankruptcy Code, by and through DWSD, to enter into, incur the indebtedness evidenced by the 2014 DWSD Revenue and Revenue Refunding Bonds under, and perform pursuant to, the Transaction Documents, all of which that have been submitted to the Court are hereby approved, and to otherwise satisfy the requirements of Act 94, the Bond Ordinances, and applicable resolutions of the Board of Water Commissioners.  The City is expressly authorized, without further authorization or approval of this Court,

CHI-1940093v3

to perform all acts, make, execute and deliver all instruments and documents, which may be required for the performance by the City under the Transaction Documents and the creation and perfection of the liens described in and provided for by this Order and the Transaction Documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements, as applicable), and to pay all fees and expenses that may be required or reasonably necessary for the City's performance of its obligations under or related to the Transaction Documents. The Net Revenues, as defined in the Bond Ordinances, and all proceeds thereof shall be deposited and applied as required by the Transaction Documents. Upon execution and delivery, the Transaction Documents shall be valid and binding obligations of the City, enforceable against the City in accordance with their terms.

4. <u>Authorization to Borrow</u>. Immediately upon the entry of this Order, the City is authorized to issue the 2014 DWSD Revenue and Revenue Refunding Bonds to the MFA or, in the event of a private placement or direct purchase, to the MFA or to the Direct Purchasers, as applicable, pursuant to the terms of the Transaction Documents and is authorized to enter into and incur the obligations under the Transaction Documents.

5. <u>2014 DWSD Revenue and Revenue Refunding Bonds</u>. The Transaction Documents and this Order shall evidence the validity and binding effect

18

of the 2014 DWSD Revenue and Revenue Refunding Bonds, which shall be effective as of the date of their issuance.  Upon entry of this Order, and effective as of the date of their issuance, the 2014 DWSD Revenue and Revenue Refunding Bonds will include all indebtedness or obligations, contingent or absolute, which may now or from time to time be owing (in each case, however, solely in connection with the 2014 DWSD Revenue and Revenue Refunding Bonds (and not in connection with other indebtedness, obligations or debt issuances, whether subject to the Transaction Documents or otherwise)) by the City to the MFA, the Underwriter, the Direct Purchasers, the DWSD Trustee, or any of the MFA Bondholders under the respective Transaction Documents or this Order, including all principal, accrued interest, costs, fees, expenses and other amounts in respect of the 2014 DWSD Revenue and Revenue Refunding Bonds under the respective Transaction Documents.  The 2014 DWSD Revenue and Revenue Refunding Bonds shall be due and payable, without notice or demand, in accordance with the terms of the Transaction Documents and notwithstanding Sections 943 and 1129(a)(9)(A) of the Bankruptcy Code or the confirmation of any plan of adjustment in this Case.

6.     <u>Liens</u>.  During the pendency of the Case and prior to the effective date of a plan of adjustment in this Case, upon issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, this Order, Act 94 and the Transaction Documents shall be conclusive evidence of the validity, perfection and priority of the liens granted by

the City and encumbering the Pledged Assets to secure the 2014 DWSD Revenue and Revenue Refunding Bonds (the "Liens") under Act 94 and sections 101(37), 364(c) and 364(d) of the Bankruptcy Code without the necessity of (a) filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or (b) the taking of any other action (including taking possession or entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the Liens.

7.    Lien Priority - Sewage Disposal System Revenue Bonds.  Pursuant to the Sewer Ordinance and the other relevant Transaction Documents, the Liens securing the Sewage Disposal System Revenue Bonds shall be equal to the existing senior liens securing the Senior Lien Bonds, senior in priority and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Sewer Indenture, other than the lien securing the Senior Lien Bonds.  Other than as set forth herein, the Transaction Documents and the Sewer Ordinance, the Liens securing the Sewage Disposal System Revenue Bonds shall not be made or become subject to or *pari passu* with any lien or security interest or otherwise and shall be valid, binding, fully perfected, continuing and enforceable, including against the City under sections 921(e) and 364(e) of the Bankruptcy Code, and this Order shall not be affected by any reversal or

modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

8.     Lien Priority - Revenue Refunding Bonds.  Pursuant to the Bond Ordinances and the Transaction Documents, the Liens securing the Sewage Disposal System Revenue Refunding Bonds and the Water Supply System Revenue Refunding Bonds (the "Refunding Bonds") shall be equal to the existing senior liens or existing second liens, as the case may be, securing Tendered Bonds that are Senior Lien Bonds and Tendered Bonds that are Second Lien Bonds, respectively. The Liens securing Refunding Bonds that are Senior Lien Bonds shall be senior in priority and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Indentures, other than the liens securing the Senior Lien Bonds.  The Liens securing Refunding Bonds that are Second Lien Bonds shall be subordinate in priority to Senior Lien Bonds and superior to the existing subordinate liens or any other pledge of, lien on or claim to any of the Pledged Assets under the DWSD Indentures, other than the liens securing Second Lien Bonds and Senior Lien Bonds.  Other than as set forth herein, the Transaction Documents and the Bond Ordinances, the Liens securing the Refunding Bonds shall not be made or become subject to or *pari passu* with any lien or security interest or otherwise and shall be valid, binding, fully perfected, continuing and enforceable, including against the City under sections 921(e) and 364(e) of the

21

CHI-1940093v3
13-53846-tjt     Doc 6998-1     Filed 08/22/14     Entered 08/22/14 18:53:47     Page 22 of 311

Bankruptcy Code, and this Order shall not be affected by any reversal or modification on appeal of this Order, nor shall the reversal on appeal of a finding of jurisdiction affect the validity of any debt incurred pursuant to this Order.

9.    No Obligation to Extend Credit.  None of the Direct Purchasers, the MFA or the Underwriter shall have any obligation to purchase any bond or make any other extension of credit under the Transaction Documents unless (a) all of the conditions precedent to the purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds and, in the case of a public offering, the purchase of the MFA Bonds and the extension of such credit provided thereby under the Transaction Documents and this Order have been satisfied in full or waived in accordance with the terms of the applicable Transaction Documents and (b) no stay of this Order pending appeal shall have been obtained by any party from this Court or any other court.

10.    Amendment of the Transaction Documents. The City is authorized, without further approval or authorization of this Court, to perform all acts and to make, execute and deliver all instruments and documents that may be reasonably required to effect one or more amendments, modifications or supplements to any of the Transaction Documents if the amendments, modifications or supplements (a) are consistent with this Order; (b) in the good faith judgment of the City, are not amendments, modifications or supplements that are materially adverse to the

22

interests of the holders of pre-petition liens securing the Existing DWSD Bonds under the Transaction Documents; (c) are otherwise permitted under the terms of the Bond Ordinances and the other Transaction Documents; and (d) are otherwise within the power of the City to effect without further order of the Court under Section 904 of the Bankruptcy Code or otherwise.

11.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  Based on the findings of fact and conclusions of law set forth in this Order and the record made during the Hearing, the City, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured have acted in good faith, as that term is used in section 364(e) of the Bankruptcy Code, in connection with the Transaction Documents, and their reliance on this Order is also in good faith.  In accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed or modified on appeal, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured are entitled to and hereby granted the protections provided in section 364(e) of the Bankruptcy Code.  Any reversal or modification of this Order on appeal shall

23

not affect the validity or enforceability of the 2014 DWSD Revenue and Revenue Refunding Bonds or any Lien, claim, or priority authorized or created hereby or the validity or enforceability of the Assured Policies. Any liens or claims granted to the MFA, the DWSD Trustee, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders or Assured hereunder arising prior to the effective date of any such reversal or modification of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

12.     Section 921(e) of the Bankruptcy Code; No Modification or Stay of this Order. In accordance with section 921(e) of the Bankruptcy Code, in the event any or all of the provisions of the order for relief or any order finding jurisdiction is reversed on appeal, the MFA, the DWSD Trustee, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured are entitled to the protections provided in section 921(e) of the Bankruptcy Code. Any such reversal shall not affect the validity or enforceability of the 2014 DWSD Revenue and Revenue Refunding Bonds or the Liens or priority authorized by this Order, or the validity or enforceability of the

Assured Policies. Any Liens granted to the DWSD Trustee authorized hereunder arising prior to the effective date of any such reversal shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

13. <u>Special Revenues</u>. Any and all Net Revenues, as defined in the Bond Ordinances, shall be treated as "special revenues" as that term is defined in section 902(2) of the Bankruptcy Code and shall be treated as "pledged special revenues" as that term is used in section 922(d) of the Bankruptcy Code and are afforded all applicable protections under the Bankruptcy Code and applicable law, including the protections contemplated in section 928 of the Bankruptcy Code, which have been validly pledged and become subject to a lien under Act 94 to secure the payment of the 2014 DWSD Revenue and Revenue Refunding Bonds issued under the DWSD Indentures, as fully set forth in the Transaction Documents.

14. <u>No Impairment</u>. All rights and remedies of the DWSD Trustee, MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured under the Transaction Documents, as they relate to the 2014 DWSD Revenue and Revenue Refunding Bonds, shall remain effective and, except as otherwise provided in the Transaction Documents, may not be modified, impaired, or discharged,

notwithstanding the authority of the Emergency Manager of City to act on behalf of and bind the City, the dismissal of this Case, or the confirmation of, or failure to confirm, any plan of adjustment in this Case.  All rights and remedies of the DWSD Trustee, MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders and Assured under this Order shall remain effective and may not, except as otherwise provided herein, be modified, impaired or discharged, notwithstanding the authority of the Emergency Manager of City to act on behalf of and bind the City, during the pendency of the Case and prior to the effective date of a plan of adjustment in this Case.

15.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the DWSD Trustee, the holders of Existing DWSD Bonds, the DWSD Bond Insurers, the MFA, the Underwriter, each holder of a 2014 DWSD Revenue and Revenue Refunding Bond, including, but not limited to the Direct Purchasers (and each of their respective assignees and transferees), the MFA Bondholders or Assured to seek any other or supplemental relief in respect of the City.

16.    <u>No Modification of Order</u>.  Following the closing date of the 2014

26

DWSD Revenue and Revenue Refunding Bonds and until and unless the 2014 DWSD Revenue and Revenue Refunding Bonds have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the Transaction Documents that by their terms survive such discharge) or otherwise defeased, the City irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent (not to be unreasonably withheld) of (a) Assured, the DWSD Trustee, the Ad Hoc Committee and, if such action is to be taken after the issuance of the 2014 DWSD Revenue and Revenue Refunding Bonds, the MFA, and (b) in the case of a direct purchase of the 2014 DWSD Revenue and Revenue Refunding Bonds, the Direct Purchasers, in each case, in the reasonable discretion of the DWSD Trustee, the MFA and the Direct Purchasers, as applicable, any modification, stay, vacatur or amendment to this Order or the order for relief in any manner.

17. <u>Exculpation</u>. Except to the extent expressly set forth in the Transaction Documents, nothing in this Order, the Transaction Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DWSD Trustee, Assured, the holders of Existing DWSD Bonds, the MFA, the Underwriter, the Direct Purchasers or the MFA Bondholders any liability for any claims arising in connection with the 2014 DWSD Revenue and Revenue Refunding Bonds. In

addition, with respect to the Pledged Assets (a) except as expressly set forth in the Transaction Documents, none of Assured, the DWSD Trustee, the holders of Existing DWSD Bonds, the MFA, the Underwriter, the Direct Purchasers or the MFA Bondholders shall, in any way or manner, be liable or responsible for (i) the safekeeping of the Pledged Assets, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Pledged Assets shall be borne by the City.

18.     <u>Effect of Stipulations</u>.  The stipulations and admissions contained in this Order shall be binding upon the City and the DWSD Objecting Parties.

19.     <u>Order Controls (Transaction Documents)</u>.  During the pendency of the Case and prior to the effective date of a plan of adjustment in this Case, in the event of any inconsistency between the terms and conditions of the Transaction Documents and this Order, the provisions of this Order shall govern and control.

20.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein or in the Transaction Documents, this Order does not create any rights for the benefit of any third party who is not expressly referenced in this Order, any creditor or any direct, indirect or incidental beneficiary.

21.     <u>Survival</u>.  The Liens and indebtedness incurred under the Transaction

28

Documents authorized by this Order and the other provisions of this Order and any actions taken pursuant hereto shall survive entry of any subsequent order that may be entered: (a) dismissing the Case; or (b) pursuant to which this Court abstains from hearing the Case.

22.    <u>No Waiver by Seeking Relief</u>.  Except to the extent this Order provides otherwise, (i) neither the filing of the Motion nor anything herein shall constitute a waiver of any right of the City to take any action, including with respect to the 2014 DWSD Revenue and Revenue Refunding Bonds, without authorization or approval of the Court, (ii) nor shall the filing of the Motion or the entry of this Order be deemed to constitute the City's consent, pursuant to Section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property, other than as provided herein.

23.    <u>The Settlement</u>.  The Settlement as described in the Motion is approved in its entirety and all of its terms are incorporated herein by reference as if fully set forth herein, and the failure to specifically describe or include in this Order any particular provision of the Motion or the Assured Insurance Commitment shall not diminish or impair the effectiveness of any such provision.  The settlements and compromises set forth in the Assured Insurance Commitment and in the Motion are fair and reasonable to, and in the best interests of, the City, its residents and its

creditors, and in entering into the Settlement, the DWSD Settlement Parties have acted in a commercially reasonable manner and exercised their respective rights and powers, and used the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances.

24. <u>DWSD Contribution to GRS Pension Plan</u>. DWSD's contributions to the GRS pension plan set forth in the Plan shall be accounted for as follows: (i) DWSD shall pay as operation and maintenance expenses, to be allocated between the Sewage Disposal System and the Water Supply System (collectively, the "<u>Systems</u>") consistent with the allocation of labor costs between the two Systems, no more than the aggregate sum of (a) $24 million per annum (which is payable monthly); and (b) DWSD's allocable share of its annual "defined contribution" payments related to the DWSD employees; and (ii) DWSD shall pay from the Revenues of each of the Sewage Disposal System and the Water Supply System, on the same ratable basis as set forth in (i) above, the difference between the annual allocation of the Plan GRS pension contributions provided in the Plan and $24 million in the aggregate from "pension liability payment funds" established for each of the Sewage Disposal System and the Water Supply System (such funds, the "<u>Pension Liability Payment Funds</u>") that will be placed in priority of payment after all of the Interest and Redemption Funds (including the Reserve Accounts, if any, therein) and before the Extraordinary Repair and Replacement Reserve Fund (all as

defined in the Existing Bond Documents) for each of the Sewage Disposal System and the Water Supply System, such that the respective Pension Liability Payment Funds will be subordinated to the 2014 DWSD Revenue and Revenue Refunding Bonds and all other existing DWSD bond debt. Sufficient funds shall be allocated to each of the Pension Liability Payment Funds on a monthly basis until such time as each System's Pension Liability Payment Fund contains funds sufficient to pay the difference between each System's allocable share of the annual allocation of the GRS pension contributions provided in the Plan, and each System's allocable share of $24 million. If such amounts in a Pension Liability Payment Fund are insufficient to provide for that fiscal year's requirement for the respective System's contribution to the GRS pension plan by June 30 of that fiscal year, then any amounts or securities held in the respective System's Surplus Fund, Construction Fund, Improvement and Extension Fund, Extraordinary Repair and Replacement Reserve Fund (in excess of the Extraordinary Repair and Replacement Minimum Requirement) and any other now-existing or after arising accounts under the applicable System's Indenture to which payments are subordinate to the payments to the Interest and Redemption Funds (including the Reserve Accounts, if any, therein) as listed in Section 2.02(a) – (f) of the respective System's Indenture, shall be credited or transferred from such Funds or accounts in the priority and order listed above (after satisfaction of the transfers required by Section 2.11 of each Indenture

31

to the Operating and Maintenance Fund and the Interest and Redemption Funds) to the respective System's Pension Liability Payment Fund; provided, however, that solely for purposes of determining the crediting or transferring of funds to the respective "Pension Liability Payment Funds": (i)(a) the formulae presently used to determine the Extraordinary Repair and Replacement Minimum Requirement and (b) the definition of "Extraordinary Repair and Replacement Minimum Requirement" in the applicable Indentures existing as of the date of this Order will not be changed unless and until DWSD has paid in full the aggregate annual allocation of the GRS pension contributions provided in the Plan; (ii) the amount of the Extraordinary Repair and Replacement Minimum Requirement is not increased over the amount of such minimum, which as of the date of this Order is $4,693,660 for the Water Supply System and $6,725,917 for the Sewage Disposal System, until the GRS pension contributions provided in the Plan are paid in full; and (iii) provided such funds are not subject to restriction barring transfer under Section 2.11 of the respective Indenture existing as of the date hereof; and provided, further, that in no event shall any amounts held in a Construction Fund that are (x) the proceeds of any debt issued for such System pursuant to the applicable Bond Ordinance, as the same may be amended, modified or supplemented, or (y) otherwise lawfully restricted to use for capital improvements to a System be credited to the Pension Liability Payment Fund. Moreover, no amounts may be credited or transferred from a Construction Fund

unless such credit or transfer (i) is approved by the Michigan Department of Treasury, if such approval is then required by law, and (ii) based upon an opinion of bond counsel, such credit or transfer will not adversely affect the exclusion from gross income for federal income tax purposes of securities the proceeds of which were deposited in such account. In the event there is any shortfall in the annual funding of a Pension Liability Payment Fund at the end of any fiscal year, that shortfall shall be paid in the next fiscal year according to the payment priorities set forth in this Paragraph 24.

25. <u>DWSD Plan Objections</u>. Upon the occurrence of the Settlement Date and the payment by the City of all professional fees and expenses as set forth in Paragraph 27 hereof (the "<u>Settlement Date Fee Payments</u>")[4], the DWSD Plan Objections shall be deemed to be withdrawn with prejudice; <u>provided</u>, <u>however</u>, that the DWSD Plan Objection of FGIC shall only be deemed withdrawn with prejudice with respect to FGIC's objections related to DWSD, including any matters that are the subject of the Motion and the Settlement. The accounting treatment of DWSD's contributions to the GRS pension plan in Paragraph 24 hereof shall not constitute "impairment" of the Existing DWSD Bonds or the Existing DWSD Bond Claims in

---

[4] The Settlement Date Fee Payments shall not include any payments on account of the DWSD Trustee Fee Claim, the GLC Payment or any other fees or expenses of the DWSD Trustee or its professionals.

respect thereof.

26.   <u>No Amendment</u>.  From and after the occurrence of the Settlement Date,

the City shall not amend, supplement or otherwise modify the Amended Plan, or

participate in, support or acquiesce to any such amendment, supplement or

modification (including any motion for an order seeking such amendment,

supplement or modification) of the Amended Plan that would result in (i) the

impairment of any Existing DWSD Bond Claim; (ii) the alteration of the accounting

treatment of DWSD's contributions to the GRS pension plan as set forth in

Paragraph 24 of this Order or (iii) be inconsistent with this Order.

27.   <u>Reimbursement of Certain Professional Fees and Expenses</u>.  On the

Settlement Date, the DWSD is authorized to and shall reimburse the professional

fees and expenses of certain of the DWSD Settlement Parties incurred in connection

with the Case, as follows: (i) to Assured, $3,000,000; (ii) to the Ad Hoc Committee,

$1,200,000; and (iii) to FGIC, $550,000[5].  In addition, pursuant to the Assured

Insurance Commitment, in the event that the City agrees, other than solely as a result

of a court order or an arbitration award (i) to pay any of the DWSD Objecting Parties

---

[5] The amounts set forth in (i)-(iii) do not contain any "success fees" for any DWSD creditor financial advisor.  If any financial advisor for a non-settling bond insurer is paid a success fee, FGIC shall have the right to request the same treatment for its financial advisor.  Additionally, the Fee Claim authorized to FGIC hereunder

34

other than the DWSD Trustee an amount in excess of $3 million for DWSD-related bankruptcy fees, costs and expenses or (ii) with respect to the DWSD Trustee, to establish a floor for DWSD-related bankruptcy fees, costs and expenses in excess of $3 million, then DWSD shall be required to pay to Assured $3 million plus such amount that is the greatest amount paid to any DWSD Objecting Party in excess of $3 million. The City and the DWSD Trustee shall resolve the DWSD Trustee Fee Claim in accordance with the DWSD Trustee Claim Arbitration as set forth in the Motion and as modified by the following: GLC Advisors & Co. shall be entitled to recover $500,000 (the "GLC Payment") in compensation as part of any payment by the City of the DWSD Trustee Fee Claim in connection with DWSD Trustee Claim Arbitration. The GLC Payment shall be made from funds already currently held by the DWSD Trustee in escrow on account of its fees and expenses, and such GLC Payment shall be included within the DWSD Trustee Fee Claim Range for purposes of determining the DWSD Trustee Fee Claim.

28. __All Appropriate Actions__. The City is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers, and to make all payments (including interest and fees, if any), and take any

---

resolves only fees and expenses incurred through the end of June 2014 in connection with the Existing DWSD Bonds and does not include any other amounts.

and all actions reasonably necessary or appropriate to consummate, complete, execute and implement the Settlement, and any actions taken heretofore in furtherance of these obligations are hereby ratified.

29. <u>Order Controls (Settlement)</u>. Unless otherwise agreed by the Parties, to the extent of any inconsistency between (i) this Order and the Assured Insurance Commitment, the terms of this Order shall govern and (ii) this Order and the Assured Insurance Commitment, on the one hand, and any plan of adjustment confirmed in this chapter 9 case (other than a Specified Plan), on the other hand, the terms of this Order and the Assured Insurance Commitment, as applicable, shall govern.

30. <u>Survival.</u> The provisions and effect of this Order, any actions taken pursuant to this Order or the Settlement and the DWSD Settlement Parties' respective rights, obligations, remedies and protections provided for herein shall survive the dismissal or closing of this chapter 9 case, or confirmation of a plan or plans of adjustment, and the terms and provision of this Order and the Assured Insurance Commitment shall continue in full force and effect notwithstanding the entry of any such order.

31. <u>Binding Effect of Order</u>. This Order shall be immediately effective upon its entry. Immediately upon entry by this Court, the terms and provisions of this Order (including the Settlement) shall become valid and binding upon all parties

in interest in this Case, including but not limited to, the City, the MFA, the Underwriter, the Direct Purchasers, the MFA Bondholders, the DWSD Settlement Parties, all other creditors of the City, the City's Emergency Manager, any committee appointed in the Case and all other parties in interest and their respective successors and assigns.

32. <u>Continuing Jurisdiction</u>. This Court shall retain continuing jurisdiction through the effective date of a plan of adjustment in this Case with respect to all matters related to or arising from this Order and the relief granted herein, the implementation of the Transaction Documents, including but not limited to compliance with the Additional Bonds Test and enforcement of the Rate Covenants required under the Ordinances, and implementation and enforcement of the terms agreed to under the Settlement.

33. <u>Existing Bond Insurance Policies</u>. Nothing in this Order impairs, modifies, affects or otherwise alters the rights of Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers (as those terms are defined under the Plan).

CHI-1940093v3
13-53846-tjt    Doc 6998-1    Filed 08/22/14    Entered 08/22/14 18:53:47    Page 38 of 311

## EXHIBIT 1A

CHI-1940093v3

**MICHIGAN FINANCE AUTHORITY**
**$_____**
**Local Government Loan Program Revenue Bonds, Series 2014D**
**(Detroit Water and Sewerage Department**
**Water Supply System Revenue Refunding Local Project Bonds)**

**BOND PURCHASE AGREEMENT**

**August [__], 2014**

Michigan Finance Authority
Richard H. Austin State Office Building
430 West Allegan Street
Lansing, Michigan 48922

Ladies and Gentlemen:

      Citigroup Global Markets, Inc. (the "Representative"), on behalf of itself and J.P. Morgan Securities LLC, BMO Capital Markets, Loop Capital Markets LLC, [Barclays[, [PNC Capital Markets LLC], [Comerica Securities, Inc.], and [Jeffries] (collectively with the Representative, the "Underwriters"), hereby offers to enter into this Bond Purchase Agreement (this "Agreement") with the Michigan Finance Authority (the "Authority") which, upon the acceptance of this offer by the Authority acting pursuant to statutory authority, including Act 227 of the Public Acts of Michigan, 1985, as amended (the "Act"), will be binding upon the Authority and the Underwriters. This offer is made subject to written acceptance of this Agreement by the Authority at or before 12:00 p.m., Eastern Time, on August [__], 2014, and if not so accepted will be subject to withdrawal by the Representative upon notice delivered to the Authority at any time prior to the acceptance hereof by the Authority.

      1.    Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein the Underwriters hereby agree to purchase from the Authority and the Authority agrees to sell to the Underwriters for $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus/plus net original issue discount/premium of $[_____]), all (but not less than all) of the following bonds issued by the Authority:

$_____          Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured)
                         (Detroit Water and Sewerage Department
                Water Supply System Revenue Refunding Senior Lien Local Project Bonds)
      Type: DWSD Water Supply System Revenue Refunding Senior Lien Local Project Bonds (Insured)

$_____           Local Government Loan Program Revenue Bonds, Series 2014D-2
                         (Detroit Water and Sewerage Department
                Water Supply System Revenue Refunding Senior Lien Local Project Bonds)
      Type: DWSD Water Supply System Revenue Refunding Senior Lien Local Project Bonds

$_____         Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Second Lien Local Project Bonds (Insured)

$_____         Local Government Loan Program Revenue Bonds, Series 2014D-4
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Water Supply System Revenue Refunding Second Lien Local Project Bonds

(collectively, the "Bonds").   The Bonds are being issued to finance the purchase by the Authority, pursuant to a Local Purchase Contract between the Authority and the City of Detroit, County of Wayne, State of Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), dated August [__], 2014 (the "Local Purchase Contract"), of the following bonds:

$_____         City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

$_____         City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

$_____         City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

$_____         City of Detroit, Michigan, Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D

(collectively, the "DWSD Obligations"), to be issued by the City (i) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Water Supply System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (ii) to pay the costs of issuance of the DWSD Obligations and the Bonds.

Payment of the principal of and interest on certain series of the Bonds (the "Insured Bonds") when due will be insured by municipal bond insurance policies (the "Bond Insurance Policies") to be issued by one or more bond insurers (the "Bond Insurers") simultaneously with the delivery of the Bonds.

The Underwriters intend to make an initial bona fide public offering of all of the Bonds at prices not in excess of the public offering prices set forth on the inside cover pages of the official statement, dated the date hereof, with respect to the Bonds (such official statement, together with the cover pages, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Official Statement") and may subsequently change such offering price without any requirement of prior notice.  The Underwriters may offer and sell Bonds to certain dealers (including dealers depositing Bonds into investment trusts) and others at prices lower than the public offering price stated on the inside cover pages of the Official Statement.  The

Underwriters agree to furnish to the Authority an issue price and yield certificate which will contain certifications necessary to determine the issue price and yield on the Bonds.

In the event that the Underwriters fail (other than for reasons permitted herein) to accept delivery of and pay for the Bonds at the Closing (as hereinafter defined in paragraph 7(a)), the parties hereto acknowledge that the damages that the Authority and the City may suffer as a result thereof shall be difficult to ascertain, and as a result, the parties hereby agree that as liquidated damages, and not as a penalty, for the Underwriters' failure, the Underwriters shall pay to the Authority, as liquidated damages to the Authority and to the City, an aggregate amount equal to the lesser of (i) 1% of the aggregate principal amount of the Bonds or (ii) $5,000,000. Payment of such liquidated damages to the Authority and acceptance by the Authority, on behalf of itself and the City, shall constitute a full release and discharge of all claims and damages for such failure of the Underwriters.

The Authority acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Agreement is an arm's-length commercial transaction between the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as the agents or fiduciaries of the Authority, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the Authority with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the Authority on other matters) and the Underwriters have no obligation to the Authority with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement, and (iv) the Authority has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the Authority's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the Authority's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

2.      The Bonds shall otherwise be as described in the Resolutions (as hereinafter defined) and the Official Statement and shall be payable in lawful money of the United States as also described herein.

The Representative has been duly authorized to execute this Agreement and to act hereunder and on behalf of each Underwriter, each of whom represents that it has the legal capacity to enter into this Agreement and to carry out the transactions contemplated hereby.

The aggregate principal amount, the date, the dates of maturity, the interest rates per annum and the initial public offering prices of the Bonds are set forth in Item 1 of Exhibit A

attached hereto and made a part hereof. The Bonds shall in all other respects be the same Bonds as are described in the Official Statement.

3. The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, [a copy of which is attached hereto as [Exhibit C] (the "Bankruptcy Court Order"),] in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the this Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order. Based upon the Bankruptcy Court Order, the Underwriters have determined to enter into this Agreement.

4. The Authority has authorized the execution of the Official Statement dated the date hereof and the use of such Official Statement by the Underwriters in connection with the public offering of the Bonds. The Authority has consented to the use in accordance with law by the Underwriters on or before the date hereof of the preliminary official statement with respect to the Bonds dated August [__], 2014 (such preliminary official statement, together with the cover page, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Preliminary Official Statement"), in connection with the public sale of the Bonds. The Authority deems the information set forth in the Preliminary Official Statement (other than the information set forth in the sections entitled [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE WATER SUPPLY SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion"), to be final as of its date, as provided in Rule 15c2-

12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12. The City and the Department, in the Letter of Representations (as defined herein), has deemed the information set forth in the City and DWSD Portion of the Preliminary Official Statement final as of its date. The Authority has prepared a Continuing Disclosure Undertaking, to be dated on or before the Closing (the "Undertaking"), to provide or cause to be provided, certain annual financial information and operating data, and timely notice of the occurrence of certain material events with respect to the Bonds.

5    You hereby agree to supply, within the earlier of (i) seven business days of the date of acceptance hereof or (ii) sufficient time to accompany any confirmation requesting payment which the Underwriters might send to its customers with respect to the Bonds (which in any event shall be a time reasonably acceptable to both the Underwriters and the Authority), such number of copies of the Official Statement as to which the Underwriters will inform you prior to the printing of such Official Statement and which will not exceed [200] copies.

6.    You hereby agree that you will provide the Underwriters with information of which you have knowledge from any source concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as defined below. You further agree that you will cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters or the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. Except as provided in the last sentence of this paragraph, the expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the Authority) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the Authority. The cost of printing and delivery in excess of [200] copies of the amendment or supplement to the Official Statement shall be paid by the Underwriters. The Underwriters agree to amend or supplement the Official Statement at its own expense in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete.

The term "end of the underwriting period" as referred to in the preceding paragraph and elsewhere herein is the later of the delivery of the Bonds by you to the Underwriters or when the Underwriters no longer retain an unsold balance of the Bonds for sale to the public. The "end of the underwriting period" shall be deemed to be 25 days after the date of Closing, unless the Representative otherwise notifies you in writing prior to such date, to the best of its knowledge, that there exists an unsold balance of the Bonds. The deemed "end of the underwriting period" may be extended for additional periods of 25 days each upon receipt of an additional written notification from the Representative that, to the best of its knowledge, there exists an unsold balance of Bonds. The Representative agrees to file the Official Statement with the MSRB on or before the date of Closing.

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

7.     The Authority represents and warrants to, and agrees with, the Underwriters, as of the date of its acceptance of this Agreement and as of the date and time of the Closing, as follows:

(a)     The Authority, has, and at the time of the Closing will have, full legal right, power and authority (i) to enter into this Agreement and the Undertaking and (ii) to sell and deliver the Bonds to the Underwriters as provided herein, in the Resolutions (as hereinafter defined) and in the Official Statement; and the Authority has, and at the time of the Closing will have, duly authorized and approved the execution and delivery of, and performance by the Authority of its obligations contained in this Agreement;

(b)     No further authorization or approval of the Authority's Board of Directors (the "Board of Directors") is required for the execution and delivery of this Agreement or the Undertaking on behalf of the Authority, and this Agreement assuming due authorization, execution and delivery of the Agreement by the other party thereto, constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the Authority is not required to obtain any further authorization or approval for the sale and delivery of the Bonds to the Underwriters or the performance by the Authority of its obligations hereunder or under the Undertaking except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing;

(c)     The Authority, acting through the Board of Directors, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement as provided in Paragraph 3 hereof;

(d)     The Bonds are issued pursuant to that certain Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds adopted by the Authority on May 15, 2014 (the "General Resolution"), and the Supplemental Resolution by the Authority adopted by the Authority on August 12, 2014 (the "Supplemental Resolution" and together with the General Resolution, the "Resolutions"). The Supplemental Resolution has been duly adopted by the Authority, acting through its Board of Directors, and the Resolutions have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the Bonds and a valid, legally binding act of the Authority, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if

equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised;

(e)     When delivered to the Underwriters and paid for in accordance with the terms of this Agreement, the Bonds (i) will have been duly authorized, executed and issued by the Authority pursuant to the Resolutions, and (ii) will constitute valid, legally binding, limited obligations of the Authority; provided, however, that the Bonds and the interest obligation thereon shall never constitute a debt or liability of the State of Michigan (the "State") or any agency or employee thereof within the meaning of any constitutional or statutory provision or limitation or a general obligation of the Authority and shall never create or constitute any indebtedness, liability or obligation of the State or constitute a pledge of the faith and credit of the State or the general funds or assets of the Authority (including funds pertaining to other loans or activities) but shall be a limited obligation of the Authority payable solely from the Security, as defined in the Resolutions;

(f)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the Authority described in subparagraphs (a), (b), (c), (d) or (e) of this Paragraph 6 or the delivery of the Bonds to the Underwriters except for the filing of IRS form 8038-G (and the Authority hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith;

(g)     All legislation necessary to permit the Authority (i) to fulfill in all material respects its obligations under the Resolutions, this Agreement and the Undertaking, and (ii) to carry out the transactions contemplated in the Resolutions and the Official Statement is in full force and effect;

(h)     The execution and delivery of the Official Statement, this Agreement, and the Undertaking by the Authority, and the fulfillment of the terms and conditions of, and the carrying out of the transactions contemplated by the Resolutions, this Agreement, and the Undertaking, do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the Authority is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the Bonds or the ability of the Authority to pay the principal of and the interest on any of the Bonds;

(i)     The Preliminary Official Statement (other than the City and DWSD Portion), as of the date thereof, did not contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which they were made, not misleading;

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(j)     The Official Statement (other than the City and DWSD Portion), does not, as of its date or will not as of the Closing, contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which it was made, not misleading;

(k)     The Bonds will conform to the terms thereof set forth in the Resolutions and described in the Official Statement; and the proceeds of the Bonds will be applied as described under the caption "THE SERIES 2014D BONDS—Sources and Uses of Funds for the Series 2014D Bonds" in the Official Statement;

(l)     Other than an appeal of the Bankruptcy Court Order, except as may have been disclosed in writing to the Underwriters before the date of this Agreement or as may be disclosed in the Official Statement, the Authority has not been served with any litigation (and to the knowledge of the Authority no litigation has been commenced or is threatened) against the Authority, in any court (i) seeking to restrain or enjoin the sale or delivery of the Bonds, or (ii) in any manner questioning the authority of the Authority to issue, or the issuance or validity of, any of the Bonds or any other indebtedness of the Authority, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the Bonds, or (iv) questioning any of the legislation referred to in subparagraph (g) of this Paragraph 6, or (v) questioning the validity or enforceability of the Resolutions or (vi) seeking to secure a lien on the Pledged Funds or the collection of the Revenues, as defined in the Resolutions, or other moneys, securities, funds and property pledged in the Resolutions that are a source of payment on the Bonds, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the Board of Directors to his or her office is being contested;

(m)     Any certificate or copy of any certificate signed by an official of the Authority and delivered to the Underwriters pursuant hereto or in connection herewith shall be deemed a representation by the Authority to the Underwriters as to the truth of the statements therein made;

(n)     Except as permitted by the Resolutions, from and after the time of Closing, the Authority will not create or permit the creation of, or issue any obligations or create any additional indebtedness secured by, a charge and lien on the Pledged Funds, as defined in the Resolutions, and other moneys, securities, funds and property pledged in the Resolutions;

(o)     To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds to be used directly or indirectly to acquire any securities or obligations, the acquisition of which would cause any Bond to be an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code of 1986 or any successor provision, act or statute, and the regulations from time to time promulgated or proposed thereunder (the "Code");

(p)     To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds or any other funds of the Authority to be used directly or indirectly in a manner which would result in the exclusion of any of the Bonds from the treatment afforded by Section 103(a) of the Code for any reason, including without limitation the classification of such Bonds as "private activity bonds" within the meaning of Section 141(a) of the Code or as obligations guaranteed by the United States of America, as provided in Section 149(b) of the Code; and the Authority will not take any action or omit to take any action which, by commission or omission, would cause interest on the Bonds to be includable in gross income for federal income tax purposes pursuant to Section 103 of the Code or cause such interest to be included in any alternative minimum tax other than an alternative minimum tax which applies to all tax exempt bonds generally;

(q)     Other than a nonmonetary default resulting from the City having filed a petition for relief under Title 11 of the United States Code, the Authority is not, and historically has not been, in default in the payment of principal of, or premium, if any, or interest on any bonds, notes or contract payments pledged for the payment of notes or bonds and has not entered into any contract or arrangement that might give rise to any lien or encumbrance on the Pledged Funds other than as provided in the Resolutions;

(r)     The Authority has complied with all continuing disclosure obligations under Rule 15c2-12 during the previous five years; and

(s)     The Authority will without any cost to the Authority cooperate with the Underwriters in the qualification of the Bonds for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Underwriters shall designate, provided that the Authority is not required to qualify as a foreign corporation or to consent to any general or special service of process in any jurisdiction.

It is acknowledged and agreed by the parties hereto that all covenants, representations and warranties made by the Authority herein and in any certificates given in compliance herewith, are made solely by the Authority and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.

8.     (a)     At 10:00 a.m., Eastern Time, on September [__], 2014, or such other time and date as shall be mutually agreed upon by the Authority and the Underwriters (the "Closing"), the Authority shall direct the Trustee to deliver the Bonds to the Underwriters at the offices of The Depository Trust Company, New York, New York, in definitive form, duly executed and authenticated by the Trustee.  Subject to the terms and conditions hereof, the Authority shall deliver at the offices of [Dickinson Wright PLLC, [location to be determined], the other documents and instruments to be delivered at the Closing pursuant to this Agreement (the "Closing Documents") and the Underwriters shall accept delivery of the Bonds and the Closing Documents and pay the purchase price for the Bonds as set forth in Item 2 of Exhibit A hereto by wire transfer to the Trustee, in Federal Reserve Funds immediately available, for the account of the Authority, or as the Authority shall direct.  The Bonds shall be registered in the name of Cede & Co., as nominee for The Depository Trust Company ("DTC") and there shall be one (1) typewritten Bond for each maturity as set forth in Item 1 of Exhibit A.  The Bonds shall be made

available to the Underwriters not less than 24 hours preceding the Closing for purposes of inspection.

(b)     If the Authority shall be unable to satisfy the conditions of the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, the respective obligations of the Authority and the Underwriters shall be as set forth in Paragraph 10 hereof.

9.     The Underwriters have entered into this Agreement in reliance upon the representations and warranties and agreements of the Authority contained herein, upon the representations and warranties and agreements of the City contained in the Letter of Representations attached hereto as <u>Exhibit B</u> executed and delivered on behalf of the City on the date hereof (the "Letter of Representations") and in the Local Purchase Contract, and upon the representations and warranties of the Authority and the City to be contained in the Closing Documents, and upon the performance by the Authority of its obligations hereunder, upon the performance by the City of its obligations under the Letter of Representations and the Local Purchase Contract, both as of the date hereof and as of the date of Closing.  The Underwriter has received a letter from KPMG LLP, the independent accountants for the Department ("KPMG"), [in the form attached hereto as Exhibit __] [providing for its consent to the inclusion of the Letter of audited financial statements of the Water Fund for the year ended June 30, 2013 in the Preliminary Official Statement and in the Official Statement and describing agreed-upon procedures] (the "Accountant's Letter").  Accordingly, the Underwriters' obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds shall be subject to the performance by the Authority and the City of their obligations to be performed hereunder, under the Letter of Representations and the Local Purchase Contract, at or prior to the Closing, and shall also be subject to the following conditions:

(a)     The representations and warranties of the Authority contained herein shall be true, complete and correct in all material respects at the date hereof and as of the time of the Closing, as if made at and as of the time of the Closing, and the Authority shall be in compliance with each of the agreements made by it in this Agreement;

(b)     At the time of the Closing, the Official Statement shall not have been amended, modified or supplemented, except in such manner as may have been agreed to by the Underwriters;

(c)     The Underwriters shall have the right in their sole discretion (except where otherwise indicated below) to terminate their obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds by notifying the Authority of its election to do so, if after the acceptance hereof by the Authority and prior to the Closing:

(i)     any event shall occur which makes untrue or incorrect in any material respect, as of the time of such event, any statement or information contained in the Official Statement or which is not reflected in the Official Statement but should be reflected therein in order to make the statements contained therein not misleading in any material respect and, in either event, the Authority refuses to permit the Official Statement to be supplemented to supply such statement or information or the effect of the Official Statement as so

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

supplemented is, in the judgment of the Underwriter, to materially adversely affect the market for the Bonds or the sale, at the contemplated offering prices (or yields), by the Underwriter of the Bonds; or

(ii)    the market price of the Bonds or the marketability thereof shall (in the reasonable opinion of the Underwriters) have been materially adversely affected by reason of the fact that between the date hereof and the Closing,

(A)    an amendment to the Constitution of the United States or to the Constitution of the State, shall have been adopted, or

(B)    legislation shall have been enacted by the Congress or by the Legislature of the State, recommended to the Congress for passage by the President of the United States or the Legislature of the State by the Governor of the State, or introduced and favorably reported for passage to either House of the Congress or of the Legislature of the State by any Committee of such House to which such legislation has been referred for consideration or by a conference committee of both Houses of the Congress; or any statement or report in respect of legislation previously introduced or favorably reported or recommended for passage shall have been made or reported to have been made by the President, any member of the Cabinet or his representative, or any agency of the Federal government, including without limitation the Internal Revenue Service, or any member or members of either House of the Congress or the members or staff of any Committee of either House of the Congress or a conference committee of both Houses of the Congress, or

(C)    a decision shall have been rendered by a court established under Article III of the Constitution of the United States, or the Tax Court of the United States, or any other Federal or State court, or an order, ruling or regulation (final, temporary or proposed) shall have been made by the Treasury Department of the United States or the Internal Revenue Service or by any other Federal or State agency affecting the tax status of the Authority or its obligations for borrowed money (including the Bonds) or the interest thereon (including any such event with the purpose or effect, directly or indirectly, of imposing Federal income taxation upon, or any taxation in the State upon, such interest as would be received by the holders of the Bonds); or

(iii)    a stop order, ruling, regulation, proposed regulation or statement by or on behalf of the SEC or any other governmental agency having jurisdiction of the subject matter shall be issued or made to the effect that the issuance, offering, sale or distribution of obligations of the general character of the Bonds is in violation or would be in violation of any provisions of the Securities Act of 1933, as amended (the "Securities Act"), the Exchange Act, or the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"); or

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(iv)   legislation introduced in or enacted (or resolution passed) by the Congress or an order, decree or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary or proposed), press release, or other form of noticed issued or made by or on behalf of the SEC, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds, including any or all underlying arrangements, are not exempt from registration under or other requirements of the Securities Act, or that the Resolutions are not exempt from qualification under or other requirements of the Trust Indenture Act, or that the issuance, offering or sale of obligations of the general character of the Bonds, including any or all underlying arrangements, as contemplated hereby or by the Official Statement or otherwise, is or would be in violation of the federal securities law as amended and then in effect; or

(v)   there shall have occurred an outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if, in the reasonable opinion of the Underwriters, the market price of the Bonds or the marketability thereof shall be materially adversely affected thereby; or

(vi)   there shall have occurred a general suspension of trading, minimum or maximum prices for trading shall have been fixed and be in force or maximum ranges or prices for securities shall have been required on the New York Stock Exchange or other national stock exchange whether by virtue of a determination by that Exchange or by order of the SEC or any other governmental agency having jurisdiction or any national securities exchange shall have (A) imposed additional material restrictions not in force as of the date hereof with respect to trading in securities generally, or to the Bonds or similar obligations, or (B) materially increased restrictions now in force with respect to the extension of credit by or the charge to the net capital requirements of underwriters or broker-dealers such as to make it, in the judgment of the Underwriters, impractical or inadvisable to proceed with the offering of the Bonds as contemplated in the Official Statement; or

(vii)   the declaration of a general banking moratorium by United States, New York or State authorities or a major financial crisis or a material disruption in commercial banking or securities settlement clearances services shall have occurred such as to make it, in the judgment of the Underwriter, impractical or inadvisable to proceed with the offering of the Bonds as contemplated by the Official Statement; or

(viii)   the purchase of and payment for the Bonds by the Underwriters, or the resale thereof by the Underwriters, on the terms and conditions herein provided, shall be prohibited by any applicable law or governmental regulation or order of any court (other than by reason of the Underwriters' failure to comply with any applicable state blue sky or securities law); or

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(ix) the market price of the Bonds or the marketability thereof shall have been materially adversely affected by the occurrence of any event which in the reasonable opinion of the Underwriters requires or has required an amendment, modification or supplement to the Official Statement; or

(x) The Bankruptcy Court Order shall have been subsequently vacated, reversed or modified, in whole or in part, in any manner without the consent of the Underwriter and the Authority by the Bankruptcy Court or any other court of competent jurisdiction or is the subject of a stay pending appeal.

(d) The Authority shall not have defaulted under any of its covenants, agreements, representations or warranties under the Resolutions or this Agreement;

(e) The City shall have issued and delivered the DWSD Obligations to be purchased with the proceeds of the Bonds.

(f) At or prior to the Closing, the Underwriters shall have received each of the following documents (the "Closing Documents"):

(i) A copy of the Official Statement, signed on behalf of the Authority by its Chairperson or other member of the Authority or its Executive Director or other authorized officer;

(ii) The opinion of the Attorney General of the State of Michigan, dated the date of Closing, substantially in the form set forth in Appendix III to the Official Statement and the opinion of Dickinson Wright PLLC ("Bond Counsel"), dated the date of the Closing and addressed to the Authority, substantially in the form set forth in Appendix III to the Official Statement;

(iii) Supplemental opinions of Bond Counsel and the Attorney General of the State of Michigan, each dated the date of the Closing and addressed to the Underwriters, to the effect that (A) at the times of execution of this Agreement the Authority had, and on the date of the Closing has, full legal right, power and authority to execute and deliver this Agreement and to cause the Bonds to be delivered to the Underwriters as provided in this Agreement and in the Resolutions, and the Authority at the times of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in this Agreement, (B) no further authorization or approval not already obtained is required by the Authority in connection with the delivery of the Bonds to the Underwriters or entering into or performing its obligations under the Resolutions or this Agreement, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, this Agreement constitutes a legal, valid and binding obligation of the Authority enforceable against the Authority in accordance with its terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors'

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

rights, (C) the Authority has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and has duly authorized, approved and executed the Official Statement, (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement under the captions [TO BE UPDATED] ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY," "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014D BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES BONDS," "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices [_____], insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the Bonds are exempt from the registration requirements of the Securities Act, and the Resolutions are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement (other than the City or DWSD Portion) as of its date and as of Closing (other than the financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     (iv)    An opinion, dated the date of the Closing and addressed to and solely for the benefit of the Underwriters, of Kutak Rock LLP, counsel to the Underwriters, in form and substance satisfactory to the Underwriters;

     (v)    A non-arbitrage certificate, dated the date of the Closing, signed by the Chairperson of the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Underwriters;

     (vi)    A certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems

appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the Bonds in all material respects to the description thereof in the Resolutions and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (F) other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices;

(vii)　A certified copy of each of the Resolutions comprising the Resolutions;

(viii)　A copy of the Bankruptcy Court Order, as described in Section 3 hereof;

(ix)　Satisfactory evidence that Standard and Poor's Ratings Services, Fitch Ratings and Moody's Investors Services shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn;

(x)　A copy of the fully executed Letter of Representations from the City and the Department;

(xi)　The opinion of Dykema Gossett PLLC ("DWSD Bond Counsel"), dated the date of the Closing and addressed to the Authority and the Underwriters, as to the validity and tax-exempt status of the DWSD Bonds, in form and substance satisfactory to the Underwriters;

(xii)    Opinions of DWSD Bond Counsel, Miller Canfield as counsel to the Emergency Manager of the City, and Jones Day as Bankruptcy Counsel to the City dated the date of the Closing and addressed to the Underwriters, to the effect, in the aggregate, that (A) at the times of execution of this Agreement the City had, and on the date of the Closing has, full legal right, power and authority to execute and deliver the Letter of Representations and the Local Purchase Contract and other transaction documents (the "DWSD Transaction Documents") and to cause the DWSD Obligations to be delivered to the Authority as provided in this Agreement and pursuant to the DWSD Authorizing Documents (as defined in the Letter of Representations), and the City at the time of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in the DWSD Transaction Documents, (B) no further authorization or approval not already obtained is required by the City in connection with the delivery of the DWSD Obligations to the Authority or entering into or performing its obligations under the DWSD Transaction Documents, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, the DWSD Transaction Documents constitute legal, valid and binding obligations of the City enforceable against the City in accordance with their terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the City has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and the Official Statement, (D) the City's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement in the [TO BE UPDATED] [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the DWSD Obligations are exempt from the registration requirements of the Securities Act, and the DWSD Authorizing Documents are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue

statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(xii)   Certificates of the City [, the Department and the Emergency Manager] dated as of the date of the Closing to the effect that the representations and warranties included in the Letter of Representations and Local Purchase Contract are true and correct in all material respects as of the date of the Closing and all obligations to be performed by the City under the Letter of Representations and the Local Purchase Contract referenced above on or prior to the date of closing have been performed;

(xiii)   A letter from Bond Counsel to the effect that the opinion referred to in clause (ii) of this subparagraph may be relied upon by the Underwriters as though such opinion was addressed to them;

(xiv)   An executed copy of the Authority's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xv)   An executed copy of the City and the Department's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xvi)   Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as required under the Local Purchase Contract;

(xvii)   [A letter from KPMG, dated the Closing Date, to the effect that it reaffirms as of the Closing Date the statements made in the Accountant's Letter (describing agreed-upon procedures and stating no material adverse change in the financial position or results of operations of the Water Fund except as set forth in or contemplated by the Official Statement or as described in such letter), in form and substance satisfactory to the Underwriters];

(xviii)   Immediately before the release of the Bonds, on the Settlement Date evidence satisfactory to Underwriters that the City has filed with the Bankruptcy Court an amended Plan of Adjustment of the City removing all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

(xix)   Certified copies of the Bond Insurance Policies issued by the Bond Insurers and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers and any other documents executed in connection therewith;

(xx)   An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Underwriters and in form and substance satisfactory to the Representative;

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

(xxi)  A certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption ["Bond Insurance"] in the Official Statement is true and correct in all material respects, and that the specimen of the Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers; and

(xxii)  Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as the Underwriters may reasonably request to evidence the truth, accuracy and completeness, as of the date hereof and as of the date of the Closing, of the representations and warranties of the Authority and of the City contained herein and of the statements and information contained in the Official Statement and the due performance or satisfaction by the Authority and the City at or prior to the Closing of all agreements then to be performed and all conditions then to be satisfied by the Authority and the City.

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Underwriters.

If the Authority shall be unable to satisfy the conditions to the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, or if the obligations of the Underwriters to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Agreement, this Agreement shall terminate and neither the Underwriters nor the Authority shall be under further obligation hereunder, except that the respective obligations of the Authority and the Underwriters set forth in Paragraphs 10 and 12 hereof shall continue in full force and effect.

10.     (a)     The Underwriters shall be under no obligation to pay, and the Authority shall pay, all expenses incident to the performance of the obligations of the Authority hereunder, including, but not limited to: (i) the cost of preparation and printing the definitive Bonds; (ii) the cost of the preparation and printing the Preliminary Official Statement, including the appendices and any amendments or supplements thereto; (iii) the fees and disbursements of the financial advisor and Bond Counsel to the Authority; (iv) the fees and disbursements of any consultants or advisors retained by the Authority; (v) fees charged by rating agencies in connection with the Bonds; (vi) the cost of preparation and printing of the Official Statement, up to the number of copies specified in Paragraph 4 hereof, including the appendices thereto; (vii) subject to the provisions of Paragraph 5 above, the cost of preparation of any amendment or supplement to the Official Statement and the costs of printing and delivery of up to [200] copies of any amendment or supplement to the Official Statement, including the reasonable fees and disbursements of counsel to the Underwriters and to the Authority with respect to any supplements or amendments to the Official Statement (all such costs to be paid by the Authority subject to the provisions of Paragraph 5 above); (viii) the fees and disbursements of counsel retained by the Underwriters; (ix) the fees of Digital Assurance Certification, L.L.C. for a continuing disclosure undertaking compliance review; (x) any

initial fees and charges of the Trustee and its counsel (including the first annual payment due the Trustee), the Bond Registrar, the Paying Agent and Co-Paying Agent, if any; and (xi) the fees and disbursements of the Bond Insurers and their counsel.

(b)     The Underwriters shall pay (i) the cost of preparation and reproduction of this Agreement and the other underwriting documents; (ii) all advertising expenses in connection with the offering of the Bonds; (iii) the cost of printing and delivering more than [200] copies of the Official Statement; (iv) the cost of printing and delivery of more than [200] copies of any supplement or amendment of the Official Statement; (v) the cost of amending or supplementing the Official Statement in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete; and (vi) all other expenses incurred by the Underwriters in connection with the Bonds.

11.     Any notice or other communication to be given to the Authority under this Agreement shall be given by delivering the same in writing to its address set forth above, and any notice or other communication to be given to the Underwriters under this Agreement shall be given by delivering the same in writing to Citigroup Global Markets, Inc., [390 Greenwich Street, New York, NY 10013], Attention: [_____], Telephone: [_____], Fax: [_____].

12.     This Agreement is made solely for the benefit of the Authority and the Underwriters (including the successors or assigns of the Underwriters); no other person shall acquire or have any right or liability hereunder or by virtue hereof.  All of the representations, warranties and agreements of the Authority contained in this Agreement and in the certificates delivered pursuant hereto shall remain operative and in full force and effect, regardless of (i) any investigations made by or on behalf of the Underwriters, (ii) delivery of and payment for the Bonds hereunder, and (iii) any termination of this Agreement.


**(Signatures on Next Page)**

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

13.     This Agreement shall become effective upon the acceptance hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance. This Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

Very truly yours,

CITIGROUP GLOBAL MARKETS, INC., As Representative

By: _____
     [Name]
     [Title]

Accepted and Agreed to this
__th day of August, 2014

MICHIGAN FINANCE AUTHORITY

By: _____
    Joseph L. Fielek
    Executive Director

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

**EXHIBIT A**

Item 1 (a)  Aggregate principal amount of the Bonds:  $[_____]

(b)  Date of the Bonds:  August __, 2014

(c)  Years of maturities, interest rates, principal amounts and initial public offering prices:

Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 1
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

Local Government Loan Program Revenue Bonds, Series 2014D-2
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____% CUSIP† _____

Exhibit A, Page 2
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured)
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 3
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

Local Government Loan Program Revenue Bonds, Series 2014D-4
(Detroit Water and Sewerage Department
Water Supply System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

(d)  The Bonds are subject to optional and mandatory redemption prior to maturity as described in the Official Statement.

Item 2.  <u>Purchase Price</u>.  The purchase price shall be $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus net original issue discount of $[_____]).

Exhibit A, Page 4
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014D

EXHIBIT B

LETTER OF REPRESENTATIONS

August [___], 2014

Citigroup Global Markets, Inc.
[Additional Underwriters]

Michigan Finance Authority

Ladies and Gentlemen:

The City of Detroit, Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), proposes to participate in the Michigan Finance Authority (the "Authority") Local Government Loan Program Revenue Bonds, Series 2014D (the "Authority Bonds") program (the "Program") by issuing, in the aggregate, $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds and Water Supply System Revenue Refunding Second Lien Bonds, in one or more series (the "DWSD Obligations"). Proceeds of the DWSD Obligations will be used (i) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Water Supply System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (ii) to pay the costs of issuance of the DWSD Obligations and the Bonds. The City will sell the DWSD Obligations to the Authority pursuant to a Local Purchase Contract between the Authority and the City dated August [___], 2014 (the "Local Purchase Contract"). The City's participation in the Program and execution of the Local Purchase Contract and other related documents have been approved by the City and the Bankruptcy Court Order (as defined below).

The Authority Bonds will be sold by the Authority pursuant to a Bond Purchase Agreement dated the date hereof (the "Purchase Agreement") between the Authority and the Underwriters listed thereunder (the "Underwriters"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

The City acknowledges and agrees that (i) the purchase of the Authority Bonds pursuant to the Purchase Agreement, providing proceeds for the purchase of the DWSD Obligations are arm's-length commercial transactions among the City, the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as the agents or fiduciaries of the City, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract or the discussions,

undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the City on other matters) and the Underwriters have no obligation to the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract except the obligations expressly set forth in the Purchase Agreement, and (iv) the City has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the City's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the City's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The City acknowledges and agrees to the terms of the liquidated damages provision in Section 1 of the Purchase Agreement, including the full release and discharge of any claims by the City against the Underwriters upon any payment of liquidated damages pursuant thereto.

Section 1.  Representations and Warranties.  In order to induce the Underwriters and the Authority to enter into the Purchase Agreement and to sell the Authority Bonds, and to induce the Authority to enter into the Local Purchase Contract with the City, the City represents and warrants, and agrees with the Underwriters and the Authority as follows:

(a)      The City has full right, power and authority to (i) execute and deliver the Local Purchase Contract and this Letter of Representations, and (ii) perform its obligations under, and carry out and consummate all other transactions described in the Purchase Agreement, the Local Purchase Contract and this Letter of Representations, all pursuant to Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"); Bond Ordinance No. 30-02, as amended and restated, adopted by the City Council of Detroit (the "City Council") on January 26, 2005, as thereafter amended (the "Bond Ordinance"); the Orders of the United States District Court in *United States v. City of Detroit, et al*., 77-71100, E.D. Michigan; the Resolution and Ordinance Authorizing the Issuance and Sale of Water Supply System Revenue Refunding Senior Lien Bonds of the City of Detroit and of Water Supply System Revenue Refunding Second Lien Bonds of the City of Detroit, adopted by the BOWC on August 13, 2014 and approved by the Emergency Manager on August 16, 2014 (the "DWSD Bond Resolution"); a Trust Indenture by and among the City, the Department and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of February 1, 2013 (the "DWSD Indenture"); and a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution, and the DWSD Indenture, the "DWSD Authorizing Documents").  The City has complied with or will comply with on or prior to the date of Closing all provisions of applicable law (specifically including, without limiting the generality of the forgoing, the Constitution and laws of the State of Michigan) and all matters relating to such transactions.

(b)     The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, a copy of which is attached as [Exhibit C to the Purchase Agreement] (the "Bankruptcy Court Order"), in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the Purchase Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order.

(c)     No further authorization or approval of the City's Emergency Manager, the City Council or the BOWC is required for the execution and delivery of the DWSD Obligations, this Letter of Representations, the Local Purchase Contract, the continuing disclosure undertaking (the "Undertaking") on behalf of the City, and any other transaction documents related thereto (collectively, the "DWSD Transaction Documents") and the DWSD Transaction Documents constitute a legal, valid and binding obligations of the City, enforceable against the City in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the City is not required to obtain any further authorization or approval for the sale and delivery of the DWSD Obligations to the Authority or the performance by the City of its obligations under the DWSD Transaction Documents except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing.

(d)     The City, acting through the BOWC and the Emergency Manager, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement.

(e)     The DWSD Obligations are issued pursuant to that Act 94 and the DWSD Authorizing Documents.  The DWSD Authorizing Documents have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the DWSD Obligations and a valid, legally binding act of the City, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised.

(f)     When delivered to the Authority and paid for in accordance with the terms of this Agreement, the DWSD Obligations (i) will have been duly authorized, executed and issued by the City pursuant to the DWSD Authorizing Documents, and (ii) will constitute valid, legally binding, limited obligations of the City.

(g)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the City described herein or the delivery of the DWSD Obligations to the Authority except for the filing of IRS form 8038-G (and the City hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith.

(h)     All legislation necessary to permit the City (i) to fulfill in all material respects its obligations under the DWSD Authorizing Documents and the DWSD Transaction Documents and (ii) to carry out the transactions contemplated in the DWSD Authorizing Documents and the DWSD Transaction Documents is in full force and effect.

(i)     The execution and delivery of the Official Statement, the DWSD Transaction Documents, and the fulfillment of the terms and conditions of and the carrying out of the transactions contemplated by the DWSD Transaction Documents, do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the City is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the DWSD Obligations or the ability of the City to pay the principal of and the interest on any of the DWSD Obligations.

(j)     The City has duly authorized the use of the information contained in [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE WATER SUPPLY SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN

CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion") of the Preliminary Official Statement and the Official Statement, to be used by the Underwriters in connection with the public sale of the Authority Bonds. The City has ratified and consented to such use of the Preliminary Official Statement and the Official Statement in accordance with law by the Underwriters in connection with the public sale of the Authority Bonds and the City deems the information set forth in the City and DWSD Portion of the Preliminary Official Statement to be "final" as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12.

(k)     The information set forth in the City and DWSD Portion of the Preliminary Official Statement and the Official Statement is true and correct in all material respects and the City and DWSD Portion of the Preliminary Official Statement and the Official Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(l)     The financial statements of the City's Water Fund as of June 30, 2013, including the notes thereof, included in Appendix II-D of the Official Statement, present fairly the financial position of the City's Water Fund as of the date indicated and the results of its operations and changes in fund balances and financial position for the year specified, and such financial statements have been prepared in the conformity with generally accepted accounting principles consistently applied in all material respects.

(m)     Except as set forth in the Preliminary Official Statement and the Official Statement, subsequent to the respective dates of which information is given in the Preliminary Official Statement and the Official Statement, the City has not incurred any liabilities, direct or contingent, or entered into any transactions, not in the ordinary course of business, that are material to the business and affairs of the City and there has not been any material change in the condition, results of operation or general affairs of the City (financial or otherwise).

(n)     Except as disclosed in the Preliminary Official Statement and the Official Statement, and other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, there is no action, suit, proceeding, inquiry or investigation at law or in equity by or before any court or public board or body pending or threatened against or affecting the City (or, the knowledge of the City, any basis therefor) (i) seeking to restrain or enjoin the sale or delivery of the DWSD Obligations, or (ii) in any manner questioning the authority of the City to issue, or the issuance or validity of, any of the DWSD Obligations or any other indebtedness of the City, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the DWSD Obligations, or (iv) questioning any of the DWSD Authorizing Documents or Act 94, or (v) questioning the validity or enforceability of the DWSD Authorizing Documents or (vi) seeking to secure a lien on the Pledged Assets or the collection of the Net Revenues, as defined in the DWSD Authorizing Documents, or other moneys, securities, funds and property pledged in the

DWSD Authorizing Documents that are a source of payment on the DWSD Obligations, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the BOWC to his or her office is being contested;

(o)     Other than as a result of the of the City's chapter 9 bankruptcy proceedings, the City is not in breach of or in default under any existing law, court or administrative regulation, decree, order, agreement, indenture, mortgage, lease, sublease or other instrument to which they are a party or by which they are bound, and no event has occurred or is continuing which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default thereunder, except as set forth in the Preliminary Official Statement and the Official Statement and except (in each case) for such minor breaches, defaults or potential defaults or event of default, if any, which individually and in the aggregate would have no material adverse effect on the City's financial condition, operations or properties.

(p)     The City has provided the following statement to the Authority for use in the Preliminary Official Statement and the Official Statement relating to the requirements described in Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission:

"*Prior Continuing Disclosure Non-Compliance by the City*

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Water Supply System.  During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Water Supply System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end.  The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010.  The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013.  The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013.  The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Water Supply System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale in the secondary market of bonds issued by the City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof."

(q)     Any certificate signed by an authorized officer of the City delivered to the Underwriters and the Authority shall be deemed a representation and warranty by the City to such parties as to the statements made therein.

Section 2. <u>Special Covenants</u>. The City covenants and agrees with the Underwriters and the Authority as follows:

(a)     The City will provide the Underwriters with information concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as described in Section 6 of the Purchase Agreement. The City agrees to cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters and the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. The expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the City) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the City.

(b)     Between the date hereof and the date of the Closing, the City will not take any action which would cause the representations and warranties contained in Section 1 to be untrue on the date of the Closing. On the date of the Closing, the City shall deliver or cause to be delivered all opinions, certificates and other documents to be delivered by it or on its behalf as provided for in the Purchase Agreement and the Local Purchase Contract and to deliver such additional certificates and other documents as the Underwriters may reasonably request to evidence performance of or compliance with the provisions of the Purchase Agreement and the DWSD Transaction Documents, all such certificates and other documents to be satisfactory in form and substance to the Underwriters.

Section 3.  Survival of Representations and Warranties.  All representations, warranties, covenants and agreements contained in this Letter of Representations or contained in certificates of officers of the City submitted pursuant hereto or pursuant to the Purchase Agreement, or the Local Purchase Contract at the dates made shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriters or any other person, and shall survive (i) delivery of the Authority Bonds to the Underwriters and payments by the Underwriters therefor pursuant to the Purchase Agreement, (ii) any termination of the Purchase Agreement by the Underwriters pursuant to the provisions thereof or (iii) any failure on the part of the City by the Authority to satisfy any condition to the obligations of the Underwriters specified in the Purchase Agreement, which failure results in a refusal by the Underwriters to purchase and pay for the Authority Bonds.

Section 4.  Parties in Interest.  This Letter of Representations shall be binding upon the City and shall inure solely to the benefit of the Underwriters and the Authority and, to the extent set forth herein, officers, directors and employees of and persons controlling the Underwriters and the Authority, and their respective personal representatives, successors and assigns, and no other person or firm shall acquire or have any right under or by virtue of this Letter of Representations.

Section 5.  Indemnification.  The City agrees to indemnify and hold harmless the Underwriters, the directors, officers, employees and  agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Securities Act or the Exchange Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any them may become subject under the Securities Act, the Exchange Act or other Federal or State statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Official Statement, the Final Official Statement (or in any amendment or supplement thereto), or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. This indemnity agreement will be in addition to any liability which the City may otherwise have.

Promptly after receipt by an indemnified party of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have

the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

In the event that the indemnity provided herein is unavailable or insufficient to hold harmless an indemnified party for any reason, the City and the Underwriter agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) to which the City and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the City on the one hand and by the Underwriters on the other from the offering. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the City and the Underwriters shall contribute in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the City on the one hand and of the Underwriters on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. In no case shall any Underwriter (except as may be provided in any agreement among the Underwriters relating to the offering) be responsible for any amount in excess of the purchase discount or fee applicable to the Authority Bonds purchased by such Underwriter hereunder. Benefits received by the City shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total purchase discounts and commissions in each case set forth on the cover of the Final Official Statement. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the City on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, information and opportunity to correct or prevent such untrue statement or omission. The City and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph, no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f)

of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Each person who controls an Underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the City within the meaning of either the Securities Act or the Exchange Act and each official, director, officer and employee of the City shall have the same rights to contribution as the City, subject in each case to the applicable terms and conditions of this paragraph.

Very truly yours,

CITY OF DETROIT, MICHIGAN

By: _____

DETROIT WATER AND SEWERAGE DEPARTMENT

By: _____

**EXHIBIT 1B**

CHI-1940093v3

**MICHIGAN FINANCE AUTHORITY**
**$_____**
**Local Government Loan Program Revenue Bonds, Series 2014C**
**(Detroit Water and Sewerage Department**
**Sewage Disposal System Revenue and Revenue Refunding Local Project Bonds)**

**BOND PURCHASE AGREEMENT**

**August [___], 2014**

Michigan Finance Authority
Richard H. Austin State Office Building
430 West Allegan Street
Lansing, Michigan 48922

Ladies and Gentlemen:

Citigroup Global Markets, Inc. (the "Representative"), on behalf of itself and J.P. Morgan Securities LLC, BMO Capital Markets, Loop Capital Markets LLC, [Barclays], [PNC Capital Markets LLC], [Comerica Securities, Inc.], and [Jeffries] (collectively with the Representative, the "Underwriters"), hereby offers to enter into this Bond Purchase Agreement (this "Agreement") with the Michigan Finance Authority (the "Authority") which, upon the acceptance of this offer by the Authority acting pursuant to statutory authority, including Act 227 of the Public Acts of Michigan, 1985, as amended (the "Act"), will be binding upon the Authority and the Underwriters. This offer is made subject to written acceptance of this Agreement by the Authority at or before 12:00 p.m., Eastern Time, on [August __], 2014, and if not so accepted will be subject to withdrawal by the Representative upon notice delivered to the Authority at any time prior to the acceptance hereof by the Authority.

1. Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein, the Underwriters hereby agree to purchase from the Authority and the Authority agrees to sell to the Underwriters for $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus/plus net original issue discount/premium of $[_____]), all (but not less than all) of the following bonds to be issued by the Authority:

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-1 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Senior Lien Local Project Bonds (Insured)

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-2
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Senior Lien Local Project Bonds (Uninsured)

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-3
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Senior Lien Local Project Bonds

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds
(Insured)

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-5
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds
(Uninsured)

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds
(Insured)

$_____      Local Government Loan Program Revenue Bonds, Series 2014C-7
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)
Type: DWSD Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds
(Uninsured)

(the "Bonds"). The Bonds are being issued to finance the purchase by the Authority, pursuant to a Local Purchase Contract between the Authority and the City of Detroit, County of Wayne, State of Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), dated [August __], 2014 (the "Local Purchase Contract"), of the following bonds:

$_____      City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Bonds, Series 2014A

$_____      City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Bonds, Series 2014B

$_____      City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Bonds, Series 2014C

$_____      City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D

$_____      City of Detroit, Michigan, Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E



$_____    City of Detroit, Michigan, Detroit Water and Sewerage Department
              Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F

$_____    City of Detroit, Michigan, Detroit Water and Sewerage Department
              Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014G

(the "DWSD Obligations") to be issued by the City (i) to finance certain capital expenditures of the Department for its Sewage Disposal System (the "System"), (ii) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Sewage Disposal System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (iii) to pay the costs of issuance of the DWSD Obligations and the Bonds.

Payment of the principal of and interest on certain series of the Bonds (the "Insured Bonds") when due will be insured by municipal bond insurance policies (the "Bond Insurance Policies") to be issued by one or more bonds insurers (the "Bond Insurers") simultaneously with the delivery of the Bonds.

The Underwriters intend to make an initial bona fide public offering of all of the Bonds at prices not in excess of the public offering prices set forth on the inside cover pages of the official statement, dated the date hereof, with respect to the Bonds (such official statement, together with the cover pages, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Official Statement") and may subsequently change such offering price without any requirement of prior notice. The Underwriters may offer and sell Bonds to certain dealers (including dealers depositing Bonds into investment trusts) and others at prices lower than the public offering price stated on the inside cover pages of the Official Statement. The Underwriters agree to furnish to the Authority an issue price and yield certificate which will contain certifications necessary to determine the issue price and yield on the Bonds.

In the event that the Underwriters fail (other than for reasons permitted herein) to accept delivery of and pay for the Bonds at the Closing (as hereinafter defined in paragraph 7(a)), the parties hereto acknowledge that the damages that the Authority and the City may suffer as a result thereof shall be difficult to ascertain, and as a result, the parties hereby agree that as liquidated damages, and not as a penalty, for the Underwriters' failure, the Underwriters shall pay to the Authority, as liquidated damages to the Authority and to the City, an aggregate amount equal to the lesser of (i) 1% of the aggregate principal amount of the Bonds or (ii) $5,000,000. Payment of such liquidated damages to the Authority and acceptance by the Authority, on behalf of itself and the City, shall constitute a full release and discharge of all claims and damages for such failure of the Underwriters.

The Authority acknowledges and agrees that (i) the purchase and sale of the Bonds pursuant to this Agreement is an arm's-length commercial transaction between the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as agents or fiduciaries of the Authority, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the Authority with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto (irrespective of whether the Underwriters have provided other

services or are currently providing other services to the Authority on other matters) and the Underwriters have no obligation to the Authority with respect to the offering contemplated hereby except the obligations expressly set forth in this Agreement, and (iv) the Authority has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the Authority's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the Authority's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission ("SEC") rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

2.      The Bonds shall otherwise be as described in the Resolutions (as hereinafter defined) and the Official Statement and shall be payable in lawful money of the United States as also described herein.

The Representative has been duly authorized to execute this Agreement and to act hereunder and on behalf of each Underwriter, each of whom represents that it has the legal capacity to enter into this Agreement and to carry out the transactions contemplated hereby.

The aggregate principal amount, the date, the dates of maturity, the interest rates per annum and the initial public offering prices of the Bonds are set forth in Item 1 of Exhibit A attached hereto and made a part hereof. The Bonds shall in all other respects be the same Bonds as are described in the Official Statement.

3.      The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in In re City of Detroit, Michigan, Case No. 13-53846, [a copy of which is attached hereto as [Exhibit C] (the "Bankruptcy Court Order"),] in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to this Agreement and all transaction documents, (2) authorizing the City to grant a lien equal or senior to, as applicable, existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

described in the Bankruptcy Court Order. Based upon the Bankruptcy Court Order, the Underwriters have determined to enter into this Agreement.

4. The Authority has authorized the execution of the Official Statement dated the date hereof and the use of such Official Statement by the Underwriters in connection with the public offering of the Bonds. The Authority has consented to the use in accordance with law by the Underwriters on or before the date hereof of the preliminary official statement with respect to the Bonds dated August [__], 2014 (such preliminary official statement, together with the cover page, and all exhibits, appendices and statements included therein or attached thereto being herein called the "Preliminary Official Statement"), in connection with the public sale of the Bonds. The Authority deems the information set forth in the Preliminary Official Statement (other than the information set forth in the sections entitled [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE SEWAGE DISPOSAL SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively, the "City and DWSD Portion"), to be final as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12. The City and the Department, in the Letter of Representations (as defined herein), has deemed the information set forth in the City and DWSD Portion of the Preliminary Official Statement final as of its date. The Authority has prepared a Continuing Disclosure Undertaking, to be dated on or before the Closing (the "Undertaking"), to provide or cause to be provided, certain annual financial information and operating data, and timely notice of the occurrence of certain material events with respect to the Bonds.

5 You hereby agree to supply, within the earlier of (i) seven business days of the date of acceptance hereof or (ii) sufficient time to accompany any confirmation requesting payment which the Underwriters might send to its customers with respect to the Bonds (which in any event shall be a time reasonably acceptable to both the Underwriters and the Authority), such number of copies of the Official Statement as to which the Underwriters will inform you prior to the printing of such Official Statement and which will not exceed [200] copies.

6. You hereby agree that you will provide the Underwriters with information of which you have knowledge from any source concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as defined below. You further agree that you will cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

of such information, in the reasonable opinion of the Underwriters or the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12. Except as provided in the last sentence of this paragraph, the expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the Authority) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the Authority. The cost of printing and delivery in excess of [200] copies of the amendment or supplement to the Official Statement shall be paid by the Underwriters. The Underwriters agree to amend or supplement the Official Statement at its own expense in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete.

The term "end of the underwriting period" as referred to in the preceding paragraph and elsewhere herein is the later of the delivery of the Bonds by you to the Underwriters or when the Underwriters no longer retain an unsold balance of the Bonds for sale to the public. The "end of the underwriting period" shall be deemed to be 25 days after the date of Closing, unless the Representative otherwise notifies you in writing prior to such date, to the best of its knowledge, that there exists an unsold balance of the Bonds. The deemed "end of the underwriting period" may be extended for additional periods of 25 days each upon receipt of an additional written notification from the Representative that, to the best of its knowledge, there exists an unsold balance of Bonds. The Representative agrees to file the Official Statement with the MSRB on or before the date of Closing.

7.     The Authority represents and warrants to, and agrees with, the Underwriters, as of the date of its acceptance of this Agreement and as of the date and time of the Closing, as follows:

(a)     The Authority, has, and at the time of the Closing will have, full legal right, power and authority (i) to enter into this Agreement and the Undertaking and (ii) to sell and deliver the Bonds to the Underwriters as provided herein, in the Resolutions (as hereinafter defined) and in the Official Statement; and the Authority has, and at the time of the Closing will have, duly authorized and approved the execution and delivery of, and performance by the Authority of its obligations contained in this Agreement;

(b)     No further authorization or approval of the Authority's Board of Directors (the "Board of Directors") is required for the execution and delivery of this Agreement or the Undertaking on behalf of the Authority, and this Agreement assuming due authorization, execution and delivery of the Agreement by the other party thereto, constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the Authority is not required to obtain any further authorization or approval for the sale and delivery of the Bonds to the Underwriters or the performance by the

Authority of its obligations hereunder or under the Undertaking except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing;

(c)     The Authority, acting through the Board of Directors, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement as provided in Paragraph 3 hereof;

(d)     The Bonds are issued pursuant to that certain Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds adopted by the Authority on May 15, 2014 (the "General Resolution"), and the Supplemental Resolution by the Authority adopted by the Authority on August 12, 2014 (the "Supplemental Resolution" and together with the General Resolution, the "Resolutions"). The Supplemental Resolution has been duly adopted by the Authority, acting through its Board of Directors, and the Resolutions have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the Bonds and a valid, legally binding act of the Authority, enforceable in accordance with the terms thereof except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the Authority neither knew nor should have known at the time of execution hereof) are raised;

(e)     When delivered to the Underwriters and paid for in accordance with the terms of this Agreement, the Bonds (i) will have been duly authorized, executed and issued by the Authority pursuant to the Resolutions, and (ii) will constitute valid, legally binding, limited obligations of the Authority; provided, however, that the Bonds and the interest obligation thereon shall never constitute a debt or liability of the State of Michigan (the "State") or any agency or employee thereof within the meaning of any constitutional or statutory provision or limitation or a general obligation of the Authority and shall never create or constitute any indebtedness, liability or obligation of the State or constitute a pledge of the faith and credit of the State or the general funds or assets of the Authority (including funds pertaining to other loans or activities) but shall be a limited obligation of the Authority payable solely from the Security, as defined in the Resolutions;

(f)     No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the Authority described in subparagraphs (a), (b), (c), (d) or (e) of this Paragraph 6 or the delivery of the Bonds to the Underwriters except for the filing of IRS form 8038-G (and the Authority hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith;

(g)     All legislation necessary to permit the Authority (i) to fulfill in all material respects its obligations under the Resolutions, this Agreement and the Undertaking, and (ii) to carry out the transactions contemplated in the Resolutions and the Official Statement is in full force and effect;

(h)     The execution and delivery of the Official Statement, this Agreement, and the Undertaking by the Authority, and the fulfillment of the terms and conditions of, and the carrying out of the transactions contemplated by the Resolutions, this Agreement, and the Undertaking, do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the Authority is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the Bonds or the ability of the Authority to pay the principal of and the interest on any of the Bonds;

(i)     The Preliminary Official Statement (other than the City and DWSD Portion), as of the date thereof, did not contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which they were made, not misleading;

(j)     The Official Statement (other than the City and DWSD Portion), does not, as of its date or will not as of the Closing, contain any untrue statement of a material fact or omit to state any material fact necessary to make such document, or the statements and information therein contained, in light of the circumstances under which it was made, not misleading;

(k)     The Bonds will conform to the terms thereof set forth in the Resolutions and described in the Official Statement; and the proceeds of the Bonds will be applied as described under the caption "THE SERIES 2014C BONDS —Sources and Uses of Funds for the Series 2014C Bonds" in the Official Statement;

(l)     Other than an appeal of the Bankruptcy Court Order, except as may have been disclosed in writing to the Underwriters before the date of this Agreement or as may be disclosed in the Official Statement, the Authority has not been served with any litigation (and to the knowledge of the Authority no litigation has been commenced or is threatened) against the Authority, in any court (i) seeking to restrain or enjoin the sale or delivery of the Bonds, or (ii) in any manner questioning the authority of the Authority to issue, or the issuance or validity of, any of the Bonds or any other indebtedness of the Authority, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the Bonds, or (iv) questioning any of the legislation referred to in subparagraph (g) of this Paragraph 6, or (v) questioning the validity or enforceability of the Resolutions or (vi) seeking to secure a lien on the Pledged Funds or the collection of the Revenues, as defined in the Resolutions, or other moneys, securities, funds and property pledged in the Resolutions that are a source of payment on the Bonds, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the Board of Directors to his or her office is being contested;

(m)     Any certificate or copy of any certificate signed by an official of the Authority and delivered to the Underwriters pursuant hereto or in connection herewith shall be deemed a representation by the Authority to the Underwriters as to the truth of the statements therein made;

(n)     Except as permitted by the Resolutions, from and after the time of Closing, the Authority will not create or permit the creation of, or issue any obligations or create any additional indebtedness secured by, a charge and lien on the Pledged Funds, as defined in the Resolutions, and other moneys, securities, funds and property pledged in the Resolutions;

(o)     To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds to be used directly or indirectly to acquire any securities or obligations, the acquisition of which would cause any Bond to be an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code of 1986 or any successor provision, act or statute, and the regulations from time to time promulgated or proposed thereunder (the "Code");

(p)     To the extent permitted by law, the Authority will not permit any of the proceeds of the Bonds or any other funds of the Authority to be used directly or indirectly in a manner which would result in the exclusion of any of the Bonds from the treatment afforded by Section 103(a) of the Code for any reason, including without limitation the classification of such Bonds as "private activity bonds" within the meaning of Section 141(a) of the Code or as obligations guaranteed by the United States of America, as provided in Section 149(b) of the Code; and the Authority will not take any action or omit to take any action which, by commission or omission, would cause interest on the Bonds to be includable in gross income for federal income tax purposes pursuant to Section 103 of the Code or cause such interest to be included in any alternative minimum tax other than an alternative minimum tax which applies to all tax exempt bonds generally; [ADJUST IF PRIVATE ACTIVITY BONDS WILL BE ISSUED]

(q)     Other than a nonmonetary default resulting from the City having filed a petition for relief under Title 11 of the United States Code, the Authority is not, and historically has not been, in default in the payment of principal of, or premium, if any, or interest on any bonds, notes or contract payments pledged for the payment of notes or bonds and has not entered into any contract or arrangement that might give rise to any lien or encumbrance on the Pledged Funds other than as provided in the Resolutions;

(r)     The Authority has complied with all continuing disclosure obligations under Rule 15c2-12 during the previous five years; and

(s)     The Authority will without any cost to the Authority cooperate with the Underwriters in the qualification of the Bonds for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Underwriters

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

shall designate, provided that the Authority is not required to qualify as a foreign corporation or to consent to any general or special service of process in any jurisdiction.

It is acknowledged and agreed by the parties hereto that all covenants, representations and warranties made by the Authority herein and in any certificates given in compliance herewith, are made solely by the Authority and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.

8.    (a)    At 10:00 a.m., Eastern Time, on September [__], 2014, or such other time and date as shall be mutually agreed upon by the Authority and the Underwriters (the "Closing"), the Authority shall direct the Trustee to deliver the Bonds to the Underwriters at the offices of The Depository Trust Company, New York, New York, in definitive form, duly executed and authenticated by the Trustee.  Subject to the terms and conditions hereof, the Authority shall deliver at the offices of [Dickinson Wright PLLC, [location to be determined], the other documents and instruments to be delivered at the Closing pursuant to this Agreement (the "Closing Documents") and the Underwriters shall accept delivery of the Bonds and the Closing Documents and pay the purchase price for the Bonds as set forth in Item 2 of Exhibit A hereto by wire transfer to the Trustee, in Federal Reserve Funds immediately available, for the account of the Authority, or as the Authority shall direct.  The Bonds shall be registered in the name of Cede & Co., as nominee for The Depository Trust Company ("DTC") and there shall be one (1) typewritten Bond for each maturity as set forth in Item 1 of Exhibit A.  The Bonds shall be made available to the Underwriters not less than 24 hours preceding the Closing for purposes of inspection.

(b)    If the Authority shall be unable to satisfy the conditions of the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, the respective obligations of the Authority and the Underwriters shall be as set forth in Paragraph 10 hereof.

9.    The Underwriters have entered into this Agreement in reliance upon the representations and warranties and agreements of the Authority contained herein, upon the representations and warranties and agreements of the City contained in the Letter of Representations attached hereto as <u>Exhibit B</u> executed and delivered on behalf of the City on the date hereof (the "Letter of Representations") and in the Local Purchase Contract, and upon the representations and warranties of the Authority and the City to be contained in the Closing Documents, and upon the performance by the Authority of its obligations hereunder, upon the performance by the City of its obligations under the Letter of Representations and the Local Purchase Contract, both as of the date hereof and as of the date of Closing.  The Underwriter has received a letter from KPMG LLP, the independent accountants for the Department ("KPMG"), [in the form attached hereto as Exhibit ___] [providing for its consent to the inclusion in the Letter of audited financial statements of the Sewage Disposal Fund for the year ended June 30, 2013 in the Preliminary Official Statement and in the Official Statement and describing agreed-upon procedures] (the "Accountant's Letter").  Accordingly, the Underwriters' obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds shall be subject to the performance by the Authority and the City of their obligations to be performed hereunder, under the Letter of Representations and the Local Purchase Contract, at or prior to the Closing, and shall also be subject to the following conditions:

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

(a)     The representations and warranties of the Authority contained herein shall be true, complete and correct in all material respects at the date hereof and as of the time of the Closing, as if made at and as of the time of the Closing, and the Authority shall be in compliance with each of the agreements made by it in this Agreement;

(b)     At the time of the Closing, the Official Statement shall not have been amended, modified or supplemented, except in such manner as may have been agreed to by the Underwriters;

(c)     The Underwriters shall have the right in their sole discretion (except where otherwise indicated below) to terminate its obligations under this Agreement to purchase, to accept delivery of and to pay for the Bonds by notifying the Authority of their election to do so, if after the acceptance hereof by the Authority and prior to the Closing:

(i)     any event shall occur which makes untrue or incorrect in any material respect, as of the time of such event, any statement or information contained in the Official Statement or which is not reflected in the Official Statement but should be reflected therein in order to make the statements contained therein not misleading in any material respect and, in either event, the Authority refuses to permit the Official Statement to be supplemented to supply such statement or information or the effect of the Official Statement as so supplemented is, in the judgment of the Underwriter, to materially adversely affect the market for the Bonds or the sale, at the contemplated offering prices (or yields), by the Underwriter of the Bonds; or

(ii)     the market price of the Bonds or the marketability thereof shall (in the reasonable opinion of the Underwriters) have been materially adversely affected by reason of the fact that between the date hereof and the Closing,

(A) an amendment to the Constitution of the United States or to the Constitution of the State, shall have been adopted, or

(B) legislation shall have been enacted by the Congress or by the Legislature of the State, recommended to the Congress for passage by the President of the United States or the Legislature of the State by the Governor of the State, or introduced and favorably reported for passage to either House of the Congress or of the Legislature of the State by any Committee of such House to which such legislation has been referred for consideration or by a conference committee of both Houses of the Congress; or any statement or report in respect of legislation previously introduced or favorably reported or recommended for passage shall have been made or reported to have been made by the President, any member of the Cabinet or his representative, or any agency of the Federal government, including without limitation the Internal Revenue Service, or any member or members of either House of the Congress or the members or staff of any Committee of either House of the Congress or a conference committee of both Houses of the Congress, or

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

(C) a decision shall have been rendered by a court established under Article III of the Constitution of the United States, or the Tax Court of the United States, or any other Federal or State court, or an order, ruling or regulation (final, temporary or proposed) shall have been made by the Treasury Department of the United States or the Internal Revenue Service or by any other Federal or State agency affecting the tax status of the Authority or its obligations for borrowed money (including the Bonds) or the interest thereon (including any such event with the purpose or effect, directly or indirectly, of imposing Federal income taxation upon, or any taxation in the State upon, such interest as would be received by the holders of the Bonds); or

(iii)   a stop order, ruling, regulation, proposed regulation or statement by or on behalf of the SEC or any other governmental agency having jurisdiction of the subject matter shall be issued or made to the effect that the issuance, offering, sale or distribution of obligations of the general character of the Bonds is in violation or would be in violation of any provisions of the Securities Act of 1933, as amended (the "Securities Act"), Exchange Act, or the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"); or

(iv)   legislation introduced in or enacted (or resolution passed) by the Congress or an order, decree or injunction issued by any court of competent jurisdiction, or an order, ruling, regulation (final, temporary or proposed), press release, or other form of noticed issued or made by or on behalf of the SEC, or any other governmental agency having jurisdiction of the subject matter, to the effect that obligations of the general character of the Bonds, including any or all underlying arrangements, are not exempt from registration under or other requirements of the Securities Act, or that the Resolutions are not exempt from qualification under or other requirements of the Trust Indenture Act, or that the issuance, offering or sale of obligations of the general character of the Bonds, including any or all underlying arrangements, as contemplated hereby or by the Official Statement or otherwise, is or would be in violation of the federal securities law as amended and then in effect; or

(v)   there shall have occurred an outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if, in the reasonable opinion of the Underwriters, the market price of the Bonds or the marketability thereof shall be materially adversely affected thereby; or

(vi)   there shall have occurred a general suspension of trading, minimum or maximum prices for trading shall have been fixed and be in force or maximum ranges or prices for securities shall have been required on the New York Stock Exchange or other national stock exchange whether by virtue of a determination by that Exchange or by order of the SEC or any other governmental agency having jurisdiction or any national securities exchange shall have (A) imposed additional material restrictions not in force as of the date hereof with respect to trading in securities generally, or to the Bonds or similar obligations, or (B)

materially increased restrictions now in force with respect to the extension of credit by or the charge to the net capital requirements of underwriters or broker-dealers such as to make it, in the judgment of the Underwriters, impractical or inadvisable to proceed with the offering of the Bonds as contemplated in the Official Statement; or

(vii) the declaration of a general banking moratorium by United States, New York or State authorities or a major financial crisis or a material disruption in commercial banking or securities settlement clearances services shall have occurred such as to make it, in the judgment of the Underwriter, impractical or inadvisable to proceed with the offering of the Bonds as contemplated by the Official Statement; or

(viii) the purchase of and payment for the Bonds by the Underwriters, or the resale thereof by the Underwriters, on the terms and conditions herein provided, shall be prohibited by any applicable law or governmental regulation or order of any court (other than by reason of the Underwriters' failure to comply with any applicable state blue sky or securities law); or

(ix) the market price of the Bonds or the marketability thereof shall have been materially adversely affected by the occurrence of any event which in the reasonable opinion of the Underwriters requires or has required an amendment, modification or supplement to the Official Statement; or

(x) The Bankruptcy Court Order shall have been subsequently vacated, reversed or modified, in whole or in part, in any manner without the consent of the Underwriter and the Authority by the Bankruptcy Court or any other court of competent jurisdiction or is the subject of a stay pending appeal.

(d) The Authority shall not have defaulted under any of its covenants, agreements, representations or warranties under the Resolutions or this Agreement;

(e) The City shall have issued and delivered the DWSD Obligations to be purchased with the proceeds of the Bonds.

(f) At or prior to the Closing, the Underwriters shall have received each of the following documents (the "Closing Documents"):

(i) A copy of the Official Statement, signed on behalf of the Authority by its Chairperson or other member of the Authority or its Executive Director or other authorized officer;

(ii) The opinion of the Attorney General of the State of Michigan, dated the date of Closing, substantially in the form set forth in Appendix III to the Official Statement and the opinion of Dickinson Wright PLLC ("Bond Counsel"), dated the date of the Closing and addressed to the Authority, substantially in the form set forth in Appendix III to the Official Statement;

(iii) Supplemental opinions of Bond Counsel and the Attorney General of the State of Michigan, each dated the date of the Closing and addressed to the Underwriters, to the effect that (A) at the times of execution of this Agreement the

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

Authority had, and on the date of the Closing has, full legal right, power and authority to execute and deliver this Agreement and to cause the Bonds to be delivered to the Underwriters as provided in this Agreement and in the Resolutions, and the Authority at the times of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in this Agreement, (B) no further authorization or approval not already obtained is required by the Authority in connection with the delivery of the Bonds to the Underwriters or entering into or performing its obligations under the Resolutions or this Agreement, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, this Agreement constitutes a legal, valid and binding obligation of the Authority enforceable against the Authority in accordance with its terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the Authority has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and has duly authorized, approved and executed the Official Statement, (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach of or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement under the captions [TO BE UPDATED] ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY," "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014C BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES BONDS," "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices [_____], insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the Bonds are exempt from the registration requirements of the Securities Act, and the Resolutions are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement (other than the City or DWSD Portion) as of its

date and as of Closing (other than the financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv)     An opinion, dated the date of the Closing and addressed to and solely for the benefit of the Underwriters, of Kutak Rock LLP, counsel to the Underwriters, in form and substance satisfactory to the Underwriters;

(v)     A non-arbitrage certificate, dated the date of the Closing, signed by the Chairperson of the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Underwriters;

(vi)     A certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the Bonds in all material respects to the description thereof in the Resolutions and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (F) other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices;

(vii)     A certified copy of each of the Resolutions comprising the Resolutions;

(viii) A copy of the Bankruptcy Court Order, as described in Section 3 hereof;

(ix) Satisfactory evidence that Standard and Poor's Ratings Services, Fitch Ratings and Moody's Investors Services shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn;

(x) A copy of the fully executed Letter of Representations from the City and the Department;

(xi) The opinion of Dykema Gossett PLLC ("DWSD Bond Counsel"), dated the date of the Closing and addressed to the Authority and the Underwriters, as to the validity and tax-exempt status of the DWSD Bonds, in form and substance satisfactory to the Underwriters;

(xii) Opinions of DWSD Bond Counsel, Miller Canfield as counsel to the Emergency Manager of the City, and Jones Day as Bankruptcy Counsel to the City dated the date of the Closing and addressed to the Underwriters, to the effect, in the aggregate, that (A) at the times of execution of this Agreement the City had, and on the date of the Closing has, full legal right, power and authority to execute and deliver the Letter of Representations and the Local Purchase Contract and other transaction documents (the "DWSD Transaction Documents") and to cause the DWSD Obligations to be delivered to the Authority as provided in this Agreement and pursuant to the DWSD Authorizing Documents (as defined in the Letter of Representations), and the City at the time of execution of this Agreement had, and on the date of the Closing has, duly authorized and approved the execution and delivery of, and the performance of its obligations contained in the DWSD Transaction Documents, (B) no further authorization or approval not already obtained is required by the City in connection with the delivery of the DWSD Obligations to the Authority or entering into or performing its obligations under the DWSD Transaction Documents, except for such approvals, consents or authorizations as are required by blue sky or securities laws of any state (as to which no opinion need be expressed) and, assuming due authorization, execution and delivery thereof by the other party thereto, the DWSD Transaction Documents constitute legal, valid and binding obligations of the City enforceable against the City in accordance with their terms, subject to the application of general principles of equity, including equitable subordination and to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting creditors' rights, (C) the City has duly authorized and approved the distribution and use in accordance with applicable law of the Preliminary Official Statement and the Official Statement, (D) the City's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is

bound that, in all cases, would have an adverse effect on the Bonds, (E) the statements in the Official Statement in the [TO BE UPDATED] [under sections "[_____]" and Appendices [_____]], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, (F) the DWSD Obligations are exempt from the registration requirements of the Securities Act, and the DWSD Authorizing Documents are exempt from qualification as an indenture under the Trust Indenture Act, and (G) nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(xii)   Certificates of the City [, the Department and the Emergency Manager] dated as of the date of the Closing to the effect that the representations and warranties included in the Letter of Representations and Local Purchase Contract are true and correct in all material respects as of the date of the Closing and all obligations to be performed by the City under the Letter of Representations and the Local Purchase Contract referenced above on or prior to the date of closing have been performed;

(xiii)   A letter from Bond Counsel to the effect that the opinion referred to in clause (ii) of this subparagraph may be relied upon by the Underwriters as though such opinion was addressed to them;

(xiv)   An executed copy of the Authority's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xv)   An executed copy of the City and the Department's Continuing Disclosure Undertaking, in the form and content set forth in Appendix IV to the Official Statement;

(xvi)   Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as required under the Local Purchase Contract;

(xvii)   [A letter from KPMG, dated the Closing Date, to the effect that it reaffirms as of the Closing Date the statements made in the Accountant's Letter (describing agreed-upon procedures and stating no material adverse change in the financial position or results of operations of the Sewage Disposal Fund except as set forth in or contemplated by the Official Statement or as described in such letter), in form and substance satisfactory to the Underwriters];

(xviii) Immediately before the release of the Bonds, on the Settlement Date evidence satisfactory to Underwriters that the City has filed with the Bankruptcy Court an amended Plan of Adjustment of the City removing all provisions contained in the current Plan of Adjustment impairing any DWSD Bonds;

(xix) Certified copies of the Bond Insurance Policies issued by the Bond Insurers and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers and any other documents executed in connection therewith;

(xx) An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Underwriters and in form and substance satisfactory to the Representative;

(xxi) A certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption ["Bond Insurance"] in the Official Statement is true and correct in all material respects, and that the specimen of the Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers; and

(xxii) Such additional legal opinions, signatures, delivery and other certificates, and other instruments and documents as the Underwriters may reasonably request to evidence the truth, accuracy and completeness, as of the date hereof and as of the date of the Closing, of the representations and warranties of the Authority and of the City contained herein and of the statements and information contained in the Official Statement and the due performance or satisfaction by the Authority and the City at or prior to the Closing of all agreements then to be performed and all conditions then to be satisfied by the Authority and the City.

All of the opinions, letters, certificates, instruments and other documents mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof if, but only if, they are in form and substance reasonably satisfactory to the Underwriters.

If the Authority shall be unable to satisfy the conditions to the obligations of the Underwriters to accept delivery of and to pay for the Bonds contained in this Agreement, or if the obligations of the Underwriters to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by this Agreement, this Agreement shall terminate and neither the Underwriters nor the Authority shall be under further obligation hereunder, except that the respective obligations of the Authority and the Underwriters set forth in Paragraphs 10 and 12 hereof shall continue in full force and effect.

10. (a) The Underwriters shall be under no obligation to pay, and the Authority shall pay, all expenses incident to the performance of the obligations of the Authority hereunder, including, but not limited to: (i) the cost of preparation and printing the definitive Bonds; (ii) the cost of the preparation and printing the Preliminary Official Statement, including the appendices and any amendments or supplements thereto; (iii) the

fees and disbursements of the financial advisor and Bond Counsel to the Authority; (iv) the fees and disbursements of any consultants or advisors retained by the Authority; (v) fees charged by rating agencies in connection with the Bonds; (vi) the cost of preparation and printing of the Official Statement, up to the number of copies specified in Paragraph 4 hereof, including the appendices thereto; (vii) subject to the provisions of Paragraph 5 above, the cost of preparation of any amendment or supplement to the Official Statement and the costs of printing and delivery of up to [200] copies of any amendment or supplement to the Official Statement, including the reasonable fees and disbursements of counsel to the Underwriters and to the Authority with respect to any supplements or amendments to the Official Statement (all such costs to be paid by the Authority subject to the provisions of Paragraph 5 above); (viii) the fees and disbursements of counsel retained by the Underwriters; (ix) the fees of Digital Assurance Certification, L.L.C. for a continuing disclosure undertaking compliance review; (x) any initial fees and charges of the Trustee and its counsel (including the first annual payment due the Trustee), the Bond Registrar, the Paying Agent and Co-Paying Agent, if any; and (xi) the fees and disbursements of the Bond Insurers and their counsel.

(b)     The Underwriters shall pay (i) the cost of preparation and reproduction of this Agreement and the other underwriting documents; (ii) all advertising expenses in connection with the offering of the Bonds; (iii) the cost of printing and delivering more than [200] copies of the Official Statement; (iv) the cost of printing and delivery of more than [200] copies of any supplement or amendment of the Official Statement; (v) the cost of amending or supplementing the Official Statement in the event that any information provided by the Underwriters for inclusion in the Official Statement is materially inaccurate or incomplete; and (vi) all other expenses incurred by the Underwriters in connection with the Bonds.

11.     Any notice or other communication to be given to the Authority under this Agreement shall be given by delivering the same in writing to its address set forth above, and any notice or other communication to be given to the Underwriters under this Agreement shall be given by delivering the same in writing to Citigroup Global Markets, Inc., [390 Greenwich Street, New York, NY 10013], Attention: [_____], Telephone: [_____], Fax: [_____].

12.     This Agreement is made solely for the benefit of the Authority and the Underwriters (including the successors or assigns of the Underwriters); no other person shall acquire or have any right or liability hereunder or by virtue hereof. All of the representations, warranties and agreements of the Authority contained in this Agreement and in the certificates delivered pursuant hereto shall remain operative and in full force and effect, regardless of (i) any investigations made by or on behalf of the Underwriters, (ii) delivery of and payment for the Bonds hereunder, and (iii) any termination of this Agreement.

**(Signatures on Next Page)**

Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

13.     This Agreement shall become effective upon the acceptance hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance.  This Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

Very truly yours,

CITIGROUP  GLOBAL  MARKETS,  INC.,  As Representative

By: _____
         [Name]
         [Title]

Accepted and Agreed to this
__th day of August, 2014

MICHIGAN FINANCE AUTHORITY

By: _____
         Joseph L. Fielek
         Executive Director

**EXHIBIT A**

Item 1 (a)  Aggregate principal amount of the Bonds:  $[_____]

(b)  Date of the Bonds:  August __, 2014

(c)  Years of maturities, interest rates, principal amounts and initial public offering prices:

Local Government Loan Program Revenue Bonds, Series 2014C-1 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-2
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 2
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

$_____

Local Government Loan Program Revenue Bonds, Series 2014C-3
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 3
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-5
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
|  |  |  |  |

$_____ Term Bonds

$_____ _____% Term Bonds
Due July 1, 20__, Price _____%

$_____ _____% Term Bonds
Due July 1, 20__, Price _____%

Exhibit A, Page 5
Bond Purchase Agreement
Local Government Loan Program Revenue Bonds, Series 2014C

Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured)
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| | | | |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

Local Government Loan Program Revenue Bonds, Series 2014C-7
(Detroit Water and Sewerage Department
Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds)

$_____ Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
|  |  |  |  |

$_____ Term Bonds

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

$_____ ____% Term Bonds
Due July 1, 20__, Price _____%

(d)  The Bonds are subject to optional and mandatory redemption prior to maturity as described in the Official Statement.

Item 2.  Purchase Price.  The purchase price shall be $[_____] (principal amount of $[_____.00], less underwriter's discount of $[_____], minus net original issue discount of $[_____]).

EXHIBIT B

LETTER OF REPRESENTATIONS

August [__], 2014

Citigroup Global Markets, Inc.
[Additional Underwriters]

Michigan Finance Authority

Ladies and Gentlemen:

The City of Detroit, Michigan (the "City"), acting upon authorization from (i) the Board of Water Commissioners (the "BOWC") of the Detroit Water and Sewerage Department (the "Department") and (ii) Kevyn D. Orr, emergency manager of the City (the "Emergency Manager"), proposes to participate in the Michigan Finance Authority (the "Authority") Local Government Loan Program Revenue Bonds, Series 2014C (the "Authority Bonds") program (the "Program") by issuing, in the aggregate, $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Senior Lien Bonds, Sewage Disposal System Revenue Refunding Senior Lien Bonds and Sewage Disposal System Revenue Refunding Second Lien Bonds, in one or more series (the "DWSD Obligations"). Proceeds of the DWSD Obligations will be used (i) to finance certain capital expenditures of the Department for its Sewage Disposal System (the "System"), (ii) to finance the City's purchase of its outstanding Detroit Water and Sewerage Department Sewage Disposal System bonds that have been offered by the bondholders thereof and accepted for purchase by the City (the "Tendered DWSD Bonds") pursuant to the Invitation to Tender Bonds dated August 7, 2014 (the "Invitation") and (iii) to pay the costs of issuance of the DWSD Obligations and the Bonds. The City will sell the DWSD Obligations to the Authority pursuant to a Local Purchase Contract between the Authority and the City dated August [__], 2014 (the "Local Purchase Contract"). The City's participation in the Program and execution of the Local Purchase Contract and other related documents have been approved by the City and the Bankruptcy Court Order (as defined below).

The Authority Bonds will be sold by the Authority pursuant to a Bond Purchase Agreement dated the date hereof (the "Purchase Agreement") between the Authority and the Underwriters listed thereunder (the "Underwriters"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

The City acknowledges and agrees that (i) the purchase of the Authority Bonds pursuant to the Purchase Agreement, providing proceeds for the purchase of the DWSD Obligations are arm's-length commercial transactions among the City, the Authority and the Underwriters, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriters are and have been acting solely as principals and are not acting as agents or fiduciaries of the City, (iii) the Underwriters have not assumed an advisory or fiduciary responsibility in favor of the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract or the discussions, undertakings and

procedures leading thereto (irrespective of whether the Underwriters have provided other services or are currently providing other services to the City on other matters) and the Underwriters have no obligation to the City with respect to the offering contemplated by the Purchase Agreement and the Local Purchase Contract except the obligations expressly set forth in the Purchase Agreement, and (iv) the City has consulted its own legal, financial and other advisors to the extent it has deemed appropriate. For both subsections (ii) and (iii) herein, it is the City's understanding that as advisory or fiduciary relationship shall not be deemed to exist when, in the course of acting as an underwriter, broker, dealer or municipal securities dealer, a person render advice to an issuer, including advice with respect to the structure, timing, terms and other similar matters concerning a new issue of municipal securities. The Representative has been advised of the City's engagement of an independent registered municipal advisor. As required by Securities and Exchange Commission rules, the Representative discloses to you that accordingly, the Underwriters are not acting as your municipal advisor and are not subject to the fiduciary duty set forth in Section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

The City acknowledges and agrees to the terms of the liquidated damages provision in Section 1 of the Purchase Agreement, including the full release and discharge of any claims by the City against the Underwriters upon any payment of liquidated damages pursuant thereto.

Section 1. <u>Representations and Warranties</u>. In order to induce the Underwriters and the Authority to enter into the Purchase Agreement and to sell the Authority Bonds, and to induce the Authority to enter into the Local Purchase Contract with the City, the City represents and warrants, and agrees with the Underwriters and the Authority as follows:

(a)     The City has full right, power and authority to (i) execute and deliver the Local Purchase Contract and this Letter of Representations, and (ii) perform its obligations under, and carry out and consummate all transactions described in the Purchase Agreement, the Local Purchase Contract and this Letter of Representations, all pursuant to Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"); Ordinance No. 18-01 adopted by the City Council of Detroit on October 18, 2001 (the "Bond Ordinance"); the Orders of the United States District Court in *United States v. City of Detroit, et al.*, 77-71100, E.D. Michigan; the Resolution and Ordinance Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds of the City of Detroit, Sewage Disposal System Revenue Refunding Second Lien Bonds of the City of Detroit and/or Sewage Disposal System Revenue SRF Junior Lien Bonds of the City of Detroit, adopted by the BOWC on August 13, 2014 and approved by the Emergency Manager on August 16, 2014 (the "DWSD Bond Resolution"); a Trust Indenture by and among the City, the Department and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of June 1, 2012, as amended (the "DWSD Indenture"); and a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution, and the DWSD Indenture, the "DWSD Authorizing Documents"). The City has complied with or will comply with on or prior to the date of Closing all provisions of applicable law (specifically including, without limiting the generality of the forgoing, the Constitution and laws of the State of Michigan) and all matters relating to such transactions.

(b)     The United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") has entered a final order in <u>In re City of Detroit, Michigan</u>, Case No. 13-

53846, a copy of which is attached as [Exhibit C to the Purchase Agreement] (the "Bankruptcy Court Order"), in substance (1) authorizing the City to enter into and perform the transactions contemplated under the Official Statement, including but not limited to the Purchase Agreement and all transaction documents, (2) authorizing the City to grant a lien equal and senior to existing liens to secure post-petition indebtedness of the City pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code, (3) finding that the Authority, the Underwriters, the Bond Insurers, the holders of the DWSD Obligations and the Bonds and all assignees and transferees of the foregoing are extending credit to the City in good faith for purposes of §§ 364(e) and 921(e) of the Bankruptcy Code, (4) finding that the Pledged Assets consisting of Net Revenues constitute "special revenues" as defined in § 902(2) of the Bankruptcy Code and "pledged special revenues" as that term is used in §§ 922(d) and 928 of the Bankruptcy Code, (5) finding (or concluding) that the satisfaction of Required Combined Coverage together with the Rate Covenant constitute adequate protection of the interests of all holders of pre-petition liens securing Secured Obligations (as defined in the Bond Ordinance) that were validly existing and outstanding as of the petition date for purposes of § 364(d)(1)(B) of the Bankruptcy Code, all as more particularly described in the Bankruptcy Court Order, and (6) approving a compromise among the City and certain parties (the "DWSD Settlement Parties") resolving objections to the City's Plan of Adjustment filed by one or more of the DWSD Settlement Parties, all as more particularly described in the Bankruptcy Court Order.

(c)  No further authorization or approval of the City's Emergency Manager, the City Council or the BOWC is required for the execution and delivery of the DWSD Obligations, this Letter of Representations, the Local Purchase Contract, the continuing disclosure undertaking (the "Undertaking") on behalf of the City, and any other transaction documents related thereto (collectively, the "DWSD Transaction Documents") and the DWSD Transaction Documents constitute a legal, valid and binding obligations of the City, enforceable against the City in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination, if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised; and, except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), the City is not required to obtain any further authorization or approval for the sale and delivery of the DWSD Obligations to the Authority or the performance by the City of its obligations under the DWSD Transaction Documents except such authorizations or approvals as shall have been obtained at or prior to the Closing, and copies of which will be delivered to the Underwriters at the Closing.

(d)  The City, acting through the BOWC and the Emergency Manager, has duly authorized and approved the Preliminary Official Statement and has duly authorized and approved the execution and delivery of the Official Statement.

(e)  The DWSD Obligations are issued pursuant to that Act 94 and the DWSD Authorizing Documents. The DWSD Authorizing Documents have not been modified, amended or rescinded and will be in full force and effect at the time of the Closing and will be a contract with the holders of the DWSD Obligations and a valid, legally binding act of the City, enforceable in accordance with the terms thereof except as such enforceability may be limited by

bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws affecting the rights of creditors generally, and by principles of equity, including those related to equitable subordination if equitable remedies are sought or if equitable defenses (based solely on facts which the City neither knew nor should have known at the time of execution hereof) are raised.

(f)      When delivered to the Authority and paid for in accordance with the terms of this Agreement, the DWSD Obligations (i) will have been duly authorized, executed and issued by the City pursuant to the DWSD Authorizing Documents, and (ii) will constitute valid, legally binding, limited obligations of the City.

(g)      No consent or approval of, or registration with or declaration of, any federal, State or other governmental commission, board, regulatory body or instrumentality, is or was required in connection with any of the actions of the City described herein or the delivery of the DWSD Obligations to the Authority except for the filing of IRS form 8038-G (and the City hereby agrees to make such filing promptly after the Closing), except as may be required under blue sky or securities laws of any state (as to which no representation or warranty is given), nor is any election or referendum of voters required in connection therewith.

(h)      All legislation necessary to permit the City (i) to fulfill in all material respects its obligations under the DWSD Authorizing Documents and the DWSD Transaction Documents and (ii) to carry out the transactions contemplated in the DWSD Authorizing Documents and the DWSD Transaction Documents is in full force and effect.

(i)      The execution and delivery of the Official Statement, the DWSD Transaction Documents, and the fulfillment of the terms and conditions of and the carrying out of the transactions contemplated by the DWSD Transaction Documents, do not and will not conflict with, or constitute on the part of the City a breach of or a default under, any existing law (including, without limitation, the Constitution of the State), any court or administrative regulation, decree or order or any agreement, indenture, mortgage, lease or other instrument to which the City is subject or by which it is bound and which breach or default would materially affect the validity or binding effect of any of the DWSD Obligations or the ability of the City to pay the principal of and the interest on any of the DWSD Obligations.

(j)      The City has duly authorized the use of the information contained in [TO BE UPDATED TO COVER SECTIONS OF THE OS COVERING CITY AND DWSD] ["DEBT SERVICE ON THE DWSD OBLIGATIONS AND COVERAGE PROVIDED BY HISTORIC REVENUES," "SECURITY AND SOURCES OF PAYMENT FOR THE DWSD OBLIGATIONS," "OUTSTANDING INDEBTEDNESS OF THE DEPARTMENT," "DEBT SERVICE REQUIREMENTS," "THE DEPARTMENT," "THE SEWAGE DISPOSAL SYSTEM," "THE CAPITAL IMPROVEMENT PROGRAM," "DEPARTMENT FINANCIAL PROCEDURES," "DEPARTMENT FINANCIAL OPERATIONS," "PENSION PLAN CONTRIBUTIONS," "SOURCE AND PRIORITY OF PENSION PAYMENTS," "OTHER POST-EMPLOYMENT BENEFITS," "FEASIBILITY CONSULTANT'S REPORT," "CITY OF DETROIT BANKRUPTCY MATTERS" and "RISK FACTORS", and Appendices [_____])] (collectively,  the "City and DWSD Portion") of the Preliminary Official Statement and the Official Statement, to be used by the Underwriters in connection with the public sale of the Authority Bonds.  The City has ratified and consented to such use of the Preliminary Official

Statement and the Official Statement in accordance with law by the Underwriters in connection with the public sale of the Authority Bonds and the City deems the information set forth in the City and DWSD Portion of the Preliminary Official Statement to be "final" as of its date, as provided in Rule 15c2-12 of the SEC ("Rule 15c2-12") except for the omission of such information as is permitted to be omitted in accordance with paragraph (b)(1) of Rule 15c2-12.

(k)     The information set forth in the City and DWSD Portion of the Preliminary Official Statement and the Official Statement is true and correct in all material respects and the City and DWSD Portion of the Preliminary Official Statement and the Official Statement does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

(l)     The financial statements of the City's Sewage Disposal Fund as of June 30, 2013, including the notes thereof, included in Appendix II-D of the Official Statement, present fairly the financial position of the City's Sewage Disposal Fund as of the date indicated and the results of its operations and changes in fund balances and financial position for the year specified, and such financial statements have been prepared in the conformity with generally accepted accounting principles consistently applied in all material respects.

(m)    Except as set forth in the Preliminary Official Statement and the Official Statement, subsequent to the respective dates of which information is given in the Preliminary Official Statement and the Official Statement, the City has not incurred any liabilities, direct or contingent, or entered into any transactions, not in the ordinary course of business, that are material to the business and affairs of the City and there has not been any material change in the condition, results of operation or general affairs of the City (financial or otherwise).

(n)     Except as disclosed in the Preliminary Official Statement and the Official Statement, and other than an appeal of the Bankruptcy Court Order or a motion seeking a stay of the Bankruptcy Court Order pending appeal, there is no action, suit, proceeding, inquiry or investigation at law or in equity by or before any court or public board or body pending or threatened against or affecting the City (or, the knowledge of the City, any basis therefor) (i) seeking to restrain or enjoin the sale or delivery of the DWSD Obligations, or (ii) in any manner questioning the authority of the City to issue, or the issuance or validity of, any of the DWSD Obligations or any other indebtedness of the City, or (iii) questioning the constitutionality of any statute, or the validity of any proceedings, authorizing the issuance of any of the DWSD Obligations, or (iv) questioning any of the DWSD Authorizing Documents or Act 94, or (v) questioning the validity or enforceability of the DWSD Authorizing Documents or (vi) seeking to secure a lien on the Pledged Assets or the collection of the Net Revenues, as defined in the DWSD Authorizing Documents, or other moneys, securities, funds and property pledged in the DWSD Authorizing Documents that are a source of payment on the DWSD Obligations, or (vii) contesting in any way the completeness, accuracy or fairness of the Preliminary Official Statement or the Official Statement, or (viii) which might in any material respect adversely affect the transactions contemplated herein and in the Official Statement; and no right of any member of the BOWC to his or her office is being contested;

(o)     Other than as a result of the of the City's chapter 9 bankruptcy proceedings, the City is not in breach of or in default under any existing law, court or administrative regulation,

decree, order, agreement, indenture, mortgage, lease, sublease or other instrument to which they are a party or by which they are bound, and no event has occurred or is continuing which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default thereunder, except as set forth in the Preliminary Official Statement and the Official Statement and except (in each case) for such minor breaches, defaults or potential defaults or event of default, if any, which individually and in the aggregate would have no material adverse effect on the City's financial condition, operations or properties.

(p)    The City has provided the following statement to the Authority for use in the Preliminary Official Statement and the Official Statement relating to the requirements described in Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission:

"*Prior Continuing Disclosure Non-Compliance by the City*

The City has entered into a number of continuing disclosure undertakings required by Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission in connection with bonds previously issued by the City to finance improvements to the Sewage Disposal System. During the past five years, the City has not complied in all material respects with its obligations under such continuing disclosure undertakings, including filings of its annual financial information and updates to certain financial and operating data.

Specifically, from Fiscal Years 1996 through 2013, the City was unable to provide annual financial information within the time periods specified in the applicable agreements. The continuing disclosure undertakings entered into by the City in connection with its prior bond issuances to finance improvements to the Sewage Disposal System required filing of annual financial information within a specified time period ranging from 180 to 360 days of the City's Fiscal Year end. The audited financial statement for Fiscal Year 2009 was filed on June 4, 2010. The audited financial statement for Fiscal Year 2010 was filed on December 28, 2010. The audited financial statement for Fiscal Year 2011 was filed on January 30, 2013. The audited financial statement for Fiscal Year 2012 was filed on January 27, 2013. The audited financial statement for Fiscal Year 2013 was filed on July 29, 2014.

From Fiscal Years 1996 through 2013, the City failed to file required updates to the financial and operating data in connection with its prior bond issuances to finance improvements to the Sewage Disposal System. On July 29, 2014 the City filed updates to such financial and operating data, but such filing was incomplete in certain respects.

A failure by the City to comply with the undertakings must be reported by the City in accordance with the Rule and must be considered by any broker, dealer or municipal securities dealer

before recommending the purchase or sale in the secondary market of bonds issued by the City. Consequently, such failure may adversely affect the marketability and liquidity of bonds issued by the City and the market price thereof."

(q)     Any certificate signed by an authorized officer of the City delivered to the Underwriters and the Authority shall be deemed a representation and warranty by the City to such parties as to the statements made therein.

Section 2.  Special Covenants.  The City covenants and agrees with the Underwriters and the Authority as follows:

(a)     The City will provide the Underwriters with information concerning the occurrence of any event that impacts the accuracy and completeness of material representations contained in the Official Statement until the earlier of (a) 90 days from the end of the underwriting period, as defined below, or (b) the time when the Official Statement is available to any person from the Municipal Securities Rulemaking Board (the "MSRB"), but in no case less than 25 days following the "end of the underwriting period," as described in Section 6 of the Purchase Agreement.  The City agrees to cooperate with the Underwriters to the extent permitted by applicable law, in amending the Official Statement if any of such information, in the reasonable opinion of the Underwriters and the Authority, requires that the Official Statement be amended in fulfillment of the Underwriters' responsibilities pursuant to Rule 15c2-12.  The expense of preparation (including without limitation the fees and expenses of legal counsel, financial advisors and other experts employed by the City) of each such amendment or supplement and the expense of printing and delivery of the first [200] copies of an amendment or supplement to the Official Statement shall be paid by the City.

(b)     Between the date hereof and the date of the Closing, the City will not take any action which would cause the representations and warranties contained in Section 1 to be untrue on the date of the Closing.  On the date of the Closing, the City shall deliver or cause to be delivered all opinions, certificates and other documents to be delivered by it or on its behalf as provided for in the Purchase Agreement and the Local Purchase Contract and to deliver such additional certificates and other documents as the Underwriters may reasonably request to evidence performance of or compliance with the provisions of the Purchase Agreement and the DWSD Transaction Documents, all such certificates and other documents to be satisfactory in form and substance to the Underwriters.

Section 3.  Survival of Representations and Warranties.  All representations, warranties, covenants and agreements contained in this Letter of Representations or contained in certificates of officers of the City submitted pursuant hereto or pursuant to the Purchase Agreement, or the Local Purchase Contract at the dates made shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriters or any other person, and shall survive (i) delivery of the Authority Bonds to the Underwriters and payments by the Underwriters therefor pursuant to the Purchase Agreement, (ii) any termination of the Purchase Agreement by the Underwriters pursuant to the provisions thereof or (iii) any failure on the part of the City by the Authority to satisfy any condition to the obligations of the Underwriters specified in the Purchase Agreement, which failure results in a refusal by the Underwriters to purchase and pay for the Authority Bonds.

Section 4.  <u>Parties in Interest</u>.  This Letter of Representations shall be binding upon the City and shall inure solely to the benefit of the Underwriters and the Authority and, to the extent set forth herein, officers, directors and employees of and persons controlling the Underwriters and the Authority, and their respective personal representatives, successors and assigns, and no other person or firm shall acquire or have any right under or by virtue of this Letter of Representations.

Section 5.  <u>Indemnification</u>.  The City agrees to indemnify and hold harmless the Underwriters, the directors, officers, employees and  agents of each Underwriter and each person who controls any Underwriter within the meaning of either the Securities Act or the Exchange Act against any and all losses, claims, damages or liabilities, joint or several, to which they or any them may become subject under the Securities Act, the Exchange Act or other Federal or State statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Official Statement, the Final Official Statement (or in any amendment or supplement thereto), or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. This indemnity agreement will be in addition to any liability which the City may otherwise have.

Promptly after receipt by an indemnified party of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or

proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

In the event that the indemnity provided herein is unavailable or insufficient to hold harmless an indemnified party for any reason, the City and the Underwriter agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending the same) to which the City and one or more of the Underwriters may be subject in such proportion as is appropriate to reflect the relative benefits received by the City on the one hand and by the Underwriters on the other from the offering. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the City and the Underwriters shall contribute in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the City on the one hand and of the Underwriters on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. In no case shall any Underwriter (except as may be provided in any agreement among the Underwriters relating to the offering) be responsible for any amount in excess of the purchase discount or fee applicable to the Authority Bonds purchased by such Underwriter hereunder. Benefits received by the City shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by the Underwriters shall be deemed to be equal to the total purchase discounts and commissions in each case set forth on the cover of the Final Official Statement. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the City on the one hand or the Underwriters on the other, the intent of the parties and their relative knowledge, information and opportunity to correct or prevent such untrue statement or omission. The City and the Underwriters agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph, no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Each person who controls an Underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of an Underwriter shall have the same rights to contribution as such Underwriter, and each person who controls the City within the meaning of either the Securities Act or the Exchange Act and each official, director, officer and employee of the City shall have the same rights to contribution as the City, subject in each case to the applicable terms and conditions of this paragraph.

Very truly yours,

CITY OF DETROIT, MICHIGAN

By: _____


DETROIT WATER AND SEWERAGE DEPARTMENT


By: _____

# **EXHIBIT 2A**

CHI-1940093v3

**PURCHASE CONTRACT**

**City of Detroit, County of Wayne, State of Michigan ("Issuer")**        **Detroit Water and Sewerage Department**
**Water Supply System Revenue Refunding**
**Local Project Bonds**

The Michigan Finance Authority (the "Authority") a public body corporate, separate and distinct from the State of Michigan hereby offers to enter into this Purchase Contract with the Issuer which, upon the acceptance of this offer by the Issuer and ratification by the Authority, will be binding upon the Authority and the Issuer.

Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein, the Authority hereby agrees to purchase from the Issuer, and the Issuer hereby agrees to sell and deliver, or cause to be assigned, to the Authority, obligations (the "Obligations") in the principal amounts, and with the maturities and interest rates as shown on Exhibit A, and with redemption provisions acceptable to the Authority. The purchase price for the Obligations shall be as set forth on Exhibit A.

The Issuer represents and warrants to, and agrees with, the Authority that (a) the Issuer has, and at time of the Closing will have, full legal right, power and authority (i) to enter into this Purchase Contract, and (ii) to sell and deliver the Obligations to the Authority or cause the Obligations to be assigned to the Authority as provided herein and in the Resolution authorizing the Obligations and the Issuer has duly authorized and approved the execution and delivery of and the performance by the Issuer of its obligations contained in this Purchase Contract; (b) the Issuer shall promptly pay its pro rata share of all transfer agent fees, trustee fees and paying agent fees of the Authority to be paid upon notification of such costs by the Authority; (c) the Issuer shall pay as and when due any rebate and/or penalty payments with respect to the Obligations required to maintain the exclusion of interest on the Obligations, or on the Authority bonds issued to provide funds to purchase the Obligations, from gross income for federal income tax purposes; (d) the Issuer will notify the Authority at least 40 days (or such lesser number of days as shall be acceptable to the Authority) prior to the effective date of any refunding, refinancing, defeasance or redemption of the Obligations; and (e) the Issuer will execute and deliver a certificate of the Issuer constituting an undertaking to provide ongoing disclosure about the Issuer for the benefit of the Authority and the holders of the Obligations and the holders of the Authority's bonds issued to provide funds to purchase the Obligations as required under paragraph (b)(5) of Rule 15c2-12 issued under the Securities Exchange Act of 1934, as amended, in form and substance satisfactory to the Authority (the "Continuing Disclosure Undertaking") and the Issuer will comply with and carry out the provisions of the Continuing Disclosure Undertaking.

*On _____, 2014, the local preclosing date, the Issuer shall make available for inspection by the Authority at the offices of Dickinson Wright PLLC, _____, Michigan, the Obligations, together with such other documents, certificates and closing opinions as the Authority shall require (the "Closing Documents"). On _____, 2014 (the "Closing Date") the Authority shall accept delivery of the Obligations and the Closing Documents and pay the purchase price for the Obligations.*

*The Authority shall have the right in its sole discretion to terminate the Authority's obligations under this Purchase Contract to purchase, to accept delivery of, and to pay for the Obligations if the Authority is unable, after reasonable effort, to sell and deliver its bonds on or prior to the Closing Date.*

This Purchase Contract shall become effective upon the execution of and the acceptance and ratification hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance and ratification.

**Michigan Finance Authority**

By: _____
        Authorized Officer

Accepted and Agreed to as of
_____, 2014

**City of Detroit,**
**County of Wayne, State of Michigan**

By: _____
        Director, Detroit Water and Sewerage Department

**Exhibit A**
**Sources and Uses of Funds**

Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014D
(Detroit Water and Sewerage Department Water Supply System Revenue Refunding Local Project Bonds)

Borrower:   City of Detroit, County of Wayne, State of Michigan

Consisting of the following local obligations:

$_____  Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

$_____ Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

$_____ Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

$_____ Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D


Sources of Funds:
Par Amount                                                                              $
Net Original Issue Premium/Discount
            Total Sources of Funds                                       $

Uses of Funds:
Computation of Purchase Price:
   Deposit to [_____] Fund                $
   Deposit to Borrower's Debt Service Reserve Account      $
            **Total Purchase Price**                               $
Costs of Issuance and Additional Proceeds               $
Underwriters' Discount
            Total Uses of Funds                                       $

# Exhibit A
# Bond Debt Service Schedule

## Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014D
(Detroit Water and Sewerage Department Water Supply System Revenue Refunding Local Project Bonds)

$_____ Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
| --- | --- | --- | --- | --- | --- |

$_____ Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
| --- | --- | --- | --- | --- | --- |

$_____Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

LANSING 40432-39 494618v2

**EXHIBIT 2B**

CHI-1940093v3

## PURCHASE CONTRACT

**City of Detroit, County of Wayne, State of Michigan ("Issuer")**     **Detroit Water and Sewerage Department**
**Sewage Disposal System Revenue and**
**Revenue Refunding Local Project Bonds**

The Michigan Finance Authority (the "Authority") a public body corporate, separate and distinct from the State of Michigan hereby offers to enter into this Purchase Contract with the Issuer which, upon the acceptance of this offer by the Issuer and ratification by the Authority, will be binding upon the Authority and the Issuer.

Upon the terms and conditions and upon the basis of the representations, warranties, and agreements set forth herein, the Authority hereby agrees to purchase from the Issuer, and the Issuer hereby agrees to sell and deliver, or cause to be assigned, to the Authority, obligations (the "Obligations") in the principal amounts, and with the maturities and interest rates as shown on Exhibit A, and with redemption provisions acceptable to the Authority. The purchase price for the Obligations shall be as set forth on Exhibit A.

The Issuer represents and warrants to, and agrees with, the Authority that (a) the Issuer has, and at time of the Closing will have, full legal right, power and authority (i) to enter into this Purchase Contract, and (ii) to sell and deliver the Obligations to the Authority or cause the Obligations to be assigned to the Authority as provided herein and in the Resolution authorizing the Obligations and the Issuer has duly authorized and approved the execution and delivery of and the performance by the Issuer of its obligations contained in this Purchase Contract; (b) the Issuer shall promptly pay its pro rata share of all transfer agent fees, trustee fees and paying agent fees of the Authority to be paid upon notification of such costs by the Authority; (c) the Issuer shall pay as and when due any rebate and/or penalty payments with respect to the Obligations required to maintain the exclusion of interest on the Obligations, or on the Authority bonds issued to provide funds to purchase the Obligations, from gross income for federal income tax purposes; (d) the Issuer will notify the Authority at least 40 days (or such lesser number of days as shall be acceptable to the Authority) prior to the effective date of any refunding, refinancing, defeasance or redemption of the Obligations; and (e) the Issuer will execute and deliver a certificate of the Issuer constituting an undertaking to provide ongoing disclosure about the Issuer for the benefit of the Authority and the holders of the Obligations and the holders of the Authority's bonds issued to provide funds to purchase the Obligations as required under paragraph (b)(5) of Rule 15c2-12 issued under the Securities Exchange Act of 1934, as amended, in form and substance satisfactory to the Authority (the "Continuing Disclosure Undertaking") and the Issuer will comply with and carry out the provisions of the Continuing Disclosure Undertaking.

*On _____, 2014, the local preclosing date, the Issuer shall make available for inspection by the Authority at the offices of Dickinson Wright PLLC, _____, Michigan, the Obligations, together with such other documents, certificates and closing opinions as the Authority shall require (the "Closing Documents"). On _____, 2014 (the "Closing Date") the Authority shall accept delivery of the Obligations and the Closing Documents and pay the purchase price for the Obligations.*

*The Authority shall have the right in its sole discretion to terminate the Authority's obligations under this Purchase Contract to purchase, to accept delivery of, and to pay for the Obligations if the Authority is unable, after reasonable effort, to sell and deliver its bonds on or prior to the Closing Date.*

This Purchase Contract shall become effective upon the execution of and the acceptance and ratification hereof by the Authority as aforesaid and shall be valid and enforceable as of the time of such acceptance and ratification.

**Michigan Finance Authority**

By: _____
Authorized Officer

Accepted and Agreed to as of
_____, 2014

**City of Detroit,**
**County of Wayne, State of Michigan**

By: _____
Director, Detroit Water and Sewerage Department

**Exhibit A**
**Sources and Uses of Funds**

Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014C
(Detroit Water and Sewerage Department Sewage Disposal System Revenue and Revenue
Refunding Local Project Bonds)

Borrower:    City of Detroit, County of Wayne, State of Michigan

Consisting of:

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014A

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014B

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014C

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014E

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F

Sources of Funds:

Par Amount                                                    $

Net Original Issue Premium/Discount

      Total Sources of Funds                          $

Uses of Funds:

Computation of Purchase Price:

  Deposit to [_____] Fund             $

  Deposit to Borrower's Debt Service Reserve Account    $

      **Total Purchase Price**                  $

Costs of Issuance and Additional Proceeds                     $

Underwriters' Discount

      Total Uses of Funds                          $

## Exhibit A
## Bond Debt Service Schedule

Michigan Finance Authority
Local Government Loan Program Revenue Bonds, Series 2014C
(Detroit Water and Sewerage Department Sewage Disposal System Revenue and Revenue
Refunding Local Project Bonds)

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014A

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Senior Lien Bonds, Series 2014B

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014C

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014E

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

$_____ Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F

| Period Ending | Principal | Coupon | Interest | Debt Service | Annual Debt Service |
|---|---|---|---|---|---|

LANSING 40432-39 493428v2

# EXHIBIT 3A

CHI-1940093v3

**BOND PURCHASE AND SUPPLEMENTAL AGREEMENT**

among

**MICHIGAN FINANCE AUTHORITY**

and

**DETROIT WATER AND SEWERAGE DEPARMENT**

and

**CITIBANK, N.A.**

and

**[OTHER BANKS TBD]**

Relating to

**Local Government Loan Program Revenue Bonds, Series 2014____
(Detroit Water and Sewerage Department Local Project Bonds)**

Dated August __, 2014

# TABLE OF CONTENTS

Page

## ARTICLE I
## DEFINITIONS

Section 1.01. Definitions................................................................................................ 2
Section 1.02. Incorporation of Certain Definitions by Reference ..................................... 13
Section 1.03. Accounting Matters.................................................................................... 14
Section 1.04. Computation of Time Periods .................................................................... 14
Section 1.05. New York City Time Presumption ............................................................. 14
Section 1.06. Relation to Other Documents..................................................................... 14
Section 1.07. Interpretation............................................................................................. 14

## ARTICLE II
## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

Section 2.01. Purchase of Bonds..................................................................................... 15
Section 2.02. Payment of Bonds ..................................................................................... 15
Section 2.03. Optional Redemption; Mandatory Redemption .......................................... 15
Section 2.04. Payments Generally ................................................................................... 15
Section 2.05. Costs, Expenses and Taxes ........................................................................ 16
Section 2.06. Change in Law ........................................................................................... 17
Section 2.07. Cure........................................................................................................... 19
Section 2.08. Payment of Interest and Other Amounts..................................................... 19

## ARTICLE III
## CONDITIONS PRECEDENT

Section 3.01. Documentary and Related Closing Conditions............................................ 20
Section 3.02. Credit Requirements .................................................................................. 29
Section 3.03. Additional Conditions Precedent ............................................................... 29

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.01. Due Organization; Power and Authority ..................................................... 30
Section 4.02. Authorization and Validity of Agreement, Related Documents and
Borrowing ................................................................................................. 30
Section 4.03. Compliance of Agreement, Related Documents with Applicable Law,
Organizational Documents, Etc .................................................................. 30
Section 4.04. Governmental Approvals............................................................................ 30
Section 4.05. Compliance with Law ................................................................................ 31
Section 4.06. Litigation................................................................................................... 31
Section 4.07. Absence of Defaults and Events of Default ................................................ 31
Section 4.08. Accuracy and Completeness of Information................................................ 31
Section 4.09. Sovereign Immunity .................................................................................. 32
Section 4.10. Incorporation of Representations and Warranties........................................ 32
Section 4.11. Bonds ........................................................................................................ 32
Section 4.12. Interest....................................................................................................... 32
Section 4.13. Investment Company Act ........................................................................... 32

Section 4.14.    Federal Reserve Board Regulations.................................................. 32
Section 4.15.    No Proposed Legal Changes....................................................... 32
Section 4.16.    Anti-Terrorism Representation .................................................... 33
Section 4.17.    Valid Lien ............................................................................... 34
Section 4.18.    Obligations; Other Debt............................................................ 34
Section 4.19.    Solvency.................................................................................. 34
Section 4.20.    Indenture a Contract................................................................. 34
Section 4.21.    Due Organization; Power and Authority ...................................... 34
Section 4.22.    Authorization and Validity of Agreement, Related Documents and
                 Borrowing ............................................................................... 35
Section 4.23.    Compliance of Agreement, Related Documents with Applicable Law,
                 Organizational Documents, Etc ................................................... 35
Section 4.24.    Governmental Approvals............................................................ 35
Section 4.25.    Compliance with Law ............................................................... 36
Section 4.26.    Litigation................................................................................. 36
Section 4.27.    Absence of Defaults and Events of Default................................... 36
Section 4.28.    Accuracy and Completeness of Information................................... 36
Section 4.29.    Sovereign Immunity.................................................................. 37
Section 4.30.    Incorporation of Representations and Warranties........................... 37
Section 4.31.    DWSD Obligations.................................................................... 37
Section 4.32.    Interest.................................................................................... 37
Section 4.33.    Investment Company Act ........................................................... 37
Section 4.34.    Federal Reserve Board Regulations............................................. 37
Section 4.35.    No Proposed Legal Changes....................................................... 37
Section 4.36.    Anti-Terrorism Representation .................................................... 38
Section 4.37.    Valid Lien ............................................................................... 38
Section 4.38.    Obligations; Other Debt............................................................ 39
Section 4.39.    Solvency.................................................................................. 39
Section 4.40.    DWSD Trust Indenture a Contract .............................................. 39

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.01.    Compliance With Laws and Regulations....................................... 40
Section 5.02.    Reporting Requirements ............................................................ 40
Section 5.03.    Notices.................................................................................... 40
Section 5.04.    Further Assurances.................................................................... 41
Section 5.05.    Right of Entry; Communication with Accountant........................... 42
Section 5.06.    Payment of Obligations.............................................................. 42
Section 5.07.    Incorporation of Covenants........................................................ 42
Section 5.08.    Disclosure to Assignees and Participants...................................... 43
Section 5.09.    Maintenance of Existence ......................................................... 43
Section 5.10.    Use of Proceeds........................................................................ 43
Section 5.11.    Parity Creditors and Covenants .................................................. 43
Section 5.12.    CUSIP Numbers....................................................................... 44
Section 5.13.    DWSD Financial Information...................................................... 44
Section 5.14.    Compliance With Laws and Regulations....................................... 44
Section 5.15.    Reporting Requirements ............................................................ 44

ii

Section 5.16.    Notices ........................................................................................... 45
Section 5.17.    Further Assurances.......................................................................... 46
Section 5.18.    Right of Entry; Communication with Accountant ........................................ 47
Section 5.19.    Payment of Obligations.................................................................... 47
Section 5.20.    Incorporation of Covenants............................................................... 47
Section 5.21.    Disclosure to Assignees and Participants ................................................ 48
Section 5.22.    Maintenance of Existence.................................................................. 48
Section 5.23.    Use of Proceeds............................................................................ 48
Section 5.24.    Parity Creditors and Covenants ........................................................... 48

## ARTICLE VI

## NEGATIVE COVENANTS AND COVENANTS

Section 6.01.    Amendments ................................................................................. 48
Section 6.02.    Preservation of Existence, Etc ............................................................ 49
Section 6.03.    Certain Information......................................................................... 49
Section 6.04.    Trustee...................................................................................... 49
Section 6.05.    Accounting Methods; Fiscal Year; Entity Classification.............................. 49
Section 6.06.    Exempt Status.............................................................................. 49
Section 6.07.    Defeasance ................................................................................. 49
Section 6.08.    Investment of Funds....................................................................... 50
Section 6.09.    Hedge Agreements ........................................................................ 50
Section 6.10.    Investment Policy.......................................................................... 50
Section 6.11.    Additional Parity Debt. .................................................................... 50
Section 6.12.    Amendments ............................................................................... 50
Section 6.13.    Preservation of Existence, Etc ............................................................ 50
Section 6.14.    Certain Information......................................................................... 51
Section 6.15.    DWSD Trustee............................................................................. 51
Section 6.16.    Accounting Methods; Fiscal Year; Entity Classification.............................. 51
Section 6.17.    Exempt Status.............................................................................. 51
Section 6.18.    Defeasance ................................................................................. 51
Section 6.19.    Investment of Funds....................................................................... 51
Section 6.20.    Hedge Agreements ........................................................................ 51
Section 6.21.    Additional Parity Debt ..................................................................... 51

## ARTICLE VII
## EVENTS OF DEFAULT

Section 7.01.    Events of Default .......................................................................... 52
Section 7.02.    Rights and Remedies; Consequences of an Event of Default........................ 55
Section 7.03.    Remedies Cumulative; Solely for the Benefit of Banks .............................. 56
Section 7.04.    Waivers or Omissions ..................................................................... 56
Section 7.05.    Discontinuance of Proceedings........................................................... 56
Section 7.06.    Injunctive Relief........................................................................... 57

## ARTICLE VIII
## NATURE OF OBLIGATIONS; INDEMNIFICATION

Section 8.01.  Obligations Absolute ............................................................................. 57
Section 8.02.  Continuing Obligation .......................................................................... 58
Section 8.03.  Liability of the Banks ........................................................................... 58
Section 8.04.  Indemnification; Taxes, Etc ................................................................. 58
Section 8.05.  Limited Obligations ............................................................................. 60

ARTICLE IX

Section 9.01.  Assignment of Rights to the Banks ...................................................... 61
Section 9.02.  Right of Setoff ...................................................................................... 61
Section 9.03.  Amendments and Waivers; Remedies Cumulative ................................ 61
Section 9.04.  Notices .................................................................................................. 61
Section 9.05.  Severability ........................................................................................... 63
Section 9.06.  GOVERNING LAW ............................................................................ 63
Section 9.07.  Headings ............................................................................................... 64
Section 9.08.  Successors and Assigns ......................................................................... 64
Section 9.09.  Counterparts; Complete and Controlling Agreement ........................... 65
Section 9.10.  Waiver of Rule of Construction ........................................................... 66
Section 9.11.  WAIVER OF JURY TRIAL ................................................................. 66
Section 9.12.  Payments Set Aside .............................................................................. 66
Section 9.13.  Usury .................................................................................................... 66
Section 9.14.  Electronic Signature; Electronically Signed Document ....................... 67
Section 9.15.  No Advisory or Fiduciary Responsibility ............................................. 67

## BOND PURCHASE AND SUPPLEMENTAL AGREEMENT

This **BOND PURCHASE AND SUPPLEMENTAL AGREEMENT** (the "Agreement") dated August __, 2014, is among the **MICHIGAN FINANCE AUTHORITY**, a public body corporate and politic existing under the laws of the State of Michigan (the "Authority"), [the **CITY OF DETROIT, MICHIGAN**,] the **DETROIT WATER AND SEWERAGE DEPARTMENT**, a public body corporate and politic existing under the laws of the State of Michigan ("DWSD") and **CITIBANK, N.A.**, a national banking association organized under the laws of the United States of America, [and OTHER BANKS, TBD] (collectively, the "Banks").

W I T N E S S E T H :

**WHEREAS**, pursuant to the provisions of Resolution 1989-15, as amended and supplemented, (the "1989 Resolution") the Michigan Municipal Bond Authority (the "MMBA") established the Local Government Loan Program for the purpose of making loans to governmental units as defined in Act 227, Public Acts of Michigan, 1985, as amended ("Act 227"); and

**WHEREAS**, the MMBA pursuant to Supplemental Resolution No. 2007-07, amended the 1989 Resolution to provide for the use of Supplemental Indentures as a means of amending the 1989 Resolution and further provided that Supplemental Indentures shall be treated the same as Supplemental Resolutions under the terms of the 1989 Resolution; and

**WHEREAS,** the Authority has been established by Executive Order 2010-2 issued by the Governor on March 4, 2010, and effective by its terms on May 30, 2010, as supplemented, as successor to the MMBA; and

**WHEREAS**, the City, upon authorization from the Board of Water Commissioners and the emergency manager for the City ("Emergency Manager"), is issuing its [$_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014__ (the "DWSD Senior Lien Refunding Obligations"), and its $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014____ (the "DWSD Second Lien Refunding Obligations" and, together with the DWSD Senior Lien Refunding Obligations, the "DWSD Obligations")pursuant to (i) the provisions of Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"), (ii) Ordinance No. 30-02, as amended and restated, adopted by the City Council of Detroit on January 26, 2005 (the "Bond Ordinance"), (iii) the Orders of the United States District Court in *United States v. City of Detroit, et al*., 77-71100, E.D. Michigan, (iv) the Resolution and Ordinance Authorizing the Issuance and Sale of Water Supply System Revenue Refunding Senior Lien Bonds of the City of Detroit and of Water Supply System Revenue Refunding Second Lien Bonds of the City of Detroit, adopted by the Board of Water Commissioners on August 13, 2014 and approved by the emergency manager of the City (the "Emergency Manager") on August 16, 2014 (the "DWSD Bond Resolution"), (v) a Trust Indenture by and among the City, the DWSD and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of February 1, 2013 (the

"DWSD Trust Indenture"), (vi) a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution and the DWSD Indenture, the "DWSD Authorizing Documents"); and

      **WHEREAS**, in order to purchase the DWSD Obligations, the Authority has agreed to issue its Local Government Loan Program Revenue Bonds, Series 2014____ (Detroit Water and Sewerage Department Local Project Bonds) (the "Bonds") in the aggregate principal amount of $___,___,___, pursuant to [the Indenture dated August __, 2014 (the "Indenture"),] the Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds, adopted by the Authority on May 15, 2014 (the "General Resolution") and a Supplemental Resolution adopted by the Authority on August 12, 2014 (the "Supplemental Resolution", and together with the General Resolution, the "Authority Bond Resolution"); and

      **WHEREAS**, the Banks have agreed to purchase the Bonds in order to provide proceeds to the Authority for the purchase of the DWSD Obligations and, as a condition to such purchase, the Banks require the Authority, the City and the DWSD to enter into this Agreement and to agree to perform the covenants and obligations stated herein; and

      **WHEREAS**, Wilmington Trust, National Association has been appointed to act as Trustee, Depository and Bond Registrar and Paying Agent under the Supplemental Resolution with respect to the Series 2014____ Bonds and, pursuant to the Authority Bond Resolution, the Authority will pledge and assign to the Trustee, for the benefit of the Series 2014____ Bonds, (i) all of the Authority's rights and interest in the DWSD Obligations and the Collateral Documents (as defined in the Authority Bond Resolution) pertaining to the DWSD Obligations, subject to reservation by the Authority of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the DWSD Obligations, (ii) all moneys in the Revenue Fund established for the Series 2014____ Bonds under the Authority Bond Resolution (the "Revenue Fund"), and (iii) all of the proceeds of the foregoing, including without limitation investments thereof and interest and earnings thereon,

      **NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, including the covenants, terms and conditions hereinafter contained, and to induce the Banks to purchase the Bonds, the Banks, the Authority, the City and the DWSD agree as follows:

**ARTICLE I**

**DEFINITIONS**

      **Section 1.01. Definitions**.  In addition to terms defined at other places in this Agreement, the following defined terms are used throughout this Agreement with the following meanings:

      "*Accountant*" means an independent certified public accountant or a firm of independent certified public accountants, selected by the Authority and satisfactory to the Banks.

2

"*Act 94*" has the meaning assigned to such term in the recitals to this Agreement.

"*Act 227*" has the meaning assigned to such term in the recitals to this Agreement.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under common control with such Person. For purposes of this definition, "control" (including "controlled by" and "under common control with"), when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting rights, membership, the power to appoint members, trustees or directors, by contract or otherwise. Without limiting the foregoing, the definition of "*Affiliate*" of any Person shall include any subsidiary of such Person.

"*Agreement*" means this Bond Purchase and Supplemental Agreement, including such amendments, modifications or supplements permitted pursuant to the terms hereof

"*Applicable Law(s)*" means, collectively, the Constitutions of the United States and the State, all applicable common law and principles of equity and all international, foreign, federal, state and local laws, statutes, treaties, codes, acts, rules, regulations, guidelines, ordinances, resolutions, orders, judgments, decrees, injunctions, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all administrative orders, directed duties, requests, licenses, certificates, authorizations and permits of, and agreements with, any Governmental Authority, and, with respect to any Person, the articles of incorporation, bylaws or other organizational or governing documents of such Person, in each case whether or not having the force of law, that are applicable now or are applicable at any time hereafter to (a) the Authority, (b) the City, (c) the DWSD or (d) any assets, property, operations or facilities of the Authority, the City or the DWSD, as the case may be or (e) the Transactions.

"*Authority*" means the Michigan Finance Authority, an autonomous public body corporate and politic, separate and distinct from the State of Michigan, created and existing under Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and its successors and assigns permitted hereunder.

"*Authority Bond Resolution*" has the meaning assigned to such term in the recitals to this Agreement.

"*Authority Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the Authority.

"*Authorized Denominations*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Authorized Officer*" shall have the meaning assigned in the Authority Bond Resolution; provided**,** however, that in each case for which a certification or other statement of fact or condition is required to be submitted by an Authorized Officer pursuant to the terms of this Agreement, such certificate or statement shall be executed only by an Authorized Officer in a position to know or to obtain knowledge of the facts or conditions that are the subject of such

certificate or statement. Any document or certificate hereunder that is executed by an Authorized Officer shall be deemed to have been authorized by all necessary action by the Authority.

"*Banks*" means the Holder of the Bonds, provided that there is a single Holder of all of the Bonds and provided further that the Bonds are not then held under the Book-Entry System. If there is more than one Holder of the Bonds, "Banks" means Holders owning a majority of the aggregate principal amount of the Bonds then Outstanding, and "Bank" shall refer to each such Holder individually. If the Bonds are then held under the Book-Entry System, "Banks" means the Beneficial Owner of the Bonds, provided that there is a single Beneficial Owner of all of the Bonds. If there is more than one Beneficial Owner of the Bonds, "Banks" means Beneficial Owners who are the beneficial owners of a majority of the aggregate principal amount of the Bonds then Outstanding. The initial Banks are Citibank, N.A. [and OTHER BANKS TBD] and upon receipt by the Authority and the Trustee of a notice described in Section 9.08(a), the "Banks" shall mean the Person identified in such notice as the Banks.

"*Bankruptcy Code*" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended, or any successor act or code.

"*Bankruptcy Order*" has the meaning assigned to such term in Section 3.01(n) hereof.

"*Beneficial Owner*" means the Person in whose name a Bond is recorded as beneficial owner of such Bond by the Securities Depository or a Participant or an Indirect Participant on the records of such Securities Depository, Participant or Indirect Participant, as the case may be, or such Person's subrogee.

"*Bonds*" has the meaning assigned to such term in the recitals to this Agreement.

"*Bonds Authorizing Act*" means, collectively, Act 94, Act 227 and Executive Order 2010-2.

"*Business Day*" has the meaning assigned to such term in the Indenture.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*City*" means the City of Detroit[ and/or the Board of Water Commissioners and/or the Emergency Manager, as the context requires].

"*Closing Date*" means August __, 2014, or such later date on which this Agreement is fully executed and delivered.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor provision or provisions thereto or any successor Federal tax code, and any regulations (including

4

temporary and proposed regulations relating to the matters governed by this Agreement) thereunder or under any such provision or successor Federal tax code.

"*Contract*" means any indenture, contract, mortgage, deed of trust, guaranty, note or agreement (other than this Agreement), other contractual restriction, lease, instrument, certificate of incorporation, charter or by-law.

"*Counsel*" means an attorney duly admitted to practice law before the highest court of any state.

"*Debt*" means with respect to any Person, all items that would be classified as a liability in accordance with GAAP, including, without limitation, (a) indebtedness or liability for borrowed money including amounts drawn under a letter of credit or other credit facility, or amounts advanced under a commercial paper program, or for the deferred purchase price of property or services (including trade obligations); (b) all Capital Lease Obligations of such Person; (c) current liabilities in respect of unfunded benefits under employee benefit, retirement or pension plans; (d) obligations issued for the account of any other Person; (e) all obligations arising under acceptance facilities; (f) all Guarantees and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss; (g) obligations secured by full faith and credit or by any mortgage, lien, pledge, security interest or other charge or encumbrance on property, whether or not the obligations have been assumed; (h) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility; (i) obligations of such Person under Hedge Agreements; and (j) all amounts required to be paid by such Person as a guaranteed payment to partners or members or as a preferred or special dividend, including any mandatory redemption of shares or interests; and, in each case, whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"*Debtor Relief Laws*" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws and regulations of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" means the occurrence of any event or the existence of any condition which constitutes an Event of Default or the occurrence of any event or the existence of any condition which with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" means a per annum rate of interest equal to [_____] percent (____%).

"*Determination Counsel*" means a firm of attorneys of nationally-recognized standing in matters pertaining to the validity of and tax-exempt nature of interest on bonds and other debt instruments issued by states and their political subdivisions, designated by the Authority and acceptable to the Banks in their sole and absolute discretion.

5

["*Determination of Taxability*" means a determination that the interest payable on the DWSD Obligations or the Bonds does not qualify as interest which is excludable from gross income of the recipient thereof for federal income tax purposes under Section 103 of the Code ("Exempt Interest") for any reason, which determination shall be deemed to have been made upon the first to occur of any of the following:

(a)     the date on which (i) the Internal Revenue issues a proposed or final determination of taxability, a Notice of Proposed Issue (IRS Form 5701 TEB), a notice of deficiency or similar notice, or any other notice, determination or decision, in each case, to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest, or (ii) a court of competent jurisdiction has rendered any final ruling or decision to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest;

(b)     the date when the Authority, the City or the DWSD files any statement, supplemental statement, or other tax schedule, return or document, which is in any respect inconsistent with interest payable on the Bonds or the DWSD Obligations, as applicable, or any portion thereof continuing to qualify as Exempt Interest;

(c)     the date of any sale, lease or other deliberate action within the meaning of Treas. Reg. § 1.141-2(d), if prior to such action the Authority, the City, the DWSD and the Banks have not received an unqualified opinion of Determination Counsel to the effect that such action will not cause interest on the Bonds or the DWSD Obligations, as the case may be, to become includable in the gross income of the recipient for federal income tax purposes; or

(d)     (i) the date that circumstances relating to the Authority, the City or the DWSD [or the Improvements (as defined in the _____) or any portion thereof] have occurred or changed, or any federal tax law or regulation, or any public or private final ruling, technical advice memorandum or any other written communication by the Internal Revenue Service is adopted or issued, or any final ruling or decision of a court of competent jurisdiction is rendered or any other set of circumstances has occurred, in any such case, which may adversely affect the excludability of the Exempt Interest from the gross income of the recipient for federal income tax purposes; and thereafter (ii) Determination Counsel is notified by the Banks in writing, with a copy to the Authority, the City and the DWSD, or by the Authority, the City or the DWSD, with a copy to the other parties hereto, that Determination Counsel is requested to deliver an updated approving tax-exempt opinion in form and substance acceptable to the Banks in their sole discretion ("Approving Opinion") during the 45-day period after receipt of the request and is assured as to the payment of its fees and expenses for such services; and (iii) within 45 days after such notice has been received by Determination Counsel, either (A) the Banks, the City, the DWSD and the Authority have received written communication from Determination Counsel to the effect that, based upon an analysis of the facts and applicable law, it is unable to render an updated Approving Opinion, or (B) Determination Counsel has not delivered an Approving Opinion.]

 "*DWSD*" means the Detroit Water and Sewerage Department established under the City Charter.

"*DWSD Authorizing Documents*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Obligations*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Resolution*" means, collectively, the DSWD Bond Resolution, the execution and delivery by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and related matters.

"*DWSD Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the DWSD.

"*DWSD Trustee*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Trust Indenture*" has the meaning assigned to such term in the recitals to this Agreement.

"*Emergency Manager*" means the Emergency Manager of the City, appointed under the Local Financial Stability and Choice Act, 2012 PA 436, MCL §§ 141.1541 et seq.

"*Emergency Manager Orders*" means Order Nos. _____ and _____ of the Emergency Manager dated _____ __, 2014, approving certain agreements relating to the DWSD.

"*EMMA*" has the meaning assigned to such term in Section 5.02.

"*Event of Default*," in relation to this Agreement, shall have the meaning assigned to such term in Article VII, and in relation to any Related Document, shall have the meaning set forth therein.

"*Event of Insolvency*" means, with respect to any Person, the occurrence of one or more of the following events:

       (a)     the issuance, under the laws of any state or under the laws of the United States of America, of an order of rehabilitation, liquidation or dissolution of such Person;

       (b)     the commencement by or against such Person of a case or other proceeding (and in the case of the commencement against such Person, there occurs the entry of an order for relief or the appointment of a trustee, receiver, liquidator, custodian or other official for such Person, or such case or proceeding is not dismissed within sixty (60) days of such commencement) seeking liquidation, reorganization or other relief with respect to the such Person or its debts under any bankruptcy, insolvency or other similar state or federal law now or hereafter in effect, including, without limitation, the appointment of a trustee, receiver, liquidator, custodian or other similar official for such Person or any substantial part of its property or there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or

similar state of financial distress with respect to it or there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

      (c)     the making of an assignment for the benefit of creditors by such Person;

      (d)     the failure of such Person to generally pay its debts as they become due;

      (e)     a debt moratorium, debt adjustment, debt restructuring or comparable restriction with respect to the payment of any Debt of such Person is declared or imposed by such Person or by any Governmental Authority having jurisdiction over such Person;

      (f)     such Person shall admit in writing its inability to pay its debts when due or shall become insolvent within the meaning of Section 101(32) of the United States Bankruptcy Code (or any equivalent provision of any successor act or code); or

      (g)     a case, proceeding or other action is commenced against such Person seeking issuance of a warrant or writ of attachment, execution, restraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which is not vacated or discharged, or stayed or bonded pending appeal, within sixty (60) days from the entry thereof; or

      (h)     the initiation of any actions to authorize, consent or acquiesce to any of the foregoing by or on behalf of such Person.

"*Excess Interest Amount*" has the meaning assigned to such term in Section 2.08.

"*Fiscal Year*" means, as applicable, the fiscal year of the Authority ending on September 30 of each calendar year, or the fiscal year of the DWSD ending on June 30 of each calendar year.

"*Fitch*" means Fitch, Inc., or any successor thereto.

"*GAAP*" means accounting principles generally accepted and consistently applied to governmental entities in the United States, as set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board and the Governmental Accounting Standards Board or in such other statements by such other entity as may be in general use by significant segments of the accounting profession as in effect on the date hereof.

"*Governmental Approvals*" means an authorization, consent, approval, permit, license, certificate of occupancy or an exemption of, a registration or filing with, or a report to, any Governmental Authority.

"*Governmental Authority*" means any national, supra-national, state or local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial, administrative, public or statutory instrumentality, authority, body,

board, agency, department, commission, bureau, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory, fiscal, monetary or administrative powers or functions of or pertaining to government, or any arbitrator, mediator or other Person with authority to bind a party at law.

"*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Hedge Agreement*" means any rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, total return swap, credit default swap or any other similar transaction (including any option with respect to any of these transactions) and any other agreement or option involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Holders*" means the Person or Persons who shall be the registered owner of any Bond, initially, Citibank, N.A.

"*Initial Purchasers*" means Citibank, N.A., and [OTHER BANKS, TBD.]

["*Indenture*" has the meaning assigned to such term in the recitals to this Agreement.]

["*Indirect Participant*" means _____.]

["*Investment Policy*" means the Michigan Finance Authority – Investment Policy, dated March 1, 2011.]

"*Interest Payment Date*" has the meaning assigned to such term in the Indenture.

["*Interest Rate*" means the LIBOR-based rate defined in the Authority Bond Resolution and/or Indenture.]

"*Issue Date*" means the date on which the Bonds are delivered to the purchaser or purchasers thereof upon original issuance.

"*Lien*" on or with respect to any asset means any mortgage, deed of trust, lien, pledge, charge, security interest, hypothecation, assignment, deposit arrangement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected or effective under applicable law, as well as the interest of a vendor or lessor under any conditional sale agreement, capital or finance lease or other title retention agreement relating to such asset and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"*Margin Stock*" has the meaning assigned to that term in Regulation U promulgated by the Board of Directors of the Federal Reserve System, as now and hereafter from time to time in effect.

"*Material Adverse Change*" means the occurrence of any event or change which, in the sole reasonable discretion of the Banks, results in a material and adverse change in the Security or which in the sole reasonable discretion of the Banks materially and adversely affects (a) the enforceability of the Bonds Authorizing Act, the Bonds, the DWSD Obligations, this Agreement or any of the other Related Documents, (b) the ability of the Authority, the City or the DWSD to perform its obligations hereunder or under any of the Related Documents or (c) the Security, the rights of, or benefits or remedies available to, the Banks under the Indenture, this Agreement or the other Related Documents.

"*Material Adverse Effect*" means (a) a materially adverse effect upon the Security, (b) with respect to this Agreement or any of the other Related Documents or any of the Authority's obligations arising under this Agreement or any of the other Related Documents, an adverse effect upon the binding nature, validity or enforceability of such agreement or obligation, (c) an adverse effect on the exclusion of interest with respect to the Bonds or the DWSD Obligations from gross income for purposes of federal income taxation or the exemption of such interest from State personal income taxes or (d) a materially adverse effect (i) on the authority or ability of the Authority, the City or the DWSD to perform any of its respective obligations under any Related Document or the ability of the Authority, the City or the DWSD to complete the Transactions or (ii) on the rights or remedies of the Banks hereunder or under the other Related Documents or on the pledge of the Security under the Related Documents or on the priority of the Liens created thereby.

"*Material Litigation*" means any actions, suits, proceedings, inquiries or investigations against a Person or any property of the Person in any court or before any arbitrator of any kind or before or by any other Governmental Authority, (i) wherein an unfavorable decision, ruling or finding could have a Material Adverse Effect, (ii) which seek to restrain or enjoin any of the Transactions, or (iii) which may adversely affect (A) the status of the Person as a public body corporate and politic of the State, created and validly existing under the laws of the State, (B) the exclusion of interest on the Bonds or the DWSD Obligations from gross income for federal income tax purposes, (C) the validity, binding effect and perfection of the pledge of and lien on the Security or (D) the ability of the Person to perform its obligations under this Agreement, the Indenture or any other Related Document.

10

"*Maximum Lawful Rate*" means the respective maximum, non-usurious, lawful rate of interest that may be contracted for, charged or received in connection with the Required Payments under this Agreement, under Applicable Law presently in effect or, to the extent permitted by law, under Applicable Law that may hereafter be in effect and that allows a higher maximum and non-usurious rate of interest than Applicable Law now allows.

"*Moody's*" means Moody's Investors Service, Inc., or any successor thereto.

"*Obligor Rating*" means any rating by a Rating Agency on any Parity Debt that is not guaranteed by any other Person or subject to any third-party credit enhancement.

"*Other Payment Obligations*" means any payment obligations due to the Banks or other Owners of the Bonds under this Agreement described in clause (b) of the definition of "*Required Payments*".

"*Other Taxes*" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Bonds or this Agreement.

"*Outstanding*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Owners*" means, collectively, the Holders or Beneficial Owners of the Bonds and "Owner" means any Holder or Beneficial Owner of the Bonds.

"*Participant*" has the meaning assigned to such term in Section 9.08(c).

"*Parity Debt*" means any Debt now or hereafter issued and Outstanding by or on behalf of the Authority or the DWSD, which is equally and ratably payable from and secured by a pledge of and lien upon the Security [on a parity with or senior to that of the Bonds or the DWSD Obligations].

"*Parity Holder*" means the holder of any Parity Debt.

"*Permitted Investments*" (i) with respect to the Authority, has the meaning assigned to the term "Eligible Investments" in the Authority Bond Resolution, and (ii) with respect to the DWSD, has the meaning assigned to the term "Permitted Investments" in the DWSD Indenture.

"*Person*" means an individual, a corporation, a partnership, an association, a joint venture, a trust, a business trust, a limited liability company or any other entity or organization, including a governmental or political subdivision or an agency or instrumentality thereof.

"*Rating Agency*" means S&P, Moody's, Fitch or any successor or additional rating agency that rates the Bonds or other Parity Debt at the written request of the Authority with the written consent of the Banks.

"*Redemption Price*" means, for any redemption of the Bonds under the Indenture, 100% of the principal amount redeemed or purchased, together with all accrued and unpaid interest thereon.

"*Related Documents*" means, collectively, this Agreement, the Authority Bond Resolution, the Bonds, [the Indenture], the DWSD Resolution, the DWSD Obligations, the DWSD Trust Indenture, the Bankruptcy Order, the Emergency Manager Orders and any exhibits, instruments or agreements relating thereto, as the same may be amended from time to time in accordance with their respective terms and the terms hereof.

"*Required Payments*" means all present and future debts, obligations and liabilities of the Authority to the Banks and any other Holders or Beneficial Owners arising pursuant to, or on account of, the provisions of this Agreement, the Bonds or any of the other Related Documents to which the Authority is a party (or to the Trustee, for the benefit of any of the foregoing Persons), including the obligations: (a) to pay all principal, interest, late charges, Redemption Price, (in each case, as applicable) and other amounts due at any time under the Bonds in accordance with the provisions of the Authority Bond Resolution and Article II of this Agreement; and (b) to pay all other amounts, charges, costs, fees (including reasonable attorneys' fees), expenses, indemnification payments, fees and other amounts due and payable by the Authority at any time under any of the Related Documents whether in the form of a direct, reimbursement, or indemnity payment obligation, and including all payment obligations of the Authority to the Banks, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Authority or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, together with interest thereon as provided in the applicable Related Document.

"*Revenues*" means the Net Revenues of the Sewage Disposal System and amounts available in certain funds and accounts established in accordance with the DWSD Bond Ordinance, all as defined in [the DWSD Authorizing Documents].

"*S&P*" means Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, or any successor thereto.

"*Section (a)(i) Proposed Determination of Taxability*" means any Determination of Taxability described under (a)(i) of the definition thereof which is a proposed and not final notice, determination or decision.

"*Securities Depository*" means The Depository Trust Company or such other securities depository which may be designated by the Authority pursuant to the Indenture, subject to the consent of the Banks, not to be unreasonably withheld.

"*Security*" means (a) the DWSD Obligations purchased by the Authority in an amount to fully secure the Bonds (b) the Trust Estate held under the DWSD Trust Indenture, (c) funds and accounts held to secure the Bonds pursuant to the Authority Bond Resolution and (d) all agreements and rights of the Authority respecting the DWSD Obligations.

"*Solvent*" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of Debts and liabilities, including contingent, subordinated, unmatured and unliquidated Debts and liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its Debts and liabilities as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur Debts or liabilities beyond such Person's ability to pay as such Debts and liabilities mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent Debts or liabilities (such as litigation) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability.

"*State*" means the State of Michigan.

["*Taxable Date*" means the date as of which interest on the Bonds is first includable in the gross income of the Owner, including, without limitation, any previous Owner thereof as determined pursuant to a Determination of Taxability.]

"*Taxes*" has the meaning assigned to such term in Section 2.05(b).

"*To the best knowledge of*" (or any similar knowledge qualifier) means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by the Person (or, in the case of a Person other than a natural Person, known by an authorized representative of such Person) making the representation, warranty or other statement, after such inquiry as the Person deems appropriate, and taking into account the responsibilities of the office the Person holds.

"*Transactions*" means the issuance, offering and sale of the Bonds, the execution and delivery by the Authority, the City and the DWSD of this Agreement and the other Related Documents, the performance by the Authority, the City and the DWSD of their respective obligations (including payment obligations) hereunder and thereunder, the purchase by the Banks of the Bonds and the use by the Authority of the proceeds of the Bonds, the purchase by the Authority of the DWSD Obligations and the use by the DWSD of the proceeds of the DWSD Obligations and the other transactions contemplated hereby and thereby.

"*Trustee*" means Wilmington Trust, National Association or its permitted successor as trustee under the Authority Bond Resolution.

["*Verification Report*" means _____.]

"*Written*" or "*in writing*" means any form of written communication, a communication by means of facsimile device and as described in Section 9.14.

**Section 1.02. Incorporation of Certain Definitions by Reference**. Each capitalized term used herein and not otherwise defined herein shall have the meaning provided therefor in

the Authority Bond Resolution and the Bonds, as applicable, unless the context requires otherwise.

**Section 1.03.  Accounting Matters**.  All accounting terms used herein without definition shall be interpreted in accordance with GAAP, and except as otherwise expressly provided herein all accounting determinations required to be made pursuant to this Agreement shall be made in accordance with GAAP.

**Section 1.04.  Computation of Time Periods**.  In this Agreement, in the computation of a period of time from a specified date to a later specified date, unless otherwise specified herein, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

**Section 1.05.  New York City Time Presumption**.  All references herein to times of the day shall be presumed to refer to New York City time unless otherwise specified.

**Section 1.06.  Relation to Other Documents**.  Nothing in this Agreement shall be deemed to amend, or relieve the Authority of any of its obligations under, any Related Document.  To the extent that the Authority undertakes in any provision of this Agreement representations, covenants or obligations which conflict with, or are more exacting than, a provision of any other Related Document to which the Authority is a party, such provisions of this Agreement shall control for all purposes of this Agreement.

**Section 1.07.  Interpretation**.  All words used herein shall be construed to be of such gender as the circumstances require.  Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, the singular includes the plural and the part includes the whole.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless otherwise specified (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in such document or herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not be limited to any particular provision of this Agreement, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and, when used in connection with any Person, to refer to all rights, title and interests of such Person in and to any and all property whether real, personal or mixed, or tangible or intangible, and wherever situated, including cash, securities, investment property, accounts, land, buildings, general intangibles, chattel, intellectual property, contract rights and other property and assets.

14

# ARTICLE II

## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

**Section 2.01.     Purchase of Bonds**.  Upon and subject to the conditions precedent and the terms and conditions provided herein and based on the representations, warranties and covenants of the Authority set forth in the Related Documents and herein, the Banks hereby agree to purchase from the Authority, and the Authority agrees to sell to the Banks, all, but not less than all, of the Bonds at an aggregate purchase price of $___,___,___.  The Bonds are to be dated the date of delivery thereof, and are to mature, be subject to redemption prior to maturity and bear interest as set forth in the Authority Bond Resolution.

**Section 2.02.  Payment of Bonds**.  The Authority shall make prompt and full payment of all payment obligations owed to the Banks under the Bonds and the Related Documents and will pay any other Required Payments owing to the Banks whether now existing or hereafter arising, irrespective of their nature, whether direct or indirect, absolute or contingent, with interest thereon at the rate or rates provided in, and at the times specified in, this Agreement and the Bonds.

**Section 2.03.  Optional Redemption; Mandatory Redemption**.  In connection with any optional or mandatory redemption of all or any portion of the Bonds, the Authority shall pay to the Banks the Redemption Price in accordance with the provisions of the Authority Bond Resolution and the Bonds.

**Section 2.04.  Payments Generally**.

(a)     All Required Payments to be made by the DWSD or the Authority or on behalf of either the DWSD or the Authority to the Banks hereunder or under any of the other Related Documents shall be fully earned when due and nonrefundable when paid and made in lawful currency of the United States of America and in immediately available funds.  All such amounts, unless otherwise directed by the Banks in writing (and in the case of principal and interest on the Bonds, subject to and in accordance with the procedures of DTC, as applicable), shall be paid by wire transfer to the Bank's account at [Citibank, New York, ABA # 021-000-089, Credit to Account No. 4058-0089; Ref:_____], (or to such other account of the Banks as each Bank may specify by written notice to the Authority or the Trustee, as applicable) not later than 3:30 p.m. New York, New York time, on the date payment is due.  Any payment received by the Banks after 3:30 p.m., New York, New York time, shall be deemed to have been received by the Banks on the next Business Day.  If any payment hereunder is due on a day that is not a Business Day, then such payment shall be due on the next succeeding Business Day, and, in the case of the computation of the interest or fees hereunder, such extension of time shall, in such case, be included in the computation of the payment due hereunder.

(b)     If at any time insufficient funds are received by and available to the Banks to pay fully all amounts of principal, interest and Other Payment Obligations

15

then due under the Bonds or hereunder, such funds shall be applied first, to payment of that portion of the Required Payments constituting accrued and unpaid interest on the Bonds or other amount unpaid hereunder (and, in any such case, first to past due interest and second to current interest), second, to payment of that portion of the Required Payments constituting unpaid principal of the Bonds and third to payment of any unpaid Other Payment Obligations.

**Section 2.05. Costs, Expenses and Taxes**.

(a)     The DWSD agrees to pay on demand all reasonable costs and expenses incurred by the Banks and their Counsel in connection with the preparation, negotiation, execution and delivery of this Agreement, the other Related Documents and any other documents and certificates which may be delivered in connection with this Agreement and the other Related Documents, including, without limitation, the reasonable fees, expenses and disbursements of Counsel for the Banks.  In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, the necessary and reasonable out-of-pocket expenses and disbursements of the Banks and the necessary and reasonable fees, expenses and disbursements of Counsel to the Banks in connection with (a) the administration of this Agreement including any waiver or consent under this Agreement or any other Related Document or other document or certificate delivered in connection with the Transactions or any amendment or requested amendment hereof or thereof (whether or not the transactions contemplated thereby shall be consummated) or any Default or alleged Default hereunder, (b) the preparation, execution, delivery, administration and enforcement or preservation of rights in connection with a workout, refinancing, restructuring or waiver with respect to this Agreement, or any of the other Related Documents and (c) the occurrence of an Event of Default and collection and other enforcement proceedings resulting therefrom.

(b)     Any and all payments to the Banks by or on behalf of the Authority or the DWSD hereunder shall be made free and clear of, and without deduction for, any and all taxes, levies, imposts, deductions, charges or withholdings imposed, including but not limited to as a result of a change in, law, rule, treaty, or regulation, or any policy, guideline, or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority, and all liabilities with respect thereto, excluding only taxes imposed on or measured by the net income or capital of the Banks by any jurisdiction or any political subdivision or taxing authority thereof or therein solely as a result of a connection between the Banks and such jurisdiction or political subdivision, other than a connection resulting solely from executing, delivering or performing its obligations or receiving a payment under, or enforcing, this Agreement (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").  If the Authority or the DWSD is required by law to withhold or deduct any sum from payments required under this Agreement, the Authority or the DWSD shall, to the maximum extent permitted by Applicable Law, increase the amount paid by it to the Banks so that, after all withholdings and deductions, the

16

amount received by the Banks shall equal the amount the Banks would have received without any such withholding or deduction.

(c)     In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, any present or future stamp, recording, or Other Taxes and fees payable or determined to be payable under Applicable Law in connection with the execution, delivery, filing and recording of this Agreement, the other Related Documents and such other documents and certificates as are referred to in clause (a) above and agrees to defend, indemnify and hold the Banks harmless from and against any and all liabilities with respect to or resulting from any failure to pay, or any delay in paying, such taxes and fees.

(d)     The DWSD shall pay the reasonable fees, costs and expenses of the Trustee incurred in connection with this Agreement and the performance of its obligations hereunder, upon notice of the amounts incurred, given to the DWSD in accordance with Section 9.04.

**Section 2.06.  Change in Law**.

(a)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any Other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any such changes to any law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, policies, regulations, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall (i) change the basis of taxation of payments to such Bank or such Participant of any amounts payable hereunder (except for taxes on the overall net income of such Bank or such other Owner), (ii) impose, modify or deem applicable any reserve, liquidity, special deposit, insurance premium, fee, financial charge, monetary burden or similar requirement in connection with complying with any term of this Agreement, or against assets held by, or deposits with or for the account of, such Bank or such other Owner or (iii) impose on such Bank or such other Owner any other condition, expense or cost regarding this Agreement, and the result of any event referred to in clause (i), (ii) or (iii) above shall be to increase the cost to such Bank or such other Owner of complying with any term of this Agreement or to reduce the amount of any sum received or receivable by the Banks or such other Owner  hereunder, then, upon receipt of supported documentation from such Bank, the DWSD shall pay to each affected Bank for its own account, or for the account of such other Owner, as

17

applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such increased costs or reductions in amount.

(b)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any changes to any such law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall impose, modify or deem applicable any capital (including but not limited to contingent capital) adequacy, reserve, insurance, liquidity or similar requirement (including, without limitation, a request or requirement that affects the manner in which such Bank or any other Owner allocates capital resources or reserves to its commitments) that either (i) affects or would affect the amount of capital or reserves to be maintained by such Bank or such other Owner in connection with this Agreement or (ii) reduces or would reduce the rate of return on the affected Bank's or such other Owner's capital or reserves to a level below that which such Bank or such other Owner could have achieved but for such circumstances (taking into consideration the policies of such Bank or such other Owner with respect to capital adequacy or the maintenance of reserves) then, upon receipt of supported documentation from the affected Bank, the DWSD shall pay to such Bank for its own account, or for the account of such other Owner, as applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such event.

(c)     All payments of amounts referred to in clauses (a) and (b) above shall be paid by the DWSD to the Banks or other Owner, as applicable, within ten Business Days of such demand. A certificate as to such increased cost, increased capital or reserves or reduction in return incurred by the Banks or any other Owner as a result of any event mentioned in clause (a) or (b) of this subsection setting forth, in reasonable detail, the basis for calculation and the amount of such calculation shall be submitted by the Banks to the DWSD simultaneously with such demand for payment and shall be conclusive as to the amount thereof absent manifest error. In making the determinations contemplated by the above-referenced certificate, the Banks or such other Owner may make such reasonable estimates, assumptions, allocations and the like that the Banks or other Owner in good faith determines to be appropriate. Other Owners entitled to the benefits of clauses (a) and (b) above shall be limited to benefits that would have been received by the Initial Purchaser.

18

(d)     The obligations of the DWSD under this Section shall survive the termination of this Agreement.

**Section 2.07.  Cure**.  The DWSD agrees to pay to the Banks on demand, any amounts advanced by or on behalf of the Banks, to the extent required to cure any Default or Event of Default under this Agreement or any Related Document.  The Banks shall give the DWSD and the Authority reasonably prompt notice of any such advances.  The Banks shall have the right, but not the obligation, to cure any such Default or Event of Default.

**Section 2.08.  Payment of Interest and Other Amounts**.

(a) The amount of interest required to be paid on any Interest Payment Date shall be due and payable by the Authority on such date at the Interest Rate, in accordance with the following provisions:

(i)     If the amount of interest required to be paid on any Interest Payment Date calculated in accordance with the terms hereof (together with any fees, charges, and other amounts which are treated as interest on amounts owing hereunder under Applicable Law (collectively, the "Charges")) exceeds the amount of interest that would have been payable for the applicable period had interest for such period been calculated at the Maximum Lawful Rate, then the required interest for such period (together with any Charges payable with respect thereto) shall be payable in an amount of interest calculated on the basis of the Maximum Lawful Rate.

(ii)     Any interest or Charges that would have been due and payable under any provision hereof but for the operation of subparagraph (i) immediately above, shall accrue and be payable as provided in this subparagraph (ii) and shall constitute, less interest actually paid to the Banks on such Interest Payment Date, the "Excess Interest Amount."  If there is any accrued and unpaid Excess Interest Amount as of any Interest Payment Date, then, on the current and each subsequent Interest Payment Date, interest shall be paid at the Maximum Lawful Rate rather than the otherwise applicable rate until the earliest of (x) payment to the Banks of the entire accrued Excess Interest Amount or (y) the date on which no principal amount hereunder remains unpaid.

(iii)     Notwithstanding the foregoing, all unpaid Excess Interest Amount shall be, to the fullest extent permitted by Applicable Law, due and payable by the Authority as a fee on the date on which no principal amount hereunder remains unpaid.

(b)     (i)     From and after the Taxable Date, the Bonds shall bear interest at the Default Rate.  In addition to the foregoing, (A) in the event of the occurrence of a Determination of Taxability other than a Section (a)(i) Proposed Determination of Taxability, the Authority shall pay to the Banks and any other Owner, as applicable, a tax gross-up within thirty (30) days after such occurrence by paying the amount to the Banks (or such other Owner), calculated based on the

19

outstanding principal amount of the Bonds for such period, by which (x) the Default Rate multiplied by the principal amount of the Bonds exceeds (y) the Interest Rate actually paid on the Bonds multiplied by the principal amount of the Bonds, for the period from the Taxable Date until the date the Authority begins paying current interest on the Bonds at the Default Rate, and (B) in the event of the occurrence of any Determination of Taxability, the Authority hereby agrees to pay to the Banks and any other Owner, as applicable, on demand therefor an amount equal to any interest, penalties or charges owed by the Banks and such other Owner as a result of interest on the Bonds becoming includable in the gross income of the Banks or such other Owner, together with any and all attorneys' fees, court costs, or other out of pocket costs incurred by the Banks or such other Owner in connection therewith.

(ii)    The obligations of the Authority under this Section 2.08 shall survive the termination of this Agreement and the redemption or other payment in full of the Bonds.

## ARTICLE III

## CONDITIONS PRECEDENT

**Section 3.01.   Documentary and Related Closing Conditions.**  As conditions precedent to the purchase of the Bonds by the Banks, the Banks shall have received the following items on or before the Closing Date, each in form and substance satisfactory to the Banks and its counsel and the Authority shall satisfy the Banks that the following conditions have been fulfilled:

(a)    *Issuance of Bonds*.  All conditions to the issuance of the Bonds shall have been satisfied and the Authority shall have duly executed, issued and delivered the Bonds, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the Bonds in the principal amount of $___,___,___ and delivered the Bonds to the Banks.  All conditions to the issuance of the DWSD Obligations shall have been satisfied and the DWSD shall have duly executed, issued and delivered the DWSD Obligations, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the DWSD Obligations in the principal amount of $___,___,___ and delivered the DWSD Obligations to the Authority.

(b)    *Agreement and Related Documents*.  The Authority and the Trustee shall have duly authorized the execution, delivery and performance of, and the Authority and the Trustee shall have duly executed and delivered the Indenture, and (in the case of the Authority) this Agreement and each of this Agreement and the Indenture is in full force and effect, and each of the other Related Documents shall have been duly authorized, executed and delivered by the respective parties thereto and shall be in full force and effect.  The Banks shall have received (i) an executed counterpart of this Agreement, duly executed by the Authority and (ii) executed originals (or, when the Banks are not a party thereto, copies thereof) of the other Related Documents and of each other agreement, document, instrument or certificate

20

required to be delivered by any Person pursuant to the Related Documents; and each of the foregoing shall be in form and substance satisfactory to the Banks, shall have been duly authorized, executed and delivered by each of the respective parties thereto, shall not have been modified, amended or rescinded, and shall be in full force and effect on and as of the Issue Date (and certified as of the Issue Date by the Authority if executed and delivered prior to the Issue Date).

(c)     *Incumbency of Authority.*   The Banks shall have received (i) an incumbency certificate of the Executive Director of the Authority certifying as to the name and true signature of the Authorized Officer authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) a certified copy of the Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and certified copies of the Statutes, and organizational documents of the Authority. The Banks shall have received (i) an incumbency certificate of the Executive Director of the DWSD certifying as to the name and true signature of the representative(s) of DWSD authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) certified copies of the Statutes, and organizational documents of the DWSD.

(d)     *Authority Resolution and Certificates.*   (i) The Authority shall have duly adopted the Supplemental Resolution authorizing the issuance and delivery of the Bonds, the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the Authority, in form and substance satisfactory to the Banks, executed by an Authorized Officer and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the Authority in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the General Resolution certified by an Authorized Officer as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the Authority relating to the issuance of the Bonds and the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party or the transactions contemplated hereby and thereby, and (iii) the Banks shall have received a certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) since

21

the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (D) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (E) no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices..

(e)    *DWSD Resolution and Certificates.*  (i) The City and the DWSD shall have duly adopted the DWSD Bond Resolution authorizing the issuance and delivery of the DWSD Obligations, the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the City and the DWSD, in form and substance satisfactory to the Banks, executed by an authorized representative of the City and the DWSD and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the City and the DWSD in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the DWSD Bond Resolution certified by an authorized representative of the City and the DWSD as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the City and the DWSD relating to the issuance of the DWSD Obligations and the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party or the transactions contemplated hereby and thereby, and (iii) A certificate or certificates of the DWSD dated the date of the Closing, signed on behalf of the DWSD by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the DWSD and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the DWSD contained in this Agreement; (B) the compliance by the DWSD with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the DWSD Obligations in all material respects to the description thereof in the DWSD

22

Resolution and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the DWSD, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the Authority Portion), and (F) no litigation or other judicial proceedings have been served upon the DWSD or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the DWSD Obligations, or (x) in any way questioning or affecting the validity of any provision of the DWSD Obligations, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the DWSD Obligations, or the pledge or application of any money or security provided for the payment of any of the DWSD Obligations, or (z) questioning or affecting the organization or existence of the DWSD or the right of any member of the DWSD to their respective offices.

(f)     *Opinions*.  The Banks shall have received the following opinions, either addressed to the Banks or accompanied by a letter addressed to the Banks from the counsel rendering such opinion stating that the Banks is entitled to rely upon such opinion as if such opinion were addressed to it:

(i)     the opinion of (A) Dickinson Wright PLLC, bond counsel ("Authority Bond Counsel"), as to the validity and tax-exempt status of the Bonds and (B) Dykema Gossett PLLC, bond counsel for the DWSD Obligations ("DWSD Bond Counsel"), as to the validity and tax-exempt status of the DWSD Obligations, each  dated the Issue Date and each in form and substance acceptable to the Banks, and such other opinions or supplemental opinions, which shall expressly include this Agreement within the scope of the matters opined upon and shall opine on such securities law matters as the Banks may request;

(ii)     written opinions of the Attorney General of the State and Authority Bond Counsel, dated the Issue Date and in form and substance acceptable to the Banks, opining (A) as to the due authorization, execution and delivery of this Agreement, and the other Related Documents to which the Authority is a party and (B) that this Agreement, and the other Related Documents to which the Authority is a party constitute the legal, valid and binding obligations thereof, enforceable in accordance with their respective terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or similar laws affecting the rights of creditors generally and to general principles of equity), and (C) that (1) all conditions precedent to the issuance and delivery of the Bonds shall have occurred, the Authority Bond Resolution is in full force and effect and the Bonds will be entitled to the benefits of the Authority Bond Resolution and (2) all actions, filings or conditions necessary to create a valid pledge of, and security interest in, the Security created by the Authority Bond Resolution and the Bonds

23

Authorizing Act in favor of the Trustee for the benefit of the Owners to secure the payment of the Bonds and the performance by the Authority of its other obligations under the Authority Bond Resolution and in favor of the Banks to secure the Required Payments, have been taken, filed and accomplished and that such pledge is on a parity with the pledge securing any other Parity Debt, and (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, and (E) the statements in the Official Statement under the captions ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY, "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014C BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2014C BONDS, "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES 2014C BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES 2014C BONDS," "CONTINUING DISCLOSURE UNDERTAKING" (as it relates to the Authority), and the statements in Appendices _____,] insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, and (F) with respect to such other matters relating to this Agreement, the Indenture, the Bonds or any of the other Related Documents or the proceedings of the Authority, as the Banks may reasonably request;

(iii)    a Memorandum of Law with legal conclusions from the DWSD Bond Counsel addressing whether the Bonds Authorizing Act constitutes a contract between the State and the holders of the DWSD Obligations that cannot be retroactively revoked or modified;

(iv)    opinion or opinions of the DWSD Bond Counsel, the Authority Bond Counsel, [Jones Day, Miller Canfield or the City's Corporation Counsel], as appropriate, or other counsel acceptable to the Banks to the following effect, all acceptable in form and substance to the Bank:

(A)    due organization and valid existence; due authorization, execution and delivery of the Related Documents by all parties thereto and the documents being legal, valid, binding and enforceable obligations of the City, the DWSD and the Authority, as applicable;

(B)    the City has enacted all ordinances and local laws, if any, relating to the imposition of and use of the Revenues necessary to comply

with the DWSD Authorizing Documents in order to permit all of the Revenues to be collected and pledged to secure the DWSD Obligations;

(C)    all consents and approvals necessary to execute and deliver the Related Documents have been obtained by the DWSD, the Authority and the City, as applicable;

(D)    no defaults in other contracts or statutes, rules or regulations of the DWSD or the Authority, and the City's and the DWSD's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, this Agreement and the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City or the DWSD a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the DWSD Obligations;

(E)    no litigation relating to the establishment of the DWSD or the collection, pledge or application of the Revenues;

(F)    the statements in the Official Statement in the [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects;

(G)    the validity of the trust and the Liens;

(H)    (i) to the extent the DWSD owns the Revenues, the Revenues are subject to [a first security interest or Lien in favor of the Authority and the DWSD has granted a first priority security interest in the Security securing the DWSD Obligations] and (ii) the Authority has granted [a first priority security interest in the Security in favor of the Trustee for the benefit of Holders of the Bonds to secure the Bonds];

(I)    the DWSD is a "municipality" and the Revenues paid and to be paid to the Authority or the Trustee under the DWSD Trust Indenture (and subsequently paid to Banks as holders of the Bonds) are pledged "special revenues" within the meaning of § 902 of the Bankruptcy Code, are entitled to the protections afforded "special revenues" under Chapter 9 of the Bankruptcy Code; and

(J)    nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative

25

information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

(v)     At the discretion of the Banks, either (A) an opinion from counsel acceptable to the Banks, or (B) a certificate from an authorized officer of the City, the DWSD or the Authority to the effect that the Bankruptcy Order is in full force and effect, is not subject to a stay and has not been modified, reversed or vacated;

(vi)    An opinion of counsel for the Trustee and the DWSD Trustee, which counsel shall be satisfactory to the Banks, as to the following:  (i) due authorization, execution and delivery of the Indenture and the DWSD Trust Indenture, (ii) the Indenture and the DWSD Trust Indenture constitute the  legal, valid and binding obligations thereof, enforceable in accordance with their terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or similar laws affecting the rights of creditors generally and to general principles of equity) and (iii) such other matters as the Banks may reasonably request.

(vii)   each other opinion delivered by any Person pursuant to the Related Documents, each of which shall be in form and substance satisfactory to the Bank;

(g)     *No Default, Etc*.  The Banks shall have received a certificate signed by an Authorized Officer of the Authority and dated the Issue Date stating that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: that the representations and warranties of the Authority contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii)  that no Default or Event of Default has occurred and is continuing or would result from the issuance of the Bonds or the execution, delivery and performance by the Authority of this Agreement or any of the other Related Document to which the Authority is a party; (iv) to the same effect as subsections (a) and (d) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks. The Banks shall have received a certificate signed by an authorized representative of the City and the DWSD and dated the Issue Date stating that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the City and the DWSD and not in any individual capacity, the signer certifies that the representations and warranties of the City and the DWSD contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii) that no Default or Event of Default has occurred and is continuing

or would result from the issuance of the Bonds or the execution, delivery and performance by the City and the DWSD of this Agreement or any of the other Related Document to which the City and the DWSD is a party; (iv) to the same effect as subsections (a) and (e) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks.

(h)     *Non-Arbitrage Certificate*.  The Banks shall have received a non-arbitrage certificate, dated the date of the Closing, signed by the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Banks.

(i)     *Governmental Approvals*  The Banks shall have received originals or certified copies of all approvals, authorizations, permits, licenses, or consents of, or notices to or filings or registrations with, any Governmental Authority required for the Authority, the City and the DWSD to execute, deliver or perform this Agreement or any of the other Related Documents to which the Authority, the City and the DWSD is a party, together with a list of any required approvals, permits, etc., still to be received.

(j)     *Investment Policy; Miscellaneous*.  The Banks shall have received (i) a copy of the Investment Policy of the Authority, as in effect as of the Issue Date, which policy shall be acceptable to the Bank; and (ii) such other agreements, documents, instruments, certificates (and, if requested by the Banks, certified duplicates of executed copies thereof) and opinions as the Banks may reasonably request.

(k)     *CUSIP and DTC.*  The Banks shall have received written evidence satisfactory to the Banks that the Bonds are eligible for inclusion in DTC's FAST automated transfer program ("FAST Eligible Bonds").

(l)     *Other Documents*.  The Banks shall have received such other documents, certificates, approvals, filings, and opinions as the Banks shall have reasonably requested.

(m)     *Legality.*  The Banks shall have determined (in their sole discretion) that (i) the consummation by the Authority, by the City, by the DWSD, by the Banks and by any other Person of any of the transactions contemplated by the Indenture, the Bonds, this Agreement and each other Related Document will not violate any Applicable Law and (ii) all legal requirements provided herein or by law incident to the execution, delivery and performance of the Indenture, the Bonds and the other Related Documents and the transactions contemplated hereby and thereby, shall have been satisfied.

(n)     *Trustee's Documents*.  The Banks shall have received (i) (A) copies of the resolution(s) of the Trustee authorizing the execution, delivery and performance of the Related Documents to which they are a party and the performance of any duties of the Trustee under or in connection with the other

27

Related Documents and (B) a certificate of an authorized representative of the Trustee (x) certifying as to the authority, incumbency and specimen signatures of the authorized representatives of the Trustee authorized to sign the Related Documents to which it is a party and any other documents to be delivered by it hereunder and who will be authorized to represent the Trustee in connection with this Agreement, upon which the Banks may rely until it receives a new certificate and certifying that the resolution(s) referred to under (B) is/are presently in full force and effect and (y) covering such matters relating to the other Related Documents as the Banks may reasonably request.

(o)     *Bankruptcy court order*.  The Banks shall have received a copy of the Order of the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") dated _____ ___, 2014 (the "Bankruptcy Order") (*In re City of Detroit, Michigan*, Case No. 13-53846, Doc. ____ (E.D. Mich.)) authorizing the City to enter into and perform the DWSD Authorizing Documents.

(p)     *Official Statement*. A copy of the Official Statement, signed on behalf of the Authority by the Executive Director or other authorized officer.

(q)     *Ratings*. [Only if applicable] The Banks shall have received satisfactory evidence that [Moody's/Fitch] shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn.

(r)     *Continuing Disclosure Undertaking*. The Banks shall have received (i) an executed copy of the Authority's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks, and (ii) an executed copy of the City's/DWSD's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks.

(s)     *[Bond Insurance*. The Banks shall have received:

(i)     Certified copies of the Bond Insurance Policies issued by the Bond Insurer, if any, and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers, if any, and any other documents executed in connection therewith;

(ii)     An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Banks and in form and substance satisfactory to the Banks; and

(iii)     a Certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption "Bond Insurance" in the Official Statement is true and correct in all material respects, and that the Specimen Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers.]

28

(t)   *Filings*.  The Banks shall have received evidence satisfactory to the Banks and their counsel that all applicable filings, recordings and agreements including any agreements necessary to create and perfect a valid and binding Lien on, pledge of and security interest in all of the Revenues and in any other Security pledged in the Related Documents in favor of the Trustee, for the benefit of the Owners, and perfected on a first priority basis to the extent such Lien on, pledge of and security interest can be perfected by any filings, recordings or agreements, have been filed and made or executed and delivered, as the case may be, in the appropriate governmental offices and that all filing fees, taxes or other impositions required therewith have been paid in full on or before the Closing Date.

**Section 3.02. Credit Requirements**.  Prior to the Closing Date, the Banks shall have determined, in its sole discretion, based in part upon the information and reports submitted by the Authority, that (i) the Authority has met the Bank's credit requirements, (ii) there has been no Material Adverse Change in the financial condition, manner of operation, properties or prospects of the Authority and that all information, representations and materials submitted to the Banks by the Authority in connection with the purchase of the Bonds are accurate in all material respects, and (iii) there has been no change in any law, rule or regulation (or their interpretation or administration) nor is there any pending or threatened litigation, that, in each case, may adversely affect the consummation of the Transactions.  Provided, that, notwithstanding the foregoing terms and any investigation and/or determination by the Banks, the Authority expressly acknowledges and agrees that no such investigation or determination by the Banks shall in any respect whatsoever qualify, or release the Authority from, any representation, warranty or covenant contained in this Agreement or create or constitute any defense to the enforcement of the provisions of this Agreement.

**Section 3.03. Additional Conditions Precedent**.  On or prior to the Closing Date, the Authority shall have paid to the Banks the reasonable fees and expenses of counsel to the Banks payable as of the Closing Date as incurred in connection with the transactions contemplated by the Related Documents.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**A.  The Authority represents, warrants and covenants to and with the Banks and the DWSD as of the Closing Date as follows in Section 4.01 through Section 4.20. It is acknowledged and agreed by the parties hereto that all representations and warranties made by the Authority, the City and the DWSD herein and in any certificates given in compliance herewith, are made solely by the Authority, the City or the DWSD, as the case may be, and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.**

**Section 4.01. Due Organization; Power and Authority**.   The Authority is an autonomous public body corporate and politic separate and distinct from the State of Michigan created and existing under Executive Order 2010-2, issued by the Governor of the State of Michigan on March 4, 2010 with the powers and authority, among others, set forth in the Bonds

Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the Authority is a party, and to perform the obligations under the Related Documents to which the Authority is a party, including the power and authority to issue and deliver the Bonds.

**Section 4.02. Authorization and Validity of Agreement, Related Documents and Borrowing**.  The execution, delivery and performance by the Authority of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the Bonds at the direction of the Authority have been duly authorized by all necessary action of the governing body of the Authority.  Each of this Agreement and the Related Documents (other than the Bonds) to which the Authority is a party constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Each Bond when issued, and as authenticated and delivered by the Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the Indenture and will constitute the legal, valid and binding obligations of the Authority enforceable in accordance with their terms, and will be entitled to the benefits of the Indenture.  The obligation of the Authority under the Indenture is absolute and unconditional payable solely from the Security.

**Section 4.03. Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.**  The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the Authority's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the Authority, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the Authority is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the Indenture.  The Authority Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

**Section 4.04. Governmental Approvals**.  All authorizations, consents, and other Governmental Approvals necessary for the Authority to enter into this Agreement and the other Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review.  No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Authority of this Agreement or the due execution, delivery or performance by the Authority of the Related Documents to which it is a party.

**Section 4.05. Compliance with Law**.  The Authority is in compliance with all Applicable Law, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the Authority's ability to perform its obligations under this Agreement and under the other Related Documents.  The Authority has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the Authority or the Transactions or any statute, law, rule or regulation applicable to the Authority or the Transactions.  The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the Authority.

**Section 4.06. Litigation**.  There is no Material Litigation pending nor, to the best knowledge of the Authority after due inquiry, threatened against the Authority or any property of the Authority.

**Section 4.07.  Absence of Defaults and Events of Default**.

      (a)      No Default or Event of Default has occurred and is continuing.

      (b)      No defaults by the Authority exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the Authority's ability to perform under this Agreement or any of the other Related Documents.  The Authority is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.08. Accuracy and Completeness of Information**.  All information, reports and other papers and data furnished by the Authority to the Banks were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds.  No fact is known to the Authority which has had or, so far as the Authority can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks prior to the Closing Date.  Any financial, budget and other projections furnished to the Banks by the Authority or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the Authority's best estimate of its future financial performance.  No document furnished nor any representation, warranty or other written statement made to the Banks in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

**Section 4.09. Sovereign Immunity**. The Authority is not entitled to claim the defense of sovereign immunity or statutory immunity in any action appropriately asserted in accordance with the Court of Claims Act, MCL 600-6401 et seq. and arising out of its obligations as set forth in this Agreement.

**Section 4.10. Incorporation of Representations and Warranties**. The Authority hereby makes to the Banks the same representations and warranties made by the Authority in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety. No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.11. Bonds**. Each Bond has been or will be duly and validly issued under the Indenture and entitled to the benefits thereof. The Bonds will be transferred and held for the benefit of the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Banks.

**Section 4.12. Interest**. None of the Related Documents to which the Authority is a party or the Bonds provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.13. Investment Company Act**. The Authority is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.14. Federal Reserve Board Regulations**. The Authority is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock. The Authority will not use any part of the proceeds of the Bonds or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the Authority out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the Authority does not own and will not acquire any such Margin Stock.

**Section 4.15. No Proposed Legal Changes**. There is no amendment, or to the best knowledge of the Authority, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the Bonds, (b) the rights or remedies of the Banks or of any Owner of the Bonds, (c) the Authority's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the Authority's existence or its power or ability to perform its obligations hereunder or under any of the other

Related Documents including without limitation the Authority's ability to repay when due its obligations under this Agreement and the Bonds.

**Section 4.16. Anti-Terrorism Representation**.

(a) The Authority is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b) The Authority is not any of the following:

(i) a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v) a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c) To its knowledge, the Authority does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The Authority makes no commitment to any party to this Agreement, nor shall have any obligation to any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the Authority.

**Section 4.17. Valid Lien**. The Authority's irrevocable pledge and assignment of the Security as set forth in the Related Documents to and for the payment of the Required Payments: (i) is valid and binding as of the Issue Date and all Revenues now or hereafter received by the Authority are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Indenture or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings

33

and registrations accomplished by the Authority as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the lien and security interest created thereby and hereby on and in the Security to secure the Bonds and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

**Section 4.18.  Obligations; Other Debt**.  The Authority hereby consents to the DWSD entering into this Agreement, which, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392.  The payment obligations to the Banks under this Agreement and the Bonds are secured and evidenced in accordance with the Indenture.  All obligations of the Authority under or in connection with this Agreement, the Bonds and the other Related Documents, including the Authority's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the Indenture.  As of the Issue Date, the Authority has not incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the Bonds, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the Bonds, this Agreement and the other Related Documents.

**Section 4.19.  Solvency**.  Both before and after giving effect to the issuance of the Bonds and the undertaking of the other obligations contemplated by this Agreement, the Indenture and the other Related Documents, the disbursement of the proceeds of such Bonds and the payment and accrual of all transaction costs in connection with the foregoing, the Authority is and will be Solvent.

**Section 4.20.  Indenture a Contract**.  The provisions of the Indenture constitute a contract between the Authority and the Trustee, for the benefit the Banks as a holder of the Bonds, subject to the provisions of the Indenture and the Bonds may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the Authority under this Agreement and the other Related Documents.

**B.  The City and the DWSD represent, warrant and covenant to and with the Banks and the Authority as of the Closing Date as follows in Section 4.21 through Section 4.40:**

**Section 4.21.  Due Organization; Power and Authority**.  The DWSD is an autonomous public body corporate and politic separate and distinct from the City and the State of Michigan created and existing under Act 94 with the powers and authority, among others, set forth in the Bonds Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the DWSD is a party, and to perform the obligations under the Related Documents to which the DWSD is a party, including the power and authority to issue and deliver the Bonds.

**Section 4.22. Authorization and Validity of Agreement, Related Documents and Borrowing**. The execution, delivery and performance by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the DWSD Obligations at the direction of the DWSD have been duly authorized by all necessary action of the City and the governing body of the DWSD. Each of this Agreement and the Related Documents (other than the DWSD Obligations) to which the City and the DWSD is a party constitutes a legal, valid and binding obligation of the City and the DWSD, enforceable against the DWSD in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). Each DWSD Obligation when issued, and as authenticated and delivered by the DWSD Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the DWSD Trust Indenture and will constitute the legal, valid and binding obligations of the DWSD enforceable in accordance with their terms, and will be entitled to the benefits of the DWSD Trust Indenture. The obligation of the DWSD under the DWSD Trust Indenture is absolute and unconditional payable solely from the Security.

**Section 4.23. Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.** The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the DWSD's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the DWSD or the City, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the DWSD or the City is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the DWSD Trust Indenture. The DWSD Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

**Section 4.24. Governmental Approvals**. All authorizations, consents, and other Governmental Approvals necessary for the City and the DWSD to enter into this Agreement and the other Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review. No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the City or the DWSD of this Agreement or the due execution, delivery or performance by the City or the DWSD of the Related Documents to which it is a party.

**Section 4.25. Compliance with Law**. The DWSD is in compliance with all Applicable Laws, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the DWSD's ability to perform its obligations under this Agreement and under the other Related

35

Documents. The DWSD has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the DWSD or the Transactions or any statute, law, rule or regulation applicable to the DWSD or the Transactions. The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the City and the DWSD.

**Section 4.26. Litigation**.   There is no Material Litigation pending nor, to the best knowledge of the DWSD after due inquiry, threatened against the DWSD or any property of the DWSD.

**Section 4.27.  Absence of Defaults and Events of Default**.

(a)      No Default or Event of Default has occurred and is continuing.

(b)      No defaults by the DWSD exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the City's or the DWSD's ability to perform under this Agreement or any of the other Related Documents.  The DWSD is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.28. Accuracy and Completeness of Information**.  All information, reports and other papers and data furnished by the City or the DWSD to the Banks or to the Authority were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds.  No fact is known to the City or the DWSD which has had or, so far as the City and the DWSD can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks and to the Authority prior to the Closing Date.  Any financial, budget and other projections furnished to the Banks and the Authority by the DWSD or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the DWSD's best estimate of its future financial performance.  No document furnished nor any representation, warranty or other written statement made to the Banks and the Authority in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

**Section 4.29. Sovereign Immunity**.  The DWSD is not entitled to claim the defense of sovereign immunity or statutory immunity in any action arising out of its obligations as set forth in this Agreement.

**Section 4.30. Incorporation of Representations and Warranties**. The City and the DWSD hereby make to the Banks and the Authority the same representations and warranties made by the City or the DWSD in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety. No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.31. DWSD Obligations**. Each DWSD Obligation has been or will be duly and validly issued under the DWSD Trust Indenture and entitled to the benefits thereof. The DWSD Obligations will be transferred and held for the benefit of the Authority and the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Authority and the Banks.

**Section 4.32. Interest**. None of the Related Documents to which the City or the DWSD is a party or the DWSD Obligations provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.33. Investment Company Act**. The DWSD is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.34. Federal Reserve Board Regulations**. The DWSD is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock. The DWSD will not use any part of the proceeds of the DWSD Obligations or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the DWSD out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the DWSD does not own and will not acquire any such Margin Stock.

**Section 4.35. No Proposed Legal Changes**. There is no amendment, or to the best knowledge of the City and the DWSD, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the DWSD Obligations, (b) the rights or remedies of the Banks or of any Owner of the DWSD Obligations, (c) the DWSD's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the DWSD's existence or its power or ability to perform its obligations hereunder or under any of the other Related Documents including without limitation the DWSD's ability to repay when due its obligations under this Agreement and the DWSD Obligations.

37

**Section 4.36. Anti-Terrorism Representation**.

(a)     The DWSD is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)     The DWSD is not any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)     To its knowledge, the DWSD does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The DWSD makes no commitment to any party to this Agreement, nor shall have any obligation enforceable by any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the DWSD.

**Section 4.37. Valid Lien**.     The DWSD's irrevocable pledge and assignment of the Security as set forth in Related Documents to and for the payment of the Required Payments: (i) is valid and binding as of the Issue Date and all Revenues now or hereafter received by the DWSD are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Related Documents or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings and registrations accomplished by the DWSD as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the

38

lien and security interest created thereby and hereby on and in the Security to secure the DWSD Obligations and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

**Section 4.38. Obligations; Other Debt**.  This Agreement, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392.  The payment obligations to the Banks under this Agreement and the DWSD Obligations are secured and evidenced in accordance with the DWSD Trust Indenture.  All obligations of the DWSD under or in connection with this Agreement, the DWSD Obligations and the other Related Documents, including the DWSD's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the DWSD Trust Indenture.  As of the Issue Date, neither the City nor the DWSD has incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the DWSD Obligations, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the DWSD Obligations, this Agreement and the other Related Documents.

**Section 4.39. Solvency**.  Both before and after giving effect to the issuance of the DWSD Obligations and the undertaking of the other obligations contemplated by this Agreement, the DWSD Trust Indenture and the other Related Documents, the disbursement of the proceeds of such DWSD Obligations and the payment and accrual of all transaction costs in connection with the foregoing, the DWSD is and will be Solvent.

**Section 4.40. DWSD Trust Indenture a Contract**.  The provisions of the DWSD Trust Indenture constitute a contract between the DWSD and the DWSD Trustee, for the benefit the Banks as holders of the DWSD Obligations, subject to the provisions of the DWSD Trust Indenture and the DWSD Obligations may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the DWSD under this Agreement and the other Related Documents.

## ARTICLE V

## AFFIRMATIVE COVENANTS

**A.  The Authority covenants and agrees to the terms of the following Section 5.01 through Section 5.14 until all Required Payments have been indefeasibly paid in full, and all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

**Section 5.01. Compliance With Laws and Regulations**.  The Authority shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the Authority may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the Authority continues to perform all of its obligations hereunder and

39

under the Related Documents and provided such acts do not affect the Authority's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.02. Reporting Requirements**.  The Authority shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the Authority in accordance with GAAP consistently applied. The Authority shall furnish to the Banks two copies of each of the following:

> (a)  *Reports related to Security.*  The Authority shall promptly furnish to the Banks any financial statement or report furnished to the Authority under any Related Document.

> (b)  *Material Event Notices*. Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the Bonds, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

> (c)  *EMMA Filings*.  Copies of all filings made by the Authority relating to the Bonds, any Parity Debt, the Security, or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including the Municipal Securities Rulemaking Board's Electronic Market Access System ("EMMA")) promptly after such filings are made.

> (d)  *Other Information*.  Promptly upon the request of the Banks, such other information respecting the Bonds, the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act and copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.02.

**Section 5.03.  Notices**.

> (a)  *Notice of Default*.  The Authority shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

> (b)  *Litigation and other Notices*.  The Authority shall provide to the Banks in writing, promptly upon learning thereof, notice of

40

(i)     any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii)     (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the Authority which the Authority has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.03(b).

(c)     *Certain Notices under or in connection with the Related Documents.* The Authority shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the City, the DWSD, the Trustee or the DWSD Trustee to the Authority or by the Authority to the City, the DWSD, the Trustee or the DWSD Trustee under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d)     *Amendments.* Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e)     *Rating Agencies.* Promptly after any Rating Agency shall have announced a change in an Obligor Rating, written notice of such rating change.

(f)     *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the Authority to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the Authority or which is a creditor of the Authority in respect of the Security.

(g)     *Legislation or Proposed Legislation.* Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the Authority has knowledge which could reasonably be expected to adversely impact the Security, the Authority's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the Bonds and the Required Payments.

**Section 5.04. Further Assurances**.  The Authority will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the Trustee, the Banks or any other Person under or in connection with the Indenture, this Agreement or the Related

41

Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the Bonds, as and in the manner provided in the Indenture. Except to the extent it is exempt therefrom, the Authority will pay or cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.05. Right of Entry; Communication with Accountant**. The Authority shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the Authority, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the Authority's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security. The Authority authorizes the Banks to communicate directly with its Accountant, including the Auditor General, and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.06. Payment of Obligations**. The Authority will pay (a) all Parity Debt and obligations of the Authority in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.07. Incorporation of Covenants**.

(a) The covenants of the Authority set forth in the Indenture and each of the other Related Documents to which the Authority is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the Authority. All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein. To the extent that any such incorporated provision permits the Authority to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the Authority, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks. No amendment to such covenants (or the defined terms relating thereto) made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks. Notwithstanding the termination or expiration of any Related Document, the Authority shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants

42

therein contained for the benefit of the Banks until the termination of this Agreement.

(b)     Subject to the terms of Section 9.01, the Authority shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the Trustee at all times to comply with the terms of the Authority Bond Resolution.

**Section 5.08. Disclosure to Assignees and Participants**.  The Authority agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.02, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the Authority.

**Section 5.09.  Maintenance of Existence**.  The Authority will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public body corporate and politic of the State and activities ancillary thereto.

**Section 5.10.  Use of Proceeds**.  The Authority shall use the proceeds of the Bonds solely for the purposes set forth in the Authority Bond Resolution and the Indenture.  The Authority will not use the proceeds of the Bonds in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.11.  Parity Creditors and Covenants**.  In the event that the Authority has previously entered into or hereafter shall enter into any agreement or instrument (or any amendment, supplement or modification thereto) providing for the incurrence of or relating to Parity Debt (each a "Relevant Agreement"), which provides to the related trustee, purchaser, credit facility provider or other obligee thereunder (each, a "Parity Creditor") (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the Trustee or the Banks or (b) any additional or materially different rights and remedies as compared to the rights and remedies of the Banks as set forth in the Related Documents and this Agreement (any such provision, a "Parity Covenant") than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the Authority shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the Authority fails to provide such amendment).

**Section 5.12.  CUSIP Numbers**.  The Authority shall at all times cause the Bonds to be assigned a CUSIP Number.

**Section 5.13.  DWSD Financial Information**.  The Authority covenants to deliver to the Banks copies of all financial information prepared by the DWSD and delivered to the Authority under any of the Related Documents

**B.  The City and the DWSD covenant and agree to the terms of the following Section 5.14 through Section 5.24 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

**Section 5.14.  Compliance With Laws and Regulations**.  The DWSD shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the DWSD may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the DWSD continues to perform all of its obligations hereunder and under the Related Documents and provided such acts do not affect the DWSD's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.15.  Reporting Requirements**.  The DWSD shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the DWSD in accordance with GAAP consistently applied. The DWSD shall furnish to the Banks two copies of each of the following:

    (a)    *Annual Financial Statements*.  As soon as available, and in any event within 7 months after the close of each fiscal year of the DWSD, (i) the audited financial statements of the DWSD, including financial information therein relating to the Revenues and the other funds and accounts constituting a part of the Security and (ii) audited financial statements of the DWSD,  including the balance sheet as of the end of such fiscal year of the DWSD and the related statements of revenues, expenses and changes in fund balance relating to the Security for such fiscal year of the DWSD, all in reasonable detail and as certified to by the DWSD's independent certified auditors as having been prepared in accordance with GAAP, consistently applied, such audit having been conducted in accordance with generally accepted auditing standards and the standards applicable to financial audits contained in Government Auditing Standards issued by the Comptroller General of the United States.

    (b)    *Certificate of Compliance*.  Simultaneously with the delivery of each set of financial statements referred to in (a) above, a certificate signed by an authorized representative of the DWSD stating (i) that under his/her supervision the DWSD has made a review of its activities during the preceding annual period for the purpose of determining whether or not the DWSD has complied with all of the terms, provisions and conditions of this Agreement and the other Related Documents and (ii) that to the best of his/her knowledge the DWSD is not in Default in the performance or observance of any of the terms, covenants, provisions or conditions of this Agreement or any of the other Related Documents, or if the DWSD shall be

44

in Default, such certificate shall specify each such Default, the nature and status thereof and any remedial steps taken or proposed to correct each such Default, and (iii) the amount of the Revenues in the last fiscal year.

(c) *Auditors*.  Concurrently with any delivery of financial statements under clause (a) above, a copy of any management letter or audit report provided to the DWSD by such auditors.

(d) *Other Reports*.  Promptly upon request by the Banks, copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.15.

(e) *Budget*.  As near as practicable to the beginning of each fiscal year of the DWSD, a copy of the annual budget for such upcoming fiscal year of the DWSD, and promptly, all other financial information prepared by the DWSD under any Related Document.

(f) *Material Event Notices*.  Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

(g) *EMMA Filings*.  Copies of all filings made by the City or the DWSD relating to the DWSD Obligations, any Parity Debt, the Security, the Obligation Trust Fund or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including EMMA) promptly after such filings are made.

(h) *Other Information*.  Such other information respecting Bonds, any Parity Debt, the Security or the Bonds Authorizing Act as the Banks may from time to time reasonably request.

**Section 5.16.  Notices**.

(a) *Notice of Default*.  The DWSD shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b) *Litigation and other Notices*.  The DWSD shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i)     any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii)     (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the DWSD which the DWSD has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.16(b).

(c)     *Certain Notices under or in connection with the Related Documents*. The DWSD shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the Authority, the DWSD Trustee or the City to the DWSD or by the DWSD to the Authority, the DWSD Trustee or the City under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d)     *Amendments*.  Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e)     *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the DWSD to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the DWSD or which is a creditor of the DWSD in respect of the Security.

(f)     *Legislation or Proposed Legislation*.  Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the City or the DWSD has knowledge which could reasonably be expected to adversely impact the Security, the DWSD's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the DWSD Obligations and the Required Payments.

**Section 5.17. Further Assurances**.   The DWSD will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the DWSD Trustee, the Banks or any other Person under or in connection with the DWSD Trust Indenture, this Agreement or the Related Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the DWSD Obligations, as and in the manner provided in the DWSD Trust Indenture.  Except to the extent it is exempt therefrom, the DWSD will pay or

46

cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.18. Right of Entry; Communication with Accountant**.  The DWSD shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the DWSD, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the DWSD's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security.  The DWSD authorizes the Banks to communicate directly with its accountants and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.19. Payment of Obligations**.  The DWSD will pay (a) all Parity Debt and obligations of the DWSD in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.20. Incorporation of Covenants**.

(a)      The covenants of the DWSD set forth in the DWSD Trust Indenture and each of the other Related Documents to which the DWSD is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the DWSD.  All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein.  To the extent that any such incorporated provision permits the DWSD to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the DWSD, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks.  No amendment to such covenants (or the defined terms relating thereto) made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks.  Notwithstanding the termination or expiration of any Related Document, the DWSD shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants therein contained for the benefit of the Banks until the termination of this Agreement.

(b) The City and the DWSD shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the DWSD Trustee at all times to comply with the terms of the Related Documents to which they are a party.

**Section 5.21. Disclosure to Assignees and Participants**. The City and the DWSD agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.15, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the City or the DWSD.

**Section 5.22. Maintenance of Existence**. The DWSD will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public municipal corporation and public body corporate of the State and activities ancillary thereto.

**Section 5.23. Use of Proceeds**. The DWSD shall use the proceeds of the DWSD Obligations solely for the purposes set forth in the DWSD Bond Resolution and the DWSD Trust Indenture. The DWSD will not use the proceeds of the DWSD Obligations in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.24. Parity Creditors and Covenants**. In the event that the DWSD has previously entered into or hereafter shall enter into any Relevant Agreement, which provides to a Parity Creditor (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the DWSD Trustee or the Banks or (b) any Parity Covenant than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the DWSD shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the DWSD fails to provide such amendment).

## ARTICLE VI

## NEGATIVE COVENANTS AND COVENANTS

**A. The Authority covenants and agrees to the terms of the following Section 6.01 through Section 6.11 until all Required Payments have been indefeasibly paid in full, and all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

**Section 6.01. Amendments**. The Authority shall not amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in,

48

or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, but only if such amendment, supplementation, termination or modification affects the Security, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section 6.01 shall be deemed a nullity and of no force and effect. The Authority shall not take any action, nor cause the Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the Authority's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the Authority's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the Indenture and the priority of the lien and security interest created thereby.

Section 6.02.  **Preservation of Existence, Etc**.  The Authority will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date), nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

Section 6.03.  **Certain Information**.  The Authority shall not include in an offering document or circular or reoffering supplement for the Bonds any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

Section 6.04.  **Trustee**.  The Authority shall not remove the Trustee or appoint a successor thereto without the written consent of the Banks. The Authority shall provide the Banks written notice of any change in the identity of the Trustee upon becoming aware of the same.  Upon written notice from the Banks that the Trustee is failing to perform its duties in the manner contemplated by the Indenture or the other Related Documents, the Authority shall replace or cause to be replaced the Trustee with a successor acceptable to the Banks.  If the position of Trustee becomes vacant, the Authority shall promptly appoint a successor which is reasonably acceptable to the Banks.

Section 6.05.  **Accounting Methods; Fiscal Year; Entity Classification**.  The Authority will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its Fiscal Year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

Section 6.06.  **Exempt Status**.  The Authority shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the Bonds to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

Section 6.07.  **Defeasance**.  The Authority will not defease, nor allow the defeasance of, the Bonds without (i) procuring a Verification Report and providing a copy thereof to the Banks

49

and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the Authority hereunder.

Section 6.08. **Investment of Funds**.  The Authority shall cause all moneys held in the Funds established under the Indenture to be invested in Permitted Investments.  The Authority shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in their discretion.

Section 6.09. **Hedge Agreements**.  The Authority will not enter into any Hedge Agreement hedging or otherwise relating to the Bonds, the Parity Debt or this Agreement without the prior written consent of the Banks.

Section 6.10. **Investment Policy**.  The Authority shall not amend its Investment Policy in any manner that could reasonably be expected to increase the degree of risk or decrease the credit quality of any of the Security. In the case of any proposed amendment, the Authority shall provide prior written notice to the Banks stating the terms of the proposed amendment.

Section 6.11. **Additional Parity Debt.**  The Authority shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding Bonds have been redeemed or otherwise refunded.

**B.  The City and the DWSD covenant and agree to the terms of the following Section 6.12 through Section 6.22 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

Section 6.12. **Amendments**.  Neither the City nor the DWSD shall amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in, or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section shall be deemed a nullity and of no force and effect.  The City and the DWSD shall not take any action, nor cause the DWSD Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the DWSD's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the DWSD's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the DWSD Trust Indenture and the priority of the lien and security interest created thereby.

Section 6.13. **Preservation of Existence, Etc**.  The DWSD will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date),

nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

**Section 6.14. Certain Information**.  The DWSD shall not include in an offering document or circular or reoffering supplement for the DWSD Obligations any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

**Section 6.15. DWSD Trustee**.  The DWSD shall not remove the DWSD Trustee or appoint a successor thereto without the written consent of the Banks. The DWSD shall provide the Banks written notice of any change in the identity of the DWSD Trustee upon becoming aware of the same.  Upon written notice from the Banks that the DWSD Trustee is failing to perform its duties in the manner contemplated by the DWSD Trust Indenture or the other Related Documents, the DWSD shall replace or cause to be replaced the DWSD Trustee with a successor acceptable to the Banks.  If the position of Trustee becomes vacant, the DWSD shall promptly appoint a successor which is reasonably acceptable to the Banks.

**Section 6.16. Accounting Methods; Fiscal Year; Entity Classification**.  The DWSD will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its fiscal year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

**Section 6.17. Exempt Status**.  The City and the DWSD shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the DWSD Obligations to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

**Section 6.18. Defeasance**.  The City and the DWSD will not defease, nor allow the defeasance of, the DWSD Obligations without (i) procuring a Verification Report and providing a copy thereof to the Banks and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the DWSD hereunder.

**Section 6.19. Investment of Funds**.  The City and the DWSD shall cause all moneys held in the Funds established under the DWSD Trust Indenture and the Related Documents to which it is a party to be invested in Permitted Investments.  The City and the DWSD shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in its discretion.

**Section 6.20. Hedge Agreements**.  The City and the DWSD will not enter into any Hedge Agreement hedging or otherwise relating to the DWSD Obligations, the Parity Debt or this Agreement without the prior written consent of the Banks.

**Section 6.21. Additional Parity Debt.**      The City and the DWSD shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding DWSD Obligations have been redeemed or otherwise refunded.

51

# ARTICLE VII

## EVENTS OF DEFAULT

**Section 7.01. Events of Default**.  The occurrence of any of the following events shall constitute an "Event of Default":

(a)     Failure by (i) the Authority to pay or cause to be paid when due any principal,  premium or interest, of or on, the Bonds, or any other amount owed by the Authority hereunder or under any of the other Related Documents or (ii) the DWSD to pay or cause to be paid when due any principal, premium or interest, of or on, the DWSD Obligations, or any other amount owed by the DWSD hereunder or under any of the other Related Documents;

(b)     Failure of the Authority to observe or perform the covenants set forth in  any of Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.11, 5.13, 6.01, 6.02, 6.04, 6.06, 6.07, 6.08 or 6.11, or failure of the City and the DWSD to observe or perform the covenants set forth in any of Sections 5.15, 5.16, 5.19, 5.20, 5.23, 5.24, 6.12, 6.13, 6.15, 6.17, 6.18, or 6.19;

(c)     Failure of the Authority, the City or the DWSD to observe or perform any covenant, condition or provision of this Agreement (other than as specified in (a) or (b) above) and such failure remains uncured 10 Business Days after written notice of such failure from the Banks to the Authority, the City, the DWSD and the Trustee, or failure to observe or perform any covenant, condition or provision contained in any other Related Document as incorporated by reference pursuant to Sections 5.07 and 5.20 hereof;

(d)     Any representation or warranty made or deemed made by or on behalf of the Authority, the City or the DWSD in this Agreement or any other Related Document or in any amendment of, or waiver under, this Agreement or other Related Document, or in any certificate, financial statement or other document furnished by or on behalf of the Authority, the City or the DWSD pursuant to or in connection with this Agreement or any of the other Related Documents shall have been inaccurate or incomplete in any material respect when made or deemed to have been made;

(e)     The occurrence and continuation of a default, event of default or termination event under any of the other Related Documents, irrespective of whether said default, event of default or termination event is declared, undeclared or has been waived under the terms of such respective document, or a mandatory redemption, prepayment or acceleration has occurred with respect to the Bonds, the DWSD Obligations or any other Parity Debt;

(f)     Failure by the Authority or the DWSD to make a payment of the principal of, or premium or interest on, any Parity Debt (other than the Bonds and the DWSD Obligations) or other Debt payable from or secured by a Lien on Revenues, when and as the same shall become due and payable (whether by

52

scheduled maturity, required prepayment or redemption, acceleration, demand or otherwise);

(g)     (i) Failure by the Authority or the DWSD or any Affiliate of either thereof to make any payment (whether of principal, redemption price, interest or other amount) due in respect of (x) any other Parity Debt owed to a Bank or any Affiliate of a Bank or (y) any other Parity Debt having an aggregate outstanding principal amount in excess of $5,000,000, in any such case, as and when the same shall become due, and provided that any applicable notice or grace period shall not apply; or (ii) the occurrence or existence of a default or event of default (other than a payment default) or other similar condition by or on the part of the Authority or the DWSD (or any Affiliate of either thereof), under any Contract evidencing, issuing, securing or relating to such Parity Debt and continuance of such default or event of default or similar condition beyond the period of grace, if any, allowed with respect thereto, which results in such Parity Debt becoming, or being capable of becoming, due and payable or subject to mandatory prepayment or purchase prior to its scheduled maturity and regardless of whether any such right is exercised;

(h)     The entry or filing of one or more judgments or orders or of any similar decrees or decisions for the payment of money which, individually or in the aggregate, equals or exceeds $5,000,000 (each, a "Judgment") shall be rendered against the Authority or the DWSD or any Affiliate of either thereof or against any of its or their respective properties or assets and (x) such Judgment shall be undischarged, unstayed or unbonded (by property other than any of the Security) for a period of 30 consecutive days, or (y) any action shall be taken by a judgment creditor by which such judgment creditor attaches, executes or levies upon the Security to enforce any such Judgment;

(i)     The occurrence of an Event of Insolvency with respect to the Authority or the DWSD;

(j)     This Agreement, any other Related Document or any provision of this Agreement or any of the other Related Documents shall cease to be valid and binding on the Authority, or a Governmental Authority with jurisdiction to rule on the validity of this Agreement, the Authority Bond Resolution or any other Related Document shall so find, announce or rule, or the Authority, the DWSD, the City or any Person on its or their behalf shall (i) contest the validity or enforceability of this Agreement or any Related Document or any provision of this Agreement or any such Related Document, (ii) deny that the Authority or the DWSD has any further liability under one or more provisions of this Agreement or any of the other Related Documents or (iii) seek an adjudication that (y) this Agreement or (z) a provision of this Agreement or of the Authority Bond Resolution or any other Related Document relating to, or the absence or invalidity of which could adversely affect, the security for the Bonds, the DWSD Obligations or the other Parity Debt, or the Authority's or the DWSD's ability to pay the Bonds, the DWSD Obligations or the other Parity Debt or perform its respective obligations under this Agreement or any of the other

Related Documents or the rights and remedies of the Banks, is not valid and binding on the Authority;

(k)    Any Security or any of the other funds or accounts established under the Authority Bond Resolution or any of the other Related Documents shall become subject to any writ, judgment, warrant or attachment, execution or similar process;

(l)    (i) any Lien created by the Related Documents in favor of  the Trustee, the DWSD Trustee or the Banks, at any time and for any reason (except as expressly permitted to be released by the terms of such governing document) shall not constitute a valid and perfected Lien or shall fail to have the priority required by the Related Documents or, except as permitted under the Related Documents, the Authority or the DWSD shall so assert in writing, (ii) any legislation is enacted, repealed, reenacted, amended or otherwise modified, and such repeal, enactment, reenactment, amendment or modification, in the opinion of the Banks, has a Material Adverse Effect on the validity, enforceability or priority of the Lien on the Revenues in favor of the Banks or the other Parity Holders or (iii) any rescission of or amendment to or any other action under or in connection with any legislation, law or regulation relating to the Revenues which would (A) materially reduce the amount of the Revenues or the allocation of the Revenues to the payment of the Bonds, the DWSD Obligations or the other Parity Debt or (B) impair or adversely affect (x) the rights of the Authority or the DWSD to any or all of the Security or (y) the rights or security of (1) the Trustee or the Owners, or of any other Parity Holder under the Authority Bond Resolution, or (2) the DWSD Trustee under the DWSD Trust Indenture;

(m)    An event (separately or in the aggregate with other events) occurs which constitutes a Material Adverse Change;

(n)    Any event (other than the exercise of an optional call or optional tender right by the holder thereof or of a right of optional redemption by the Authority or the DWSD, in each case in the absence of a default or event of default) occurs or condition exists that results in any Parity Debt becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) any Parity Holder, or any trustee or agent on its or their behalf, to exercise any right to accelerate any Parity Debt or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(o)    A repudiation by the Authority, the City or the DWSD of the payment when due of the principal of or premium or interest on the Bonds, the DWSD Obligations or any Parity Debt;

(p)    The Bankruptcy Order shall cease to be fully effective, in whole or in part, for any reason;

(q)     The commencement of any action by the City, the DWSD, the Authority or any third party challenging the Bonds Authorizing Act, or the validity or effect of either the Bonds Authorizing Act or the validity of the transactions contemplated by this Agreement; provided, however, that a direct appeal of the Bankruptcy Order shall not constitute an Event of Default hereunder.

**Section 7.02. Rights and Remedies; Consequences of an Event of Default**.  If an Event of Default specified in Section 7.01 hereof shall occur, then in addition to any other rights or remedies available to the Trustee or the Banks under any other Related Documents or under Applicable Law, the Banks may exercise any one or more of the following rights and remedies:

(a)     by notice to the Authority or the DWSD, accelerate all of the Required Payments (other than the Bonds, which are subject to acceleration as provided in Section 7.02(c)) whereupon such Required Payments shall become immediately due and payable without presentment, demand for payment, protest or notice of nonpayment or dishonor, or other notice of any kind or character, all of which are hereby expressly waived, and an action therefor shall immediately accrue; provided that (i) upon the occurrence of any Event of Default described in Sections 7.01(i) or 7.01(o) above, or (ii) upon any payment by the Authority of all or any portion of the principal amount of any Parity Debt that is accelerated due to the occurrence of an event of default or similar event, or any deposit to a cash collateral account in respect of, or as security for, any Parity Debt due to the occurrence of an event of default or similar event (other than a posting of collateral pursuant to a Hedge Agreement in the absence of a default or termination event or the posting of collateral to secure all Parity Debt pari passu), the Required Payments under this Agreement and the other Related Documents shall automatically mature and be due and payable on the date of the occurrence of such event described under (i) or (ii) without presentment, demand, protest, notice of default or intention to accelerate, notice of acceleration or other notice of any kind to the Authority or any other Person, all of which are hereby expressly waived;

(b)     (i) apply to any court of competent jurisdiction for, and obtain appointment of, a receiver, (ii) either personally or by attorney or agent and without bringing any action or proceeding, or by such a receiver, take whatever action at law or in equity may appear necessary or desirable to collect the amounts due and payable under the Related Documents or to enforce performance or observance of any of the Required Payments under the Related Documents, whether for specific performance of any agreement or covenant of the Authority or in aid of the execution of any power granted to the Banks in the Related Documents or as otherwise available at law or in equity;

(c)     deliver a notice to the Trustee, the Authority and the DWSD that an Event of Default has occurred and is continuing and instructing the Trustee to take all actions required as provided under the Indenture;

55

(d)     cure any Default, Event of Default or event of nonperformance hereunder or under any other Related Document; provided, however, that the Banks shall have no obligation to effect such a cure; and

(e)     exercise, or cause to be exercised, any and all remedies as it may have to realize on the Security under the other Related Documents including, without limitation, any rights it holds as a holder singly or together with other holders of Parity Debt to accelerate the Bonds and the other Parity Debt as provided in the Authority Bond Resolution and the Related Documents and to take any and all actions otherwise available under the Authority Bond Resolution and the Related Documents and any and all remedies as are otherwise available at law or in equity.

**Section 7.03. Remedies Cumulative; Solely for the Benefit of the Banks**.   To the extent permitted by, and subject to the mandatory requirements of, Applicable Law, each and every right, power and remedy specifically given to the Banks herein or in the other Related Documents shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Banks, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Banks specified herein are for the sole and exclusive benefit, use and protection of the Banks, and the Banks are entitled, but shall have no duty or obligation to the Authority, the City, the DWSD, the Trustee or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Banks hereunder or under any of the other Related Documents.

**Section 7.04. Waivers or Omissions**.   No delay or omission by the Banks in the exercise of any right, remedy or power or in the pursuit of any remedy shall impair any such right, remedy or power or be construed to be a waiver of any default on the part of the Banks or to be acquiescence therein.  No express or implied waiver by the Banks of any Event of Default shall in any way be a waiver of any future or subsequent Event of Default.  No delay or omission on the part of the Banks (or the Trustee) in exercising any right to acceleration of the maturity of the Bonds or any of the other Required Payments, or any remedy under the Related Documents following any Event of Default as aforesaid, or any other option granted to the Banks (or the Trustee) hereunder in any one or more instances, or the acceptance by the Banks (or the Trustee) of any partial payment on account of the Required Payments shall constitute a waiver of any such Event of Default and each such option shall remain continuously in full force and effect.

**Section 7.05. Discontinuance of Proceedings**.   In case the Banks shall proceed to invoke any right, remedy or recourse permitted hereunder or under the Related Documents and shall thereafter elect to discontinue or abandon the same for any reason, the Banks shall have the unqualified right so to do and, in such event, the Authority, the DWSD and the Banks shall be restored to their former positions with respect to the Required Payments, the Related Documents

56

and otherwise, and the rights, remedies, recourse and powers of the Banks hereunder shall continue as if the same had never been invoked.

**Section 7.06. Injunctive Relief**.  The Authority, the City and the DWSD recognize that in the event an Event of Default occurs, any remedy of law may prove to be inadequate relief to the Banks; therefore, the Authority, the City and the DWSD agree that the Banks, if the Banks so request, shall be entitled to temporary and permanent injunctive relief in any such case.

## ARTICLE VIII

## NATURE OF OBLIGATIONS; INDEMNIFICATION

**Section 8.01. Obligations Absolute**.  The obligations of the Authority and the DWSD to pay all Required Payments under this Agreement and the other Related Documents shall be absolute, unconditional and irrevocable, subject, however to Section 8.05 hereof, notwithstanding any other provision of this Agreement or any other Related Document, and shall not be subject to any right of setoff, recoupment or counterclaim against the Banks or any other Owner and shall be paid and performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever.  Until the principal of and interest on the Bonds and all Required Payments, have been indefeasibly paid in full and all other obligations of the Authority and the DWSD hereunder and under the Related Documents have been performed and discharged, the Authority, the City and the DWSD each waive and covenant not to assert any right of setoff or recoupment against its obligation to make all payments of principal, interest and all other Required Payments due hereunder and under the other Related Documents in the amounts and at the times required hereby and thereby, and without abatement, diminution, deduction, counterclaim or defense for any reason, including, without limitation, in the following circumstances:

> (a)     any lack of validity or enforceability of any of the Related Documents;

> (b)     any amendment or waiver of any provision, term or condition of any of the Related Documents;

> (c)     the existence of any dispute with, or any claim, right of setoff or recoupment, defense or other rights which the Authority, the City and the DWSD may have at any time against the Trustee, the DWSD Trustee, the Banks (other than the defense of payment to the Banks in accordance with the terms of this Agreement), any Owner or any other Person, whether in connection with this Agreement, the Related Documents or any transaction contemplated thereby or any unrelated transaction; and

> (d)     any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff or recoupment against, the Authority's or the DWSD's obligations hereunder or under any of the other Related Documents.

13-53846-tjt    Doc 6998-1    Filed 08/22/14    Entered 08/22/14 18:53:47    Page 191 of 311

**Section 8.02. Continuing Obligation**. All covenants, agreements, representations and warranties made by the Authority, the City and the DWSD in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Banks and shall survive the execution and delivery of this Agreement and the issuance and purchase by the Banks of the Bonds, regardless of any investigation made by the Banks or on its behalf and notwithstanding that the Banks may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the Bonds or any Required Payments remain outstanding and unpaid. The obligations of the Authority, the City and the DWSD under this Agreement shall survive and continue until the date upon which all amounts due and owing to the Banks hereunder and under any Bonds shall have been indefeasibly paid in full; *provided, however,* that the obligations of the Authority, the City and the DWSD pursuant to Sections 2.06, 8.03, 8.04, 9.12 and 9.13 hereof shall survive any expiration or termination of this Agreement.

**Section 8.03. Liability of the Banks**. The Authority, the City and the DWSD each hereby unconditionally and irrevocably releases and discharges the Banks, its Affiliates and each other Owner, and each of their respective officers, directors, employees and agents (each, a "Releasee"), from all liability or responsibility for any losses, liabilities, damages, claims, costs (including attorneys' fees), judgments or causes of action (collectively, "Liabilities") arising out of or in connection with any of the following: (a) the use that may be made of the proceeds of the Bonds or for any acts or omissions of the Authority, the City, the DWSD or the Trustee; (b) any of the acts, omissions, agreements, circumstances or conditions covered by the indemnification provided in Section 8.04 and (c) any other circumstance whatsoever in connection with the purchase and holding by the Banks (or other Owner) of the Bonds or the enforcement of this Agreement or the exercise of any rights or remedies hereunder, under any other Related Document or under law or in equity by the Banks (or other Owner); provided that, the Authority and the DWSD shall have a claim against the Banks (or other Owner) and the Banks (or other Owner) shall be liable to the Authority and the DWSD to the extent, but only to the extent, of any direct, actual damages suffered or incurred by the Authority and the DWSD, and not required to be mitigated by the Authority, the City and the DWSD, which direct, actual damages are determined by a final and nonappealable judgment of a court of competent jurisdiction to have been directly caused by the Bank's willful misconduct or gross negligence in the performance or non-performance of a duty owed to the Authority and the DWSD. The Authority, the City and the DWSD further unconditionally and irrevocably release the Releasees from all Liabilities for or constituting lost profits and from all Liabilities for or constituting consequential, special, indirect or punitive (or exemplary) damages (the right to recover or receive lost profits, consequential, special, indirect or punitive (or exemplary) damages being hereby waived), suffered or incurred by the Authority, the City and the DWSD.

**Section 8.04. Indemnification; Taxes, Etc.** (a) In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the Authority hereby agrees to defend, indemnify and hold harmless each of the Banks, their Affiliates, each other Owner and each Participant and each of the respective officers, directors, employees and agents of the foregoing Persons (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an

58

Indemnified Party may incur (or which may be claimed against an Indemnified Party by any Person whatsoever) that arises out of or in connection with any of the transactions contemplated by this Agreement or the Related Documents, including, without limitation, (i) the issuing, offering or sale of the Bonds; (ii) the proposed or actual use of the proceeds of the Bonds; (iii) the untruth or material inaccuracy of any warranty or representation undertaken or given by the Authority in this Agreement or any Related Document or in any certificate furnished hereunder or thereunder or the breach or nonperformance by any Person of any covenant of this Agreement or any other Related Document; (iv) any act or omission of the Authority or any imposition arising from, burden imposed by, violation of, or failure to comply with, any Applicable Law by the Authority; (v) any Taxes or Other Taxes; or (vi) the involvement of any Indemnified Party in any legal suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the purchase or holding of the Bonds, the entering into of this Agreement or any action taken or omitted to be taken hereunder or under any of the other Related Documents or any other event or transaction contemplated by any of the foregoing; provided, in each case, that the Authority shall not be required to indemnify the Banks for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, directly caused by the willful misconduct or gross negligence of the Banks, to the extent that there has been a final and nonappealable judgment of a court of competent jurisdiction that such claims, damages, losses, liabilities, costs and expenses were directly caused by the willful misconduct or gross negligence of the Banks.  If any proceeding shall be brought or threatened against an Indemnified Party by reason of or in connection with the events described in (i), (ii), (iii), (iv), (v) or (vi), such Indemnified Party shall promptly notify the Authority in writing and the Authority shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.

(b)  In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the DWSD hereby agrees to defend, indemnify and hold harmless each Indemnified Party from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an Indemnified Party may incur (or which may be claimed against an Indemnified Party by any Person whatsoever) that arises out of or in connection with any of the transactions contemplated by this Agreement or the Related Documents, including, without limitation, (i) the issuing, offering or sale of the Bonds; (ii) the proposed or actual use of the proceeds of the Bonds; (iii) the untruth or material inaccuracy of any warranty or representation undertaken or given by the DWSD in this Agreement or any Related Document or in any certificate furnished hereunder or thereunder or the breach or nonperformance by any Person of any covenant of this Agreement or any other Related Document; (iv) any act or omission of the DWSD or any imposition arising from, burden imposed by, violation of, or failure to comply with, any Applicable Law by the DWSD; (v) any Taxes or Other Taxes; or (vi) the involvement of any Indemnified Party in any legal suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the purchase or holding of the Bonds, the entering into of this Agreement or any action taken or omitted to be taken hereunder or under any of the other Related Documents or any other event or transaction contemplated by any of the foregoing; provided, in each case, that the DWSD shall not be required to indemnify the Banks for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, directly caused by the willful misconduct or gross negligence of the Banks, to the extent that there has been a final and nonappealable judgment of a court of competent jurisdiction that such claims, damages, losses, liabilities, costs and expenses were

59

directly caused by the willful misconduct or gross negligence of the Banks. If any proceeding shall be brought or threatened against an Indemnified Party by reason of or in connection with the events described in (i), (ii), (iii), (iv), (v) or (vi), such Indemnified Party shall promptly notify the DWSD in writing and the DWSD shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.

(c)     Neither the Authority nor the DWSD will settle or compromise any such action or claim without the prior written consent of the relevant Indemnified Party if the settlement or compromise would require any act or admission by such Indemnified Party or any of its Affiliates, or impose any cost or expense on the Indemnified Party or its Affiliates or impose any limitation on the business or future actions of the Indemnified Party or its Affiliates. Notwithstanding the preceding sentence, an Indemnified Party shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the employment of such counsel has been authorized in writing by the Authority or the DWSD, as applicable or (y) the Authority or the DWSD, as applicable, after due notice of the action, shall not have employed counsel to have charge of such defense, in either of which events the reasonable fees and expenses of counsel for such Indemnified Party shall be borne by the Authority or the DWSD, as applicable. The Authority and the DWSD shall not be liable for any settlement of any such action effected without its consent. Nothing under this Section 8.04 shall or shall be construed to limit the Authority's or the DWSD's payment obligations under Article II.

(d)     The provisions of this Section 8.04 shall survive the termination of this Agreement and the payment in full of the Bonds and the obligations of the Authority and the DWSD thereunder and hereunder.

**Section 8.05. Limited Obligations.** Notwithstanding anything in this Agreement to the contrary, the Authority and the DWSD are obligated to pay their obligations under this Agreement only from the Security. The State is not obligated to pay any such obligation and neither the faith and credit nor the taxing power of the State is pledged to the payment of such obligations. The Authority and the DWSD have no taxing power. **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THIS AGREEMENT IS NOT A DEBT OR LIABILITY OF THE STATE OR OF ANY AGENCY OR INSTRUMENTALITY OF THE STATE, OTHER THAN THE AUTHORITY AND THE DWSD AS SET FORTH IN THE BONDS AUTHORIZING ACT, EITHER LEGAL, MORAL OR OTHERWISE. THIS AGREEMENT DOES NOT CREATE OR CONSTITUTE AN INDEBTEDNESS, LIABILITY OR OBLIGATION OF THE STATE OR CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE. NOTHING IN THE BONDS AUTHORIZING ACT SHALL BE CONSTRUED TO AUTHORIZE THE AUTHORITY AND THE DWSD TO INCUR ANY INDEBTEDNESS OR LIABILITY ON BEHALF OF THE STATE.**

## ARTICLE IX

## MISCELLANEOUS

60

**Section 9.01. Assignment of Rights to the Banks.** The Authority appoints the Banks as its representative for all purposes of enforcing the rights of the owners of the DWSD Obligations as set forth in the DWSD Trust Indenture.

**Section 9.02. Right of Setoff**. Upon the occurrence of an Event of Default, the Banks and their Affiliates may, at any time and from time to time, without notice to the Authority and the DWSD or any other Person (any such notice being expressly waived), set off and appropriate and apply, against and on account of, any obligations and liabilities of the Authority and the DWSD to the Banks or their Affiliates, whether or not arising under or connected with this Agreement or the Related Documents and without regard to whether or not the Banks shall have made any demand therefor and although such obligations and liabilities may be contingent or unmatured and regardless of currency, place of payment or booking office thereof, any and all deposits (general or special, including but not limited to Debt evidenced by certificates of deposit, but not including trust accounts) and any other Debt or other payment obligation at any time held or owing by the Banks or their Affiliates to or for the credit or the account of the Authority and the DWSD, whether or not arising under or connected with this Agreement or the Related Documents, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office thereof. The rights of the Banks under this Section are in addition to other rights and remedies (including other rights of setoff) which the Banks may have at law or in equity.

**Section 9.03. Amendments and Waivers; Remedies Cumulative**. No amendment or waiver of any provision of this Agreement nor consent to any departure by the Authority, the City or the DWSD from any such provision shall in any event be effective unless the same shall be in writing and signed by the Banks. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. In the event any covenant or agreement contained in this Agreement should be breached by the Authority, the City or the DWSD and thereafter waived by the Banks, such waiver shall be limited to the particular breach so waived for the specific period set out in such waiver and such waiver shall not constitute a waiver of such breach for any other period and shall not waive any other or similar breach hereunder. Specifically and not in limitation of the foregoing, this Agreement may not be amended or modified by course of dealing, oral acknowledgement or agreement or by any writing, unless it is a writing which is expressly stated to constitute an amendment of this Agreement and is signed by an authorized officer for the Banks and an Authorized Officer and an authorized representative of the Authority, the City and the DWSD. The rights and remedies of the Banks hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.

**Section 9.04. Notices**. All notices, requests, demands, directions and other communications (collectively "notices") under the provisions of this Agreement shall be in writing (including facsimile communication), unless otherwise expressly permitted hereunder, and shall be properly addressed and sent by registered or certified mail or by express courier for next Business Day delivery and shall be deemed received as follows: (a) if by registered or certified mail, five (5) days after mailing; (b) if by express courier for next Business Day delivery, on the next Business Day; and (c) if by facsimile, when confirmation of transmission is obtained if prior to 5:00 p.m. local time on a Business Day, and otherwise, on the next Business Day; provided that service of a notice prescribed by any applicable statute shall be considered

complete when the requirements of that statute are met. Notices by electronic mail (e-mail) shall not constitute notice under this Agreement and are only to be used in addition to notice given as prescribed under (a), (b) or (c) of this Section 9.04. All notices shall be sent to the applicable party at the following address or in accordance with the last unrevoked written direction from such party to the other parties hereto:

if to the Authority, addressed to the Authority at:

> Michigan Finance Authority
> 430 W. Allegan Street
> Lansing, Michigan 48922
> Attention: Executive Director
> Telephone: (517) 335-0994
> Facsimile: (517) 241-1233
> Email: treas_bondfinance@michigan.gov

if to the DWSD, addressed to the DWSD at:

> Detroit Water and Sewerage Department
> _____
> Detroit, MI _____
> Attention: Executive Director
> Telephone: 313-324-8290
> Facsimile: 313-638-2805
> Email: _____

if to the City, addressed to the City at:

> City of Detroit
> _____
> Detroit, MI _____
> Attention: _____
> Telephone: _____
> Facsimile: _____
> Email: _____

or if to the Banks, addressed to them at:

> For Administrative Matters:

> Citibank, N.A.
> 390 Greenwich Street, 2nd Flood
> New York, New York 10013
> Attention: _____
> Telephone: 212-723-5577

Facsimile: 866-914-8193
Email: _____

For Credit Matters:

Citibank, N.A.
390 Greenwich Street, 8th Floor
New York, New York 10013
Attention: Municipal Credit Surveillance
Telephone: 212-723-4339
Facsimile: 212-723-8592
Email: munisurveillance@citi.com

[INSERT NOTICE ADDRESSES FOR OTHER BANKS]

or if to the Trustee, addressed to it at:

Wilmington Trust, National Association
Corporate Trust Services
25 South Charles Street, 11th Floor
Baltimore, MD 21201
Attention: _____
Telephone: 410-545-2193
Facsimile: 410-244-4236

or as to each party at such other address as shall be designated by such party in a written notice to the other parties.

Any notice or other communication shall be sufficiently given and shall be deemed given when delivered to the addressee in writing or when given by telephone immediately confirmed in writing by electronic mail or other telecommunication device.

**Section 9.05. Severability**. Each of the parties to this Agreement intends that each provision in this Agreement comport with all applicable requirements of law. However, if all or any portion of any provision or provisions in this Agreement is or are found by a court of competent jurisdiction to be in violation of any applicable statute, regulation, administrative or judicial decision or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be invalid, unlawful, void or unenforceable as written, then it is the express intent of each of the parties hereto that the obligations, rights and interests of the respective parties under the remainder of this Agreement shall continue in full force and effect and such portion, provision or provisions which is held or determined to be invalid, unlawful, void or unenforceable as written shall, nonetheless, be enforced and binding to the fullest extent permitted by law as though such portion, provision or provisions had been written in such a manner and to such an extent as to be valid, lawful and enforceable under the circumstances.

**Section 9.06. GOVERNING LAW**. THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT UNDER, AND TOGETHER WITH ANY DISPUTES OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE

63

GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND APPLICABLE FEDERAL LAW, WITHOUT REGARD TO CHOICE OF LAW RULES OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 (OR ANY SUCCESSOR STATUTE THERETO); PROVIDED THAT THE OBLIGATIONS OF THE AUTHORITY, THE CITY AND THE DWSD AND LEGAL AUTHORITY AND CAPACITY OF THE AUTHORITY, THE CITY AND THE DWSD UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE.

**Section 9.07. Headings**.  Section headings in this Agreement are included herein for convenience of reference only and shall not have any effect for purposes of interpretation or construction of the terms of this Agreement.

**Section 9.08. Successors and Assigns**.  (a) (i) This Agreement is a continuing obligation and shall be binding upon and inure to the benefit of the Authority, DWSD, the Banks and their respective successors, endorsees and assigns; provided, that, the Authority and the DWSD shall not assign, transfer or delegate all or any portion of their rights or obligations hereunder or under the other Related Documents without the prior written consent of the Banks.  The Banks may from time to time and without the consent of the Authority, the City or the DWSD or any other Person assign, sell or transfer in whole or in part, this Agreement and any of its rights or interests hereunder and all or any part of its interest in the Bonds and the Related Documents.

(ii)     Any successor to, or assignee of, Citibank, N.A. [or OTHER BANKS, TBD] as the initial Banks shall give written notice to the Authority and the DWSD and the Trustee identifying the assignee or successor as the Banks for all purposes of this Agreement and the other Related Documents. Insofar as the successor Bank is not the sole Owner of the Bonds, the group of Owners then owning a majority of the aggregate principal amount of the Bonds then Outstanding shall give notice to the Authority and the DWSD and the Trustee that they constitute the Banks as herein defined and, provided any such notice on its face establishes the requisite ownership of a majority of the aggregate principal amount of the Bonds then Outstanding by the Owners identified therein, such Owners shall thereupon constitute the Banks and shall succeed to and become vested with all of the rights, powers, privileges and responsibilities of the Banks in this Agreement and each of the other Related Documents.  The predecessor Bank shall be discharged from its duties and obligations hereunder, provided that the predecessor Bank shall continue to be entitled to the benefits of Article II and Sections 8.03, 8.04, 9.12 and 9.13 hereof and of each other provision of any Related Document granting a right of payment, indemnity or reimbursement in favor of the Banks.

(iii)     Each Bank may designate any nominee, designee or agent to act for and in the name of the Bank by written notice to the Authority, the DWSD and the Trustee and any such duly designated nominee, designee or agent shall thereupon be empowered to act for and on behalf of the Bank and exercise the rights, powers, privileges and responsibilities of a Bank in this Agreement and each of the other Related Documents.

64

(iv)   The Authority and the DWSD agree to provide to the Banks, promptly upon request, a copy of the most recent financial information concerning the Authority and the DWSD in connection with any assignment or prospective assignment.  A Bank may disclose to any assignees or prospective assignees any information or data in the Bank's possession relating to this Agreement, the Bonds or any other Related Document, without the consent of or notice to the Authority, the City or the DWSD.

(b)   *Certain Pledges*.  The Banks, and each of them, may at any time, without notice to, or any requirement to seek the consent of, the Authority, the City or the DWSD, pledge or grant a security interest in all or any portion of its rights under the Bonds, this Agreement and the other Related Documents (including without limitation rights to payment under the Bonds and this Agreement) to secure obligations of the Banks, including any pledge or assignment to secure obligations to a Federal Reserve Banks.

(c)   *Participations*.  The Authority, the City and the DWSD acknowledge and agree that the Banks shall have the right to grant participations in all or a portion of a Bank's interest in the Bonds, this Agreement and the other Related Documents to one or more other banking institutions (each Person granted such participation to be a "Participant"), and such Participants shall, except as set forth in the following clause (ii), be entitled to the benefits of this Agreement and the Related Documents to the same extent as if they were a direct party to this Agreement; provided, however, that (i) no such participation by any such Participant shall in any way affect the obligations of the Banks hereunder and (ii) the Authority, the City, the DWSD and the Trustee shall be required to deal only with the Banks, with respect to any matters under this Agreement, the Bonds and the other Related Documents and no such Participant shall be entitled to enforce against the Authority and the DWSD any provision hereunder.  The Authority and the DWSD agree to provide to the Banks, promptly upon request, a copy of the most recent financial information concerning the Authority and the DWSD in connection with any such participation or prospective participation.   The Banks may disclose to any Participants or prospective Participants any information or data in a Bank's possession relating to this Agreement, the Bonds or any other Related Document, without the consent of or notice to the Authority, the City and the DWSD.  The Authority, the City and the DWSD further acknowledge and agree that upon any such participation the Participants will become owners of a pro rata portion of the participated obligations and the Authority, the City and the DWSD waive any right of setoff it may at any time have against the Banks or any Participant with regard to the participated obligations.

**Section 9.09.  Counterparts; Complete and Controlling Agreement**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Related Documents completely set forth the agreements between the Banks and the Authority and between the Banks and the DWSD and supersede all prior and contemporaneous understandings, agreements and contracts, both written

65

and oral, between the Banks and the Authority and between the Banks and the DWSD relating to the issuance, sale and purchase of the Bonds and all matters set forth herein and in the Related Documents.

**Section 9.10.  Waiver of Rule of Construction**.  The Authority, the City and the DWSD hereby waive any and all provisions of law to the effect that an ambiguity in a contract or agreement should be interpreted against the party responsible for its drafting.

**Section 9.11.  WAIVER OF JURY TRIAL**.  THE AUTHORITY, THE CITY, THE DWSD AND THE BANKS EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (WHETHER AS CLAIM, COUNTER-CLAIM, AFFIRMATIVE DEFENSE OR OTHERWISE) BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE AUTHORITY, THE CITY, THE DWSD OR THE BANKS.  THE AUTHORITY, THE CITY AND THE DWSD EACH ACKNOWLEDGE AND AGREE THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND RECOGNIZES AND AGREES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANKS ENTERING INTO THIS AGREEMENT AND PURCHASING THE BONDS.  THE AUTHORITY, THE CITY AND THE DWSD REPRESENT AND ACKNOWLEDGE THAT EACH HAS REVIEWED THIS PROVISION WITH ITS LEGAL COUNSEL AND THAT EACH HAS KNOWINGLY AND VOLUNTARILY WAIVED ANY JURY TRIAL RIGHTS EACH MAY HAVE FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.

**Section 9.12.  Payments Set Aside**.  To the extent that any payment by or on behalf of the Authority and the DWSD is made to the Banks, or the Banks exercise their right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Banks in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**Section 9.13.  Usury**.   If notwithstanding the application of Section 2.08 of this Agreement, Applicable Law shall be interpreted by a court of competent jurisdiction to render usurious any amount or amounts payable to the Banks under this Agreement or under the Bonds, or contracted for, charged or received by the Banks with respect to the obligations of the Authority and the DWSD hereunder or under the Bonds, or if any acceleration or optional or extraordinary prepayment results in the Authority and the DWSD having paid any interest (together with any Charges) in excess of that permitted by Applicable Law, then it is the Bank's express intent that all excess amounts theretofore collected by the Banks shall be credited against the principal balance of the Authority's and the DWSD's obligations to the Banks and the provisions of this Agreement and the other Related Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder modified, without the

66

necessity of the execution of any new documents, so as to comply with the Applicable Law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to the Banks, which may be characterized as interest under Applicable Law shall, to the extent permitted thereby, be amortized, prorated, allocated, and spread throughout the full stated term of the Bonds or other obligations of the Authority and the DWSD until payment in full so that the rate or amount of interest on account of such obligations does not exceed the Maximum Lawful Rate from time to time in effect and applicable to such obligations for so long as the obligations are outstanding.

**Section 9.14. Electronic Signature; Electronically Signed Document**.  For purposes hereof, "electronic signature" means a manually-signed original signature that is then transmitted by electronic means; "transmitted by electronic means" means sent in the form of a facsimile or sent via the Internet as a pdf (portable document format) or other replicating image attached to an e-mail message; and, "electronically signed document" means a document transmitted by electronic means and containing, or to which there is affixed, an electronic signature.  The parties agree that the electronic signature of a party to this Agreement (or any amendment or supplement of this Agreement) shall be as valid as an original signature of such party and shall be effective to bind such party to this Agreement.  The parties agree that any electronically signed document (including this Agreement) shall be deemed (i) to be "written" or "in writing," (ii) to have been signed, and (iii) to constitute a record established and maintained in the ordinary course of business and an original written record when printed from electronic files.  Such paper copies or "printouts", if introduced as evidence in any judicial, arbitral, mediation or administrative proceeding, will be admissible as between the parties to the same extent and under the same conditions as other original business records created and maintained in documentary form.  Neither party shall contest the admissibility of true and accurate copies of electronically signed documents on the basis of the best evidence rule or as not satisfying the business records exception to the hearsay rule.

**Section 9.15. No Advisory or Fiduciary Responsibility**.  In connection with all aspects of the transactions contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Related Document), the Authority, the City and the DWSD acknowledge and agree that: (a) (i) the services, if any, regarding this Agreement provided by the Banks and any of their Affiliates are arm's-length commercial transactions between the Authority, the City, the DWSD and its Affiliates, on the one hand, and the Banks and their Affiliates, on the other hand, (ii) the Authority, the City and the DWSD each have consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Authority, the City and the DWSD are each capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Related Documents; (b) (i) the Banks and each of its Affiliates is and has been acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Authority, the City, the DWSD or any of its Affiliates, or any other Person and (ii) neither the Banks nor any of their Affiliates has any obligation to the Authority, the City the DWSD or any of its Affiliates with respect to the Transactions, except those obligations expressly set forth herein; and (c) the Banks and each of their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Authority, the DWSD and its Affiliates, and neither the Banks nor any of their Affiliates has any obligation to disclose any of such interests to the Authority, the DWSD or its Affiliates.  To the fullest extent

permitted by Applicable Law, the Authority and the DWSD hereby waive and release any claims that it may have against the Banks and each of their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Bond Purchase and Supplemental Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

MICHIGAN FINANCE AUTHORITY

By _____
Name        Joseph      L.      Fielek
Title Executive DirectorCITY OF DETROIT, MICHIGAN

By _____
Name
Title_____

DETROIT WATER AND SEWERAGE DEPARTMENT

By _____
Name Odis Jones
Title Executive Director

[Signatures continued on next page]

[Signature page to Bond Purchase and Supplemental Agreement]

CITIBANK, N.A.

By _____

Name _____

Title <u>Vice-President</u>

**EXHIBIT [A]**
**BANKRUPTCY ORDER**

# SCHEDULE I

# BOND PURCHASE PRICE

**EXHIBIT 3B**

CHI-1940093v3

**BOND PURCHASE AND SUPPLEMENTAL AGREEMENT**

among

**MICHIGAN FINANCE AUTHORITY**

and

**DETROIT WATER AND SEWERAGE DEPARMENT**

and

**CITIBANK, N.A.**

and

**[OTHER BANKS TBD]**

Relating to

**Local Government Loan Program Revenue Bonds, Series 2014____
(Detroit Water and Sewerage Department Local Project Bonds)**

Dated August __, 2014

TABLE OF CONTENTS

Page

# ARTICLE I
## DEFINITIONS

Section 1.01.   Definitions.................................................................................... 2
Section 1.02.   Incorporation of Certain Definitions by Reference ...................... 14
Section 1.03.   Accounting Matters....................................................................... 14
Section 1.04.   Computation of Time Periods........................................................ 14
Section 1.05.   New York City Time Presumption ................................................ 14
Section 1.06.   Relation to Other Documents........................................................ 14
Section 1.07.   Interpretation................................................................................. 14

# ARTICLE II
## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

Section 2.01.   Purchase of Bonds......................................................................... 15
Section 2.02.   Payment of Bonds ......................................................................... 15
Section 2.03.   Optional Redemption; Mandatory Redemption ............................ 15
Section 2.04.   Payments Generally....................................................................... 15
Section 2.05.   Costs, Expenses and Taxes ........................................................... 16
Section 2.06.   Change in Law .............................................................................. 17
Section 2.07.   Cure............................................................................................... 18
Section 2.08.   Payment of Interest and Other Amounts........................................ 19

# ARTICLE III
## CONDITIONS PRECEDENT

Section 3.01.   Documentary and Related Closing Conditions............................. 20
Section 3.02.   Credit Requirements ..................................................................... 27
Section 3.03.   Additional Conditions Precedent .................................................. 27

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.01.   Due Organization; Power and Authority ....................................... 27
Section 4.02.   Authorization and Validity of Agreement, Related Documents and
                Borrowing..................................................................................... 27
Section 4.03.   Compliance of Agreement, Related Documents with Applicable Law,
                Organizational Documents, Etc .................................................... 28
Section 4.04.   Governmental Approvals............................................................... 28
Section 4.05.   Compliance with Law ................................................................... 28
Section 4.06.   Litigation....................................................................................... 29
Section 4.07.   Absence of Defaults and Events of Default................................... 29
Section 4.08.   Accuracy and Completeness of Information.................................. 29
Section 4.09.   Sovereign Immunity...................................................................... 29
Section 4.10.   Incorporation of Representations and Warranties.......................... 29
Section 4.11.   Bonds ............................................................................................ 30
Section 4.12.   Interest........................................................................................... 30
Section 4.13.   Investment Company Act ............................................................. 30

Section 4.14.    Federal Reserve Board Regulations...........................................................30
Section 4.15.    No Proposed Legal Changes ...................................................................30
Section 4.16.    Anti-Terrorism Representation ...............................................................30
Section 4.17.    Valid Lien ..............................................................................................31
Section 4.18.    Obligations; Other Debt.........................................................................31
Section 4.19.    Solvency.................................................................................................32
Section 4.20.    Indenture a Contract...............................................................................32
Section 4.21.    Due Organization; Power and Authority .................................................32
Section 4.22.    Authorization and Validity of Agreement, Related Documents and
                 Borrowing ...............................................................................................32
Section 4.23.    Compliance of Agreement, Related Documents with Applicable Law,
                 Organizational Documents, Etc ...............................................................33
Section 4.24.    Governmental Approvals ........................................................................33
Section 4.25.    Compliance with Law .............................................................................33
Section 4.26.    Litigation................................................................................................33
Section 4.27.    Absence of Defaults and Events of Default.............................................33
Section 4.28.    Accuracy and Completeness of Information.............................................34
Section 4.29.    Sovereign Immunity................................................................................34
Section 4.30.    Incorporation of Representations and Warranties.....................................34
Section 4.31.    DWSD Obligations..................................................................................34
Section 4.32.    Interest....................................................................................................35
Section 4.33.    Investment Company Act ........................................................................35
Section 4.34.    Federal Reserve Board Regulations.........................................................35
Section 4.35.    No Proposed Legal Changes ...................................................................35
Section 4.36.    Anti-Terrorism Representation ...............................................................35
Section 4.37.    Valid Lien ..............................................................................................36
Section 4.38.    Obligations; Other Debt.........................................................................36
Section 4.39.    Solvency.................................................................................................37
Section 4.40.    DWSD Trust Indenture a Contract ..........................................................37

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.01.    Compliance With Laws and Regulations...................................................37
Section 5.02.    Reporting Requirements .........................................................................37
Section 5.03.    Notices...................................................................................................38
Section 5.04.    Further Assurances..................................................................................39
Section 5.05.    Right of Entry; Communication with Accountant.....................................39
Section 5.06.    Payment of Obligations...........................................................................40
Section 5.07.    Incorporation of Covenants.....................................................................40
Section 5.08.    Disclosure to Assignees and Participants.................................................40
Section 5.09.    Maintenance of Existence .......................................................................40
Section 5.10.    Use of Proceeds......................................................................................40
Section 5.11.    Parity Creditors and Covenants ..............................................................41
Section 5.12.    CUSIP Numbers......................................................................................41
Section 5.13.    DWSD Financial Information...................................................................41
Section 5.14.    Compliance With Laws and Regulations...................................................41
Section 5.15.    Reporting Requirements .........................................................................42

ii

| | | |
|---|---|---|
| Section 5.16. | Notices | 43 |
| Section 5.17. | Further Assurances | 44 |
| Section 5.18. | Right of Entry; Communication with Accountant | 44 |
| Section 5.19. | Payment of Obligations | 44 |
| Section 5.20. | Incorporation of Covenants | 45 |
| Section 5.21. | Disclosure to Assignees and Participants | 45 |
| Section 5.22. | Maintenance of Existence | 45 |
| Section 5.23. | Use of Proceeds | 45 |
| Section 5.24. | Parity Creditors and Covenants | 45 |

## ARTICLE VI

### NEGATIVE COVENANTS AND COVENANTS

| | | |
|---|---|---|
| Section 6.01. | Amendments | 46 |
| Section 6.02. | Preservation of Existence, Etc | 46 |
| Section 6.03. | Certain Information | 47 |
| Section 6.04. | Trustee | 47 |
| Section 6.05. | Accounting Methods; Fiscal Year; Entity Classification | 47 |
| Section 6.06. | Exempt Status | 47 |
| Section 6.07. | Defeasance | 47 |
| Section 6.08. | Investment of Funds | 47 |
| Section 6.09. | Hedge Agreements | 47 |
| Section 6.10. | Investment Policy | 48 |
| Section 6.11. | Additional Parity Debt. | 48 |
| Section 6.12. | Amendments | 48 |
| Section 6.13. | Preservation of Existence, Etc | 48 |
| Section 6.14. | Certain Information | 48 |
| Section 6.15. | DWSD Trustee | 48 |
| Section 6.16. | Accounting Methods; Fiscal Year; Entity Classification | 49 |
| Section 6.17. | Exempt Status | 49 |
| Section 6.18. | Defeasance | 49 |
| Section 6.19. | Investment of Funds | 49 |
| Section 6.20. | Hedge Agreements | 49 |
| Section 6.21. | Additional Parity Debt | 49 |

## ARTICLE VII
### EVENTS OF DEFAULT

| | | |
|---|---|---|
| Section 7.01. | Events of Default | 50 |
| Section 7.02. | Rights and Remedies; Consequences of an Event of Default | 53 |
| Section 7.03. | Remedies Cumulative; Solely for the Benefit of Banks | 54 |
| Section 7.04. | Waivers or Omissions | 54 |
| Section 7.05. | Discontinuance of Proceedings | 54 |
| Section 7.06. | Injunctive Relief | 54 |

## ARTICLE VIII
### NATURE OF OBLIGATIONS; INDEMNIFICATION

Section 8.01.  Obligations Absolute ................................................................. 55
Section 8.02.  Continuing Obligation ............................................................... 55
Section 8.03.  Liability of the Banks................................................................ 56
Section 8.04.  Indemnification; Taxes, Etc ...................................................... 56
Section 8.05.  Limited Obligations .................................................................. 57

## ARTICLE IX

Section 9.01.  Assignment of Rights to the Banks............................................ 58
Section 9.02.  Right of Setoff........................................................................... 58
Section 9.03.  Amendments and Waivers; Remedies Cumulative..................... 58
Section 9.04.  Notices ...................................................................................... 58
Section 9.05.  Severability ............................................................................... 60
Section 9.06.  GOVERNING LAW .................................................................. 60
Section 9.07.  Headings ................................................................................... 61
Section 9.08.  Successors and Assigns.............................................................. 61
Section 9.09.  Counterparts; Complete and Controlling Agreement ................. 62
Section 9.10.  Waiver of Rule of Construction ................................................. 62
Section 9.11.  WAIVER OF JURY TRIAL........................................................ 63
Section 9.12.  Payments Set Aside.................................................................... 63
Section 9.13.  Usury......................................................................................... 63
Section 9.14.  Electronic Signature; Electronically Signed Document ............. 64
Section 9.15.  No Advisory or Fiduciary Responsibility ................................... 64

**BOND PURCHASE AND SUPPLEMENTAL AGREEMENT**

This **BOND PURCHASE AND SUPPLEMENTAL AGREEMENT** (the "Agreement") dated August __, 2014, is among the **MICHIGAN FINANCE AUTHORITY**, a public body corporate and politic existing under the laws of the State of Michigan (the "Authority"), [the **CITY OF DETROIT, MICHIGAN**,] the **DETROIT WATER AND SEWERAGE DEPARTMENT**, a public body corporate and politic existing under the laws of the State of Michigan ("DWSD") and **CITIBANK, N.A.**, a national banking association organized under the laws of the United States of America, [and OTHER BANKS, TBD] (collectively, the "Banks").

W I T N E S S E T H :

**WHEREAS**, pursuant to the provisions of Resolution 1989-15, as amended and supplemented, (the "1989 Resolution") the Michigan Municipal Bond Authority (the "MMBA") established the Local Government Loan Program for the purpose of making loans to governmental units as defined in Act 227, Public Acts of Michigan, 1985, as amended ("Act 227"); and

**WHEREAS**, the MMBA pursuant to Supplemental Resolution No. 2007-07, amended the 1989 Resolution to provide for the use of Supplemental Indentures as a means of amending the 1989 Resolution and further provided that Supplemental Indentures shall be treated the same as Supplemental Resolutions under the terms of the 1989 Resolution; and

**WHEREAS,** the Authority has been established by Executive Order 2010-2 issued by the Governor on March 4, 2010, and effective by its terms on May 30, 2010, as supplemented, as successor to the MMBA; and

**WHEREAS**, the City, upon authorization from the Board of Water Commissioners and the emergency manager for the City ("Emergency Manager"), is issuing its [$_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Senior Lien Bonds, Series 2014__ (the "DWSD Senior Lien Revenue Obligations"), [$_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014__ (the "DWSD Senior Lien Refunding Obligations"), and its $_____ City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014____ (the "DWSD Second Lien Refunding Obligations" and, collectively with the DWSD Senior Lien Revenue Obligations and the DWSD Senior Lien Refunding Obligations, the "DWSD Obligations")pursuant to (i) the provisions of Act 94, Public Acts of Michigan, 1933, as amended ("Act 94"), (ii) Ordinance No. 18-01 adopted by the City Council of Detroit on October 18, 2001 (the "Bond Ordinance"), (iii) the Orders of the United States District Court in *United States v. City of Detroit, et al.*, 77-71100, E.D. Michigan, (iv) the Resolution and Ordinance Authorizing the Issuance and Sale of Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds of the City of Detroit, Sewage Disposal System Revenue Refunding Second Lien Bonds of the City of Detroit and/or Sewage Disposal System Revenue SRF Junior Lien Bonds of the City of Detroit, adopted by the Board of Water

Commissioners on August 13, 2014 and approved by the emergency manager of the City (the "Emergency Manager") on August 16, 2014 (the "DWSD Bond Resolution"), (v) a Trust Indenture by and among the City, the DWSD and U.S. Bank National Association, as trustee (the "DWSD Trustee") dated as of June 1, 2012 (the "DWSD Trust Indenture"), (vi) a Sale Order of the Director of the Department dated August [__], 2014 and approved by the Emergency Manager on August [__], 2014 (the "Sale Order" and, collectively with the Bond Ordinance, the DWSD Bond Resolution and the DWSD Indenture, the "DWSD Authorizing Documents"); and

**WHEREAS**, in order to purchase the DWSD Obligations, the Authority has agreed to issue its Local Government Loan Program Revenue Bonds, Series 2014____ (Detroit Water and Sewerage Department Local Project Bonds) (the "Bonds") in the aggregate principal amount of $___,___,___, pursuant to [the Indenture dated August __, 2014 (the "Indenture"),] the Amended and Restated Resolution Establishing Michigan Finance Authority Local Government Loan Program and Providing for the Issuance of Local Government Program Revenue Bonds, adopted by the Authority on May 15, 2014 (the "General Resolution") and a Supplemental Resolution adopted by the Authority on August 12, 2014 (the "Supplemental Resolution", and together with the General Resolution, the "Authority Bond Resolution"); and

**WHEREAS**, the Banks have agreed to purchase the Bonds in order to provide proceeds to the Authority for the purchase of the DWSD Obligations and, as a condition to such purchase, the Banks require the Authority, the City and the DWSD to enter into this Agreement and to agree to perform the covenants and obligations stated herein; and

**WHEREAS**, Wilmington Trust, National Association has been appointed to act as Trustee, Depository and Bond Registrar and Paying Agent under the Supplemental Resolution with respect to the Series 2014____ Bonds and, pursuant to the Authority Bond Resolution, the Authority will pledge and assign to the Trustee, for the benefit of the Series 2014____ Bonds, (i) all of the Authority's rights and interest in the DWSD Obligations and the Collateral Documents (as defined in the Authority Bond Resolution) pertaining to the DWSD Obligations, subject to reservation by the Authority of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the DWSD Obligations, (ii) all moneys in the Revenue Fund established for the Series 2014____ Bonds under the Authority Bond Resolution (the "Revenue Fund"), and (iii) all of the proceeds of the foregoing, including without limitation investments thereof and interest and earnings thereon,

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, including the covenants, terms and conditions hereinafter contained, and to induce the Banks to purchase the Bonds, the Banks, the Authority, the City and the DWSD agree as follows:

# ARTICLE I

## DEFINITIONS

**Section 1.01. Definitions**.    In addition to terms defined at other places in this Agreement, the following defined terms are used throughout this Agreement with the following meanings:

"*Accountant*" means an independent certified public accountant or a firm of independent certified public accountants, selected by the Authority and satisfactory to the Banks.

"*Act 94*" has the meaning assigned to such term in the recitals to this Agreement.

"*Act 227*" has the meaning assigned to such term in the recitals to this Agreement.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by or under common control with such Person.  For purposes of this definition, "control" (including "controlled by" and "under common control with"), when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting rights, membership, the power to appoint members, trustees or directors, by contract or otherwise.  Without limiting the foregoing, the definition of "*Affiliate*" of any Person shall include any subsidiary of such Person.

"*Agreement*" means this Bond Purchase and Supplemental Agreement, including such amendments, modifications or supplements permitted pursuant to the terms hereof

"*Applicable Law(s)*" means, collectively, the Constitutions of the United States and the State, all applicable common law and principles of equity and all international, foreign, federal, state and local laws, statutes, treaties, codes, acts, rules, regulations, guidelines, ordinances, resolutions, orders, judgments, decrees, injunctions, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all administrative orders, directed duties, requests, licenses, certificates, authorizations and permits of, and agreements with, any Governmental Authority, and, with respect to any Person, the articles of incorporation, bylaws or other organizational or governing documents of such Person, in each case whether or not having the force of law, that are applicable now or are applicable at any time hereafter to (a) the Authority, (b) the City, (c) the DWSD or (d) any assets, property, operations or facilities of the Authority, the City or the DWSD, as the case may be or (e) the Transactions.

"*Authority*" means the Michigan Finance Authority, an autonomous public body corporate and politic, separate and distinct from the State of Michigan, created and existing under Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and its successors and assigns permitted hereunder.

"*Authority Bond Resolution*" has the meaning assigned to such term in the recitals to this Agreement.

"*Authority Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the Authority.

"*Authorized Denominations*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Authorized Officer*" shall have the meaning assigned in the Authority Bond Resolution; provided**,** however, that in each case for which a certification or other statement of fact or condition is required to be submitted by an Authorized Officer pursuant to the terms of this Agreement, such certificate or statement shall be executed only by an Authorized Officer in a position to know or to obtain knowledge of the facts or conditions that are the subject of such certificate or statement. Any document or certificate hereunder that is executed by an Authorized Officer shall be deemed to have been authorized by all necessary action by the Authority.

"*Banks*" means the Holder of the Bonds, provided that there is a single Holder of all of the Bonds and provided further that the Bonds are not then held under the Book-Entry System. If there is more than one Holder of the Bonds, "Banks" means Holders owning a majority of the aggregate principal amount of the Bonds then Outstanding, and "Bank" shall refer to each such Holder individually. If the Bonds are then held under the Book-Entry System, "Banks" means the Beneficial Owner of the Bonds, provided that there is a single Beneficial Owner of all of the Bonds. If there is more than one Beneficial Owner of the Bonds, "Banks" means Beneficial Owners who are the beneficial owners of a majority of the aggregate principal amount of the Bonds then Outstanding. The initial Banks are Citibank, N.A. [and OTHER BANKS TBD] and upon receipt by the Authority and the Trustee of a notice described in Section 9.08(a), the "Banks" shall mean the Person identified in such notice as the Banks.

"*Bankruptcy Code*" means the United States Bankruptcy Code, Title 11 of the United States Code, as amended, or any successor act or code.

"*Bankruptcy Order"* has the meaning assigned to such term in Section 3.01(n) hereof.

"*Beneficial Owner*" means the Person in whose name a Bond is recorded as beneficial owner of such Bond by the Securities Depository or a Participant or an Indirect Participant on the records of such Securities Depository, Participant or Indirect Participant, as the case may be, or such Person's subrogee.

"*Bonds*" has the meaning assigned to such term in the recitals to this Agreement.

"*Bonds Authorizing Act*" means, collectively, Act 94, Act 227 and Executive Order 2010-2.

"*Business Day*" has the meaning assigned to such term in the Indenture.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount

of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"*City*" means the City of Detroit[ and/or the Board of Water Commissioners and/or the Emergency Manager, as the context requires].

"*Closing Date*" means August __, 2014, or such later date on which this Agreement is fully executed and delivered.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor provision or provisions thereto or any successor Federal tax code, and any regulations (including temporary and proposed regulations relating to the matters governed by this Agreement) thereunder or under any such provision or successor Federal tax code.

"*Contract*" means any indenture, contract, mortgage, deed of trust, guaranty, note or agreement (other than this Agreement), other contractual restriction, lease, instrument, certificate of incorporation, charter or by-law.

"*Counsel*" means an attorney duly admitted to practice law before the highest court of any state.

"*Debt*" means with respect to any Person, all items that would be classified as a liability in accordance with GAAP, including, without limitation, (a) indebtedness or liability for borrowed money including amounts drawn under a letter of credit or other credit facility, or amounts advanced under a commercial paper program, or for the deferred purchase price of property or services (including trade obligations); (b) all Capital Lease Obligations of such Person; (c) current liabilities in respect of unfunded benefits under employee benefit, retirement or pension plans; (d) obligations issued for the account of any other Person; (e) all obligations arising under acceptance facilities; (f) all Guarantees and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any other Person or otherwise to assure a creditor against loss; (g) obligations secured by full faith and credit or by any mortgage, lien, pledge, security interest or other charge or encumbrance on property, whether or not the obligations have been assumed; (h) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility; (i) obligations of such Person under Hedge Agreements; and (j) all amounts required to be paid by such Person as a guaranteed payment to partners or members or as a preferred or special dividend, including any mandatory redemption of shares or interests; and, in each case, whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"*Debtor Relief Laws*" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws and regulations of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" means the occurrence of any event or the existence of any condition which constitutes an Event of Default or the occurrence of any event or the existence of any condition which with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" means a per annum rate of interest equal to [____] percent (____%).

"*Determination Counsel*" means a firm of attorneys of nationally-recognized standing in matters pertaining to the validity of and tax-exempt nature of interest on bonds and other debt instruments issued by states and their political subdivisions, designated by the Authority and acceptable to the Banks in their sole and absolute discretion.

["*Determination of Taxability*" means a determination that the interest payable on the DWSD Obligations or the Bonds does not qualify as interest which is excludable from gross income of the recipient thereof for federal income tax purposes under Section 103 of the Code ("Exempt Interest") for any reason, which determination shall be deemed to have been made upon the first to occur of any of the following:

(a)     the date on which (i) the Internal Revenue issues a proposed or final determination of taxability, a Notice of Proposed Issue (IRS Form 5701 TEB), a notice of deficiency or similar notice, or any other notice, determination or decision, in each case, to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest, or (ii) a court of competent jurisdiction has rendered any final ruling or decision to the effect that the interest payable on the DWSD Obligations or the Bonds or any portion thereof does not qualify as Exempt Interest;

(b)     the date when the Authority, the City or the DWSD files any statement, supplemental statement, or other tax schedule, return or document, which is in any respect inconsistent with interest payable on the Bonds or the DWSD Obligations, as applicable, or any portion thereof continuing to qualify as Exempt Interest;

(c)     the date of any sale, lease or other deliberate action within the meaning of Treas. Reg. § 1.141-2(d), if prior to such action the Authority, the City, the DWSD and the Banks have not received an unqualified opinion of Determination Counsel to the effect that such action will not cause interest on the Bonds or the DWSD Obligations, as the case may be, to become includable in the gross income of the recipient for federal income tax purposes; or

(d)     (i) the date that circumstances relating to the Authority, the City or the DWSD [or the Improvements (as defined in the _____) or any portion thereof] have occurred or changed, or any federal tax law or regulation, or any public or private final ruling, technical advice memorandum or any other written communication by the Internal Revenue Service is adopted or issued, or any final ruling or decision of a court of competent jurisdiction is rendered or any other set of circumstances has occurred, in any such case, which may adversely affect the excludability of the Exempt Interest from the gross income of the recipient for federal income tax purposes; and thereafter (ii) Determination Counsel is notified by the Banks in writing, with a copy to the Authority, the City and the DWSD, or by the Authority, the City or the DWSD, with a copy to the other parties hereto, that Determination Counsel is requested to deliver an updated

approving tax-exempt opinion in form and substance acceptable to the Banks in their sole discretion ("Approving Opinion") during the 45-day period after receipt of the request and is assured as to the payment of its fees and expenses for such services; and (iii) within 45 days after such notice has been received by Determination Counsel, either (A) the Banks, the City, the DWSD and the Authority have received written communication from Determination Counsel to the effect that, based upon an analysis of the facts and applicable law, it is unable to render an updated Approving Opinion, or (B) Determination Counsel has not delivered an Approving Opinion.]

"*DWSD*" means the Detroit Water and Sewerage Department established under the City Charter.

"*DWSD Authorizing Documents*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Obligations*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Resolution*" means, collectively, the DSWD Bond Resolution, the execution and delivery by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and related matters.

"*DWSD Tax Agreement*" means the Non-Arbitrage and Tax Compliance Certificate of the DWSD.

"*DWSD Trustee*" has the meaning assigned to such term in the recitals to this Agreement.

"*DWSD Trust Indenture*" has the meaning assigned to such term in the recitals to this Agreement.

"*Emergency Manager*" means the Emergency Manager of the City, appointed under the Local Financial Stability and Choice Act, 2012 PA 436, MCL §§ 141.1541 et seq.

"*Emergency Manager Orders*" means Order Nos. _____ and _____ of the Emergency Manager dated _____ __, 2014, approving certain agreements relating to the DWSD.

"*EMMA*" has the meaning assigned to such term in Section 5.02.

"*Event of Default*," in relation to this Agreement, shall have the meaning assigned to such term in Article VII, and in relation to any Related Document, shall have the meaning set forth therein.

"*Event of Insolvency*" means, with respect to any Person, the occurrence of one or more of the following events:

       (a)      the issuance, under the laws of any state or under the laws of the United States of America, of an order of rehabilitation, liquidation or dissolution of such Person;

(b)     the commencement by or against such Person of a case or other proceeding (and in the case of the commencement against such Person, there occurs the entry of an order for relief or the appointment of a trustee, receiver, liquidator, custodian or other official for such Person, or such case or proceeding is not dismissed within sixty (60) days of such commencement) seeking liquidation, reorganization or other relief with respect to the such Person or its debts under any bankruptcy, insolvency or other similar state or federal law now or hereafter in effect, including, without limitation, the appointment of a trustee, receiver, liquidator, custodian or other similar official for such Person or any substantial part of its property or there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;

(c)     the making of an assignment for the benefit of creditors by such Person;

(d)     the failure of such Person to generally pay its debts as they become due;

(e)     a debt moratorium, debt adjustment, debt restructuring or comparable restriction with respect to the payment of any Debt of such Person is declared or imposed by such Person or by any Governmental Authority having jurisdiction over such Person;

(f)     such Person shall admit in writing its inability to pay its debts when due or shall become insolvent within the meaning of Section 101(32) of the United States Bankruptcy Code (or any equivalent provision of any successor act or code); or

(g)     a case, proceeding or other action is commenced against such Person seeking issuance of a warrant or writ of attachment, execution, restraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which is not vacated or discharged, or stayed or bonded pending appeal, within sixty (60) days from the entry thereof; or

(h)     the initiation of any actions to authorize, consent or acquiesce to any of the foregoing by or on behalf of such Person.

"*Excess Interest Amount*" has the meaning assigned to such term in Section 2.08.

"*Fiscal Year*" means, as applicable, the fiscal year of the Authority ending on September 30 of each calendar year, or the fiscal year of the DWSD ending on June 30 of each calendar year.

"*Fitch*" means Fitch, Inc., or any successor thereto.

"*GAAP*" means accounting principles generally accepted and consistently applied to governmental entities in the United States, as set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants, the

Financial Accounting Standards Board and the Governmental Accounting Standards Board or in such other statements by such other entity as may be in general use by significant segments of the accounting profession as in effect on the date hereof.

"*Governmental Approvals*" means an authorization, consent, approval, permit, license, certificate of occupancy or an exemption of, a registration or filing with, or a report to, any Governmental Authority.

"*Governmental Authority*" means any national, supra-national, state or local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial, administrative, public or statutory instrumentality, authority, body, board, agency, department, commission, bureau, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory, fiscal, monetary or administrative powers or functions of or pertaining to government, or any arbitrator, mediator or other Person with authority to bind a party at law.

"*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"*Hedge Agreement*" means any rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, total return swap, credit default swap or any other similar transaction (including any option with respect to any of these transactions) and any other agreement or option involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Holders*" means the Person or Persons who shall be the registered owner of any Bond, initially, Citibank, N.A.

"*Initial Purchasers*" means Citibank, N.A., and [OTHER BANKS, TBD.]

[*"Indenture"* has the meaning assigned to such term in the recitals to this Agreement.]

[*"Indirect Participant"* means _____.]

[*"Investment Policy"* means the Michigan Finance Authority – Investment Policy, dated March 1, 2011.]

*"Interest Payment Date"* has the meaning assigned to such term in the Indenture.

[*"Interest Rate"* means the LIBOR-based rate defined in the Authority Bond Resolution and/or Indenture.]

*"Issue Date"* means the date on which the Bonds are delivered to the purchaser or purchasers thereof upon original issuance.

*"Lien"* on or with respect to any asset means any mortgage, deed of trust, lien, pledge, charge, security interest, hypothecation, assignment, deposit arrangement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected or effective under applicable law, as well as the interest of a vendor or lessor under any conditional sale agreement, capital or finance lease or other title retention agreement relating to such asset and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

*"Margin Stock"* has the meaning assigned to that term in Regulation U promulgated by the Board of Directors of the Federal Reserve System, as now and hereafter from time to time in effect.

*"Material Adverse Change"* means the occurrence of any event or change which, in the sole reasonable discretion of the Banks, results in a material and adverse change in the Security or which in the sole reasonable discretion of the Banks materially and adversely affects (a) the enforceability of the Bonds Authorizing Act, the Bonds, the DWSD Obligations, this Agreement or any of the other Related Documents, (b) the ability of the Authority, the City or the DWSD to perform its obligations hereunder or under any of the Related Documents or (c) the Security, the rights of, or benefits or remedies available to, the Banks under the Indenture, this Agreement or the other Related Documents.

*"Material Adverse Effect"* means (a) a materially adverse effect upon the Security, (b) with respect to this Agreement or any of the other Related Documents or any of the Authority's obligations arising under this Agreement or any of the other Related Documents, an adverse effect upon the binding nature, validity or enforceability of such agreement or obligation, (c) an adverse effect on the exclusion of interest with respect to the Bonds or the DWSD Obligations from gross income for purposes of federal income taxation or the exemption of such interest from State personal income taxes or (d) a materially adverse effect (i) on the authority or ability of the Authority, the City or the DWSD to perform any of its respective obligations under any Related Document or the ability of the Authority, the City or the DWSD to complete the Transactions or (ii) on the rights or remedies of the Banks hereunder or under the other Related Documents or on the pledge of the Security under the Related Documents or on the priority of the Liens created thereby.

"*Material Litigation*" means any actions, suits, proceedings, inquiries or investigations against a Person or any property of the Person in any court or before any arbitrator of any kind or before or by any other Governmental Authority, (i) wherein an unfavorable decision, ruling or finding could have a Material Adverse Effect, (ii) which seek to restrain or enjoin any of the Transactions, or (iii) which may adversely affect (A) the status of the Person as a public body corporate and politic of the State, created and validly existing under the laws of the State, (B) the exclusion of interest on the Bonds or the DWSD Obligations from gross income for federal income tax purposes, (C) the validity, binding effect and perfection of the pledge of and lien on the Security or (D) the ability of the Person to perform its obligations under this Agreement, the Indenture or any other Related Document.

"*Maximum Lawful Rate*" means the respective maximum, non-usurious, lawful rate of interest that may be contracted for, charged or received in connection with the Required Payments under this Agreement, under Applicable Law presently in effect or, to the extent permitted by law, under Applicable Law that may hereafter be in effect and that allows a higher maximum and non-usurious rate of interest than Applicable Law now allows.

"*Moody's*" means Moody's Investors Service, Inc., or any successor thereto.

"*Obligor Rating*" means any rating by a Rating Agency on any Parity Debt that is not guaranteed by any other Person or subject to any third-party credit enhancement.

"*Other Payment Obligations*" means any payment obligations due to the Banks or other Owners of the Bonds under this Agreement described in clause (b) of the definition of "*Required Payments*".

"*Other Taxes*" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Bonds or this Agreement.

"*Outstanding*" has the meaning assigned to such term in the Authority Bond Resolution.

"*Owners*" means, collectively, the Holders or Beneficial Owners of the Bonds and "Owner" means any Holder or Beneficial Owner of the Bonds.

"*Participant*" has the meaning assigned to such term in Section 9.08(c).

"*Parity Debt*" means any Debt now or hereafter issued and Outstanding by or on behalf of the Authority or the DWSD, which is equally and ratably payable from and secured by a pledge of and lien upon the Security [on a parity with or senior to that of the Bonds or the DWSD Obligations].

"*Parity Holder*" means the holder of any Parity Debt.

"*Permitted Investments*" (i) with respect to the Authority, has the meaning assigned to the term "Eligible Investments" in the Authority Bond Resolution, and (ii) with respect to the DWSD, has the meaning assigned to the term "Permitted Investments" in the DWSD Indenture.

11

"*Person*" means an individual, a corporation, a partnership, an association, a joint venture, a trust, a business trust, a limited liability company or any other entity or organization, including a governmental or political subdivision or an agency or instrumentality thereof.

"*Rating Agency*" means S&P, Moody's, Fitch or any successor or additional rating agency that rates the Bonds or other Parity Debt at the written request of the Authority with the written consent of the Banks.

"*Redemption Price*" means, for any redemption of the Bonds under the Indenture, 100% of the principal amount redeemed or purchased, together with all accrued and unpaid interest thereon.

"*Related Documents*" means, collectively, this Agreement, the Authority Bond Resolution, the Bonds, [the Indenture], the DWSD Resolution, the DWSD Obligations, the DWSD Trust Indenture, the Bankruptcy Order, the Emergency Manager Orders and any exhibits, instruments or agreements relating thereto, as the same may be amended from time to time in accordance with their respective terms and the terms hereof.

"*Required Payments*" means all present and future debts, obligations and liabilities of the Authority to the Banks and any other Holders or Beneficial Owners arising pursuant to, or on account of, the provisions of this Agreement, the Bonds or any of the other Related Documents to which the Authority is a party (or to the Trustee, for the benefit of any of the foregoing Persons), including the obligations: (a) to pay all principal, interest, late charges, Redemption Price, (in each case, as applicable) and other amounts due at any time under the Bonds in accordance with the provisions of the Authority Bond Resolution and Article II of this Agreement; and (b) to pay all other amounts, charges, costs, fees (including reasonable attorneys' fees), expenses, indemnification payments, fees and other amounts due and payable by the Authority at any time under any of the Related Documents whether in the form of a direct, reimbursement, or indemnity payment obligation, and including all payment obligations of the Authority to the Banks, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Authority or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, together with interest thereon as provided in the applicable Related Document.

"*Revenues*" means the Net Revenues of the Sewage Disposal System and amounts available in certain funds and accounts established in accordance with the DWSD Bond Ordinance, all as defined in [the DWSD Authorizing Documents].

"*S&P*" means Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, or any successor thereto.

"*Section (a)(i) Proposed Determination of Taxability*" means any Determination of Taxability described under (a)(i) of the definition thereof which is a proposed and not final notice, determination or decision.

"*Securities Depository*" means The Depository Trust Company or such other securities depository which may be designated by the Authority pursuant to the Indenture, subject to the consent of the Banks, not to be unreasonably withheld.

"*Security*" means (a) the DWSD Obligations purchased by the Authority in an amount to fully secure the Bonds (b) the Trust Estate held under the DWSD Trust Indenture, (c) funds and accounts held to secure the Bonds pursuant to the Authority Bond Resolution and (d) all agreements and rights of the Authority respecting the DWSD Obligations.

"*Solvent*" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of Debts and liabilities, including contingent, subordinated, unmatured and unliquidated Debts and liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its Debts and liabilities as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur Debts or liabilities beyond such Person's ability to pay as such Debts and liabilities mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent Debts or liabilities (such as litigation) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability.

"*State*" means the State of Michigan.

[*"Taxable Date"* means the date as of which interest on the Bonds is first includable in the gross income of the Owner, including, without limitation, any previous Owner thereof as determined pursuant to a Determination of Taxability.]

"*Taxes*" has the meaning assigned to such term in Section 2.05(b).

"*To the best knowledge of*" (or any similar knowledge qualifier) means, when modifying a representation, warranty or other statement of any Person, that the fact or situation described therein is known by the Person (or, in the case of a Person other than a natural Person, known by an authorized representative of such Person) making the representation, warranty or other statement, after such inquiry as the Person deems appropriate, and taking into account the responsibilities of the office the Person holds.

"*Transactions*" means the issuance, offering and sale of the Bonds, the execution and delivery by the Authority, the City and the DWSD of this Agreement and the other Related Documents, the performance by the Authority, the City and the DWSD of their respective obligations (including payment obligations) hereunder and thereunder, the purchase by the Banks of the Bonds and the use by the Authority of the proceeds of the Bonds, the purchase by the Authority of the DWSD Obligations and the use by the DWSD of the proceeds of the DWSD Obligations and the other transactions contemplated hereby and thereby.

"*Trustee*" means Wilmington Trust, National Association or its permitted successor as trustee under the Authority Bond Resolution.

[*"Verification Report"* means _____.]

"*Written*" or "*in writing*" means any form of written communication, a communication by means of facsimile device and as described in Section 9.14.

**Section 1.02. Incorporation of Certain Definitions by Reference**. Each capitalized term used herein and not otherwise defined herein shall have the meaning provided therefor in the Authority Bond Resolution and the Bonds, as applicable, unless the context requires otherwise.

**Section 1.03. Accounting Matters**. All accounting terms used herein without definition shall be interpreted in accordance with GAAP, and except as otherwise expressly provided herein all accounting determinations required to be made pursuant to this Agreement shall be made in accordance with GAAP.

**Section 1.04. Computation of Time Periods**. In this Agreement, in the computation of a period of time from a specified date to a later specified date, unless otherwise specified herein, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

**Section 1.05. New York City Time Presumption**. All references herein to times of the day shall be presumed to refer to New York City time unless otherwise specified.

**Section 1.06. Relation to Other Documents**. Nothing in this Agreement shall be deemed to amend, or relieve the Authority of any of its obligations under, any Related Document. To the extent that the Authority undertakes in any provision of this Agreement representations, covenants or obligations which conflict with, or are more exacting than, a provision of any other Related Document to which the Authority is a party, such provisions of this Agreement shall control for all purposes of this Agreement.

**Section 1.07. Interpretation**. All words used herein shall be construed to be of such gender as the circumstances require. Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, the singular includes the plural and the part includes the whole. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless otherwise specified (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in such document or herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not be limited to any particular provision of this Agreement, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same

meaning and effect and, when used in connection with any Person, to refer to all rights, title and interests of such Person in and to any and all property whether real, personal or mixed, or tangible or intangible, and wherever situated, including cash, securities, investment property, accounts, land, buildings, general intangibles, chattel, intellectual property, contract rights and other property and assets.

## ARTICLE II

## PURCHASE OF BONDS; PAYMENT AND REIMBURSEMENT OBLIGATIONS

**Section 2.01.    Purchase of Bonds**.  Upon and subject to the conditions precedent and the terms and conditions provided herein and based on the representations, warranties and covenants of the Authority set forth in the Related Documents and herein, the Banks hereby agree to purchase from the Authority, and the Authority agrees to sell to the Banks, all, but not less than all, of the Bonds at an aggregate purchase price of $___,___,___.  The Bonds are to be dated the date of delivery thereof, and are to mature, be subject to redemption prior to maturity and bear interest as set forth in the Authority Bond Resolution.

**Section 2.02.  Payment of Bonds**.  The Authority shall make prompt and full payment of all payment obligations owed to the Banks under the Bonds and the Related Documents and will pay any other Required Payments owing to the Banks whether now existing or hereafter arising, irrespective of their nature, whether direct or indirect, absolute or contingent, with interest thereon at the rate or rates provided in, and at the times specified in, this Agreement and the Bonds.

**Section 2.03.  Optional Redemption; Mandatory Redemption**.  In connection with any optional or mandatory redemption of all or any portion of the Bonds, the Authority shall pay to the Banks the Redemption Price in accordance with the provisions of the Authority Bond Resolution and the Bonds.

**Section 2.04.  Payments Generally**.

(a)      All Required Payments to be made by the DWSD or the Authority or on behalf of either the DWSD or the Authority to the Banks hereunder or under any of the other Related Documents shall be fully earned when due and nonrefundable when paid and made in lawful currency of the United States of America and in immediately available funds.  All such amounts, unless otherwise directed by the Banks in writing (and in the case of principal and interest on the Bonds, subject to and in accordance with the procedures of DTC, as applicable), shall be paid by wire transfer to the Bank's account at [Citibank, New York, ABA # 021-000-089, Credit to Account No. 4058-0089; Ref:_____], (or to such other account of the Banks as each Bank may specify by written notice to the Authority or the Trustee, as applicable) not later than 3:30 p.m. New York, New York time, on the date payment is due.  Any payment received by the Banks after 3:30 p.m., New York, New York time, shall be deemed to have been received by the Banks on the next Business Day.  If any payment hereunder is due on a day that is not a Business Day, then such payment shall be due on the next succeeding Business Day,

and, in the case of the computation of the interest or fees hereunder, such extension of time shall, in such case, be included in the computation of the payment due hereunder.

(b)    If at any time insufficient funds are received by and available to the Banks to pay fully all amounts of principal, interest and Other Payment Obligations then due under the Bonds or hereunder, such funds shall be applied first, to payment of that portion of the Required Payments constituting accrued and unpaid interest on the Bonds or other amount unpaid hereunder (and, in any such case, first to past due interest and second to current interest), second, to payment of that portion of the Required Payments constituting unpaid principal of the Bonds and third to payment of any unpaid Other Payment Obligations.

**Section 2.05.  Costs, Expenses and Taxes**.

(a)    The DWSD agrees to pay on demand all reasonable costs and expenses incurred by the Banks and their Counsel in connection with the preparation, negotiation, execution and delivery of this Agreement, the other Related Documents and any other documents and certificates which may be delivered in connection with this Agreement and the other Related Documents, including, without limitation, the reasonable fees, expenses and disbursements of Counsel for the Banks.  In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, the necessary and reasonable out-of-pocket expenses and disbursements of the Banks and the necessary and reasonable fees, expenses and disbursements of Counsel to the Banks in connection with (a) the administration of this Agreement including any waiver or consent under this Agreement or any other Related Document or other document or certificate delivered in connection with the Transactions or any amendment or requested amendment hereof or thereof (whether or not the transactions contemplated thereby shall be consummated) or any Default or alleged Default hereunder, (b) the preparation, execution, delivery, administration and enforcement or preservation of rights in connection with a workout, refinancing, restructuring or waiver with respect to this Agreement, or any of the other Related Documents and (c) the occurrence of an Event of Default and collection and other enforcement proceedings resulting therefrom.

(b)    Any and all payments to the Banks by or on behalf of the Authority or the DWSD hereunder shall be made free and clear of, and without deduction for, any and all taxes, levies, imposts, deductions, charges or withholdings imposed, including but not limited to as a result of a change in, law, rule, treaty, or regulation, or any policy, guideline, or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority, and all liabilities with respect thereto, excluding only taxes imposed on or measured by the net income or capital of the Banks by any jurisdiction or any political subdivision or taxing authority thereof or therein solely as a result of a connection between the Banks and such jurisdiction or political subdivision, other than a connection resulting solely from executing, delivering or performing its obligations or receiving

a payment under, or enforcing, this Agreement (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Authority or the DWSD is required by law to withhold or deduct any sum from payments required under this Agreement, the Authority or the DWSD shall, to the maximum extent permitted by Applicable Law, increase the amount paid by it to the Banks so that, after all withholdings and deductions, the amount received by the Banks shall equal the amount the Banks would have received without any such withholding or deduction.

(c)     In addition, the DWSD shall pay or cause to be paid on demand, upon not less than ten (10) days prior written notice to the DWSD, any present or future stamp, recording, or Other Taxes and fees payable or determined to be payable under Applicable Law in connection with the execution, delivery, filing and recording of this Agreement, the other Related Documents and such other documents and certificates as are referred to in clause (a) above and agrees to defend, indemnify and hold the Banks harmless from and against any and all liabilities with respect to or resulting from any failure to pay, or any delay in paying, such taxes and fees.

(d)     The DWSD shall pay the reasonable fees, costs and expenses of the Trustee incurred in connection with this Agreement and the performance of its obligations hereunder, upon notice of the amounts incurred, given to the DWSD in accordance with Section 9.04.

**Section 2.06.  Change in Law**.

(a)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any Other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any such changes to any law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, policies, regulations, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall (i) change the basis of taxation of payments to such Bank or such Participant of any amounts payable hereunder (except for taxes on the overall net income of such Bank or such other Owner), (ii) impose, modify or deem applicable any reserve, liquidity, special deposit, insurance premium, fee, financial charge, monetary burden or similar requirement in connection with complying with any term of this Agreement, or against assets held by, or deposits with or for the account of, such Bank or such other Owner or (iii) impose on such Bank or such other Owner any other condition,

expense or cost regarding this Agreement, and the result of any event referred to in clause (i), (ii) or (iii) above shall be to increase the cost to such Bank or such other Owner of complying with any term of this Agreement or to reduce the amount of any sum received or receivable by such Bank or such other Owner hereunder, then, upon receipt of supported documentation from such Bank, the DWSD shall pay to each affected Bank for its own account, or for the account of such other Owner, as applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such increased costs or reductions in amount.

(b)     If any Bank or any other Owner shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty, regulation, policy, guideline, supervisory standard or directive of, or any change in the interpretation, implementation, or administration thereof by, any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), or compliance by such Bank or any other Owner with any request by or directive of any Governmental Authority (in each case, subsequent to the Closing Date and whether or not having the force of law), including but not limited to any changes to any such law, rule, regulation, policy, guideline, standard, directive, interpretation or application implementing, invoking or in any way related to any provision (as now or hereafter amended) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (or any other statute referred to therein or amended thereby) or any rules, guidelines, standards, or directives promulgated by the Basel Committee on Banking Supervision or the Bank for International Settlements (BIS) (or any successor or similar organizations), shall impose, modify or deem applicable any capital (including but not limited to contingent capital) adequacy, reserve, insurance, liquidity or similar requirement (including, without limitation, a request or requirement that affects the manner in which such Bank or any other Owner allocates capital resources or reserves to its commitments) that either (i) affects or would affect the amount of capital or reserves to be maintained by such Bank or such other Owner in connection with this Agreement or (ii) reduces or would reduce the rate of return on the affected Bank's or such other Owner's capital or reserves to a level below that which such Bank or such other Owner could have achieved but for such circumstances (taking into consideration the policies of such Bank or such other Owner with respect to capital adequacy or the maintenance of reserves) then, upon receipt of supported documentation from the affected Bank, the DWSD shall pay to such Bank for its own account, or for the account of such other Owner, as applicable, such additional amount or amounts as will compensate such Bank or such other Owner for such event.

(c)     All payments of amounts referred to in clauses (a) and (b) above shall be paid by the DWSD to the Banks or other Owner, as applicable, within ten Business Days of such demand.  A certificate as to such increased cost, increased capital or reserves or reduction in return incurred by the Banks or any other Owner as a result of any event mentioned in clause (a) or (b) of this subsection setting forth, in reasonable detail, the basis for calculation and the amount of such calculation shall be submitted by the Banks to the DWSD simultaneously with such demand for payment and shall be conclusive as to the amount thereof absent manifest error.  In

making the determinations contemplated by the above-referenced certificate, the Banks or such other Owner may make such reasonable estimates, assumptions, allocations and the like that the Banks or other Owner in good faith determines to be appropriate. Other Owners entitled to the benefits of clauses (a) and (b) above shall be limited to benefits that would have been received by the Initial Purchaser.

(d)　　The obligations of the DWSD under this Section shall survive the termination of this Agreement.

**Section 2.07. Cure**.  The DWSD agrees to pay to the Banks on demand, any amounts advanced by or on behalf of the Banks, to the extent required to cure any Default or Event of Default under this Agreement or any Related Document.  The Banks shall give the DWSD and the Authority reasonably prompt notice of any such advances.  The Banks shall have the right, but not the obligation, to cure any such Default or Event of Default.

**Section 2.08. Payment of Interest and Other Amounts**.

(a) The amount of interest required to be paid on any Interest Payment Date shall be due and payable by the Authority on such date at the Interest Rate, in accordance with the following provisions:

(i)　　If the amount of interest required to be paid on any Interest Payment Date calculated in accordance with the terms hereof (together with any fees, charges, and other amounts which are treated as interest on amounts owing hereunder under Applicable Law (collectively, the "Charges")) exceeds the amount of interest that would have been payable for the applicable period had interest for such period been calculated at the Maximum Lawful Rate, then the required interest for such period (together with any Charges payable with respect thereto) shall be payable in an amount of interest calculated on the basis of the Maximum Lawful Rate.

(ii)　　Any interest or Charges that would have been due and payable under any provision hereof but for the operation of subparagraph (i) immediately above, shall accrue and be payable as provided in this subparagraph (ii) and shall constitute, less interest actually paid to the Banks on such Interest Payment Date, the "Excess Interest Amount."  If there is any accrued and unpaid Excess Interest Amount as of any Interest Payment Date, then, on the current and each subsequent Interest Payment Date, interest shall be paid at the Maximum Lawful Rate rather than the otherwise applicable rate until the earliest of (x) payment to the Banks of the entire accrued Excess Interest Amount or (y) the date on which no principal amount hereunder remains unpaid.

(iii)　　Notwithstanding the foregoing, all unpaid Excess Interest Amount shall be, to the fullest extent permitted by Applicable Law, due and payable by the Authority as a fee on the date on which no principal amount hereunder remains unpaid.

(b)     (i)     From and after the Taxable Date, the Bonds shall bear interest at the Default Rate. In addition to the foregoing, (A) in the event of the occurrence of a Determination of Taxability other than a Section (a)(i) Proposed Determination of Taxability, the Authority shall pay to the Banks and any other Owner, as applicable, a tax gross-up within thirty (30) days after such occurrence by paying the amount to the Banks (or such other Owner), calculated based on the outstanding principal amount of the Bonds for such period, by which (x) the Default Rate multiplied by the principal amount of the Bonds exceeds (y) the Interest Rate actually paid on the Bonds multiplied by the principal amount of the Bonds, for the period from the Taxable Date until the date the Authority begins paying current interest on the Bonds at the Default Rate, and (B) in the event of the occurrence of any Determination of Taxability, the Authority hereby agrees to pay to the Banks and any other Owner, as applicable, on demand therefor an amount equal to any interest, penalties or charges owed by the Banks and such other Owner as a result of interest on the Bonds becoming includable in the gross income of the Banks or such other Owner, together with any and all attorneys' fees, court costs, or other out of pocket costs incurred by the Banks or such other Owner in connection therewith.

(ii)     The obligations of the Authority under this Section 2.08 shall survive the termination of this Agreement and the redemption or other payment in full of the Bonds.

## ARTICLE III

## CONDITIONS PRECEDENT

**Section 3.01.  Documentary and Related Closing Conditions.**  As conditions precedent to the purchase of the Bonds by the Banks, the Banks shall have received the following items on or before the Closing Date, each in form and substance satisfactory to the Banks and its counsel and the Authority shall satisfy the Banks that the following conditions have been fulfilled:

(a)     *Issuance of Bonds*.  All conditions to the issuance of the Bonds shall have been satisfied and the Authority shall have duly executed, issued and delivered the Bonds, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the Bonds in the principal amount of $___,___,___ and delivered the Bonds to the Banks. All conditions to the issuance of the DWSD Obligations shall have been satisfied and the DWSD shall have duly executed, issued and delivered the DWSD Obligations, in form and substance satisfactory to the Banks, to the Trustee and the Trustee shall have duly authenticated and registered the DWSD Obligations in the principal amount of $___,___,___ and delivered the DWSD Obligations to the Authority.

(b)     *Agreement and Related Documents*.  The Authority and the Trustee shall have duly authorized the execution, delivery and performance of, and the Authority and the Trustee shall have duly executed and delivered the Indenture, and (in the case of the Authority) this Agreement and each of this Agreement and the

Indenture is in full force and effect, and each of the other Related Documents shall have been duly authorized, executed and delivered by the respective parties thereto and shall be in full force and effect. The Banks shall have received (i) an executed counterpart of this Agreement, duly executed by the Authority and (ii) executed originals (or, when the Banks are not a party thereto, copies thereof) of the other Related Documents and of each other agreement, document, instrument or certificate required to be delivered by any Person pursuant to the Related Documents; and each of the foregoing shall be in form and substance satisfactory to the Banks, shall have been duly authorized, executed and delivered by each of the respective parties thereto, shall not have been modified, amended or rescinded, and shall be in full force and effect on and as of the Issue Date (and certified as of the Issue Date by the Authority if executed and delivered prior to the Issue Date).

(c)    *Incumbency of Authority*.    The Banks shall have received (i) an incumbency certificate of the Executive Director of the Authority certifying as to the name and true signature of the Authorized Officer authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) a certified copy of the Executive Order 2010-2 issued by the Governor of the State of Michigan on March 4, 2010, and certified copies of the Statutes, and organizational documents of the Authority. The Banks shall have received (i) an incumbency certificate of the Executive Director of the DWSD certifying as to the name and true signature of the representative(s) of DWSD authorized to execute this Agreement, the other Related Documents and any other document or certificate to be delivered by the Authority hereunder or under the other Related Documents and (ii) certified copies of the Statutes, and organizational documents of the DWSD.

(d)    *Authority Resolution and Certificates*.    (i) The Authority shall have duly adopted the Supplemental Resolution authorizing the issuance and delivery of the Bonds, the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the Authority, in form and substance satisfactory to the Banks, executed by an Authorized Officer and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the Authority in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the General Resolution certified by an Authorized Officer as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the Authority relating to the issuance of the Bonds and the execution, delivery and performance by the Authority of this Agreement and each of the other Related Documents to which the Authority is a party or the transactions contemplated hereby and thereby, (iii) the Banks shall have received a certificate or certificates of the Authority dated the date of the Closing, signed on behalf of the Authority by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems

appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the Authority contained in this Agreement; (B) the compliance by the Authority with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the Authority, (D) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the City and DWSD Portion), and (E) no litigation or other judicial proceedings have been served upon the Authority or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the Bonds, or (x) in any way questioning or affecting the validity of any provision of the Bonds, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the Bonds, or the pledge or application of any money or security provided for the payment of any of the Bonds, or (z) questioning or affecting the organization or existence of the Authority or the right of any member of the Authority to their respective offices..

(e)     *DWSD Resolution and Certificates.*  (i) The City and the DWSD shall have duly adopted the DWSD Bond Resolution authorizing the issuance and delivery of the DWSD Obligations, the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party and approving each such Related Document and the transactions contemplated hereby and thereby, (ii) the Banks shall have received a certificate of the City and the DWSD, in form and substance satisfactory to the Banks, executed by an authorized representative of the City and the DWSD and dated the Issue Date, (A) to the effect that all actions required to be taken by, and all resolutions required to be adopted under Applicable Law by the City and the DWSD in connection with the authorization of the execution, delivery and performance of and under the Related Documents have been done and adopted and (B) attaching a copy of the DWSD Bond Resolution certified by an authorized representative of the City and the DWSD as (x) being in full force and effect on the Issue Date, (y) not having been amended or supplemented through the Issue Date, and (z) being the only resolution adopted by the City and the DWSD relating to the issuance of the DWSD Obligations and the execution, delivery and performance by the City and the DWSD of this Agreement and each of the other Related Documents to which the City and the DWSD is a party or the transactions contemplated hereby and thereby, and (iii) A certificate or certificates of the DWSD dated the date of the Closing, signed on behalf of the DWSD by an authorized officer to the effect that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and

on behalf of the DWSD and not in any individual capacity, the signer certifies: (A) the truthfulness in all material respects on and as of the date of Closing of all representations and warranties of the DWSD contained in this Agreement; (B) the compliance by the DWSD with all agreements and satisfaction of all conditions to be complied with or satisfied at or prior to the Closing; (C) the conformity of the DWSD Obligations in all material respects to the description thereof in the DWSD Resolution and the Official Statement; (D) since the respective dates as of which information is given in the Official Statement, and except as set forth therein, there having been no material adverse change in the condition, financial or otherwise, of the DWSD, (E) the Preliminary Official Statement and the Official Statement, as of their dates and as of the Closing, does not contain any untrue statements of a material fact or omit to state a material fact that is necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading (other than under the Authority Portion), and (F) no litigation or other judicial proceedings have been served upon the DWSD or threatened (either in State courts or in federal courts in Michigan) (w) restraining or enjoining or seeking to restrain or enjoin the issuance, sale, execution or delivery of any of the DWSD Obligations, or (x) in any way questioning or affecting the validity of any provision of the DWSD Obligations, or (y) in any way questioning or affecting the validity of any of the proceedings or the authority for the authorization, issuance, sale, execution or delivery of any of the DWSD Obligations, or the pledge or application of any money or security provided for the payment of any of the DWSD Obligations, or (z) questioning or affecting the organization or existence of the DWSD or the right of any member of the DWSD to their respective offices.

(f)     *Opinions*.   The Banks shall have received the following opinions, either addressed to the Banks or accompanied by a letter addressed to the Banks from the counsel rendering such opinion stating that the Banks is entitled to rely upon such opinion as if such opinion were addressed to it:

(i)     the opinion of (A) Dickinson Wright PLLC, bond counsel ("Authority Bond Counsel"), as to the validity and tax-exempt status of the Bonds and (B) Dykema Gossett PLLC, bond counsel for the DWSD Obligations ("DWSD Bond Counsel"), as to the validity and tax-exempt status of the DWSD Obligations, each  dated the Issue Date and each in form and substance acceptable to the Banks, and such other opinions or supplemental opinions, which shall expressly include this Agreement within the scope of the matters opined upon and shall opine on such securities law matters as the Banks may request;

(ii)     a written opinion of the Attorney General of the State and Authority Bond Counsel, dated the Issue Date and in form and substance acceptable to the Banks, opining (A) as to the due authorization, execution and delivery of this Agreement, and the other Related Documents to which the Authority is a party and (B) that this Agreement, and the other Related Documents to which the Authority is a party constitute the legal, valid and binding obligations thereof, enforceable in accordance with their respective terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or

similar laws affecting the rights of creditors generally and to general principles of equity), and (C) that (1) all conditions precedent to the issuance and delivery of the Bonds shall have occurred, the Authority Bond Resolution is in full force and effect and the Bonds will be entitled to the benefits of the Authority Bond Resolution and (2) all actions, filings or conditions necessary to create a valid pledge of, and security interest in, the Security created by the Authority Bond Resolution and the Bonds Authorizing Act in favor of the Trustee for the benefit of the Owners to secure the payment of the Bonds and the performance by the Authority of its other obligations under the Authority Bond Resolution and in favor of the Banks to secure the Required Payments, have been taken, filed and accomplished and that such pledge is on a parity with the pledge securing any other Parity Debt, and (D) the Authority's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, the Resolutions and this Agreement do not and will not conflict with, or constitute on the part of the Authority a breach or a default under, any agreement or other instrument known to them to which the Authority is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the Authority is subject or by which it is bound that, in all cases, would have an adverse effect on the Bonds, and (E) the statements in the Official Statement under the captions ["INTRODUCTION," "THE MICHIGAN FINANCE AUTHORITY, "THE MICHIGAN FINANCE AUTHORITY'S LOCAL GOVERNMENT LOAN PROGRAM," "THE SERIES 2014C BONDS" (except the subsection "Book-Entry-Only System"), "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2014C BONDS, "TAX MATTERS," "LITIGATION" (as to supplemental opinion of Attorney General only), "LEGALITY OF SERIES 2014C BONDS FOR INVESTMENT AND DEPOSIT," "STATE NOT LIABLE ON SERIES 2014C BONDS," "CONTINUING DISCLOSURE UNDERTAKING"] (as it relates to the Authority), and the statements in Appendices _____, insofar as such statements summarize the language and effect of the Resolutions, the Bonds, the Continuing Disclosure Undertaking of the Authority and the Constitution and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects, and (F) with respect to such other matters relating to this Agreement, the Indenture, the Bonds or any of the other Related Documents or the proceedings of the Authority, as the Banks may reasonably request;

(iii)     a Memorandum of Law with legal conclusions from the DWSD Bond Counsel addressing whether the Bonds Authorizing Act constitutes a contract between the State and the holders of the DWSD Obligations that cannot be retroactively revoked or modified;

(iv)     opinion or opinions of the DWSD Bond Counsel, the Authority Bond Counsel, [Jones Day, Miller Canfield or the City's Corporation Counsel], as appropriate, or other counsel acceptable to the Banks to the following effect, all acceptable in form and substance to the Bank:

(A)    due organization and valid existence; due authorization, execution and delivery of the Related Documents by all parties thereto and the documents being legal, valid, binding and enforceable obligations of the City, the DWSD and the Authority, as applicable;

(B)    the City has enacted all ordinances and local laws, if any, relating to the imposition of and use of the Revenues necessary to comply with the DWSD Authorizing Documents in order to permit all of the Revenues to be collected and pledged to secure the DWSD Obligations;

(C)    all consents and approvals necessary to execute and deliver the Related Documents have been obtained by the DWSD, the Authority and the City, as applicable;

(D)    no defaults in other contracts or statutes, rules or regulations of the DWSD or the Authority, and the City's and the DWSD's execution and delivery of and compliance with the terms and conditions of, and the carrying out of the transactions contemplated by, this Agreement and the DWSD Transaction Documents do not and will not conflict with, or constitute on the part of the City or the DWSD a breach of or a default under, any agreement or other instrument known to them to which the City is subject or by which it is or may be bound or violate any decree or order known to them or any law, rule or regulation to which the City is subject or by which it is bound that, in all cases, would have an adverse effect on the DWSD Obligations;

(E)    no litigation relating to the establishment of the DWSD or the collection, pledge or application of the Revenues;

(F)    the statements in the Official Statement in the [under sections "_____" and Appendices _____], insofar as such statements summarize the language and effect of the DWSD Authorizing Documents, the Continuing Disclosure Undertaking of the City and the laws of the State and the United States, are fair and accurate summaries thereof in all material respects;

(G)    the validity of the trust and the Liens;

(H)    (i) to the extent the DWSD owns the Revenues, the Revenues are subject to [a first security interest or Lien in favor of the Authority and the DWSD has granted a first priority security interest in the Security securing the DWSD Obligations] and (ii) the Authority has granted [a first priority security interest in the Security in favor of the Trustee for the benefit of Holders of the Bonds to secure the Bonds];

(I)    the DWSD is a "municipality" and the Revenues paid and to be paid to the Authority or the Trustee under the DWSD Trust Indenture (and subsequently paid to Banks as holders of the Bonds) are

pledged "special revenues" within the meaning of § 902 of the Bankruptcy Code, are entitled to the protections afforded "special revenues" under Chapter 9 of the Bankruptcy Code; and

(J)  nothing has come to their attention that would lead them to believe that the Official Statement, as of its date and as of Closing (other than financial statements, other financial, statistical or quantitative information, projections or estimates, and opinions of other counsel, as to all of which no opinion is expressed) contains any untrue statement of a material fact or omits to state a material fact that is necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

(v)  At the discretion of the Banks, either (A) an opinion from counsel acceptable to the Banks, or (B) a certificate from an authorized officer of the City, the DWSD or the Authority to the effect that the Bankruptcy Order is in full force and effect, is not subject to a stay and has not been modified, reversed or vacated;

(vi)  An opinion of counsel for the Trustee and the DWSD Trustee, which counsel shall be satisfactory to the Banks, as to the following:  (i) due authorization, execution and delivery of the Indenture and the DWSD Trust Indenture, (ii) the Indenture and the DWSD Trust Indenture constitute the  legal, valid and binding obligations thereof, enforceable in accordance with their terms (subject, as to enforceability, to applicable bankruptcy, moratorium, insolvency or similar laws affecting the rights of creditors generally and to general principles of equity) and (iii) such other matters as the Banks may reasonably request.

(vii)  each other opinion delivered by any Person pursuant to the Related Documents, each of which shall be in form and substance satisfactory to the Bank;

(g)  *No Default, Etc*.  The Banks shall have received a certificate signed by an Authorized Officer of the Authority and dated the Issue Date stating that to the best knowledge of the signer, after such inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the Authority and not in any individual capacity, the signer certifies: that the representations and warranties of the Authority contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii)  that no Default or Event of Default has occurred and is continuing or would result from the issuance of the Bonds or the execution, delivery and performance by the Authority of this Agreement or any of the other Related Document to which the Authority is a party; (iv) to the same effect as subsections (a) and (d) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks. The Banks shall have received a certificate signed by an authorized representative of the City and the DWSD and dated the Issue Date stating that to the best knowledge of the signer, after such

inquiry as the signer deems appropriate, and taking into account the responsibilities of the office which the signer holds, and on behalf of the City and the DWSD and not in any individual capacity, the signer certifies that the representations and warranties of the City and the DWSD contained (or incorporated by reference) in Article IV hereof are true and correct, in all material respects, on and as of the Issue Date, as though made on and as of such date; (ii) that no Material Adverse Change has occurred; (iii) that no Default or Event of Default has occurred and is continuing or would result from the issuance of the Bonds or the execution, delivery and performance by the City and the DWSD of this Agreement or any of the other Related Document to which the City and the DWSD is a party; (iv) to the same effect as subsections (a) and (e) of this Section 3.01; and (v) covering such other matters of fact as shall be reasonably requested by the Banks.

(h)     *Non-Arbitrage Certificate*. The Banks shall have received a non-arbitrage certificate, dated the date of the Closing, signed by the Board of Directors or his designee, or the Executive Director of the Authority, in a form acceptable to the Banks.

(i)     *Governmental Approvals* The Banks shall have received originals or certified copies of all approvals, authorizations, permits, licenses, or consents of, or notices to or filings or registrations with, any Governmental Authority required for the Authority, the City and the DWSD to execute, deliver or perform this Agreement or any of the other Related Documents to which the Authority, the City and the DWSD is a party, together with a list of any required approvals, permits, etc., still to be received.

(j)     *Investment Policy; Miscellaneous*.  The Banks shall have received (i) a copy of the Investment Policy of the Authority, as in effect as of the Issue Date, which policy shall be acceptable to the Bank; and (ii) such other agreements, documents, instruments, certificates (and, if requested by the Banks, certified duplicates of executed copies thereof) and opinions as the Banks may reasonably request.

(k)     *CUSIP and DTC.*  The Banks shall have received written evidence satisfactory to the Banks that the Bonds are eligible for inclusion in DTC's FAST automated transfer program ("FAST Eligible Bonds").

(l)     *Other Documents*.  The Banks shall have received such other documents, certificates, approvals, filings, and opinions as the Banks shall have reasonably requested.

(m)     *Legality.*  The Banks shall have determined (in their sole discretion) that (i) the consummation by the Authority, by the City, by the DWSD, by the Banks and by any other Person of any of the transactions contemplated by the Indenture, the Bonds, this Agreement and each other Related Document will not violate any Applicable Law and (ii) all legal requirements provided herein or by law incident to the execution, delivery and performance of the Indenture, the Bonds and the other

Related Documents and the transactions contemplated hereby and thereby, shall have been satisfied.

(n)     *Trustee's Documents*.  The Banks shall have received (i) (A) copies of the resolution(s) of the Trustee authorizing the execution, delivery and performance of the Related Documents to which they are a party and the performance of any duties of the Trustee under or in connection with the other Related Documents and (B) a certificate of an authorized representative of the Trustee (x) certifying as to the authority, incumbency and specimen signatures of the authorized representatives of the Trustee authorized to sign the Related Documents to which it is a party and any other documents to be delivered by it hereunder and who will be authorized to represent the Trustee in connection with this Agreement, upon which the Banks may rely until it receives a new certificate and certifying that the resolution(s) referred to under (B) is/are presently in full force and effect and (y) covering such matters relating to the other Related Documents as the Banks may reasonably request.

(o)     *Bankruptcy court order*.  The Banks shall have received a copy of the Order of the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") dated _____ ___, 2014 (the "Bankruptcy Order") (*In re City of Detroit, Michigan*, Case No. 13-53846, Doc. ____ (E.D. Mich.)) authorizing the City to enter into and perform the DWSD Authorizing Documents.

(p)     *Official Statement*. A copy of the Official Statement, signed on behalf of the Authority by the Executive Director or other authorized officer.

(q)     *Ratings*. [Only if available] The Banks shall have received satisfactory evidence that [Moody's/Fitch] shall have assigned to the Bonds the rating set forth on the inside cover page of the Official Statement, and that the rating shall not have been reduced or withdrawn.

(r)     *Continuing Disclosure Undertaking*. The Banks shall have received (i) an executed copy of the Authority's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks, and (ii) an executed copy of the City's/DWSD's Continuing Disclosure Undertaking, in form and substance satisfactory to the Banks.

(s)     *[Bond Insurance*. The Banks shall have received:

(i)     Certified copies of the Bond Insurance Policies issued by the Bond Insurer, if any, and certified copies of any debt service reserve fund surety insurance policies issued by the Bond Insurers, if any, and any other documents executed in connection therewith;

(ii)     An opinion of counsel to the Bond Insurers, dated the Closing Date, addressed to the Banks and in form and substance satisfactory to the Banks; and

(iii) a Certificate of the Bond Insurers, dated the Closing Date, signed by an authorized officer of the Bond Insurers, to the effect that the information contained under the caption "Bond Insurance" in the Official Statement is true and correct in all material respects, and that the Specimen Bond Insurance Policies contained in Appendix VI to the Official Statement is a true and correct specimen of the Bond Insurance Policies being issued by the Bond Insurers.]

(t) *Filings*. The Banks shall have received evidence satisfactory to the Banks and their counsel that all applicable filings, recordings and agreements including any agreements necessary to create and perfect a valid and binding Lien on, pledge of and security interest in all of the Revenues and in any other Security pledged in the Related Documents in favor of the Trustee, for the benefit of the Owners, and perfected on a first priority basis to the extent such Lien on, pledge of and security interest can be perfected by any filings, recordings or agreements, have been filed and made or executed and delivered, as the case may be, in the appropriate governmental offices and that all filing fees, taxes or other impositions required therewith have been paid in full on or before the Closing Date.

**Section 3.02. Credit Requirements**. Prior to the Closing Date, the Banks shall have determined, in its sole discretion, based in part upon the information and reports submitted by the Authority, that (i) the Authority has met the Bank's credit requirements, (ii) there has been no Material Adverse Change in the financial condition, manner of operation, properties or prospects of the Authority and that all information, representations and materials submitted to the Banks by the Authority in connection with the purchase of the Bonds are accurate in all material respects, and (iii) there has been no change in any law, rule or regulation (or their interpretation or administration) nor is there any pending or threatened litigation, that, in each case, may adversely affect the consummation of the Transactions. Provided, that, notwithstanding the foregoing terms and any investigation and/or determination by the Banks, the Authority expressly acknowledges and agrees that no such investigation or determination by the Banks shall in any respect whatsoever qualify, or release the Authority from, any representation, warranty or covenant contained in this Agreement or create or constitute any defense to the enforcement of the provisions of this Agreement.

**Section 3.03. Additional Conditions Precedent**. On or prior to the Closing Date, the Authority shall have paid to the Banks the reasonable fees and expenses of counsel to the Banks payable as of the Closing Date as incurred in connection with the transactions contemplated by the Related Documents.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**A. The Authority represents, warrants and covenants to and with the Banks and the DWSD as of the Closing Date as follows in Section 4.01 through Section 4.20. It is acknowledged and agreed by the parties hereto that all representations and warranties made by the Authority, the City and the DWSD herein and in any certificates given in**

29

**compliance herewith, are made solely by the Authority, the City or the DWSD, as the case may be, and not by any individual executing this Agreement or any certificate in his or her own capacity, and no liability shall be imposed, directly or indirectly, on such individual.**

Section 4.01. **Due Organization; Power and Authority**. The Authority is an autonomous public body corporate and politic separate and distinct from the State of Michigan created and existing under Executive Order 2010-2, issued by the Governor of the State of Michigan on March 4, 2010 with the powers and authority, among others, set forth in the Bonds Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the Authority is a party, and to perform the obligations under the Related Documents to which the Authority is a party, including the power and authority to issue and deliver the Bonds.

Section 4.02. **Authorization and Validity of Agreement, Related Documents and Borrowing**. The execution, delivery and performance by the Authority of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the Bonds at the direction of the Authority have been duly authorized by all necessary action of the governing body of the Authority. Each of this Agreement and the Related Documents (other than the Bonds) to which the Authority is a party constitutes a legal, valid and binding obligation of the Authority, enforceable against the Authority in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). Each Bond when issued, and as authenticated and delivered by the Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the Indenture and will constitute the legal, valid and binding obligations of the Authority enforceable in accordance with their terms, and will be entitled to the benefits of the Indenture. The obligation of the Authority under the Indenture is absolute and unconditional payable solely from the Security.

Section 4.03. **Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.** The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the Authority's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the Authority, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the Authority is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the Indenture. The Authority Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

Section 4.04. **Governmental Approvals**. All authorizations, consents, and other Governmental Approvals necessary for the Authority to enter into this Agreement and the other

Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review. No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by the Authority of this Agreement or the due execution, delivery or performance by the Authority of the Related Documents to which it is a party.

**Section 4.05. Compliance with Law**. The Authority is in compliance with all Applicable Law, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the Authority's ability to perform its obligations under this Agreement and under the other Related Documents. The Authority has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the Authority or the Transactions or any statute, law, rule or regulation applicable to the Authority or the Transactions. The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the Authority.

**Section 4.06. Litigation**. There is no Material Litigation pending nor, to the best knowledge of the Authority after due inquiry, threatened against the Authority or any property of the Authority.

**Section 4.07. Absence of Defaults and Events of Default**.

        (a)      No Default or Event of Default has occurred and is continuing.

        (b)      No defaults by the Authority exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the Authority's ability to perform under this Agreement or any of the other Related Documents. The Authority is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.08. Accuracy and Completeness of Information**. All information, reports and other papers and data furnished by the Authority to the Banks were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds. No fact is known to the Authority which has had or, so far as the Authority can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks prior to the Closing Date. Any financial, budget and other projections furnished to the Banks by the Authority or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the Authority's

best estimate of its future financial performance. No document furnished nor any representation, warranty or other written statement made to the Banks in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

Section 4.09. **Sovereign Immunity**. The Authority is not entitled to claim the defense of sovereign immunity or statutory immunity in any action appropriately asserted in accordance with the Court of Claims Act, MCL 600-6401 et seq. and arising out of its obligations as set forth in this Agreement.

Section 4.10. **Incorporation of Representations and Warranties**. The Authority hereby makes to the Banks the same representations and warranties made by the Authority in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety. No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

Section 4.11. **Bonds**. Each Bond has been or will be duly and validly issued under the Indenture and entitled to the benefits thereof. The Bonds will be transferred and held for the benefit of the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Banks.

Section 4.12. **Interest**. None of the Related Documents to which the Authority is a party or the Bonds provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

Section 4.13. **Investment Company Act**. The Authority is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

Section 4.14. **Federal Reserve Board Regulations**. The Authority is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock. The Authority will not use any part of the proceeds of the Bonds or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the Authority out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the Authority does not own and will not acquire any such Margin Stock.

Section 4.15. **No Proposed Legal Changes**. There is no amendment, or to the best knowledge of the Authority, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot

initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the Bonds, (b) the rights or remedies of the Banks or of any Owner of the Bonds, (c) the Authority's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the Authority's existence or its power or ability to perform its obligations hereunder or under any of the other Related Documents including without limitation the Authority's ability to repay when due its obligations under this Agreement and the Bonds.

**Section 4.16. Anti-Terrorism Representation**.

(a)    The Authority is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)    The Authority is not any of the following:

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)    a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)    To its knowledge, the Authority does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The Authority makes no commitment to any party to this Agreement, nor shall have any obligation to any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the Authority.

**Section 4.17. Valid Lien**.   The Authority's irrevocable pledge and assignment of the Security as set forth in the Related Documents to and for the payment of the Required Payments: (i) is valid and binding as of the Issue Date and all Revenues now or hereafter received by the Authority are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Indenture or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings and registrations accomplished by the Authority as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the lien and security interest created thereby and hereby on and in the Security to secure the Bonds and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

**Section 4.18. Obligations; Other Debt**.   The Authority hereby consents to the DWSD entering into this Agreement, which, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392.  The payment obligations to the Banks under this Agreement and the Bonds are secured and evidenced in accordance with the Indenture.  All obligations of the Authority under or in connection with this Agreement, the Bonds and the other Related Documents, including the Authority's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the Indenture.  As of the Issue Date, the Authority has not incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the Bonds, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the Bonds, this Agreement and the other Related Documents.

**Section 4.19. Solvency**.   Both before and after giving effect to the issuance of the Bonds and the undertaking of the other obligations contemplated by this Agreement, the Indenture and the other Related Documents, the disbursement of the proceeds of such Bonds and the payment and accrual of all transaction costs in connection with the foregoing, the Authority is and will be Solvent.

**Section 4.20. Indenture a Contract**.   The provisions of the Indenture constitute a contract between the Authority and the Trustee, for the benefit the Banks as a holder of the Bonds, subject to the provisions of the Indenture and the Bonds may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the Authority under this Agreement and the other Related Documents.

**B.   The City and the DWSD represent, warrant and covenant to and with the Banks and the Authority as of the Closing Date as follows in Section 4.21 through Section 4.40:**

**Section 4.21. Due Organization; Power and Authority**.   The DWSD is an autonomous public body corporate and politic separate and distinct from the City and the State of Michigan

created and existing under Act 94 with the powers and authority, among others, set forth in the Bonds Authorizing Act, including all requisite power and authority to execute and deliver the Related Documents to which the DWSD is a party, and to perform the obligations under the Related Documents to which the DWSD is a party, including the power and authority to issue and deliver the Bonds.

**Section 4.22. Authorization and Validity of Agreement, Related Documents and Borrowing**.  The execution, delivery and performance by the City and the DWSD of this Agreement and the other Related Documents to which it is a party, and the issuance and delivery of the DWSD Obligations at the direction of the DWSD have been duly authorized by all necessary action of the City and the governing body of the DWSD.  Each of this Agreement and the Related Documents (other than the DWSD Obligations) to which the City and the DWSD is a party constitutes a legal, valid and binding obligation of the City and the DWSD, enforceable against the DWSD in accordance with its terms, except as such enforceability may be limited by applicable reorganization, insolvency, liquidation, readjustment of debt, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Each DWSD Obligation when issued, and as authenticated and delivered by the DWSD Trustee against payment therefor will have been duly issued, authenticated and delivered under the Bonds Authorizing Act and in conformity with the DWSD Trust Indenture and will constitute the legal, valid and binding obligations of the DWSD enforceable in accordance with their terms, and will be entitled to the benefits of the DWSD Trust Indenture. The obligation of the DWSD under the DWSD Trust Indenture is absolute and unconditional payable solely from the Security.

**Section 4.23. Compliance of Agreement, Related Documents with Applicable Law, Organizational Documents, Etc.**  The execution, delivery and performance of this Agreement and each of the other Related Documents in accordance with its and their respective terms, the assignment and pledge of the Security and the consummation of the Transactions do not and will not (a) contravene or conflict with the DWSD's by-laws or other organizational documents or with any provision of the Bonds Authorizing Act, (b) require any consent or approval of any creditor of the DWSD or the City, (c) violate any Applicable Law (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, or any successor regulations), (d) conflict with, result in a breach of or constitute a default under any Contract relating to the Security to which the DWSD or the City is a party or by which any of its properties or assets may be bound or (e) result in or require the creation or imposition of any charge, pledge, security interest, encumbrance or other Lien upon or with respect to the Security except such Liens, if any, created by this Agreement or the DWSD Trust Indenture.  The DWSD Bond Resolution has been adopted in compliance with all requirements of Applicable Law.

**Section 4.24. Governmental Approvals**.  All authorizations, consents, and other Governmental Approvals necessary for the City and the DWSD to enter into this Agreement and the other Related Documents and perform the transactions contemplated hereby and thereby have been obtained and remain in full force and effect and are subject to no further administrative or judicial review.  No other authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance

by the City or the DWSD of this Agreement or the due execution, delivery or performance by the City or the DWSD of the Related Documents to which it is a party.

**Section 4.25. Compliance with Law**.  The DWSD is in compliance with all Applicable Laws, including all Governmental Approvals, except for noncompliance that, singly or in the aggregate, has not had and will not have a Material Adverse Effect or have an adverse effect on the DWSD's ability to perform its obligations under this Agreement and under the other Related Documents.  The DWSD has not received any complaint or other notice alleging a violation of or failure to comply with, any judgment, order, writ, injunction or decree of any Governmental Authority applicable to the DWSD or the Transactions or any statute, law, rule or regulation applicable to the DWSD or the Transactions.  The collection of Revenues and the accounting and recordkeeping therefor are in material compliance with all Applicable Law and all applicable resolutions, ordinances and rules of the City and the DWSD.

**Section 4.26. Litigation**.  There is no Material Litigation pending nor, to the best knowledge of the DWSD after due inquiry, threatened against the DWSD or any property of the DWSD.

**Section 4.27.  Absence of Defaults and Events of Default**.

(a)  No Default or Event of Default has occurred and is continuing.

(b)  No defaults by the DWSD exist under any Contract related to the Security, except for defaults that, singly or in the aggregate, have not had and will not have (i) a Material Adverse Effect, or (ii) an adverse effect on the validity or enforceability of this Agreement or any of the other Related Documents or on the City's or the DWSD's ability to perform under this Agreement or any of the other Related Documents.  The DWSD is not in breach of any financial covenant or any other material provision of any Contract related to the Security entered into in connection with any Debt.

**Section 4.28. Accuracy and Completeness of Information**.  All information, reports and other papers and data furnished by the City or the DWSD to the Banks or to the Authority were, at the time the same were so furnished, complete and correct in all material respects, to the extent necessary to give the recipient a true and accurate knowledge of the subject matter and were provided in expectation of the Bank's reliance thereon in purchasing the Bonds.  No fact is known to the City or the DWSD which has had or, so far as the City and the DWSD can now reasonably foresee, may in the future have a Material Adverse Effect, which has not been set forth in such information, reports or other data disclosed in writing to the Banks and to the Authority prior to the Closing Date.  Any financial, budget and other projections furnished to the Banks and the Authority by the DWSD or its agents were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such financial, budget or other projections, and represented, and as of the date of this representation, represent the DWSD's best estimate of its future financial performance.  No document furnished nor any representation, warranty or other written statement made to the Banks and the Authority in connection with the negotiation, preparation or execution of this Agreement or the Related Documents contains or will contain

any untrue statement of a material fact or omits or will omit (as of the date made or furnished) to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were or will be made, not misleading.

**Section 4.29. Sovereign Immunity**. The DWSD is not entitled to claim the defense of sovereign immunity or statutory immunity in any action arising out of its obligations as set forth in this Agreement.

**Section 4.30. Incorporation of Representations and Warranties**. The City and the DWSD hereby make to the Banks and the Authority the same representations and warranties made by the City or the DWSD in each Related Document to which it is a party, which representations and warranties, together with the related definitions of terms contained therein, are incorporated herein by this reference with the same effect as if each and every such representation and warranty and definition were set forth herein in its entirety. No amendment to or waiver of such representations, warranties or definitions made pursuant to the relevant Related Document shall be effective to amend such representations and warranties and definitions as incorporated by reference herein without the prior written consent of the Banks.

**Section 4.31. DWSD Obligations**. Each DWSD Obligation has been or will be duly and validly issued under the DWSD Trust Indenture and entitled to the benefits thereof. The DWSD Obligations will be transferred and held for the benefit of the Authority and the Banks, free and clear of any pledge, security interest, claim or other Lien of any Person other than the Authority and the Banks.

**Section 4.32. Interest**. None of the Related Documents to which the City or the DWSD is a party or the DWSD Obligations provide for any payments that would violate any Applicable Law regarding permissible maximum rates of interest or the calculation or collection of interest upon interest.

**Section 4.33. Investment Company Act**. The DWSD is not an "investment company" or a company "controlled" by an "investment company," as such terms are defined in the Investment Company Act of 1940 (15 U.S.C. §80a-1 et seq.), as amended.

**Section 4.34. Federal Reserve Board Regulations**. The DWSD is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock. The DWSD will not use any part of the proceeds of the DWSD Obligations or the funds advanced hereunder and has not incurred any Debt to be reduced, retired or purchased by the DWSD out of such proceeds, for the purpose of purchasing or carrying any Margin Stock, and the DWSD does not own and will not acquire any such Margin Stock.

**Section 4.35. No Proposed Legal Changes**. There is no amendment, or to the best knowledge of the City and the DWSD, proposed amendment to the Constitution of the State or any State law or any published administrative interpretation of the Constitution of the State or any State law, or any proposition or referendum (or proposed proposition or referendum) or other ballot initiative or any legislation that has passed either house of the legislature of the State, or any published judicial decision interpreting any of the foregoing, the effect of which could

reasonably be expected to affect adversely (a) the issuance of, or Security for, any of the DWSD Obligations, (b) the rights or remedies of the Banks or of any Owner of the DWSD Obligations, (c) the DWSD's power or ability to perform its obligations under the Bonds Authorizing Act, or (d) the DWSD's existence or its power or ability to perform its obligations hereunder or under any of the other Related Documents including without limitation the DWSD's ability to repay when due its obligations under this Agreement and the DWSD Obligations.

**Section 4.36. Anti-Terrorism Representation**.

(a)     The DWSD is not in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act, Title III of Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act");

(b)     The DWSD is not any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which the Banks are prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the Office of Foreign Asset Control ("OFAC") or any list of Persons issued by OFAC pursuant to the Executive Order at its official website or any replacement website or other replacement official publication of such list;

(c)     To its knowledge, the DWSD does not (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in subsection (b)(ii) above, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. The DWSD makes no commitment to any party to this Agreement, nor shall have any obligation enforceable by any party to this Agreement, to adopt or implement compliance procedures or measures not already in place at the DWSD.

**Section 4.37. Valid Lien**.     The DWSD's irrevocable pledge and assignment of the Security as set forth in Related Documents to and for the payment of the Required Payments: (i)

is valid and binding as of the Issue Date and all Revenues now or hereafter received by the DWSD are immediately subject to the lien thereof; (ii) requires no act, instrument, approval, filing, registration, recording or publication of the Related Documents or any other instrument nor any prior separation or physical delivery of the Security or notice to any Person, other than the filings and registrations accomplished by the DWSD as of the Closing Date, to validly establish the pledge provided for under the Related Documents or the Bonds Authorizing Act or the pledge provided for under this Agreement or to create, attach, perfect, protect or maintain the lien and security interest created thereby and hereby on and in the Security to secure the DWSD Obligations and the Required Payments; and (iii) does not require any act of appropriation for the application thereof to the purposes for which pledged.

Section 4.38. **Obligations; Other Debt**.  This Agreement, with respect to the Other Payment Obligations, is an "Ancillary Facility" under Act 392.  The payment obligations to the Banks under this Agreement and the DWSD Obligations are secured and evidenced in accordance with the DWSD Trust Indenture.  All obligations of the DWSD under or in connection with this Agreement, the DWSD Obligations and the other Related Documents, including the DWSD's obligations to pay all Required Payments are payable from the Security, are secured by a valid first lien on and pledge of the Security and are not subordinate to any payment secured by a Lien on the Security or any other claim, and are prior as against all Persons having claims of any kind in tort, contract or otherwise, whether or not such Persons have notice of the Lien established by the DWSD Trust Indenture.  As of the Issue Date, neither the City nor the DWSD has incurred, issued, created or assumed (i) any Debt payable from or secured by the Security or any portion thereof which is senior in right of payment or security to any of its obligations under the DWSD Obligations, this Agreement, any of the other Related Documents or (ii) any Debt payable from or secured by the Security or any portion thereof which is pari passu in right of payment or security with the DWSD Obligations, this Agreement and the other Related Documents.

Section 4.39. **Solvency**.  Both before and after giving effect to the issuance of the DWSD Obligations and the undertaking of the other obligations contemplated by this Agreement, the DWSD Trust Indenture and the other Related Documents, the disbursement of the proceeds of such DWSD Obligations and the payment and accrual of all transaction costs in connection with the foregoing, the DWSD is and will be Solvent.

Section 4.40. **DWSD Trust Indenture a Contract**.  The provisions of the DWSD Trust Indenture constitute a contract between the DWSD and the DWSD Trustee, for the benefit the Banks as holders of the DWSD Obligations, subject to the provisions of the DWSD Trust Indenture and the DWSD Obligations may at law or in equity, by suit, action, mandamus or other proceedings, enforce and compel the performance of all duties required to be performed by the DWSD under this Agreement and the other Related Documents.

## ARTICLE V

## AFFIRMATIVE COVENANTS

**A.  The Authority covenants and agrees to the terms of the following Section 5.01 through Section 5.14 until all Required Payments have been indefeasibly paid in full, and**

**all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

Section 5.01. **Compliance With Laws and Regulations**. The Authority shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the Authority may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the Authority continues to perform all of its obligations hereunder and under the Related Documents and provided such acts do not affect the Authority's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

Section 5.02. **Reporting Requirements**. The Authority shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the Authority in accordance with GAAP consistently applied. The Authority shall furnish to the Banks two copies of each of the following:

      (a)    *Reports related to Security*. The Authority shall promptly furnish to the Banks any financial statement or report furnished to the Authority under any Related Document.

      (b)    *Material Event Notices*. Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the Bonds, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

      (c)    *EMMA Filings*. Copies of all filings made by the Authority relating to the Bonds, any Parity Debt, the Security, or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including the Municipal Securities Rulemaking Board's Electronic Market Access System ("EMMA")) promptly after such filings are made.

      (d)    *Other Information*. Promptly upon the request of the Banks, such other information respecting the Bonds, the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act and copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.02.

Section 5.03. **Notices**.

      (a)    *Notice of Default*. The Authority shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or

Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b) *Litigation and other Notices*. The Authority shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i) any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii) (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the Authority which the Authority has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.03(b).

(c) *Certain Notices under or in connection with the Related Documents*. The Authority shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the City, the DWSD, the Trustee or the DWSD Trustee to the Authority or by the Authority to the City, the DWSD, the Trustee or the DWSD Trustee under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d) *Amendments*. Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e) *Rating Agencies*. Promptly after any Rating Agency shall have announced a change in an Obligor Rating, written notice of such rating change.

(f) *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the Authority to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the Authority or which is a creditor of the Authority in respect of the Security.

(g) *Legislation or Proposed Legislation*. Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the Authority has knowledge which could reasonably be expected to adversely impact the Security, the Authority's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the Bonds and the Required Payments.

**Section 5.04. Further Assurances**. The Authority will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record

and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the Trustee, the Banks or any other Person under or in connection with the Indenture, this Agreement or the Related Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the Bonds, as and in the manner provided in the Indenture. Except to the extent it is exempt therefrom, the Authority will pay or cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.05. Right of Entry; Communication with Accountant**. The Authority shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the Authority, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the Authority's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security. The Authority authorizes the Banks to communicate directly with its Accountant, including the Auditor General, and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.06. Payment of Obligations**. The Authority will pay (a) all Parity Debt and obligations of the Authority in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.07. Incorporation of Covenants**.

    (a)    The covenants of the Authority set forth in the Indenture and each of the other Related Documents to which the Authority is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the Authority. All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein. To the extent that any such incorporated provision permits the Authority to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the Authority, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks. No amendment to such covenants (or the defined terms relating thereto)

made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks. Notwithstanding the termination or expiration of any Related Document, the Authority shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants therein contained for the benefit of the Banks until the termination of this Agreement.

(b)     Subject to the terms of Section 9.01, the Authority shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the Trustee at all times to comply with the terms of the Authority Bond Resolution.

**Section 5.08. Disclosure to Assignees and Participants**.  The Authority agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.02, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the Authority.

**Section 5.09.  Maintenance of Existence**.  The Authority will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public body corporate and politic of the State and activities ancillary thereto.

**Section 5.10.  Use of Proceeds**.  The Authority shall use the proceeds of the Bonds solely for the purposes set forth in the Authority Bond Resolution and the Indenture.  The Authority will not use the proceeds of the Bonds in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.11.  Parity Creditors and Covenants**.  In the event that the Authority has previously entered into or hereafter shall enter into any agreement or instrument (or any amendment, supplement or modification thereto) providing for the incurrence of or relating to Parity Debt (each a "Relevant Agreement"), which provides to the related trustee, purchaser, credit facility provider or other obligee thereunder (each, a "Parity Creditor") (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the Trustee or the Banks or (b) any additional or materially different rights and remedies as compared to the rights and remedies of the Banks as set forth in the Related Documents and this Agreement (any such provision, a "Parity Covenant") than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the Authority shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the Authority fails to provide such amendment).

43

**Section 5.12.  CUSIP Numbers**.  The Authority shall at all times cause the Bonds to be assigned a CUSIP Number.

**Section 5.13.  DWSD Financial Information**.  The Authority covenants to deliver to the Banks copies of all financial information prepared by the DWSD and delivered to the Authority under any of the Related Documents

**B.  The City and the DWSD covenant and agree to the terms of the following Section 5.14 through Section 5.24 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

**Section 5.14.  Compliance With Laws and Regulations**.  The DWSD shall comply with all Applicable Laws, to which it or its property may be subject; provided, however, that the DWSD may contest the validity or application thereof and appeal or otherwise seek relief therefrom, so long as the DWSD continues to perform all of its obligations hereunder and under the Related Documents and provided such acts do not affect the DWSD's power and authority to execute this Agreement and the Related Documents to which it is a party or to perform its obligations and pay all amounts payable by it hereunder and thereunder, or otherwise result in a Default or Event of Default hereunder or under any of the other Related Documents.

**Section 5.15.  Reporting Requirements**.  The DWSD shall keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the affairs, operations, transactions and activities of the DWSD in accordance with GAAP consistently applied. The DWSD shall furnish to the Banks two copies of each of the following:

> (a)      *Annual Financial Statements*.  As soon as available, and in any event within 7 months after the close of each fiscal year of the DWSD, (i) the audited financial statements of the DWSD, including financial information therein relating to the Revenues and the other funds and accounts constituting a part of the Security and (ii) audited financial statements of the DWSD,  including the balance sheet as of the end of such fiscal year of the DWSD and the related statements of revenues, expenses and changes in fund balance relating to the Security for such fiscal year of the DWSD, all in reasonable detail and as certified to by the DWSD's independent certified auditors as having been prepared in accordance with GAAP, consistently applied, such audit having been conducted in accordance with generally accepted auditing standards and the standards applicable to financial audits contained in Government Auditing Standards issued by the Comptroller General of the United States.

> (b)      *Certificate of Compliance*.  Simultaneously with the delivery of each set of financial statements referred to in (a) above, a certificate signed by an authorized representative of the DWSD stating (i) that under his/her supervision the DWSD has made a review of its activities during the preceding annual period for the purpose of determining whether or not the DWSD has complied with all of the terms, provisions and conditions of this Agreement and the other Related Documents

and (ii) that to the best of his/her knowledge the DWSD is not in Default in the performance or observance of any of the terms, covenants, provisions or conditions of this Agreement or any of the other Related Documents, or if the DWSD shall be in Default, such certificate shall specify each such Default, the nature and status thereof and any remedial steps taken or proposed to correct each such Default, and (iii) the amount of the Revenues in the last fiscal year.

(c)     *Auditors*.   Concurrently with any delivery of financial statements under clause (a) above, a copy of any management letter or audit report provided to the DWSD by such auditors.

(d)     *Other Reports*.   Promptly upon request by the Banks, copies of any financial statement or report furnished to any other holder of any Parity Debt pursuant to the terms of any Contract and not otherwise required to be furnished to the Banks pursuant to any other clause of this Section 5.15.

(e)     *Budget*.   As near as practicable to the beginning of each fiscal year of the DWSD, a copy of the annual budget prepared in accordance with Act 94 for such upcoming fiscal year of the DWSD, and promptly, all other financial information prepared by the DWSD under any Related Document.

(f)     *Material Event Notices*.   Immediately following any dissemination, distribution or provision thereof to any Person, a copy of any Material Event Notice, relating to the DWSD Obligations, any Parity Debt, the Security or the Bonds Authorizing Act, disseminated, distributed or provided in satisfaction of or as may be required by the provisions of Rule 15c2-12 promulgated pursuant to the Securities Exchange Act of 1934, as amended (17 C.F.R. Sec. 240.15c2-12), or any successor or similar legal requirement.

(g)     *EMMA Filings*.   Copies of all filings made by the City or the DWSD relating to the DWSD Obligations, any Parity Debt, the Security, the Obligation Trust Fund or the Bonds Authorizing Act, with any Nationally Recognized Municipal Securities Information Repository (including EMMA) promptly after such filings are made.

(h)     *Other Information*.   Such other information respecting Bonds, any Parity Debt, the Security or the Bonds Authorizing Act as the Banks may from time to time reasonably request.

**Section 5.16.  Notices**.

(a)     *Notice of Default*.   The DWSD shall provide to the Banks immediate notice by telephone, promptly confirmed in writing, of any Default or Event of Default or any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(b)     *Litigation and other Notices*.   The DWSD shall provide to the Banks in writing, promptly upon learning thereof, notice of

(i)    any Material Litigation and any other action, suit, proceeding, inquiry or investigation that is commenced or threatened (A) against any part of the Security or (B) which seeks injunctive relief, and

(ii)    (A) any criminal investigation or proceeding by a Governmental Authority involving the Security; (B) the proposal of a bill or other legislation or the filing of any initiative or referendum which challenges the validity or enforceability of any of the Related Documents, the Bonds Authorizing Act, or otherwise could annul, amend, modify or replace the Bonds Authorizing Act or which could lead to a diminution or reallocation of the Security or any portion thereof; and (C) any material development in any legal proceeding or other action affecting the DWSD which the DWSD has, or should have, provided notice of to the Banks pursuant to clause (i) of this Section 5.16(b).

(c)    *Certain Notices under or in connection with the Related Documents*. The DWSD shall furnish to the Banks a copy of any notice, certification, demand or other writing or communication given by the Authority, the DWSD Trustee or the City to the DWSD or by the DWSD to the Authority, the DWSD Trustee or the City under or in connection with any of the Related Documents, in each case promptly after the receipt or giving of the same.

(d)    *Amendments*.  Promptly after the adoption thereof, copies of any amendments of or supplements to any of the Related Documents.

(e)    *Governmental Authority Filing*s. Copies of all reports and other materials filed or delivered by the DWSD to or with any Governmental Authority, if any, which has jurisdiction over the financial affairs of the DWSD or which is a creditor of the DWSD in respect of the Security.

(f)    *Legislation or Proposed Legislation*.  Copies of (i) any amendments or modifications to the Bonds Authorizing Act and (ii) any other legislation of which the City or the DWSD has knowledge which could reasonably be expected to adversely impact the Security, the DWSD's ability to perform its obligations under the Related Documents or the pledge of the Security to payments on the DWSD Obligations and the Required Payments.

**Section 5.17.  Further Assurances**.   The DWSD will from time to time promptly execute and deliver to the Banks (or as directed by the Banks) all further financing statements, amendments, confirmation statements and will register, record and file and re-register, re-record and re-file all such documents and instruments, at such time or times, in such manner and at such place or places, and shall take any and all other actions as may be necessary or reasonably required by the Banks to enable the Banks to (i) perfect and protect, any lien, pledge or security interest or other right or interest given, or purported to be given to the DWSD Trustee, the Banks or any other Person under or in connection with the DWSD Trust Indenture, this Agreement or the Related Documents or (ii) exercise and enforce its rights under this Agreement and its rights and the rights of the Owners of the DWSD Obligations, as and in the manner provided in the DWSD Trust Indenture.  Except to the extent it is exempt therefrom, the DWSD will pay or

cause to be paid all filing, registration and recording fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of such instruments of further assurance.

**Section 5.18. Right of Entry; Communication with Accountant**.  The DWSD shall permit or will use its best efforts to arrange access for the agents or representatives of the Banks during normal business hours and upon reasonable notice to enter the premises of the DWSD, or any parts thereof, to examine and copy all financial and corporate books, records and accounts relating to the Security, and to discuss the affairs, finances, business and accounts related to the Security with the DWSD's officers, employees and agents or such other officers, employees and agents of the State who have information relating to the Security.  The DWSD authorizes the Banks to communicate directly with its accountants and authorizes and shall instruct those accountants and advisors to communicate with, disclose and make available to, the Banks, any and all financial statements and other supporting financial documents, schedules and information relating to the Security.

**Section 5.19. Payment of Obligations**.  The DWSD will pay (a) all Parity Debt and obligations of the DWSD in accordance with the terms thereof, and (b) all amounts payable by it hereunder and under the Related Documents in accordance with the terms hereof or thereof.

**Section 5.20.  Incorporation of Covenants**.

(a)	The covenants of the DWSD set forth in the DWSD Trust Indenture and each of the other Related Documents to which the DWSD is a party, as well as related defined terms contained therein, are hereby incorporated by reference herein with the same effect as if each and every such provision were set forth herein in its entirety for the benefit of the Banks and shall be enforceable by the Banks against the DWSD.  All such incorporated covenants shall be in addition to the express covenants contained herein and shall not be limited by the express covenants contained herein nor shall such incorporated covenants be a limitation on the express covenants contained herein.  To the extent that any such incorporated provision permits the DWSD to waive compliance with or consent to such provision or requires that a document, opinion, report or other instrument or any event or condition be acceptable or satisfactory to the DWSD, for purposes of this Agreement, such compliance shall be waived, or such provision shall be consented to, only if it is waived or consented to, as the case may be, by the Banks and such document, opinion, report or other instrument shall be acceptable or satisfactory to the Banks.  No amendment to such covenants (or the defined terms relating thereto) made pursuant to the Related Documents shall be effective to amend such incorporated covenants without the written consent of the Banks.  Notwithstanding the termination or expiration of any Related Document, the DWSD shall, unless such Related Document has terminated or expired in accordance with its terms and has been replaced by a new Related Document, continue to observe the covenants therein contained for the benefit of the Banks until the termination of this Agreement.

(b)     The City and the DWSD shall diligently and in good faith pursue enforcement of each of the Related Documents to which it is a party against each of the other parties thereto and shall in particular and not in limitation of the foregoing cause the DWSD Trustee at all times to comply with the terms of the Related Documents to which they are a party.

**Section 5.21. Disclosure to Assignees and Participants**.  The City and the DWSD agrees to permit the Banks to disclose any information received by the Banks in connection herewith, including without limitation the financial information described in Section 5.15, to any assignees or Participants of the Banks in this Agreement without notice to or further consent from the City or the DWSD.

**Section 5.22. Maintenance of Existence**.  The DWSD will continue to conduct in the ordinary course the activities in which it is presently engaged which is that of a public municipal corporation and public body corporate of the State and activities ancillary thereto.

**Section 5.23. Use of Proceeds**.  The DWSD shall use the proceeds of the DWSD Obligations solely for the purposes set forth in the DWSD Bond Resolution and the DWSD Trust Indenture.  The DWSD will not use the proceeds of the DWSD Obligations in a manner which violates Regulation U, as it may be amended or interpreted from time to time by the Board of Governors of the Federal Reserve System.

**Section 5.24. Parity Creditors and Covenants**.   In the event that the DWSD has previously entered into or hereafter shall enter into any Relevant Agreement, which provides to a Parity Creditor (a) any preference or priority with respect to the Security or other collateral or the allocation of the Security or other collateral as compared to the pledge and allocation to, in favor, or for the benefit, of the DWSD Trustee or the Banks or (b) any Parity Covenant than are provided to the Banks, then each such Parity Covenant shall automatically be deemed to be incorporated into this Agreement for the duration of this Agreement and the Banks shall have the benefits of such Parity Covenant as if it were specifically set forth in this Agreement. Upon request of the Banks, the DWSD shall promptly enter into an amendment to this Agreement to include the Parity Covenant (provided that the Banks shall maintain the benefit of such Parity Covenant even if the DWSD fails to provide such amendment).

### ARTICLE VI

### NEGATIVE COVENANTS AND COVENANTS

**A.  The Authority covenants and agrees to the terms of the following Section 6.01 through Section 6.11 until all Required Payments have been indefeasibly paid in full, and all other obligations of the Authority under this Agreement and under the other Related Documents have been performed:**

**Section 6.01. Amendments**.  The Authority shall not amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in,

or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, but only if such amendment, supplementation, termination or modification affects the Security, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section 6.01 shall be deemed a nullity and of no force and effect. The Authority shall not take any action, nor cause the Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the Authority's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the Authority's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the Indenture and the priority of the lien and security interest created thereby.

Section 6.02. **Preservation of Existence, Etc**. The Authority will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date), nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

Section 6.03. **Certain Information**. The Authority shall not include in an offering document or circular or reoffering supplement for the Bonds any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

Section 6.04. **Trustee**. The Authority shall not remove the Trustee or appoint a successor thereto without the written consent of the Banks. The Authority shall provide the Banks written notice of any change in the identity of the Trustee upon becoming aware of the same. Upon written notice from the Banks that the Trustee is failing to perform its duties in the manner contemplated by the Indenture or the other Related Documents, the Authority shall replace or cause to be replaced the Trustee with a successor acceptable to the Banks. If the position of Trustee becomes vacant, the Authority shall promptly appoint a successor which is reasonably acceptable to the Banks.

Section 6.05. **Accounting Methods; Fiscal Year; Entity Classification**. The Authority will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its Fiscal Year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

Section 6.06. **Exempt Status**. The Authority shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the Bonds to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

Section 6.07. **Defeasance**. The Authority will not defease, nor allow the defeasance of, the Bonds without (i) procuring a Verification Report and providing a copy thereof to the Banks

and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the Authority hereunder.

Section 6.08. **Investment of Funds**. The Authority shall cause all moneys held in the Funds established under the Indenture to be invested in Permitted Investments. The Authority shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in their discretion.

Section 6.09. **Hedge Agreements**. The Authority will not enter into any Hedge Agreement hedging or otherwise relating to the Bonds, the Parity Debt or this Agreement without the prior written consent of the Banks.

Section 6.10. **Investment Policy**. The Authority shall not amend its Investment Policy in any manner that could reasonably be expected to increase the degree of risk or decrease the credit quality of any of the Security. In the case of any proposed amendment, the Authority shall provide prior written notice to the Banks stating the terms of the proposed amendment.

Section 6.11. **Additional Parity Debt.** The Authority shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding Bonds have been redeemed or otherwise refunded.

**B. The City and the DWSD covenant and agree to the terms of the following Section 6.12 through Section 6.22 until all Required Payments have been indefeasibly paid in full, and all other obligations of the DWSD under this Agreement and under the other Related Documents have been performed:**

Section 6.12. **Amendments**. Neither the City nor the DWSD shall amend, modify or supplement, nor agree to any amendment or modification of, or supplement to, any of the Related Documents or consent to, or permit or suffer to occur any action, course of dealing or omission which results in, or is equivalent to, an amendment, supplementation, termination or modification of any of the Related Documents, without the prior written consent of the Banks and any such amendment, supplementation, termination or modification made or entered into in violation of this Section shall be deemed a nullity and of no force and effect. The City and the DWSD shall not take any action, nor cause the DWSD Trustee to take any action under any of the Related Documents, which is inconsistent with, or could reasonably be expected to impair, the DWSD's obligations, or the rights of the Banks, under this Agreement or any of the other Related Documents including, without limitation, any right or remedy of the Banks upon an Event of Default, the DWSD's obligations to make payments to the Banks under Article II of this Agreement, and the pledge of the Security under the DWSD Trust Indenture and the priority of the lien and security interest created thereby.

Section 6.13. **Preservation of Existence, Etc**. The DWSD will not seek to directly or indirectly liquidate, wind up, terminate, reorganize, dissolve, merge or consolidate (or suffer any liquidation, winding up, termination, reorganization or dissolution), or form or acquire any subsidiary (other than in the ordinary course of business as conducted as of the Closing Date),

nor shall it sell, lease, assign, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its property.

**Section 6.14. Certain Information**.   The DWSD shall not include in an offering document or circular or reoffering supplement for the DWSD Obligations any information concerning the Banks that is not supplied in writing, or otherwise approved in writing, by the Banks expressly for inclusion therein.

**Section 6.15. DWSD Trustee**.   The DWSD shall not remove the DWSD Trustee or appoint a successor thereto without the written consent of the Banks. The DWSD shall provide the Banks written notice of any change in the identity of the DWSD Trustee upon becoming aware of the same.   Upon written notice from the Banks that the DWSD Trustee is failing to perform its duties in the manner contemplated by the DWSD Trust Indenture or the other Related Documents, the DWSD shall replace or cause to be replaced the DWSD Trustee with a successor acceptable to the Banks.   If the position of Trustee becomes vacant, the DWSD shall promptly appoint a successor which is reasonably acceptable to the Banks.

**Section 6.16. Accounting Methods; Fiscal Year; Entity Classification**.   The DWSD will not adopt, permit or consent to any change in accounting practices other than as required by GAAP and will not adopt, permit or consent to any change in its fiscal year or take (or permit to be taken) any action that results in a change to its entity classification for U.S. federal income tax purposes.

**Section 6.17. Exempt Status**.   The City and the DWSD shall not take any action or omit to take any action, respectively, that, if taken or omitted, respectively, could cause any revocation or adverse modification of its federal income tax-exempt status or which would cause the interest with respect to the DWSD Obligations to be included in the gross income of the Owners thereof for purposes of federal income taxation under the Code.

**Section 6.18. Defeasance**.   The City and the DWSD will not defease, nor allow the defeasance of, the DWSD Obligations without (i) procuring a Verification Report and providing a copy thereof to the Banks and (ii) contemporaneously paying all Required Payments and satisfying all obligations of the DWSD hereunder.

**Section 6.19. Investment of Funds**.   The City and the DWSD shall cause all moneys held in the Funds established under the DWSD Trust Indenture and the Related Documents to which it is a party to be invested in Permitted Investments.   The City and the DWSD shall not after the Issue Date supplement or otherwise modify or amend (except by the removal of one or more investments which are Permitted Investments as of the Issue Date) the list of Permitted Investments without the prior written consent of the Banks in its discretion.

**Section 6.20. Hedge Agreements**.   The City and the DWSD will not enter into any Hedge Agreement hedging or otherwise relating to the DWSD Obligations, the Parity Debt or this Agreement without the prior written consent of the Banks.

**Section 6.21. Additional Parity Debt.**      The City and the DWSD shall not issue any additional Parity Debt without the prior written consent of the Banks, unless all Outstanding DWSD Obligations have been redeemed or otherwise refunded.

# ARTICLE VII

## EVENTS OF DEFAULT

**Section 7.01. Events of Default**.  The occurrence of any of the following events shall constitute an "Event of Default":

(a) Failure by (i) the Authority to pay or cause to be paid when due any principal, premium or interest, of or on, the Bonds, or any other amount owed by the Authority hereunder or under any of the other Related Documents or (ii) the DWSD to pay or cause to be paid when due any principal, premium or interest, of or on, the DWSD Obligations, or any other amount owed by the DWSD hereunder or under any of the other Related Documents;

(b) Failure of the Authority to observe or perform the covenants set forth in any of Sections 5.02, 5.03, 5.06, 5.07, 5.10, 5.11, 5.13, 6.01, 6.02, 6.04, 6.06, 6.07, 6.08 or 6.11, or failure of the City and the DWSD to observe or perform the covenants set forth in any of Sections 5.15, 5.16, 5.19, 5.20, 5.23, 5.24, 6.12, 6.13, 6.15, 6.17, 6.18, or 6.19;

(c) Failure of the Authority, the City or the DWSD to observe or perform any covenant, condition or provision of this Agreement (other than as specified in (a) or (b) above) and such failure remains uncured 10 Business Days after written notice of such failure from the Banks to the Authority, the City, the DWSD and the Trustee, or failure to observe or perform any covenant, condition or provision contained in any other Related Document as incorporated by reference pursuant to Sections 5.07 and 5.20 hereof;

(d) Any representation or warranty made or deemed made by or on behalf of the Authority, the City or the DWSD in this Agreement or any other Related Document or in any amendment of, or waiver under, this Agreement or other Related Document, or in any certificate, financial statement or other document furnished by or on behalf of the Authority, the City or the DWSD pursuant to or in connection with this Agreement or any of the other Related Documents shall have been inaccurate or incomplete in any material respect when made or deemed to have been made;

(e) The occurrence and continuation of a default, event of default or termination event under any of the other Related Documents, irrespective of whether said default, event of default or termination event is declared, undeclared or has been waived under the terms of such respective document, or a mandatory redemption, prepayment or acceleration has occurred with respect to the Bonds, the DWSD Obligations or any other Parity Debt;

(f) Failure by the Authority or the DWSD to make a payment of the principal of, or premium or interest on, any Parity Debt (other than the Bonds and the DWSD Obligations) or other Debt payable from or secured by a Lien on Revenues, when and as the same shall become due and payable (whether by

scheduled maturity, required prepayment or redemption, acceleration, demand or otherwise);

(g)    (i) Failure by the Authority or the DWSD or any Affiliate of either thereof to make any payment (whether of principal, redemption price, interest or other amount) due in respect of (x) any other Parity Debt owed to a Bank or any Affiliate of a Bank or (y) any other Parity Debt having an aggregate outstanding principal amount in excess of $5,000,000, in any such case, as and when the same shall become due, and provided that any applicable notice or grace period shall not apply; or (ii) the occurrence or existence of a default or event of default (other than a payment default) or other similar condition by or on the part of the Authority or the DWSD (or any Affiliate of either thereof), under any Contract evidencing, issuing, securing or relating to such Parity Debt and continuance of such default or event of default or similar condition beyond the period of grace, if any, allowed with respect thereto, which results in such Parity Debt becoming, or being capable of becoming, due and payable or subject to mandatory prepayment or purchase prior to its scheduled maturity and regardless of whether any such right is exercised;

(h)    The entry or filing of one or more judgments or orders or of any similar decrees or decisions for the payment of money which, individually or in the aggregate, equals or exceeds $5,000,000 (each, a "Judgment") shall be rendered against the Authority or the DWSD or any Affiliate of either thereof or against any of its or their respective properties or assets and (x) such Judgment shall be undischarged, unstayed or unbonded (by property other than any of the Security) for a period of 30 consecutive days, or (y) any action shall be taken by a judgment creditor by which such judgment creditor attaches, executes or levies upon the Security to enforce any such Judgment;

(i)    The occurrence of an Event of Insolvency with respect to the Authority or the DWSD;

(j)    This Agreement, any other Related Document or any provision of this Agreement or any of the other Related Documents shall cease to be valid and binding on the Authority, or a Governmental Authority with jurisdiction to rule on the validity of this Agreement, the Authority Bond Resolution or any other Related Document shall so find, announce or rule, or the Authority, the DWSD, the City or any Person on its or their behalf shall (i) contest the validity or enforceability of this Agreement or any Related Document or any provision of this Agreement or any such Related Document, (ii) deny that the Authority or the DWSD has any further liability under one or more provisions of this Agreement or any of the other Related Documents or (iii) seek an adjudication that (y) this Agreement or (z) a provision of this Agreement or of the Authority Bond Resolution or any other Related Document relating to, or the absence or invalidity of which could adversely affect, the security for the Bonds, the DWSD Obligations or the other Parity Debt, or the Authority's or the DWSD's ability to pay the Bonds, the DWSD Obligations or the other Parity Debt or perform its respective obligations under this Agreement or any of the other

Related Documents or the rights and remedies of the Banks, is not valid and binding on the Authority;

(k) Any Security or any of the other funds or accounts established under the Authority Bond Resolution or any of the other Related Documents shall become subject to any writ, judgment, warrant or attachment, execution or similar process;

(l) (i) any Lien created by the Related Documents in favor of the Trustee, the DWSD Trustee or the Banks, at any time and for any reason (except as expressly permitted to be released by the terms of such governing document) shall not constitute a valid and perfected Lien or shall fail to have the priority required by the Related Documents or, except as permitted under the Related Documents, the Authority or the DWSD shall so assert in writing, (ii) any legislation is enacted, repealed, reenacted, amended or otherwise modified, and such repeal, enactment, reenactment, amendment or modification, in the opinion of the Banks, has a Material Adverse Effect on the validity, enforceability or priority of the Lien on the Revenues in favor of the Banks or the other Parity Holders or (iii) any rescission of or amendment to or any other action under or in connection with any legislation, law or regulation relating to the Revenues which would (A) materially reduce the amount of the Revenues or the allocation of the Revenues to the payment of the Bonds, the DWSD Obligations or the other Parity Debt or (B) impair or adversely affect (x) the rights of the Authority or the DWSD to any or all of the Security or (y) the rights or security of (1) the Trustee or the Owners, or of any other Parity Holder under the Authority Bond Resolution, or (2) the DWSD Trustee under the DWSD Trust Indenture;

(m) An event (separately or in the aggregate with other events) occurs which constitutes a Material Adverse Change;

(n) Any event (other than the exercise of an optional call or optional tender right by the holder thereof or of a right of optional redemption by the Authority or the DWSD, in each case in the absence of a default or event of default) occurs or condition exists that results in any Parity Debt becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) any Parity Holder, or any trustee or agent on its or their behalf, to exercise any right to accelerate any Parity Debt or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(o) A repudiation by the Authority, the City or the DWSD of the payment when due of the principal of or premium or interest on the Bonds, the DWSD Obligations or any Parity Debt;

(p) The Bankruptcy Order shall cease to be fully effective, in whole or in part, for any reason;

(q)     The commencement of any action by the City, the DWSD, the Authority or any third party challenging the Bonds Authorizing Act, or the validity or effect of either the Bonds Authorizing Act or the validity of the transactions contemplated by this Agreement; provided, however, that a direct appeal of the Bankruptcy Order shall not constitute an Event of Default hereunder.

**Section 7.02. Rights and Remedies; Consequences of an Event of Default**.  If an Event of Default specified in Section 7.01 hereof shall occur, then in addition to any other rights or remedies available to the Trustee or the Banks under any other Related Documents or under Applicable Law, the Banks may exercise any one or more of the following rights and remedies:

(a)     by notice to the Authority or the DWSD, accelerate all of the Required Payments (other than the Bonds, which are subject to acceleration as provided in Section 7.02(c)) whereupon such Required Payments shall become immediately due and payable without presentment, demand for payment, protest or notice of nonpayment or dishonor, or other notice of any kind or character, all of which are hereby expressly waived, and an action therefor shall immediately accrue; provided that (i) upon the occurrence of any Event of Default described in Sections 7.01(i) or 7.01(o) above, or (ii) upon any payment by the Authority of all or any portion of the principal amount of any Parity Debt that is accelerated due to the occurrence of an event of default or similar event, or any deposit to a cash collateral account in respect of, or as security for, any Parity Debt due to the occurrence of an event of default or similar event (other than a posting of collateral pursuant to a Hedge Agreement in the absence of a default or termination event or the posting of collateral to secure all Parity Debt pari passu), the Required Payments under this Agreement and the other Related Documents shall automatically mature and be due and payable on the date of the occurrence of such event described under (i) or (ii) without presentment, demand, protest, notice of default or intention to accelerate, notice of acceleration or other notice of any kind to the Authority or any other Person, all of which are hereby expressly waived;

(b)     (i) apply to any court of competent jurisdiction for, and obtain appointment of, a receiver, (ii) either personally or by attorney or agent and without bringing any action or proceeding, or by such a receiver, take whatever action at law or in equity may appear necessary or desirable to collect the amounts due and payable under the Related Documents or to enforce performance or observance of any of the Required Payments under the Related Documents, whether for specific performance of any agreement or covenant of the Authority or in aid of the execution of any power granted to the Banks in the Related Documents or as otherwise available at law or in equity;

(c)     deliver a notice to the Trustee, the Authority and the DWSD that an Event of Default has occurred and is continuing and instructing the Trustee to take all actions required as provided under the Indenture;

(d) cure any Default, Event of Default or event of nonperformance hereunder or under any other Related Document; provided, however, that the Banks shall have no obligation to effect such a cure; and

(e) exercise, or cause to be exercised, any and all remedies as it may have to realize on the Security under the other Related Documents including, without limitation, any rights it holds as a holder singly or together with other holders of Parity Debt to accelerate the Bonds and the other Parity Debt as provided in the Authority Bond Resolution and the Related Documents and to take any and all actions otherwise available under the Authority Bond Resolution and the Related Documents and any and all remedies as are otherwise available at law or in equity.

**Section 7.03. Remedies Cumulative; Solely for the Benefit of the Banks**. To the extent permitted by, and subject to the mandatory requirements of, Applicable Law, each and every right, power and remedy specifically given to the Banks herein or in the other Related Documents shall be cumulative, concurrent and nonexclusive and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in equity or by statute, and each and every right, power and remedy (whether specifically herein given or otherwise existing) may be exercised from time to time and as often and in such order as may be deemed expedient by the Banks, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.

The rights and remedies of the Banks specified herein are for the sole and exclusive benefit, use and protection of the Banks, and the Banks are entitled, but shall have no duty or obligation to the Authority, the City, the DWSD, the Trustee or any other Person or otherwise, to exercise or to refrain from exercising any right or remedy reserved to the Banks hereunder or under any of the other Related Documents.

**Section 7.04. Waivers or Omissions**. No delay or omission by the Banks in the exercise of any right, remedy or power or in the pursuit of any remedy shall impair any such right, remedy or power or be construed to be a waiver of any default on the part of the Banks or to be acquiescence therein. No express or implied waiver by the Banks of any Event of Default shall in any way be a waiver of any future or subsequent Event of Default. No delay or omission on the part of the Banks (or the Trustee) in exercising any right to acceleration of the maturity of the Bonds or any of the other Required Payments, or any remedy under the Related Documents following any Event of Default as aforesaid, or any other option granted to the Banks (or the Trustee) hereunder in any one or more instances, or the acceptance by the Banks (or the Trustee) of any partial payment on account of the Required Payments shall constitute a waiver of any such Event of Default and each such option shall remain continuously in full force and effect.

**Section 7.05. Discontinuance of Proceedings**. In case the Banks shall proceed to invoke any right, remedy or recourse permitted hereunder or under the Related Documents and shall thereafter elect to discontinue or abandon the same for any reason, the Banks shall have the unqualified right so to do and, in such event, the Authority, the DWSD and the Banks shall be restored to their former positions with respect to the Required Payments, the Related Documents

and otherwise, and the rights, remedies, recourse and powers of the Banks hereunder shall continue as if the same had never been invoked.

**Section 7.06. Injunctive Relief**. The Authority, the City and the DWSD recognize that in the event an Event of Default occurs, any remedy of law may prove to be inadequate relief to the Banks; therefore, the Authority, the City and the DWSD agree that the Banks, if the Banks so request, shall be entitled to temporary and permanent injunctive relief in any such case.

## ARTICLE VIII

## NATURE OF OBLIGATIONS; INDEMNIFICATION

**Section 8.01. Obligations Absolute**. The obligations of the Authority and the DWSD to pay all Required Payments under this Agreement and the other Related Documents shall be absolute, unconditional and irrevocable, subject, however to Section 8.05 hereof, notwithstanding any other provision of this Agreement or any other Related Document, and shall not be subject to any right of setoff, recoupment or counterclaim against the Banks or any other Owner and shall be paid and performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever. Until the principal of and interest on the Bonds and all Required Payments, have been indefeasibly paid in full and all other obligations of the Authority and the DWSD hereunder and under the Related Documents have been performed and discharged, the Authority, the City and the DWSD each waive and covenant not to assert any right of setoff or recoupment against its obligation to make all payments of principal, interest and all other Required Payments due hereunder and under the other Related Documents in the amounts and at the times required hereby and thereby, and without abatement, diminution, deduction, counterclaim or defense for any reason, including, without limitation, in the following circumstances:

      (a)    any lack of validity or enforceability of any of the Related Documents;

      (b)    any amendment or waiver of any provision, term or condition of any of the Related Documents;

      (c)    the existence of any dispute with, or any claim, right of setoff or recoupment, defense or other rights which the Authority, the City and the DWSD may have at any time against the Trustee, the DWSD Trustee, the Banks (other than the defense of payment to the Banks in accordance with the terms of this Agreement), any Owner or any other Person, whether in connection with this Agreement, the Related Documents or any transaction contemplated thereby or any unrelated transaction; and

      (d)    any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff or recoupment against, the Authority's or the DWSD's obligations hereunder or under any of the other Related Documents.

57

**Section 8.02. Continuing Obligation**.  All covenants, agreements, representations and warranties made by the Authority, the City and the DWSD in this Agreement and in the certificates or other instruments  delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Banks and shall survive the execution and delivery of this Agreement and the issuance and purchase by the Banks of the  Bonds, regardless of any investigation made by the Banks or on its behalf and notwithstanding that the Banks may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the Bonds or any Required Payments remain outstanding and unpaid. The obligations of the Authority, the City and the DWSD under this Agreement shall survive and continue until the date upon which all amounts due and owing to the Banks hereunder and under any Bonds shall have been indefeasibly paid in full; *provided, however,* that the obligations of the Authority, the City and the DWSD pursuant to Sections 2.06,  8.03,  8.04,  9.12 and 9.13 hereof shall survive any expiration or termination of this Agreement.

**Section 8.03. Liability of the Banks**.  The Authority, the City and the DWSD each hereby unconditionally and irrevocably releases and discharges the Banks, its Affiliates and each other Owner, and each of their respective officers, directors, employees and agents (each, a "Releasee"), from all liability or responsibility for any losses, liabilities, damages, claims, costs (including attorneys' fees), judgments or causes of action (collectively, "Liabilities") arising out of or in connection with any of the following: (a) the use that may be made of the proceeds of the Bonds or for any acts or omissions of the Authority, the City, the DWSD or the Trustee; (b) any of the acts, omissions, agreements, circumstances or conditions covered by the indemnification provided in Section 8.04 and (c) any other circumstance whatsoever in connection with the purchase and holding by the Banks (or other Owner) of the Bonds or the enforcement of this Agreement or the exercise of any rights or remedies hereunder, under any other Related Document or under law or in equity by the Banks (or other Owner); provided that, the Authority and the DWSD shall have a claim against the Banks (or other Owner) and the Banks (or other Owner) shall be liable to the Authority and the DWSD  to the extent, but only to the extent, of any direct, actual damages suffered or incurred by the Authority and the DWSD, and not required to be mitigated by the Authority, the City and the DWSD, which direct, actual damages are determined by a final and nonappealable judgment of a court of competent jurisdiction to have been directly caused by the Bank's willful misconduct or gross negligence in the performance or non-performance of a duty owed to the Authority and the DWSD.   The Authority, the City and the DWSD further unconditionally and irrevocably release the Releasees from all Liabilities for or constituting lost profits and from all Liabilities for or constituting consequential, special, indirect or punitive (or exemplary) damages (the right to recover or receive lost profits, consequential, special, indirect or punitive (or exemplary) damages being hereby waived), suffered or incurred by the Authority, the City and the DWSD.

**Section 8.04. Indemnification; Taxes, Etc.**  (a)  In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the Authority hereby agrees to defend, indemnify and hold harmless each of the Banks, their Affiliates, each other Owner and each Participant and each of the respective officers, directors, employees and agents of the foregoing Persons (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an

Indemnified Party may incur (or which may be claimed against an Indemnified Party by any Person whatsoever) that arises out of or in connection with any of the transactions contemplated by this Agreement or the Related Documents, including, without limitation, (i) the issuing, offering or sale of the Bonds; (ii) the proposed or actual use of the proceeds of the Bonds; (iii) the untruth or material inaccuracy of any warranty or representation undertaken or given by the Authority in this Agreement or any Related Document or in any certificate furnished hereunder or thereunder or the breach or nonperformance by any Person of any covenant of this Agreement or any other Related Document; (iv) any act or omission of the Authority or any imposition arising from, burden imposed by, violation of, or failure to comply with, any Applicable Law by the Authority; (v) any Taxes or Other Taxes; or (vi) the involvement of any Indemnified Party in any legal suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the purchase or holding of the Bonds, the entering into of this Agreement or any action taken or omitted to be taken hereunder or under any of the other Related Documents or any other event or transaction contemplated by any of the foregoing; provided, in each case, that the Authority shall not be required to indemnify the Banks for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, directly caused by the willful misconduct or gross negligence of the Banks, to the extent that there has been a final and nonappealable judgment of a court of competent jurisdiction that such claims, damages, losses, liabilities, costs and expenses were directly caused by the willful misconduct or gross negligence of the Banks. If any proceeding shall be brought or threatened against an Indemnified Party by reason of or in connection with the events described in (i), (ii), (iii), (iv), (v) or (vi), such Indemnified Party shall promptly notify the Authority in writing and the Authority shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.

(b) In addition to any and all rights of reimbursement, indemnification, subrogation or any other rights pursuant hereto or under law or equity, only to the extent permitted by applicable law, the DWSD hereby agrees to defend, indemnify and hold harmless each Indemnified Party from and against any and all claims, damages, losses, liabilities, reasonable costs or expenses whatsoever (including reasonable attorneys' fees) that an Indemnified Party may incur (or which may be claimed against an Indemnified Party by any Person whatsoever) that arises out of or in connection with any of the transactions contemplated by this Agreement or the Related Documents, including, without limitation, (i) the issuing, offering or sale of the Bonds; (ii) the proposed or actual use of the proceeds of the Bonds; (iii) the untruth or material inaccuracy of any warranty or representation undertaken or given by the DWSD in this Agreement or any Related Document or in any certificate furnished hereunder or thereunder or the breach or nonperformance by any Person of any covenant of this Agreement or any other Related Document; (iv) any act or omission of the DWSD or any imposition arising from, burden imposed by, violation of, or failure to comply with, any Applicable Law by the DWSD; (v) any Taxes or Other Taxes; or (vi) the involvement of any Indemnified Party in any legal suit, investigation, proceeding, inquiry or action as a consequence, direct or indirect, of the purchase or holding of the Bonds, the entering into of this Agreement or any action taken or omitted to be taken hereunder or under any of the other Related Documents or any other event or transaction contemplated by any of the foregoing; provided, in each case, that the DWSD shall not be required to indemnify the Banks for any claims, damages, losses, liabilities, costs or expenses to the extent, but only to the extent, directly caused by the willful misconduct or gross negligence of the Banks, to the extent that there has been a final and nonappealable judgment of a court of competent jurisdiction that such claims, damages, losses, liabilities, costs and expenses were

directly caused by the willful misconduct or gross negligence of the Banks. If any proceeding shall be brought or threatened against an Indemnified Party by reason of or in connection with the events described in (i), (ii), (iii), (iv), (v) or (vi), such Indemnified Party shall promptly notify the DWSD in writing and the DWSD shall assume the defense thereof, including the employment of counsel and the payment of all costs of litigation.

(c)     Neither the Authority nor the DWSD will settle or compromise any such action or claim without the prior written consent of the relevant Indemnified Party if the settlement or compromise would require any act or admission by such Indemnified Party or any of its Affiliates, or impose any cost or expense on the Indemnified Party or its Affiliates or impose any limitation on the business or future actions of the Indemnified Party or its Affiliates. Notwithstanding the preceding sentence, an Indemnified Party shall have the right to employ its own counsel and to determine its own defense of such action in any such case, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the employment of such counsel has been authorized in writing by the Authority or the DWSD, as applicable or (y) the Authority or the DWSD, as applicable, after due notice of the action, shall not have employed counsel to have charge of such defense, in either of which events the reasonable fees and expenses of counsel for such Indemnified Party shall be borne by the Authority or the DWSD, as applicable. The Authority and the DWSD shall not be liable for any settlement of any such action effected without its consent. Nothing under this Section 8.04 shall or shall be construed to limit the Authority's or the DWSD's payment obligations under Article II.

(d)     The provisions of this Section 8.04 shall survive the termination of this Agreement and the payment in full of the Bonds and the obligations of the Authority and the DWSD thereunder and hereunder.

**Section 8.05. Limited Obligations.**  Notwithstanding anything in this Agreement to the contrary, the Authority and the DWSD are obligated to pay their obligations under this Agreement only from the Security. The State is not obligated to pay any such obligation and neither the faith and credit nor the taxing power of the State is pledged to the payment of such obligations. The Authority and the DWSD have no taxing power. **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THIS AGREEMENT IS NOT A DEBT OR LIABILITY OF THE STATE OR OF ANY AGENCY OR INSTRUMENTALITY OF THE STATE, OTHER THAN THE AUTHORITY AND THE DWSD AS SET FORTH IN THE BONDS AUTHORIZING ACT, EITHER LEGAL, MORAL OR OTHERWISE.  THIS AGREEMENT DOES NOT CREATE OR CONSTITUTE AN INDEBTEDNESS, LIABILITY OR OBLIGATION OF THE STATE OR CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE. NOTHING IN THE BONDS AUTHORIZING ACT SHALL BE CONSTRUED TO AUTHORIZE THE AUTHORITY AND THE DWSD TO INCUR ANY INDEBTEDNESS OR LIABILITY ON BEHALF OF THE STATE.**

**ARTICLE IX**

**MISCELLANEOUS**

**Section 9.01.  Assignment of Rights to the Banks.**  The Authority appoints the Banks as its representative for all purposes of enforcing the rights of the owners of the DWSD Obligations as set forth in the DWSD Trust Indenture.

**Section 9.02.  Right of Setoff**.  Upon the occurrence of an Event of Default, the Banks and their Affiliates may, at any time and from time to time, without notice to the Authority and the DWSD or any other Person (any such notice being expressly waived), set off and appropriate and apply, against and on account of, any obligations and liabilities of the Authority and the DWSD to the Banks or their Affiliates, whether or not arising under or connected with this Agreement or the Related Documents and without regard to whether or not the Banks shall have made any demand therefor and although such obligations and liabilities may be contingent or unmatured and regardless of currency, place of payment or booking office thereof, any and all deposits (general or special, including but not limited to Debt evidenced by certificates of deposit, but not including trust accounts) and any other Debt or other payment obligation at any time held or owing by the Banks or their Affiliates to or for the credit or the account of the Authority and the DWSD, whether or not arising under or connected with this Agreement or the Related Documents, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office thereof. The rights of the Banks under this Section are in addition to other rights and remedies (including other rights of setoff) which the Banks may have at law or in equity.

**Section 9.03.  Amendments and Waivers; Remedies Cumulative**.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Authority, the City or the DWSD from any such provision shall in any event be effective unless the same shall be in writing and signed by the Banks.  Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  In the event any covenant or agreement contained in this Agreement should be breached by the Authority, the City or the DWSD and thereafter waived by the Banks, such waiver shall be limited to the particular breach so waived for the specific period set out in such waiver and such waiver shall not constitute a waiver of such breach for any other period and shall not waive any other or similar breach hereunder. Specifically and not in limitation of the foregoing, this Agreement may not be amended or modified by course of dealing, oral acknowledgement or agreement or by any writing, unless it is a writing which is expressly stated to constitute an amendment of this Agreement and is signed by an authorized officer for the Banks and an Authorized Officer and an authorized representative of the Authority, the City and the DWSD.  The rights and remedies of the Banks hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.

**Section 9.04.  Notices**.  All notices, requests, demands, directions and other communications (collectively "notices") under the provisions of this Agreement shall be in writing (including facsimile communication), unless otherwise expressly permitted hereunder, and shall be properly addressed and sent by registered or certified mail or by express courier for next Business Day delivery and shall be deemed received as follows:  (a) if by registered or certified mail, five (5) days after mailing; (b) if by express courier for next Business Day delivery, on the next Business Day; and (c) if by facsimile, when confirmation of transmission is obtained if prior to 5:00 p.m. local time on a Business Day, and otherwise, on the next Business Day; provided that service of a notice prescribed by any applicable statute shall be considered

complete when the requirements of that statute are met. Notices by electronic mail (e-mail) shall not constitute notice under this Agreement and are only to be used in addition to notice given as prescribed under (a), (b) or (c) of this Section 9.04. All notices shall be sent to the applicable party at the following address or in accordance with the last unrevoked written direction from such party to the other parties hereto:

if to the Authority, addressed to the Authority at:

> Michigan Finance Authority
> 430 W. Allegan Street
> Lansing, Michigan 48922
> Attention: Executive Director
> Telephone: (517) 335-0994
> Facsimile: (517) 241-1233
> Email: treas_bondfinance@michigan.gov

if to the DWSD, addressed to the DWSD at:

> Detroit Water and Sewerage Department
> _____
> Detroit, MI _____
> Attention: Executive Director
> Telephone: 313-324-8290
> Facsimile: 313-638-2805
> Email: _____

if to the City, addressed to the City at:

> City of Detroit
> _____
> Detroit, MI _____
> Attention: _____
> Telephone: _____
> Facsimile: _____
> Email: _____

or if to the Banks, addressed to them at:

> For Administrative Matters:

> > Citibank, N.A.
> > 390 Greenwich Street, 2nd Flood
> > New York, New York 10013
> > Attention: _____
> > Telephone: 212-723-5577

Facsimile: 866-914-8193
Email: _____

For Credit Matters:

Citibank, N.A.
390 Greenwich Street, 8th Floor
New York, New York 10013
Attention: Municipal Credit Surveillance
Telephone: 212-723-4339
Facsimile: 212-723-8592
Email: munisurveillance@citi.com

[INSERT NOTICE ADDRESSES FOR OTHER BANKS]

or if to the Trustee, addressed to it at:

Wilmington Trust, National Association
Corporate Trust Services
25 South Charles Street, 11th Floor
Baltimore, MD 21201
Attention: _____
Telephone: 410-545-2193
Facsimile: 410-244-4236

or as to each party at such other address as shall be designated by such party in a written notice to the other parties.

Any notice or other communication shall be sufficiently given and shall be deemed given when delivered to the addressee in writing or when given by telephone immediately confirmed in writing by electronic mail or other telecommunication device.

**Section 9.05. Severability**. Each of the parties to this Agreement intends that each provision in this Agreement comport with all applicable requirements of law. However, if all or any portion of any provision or provisions in this Agreement is or are found by a court of competent jurisdiction to be in violation of any applicable statute, regulation, administrative or judicial decision or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be invalid, unlawful, void or unenforceable as written, then it is the express intent of each of the parties hereto that the obligations, rights and interests of the respective parties under the remainder of this Agreement shall continue in full force and effect and such portion, provision or provisions which is held or determined to be invalid, unlawful, void or unenforceable as written shall, nonetheless, be enforced and binding to the fullest extent permitted by law as though such portion, provision or provisions had been written in such a manner and to such an extent as to be valid, lawful and enforceable under the circumstances.

**Section 9.06. GOVERNING LAW**. THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT UNDER, AND TOGETHER WITH ANY DISPUTES OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE

GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND APPLICABLE FEDERAL LAW, WITHOUT REGARD TO CHOICE OF LAW RULES OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 (OR ANY SUCCESSOR STATUTE THERETO); PROVIDED THAT THE OBLIGATIONS OF THE AUTHORITY, THE CITY AND THE DWSD AND LEGAL AUTHORITY AND CAPACITY OF THE AUTHORITY, THE CITY AND THE DWSD UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE.

**Section 9.07. Headings**. Section headings in this Agreement are included herein for convenience of reference only and shall not have any effect for purposes of interpretation or construction of the terms of this Agreement.

**Section 9.08. Successors and Assigns**. (a) (i) This Agreement is a continuing obligation and shall be binding upon and inure to the benefit of the Authority, DWSD, the Banks and their respective successors, endorsees and assigns; provided, that, the Authority and the DWSD shall not assign, transfer or delegate all or any portion of their rights or obligations hereunder or under the other Related Documents without the prior written consent of the Banks. The Banks may from time to time and without the consent of the Authority, the City or the DWSD or any other Person assign, sell or transfer in whole or in part, this Agreement and any of its rights or interests hereunder and all or any part of its interest in the Bonds and the Related Documents.

(ii) Any successor to, or assignee of, Citibank, N.A. [or OTHER BANKS, TBD] as the initial Banks shall give written notice to the Authority and the DWSD and the Trustee identifying the assignee or successor as the Banks for all purposes of this Agreement and the other Related Documents. Insofar as the successor Bank is not the sole Owner of the Bonds, the group of Owners then owning a majority of the aggregate principal amount of the Bonds then Outstanding shall give notice to the Authority and the DWSD and the Trustee that they constitute the Banks as herein defined and, provided any such notice on its face establishes the requisite ownership of a majority of the aggregate principal amount of the Bonds then Outstanding by the Owners identified therein, such Owners shall thereupon constitute the Banks and shall succeed to and become vested with all of the rights, powers, privileges and responsibilities of the Banks in this Agreement and each of the other Related Documents. The predecessor Bank shall be discharged from its duties and obligations hereunder, provided that the predecessor Bank shall continue to be entitled to the benefits of Article II and Sections 8.03, 8.04, 9.12 and 9.13 hereof and of each other provision of any Related Document granting a right of payment, indemnity or reimbursement in favor of the Banks.

(iii) Each Bank may designate any nominee, designee or agent to act for and in the name of the Bank by written notice to the Authority, the DWSD and the Trustee and any such duly designated nominee, designee or agent shall thereupon be empowered to act for and on behalf of the Bank and exercise the rights, powers, privileges and responsibilities of a Bank in this Agreement and each of the other Related Documents.

(iv)     The Authority and the DWSD agree to provide to the Banks, promptly upon request, a copy of the most recent financial information concerning the Authority and the DWSD in connection with any assignment or prospective assignment.  A Bank may disclose to any assignees or prospective assignees any information or data in the Bank's possession relating to this Agreement, the Bonds or any other Related Document, without the consent of or notice to the Authority, the City or the DWSD.

(b)     *Certain Pledges*.  The Banks, and each of them, may at any time, without notice to, or any requirement to seek the consent of, the Authority, the City or the DWSD, pledge or grant a security interest in all or any portion of its rights under the Bonds, this Agreement and the other Related Documents (including without limitation rights to payment under the Bonds and this Agreement) to secure obligations of the Banks, including any pledge or assignment to secure obligations to a Federal Reserve Banks.

(c)     *Participations*.  The Authority, the City and the DWSD acknowledge and agree that the Banks shall have the right to grant participations in all or a portion of a Bank's interest in the Bonds, this Agreement and the other Related Documents to one or more other banking institutions (each Person granted such participation to be a "Participant"), and such Participants shall, except as set forth in the following clause (ii), be entitled to the benefits of this Agreement and the Related Documents to the same extent as if they were a direct party to this Agreement; provided, however, that (i) no such participation by any such Participant shall in any way affect the obligations of the Banks hereunder and (ii) the Authority, the City, the DWSD and the Trustee shall be required to deal only with the Banks, with respect to any matters under this Agreement, the Bonds and the other Related Documents and no such Participant shall be entitled to enforce against the Authority and the DWSD any provision hereunder.  The Authority and the DWSD agree to provide to the Banks, promptly upon request, a copy of the most recent financial information concerning the Authority and the DWSD in connection with any such participation or prospective participation.  The Banks may disclose to any Participants or prospective Participants any information or data in a Bank's possession relating to this Agreement, the Bonds or any other Related Document, without the consent of or notice to the Authority, the City and the DWSD.  The Authority, the City and the DWSD further acknowledge and agree that upon any such participation the Participants will become owners of a pro rata portion of the participated obligations and the Authority, the City and the DWSD waive any right of setoff it may at any time have against the Banks or any Participant with regard to the participated obligations.

**Section 9.09.  Counterparts; Complete and Controlling Agreement**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Related Documents completely set forth the agreements between the Banks and the Authority and between the Banks and the DWSD and supersede all prior and contemporaneous understandings, agreements and contracts, both written

and oral, between the Banks and the Authority and between the Banks and the DWSD relating to the issuance, sale and purchase of the Bonds and all matters set forth herein and in the Related Documents.

**Section 9.10. Waiver of Rule of Construction**. The Authority, the City and the DWSD hereby waive any and all provisions of law to the effect that an ambiguity in a contract or agreement should be interpreted against the party responsible for its drafting.

**Section 9.11. WAIVER OF JURY TRIAL**. THE AUTHORITY, THE CITY, THE DWSD AND THE BANKS EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (WHETHER AS CLAIM, COUNTER-CLAIM, AFFIRMATIVE DEFENSE OR OTHERWISE) BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE AUTHORITY, THE CITY, THE DWSD OR THE BANKS. THE AUTHORITY, THE CITY AND THE DWSD EACH ACKNOWLEDGE AND AGREE THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND RECOGNIZES AND AGREES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANKS ENTERING INTO THIS AGREEMENT AND PURCHASING THE BONDS. THE AUTHORITY, THE CITY AND THE DWSD REPRESENT AND ACKNOWLEDGE THAT EACH HAS REVIEWED THIS PROVISION WITH ITS LEGAL COUNSEL AND THAT EACH HAS KNOWINGLY AND VOLUNTARILY WAIVED ANY JURY TRIAL RIGHTS EACH MAY HAVE FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.

**Section 9.12. Payments Set Aside**. To the extent that any payment by or on behalf of the Authority and the DWSD is made to the Banks, or the Banks exercise their right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Banks in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**Section 9.13. Usury**. If notwithstanding the application of Section 2.08 of this Agreement, Applicable Law shall be interpreted by a court of competent jurisdiction to render usurious any amount or amounts payable to the Banks under this Agreement or under the Bonds, or contracted for, charged or received by the Banks with respect to the obligations of the Authority and the DWSD hereunder or under the Bonds, or if any acceleration or optional or extraordinary prepayment results in the Authority and the DWSD having paid any interest (together with any Charges) in excess of that permitted by Applicable Law, then it is the Bank's express intent that all excess amounts theretofore collected by the Banks shall be credited against the principal balance of the Authority's and the DWSD's obligations to the Banks and the provisions of this Agreement and the other Related Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder modified, without the

necessity of the execution of any new documents, so as to comply with the Applicable Law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to the Banks, which may be characterized as interest under Applicable Law shall, to the extent permitted thereby, be amortized, prorated, allocated, and spread throughout the full stated term of the Bonds or other obligations of the Authority and the DWSD until payment in full so that the rate or amount of interest on account of such obligations does not exceed the Maximum Lawful Rate from time to time in effect and applicable to such obligations for so long as the obligations are outstanding.

**Section 9.14. Electronic Signature; Electronically Signed Document**. For purposes hereof, "electronic signature" means a manually-signed original signature that is then transmitted by electronic means; "transmitted by electronic means" means sent in the form of a facsimile or sent via the Internet as a pdf (portable document format) or other replicating image attached to an e-mail message; and, "electronically signed document" means a document transmitted by electronic means and containing, or to which there is affixed, an electronic signature. The parties agree that the electronic signature of a party to this Agreement (or any amendment or supplement of this Agreement) shall be as valid as an original signature of such party and shall be effective to bind such party to this Agreement. The parties agree that any electronically signed document (including this Agreement) shall be deemed (i) to be "written" or "in writing," (ii) to have been signed, and (iii) to constitute a record established and maintained in the ordinary course of business and an original written record when printed from electronic files. Such paper copies or "printouts", if introduced as evidence in any judicial, arbitral, mediation or administrative proceeding, will be admissible as between the parties to the same extent and under the same conditions as other original business records created and maintained in documentary form. Neither party shall contest the admissibility of true and accurate copies of electronically signed documents on the basis of the best evidence rule or as not satisfying the business records exception to the hearsay rule.

**Section 9.15. No Advisory or Fiduciary Responsibility**. In connection with all aspects of the transactions contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Related Document), the Authority, the City and the DWSD acknowledge and agree that: (a) (i) the services, if any, regarding this Agreement provided by the Banks and any of their Affiliates are arm's-length commercial transactions between the Authority, the City, the DWSD and its Affiliates, on the one hand, and the Banks and their Affiliates, on the other hand, (ii) the Authority, the City and the DWSD each have consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Authority, the City and the DWSD are each capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Related Documents; (b) (i) the Banks and each of its Affiliates is and has been acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Authority, the City, the DWSD or any of its Affiliates, or any other Person and (ii) neither the Banks nor any of their Affiliates has any obligation to the Authority, the City the DWSD or any of its Affiliates with respect to the Transactions, except those obligations expressly set forth herein; and (c) the Banks and each of their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Authority, the DWSD and its Affiliates, and neither the Banks nor any of their Affiliates has any obligation to disclose any of such interests to the Authority, the DWSD or its Affiliates. To the fullest extent

permitted by Applicable Law, the Authority and the DWSD hereby waive and release any claims that it may have against the Banks and each of their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Bond Purchase and Supplemental Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

MICHIGAN FINANCE AUTHORITY

By _____
Name          Joseph          L.          Fielek
Title Executive DirectorCITY OF DETROIT, MICHIGAN

By _____
Name
Title_____

DETROIT WATER AND SEWERAGE DEPARTMENT

By _____
Name Odis Jones
Title Executive Director

[Signatures continued on next page]

[Signature page to Bond Purchase and Supplemental Agreement]

CITIBANK, N.A.

By _____

Name _____

Title <u>Vice-President</u>

**EXHIBIT [A]**
**BANKRUPTCY ORDER**

# **EXHIBIT 4**

CHI-1940093v3

# THE REVENUE BOND ACT OF 1933
## Act 94 of 1933

## Relevant Provisions

**141.101 Short title; revenue bond act of 1933.**

Sec.1.

This act shall be known and may be cited as "the revenue bond act of 1933."

**141.102 Construction of act.**

Sec. 2.

This act shall be construed as cumulative authority for the exercise of the powers herein granted and shall not be construed to repeal any existing laws with respect thereto, it being the purpose and intention of this act to create full and complete additional and alternate methods for the exercise of such powers. The powers conferred by this act shall not be affected or limited by any other statute or by any charter, except as otherwise herein provided. The functions, powers and duties of the state commissioner of health in connection with any such public improvement shall remain unaffected by this act.

**141.103 Definitions.**

Sec. 3.

As used in this act:

(a) "Public corporation" means a county, city, village, township, school district, port district, or metropolitan district of the state or a combination of these if authorized by law to act jointly; an authority created by or under an act of the legislature; or a municipal health facilities corporation or subsidiary municipal health facilities corporation incorporated as provided in the municipal health facilities corporations act, 1987 PA 230, MCL 331.1101 to 331.1507.

(b) "Public improvements" means only the following improvements: housing facilities; garbage disposal plants; rubbish disposal plants; incinerators; transportation systems, including plants, works, instrumentalities, and properties used or useful in connection with those systems; sewage disposal systems, including sanitary sewers, combined sanitary and storm sewers, plants, works, instrumentalities, and properties used or useful in connection with the collection, treatment, or disposal of sewage or industrial wastes; storm water systems, including storm sewers, plants, works, instrumentalities, and properties used or useful in connection with the collection, treatment, or disposal of storm water; water supply systems, including plants, works, instrumentalities, and properties used or useful in connection with obtaining a water supply, the treatment of water, or the distribution of water; utility systems for supplying light, heat, or

power, including plants, works, instrumentalities, and properties used or useful in connection with those systems; approved cable television systems, approved cable communication systems, or telephone systems, including plants, works, instrumentalities, and properties used or useful in connection with those systems; automobile parking facilities, including within or as part of the facilities areas or buildings that may be rented or leased to private enterprises serving the public; yacht basins; harbors; docks; wharves; terminal facilities; elevated highways; bridges over, tunnels under, and ferries across bodies of water; community buildings; public wholesale markets for farm and food products; stadiums; convention halls; auditoriums; dormitories; hospitals and other health care facilities; buildings devoted to public use; museums; parks; recreational facilities; reforestation projects; aeronautical facilities; and marine railways; or any right or interest in or equipment for these improvements. The term "public improvement" means the whole or a part of any of these improvements or of any combination of these improvements or any interest or participation in these improvements, as determined by the governing body. The definition contained in this subdivision does not broaden or enlarge the extent of a particular public improvement made by a public corporation.

(c) "Borrower" means a public corporation exercising the power to issue bonds as provided in this act.

(d) "Governing body" means for a county, the board of commissioners; for a city, the body having legislative powers; for a village, the body having legislative powers; for a township, the township board; for a school district, the board of education; for a port district, the port commission; for a metropolitan district, the legislative body of the district; for a municipal health facilities corporation, the board of trustees; for a nonprofit subsidiary municipal health facilities corporation, the nonprofit subsidiary board; and for an authority, the body in which is lodged general governing powers. If the charter of a public corporation or applicable law provides that a separate board has general management over a public improvement, "governing body" means, with respect to that public improvement, the separate board, subject to review by the legislative body of the public corporation as the charter or law may provide. Unless the charter or law specifically provides otherwise, the separate board shall adopt the bond authorizing ordinance, but shall not pledge full faith and credit.

(e) "Rates" means the charges, fees, rentals, and rates that may be fixed and imposed for the services, facilities, and commodities furnished by a public improvement.

(f) "Revenues" means the income derived from the rates charged for the services, facilities, and commodities furnished by a public improvement. Revenues include, to the extent provided in the authorizing ordinance, earnings on investment of funds of the public improvement and other revenues derived from or pledged to operation of the public improvement.

(g) "Net revenues" means the revenues of a public improvement remaining after deducting the reasonable expenses of administration, operation, and maintenance of the public improvement.

(h) "Project cost" or "costs" means the costs of purchasing, acquiring, constructing, improving, enlarging, extending, or repairing a public improvement, including any engineering, architectural, legal, accounting, financial, and other expenses incident to the public improvement.

Project costs include interest on the bonds, and other obligations of the borrower issued to pay project costs, during the period of construction and until full revenues are developed. Project costs include a reserve or addition to a reserve for payment of principal and interest on the bonds and the amount required for operation and maintenance until sufficient revenues have developed.

(i) "Ordinance" means an ordinance, resolution, or other appropriate legislative enactment of the governing body of a public corporation.

(j) "Approved cable television system" or "approved cable communication system" means a cable television or communication system to which 1 of the following applies:

(i) A municipality acquires or establishes the system either before January 1, 1987 or before a system is established in that municipality by a private person.

(ii) A municipality acquires or establishes the system after a system is established in that municipality by a private person and after approval by a majority of the electors in the affected area of that municipality voting on the question of the sale of revenue bonds to finance the acquisition or establishment of the municipal system.

**141.104 Municipal public improvements; limitations; bonds; acquiring utility for supplying light, heat or power; referendum; powers exercised.**

Sec.4.

Any public corporation is authorized to purchase, acquire, construct, improve, enlarge, extend or repair 1 or more public improvements and to own, operate and maintain the same, within or without its corporate limits, and to furnish the services, facilities and commodities of any such public improvement to users within or without its corporate limits. The exercise by any public corporation of such powers outside its corporate limits shall be subject to the legal rights of the political subdivision within which such powers are to be exercised and shall also be subject to any and all constitutional and statutory provisions relating thereto. The authority herein granted shall be further limited as follows:

(a) No public corporation shall establish warehouses for the purpose of storing or dispensing alcoholic beverages.

(b) School districts shall be limited to such public improvements as are within the scope of their powers under other statutory provisions.

(c) Port districts shall be limited to such public improvements as are within the scope of their powers under acts creating the same.

(e) No public corporation may acquire a utility for the supplying of light, heat or power unless such proposition shall have first received the affirmative vote of 3/5 of the electors of such public corporation voting thereon at a regular or special municipal election.

The powers in this act granted may be exercised notwithstanding that no bonds are issued hereunder.

**141.105 Estimate of cost and period of usefulness.**

Sec. 5.

Whenever the governing body of any public corporation shall determine to purchase, acquire, construct, improve, enlarge, extend and/or repair any public improvement and to issue bonds under this act, it shall first cause an estimate to be made of the cost and the period of usefulness thereof, and the fact that such estimate has been made and the amount and period of time thereof shall appear in the ordinance authorizing and providing for the issuance of the bonds.

**141.106 Ordinances; adoption; purpose; approval or disapproval; veto; effective date; referendum; record; authentication; publication.**

Sec. 6.

The governing body of a public corporation by the affirmative vote of a majority of its elected members, at the meeting at which it is introduced or any subsequent meeting, may adopt an ordinance relating to the exercise of the powers granted in this act and to other matters necessary or desirable to effectuate this act, to provide for the adequate operation of a public improvement established under this act, and to insure the security of bonds issued. The adoption shall be subject to applicable statutory or charter provisions in respect to the approval or disapproval of the chief executive or other officer of the public corporation and the adoption of the ordinance over his or her veto, except in case of the adoption of an ordinance under this act by the board of commissioners of a county, it shall not be necessary to submit the ordinance to the governor for approval. An ordinance adopted under this act shall become effective upon its adoption unless otherwise specified in the ordinance. It shall not be subject to a referendum vote of the electors of the public corporation except as provided in section 33. The ordinance shall be recorded in the minutes of the meeting of the governing body of the public corporation as soon as practicable after its passage. The record shall be authenticated by the signatures of the presiding officer and the clerk or other recording officer of the governing body. The ordinance shall be published once in a newspaper of general circulation within the boundaries of the public corporation. The publication of the ordinance as a part of the minutes of the meeting at which it was adopted, shall be considered a publication in conformity with this act. Except as otherwise provided in this act, this section shall constitute the sole requirements in respect to the adoption and publication of an ordinance and shall not be limited by a charter or statutory provisions.

**141.107 Bonds; issuance; form; term; interest; exclusion from net bonded indebtedness; registration; pledge of funds; statutory first lien.**

Sec. 7.

(1) For the purpose of defraying the whole or a part of project costs, a public corporation may borrow money and issue its negotiable bonds. The bonds shall not be issued unless and until authorized by an ordinance, which shall set forth a brief description of the contemplated project, the estimated cost of the project, and the amount, maximum rate of interest, and time of payment of the bonds. The bonds shall be serial bonds or term bonds, or a combination of serial and term bonds, and shall be payable semiannually or annually by maturity of serial bonds or maturity or required redemption of term bonds. The last annual principal installment shall be not longer than the estimated period of usefulness of the public improvement for which the bond is issued, but the last installment shall not be more than 40 years from the date of the bond. The bonds shall bear interest, payable as provided in the authorizing ordinance, except that the first interest installment shall be payable not later than 10 months following the delivery date of the bonds. The bonds and coupons shall be substantially in the form provided in the authorizing ordinance and shall be executed in the manner prescribed in the bond, which may be by facsimile signature or signatures. The bonds and the interest on the bonds shall be made payable in lawful money of the United States, and shall be exempt from taxation by this state or by any taxing authority within this state. The public corporation may provide that the redemption of term bonds may be satisfied in whole or in part by the purchase and cancellation of term bonds otherwise required to be redeemed. As used in this subsection, "annual principal installment" means a maturity of serial bonds, an amount of term bonds required to be redeemed in that year, or a maturity of term bonds less amounts previously required to be redeemed.

(2) The principal of and interest on the bonds shall be payable, except as provided in this act, solely from the net revenues derived from the operation of the public improvement purchased, acquired, constructed, improved, enlarged, extended, or repaired from the proceeds of the bonds, as shall be pledged to the bonds in the authorizing ordinance, which may include if the ordinance so provides, net revenues derived by reason of future improvements, enlargements, extensions, or repairs to the improvement, and payments made to the public corporation issuing the bonds by any other governmental entity pursuant to another law of this state or the United States for payment of principal and interest on the bonds, even though the payments are made from or include grants or other funds provided by this state or the United States or the proceeds of taxes levied on taxable property as provided by other law.

(3) As additional security for the payment of bonds that are used to finance the local share of projects that receive more than 25% of financing from federal or state grants or that are being initially purchased, in whole or in part, by the Michigan municipal bond authority created under the shared credit rating act, 1985 PA 227, MCL 141.1051 to 141.1076, or if specifically authorized by another law pertaining to the public improvements for which bonds are to be issued under this act, a public corporation, by majority vote of the elected members of its governing body, may include as a part of the ordinance authorizing the issuance of the bonds a pledge of its full faith and credit for payment of the principal of an interest on the bonds. For bonds issued for airports or airport improvements under the aeronautics code of the state of Michigan, 1945 PA 327, MCL 259.1 to 259.208, a public corporation, by majority vote of the elected members of its governing body, may agree that if funds pledged for payment of bonds are not sufficient to pay principal and interest on the bonds as the bonds become due, the public corporation shall advance sufficient funds out of its general funds for the payment if the proceeds of the bonds are used exclusively within the territorial limits of the county in which the political

corporation is located. If a pledge is made, and the net revenues primarily pledged to the payment are insufficient to make a payment, the public corporation shall be obligated to pay the bonds and interest on the bonds in the same manner and to the same extent as other general obligation bonds of the public corporation, including the levy, when necessary, of a tax on all taxable property in the public corporation without limitation as to rate or amount, in addition to all other taxes that the public corporation is authorized to levy, but not exceeding the rate or amount necessary to make the payment. If a public corporation makes payment from taxes or general funds pursuant to a full faith and credit pledge or agreement to advance, it shall be reimbursed from net revenues subsequently received by the public improvement for which the bonds are issued that are not otherwise pledged or encumbered. A bond or coupon issued under this act shall not be general obligation or constitute an indebtedness of the borrower unless its full faith and credit are pledged. Unless a public corporation pledges its full faith and credit for the payment of bonds issued pursuant to this act, or unless otherwise exempt, the amount of the bonds shall not be included in computing the net bonded indebtedness of the public corporation for the purposes of debt limitations imposed by any statutory or charter provisions. Bonds may be made registerable as to principal, or principal and interest, under terms and conditions determined by the governing body of the borrower.

(4) The governing body in the ordinance authorizing the bonds or in an agreement entered into under section 7a(1)(a) may pledge any funds established by the ordinance or agreement for the payment of the bonds or other obligations of the public corporation under the agreement and create a statutory first lien in favor of the holders of the bonds or a party subject to the agreement.


**141.107a Powers of public corporation in determining to issue bonds; terms of payment; interest; sale or remarketing; tender of bonds by holders; determining aggregate authorized amount of bonds outstanding; remarketing or resale of tendered bonds or incurrence of obligation of public corporation; provisions of section construed.**

Sec. 7a.

(1) A public corporation in determining to issue bonds, including refunding bonds, may do the following:

(a) As additional security to assure timely payment of the bonds, authorize and enter into an insurance contract, agreement for lines of credit, letter of credit, commitment to purchase obligations, remarketing agreement, reimbursement agreement, tender agreement, and any other transaction to provide security to assure timely payment of any bond, and may pledge and create a statutory lien on 1 or more of the following for timely payment of the bonds or payment of any obligations of the public corporation under any of the foregoing:

(i) Proceeds of additional security provided to assure timely payment of the bonds.

(ii) Proceeds of bonds.

(iii) Earnings on proceeds of bonds or other funds held for payment of bonds.

(iv) Revenues.

(b) If the bonds are additionally secured as provided in subsection (1)(a), authorize, from the proceeds of the bonds or other available funds, payment of the cost of issuing the bonds, which may include, but is not limited to, fees for placement, fees or charges for insurance, letters of credit, lines of credit, remarketing agreements, reimbursement agreements, tender agreements, or purchase or sales agreements or commitments, or other agreements to provide security to assure timely payment of bonds.

(c) Authorize or provide for an officer of the public corporation, but only within limitations which shall be contained in the ordinance of the governing body authorizing the bonds, to do 1 or more of the following:

(i) Sell and deliver and receive payment for bonds.

(ii) Refund bonds by the delivery of new bonds, whether or not the bonds to be refunded have matured or are subject to redemption prior to maturity on the date of delivery of the refunding bonds.

(iii) Buy and hold without cancellation or sell bonds so issued.

(iv) Deliver bonds partly to refund bonds and partly for any other authorized purpose.

(v) Approve interest rates or methods for fixing interest rates, prices, discounts, maturities, principal amounts, denominations, dates of issuance, interest payment dates, optional or mandatory redemption or tender rights, obligations to be exercised by the public corporation or the holder of the bond, the place of delivery and payment, and other matters and procedures necessary to complete the transactions authorized.

(2) If the bonds are additionally secured as provided in subsection (1)(a) and notwithstanding other provisions of this act, the bonds, including an obligation of the public corporation to a provider of additional security under subsection (1)(a) relating to that additional security, may be made payable on demand or prior to maturity at the option of the public corporation or the holder, or made subject to a tender, right, or obligation, at the time and in the manner determined by the governing body in the ordinance authorizing the bonds. If payable on demand or prior to maturity at the option of the public corporation or the holder, or if subject to a tender, right, or obligation, the bonds, including an obligation of the public corporation to a provider of additional security under subsection (1)(a) relating to that additional security, may bear no rate of interest or bear interest at a rate or rates which may be variable and which shall not be subject to the limitations provided in section 12, may be in a form with or without interest coupons, and may be sold at discount which shall not be subject to the limitation on discount provided in section 12 all as provided by the governing body in the ordinance authorizing the bonds.

(3) Bonds which are additionally secured under subsection (1)(a), and which are tendered by the holder or considered tendered as provided in this subsection to the public corporation, to the trustee appointed pursuant to section 38, or to any other entity appointed pursuant to an agreement authorized by subsection (1)(a), shall not be redeemed by an optional or mandatory tender, but may be sold or remarketed by the public corporation, by the trustee appointed pursuant to section 38, or by any other entity appointed pursuant to an agreement authorized by subsection (1)(a) without the sale or remarketing being a reissuance or refunding. If so provided by the governing body in the ordinance authorizing the bonds, bonds which are additionally secured under the provisions of subsection (1)(a) may contain provisions under which the holders of the bonds may be considered to have tendered the bonds pursuant to the ordinance and the bonds. For purposes of determining the aggregate authorized amount of bonds outstanding, bonds which are considered tendered are no longer outstanding and may be replaced without redemption by bonds which may be sold or remarketed as provided in this subsection without the sale or remarketing being a reissuance or refunding.

(4) The remarketing or resale of tendered bonds or the incurrence of an obligation of the public corporation pursuant to an agreement providing additional security under subsection (1)(a) is not subject to referendum by the qualified electors of the public corporation pursuant to section 33 and may be sold or remarketed in the case of tendered bonds, or incurred in the case of an obligation pursuant to an agreement providing additional security under section 7a(1)(a), at public or private sale as determined by the governing body in the ordinance authorizing the bonds. The remarketing or resale of tendered bonds is not subject to the prior approval of the department of treasury as provided in this act if the original issue of bonds to which the tendered bonds or agreement relates was approved or excepted from approval by the department of treasury.

(5) The provisions of this section specify general authority under this act, may be exercised notwithstanding a charter provision to the contrary, and may be included in bonds issued before the effective date of this section which bonds are ratified and validated by this section.

(6) The amendatory act which added this section shall not be construed to expand or diminish the authority of a public corporation to pledge its full faith and credit without a referendum of the qualified electors.


**141.108 Lien on revenue in favor of bondholders.**

Sec. 8.

There shall be created in the authorizing ordinance a lien, by this act made a statutory lien, upon the net revenues pledged to the payment of the principal of and interest upon such bonds, to and in favor of the holders of such bonds and the interest coupons pertaining thereto, and each of such holders, which liens shall be a first lien upon such net revenues, except where there exists a prior lien or liens then such new lien shall be subject thereto.

**141.109 Statutory lien on net revenues; duration; enforcement.**

Sec. 9.

The net revenues which are pledged shall be and remain subject to the statutory lien until the payment in full of the principal of and interest upon the bonds unless the authorizing ordinance provides for earlier discharge of the lien by substitution of other security. The holder of the bonds, representing in the aggregate not less than 20% of the entire issue then outstanding, may protect and enforce the statutory lien and enforce and compel the performance of all duties of the officials of the borrower, including the fixing of sufficient rates, the collection of revenues, the proper segregation of revenues, and the proper application of the revenues. The statutory lien shall not be construed to give a holder or owner of a bond or coupon authority to compel the sale of the public improvement, the revenues of which are pledged to the improvement.

**141.110 Receiverships for public improvements.**

Sec. 10.

If there be any default in the payment of the principal of or interest upon any of said bonds, any court having jurisdiction in any proper action may appoint a receiver to administer and operate on behalf of the borrower, under the direction of said court, any public improvement the revenues of which are pledged to the payment of such principal and interest; and by and with the approval of said court, to fix and charge rates and collect revenues sufficient to provide for the payment of any bonds or other obligations outstanding against the revenues of said public improvement and for the payment of the expenses of operating and maintaining the same and to apply the income and revenues of said public improvement in conformity with this act and the ordinance providing for the issuance of such bonds and in accordance with such orders as the court shall make.

**141.111 Bonds; application of other laws and charters.**

Sec. 11.

The bonds authorized hereunder shall not be subject to any limitations or provisions contained in the laws of the state of Michigan, pertaining to public corporations or in the charters of public corporations, as now in force or hereafter amended, other than as provided for in this act.

**141.112 Bonds; discount; sale price; interest; competitive or negotiated sale; notice; publication.**

Sec. 12.

(1) Bonds issued under this act may be sold at a discount but may not be sold at a price that would make the interest cost on the money borrowed after deducting any premium or adding any discount exceed 10% per annum or the maximum rate permitted by the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, whichever is greater, and may bear a stated rate of interest or no rate of interest.

(2) A public corporation may sell bonds at a competitive sale or a negotiated sale as determined in the authorizing ordinance. If a public corporation determines to sell a bond at a negotiated sale, the governing body shall expressly state the method and reasons for choosing a negotiated sale instead of a competitive sale in the resolution or ordinance authorizing the issuance or sale of the bonds.

(3) Bonds sold at a competitive sale shall not be sold until notice by publication at least 7 days before the sale in a publication printed in the English language and circulated in this state that carries as a part of its regular service notices of the sale of municipal bonds.

(4) A public corporation shall award a bond sold at a competitive sale to the bidder whose bid meets all specifications and requirements and results in the lowest interest cost to the public corporation, unless all bids are rejected.

(5) A public corporation may accept bids for the purchase of a bond made in person, by mail, by facsimile, by electronic means, or by any other means authorized by the public corporation.


**141.112a Bonds subject to revised municipal finance act.**

Sec. 12a.

(1) Bonds issued under this act for which a municipality pledges its full faith and credit are also subject to the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, except for part VI and section 503 of the revised municipal finance act, 2001 PA 34, MCL 141.2601 to 141.2613, and MCL 141.2503.

(2) For bonds issued under this act, the first principal amount maturity date or mandatory redemption date shall be not later than 5 years after the date of issuance and some principal amount shall mature or be subject to mandatory redemption in each subsequent year of the term of the bond.

(3) As used in this section, "municipality" means that term as defined in the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821.

(4) Except as otherwise provided in this act, bonds subject to this act are not subject to the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821.

**141.116 Bonds; use of sale proceeds; cancellation of bonds acquired by purchase; payment of capitalized interest.**

Sec. 16.

Money received from the sale of bonds shall be used solely for the payment of project costs. An unexpended balance of the proceeds of the sale of any bonds remaining after the completion of the project for which issued, may be used for the improvement, enlargement, or extension of the public improvement, if the use is approved by the department of treasury. Any remaining balance shall be paid immediately into the bond and interest redemption deposit account for the bonds, and the money shall be used only for meeting bond reserve requirements or for the redemption or purchase, at not more than the fair market value, of outstanding bonds of the issue from which the proceeds were derived. Bonds acquired by purchase shall be canceled and shall not be reissued. Each ordinance shall state the period for which interest is to be capitalized, and the amount of reserves to be funded from the bonds. Upon receipt of the proceeds of the bonds, there shall be set aside, in the bond and interest redemption deposit account, the amount of interest that will accrue during the period at the interest rate specified in the bonds and the amount required to be set aside in the bond and interest redemption account. Money set aside shall be used solely for the payment of the capitalized interest or to satisfy bond reserve requirements.

**141.118 Charges for services; providing medical care without charge or at reduced rates.**

Sec. 18.

(1) Except as provided in subsection (2), free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality. The reasonable cost and value of any service rendered to a public corporation, including the borrower, by a public improvement shall be charged against the public corporation and shall be paid for as the service accrues from the public corporation's current funds or from the proceeds of taxes which the public corporation, within constitutional limitations, is hereby authorized and required to levy in an amount sufficient for that purpose, or both, and those charges, when so paid, shall be accounted for in the same manner as other revenues of the public improvement.

(2) A public improvement that is a hospital or other health care facility may provide medical care to the indigent without charge or at reduced rates and may provide medical care without charge to comply with conditions for the receipt of a grant or contribution from a public or private donor.

**141.119 Additional bonds.**

Sec. 19.

(1) A borrower issuing bonds for any public improvement pursuant to this act, at the time of the authorization of the bonds, may provide in the authorizing ordinance for the issuance of additional bonds of equal standing for its completion in the event the bonds first authorized shall prove to be insufficient therefor, or for its subsequent enlargement, extension, improvement, or repair, or to refund part or all of 1 or more outstanding issues, or for any of these purposes, which additional bonds may be issued and be negotiated from time to time as the proceeds

therefrom may be necessary for that purpose. The bonds, when sold, shall have equal standing with those issued in the first instance. The additional bonds may be issued in separate series from the original bonds, with different dates of issuance, and with changes in the form thereof which are consistent with that equality of standing.

(2) The provisions of section 7 providing for annual installments, the amounts of the installments, and the due date of the first installment shall not be controlling as to each additional series whether the additional series is of equal or subordinate standing. Instead, section 7 shall be applied to the combined annual principal installments and interest at actual rates on outstanding bonds and at the maximum authorized rate on the additional series. Additional bonds of equal standing shall not be issued unless authorized as provided in this section.

**141.120 Revenue refunding bonds.**

Sec. 20.

(1) If a borrower has outstanding any bonds issued under this act, it may issue and negotiate new bonds under this act for the purpose of providing for the retirement of those outstanding bonds, in whole or in part. The new bonds shall be designated "revenue refunding bonds". Except as otherwise provided in the refunding ordinance, revenue refunding bonds shall be secured to the same extent and shall have the same source of payment as the bonds to be refunded, or may be payable from earnings on investments held in trust to pay refunded bonds for the period of time specified in the ordinance authorizing the bonds or from any other source provided in the ordinance authorizing the refunding bonds. The revenue refunding bonds may be issued to include the amount of any premium to be paid upon the calling of the bonds to be refunded, interest to the maturity or the earliest or any subsequent redemption date of the bonds to be refunded, and the cost of issuing the refunding bonds, or if the bonds are not callable, any premium necessary to be paid in order to secure the surrender of the bonds to be refunded. This section shall not be construed as providing for the redemption of noncallable unmatured bonds without the consent of the holder or holders of the bonds.

(2) The borrower may issue bonds partly to refund outstanding bonds, which portion shall be considered a revenue refunding bond for purposes of this section, and partly for any other purpose contemplated by this act but which would not include loans for private mortgage purposes.

(3) Bonds issued to refund outstanding bonds and bonds issued partly to refund outstanding bonds and partly for any other purposes may be issued in a principal amount and may bear an interest rate that is greater than, the same as, or lower than the principal amount and interest rate of the bonds to be refunded. The refunding bonds and the bonds issued pursuant to subsection (2) may be sold as provided in section 12 or, to the extent the bond is issued to refund an outstanding bond, may be exchanged for the obligations to be refunded by the obligations, and if sold, the proceeds attributable to the purpose of refunding an outstanding obligation shall be deposited in a bank, trust company, savings and loan association, or credit union in a special trust account or escrow account to be used only for the payment at maturity or redemption or purchase of the outstanding bonds. If refunding bonds or bonds issued pursuant to subsection (2) are to be issued

and sold for the sole or partial purpose of refunding unmatured noncallable bonds, the latter shall be surrendered and canceled at the time of the delivery to the purchaser of the refunding bonds, or the proceeds of the bonds attributable to the purpose of refunding an outstanding obligation and sufficient other funds shall be deposited in trust to pay principal and interest to maturity or principal, interest, and redemption premium to the earliest or any subsequent redemption date together with irrevocable instructions to the paying agent to call the bonds for redemption on that date. The borrower may deposit in trust direct obligations of, or obligations the principal and interest of which are unconditionally guaranteed by, the United States that do not permit redemption at the option of the issuer and the principal and interest on which when due, without reinvestment, provide funds sufficient to pay principal, interest, and call premium, when due, on the bonds being refunded.

**141.121 Rates for services; sufficiency; fixing and revising; pledge for payment of bonds; charges for services as lien on premises; certification of delinquent charges; notice of tenants' responsibility for payment of charges; cash deposit; discontinuance of service to enforce payment of charges; validation of enforcement methods included in ordinance.**

Sec. 21.

(1) Rates for services furnished by a public improvement shall be fixed before the issuance of the bonds. The rates shall be sufficient to provide for all the following:

(a) The payment of the expenses of administration and operation and the expenses for the maintenance of the public improvement as may be necessary to preserve the public improvement in good repair and working order.

(b) The payment of the interest on and the principal of bonds payable from the public improvements when the bonds become due and payable.

(c) The creation of any reserve for the bonds as required in the ordinance.

(d) Other expenditures and funds for the public improvement as the ordinance may require.

(2) The rates shall be fixed and revised by the governing body of the borrower so as to produce the amount described in subsection (1). The borrower shall covenant and agree in the ordinance authorizing the issuance of the bonds and on the face of each bond to maintain at all times the rates for services furnished by the public improvement sufficient to provide for the amount described in subsection (1). Rates pledged for the payment of bonds that are fixed and established pursuant to a contract or lease shall not be subject to revision or change, except in the manner provided in the lease or contract.

(3) Charges for services furnished to a premises may be a lien on the premises, and those charges delinquent for 6 months or more may be certified annually to the proper tax assessing officer or agency who shall enter the lien on the next tax roll against the premises to which the services shall have been rendered, and the charges shall be collected and the lien shall be enforced in the same manner as provided for the collection of taxes assessed upon the roll and the enforcement

of the lien for the taxes. The time and manner of certification and other details in respect to the collection of the charges and the enforcement of the lien shall be prescribed by the ordinance adopted by the governing body of the public corporation. However, in a case when a tenant is responsible for the payment of the charges and the governing body is so notified in writing, the notice to include a copy of the lease of the affected premises, if there is one, then the charges shall not become a lien against the premises after the date of the notice. In the event of filing of the notice, the public corporation shall render no further service to the premises until a cash deposit in a sum fixed in the ordinance authorizing the issuance of bonds under this act is made as security for the payment of the charges. In addition to any other lawful enforcement methods, the payment of charges for water service to any premises may be enforced by discontinuing the water service to the premises and the payment of charges for sewage disposal service or storm water disposal service to a premises may be enforced by discontinuing the water service, the sewage disposal service, or the storm water disposal service to the premises, or any combination of the services. The inclusion of these methods of enforcing the payment of charges in an ordinance adopted before February 26, 1974, is validated.

**141.122 Accounting of revenues; order of priority; disposition of surplus.**

Sec. 22.

(1) In the authorizing ordinance the governing body of the borrower shall provide that the revenues of the public improvement be accounted for separately from the other funds and accounts of the borrower in the following order of recorded priority:

(a) After provision for the payment for the next succeeding period of all current expenses of administration and operation and the current expenses for that period for maintenance as may be necessary to preserve the public improvement in good repair and working order.

(b) There shall be next set aside a sum sufficient to provide for the payment of the principal of and the interest upon all bonds payable from those revenues, as and when the bonds become due and payable. This account shall be designated "bond and interest redemption account". In the event that the revenues of any operating year over and above those necessary for the operation and maintenance expenses shall be insufficient to pay the principal of and interest on the bonds maturing in any operating year, then an additional amount sufficient to pay the principal and interest shall be set aside out of the revenues of the next succeeding operating year, after provision for the expenses of operation and maintenance. In respect to the allocation and use of money in the bond and interest redemption account, due recognition shall be given as to priority rights, if any, between different issues or series of outstanding bonds. The public corporation may provide by ordinance that a reasonable excess amount shall be set aside in the bond and interest redemption account from time to time so as to produce and provide a reserve to meet any possible future deficiencies.

(c) Next there shall be set aside, in the manner and priority provided by the ordinance, the sum or sums necessary for the additional accounts as may be required.

(2) Revenues remaining, after satisfaction of subsection (1), at the end of any operating year shall be considered surplus and shall be disposed of by the governing body as provided in this act.

### 141.124 Money in several accounts of public improvement; separate deposit account; investment.

Sec. 24.

(1) Money in the several accounts of the public improvement shall be deposited as designated by the governing body of the borrower. Money in the several accounts of the public improvement, except money in the bond and interest redemption account and money derived from the proceeds of sale of the bonds each of which shall be kept in a separate deposit account, may be kept in 1 deposit account. In that case the money in the combined deposit accounts shall be allocated on the books and records of the borrower to the various accounts in the manner provided in the authorizing ordinance. The governing body of the borrower may provide that the money in the several accounts of the public improvement may be kept in separate depository accounts. The money in the bond and interest redemption account shall be accounted for separately.

(2) Subject to the limitations and conditions provided in the authorizing ordinance, money in the several accounts of the public improvement may be invested in accordance with the public corporation's investment policy adopted by the legislative body or governing body of the public corporation under 1943 PA 20, MCL 129.91 to 129.96.

### 141.127 Issuance of bonds by public corporation; applicable laws.

Sec. 27.

A public corporation issuing bonds under this act is subject to all of the following:

(a) If the public corporation issuing the bonds meets the requirements of qualified status under section 303(3) of the revised municipal finance act, 2001 PA 34, MCL 141.2303, the public corporation complies with section 319(1) of the revised municipal finance act, 2001 PA 34, MCL 141.2319.

(b) If the public corporation issuing the bonds does not meet the requirements of qualified status under section 303(3) of the revised municipal finance act, 2001 PA 34, MCL 141.2303, the public corporation meets the requirements of section 303(7) and (8) and section 319(2) of the revised municipal finance act, 2001 PA 34, MCL 141.2303 and 141.2319.

(c) Section 321 of the revised municipal finance act, 2001 PA 34, MCL 141.2321.

### 141.128 Effect of approval permitting issuance of bonds.

Sec. 28.

Qualification or approval to issue obligations under the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, that permits the issuance of bonds under this act shall not be considered an approval of the legality of issuing bonds under this act.

## 141.131 Redemption of bonds before maturity.

Sec. 31.

The governing body of the borrower authorizing bonds under this act may make provisions in the authorizing ordinance for the redemption before maturity of the bonds or a part of the bonds. In case of refunding, bonds of an issue less than all the outstanding bonds of the issue, shall not be called for redemption unless the borrower has on hand in its bond and interest redemption fund sufficient money to refund the bonds not otherwise appropriated or pledged, in excess of the amount of interest and principal maturing within the next 12 months from the redemption date.

## 141.133 Issuance of bonds without submitting proposition to voters for approval; notice of intent to issue bonds; petition requesting referendum; special election; verification and rejection of signatures; determining number of registered electors.

Sec. 33.

Unless otherwise provided in this act, the powers conferred upon public corporations by this act shall be exercised by their respective governing bodies and this act shall be construed as authorizing the issuance of bonds under this act without submitting the proposition for the approval of the proposition to the voters of the borrowers. Except in the case of refunding bonds or bonds issued to comply with an order of a court or an order or permit requirement of a state or federal agency of competent jurisdiction to prevent or limit pollution of the environment, the governing body shall publish a notice of intent to issue bonds. If within 45 days after the publication of the notice a petition, signed by not less than 10% or 15,000 of the registered electors, whichever is less, residing within the limits of the borrower, is filed with the clerk, or other recording officer, of the borrower, requesting a referendum upon the question of the issuance of the bonds, then the bonds shall not be issued until approved by the vote of a majority of the electors of the borrower qualified to vote and voting on the bonds at a general or special election. The notice shall be directed to the electors of the borrower, and, if the borrower is an authority, to the electors of its constituent public corporations, and shall be published in a newspaper which has general circulation in the territory of the borrower, and shall state the maximum amount of bonds to be issued, the purpose of the bonds, source of payment, right of referendum on the bonds, and other information the governing body determines necessary to adequately inform the electors of the nature of the issue. A special election called for this purpose shall not be included in a statutory or charter limitation as to the number of special elections to be called within a period of time. Signatures on the petition shall be verified by a person under oath, as the actual signatures of the persons whose names are signed to the petition, and the clerk, or other recording officer, of the borrower shall have the same power to reject signatures and petitions as city clerks pursuant to section 25 of Act No. 279 of the Public Acts of 1909, as amended, being section 117.25 of the Michigan Compiled Laws. The number of

registered electors in any borrower shall be determined by the township or city registration books, or both, or if the borrower is a village, then by the village registration books. Section 5(g) of Act No. 279 of the Public Acts of 1909, as amended, being section 117.5 of the Michigan Compiled Laws, relative to notice of intention to issue bonds, shall not apply to the authorization of the issuance of bonds under this act.

## 141.134 Liberal construction of act.

Sec. 34.

This act, being necessary for and to secure the public health, safety, convenience and welfare of the counties, cities, incorporated villages, townships, school districts, port districts, and metropolitan districts of the state of Michigan, shall be liberally construed to effect the purposes hereof.

## 141.138 Trustee; appointment; powers and duties; pledging of trust funds.

Sec. 38.

An ordinance authorizing the issuance of bonds under this act may provide for the appointment of a trustee with the powers and duties prescribed in the ordinance in respect to the bonds and the payment and security of the bonds including provision that funds, including the proceeds of bonds, which are trust funds under the ordinance, may be held in trust by the trustee for the primary benefit and payment of the holders of the bonds. These trust funds may also be pledged by the trustee pursuant to the ordinance to an entity providing additional security for the bonds pursuant to section 7a(1)(a).

**EXHIBIT 5**

CHI-1940093v3

# REVISED MUNICIPAL FINANCE ACT
## Act 34 of 2001

### Relevant Provisions

**141.2103 Definitions.**

Sec. 103.

As used in this act:

(a) "Assessed value", "assessed valuation", "valuation as assessed", and "valuation as shown by the last preceding tax assessment roll", or similar terms, used in this act, any statute, or charter as a basis for computing limitations upon the taxing or borrowing power of any municipality, mean the state equalized valuation as determined under the general property tax act, 1893 PA 206, MCL 211.1 to 211.155.

(b) "Chief administrative officer" means that term as defined in section 2b of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.422b.

(c) "Debt" means all borrowed money, loans, and other indebtedness, including principal and interest, evidenced by bonds, obligations, refunding obligations, notes, contracts, securities, refunding securities, municipal securities, or certificates of indebtedness that are lawfully issued or assumed, in whole or in part, by a municipality, or will be evidenced by a judgment or decree against the municipality.

(d) "Debt retirement fund" means a segregated account or group of accounts used to account for the payment of, interest on, or principal and interest on a municipal security.

(e) "Deficit" means a situation for any fund of a municipality in which, at the end of a fiscal year, total expenditures, including an accrued deficit, exceeded total revenues for the fiscal year, including any surplus carried forward.

(f) "Defined benefit plan" means a retirement program other than a defined contribution plan.

(g) "Defined contribution plan" means a retirement program that provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains, and losses credited or charged to the account, and any forfeitures of accounts of other participants that may be allocated to the participant's account.

(h) "Department" means the department of treasury.

(i) "Fiscal year" means a 12-month period fixed by statute, charter, or ordinance, or if not so fixed, then as determined by the department.

(j) "Governing body" means the county board of commissioners of a county; the township board of a township; the council, common council, or commission of a city; the council, commission, or board of trustees of a village; the board of education or district board of a school district; the board of an intermediate school district; the board of trustees of a community college district; the county drain commissioner or drainage board of a drainage district; the board of the district library; the legislative body of a metropolitan district; the port commission of a port district; and, in the case of another governmental authority or agency, that official or official body having general governing powers over the authority or agency.

(k) "Health care trust fund" means a trust or fund created in accordance with the public employee health care fund investment act, 1999 PA 149, MCL 38.1211 to 38.1216, or other state or federal statute, and used exclusively to provide funding for postemployment health care benefits for public employee retirees of a county, city, village, or township. A health care trust fund also includes the retiree health fund vehicle administered by the municipal employees retirement system described in the municipal employees retirement act of 1984, 1984 PA 427, MCL 38.1501 to 38.1555, for a county, city, village, or township that has adopted the municipal employee retirement system to provide funding for postemployment health care benefits for public employee retirees.

(l) "Municipal security" means a security that when issued was not exempt from this act or former 1943 PA 202 by the provisions of this act or by former 1943 PA 202 or by the provisions of the law authorizing its issuance and that is payable from or secured by any of the following:

(i) Ad valorem real and personal property taxes.

(ii) Special assessments.

(iii) The limited or unlimited full faith and credit pledge of the municipality.

(iv) Other sources of revenue described in this act for debt or securities authorized by this act.

(m) "Municipality" means a county, township, city, village, school district, intermediate school district, community college district, metropolitan district, port district, drainage district, district library, or another governmental authority or agency in this state that has the power to issue a security. Municipality does not include this state or any authority, agency, fund, commission, board, or department of this state.

(n) "Outstanding security" means a security that has been issued, but not defeased or repaid, including a security that when issued was exempt from this act or former 1943 PA 202, by the provisions of this act or by former 1943 PA 202 or by the provisions of the law authorizing its issuance.

(o) "Qualified status" means a municipality that has filed a qualifying statement under section 303 and has been determined by the department to be qualified to issue municipal securities without further approval by the department.

(p) "Refunding security" means a municipal security issued to refund an outstanding security.

(q) "Retirement program" means a program of rights and obligations which a county, city, village, or township establishes, maintains, or participates in and which, by its express terms or as a result of surrounding circumstances, does 1 or more of the following:

(i) Provides retirement income to participants.

(ii) Results in a deferral of income for periods extending to the termination of covered employment or beyond.

(r) "Security" means an evidence of debt such as a bond, note, contract, obligation, refunding obligation, certificate of indebtedness, or other similar instrument issued by a municipality, which pledges payment of the debt by the municipality from an identified source of revenue.

(s) "Sinking fund" means a fund for the payment of principal only of a mandatory redemption security.

(t) "Taxable value" means the taxable value of the property as determined under section 27a of the general property tax act, 1893 PA 206, MCL 211.27a.

(u) "Unfunded accrued health care liability" means the difference between the assets and liabilities of a health care trust fund as determined by an actuarial study according to the most recent governmental accounting standards board's applicable standards.

(v) "Unfunded pension liability" means the amount a defined benefit plan's liabilities exceed its assets according to the most recent governmental accounting standards board's applicable standards.

**141.2303 Annual audit report and qualifying statement; filing by municipality; compliance requirements; determination; correction of noncompliant requirements; reconsideration; order granting exception from prior approval.**

Sec. 303.

(1) Each municipality shall file an audit report annually with the department within 6 months from the end of its fiscal year or as otherwise provided in the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a.

(2) Accompanying the audit report described in subsection (1), a municipality shall file a qualifying statement, on a form and in the manner provided by the department, which shall be certified by the chief administrative officer. Within 30 business days of the receipt of the qualifying statement, the department shall determine if the municipality complies with the requirements of subsection (3). If the department determines that the municipality complies with the provisions of subsection (3) or if the department fails to notify the municipality of its determination under this subsection within 30 business days of receipt of the qualifying

statement, the municipality may proceed to issue municipal securities under this act without further approval from the department until 30 business days after the next qualifying statement is due or a new determination is made by the department, whichever occurs first.

(3) To qualify to issue municipal securities without further approval from the department, the municipality shall be in material compliance with all of the following requirements, as determined by the department:

(a) The municipality is not operating under the provisions of the local government and school district fiscal accountability act.

(b) The municipality did not issue securities in the immediately preceding 5 fiscal years or current fiscal year that were authorized by either the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942, other than a security issued for a loan authorized under section 3(2)(a) of the emergency municipal loan act, 1980 PA 243, MCL 141.933, or the fiscal stabilization act, 1981 PA 80, MCL 141.1001 to 141.1011.

(c) The municipality was not required by the terms of a court order or judgment to levy a tax in the preceding fiscal year. For purposes of this subdivision, the department may determine that a court order or judgment to levy a tax is not material if it did not have an adverse financial impact on the municipality.

(d) The most recent audit report, as required by the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, was filed with the department within 6 months from the end of the fiscal year of the municipality.

(e) The debt retirement fund balance for any municipal security that is funded from an unlimited tax levy does not exceed 150% of the amount required for principal and interest payments due for that municipal security in the next fiscal year.

(f) The municipality is not currently exceeding its statutory or constitutional debt limits.

(g) The municipality has no outstanding securities that were not authorized by statute.

(h) The municipality is not currently and during the preceding fiscal year was not in violation of any provisions in the covenants for an outstanding security.

(i) The municipality was not delinquent more than 1 time in the preceding fiscal year in transferring employee taxes withheld to the appropriate agency, transferring taxes collected as agent for another taxing entity to that taxing unit, or making all required pension, retirement, or benefit plan contributions.

(j) The most recent delinquent property taxes of the municipality, without regard to payments received from the county under the general property tax act, 1893 PA 206, MCL 211.1 to 211.155, did not exceed 18% of the amount levied.

(k) The municipality did not submit a qualifying statement or an application for any other municipal security in the preceding 12 months that was materially false or incorrect.

(l) The municipality is not in default on the payment of any debt, excluding industrial development revenue bonds issued under the industrial development revenue bond act of 1963, 1963 PA 62, MCL 125.1251 to 125.1267, economic development corporation bonds issued under the economic development corporations act, 1974 PA 338, MCL 125.1601 to 125.1636, bonds issued by a local hospital finance authority for a private hospital under the hospital finance authority act, 1969 PA 38, MCL 331.31 to 331.84, or any other debt for which the municipality is not financially liable.

(m) The municipality did not end the immediately preceding fiscal year with a deficit in any fund, unless the municipality has filed a financial plan to correct that deficit condition that is acceptable to the department.

(n) The municipality has not been found by a court of competent jurisdiction to be in violation of any finance or tax-related state or federal statutes during the preceding fiscal year.

(o) The municipality has not been determined by the department to be in violation of this act during the preceding fiscal year.

(p) The municipality did not issue a refunding security in the preceding fiscal year to avoid a potential default on an outstanding security.

(4) If a municipality is notified within 30 business days of the filing of the qualifying statement that it does not comply with 1 or more of the requirements of subsection (3), the municipality may correct the noncompliant requirements and request a reconsideration of the determination from the department as provided in subsection (5).

(5) A municipality may request a reconsideration of the determination from the department. That request shall indicate the requirements that the department determined the municipality to be not in compliance with and the action taken by the municipality to correct the noncompliance. Within 30 business days of the receipt of the request for reconsideration, the department shall determine if the municipality complies with the requirements of subsection (3) or, if the department fails to notify the municipality of its determination under this subsection within 30 business days of receipt of the request for reconsideration, the municipality will be granted qualified status.

(6) If a municipality is notified within 30 business days after filing a request for reconsideration that it does not comply with the requirements of subsection (3), the municipality shall not issue municipal securities under this act without the prior written approval of the department to issue a municipal security as provided in subsections (7) and (8).

(7) If a municipality has not been granted qualified status, the municipality must obtain, for each municipal security, the prior written approval of the department to issue a municipal security. To request prior written approval to issue a municipal security, the municipality shall submit an

application and supporting documentation to the department on a form and in a manner prescribed by the department, which shall be certified by the chief administrative officer. A filing fee equal to 0.03% of the principal amount of the municipal security to be issued, but not less than $800.00 and not greater than $2,000.00 as determined by the department, shall accompany each application. If the qualifying statement required by subsection (2) was received by the department more than 6 months after the end of the municipality's fiscal year, a late fee of $100.00 shall accompany the first application filed after that date. Within 30 business days of receiving an application, the fee, and supporting documentation from a municipality, the department shall make a determination whether the municipality has met all of the following requirements:

(a) Has indicated the authority to issue the municipal security requested.

(b) Is projected to be able to repay the municipal security when due.

(c) Has filed information with the department indicating compliance with the requirements of subsection (3) or adequately addressed any noncompliance with subsection (3) as determined by the department.

(d) If required by the department, has obtained an investment grade rating for the municipal security or has purchased insurance for payment of the principal and interest on the municipal security to the holders of the municipal security, or has otherwise enhanced the creditworthiness of the municipal security.

(8) If the department determines that the requirements in subsection (7) have been met, the department shall approve the issuance of the proposed municipal security. If the department determines that the requirements in subsection (7) have not been met, the department shall issue a notice of deficiency to the municipality that prevents the issuance of the proposed municipal security. The notice of deficiency shall state the specific deficiencies and problems with the proposed issuance. After the deficiencies and problems have been addressed as determined by the department, the department shall approve the issuance of the proposed municipal security.

(9) A determination by the department that a municipality has been granted qualified status constitutes an order granting exception from prior approval under former 1943 PA 202, of that municipality's securities.

**141.2305 Issuance of municipal security; interest rate; sale at discount; rating; maturity; principal as interest.**

Sec. 305.

(1) A municipal security authorized by law to be issued by a municipality may, notwithstanding the provisions of a charter, bear no interest as provided in this section or a rate of interest not to exceed a maximum rate established by the governing body of the issuing municipality as set forth in its resolution or ordinance authorizing the issuance of the municipal security, which rate shall not exceed 18% per annum or a per annum rate determined by the department at the request

of the municipality, whichever is higher. In making its determination, the department shall establish a rate that shall bear a reasonable relationship to 80% of the adjusted prime rate determined by the department under section 23 of 1941 PA 122, MCL 205.23. Except as otherwise provided in this section, the rate determined by the department shall be conclusive as to the maximum rate of interest permitted for a municipal security issued under this act.

(2) Except as provided in subsection (3), a municipal security issued under this act shall not be sold at a discount exceeding 10% of the principal amount of the municipal security. The amortization of the discount shall be considered interest and shall be within the interest rate limitation set forth in subsection (1).

(3) A municipal security may be sold at a discount exceeding 10% of the principal amount of the municipal security only if 1 or more of the following conditions apply, as determined by the department:

(a) The sale will result in the more even distribution for the municipality of total debt service on proposed and outstanding municipal securities.

(b) The sale will result in an interest cost savings when compared to the best available alternative that does not include a municipal security being sold at a discount exceeding 10% of the principal amount.

(c) The issuance is based on the availability of specific revenues previously pledged for another purpose and lawfully available for this purpose.

(d) The municipal security is issued to this state or the federal government to secure a loan or agreement.

(e) The municipal security is issued pursuant to section 518.

(4) A municipal security issued in accordance with subsection (3)(a), (b), or (c) shall be rated investment grade by a nationally recognized rating agency or have insurance for payment of the principal and interest on the municipal security to the holders of the municipal security.

(5) Notwithstanding any other provision of this section, a municipal security meeting the requirements of subsection (3) that is a refunding security shall not have a maturity that exceeds the maturity of the existing municipal security.

(6) Not more than 25% of the total principal amount of any authorized issue of a municipal security shall meet the qualifications under subsection (3)(a), (b), and (c).

(7) A municipal security may bear no interest if sold in accordance with a federal program by which the holder of the municipal security, as a result of holding the municipal security, may declare a credit against a federal tax.

(8) A municipal security may bear no interest and appreciate as to principal amount if it meets the requirements of subsections (3), (4), and (6). The accreted principal amount of a municipal security shall be considered interest and shall be within the interest rate limitations provided in subsection (1).

**141.2319 Document to be filed by municipality; failure to comply with subsection (1) or (2).**

Sec. 319.

(1) Within 15 business days of completing the issuance of any municipal security qualified under section 303(3), the municipality shall file a copy of all of the following with the department in a form and manner prescribed by the department:

(a) A copy of the municipal security.

(b) A proof of publication of the notice of sale, if applicable.

(c) A copy of the award resolution or certificate of award including a detail of the annual interest rate and call features on the municipal security.

(d) A copy of the legal opinion regarding the legality and tax status of the municipal security.

(e) A copy of the notice of rating of the municipal security received from a recognized rating agency, if any.

(f) A copy of the resolution or ordinance authorizing the issuance of the municipal security.

(g) A copy of the official statement, if any.

(h) For a refunding security, documentation indicating compliance with section 611.

(i) A filing fee equaling 0.02% of the principal amount of the municipal security issued, but in an amount not less than $100.00 and not greater than $1,000.00, as determined by the department.

(j) If the qualifying statement required by section 303(2) was received by the department more than 6 months after the end of the municipality's fiscal year, a late fee of $100.00 with the first filing thereafter.

(k) For a municipal security issued under section 305(2), documentation indicating compliance with section 305(2).

(2) Within 15 business days of completing the issuance of any municipal security approved under section 303(7), the municipality shall file all of the following with the department in a form and manner prescribed by the department:

(a) A copy of the municipal security.

(b) A proof of publication of the notice of sale, if applicable.

(c) A copy of the award resolution including a detail of the annual interest rate and call features on the municipal security.

(d) A copy of the legal opinion regarding the legality and tax status of the municipal security.

(e) A copy of the notice of rating of the municipal security received from a recognized rating agency, if any.

(f) A copy of the resolution or ordinance authorizing the issuance of the municipal security.

(g) A copy of the official statement, if any.

(h) For a refunding security, documentation indicating compliance with section 611.

(i) For a municipal security issued under section 305(2), documentation indicating compliance with section 305(2).

(3) The failure to comply with subsection (1) or (2) does not invalidate any of the securities issued or reported under this act.