# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## MOTION TO EXCLUDE CERTAIN OF THE EXPERT OPINIONS OF MARTHA KOPACZ UNDER FEDERAL RULE OF EVIDENCE 702

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") submit this motion (the "Motion to Exclude") to exclude portions of the expert opinions of Martha Kopacz, which were disclosed in her expert report and during her deposition.[1]  In support of their motion, Syncora respectfully states as follows:

## INTRODUCTION

1.     Ms. Kopacz is a well-respected and deeply-experienced restructuring professional.  She has an impressive resume that details her extensive Chapter 11 expertise — experience that includes her participation in over 100 consulting and restructuring engagements representing companies, debtors, investors, creditor committees, banks, and Chapter 11 Trustees, many of which are very prominent.

---

[1] Ms. Kopacz's expert report is attached as Exhibit 6A.  The relevant excerpts from Ms. Kopacz's deposition are attached as Exhibit 6B.

2. Given Ms. Kopacz's well-deserved reputation as a hard-working and incredibly-capable restructuring professional, it is no surprise that she approached her assignment as the Court's feasibility expert in an industrious manner. Indeed, in just a few short months, Ms. Kopacz and her team conducted over two hundred interviews and fact-gathering meetings in an attempt to gain an understanding of Detroit's operations, the City's current situation, and the bankruptcy process. Based on this work, Ms. Kopacz and her team were able to produce a report that contains many helpful observations on the issues the City faces, and a variety of useful insights into the challenges of Detroit's bankruptcy. With respect to many of these observations and insights, Syncora is in full agreement.

3. Unfortunately, despite Ms. Kopacz's hard work and expertise, she and her team had an impossible task. To begin, she was operating under incredible time pressure — specifically, she had approximately 90 days to provide her expert report.[2]

4. In this case, the time pressures were particularly significant given that the City's forecasts were, in her view, "highly subjective,"[3] "convoluted," and "confusing."[4] As a result, she and her team spent more than two months simply

---

[2] Ex. 6B, Kopacz Dep. Tr. at 113:19-21.

[3] *Id*. at 160:15-17.

[4] *Id*. at 181:17-21.

trying to understand the forecasts, projections, and models that the City had created.[5]

5.     Unfortunately, the City did little to help Ms. Kopacz in her impossible task and, in fact, compounded her difficulties by its repeated failures to provide all requested information in a timely fashion.[6]  In fact, even as of the date of Ms. Kopacz's report, the City had still failed to satisfy all of Ms. Kopacz's outstanding information requests.[7]

6.     Further complicating matters was Ms. Kopacz's inexperience in the municipal finance realm.  Though Ms. Kopacz undoubtedly has experience in the Chapter 11 context, she has no experience forecasting municipal revenues and expenses.[8]  And, as she acknowledged, municipal budgeting is "significantly different" from forecasting for private entities.[9]

7.     Regrettably, the confluence of all of these factors requires the submission of the instant motion.  As the Court set out in its April 22, 2014 order appointing Ms. Kopacz, one of her principal tasks was to investigate "[w]hether

---

[5] *Id*. at 113:7-11.

[6] *Id.* at 325:9-17, 326:12-327:1.

[7] *Id.* at 21:20-22:3; Ex. 6A, Kopacz Report, Ex. 4.

[8] Ex. 6B, Kopacz Dep. Tr. at 149:14-16, 148:21-24.

[9] *Id*. at 40:9-16.

the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable."[10] Unfortunately, for a variety of reasons — many of which are the product of the impossible situation that Ms. Kopacz found herself in — Ms. Kopacz's report and deposition testimony indicate that she did not conduct a reliable assessment of the City's forecasts or assumptions and thus cannot satisfy Federal Rule of Evidence 702.

8.  *First*, Ms. Kopacz did <u>not</u> actually test the reasonableness of the majority of the assumptions in the City's forecasts.[11] Instead, Ms. Kopacz opined that the City's assumptions are reasonable when considered in the "aggregate."[12]

---

[10] *See* 6C, Dkt. No. 4215, Apr. 22, 2014 Order Appointing Expert Witness.

[11] Ex. 6B, Kopacz Dep. Tr. at 196:12-23 (assumptions surrounding assessable value per property); 201:9-24 (assumptions surrounding taxable value), 267:12-269:19 (assumptions surrounding employment growth), 275:21-23 (assumptions surrounding population), 283:21-284:11 (assumptions surrounding wagering revenues), 290:4-23 (assumptions surrounding property values), 291:3-12 (assumptions surrounding property tax collection), 291:13-24 (assumptions surrounding utility user tax revenues). Ms. Kopacz also testified that she did not test any of the City's underlying assumptions except where she specifically stated that she had done so in her report, which means that she did not test the assumptions surrounding (a) salaries and wages; (b) overtime; (c) benefits such as Social Security, (d) unemployment; (e) life insurance; (f) health benefits; (g) employee contributions to the pension plan and the Voluntary Employment Benefit Account; (h) litigation, workers' compensation, and insurance claims; (i) utilities; (j) purchased services; and (k) capital outlays. *Id.* at 320:2-18.

[12] *See, e.g., id.* at 223:12-22, 253:11-254:2, 267:7-11, 320:2-18.

But her report does not explain this apparent contradiction or show her work when it comes to her "reasonable in the aggregate" opinion.[13] And, of course, the fact that Ms. Kopacz failed to evaluate the City's material forecasting assumptions individually means that she could have no reliable basis to say that they were all "reasonable in the aggregate."

9. *Second*, when opining on the "reasonableness" of the forecasts for feasibility purposes, Ms. Kopacz did not make any determination regarding their reliability. In other words, she "didn't reach a conclusion about the quality of Ernst & Young's work"[14] or "independently verify all of the data on which the forecasts are built."[15] Nor did she evaluate the City's forecasting methodology for the City's various revenue streams.[16] Instead, Ms. Kopacz testified that she does not know what methodology, if any, underlies the City's forecasts and instead simply "accepted the [City's] methodology, whatever that may be."[17] Having

---

[13] *See e.g., id.* at 196:13-23 (testifying that she made no effort to validate any assumptions regarding assessed value per property parcel in the aggregate). *See generally* Ex. 6A, Kopacz Report (containing no analysis supporting Ms. Kopacz's assertion that all of the City's assumptions are "reasonable in the aggregate").

[14] Ex. 6B, Kopacz Dep. Tr. at 48:21-22.

[15] *Id.* at 178:2-9.

[16] *Id.* at 189:16-20.

[17] *Id.* at 190:8-11.

failed to rigorously evaluate (or even understand) the reliability of the City's forecasting methodology, Ms. Kopacz cannot herself offer a sound opinion on the "reasonableness of the City's forecasts."

10.     For all of these reasons, Ms. Kopacz failed to render a rigorous and reliable opinion regarding the reasonableness of the City's forecasts and underlying assumptions.  But even as it moves to exclude this portion of her report, Syncora would like to reiterate that it recognizes and appreciates the hard work of Ms. Kopacz and her team.  Nevertheless, Syncora's admiration for Ms. Kopacz — and its sympathy for the difficulties she encountered dealing with the City — do not excuse her from the requirements of Rule 702.  Accordingly, for the reasons herein, Syncora moves the Court to exclude Ms. Kopacz's opinions regarding the City's forecasts and underlying assumptions.

