## Exhibit 6B

## Excerpts of July 31, 2014 M. Kopacz Deposition Transcript

- MARTI KOPACZ - VOLUME 1-
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re            ) Chapter 9

CITY of DETROIT, MICHIGAN,    ) Case No. 13-53846

Debtor.    ) Hon. Steven Rhodes

DATE: July 31, 2014
TIME: 9:12 a.m.

VOLUME 1
VIDEOTAPED DEPOSITION OF MARTI
KOPACZ, held at the offices of Squire Patton
Boggs, 30 Rockefeller Plaza, New York, New York,
pursuant to Order, before Hope Menaker, a
Shorthand Reporter and Notary Public of the State
of New York.

1    - MARTI KOPACZ - VOLUME 1-
2  A P P E A R A N C E S
3  GEOFFREY S. STEWART, ESQ.
4  CHRISTOPHER DiPOMPEO, ESQ.
5  ALEXANDER BLANCHARD, ESQ.
6  Jones Day
7  51 Louisiana Avenue, N.W.
8  Washington, D.C. 20001
9    Appearing on behalf of the Debtor
10
11  STEPHEN C. HACKNEY, ESQ.
12  Kirkland & Ellis, LLP
13  300 North LaSalle Street
14  Chicago, Illinois 60654
15    Appearing on behalf of Syncora
16
17  KATHLEEN HITCHINS, ESQ.
18  Sidley Austin, LLP
19  1501 K Street, N.W.
20  Washington, D.C. 20005
21    Appearing on behalf of National Public Financing
22
23
24
25

1    - MARTI KOPACZ - VOLUME 1-
2  ALFREDO R. PEREZ, ESQ.
3  Weil, Gotshal & Manges, LLP
4  700 Louisiana Street, Suite 1700
5  Houston, Texas 77002
6    Appearing on behalf of Financial Guaranty
7    Insurance Company
8
9  LISA SCHAPIRA, ESQ.
10  Chadbourne & Parke, LLP
11  30 Rockefeller Plaza
12  New York, New York 10112
13    Appearing on behalf of Assured Guaranty
14    Municipal Corporation
15
16  SHANNON L. DEEBY, ESQ.
17  Clark Hill, PLC
18  151 South Old Woodward Avenue
19  Suite 200
20  Birmingham, Michigan 48009
21    Appearing on behalf of the Retirement Systems
22    for the City of Detroit
23
24
25

1    - MARTI KOPACZ - VOLUME 1-
2  JENNIFER K. GREEN, ESQ. (Via Telephone)
3  Clark Hill, PLC
4  500 Woodward Avenue, Suite 3500
5  Detroit, Michigan 48226
6    Appearing on behalf of the Retirement Systems
7    for The City of Detroit
8
9  SAM J. ALBERTS, ESQ.
10  Dentons US, LLP
11  1301 K Street, N.W.
12  Suite 600, East Tower
13  Washington, D.C. 20005
14    Appearing on behalf of the Retiree Committee
15
16
17  ALLAN S. BRILLIANT, ESQ.
18  Dechert
19  1095 Avenue of the Americas
20  New York, New York 10036
21    Appearing on behalf of Macomb County
22
23
24
25

1 (Pages 1 to 4)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 2 of 52

- MARTI KOPACZ - VOLUME 1-

1
2  is a spreadsheet that Jones Day has updated as we
3  went along.
4          Have you seen versions of Exhibit 3
5  before?
6      A.   I have not.
7      Q.   You have not.  Are you aware that
8  versions of it were given to members of your team
9  as the project went along?
10     A.   I'm not sure I understand that
11 question.
12     Q.   Do you know whether anyone from your
13 team has seen this document or versions of it?
14     A.   Not that I know of.
15     Q.   Okay.  Let's go to Exhibit 4 of
16 your -- of your report.  Do you have Exhibit 4
17 before you?
18     A.   I do.
19     Q.   And what does Exhibit 4 set forth?
20     A.   Exhibit 4 sets forth the open
21 information requests as of the date of my report.
22     Q.   Okay.  Your report was, what, the
23 25th?
24     A.   July 18th.
25     Q.   July 18th.  Have some of these

- MARTI KOPACZ - VOLUME 1-

1
2  materials since July 18th been provided to you?
3      A.   I don't think so.  I don't think so.
4      Q.   Okay.  Do you know for a fact that
5  all of these materials, in fact, exist?
6      A.   I do not know that.
7      Q.   Has the absence of these materials
8  affected your analysis in any way?
9      A.   The -- some of the requests here I
10 would still like to receive.
11     Q.   Sure.
12     A.   Because it would -- obviously, I
13 asked for it because I thought it was -- would be
14 helpful and it would be more information.
15         I reached my opinion on the
16 information I had so, you know, I don't know how
17 to answer that.  In the sense of yes, I'd still
18 like to have them, but --
19     Q.   Sure.
20     A.   -- I didn't have it and I was still
21 able to reach an opinion.
22     Q.   In other words, you were able to work
23 around the absence of these materials?
24     A.   I did.
25     Q.   Okay.  Exhibit 3 of your report

- MARTI KOPACZ - VOLUME 1-

1
2  contains a list of all the meetings that you and
3  others at Phoenix held.  Am I correct on that?
4      A.   This is the contact log that the
5  Judge asked me to keep.  I, in turn, then asked my
6  team to keep a contact log as well.
7      Q.   Okay.
8      A.   So, it's -- there really are kind of
9  two sections to it.  One is all of the contacts
10 that I was involved in and then the second part of
11 it is contacts that team members had that I wasn't
12 involved in.
13     Q.   Okay.
14     A.   And it could -- it could be phone
15 calls, it could be e-mails.  Most of them are
16 face-to-face meetings.
17     Q.   Sure.  You began your work shortly
18 after your appointment on April 22nd?
19     A.   I began my work on April 22nd, yes.
20     Q.   And certainly continued it up until
21 the time you submitted your report?
22     A.   I did.
23     Q.   And have you continued working since
24 then?
25     A.   Other than to prepare for this

- MARTI KOPACZ - VOLUME 1-

1
2  deposition, no.
3      Q.   Okay.  During the period of time
4  between April 22nd and July 25th, how many
5  meetings do you believe that you personally had in
6  connection with this project?
7      A.   More than 50.
8      Q.   And who in general -- you met with
9  the mayor, did you not?
10     A.   I met with the mayor.
11     Q.   And John Hill who is the city CFO?
12     A.   I did.
13     Q.   And the emergency manager?
14     A.   Yes.
15     Q.   And counsel for various creditors?
16     A.   Yes.
17     Q.   Okay.  And members of the City
18 Council?
19     A.   Yes.
20     Q.   Members of the city government?
21     A.   Yes.
22     Q.   And those are just some categories.
23         What other categories of person have
24 I not mentioned in summarizing the persons with
25 whom you met?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 3 of 52

- MARTI KOPACZ - VOLUME 1-

1 analysis or projections, what-ifs, that sort of
2 thing, whereas a forecast is something that's a
3 little more rigorous, a best -- the best guess, if
4 you will.
5     Q.   So would it be fair to say, and I'm
6 not going to spend a lot of time on this, this
7 morning, that the base case scenario from EY is a
8 forecast, but the restructuring analysis is a
9 projection?
10     A.   I don't know that I would say that.
11     Q.   Okay. And I'll use the terms
12 interchangeably myself.
13     A.   Thank you.
14     Q.   You raise the -- use the phrase
15 "mathematically accurate."
16     I assume that means whether the
17 calculations that were done produced the results
18 that mathematics requires?
19     A.   Yes.
20     Q.   In other words, no errors in
21 calculation?
22     A.   Correct.
23     Q.   Okay. You used the phrase
24 "reasonableness" when you speak about assumptions.

- MARTI KOPACZ - VOLUME 1-

1     What do you mean when you use the
2 phrase "reasonableness"?
3     A.   That the assumption is neither too
4 conservative or too aggressive.
5     Q.   Okay. Is reasonableness a synonym in
6 this context for reliable?
7     A.   No.
8     Q.   Okay. In other words, that a
9 reasonable assumption is one that is in the middle
10 of the continuum of possible assumed facts?
11     A.   I think I can agree with that, yes.
12     Q.   Okay. Did you try to place it a
13 particular place on the continuum?
14     A.   No.
15     Q.   You also listed qualitative factors
16 as well, and I'll come back to those.
17     A.   Yes.
18     Q.   And they're part of your feasibility
19 analysis too?
20     A.   They are.
21     Q.   Sometimes you've used the term
22 "material" in your report?
23     A.   Yes.
24     Q.   What does the term "material" mean as

- MARTI KOPACZ - VOLUME 1-

1 you've used it here?
2     A.   Material is a term that indicates
3 whatever the value or the variable is could have
4 an impact, positive or negative. It is not --
5 it's not de minimis.
6     Q.   Okay. Do you associate any
7 percentage level with the term "material"?
8     A.   I do not.
9     Q.   Have you heard, for example in the
10 accounting world, they sometimes speak of
11 materiality as being 1 percent of assets or
12 5 percent of income?
13     A.   I think it depends on the context.
14     Q.   But it's not how you've used it, one
15 way or another?
16     A.   Not how I've used it, no.
17     Q.   Now, I'm going to ask you about
18 forecasting now.
19     A.   Sure.
20     Q.   Let me go back to Exhibit 1 of your
21 report. This is your -- for want of -- I'll call
22 it your CV although --
23     A.   It's not really.
24     Q.   -- it's not really a CV. What would

- MARTI KOPACZ - VOLUME 1-

1 you call it? Just a back -- description of your
2 background?
3     A.   Yes.
4     Q.   Okay. Why don't we just call it
5 Exhibit 1?
6     A.   Exhibit 1 is good.
7     Q.   Under "General Experience," you've
8 written about your -- about your experience with
9 financial projections and I'm going to read parts
10 of this, and I'm going to ask you questions about
11 it.
12     First sentence you've written -- by
13 the way, did you write this part of your report or
14 was it written for you by others?
15     A.   No. This is the -- this is the same
16 document that was attached to my proposal. It's
17 just in a different format, but the --
18     Q.   Sure.
19     A.   -- the -- the information is
20 generally the same and I think there's some
21 added -- there may be some added verbiage around
22 speaking engagements, publications and the like.
23     Q.   Sure. Is it accurate however?
24     A.   Yes, it is.

- MARTI KOPACZ - VOLUME 1-

Q.    So the first sentence says,
"Ms. Kopacz has prepared dozens of financial
projections for clients and reviewed and critiqued
dozens more prepared by others."
          This has been in connection with your
work at Phoenix and elsewhere?
A.    Yes.
Q.    And by "projections," you mean
forecasts as well as projections as we just
discussed?
A.    Yes.
Q.    And just as a general matter, when
you, yourself, have prepared projections, what
kind of assignment did you have that asked you to
prepare projections?
A.    Generally, it would be in the context
of representing a client that was financially or
operationally troubled, potentially involved in a
formal or informal restructuring or Bankruptcy
Court proceeding.
Q.    Okay.  And then you write you
"critiqued dozens more prepared by others."
          Would that be in a comparable --
comparable setting?

- MARTI KOPACZ - VOLUME 1-

A.    Yes.
Q.    Okay.  And then you write -- or this
exhibit says, "She has previously testified as to
the appropriateness of forecasting methodology,
the assumptions upon which forecasts are based and
the likelihood of an organization to meet its
forecast."
          Okay.  And what engagements asked you
to do that work?
A.    That -- the first time I ever
testified on forecasting and assumptions was in a
matter called HealthCo -- HealthCo.  It was a case
that -- and I believe it's in, we go back to my
proposal to the Court, it's listed and it will
tell you, but it was a bankruptcy case that
involved a failed leverage buyout transaction that
the trustee believed was a fraudulent conveyance.
Q.    Okay.
A.    And my engagement, I represented the
Lazard Freres who had been the investment banker
and Coopers & Lybrand, at the time the
accountants, who were being sued and my job was to
put myself back in the position at the time that
that transaction was done and evaluate the

- MARTI KOPACZ - VOLUME 1-

reasonableness of the projections that were made
then.
Q.    And this leads me to ask you a
question.
          I take it that a good deal of your
work in your career has involved entities that are
one way or the other involved in bankruptcy or
insolvency matters?
A.    Yes.
Q.    Have you, as a practice, represented
one side more than the other side; in other words,
creditors more than debtors or debtors more than
creditors in this work?
A.    I don't think -- I think it's very
balanced for the most part.
Q.    And you've also been involved in
municipal insolvencies?
A.    I have been involved in municipal --
troubled municipal situations.
Q.    Okay.  And what are some examples of
those?
A.    The one that I was involved in most
significantly and for the longest period of time
was Nassau County here in New York.

- MARTI KOPACZ - VOLUME 1-

Q.    Okay.  But you've had others too?
A.    Yes.
Q.    Okay.  Back to Exhibit 1, further
down it's written, "Ms. Kopacz understands the
nuanced area" -- "area of municipal budgeting."
          Do you see that -- budgeting.
A.    Yes.
Q.    Okay?  What -- what do you mean when
you say "nuanced area"?
A.    Municipal budgeting and government
accounting are significantly different than what
most of us become familiar with in the private
sector.  It involves fund accounting.  It involves
appropriations and encumbrances and concepts that
we don't have in the private sector.
Q.    When you say "incumbrances," what do
you mean?
A.    Encumbrances is a manner by which
government on paper sets aside funding for
particular projects or services or goods.
Q.    Okay.  And the next sentence says,
"Because municipal entities lack a 'standard' in
budgeting, forecasting and accounting, great
variations occur in the manner in which public

- MARTI KOPACZ - VOLUME 1-

1    entities report financial results and develop
2    forecasts."
3        When you say they "lack a standard,"
4    what do you mean by that?
5        A.    They -- private entities are for the
6    most part required to adhere to generally accepted
7    accounting principles. There are the government
8    version of accounting principles allow for a great
9    deal of variety and individual variation in terms
10   of how municipal entities report revenues,
11   expenses, capital expenditures, and the like.
12       Q.    Do municipalities typically approach
13   these issues in the same manner?
14       A.    No.
15       Q.    So how does one go about
16   understanding how any particular municipality has
17   handled its accounting?
18       A.    You have to do a detailed analysis of
19   whatever the revenue, the expense and the
20   accounting for that is.
21       Q.    You did that here in the case of the
22   City of Detroit?
23       A.    In -- in some cases, yes.
24       Q.    Okay. You certainly got to the point

- MARTI KOPACZ - VOLUME 1-

1    where you felt you understood how Detroit did its
2    forecasting and budgeting, correct?
3        A.    Is that -- are you talking before the
4    bankruptcy or during the bankruptcy?
5        Q.    No, during -- during your -- your
6    work.
7        A.    Right. In terms of those forecasts
8    and budgets --
9        Q.    Yes.
10       A.    -- as they relate to the plan?
11       Q.    Yes.
12       A.    Yes, I do.
13       Q.    Okay. Now, you mentioned that you
14   met with financial advisors, including Ernst &
15   Young and Conway MacKenzie?
16       A.    Yes.
17       Q.    As between the two, how have they
18   divided up the work of being advisors to the City?
19       A.    It's my understanding that Ernst &
20   Young was responsible for the ten-year baseline
21   plan, the 40-year plan and, at a functional level,
22   is responsible for the cash management for the
23   City. And that Conway MacKenzie developed the
24   restructuring and reinvestment initiatives, what

- MARTI KOPACZ - VOLUME 1-

1    we call the RRIs and looked at the operational
2    aspects of the City.
3        Q.    So, when you're looking at financial
4    forecasts, for the most part, you were looking at
5    the work of Ernst & Young?
6        A.    No. I looked at all of them
7    together.
8        Q.    Okay.
9        A.    Right.
10       Q.    The baseline forecast was just Ernst
11   & Young?
12       A.    Yes, my -- that's my recollection,
13   yes. It was just Ernst & Young at the time.
14       Q.    Okay. And then when the RRIs and
15   other things were involved, that's when Conway
16   MacKenzie input became part of the forecast?
17       A.    Part of the 40-year forecast, yes.
18       Q.    Now, let me just break this down so
19   that as we go down the road we can go more
20   quickly. And I apologize for the elementary
21   approach here.
22       Could you just describe for me as a
23   series of steps how one goes about preparing a
24   forecast in your experience?

- MARTI KOPACZ - VOLUME 1-

1        A.    To prepare -- in preparing a
2    forecast?
3        Q.    Correct.
4        A.    Okay. Generally, the -- the first
5    thing you do is estimate revenues.
6        Q.    Uh-huh.
7        A.    Then you estimate expenses.
8        Q.    Uh-huh.
9        A.    And in order to get those estimates,
10   you have to make assumptions and you have to have
11   a base -- a baseline. You have to decide when
12   you're going to start it and when you're going to
13   end it.
14       Q.    And then when you project -- and you
15   start with known numbers, correct?
16       A.    You generally will look at actual
17   results for prior periods.
18       Q.    And is there some mathematical means
19   then of taking the actual results and, from the
20   actuals, extrapolating the numbers in the years to
21   come?
22       A.    Sometimes that makes sense.
23   Sometimes that doesn't make sense.
24       Q.    And is it -- is it possible to --

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2  would it be possible for you to tell me when it
3  does make senses and when it does not make senses?
4      A.   I can give you an example.
5      Q.   Sure.
6      A.   If you had an ongoing operation, and
7  you were selling widgets to someone, right, and
8  that customer bought, you know, a hundred dollars
9  worth of widgets every year for the past ten
10  years, unless something suggested a contrary
11  behavior, you would probably project that they're
12  going to buy a hundred dollars worth of widgets.
13  Okay?
14          On the expense side, if you're
15  manufacturing those widgets in a production plant
16  and it costs you 80 cents to make a widget, right,
17  but then you're building a new plant and all of a
18  sudden your costs are going to go down to 65, you
19  wouldn't be using the continuation of the
20  historical cost to make a going-forward
21  projection.
22      Q.   Now, is it sometimes the case as you
23  extrapolate forward, instead of having a constant
24  value, you're dealing with a value that is
25  expected to increase in some manner or decrease in

1      - MARTI KOPACZ - VOLUME 1-
2  some manner year to year to year; in other words,
3  either in the linear or nonlinear function?
4      A.   Yes, it is.
5      Q.   Okay.  And what do you do when you're
6  faced with that type of a forecast?
7      A.   You have to look at the basis for why
8  the change is going to occur and evaluate it with
9  the information you have as to, you know, does
10  that new assumption make sense.
11      Q.   Now, when you dealt with looking at
12  the forecasts for the City of Detroit, did you
13  find that those extrapolations required
14  forecasting that was not a constant value for
15  either revenue or expense year to year in the
16  years that were coming?
17      A.   In some cases, yes.
18      Q.   So how did you determine what the
19  appropriate coefficient was year to year to
20  increase or decrease the projected amount?
21      A.   The -- the example that I can give
22  you is the baseline is -- for example, the
23  baseline projections include ongoing pension
24  expense.
25      Q.   Okay.

1      - MARTI KOPACZ - VOLUME 1-
2      A.   Ongoing interest expense.  Obviously,
3  as the City worked through its bankruptcy and its
4  plan, it became clear that those weren't going to
5  get paid, so those numbers changed in line with
6  what the settlements were.  So I didn't really
7  have to make -- it was a number that was in the
8  ten-year that didn't need to be there, so it just
9  came out.
10      Q.   So that came out.
11          Let me take the example though of a
12  revenue item.  I don't -- we'll just make it
13  income tax.
14          As you looked at the forecasts of
15  income tax revenue in the years to come, it was
16  not a constant number, correct?
17      A.   Correct.
18      Q.   And it went up or down as the years
19  went on, correct?
20      A.   Yes.
21      Q.   And it went up or down for various
22  reasons, such as incomes and other factors such as
23  that, correct?
24      A.   Yes.
25      Q.   How did you determine whether a

1      - MARTI KOPACZ - VOLUME 1-
2  forecast of income in future years -- income tax
3  revenues in future years was or was not a
4  reasonable forecast?
5      A.   I looked at historical information.
6  I looked at the outside -- the statewide
7  information from various parties, and I and my
8  team interviewed the team at Ernst & Young who did
9  the analysis and the development of these
10  projections.
11      Q.   Fair to say you didn't simply accept
12  the credibility of the Ernst & Young assumptions?
13      A.   I did not.
14      Q.   Or the Ernst & Young calculations?
15      A.   I did not.
16      Q.   You did your own checking of them?
17      A.   I did.
18      Q.   And then used your own knowledge base
19  to reach a conclusion about the quality of Ernst &
20  Young's work?
21      A.   I -- I didn't reach a conclusion
22  about the quality of Ernst & Young's work.  I
23  reached a conclusion on the reasonableness of
24  those assumptions.
25      Q.   Okay.  And -- and by the way, the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 7 of 52

1          - MARTI KOPACZ - VOLUME 1-
2   process you just described for me, we used the
3   example of income tax.
4          A.    Yes.
5          Q.    Would it -- would you give the same
6   answer if I asked about other types of taxes of
7   revenue items in terms of your general approach?
8          A.    Yes.
9          Q.    And in terms of various items of
10  expense in terms of your general approach?
11         A.    Yes.
12         Q.    Okay.  Now, let me, if I could, just
13  ask you about some of the opinions that you
14  reached.
15         A.    Uh-huh.
16         Q.    And on Page 200 of your report you
17  speak of some of the qualitative issues.
18         A.    Yes.  I have quantitative issues on
19  200.
20         Q.    I'm sorry.  Quantitative, sorry.
21  Advancing age and failing eyesight has -- has
22  undermined me.  Yeah, on quantitative issues.
23         A.    Yes.
24         Q.    The first paragraph you write, "It is
25  my opinion that except for otherwise noted in my

1          - MARTI KOPACZ - VOLUME 1-
2   report the projections are generally
3   mathematically correct and materially reasonably
4   and, therefore, fall within the feasibility
5   standard I have defined."
6          Do you see the language I read?
7          A.    Yes.
8          Q.    I notice there's a typo.  Did you
9   mean to write "materially reasonable" instead of
10  "materially reasonably"?
11         A.    Yes.  Thank you.
12         Q.    It's all right.  It's basically what
13  lawyers are trained to do is look for typos.  I
14  went to law school imagining myself in front of
15  the U.S. Supreme Court; instead I've become a
16  glorified proofreader.
17         All right.  Now, when you say the
18  generally mathematically -- the projections you're
19  speaking about are the City's 10 and 40-year
20  projections?
21         A.    That's correct.
22         Q.    And we already -- go ahead.  I'm
23  sorry.
24         A.    And the -- and the RRI projections.
25         Q.    And I've already asked you about the

1          - MARTI KOPACZ - VOLUME 1-
2   phrase "mathematically correct."
3          A.    Uh-huh.
4          Q.    What do you mean when you say
5   "materially reasonable"?
6          A.    I believe the projections taken as a
7   whole are reasonable.
8          Q.    And then the next paragraph says, "It
9   is my opinion that, except where otherwise noted
10  in my report, the individual assumptions used to
11  build the projections fall into a reasonable range
12  and that, when taken as a group, these assumptions
13  are also reasonable."
14         Can you tell me why you were able to
15  reach that conclusion?
16         A.    Because we reviewed and looked at
17  every line item, every cell of every model.
18         Q.    And how big was this model?
19         A.    The -- the E&Y model is, my
20  recollection, I think about a -- over a hundred
21  sheets -- over a hundred Excel spreadsheets.
22         Q.    Okay.
23         A.    The Conway model is actually about
24  30 models together and each of those models is
25  multiple Excel spreadsheets.  Clearly, Kevin Barr

1          - MARTI KOPACZ - VOLUME 1-
2   on my team probably knows exactly how many pages
3   there are, but it's hundreds.
4          Q.    And you looked at every one of those
5   worksheets --
6          A.    He did -- he did.  I didn't.
7          Q.    And every -- every cell of every
8   worksheet?
9          A.    He did.
10         Q.    On Page 37 of your report, you refer
11  to -- you state at the bottom, there's a carryover
12  sentence having to do with the fact that the City
13  does not have an aggregated forecast to use.
14         Can you tell me what you meant by an
15  "aggregated forecast"?
16         A.    Can you show me the sentence?
17         Q.    It's the carryover.  It says, "while
18  the respective -- "
19         A.    Ten-year 40-year.
20         Q.    Yes.  And then it carries over and
21  the language I was referring to is the top of the
22  next page.
23         It says, "The City does not have an
24  aggregated forecast to use as a fiscal road map
25  going forward."

