# Exhibit 6F

# Excerpts of July 24, 2014 C. Sallee Deposition Transcript

```
 1              UNITED STATES BANKRUPTCY COURT
 2               EASTERN DISTRICT OF MICHIGAN
 3   In re                       )
 4                               ) Chapter 9
 5   CITY OF DETROIT, MICHIGAN,  ) Case No. 13-53846
 6      Debtor.                  ) Hon. Steven W. Rhodes
 7
 8            The videotaped deposition of CAROLINE
 9   SALLEE, called for examination pursuant to the
10   Rules of Civil Procedure for the United States
11   District Courts pertaining to the taking of
12   depositions, taken before GINA M. LUORDO, a notary
13   public within and for the County of Cook and State
14   of Illinois, at 77 West Wacker Drive, Suite 3500,
15   Chicago, Illinois, on the 24th day of July, 2014,
16   at the hour of 9:04 a.m.
17
18
19
20
21
22
23
24   Reported by:  Gina M. Luordo, CSR, RPR, CRR
25   License No.:  084-004143
```

## Page 22

1  or the state government, correct?
2      MR. STEWART: Just a second. Objection.
3  BY MR. SMITH:
4      Q. Now you can answer.
5      MR. STEWART: You can answer the question.
6      THE WITNESS: I guess I don't know what the
7  question is.
8  BY MR. SMITH:
9      Q. One significant source of revenue for a
10 city is grants from the federal government or state
11 government, correct?
12     A. I guess it depends on the city and what
13 you mean by significant.
14     Q. For the City of Detroit, grant money from
15 the state and federal governments is a significant
16 source of funds, correct?
17     A. I don't know.
18     Q. You would agree that property tax revenue
19 is a significant sort of revenue for Detroit,
20 correct?
21     A. What do you mean by significant?
22     Q. Well, you've used the word significant
23 before, right?
24     A. I don't know. I don't think I have.
25     Q. You're saying in your life, you've never

## Page 23

1  used the word significant before?
2      A. Well, I use it, but I don't know if I
3  would use it in this context, so what do you mean
4  by significant?
5      Q. Okay. The property tax revenue would be
6  one of the top revenue sources for the City of
7  Detroit?
8      A. So for the City of Detroit, when I look at
9  the various tax components, property tax revenue
10 makes up a good portion of the tax revenue that the
11 City receives.
12     Q. Do you know what the proportion is?
13     A. So it's around 17 percent.
14     Q. And what's the proportion of revenue for
15 the city that the state revenue sharing makes up?
16     A. Off the top of my head, I don't know.
17     Q. Would it be fair that to say that state
18 revenue sharing is one of the top revenue sources
19 for the City of Detroit?
20     A. State revenue sharing, when I look at the
21 tax revenue plus the state revenue sharing, state
22 revenue sharing is a good portion of that revenue,
23 yes.
24     Q. Have you ever forecasted expenditures for
25 a city?

## Page 24

1      A. Expenditures for a city? No, I haven't.
2      Q. Before -- before the Detroit matter, did
3  you ever forecast property tax revenues?
4      A. Yes.
5      Q. What context did you do that?
6      A. I would do it for clients related to
7  certain projects, so for example, I would be
8  retained in my old job to look at a new facility
9  and then to forecast the property tax revenue from
10 that.
11     Q. Okay. But before the Detroit matter, you
12 never forecasted the total property tax revenues a
13 city received, did you?
14     A. For -- what do you mean the total forecast
15 for a city?
16     Q. I mean you never forecasted the amount of
17 property tax revenue a city would receive in total
18 before your retention on the Detroit matter,
19 correct?
20     A. That's correct.
21     Q. You've never been qualified as an expert
22 by any court; is that correct?
23     A. That's correct.
24     Q. Have you ever been retained to do any
25 expert work before in a litigation context?