## JURISDICTION

11.     The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

12.     Syncora respectfully moves the Court to exclude Ms. Kopacz's opinions regarding the City's forecasts and underlying assumptions and enter an order substantially in the form of Exhibit 1 attached hereto.

## BACKGROUND

13.     The Court appointed Ms. Kopacz to review the City's forecasts for the "narrow[]" purpose of assessing the feasibility of the Plan of Adjustment and, in particular, to assess the "reasonableness" of the assumptions underlying the City's projections.[18]  Given the "extraordinary" speed of this bankruptcy case, she had less than ninety days to perform the work she was appointed to do. [19]

14.     As Ms. Kopacz began her work, she recognized that the forecasts on which the City seeks to base its Plan of Adjustment are "convoluted" and "confusing"[20] — *i.e.*, a "black box" that does not seek to provide a comprehensive forecast of all revenues available to the City.[21]  In fact, according to Ms. Kopacz,

---

[18] Ex. 6C, Dkt. No. 4215, Apr. 22, 2014 Order Appointing Expert Witness.

[19] Ex. 6B, Kopacz Dep. Tr. at 113:17-21.

[20] *Id*. at 181:17-21; *see also id.* at 111:9-10 ("I, again, have been really critical of how confusing they are.").

[21] Ex 6A, Kopacz Report at 26.

she had never seen any city "employ[] a methodology or an approach . . . like this one."[22]

15.    Due to the convoluted nature of the City's model, it "took a lot of time to learn what the City did" in preparing the forecasts.[23]  As she observed, the "projections are comprised of multiple forecasts, inclusive of hundreds of individual spreadsheets, prepared by many different individuals and then concatenated into what we all simply call the 'projections.'"[24]  Moreover, the different firms who supplied pieces of the forecasts used different "modeling approach[es]."[25]

---

[22] Ex. 6B, Kopacz Dep. Tr. at 182:14-17; *see also* Ex. 6A, Kopacz Report at 25 ("[T]he '10 Yr projections'; the '10 Yr/40 Yr projections,' and the 'Restructuring and Reinvestment Initiatives' form an unusual construct for a financial plan for an enterprise attempting to emerge from bankruptcy.").

[23] Ex. 6B, Kopacz Dep. Tr. at 165:16-18.

[24] Ex. 6A, Kopacz Report at 15.  *See also* Ex. 6B, Kopacz Dep. Tr. at 51:23-25 ("The Conway model is actually about 30 models together and each of those models is multiple Excel spreadsheets.").

[25] Ex. 6A, Kopacz Report at 15 n. 13 ("There were also differences in modeling approach used by Conway MacKenzie, Mr. Moore's firm, and Ernst & Young, the City's other financial advisor.").  *See also* Ex. 6B, Kopacz Dep. Tr. at 180 (agreeing that "the City did not employ a uniform approach in constructing the forecasts").

16.     Ms. Kopacz also faced resistance from the City and its outside consultants in obtaining the information necessary to perform her review.[26]  The resistance was so great, in fact, that at one point she was forced to seek assistance from the Court.[27]  As she explained in her deposition, she was having "trouble getting the working models" from Ernst & Young and the City's "counsel had requested to participate in all of [her] interviews."[28]  Her "team's relationships with Ernst & Young and Conway got frayed" to the point that "all of the parties [were] being called to [Judge Rosen's] chambers to be instructed to play nicely."[29]  Even more troubling, Ms. Kopacz revealed that during this meeting with Judge Rosen, the City, and its advisors then "discussed" how broad or narrow "her assessment of feasibility was or should be."[30]

17.     Though the City ultimately provided some of the information Ms. Kopacz requested, she had not received all the data that she requested as of her

---

[26] Ex. 6B, Kopacz Dep. Tr. at 325:9-17, 328:6-13.

[27] *Id.* at 325:9-17, 326:12-327:1.

[28] *Id*. at 328:6-13.

[29] *Id.* at 379:2-7; *see also id.* at 379:8-21 ("Judge Rosen initiated this meeting" and "it was like we need to have a conversation now.").

[30] *Id*. at 380:22-381:4 (explaining that there was a dispute with "Jones Day and me and the advisers about … how broad or narrow … [her] assessment of feasibility was and should be").

July 31, 2014 deposition.[31] Her expert report lists, for example, a dozen requests that were still outstanding at the time she submitted her report — including requests for(a) a "[r]econciliation of 10 Year Plan and City's Triennial Budget"; (b) stochastic or sensitivity analyses on the use of a 6.75% investment return assumption for GRS; and (c) "[a]ll pension plan sensitivity analyses."[32]

---

[31] *Id*. at 21:25-22:3; *see also id*. at 119:8-13 ("they're still open requests, so I haven't looked at that."). For example, Ms. Kopacz observed: "Phoenix has no visibility into the receptiveness of the financing sources to the proposed debt offering. To the degree the City is not able to procure anticipated Exit Financing in the amount or at a reasonable interest rate will materially impact the City's cash flow liquidity at its emergence from bankruptcy. As of the date of this Report, it appears that the assumed interest rate of 6% could be low for a high yield instrument like the proposed Exit Financing." Ex. 6A, Kopacz Report at 190. *See also id*. at 195 ("In the event that this financing is unavailable to the City on reasonable terms, is significantly lower in terms of facility amount, or is otherwise different than the assumptions in the POA, it is unlikely the City will have sufficient liquidity to operate and satisfy its obligations."). Other requests were fulfilled too late for her to conduct her analysis. As she observed with respect to the recently-executed CBAs, for example: "Phoenix has recently received the majority of negotiated CBAs, some of which have been fully approved by the State of Michigan, and some of which have been ratified but await the State's approval. Due to the timing of when Phoenix received these CBAs relative to our Report deadline, we have not fully reviewed each of these CBAs. To the degree that the final, agreed-upon terms of the respective CBAs contain aspects that are costlier to the City than the current CETs or contemplated in the projections, the City's liquidity could be negatively impacted. I am further concerned that the newly negotiated CBAs may not have sufficiently addressed the City's historic work rule issues." Ex. 6A, Kopacz Report at 187.

[32] Ex. 6A, Kopacz Report, Exhibit 4 (listing "outstanding requests" to Jones Day, Ernst & Young, and Conway MacKenzie).

18.     Ms. Kopacz's lengthy report reflects both her difficulties in grasping the City's forecasts and her failure to analyze the assumptions underlying them. Take, for example, pages 50 and 51 of her report. These two pages narratively describe the City's assumptions regarding future state revenue sharing. But they contain no analysis whatsoever of the reasonableness of those assumptions.

19.     Indeed, in reading pages 39 to 110 of Ms. Kopacz's report, one quickly sees that the vast bulk of these pages is given over to simply _describing_ the City's assumptions — rather than _analyzing_ those assumptions. After a few desultory efforts (see, for example, page 47 where she notes that the City's wage growth assumptions "appear reasonable," despite the fact that they are _far_ below the wage growth assumptions for the State), Ms. Kopacz lapses into almost purely narrative descriptions of the City's assumptions, occasionally punctuated by what she describes as her "sensitivity analyses," which are discussed in more detail below.