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2      Q.     Would your answer be the same if I
3  ask you whether that had to be provided for in
4  today's contingency?
5      A.     Yes.
6      Q.     And just so we don't spend all day on
7  pensions, there were other issues identified as
8  well in your report having to do with pensions,
9  correct, besides --
10     A.     Yes.
11     Q.     And your answer would be the same
12 that, although that is a potential cost to the
13 City in future years, it is not something that
14 would have to be reflected in the contingency
15 today?
16     A.     Correct.
17     Q.     Okay.  Let's look, if we could, then
18 I'll move on and almost be done, on Page 200 and
19 201?
20     A.     200 and 201.
21     Q.     The bottom --
22            (Whereupon, a brief discussion was
23            held off record.)
24 BY MR. STEWART:
25     Q.     Anyhow, 200 to 201, you've written in

- MARTI KOPACZ - VOLUME 1-

1
2  the carryover sentence, and I'm going to start in
3  the middle of it, "I believe that there are enough
4  conservative assumptions in the projections to
5  offset what I view as an aggressive assumption
6  concerning the level of contingencies particularly
7  in the early years."
8            And fair to say that the aggressive
9  assumption on contingencies is the 1 percent?
10     A.     Yes.
11     Q.     And the conservative assumptions
12 would be what?
13     A.     I think the -- I think there are
14 reasonably conservative assumptions on the revenue
15 side.
16     Q.     Uh-huh.
17     A.     I think there are -- there are some
18 reasonably conservative assumptions relative to
19 the total head count in the early years in terms
20 of the people employed by the City.
21     Q.     Anything else?
22     A.     Not off the top of my head.
23     Q.     And when you use the phrase
24 "conservative assumptions," what do you mean?
25     A.     Conservative would mean -- a

- MARTI KOPACZ - VOLUME 1-

1
2  conservative assumption would be something that
3  would either cause a reduction in the value of the
4  revenue or an increase of the value of the
5  expenses.
6      Q.     Have you attempted to quantify the
7  conservative assumptions in the City's
8  projections?
9      A.     I have not.
10     Q.     You then go on the say, "While I do
11 not believe a 1 percent contingency is adequate, I
12 believe that the POA projections taken as a whole
13 fall within the range of reasonableness and within
14 my definition of the feasibility standard."
15            Do you see that?
16     A.     That's correct.
17     Q.     And are you saying that, although the
18 1 percent contingency is not enough, the other
19 conservative assumptions offset any shortcomings?
20     A.     I'm saying taken as a whole -- the
21 projections with all of the conservative and
22 aggressive assumptions taken as -- as a whole are
23 reasonable.
24     Q.     Okay.  Let me ask you about
25 sensitivity analyses now.

- MARTI KOPACZ - VOLUME 1-

1
2      A.     Okay.
3      Q.     And you have about a half dozen of
4  them in your report, correct?
5      A.     I haven't counted them.
6      Q.     Okay.  Well, nor are we going to
7  itemize them all here, but they seem to be about
8  that many.  And let me just go to the first one,
9  which is on Page 48, 49.  And this is the
10 sensitivity analysis about income taxes.
11     A.     Okay.
12     Q.     And the analysis is described on
13 Page 48 and the table is on 49.
14     A.     Uh-huh.
15     Q.     Is it fair to say that this is the
16 mathematical exercise of the simply showing what a
17 1 percent change results in if no other constants
18 change?
19     A.     That's correct.
20     Q.     In fact, a change in taxable income
21 could affect other constants, right?
22     A.     It could.
23     Q.     And if so, the sensitivity analysis
24 would have to be altered to take into account
25 those other changes; is that right?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    Generally, a sensitivity analysis is
3  done around a single variable.
4    Q.    Okay.
5    A.    Right?
6    Q.    And all of the sensitivity
7  analyses -- analyses you have done have been done
8  around a single variable, right?
9    A.    Yes.
10    Q.    And when it predicts a -- the effects
11  of a 1 percent change, it would be that absolute
12  number whether the 1 percent is up or whether the
13  1 percent is down, correct?
14    A.    Yes. Yes.
15         MR. STEWART: That is all I have.
16         MR. HACKNEY: This might be a good
17  time for a break. I'm going to move all my
18  stuff over there.
19         MR. STEWART: Sure.
20         THE VIDEOGRAPHER: Okay. The time
21  now is 11:04 a.m. We're going off the
22  record.
23         (Whereupon, there was a brief recess
24  in the proceedings.)
25         THE VIDEOGRAPHER: Time now is

- MARTI KOPACZ - VOLUME 1-

1
2  11:12 a.m., and we're back on the record.
3  EXAMINATION BY MR. HACKNEY:
4    Q.    Ms. Kopacz, we've met before but --
5    A.    We have.
6    Q.    -- I'll introduce myself again. My
7  name is Steve Hackney and I represent Syncora in
8  the City of Detroit bankruptcy case. It's ice to
9  see you again.
10    A.    Nice to see you again.
11    Q.    Let me ask you some open-ended
12  questions at the start here.
13         I first want to confirm that you're
14  not intending to offer opinions other than the
15  ones that are contained in your report, correct?
16    A.    That is my intention, yes.
17    Q.    Okay. And you have disclosed the
18  bases for your opinions as well as the facts and
19  data that you considered in your report, correct?
20    A.    Yes.
21    Q.    What are the limitations of the EY
22  forecasts in your view? And I'm going to get some
23  terminology down here, which is to say when I
24  refer to the EY forecast at large, I mean all of
25  them. So I mean the -- the baseline forecast

- MARTI KOPACZ - VOLUME 1-

1
2  without RRIs. I mean the forecast with RRIs. I
3  mean the 40-year forecast. So when I refer to the
4  forecasts at large, I'll call them the EY
5  forecasts. Does that work for you?
6    A.    And that includes the Conway
7  position?
8    Q.    It does.
9    A.    Okay.
10    Q.    Because you have to -- to have a name
11  for them and ultimately EY assembled them.
12    A.    Right.
13    Q.    And so -- I mean, I can call them
14  whatever you want, put it another way --
15    A.    Okay.
16    Q.    -- but if there's a time where you
17  want to say well, Steve, I need to talk about this
18  instead of this, let me know. Okay?
19         And, as a general rule, if I ask you
20  a question that doesn't make sense, as I am wont
21  to do, will you please let me know so that I can
22  rephrase it?
23    A.    Yes.
24    Q.    If you -- do you understand that if
25  you answer my question, I'm going to assume that

- MARTI KOPACZ - VOLUME 1-

1
2  you understood my question?
3    A.    Yes.
4    Q.    So going back to it, what are the
5  limitations of the EY forecasts that are included
6  in the plan in your view?
7    A.    The limitations? I'm struggling with
8  the word "limitations."
9    Q.    Okay.
10    A.    As I said in an answer to
11  Mr. Stewart's question, the projections in the
12  City's plan are -- were created for specific
13  purpose and they are not what we would typically
14  expect to see as a set of projections for a plan
15  of reorganization in a Chapter 11 case. So,
16  they're just -- they're -- it takes more effort to
17  understand what they are and what they aren't.
18    Q.    Going back to that, I wanted to make
19  clear that you are specifically disclaiming any
20  opinions on whether the -- whether the plan is in
21  the best interests of creditors, correct?
22    A.    That was not in my scope.
23    Q.    And you don't have any opinions on
24  that?
25    A.    I do not have an opinion.

- MARTI KOPACZ - VOLUME 1-

Q.    And you did not attempt to -- to
determine whether the -- the City might do better
than the -- the forecasts such that there would be
more to distribute to creditors, correct?

A.    Yes.  And I -- I think at some point
in my report I said there are -- there are things
that I didn't -- that I very clearly didn't do,
and I didn't -- I didn't look at best interest of
creditors.  It was outside of my scope, and I
didn't look to see if there was a way in which the
City could generate more cash, and I didn't look
at any of the alternative plans.

Q.    And just to be clear, to the extent
the City is purporting to use the projections to
satisfy the best interests of creditors test, you
do not have an opinion that the projections are
appropriate for that purpose, correct?

A.    I don't have any opinion around best
interest at any level.

Q.    Okay.  But I have to tie it to the
forecasts as well, correct?  You're not saying
these forecasts satisfy the City's burden in
connection with the best interests of creditors?

A.    I -- no.  I don't have any -- I don't

- MARTI KOPACZ - VOLUME 1-

have anything to say about that.

Q.    Okay.  I guess -- let me go back to
the subject of limitations and give you an example
to help inform my question a little bit.

So you're aware that the City has
what I'll describe as troubled data systems with
respect to the collection of financial records?

A.    Yes.

Q.    You're also aware that the forecast
is, in some respects, based on historical
financial records?

A.    Yes.

Q.    So, an example of a limitation would
be that if the City has historical financial
records that are of questionable reliability, that
that could be a limitation on the accuracy of the
forecast.  So I'm using this as an example of
something that could be a limitation.  I'm not
saying that it is or it isn't, but I'm trying to
inform my question to you more to help put some
meat on the bones so to speak.

A.    The City has accurate financial
information once a year when it completes its --
its annual audit and gets its annual financial

- MARTI KOPACZ - VOLUME 1-

stuff, right?  And at that point in time, when
KPMG signs off and it files its CAFR, then --
CAFR, C-A-F-R, comprehensive annual financial
report, those are numbers that have been vetted,
if you will.

Q.    The negative implication of your
question is that in between CAFRs, the City does
not have reliable financial records, correct?

A.    They have ad hoc records.

Q.    They are definitely ad hoc.

A.    Yes.

Q.    Are they reliable?

A.    Some may be and some may not be.

Q.    Okay.  You did not have sufficient
time to audit the records of the City, correct?

A.    No, and it wasn't in my scope.

Q.    Okay.  So you have not made a
determination as to whether the financial
information upon which the projections are built,
to the extent that they're not derived from a
CAFR, are based on reliable financial records,
correct?  You haven't made that determination.

A.    Can you repeat the question, please?

MR. KANE:  I was distracting her with

- MARTI KOPACZ - VOLUME 1-

the microphone.

MR. HACKNEY:  That's okay.  It's a
long one, but I think it was the best way to
ask it, so it may be better to have it read
back.

(The question requested was read back
by the reporter.

THE WITNESS:  That didn't help me.
Can we try again?

BY MR. HACKNEY:

Q.    Yeah.  So, I think -- let me try and
summarize what you've said.

I believe that you have testified
that you believe the CAFRs are reliable financial
information sets, correct?

A.    Right.  I -- the CAFRs are based on
financial information that has been tested and
vetted and upon which KPMG has opined.  Okay?

I may quibble with some of the
accounting that's in there just because I have a
view of certain things.  Okay?  But at least at
that point in time, if we're looking at, for
example, the CAFR in June of '12, which was the
basis for the original baseline by E&Y, if they

26 (Pages 101 to 104)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 11 of 52

1      - MARTI KOPACZ - VOLUME 1-
2  said they had 10,002 employees and they paid them
3  $386 million, I think those are probably very good
4  numbers.
5      Q.   Okay.  So, I think we're on common
6  ground when we say to one another the CAFRs are in
7  your view reliable financial information sets,
8  correct?
9      A.   Right.
10     Q.   We then talked about the -- in the
11  interim between --
12     A.   Right.
13     Q.   -- between the CAFRs, I think your
14  testimony was to the effect of some information
15  may be reliable and some may not be reliable,
16  correct?
17     A.   Yes.
18     Q.   That's part of the problem that
19  Detroit is facing now, right, it's difficulty with
20  its an assembly of financial information?
21     A.   Yes.
22     Q.   So my question is that to the extent
23  that the forecasts in the plan are based on
24  information that was developed after the 2012
25  fiscal year CAFR, you have not made an assessment

1      - MARTI KOPACZ - VOLUME 1-
2  of whether that financial information is reliable,
3  correct?
4      A.   Individually that is correct.  Yes.
5      Q.   Okay.  And isn't it true that the
6  fiscal year 2013 CAFR just came out last week?
7      A.   That is correct.
8      Q.   So that wasn't available to the
9  forecasters at EY in connection with their
10  forecast, correct?
11     A.   Parts of that -- information that is
12  contained in the CAFR is available throughout the
13  year.  So, for example, the City has a good handle
14  on cash, so it can tell you how much cash it has
15  and how much cash it has to pay, right?
16          What its future obligations may be
17  for some construction project that's going on, it
18  probably can't tell you.
19     Q.   Okay.  So there were parts of the
20  2013 CAFR that may have been available to E&Y --
21     A.   Yes.
22     Q.   -- and parts that were not?
23     A.   Correct.
24     Q.   And they -- the same parts were
25  available to you and not, correct?

1      - MARTI KOPACZ - VOLUME 1-
2      A.   Yes.
3      Q.   Okay.  Now, with respect to the
4  forecasts that are included in the plan, what is
5  the base year for those forecasts?
6      A.   The base year for the original
7  ten-year was 2012 and then it was updated for
8  information that was known in 2013 and it has been
9  subsequently updated for information that is known
10  in 2014, which is the year we just finished.
11     Q.   So let's get terminology straight,
12  because I would get this turned around.
13          But isn't it true that fiscal year
14  2013 ended on June 30th, 2013?
15     A.   Correct.
16     Q.   Okay.
17     A.   And that's the first baseline.
18     Q.   And you understand that when the
19  first baseline forecast was being built it was
20  prior to the end of fiscal year 2013?
21     A.   Yes.
22     Q.   And so, in that forecast, the base
23  year was clearly fiscal year 2012, correct?
24     A.   Up to -- yes, and updated for what
25  was discernable and knowable before that

1      - MARTI KOPACZ - VOLUME 1-
2  projection was made.
3      Q.   So I understand that the projection
4  involves updating --
5      A.   Yes.
6      Q.   -- things, but when I talk about the
7  base year, that's not something that you update,
8  correct?
9      A.   Correct.
10     Q.   The base year is the historical base,
11  correct?
12     A.   Correct.  Yes.
13     Q.   So, when we get to the forecasts that
14  are included in the instant plan, the most recent
15  set of those was dated July 2nd, correct?
16     A.   Correct.
17     Q.   And that's of 2014?
18     A.   Correct.
19     Q.   What was the historical base year for
20  the forecasts that are in the plan?
21     A.   It's -- it's still the baseline plan,
22  ten-year plan, updated for the updated RRIs,
23  updated for the new 40-year.
24     Q.   But based off of fiscal year 2012?
25     A.   The baseline was 2012.

- MARTI KOPACZ - VOLUME 1-
1
2  Q.   Right.
3  A.   Right.
4  Q.   But what about the ten-year
5  restructuring forecast?  Is that base year 2012?
6  Base year 2013?
7  A.   The ten-year restructuring forecast,
8  I think of that as the 40-year plan.  The ten-year
9  that's within the 40-year?
10 Q.   Yes.
11 A.   I think that has been largely up
12 dated for '13.
13 Q.   Okay.  So is the base year for the
14 40-year that includes the 10-year --
15 A.   Yes.
16 Q.   -- fiscal year 2013?
17 A.   It's '12 adjusted for what they knew
18 about '13.
19 Q.   Okay.  So it's --
20 A.   It's a hybrid.
21 Q.   -- it's a bit of a hybrid?
22 A.   It is.
23 Q.   Okay.  And is that typical in
24 forecasting?
25 A.   Is it typical in forecasting?  It is

- MARTI KOPACZ - VOLUME 1-
1
2  typical if forecasting goes on for a long period
3  of time as this has.  And think about it.  They've
4  been -- they've been doing these forecasts for a
5  long, long time, and so they keep updating them.
6  But originally, it started with the baseline which
7  was predicated on '12 -- of 2012.
8  Q.   Okay.  And so to the extent the
9  forecast for 2013 was superseded by actual
10 results, your testimony is that the forecast was
11 updated to take account of the actual results that
12 had already happened?
13 A.   To the -- to the extent that -- yes,
14 there are -- there are updates.  Because there
15 are -- I'm trying to think, I think there are six
16 sets of projections, right?  We only focused on
17 the May 5th and the July 2nd, but there were other
18 sets of projections before that that existed, you
19 know, from that.  So, all of those have changed
20 and incorporated both new actual results and new
21 assumptions.
22 Q.   And the new actual results
23 post-fiscal year 2012 are ones that were derived
24 from something other than the CAFR, correct?
25 A.   As the CAFR was filed last week, yes,

- MARTI KOPACZ - VOLUME 1-
1
2  had to be.
3  Q.   Yeah.  It had to be.
4  A.   By definition, had to be.
5  Q.   Are there problems with the forecasts
6  that are in the plan in your view?
7  A.   Problems?  I -- I don't -- there's
8  not problems with them in the sense of where they
9  end up, right?  I, again, have been really
10 critical of how confusing they are.
11 Q.   I was going to say that it seems to
12 me that when a forecast is confusing, and I'm one
13 of the people that shares your view that they're
14 confusing, that strikes me as a problem with the
15 forecast.  I think a forecast should not be
16 confusing, but that's me and I wanted to ask
17 whether or not the confusing nature of the
18 forecasts was a problem from your point of view?
19 A.   It -- it caused my team to spend an
20 enormous amount of time in understanding and
21 checking the model, right?  It -- it -- I think
22 the -- the word I'd use in here or a word I used
23 at one point in time was it was tedious.
24 Q.   Isn't it fair to say that it -- it
25 took an enormous amount of time just to understand

- MARTI KOPACZ - VOLUME 1-
1
2  the model?
3  A.   We -- yes.  I -- I believe that I
4  have a good understanding of all the models.  You
5  know, members of my team have a -- an incredibly
6  intimate understanding of those models.  But that
7  required a significant effort on our part, but we
8  understand them now.
9  Q.   How long would you say it took you
10 and your team to reach the point where you could
11 say, okay, I now have an understanding of the
12 model?
13 A.   About the -- by the time we got the
14 July 2nd numbers, we had a really good
15 understanding of the May 5th numbers.
16 Q.   Okay.  So, you were retained on or
17 about April 22?
18 A.   April 22nd.  We got the working
19 models on the E&Y stuff Memorial Day.
20 Q.   Which was April 30 or something like
21 that?
22 A.   May something or other, right?
23 Q.   Okay.
24 A.   And, you know, within a couple of
25 weeks of actually getting the working models, we

28 (Pages 109 to 112)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 13 of 52

- MARTI KOPACZ - VOLUME 1-

1 were in -- in pretty good stead with understanding
2 the May 5th, and then we got the July 2nd and went
3 through a similar process with that; albeit, you
4 know, we already knew how they worked so it was
5 easier to do those.
6 Q. So would you say by the end of May
7 that you believe your team had achieved a good
8 working understanding?
9 A. No. By the end of -- by the end of
10 June.
11 Q. Oh, by the end of June?
12 A. By the end of June.
13 Q. And you --
14 A. We didn't get the working models
15 until the end of May.
16 Q. Okay. You had less than --
17 A. May something or other.
18 Q. You had less than 90 days to do your
19 work in this case, correct?
20 A. Yeah, whatever it's been.
21 Q. So May, June, July -- April 22 to
22 May -- July 18 I think.
23 A. Yes.
24 Q. Did you have sufficient time to do

- MARTI KOPACZ - VOLUME 1-

1 your work?
2 A. I feel like I did. I mean there's
3 still a couple of things that, as I said in to
4 response to Mr. Stewart, questions that I intend
5 to do going forward. But for the most part, I am
6 satisfied with our ability to evaluate what all
7 the information that was available and meet with
8 the people that were available and do what we
9 needed to do.
10 Q. With respect to the forecasts?
11 A. With respect to the forecasts.
12 Q. Now, with respect to the
13 restructuring and reinvestment initiatives, you're
14 not offering the opinion that they will achieve
15 the goals that they're held out to achieve,
16 correct?
17 A. No. No.
18 Q. And you haven't conducted a
19 comprehensive review of the City's department from
20 an operational standpoint to understand how the
21 restructuring and reinvestment initiatives map on
22 to needs of each department, correct?
23 A. I have not redone -- I have not
24 redone the work that Conway has done. That's for

- MARTI KOPACZ - VOLUME 1-

1 sure, right?
2 Q. And my question was, you haven't done
3 a comprehensive review to test whether Conway is
4 correct in either the assessment of operational
5 needs or its conclusion regarding whether the RRIs
6 will solve the operational needs, correct?
7 A. That's correct.
8 Q. What -- what revenue streams are not
9 included in the plan forecasts?
10 A. The Grand Bargain revenue streams.
11 Q. Okay. Those are not included in the
12 forecasts?
13 A. Well, they're in the forecasts, but
14 they're not in the -- they're in the plan
15 forecast, but they're not in the City's budget
16 because those monies don't -- they don't flow
17 through the city when they come in.
18 Q. Understood. Okay. So the Grand
19 Bargain forecasts are not -- not --
20 A. So the --
21 Q. -- in -- the Grand Bargain proceeds
22 are not in the City's forecasts, correct?
23 A. They're in the plan, but they're not
24 in -- I -- I may have confused myself.

- MARTI KOPACZ - VOLUME 1-

1 They're not in -- they're not what we
2 would consider to be part of the City's budget.
3 Q. Understood.
4 A. Right. But they're in the plan as a
5 sources of funds.
6 Q. Okay. So, let me -- let me put --
7 let me turn the question around, which is what
8 revenue streams did you not study?
9 A. I don't think that there was any
10 revenue stream of a recurring nature that we
11 didn't study.
12 Q. Well, what about something like DWSD?
13 Did you undertake an analysis to determine whether
14 in the future the City's general fund might obtain
15 revenue from what is currently known as DWSD?
16 A. We did not do that.
17 Q. Okay. So you have no opinions on
18 that one way or the other?
19 A. I do not.
20 Q. You are generally aware that there is
21 this concept that the DWSD may change the
22 structuring in which it's housed in a way that
23 yields an additional revenue stream to the general
24 fund?