## Page 25

1      A. Yes.
2      Q. And what context was that?
3      A. Sorry. Let me clarify. Do you mean -- so
4  in my old job, my boss had been an expert on a
5  number of cases, so I would work on his cases. I
6  was not the expert, though.
7      Q. Okay. So you've done litigation
8  consulting work before, but you weren't personally
9  the expert, correct?
10     A. That's correct.
11     Q. When did you begin your work on the City
12 of Detroit matter?
13     A. I started work in May of 2013.
14     Q. Have you ever forecasted municipal
15 population levels before?
16     A. For specific projects in my old job, yes.
17     Q. Have you ever forecasted -- have you ever
18 done a forecast for municipal revenue sharing for
19 the Detroit matter?
20     A. No, I don't think so.
21     Q. And have you ever forecasted what future
22 property assessments would be in a city before the
23 Detroit matter?
24     A. So in this case, I forecasted taxable
25 value, which obviously, has some relationship with

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6999-12    Filed 08/22/14    Entered 08/22/14 19:36:51    Page 3 of 4

1 assessments, and this is the first time that I did
2 that for a municipality, yes.
3    Q. You're not a lawyer, correct?
4    A. I am not.
5    Q. And you're not holding yourself out as a
6 legal expert?
7    A. What do you mean by legal expert? I'm an
8 expert in this case.
9    Q. Okay. Are you offering any opinions on
10 the law like as it relates to this case?
11    MR. STEWART: Objection.
12    THE WITNESS: I don't think I'm offering
13 opinions on the law. I'm offering opinions on the
14 two things that are in my report.
15 BY MR. SMITH:
16    Q. Okay. So other than what's in your
17 report, you're not offering any expert opinions
18 other than that, correct?
19    A. That's correct.
20    Q. Okay. And is it fair to say that in your
21 report, you're not -- or anywhere else, you're not
22 trying to offer an opinion about interpreting the
23 law, correct?
24    A. I'm not offering an interpretation of the
25 law.

1    Q. Okay. Have you reviewed any depositions
2 in this case?
3    A. Yes. No, I haven't. Sorry. I've
4 reviewed expert reports. Sorry.
5    Q. But no depositions?
6    A. I have not reviewed depositions.
7    Q. So you didn't review Mr. Evanko's
8 deposition?
9    A. I have not reviewed Mr. Evanko's
10 deposition.
11    Q. You know who Mr. Evanko is, though,
12 correct?
13    A. I do.
14    Q. Who is Mr. Evanko?
15    A. Gary Evanko --
16    Q. Yes.
17    A. -- is the city assessor for the City of
18 Detroit.
19    Q. Have you -- you mentioned you had reviewed
20 expert reports. What expert reports have you
21 reviewed?
22    A. I have read Robert Cline's expert report
23 and Gaurav Malhotra's.
24    Q. Any other expert reports?
25    A. Not that I'm aware of, no.

1    Q. You didn't read Charles Moore's expert
2 report, correct?
3    A. I have not.
4    Q. And do you know who he is?
5    A. I do not.
6    Q. Do you know --
7    A. And I read Martha -- what's her last name?
8    Q. Ms. Kopacz?
9    A. Yes. Thank you.
10    Q. You read her report?
11    A. I did read her report.
12    Q. And you know that Ms. Kopacz opines that
13 the forecasts Ernst & Young had presented were
14 subjective, correct?
15    MR. STEWART: Objection.
16    THE WITNESS: I do not recall reading that, no.
17 BY MR. SMITH:
18    Q. Do you recall her doing an analysis where
19 she calculated the effect of a 1 percent increase
20 in property tax collections?
21    A. I did read her report where she did do the
22 sensitivity analysis, yes.
23    Q. She found that increasing property tax
24 collections by 1 percent could lead to more than a
25 $20 million increase in revenue, correct?

1    A. My recollection from her report is that if
2 you assumed that -- if you were able to change the
3 parameter by 1 percent, what would that mean over
4 the long haul, and my recollection is over
5 20 million in property tax revenue.
6    Q. Has Ernst & Young done any sensitivity
7 analysis on its forecast to understand what
8 changing the inputs would mean in terms of revenues
9 available to the city?
10    A. Throughout the process, we would vary our
11 assumptions, change our assumptions and see what
12 the revenue impacts are.
13    Q. And what assumptions did you change during
14 the process?
15    A. So for property taxes, we would change the
16 important drivers, so whether it be taxable value
17 or collection rates. Those are the key assumptions
18 that we would change.
19    Q. And did you increase or decrease taxable
20 value over time, I mean, in changing the
21 assumptions?
22    A. Well, so do you have a -- I mean, both. I
23 mean, there are times when we would say we would
24 get a new piece of information, and we might adjust
25 our growth rates, and sometimes they would raise

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 6999-12    Filed 08/22/14    Entered 08/22/14 19:36:51    Page 4 of 4