20.     Ms. Kopacz did not evaluate the reliability of the City's forecasts, did not test many of the assumptions that went into the forecasts (and indeed admitted that many of them are untestable), and was unable even to identify the methodology behind the forecasts — let alone vouch for its reliability. For all these reasons, Ms. Kopacz's opinions on feasibility and the reasonableness of the City's projections are unreliable and do not satisfy Rule 702.

11

## **LEGAL STANDARD**

21.     Under Rule 702 and *Daubert*, federal courts must serve as "gatekeep[ers]" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[33]  The burden is on the proponent of the expert evidence to satisfy each of Rule 702's requirements.[34]  Among other things, the proponent of expert testimony must demonstrate that (1) the proffered expert is "qualified by knowledge, skill, experience, training, or education" to offer the expert's opinions; (2) the proffered testimony is relevant to the issues at hand; and (3) that the testimony is based on "sufficient facts," is "the product of reliable principles and methods," and that those methods have been reliably applied to the facts of the case.[35]

22.     Rule 702 requires that the witness be "qualified as an expert by knowledge, skill, experience, training, or education[.]"  This is a case-specific and opinion-specific inquiry, because "an individual is not an expert in the abstract; expertise can only be judged within the context of a given case."[36]

---

[33] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[34] *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2000); *Daubert*, 509 U.S. at 592 n.10.

[35]  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 594–95.

[36] *Coffee v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 975 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (unpublished); *accord Berry v. City of Detroit*, 25

23. Under Rule 702 and *Daubert*, an expert's opinions may not be based on "subjective belief or unsupported speculation."[37]   In order to be admissible, expert testimony must be based on "'good grounds,' based on what is known."[38] The "court's gatekeeping function requires more than simply 'taking the expert's word for it.'"[39]   Rather, "the existence of sufficient facts and a reliable methodology is in all instances mandatory."[40]

24. Likewise, in order to satisfy Rule 702's relevance requirement, an expert's opinions must be "sufficiently tied to the facts of the case."[41]   Expert

---

F.3d 1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

[37] 509 U.S. at 590; *Tamraz*, 620 F.3d at 670.

[38] *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (E.D. Mich. 1995) (quoting *Daubert*, 509 U.S. at 590).

[39] *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

[40] *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (affirming exclusion of economist's testimony regarding future earnings because it "relied on several empirical assumptions that were not supported by the record").

[41]  *Daubert*, 509 U.S. at 591; *see also Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) ("there must be a connection between the [expert opinion] being offered and the disputed factual issues in the case in which the expert will testify.") (citation omitted).

testimony is inadmissible where "there is simply too great an analytical gap between the data and the opinion proffered."[42]

25.    It is "critical" that an expert's analysis meet these requirements at "every step."[43]  "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."[44]

## ARGUMENT

26.    As explained below, Ms. Kopacz's opinion testimony regarding the reasonableness of the City's forecasts and projections fails to satisfy the standards of Rule 702 and *Daubert* for three reasons.[45]

27.    *First*, Ms. Kopacz did not evaluate or test the vast majority of the assumptions in the City's forecasts.  Ms. Kopacz's failure to evaluate the relevant assumptions was not only contrary to the Court's direction, but it also meant that

---

[42] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[43] *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

[44]  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

[45] Syncora does not challenge Ms. Kopacz's over-arching opinion that the City will be able to achieve its forecasts.  Indeed, Syncora believes and will present evidence demonstrating that it is highly likely that the City will far exceed its forecasts because of the unreasonably-conservative assumptions its forecasters applied at each turn.  This motion is thus limited to her opinions that the forecasts and underlying assumptions are "reasonable."

14

she could not reliably opine on the reasonableness of the City's forecasts and projections.

28.    *Second*, Ms. Kopacz did not examine the reliability of the City's forecasts and projections.  In other words, Ms. Kopacz did not examine such things as the methodology underlying the City's forecasts or the qualifications of the forecasters.

29.    *Third*, Ms. Kopacz lacks the necessary expertise to provide an opinion regarding feasibility or the reasonableness of the City's forecasts and projections. As Ms. Kopacz conceded, she had never projected revenues or expenses or expenses for a municipality — a subject area that is "significantly different" from work she had previously performed.

**I.    Ms. Kopacz Did Not Perform the Work Necessary to Reliably Opine on the Reasonableness of the City's Forecasts and Projections.**

30.    When appointing Ms. Kopacz as an expert witness, the Court specifically directed her to "investigate and reach a conclusion" on "[w]hether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable."[46]  As discussed below, however, Ms. Kopacz failed to perform the work necessary to complete this task — specifically, she did not (a) test the accuracy or reliability of the City's

---

[46] Ex. 6C, Dkt. 4215, Apr. 22, 2014 Order Appointing Expert Witness, ¶ 2.

assumptions; (b) test the reliability of the data underlying the City's forecasts or projections; (c) provide an opinion that could be tested by the Court; or (d) perform true sensitivity analyses.

### A. Ms. Kopacz Did Not Actually Test the Reasonableness of the Assumptions in the City's Forecasts and Projections.

31.    As part of her expert report, Ms. Kopacz does not attempt to evaluate the reasonableness of the vast majority of the City's assumptions.  Instead, she simply describes the assumptions without performing any analysis or verification, including the following significant revenues and expenses:

- Property Tax Revenues: Ms. Kopacz reported that the City's property tax revenues are "largely predicated upon assumed changes in assessed property values and the estimated collection rates going forward" but did not evaluate the accuracy or reliability of any of these assumptions.[47]

- Sales and Charges for Services: Ms. Kopacz stated, with no analysis, that the balance of the revenue categories for the City's projections for sales and charges for services "are assumed to remain relatively constant over the FY2014-2023 time period."[48]   She did not analyze the accuracy or reliability of these assumptions.

- Wagering Tax Revenues: Ms. Kopacz reported that the City's 10-year projections for casino tax revenues "assume a 2.5 YoY [year-over-year] decline in FY2014, a 1.0% decline in FY2015, a 0.5% annual increase in FY2016 and FY 2017, and a 1.0% annual increase in FY2018-23," but provided no analysis of the accuracy or reliability of these assumptions.[49]

---

[47] Ex. 6A, Kopacz Report at 56.

[48] *Id.* at 55.

[49] *Id.* at 53.

- <u>Salaries and Wages</u>: Ms. Kopacz summarized the projections for the City's salaries and wages without specifically assessing the reliability or accuracy of the City's assumptions.[50]

- <u>Health Benefits</u>: Ms. Kopacz relied on the projections for City employee health benefits that were prepared by the City's actuary, Milliman, without specifically assessing the accuracy or reliability of the assumptions that underlie the projections.[51]

32.     During her deposition, Ms. Kopacz was asked a number of questions regarding the work that she did to test the reasonableness of the assumptions underlying the City's forecasts and projections.  Her testimony further confirmed that she did not analyze the accuracy or reliability of the following assumptions:

## Assumptions Surrounding Assessed Value Per Property

Q. Okay. I take it you made no effort to validate any assumptions regarding assessed value per property?

A. That's correct.

Q. Or in the aggregate, correct?

A. Or in the aggregate?

Q. Meaning to the extent the City aggregated assessed values across the City and made assumptions about that, you did not test those assumptions, correct?