1          - MARTI KOPACZ - VOLUME 1-
2          MR. KANE: Objection. You can
3     answer.
4     BY MR. HACKNEY:
5          Q.    Just -- are you aware of the concept?
6          A.    I'm aware that there's discussion
7     around that, yes, and that DWSD is an enterprise
8     fund.
9          Q.    Other than that, DWSD was outside
10    your scope?
11         A.    DW -- other than the pension funding
12    transfer from DWSD to the general fund, I did not
13    look at DWSD.
14         Q.    What about, did you study the
15    likelihood and magnitude of potential asset sales?
16         A.    I met with people in the City and
17    with the City's advisors to talk about potential
18    asset sales, yes.
19         Q.    Are potential asset sales included in
20    the plan forecasts as a potential source of
21    revenue?
22         A.    No.
23         Q.    Okay.  So, is it fair to say that,
24    because they're not in the forecasts, you don't
25    have an opinion on the likelihood of revenue that

1          - MARTI KOPACZ - VOLUME 1-
2     will arise from asset sales in the future?
3          A.    That's correct.
4          Q.    Okay.  What are the uncertainties
5     that exist over the next ten years that could
6     impact the forecasts?
7          A.    I think we went through them, right,
8     in the report?  The risk and opportunity.
9          Q.    So, yeah -- to the -- to the extent
10    there are uncertainties, if I want to know what
11    your view on that is, I should read your report?
12         A.    You should.  And it's the section on
13    risk and opportunity.
14         Q.    Do you agree that changes to the law
15    is an uncertainty that could impact the forecast?
16         A.    Changes to what law?
17         Q.    Any law.
18         A.    That impacts the City?  It could.
19         Q.    Changes to the tax law could
20    certainly impact the forecast?
21         A.    Yes.
22         Q.    Did you study the likelihood of
23    changes to tax law?
24         A.    Generally, no.
25         Q.    The macroeconomic condition of the

1          - MARTI KOPACZ - VOLUME 1-
2     United States could impact the City over the next
3     ten years, correct?
4          A.    It could.
5          Q.    Did you conduct a separate analysis
6     of that question?
7          A.    No.
8          Q.    What kinds of information were you
9     unable to examine regarding the forecasts?
10         A.    I -- the -- the exhibit here of what
11    the open requests I was not able, I obviously
12    haven't -- they're still open requests, so I
13    haven't looked at that.
14         Q.    Anything else other than that that
15    was something that you would have liked to have
16    had but you didn't?
17         A.    Not that I'm recalling.
18         Q.    What about information regarding
19    grants?  Did you undertake an assessment of what
20    grants the City is or is not likely to get in the
21    future?
22         A.    Only as it relates to the
23    departmental reviews, not a broad review of grants
24    that are available that it doesn't apply for, no.
25         Q.    What are the assumptions that area in

1          - MARTI KOPACZ - VOLUME 1-
2     the forecasts regarding what grants the City will
3     get?
4          A.    It -- again, there's an exhibit in
5     here that identifies the grants and the totality
6     of the grants, but they -- they're fire and
7     safety, public safety and transportation
8     primarily.
9          Q.    And did you undertake any assessment
10    of the likelihood that they would get those
11    grants?
12         A.    No, I mean in terms of -- no.  I mean
13    there -- I assumed -- I looked at the grants that
14    they're assuming they're going to get and I agreed
15    that it looks like they're going to get those
16    grants.
17         Q.    On what basis?
18         A.    On the fact that they've applied for
19    those, like the SAFER grants for the fire
20    department, those sort of things.
21         Q.    So the extent of your confirmation
22    was to confirm that they had, in fact, applied for
23    the grants?
24         A.    No.  My -- my analysis of that was to
25    get comfortable that the grants that were in the

- MARTI KOPACZ - VOLUME 1-

1
2      Q.    Have you ever seen another
3  municipality do a comprehensive general fund
4  forecast over a 40-year period -- a gen --
5  comprehensive general fund forecast over a 40-year
6  period?
7      A.    Forty years.
8      Q.    Yeah.
9      A.    No.
10     Q.    So, the two that are in the plan, the
11  10-year and the 40-year, are the first you've ever
12  seen a municipality do, correct?
13     A.    That I've ever seen?  Yes.
14     Q.    Have you ever seen a municipality do
15  a forecast when it was undergoing this level of
16  change?
17     A.    Personally?  No.
18     Q.    Ma'am, have you ever been qualified
19  in a court of law as an expert before?
20     A.    I have.
21     Q.    Okay.  And tell me how many times
22  that's happened to you?
23     A.    We should go back and look at my
24  testimony list, right?  Probably -- I don't think
25  it's in there.  I think it's in my proposal.  I

- MARTI KOPACZ - VOLUME 1-

1
2  referenced it.
3          MR. KANE:  I've got some copies of it
4  if you want it.
5  BY MR. HACKNEY:
6      Q.    Okay.  I missed that.
7      A.    Yeah.  More than two, probably less
8  than five, ten.  Something like that.
9      Q.    Okay.  So that means that's where a
10  Court has said Ms. Kopacz is an expert and I'm
11  going to allow her to testify on Subject X?
12     A.    Right.
13     Q.    And it's somewhere between two and
14  five?
15     A.    That's what I'm thinking.
16     Q.    What were the subjects of your
17  testimony?
18     A.    Generally, it's all been insolvency
19  and restructuring oriented.  So whether or not,
20  you know, an entity was solvent or insolvent.
21  Whether or not -- it's all -- I mean, my career
22  has been spent in restructuring, so it's all in
23  that context.
24     Q.    A very typical restructuring expert
25  testimonies that I come across in my practice, an

- MARTI KOPACZ - VOLUME 1-

1
2  example would be valuation.  Have you been
3  qualified as an expert in valuation?
4      A.    I don't think so.  I don't think so.
5      Q.    You talked about solvency.
6      A.    Yes.
7      Q.    Have you ever been qualified as an
8  expert in whether an entity is or is not solvent?
9      A.    Yes.
10     Q.    Have you ever offered expert
11  testimony as to whether or not a plan was
12  feasible?
13     A.    I don't think so in terms of that
14  narrow definition of feasibility.
15     Q.    Okay.
16     A.    Right?
17     Q.    Have you ever offered expert
18  testimony in a Chapter 9 case?
19     A.    No.  No.
20          MR. KANE:  Other than this one?
21  BY MR. HACKNEY:
22     Q.    Other than this one -- other than
23  today?
24     A.    Yeah.
25     Q.    Have you ever offered expert

- MARTI KOPACZ - VOLUME 1-

1
2  testimony on whether a plan satisfies the best
3  interests of creditors test?
4      A.    No.
5      Q.    Other than expert testimony on
6  insolvency, do you remember any -- any other areas
7  where you testified as an expert?
8      A.    Yes.  And I have testified -- I have
9  testified on behalf of clients in a variety of
10  bankruptcy hearings and confirmation hearings and
11  I -- to be honest with you, I don't really know if
12  that's expert or fact or some sort of mix of the
13  two.  All right?  I -- very few times in my career
14  have I been hired exclusively as an expert.  I've
15  generally been the financial advisor, the chief
16  restructuring officer or had some other role
17  before I got to the witness stand.
18     Q.    And it does create some complexity
19  because sometimes an FA will be a witness to facts
20  that happen in the bankruptcy.
21     A.    Yes.
22     Q.    And then they will also have the
23  expertise to render opinions, as we lawyers think
24  of them, in connection with their testimony.  So I
25  under -- understand what I think you're alluding

- MARTI KOPACZ - VOLUME 1-

1       - MARTI KOPACZ - VOLUME 1-
2  to, which it can sometimes be hard to
3  distinguish. Is that what you're saying?
4       A.   It is. And -- and I've -- like I
5  said, I've testified on projections and
6  reasonableness and solvency and ordinary course
7  and -- all that.
8       Q.   Have you ever worked in connection
9  with a Chapter 9 bankruptcy other than this one?
10      A.   No.
11      Q.   Just to tie it up, have you testified
12 as an expert in a deposition or at trial in the
13 last four years?
14      A.   Live testimony?
15      Q.   Yup.
16      A.   Yup, the answer to that --
17      Q.   I don't want to dead ones.
18      A.   -- the answer is no. Okay? There
19 are --
20      Q.   Well, I guess you could do
21 depositions on written questions I guess, if
22 that's what you meant.
23      MR. KANE: Are you done answering?
24      THE WITNESS: I am done answering.
25 BY MR. HACKNEY:

1       - MARTI KOPACZ - VOLUME 1-
2       Q.   So you've not testified, to the best
3  of your recollection, as an expert in a deposition
4  or at trial in the last four years, correct?
5       A.   That's correct -- I -- that's
6  correct. I'm thinking hard.
7       Q.   Okay. Maybe I'll just ask to confirm
8  that the report doesn't identify any and so I
9  assumed that there weren't any, but maybe just to
10 confirm to be safe.
11      MR. KANE: I've got the application
12      that's of record in the -- the court case
13      already that includes expert testimony
14      experience, so I can get that at a break
15      either now or later. But it was already of
16      record.
17      MR. HACKNEY: It's not urgent. If --
18      I don't know if you remembered whether there
19      was one in the last four, but it --
20      MR. KANE: To be honest, I don't
21      remember.
22      MR. HACKNEY: -- you're saying it
23      would be there. Yeah.
24      MR. KANE: It would be there.
25      MR. HACKNEY: That's fine.

1       - MARTI KOPACZ - VOLUME 1-
2       THE WITNESS: Yes.
3  BY MR. HACKNEY:
4       Q.   So, Ms. Kopacz, you have an
5  impressive record in the restructuring industry.
6  I've spent a lot time on the Internet reading it.
7       I won't go into all of your different
8  experiences just other than to say I was impressed
9  by them; But I do want to sort of clarify the
10 boundaries of your expertise so that we know where
11 you are holding yourself out as an expert and
12 where you're not. Okay?
13      You are not an actuary, correct?
14      A.   I am not.
15      Q.   And you don't hold yourself out as an
16 expert in actuarial science, correct?
17      A.   Correct.
18      Q.   You are not offering opinions as to
19 what the appropriate discount rate is or assets or
20 liabilities of a pension system, correct?
21      A.   That's correct.
22      Q.   Now, you are not an economist,
23 correct?
24      A.   That is correct.
25      Q.   And you are not holding yourself out

1       - MARTI KOPACZ - VOLUME 1-
2  as an expert in economics, correct?
3       A.   That's correct.
4       Q.   And you are not opining on the
5  macroeconomic factors that are or are not likely
6  to impact the City of Detroit in future years,
7  correct?
8       A.   That's correct.
9       Q.   You are not a statistician, correct?
10      A.   That's correct.
11      Q.   I think when you ask someone if
12 they're a statistician that every single person is
13 happy to say that they're not, other than
14 statisticians.
15      MR. KANE: Other than baseball.
16      MR. HACKNEY: Well, and we won't get
17      started on that. Maybe now she's going to
18      say that she is. You might be an expert on
19      baseball statistics.
20 BY MR. HACKNEY:
21      Q.   You don't hold yourself out as an
22 expert in statistics, correct?
23      A.   I do not.
24      Q.   You have not conducted statistical
25 analysis of the forecasts to determine, for

- MARTI KOPACZ - VOLUME 1-

1  example, whether they fall outside the standard of
2  deviation for mean analysis, correct?
3
4      A.   I have not attempted to calculate a
5  standard deviation for the forecasts; that is
6  correct.
7      Q.   And you have not applied statistical
8  science to the forecasts?
9      A.   That's correct.
10     Q.   Now, you are not a real property
11 appraiser, correct?
12     A.   That's correct.
13     Q.   And you don't hold yourself out as an
14 expert in property appraisal, correct?
15     A.   That's correct.
16     Q.   You have not conducted any studies to
17 determine the reasonableness of the City's
18 property tax appraisals, correct?
19     A.   Correct.
20     Q.   Do you agree that the assessed value
21 of the City's property tax base is an important
22 consideration to any analysis of property tax
23 revenues?
24     A.   Repeat -- say that again.
25     Q.   You bet.

- MARTI KOPACZ - VOLUME 1-

2          Do you agree that the assessed value
3  of the City's property tax base is a key
4  consideration to any analysis of property tax
5  revenue?
6      A.   I -- yes, in the sense that you need
7  to know what the assessed value is.
8      Q.   And also, what it's likely to be in
9  the future, right?
10     A.   You have to make an assumption around
11 it, yes.
12     Q.   Yeah.  Because the assessed -- do you
13 understand the nomenclature difference between
14 "assessed value" and "taxable value" in Michigan?
15     A.   A little bit.
16     Q.   Okay.  There are differences between
17 the two terms.
18     A.   Yes.
19     Q.   I'd like to find a way to not get
20 caught up in them, so maybe I'll --
21     A.   Why don't we just say property
22 values?
23     Q.   Yeah.  Yeah.  At a general level, the
24 property value's actually itself is a different
25 term from assessed value.

- MARTI KOPACZ - VOLUME 1-

2      A.   It is.
3      Q.   So it's just a horrible thing all
4  around.  But the -- the assessed value is
5  important to forecast of property tax revenue
6  because it represents the base against which the
7  millage rate is applied against which the
8  collection rate is applied from which you get an
9  understanding of what property tax revenues may
10 be.
11     A.   That is correct.  I agree with that.
12     Q.   Okay.  Now, you interviewed
13 Mr. Evanko the City's assessor; isn't that right?
14     A.   I did not.  One of the members of my
15 team did.
16     Q.   So you have not had a chance to speak
17 with him?
18     A.   I did not.
19     Q.   Who did?
20     A.   We'd have to go back on the contact
21 log.
22     Q.   Okay.
23     A.   To know who all was present in that
24 meeting.
25     Q.   And by "speak with," I meant even on

- MARTI KOPACZ - VOLUME 1-

1  the phone.
2      A.   I have not spoken with him, no.
3      Q.   Did you e-mail with him?
4      A.   I did not.
5      Q.   What did your team tell you about
6  what Mr. Evanko thought?
7          MR. KANE:  About what?
8          THE WITNESS:  About what?
9  BY MR. HACKNEY:
10     Q.   Anything.  I will make a loose
11 prediction that it related to property tax
12 assessments, but I don't mean to limit my
13 question.  I'm looking for my team -- my guys
14 talked to Evanko and they came back and told me X.
15     A.   They thought he was very capable.
16     Q.   Yeah.  Okay.  Did they tell you what
17 he thought about future property tax valuation --
18 property -- future assessed property values in the
19 City?
20     A.   I'm not real -- I'm not recalling a
21 conversation that I had with my team on that
22 specifically.
23     Q.   Do you understand that property tax
24 assessed values are equalized within a

- MARTI KOPACZ - VOLUME 1-

1    jurisdiction?
2
3        A.    Yes.
4        Q.    And then do you understand that that
5    jurisdiction's property tax values are then
6    equalized with other jurisdictions?
7        A.    When you mean "other jurisdictions"?
8        Q.    Meaning other jurisdictions outside
9    that city -- that municipality.  Do you understand
10   that there are multiple levels of equalization as
11   you go up towards the state level?
12       A.    I'm not sure I'm aware of that
13   process outside of Detroit.
14       Q.    Okay.
15       A.    Okay?
16       Q.    Are you aware of that process to the
17   extent it relates to Detroit?  Meaning -- let me
18   ask it another way.
19            Do you know that the tax roll in the
20   City ultimately goes through an entity at Wayne
21   County that then looks at the City's tax roll and
22   looks at other municipalities and then determines
23   an equalization factor to determine whether the
24   City of Detroit is over or under-assessed compared
25   to other municipalities?

- MARTI KOPACZ - VOLUME 1-

1
2        A.    Generally, yes.  Specifically, no.
3        Q.    Okay.  Meaning you have a general
4    sense that that happens, but you don't have a
5    specific understanding?
6        A.    I don't know how it does it.
7            MR. KANE:  Wait for him -- wait for
8        him to stop asking a question before you
9        start answering.
10           MR. HACKNEY:  That's okay.  It's
11       mainly for her benefit, so that she can go
12       one and one.
13           MR. KANE:  And your benefit to make
14       sure you know what the question fully is.
15   BY MR. HACKNEY:
16       Q.    And do you know what an equalization
17   factor of 1.0 means?
18       A.    I do not.
19       Q.    Do you know what Detroit's
20   equalization factor was over the prior 15 years?
21       A.    I do not.
22       Q.    Okay.  You are also not trained in
23   the social science of urban planning; is that
24   correct?
25       A.    That's correct.

- MARTI KOPACZ - VOLUME 1-

1
2        Q.    And you're not holding yourself out
3    as an urban planning expert, correct?
4        A.    That's correct.
5        Q.    You're not opining on whether or not
6    the restructuring and reinvestment initiatives
7    involve the an application of urban planning
8    disciplines to the City of Detroit, correct?
9        A.    Correct.
10       Q.    What are the key variables when it
11   comes to assessing future income tax revenue for
12   the City of Detroit?
13       A.    For the City of Detroit?  It occur --
14   it occurs at three levels.  There's a rate for
15   residents, a rate for nonresidents and a rate for
16   businesses.
17       Q.    And so within those levels, what are
18   the key variables that you have to study?
19       A.    We have to look at for -- for the
20   people, for the residents and the nonresidents, we
21   have to look at the number of people employed and
22   what the wage rates are.  Okay?  For the
23   corporations, it's -- it's corporate income.
24       Q.    So you look at the number of people
25   that are working, average wage or income levels?

- MARTI KOPACZ - VOLUME 1-

1
2        A.    Correct.
3        Q.    And then the tax rate, correct?
4        A.    Correct.
5        Q.    And then you also have to assess the
6    rate of collection, correct?
7        A.    Yes.
8        Q.    Any other variables that you can
9    think of that go into forecasting future income
10   tax revenues other than those?
11       A.    No.  That just they're slightly
12   different for the corporations.
13       Q.    Understood.  Understood.
14            Now, let's take something like
15   average income data, which I think is -- is
16   presented as a -- as a different concept from wage
17   data in the forecasts, correct?
18       A.    We're going to need to --
19       Q.    Take a look?
20       A.    Yeah.
21       Q.    Okay.  Let me -- let's take a step
22   back and look -- think of the concept of income in
23   a broad way that includes salaries or wages.
24   Okay?  I might be mistaken.
25            You haven't independently assessed

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  the average income data for the City of Detroit,
3  correct?
4      A.   That's correct.
5      Q.   Okay.  You relied on data that was
6  given to you by Ernst & Young?
7      A.   That's correct.
8      Q.   Okay.  And you haven't taken steps to
9  assess the accuracy of that data, correct?
10     A.   That's correct.
11     Q.   And with respect to the level of
12 unemployment in the City, you also relied on data
13 that was given to you by Ernst & Young, correct?
14     A.   Yes.
15     Q.   But you did not attempt to
16 independently verify that data --
17     A.   I'm not --
18     Q.   -- correct?
19     A.   -- sure.  I'm not sure what
20 independent information we had on employment -- on
21 unemployment.
22     Q.   Okay.  You may have.  You may not
23 have.  You just don't know?
24     A.   Yes.
25     Q.   Is it true that unemployment in the

1  - MARTI KOPACZ - VOLUME 1-
2  City of Detroit bottomed out in 2010?
3      A.   I don't know that.
4      Q.   Isn't it true that year over year
5  since 2010 unemployment has decreased?
6      A.   I don't know that.
7      Q.   Do you know how the City's current
8  unemployment rates compare to last year's
9  unemployment rates?
10     A.   I don't.
11     Q.   Let me ask you some questions about
12 the wagering revenues.
13          What is the tax rate that's applied
14 to the wagering revenues?
15     A.   It's in my report.  It's 10.95?  We
16 can look it up.
17     Q.   Did you conduct any independent
18 analysis of the gaming market in the City of
19 Detroit?
20     A.   I did not.
21     Q.   Okay.  So you didn't do an
22 independent study to understand, for example, the
23 impact that the Toledo casinos will have on the
24 casinos in the City of Detroit; is that correct?
25          MR. KANE:  He'll direct you to this

1  - MARTI KOPACZ - VOLUME 1-
2  if he wants you to look for the specific
3  page.
4          MR. HACKNEY:  Yeah, that's okay.
5          THE WITNESS:  Yeah.  No.
6  BY MR. HACKNEY:
7      Q.   I am correct when I say that, right?
8      A.   Correct.
9      Q.   And you also did not conduct any
10 sensitivity analysis around casino gaming revenue,
11 correct?
12     A.   Whatever's in here is what we did.
13     Q.   Okay.  So if you did sensitivity
14 analysis, it's in your report, correct?
15     A.   That's correct.
16     Q.   If it's not in your report, it's
17 because you didn't do it?
18     A.   That's correct.
19     Q.   What is the utility user's tax?
20     A.   It is a tax that the City of Detroit
21 assesses on telephone, cable, utility charges to
22 residents in Detroit.
23     Q.   Now, when it came to historical data
24 about utility user tax revenues, you relied on
25 what was given to you by Ernst & Young; is that

1  - MARTI KOPACZ - VOLUME 1-
2  correct?
3      A.   That's correct.
4      Q.   You did not attempt to independently
5  assess that data, correct?
6      A.   Correct.
7      Q.   And to the extent you conducted
8  sensitivity analysis around the utility user's
9  tax, it will be in your report?
10     A.   We did not.
11     Q.   You did not?  I --
12     A.   Did not.
13     Q.   It's not a memory test, but it's
14 fine.
15          Let's talk a little bit about your
16 experience -- your personal experience forecasting
17 municipal revenues -- or I'm sorry, doing
18 municipal forecasts of both revenues and expenses.
19 Okay?
20     A.   Okay.
21     Q.   So tell me about the times that
22 you've had the opportunity to do it personally.
23     A.   I have not directly worked for a
24 municipality in projecting revenues or expenses.
25     Q.   Okay.  What do you mean by

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2    "directly"?
3        A.    Well, I've -- I worked extensively
4    for the Nassau County Interim Finance Authority,
5    which is the state control board that oversees the
6    finances in Nassau County here in New York.  So,
7    the -- that -- that is -- again, it's not the
8    county itself.  It's the control board that
9    oversees the county.
10       Q.    Understood.  Okay.
11       A.    Right.
12       Q.    Now -- so let's try and -- let's try
13   and break it down a bit.
14             You personally have never done a
15   municipal forecast, correct?
16       A.    That's correct.
17       Q.    You have worked with municipal
18   forecasts in connection with your work for Nassau
19   County, correct?
20       A.    Correct, and other entities in
21   municipalities.
22       Q.    Okay.  That was my next question,
23   which is other than Nassau County, what
24   engagements have you had where you worked with a
25   municipal forecast understanding that you're not

1        - MARTI KOPACZ - VOLUME 1-
2    the one who created it?
3        A.    In -- I had an engagement where I've
4    been retained by seven transit authorities.
5        Q.    One engage meant?
6        A.    Yes, it was interesting.  New York,
7    Chicago, Boston, San Francisco, Minneapolis.  I'm
8    trying to think.  Oh, Dallas was part of that
9    group, right.  So I worked with their forecasts
10   and their budgeting and planning system.
11       Q.    Oh, I see.
12       A.    Right.
13       Q.    And that was limited to just their
14   enterprise funds?
15       A.    I -- I -- to be honest with you, I
16   don't know if they were just enterprise funds or
17   general funds, but it would have been departmental
18   level budgeting and projecting.
19       Q.    Can I describe your work for those --
20   those transit authorities as looking at their
21   operations and at the forecasts that related to
22   them and trying to understand how they could
23   improve operations in order to improve the
24   forecast?  Is that a generally accurate
25   description?