A. Correct.[52]

---

[50] *See id.* at 65-71.

[51] *Id.* at 71-72.

[52] Ex. 6B, Kopacz Dep. Tr. at 196:13-23.

## Assumptions Surrounding Taxable Value

Q. [D]o you believe it's reasonable to assume that taxable value in the City of Detroit will decrease over the next -- by 9 percent, as a result of the citywide reappraisal where the City's senior assessor says that he doesn't know whether taxable value will go up or down?

[Objection.]

A. I don't know.

Q. You don't know if that's reasonable or not?

A. Yes, I do not know if that's reasonable or not.

Q. It's not something you've considered before today?

A. That's correct.[53]

## Assumptions Surrounding Casino Tax Revenues

Q. And so you're -- the focus then was on what are the casino gross receipts against which the rate is applied, right?

A. Yes.

Q. Now, you see that the ten-year projections assume two-and-a-half percent year-over-year declines in fiscal year 2014, a one percent decline in 2015, a half a percent increase in fiscal year 2016 and '17, and a one percent increase thereafter through 2023, correct?

A. Yes.

Q. You did not make an independent finding as to that assumption, as to its reasonableness, correct?

---

[53] *Id.* at 201:9-24.

A. Correct.[54]

## Assumptions Surrounding Property Values

Q. Okay. So, take a look at Page 59. We're going to move on to property values here, okay?

A. Yes. We did this.

Q. So, yeah, we definitely touched on these. But I guess I want to confirm that you didn't make any independent findings regarding whether a one percent, 1.7 percent decline in real property values during the period was a reasonable assumption, correct?

A. Correct.

Q. And you didn't make any findings with respect to whether the personal property increased by .9 percent was a reasonable assumption during that period, correct?

A. That's correct.

Q. And it's also correct that you didn't test the assumption of a 4.8 percent renaissance zone increase during that period, correct?

A. That's correct.[55]

## Assumptions Surrounding Population

Q. Okay. You didn't study or evaluate the assumptions regarding population?

A. Correct.[56]

---

[54] *Id.* at 283:21-284:11.

[55] *Id.* at 290:4-23.

[56] *Id.* at 275:21-23.

## Assumptions Surrounding Employment Growth

Q. You did not make a specific finding or conclusion about whether this assumption on Page 46 regarding employment growth was reasonable, correct?

A. That is correct. I looked at a what-if scenario, the -- the estimate was off. Now, how -- if -- if that estimate is off, right, by some amount, does that have a -- what kind of an impact does that have on the overall projection for income tax?

Q. Okay. So speaking to your expertise in terms of what your training and experience renders you capable of doing, you are capable of assessing whether or not a forecasted increase of .15 percent in City resident employment is a reasonable assumption, correct?

A. Could I do that? Absolutely.

Q. Yeah. You could have done it, but you did not do it.

A. I did not.

Q. Okay. Is that a reasonable assumption?

A. I believe that that assumption is reasonable in light of the -- the totality of what the income tax and revenue assumptions are.

Q. What is the basis for EY's .15 percent assumption in City resident employment increase?

A. You'd have to ask them.

Q. What is the basis for your conclusion that this assumption --

A. Right.

Q. -- is reasonable?

A. Again, as I said, I did not -- in this case, I looked at this assumption. It did not appear unreasonable to me. Okay? And when I

factored in the result of all of these estimates in terms of coming up with the revenue assumptions, and I did the sensitivity analysis, the result of what the city is projecting in terms of municipal taxable income and all the other individual revenue items is reasonable.

Q. Do you agree that you're not able to give me an opinion regarding the reasonableness of this assumption on a stand-alone basis?

A. That is correct.[57]

## Assumptions Surrounding Property Tax Collection

Q. On the collection rates, do you notice that the City has assumptions regarding different collection rates that bleed from Page 59 to 60?

A. I do.

Q. And it's also fair to say that you didn't make independent findings regarding whether their property tax collection assumptions were reasonable, correct?

A. That's correct.[58]

## Assumptions Surrounding Utility User Tax Revenue

Q. Then, similarly, on the utility users tax on Page 62, do you see that?

A. I do.

Q. The forecast -- the forecasted amount is forecast to be approximately two percent of general fund revenue, correct?

A. Yes.

---

[57] *Id.* at 267:12-269:19.

[58] *Id.* at 291:3-12.

Q. Fair to say you did not test the assumptions around the specific utility user tax revenue assumptions by the City forecasters, correct?

A. Correct.[59]

33.    Notably, the above are but a handful of the instances where Ms. Kopacz acknowledged that she had not in fact assessed the reasonableness of the City's assumptions.  Of even greater significance, however, Ms. Kopacz conceded that if her report does not contain a specific finding regarding the reasonableness of a cost assumption then she ***did not analyze*** whether that particular assumption is reasonable:

Q:  .  .  .  [T]o the extent a description regarding a particular cost assumption doesn't include a specific finding by you regarding the reasonableness of that cost assumption, ***is it fair for the Court to infer that you did not make a specific finding about that cost assumption*** and that you treated it merely as part of your aggregate opinion?

A: Generally, I think that is a correct statement.[60]

34.    In other words, where Ms. Kopacz did not explicitly state in her report that she independently evaluated the reasonableness of an assumption, it means that she did not, in fact, do so.  This admission has far-reaching implications[61] as a

_____

[59] *Id*. at 291:13-24.

[60] *Id*. at 320:6-18.

[61] Ms. Kopacz's testimony regarding the omission of specific findings on the cost side clearly implicates similar issues on the revenue assumptions as well.  For the vast majority of assumptions, her report discloses no individualized analysis of the

review of Ms. Kopacz's report reveals that she did not specifically evaluate the reasonableness of the vast majority of the City's assumptions, including the following assumptions:[62]

- The City's assumptions regarding <u>projected salaries and wages</u>;[63]

- The City's assumptions regarding <u>overtime</u>;[64]

- The City's assumptions regarding <u>benefits such as Social Security, unemployment, and life insurance</u>;[65]

- The City's assumptions regarding <u>health benefits</u>;[66]

- The City's assumptions regarding <u>employee contributions to the pension plan and the Voluntary Employment Benefit Account</u>;[67]

- The City's assumptions regarding <u>litigation, workers' compensation, and insurance claims</u>;[68]

---

macro revenue assumptions — and she explicitly testified that she conducted no analysis of many of the macro revenue assumptions, as cited above.

[62] Moreover, this is in addition to the many other assumptions underlying the City's forecasts that are addressed in the City's expert reports, but are *not* addressed in the report submitted by Ms. Kopacz.

[63] Ex. 6A, Kopacz Report at 66-71.

[64] *Id*. at 73-75.

[65] *Id*. at 75-76.

[66] *Id*. at 71-72.

[67] *Id*. at 77-78.

[68] *Id*. at 79-80.