1        - MARTI KOPACZ - VOLUME 1-
2        A.    It could be -- you could generally
3    say that, but yes.
4        Q.    Okay.  Is it fair to say that in --
5    in that retention you weren't studying the
6    accuracy of the forecasts.  You were trying to
7    help the transit authorities improve?
8        A.    No.  In that situation we were
9    dealing explicitly with the revenue side of
10   transit businesses and advertising income and, you
11   know, pricing that.
12       Q.    Okay.  So you were trying to
13   understand the accuracy of the forecasts of the
14   transit revenue?
15       A.    And the -- and the potential to
16   transit revenue.
17       Q.    I see.  Okay.  So it was kind of a
18   mixture of trying to understand, first, whether
19   you agreed with forecast and then, second, trying
20   to understand whether doing things like
21   advertising might improve --
22       A.    No.  It had to do with long-term
23   contracts for advertising revenue to those transit
24   authorities relative to the person who -- the
25   entities that had contracted with them for the

1        - MARTI KOPACZ - VOLUME 1-
2    advertising revenue.
3        Q.    Okay.  So, we have NIFA, right, which
4    is the Nassau County --
5        A.    Yes.
6        Q.    I learned all about NIFA.  And then
7    we've got transit authority retention?
8        A.    We've got the transit authority.
9        Q.    Any other municipal retentions where
10   you've worked with a municipal forecast?
11       A.    In the -- in the Legal Aid Society
12   case, because the vast majority of the Society's
13   revenue comes from New York City or New York
14   state, okay, in terms of we worked with those
15   municipal entities relative to our own budgets.
16       Q.    I see.  So because they get money
17   from the state --
18       A.    Right.
19       Q.    -- you worked with --
20       A.    And the City and has to be
21   appropriate and legislated, yes.
22       Q.    And does that mean that you worked
23   with the state and city forecasts because had you
24   to understand them in order to prepare a forecast
25   for the Legal Aid Society?

38 (Pages 149 to 152)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 21 of 52

- MARTI KOPACZ - VOLUME 1-

1
2     A.     We had to understand what the
3  possibility of funding was from state and the
4  City, okay, and how the City's budget process
5  worked and how we got appropriated our monies.
6     Q.     But in that context, you were not
7  assessing the accuracy of either the state or city
8  forecasts?
9     A.     That's correct.
10    Q.     Okay. And in the Nassau County
11 retention, were you assessing the accuracy of the
12 Nassau County forecast?
13    A.     Yes.
14    Q.     Okay. So you were -- part of your
15 job was to evaluate the Nassau County forecast to
16 determine whether you agreed with it?
17    A.     Yes.
18    Q.     Okay. That's helpful.
19          What is the methodology that a
20 municipality typically employs when preparing a
21 forecast for its general fund?
22    A.     I'm not sure there's a typical.
23    Q.     Okay. So, I noticed in your CV that
24 you said one aspect of municipal -- I think you
25 said, we can get it out, but it was something like

- MARTI KOPACZ - VOLUME 1-

1
2  municipal accounting and budgeting is that there
3  is no standard.
4     A.     Correct.
5     Q.     Do you remember saying that in your
6  CV?
7     A.     Yes.
8     Q.     What did you mean by that?
9     A.     Well, there's no -- government
10 accounting -- there's something called the
11 Government Accounting Standards Board, okay, that
12 would like to believe that it creates standards
13 analogous to generally accepted accounting
14 principles. But there is a great deal of
15 variability in what the GASB prescribes in terms
16 of municipal accounting procedures, right? And
17 there is no standard for budgets. Okay? There is
18 no accounting standard that covers budgets.
19 Accounting covers historical recording of revenues
20 and expenses.
21    Q.     So, you're not aware, as you sit here
22 today, of any other government agencies or -- or
23 associations that have promulgated methodologies
24 for forecasting municipal revenues?
25    A.     There are. Okay? Either it's things

- MARTI KOPACZ - VOLUME 1-

1
2  like the Government Finance Officers Association.
3  There are trade associations. There are
4  quasi-oversight committees that -- panels and
5  groups that are trying to promulgate a set of
6  standards for municipalities in these areas, but
7  there's nothing that is as uniform and
8  acknowledged as we have with generally accepted
9  accounting principles and the way that the SEC
10 oversees that.
11    Q.     Okay. So have you reviewed the
12 publications of the Government Finance Officers
13 Association?
14    A.     I saw them.
15    Q.     Okay. It's fair to say that you
16 didn't review them in connection with this case,
17 correct?
18    A.     No, that's correct.
19    Q.     Okay. So, have you ever reviewed An
20 Elected Officials Guide to Revenue Forecasting,
21 which is a publication by the GFOA?
22    A.     I may have.
23    Q.     I'll show you what it looks like. It
24 looks like this.
25    A.     I would probably have looked at it

- MARTI KOPACZ - VOLUME 1-

1
2  online. I would probably not have looked at it in
3  a hard copy like that.
4     Q.     It's fair to say you didn't rely on
5  it though, correct?
6     A.     I did not.
7     Q.     Have you ever seen this book?
8  Revenue Analysis and Forecasting. It's by Barry
9  Blom and Salomon -- Barry Blom and Salomon
10 Guajardo?
11    A.     No. That I know I have not seen.
12    Q.     Okay. Do you know what the different
13 types of qualitative forecasting methods are that
14 are specified by the GFOA?
15    A.     Not off the top of my head, no.
16    Q.     And do you know what the quantitative
17 methodologies are that the GFOA specifies?
18    A.     Not off the top of my head, no.
19    Q.     So, for example, do you know what
20 naive forecasting is? I didn't make that up.
21    A.     You didn't make that up?
22    Q.     No.
23    A.     No.
24    Q.     Okay. Do you know what Delphi
25 forecasting is?

39 (Pages 153 to 156)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 22 of 52

- MARTI KOPACZ - VOLUME 1-

1
2    A.   No.
3    Q.   What about judgmental forecasting?
4    A.   No.
5    Q.   Consensus forecasting, do you know
6 what that is?
7    A.   Consensus generally means that
8 everybody agrees on It.  It's -- it's the way that
9 Michigan does its revenue forecasting and Detroit
10 does it.
11    Q.   That's using multiple people to check
12 one another, correct?
13    A.   Yes.
14    Q.   And then do you know what expert
15 forecasting is in the qualitative context?
16    A.   No.
17    Q.   Fair to say that you have never
18 consciously applied these methodologies in your
19 own forecasting work?
20    A.   That's correct.
21    Q.   And you did not in connection with
22 the City's forecasting?
23    A.   That's correct.
24    Q.   Now, let me ask you some questions
25 about the -- the quantitative types.

- MARTI KOPACZ - VOLUME 1-

1
2    Have you ever heard of econometric
3 forecasting?
4    A.   Yes.
5    Q.   Okay.  You did not perform any
6 econometric forecasting, correct?
7    A.   That's right.
8    Q.   Neither did the City, right?
9    A.   I'm not going to answer for the City.
10    Q.   Oh, you don't know whether they did
11 or they didn't?
12    A.   I'm not -- again, I didn't do any,
13 but I didn't -- I haven't seen any, so...
14    Q.   Sorry.  Maybe I'm not asking my
15 question the right way.
16    In connection with the City's
17 forecasts, you're unaware of anyone associated
18 with the City performing an econometric forecast?
19    A.   Like I said, I'm not aware of it, but
20 I don't know.
21    Q.   Okay.  So I'm not trying to -- I'm
22 not trying to sharp shoot you, but one of your
23 jobs here was to understand everything about the
24 forecasts, so --
25    A.   Yes.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.   To -- when you say I'm not aware of
3 someone doing it, your expectation is that it
4 wasn't done?
5    A.   That's correct.
6    Q.   Okay.  And similarly, have you ever
7 heard of regression analysis?
8    A.   Yes.
9    Q.   You didn't perform any regression
10 analysis with respect to the City forecasts?
11    A.   That's correct.
12    Q.   And to the best of your knowledge,
13 neither did the City, correct?
14    A.   Not that I'm aware of.
15    Q.   Okay.  Are you aware of -- of what's
16 called a time series forecast?
17    A.   Yes.
18    Q.   You didn't perform any time series
19 analysis of the City's forecast, correct?
20    A.   That's correct.
21    Q.   And to the best of your knowledge,
22 neither did the City?
23    A.   Not that I'm aware of.
24    Q.   Okay.  And then you're aware of a
25 concept of trend analysis, correct?

- MARTI KOPACZ - VOLUME 1-

1
2    A.   Yes.
3    Q.   You didn't perform trend analysis
4 with respect to the City's forecasts?
5    A.   That I would say we did.
6    Q.   Okay.  That is something you would
7 say that you did do?
8    A.   Yes.
9    Q.   And did the City do that?
10    A.   I believe the City did that.
11    Q.   Okay.  Now, have you reviewed the
12 National Advisory Council on State and Local
13 Budgeting and their publications?
14    A.   I have not.
15    Q.   Do you agree that forecasting is a
16 highly subjective area?
17    A.   Yes.
18    Q.   And, as such, it's subject to the
19 biases of the person doing the forecast, correct?
20    A.   Yes.  And -- and -- but I would
21 qualify biases as neither good nor bad.
22    Q.   Understood.  It's not a -- it's not
23 meant to be a negative word like -- like racial
24 bias.
25    A.   Right.

40 (Pages 157 to 160)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 23 of 52

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2        Q.    It's meant to be a word that says
3    your own personal viewpoint can have an impact on
4    your forecast?
5        A.    That's correct.  I agree with that.
6        Q.    And do you -- as a restructuring
7    professional, do you understand the idea that the
8    City here has an incentive to have a very
9    conservative forecast?
10        MR. KANE:  Objection.  You can
11        answer.
12        THE WITNESS:  I --
13    BY MR. HACKNEY:
14        Q.    Thinking about it from the stand --
15    just as a restructuring professional and drawing
16    on your experience, do you understand the general
17    concept that the City has an incentive to have a
18    conservative forecast because then it can say to
19    creditors, I have nothing more to give you, but if
20    it does better than the forecast, it will have
21    more cushion later.
22        MR. STEWART:  Objection.
23        THE WITNESS:  I'm struggling --
24        MR. STEWART:  Did you get my
25    objection to the question?

1    - MARTI KOPACZ - VOLUME 1-
2        THE WITNESS:  I'm not under -- I'm --
3    I'm struggling with incentive.
4    BY MR. HACKNEY:
5        Q.    Okay.  Let's turn it around then.
6        You didn't consider or analyze what
7    the biases of the City forecasters were, correct?
8        A.    Correct.
9        Q.    Okay.
10        MR. HACKNEY:  Ma'am, there is just
11        five minutes left on tape, and one of the
12        things I like to tell people is that a
13        deposition is not akin to being stretched out
14        on the rack.  So, if you would like to take a
15        lunch break, this could be a good time.
16        THE WITNESS:  I would like to take a
17        break.
18        MR. HACKNEY:  Okay.  Absolutely.
19        THE VIDEOGRAPHER:  Thank you.  The
20        time is now 12:17 p.m.  We're off the record.
21        This is the end of Disk Number 2.
22        (Whereupon, a lunch break was taken
23        from 12:17 p.m. to 1:20 p.m.)
24        THE VIDEOGRAPHER:  The time now is
25        approximately 1:20 p.m.  We're back on the

1    - MARTI KOPACZ - VOLUME 1-
2    record.  This is the beginning of Disk
3    Number 3.
4    BY MR. HACKNEY:
5        Q.    Ms. Kopacz, welcome back.
6        A.    Thank you.
7        THE VIDEOGRAPHER:  Do you have your
8        microphone on?
9        MR. HACKNEY:  I don't.  Neither of us
10        do.
11        MR. KANE:  Let the record reflect I
12        have mine on.
13        MR. HACKNEY:  Teacher's pet.
14        (Whereupon, a brief discussion was
15        held off record.)
16    BY MR. HACKNEY:
17        Q.    Okay.  Ms. Kopacz, so do you agree
18    that in order to minimize the impacts of
19    subjectivity, it is important for a forecaster to
20    utilize a reliable methodology?
21        A.    Never thought about it.
22        Q.    Okay.  Having thought about it for
23    the first time, do you agree?
24        A.    I don't know.  I don't know.
25        Q.    How about put it this way:  Do you

1    - MARTI KOPACZ - VOLUME 1-
2    agree that it's important for a forecaster to use
3    a reliable methodology?
4        A.    Yes.
5        Q.    What methodology did the City use?
6        A.    I'm not understanding the question.
7        Q.    Okay.  Methodology is one of those
8    words that's kind of hard.  It -- the more you try
9    define it, the more you can roll around in it.
10        Do you have a general understanding
11    of the concept of a methodology?
12        Let's try and get on common ground in
13    terms of what the word means and then we can try
14    and ask the questions.
15        A.    Okay.
16        Q.    So, when I talk about forecasting
17    methodology, what does that mean to you?
18        A.    Approach.
19        Q.    Okay.  Okay.  And so what approach
20    did the City utilize in compiling its forecasts?
21        A.    There's not -- I'm struggling because
22    I think the way you're using it is as if there's a
23    professional standard for methodology.  There are
24    like -- like we were talking about generally
25    accepted accounting principles.  There aren't --

1      - MARTI KOPACZ - VOLUME 1-
2  there's no -- there are no standards like that for
3  forecasting.  There are approaches that people
4  use, but I don't think there's any -- there's no
5  check-the-box sort of standard for forecasting.
6      Q.    Okay.  So you're not able to point to
7  a forecasting methodology that exists and say
8  whether the City employed that forecasting
9  methodology or not, correct?
10     A.    That's correct.
11     Q.    And that's because to the best of
12 your knowledge, you're not aware of a standard
13 forecasting methodology for municipal forecasts
14 like these, correct?
15     A.    Or -- yes, that's correct.
16     Q.    And you took a lot of time to learn
17 what the City did, right?
18     A.    Yes.
19     Q.    What you're not able to say is how
20 what the City did compares to what people
21 typically do when compiling a municipal forecast,
22 correct?
23     A.    Yes.
24     Q.    Because to the best of your
25 knowledge, there is no typical?

1      - MARTI KOPACZ - VOLUME 1-
2      A.    Every municipal forecast I've seen is
3  different.
4      Q.    Okay.  So, following on this line,
5  it's fair to say that you can't subject the City's
6  analysis to peer review, correct?
7      A.    I'm not sure I would say that.
8      Q.    You might be able to, you might not
9  be able to; you just don't know?
10     A.    I don't know who the peer would be.
11     Q.    Okay.  You can't compare it to
12 industry standards, correct?
13     A.    In -- "industry standards" being?
14     Q.    Municipal forecasting industry.
15     A.    Promulgated by whom?
16     Q.    Anyone.
17     A.    Again, I don't -- I guess the answer
18 would be no.
19     Q.    'Cause your view is that there aren't
20 any industry standards?
21     A.    That's correct.
22     Q.    So of course you can't, right?
23     A.    Yes.  Yes.
24     Q.    Did you attempt to compare the City's
25 approach to literature on the subject of municipal

1      - MARTI KOPACZ - VOLUME 1-
2  forecasts?
3      A.    No.
4      Q.    Could you have done that?
5      A.    I think we've got to go back and
6  decide -- define again what we're talking about.
7          I'm talking about the projections in
8  the plan of adjustment.  Okay?  There are no
9  standards that govern projections in a plan.
10 Whether that's a plan of adjustment, a plan of
11 reorganization or anything like that.  Okay?
12         The -- the quote, standards, and I --
13 and I put that in the finger quotes because I
14 think what you're trying to talk about is the City
15 budget or something -- again, like I said, I
16 don't -- there aren't standards that you would go
17 to to say how do you prepare these projections for
18 the plan of adjustment.
19     Q.    Okay.  And there's not literature
20 either?
21     A.    In the sense of?
22     Q.    Scholarly literature on the subject
23 of municipal forecasts of revenues and costs?
24     A.    I believe that there are -- there are
25 people that write on what would be good municipal

1      - MARTI KOPACZ - VOLUME 1-
2  finance practices; what would be good pension
3  forecasting practices; what would be good
4  actuarial -- I mean, there's lots of professional
5  literature on any topic that you want to find, but
6  that's not what we're talking about here.
7      Q.    Let's give an example.  There's
8  literature from the GFOA of which you are aware,
9  correct?
10     A.    And with all due respect none of it
11 covers a situation like a Chapter 9.
12     Q.    No, it covers municipalities, right?
13     A.    It covers municipality.
14     Q.    And for example, you didn't attempt
15 to take the City's forecasts and compare them to
16 the methodologies identified by the GFOA?
17     A.    No, no.
18     Q.    I'm correct when I say that?
19     A.    You are correct.
20         THE VIDEOGRAPHER:  Counsel, excuse
21 me.  You're rubbing against your mike.  I'm
22 sorry for the interruption.
23 BY MR. HACKNEY:
24     Q.    Are the City's forecasts amenable to
25 statistical testing?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    I don't know.
3    Q.    Okay.  Now, I think we talked about
4  earlier the fact that you haven't done any?
5    A.    That's correct.
6    Q.    Any statistical testing, correct?
7    A.    Correct.
8    Q.    Is it fair to say that the City's
9  forecasts are -- and I'm talking about the ones in
10  the plan of adjustment, you understand that,
11  right?
12    A.    Okay.
13    Q.    The City's forecasts are principally
14  the product of the judgment of the City
15  forecasters?
16    A.    I don't know who that is.
17    Q.    You don't know --
18    A.    What are -- tell me who those people
19  are.
20    Q.    Well, I was talking about the
21  forecasters that are the subject of your expert
22  opinion.
23    A.    Right.
24    Q.    So those forecasts are principally
25  the product of the judgments of the forecasters.

- MARTI KOPACZ - VOLUME 1-

1
2          Do you agree with that?
3    A.    I think so.  Yes.  The people who
4  prepare the forecast, it seems circular.  They
5  prepare the forecast, they make the assumptions
6  and the calculations, yes.
7    Q.    But the assumptions are ones that
8  they use their judgment to determine, correct?
9    A.    I believe that's correct, yes.
10    Q.    Who are the forecasters on the
11  revenue side for the City?
12    A.    Ernst & Young.
13    Q.    Yeah, I meant the people.
14    A.    Bob Kline and his team.
15    Q.    Who else?
16    A.    I -- I would -- I would have to -- we
17  could look and see who we talked about, but I
18  remember Bob.
19    Q.    Okay.
20    A.    And there are a couple of women who
21  worked with him.
22    Q.    Do you remember Caroline Sally?
23    A.    That's sounds familiar.
24    Q.    Okay.
25    A.    But, yes.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    And then Gaurav Malhotra?
3    A.    No.
4          THE REPORTER:  I'm sorry.
5          MR. HACKNEY:  Gaurav Malhotra.
6          And general spellings I can
7  definitely give them you at a break.
8    Q.    You remember Gaurav?
9    A.    Absolutely I remember Gaurav.
10    Q.    I didn't hear your answer, I'm sorry.
11    A.    I said Bob Kline and his team,
12  okay --
13          (Cell phone interruption.)
14          THE VIDEOGRAPHER:  I'm sorry that
15  shouldn't happen.
16          MR. HACKNEY:  That's okay.  That's a
17  good ringer.
18    A.    Bob Kline and his team, who are a
19  division of Ernst & Young in some way, shape or
20  form, were the professionals that worked on the
21  revenue projections.
22    Q.    On the revenue projections?
23    A.    Correct.
24    Q.    I see what you're saying.
25          Okay.  So, are you distinguishing

- MARTI KOPACZ - VOLUME 1-

1
2  Gaurav from Bob Kline's team --
3    A.    Bob --
4    Q.    Is it Bob Kline or Ron Kline?
5    A.    Bob.  Bob.  I think so.
6    Q.    Mr. Kline.
7    A.    Mr. Kline.
8    Q.    Let's get a sense of who's on
9  Mr. Kline's team and whether Gaurav is on that
10  team.
11    A.    Gaurav is the Ernst & Young partner
12  responsible for the Detroit engagement.
13    Q.    Got it.
14    A.    Okay?  Gaurav has work groups, right,
15  from various parts of Ernst & Young working for
16  him on this.
17          Bob Kline is the Ph.D. economist that
18  has a group of people also working for him that
19  worked on the revenue projections.
20    Q.    And the cost projections principally
21  came from Conway MacKenzie; is that right?
22    A.    No.  No.  It depends on which --
23    Q.    I see?
24    A.    The RRIs came from the Conway
25  MacKenzie.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 26 of 52

- MARTI KOPACZ - VOLUME 1-

1
2      Q.    The historical call cost expense came
3  from whom?
4      A.    The historical costs came from the
5  City. The cost projections came primarily from
6  Ernst & Young, a group of people that worked for
7  Gaurav.
8      Q.    I see. Okay.
9            So if I was thinking broadly about
10  the forecasts in the go-forward years, if I was
11  thinking about revenue forecasts, I'm thinking
12  about Mr. Kline's team?
13     A.    That's how I think of it, yes.
14     Q.    If I'm thinking about cost
15  projections that don't entail RRIs, I'm thinking
16  about Mr. Malhotra's team?
17     A.    Right. And he has specific people
18  that are responsible for specific parts of the
19  cost projections that work for him.
20     Q.    Understood.
21           Then if I'm thinking about RRIs and
22  their impacts on either costs or revenues, I'm
23  thinking about the Conway MacKenzie team?
24     A.    Generally that's correct.
25     Q.    And is this, by the way, part of the

- MARTI KOPACZ - VOLUME 1-

1
2  reason that you found the forecasts confusing is
3  because they were the product of actually three
4  different groups of forecasters?
5      A.    It's not that there are different
6  people involved. It is that they were never
7  harmonized and concatenated in a way that they're
8  all in one kind of place.
9      Q.    What is the experience of Mr. Kline
10  and his team when it comes to forecasting
11  municipal revenues?
12     A.    I don't know.
13     Q.    Okay. Did you make any effort to
14  assess that?
15     A.    I did not.
16     Q.    Was that important to you?
17     A.    I looked at -- I used all the
18  information that was available to me and all the
19  people that were available to me and -- got
20  satisfied with the projections in the plan as
21  being reasonable revenue projections.
22     Q.    Were you working under the assumption
23  that Mr. Kline and his team had substantial
24  experience forecasting municipal revenues?
25     A.    I did not make that assumption, no.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.    You hadn't thought about it one way
3  or the other?
4      A.    No, I did not make a determination
5  one way or the other.
6      Q.    Okay. Did you ever meet them in
7  person?
8      A.    I did not.
9      Q.    You spoke to them on the phone?
10     A.    I did.
11     Q.    And what was the experience of Mr.
12  Malhotra's team when it came to forecasting
13  municipal expenses?
14     A.    I don't know.
15     Q.    And what was the experience of the
16  Conway MacKenzie team when it came to projecting
17  the costs or revenues associated with a municipal
18  restructuring?
19     A.    I don't know.
20     Q.    Now, when you were assessing the
21  reliability of the assumptions that are in the
22  forecasts, did you independently seek to develop
23  your own assumptions first and then compare so
24  that you could then compare them to the City's
25  assumption and see how they compared?