- The City's assumptions regarding <u>operating supplies, fuel and lubricants, and repairs and maintenance</u>;[69]

- The City's assumptions regarding <u>utilities</u>;[70]

- The City's assumptions regarding <u>purchased services</u>;[71] and

- The City's assumptions regarding <u>capital outlays</u>.[72]

35.    Put simply, Ms. Kopacz's failure to individually assess and opine upon the vast majority of the City's assumptions renders her opinion regarding the City's forecasts and projections unreliable and any corresponding testimony should therefore be excluded.

### B.    Ms. Kopacz Failed to Test the Data Underlying the City's Forecasts and Projections.

36.    Separate and apart from Ms. Kopacz's failure to test the assumptions underlying the City's projections and forecasts, Ms. Kopacz committed another error as part of her expert report — she failed to test the data underlying the City's projections and forecasts and instead relied on the data provided by Ernst & Young.   Examples of Ms. Kopacz's failure to test the relevant underlying data include the following:

---

[69] *Id*. at 80-81.

[70] *Id*. at 81-82.

[71] *Id*. at 83.

[72] *Id*. at 83-84.

## Average Income Data

Q. You haven't independently assessed the average income data for the City of Detroit, correct?

A. That's correct.

Q. Okay. You relied on data that was given to you by Ernst & Young?

A. That's correct.

Q. Okay. And you haven't taken steps to assess the accuracy of that data, correct?

A. That's correct.[73]

## Unemployment

Q. And with respect to the level of unemployment in the City, you also relied on data that was given to you by Ernst & Young, correct?

A. Yes.[74]

## Property Values

Q. I take it you don't know what the City's assessed property values are as you sit here today?

A. I do not.

Q. And you haven't engaged in an independent effort to determine what the assessed value should be, correct?

A. That's correct.[75]

---

[73] Ex. 6B, Kopacz Dep. Tr. at 144:25-145:10.

[74] *Id.* at 145:11-145:14.

[75] *Id.* at 195:5-12.

## Population Growth

Q. Okay. With respect to the population assumptions in the forecasts, is it correct that the ten-year projections assume that there will be a 12.3 percent decline in Detroit's population over the next ten years?

A. That is the SEMCOG estimate and that's what the City used.

Q. So the City relied on SEMCOG, correct?

A. Correct.

Q. Do you -- you did not make a specific finding in this section as to whether that population assumption was a reasonable one. Do you agree?

A. I accepted that as a given.

Q. Okay. You accepted it as a given. You did not otherwise test its reasonableness, correct?

A. I did not.[76]

## Utility Users Tax

Q. Now, when it came to historical data about utility user tax revenues, you relied on what was given to you by Ernst & Young; is that correct?

A. That's correct.

Q. You did not attempt to independently assess that data, correct?

A. Correct.[77]

---

[76] *Id.* at 273:4-22.

[77] *Id.* at 147:19-148:6.

37.     As a justification for this failure, Ms. Kopacz asserted that she did not have enough time "to independently verify all of the data on which the forecasts are built in order to develop [her] own assumptions."[78]  Although Ms. Kopacz was operating under an admittedly tight timeline, her failure to independently assess the data on which the City's forecasts are built is problematic for two reasons.

38.     First, as Ms. Kopacz conceded, much of the City's financial information is unreliable.[79]  Thus, more than in any other case, it was critical for Ms. Kopacz to dig into, understand, and then assess the reliability of the underlying data.

39.     Second, Ms. Kopacz's acceptance of the data given to her by Ernst & Young is problematic because Ernst & Young, on multiple occasions, made assumptions that were inconsistent with other information available to the City.[80]  Ms. Kopacz thus skipped a critical step when she failed to pressure-test the data.

### C.     Ms. Kopacz's Expert Opinions Are Not Testable.

---

[78] *Id.* at 178:2-9.

[79] *Id*. at 104:12-107:2.

[80] *See generally Motion to Exclude the Testimony of the City's Forecasting Experts Under Federal Rule of Evidence 702*.

40.     Rule 702 requires that proffered expert testimony be the product of reliable principles and methods.[81]     Courts consider several factors when determining whether a proffered expert's testimony is reliable: (1) the testability of the expert's hypotheses (*i.e.*, whether they can or have been tested); (2) whether the expert's methodology has been subjected to peer review and publication; (3) the known or potential rate of error with respect to the expert's methodology; and (4) whether the methodology is generally accepted in the scientific community.[82] Courts interpreting *Daubert* have considered testability of the expert's hypotheses to be the most important of these four factors.[83]     When a proffered expert does not offer any reliable testing of his or her opinions, courts, including the Sixth Circuit, have routinely precluded that witness from testifying.[84]

41.     Here, Ms. Kopacz candidly admitted that her opinions regarding the reasonableness of the City's forecasts and assumptions <u>could not</u> be tested:

> Q. So how -- how -- how can we know that taxable incomes as an economic matter shouldn't be  expected to grow at the 3.4 percent rate for a decade?

---

[81] *Daubert*, 509 U.S. at 594-95.

[82]  *Id*. at 593-94.

[83] *See, e.g.*, *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000); *see also Soldo v. Sandez Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 462 (W.D. Pa. 2003) (stating that "testability" is most important *Daubert* factor).

[84] *See, e.g., Pride*, 218 F.3d at 578; *Berry*, 108 F. Supp. 2d at 754;

A. We don't.

Q. Okay. So how do we test your finding that .46 percent is reasonable?

A. It's not unreasonable.

Q. How do we test that?

A. I don't know that we do.

Q. Do you know of a way that we could test that opinion?

A. I don't know that we can.[85]

*****************************

Q. So what was your basis for -- your conclusion that 1.25 percent average wage growth between fiscal year 2014 and 2023 appears to be a reasonable assumption?

A. The 1.25 over a ten-year period, where you had historically both a decrease in taxable income and an increase in taxable income appears to me to be a reasonable, long-term projection of the overall average increase.

Q. Are you aware of any way to test that conclusion?

A. To test that conclusion?

Q. To test the reasonableness of your assumption?

A. I don't know how you would test the assumption until after it happens.

---

[85] Ex. 6B, Kopacz Dep. Tr. at 241:9-21.

Q. Okay. But if the -- if the Court wants to test your finding that this is a reasonable assumption, you're not aware of a way it can test it, correct?

A. No, I am not.[86]

42.     In addition, Ms. Kopacz admitted that she could not test the work that

the City and Ernst & Young had performed or compare it to other municipalities:

Q. Okay. Okay. And so what approach did the City utilize in compiling its forecasts?

A. There's not -- I'm struggling because I think the way you're using it is as if there's a professional standard for methodology. There are like -- like we were talking about generally accepted accounting principles. There aren't --there's no -- there are no standards like that for forecasting. There are approaches that people use, but I don't think there's any -- there's no check-the-box sort of standard for forecasting.

Q. Okay. So you're not able to point to a forecasting methodology that exists and say whether the City employed that forecasting methodology or not, correct?

A. That's correct.

Q. And that's because to the best of your knowledge, you're not aware of a standard forecasting methodology for municipal forecasts like these, correct?

A. Or -- yes, that's correct.

Q. And you took a lot of time to learn what the City did, right?

A. Yes.

---

[86] *Id.* at 252:14-253:10.

Q. What you're not able to say is how what the City did compares to what people typically do when compiling a municipal forecast, correct?