- MARTI KOPACZ - VOLUME 1-

1
2      A.    No.
3      Q.    Okay.
4      A.    Generally not.
5      Q.    So what you did, instead, was you
6  first understood what the City's assumption was
7  and then you tested the reasonableness of that
8  assumption, correct?
9      A.    Generally that's correct, yes.
10     Q.    Okay. Why didn't you, for example,
11  kind of in order to avoid just, you know, the
12  impact that even seeing their assumption can have
13  on you, why didn't you say, What do I think wages
14  will be year over year for the next ten years, and
15  do the work independently and then see how it
16  mapped?
17     A.    Generally two reasons, time. When I
18  was appointed I had, I think, 62 days originally
19  between when I was appointed and when my report
20  was due.
21     Q.    Yeah.
22     A.    Okay. Secondly, I learned very
23  quickly the condition of the historical records of
24  the City, and realized that in order to get done
25  with my assignment, I was going to have to rely on

- MARTI KOPACZ - VOLUME 1-

1       - MARTI KOPACZ - VOLUME 1-
2   the assimilation of data that the other
3   professionals had acquired.  And that included the
4   creditors' professionals, as well.
5           Being the last person at the dance,
6   so to speak, I needed to rely on not only on
7   Ernst & Young and Conway, but Alvarez and FDI --
8       Q.   Yeah.
9       A.   -- and Houlihan, to help get us to
10  the best data that was out there.
11      Q.   So let me see if I can summarize, the
12  time that you were allotted which we discussed and
13  which I've told you I'm of the view wasn't very
14  much, but it was what it was, but the time that
15  you were allotted did not allow you to either
16  independently verify the data or independently
17  generate your own assumptions?
18      A.   I -- I wouldn't go so far as to say
19  we didn't independently verify because we did,
20  specifically on the revenue projections and things
21  surrounding those, we did seek other third-party
22  sources of data.  So --
23      Q.   There were instances where you sought
24  some form of corroboration?
25      A.   Separate and apart from the City.

1       - MARTI KOPACZ - VOLUME 1-
2       Q.   But in general, you'd agree with my
3   statement that you didn't have sufficient time to
4   independently verify all of the data on which the
5   forecasts are built in order to develop your own
6   assumptions?
7           MR. KANE:  Objection.  Go ahead and
8   answer.
9       A.   Yes.
10      Q.   You agree with me?
11      A.   Yes.
12      Q.   Your reliance materials only list the
13  City's CAFR for 2012 specifically by name?
14      A.   Uh-huh.
15      Q.   Is that the only CAFR that you
16  reviewed?
17      A.   We did not get the CAFR, the '13 CAFR
18  until after my report was filed.
19      Q.   Understood.
20          So we've had a conversation about the
21  '13 CAFR and how some of the information in it may
22  have been known to you --
23      A.   Right.
24      Q.   -- and other parts of the information
25  may not have been?

1       - MARTI KOPACZ - VOLUME 1-
2       A.   Right.
3       Q.   Let's put that to one side, now let's
4   go backwards in time.
5           Did you review any CAFRs other than
6   the 2012 CAFR?
7       A.   I did not.
8       Q.   And whether your team did or not, you
9   don't know?
10      A.   I don't know.
11      Q.   Do you -- is it your opinion that
12  none of the prior year CAFRs prior to 2012 have
13  any relevance to the City's financial projections?
14      A.   Like I said, I didn't look at it.
15  Don't know if my team did or not.
16      Q.   So, do you think they are relevant or
17  not?
18      A.   I don't know.
19      Q.   You don't know.  They might be, they
20  may not be?
21      A.   They weren't part -- they weren't
22  part of the basis for my opinion.
23      Q.   Okay.  But I'm asking about the
24  relevance of them?
25      A.   I don't know.

1       - MARTI KOPACZ - VOLUME 1-
2       Q.   You don't know what the relevance is?
3       A.   Yes.
4       Q.   Would you agree -- let's go back to
5   our word methodology which you've used to describe
6   as approach.
7           Methodologies is an important word in
8   the legal setting, that's why lawyers are always
9   asking about methodology.
10          But would you agree that the City did
11  not employ a uniform approach in constructing the
12  forecasts?
13      A.   Yes.
14      Q.   Would you also agree that the City
15  didn't apply a uniform methodology in constructing
16  the forecasts?
17      A.   I don't like the word methodology.
18      Q.   Okay.  You're more comfortable with
19  approach?
20      A.   I'm more comfortable with approach.
21      Q.   But can you describe what the
22  approach was?
23      A.   It depends on -- it depends on which
24  model we're talking about.  The original baseline
25  E & Y model, the Conway models, or the E & Y

1        - MARTI KOPACZ - VOLUME 1-
2   10-year, 40-year model.  It depends on what the
3   line item that is being projected is, okay?
4           And there are different approaches
5   used for estimating both revenues and expenses
6   depending on which one you're talking about and
7   who did it.
8       Q.    And then are there different
9   approaches even within categories like did they
10  employ a different approach to estimating
11  different types of revenue?
12      A.    Yes.  Well, revenue -- revenue in
13  terms of the E & Y models, no.  Okay.  There are
14  differences in approaches, for example, to
15  salaries and wages, depending on whether it's a
16  Conway model or whether it's an E & Y model.
17      Q.    Did you say in your expert report
18  that you found the City's model to be convoluted?
19      A.    And confusing.
20      Q.    Yeah.  Did you also say convoluted?
21      A.    Yes.
22      Q.    Okay.  I will put my hand up and
23  agree with you on that.
24          MR. KANE:  Objection.
25          MR. HACKNEY:  For now?

1        - MARTI KOPACZ - VOLUME 1-
2           MR. KANE:  What?
3   BY MR. HACKNEY:
4       Q.    So we've talked a lot about -- we've
5   talked about industry standards and -- but have
6   you ever seen another city employ the approach for
7   its forecasts that was employed here?
8       A.    No, because as we've established,
9   I've never seen another city like this doing
10  forecasts for a plan of adjustment.
11      Q.    True, but you have seen other cities
12  doing forecasts, right?
13      A.    Budgetary forecasts, yes.
14      Q.    Yeah.  Have you ever seen any of
15  those cities employ a methodology or an approach,
16  sorry, like this one?
17      A.    No.
18      Q.    When it comes to forecasting revenue,
19  do you believe that the forecasting technique that
20  you employed depends on the nature of the revenue
21  source that's being forecasted?
22      A.    Can you explain that?
23      Q.    Sure.  So do you understand that
24  there are -- certainly understand that there are
25  different types of revenue, right?  You understand

1        - MARTI KOPACZ - VOLUME 1-
2   that?
3       A.    Yes.
4       Q.    Income tax revenue is a different
5   type of revenue from wagering revenue, right?
6       A.    Yes.
7       Q.    Do you understand the idea that there
8   are -- there are -- that revenue is often divided
9   into two board categories of whether it's
10  deterministic on the one hand or volatile on the
11  other?
12      A.    I would agree there are different
13  types of revenue that have the different bases for
14  -- around which you would estimate.  But I would
15  want you to define those words before I would
16  agree or disagree with them.
17      Q.    Deterministic I use in the sense that
18  it means predictable and volatile means
19  unpredictable?
20      A.    Yes.
21      Q.    Have you ever -- do you understand
22  the idea that you can classify revenue streams as
23  being either predictable or unpredictable?
24      A.    I would think that is the analyst's
25  choice of how they want to describe them,

1        - MARTI KOPACZ - VOLUME 1-
2   generally.
3       Q.    Yes.  Right.  And did you undertake a
4   revenue portfolio analysis in this case?
5       A.    A revenue portfolio analysis?  Don't
6   know what a revenue portfolio analysis is.
7           We looked at all the revenues that
8   were presented in the plan of adjustment
9   projections.
10      Q.    So I guess can I say that to the
11  extent you undertook a revenue portfolio analysis,
12  you didn't do so consciously?
13      A.    I wouldn't -- I don't think -- that
14  sounds like a term of art, it doesn't sound like
15  something that you would think about.
16      Q.    That's -- that sounds like a term of
17  art from the world of revenue forecasting?
18      A.    It's somebody's -- it's somebody's
19  term of art, but it's not my term of art.
20      Q.    Okay.  Did you make an independent
21  assessment for yourself as to whether or not the
22  City's revenue streams could be classified as
23  either predictable or unpredictable?
24      A.    I looked at each revenue stream and
25  assessed whether I thought the City's forecast or

- MARTI KOPACZ - VOLUME 1-

1    future?
2        A.    I agree with that, yes.
3        Q.    That's a possible approach?
4        A.    Yes.
5        Q.    Correct?
6        A.    Uh-huh.
7        Q.    But separately, you can use a
8    statistical method like a time series forecast in
9    order to forecast future property revenues,
10   correct?
11       A.    You could, yes.
12       Q.    Let's describe those for purposes of
13   my question as two different methodologies, okay?
14       A.    Okay.
15       Q.    You never attempted to look at the
16   City's approach to any of the revenue streams and
17   say, they are using the wrong methodology,
18   correct?
19       A.    That's correct.
20       Q.    Now, within their methodology, what
21   you did is you looked at the assumptions that
22   went into the methodology the City adopted and
23   determined the reasonableness of those
24   assumptions, correct?

- MARTI KOPACZ - VOLUME 1-

1        A.    That's correct.
2        Q.    Okay.  And I take it as a corollary
3    of that, you don't have an opinion as to whether
4    the City utilized the correct methodology, not
5    assumptions, in forecasting the revenue that it
6    forecasted, correct?
7        A.    I accepted the methodology, whatever
8    that may be, that the City used and evaluated the
9    result of that methodology, plus the inputs and
10   the assumptions.
11       Q.    Okay.  You did not attempt to
12   critique whether they employed the correct
13   methodology, correct?
14       A.    I don't know that there is a correct
15   methodology, so --
16       Q.    Okay.
17       A.    -- the answer is I don't know.
18       Q.    So, you don't know if there is one so
19   you couldn't have critiqued it, right?
20       A.    I think that's correct.
21       Q.    Okay.  Now, have you -- you know that
22   the City's forecasts in one form or another, they
23   go back to the prefiling period 2013, correct?
24       A.    In terms of their preparation?

- MARTI KOPACZ - VOLUME 1-

1        Q.    Well, so let me -- I didn't ask that
2    very well.
3             So, do you understand that there was
4    a -- that there was a ten-year forecast in the
5    June 2013 proposal to creditors?
6        A.    Yes.
7        Q.    And do you understand that that
8    proposal to creditors included a forecast both
9    with and without the RRIs?
10       A.    I don't recall.
11       Q.    Okay.  Let me put it more generally.
12            Do you remember that there was a
13   forecast for what happens if there's no bankruptcy
14   and then there was a forecast for what happens if
15   there is a bankruptcy, or if there are
16   restructuring initiatives?
17       A.    My recollection of the June '13
18   projections that were provided to creditors was --
19   was this is the projection of what will happen.
20   Okay?  This is going to happen to this city in
21   terms of its obligations in the future.
22            So this was -- right -- and again, I
23   don't know about --
24       Q.    You don't remember --

- MARTI KOPACZ - VOLUME 1-

1        A.    -- multiple -- I don't remember
2    multiple versions.
3        Q.    Okay.  So, I'll tell you my
4    recollection of it was there was a so-called
5    steady state five-year forecast, but there was
6    also a ten-year forecast where they also presented
7    in an aggregate level the RRIs and then the delta
8    was amounts available for distribution of
9    creditors.
10            But if that doesn't ring a bell --
11       A.    My recollection of that projection
12   was that this is what's going to happen to this
13   city if nothing else changes.
14       Q.    Let's go up a level and I'll try to
15   not get bogged down in some of the specifics, but
16   let's do it this way:
17            You -- you agree that when the
18   forecasts -- that the forecasting process had
19   already begun prior to the bankruptcy, correct?
20       A.    Yes.
21       Q.    And the forecasting process that has
22   resulted in the forecasts that are in the plan has
23   continued throughout the bankruptcy, correct?
24       A.    Yes.

48 (Pages 189 to 192)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 30 of 52

- MARTI KOPACZ - VOLUME 1-

2    Q.   And so as a result of the passage of
3  time, as we sit here today, there are now actually
4  historical results that we have that are
5  historical as of today, that can be compared to
6  what was once a forecast, correct?
7    A.   That's possible, yes.
8    Q.   I take it you have not done that?
9    A.   I have not done that.
10    Q.   So you haven't attempted to validate
11  what the prior forecasts against subsequent
12  historical information that's come in?
13    A.   No, I have not.
14    Q.   Okay.  You have not -- I want to talk
15  briefly about taxes, okay?
16        You did not include -- you did not
17  conduct analysis of whether the City can increase
18  taxes, correct?
19    A.   That's correct.
20    Q.   Both from the standpoint -- you
21  didn't analyze whether it legally can increase
22  taxes, correct?
23    A.   Correct.
24    Q.   You also didn't analyze whether
25  economically if it did increase taxes, what would

- MARTI KOPACZ - VOLUME 1-

2  happen to the City, correct?
3    A.   Correct.
4    Q.   And you're offering opinions on tax
5  policy in this case, correct?
6    A.   I am not.
7    Q.   Now, is it correct -- I want to talk
8  about property value, okay?
9        Is it correct that the average
10  assessed value per parcel in the City of Detroit
11  decreased by 37 percent between 2008 and 2013?
12    A.   I'm not familiar with that data
13  point.
14    Q.   Do you know -- do you agree that
15  there was a substantial decrease in the assessed
16  value per parcel in the City of Detroit between
17  2008 and 2013?
18    A.   I don't know what "substantial" means
19  but I can say, I am aware that property value
20  -- assessed property values decreased.
21    Q.   What would you define "substantial"
22  as?
23    A.   I don't know.
24    Q.   I mean, you can do whatever you want.
25    A.   Property -- assessed property value

- MARTI KOPACZ - VOLUME 1-

2  decreased.
3    Q.   Do you know how much it decreased?
4    A.   I don't.
5    Q.   I take it you don't know what the
6  City's assessed property values are as you sit
7  here today?
8    A.   I do not.
9    Q.   And you haven't engaged in an
10  independent effort to determine what the assessed
11  value should be, correct?
12    A.   That's correct.
13    Q.   Now, is it reasonable to assume that
14  the assessed value per parcel in the City of
15  Detroit will fall by an additional 50 percent
16  between -- over the next seven years?
17    A.   I am not --
18        MR. STEWART:  Objection.
19    A.   I have no way to know that.
20    Q.   You have no way to test that
21  assumption?
22        Let's start -- you did not test that
23  assumption, correct?
24    A.   That's correct.
25    Q.   Okay.  There is a way to test the

- MARTI KOPACZ - VOLUME 1-

2  assumption, though, correct?
3    A.   I don't know.
4    Q.   Okay.  Do you understand that the
5  City's forecasts include assumptions about future
6  assessed value per parcel?
7    A.   I don't know -- I know that the
8  City's projections include estimates for property
9  taxes going forward, right.
10    Q.   Yes.
11    A.   I don't know what their per parcel
12  estimates have been.
13    Q.   Okay.  I take it you made no effort
14  to validate any assumptions regarding assessed
15  value per property?
16    A.   That's correct.
17    Q.   Or in the aggregate, correct?
18    A.   Or in the aggregate?
19    Q.   Meaning to the extent the City
20  aggregated assessed values across the City and
21  made assumptions about that, you did not test
22  those assumptions, correct?
23    A.   Correct.
24    Q.   Now, do you know what Mr. -- do you
25  know that the City reassessed its properties in

49 (Pages 193 to 196)

- MARTI KOPACZ - VOLUME 1-

1       - MARTI KOPACZ - VOLUME 1-
2  Decem -- December of 2013?
3       A.  I believe it's in the process of
4  assessing a lot of properties, right.
5       Q.  So I want to distinguish between
6  these two concepts, so I'm going to ask you about
7  them separately, though, because you're right,
8  there is a citywide appraisal, and you're right,
9  it is ongoing.  Put that here for a second,
10  mentally, okay?
11       A.  Okay.
12       Q.  Now, are you aware there was a
13  reassessment in December of 2013?
14       A.  Vaguely, yes.
15       Q.  So "vaguely" means?
16       A.  I was aware of it --
17       Q.  You are --
18       A.  Anecdotally I am aware of it, yes.
19       Q.  Okay.  You did not -- do you know the
20  impact of that assessment on taxable value in the
21  City of Detroit?
22       A.  I don't.
23       Q.  Do you know the approximate impact of
24  it?
25       A.  I don't.

1       - MARTI KOPACZ - VOLUME 1-
2       Q.  Do you know what impact it had on the
3  forecasts?
4       A.  I know that property tax forecast --
5  property tax revenue forecasts declined between
6  the May 5th and the July 2nd projections.
7       Q.  Do you know why it declined?
8       A.  It declined as a result of --
9  Ernst & Young's view that the assessed value was
10  going down.
11       Q.  Was going to go down or had gone
12  down?
13       A.  I don't -- I don't have a precise
14  time recollection on that.
15       Q.  Do you know whether the citywide
16  reappraisal has begun?
17       A.  I don't know.
18       Q.  Do you know when it will -- it is
19  estimated to conclude?
20       A.  I don't.
21       Q.  Do you know anyone in the City of
22  Detroit who is more knowledgeable about the
23  assessed values of property in the City of Detroit
24  than Mr. Evanko, the chief assessor?
25       A.  I don't know.

1       - MARTI KOPACZ - VOLUME 1-
2       Q.  Is it fair to assume that he is the
3  most knowledgeable person in the City of Detroit?
4       A.  I don't know.
5       Q.  That's not a question you've
6  considered?
7       A.  It is not.
8       Q.  Do you believe that Mr. Evanko's
9  opinions regarding the effect of the citywide
10  reappraisal will have on property values are
11  relevant to determining future property values?
12       A.  Could you repeat that question?
13       Q.  Yeah.  So do you believe Mr. Evanko,
14  who is the City's only Level 4 assessor, right?
15       A.  Uh-huh.
16       Q.  Yes?
17       A.  Yes.
18       Q.  Sorry.  That's okay.  I do that all
19  the time.
20       Do you agree that Mr. Evanko's coast
21  views about the impact of citywide reappraisal
22  that we were just talking about, that the impact
23  that that will have on taxable value in the City
24  of Detroit is an important data point to consider?
25       A.  Yes.

1       - MARTI KOPACZ - VOLUME 1-
2       Q.  If Mr. Evanko told you that he has no
3  idea whether that citywide reappraisal will cause
4  taxable values to be lower or higher, would you
5  consider that an important data point?
6       A.  I -- I'm -- I would consider what he
7  said to be relevant.  Okay?  So I don't know what
8  he said so I can't really say whether I think I
9  agree or don't agree.  I would think that the
10  City's assessor would be an important person to
11  consider as somebody who is looking at this.
12       Q.  Understood.  So do you understand
13  that the Ernst & Young forecasts project the
14  taxable value will decrease by 9 percent as a
15  result of the citywide reappraisal?
16       A.  I understand that as part of their
17  assumption, yes.
18       Q.  What is the basis for their
19  assumption?
20       MR. DiPOMPEO:  Objection.
21       A.  Their assessment in consultation with
22  the City.
23       Q.  Okay.  But like what -- they talk to
24  people that told them that?
25       A.  That is my assumption, yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6999-8  Filed 08/22/14  Entered 08/22/14 19:36:51  Page 32 of 52

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    That's your assumption about their
3  assumption?
4     A.    Yes.
5     Q.    Okay.  Have you independently
6  verified the reasonableness of that particular
7  assumption?
8     A.    I have not.
9     Q.    Do you believe -- this get -- so do
10 you believe it's reasonable to assume that taxable
11 value in the City of Detroit will decrease over
12 the next -- by 9 percent, as a result of the
13 citywide reappraisal where the City's senior
14 assessor says that he doesn't know whether taxable
15 value will go up or down.
16        MR. STEWART:  Objection.
17     A.    I don't know.
18     Q.    You don't know if that's reasonable
19 or not?
20     A.    Yes, I do not know if that's
21 reasonable or not.
22     Q.    It's not something you've considered
23 before today?
24     A.    That's correct.
25     Q.    One of the interesting things about

- MARTI KOPACZ - VOLUME 1-

1
2  when you are feasibility expert is we were talking
3  earlier about the notion of there being a hurdle
4  and your job being to assess whether the City will
5  get over that hurdle, right?
6     A.    Correct.
7     Q.    Do you remember that testimony?
8     A.    Uh-huh.
9     Q.    Isn't it true that if the City adopts
10 an assumption about taxable value which is that in
11 the future it's going to go down by 9 percent, as
12 it did, right?  Correct?
13     A.    We can look at it.
14     Q.    If you want to double-check it,
15 that's totally fine.
16        Do you want to?
17        Take a look at Page 59.
18     A.    About Page 59, there is a typo on
19 Page 59 about two-thirds of the way down, there
20 are two numbers, FY 215, 2015, followed by another
21 FY 2015.  The second FY 2015 should be 2016.
22     Q.    Okay.  So what this is saying is that
23 because of the citywide reappraisal, there's going
24 to be a 9 percent drop in real property
25 assessments in fiscal year 2015 and then another

- MARTI KOPACZ - VOLUME 1-

1
2  three to four percent drop in fiscal year 2016,
3  right?
4     A.    That is --
5     Q.    What it should say?
6     A.    -- the -- yes, it should say '16.
7     Q.    That's what you meant it to say?
8     A.    That is what I meant it to say.
9     Q.    Now, if the available evidence shows
10 that -- and Ms. Kopacz, this is kind of a -- this
11 almost goes to your own methodology, so consider
12 this for a second.
13        If the available evidence shows that
14 there's unlikely to be any drop in taxable value
15 in either 2015 or 2016, would you still consider
16 this a reasonable assumption because it's
17 conservative?
18        You see the point of my question?
19 Which is I'm trying to tease out a little bit what
20 you were thinking about when you were testing
21 assumptions.
22        Consider a situation where the
23 available evidence actually suggests that there
24 will not be any drop in real property assessments,
25 okay?  But the City employs a methodology that

- MARTI KOPACZ - VOLUME 1-

1
2  says that there will be a nine percent drop in
3  2015 and a three to four percent drop in 2016,
4  okay?
5     Isn't it true that based on your task
6  as the feasibility expert, you could still find
7  that assumption to be reasonable.  Correct?
8        MR. KANE:  Hold on a second.  So
9  there's a lot in there so, one, I will object
10 on vagueness.  But I'm not trying to
11 interfere, I just want to clarify.
12        Are you asking her to assume that the
13 available evidence shows that?
14        MR. HACKNEY:  Yes.
15        MR. KANE:  Okay.  So he's asking you
16 to assume --
17        MR. HACKNEY:  It's a hypothetical?
18        MR. KANE:  That's all I want --
19     A.    It's an assuming there's evidence to
20 say that property values won't decline.
21     Q.    That's right.
22     A.    And that this forecast says they will
23 decline, right?
24     Q.    Right.
25     A.    That is a positive contributor to my

51 (Pages 201 to 204)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 33 of 52

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2   assessment of feasibility.
3       Q.   Okay.  So do you understand how
4   whether or not the -- in that hypothetical, where
5   the available evidence shows -- predicts that
6   there won't be a drop in real property
7   assessments, but the forecasters project a drop,
8   do you understand that the reasonableness of that
9   assumption depends very much on how you are
10  looking at the question?
11          MR. STEWART:  Objection.
12      A.   And the question is?
13      Q.   Do you understand that the
14  reasonableness of the assumption depends on what
15  you're evaluating the forecast for?
16          MR. STEWART:  Objection.
17      A.   I only evaluate it for purposes of
18  feasibility, okay.  And therefore, if the
19  projection relative to property tax revenue is
20  conservative, right, then I consider that to be a
21  good thing relative to my feasibility assessment.
22  Okay?
23      Q.   You said exactly what I was driving
24  at.  Isn't it true the more conservative the City
25  gets, the happier you become about the

1   - MARTI KOPACZ - VOLUME 1-
2   reasonableness of their assumption, in terms of
3   evaluating feasibility?
4           MR. STEWART:  Objection.
5       A.   Consistent with the standard that I
6   laid out, okay, the reasonableness of the
7   projections, okay, are going to be influenced by
8   both assumptions that I find to be aggressive and
9   assumptions I find to be conservative.  Okay?
10  There are instances of both of that, those -- in
11  these projections.
12      Q.   If the assumptions were all
13  conservative, it would be more likely that you'd
14  find feasibility than if some were conservative
15  and some were aggressive.  Do you agree?
16      A.   I think in totality the answer is
17  yes.
18          MR. STEWART:  Objection.
19      Q.   Okay.  In fact, your test for
20  reasonableness means as long as an assumption is
21  not exceptionally conservative, it is reasonable,
22  correct?
23          MR. STEWART:  Objection.
24      A.   I'm not sure -- I'm not sure I know
25  what exceptionally conservative is.