A. Yes.

Q. Because to the best of your knowledge, there is no typical?

A. Every municipal forecast I've seen is different.

Q. Okay. So, following on this line it's fair to say that you can't subject the City's analysis to peer review, correct?

A. I'm not sure I would say that.

Q. You might be able to, you might not be able to; you just don't know?

A. I don't know who the peer would be.

Q. Okay. You can't compare it to industry standards, correct?

A. In -- "industry standards" being?

Q. Municipal forecasting industry.

A. Promulgated by whom?

Q. Anyone.

A. Again, I don't -- I guess the answer would be no.

Q. 'Cause your view is that there aren't any industry standards?

A. That's correct.

Q. So of course you can't, right?

A. Yes. Yes.

Q. Did you attempt to compare the City's approach to literature on the subject of municipal forecasts?

A. No.

Q. Could you have done that?

A. I think we've got to go back and decide -- define again what we're talking about. I'm talking about the projections in the plan of adjustment. Okay? There are no standards that govern projections in a plan. Whether that's a plan of adjustment, a plan of reorganization or anything like that. Okay? The -- the quote, standards, and I -- and I put that in the finger quotes because I think what you're trying to talk about is the City budget or something -- again, like I said, I don't -- there aren't standards that you would go to to say how do you prepare these projections for the plan of adjustment.[87]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Are the City's forecasts amenable to statistical testing?

A. I don't know.[88]

43.    Ms. Kopacz's testimony that there are no standard forecasting methodologies is obviously incorrect.  As Dr. Cline testified, there are standard forecasting methodologies that cities can use.[89]

44.    Without the ability to test Ms. Kopacz's conclusions and opinions, the Court is forced to simply accept Ms. Kopacz's opinions at face value.  In other

---

[87] *Id*. at 164:19-167:18.

[88] *Id*. at 168.24-169:2.

[89] Ex. 6D, Cline Dep. Tr. at 47:13-18.

words, the assumptions underlying the City's forecasts and projections are reasonable because Ms. Kopacz says they are reasonable. Such testimony, however, represents classic *ipse dixit* opinion testimony that Federal courts have rejected time and again and likewise should be excluded in this case.[90]

### D. Ms. Kopacz Did Not Perform True Sensitivity Analyses.

45. The fact that Ms. Kopacz did not fully and rigorously assess the City's assumptions is further demonstrated by the limited "sensitivity analyses" she performed. While Ms. Kopacz purported to perform certain limited sensitivity analyses "related to the forecast and critical assumptions" in order "to better assess the achievability of the projections,"[91] she performed such analyses for only a handful of the assumptions underlying the City's forecasts. Moreover, even with respect to these assumptions, she failed to perform a proper analysis. Rather, she instead conducted what amount to arithmetical exercises, rather than true sensitivity analyses.

46. A sensitivity analysis "is the study of how the variation in the output of a model (numerical or otherwise) can be apportioned, qualitatively and quantitatively, to different sources of variation, and how the given model depends

---

[90] *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010).

[91] Ex. 6A, Kopacz Report at 3.

on the information fed to it."[92]  Properly done, this technique "allows the analyst to assess the effects on inferences of departures from the assumptions made and the data values[.]"[93]  Put slightly differently, when properly executed, sensitivity analyses allow evaluation of "what if?" scenarios that show the effect that changing the model's data or assumptions will have on the model's predictions — allowing, for example, the analyst to determine whether the proposed reorganization plan may still be feasible if the City sees a recession that shrinks its economy in the next decade.

47.    A true sensitivity analysis would postulate a change in Detroit's economy, up or down, and then study the way that change rippled through the entire forecast.  The expert would then evaluate the likelihood of that outcome in order to gauge the likelihood that the City will under- or over-perform its forecast.

48.    Ms. Kopacz never did that.  Instead, her purported sensitivity analyses simply calculate the absolute dollar impact that a change in *one* of the City's assumption variables would have.  For example, when addressing the City's municipal income forecasts, Ms. Kopacz "estimate[d] the impact of a 1 percentage point change in the forecasted growth rate, up or down" on "each category of

---

[92] *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at 22 n.53 (N.D. Cal. Apr. 4, 2014) (citation omitted).

[93] *Id.*

income tax payer in both scenarios."[94]  As she testified, this analysis is simply an arithmetical exercise:

> Q.  Is it fair to say that this is the mathematical exercise of the simply showing what a 1 percent change results in if no other constants change?
>
> A.  That's correct.[95]

49.  Ms. Kopacz conceded in her deposition that "all of the sensitivity analyses . . . [she had] done have been done around a single variable."[96]  But this is of little use.  If the City enjoys an economic boom as a result of the urban revitalization effort it is forcing its creditors to fund, that boom will impact <u>all</u> of the City's revenue streams, not just one of them.  Ms. Kopacz did not assess how **cumulative** deviations from the City's forecasts may affect the feasibility of the plan in the aggregate — instead addressing the potential impact of these deviations only "around . . . single variable[s]," which does not help a meaningful evaluation of feasibility:

> Q.  Did you ever take the sensitivity analyses and say, Now I'm going to link them all together and I'm going to assume that taxable income growth is down a percent, property tax is down a percent, gaming revenue is down a percent, and utility users' tax revenue is down a

_____

[94] Ex. 6A, Kopacz Report at 48.

[95] Ex. 6B, Kopacz Dep. Tr. at 96:15-19.

[96] *Id.* at 97:6-9.

percent and then step back and look to see what impact it had on whether the City can achieve the forecasts?

A. I did not do that analysis.[97]

50.     Moreover, even with respect to the single variable she did address, she did not assess the ***likelihood*** that the deviation from the forecast would actually occur:

> Q.  But you didn't undertake an assumption of the likelihood that that [change in the gross receipts assumption] would happen, correct?
>
> A.  That's right.
>
> Q.   And just to save time, that's true for all the sensitivity analyses that you did, correct?
>
> A. Yes.
>
> Q. You presented the arithmetical equation, but you did not undertake an assessment of the likelihood of the event, correct?
>
> A. That's correct.[98]

In short, because Ms. Kopacz did not calculate the likelihood that deviations from the City's forecasts may actually happen, ***and*** did not even attempt to address the possible impact that multiple such deviations may have on the City's ability to achieve the forecasts, these purported sensitivity analyses bear almost no relevance to feasibility — the issue the Court directed Ms. Kopacz to address.

*****************

---

[97] *Id.* at 270:25-271:9.

[98] *Id.* at 284:21-285:8.  *See also id.* at 270:16-19, 271:10-20, 280:3-19.

51.     In sum, having failed to assess the "reasonableness" of the vast majority of the individual assumptions underlying the City's forecast and having performed an inadequate analysis with respect to those assumptions she did address, Ms. Kopacz cannot reliably fulfill her role as the Court's expert witness.