1   - MARTI KOPACZ - VOLUME 1-
2       Q.   Okay.  So --
3       A.   Go ahead.
4       Q.   Okay.  So I'm not going to sharp
5   shoot you, so don't take this wrong way.
6       A.   That's okay.
7       Q.   I'm going to read from your report.
8   Let's take a step back, okay?
9       A.   Okay.
10          MR. KANE:  What page are you on?
11          MR. HACKNEY:  This is Page 18.
12      Q.   You're talking about reasonableness
13  here, okay?
14      A.   Reasonableness.  And we're in -- I
15  know where we are.  We're in the definition of
16  feasibility.
17      Q.   That's right.
18      A.   Yes.
19      Q.   So, of course, I'm looking here at --
20  it's like the -- sort of second, third of the big
21  paragraph.
22          "Of course at the outer edges of
23  'reasonable,' values become unreasonable either
24  because they are exceptionally conservative or
25  wildly aggressive," right?

1   - MARTI KOPACZ - VOLUME 1-
2       A.   Yes.
3       Q.   Those are the terms you used in your
4   report?
5       A.   I did.
6       Q.   What I want to establish is when we
7   think of Marti Kopacz's definition of
8   reasonableness, we should see a continuum, right?
9       A.   Correct.
10      Q.   And on one of end of the continuum we
11  should see exceptionally conservative, correct?
12      A.   Yes.
13      Q.   And on the other end of the
14  continuum, we should see wildly aggressive?
15      A.   Correct.
16      Q.   And as long as the assumption falls
17  between those two points, it fits your definition
18  of reasonable?
19      A.   Yes, as long as it's not
20  exceptionally conservative or wildly aggressive,
21  right.  In other words, it's not in -- it's in
22  that middle of those ranges, right, then I'm -- I
23  am going to accept that it's reasonable.
24      Q.   But wouldn't an exceptionally
25  conservative plan be highly feasible?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 34 of 52

- MARTI KOPACZ - VOLUME 1-

1
2     Q.     On assessed values?
3     A.     Could be.
4     Q.     Okay.  But you would agree that to
5  the extent you're basing your assumption, a person
6  is basing their assumption that the reappraisal
7  will have an impact on assessed values, do you
8  agree that the reappraisal has to conclude before
9  it can have the impact?
10    A.     I would agree with that.
11    Q.     And do you know when the reappraisal
12  will conclude?
13    A.     I don't.
14    Q.     Would you agree -- let's talk about
15  tax collection for a second, if we could, shift
16  gears here.
17    A.     Okay.
18    Q.     Do you agree that the -- Detroit's
19  tax collection enforcement mechanism has been
20  broken for a number of years?
21    A.     The percentage of tax that the City
22  collects relative to the amount of tax that's due
23  is poor.
24    Q.     And I want to focus on the
25  enforcement mechanism which is the tax collection

- MARTI KOPACZ - VOLUME 1-

1
2  efforts that's go into either property or income
3  taxes, okay?
4          Would you agree that that enforcement
5  mechanism has been dysfunctional for a number of
6  years --
7     A.     It has been --
8     Q.     -- in Detroit?
9     A.     It has been ineffective, yes.
10    Q.     Do you agree that fixing the
11  enforcement mechanism alone will have an
12  improvement on the level of tax delinquencies in
13  the City?
14    A.     I believe it would, yes.
15    Q.     In fact, you've expressed that
16  opinion, haven't you?
17    A.     I have expressed that opinion.  Well
18  that point of view, right.
19    Q.     Yes.
20    A.     Little O.
21    Q.     Now, I hope I didn't ask this before
22  and if I did I apologize.  But you did not attempt
23  to construct your own forecasts, correct?
24    A.     Correct.
25    Q.     Why didn't you?

- MARTI KOPACZ - VOLUME 1-

1
2     A.     Because there would never have been
3  enough time and the availability of information to
4  do that, okay, would -- again, there wouldn't have
5  been the time, the money, the anything to do that
6  so...
7     Q.     If you had had enough time -- have
8  you ever heard of like in a scientific realm when
9  they do double blind --
10    A.     Yes.
11    Q.     -- studies?  Have you ever heard of
12  that?
13    A.     I have.
14    Q.     You know that double blind study is
15  where there's the drug that is being tested and
16  then there's a placebo and the double blind is
17  that the people don't even know what they're
18  taking and then the researchers don't know who's
19  taking what, right?
20    A.     Right.
21    Q.     Do you understand that the concept of
22  using a double blind methodology is to protect
23  against the types of biases that can actually even
24  creep into things like pharmaceutical statistics?
25    A.     Yes.

- MARTI KOPACZ - VOLUME 1-

1
2     Q.     Do you agree if you'd had enough
3  time, it would have been preferable for you to be
4  able to construct your own forecast first and then
5  compare it to the City's?
6     A.     Oh, I think that's idealistic.
7     Q.     It's -- it's idealistic?
8     A.     Yeah.
9     Q.     Given my idealism, would you agree
10  that would have been preferable?
11    A.     I'm not sure it's preferable or not.
12  I mean, it would have been interesting.  It would
13  have been very interesting.
14    Q.     You didn't have enough time to do
15  that?
16    A.     I wasn't asked to do that.
17    Q.     And how much time would you have
18  needed to construct a forecast?
19    A.     I don't know.
20    Q.     How much time did Ernst & Young and
21  Conway MacKenzie need?
22    A.     I don't know.
23    Q.     Did they have adequate time?
24    A.     I don't know.
25    Q.     Would you -- do you -- is it your

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 6999-8  Filed 08/22/14  Entered 08/22/14 19:36:51  Page 35 of 52

- MARTI KOPACZ - VOLUME 1-

1 opinion that there is a material risk that the
2 City will not achieve the forecasts set forth in
3 the plan?
4    MR. STEWART:  Objection.
5    A.    A material risk that the City will
6 not achieve the -- I don't -- again, I don't know
7 what "material" means.
8    Q.    I want to use your definition of
9 material that you discussed earlier with Mr.
10 Stewart.
11    A.    If I -- yes, if I thought there was a
12 material risk that they wouldn't meet these
13 projections, I would not have an opinion that the
14 plan is feasible.
15    Q.    Okay.  So to turn that around on you,
16 it is your opinion that there is not a material
17 risk that the City will fail to achieve its
18 projections, correct?
19    A.    I believe that the City has a
20 reasonable likelihood of meeting the commitments
21 it's laid out in the plan and delivering essential
22 services.
23    Q.    Okay.  And using your definition of
24 materiality, though, I want to confirm, you do not
25

- MARTI KOPACZ - VOLUME 1-

1 see a material risk that the City will fail to
2 live up to the plan's forecasts, correct?
3    A.    Again, I don't -- the City can meet
4 its obligation -- I believe the City can meet its
5 obligations in the plan of arrangement and deliver
6 services, okay, within the confines of the
7 projections.
8    I don't believe for a minute that the
9 projections will come in exactly as they've been
10 forecast.
11    Q.    I understand.  But in the aggregate,
12 you would not have rendered your opinion if you
13 believed a material risk of failure existed,
14 correct?
15    A.    That is correct.
16    Q.    When it comes to evaluating the
17 City's obligations, the ability to meet its
18 obligation, Ms. Kopacz, in order to get your seal
19 of approval, would you agree that you needed
20 really to confirm that the actual results would
21 not turn out to be materially worse than the
22 forecasted results; that's what you're assessing,
23 right?
24    A.    I'm not assessing future actuals.  I
25

- MARTI KOPACZ - VOLUME 1-

1 am assessing --
2    Q.    There isn't any such thing, I think,
3 but I know what you mean.
4    MR. KANE:  Sounded to me like you
5    were in the middle of a sentence.  So if you
6    were finished, if not, wait for him to --
7    Q.    That's all right.  I didn't mean to
8 be rude and interrupt.  I didn't mean to be, I
9 apologize.
10    A.    I didn't take it as that.
11    Q.    Let me put it this way; that is, in
12 order to get your seal of approval, you needed to
13 find that in your opinion the City's likely
14 results will not be materially worse than the
15 forecasted results?
16    A.    In the aggregate -- and I don't know
17 how say it any differently than I've said it
18 before or in my report, okay, I think the
19 projections are reasonable.  I think the City can
20 meet its commitments in the plan.  I think it can
21 deliver services in the future.
22    Q.    You do not perceive a material risk
23 of the City failing any of those; else you would
24 not have opined it's feasible?
25

- MARTI KOPACZ - VOLUME 1-

1    A.    If I thought the City couldn't pay
2 its commitments, couldn't meet its commitments or
3 it couldn't deliver services, I would have said --
4 I would have found -- I would have had the opinion
5 that the plan was not feasible.
6    Q.    Now, let me ask you another
7 hypothetical question which is pretend that you
8 conducted -- constructed your own forecasts.
9    A.    Okay.
10    Q.    Okay?  Same time period, same subject
11 matter as the forecasts that are in the plan.  If
12 you found that the City's forecasts were 50
13 percent more conservative than yours, would you
14 have still found the City's forecast to be
15 reasonable, using your definition of
16 reasonableness?
17    A.    I don't know.
18    Q.    Are you able to give me a percentage
19 deviation from the hypothetical forecast that you
20 constructed at which point you would say that the
21 City's forecasts were unreasonable?
22    A.    I don't think I could.
23    Q.    All right.  Let me direct you to your
24 report in Section F.
25

- MARTI KOPACZ - VOLUME 1-

1
2  the Great Recession?
3      A.    The Great Recession, right.  Yes.
4      Q.    Yes?  And that's sort of an homage to
5  the fact that it was -- it was so serious, right?
6  It was almost like the Great Depression, right?
7      A.    I don't know where -- I don't know
8  where it comes from, but yes, it's been long.
9      Q.    So how -- how -- how can we know that
10 taxable incomes as an economic matter shouldn't be
11 expected to grow at the 3.4 percent rate for a
12 decade?
13     A.    We don't.
14     Q.    Okay.  So how do we test your finding
15 that .46 percent is reasonable?
16     A.    It's not unreasonable.
17     Q.    How do we test that?
18     A.    I don't know that we do.
19     Q.    Do you know of a way that we could
20 test that opinion?
21     A.    I don't know that we can.
22     Q.    Do you see that taxable income growth
23 for nonresidents is 3.5 percent, correct?
24     A.    3.5 -- yes, 3.4 versus -- yes, 3.5.
25     Q.    Is it true that the -- the taxable

- MARTI KOPACZ - VOLUME 1-

1
2  income growth is fairly consistent between
3  residents and nonresidents in the City in your
4  experience?
5      A.    It has been.  Uh-huh.
6      Q.    It has been?
7      A.    It has been.
8      Q.    And yet, in the presentation,
9  wouldn't you agree that the forecast for City
10 residents year-over-year income growth is more
11 conservative than the historical evidence suggests
12 in terms of disparity from nonresidents?
13          Let me put it to you another way.
14     A.    Yes, please.
15     Q.    Do you see that in the three prior
16 years taxable income growth for residents versus
17 nonresidents was something like 97 percent of what
18 nonresidents saw?
19     A.    Can you tell me where you're getting
20 the data --
21     Q.    Whatever 3.4 is over 3.5?
22     A.    -- where are you getting the data?
23     Q.    So if you put 3.4 over 3.5, and think
24 of 135th, okay, being about 3 percent?
25     A.    Uh-huh.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.    Nonresident -- or I should say
3  resident taxable income growth over the prior
4  three years was about --
5      A.    Has been a little bit less.
6      Q.    -- 97 percent of nonresident growth,
7  right?
8      A.    Well, I think you're -- I think you
9  are trying to be very precise with a number that
10 is an average of a lot of other -- of a variety of
11 numbers.  So, but yes, if you want to take 3.4
12 over 3.5 it will be --
13     Q.    About 97 percent, right?
14     A.    If that's the math, yes.
15     Q.    And then -- but when you look at
16 .85 percent for City residents in the forecast on
17 average over the next ten years, and you compare
18 it to 1.18 percent, do you see that that's more on
19 the order of three-quarters?
20     A.    But that doesn't -- I mean, again,
21 that doesn't concern me.  I'm looking at '14, '15,
22 '16, I'm looking at that nonresidents, working in
23 the City of Detroit, okay, versus City residents
24 in the City of Detroit, I would expect
25 nonresidents' income to grow faster than

- MARTI KOPACZ - VOLUME 1-

1
2  residents --
3      Q.    Why?
4      A.    -- based on this general economic --
5  you've got so many more residents at the poverty
6  level in the City versus the suburbs.
7      Q.    Why didn't it do that in the prior
8  three years?
9      A.    Could be as a result of number of
10 people working.
11     Q.    How would the number of people
12 working impact the average growth of the income of
13 people that were working?
14     A.    No, no, no.  The -- the --
15     Q.    Let me -- let me ask it again.
16          So, you would agree that in the prior
17 three years, 2011, 2012, 2013, there was not a
18 significant differential between the
19 year-over-year income growth of residents versus
20 nonresidents?
21     A.    I would agree with that, yes.
22     Q.    In the projections, however, there is
23 a material difference that's presented.
24     A.    I'm not sure I would agree with you
25 that there's a material difference.  There is a

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1     A.    This is tax -- this is municipal
2  income tax. Okay?
3           MR. KANE: Go ahead. Finish your
4  answer.
5  BY MR. HACKNEY:
6     Q.    Okay. I understand -- okay. Let me
7  take a step back.
8           Are you saying that the .85 percent
9  versus the 1.18 percent are findings of two
10 different sets of assumptions that impact taxable
11 income growth; one of those assumptions being wage
12 growth and the other assumption being employment
13 growth?
14    A.    Yes.
15    Q.    Okay. In order to discuss this
16 differential then, are you saying that you have to
17 drop down to the level of wage growth --
18    A.    Yes.
19    Q.    -- and employment growth --
20    A.    Yes.
21    Q.    -- and talk about those things?
22    A.    Yes.
23    Q.    Okay. Okay. Understood. That's
24 helpful to me. One last question though.

- MARTI KOPACZ - VOLUME 1-

1           The historical taxable income growth
2  of 3 -- 3.4 percent, are those inflation adjusted
3  numbers or are they nominal dollars?
4     A.    I would say they are nominal dollars.
5  I mean, they're -- they're not -- they're not
6  adjusted -- they're -- they're actuals.
7     Q.    Do you know where that number comes
8  from?
9     A.    Do I know as I sit here today? No.
10    Q.    Okay. Do you know whether the
11 Michigan State Department of Treasury presents
12 income growth numbers in inflation adjusted or
13 nominal dollars?
14    A.    I don't recall.
15    Q.    Okay. Let's drop down, like you
16 said, and talk about wage growth then.
17    A.    Okay.
18    Q.    Okay? Do you see that average wage
19 growth on Page 42 in the ten-year plan without
20 RRIs. Do you see that section?
21    A.    Uh-huh. Yes.
22    Q.    Do you see that the ten-year plan
23 estimates that for both City residents and
24 nonresidents average wage growth of 1.25 percent

- MARTI KOPACZ - VOLUME 1-

1  for fiscal year 2014 through fiscal year 2023?
2     A.    Yes.
3     Q.    As far as I can tell, in your report,
4  you do not present a comparable historical number
5  for that.
6     A.    I don't.
7     Q.    Are you aware of one?
8     A.    Am I aware of one? No.
9     Q.    Okay.
10    A.    Not that I recall.
11    Q.    Do you know what the basis for this
12 1.25 percent assumption is?
13    A.    No.
14    Q.    Okay. So let's get back to kind of
15 our two step.
16          Somebody at Ernst & Young decided to
17 use 1.25 percent, correct?
18    A.    Correct.
19    Q.    You don't know why they decided that,
20 right?
21    A.    Not as I sit here today, no.
22    Q.    Okay. Now, you do know that you have
23 found that this estimate appears reasonable,
24 correct?

- MARTI KOPACZ - VOLUME 1-

1     A.    Correct.
2     Q.    And let me -- let me quibble were you
3  a little bit.
4           What's the difference between when
5  something is reasonable and when something appears
6  reasonable? Is there a difference in your
7  opinion?
8     A.    I would say is reasonable you can
9  only make after the -- after event, right? It
10 appears reasonable.
11    Q.    Okay.
12    A.    Looking at it prospectively.
13    Q.    So what was your basis for -- your
14 conclusion that 1.25 percent average wage growth
15 between fiscal year 2014 and 2023 appears to be a
16 reasonable assumption?
17    A.    The 1.25 over a ten-year period,
18 where you had historically both a decrease in
19 taxable income and an increase in taxable income
20 appears to me to be a reasonable, long-term
21 projection of the overall average increase.
22    Q.    Are you aware of any way to test that
23 conclusion?
24    A.    To test that conclusion?

63 (Pages 249 to 252)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 38 of 52

- MARTI KOPACZ - VOLUME 1-

1    Q.    To test the reasonableness of your
2  assumption?
3    A.    I don't know how you would test the
4  assumption until after it happens.
5    Q.    Okay.  But if the -- if the Court
6  wants to test your finding that this is a
7  reasonable assumption, you're not aware of a way
8  it can test it, correct?
9    A.    No, I am not.
10    Q.    Okay.  So what is your basis, though,
11  for finding that 1.25 percent is a good average?
12    A.    I looked at all of the information
13  that was available, okay, about all of these
14  topics, all of these assumptions, both the revenue
15  side and the expense side.  I looked at the recent
16  tax history.  I talked to the people who made the
17  assumptions, asked them questions about how they
18  came up with this assumption or that assumption or
19  what they did and, you know, how much if you
20  changed this, how much would that change.  Okay?
21  And concluded that, in totality, the estimates
22  contained in the projections provide a reasonable
23  basis for forecasting what the City is going to do
24  from an economic perspective during the life of

- MARTI KOPACZ - VOLUME 1-

1  this -- these projections.
2    Q.    Understood.
3    A.    And I didn't -- you know, again --
4    Q.    You didn't -- did you not consider
5  whether any individual assumption was reasonable
6  standing by itself?  You only considered them in
7  the aggregate?
8    A.    I looked at all of the individual
9  assumptions.
10    Q.    You did?
11    A.    I did.  Okay?
12    Q.    Okay.  So let's talk about this one.
13    A.    Right.
14    Q.    What's your basis for your opinion
15  that 1.25 percent appears reasonable?
16    A.    This -- it is reasonable because it
17  is not either too low or too high when you look at
18  all the surrounding data points.
19    Q.    What are those data points?
20    A.    It is the prior experience in terms
21  of what's been collected over time, all that,
22  right?  It's looking at information that comes
23  from the state.
24    Q.    Okay.

- MARTI KOPACZ - VOLUME 1-

1    A.    I know we looked at some federal
2  estimates, right?
3    Q.    So what was the prior experience with
4  income with average wage growth?
5    A.    I would have to go back and look at
6  the historical information that we looked at at
7  the time to be able to answer that today because I
8  don't recall.
9    Q.    But do you have like workpapers that
10  show that?
11    A.    There would be documents that we
12  looked at that showed that.  I'm sure.
13    Q.    Okay.  And they'll be -- they'll be
14  somewhere on Exhibit 2?
15    A.    Tell be somewhere on Exhibit 2 or
16  they'll be somewhere in the -- in the data room.
17    Q.    Okay.  And what did they show?  You
18  can't remember the specifics, but what time period
19  did they show?
20    A.    I can't remember.  I remember that
21  income taxes went down and income taxes have
22  started to grow back.
23    Q.    Okay.  Was it aggregate income tax
24  data that you reviewed?

- MARTI KOPACZ - VOLUME 1-

1    A.    I don't recall.
2    Q.    Do you remember when we were looking
3  at taxable income growth you had some historical
4  comparisons that you showed here in your text,
5  right?
6    A.    That's correct.
7    Q.    But here you didn't present any,
8  correct, in the body of your report?
9    A.    There are other data points shown on
10  Page 47.
11    Q.    Aren't those forecasted data points?
12    A.    They are forecasted data points.
13    Q.    Okay.  Did you rely on any
14  historical -- so is -- are these the data points
15  that you relied upon these forecasts?
16    A.    These are forecasts made by other
17  forecasting entities that we looked at to analyze
18  and assess the forecasts for wage growth and on
19  Page 48 for employment growth that the City used.
20    Q.    Okay.  So, for example, in the
21  ten-year without reinvestment scenario, do you see
22  that box on Page 47?
23    A.    Yes.
24    Q.    First of all, was your basis for

- MARTI KOPACZ - VOLUME 1-

1
2   were?
3       A.   I am not seeing that here.
4       Q.   Do you know separate and apart from
5   the presentation here?
6       A.   I don't.
7       Q.   Let's go down to employ -- sorry.
8   Let's go down to Employment Growth.  Do you see
9   that the number of city residents that are
10  employed is forecasted to increase .15 percent?
11      A.   Can you tell me where we are?
12      Q.   Yes.  It's on Page 46 right down
13  below "Employment Growth with RRIs.  It's in the
14  prose section, the number of city residents
15  employees forecasted to increase .15 percent.  Do
16  you see that?
17      A.   Over a ten-year period, yeah.
18      Q.   Yes.  For the fiscal year period.
19           While the nonresidents' average
20  annual employment is anticipated to increase
21  .21 percent.  Do you see that?
22      A.   Yes.
23      Q.   Now, in -- this is one of those
24  sections in your report where you are just
25  narrating what the assumptions are, correct?