52.     While Ms. Kopacz suggested during her deposition that the City's forecast assumptions are reasonable in the "aggregate,"[99] this opinion is not tethered to any data or analysis because she did not examine the reasonableness of the City's individual assumptions.  Her report contains no analysis to support this opinion and it thus amounts to the sort of *ipse dixit* opinion that is forbidden by *Daubert*.    Accordingly, she has **no** basis on which to opine about the reasonableness of the forecast assumptions as her appointment requires.[100]

---

[99] *See* Ex. 6B, Kopacz Dep. Tr. at 253:22-254:2 (explaining that she "concluded that, in totality, the estimates contained in the projections provide a reasonable basis what the City is going to do from an economic perspective during the life of this -- these projections."); *id.* at 267:9-11 ("Q. [ . . . ] You included that in the aggregate all of the assumptions were reasonable, correct?  A.  Correct.").

[100] *See, e.g.*, *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 974, 975 (M.D. Tenn. 2002) (excluding expert whose "theories [were] not based on sufficient facts and data" and who "did not utilize reliable principles and methods."), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (unpublished); *Barnette v. Grizzly Processing, LLC*, 2012 WL 293305, at *3 (E.D. Ky. Jan. 31, 2012) (excluding expert who, in opining that defendant's coal processing operations were violating certain regulations, did not do independent analysis and instead "merely parrot[ed]" a witness's testimony that coal dust was escaping the coal processing areas, "and add[ed] the label . . . 'violation' to it.").

## II.  Ms. Kopacz Did Not Examine the Reliability of the City's Forecasts and Has No Basis to Opine that the Assumptions in Those Forecasts are "Reasonable."

53.     Even the work that Ms. Kopacz did perform, however, is unreliable and thus inadmissible under Rule 702.  Ms. Kopacz concedes that she did not assess the reliability of the City's forecasts and thus cannot offer any reliable opinion that those forecasts are "reasonable."  Although she was appointed to opine on "[w]hether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable,"[101] she admits that reasonableness for purposes of feasibility is *not* a synonym for "reliable."[102]

54.     As detailed further below, Ms. Kopacz did not examine the experience of the City's forecasting experts to determine whether they are qualified to offer forecasting opinions; she made no effort to determine how bias and subjectivity may have affected the City's forecasts; she did not verify the data on which the forecasts were based; and does not even know what methodology was used for the

---

[101] Ex. 6A, Kopacz Report at 1.

[102] Ex. 6B, Kopacz Dep. Tr. at 34:6-8; *see also id.* at 205:13-18 (testifying that in evaluating reasonableness of assumptions, she "only evaluate[d] it for purposes of feasibility").

City's forecasts. Without having undertaken these basic inquiries, Ms. Kopacz cannot say whether the City's projections are "reasonable."[103]

55. As a preliminary matter, Ms. Kopacz did not examine the experience and qualifications of the City's forecasting experts to determine whether they are even qualified to offer projections for the City's revenues and expenditures. Thus, Ms. Kopacz does not know, for example, whether Mr. Cline and his team have any experience in forecasting municipal revenues, and never attempted to assess the extent of that experience, if any.[104] She was likewise unaware of the prior experience, if any, of Mr. Malhotra's team and the Conway MacKenzie team in forecasting municipal expenses and revenues.[105] This oversight is particularly

---

[103] *See Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (the "court's gatekeeping function requires more than simply 'taking the expert's word for it.'"); *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("the existence of sufficient facts and a reliable methodology is in all instances mandatory."). Nor may an expert rely on another expert's opinion without attempting to verify the validity of that opinion. *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732–33 (10th Cir.1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no familiarity with methods and reasons underlying the hearsay report); *see also In re TMI Litig.*, 193 F.3d 613, 715–16 (3d Cir.1999) (finding unsubstantiated reliance by expert on other expert opinions demonstrates flawed methodology).

[104] *Id.* at 174:9-15 ("Q. What is the experience of Mr. [C]line and his team when it comes to forecasting revenues? A. I don't know. Q. Okay. Did you make any effort to assess that? A. I did not.").

[105] *Id.* at 175:11-19 (unaware of "the experience of Mr. Malhotra's team when forecasting municipal expenses" or of "the experience of the Conway MacKenzie

important when one remembers that Mr. Cline, Mr. Malhotra, and Ms. Sallee had never forecast revenues or expenses for a City prior to this case.[106]

56.     Nor did she undertake any analysis of the biases of the City's forecasters in evaluating the feasibility of the City's Plan of Adjustment.[107]  This oversight is critical because of the obvious incentives of the City's forecasters to employ excessively conservative assumptions, as they in fact did.

57.     More generally, she acknowledges that she reached no conclusions about the quality of Ernst & Young's work.[108]  She admitted, for example, that she did not develop her own assumptions to compare them against the City's.[109]  Nor

---

team when it came to projecting the costs or revenues associated with a municipal restructuring.").

[106] Mr. Cline, Mr. Malhotra, and Ms. Sallee all testified that they have never done municipal forecasts before the Detroit matter.  *See* Ex. 6D, Cline Dep. Tr. at 8:23-24 ("I have not done forecasting for a City."); Ex. 6E, Malhotra Dep. Tr. at 17:14-18, 80:8-11 (stating he had never performed a forecast for a municipality before this forecast for Detroit); Ex. 6F, Sallee Dep. Tr. at 23:24-24:1, 25:24-26:2 (testifying that this is "the first time" she has forecasted taxable values "for a municipality[.]")

[107] Ex. 6B, Kopacz Dep. Tr. at 162:6-8 (agreeing she "didn't consider or analyze what the biases of the City forecasters were").

[108] *Id.* at 48:21-22 ("I -- I didn't reach a conclusion about the quality of Ernst & Young's work.").

[109] *Id.* at 175:20-176:2 (agreeing she did not "independently seek to develop [her] own assumptions first and then compare so that [she] could then compare them to the City's assumption[s]").

did she develop her own forecasts.[110]  And although there is now historical data that could be compared to the predictions in the forecasts, Ms. Kopacz did not attempt to validate the forecasts against this data.[111]  As she ultimately acknowledged, while some of the information used in the forecast may be reliable, "some may not be reliable."[112]

58.   Importantly, Ms. Kopacz also admitted that she does not know what methodology underlies the City's forecasts.[113]  And while Ms. Kopacz is aware of at least some forecasting methodologies that exist for predicting municipal revenues, she did not rely on them in this case.[114]  She did not "attempt to compare

---

[110] *Id.* at 218:21-219:6 (did not construct her own forecasts "[b]ecause there would never have been enough time and the availability of information to do that").

[111] *Id.* at 193:2-13 (agreeing that there are now "historical results" that "can be compared to what was once a forecast" but she has not "attempted to validate . . . the prior forecasts against subsequent historical information that's come in").

[112] *Id.* at 103:7-105:21.  Nor did Ms. Kopacz perform "a comprehensive review to test whether Conway is correct in either the assessment of operational needs or its conclusion regarding whether the RRIs will solve the operational needs."  *Id.* at 115:3-8.

[113] *Id*. at 165:6-10 (testifying that she was "not able to point to a forecasting methodology that exists and say whether the City employed that forecasting methodology or not").