- MARTI KOPACZ - VOLUME 1-

1
2       A.   That is correct.
3       Q.   You did not make a finding in your
4   report that these two assumptions were reasonable
5   specifically, correct?
6       A.   Correct.
7       Q.   Do you -- did you make a specific
8   finding that these two assumptions were
9   reasonable?
10      A.   I did not.
11      Q.   Is it -- am I correct in reading your
12  report that if there is a section that
13  describes -- like this one, that describes what
14  the City's assumptions are, but does not include
15  your specific seal of approval as to finding that
16  the specific assumption being discussed, that I
17  should infer that you did not make a specific
18  finding about that assumption?
19      A.   I did not make a specific finding
20  about 2.16 or any of that sort of thing.  What I
21  did is, as I said before, I looked at all the
22  information that was available to us, historical,
23  projections, talked with people who did this,
24  looked at other people who make projections about
25  these things.  I did the sensitivity analysis that

- MARTI KOPACZ - VOLUME 1-

1
2   said what if they're off by a percentage point one
3   way or another, what does that do?  Okay?  And in
4   totality of looking at all of that stuff, I
5   concluded that this is a reasonable assumption
6   for, in this case, municipal income tax.
7       Q.   Well, wait.  I would rephrase that
8   and see if you agree with how I rephrase it.
9            You included that in the aggregate
10  all of the assumptions were reasonable, correct?
11      A.   Correct.
12      Q.   You did not make a specific finding
13  or conclusion about whether this assumption on
14  Page 46 regarding employment growth was
15  reasonable, correct?
16      A.   That is correct.  I looked at a
17  what-if scenario, the -- the estimate was off.
18  Now, how -- if -- if that estimate is off, right,
19  by some amount, does that have a -- what kind of
20  an impact does that have on the overall projection
21  for income tax?
22      Q.   Okay.  So speaking to your expertise
23  in terms of what your training and experience
24  renders you capable of doing, you are capable of
25  assessing whether or not a forecasted increase of

- MARTI KOPACZ - VOLUME 1-

1
2   .15 percent in City resident employment is a
3   reasonable assumption, correct?
4       A.   Could I do that?  Absolutely.
5       Q.   Yeah.  You could have done it, but
6   you did not do it.
7       A.   I did not.
8       Q.   Okay.  Is that a reasonable
9   assumption?
10      A.   I believe that that assumption is
11  reasonable in light of the -- the totality of what
12  the income tax and revenue assumptions are.
13      Q.   What is the basis for EY's
14  .15 percent assumption in City resident employment
15  increase?
16      A.   You'd have to ask them.
17      Q.   What is the basis for your conclusion
18  that this assumption --
19      A.   Right.
20      Q.   -- is reasonable?
21      A.   Again, as I said, I did not -- in
22  this case, I looked at this assumption.  It did
23  not appear unreasonable to me.  Okay?  And when I
24  factored in the result of all of these estimates
25  in terms of coming up with the revenue

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1 assumptions, and I did the sensitivity analysis,
2 the result of what the city is projecting in terms
3 of municipal taxable income and all the other
4 individual revenue items is reasonable.
5 Q. Do you agree that you're not able to
6 give me an opinion regarding the reasonableness of
7 this assumption on a stand-alone basis?
8 A. That is correct.
9 Q. Okay. Take a look at Page 48 where
10 you have another one of your comparable metrics.
11 A. Uh-huh.
12 Q. Do you see that?
13 A. I do.
14 Q. Do you see that the -- so there are
15 comparable metrics here from the Michigan
16 Department of Treasury and the Michigan Senate
17 Fiscal Agency. Do you see that?
18 A. I do.
19 Q. And do you know whether those metrics
20 are statewide metrics or City of Detroit metrics?
21 A. My recollection and I -- I was trying
22 to find it in the report, my recollection is that
23 these are statewide estimates.
24 Q. I see. So these are -- are

- MARTI KOPACZ - VOLUME 1-

1 respective entities estimations of employment
2 growth statewide for the fiscal years denoted,
3 right? That's your belief?
4 A. That's my recollection. It is not
5 the clearest recollection I have.
6 Q. Okay. Now, do you see that you did
7 the sensitivity analysis on Page 49?
8 A. Yes.
9 Q. Do you remember when you were
10 testifying with Mr. Stewart that you described
11 this as an arithmetical exercise that tells you
12 what every 1 percent change in annual taxable
13 income growth amounts to in terms of dollars?
14 A. Yes.
15 Q. You did not do an assessment of the
16 likelihood that taxable income would be 1 percent
17 lower or higher though, correct?
18 A. That's correct.
19 Q. Okay. Did you ever -- I know that
20 you presented multiple sensitivity analyses for
21 different types of revenue and cost in this
22 opinion; isn't that right?
23 A. Yes.
24 Q. Did you ever take the sensitivity

- MARTI KOPACZ - VOLUME 1-

1 analyses and say, Now I'm going to link them all
2 together and I'm going to assume that taxable
3 income growth is down a percent, property tax is
4 down a percent, gaming revenue is down a percent,
5 and utility users' tax revenue is down a percent
6 and then step back and look to see what impact it
7 had on whether the City can achieve the forecasts?
8 A. I did not do that analysis.
9 Q. Okay. So do you agree that this
10 sensitivity analysis tells you what a 1 percent
11 change is worth when it comes to municipal income
12 tax revenue?
13 A. Yes.
14 Q. It doesn't tell you how likely a
15 1 percent deviation is.
16 A. Correct.
17 Q. And you did not conduct that
18 analysis, correct?
19 A. I did not.
20 Q. Take a look at -- I'm going to move
21 into the state revenue sharing if I could. Take a
22 look at Page 50. You give a general introduction
23 into state revenue sharing on Page 49.
24 A. Right.

- MARTI KOPACZ - VOLUME 1-

1 Q. And you talk about the constitutional
2 revenue sharing function and then the
3 discretionary EVIP portion -- E-V-I-P portion. Do
4 you remember that?
5 A. I do.
6 Q. And then you start with the
7 constitutional portion on Page 50. Do you see
8 that?
9 A. I do.
10 Q. Do you understand that constitutional
11 state revenue sharing in Michigan is driven by a
12 municipality's percentage of the state's total
13 population?
14 A. I do.
15 Q. So you understand that forecasting
16 the constitutional portion of state revenue
17 sharing requires you to forecast the population of
18 the municipality, correct?
19 A. It -- it does.
20 Q. Now, isn't it true that in every
21 instance in your -- in the City's forecasts, the
22 City made a determination that the presence of the
23 RRIs would have an impact on the forecasts,
24 correct? So, for example, wage growth without

- MARTI KOPACZ - VOLUME 1-

1  RRIs was lower than with RRIs, correct?
2  
3      A.   That's correct.
4      Q.   Okay.  With respect to the population
5  assumptions in the forecasts, is it correct that
6  the ten-year projections assume that there will be
7  a 12.3 percent decline in Detroit's population
8  over the next ten years?
9      A.   That is the SEMCOG estimate and
10  that's what the City used.
11     Q.   So the City relied on SEMCOG,
12  correct?
13     A.   Correct.
14     Q.   Do you -- you did not make a specific
15  finding in this section as to whether that
16  population assumption was a reasonable one.  Do
17  you agree?
18     A.   I accepted that as a given.
19     Q.   Okay.  You accepted it as a given.
20  You did not otherwise test its reasonableness,
21  correct?
22     A.   I did not.
23     Q.   Okay.  Do you know -- have you read
24  SEMCOG's report?
25     A.   I did not personally read it.

- MARTI KOPACZ - VOLUME 1-

1  
2  Someone on my team did.
3      Q.   Okay.  Somebody looked at it.  Do you
4  remember if they told you when it was done?
5      A.   I don't recall.
6      Q.   Do you know whether the SEMCOG
7  authors were considering the idea that there might
8  be in excess of a billion dollars pumped into the
9  City of Detroit during the very ten-year period
10  they were studying?
11     A.   I don't know one way or another.
12     Q.   Would you expect that if a city like
13  Detroit puts a billion dollars into itself in the
14  form of restructuring reinvestment that it would
15  have an impact on its population level?
16     A.   That's what everyone is hoping.
17     Q.   Okay.  Do you know whether the City
18  adjusted its population estimates with respect to
19  constitutional revenue sharing to take account of
20  the impact the RRIs might have on its population
21  estimate?
22     A.   The answer is I don't know, and they
23  would also have to estimate the change in
24  population in the state because Detroit gets --
25  it's -- if both the Detroit population and the

- MARTI KOPACZ - VOLUME 1-

1  
2  state population are moving in the same direction,
3  it wouldn't necessarily change the percentage of
4  revenue sharing that Detroit gets.  If they're
5  changing in opposite directions, it would have --
6  it could have an effect.
7      Q.   Right.  Right.  Because the ratio
8  wouldn't change in the former instance.
9      A.   Correct.
10     Q.   But if putting a bunch of money into
11  Detroit pulled population from the surrounding
12  municipalities into Detroit without otherwise
13  changing the larger state's population, that could
14  have an impact on Detroit's population as a
15  percentage of state population?
16     A.   That could, yes.
17     Q.   This is not something you thought
18  about?
19     A.   No.  I mean it's not something I
20  attempted to quantify.
21     Q.   Okay.  You didn't study or evaluate
22  the assumptions regarding population?
23     A.   Correct.
24     Q.   Now, take a look at Page 51.  Now
25  you're going into statutory payments.  Okay?

- MARTI KOPACZ - VOLUME 1-

1  
2      A.   Yes.
3      Q.   These are the -- this is the EVIP
4  portion of state revenue sharing, right?
5      A.   Yes.
6      Q.   Now, do you see here that the ten
7  year -- you say, "the ten-year projections assume
8  that the City continues to receive 100 percent of
9  its possible state allocation or approximately
10  140 million annually for the entire 2014 to 2023
11  time period," correct?
12     A.   Yes.
13     Q.   Now, you did this make a specific
14  finding as to the reasonableness of this
15  assumption, correct?
16     A.   No.  I relied on the fact that the
17  City has received a hundred percent of its
18  possible EVIP allocation over the recent past
19  years.
20     Q.   Has it?
21     A.   It has.
22     Q.   Over what time period?
23     A.   I'd have to -- I'd have to look at
24  that, but it's been overlooked -- over the years
25  that that EVIP has existed.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    Okay.  Because that didn't come in
3  until Governor Snyder?
4    A.    It was a governor Snyder thing.
5    Q.    Okay.
6    A.    Yes.
7    Q.    But did you independently assess
8  whether on a go-forward basis it's likely that the
9  City will continue to receive a hundred percent?
10    A.    My assumption is that if the state
11  believed that Detroit had met the requirements to
12  receive EVIP previously, given the change in the
13  administration and all of the RRIs around
14  accounting and systems, that it is highly likely
15  that it's going to get its EVIP going forward.
16    Q.    Well, for example, like in
17  Category 3, Unfunded Actual Liability Plan relates
18  to the level of your unfunded liabilities and
19  whether you're doing a good job to reduce them,
20  right?  That's a component of whether you get
21  EVIP?
22    A.    It is -- you are to produce a plan.
23    Q.    Okay.  Is it -- let's see if we can
24  summarize your testimony on this in a way
25  that's -- that's accurate.

- MARTI KOPACZ - VOLUME 1-

1
2          Is it fair to say that you basically
3  made a single assumption that whatever went into
4  getting EVIP payments that Detroit would be better
5  at it going forward?
6    A.    Yes.
7    Q.    And it's on the basis of that
8  assumption that you concluded that Detroit is
9  likely to receive 100 percent of its EVIP payments
10  going forward?
11    A.    Correct.
12    Q.    But you did this test the assumption
13  beyond that level?
14    A.    Correct.
15    Q.    Now, there's another sensitivity
16  analysis on Page 52.  Do you see that?
17    A.    Yes.
18    Q.    And do you agree that this is an
19  arithmetical analysis of the impact of a 5 percent
20  change in the E -- no, in -- in -- yes, it's the
21  impact of a 5 percent change in the state revenue
22  sharing numbers on the general fund, right?
23    A.    It's a sensitivity analysis of a
24  5 percent change in the -- in the -- of fact of a
25  population change on the statutory revenue

- MARTI KOPACZ - VOLUME 1-

1  sharing.
2    Q.    But the statutory revenue sharing is
3  the EVIP payments, right?
4    A.    Yes.
5    Q.    And those are independent of
6  population?
7    A.    It is, but it is -- statutory is an
8  independent of population and the constitutional
9  will change in 2021.
10    Q.    Let's break it down.
11          You did two different things in this
12  sensitivity analysis, right?
13    A.    Yes.
14    Q.    The first thing you did is you said
15  what's the -- what's the impact of a 5 percent
16  change downward in population on the
17  constitutional portion?
18    A.    Yes.
19    Q.    You separately said what's the impact
20  of just a 5 percent reduction in the statutory
21  portion?
22    A.    Yes.
23    Q.    And you presented it here in this
24  box, right?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    That's correct.
3    Q.    Okay.  Now, you did not take
4  undertake an assessment of the likelihood that
5  there would be a 5 percent reduction in the
6  population in the City, correct?
7    A.    Correct.
8    Q.    And you did not undertake an
9  assumption of whether or not there would be a
10  5 percent reduction in statutory payments,
11  correct?
12    A.    Correct.
13    Q.    So you're not presenting the
14  likelihood that this will occur; you're presenting
15  the impact if it does occur?
16    A.    Correct.
17    Q.    And you have not considered the
18  likelihood that this will occur, correct?
19    A.    That is correct.
20    Q.    But isn't it true that the forecast,
21  when you talk about a 5 percent reduction are you
22  talking about -- oh, that's based on the 2010
23  census figure, correct?
24    A.    Yes.
25    Q.    So you're saying I'm going to

1      - MARTI KOPACZ - VOLUME 1-
2  evaluate what will happen if there's a 5 percent
3  reduction in the population compared to the 2010
4  census in 2022 as a result of 2020 census?
5      A.    Okay.  If the population declines --
6  how do I say this very precisely?
7          If the -- if Detroit's population
8  percentage of constitutional payments declines as
9  a result of its share of statewide population by 5
10  percent, then the constitutional payments will
11  decrease by the amount shown here.
12      Q.    Oh, I see.  So, when it says on the
13  top of Page 52, "the analysis below estimates the
14  impact of a 5 percent change in the 2020 census
15  forecasted population: That's not quite right.
16  It means --
17      A.    Yes.
18      Q.    -- if it -- if there's a change that
19  has the net impact of being 5 percent less as a
20  percentage of the state as a whole?
21      A.    Yes.
22      Q.    Okay.  Am I right in the way I've
23  reformulated what you meant?
24      A.    I think you are.  The measurement
25  won't occur until 2021.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.    Okay.
3      A.    And then there will be a new
4  percentage allocated to Detroit for state
5  constitutional revenue sharing for the next ten
6  years.
7      Q.    Okay.
8      A.    Okay?  And that is an assumption that
9  has been made and this sensitivity says what if
10  that's off.
11      Q.    Okay.
12      A.    What if that -- what if that changes
13  by 5 percent?  That's what this says.
14      Q.    So if do you know what's supposed
15  to -- what is projected by SEMCOG or others to
16  happen to the state's population around Detroit,
17  meaning excluding Detroit?
18      A.    I don't recall.
19      Q.    Now, you remember SEMCOG says that
20  Detroit's will go down by 12.3 percent --
21      A.    Right.
22      Q.    -- correct?
23      A.    Correct.
24      Q.    Do you agree that if the rest of the
25  state's population goes up at all -- well, I guess

1      - MARTI KOPACZ - VOLUME 1-
2  that doesn't follow, does it?
3      A.    No.
4      Q.    What -- what percentage as a ratio of
5  Michigan's population does a 12 percent decrease
6  in Detroit's population represent if the rest of
7  Michigan's population stays constant?
8      A.    I don't know.
9      Q.    Okay.  Let's talk about the wagering
10  taxes if we could.
11      A.    Sure.
12      Q.    And by the way, you nailed that
13  percentage right on the nail head there.  It was
14  10.9 percent.  Remember, you said that earlier?
15      A.    Plus one.
16      Q.    Okay.  And then you see here that --
17  yeah, so when you were -- when you were analyzing
18  wagering receipts, you assume that the tax rate
19  would be constant, correct?
20      A.    That's correct.
21      Q.    And so you're -- the focus then was
22  on what are the casino gross receipts against
23  which the rate is applied, right?
24      A.    Yes.
25      Q.    Now, you see that the ten-year

1      - MARTI KOPACZ - VOLUME 1-
2  projections assume two-and-a-half percent
3  year-over-year declines in fiscal year 2014, a one
4  percent decline in 2015, a half a percent increase
5  in fiscal year 2016 and '17, and a one percent
6  increase thereafter through 2023, correct?
7      A.    Yes.
8      Q.    You did not make an independent
9  finding as to that assumption, as to its
10  reasonableness, correct?
11      A.    Correct.
12      Q.    Similarly, with the sensitivity
13  analysis on Page 54, do you agree that that is an
14  arithmetical exercise that's designed as to
15  present what the impact of a one percentage point
16  change in the gross receipts assumption is?
17      A.    Yes.
18      Q.    And what it is is it's about
19  $16.3 million over the ten-year period, right?
20      A.    That's correct.
21      Q.    But you didn't undertake an
22  assumption of the likelihood that that would
23  happen, correct?
24      A.    That's right.
25      Q.    And just to save time, that's true

71 (Pages 281 to 284)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 44 of 52

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2   for all the sensitivity analyses that you did,
3   correct?
4        A.   Yes.
5        Q.   You presented the arithmetical
6   equation, but you did not undertake an assessment
7   of the likelihood of the event, correct?
8        A.   That's correct.
9        Q.   Now, did you see -- on Page 55, do
10  you see that there is discussion around sales and
11  charges for services?
12       Do you see that?
13       A.   I do.
14       Q.   You note in the pros that's below the
15  table some changes that will happen around the --
16  the public lighting authority replacing the public
17  lighting department.
18       Do you see that?
19       A.   I do.
20       Q.   That's presented in the fairly
21  dramatic decrease in revenue that the PLD line
22  item observes during that ten-year period, right?
23       A.   Yes.
24       Q.   So that, you're describing why that's
25  happening there, right?

1   - MARTI KOPACZ - VOLUME 1-
2        A.   Yes.
3        Q.   Why that is forecast to happen,
4   right?
5        But with respect to the other
6   numbers, the other revenue categories other than
7   PLD, your narrative says that the balance of these
8   revenue categories are assumed to remain
9   relatively constant over the time period, correct?
10       A.   That's correct.
11       Q.   And you did not make an independent
12  assessment of whether that assumption was a
13  reasonable one, correct?
14       A.   Let's -- the -- the reason I think
15  that this is reasonable is this is the baseline.
16  Okay? There are a variety of changes, if you
17  will, that will occur pursuant to the RRIs in some
18  of these departments that you see in the revenue
19  assumptions with the RRI. And this, you know,
20  this goes to my desire to have a single set of
21  projections built by department for the City.
22       So, you know, an easy example is
23  fire. Right. These are these are ambulances
24  charges and false alarm things. Okay? Because of
25  changes in that department that are envisioned

1   - MARTI KOPACZ - VOLUME 1-
2   with the RRIs and the investment and the
3   reconfiguring of that, you will see revenue
4   enhancements in the fire department but they sit
5   over in the RRI model.
6        Q.   I see. So what you're saying is,
7   separate and apart from the benefits that the RRIs
8   drive on the sales and charges for services front,
9   which is presented separately with them, it is
10  reasonable to assume that sales and charges for
11  services will not otherwise increase.
12       So you're effectively --
13       A.   Yes.
14       Q.   -- saying, I'm going to take the
15  preliminary forecast which keeps them constant --
16       A.   Right.
17       Q.   -- but I'm comfortable with that
18  because I know in the presentation of RRIs, there
19  are revenue enhancements that include sales and
20  charges for services; is that right?
21       A.   It is. And the one --
22       Q.   Okay.
23       A.   -- thing that fundamentally changes
24  in the baseline is the transfer of the lighting,
25  okay, to the -- to the authority.

1   - MARTI KOPACZ - VOLUME 1-
2        Q.   Which we talked about.
3        A.   Right.
4        Q.   Absolutely. Sorry. I meant with
5   that caveat, I apologize.
6        A.   Yes.
7        Q.   Okay. So, the -- if we wanted to
8   test the reasonableness of the City's assumptions
9   regarding increases in sales and charges for
10  services, what we really have to do is get under
11  the hood of the RRIs and their likely impact on
12  sales and charges for services?
13       A.   You really have to combine them on a
14  departmental level basis and then look at them.
15       Q.   Right. We could build off these
16  things if we added them all together --
17       A.   Correct.
18       Q.   -- and then looked at them?
19       A.   Correct.
20       Q.   Now, you didn't make that
21  presentation, correct? In your report?
22       A.   In our report I did not, no.
23       Q.   And the City hasn't made that
24  presentation either, correct?
25       A.   That's correct.

- MARTI KOPACZ - VOLUME 1-

2    Q.    So it's interesting.  So in every
3  other instance, though, where -- where the EY
4  forecasters were forecasting revenue, they
5  considered the impact of the RRIs, right, to the
6  best of your knowledge?
7    A.    Clearly with income tax and property
8  tax.
9    Q.    Oh, right.  Good point.  Good point.
10   A.    They do it both ways.
11   Q.    Yes.  Fair -- fair correction.
12         But is it your understanding that
13  when -- when they were forecasting --
14   A.    Not wagering taxes.
15   Q.    Right.
16   A.    Not wagering taxes and not sales and
17  services tax.  Income, not taxes income.
18   Q.    Yes.  But is it your understanding
19  that the EY forecasters did not consider the
20  impact of restructuring reinvestment initiatives
21  on sales and charges for services?
22   A.    The Bob Kline group didn't do
23  sales -- didn't do the categories we're talking
24  about right now; sales and charges for services.
25   Q.    Okay.