[114] *Id.* at 154:21-155:10 (aware of some methodologies for forecasting municipal revenues but "there's nothing that is as uniform and acknowledged as we have with generally accepted accounting principles"); *id.* at 155:11-156:6 (did not rely on methodologies in publications from the Government Finance Officers Association

the City's approach to literature on the subject of municipal forecasts."[115]  Nor was she able to opine as to "how what the City did compares to what people typically do when compiling a municipal forecast."[116]  Indeed, she testified that she was not able to identify *any* existing forecasting methodology employed by the City, much less perform any analysis to determine whether the City reliably implemented such methodology:

> Q. Okay. So you're not able to point to a forecasting methodology that exists and say whether the City employed that forecasting methodology or not, correct?
>
> A. That's correct.[117]

59.    Ms. Kopacz therefore offered no opinion on whether the City used the correct methodology — or, for that matter, *any* methodology — in its forecasts.[118] Ms. Kopacz's testimony is in stark contrast to the testimony of Mr. Cline, who

---

in this case); *see also id.* at 156:12-18 (could not identify the different types of qualitative and quantitative "forecasting methods . . . that are specified by the GFOA"); *id.* at 168:17-23 (agreeing she "never consciously applied these methodologies in [her] own forecasting work" and "did not in connection with the City's forecasting").

[115] *Id.* at 166:24-167:3.

[116] *Id.* at 165:19-23.

[117] *Id.* at 164:19-165:15.  *See also id.* at 153:19-154:4, 154:21-155:10, 165:19-167:18.

[118] *Id.* at 180:16-20 (agreeing she "never attempted to look at the City's approach to any of the revenue streams and say, they are using the wrong methodology").

stated that "[t]he methodology [Ernst & Young] used is a fairly standard forecasting methodology that's been used extensively in the City of Detroit and for the State of Michigan and in other cities."[119]  Rather than test this methodology, Ms. Kopacz simply accepted the City's forecasts as a given even though she found the City's models "convoluted" and "confusing," and testified that she has been "really critical of how confusing they are."[120]

60.    Without any meaningful understanding of the methodology that underlies the City's forecasts and assumptions, Ms. Kopacz has no basis to opine on their reasonableness.  Any "reasonableness" opinions Ms. Kopacz purports to

---

[119] Ex. 6D, Cline Dep. Tr. at 47:13-18.  As detailed in Syncora's *Motion to Exclude the Testimony of the City's Forecasting Experts Under Federal Rule of Evidence 702*, although Ernst & Young purported to apply a standard forecasting methodology, that methodology suffers from numerous errors that render it inadmissible.

[120] *Id.* at 181:17-21, 111:5-10; *see also* Ex. 6A, Kopacz Report at 26 (acknowledging creditors' concerns that the financial projections "are a 'black box' and that it was the City's intent to obfuscate important information."); *see also* Ex. 6B, Kopacz Dep. Tr. at 182:14-17 (had never seen any city "employ[] a methodology or an approach . . . like this one); *id.* at 100:4-17 (these projections "are not what we would typically expect to see as a set of projections for a plan of reorganization in a Chapter 11 case."); *id.* at 174:5-8 (the projections between different forecasters "were never harmonized and concatenated in a way that they're all in one kind of place.").

provide thus amount to little more than her subjective, unverified, and unverifiable determinations — precisely what Rule 702 and *Daubert* forbid.[121]

### III. Notwithstanding Her Experience with Chapter 11 Restructuring, Ms. Kopacz Lacks the Qualifications to Opine on the Feasibility and Reasonableness of the City's Forecasts in this Chapter 9 Proceeding.

61. Finally, while Ms. Kopacz has experience with restructuring engagements generally, she lacks the qualifications and experience either to forecast revenues and expenses for a municipality in a Chapter 9 bankruptcy or to opine on the feasibility or reasonableness of the City's forecasts. Rule 702

---

[121] *E.g.*, *Daubert*, 509 U.S. at 590 (an expert's opinions may not be based on "subjective belief or unsupported speculation."); *Coffey*, 187 F. Supp. 2d at 977-78 (noting that "*Daubert* . . . makes clear that proposed expert testimony must be supported by appropriate validation" and excluding expert testimony for failure to meet this requirement) (citation, quotation marks, and alterations omitted); *Powell v. Tosh*, 942 F. Supp. 2d 678, 706 (W.D. Ky. 2013) (declining to accept expert's testimony "based solely on his thirty-years' experience" because despite that experience, those opinions were "anecdotal, subjective, and incapable of independent verification"); *Barnette*, 2013 WL 293305, at *4 (excluding expert who opined, based on fourteen citations that a coal plant received, that that plant was in violation every day for two years because he "[did] not explain how he infer[red] two years' worth of daily violations from [those] fourteen citations"); *Tamraz*, 620 F.3d at 670; *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (subjectivity and "lack of testing" are "red flags" under *Daubert* and Rule 702); *In re TMI Litig.*, 193 F.3d 613, 703 n.144 (3d Cir. 1999) (excluding expert's opinion based on "subjective" methodology, and noting that "it is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology").

precludes opinions by experts on matters that lie outside their area of expertise — as is the case here.[122]

62.     Before this bankruptcy, Ms. Kopacz had never served as an expert in a Chapter 9 case.[123]  She is not an economist, an actuary, a statistician, a real property appraiser, or an expert on macroeconomic factors that may impact Detroit in the future.[124]  Ms. Kopacz has never been qualified as a valuation expert nor has she offered prior expert testimony on feasibility.[125]

63.     As Ms. Kopacz herself acknowledged, municipal budgeting is "significantly different" from forecasting for private entities because it "involves appropriations and encumbrances and concepts" that do not exist "in the private sector."[126]  Before this case though, Ms. Kopacz had "not directly worked for a

---

[122] *See, e.g.*, *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (under Rule 702, an expert must have "qualifications [that] provide a foundation for a witness to answer a specific question"); *Peak v. Kubota Tractor Corp.*, 924 F. Supp. 2d 822, 829 (E.D. Mich. 2013) (expert opinion is inadmissible where "the expert's training and qualifications" do not "relate to the subject matter of his proposed testimony").

[123] Ex. 6B, Kopacz Dep. Tr. at 131:17-19; *see also id.* at 133:8-10 (never "worked in connection with a Chapter 9 bankruptcy other than this one").

[124] *Id.* at 135:13-136:10, 137:10-15.

[125] *Id.* at 131:2-4, 131:10-14.

[126] *Id.* at 41:4-12, 40:9-16.

municipality in projecting revenues or expenses," and "personally ha[s] never done a municipal forecast."[127]

64.    Without prior first-hand experience with feasibility analyses or with municipal forecasting —which Ms. Kopacz concedes is "significantly different" from the private sector — Ms. Kopacz's opinions about the feasibility of the City's plans or the reasonableness of the City's forecasts are beyond her area of expertise and thus inadmissible.[128]

## CONCLUSION

65.    For the foregoing reasons, Syncora respectfully requests that the Court exclude certain of the opinions of Martha Kopacz.


[*Remainder of Page Intentionally Left Blank*]

---

[127] *Id.* at 149:14-16, 148:21-24.

[128] *See, e.g.*, *Coffee*, 187 F. Supp. 2d at 975 (excluding expert testimony of "an experienced mechanical engineer and professor of engineering," noting that "an individual is not an expert in the abstract; expertise can only be judged within the context of a given case").

Dated:  August 22, 2014

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and
Syncora Capital Assurance Inc.*