- MARTI KOPACZ - VOLUME 1-

2    A.    That was done by somebody in on
3  Gaurav 's direct team.
4    Q.    Okay.  So, take a look at Page 59.
5  We're going to move on to property values here,
6  okay?
7    A.    Yes.  We did this.
8    Q.    So, yeah, we definitely touched on
9  these.  But I guess I want to confirm that you
10  didn't make any independent findings regarding
11  whether a one percent, 1.7 percent decline in real
12  property values during the period was a reasonable
13  assumption, correct?
14   A.    Correct.
15   Q.    And you didn't make any findings with
16  respect to whether the personal property increased
17  by .9 percent was a reasonable assumption during
18  that period, correct?
19   A.    That's correct.
20   Q.    And it's also correct that you didn't
21  test the assumption of a 4.8 percent renaissance
22  zone increase during that period, correct?
23   A.    That's correct.
24   Q.    We did talk about the nine percent,
25  I'm sorry, we actually skipped forward to this

- MARTI KOPACZ - VOLUME 1-

2  page, didn't we?
3         On the collection rates, do you
4  notice that the City has assumptions regarding
5  different collection rates that bleed from Page 59
6  to 60?
7    A.    I do.
8    Q.    And it's also fair to say that you
9  didn't make independent findings regarding whether
10  their property tax collection assumptions were
11  reasonable, correct?
12   A.    That's correct.
13   Q.    Then, similarly, on the utility users
14  tax on Page 62, do you see that?
15   A.    I do.
16   Q.    The forecast -- the forecasted amount
17  is forecast to be approximately two percent of
18  general fund revenue, correct?
19   A.    Yes.
20   Q.    Fair to say you did not test the
21  assumptions around the specific utility user tax
22  revenue assumptions by the City forecasters,
23  correct?
24   A.    Correct.
25   Q.    So, let me ask you a question about

- MARTI KOPACZ - VOLUME 1-

2  the feasibility of the POA, if there's no exit
3  financing.
4         In your opinion, you assumed that
5  there would be.  Do you remember that?
6    A.    I did.
7    Q.    Let's engage the hypothetical where
8  Mr. Buckfire fails to obtain exit financing.  How
9  does that impact your finding of feasibility?
10   A.    If there is no replacement source of
11  funding?
12   Q.    Yes.
13   A.    Then I would conclude that the plan
14  is not feasible.
15   Q.    Why is that?
16   A.    Because the -- going back to my
17  definition of feasibility, it is both a
18  quantitative and a qualitative assessment.  I
19  think the reinvestment initiatives, the RRIs, are
20  important to the City's ability to deliver
21  municipal services, to pay the commitments in the
22  plan and the City does not have the surplus, the
23  structural surplus in the next couple of years to
24  execute on the RRIs without the exit financing.
25   Q.    What is the basis for your assumption

- MARTI KOPACZ - VOLUME 1-

1
2    kind of supplements what -- what the City spends.
3        So a perfect example of that is when
4    Roger Penske and Dan Gilbert bought police
5    cruisers.  That's unheard of.  The private
6    citizens write checks to governments to do things
7    that governments should do.
8        Q.    So, let me -- with these first two,
9    you get an e-mail that -- you have an e-mail
10   exchange with Mr. O'Reilly.
11       Was it merely to schedule your
12   meeting with the DIA folks?
13       A.    It was.
14       Q.    We can talk about that later when we
15   hit it on this log.  I take it you didn't have any
16   other interaction with Mr. O'Reilly?
17       A.    I don't know Mr. O'Reilly, no.
18       Q.    What did Mr. Levin write to you about
19   the --
20       A.    I actually think that I reached out
21   to Mr. Levin first.  I mean, they're all the same
22   date, so it's kind of hard.
23       Q.    These are you e-mailing people?
24       A.    Yes.  And I think, because I know
25   Mr. Levin, I reached out to him and he said really

- MARTI KOPACZ - VOLUME 1-

1
2    the person you need to talk to is Mr. O'Reilly.
3        Q.    Got it.  Take a look down on April
4    30th.  Do you see that you do a bus tour of the
5    City with Mr. Driker and Jerry Stroop?
6        A.    Yes.
7        Q.    How long did that bus tour go on for?
8        A.    About three hours, three and a half
9    hours.
10       Q.    And do you remember what Mr. Driker
11   described during that bus tour, if anything to
12   you?
13       A.    We -- on that bus tour was my team as
14   out there, there was Mr. Driker and his wife, and
15   Jerry Stroop from Wayne State and the bus we were
16   on was courtesy of the president of Wayne State.
17       And we did Mr. Driker's the good, the
18   bad, and the ugly in Detroit.
19       Q.    Can you remember what was discussed
20   on that bus tour?
21       A.    I mean, we -- we went to Bell Isle --
22       Q.    Mainly pointing out areas saying this
23   is Bell Isle, this is the art institute?
24       A.    We went to Bell Isle.  We went to the
25   art institute.  We did the midtown stuff.  We

- MARTI KOPACZ - VOLUME 1-

1
2    looked at blight.  We looked at the waterfront.
3    We looked at the old Packard building.  We looked
4    at the Michigan train station.
5        Q.    Anything else you can recall from
6    that tour?
7        A.    No, not really.
8        MR. HACKNEY:  We're about near the
9    end of this tape so it might be a good time
10   to take an afternoon restroom break and we
11   can try and push through the rest of this
12   here.
13       THE WITNESS:  Okay.
14       THE VIDEOGRAPHER:  Thank you.  The
15   time now is approximately 4:27 p.m.  We're
16   going off the record.  This is the end of
17   Disk Number 4.
18       (Whereupon, there was a brief recess
19   in the proceedings.)
20       THE VIDEOGRAPHER:  The time now is
21   4:39 p.m.  We're back on the record.  This is
22   the beginning of Disk Number 5.
23   BY MR. HACKNEY:
24       Q.    Ms. Kopacz, welcome back.
25       A.    Thank you.

- MARTI KOPACZ - VOLUME 1-

1
2        Q.    Ma'am, I'd like to save some time
3    because I questioned you fairly extensively about
4    the revenue assumptions and with respect to the
5    cost assumptions, I'm happy to go through each one
6    of them like we did before.  But I was wondering
7    if I could establish something that I thought
8    emerged fairly consistently on the revenue
9    assumption which was, to the extent a description
10   regarding a particular cost assumption doesn't
11   include a specific finding by you regarding the
12   reasonableness of that cost assumption, is it fair
13   for the Court to infer that you did not make a
14   specific finding about that cost assumption and
15   that you treated it merely as part of your
16   aggregate opinion?
17       A.    Generally, I think that is a correct
18   statement.
19       THE VIDEOGRAPHER:  Can you please put
20   your mike on and then maybe repeat your
21   answer.  Thank you.
22       THE WITNESS:  I said generally I
23   believe that is a correct statement.
24   BY MR. HACKNEY:
25       Q.    Okay.  Ma'am, are you aware that --

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 6999-8   Filed 08/22/14   Entered 08/22/14 19:36:51   Page 47 of 52

1          - MARTI KOPACZ - VOLUME 1-
2 you know what the COPs are, the certificates of
3 participation?
4          A.    Generally, yes.
5          Q.    Do you know that the COPs -- that the
6 City soon to invalidate the COPs?
7          A.    I'm aware of that, yes.
8          Q.    Do you know that the COPs assert that
9 if the COPs are invalidated, that the pension
10 funds have to give back the approximately
11 billion-four that was raised?
12          A.    I've heard you say that before.
13          Q.    And do you know -- I know you and I
14 have talked about this and I've tried to describe
15 sort of the general lay of the land, we've had a
16 conversation on that subject, right?
17          A.    We have.
18          Q.    I mean, separate and part from me
19 like -- do you know the fact that there have
20 actually been claims filed or that the COPs have
21 indicated that they would file these types of
22 claims in the litigation or is it just based on
23 what I told you?
24          A.    It's based on what you told me.  I
25 didn't do any independent research.

1          - MARTI KOPACZ - VOLUME 1-
2          Q.    So your kind of understanding of the
3 COPs invalidity case is based on the conversation
4 that you and I had about that subject?
5          A.    Yes.
6          Q.    Let me just ask you a freestanding
7 question, then, which is assume hypothetically
8 that at some point in the future, it could be a
9 year after the bankruptcy plan is confirmed or
10 three years, something in the order of one to five
11 years, assume that the pension systems are ordered
12 to disgorge a billion-four back to the COPs.
13 Okay?
14          Have you made a determination as to
15 whether the City would be feasible in that
16 instance?
17          A.    I have not.
18          Q.    In your opinion, you are assuming
19 that has not come to pass; is that correct?
20          A.    Correct.
21          MR. LERNER:  Let me interrupt.  Your
22 question is the City's feasible.
23          MR. HACKNEY:  Is the City's plan
24 feasible.  Fair amendment.  Is the City's
25 plan feasible.

1          - MARTI KOPACZ - VOLUME 1-
2          Q.    And I think my question was did you
3 consider whether the City's plan was feasible in
4 that circumstance?
5          A.    No.
6          Q.    Okay.  As you sit here today, do you
7 believe the City's plan would be feasible if that
8 were to come to pass; that the City had to -- that
9 the pension systems had to disgorge a
10 billion-four?
11          A.    I don't know.
12          Q.    Okay.  Do you believe that that's a
13 sufficiently material issue as it relates to the
14 City's potential pension obligations, that it
15 could impact your opinion?
16          A.    It is -- it is an issue.  I've
17 identified it in my report, along with a lot of
18 other issues that are unresolved, that, depending
19 on how they ultimately resolve themselves and what
20 position, condition the City's in, could --
21          Q.    Oh, I see.  I didn't take your -- I
22 saw the disclosure on that, but I actually read
23 the disclosure to say that if the COPs were
24 determined to be valid, it might impose higher
25 obligations on the city, not addressing the

1          - MARTI KOPACZ - VOLUME 1-
2 situation where they're determined to be invalid
3 but they get disgorgement back.
4          A.    We can read it.
5          Q.    That's okay.  It says what it says.
6          Let me try to -- let me put it this
7 way, though:  If you knew today that there was a
8 high probability that the pension systems would
9 disgorge $1.4 billion and that the City would have
10 the obligation to make up the difference, would
11 you find the plan feasible?
12          A.    I would have to talk with the City
13 about how they intended to make up that deficiency
14 or modify the plan.
15          Q.    Certainly if you modified the plan to
16 take account of it, that could be a way it could
17 become feasible.  But under this plan's forecast,
18 would the City be feasible if it had an additional
19 $1.4 billion obligation thrust upon it?
20          A.    I don't know, but probably not.
21          Q.    Okay.  And it's not something you've
22 evaluated?
23          A.    It is not.
24          Q.    Okay.  Going back to this chart
25 here.  If you look down at May 7th.

- MARTI KOPACZ - VOLUME 1-

2     A.   Uh-huh.

3     Q.   Do you have that in front of you,

4 ma'am?

5     A.   I do.

6     Q.   Do you see that you had a call with

7 Judge Rosen?  Do you see that?

8     A.   I did.

9     Q.   And what did you and Judge Rosen

10 discuss on that call?

11     A.   I called Judge Rosen because I was

12 having difficulty accessing some information and

13 that the City's counsel had requested to

14 participate in all meetings and interviews that I

15 had and I was honoring the order that the Judge

16 had entered in April appointing me not to have any

17 ex parte communication.

18     And I didn't know where to turn and I

19 called Judge Rosen and I said, this is what I'm

20 faced with and he said, you have my permission to

21 call Judge Rhodes.

22     Q.   I see.  So Judge Rosen gave you

23 permission to call Judge Rhodes?

24     A.   He said it's okay.  He said, for

25 something like this, you can call him.  And that's

- MARTI KOPACZ - VOLUME 1-

2 what I did.

3     Q.   Okay.  So did you talk about anything

4 else other than that?

5     A.   No.

6     Q.   Okay.  So -- so that went in an

7 unexpected direction for me.

8     So were you -- were you saying, I

9 want to talk to Judge Rhodes about it or did he

10 say --

11     A.   No.

12     Q.   -- you've got to talk to Judge

13 Rhodes?

14     A.   I said I -- I've got these issues, I

15 don't know how to handle them.  Right.  And he

16 said -- and I said, I know I'm not supposed to

17 talk to the Judge.  And he said, in this instance

18 you need to call the Judge and ask him what he

19 wants you to do about it.

20     And at that point -- I never, ever

21 did talk to him at that juncture, but he said

22 "send me a letter."

23     Q.   Judge Rhodes did?

24     A.   Judge Rhodes said "send me a letter."

25 So that was my first letter that I sent to the

- MARTI KOPACZ - VOLUME 1-

2 Court and --

3     Q.   Let me -- sorry.  Let me catch up to

4 you before you go ahead of me.  I'm sorry, I

5 didn't mean to interrupt you.  I didn't mean to be

6 rude.  I'm just trying to keep it organized

7 chronologically.

8     Did Judge Rosen say that he had

9 talked to Judge Rhodes and that Judge Rhodes said

10 it was okay or was Judge Rosen just saying that

11 unbidden, as far as you could tell?

12     A.   Judge Rosen said, you -- again, I

13 think you need to touch base with Judge Rhodes on

14 this.

15     Q.   Okay.

16     A.   And even though you're not supposed

17 to have ex parte communication, you need to call

18 his office, explain the situation, and get

19 direction on how he wants you to handle that.

20     Q.   Okay.  And so, then did you just say,

21 okay, I will do that?

22     A.   Yes.

23     Q.   Okay.  Did you say how do you know,

24 Judge Rosen, what Judge Rhodes wants me to do?

25     A.   He --

- MARTI KOPACZ - VOLUME 1-

2     Q.   You're in a tough spot, I'm just

3 curious --

4     A.   Judge Rosen said, If he gets mad at

5 you, tell him I said it was okay.

6     Q.   Okay.  Well, that's fair enough.  I'm

7 not making fun of you, you were in a -- what was

8 the problem you were having that militated the

9 call?

10     A.   There are really two things, we were

11 having trouble getting the working models.  Okay.

12 And counsel had requested to participate in all of

13 my interviews.

14     Q.   Was that bogging you down a bit in

15 terms of setting them up?

16     A.   It was just -- it was raising the

17 whole issue of, you know, what sort of openness I

18 would have.  And again, it wasn't going to affect

19 the questions I asked.  Right.  But it might

20 affect what people were telling me.

21     Q.   Interesting.  Okay.

22     Now, so then you -- okay, so I'm

23 assuming you got off the phone with Judge Rosen

24 and you called Judge Rhodes?

25     A.   I called Judge Rhodes.

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2   not identified by name on here is a spouse. You
3   didn't leave any sort of principals off, so to
4   speak.
5       A.   No, I did not.
6       Q.   Okay. And what did you talk about?
7   How long did the dinner party go and what -- what
8   did you all talk about?
9       A.   I would say the dinner party was a
10  couple of hours. It was a -- it was really an
11  occasion for Mr. Ravitch and I to meet all of
12  these people other than Judge Rosen and
13  Mr. Driker and I had just met Mr. Gargaro that
14  day, the rest of those people I had never met and
15  I don't think that, other than Judge Rosen and the
16  Bluesteins, I don't think Mr. Ravitch knew any of
17  these people. So it was just a -- it was a
18  welcoming dinner, if you will.
19      Q.   So, let me ask you a question.
20           Were you concerned at all as an
21  independent expert about the informality, so to
22  speak, of kind of breaking bread with, for
23  example, Kevyn Orr?
24      A.   Not at all.
25      Q.   No? Why not?

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2       A.   Why would I be? I mean it's not
3   going to impact my view of the plan whether or not
4   I've had a meal with these people.
5       Q.   Did you have -- did you take meals
6   with any -- anybody else other than this? This is
7   I think one of the only dinner parties I saw.
8       A.   There were -- there were a couple of
9   different dinner parties. I've had -- I've had
10  breakfast with the Bluesteins. I've had -- I don't
11  generally do lunch.
12      Q.   Who was the other dinner party with?
13      A.   There was another -- there was
14  another -- there was another dinner party
15  somewhere. It may be listed as a meeting, but it
16  was after that -- it was -- it was June 11th.
17      Q.   The one where it's with Judge Rosen?
18      A.   Judge Rosen and that whole group of
19  people. Steven was on the phone. He wasn't
20  there. But basically this group left and went to
21  dinner.
22      Q.   On June 11th?
23      A.   On June 11th.
24      Q.   Was that a meeting that started in
25  Judge Rosen's chambers?

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2       A.   Yes, it was.
3       Q.   And then after it was revolved,
4   everybody went out to dinner?
5       A.   Everyone went to the Bluesteins'
6   country club. They hosted again.
7       Q.   Okay. Do you remember how many
8   people were at that dinner?
9       A.   Dozen. Maybe.
10      Q.   So, what do you remember Judge Rosen
11  talking about at the May 7th dinner party back on
12  in 2014? He's a fairly voluble -- I won't
13  characterize him, but he's a dynamic person. I --
14  I haven't met him in person, but I've seen his
15  press conferences --
16      A.   I'm trying to remember.
17      Q.   -- he's not somebody who I -- I view
18  as a shrinking violet, so I was wondering whether
19  he had conveyed to you his views?
20      A.   I'm not -- I'm trying to remember how
21  the seating was because there were -- like the
22  May -- at the May 7th, there were two large
23  tables, one in their dining room and one on
24  their -- on their patio or screened-in porch, and
25  I remember the mayor was on my right. Mr. Ravitch

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2   was on my left and Kevyn was across from me and
3   Tom Lewand was over there. And to be honest with
4   you, I can't remember who was at the rest of my
5   table versus who was at the other table.
6       Q.   But you know -- was Judge Rosen at
7   the other table?
8       A.   I think he may have been at the other
9   table. I don't know.
10      Q.   And so were people basically talking
11  about the case and how it was going and the City
12  and --
13      A.   Not really. The -- the conversation
14  was a lot more social and informal. I mean, I
15  learned about, you know, where Kevyn Orr went to
16  college and, you know, what Mike Duggan had done
17  with his life and how Tom Lewand got to the City.
18  I mean, that was the discussion, right?
19      Q.   Okay. It was sort of getting to know
20  the people more than it was talking about the
21  substance of your assignment or the case? More
22  polite sort of?
23      A.   It was -- Yes. Yes. You know, and I
24  think, you know, Dick was -- Dick Ravitch was --
25  was -- we were having all kinds lots -- of of

- MARTI KOPACZ - VOLUME 1-

1  A.  What he thinks his assignment is.
2  MR. GLEASON: You need to fix your
3  microphone.
4  THE WITNESS: Thank you.
5  Q.  So we've gone through a bunch of
6  communications with him. Was there -- was there
7  ever a meeting or a call where he drove it, he
8  drove the call, he drove the meeting, he said,
9  Marti, I want to meet with you, or Marti I needed
10  to call you?
11  Or were all the meetings or calls
12  ones where you said, Dick, I need to talk to you?
13  A.  No, if I hadn't talked to Dick in a
14  week or so, I would usually get a call from Rita,
15  his assistant, who would say I have Mr. Ravitch
16  for you and he'd say, how are you?
17  Q.  And he would check in on how you were
18  doing?
19  A.  Yeah. He would check in.
20  Q.  Okay. He would definitely check in
21  with you to see how you were coming along?
22  A.  Yes.
23  Q.  So some of these meetings or calls
24  were initiated by him and some were initiated by

- MARTI KOPACZ - VOLUME 1-

1  you?
2  A.  Yes.
3  Q.  Okay. So, June 3rd, 2014, you have
4  one with him where you catch up on case
5  developments. Was that just such a call where he
6  might have called you --
7  A.  And, again, I don't know if he called
8  me or I called him.
9  Q.  Okay. Do you remember what you
10  talked about?
11  A.  I don't.
12  Q.  Okay. Now, take a look on the next
13  page, if you could, at June 11, 2014. This is the
14  -- this is the meeting that then moves into the
15  dinner party that you talked about.
16  Remember that?
17  A.  Yes.
18  Q.  What was -- what was the subject --
19  what was the occasion for and the subject of the
20  meeting in Judge Rosen's chambers?
21  This is kind of like -- this is a big
22  group of people --
23  A.  It is a big group of people.
24  Q.  -- all of a sudden get together.

- MARTI KOPACZ - VOLUME 1-

1  A.  At some time prior to this, okay, my
2  team's relationships with Ernst & Young and Conway
3  got frayed okay? And there were, this was
4  basically all of the parties being called to
5  chambers to be instructed to play nicely in the
6  sand box.
7  Q.  So did Judge Rosen initiate this
8  meeting?
9  A.  Judge Rosen initiated this meeting.
10  Q.  So he called you and said I want to
11  clear the air?
12  A.  Yes, you're not playing we will
13  continue sand box with the other children.
14  Q.  He said that to you?
15  A.  Yes generally that's, that's he
16  didn't, he didn't use those words but it was like
17  we need to have a conversation now. By the time
18  we get to this meeting of which there was already
19  this kind of dinner party plan, that same with Mr.
20  Ravitch --
21  Q.  There was already the plan for the
22  dinner party?
23  A.  This was, actually, that night was to
24  be this group and E & Y and Conway didn't

- MARTI KOPACZ - VOLUME 1-

1  participate in the dinner. But that was to be the
2  dinner in which I was going to -- and Mr. Ravitch
3  were meeting with Dan Gilbert. All right. He
4  canceled last minute. So we all went anyway.
5  But, yes, it was -- that was -- that
6  was the way that I got on his calendar was for the
7  Blustein's to throw a dinner party.
8  Q.  So what happened at the meeting that
9  was called because there was -- whatever, tempers
10  were flaring or whatever?
11  A.  Yes. By the time we got to the
12  meeting, we had already worked out our issues and
13  our differences.
14  Q.  And so everyone was kind of like,
15  we're good?
16  A.  We're good. And we talked -- at that
17  point in time we talked a lot about where my
18  thinking was on the feasibility standard.
19  Q.  In this meeting with Judge Rosen?
20  A.  Uh-huh.
21  Q.  What did Judge Rosen say during this
22  meeting?
23  A.  I'm not sure that Judge Rosen said a
24  whole lot. It was mostly a dialogue with Jones

- MARTI KOPACZ - VOLUME 1-

1
2  Day and me and the advisors about, you know, how
3  broad or narrow feas -- my assessment of
4  feasibility was and should be.
5       Q.   Was there a dispute about that?
6       A.   I think there was, yes.
7       Q.   And who was the dispute between and
8  what were the contours of it?
9       A.   I think generally the dispute was
10 between the City and me in terms of things like
11 the time frame.  Right.  And you know, where --
12 where I was coming out on my thinking about
13 certain topics.
14      Q.   Okay.  Like what topics -- so let me
15 see if I can set it up in a way that is fair and
16 accurate.
17           Were you in communications with the
18 City, communicating to them concerns that you had
19 about the plan?
20      A.   Yes.
21      Q.   And was the City, in response, saying
22 that's not your job to have those types of
23 concerns, and so we think you're -- you're
24 straying from what you are supposed to do, you're
25 just supposed to take this plan and say whether

- MARTI KOPACZ - VOLUME 1-

1
2  this plan is or isn't feasible, you're not
3  supposed to change this plan, or words to that
4  effect.  I wasn't there so --
5       A.   Yeah.  I don't think it was that cut
6  and dry, if you will.  Right.
7       Q.   Okay.  It was a debate about scope,
8  though, right?
9       A.   There was a debate about scope.
10 There was also debate about -- I mean, at this
11 point in time I am still very, very troubled by
12 the lack of -- this is before the July 2nd
13 projections, there's $160 million worth of RRI
14 deferrals in the May 5th projections, and nobody's
15 told me where those go.  Okay?
16           So those are -- I'm having those
17 kinds of discussions and disagreements, if you
18 will, with the City as to whether or not that is
19 an important issue for me or not an important
20 issue for me.
21           MR. KANE:  When you just said "at
22      this point in time" you're referring to his
23      questions about the meeting --
24           THE WITNESS:  I'm talking about in
25      this time --

- MARTI KOPACZ - VOLUME 1-

1
2           MR. HACKNEY:
3       Q.   And you're saying now you know the
4  answer to that question --
5       A.   Now, I know the answer to the
6  question because we have the July 2nd projection.
7       Q.   That answered the question.
8       A.   That got to the point where the
9  deferrals are actually -- have been pushed back
10 into the 40-year projections.
11      Q.   They have been pushed outside the
12 ten-year period into --
13      A.   No, no.  They're in the -- they're --
14 they're at a more granular level so that you can
15 look at how the RRI money is going to be spent.
16 Okay?
17           So those are the kinds of issues that
18 I was having with E & Y and Conway and the City.
19      Q.   And did those issues get discussed --
20 oh, I see.
21           So then -- okay.  So did the
22 conversation kind of morph in this meeting in
23 Judge Rosen's chambers to one that was originally
24 going to be about are remember getting along
25 well --

- MARTI KOPACZ - VOLUME 1-

1
2       A.   Yes.
3       Q.   -- to one that was about, What is
4  your role?
5       A.   Right.
6       Q.   And then was there a subsequent
7  conversation held on that?
8       A.   I think we worked it out.  I mean, we
9  ultimately had a -- we agreed to have a -- what we
10 refer to as the big issues meeting here in New
11 York.  We had it in this room with the City, to go
12 through what I consider to be the issues and in
13 essence it almost looks like the table of contents
14 to my report.  Right?
15      Q.   In terms of --
16      A.   Feasibility.
17      Q.   Did you go down the list of things
18 that you thought was a big issue to the findings
19 of feasibility?  Is that what you mean?
20      A.   Yes.  We talked general -- we talked
21 about what I thought was important to my
22 feasibility assessment.  And I listened to the
23 City as to whether or not they thought those were
24 big issues.
25      Q.   And so, did -- in this meeting on