## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) )  ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN | ) Case No.: 13-53846 |
|  | ) |
| Debtor. | ) Hon.  Steven W. Rhodes |
|  | ) ) |
|  | ) |

## CITY OF DETROIT'S MOTION TO EXCLUDE TESTIMONY OF VICTOR WIENER

The City of Detroit, Michigan (the "City") moves to exclude the testimony of Victor Wiener, a putative expert offered by Financial Guaranty Insurance Company ("FGIC").  In support of its Motion, the City states as follows:

### INTRODUCTION

1.     Victor Wiener is an appraiser who purported to appraise the entire 60,000-plus collection of art at the Detroit Institute of Arts ("DIA") in less than two weeks—a feat that even Mr. Wiener admits had never been achieved in the history of art appraisal.  Mr. Wiener and his consultants, however, did not achieve it either.  Instead, Mr. Wiener cut corners and employed a mishmash method that he invented for this litigation and that—as even he concedes—has never been used by any other appraiser or endorsed by any professional publication.  Because FGIC cannot meet its burden to prove that Mr. Wiener's opinions are admissible, the

1

Court should exclude Mr. Wiener from testifying at trial.

2. Mr. Wiener's process for determining the DIA collection's "marketable cash value" proceeded in five steps, each involving an entirely different approach. Unsurprisingly, this novel, slapdash method reveals its unreliability at every step. In fact, just two days ago, Mr. Wiener acknowledged and sought to correct numerous "errors" in his report that had caused him to overstate the value of the DIA collection by *more than $400 million*.

- At Step 1, Mr. Wiener claims to have independently appraised 387 DIA works—and many of his appraisals vary wildly from appraisals performed by other experts in this case, including a work that he appraised at a value *172 times larger* than any other appraiser. Moreover, even though Mr. Wiener testified that it is not appropriate to appraise a work's marketable cash value simply by taking a percentage of its fair market value calculated by one of the other experts, he did precisely that with regard to numerous works.

- Step 2 required no expert method at all, and nothing more than a calculator, because Mr. Wiener merely took the average value for 596 DIA works appraised by the three other experts in the case. But the values provided by the three other experts are "fair market value" figures, which Mr. Wiener repeatedly distinguished from his "marketable cash value" approach in Step 1.

- For Step 3, Mr. Wiener used a list of 16,388 DIA works that he assumed contained "insurance value" information. Mr. Wiener never attempted to verify that the list actually provided "insurance values" or that any of the information on the list, some of which was more than a decade old, was accurate. As Mr. Wiener now acknowledges, this failure to verify the underlying data distorted Step 3: for example, Mr. Wiener initially valued *each* of the 501 pages of a manuscript at the total value of the *entire* manuscript. Mr. Wiener now concedes that this error may have been repeated for other works he valued at Step 3—but instead of correcting his data, Mr. Wiener merely applies

2

an arbitrary, unexplained 3.5% discount to address this risk of error. And despite the fact that insurance values undeniably yield the highest valuations among competing approaches, Mr. Wiener actually added a massive across-the-board *premium* to *increase* the purported insurance values.

- At Step 4, Mr. Wiener then purported to appraise a staggering 42,854 DIA works all at once, but he did not base this computation on *any* appraisal of *any* of those works. Instead, he constructed a "pricing matrix" of the average sales price, by *category*, of works sold at Christie's and Sotheby's in 2013, and from there assigned an average value to each DIA work. This was no apples-to-apples comparison: Mr. Wiener (1) did not assess whether the Christie's and Sotheby's works and the DIA works were comparable; (2) ignored that all sold works by definition have value while a large number of DIA works (*i.e.*, pot shards, textile fragments, arrowheads, and similar pieces held for academic purposes) do not; and (3) compared *all* works (including the most valuable pieces) sold by two of the premium auction houses in the world to the *bottom* two-thirds of the DIA collection left over after Mr. Wiener removed the most valuable DIA works in Steps 1, 2, and 3. Mr. Wiener therefore chose a multiplier derived from values of some of the top art sales in the world and applied it to the DIA's lowest-value (and nil-value) pieces. This Step alone yielded an astounding $3.5 billion in value, almost half of Mr. Wiener's total valuation of the DIA collection.

- Despite admitting no prior use or peer approval of the "methodology" in Steps 2, 3, and 4, Mr. Wiener compounded all of these flaws at Step 5, where he simply added together the subtotals he generated in Steps 1 through 4. Mr. Wiener thus attempted to fuse marketable cash value appraisals (Step 1), fair market value averages (Step 2), insurance values multiplied by an across-the-board premium (Step 3), and average sales prices by category for unrelated works (Step 4) to divine the marketable cash value of the entire DIA collection. This haphazard method, all done in less than two weeks, predictably led to untenable results that already had to be corrected once and leave serious questions as to their reliability.

3.     Finally, Mr. Wiener also was asked to critique the economic and

financial analysis performed by Michael Plummer, one of the City's experts. But Mr. Wiener is not an expert in economics and, therefore, had to outsource this assignment to others. He thus attached to his report the written analysis and conclusions of these other individuals, Mr. Zhang Yi and Dr. Jannette M. Barth, who have not been disclosed as experts and are not testifying in this case. But the Federal Rules do not permit Mr. Wiener to serve as the vehicle through which other witnesses in entirely different specialties, and who are not subject to cross-examination at trial, are allowed to testify indirectly.

4.      Mr. Wiener thus rests his opinions on an unreliable and unprecedented method necessarily slapped together in less than two weeks and on the opinions of non-testifying persons on topics far beyond his area of expertise. FGIC cannot establish that Mr. Wiener's testimony is reliable, and the Court should exclude it.

## BACKGROUND

5.      Mr. Wiener is an appraiser who, along with his consultants at Victor Wiener Associates (VWA), was retained by FGIC's counsel to appraise the "marketable cash value" of the DIA's entire 60,000-work collection. *See* Wiener Rep. 6 (Ex. A); Wiener Dep. 42 (Ex. B). Mr. Wiener distinguished "marketable cash value" from other approaches like "fair market value" taken by other experts in this case. *See* Wiener Rep. 15–16; Wiener Dep. 132–33.

6.      Mr. Wiener executed his retention agreement with FGIC's counsel on

4

July 11, 2014, and submitted his report two weeks later on July 25, 2014. *See* Wiener Rep. 6. Mr. Wiener "felt time constraints" in performing his appraisal in less than two weeks and is not "aware of any appraiser in history ever performing a valuation of 60,000 works of art in two weeks." Wiener Dep. 348.

7. Mr. Wiener repeatedly described his report as "preliminary." *See* Wiener Rep. 6, 7, 19, 31, 46, 47, 48; Wiener Dep. 188. Mr. Wiener served a corrected expert report on August 20, 2014. *See* Wiener Rep. 1. Mr. Wiener sought to correct "errors" in his report, but continues to refer to his conclusions as "preliminary." Wiener Rep. 6, 7, 19, 31, 46, 47, 48, 50.

8. Mr. Wiener followed five steps to appraise the DIA collection's "marketable cash value." *See* Wiener Rep. 3, 45–47. At Step 1, Mr. Wiener independently appraised 387 DIA works. *See id.* at 3, 45; Wiener Dep. 196.

9. At Step 2, Mr. Wiener computed the average value for 596 DIA works appraised in the three other expert reports in the case. *See* Wiener Rep. 3, 45–46. Those expert reports are the Christie's Report on behalf of the City and the DIA; the Artvest Report authored by Michael Plummer on behalf of the City; and the Winston Report authored by Elizabeth von Habsburg on behalf of Syncora. *See id.*

10. At Step 3, Mr. Wiener derived the values for 16,388 works of art by adding an across-the-board appreciation premium to outdated "insurance values" for those works. *See* Wiener Rep. 3, 45–47; Wiener Dep. 70–77. Mr. Wiener

originally calculated the premium at 64.6%, but now has "corrected" it to 62%.
*See* Wiener Rep. 3, 45–47; Wiener Dep. 70–77. The Step 3 approach incorporated
"[t]echnical, statistical, and financial analysis" performed by Robert Leeds of Silar
Advisors. Wiener Rep. 9; Wiener Dep. 192–93, 277–79.

11. At Step 4, Mr. Wiener calculated an aggregate value of 42,854 works
of art by reference to a "pricing matrix" that reflected the average sales price, by
category, of works sold by Christie's and Sotheby's in 2013. *See* Wiener Rep. 3,
45–47; Wiener Dep. 282–87. At Step 5, Mr. Wiener added the subtotals he
computed in Steps 1 through 4. *See* Wiener Rep. 3, 46–47.

12. The total value of the DIA collection that Mr. Wiener originally
calculated in Step 5 was $8,552,395, which he now has "corrected" to
$8,149,232,354, a difference of more than $400 million. *See* Wiener Rep. 3;
Wiener 7/25/14 Table (Ex. C); Wiener Dep. 141.

13. Mr. Wiener was also asked to critique the discount factor analysis
involving real-world analytics and economic considerations provided by one of the
City's experts, Michael Plummer, but he could not and did not perform that
critique himself. Instead, he attached to his report two other written reports: a
report by Zhang Yi ("Zhang Report") and a report by Jannette M. Barth ("Barth
Report"), neither of whom has been disclosed as an expert or is testifying at trial.
*See* Wiener Rep. 41–44. The Zhang Report and the Barth Report purport to

challenge Mr. Plummer's financial and economic assumptions. *See id.* Presumably Mr. Wiener intends to adopt those critiques as his own at trial. *See id.*

## ARGUMENT

14. The proponent of expert testimony bears the burden of proving its admissibility. *See EEOC v. Kaplan Higher Ed. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014). FGIC cannot establish that Mr. Wiener's testimony is admissible: Mr. Wiener did not employ a reliable method and seeks to be a mouthpiece for other specialists on matters outside his area of expertise. For each of these reasons, the Court should grant the Motion and exclude Mr. Wiener's testimony.

## I. MR. WIENER'S UNPRECEDENTED MIX-AND-MATCH VALUATION METHOD IS UNRELIABLE

15. Expert testimony is admissible only if it "is based on sufficient facts and data" and "is the product of reliable principles and methods" that the expert "has reliably applied . . . to the facts of the case." Fed. R. Evid. 702(c)–(d). Rule 702 "imposes a special obligation upon a trial judge" to ensure that any and all expert testimony "'is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). Courts determine reliability through a number of factors, including (1) whether a theory or technique can be or has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of

7

standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance by experts in the field. *See Daubert*, 509 U.S. at 593–94; *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 407 (6th Cir. 2006).

16.     Mr. Wiener's five–step method for appraising the 60,000-work DIA collection—which he implemented in less than two weeks to arrive at his "preliminary" and now corrected conclusions, Wiener Rep. 6—is unreliable. At his deposition, Mr. Wiener freely conceded that he has *never* before used this method, that he is unaware of any other appraiser who has used it, and that he does not know of any professional publication that has endorsed it. *See* Wiener Dep. 255–58, 273, 307–08. Mr. Wiener also is not "aware of any appraiser in history ever performing a valuation of 60,000 works of art in two weeks." *Id.* at 348.

17.     This lack of peer review and general acceptance, coupled with the "novelty" of Mr. Wiener's method, *Mike's Train House*, 472 F.3d at 408, and his fundamental inability to provide any detail to support his calculations—stating time and again that the specifics of his methods are simply "implicit" in his conclusions, *see* Wiener Dep. 42, 43, 46, 48–49, 82, 84–87, 93, 96, 142, 241, 322, thus making it impossible to test them—demonstrate the report's unreliability.

18.     Indeed, Mr. Wiener just two days ago acknowledged and sought to correct "errors" in his report. Wiener Rep. 50. Those conceded errors caused Mr. Wiener to overstate the value of the DIA collection by more than $400 million.

*See* Wiener Rep. 3; Wiener 7/25/14 Table. Mr. Wiener's corrections of these errors reduced his total valuation at Step 2 by more than 28%, and his total valuation at Step 3 by more than 27%, *see* Wiener Rep. 3; Wiener 7/25/14 Table, raising serious questions about the reliability of his method.

### A. Step 1 Produces Widely Divergent Results When Compared To Other Testifiers And Utilizes A Method Even Mr. Wiener Concedes Is Inappropriate

19. At Step 1, Mr. Wiener independently appraised the "marketable cash value" of 387 works in the DIA collection. *See* Wiener Rep. 3, 45; Wiener Dep. 196. Many of Mr. Wiener's appraisals are outliers that diverge dramatically from the appraisals performed by other testifiers in the case, including appraisals from fellow objector Syncora's putative expert, Elizabeth von Habsburg. *See* Wiener Dep. 245–52. While there are numerous examples of appraisals several times higher than anyone else's, a number of Mr. Wiener's estimates are simply off the charts. For example, Mr. Wiener appraised Accession 09.1s934 by Rembrandt at a value of $32,5000, nearly ten times the $3,500 appraisal value calculated by Ms. von Habsburg. *See id.* at 248. Mr. Wiener appraised another Rembrandt work, Accession 09.1s937, at a value of $86,000—an astounding *172 times greater* value than the $500 value that Ms. von Habsburg assigned to it. *See id.* at 250–52; *see also* FGIC-Wiener 000063 (Ex. D).

20. For other works in Step 1, Mr. Wiener appears to have applied a

simple 40% discount to the fair market value calculations of the City's experts in the case, which is no methodology at all. Curiously, Mr. Wiener admitted that it would be "inappropriate" to "take 60 percent of the fair market value to determine the marketable cash value of items of art." Wiener Dep. 88–89. Yet he did precisely that with respect to at least two works. *See id.* at 89–92. In one instance, Mr. Wiener computed the marketable cash value of a Roman marble torso of Apollo simply by taking 60% of the Christie's Report's fair market value. *See id.*; FGIC-Wiener 000034 (Ex. E). In another, Mr. Wiener computed the marketable cash value of a Mesopotamian relief panel by again taking 60% of the Artvest Report's fair market value. Wiener Dep. 89–92; FGIC-Wiener 000035 (Ex. F).

21. Compounding the problem with unpacking Step 1, Mr. Wiener did not disclose *any* data regarding comparable works of art on which he relied to perform his appraisals until just two days ago, August 20, 2014. Moreover, while the data included in Mr. Wiener's belated wholesale production appears to relate to his "comparable" works, there is *nothing* to connect the data to any work in the DIA collection. It therefore is impossible to discern which DIA works the "comparable" works relate to, or to test whether Mr. Wiener's use of those comparable works and data was accurate and reliable. And even now, it is not clear whether Mr. Wiener has disclosed *all* of the data on which he relied at Step 1: his August 20 product did not include the "electronic work file" to which Mr.

Wiener alluded at his deposition.  Wiener Dep. 17, 239.  Step 1 is incapable of reproduction , and regardless unreliable.

**B.  Step 2 Involves No Expertise At All And Both Endorses And Piggybacks Off The Work Of Three Other Experts, Two Of Whom Are The City's Experts**

22.  Step 2 of Mr. Wiener's method is an exercise in simple arithmetic, not an expert "principle[] or method[]."  Fed. R. Evid. 702(c).  At Step 2, Mr. Wiener credits the appraisal work done by the three other experts, and merely averages the values of the 596 DIA works already appraised in the Christie's Report, the Artvest Report, and the Winston Report.  *See* Wiener Rep. 3, 45–46.  Such rudimentary math is well within the ken of the Court and, thus, is not "helpful" or admissible as expert evidence.  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591–92.

23.  To wit, Mr. Wiener admitted that Step 2 was "the first time" in his career that he "created a valuation by averaging the results of appraisals done by third parties"; Mr. Wiener has "never heard of" any other appraiser "using an average of third-party appraisals to determine value"; and no professional publication states that "it is acceptable to determine a valuation of art by looking at an average of third-party appraisals of art."  Wiener Dep. 257–58.

24.  Mr. Wiener's adoption of and reliance on the calculations provided by the City's experts as part of Step 2 also reveals a fundamental paradox in his approach.  On the one hand, Mr. Wiener plainly finds the work of the City's

11

experts reliable enough to adopt as the basis for his own calculations. *See* Wiener Rep. 4, 45–46. But on the other hand, and where it suits him, he seeks to criticize the City's experts and their results. In his report, Mr. Wiener "called . . . into question" the Christie's Report for assigning "an extremely wide range" of potential values to DIA works. *See* Wiener Rep. 19. He also disputed the Artvest Report as "lend[ing] itself to uncertainty as an appraisal report" because its author, Michael Plummer, "is not an appraiser" and, in Mr. Wiener's view, the Artvest Report is not "compliant with" accepted appraisal standards. *See id.* at 19–20.

25.    Mr. Wiener obviously cannot "reasonably . . . rely" on expert reports he believes are unreliable. Fed. R. Evid. 703. Ms. von Habsburg, co-objector Syncora's expert, confirmed that an appraiser would "never" rely on an appraisal that she believes "is incorrect or causes concern." von Habsburg Dep. 121 (Ex. G). Yet Mr. Wiener cannot seem to make up his mind as to whether the Christie's Report and the Artvest Report are reliable or unreliable.

26.    Regardless, the other appraisers used a fair market value approach, not a marketable cash value approach, so Mr. Wiener necessarily arrives at a computation at Step 2 that is fundamentally different from his computation at Step 1. *See* Wiener Rep. 3, 16, 45–47; Wiener Dep. 46–49.

### C. Step 3 Rests On Unverified Data And Compounds The Flaws From Step 1

27.    Step 3 of Mr. Wiener's method was another mathematical exercise—

one that rested on unverified data and the flawed results of Step 1. At Step 3, Mr. Wiener purported to appraise 16,388 DIA works from what he believed was a list of their "insurance values," which had an average age of "13 years." Wiener Rep. 3, 45–47. Ms. von Habsburg, however, testified that use of insurance values is appropriate only when there is a "primary" retail market for the work and "no significant or secondary market," and that an appraiser should *never* rely on insurance values that are "ten years out of date," von Habsburg Dep. 123–24, 127.

28. Ms. von Habsburg also cautioned that an appraiser would "have to do [his] research" to determine that insurance values are correct. *See id.* at 125. But the DIA spreadsheet from which Mr. Wiener took the outdated "insurance values" had only a column labeled "value" but no column labeled "insurance value." *See* DIAINSP124564 (Ex. H); Wiener Dep. 70–77. Mr. Wiener did not independently verify that those "values" were accurate or even insurance values, but instead relied entirely upon the representation of counsel to that effect. *See* Wiener Rep. 45; Wiener Dep. 70–77. The fact of the matter is that he has no idea what those numbers represent or how they were derived.

29. Regardless, Mr. Wiener's carelessness and failure to verify the data improperly inflated his Step 3 valuation—an error that he now has acknowledged. Wiener Rep. 50. For example, Mr. Wiener now believes that the DIA spreadsheet "gave each of the 501 pages" of "an Asian manuscript, *Perfection of Transcendent*

*Wisdom in Eight Thousand Verses*, . . . a different accession number" and a "value of $300,000 for each page," even though that value related to the *entire* manuscript. *Id.* Mr. Wiener therefore initially included this value "501 times" at Step 3 when he should have included it only once—a *$150 million mistake. Id.*

30. Mr. Wiener readily acknowledges that the DIA spreadsheet "may include additional instances of the same mistake of listing the insurance value for one object multiple times." *Id.* at 50. But despite this acknowledgement, Mr. Wiener has neither undertaken to verify the values in the list nor abandoned them. *See id.* Instead, he continues to rely on the spreadsheet that he believes "is incorrect or causes concern"—something Ms. von Habsburg confirmed an appraiser should "never" do. von Habsburg Dep. 121.

31. Indeed, Mr. Wiener's only attempt to address the lurking errors in the spreadsheet is to apply an arbitrary "discount of 3.5%" to the aggregate values at Step 3. Wiener Rep. 50. Yet Mr. Wiener *never* explains where that discount comes from, how he conjured it, how it relates to the risk of error he acknowledges, or how its accuracy can be tested. *See id.* It is pure conjecture.

32. Once again, despite assuming that he was utilizing "insurance values"—closely associated with "retail replacement cost," or the highest valuation approach possible—Mr. Wiener also did not apply *any* discount to these purported "insurance values" to convert them to the much lower marketable cash value he

sought to calculate in his report. *See id.* at 3, 45–46; Wiener Dep. 41.

33. To the contrary, Mr. Wiener actually *increased* the already swollen "insurance values" by an across-the-board premium first pegged at 64.6% and then later "corrected" to 62%. *See* Wiener Rep. 3, 45–47; Wiener Dep. 70–77. Mr. Wiener divined this premium from his own faulty appraisals in Step 1: Mr. Wiener "cross-referenced DIA insurance values to works VWA valued" in Step 1, "compared results," and then attempted to factor the "average weighted age" for the "insurance values." Wiener Rep. 45–46. Step 3 thus incorporates all of the flaws that rendered Step 1 unreliable and then magnifies them. *See supra* Part I.A.

34. Moreover, Mr. Wiener did not perform any of the "[t]echnical, statistical, or financial analysis" behind these calculations. Wiener Rep. 9. Instead, he outsourced that analysis to Mr. Leeds and Silar Advisors, who conduct "asset valuations" and "asset pricing" in non-art contexts. *Id.* Mr. Leeds, rather than Mr. Wiener, performed the statistical analysis and prepared the charts regarding the age of the purported "insurance values," the weighted averages, and the projected market value for the DIA works valued at Step 3. *See* Wiener Rep. Attach. L; Wiener Dep. 192–93, 277–79. These are complicated statistical analyses that Mr. Wiener is incapable of creating, explaining, or defending on his own, a point he made repeatedly during his deposition. Wiener Dep. 58–61, 279. But neither Mr. Leeds nor anyone from Silar Advisors will be testifying at trial,

15

and Mr. Wiener will simply adopt the Silar conclusions as his own.

35.     Mr. Wiener ignores these issues, and attempts to salvage his arbitrary 62% across-the-board premium by asserting with a straight face that Step 3 actually contains a *discount* because the premium "wasn't higher."  Wiener Dep. 41.  Again, this entirely circular proposition is *impossible to probe or test* because Mr. Wiener repeatedly takes refuge in the notion that his assumptions and calculations are "implicit" in his approach.  Here specifically, Mr. Wiener was "not prepared to tell" the City's counsel "the exact figure" of this implicit discount— and he *agreed* that it "would be very difficult to test" whether his "conclusion regarding the amount of that discount was correct."  *Id.* at 41–43.  These *ipse dixit* assertions that are designed to frustrate counsel's and the Court's ability to understand and challenge Mr. Wiener's conclusions render the entire report and analysis inadmissible.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *see also* Wiener Dep. 42–43, 46, 48–49, 82, 84–87, 93, 96, 142, 241, 322 (discussing "implicit" calculations).

36.     Finally, that Mr. Wiener has never before "utilized the methodology" he used in Step 3, is unaware of "anyone else in the industry who has used" it, and does not know of any "publication or treatise that suggests that it is proper,"

16

Wiener Dep. 273, is hardly surprising and renders Step 3 altogether unreliable. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 593–94.

### D. Step 4 Assigns An Average Value From Unrelated Works And Leads To Widely Disparate Results

37.    Step 4 is a crucial component of Mr. Wiener's analysis, accounting for more than $3.5 billion, or almost half, of the total value he ascribes to the DIA collection. *See* Wiener Rep. 3. Mr. Wiener sought to calculate the value of a staggering 42,854 works in Step 4—but he did not rely on any appraisal or purported "insurance value" for *any* of those works. *See id.* at 3, 45–47. In fact, his analysis has no bearing at all on the valuation of any piece of art at the DIA.

38.    Instead, Mr. Wiener constructed a "pricing matrix" that reflected the average sales price by *category* of works sold by Christie's and Sotheby's in 2013. Wiener Rep. 46–47. These categories included such broad-ranging genres as "American Art" and "Old Master." Wiener Dep. 282–87, 310, 319.

39.    Mr. Wiener then assigned each of the 42,854 DIA works to one of the categories and its corresponding average adjusted sale value. *See* Wiener Rep. 3, 46–47. Mr. Wiener, however, did absolutely *nothing* to assess whether any of the DIA works of art were at all comparable to the works that Christie's and Sotheby's sold in 2013. *See* Wiener Rep. 3, 45–47; Wiener Dep. 292–97, 313–15.

40.    Mr. Wiener's reliance on Christie's and Sotheby's sales prices and his failure to assess comparability are particularly damaging here. At Steps 1, 2, and

17

3, Mr. Wiener already had appraised a "little less than a third" of the DIA collection—and those more than 17,000 works were the most "high-valued" DIA works. Wiener Dep. 302–303. Indeed, the 387 works that Mr. Wiener appraised at Step 1 represented the smallest number of works in any of his four groupings, but had the largest appraised value at more than $3.56 billion. *See* Wiener Rep. 3. In other words, by the time he got to Step 4, Mr. Wiener had broken off the largest chunk of value in the DIA collection and left only the least valuable works, including works with no monetary value at all. *See* Wiener Dep. 302–03.

41.     By contrast, Christie's and Sotheby's predominantly sell high-value works, with many sales exceeding $1 million. *See id.* at 316; *see also* von Habsburg Dep. 130–33. Some of the world's most extraordinary art is sold at these auction houses. That Mr. Wiener chose Christie's and Sotheby's sales prices as a point of comparison is therefore quite illogical, but Mr. Wiener did not exclude *any* Christie's or Sotheby's sales from his comparison in Step 4, let alone the most valuable one-third of those sales. *See* Wiener Dep. 316–17.

42.     Thus, at Step 4, Mr. Wiener failed to assess whether the Christie's and Sotheby's works were comparable to the DIA works, and did not control for the fact that all of the Christie's and Sotheby's works had value while some of the DIA works did not. In fact, Mr. Wiener had no choice but to admit at his deposition that he had excluded "potentially the top one-third of the DIA collection's artwork

18

by value but . . . included the top one-third of the Sotheby's/Christie's collection by value." *Id.* at 317.

43. Mr. Wiener again acknowledged that he has never before utilized the unorthodox average sales price approach he used in Step 4. *See id.* at 306. Step 4 is unreliable. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 593–94.

## E. Step 5 Aggregates The Faults In Steps 1 Through 4 And Yields An Inflated Appraisal Value

44. Mr. Wiener compounded all of the flaws of Steps 1 through 4 at Step 5, where he added together the subtotals computed at the prior steps. *See* Wiener Rep. 3, 46–47. The total value of the DIA collection that Mr. Wiener calculated at Step 5 was $8,149,232,354—*more than $3.5 billion (or about 77%) more* than the highest estimate computed by the City's expert. *See id.* at 3; Artvest Rep. 19.

45. Mr. Wiener arrived at this inflated total by mixing and matching methods and measurements of value. Indeed, he purported to perform a marketable cash value appraisal at Step 1, averaged fair market values at Step 2, added a premium to supposed "insurance values" at Step 3, and used a comparison to Christie's and Sotheby's sales prices for a single year at Step 4. Mr. Wiener had never before "utilized different definitions of value and just add[ed] them together" in an effort to calculate a collection's marketable cash value. Wiener Dep. 140. Even Ms. von Habsburg opined that it is not "appropriate" to "mix a fair market value approach with a marketable cash value approach" to appraise a collection,

and that the appraisal standards to which Mr. Wiener clings do not permit such a method. *See* von Habsburg Dep. 121.

46. Mr. Wiener's homemade method—slapped together in less than two weeks and never before used or endorsed—is unreliable. FGIC cannot establish that Mr. Wiener's testimony is admissible, and the Court should exclude it.

## II. AT A MINIMUM, THE COURT SHOULD EXCLUDE ANY TESTIMONY BASED ON THE ZHANG REPORT, THE BARTH REPORT, OR MR. LEEDS' ANALYSIS IN STEP 3

47. Even if Mr. Wiener's testimony somehow were admissible despite his failure to use a reliable methodology, the Court at a minimum should strike—and exclude any testimony based upon—the Zhang Report, the Barth Report, and Mr. Leeds' analysis in Step 3.

48. An expert, "however well credentialed he may be, is not permitted to be the mouthpiece of" an expert "in a different specialty." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). This commonsense rule reflects the principle that an expert may testify only regarding matters within "*the expert's* scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a) (emphasis added). Thus, courts routinely preclude one expert from offering testimony or evidence regarding the opinions of another expert in a different area.[1]

---

[1] *See Mike's Train House*, 472 F.3d at 409 (excluding expert testimony based upon opinion of another expert in a different area); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478–480 (6th Cir. 2008) (excluding testimony of expert

49.     One of the City's experts is Michael Plummer, who authored the Artvest Report.  Mr. Plummer has over 35 years of experience valuing art and advising major auction houses, private collectors, corporations, and art professionals regarding the sale and purchase of art.  Artvest Rep. 12.  He is an expert "in the field of analyzing art market economics, valuations, patterns and behavior."  *Id.* at 5.  Thus, in addition to valuing the DIA collection, Mr. Plummer constructed a model on real-world realization of revenues from a sale of the DIA collection and opined on the "feasibility and likely effects on the market and value realization of a sale of the DIA collection under a variety of market and sale conditions."  *Id.* at 4.  As part of those opinions, Mr. Plummer described "issues and dynamics currently at work in the art market in general," outlined "trends and patterns that will affect any decision to sell into the current marketplace and estimates of value placed on the works before they are sold," and discussed "conditions for the evaluation of a selling strategy that is undertaken either to maximize value or to find quick liquidity."  *Id.* at 6.  Mr. Plummer also analyzed

in auto mechanics that rested on testimony of expert in accident reconstruction); *Dura Auto. Sys.*, 285 F.3d at 614 (excluding expert testimony based upon opinion of another expert); *Auto Indus. Supplier ESOP v. SNAPP Sys.*, 2008 U.S. Dist. LEXIS 105961, at *15–17 (E.D. Mich. Dec. 23, 2008) (excluding expert testimony resting on summaries prepared by another expert because an expert may not be a "mere conduit for information prepared by others"); *see also Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir. 1966) (an expert may not testify regarding matters based "upon the opinion of others who [are] not even qualified as experts, nor present at the trial").

"the discount factors for various sale scenarios." *Id.* at 26.

50. Plainly Mr. Wiener was asked by counsel to challenge Mr. Plummer on his economic and financial analysis, but he is not qualified to mount such a challenge. *See* Wiener Dep. 341. He therefore outsourced this task to Mr. Zhang and Dr. Barth, and presumably seeks to become a conduit at trial for the Zhang Report and the Barth Report appended to his report. *See* Wiener Rep. 41–44; *see also* Wiener Rep. Attach. B, C.

51. Mr. Zhang, unlike Mr. Wiener, has experience in "art economic research" and "art and finance research." Wiener Rep. 9. His 11-page, single-spaced report takes issue with the Artvest Report's description and analysis of the current global art market. *See* Wiener Rep. Attach. B at 1–11. Mr. Zhang opines, for example, that the art market is "supply-driven," concludes that "the growth in the art market from 2002 to 2011 is [not] a once in a lifetime event," and considers the effect of "easy monetary policy" on the art market. *Id.* at 1, 3, 4. He also charts economic trends in the art market. *See id.* at 2, 7–8.

52. Dr. Barth, unlike Mr. Wiener, is an economist. *See* Wiener Rep. Attach. C at 1. Dr. Barth's 14-page single-spaced report takes aim at the Artvest Report's discussion of "economic factors" and their relevance, its "concept and application of blockage discount," and its application of "discounts to the final valuation" of the DIA collection. *Id.* at 1.

22

53.     Mr. Wiener, however, does not have a degree in economics, nor do any members of his VWA team.  Wiener Dep. 341–42.  Thus, "however well credentialed" Mr. Wiener "may be" in the field of art appraisal, he "is not permitted to be the mouthpiece of" others opining in the "different specialty" of economics.  *Dura Auto. Sys.*, 285 F.3d at 614.  That is especially true here because Mr. Zhang and Dr. Barth have not been identified as experts, have not produced any reliance materials or documents, and will not be testifying at trial.  *See, e.g.*, *Taylor*, 364 F.2d at 613.  Thus, the Court should strike the Zhang Report and the Barth Report and preclude Mr. Wiener from testifying regarding the subjects they cover, which are outside the area of his expertise.

54.     Finally, as discussed, Mr. Wiener did not perform the "[t]echnical, statistical, or financial analysis" at Step 3.  Wiener Rep. 9.  Mr. Wiener concedes that he is "not an expert in statistics," so he outsourced that analysis to Mr. Leeds and Silar Advisors.  *Id.*; *see also* Wiener Dep. 279.  Thus, Mr. Leeds, rather than Mr. Wiener, performed the analysis and prepared the charts regarding the age of the purported "insurance values," the comparisons of those values to Mr. Wiener's Step 1 values for other works, and the projected current market value for the DIA works valued at Step 3.  *See* Wiener Rep. Attach. L; Wiener Dep. 192–93, 277–79.

55.     Even a cursory review of the two pages of charts Mr. Leeds compiled confirms that they are statistical analyses, not appraisals.  *See* Wiener Rep. Attach.

L.  Mr. Wiener, as an appraiser, may not "be the mouthpiece of" Mr. Leeds in the "different specialty" of technical, statistical, or financial analysis.  *Dura Auto. Sys.*, 285 F.3d at 614.  Thus, the Court also should exclude from trial Mr. Leeds' work product and any testimony based upon it.  *See id.*

56.    Mr. Wiener's attempt to incorporate and rely indirectly upon Mr. Leeds' work poses practical problems for the City at trial.  For example, Mr. Wiener does not know anything about Mr. Leeds' reputation in the industry and "didn't do any investigation as to Silar or Rob Leeds['] prior litigation history." Wiener Dep. 277–78.  If Mr. Wiener had done so, he might have discovered that Mr. Leeds and Silar Advisors were sanctioned by a federal bankruptcy court in 2010 for improprieties before that court.  *See* Order On Certain Direct Lenders' Motion For The Imposition Of Sanctions, *In Re Asset Resolution, LLC*, No. 09-32824 (Bankr. D. Nev. May 25, 2010) (Ex. I).

57.    The debtor in that case filed for Chapter 7 protection in Nevada, but Mr. Leeds and Silar Advisors, along with others who controlled or influenced the debtor, "sought to evade the" Nevada court's "jurisdiction" after that court entered an order adverse to the debtor.  *Id.* at 5.  Among other things, the Nevada court found that Mr. Leeds personally was "involved in, and responsible for, the decision to file" chapter 11 bankruptcy cases for the debtor in New York "in an attempt to evade the jurisdiction and the adverse ruling of this Court."  *Id.* at 16.  The Nevada

court found that the chapter 11 cases were "frivolous" and, thus, that Mr. Leeds and others "intentionally caused Debtors to engage in improper conduct." *Id.*

58.     The Nevada court stated on the record, and repeated in its order:

> [S]omebody counseled that the way to avoid this is to get the assets out of the hands of the Federal District Court.  Let's put it into chapter 11.  That gets it in front of another judge and of course as it works out now, that did not work. . . . basically what Silar and Asset Resolution . . . are doing [is] exactly what I told you not to do.  Do not further rape or pillage.  Do not violate your fiduciary duties to the direct lenders.  I expect to hold the principals of Asset Resolution and Silar, the entities themselves and any attorneys or professionals who counseled this frivolous—under Rule 11 of the Federal Rules of Civil Procedure, this frivolous endeavor—I expect to hold you personally liable for the Rule 11 appropriate sanctions and I will expect to see those motions.

*Id.* at 11.  The court made good on its word:  it sanctioned Silar Advisors, Mr. Leeds personally, and the other respondents, jointly and severally, for $279,615.47 in attorneys' fees incurred by other parties.  *Id.* at 23.

59.     Mr. Leeds has not been listed as a witness at trial, perhaps for this reason, and therefore will not be subject to cross-examination on the analysis he performed for Mr. Wiener and whether it is trustworthy, placing the City at an unfair disadvantage.   His analysis, and any testimony based upon it, should therefore be excluded from trial.  *See, e.g.*, *Taylor*, 364 F.2d at 613.

WHEREFORE, for the foregoing reasons, the City requests that the Court exclude the testimony of Victor Wiener from trial.

13-53846-tjt   Doc 7000   Filed 08/22/14   Entered 08/22/14 19:40:39   Page 25 of 400

## CERTIFICATION OF COMPLIANCE WITH FEDERAL RULE OF CIVIL PROCEDURE 26(c)(1) AND LOCAL RULE 9014-1(h)

In compliance with Federal Rule of Civil Procedure 26(c)(1) and Local Rule 9014-1(h), the City hereby certifies that its counsel conferred with counsel for FGIC in a good faith effort to narrow and resolve the issues raised in this motion. Ultimately, counsel were unable to reach an agreement.

Dated: August 22, 2014       Respectfully submitted,

        /s/ Bruce Bennett
        Bruce Bennett (CA 105430)
        JONES DAY
        555 South Flower Street
        Fiftieth Floor
        Los Angeles, California 90071
        Telephone: (213) 243-2382
        Facsimile: (213) 243-2539
        bbennett@jonesday.com

        David G. Heiman (OH 0038271)
        Heather Lennox (OH 0059649)
        JONES DAY
        North Point
        901 Lakeside Avenue
        Cleveland, Ohio 44114
        Telephone: (216) 586-3939
        Facsimile: (216) 579-0212
        dgheiman@jonesday.com
        hlennox@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, Michigan  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

# SUMMARY OF EXHIBITS

The following exhibits are attached to this motion, labeled in accordance with Local Rule 9014-1(b):

Exhibit 1    Proposed Order

Exhibit 2    Notice

Exhibit 3    None (Brief Not Required)

Exhibit 4    Certificate of Service

Exhibit 5    None (No Affidavits Filed Specific to this Motion)

Exhibit 6    Documentary Exhibits

# EXHIBIT 1

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) )  Chapter 9 |
| CITY OF DETROIT, MICHIGAN | ) )  Case No.: 13-53846 |
| Debtor. | ) )  Hon.  Steven W. Rhodes |
|  | ) ) |

## ORDER GRANTING CITY OF DETROIT'S MOTION TO EXCLUDE TESTIMONY OF VICTOR WIENER

This matter comes before the Court on the City Of Detroit's Motion To Exclude Testimony Of Victor Wiener.  Having reviewed the Motion and the Opposition, having considered the statements of counsel at a hearing before the Court, and having determined that there is no legal or factual basis for subpoena to the City's counsel:

IT IS HEREBY ORDERED THAT the Motion is GRANTED.

_____

# **EXHIBIT 2**

## **Notice**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No.: 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

## NOTICE OF MOTION AND OPPORTUNITY TO RESPOND

PLEASE TAKE NOTICE that on August 22, 2014, the Debtor, City of Detroit, filed its *Motion To Exclude Testimony Of Victor Wiener* (the "Motion") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order excluding the testimony of Victor Wiener at trial.

PLEASE TAKE FURTHER NOTICE that **your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

PLEASE TAKE FURTHER NOTICE that if you do not want the Bankruptcy Court to grant the Debtor's Motion, or you want the Bankruptcy Court to consider your views on the Motion, by **August 27, 2014**[1] you or your attorney must:

1.    File a written objection or response to the Motion explaining your position with the Bankruptcy Court electronically through the Bankruptcy Court's electronic case filing system in accordance with the Local Rules of the Bankruptcy Court or by mailing any objection or response to:[2]

---

[1] This deadline was established by an order of the Court.

[2] A response must comply with Fed. R. Civ. P. 8(b), (c) and (e).

**United States Bankruptcy Court**
Theodore Levin Courthouse
231 West Lafayette Street
Detroit, MI 48226

You must also serve a copy of any objection or response upon:

**Jones Day**
51 Louisiana Ave. NW Washington, D.C. 20001-2113
Attention: Gregory Shumaker

-and-

**Pepper Hamilton LLP**
Suite 1800, 4000 Town Center Southfield, Michigan 48075
Attn: Robert Hertzberg and Deborah Kovsky-Apap

2.     If an objection or response is timely filed and served, the clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**PLEASE TAKE FURTHER NOTICE that if you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the Motion and may enter an order granting such relief.**

Dated: August 22, 2014  Respectfully submitted,

   /s/ Bruce Bennett
   Bruce Bennett (CA 105430)
   JONES DAY
   555 South Flower Street
   Fiftieth Floor
   Los Angeles, California 90071
   Telephone: (213) 243-2382
   Facsimile: (213) 243-2539
   bbennett@jonesday.com

   David G. Heiman (OH 0038271)
   Heather Lennox (OH 0059649)
   JONES DAY
   North Point
   901 Lakeside Avenue
   Cleveland, Ohio 44114
   Telephone: (216) 586-3939
   Facsimile: (216) 579-0212
   dgheiman@jonesday.com
   hlennox@jonesday.com

   Thomas F. Cullen, Jr. (DC 224733)
   Gregory M. Shumaker (DC 416537)
   Geoffrey S. Stewart (DC 287979)
   JONES DAY
   51 Louisiana Ave., N.W.
   Washington, D.C. 20001
   Telephone: (202) 879-3939
   Facsimile: (202) 626-1700
   tfcullen@jonesday.com
   gshumaker@jonesday.com
   gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, Michigan  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

# **EXHIBIT 3**

**Brief (Not Applicable)**

# **EXHIBIT 4**

**Certificate of Service**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

|  |  |
|---|---|
| In re | ) |
|  | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN | ) Case No.: 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2014, I electronically filed the City Of Detroit's Motion To Exclude Testimony Of Victor Wiener with the Clerk of the Court, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

Dated: August 22, 2014                    /s/ Bruce Bennett
                                          Bruce Bennett

# **EXHIBIT 5**

## **Affidavits (Not Applicable)**

# EXHIBIT 6

## Documentary Exhibits

**<u>Exhibit A</u>**

**VICTOR WIENER ASSOCIATES,** LLC.

FINE ART CONSULTANTS AND APPRAISERS

201 WEST 89TH STREET, 11 D
NEW YORK, NY 10024
TEL: 646-206-3992

*In re City of Detroit, Michigan*, Case No. 13-53846 (SWR)

**Expert Report**

**Prepared by Victor Wiener,**
**Director of Victor Wiener Associates, LLC**

**July 25, 2014**[1]

---

[1] This Report has been corrected as of August 20, 2014 to account for certain typographical and transcription errors, as explained in greater detail in the Addendum attached hereto.

*In re City of Detroit, Michigan*, Case No. 13-53846 (SWR)

## EXPERT WITNESS DISCLOSURE BY VICTOR WIENER, DIRECTOR OF VICTOR WIENER ASSOCIATES, LLC

The following expert report (***REPORT***) has been prepared by Victor Wiener of the firm Victor Wiener Associates, LLC (***VWA***) an art appraisal and consultancy firm located in New York City with associates and affiliates worldwide.

The Report contains:

- The issues to be addressed

- The opinions reached in addressing these issues

- The data which was relied upon in forming these opinions

- Certain attachments, which support the opinions stated in the body of the Report

- The qualifications of the expert witness

- A list of all publications authored by the witness during the previous 10 years as stipulated

- A list of all cases in which the witness has testified as a witness within and beyond the stipulated 4 years required in this disclosure

Compensation to the witness has been agreed at $300 per hour for the preparation of this and supplemental reports if necessary: $400 per hour for preparation for all testimony including depositions; $5,000 per day for deposition and court testimony; reimbursement for all out-of-pocket expenses, including travel, associated with the expert witness testimony.

## SUBJECT PROPERTY

The subject property to be appraised is approximately 60,000 works of art (***SUBJECT PROPERTY***) comprising the entire art collection of the Detroit Institute of Arts (***DIA***) located in Detroit, Michigan.

## VALUATION CONCLUSIONS

In fulfillment of the appraisal assignment VWA reached the following valuation conclusion:

That the total value of the collection is **$8,149,232,354** and probably more than that.

The appraised total has been determined as of July 25th, 2014.

## METHODOLOGY DETERMINING VALUE CONCLUSIONS

**Methodology Step by Step Chart**

| Step 1 | Valuation of High-Value Works by VWA | | | |
|---|---|---|---|---|
| | # of Units | Low Value | High Value | Average Value |
| | 387 | 3,092,419,700 | 4,040,303,800 | 3,566,631,750 |
| Step 2 | Valuation of High-Value Works performed by Christie's, Artvest and Winston | | | |
| | # of Units | | | Average Value |
| | 596 | | | 311,370,325 |
| Step 3 | Projected valuation of works on DIA Insurance List (estimated for appreciation) | | | |
| | # of Units | DIA Insurance Value | % Appreciation | Projected Value |
| | 16,388 | 468,449,537 | 62.0% | 758,888,249 |
| Step 4 | Pricing matrix of remaining works based on Christie's and Southeby's 2013 sales price by department | | | |
| | # of Units | | | Average Value |
| | 42,854 | | | 3,512,612,030 |
| Step 5 | Combined Value | | | |
| | **# of Units** | | | **Average Value** |
| | **60,225** | | | **8,149,232,354** |

## ASSIGNMENT

The following section discusses:

- The background of the assignment, in which specifics of the appraisal assignment are discussed

- The decision to accept the assignment

- The specific qualifications of VWA in fulfilling the assignment

- Time restrictions dictating the nature of the Appraisal Report

## Background of the assignment

In May 2014 Victor Wiener was contacted by Ian Peck of Art Capital Group (**ACG**), an art financing company to see if VWA would be interested in appraising the entire collection of the DIA constituting the Subject Property cited above with a view to producing an appraisal report which could be used in the process of generating a loan to the City of Detroit (**DETROIT**).

After considerable discussion, VWA committed to perform the appraisal report and ACG committed to retain the services of VWA.

At that point, AGC submitted a non-disclosure agreement in order to send Mr. Wiener confidential documents to review in order for Mr. Wiener to determine the scope of work required to fulfill the assignment.

## The decision to accept the assignment

Mr. Wiener had an initial hesitation in accepting the assignment; considerable attention within the media had been devoted to press stories of Detroit's bankruptcy and the possibility that the holdings of the DIA would be sold to cover Detroit's obligations.

As discussed in this report and disclosed in Mr. Wiener's CV (*see* Attachment A), Mr. Wiener has had extensive museum experience.  As such, he felt that the DIA holdings should be maintained.

However, once Mr. Wiener had a chance to review the Catalogue of Information Concerning Artwork Housed at the Detroit Institute of Arts, prepared by Houlihan Lokey Capital, Inc. (**HOULIHAN CATALOGUE**), Mr. Wiener was convinced that a loan was a viable plan for the DIA collection, including the loan proposed by ACG.

In order for the loan to take place, a credible appraisal report of the DIA holdings was required.

Mr. Wiener had informed ACG that any report VWA would submit would be in conformity with the Uniform Standards of Professional Appraisal Practice (**USPAP**), the universally accepted appraisal standards within the United States and abroad for all classes of property which require appraisals.

The USPAP stresses that the USPAP have been written to contribute to "public trust" of the appraisal practice (*see e.g.* Attachment D: Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation [emphasis added by Appraisal Foundation]).

In keeping with this requirement appraisers are given the option of refusing an assignment (see EG USPAP U-8 Management).

Taking all the facts into consideration, Mr. Wiener concluded that the public trust would indeed be served if indeed VWA conducted the appraisal assignment.

Sometime after VWA had committed its services to ACG, Mr. Wiener was informed that, in keeping with confidentiality requirements and the fact that court testimony would be required, VWA would be retained by the law firm Weil, Gotshal & Manges, LLP (**WEIL**), working on behalf of Financial Guaranty Insurance Company (**CLIENT**). However, the assignment would also have the stipulation that ACG would be named as an intended user of the report and the appraisal report could also be used by any additional funders ACG may require to help in putting together the funding necessary to advance a loan to keep the DIA collection in place.


## Specific qualifications of VWA in fulfilling the assignment

In accepting the assignment, VWA felt extremely well qualified. Two of the principals in the appraisal process have extensive museum experience.

Victor Wiener received a certificate in Museum Training given jointly by the Institute of Fine Arts of New York University and the Metropolitan Museum of Art. In addition to having instructors from the Institute of Fine Arts and the Metropolitan Museum of Art, his instructors also included Pierre Verlet, head of the department of furniture at the Louvre, and Charles Sterling, curator emeritus of paintings at the Louvre. In addition, Mr. Wiener received a two-year fellowship from the Ford Foundation providing for internship at the Department of Prints, Drawings, and Photographs at the Metropolitan Museum of Art and the Victoria and Albert Museum in London under direct supervision of the Museum's director, Sir John Pope-Hennessy. Upon returning from London to New York, Mr. Wiener was awarded a Chester Dale Fellowship from the Metropolitan Museum of Art, providing for another year of work at the Department of Prints, Drawings, and Photographs where he curated an exhibition, "Eighteenth Century Italian Prints." In addition, prior to assuming the position of executive director of the Appraisers Association of America, Mr. Wiener worked directly for the Philadelphia Museum of Art on loan agreements and appraisals for loan exhibitions. He has also lectured on several occasions for the American Association of Museums. Further discussion of Mr. Wiener's credentials and his complete curriculum vitae are appended to this report. (*See* Attachment A.)

David Shapiro has also had direct relationships with museums in a variety of capacities. He has taught courses of art history at the Museum of Modern Art (MoMA), and he has worked as an in-gallery museum educator at MoMA PS1, the Dahesh Museum of Art, and the Bronx Museum of the Arts, interpreting collections and special exhibitions for diverse audiences, largely school groups. Mr. Shapiro's proposal to create the Rockaway Museum of Contemporary Art was featured in MoMA PS1's exhibition "EXPO 1" as a

response to a Call for Proposals to revitalize the Rockaways after the damage of Superstorm Sandy. Shapiro's writing has also been published in a catalogue by MoMA to accompany a major retrospective exhibition. Mr. Shapiro has also worked extensively with museums in external roles. At the Fashion Institute of Technology (FIT), he taught "Art in New York," an on-site course that takes place entirely in the city's museums and galleries. Presently, he works indirectly with museum collections as an editor of higher-education art history textbooks. Mr. Shapiro's academic and appraisal credentials are discussed in greater detail below.

### Time restrictions dictating the nature of the Appraisal Report

The retention agreement was not finalized and signed until July 11th, 2014; since all expert reports were required by the Court to be filed by July 25th, 2014, VWA had less than two weeks to finalize a report for more than 60,000 works of art.

Under these circumstances it was decided that a preliminary appraisal report would be written which would be of a summary nature; however the document to be filed would be in compliance with the USPAP in which all requirements for such a report would be fulfilled. Complete discussion of the format of the report is given below.

There were further complications impeding the timely production of the Report.

It is our understanding that the DIA was requested to produce in a timely fashion a searchable inventory of the museum collection.

Among the documents supplied to us was a 17,000-page image inventory with about 40% of the photographs of objects in the collection missing. (*See* Attachment E: DIA Inventory Page, Missing Photograph Example)

In addition, all inventory entries were in PDF format and not within a searchable or sortable format.

Furthermore, instead of giving the name of the artist or creator of specific objects all objects were named "Unknown, American." In other words, a painting by Italian Renaissance artist, Benozzo Gozzoli created ca. 1460 was labeled on the PDF, "Unknown, American," before America was discovered by Columbus; or the paintings by Van Gogh who never even visited America were called "Unknown, American." (*See* Attachment F: DIA Inventory Page, Mislabeled "Unknown, American" Examples.)

One presumes that the DIA has a searchable database since a partial database is available online on the DIA website. This database was useful for thumbnail photographs for a selection of the works, but VWA was unable to get an electronic count of how many objects were in each of the DIA's curatorial departments.

6

VWA made numerous requests before our official retention to be supplied with digital data that we could use, but we were not provided with the information.

It was only on July 18th, 2014, just about one week before the report was due, that we received some of the electronic data we had requested, but it was still incomplete, which presented substantial challenges.

For these reasons the current report is labeled "preliminary."


## QUALIFICATIONS OF APPRAISERS

The above valuation was formulated by VWA.

VWA has brought together a select team of the most qualified expert appraisers and consultants offering its clients specialized services and highly personalized attention coupled with utmost confidentiality.

This team has been assembled by Victor Wiener, who for over twenty years served as Executive Director of the Appraisers Association of America.  During his tenure and afterwards, Mr. Wiener identified and worked with those experts now employed by VWA.

Those appraisers who worked on this Report are:

### Victor Wiener:  Principal author and signatory

Currently an appraiser in private practice, Victor Wiener served as executive director of the Appraisers Association of America for 21 years.  Prior to that he worked for several auction houses in Rome, London, and New York, including Sotheby's and Christie's, where he was Director of the fine arts department in Rome.  A trained art historian, Mr. Wiener has worked at several museums including the Metropolitan Museum of Art in New York and the Victoria and Albert Museum in London.  He has published extensively, and is co-editor and a principal contributor to *All About Appraising: The Definitive Appraisal Handbook* (2003)*, and a co-author of *An Underwriter's Guide to the Valuation of Art, Antiques & Collectibles* published by the Inland Marine Underwriters Association, 2001. He has also taught the appraisal of fine and decorative arts at The New School, Baruch College, and New York University (NYU), where, for over twenty years, he has been an adjunct assistant professor on the faculty of the Appraisal Studies Program. At NYU, he teaches courses on the Legal and Ethical Responsibilities for Appraisers and on the USPAP; he previously taught IRS Rules and Regulations. Mr. Wiener is one of the few instructors of the USPAP with a specialty in personal property to be certified by the Appraisal Standards Board of the Appraisal Foundation, the organization "authorized by Congress as the source of appraisal standards and appraiser qualifications" (*cf.* text on Appraisal Foundation's logo).

Mr. Wiener has served as an expert witness in several high-profile art cases including matters concerning the estates of Andy Warhol and Louise Nevelson, and litigation concerning two of the most important works by Damien Hirst. He has been employed by several agencies of the Canadian government; by the Department of Justice as an expert witness in the litigation, *Charles Malette v. H.M. the Queen*; by the Canadian Cultural Property Export Review Board (CCPERB) in the determination of value of property seeking certification as culturally relevant to Canada; and by the Canadian Revenue Agency (CRA) in the review of donated items to Canadian cultural institutions. Mr. Wiener has written extensively on the application of blockage discount and other tax-related matters.

His work in valuing highly valuable property is extensive. He has served as an expert witness in *Stephen and Elaine Wynn v. Those Certain Underwriters at Lloyds, London et al.*, in which the value of the damaged painting *Le Rêve* by Picasso was the matter at issue; at the time *Le Rêve* the most expensive painting ever to have been sold ($139 million). Subsequent to the settlement of the Wynn case, he published an extensive article on the determination of loss in value for highly valuable works of art. This article is cited in Mr. Wiener's CV, which has been appended to this document. (*See* Attachment A.)

### David Shapiro: Valuation and report preparation

David Shapiro brings to his appraisals a significant background as an art historian with specific expertise in contemporary art. The founding editor of the online contemporary art publication *Museo* and founding owner of Museo Publications, a business providing expert editorial solutions for art historical publications, Mr. Shapiro has played critical editorial roles in recent editions of a number of industry-leading higher education art history titles including Janson's *History of Art* and Marilyn Stokstad and Michael Cothren's *Art History*. His interview with Jeff Wall was published in the Museum of Modern Art's book *Jeff Wall: Selected Essays and Interviews* (MoMA).

An Associate Member of the Appraisers Association of America, Mr. Shapiro's appraisals are compliant with the USPAP. He holds a BA in Art History from Columbia University and a certificate in Appraisal Studies in Fine and Decorative Arts from New York University. He studied Modern Art in the PhD program in Art History at the Graduate Center of the City University of New York and has taught courses of Art History at the Fashion Institute of Technology, Pratt Institute, Parsons The New School for Design, and The Museum of Modern Art.

Mr. Shapiro has worked with VWA on several significant donation, damage and loss, and collateral loan appraisals.

### Shaun Cooper: Appraisal coordination and financial review

Shortly after receiving his Master of Arts degree from L'Université Libre de Bruxelles in 1993, Shaun Cooper began working for a private Manhattan art dealer before opening a gallery specializing in twentieth-century decorative arts. As a dealer, Mr. Cooper has participated in international art fairs, bought and sold works privately and at public auction, and has developed a deep understanding of the market. His studies include a Bachelor of Arts degree from McGill University in Montreal, a certificate in French Language and Civilization from L'Université de Paris IV, and a certificate in Appraisal Studies in Fine and Decorative Arts from New York University. He is certified in the USPAP and is an Associate Member of the Appraisers Association of America.


**Charles Wong, LL.M.: Review and compliance**

Charles Wong, LL.M. provided technical and administrative review and assistance for the methodology used in this report. He has had over 20 years' commercial legal experience working as in-house counsel for listed corporations both in Australia and in the United Kingdom. He has co-authored, with Victor Wiener, an article on "The Role of Appraisers in the Process of Authentication and in Other Related Valuation Issues" and another article that has been published on the Chubb Collectors website concerning "Why Auction Estimates are not Appraised Values." Mr. Wong is certified in the USPAP.


**Robert Leeds: CEO Silar Advisors, LP.: Technical, statistical, and financial analysis**

Robert Leeds has over 25 years of investment experience largely focused on all aspects of large pools of underlying assets. His responsibilities included capital commitments, asset valuations, asset pricing, and advising clients on multi-billion dollar asset transactions. Prior to forming Silar Advisors in 2006, he spent 13 years at Goldman Sachs & Co in institutional sales and mortgage trading, 3 years at Nomura Securities responsible for the firm's residential whole loan trading platform, where he built a profitable conduit that acquired and securitized over $20 billion in loans, and approximately 2 years at Fortress Investment Group as a Managing Director and partner in the Drawbridge Special Opportunities Fund, LP. Mr. Leeds is a 1985 graduate from Hamilton College.


**Zhang Yi: Art market analysis**

Zhang Yi began his career in the financial industry from 2006 to 2014 in HSBC and Goldman Sachs. Meanwhile, he headed the Research Department of HIHEY.COM, an e-commerce company specializing in art from 2011 to 2014. From 2012 to 2014, he was also the head of the Art & Finance Department in the China Art Market Research Center, where he was in charge of art economic research, art and finance research, and art wealth management.

Zhang Yi was a visiting lecturer at the Central Academy of Fine Arts in 2013 for "Art and Finance." He co-authored "China Art Market Research Report" and "China Art

Market Annual Report" from 2011 to 2013. Since 2013, he has been a consultant on the Chinese art market for the annual "TEFAF Art Market Report." His writings and interviews on contemporary art and economics have appeared in *China Culture Daily, Bazaar Art, China Auction,* and *Bloomberg Weekly*.

Zhang Yi received an MA from the Art Administration Department of the Central Academy of Fine Arts in 2013 and BAs in Finance from Wuhan University and International Economics and Trade from Huazhong Agriculture University.


### Jannette Barth, Ph.D.: Discount analysis

Jannette Barth, Ph.D. is the principal of J.M. Barth & Associates, Inc. Holding degrees from The Johns Hopkins University and the University of Maryland, Inc., Dr. Barth has worked in the field of economic research, demand analysis, and econometrics for over 30 years. She has held positions as Chief Economist, New York Metropolitan Transportation Authority, and as Consultant and Account Manager, Chase Econometrics/Interactive Data Corporation.

Dr. Barth has extensive experience in the economic analysis of the art market. As a practicing economist with a Certificate in Appraisal Studies in Fine and Decorative Art from New York University and a Certificate in American Art from Sotheby's Institute of Art, Dr. Barth's work in the art market ranges from the analysis of particular segments of the art market for litigation support to the analysis and calculation of blockage discount for galleries and artists' estates.

Dr. Barth has taught economics courses at both the graduate and undergraduate levels and was a Senior Lecturer in the MA in Art Business program at Sotheby's Institute of Art. She regularly lectures on art as investment and blockage discount, including seminars at appraisal conferences and for staff of Internal Revenue Service Art Appraisal Services.


### James Callahan: Valuation, Asian art

James Callahan is Director of Asian Art for the auction house James D. Julia, Inc. He has expertise on wide-ranging aspects of Asian art, including Chinese, Japanese, Korean, Vietnamese, Khmer, Thai, Burmese, Ottoman Turkish, Armenian, Arabic, Persian, and Indian objects. He is also an appraiser of arms and armor, nineteenth-century European and American furniture and decorative arts, and eighteenth- to twentieth-century fine silver. A frequent lecturer and consultant to museums, historical societies, and independent art groups nationwide, Mr. Callahan has worked with the Brooklyn Museum to bring to auction over 200 important pieces of Southeast Asian art from the collection of Samuel Eilenberg.

**Jason Christian: Valuation, photography**

Jason Christian is a photography specialist and founding principal of the appraisal firm Christian | Reilly. Since 2004, he has appraised photographs for insurance, donation, and estate purposes for clients including the estates of Ansel Adams, Brett Weston, Cole Weston, Ernst Haas, and Yousuf Karsh and institutions including the San Francisco Museum of Modern Art; the Museum of Fine Arts, Boston; and the Los Angeles County Museum of Art. Mr. Christian holds an M.A. from Dartmouth College and a B.A. from the University of California, Santa Cruz. He maintains a current USPAP certification.

**Sarah Cox: Valuation, ancient art**

Sarah Cox has worked as a researcher of ancient art at the New York gallery Fortuna Fine Arts, Ltd. since 1999. A Romanist with specialist expertise in numismatics and mosaics, she has published and lectured extensively on a range of subjects in these areas. Dr. Cox holds a Ph.D. in Classical Studies from Columbia University and a certificate in Appraisal Studies from New York University. Her professional affiliations include membership in the Appraisers Association of America, the Archaeological Institute of America, the Society for Classical Studies, L'Association Internationale pour l'Etude de la Mosaïque Antique, and the Society of Architectural Historians.

**Louise Devenish: Valuation, furniture and decorative arts**

Louise Devenish is an appraiser and dealer specializing in American and European decorative art from the sixteenth century to the present.  She is a consulting appraiser for the online marketplace 1stdibs as well as the founding principal of the professional arts community Devenish Group LLC.

Ms. Devenish has taught for over twenty years at both New York University, in the Appraisal Studies program, and at Parsons The New School for Design. She lectures widely at museums and historical societies and has served as the keynote speaker at the International Antiques Fair in Chicago. As an antiques dealer, she has participated in the International Confederation of Dealers at the Metropolitan Museum of Art. Ms. Devenish is recognized by the Appraisers Association of America as a Certified Appraiser in American and European decorative art. Her appraisals are compliant with the USPAP. She is also a member of the LAPADA: The Association of Art & Antique Dealers.

**Marina Whitman: Valuation, Islamic art**

Marina Whitman is an independent appraiser specializing in Islamic art. She has taught art history at Pennsylvania State University and John Carroll University and has curated for the Lowe Art Museum, University of Miami. She has published articles on Islamic ceramics. Dr. Whitman holds a Ph.D. from New York University's Institute of Fine Art

with a certificate in Museum Studies. She is an Accredited Property Appraiser from the International Society of Appraisers.

## THIS REPORT

### Content of this report

In conjunction with the steps taken in fulfillment of the assignment as listed and discussed below, VWA determined and settled with the Client the appropriate type of appraisal report in keeping with the USPAP.

As part of this process and in fulfillment of this assignment VWA also determined:
- the type and definition of value to be used;
- the appropriate marketplace(s) in which this value should be determined; and
- the valuation approach most appropriate for this report.

These are discussed in this report.

In conformity with the USPAP as discussed below, this Report is subject to extraordinary assumptions, hypothetical conditions, and limiting conditions as set out below.

### USPAP conformity

As cited above, this Report has been prepared in accordance with the USPAP. USPAP comprises standards promulgated by the Appraisal Foundation in Washington, D.C. as the major codification of appraisal standards for all appraisal disciplines. USPAP is both recognized by Congress (as stated on the Appraisal Foundation logo) and generally accepted in the United States and abroad.

All significant information affecting the valuation conclusions has been disclosed within the body of the report. Other, secondary, information to which the report may refer is retained in a work file for reference purposes.

The methodology VWA has employed to support its valuation conclusions is in conformity with a USPAP Appraisal Report as discussed below.

### SCOPE OF WORK

### Inspection and research

#### *Inspection*

Normally one would hope to have a physical inspection of the Subject Property, although USPAP does not preclude production of an appraisal report without physical inspection. [NB the Internal Revenue Service frequently performs audits of appraisal reports without performing physical inspections].

Due to the time constraints for the production of this report, a formal inspection of the Subject Property was not possible.

However, in late April 2014, Mr. Wiener made a trip to Detroit especially to view the collection.

### *Research*

In the process of preparing this report, VWA conducted extensive research:

- VWA reviewed numerous database records for auction sales.

- Within a short amount of time, VWA consulted numerous books concerning sections of the Subject Property. Due to the time restrictions of producing the Report, VWA is continuing to work on the bibliography and will continue to update the production of documents upon which VWA relied to form the opinions in this Report, as necessary.

- VWA consulted dealers of material similar to works of art contained in the Subject Property.

- Of significant importance, VWA reviewed reports submitted by others. These include:

   o Expert Report of Vanessa Fusco of Christie's Inc., dated July 8th, 2014 (***CHRISTIE'S REPORT***)

   o Expert Witness Report of Michael Plummer of Artvest Partners, dated July 8th, 2014 (***ARTVEST REPORT***)

   o Fair Market Value Appraisal written by the Winston Art Group, dated March 25th, 2014 (***WINSTON REPORT***)

- VWA also reviewed an undated listing of insurance values prepared by the Detroit Institute of Arts (***DIA INSURANCE LIST***) and the Houlihan Catalogue.

   These documents are discussed in detail below.

## EXTRAORDINARY ASSUMPTIONS, HYPOTHETICAL AND LIMITING CONDITIONS

Most appraisal assignments are subject to extraordinary assumptions, hypothetical conditions, and limiting conditions.

An extraordinary assumption is defined in USPAP, 2014-15 edition, substantively as an assumption which the appraiser has every reason to believe is true at the time the report is written, but if subsequently this is proven not to be the case, then the valuation conclusions reached by the appraiser should be reviewed and may be subject to change (see USPAP, 2014-15 edition definitions).

A hypothetical condition as defined in USPAP, 2014-15 edition, is:

> That which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

A limiting condition is a factor that defines and limits the type of work an appraiser is able to do within the agreed-upon appraisal assignment and scope of work deemed necessary for fulfillment of the assignment.

Extraordinary assumptions, hypothetical conditions, and limiting conditions are frequently interlinked.

The specific extraordinary assumptions, hypothetical conditions, and limiting conditions associated with this assignment are listed and discussed below.

### *Extraordinary assumptions*

The extraordinary assumptions that VWA has taken in fulfillment of this assignment are as follows:

1. That the Subject Property has been accurately described within the DIA catalogue and that it will be recognized as such within the marketplace determined to be most appropriate within the context of this report.

2. That the Subject Property is in relatively good condition unless otherwise noted by the DIA or by other reliable sources.

3. That the Diego Rivera mural, *Detroit Industry*, can be removed successfully and that if necessary it would be removed by highly trained technicians with specialization in the removal of wall paintings.

4. That the charts given in Exhibit E of the Artvest Report are accurate.

5. In addition, VWA was told to assume that the Subject Property was not the subject of any encumbrances.

### *Hypothetical conditions*

There are no hypothetical conditions connected with this report.

### *Limiting conditions*

There are numerous limiting conditions connected with the production of this report. Among the most important ones are:

1. That VWA had less than two weeks to produce an appraisal report for approximately 60,000 works of art.

2. That VWA was provided unsearchable data by the DIA. Instead of providing a searchable database, similar to the type to be found on the DIA website, we were provided with 17,000 pages of a partially catalogued inventory of images, which could not be sorted, and each file was labeled "Unknown, American" instead of the true author and origin of the work of art.

3. That no file entries in the records provided note whether a work of art is signed or not. This in turn compromises an independent determination, based on the records, of whether an attribution is tenable or not. As such, VWA has taken an extraordinary assumption that the attributions in the files are indeed tenable since these attributions were made by the DIA's highly qualified curatorial staff.

4. In addition, the catalogue entries provided contain incomplete entries concerning dates or other inscriptions, significant publications and exhibitions, all of which can influence value. Thus the lack of time to research these matters ourselves constitutes a limiting condition.

## VALUATION

## TYPE OF VALUE USED FOR THIS REPORT: MARKETABLE CASH VALUE

The type of value deemed most appropriate for this report is Marketable Cash Value which is defined as:

> The value realized, <u>net of expenses</u>, by a willing seller disposing of property in a competitive and open market to a willing buyer, both reasonably knowledgeable of all relevant facts, and neither being under constraint to buy or sell." (*All About Appraising: The Definitive Appraisal Handbook* [Appraisal Institute of America

and The Educational Foundation of the Appraisers Association of America, 2003], p. 219)

The reason for the selection of this value is that this Report was originally commissioned by ACG whose purpose was to have proper appraisal documentation to generate a loan for the DIA collection.

Under such circumstances a value which is net of transaction costs is appropriate since, if the borrower were to forfeit on loan payments, a lender would confiscate the collateral (art in this case) and sell part or all of the property used as collateral to satisfy the debt. Consequently an appropriate value is one which reflects how much the lender would actually receive net of commissions rather than how much the sales agent for the lender, such as an auction house, would receive inclusive of commissions.

It should be noted that other values are used in other reports.

The Winston Report states that they used "fair market value" (**FMV**) which is defined in the body of the report as:

> …the price that property would sell for on the open market between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. Note that in this case fair market values are inclusive of buyer's premiums. (Winston Report p. 3)

Presumably within the Winston Report definition, commissions due to the sales agent such as the auction house are also included as is commonly the case in the definition of fair market value.

The Christie's Report states that they have used fair market value, but they do not provide a definition of this value. In addition, they do not consider any buyer's premium, which is an essential important part of fair market value. (Christie's Report, p. 6)

The Artvest Report does not define which value was used.

The DIA Insurance List does not state which value has been used. Presumably it used Retail Replacement Value (**RRV**), which is the most common value used when art is scheduled on an insurance policy.

Retail Replacement Value is generally defined as:

> "A property's highest value, usually for insurance purposes, that is defined as the highest amount in terms of U.S. dollars that would be required to replace the property with another of similar age, quality, origin, appearance, provenance, and condition within a reasonable length of time in an appropriate and relevant market. When applicable, sales and/or import tax, commissions, and or premiums are included in this amount." (*Appraising Art: The Definitive* Guide [New York: Appraisers Association of America, p. 438])

## APPROACH SELECTED FOR THIS REPORT: THE MARKET COMPARISON APPROACH

USPAP requires appraisers to determine which valuation approach is necessary:

The three standard approaches to valuation cited in USPAP are the Market Comparison Approach, the Cost Approach, and the Income Approach. (See USPAP 2014-15, Standards Rule 7-4)

VWA has selected, as the most appropriate approach for this type of valuation, the Market Comparison Approach (***MARKET COMPARISON APPROACH***), in which the Subject Property has been compared to other similar and like objects which have sold or have been offered for sale as closely as possible to the Effective Date of Valuation stated above, in the marketplace designated as most appropriate.

## THE OTHER APPROACHES CONSIDERED

VWA has also considered the other two traditional approaches to valuation, the Cost Approach (***COST APPROACH***) and the Income Approach (***INCOME APPROACH***).

The Cost Approach obliges the appraiser to take into consideration the amount of money required to re-fabricate the Subject Property if the Subject Property is of a type that lends itself to re-fabrication. The Subject Property could not be re-fabricated if for no other reason than the fact that there are numerous artists, many of whom are no longer living.

The Income Approach for the valuation of the Subject Property has been rejected as inappropriate to this assignment because the Subject Property, to the best of our knowledge, has no history of having been used primarily to generate income.

## THE MOST APPROPRIATE MARKET FOR VALUATION

Works of art can be sold in a variety of marketplaces. The two most prominent marketplaces are the public auction marketplace and the private gallery marketplace. For the purposes of this appraisal, VWA believes the auction marketplace to be the primary venue for valuation purposes of the Subject Property.

With this in mind, VWA has examined both marketplaces extensively. However, it should be noted that dealer representations are often anecdotal and are frequently hard to verify since such sales are confidential, and even redacted versions of sales receipts are difficult to obtain unless by court order. In addition, private dealers in the United States feel confined by the confidentiality provisions of the Gramm-Leach-Bliley Act of 1999.

In addition, of primary consideration is the fact that in a loan situation, if the borrower such as the City were to default on loan payments, a lender would most likely want to sell the collateral as quickly and efficiently as possible. While consignment to private dealers may be an option for some of the works constituting the public property, the vast majority of the works would most likely fetch higher prices at public auction in a prominent sale highlighting the curatorial excellence of the DIA collection. Consequently, the most appropriate marketplace, without doubt, would be a public auction where large market exposure and competitive bidding would take place.

## VALUATION METHODOLOGY

In this section the general methodology followed by VWA is set forth and observations are made by contrasting the valuation methodology perceived to have taken place in the other reports.

### General methodology followed by VWA in determining value as reflected in the Report

As previously stated, VWA is comprised of a number of specialists, each highly qualified in the sector of valuation to which they are assigned primary responsibility (see credentials of appraisers given above).

While each specialist performed initial valuations for specific sectors, these valuations were only a point of departure. After the valuations were submitted to VWA they were reviewed by the team; in some cases further research was performed after review. In brief, the methodology for determining value by VWA is organic taking into consideration points made by specialists and comments made by colleagues. Final valuation figures are arrived at after intense review.

By nature of the assignment, the VWA appraisal has set about to value the entire collection of the DIA operating under highly limiting conditions as stated above and specified further below.

As stated above, the VWA team did not have the opportunity to view the Subject Property physically although the DIA collection was viewed by Mr. Wiener in situ before he was offered the opportunity to appraise the collection.

As such the team had to work with whatever resources were available including:

- Compromised data submitted by the DIA as discussed above.

- For the most, part thumbnail photographs taken from the DIA website. Although some additional photographs were supplied electronically by the DIA, the order in which they were supplied was so chaotic as to make them virtually unusable. The quality of the images used was not uniformly high resolution.

- VWA did not have the opportunity to discuss the collection with curators.

- VWA was not given access to the DIA files. As a result, information about significant publications and exhibitions, both of which can influence value was not shared by the DIA.

As a result of these limitations our report is classified as "preliminary." However, VWA feels secure in setting forth the values in this report in keeping with the nature of a preliminary report and in keeping with the requirements of USPAP.

## General methodology followed by Christie's in determining value as reflected in the Christie's Report

As is common with Christie's, the Christie's Report was done by a team of appraisers, each member coordinated by Vanessa Fusco of the Appraisal Department.

As stated in the Christie's Report, team members visited Detroit on numerous occasions, reflected in a billing of $65,000 for expenses.

The appraisal, as stated in the Christie's Report, used fair market value, but since no commissions were included in the range of values ascribed, the ultimate values are more in keeping with marketable cash values – although no accommodation was made to the fact that a seller's commission would normally be due to the auction house, this latter point may be moot since auction houses frequently do not charge important consignors, such as the DIA, a seller's commission.

However, what should be noted is that while using a range in value, as is common in auction estimates, Christie's assigned an extremely wide range, often as wide as over 100% between the low and the high value. While this may be understandable for objects where a value may require substantive analysis and the appraiser is not willing or able to perform such a task, it is hardly the norm in appraisal reports. As such, this factor places the Christie's Report in a position in which its credibility is called into question.

At no point does Christie's state that the Christie's Report is compliant with USPAP. While USPAP does allow for a range in value, such a wide range is definitely outside the norm.

## General methodology followed by Michael Plummer of Artvest in determining value as reflected in the Artvest Report

The Artvest Report was written by Michael Plummer, who signed it.

Mr. Plummer is not an appraiser. The Artvest Report is labeled an "Expert Witness Report" but since he states values which he formulated for the major part of the report, this would qualify as an appraisal under USPAP (see USPAP definitions, 2014).

Although the Artvest Report relied upon the input of experts, some of whom are known to VWA to be of high quality, the nature of many of the DIA pieces required the benefit of consultation by a committee for quality control.

While Mr. Plummer uses appraisers as consultants, the use of the data they have supplied is entirely his. As such the Artvest Report lends itself to uncertainty as an appraisal report.

The Artvest Report is not compliant with USPAP, nor does it state that it is. Some of the consultants are USPAP certified but they only supplied undefined values for Mr. Plummer to use as he saw fit. Unlike VWA, the values stated in the Artvest Report are not the products of team consensus since each value carries the name of the consultant who supplied it. (See documents appended to the Artvest Report).

It is not the intention of this Report to serve as an "Appraisal Review" as defined in Standard 3 in USPAP; as such a full description of how the Artvest Report is not compliant with USPAP is not given here but can be supplied if requested by the court.

VWA has mentioned the methodology the Artvest Report used determining individual or unit values – i.e. using individual consultants to make those determinations on their own.

The major part of the Artvest Report discusses general valuation considerations Plummer feels one should take into consideration in determining the total value of the DIA collection. It is VWA's intention to address these considerations as they appear within the methodological framework VWA uses to make its own determination of the total value of the DIA collection.

It should be mentioned at this point that the only appraisal reports VWA has seen so far in which the total value of the DIA collection is discussed are this Report and the Artvest Report. The other reports reviewed just address individual objects in the DIA collection but not the whole collection.


**THE IMPORTANCE OF THE DIA COLLECTION**

The DIA is one of the largest and most significant art museums in the country, comprised of approximately 60,000 works of art from a range of cultures throughout the globe. It is one of the country's few encyclopedic art museums, representing the art of most major cultures from early ancient history to the present. The collection includes works of ancient Greek, Roman, Mesopotamian, and Egyptian art, as well as Islamic, African, Chinese, and Oceanic art and major collections of American art, European art, Modern art, and decorative art. It contains masterpieces by such artists as Pieter Bruegel,

Caravaggio, Pablo Picasso, Auguste Rodin, Mark Rothko, Jacob van Ruisdael, Vincent van Gogh, and Andy Warhol. DIA also houses the armor collection of newspaper baron William Randolph Hearst.

As noted, the scope and breadth of the collection is extraordinary. Although it may hold fewer objects than other museums, the refined curatorial selection is unparalleled for a museum of its size.

The collection was assembled at a time when Detroit had funds beyond what most museums had and was able to attract curators of worldwide renown. A review of the holdings invites comparison with the holdings of the best of other museums anywhere in the world. This is an overwhelming valuation factor which serves as the proper orientation for this appraisal report.

The museum was established in 1885 as a result of the initiatives of another newspaper magnate, James Scripps, and his manager William H. Brearly. Among the institution's numerous prominent donors have been many leaders of the automobile, including the Ford family, particularly Edsel Ford, the Dodges, and the Firestones. Other important donors include Governor and U.S. Senator Russell A. Alger, U.S. Senators James McMillan and Thomas W. Palmer, businessman Dexter Ferry, distiller Hiram Walker (Canadian Club Whiskey), industrialists Christian Buhl, Charles Lang Freer, and John Stoughton Newberry, and department store magnates C.R. Mabley, Cyerenius A. Newcomb, Sr., and Robert Hudson Tannahill of the Hudson's Department Store fortune, who, upon his death, bequeathed a particularly large and important collection of European art, including Modern masters Paul Cézanne, Edgar Degas, Paul Gauguin, Pablo Picasso, and Georges Seurat. A pioneer in collecting taste, DIA was the first public collection in the United States to include works by Van Gogh and Henri Matisse.

The DIA collection is housed in 658,000 square feet of gallery space in over 100 galleries in a 1927 Beaux-Arts building designed by Paul Philippe Cret, with a portion of the collection kept in storage. Among the most celebrated rooms in the building is the Rivera Court, which contains Mexican painter Diego Rivera's monumental frescoes *Detroit Industry*, a cycle that commemorates the work that fueled the ascendency of a great American city.


## THE EFFECTS OF SELLING MUSEUM AND CELEBRITY ART

### Museum provenance

It is apparent that works of fine and decorative art, and other collectibles from museums and other significant collections perform much better at auctions than similar objects lacking notable provenance. This tendency manifests itself in the sales of objects that differ greatly in kind and value, similarly in major auctions of international importance, and small regionally scaled auctions.

An indication of the substantial potential premium that would be given to the collection of the DIA collection, were it to be auctioned, can be found in the Cleveland Museum of Art's January 2011 sale of two dozen European old master paintings. In an article in that city's paper, *The Plain Dealer*, Steven Litt wrote of this sale, the largest sell-off from its collection in more than a half-century (…):

> From a market perspective, **collectors love things with a museum provenance** and hopefully, [the sale] will do well for the museum," said Christopher Apostle, a Sotheby's senior vice president and director for old master paintings in New York. (Steven Litt, "Cleveland Museum of Art to auction 32 old master paintings at Sotheby's," *The Plain Dealer*)

In fact, the sale performed 45% better than expectations, earning $450,000 more than the high estimate. (Steven Litt, "Cleveland Museum of Art earns more than expected from Sotheby's sale of selected old master paintings," Feb. 1st, 2011). The very strong performance of the sales from the Cleveland Museum of Art, no less at a moment when the art market was still in recovery from the financial crash of 2008-09, attests to the premium that buyers are willing to pay for works from great collections such as major museums.

In a 2007 article "Christie's is Cagey about Maier Museum Provenance, Discloses the Rose," Lee Rosenbaum identifies the same tendency:

> **Auction houses always tout museum consignments** in their presale press releases, because of the **cachet and higher market value that distinguished provenance confers**. (Lee Rosenbaum, "Christie's is Cagey about Maier Museum Provenance, Discloses the Rose," *CultureGrrl*, November 1st, 2007)

In a report for Christie's Features, Joshua Glazer and Alexis Glashot discuss this tendency as well:

> Deaccessioning sales, which occur infrequently and tend to be part of a carefully tailored collection-management strategy, **provide private clients with a unique opportunity to acquire works with impeccable museum provenance and often a substantial history of research and publication**, from some of the most hallowed and prestigious collections in the world. (…) **Our June New York Sale saw the successful sale of 11 works from the Metropolitan Museum of Art**, sold to benefit the acquisitions fund of the European Paintings department. The group, which was 100% sold, was led by Hubert Robert's The Ruins and The Old Bridge, which realized $1,874,500 (£1,219,310). (Joshua Glazer and Alexis Glashot, *Market Barometer: Old Master Paintings*, spring 2012)

Jesse Hamlin identifies the same tendency in a discussion of a sale of works from the M.H. de Young Memorial Museum:

> A couple of thousand objects were put up for auction after being culled from the collections at the M.H. de Young Memorial Museum in Golden Gate Park and the California Palace of the Legion of Honor. About 95 percent of them were snapped up at Butterfields in San Francisco and online yesterday and Monday in auctions that included objects from the Art Institute of Chicago and other institutions. Most sold for more than their estimated value.

> "That's very good news," said museums Director Harry Parker. "**I think there was a premium paid for objects that have a museum provenance. That gives them a cachet.**" (Jesse Hamlim, "Museum pieces auctioned / De Young, Legion items get top dollar," San Francisco Chronicler, June 27th, 2011)

The premium paid for a museum provenance can also be seen in the sale of Rafino Tamayo's *Watermelon Slices*. In an article for *Blouin Art Info*, Judith H. Dobrzynski predicted the effect of the MoMA provenance, which proved true; the painting sold for $2,200,000, which was $200,000 above the high estimate. Dobrzynski wrote:

> Give Sotheby's credit for salesmanship: today, announcing **the sale of a painting by Rufino Tamayo, which is being deaccessioned by the Museum of Modern Art**, the auction house called Watermelon Slices "a major work…depicting one of his signature themes."

> Estimated at $1.5 million to $2 million, it will be in the Nov. 16 auction of Latin American Art. Carmen Melian, the Latin American expert at Sotheby's, said "This is one of the most important Tamayo watermelon paintings to appear on the market for several years. **Collectors are sure to gravitate towards a work of this iconic subject matter from an important period that also boasts such distinguished provenance**." (Judith H. Dobrzynski, "MoMA To Sell Tamayo, With Acquisition Policy Implications," *Blouin ArtInfo*, October 19th, 2011)

In a 2011 article for *The New York Times*, Carol Vogel notes the tendency of museum provenance to be used as a sales tool:

> It is clear from the Impressionist and modern art catalogs that a number of museums, eager to clean house, are willing to take a gamble on the market, hoping some of today's new buyers — predominately from Asia, Russia and the Middle East — **will be impressed by a museum provenance**. **For auction house experts, that's a compelling sales tool**. (Carol Vogel, "A Bouquet of Offerings to Test Uncertain Waters," *The New York Times*, October 28th, 2011.)

Vogel made a similar point seven years earlier, addressing the impact of MoMA provenance:

> The top seller was Pollock's "No. 12, 1949," one of his classic drip paintings. Five bidders fought over the oil on paper, which sold to a telephone bidder for $11.6 million, **well above its $7 million high estimate and a record for the artist**. Practically no drip paintings are available**; this one came with an exceptional provenance: the Museum of Modern Art had owned it for 52 years**. (Carol Vogel, "Contemporary-Art Bidding Tops $102 Million in Sales," *The New York Times*, May 12th, 2004)

Suzanne Muchnic noted the same tendency in an article the same year, identifying the capacity of museum provenance to have a significant effect.

> "Ultimately a painting sells based on its merits -- the quality of the work, whether it stems from the artist's greatest period, the condition of the work, whether it has been on the market recently," Eykyn says. "**But clients like to feel vindication of their taste. To be able to say a work has been in the collection of the Museum of Modern Art the last 40 or 50 years achieves that**."
>
> Amy Cappellazzo, Christie's chief of Post-War and Contemporary art, also has MoMA consignments -- a small drip painting by Jackson Pollock, valued at $5 million to $7 million, and a painting of a cow by Jean Dubuffet, expected to fetch $2.5 million to $3.5 million.
>
> "**The MoMA provenance adds cachet for sure**," she says. **The relatively obscure Anderson Fine Arts Center in Anderson, Ind**. -- which hopes to reap $1.8 million to $2.5 million from the sale of Edward Ruscha's 1964 painting "Damage," donated to the center in 1972-- **doesn't have the same effect. But the Anderson name can't hurt**, even though some of the proceeds are likely to fund operations not condoned by the American Assn. of Museums' code of ethics. (Suzanne Muchnic, "Art; Banking on big names; More than $500 million worth of art is up for auction in New York. Quality is important, but illustrious ownership can add real value to the sale price," *Los Angeles Times*, May 2nd 2004)

The effect of museum provenance on the market is known to be so significant that some dealers take great measures to ensure that works that they market have it. Joy Lo Dico wrote of this phenomenon in a recent article for the *London Evening Standard*:

> This February Olyvia Kwok was in the sales room at Sotheby's for its Contemporary Art Auction. Two other Basquiats had sold well above their estimates already but, when it came to the Water-Worshipper canvas, the

bidding was pedestrian. The auctioneer's hammer was falling when Kwok, dubbed the Chinese It-girl of the art market, put in one last bid for £2.49 million. She got her Basquiat, and below the expected price. "I think it was a bargain," she told a journalist as she left the salesroom, and reckoned it would double in value over the next 18 months (…)
As for the Basquiat and the Twombly, Kwok has a plan. "I got the Basquiat for $4 million. It is now insured for $12 million. **We are going to place the painting in a museum so it will have a better provenance, because everyone likes things with more academic value**. Once placed we will talk to Basquiat experts, find out some more information, someone will write about it, and **we will put it back on the market for different collectors**." (Joy Lo Dico, "I look at artists like a commodity balance sheet: art dealer Olyvia Kwok on picking paintings and being sued by Sotheby's," *London Evening Standard*, July $^{3rd}$, 2014)

The tendency for museum provenance to elevate value can be found in art of diverse type. A 2012 article for BBC News, "Vase used as doorstop raises $1.3m at auction," demonstrates the phenomenon to take place in the sale of Chinese art:

Dr. Tao Wang, who was recently appointed head of the Chinese Works of Art Department at Sotheby's New York, said he was "thrilled" with the result of the first auction he has attended there. "We saw exceptional demand across the sale which drove the total to such heights," said Wang. **"Collectors from around the world were drawn to high-quality pieces with distinguished provenance, particularly that of museums**." ("Vase used as doorstop raises $1.3m at auction," BBC News, September 14th, 2012)

In a *Washington Post* article "Museum Quality," Jane Friedman notes that the Baltimore Museum of Art provenance will benefit the sale of pre-Columbian works:

Museums, like homeowners, occasionally need to winnow their possessions. But **when a museum's goods are put back on the market, their value usually is increased**.

Weschler Auctioneers and Appraisers, the Washington-based auction house, this weekend will sell more than 130 lots of pre-Columbian as well as African and Native American objects, most of which were in the collections of the Baltimore Museum of Art.

**"These works have been authenticated, and what we call provenance always affects the value**," says Frederick Lamp, the museum's curator of the arts of Africa, Asia, the Americas and Oceania. (Jane Friedman, "Museum Quality," *The Washington Post*, October 1st, 1998)

The same effect can be seen in the sale of Western antiquities, as addressed in Elspeth Moncrieff's 2006 article "Antiquities Sold to Pay New Art Bonanza in *The Daily Telegraph*:

> The ongoing high-profile trial in Rome of Marion True, former antiquities curator at the Getty, on suspicion of conspiring to buy illegally excavated works of art for the museum, has uncovered a labyrinth of dealers, curators and collectors allegedly involved in handling illicitly excavated antiquities.

> The trial has put the wind up everybody, and curators can no longer turn a blind eye to provenance. **Buying publicly at a vetted auction in which each item has a published museum provenance gives the buyer complete security - so these works are particularly desirable**. (Elspeth Moncrieff, "Antiquities Sold to Pay New Art Bonanza," *The Daily Telegraph*, November, 28th, 2006)

The elevating effect of museum provenance is not even particular to high-value fine art. In an article for *Forbes*, Missy Sullivan addresses this point:

> You don't have to be in the market for a Monet or a Manet to benefit. If you look closely, you'll find museum property sprinkled among sales of almost every category (…) Bonus: When you buy a museum piece at auction, it comes free of sales tax.

> **A museum provenance can exercise a halo effect on mediocre work, giving it a higher hammer price**. You can safely assume a museum piece has been well cared for and researched. (Missy Sullivan, "Yard Sale of the Gods," *Forbes*, December 24th, 2001)

The tendency of museum provenance can be seen in the sale of historical memorabilia. Steve Campbell discusses the museum provenance effect in a sale of Robert E. Lee memorabilia:

> In 1867, Lee donated the items to help out an orphanage in Baltimore, Quinn said. The items were eventually bought by Civil War collector William Beverly Bristor Jr. of Baltimore, who died in 1999. That year, his heirs loaned the items to the National Park Service's Arlington House, Lee's former family home that became the Arlington National Cemetery. But an illness in the owners' family owners forced them to put the items up for auction.
>
> When Kathy Huxhold of Muncie, Ind., first contacted Quinn about selling the items collected by her uncle, he told her they held enormous potential. "**It was Robert E. Lee and we had museum provenance – this had the power to create a perfect storm at auction**," Quinn said, noting that 1,500 bidders signed up for the bidding. "We had estimated it at about $20,000 but the bidding started at $25,000. When it ended at $55,000, it

was a tear-jerking moment to do something for a client," he said. (Steve Campbell, "Prolific Fort Worth Civil War collector scoops up rare Robert E. Lee items," *The Star Telegram*, February 2nd, 2014)

## Celebrity sales

The effect of museum provenance is not unlike that of celebrity provenance, which tends to augment value dramatically.

The Elizabeth Taylor sale at Christie's New York on December 3rd to 17th, 2011 made $156,756,576. Every item that was offered sold. The evening sale of Taylor's jewelry alone achieved $115,932,000, becoming the most valuable jewelry auction in history. Seven new world auction records were established during the sale including price per carat for a colorless diamond and for a ruby. These record prices owed in large part to the golden provenance of having been part of Taylor's collection.

This provenance contributed to unexpectedly high achieved prices for the fine art in Taylor's collection as well.

For example, Vincent van Gogh's landscape painting *Vue de l'Asile et de la Chapelle de Saint-Rémy* illustrates the celebrity effect. Relatively modest in scale, bland in color, and prosaic in composition, this painting was offered with an ambitious estimate of £5,000,000 - £7,000,000 ($7,885,000 - $11,039,000) at Christie's London in February 2012. It sold for £10,121,250 ($15,991,575), more than doubling the low estimate, despite its relative deficiencies; this high realized price was in large part determined by the provenance. The celebrity factor can be discerned when comparing this painting to other relatively minor van Gogh oil paintings of landscapes that sold in the same general time period. For example, the slightly inferior painting by van Gogh *Pont de Clichy* sold for vastly less money ($6,130,919) at Koller in Zurich in June 2013. And the superior painting by van Gogh *Parc de l'hôpital* sold for less ($13,302, 947) in June 2010.

The collection of Yves Saint Laurent and Pierre Berge was also incredibly successful, setting numerous records including the biggest auction ever held in Europe. The auction made 374.4 million euros ($477 million with fees), dramatically surpassing the estimate of 200 million euros to 300 million euros. Nearly 96% of the lots sold, an extremely high sale rate. That success of this auction, which was the largest-grossing auction of a private collection, particularly in relation to its estimates, attests to the premium that collectors are willing to pay for work that has impressive provenance.

The capacity for celebrity provenance to draw extremely high prices at auction is perhaps most evident in the auction of Jacqueline Kennedy's personal memorabilia, which fetched astronomical prices in the 1990s. Collectors paid $772,500 for her golf clubs, and $211,500 for her fake pearls, among numerous other such prices, all of which attest to the premiums that collectors will pay for provenance. (*See* James Barron, "Reporter's Notebook; Oohs, Aahs and Millions in Frenzy to Buy Camelot," April 26th, 1996.)

Damien Hirst sold 100% of his lots on September 16th, 2008 at Sotheby's London, setting the record for a one-artist auction the day after Lehman Brothers collapsed. The sale, which made $200.7 million, soaring past the high estimate of $177.6 million is another example of the power of celebrity status. (*See* "Maev Kennedy, £111 Damien Hirst Total Sets Record for One-Artist Auction," *The Guardian*, September 16th, 2008.)

The Christie's Report is silent on the importance of the museum provenance which is related to the celebrity provenance factor discussed above.


## Sale of any century

As art appraiser Elizabeth Gaidos says:

> I was Assistant Curator of American Art at the DIA many years ago. The collection is a world treasure, not just the subject of a regional dispute. A museum collection of this stature is a compilation of the curatorial expertise and donor contributions of decades. It has a life and character developed over time and is not merely an assemblage of individual properties." (posted on Linkedin July 18th, 2014)

The sale of the entire contents of the DIA would be unprecedented in scope. Given the extremely high quality and curatorial consistency of the DIA collection, even an auction sale of selected masterpieces from the museum would perform better than any sale in history, including major sales centuries ago, such as the dispersal of royal treasures of the French Revolution or the Walpole sale to Catherine the Great in the eighteenth century.

In view of this extensive evidence, it is instructive to contrast the comments of the Artvest Report on this issue. Not only does the Artvest Report appear not to take into consideration the exalted factor of provenance but it belittles it.

The Artvest Report says:

> General gifts and other museum acquisitions often involve property with little or no sales value and/or scholarly or historic value only. Also in many instances donors give entire collections, which include poor to mediocre property side-by-side with good property. (Artvest Report p. 19)

While this may or may not be the case, what the Artvest Report ignores is that when and if museums receive gifts of low value, they more frequently than not sell unwanted objects soon after receiving them.

Such sales are condoned by the American Association of Museums provided that the proceeds of such sales are given to an acquisitions fund and are not dispersed for other purposes.

This is a fact that the Artvest Report ignores when discussing the recent sale by the Delaware Museum of Art of a William Homan Hunt painting, illustrated in the Artvest Report. (See Artvest Report, pp. 32-34)

There is also a major valuation flaw in the analysis of works under $5,000 in both the Artvest Report and the Christie's Report.

The Artvest Report states:

> For property with a value below $5,000 I attributed an effective value of $0, as is my opinion that the cost of cataloguing, handling, administering and finding buyers for this property will be equal or greater than the cost of selling it. For that reason this is a price level of property that Sotheby's and Christie's, under normal circumstances try to avoid selling. (Artvest Report p. 19)

The Artvest Report accepts without question Christie's classification of these works. However, Christie's did not provide a list of the works under $5,000 with illustrations, and so, the user of their appraisal report has no way of verifying whether these works are indeed under $5,000. In light of the fact that Christie's has not valued these objects, the total number of objects valued in their report may be closer to 1,500 rather than approximately 2,700, which they say they have valued. Yet, the Artvest Report accepts these numbers without question and incorporates them, and in so doing, skews the results.

Not only is this point fallacious for its refusal to account for the major cumulative value of works under $5,000 in the DIA collection, but it is untrue in regard to the business practices of Sotheby's and Christie's, both of which sell works under $5,000. Many of these works, such as his Polaroid photographs offered in Christie's online "Eye Candy" sale have estimates as low as $1,000-$2,000.

Sotheby's is also working in the lower end of the art market, having recently announced a partnership with eBay for online sales. (op cit. Carol Vogel and Mike Isaac, "A Warhol with Your Moose Head? Sotheby's Team with EBay," *New York Times*)

The Artvest Report also implies that selling museum works which are not condoned by professional associations result in lower realized prices, as evidenced by the Delaware Museum sale which took place in London, referenced above, which most likely was due to an aggressive estimate by Christie's. (*See* Artvest Report, p. 33).

Ironically, on July 14th, 2014, a few weeks after the Delaware Museum sale, the *New York Times* published a story of how an Egyptian statue de-accessioned from the Northampton Museum in England made approximately $27 million in London above its estimate of $7-11 million, despite the fact that both the Egyptian government, local residents and British museum officials tried to block the sale on "moral grounds" (using the terminology of the *New York Times*).

One of the most egregious errors in the Artvest Report is the treatment of Diego Rivera's *Detroit Industry* frescoes. The Artvest Report says that the frescoes "cannot be removed with cutting them off the wall and inflicting serious damage, and incurring significant cost." [*sic* – he presumably means "without cutting them…"]. While of course there would be costs associated with moving the frescoes, it is certainly possible, and it is fully in keeping with the regulations of National Park Service, which organization has named the murals a national hallmark and explicitly noted that this designation "does not shield the property from ownership changes or prevent an owner from making any other changes they wish"; a review process is in fact only needed if federal funding is to continue (See "Iconic Diego Rivera mural at DIA named National Historic Landmark," *Detroit Free Press*, Apr. 24th, 2014)

In fact, frescoes are commonly moved from their original sites to museums. There is currently an exhibition in Ravenna, Italy titled *L'incanto dell'affresco* ("The Charm of the Fresco: Detached Masterpieces from Pompeii to Giotto, from Correggio to Tiepolo"). The show is comprised of 110 detached frescoes from antiquity to the nineteenth century. (*See* Attachment G: Article on *L'incanto dell'affresco esco*)

It is common for museums to display detached frescoes in this country as well. One prominent example of this is Domenico Ghirlandaio's detached fresco *Saint Christopher and the Infant Christ* in the Metropolitan Museum of Art. At the same institution, one can see several entire rooms of detached frescoes from villas such as Boscoreale and Boscotrecase; these paintings, buried under the lava of Mount Vesuvius, suffered a fate far worse than surgical modern processes that necessarily attend the transport of major frescoes, and yet, they are in very good condition and set up in situations that approximate the original rooms. The removal of frescoes in a setting such as a major museum today would be performed with state-of-the-art technology that would leave the works in essentially perfect condition in a new location.



Domenico Ghirlandaio, *Saint Christopher and the Infant Christ*

The relocation of room-scaled works is not particular to frescoes. Entire rooms are regularly moved without damaging effect. Consider Whistler's Peacock Room, which was moved from Freer's Detroit mansion to the Freer Gallery of Art in Washington, DC. Consider, similarly, Louis Comfort Tiffany's Tiffany Chapel at the Morse Museum in Winter Park, Florida, which was moved three or four times prior to its current installation. Museums sometimes move entire buildings to great distances; consider the Temple of Dendur, which was moved from Egypt to the Metropolitan Museum of Art. With such examples in mind, the reconstruction of Rivera's masterful frescoes in a comparable museum is entirely plausible.

Later in the Artvest Report, in the section for individual valuations, Betty Krulik says "the works would be destroyed if they were removed from the building, therefore the value is 0 OR the value of the real estate." As discussed above, there is no indication that the works would be destroyed or even damaged if they were to be moved, and therefore these works, major masterpieces by the most important Mexican artist in history, have a value far in excess of zero. And since, as discussed above, the Rivera murals are of a class of property that can be relocated with relative ease, their value is not the value of the real estate.

## STATE OF THE CURRENT ART MARKET

The time constraints of producing this preliminary and summary report preclude a detailed analysis of the state of the art market at present. However, a few general comments are in order.

At the moment, as in the past, the art market tends to be strong for works of art of significant quality. The curatorial care which the DIA has exhibited over during the last century in particular has produced an extraordinary collection of world renown as stated by Elizabeth Galdos above.

Among the masterpieces in the DIA collection are:



Pieter Bruegel, *The Wedding Dance*

This major painting by Bruegel depicts a wedding festivity from his typical bird's-eye vantage point with a characteristic plethora of detail. It is among the best surviving examples of later Northern Renaissance painting and among this master's most important paintings.



Vincent van Gogh, *Self-Portrait with Straw Hat*

This self-portrait typifies one of the most important genres for the legendary Post-Impressionist. The self-portrait has a three-quarters pose, psychologically expressive gaze, pungent saturated color, and long dappled bushstrokes, all of which are characteristic of the artist's self-portraits.



Rembrandt van Rijn, *The Visitation*

This is a major religious painting by Rembrandt van Rijn, the most important Dutch painter of the seventeenth century. The architecture is similar to that of Rembrandt's masterpiece, *The Nightwatch*, painted around the same time but cut and altered in the nineteenth century. *The Visitation* remains unaltered, a very important consideration in valuing.



Frederic Church, *Cotopaxi*

This painting exemplifies the representation of the sublime in nineteenth-century American landscape painting. It epitomizes the artist's signature panoramic vantage

point, and stands out even from comparably well-painted Church paintings in its brilliant color.



Caravaggio, *The Conversion of the Magdalen*

The painting was made for Caravaggio's first major patron, Cardinal del Monte. Its realistic portrayal of ordinary people as models, dramatic approach to storytelling and strong value contrasts embody what a collector would expect in Baroque painting. The brilliantly painted elliptical mirror and its reflection served as an important point of departure for Baroque still life painting, and the gestures influenced many Baroque artists such as Georges de La Tour.



Mark Rothko, *Orange Brown*

This work is a classic example of Mark Rothko's style, in which large minimally modulated rectangular shapes float in an abstract space. This style of painting, called color-field painting, is a sub-style of Abstract Expressionism, and Rothko was its most prominent practitioner.



Henri Matisse, *The Window*

This painting features a classic subject for Matisse, namely an interior with a window. Characteristic of his painting style, flat planes of color are emphasized. The DIA was the first public collection in the United States to include a Matisse.



Pablo Picasso, *Melancholy Woman*

This is a significant Blue-Period painting by Pablo Picasso. The works for this series, his first mature body of work, feature cool colors, melancholy subjects, and significant attention to linear elements, all of which are present in this painting. As such, this is one of the most important paintings of Picasso's Blue Period.



Snake-dragon, symbol of Marduk, patron God of Babylon panel from the Ishtar Gate

This extremely rare glazed-brick relief is from the Ishtar Gate, a major Neo-Babylonian structure built by King Nebuchadnezzar II in honor of the Babylonian gate Ishtar. This relief depicts the god Marduk in the guise of a chimerical mixed creature. Only two other museums in the world have dragons from the Ishtar Gate; this is the only dragon in the United States.



Andy Warhol, *Double Self Portrait*

This large-scale self-portrait treats central themes in Warhol's Pop art oeuvre, namely celebrity, repetition, and the visual language of popular culture. The two-part format and the heightened color palette are signature for the artist.



Edgar Degas, *Danseuses au foyer (Dancers in the Green Room)*

This painting features ballerinas, the most important subject for Impressionist painter Edgar Degas. The asymmetrical composition of this early painting reflects his newfound interest in Japanese prints. The subject is accessible to contemporary collectors.



Henry Fuseli, *The Nightmare*

This painting is, by far, Fuseli's most important work. It is a defining monument of Romanticism, embodying the concept of the irrational and its connection to imaginative forces. It is a precocious painting, looking forward to themes that would occupy many artists in the nineteenth and twentieth centuries. It anticipates Surrealism, an important painting style for contemporary collectors. It has a place in psychology textbooks and art history textbooks alike.



James Abbott McNeill Whistler, *Nocturne in Black and Gold – The Falling Rocket*

This painting is the most important of Whistler's Nocturnes, a series of muted landscapes painted with limited palettes. This work, which closely looks forward to modern abstraction more than any other work in the series, was the subject of a major controversy and libel suit involving a foremost critic of the day, John Ruskin, who accused Whistler of "flinging a pot of paint in the public's face."

With a collection of masterpieces such as the twelve examples cited above, it is clear that any DIA sale would excite world attention no matter what generalized statements one could make about market performance within any one particular sector. A sale of such extraordinary works of art would transcend any generalized comments one might make because in point of fact there will has never been a sale comparable to that of the Subject Property.

Notwithstanding this more obvious observation, the Christie's Report did not comment on the state of the art market.

The Artvest Report mentions the topic, but it does not discuss in depth the prominence of the DIA collection.

Instead, the first part of the Artvest Report details observation on the current art market; a major source cited in the Artvest Report is the TEFAF Art Market Report prepared by art economist Clare McAndrew. (**TEFAF REPORT**)

Chinese art economist, Zhang Yi also worked on the TEFAF Report and is credited with this in the report. Mr. Zhang who also works with VWA was asked to comment on the observations made in the Artvest Report regarding the TEFAF Report. The Review of Expert Witness Report of Michael Plummer, Artvest Partners, dated July 8th, 2014, Submitted to VWA on July 25th, 2014, Prepared by Zhang Yi (***ZHANG REPORT***) is appended to this report. (*See* Attachment B.)

The Zhang Report states that the Artvest Report misstates or obscures the points raised and conclusions of the TEFAF Report.

Generally speaking, the conclusions that the TEFAF Report makes are based on heterogeneous mixed consignor sales which in many cases suffered by a paucity of excellent objects; in other words, sales which have profiles significantly different than what would be the case if there were a sale of the excellent holdings of the DIA.

Consequently, while the general observations made in the Artvest Report may or may not apply to mixed consignor sales of objects of uneven quality, a DIA sale would not fit such a profile and, as such, it is inappropriate to compare such a sale with what has taken place during the past sale season.

## THE ISSUES OF SUPPLEMENTS AND DISCOUNTS WITHIN THE CONTEXT OF MASS APPRAISALS

In the event that a valuation is predicated on the premise that a large group of similar and like items were to valued at one time in a hypothetical sales construct, USPAP Standard 6, under Mass Appraisals, instructs the appraiser to consider whether the value of the whole mass may be different than the sum of its parts.

Taking into consideration this valuation instruction, one should determine whether a supplement or a discount to a normal value would be appropriate.

## SUPPLEMENTS

Based on our discussion above, one would be justified in determining that an increase in value would be appropriate due to the extraordinary quality of works of art in the DIA collection.

In point of fact, such a sale would be the sale of any century.

VWA has taken a conservative view and have added conservative supplements to various sector of the DIA collection, which are discussed below. VWA feels justified in doing this because the "sale of any century" would consist of consistently superior items which

are distinctly different from the items which would be found in a mixed-consigner sale such as the ones in the TEFAF report cited by the Artvest Report.

The reason VWA has not applied an across-the-board supplement is because such supplements are hard to quantify.

However, it should be mentioned that Mr. Wiener was required to quantify a glamor supplement in the DeBekessy case, cited in the attached CV, in which Christie's sold a distinguished collection of eighteenth-century French furniture and decorative arts without citing provenance, publication and exhibition history, resulting in lower prices realized for the consignor than if such important factors had been cited.

Neither the Christie's Report nor the Artvest Report address the possibility of including a valuation supplement due to the DIA provenance.


## DISCOUNTS

VWA has not applied a valuation discount factor to the DIA collection, which one would normally do when valuing such a large collection of similar and like items, albeit in many diverse collecting categories, to be sold at one time. Given the nature of the DIA collection, it is unlikely that the entire collection would be sold at one time. Instead, a more likely hypothetical sale scenario would be one that takes place over time.

Alternatively, under the loan scenario presented by ACG and discussed in the Houlihan Catalogue, the DIA collection would not be sold at all, providing, of course, that the debtor would be able to repay the loan. The only way any of the works of art would be removed or sold would be if there were to be a loan default. Consequently the collection would not be valued as an organic whole or "mass" to use the terminology in USPAP Standard 6.

The Christie's Report does not address the issue of the appraisal of a mass.

The Artvest Report addresses the issue of applying a blockage discount, although it would appear that the Artvest Report ultimately rejects this, presumably because it is a draconian solution (although this point, in our opinion, is not entirely clear in the Artvest Report narrative). (*See* Artvest Report, pp. 27 ff).

The Artvest Report offers a number of different scenarii for calculating discounts which could be applied to value all 60,000 plus art holdings of the City.

These scenarii are articulated in a variety of tables. (See Artvest Report Tables 4, 5, 6, 7 pp. 28 – 7)

Economist Jannette Barth, Ph.D was asked to opine on the Artvest Report's view of blockage discount as it applied to the DIA and the supporting data use for the conclusions in the tables set forth in the Artvest Report.

Dr. Barth's conclusions are stated below and elaborated upon in the attached The Review of Expert Witness Report of Michael Plummer, Artvest Partners, dated July 8th, 2014, Submitted to VWA on July 24th, 2014, Prepared by Jannette M. Barth, Ph.D., Pepacton Institute LLC (**BARTH REPORT**) is appended to this report. (*See* Attachment C.).

In brief, Dr. Barth opines that most, if not all, of the discounts applied in the Artvest Report are unsustainable because of reliance upon unsupported data. The Barth Report goes through each discount that the Artvest Report applies and shows that the data is either lacking or inconsistent with the conclusions reached. As such, the Barth Report concludes that the Artvest Report is unreliable.

With this in mind, one can see that the Artvest Report puts forth its own discount calculations stated in the conclusion, resulting in a discount scenario in which the DIA collection would fetch between $1.1 and $1.8 billion "in the highest value scenario." (See Artvest Report, p. 48).

The Artvest Report also dismisses all expressions of interest by three potential purchasers and one potential lender as reported by Houlihan (See Artvest Report pp. 39-40).

While VWA did not have direct access to the three potential purchasers, according to Houlihan, Poly International Auction House expressed interest in purchasing all Chinese works for up to $1 billion, Yuan Capital expressed interest in purchasing 116 pieces for $895 million to $1.473 billion, and Catalyst Acquisitions/Bell Capital Partners expressed interest in purchasing the entire collection for $1.75 billion. VWA did have access to ACG, who offered to provide a $2 billion loan.

VWA asked Ian Peck of ACG to comment on the way the Artvest Report characterized his offer to which he replied:

> The Artvest Report, and more specifically the sections referencing ACG and its proposal to monetize the art collection of the DIA, is predictably skewed and misleading. Our proposal, which was submitted April 9, 2014, laid out interest rate ranges and loan proceed estimates in hopes of having collaborative discussions with the DIA and bankruptcy administrators. All relevant estimates were bracketed within the proposal to signify that we were open to discussion and analysis. ACG is confident that any loan against the collection for the purposes of enhanced relief to creditors will price at the lower end of the aforementioned interest rate range thereby rendering Mr. Plummer's cost estimates in Section 70 a. inaccurate. In section 70 e. Mr. Plummer again utilizes his inflated numbers to calculate debt service amounts. ACG is prepared to look at all options to provide non burdensome terms in the early years of the loan i.e. interest taken out of loan proceeds, PIK structures, etc. To be clear, ACG's proposal has no language

included that requires sales of any of the DIA collection. Further, the absence of any fees in the proposal that would reward ACG if any sales did occur should mitigate any offensive claims asserted by Mr. Plummer in section 70 g. The spirit of our proposal was and continues to be a willingness to work with all sides to find a mutually agreeable solution, thereby protecting a national treasure and allowing it to remain in Detroit whilst effecting enhanced recovery to creditors.

## VALUATION DETERMINATION:  METHODOLOGY

1. VWA valued 387 items with a low value of $3,092,419,700, high value of $4,040,303,800 and an average value of $3,566,361,750.

2. The Christie's Report, the Artvest Report, and the Winston Report valued 596 works that VWA did not value.

3. VWA believes the values of the 596 works valued by the third parties stated above are generally too low.

4. The total of the average values of the 596 works arrived at by the third parties above was $311,370,325.

5. Combined, VWA and other third parties valued 983 works for a total average value of $3,877,732,075 (*See* Attachment J:  Step 2 Attachment).

6. Of 17,178 DIA insurance values, 16,388 works were not valued by any of the third parties.

7. Many of the DIA insurance values were arrived at during the last decade or prior (see table "Overview of Age of DIA Insurance Value For Those Works that Have DIA Insurance Value and No Third Party Values")

8. VWA determined that a market percentage appreciation is appropriate for 16,338 of the DIA insurance values because the average weighted age of the values is 13.0 years (see chart "Overview of Age of Insurance Value For Those Works That Have DIA Insurance Values and No Third Party Values").

9. In order to determine a market appreciation rate, VWA first cross-referenced DIA insurance values to works that VWA valued and compared results. There were 317 works that had insurance values that VWA had valued.

10. With respect to the 317 pieces that had both insurance values and VWA values, VWA calculated the weighted value to be $3,566,361,750 and calculated the average age of the DIA's insurance value to be 5.9 years old with an initial DIA insurance value of $2,200,811,839. (*See* Attachment L: Step 3 Attachment).

11. VWA calculated the percentage change between the VWA values and the initial DIA insurance values and used that percentage as the market appreciation rate to be applied to the 16,388 works to arrive at current market value for the 16,388 works.

12. The current market value for the 16,388 works is $758,888,249. (*See* Attachment L: Step 3 Attachment)

13. For the remaining works, VWA developed a pricing matrix based on average sales price of artworks by Sotheby's and Christie's by sales department for 2013 by using the chart from Exhibit E in the Artvest Report, "Sotheby's and Christie's Unsold Rates by Sector – 2013."

14. For reasons previously discussed in this report, particularly the unparalleled provenance of the DIA works, and the examples of recent celebrity sales, VWA believes that if the DIA collection ever were to be offered for sale at public auction, the buy-in rate for unsold lots in the categories would be essentially zero.

15. A premium or discount was applied to most of the DIA categories.

16. When appropriate, premiums were applied to categories within the pricing matrix to compensate for factors including the strength of many individual market sectors and the high collectability and rarity of the DIA works in those sectors.

17. When appropriate, discounts were applied to categories in the pricing matrix to compensate for less collectible works of art.

18. The values of the remaining 42,854 DIA works were calculated by taking the average sales price described above (see above) and also applying the premium or discount where applicable.

19. The total value of the remaining 42,854 DIA works was determined to be $3,512,612,030.

20. VWA has considered that an error rate in the DIA data would affect results. Until VWA can consult with the DIA on quality control issues, VWA is unable to adjust for such errors.

21. The preliminary MCV grand total for the works in the DIA collection is $8,149,232,354 and was determined by adding (1) the total value of works in the DIA collection valued individually by VWA, (2) the total value of works in the DIA collection valued individually by independent third parties (not including VWA), (3) the projected value of works not covered by clauses 1

and 2 in this paragraph but have aged DIA insurance values which VWA subsequently estimated for market appreciation, and (4) the total values of remaining works which were valued using the pricing matrix. (*See* Attachment H: Methodology Step by Step Chart)

22.  All values were reviewed and adjusted by internal committee.


## CONCLUSION

In arriving at a determination of the value by VWA of the entire holdings (approximately 60,000 works of art) of the DIA, the following points should be stressed:

1.  The above appraisal report is to be considered as a preliminary report of a summary nature. All notes included in the work file may or may not have been included in the report. Clearly only when they are of truly determinative importance have such notes been cited, in keeping with the report's definition as both preliminary and summary.

2.  There have been at least three other appraisal reports reviewed by VWA which have been produced in conjunction with the above cited litigation. Two of these reports, the Winston report and the Christie's report, take into consideration only a small segment of the DIA collection. The Report and the Artvest Report are the only two reports that attempt to value the entire DIA collection.

3.  Of these two reports, the Report is the only report issued in compliance with the Uniform Standards of Professional Appraisal Practice.

4.  Of these two reports, this Report is the only report issued by qualified appraisers. While the Artvest Report may have used qualified appraisal consultants that report was issued by Michael Plummer who is not an appraiser.

5.  Furthermore, as evidenced by the CVs attached to the Artvest Report, neither Mr. Plummer nor his appraisal consultants show any significant museum training.

6.  At least two of the leading appraisers responsible for the Report have significant museum training – i.e. Victor Wiener who holds a Certificate in Museum Training issued jointly by the Metropolitan Museum of Art and the Institute of Fine Arts, NYU and David Shapiro, who has worked in and with museums in a variety of capacities.

7.  This Report is the only report that takes into consideration in a prominent way the great importance of the art holdings of the DIA. This is an important

valuation factor, which has been almost totally ignored in the other appraisal reports. In fact Artvest appears to denigrate the DIA holdings by saying it contains many items of low value, which may have been dumped into the museum collection by donors.

8.  VWA has had only two weeks in which to issue the preliminary report.

9.  Because the data supplied was compromised we were obliged to engage Silar Advisors to attempt to sort the data and assist in calculations. This is an on-going process but enough progress has been made at this point to render credible results.

10. Because much of the analysis of the Artvest Report is dependent on work done by Clare McAndrew and her associates for the TEFAF Report, as well as economic projections. VWA consulted with Zhang Yi, a co-author of the TEFAF Report; we also consulted with Janette Barth, a noted economist to comment on these sections. The Zhang Report and the Barth Report are appended to the Report. In sum, both these authorities take issue with statements made in the Artvest Report.

11. While the Report does make a number of economic projections, the methodology employed and the limitations under the time constraints are disclosed fully within the body of this report. Such full disclosure is not obvious to us within the text of the Artvest Report.

12. Under the limitations cited above and within the Report and within the nature of the type of preliminary report delivered, with all its disclosures, it is VWA's opinion that the Report has arrived at credible results. Such is the overriding principle of USPAP which stresses that appraisers must strive to maintain "public trust" and perform assignments with "objectivity, independence and without bias." VWA strives to maintain those principles.

Executed this 25th day of July, 2014, in New York, New York.

Victor Wiener

**USPAP Appraisal Certification:**

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are the impartial and unbiased professional analyses, opinions and conclusions of the appraiser.

- The appraiser has no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

- The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The appraiser's analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the *Uniform Standards of Professional Appraisal Practice.*

- Any person who has provided significant personal property appraisal assistance to the person signing this certification is listed in the body of the report.

- The appraiser has the appropriate experience and level of competence to appraise the property which is the subject of this report and the qualifications of all who have worked on this report are stated both within the body of the report and in the *curriculum vitae* of the principal appraiser which is appended to the report.

- While the appraiser attests to the descriptions of property contained in this report, this appraisal report is not to be considered to be a statement of authenticity or a warranty of the subject property, and is limited by the extraordinary assumptions stated with inches. However, careful review of all scholarly and market sources have not revealed any doubt about the authenticity of the subject property as of the date of this report, unless specifically stated.

_____
Victor Wiener for
Victor Wiener Associates, LLC
July 25th, 2014

<u>**ADDENDUM**</u>

<u>**CORRECTIONS TO REPORT AS OF AUGUST 20, 2014**</u>

The Report has been corrected to account for the following errors noted as of the above date:

- Obvious typographical errors of spelling and syntax.

- The following transcription errors:

  o VWA identified 20 works that should not have been included in Step 2. VWA deleted each of these works from the Step 2 Attachment (Attachment J), and those with DIA insurance values were included in Step 3 (*see* Attachment L) and the others were added to the pricing matrix in Step 4 (*see* Attachment M). The Methodology Step by Step Chart (Attachment H, and reproduced on page 3), the Step 2 Attachment Supplement (Attachment K), the explanation of the valuation methodology on pages 45-47 and the valuation conclusions on page 3 have been updated to reflect the corrected number of units and average values.

  o The DIA Insurance List includes an Asian manuscript, *Perfection of Transcendent Wisdom in Eight Thousand Verses* consisting of 501 pages. The DIA Insurance list gave each of the 501 pages a different accession number, and the insurance value of $300,000 for each page of the manuscript. This is an obvious error, as $300,000 is an appropriate insurance value for the whole manuscript, but not for each page. Thus, the $300,000 insurance value for this work should have been listed only once on the DIA Insurance List, but was instead repeated 501 times. The Step 3 Attachment (Attachment L), the Methodology Step by Step Chart (Attachment H, and reproduced on page 3), the explanation of the valuation methodology on pages 45-47 and the valuation conclusions on page 3 have been updated to reflect the corrected number of units and average value, accounting for $300,000 as the value of this work, only once.

  o It is VWA's opinion that the DIA Insurance List may include additional instances of the same mistake of listing the insurance value for one object multiple times. This would be impossible to verify without a detailed physical inspection of each work in the DIA Collection; however, in order to account for this possibility, VWA applied an additional discount of 3.5% to calculate the Grand Total, Projected Sum of Average DIA Insurance Value listed on the Step 3 Attachment (Attachment L), and updated the Methodology Step by Step Chart (Attachment H, and reproduced on page 3), the explanation of the valuation methodology on pages 45-47 and the valuation conclusions on page 3 to reflect the

corrected, discounted value.

     ○  As a result of these and other mistakes identified on the DIA Insurance List, VWA corrected the total amount of DIA insurance values in paragraph 6 of the explanation of the valuation methodology on page 45.

- The definitions of Christie's Report, Artvest Report and Winston Report in Attachment K were corrected to conform to the definitions in the Report.

- The formatting of Attachments H – M was fixed to make those attachments more readable.

## <u>INDEX OF ATTACHMENTS</u>

A:  Curriculum Vitae of Victor Wiener

B:  Zhang Report

C:  Barth Report

D:  Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation

E:  DIA Inventory Page, Missing Photograph Example

F:  DIA Inventory Page, Mislabeled "Unknown, American" Examples

G:  Article on *L'incanto dell'affresco*

H:  Methodology Step by Step Chart

I:  Step 1 Attachment

J:  Step 2 Attachment

K:  Step 2 Attachment Supplement

L:  Step 3 Attachment

M:  Step 4 Attachment

**Attachment A**

**Curriculum Vitae of Victor Wiener**

**VICTOR WIENER**
**201 W. 89TH St., 11D**
**New York, N.Y. 10024**
**(646) 206 3992 PHONE**
**(212) 873-5218 FAX**
**victorwiener@aol.com**

**Independent Appraiser and Art Consultant**,  2004-present:

CEO and director of Victor Wiener Associates, LLC the successor company to Wiener Wolf Associates, LLC, an international firm of independent specialist appraisers and art advisors drawn from professional associations, specializing in insurance appraisals, damage and loss appraisals, tax appraisals, equitable distribution appraisals, appraisals for collateralized transactions, and art market advice for private collectors and financial institutions.  The firm's diverse group of expert appraisers specializes in all aspects of fine arts and decorative arts and has an additional specialty in the appraisal of photography, photo archives and audio visual related material.

Appraisers Association of America, Inc., New York, N.Y.
**Executive Director**,  1982- 2004:

CEO of international organization of 1200 members engaged in the profession of appraising art. Responsible for implementation of all Association programs including:  monthly newsletter and journal as editor:  government liaison as listed below; analyses and monitoring of art market to report to members and professional and general public; design and supervision of computerized appraisal referral service; implementation and management of Association's educational program including monthly seminars, national conferences, professional travel program, and ad hoc lecture series on the art market under the auspices of the AAA's parallel educational foundation, the Appraisal Institute of America; implementation and administration of Association's public relations program, including preparation of all press releases; design and supervision of criteria for prospective members; review of member's appraisals and source of advice to members on appraisal problems; general liaison with art community:  i.e. collectors, dealers, auction houses and appraisers.

Sotheby's Appraisal Company:  New York, N.Y.
**Consultant**, 1981-1982:

Responsible for preparation of appraisals for old master and 19th century paintings for clients requesting insurance appraisals, estate appraisals and appraisals for donation purposes.

New York, NY
**Art Broker**, 1981-1982:

Specializing in the sale of fine art, including old masters and 19th and 20th century paintings and sculpture.

La Cassa di Risparmio:  Rome, Italy
**Consultant,** 1978-1980:

Resident consultant for old master, 19th and 20th century paintings.  Responsibilities included: supervision of monthly auction sales; advisor to consignors and collectors; development of new client base; recommendations to bank officers on the purchase of works of art for the bank.

Rome, Italy
**Private dealer and art broker**, 1978-1980:

Specializing in the sale and acquisition of fine and decorative arts.

Christie's: Rome, Italy
**Director, Fine Arts Department** 1974-1978:

Responsible for 10-12 sales annually of paintings, drawings and prints. Advisor to consignors and collectors in Italy and throughout Europe. Preparation of all fine art catalogues, verifying attribution and prices of all works offered. Liaison with branch offices throughout Italy and with general office in London.

Colnaghi, Rome, Italy
**Research Assistant to the Director,** 1973-74.

## University Teaching Positions:

1990 – present: Adjunct Assistant Professor New York University Appraisal Studies Program, School of Professional and Continuing Studies. Courses include: Art Law; IRS Rules and Regulations and Uniform Standards of Professional Appraisal Practice.

1987: Instructor, Art Dept, Baruch College, New York. Course on Basic Appraisal Methodology.

1985: Instructor, Baruch College, New York, School of Continuing Education. Course on Basic Appraisal Methodology.

1985: Instructor, The New School, New York. Course on the Art Market and Appraising.

1970-1973: Instructor, Art History, Finch College International Study Program: Rome, Italy

Development of a curriculum utilizing the resources of Rome as a point of departure for the study of the connoisseurship of paintings and sculpture and the basic principles of architectural history.

## Governmental Research, Development, and Testimony:

2009: Member of working group of 5 experts retained to develop and recommend new standards for donation appraisal reports concerning audio, visual and related photographic material to be considered by the Canadian Cultural Properties Export Review Board for potential Canadian tax deductions.

1990: Established with the Resolution Trust Corporation a national database of appraisers to help in the liquidation of assets of failed Savings & Loan Institutions.

1986: Testimony submitted to the House Ways and Means Committee, Subcommittee on Oversight, concerning the IRS Art Advisory Panel. Testimony published by the Government Printing Office with the proceedings of the Hearing.

1985: Testimony before the IRS and Treasury on the new IRS regulations for donations of personal property to charitable institutions.

**Governmental Research, Development, and Testimony (cont'd) :**

1985.  Expert witness for the Treasury Dept. in the United States of America v. Jarelco, Inc..  As a result of this action, the Treasury Dept. was able to reclaim more than $50 million in lost revenue.


1984:  Participant at the meeting of IRS and Treasury officials and invited representatives of the appraisal profession to discuss the ramifications of the new legislation and rules regarding donations of personal property to charitable institutions.

1983:  Testimony on appraising before the House Government Activities Subcommittee, chaired by Rep. Cardiss Collins.  Testimony published in "Revision of IRS Tax Deductions for the Arts", the proceedings of the Hearing published by the Government Printing Office.  (The results of the Hearing and the

subsequent data collected by the House Government Activities Subcommittee were influential in leading to the current legislative revision and IRS rulings issued in 1984).


**Testimony as Expert Witness and Legal Consultation:**

2012-2014:  Ronald Appleby v. Her Majesty the Queen.  Retention by the Justice Department of Canada and Canadian Revenue.  Case concerning the donation of a monumental sculpture by Gerome to the Art Gallery of Hamilton Ontario.  Issues concerning re-fabrication of significant parts, use of undocumented ivory in the restoration and issues concerning the sculpture's Cuban provenance and its nationalization and subsequent sale by the Castro government.

2011-2013: Marguerite Hoffman v. L&M Arts, David Martinez and Studio Capital, Inc.  The case involving a commercial transaction and valuation issues concerning a major Mark Rothko painting.

2011-2014: Cin-Con Heating v. Shapiro and Weigner:  The case involving claimed damage to a fixture and interior attributed to Frank Lloyd Wright.

2011-2013:  The Dorothy G. Bender Foundation, Inc. and John McEnroe  v.  Joseph P. Carroll and Joseph P. Carroll Limited:  The case involving the valuation of an Arshile Gorky painting and two other works of art connected with the settlement of the Lawrence Salander assets.

2011-2012: American International Ins. Co., as subrogee of Theodore Forstmann, v. Acquavella Galleries, Inc. The case involving the damaged Picasso Portrait of Dora Maar.

2010-2012: Glacier Gallery and I.S.O. Art Ltd. v. Fedex Ground Package System, Inc, Art Capital Group and ACG Galleries.  The case involving a painting by Thomas Hart Benton damaged in shipping.

2010-2011: AXA Art Insurance Corp. as subrogee of Gagosian Gallery International, LLC v. Art Courier, et. al.  The case involving a highly important painting by Brice Marden, owned by Sotheby's which had been damaged when in custody of the Courier while it was being transported by the Gagosian Gallery.

2010-2011: AXA Art  Insurance Corporation as subrogee of Steven A. Cohen v. Arenson Office Furnishings Inc.  The case involving a damaged important sculpture by Jeff Koons owned by collector Steven Cohen.

2009-2012 (ongoing):  Atlantic Specialty Insurance Co. v. AE Outfitters.  The case involving fire damage to an important sculpture by Jeff Koons owned by collector, Peter Brant.

**Testimony as Expert Witness and Legal Consultation (cont'd):**

2010- 2011:  Friedman Benda Gallery v. Museum of Modern Art et al.  The case involving the claimed damage to pieces of furniture by 20th century artist, Ron Arad.

2009-2011: Richard Green (Fine Paintings) v. Doyle McClendon and Mary Alice McClendon.  The case involving the current valuation of one of the most expensive Bonnard painting ever to have been sold.

2009:  Cincinatti Art Gallery and Travelers v.  Covenant: The case involving a damaged painting by William Glackens.

2009: Expert Witness in Venetia Kapernekas v. Udo Fritz-Hermann Brandhorst.  The case involving the valuation of large scale sculpture by Damian Hirst.

2009:  Expert Witness in  775 Park Avenue Corp, a/k/a Anton deBekessy v. Marguerite deBekessy.  The case involving the role of provenance in the auction sales of fine and decorative art.

2008:  Expert Witness testimony in Christie's, Inc v. SWCA, Inc et al.  The case concerning authentication procedures for a Picasso bronze.

2006-2009:  Expert witness in P&E entertainment v. Chubb Insurance.  The case involving a loss claim for audio-visual and photographic sports entertainment material.

2007:  Expert witness in Trimount Foundation v. Dexter House Development, Boston.  The case involved the valuation and assessment of damages to a major Tiffany mosaic room decoration located in the Ayer Mansion, Boston.  The case was settled out of court, although a deposition was taken and a video-taped testimony to be played in court in the event of a trial was made.

2007:  Designated expert witness in Stephen and Elaine Wynn v Those Certain Underwriters at Lloyds, London et al.  Retained to determine the diminution in value to the painting *Le Reve* by Pablo Picasso due to a puncture of the canvas; and to determine the market value of the painting prior to the accident. [n.b. *Le Reve* was to be sold, prior to the damage, for $139 million which would have made it at the time the most expensive work of art ever to be sold.]

2006:  Expert witness in Those Certain Underwriters at Lloyds, London et al v Nancy Cooperman.  Civil case in which Nancy Cooperman was sued for $22 million by the above insurance companies.  The case was decided in her favor based, in part, on the valuation submitted by Wiener Wolf Associates, LLC and my testimony.  In addition, the Court accepted our stated valuation concept that a substantial appraisal discount was mandated by the events of September 11, 2001.  (This may be the only case in which this concept was presented to a jurisdictional authority).

2005:  Expert witness in United States v. Rocco de Simone: Criminal case involving representation of French impressionist and modern paintings, consignment agreements and related art world practices.  De Simone, who risked going to prison for approximately seven years, was exonerated based, in large part, on expert witness testimony.

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of 19th century Italian sculpture sold by Gallery 63, New York

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture and decorative arts sold by Ed Hardy, Inc. San Francisco.

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture and decorative arts sold by Foster Gwin, Inc. San Francisco.

**Testimony as Expert Witness and Legal Consultation (cont'd):**

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture and decorative arts sold by John J. Nelson Antiques, Inc,.Los Angeles.

2004:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture sold by Dalva Brothers, Inc., New York.  Testified for Dalva Brothers who won on all counts.

2004:  Expert witness in Cathers v. Barnes.  Case involving allegation of non-payment of bill.  Testified for defendant on art market practices and representation of objects by dealers. Victor Wiener—

2003:  Legal consultation in "Phoenix Art Gallery  v.  Kimbell Museum."  Case involving non-fulfillment of purchase and the interrelationship of provenance concerns.

2003:  Expert witness in "Charles Malette v. Her Majesty The Queen," Vancouver, Canada.  Retained by the Department of Justice, Canada as an expert witness in appraisal methodology and blockage discount in a dispute concerning the donation of 981 works on paper by the Canadian artist, Harold Feist.  The government's position was upheld by the Court of Appeals with reliance upon my expert report as part of the justification for the decision.

2002—present:  Consultant and expert witness for the City of New York in the settlement of an insurance claim for artist Wen-Ying Tsai.   Valuation considerations include issue of blockage discount.

2001—2002:  Expert witness testimony in "Thomas Colville Fine Arts, LLC v. Kent Gilyard et al." Testimony concerning art sales practices, issues of authenticity and auction house sales practices and guarantees.

2002:  Legal consultation in "Gay Culverhouse v. Centrifugal/ Mechanical Associates, Inc. et al." Case involving insurance damage and loss claim.

2002:  Expert witness testimony in "Estate of Louise Nevelson et al v. Carro, Spanbock et al."  Testimony concerning the valuation of over 3,000 works of art by Louise Nevelson and issues of blockage discount.

2002:  Legal consultation in "Nares et al v. M&W Waterproofing, Inc."  Case involving insurance damage and loss claim for art work created by artist, James Nares.

1999—2001:  Expert witness for testimony to the Philadelphia Arts Commission re:  *Dream Garden* Mosaic in the Curtis Office Building.  It was anticipated that litigation in this case would be heard in the U.S. Supreme Court since constitutional issues are involved.

1993:  Expert Witness in "The Matter of the Definition of Legal Fees Payable to the Estate of Andy Warhol."  Expert Witness on appraisal methodology and blockage discount.  At issue was the valuation of an estate claimed to be in excess of $900. million.  This was probably the most important art valuation case ever to be tried in the U.S.

1992:  Expert Witness in "Goldman v. Barnett"

1985:  Expert Witness for the Treasury Department in the United States of America v. Jarelco, Inc.  As a result of this action, the Treasury Department was able to reclaim more than $50 million in lost revenue.

**Lectures and Conference Participation:**

March, 2013: Panelist, Art Governance and Financial Planning Conference, Stephenson Harwood, London.

May, 2012: Speaker and panelist at the Art Investment Conference of the London Business School of London University. The panel concerning contemporary art as an asset class in a volatile marketplace.

April, 2012: "Art Appraisal and Litigation". Seminar organized by the Art History Faculty of Stanford, University, Palo Alto, CA.

April, 2012: "Valuing Art in the Time of Chaos". Speaker and panelist at the seminar hosted and organized by the New York Law School.

March, 2012 "What is art worth NOW?": Panel discussion presented by the New York Armory Show.

March, 2012: "Best Practices in Art Valuation", lecture presented for financial advisors as part of a seminar series hosted by Fine Art Wealth Management, London, England.

November, 2011: "Art Valuation Concerns for High Net Worth Clients", lecture presented for financial advisors and clients as part of a seminar series hosted by BNY Mellon, London, England.

August 2011: "Legal Liability Exposure When Conforming to USPAP" lecture presented for the American Society of Appraisers in Washington, DC at their annual national conference.

March, 2011: "The Importance of a Properly Prepared Art Valuation", lecture presented for financial advisors as part of a seminar series hosted by Fine Art Wealth Management, London, England.

June, 2010: "Valuation Parameters for Fine Art in a Volatile Marketplace" for the Monterey Historical Society, Monterey, California.

May, 2010: Speaker and panelist at the Art Investment Conference of the London Business School of London University. The seminar concerning art as an asset class in a volatile marketplace.

April, 2010: Series of lectures for the University of Southern California, Los Angeles, on the "Valuation of Mondrian's Furniture and its Relation to his Body of Work".

November, 2009: "Appraising Works of Art in a Selective Marketplace", for Chubb Insurance underwriters and brokers as part of Chubb's continuing education program.

May, 2009: Speaker and panelist at the Art Investment Conference of the London Business School of London University. The seminar concerning art as an asset class in general and the current market for contemporary art in particular.

February, 2009, Moderator of Panel on works of art seized during the Holocaust, panel organized by Withers Bergman, LLC.

November, 2008: "The Appraisal of Photography, Photographic Archives and Audio Visual Material" and "Serving as an Expert Witness" for the Picture Archive Council of America.

July, 2008: "The Dynamics of Fair Market Value" for *Jewelry Camp*, an international conference for appraisers of gems and jewelry and for gemologists held at Hofstra University, Garden City, New York.

**Lectures and Conference Participation   (cont'd):**

May, 2008:  "The Current Market for Contemporary Art and Other Property of High Value", for Chubb Insurance underwriters and brokers as part of Chubb's continuing education program.

December, 2006:  "Appraising and the Cotemporary Art Market", for Sotheby's Masters Degree program in the Business of Art, given in Miami Beach, Florida in conjunction with Art Basel Miami.

April, 2006:  "The Legal Responsibilities of Appraisers for their Clients" for national conference of the International Society of Appraisers," Santa Fe, NM.

October, 2005:  "Appraising for Insurance Purposes", for Chubb Insurance underwriters and brokers as part of Chubb's continuing education program.

April, 2005:  "Recent Legal Developments and Expert Witness Testimony" for national conference of the International Society of Appraisers," Chicago, IL.

December, 2004:  "Appraising for Insurance Purposes", for Chubb Insurance underwriters.

March, 2004:  "Authenticity Considerations for Appraisers of Fine Art," for national conference of the International Society of Appraisers," Atlanta, GA.

March, 2004:  "The Balancing Act:  Professional Responsibilities and Legal Expectations," for national conference of the International Society of Appraisers," Atlanta, Georgia

March, 2004:  "Appraising and Underwriting Government Collections," for the Association of Government Risk Insurance Pools, Santa Barbara, CA.

October, 2003:  "Appraising for Insurance Purposes" Special seminar of the Inland Marine Underwriters Association, given in Chicago and New York.

April, 2003:  "The Dream Garden Mosaic, The Masterpiece of Louis Comfort Tiffany," for national conference of International Society of Appraisers, Philadelphia, PA.

April, 2003:  "From Bauhaus to Art Deco:  German Ceramics of the 1920s and 1930s," The Cleveland Museum of Art, Cleveland, OH.

November, 2002:  "Blockage Discount," lecture and Art Law section of New York City Bar Association.

January, 2002:  "Do it Now:  Workshop on Emergency Preparedness," National Association of Corporate Art Managers, Sotheby's New York, NY.

November, 2001:  "From Bauhaus to Art Deco:  German Ceramics of the 1920s and 1930s," Sotheby's Institute of Art, New York, NY.

June, 2001:  "Fine Arts Appraisals and Valuations," Inland Marine Underwriters Association National Conference, Keystone, CO.

April, 2001:  "Appraisal Standards for the Insurance Profession," Mariners Club, New York City.

October, 2001:  "Fine Arts Appraisals and Valuations,"Inland Marine Underwriters Association, Minneapolis, MN.

**Lectures and Conference Participation   (cont'd)**

May, 2000:  Chair and speaker of session on "Museum Loan Shows:  The Valuation Process," American Association of Museums Conference, Baltimore, MD.

June, 1997 and June, 1999:  Program Coordinator and Moderator for all day seminar on "How to Establish and Conduct an Appraisal Practice" offered by New York University Appraisal Studies Program and the Appraisers Association of America.

November, 1998:  Lecture on "Art Theft Forgery and Illicit Traffic:  The Appraiser's Perspectives" paper delivered at a symposium on Art Theft organized by Rutgers University, New Brunswick, NJ.  This paper will soon be published by Rutgers.

November, 1997:  Lecture on "Art Fraud and Forgeries" for International Art Theft Symposium organized by the FBI.

June, 1997:  Lecture on "Object ID and the Appraiser" at a symposium on "Protecting Cultural Objects in the Global Information Society;" an international symposium in Amsterdam organized by the Getty Information Institute.

June, 1995:  Program Coordinator and Moderator for all day seminar on "How to Choose an Appraiser" offered by New York University Appraisal Studies Program and the Appraisers Association of America.

June, 1993:  June, 1994, June 1996 and June 1998.  Program Coordinator and Moderator for all day seminar on "Professional and Legal Liability Concerns for Personal Property Appraisers" offered by New York University Appraisal Studies Program and the Appraisers Association of America.

October, 1990:  Lecture to patrons of the Metropolitan Museum of Art on "The Art of Appraising for Insurance, Estate and Donation."

March, 1990:  Moderator of panel discussion on appraising and insurance for Conference of National Association of Corporate Art Managers.

April, 1989:  Moderator and participant in panel discussion on appraising and the art market as part of the 1989 ARTnews World Art Market Conference.

May, 1985:  Discussant at all-day seminar on "The Economics of Art" organized jointly by the New York University Graduate School of Business and The Art Economist.

March, 1984:  One of four panel participants on "The Tax Exempt Gift", a seminar organized by the International Foundation for Art Research.

1983-1984:  Participant and organizer of public service seminars on appraising and the art market held in New York, Los Angeles, San Francisco and Chicago, sponsored jointly by the Appraisers Association of America and "Dewar's White Label."

November, 1983:  Lecture on principles of appraising before the American Society of Picture Professionals, New York (Photo researchers and editors).

October, 1983:  Crocker Museum of Art, Sacramento, California.  Lecture on appraising and the art market.

1983-2001:  Organizer and participant in sixteen National Conferences of the Appraisers Association of America.

**Exhibitions**:

"Now Playing; Italian Film Posters from the Lawrence Auriana Collection", New York University, Casa Italiana Zerilli Marimo, 2005.

Series of Exhibitions of Paintings, Drawings and Prints for La Cassa di Risparmio, Rome, 1978-1980.

Series of Exhibitions of Paintings, Drawings and Prints for Christie's Rome, 1974-1978.

"Eighteenth Century Italian Prints" for the Metropolitan Museum of Art, 1971.


**Publications**:

*Overview of the Current State of the Art Market* 2012, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*Why Auction Estimates are not Insurance Appraisals*, (co-authored with Charles Wong), 2011, for Chubb Collectors (website and printed copy)

*Valuing Art Investment Funds: An Appraisers Viewpoint*, 2011, published by Fine Arts Wealth Management.

*The Role of Appraisers in the Process of Authentication and in Other Related Valuation Issues*, (co-authored with Charles Wong), 2011, included in Appraisal Studies Journal of the International Society of Appraisers.

*Overview of  the Current State of the Art Market* 2010, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*The Unique Aspects of Appraising Large Scale Works of Art, 2009*, included in Appraisal Studies Journal of the International Society of Appraisers

*Appraising Art in the Stratosphere:  The Dynamics of Steve Wynn's Elbow and Other Valuation Situations:* 2008, included in Appraisal Studies Journal of the International Society of Appraisers.

*Visual Artists Rights Act [VARA]*, 2005, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*Collections Management Systems for Collectors and Institutions,* 2004, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*All About Appraising:  The Definitive Appraisal Handbook,* 2003, published by Appraisal Institute of America, co-editor and principal contributor.

"The Pleasures and Perils of Buying in the Glamour Marketplace:  Gianni Versace, Jacqueline Onassis, Pamela Harriman, Andy Warhol and Others," *The Appraiser*, First Issue, 2002.

"Art Theft Forgery and Illicit Traffic:  The Appraiser's Perspectives" Rutgers University Press, New Brunswick, NJ – forthcoming.

 "Appraisal Standards for the Insurance Profession," co-author, published by the Inland Marine Underwriters Association, June, 2001 and distributed to insurance professionals.

**Publications (Cont'd):**

"German Ceramics of the 1920s—1930s," *The Appraiser*, First Issue, 2000.

"All About Appraising, Elements of a Correctly Prepared Appraisal: Clear Title," *Antiques and the Arts Weekly—The Newtown Bee*, January 31, 1997.

"All About Appraising, Elements of a Correctly Prepared Appraisal: Market Analysis," *Antiques and the Arts Weekly—The Newtown Bee*, October 18, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal: Determining Authenticity," *Antiques and the Arts Weekly—The Newtown Bee*, September 20, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal: A Practical Example of Blockage Discount," *Antiques and the Arts Weekly—The Newtown Bee*, May 24, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal: The Chagall Sale," *Antiques and the Arts Weekly—The Newtown Bee,* May 24, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal: Liquidation Value," *Antiques and the Arts Weekly—The Newtown Bee*, March 15, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal: Marketable Cash Value," *Antiques and the Arts Weekly—The Newtown Bee*, December 22, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal: Marketable Cash Value" *Antiques and the Arts Weekly—The Newtown Bee*, November 17, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part VII: Fair Market Value" *Antiques and the Arts Weekly—The Newtown Bee*, November 17, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part VI: Definition of Value", *Antiques and the Arts Weekly—The Newtown Bee*, September 8, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part V: Choosing the Most Appropriate Market for Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, July 21, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part IV: The Comparative Market Data Approach to Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, June 16, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part III: The Income Approach to Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, April 28, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part II: The Cost Approach to Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, April 7, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part I", *Antiques and the Arts Weekly—The Newtown Bee*, February 10, 1995.

"All About Appraising, How to Find an Appraiser", *Antiques and the Arts Weekly—The Newtown Bee*, January 13, 1995.

**Publications (Cont'd):**

"All About Appraising, What is an Appraisal", *Antiques and the Arts Weekly—The Newtown Bee*, December 9, 1994.

"Volatile Art World Increases Pressure On Appraiser's Job", *New York Law Journal*, March 21, 1994.

"Be Accurate, Not Sorry Standards Set for Fraud Liability of Dealers, Appraisers", *New York Law Journal*, November 8, 1993.

"Napoleon Takes Memphis", *The Appraiser*, Summer, 1993.

"The 'Flea Market' Phenomenon—An Overview", *The Appraiser*, November-December, 1992.

"Sotheby's Sells the Friedman Collection", *The Appraiser*, November-December, 1992.

"Using An Appraiser: What Lawyers Need To Know" *New York Law Journal*, March, 1991, (subsequently reprinted in the national <u>Law</u> <u>Journal</u>.)

"Artful Marketing: Sporting Art," *Spur Magazine*, September/October, 1988.

"Investing in Equine Art," *Horse Digest,* January, 1986.

Bimonthly articles on the New York art scenes for *Fine Arts*, an Italian magazine, 1981-1983.

Series of auction catalogues for Christie's Rome, 1974-1978.

Editor, *The Appraiser*, a monthly publication of the Appraisers Association of America on developments within the profession, 1982-2004.

"Eighteenth century Italian Prints," *Metropolitan Museum of Art Bulletin*, January, 1971.


**Education:**

Completion of all course requirements for Ph.D., New York University, Institute of Fine Arts.

M.A. New York University, Institute of Fine Arts.

Certificate in Museum Training, New York University, Institute of Fine Arts, offered in conjunction with the Metropolitan Museum of Art, New York (including a 6 month internship at the Victoria and Albert Museum, London).

B.A. City College of New York.

**Fellowships:**

Chester Dale Fellowship, Metropolitan Museum of Art, for preparation of the Print Department exhibition, "Eighteenth Century Italian Prints," 1971. A one year grant.

Ford Foundation Fellowship in Museum Training. A two year grant which provided for course work at the Institute of Fine Arts and internships in the Print Department of the Metropolitan Museum of Art and in the Print Department of the Victoria and Albert Museum, London, as well as extensive European travel for two summers.

Fellowship, Institute of Fine Arts, New York University for Ph.D studies. A one year grant.

Graduate Faculty Fellowship, New York University. A one semester grant.

New York State Regents Scholarship. A four year grant

**Professional Recognition:**

2005: Member Vetting Committee for the San Francisco Antiques Fair.

2003: Certified Instructor of *Uniform Standards of Professional Appraisal Practice*, designation given by the Appraisal Foundation, Washington, D.C. (recertified 2005, 2010, 2012).

1988: Certified Association Executive. Designation awarded by the American Society of Association Executives after an all day examination and evaluation of professional achievements.

1979: Accepted for membership, Appraisers Association of America. While Executive Director, served on the by-laws committee, responsible for current revisions; and wrote the methodological section and Old Masters Paintings section of the certification examination as well as taught the course on "How to Prepare for the Certification Examination."

1978: Designated Art Expert for the Italian Courts in Rome and elsewhere in Italy. ("Perito del Tribunale in Arte" by the Tribunale di Roma).

Quoted frequently in *The New York Times*, *International Herald Tribune*, *The Wall Street Journal*, *Art & Auction*, *The Economist*, *The Financial Times* et al. Press clippings available upon request.

Interviewed on CNN, The Today Show, ABC News with Peter Jennings, NPR, ABC News, New York et al.

**Attachment B**

**Zhang Report**

**REVIEW OF EXPERT WITNESS REPORT OF MICHAEL PLUMMER, ARVEST PARTNERS, dated July 8, 2014**

SUBMITTED TO VICTOR WIENER, VICTOR WIENER ASSOCIATES, LLC on July 25, 2014

PREPARED BY ZHANG YI

1. This report outlines the ways in which the Expert Witness Report of Michael Plummer of Artvest Partners, dated July 8, 2014 (***ARTVEST REPORT***) misinterprets Clare McAndrew's TEFAF Art Market Report 2014, to which I contributed as a co-author.

2. The Artvest Report identifies four major sectors of the fine art market: European Modern Art, Impressionist and Post-Impressionist Art, European Old Master Paintings, and Post-War and Contemporary Art. The Artvest Report compares the successes of these categories:

> Of these four sectors, three have declined in value since 2011"; "While record prices have been set and growth has been significant in the Post War and Contemporary ("PWC") sector, other sectors of the art market have been stagnant, and, as mentioned above, some have posted declines in turnover in the last two years." (Michael Plummer's Artvest report, pp. 7-8)

3. The art market is a supply-driven market. The reason for which Impressionist & Modern paintings failed to meet expectations is the lack of high-quality works on the market.

4. The charts on pp. 7-8 of the Artvest Report show that a sector's turnover depends on the volume of work in the sector. More works in a sale will likely bring more turnover. The lack of works to sell explains the decline of Old Master works, Impressionist & Post-Impressionist works, and works of Modern Art.

5. In the TEFAF Art Market Report 2014, McAndrew explains differences in the performance of Impressionist and Post-Impressionist sector relative to other sectors:

> The Impressionist and Post-Impressionist sector is now much smaller relative to Post War and Contemporary and Modern art, and its share of the fine art market was less than half that of Modern art in 2013 at 13%. Works by 15,300 artists were sold at auction in this sector, less than half that of the Post War and Contemporary sector and 10% less than the Modern sector. This can be explained to an extent by the increasing scarcity of Impressionist and Post Impressionist works: **for example, in 2013 just eight paintings by Paul Cezanne were sold at auction and only 25 by Claude Monet whereas hundreds of paintings by**

**artists such as Andy Warhol or Pablo Picasso were sold during the year.**
(Clare McAndrew, *TEFAF Art Market Report 2014*, p. 51)

6. In the TEFAF Art Market Report 2014, McAndrew explains differences in the performance of the Old Master sector relative to other sectors:

Old Masters is the smallest sector of fine art, with just 10% of the total value of sales. In 2013, like the Impressionist sector, it suffered from a scarcity of major works with the highest quality works appearing on the market less frequently. (Clare McAndrew, TEFAF Art Market Report 2014, p. 53)

7. The Artvest Report is incorrect about Christie's auction data for the Evening Sales of Impressionist & Modern art. The turnover of that section on May 6th was $285.9 million, and the estimate was between $244.5 million to $360.4 million.

8. Among four evening sales of Impressionist & Modern in 2014 (Chart 1), three of them were above their low estimate. Only one sold below its estimate, owing to the low quality of works offered. Art journalist Carol Vogel noted: "Top-flight Impressionist and Modern works are far harder to come by than choice contemporary works. And as was true at the sales last month in New York, both Christie's and its arch rival, Sotheby's, had to struggle to find material." Furthering the point, Vogel quoted prominent New York art dealer Dominique Lévy on the quality of the works in the sale: "'It was day-sale material,' referring to the less-expensive daytime auctions." (Carol Vogel, "At Christie's London Auction, Little Action", New York Times, June 24th)

CHART 1 Four Evening Sales of Impressionist & Modern in 2014



Source: VWA based on Christie's & Sotheby's Auction Data

9. On June 24th, 2014, Sotheby's Sale of Old Master & 19th Century Paintings & Drawings made $11.1 million, the highest total for a sale in this category in France in the last 20 years. In their press release for this sale, Sotheby's said that the sale contained "a refined choice of rare artists and powerful, high-quality images," demonstrating that great works in this sector command strong prices. The performance of this sector depends not only on the quality of works, but also on verifiable authenticity and provenance, among other factors.

10. On July 9th, 2014, Sotheby held an Old Master & British Paintings Evening Sale In London. The sale made $117.13 million, above its high estimate of $116.79, the highest total the company has earned for the category in London, while a day before Christie's faced what art dealer Richard Feigen called "bloodbath" in the same category. The reasons for this contrast are evident in Scott Reyburn's explanations in a *New York Times* article.

    A. Brand-name artists are an issue:

        "There is an issue of branding here," said Andreas Pampoulides, head of fine arts and business development at the Mayfair branch of the Spanish dealers Coll & Cortés. "There aren't so many brand artists in Old Masters, but when they do appear, they can sell for stratospheric prices." （Scott Reyburn, "For Old Masters, It's All About the Name," New York Times, July 11th, 2014）

    B. Issues of quality and provenance are important:

        Sotheby's had the edge on this occasion thanks to quality paintings from four prestigious private collections, including the English aristocratic families of the Earl of Warwick and the Duke of Northumberland. (Scott Reyburn, "For Old Masters, It's All About the Name," New York Times, July 11th, 2014)

    C. The subject and quality relative to expectations for a certain artist are relevant:

        […] Christie's included a painting [*Saint Praxedis*] catalogued as the work of Johannes Vermeer, 17th-century Holland's most coveted painter, despite debate over its authorship. […] At the sale, the painting attracted little competition and was bought for $10.6 million; including fees by an unidentified Asian bidder in the room, and the painting's low estimate is $10.26 million "Collectors remained skeptical," the London dealer Charles Beddington said. "It wasn't a subject you want from Vermeer." (Scott Reyburn, "For Old Masters, It's All About the Name," New York Times, July 11th, 2014)

11. The Artvest Report states: "Both the Impressionist & Modern Paintings and PWC sale had significant and desirable works of art with many that had not been on the market for decades, yet the Impressionist & Modern paintings sale still performed below expectations and estimates" (Artvest Report p. 8, #24 a.)

12. There is no evidence showing that significant and desirable works from the Impressionist & Modern sector performed below expectations or estimates. On the contrary, when a significant and desirable work appears, it is much more likely to perform above expectations, and at least above its low estimate.

13. In June 2014, at Sotheby's Impressionist & Modern Evening Sale in London, Monet's painting *Nympheas* made $54 million, well above its high estimate of $50.4 million. This painting failed to sell in 2010 because of a very high estimate of $44.3 million to $59.1 million. According to our experience, if a work has been bought in, it is unlikely to appear on auction for the next five years. This painting appeared on auction again after four years and achieved a price above its high estimate, even exceeding the low estimate four years earlier and showing clearly that if a work is highly desirable and significant, collectors will pay for it. This also shows that high-quality work is scarce in this sector.

14. The Artvest Report identifies the emergence of new art markets as an exceptional occurrence:

> The significant growth in the size of the art market from 2002 – 2011 is a once in a lifetime event (due to the sudden addition to the global art economy of Russia, China, India and other countries that previously had not been active art collectors). This burst of growth is not likely to be repeated over the next five years. In fact, with growth now concentrated almost exclusively in the PWC sector, I estimate that excluding a price disruption in this sector (see below), growth of the art market will remain choppy over the near to mid-term in all other sectors other than PWC." (Michael Plummer's Artvest Report p. 10, # 25, b)

15. We cannot conclude that the growth of the art market from 2002 to 2011 is a once in a lifetime event. Another art market boom driven by the Japanese economic boom took place less than 30 years ago, from 1985 to 1990, during which period the size of art market tripled.

16. The size of art market depends highly on wealthy people. From 2001 to 2013, there was a continuous growth of the number of high-net-worth individuals (HNWI) and world wealth. There is considerable reason to expect global wealth to grow at an accelerated pace in the coming years.

17. McAndrew discusses emerging markets in the TEFAF Art Market Report 2014:

Each year, emerging markets are increasing their importance in the global wealth hierarchy and have been growing at faster rates than more developed markets, a trend that is expected to continue. Between 2000 and 2013, emerging markets nearly doubled their share of global wealth from 12% to 21%." (Clare McAndrew, TEFAF Art Market Report 2014, p. 81)

18. In an economy that is facing easy monetary policy, people intend to allocate a great share of their wealth into tangible assets, such as real estate, art etc., to caution against uncertainty or further inflation. Indeed, the size of the art market has benefited heavily from the economic boom of Russia, India, and especially China. However, considering that the Chinese art market is largely a domestic market with very little Western artwork traded in Mainland China, its art taste should be further separated from that of the Western world. Before 2013, Chinese collectors were not very interested in Western artworks. Also, Asian artworks comprise only 3% of DIA's collection. Taking that into account, we should remove the turnover of the Chinese art market from the global art market (CHART 2). Doing this, we can see that the size of the global art market was far from its second highest peak in 2008, even further from 2007, its highest peak. From this, we can see great potential strength in the future. Since 2013, Chinese collectors have shown great interest in Western artworks. Experts estimate that there are currently only about thirty major collectors of Western art in Mainland China. Serious Chinese collectors of Western art spend considerable amounts of money. For example, Chinese collector Zhang Lan spent $29.145 million on Andy Warhol's Little Electric Chair and Martin Kippenberger's Untitled on May 12th, 2014 at Christie's auction "If I Live I'll See You Tuesday: Contemporary Art Auction."

19. McAndrew also notes the recent increase in Chinese collecting interest in Western art:

Sotheby's reported that since 2010, the number of Chinese clients bidding for non-Chinese works of art has increased 54%, with about 530 collectors from Mainland China spending $378 million on Western works during the year. At Christie's, registrations to bid at auction in London and Hong Kong from Mainland Chinese buyers have doubled.72 In November 2013, Wanda Group, one of China's biggest property developers, attracted much public attention when it bought a Picasso work, Claude et Paloma, for $28 million at Christie's in new York. Various media sources also reported that a Chinese collector bid for the record-breaking Francis Bacon triptych up to $120 million." (Clare McAndrew, TEFAF Art Market Report 2014, p. 201)

Chinese collectors have entered the Western market slowly and with caution to date. However of the galleries interviewed, 80% felt that Chinese collectors were becoming more interested in foreign art." (Clare McAndrew, TEFAF Art Market

Report 2014, p. 201)

20. The recent increase in Chinese collecting interest in Western art has also been reported in the mainstream press. Chris Michaud has written about it for Reuters:

> Asian buyers nabbed at least two of the sale's top 10 lots, including "Nymphéas," in a category that was once the near-exclusive purview of U.S. and European collectors. (Chris Michaud, "Christie's NY has its best Impressionist, modern sale since 2010 Reuters, May 6th)

> Lampley said growing interest from Asians reflected "a growth in the Asian (art) market generally," as well as the auction house's relatively new presence in Mainland China. (Chris Michaud, "Christie's NY has its best Impressionist, modern sale since 2010," Reuters, May 6th)

21. There is no evidence to validate the Artvest Report's suggestion that the "growth of the art market will remain choppy over the near to mid-term in all other sectors other than PWC." Nor is there any sign of validity to the Artvest Report's point: "As a consequence of this heightened focus of collectors on the PWC sector, I believe the sector could soon be reaching a "breaking point," (Artvest Report, p. 11, 26.)

22. From CHART 3, we can see that the average price of PWC has not had a dramatic boom from 2011 to 2013. The increase of its average price was mild. Also, the average price of the PWC sector was lower than that of the Modern Art sector and the Old Master sector. Except for Impressionism & Post-Impressionism, all other sectors have had mild increases.

23. Financially, a market can be called "over-heated" or "in a bubble" simply because the growth in high-quality assets of the market can dramatically affect the low-quality assets and, in this case, push up the price. In the PWC scenario, these trends were not evident. Even blue-chip artists breaking their records repeatedly did not affect second- or third-tier artists notably.



Source: VWA with data from Arts Economics



Source: VWA with data from Arts Economics

24. The Artvest Report discuss the impact of the financial crisis of 2008-09 on the art market:

> When a market sector or the entire market "crashes," as it did in the Autumn Season in 2008, it creates an illiquid marketplace where values often fall by as much as 50%, and property, especially that of the highest caliber, becomes either difficult to sell, and/or sells for a fraction of its previous value. From the previous market peak in 2007, to its nadir in 2009, the fall in sales was 54.6%." (Michael Plummer's Artvest Report p. 10)

25. When facing systematic economic risk, the art market will definitely be affected. However there is no evidence showing that the value will fall sharply. The turnover of the entire art market was falling deeply simply because collectors did not want to sell their collections in a decreasing market, and there were less volumes for trade.

Total Global Art Sales and Volumes 2003 to 2013

CHART 4



Source: VWA with data from Art Economics

26. CHART 12 in the Artvest Report shows that the buy-in rate nearly doubled in Nov. 2008. However, the high buy-in rate owed in large part to the collapse of the Emerging Asian Market and some "superstar" living artists.

27. Artprice Art Market Trends 2008 identifies buy-in rates for that year:

In 2008, the bought-in rate for works estimated above $100,000 was 37.75% compared with 40.87% for those valued at between $10,000 and $100,000. At the Christie's and Sotheby's October / November sales of Modern and Contemporary Asian art in Hong-Kong 35% of the works remained unsold. On 30 November, Christie's Asian art sale, there are 44% of the works had to be bought in. (Artprice Art Market Trends 2008)

28. Artprice Art Market Trends 2009 shows the effects in the following year:

Gupta, a figure-head of the Indian avant-garde, posted an annual total down 95% (from $15.1m to $627,000). Takashi Murakami, guru of the new Japanese art scene, saw his auction revenue divided by ten ($3m in 2009 vs. $32m in 2008). Damien Hirst's revenue total was only 1/14th of its 2008 total. The big winner of the last manifestation of the acquisitive fever that consumed the market during its

speculative ascent - with no less than 65 results above the $1m line in 2008 - signed only 2 seven-figure results in 2009. The year was also quiet for Jeff Koons, an- other major star of the Contemporary scene, whose revenue total dropped from $89m to $28m and whose prices contracted by 39% (2007-2009). (Artprice Art Market Trends 2009)

29. Artprice Art Market Trends 2009 discusses the Chinese art market that same year:

Likewise, the revenue totals of Chinese contemporary artists who shot to the top of the market in record times, were also substantially impacted by the crisis: Wang Guangyi's total shrank by 75% and Zhou Chunya's by 57%. Liu Ye's total contracted by 65%, Yan Pei-Ming's by 80%, Yue Minjun's by 84%, Zhang Xiaogang's by 86% and Liu Xiaodong's by 88%. (Artprice Art Market Trends 2009)

30. In 2009, we can see that the buy-in rate went back to normal, mostly because the auction houses were very cautious in selecting lots, and collectors did not want to sell their works during a recession.

31. Even in a recession, we can see that there were high-quality works from the Old Master sector, Impressionism & Post-Impressionism, and even the Modern sector and Post-War sector to sell. This trend is detailed in Artprice Art Market Trends 2009:

In the first quarter of 2009 there were 80 results above the $1m line (half the number posted in the 1st quarter of 2008) of which 30 came from the Pierre Bergé/ Yves Saint Laurent sale, suggesting an exceptionally dynamic market for museum quality works. This happened just as Wall Street was posting its lowest level for 12 years (S&P 500 at 743.33 points). (Artprice Art Market Trends 2009)

The first big event in 2009 was Sotheby's Old Masters sale in New York. The catalogue was still large (289 lots) but demand had become very selective. The result was an unsold rate of 45%. The millionaire collectors were however still in the game and they bid a particularly rare work to above $10m: the best result of the 29 January sale was $11.5m for Joseph Mallord William Turner's The Temple of Jupiter Panellenius restored ($500,000 short of its low estimate). (Artprice Art Market Trends 2009)

32. The 41% buy-in rate in November 2008 was the consequence of the financial crisis, which was possibly a once-in-a-lifetime event. The last financial crisis of such a magnitude was in 1929, and it is unlikely to happen in the next five years.

33. The Artvest Report identifies the role of Sotheby's and Christie's in the market:

At the higher end of the market, Sotheby's and Christie's are the preferred venue

for selling to achieve maximum sales value, as they have the greatest global reach amongst collectors and control over a third of the international auction market." (Michael Plummer's Artvest report, p. 14)

34. While it is true that Sotheby's and Christie's dominate the high end of the art market, the art market is a very diverse market, with numerous venues unique advantages. For example, Phillip's is strong for emerging artists, and Poly Auction and Guardian Auction are strong for traditional Chinese paintings.

35. Artprice Art Market Trends 2010 shows Phillip's strengths relative to any auction house:

> The auctioneer (Phillips) also posted seven new records on the same day - all above the million-dollar line – for Felix Gonzalez-Torres, Cindy Sherman, Daniel Buren, Lee Lozano, Robert Morris, Rudolf Stingel and Thomas Schütte. (Artprice Art Market Trends 2010)

36. Considering the market capacity, it is wise to use multiple auction channels to deal with different sectors of works.

37. The Artvest Report attempts to demonstrate collecting disinterest in certain collecting categories:

> A significant segment of DIA's collection is in areas that have fallen out of favor with collectors and that are underperforming their market peak in 2007, specifically American Art pre-1950 (14.6%), Old Master and 19th Century European Paintings (28.1%), Impressionist & Modern Art (23.8%), for a total of 66.5% of the collection." (Refer to Section IV.) (Artvest Report, p. 24)

38. There is no evidence showing that the sectors identified by the Artvest Report "have fallen out of favor with collectors."

39. The Artvest Report quotes a line chart by Mei Moses Art Index in an effort to proved his conclusion. However this data does not prove the conclusion, because it is based on a very limited data sample. The Mei Moses Art Index is based on data from works that have repeat sales records in Christie's and Sotheby's, and so, there are only a few thousand samples that qualify for its indices. Every year tens of thousands of works are sold through auctions and private dealers, so this is a very narrow sample for the art market, and it cannot represent greater art market trends. For example, from 1990 to 1991, the art market retracted significantly, but the Mei Moses Art Index still shows a mild increase for that period.   Also, the methodology of the Mei Moses Art Index does not accurately reflect the importance of individual artists or the quality of individual artworks, which are critical matters for sales. Also, the line chart does not show negative returns on each sector; we can only see positive returns on all sectors.

40. The Artvest Report discusses the effects of offering a large volume of work:

> Selling a large block of property into a market that exceeds its liquidity or capacity is a high risk strategy. Even the most liquid of the sectors, PWC and Impressionist & Modern, have capacity limitations." (Artvest Report, p. 30)

41. While capacity limitations may apply, such limitations are based on the amount of wealth held by HNWI and the number of collectors in those areas. Using sales values based on Christie's and Sotheby's to calculate that limitation is speculative and narrow.

Submitted By:    Zhang Yi

**Attachment C**

**Barth Report**

**REVIEW OF EXPERT WITNESS REORT OF MICHAEL PLUMMER, ARTVEST PARTNERS LLC, dated July 8, 2014**

SUBMITTED TO VICTOR WIENER, VICTOR WIENER ASSOCIATES, LLC on July 24, 2014

PREPARED BY JANNETTE M. BARTH, PH.D., PEPACTON INSTITUTE LLC

BACKGROUND:

Pepacton Institute LLC (the "Company") was retained by Weil, Gotshal & Manges LLP ("Counsel") in connection with Counsel's representation of Financial Guaranty Insurance Company ("the Client") to assist Victor Wiener Associates, LLC (VWA) in the preparation of an appraisal report of works of art in the collection of the Detroit Institute of Arts (DIA).  I am an Economist and Managing Director at the Company.  I have extensive experience concerning economic issues related to art valuation.   In addition to having multiple degrees (B.A., M.A. and Ph.D.) in economics, I have a Certificate in Personal Property Appraising from New York University and a Certificate in Fine and Decorative Art from Sotheby's Institute of Art. I have consulted on many art appraisals and have served as an expert witness on numerous art valuation cases. I have taught both undergraduate and graduate courses in economics at several colleges and universities, and was a senior faculty member, teaching art economics and finance, in the graduate art business program at Sotheby's Institute of Art. I have authored articles on blockage discount and regularly lecture on the topic. In addition to specific work in the art market, I have over 35 years of experience conducting economic analysis in various sectors. A full CV is attached. The Company is being compensated at the rate of $300 per hour for my time.

In connection with the Company's engagement, I prepared this written review of a valuation conducted by Artvest Partners LLC.

Neither I nor the Company has a financial interest in the DIA works of art; neither is affiliated with an auction house, art dealer, or art investment fund; and neither is an adviser regarding investments of any kind.

In connection with this review, I was provided with copies of the following documents:

   (1) Artvest Partners LLC, Expert Witness Report of Michael Plummer, July 8, 2014, with Exhibits A through G.

(2) Houlihan Lokey, Catalog of Information Concerning Artwork Housed at
    Detroit Institute of Arts, with Christie's Appraisal attached as an Appendix.

In addition, the following document was reviewed:

TEFAF 2014 Art Market Report

This review report does not value any of the works in the DIA collection. The
appraisal firm, VWA, is solely responsible for final valuation figures. This report
provides only a review of Artvest's methodology applied in the valuation of works in
the DIA collection, with particular attention paid to the economic assumptions
Artvest uses in arriving at its conclusions. This report is intended to assist VWA in
its own valuation of the works.

SUMMARY OF FINDINGS:

- While it is recognized that this valuation assignment is challenging due to its
  size, complexity and short deadline, there are a number of elements in the
  Artvest report that indicate that the valuation presented by Artvest is
  inaccurate.
- Artvest discusses a number of economic factors in the report, and the
  presumed relevance of these economic factors is unsubstantiated.
- Artvest has used questionable valuation methodology and unsupported
  assumptions in its valuation.
- It appears that the valuation conclusions stated by Artvest are unrealistically
  low.
- While the Artvest report frequently references the TEFAF 2014 Art Market
  Report, it omits relevant findings in the TEFAF report and misinterprets
  other findings.
- Artvest accepts and relies on Christie's valuations for a small portion of the
  entire collection, but there are concerns regarding Christie's valuations.
- The Artvest report does not provide sufficient information or justification for
  its valuation methodology or many of its assumptions.
- Artvest appears to be unclear about the concept and application of blockage
  discount.
- Artvest applies discounts to the final valuation, without offering sufficient
  supporting evidence that such discounts should be applied.

This review of the Artvest valuation report is organized into the following five
sections:

Use of the TEFAF report
Reliance on Christie's Valuation
Valuation Methodology

2

Analysis and Application of Discounts
Impacts of Artvest's Assumptions on Valuation

USE OF THE TEFAF REPORT:

While the Artvest report frequently references the TEFAF report, it disregards several key findings.  In fact, in some instances, the conclusions drawn by Artvest appear to be counter to those of the TEFAF report.

(a) Performance of the Art Market by Sector as Interpreted by Artvest

Artvest's paragraph no. 23, Page 7, states,

> *Four sectors of the art market constitute 98% of the value of the fine art market: European Modern Art, Impressionist and Post-Impressionist Art, European Old Masters Paintings, and Post-War and Contemporary Art.  Of these four sectors, three have declined in value since 2011.*

This statement is somewhat misleading.  It is clear from the charts in TEFAF and reproduced in the Artvest report, that value and volume both peaked in 2011.  The fact is that 2011 appears to be an outlier.  Artvest does not point out that the charts show that for all three sectors referenced, European Modern Art, Impressionist and Post-Impressionist Art, and European Old Masters, the 2012 and 2013 estimates of volume and sales exceed pre-recession levels.

While it is widely recognized that the Post-War and Contemporary Art Sector has been the most celebrated in the marketplace of late, this does not mean that the others have been in decline.

In paragraph no. 24, Artvest cites two recent evening auctions to support its conclusion regarding the Post-War and Contemporary Sector relative to other sectors. It is highly suspect to rely on only one or two observations when estimating or forecasting.

In paragraph no. 37, Artvest applies the discussion of the market performance of the major sectors to the DIA collection.  Artvest states,

> *"A significant segment of DIA's collection is in areas that have 'fallen out of favor' with collectors and that are underperforming their market peak in 2007, specifically American Art pre-1950 (14.6%), Old Master and 19th Century European Paintings (28.1%), Impressionist & Modern Art (23.8%), for a total of 66.5% of the collection."*

And yet, the TEFAF report states on Page 37 that the Modern Art sector "has more than doubled in value since the low point in 2009, and has grown by over four times in ten years."

Regarding Impressionist and Post-Impressionist, the TEFAF report states on Page 38,

> *This sector peaked in 2011 when total sales reached € 1.7 billion, an increase of over 140% form their low point in 2009. However, both values and volumes dropped in 2012 (by 26% and 14%, respectively), before returning to growth in 2013.  Sales grew 9% in value year-on-year reaching € 1.4 euro billion, below the peak of 2011, but above any level previously recorded since 2000.*

And regarding Old Masters, the TEFAF report states,

> *Old Masters is the smallest sector of fine art, with just 10% of the total value of sales.  In 2013, like the Impressionist sector, it suffered from a scarcity of major works with the highest quality works appearing less frequently on the market.*

If some major works of the highest quality, with impeccable provenance from a highly regarded collection such as DIA, appeared on the market, it is quite likely that there would be great interest. It is suspect to claim that these major sectors have "fallen out of favor."

Regarding the large, very popular and sales record holding Post-War and Contemporary Art Sector, Artvest suggests that this Sector has reached a peak. With the general economy improving, the continually increasing wealth at the high end of the income distribution worldwide, and continuing increased interest in art as investment by financial experts such as hedge fund managers, it is far from clear that the Post-War and Contemporary Sector has reached its peak.

(b) Key findings of TEFAF Report More Optimistic than Artvest

Several important findings listed in the TEFAF report, even included in its list of Key Findings featured at the beginning of the TEFAF report, are not mentioned in the Artvest report. These TEFAF findings give a much more favorable impression of the condition of the general art market than is implied in the Artvest report.

The first three key findings listed in the TEFAF "Key Findings" are the following:

Key Finding 1: "The international art market reached € 47.4 billion in total sales of art and antiques in 2013, close to its highest ever recorded total, and advancing 8% year-on-year."

Key Finding 2: "The volume of transactions in the global market also increased in 2013, but by less than the growth of value, indicating that a significant part of the uplift of the market was due to higher priced works, rather than simply more works sold."

Key Finding 3: Sales in the US in 2013 increased by 25% in value year-on-year, confirming its position as the key center worldwide for sales of the highest priced art.

(c) Relevance of TEFAF findings to DIA Valuation

Artvest's references to the TEFAF report are included in this review only because the Artvest report appears to rely heavily on the TEFAF report.

The reality is that basing an appraisal on general art market trends can result in inaccurate valuations.

The DIA collection is noted to be exceptional. It is highly unusual for such a collection to be offered on the market, and the general art market trends that are analyzed in the TEFAF report and are reflected in various price indices, such as Mei-Moses (also referenced by Artvest), are not at all applicable to valuing such a unique and highly regarded collection.

As Artvest focused on such general analyses, a few words on their accuracy and usefulness should be mentioned.

Many sales are not reflected in such indices or reports. Even the TEFAF report states on Page 24,

> *The transparency of prices and the public nature of sales data in the auction sector have made it the basis for much of the analysis and research into the art market. However even auction houses now increasingly involve themselves in private sales and online selling, both of which are often not in the public domain.*

It goes on to state that "in 2013 private sales at Christie's increased 18% year-on-year to $1.2 billion or 17% of their total sales in 2013. Sotheby's private sales grew 30% to $1.2 billion, also representing 17% of total sales."

Articles in the press that compare art price indices to other more traditional investments can be interesting, however, art price indices are generally not helpful in appraising art. They are calculated on the basis of repeat sales at auction. Of course, other price indices, such as the Consumer Price Index or the S&P 500, etc., are also based on volume and price over time, but each share of common stock in a given corporation, say for example Microsoft, has identical value. Each work of art, even by the same artist, is likely to have a unique value. In the case of artworks, the

5

value depends on many factors, including provenance, style, rarity, condition, medium, size, frame, etc., and these are not reflected in the art price indices.

In addition, it is likely that any index of art prices based on repeat sales has an upward bias because many works that are sold at auction will return to the marketplace only if the value has increased. It is likely that, if at all possible, an owner of a highly valued work of art will attempt to wait out a down market. An art price index, thus, may not reflect the works that drop in value or even become unsalable.

## RELIANCE ON CHRISTIE'S VALUATION

While the methodological approach to valuing the large quantity of works is not explained clearly in the Artvest report (more on this below), it is clear that much of the valuation is based on Christie's appraisal. Christie's had been retained to value 2,773 works in the collection, which Christie's was told represented the works purchased by the City of Detroit (COD). Artvest has accepted Christie's valuation for these works. In addition, Artvest applied average values by sector from the Christie's valuation to assign values to a large quantity of remaining works (57,181 works).

Christie's valuation of the 2,773 COD works was given as a range, from $454 million to $867 million.

It is a concern, but not surprising, that Christie's valuation of fair market value reads more like an auction catalog than a qualified appraisal. Normally, a qualified appraisal discusses and compares comparables, especially for the high value works. I did not see a discussion of comparables associated with the Christie's appraisal. In addition, the wide range of values given is highly unusual in a qualified appraisal.

It is not unusual to have a wide range of estimates for certain individual works in an auction catalog, but in the end there is one hammer price.

The value range presented by Christie's where the upper end of the range is almost double the lower end, is highly imprecise. And the fact that Artvest relies on this wide range of values to apply averages to the bulk of the works, causes the total valuation of the works by Artvest to be highly suspect.

## VALUATION METHODOLOGY

It is impossible to review in detail the valuation methodology used by Artvest because there is insufficient support given for the value determinations.

Tables 1 and 2 of the Artvest report appear to be intended to summarize the methodology used by Artvest in valuing the works. However, there are few details provided.

As discussed above, Artvest relied on the Christie's valuation for the works purchased by COD. The Christie's valuation is straightforward, rather like an auction catalog with high and low estimates. (Again, there is no discussion of comparables by Christies.)

The following is my understanding of Artvest's approach to the valuation.

Artvest grouped COD works valued by Christie's into two groups:
**Group 1.** High value COD works that were appraised by Christie's for greater than $750,000 (68 items); and **Group 2.** COD works appraised by Christie's of lower value, that under $750,000, including property for which they assigned limited or no value (1,654 with value, 1,038 with limited to no value, and 13 that were combined in Phase III.)

Artvest then created three additional groups as follows: **Group 3.** High value Non-COD works in the DIA works (of works insured for greater than $1 million) totaling 350 works; **Group 4.** Another 73 works based on a personal tour of the museum; and **Group 5.** Balance of the Collection.

The 350 works in Group 3 are listed, in spreadsheet form, attached as Exhibit G to the Artvest report. It appears that each value is based on a range of estimates from an auction catalog and not the hammer price, as is normally the case. In addition, while there is a column titled "summary of valuation support," in many cases what appears in this column is, "Summary not provided." Based on Exhibit G, approximately 50% of the works in this section were valued on the basis of comparables. Comparables are omitted for the other 50% of the works.

There are no comparables at all for the items in Group 4. The author states, "Based on a tour of objects on view in Museum in June 2014, another 73 works I determined to be High Value, which are likely to have values in the range of $750,000 or higher." The author simply states, "As these were discoveries late in the process, I have put an approximate valuation on these items and will provide a fuller evaluation and documentation in a supplement to this report." [Note that I have not received a supplement, so this portion of the valuation cannot be reviewed, other than to say that the value assigned here is arbitrary.]

Values for the works in Group 5, the balance of the works, or 57,181 works, were based on Christie's valuation. The valuation of Group 5 is impossible to review due to the fact that insufficient details are provided. It is stated that "the balance of the DIA's collection was evaluated by sector using the sample valuation data of the COD works appraised by Christie's with a low value of at or below $750,000, and applying an average price, sector by sector, based on that data."

The details, however, are not provided, so the reader does not know what are the average prices, sector by sector, that were applied. The reader further does not know the number of items in each sector. If a series of calculations was performed, a summary of such calculations should be provided, perhaps in the form of a spreadsheet, so the reader can fully understand and assess the methodology. It is worrisome that almost $1 billion of value, representing 57,181 works, is based on non-transparent methodology.

On Page 19, the Artvest report states that for works with a value below $5,000, a value of zero is attributed. This seems shortsighted in light of the large number of works in the collection (60,000). Obviously, if there are even 1000 works with a value of $5,000, the cumulative value is five million dollars, not an insignificant value. While the author claims that neither Sotheby's nor Christie's would want to sell these works, there are many other market places for works of this value. And even Sotheby's recently announced the formation of a partnership with Ebay to sell more works online. This may result in far more sales by Sotheby's at the less than $5,000 level.

Discussion of online sales in the TEFAF report states (page 28),

> The main focus of online companies has been on the middle market for authentic, original works worth between a few hundred euros to a maximum of around € 100,000…While worries over provenance and authenticity have tended to keep the online market focused on lower price points, this ceiling is gradually shifting upwards.

The TEFAF report estimates that "online sales in the art market could grow at a rate of at least 25% per annum, meaning that they could exceed 10 billion euros by 2020."

An effort should be made to determine how many works are valued at $5,000 and below before simply assigning a value of zero. Again, many works sold at the $5,000 level may result in significant revenue. There is no evidence that either Christie's or Artvest attempted to inventory these works.

Using non-transparent methodology, omitting comparables, and making arbitrary unsupported assumptions to support valuation conclusions for such a large and important collection cause the reader to lack confidence in the Artvest valuation.

ANALYSIS AND APPLICATION OF DISCOUNTS

Perhaps the most curious statement in the entire document is paragraph no. 39 on page 26.

*In this section, I anticipate and quantify various different potential factors that, based on either current market conditions or historic precedent, are likely to have a financial effect on the sale of the art from the DIA collection. Many of these factors are not taken into account in any standard appraisal or fair market valuation. I also apply the discount factors for various sale scenarios.*

I have been consulted as an economist on art appraisals for the past 20 years, representing well over one hundred appraisals and hundreds of thousands of individual works of art making up these appraisals. I have never heard such a statement from a qualified appraiser.

A well documented, thorough valuation, whether is it based on marketable cash value, fair market value, or other, considers each and every factor that may influence a value conclusion.

In fact, in a fair market valuation of a large group of works, it is imperative that the application of a blockage discount be considered. There is no question that the appraisal assignment at hand involves a large group of works. There are over 66,000 works in the DIA collection.

The Artvest report discusses various separate discounts as follows:

1. Immediate liquidation discount
2. Blockage discount
3. Discount for unsold rates
4. Discount for not selling through Sotheby's or Christies
5. Discount for market capacity
6. Discount for a longer term sale process
7. Discount for a market backlash
8. Discount due to a PWC market crash

I maintain that at least four of these discounts would be encompassed by a properly executed blockage discount analysis.

The author references a narrow definition of the concept of blockage discount, and states that "the IRS's current practice of using a discounted number has ranged from 25% to 46%." The author has referenced dated tax cases and appears to be behind the times with respect to the application and determination of an appropriate level of a blockage discount.

I have been involved in valuation cases in which the percentage discount has been as low as 5% and as great as 99%. I have been consulted on blockage discount analysis for IRS appraisals, both for estate and for gift tax purposes, for insurance damages claims, for litigation involving injured parties, for gallery valuations, and more.

A blockage discount would be applied if immediate liquidation were required of a relatively large block of works.  So, a liquidation discount would be covered by a proper blockage discount analysis.

The concept of blockage discount theoretically refers to the discount resulting from a large block of similar items being put on the market at one time, thus depressing the value. The concept, originally used in valuing securities, is relevant to valuation in the art market when a large block of similar works of art is put on the market at one time, or must be valued as of one point in time. Blockage discount must be considered whenever a mass appraisal (as defined by Standard 6 of the Uniform Standards of Professional Appraisal Practice) is conducted. It is especially relevant in valuing the estate of an artist or collector where the estate is comprised of many similar works. However, it is applicable in many other cases as well, as shown above.

If it is determined that a blockage discount should apply, then various factors must be considered.  Wherever possible, the following factors are considered in the determination of blockage discount and/or the base valuation before a discount is applied:

- The reputation of the artist and the market's acceptance of the artist's work.
- The likelihood of future markets for the artist's work
- The date of the work relative to the artist's most popular style.
- The quality, size and condition of the work relative to the artist's best work.
- The location of the works relative to the location of the best marketplace for the works.
- The stability or permanence of the artist's reputation and the related expectation of appreciation or risk of depreciation of the works until they are likely to be sold.
- The length of time necessary for the market to absorb all of the work
- The determination that the works are part or all of a series by the artist
- The expected health of the art market and the general economy, especially the expected rate of price increase during the period of time it would take to sell the works.
- The carrying costs associated with selling the works over a long period of time, such as storage, insurance, maintenance, display and marketing.
- The opportunity cost of bulk purchase and long term resale of the works, or the relative returns that can be expected from alternative investments.
- The provenance and specifically, whether the artwork is currently the property of the artist or the artist's estate.
- Whether there are known collectors of these works who may be willing to buy a large block of these items at a non-discounted value.
- Sales before and after the date of valuation.

In determining an appropriate level of blockage discount, one would consider the impacts of an immediate liquidation, the impacts of the time value of money and thus a present value concept, and the impacts of the ability of the market to absorb the works given market capacity (or how many similar works can typically sell at a given time).

Artvest considers a separate discount for market capacity. Clearly, a blockage discount encompasses this consideration by taking account of how long it would take for the market to absorb the works.

In the case of the DIA collection, the application of a blockage discount does not seem appropriate. Even with limited marketing and far less than full information, I understand that there are indications of interest pending for the purchase of the full collection. In addition, as Artvest has astutely pointed out, the collection is highly important, describing it as "world class."

On Page 25, Artvest affirms the importance of the collection by stating, "A collection of the quality and range of the art in the DIA would be impossible to recreate in current times." And VWA has identified that there is general agreement among experts that the collection is extraordinary and one of a kind.

It is possible, upon a detailed inventory and valuation of the works, that some individual categories of works may be identified for which the application of a blockage discount would be appropriate. However, there is insufficient time to do this for the expansive collection, and in light of the importance of the overall collection, I would not recommend that a blockage discount be applied.

Again, four of the discounts suggested by Artvest (immediate liquidation discount, blockage discount, discount for market capacity, discount for a longer-term sale process) are encompassed by the concept of blockage discount, and it seems that the application of a blockage discount would not be appropriate in this case.

Turning to the remaining discounts suggested by Artvest, they include a discount for unsold rates, discount for not selling through Sotheby's or Christie's, discount for a market backlash, and discount due to a Post War and Contemporary Sector market crash.

Artvest applies a discount for "unsold rates." In some cases, works are unsold simply because the auction estimate was too high. One must be cautious in making assumptions based on unsold rates. A comprehensive appraisal would consider unsold rates if the type of work being valued had significant unsold works. In fact, in calculating blockage discount, I often consider works that actually sell as opposed to being offered for sale and remain unsold. Again, however, in the case of this collection, the assumptions should be that any works to be sold at auction are given the correct estimate, and that they are likely to sell.

Artvest points out that the likely marketplaces for works are Sotheby's and Christie's. They point out that the highest valued works are most successfully sold at these two major auction houses. As far as a discount for not selling through Sotheby's or Christie's, in my opinion the collection is so large that if it were to be sold, it would be most appropriate to distribute it among many auction houses, of which Sotheby's and Christie's are only two. Of course, the works should be consigned to the various auction houses on the basis of each house's experience and success in selling each type of work. The logical way to sell the works is to distribute the sales across various auction houses, and time the sales well, as a successful high profile sale from an important collection can encourage a higher price for a lower valued piece from the same collection.

I also think that a discount for a market backlash is inappropriate. Again, the collection is highly important and visible, and any potential buyer would know the reason for the sale. The DIA potential sale is beyond the control of the DIA, and potential buyers will know this. VWA has compiled many examples of public collections selling works without Artvest's so-called backlash discount. In some cases, the provenance of having been part of an important public collection may increase the value.

Regarding a discount for an impending Post-War and Contemporary Art market crash, a qualified appraisal values the collection as of a single date, the date of valuation. There has not been a Post-War and Contemporary art market crash as of the date of valuation. And there is no evidence that such a crash is likely in the near future.

In my opinion, no discounts should be applied to the valuation of works of art in the DIA collection.

IMPACT OF ARTVEST'S ASSUMPTIONS ON VALUATION

Many of the various unsupported assumptions and value adjustments made by Artvest have the effect of decreasing the valuation of the collection.

For example, in Tables 6 and 7, where Artvest applies various discounts (discounts that I think should not be taken at all), the calculations were done for only the low estimate and the mid estimate from Table 2, not for the high estimate. No explanation is given for omitting the high estimate in these calculations.

Regarding its Unsold Discount Factor, in the narrative (page 28), Artvest states

> *It is customary business practice to devalue a work by 20% of the low estimate after it has been 'bought in' – auction terminology for a work of art going unsold.*

And then in the Tables 6 and 7, the Unsold Discount Factor is not printed, but based on the quantity of the discount, it can be determined that Artvest applied a discount closer to 25%, without giving further explanation.

Some of the discount factors used by Artvest are entirely arbitrary. For example, on Page 29, it is stated,

> *The Impact of Not Selling through Sotheby's or Christie's is a subjective number to calculate…Nevertheless, I estimate that the impact of selling the DIA collection through an auction venue other than these two houses would result, at a minimum, of a loss value of 20% to 40%.*

Artvest did indeed apply the arbitrary discount of 20% in this case.

In the discussion about the Effect of Longer Term Sale Process (which, as explained above, should be encompassed into a proper blockage discount analysis, if relevant to the valuation assignment), Artvest bases its estimate of the number of years to sell on the experience of the British Rail Pension Fund, and then approximately doubles it. The British Rail Pension Fund situation is not comparable to the DIA situation. The works in the Pension Fund were purely for investment, quite unlike the collection of a renowned museum. And the sale experience of the Pension Fund's works is dated. It would be more accurate to base it on an analysis of similar works (and numbers of them) that have appeared on the market in recent years. Also, Artvest used a discount rate of 12% for the discounted present value calculation, which seems a bit high in light of the currently low level of interest rates. The choice of an appropriate discount rate in present value calculations is always subject to controversy. A relatively high discount rate will decrease the present value, and a low discount rate will increase the present value. Frequently in a blockage discount analysis, as in business valuation, the long-term Treasury security rate is viewed as a risk free rate of return, the minimum to which upward adjustments are made to reflect different elements of risk. With long-term Treasury security rates currently in the 3% to 4% range, a discount rate of 12% seems high even in light of the increased risk associated with holding art.


CONCLUSION:

This valuation assignment is difficult due to the vast number of varied works, the quality of the collection, its provenance and its notoriety. Such a complex appraisal requires significant due diligence and a logical, transparent, and defensible methodological approach. Any assumptions used must be justified, using support well beyond any one individual's personal opinion.

In the case of any collection, I always recommend that a well-supported, defensible appraisal be the goal. There are many cases where incomplete information and/or time constraints cause a valuation to be rushed and short cuts to be taken.

However, there are logical analytical approaches to sampling that should be applied to achieve the most accurate valuation.

As evidenced by the comments throughout this review, the Artvest valuation report is flawed and thus does not provide a reliable, well-supported valuation of the DIA collection of works.  Statements of value and of underlying economic constructs are often stated as the opinion of one individual who is neither a qualified appraiser nor an economist with economic education beyond the undergraduate level.  Unless and until support can be produced for the claims made in this report, the valuations cannot be considered reliable.

Finally, the application of a variety of discounts, arbitrarily selected without solid justification, suggests that Artvest or the author of the report may be purposefully valuing the collection conservatively rather than objectively and accurately.

Submitted By:         Jannette M. Barth, Ph.D.
                              Economist and Managing Director
                              Pepacton Institute LLC

**<u>Attachment D</u>**

**Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation**







**<u>Attachment E</u>**

**DIA Inventory Page, Missing Photograph Example**


**Unknown, American**
<u>Walt Whitman</u>
United States
Half tone print
*Gift of Mr. and Mrs. Charles E. Feinberg*

PROVENANCE
*not documented*

DIA no. **F78.125**

---

**Unknown, American**
<u>(Untitled)</u>
1977
Color lithograph
*Gift of Marshall Schuster*

PROVENANCE
*not documented*

DIA no. **F78.130.1**

---

**Unknown, American**
<u>(Untitled)</u>
1977
Color lithograph
*Gift of Marshall Schuster*

**<u>Attachment F</u>**

**DIA Inventory Page, Mislabeled "Unknown, American" Examples**



**Unknown, American**
<u>Fragment of Tiraz Textile</u>
Egypt, Fatimid, 12th Century
Weft faced plain weave with eccentric and discontinuous wefts (tapestry); one end hemmed with linen in whip stitch
2 3/4 x 5 in. ( 6.99 x 12.70 cm)
Pressure-mounted with 29.393.
*City of Detroit Purchase*

**PROVENANCE**
*Formerly in the collection of:*
*Dorothea Russell*

DIA no. **29.40**1



**Unknown, American**
<u>Fragment of Tiraz Textile</u>
Egypt, Fatimid, 12th Century
Balanced plain weave (tabby); weft faced plain weave with discontinuous wefts (tapestry)
8 3/8 x 4 5/8 in.
21.4 x 11.6 cm
*City of Detroit Purchase*

**PROVENANCE**
*Formerly in the collection of:*
*Dorothea Russell*

DIA no. **29.402**



**Unknown, American**

<u>Transylvanian-Church-style 'Lotto' Rug</u>

Ushak, Western Anatolia, Turkey, Ottoman, 17th Century

Wool

67 1/2 x 46 in.

*Gift of Mr. and Mrs. Harold J. Quilhot*

PROVENANCE
*Ex coll.*
*Vincent D. Cliff (Detroit)*
*Mary Cliff (Mrs. J. F. Brandmier), daughter of V.D. Cliff*
*Harold J. Qilhot*

DIA no. **70.926**



**Unknown, American**

<u>"Lotto" Rug with Arabesque Design</u>

Ushak, Western Turkey, Turkey, Ottoman, c. 1550/1600

Wool pile on a wool foundation
135 x 77 in.
342 x 195 cm
*Gift of Dr. Eva Cassirer, 2000*

**PROVENANCE**
*From the collection of Alfred Cassirer, lent to \the DIA by his daughter, Eva Cassirer from 1948-2002. In 2002, most of the Cassirer carpets went back to Berlin, but this one was left as a gift to the DIA.*

DIA no. **F49.7**

**Attachment G**

**Article on *L'incanto dell'affresco***

# Italy: The charm of the frescoes

6-06-2014
Filed under [News](#), [The Church in the world](#)



Under the title *"L'incanto dell'affresco"* (the charm of the fresco), the Museum of Art in Ravenna is displaying 110 frescos: "detached masterpieces from Pompeii to Giotto, from Correggio to Tiepolo". The exhibition, which will run until June 15, 2014, was organized by **Claudio Spadoni**, artistic director of the Museum, and **Lucia Ciancabilla**. It is divided into six sections, arranged in chronological order of their detachment, thus tracing the history and the popularity of the practice of detaching wall paintings. This display of paintings that have been wrested from walls and partitions of public, religious or private monuments, reviews the three chief methods of cutting out frescoes, their restoration, and also the conservation of the ancient heritage of Italian painting, with extremely valuable loans from places in Italy and abroad.

The first stages of detachment go back to Vitruvius and Pliny, where the removal of frescoes is done together with part of the supporting wall, as was the case with the *Face of Christ* by Fra Angelico or Melozzo de Forli'a music-making *Angels*. Until the late 19th century, a large number of masterpieces of Italian painting were snatched from the vaulted ceilings of churches and chapels, from the walls of public and private buildings that had housed them for centuries, in order to transport them to safer places…. Behind the evident needs for conservation there were often hidden motives of the collectors.

On this occasion, the Museum of Art in Ravenna, housed in a 16th-century building, is displaying several of the most beautiful paintings of Pompeii and Herculanum, as well as others by Giotto, Buffamalco, Altichiero, Vitale da Bologna, Pisanello, Signorelli, Pontormo, and Tiepolo, to mention only a few.

On the Adriatic coast, in Emilia-Romagna, the city of Ravenna had as its first bishop Saint **Apollinaris**, who had come from Antioch to Rome with Saint **Peter** and died a martyr on July 23, 87 A.D.; he was buried in Classe, the port of Ravenna. The capital of the Roman Empire in the 5th century, and then of Byzantine Italy until the 8th century, Ravenna has a set of early Christian mosaics and monuments unlike any other in the world. Eight buildings—the Mausoleum of Galla Placidia, the Neonian Baptistry, the Basilica of Sant'Apollinare Nuovo, the Baptistry of the Arians, the Archiepiscopal Chapel, the Mausoleum of Theodoric, the Church of San Vitale, and the Basilica of Sant'Apollinare in Classe—were built in the 5th and 6th centuries and testify to a great artistic mastery that marvelously combines the Greco-Roman tradition, Christian iconography and the styles of East and West.

Museum of Art of Ravenna (MAR) – Via di Roma, 13 – 48100 Ravenna.

Until June 15, 2014;  open from 9:00 to 18:00 Tuesday through Friday, until 19:00 on Saturday and Sunday;  closed Monday;  admission:  9 Euros;  teachers, students, pupils:  4 Euros

*(Sources:  MAR/Unesco/Osservatore Romano – DICI no. 296 dated June 06, 2014)*

**<u>Attachment H</u>**

**Methodology Step by Step Chart**

**Methodology Step by Step Chart**

| Step 1 | Valuation of High-Value Works by VWA | | | |
|---|---|---|---|---|
| | # of Units | Low Value | High Value | Average Value |
| | 387 | 3,092,419,700 | 4,040,303,800 | 3,566,631,750 |

| Step 2 | Valuation of High-Value Works performed by Christie's, Artvest and Winston | |
|---|---|---|
| | # of Units | Average Value |
| | 596 | 311,370,325 |

| Step 3 | Projected valuation of works on DIA Insurance List (estimated for appreciation) | | | |
|---|---|---|---|---|
| | # of Units | DIA Insurance Value | % Appreciation | Projected Value |
| | 16,388 | 468,449,537 | 62.0% | 758,888,249 |

| Step 4 | Pricing matrix of remaining works based on Christie's and Southeby's 2013 sales price by department | |
|---|---|---|
| | # of Units | Average Value |
| | 42,854 | 3,512,612,030 |

| Step 5 | Combined Value | |
|---|---|---|
| | **# of Units** | **Average Value** |
| | **60,225** | **8,149,232,354** |

**Attachment I**

**Step 1 Attachment**

| DIA Accession No. | Artist | Title | VWA Low Value | VWA High Value | VWA Average Value |
|---|---|---|---|---|---|
| 30.374 | Pieter Bruegel the Elder | The Wedding Dance | 150,000,000 | 200,000,000 | 175,000,000 |
| 22.13 | Vincent Willem van Gogh | Self Portrait | 120,000,000 | 150,000,000 | 135,000,000 |
| 1996.25 | Vincent Willem van Gogh | Portrait of Postman Roulin | 90,000,000 | 130,000,000 | 110,000,000 |
| 27.200 | Rembrandt Harmensz van Rijn | The Visitation | 90,000,000 | 110,000,000 | 100,000,000 |
| 70.190 | Pablo Picasso | Melancholy Woman | 75,000,000 | 100,000,000 | 87,500,000 |
| 76.89 | Frederic Edwin Church | Cotopaxi | 60,000,000 | 90,000,000 | 75,000,000 |
| 1988.175 | Alberto Giacometti | Standing Woman II | 60,000,000 | 80,000,000 | 70,000,000 |
| 22.14 | Henri Matisse | The Window | 60,000,000 | 80,000,000 | 70,000,000 |
| 65.8 | Mark Rothko | Orange, Brown | 60,000,000 | 80,000,000 | 70,000,000 |
| 73.268 | Michelangelo Merisi da Caravaggio | Martha and Mary Magdalene | 60,000,000 | 80,000,000 | 70,000,000 |
| 70.160 | Paul Cezanne | Madame Cezanne | 55,000,000 | 75,000,000 | 65,000,000 |
| 70.193 | Pablo Picasso | Woman Seated in an Armchair | 60,000,000 | 70,000,000 | 65,000,000 |
| 70.159 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 50,000,000 | 70,000,000 | 60,000,000 |
| 76.78 | Barnett Newman | Be I (second version) | 50,000,000 | 70,000,000 | 60,000,000 |
| 31.25 | Neo-Babylonian | Snake-Dragon, Symbol of Marduk, the Patron God of Babylon; Panel from the Ishtar Gate | 50,000,000 | 60,000,000 | 55,000,000 |
| 65.310 | Clyfford Still | Untitled 1951-T, No. 2 | 50,000,000 | 60,000,000 | 55,000,000 |
| 68.292.1 | Andy Warhol | Self Portrait: Former Double Self Portrait | 50,000,000 | 60,000,000 | 55,000,000 |
| 70.175 | Henri Matisse | Poppies | 50,000,000 | 60,000,000 | 55,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| 27.2.A | Michelangelo | Scheme for the Decoration of the Ceiling of the Sistine Chapel | 45,000,000 | 60,000,000 | 52,500,000 |
| 46.309 | James Abbott McNeill Whistler | Nocturne in Black and Gold, the Falling Rocket | 40,000,000 | 60,000,000 | 50,000,000 |
| 55.353 | Francis Bacon | Study for Crouching Nude | 45,000,000 | 55,000,000 | 50,000,000 |
| 50.32 | Neo-Assyrian | Tiglath-Pileser III Receiving Homage | 40,000,000 | 50,000,000 | 45,000,000 |
| 2005.60 | Pablo Picasso | Girl Reading | 35,000,000 | 45,000,000 | 40,000,000 |
| 21.5 | Edgar Degas | Dancers in the Green Room | 30,000,000 | 50,000,000 | 40,000,000 |
| 22.143 | Auguste Rodin | The Thinker | 35,000,000 | 40,000,000 | 37,500,000 |
| 70.174 | Henri Matisse | Coffee | 35,000,000 | 40,000,000 | 37,500,000 |
| 78.37 | Henri Matisse | The Wild Poppies | 35,000,000 | 40,000,000 | 37,500,000 |
| 66.66 | Joan Miró | Self Portrait II | 30,000,000 | 40,000,000 | 35,000,000 |
| 70.183 | Georges Pierre Seurat | View of Le Crotoy from Upstream | 30,000,000 | 40,000,000 | 35,000,000 |
| 36.11 | Nicolas Poussin | Selene and Endymion | 30,000,000 | 38,000,000 | 34,000,000 |
| 64.117 | John Constable | The Glebe Farm | 30,000,000 | 35,000,000 | 32,500,000 |
| 78.31 | Henri Matisse | The Wild Poppies | 30,000,000 | 35,000,000 | 32,500,000 |
| 56.144 | Franz Marc | Animals in a Landscape | 28,000,000 | 36,000,000 | 32,000,000 |
| 89.63 | Peter Paul Rubens | The Meeting of David and Abigail | 25,000,000 | 35,000,000 | 30,000,000 |
| 65.7 | Franz Kline | Siskind | 28,000,000 | 30,000,000 | 29,000,000 |
| 64.84 | Juan Gris | Still Life | 25,000,000 | 30,000,000 | 27,500,000 |
| 17.17 | George Wesley Bellows | A Day in June | 20,000,000 | 30,000,000 | 25,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| 50.138 | George Caleb Bingham | The Trappers' Return | 20,000,000 | 30,000,000 | 25,000,000 |
| 57.234 | Wassily Kandinsky | Study for Painting with White Form | 22,000,000 | 28,000,000 | 25,000,000 |
| 70.177 | Pierre Auguste Renoir | Seated Bather | 20,000,000 | 30,000,000 | 25,000,000 |
| 1985.24 | Pierre Auguste Renoir | Woman in an Armchair | 20,000,000 | 25,000,000 | 22,500,000 |
| 21.71 | Claude Monet | Gladioli | 20,000,000 | 25,000,000 | 22,500,000 |
| 26.3 | Jacob Isaaksz van Ruisdael | The Jewish Cemetery | 20,000,000 | 25,000,000 | 22,500,000 |
| 35.10 | Titian | Judith with the Head of Holofernes | 20,000,000 | 25,000,000 | 22,500,000 |
| 40.166 | Bernardo Bellotto | View of the Tiber in Rome with the Castel Sant'Angelo | 20,000,000 | 25,000,000 | 22,500,000 |
| 42.57 | Agnolo Bronzino | Eleonora of Toledo and Her Son | 20,000,000 | 25,000,000 | 22,500,000 |
| 46.310 | John Singleton Copley | Watson and the Shark | 20,000,000 | 25,000,000 | 22,500,000 |
| 55.410 | Max Beckmann | Self Portrait in Olive and Brown | 20,000,000 | 25,000,000 | 22,500,000 |
| 70.161 | Paul Cezanne | Mont Sainte-Victoire | 20,000,000 | 25,000,000 | 22,500,000 |
| 70.163 | Paul Cezanne | The Three Skulls | 20,000,000 | 25,000,000 | 22,500,000 |
| 1988.176 | Pablo Picasso | Seated Woman | 18,000,000 | 22,000,000 | 20,000,000 |
| 53.145 | Auguste Rodin | Eve | 18,000,000 | 22,000,000 | 20,000,000 |
| 55.5.A | Henry Fuseli | The Nightmare | 18,000,000 | 22,000,000 | 20,000,000 |
| 60.88 | Alberto Giacometti | Annette Seated | 18,000,000 | 22,000,000 | 20,000,000 |
| 62.126 | Pablo Picasso | Portrait of Manuel Pallares | 18,000,000 | 22,000,000 | 20,000,000 |
| 70.162 | Paul Cezanne | Bathers | 18,000,000 | 22,000,000 | 20,000,000 |

3

| | | | | | |
|---|---|---|---|---|---|
| 77.81 | Hans Holbein the Younger | A Woman | 18,000,000 | 22,000,000 | 20,000,000 |
| 1988.177 | Willem de Kooning | Merritt Parkway | 16,000,000 | 20,000,000 | 18,000,000 |
| 69.306 | Paul Gauguin | Self Portrait | 15,000,000 | 20,000,000 | 17,500,000 |
| 70.191 | Pablo Picasso | Head of a Harlequin | 15,000,000 | 20,000,000 | 17,500,000 |
| 89.35 | Jan Provost | The Last Judgment | 15,000,000 | 20,000,000 | 17,500,000 |
| 66.36 | David Smith | Cubi I | 15,000,000 | 18,000,000 | 16,500,000 |
| 70.192 | Pablo Picasso | Bottle of Anis del Mono | 15,000,000 | 18,000,000 | 16,500,000 |
| 26.114 | Neri di Bicci | Tobias and Three Archangels | 12,000,000 | 16,000,000 | 14,000,000 |
| 30.297 | Michael Sweerts | In the Studio | 12,000,000 | 16,000,000 | 14,000,000 |
| 49.347 | Frans Hals | Portrait of Hendrik Swalmius | 12,000,000 | 16,000,000 | 14,000,000 |
| 69.6 | Guido Reni | The Angel Appearing to St. Jerome | 12,000,000 | 16,000,000 | 14,000,000 |
| 1992.1 | Roy Lichtenstein | Interior with Mirrored Closet | 12,000,000 | 15,000,000 | 13,500,000 |
| 70.167 | Edgar Degas | Violinist and Young Woman | 12,000,000 | 15,000,000 | 13,500,000 |
| 77.2 | Benozzo Gozzoli | Virgin and Child with Angels | 12,000,000 | 15,000,000 | 13,500,000 |
| 89.46 | Jan Havicksz Steen | Gamblers Quarreling | 12,000,000 | 15,000,000 | 13,500,000 |
| 30.280 | Antoine Le Nain | The Village Piper | 12,000,000 | 14,000,000 | 13,000,000 |
| 52.220 | Giovanni Lorenzo Bernini | Chair of St. Peter | 10,000,000 | 15,000,000 | 12,500,000 |
| 52.253 | Artemisia Gentileschi | Judith and Her Maidservant with the Head of Holofernes | 10,000,000 | 15,000,000 | 12,500,000 |
| 70.178 | Pierre Auguste Renoir | The White Pierrot | 10,000,000 | 15,000,000 | 12,500,000 |

4

| | | | | | |
|---|---|---|---|---|---|
| 40.58 | Ernst Ludwig Kirchner | Winter Landscape in Moonlight | 11,000,000 | 13,000,000 | 12,000,000 |
| 89.70 | Bartolome Esteban Murillo | The Immaculate Conception | 11,000,000 | 13,000,000 | 12,000,000 |
| 10.11 | Frederic Edwin Church | Syria by the Sea | 10,000,000 | 12,000,000 | 11,000,000 |
| 28.115 | Giovanni Bellini | Madonna and Child | 10,000,000 | 12,000,000 | 11,000,000 |
| 44.266 | Peter Paul Rubens | Hygeia, Goddess of Health | 10,000,000 | 12,000,000 | 11,000,000 |
| 69.50 | Donald Judd | Stack | 10,000,000 | 12,000,000 | 11,000,000 |
| 71.170 | Thomas Gainsborough | Lady Anne Hamilton | 10,000,000 | 12,000,000 | 11,000,000 |
| 1993.18 | John Singer Sargent | Mosquito Nets | 8,000,000 | 12,000,000 | 10,000,000 |
| 69.48 | Robert Rauschenberg | Creek | 9,000,000 | 11,000,000 | 10,000,000 |
| 70.158 | Vincent Willem van Gogh | The Diggers | 8,000,000 | 12,000,000 | 10,000,000 |
| 71.1 | Guercino (Giovanni Francesco Barbieri) | Assumption of the Virgin | 8,000,000 | 12,000,000 | 10,000,000 |
| 70.339 | Pablo Picasso | Bather by the Sea | 8,000,000 | 11,000,000 | 9,500,000 |
| 71.169 | Thomas Gainsborough | The Honorable Richard Savage Nassau de Zuylestein, M.P. | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.390 | Jean Honore Fragonard | The Shepherdess | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.391 | Jean Honore Fragonard | The Grape Gatherer | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.392 | Jean Honore Fragonard | The Reaper | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.393 | Jean Honore Fragonard | The Gardener | 8,000,000 | 10,000,000 | 9,000,000 |
| 77.1.1 | Fra Angelico | Annunciatory Angel | 8,000,000 | 10,000,000 | 9,000,000 |
| 24.94 | Sassetta | The Procession to Calvary | 7,000,000 | 10,000,000 | 8,500,000 |

| | | | | | |
|---|---|---|---|---|---|
| 26.296 | Jean Siméon Chardin | Still Life with Dead Hare | 7,000,000 | 10,000,000 | 8,500,000 |
| 48.96 | Bartolome Esteban Murillo | The Flight into Egypt | 7,000,000 | 9,000,000 | 8,000,000 |
| 69.1 | Jean Dubuffet | Le plomb dans l'aile | 7,000,000 | 9,000,000 | 8,000,000 |
| 1998.65 | Edgar Degas | Jockeys on Horseback before Distant Hills | 7,000,000 | 8,000,000 | 7,500,000 |
| 20.111 | Pierre Auguste Renoir | Graziella | 6,000,000 | 9,000,000 | 7,500,000 |
| 26.385 | Peter Paul Rubens | Philippe Rubens, the Artist's Brother. | 6,000,000 | 9,000,000 | 7,500,000 |
| 1988.178 | Pablo Picasso | Fruit, Carafe and Glass | 6,000,000 | 8,000,000 | 7,000,000 |
| 23.27 | Frans Hals | Portrait of a Woman | 6,000,000 | 8,000,000 | 7,000,000 |
| 25.4 | Jan van Eyck | Saint Jerome in His Study | 6,000,000 | 8,000,000 | 7,000,000 |
| 26.387 | Master of the St. Lucy Legend | Virgin of the Rose Garden | 6,000,000 | 8,000,000 | 7,000,000 |
| 27.385 | Titian | Man Holding a Flute | 6,000,000 | 8,000,000 | 7,000,000 |
| 30.295 | Parmigianino | The Circumcision | 6,000,000 | 8,000,000 | 7,000,000 |
| 34.27 | James Abbott McNeill Whistler | Arrangement in Gray: Portrait of the Painter | 6,000,000 | 8,000,000 | 7,000,000 |
| 41.80 | Francisco Goya | Dona Amalia Bonells de Costa | 6,000,000 | 8,000,000 | 7,000,000 |
| 53.356 | Peter Paul Rubens | Briseis Given Back to Achilles | 6,000,000 | 8,000,000 | 7,000,000 |
| 65.10 | Gerard  Ter Borch | Lady at Her Toilette | 6,000,000 | 8,000,000 | 7,000,000 |
| 68.47 | Orazio Gentileschi | Young Woman with a Violin (Saint Cecilia) | 6,000,000 | 8,000,000 | 7,000,000 |
| 21.206 | Max Pechstein | Under the Trees | 5,000,000 | 8,000,000 | 6,500,000 |
| 21.34 | Camille Pissarro | The Path | 5,000,000 | 8,000,000 | 6,500,000 |

6

| | | | | | |
|---|---|---|---|---|---|
| 27.202 | Gustave Courbet | Bather Sleeping by a Brook | 5,000,000 | 8,000,000 | 6,500,000 |
| 82.64 | Neo-Sumerian | Gudea of Lagash | 5,000,000 | 8,000,000 | 6,500,000 |
| 21.208 | Lyonel Feininger | Sidewheeler II | 5,000,000 | 7,000,000 | 6,000,000 |
| 21.6 | Edgar Degas | Dancers | 5,000,000 | 7,000,000 | 6,000,000 |
| 37.147 | Pollaiuolo | Judith | 5,000,000 | 7,000,000 | 6,000,000 |
| 46.134 | Thomas Cole | From the Top of Kaaterskill Falls | 5,000,000 | 7,000,000 | 6,000,000 |
| 51.65 | Otto Dix | Self Portrait | 5,000,000 | 7,000,000 | 6,000,000 |
| 67.113 | Alexander Calder | The X and Its Tails | 5,000,000 | 7,000,000 | 6,000,000 |
| 70.170 | Jean Auguste Dominique Ingres | Perseus and Andromeda | 5,000,000 | 7,000,000 | 6,000,000 |
| 76.77 | Aristide Maillol | La Flore, nue | 5,000,000 | 7,000,000 | 6,000,000 |
| 77.3 | Pietro Perugino | Madonna and Child | 5,000,000 | 7,000,000 | 6,000,000 |
| 1993.77.A | Joseph Cornell | Night Songs | 5,000,000 | 6,500,000 | 5,750,000 |
| 57.180 | Giovanni Battista Tiepolo | Girl with a Mandolin | 5,000,000 | 6,500,000 | 5,750,000 |
| 22.6 | Mary Cassatt | In the Garden | 5,000,000 | 6,000,000 | 5,500,000 |
| 27.3 | Sandro Botticelli | The Resurrected Christ | 5,000,000 | 6,000,000 | 5,500,000 |
| 27.201 | Gerard David | The Annunciation | 4,000,000 | 6,000,000 | 5,000,000 |
| 45.420 | Joos van der Beke van Cleve | Adoration of the Magi | 4,000,000 | 6,000,000 | 5,000,000 |
| 54.458 | William Adolphe Bouguereau | The Nut Gatherers | 4,000,000 | 6,000,000 | 5,000,000 |
| 61.48 | Joan Miró | Women and Bird in the Night | 4,000,000 | 6,000,000 | 5,000,000 |

7

| | | | | | |
|---|---|---|---|---|---|
| 66.41 | Giulio Romano | An Allegory of Immortality | 4,000,000 | 6,000,000 | 5,000,000 |
| 79.34 | Eva Hesse | Accession II | 4,000,000 | 6,000,000 | 5,000,000 |
| 25.207 | Giovanni Domenico Tiepolo | The Women of Darius Invoking the Clemency of Alexander | 4,000,000 | 5,000,000 | 4,500,000 |
| 29.260 | William Merritt Chase | The Whistling Boy | 3,500,000 | 5,500,000 | 4,500,000 |
| 52.218 | Giovanni Lorenzo Bernini | Triton with a Sea Serpent | 4,000,000 | 5,000,000 | 4,500,000 |
| 52.219 | Giovanni Lorenzo Bernini | Triton with a Shell | 4,000,000 | 5,000,000 | 4,500,000 |
| 27.159 | Maurice Brazil Prendergast | Promenade | 3,500,000 | 5,000,000 | 4,250,000 |
| 70.164 | Jean Siméon Chardin | Still Life | 3,500,000 | 5,000,000 | 4,250,000 |
| 11.5 | Childe Hassam | Place Centrale and Fort Cabanas, Havana | 3,000,000 | 5,000,000 | 4,000,000 |
| 1995.67 | Rachel Ruysch | Flowers in a Glass Vase | 3,000,000 | 5,000,000 | 4,000,000 |
| 20.114 | Alfred Sisley | Church at Moret after the Rain | 3,000,000 | 5,000,000 | 4,000,000 |
| 21.203 | Oskar Kokoschka | The Elbe Near Dresden | 3,500,000 | 4,500,000 | 4,000,000 |
| 23.11 | Tintoretto | The Dreams of Men | 3,000,000 | 5,000,000 | 4,000,000 |
| 29.256 | Gerard Ter Borch | Young Man Reading a Letter | 3,000,000 | 5,000,000 | 4,000,000 |
| 54.2 | Nicolas Poussin | The Holy Family | 3,000,000 | 5,000,000 | 4,000,000 |
| 62.141 | Pablo Picasso | Sylvette | 3,000,000 | 5,000,000 | 4,000,000 |
| 72.465 | Paul Cezanne | Head of a Man | 3,000,000 | 5,000,000 | 4,000,000 |
| 79.33 | Benjamin West | Death on the Pale Horse | 3,000,000 | 5,000,000 | 4,000,000 |
| 56.43 | Giovanni Paolo Panini | Interior of St. Peter's, Rome | 3,500,000 | 4,000,000 | 3,750,000 |

8

| | | | | | |
|---|---|---|---|---|---|
| 1983.23 | John Singleton Copley | George Boone Roupell | 3,000,000 | 4,000,000 | 3,500,000 |
| 1986.60 | Mary Cassatt | Alexander J. Cassatt | 3,000,000 | 4,000,000 | 3,500,000 |
| 21.204 | Ernst Ludwig Kirchner | Coastal Landscape on Fehmarn | 3,000,000 | 4,000,000 | 3,500,000 |
| 27.556 | John Singleton Copley | Mrs. Clark Gayton | 3,000,000 | 4,000,000 | 3,500,000 |
| 28.151 | Unknown | South Indian Brahma-Shiva | 3,000,000 | 4,000,000 | 3,500,000 |
| 37.21 | Jacob Isaaksz van Ruisdael | Farm and Hayrick on a River | 3,000,000 | 4,000,000 | 3,500,000 |
| 38.60 | William Sydney Mount | The Banjo Player | 3,000,000 | 4,000,000 | 3,500,000 |
| 48.279 | Edgar Degas | Morning Ride | 3,000,000 | 4,000,000 | 3,500,000 |
| 60.61 | Master of the Osservanza | The Resurrection | 3,000,000 | 4,000,000 | 3,500,000 |
| 61.164 | Master of the Arenberg Lamentation | The Lamentation | 3,000,000 | 4,000,000 | 3,500,000 |
| 61.165 | John Sloan | Wake of the Ferry, No. 1 | 3,000,000 | 4,000,000 | 3,500,000 |
| 65.139 | Paul Cezanne | Skull and Book | 3,000,000 | 4,000,000 | 3,500,000 |
| 65.76 | John Chamberlain | Coo Wha Zee | 3,000,000 | 4,000,000 | 3,500,000 |
| 68.298 | Jacob Isaaksz van Ruisdael | Wooded Landscape with a Stream | 3,000,000 | 4,000,000 | 3,500,000 |
| 72.441 | Edgar Degas | Dancers in Repose | 3,000,000 | 4,000,000 | 3,500,000 |
| 77.48 | Robert Motherwell | Elegy to the Spanish Republic #131 | 3,000,000 | 4,000,000 | 3,500,000 |
| 78.59 | John Everett Millais | Leisure Hours | 3,000,000 | 4,000,000 | 3,500,000 |
| 21.72 | John Singer Sargent | Home Fields | 2,800,000 | 4,000,000 | 3,400,000 |
| 08.8 | Mary Cassatt | Women Admiring a Child | 2,800,000 | 3,500,000 | 3,150,000 |

9

| | | | | | |
|---|---|---|---|---|---|
| 80.104 | Dan Flavin | Monument for V. Tatlin | 2,800,000 | 3,500,000 | 3,150,000 |
| 73.41 | John Singer Sargent | Madame Paul Poirson | 2,500,000 | 3,700,000 | 3,100,000 |
| 19.148 | Robert Cozad Henri | The Young Girl | 2,500,000 | 3,500,000 | 3,000,000 |
| 24.2 | John Sloan | McSorley's Bar | 2,500,000 | 3,500,000 | 3,000,000 |
| 28.102 | Giorgio de Chirico | Gladiators and Lion | 2,000,000 | 4,000,000 | 3,000,000 |
| 30.296 | Thomas Cowperthwaite Eakins | Dr. Horatio C. Wood | 2,500,000 | 3,500,000 | 3,000,000 |
| 44.5 | Marsden Hartley | Log Jam, Penobscot Bay | 2,500,000 | 3,500,000 | 3,000,000 |
| 65.60 | Helen Frankenthaler | The Bay | 2,500,000 | 3,500,000 | 3,000,000 |
| 70.560.A | John Singleton Copley | Colonel George Lewis | 2,500,000 | 3,500,000 | 3,000,000 |
| 77.5 | Diego M. Rivera | Edsel B. Ford | 2,500,000 | 3,500,000 | 3,000,000 |
| 21.210 | Otto Mueller | Bathers | 2,500,000 | 3,200,000 | 2,850,000 |
| 16.5 | William Merritt Chase | The Yield of the Waters | 2,500,000 | 3,000,000 | 2,750,000 |
| 1986.102 | Max Ernst | Moonmad | 2,500,000 | 3,000,000 | 2,750,000 |
| 43.30 | John Singleton Copley | John Gray | 2,500,000 | 3,000,000 | 2,750,000 |
| 70.900 | John Singleton Copley | Hannah Loring | 2,500,000 | 3,000,000 | 2,750,000 |
| 41.37 | John Singleton Copley | Colonel John Montresor | 2,200,000 | 3,200,000 | 2,700,000 |
| 27.150 | Nino Pisano | Madonna and Child | 2,000,000 | 3,000,000 | 2,500,000 |
| 44.213 | Giovanni Battista Tiepolo | Saint Joseph and the Christ Child | 2,000,000 | 3,000,000 | 2,500,000 |
| 71.168 | John Singleton Copley | Mrs. Benjamin Hallowell | 2,200,000 | 2,800,000 | 2,500,000 |

10

| | | | | | |
|---|---|---|---|---|---|
| 72.437 | Naum Gabo | Linear Construction No. 4 | 2,200,000 | 2,800,000 | 2,500,000 |
| 30.416 | Islamic | Bottle made for the Rasulid Sultan Hizabr al-Din in Yemen | 2,300,000 | 2,600,000 | 2,450,000 |
| 21.8 | Edgar Degas | Portrait of a Woman | 2,000,000 | 2,500,000 | 2,250,000 |
| 30.323 | Islamic | Qur'an | 2,000,000 | 2,500,000 | 2,250,000 |
| 54.460 | Emil Nolde | Sunflowers | 2,000,000 | 2,500,000 | 2,250,000 |
| 1985.25 | Pierre Auguste Renoir | Clearing in the Woods | 1,800,000 | 2,500,000 | 2,150,000 |
| 74.53 | Roman | Torso of Aphrodite, Roman copy of the Venus Genetrix type | 1,500,000 | 2,500,000 | 2,000,000 |
| 76.146 | Sebastiano Ricci | Christ at the Sea of Galilee | 1,800,000 | 2,200,000 | 2,000,000 |
| 78.47 | Iranian | Achaemenid Persian Spearman | 1,500,000 | 2,500,000 | 2,000,000 |
| 71.385.A | Richard Artschwager | Hospital Ward | 1,700,000 | 2,000,000 | 1,850,000 |
| 2000.85 | Medici Manufactory | Ewer (brocca) | 1,300,000 | 2,300,000 | 1,800,000 |
| 70.206 | Henri Matisse | Seated Nude | 1,700,000 | 1,900,000 | 1,800,000 |
| 41.126 | Master of the Tiburtine Sibyl | Crucifixion | 1,500,000 | 2,000,000 | 1,750,000 |
| 64.155.A | Robert Indiana | The Brooklyn Bridge | 1,500,000 | 2,000,000 | 1,750,000 |
| 69.304 | Auguste Rodin | The Age of Bronze | 1,500,000 | 2,000,000 | 1,750,000 |
| 1983.16 | Jean Baptiste Carpeaux | Genius of the Dance | 1,500,000 | 1,800,000 | 1,650,000 |
| 1992.223 | Jean Baptiste Carpeaux | Genius of Dance | 1,500,000 | 1,800,000 | 1,650,000 |
| 45.514 | Andrea della Robbia | Madonna and Child | 1,500,000 | 1,800,000 | 1,650,000 |
| 25.64 | Islamic | Figure of a Courtier from a Palace Frieze | 1,200,000 | 1,800,000 | 1,500,000 |

11

| | | | | | |
|---|---|---|---|---|---|
| 29.245 | Unknown | Buddha | 1,200,000 | 1,800,000 | 1,500,000 |
| 59.123 | Hubert Gerhard | Hebe | 1,400,000 | 1,600,000 | 1,500,000 |
| 59.296 | Johann Joachim Kaendler | Postmaster "Baron" Schmiedel | 1,400,000 | 1,600,000 | 1,500,000 |
| 52.118 | John Singleton Copley | Head of a Negro | 1,200,000 | 1,500,000 | 1,350,000 |
| 43.477 | Andrea della Robbia | Head of a Youth | 1,200,000 | 1,400,000 | 1,300,000 |
| 2001.67 | Francois Rude | Departure of the Volunteers of 1792 (The Marseillaise) | 1,000,000 | 1,500,000 | 1,250,000 |
| 64.82 | Jean Auguste Dominique Ingres | Mlle. Cécile-Marie Panckoucke (later Mme. Jacques-Raoul Tournouër) | 1,000,000 | 1,500,000 | 1,250,000 |
| 70.168 | Edgar Degas | Woman with a Bandage | 1,000,000 | 1,500,000 | 1,250,000 |
| 19.149 | Robert Cozad Henri | The Beach Hat | 1,000,000 | 1,400,000 | 1,200,000 |
| 71.78 | Edgar Degas | Seated Woman Wiping her Left Side | 1,000,000 | 1,200,000 | 1,100,000 |
| 54.100 | John Singer Sargent | Judith Gautier | 900,000 | 1,200,000 | 1,050,000 |
| 21.207 | Karl Schmidt-Rottluff | Still Life, Cactus | 800,000 | 1,200,000 | 1,000,000 |
| 21.73 | Henri Eugene Augustin Le Sidaner | The Tea Table | 800,000 | 1,200,000 | 1,000,000 |
| 58.360 | John Singleton Copley | Jonathan Mountfort | 800,000 | 1,200,000 | 1,000,000 |
| 21.180 | Tang Di | Landscape | 800,000 | 1,100,000 | 950,000 |
| 2005.63 | Edgar Degas | Seated Nude Woman Brushing Her Hair | 800,000 | 1,000,000 | 900,000 |
| 36.14 | Alessandro Magnasco | Satire on a Nobleman in Misery | 800,000 | 1,000,000 | 900,000 |
| 70.188 | Diego M. Rivera | Robert Tannahill | 1,500,000 | 200,000 | 850,000 |
| 72.296 | Louis Jean Francois Lagrenee | Pygmalion and Galatea | 700,000 | 1,000,000 | 850,000 |

12

| | | | | | |
|---|---|---|---|---|---|
| 70.253 | Charles Demuth | Still Life with Apples and Bananas | 750,000 | 900,000 | 825,000 |
| 1997.1 | Jean-Léon Gérôme | Seated Woman | 700,000 | 900,000 | 800,000 |
| 21.17 | Henri Baptiste Lebasque | On the Balcony | 700,000 | 900,000 | 800,000 |
| 25.63 | Unknown | Buddha's Descent from the Trayastrimsas Heaven | 700,000 | 900,000 | 800,000 |
| 47.92 | Salvator Rosa | The Finding of Moses | 700,000 | 900,000 | 800,000 |
| 29.172 | Unknown | Sakyamuni Emerging from the Mountains | 600,000 | 900,000 | 750,000 |
| 59.295 | Johann Gottlieb Kirchner | Joseph Froehlich, Court Jester of Augustus the Strong | 700,000 | 800,000 | 750,000 |
| 48.274 | Nathan Bowen | Chest on Chest | 650,000 | 800,000 | 725,000 |
| 26.128 | Unknown | Guanyin | 600,000 | 800,000 | 700,000 |
| 29.444 | Unknown | Pratyeka Buddha | 550,000 | 850,000 | 700,000 |
| 37.73 | Job Adriaensz Berckheyde | Interior of the Grote Kerk, Haarlem | 600,000 | 800,000 | 700,000 |
| 65.145 | Edgar Degas | Ballet Dancer Adjusting her Costume | 600,000 | 800,000 | 700,000 |
| 65.174 | Max Beckmann | Sacrificial Meal | 600,000 | 800,000 | 700,000 |
| 76.3 | Wen Zhengming | The First Prose Poem on the Red Cliff | 600,000 | 800,000 | 700,000 |
| 1992.212 | Enzo Cucchi | Quadro Feroce | 500,000 | 800,000 | 650,000 |
| 26.122 | Roman | Torso of Apollo, Roman copy | 500,000 | 700,000 | 600,000 |
| 65.223 | Pierre Auguste Renoir | Country Lane | 500,000 | 700,000 | 600,000 |
| 1999.59 | Paul Gauguin | La Petite Parisienne | 500,000 | 600,000 | 550,000 |
| 40.161 | Shen Zhou | Ode to the Pomegranate and Melon Vine | 500,000 | 600,000 | 550,000 |

| | | | | | |
|---|---|---|---|---|---|
| F1983.124 | Charles Sheeler | Drive Wheels | 500,000 | 600,000 | 550,000 |
| 09.1S382 | Albrecht Dürer | Adam and Eve | 450,000 | 550,000 | 500,000 |
| 2007.145 | Charles Rennie Mackintosh | Chair | 400,000 | 600,000 | 500,000 |
| 35.54 | Islamic | Folio from the Great Mongol Shahnama: Ardashir Battles Bahman, Son of Ardavan | 400,000 | 600,000 | 500,000 |
| 51.223 | James Abbott McNeill Whistler | In the Studio | 400,000 | 600,000 | 500,000 |
| 60.63 | Pieter Pietersz Lastman | King David Handing the Letter to Uriah | 400,000 | 600,000 | 500,000 |
| 1994.78.A | Greene and Greene | Blacker Dining Table | 300,000 | 600,000 | 450,000 |
| 50.58 | Charles Willson Peale | James Peale | 350,000 | 550,000 | 450,000 |
| 70.187 | Diego M. Rivera | Robert H. Tannahill | 800,000 | 100,000 | 450,000 |
| 1985.30 | Richard Estes | Welcome to 42nd Street (Victory Theatre) | 350,000 | 450,000 | 400,000 |
| 2006.87 | James Abbott McNeill Whistler | Violet and Blue: Among the Rollers | 300,000 | 500,000 | 400,000 |
| 60.1 | Auguste Rodin | Aime Jules Dalou | 375,000 | 425,000 | 400,000 |
| 66.131 | George Bright | Secretary | 350,000 | 450,000 | 400,000 |
| 69.218 | Roman | Statue of the Young Nero Wearing a Toga | 350,000 | 450,000 | 400,000 |
| 71.399 | Jean Baptiste Carpeaux | Ugolino and his Children | 350,000 | 400,000 | 375,000 |
| 2003.32 | Auguste Rodin | Vase of the Titans | 300,000 | 400,000 | 350,000 |
| 40.48 | Egyptian | Head of a Man | 300,000 | 400,000 | 350,000 |
| 45.469 | Rembrandt Peale | Self Portrait | 300,000 | 400,000 | 350,000 |
| 67.273 | Edgar Degas | Dancer Adjusting Her Slipper | 300,000 | 400,000 | 350,000 |

14

| | | | | | |
|---|---|---|---|---|---|
| 71.196 | Martin Carlin | Jewel Coffer | 300,000 | 400,000 | 350,000 |
| 1992.16 | Julian Schnabel | Cabalistic Painting | 250,000 | 400,000 | 325,000 |
| 20.42 | James Abbott McNeill Whistler | Robert Barr | 250,000 | 350,000 | 300,000 |
| 50.193.A | Asteios Group | Panathenaic Amphora | 250,000 | 350,000 | 300,000 |
| 58.359 | John Singleton Copley | Elizabeth Pitts | 250,000 | 350,000 | 300,000 |
| 59.314 | George Cochran Lambdin | At the Front | 250,000 | 350,000 | 300,000 |
| 52.27 | George Caleb Bingham | The Checker Players | 250,000 | 300,000 | 275,000 |
| 69.302 | Edgar Degas | Spanish Dancer | 250,000 | 300,000 | 275,000 |
| 1984.87 | Andre-Charles Boulle and his sons | Pedestal Clock | 200,000 | 300,000 | 250,000 |
| 40.47 | Egyptian | Head of a Man | 200,000 | 300,000 | 250,000 |
| 53.169 | Unknown | Ritual Wine Vessel | 200,000 | 300,000 | 250,000 |
| 1993.122 | Richard Estes | Blue Cadillac | 200,000 | 250,000 | 225,000 |
| 37.92 | Paul Revere II | Teapot | 200,000 | 250,000 | 225,000 |
| 29.1 | Qian Xuan | Early Autumn | 150,000 | 200,000 | 175,000 |
| 56.173 | Edgar Degas | Schoolgirl | 150,000 | 200,000 | 175,000 |
| 59.149 | Thomas Harland | Tall Case Clock | 150,000 | 200,000 | 175,000 |
| F74.36 | Diego M. Rivera | The Meal | 150,000 | 200,000 | 175,000 |
| 1994.30 | Auguste Rodin | Head of Balzac | 150,000 | 180,000 | 165,000 |
| F82.198 | Jean Baptiste Carpeaux | Neapolitan Fisherboy | 150,000 | 175,000 | 162,500 |

15

| | | | | | |
|---|---|---|---|---|---|
| 1983.25.A | Baltimore Painter | South Italian Funerary Vase | 125,000 | 175,000 | 150,000 |
| 45.369 | Rembrandt Harmensz van Rijn | Jan Lutma, Goldsmith | 125,000 | 175,000 | 150,000 |
| 65.148 | Edgar Degas | Mlle La La at the Circus Fernando | 130,000 | 150,000 | 140,000 |
| 66.391 | Hughie Lee-Smith | The Piper | 100,000 | 180,000 | 140,000 |
| 75.86 | Jean Baptiste Carpeaux | Le fumeur | 125,000 | 150,000 | 137,500 |
| 77.63 | Dong Qichang | Freehand Copy of Zhang Xu's Writing of the Stone Record | 120,000 | 150,000 | 135,000 |
| 2005.1.1 | Duncan Phyfe | Pair of Lyre Back Chairs | 100,000 | 150,000 | 125,000 |
| 41.81 | Unknown | Parvati | 100,000 | 150,000 | 125,000 |
| 80.39 | Korean | Pillow | 100,000 | 150,000 | 125,000 |
| 09.1S949 | Rembrandt Harmensz van Rijn | Christ with the Sick around Him, Receiving Little Children | 100,000 | 130,000 | 115,000 |
| 59.297 | Unknown | Crozier Head: Saint Michael and the Dragon | 113,000 | 115,000 | 114,000 |
| 25.13 | Egyptian | Head from an Anthropoid Sarcophagus | 100,000 | 125,000 | 112,500 |
| 59.185 | George Wesley Bellows | A Stag at Sharkey's | 100,000 | 120,000 | 110,000 |
| 70.209 | Pierre Auguste Renoir | La blanchisseuse | 90,000 | 120,000 | 105,000 |
| 2001.70 | George Cochran Lambdin | Roses on a Wall | 80,000 | 120,000 | 100,000 |
| 53.153 | George Caleb Bingham | John Quincy Adams | 90,000 | 110,000 | 100,000 |
| 1984.2 | Korean | Full Moon Jar | 80,000 | 100,000 | 90,000 |
| 09.1S937 | Rembrandt Harmensz van Rijn | Presentation in the Temple | 12,000 | 160,000 | 86,000 |
| 14.7 | Rembrandt Harmensz van Rijn | The Goldweigher's Field | 70,000 | 90,000 | 80,000 |

| | | | | | |
|---|---|---|---|---|---|
| 09.1S922 | Rembrandt Harmensz van Rijn | Self Portrait with Saskia | 50,000 | 100,000 | 75,000 |
| 1993.19 | Leonaert Bramer | The Adoration of the Magi | 60,000 | 80,000 | 70,000 |
| 38.33 | Rembrandt Harmensz van Rijn | Descent from the Cross by Torchlight | 45,000 | 85,000 | 65,000 |
| 1988.1 | Korean | Head of Buddha | 50,000 | 70,000 | 60,000 |
| 65.140 | Paul Cezanne | Slave | 50,000 | 70,000 | 60,000 |
| 09.1S928 | Rembrandt Harmensz van Rijn | Abraham and Isaac | 40,000 | 70,000 | 55,000 |
| 09.1S968 | Rembrandt Harmensz van Rijn | Landscape with a Square Tower | 50,000 | 60,000 | 55,000 |
| 1990.295 | Louis Comfort Tiffany | Jack-in-the-Pulpit Vase | 50,000 | 55,000 | 52,500 |
| 09.1S945 | Rembrandt Harmensz van Rijn | Christ and the Woman of Samaria | 40,000 | 60,000 | 50,000 |
| 09.1S972 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | 40,000 | 60,000 | 50,000 |
| 68.22 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | 40,000 | 60,000 | 50,000 |
| F77.104 | Thomas Cowperthwaite Eakins | Three Female Nudes | 40,000 | 60,000 | 50,000 |
| 09.1S959 | Rembrandt Harmensz van Rijn | Death of the Virgin | 35,000 | 55,000 | 45,000 |
| 09.1S963 | Rembrandt Harmensz van Rijn | Medea: Or the Marriage of Jason and Creusa | 30,000 | 50,000 | 40,000 |
| 09.1S963.A | Rembrandt Harmensz van Rijn | Medea: Or the Marriage of Jason and Creusa | 30,000 | 50,000 | 40,000 |
| 09.1S986 | Rembrandt Harmensz van Rijn | Three Heads of Women | 35,000 | 45,000 | 40,000 |
| 1994.97.A | Islamic | Qur'an Folio | 20,000 | 60,000 | 40,000 |
| 2006.109 | Gandhara | Bodhisattva Padmapani | 30,000 | 50,000 | 40,000 |
| 31.70 | Egyptian | Seated Scribe | 35,000 | 45,000 | 40,000 |

17

| | | | | | |
|---|---|---|---|---|---|
| 2003.26.1 | Lorna Simpson | Bathroom | 30,000 | 40,000 | 35,000 |
| 70.210 | Auguste Rodin | Baudelaire | 30,000 | 40,000 | 35,000 |
| 09.1S934 | Rembrandt Harmensz van Rijn | Adoration of the Shepherds | 25,000 | 40,000 | 32,500 |
| 09.1S975 | Rembrandt Harmensz van Rijn | Man in an Arbour | 30,000 | 35,000 | 32,500 |
| 09.1S923 | Rembrandt Harmensz van Rijn | Self Portrait in a Velvet Cap with Plume | 20,000 | 40,000 | 30,000 |
| 09.1S981 | Rembrandt Harmensz van Rijn | Bearded Man in a Velvet Cap with a Jewel Clasp | 20,000 | 40,000 | 30,000 |
| 27.586.1 | Nepalese | Manuscript of the "Perfection of Transcendent Wisdom in Eight Thousand Verses" Text | 20,000 | 40,000 | 30,000 |
| 35.40 | Paul Revere II | Sugar Basket | 25,000 | 35,000 | 30,000 |
| 35.41 | Paul Revere II | Creamer | 25,000 | 35,000 | 30,000 |
| 46.174 | Rembrandt Harmensz van Rijn | Self Portrait in a Velvet Cap with Plume | 20,000 | 40,000 | 30,000 |
| 2001.1 | Rembrandt Harmensz van Rijn | The Angel Appearing to the Shepherds | 24,000 | 34,000 | 29,000 |
| 09.1S974 | Rembrandt Harmensz van Rijn | Old Man with a Divided Fur Cap | 24,000 | 32,000 | 28,000 |
| 09.1S979 | Rembrandt Harmensz van Rijn | Jan Asselyn | 25,000 | 30,000 | 27,500 |
| 09.1S933 | Rembrandt Harmensz van Rijn | Angel Appearing to the Shepherds | 22,000 | 30,000 | 26,000 |
| 09.1S1044 | Peter Paul Rubens | Saint Catherine of Alexandria | 20,000 | 30,000 | 25,000 |
| 09.1S926 | Rembrandt Harmensz van Rijn | Abraham Casting Out Hagar and Ishmael | 20,000 | 30,000 | 25,000 |
| 09.1S943 | Rembrandt Harmensz van Rijn | Christ Driving the Money Changers from the Temple | 23,000 | 27,000 | 25,000 |
| 09.1S944 | Rembrandt Harmensz van Rijn | Christ Driving the Money Changers from the Temple | 23,000 | 27,000 | 25,000 |
| 2001.9 | Lorna Simpson | Coiffure | 20,000 | 30,000 | 25,000 |

18

| | | | | | |
|---|---|---|---|---|---|
| 35.103 | Coptic | Female Portrait with Halo | 20,000 | 30,000 | 25,000 |
| 45.370 | Rembrandt Harmensz van Rijn | Golf Player | 18,000 | 30,000 | 24,000 |
| 09.1S982 | Rembrandt Harmensz van Rijn | Bust of a Man Wearing a High Cap, Three-Quarters Right: The Artist's Father (? | 20,000 | 25,000 | 22,500 |
| 1989.76.A | Henry Kirke Brown | Filatrice | 20,000 | 25,000 | 22,500 |
| 09.1S921 | Rembrandt Harmensz van Rijn | Self Portrait in a Cap and Scarf with the Face Dark: Bust | 15,000 | 28,000 | 21,500 |
| 09.1S929 | Rembrandt Harmensz van Rijn | Joseph Telling His Dreams | 16,000 | 24,000 | 20,000 |
| 68.20 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | 15,000 | 25,000 | 20,000 |
| 2004.52 | James Abbott McNeill Whistler | The Kitchen | 18,000 | 20,000 | 19,000 |
| 79.28.1 | Suzuki Kiitsu | Reeds and Cranes | 18,000 | 20,000 | 19,000 |
| 09.1S955 | Rembrandt Harmensz van Rijn | Return of the Prodigal Son | 15,000 | 22,000 | 18,500 |
| 09.1S936 | Rembrandt Harmensz van Rijn | Presentation in the Temple | 15,000 | 21,000 | 18,000 |
| 1988.62 | Choi Sokhwan | Grapevine | 15,000 | 20,000 | 17,500 |
| 09.1S941 | Rembrandt Harmensz van Rijn | Tribute Money | 13,000 | 20,000 | 16,500 |
| 45.368 | Rembrandt Harmensz van Rijn | Triumph of Mordecai | 12,000 | 20,000 | 16,000 |
| 52.243 | Rembrandt Harmensz van Rijn | Christ Crucified between the Two Thieves | 11,000 | 21,000 | 16,000 |
| 09.1S946 | Rembrandt Harmensz van Rijn | Christ and the Woman of Samaria Among Ruins | 14,000 | 17,000 | 15,500 |
| 09.1S953 | Rembrandt Harmensz van Rijn | Christ Carried to the Tomb | 14,000 | 16,000 | 15,000 |
| 09.1S984 | Rembrandt Harmensz van Rijn | The Artist's Mother Seated, in an Oriental Headdress Half Length | 12,000 | 18,000 | 15,000 |
| 1983.3 | Unknown | Noh Theater Robe, Surihaku Type | 10,000 | 20,000 | 15,000 |

19

| | | | | | |
|---|---|---|---|---|---|
| 52.242 | Rembrandt Harmensz van Rijn | Flight into Egypt | 14,000 | 16,000 | 15,000 |
| 09.1S973 | Rembrandt Harmensz van Rijn | Old Man with Beard, Fur Cap, and Velvet Cloak | 13,000 | 16,000 | 14,500 |
| 09.1S935 | Rembrandt Harmensz van Rijn | The Circumcision | 12,500 | 16,000 | 14,250 |
| 09.1S940 | Rembrandt Harmensz van Rijn | Christ Disputing with the Doctors | 11,000 | 15,000 | 13,000 |
| 09.1S947 | Rembrandt Harmensz van Rijn | Raising of Lazarus | 11,000 | 13,000 | 12,000 |
| 09.1S939 | Rembrandt Harmensz van Rijn | Virgin and Child in the Clouds | 8,000 | 15,000 | 11,500 |
| 09.1S980 | Rembrandt Harmensz van Rijn | Old Bearded Man in a High Fur Cap | 10,000 | 13,000 | 11,500 |
| 1988.10.13 | Egyptian | The Book of the Dead of Nes-Min, Section 13 | 10,000 | 12,500 | 11,250 |
| 09.1S961 | Rembrandt Harmensz van Rijn | Saint Jerome Praying: Arched | 10,000 | 12,000 | 11,000 |
| 09.1S985 | Rembrandt Harmensz van Rijn | Studies of the Head of Saskia and Others | 8,000 | 12,000 | 10,000 |
| 59.79 | Rembrandt Harmensz van Rijn | A Peasant in a High Cap, Standing Leaning on a Stick | 9,000 | 11,000 | 10,000 |
| 46.173 | Rembrandt Harmensz van Rijn | The Rest on the Flight: A Night Piece | 6,000 | 8,000 | 7,000 |
| 59.289 | Louis Comfort Tiffany | Flower-form Vase | 6,000 | 8,000 | 7,000 |
| 64.295 | John Sloan | Night Windows | 6,000 | 7,500 | 6,750 |
| 09.1S956 | Rembrandt Harmensz van Rijn | Beheading of John the Baptist | 6,000 | 7,000 | 6,500 |
| 2002.135 | Carrie Mae Weems | Not Manet's Type | 5,000 | 7,500 | 6,250 |
| F81.57 | Robert Adamson | Elizabeth Rigby (later Lady Eastlake) | 5,000 | 7,500 | 6,250 |
| 09.1S958 | Rembrandt Harmensz van Rijn | Stoning of Saint Stephen | 4,000 | 6,000 | 5,000 |
| 09.1S965 | Rembrandt Harmensz van Rijn | Baptism of the Eunuch | 3,500 | 6,500 | 5,000 |

20

| | | | | | |
|---|---|---|---|---|---|
| 09.1S964 | Rembrandt Harmensz van Rijn | Bathers | 3,000 | 5,000 | 4,000 |
| 09.1S977 | Rembrandt Harmensz van Rijn | Samuel Manesseh Ben Israel | 2,500 | 5,000 | 3,750 |
| 09.1S977.50 | Rembrandt Harmensz van Rijn | Samuel Manasseh Ben Israel | 2,500 | 5,000 | 3,750 |
| 64.285 | John Sloan | Connoisseurs of Prints | 3,500 | 4,000 | 3,750 |
| 64.279 | John Sloan | The Woman's Page | 3,200 | 3,800 | 3,500 |
| 64.304 | John Sloan | Prone Nude | 2,000 | 3,000 | 2,500 |
| F74.21 | Islamic | Jewel Box inscribed "Amir Bukhara" | 1,000 | 4,000 | 2,500 |
| 1983.21 | Maruyama Okyo | Entertainments of the Four Seasons in Kyoto | 2,000 | 2,500 | 2,250 |

13-53846-tjt    Doc 7000    Filed 08/22/14    Entered 08/22/14 19:40:39    Page 168 of 400

**<u>Attachment J</u>**

**Step 2 Attachment**

| DIA Accession No. | Artist | Title | Third Party Average Values |
|---|---|---|---|
| 40.19 | Donatello | Madonna and Child | 5,750,000 |
| 70.186 | Amedeo Modigliani | A Man | 5,750,000 |
| 1994.57 | Pierre Auguste Renoir | The Spanish Guitarist | 5,000,000 |
| 34.188 | Frans Jansz Post | View of the Jesuit Church at Olinda, Brazil | 5,000,000 |
| 56.32 | Fra Angelico | Madonna and Child with Angels | 5,000,000 |
| 2005.62 | Henri Matisse | Anemones and Peach Blossoms | 4,750,000 |
| 65.108 | Henry Moore | Reclining Figure | 4,375,000 |
| 1988.18 | Joan Mitchell | Before, Again II | 4,000,000 |
| 46.56 | Sassetta | The Betrayal of Christ | 4,000,000 |
| 61.397 | Lucas Cranach the Elder | Saint Christopher | 4,000,000 |
| 22.3 | Michel Erhart | Virgin and Child | 3,750,000 |
| 43.38 | Canaletto | The Piazza San Marco | 3,500,000 |
| 53.270 | Sassetta | The Agony in the Garden | 3,500,000 |
| 69.305 | Lyonel Feininger | Sailboats | 3,500,000 |
| 23.31 | Lucas Cranach the Elder | Madonna and Child with Infant Saint John the Baptist and Angels | 3,350,000 |
| 26.94 | Correggio | The Mystic Marriage of Saint Catherine | 3,250,000 |
| 47.58 | Peter Paul Rubens | Archduke Ferdinand, Cardinal-Infante of Spain, at the Battle of Nordlingen | 3,250,000 |
| 63.156 | Stuart Davis | Standard Brand | 3,250,000 |

| | | | |
|---|---|---|---|
| 89.11 | Giovanni Battista Cima | Madonna and Child | 3,250,000 |
| 29.264 | Diego Rodriguez de Silva Velazquez | A Man | 3,125,000 |
| 47.81 | Winslow Homer | The Dinner Horn | 3,100,000 |
| 40.56 | Winslow Homer | Girl and Laurel | 3,000,000 |
| 59.11 | Lyonel Feininger | Fisher off the Coast | 3,000,000 |
| 74.2 | Gaetano Gandolfi | Venus Receiving the Arms from Vulcan for Aeneas | 3,000,000 |
| 77.1.2 | Fra Angelico | Virgin Annunciate | 3,000,000 |
| 74.122 | Yves Tanguy | Shadow Country | 2,950,000 |
| 64.459 | Peter Paul Rubens | Saint Ives of Treguier, Patron of Lawyers, Defender of Widows and Orphans | 2,750,000 |
| 70.150 | Winslow Homer | The Four-Leaf Clover | 2,750,000 |
| 51.66 | Winslow Homer | Defiance: Inviting a Shot Before Petersburg | 2,700,000 |
| 24.95 | Benvenuto di Giovanni di Meo del Guasta | Virgin and Child with Angels | 2,500,000 |
| 25.35 | Carlo Crivelli | The Deposition of Christ | 2,500,000 |
| 40.50 | Michel Sittow | Catherine of Aragon as the Magdalene | 2,500,000 |
| 59.444 | Sodoma | The Holy Family and St. John | 2,500,000 |
| 70.185 | Amedeo Modigliani | Young Man with a Cap | 2,500,000 |
| 72.436 | Tony Smith | Gracehoper | 2,500,000 |
| 73.1 | Charles Le Brun | The Presentation of Christ in the Temple | 2,500,000 |
| 45.454 | Georgia O'Keeffe | Stables | 2,375,000 |

2

| | | | |
|---|---|---|---|
| F76.92 | Donatello | The Nativity (Ford Nativity) | 2,362,500 |
| 59.18 | Thomas Germain | Tureen with Lid, Liner, and Stand | 2,350,000 |
| 42.127 | Claude Gellée | A Seaport at Sunset | 2,300,000 |
| 26.107 | Titian | The Appeal | 2,250,000 |
| 41.10 | Claude Gellée | Sunrise | 2,250,000 |
| 44.271 | Heinrich Campendonk | In the Forest | 2,250,000 |
| 65.347 | Niccolo dell' Abbate | Eros and Psyche | 2,250,000 |
| 66.15 | Giovanni di Paolo | Saint Catherine of Siena Dictating Her Dialogues | 2,250,000 |
| 70.173 | Edouard Manet | On the Beach | 2,200,000 |
| 31.27 | William Merritt Chase | My Little Daughter Dorothy | 2,125,000 |
| 51.13 | Bernardo Strozzi | Street Musicians | 2,062,500 |
| 49.337 | Antoine Jean Gros | Murat Defeating the Turkish Army at Aboukir | 2,000,000 |
| 57.182 | Otto Mueller | Gypsy Encampment | 2,000,000 |
| 54.118 | Charles Demuth | Buildings Abstraction, Lancaster | 1,875,000 |
| 35.110 | Oskar Kokoschka | View of Jerusalem | 1,850,000 |
| 25.2 | Egyptian | Head of a Woman | 1,800,000 |
| 38.56 | Giovanni Battista Piazzetta | Madonna and Child with an Adoring Figure | 1,750,000 |
| 55.183.A | Thomas Germain | Tureen with Lid and Stand | 1,750,000 |
| 61.28 | Albert Bierstadt | The Wolf River, Kansas | 1,750,000 |

3

| | | | |
|---|---|---|---|
| 78.38 | Jasper Francis Cropsey | Indian Summer | 1,750,000 |
| 08.9 | Thomas Wilmer Dewing | The Recitation | 1,700,000 |
| 27.316 | Thomas Wilmer Dewing | Summer | 1,700,000 |
| 73.3 | Henry Clifton and Thomas Carteret, Philadelphia | High Chest of Drawers | 1,700,000 |
| 49.23 | Jean Antoine Houdon | Robert Fulton | 1,625,000 |
| 50.20 | Max Beckmann | Still Life with Lilies | 1,600,000 |
| 77.12 | Andrew Wyeth | Sea Boots | 1,600,000 |
| 53.359 | Francesco Guardi | View of Dolo on the Brenta | 1,575,000 |
| 76.79 | Kongo | Nail Figure | 1,575,000 |
| 53.468 | Domenico Ghirlandaio | Young Man | 1,550,000 |
| 25.65 | Jan de Cock | Lot and His Daughters | 1,500,000 |
| 26.110 | Andrea Solario | Saint George and Saint Sebastian | 1,500,000 |
| 29.316 | Giovanni del Biondo | Virgin Annunciate | 1,500,000 |
| 29.322 | Max Beckmann | Still Life with Fallen Candles | 1,500,000 |
| 47.398 | John Zoffany | Scene from "Love in a Village" | 1,500,000 |
| 63.135 | Karl Schmidt-Rottluff | Evening by the Sea | 1,450,000 |
| 63.133 | Oskar Kokoschka | Girl with Doll | 1,425,000 |
| 25.6 | George Benjamin Luks | Three Top Sergeants | 1,400,000 |
| 58.385 | Paula Modersohn-Becker | Old Peasant Woman | 1,400,000 |

4

| | | | |
|---|---|---|---|
| 2010.106 | Philip Guston | Driver | 1,375,000 |
| 53.193 | Lorenz Helmschmied | Armor in the Gothic Style | 1,375,000 |
| 1999.119.A | Raoul Dufy | The Allegory of Electricity | 1,350,000 |
| 66.68 | Frank Stella | Union I | 1,350,000 |
| 66.17 | Johann Joachim Kaendler | Crane (Grus Grus) | 1,325,000 |
| 2006.153 | Raymond Duchamp-Villon | Le Cheval Majeur (The Large Horse) | 1,250,000 |
| 24.96 | Master of Città di Castello | Madonna and Child | 1,250,000 |
| 89.30 | Gerrit Adriaensz. Berckheyde | View of the Grote Kerk in Haarlem | 1,250,000 |
| 16.31 | Frank Weston Benson | My Daughter Elisabeth | 1,200,000 |
| 25.20 | Antonio Susini | Lion Attacking Horse | 1,200,000 |
| 59.450 | Ernst Ludwig Kirchner | Café | 1,200,000 |
| 79.143 | Childe Hassam | Notre Dame Cathedral, Paris, 1888 | 1,200,000 |
| 24.30 | Maurice Brazil Prendergast | Landscape with Figures | 1,175,000 |
| 2011.18 | Sanford Robinson Gifford | On the Nile | 1,150,000 |
| 29.321 | Edvard Munch | Boy in Blue | 1,150,000 |
| 29.315 | Giovanni del Biondo | Angel Annunciate | 1,125,000 |
| 79.30 | Bartolomeo Manfredi | The Fortune Teller | 1,125,000 |
| 62.97 | Henry Moore | Reclining Figure | 1,100,000 |
| 64.264 | Jean Arp | Torso of a Giant | 1,075,000 |

5

| | | | |
|---|---|---|---|
| 25.205 | Domenico Ghirlandaio | Saint Michael and the Angels at War with the Devil | 1,050,000 |
| 26.17 | Boris Grigoriev | Russian Peasant Girl | 1,050,000 |
| 70.229 | Constantin Brancusi | Sleeping Child | 1,050,000 |
| 1991.1015 | Paul Klee | Translucencies, Orange-Blue | 1,025,000 |
| 81.695 | Giovanni Battista Foggini | Cupid and Psyche | 1,025,000 |
| 77.72 | Jean Francois de Troy | Luncheon with Figures in Masquerade Dress | 1,020,000 |
| 89.39 | Pieter de Hooch | Mother Nursing Her Child | 1,000,000 |
| 25.183 | Kongo | Knife Case and Lid | 950,000 |
| 73.167 | Pietro Piffetti | Secretary | 950,000 |
| 01.2 | John Mix Stanley | Indian Telegraph | 900,000 |
| 59.443 | Pierre Bonnard | Woman with Dog | 875,000 |
| 63.134 | Karl Schmidt-Rottluff | Man with a Green Beard | 875,000 |
| 75.31 | Camille Pissarro | The Kitchen at Piette's, Montfoucault | 850,000 |
| 89.23 | Guido Reni | Head of Christ Crowned with Thorns | 850,000 |
| 37.2 | Karl Schmidt-Rottluff | Rain Clouds, Lago di Garda | 825,000 |
| 82.27 | Giovanni Franceso Susini | Bacchus and a Young Satyr | 825,000 |
| 19.34 | Frederick Carl Frieseke | The Blue Gown | 800,000 |
| 1990.10 | Gioacchino Assereto | St. Francis of Assisi in Ecstasy before a Cherub with a Violin | 800,000 |
| 22.203 | Ferdinand Hodler | A Woman | 800,000 |

6

| | | | |
|---|---|---|---|
| 49.417 | Danese Cattaneo | Neptune: Allegory of Winter and Water | 775,000 |
| 49.418 | Danese Cattaneo | Mars: Allegory of Summer and Fire | 775,000 |
| 53.177 | Etienne Pollet | Toilet Service of the Duchesse de Cadaval | 775,000 |
| 76.95 | Robert Smithson | Non Site - Site Uncertain | 775,000 |
| 21.205 | Erich Heckel | Woman | 750,000 |
| 26.113 | Cristoforo Caselli | Saint Matthew and Saint Sebastian | 750,000 |
| 44.90 | Paul Klee | Reclining | 750,000 |
| 46.135 | Martin Johnson Heade | Sunset | 750,000 |
| 56.85.2 | Thomas Germain | Candelabrum | 750,000 |
| 71.7 | Claes Oldenburg | Giant Three-Way Plug | 750,000 |
| 75.18 | Claes Oldenburg | Alphabet / Good Humor - Cloth Study | 750,000 |
| 77.14 | Claes Oldenburg | Alphabet / Good Humor | 750,000 |
| 36.10 | Il Pensionante del Saraceni | The Fruit Vendor | 725,000 |
| 15.12 | Willard Leroy Metcalf | The White Veil | 700,000 |
| 1983.24 | Fang | Mask | 700,000 |
| 37.11 | Frederic Sackrider Remington | The Mountain Man | 700,000 |
| 26.43 | Willem Kalf | Still Life with Columbine Goblet | 675,000 |
| 37.1 | Emanuel de Witte | Interior of the Oude Kerk in Amsterdam | 675,000 |
| 56.31 | Thomas Cole | American Lake Scene | 675,000 |

7

| | | | |
|---|---|---|---|
| F76.14 | Albrecht Dürer | Adam and Eve | 650,000 |
| 64.218 | Karl Hofer | Wind | 625,000 |
| 74.123 | Chaim Soutine | Red Gladioli | 625,000 |
| 1992.290 | Benin | Horse and Rider | 615,000 |
| 55.519 | Unknown | Pride | 600,000 |
| 19.150 | Robert Cozad Henri | Boy with Plaid Scarf | 550,000 |
| 1995.26 | Martin Johnson Heade | Seascape: Sunset | 550,000 |
| 26.28 | Maurice de Vlaminck | Marine | 550,000 |
| 52.246 | Augustus Saint-Gaudens | Abraham Lincoln | 550,000 |
| 77.29 | Fang | Head | 550,000 |
| 34.191 | Bacchiacca (Francesco Ubertini Verdi) | Saint John the Baptist in the Wilderness | 545,000 |
| 56.85.1 | Thomas Germain | Candelabrum | 525,000 |
| 75.59 | Felix Vallotton | Standing Nude Holding Gown on Her Knee | 525,000 |
| 26.112 | Cristoforo Caselli | Saint Paul and Saint James the Elder | 500,000 |
| 28.123 | Master of the Games | A Peasant Family | 500,000 |
| 30.322 | William James Glackens | The Promenade | 500,000 |
| 46.359 | Rogier van der Weyden | Saint Jerome in the Desert | 500,000 |
| 57.88 | Unknown | Yogini | 500,000 |
| 1988.9 | Jean-Frederic Bazille | Still Life with Fish | 475,000 |

| | | | |
|---|---|---|---|
| 79.21 | Pierre Puget | Le ravissement d'Helene | 475,000 |
| 53.197 | Unknown | Armor for the Tilt in the Saxon Fashion | 462,500 |
| 14.5 | Jonas Lie | Culebra Cut | 450,000 |
| 19.36 | Elie Nadelman | Resting Stag | 450,000 |
| 19.43 | Paul Manship | Dancer and Gazelles | 450,000 |
| 1987.75 | Louis Francois Roubiliac | Bust of Isaac Ware | 450,000 |
| 1992.8 | Henri Gervex | Cafe Scene in Paris | 450,000 |
| 21.181 | Unknown | Landscape | 450,000 |
| 29.425 | Unknown | Ceremonial Wine Vessel | 450,000 |
| 58.383 | Michel Sittow | A Young Man in a Red Cap | 450,000 |
| 72.201 | Rembrandt Harmensz van Rijn | Man Wearing a Plumed Beret and Gorget | 450,000 |
| 79.22 | Bamileke | Maternity Figure | 450,000 |
| 41.124 | Donatello | Coat of Arms of the Boni Family | 437,500 |
| 76.159 | Lovis Corinth | Still Life with Lilacs | 437,500 |
| 2005.72 | Thomas Wilmer Dewing | Commerce and Agriculture Bringing Wealth to Detroit | 425,000 |
| 22.8 | Andrea Previtali | Madonna and Child in Landscape | 425,000 |
| 22.9 | Antonio Rimpatta | Madonna and Child with the Infant Saint John the Baptist | 425,000 |
| 24.113 | Greek | Draped Female Figure | 425,000 |
| 27.160 | Augustus Edwin John | The Mumpers | 425,000 |

9

| | | | |
|---|---|---|---|
| 50.31 | John Haberle | Grandma's Hearthstone | 425,000 |
| 82.49 | Bena Lulua | Figure | 425,000 |
| 19.66 | James Earle Fraser | The End of the Trail | 400,000 |
| 25.201 | Odilon Redon | Evocation of Butterflies | 400,000 |
| 25.41 | Maso di Banco | Virgin Enthroned with Saints, Nativity and Crucifixion | 400,000 |
| 26.370 | Sawos | Ceremonial Shield | 400,000 |
| 29.331 | Georg Kolbe | Assunta | 400,000 |
| 38.80 | Bernardino dei Conti | Gentleman of the Trivulzio Family | 400,000 |
| 69.361 | Ellsworth Kelly | Black White | 400,000 |
| 82.3 | Paul Manship | The Moods of Time: Evening | 400,000 |
| 20.100 | Henry Raeburn | Henry David Erskine, Twelfth Earl of Buchan | 375,000 |
| 2001.36 | Severin Roesen | Flowers | 375,000 |
| 36.30 | Paolo Veronese | The Muse of Painting | 375,000 |
| 37.74 | Unknown | Vase | 375,000 |
| 10.6 | Willard Leroy Metcalf | Unfolding Buds | 350,000 |
| 19.19 | Childe Hassam | Surf and Rocks | 350,000 |
| 19.37 | Elie Nadelman | Wounded Stag | 350,000 |
| 1990.245 | Doccia Porcelain Factory | Apollo in his Chariot | 350,000 |
| 1996.32 | Joseph Chinard | Perseus Rescuing Andromeda | 350,000 |

10

| | | | |
|---|---|---|---|
| 25.206 | Unknown | Young Man | 350,000 |
| 44.165 | Washington Allston | The Flight of Florimell | 350,000 |
| 45.455 | Charles Sheeler | Home Sweet Home | 350,000 |
| 53.470 | Oskar Kokoschka | The Cat | 350,000 |
| 70.680 | Theodore Robinson | Scene at Giverny | 350,000 |
| 29.355 | Luca della Robbia | Madonna and Child | 340,000 |
| 1994.88 | Thomas Worthington Whittredge | The Baptism | 325,000 |
| 1998.58 | Ercole Ferrata | Portrait Bust of Ottaviano Acciaiuoli | 325,000 |
| 39.6 | Asher Brown Durand | Monument Mountain, Berkshires | 325,000 |
| 43.418 | Jacob Jordaens | Job | 325,000 |
| 72.839 | Thomas Wilmer Dewing | Classical Figures | 325,000 |
| 73.254 | Antonio Montauti | The Return of the Prodigal Son | 325,000 |
| 46.260 | Etruscan | Bronze Statuette of a Rider | 317,500 |
| 27.158 | Arthur Bowen Davies | Dances | 312,500 |
| 53.196 | Unknown | Armor for the Tilt | 312,500 |
| 1983.13 | Franz Ignaz Günther | Christ at the Column | 300,000 |
| 1998.1 | Richard Wilson | Caernarvon Castle | 300,000 |
| 21.102 | Charles Rennie Mackintosh | Petunias | 300,000 |
| 26.22 | Jan Baptist Weenix | Still Life with a Dead Swan | 300,000 |

11

| | | | |
|---|---|---|---|
| 28.95 | Nicolas Lancret | The Repast of the Hunting Party | 300,000 |
| 29.320 | Andrea di Bartolo | Christ in Benediction | 300,000 |
| 55.175 | Richard Caton Woodville | The Card Players | 300,000 |
| 21.70 | William McGregor Paxton | Woman Sewing | 290,000 |
| 47.122 | George Benjamin Luks | Woman with Macaws | 287,500 |
| 26.126 | Byzantine | Casket | 275,000 |
| 26.180 | Benin | Royal Portrait | 275,000 |
| 29.324 | Giorgio de Chirico | Horses | 275,000 |
| 29.357.A | Carl Milles | Europa and the Bull | 275,000 |
| 51.9 | Ojibwa | Bowl in the Form of a Beaver | 275,000 |
| 53.200 | Unknown | Corsaletto | 262,500 |
| 08.7 | John Henry Twachtman | The Pool | 250,000 |
| 1999.1 | Martin Puryear | Untitled, 1997 | 250,000 |
| 25.22 | Albert Pinkham Ryder | Summer Night, Moonlight | 250,000 |
| 30.370 | Rembrandt Harmensz van Rijn | Christ | 250,000 |
| 50.19 | Albert Pinkham Ryder | The Tempest | 250,000 |
| 81.698 | Easter Island | Gorget | 250,000 |
| F80.215 | Robert S. Duncanson | Ellen's Isle, Loch Katrine | 250,000 |
| 23.100 | George Inness | Apple Orchard | 240,000 |

12

| | | | |
|---|---|---|---|
| 51.331 | George Inness | The Lonely Pine | 240,000 |
| 26.106 | Unknown | Adoration of the Magi, St. Severus and St. Walburga, St. James and St. Philip | 225,000 |
| 26.124 | Francesco da Valdambrino | Corpus of Christ | 225,000 |
| 29.348 | Francesco Fanelli | Don Gaspar de Guzman, Duke of San Lucar, known as the Count-Duke of Olivares (1587-1645) | 225,000 |
| 30.371 | Egyptian | Relief of Peasants Driving Cattle and Fishing | 225,000 |
| 82.26 | John White Alexander | Panel for Music Room | 225,000 |
| 15.2 | Paul Manship | Centaur and Dryad | 210,000 |
| 25.145 | Domenico di Michelino | The Trinity | 210,000 |
| 28.147 | Unknown | Reliquary | 210,000 |
| 10.21 | Birge Harrison | Fifth Avenue at Twilight | 200,000 |
| 1997.80 | Olówè of Isè | Palace Door | 200,000 |
| 27.382 | Philippe Magnier | Nymph and Eros | 200,000 |
| 27.383 | Antoine Coysevox | Le Fleuve la Garonne | 200,000 |
| 28.150 | Unknown | Attendant Deity | 200,000 |
| 28.99 | Marie Laurencin | Mother and Child | 200,000 |
| 49.498 | Robert S. Duncanson | Uncle Tom and Little Eva | 200,000 |
| 55.520 | Unknown | Charity | 200,000 |
| 55.521 | Unknown | Fortitude | 200,000 |
| 55.522 | Unknown | Wrath | 200,000 |

13

| | | | |
|---|---|---|---|
| 89.44 | Rembrandt Harmensz van Rijn | The Death of Lucretia (?) | 200,000 |
| 22.10 | Francesco dai Libri | Madonna and Child | 190,000 |
| 27.211 | Roman | Head of a Man | 190,000 |
| 53.198 | Unknown | Half-Armor | 187,500 |
| 21.182 | Unknown | Virgin and Child Enthroned | 185,000 |
| 21.197 | Unknown | Altar Cross | 185,000 |
| 22.30 | Unknown | Virgin and Child with Donor | 185,000 |
| 1992.42 | Bartolomeo Bellano | Head of a Youth or Angel | 175,000 |
| 21.213 | Georg Kolbe | Resurrection | 175,000 |
| 65.162 | Henri Matisse | Plumed Hat | 175,000 |
| 70.323 | Emil Nolde | Portrait of the Artist and His Wife | 175,000 |
| 59.124.A | Fontana Workshop | Childbirth Set | 172,500 |
| 43.486 | William Merritt Chase | Portrait of a Lady in Black | 162,500 |
| 67.254 | William Merritt Chase | Mrs. William Merritt Chase | 162,500 |
| 70.831 | Benjamin West | Lot Fleeing from Sodom | 162,500 |
| 20.113 | Eugene Louis Boudin | View of Antibes | 160,000 |
| 21.209 | Erich Heckel | Sunflowers | 160,000 |
| 29.327 | James Ensor | Le Ballet Féerique (Le Jardin D'Amour) | 160,000 |
| 31.55 | Islamic | Ewer | 160,000 |

13-53846-tjt   Doc 7000   Filed 08/22/14   Entered 08/22/14 19:40:39   Page 183 of 400

| | | | |
|---|---|---|---|
| 2004.14 | Hale Woodruff | The Art of the Negro: Artists (Study) | 150,000 |
| 25.147 | Tino di Camaino | Madonna and Child | 150,000 |
| 26.108 | Guercino (Giovanni Francesco Barbieri) | Christ and the Woman of Samaria | 150,000 |
| 27.380 | Donatello | Saint George | 150,000 |
| 27.381 | Michelangelo | Dying Slave | 150,000 |
| 28.144 | John Crome | View near Weymouth | 150,000 |
| 35.119 | Thomas Doughty | In Nature's Wonderland | 150,000 |
| 38.25 | Turone da Verona | Crucifixion | 150,000 |
| 69.452 | Henry Ossawa Tanner | Flight into Egypt | 150,000 |
| 70.328 | Karl Schmidt-Rottluff | Water Lilies | 150,000 |
| 81.644 | Meskwaki | Bear Claw Necklace | 150,000 |
| 24.73 | Aristide Maillol | Crouching Female | 140,000 |
| 25.184 | Niccolo Tribolo | Putto and Two Geese | 140,000 |
| 28.83 | Unknown | Vase | 140,000 |
| 24.98 | Egyptian | Relief of Mourners and Funeral Meats | 137,500 |
| 42.59 | Asher Brown Durand | View of Rutland, Vermont | 137,500 |
| 28.181 | Renee Sintenis | Donkey | 135,000 |
| 28.94 | Jan Fyt | Dead Game and Weasels | 135,000 |
| 25.18 | Unknown | Angel Holding Candlestick | 130,000 |

| | | | |
|---|---|---|---|
| 51.54 | Girolamo Campagna | Athena Armed | 130,000 |
| 16.13 | Solon Hannibal Borglum | Lassoing Wild Horses | 125,000 |
| 1983.7 | Eskimo | Winged Object | 125,000 |
| 26.7 | Riza-i 'Abbasi | Pair of Doors | 125,000 |
| 29.313 | Islamic | Double-niche rug | 125,000 |
| 29.41 | Luca Signorelli | The Resurrected Christ Appearing to St. Magdalene | 125,000 |
| 29.42 | Luca Signorelli | The Resurrected Christ Appearing to His Disciples | 125,000 |
| 44.219 | School of Florence | The Agony in the Garden | 125,000 |
| 44.220 | School of Florence | Pilate Washing his Hands | 125,000 |
| 47.397.A | Dick Price | Sisiutl | 125,000 |
| 59.312 | John Mix Stanley | Mountain Landscape with Indians | 125,000 |
| 80.25 | Unknown | Tray with Design of Cranes and Chrysanthemums | 125,000 |
| 22.12 | Andrea di Bartolo | Madonna and Child | 120,000 |
| 26.111 | Antoniazzo Romano | Christ Enthroned, the Virgin, Saint Francesca Romana, an Angel and Donor | 120,000 |
| 1994.77 | Unknown | Pietre dure Cabinet | 115,000 |
| 22.254.1 | Unknown | Console | 115,000 |
| 24.104 | Roman | Head of Bearded Man | 115,000 |
| 24.13 | Tyskiewicz Painter | Jar depicting Aphrodite, Hera and Hermes | 115,000 |
| 27.208 | Roman | Sarcophagus with Winged Victories Holding Plaque | 115,000 |

16

| | | | |
|---|---|---|---|
| 48.137 | Islamic | Summer Floor Covering (nihale) | 115,000 |
| 16.16 | William Merritt Chase | Self Portrait | 112,500 |
| 24.110 | Bonino da Campione | Madonna and Child | 110,000 |
| 27.273 | Islamic | 'Dragon' Rug | 110,000 |
| 26.138 | Unknown | Sarcophagus | 105,000 |
| 29.443 | Unknown | Buddha Triad with Mandorla | 105,000 |
| 13.8 | Robert Reid | The Miniature | 100,000 |
| 2001.74 | Islamic | Section of a Tile Panel | 100,000 |
| 25.151 | Agostino di Giovanni | Madonna and Child with Angels | 100,000 |
| 26.181 | Islamic | Bowl | 100,000 |
| 27.541 | Unknown | Scene from "The Tale of Genji": from the chapter "The Maiden" | 100,000 |
| 29.297 | Islamic | Inkwell | 100,000 |
| 30.283 | Paul Klee | Woman Reading | 100,000 |
| 34.153 | Tintoretto | Study after Michelangelo's Saint Damian | 100,000 |
| 53.273 | Irish | Lunula | 100,000 |
| 27.314 | Dwight William Tryon | Autumn | 95,000 |
| 27.315 | Dwight William Tryon | Spring | 95,000 |
| 30.421 | Islamic | Bowl Inscribed "Wealth" | 90,000 |
| 1997.72.A | Louis Comfort Tiffany | Tall Case Clock | 85,000 |

17

| | | | |
|---|---|---|---|
| 22.15 | Raoul Dufy | Still Life | 85,000 |
| 24.105 | Cypriot | Head of a Bearded Man | 85,000 |
| 25.43 | Mariotto di Nardo | Madonna and Child | 85,000 |
| 27.546 | Anonymous | Seated Nyoirin Kwannon | 85,000 |
| 29.333 | Unknown | Saint John the Evangelist | 85,000 |
| 30.291 | Max Kaus | Man in a Fur Coat | 85,000 |
| 30.432.A | Islamic | Salt Cellar inscribed with Poem about Salt | 85,000 |
| 28.186 | Edward Hopper | The Locomotive | 82,500 |
| 21.23 | Bessie Potter Vonnoh | Allegresse | 80,000 |
| 26.144 | Unknown | Transenna | 80,000 |
| 26.145 | Unknown | Transenna | 80,000 |
| 27.1 | Unknown | Tomb Effigy of a Recumbent Knight | 80,000 |
| 29.430 | Edward Hopper | Night in the Park | 80,000 |
| 76.144 | Cheyenne | Shield | 80,000 |
| 2002.216 | Claes Oldenburg | Inverted Q | 75,000 |
| 22.11 | Antoniazzo Romano | Madonna and Child | 75,000 |
| 25.114 | George Wesley Bellows | A Knockout, Second State | 75,000 |
| 25.5 | Islamic | Bottle | 75,000 |
| 26.79 | Dante Gabriel Rossetti | A fight for a Woman | 75,000 |

18

| | | | |
|---|---|---|---|
| 29.233.A | Egyptian | Portion of a Carpet | 75,000 |
| 29.356 | Carl Milles | Folke Filbyter | 75,000 |
| 57.84 | Robert S. Duncanson | Fruit Piece | 75,000 |
| 70.651 | Claes Oldenburg | Profile Airflow | 75,000 |
| 77.49 | Maya | Embracing Couple | 75,000 |
| 79.179 | Western Apache | Olla | 75,000 |
| 82.33.A | Korean | Stationery Box with Design of Lotus Blossoms and Scrolls | 75,000 |
| 85.3 | Rembrandt Peale | The Court of Death | 75,000 |
| 24.120 | Leningrad Painter | Mixing Vessel | 70,000 |
| 26.142 | Unknown | Christ and the Symbols of the Four Evangelists | 70,000 |
| 26.179 | Unknown | Transenna | 70,000 |
| 28.81.1 | Jean Hauré | Sconce | 70,000 |
| 77.78 | Nazca Huari | Ceremonial Textile | 70,000 |
| 24.108.A | St. Romauld and Camaldolse Monks | Choral Leaf Fragment: Historiated "A" with Six Monks Presenting a Book to an Enthroned Saint (?) | 67,500 |
| 1999.58 | William T. Williams | The Flute Player | 65,000 |
| 2000.44 | Howardena Pindell | Autobiography: Air/CS560 | 65,000 |
| 24.127 | Swing Painter | Storage Jar | 65,000 |
| 28.112 | Max Kaus | Young Woman Sewing | 65,000 |
| 28.67 | Unknown | Four Heads of Buddhist Divinities | 65,000 |

19

| | | | |
|---|---|---|---|
| 30.285 | Oscar Ghiglia | The Artificial Rose | 65,000 |
| 38.9 | Jacques de Gheyn II | Studies of the Heads of Two Youths and an Old Woman | 65,000 |
| 45.130 | Roman | Oscillum with Satyr and Maenad | 65,000 |
| 47.82 | Robert Crosman | Taunton Chest | 65,000 |
| 21.79 | Wilhelm Pleydenwurff | The Nuremberg Chronicle | 60,000 |
| 27.547 | Anonymous | Seated Kwannon with Two Attendants | 60,000 |
| 28.100 | Maurice Utrillo | The Country House | 60,000 |
| 70.953 | Mather Brown | Sir George Augustus Elliott, Baron Heathfield | 60,000 |
| 25.36 | Islamic | Tile | 57,500 |
| 28.88 | François-Joseph Duret | Flora | 57,500 |
| 26.90 | Thomas Sully | Mrs. Edward Hudson | 55,000 |
| 27.281 | Micali Painter | Storage Jar | 55,000 |
| 28.96 | Andre Derain | Bay of Ciotat | 55,000 |
| 28.97 | Andre Derain | Young Girl | 55,000 |
| 29.347 | Wilhelm Lehmbruck | Standing Female Figure | 55,000 |
| 30.372 | Egyptian | A Middle Kingdom Dignitary | 55,000 |
| 26.20 | Augustin Hirschvogel | Landscape with the Conversion of Saulus | 52,500 |
| 30.373 | Egyptian | Scarab | 52,500 |
| 1986.25 | Huari | Tunic | 50,000 |

| | | | |
|---|---|---|---|
| 2002.126 | Robert Colescott | Change Your Luck | 50,000 |
| 21.135 | Jean Duvet | The Martyrdom of Saint John the Evangelist | 50,000 |
| 21.192 | Unknown | The Dream of Daniel | 50,000 |
| 24.72 | Aristide Maillol | Standing Female | 50,000 |
| 26.369 | Papuan Gulf | Ceremonial Shield | 50,000 |
| 27.542 | Anonymous | Seishi, the Wisdom of Amida, Seated on Lotus Pedestal | 50,000 |
| 27.545 | Anonymous | Amida, Jizo, Seishi, Kwannon and Raikabutsu | 50,000 |
| 30.359 | Rembrandt Harmensz van Rijn | Abraham's Sacrifice | 50,000 |
| 30.362 | Rembrandt Harmensz van Rijn | Abraham Entertaining the Angels | 50,000 |
| 47.180 | Vera Cruz | Palma with Maize God Receiving a Human Sacrifice | 50,000 |
| 51.10 | Ojibwa | Scoop or Spoon | 50,000 |
| 52.207 | Robert S. Duncanson | William Berthelet | 50,000 |
| 78.87 | Hale Woodruff | Ancestral Memory | 50,000 |
| F1983.73 | Bob Thompson | The Death of Camilla | 50,000 |
| 1994.19 | Donald Sultan | Oranges on a Branch March 14, 1992 | 45,000 |
| 21.189 | School of Burgundy | Saint Paul | 45,000 |
| 22.213 | A Stone Buddhist stele | Buddha with Attendants | 45,000 |
| 22.277 | Unknown | Pieta | 45,000 |
| 26.139 | Roman | Strigilated Sarcophagus with Figures of Salus & Asclepius | 45,000 |

21

| 26.161 | Unknown | Amida Buddha | 45,000 |
| --- | --- | --- | --- |
| 26.35 | Auguste Herbin | Still Life | 42,500 |
| 29.301.A | The Annunciation | Antiphonary Leaf: Historiated "M" with Annunciation | 42,500 |
| 29.302.A | The Assumption | Antiphonary Leaf: Historiated "V" with Assumption | 42,500 |
| 40.49 | Egyptian | Cinerary Urn | 42,500 |
| 45.120 | Roman | Bull Statuette | 42,500 |
| 82.29 | Mangbetu | Harp | 40,770 |
| 1983.31.1 | Sam Gilliam | The Arc Maker I & II | 40,000 |
| 1985.18 | Judy Pfaff | The Italians | 40,000 |
| 22.205 | Niklaus Weckmann | Virgin and Child | 40,000 |
| 24.14 | Group E, Greek | Neck Amphora | 40,000 |
| 25.176 | Byzantine | Calendar of the Twelve Great Feasts of the Orthodox Church | 40,000 |
| 26.10 | Benin (i) | Warrior | 40,000 |
| 26.109 | Jan van Coninxloo | The Crucifixion | 40,000 |
| 26.11 | Benin (II) | Warrior | 40,000 |
| 26.116 | Mariano Andreu | Spanish Dancer | 40,000 |
| 26.117 | Mariano Andreu | The Bathers | 40,000 |
| 26.32 | Paul Signac | Port Louis | 40,000 |
| 26.33 | Paul Signac | The Seine | 40,000 |

| | | | |
|---|---|---|---|
| 28.103 | Gino Severini | Still Life | 40,000 |
| 29.312 | William Cripps | Epergne | 40,000 |
| 29.330 | Aristide Maillol | Venus | 40,000 |
| 60.66 | Jean-Léon Gérôme | Solitude | 40,000 |
| 22.225 | Islamic | Carpet with a Large Octagon and Four Small Octagons | 37,500 |
| 26.120 | Unknown | The Flagellation | 37,500 |
| 26.89 | Thomas Sully | Dr. Edward Hudson | 37,500 |
| 30.380 | George Grosz | Conversation | 37,500 |
| 30.446 | Islamic | Seven-wick Lamp | 37,500 |
| 30.460 | Islamic | Bowl | 37,500 |
| 1987.93 | Navajo | Wearing Blanket | 35,000 |
| 1989.50 | Alvin Loving | J.E. and the Uptown A's | 35,000 |
| 1997.8 | Sèvres Porcelain Manufactory | Napoléon I | 35,000 |
| 2001.38 | Augusta Savage | Gamin | 35,000 |
| 25.156 | Donatello | Coat of Arms of the Martelli Family | 35,000 |
| 26.223 | Unknown | Window Frame | 35,000 |
| 28.132 | Tibetan | Yamantaka and Minor Deities | 35,000 |
| 29.318 | Antonio Vivarini | Scene from the Life of a Female Saint | 35,000 |
| 29.342 | Unknown | Lady with Phoenix Headdress | 35,000 |

23

| | | | |
|---|---|---|---|
| 30.274 | Unknown | Portrait of an Artist | 35,000 |
| 53.171 | Unknown | Tiger Mask | 35,000 |
| 53.175 | Unknown | Central Asian Musician | 35,000 |
| 53.176 | Unknown | Central Asian Musician | 35,000 |
| 21.194 | Unknown | Saint Catherine | 32,500 |
| 25.61 | Ivan Mestrovic | Contemplation | 32,500 |
| 27.216 | Roman | Cinerary Urn | 32,500 |
| 22.279 | Unknown | Chandelier | 31,000 |
| 1992.214 | Beauford Delaney | Self Portrait | 30,000 |
| 21.31 | Charles Cottet | The Port of Douarnenez | 30,000 |
| 25.161 | Unknown | Candelabrum Relief | 30,000 |
| 26.129 | Unknown | Bas-relief of a Horse | 30,000 |
| 28.141 | Unknown | Gateleg Table | 30,000 |
| 28.145 | Islamic | Dish | 30,000 |
| 29.250 | William Savery | Arm Chair | 30,000 |
| 25.155 | Unknown | Relief | 29,000 |
| 1992.279 | Sèvres Porcelain Manufactory | Fénelon, from the "Great Men" Series | 27,500 |
| 22.29 | Unknown | Drawing Room | 27,500 |
| 29.259 | Alexander Helwig Wyant | Summer Landscape | 27,500 |

24

| | | | |
|---|---|---|---|
| 31.347 | Islamic | Carved Panel, possibly from a cenotaph | 27,500 |
| 26.155 | Unknown | Coat of Arms of the Neapolitan Branch of the Antinori Family | 26,500 |
| 26.193 | Unknown | Roundel with Two Lions (?) in Combat | 26,500 |
| 26.203 | Unknown | Coat of Arms of Federico da Montefeltro | 26,500 |
| 09.1S1047 | Jacob Isaaksz van Ruisdael | Cottage on the Summit of the Hill | 25,000 |
| 21.196 | Unknown | Dish | 25,000 |
| 74.44 | Richard Hunt | Field Section | 25,000 |
| 22.206 | Unknown | Saint Bridget of Sweden | 24,000 |
| 26.143 | Unknown | Coat of Arms of Pope Leo X, of the Deputy Apostolic Legate in Bologna, Archbishop Altobello Averoldi of Brisighella, and of the town of Bologna | 24,000 |
| 26.183 | Unknown | Coat of Arms | 23,500 |
| 22.246 | Unknown | Roundel with Pair of Dragons | 22,500 |
| 22.247 | Unknown | Roundel with Pair of Birds | 22,500 |
| 26.146 | Unknown | Lion | 22,500 |
| 26.192 | Unknown | Roundel with Bird Attacking a Rabbit | 22,500 |
| 27.210 | Arnolfo di Cambio | Angel | 22,500 |
| 27.573 | Unknown | Arm Chair | 22,500 |
| 26.119 | Unknown | An Apostle | 21,000 |
| 26.205 | Unknown | Coat of Arms of the Brancaccio Imbriani Family | 21,000 |
| 27.217 | Roman | Fish | 21,000 |

25

| | | | |
|---|---|---|---|
| 1986.66 | Sam Gilliam | Gram | 20,000 |
| 21.116 | Honore Daumier | Le ventre legislatif | 20,000 |
| 26.235 | Unknown | Lunette | 20,000 |
| 24.77 | Unknown | Lamentation over the Dead Christ | 18,500 |
| 27.241 | Unknown | Coat of Arms, Governor of Duren | 18,500 |
| 1992.43 | Meissen Porcelain Manufactory | Teapot | 17,500 |
| 26.148 | Unknown | Fragment of a Relief | 17,500 |
| 26.217 | Unknown | Coat of Arms of Niccolo Sottile (?) | 17,500 |
| 26.221 | Unknown | Coat of Arms, probably of the Suarez Family | 17,500 |
| 46.145 | Pablo Picasso | Le combat | 17,500 |
| 22.249 | Unknown | Roundel with Lion Passant | 16,000 |
| 26.219 | Unknown | Relief Panel with Birds and Lions | 16,000 |
| 28.91 | Islamic | Dish | 16,000 |
| 22.245 | Unknown | Roundel with Mermaid | 15,000 |
| 22.248 | Unknown | Roundel with Lion Attacking a Deer | 15,000 |
| 26.156 | Unknown | Roundel With a Bird Attacking a Rabbit | 15,000 |
| 26.187 | Unknown | Roundel with Bird Attacking a Rabbit | 15,000 |
| 26.188 | Unknown | Roundel with Bird Attacking a Rabbit | 15,000 |
| 26.194 | Unknown | Roundel with Horsemen in Combat with a Feline Animal | 15,000 |

| | | | |
|---|---|---|---|
| 26.220 | Unknown | Relief Fragment | 15,000 |
| 77.71 | Bamgboye of Odo-Owa | Epa Cult Mask | 15,000 |
| 21.184 | Unknown | Crespina Istoriato | 14,000 |
| 24.143 | Larghetto Painter | Mixing Vessel | 14,000 |
| 24.147 | Dotted Stripe Group, Greek | Fish Plate | 14,000 |
| 26.170 | Unknown | Ciborium Fragment | 14,000 |
| 26.189 | Unknown | Roundel: Two Birds Flanking a Tree | 14,000 |
| 26.190 | Unknown | Roundel with Pair of Birds | 14,000 |
| 26.197 | Unknown | Roundel with Agnes Dei | 14,000 |
| 28.79 | Jean-Baptiste-François Cronier | Mantel Clock | 14,000 |
| 31.349 | Islamic | Tile with Lotus Blossoms | 14,000 |
| 29.214 | Unknown | Standing Bowl | 13,500 |
| 26.196 | Unknown | Roundel with Fox Attacking a Sheep | 13,000 |
| 26.201 | Unknown | Roundel with Two Animals in Combat | 13,000 |
| 27.220 | Unknown | Coat of Arms of the Pasqui or possibly Bernardi Family | 13,000 |
| 2002.136.1 | Fletcher and Gardiner | Coffee Pot | 12,500 |
| 26.215 | Unknown | Coat of Arms of Federico da Montefeltro | 12,500 |
| 09.1S932 | Rembrandt Harmensz van Rijn | Angel Departing from the Family of Tobias | 12,000 |
| 47.160 | Rembrandt Harmensz van Rijn | Angel Departing from the Family of Tobias | 12,000 |

| | | | |
|---|---|---|---|
| 24.11 | Greek | Flask | 11,750 |
| 26.213 | Unknown | Coat of Arms of the Fiaschi Family | 11,500 |
| 1993.24 | C. F. A. Voysey | Arm Chair | 11,000 |
| 26.212 | Unknown | Coat of Arms of the Pucci delle Stelle Family | 11,000 |
| 27.221 | Unknown | Coat of Arms, possibly of the Gioacchini Family | 11,000 |
| 79.37 | Pende | Mask | 11,000 |
| 26.202 | Unknown | Coat of Arms, Probably of the 'Capitani del Bigallo' | 10,500 |
| 26.209 | Unknown | Coat of Arms of the Gazola Family | 10,500 |
| 26.214 | Unknown | Coat of Arms of the Courtot de Cissey Family | 10,500 |
| 1994.3.A | Boston & Sandwich Glass Company | Overlaid Glass Lamp | 10,000 |
| 52.130 | Edgar Degas | Horses in the Meadow | 10,000 |
| 24.12 | Painter of the Lowering Bulls | Bottle | 9,750 |
| 30.457 | Islamic | Jug | 9,750 |
| 27.218 | Unknown | Sarcophagus | 9,500 |
| 30.431 | Islamic | Mirror with Benedictory Inscription | 9,250 |
| 1993.49 | Robert Moskowitz | Hard Ball III | 9,000 |
| 26.191 | Unknown | Roundel with Bird Attacking a Rabbit | 9,000 |
| 26.206 | Unknown | Coat of Arms, Probably of the Nini Family | 9,000 |
| 26.208 | Unknown | Coat of Arms of the Swiss Luder Family and of the Lund Family, from Schleswig | 9,000 |

28

| | | | |
|---|---|---|---|
| 26.210 | Unknown | Coat of Arms, unidentified Italian or possibly of the Michault de St-Mars Family | 9,000 |
| 25.149 | Unknown | Cassone | 8,500 |
| 26.158 | Unknown | Madonna and Child with Saints and Angels | 8,500 |
| 30.447 | Islamic | Base of a Lamp Stand wwith Benedictory Inscription | 8,500 |
| 78.43 | Unknown | Capital | 8,500 |
| 70.95 | Guro | Standing Female Figure | 8,130 |
| 62.70 | Rembrandt Harmensz van Rijn | Descent from the Cross by Torchlight | 8,000 |
| 1995.5 | Allie McGhee | Night Ritual | 7,500 |
| 2011.2 | Alison Saar | Blood/Sweat/Tears | 7,500 |
| 26.207 | Unknown | Coat of Arms, Probably of the Tafuri | 7,500 |
| 29.252 | John E. Elliott | Mirror | 7,500 |
| 26.157 | Unknown | Relief Fragment with a Bird | 7,000 |
| 26.200 | Unknown | Roundel with a Feline Animal Attacking a Rabbit | 7,000 |
| 26.211 | Unknown | Coat of Arms of the Medici Family | 7,000 |
| 26.216 | Unknown | Keystone | 7,000 |
| 39.657 | Unknown | Writing Table | 7,000 |
| 26.204 | Unknown | Coat of Arms, Probably of the Della Gherardesca Family | 6,500 |
| 27.275.A | Roman | Earring | 6,500 |
| 29.308 | Alexander Rood | Tankard | 6,500 |

29

| | | | |
|---|---|---|---|
| 29.309 | David King | Two-Handled Cup | 6,500 |
| 49.288 | Joseph Anthony, Jr. | Sauceboat | 6,500 |
| 22.232 | Georg Vest | The Ascension | 5,500 |
| 26.154 | Palestinian | Ampulla | 5,500 |
| 2008.5 | Georges de Feure | Vase | 5,000 |
| F66.40 | Rembrandt Harmensz van Rijn | Adoration of the Shepherds | 5,000 |
| 27.274.A | Roman | Earring | 4,750 |
| 26.178 | Bertoldo di Giovanni | Triumph of Love | 4,500 |
| 29.386 | Islamic | Fragment of a Tiraz Textile with Multiple Inscriptions (illegible) | 4,250 |
| 30.462 | Islamic | Bowl Inscribed "Increasing Prosperity, Wealth" | 4,250 |
| 25.83 | Unknown | Capital: Sinner Fleeing from a Chimera | 4,000 |
| 25.84 | Unknown | Capital: Two Heads between Foliate Forms | 4,000 |
| 30.461 | Islamic | Bowl | 4,000 |
| 31.54 | Islamic | Dish | 4,000 |
| 24.88 | Valerio Belli | Mythological Subject | 3,250 |
| 09.1S969 | Rembrandt Harmensz van Rijn | Cottage beside a Canal: A View of Diemen | 3,000 |
| 24.86 | Valerio Belli | The Judgement of Paris | 3,000 |
| 26.218 | Unknown | Decorative Relief | 3,000 |
| 30.440 | Islamic | Pierced-work Lamp Section with Benedictory Inscription | 3,000 |

| | | | |
|---|---|---|---|
| 69.359 | Pablo Picasso | Sueño y Mentira de Franco (Planche I) | 3,000 |
| 90.1S14462 | Kongo | Male Figure | 3,000 |
| 24.78 | Jacopo Sansovino | Madonna and Child with the Young Saint John | 2,750 |
| 24.84 | Antonio Abondio | Pieta with Two Cherubs | 2,750 |
| 30.442 | Islamic | Spigot | 2,750 |
| 30.452 | Iranian | Vase | 2,100 |
| 1994.94.1A | Boston & Sandwich Glass Company | Jewel Casket | 2,000 |
| 1996.13 | Boston & Sandwich Glass Company | Lacy Compote | 2,000 |
| 26.195 | Unknown | Roundel with Bust of Christ | 2,000 |
| 48.250 | Henri Matisse | L'Avaleur de sabres | 2,000 |
| 30.433 | Islamic | Mirror Case | 1,650 |
| 30.434 | Islamic | Mortar | 1,500 |
| 30.439.A | Islamic | Ewer inscribed "Prosperity, favor" | 1,500 |
| 26.152 | Byzantine | Adoration of the Kings | 1,250 |
| 26.404 | Simon Gate | Bowl | 1,250 |
| 29.225 | Islamic | Mirror with a Harpy | 1,200 |
| 26.177 | Unknown | Relief Fragment | 1,150 |
| 09.1S976 | Rembrandt Harmensz van Rijn | Young Man in a Velvet Cap | 1,000 |
| 29.392 | Islamic | Fragment of a Tiraz Textile | 1,000 |

31

| | | | |
|---|---|---|---|
| 59.80 | Rembrandt Harmensz van Rijn | Bust of a Man Wearing a High Cap, Three-Quarters Right: The Artist's Father(? | 1,000 |
| 29.227 | Islamic | Mirror with Flying Phoenixes | 925 |
| 30.437 | Persian | Lamp with Benedictory Inscription | 925 |
| 30.438 | Persian | Lamp with Benedictory Inscription | 925 |
| 26.255 | Villanovan | Pin | 500 |
| 1990.19 | Asante | Soul Washers Badge | 400 |
| 29.224 | Persian | Mirror with Benedictory Inscription | 400 |
| 79.28.2 | Suzuki Kiitsu | Reeds and Cranes | - |

32

**<u>Attachment K</u>**

**Step 2 Attachment Supplement**

## I.     CHRISTIE'S REPORT:

VWA reviewed Christie's Appraisals, Inc.'s ("Christie's") "Fair Market Value for Financial Planning" ("Christie's Report") dated December 17, 2013, attached as Exhibit 2 to the Expert Report of Vanessa Fusco, dated July 8, 2014, and considered all values Christie's ascribed to works at the DIA.

| Christie's Phase | Christie's # of Objects | Christie's Low Value | Christie's High Value | Christie's Average Value |
|---|---|---|---|---|
| 0 | 1032 | - | - | |
| 1 | 326 | 421,572,850 | 805,167,200 | 613,370,025 |
| 2 | 119 | 29,620,000 | 55,800,000 | 42,710,000 |
| 3 | 1296 | 3,085,145 | 6,030,040 | 4,557,593 |
| **Grand Total** | **2773** | **454,277,995** | **866,997,240** | **660,637,618** |

## PHASE 1:     SUMMARY OF CHRISTIE'S REPORT

| Christie's Phase 1 | Sum of Christie's Low Value | Sum of Christie's High Value | Sum of Christie's # of Objects |
|---|---|---|---|
| 19th Century European Art | 2,000,000 | 3,000,000 | 1 |
| 20th Century Decorative Art & Design | 410,500 | 824,000 | 9 |
| African & Oceanic Art | 850,000 | 1,600,000 | 2 |
| American Art | 12,220,000 | 25,870,000 | 17 |
| American Furniture & Decorative Arts | 120,000 | 218,000 | 8 |
| American Indian Art | 300,000 | 500,000 | 8 |
| Antiquities | 2,272,400 | 6,187,800 | 26 |
| Architectural Elements | 1,185,800 | 2,358,500 | 68 |
| Chinese Ceramics & Works of Art | 600,000 | 1,300,000 | 2 |
| European Furniture, Sculpture and Decorative Objects | 3,442,000 | 7,833,500 | 57 |
| Impressionist & Modern Art | 172,470,000 | 328,420,000 | 25 |
| Islamic Art | 3,021,150 | 7,378,400 | 44 |
| Old Master Paintings | 219,230,000 | 412,190,000 | 36 |
| Porcelain, European Ceramics & Glass | 1,308,000 | 3,268,000 | 9 |
| Pre-Columbian Art | 40,000 | 60,000 | 1 |
| Prints & Multiples | 15,000 | 25,000 | 1 |
| Silver & Objects of Vertu | 55,000 | 89,000 | 9 |
| Indian & Southeast Asian Art | 2,000,000 | 4,000,000 | 1 |
| Post-War & Contemporary Art | 33,000 | 45,000 | 2 |
| **Grand Total** | **421,572,850** | **805,167,200** | **326** |

# PHASE 2: SUMMARY OF CHRISTIE'S REPORT

| Christie's Phase 2 | Sum of Christie's Low Value | Sum of Christie's High Value | Sum of Christie's # of Objects |
|---|---|---|---|
| 20th Century Decorative Art & Design | 200,000 | 400,000 | 1 |
| African & Oceanic Art | 400,000 | 660,000 | 4 |
| American Art | 3,050,000 | 6,510,000 | 9 |
| American Indian Art | 40,000 | 60,000 | 1 |
| Antiquities | 290,000 | 1,165,000 | 9 |
| Books & Manuscripts | 125,000 | 300,000 | 7 |
| Chinese Ceramics & Works of Art | 2,130,000 | 5,030,000 | 13 |
| Chinese Paintings | 1,000,000 | 1,800,000 | 2 |
| European Furniture, Sculpture and Decorative Objects | 110,000 | 270,000 | 3 |
| Impressionist & Modern Art | 5,195,000 | 10,570,000 | 27 |
| Islamic Art | 175,000 | 300,000 | 3 |
| Japanese Art | 280,000 | 410,000 | 5 |
| Modern British Art | 250,000 | 600,000 | 1 |
| Old Master Drawings | 12,100,000 | 20,180,000 | 3 |
| Old Master Paintings | 2,330,000 | 4,360,000 | 19 |
| Prints & Multiples | 345,000 | 535,000 | 7 |
| Russian Art | 830,000 | 1,350,000 | 2 |
| Indian & Southeast Asian Art | 770,000 | 1,300,000 | 3 |
| **Grand Total** | **29,620,000** | **55,800,000** | **119** |

# ALL PHASES: CHRISTIE'S REPORT TOP 15 WORKS BY VALUE

| Christie's Lot Num. | Artist | Title | Christie's Low Value | Christie's High Value | Christie's Average Value |
|---|---|---|---|---|---|
| 244 | Pieter Bruegel the Elder | The Wedding Dance | 100,000,000 | 200,000,000 | 150,000,000 |
| 197 | Vincent Willem van Gogh | Self Portrait | 80,000,000 | 150,000,000 | 115,000,000 |
| 266 | Rembrandt Harmensz van Rijn | The Visitation | 50,000,000 | 90,000,000 | 70,000,000 |
| 186 | Henri Matisse | The Window | 40,000,000 | 80,000,000 | 60,000,000 |
| 176 | Edgar Degas | Dancers in the Green Room | 20,000,000 | 40,000,000 | 30,000,000 |
| 188 | Claude Monet | Gladioli | 12,000,000 | 20,000,000 | 16,000,000 |
| 376 | Michelangelo | Scheme for the Decoration of the C | 12,000,000 | 20,000,000 | 16,000,000 |
| 240 | Neri di Bicci | Tobias and Three Archangels | 8,000,000 | 15,000,000 | 11,500,000 |
| 256 | Frans Hals | Portrait of Hendrik Swalmius | 6,000,000 | 10,000,000 | 8,000,000 |
| 270 | Michael Sweerts | In the Studio | 5,000,000 | 10,000,000 | 7,500,000 |
| 264 | Antoine Le Nain | The Village Piper | 6,000,000 | 8,500,000 | 7,250,000 |
| 239 | Giovanni Bellini | Madonna and Child | 4,000,000 | 10,000,000 | 7,000,000 |
| 268 | Sassetta | The Procession to Calvary | 5,000,000 | 8,000,000 | 6,500,000 |
| 21 | John Singer Sargent | Mosquito Nets | 4,500,000 | 8,000,000 | 6,250,000 |
| 247 | Jean Siméon Chardin | Still Life with Dead Hare | 5,000,000 | 7,000,000 | 6,000,000 |
| 250 | Jan van Eyck | Saint Jerome in His Study | 4,000,000 | 8,000,000 | 6,000,000 |

## II.     ARTVEST REPORT:

VWA reviewed Artvest Partners LLC's ("Artvest") July 8, 2014 report "Expert Witness Report of Michael Plummer" ("Artvest Report") and considered all values Artvest ascribed to works at the DIA.

### ARTVEST REPORT'S GROUP 3:
### "HIGH VALUE, NON-COD WORKS IN THE DIA COLLECTION, THAT DIA VALUED FOR INSURANCE PURPOSES OR OTHERWISE OF $1,000,000 OR MORE."

| Artvest Category | Artvest Low Value | Artvest High Value | Artvest Average Value | Count of Objects |
|---|---|---|---|---|
| Africa, Oceania & Indigenous America | 3,100,000 | 5,200,000 | 4,150,000 | 6 |
| American Art Before 1950 | 222,355,000 | 325,885,000 | 274,120,000 | 86 |
| Ancient Near Eastern Art | 80,000,000 | 180,000,000 | 130,000,000 | 3 |
| Asian Art | 200,000 | 300,000 | 250,000 | 1 |
| Contemporary Art after 1950 | 238,800,000 | 318,700,000 | 278,750,000 | 25 |
| European Modern Art to 1950 | 371,880,000 | 518,140,000 | 445,010,000 | 51 |
| European Painting | 601,790,000 | 861,470,000 | 731,630,000 | 120 |
| European Sculpture and Decorative Arts | 46,150,000 | 72,000,000 | 59,075,000 | 49 |
| Islamic Art | 80,000 | 150,000 | 115,000 | 1 |
| Prints, Drawings & Photographs | 4,940,000 | 8,160,000 | 6,550,000 | 6 |
| Timepieces | 60,000 | 80,000 | 70,000 | 1 |
| **Grand Total** | **1,569,355,000** | **2,290,085,000** | **1,929,720,000** | **349** |

### ARTVEST REPORT'S TOP 15 WORKS BY VALUE

| Artvest OBS | Artist | Title | Artvest Low Value | Artvest High Value | Artvest Average Value |
|---|---|---|---|---|---|
| 181 | Vincent Willem van Gogh | Portrait of Postman Roulin | 80,000,000 | 120,000,000 | 100,000,000 |
| 166 | Pablo Picasso | Melancholy Woman | 60,000,000 | 80,000,000 | 70,000,000 |
| 96 | Neo-Assyrian | Tiglath-Pileser III Receiving Homag | 40,000,000 | 80,000,000 | 60,000,000 |
| 83 | Frederic Edwin Church | Cotopaxi | 40,000,000 | 60,000,000 | 50,000,000 |
| 95 | Neo-Babylonian | Snake-Dragon, Symbol of Marduk, | 30,000,000 | 70,000,000 | 50,000,000 |
| 169 | Pablo Picasso | Woman Seated in an Armchair | 40,000,000 | 60,000,000 | 50,000,000 |
| 187 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 40,000,000 | 50,000,000 | 45,000,000 |
| 115/116 | Andy Warhol | Self Portrait: Former Double Self Po | 40,000,000 | 50,000,000 | 45,000,000 |
| 121 | Barnett Newman | Be I (second version) | 35,000,000 | 45,000,000 | 40,000,000 |
| 54 | James Abbott McNeill Whistler | Nocturne in Black and Gold, the Fal | 25,000,000 | 45,000,000 | 35,000,000 |
| 111 | Mark Rothko | Orange, Brown | 30,000,000 | 40,000,000 | 35,000,000 |
| 188 | Paul Cezanne | Madame Cezanne | 30,000,000 | 40,000,000 | 35,000,000 |
| 277 | Michelangelo Merisi da Caravaggio | Martha and Mary Magdalene | 30,000,000 | 40,000,000 | 35,000,000 |
| 143 | Franz Marc | Animals in a Landscape | 25,000,000 | 40,000,000 | 32,500,000 |
| 197 | Georges Pierre Seurat | View of Le Crotoy from Upstream | 20,000,000 | 40,000,000 | 30,000,000 |

## III.    WINSTON REPORT

VWA reviewed Winston Art Group's ("Winston") report "Fair Market Value Appraisal" (the "Winston Report") for property in the collection of the DIA and considered all values Winston ascribed as of March 25th, 2014.

| Winston Group Categories | Winston Count of Objects | Sum of Winston Value |
|---|---|---|
| Fine Art | 483 | 1,645,631,950 |
| Furniture, Decorative Art, Silver , and Armor | 39 | 21,575,500 |
| Other | 60 | 75,038,300 |
| **Grand Total** | **582** | **1,742,245,750** |

### WINSTON REPORT BREAKDOWN BY CLASSIFICATIONS

| Winston Classifications | Winston Count of Objects | Sum of Winston Values | Percentage by Classification |
|---|---|---|---|
| African | 13 | 4,057,900 | 0.23% |
| Ancient Near East | 4 | 39,000,000 | 2.24% |
| Armor | 5 | 3,550,000 | 0.20% |
| Asian | 20 | 21,795,000 | 1.25% |
| Badge | 1 | 400 | 0.00% |
| Decorative | 6 | 1,251,500 | 0.07% |
| Easter Island | 1 | 250,000 | 0.01% |
| Egyptian | 4 | 2,355,000 | 0.14% |
| Fine Art | 483 | 1,645,631,950 | 94.45% |
| Furniture | 9 | 6,124,000 | 0.35% |
| Greco-Roman | 5 | 6,920,000 | 0.40% |
| Islamic | 4 | - | 0.00% |
| Native American | 6 | 535,000 | 0.03% |
| Pre-Columbian | 2 | 125,000 | 0.01% |
| Silver | 15 | 9,650,000 | 0.55% |
| Tapestry | 4 | 1,000,000 | 0.06% |
| **Grand Total** | **582** | **1,742,245,750** | **100.00%** |

13-53846-tjt    Doc 7000    Filed 08/22/14    Entered 08/22/14 19:40:39    Page 206 of 400

# WINSTON REPORT'S TOP 15 WORKS BY VALUE

| Winston OBS | Artist | Title | Winston Values |
|---|---|---|---|
| 390 | Vincent Willem van Gogh | Portrait of Postman Roulin | 100,000,000 |
| 37 | Michelangelo Merisi da Caravaggio | Martha and Mary Magdalene | 50,000,000 |
| 230 | Henri Matisse | Coffee | 50,000,000 |
| 281 | Pablo Picasso | Melancholy Woman | 50,000,000 |
| 389 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 40,000,000 |
| 322 | Mark Rothko | Orange, Brown | 40,000,000 |
| 318 | Auguste Rodin | The Thinker | 35,000,000 |
| 465 | Andy Warhol | Self Portrait: Former Double Self Po | 30,000,000 |
| 162 | Alberto Giacometti | Standing Woman II | 30,000,000 |
| 283 | Pablo Picasso | Woman Seated in an Armchair | 30,000,000 |
| 9 | Francis Bacon | Study for Crouching Nude | 28,000,000 |
| 50 | Paul Cezanne | Madame Cezanne | 25,000,000 |
| 391 | Vincent Willem van Gogh | The Diggers | 25,000,000 |
| 369 | Clyfford Still | Untitled 1951-T, No. 2 | 22,000,000 |
| 224 | Franz Marc | Animals in a Landscape | 22,000,000 |

## IV.   OVERVIEW OF THIRD-PARTY VALUATIONS

### OVERVIEW OF VALUATION BY NUMBER OF ITEMS

| DIA Insurance Value Buckets | DIA's # of Items | Artvest's # of Items | Christie's # of Items | VWA's # of Items | Winston's # of Items |
|---|---|---|---|---|---|
| a. >= 50M | 10 | 7 | 3 | 10 | 7 |
| b. >= 25M, < 50M | 18 | 17 | 1 | 16 | 17 |
| c. >= 10M, < 25M | 53 | 50 | 3 | 42 | 51 |
| d. >= 5M, < 10M | 55 | 39 | 13 | 32 | 39 |
| e. >= 2M, < 5M | 125 | 106 | 18 | 57 | 105 |
| f. >= 750K, < 2M | 275 | 130 | 29 | 61 | 148 |
| g. >= 500K, < 750K | 157 | | 10 | 11 | 12 |
| h. >= 100K, < 500K | 1,433 | | 55 | 51 | 64 |
| i. >= 2.5K, < 100K | 5,970 | | 127 | 32 | 52 |
| j. < 2.5K | 9,082 | | 56 | 5 | 6 |
| No DIA insurance and no valuation by any party | 42,854 | | | | 3 |
| No DIA insurance and valuation by at least one party | 193 | | 130 | 70 | 78 |
| **Grand Total** | **60,225** | **349** | **445** | **387** | **582** |

## OVERVIEW OF TOTAL VALUATION BY AVERAGE VALUE

| DIA Insurance Value Buckets | DIA's Insurance Value | Artvest's Average Value | Christie's Average Value | VWA's Average Value | Winston's Average Value |
|---|---|---|---|---|---|
| a. >= 50M | 635,000,000 | 338,000,000 | 335,000,000 | 865,000,000 | 245,000,000 |
| b. >= 25M, < 50M | 579,000,000 | 360,125,000 | 60,000,000 | 575,000,000 | 280,250,000 |
| c. >= 10M, < 25M | 739,000,000 | 446,900,000 | 42,250,000 | 850,350,000 | 467,775,000 |
| d. >= 5M, < 10M | 335,000,000 | 298,625,000 | 47,740,000 | 356,000,000 | 162,650,000 |
| e. >= 2M, < 5M | 352,800,000 | 315,430,000 | 78,950,000 | 510,750,000 | 314,255,000 |
| f. >= 750K, < 2M | 286,060,000 | 170,640,000 | 35,455,000 | 270,489,000 | 211,430,000 |
| g. >= 500K, < 750K | 88,298,702 | | 3,110,000 | 12,019,000 | 5,670,000 |
| h. >= 100K, < 500K | 192,488,232 | | 18,436,500 | 97,308,750 | 47,428,770 |
| i. >= 2.5K, < 100K | 105,254,838 | | 23,315,150 | 13,047,500 | 3,574,030 |
| j. < 2.5K | 5,026,605 | | 1,971,625 | 77,750 | 42,750 |
| No DIA insurance and no valuation by any party | 0 | | | | 0 |
| No DIA insurance and valuation by at least one party | 0 | | 9,851,750 | 16,319,750 | 4,170,200 |
| **Grand Total** | **3,317,928,376** | **1,929,720,000** | **656,080,025** | **3,566,361,750** | **1,742,245,750** |

## OVERVIEW OF THIRD-PARTY VALUATION

| DIA Insurance Value Buckets | # of Units that were valued by third parties | Average Value of VWA and if not available, average value of independent third parties |
|---|---|---|
| a. >= 50M | 10 | 865,000,000 |
| b. >= 25M, < 50M | 18 | 577,937,500 |
| c. >= 10M, < 25M | 52 | 874,000,000 |
| d. >= 5M, < 10M | 51 | 401,715,000 |
| e. >= 2M, < 5M | 123 | 608,440,000 |
| f. >= 750K, < 2M | 173 | 360,911,500 |
| g. >= 500K, < 750K | 23 | 15,404,000 |
| h. >= 100K, < 500K | 120 | 115,663,520 |
| i. >= 2.5K, < 100K | 165 | 33,299,680 |
| j. < 2.5K | 55 | 2,052,375 |
| No DIA insurance and valuation by at least one party | 193 | 23,308,500 |
| **Grand Total** | **983** | **3,877,732,075** |

6

# OVERVIEW OF THIRD PARTY VALUATION (EXPANDED)

| DIA Insurance Value Buckets | # of Units valued by VWA | # of Units valued by Independent third parties | # of Units that were value by VWA or Independent | Total Average Value of VWA | Total Average Value of Independent third parties | Total Average Value of VWA or Independent third parties |
|---|---|---|---|---|---|---|
| a. >= 50M | 10 | | 10 | 865,000,000 | | 865,000,000 |
| b. >= 25M, < 50M | 16 | 2 | 18 | 575,000,000 | 2,937,500 | 577,937,500 |
| c. >= 10M, < 25M | 42 | 10 | 52 | 850,350,000 | 23,650,000 | 874,000,000 |
| d. >= 5M, < 10M | 32 | 19 | 51 | 356,000,000 | 45,715,000 | 401,715,000 |
| e. >= 2M, < 5M | 57 | 66 | 123 | 510,750,000 | 97,690,000 | 608,440,000 |
| f. >= 750K, < 2M | 61 | 112 | 173 | 270,489,000 | 90,422,500 | 360,911,500 |
| g. >= 500K, < 750K | 11 | 12 | 23 | 12,019,000 | 3,385,000 | 15,404,000 |
| h. >= 100K, < 500K | 51 | 69 | 120 | 97,308,750 | 18,354,770 | 115,663,520 |
| i. >= 2.5K, < 100K | 32 | 133 | 165 | 13,047,500 | 20,252,180 | 33,299,680 |
| j. < 2.5K | 5 | 50 | 55 | 77,750 | 1,974,625 | 2,052,375 |
| No DIA insurance and valuation by at least one party | 70 | 123 | 193 | 16,319,750 | 6,988,750 | 23,308,500 |
| **Grand Total** | **387** | **596** | **983** | **3,566,361,750** | **311,370,325** | **3,877,732,075** |

**Attachment L**

**Step 3 Attachment**

## OVERVIEW OF AGE OF DIA INSURANCE VALUE FOR ENTIRE COLLECTION

| DIA Insurance Value Buckets | DIA's # of Items | DIA's Insurance Value | Weighted Average Age |
|---|---|---|---|
| a.  >= 50M | 10 | 635,000,000 | 5.5 yrs |
| b.  >= 25M, < 50M | 18 | 579,000,000 | 3.9 yrs |
| c.  >= 10M, < 25M | 53 | 739,000,000 | 4.9 yrs |
| d.  >= 5M, < 10M | 55 | 335,000,000 | 6.4 yrs |
| e.  >= 2M, < 5M | 125 | 352,800,000 | 10.4 yrs |
| f.  >= 750K, < 2M | 275 | 286,060,000 | 10.4 yrs |
| g.  >= 500K, < 750K | 157 | 88,298,702 | 12.0 yrs |
| h.  >= 100K, < 500K | 1,433 | 192,488,232 | 13.2 yrs |
| i.  >= 2.5K, < 100K | 5,970 | 105,254,838 | 14.7 yrs |
| j.  < 2.5K | 9,082 | 5,026,605 | 15.3 yrs |
| No DIA insurance and no valuation by any party | 42,854 | 0 | |
| No DIA insurance and valuation by at least one party | 193 | 0 | |
| **Grand Total** | **60,225** | **3,317,928,376** | **7.1 yrs** |

## OVERVIEW OF AGE OF DIA INSURANCE VALUE FOR THOSE WORKS THAT HAVE DIA INSURANCE VALUES AND NO THIRD-PARTY VALUES

| DIA Insurance Value Buckets | # of Units valued by DIA Insurance only | Sum of Average DIA Insurance Value | Weighted Average Age |
|---|---|---|---|
| c.  >= 10M, < 25M | 1 | 10,000,000 | 17.8 yrs |
| d.  >= 5M, < 10M | 4 | 24,000,000 | 14.3 yrs |
| e.  >= 2M, < 5M | 2 | 5,000,000 | 8.0 yrs |
| f.  >= 750K, < 2M | 102 | 82,230,000 | 10.6 yrs |
| g.  >= 500K, < 750K | 134 | 75,423,702 | 12.0 yrs |
| h.  >= 100K, < 500K | 1,313 | 167,760,232 | 13.2 yrs |
| i.  >= 2.5K, < 100K | 5,805 | 99,072,904 | 14.6 yrs |
| j.  < 2.5K | 9,027 | 4,962,700 | 15.3 yrs |
| **Grand Total** | **16,388** | **468,449,537** | **13.0 yrs** |

## COMPARISON OF DIA INSURANCE VALUE AND VWA VALUE

| DIA Insurance Value Buckets | DIA's # of Items | DIA's Insurance Value | Weighted Average Age | VWA's Average Value | Annualized % Increase |
|---|---|---|---|---|---|
| a.  >= 50M | 10 | 635,000,000 | 5.5 yrs | 865,000,000 | 6.6% |
| b.  >= 25M, < 50M | 16 | 510,000,000 | 3.9 yrs | 575,000,000 | 3.3% |
| c.  >= 10M, < 25M | 42 | 605,000,000 | 4.8 yrs | 850,350,000 | 8.4% |
| d.  >= 5M, < 10M | 32 | 196,000,000 | 7.3 yrs | 356,000,000 | 11.1% |
| e.  >= 2M, < 5M | 57 | 166,500,000 | 12.1 yrs | 510,750,000 | 17.1% |
| f.  >= 750K, < 2M | 61 | 70,050,000 | 11.7 yrs | 270,489,000 | 24.5% |
| g.  >= 500K, < 750K | 11 | 6,175,000 | 12.2 yrs | 12,019,000 | 7.8% |
| h.  >= 100K, < 500K | 51 | 10,848,000 | 15.0 yrs | 97,308,750 | 53.2% |
| i.  >= 2.5K, < 100K | 32 | 1,234,234 | 16.6 yrs | 13,047,500 | 57.6% |
| j.  < 2.5K | 5 | 4,605 | 16.5 yrs | 77,750 | 96.3% |
| No DIA insurance and valuation by at least one party | 70 | 0 | | 16,319,750 | |
| **Grand Total** | **387** | **2,200,811,839** | **5.9 yrs** | **3,566,361,750** | **10.5%** |

## PROJECTED CURRENT MARKET VALUE OF DIA INSURANCE VALUE NOT COVERED BY THIRD PARTY VALUES

| DIA Insurance Value Buckets | # of Units valued by DIA Insurance only | Initial Sum of Average DIA Insurance Value | Market Appreciation Rate | Projected Sum of Average DIA Insurance Value |
|---|---|---|---|---|
| c.  >= 10M, < 25M | 1 | 10,000,000 | 62.0% | 16,200,000 |
| d.  >= 5M, < 10M | 4 | 24,000,000 | 62.0% | 38,880,000 |
| e.  >= 2M, < 5M | 2 | 5,000,000 | 62.0% | 8,100,000 |
| f.  >= 750K, < 2M | 102 | 82,230,000 | 62.0% | 133,212,600 |
| g.  >= 500K, < 750K | 134 | 75,423,702 | 62.0% | 122,186,397 |
| h.  >= 100K, < 500K | 1,313 | 167,760,232 | 62.0% | 271,771,575 |
| i.  >= 2.5K, < 100K | 5,805 | 99,072,904 | 62.0% | 160,498,104 |
| j.  < 2.5K | 9,027 | 4,962,700 | 62.0% | 8,039,573 |
| **Grand Total** | **16,388** | **468,449,537** | **62.0%** | **758,888,249** |

**<u>Attachment M</u>**

**Step 4 Attachment**

| Cat. | Department | Avg Price | Africa, Oceania & Indigenous Americas | American Art before 1950 & African American Art | Ancient Near Eastern & Greco-Roman & Ancient European | Asian & Islamic Art | Contemporary Art after 1950 | European Modern Art to 1950 | European Painting | European Sculpture and Dec Arts | Prints, Drawings & Photographs, Performing Art, & Textiles | TOTAL PORTFOLIO VALUE (ex. High Value Arts) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 5,632 | 1,566 | 1,679 | 6,877 | 1,023 | 253 | 95 | 4,962 | 20,767 | 42,854 |
| | % Premium and/or Discount | | 0.0% | 0.0% | 25.0% | 15.0% | 15.0% | 15.0% | 10.0% | 15.0% | (10.0%) | |
| 1 | 19th Century European | 110,904 | | | | | | | 3,863,140 | | | 3,863,140 |
| 2 | American Art | 464,418 | | 363,639,547 | | | | | | | | 363,639,547 |
| 3 | Antiquities | 80,049 | | | 168,003,344 | | | | | | | 168,003,344 |
| 4 | Arms & Armor | 8,166 | | | | | | | | 7,766,225 | | 7,766,225 |
| 5 | Asian Art (MIX) | 77,216 | | | | 122,132,628 | | | | | | 122,132,628 |
| 6 | Asian Contemporary | 420,795 | | | | | 165,014,781 | | | | | 165,014,781 |
| 7 | Chinese Paintings | 196,647 | | | | 311,038,220 | | | | | | 311,038,220 |
| 8 | Chinese WOA | 179,882 | | | | 284,521,390 | | | | | | 284,521,390 |
| 9 | Decorative Arts | 15,811 | | | | | | | | 15,036,800 | | 15,036,800 |
| 10 | European Interiors | 32,291 | | | | | | | | 30,710,284 | | 30,710,284 |
| 11 | European WOA | 61,556 | | | | | | | | 58,543,166 | | 58,543,166 |
| 12 | Japanese WOA | 33,035 | | | | 52,252,107 | | | | | | 52,252,107 |
| 13 | Latin American | 185,579 | | 145,308,679 | | | | | | | | 145,308,679 |
| 14 | Judaica | 36,054 | | | | | | | | 34,288,815 | | 34,288,815 |
| 15 | Modern & Imp | 599,703 | | | | | | 174,483,480 | | | | 174,483,480 |
| 16 | Native American | 31,113 | 87,612,909 | | | | | | | | | 87,612,909 |
| 17 | Oceanic | 136,072 | 383,177,943 | | | | | | | | | 383,177,943 |
| 18 | Old Masters | 294,186 | | | | | | | 10,247,492 | | | 10,247,492 |
| 19 | Photographs | 46,262 | | | | | | | | | 432,328,608 | 432,328,608 |
| 20 | Post war | 562,196 | | | | | 220,465,012 | | | | | 220,465,012 |
| 21 | Prints | 30,857 | | | | | | | | | 288,359,796 | 288,359,796 |
| 22 | Russian Art | 160,601 | | | | | | | 5,594,285 | | | 5,594,285 |
| 23 | Silver | 22,033 | | | | | | | | 20,954,154 | | 20,954,154 |
| 24 | South Asian Contemporary | 122,804 | | | | | 48,157,630 | | | | | 48,157,630 |
| 25 | Southeast Asian | 50,016 | | | | 79,111,593 | | | | | | 79,111,593 |
| | TOTAL | | 470,790,851 | 508,948,226 | 168,003,344 | 849,055,938 | 433,637,424 | 174,483,480 | 19,704,918 | 167,299,444 | 720,688,404 | 3,512,612,030 |

- Average price per department was calculated based on Christie's and Sotheby's 2013 sales figures as detailed in Exhibit E of the Artvest report;

- These prices were then applied linearly across the applicable DIA departments using averages for instances where multiple departments overlap;

- The table above illustrates this methodology and resulting compilation in the form of a pricing matrix;

- For the category of Prints, Drawings, and Photographs: Apply 10% discount to account for works by less collected artists, which may be offset by a number of works by extremely well-known and highly collected artists

- Supplements have been applied to the categories:

  - Ancient Near Eastern & Greco-Roman & Ancient European (25%): because of the verifiable provenance and the fact that in most cases the objects entered the museum prior to the UNESCO Convention on Cultural Property of 1970

  - Asian & Islamic Art (15%): because of the strong market interest in this category

  - Contemporary Art after 1950 (15%): because of the strong market interest in this category; however, the supplement has been kept low to be conservative

  - European Modern Art to 1950 (15%): because this market is very selective, and because of the strength of DIA's holdings in this category; this is conservative

  - European Painting (10%): because most of the paintings in this category have been valued individually and the remaining paintings are less important and, as such, we have ascribed a conservative supplement

  - European Sculpture and Decorative Art (15%): this is a conservative supplement because of the large variety of objects within this sector

2

**Exhibit B**

1          UNITED STATES BANKRUPTCY COURT
            EASTERN DISTRICT OF MICHIGAN
2                 SOUTHERN DIVISION

3

4   In re:                      )
    CITY OF DETROIT, MICHIGAN,   )
5                                )
         Debtor.                 )   Chapter 9
6                                )
            vs.                  )  Case No. 13-53846
7                                )
    ---------------------------)Hon. Steven W. Rhodes

8

9

10

11

12

13        VIDEOTAPED DEPOSITION OF VICTOR WIENER

14                New York, New York

15             Monday, August 4, 2014

16

17

18

19

20

21

22

23

24   Reported by:
     MICHELLE COX
25   JOB NO.: 215823

Page 2

```
 1
 2
 3                          August 4, 2014
 4                          9:02 a.m.
 5
 6
 7        Videotaped Deposition of VICTOR WIENER,
 8   held at the offices of Jones Day, 222 East 41st
 9   Street, New York, New York, pursuant to Notice,
10   before Michelle Cox, a Notary Public of the
11   State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S :
 2
 3        HONIGMAN MILLER SCHWARTZ AND COHN LLP
 4        Attorneys for Detroit Institute of Fine Arts
 5             2290 First National Building
 6             660 Woodward Avenue
 7             Detroit, Michigan 48226-3506
 8        BY:    JASON R. ABEL, ESQ.
 9
10        CRAVATH, SWAINE & MOORE LLP
11        Attorneys for Detroit Institute of Fine Arts
12             825 Eight Avenue
13             New York, New York 10019-7475
14        BY:    RICHARD LEVIN, ESQ.
15
16        JONES DAY
17        Attorneys for City of Detroit
18             51 Louisiana Avenue NW
19             Washington, D.C. 20001-2113
20        BY:    GEOFFREY S. IRWIN, ESQ.
21               ALEX BLANCHARD, ESQ. (Telephonically)
22
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S :  (Cont'd.)
 2
 3        WEIL, GOTSHAL & MANGES LLP
 4        Attorneys for the Financial Insurance
 5        Guaranty Company
 6             700 Louisiana, Suite 1700
 7             Houston, Texas 77002-2755
 8        BY:    ALFRED R. PEREZ, ESQ.
 9               DANA KAUFMAN, ESQ.
10
11        DENTONS
12        Attorneys Official Committee of Retirees
13             1221 Avenue of the Americas
14             New York, New York 10020-1089
15        BY:    ARTHUR H. RUEGGER, ESQ.
16
17        CLARK HILL PLC
18        Attorneys for Detroit Retirement Systems
19             212 East Grand River
20             Lansing, Michigan 48906
21        BY:    MICHAEL J. PATTWELL, ESQ.
22
23        ALSO PRESENT:  Jim Brady, Videographer
24
25
```

Page 5

```
 1                      INDEX
 2   WITNESS              EXAMINATION BY        PAGE
 3   VICTOR WIENER        MR. ABEL                8
 4
 5
 6               INFORMATION REQUESTS
 7
 8   REQUESTS: ,20
 9   MOTIONS:,204
10                      EXHIBITS
11   DEPOSITION EXHIBITS                FOR ID.
12   Exhibit 1    Notice of Deposition       11
13   Exhibit 2    Portion of the Work File   17
14   Exhibit 3    Expert Report              36
15   Exhibit 4    2014-2015 USPAP Standards  97
16   Exhibit 5    Extract from the USPAP     127
                  Frequently Asked Questions
17
     Exhibit 6    Printout From the American  172
18                Alliance Museum's Website
19   Exhibit 7    Document Entitled "All about 270
                  Appraisal:  The Definitive
20                Appraisal Handbook"
21   Exhibit 8    Supplemental Receipt and    325
                  Commitment
22
     Exhibit 9    Article Entitled "Unique    330
23                Aspects of Appraising Large
                  Scale Art"
24
25
```

Page 6

1        IT IS HEREBY STIPULATED AND AGREED
2   by and between the attorneys for the respective
3   parties herein, that filing and sealing be and
4   the same are hereby waived.
5        IT IS FURTHER STIPULATED AND AGREED
6   that all objections, except as to the form of
7   the question, shall be reserved to the time of
8   the trial.
9        IT IS FURTHER STIPULATED AND AGREED
10  that the within deposition may be sworn to and
11  signed before any officer authorized to
12  administer an oath, with the same force and
13  effect as if signed and sworn to before the
14  Court.
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        THE VIDEOGRAPHER:  Today's date is
2   August 4, 2014.  The time is 9:04 a.m.
3        My name is Jim Brady.  I'm the
4   videographer here today at the law firm of
5   Jones Day, 222 East 41st Street, New York, New
6   York, here today in the matter of Detroit
7   Bankruptcy.
8        Today's witness' name is Victor Wiener.
9        I'd ask to have the attorneys please
10  introduce themselves, and for the court
11  reporter to swear in the witness.
12       MR. ABEL:  Good morning.
13       Jason Abel on behalf of the Detroit
14  Institute of Art Corporation -- Corp.
15       MR. IRWIN:  Jeff Irwin, Jones Day, on
16  behalf of the City of Detroit.
17       MR. RUEGGER:  Arthur Ruegger from Dentons,
18  on behalf of the Retirees Committee.
19       MR. PEREZ:  Alfredo Pérez, Weil Gotshal,
20  on behalf of Financial Insurance Guaranty
21  Company.
22       MS. KAUFMAN:  Dana Kaufman, also from Weil
23  Gotshal, on behalf of Financial Guaranty
24  Insurance Company.
25       MR. PEREZ:  And also present is

Page 8

1   David Shapiro, who is one of Mr. Wiener's
2   collaborators.
3        THE VIDEOGRAPHER:  Would folks on the
4   phone wish to introduce themselves, please.
5        MR. BLANCHARD:  Sure.
6        This is Alex Blanchard of Jones Day on
7   behalf of the City.
8        MR. ABEL:  Anyone else on the phone?
9        Okay.
10  V I C T O R   W I E N E R, called as a witness,
11       having been duly sworn by a Notary Public, was
12       examined and testified as follows:
13       MR. ABEL:  Thank you.
14  EXAMINATION BY
15  MR. ABEL:
16  Q    Good morning, sir.
17       As I said, my name is Jason Abel.  I'm
18  here representing the Detroit Institute of Art
19  Corp.
20       What is your name, for the record?
21  A    Victor Wiener.
22  Q    And how do you spell your last name?
23  A    W-I-E-N-E-R.
24  Q    Have you ever been deposed before, sir?
25  A    I have.

Page 9

1   Q    Approximately how many times?
2   A    I'd say between 10 or 15.
3   Q    So you're an "old hat" at the deposition
4   process.  I won't belabor the ground rules, but
5   for the purposes of this deposition, I'm going
6   to be asking you a series of questions.  If I
7   ask you a question and you don't understand it,
8   please let me know and I'll try to clarify it.
9        Do you understand?
10  A    I do.
11  Q    And if you don't ask me to clarify it, I,
12  as the trier of the facts in the case, will
13  assume that you understand what I'm talking
14  about and answered to the best of your
15  recollection.
16       Okay?
17  A    That's fine.
18  Q    The court reporter is going to be here.
19  She's going to be transcribing your testimony,
20  and typing quickly.
21       Because the court reporter is transcribing
22  your testimony it's important that all of our
23  communications be oral.  She can't take down
24  nods of the head or shakes of the head.
25       Do you understand?

1  A    I do.
2  Q    And also it's difficult to take down
3  things like uh-huh and uh-uhs, for the record.
4  So try to keep your answers to "yeses, nos" and
5  more verbal communications.
6       Okay?
7  A    I understand.
8  Q    Great.
9       And if at any time during the process you
10 need a break, let me know.  If we're not in the
11 middle of a question, I'll try to accommodate
12 you.
13 A    Thank you.
14 Q    I also like to use some abbreviations
15 during the course of the deposition to try to
16 help things move faster.
17      So if I use the term "DIA," I'll be
18 referring to the art museum, not the
19 corporation.
20      Does that make sense?
21 A    Definitely.
22 Q    Perfect.
23      And if I refer to "VWA," you understand
24 that to mean Victor Wiener Associates, LLC?
25 A    That is correct.

1  Q    And if I refer to "ACG," you understand
2  that to be Art Capital Group?
3  A    Yes.
4       (Deposition Exhibit 1, Notice of
5  Deposition, marked for identification as of
6  this date.)
7  BY MR. ABEL:
8  Q    Okay.  I'm showing you a document -- I'm
9  showing you a document that's marked -- can you
10 tell me, actually, what's been marked at the
11 bottom?
12 A    Sorry?
13 Q    Is it Deposition 1 or Wiener Exhibit 1?
14 A    It says "Deposition Exhibit 1."
15 Q    Okay.  I'm showing you a document that's
16 marked Deposition Exhibit 1.
17      Have you ever seen this before?
18 A    Yes.
19 Q    And am I correct that this is the notice
20 of video deposition for you?
21 A    Yes.
22 Q    And you're appearing today pursuant to
23 this notice of deposition?
24 A    I am.
25 Q    Did you do anything to prepare for today's

1  deposition, other than talk with counsel?
2  A    I reviewed pertinent documents.
3  Q    And what pertinent documents did you
4  review?
5  A    I reviewed our report.  I reviewed the
6  attachments to the report.  I reviewed the
7  deposition testimony of Elizabeth von Habsburg.
8  I reviewed very briefly deposition extracts of
9  Michael Plummer.
10 Q    And when you say "deposition extracts" of
11 Michael Plummer, who extracted those
12 depositions?
13 A    Mr. Perez.
14 Q    And what extracts of Mr. Plummer's
15 deposition did you review?
16 A    If I recall correctly, Mr. Plummer, the
17 extracts that I reviewed concerned the
18 methodology we applied in our present report.
19 Q    So you reviewed extracts relating to your
20 report in this case?
21 A    That is correct.
22 Q    Did you talk with anyone other than
23 counsel to prepare for today's deposition?
24 A    No.
25      I did solicit a written response from

1  Zhang Yi who wrote a report to -- who wrote a
2  report that was attached to our report, which
3  was questioned by Mr. Plummer.  And I asked him
4  to respond to that in a brief way, if he could.
5  Q    And when did you communicate with Zhang
6  Yi?
7  A    Yesterday afternoon.
8  Q    And did you get a response from him?
9  A    I got a brief response.
10 Q    And what did he say?
11 A    He said in the response that he thought he
12 stood by what he said, and that he thought
13 that, again, Mr. Plummer's conclusions were
14 unsupported in relation to the TEFAF report.
15 Q    Did you talk with anyone else to prepare
16 for today's deposition?
17 A    Other than David Shapiro, who works with
18 me.
19 Q    And what did you talk about with
20 Mr. Shapiro?
21 A    Just reviewed our report.
22 Q    Anything specific in the report that you
23 reviewed with Mr. Shapiro?
24 A    Generally speaking.
25 Q    Okay.  And other than the documents you

1  mentioned previously, did you review any other
2  documents in preparation for today?
3  A    To the best of my recollection, no, at
4  this moment.
5  Q    Do you maintain a work file for this
6  engagement?
7  A    Yes, I do.
8  Q    And am I -- well, let me take a step back.
9        Have you ever heard the term "Uniform
10  Standards Professional Appraisal Practice"
11  before?
12  A    I have.
13  Q    If I refer to that as USPAP, would you
14  understand to whom I'm referring?
15  A    Definitely.
16  Q    Excellent.
17        Am I correct that maintenance of a work
18  file is required under USPAP?
19  A    That is correct.
20  Q    And what is USPAP?
21  A    USPAP is the -- it stands for Uniform
22  Standards of Professional Appraisal Practice.
23        It is a document that is issued by an
24  organization in Washington called the
25  "Appraisal Foundation."

1        Specifically, the document is issued by a
2  subcommittee of the Appraisal Foundation called
3  the "Appraisal Standards Board."
4        It's issued now on a biannual basis.  It
5  addresses standards for proper appraisal
6  practice, covering all disciplines of
7  appraising, which means real property, personal
8  property, both appreciable and depreciable
9  personal property and business property as
10  well.
11  Q    Do you know why USPAP requires you to
12  maintain a work file for your engagements?
13  A    It requires a work file so -- to make sure
14  that everything in the appraisal report has
15  been accounted for.
16  Q    And did you produce your work file in this
17  action?
18  A    I produced -- yes, I did.
19  Q    When?
20  A    Upon request.
21  Q    Did you bring it with you today?
22  A    No, I did not.
23  Q    Does the work file for this engagement
24  contain information, all the comparables you
25  used in forming your opinions of value here?

1  A    Many of the comparables we used were
2  online and are not printed out in the work
3  file, but readily obtainable.
4        The -- there are some printed comparables
5  which we produced.
6  Q    And if the comparables were identified
7  online and not printed out, how do you know
8  what comparables you utilized in forming your
9  opinions?
10  A    We certainly discussed it very clearly.
11  And it's reflected in our appraisal report.
12  Q    And are those specific comparables that
13  you used for valuing each item of art in your
14  report identified somewhere?
15  A    It's identified in the report, I believe,
16  that what we did is part of the appraisal
17  process, and it is indeed reflected in the
18  values that we assigned.
19  Q    Other than reflecting the value of the
20  comparables in your report, is there anything
21  the Court could do in reviewing your opinions
22  in this case to determine what comparables you
23  utilized for each specific piece of art that
24  you valued?
25  A    I suppose -- I really don't know what the

1  Court could do or could not do.  I am not a
2  lawyer, so I can't make that judgment.
3  Q    Assuming Judge Rosen in this case asked
4  you what comparables did you utilize for each
5  one of the pieces of art that you valued in
6  this case, what would you be able to identify?
7  A    We would be able to do a printout.
8  Q    So you have a printout somewhere of every
9  comparable you utilized?
10  A    It's in the computer, not printed out.
11  Q    And that wasn't part of your work file?
12  A    In theory it was part of our work file.
13  Q    And you didn't produce that today?
14  A    No, because we did not do printouts.
15  Q    What other items do you have in electronic
16  format that you didn't print out as part of
17  your work file?
18  A    To the best of my recollection, that's the
19  most substantive.
20  Q    What's the next most substantive?
21  A    The substantive, shall we say.
22        (Deposition Exhibit 2, Portion of the Work
23  File, marked for identification as of this
24  date.)
25

BY MR. ABEL:

2  Q   I'm showing you a document that's been
3  marked Deposition Exhibit 2.
4      Is this the portions of the work file that
5  you mentioned producing earlier in your
6  testimony today?
7  A   This is the -- give me a moment.
8      MR. PEREZ:  Let me say something before
9  you respond.
10     Counsel, in response to the request by, I
11 believe is somebody at your firm, we
12 produced, not only portions of the work file,
13 but all the communications with Art Capital
14 Group.
15     MR. ABEL:  Thank you.
16     MR. PEREZ:  So a portion of this, the
17 front part, are the communications with Art
18 Capital Group, and then there's also a very
19 lengthy spreadsheet that was not copied, but it
20 was also produced natively.
21 BY MR. ABEL:
22 Q   Let me ask you the question:  Is your work
23 file contained -- well, for the record,
24 Deposition Exhibit 2 is Bates stamped at the
25 bottom FGIC Wiener 000001 through 67.

1  Does this contain, absent the native
2  format file that counsel mentioned, your work
3  file in this case?
4  A   The printed file, yes.
5  Q   And this is the entire printed work file
6  as contained between FGIC Wiener 00030 and 62,
7  absent that electronic portion?
8  A   And perhaps there are electronic documents
9  that have not been produced, due to the fact
10 that the request came rather late, and that
11 some of the experts who worked on it, on the
12 report --
13 Q   I'm sorry.
14 A   That's okay.
15     The experts who worked on the report may
16 not have gathered it as quickly as possible in
17 compliance with your request.
18 Q   So when you generated the appraisal in
19 this case, you didn't have access to all of --
20 so you didn't have possession of all of the
21 work files of all of the people who were
22 involved in the process?
23 A   We had verbal communications with
24 absolutely everyone who was there and we
25 reviewed the material.

1  Q   But you didn't have their work file?
2  A   That's correct.  We -- that's not what I
3  said.
4      There may be portions of their work file
5  that weren't printed out.
6  Q   And do you have possession of those
7  portions of the work file that perhaps weren't
8  printed out?
9  A   At the moment you have everything that we
10 have in printed form.
11 Q   Who made the decision to print out
12 portions of the work file?
13 A   The individual consultants.
14 Q   And did you ask the individual consultants
15 to provide you with all of the information they
16 relied upon in their work files?
17 A   Considering the fact that we got the
18 reports verbally, I then asked them to print it
19 out.
20     Some were available to print it out; some
21 were not.
22     MR. ABEL:  Counsel, for the record, we can
23 talk about this later.  We'd like to see a copy
24 of the complete electronic file as well.
25     MR. PEREZ:  We'll take that under

1  consideration, but I think you may actually
2  have it other than third party sources, but we
3  can talk about it later.
4  BY MR. ABEL:
5  Q   Let's take a look at the first couple of
6  pages of Exhibit 2, specifically pages Bates
7  marked at the bottom FGIC Wiener 000001 through
8  4.
9      Can you tell me what this portion of the
10 document is?
11 A   This is a proposal submitted to Ian Peck
12 of Art Capital Group on May 23, 2014.
13 Q   Am I correct that this is a proposal that
14 you drafted to Mr. Peck, correct?
15 A   That's correct.
16 Q   And at the time you drafted this proposal
17 you had not yet seen an inventory of the DIA
18 collection; is that right?
19 A   An inventory, no.
20 Q   And if you look at the second to last
21 paragraph, the last --
22 A   Can we go back?
23 Q   Sure.
24 A   Can you define "an inventory"?
25 Q   Well, sir, do you know what an "inventory"

1  is?
2  A    I know what I think of an inventory.  But
3  I'm asking you to put your definition forward.
4  Q    Let's make it easy.  Why don't you tell
5  the Court how you define an inventory.
6  A    Well, the inventory, the way I define it,
7  is a listing of objects.
8       An inventory can be either a complete
9  inventory or a partial inventory.  And that is
10 why I asked you for your definition.
11 Q    So what inventory were you referring to in
12 your memo from May 23rd when you wrote,
13 "Naturally I'm handicapped at this point in the
14 sense that I have not seen an inventory"?
15 A    I was referring to a complete inventory.
16 Q    Had you seen a partial inventory?
17 A    I believe I had in the form of the report
18 submitted by Houlihan Lokey.  But I cannot be
19 100 percent certain of the chronology.
20 Q    So you're not sure whether or not you had
21 seen any inventory on May 23, 2014 of the DIA
22 collection?
23 A    That is correct.
24 Q    Okay.  That's was going to be my next
25 question.

1  A    Oh, wait.  I take that back.
2       Other than published inventory in the
3  handbook that I did review.
4  Q    Okay.  So when you're writing to Mr. Peck
5  in May of 2014 saying that you have not seen an
6  inventory, given your definition that inventory
7  be partially or complete, you are
8  misrepresenting Mr. Peck, correct?
9  A    No.
10 Q    You had seen an inventory at that time,
11 right?
12 A    I had seen -- I had seen a partial
13 inventory.
14 Q    And by your definition that's an
15 inventory, right?
16 A    By definition, if you specify it is an
17 inventory, and that is why I asked you.  It
18 could be considered -- it should be qualified
19 as a partial inventory.
20 Q    Did you qualify it in your proposal to
21 Mr. Peck as to what you were doing in this
22 case?
23 A    No, I didn't.
24 Q    Let's jump to the next question.
25      Second to last paragraph, first page of

1  Exhibit 2, last sentence.  You wrote:  "What I
2  would propose to do is to apply a methodology
3  that is as scholarly as possible given the
4  parameters of the assignment."
5       Did I read that correctly?
6  A    This is -- I'm sorry.  I missed the
7  reference.
8       Which paragraph?
9  Q    Looking to the second -- the penultimate
10 paragraph of the first page?
11 A    First page?
12 Q    Yes, the last sentence.
13      You wrote:  "What I would propose to do is
14 to apply a methodology that is as scholarly as
15 possible given the parameters of the
16 assignment"; is that right?
17 A    That is what I wrote.
18 Q    Why did you propose applying a methodology
19 that is as scholarly as possible?
20 A    Because I thought that was commensurate
21 with the assignment.
22 Q    What is a "scholarly methodology"?
23 A    Scholarly methodology is looking at all
24 the pertinent literature, assessing it, and
25 coming to a valuation conclusion based upon the

1  review.
2  Q    Ad how does that differ from a
3  non-scholarly methodology?
4  A    Non-scholarly methodology, in my
5  definition, is one that I would consider to be
6  the "finger-in-the-air" methodology.
7  Q    You believe that there's another
8  methodology called "a finger-in-the-air"
9  methodology?
10 A    It's a methodology that I would define.
11 Q    Would you agree with me that different
12 appraisers use different methodologies?
13 A    I do.
14 Q    And there's no single right methodology to
15 doing an appraisal?
16 A    There is a single right methodology.
17 Q    You mentioned the fingers-in-the-air
18 appraisal method.
19      What is that method?
20 A    That method is intuitively, I believe, the
21 object would be worth A, B or C, or D.
22 Q    And what does that have to do with
23 "fingers in the air"?
24 A    It's pulling the value out of the air,
25 literally.

1  Q   So you mean fingers in the air is people
2  raising their fingers into the air an pulling
3  appraisals values for?
4  A   I think it was worth this.
5  Q   You mean people raise their fingers, give
6  you an opinion of value and you take the
7  consensus of that value?
8  A   No.  I say people raise their finger and
9  give a value.  I didn't say anything about
10  consensus.
11  Q   How frequently do people utilize that
12  methodology?
13  A   Frequently.
14  Q   So it's standard in the industry for
15  people to use the fingers-in-the-air method to
16  come up with a value for a work of art?
17  A   What industry are you referring to?
18  Q   The valuation industry.
19  A   I would consider it to be a profession.
20  Q   Okay.  In the profession?
21  A   It is not appropriate standards, in my
22  opinion.
23  Q   So why do you refer to it as a methodology
24  and indicate that many people in the profession
25  utilize it?

1          MR. PEREZ:  Object to the form of the
2  question.  Assumes facts not in evidence.
3  BY MR. ABEL:
4  Q   Who uses the fingers-in-the-air
5  methodology?
6  A   Primarily auction houses.
7  Q   How many auction houses are there?
8  A   There are numerous auction houses.
9  Q   And how many people in those auction
10  houses use the fingers-in-the-air methodology
11  to value art?
12  A   Hundreds, if not thousands.
13  Q   Is that the methodology used by Christie's
14  and Sotheby's?
15  A   In many cases, I believe so.
16  Q   Have you ever heard of a methodology for
17  valuing art called the "French grid system"?
18  A   I have.
19  Q   And what is that?
20  A   The French grid system is a method that
21  was in favor, at one point or another, in which
22  a small section of a work of art was -- well, a
23  work of art was divided into sections,
24  literally a small section was valued in a
25  certain way, and then by mathematical extension

1  in the grid, it was determined this is the
2  value of the whole would be.
3  Q   And is the French grid system ever used to
4  value a collection of arts by taking the value
5  of a chunk of the collection and extrapolating
6  the full value from that chunk?
7  A   The French grid system is generally
8  applied to specific works of art and not a
9  whole collection.
10  Q   Why not?
11  A   It's common usage within those who apply
12  it to apply it that way.
13  Q   Let's look at the second page of
14  Deposition Exhibit 2 marked FGIC Wiener 000002.
15  There's a section entitled "Suggested Steps to
16  be Taken."
17      Do you see that?
18  A   That is correct.
19  Q   And under that "Suggested Steps to be
20  Taken" item you list suggested steps that you
21  suggest should be taken in valuing the DIA
22  collection; is that right?
23  A   That's correct.
24  Q   Did you utilize this methodology that you
25  indicate on this page of Exhibit 2 before, in

1  valuing an art collection?
2  A   In valuing?
3  Q   An art collection?
4  A   An art collection?
5  Q   Yes.
6  A   Have I -- I don't understand the question.
7  Q   Let me rephrase.
8      Have you ever used these steps that you
9  detail on the second page of Exhibit 2 in
10  valuing an art collection before?
11  A   Can you repeat the question?
12  Q   Sure.
13      Have you ever used these steps that you
14  detail on Page 2 of Exhibit 2 in valuing an art
15  collection before?
16  A   I have.
17  Q   How frequently?
18  A   When one has to value an extremely large
19  collection of works of art.
20  Q   And how frequently have you valued an
21  extremely large collection of art before?
22  A   I've think one or two or three times.
23  Q   Well, let's be exact.
24  A   One very recently, and I believe in the
25  past we've used it as well.

1  Q    And when you say "one very recently," are
2  you referring to the DIA collection?
3  A    No.
4  Q    What collection are you referring to?
5  A    I cannot tell you.  That would be
6  violating confidentiality.
7  Q    Did you have a confidentiality agreement
8  with the client in that case?
9  A    I did.
10  Q    And when did that take place?
11  A    The valuation took place last year.
12  Q    And what was the type of art involved?
13  A    Fine art.
14  Q    Any specific type of fine art?
15  A    What do you mean by "specific type"?
16  Q    Sure.
17        Are we talking about contemporary art, Old
18  Masters, any more specificity you can provide
19  on that case?
20  A    Contemporary art.
21  Q    Sorry?
22  A    Contemporary art.
23  Q    Contemporary art.
24        And we're talking about paintings versus
25  sculptures or decorative art?

1  A    We're talking about two dimensional art.
2  Q    And what was the size of that collection?
3  A    What do you mean by "size"?
4  Q    Volume of works.
5  A    About 20,000.
6  Q    And what was your ultimate value
7  conclusion for those 20,000 pieces?
8  A    Is the question what value did I conclude?
9  Q    Yes.
10  A    I can't tell you that.
11  Q    Can you give me a ballpark?
12        Was it over a billion dollar?
13        MR. PEREZ:  If he can't tell you, he can't
14  tell you.
15  A    It's a possible violation of my
16  confidentiality agreement.
17  BY MR. ABEL:
18  Q    And you said you used this methodology
19  detailed on Page 2 of Exhibit 2 to perform that
20  valuation of the 20,000 works?
21  A    I did.
22  Q    Let's look at the next page of Deposition
23  Exhibit 2.
24  A    Is that Page 3?
25  Q    Yes.

1        Second paragraph you wrote:  "Recently we
2  appraised for state tax purposes the enormous
3  and varied collection of an extremely famous
4  American artist.  At this moment I'm not at
5  liberty to mention the name of the artist.  The
6  inventory consists of approximately 20,000
7  objects."
8        Is that right?
9  A    That's correct.
10  Q    Is that the project you were just
11  referring to?
12  A    Yes, it is.
13  Q    And you performed that appraisal for
14  estate tax purposes, correct?
15  A    I did.
16  Q    So you weren't asked to determine what the
17  collection would achieve in terms of actual
18  dollars to the owner of the collection if it
19  was sold?
20  A    That's not true.
21  Q    What -- do you understand if I ask you the
22  question -- sorry, let me take a step back.
23        Have you ever heard of the term
24  "definition of value before"?
25  A    Yes.

1  Q    And what do you understand definition of
2  value to mean?
3  A    Exactly what the term says, the value
4  being used is defined.
5  Q    And what definition of value did you
6  utilize in that estate tax purpose appraisal?
7  A    Fair market value.
8  Q    You didn't use marketable cash value?
9  A    I did not.
10  Q    And you had two months to perform that
11  appraisal of the 20,000 objects; is that right?
12  A    Slightly under.
13  Q    How much under?
14  A    I would say more like six or eight -- six
15  to eight weeks.
16  Q    And was the collection by the American
17  artist a collection of pieces that the artist
18  himself or herself generated or was that artist
19  collecting other people's work?
20  A    It was a collection of both.
21  Q    And what portion of the collection
22  belonged to that -- sorry.  Let me strike that.
23        What portion of that collection was
24  generated by that artist as opposed to
25  collected by the artist?

1  A    A significant portion.

2  Q    Over 50 percent?

3  A    I really think that by saying that I may
4  violate my confidentiality agreement.

5  Q    Did you provide a copy of that appraisal
6  to the IRS?

7  A    Presumably the client did.

8  Q    So you don't know -- do you know whether
9  the IRS approved your appraisal?

10  A    We -- I've heard from the client that
11  there's been absolutely, what shall we say, no
12  objection from the IRS.

13  Q    So let's go back to my question.

14       Do you know if the IRS has approved your
15  appraisal?

16  A    The IRS, I don't think, sends out letters
17  of approval.

18  Q    Let me go back to my question:  Do you
19  know whether or not the IRS approved your
20  appraisal?

21  A    And my answer is, no.

22  Q    Did you use the methodology detailed on
23  Page 2 of Exhibit 2 to value the DIA
24  collection?

25  A    I'm sorry.  We're going back to Page 2?

1  Q    Yes.

2  A    And what was your question?

3  Q    Sure.

4       Did you used this methodology that you say
5  you utilized to value the 20,000 works in this
6  undisclosed appraisal to value the DIA
7  collection?

8  A    In part, yes.

9  Q    And what parts did you use?

10  A    We -- shall we go back step by step?

11  Q    Sure.

12  A    Okay.  Each category should be divided
13  into groupings, we did.

14  Q    And how did you divide the DIA collection
15  into groupings?

16  A    We basically worked with the groupings
17  that the DIA used in its cataloging.

18  Q    You mean groupings by type of art?

19  A    Correct.

20  Q    Okay.  Not groupings by value of art?

21  A    Within those groupings we also did
22  subdivisions with a value of art, yes.

23  Q    And how did you utilize the Step 2
24  detailed in Page 2 of Exhibit 2 to value the
25  DIA collection?

1  A    We followed that fairly closely.

2  Q    Am I correct that you had four different
3  steps in your methodology for valuing the DIA
4  collection?

5  A    I had four different steps -- the answer
6  to your question is no.

7  Q    If you look at your report, am I correct
8  that you detail four steps for valuing the DIA
9  collection?

10  A    Well, if I could look at my report I could
11  answer the question properly.

12       (Deposition Exhibit 3, Expert Report,
13  marked for identification as of this date.)

14  BY MR. ABEL:

15  Q    I'm showing you a document that's been
16  marked Deposition Exhibit 5.

17       Is this your report in this matter?

18  A    It's marked Deposition Exhibit 3, I
19  believe.

20  Q    Sorry.  Deposition Exhibit 3, you're
21  correct.

22       Is that your report in this matter?

23  A    Well, without checking every page, I can
24  say that it appears to be my report.

25  Q    Take a look at Page 49 of Exhibit 3.

1       My question for you is:  Is that your
2  signature at the bottom of Page 49?

3  A    That is my signature.

4  Q    I think I misspoke earlier.  Maybe that's
5  why you're correcting me.

6       If you look at Page 3 of Exhibit 3, it
7  details five steps to your methodology; is that
8  right?

9  A    Yes, there are five steps labeled.

10  Q    Okay.  And so my question for you is,
11  looking back at Exhibit 2, any suggested steps
12  to be taken, specifically the Paragraph 2, that
13  starts off by saying, "Appropriate comparables
14  for each group should be identified."

15       What step in your report does Step 2 in
16  your proposal correspond with?

17  A    Step 1.

18  Q    Does it correspond to any of the other
19  steps in your report?

20       MR. PEREZ:  Object to the form of the
21  question.

22  BY MR. ABEL:

23  Q    You can answer.

24  A    Sure.  I'm just looking at the report.

25       It corresponds to portions of Step 3 and

1 portions of Step 4.
2 Q    We'll come back to that in a bit.
3       Take a look at Item 3 on Exhibit 2.  You
4 indicate --
5 A    Exhibit 2 is the memo; is that correct?
6 Q    Right.  Where you indicate "a general
7 analysis, the common factors one sees in a
8 comparable selected should be stated."
9       What does that correspond to in the steps
10 detailed in your report, Exhibit 3?
11 A    This step was not followed specifically
12 the way it was written in the proposal.
13 Q    Why not?
14 A    It was a question of time.
15 Q    You didn't have enough time to do Step 3
16 in your proposal?
17 A    It was -- Step 3 was basically subsumed
18 into our analysis of comparables.
19 Q    Is there some document that you could
20 point me to where you detail the common factors
21 one sees in comparables selected?
22 A    It is not written in the report.
23 Q    So you didn't actually state that anywhere
24 in your report or any other work files?
25 A    It's not stated in the report.

1 Q    Is it in your work files?
2 A    It's in the work file in the sense of the
3 analysis of the comparables that we used.
4 Q    It's not specifically, or explicitly
5 stated; am I correct?
6 A    Not explicitly stated.
7 Q    Let's take a look at Page 4 of Exhibit 2,
8 under the topic "Matters Not Discussed."
9       Do you see that?
10 A    Yes.
11 Q    And if you look at the second sentence you
12 wrote:  "It is my opinion at this point that
13 such a discount consideration would not be
14 appropriate for the report since, presumably,
15 there are numerous potential buyers for all of
16 the works in the DIA collection, and if the
17 works were to be sold they would not be sold at
18 a single sale but numerous sales spread over
19 time."
20       Do you see that?
21 A    That is correct.
22 Q    And so on May 23, 2014, before ever seeing
23 the complete inventory of the DIA collection,
24 you had formed an opinion that consideration of
25 discounts would not be appropriate; is that

1 right?
2 A    It says "at this point."
3 Q    Am I correct that as of May 23, 2014 you
4 had determined that no discount was appropriate
5 for the valuation of the DIA collection?
6       MR. PEREZ:  Object as to form.
7 BY MR. ABEL:
8 Q    You can answer.
9 A    I'm looking at exactly what I wrote.
10       In a preliminary point of view, yes.
11 Q    Did you ever determine that a discount
12 would be appropriate for the valuation of the
13 DIA collection?
14 A    If you look at my report, you will see
15 that there are discounts that I consider to be
16 appropriate.
17 Q    What discounts did you consider to be
18 appropriate?
19 A    If you look at Step 4, you'll see that the
20 art is divided into various categories and that
21 some of the categories have a discount or no
22 discount.
23 Q    And am I correct the only discount that
24 you utilized in your entire report was a
25 10 percent discount on prints, drawings and

1 photographs, performing arts and textiles
2 through to Step 4?
3 A    That is not correct.
4 Q    What else did you apply a discount to?
5 A    In step -- hang on.
6       In Step 3 where we adjusted the insurance
7 values to correspond to marketable cash value,
8 we provided a discount.
9 Q    What discounts did you provide there?
10 A    Well, we provided an increment, a global
11 increment of 10.9 percent, and had we brought
12 it up to retail replacement value it probably
13 would have been higher.  And that in my mind
14 would qualify as a discount.
15 Q    So you applied a supplement, but because
16 the supplement wasn't higher you're telling the
17 Court that constituted a discount?
18 A    I am.
19       MR. PEREZ:  I object to the form of the
20 question.
21 BY MR. ABEL:
22 Q    Sorry.  What was your answer?
23 A    The answer is, yes, I am.
24 Q    And what was the amount of the discount
25 that you applied with regard to Step 3?

1  A    That it was an adjustment, and I can't
2  tell you the exact figure at this point.
3  Q    You can't tell the Court the quantity of
4  the discount that you applied for Step 3?
5       MR. PEREZ:  Object to the form of the
6  question.  Asked and answered.
7  BY MR. ABEL:
8  Q    You can answer.
9  A    Okay.  Yes, the exact number I'm not
10  prepared to tell you at this particular point.
11  Q    Were you ever prepared to tell me what the
12  exact number was for that discount?
13  A    It figured into our calculations.
14  Q    But you don't know what it was that
15  figured into your calculations?
16  A    At this particular point, no.
17  Q    Is there any document that you could look
18  at that would inform your opinion as to what
19  that discount was for Step 3?
20  A    Perhaps careful review would reveal that.
21  Q    What would you look at to find that
22  information?
23  A    I would look at a projection of retail
24  replacement value.  But since we were using
25  marketable cash value it was implicit in the

1  value arrived at.
2  Q    Well, if we were to test whether or not
3  your conclusion regarding the amount of that
4  discount was correct, how could we go about
5  doing so?
6  A    It would be very difficult to test.
7  Q    So the Court just has to assume that
8  you're correct?
9  A    The Court has to assume that I did what I
10  stated in the report, which was carry forward
11  or make a percentage adjustment based upon the
12  difference between the retail replacement
13  values, presumably.  We don't even know if
14  those are retail replacement values in the DIA
15  inventory, and our marketable cash value, which
16  by definition implicitly has a discount built
17  in.
18  Q    You say marketable cash value implicitly
19  has a discount built in?
20  A    Correct.
21  Q    What is the amount of that discount that
22  marketable cash value has built into it?
23  A    It varies from case to case.  There's no
24  specific amount.
25  Q    Well, in this case what was the discount

1  that you applied to determine marketable cash
2  value?
3       MR. PEREZ:  Object to the form of the
4  question.
5  A    I'm not quite sure I understand your
6  question.
7       When -- can you clarify that?
8  BY MR. ABEL:
9  Q    Sure.
10       You said that there is a discount utilized
11  in coming up with marketable cash value that
12  varies from case to case.
13       My question for you is:  What discount did
14  you utilize in coming up with marketable cash
15  value in this case?
16       MR. PEREZ:  Object to the form of the
17  question.
18  A    From object to object, we looked at the
19  comparables.  We saw -- we observed whether the
20  comparables were hammer prices, included the
21  buyers premium, did not, and we discounted
22  those values when appropriate, and on a
23  case-by-case basis to come up with marketable
24  cash value.

1  BY MR. ABEL:
2  Q    Is there someplace we can look in your
3  work file to see what discount you applied on
4  an object-by-object basis to come up with
5  marketable cash value?
6  A    The values are reflective of it and we did
7  not specify or write in it.  But by use of the
8  comparables, you can check it.
9  Q    Does the hammer price you're referring to
10  before ever include buyers premium?
11  A    Hammer's price does not include buyers
12  premium.
13  Q    Never include buyers premium.
14  A    By definition, no.
15  Q    When you're referring to the process that
16  you utilized for taking into account discount
17  in a piece by piece appraisal, am I correct
18  that was only with regard to Step 1 of your
19  appraisal not Steps 2 through 4?
20  A    The question again?
21  Q    Sure.
22       You said that in looking at pieces on a
23  piece-by-piece basis, you applied a discount to
24  determine marketable cash value.
25       Am I correct you only did that with regard

1  to Step 1 of your methodology, not Steps 2
2  through 4?
3  A    You're not correct.
4  Q    What discount did you utilize in
5  determining marketable cash value for Step 2?
6  A    In Step 2 we didn't do it on a
7  piece-by-piece basis.
8  Q    Well, did you do it on a collection basis?
9  A    We -- on the basis of Step 2 we took into
10 consideration the various values that third
11 party sources used, and on that
12 determination -- on that basis, we made a
13 determination whether any specific discounts
14 should be applied or not applied.
15 Q    Did you apply any discounts to the results
16 of Step 2?
17       Let me take a step back.  Step 2 you
18 averaged together third-party appraisals,
19 correct?
20 A    Correct.
21 Q    Did you apply any discount to that
22 average?
23 A    It was implicit in the methodology.
24 Q    How was it implicit in the methodology?
25 A    Because the third-party sources that we

1  used were generally lower than our individual
2  values.
3        Consequently, on the 616 objects, we
4  considered that those prices were -- that those
5  values, I mean, were discounted in relation to
6  ours, and, therefore, conservative.
7        So it was intentional for us to use
8  conservative values incorporating third-party
9  sources.
10 Q    So my question for you is much simpler
11 than that.
12       Did you apply a discount to the amount
13 that you determined by averaging the
14 third-party prices?
15 A    And my answer was before, yes.
16 Q    Let's take a step back.
17       You averaged the third-party appraisals,
18 correct?
19 A    Correct.  We averaged -- no, that's not
20 correct.
21 Q    What did you do in Step 2?
22 A    We averaged the individual values in the
23 third-party appraisals.
24 Q    And what did you do with the results of
25 that average?

1  A    It was implicit in the results that a
2  discount was --
3  Q    Sir, I am going to ask questions, and I
4  appreciate if you listen to my question.  I'm
5  not asking about what's implicit.
6        MR. ABEL:  Can you please read back the
7  question.
8  BY MR. ABEL:
9  Q    It's much simpler than that.
10       (Record read.)
11 BY MR. ABEL:
12 Q    You can answer.
13 A    You stated it.
14 Q    You stated the average in your report?
15 A    Correct.
16 Q    You didn't make any adjustments to the
17 results of that averaging process in your
18 report?
19       MR. PEREZ:  Object to the form of the
20 question.
21 A    But -- and my answer is that it was
22 implicit in the results.
23 BY MR. ABEL:
24 Q    I'm asking you:  Did you make any
25 adjustments to the results of the averaging

1  process you just disclosed?
2        MR. PEREZ:  Object to the form.  Asked and
3  answered.
4  BY MR. ABEL:
5  Q    You can actually answer.
6  A    I can answer.  I understand.
7        And my answer is it was implicit in the
8  results.
9  Q    Let's take a step back.
10       When you say something is implicit in the
11 results, does that mean that you actually made
12 an adjustment to achieve the results, or that
13 you just utilized the results because you felt
14 they were satisfactory?
15       MR. PEREZ:  Object to the form of the
16 question.
17 A    We used the results because we thought it
18 was satisfactory with an implicit discount
19 built in.
20 BY MR. ABEL:
21 Q    Other than the discount that you believe
22 was implicit in the results, did you apply any
23 additional discounts after averaging the
24 information with the third-party appraisers?
25 A    No.

1    Q    Looking back at Exhibit 2, again, and
2   again Page 4.
3        If you look at the second paragraph, you
4   write: "However, as you pointed out there is
5   the possibility that parts of the collection be
6   sold as a whole or in block."
7        Do you recall that?
8   A   Which page are you referring to?
9   Q   Page 4. FGIC Wiener 000004.
10  A   I have the paragraph.
11       What is the question?
12  Q   Is that a statement that Mr. Peck of ACG
13  provided to you?
14  A   Sir, can you just repeat the question?
15  Q   Sure. You wrote, "However, as you had
16  pointed out, there is the possibility that
17  parts of the collection could be sold as a
18  whole or in block."
19       Is that something that Mr. Peck told you?
20  A   Yes.
21  Q   And you then wrote: "If this were to
22  occur and that the parties involved were
23  considered to be appropriate, we could also
24  calculate a blockage discount consideration
25  since we have on staff an economist who does

1   this type of work for us."
2        Do you see that?
3   A   I do.
4   Q   Did you take into account the possibility
5   that the DIA collection could be sold as a
6   whole or in block in your appraisal?
7   A   I did.
8   Q   And how did you take that into account?
9   A   It's written within the report.
10  Q   Did you apply any blockage discounts in
11  your report?
12  A   We did not.
13  Q   So how did you take into account the
14  possibility that parts of the collection could
15  be sold as a whole or in block?
16  A   One would have to turn to my report to see
17  exactly what was written, and what we took into
18  consideration.
19  Q   Sorry, sir.
20       You don't know your opinion as to why you
21  didn't apply a blockage discount in this case?
22  A   It's stated clearly in the report and I
23  would prefer to refer to it to get it exactly
24  right.
25  Q   You understand that at trial you're not

1   going to be relying upon your report; you're
2   going to be testifying to the judge as to your
3   own opinions?
4        MR. PEREZ:  Object to the form of the
5   question.  Assumes facts not in evidence.
6   BY MR. ABEL:
7   Q   Do you need to have your report in front
8   of you at all times to express your opinions to
9   the Court?
10  A   No.
11  Q   Okay.  So what is your opinion as to why a
12  blockage discount wasn't necessary in this
13  case?
14       MR. PEREZ:  Object to the form of the
15  question.
16  A   Because, as I stated in the report, the --
17  at the time that the report was written it was
18  apparent that the collection was not going to
19  be sold on block and that, therefore, a
20  blockage discount was not to be applied.
21  Q   Who told you it was apparent?
22       Well, let's take a step back.
23       How was it apparent that the DIA
24  collection would not be sold on block?
25  A   At the moment it was our determination

1   that it was most likely that if anything were
2   to be sold the pieces would be sold
3   individually, and I think that is clearly
4   stated in the report.
5   Q   And how did you form that assumption?
6   A   By the nature of the collection; by the
7   fact that we were -- that we were writing this
8   report primarily for the use of the collection
9   in a collateralized transaction.  And in that
10  particular scenario, there would not be a
11  blockage discount applicable, it would not be
12  sold in block.  It would not be sold at all.
13  It would be used as collateral.
14  Q   So if the Court orders the DIA collection
15  to be sold on block, your valuation appraisal
16  wouldn't be sufficient to identify the blockage
17  discount in that case?
18       MR. PEREZ:  Object to the form of the
19  question.  It assumes facts not in evidence
20  and, in fact, completely contradictory to the
21  record.
22       MR. ABEL:  Well, it's a hypothetical.
23  BY MR. ABEL:
24  Q   So my hypothetical is:  Assume that the
25  DIA collection was forcibly sold on block, how

1  who that impact your analysis in this case?
2  A   Well, it is a hypothetical question so
3  there might be other factors that I don't
4  understand.  But presumably, in that case, a
5  blockage discount may or may not be applicable.
6  Q   And when would it be applicable?
7  A   I would have to see the exact hypothetical
8  circumstances.  The exact circumstances, it
9  would not longer be hypothetical.
10 Q   Have you ever been involved in a valuation
11 for purposes of determining the value of an art
12 collection in a bankruptcy proceeding before?
13 A   No.
14 Q   Take a look at Page 6 of Exhibit 2.
15 Is this an e-mail that you sent to
16 Mr. Plummer of ACG on July 17, 2014?
17 A   I believe you mean Mr. Peck.
18 Q   Sorry, Mr. Peck.  My apologies.
19 A   And this is -- I'm sorry.
20 Q   Page 6.
21 A   Are we looking at --
22 Q   Exhibit 2.
23 A   Exhibit 2.
24 Q   You might have taken it apart.
25 A   Exhibit 2, I believe -- you said Page 6?

1  Q   FGIC Wiener 000006 as well?
2  A   That's not Exhibit 2, though.  Oh, wait.
3  This is something else.
4  Q   Let's try to keep the binder clips on
5  there so that we're not mixing it with other
6  pages.
7  A   It's very difficult to work with binder
8  clips, I must say.
9      But it's not Exhibit 2.  It's a different
10 exhibit.  Exhibit 2, I believe, was just this
11 memo.  But if it's all the documents produced.
12 I'm not sure --
13 Q   Let's put it back together the way it was.
14 So Exhibit 2 was documents Bates-stamped
15 FGIC Wiener 000001 through 67.
16 A   Okay.  That's Exhibit 2.
17 Q   And we're looking at Page 6 of that.
18 A   I think it would be easier if we refer to
19 it just by the Bates number.
20 Q   Okay.  Let's look at FGIC Wiener 000006.
21 A   It's hard to read with the clips on,
22 that's all.
23 Q   So why don't we put the clip on -- put the
24 clip on -- put it on the corner, so that way
25 you can flip it more easily.

1  A   I always take documents apart from clips.
2  Q   I don't like taking documents apart at
3  depositions.  I have to figure out what they
4  were.
5  A   Well, that's why we have Bates numbers.
6      And what is the question?
7  Q   Sure.
8      Is this an e-mail that you sent to
9  Mr. Peck on July 17, 2014?
10 A   That is July 17, 2014, that is correct.
11 Q   And you're asking Mr. Peck to comment on a
12 statement that Mr. Plummer made in his report;
13 is that right?
14 A   That is correct.
15 Q   And you write, "P.S. we had discussed
16 this"; is that right?
17 A   That's correct.
18 Q   What did you discuss with Mr. Peck prior
19 to this e-mail?
20 A   Whether -- very briefly, we had discussed
21 the possibility of Mr. Peck responding in
22 writing to what Mr. Plummer stated on Page 40,
23 No. 67.
24 Q   Why did you think that Mr. Peck would need
25 to respond to Mr. Plummer's statement before

1  ever reading Mr. Plummer's report?
2      MR. PEREZ:  Objection to the form of the
3  question.  Assumes facts not in evidence.
4  A   Who was reading what?
5  BY MR. ABEL:
6  Q   Sure.
7      When was the discussion with Mr. Peck
8  regarding responding to Mr. Plummer's report?
9  A   I believe probably on July 17th.
10 Q   Was that before or after you received
11 Mr. Plummer's report?
12 A   Definitely after.
13 Q   So why did you discuss it with Mr. Peck
14 and then send him an e-mail asking him to
15 comment something you had already asked to
16 discuss, or that you had already discussed with
17 him?
18     MR. PEREZ:  Object to the form of the
19 question.
20 A   Simply it was a remainder.
21 BY MR. ABEL:
22 Q   Let's look at Page 7 of Exhibit 2.  It's
23 FGIC Wiener 000007.
24     Is this another e-mail that you sent to
25 Mr. Peck, this time on July 2, 2014?

1    A    That is correct.

2    Q    And you wrote: "Just a reminder, send me

3  contact information for the computer people;"

4  is that right?

5    A    That's correct.

6    Q    Who are the "computer people"?

7    A    Computer people outside of the group.

8    Q    Who's side of the group?

9    A    The side of the group is the firm, it's a

10  financial firm, I believe, that provided the

11  various analysis of the DIA data that we

12  received in, shall we say, in accurate form.

13   Q    We'll come back to that.

14        But how did you first become aware of this

15  side of the group?

16   A    I asked Mr. Peck if he could recommend

17  someone who could decipher what I could not

18  decipher from the DIA raw data that was sent to

19  us.

20   Q    Did you do any analysis of the background

21  of this side of the group to see if they

22  were -- if they had expertise in performing

23  that type of analysis you're looking for?

24   A    Well, I relied upon Mr. Peck's

25  recommendation.

1    Q    Did you ever do any kind of analysis to

2  determine whether the Silar Group had the

3  expertise sufficient to do the analysis you

4  were looking for?

5    A    Again, I relied on Mr. Peck's

6  representation, which was then confirmed by the

7  results.

8    Q    But you don't know if the Silar Group's

9  work on this case was accurate, do you?

10   A    I presume that -- no way that I know that

11  about any computer firms.

12   Q    You didn't do any testing of the data

13  provided by the Silar Group to make sure it was

14  accurate?

15   A    We did some -- we reviewed it, certainly.

16   Q    Who was your contact person at the Silar

17  Group?

18   A    Rob Leeds.

19   Q    Did you do any research on Rob Leeds to

20  make sure that he had the expertise necessary

21  to perform the work?

22   A    I relied on Mr. Peck's recommendation.

23   Q    And what analysis did you do of the Silar

24  Group's results to confirm it was accurate?

25   A    We looked at individual values

1  transcribed.  We looked at percentages arrived

2  at, and we reviewed, quite carefully,

3  everything that Mr. Leeds provided to us.

4    Q    Did you compare any of Mr. Leeds data that

5  he provided to you to the original source data

6  provided by the DIA?

7    A    We did.

8    Q    How large a sample did you compare?

9    A    A fairly large sample, I can't give you an

10  exact number.

11   Q    Do you have any estimate?

12   A    Estimate in terms of what?

13   Q    Estimate in terms of the size of the

14  sample.

15   A    But are we talking about pages?  Are we

16  talking about objects?

17   Q    Let's talk about objects.

18   A    Okay.

19   Q    What size of the sample -- estimate, did

20  you compare Mr. Leeds' analysis to the original

21  DIA sample?

22   A    I think hundreds.

23   Q    You think hundreds or you know hundreds?

24   A    It's my opinion at this point it was

25  hundreds.

1    Q    Anything in your work file that would show

2  what the sample size you compared between the

3  DIA collection information and Mr. Leeds'

4  information?

5    A    No, we did it ad hoc in Mr. Leeds' office.

6    Q    Let's look at Page 10 of Exhibit 2,

7  FGIC -- Bates stamped FGIC Wiener 000010.

8    A    Page?

9    Q    Ten.

10   A    Yes.

11   Q    Second e-mail in this e-mail string, is

12  that an e-mail from you to Mr. Peck dated

13  May 21, 2014?

14   A    It appears to be.

15   Q    And do you see the paragraph that begins

16  "By the end of the week"?

17   A    That is correct.

18   Q    Second sentence in there says, "There are

19  so many aspects of the project which I guess we

20  will be developing together, so I look forward

21  to working closely with you."

22        Did I read that correctly?

23   A    Yes.

24   Q    What aspects of the appraisal did you

25  develop with ACG?

1    A    The parameters of the job.
2    Q    Did you work determining your methodology
3    with Mr. Peck?
4    A    Generally speaking, I worked with clients
5    in determining methodology for fulfilling the
6    needs of the assignment.
7    Q    Okay.  That wasn't my question, though,
8    sir.  So I'm going to ask that you listen to my
9    question and answer my question, not the
10    question that you think I'm asking.
11         My question for you was:  Did you work
12    closely with Mr. Peck in forming the
13    methodology in this case?
14         MR. PEREZ:  Object to the form of the
15    question.
16         THE WITNESS:  I can answer?
17         MR. PEREZ:  Yes.
18    A    I consulted with Mr. Peck.
19  BY MR. ABEL:
20    Q    In your e-mail you said:  "I look forward
21    to working closely with you," right?
22    A    That's correct.
23    Q    Did you work closely with Mr. Peck in
24    forming the methodology that you used in this
25    case?

1    A    Not as closely as one would assume from
2    reading that sentence.
3    Q    Well, how closely did you work with Mr.
4    Peck in forming your methodology in this case?
5    A    I consulted with Mr. Peck.
6    Q    How frequently?
7    A    Not terribly frequently.
8    Q    On what aspects of your methodology did
9    you consult with Mr. Peck?
10    A    The nature of the value, the fact that the
11    DIA information was inadequate, how to resolve
12    it, and things of that nature.
13    Q    When you say you worked with Mr. Peck on
14    the nature of value, what do you mean by that?
15    A    Well, which would be the appropriate value
16    to be applied, considering the assignment.
17    Q    And what did Mr. Peck suggest the
18    appropriate value to be utilized would be?
19         MR. PEREZ:  Object to the form of the
20    question.
21    A    Mr. Peck didn't suggest anything.
22  BY MR. ABEL:
23    Q    Did Mr. Peck have any comments on the
24    issue of what nature of value to utilize in
25    this assignment?

1    A    Mr. Peck confirmed that my choice of using
2    marketable cash value was correct and accurate,
3    given the assignment.
4    Q    Did he have any other comments on your
5    choice to use marketable cash value?
6    A    I think that's fairly sufficient.
7    Q    Did Mr. Peck ever tell you that in lending
8    to -- against art collections, he utilized any
9    other definition of value?
10    A    Is your question:  Did Mr. Peck ever tell
11    me that in lending to other institutions he,
12    Mr. Peck, used other types of value?
13    Q    Yes.
14    A    Is that the question?
15         The answer is no.
16    Q    Take a look at Page 17 of Exhibit 2.
17         Are you there?
18    A    Give me one minute.  I'm there.
19    Q    The middle of the page we have an e-mail
20    from Mr. Peck to you dated June 6, 2014.
21         Do you see that?
22    A    I do.
23    Q    You recall that e-mail?
24    A    I do.
25    Q    And am I correct that, at least according

1    to Mr. Peck, the images that you received from
2    the DIA were good and the descriptions were
3    relatively complete?
4         MR. PEREZ:  Object to the form of the
5    question.  Assumes facts not in evidence.
6  BY MR. ABEL:
7    Q    Did you have any discussion with Mr. Peck
8    regarding his statement in this e-mail that,
9    "the images are good and the description's
10    relatively complete"?
11    A    Only afterwards that I reviewed it.
12    Q    Was Mr. Peck wrong?
13    A    Yes.  Well, partially wrong.  I take it
14    back.
15         He said it is organized by genre.  He was
16    correct in that.
17    Q    He was wrong, though, that "the images
18    were good and the descriptions were relatively
19    complete"?
20    A    That's correct.
21    Q    Let's take a look at Page 20 of Exhibit 2.
22         Is that an e-mail from -- sorry.
23         In the middle of the page is an e-mail
24    from Mr. Peck to you dated May 19, 2014?
25    A    It appears to be.

1    Q    Do you recall that e-mail?

2    A    I do.

3    Q    In the second paragraph he writes: "I

4    wanted to thank you for your help with the

5    first matter."

6         Do you know what "first matter" Mr. Peck

7    was referring to in that e-mail?

8    A    I do.

9    Q    And what was that matter?

10   A    If my recollection serves me correctly,

11   Mr. Peck was in litigation with Veronica Hurst,

12   because apparently, he believed she defaulted

13   on a loan that she had taken out from Art

14   Capital Group.  He needed, "he" being Mr. Peck,

15   needed an expert opinion on whether her

16   objections concerning valuation were

17   well-founded or not.

18   Q    And how did you determine whether or not

19   her objections were well-founded or not?

20   A    I conducted research and arrived at a

21   conclusion.

22   Q    Did you perform an appraisal of the value

23   of the Hurst collection?

24   A    No, I did not.

25   Q    Did you perform an appraisal of value of

1    any portion of the collection at issue?

2    A    I retract that statement.  I performed an

3    oral appraisal.

4    Q    What's an oral appraisal?

5    A    An oral appraisal is exactly that.  It's a

6    statement on valuation that is arrived at after

7    considerable research, that is transmitted to

8    the client orally as opposed to being

9    transmitted in written form.

10   Q    And does USPAP allow for oral appraisals?

11   A    Most certainly does.

12   Q    Do USPAP standards allow or oral

13   appraisals or the AAA standards allow for oral

14   appraisals?

15   A    I'm not familiar with the AAA standards at

16   this point.  I'm familiar, quite well, with

17   USPAP standards, which take precedent.

18   Q    And what was the definition of value you

19   used for that engagement?

20   A    The definition of value was marketable

21   cash value.

22   Q    And how large was that collection that you

23   valued?

24   A    If I recall, it was about 10 or 12

25   objects.  But I have to amend my answer in the

1    sense that the oral appraisal I performed was

2    not an appraisal report as defined by USPAP,

3    but was a review appraisal.

4    Q    You were reviewing someone else's

5    appraisal in that --

6    A    That is correct.

7    Q    -- opinion?

8         Did you form your own opinion as to a

9    value with regard to that Hurst collection?

10   A    In performing a review appraisal, I did

11   form my own opinion as to the validity of a

12   stated value.

13   Q    And you believe that it's not required

14   under USPAP to have a written appraisal in that

15   context?

16   A    USPAP doesn't give -- tell the appraiser

17   what to do in a specific context.  But in the

18   context of review appraising, it is acceptable.

19   Q    Take a look at Page 30 of Exhibit 2.

20   A    Can we take a break?

21   Q    Sure.

22        THE VIDEOGRAPHER:  We'll go off the

23   record.  The time is 10:15.

24        (Recess taken.)

25        THE VIDEOGRAPHER:  Go back on the record.

1    The time is 10:28, beginning of DVD No. 2.

2    BY MR. ABEL:

3         Q    Mr. Wiener, if you can take a look at

4         Page 30 of Exhibit 2.  It's Bates-stamped FGIC

5         Wiener 000030.

6              Do you see that?

7    A    That is correct.

8    Q    This was a handwritten page; is that

9    right?

10   A    It is.

11   Q    And whose handwriting is this?

12   A    Sarah Cox.

13   Q    If you look at the top of the page on the

14   right-hand side it says, "DIA INS value equals

15   150,000 at 1697"; is that right?

16   A    Yes.

17   Q    Do you know why Sarah Cox was

18   indicating -- does that stand for, in your

19   understanding, DIA insurance value?

20   A    I believe so.

21   Q    Do you know why she was including DIA

22   insurance value information in her page?

23   A    No.

24   Q    Did you ever have any discussion with any

25   of the other appraisers who worked on this

1  engagement as to whether or not they utilized
2  DIA insurance value in coming up with their
3  appraisals?
4  A   I did not.
5  Q   Do you know if they did?
6  A   I don't.  I don't know.
7  Q   Do you know where Ms. Cox would have
8  obtained information on DIA insurance value
9  from?
10 A   Presumably from the information that was
11 sent to her.
12 Q   What information was sent to her?
13 A   I believe she was sent all the other
14 valuation figures, but I can't tell you
15 precisely.
16 Q   And where did you obtain DIA insurance
17 value information from?
18 A   It was part of the document production
19 that came from your client, I believe.
20 Q   On the screen up in front of you is a
21 native format document that was produced in
22 this action as DIA INSP124564.
23     You see what I'm referring to?
24 A   I do.
25 Q   Is this the document that you believe

1  contains insurance value information from the
2  DIA?
3  A   I really don't know what was sent to
4  Sarah Cox.  I told the people who work for me
5  to send all relevant information, but I didn't
6  supervise each one.
7  Q   Well, did you ever look at this document
8  before?
9  A   I did.
10 Q   And is this the information you believe
11 contains insurance value information from the
12 DIA?
13 A   You would have to scroll to the left of
14 the Excel form.
15 Q   You mean look at the sort number, this
16 one?
17     Does that help you?
18 A   Unless it specifically states insurance
19 value, I don't know.
20 Q   Well, did you ever see a document produced
21 in this action that said "Insurance Value" as
22 opposed to just "value"?
23 A   I can't recall -- I believe I have, but I
24 can't recall precisely.
25 Q   Would that be in your work file?

1  A   That's part of the native information.
2  Q   Is there --
3  A   Electronically, we have it.
4  Q   Are you confident that the document that
5  you relied upon indicated that it was for
6  insurance value?
7  A   I don't -- as I say, I don't know exactly
8  what was sent to Sarah Cox by my staff.
9  Q   I'm not asking what was sent to Sarah Cox.
10 I'm asking you.
11     You said that you relied on a chart
12 showing insurance values; is that right?
13 A   I believe so, yes.
14 Q   And how did you know it was for insurance
15 value?
16 A   Because it was represented as such.
17 Q   Represented as such by whom?
18 A   By, I believe, you.  By your client, that
19 these were labeled insurance values.
20 Q   The document you saw had information
21 labeled "Insurance Values"?
22 A   I believe so, but I can't be 100 percent
23 precise because I didn't focus on the exact
24 title.
25 Q   Well, isn't it important to determine

1  whether or not the information you're relying
2  upon is insurance value versus fair market
3  value versus marketable cash value?
4  A   It may.  It was represented to us that
5  these values were for insurance purpose.
6      Whether the document itself said insurance
7  value or just value, I can't recall precisely,
8  but it was clearly my understanding that the
9  values given were for insurance purposes.
10 Q   And who at the DIA represented to you that
11 the values that you're relying upon were
12 insurance values?
13 A   It came from counsel.
14 Q   If counsel was wrong, would that make your
15 analysis wrong?
16 A   Depends upon what the values were.
17 Q   Well, if the value in the insurance value
18 list that you're referring to is not insurance
19 value --
20 A   Then --
21 Q   -- it was arbitrary value, would that make
22 your analysis wrong?
23 A   I don't know what "arbitrary value" means.
24 Q   Well, if there is no standard of value,
25 insurance value, liquidation value, marketable

1    cash value, the values input in that list were
2    just values, as you said, pulled out of the air
3    by third parties, would that have any impact on
4    your valuation?
5          MR. PEREZ:  Object to the form of the
6    question.  Assumes facts not in evidence.
7    A    I take into consideration all valuation,
8    and I assess the validity, the source, the
9    place in the market.  So it's definitely
10   something I would consider.
11   BY MR. ABEL:
12   Q    So how did you take into account the
13   validity of the -- what you call the insurance
14   value chart in forming your opinion in this
15   case?
16   A    I -- we definitely reviewed values that
17   were given, which we believe, for insurance
18   purposes, with the other values applied by the
19   other appraisers and with comparables we
20   selected in forming our valuation conclusion on
21   an object-by-object basis.
22   Q    And in that comparison, did you make any
23   determination as to whether or not the
24   information in this insurance value chart that
25   you relied upon was accurate?

1    A    Accurate in what sense?
2    Q    That the values indicated on the chart
3    were accurate.
4          MR. PEREZ:  Object to the form of the
5    question.
6    A    I believe I made the conclusion that the
7    values were most likely accurately transcribed,
8    and they were represented as being insurance
9    values from the DIA.
10   BY MR. ABEL:
11   Q    Did you do anything to confirm whether the
12   values on that list actually corresponded to
13   the insurance values for the artwork in
14   question?
15   A    I'm not sure I understand the question.
16   Q    Sure.
17         Did you know the source of the values on
18   that chart you're referring to?
19   A    I was told by counsel that it came from
20   the DIA.
21   Q    Do you know who at the DIA it came from?
22   A    I do not.
23   Q    Does that matter to you, what the source
24   was for the piece of data?
25   A    It's data that came from the DIA, simple

1    as all that.
2    Q    So hypothetically speaking, if a clerk at
3    the DIA were to enter random numbers into the
4    DIA chart, would that have the same
5    credibility, in your mind, as if it came from a
6    curator?
7    A    I take every piece of data into
8    consideration and look at it in relation to the
9    market at the time.
10   Q    And do you assume that all data utilized
11   is equal in its accuracy?
12   A    Again, we're going back to the term
13   "accuracy."
14         I assume that it's accurately transcribed.
15   Q    What do you mean "accurately transcribed"?
16   Transcribed from what?
17   A    Transcribed from rough notes, from verbal
18   assessments.
19   Q    So you assume that there is some basis for
20   the underlying data that you're relying upon,
21   other than that it was just invented whole
22   cloth?
23   A    I didn't say that.  I say that I take
24   every individual piece of data into
25   consideration.

1    Q    So how do you test that data that you're
2    relying upon to confirm that it's accurate?
3    A    I review the comparables at the time.  I
4    rely upon mine and other experts' knowledge at
5    the time of -- the market at the time it was
6    written, and make some determination of what
7    part, what the element of credibility -- I take
8    the word back, "credibility."  The element of
9    correct assessment that data had in relation to
10   our own determinations.
11   Q    And what did you do in this case to
12   determine that the information on the insurance
13   value charts that you're referring to earlier
14   were correct?
15   A    We reviewed them in context of what we
16   knew of the market at the time these values
17   were dated.
18   Q    How many items were on that insurance
19   value chart?
20   A    I believe 17,000.
21   Q    Did you look at the entire chart?
22   A    We did.
23   Q    Am I correct that there is actually 60,228
24   items on the insurance value chart that you
25   reviewed?

1    A    Well, no.
2         I mean, the answer -- is are you referring
3    to values or are you referring to --
4    Q    I'm asking about objects.
5         Am I correct there were 60,228 objects
6    listed on the insurance value chart you
7    reviewed?
8         MR. PEREZ:  Object to the form of the
9    question.  Assumes facts not in evidence.
10        THE WITNESS:  I can answer?
11        MR. PEREZ:  Yeah.
12   A    The -- I believe --
13   BY MR. ABEL:
14   Q    You didn't look through the 60,228 objects
15   listed on the chart to confirm that the values
16   for each one of those objects, to the extent it
17   was listed, was correct, did you?
18   A    Again, I take issue with the word
19   "correct."
20        So in answer to your question, we reviewed
21   a selection of values on that chart.
22   Q    How large a sample did you review to
23   confirm that the values listed on the alleged
24   insurance value chart was correct?
25   A    Again, I didn't -- the question is

1    correct.  I take issue with the word "correct."
2    Q    Okay.  Let's use the word "accurate."
3         Do you understand what the word "accurate"
4    means?
5    A    Of course I understand what the word
6    "accurate" means.
7    Q    So what sample size did you review from
8    the insurance, alleged insurance value chart to
9    confirm that the values indicated on that chart
10   were accurate?
11        MR. PEREZ:  Object to the form of the
12   question.  Assumes facts not in evidence.
13   A    We reviewed close to 400 objects, and
14   again, I don't know if I'd use the word
15   "accurate," to see whether they corresponded
16   with our opinion.
17        Accuracy is an arbitrary word.
18   BY MR. ABEL:
19   Q    And did those 400 objects from the DIA
20   alleged insurance value list correspond with
21   your valuations?
22        MR. PEREZ:  Objection to the form of the
23   question.  Assumes facts not in evidence.
24   A    Some we agreed with; some we did not.
25

1    BY MR. ABEL:
2    Q    And what was the error rate between the
3    information on the alleged DIA insurance value
4    list and your independent appraisals?
5         MR. PEREZ:  Object.  Same objection.
6    A    I didn't calculate an error rate.  And I
7    wouldn't use an "error rate," I don't think, is
8    the proper term.
9         I didn't calculate how closely the object
10   was in relation to our valuation, the valuation
11   given at that time.
12   Q    Of the 400 items that you analyzed from
13   the DIA alleged insurance value chart, how many
14   of those corresponded with the value that you
15   determined independently?
16   A    Considering that they were presumably, and
17   I don't know for sure because it wasn't labeled
18   as such, retail replacement value from a period
19   of 9 to 15 years ago, I would estimate maybe
20   50 percent, maybe more, were comprehensible or
21   understandable within that framework.
22   Q    So 50 percent, approximately, of the items
23   in the DIA alleged insurance value list did not
24   correspond with the values that you determined
25   through your independent analysis?

1    A    They needed -- possibly needed some
2    adjustments, in our review.
3    Q    What adjustments?
4    A    Some were, we thought, a little bit too
5    high for the time; some we thought were a
6    little bit too low for the time.
7    Q    Did you make a determination that the
8    information on that alleged insurance value
9    chart was actually accurate for the period in
10   which it was presented on the chart?
11   A    Again, the answer is, it was determined on
12   a case-by-case basis.
13   Q    Did you make any adjustments to the
14   information on the alleged DIA insurance value
15   chart to take into account that case-by-case
16   basis determination?
17   A    We reviewed that information in context
18   with other values supplied.
19   Q    Did you do that in Step 3 of your
20   methodology?
21   A    Did we do what in Step 3 of the
22   methodology.
23   Q    Make adjustments to the alleged DIA
24   insurance value charts, value information, with
25   regard to Step 3 of your analysis?

1    A    We made adjustments within Step 3.
2    Q    Did you make adjustments other than
3    applying an appreciation rate to the
4    information provided in the alleged DIA
5    insurance chart?
6    A    Again, I answered that before.
7         The adjustments were implicit in the fact
8    that we used marketable cash value in Step 3,
9    is part of the appreciation rate as opposed to
10   retail replacement value, if indeed that was
11   the value used by the DIA.
12   Q    Other than applying a 64.6 percent
13   appreciation rate, as detailed on Page 3 of
14   your report, did you apply any other discounts
15   or supplements or other adjustments to the
16   information from the alleged DIA insurance
17   chart?
18        MR. PEREZ:  Object to the question.  Asked
19   and answered.
20   A    Is your question:  Did we take individual
21   values at that time and adjust each individual
22   value given by the DIA to our assessment?
23   BY MR. ABEL:
24   Q    No.
25        My question for you is, you took 16 -- let

1    me -- correct me if I'm wrong.
2         You took 16,378 items from the DIA
3    insurance value chart, that you're identifying
4    as such, and you took the valuation information
5    from that chart and applied a 64.6 percent
6    appreciation factor to that amount to achieve
7    your projected value; is that right?
8    A    Partially.
9    Q    What am I missing?
10   A    In relation to marketable cash value.
11   Q    And how did you determine marketable cash
12   value in that context?
13   A    By -- I think it's pretty clear on the
14   attachment that goes with Step 3.  And let me
15   find it.
16        If you look at -- again, it would be
17   easier if these had Bates numbers on them.  But
18   if you look at Page 2, which is in the
19   attachment explaining Step 3.
20   Q    You're looking at Attachment L of
21   Exhibit 3?
22   A    No.  Let me just check and make sure we're
23   talking about the same thing.
24        Yes.
25   Q    Okay.

1    A    And now we're looking at Page 2.
2         Are we all there?
3    Q    Yes.
4    A    You'll see there's a total of 387 objects
5    that was part of our sampling, of which 70 did
6    not have any DIA insurance value or what we
7    presume to be DIA insurance value.  We have a
8    total.  We average weight of age, and then you
9    see average value of VWA.  That average value
10   is defined in the report as marketable cash
11   value.
12        So as I've said earlier, the adjustment
13   was implicit in bringing the 2,000,166,000
14   objects up to marketable cash value, which
15   would -- which was 3,000,566,000 and so on.  I
16   forget -- I'm sorry, 3,566,000,000.
17   Q    You compared what you believed to be
18   insurance value to marketable cash value in
19   that chart; is that right?
20   A    We projected.  I wouldn't say "compared."
21   We projected.
22   Q    Well, let's discuss the columns.
23        The column marked "DIA Insurance Value" is
24   the value taken from the alleged DIA insurance
25   chart, correct?

1    A    That's correct.
2    Q    And the column marked "VWA's Average
3    Value," that is the value information that you
4    independently came up with in your analysis;
5    isn't that right?
6    A    For 387 objects.
7    Q    For 387 objects; is that right?
8    A    Correct.
9    Q    So you're comparing what you believe to be
10   DIA insurance valuation to your market value --
11   marketable cash value information?
12   A    That is correct.
13   Q    And you say because you compared those two
14   items and determined a 10.9 percent annual
15   increase, that somehow the discount to
16   determine marketable cash value is baked into
17   that analysis?
18   A    I don't think I used the word baked in.
19   Q    You said implicit?
20   A    Implicit, yes.
21   Q    How is it implicit in that analysis?
22   A    Well, if you're adjusting a valuation that
23   by definition, presumably, is considerably
24   higher than the one we used, and when
25   contrasting it and bringing it up to current

1  valuation standards, you would be -- the
2  adjustment is now in marketable cash value
3  terms.
4      In other words, if we had used retail
5  replacement value the average value of VWA in
6  current terms would be considerably higher than
7  3,000,566,000, so we have now brought the
8  value, presumably retail replacement value, we
9  don't know for sure, on the DIA insurance,
10 that's why we called it insurance values, into
11 marketable cash value terms.
12     I think that's pretty clear and pretty --
13 and the implicit factor that I've -- I'm
14 referring to is clear as well.
15 Q    And the factor that you utilized to
16 convert it the DIA insurance value into what
17 you believe to be the present marketable cash
18 value is 10.9 percent?
19 A    The annual, it's labeled annualized
20 percentage increase.
21 Q    So how did you get from 10.9 percent in
22 that chart to your ultimate conclusion of the
23 marketable cash value of the 16,378 objects in
24 the DIA collection that you valued for Step 3?
25 A    If you look at Step 3 on Page 3 of the

1  report, you see that there was a -- they are
2  using that on an annualized basis, there's a
3  percentage of appreciation of 64.6 percent.
4  That was all done by computers and people who
5  do it.
6  Q    How did you get to 64.6 percent from the
7  annualized percent of 10.9 percent?
8  A    Taking the years that these values were
9  done I think there's another chart about that
10 but taking the years it was done it came to a
11 percentage of appreciation for the time period
12 in question of 64.6 percent.
13 Q    And the 64.6 percent referred to there
14 isn't is it true just a market appreciation
15 rate you're saying it also included a
16 collection to take into account from the change
17 from insurance value to do marketable cash
18 value?
19 A    That is correct.
20 Q    Why didn't you include that in your
21 report?
22 A    I think it is in my report.
23 Q    Do you see that anywhere in your report?
24 A    Possibly, not, but I think it's understood
25 and implicit when one looks at the charts.

1  Q    But you didn't think it was necessary or
2  sufficient to specifically detail that what you
3  were doing in your analysis was taking
4  insurance value information and applying a
5  conversion factor to marketable cash value?
6  A    I don't believe we stated it explicitly
7  but I will defer answering totally unless we
8  look at steps is taken.
9  Q    Sure.  We'll come back to that.
10     Is there a percentage factor that you
11 usually apply to insurance value to determine
12 marketable cash value?
13 A    Are you asking me whether there's a
14 standard insurance factor that one applies?
15 Q    Is there any standard factor of percentage
16 utilized in your profession in order to convert
17 an insurance value to a marketable cash value?
18 A    No.
19 Q    Is there any standard utilized in your
20 profession to convert a fair market value to a
21 marketable cash value?
22 A    Again, it's a case by case basis.
23 Q    So for example, you can't simply say you
24 take 60 percent of marketable cash or
25 marketable -- sorry.  Strike that.

1      Is it inappropriate to say, for example,
2  you take 60 percent of fair market value to
3  determine the marketable cash value of items of
4  art?
5  A    It's inappropriate.
6  Q    Let's look at Page 35 of Exhibit 2.
7      And, again, this was from the work file of
8  one of your appraisers.
9  A    You said Page 35?
10 Q    Thirty-five, yeah.
11 A    Yes, I'm on Page 35.
12 Q    And this is from the work file of one of
13 your appraisers?
14 A    That's correct.
15 Q    If you look at the last item on the page
16 the middle of the page.  It says "Artvest
17 equals FMV" -- so two squiggly lines,
18 "60 percent equals MCV."
19     Do you see that?
20 A    I'm sorry.  Oh, yes.
21 Q    Do you understand that to mean that she
22 determined marketable cash value by taking
23 60 percent -- a percentage of fair market
24 value?
25 A    For those items listed on the page, I do.

1    Q    And you said that that was not
2    appropriate?
3         MR. PEREZ:  Object the form of the
4    question.  Assumes facts not in evidence.
5    BY MR. ABEL:
6    Q    Well, you just testified it was not
7    appropriate to apply 60 percent, percentage
8    factor to transfer or to convert fair market
9    value to marketable cash value, you did not?
10   A    That's not what I testified.
11   Q    Well, the transcript will speak for
12   itself.
13        Did you understand that what she was doing
14   was converting fair market value to marketable
15   cash values in a 60 percent percentage factor?
16   A    In that particular case, I believe so.
17   Q    Did you ever ask her in how many of her
18   cases she converted fair market value to
19   marketable cash value simply by utilizing a
20   60 percent percentage factor?
21   A    We review each value on a case-by-case
22   basis.
23   Q    And do you recall discussing during that
24   case-by-case evaluation how many times she
25   converted fair market value to marketable cash

1    value by applying a 60 percent factor?
2    A    I don't recall.
3    Q    Let's look at Page 38.
4         Am I correct that this appraiser also did
5    the exact same thing with regard to preparing a
6    Christie's fair market value to marketable cash
7    value with regard to an Egyptian Blackstone
8    portrait?
9    A    That is correct.
10   Q    And if you flip the page, she did it again
11   with regard to an Egyptian Ptolemaic Blackstone
12   head?
13   A    On what page are you referring?
14   Q    Page 39.
15   A    That's correct.
16   Q    If you flip to Page 41, she did it yet
17   again with regard an Artvest appraisal of a
18   Mesopotamia Limestone release?
19   A    That is correct.
20   Q    Do you know how many of your other
21   appraisers did similar conversions?
22   A    I don't know.  The instructions to the
23   appraisers we used were to use marketable cash
24   value.  And as I say, these things are
25   determined on a case-by-case basis.  And as I

1    testified, they are not formulaic.
2    Q    Am I correct that VWA independently valued
3    387 works of art in the DIA project?
4    A    That is correct.
5    Q    How may of those works of art did you
6    value?
7    A    I reviewed practically everything.
8    Q    I'm not asking how you did you review.
9         How many did you value as an initial
10   matter?
11   A    Well, again, the valuation determined by
12   VWA, as stated in the report very clearly, is
13   done in committee.  So the final valuations, I
14   participated in practically every single
15   valuation.
16   Q    Do you know, for each one of those 387
17   value -- 387 items, what percentage was applied
18   to convert from fair market value to marketable
19   cash value?
20   A    As a general percentage, is that the
21   question?
22   Q    Do you know for any of the items what
23   percentage was used?
24   A    It was a case-by-case basis.  I didn't
25   calculate a percentage.  We came up with a

1    final number for each item.
2    Q    And in coming up with that final number
3    for each item, did you ask the person who did
4    the initial valuation what percentage factor,
5    what factor they utilized in converting from
6    fair market value to marketable cash value?
7    A    We spoke about each individual value
8    individually.
9         Implicit in the valuation was a potential
10   discount factor, and we discussed it with them
11   whether we thought it was tenable or not.
12   Q    Did you ask them what discount factor they
13   utilized for each of the 387 works?
14   A    We reviewed the results.
15   Q    Did you ask them what discount factor they
16   applied for each of the 387 results?
17   A    Not explicitly.
18   Q    Am I correct that USPAP requires you
19   identify the intended use of your opinions and
20   conclusions in an appraisal?
21   A    They -- not explicitly.  It requires you
22   to identify intended users.
23   Q    Are you sure about that, sir?
24   A    I'm not 100 -- without USPAP in front of
25   me, I can't answer that definitively.

1  Q    Isn't it a fundamental precept of USPAP
2  that in an appraisal you're supposed to
3  identify the intended use of your opinions and
4  conclusions?
5  A    That is correct.
6  Q    And USPAP also requires you to identify
7  your client and other intended users for an
8  appraisal?
9  A    That is correct.
10 Q    Why is that?
11 A    So that your appraisal report does not get
12 misused.
13 Q    How can your appraisal report get misused
14 if it's used by someone other than your client
15 or an intended user?
16 A    Simply.
17      The -- I can't give you specific agendas,
18 but frequently it happens that appraisal
19 reports are being misused.  That they are
20 disseminated to third parties that are not
21 intended to have the report.
22 Q    And in your opinion, how does that create
23 a problem?
24 A    Well, if an appraiser -- if an unintended
25 user were to take an appraisal report for which

1  that user was not intended and use it for a
2  purpose for which the report was not intended
3  to be used, such as taking an insurance report
4  and then representing it as being comparable
5  with fair market value, for example, that would
6  be an -- that would be a misuse of the report,
7  and the report is only to be used by intended
8  users.
9  Q    And why is it your understanding that
10 USPAP requires you to identify the intended use
11 of your opinions and conclusions?
12 A    So that the report does not get misused.
13 Q    What's the definition of an "intended
14 user" under USPAP, to your knowledge?
15 A    One who is identified by the appraiser, by
16 name or by generic type as an appropriate user
17 of the report within the context of the
18 appraisal assignment.
19 Q    And under USPAP is the intended user
20 required to be identified in the appraisal
21 report itself?
22 A    Either by -- the intended user is required
23 to be identified either by generic type or by
24 name.
25 Q    Who is the client on your engagement that

1  you're testifying regarding here?
2  A    Weil.
3  Q    Any other client for that engagement?
4  A    No.
5  Q    Was ACG a client for your engagement in
6  this case?
7  A    No.
8  Q    Was ACG ever your client for your
9  engagement in this case?
10 A    I did not sign an engagement letter with
11 ACG.
12 Q    Who are the intend users for your
13 appraisal in this case?
14 A    Weil and ACG, for the purposes of
15 obtaining a loan, and possibly those connected
16 with ACG for that purpose.
17 Q    Is the Court an intended user of your
18 appraisal?
19 A    I believe so.
20 Q    Did you disclose the Courts, generically
21 or directly, as an intended user of your
22 appraisal in this case?
23 A    I think it's implicit in the reports that
24 we were engaged by Weil for the purpose of
25 bankruptcy court proceedings.

1  Q    Does USPAP allow you to implicitly
2  identify intended users of your report?
3  A    USPAP gives the appraiser considerable
4  latitude and it's decided on a case-by-case
5  basis.
6  Q    It's your understanding that USPAP gives
7  you considerable latitude to determine who
8  the -- to disclose -- in determining how
9  accurately to disclose the intended user of
10 your appraisal report?
11 A    That is what I said.
12     (Deposition Exhibit 4, 2014-2015 USPAP
13 Standards, marked for identification as of this
14 date.)
15     THE WITNESS:  Can I just refill my tea cup
16 for a minute?
17     MR. ABEL:  Take a quick break?
18     THE WITNESS:  Yeah, two seconds.
19     THE VIDEOGRAPHER:  You're taking a break?
20     THE WITNESS:  We can just take a full
21 break if you want to.
22     (Discussion off the record.)
23     MR. ABEL:  Let's go off the record for a
24 minute.
25     THE VIDEOGRAPHER:  We're off the record.

Page 98

1    The time is 11:05.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  Go back on the record.
4    The time is 11:06.
5  BY MR. ABEL:
6    Q    So I'm showing you a copy -- so I'm
7    showing you a document that's been marked
8    Deposition Exhibit 4.
9    A    Thank you.
10   Q    Without reading through the entire thing,
11   does that appear to be the 2014 to 2015 USPAP
12   standards?
13   A    It is.
14   Q    You ever heard of term "prospective
15   appraisal" before?
16   A    Prospective appraisal?
17   Q    Prospective appraisal.
18   A    Yes.
19   Q    And what is a prospective appraisal?
20   A    One in which the appraiser gives a, what
21   shall we say, a determination of value at a
22   future date.
23   Q    And what's the difference between a
24   current appraisal and a prospective appraisal?
25   A    Current appraisal is determined as of the

Page 99

1  date on which the appraisal is being written.
2        Prospective appraisal is projected values
3  at some point in the future, as identified
4  within the appraisal report.
5    Q    And did you perform a current appraisal or
6  a prospective appraisal for this engagement?
7    A    We performed a current appraisal.
8    Q    When did you first hear about the DIA
9  collection may be at issue in the Detroit
10  bankruptcy?
11   A    There were numerous stories in the press
12  long before I was approached to be become
13  engaged in one way or another.
14   Q    Do you recall when you first heard about
15  that?
16   A    I can't tell you the exact date.  I
17  suppose in the first part of 2004, but maybe
18  before.
19   Q    Did you ever hear about the possibility
20  that the DIA collection could be sold in
21  conjunction with the bankruptcy?
22   A    I believe press reports mentioned that.
23   Q    And what did you think about the
24  possibility that the DIA collection could be
25  sold?

Page 100

1    A    I thought that it would be terrible if it
2  were to be sold.
3    Q    Why?
4    A    Because I believe the collection is
5  spectacular in terms of quality of objects.  I
6  believe it has an integral part in the cultural
7  history of Detroit.  I believe it could be part
8  of cultural tourism, which may help rejuvenate
9  a municipal economy that is in bankruptcy.
10       And those are the reasons.
11   Q    Any other reasons?
12   A    Those are the main ones, I think.
13   Q    When were you first contacted with regard
14  to providing services with regard to the
15  valuation of the DIA collection?
16   A    In the middle of May of this year.
17   Q    And were you contacted by Ian Peck of ACG
18  in May for that purpose?
19   A    I was.
20   Q    And was that the first time, in May of
21  2014, that you spoke with Mr. Peck about
22  valuing the DIA collection?
23   A    That is correct.
24   Q    Where did your May 2014 discussion with
25  Mr. Peck take place?

Page 101

1    A    It took place on the telephone.  I was in
2  California at the time.
3    Q    Did he call you?
4        Did you call him?
5    A    I received an e-mail from Mr. Peck asking
6  me to set up a time when we could talk on the
7  phone about a matter that he was considering
8  engaging my services with.
9    Q    Did Mr. Peck or ACG engage your services
10  on an appraisal of the DIA collection?
11   A    Mr. Peck asked me to submit a proposal.
12  And Mr. Peck indicated at a certain point, I
13  can't recall exactly when, that indeed he would
14  be very interested in retaining our services.
15   Q    Did ACG commit to retain the services of
16  VWA for that appraisal?
17   A    Without a formal letter of retention,
18  there could never be a commitment.
19       But it was my understanding that a formal
20  letter of retention would be following from
21  Mr. Peck.
22   Q    Did he ever send you one?
23   A    He sent me -- well, asked me to submit my
24  standard letter of retention in draft form.  He
25  then -- then his attorney put some suggestions

1  in.  My attorney reviewed it.  And there was a
2  certain amount of back and forth.
3  Q    Was it ever signed?
4  A    No.
5  Q    Why not?
6  A    Because at a certain point Mr. Peck
7  informed me that Weil would be the one who
8  would be retaining me.
9  Q    And were you ultimately retained by Weil?
10  A    I was.
11  Q    When was that?
12  A    The letter of retention, to the best of my
13  recollection, was signed on July 11, 2014.
14  Q    And between May of 2014, when you were
15  initially contacted by Mr. Peck, and July 11th
16  of 2014, when you were retained by Weil, did
17  you perform any work on the engagement to value
18  the DIA collection?
19  A    Only preliminary reviews of data sent to
20  me for review.
21  Q    What do you mean by that?
22  A    What is your -- I don't understand your
23  question.
24       What do you mean by that?
25  Q    You said you only performed preliminary

1  reviews of data sent to you.  Let's break it
2  down.
3       Who sent you the data?
4  A    I was -- all data that I received was sent
5  to me at that point by Mr. Peck.
6  Q    And what data did he send you?
7  A    He sent -- to the best of my recollection,
8  he sent me the Houlihan Lokey report, with
9  attachments, or exhibits, I think they called
10  it, and also data sheets that he obtained from
11  the DIA.
12  Q    And what did you do with the Houlihan
13  Lokey report, if anything?
14  A    I read it.
15  Q    Did you form any preliminary analysis of
16  that report or the data in there?
17  A    I -- what do you mean by "analysis"?
18  Q    Well, did you -- were you looking for
19  anything specific in the Houlihan Lokey report?
20  A    I was looking to see what it said.
21  Q    And did you draw any conclusions or form
22  any opinions from that review?
23  A    Only in a very summary and preliminary
24  way.
25  Q    And what were those opinions you drew?

1  A    That my conclusions, after the preliminary
2  review of Houlihan Lokey, was that the DIA
3  collection was indeed imperilled, that there
4  were various options to monetize the collection
5  and make the creditors whole, I believed, and
6  that for these purposes an appraisal report
7  would be required.
8  Q    And what did you do with regard, if
9  anything, with regard to the data sheets
10  obtained from the DIA prior to July 11, 2014?
11  A    Prior to July 11th, is that what you said?
12  Q    Yes.
13  A    We reviewed them.  We got them
14  electronically.  And I then informed Mr. Peck
15  that, contrary to what he imagined in the
16  beginning, that they were not adequate, in the
17  sense that the most -- for two reasons or three
18  reasons, some of which we compensated for
19  later.
20       But mostly that the author or the artist
21  involved in a particular object, the crafts
22  person in some objects was not correctly
23  identified in these data sheets.
24  Q    Could you rely on information that you
25  knew was incorrect?

1       MR. PEREZ:  Object to the form of the
2  question.  Assumes facts not in evidence.
3  BY MR. ABEL:
4  Q    You can answer.
5  A    I felt that in order to rely on the
6  information, part of it which could be relied
7  upon, and part of it which could not be relied
8  upon, we would need correction.
9  Q    So you believe that you couldn't rely upon
10  the information that you knew was incorrect?
11  A    Not totally, the way it was written up in
12  the data that we received.
13  Q    Have you ever, in an engagement, relied
14  upon information that you knew was incorrect?
15  A    I relied on -- never.  I take that back.
16       I -- again, there is a, what shall we say,
17  a difference that I know of between the legal
18  definition of relying and the appraisal
19  definition of relying, which is -- which would
20  mean, in appraisal sense, it would be
21  determinative, in a legal sense, taking it
22  under consideration.  I take all data under
23  consideration, whether it's -- whether I
24  consider it to be correct or inaccurate.
25       If you believe data that you're looking at

1  is incorrect, how do you take it into
2  consideration?
3  A    I try to take steps to correct it so I can
4  rely upon it, so I can use it.
5  Q    What were you engaged in this case by Weil
6  to do?
7  A    To produce an appraisal report for the
8  60-some-odd thousand objects in the DIA
9  collection.
10 Q    And what was the purpose of that report?
11 A    The purpose of the report was presumably
12 that it would be used in bankruptcy
13 proceedings.
14 Q    Were you aware of any specific purpose
15 that it would be used for in bankruptcy
16 proceedings?
17 A    I think bankruptcy proceedings are fairly
18 specific.
19 Q    Am I correct that the purpose of your
20 appraisal was that it be used to determine the
21 collateral value of the DIA collection for a
22 loan for the City of Detroit?
23     MR. PEREZ:  Object to the form of the
24 question.  Assumes facts not in evidence.
25     THE WITNESS:  I can answer?

1      MR. PEREZ:  Yeah.
2  A    Okay.  The -- as I said, the initial
3  parameters of my engagement were with Mr. Peck.
4  The -- it was my understanding that the report
5  that I would supply to Weil would fulfill two
6  purposes:  One, to be used in the bankruptcy
7  proceeding, which is acceptable to Weil.
8      The second was that it would be used
9  potentially for the procurement of
10 collateral -- will be used as, what shall we
11 say, demonstration of the economic potential of
12 the collection to be used as collateral.
13 Q    And how did you understand your appraisal
14 would be used in the bankruptcy proceeding?
15 A    That it would be used by Weil and the
16 clients to serve as a determination of the
17 value of the Detroit collection.
18 Q    The value in a sale context?
19 A    The value in any context.
20 Q    Well, wouldn't you agree with me that the
21 context in which property being appraised would
22 be sold is part of the analysis that you must
23 use in determining the definition of value and
24 methodology for your appraisal?
25 A    I would agree with that, yes.

1  Q    So in what context did you understand the
2  appraisal would be used in the bankruptcy
3  proceeding here?
4      MR. PEREZ:  Object to the form of the
5  question.  Asked and answered.
6  A    I stated very clearly that the appraisal
7  report would be used in the bankruptcy
8  proceeding, in my opinion -- in -- consistent
9  with my understanding, and that Mr. Peck could
10 then use the appraisal report for the
11 procurement of a loan in which the collection
12 would be used as collateral.
13 BY MR. ABEL:
14 Q    If the context of the sale is important to
15 determining the definition of value and
16 methodology to be used in appraisal, what was
17 the context of the sale you were envisioning
18 taking place in the bankruptcy proceeding?
19 A    I wasn't -- I didn't envision any sale
20 taking place.  I envisioned that the objects
21 would be used for collateral purposes.
22     It could possibly be used for sale, but my
23 report, I think, clearly states that the
24 parameters were for collateralized transaction
25 purposes.

1  Q    So what adjustments to the opinions in
2  your report would be required to take into
3  account the sale of the DIA collection as
4  opposed to the use of it as collateral for a
5  loan?
6  A    If it were -- if my report were to be used
7  in a sales situation, I don't think many
8  adjustments would need to be taken.
9  Q    Well, which adjustments would need to be
10 taken?
11 A    Well, I think that the value of marketable
12 cash value would most likely be appropriate for
13 either collateralized purposes or sale
14 situations.
15 Q    You said before that you've never
16 performed an appraisal in the context of a
17 bankruptcy; is that right?
18 A    That's correct.
19 Q    So how are you aware of the circumstances
20 of a bankruptcy sale and how that would impact
21 the definition of value and methodology to be
22 used in an appraisal of property sold in that
23 context?
24     MR. PEREZ:  Object to the form of the
25 question.

1    A    These are -- one doesn't have to
2    necessarily perform it to understand it.  These
3    are circumstances with which -- which form a
4    part of my curriculum at New York University.
5  BY MR. ABEL:
6    Q    You taught a course at New York University
7    about bankruptcy sale?
8    A    I taught a -- I teach a course at New York
9    University, it's ongoing, which covers
10   bankruptcy.
11   Q    And do you have any written presentation
12   that goes along with that course?
13   A    I have a course outline that is
14   distributed to students.
15   Q    And does that course outline describe the
16   particulars of how you perform a valuation in
17   the context of a bankruptcy?
18   A    It covers the topic.  It doesn't give
19   detail.  That's covered in classroom
20   discussion.
21   Q    Is there any publication that you have
22   your students review in order to determine or
23   to discuss the proper methodology for a
24   valuation in the context of bankruptcy?
25   A    There is.

1    Q    And what is that?
2    A    Several publications.
3         There is -- bankruptcy situations are
4    discussed in a valuation context within the, at
5    least the 2003 appraisal handbook, which I
6    coauthored or as co-editor and authored a good
7    deal of the text.
8         It's also discussed in, I believe, in
9    various cases that are published in the basic
10   textbook for the course, which is Art Law,
11   written by Ralph Lerner and Judith Bressler.
12        And I also encourage my students to search
13   online sources for current cases that may
14   relate to a variety of topics, one of which
15   being bankruptcy cases.
16   Q    The 2003 appraisal handbook you're
17   referring to, is that the treatise entitled
18   "All About Appraising"?
19   A    That is correct.
20   Q    And you believe the information contained
21   in there is -- in there accurately
22   reflects the standards of your profession with
23   regard to a valuation?
24   A    I do.
25   Q    Has any of the standards discussed in the

1    appraisal handbook changed since 2003, with
2    regard to bankruptcy valuations?
3    A    I don't think so.
4    Q    Did you intend that your appraisal in this
5    case would be utilized to determine the value
6    at which the DIA collection could be sold on
7    the market?
8    A    It was a possibility, yes.
9    Q    Was it your intention that your appraisal
10   could be used for the purpose of determining
11   how much money could be realized by the DIA in
12   its sale of its collection?
13        MR. PEREZ:  Object to the question.  Asked
14   and answered.
15  BY MR. ABEL:
16   Q    You can answer.
17   A    The primary purpose of the appraisal was
18   to determine the value of the collection for
19   bankruptcy proceedings.
20        The secondary -- the secondary use of the
21   appraisal, as stated in my report, was that it
22   would be used for the procurement of a loan.
23        What took place within the context of
24   bankruptcy were specific situations that I
25   could not envision because I was not privy to

1    all of the financial situations and/or
2    financial backup, so I really don't know.
3         But I could envision that it would be used
4    for some type of sale.
5    Q    Well, let's step back and parse that
6    comment.
7         You said you could envision it being used
8    for -- in conjunction with the sale.
9         Did you intend that your appraisal in this
10   case be utilized to determine the amount of
11   money the DIA could realize on the sale of its
12   collection?
13        MR. PEREZ:  Object to the form of the
14   question.  Asked and answered.
15   A    In "intend," with my appraisal report was
16   not determinative to intention.
17        I could envision that the report may be
18   used for potential sale, that the value -- that
19   each individual object was valued individually.
20   And that there was always that possibility.
21        The intention or intended use of the
22   report, I think, is pretty fairly stated in the
23   report.
24   Q    And you're required by USPAP to detail the
25   intended use of your appraisal report in the

1  report itself; isn't that right?
2        MR. PEREZ:  Objection to the question.
3  Asked and answered.
4  BY MR. ABEL:
5    Q    You can answer.
6    A    USPAP asks -- again, it gives the
7  appraiser great latitude, but asks the
8  appraiser to state the intended use of the
9  report.
10   Q    And was the intended use of your appraisal
11  report, under USPAP, to determine how much
12  money the DIA would realize in a sale of its
13  collection?
14       MR. PEREZ:  Object to the form of the
15  question.  Asked and answered.
16       You can answer.
17       THE WITNESS:  I can answer?
18       MR. PEREZ:  Yeah.
19   A    The intended use of the report was to be
20  used by Weil in the bankruptcy proceeding.
21  BY MR. ABEL:
22   Q    And was it your understanding that one of
23  those intended uses in the bankruptcy
24  proceeding was to determine how much money the
25  DIA could realize in the sale of its

1  collection?
2        MR. PEREZ:  Same objection.
3  BY MR. ABEL:
4    Q    You can answer.
5    A    And the answer remains the same, it is
6  my -- I don't know how it would be used.
7        My -- the intended use of my appraisal
8  report was to determine the value of the
9  subject property in connection with the
10  bankruptcy proceeding, full stop.
11   Q    Did ACG ever tell you that anyone was --
12  sorry.  Strike that.
13       Did ACG ever tell you that they had made a
14  loan proposal with regard to the DIA collection
15  in an amount not to exceed $2 billion?
16   A    I can't recall whether ACG told me, but it
17  was -- it was stated in -- in an -- in an
18  exhibit, I believe, of the Houlihan Lokey
19  report.
20   Q    Did you ever see the proposal from ACG
21  with regard to its loan, with regard to the DIA
22  holdings?
23   A    No.
24   Q    Do you know how ACG arrived at the
25  2 billion-dollar number?

1    A    I have no idea.
2    Q    Why did you take on the engagement to
3  appraise the DIA, given your misgivings about
4  the sale of its collection?
5    A    I took on --
6        MR. PEREZ:  Object to the form of the
7  question.
8        THE WITNESS:  I can answer?
9        MR. PEREZ:  Yeah.
10   A    I took on the engagement, as I've stated
11  earlier, because I was afraid that the
12  collection was imperilled and that I thought
13  that a viable solution would be, considering
14  all factors, what little I knew, would be to
15  collateralize the collection and use it for a
16  loan that in turn would satisfy the creditors.
17  BY MR. ABEL:
18   Q    And if a loan is not possible in this
19  context, do you still -- no, let's strike that.
20       Take a step back.
21       Did you have any misgivings about this
22  assignment?
23       Am I correct you did?
24       MR. PEREZ:  Object to the form of the
25  question.  Assumes facts not in evidence.

1    A    I don't know if "misgivings" is the
2  correct word.
3        I had -- "misgivings" is too strong a
4  term.
5        I had concerns.  I, as I testified
6  already, and it's written in my report, I
7  believed the public trust would be served well
8  by a properly prepared appraisal report.
9  BY MR. ABEL:
10   Q    Did you ultimately conclude that a loan
11  was a viable plan for the DIA collection?
12   A    That's beyond the scope of my work or my
13  competence.
14   Q    Let's take a look at your report,
15  Exhibit 3, Page 4, under the category "The
16  Decision to Accept the Assignment."
17       Do you see the paragraph in the middle of
18  the page that begins "However"?
19   A    I do.
20   Q    If you read after the words "Houlihan
21  catalogue" it states:  "Mr. Wiener was
22  convinced that a loan was a viable plan for the
23  DIA collection, including the loan proposed by
24  ACG."
25       Did you write that sentence?

1  A   I did.
2  Q   So how were you convinced that a loan was
3  a viable plan for the DIA collection if you
4  lack the experience necessary to form that
5  opinion?
6  A   Because that's the way it was presented to
7  me by Mr. Peck, and that it was written in the
8  Houlihan Lokey report that -- or catalog, as it
9  stated, that it was included as a possible
10 option.
11 Q   And because that Mr. Peck and Houlihan
12 Lokey identified that as an option, you were
13 convinced that it was a viable plan for the DIA
14 collection?
15 A   I believed it would be a viable plan.
16 Q   Have you ever served as broker with regard
17 to loans with regard to art?
18 A   As a broker?
19 Q   Yes.
20 A   No.
21 Q   Have you ever advised a client to get a
22 loan secured by art in any capacity?
23 A   I worked for lending institutions.
24 Q   Which lending institutions?
25     THE WITNESS:  Can I reveal that without

1  breaching confidentiality?
2      MR. PEREZ:  Is there a confidentiality
3  agreement in place?
4      THE WITNESS:  There are confidentiality
5  agreements in place with every lending
6  institution that I work with.
7  BY MR. ABEL:
8  Q   Well, how many different lending
9  institutions do you work with in conjunction
10 with valuing art to secure loans?
11 A   I think about five or six.
12 Q   An dhow many different engagements have
13 you been involved in to -- on behalf of lending
14 agencies to determine the value of art in
15 conjunction with a loan?
16 A   Numerous.
17 Q   How many, approximately?
18 A   Twenty, maybe more.
19 Q   What percentage of your practice at VWA is
20 done in conjunction with providing consulting
21 services to lending companies?
22 A   It varies from year to year, so . . .
23 Q   Well, last year, what percentage of your
24 work at VWA was done in conjunction with
25 lending agencies?

1  A   Possibly 15 or 20 percent.  I would have
2  to review our records.
3  Q   Do you know what percentage of revenue
4  that work related to for the VWA?
5  A   I would -- you mean the billing --
6  Q   Yes.
7  A   -- is that correct?
8      No, I haven't done any analysis as far as
9  billing, as far as revenue sources go.
10 Q   Do you know on what terms a loan was
11 offered with regard to the DIA collection?
12 A   I have no idea.
13 Q   Do you know what the ability of the DIA or
14 the City of Detroit would be to service that
15 loan?
16 A   I do not.
17 Q   Do you know how the DIA would get money to
18 service that loan?
19 A   I do not.
20 Q   Did you do any analysis to determine how
21 the DIA could potentially pay off any loan from
22 ACG?
23 A   I did not.
24 Q   So how were you convinced that it was a
25 good idea for the DIA to, or the City of

1  Detroit to borrow money secured by the DIA
2  collection?
3  A   I, as I've testified, I saw -- I believed
4  it was a viable option since it was included in
5  the Houlihan Lokey report, and then from
6  representations made to me by Mr. Peck.
7  Q   You understand that in any loan situation
8  there's a possibility for default?
9  A   I do.
10 Q   Did you ever take into consideration how
11 likely it would be that the City of Detroit
12 would default on the loan and the DIA
13 collection would be forcibly sold in that
14 context?
15 A   I did not.
16 Q   Did that play any role in your decision to
17 take on the assignment in this case?
18 A   Did what play?
19 Q   The possibility that there could be a
20 foreclosure and forced sale of the DIA
21 collection.
22 A   In any loan situation there is the
23 possibility of foreclosure.  It's inherent to
24 the assignment, of any loan assignment.
25 Q   And what happens in the context of a

Page 122

1  foreclosure of art, in your experience?
2  A    Well, I haven't been involved with too
3  many foreclosures.  But at a certain point, and
4  I think it varies from case to case, from my
5  discussions with my clients, the lender will
6  take possession of the collateral and the
7  collateral will be liquidated in one form or
8  another.
9  Q    What do you mean by "liquidated"?
10  A    Liquidated means sold; or could be then
11  used for another loan.  I don't know.  It could
12  be.  But certainly there would be some type of
13  transaction that would make the lender whole in
14  a case of a default.
15  Q    In your experience, how frequently are
16  collections in foreclosure actions liquidated?
17  A    Not that often.
18  Q    Well, let me take a step back.  Perhaps I
19  phrased it inartfully.
20       How quickly are collections that are
21  subject to a foreclosure action sold, in your
22  experience?
23       MR. PEREZ:  Object to the form of the
24  question.  Assumes facts not in evidence.
25  A    I'm sorry, could you -- I'm not sure I

Page 123

1       understood the question.  Could you repeat it?
2  BY MR. ABEL:
3  Q    Sure.
4       In your experience, when art collections
5  are foreclosed upon in conjunction of a loan
6  default, how quickly are they sold by the
7  lender in question?
8  A    Generally speaking, in that type of
9  situation, they are sold in an orderly sales
10  transaction, which would take place over time.
11  Q    And with regard to how many different
12  foreclosures have you been involved in your
13  career, with regard to art collection?
14  A    Very few.
15  Q    Can you tell me approximately how many?
16  A    One or two.
17  Q    And what were the sizes of those two
18  collections that were sold in the foreclosure
19  environment?
20  A    One was considerably large and the other
21  was relatively modest in size.
22  Q    And the one that you say was considerably
23  large, what was the value of objects in that
24  collection?
25  A    About how many objects; is that your

Page 124

1  question?
2  Q    Yes.
3  A    Several hundred.
4  Q    And do you know who foreclosed on that
5  collection?
6  A    I was -- well, this is public knowledge,
7  so I can put it out there.
8       I was consulted by Merrill Lynch, who
9  eventually foreclosed on, I forgot his name,
10  Mr. Meyer's collection, which they advanced
11  money from.
12       I reviewed the lending documents and I
13  read in the paper that -- and I was paid for my
14  services.  I read in the papers that -- at
15  least, that eventually a sale took place, I
16  believe at Christie's and Sotherby's.  There
17  were quite a few objects.
18  Q    And how long after the foreclosure did
19  that sale take place?
20  A    I believe several months.  It was sold in
21  on orderly sales fashion.
22  Q    What does that mean?
23  A    What does an "orderly sales fashion" mean?
24  Q    Yes.
25  A    It means was that the collection was sold

Page 125

1  in a manner to maximize the amount of money the
2  lender would receive for the foreclosed
3  property.
4  Q    In the context of that sale, the orderly
5  liquidation could take place over several
6  months, you said?
7  A    I believe so.
8  Q    And what was your involvement in that
9  engagement?
10  A    I was a consultant.
11  Q    Did you perform a valuation determination
12  with regard to the collection?
13  A    I did.
14  Q    And what was the nature, or definition of
15  value you used in that context?
16  A    Marketable cash value.
17  Q    Have you ever performed a valuation
18  utilizing liquidation value?
19  A    No.
20  Q    What is "liquidation value"?
21  A    Liquidation value -- is the value that
22  would be used in a forced sale situation, which
23  would be forced sale, as opposed to an orderly
24  sale, or one could say a disorderly sale, in
25  which the collection was sold in a marketplace

1  in which the value of the collection would not
2  be maximized because of the time element
3  involved, and consequently the amount of money
4  received would be lower than what would be
5  received if the collection were to be sold in
6  an orderly sale situation.
7  Q   Jumping around a little bit.  Let's go
8  back to discussing USPAP.
9      Do you believe USPAP is a binding code of
10 ethics that governs your work?
11 A   Yes.
12 Q   What would be the impact on one of your
13 appraisals if it wasn't compliant with USPAP?
14 A   USPAP is not federally regulated, or state
15 regulated for that matter, in their personal
16 property.  So there's no discrediting body to
17 discredit an appraisal report.
18 Q   Would you agree with me that personal
19 property appraising is a nonregulated
20 profession?
21 A   That's correct.
22 Q   And that would you agree with me that one
23 of the reasons why appraisers join
24 organizations like the Appraisers Association
25 of American is in an effort to gain credibility

1      and recognition?
2  A   That's correct.
3  Q   And do you agree with me that there are
4  other individuals performing valuations of
5  personal property that don't use USPAP?
6  A   I do.
7  Q   And USPAP itself focuses on appraisal
8  standards not appraisal methodology; is that
9  right?
10 A   No.
11 Q   That's not right?
12 A   No.
13     (Deposition Exhibit 5, Extract from the
14 USPAP Frequently Asked Questions, marked for
15 identification as of this date.)
16     MR. PEREZ:  What number is it?
17     MR. ABEL:  5.
18 BY MR. ABEL:
19 Q   I'm showing you a document that's been
20 marked Deposition Exhibit 5.
21     MR. ABEL:  And I will represent for the
22 record that this is an extract from the USPAP
23 frequently asked questions, a document from the
24 Appraisal Foundation website.
25

1  BY MR. ABEL:
2  Q   I'd like you to take a look at Page F85.
3  Unfortunately, it's, you know, a little bit out
4  of order since the page numbers are in their
5  backwards.  But 85 is at the top of the -- no,
6  it has Item 89 through 191 on there.
7      Do you see what I'm referring to?
8  A   I do.
9  Q   If you look at the response under
10 "Calculating Blockage Discount" it reads:
11 "Note:  USPAP focuses on appraisal
12 standards" --
13 A   Which -- are you on 189 or 190?
14 Q   Sorry, 191.
15 A   191, where it says "Calculating Blockage
16 Discount"?
17 Q   Yes, in the response.
18     Am I correct it provides -- "USPAP focuses
19 on appraisal standards not appraisal
20 methodology or how-to-perform calculations."
21     Did I read that correctly?
22 A   Correct.
23 Q   Does that change your opinion as to
24 whether or not USPAP focuses on appraisal
25 standards not appraisal methodology?

1  A   It doesn't change my opinion.
2  Q   So -- okay.
3      You consider yourself to be an expert on
4  USPAP?
5  A   I do.
6  Q   Did you write the USPAP Frequently Asked
7  Question portion of the manual?
8  A   I did not.
9  Q   Did you review it previously?
10 A   I reviewed it from time to time.
11 Q   Did you ever tell the authors of USPAP
12 that they are incorrect in their "Frequently
13 Asked Questions" section of their manual?
14 A   In certain cases, yes.
15 Q   So you disagree with the authors of the
16 manual as to what USPAP actually requires?
17 A   This is not -- let's go back.  You're
18 mischaracterizing the document.
19     This is not a manual.  These are -- nor is
20 it binding part of USPAP, as it states very
21 clearly in the document.
22     These are frequently asked questions that
23 are issued by people within the Appraisal
24 Foundation or the appraisal subcommittee, the
25 appraisal standards board.  Sorry.  I take back

1  subcommittee, I say Appraisal Standards board.
2      So these are not -- have no weight, weight
3  of USPAP, and this is clearly stated within the
4  document.  And if you look at the big book that
5  you, I think you had, there's an absolute
6  division, and it says something to the effect
7  of nonbinding or opinions or whatever, and
8  that's where frequently asked questions appear.
9      So I take issue with the vocabulary used
10  in -- are we talking about No. 191, I believe,
11  or is it 190?
12      I forget.
13  Q    Do you know who drafted the opinions
14  expressed in the FAQ to the USPAP?
15  A    There's no author given.
16  Q    Have you ever heard the term "appraisal
17  consulting" before?
18  A    I have.
19  Q    And am I correct that an appraisal
20  consulting does not require a USPAP appraisal?
21  A    At present it does not.
22  Q    What is an "appraisal consulting"?
23  A    An appraisal consulting assignment is when
24  a consultant who relies, to a certain extent,
25  on valuation, will offer advice or primarily a

1  recommendation to a client for whatever the
2  assignment happens to be.
3  Q    During -- am I correct that you were
4  previously an executive director of the
5  Appraisers Association of America?
6  A    You are.
7  Q    If I refer to that as the "AAA," you'll
8  understand to what I'm referring?
9  A    Of course.
10  Q    And am I correct that the AAA actually
11  published a position paper during your tenure
12  as the executive director of the AAA that
13  disagreed with the Appraisal Foundation and
14  Appraisal Standards Board, the author of USPAP,
15  regarding whether appraisers can provide
16  opinions of value without those opinions being
17  USPAP compliant?
18  A    I am.
19  Q    And the AAA said that its appraisers could
20  do so, could provide opinions of value without
21  those opinions being USPAP compliant?
22  A    It did.
23  Q    We've been talking for a while about the
24  different definitions of value that can be used
25  in appraisal.

1      You mentioned before insurance value; is
2  that right?
3  A    I don't use the term "insurance value."
4  Q    What do you refer to?
5      Do you use the term "replacement value"?
6  A    Retail replacement value.
7  Q    Retail replacement value.
8      Is that the highest definition of value
9  utilized in an appraisal?
10  A    Again, it's not a definition -- well, it's
11  not a definition of value.
12      It is the -- well, it's a defined term.
13  It is the -- in a structure or hierarchy of
14  value, it would be the highest amount under
15  most circumstances.
16  Q    What would be the next highest amount?
17  A    Fair market value.
18  Q    What is fair market value?
19  A    Fair market value is the, as was defined
20  in the 2003 handbook of the Appraisers
21  Association, the amount of money that would be
22  paid by a willing buyer to a willing seller,
23  neither being under compulsion to buy or sell,
24  both being knowledgeable of all the relevant
25  facts.

1      And I believe that definition also carries
2  with it a clarification or proviso that fair
3  market value takes into consideration all
4  transaction costs.
5  Q    For what purposes do you use a fair market
6  value?
7  A    Fair market value is basically -- the main
8  purpose for using fair market value is it's a
9  defined term by the federal government, is for
10  internal revenue services purposes, internal
11  IRS purposes.
12      The fair market value is also frequently
13  used in the determination of compensation due
14  to a -- an insured individual in the event of a
15  partial loss of a -- an object that had been
16  insured.
17      Those are the two main applications of
18  fair market value.
19  Q    Okay.  What is marketable cash value?
20  A    Marketable cash value is the value net --
21  it's basically fair market value, net of all
22  transaction costs.
23  Q    So it also involved a willing buyer and a
24  willing seller with no compulsion?
25  A    But being knowledgeable of all the

VICTOR WIENER - 08/04/2014

1 relevant facts, yes.
2 Q   And what is "liquidation value"?
3 A   Liquidation value is generally used in
4 many bankruptcy proceedings, as I've testified
5 earlier, where a forced sale is involved, and
6 the seller, for whatever reason, does not have
7 the luxury of time and the possibility of
8 selling the objects in an orderly sale
9 situation.
10 Q   How does retail replacement value differ
11 from fair market value or marketable cash
12 value?
13 A   In all the definitions, a value is
14 determined by the interaction of a buyer and a
15 seller.
16     If you didn't have a willing buyer and you
17 didn't have a willing seller, your property
18 would be valueless.  I can't think of any
19 instances where this would occur, but
20 nonetheless there is always that hypothetical
21 possibility.
22     Retail replacement value is calculated --
23 let me backtrack.
24     We have two individuals determining value,
25 the buyer and the seller.  Retail replacement

1 value is determined from the perspective of the
2 buyer, how much would a buyer have to pay if he
3 or she were to go out into the marketplace in a
4 relatively short amount of time and replace
5 that object with a similar and like object.
6 Okay.
7     Retail, I mean -- sorry.
8     Fair market value, marketable cash value,
9 and liquidation value are -- is determined from
10 the perspective of the seller, how much would
11 the seller actually receive if he or she were
12 to sell the object at a certain time.
13 Q   Are the different standards of value that
14 we went through interchangeable?
15     For example, if the Court liked a fair
16 market value analysis of one piece of the DIA
17 collection, and a marketable cash value for
18 another piece of the DIA collection, could it
19 take those two values and add them together?
20 A   That would be a determination of the
21 Court.
22 Q   Can it do that as a proper valuation
23 method, from your perspective?
24 A   The appraiser provides a value consistent
25 with the definition of value.  What the Court

1 were to decide is up to the Court.
2 Q   Okay.  So if you were to attempt to come
3 up with a marketable cash value for the entire
4 DIA collection, would be permissible to take a
5 marketable cash value assessment of one portion
6 of the collection and simply add it to a retail
7 replacement value for another part of the
8 collection to get the total value?
9 A   I don't quite understand the question,
10 permissible --
11 Q   Appropriate in your profession.
12 A   Every application of value is a case
13 specific situation.  So I don't necessarily
14 feel comfortable in responding in generalities.
15 Q   Well, I'm going to ask you, as an expert,
16 to assume a hypothetical.
17     Okay?
18 A   Yes.
19 Q   Assume for a valuation you are asked to
20 do, that you were asked to determine the
21 marketable cash value of an entire collection.
22 That's the first assumption.
23     Okay?
24 A   Yes.
25 Q   Assume then you were asked to value a

1 portion of that collection utilizing retail
2 replacement value.
3     Okay?
4 A   Yes.
5 Q   And then assume you were asked to value
6 another portion of that collection using
7 marketable cash value.
8 A   Yes.
9 Q   Is it permissible, in your profession, to
10 determine the marketable cash value of the
11 entire collection by adding together the retail
12 replacement value for a portion of the
13 collection with the marketable cash value for
14 the remainder of the collection?
15     MR. PEREZ:  Is this a hypothetical?
16     MR. ABEL:  This is a hypothetical.
17 A   But the question is permissible by whom?
18 BY MR. ABEL:
19 Q   In your profession.
20 A   I understand in my profession.  But you
21 use the word "permissible."  I'm don't
22 understand, who's permitting or not permitting?
23 Q   Let's make it easier.
24     Do you believe -- is it consistent with
25 USPAP or the standards you believe are

1  applicable governing your profession to value
2  an entire collection utilizing -- for
3  marketable cash value purposes, using a portion
4  of the collection valued at retail replacement
5  value, and a portion of the collection valued
6  at marketable cash value?
7       MR. PEREZ:  Object to the form of the
8  question.  Assumes facts not in evidence.
9  A    Well, is your question is it -- what word
10 did you say with USPAP permissible?
11      What is the word you used that's an
12 important --
13 Q    So let's break it down.
14      Is it consistent with USPAP to value an
15 entire collection under a marketable cash value
16 assessment by valuing a portion of that
17 collection utilizing retail replacement value,
18 a portion of the collection using marketable
19 cash value, then adding those two values
20 together?
21 A    Is that consistent with USPAP --
22 Q    Yes.
23 A    -- is that correct?
24 Q    Yes.
25 A    Yes.

1  Q    So you can add -- so what you're saying
2  is:  Even though retail replacement value and
3  marketable cash value are different, you can
4  simply add a retail replacement value to a
5  marketable cash value and get a marketable cash
6  value for the total collection?
7  A    Again, this is a generality, and you'd
8  have to give me a case-specific statement.
9       USPAP calls for --
10 Q    Let's make it easier.
11      MR. PEREZ:  Let him finish his answer.
12      MR. ABEL:  Actually, I have another
13 question.
14 A    I haven't answered my question properly.
15 BY MR. ABEL:
16 Q    I'm going to make it even easier.
17 A    Okay.
18 Q    Assume that for Step 3 of your report you
19 determine an insurance value or retail
20 replacement value.
21      Okay?
22 A    Hypothetically.
23 Q    Hypothetically.
24      And assume that for the rest of the steps
25 in your report you determined a marketable cash

1  value.
2  A    Correct.
3  Q    Can you determine the marketable cash
4  value for the entire collection simply by
5  adding Step 3 to the other steps?
6  A    The devil is in the details.  It depends
7  how it's done.  I can't answer generally.
8  Q    Have you ever done that before, utilized
9  different definitions of value and just add
10 them together to get a definition, a marketable
11 cash value definition?
12      MR. PEREZ:  Object to the form of the
13 question.  Assumes facts not in evidence.
14 A    Again, one takes into consideration a
15 variety of factors and previous valuations and
16 makes a determination.
17      I haven't -- I don't think I've done
18 exactly what you've described, but I've
19 certainly taken all these factors into
20 consideration, and not necessarily done a
21 mathematical, what shall we say, summation
22 conclusion, but it's all cite-specific and has
23 to be defined.
24 BY MR. ABEL:
25 Q    What was the total marketable cash value

1  of the DIA collection, in your opinion?
2  A    As stated in the report, 8,552,000,000, so
3  on.
4  Q    You actually said it was 8,552,395,675 and
5  probably more than that.
6  A    That's what I said, and that's what I
7  believe.
8  Q    And what's the probability that the value
9  is higher than that?
10 A    There is a probability.  But I haven't
11 made that determination at this point.  But
12 there certainly is every indication that the
13 value probably would be higher than that.
14 Q    And what's the probability that it's lower
15 than that?
16 A    Not too much.
17 Q    Are you opining that the City of Detroit
18 would have received approximately 8.5 billion
19 if the entire collection was sold?
20 A    In an orderly sales situation, yes.
21 Q    Would you agree with me that marketable
22 cash value is typically used in divorce
23 settlements?
24 A    Yes.
25 Q    And would you agree with me that the

Page 142

1  concept of time is a very important operative
2  factor in determining marketable cash value?
3  A    Depends upon the divorce.
4  Q    Well, outside of the divorce context,
5  would you agree with me that the concept of
6  time is very important in determining
7  marketable cash value?
8  A    Concept of time is very important in
9  determining all value.
10 Q    And how did you take time into
11 consideration in your appraisal here?
12 A    In what sense?
13 Q    Well, you said it's important in all
14 appraisals.
15       How did you take it into account or
16 consideration in forming your opinions here?
17 A    Well --
18       MR. PEREZ:  Object to the form of the
19 question.
20 A    It's, as I say, implicit in the definition
21 of marketable cash value, which marketable cash
22 value, by definition, implies an orderly-sales
23 situation.
24 BY MR. ABEL:
25 Q    So you assume that there would be an

Page 143

1  orderly-sales situation here?
2  A    I do.
3  Q    And if that assumption is incorrect, would
4  that render your opinion flawed?
5  A    It depends upon the circumstances.
6        Flawed?  I don't know.
7        It depends upon each individual
8  circumstances, and I'm not prepared to answer
9  it in general terms.
10 Q    Well, if this was a forced-sale situation,
11 would you agree with me that the proper
12 valuation definition to use would be
13 liquidation value?
14 A    It depends upon how the property were to
15 be sold.
16       When you talk about forced situations, you
17 can still have an orderly liquidation or a
18 disorderly liquidation.  It's depending upon
19 the circumstances.
20 Q    And how many disorderly liquidations have
21 you been involved in, in your career?
22 A    I don't think I've been involved in any.
23 Q    And how many orderly liquidations have you
24 been involved with in your career?
25 A    Not that many, but some.

Page 144

1  Q    Do you have any opinion as to whether this
2  would be an orderly or disorderly liquidation
3  of the DIA collection assets?
4        MR. PEREZ:  Object.  Object to the form of
5  the question.  Assumes facts not in evidence.
6        THE WITNESS:  I can answer?
7        MR. PEREZ:  Yeah.
8  A    I would expect that if part of the DIA
9  collection were to be sold it would be sole --
10 there would only be selected objects that would
11 be sold, and it would take place in a manner in
12 which the sale price would maximize the value
13 of the collection, which would mean that it
14 would be sold in an orderly sale context.
15 BY MR. ABEL:
16 Q    And how did you form that opinion?
17 A    Because the -- because the collection,
18 under normal circumstances, is of such high
19 profile, high value, one would sell it in a
20 manner and in the marketplace in which it would
21 make the most money.
22 Q    And how long would it take to do an
23 orderly sale of the DIA collection, in your
24 opinion?
25 A    Different sectors of the collection would

Page 145

1  be -- would have a different time frame for
2  being sold.
3  Q    How long would it take to sell the entire
4  DIA collection, in your opinion?
5  A    To sell it in an orderly sale context?
6  Q    Yes.
7  A    Years.
8  Q    How many years?
9  A    I don't know.  I haven't done that
10 calculation.  Nor do I -- it's a general, it's
11 calling for a general conclusion that I'm not
12 prepared to give you.
13 Q    You're assuming -- well, I don't need to
14 go there.
15       You also said marketable cash value is the
16 value realized net of expenses; is that right?
17 A    That's the way it's defined in my present
18 report so I could say that.
19 Q    And what expenses did you net out in
20 determining marketable cash value?
21 A    Marketable cash value in this particular
22 situation would be all transaction costs
23 connected with it, which would be the buyer's
24 premium and possibly a seller's commission,
25 although in this particular circumstance I

1  would think that the sellers commission would
2  be waived by the agent of sale.
3  Q    And what did you assume to be the buyers
4  premium with regard to the sale of the
5  collection?
6  A    Buyers premium are all over the place
7  because, as you may know, if it were to be sold
8  at auction, each auction house has a
9  different -- different parameters for buyers
10  premium.
11      If part of it were to be sold privately,
12  through brokers, through dealers, that's open
13  to negotiation.
14      Generally speaking, one could probably
15  look at 10 to 20 percent in buyers premiums.
16  But, again, this is a general answer, and it's
17  a case-by-case basis.
18  Q    Case-by-case basis on each piece of art?
19  A    Correct.
20  Q    Well, what buyers premium did you utilize
21  in Steps 3 -- 2, 3 and 4 of your analysis?
22  A    Generally, we were looking on specific
23  objects and somewhere between 10 and
24  20 percent.
25  Q    Well, for Steps 2, 3 and 4, did you do an

1  object-by-object analysis of buyers premium?
2  A    Object-by-object?
3      We did some spot checks of objects, but
4  not object by object.
5  Q    Okay.  So what buyers premium did you
6  apply to determine the marketable cash value
7  with regard to Steps 2, 3 and 4?
8  A    Depending upon the value of the object, as
9  I said, it would probably be between 10 and
10  20 percent, in this case.
11  Q    Is it your testimony that you went object
12  by object through Steps 2, 3 and 4 to determine
13  that buyers premium?
14  A    In this we took, generally -- we did
15  categories also.  And we took, generally, as I
16  said, between 10 and 20 percent.
17  Q    If the Court were to attempt to determine
18  what percentage between 10 and 20 you utilized
19  for those different categories, how could it
20  determine that?
21  A    Well, generally, the Court would ask me
22  and I'd say, to be on the safe side, one would
23  say 20 percent.
24  Q    So your testimony is that you utilized
25  20 percent in determining the buyers premium

1  for the objects identified in Steps 2 through 4
2  of your report?
3  A    My testimony is that we looked at various
4  categories and we thought the range between 10
5  and 20 percent.  And, again, it would probably
6  be around 20 percent.
7  Q    What would you look at to determine what
8  exactly it was for each one of these
9  categories?
10  A    The -- generally, the value of the objects
11  within a particular category.
12      So if you have objects of a relatively low
13  value, the buyers premium would be higher.
14  Q    Is there any document in your work file
15  that would detail what buyers commission -- or
16  sorry -- what buyers premium you utilized to
17  value any specific object in Tier 2 through 4?
18  A    I would have to consult the document.
19  Q    But you don't know?
20  A    Off the top of my head.
21  Q    Okay.  How about cost to prepare art for
22  sale; would you take that into account --
23  A    What?
24  Q    The cost to prepare art for sale, did you
25  take that into account in determining your

1  marketable cash value?
2  A    I don't understand the question.
3      Cost to prepare art for sale.
4  Q    Sure.
5      Let's look to Page 15 of your report.
6  A    Sure.
7  Q    Are you there?
8      We're on -- the report is Exhibit 3.
9  A    I am on Page 15 of Exhibit 3.
10  Q    And the definition of marketable cash
11  value on Page 15 of your report, that's the
12  definition that you provided to us?
13  A    That's what?
14  Q    That's the definition that you just
15  testified to?
16  A    Correct.
17  Q    And if we flip to the next page of your
18  report.
19  A    Page 16.
20  Q    Page 16.
21  A    Correct.
22  Q    You indicate in the second full paragraph,
23  talking about the circumstances of a loan
24  default; is that right, what would happen?
25      You read:  "Under such circumstances, a

1  value which is net of transaction costs is
2  appropriate since the borrower were to forfeit
3  on loan payments a lender would confiscate the
4  collateral art in this case and sell part or
5  all of the property used as collateral to
6  satisfy the debt."
7      Did I read that correctly?
8  A    Correct.
9  Q    Is one of the things that the lender would
10 do in the context of a foreclosure to prepare
11 the art for sale?
12 A    I don't understand "prepare the art for
13 sale."
14 Q    Do you have to collect the art and take it
15 to an auction house to sell it?
16 A    Sometimes the auction house collects it.
17 Q    Is there a cost associated with that?
18 A    Frequently the auction house assumes that
19 cost.
20 Q    Are there any insurance charges associated
21 with holding art taken in a liquidation or
22 foreclosure context?
23 A    There are insurance costs associated with
24 the sale of art.
25 Q    Let's take a step back.

1      Well, actually, no.
2      You testified before you have little
3  experience with regard to the foreclosure and
4  sale of art collections; isn't that right?
5      MR. PEREZ:  Object to the form of the
6  question.  Assumes facts not in evidence.
7  A    The -- I testified that I have only
8  casually been involved with foreclosure sale
9  situations.
10 BY MR. ABEL:
11 Q    And do you know what costs were incurred
12 by the lender in conjunction with that
13 foreclosure sale?
14 A    I don't not.
15 Q    Do you know what costs were actually
16 realized by the borrower with regard to those
17 foreclosure sales?
18 A    I don't not.
19 Q    Are you aware of any example where a
20 lender has lent money against the full amount
21 indicated in the marketable cash value
22 appraisal?
23 A    None.
24 Q    Did anyone at ACG ever tell you what the
25 loan-to-value they were willing to lend against

1  in this case was with regard to DIA collection?
2  A    They did not.
3  Q    You ever hear that the loan maximum --
4  that the maximum loan amount from ACG was tied
5  to a 20 percent appraised value?
6  A    I did not.
7  Q    Are you aware of whether a 20 percent loan
8  amount is typical in the lending industry?
9  A    I have been involved in many different
10 loan transactions, and there's no such thing as
11 "typical."
12     THE WITNESS:  Can we take a break now?
13     MR. ABEL:  Sure.
14     THE VIDEOGRAPHER:  We're off the record.
15 The time is 12:10.
16     (Recess taken.)
17     THE VIDEOGRAPHER:  Go back on the record.
18 The time is 12:22.  Beginning of DVD No. 3.
19 BY MR. ABEL:
20 Q    Mr. Wiener, am I correct that both
21 marketable cash value and fair market value
22 require you to assume a willing buyer and a
23 willing seller acting without compulsion?
24 A    I testified to that effect.
25 Q    In a foreclosure context, are you dealing

1  with a willing seller acting without
2  compulsion?
3  A    Depends upon the actual situation.
4  Q    Have you seen any evidence in this case
5  that the DIA wants to sell its art collection?
6  A    I have not.
7  Q    Have you seen any evidence in this case
8  that the DIA is a willing seller acting without
9  compulsion in conjunction with the sale of its
10 collection?
11     MR. PEREZ:  Object to the form of the
12 question.  Assumes facts not in evidence.
13 BY MR. ABEL:
14 Q    I'm asking what evidence you've seen, sir,
15 not what facts might be in evidence.  So let me
16 rephrase it.
17     Have you seen any evidence suggesting that
18 the DIA is a willing seller acting without
19 compulsion with regard to the sale of its
20 collection?
21     MR. PEREZ:  Same objection.
22 A    I have not.
23 BY MR. ABEL:
24 Q    You don't present a liquidation value
25 opinion in this case, do you?

1   A   I do not.
2   Q   The report that you produced in this case,
3   dated July 25, 2014, Exhibit 3, can you tell me
4   who drafted the first draft of that report?
5   A   Who drafted the first draft?
6       I did.
7   Q   Yes.
8       Were there multiple drafts?
9   A   There were some revisions.
10  Q   How many drafts were there?
11  A   I really can't recall.
12  Q   And was anyone else involved in editing
13  the report?
14  A   Actually, I showed some things to
15  David Shapiro.
16  Q   You show it to anyone else?
17  A   Counsel reviewed it.
18  Q   Anyone from AGC or --
19  A   ACG.
20  Q   -- ACG or FGIC comment on the drafts?
21  A   No one from those two agencies.
22  Q   Did you show anyone from those two
23  agencies any drafts of your report at all?
24  A   No.
25  Q   Did your conclusions of the value of the

1   DIA collection change between drafts?
2   A   No.
3   Q   Were you ever a member of the Appraisers
4   Association of America?
5   A   I was.
6   Q   Are you now?
7   A   No.
8   Q   When did you stop being a member of the
9   Appraisers Association of America?
10  A   I was a member before I became executive
11  director.  In about, I guess, two or three
12  years into my position as executive director, I
13  dropped membership.
14  Q   Why?
15  A   There was no need to retain any
16  membership.
17  Q   Why not?
18  A   Why?
19      Because I was running the organization.  I
20  had published, at that point, quite a lot on
21  it, on appraising.  I was recognized as an
22  authority.  I did not need to retain my
23  membership to maintain my credibility as an
24  appraiser.
25  Q   And you're not an appraiser of the AAA

1   now?
2   A   I'm not a member, you mean?
3   Q   Sorry.
4       You're not a member of the Appraisers
5   Association of America now?
6   A   I'm not.
7   Q   And you're not a certified appraiser of
8   the Appraisers Association of America?
9   A   Of the Appraisers Association of America?
10  Q   Yes.
11  A   No, I'm not a member.
12  Q   Were you elected to be the executive
13  director of the Appraisers Association of
14  America?
15  A   Executive directors positions are
16  generally not subject to election.  I was
17  chosen by the board of directors.
18  Q   And that was a paid position, correct?
19  A   Yes.
20  Q   You were working in the administration of
21  the AAA; is that right?
22  A   Among other things.
23  Q   Why did you leave that position?
24  A   Well, I had been in the position for 21
25  years, and I didn't want to die in the job, and

1   I was ready for a change, so I resigned.
2   Q   Were you asked to leave the position as
3   executive director?
4   A   No, I was not.
5   Q   Any conflicts between you and anyone else
6   at the Appraisers Association of America?
7   A   Well, there always, in any organization,
8   differences of opinion.
9   Q   Were you ever accused by anyone at the
10  Appraisers Association of America of violating
11  any rules?
12  A   No.
13  Q   Accused of violating any laws?
14  A   Any?
15  Q   Laws.
16  A   Laws?
17  Q   Yes, of the United States.
18  A   No.
19  Q   Were you ever accused in conjunction with
20  your role as executive director of the
21  Appraisers Association of America of funneling
22  appraisals to yourself?
23  A   Was I accused of doing that?
24  Q   Yes.
25  A   No.

1  Q    At VWA do you provide investment advice to
2  clients regarding the purchase or sale of art?
3  A    We provide consulting services.
4  Q    And do you ever provide investment advice
5  to clients regarding the purchase or sale of
6  art?
7  A    Part of consulting services is advising
8  clients whether one thinks the art may
9  appreciate or not appreciate over time.
10 Q    In what percentage of VWA's business is
11 devoted to advising clients regarding the
12 purchase or sale of art?
13 A    I'm sorry.  I didn't understand that.
14 Q    What percentage of VWA's business is
15 devoted to providing investment advice to
16 clients regarding the purchase or sale of art?
17 A    Well, I wouldn't call it investment
18 advice, but in -- advice on the sale and
19 purchase of works of art, I'd say about
20 25 percent.
21 Q    Okay.  Let's take a step back.
22      Do you ever give provide investment advice
23 to clients regarding the purchase or sale of
24 art?
25 A    Again, investment advice makes one sound

1  like an investment counselor.
2       I provide advice, whether I think it may
3  be a good purchase or a not so good purchase.
4  Then the client can do with it what he wants.
5       But whether this is considered to be
6  "investment advice," I don't think I would
7  characterize it that way.
8  Q    What percentage of VWA's business is
9  related to providing appraisals for the purpose
10 of determining how much a piece of art work
11 would sell at auction?
12 A    Would sell at auction.  If auction were to
13 be considered to be an appropriate venue of
14 sale, it's an auction that one would include in
15 appraisal reports.
16      As I say, every appraisal report has its
17 unique profile.  So as far as percentage goes,
18 I don't know if I can quantify it at this
19 point; possibly 30 percent, 40 percent.  I
20 really don't know.  It's a valuation
21 consideration prevalent to all appraisal
22 reports, basically.
23 Q    Am I correct the last time you actually
24 worked in an auction house was is 1982?
25 A    You're incorrect.

1  Q    When's the last time you actually worked
2  at an auction house?
3  A    Let me just think.  I'll give you an exact
4  month.
5       December 2013.
6  Q    And what did you do with regard to the
7  auction house in that engagement?
8  A    I curated sales and I reviewed the catalog
9  information at auction.
10 Q    Which house was that?
11 A    It's a company in Germany and United
12 States at the moment called "Auctionata."
13      THE WITNESS:  Do you want me to spell
14 that?
15      THE COURT REPORTER:  Mm-hmm.
16      THE WITNESS:  I knew you would.
17      Okay.  A-U-C-T-I-O-N-A-T-A.
18      THE COURT REPORTER:  Thank you.
19 BY MR. ABEL:
20 Q    And prior to working at Auctionata, when
21 was the last time before that that you worked
22 for an auction house?
23 A    Several decades before that.
24 Q    1982?
25 A    Yes.

1  Q    How long were you working at Auctionata?
2  A    Well, two, three years.  I still am.
3  Q    What percentage of VWA's business have
4  related to providing insurance -- appraisals
5  for insurance related engagements?
6  A    Again, I don't break it down necessarily
7  in percentages.  But if I were to estimate, I'd
8  say, again, 20, 25 percent.  As I say, I don't
9  do studies of percentages of what we do.
10 Q    Does VWA ever sell property directly for
11 clients?
12 A    Do we broker sales?
13 Q    Yes.
14 A    Upon occasion.
15 Q    How frequently?
16 A    Not that frequently.
17 Q    Have you had any discussions with anyone
18 about brokering any portions of the DIA's
19 collection?
20 A    None.
21 Q    Would you do so?
22 A    Would I broker the collection?
23 Q    Would you broker any portion of the
24 collection?
25 A    Not while I'm appraising it.

1  Q   Are you done appraising it?
2  A   When the case is over I'll be done.
3  Q   Are you still appraising the DIA
4  collection after the submission of your
5  July 25, 2014 report?
6  A   We are.
7  Q   What are you still doing?
8  A   We're looking at other -- other specific
9  items.  We are reviewing values that were put
10  on them.  And we are in the continual process
11  of updating your appraisal report.
12  Q   Have you submitted a supplement to your
13  report in this matter?
14  A   We have not.
15  Q   Do you intend to?
16  A   That depends on counsel.
17  Q   Do you believe that there are any
18  inaccuracies in your report that need to be
19  supplemented?
20  A   There may be a few corrections due to
21  typos, things of that sort, or
22  mistranscriptions, but . . .
23  Q   What are you aware of, in terms of errors
24  in your report?
25  A   Well, if you turn to -- it's hard for me

1  to maneuver this.
2  Q   And just be clear, when we're talking
3  about errors in your report, I'm not referring
4  to spelling errors or grammar errors.
5  A   I understand.
6      If you turn to -- the pages are not sure
7  numbered, unfortunately.
8      But if you turn to attachment -- Step 2,
9  the Attachment J, as in John, you can -- the
10  first -- the first five entries.  That's Andy
11  Warhol, Armando Morales, Donald Baechler,
12  Friedrich Hundertwasser, up to there.  It says
13  one, two, three, four.  These four have been --
14  are a subject to mistranscriptions.
15  Q   How were they mistranscriptions?
16  A   The Andy Warhol portrait, "Self Portrait"
17  was appraised individually.  So it shouldn't be
18  included on the list of the 616.  The Morales,
19  The Unknown, and The Baechler have
20  mistranscribed values that are much too high.
21  Q   And how did you determine that they were
22  much too high?
23  A   In reviewing the transcriptions that were
24  made.
25  Q   Have you looked at every transcription

1  made in your report?
2  A   I think we have.  I think we have.
3  Q   You've now gone through everything for
4  Steps 1, Steps 2, Steps 3 and Steps 4 to make
5  sure that there are no mistranscriptions?
6  A   To the best of our ability, at this
7  moment, yes.
8  Q   In what degree were they mistranscribed?
9  A   What do you mean by "degree"?
10  Q   How much should they be?
11  A   Much lower.  The Warhol should be
12  eliminated.  I think, basically, to correct,
13  you can deduct the entire values, because they
14  are much lower; they not in the millions.
15  They're in, probably the low thousands.
16  Q   So the Unknown, "Plate" that you have
17  listed as $18 million should be really in the
18  thousand-dollar range?
19  A   Sure.  Correct.
20  Q   Do you know exactly how much that should
21  be?
22  A   No, I haven't.  I'd have to look at the
23  records.  But it's just the magnitude of error
24  is significant.
25  Q   Who valued an Unknown, "Plate" at $18

1  million?
2  A   This was -- if you noticed, Step 2 is --
3  refers to -- and I'll quote directly in the
4  report, the high value by the independent third
5  parties.  So these were the averages.  And for
6  some reason the value was mistranscribed.
7  Q   And who did the transcription of those
8  values?
9  A   Rob Leeds at Silar.  I'm sorry, or Silar,
10  in general.  I'm not sure if he did it
11  personally.
12  Q   How many employees does VWA have?
13  A   We have 10 or 11.
14  Q   Are they all full-time?
15  A   No.
16  Q   How many are full-time?
17  A   Well, two are close to full-time.
18  Q   What do you mean "close to full-time"?
19  A   Meaning they get paid on a per job basis,
20  and seem to be working full-time.
21  Q   And who are they?
22  A   David Shapiro, who is seated here.  And
23  Shaun Cooper.
24  Q   Who are the associates at VWA, other than
25  Mr. Cooper and Mr. Shapiro?

1  A     Numerous.  You can go on to our website.
2  They are people who we work with on a regular
3  basis.
4  Q     And are they hired by engagement by VWA?
5  A     They are hired on a per job basis, yes.
6  Q     Do you have any experience in setting an
7  accession policies at museums?
8  A     I'm not quite sure, what do you mean by
9  "accession policies"?
10 Q     Do you know what the accession is with
11 regard to a museum collection?
12 A     Yes, I do.
13 Q     Are you aware that museums have policies
14 regarding the accession and deaccessioning of
15 work from their collections?
16 A     I do.
17 Q     Did you have any experience with the
18 setting of any of those policies at any museum?
19 A     I do not set policy.
20 Q     Do you have experience in determining
21 works for deaccessioning at a museum?
22 A     I have never determined or made a
23 recommendation which works should be
24 deaccessioned.
25 Q     Have you ever had any engagement to

1  appraise museum works for deaccessioning?
2  A     No.
3  Q     How do you believe -- sorry.  Take a step
4  back.
5        Do you believe you have extensive museum
6  experience?
7  A     I do.
8  Q     How do you believe your museum experience
9  is relevant to determining the value of the DIA
10 collection here?
11 A     Very simply.  I have worked full-time for
12 three years, part-time for several years
13 afterwards, interacted with museum curators,
14 and basically know cataloging policy, have seen
15 objects that have been deaccessioned.  I've
16 seen many objects that have been taken into the
17 collection.  And I have a pretty strong
18 curatorial background.  And if you look at my
19 CV I have a certificate from the Metropolitan
20 Museum of Art and New York University, offered
21 jointly, in museum training, which involved
22 three years full-time work in museums.
23 Q     And did any of that training that you
24 received or the certificates that you received,
25 address the issue of valuation of museum

1  collections?
2  A     Not the certificates.
3  Q     And did any of the work that you mentioned
4  have any role with regard to valuation of
5  museum collections?
6  A     Yes.
7  Q     What was that?
8  A     Well, work for museums.  I worked for --
9  quite a bit for the Philadelphia Museum of Art
10 in setting values for insurance purposes or
11 loan purposes.
12 Q     And when you say "loan," are you referring
13 to inter-museum loans, not loans to obtain
14 capital?
15 A     Inter-museum loans, correct.
16 Q     Did you talk to any museum personnel at
17 any museum in connection with this engagement?
18 A     I did not.
19 Q     Did you talk to anyone at any auction
20 houses in connection with this engagement?
21 A     I did not.
22 Q     Did you talk to anyone at Christie's or
23 Sotherby's to see whether they -- those
24 entities would be willing to sell any portion
25 of the DIA collection?

1  A     I did not.
2  Q     Have you ever had any involvement with any
3  museum that was forced to deaccession art
4  before?
5        And when I say "forced," I mean
6  deaccession for purposes other than buying new
7  art.
8  A     I have not.
9  Q     Are you aware of the American Alliance of
10 Museums?
11 A     I think it's the American Association of
12 Museums.
13       Is that the AAM?
14 Q     That's the AAM.
15 A     I believe it's correctly called the
16 "American Association of Museums."
17 Q     Are you aware of the AMM's code of ethics?
18 A     Yes.
19 Q     Do you know whether or not DIA is a member
20 of the AAM?
21 A     I'm assuming that they were.
22 Q     Do you know whether the DIA is subject to
23 their code of ethics?
24 A     As a member, I believe they would be.
25 Q     Do you know whether it would be a

1 violation of the AAM's code of ethics for the
2 DIA to offer its collection as collateral for a
3 loan or to sell its collection?
4 A    I think it would depend upon the
5 circumstances.
6 Q    Well, are you aware of any standard or
7 policy governing the DIA that would allow it to
8 deaccession its collection to pay creditors?
9 A    Only what I can -- what shall we say.
10       Only what I can assume, but not
11 specifically.
12 Q    Are you aware of other art museums that
13 deaccessioned art to pay operating costs?
14 A    I am.
15 Q    What museums are those?
16 A    The Delaware Art Museum.  The North
17 Hampton collection in England.  Primarily
18 recent, but I've certainly been aware of this
19 in the past, the National Academy of Design has
20 done this.
21 Q    Were the Maier Museum?
22 A    The?
23 Q    Maier Museum?  M-A-I-E-R.
24 A    I'm not aware of the Maier Museum using
25 their funding for necessarily paying operating

1 costs.
2 Q    Are you aware of any sanctions imposed on
3 any museum for deaccessioning art to pay
4 operating costs?
5 A    Yes.
6 Q    What sanctions are you aware of?
7 A    The -- I believe the National Academy of
8 Design encountered sanctions.  I believe the
9 Delaware Art Museum has encountered sanctions.
10 And I believe the North Hampton collection in
11 London has also encountered sanctions.
12 Q    And what were those sanctions?
13 A    I think it varied from time to time.  I
14 haven't been following all the details.  I know
15 they were sanctioned.
16 Q    Do you know what impact those sanctions
17 had on their ability to operate?
18 A    I do not.
19 Q    Do you have any evidence -- sorry.
20       With regard to those institutions that you
21 mentioned, do you know whether or not the art
22 that they sold in association with the
23 deaccessioning for which they were sanctioned
24 received lower prices at auction?
25 A    As a result of deaccessioning?

1 Q    Result of sanctions, yes.
2 A    Am I -- and the question I believe is:  Am
3 I aware that the -- well, generally speaking,
4 the sanctions would take place after the sale.
5 Q    And was the public aware of the purpose of
6 the deaccessioning?
7 A    I believe so.
8 Q    Are you aware of whether or not there was
9 any impact on the price for which those art
10 pieces were sold as a result of the fact that
11 they were being deaccessioned for purposes of
12 paying operating costs as opposed to buying new
13 art?
14 A    It's my opinion that there was no impact.
15 Q    And how did you form that opinion?
16 A    By seeing the prices, by looking at the
17 prices realized in the sales, and my knowledge
18 of, generally, the art market.
19 Q    Did you appraise those pieces of art in
20 question?
21 A    No, I did not.
22       (Deposition Exhibit 6, Printout From the
23 American Alliance Museum's Website, marked for
24 identification as of this date.)
25

1 BY MR. ABEL:
2 Q    You have 6.
3       I'm showing you a document marked
4 Deposition Exhibit 6.
5 A    Mm-hmm.
6 Q    You ever seen this document before?
7 A    No, I haven't.
8       MR. ABEL:  Well, let's, for the record,
9 this is a printout from a document on the
10 American Alliance Museum's website.
11 BY MR. ABEL:
12 Q    Are you aware of the American Alliance
13 Museums?
14 A    Yes.
15 Q    And you said before that one of the
16 entities that was sanctioned was the Delaware
17 Art Museum?
18 A    Yes.
19 Q    To the extent that this is a true and
20 accurate document, would you agree with the
21 statement that "the Delaware Art Museum's
22 decision to sell certain pieces of art in
23 association with the deaccessioning for
24 operating costs threatens to erode the trust
25 museums have earned from the American public

1  for more than two centuries"?
2      MR. PEREZ:  Object to the form of the
3  question.  He testified he hadn't seen this
4  document before.
5      MR. ABEL:  I'm asking about the statement,
6  not about the document itself.
7  A    So the question is am I aware of what it
8  says?
9  BY MR. ABEL:
10  Q    No.
11      My question is:  Would you agree that "the
12  Delaware Art Museum's decision to sell or
13  deaccession art pieces in conjunction with
14  paying its debts threatens to erode the trust
15  museums have earned from the American public
16  over more than two centuries"?
17      MR. PEREZ:  Same objection.
18  A    I'm aware that this is an opinion issued
19  by the American Alliance Museums.
20  BY MR. ABEL:
21  Q    I'm asking you whether you agree with the
22  opinion, sir, not what it is.
23  A    I'm not sure I wholeheartedly agree.
24  Q    Why don't you agree?
25  A    What?

1  Q    Why don't you agree?
2  A    Well, this is a very broad statement, that
3  it will erode the trust.
4      I mean, I think many people would be
5  disturbed by it.  But whether it erodes the
6  trust, I'm not 100 percent sure.  I think it
7  might be a very strong statement, and it's not
8  measured.
9  Q    It's not a measurable statement, in your
10  opinion?
11  A    Well, the statement is not measured.  It's
12  a strong statement, and I don't know whether
13  the trust has been eroded.
14      I think it's something that would upset
15  people, but whether it's eroded, I don't know.
16  Q    Well, have you done anything to determine
17  the impact of a forced deaccessioning on a
18  museum before?
19  A    What do you mean have I done anything?
20  Q    Have you performed any analysis, read any
21  books, done any studies as to the impact on
22  forced deaccessioning on a value of a museum
23  collection before?
24  A    I've just read articles.
25  Q    And what articles have you read with

1  regard to the impact on the evaluation of a
2  collection held by a museum as a result of a
3  forced deaccessioning?
4  A    I haven't read any articles about the
5  impact of -- are you asking me have I read
6  anything about the value of the objects sold at
7  auction that were impacted by potential
8  sanctions or condemnation by the American
9  Alliance Museum; is that your question?
10  Q    Yes.
11  A    My answer is no.
12  Q    You mentioned museum provenance in your
13  report, correct?
14  A    I did.
15  Q    And you believe that works sold from a
16  museum may have added value?
17  A    I do.
18  Q    Did you perform any analysis of the market
19  to confirm whether that assumption was correct?
20  A    I did.
21  Q    What did you do?
22  A    We looked at quite a number of sales of
23  deaccessioned stuff -- not deaccessioned stuff,
24  that's the wrong word.  Of deaccessioned
25  property from a variety of museums, all of

1  which are listed in our appraisal report, and
2  came to the conclusion, as stated in the
3  report, that the museum provenance basically
4  adds to the value of the objects offered for
5  sale.
6  Q    And am I correct that none of those
7  examples that you utilized in conjunction with
8  forming your opinion in this case dealt with a
9  deaccession from a museum collection in the
10  context of a sale for operating costs or to pay
11  lenders?
12  A    Yes, to the best of my knowledge.
13  Q    Do you believe that the sale of the DIA
14  collection would be unprecedented in scope?
15  A    It probably would be.
16  Q    There's never been a sale like this before
17  of its collection, assuming it happens?
18  A    Well, what type of sale are you talking
19  about?
20  Q    Well, if the DIA collection was sold in
21  toto, there was never -- in the history of the
22  sale of art, you're not aware of another time
23  period where such a sale was -- where such a
24  sale occurred?
25  A    Correct.  That's correct.

Q   The sale of the DIA collection would be unique, in your opinion?

A   In that context, yes.

Q   Am I correct that there are different kinds of arts at the DIA?

A   There are.

Q   It's a mixed collection?

A   There are.

Q   Do you know whether all the works of the DIA were of the same quality?

A   Is the question: Am I aware whether the works collected by the DIA are all uniformly of the same quality?

Q   Yes.

A   And the answer is, they are not.

Q   The DIA collection has uneven quality, correct?

A   It has a varied quality. I don't know if I'd use the word "uneven."

Q   Before the bankruptcy of the City of Detroit and the contemplated liquidation of the DIA collection, are you aware of a liquidation of such a collection ever being considered in any treatise or publication?

MR. PEREZ:  Object to the form of the

question. Assumes facts not in evidence.

A   I'm not quite sure. It's a composite question anyway.

What exactly is the question? I'm not sure.

BY MR. ABEL:

Q   Sure.

Are you aware of any treatises or publications that contemplate the methodology to be used in the liquidation of a collection the size of the DIA's?

A   I'm not aware of any.

Q   Are you aware of any discussions or courses in which the liquidation of a DIA collection was at issue?

MR. PEREZ:  Object to the form of the question.

BY MR. ABEL:

Q   Let me take a step back. Let me rephrase.

Are you aware of any courses or panel discussions where the orderly liquidation of the DIA collection was at issue?

A   You're talking about something in an academic setting?

Q   Yes.

A   I am not.

Q   What's the largest collection you've ever appraised by value?

A   About $300 million.

Q   And how many works of art comprised that collection?

A   That one, 20,000.

Q   And what was the second largest collection you've ever valued by volume?

MR. PEREZ:  Object to the form of the question. Assumes facts not in evidence.

A   I think we're now in the process of appraising a collection that is maybe 15, 19,000 works of art.

BY MR. ABEL:

Q   And how long have you spent on that engagement?

A   Well, it's something that is being done over time. So we've been spending about, on and off, for various reasons, about four months.

Q   And how long do you expect to take on that engagement?

A   That depends on a variety of factors.

Q   What factors?

A   Availability of the art; groupings of the art; and other factors that I can't determine at this particular point.

Q   What kind of valuation are you performing for that 15 to 19,000 piece collection?

A   The value will be most likely fair market value.

Q   And why fair market value as opposed to marketable cash value?

A   Again, I really feel uncomfortable for a variety of reasons talking about the valuation specifics of this collection. And, indeed, it is subject to strict confidentiality with the client.

Q   Did you use the same methodology you utilized with regard to the valuation of the DIA collection for that -- to value that collection 15 to 19,000 items?

A   It's an ongoing situation, and again I feel compelled not to answer, due to the confidentiality agreement.

Q   Prior to this engagement and the Hurst engagement, have you ever performed any work for ACG or Ian Peck?

MR. PEREZ:  Objection to the form of the

1  question.  Assumes facts not in evidence.
2      A    Directly?
3  BY MR. ABEL:
4      Q    Well, have you ever been engaged by ACG or
5  Ian Peck to perform an appraisal?
6      A    No.
7           Prior to the two engagements you cited?
8      Q    Other than those two engagements, have you
9  ever been engaged by ACG or Ian Peck to perform
10  an appraisal?
11      A    I have not.
12      Q    Are you aware of ACG's reputation in the
13  art industry?
14           MR. PEREZ:  Object to the form of the
15  question.
16  BY MR. ABEL:
17      Q    Well, let's take a step back.
18           Does ACG have a reputation in the
19  industry, that you're aware of?
20      A    Yes.
21      Q    And what is that reputation?
22      A    Very straightforward.  Relatively good
23  reputation.
24      Q    You believe that ACG is respected in the
25  art industry?

1      A    Definitely.
2      Q    Are you aware of any lawsuits involving
3  ACG?
4      A    I am.
5      Q    What lawsuits were those?
6      A    I believe that there was -- well, I
7  already testified that in the Hurst matter I
8  was an expert witness in a lawsuit.  And that I
9  believe, I haven't examined in detail, there
10  was a lawsuit involving the foreclosure of a
11  loan to Annie Leibovitz, the photographer.
12      Q    You ever advised a client to get a loan
13  from ACG or Ian Peck?
14      A    No.
15      Q    Do you know anything about ACG's lending
16  practices, generally?
17      A    Not really.
18      Q    You ever heard of Poly International
19  Auction?
20      A    Yes.
21      Q    Does it have a reputation in the art
22  market?
23      A    I think it has a relatively new
24  reputation.
25      Q    And what is that reputation?

1      A    That is an auction house in China.
2      Q    Anything positive or negative about its
3  reputation in the art market, that you're aware
4  of?
5      A    Nothing of great substance.  There have
6  been some aspersions in the press which may or
7  may not be true.  But basically it has a
8  reputation of being a venue of sale in China.
9      Q    Have you ever used the Poly International
10  Auction?
11      A    I have not.
12      Q    Have you ever heard of Catalyst or Cat
13  List Acquisition's LLC?
14      A    No, other than in the context of this
15  report.
16      Q    You visited the DIA in April 2014; is that
17  correct?
18      A    That is correct.
19      Q    Why?
20      A    Well, I was invited by the Chinese
21  government to lecture in China.  They were
22  paying for my way.  I wanted to fly on Delta
23  Airlines.  There was no direct flight from New
24  York to Beijing.  I had a choice of either
25  flying to Nurato in Japan or flying through

1  Detroit.  I thought this was a great
2  opportunity to see the DIA, which I had never
3  seen before, so I paid out of my own pocket an
4  extra night in Detroit and spent a considerable
5  amount of time at the DIA.
6      Q    How long did you spend there?
7      A    About eight hours.
8      Q    Did you talk to anyone at the DIA during
9  that trip?
10      A    Other than the ticket taker in the garage,
11  and the guards and the woman who sold me lunch,
12  no.
13      Q    Did anyone else come with you on that trip
14  to the DIA?
15      A    No, I was alone.
16      Q    Did you perform your appraisal in this
17  case under what you believed to be highly
18  limiting conditions?
19      A    I set forth in the appraisal report the
20  limiting conditions.  I did not use the word
21  "highly limited."
22      Q    Let's take a look at your report.
23  Exhibit 3, Page 18.  In the middle of page, you
24  see the paragraph that starts "By nature of the
25  assignment"?

1  A   Mm-hmm.  I do.  I'm sorry.

2  Q   It goes on to say "The VWA appraisal has

3  set about to value of the entire collection of

4  the DIA operating under highly limiting

5  conditions."

6     Do you see that?

7  A   Yes, I do.

8  Q   Would you agree that you performed your

9  work appraising the DIA collection under highly

10  limiting conditions?

11  A   In that sense, yes.

12  Q   You didn't review the artwork in person at

13  the DIA except for your visit in April 2014?

14  A   Prior to the issuance of this report, no.

15  Q   After the issuance of the report did you

16  visit the DIA?

17  A   I did.

18  Q   When was that?

19  A   A few days ago.

20  Q   And why did you visit the DIA?

21  A   Because I wanted to verify and bring with

22  me those members of my team who are either

23  associated with it or would be possibly

24  associated with it in the future to review the

25  collection.

1  Q   Why didn't you review the collection in

2  person prior to your July 25, 2014 report?

3  A   We had an extremely limited amount of time

4  to do this.  I couldn't write the report, do

5  the research and visit the DIA at the same

6  time.

7  Q   You didn't visit -- you didn't decide it

8  was necessary to visit the DIA between May and

9  July of 2015 to see it in person?

10  A   Not for the purposes of issuing this

11  report.

12  Q   Do you intend for your associates who you

13  brought with you to the DIA for the visit,

14  after your July 25th report to testify in this

15  case?

16  A   No.  That would be a decision of counsel.

17  Q   Do you understand that they will be

18  testifying in this case?

19  A   I have no such understanding.

20  Q   Which associates did you bring with you to

21  Detroit?

22  A   David Shapiro and another associate who is

23  not mentioned in report named -- and I'll have

24  to spell this for you.

25     Frans, F-R-A-N-S.  Pijnenburg,

1  P-I-J-N-E-N-B-U-R-G.

2  Q   Am I correct that you refer to your report

3  as preliminary?

4  A   You are correct.

5  Q   Does USPAP provide for the issuance of

6  preliminary reports?

7  A   It does.

8  Q   What does it say about preliminary

9  reports?

10  A   It doesn't define it as such.  But the

11  appraiser, as I testified already, is given a

12  great deal of latitude in the appraisal report

13  issuance process.

14  Q   Are there any opinions that you formed

15  that are not contained in your report with

16  regard to the DIA collection?

17  A   What type of opinions are you referring

18  to?

19  Q   Have you formed any opinions with regard

20  to the value of the DIA collection that aren't

21  contained in your report?

22  A   The report contains all of our opinions of

23  value as of this moment.

24  Q   Have you been asked to provide any other

25  opinions in this case that aren't contained in

1  your report?

2  A   No.

3  Q   Have you identified all the facts that you

4  relied upon in your report?

5  A   In the -- yes.

6  Q   And have you identified all the documents

7  that you relied upon in your report?

8  A   At the moment, yes.

9  Q   Have you done all the work that you

10  believe is required to reach the opinions that

11  you've expressed in your report?

12  A   I did.

13  Q   Are all the assumptions that you made in

14  forming your opinions identified in your

15  report?

16  A   Yes.

17     MR. ABEL:  Now is probably a good time to

18  break for lunch.

19     THE VIDEOGRAPHER:  Go off the record.  The

20  time is 1:02.

21     (Luncheon Recess:  1:02 p.m.)

22     A F T E R N O O N   S E S S I O N

23     (Time noted:  1:39 p.m.)

24     THE VIDEOGRAPHER:  Go back on the record.

25  The time is 1:39.

1  V I C T O R  W I E N E R, resumed and
2       testified as follows:
3  EXAMINATION BY (Cont'd.)
4  MR. ABEL:
5       Q    Good afternoon, Mr. Wiener, hope you had a
6  good lunch.
7       A    Yes, thank you.
8       Q    Am I correct that you worked on this
9  engagement with a team of people?
10      A    You are correct.
11      Q    And what was your role in that engagement?
12      A    I was in charge of a team.
13      Q    What does that mean?
14      A    That means I selected the members of the
15  team.  I reviewed all the work.  I reviewed
16  their assignments.  I discussed with them
17  aspects of the assignment.  I accept full
18  responsibility for the appraisal report.
19      Q    And what did you tell each member of the
20  team about what the assignment involved?
21      A    I told the team members that we were --
22  that they were to appraise selected works from
23  are the DIA collection, the valuation parameter
24  was marketable cash value.  The -- we had a
25  limited amount of time in which to do it, so do

1  it as quickly as possible.
2       Q    Did you talk to any of the team members
3  regarding the methodology that you would be
4  utilizing to determine the marketable cash
5  value for the DIA collection?
6       A    All of my team members are extremely
7  experienced, and they all know what marketable
8  cash value means and they know how to apply it.
9            I don't think anyone had any questions
10  about that.
11      Q    Let's break it down.
12           Did you talk to any of your team members
13  about the methodology under Step 2 of the
14  methodology indicated in your appraisal report?
15      A    Hang on.
16           Yes.
17      Q    Who did you talk to about the methodology
18  in Step 2?
19      A    Primarily David Shapiro, and Shaun Cooper,
20  and Rob Leeds and his associates at Silar.
21      Q    And what did you talk with them about that
22  Step 2 methodology?
23      A    That we would be reviewing these works.
24  We couldn't appraise them individually, and
25  that they should be identified, put together

1  with accuracy, and that we would then be taking
2  average values.
3       Q    And who came up with the idea for the
4  methodology detailed in Step 2?
5       A    I think we -- it was -- of course, I had
6  the ultimate decision-making in it.  But
7  basically the methodology was done in
8  consultation with Silar and with David Shapiro
9  and with Shaun Cooper.
10      Q    Who came up with that idea for that
11  methodology originally?
12      A    I think we discussed -- this came out of
13  consultation.  All four of us sat down and
14  discussed how we would do -- how we would
15  handle it, possibly me.  I don't think that
16  methodology has any "author" attached to it.
17           It's, again, a team effort, as I say
18  repeatedly in the report.
19      Q    But you don't know who came up with the
20  idea?
21      A    As I told you it was a team effort.  I
22  don't know who uttered it the first time.
23      Q    How about Step 3; who came up with the
24  methodology detailed in Step 3?
25      A    Again, the answer is the same as before,

1  it was a team effort.  We all came up with it.
2  The applications went to the technical people.
3  And but the methodology involved was certainly
4  my decision and the others, together, thinking
5  that this was an appropriate thing to do.
6       Q    And did anyone on your team other than
7  David Shapiro -- who is Shaun?
8       A    Cooper.
9       Q    Shaun Cooper.
10           And who was the third person?
11      A    Rob Leeds and his associates at Silar.
12      Q    Did anyone except for David, Shaun and Rob
13  provide insight into the methodology in Step 3?
14      A    In Step 3, not that I can recall.
15      Q    What about Step 4, who came up with the
16  methodology in Step 4?
17      A    That was primarily me, I think.  But I
18  think, everybody is again -- I'm saying like a
19  broken record; everybody was part of the team
20  and we all discussed this.
21      Q    Did anyone on your team ever criticize or
22  say we can't use Step 2, 3 or 4?
23      A    Not that I recall.
24      Q    What are David's Shapiro's qualifications
25  for doing a valuation of a 60,000 piece art

1  collection?
2  A    David Shapiro, as stated in the report, is
3  an appraiser of various works of arts.  He also
4  is extremely knowledgeable about important
5  museum pieces, since he has edited numerous
6  textbooks concerning museum collections, and he
7  has taught museum collections at various
8  institutions of higher learning.
9  Q    What is the largest collection that
10 David Shapiro has ever valued?
11 A    I think this is the largest.
12 Q    And after this collection, what's the
13 second largest that he's ever valued?
14 A    Well, we're in the process of valuing
15 another collection of about, I think 25,000
16 works of art.
17 Q    Before this collection, what was the
18 largest collection he's ever valued in terms of
19 art?
20 A    He worked with us on a collection of
21 20,000 works of art.
22 Q    And did he come up with the methodology
23 there for the valuation?
24 A    No, the methodology was decided in
25 consultation by me and the client and the --

1  well, fulfillment of the -- take that back.
2       The fulfillment of the assignment was our
3  decision.  We then proposed it to the client to
4  make sure this was in keeping with their
5  expectations.  But the total methodology was
6  our decision.
7  Q    Let's break down the process again a
8  little bit in terms of determining what this
9  consultation actually involved.
10      Before you met in consultation with the
11 other people on your team, did you have them
12 perform their own analyses and come up with
13 their own conclusions?
14 A    In what sense?
15 Q    Did you ask them to come up with any
16 conclusions that they were going to present to
17 the team with regard to the valuation of any
18 piece of the DIA collection?
19 A    Well, all members of the team, not only
20 the ones who decided on the methodology, came
21 up with their suggested individual values.
22 Q    And did each member of the team come up
23 with suggested individual values for every item
24 in the DIA collection?
25 A    We started with -- well, start again.

1       With -- go back to your question.
2       With every item in the DIA collection, are
3  you referring to all 60,000 items?
4  Q    Yes.
5  A    The answer to that question is no.
6  Q    Did every member of the team come up with
7  their own opinion of value as to the 387 units
8  detailed in Step 1 of your valuation?
9  A    Various members of the team came up with
10 preliminary values, preliminary ideas, which
11 was then reviewed by the team.
12 Q    Did they present those ideas in writing?
13 A    Some did; some didn't.
14 Q    And for those that didn't, did you do
15 anything to determine whether or not the
16 information they were relying upon to form
17 their opinions of values of work was correct?
18 A    We did.
19 Q    What did you do?
20 A    We did some of -- the team did some of its
21 own review and corroboration of what was
22 transmitted to us, either in writing or
23 telephonically.
24 Q    When you were in consultation, were there
25 any examples you can point to where you made

1  adjustments to the opinions of values that were
2  presented by the independent appraisers on the
3  team to the committee?
4  A    I can't recall.  We looked and relooked
5  many times at the individual values.
6       So specifically, I'd have to go back to
7  each of the 387 items and talk about it and
8  review.
9       But ultimately everything got discussed.
10 Q    Did you form any independent valuations,
11 other than through this committee process, as
12 to the value of any specific pieces of art of
13 the DIA collection?
14 A    It was always -- I did, but it was always
15 in conjunction with the team.  That's how we
16 work.
17 Q    Well, what did you do independently in
18 conjunction with this engagement?
19 A    I -- every value, I'll repeat.
20      Every value that appears in the report was
21 looked at by me in consultation with the team.
22 Q    Were you ever the one who generated the
23 first opinion of value that was presented to
24 the team for consideration, with regard to any
25 of the pieces in the DIA collection?

Page 198

1  A    I can't recall because it's all part of a
2  team process.  But I certainly was there when
3  the individual values were first determined.
4  Q    Did you doublecheck to make sure any of
5  the appraisers who were working for you did
6  a -- performed accurately or performed an
7  appraisal that was methodologically correct?
8  A    We did.
9  Q    And how did you do that?
10 A    We spot checked values.  We more than spot
11 checked the individual values.  We looked at
12 all the backup information and discussed it.
13 Q    For all 387 pieces?
14 A    Correct.
15 Q    What about for the other items in the
16 collection, other than the 387 --
17 A    Well, the methodology that we used for
18 these other items is detailed in the report,
19 and we had discussed it.  But we can do it
20 again if you'd like.
21 Q    What's the average salary for an
22 appraiser, generally, at the VWA?
23 A    I don't know.  I haven't done average
24 salaries.  Everyone works on an ad hoc basis.
25 I really don't -- I can't answer that question

Page 199

1  at this point.
2      I will let you know at the end of the
3  year.  But I can't do it now.
4  Q    How about last year?
5  A    I haven't -- again, I haven't reviewed it.
6  We did your taxes and it is there.
7      I mean, really, you know, different people
8  get paid for the amount of work that they've
9  done in different ways, and it's there.
10 Q    You wrote in your report that you
11 consulted dealers materials similar to works of
12 art contained in the subject property; is that
13 right?
14 A    That is correct.
15 Q    Who did you contact?
16 A    I can't tell you.  It's a very sensitive
17 assignment.  No dealer wanted to be identified
18 as a source for giving me values.
19 Q    Why not?
20 A    Why?
21 Because many dealers have relationship
22 with the DIA, and they would feel uncomfortable
23 having their names associated with the report.
24 Q    Why is that?
25 A    They felt that it might impact on their

Page 200

1  future dealings with the DIA.
2  Q    Do you have any sense of why that would
3  be?
4      MR. PEREZ:  Object to the form of the
5  question.  Asked and answered.
6  A    Do I have any sense of why it might be?
7  BY MR. ABEL:
8  Q    Yes.
9  A    The answer is yes.
10 Q    Why is that?
11 A    Like I said before, the dealers, it may
12 affect their business dealing.
13 Q    And how would it impact their business
14 dealing?
15     MR. PEREZ:  Object to the form of the
16 question.  Asked and answered.
17     THE WITNESS:  I can answer?
18     MR. PEREZ:  Yeah.
19 A    I didn't ask the dealer whether their
20 motivation was well-founded or not.  If
21 somebody tells me I'll tell you what I think
22 but I don't want to be connected with this
23 report in any way where I can be identified, I
24 respect that.
25     But I certainly did consult them.

Page 201

1  BY MR. ABEL:
2  Q    Is that what they told you, these dealers?
3  A    Yes.
4  Q    AND how many dealers did you talk to?
5  A    Again, I think that's rather sensitive
6  information, so I really don't want to answer.
7  Q    You're not going to tell me how many
8  dealers you spoke to in conjunction with
9  forming the opinions in your report?
10 A    I just feel very uncomfortable about
11 talking about specific dealers, even in
12 numbers, and so on, but we did speak to a
13 number, and I think we should just leave it at
14 that.
15 Q    Well, I understand you're reticence to
16 talk about the source date for your report.
17 However, I'm entitled to find out how many
18 people you spoke to, and indeed, who you spoke
19 to.
20     MR. ABEL:  If you are going to take the
21 position that he's not required under some
22 confidentiality agreement to disclose this
23 information, then that will be a different
24 story.
25     MR. PEREZ:  It's the same position

1  Mr. Plummer took with respect to every item of
2  testimony.
3       MR. ABEL:  Fundamentally different.  We're
4  not talking --
5  BY MR. ABEL:
6       Q    Let me ask you:  Did you have a
7  confidentiality agreement with any of these
8  individuals, these third parties?
9       A    It's implicit in our agreement, yes.  We
10 have oral confidentiality.
11      Q    Did you discuss that oral confidentiality
12 with them?
13      A    With whom?
14      Q    With those third-party dealers?
15      A    Yes.
16      Q    I don't really care about the names.
17           Did you have an agreement with them that
18 you wouldn't close the number of dealers you
19 had talked to?
20      A    I feel that anything I can say in
21 particular is really basically a violation of
22 the confidentiality and the trust that my long
23 established sources felt.
24      Q    How is the number of dealers that you
25 spoke to in forming your opinion in any way

1  disclosing their identities?
2       A    There are a limted number of dealers in
3  each particular field.  And, consequently, even
4  that -- it's a very small world and people know
5  who my friends are, and even that, would be, I
6  think, a breach of confidentiality.
7       Q    Were any of your team members involved in
8  picking what definition of value you utilized
9  in this case?
10      A    I think the decision was ultimately mine,
11 but I certainly discussed it with them.
12      Q    Did you review reports submitted by other
13 experts in this case?
14      A    I certainly did.  I mean, the reports I
15 reviewed -- we had, as I testified before
16 several times, we had a number of phone
17 conversations.  I spoke to most people.  Some
18 of the other members of the core team spoke to
19 others.  We then discussed it.
20      MR. PEREZ:  I'm sorry.  I think I missed
21 the question because that answer was not to the
22 question that was asked.
23      MR. ABEL:  No.  I'm going to ask a
24 different question.
25      MR. PEREZ:  And I'm going to move to

1  strike your answer because you didn't answer
2  the question that was asked.
3  BY MR. ABEL:
4       Q    Okay.  My question to you is:  You're
5  aware that other individuals in this case,
6  including -- or entities including Christie's,
7  Artvest and Winston filed reports?
8       A    Yes.
9       Q    Did you review those reports?
10      A    Yes, I did.
11      Q    In fact, you believe -- you wrote in your
12 report that it was of significant importance
13 that you reviewed the reports submitted by
14 others; isn't that right?
15      A    That's correct.
16      Q    Why was it of significant importance that
17 you review the Christie's, Artvest and Winston
18 reports?
19      A    Because they clearly had opinions in the
20 case with the property.  And as I testified
21 earlier, it's of significant importance to
22 review all valuations for the items under --
23 that are being considered for appraisal.
24      Q    You don't believe you'd be more objective
25 by forming your own appraisal without looking

1  at third parties?
2       A    No.
3       Q    Have you ever worked at Christie's before?
4       A    I've worked for Christie's.
5       Q    And do you believe that Christie's is a
6  respected auction house in the profession, in
7  the industry?
8       A    Yes.
9       Q    And Christie's appraises works of art?
10      A    Yes.
11      Q    That's their core business?
12      A    No.
13      Q    That's part of their core business?
14      A    Yes and no.
15      Q    Am I correct that Christie's sells art
16 regularly?
17      A    Yes.
18      Q    And they appraise works of art in
19 conjunction with those sales?
20      A    They give what USPAP calls valuation
21 services, which is different from appraising.
22      Q    Well, they value works in conjunction with
23 those sales?
24      A    They value works that are being offered
25 for sale.

1    Q    And the value that they place on those
2  works is intended to determine how much they
3  are expected to sell for at auction?
4    A    They are auction estimates.
5    Q    And is that the same thing as what I just
6  said?
7    A    What?
8    Q    Their estimates as to how much the artwork
9  will actually sell for at auction?
10   A    That's how I would define auction
11 estimates.
12   Q    And would you say that Christie's is
13 respected in the industry for doing art
14 estimate appraisals, art valuation estimate
15 appraisals?
16        Let me rephrase it.
17   A    Yeah.
18   Q    Would you say that Christie's is respected
19 in the industry for doing auction estimate
20 appraisals?
21        MR. PEREZ:  Move to -- objection based on
22 form.
23   A    Those are not appraisals.
24 BY MR. ABEL:
25   Q    Okay.  Would you agree with me that

1  Christie's is respected in the industry for
2  doing auction estimates of value?
3        MR. PEREZ:  Same objection.
4    A    I would prefer to use the word
5  "profession" as opposed to industry.  But the
6  answer to the question is yes.
7  BY MR. ABEL:
8    Q    You opined on Christie's methodology in
9  the Andy Warhol case; isn't that right?
10   A    I did, yes.
11   Q    And what was Christie's methodology in
12 that case?
13   A    I was basically retained by the Andy
14 Warhol Foundation for the Visual Arts to opine
15 on, in that particular case, whether Christie's
16 employed proper methodology in applying a
17 blockage discount.
18   Q    Do you know what Christie's methodology
19 was in that case was?
20   A    It was a long time ago.  It was 1993.  So
21 that's 21 years ago, I guess.  So I have a
22 recollection.  But it's been a while since I
23 looked at the file.
24   Q    And what was your recollection as to their
25 methodology?

1    A    In broad terms, they determined values for
2  individual works of art in the Andy Warhol
3  holdings and then applied blockage discount in
4  various categories.  I think they had about ten
5  different categories and ten different
6  discounts.
7        But again, it's been 21 years since I've
8  been involved in this.
9    Q    And do you know if Christie's methodology
10 in that case involved anything other than
11 valuing distinct pieces of art as opposed to
12 categories of art?
13   A    They valued categories of art, yes.
14   Q    And what was the size of the Warhol
15 collection being valued?
16   A    96,000 pieces.
17   Q    And the categories of art that Christie's
18 valued in that collection, do you recall
19 anything about what those were compromised of?
20   A    Yes, I do.
21   Q    What were they compromised of?
22   A    There were paintings, there were prints,
23 there were drawings, there were photographs,
24 there were subdivisions of each one of those
25 categories.

1        And as I think I've testified, maybe not,
2  there were about, if I recall correctly, there
3  were about ten separate categories that they,
4  what shall I say, that they aggregated together
5  and then looked at the profile of each category
6  as a whole.
7    Q    And do you know how Christie's in that
8  context went about determining the value for
9  each one of the categories before applying a
10 blockage discount?
11   A    Other than what was put in their report, I
12 was not party to that determination.
13   Q    You recall testifying in that case that
14 you thought Christie's appraisal was a
15 visionary?
16   A    I don't recall.
17   Q    Do you recall testifying in that action
18 that when doing an appraisal of a collection it
19 is improper to consider the owner's business
20 plan?
21   A    In the context of that case, I may have
22 said that.
23        But, again, it was all qualified within
24 the context of that case.
25   Q    Am I correct, that you testified in that

1  case that the underlying premise of an
2  appraisal is that the value of the collection
3  is determined as if all of the work were put up
4  for sale at one time?
5  A    In that particular case.
6  Q    And why did you form that opinion in that
7  case but not here?
8  A    Because in that particular case there was
9  a block transfer of assets from the estate of
10 Andy Warhol to the Andy Warhol Foundation for
11 the Visual Arts.
12 Q    And what did that have to do with whether
13 or not you make a determination as to whether
14 or not all of the assets would be sold at one
15 time?
16 A    Because all property was changing
17 ownership and changing hands.  So it had to be
18 valued in that context.
19 Q    What was the definition of value used in
20 that context?
21 A    I didn't use the definition of value.
22 Q    What was the definition of value used by
23 Christie's in that context?
24 A    If my memory serves me correctly, it was
25 fair market value.

1  Q    And did you opine that that was the
2  correct definition of the value used?
3  A    I was not asked to give an opinion on
4  that.
5  Q    Do you recall testifying in that Warhol
6  case about a Mapplethorpe appraisal?
7  A    I do.
8  Q    And do you recall testifying that you
9  thought that the Mapplethorpe appraisal should
10 be torn up and started again because the
11 owner's business plan was considered in no
12 blockages discount had been applied?
13 A    In that particular case, yes.
14 Q    And why was that?
15 A    Because, again, the -- it was a transfer
16 of the assets of the estate of Robert
17 Mapplethorpe to the foundation -- I forgot what
18 it was called.  It was the exact same parallel
19 as -- in Warhol.
20 Q    And would you agree that whenever there is
21 a transfer of the assets of one entity to
22 another, then you need to assume that the
23 entire collection would be put up for sale at
24 one time in forming your opinion of value?
25 A    If there's was a specific transfer, yes.

1  Q    You reviewed the report in this matter by
2  Vanessa Fusco of Christie's, correct?
3  A    I did.
4  Q    When did you receive it?
5  A    Well, it came piecemeal, because part of
6  the report was published in the Houlihan
7  Lokey -- I don't know how you classify the
8  report, or exhibits, but it was in Houlihan
9  Lokey's documentation.
10      The important matter of the report,
11 explaining what was done, I believe, was dated
12 July 8, 2014, which -- and then I can't tell
13 you the exact date I received it, but sometime
14 after that date and prior to the completion of
15 our report.
16 Q    Do you know Vanessa Fusco?
17 A    No, I do not.
18 Q    Are you aware of -- does she have a
19 reputation in the profession, to your
20 knowledge?
21 A    I don't know of anything about her.
22 Q    Do you know the valuation methodology
23 generally employed by Christie's for valuing
24 art?
25 A    I wish I did.

1  Q    Were you engaged in this action to perform
2  a rebuttal of Fusco's report?
3  A    No.
4  Q    Was Fusco's methodology in this case
5  similar to her -- to the methodology used by
6  Christie's in the Warhol case?
7  A    I can't recall.
8  Q    You note that Christie's -- in your report
9  you note that Christie's assigns a wide range
10 of value between high and low value for pieces
11 of art; is that right?
12 A    Are we talking about in general?
13      Are we talking about specifically to the
14 Fusco report in this particular case?
15 Q    Let's talk about the Fusco report in this
16 case.
17      Is it your opinion that Fusco assigns a
18 wide range between high and low values in the
19 values that she came up with for the pieces of
20 art in her report?
21 A    That is my opinion.
22 Q    And you say that you believe the range of
23 values was extremely wide?
24 A    I do.
25 Q    And do you believe that undermines her

1 credibility in her report?
2 A    To a certain extent, yes.
3 Q    And why is that?
4 A    Because an appraiser, if indeed she was
5 acting as an appraiser, while range of value is
6 certainly permissible and explicitly stated in
7 USPAP, nonetheless, a reasonable person would
8 want a narrower range than the one used in the
9 Christie's valuation object after object.
10 Q    And why is that?
11 A    Why?
12        Because an appraiser can do better than
13 doing a huge range.  There is certainly a
14 validity in using ranges, but not when the
15 range is anywhere near the range that
16 Christie's put into their report.
17 Q    Can an appraiser do better when faced with
18 those "extreme," as you call, ranges, by simply
19 averaging the high and low together and coming
20 up with a number?
21 A    No.
22 Q    Why is that not appropriate?
23 A    It's not appropriate because the appraiser
24 should do an analysis initially to determine
25 what a credible range would be.

1 Q    Did you review the report in this matter
2 by Elizabeth von Habsburg at Winston Art Group?
3 A    I did.
4 Q    Did you discuss that report with anyone
5 other than counsel?
6 A    I discussed it with the team.
7 Q    The entire team?
8 A    The core members of the team.
9 Q    And who were they?
10 A    And possibly with some of the others
11 because -- I can't recall if we shared that
12 report, because we only got it in draft form
13 relatively before.
14        But the core members of the team, as I
15 have identified are:  David Shapiro,
16 Shaun Cooper and Rob Leeds with the Silar
17 Group.
18 Q    What about with regards to the Fusco
19 report, did you review the report with those
20 same team members?
21 A    I did.
22 Q    Did you review it with anyone other than
23 counsel and those team members?
24 A    I really can't recall whether we shared
25 those values with the individual appraiser.

1 But we certainly reviewed them.
2 Q    Did you know Elizabeth von Habsburg before
3 this case.
4 A    Yes, I do.
5 Q    Do you respect her in the industry?
6 A    Very much so.
7 Q    Do you know the valuation methodology
8 generally employed by von Habsburg?
9 A    Well, I don't think von Habsburg applies
10 her own valuation methodology.  She's the
11 director of the Winston Group and they apply
12 methodology.
13 Q    What was her role with regard to this
14 engagement, in your understanding?
15 A    What was Elizabeth von Habsburg's role?
16 Q    Yes.
17 A    It's my understanding that as head of
18 Winston Art Group, they were engaged by
19 Syncora, another creditor in the bankruptcy
20 action, bankruptcy case, I should say.
21 Q    Did you talk with her about her report of
22 the methodology in her report?
23 A    Did I speak to Elizabeth von Habsburg --
24 Q    Yes?
25 A    -- about the report, no.

1 Q    How did the -- how did what Elizabeth von
2 Habsburg did in her report differ from what you
3 did with regard to your method on Step 1 of
4 your methodology?
5        MR. PEREZ:  Objection.  Assumes facts not
6 in evidence.
7 A    I think it's all detailed in my report.
8 But it's not Elizabeth von Habsburg, it's
9 Winston group, because there are many people
10 involved in that; appraised individual objects
11 and came up with their range in their valuation
12 conclusions.
13        I can't recall whether they used range or
14 whether they came up with a specific value.
15 BY MR. ABEL:
16 Q    Do you know if they used a committee
17 approach to determining value?
18 A    I believe it's stated in their report that
19 they did.
20 Q    And do you know how their committee
21 approach differ from your committee approach,
22 if at all?
23 A    I have no idea what their committee
24 approach is so I can't answer that question.
25 Q    Is it appropriate to rely upon the

Page 218

1  opinions of specialists in coming up with an
2  opinion of value?
3  A   I certainly think it's appropriate to take
4  them into consideration.
5  Q   You've also reviewed the report in this
6  matter by Michael Plummer of Artvest?
7  A   I did.
8  Q   Did you discuss that report with anyone
9  other than counsel and, I believe you said
10 Ian Peck before?
11 A   Yes.
12 Q   And who else did you discuss it with?
13 A   My team members.
14 Q   And was it the same core team members that
15 you discussed it with?
16 A   Yes.
17 Q   Anyone else?
18 A   I believe possibly individual team
19 members.  When I say "team," I mean all the
20 people who worked on the valuation, and I
21 consider them to be part of the team.
22 Q   And who are those?
23 A   They are all listed in the appraisal
24 report.  I can look at it.
25     But if I remember correctly.

Page 219

1      Do you want me to give the names?
2  Q   Yeah.  If you recall who you spoke to
3  about the Plummer report.
4  A   Okay.  I or the core team members spoke
5  about it.  And they were -- it was Davinish,
6  [ph], James Callahan, Mariana Whitman,
7  Sarah Cox, Jason Christian.
8      I'm sure there might be someone else, but
9  I can't recall at this moment.  And of course
10 the core team members.
11 Q   Were you engaged in this case to perform a
12 rebuttal of Plummer's report?
13 A   No.
14 Q   You note in your report that Plummer
15 relied upon the input of experts, some of whom
16 are known by VWA to be of high quality; is that
17 right?
18 A   Correct.
19 Q   Who are you referring to?
20 A   Specifically Sabina Wilson and Betty
21 Krulik.
22 Q   Anyone else?
23 A   Not that I can recall at this moment.
24 Q   Is it your opinion that the nature of many
25 of the DIA pieces in the collection require the

Page 220

1  benefit of consultation by a committee for
2  quality control in conjunction with the
3  valuation?
4  A   I do.
5  Q   Is that a requirement of USPAP?
6  A   USPAP does not have any such requirement.
7  Q   Does USPAP provide for the use of a
8  committee for quality control?
9  A   USPAP does not dictate the form in which
10 an assignment is being fulfilled.
11 Q   Are you aware of any standard in the
12 profession for utilizing a consultation by
13 committee to determine the value of a
14 collection of art?
15 A   I don't believe that there's any codified
16 standards within the profession for -- what did
17 you say, reviewing -- what was your question?
18     I'm sorry.
19 Q   Would you mind repeating it?
20     (Record read.)
21 A   And my answer stands.  I don't believe
22 there is any codified standard for this type of
23 work.
24 Q   Are you opining in this case regarding a
25 committee's consensus or your own expert

Page 221

1  opinion?
2  A   I'm opining in this case on the opinion of
3  VWA.
4  Q   Well, VWA is separate and apart from you,
5  correct?
6  A   I'm a member of VWA.
7  Q   So I'm asking you, are the opinions that
8  you're expressing in this case your opinions or
9  are they opinions of a consensus via a
10 committee of which you are a part?
11     MR. PEREZ:  Objection to the form of the
12 question.  Asked and answered.
13 A   I can repeat my answer, which is simply
14 that all opinions expressed in the report are
15 the opinions of VWA -- and I think the report
16 clearly states, VWA arrives at its opinions.
17 BY MR. ABEL:
18 Q   Did you disagree with any of the opinions
19 expressed by the committee?
20 A   Disagree?
21     I don't know if that's the correct word.
22 We discuss it.  One has one opinion; one has
23 another opinion, possibly, sometimes not.  And
24 at the end of the day there's a consensus
25 opinion that is issued by VWA.

Page 222

1    Q    Did you have a difference of opinion in
2    regarding any of the, as you called it,
3    "consensus opinions" that were made by VWA?
4    A    Every committee that discusses any issue
5    may have an initial viewpoint from the
6    individual team members.
7         But at the end of the day, if there's
8    agreement, and in our case there was, that's
9    the answer.
10   Q    So my question is with regard to you
11   personally.
12        Do you, today, have any opinion that is
13   different from the opinions arrived at through
14   the consensus process of VWA?
15        MR. PEREZ:  Object to the form of the
16   question.  Asked and answered.
17   A    The answer is no.
18   BY MR. ABEL:
19   Q    In valuing individual pieces of art --
20   well, let's take a step back.
21        Do you know what Mr. Plummer's methodology
22   was for valuing individual pieces of art?
23   A    I don't think Mr. Plummer valued any
24   individual pieces of art.
25   Q    And why do you believe that?

Page 223

1    A    Because he's not an appraiser.
2    Q    And is it your opinion that you cannot
3    value pieces of art without being an appraiser?
4    A    I don't think anyone but a trained
5    appraiser should give opinions on works of art.
6    Q    I'm not asking you what you think should
7    be done, I'm asking is it your opinion that it
8    can be done?
9    A    Anything can be done.
10   Q    Am I correct that auction houses like
11   Christie's and Sotheby's routinely produce
12   opinions of value as to pieces of art?
13   A    Generally in the auction estimate context.
14   Q    Do and you know understand what their
15   methodology is?
16   A    At this point, since it's been, God knows
17   how many years, decades, I guess close to 35
18   years since I've worked for Christie's, I'm not
19   quite sure what they are doing now.
20   Q    And do you know what methodology
21   Mr. Plummer utilized in valuing pieces of art?
22   A    I don't think Mr. Plummer valued pieces of
23   art.
24   Q    What do you think he did?
25   A    I think Mr. Plummer issued a report.  He

Page 224

1    utilized valuations that came from individual
2    members of his consulting team of appraisers.
3    But I don't think Mr. Plummer did any specific
4    valuations himself.
5         That is my opinion.
6    Q    Did you do any specific valuations
7    yourself of any of the specific items of art
8    that you detailed in Step 1 of your report?
9    A    Initially, I stated my opinions to the
10   various team members, and they stated their
11   opinions.  And as I've said over and over again
12   today, and state very clearly in the report,
13   the final opinions that are in the report are
14   arrived at through consensus.
15        It's a team process.
16   Q    Did you do anything to compare the results
17   of the Plummer's, Christie's and Winston's
18   appraisals?
19   A    We did, for individual values certainly.
20   Q    Did you notice any large deviations
21   between those values?
22   A    We did.
23   Q    If one of those appraisals -- am I correct
24   that in certain circumstances one of the
25   appraisals was several times larger than

Page 225

1    another?
2    A    In some cases, yes.
3    Q    Does that mean that one of them was wrong?
4    A    No.
5         I can only speak for the opinions that
6    were arrived at by VWA.  And if they are
7    different than the opinions of others, I would
8    not apply right or wrong to it, it's too strong
9    a term.  I would just say that we have
10   differences of opinion.
11   Q    Let's talk about that market comparison
12   methodology generally.
13        When using that methodology, or that
14   approach, is the reliability of the data being
15   used for the comparison important in your
16   opinion?
17   A    Yes.
18   Q    Is having accurate data generally
19   important to an appraisal?
20   A    One strives to have accurate data.
21   Q    Why is that?
22   A    Because one takes into consideration data,
23   and consequently one hopes that the data is
24   reliable.
25   Q    And if the data is not reliable, does that

1 mean the conclusions generated from that data
2 is not reliable?
3 A    No, not necessarily.
4 Q    What do you mean?
5 A    Simply that one analyzes the data and sees
6 whether some sections of the data can be
7 accepted, some not. But certainly one doesn't
8 reject a priori data that has been collected.
9 Q    And is it a requirement in your
10 profession, with looking at data to check its
11 accuracy to remove those elements of the data
12 or to discount those elements of the data that
13 you believe are inaccurate?
14 A    Correct.
15 Q    Did you use the market comparison approach
16 to value the DIA collection?
17 A    We did.
18 Q    Use the market comparison -- sorry.
19      Was that the only approach that you
20 utilized to value the DIA collection?
21 A    That is correct.
22 Q    And you used the market comparison
23 approach to value the entire DIA collection?
24 A    That is correct.
25 Q    In the market comparison approach, am I

1 correct that one of the goals is to identify
2 the unique characteristics of your subject and
3 then try to identify other items that are
4 similar?
5 A    That's correct.
6 Q    And then you make adjustments to account
7 for the dissimilarities between the subjects
8 and the other pieces of art, for example?
9 A    That's correct.
10 Q    And under the market comparison approach,
11 you can't just assume that two pieces of art
12 are similar enough to be valued similarly?
13 A    Every say, work of art -- every work of
14 art has its own unique property
15 characteristics.
16 Q    And would that be the same for collections
17 of art, that every collection of work has it's
18 own unique characteristics?
19 A    Collection is the sum of its component
20 parts. So putting it in that context, yes.
21 Q    So am I correct that under the market
22 comparison approach you couldn't, for example,
23 just say that because the Barnes Museum
24 collection was valued at a certain price that
25 all museum collections would be valued at a

1 similar price?
2 A    And is the question is that correct?
3 Q    Yes.
4 A    The answer is that's not correct.
5      What the Barnes collection is worth is
6 unique to the Barnes collection.
7 Q    And you can't just say okay, well, we have
8 the Barnes collection over here, we have
9 another museum's collection in New York, for
10 example, and because the Barnes collection was
11 10,000 pieces at 10,000 or $10,000, just
12 picking numbers out of a hat, you can't say
13 that because of this museum in New York has
14 20,000 pieces it would be worth $20,000?
15 A    Anyone can say anything but I wouldn't say
16 that.
17 Q    That would be an absurd valuation, in your
18 opinion?
19      MR. PEREZ:  Object to the form of the
20 question.
21 A    I don't use the word "absurd." That would
22 be, most likely, inappropriate.
23 BY MR. ABEL:
24 Q    So let's look at your methodology in this
25 case.

1 Q    Am I correct, there were was five steps as
2 detailed in --
3 A    That's correct.
4 Q    -- in your chart on Page 3 of your report?
5 A    That is correct.
6 Q    And what did you do for Step 1?
7 A    Step 1.  We have spoken about this
8 already.
9      But we looked at 387 works of art
10 individually and took into consideration the
11 number of factors, discussed it, and came up
12 with a range in value, going from a low value
13 to a high value.
14 Q    And how did you determine to value those
15 387 units?
16 A    We -- several ways.
17      We looked at Christie's appraisal report,
18 what they identified as high value works of
19 art.  We worked -- looked at the items that
20 were identified in the Houlihan Lokey report as
21 high value works of art.  We looked at the
22 Detroit handbook of the collections of their
23 published -- which they considered to be
24 important works of art.  We also looked at the
25 inventory when -- and the database that Detroit

1    had and came up with our determination of 387
2    works of art, which we could spend the time and
3    intellectual capacity and consideration of
4    valuing in within the time period that we had
5    to produce this report.
6    Q    And in reviewing those documents that you
7    referenced, how did you determine to value
8    these 387 pieces?
9         MR. PEREZ:  Object to the form of the
10   question.  Asked and answered.
11   A    I just -- do you want me to repeat what I
12   said?
13   BY MR. ABEL:
14   Q    No, I want to know -- you said that you
15   looked at the material and the high value items
16   in those resources.
17        How did you determine from looking at
18   those resources which ones you were going to
19   value for the 387?
20   A    We identified the ones that we considered
21   to be the most important in terms of both
22   significance to the collection, significance to
23   the art market, and which were most likely to
24   be high value works of art within the context
25   of the collection.

1    Q    How do you define a "high value" item of
2    art for the collection?
3    A    Well, the collection, as one probably
4    knows, has a number, quite a large number of
5    extremely important works of art that are very
6    valuable.
7         So looking at the works of art drawn from
8    the sources I've just stated, we could tell
9    initially what had the potential of having a
10   rather high value.
11   Q    Do you attempt to sample any different
12   works from different departments in coming up
13   with the 387 items that you valued in Step 1?
14   A    We selected works from different
15   departments.
16   Q    Did you make a specific attempt to obtain
17   a representative sample from each department in
18   the DIA in doing so?
19   A    To the best of our ability, we did.
20   Q    Did you attempt to --
21   A    I just want to go back and say, within the
22   context of the selection process I just
23   mentioned.
24   Q    Was one of the -- other than sampling in
25   the context of the greater selection process,

1    did you make a specific attempt to obtain
2    relative samples from each of the DIA
3    departments in coming up with the set of 387
4    you looked at in Step 1?
5    A    I think I just answered that I did, we
6    did.
7    Q    Did you attempt to sample different works
8    from different price ranges for the set of
9    items you reviewed in Step 1?
10   A    We did.
11   Q    What constitutes a high value work, in
12   your opinion, in terms of dollar value?
13   A    That varies from object to object.  High
14   value is determined within the context of the
15   category that one is valuing.
16   Q    Let's look at Exhibit 3 in your report.
17   And this is attachment J.
18   A    Sure.
19   Q    Sorry.  Actually, it's attachment I that
20   I'd like to look at.
21   A    Okay.  It's a bit awkward dealing with
22   this without tabs.  So bear with me.
23        Attachment I, you said; is that correct?
24   Q    I.
25   A    Okay.

1    Q    My question for you when you get there is:
2    Does attachment I correspond to Step 1 of your
3    analysis?
4    A    Let me get there first.  You know, can we
5    take a break for two seconds.
6    Q    Sure.
7         THE VIDEOGRAPHER:  Go off the record.  The
8    time is 2:27.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  Go back on the record.
11   The time is 2:34.  Beginning of DVD No. 4.
12   BY MR. ABEL:
13   Q    Mr. Wiener, before the break we were
14   looking at Exhibit 3 Attachment I.
15        You still have it in front of you?
16   A    I'm sorry.  I have it in front of me now.
17   Q    Looking at the first page of Attachment I,
18   as the top "DIA Accession No. 30.374"?
19   A    That is correct.
20   Q    And if I look on the right side there's
21   three columns, one marked "VWA Low Value," one
22   "VWA High Value," one "VWA Average Value"; is
23   that correct?
24   A    That is correct.
25   Q    Is one of those values more correct than

1  the other, in your opinion?
2  A    It's a range in value.  There's not one
3  that isn't more correct than the other.
4  Q    So it's your opinion that one of them is
5  not more correct than the other?
6  A    Correct.  It's the value -- let me just go
7  back to explain.
8       The value is expressed in a range; the
9  range is as stated.  Therefore, there's just
10 one value.
11 Q    And the one value is the range between low
12 and high?
13 A    That's correct.
14 Q    Let's look at the second to last page of
15 this attachment.  At the top is "Accession No.
16 09.18984."
17 A    Sorry.  What's the accession number?
18 Q    09.18984 is the Rembrant, "The Artist's
19 Mother Seated."
20 A    Zero nine --
21 Q    18984.  The Rembrant at the top, "The
22 Artist's Mother Seated."
23 A    It's 1S; is that correct?
24 Q    I'm sorry.
25      Yes, it's 1S?

1  A    Okay.  Sure.
2  Q    Do you see what I'm referring to?
3  A    I think I do.
4  Q    If you look on the right column, the low
5  value is 12,000; high value is 18,000; the
6  average is 15,000?
7  A    That's correct.
8  Q    If you look down the page from there and
9  on to the next page, am I correct that the
10 values decrease from there?
11 A    The value in the range --
12 Q    Yes.
13 A    -- decreases?
14      And you're saying if I look at the bottom
15 of this page and continue on to the next page,
16 the values decrease.
17 Q    And they decrease all the way down to 2000
18 at the low value, 2500 for the high value and
19 2250 for the average value for the
20 Maruyama Okyo?
21 A    That is not entirely correct.
22 Q    No.
23      What is the lowest valuation for any piece
24 of this Step 1 attachment?
25 A    Again, how do you define "lowest"?

1       Are you talking about low values within
2  the range or average low value or average
3  value?
4  Q    I see what you're saying.
5       In terms of the average value, the lowest
6  is the 2,250 for the Maruyama Okyo piece; is
7  that right?
8  A    That appears to be the case.
9  Q    And if you look at the lowest of the low
10 values it's 1,000 for the "Jewel Box inscribed
11 'Ahmur Bukhara'"?
12 A    That's correct.
13 Q    Why were you valuing items less than
14 $15,000 for purposes of valuing high value
15 works in the DIA collection?
16 A    Because we probably took them from the
17 Christie's appraisal report that did exactly
18 the same thing, and we attempted to incorporate
19 as many of the values that they did -- as
20 possible.
21      And if you recall, Christie's appraisal
22 report, they divided the property into three
23 phases, I think they called it.  And the first
24 phase were objects that were what they called
25 "COD," City of Detroit, on display, in the DIA

1  collection.
2       So that's probably where that came from.
3  Q    Now, if I were to look at one of the items
4  on Step 1 of your report in this attachment,
5  would this tell me your -- the expected result
6  that the DIA would achieve on the sale of one
7  of these goods?
8       So for example, if I looked at the, on the
9  first page, the Bruegel, The Wedding Dance?
10      MR. PEREZ:  You're going to ask a question
11 or are you done?
12      MR. ABEL:  Sure enough.  I'm making sure
13 that he's situated before I ask.
14 BY MR. ABEL:
15 Q    You see I'm referring to, the Bruegel?
16 A    I sort of know but I just can't seem to
17 see.
18 Q    See what I'm referring to?
19 A    I do now.
20 Q    Is it your opinion that the DIA would be
21 able to recognize between 150 million and
22 $200 million based on the sale of that Bruegel
23 piece?
24 A    Depending upon which marketplace you're
25 referring to.

1  Q   Which marketplace do you believe it would
2  be sold in to achieve 150 million to $200
3  million Bruegel for that piece?
4  A   Of course this would be -- at the time we
5  were probably looking at a combination between
6  auction and private dealer sale, and bear in
7  mind that auction houses frequently have
8  private treatise sales in the sense that they
9  act like dealers.
10 Q   So for which pieces in your Step 1 did you
11 look at auction house sales versus non-auction
12 house sales?
13 A   I think we looked at -- took it into
14 consideration for everyone, especially the very
15 high end pieces.
16 Q   And what impact did looking at non-auction
17 house sales have on your opinion of value for
18 each of these pieces?
19 A   USPAP states that objects have to be
20 valued in the most appropriate marketplace.
21 The most appropriate marketplace would be where
22 the object would obtain the most money.  It
23 used to be called "highest and best use" within
24 USPAP, and I forget exactly the terminology
25 that they use now, but it more or less

1  translates into the highest obtainable price.
2  Q   And where would I look at in your work
3  papers to make a determination as to what you
4  considered to be the best marketplace for each
5  one of these items to be sold?
6  A   It would have to be printed.  It would be
7  in relation to the comparable selected and in
8  relation to our understanding of the
9  marketplace.
10     And, again, it would have to be printed
11 out.
12 Q   So that's in your electronic work file
13 somewhere?
14 A   Correct.
15 Q   For each one of these item?
16 A   Each one of which items?
17 Q   Each one of the items in Attachment I?
18 A   Are we talking about all 387 works of art?
19 Q   Yes.
20 A   Most of them, if not all, have comparables
21 in the electronic work file.
22 Q   And, again, I'm not asking about
23 comparables.  I'm asking about a determination
24 as to which market you believe that each one of
25 these items in Attachment I that would be sold

1  at to achieve the maximum value.
2      Is that in your work file?
3  A   That is not contained in the work file.
4  That was contained -- that was determined in
5  consensus with the committee or with the team.
6  Q   Okay.  So how do you know which
7  marketplace you considered would be best to
8  sell the Bruegel piece?
9  A   How do I know?
10 Q   Yes.
11 A   Based upon our internal discussions.
12 Q   And what was the answer?
13 A   The answer was most likely the Bruegel
14 wedding piece could be sold at auction and
15 achieve results more or less similar to what is
16 stated.  And it probably would arrive at
17 similar, if not higher results if it were sold
18 privately, either by the auction house in a
19 private treaty sale or by on consignment to a
20 dealer.
21 Q   And if I were to try to determine what
22 impact the chosen marketplace has on the sale
23 value identified in this chart, how could I do
24 that based on your work file, if at all?
25 A   It's reflected in the appraised value,

1  that could be considered all marketplace and we
2  determined, as I've defined, the marketplace in
3  which it would achieve the highest obtainable
4  price.
5      It is not common practice to identify
6  which marketplace one would do even in a
7  report, that is not summary.
8  Q   Is it your testimony that the only way
9  that the Court can make a determination as to
10 whether or not you picked the appropriate
11 percentages or discounts or supplements to
12 determine the marketplace for sale of these
13 items is to ask you?
14     MR. PEREZ:  Object to the form of the
15 question.  Assumes facts not in evidence.
16 A   Yes.  And there has been no discussion
17 about discounts and supplements.  And so I
18 don't know how that enters into the question
19 that you asked, to be quite honest.
20 BY MR. ABEL:
21 Q   Is the only way to figure out what impact
22 the marketplace or sale that you chose had on
23 each one of the items in this attachment is to
24 ask you?
25 A   It's implicit in the report, if you go

Page 242

1  down to the most -- into the highest, best use,
2  the discussion of marketplace, and it's within
3  the -- it's in the report. And if you wanted
4  to know specifically which marketplace the
5  appraised value or potentially realized price
6  would be, then of course you'd have to ask.
7  Q   And if I asked you, would you know the
8  answer or would you be able --
9  A   For what?
10 Q   For example, the Bruegel?
11 A   For example, the Bruegel, I think it
12 probably would sell best in a private treaty
13 sale.
14 Q   And do you know whether or not the
15 valuation range that you came up with for the
16 Bruegel piece was based on that assumption?
17 A   We took everything into consideration.
18 There isn't one primary assumption. We took it
19 into consideration certainly.
20 Q   And is there any way to test your
21 statement that you took it into consideration
22 for each one of these pieces?
23 A   Other than taking my word for it. There's
24 only two ways to test it: Offer it for sale or
25 take my word for it.

Page 243

1  Q   Can third parties rely on your valuation
2  of a specific piece of art in Step 1 for their
3  purchase decisions?
4  A   For?
5  Q   If a consumer were to see a copy of this
6  report, and were to say, okay, well, I see
7  Pieter Bruegel the Elder, is appraised by
8  Mr. Wiener for -- between 150 million and
9  $200 million, I'm going to buy it for $175
10 million.
11     Can they rely on that statement in your
12 report?
13 A   The report is written for a seller, not
14 for a purchaser, which I think we've discussed
15 at considerable length all during the day.
16 Q   So if the DIA sells its Bruegel and
17 achieves -- or agrees to sell its Bruegel as a
18 result of your appraisal in this case, and
19 achieves only $10 million, would you believe
20 that was an error of your making or an error
21 that belongs to someone else or is attributable
22 to someone else?
23     MR. PEREZ: I would object to the form of
24 the question. Compound.
25 A   Yes, I don't know who "someone else"

Page 244

1  attributable would be. I would have to look at
2  the specific circumstances. That's a
3  generalized question, I don't have an answer.
4  BY MR. ABEL:
5  Q   Did you compare your valuation results,
6  these 387 to pieces to valuations done by
7  Plummer, Winston or Fusco?
8  A   We did.
9  Q   Why?
10 A   Because as I said several times earlier in
11 this case, we took into consideration every
12 valuation opinion that we had at hand.
13 Q   And were your values always consistent
14 with Plummer, Fusco and Winston?
15 A   Always consistent in what sense?
16 Q   In terms of the values that you placed on
17 items in the collection.
18 A   Can you define "consistent"?
19     I don't understand.
20 Q   Sure.
21     Was there any discrepancies between the
22 values that you came up with for the specific
23 items and the values that Christie's, Fusco or
24 Winston came up with?
25     MR. PEREZ: Object to the form of the

Page 245

1  question.
2  BY MR. ABEL:
3  Q   I'm sorry.
4     Christie's, Plummer or Winston came up
5  with?
6     MR. PEREZ: Same objection.
7  A   Is your question: Did we have any
8  differences of opinion, meaning VWA, as opposed
9  to the three reports you've mentioned --
10 BY MR. ABEL:
11 Q   Yes.
12 A   -- in the values assigned?
13 Q   Yes.
14 A   And the answer to that question is yes.
15 Q   Ad did you do anything to adjust your
16 values after seeing those differences with the
17 other reports?
18 A   We took those values into consideration
19 and came up with one more data point that we
20 took into consideration and came up with our
21 values fully informed of what the others had
22 assigned.
23 Q   I'm showing you on the screen a document
24 that was produced in this action in native
25 format marked FGIC Wiener 0000063.

1    Have you ever seen this document before?
2  A    I believe so.
3  Q    And what is it?
4  A    Well, you'd have to go through the Excel
5  chart.
6       But we have -- well, go back.  It's a bit
7  difficult in Excel, I must say.  But anyway we
8  have various columns.  We have -- first of all
9  there's the name of the object, and the name of
10 the artist that is, and the title of the
11 object.
12      Then we delineate -- you went too far.
13      Okay.  That's good.
14      You meant we delineate whether Christie's
15 valued it, whether Artvest valued it, Winston
16 valued in, then we have listed the DIA
17 insurance value.
18      We have the average value for that object
19 on -- for Artvest, and we have the Winston
20 value, and I think we have the value going
21 across, average value and we have the value
22 that was achieved by VWA or an independent
23 valuer.
24      And if you recall, that there were roughly
25 about 614 items that we did not value, but we

1  took an average of what others had done, and
2  this chart clearly sets forth all of these
3  considerations.
4  Q    Who put together this chart?
5  A    Well, we certainly looked at the data, but
6  Rob Leeds and Silar Group put together this
7  chart.
8  Q    What was the purpose of this chart?
9  A    To come up with an easy comparison of what
10 everyone thought.
11 Q    And why did you do that?
12 A    I've stated enumerable times today that we
13 take into consideration everybody's values.
14 This was the easy -- a relatively easy way of
15 considering this data.
16 Q    I'm going to freeze the top row and try to
17 shrink some of these columns to make it easier
18 to read the rest.
19      Let's take a look at Row 17.
20 A    Okay.
21 Q    Did you ever look at the difference -- so
22 if we're looking at Row 17 under Column J, this
23 is the $32,500 average value that you placed on
24 this item?
25 A    That is correct.

1  Q    And this is Accession 09.1S934 Rembrant?
2  A    That's correct.
3  Q    And your value was 32,500, and Winston's
4  value was $3,500?
5  A    Correct.
6  Q    Did you do anything to ascertain why your
7  number was almost ten times larger than
8  Winston's value for the same piece of work?
9  A    We certainly questioned it.
10 Q    And what did you do after questioning it,
11 to determine that your number was more
12 accurate, if anything?
13 A    We reviewed the data that we used and
14 arrived at our determination.
15 Q    Did you come to the $32,500 number
16 separate and apart from looking at Winston's
17 value?
18 A    Probably initially.  But then we reviewed
19 it in conjunction with Winston's value to see
20 if we believed that they were right and that we
21 agreed with their value and then modify it, or
22 whether we stuck to our, or maintained, to be
23 precise, our value.
24 Q    And how would you suggest that the Court
25 in this case make a determination as to whether

1  or not the value for this piece is $32,500 or
2  $3,500?
3       MR. PEREZ:  Object to the form of the
4  question.  Assumes facts not in evidence.
5       THE WITNESS:  I can answer it, though?
6       MR. PEREZ:  Yes.
7  A    The Court is going to take into
8  consideration what our value was, what we did,
9  and then make a determination which value would
10 be more credible than the other.
11 BY MR. ABEL:
12 Q    But what are you going to be able to tell
13 the Court that you did in coming up with a
14 $32,500 determination for this specific piece
15 of work?
16 A    Just as I told you on several times today,
17 that we looked at comparable sales and arrived
18 at the determination that is stated in our
19 report.  Taking -- let me finish.
20      Taking into consideration the valuation
21 ascribed by other experts connected with this
22 valuation, with the case, I mean.
23 Q    And what comparables did you look at in
24 arriving at a $32,500 number for this piece?
25 A    I would have to have the work file in

1  front of us, either electronically or in
2  printed form to give you a precise answer.
3  Q    How about No. 20, it's another Rembrant,
4  this time Accession 09.1S937.
5       Your average value for this piece was
6  $86,000?
7  A    Yes.  That's the average, right.
8  Q    The average value?
9  A    Yes.
10  Q    Who came up with the original valuation
11  for this piece on your team?
12  A    I can't recall.  I think David Shapiro and
13  I discussed it together.
14  Q    And did you see, in reviewing this chart,
15  that Winston came up with a $500 value for a
16  piece that you ascribed a value of -- average
17  valve of $86,000 for?
18  A    Definitely.
19  Q    Did you have an explanation as to why you
20  were 170 -- 172 times greater than Winston's
21  value?
22  A    Yes, we probably assumed -- I can't recall
23  without looking at the work file, again, either
24  electronically or printed, that we used more
25  appropriate comparables than they did.

1  Q    And do you know what comparables you used
2  for this item?
3  A    Off the top of my head, I don't.
4  Q    Do you know what comparables Winston used?
5  A    I only got the comparables from Winston at
6  the last minute, so I would have to review
7  that.
8       But at the time that we looked at
9  Winston's values we did not have their
10  comparables in front of us.
11  Q    Do you know what comparables you used for
12  any of the pieces described on this chart?
13  A    Not off the top of my head.  I would look
14  at the work file.  I don't think anyone knows
15  off the top of their head what comparables they
16  used.  And it would be a disservice not to look
17  at the data before answering.
18  Q    Given that you're 172 times higher than
19  Winston for this Rembrant, does that mean that
20  you believe Winston is -- her valuation is
21  incorrect, or Winston's valuation is incorrect?
22  A    I would assume so.
23  Q    You wouldn't assume that your valuation is
24  incorrect?
25  A    I wouldn't put it down if I assumed that

1  our valuation is incorrect.
2  Q    But the Court seeing that kind of -- well,
3  strike that.
4       How did you use the market comparison
5  approach for Step 2 of your methodology?
6  A    We factored -- we made an assumption, Step
7  2 is where -- for the 600 items or so; is that
8  correct?
9  Q    That's correct.
10  A    We took into consideration that our
11  colleagues in appraising these items looked at
12  appropriate value markets and, therefore, did
13  an average of their values, as basically
14  reflective of market research that they
15  performed, bearing in mind that our values to a
16  large extent tended to be a little higher.
17  Q    So having seen the fact that you believe
18  that Winston was inaccurate in some of the
19  valuation conclusions that she arrived at when
20  compared to your own, why did you believe it
21  was appropriate to then utilize her data to
22  form a -- an opinion of value based on
23  averaging hers with others?
24       MR. PEREZ:  Object to the form of the
25  question.  Assumes facts not in evidence.

1  A    It was -- it was, again you've answered
2  your own question.
3       It was part of an average, and we just use
4  that as a point of departure, realizing that
5  most likely their values, the average would be
6  lower than ours and, therefore, considering
7  this to be an appropriate control in case maybe
8  we overvalued some things.
9  Q    So is it your opinion it's appropriate to
10  determine the value for a piece of work by
11  averaging values that were come up with by
12  third parties?
13  A    I think it's appropriate to take them into
14  consideration.
15  Q    Well, in arriving at the average value of
16  434,000,357,825 for Step 2 of your methodology,
17  did you do anything other than simply averaging
18  the third party appraisals by Christie's,
19  Artvest and Winston?
20  A    We briefly looked at the individual values
21  for many of these items, but did not do a
22  complete analysis of them, because otherwise
23  they would be considered part of the 387.
24  Q    Am I correct that the only thing that you
25  did to arrive at the average value under Step 2

1  is average Christie's, Artvest and Winston's
2  numbers for 616 units and place that average
3  value in your report?
4  A   I explained to you that that's not the
5  only thing we did.
6  Q   Did you make any adjustments to the
7  Christie's, Artvest or Winston's numbers before
8  averaging them together to determine the
9  average value for Step 2?
10  A   We did not.  The adjustments were made in
11  factoring them in, in relation to ours.
12      I just answered that.  I said that the
13  average values would be a good control in
14  coming up with cumulative value for the 1,000
15  some odd pieces that were valued by us and by
16  others.  And so, therefore, if we were a little
17  too high, although I didn't think we were,
18  otherwise I wouldn't have put the values down,
19  this would serve as a control and give us a
20  more conservative valuation for 1,000 pieces of
21  which we had specific values.
22  Q   I'm not asking about 1,000 pieces.  I'm
23  asking for the 616 pieces that you valued in
24  Step 2.
25      Am I correct that your methodology there

1      was simply to average Christie's, Artvest and
2  Winston's third-party values and come up with
3  the average value?
4          MR. PEREZ:  Object to the form of the
5  question.  Asked and answered.
6      A   Correct.
7  BY MR. ABEL:
8  Q   You can answer.
9  A   The answer lies in methodology.
10      The averages were part of the general
11  methodology in arriving at the cumulative value
12  for pieces that were specifically valued.
13  Q   Let me ask you about the math, a very
14  simple question.
15  A   Which math?
16  Q   The math for Step 2.
17  A   Okay.
18  Q   The math you utilize in Step 2 was to
19  average Christie's, Artvest and Winston's
20  valuation for 616 pieces of art; is that right?
21  A   That is correct.
22  Q   And is it your opinion that Step 2 doesn't
23  stand on its own, but should be reviewed in
24  context of Step 1 as well?
25  A   It was my opinion that Step 2 is to be

1  taken in as part and parcel of the entire
2  valuation within the context that I've said
3  several times.
4  Q   Are you aware of any -- strike that.
5      Is it recognized as a USPAP valuation
6  approach to average third-party valuation
7  opinions to come up with a valuation as to the
8  value of those works?
9  A   As I've testified, I believe USPAP does
10  not dictate any specific methodology.
11  "Specific" is the operative word, in arriving
12  at a particular value.
13  Q   Other than in this case, have you ever
14  created a valuation by averaging the results of
15  appraisals done by other people who weren't
16  working for you?
17  A   Sorry.  Working for me?
18  Q   Yes.
19  A   We come up with -- we don't do averages;
20  we come up with consensus opinions.
21  Q   Other than in this case, have you ever
22  created a valuation on appraisals done by third
23  parties?
24  A   We've always taken into consideration
25  third-party valuations in conjunction, if it's

1  the same as the subject property.
2  Q   And have you ever done a valuation or
3  created a valuation by averaging the results of
4  appraisals done by third parties?
5  A   This is first time that we've actually
6  created an average.
7  Q   Have you ever heard of anyone in the
8  industry, in your profession, utilizing an
9  average of third-party appraisals to determine
10  value?
11  A   I haven't heard of anyone who valued a
12  collection of 60,000 works of art.
13  Q   Well, let's take a step back, and why
14  don't you answer my question.
15      Have you ever heard of, except in the
16  context of this case, anyone in your profession
17  ever using an average of third-party appraisals
18  to determine value?
19  A   And, again, my answer is you cannot -- you
20  cannot remove it from the context of this case,
21  but the -- qualifying it, but the answer is no.
22  Q   Are you aware of any textbook or other
23  publication that suggest that it is acceptable
24  in your profession to determine a valuation of
25  art by looking at an average of third-party

1  appraisals of that art?
2  A   Yes.
3  Q   And what is that publication?
4  A   USPAP.
5  Q   And it is your opinion that USPAP provides
6  that it is appropriate to form a valuation of a
7  collection of art by looking at averages of
8  third-party appraisals of that art?
9      MR. PEREZ:  Objection to the form of the
10 question.  Assumes facts not in evidence.
11 A   And I've answered question that USPAP does
12 not get specific.
13 BY MR. ABEL:
14 Q   Where in USPAP does it provide that you
15 can utilize an average of third-party
16 appraisals to determine value?
17 A   USPAP states that appraisers have to take
18 into consideration other -- whatever data is
19 deemed to be appropriate and employ the
20 necessary steps in using that data in arriving
21 at valuation.
22 Q   So it doesn't provide specifically for the
23 use of an average of third-party appraisals,
24 correct?
25 A   I've testified already that USPAP is not

1  that specific.
2  Q   Am I correct that Christie's and Winston
3  used a fair market value definition in their
4  appraisals?
5  A   Christie's and Winston stated that they
6  used fair market values, yes.
7  Q   And how did you determine marketable cash
8  value utilizing an average of Christie's,
9  Artvest and Winston's values if they didn't use
10 marketable cash value?
11 A   Well, let's backtrack.
12     Artvest didn't say what value they used,
13 to the best of my knowledge.
14     Christie's stated that they were using
15 fair market value, when in point of fact, they
16 were using marketable cash value.  They called
17 it something else, but what they did was
18 marketable cash value.
19     As far as Winston goes, they stated that
20 they were using fair market value.
21     So already we have two out of the three
22 either undefined or incorrectly defined values
23 for the report, and one, only one, that states
24 correctly, I presume, that they used fair
25 market value.

1  Q   Do you remember my question, sir?
2  A   Would you repeat it?
3  Q   Sure.
4      If in your opinion only one of the three
5  appraisers that you looked at utilized
6  marketable cash value, how did you go about
7  taking -- averaging the three different
8  appraisals and determining marketable cash
9  value in Step 2?
10 A   Simple.
11     We, as I testified earlier, by taking this
12 average and realizing that their values, all
13 three, tended to be lower than ours, we
14 considered this more to be a reflection of
15 marketable cash value in our context than fair
16 market value that one of the three stated they
17 used.
18 Q   So am I correct that you did nothing to
19 apply a -- any analysis of what the cost would
20 be for the sale of any of the artwork described
21 in Step 2 to convert from what Christie's,
22 Artvest and Winston determined was the
23 definition of value to marketable cash value?
24     MR. PEREZ:  Objection to the form of the
25 question.  Assumes facts not in evidence.

1  A   And can you define what the cost is.  I'm
2  not sure I understand that.
3  BY MR. ABEL:
4  Q   Sure.  Let's have you define it.
5      Am I correct that marketable cash value is
6  essentially fair market value minus transaction
7  cost?
8  A   Yes.
9  Q   So what transaction cost did you apply to
10 the average value in Step 2 to determine
11 marketable cash value, if anything?
12 A   That the fair market value in one of the
13 reports would be averaged out with the unstated
14 and essentially, cost of -- and essentially
15 marketable cash value in the other report and
16 it will be expected that, as I've said before,
17 that there would be a lower average value that
18 we might not necessary -- that we would
19 probably apply in many of the cases, and that
20 this would serve as an appropriate control for
21 our values which tended to be higher.
22 Q   Let me make the question easier.
23     Did you subtract any transaction expenses
24 from the average value you determined by
25 averaging Christie's, Artvest and Winston's

1 numbers?

2 A    I testified already that we considered the
3 total reflective of marketable cash value.

4 **Q    Let's make it even easier.  This is math**
5 **again.**

6       **Did you subtract expenses in any way from**
7 **the average value that you arrived at from**
8 **looking at Christie's, Artvest and Winston?**

9       MR. PEREZ:  Let me object to the question.
10 First, you should -- he should be able to
11 finish his answer.

12      MR. ABEL:  Well, actually not if he's
13 going to waste the entire seven hours not
14 answering questions.

15      As you said before, move to strike when
16 the witness isn't being cooperative.  And I'm
17 asking a simple yes-or-no question, and he's
18 giving me five-minute narratives.

19      So I'm going to ask that my question be
20 answered in a yes-or-no format just to make it
21 easier.

22      MR. PEREZ:  You can answer however you
23 like.

24      He's not dictating how you answer the
25 question.  Just answer his question.

1       A    Okay.  I need the question repeated to me.

2 **Q    Sure.  Let's make it easy.**

3       **Yes or no, did you subtract from the**
4 **amount that you obtained by averaging**
5 **Christie's, Artvest and Winston's number**
6 **anything?**

7       A    Initially, no.

8 **Q    Did you ever subtract from the**
9 **mathematical action of averaging Christie's,**
10 **Artvest and Winston's number, anything for**
11 **purposes of Step 2?**

12      A    In arriving at the average number, no,
13 except within the context of the way it was
14 used.

15 **Q    In Step 2 there was no subtraction to that**
16 **average, correct?**

17      MR. ABEL:  Object to the form of the
18 question.  It misstates the testimony.

19      A    I've answered it, and I've told you
20 exactly how we used it, how we viewed it, and
21 how it was to be incorporated in the report.

22      I think I was pretty clear on it.

23 BY MR. ABEL:

24 **Q    How did you go about using the market**
25 **comparison approach for Step 3?**

1       A    Okay.  Step 3 projected the insurance
2 values using the model that we had -- we talked
3 about earlier, the 387, and the percentage
4 increments into projecting a marketable cash
5 value.

6 **Q    Am I correct that you applied Step 3 to**
7 **16,378 units?**

8       A    That's correct.

9 **Q    Why didn't you simply utilize the**
10 **methodology in Step 3 to calculate the value**
11 **for the items for which you provided values in**
12 **Step 2 and Step 1?**

13      A    What methodology are you referring to?

14 **Q    Sure.**

15      **You projected the valuation of 16,378**
16 **units in the DIA collection by utilizing**
17 **insurance value and estimating for**
18 **appreciation, why didn't you do the same thing**
19 **for the other 1,000 units that you valued in**
20 **Step 1 and Step 2?**

21      A    Well, for 387 value -- first of all,
22 these -- this projection in Step 3 was
23 adjusting to current day marketable cash value
24 what occurred in time past.

25      The 387 values that we came up with on our

1 own were done as of the present day, as were
2 the 616 or 612 values that were among the --
3 well the 600, so-called 616 values that we're
4 looking at in Step 2.

5       So there was no percentage of increase,
6 that was what they said as of -- more or less
7 the same time.

8 **Q    Now, you could have saved yourself the**
9 **time and expense of appraising independently**
10 **387 units and doing the average of 616 units**
11 **simply by adding in those thousand units to the**
12 **16,378 you valued in Step 3, couldn't you?**

13      A    No.

14      We if by -- that's definitely not correct.

15 **Q    You couldn't have valued 17,378 units**
16 **utilizing Step 3 instead of Step 1 and Step 2?**

17      A    It wouldn't be the same.

18 **Q    I know it wouldn't have been the same, but**
19 **you could have done it, couldn't you?**

20      A    You're talking about wouldn't be the same
21 as far as the results.  I'm talking about it
22 wouldn't be the same in the methodology.

23 **Q    I understand it wouldn't be the same in**
24 **terms of methodology.**

25      **I'm asking you, methodologically, could**

Page 266

1  you have done it.
2      Could you have used the methodology
3  specified in Step 3 to also value the items
4  indicated in Step 1 and Step 2?
5      MR. PEREZ:  Object to the form of the
6  question.  Asked and answered.
7      Now you are just badgering the witness.
8      MR. ABEL:  If the witness would actually
9  answer a question, then your objection would
10  stand.
11      MR. PEREZ:  We'll he's answering the
12  question, but because you don't like the
13  answer.
14  Q   My answer [sic] is simple.
15      Could you have utilized the methodology in
16  Step 3 to value the items that you valued in
17  Step 1 and Step 2 as well?
18  A   I think your question is could I have used
19  the methodology in Step 1 and 2 that's the same
20  as in Step 3?
21  Q   No.
22  A   Okay.  Then I don't understand the
23  question.
24  Q   My question for you is:  The methodology
25  that you used in Step 3, which was projecting

Page 267

1  valuation based on taking the DIA insurance
2  values for work and estimating appreciation.
3      Could you have done that by looking at the
4  same items that you've valued in Step 2 and
5  Step 1, on the insurance value chart, and then
6  extrapolating their current value by applying
7  the appreciation factor that you utilized?
8      MR. PEREZ:  Object to the form of the
9  question.
10  A   The answer is no.
11  BY MR. ABEL:
12  Q   It's mathematically impossible?
13  A   Mathematics can be anything; it's
14  methodologically impossible.
15  Q   How is it methodologically impossible?
16  A   Very simple.
17      The -- in order to come up with the
18  64.4 percent one needed a reliable sampling
19  that was done from the 387, and I could show
20  you the chart again that we looked at this
21  morning that reflects that, that allowed --
22  that then we would have been able to arrive at
23  the, what shall we say, the appreciation of,
24  the percentage of appreciation at 64.6 percent.
25      But if we didn't have the sampling of 387

Page 268

1  that we considered, that we debated, and that
2  we came to specific valuation conclusions, we'd
3  have an incorrect basis for projecting the
4  16,000 forward.
5  Q   So you're saying that you couldn't have
6  used the methodology detailed in Step 3 with
7  regard to the items in Step 1.
8      What about utilizing the methodology in
9  Step 3 for the 616 items that you valued in
10  Step 2; could you have done that
11  methodologically?
12  A   No, because the Step 2 took into
13  consideration present day valuations done by
14  other experts in the case that we thought were
15  certainly more reliable in doing -- taking the
16  insurance values and projecting them forward.
17  We had specific numbers to work with as opposed
18  to going back to data that was 9 to 15 years
19  old, if not older.
20  Q   And why did you believe that the data that
21  you utilized in Step 2 was more reliable than
22  the data you used in Step 3?
23  A   Because, as I've stated before, that this
24  data was done by other experts as of the
25  current date of this report.

Page 269

1      It's clearly more reliable, even as a
2  basis for making adjustments and using it as a
3  control, and taking data that's 9 to 15 years
4  old.
5  Q   And you don't know, as we discussed
6  before, who actually prepared the DIA insurance
7  values that you utilized in your report; is
8  that right?
9  A   That's correct.
10  Q   And you don't actually know for what
11  purpose they gathered the values that were
12  included in that chart; isn't that right?
13  A   That's correct.
14  Q   And am I correct --
15  A   Let's backtrack.  It was represented to me
16  that they were insurance values.
17  Q   By counsel, correct?
18  A   Yes, I believe so.  Yes, by counsel, who
19  had a basis for making that assumption, I
20  believe.
21  Q   Well, did you ask counsel whether they had
22  a basis for making that assumption?
23  A   Yes.
24  Q   And what was their response to you?
25  A   That they received these insurance values

1  from the DIA.
2  Q    So counsel told you that these were
3  insurance values?
4  A    Well, I would have to go back and see
5  exactly what the data said on it, but I believe
6  that's the case.
7  Q    Am I correct that there's data on this
8  chart from over ten years?
9  A    Which data are you referring?
10  Q    Alleged insurance value chart.
11  A    Well, I just testified that we, in
12  projecting forward, we were using data between
13  9 and 15 years, on average.
14  Q    And in your experience, how frequently
15  should insurance valuation be redone?
16  A    That depends on the property.
17  Q    Well, am I correct that conventional
18  wisdom calls for a collection to be revalued
19  every three to five years?
20  A    I don't deal with conventional wisdom; I
21  deal with professional standards.
22       (Deposition Exhibit 7, Document Entitled
23  "All about Appraisal:  The Definitive Appraisal
24  Handbook," marked for identification as of this
25  date.)

1  BY MR. ABEL:
2  Q    I'm showing you a document that's marked
3  Deposition Exhibit 7.  This is a excerpt from a
4  book I checked out of the library, called "All
5  about Appraisal:  The Definitive Appraisal
6  Handbook."
7       Is this the appraisal book that you were
8  talking about earlier that you said you were
9  one of the authors on?
10  A    That was published in 2003?
11  Q    It was.
12  A    Yes.
13  Q    Take a look at Page 7.  Top of the page.
14       Am I correct it says "how often should a
15  collection be valued," and right underneath
16  that, "conventional wisdom calls for a
17  collection to be revalued every three to five
18  years"; is that right?
19  A    That's correct.
20  Q    Ad this was actually an article that you
21  wrote; isn't it, sir?
22  A    That is correct.
23  Q    So when you say you don't talk about
24  conventional wisdom, that's inaccurate; isn't
25  that right?

1  A    Well, yes, that is -- in the context of
2  this article, which is ten years old, 11 years
3  old.
4  Q    And you said -- it is your opinion that
5  the information in the textbook hadn't changed
6  in the last ten years; isn't that right?
7  A    I didn't say that.
8  Q    See what the transcript says.
9       So how frequently do you believe that
10  collections should be redone?
11  A    Depending upon the items involved, could
12  be every -- it could be three to five years, it
13  could be every year.  It depends on the
14  specific type.
15  Q    So it should be done at least three to
16  five years but maybe more frequently?
17  A    Possibly.
18  Q    How frequently do insurers, in your
19  opinion, require insurance valuation appraisals
20  to be redone?
21  A    That depends on the insurance company.
22  Every insurance company has its own
23  requirements.  There's no general answer to
24  that question.
25  Q    Are you aware of any insurance company, in

1  your experience, that allows insurance
2  appraisals to be redone in periods longer than
3  five years?
4  A    Frequently.
5  Q    A decade?
6  A    Frequently.
7  Q    Have you ever done an appraisal where you
8  utilized the methodology that you utilized with
9  regard to Step 3 to value a portion of a
10  collection before?
11  A    Projecting values forward, no.
12  Q    Are you aware of anyone else in the
13  industry who has used the methodology that you
14  utilized in Step 3 to value a portion of a
15  collection?
16  A    Again I take issue with the word
17  "industry," profession.
18       To the best of my knowledge, no.
19  Q    Are you aware of any publication or
20  treatise that suggests that it is proper to
21  perform the methodology you utilized for Step 3
22  to value a portion of a collection?
23  A    To the best of my knowledge, no.
24  Q    Did you do anything to examine whether or
25  not the information contained in the insurance

1  value charts, as we've been referring to it,
2  was accurate?
3  A    Accurate in what sense, that it was
4  accurately transcribed?
5  Q    No, that it was accurate for the period
6  that it was alleged to have been entered into
7  the system.
8  A    I think I testified earlier that we
9  reviewed it.
10  Q    In reviewing it, did you notice anything
11  that you thought was erroneous?
12  A    Yes.
13  Q    What did you think was in error based on
14  your review of that document?
15  A    That certain values might have been
16  anomalies and not done necessarily properly.
17  Q    How did you take that factor into account
18  in determining what the value should be for the
19  16,378 objects you appraised according to that
20  methodology?
21  A    When you're dealing with such a large mass
22  of objects, definitely there's going to be some
23  type of variation.  But it was our opinion that
24  at the end of the day there were, judging from
25  the chart that we provided, you could see that

1  there was consistency, going back over time,
2  that our values, even averaging these things
3  together, would render a specific annual
4  percentage, which I believe was 10.9 percent.
5         So when you're dealing with such a large
6  group of items, clearly, there are going to be
7  individual discrepancies.
8  Q    And how does multiplying a sample of data
9  that you believe has errors or discrepancies by
10  an appreciation rate resolve those errors or
11  minimize them, in your opinion?
12         MR. PEREZ:  Object to the form of the
13  question.  Misstates facts not in evidence.
14  A    Which data are you referring to?
15  BY MR. ABEL:
16  Q    Sure.
17         Is it your opinion that by multiplying the
18  631,949,458 alleged DIA value by 64.6 percent,
19  that you somehow addressed the errors that you
20  believed existed in the underlying data from
21  the insurance value chart?
22         MR. PEREZ:  Object to the form of the
23  question.
24  A    The answer to the question is yes.
25

1  BY MR. ABEL:
2  Q    And how did you go about doing that?
3  A    Simply.
4         That when you're dealing with a large
5  sample or a large group, I would call it a
6  "sample of objects," the anomalies average out
7  and one sees a particular trend.
8  Q    Did you average the DIA insurance value
9  collection to determine the ultimate price that
10  you put on it?
11  A    It's certainly -- we took the total, and
12  then when I say "average," I mean that one
13  value that may be wrong, too low, would be
14  compensated for by another one that's too high,
15  and at the end of the day the total reflects
16  it.
17  Q    Did you do any sampling to make a
18  determination as to how many errors or how
19  erroneous the DIA insurance value chart was?
20  A    We looked at the insurance values, what we
21  presumed to be insurance values, and reflected
22  on what we thought it would be worth at the
23  time and the results of our inspection, of our
24  review of this data, led to the conclusion I've
25  just stated.

1  Q    What sample size did you utilize to
2  perform that task?
3  A    Oh, I can't recall.  Hundreds, I presume.
4  Q    You presume or you know?
5  A    I believe.
6  Q    Who performed that sample test?
7  A    We all did it together, the core team.
8  Q    Do you have any experience in statistics
9  yourself?
10  A    Other than the fact that I took two years
11  of statistics as an undergraduate a long time
12  ago, I don't.
13  Q    How many years was that?
14  A    Ago?
15         In the '60s.
16  Q    Who else on your team had training in
17  statistics?
18  A    Rob Leeds of Silar.
19  Q    Anyone else?
20  A    The team of Silar was comprised of four or
21  five members led by Rob who worked on this.
22  And they definitely have a great deal of
23  experience in statistics.
24  Q    Do you know anything about Rob Leeds or
25  Silar's reputation in the industry?

1 A    Not particularly.
2 Q    You didn't do any investigation as to
3 Silar or Rob Leeds prior litigation history?
4 A    I did not.
5 Q    Did you do anything to determine what the
6 error rate in your analysis for Step 3?
7 A    I believe Rob did.
8 Q    What was the error rate that he
9 determined?
10 A    I would have to look at his notes, what we
11 see on the charts are his conclusions.
12 Q    Did he have a written work file?
13 A    I believe so.
14 Q    Was that produced in this case?
15 A    I think all the substantive -- I think he
16 had a file as he was going.  And then all of
17 the various charts that were included in this
18 report are his work file.
19 Q    Well, did he have a separate work file
20 other than the opinions expressed in the
21 report?
22 A    No.  I believe anything of substance was
23 put in the report.
24 Q    So you believe that somewhere in the
25 report is an indication of the error rate that

1 Mr. Leeds' determined with regard to the
2 methodology in Step 3?
3 A    I would have to look at the -- again, I'm
4 not an expert in statistics, and I would have
5 to look at it.  I think there is a
6 compensation, but I'm not prepared to answer
7 that at this time.
8 Q    If it's not in the report, is it your
9 opinion that it doesn't exist?
10 A    That's not my opinion.  It may.
11 Q    If it's not in the report where else would
12 we look to try to determine what that error
13 rate is?
14 A    I don't know.  I would have to look very
15 closely at his individual numbers to see if
16 that's there.  But I know he certainly took it
17 into consideration in arriving at the final
18 computation numbers.
19 Q    In comparing the 387 -- I'm sorry, let's
20 actually look at your chart, Attachment L, to
21 Deposition Exhibit 3.
22 A    Sure.
23 Q    If you wouldn't mind flipping there.
24 A    Of course.
25 Q    Are you there?

1 A    No, I'm getting there.
2      Attachment L, you said, right?
3 Q    Yes.
4 A    I'm there.
5 Q    So I'm looking at Page 2 of this
6 attachment, the chart entitled "Comparison of
7 DIA Insurance Value and VWA Value."
8 A    Correct.
9      That's at the top of the page; is that
10 right?
11 Q    We looked at that before.
12 A    We did.
13 Q    Am I correct that in each of the
14 categories for which you include information,
15 the DIA Insurance Value and the VWA Average
16 Value, the VWA Average Value is higher than the
17 DIA Insurance Value?
18 A    That is correct.
19 Q    Am I correct that you assumed that the
20 difference between the DIA Insurance Value and
21 the VWA Average Value is based on; A, the
22 difference between insurance value and
23 marketable cash value, and also the time frame
24 in which the DIA insurance value was taken
25 versus the valuation date of the VWA average

1 value?
2 A    That's correct.
3 Q    Do you ever assume that perhaps the
4 difference between those two values was simply
5 because the DIA insurance value was incorrect?
6 A    Simply stated, that we did spot checks and
7 we considered a good deal of the numbers as to
8 be credible within the time frame that they
9 were applied to those charts.
10 Q    But you don't recall the sample size or
11 error rate utilized from the methodology?
12 A    I do not.
13 Q    Did you apply any supplements or discounts
14 to any of the items that you valued with regard
15 to Step 3?
16 A    Within Step 3?
17 Q    Yes.
18 A    We're talking about the 387 which is the
19 base.
20      Other than the sup -- we applied
21 supplements because of the appreciation or the
22 annualized increase, so that definitely is a
23 supplement.
24 Q    Anything else?
25 A    At this moment, no, that I can think of.

1    Q    Is there anyplace that you could look at
2    to determine whether or not you applied
3    additional supplements or discounts to the
4    items that you valued in Step 3?
5    A    I don't believe so.
6    Q    Let's talk about Step 4.
7         What did you do for Step 4?
8    A    Can we take another quick break?
9    Q    Sure.
10        THE VIDEOGRAPHER:  Go off the record.  The
11   time is 3:35.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  We're back on the
14   record.  The time is 3:54.
15   BY MR. ABEL:
16   Q    Good afternoon, Mr. Wiener.  Let's talk
17   about step four of your methodology.
18        What did you do for step four?
19   A    Okay.  We took the remaining part of the
20   inventory that had not been accounted for in
21   steps three, two and one, and then compiled a
22   chart that you can see in Attachment M, as in
23   Mary.
24        So what you see reflected in this chart
25   is, on the top line going across -- well, first

1    of all, we looked at the various categories of
2    art that are sold at auction that had been sold
3    at auction in the calendar year of 2013, when
4    we have complete results for a given year.  We
5    then compiled an average price for each of the
6    categories.  So what you see on the left is the
7    auction -- auction departments that have the
8    various sales.  So it starts with 19th century
9    European, it ends up with South East Asia.
10        These are kind of areas in which the
11   auction houses offer property that is
12   comparable to the holdings in the DIA
13   collection.
14        The auction categories are not the same as
15   the categories that are used for the
16   classification in the DIA, in which case we
17   amalgamated the auction categories into the
18   categories that are the same as the DIA.
19        So we have starting with Africa, Oceania
20   and Indigenous Americas.  And we see it
21   includes native American or -- I think -- yeah,
22   native American, below that Oceanic, and these
23   are the average prices that have been obtained
24   at art for that category.  You can see this
25   done across the board starting with African,

1    Oceanic and ending with prints, drawings and
2    photographs.
3         Then these were the average price computed
4    with the sold rates of the individual objects.
5         We then took into consideration whether
6    there should be a discount or a supplement
7    based upon our review of individual objects
8    within this category compromising the 42,844
9    units.
10        And then if we felt it was necessary, we
11   applied a, either a supplement or discount or
12   nothing.
13        So in the category of Africa, Oceanic
14   Indigenous, we felt that there was a zero
15   percent adjustment made for various factors
16   such as the prominence of the objects in the
17   collection, how it might vary from the norm of
18   the objects that would be comprised -- that are
19   compromised in the DIA collection and so on.
20        So that's reflected in the notes below.
21        And so it says average price per
22   department was calculated based on Christie's
23   and Sotheby's 2013 sales figure as detailed in
24   Exhibit E of the Artvest report.
25        We relied upon the Artvest report

1    transcription of data, which is readily
2    available to anyone.  But since Artvest had
3    done that, we couldn't see why not to use it,
4    and we took as an extraordinary assumption that
5    that data was accurately transcribed.
6         These prices were then applied linearly
7    across the applicable DIA departments using
8    averages for instances where multiple
9    departments overlap.  You can see that in each
10   column when they were multiple departments
11   which I've just explained.
12        Now, four categories of prints, drawings
13   and photographs, we applied a 10 percent
14   discount to account for works by less collected
15   artists, which may be offset by a number of
16   works of extremely well-known artists, for
17   example, in the category of photographs.  The
18   DIA has a really prominent collection of
19   photographs.
20        But they also have some sort of -- which I
21   say, localized interest artists, people from
22   the Detroit area.  So we took that into
23   consideration and we applied, based upon our
24   sampling and based upon our overview of each
25   category, we applied a 10 percent discount.

Then in other categories we applied
supplements, considering the high quality of
the works of art in that -- in that category.

So, for example, an ancient near Eastern
and Great Britain Roman art we applied a 25
percent supplement. And the reason given for
that is because of the verifiable provenance,
and the fact that most cases, the object
entered the museum prior to the UNESCO
convention on cultural property of 1970. In
the category of ancient and Islamic art we
applied a 15 percent supplement because of the
strong market interest in this category. In
the -- so that's lower.

In the category of contemporary art after
1950, again, another 15 percent supplement
because of the strong market interest in this
category. However, the supplement has been
kept low to be conservative.

As many people know, this sector of the
marketplace is extremely, for lack of a better
work, "hot" at the moment, but we decided to be
very conservative, thinking that the prices may
have, you know, may not be sustainable at such
a rapid growth of increase over the years, and

therefore we put a lower supplement, but
definitely a supplement, reflecting the high
quality objects and the curatorial care that
have gone into selecting these objects.

Then we have European Modern Art in 1950.
And we put a 15 percent supplement, because
this market is very selective and because of
the strength of the DIA hold in connection with
this category, this is a conservative supplement.
And then we have European paintings, where we
only applied a 10 percent supplement, and
because most of these paintings in this
category have been valued individually, and the
remaining paintings are less important or
secondary in nature, and as such we've ascribed
a conservative supplement. But nonetheless,
they are extremely strong paintings.

Then in European sculpture and decorative
arts, we have a supplement of 15 percent, which
is a conservative supplement, because of the
large variety of objects within this sector.

So that's, in a nutshell, what we did for
this sector.

Q    And was this, again, the process of a
consensus in the committee at VWA?

A    That is correct.

Q    Who came up with the amounts of the
supplements or discounts utilized in step four,
the whole committee?

A    Well, we discussed it all together, but
ultimately the final decision was mine.

Q    Do you believe your methodology for step
four yields accurate results?

A    I do.

Q    Do you have any understanding of what the
error rate is for that methodology?

A    I don't think we calculated -- the error
rate is built into the conservative supplements
that we took, and also the discounts that we
took.

Q    So what is the error rate given that
conservative methodology?

A    Well, it's reflected in the supplements.
So you have supplements ranging between
25 percent, which is the highest, and
zero percent. And you have discount rate,
which would also account for error rate as
well, between 10 percent and zero percent.

Q    But you don't know what the error rate,
the statistical error rate is for this

methodology?

A    We did not use statistics -- statistic
methodology for this, other than the process
that I just applied.

But -- but there's a big but.

By taking into consideration the
supplements and the discounts, we accounted for
what we would perceive would be proper error
rates, given the quality of the works of art
and our judgment about the quality of the works
of art which was done for a fairly large
sampling.

Q    What sampling are you referring to?

A    Our review of the data, which at that
point had been sorted by Rob Leeds, because we
were given new data by your client.

Q    And what was the sample size that you
utilized to test your conclusions in step four?

A    As I told you, it was fairly large. I
don't have the exact sample size. It was
hundreds of items within a particular sample
size.

Q    You're dealing with a 42,844 piece portion
of the collection, is it your testimony that
you sampled to determine that was correct only

1  by utilizing a couple hundred units?
2  A    I said a couple units in each category.
3  Q    But you don't know how many totally you
4  utilized for a that size?
5  A    No, we didn't keep track.
6        For example, in photographs, we did easily
7  2,000.
8        In other categories, maybe a little bit
9  less.  But it was fairly large.
10 Q    And how did you perform this test
11 utilizing these samples in each one of the
12 categories to determine that your conclusions
13 with accurate?
14 A    By looking at various appraised values in
15 connection with the average prices that we used
16 as a point of departure.
17 Q    Are you aware of what types of art the DIA
18 used to compromise the 42,000 pieces that you
19 valued in step four?
20 A    I'm not sure we were aware of what that
21 means.
22 Q    Sure.
23       For example, are you aware of how man
24 pottery shards are included in that
25 42,000-piece collection that you valued for

1  step four?
2  A    I can't give you a number off the top of
3  my head.  But indeed we took all of that into
4  consideration.
5  Q    How did you do that?
6  A    Simply by examining the inventory.
7  Q    Did you do an analysis of how many pottery
8  shards were part of the inventory?
9  A    Not specifically with a count, but we
10 looked at it in relation to the strength of the
11 other objects.
12 Q    How about textile fragments; how many
13 textile fragments were in the 42,000 remaining
14 pieces of the DIA?
15 A    Again, I don't have a specific count.  We
16 took that into consideration.
17 Q    How did you take it into consideration?
18 A    By looking at the volume and contrasting
19 it in other areas in that particular category
20 which were particularly strong.
21 Q    Isn't the reason why you had to perform
22 this analysis, utilizing this methodology
23 because the DIA didn't actually provide you
24 with information regarding these pieces in that
25 insurance chart that you previously looked at?

1  A    Yes.  The reason -- it's stated very
2  clearly in the report, that the -- we did not
3  have insurance values for these 42,844 pieces.
4  Q    Are you surprised that the DIA would not
5  have insurance value for 42,000 pieces, when
6  looking at your average prices, they range
7  anywhere from 8,166 to over $500,000 per unit?
8        MR. PEREZ:  Object to the form of the
9  question.  Assumes facts not in evidence.
10 A    And I don't understand question, to be
11 honest.
12 BY MR. ABEL:
13 Q    Sure.
14       Am I correct if you look at the average
15 price that you determined per unit for some of
16 these categories like American Art, you
17 determined that the average price for a piece
18 of work at the DIA for American Art was
19 $464,418; is that correct?
20 A    Give me a moment to check.
21       American Art for African American.  So I
22 think your number is wrong.  But let me just
23 check it out.
24       So which column, which category are you --
25 Q    So I'm looking at American Art in the

1  left-hand side by department.
2        American Art --
3  A    That's auction department.
4  Q    Right.
5        And you determined that the average price
6  for a piece from the auction department on
7  American Art at Christie's or Sotheby's was
8  $464,418, right?
9  A    That's correct.
10 Q    And if you can look over to the right-hand
11 side, if you look under American Art before
12 1950 and African American Art --
13 A    Correct.
14 Q    -- you determined that there were 363 --
15 sorry.
16       How many pieces of art were there in the
17 collection of the DIA that corresponded to the
18 American Art that you determined was an average
19 price of $464,000?
20 A    If you look at the top like 1,5 -- 1,565.
21 Q    So what you do to determine the value of
22 that piece of the collection, is multiply
23 1,565, take into account any premium or
24 discount, which there were none, by the price
25 per art under American Art on the left-hand

1 side. So it would be 1,565 times 464,418
2 adding in zero percent; is that right?
3 A   Well, the -- excuse me.
4      The total cost would also include Latin
5 American Art in that category. So the total
6 comes to using the average price for both Latin
7 American Art and for -- hang on -- American
8 Art, comes to 508,600 -- I'm sorry.
9 508,623,227.
10 Q   Okay. Let's break that down.
11      So explain for me the arithmetic to
12 determine the value for the American Art
13 indicated in the column marked American Art
14 before 1950, and African American Art that
15 corresponds to the American Art department at
16 Sotheby's and Christie's?
17 A   The total number of objects in that
18 particular category, as I've just said, is
19 1,565.
20      We didn't give the total number of objects
21 for American Art, per se. But using the
22 average price from the auction house of 460 --
23 I'm sorry. It's hard to read the Excel chart.
24 464,418, we came to the total of
25 300,063,407,337 for that particular

1 subcategory, or category, depending upon which
2 one you're viewing. Within the category of --
3 auction category and the category within the
4 DIA holdings, in -- which would compromise of
5 American Art before 1950 and African American
6 Art.
7 Q   How did you determine what percentage of
8 the 1,565 items you attributed to the American
9 Art before 1950 and African American Art
10 corresponded to the American Art department at
11 Sotheby's and Christie's?
12 A   It's Latin American.
13 Q   I'm looking at -- under the column --
14 A   Yeah. But we didn't include African
15 American Art, we included it with American Art.
16 Q   Sorry.
17      If you look at the column header, am I
18 correct it says, American Art before 1950 and
19 African American Art?
20 A   Right.
21      That's the categorization that DIA used,
22 and it's normally both -- American and African
23 American Art or generally sold together in the
24 American Art category.
25      We used simply, to be consistent, the

1 categorizations the DIA used, which as I've
2 said earlier, does not necessarily correspond
3 to the categories that are used by the auction
4 houses.
5 Q   What number did you multiply 464,418 by to
6 get 363,407,337?
7 A   Unfortunately, I don't have the specific
8 number here, but I can gladly supply it at a
9 later date.
10 Q   How did you determine what portion of this
11 column that you say is attributable to American
12 Art before 1950 and Latin American Art
13 corresponded to the American Art department of
14 the Sotheby's and Christie's?
15 A   We simply looked at auction catalogs and
16 the holding of DIA and made a determination
17 that within those categories the average price
18 was a pretty good reflection in what we've seen
19 in our sampling and review, which is pretty
20 extensive, I might say.
21      And, therefore, we totaled the number of
22 pieces by the average price and came up with
23 the grand total of 508,623,227, as you see.
24 Q   Okay. So in column -- in the column
25 marked "American Art before 1950" and "African

1 American Art," because there are items in there
2 that correspond to the American Art department
3 at Christie's/Sotheby's and the Latin American
4 Art department at Christie's/Sotheby's, you
5 took the 1,565 item total for that column in
6 the DIA, you divided it by two and attributed
7 half to American Art and half to Latin
8 American; is that right?
9 A   No. We didn't do it by two. And I told
10 you -- I can supply it later on.
11      We looked at the classifications of the
12 type of art within that category and came to
13 that determination. And we were pretty good
14 about that.
15 Q   You're positive you did that, sir?
16 A   I am relatively sure.
17 Q   If you didn't do that, would that be an
18 error in your methodology?
19 A   Perhaps.
20      MR. ABEL: Let's take a break.
21      THE VIDEOGRAPHER: Let's take a quick
22 break. The time is 4:16.
23      (Recess taken.)
24      THE VIDEOGRAPHER: Back on the record.
25 The time is 4:22.

BY MR. ABEL:

Q    Mr. Wiener, you mentioned you believe some sampling had been done to test of the accuracy of step four.

Do you know who performed that sampling.

A    We all did as a committee.

Q    And do you know what kind of statistical sampling had been performed?

A    We performed a sampling for the quality of work in the DIA holdings.

Q    And who determined that the sampling you did was statistically significance, if anyone?

A    We all determined together.

Q    Did any one of you have a background in determining the significance of sampling utilizing statistics?

A    We all have a background in art.  And we looked at the quality of the art as I testified.

Q    And was -- was Mr. Leeds involved in that process at all?

A    Mr. Leeds helped us compromise the document.

Q    Did Mr. Leeds determine what size a sample you needed to do to make sure your sample was

statistically significant?

A    He did not.

Q    Do you believe your methodology in step four yielded accurate results?

A    I did.

Q    Why then didn't you just use the methodology in step four to value the entire DIA collection?

A    For the reasons I've stated earlier, that, first of all, looking at individual works of art and coming up with a specific value for each one is definitely one step that one should take, and we did as many as we could.

We then had to look at the remainder of the DIA works and come up with a methodology that would yield meaningful and still conservative results.

Q    If you believe that step four is a methodology that yield meaningful and conservative results, why not utilize step four instead of steps two and three?

A    Very simple.

The methodology by looking at large groups and making general assumptions is not the same as using, especially when one is dealing with

relatively high-end works of art, of coming up with an individual valuation for a specific artwork one after another.

Q    Am I correct that step four, in your belief or opinion, is potentially less accurate a methodology for valuing the art in steps two and three?

A    I think that -- no, you are not correct.

I think that step four is correct within the parameters stated of step four.

Q    And my question for you is:  If that's correct, why not utilize the methodology in step four instead of two and three?

Why use three separate methodologies to review three different pieces of the collection instead of one that you believe was accurate?

MR. PEREZ:  Objection to the form of question.  It's been asked and answered, and it assumes facts not in evidence.

BY MR. ABEL:

Q    You can answer.

A    Because the methodology used in step one, and then again in step two, basically was focused on high-end works of art, which most likely -- with some anomalies, most likely

require closer examination than one sees in the example used in step four.

Q    So is it your opinion that the examples -- sorry, that the sample valued in step four were not the high-end pieces of the DIA collection?

A    In many cases they were not.

Q    Did you do anything to determine how the sample that you valued for step four corresponded to the overall sample of the DIA collection in toto?

A    I don't understand the question.

Q    Sure.

Did you -- let me try to rephrase it for you.

Did you do anything to determine how the DIA collection that you valued for step four corresponded to the overall DIA collection in terms of value?

A    The -- again, the question of the overall value of the DIA collection, one can see in the value that is ascribed to step four and contrast it to the overall valuation plan, if I understood you correctly, of the combined value in step five.

Q    Let me ask you a different question.

Page 302

1    Am I correct that you didn't value the --
2 what you previously valued.  Take a step back.
3    You previously valued the high-end items
4 from the DIA collection in step one, correct?
5 A    Correct.
6 Q    And in step two, you valued other
7 high-valued works that were valued by
8 third-party appraisers, correct?
9 A    That's correct, for the most part.
10 Q    So the top 1,000 pieces in the DIA
11 collection, in terms of high value, were not
12 valued in step four; is that right?
13 A    They were removed from the account,
14 correct.
15 Q    And all of the other items that the DIA
16 itself determined were valuable enough to
17 provide a valuation in the insurance value
18 chart were valued in step three, correct?
19 A    That's correct.
20    MR. PEREZ:  Object to the question.
21 Assumes facts not in evidence.
22 Q    And you didn't include any of the almost
23 17,000 pieces of art that were independently
24 valued for steps 1, 2 and 3 in your valuation
25 of step four; is that right?

Page 303

1 A    That is correct.
2 Q    And the total number of units you valued
3 was 60,000, right?
4 A    The total number of the DIA collection,
5 60,225.
6 Q    So approximately one-third of the,
7 potentially the highest value art in the DIA
8 was not part of the sample size that you
9 analyzed utilizing step four; is that right?
10 A    The 16,000 plus 1,000 other pieces, making
11 17,000, were not included in the 42,844 that
12 were included in step four.
13 Q    And that 17,000 was comprised of those
14 items that had already been valued because you
15 determined that they were high value or someone
16 else determined that they were high value, or
17 that the DIA put on a list indicating some
18 value for it?
19 A    That is correct.
20    That's for 17,000-some odd pieces.
21 Q    And that's about a third of the total
22 collection, right?
23 A    Yes.
24 Q    A little less than a third?
25 A    Little less than a third.

Page 304

1 Q    So the items that you were valuing in step
2 four were the items that, at least to your
3 knowledge, no one at the DIA or any of the
4 experts in this case were valuable enough to
5 independently value for a charter report,
6 right?
7    MR. PEREZ:  Object to the question.
8 Assumes facts not in evidence.
9 A    And I disagree.
10 BY MR. ABEL:
11 Q    Could you have utilized step four to value
12 the items in step three and step two?
13    MR. PEREZ:  Object to the question.  Asked
14 and answered.
15 BY MR. ABEL:
16 Q    You can answer.
17 A    One can utilize anything.  Whether it's
18 considered to be appropriate enough, given the
19 circumstances, is another question and another
20 determination.
21 Q    Did you do anything to determine whether
22 or not your methodology in step four was more
23 accurate than step -- methodology you utilized
24 in step two and three?
25 A    "More accurate," I don't think is the

Page 305

1 correct term.
2    It was different given the volume and the
3 profile of the pieces.
4 Q    Did you do anything to determine whether
5 the results of your methodology utilized in
6 step four produced more accurate valuation
7 results than the methodology used for step two
8 and three?
9    MR. PEREZ:  Object to the form of the
10 question.  Asked and answered.
11 A    We -- within the parameters of step four,
12 we considered our conclusions accurate.
13 BY MR. ABEL:
14 Q    Did you consider your conclusions accurate
15 within the greater parameters of the
16 assignment?
17    MR. PEREZ:  Object to the form of the
18 question.
19 A    Did I consider the conclusions reached as
20 accurate within the greater parameters of the
21 collection; is that right, the question?
22 BY MR. ABEL:
23 Q    Yes.
24    You testified that you believe that the
25 conclusions reached utilized the methodology

1  for step four were accurate with regard to the
2  parameters utilized for that step.
3      And my question for you is:  Were the --
4  was the step four methodology and the results
5  from that methodology correct in conjunction
6  with the parameters for the entire engagements
7  to value a DIA collection?
8  A   The parameters of the entire -- I believe
9  that the parameters that we used for valuation
10 of the entire DIA collection were correct and
11 accurate.
12 Q   Did you consider any other methodology in
13 appraising the items that you appraised in step
14 four?
15 A   We considered this to be the most
16 appropriate methodology to be used.
17 Q   Did you consider any other methodology to
18 appraise those 42,000-some items?
19 A   No, we didn't look at any alternative
20 methodology because I didn't think there was
21 any viable alternative to be used.
22 Q   Did you look at the literature in the
23 valuation industry or profession to determine
24 whether or not there was any recognized
25 methodology for valuing 42,000 pieces of the

1  type you valued in step four?
2  A   Works of art?
3  Q   Yes.
4  A   Is that the question?
5      There is no literature.
6  Q   Were you aware of any discussions in
7  classes or conferences of how to value a
8  collection of 42,000 pieces of art of the type
9  that you valued in step four?
10 A   To my knowledge, there has been no
11 seminars or discussions on the valuation of
12 42,000 diverse works of art.
13 Q   Have you ever in your profession ever
14 utilized the methodology described in step four
15 to value any number of art or any size
16 collection?
17 A   Not specifically like this.
18 Q   What do you mean?
19 A   Meaning that when we valued 20,000 pieces,
20 we applied, possibly, an analogous methodology.
21 Q   Let's talk about that.
22     When you valued those 20,000 pieces for
23 the unknown artist, did you do a comparison to
24 the departments at Sotheby's and Christie's to
25 determine an average price per piece?

1  A   No.
2  Q   So what did you do that was similar to
3  your methodology for step four in valuing those
4  20,000 pieces?
5  A   We divided the art into categories.
6  Q   And is that the only similarity between
7  what you did in regard to this engagement for
8  step four and what you did with regard to that
9  other engagement for 20,000 pieces?
10 A   At this moment, that's what I can recall.
11 Q   You could have divided the DIA collection
12 into categories and utilized some other sample
13 other than at Christie's and Sotheby's to
14 compare it to, couldn't you have?
15 A   I wouldn't know what other sample to use.
16 Q   Am I correct, as we discussed before, that
17 using a comparable market analysis, you need to
18 compare your subject to a target collection or
19 item for comparison purposes; is that right?
20 A   I don't know what the word "target" means
21 in this context.
22 Q   Sure.  Am I correct that utilizing the
23 comparable market approach here, what you would
24 do is you'd look at the collection contained in
25 one of the DIA departments and look at a

1  comparable department at some other location to
2  see if they were the same or different?
3  A   That's what we did.
4  Q   To the extent that they were different,
5  you make adjustments to the subject property to
6  try to figure out what the price would be on
7  the comparison basis; is that right?
8  A   That is correct.
9  Q   How did you -- sorry.
10     So for example, looking at the American
11 Art column, your comparison here was, you
12 looked at the DIA's collection of American Art
13 and you compared it to the Christie's.
14 Sotheby's, collection of the American Art that
15 they sold in 2013; is that right?
16 A   That's correct.
17 Q   How were they similar, the DIA collection
18 of American Art and the Sotheby's collection of
19 American Art that they sold in 2013?
20 A   There were major points of similarity:
21 The type of art, the subjects, the artists, the
22 sizes, the media, many different points of
23 similarity.
24 Q   And how did they differ, sir?
25 A   In this particular case, we're talking

1 about American Art before 1950 and African
2 American Art, they were quite similar, and that
3 is, therefore, reflected in the zero percent
4 neither supplement nor discount.
5 Q     Did you review the Sotheby's/Christie's
6 list of American Art?
7 A     We reviewed catalogs, of course.
8 Q     I'm asking you.
9         Did you review it?
10 A     Personally?
11 Q     Yes.
12 A     Over time, I have.
13 Q     And did you make a specific determination
14 that they were so similar, that the DIA
15 collection of American Art was so similar to
16 the total sale volume of the 2013 art for the
17 Christie's/Sotheby's collections, that you
18 didn't have to make any adjustment to match
19 them up in a comparison examination?
20         MR. PEREZ: Object to the form of the
21 question.
22 BY MR. ABEL:
23 Q     You can answer.
24 A     Sure.
25         I'm totally cognizant what takes place in

1 the sale. I appraise this property all the
2 time. And on the basis of that and in
3 comparison with the works of art that would
4 comprise that category among the 42,000, I
5 believe that the zero percentage, neither for
6 discount or supplement is correct and accurate,
7 if not conservative.
8 Q     What percentage of the DIA collection of
9 American art was gathered or collected for
10 academic or scholarly purposes?
11 A     I was not given that type of curatorial
12 determination, nor is it included on the data
13 sheets that was supplied, so I couldn't answer
14 that question.
15 Q     What percentage of the DIA or Sotheby's
16 collection for the 2013 of items sold in the
17 American Art department related to scholarly or
18 academic pieces?
19 A     The -- again, the offerings at auction
20 sale are extremely varied, and I don't know the
21 motivation of the individual consignors,
22 whether they viewed these pieces as academic,
23 or whether they viewed them in some other way,
24 nor do I think could anyone make that
25 determination based upon auction catalogs

1 because for the simple reason that information
2 is never given.
3 Q     Did you do any independent determination
4 to determine what percentage of the DIA's
5 American art collection was valued under $5,000
6 or should be valued under $5,000 in your
7 opinion?
8 A     We looked at the quality of the art and
9 came to some type -- not some type, came to a
10 valuation conclusion reflected in the reliance
11 upon the auction sale averages.
12 Q     I'm not asking you what your ultimate
13 conclusion was from your analysis.
14         I'm asking you: Before you made the
15 determination that it was proper to compare the
16 DIA, for example, American art collection, to
17 the Sotheby's total sale of art in the American
18 Art department for 2013, what did you do to
19 determine that they were equal samples, that
20 you could make that comparison?
21         MR. PEREZ: Objection to the form of the
22 question.
23 A     We looked at the quality of the pieces in
24 the DIA, as evidenced in the photographs that
25 we were given for this particular sector. And

1 we also compared it to the auction catalogs
2 within that particular sector.
3 BY MR. ABEL:
4 Q     And who is we? Who did that?
5 A     The inner committee, which we discussed it
6 at great length.
7 Q     And what did you do before comparing the
8 DIA American Art sample to the
9 Sotheby's/Christie's sample to determine what
10 percentage of the DIA sample was comprised of
11 goods under $5,000 or art under $5,000?
12 A     We did -- we looked at the entirety of the
13 collection, and I wouldn't say before, it was
14 generally done while we were doing the
15 valuation.
16 Q     So am I correct that you assumed that the
17 American Art collection at the DIA was
18 equivalent to the Sotheby's/Christie's Art
19 department sales for 2013 for the American Art
20 department --
21         MR. PEREZ: Object to the form of the
22 question.
23 BY MR. ABEL:
24 Q     -- as part of your methodology?
25         MR. PEREZ: Assumes facts not in evidence.

1    Go ahead.
2    A    We made that determination.
3  BY MR. ABEL:
4    Q    And did you make that determination before
5    or after you decided to use this methodology
6    that you detailed in step four to compare the
7    DIA collection to Sotheby's and Christie's?
8    A    During the process of making this
9    determination.
10    Q    Didn't you think it was important to
11    determine whether or not Sotheby's and
12    Christie's was an adequate comparable to the
13    DIA collection before utilizing it as a
14    comparable?
15    A    More or less I knew what the quality of
16    the sales were.  I looked at the DIA holdings.
17    And we simply came up with that conclusion,
18    that it was appropriate to use that category
19    without adjustment of a supplement up or a
20    supplement down the way we did in other
21    sectors.
22    Q    Does your work file show what data you
23    utilized from the DIA collection or the
24    Christie's/Sotheby's collection to make a
25    determination that in each of the cases you

1    identified, that the DIA collection, as
2    separated out in your chart, Attachment M was
3    equivalent to a department at
4    Christie's/Sotheby's for sales in 2013?
5    A    Yes.
6    Q    That's in your electronic work file?
7    A    That is in the electronic work file, yes.
8    Q    And the electronic work file shows the
9    sample sizes that you utilized to make that
10    comparison?
11    A    We did not record sample sizes.
12    Q    Does the work file show what led to you
13    believe that the DIA -- sorry, that the
14    Sotheby's/Christie's department sales
15    information for 2013 was comparable to each one
16    of the departments at the DIA?
17    A    As listed, yes.
18    Q    Other than the adjustments that you
19    indicate that you made under the supplements
20    column -- sorry, supplement bullet at the
21    bottom of this chart, were there any other
22    adjustments that you made in order to be able
23    to compare accurately the DIA collection, per
24    department, with the Sotheby's/Christie's
25    department, collection per department?

1    A    All the adjustments that were applied and
2    the reasons behind it were listed below.
3    Q    Am I correct that Sotheby's sells works of
4    art at over a million dollars?
5    A    Yes.
6    Q    Do you know what percentage of the works
7    that Sotheby's and Christie's sell are over a
8    million dollars?
9    A    In toto?
10    Q    Yes.
11    A    I don't have those figures at hand.
12    Q    Did you look at those figures in forming
13    your opinions in this case?
14    A    There was no point in looking at the total
15    number in all categories that they sold over a
16    million dollars.  We looked at individual
17    sectors.
18    Q    Okay.  In the individual sectors that you
19    looked at for Sotheby's and Christie's, do you
20    know how many sales they have over a million
21    dollars?
22    A    Generally speaking, yes.
23    Q    And is that information contained in your
24    work file?
25    A    That information is contained in the work

1    file.
2    Q    Did you do anything to exclude those sales
3    of over a million dollars from your comparison
4    between the DIA's collection and the
5    Sotheby's/Christie's collection for purposes of
6    looking at value in step four?
7    A    We thought that -- no, we didn't.  We did
8    not exclude any of the individual sales at
9    Sotheby's or Christie's.
10    Q    So you excluded the top, potentially the
11    top one-third of the DIA collections artwork by
12    value but you included the top one-third of the
13    Sotheby's/Christie's collection by value; isn't
14    that right?
15    A    Correct.
16    Q    Did you do anything to compare the results
17    of your conclusions in step four to the results
18    of your conclusions in steps one, two and
19    three?
20    A    I don't quite understand the question.
21    Q    Sure.
22    If I were to take a piece of, for example,
23    Old Masters artwork that you valued, let's say
24    the Bruegel.
25    Is that an Old Master?

1  A    That's Old Master.

2  Q    And if I were to use step four to value
3  the Bruegel, for example, am I correct that I
4  would value that at $294,186?

5  A    Well, if you look at the category for Old
6  Master, you will see that there is a note that
7  said that we -- it's under European painting,
8  that we only used a 10 percent increment
9  because most of the paintings in this category
10 have been valued individually, and the
11 remaining paintings are less important, and as
12 such we have ascribed a conservative
13 supplement.

14 Q    Let me make it easier then.

15       In your understanding, what's the most
16 available piece of American Art at the DIA?

17 A    Probably the Cotopaxie, which is by
18 Church.

19 Q    And what do you believe that should be
20 valued at?

21 A    If my memory serves me right, we ascribed
22 $75 million to it.

23 Q    Utilizing your step four to value that
24 piece, am I correct that you'd value that at
25 $464,418?

1        A    No, because we removed it from the
2  sampling.

3        Q    If we were to use the methodology in step
4  four to value that piece of art -- I'm not
5  asking what you did, if you were to use the
6  methodology to value that piece of art, you
7  would value it at $464,418, wouldn't you, sir?

8        MR. PEREZ:  Object to the form the
9  question.  It's been asked and answered.

10       A    It would be an inappropriate methodology.
11 I wouldn't use it.

12 BY MR. ABEL:

13       Q    Exactly.

14            And isn't it also equally inappropriate as
15 methodology to value pottery shards
16 utilizing -- let me take a step back.

17            What department at Sotheby's/Christie's
18 would you say corresponds to pottery shards in
19 the DIA collection?

20       A    Depends on the type of pottery shards.

21       Q    Let's say Native American pottery shards.

22       A    It would be in Native American Art.

23       Q    That's row 16?

24       A    Correct.

25       Q    And wouldn't you agree with me that a

1  random unattributed piece of Native American
2  art is not worth $31,113?

3  A    That's correct.

4  Q    If we utilize your step four methodology
5  to value that random piece of unattributed
6  Native American art, you would value it at
7  $31,114, wouldn't you, sir?

8  A    Yes.

9  Q    Step four mass appraisal?

10 A    No.

11 Q    What transaction cost did you apply --

12 A    Well, I retract that statement -- step --
13 well, no, step one is not a mass appraisal.

14 Q    Is step four a mass appraisal?

15 A    Step four, no.

16 Q    What transaction costs did you apply, if
17 any, for determining marketable cash value in
18 step four?

19 A    We factored that into the percentage
20 supplements up and down.

21 Q    Is there any way to determine what
22 percentage of those supplements or discounts
23 were comprised of the transaction cost?

24 A    In each individual category?

25 Q    Yes.

1  A    Yes.

2  Q    How do I do that?

3  A    Well, as said below, that in the
4  categories where there are supplements, that we
5  used conservative values.

6        So in many of these categories where there
7  would be supplements, the -- had we not used
8  marketable cash value, which takes into
9  consideration transaction costs, the actual
10 supplement would be higher.

11 Q    Let's make it easier.

12       How can I identify specifically what
13 transaction costs you took into account in
14 calculating marketable cash value for step
15 four?

16 A    Very simple.

17       The -- by seeing the reflection in the
18 percentages applied up or down.

19 Q    Is that in your work file somewhere, the
20 mathematical calculation that you did to be
21 able to determine the transaction costs
22 applicable to each one of these departments in
23 the DIA in step four?

24 A    It's reflected in the percentages applied.

25 Q    Other than the percentages -- other than

1    being implicit in the percentages applied in
2    step four, is there any way to determine
3    mathematically what the specific or exact
4    transaction cost you utilized to determine
5    marketable cash value was for any of these?
6        A    As I say, it's implicit.
7        Q    To get to the $8.5 billion total valuation
8    for the DIA collection, did you simply add the
9    results of step one through four?
10       A    Yes.
11       Q    Did you consider whether the value would
12   change if you added the different pieces
13   analyzed in steps one through four?
14       A    I don't understand the question.
15       Q    Sure.
16            Did you analyze the effect of the value of
17   on the assemblage of the different pieces on
18   steps one through four?
19            MR. PEREZ:  Objection to the question
20       form.
21       A    That's inherent in steps one through four.
22   BY MR. ABEL:
23       Q    Am I correct that USPAP actually requires
24   you, when you're examining the effects of
25   assemblage of different methodologies or

1    different pieces of the collection, to make an
2    independent determination as to whether or not
3    the assemblage changes the overall value?
4        A    USPAP in standard six states that the
5    appraiser has to consider that.
6        Q    And did you do that?
7        A    Yes.
8        Q    Where in your report does it indicate that
9    you did that?
10       A    In the section concerning the application
11   of blockage discount, I think it's clearly
12   stated.
13       Q    And your opinion was that a blockage
14   discount is not appropriate in this case
15   because you believe that the DIA collection
16   would be sold in an orderly manner?
17       A    That is correct.  No, well -- sold in the
18   manner described within the text.
19       Q    And if the DIA collection was not sold in
20   an orderly manner, your assumption that no
21   blockage discount would be appropriate would be
22   wrong, correct?
23       A    Depends on the circumstances.  I can't
24   make that determination now.
25       Q    What's an extraordinary assumption, sir?

1        A    An extraordinary assumption as defined by
2    USPAP is an assumption that one takes as true
3    and correct.  But if upon further review, it
4    turns out not to be the case, the appraiser may
5    be obliged to reconsider one's valuation
6    conclusion.
7        Q    Under what circumstances is an appraiser
8    potentially obliged to reconsider his facts and
9    appraisal if he finds out that assumption is
10   wrong?
11       A    If, for example, it was considered to be
12   totally authentic at the time, it was doubted
13   at a later stage, one may go back to reexamine
14   it and see it that affects value as of the
15   effective date of valuation.
16       Q    Any other examples?
17       A    Same thing with clear title.
18            If it turns out that the work of art that
19   was reported as being owned by a collector
20   turns out to have a claim of being stolen, then
21   one may be obliged to go back and reconsider
22   that the value has been affected.
23       Q    What if a piece of art is subject to an
24   encumbrance that prevents its sale, and your
25   valuation is for purposes of determining sale,

1    is that one of those circumstances where you'd
2    have to go back and redo your opinion?
3        A    Depends upon the specific circumstances.
4        Q    What circumstances does it depend on?
5            MR. PEREZ:  Object to the form of the
6        question.
7        A    I think you're asking me to construct a
8    hypothetical that I'm not prepared to
9    construct.
10           I think that all of these determinations
11   are dependent upon specific fact patterns as of
12   the date in which a value is being ascribed.  I
13   would need to know the fact pattern.
14   BY MR. ABEL:
15       Q    Am I correct that one of the extraordinary
16   assumptions that you made in this case was that
17   none of the artwork held by -- in the DIA
18   collection were subject to encumbrances that
19   would prevent their sale?
20       A    That's correct.
21           I -- let me check my report.  I believe
22   that's correct.
23           (Deposition Exhibit 8, Supplemental
24   Receipt and Commitment, marked for
25   identification as of this date.)

BY MR. ABEL:
1 Q    I'm showing a document marked deposition
3 Exhibit 8?
4      MR. PEREZ: A?
5      MR. ABEL: 8.
6 BY MR. ABEL:
7 Q    Have you ever seen this document before?
8 A    I have not.
9 Q    I represent to you this was produced in
10 this action.  This is a supplemental receipt
11 and commitment by the Founder Society of DIA
12 with regard to the receipt of certain art
13 assets from the Tannerhill Estate.
14      Do you recall the name Tannerhill in going
15 through the documents showing the inventory of
16 the DIA collection?
17 A    I do.
18 Q    Do you know what percentage of the DIA
19 collection is comprised by Tannerhill art
20 pieces?
21 A    I do not.
22 Q    Take a look at Page 2 of Exhibit 8.
23      Item 2 in the middle of the page reads
24 that the Arts Commission and the Founders
25 society, Detroit Institute of Arts, hereby

1 agree that the collection described in Exhibit
2 A attached hereto --
3 A    I'm sorry, I'm not.
4 Q    Middle of the page.
5 A    Of page?
6 Q    Two.
7 A    I was on the wrong page.  Sorry.
8 Q    It reads -- you see where I'm referring
9 to?
10 A    I do.
11 Q    "The Arts Commission, The Founders Society
12 Detroit Institute of Arts hereby agrees that
13 the collection described in Exhibit A attached
14 hereto in toto will be permanently retained
15 with the Detroit Institute of Arts with no
16 right of reservation on the part of either of
17 them or the City of Detroit at any time to sell
18 or otherwise depose of said collection or any
19 part therefore."
20      You see that?
21 A    That's correct.
22 Q    Is that an encumbrance that you were
23 referring to earlier to the art in question?
24 A    This is a legal determination, that I
25 don't know whether it was an encumbrance or

1 not.  It's certainly included in the gift,
2 whether that qualify as an encumbrance I'm
3 really not competent to determine.
4 Q    Well, am I correct that you assumed as
5 part of this case that there were no
6 encumbrances on any of the DIA collection; is
7 that right?
8 A    That is what is stated in my report.
9 Q    Does this document cause you to doubt that
10 assumption that you included in your report?
11 A    No.
12 Q    What would you need to do in order to
13 doubt the assumption in your report, having
14 read this document?
15 A    I would -- I would need some type of legal
16 determination.
17 Q    And if the assumption was in fact
18 incorrect and there were encumbrances on the
19 DIA collection, would that increase or decrease
20 its value?
21 A    What type of encumbrances?
22 Q    An encumbrance that prevents the sale of
23 the DIA collection or a piece of it thereof?
24 A    The value would remain the same, whether
25 the art could be sold or not is another story.

1 Q    In your opinion, do encumbrances usually
2 increase or decrease the value of a collection?
3 A    The values remain the same.
4 Encumbrances -- depending upon what the
5 specific encumbrances are, basically determine
6 whether the piece can be sold or not, but the
7 value is the same.
8 Q    So if an encumbrance prevents a piece of
9 art from being sold, wouldn't you agree with me
10 that the marketable cash value is zero?
11 A    Then the -- no.
12      The marketable cash value is what it is.
13 Whether the piece can be sold or not is another
14 story.
15 Q    You've never opined before that where
16 contracts or law prevent a piece of art from
17 being sold renders its value zero?
18 A    Have I opined in a report, according to
19 the verbiage that you have just ascribed or
20 whatever.
21 Q    Sure.  Let's rephrase it.
22      Have you ever opined that where a piece of
23 art cannot be sold for some reason that its
24 value is essentially zero?
25 A    No, I've never written that in my report.

1            (Deposition Exhibit 9, Article Entitled
2     "Unique Aspects of Appraising Large Scale Art,"
3     marked for identification as of this date.)
4  BY MR. ABEL:
5     Q    I'm showing you a document that's been
6  marked Exhibit 9.
7          Is this an article that you wrote entitled
8  "Unique Aspects of Appraising Large Scale Art"?
9     A    It is.
10    Q    Do you know when you wrote this?
11    A    I believe it was close to ten years ago,
12 but I'm not 100 percent certain since it's not
13 dated.
14    Q    And do you recall a dispute with regard to
15 the disposition of the Tiffany Dream Garden?
16    A    That is correct.
17    Q    Am I correct that as part of that dispute,
18 the original -- one of the owners of the dream
19 garden wanted to sell the dream garden mosaic
20 and one was unable to because there were
21 landmark hearings that prevented the sale?
22    A    That's correct.
23    Q    And am I correct, looking at Page 80, the
24 first full paragraph, you wrote in the second
25 sentence, "In point of fact during this period

1  the value of mosaic had changed from 10 million
2  or more which was a demonstrable value prior to
3  the landmark hearings to virtually zero while
4  the legal deliberations continued?
5     A    That's correct.
6     Q    Let's talk about another Fresco, the
7  Rivera Fresco.
8          Are you aware of the Rivera Fresco of the
9  DIA?
10    A    Am I aware of it?
11    Q    Yes.
12    A    Is that the question?
13          Yes.
14    Q    What is its name?
15    A    What is the name of the Fresco?
16    Q    Yes.
17    A    It is called "The Power of Industry."
18    Q    Did you discuss of the removal of the
19 Diego Fresco with anyone?
20    A    Did I discuss it with anyone?
21    Q    Yes.
22    A    I opined on the fact whether it could be
23 removed or not.  So we discussed it in
24 committee.
25    Q    And do you recall what that discussion was

1  in the committee?
2     A    Yes, I do.
3          The -- there were two issues.
4          You want me to state them?
5     Q    Did someone on the committee opine that
6  the Diego Rivera mural could be removed?
7     A    Yes.
8     Q    Who in the committee opined it could be
9  successfully removed?
10    A    I think that was decided on consensus.
11    Q    Who in the committee has experience in
12 removing large scale frescoes?
13    A    In removing large scale frescoes?
14    Q    Yeah.
15    A    That would mean that you would be directly
16 involved with removing the frescoes themselves,
17 or with the fact that frescoes could be
18 removed.
19    Q    Am I correct that one of the extraordinary
20 assumptions in your report was that the Diego
21 Rivera mural Detroit Industry can be removed
22 successfully?
23    A    That is correct, I believe.  I will check
24 my report to make sure it's written.
25    Q    Looking at Page 14.

1     A    Thank you.
2     Q    Extraordinary Assumption 3.
3     A    Yes.
4     Q    Okay.  And who in your committee -- who in
5  your team, had experience in the removal of
6  large scale frescoes?
7     A    When you say "experience," what exactly do
8  you mean?
9     Q    Let's make it easier.
10          Has anyone in your team at VWA ever been
11 involved in the removal of a large scale Fresco
12 before?
13    A    An active participant in the removal?
14    Q    Either actually removing the large scale
15 Fresco or advising someone else on removing the
16 large scale Fresco?
17    A    On having knowledge of removal of a large
18 scale Fresco.
19    Q    No, experience.
20          So either consulted on the removal or
21 actually removed it; anyone on your team have
22 that kind of experience?
23    A    Fresco, no; Mosaic, yes.
24    Q    Who on your team had experience with
25 removal of large scale Mosaic?

1  A    I am the person.
2  Q    You?
3  A    Yes.
4  Q    What large scale mosaics have you been
5  involved in the removal of?
6  A    I opined on the possibility of removing
7  the Dream Garden Mosaic in Philadelphia.
8  Q    Is that the only large scale Mosaic or
9  Fresco you've been involved in the removal of?
10  A    Personally, but that depended upon
11  knowledge and analysis of the Tiffany Mosaics
12  that had been removed.
13  Q    Am I correct that the Dream Garden Mosaic
14  in Philadelphia was originally designed for the
15  World Fair as being a -- from its inception a
16  piece of portable personal property?
17  A    The answer is no.
18  Q    You didn't write in your article the
19  unique aspects of appraising large scale art,
20  that despite, it's architectural structure --
21  sorry.  I'm talking about a different item.  I
22  think that's probably why we have confusion.
23      How large was the Dream Garden Mosaic?
24  A    If my memory serves me correctly, it was
25  18 feet tall by 40 feet wide.

1  Q    And how was it affixed to the wall of the
2  building in which it was located?
3  A    It was affixed in sections that were then
4  affixed to the wall.
5  Q    So when it was originally put on the wall,
6  it was already in sections, correct?
7  A    That is correct.
8  Q    How large is the River Fresco of the DIA?
9  A    I haven't, it's on -- first of all, the
10  Dream Garden Mosaic was on one wall.  I don't
11  know the measurements of Diego Rivera Fresco,
12  but judging from my knowledge of the rooms of
13  both, its -- they are both very large scale,
14  and I cannot give you the exact comparison of
15  the dimensions for the Diego Rivera Fresco.
16  Q    Am I correct that the Diego Fresco is
17  painted on the wall?
18  A    The Diego Rivera Fresco is painted on the
19  wall.
20  Q    It wasn't applied in sections like the
21  Dream Garden mural, correct?
22  A    That is correct.
23  Q    So in order to remove the Diego Fresco,
24  the Rivera Fresco, you would actually need to
25  cut the Diego Rivera Fresco in the middle or

1  along one of the parts; is that right?
2  A    No.
3  Q    Well, what did you do to make the
4  determination as to how you could remove the
5  Diego Rivera Fresco without damaging it?
6  A    I compared it to my knowledge of how other
7  frescoes have been removed in various
8  structures.
9  Q    Is it your opinion that you take the
10  entire wall on which the Fresco is situated and
11  remove it in toto?
12  A    Possibly.  You take a strata of the wall.
13  Q    What does that mean?
14  A    Strata is exactly what strata means.  It
15  means a layer of the wall.
16  Q    Did you talk to anyone to make a
17  determination as to whether that was possible
18  at the DIA?
19  A    No.
20  Q    Have you ever opined as an expert in the
21  removal of such a large Fresco before?
22  A    No.
23  Q    Doesn't USPAP require personal property
24  that is affixed to real property to be valued
25  as a part of the real estate if it cannot be

1  easily detached from the real estate?
2  A    USPAP advises the appraiser to take that
3  into consideration.
4  Q    You've opined on art restoration before,
5  haven't you?
6  A    I have.
7  Q    Would you agree with me that art
8  restoration is like plastic surgery in that
9  there have been many times where it has been
10  bungled and people have paid fortunes for it?
11  A    There have been some times where it hasn't
12  been done successfully.
13  Q    There's no guarantee that the Diego Rivera
14  Fresco could be removed and moved without
15  damages?
16  A    There's no guarantee of anything.
17  Q    Am I correct that the Diego Rivera Fresco
18  is tied to the City of Detroit?
19      MR. PEREZ:  Objection to the form of the
20  question.  Vague.
21  BY MR. ABEL:
22  Q    Do you believe that the Diego Rivera mural
23  has a special significance to the City of
24  Detroit?
25      MR. PEREZ:  Same objection.

BY MR. ABEL:

Q    You can answer.

A    I don't even understand.

Everything has special significance.

Q    Let me ask you a different question: Do you believe that there would be an uproar in the community about removing the Fresco from Detroit?

MR. PEREZ:  Object to the form of the question.

A    That requires speculation.  I believe that someone might -- people might be upset. Whether that qualifies as an uproar or not, I don't know.

BY MR. ABEL:

Q    How long did it take for the Philadelphia Landmarks department to resolve its dispute over whether or not the Tiffany Garden could be removed?

A    The Philadelphia Landmarks Commission did not resolve it.

Q    Was that issue ever resolved as to whether or not it could be moved?

A    In the settlement of the case, the part of the settlement was that the Pennsylvania

Academy of Fine Arts, that now owns the Dream Garden Mosaic, could remove it if they wished to.

Q    Do you have any opinion in this case as to whether or not there could be any legal action taken to prevent the removal of the Rivera frescoes under either local, state or national landmark designation requirements?

A    Looking at the evidence that was presented, we saw nothing in the -- I believe National Register of Historic places, that would prevent the removal of the Fresco.

Q    What evidence did you look at?

A    I believe we looked at the registry and, seeing what type of restrictions were listed on the registry, and made that determination from what we looked at.

Q    How much would it cost to remove the Diego Rivera Fresco from the wall of the DIA?

A    I assume it would be very costly.

Q    Do you have any estimate as to what the cost would be?

A    No, I would assume a million dollars or so or more.

Q    Did you include that transaction cost in

determining the marketable cash value for the Diego Rivera Fresco?

A    I did.

Q    And in coming to that conclusion, what specific cost did you determine would be involved in removing the Fresco as opposed to the costs of buyer's premiums and other issues?

A    It would probably be, I'd assume, in the range of 1 to $3 million, but I didn't conduct an exact survey of it.

Q    You mentioned that other rooms, Frescoes and murals have been removed during history in your report; is that right?

A    I did.

Q    Are you aware of any damage that was done to any of those murals, frescoes or rooms in the removal process?

A    Most of them have been removed successfully.

Q    You say most of them.

A    Correct.

Q    How many instances have there been where a large scale Fresco or mural had been removed from its location that was damaged in the process?

A    I can't think of any.

Would it be appropriate to take a break now?

Q    Sure.

A    I mean, I can hold out.

THE VIDEOGRAPHER:  Go off the record.  The time is 5:12.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record. The time is 5:20.

BY MR. ABEL:

Q    Sir, do you have any degree in economics?

A    No.

Q    Do you have a degree in business administration?

A    I have a designation as a certified association executive, which involves business administration, I presume.

Q    Where did you get that certification from?

A    That's a designation that's given by the National Association of Association Executives.

Q    Do any of the members of your team have a degree in economics?

A    As far as I know, no.  I think Shawn might have a minor in that, but I'm not 100 percent

1  sure.
2  Q   Any members of your team have an MBA?
3  A   Not that I know of.
4  Q   Any members of your team work for an
5  auction housework -- work for Sotherby's or
6  Christie's in the last ten years?
7  A   I don't believe so.
8  Q   Were you listening on the phone during the
9  Winston deposition?
10 A   No.
11 Q   To your knowledge, have you ever been
12 criticized by anyone in the art community?
13 A   Everybody criticized everyone else.
14     I don't know to what you're referring.
15 Q   Do you recall any specific criticisms to
16 any work that you performed by anyone in the
17 art community?
18 A   Any appraisal?
19 Q   Yeah.
20 A   Well, I do a lot of expert witness
21 testimony.  And there are -- when you're doing
22 an expert witness testimony, there are various
23 opinions about the quality of one's work,
24 especially the expert on the other side.
25 Q   Has your work, in any case in which you

1  provided expert opinion ever been criticized by
2  any court, arbitrator or tribunal?
3  A   No.
4  Q   Has any court, arbitrator, tribunal, on
5  which you have ever appeared to provide expert
6  advice, ever ignored your opinion?
7  A   No.
8  Q   Other than in the context of your expert
9  work, have your conclusions or appraisals ever
10 been criticized by anyone in the art community?
11 A   Can you rephrase that question.
12 Q   Sure.  Actually, I'll skip over it.
13     Looking at your report, again, pages --
14 starting on Page 31.  And, again, we're looking
15 at Exhibit 3.
16     Page 31 it starts, "State of the Current
17 Art Market."
18     Do you see that?
19 A   I do.
20 Q   Who drafted the section of your report
21 entitled "State of the Current Art Market,"
22 that runs from Page 31 until 41?
23 A   Page 31 to 41; is that what you said?
24 Q   Yes.
25 A   Okay.  I did, together with David Shapiro.

1  Q   What percentage of that was drafted by
2  you, as opposed to David Shapiro?
3  A   I think we both did equal amounts.
4  Q   Do you know which portions of that were
5  drafted by you as opposed to David Shapiro?
6  A   We worked on it together.
7  Q   Who's going to be testifying -- well,
8  strike that.
9     Who do you believe is the expert who will
10 be testifying at court regarding the opinions
11 expressed in your report?
12 A   I will.
13 Q   Do you believe you have the expertise
14 sufficient to opine on all of the subjects
15 identified in your report?
16 A   I do.
17 Q   You testified earlier that there were
18 issues with the data that provided to you
19 by the DIA; is that right?
20 A   I did.
21 Q   Was one of the issues you believed existed
22 was that the data you were provided was not
23 searchable?
24 A   That is correct.
25 Q   Did you try to search it?

1  A   We did.
2  Q   Was it a PDF?
3  A   It was.
4  Q   And was it a PDF containing approximately
5  17,000 pages?
6  A   It was.
7  Q   And how did you try to search it?
8  A   By trying to sort it in various
9  categories, and it wouldn't respond.
10 Q   Am I correct that searching is different
11 from sorting?
12 A   They're aligned together.
13 Q   Did you try to run a word search through
14 that $17,000 -- sorry, 17,000-page PDF for any
15 specific words?
16 A   Upon occasion we did.
17 Q   Was it searchable?
18 A   For specific words, I believe it was.
19 Q   So when you write in your report that the
20 data you were provided was not searched, well,
21 that was incorrect, right?
22 A   For the purposes that we needed it, no, it
23 was not searchable.
24 Q   It was searchable but not sortable,
25 correct?

1    A    Correct.
2    Q    But you testified and you indicated in
3    your report that it was not searchable; is that
4    right?
5         MR. PEREZ:  Object to the form of the
6    question.  Asked and answered.
7    BY MR. ABEL:
8    Q    You can answer.
9    A    I -- we did a -- random searches; it
10   wasn't useable for any substantive purpose.
11   Q    You also received a copy of a document
12   we've been referring to as the "insurance
13   list"; is that right?
14   A    That's right.
15   Q    That's a searchable document as well?
16   A    I believe so.
17   Q    Do you know when you received that
18   document?
19   A    I can't recall exactly, but I think it was
20   probably about a week before the report was
21   issued.
22   Q    You also identified an issue with some of
23   the information you provided -- you were
24   provided by the DIA in that the file had
25   various items label as "unknown American"; is

1    that right?
2    A    I did.
3    Q    When did you identify that issue with the
4    file?
5    A    I'm sorry?
6    Q    When did you identify that issue with the
7    file?
8    A    When did I identify the issue?
9    Q    Yes.
10   A    Basically, at the beginning of my work.
11   Q    Am I correct that -- and when did you
12   notify counsel of that issue with the file?
13   A    The same day I was retained.
14   Q    Am I correct that two days after you
15   identified the issue with that file you
16   received a new file with 17,000 pages with the
17   corrected information?
18   A    I did not receive it.  I don't know who
19   did.  And we did receive documentation
20   afterwards, but I understand there were still
21   problems with sorting it.
22   Q    Did you ever ask to discuss the DIA
23   collection with any curators at the museum?
24   A    Did I not.
25   Q    Why not?

1    A    Because it of the -- it was ascribed to me
2    that it was a rather hostile environment.
3    Q    You didn't even ask to talk with the
4    curators?
5    A    I believe I mentioned it would be a good
6    idea, and it wasn't followed through.
7    Q    Who didn't follow through with it?
8    A    I can't recall whether it was counsel or
9    not, but I expressed interest in doing it.
10   Q    Are you aware of any appraiser in history
11   ever performing a valuation of 60,000 works in
12   two weeks?
13   A    No.
14   Q    Did you feel rushed in performing your
15   appraisal?
16   A    I felt time constraints.
17   Q    Were you able to complete all of the work
18   that you wanted to complete --
19   A    I did.
20   Q    -- in this two weeks?
21   A    The answer to that question is yes.
22   Q    Anything that you didn't do that you
23   wanted to do had you had more time?
24   A    Work that we're doing at the moment.
25   Q    In forming your opinions as to the value

1    of the DIA collection, did you consider any
2    discount for a for sale?
3    A    It's stated in my report that we did not.
4    Q    Did you take into any delay in selling the
5    art?
6         MR. PEREZ:  Object to form of the
7    question.  Asked and answered.
8    A    I don't understand "any delay in selling
9    the art."
10   BY MR. ABEL:
11   Q    Well, let me take a step back.
12        You mentioned earlier that you're
13   currently doing work with regard to this
14   engagement.
15        What work are you doing currently?
16   A    As I testified earlier in the day, we
17   are -- we are examining works that we did not
18   appraise individually, and we are basically
19   reviewing specific works in the collection of
20   the DIA.
21   Q    In considering blockage discounts, am I
22   correct that you need to take into account how
23   much interest will be sacrificed in tying up
24   cash to purchase the arts, rather than letting
25   funds grow in a money market?

1 A    That is a consideration under certain
2 circumstances.
3 Q    And did you take that into consideration
4 in forming your opinion here?
5 A    We did not think blockage discount was
6 applicable, as I've testified on numerous
7 occasions today.
8    So, therefore, that determination was
9 extraneous.
10 Q    Did you take into account whether the
11 expected increase in the value for the art
12 would be offset by the interest sacrificed by a
13 purchase?
14 A    The answer to that question is the same as
15 the question before.
16 Q    Is the answer "no"?
17 A    No.
18 Q    Did you take into account how much money
19 it will devalue over time?
20 A    The answer is no, and the reason is stated
21 above.
22 Q    Did you take into account whether there
23 would be any storage charges or cost for
24 curatorial services connected with the DIA
25 collection?

1 A    In the context of blockage discount, no.
2 Q    Did you take that into account in any way?
3 A    No.
4 Q    Did you take into account whether the
5 Works of Art of DIA would deteriorate over time
6 and whether the services of surveyors would be
7 necessary?
8 A    No.
9 Q    Is Exhibit 3 your final report in this
10 case?
11 A    No.
12 Q    Do you have a supplemental report?
13 A    It -- this, I have to discuss with
14 counsel.
15 Q    Have you drafted something already?
16 A    At the moment, no.
17 Q    Would you like to submit a supplemental
18 report in this case?
19 A    Again, I'd have to discuss it with
20 counsel.
21 Q    I'm not asking what counsel want.
22    I'm asking:  If you feel it's necessary to
23 submit a supplemental report?
24 A    The report is called preliminary.  It
25 would be -- it would be nice to submit a

1 supplemental report.
2 Q    And when would you intend on submitting
3 that report if you had your druthers?
4 A    As soon as the report is ready.
5 Q    And when do you expect the report to be
6 ready?
7 A    I don't know, at this point.
8 Q    Do you know whether Christie's or
9 Sotherby's sells unattributed Works of Art?
10 A    On unattributed Works of Art?
11 Q    Yes.
12 A    Yes.
13 Q    Do you know whether Christie's or
14 Sotherby's sells Potshards?
15 A    Possibly.
16 Q    Do you know if they sell textile
17 fragments?
18 A    Possibly.
19 Q    So you're not sure?
20 A    It depends upon what's the specific
21 objects in question.
22 Q    Who would -- who do you believe would
23 purchase the DIA art collection from auction?
24 A    Are we talking about the entire
25 collection?

1 Q    Yes.
2 A    Am I understanding your question properly,
3 that if the collection were to be offered as a
4 whole or on block, who would the purchasers be
5 at auction?
6 Q    Yes.
7 A    I don't believe it would be offered at
8 auction.
9 Q    Are you aware of how the auction houses
10 advertise art that has been deaccessioned from
11 a museum for purposes of paying creditors or
12 paying operating expenses?
13 A    I don't think the auction houses make any
14 distinction on what the purpose of selling the
15 deaccession works are.  They just list it in
16 the provenance, if indeed they list it.
17 Q    Are you aware of whether or not an auction
18 houses auction Works of Art deaccessioned by
19 museum for purposes other than buying new art
20 that they refrain from indicating the museum
21 provenance whenever possible in their
22 advertisements?
23 A    Am I aware of that practice?
24 Q    Yes.
25 A    No, I'm not aware of that practice.

Page 354

1  Q    Have you ever talked to an auction house
2  how they would advertise an Work of Art that
3  had been deaccessioned from the museum other
4  than for the purposes of buying new art?
5  A    Perhaps.
6  Q    Well, the question is:  Have you or
7  haven't you had that conversation?
8  A    I'm not sure I understand the question.
9       The hypothetical or whatever, realistic
10 situation would be:  Have I spoken to auction
11 houses personnel about how they would handle
12 Works of Art that have been deaccessioned from
13 a museum that was deaccessioned not for the
14 purpose of adding revenue to the acquisition
15 fund.
16      Is that the question that you're asked?
17 Q    Yes.
18 A    And the question is:  Have I spoken to
19 auction house personal about that?
20 Q    Yes.
21 A    The answer is no.
22      MR. PEREZ:  Are we're done?
23      MR. ABEL:  I think we're done.
24      MR. PEREZ:  Thank you.
25      MR. ABEL:  Thank you.

Page 355

1       THE VIDEOGRAPHER:  That concludes today's
2  deposition of Victor Wiener.  The time is 5:36,
3  and that is the end of DVD No. 5.
4       (Time noted:  5:36 p.m.)
5
6       _____
                VICTOR WIENER
7
8  Subscribed and sworn to before me
9  this _____ day of _____, 2014.
10
11 _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 356

1            C E R T I F I C A T E
2  STATE OF NEW YORK        )
3                           :ss
4  COUNTY OF NEW YORK       )
5
6       I, MICHELLE COX, a Notary Public within
7  and for the State of New York, do hereby
8  certify:
9       That VICTOR WIENER, the witness whose
10 deposition is hereinbefore set forth, was duly
11 sworn by me and that such deposition is a true
12 record of the testimony given by the witness.
13      I further certify that I am not related to
14 any of the parties to this action by blood or
15 marriage, and that I am in no way interested in
16 the outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto set my
18 hand this 5th day of August 2014.
19                         _____
20                         _____
21                         MICHELLE COX, CLR
22
23
24
25

Page 357

1  Case Name:  In re:  City of Detroit, Michigan
2  Dep. Date:  August 4, 2014
3  Deponent:  VICTOR WIENER
4  Pg.  Ln.  Now Reads   Should Read   Reason
5  ___  ___  _____   _____   _____
6  ___  ___  _____   _____   _____
7  ___  ___  _____   _____   _____
8  ___  ___  _____   _____   _____
9  ___  ___  _____   _____   _____
10 ___  ___  _____   _____   _____
11 ___  ___  _____   _____   _____
12 ___  ___  _____   _____   _____
13 ___  ___  _____   _____   _____
14 ___  ___  _____   _____   _____
15 ___  ___  _____   _____   _____
16 ___  ___  _____   _____   _____
17
18            _____
19                 VICTOR WIENER
20
21 Subscribed and sworn before me
22 This_____ day of _____, 2014.
23
24 _____     _____
25 (Notary Public)     MY COMMISSION EXPIRES:

**Exhibit C**

## VALUATION CONCLUSIONS

In fulfillment of the appraisal assignment VWA reached the following valuation conclusion:

That the total value of the collection is **$8,552,395,675** and probably more than that.

The appraised total has been determined as of July 25th, 2014.

## METHODOLOGY DETERMINING VALUE CONCLUSIONS

**Methodology Step by Step Chart**

| | | | | |
|---|---|---|---|---|
| Step 1 | Valuation of High-Value Works by VWA | | | |
| | # of Units | Low Value | High Value | Average Value |
| | 387 | 3,092,419,700 | 4,040,303,800 | 3,566,361,750 |
| Step 2 | Valuation of other High-Value Works performed by independent third parties (e.g., Christie's, Artvest, and Winston) | | | |
| | # of Units | | | Average Value |
| | 616 | | | 434,357,825 |
| Step 3 | Projected valuation of other works as measured by DIA's Insurance Value, and estimated for appreciation | | | |
| | # of Units | DIA Insurance Value | % Appreciation | Projected Value |
| | 16,378 | 631,949,458 | 64.6% | 1,040,125,005 |
| Step 4 | Pricing matrix of remaining works based on average Christie's and Sotheby's sales price by department for 2013 | | | |
| | # of Units | | | Average Value |
| | 42,844 | | | 3,511,551,095 |
| Step 5 | Combined value | | | |
| | **# of Units** | | | **Total Average Value** |
| | **60,225** | | | **8,552,395,675** |

## ASSIGNMENT

The following section discusses:

- The background of the assignment, in which specifics of the appraisal assignment are discussed

- The decision to accept the assignment

- The specific qualifications of VWA in fulfilling the assignment

- Time restrictions dictating the nature of the Appraisal Report

**Exhibit D**

| DIA Accession No. | Christie OBS | Artvest OBS | Winston OBS | Artist | Title | DIA Insurance Value | Christie Average Value | Artvest Average Value | VWA Average Value | Winston Value | VWA Value or Independent Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01.2 | 7 | 385 | | John Mix Stanley | Indian Telegraph | 1,100,000 | | 1,000,000 | | 800,000 | 900,000 |
| 08.7 | | 8 | | John Henry Twachtman | The Pool | 1,000,000 | | 300,000 | | 200,000 | 250,000 |
| 08.8 | 9 | 45 | | Mary Cassatt | Woman Admiring a Child | 3,500,000 | | 1,375,000 | 3,150,000 | 3,250,000 | 1,500,000 |
| 08.9 | 10 | 116 | | Thomas Wilmer Dewing | The Recitation | 6,000,000 | | | | 400,000 | 1,700,000 |
| 09.15104I | | 328 | | Peter Paul Rubens | Saint Catherine of Alexandria | NULL | | | 25,000 | 50,000 | 25,000 |
| 09.15104T | | 459 | | Jacob Isaacksz van Ruisdael | Cottage on the Summit of the Hill | NULL | | | | 25,000 | 25,000 |
| 09.15382 | | | | Albrecht Dürer | Adam and Eve | NULL | | | 500,000 | | 500,000 |
| 09.15921 | | 441 | | Rembrandt Harmensz van Rijn | Self Portrait in a Cap and Scarf with the Face Dark: Bust | NULL | | | 21,500 | 6,000 | 21,500 |
| 09.15922 | | 444 | | Rembrandt Harmensz van Rijn | Self Portrait with Saskia | NULL | | | 75,000 | 15,000 | 75,000 |
| 09.15923 | | 442 | | Rembrandt Harmensz van Rijn | Self Portrait in a Velvet Cap with Plume | NULL | | | 30,000 | 7,500 | 30,000 |
| 09.15926 | | 395 | | Rembrandt Harmensz van Rijn | Abraham Casting Out Hagar and Ishmael | NULL | | | 23,000 | 15,000 | 23,000 |
| 09.15928 | | 394 | | Rembrandt Harmensz van Rijn | Abraham and Isaac | NULL | | | 20,000 | | 55,000 |
| 09.15929 | | 424 | | Rembrandt Harmensz van Rijn | Joseph Telling His Dreams | NULL | | | 20,000 | 750 | 20,000 |
| 09.15932 | | 400 | | Rembrandt Harmensz van Rijn | Angel Departing from the Family of Tobias | NULL | | | | 12,000 | 12,000 |
| 09.15933 | | 399 | | Rembrandt Harmensz van Rijn | Angel Appearing to the Shepherds | 500 | | | 26,000 | 25,000 | 26,000 |
| 09.15934 | | 396 | | Rembrandt Harmensz van Rijn | Adoration of the Shepherds | NULL | | | 32,500 | 3,500 | 32,500 |
| 09.15935 | | 448 | | Rembrandt Harmensz van Rijn | The Circumcision | NULL | | | 14,250 | 8,000 | 14,250 |
| 09.15936 | | 434 | | Rembrandt Harmensz van Rijn | Presentation in the Temple | NULL | | | 18,000 | 4,000 | 18,000 |
| 09.15937 | | 435 | | Rembrandt Harmensz van Rijn | Presentation in the Temple | NULL | | | 86,000 | 500 | 86,000 |
| 09.15939 | | 454 | | Rembrandt Harmensz van Rijn | Virgin and Child in the Clouds | NULL | | | 11,500 | 10,000 | 11,500 |
| 09.15940 | | 412 | | Rembrandt Harmensz van Rijn | Christ Disputing with the Doctors | NULL | | | 13,000 | 12,000 | 13,000 |
| 09.15941 | | 452 | | Rembrandt Harmensz van Rijn | Tribute Money | NULL | | | 16,500 | 4,000 | 16,500 |
| 09.15943 | | 413 | | Rembrandt Harmensz van Rijn | Christ Driving the Money Changers from the Temple | NULL | | | 25,000 | 15,000 | 25,000 |
| 09.15944 | | 414 | | Rembrandt Harmensz van Rijn | Christ Driving the Money Changers from the Temple | NULL | | | 25,000 | 3,500 | 25,000 |
| 09.15945 | | 409 | | Rembrandt Harmensz van Rijn | Christ and the Woman of Samaria | NULL | | | 50,000 | 6,000 | 50,000 |
| 09.15946 | | 408 | | Rembrandt Harmensz van Rijn | Christ and the Woman of Samaria Among Ruins | NULL | | | 15,500 | 1,000 | 15,500 |
| 09.15947 | | 436 | | Rembrandt Harmensz van Rijn | Raising of Lazarus | NULL | | | 12,000 | 8,000 | 12,000 |
| 09.15949 | | 415 | | Rembrandt Harmensz van Rijn | Christ with the Sick around Him, Receiving Little Children | 40,000 | | | 115,000 | 50,000 | 115,000 |
| 09.15953 | | 410 | | Rembrandt Harmensz van Rijn | Christ Carried to the Tomb | 1,500 | | | 15,000 | 8,000 | 15,000 |
| 09.15955 | | 437 | | Rembrandt Harmensz van Rijn | Return of the Prodigal Son | NULL | | | 18,500 | 6,000 | 18,500 |
| 09.15956 | | 405 | | Rembrandt Harmensz van Rijn | Beheading of John the Baptist | NULL | | | 6,500 | 1,000 | 6,500 |
| 09.15958 | | 445 | | Rembrandt Harmensz van Rijn | Stoning of Saint Stephen | NULL | | | 30,000 | 9,000 | 30,000 |
| 09.15959 | | 417 | | Rembrandt Harmensz van Rijn | Death of the Virgin | 15,000 | | | 45,000 | 5,000 | 45,000 |
| 09.15961 | | 438 | | Rembrandt Harmensz van Rijn | Saint Jerome Praying: Arched | NULL | | | 11,000 | 500 | 11,000 |
| 09.15965 | | 427 | | Rembrandt Harmensz van Rijn | Medea: Or the Marriage of Jason and Creusa | NULL | | | 40,000 | 1,000 | 40,000 |
| 09.1596X A | | 428 | | Rembrandt Harmensz van Rijn | Medea: Or the Marriage of Jason and Creusa | NULL | | | 40,000 | 2,500 | 40,000 |
| 09.15964 | | 403 | | Rembrandt Harmensz van Rijn | Bathers | NULL | | | 4,000 | 2,000 | 4,000 |
| 09.15965 | | 402 | | Rembrandt Harmensz van Rijn | Baptism of the Eunuch | NULL | | | 5,000 | 1,500 | 5,000 |
| 09.15968 | | 425 | | Rembrandt Harmensz van Rijn | Landscape with a Square Tower | NULL | | | 55,000 | 15,000 | 55,000 |
| 09.15969 | | 416 | | Rembrandt Harmensz van Rijn | Cottage beside a Canal: A View of Diemen | NULL | | | | 3,000 | 3,000 |
| 09.15972 | | 430 | | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | NULL | | | 50,000 | 3,000 | 50,000 |
| 09.15973 | | 433 | | Rembrandt Harmensz van Rijn | Old Man with Beard, Fur Cap, and Velvet Cloak | NULL | | | 14,500 | 2,000 | 14,500 |
| 09.15974 | | 432 | | Rembrandt Harmensz van Rijn | Old Man with a Divided Fur Cap | 25 | | | 28,000 | 3,000 | 28,000 |
| 09.15975 | | 426 | | Rembrandt Harmensz van Rijn | Man in an Arbour | NULL | | | 32,500 | 8,000 | 32,500 |
| 09.15976 | | 455 | | Rembrandt Harmensz van Rijn | Young Man in a Velvet Cap | NULL | | | | 1,000 | 1,000 |
| 09.15977 | | 439 | | Rembrandt Harmensz van Rijn | Samuel Manasseh: Ben Israel | NULL | | | 3,750 | 6,000 | 3,750 |
| 09.15977 50 | | 440 | | Rembrandt Harmensz van Rijn | Samuel Manasseh: Ben Israel | NULL | | | 3,750 | 4,000 | 3,750 |
| 09.15979 | | 422 | | Rembrandt Harmensz van Rijn | Jan Asselyn | NULL | | | 27,500 | 500 | 27,500 |
| 09.15980 | | 429 | | Rembrandt Harmensz van Rijn | Old Bearded Man in a High Fur Cap | NULL | | | 11,500 | 8,000 | 11,500 |
| 09.15981 | | 404 | | Rembrandt Harmensz van Rijn | Bearded Man in a Velvet Cap with a Jewel Clasp | NULL | | | 30,000 | 14,000 | 30,000 |
| 09.15982 | | 406 | | Rembrandt Harmensz van Rijn | Bust of a Man Wearing a High Cap, Three-Quarters Right: The Artist's Father (?) | NULL | | | 22,500 | 3,000 | 22,500 |
| 09.15984 | | 447 | | Rembrandt Harmensz van Rijn | The Artist's Mother Seated, at an Oriental Headdress Half Length | NULL | | | 15,000 | 1,000 | 15,000 |
| 09.15985 | | 446 | | Rembrandt Harmensz van Rijn | Studies of the Head of Saskia and Others | NULL | | | 10,000 | 9,000 | 10,000 |
| 09.15986 | | 451 | | Rembrandt Harmensz van Rijn | Three Heads of Women | NULL | | | 40,000 | 20,000 | 40,000 |
| 10.1 | 63 | 62 | | Frederic Edwin Church | Syria by the Sea | 6,000,000 | | | 11,000,000 | 12,500,000 | 6,000,000 |
| 10.21 | 296 | | | Birge Harrison | Fifth Avenue at Twilight | 125,000 | 200,000 | | | | 200,000 |
| 10.6 | 12 | 239 | | Willard Leroy Metcalf | Unfolding Buds | 1,500,000 | | 300,000 | | 400,000 | 350,000 |
| 11.5 | 14 | | | Childe Hassam | Place Centrale and Fort Cabanas, Havana | 2,000,000 | 550,000 | | 4,000,000 | | 4,000,000 |
| 13.9 | 302 | | | Robert Reid | The Miniature | 750,000 | 100,000 | | | | 100,000 |
| 14.5 | 18 | | | Jonas Lie | Looking Out | 800,000 | 450,000 | | | | 450,000 |
| 14.7 | | 449 | | Rembrandt Harmensz van Rijn | The Goldweigher's Field | NULL | | | 80,000 | 75,000 | 80,000 |
| 15.2 | 13 | 238 | | Willard Leroy Metcalf | The White Veil | 3,000,000 | | 1,000,000 | | 400,000 | 500,000 |
| 15.2 | 14 | 221 | | Paul Manship | Centaur and Dryad | 1,500,000 | | 70,000 | | 350,000 | 210,000 |
| 16.13 | 15 | 28 | | Salon Hannibal Borglum | Lassoing Wild Horses | 1,000,000 | | 125,000 | | 125,000 | 125,000 |
| 16.16 | 16 | 60 | | William Merritt Chase | Self Portrait | 1,000,000 | | 125,000 | | 300,000 | 112,500 |
| 16.31 | 17 | 17 | | Frank Weston Benson | My Daughter Elisabeth | 3,000,000 | | 2,000,000 | | 600,000 | 1,200,000 |
| 16.5 | 10 | | | William Morrit Chase | The Yield of the Waters | 6,000,000 | 550,000 | | 2,750,000 | | 2,750,000 |
| 17.15 | 18 | 15 | | George Wesley Bellows | A Day in June | 25,000,000 | | 27,500,000 | 29,000,000 | 12,000,000 | 29,000,000 |
| 19.148 | 15 | | | Robert Cozad Henri | The Young Girl | 1,750,000 | 750,000 | | 3,000,000 | | 3,000,000 |
| 19.149 | 16 | | | Robert Cozad Henri | The Beach Hat | 1,000,000 | 600,000 | | 1,200,000 | | 1,200,000 |
| 19.150 | 17 | | | Robert Cozad Henri | Boy with Plaid Scarf | 750,000 | 550,000 | | | | 550,000 |
| 19.19 | 19 | 177 | | Childe Hassam | Surf and Rocks | 2,000,000 | | 400,000 | | 300,000 | 350,000 |
| 19.34 | 20 | 145 | | Frederick Carl Frieseke | The Blue Gown | 2,000,000 | | 700,000 | | 900,000 | 600,000 |
| 19.36 | 299 | | | Elie Nadelman | Resting Stag | 300,000 | 450,000 | | | | 450,000 |
| 19.37 | 300 | | | Elie Nadelman | Wounded Stag | 750,000 | 350,000 | | | | 350,000 |
| 19.43 | 21 | 222 | | Paul Manship | Dancer and Gazelles | 1,200,000 | | 450,000 | | 450,000 | 350,000 |
| 19.66 | 22 | 144 | | James Earle Fraser | The End of the Trail | 1,200,000 | | 450,000 | | 350,000 | 400,000 |
| 1983.13 | | 172 | | Franz Ignaz Günther | Christ at the Column | NULL | | | | 300,000 | 300,000 |
| 1983.16 | | 39 | | Jean Baptiste Carpeaux | Genius of the Dance | NULL | | | 1,650,000 | 800,000 | 1,650,000 |
| 1983.21 | | 216 | | Maruyama Ōkyo | Entertainments of the Four Seasons in Kyoto | 150,000 | | | 2,250 | 60,000 | 2,250 |
| 1983.23 | 23 | 73 | | John Singleton Copley | George Boone Roupell | 1,000,000 | | 625,000 | 3,500,000 | 3,000,000 | 3,500,000 |
| 1983.24 | 1 | | | Fang | Mask | 2,000,000 | | 700,000 | | | 700,000 |
| 1983.25 A | | 571 | | Baltimore Painter | South Italian Century Vase | 150,000 | | | 150,000 | | 250,000 |
| 1983.5 | | 548 | | Unknown | Nok Theater Robe, Surihaku Type | 50,000 | | | 15,000 | 30,000 | 15,000 |
| 1983.31 1 | | 585 | | Sam Gilliam | The Art Maker I & 6 | 60,000 | | | | 40,000 | 40,000 |
| 1983.7 | | 580 | | Eskimo | Winged Object | 80,000 | | | | 125,000 | 125,000 |
| 1984.2 | | 543 | | Korean | Full Moon Jar | 300,000 | | | 90,000 | 1,400,000 | 90,000 |
| 1984.67 | | 489 | | Andre-Charles Boulle and his sons | Pedestal Clock | NULL | | | 250,000 | 300,000 | 250,000 |
| 1985.18 | | 270 | | Jody Pfaff | The Italians | 20,000 | | | | | 40,000 |
| 1985.24 | 176 | 305 | | Pierre Auguste Renoir | Woman in an Armchair | 14,000,000 | | 10,000,000 | 22,500,000 | 15,000,000 | 22,500,000 |
| 1985.25 | 177 | 299 | | Pierre Auguste Renoir | Clearing in the Woods | 2,500,000 | | 400,000 | 2,150,000 | 3,000,000 | 2,150,000 |
| 1985.30 | | 136 | | Richard Estes | Welcome to 42nd Street (Victory Theater) | 250,000 | | | 400,000 | 225,000 | 400,000 |
| 1986.18 | | 194 | | Max Ernst | Moonmad | 250,000 | | | 250,000 | 200,000 | 250,000 |
| 1986.25 | | 583 | | Huari | Tunic | 120,000 | | | | 50,000 | 50,000 |
| 1986.44 | 24 | 43 | | Mary Cassatt | Alexander J. Cassatt | 4,000,000 | | 1,250,000 | 3,500,000 | 750,000 | 3,500,000 |
| 1986.66 | | 164 | | Sam Gilliam | Grains | 16,000 | | | | 20,000 | 20,000 |
| 1987.75 | | 306 | | Louis Francois Roubiliac | Bust of Isaac Ware | 750,000 | | | 150,000 | 350,000 | 150,000 |
| 1987.93 | | 577 | | Navajo | Wearing Blanket | 125,000 | | | | 35,000 | 35,000 |
| 1988.1 | | 545 | | Korean | Head of Buddha | 250,000 | | | 60,000 | 250,000 | 60,000 |
| 1988.10 153 | | 560 | | Egyptian | The Head of Nes-Min, Section 13 | NULL | | | 11,250 | 250,000 | 11,250 |
| 1988.175 | 99 | 162 | | Alberto Giacometti | Standing Woman II | 40,000,000 | | 27,000,000 | 70,000,000 | 30,000,000 | 70,000,000 |
| 1988.176 | 125 | 278 | | Pablo Picasso | Seated Woman | 20,000,000 | | 17,500,000 | 20,000,000 | 10,000,000 | 20,000,000 |
| 1988.177 | 100 | 163 | | Willem de Kooning | Merritt Parkway | 25,000,000 | | 17,500,000 | 18,000,000 | 10,000,000 | 18,000,000 |
| 1988.178 | 126 | 274 | | Pablo Picasso | Fruit, Carafe and Glass | 5,000,000 | | 5,500,000 | 7,000,000 | 5,000,000 | 7,000,000 |
| 1988.18 | 101 | 243 | | Joan Mitchell | Before, Again II | 4,000,000 | | 4,000,000 | | 4,000,000 | 5,000,000 |
| 1988.62 | | 554 | | Choi Sokhwan | Grapevine | 125,000 | | | 17,500 | 25,000 | 17,500 |
| 1988.9 | 178 | 10 | | Jean-Frederic Bazille | Still Life with Fish | 1,000,000 | | 70,000 | | 350,000 | 475,000 |
| 1989.50 | | 216 | | Alvin Loving | J.E. and the Uptown A's | 35,000 | | | | 30,000 | 30,000 |
| 1989.76 A | | 37 | | Henry Kirke Brown | Filatrice | 150,000 | | | 22,500 | 25,000 | 22,500 |
| 1990.10 | 237 | | | Gioacchino Assereto | St. Francis of Assisi in Ecstasy before a Cherub with a Violin | 250,000 | 800,000 | | | | 800,000 |
| 1990.19 | | 524 | | Asante | Asante | 15,000 | | | | 4,000 | 4,000 |
| 1990.285 | 302 | | | Doccia Porcelain Factory | Apollo in his Chariot | 3,000,000 | 400,000 | | | | 400,000 |
| 1990.295 | | 533 | | Louis Comfort Tiffany | Jack-in-the-Pulpit Vase | 85,000 | | | 52,500 | 50,000 | 52,500 |
| 1991.1015 | 345 | 205 | | Paul Klee | Translucencies, Orange-Blue | 4,000,000 | | 1,250,000 | | 800,000 | 1,025,000 |
| 1992.1 | 102 | 215 | | Roy Lichtenstein | Interior with Mirrored Closet | 3,000,000 | | 3,500,000 | 13,500,000 | 8,000,000 | 13,500,000 |
| 1992.14 | | 345 | | Julian Schnabel | Cabalistic Painting | 250,000 | | | 60,000 | 100,000 | 60,000 |
| 1992.212 | | 46 | | Gaio Cancelliere | Quadro Fiorentino | 650,000 | | | 400,000 | 500,000 | 400,000 |
| 1992.214 | 262 | | | Beauford Delaney | Self Portrait | 75,000 | 30,000 | | | | 30,000 |
| 1992.223 | | 38 | | Jean Baptiste Carpeaux | Genius of Drama | 120,000 | | | 1,650,000 | | 3,500,000 |
| 1992.279 | 2 | 527 | | Shona Porcelain Manufactory | Fénélon, from the "Great Men" Series | 20,000 | 27,500 | | | | 27,500 |
| 1992.290 | | 527 | | Benin | Horse and Rider | 3,500,000 | | | 1,150,000 | | 815,000 |
| 1992.42 | 170 | | | Bartolomeo Bellano | Head of a Youth or Angel | 175,000 | 175,000 | | | | 175,000 |
| 1992.43 | | 279 | | Meissen Porcelain Manufactory | Teapot | 9,900 | 17,500 | | | | 17,500 |
| 1992.6 | 180 | 159 | | Henri Gervex | Café Scene | 1,000,000 | | 400,000 | | 500,000 | 650,000 |
| 1992.85 | | 135 | | Blue Cadillac | Mosaico | 18,000 | | | | | 6,250 |
| 1993.18 | 23 | 197 | | John Singer Sargent | Mosquito Nets | 18,000,000 | | 6,250,000 | 10,000,000 | 3,500,000 | 10,000,000 |
| 1993.19 | | 32 | | Leonaert Bramer | The Adoration of the Magi | 175,000 | | | 70,000 | 100,000 | 70,000 |
| 1993.24 | 6 | | | C.F.A. Voysey | Arm Chair | NULL | 11,000 | | | | 11,000 |
| 1993.49 | 283 | | | Robert Moskowitz | Hard Ball III | 90,000 | 35,000 | | | | 35,000 |
| 1993.77 A | | | | Joseph Cornell | Night Songs | NULL | | | 5,750,000 | | 5,750,000 |
| 1993.81 | | 115 | | Donald Sultan | Oranges on a Branch March 14, 1992 | 70,000 | | | 45,000 | 45,000 | 45,000 |
| 1994.3 | 31 | | | Milton Avery | Overland | 400,000 | 10,000 | | | | 10,000 |
| 1994.43 | | 11 | | Leon Bazile Perrault | Head of Balzac | 26,735 | | | 165,000 | 150,000 | 165,000 |
| 1994.57 | 171 | 302 | | Pierre Auguste Renoir | The Spanish Guitarist | 6,000,000 | | 6,000,000 | | 4,000,000 | 5,000,000 |
| 1994.79 A 1 | | | | Unknown | Pietre dure Cabinet | 1,000,000 | 1,050,000 | | | | 1,050,000 |
| 1994.79 A 4 | | | | Unknown | Blackamoor Stand | 45,000 | 8,000 | | | | 8,000 |
| 1994.8 | 25 | | | Thomas Worthington Whittredge | The Baptism | 60,000 | 60,000 | | | | 60,000 |
| 1994.9.1 A 32 | | | | Jewel Casket | | 1,000,000 | 30,000 | | | | 30,000 |
| 1994.97 A 52 | | 574 | | Unknown | Qu'ran Folios | 5,519 | | | | | 115,000 |
| 1995.26 | 28 | 178 | | Martin Johnson Heade | Seascape: Sunset | 2,700,000 | | 800,000 | | Unable to value | 800,000 |
| 1995.5 | 237 | | | Abbott Handerson Thayer | Angel | 600,000 | 400,000 | | | | 400,000 |
| 1997.47 | 267 | | | Reginald Marsh | Flowers in a Glass Vase | 80,000 | 4,000 | | 4,000 | | 4,000 |
| 1998.11 26 | | | | Lucas Cranach | Lucy Crucipere | 20,000,000 | | | 41,500,000 | | 41,500,000 |
| 1998.23 | 181 | 290 | | Vincent Willem van Gogh | Portrait of Postman Roulin | 90,000,000 | | 100,000,000 | 100,000,000 | | 100,000,000 |
| 1998.32 | 137 | | | Joseph Chinard | Madame Recamier | NULL | | | | 300,000 | 300,000 |
| 1997.1 | 298 | | | Louis Comfort Tiffany | Seated Woman | 150,000 | 60,000 | | | | 60,000 |
| 1997.72 A | 94 | 513 | | Louis Comfort Tiffany | Tall Case Clock | 350,000 | | | 110,000 | | 35,000 |
| 1998.1 | 280 | | | Shang Porcelain Manufactory | Baptistère | 500,000 | 35,000 | | | | 35,000 |
| 1997.47 1 2 | | | | Allan McCollum | Palace Door | 650,000 | | | 300,000 | 200,000 | 300,000 |
| 1998.1 | 200 | | | Caernavon Castle | | | 100,000 | 200,000 | | | 200,000 |
| 1998.6 | | 574 | | Ercole Ferrata | Portrait Bust of Ottaviano Acciaiuoli | 15,000,000 | | | | | 7,500,000 |
| 1998.65 | 182 | 98 | | Edgar Degas | Jockeys on Horseback before Distant Hills | 15,000,000 | 325,000 | | 6,000,000 | 7,500,000 | 7,500,000 |

| ID | | | Artist | Title | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1999.1 | | 294 | Martin Puryear | Untitled | 350,000 | | | | 250,000 | 250,000 |
| 1999.119.A | 127 | 124 | Raoul Dufy | The Allegory of Electricity | | | 2,000,000 | | 700,000 | 1,350,000 |
| 1999.119.B | | 477 | William T. Williams | The Flute Player | 75,000 | | | | 65,000 | 65,000 |
| 1999.79 | | 150 | Paul Gauguin | La Petite Parisienne | 62,000 | | | 550,000 | 100,000 | 550,000 |
| 20.100 | 265 | | Henry Raeburn | Mrs. Downe and Erskine, Twelfth Earl of Buchan | 30,000 | 375,000 | | | | 375,000 |
| 20.111 | 193 | | Pierre Auguste Renoir | Graziella | 5,000,000 | 2,400,000 | | 7,500,000 | | 7,500,000 |
| 20.113 | 344 | | Eugene Louis Boudin | View of Antibes | 140,000 | 160,000 | | | | 160,000 |
| 20.114 | 196 | | Alfred Sisley | Church at Moret after the Rain | 5,000,000 | 1,750,000 | | 4,000,000 | | 4,000,000 |
| 20.42 | | 473 | James Abbott McNeill Whistler | Robert Barr | 750,000 | | | 300,000 | 325,000 | 300,000 |
| 2000.44 | | 284 | Howardena Pindell | Autobiography: Air/CS560 | 65,000 | | | | 65,000 | 65,000 |
| 2000.65 | 281 | | Medoc Manufactory | Ewer (brocca) | 3,000,000 | 2,100,000 | | 1,800,000 | | 1,800,000 |
| 2001.1 | | 398 | Rembrandt Harmensz van Rijn | The Angel Appearing to the Shepherds | 550,000 | | | 29,000 | 25,000 | 29,000 |
| 2001.36 | 20 | | Severin Roesen | Flowers | 375,000 | 375,000 | | | | 375,000 |
| 2001.38 | | 340 | Augusta Savage | Gamin | 42,000 | | | | 35,000 | 35,000 |
| 2001.67 | 209 | 331 | Francois Rude | Departure of the Volunteers of 1792 (The Marseillaise) | 2,000,000 | | | 225,000 | 1,250,000 | 25,000 |
| 2001.70 | | 211 | George Cochran Lambdin | Roses on a Wall | 350,000 | | | | 100,000 | 100,000 |
| 2001.74 | 236 | | Islamic | Section of a Tile Panel | NULL | 100,000 | | | | 100,000 |
| 2001.9 | | 350 | Lorna Simpson | Coiffure | 20,000 | | | 25,000 | 17,500 | 25,000 |
| 2002.126 | | 466 | Corine Mac Worten | Not Manet's Type | 1,080 | | | 6,250 | 1,750 | 6,250 |
| 2002.136.11 | 290 | | Fletcher and Gardiner | Coffee Pot | NULL | 12,500 | | | | 12,500 |
| 2002.216 | | 261 | Claes Oldenburg | Inverted Q | NULL | | | | 75,000 | 75,000 |
| 2002.26.1 | | 349 | Lorna Simpson | Bathroom | NULL | | | 35,000 | 17,500 | 35,000 |
| 2003.11 | | 319 | Auguste Rodin | Vase of the Titans | NULL | | | 350,000 | 125,000 | 350,000 |
| 2004.14 | | 480 | Hale Woodruff | The Art of the Negro: Artists (Study) | NULL | | | | 150,000 | 150,000 |
| 2004.52 | | 474 | James Abbott McNeill Whistler | The Kitchen | 9,500 | | | 19,000 | 6,000 | 19,000 |
| 2005.1.1 | | 505 | Duncan Phyfe | Pair of Lyre Back Chairs | NULL | | | 125,000 | 14,000 | 125,000 |
| 2005.6 | | 275 | Donald Baechler | Untitled (Linen Flower # 1) | 2,250 | | | | 18,000,000 | 18,000,000 |
| 2005.60 | 128 | | Pablo Picasso | Girl Reading | 7,000,000 | | 20,000,000 | 40,000,000 | | 40,000,000 |
| 2005.62 | 129 | 229 | Henri Matisse | Anemones and Peach Blossoms | 15,000,000 | | 5,500,000 | | 4,000,000 | 4,750,000 |
| 2005.63 | | 103 | Edgar Degas | Seated Nude Woman Brushing Her Hair | NULL | | | 900,000 | 900,000 | 900,000 |
| 2005.72 | 27 | 154 | Thomas Wilmer Dewing | Commerce and Agriculture Bringing Wealth to Detroit | 1,500,000 | | 600,000 | | 250,000 | 425,000 |
| 2006.109 | | 544 | Gandhara | Bodhisattva Padmapani | NULL | | | 40,000 | 150,000 | 40,000 |
| 2006.133 | 130 | 123 | Raymond Duchamp-Villon | Le Cheval Majeur (The Large Horse) | 2,000,000 | | 1,000,000 | | 1,500,000 | 1,250,000 |
| 2006.87 | | 475 | James Abbott McNeill Whistler | Violet and Blue: Among the Rollers | NULL | | | 400,000 | 200,000 | 400,000 |
| 2007.145 | 5 | | Charles Ronnie Mackintosh | Chair | NULL | 300,000 | | 500,000 | | 500,000 |
| 2008.3 | 2 | | Georges de Feure | Vase | 60,000 | 5,000 | | | | 5,000 |
| 2010.106 | 103 | 133 | Philip Guston | Drawer | 2,000,000 | | 1,750,000 | | 1,000,000 | 1,000,000 |
| 2011.16 | | 343 | Sanford Robinson Gifford | On the Nile | 1,000,000 | | 2,000,000 | | 300,000 | 1,150,000 |
| 2011.2 | | 103 | Alison Saar | Blood/Sweat/Tears | 68,000 | | | | 7,500 | 7,500 |
| 21.102 | 291 | | Charles Rennie Mackintosh | Petunias | 500,000 | 300,000 | | | | 300,000 |
| 21.116 | 285 | | Honore Daumier | Le ventre legislatif | NULL | 20,000 | | | | 20,000 |
| 21.155 | 399 | | Jean Duvet | The Martyrdom of Saint John the Evangelist | NULL | 50,000 | | | | 50,000 |
| 21.17 | 359 | | Henry Baptiste Lebasque | On the Balcony | 90,000 | 600,000 | | 800,000 | | 600,000 |
| 21.180 | 332 | | Tang Di | Landscape | NULL | 950,000 | | 950,000 | | 950,000 |
| 21.181 | 333 | | Unknown | Landscape | NULL | 450,000 | | | | 450,000 |
| 21.182 | 127 | | Unknown | Virgin and Child Enthroned | NULL | 185,000 | | | | 185,000 |
| 21.184 | 273 | | Unknown | Crispina Istoriato | NULL | 14,000 | | | | 14,000 |
| 21.189 | 334 | | School of Burgundy | Saint Paul | NULL | 45,000 | | | | 45,000 |
| 21.192 | 274 | | Unknown | The Dream of Daniel | 450,000 | 50,000 | | | | 50,000 |
| 21.194 | 128 | | Unknown | Saint Catherine | NULL | 32,500 | | | | 32,500 |
| 21.196 | 275 | | Unknown | Dish | 50,000 | 25,000 | | | | 25,000 |
| 21.197 | 129 | | Unknown | Altar Cross | 30,000 | 185,000 | | | | 185,000 |
| 21.203 | 183 | | Oskar Kokoschka | The Elbe Near Dresden | 5,000,000 | 4,000,000 | | 4,000,000 | | 4,000,000 |
| 21.204 | 182 | | Ernst Ludwig Kirchner | Coastal Landscape on Fehmarn | 5,000,000 | 3,850,000 | | 3,500,000 | | 3,500,000 |
| 21.205 | 179 | | Erich Heckel | Woman | 5,000,000 | 750,000 | | | | 750,000 |
| 21.206 | 190 | | Max Pechstein | Under the Trees | 5,000,000 | 3,000,000 | | 6,500,000 | | 6,500,000 |
| 21.207 | 194 | | Karl Schmidt-Rottluff | Still Life, Cactus | 3,000,000 | 900,000 | | 1,000,000 | | 1,000,000 |
| 21.208 | 178 | | Lyonel Feininger | Sidewheeler II | 8,000,000 | 4,000,000 | | 6,000,000 | | 6,000,000 |
| 21.209 | 353 | | Erich Heckel | Sunflowers | 1,000,000 | 160,000 | | | | 160,000 |
| 21.21 | | 189 | Lippi Thompson | Toneyson's Princess | 5,000 | | | 2,850,000 | | 2,850,000 |
| 21.210 | 189 | | Otto Mueller | Bathers | 4,000,000 | 1,500,000 | | | | 1,500,000 |
| 21.213 | 356 | | Georg Kolbe | Resurrection | 250,000 | 175,000 | | | | 175,000 |
| 21.23 | 304 | | Bessie Potter Vonnoh | Allegresse | 150,000 | 80,000 | | | | 80,000 |
| 21.31 | 346 | | Charles Cottet | The Port of Douarnenez | 15,000 | 30,000 | | | | 30,000 |
| 21.34 | 191 | | Camillo Pissarro | The Path | 950,000 | 2,250,000 | | 6,500,000 | | 6,500,000 |
| 21.5 | 176 | | Edgar Degas | Dancers in the Green Room | 15,000,000 | 30,000,000 | | 80,000,000 | | 80,000,000 |
| 21.6 | 347 | | Edgar Degas | Dancers | 3,500,000 | 3,500,000 | | 6,000,000 | | 6,000,000 |
| 21.70 | 28 | 295 | William McGregor Paxton | Woman Sewing | 1,000,000 | | 400,000 | | 180,000 | 290,000 |
| 21.71 | 188 | | Claude Monet | Gladioli | 5,500,000 | 16,000,000 | | 22,500,000 | | 22,500,000 |
| 21.72 | 22 | | John Singer Sargent | Home Fields | 750,000 | 2,200,000 | | 3,400,000 | | 3,400,000 |
| 21.73 | 358 | | Henri Eugene Augustin Le Sidaner | The Tea Table | 800,000 | 650,000 | | 1,000,000 | | 1,000,000 |
| 21.79 | 315 | | Wilhelm Pleydenwurff | The Nuremberg Chronicle | 14,000 | 60,000 | | | | 60,000 |
| 21.8 | 183 | 105 | Edgar Degas | Portrait of a Woman | 1,000,000 | | 1,000,000 | 2,250,000 | 4,000,000 | 2,250,000 |
| 22.10 | 386 | | Francesco dal Libri | Madonna and Child | 85,000 | 190,000 | | | | 190,000 |
| 22.11 | 392 | | Antonazzo Romano | Madonna and Child | 150,000 | 75,000 | | | | 75,000 |
| 22.12 | 380 | | Andrea di Bartolo | Madonna and Child | 85,000 | 120,000 | | | | 120,000 |
| 22.13 | 197 | | Vincent Willem van Gogh | Self Portrait | 75,000,000 | 115,000,000 | | 155,000,000 | | 155,000,000 |
| 22.14 | 186 | | Henri Matisse | The Window | 30,000,000 | 50,000,000 | | 70,000,000 | | 70,000,000 |
| 22.15 | 116 | 218 | August Rodin | The Thinker | 12,000,000 | | 27,500,000 | 37,500,000 | 35,000,000 | 37,500,000 |
| 22.15 | 349 | | Raoul Dufy | Still Life | 500,000 | 85,000 | | | | 85,000 |
| 22.151 | 180 | | Ferdinand Hodler | A Woman | 500,000 | 300,000 | | | | 300,000 |
| 22.205 | 131 | | Niklaus Weckmann | Virgin and Child | NULL | 40,000 | | | | 40,000 |
| 22.206 | 132 | | Unknown | Saint Bridget of Sweden | NULL | 24,000 | | | | 24,000 |
| 22.213 | 319 | | A Stone Buddhist stele | Buddha with Attendants | 1,000 | 45,000 | | | | 45,000 |
| 22.223 | 372 | | Islamic | Carpet with a Large Octagon and Four Small Octagons | 1,000 | 37,500 | | | | 37,500 |
| 22.232 | 276 | | Georg Vest | The Ascension | 5,000 | 5,500 | | | | 5,500 |
| 22.245 | 63 | | Unknown | Roundel with Mermaid | 1,000 | 15,000 | | | | 15,000 |
| 22.246 | 64 | | Unknown | Roundel with Pair of Dragons | NULL | 22,500 | | | | 22,500 |
| 22.247 | 65 | | Unknown | Roundel with Pair of Birds | NULL | 22,500 | | | | 22,500 |
| 22.248 | 66 | | Unknown | Roundel with Lion Attacking a Deer | NULL | 15,000 | | | | 15,000 |
| 22.249 | 67 | | Unknown | Roundel with Lion Passant | NULL | 16,000 | | | | 16,000 |
| 22.254.1 | 68 | | Unknown | Console | 24,000 | 115,000 | | | | 115,000 |
| 22.277 | 335 | | Unknown | Pieta | 30,000 | 45,000 | | | | 45,000 |
| 22.279 | 133 | | Unknown | Drawing Room | 5,000 | 31,500 | | | | 31,500 |
| 22.29 | 62 | | Unknown | Drawing Room | NULL | 27,500 | | | | 27,500 |
| 22.3 | 380 | 133 | Michel Erhart | Virgin and Child | 2,000,000 | | 5,000,000 | | 2,500,000 | 3,750,000 |
| 22.30 | 130 | | Unknown | Virgin and Child with Donor | NULL | 37,500 | | | | 37,500 |
| 22.6 | 29 | 44 | Mary Cassatt | In the Garden | 5,000,000 | | 4,500,000 | 5,500,000 | 4,000,000 | 5,500,000 |
| 22.8 | 389 | | Andrea Previtali | Madonna and Child in Landscape | 150,000 | 425,000 | | | | 425,000 |
| 22.9 | 390 | | Antonio Rimpatta | Madonna and Child with the Infant Saint John the Baptist | 50,000 | 425,000 | | | | 425,000 |
| 23.100 | 30 | 152 | George Inness | Apple Orchard | NULL | | 400,000 | | 80,000 | 240,000 |
| 23.11 | 271 | | Tintoretto | The Dreams of Men | 800,000 | 2,500,000 | | 4,000,000 | | 4,000,000 |
| 23.27 | 255 | | Frans Hals | Portrait of a Woman | 3,000,000 | 4,000,000 | | 7,000,000 | | 7,000,000 |
| 23.30 | 201 | 82 | Lucas Cranach the Elder | Madonna and Child with Infant Saint John the Baptist and Angels | 1,000,000 | | 700,000 | | 6,000,000 | 3,850,000 |
| 24.103 | 347 | | Roman | Head of Bearded Man | 30,000 | 115,000 | | | | 115,000 |
| 24.105 | 308 | | Coptic | Head of a Bearded Man | 25,000 | 85,000 | | | | 85,000 |
| 24.106.A | 316 | | St. Kunruand and Camaldolese Monks | Choral Leaf Fragment: Historiated "A" with Six Monks Presenting a Book to an Enthroned Saint (?) | NULL | 6,750 | | | | 6,750 |
| 24.11 | 36 | | Greek | Flask | NULL | 11,750 | | | | 11,750 |
| 24.110 | 139 | | Bonino da Campione | Madonna and Child | 500,000 | 110,000 | | | | 110,000 |
| 24.113 | 40 | | Greek | Draped Female Figure | 200,000 | 425,000 | | | | 425,000 |
| 24.12 | 37 | | Painter of the Lowering Bulls | Skyphos | 1,500 | 9,750 | | | | 9,750 |
| 24.120 | 41 | | Leningrad Painter | Mixing Vessel | 50,000 | 70,000 | | | | 70,000 |
| 24.13 | 42 | | Swing Painter | Storage Jar | 20,000 | 65,000 | | | | 65,000 |
| 24.13 | 38 | | Tyskiewicz Painter | Jar depicting Aphrodite, Hera and Hermes | 20,000 | 115,000 | | | | 115,000 |
| 24.14 | 306 | | Greek, C | Neck Amphora | 20,000 | 40,000 | | | | 40,000 |
| 24.143 | 43 | | Larghetto Painter | Mixing Vessel | 20,000 | 14,000 | | | | 14,000 |
| 24.14 | | | Dotted Stripe Group, Greek | Fish Plate | 5,000 | 14,000 | | | | 14,000 |
| 24.2 | 31 | 354 | John Sloan | McSorley's Bar | 5,000,000 | | 1,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| 24.30 | 32 | 291 | Maurice Brazil Prendergast | Landscape with Figures | 3,500,000 | | 1,500,000 | | 850,000 | 1,175,000 |
| 24.72 | 361 | | Aristide Maillol | Standing Female | NULL | 50,000 | | | | 50,000 |
| 24.73 | 366 | | Aristide Maillol | Crouching Female | 6,000 | 140,000 | | | | 140,000 |
| 24.77 | 134 | | Unknown | Lamentation over the Dead Christ | 75,000 | 18,500 | | | | 18,500 |
| 24.79 | 135 | | Jacopo Sansovino | Madonna and Child with the Young Saint John | NULL | 2,750 | | | | 2,750 |
| 24.84 | 136 | | Antonio Abondio | Pieta with Two Cherubs | NULL | 2,750 | | | | 2,750 |
| 24.87 | 137 | | Valerio Belli | The Lamb of God | NULL | 1,300 | | | | 1,300 |
| 24.88 | 138 | | Valerio Belli | Mythological Subject | NULL | 1,250 | | | | 1,250 |
| 24.94 | 268 | | Nonino | The Procession to Calvary | 8,500,000 | 8,000,000 | | 9,500,000 | | 8,500,000 |
| 24.95 | 253 | | Benvenuto di Giovanni di Meo del Guasta | Virgin and Child with Angels | 90,000 | 2,500,000 | | | | 2,500,000 |
| 24.96 | 259 | | Master of Città di Castello | Madonna and Child | 75,000 | 1,750,000 | | | | 1,750,000 |
| 24.98 | 20 | | Gaudenzio Ferrari | Relief of Mourners and Funeral Meats | 300,000 | 137,500 | | | | 137,500 |
| 25.118 | 398 | | George Wesley Bellows | A Knockout, Second State | 75,000 | 75,000 | | | | 75,000 |
| 25.13 | 563 | | Egyptian | Head from an Anthropoid Sarcophagus | 20,000 | | | 112,500 | 180,000 | 112,500 |
| 25.145 | 387 | | Domenico di Michelino | The Trinity | 50,000 | 210,000 | | | | 210,000 |
| 25.147 | 144 | | Tino di Camaino | Madonna and Child | 1,000,000 | 150,000 | | | | 150,000 |
| 25.149 | 145 | | Unknown | Crucifix | 10,000 | 8,500 | | | | 8,500 |
| 25.151 | 336 | | Agostino di Giovanni | Madonna and Child with Angels | 150,000 | 160,000 | | | | 160,000 |
| 25.155 | 69 | | Unknown | Relief | NULL | 29,000 | | | | 29,000 |
| 25.156 | 70 | | Donatello | Coat of Arms of the Martelli Family | NULL | 35,000 | | | | 35,000 |
| 25.161 | 71 | | Unknown | Candelabrum Relief | NULL | 14,000 | | | | 14,000 |
| 25.176 | 406 | | Byzantine | Calendar of the Twelve Great Feasts of the Orthodox Church | NULL | 30,000 | | | | 30,000 |
| 25.18 | 140 | | Unknown | Angel Holding Candlestick | NULL | 100,000 | | | | 100,000 |
| 25.19 | 141 | | Unknown | Angel Holding Candlestick | NULL | 100,000 | | | | 100,000 |
| 25.3 | 72 | | Kongo | Knife Case and Lid | 8,000 | 500,000 | | | | 500,000 |
| 25.144 | 304 | | Niccolò Tribolo | Putto and Dolphins | 600,000 | 125,000 | | | | 125,000 |
| 25.164 | | | Egyptian | Head of a Woman | 1,800,000 | 1,200,000 | | | 1,800,000 | 1,200,000 |
| 25.30 | 337 | | Antonio Susini | Lion Attacking Horse | 100,000 | 360,000 | | | | 360,000 |
| 25.201 | 192 | | Odilon Redon | Evocation of Butterflies | 1,000,000 | 2,000,000 | | | | 2,000,000 |
| 25.205 | 252 | | Domenico Ghirlandaio | Saint Michael and the Angels at War with the Devil | 150,000 | 1,050,000 | | | | 1,050,000 |
| 25.26 | 273 | | Unknown | Young Man | 350,000 | 50,000 | | | | 50,000 |
| 25.207 | 202 | 379 | Giovanni Domenico Tiepolo | The Erection of Darius Invoking the Clemency of Alexander | 1,200,000 | | 3,000,000 | 4,500,000 | 4,000,000 | 4,500,000 |
| 25.208 | 201 | 84 | Carlo Crivelli | The Deposition of Christ | 3,000,000 | | 2,500,000 | | 2,500,000 | 2,500,000 |
| 25.36 | 300 | | Islamic | Figure of a Lion | 1,500,000 | | | | 57,000 | 57,000 |
| 25.4 | 250 | | Jan van Eyck | Saint Jerome in His Study | 10,000,000 | 6,000,000 | | 7,000,000 | | 7,000,000 |
| 25.41 | 263 | | Maso di Banco | Crucifixion with Saints | NULL | 1,000,000 | | | | 1,000,000 |
| 25.43 | 368 | | Mariotto di Nardo | Madonna and Child | 75,000 | 85,000 | | | | 85,000 |
| 25.5 | 201 | | Islamic | Bottle | 1,000 | 75,000 | | | | 75,000 |
| 25.6 | 19 | | George Benjamin Luks | Three Top Sergeants | 1,000,000 | 1,400,000 | | | | 1,400,000 |

| Ref | No. | No.2 | Artist | Title | Val 1 | Val 2 | Val 3 | Val 4 | Val 5 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 25.61 | 363 | | Ivan Mestrovic | Contemplation | NULL | 32,500 | | | | 32,500 |
| 25.63 | 369 | | Unknown | Buddha's Descent from the Trayastrimsas Heaven | 35,000 | 800,000 | | 800,000 | | 800,000 |
| 25.64 | 202 | | Islamic | Figure of a Courtier from a Palace Frieze | 75,000 | 775,000 | 1,500,000 | | | 1,500,000 |
| 25.63 | 248 | | Jan de Cock | Lot and His Daughters | 65,000 | 1,500,000 | | | | 1,500,000 |
| 25.61 | 142 | | Unknown | Capital: Sinner Fleeing from a Chimera | 5,000 | 4,000 | | | | 4,000 |
| 25.84 | 143 | | Unknown | Capital: Two Heads between Foliate Forms | NULL | 4,000 | | | | 4,000 |
| 26.10 | 292 | | Benin (I) | Warrior | NULL | 40,000 | | | | 40,000 |
| 26.106 | 393 | | Unknown | Adoration of the Magi, St. Severus and St. Walburga, St. James and St. Philip | 750,000 | 225,000 | | | | 225,000 |
| 26.107 | 272 | | Titian | The Appeal | 2,500,000 | 2,250,000 | | | | 2,250,000 |
| 26.108 | 254 | | Guercino (Giovanni Francesco Barbieri) | Christ and the Woman of Samaria | 30,000 | 150,000 | | | | 150,000 |
| 26.109 | 382 | | Jan van Coninxloo | The Crucifixion | NULL | 40,000 | | | | 40,000 |
| 26.11 | 293 | | Benin (II) | Warrior | NULL | 40,000 | | | | 40,000 |
| 26.110 | 269 | | Andrea Solario | Saint George and Saint Sebastian | 75,000 | 1,500,000 | | | | 1,500,000 |
| 26.111 | 391 | | Antonaiazzo Romano | Christ Enthroned, the Virgin, Saint Francesca Romana, an Angel and Donor | NULL | 120,000 | | | | 120,000 |
| 26.112 | 245 | | Cristofano Casalli | Saint Paul and Saint James the Elder | 95,000 | 500,000 | | | | 500,000 |
| 26.113 | 246 | | Cristofano Caselli | Saint Matthew and Saint Sebastian | 95,000 | 750,000 | | | | 750,000 |
| 26.114 | 240 | | Non di Bicci | Tobias and Three Archangels | 2,200,000 | 11,500,000 | 14,000,000 | | | 11,500,000 |
| 26.116 | 342 | | Mariano Andreu | Spanish Dancer | NULL | 40,000 | | | | 40,000 |
| 26.117 | 343 | | Mariano Andreu | The Bathers | 5,000 | 40,000 | | | | 40,000 |
| 26.119 | 147 | | Unknown | An Apostle | NULL | 21,000 | | | | 21,000 |
| 26.12 | 148 | | Unknown | The Flagellation | 110,000 | 37,500 | | | | 37,500 |
| 26.122 | 45 | | Roman | Torso of Apollo, Roman copy | 150,000 | 1,650,000 | 600,000 | | | 600,000 |
| 26.124 | 149 | | Francesco da Valdambrino | Corpus of Christ | 750,000 | 225,000 | | | | 225,000 |
| 26.126 | 150 | | Byzantine | Casket | 90,000 | 275,000 | | | | 275,000 |
| 26.126 | 320 | | Unknown | Guanyin | NULL | 600,000 | 700,000 | | | 700,000 |
| 26.129 | 321 | | Unknown | Bas-relief of a Horse | NULL | 30,000 | | | | 30,000 |
| 26.138 | 46 | | Unknown | Sarcophagus | NULL | 105,000 | | | | 105,000 |
| 26.139 | 309 | | Roman | Strigilated Sarcophagus with Figures of Salus & Asclepius | 30,000 | 45,000 | | | | 45,000 |
| 26.142 | 72 | | Unknown | Christ and the Symbols of the Four Evangelists | 2,500 | 70,000 | | | | 70,000 |
| 26.143 | 73 | | Unknown | Coat of Arms of Pope Leo X, of the Deputy Apostolic Legate in Bologna, Archbishop Altobello Averoldi of Brisighella, and of the town of Bologna | NULL | 24,000 | | | | 24,000 |
| 26.144 | 151 | | Unknown | Triennenna | NULL | 80,000 | | | | 80,000 |
| 26.145 | 152 | | Unknown | Triennenna | 20,000 | 80,000 | | | | 80,000 |
| 26.146 | 153 | | Unknown | Lion | NULL | 22,500 | | | | 22,500 |
| 26.148 | 74 | | Unknown | Fragment of a Relief | 2,500 | 17,500 | | | | 17,500 |
| 26.152 | 47 | | Byzantine | Adoration of the Kings | 5,000 | 1,250 | | | | 1,250 |
| 26.154 | 48 | | Palestinian | Ossuary | 15,000 | 5,500 | | | | 5,500 |
| 26.155 | 75 | | Unknown | Coat of Arms of the Neapolitan Branch of the Antinori Family | NULL | 26,500 | | | | 26,500 |
| 26.156 | 76 | | Unknown | Roundel With a Bird Attacking a Rabbit | 1,000 | 15,000 | | | | 15,000 |
| 26.157 | 77 | | Unknown | Relief Fragment with a Bird | 1,000 | 7,000 | | | | 7,000 |
| 26.158 | 154 | | Unknown | Madonna and Child with Saints and Angels | NULL | 8,500 | | | | 8,500 |
| 26.161 | 322 | | Unknown | Amida Buddha | 30,000 | 45,000 | | | | 45,000 |
| 26.17 | 405 | | Boris Grigoriev | Russian Peasant Girl | 1,000 | 1,050,000 | | | | 1,050,000 |
| 26.170 | 78 | | Unknown | Ciborium Fragment | NULL | 14,000 | | | | 14,000 |
| 26.177 | 79 | | Unknown | Relief Fragment | 50,000 | 1,150 | | | | 1,150 |
| 26.176 | 155 | | Bertoldo di Giovanni | Triumph of Love | 500 | 4,500 | | | | 4,500 |
| 26.179 | 156 | | Unknown | Triennenna | NULL | 70,000 | | | | 70,000 |
| 26.180 | 8 | | Benin | Royal Portrait | NULL | 275,000 | | | | 275,000 |
| 26.181 | 204 | | Islamic | Bowl | 60,000 | 100,000 | | | | 100,000 |
| 26.183 | 80 | | Unknown | Coat of Arms | 500 | 23,500 | | | | 23,500 |
| 26.187 | 81 | | Unknown | Roundel with Bird Attacking a Rabbit | 500 | 15,000 | | | | 15,000 |
| 26.188 | 82 | | Unknown | Roundel with Bird Attacking a Rabbit | NULL | 15,000 | | | | 15,000 |
| 26.189 | 83 | | Unknown | Roundel: Two Birds Flanking a Tree | NULL | 14,000 | | | | 14,000 |
| 26.190 | 84 | | Unknown | Roundel with Pair of Birds | 2,000 | 14,000 | | | | 14,000 |
| 26.191 | 85 | | Unknown | Roundel with Bird Attacking a Rabbit | NULL | 9,000 | | | | 9,000 |
| 26.192 | 86 | | Unknown | Roundel with Bird Attacking a Rabbit | NULL | 22,500 | | | | 22,500 |
| 26.193 | 87 | | Unknown | Roundel with Two Lions (?) in Combat | 500 | 26,500 | | | | 26,500 |
| 26.194 | 88 | | Unknown | Roundel with Horsemen in Combat with a Feline Animal | 1,000 | 15,000 | | | | 15,000 |
| 26.195 | 89 | | Unknown | Roundel with Bust of Christ | 1,100 | 2,000 | | | | 2,000 |
| 26.196 | 90 | | Unknown | Roundel with Fox Attacking a Sheep | 1,200 | 13,000 | | | | 13,000 |
| 26.197 | 91 | | Unknown | Roundel with Agnes Dei | 10,000 | 14,000 | | | | 14,000 |
| 26.20 | 400 | | Augustin Hirschvogel | Landscape with the Conversion of Saulus | NULL | 52,500 | | | | 52,500 |
| 26.200 | 92 | | Unknown | Roundel with a Feline Animal Attacking a Rabbit | 2,000 | 7,000 | | | | 7,000 |
| 26.201 | 93 | | Unknown | Roundel with Two Animals in Combat | NULL | 13,000 | | | | 13,000 |
| 26.202 | 94 | | Unknown | Coat of Arms, Probably of the 'Capitani del Bigallo' | NULL | 10,500 | | | | 10,500 |
| 26.203 | 95 | | Unknown | Coat of Arms of Federico da Montefeltro | 500 | 26,500 | | | | 26,500 |
| 26.204 | 96 | | Unknown | Coat of Arms, Probably of the Della Gherardesca Family | NULL | 6,500 | | | | 6,500 |
| 26.205 | 97 | | Unknown | Coat of Arms of the Brancaccio Imbriani Family | NULL | 21,000 | | | | 21,000 |
| 26.206 | 98 | | Unknown | Coat of Arms, Probably of the Nini Family | 1,000 | 9,000 | | | | 9,000 |
| 26.207 | 99 | | Unknown | Coat of Arms, Probably of the Tafuri | NULL | 7,500 | | | | 7,500 |
| 26.208 | 100 | | Unknown | Coat of Arms of the Swiss Luder Family and of the Lund Family, from Schleswig | NULL | 9,000 | | | | 9,000 |
| 26.209 | 101 | | Unknown | Coat of Arms of the Gazola Family | 1,000 | 10,500 | | | | 10,500 |
| 26.210 | 102 | | Unknown | Coat of Arms, unidentified Italian or possibly of the Michault de St-Mars Family | NULL | 9,000 | | | | 9,000 |
| 26.211 | 103 | | Unknown | Coat of Arms of the Medici Family | NULL | 7,000 | | | | 7,000 |
| 26.212 | 104 | | Unknown | Coat of Arms of the Pucci delle Stelle Family | NULL | 11,000 | | | | 11,000 |
| 26.213 | 105 | | Unknown | Coat of Arms of the Faschi Family | 1,500 | 11,500 | | | | 11,500 |
| 26.214 | 106 | | Unknown | Coat of Arms of the Courtot de Cissey Family | NULL | 10,500 | | | | 10,500 |
| 26.215 | 107 | | Unknown | Coat of Arms of Federico da Montefeltro | NULL | 12,500 | | | | 12,500 |
| 26.216 | 108 | | Unknown | Keystone | 1,200 | 7,000 | | | | 7,000 |
| 26.217 | 109 | | Unknown | Coat of Arms of Niccolo Sottile (?) | NULL | 17,500 | | | | 17,500 |
| 26.218 | 110 | | Unknown | Decorative Relief | NULL | 3,000 | | | | 3,000 |
| 26.219 | 111 | | Unknown | Relief Panel with Birds and Lions | NULL | 16,000 | | | | 16,000 |
| 26.22 | 467 | 204 | Jan Baptist Weenix | Still Life with a Dead Swan | 400,000 | | 200,000 | | | 200,000 |
| 26.220 | 112 | | Unknown | Relief Fragment | NULL | 15,000 | | | | 15,000 |
| 26.221 | 113 | | Unknown | Coat of Arms, probably of the Suarez Family | NULL | 17,500 | | | | 17,500 |
| 26.223 | 114 | | Unknown | Window Frame | NULL | 35,000 | | | | 35,000 |
| 26.225 | 115 | | Unknown | Lunette | NULL | 20,000 | | | | 20,000 |
| 26.28 | 49 | | Villanovan | Pin | 1,000 | 500 | | | | 500 |
| 26.28 | 198 | | Maurice de Vlaminck | Marine | 80,000 | 550,000 | | | | 550,000 |
| 26.296 | 247 | | Jean Simeon Chardin | Still Life with Dead Hare | 1,500,000 | 6,000,000 | 8,500,000 | | | 8,500,000 |
| 26.3 | 205 | 461 | Jacob Isaaksz van Ruisdael | The Jewish Cemetery | 50,000,000 | | 8,000,000 | 22,500,000 | 5,000,000 | 22,500,000 |
| 26.30 | 366 | | Paul Signac | Port Louis | 250,000 | 40,000 | | | | 40,000 |
| 26.31 | 367 | | Paul Signac | The Seine | 100,000 | 40,000 | | | | 40,000 |
| 26.33 | 154 | | Auguste Herbin | Still Life | 100,000 | 42,500 | | | | 42,500 |
| 26.369 | 294 | | Papuan Gulf | Ceremonial Shield | NULL | 50,000 | | | | 50,000 |
| 26.37 | 295 | | Sawos | Ceremonial House Post | NULL | 400,000 | | | | 400,000 |
| 26.385 | 206 | 327 | Peter Paul Rubens | Philippe Rubens, the Artist's Brother | 25,000,000 | | 7,500,000 | 7,500,000 | 6,000,000 | 7,500,000 |
| 26.387 | 207 | 221 | Master of the St. Lucy Legend | Virgin of the Rose Garden | 4,000,000 | | 4,000,000 | 7,000,000 | 4,000,000 | 7,000,000 |
| 26.464 | 3 | | Simon Gate | Bowl | 25,000 | 1,250 | | | | 1,250 |
| 26.5 | 208 | 197 | Willem Kalf | Still Life with Columbine Goblet | 1,500,000 | | 600,000 | | 750,000 | 675,000 |
| 26.7 | 202 | | Roa i Abbasi | Pair of Doors | 50,000 | 125,000 | | | | 125,000 |
| 26.74 | 378 | | Dante Gabriel Rossetti | A fight for a Woman | NULL | 75,000 | | | | 75,000 |
| 26.89 | 23 | | Thomas Sully | Dr. Edward Hudson | NULL | 37,500 | | | | 37,500 |
| 26.9 | 24 | | Thomas Sully | Mrs. Edward Hudson | 300,000 | 55,000 | | | | 55,000 |
| 26.94 | 209 | 90 | Correggio | The Mystic Marriage of Saint Catherine | 1,750,000 | | 1,500,000 | | 5,000,000 | 3,250,000 |
| 26.95 | 157 | | Unknown | Tomb Effigy of a Recumbent Knight | NULL | 80,000 | | | | 80,000 |
| 27.150 | 285 | | Nino Pisano | Madonna and Child | 15,000,000 | | 7,000,000 | 2,500,000 | 600,000 | 2,500,000 |
| 27.156 | 33 | 87 | Arthur Bowen Davies | Dances | 1,000,000 | | 400,000 | 225,000 | | 225,000 |
| 27.159 | 301 | | Maurice Brazil Prendergast | Promenade | 1,750,000 | 3,000,000 | 4,250,000 | | | 4,250,000 |
| 27.160 | 175 | | Augustus Edwin John | The Mumpers | 500,000 | 425,000 | | | | 425,000 |
| 27.2 A | 376 | | Michelangelo | Scheme for the Decoration of the Ceiling of the Sistine Chapel | 4,000,000 | 16,000,000 | 32,500,000 | | | 32,500,000 |
| 27.260 | 266 | | Rembrandt Harmensz van Rijn | The Visitation | 65,000,000 | 70,000,000 | 100,000,000 | | | 100,000,000 |
| 27.269 | 249 | | Gerard Dorud | The Annunciation | 750,000 | 4,500,000 | 5,000,000 | | | 5,000,000 |
| 27.262 | 1 | 81 | Gustave Courbet | Bather Sleeping by a Brook | 1,750,000 | 2,500,000 | 6,500,000 | | | 4,000,000 |
| 27.208 | 50 | | Roman | Sarcophagus with Winged Victories Holding Plaque | 40,000 | 115,000 | | | | 115,000 |
| 27.210 | 158 | | Arnolfo di Cambio | Angel | 20,000 | 22,500 | | | | 22,500 |
| 27.211 | 310 | | Roman | Head of a Man | 80,000 | 190,000 | | | | 190,000 |
| 27.216 | 311 | | Roman | Cinerary Urn | 15,000 | 32,500 | | | | 32,500 |
| 27.216 | 51 | | Roman | Fish | 500 | 21,000 | | | | 21,000 |
| 27.218 | 117 | | Unknown | Sarcophagus | 500 | 9,500 | | | | 9,500 |
| 27.229 | 118 | | Unknown | Coat of Arms of the Pasqui or possibly Bernardi Family | NULL | 11,000 | | | | 11,000 |
| 27.221 | 119 | | Unknown | Coat of Arms, possibly of the Guiacchini Family | NULL | 11,000 | | | | 11,000 |
| 27.224 | 120 | | Unknown | Coat of Arms, Governor of Duren | NULL | 18,500 | | | | 18,500 |
| 27.273 | 205 | | Islamic | 'Dragon' Rug | NULL | 110,000 | | | | 110,000 |
| 27.274 A | 51 | | Roman | Earring | 2,000 | 4,750 | | | | 4,750 |
| 27.275 A | 52 | | Roman | Earring | 3,000 | 6,500 | | | | 6,500 |
| 27.4 | 53 | | Micali Painter | Storage Jar | 25,000 | 55,000 | | | | 55,000 |
| 27.5 | 210 | 29 | Sandro Botticelli | The Resurrected Christ | 3,000,000 | | 1,250,000 | 5,500,000 | 3,000,000 | 5,500,000 |
| 27.514 | 34 | 383 | Dwight William Tryon | Autumn | 300,000 | 40,000 | | | | 40,000 |
| 27.515 | 35 | 384 | Dwight William Tryon | Summer | 300,000 | 150,000 | | | | 150,000 |
| 27.516 | 36 | 115 | Thomas Wilmer Dewing | Summer | 3,000,000 | 3,000,000 | 400,000 | | | 400,000 |
| 27.560 | 121 | | Michelangelo | Saint George | 30,000 | 150,000 | | | | 150,000 |
| 27.561 | 122 | | Michelangelo | Dying Slave | 30,000 | 150,000 | | | | 150,000 |
| 27.562 | 123 | | Philippe Magnier | Nymph and Eros | 30,000 | 30,000 | | | | 30,000 |
| 27.563 | 124 | | Antoine Coysevox | Le Fleuve la Garonne | 30,000 | 200,000 | | | | 200,000 |
| 27.567 | 211 | 262 | Titian | Man Holding a Flute | 2,500,000 | | 250,000 | 7,000,000 | 5,000,000 | 7,000,000 |
| 27.541 | 337 | | Anonymous | Scene from 'The Tale of Genji': from the chapter 'The Maiden' | 200,000 | 500,000 | | | | 500,000 |
| 27.542 | 338 | | Anonymous | Seishi, the Wisdom of Amida, Seated on Lotus Pedestal | NULL | 30,000 | | | | 30,000 |
| 27.545 | 339 | | Anonymous | Amida, Jizo, Seishi, Kwannon, and Six Bodhisattvas | NULL | 42,000 | | | | 42,000 |
| 27.546 | 340 | | Anonymous | Seated Nyoirin Kwannon | NULL | 80,000 | | | | 80,000 |
| 27.547 | 341 | | Anonymous | Seated Eleven-headed Kwannon | NULL | 90,000 | | | | 90,000 |
| 27.569 | 37 | 79 | John Singleton Copley | Mrs. Clark Gayton | 1,250,000 | | 1,000,000 | 3,500,000 | 3,750,000 | 3,500,000 |
| 27.573 | 26 | | Unknown | Arm Chair | NULL | 22,500 | | | | 22,500 |
| 27.586 A | 547 | | Nepalese | Manuscript of the 'Perfection of Transcendent Wisdom in Eight Thousand Verses' Text | 300,000 | | | 30,000 | 60,000 | 30,000 |
| 28.100 | 368 | | Maurice Utrillo | The Country House | 200,000 | 60,000 | | | | 60,000 |
| 28.102 | 26 | | Giorgio de Chirico | Gladiators and Lion | 3,500,000 | 3,000,000 | 3,000,000 | | | 3,000,000 |
| 28.103 | 365 | | Gino Severini | Still Life | 20,000 | 60,000 | | | | 60,000 |
| 28.114 | 184 | | Max Kalish | Young Woman Sewing | 250,000 | 40,000 | | | | 40,000 |
| 28.115 | 239 | | Giovanni Bellini | Madonna and Child | 7,000,000 | 7,000,000 | 11,000,000 | | | 11,000,000 |
| 28.129 | 262 | | Master of the Games | Female Head | NULL | 100,000 | | | | 100,000 |
| 28.132 | 370 | | Unknown | Yamantaka and Minor Deities | 30,000 | 35,000 | | | | 35,000 |
| 28.141 | 27 | | Unknown | Gilding Table | 20,000 | 6,000 | | | | 6,000 |
| 28.144 | 384 | | John Crome | View near Weymouth | 15,000 | 150,000 | | | | 150,000 |
| 28.145 | 207 | | Islamic | Dish | 20,000 | 90,000 | | | | 90,000 |
| 28.147 | 163 | | Unknown | Reliquary | NULL | 210,000 | | | | 210,000 |
| 28.150 | 371 | | Anonymous | Attendant Deity | NULL | 200,000 | | | | 200,000 |
| 28.151 | 199 | 551 | Unknown | Brahma-Shiva | 175,000 | 3,000,000 | 3,500,000 | 6,000,000 | | 3,500,000 |
| 28.184 | 195 | | Renee Sintenis | Donkey | 15,000 | 25,000 | | | | 25,000 |
| 28.186 | 401 | | Edward Hopper | The Locomotive | 125,000 | 82,500 | | | | 82,500 |

| Ref | No.1 | No.2 | Artist | Title | V1 | V2 | V3 | V4 | V5 |
|---|---|---|---|---|---|---|---|---|---|
| 28.67 | 123 | | Unknown | Four Heads of Buddhist Divinities | NULL | 65,000 | | | 65,000 |
| 28.79 | 159 | | Jean-Baptiste-François Croisier | Mantel Clock | 100,000 | 14,000 | | | 14,000 |
| 28.81.1 | 160 | | Jean Houré | Sconce | NULL | 70,000 | | | 70,000 |
| 28.83 | 161 | | Unknown | Vase | 30,000 | 140,000 | | | 140,000 |
| 28.88 | 162 | | François-Joseph Duret | Flora | NULL | 57,500 | | | 57,500 |
| 28.94 | 206 | | Islamic | Dish | 18,000 | 16,000 | | | 16,000 |
| 28.94 | 251 | | Jan Fyt | Dead Game and Wreath | 100,000 | 135,000 | | | 135,000 |
| 28.95 | 258 | | Nicolas Lancret | The Repast of the Hunting Party | 500,000 | 300,000 | | | 300,000 |
| 28.96 | 348 | | Andre Derain | Bay of Costal | 100,000 | 55,000 | | | 55,000 |
| 28.97 | 177 | | Andre Derain | Young Girl | 145,000 | 55,000 | | | 55,000 |
| 28.99 | 357 | | Marie Laurencin | Mother and Child | 200,000 | 200,000 | | | 200,000 |
| 29.1 | | 557 | Chan Xuan | Early Autumn | 500,000 | | 175,000 | 350,000 | 175,000 |
| 29.172 | 125 | | Unknown | Sakyamuni Emerging from the Mountains | 750,000 | 750,000 | | 750,000 | 750,000 |
| 29.214 | 277 | | Unknown | Standing Bowl | NULL | 13,500 | | | 13,500 |
| 29.224 | 208 | | Persian | Mirror with Benedictory Inscription | 1,500 | 400 | | | 400 |
| 29.225 | 209 | | Islamic | Mirror with a Harpy | 2,000 | 1,200 | | | 1,200 |
| 29.227 | 210 | | Islamic | Mirror with Flying Phoenixes | 2,000 | 925 | | | 925 |
| 29.233.A | 373 | | Egyptian | Portion of a Carpet | NULL | 75,000 | | | 75,000 |
| 29.245 | 324 | | Unknown | Buddha | NULL | 1,400,000 | 1,500,000 | | 1,500,000 |
| 29.250 | 28 | | William Savery | Arm Chair | NULL | 30,000 | | | 30,000 |
| 29.252 | 29 | | John E. Elliott | Mirror | NULL | 7,500 | | | 7,500 |
| 29.256 | 243 | | Gerard Ter Borch | Young Man Reading a Letter | 1,800,000 | 3,250,000 | 4,000,000 | | 4,000,000 |
| 29.259 | 25 | | Alexander Helwig Wyant | Summer Landscape | 75,000 | 27,500 | | | 27,500 |
| 29.260 | 11 | | William Merritt Chase | The Wrestling Boy | 125,000 | 2,000,000 | 4,500,000 | | 4,500,000 |
| 29.264 | 212 | 463 | Diego Rodríguez de Silva Velázquez | A Man | 7,000,000 | | 5,500,000 | 750,000 | 3,125,000 |
| 29.297 | 211 | | Islamic | Inkwell | 10,000 | 100,000 | | | 100,000 |
| 29.301.A | 317 | | The Annunciation | Antiphonary Leaf: Historiated "M" with Annunciation | NULL | 42,500 | | | 42,500 |
| 29.302.A | 318 | | The Assumption | Antiphonary Leaf: Historiated "V" with Assumption | NULL | 42,500 | | | 42,500 |
| 29.308 | 286 | | Alexander Roed | Tankard | NULL | 6,500 | | | 6,500 |
| 29.309 | 287 | | David King | Two-Handled Cup | NULL | 6,500 | | | 6,500 |
| 29.312 | 288 | | William Cripps | Epergne | 150,000 | 40,000 | | | 40,000 |
| 29.313 | 374 | | Islamic | Double-niche rug | NULL | 125,000 | | | 125,000 |
| 29.315 | 241 | | Giovanni del Biondo | Angel Annunciate | 65,000 | 1,125,000 | | 1,125,000 | 1,125,000 |
| 29.316 | 242 | | Giovanni del Biondo | Virgin Annunciate | 40,000 | 1,500,000 | | 1,500,000 | 1,500,000 |
| 29.318 | 397 | | Antonio Vivarini | Scene from the Life of a Female Saint | NULL | 35,000 | | | 35,000 |
| 29.320 | 238 | | Andrea di Bartolo | Christ in Benediction | 120,000 | 300,000 | | | 300,000 |
| 29.321 | 364 | | Edvard Munch | Boy in blue | 750,000 | 1,150,000 | | | 1,150,000 |
| 29.322 | 174 | | Max Beckmann | Still Life with Fallen Candles | 1,050,000 | 500,000 | | | 500,000 |
| 29.324 | 345 | | Giorgio de Chirico | Horses | 100,000 | 275,000 | | | 275,000 |
| 29.327 | 350 | | James Ensor | Le Ballet Féerique (Le Jardin D'Amour) | 800,000 | 160,000 | | | 160,000 |
| 29.330 | 362 | | Aristide Maillol | Venus | 80,000 | 40,000 | | | 40,000 |
| 29.331 | 184 | | Georg Kolbe | Assunta | 1,000,000 | 400,000 | | | 400,000 |
| 29.333 | 164 | | Unknown | Saint John the Evangelist | NULL | 85,000 | | | 85,000 |
| 29.342 | 325 | | Unknown | Lady with Phoenix Headdress | 8,000 | 35,000 | | | 35,000 |
| 29.347 | 360 | | Wilhelm Lehmbruck | Standing Female Figure | 200,000 | 55,000 | | | 55,000 |
| 29.348 | 165 | | Francesco Fanelli | Don Gaspar de Guzman, Duke of San Lucar, known as the Count-Duke of Olivares (1587-1645) | 95,000 | 225,000 | | | 225,000 |
| 29.355 | 166 | | Luca della Robbia | Madonna and Child | 8,000,000 | 340,000 | | | 340,000 |
| 29.356 | 297 | | Carl Milles | Folke Filbyter | 10,000 | 75,000 | | | 75,000 |
| 29.357.A | 298 | | Carl Milles | Europa and the Bull | 50,000 | 275,000 | | | 275,000 |
| 29.386 | 212 | | Islamic | Fragment of a Tiraz Textile with Multiple Inscriptions (illegible) | 800 | 4,250 | | | 4,250 |
| 29.392 | 213 | | Islamic | Fragment of a Tiraz Textile | 500 | 1,000 | | | 1,000 |
| 29.41 | 394 | | Luca Signorelli | The Resurrected Christ Appearing to St. Magdalene | 250,000 | 125,000 | | | 125,000 |
| 29.42 | 395 | | Luca Signorelli | The Resurrected Christ Appearing to His Disciples | 250,000 | 125,000 | | | 125,000 |
| 29.425 | 326 | | Unknown | Ceremonial Wine Vessel | 150,000 | 450,000 | | | 450,000 |
| 29.430 | 402 | | Edward Hopper | Night in the Park | 125,000 | 90,000 | | | 90,000 |
| 29.443 | 327 | | Unknown | Buddha Triad with Mandorla | 50,000 | 105,000 | | | 105,000 |
| 29.444 | 328 | | Unknown | Prateoka Buddha | NULL | 700,000 | 700,000 | | 700,000 |
| 29.274 | 385 | | Unknown | Portrait of an Artist | 7,000 | 35,000 | | | 35,000 |
| 30.280 | 264 | | Antoine Le Nain | The Village Piper | 750,000 | 250,000 | | | 250,000 |
| 30.283 | 355 | | Paul Klee | Woman Reading | 600,000 | 100,000 | | | 100,000 |
| 30.285 | 351 | | Oscar Gmglia | The Artificial Rose | 25,000 | 65,000 | | | 65,000 |
| 30.291 | 132 | 199 | Max Klus | Man in a Fur Coat | 1,000,000 | | 110,000 | 60,000 | 83,000 |
| 30.293 | 213 | 264 | Parmigianino | The Circumcision | 4,500,000 | | 22,500,000 | 7,000,000 | 3,000,000 |
| 30.296 | 12 | | Thomas Cowperthwaite Eakins | Dr. Eleanor C. Wood | 3,000,000 | 2,500,000 | 3,000,000 | | 3,000,000 |
| 30.297 | 270 | | Michael Sweerts | In the Studio | 2,400,000 | 7,500,000 | 14,000,000 | | 14,000,000 |
| 30.322 | 11 | | William James Glackens | The Promenade | 450,000 | 500,000 | | | 500,000 |
| 30.323 | 214 | | Islamic | Qur'an | 100,000 | 1,350,000 | 2,250,000 | | 2,250,000 |
| 30.359 | 403 | | Rembrandt Harmensz van Rijn | Abraham's Sacrifice | 50,000 | 50,000 | | | 50,000 |
| 30.362 | 404 | | Rembrandt Harmensz van Rijn | Abraham Entertaining the Angels | NULL | 50,000 | | | 50,000 |
| 30.370 | 214 | 392 | Rembrandt Harmensz van Rijn | Christ | 2,500,000 | | 250,000 | 250,000 | 250,000 |
| 30.371 | 54 | | Egyptian | Relief of Peasants Driving Cattle and Fishing | 150,000 | 225,000 | | | 225,000 |
| 30.372 | 312 | | Egyptian | A Middle Kingdom Dignitary | 100,000 | 55,000 | | | 55,000 |
| 30.373 | 55 | | Egyptian | Scarab | 5,000 | 52,500 | | | 52,500 |
| 30.374 | 244 | | Pieter Bruegel the Elder | The Wedding Dance | 60,000,000 | 150,000,000 | 175,000,000 | | 175,000,000 |
| 30.380 | 352 | | George Grosz | Conversation | 120,000 | 37,500 | | | 37,500 |
| 30.416 | 215 | | Islamic | Bottle made for the Rasulid Sultan Husdr al-Din in Yemen | 75,000 | 1,850,000 | 2,450,000 | | 2,450,000 |
| 30.421 | 216 | | Islamic | Bowl inscribed "Wealth" | 50,000 | 90,000 | | | 90,000 |
| 30.411 | 217 | | Islamic | Mirror with Benedictory Inscription | 1,000 | 9,250 | | | 9,250 |
| 30.412.A | 218 | | Islamic | Salt Cellar inscribed with Poem about Salt | 500 | 85,000 | | | 85,000 |
| 30.433 | 219 | | Islamic | Mirror Case | 1,000 | 1,650 | | | 1,650 |
| 30.434 | 220 | | Islamic | Mortar | 700 | 1,500 | | | 1,500 |
| 30.437 | 221 | | Persian | Lamp with Benedictory Inscription | 2,000 | 925 | | | 925 |
| 30.438 | 222 | | Islamic | Lamp with Benedictory Inscription | 2,000 | 925 | | | 925 |
| 30.439.A | 223 | | Islamic | Ewer inscribed "Prosperity, favor" | 3,000 | 1,500 | | | 1,500 |
| 30.442 | 224 | | Islamic | Pierced-work Lamp Section with Benedictory Inscription | 6,000 | 3,000 | | | 3,000 |
| 30.442 | 225 | | Islamic | Spigot | 1,000 | 2,750 | | | 2,750 |
| 30.446 | 226 | | Islamic | Seven-wick Lamp | 1,500 | 37,500 | | | 37,500 |
| 30.447 | 227 | | Islamic | Base of a Lamp Stand with Benedictory Inscription | 15,000 | 8,500 | | | 8,500 |
| 30.46 | 228 | | Iranian | Vase | 2,000 | 2,100 | | | 2,100 |
| 30.457 | 228 | | Islamic | Jug | 12,000 | 9,750 | | | 9,750 |
| 30.460 | 229 | | Islamic | Bowl | 12,000 | 37,500 | | | 37,500 |
| 30.461 | 230 | | Islamic | Bowl | 1,000 | 4,000 | | | 4,000 |
| 30.462 | 231 | | Islamic | Bowl Inscribed "Increasing Prosperity, Wealth" | 1,500 | 4,250 | | | 4,250 |
| 31.25 | 95 | 540 | Neo-Babylonian | Snakk-Dragon, Symbol of Marduk, the Patron God of Babylon; Panel from the Ishtar Gate | 5,000,000 | | 50,000,000 | 55,000,000 | 15,000,000 |
| 31.27 | 38 | 58 | William Merritt Chase | My Little Daughter Dorothy | 1,250,000 | | 4,000,000 | 250,000 | 2,125,000 |
| 31.347 | 234 | | Islamic | Carved Panel, possibly from a cenotaph | 5,000 | 27,500 | | | 27,500 |
| 31.349 | 235 | | Islamic | Tile with Lotus Blossoms | 1,500 | 14,000 | | | 14,000 |
| 31.54 | 232 | | Islamic | Dish | 800 | 4,000 | | | 4,000 |
| 31.55 | 233 | | Islamic | Ewer | 1,000 | 160,000 | | | 160,000 |
| 31.70 | | 565 | Egyptian | Seated Scribe | 50,000 | | | 40,000 | 175,000 |
| 34.153 | | 380 | Tintoretto | Study after Michelangelo's Saint Damian | NULL | | | 40,000 | 175,000 |
| 34.186 | 219 | 248 | Frans Janez Post | View of the Araraci Canal, Olinda, Brazil | 4,000,000 | | 6,000,000 | 6,000,000 | 3,000,000 |
| 34.191 | 216 | 8 | Bacchiacca (Francesco Ubertini Verdi) | Saint John the Baptist in the Wilderness | 20,000,000 | | 5,000,000 | 7,000,000 | 5,000,000 |
| 34.27 | 39 | 470 | James Abbott McNeill Whistler | Arrangement in Gray: Portrait of the Painter | 13,000,000 | | 22,500,000 | 20,000,000 | 13,500,000 |
| 35.122 | 217 | 381 | Titian | Copy | 50,000 | | | 25,000 | 120,000 |
| 35.163 | | 209 | Master of the Pietà | Crucifixion and the Virgin Annunciate | 7,000,000 | 2,500,000 | | | 1,200,000 |
| 35.11 | 40 | 121 | Thomas Doughty | In Nature's Wonderland | 7,000,000 | | 2,500,000 | | 75,000 |
| 35.119 | 508 | Paul Revere II | Sugar Basket | 80,000 | | 30,000 | 50,000 | 30,000 |
| 35.40 | 507 | Paul Revere II | Creamer | 75,000 | | 30,000 | 30,000 | 50,000 |
| 35.41 | 572 | Islamic | Folio from the Great Mongol Shahnama: Ardashir Battles Bahman, Son of Ardavan | 600,000 | | | 500,000 | unable to value | 500,000 |
| 35.54 | 218 | 107 | Pensionante del Saraceni | The Fruit Vendor | 6,000,000 | | 700,000 | 750,000 | 725,000 |
| 36.30 | 219 | 289 | Nicolas Poussin | Selene and Endymion | 12,000,000 | 30,000,000 | 34,000,000 | 8,000,000 | 8,000,000 |
| 36.11 | 218 | | Alessandro Magnasco | Satyrs on a Nobleman in Misery | 900,000 | | 900,000 | | 500,000 |
| 36.14 | 220 | 464 | Paolo Veronese | The Muse of Painting | 3,000,000 | | 1,800,000 | | 750,000 |
| 36.30 | 221 | 92 | Emanuel de Witte | Interior of the Oude Kerk in Amsterdam | 1,300,000 | | | | 750,000 |
| 36.31 | 41 | 296 | Frederic Sackrider Remington | The Mountain Man | 3,000,000 | | 6,000,000 | | 6,000,000 |
| 37.11 | 302 | 287 | Polbausto | Judith | 5,000,000 | | 6,000,000 | | 6,000,000 |
| 37.147 | 135 | 143 | Hugo Carlmoth-Rottluff | Rain Clouds, Lago di Garda | 2,000,000 | | 800,000 | | 825,000 |
| 37.2 | 295 | 460 | Jacob Isaacksz van Ruisdael | Farm and Haystack on a River | 1,500,000 | | 3,500,000 | 3,000,000 | 3,000,000 |
| 37.21 | 19 | 16 | Albrecht Bouts | Man of Sorrows | 3,000,000 | | 2,800,000 | 700,000 | 950,000 |
| 37.22 | 222 | | Islamic | Interior of the Grote Kerk, Haarlem | 1,000,000 | | 700,000 | | 500,000 |
| 37.55 | 303 | 523 | Unknown | Vase | | | | | 700,000 |
| 37.74 | 509 | Paul Revere II | Tankard | 225,000 | | | | 150,000 |
| 37.92 | 396 | | Turner da Verona | Crucifixion | 225,000 | 150,000 | | | 225,000 |
| 38.3 | | 438 | Rembrandt Harmensz van Rijn | Descent from the Cross by Torchlight | 150,000 | | 65,000 | | 20,000 |
| 38.56 | 223 | 275 | Giovanni Battista Piazzetta | Madonna and Child with an Adoring Figure | 1,500,000 | | 2,500,000 | | 1,750,000 |
| 38.58 | 250 | | Unknown | Pitcher | 2,500,000 | | | | 2,500,000 |
| 39.60 | 42 | | William Sydney Mount | The Banjo Player | 1,500,000 | 8,500,000 | | | 7,500,000 |
| 39.80 | 383 | | Bernardino dei Conti | Gentleman of the Trivulzio Family | 350,000 | 400,000 | | | 400,000 |
| 39.77 | 211 | | Jacques de Gheyn II | Studies of the Heads of Two Youths and an Old Woman | NULL | | 65,000 | | 65,000 |
| 39.6 | 43 | 129 | Asher Brown Durand | Monument Mountain, Berkshires | 1,500,000 | | 150,000 | | 250,000 |
| 39.657 | 167 | | Unknown | Writing Table | 30,000 | 7,500 | | | 7,500 |
| 40.161 | 98 | 558 | Shen Zhou | Ode to the Pomegranate and Melon Vine | 3,500,000 | | 250,000 | 700,000 | 550,000 |
| 40.166 | 224 | 14 | Bernardo Bellotto | View of the Tiber in Rome with the Castel Sant'Angelo | 6,500,000 | | 7,000,000 | 22,500,000 | 19,000,000 |
| 40.19 | 304 | 119 | Donatello | Madonna and Child | 8,000,000 | | 4,500,000 | | 3,750,000 |
| 40.47 | 57 | | Egyptian | Head of a Man | 100,000 | | 250,000 | | 250,000 |
| 40.49 | 58 | | Egyptian | Head of a Man | 150,000 | | 375,000 | | 375,000 |
| 40.55 | 59 | | Egyptian | Cinerary Urn | 150,000 | 42,500 | | | 42,500 |
| 40.5 | | 352 | Adriaen van Ostade | Wandering Musicians | NULL | | | | 1,000,000 |
| 40.56 | | 354 | Michel Sittow | Catherine of Aragon as the Magdalene | 2,250,000 | | 4,000,000 | | 4,000,000 |
| 40.56 | 44 | 184 | Winslow Homer | Girl and Laurel | 8,000,000 | | 2,000,000 | | 3,000,000 |
| 40.58 | 136 | 202 | Ernst Ludwig Kirchner | Winter Landscape in Moonlight | 4,000,000 | | 6,000,000 | 12,000,000 | 9,000,000 |
| 41.1 | | 153 | Michael Wohlgemut | A Young Man | 30,000 | | | | 50,000 |
| 41.10 | 226 | | Claude Gellée | Sunrise | 1,400,000 | | 1,500,000 | | 750,000 |
| 41.126 | 227 | 228 | Master of the Legends of Sibyl | Crucifixion | 1,000,000 | | 125,000 | | 125,000 |
| 41.135 | 228 | 236 | John Singleton Copley | Colonel John Montresor | 3,000,000 | | 825,000 | 2,500,000 | 1,750,000 |
| 41.145 | 228 | 186 | Francisco Goya | Doña Amalia Bonells de Costa | 6,500,000 | | 9,000,000 | | 6,500,000 |
| 41.80 | | 549 | Unknown | Parvum | | | | | 75,000 |
| 41.87 | 152 | | Claude Gellée | A Seaport at Sunset | 1,000,000 | | | | 3,750,000 |
| 41.116 | 152 | | Claude Gellée | Elements of Toledo and Her Son | 3,000,000 | | 12,000,000 | 22,500,000 | 17,000,000 |
| 42.59 | 46 | 133 | Asher Brown Durand | View of Rutland, Vermont | 3,000,000 | | 200,000 | | 175,000 |
| 43.38 | 231 | 36 | Canaletto | The Piazza San Marco | 800,000 | | 2,500,000 | 2,750,000 | 2,500,000 |
| 43.418 | 232 | 234 | Unknown | The Piazza San Marco | 4,000,000 | | | | 350,000 |
| 43.477 | 108 | | Andrea della Robbia | Head of a Youth | 400,000 | | 1,500,000 | | 125,000 |
| 43.486 | 47 | 59 | William Merritt Chase | Portrait of a Lady in Black | 2,500,000 | | 200,000 | 125,000 | 162,500 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 44.165 | 9 | | | Washington Allston | The Flight of Florimell | 300,000 | 350,000 | | | | 350,000 |
| 44.213 | | 233 | 377 | Giovanni Battista Tiepolo | Saint Joseph and the Christ Child | 1,200,000 | | 4,000,000 | 2,500,000 | 2,000,000 | 2,500,000 |
| 44.219 | 260 | | | School of Florence | The Agony in the Garden | 15,000 | 125,000 | | | | 125,000 |
| 44.220 | 261 | | | School of Florence | Pilate Washing his Hands | 1,500 | 125,000 | | | | 125,000 |
| 44.266 | | 234 | 326 | Peter Paul Rubens | Hygeia, Goddess of Health | 20,000,000 | | 6,000,000 | 11,000,000 | 10,000,000 | 11,000,000 |
| 44.271 | | 137 | 35 | Heinrich Campendonk | In the Forest | 2,500,000 | | 2,000,000 | | 2,500,000 | 2,250,000 |
| 44.5 | | 48 | 175 | Marsden Hartley | Log Jam, Penobscot Bay | 1,000,000 | | 600,000 | 3,000,000 | 800,000 | 3,000,000 |
| 44.9 | | | 204 | Francisco Goya | The Men in Sacks | NULL | | | | 800,000 | 800,000 |
| 44.90 | | 184 | | Paul Klee | Reclining | 1,500,000 | | 700,000 | | | 700,000 |
| 45.120 | 60 | | | Roman | Bull Statuette | 75,000 | 42,500 | | | | 42,500 |
| 45.130 | 313 | | | Roman | Oscillum with Satyr and Maenad | 25,000 | 65,000 | | | | 65,000 |
| 45.368 | | | 453 | Rembrandt Harmensz van Rijn | Triumph of Mordecai | 30,000 | | | 16,000 | 50,000 | 16,000 |
| 45.369 | | | 423 | Rembrandt Harmensz van Rijn | Jan Lutma, Goldsmith | NULL | | | 150,000 | 6,000 | 150,000 |
| 45.370 | | | 421 | Rembrandt Harmensz van Rijn | Golf Player | NULL | | | 24,000 | 2,500 | 24,000 |
| 45.420 | | 235 | 387 | Joos van der Beke van Cleve | Adoration of the Magi | 6,500,000 | | 6,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| 45.454 | | 49 | 257 | Georgia O'Keeffe | Stables | 1,800,000 | | 2,750,000 | | 2,000,000 | 2,375,000 |
| 45.455 | | 50 | 348 | Charles Sheeler | Home Sweet Home | 8,000,000 | | 350,000 | | 350,000 | 350,000 |
| 45.469 | | 51 | 267 | Rembrandt Peale | Self Portrait | 1,000,000 | | 150,000 | 350,000 | 225,000 | 350,000 |
| 45.514 | | | 110 | Andrea della Robbia | Madonna and Child | 500,000 | | | 1,650,000 | 950,000 | 1,650,000 |
| 46.134 | | 52 | 65 | Thomas Cole | From the Top of Kaaterskill Falls | 1,000,000 | | 7,000,000 | 6,000,000 | 900,000 | 6,000,000 |
| 46.135 | | 53 | 179 | Martin Johnson Heade | Sunset | 1,500,000 | | 850,000 | | 650,000 | 750,000 |
| 46.145 | | | 277 | Pablo Picasso | Le combat | 29,800 | | | | 17,500 | 17,500 |
| 46.173 | | | 450 | Rembrandt Harmensz van Rijn | The Rest on the Flight: A Night Piece | NULL | | | 7,000 | 10,000 | 7,000 |
| 46.174 | | | 443 | Rembrandt Harmensz van Rijn | Self Portrait in a Velvet Cap with Plume | 50,000 | | | 30,000 | 20,000 | 30,000 |
| 46.260 | 61 | | 568 | Etruscan | Bronze Statuette of a Rider | 200,000 | 85,000 | | | 550,000 | 317,500 |
| 46.309 | | 54 | 472 | James Abbott McNeill Whistler | Nocturne in Black and Gold, the Falling Rocket | 35,000,000 | | 35,000,000 | 50,000,000 | 8,000,000 | 50,000,000 |
| 46.310 | | 55 | 78 | John Singleton Copley | Watson and the Shark | 10,000,000 | | 17,500,000 | 22,500,000 | 2,000,000 | 22,500,000 |
| 46.359 | | 236 | 388 | Rogier van der Weyden | Saint Jerome in the Desert | 3,000,000 | | 400,000 | | 600,000 | 500,000 |
| 46.56 | | 237 | 339 | Sassetta | The Betrayal of Christ | 4,000,000 | | 5,000,000 | | 3,000,000 | 4,000,000 |
| 47.122 | | 56 | 217 | George Benjamin Luks | Woman with Macaws | 2,000,000 | | 500,000 | | 75,000 | 287,500 |
| 47.160 | | | 401 | Rembrandt Harmensz van Rijn | Angel Departing from the Family of Tobias | 15,000 | | | | 12,000 | 12,000 |
| 47.180 | 284 | | | Vera Cruz | Palma with Maize God Receiving a Human Sacrifice | 50,000 | 50,000 | | | | 50,000 |
| 47.397.A | 34 | | | Dick Price | Sisiutl | 10,000 | 125,000 | | | | 125,000 |
| 47.398 | | 238 | 483 | John Zoffany | Scene from "Love in a Village" | 1,200,000 | | 500,000 | | 2,500,000 | 1,500,000 |
| 47.58 | | 239 | 324 | Peter Paul Rubens | Archduke Ferdinand, Cardinal-Infante of Spain, at the Battle of Nordlingen | 3,500,000 | | 2,500,000 | | 4,000,000 | 3,250,000 |
| 47.81 | | 57 | 185 | Winslow Homer | The Dinner Horn | 3,000,000 | | 4,000,000 | | 2,200,000 | 3,100,000 |
| 47.82 | 30 | | | Robert Crosman | Taunton Chest | 80,000 | 65,000 | | | | 65,000 |
| 47.92 | | 240 | 321 | Salvator Rosa | The Finding of Moses | 2,200,000 | | 600,000 | 800,000 | 2,500,000 | 800,000 |
| 48.137 | | 344 | 575 | Islamic | Summer Floor Covering (nihale) | 2,000,000 | | 115,000 | | Unable to value | 115,000 |
| 48.250 | | | 231 | Henri Matisse | L'Avaleur de sabres | 216,750 | | | | 2,000 | 2,000 |
| 48.274 | | 91 | 490 | Nathan Bowen | Chest on Chest | 1,250,000 | | 1,000,000 | 725,000 | 500,000 | 725,000 |
| 48.279 | | 185 | 100 | Edgar Degas | Morning Ride | 10,000,000 | | 1,000,000 | 3,500,000 | 8,000,000 | 3,500,000 |
| 48.96 | | 241 | 252 | Bartolome Esteban Murillo | The Flight into Egypt | 5,500,000 | | 9,000,000 | 8,000,000 | 6,000,000 | 8,000,000 |
| 49.23 | | 306 | 187 | Jean Antoine Houdon | Robert Fulton | 10,000,000 | | 2,500,000 | | 750,000 | 1,625,000 |
| 49.288 | 289 | | | Joseph Anthony, Jr. | Sauceboat | NULL | 6,500 | | | | 6,500 |
| 49.337 | | 242 | 169 | Antoine Jean Gros | Murat Defeating the Turkish Army at Aboukir | 1,200,000 | | 1,000,000 | | 3,000,000 | 2,000,000 |
| 49.347 | 256 | | | Frans Hals | Portrait of Hendrik Swalmius | 2,500,000 | 8,000,000 | | 14,000,000 | | 14,000,000 |
| 49.417 | | 307 | 47 | Danese Cattaneo | Neptune: Allegory of Winter and Water | 1,500,000 | | 1,250,000 | | 300,000 | 775,000 |
| 49.418 | | 308 | 46 | Danese Cattaneo | Mars: Allegory of Summer and Fire | 1,500,000 | | 1,250,000 | | 300,000 | 775,000 |
| 49.498 | | | 127 | Robert S. Duncanson | Uncle Tom and Little Eva | 200,000 | | | | 200,000 | 200,000 |
| 50.138 | | 58 | 26 | George Caleb Bingham | The Trappers' Return | 8,000,000 | | 25,000,000 | 25,000,000 | 250,000 | 25,000,000 |
| 50.19 | | 59 | 332 | Albert Pinkham Ryder | The Tempest | 2,000,000 | | 350,000 | | 150,000 | 250,000 |
| 50.193 | | | 567 | Asteios Group | Panathenaic Amphora | 900,000 | | | 300,000 | 400,000 | 300,000 |
| 50.2 | | | 13 | Unknown | Tablecloth | NULL | | | | 1,200,000 | 1,200,000 |
| 50.20 | | 138 | | Max Beckmann | Still Life with Lilies | 3,000,000 | | 2,000,000 | | | 2,000,000 |
| 50.31 | | 60 | 174 | John Haberle | Grandma's Hearthstone | 2,000,000 | | 500,000 | | 350,000 | 425,000 |
| 50.32 | | 96 | 541 | Neo-Assyrian | Tiglath-Pileser III Receiving Homage | 3,000,000 | | 60,000,000 | 45,000,000 | 20,000,000 | 45,000,000 |
| 50.58 | | 61 | 266 | Charles Willson Peale | James Peale | 4,000,000 | | 200,000 | 450,000 | 125,000 | 450,000 |
| 51.10 | 305 | | | Ojibwa | Scoop or Spoon | 15,000 | 50,000 | | | | 50,000 |
| 51.13 | | 243 | 370 | Bernardo Strozzi | Street Musicians | 1,000,000 | | 125,000 | | 4,000,000 | 2,062,500 |
| 51.223 | | | 471 | James Abbott McNeill Whistler | In the Studio | 700,000 | | | 500,000 | 125,000 | 500,000 |
| 51.331 | | 62 | 193 | George Inness | The Lonely Pine | 1,750,000 | | 400,000 | | 80,000 | 240,000 |
| 51.54 | 168 | | | Girolamo Campagna | Athena Armed | 880,000 | 130,000 | | | | 130,000 |
| 51.65 | | 139 | 118 | Otto Dix | Self Portrait | 10,000,000 | | 4,000,000 | 6,000,000 | 275,000 | 6,000,000 |
| 51.66 | | 63 | 183 | Winslow Homer | Defiance: Inviting a Shot Before Petersburg | 12,000,000 | | 5,000,000 | | 400,000 | 2,700,000 |
| 51.9 | 35 | | | Ojibwa | Bowl in the Form of a Beaver | 85,000 | 275,000 | | | | 275,000 |
| 52.118 | | 64 | 73 | John Singleton Copley | Head of a Negro | 2,500,000 | | 850,000 | 1,350,000 | 300,000 | 1,350,000 |
| 52.130 | | | 97 | Edgar Degas | Horses in the Meadow | 10,000 | | | | 10,000 | 10,000 |
| 52.207 | | | 128 | Robert S. Duncanson | William Berthelet | 25,000 | | | | 50,000 | 50,000 |
| 52.218 | | 309 | 21 | Giovanni Lorenzo Bernini | Triton with a Sea Serpent | 10,000,000 | | 2,500,000 | 4,500,000 | set | 4,500,000 |
| 52.219 | | 310 | 22 | Giovanni Lorenzo Bernini | Triton with a Shell | 10,000,000 | | 2,500,000 | 4,500,000 | set | 4,500,000 |
| 52.220 | | 311 | 20 | Giovanni Lorenzo Bernini | Chair of St. Peter | 16,000,000 | | 4,000,000 | 12,500,000 | 7,500,000 | 12,500,000 |
| 52.242 | | | 420 | Rembrandt Harmensz van Rijn | Flight into Egypt | NULL | | | 15,000 | 4,000 | 15,000 |
| 52.243 | | | 411 | Rembrandt Harmensz van Rijn | Christ Crucified between the Two Thieves | 1,500 | | | 16,000 | 3,000 | 16,000 |
| 52.246 | | 65 | 334 | Augustus Saint-Gaudens | Abraham Lincoln | 2,000,000 | | 700,000 | | 400,000 | 550,000 |
| 52.253 | | 244 | 154 | Artemisia Gentileschi | Judith and Her Maidservant with the Head of Holofernes | 8,000,000 | | 22,500,000 | 12,500,000 | 4,000,000 | 12,500,000 |
| 52.27 | | 66 | 25 | George Caleb Bingham | The Checker Players | 1,500,000 | | 2,500,000 | 275,000 | 80,000 | 275,000 |
| 53.145 | | 199 | 315 | Auguste Rodin | Eve | 2,000,000 | | 2,250,000 | 20,000,000 | 17,500,000 | 20,000,000 |
| 53.153 | | | 24 | George Caleb Bingham | John Quincy Adams | 75,000 | | | 100,000 | 100,000 | 100,000 |
| 53.169 | 126 | | | Unknown | Ritual Wine Vessel | 5,000 | 200,000 | | 250,000 | | 250,000 |
| 53.171 | 329 | | | Unknown | Tiger Mask | 1,000 | 35,000 | | | | 35,000 |
| 53.175 | 330 | | | Unknown | Central Asian Musician | NULL | 35,000 | | | | 35,000 |
| 53.176 | 331 | | | Unknown | Central Asian Musician | NULL | 35,000 | | | | 35,000 |
| 53.177 | | 312 | 517 | Etienne Pollet | Toilet Service of the Duchesse de Cadaval | 1,000,000 | | 650,000 | | 900,000 | 775,000 |
| 53.193 | | 318 | 487 | Lorenz Helmschmied | Armor in the Gothic Style | 1,500,000 | | 750,000 | | 2,000,000 | 1,375,000 |
| 53.196 | | 319 | 485 | Unknown | Armor for the Tilt | 1,000,000 | | 225,000 | | 400,000 | 312,500 |
| 53.197 | | 320 | 488 | Unknown | Armor for the Tilt in the Saxon Fashion | 1,000,000 | | 225,000 | | 700,000 | 462,500 |
| 53.198 | | 321 | 486 | Unknown | Half-Armor | 1,000,000 | | 225,000 | | 150,000 | 187,500 |
| 53.2 | | | 484 | Unknown | Beaker | 150 | | | | 300,000 | 300,000 |
| 53.200 | | 322 | | Unknown | Corsaletto | 2,000,000 | | 225,000 | | | 225,000 |
| 53.27 | | | 338 | John Wallace | Riverscape | NULL | | | | 2,000,000 | 2,000,000 |
| 53.270 | | 245 | | Sassetta | The Agony in the Garden | 4,000,000 | | 5,000,000 | | | 5,000,000 |
| 53.273 | 314 | | | Irish | Lunula | 20,000 | 100,000 | | | | 100,000 |
| 53.356 | | 246 | 325 | Peter Paul Rubens | Briseis Given Back to Achilles | 3,500,000 | | 6,000,000 | 7,000,000 | 5,000,000 | 7,000,000 |
| 53.359 | | 247 | 170 | Francesco Guardi | View of Dolo on the Brenta | 1,300,000 | | 1,150,000 | | 2,000,000 | 1,575,000 |
| 53.468 | | 248 | 160 | Domenico Ghirlandaio | Young Man | 2,000,000 | | 600,000 | | 2,500,000 | 1,550,000 |
| 53.47 | | | 208 | Henri Matisse | Tete du femme en mascaron | NULL | | | | 450,000 | 450,000 |
| 53.470 | | 140 | | Oskar Kokoschka | The Cat | 3,000,000 | | 250,000 | | | 250,000 |
| 54.100 | | 67 | 335 | John Singer Sargent | Judith Gautier | 1,500,000 | | 625,000 | 1,050,000 | 8,000,000 | 1,050,000 |
| 54.118 | | 68 | 111 | Charles Demuth | Buildings Abstraction, Lancaster | 1,000,000 | | 1,750,000 | | 2,000,000 | 1,875,000 |
| 54.2 | | 249 | 290 | Nicolas Poussin | The Holy Family | 10,000,000 | | 2,500,000 | 4,000,000 | 1,500,000 | 4,000,000 |
| 54.458 | | | | William Adolphe Bouguereau | The Nut Gatherers | 400,000 | | | 5,000,000 | | 5,000,000 |
| 54.460 | | 141 | 256 | Emil Nolde | Sunflowers | 7,000,000 | | 2,500,000 | 2,250,000 | 1,900,000 | 2,250,000 |
| 55.175 | | 69 | 481 | Richard Caton Woodville | The Card Players | 5,000,000 | | 500,000 | | 100,000 | 300,000 |
| 55.183.A | | 323 | 499 | Thomas Germain | Tureen with Lid and Stand | 10,000,000 | | 500,000 | | 3,000,000 | 1,750,000 |
| 55.353 | | 104 | 9 | Francis Bacon | Study for Crouching Nude | 40,000,000 | | 10,500,000 | 50,000,000 | 28,000,000 | 50,000,000 |
| 55.410 | | 142 | 12 | Max Beckmann | Self Portrait in Olive and Brown | 10,000,000 | | 21,000,000 | 22,500,000 | 18,000,000 | 22,500,000 |
| 55.5.A | | 250 | 146 | Henry Fuseli | The Nightmare | 25,000,000 | | 3,500,000 | 20,000,000 | 10,000,000 | 20,000,000 |
| 55.519 | | 324 | 510 | Unknown | Pride | 1,000,000 | | 200,000 | | 1,000,000 | 600,000 |
| 55.520 | | 325 | 512 | Unknown | Charity | 1,000,000 | | 200,000 | | set | 200,000 |
| 55.521 | | 326 | 513 | Unknown | Fortitude | 1,000,000 | | 200,000 | | set | 200,000 |
| 55.522 | | 327 | 511 | Unknown | Wrath | 1,000,000 | | 200,000 | | set | 200,000 |
| 56.144 | | 143 | 224 | Franz Marc | Animals in a Landscape | 25,000,000 | | 32,500,000 | 32,000,000 | 22,000,000 | 32,000,000 |
| 56.173 | | | 102 | Edgar Degas | Schoolgirl | 100,000 | | | 175,000 | 110,000 | 175,000 |
| 56.31 | | 70 | 64 | Thomas Cole | American Lake Scene | 2,500,000 | | 850,000 | | 500,000 | 675,000 |
| 56.32 | | 251 | 4 | Fra Angelico | Madonna and Child with Angels | 4,000,000 | | 6,000,000 | | 4,000,000 | 5,000,000 |
| 56.43 | | 252 | 263 | Giovanni Paolo Panini | Interior of St. Peter's, Rome | 2,000,000 | | 2,000,000 | 3,750,000 | 6,000,000 | 3,750,000 |
| 56.85.1 | | 328 | 497 | Thomas Germain | Candelabrum | 10,000,000 | | 300,000 | | 750,000 | 525,000 |
| 56.85.2 | | 343 | 498 | Thomas Germain | Candelabrum | 10,000,000 | | | | 750,000 | 750,000 |
| 57.18 | | | 378 | William Long | Chair | NULL | | | | 5,000,000 | 5,000,000 |
| 57.180 | | 253 | | Giovanni Battista Tiepolo | Girl with a Mandolin | 4,500,000 | | 7,000,000 | 5,750,000 | | 5,750,000 |
| 57.182 | | 144 | 251 | Otto Mueller | Gypsy Encampment | 6,000,000 | | 2,000,000 | | 2,000,000 | 2,000,000 |
| 57.234 | | 145 | 198 | Wassily Kandinsky | Study for Painting with White Form | 30,000,000 | | 25,000,000 | 25,000,000 | 20,000,000 | 25,000,000 |
| 57.84 | | | 126 | Robert S. Duncanson | Fruit Piece | 150,000 | | | | 75,000 | 75,000 |
| 57.88 | | | 542 | Unknown | Yogini | 750,000 | | | | 500,000 | 500,000 |
| 58.359 | | | 70 | John Singleton Copley | Elizabeth Pitts | 50,000 | | | 300,000 | 200,000 | 300,000 |
| 58.360 | | | 75 | John Singleton Copley | Jonathan Mountfort | 400,000 | | | 1,000,000 | 2,000,000 | 1,000,000 |
| 58.383 | | 254 | 351 | Michel Sittow | A Young Man in a Red Cap | 1,200,000 | | 300,000 | | 600,000 | 450,000 |
| 58.385 | | 146 | 244 | Paula Modersohn-Becker | Old Peasant Woman | 6,000,000 | | 2,000,000 | | 800,000 | 1,400,000 |
| 59.11 | | 71 | 137 | Lyonel Feininger | Fisher off the Coast | 1,000,000 | | 3,000,000 | | 3,000,000 | 3,000,000 |
| 59.123 | | 329 | 156 | Hubert Gerhard | Hebe | 2,000,000 | | 700,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| 59.124.A | | 330 | 496 | Fontana Workshop | Childbirth Set | 1,200,000 | | 300,000 | | 45,000 | 172,500 |
| 59.149 | | | 504 | Thomas Harland | Tall Case Clock | NULL | | | 175,000 | 60,000 | 175,000 |
| 59.18 | | 331 | 500 | Thomas Germain | Tureen with Lid, Liner, and Stand | 20,000,000 | | 700,000 | | 4,000,000 | 2,350,000 |
| 59.185 | | | 16 | George Wesley Bellows | A Stag at Sharkey's | 103,000 | | | 110,000 | 150,000 | 110,000 |
| 59.289 | | | 514 | Louis Comfort Tiffany | Flower-form Vase | 8,000 | | | 7,000 | 6,500 | 7,000 |
| 59.295 | | 332 | 203 | Johann Gottlieb Kirchner | Joseph Froehlich, Court Jester of Augustus the Strong | 1,000,000 | | 2,500,000 | 750,000 | 500,000 | 750,000 |
| 59.296 | | 333 | 195 | Johann Joachim Kaendler | Postmaster "Baron" Schmiedel | 1,000,000 | | 3,750,000 | 1,500,000 | 500,000 | 1,500,000 |
| 59.297 | | | 493 | Unknown | Crozier Head: Saint Michael and the Dragon | 750,000 | | | 114,000 | 150,000 | 114,000 |
| 59.312 | | 72 | 366 | John Mix Stanley | Mountain Landscape with Indians | 1,000,000 | | 100,000 | | 150,000 | 125,000 |
| 59.314 | | | 210 | George Cochran Lambdin | At the Front | 450,000 | | | 300,000 | 25,000 | 300,000 |
| 59.443 | | 147 | 27 | Pierre Bonnard | Woman with Dog | 1,500,000 | | 1,000,000 | | 750,000 | 875,000 |
| 59.444 | | 255 | 362 | Sodoma | The Holy Family and St. John | 4,200,000 | | 4,000,000 | | 1,000,000 | 2,500,000 |
| 59.45 | | | 201 | Frank Cassara | Configuration | NULL | | | | 1,000,000 | 1,000,000 |
| 59.450 | | 148 | | Ernst Ludwig Kirchner | Café | 4,000,000 | | 1,400,000 | | | 1,400,000 |
| 59.79 | | | 393 | Rembrandt Harmensz van Rijn | A Peasant in a High Cap, Standing Leaning on a Stick | NULL | | | 10,000 | 6,000 | 10,000 |
| 59.80 | | | 407 | Rembrandt Harmensz van Rijn | Bust of a Man Wearing a High Cap, Three-Quarters Right: The Artist's Father (? | NULL | | | | 1,000 | 1,000 |
| 60.1 | | | 313 | Auguste Rodin | Aime Jules Dalou | 380,000 | | | 400,000 | 250,000 | 400,000 |
| 60.61 | | 256 | 226 | Master of the Osservanza | The Resurrection | 4,500,000 | | 7,000,000 | 3,500,000 | 3,000,000 | 3,500,000 |
| 60.63 | | | 212 | Pieter Pietersz Lastman | King David Handing the Letter to Uriah | 500,000 | | | 500,000 | 450,000 | 500,000 |
| 60.66 | | | 158 | Jean-Léon Gérôme | Solitude | 85,000 | | | | 40,000 | 40,000 |
| 60.88 | | 105 | 161 | Alberto Giacometti | Annette Seated | 12,000,000 | | 3,250,000 | 20,000,000 | 6,000,000 | 20,000,000 |
| 61.164 | | 334 | 225 | Master of the Arenberg Lamentation | The Lamentation | 3,000,000 | | 500,000 | 3,500,000 | 1,000,000 | 3,500,000 |
| 61.165 | | 73 | 358 | John Sloan | Wake of the Ferry, No. 1 | 8,500,000 | | 3,000,000 | 3,500,000 | 1,000,000 | 3,500,000 |
| 61.28 | | 74 | 23 | Albert Bierstadt | The Wolf River, Kansas | 3,000,000 | | 2,500,000 | | 1,000,000 | 1,750,000 |
| 61.397 | | 257 | 83 | Lucas Cranach the Elder | Saint Christopher | 1,400,000 | | 4,000,000 | | 4,000,000 | 4,000,000 |
| 61.48 | | 149 | 242 | Joan Miró | Women and Bird in the Night | 5,000,000 | | 1,250,000 | 5,000,000 | 4,000,000 | 5,000,000 |
| 62.126 | | 150 | 282 | Pablo Picasso | Portrait of Manuel Pallares | 8,000,000 | | 13,500,000 | 20,000,000 | 8,000,000 | 20,000,000 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 62.141 | 153 | 280 | Pablo Picasso | Sylvette | 10,000,000 | | 3,750,000 | 4,000,000 | 2,000,000 | 4,000,000 |
| 62.70 | | 419 | Rembrandt Harmensz van Rijn | Descent from the Cross by Torchlight | 80,000 | | | | 8,000 | 8,000 |
| 62.97 | 152 | 249 | Henry Moore | Reclining Figure | 4,000,000 | | 700,000 | | 5,000,000 | 1,100,000 |
| 63.133 | 153 | 207 | Oskar Kokoschka | Girl with Doll | 4,000,000 | | | 850,000 | 2,000,000 | 1,425,000 |
| 63.134 | 154 | 342 | Karl Schmidt-Rottluff | Man with a Green Beard | 1,500,000 | | 1,800,000 | 2,000,000 | | 875,000 |
| 63.135 | 155 | 341 | Karl Schmidt-Rottluff | Evening by the Sea | 5,000,000 | | 2,000,000 | | 900,000 | 1,450,000 |
| 63.156 | 106 | 88 | Stuart Davis | Standard Brand | 15,000,000 | | 3,500,000 | | 3,000,000 | 3,750,000 |
| 64.117 | 258 | 67 | John Constable | The Glebe Farm | 2,200,000 | | 2,500,000 | 32,500,000 | 6,000,000 | 32,500,000 |
| 64.155.A | 107 | 189 | Robert Indiana | The Brooklyn Bridge | 3,200,000 | | 1,750,000 | 3,750,000 | 1,750,000 | 1,750,000 |
| 64.218 | 156 | 181 | Karl Hofer | Wind | 1,000,000 | | 850,000 | | 400,000 | 625,000 |
| 64.264 | 157 | 6 | Jean Arp | Torso of a Giant | 1,000,000 | | 1,150,000 | | 1,000,000 | 975,000 |
| 64.279 | | 357 | John Sloan | The Woman's Page | NULL | | | | 750 | 3,500 |
| 64.285 | | 353 | John Sloan | Connoisseurs of Prints | NULL | | | | 3,750 | 2,500 |
| 64.295 | | 355 | John Sloan | Night Windows | 4,000 | | | | 6,750 | 6,750 |
| 64.304 | | 356 | John Sloan | Prone Nude | 2,500 | | | | 2,500 | 2,500 |
| 64.459 | 259 | 329 | Peter Paul Rubens | Saint Ives of Treguier, Patron of Lawyers, Defender of Widows and Orphans | 2,500,000 | | 500,000 | | 5,000,000 | 2,750,000 |
| 64.92 | | 193 | Jean Auguste Dominique Ingres | Mlle. Cécile-Marie Panckoucke (later Mme. Jacques-Raoul Tournouër) | 800,000 | | | 1,250,000 | 800,000 | 1,250,000 |
| 64.94 | 158 | 368 | Juan Gris | Still Life | 3,000,000 | | 7,000,000 | 27,500,000 | 15,000,000 | 27,500,000 |
| 65.10 | 260 | 375 | Gerard Ter Borch | Lady at Her Toilette | 15,000,000 | | 1,500,000 | 7,000,000 | 1,500,000 | 27,500,000 |
| 65.108 | 159 | 248 | Henry Moore | Reclining Figure | 12,000,000 | | 3,750,000 | | 5,000,000 | 4,375,000 |
| 65.139 | 346 | 52 | Paul Cézanne | Skull and Book | 2,500,000 | | 1,750,000 | 3,500,000 | 1,500,000 | 3,500,000 |
| 65.140 | 347 | 53 | Paul Cézanne | Slave | 1,500,000 | | 50,000 | | 50,000 | 60,000 |
| 65.143 | | 93 | Edgar Degas | Ballet Dancer Adjusting her Costume | 900,000 | | | 700,000 | 575,000 | 700,000 |
| 65.148 | | 99 | Edgar Degas | Mlle La La at the Circus Fernando | 750,000 | | | 140,000 | 100,000 | 140,000 |
| 65.162 | 348 | 234 | Henri Matisse | Plumed Hat | 1,400,000 | | 250,000 | | 100,000 | 175,000 |
| 65.174 | | 11 | Max Beckmann | Sacrificial Meal | 100,000 | | | 700,000 | 400,000 | 700,000 |
| 65.223 | | 303 | Pierre Auguste Renoir | Country Lane | 400,000 | | | 600,000 | 125,000 | 600,000 |
| 65.31 | | 369 | Armando Morales | Winter | NULL | | | | 22,000,000 | 22,000,000 |
| 65.310 | 108 | | Clyfford Still | Untitled 1951-T, No. 2 | 20,000,000 | | 21,000,000 | 55,000,000 | | 55,000,000 |
| 65.347 | 261 | 108 | Niccolo dell' Abbate | Eros and Psyche | 1,200,000 | | 2,000,000 | | 2,500,000 | 2,250,000 |
| 65.60 | | | Helen Frankenthaler | The Bay | 750,000 | | | 3,000,000 | | 3,000,000 |
| 65.7 | 109 | 206 | Franz Kline | Siskind | 5,000,000 | | 4,500,000 | 7,500,000 | 7,500,000 | 29,000,000 |
| 65.76 | 110 | 55 | John Chamberlain | Coo Wha Zee | 6,000,000 | | 4,000,000 | 3,500,000 | 4,000,000 | 3,500,000 |
| 65.8 | 111 | 322 | Mark Rothko | Orange, Brown | 25,000,000 | | 35,000,000 | 70,000,000 | 40,000,000 | 70,000,000 |
| 66.131 | 92 | 495 | George Bright | Secretary | 1,200,000 | | 500,000 | 400,000 | 1,250,000 | 400,000 |
| 66.15 | 262 | 107 | Giovanni di Paolo | Saint Catherine of Siena Dictating Her Dialogues | 2,500,000 | | 3,000,000 | | 1,500,000 | 2,250,000 |
| 66.17 | 335 | 196 | Meissen Porcelain Manufactory | Crane | 1,600,000 | | 1,150,000 | | 1,500,000 | 1,325,000 |
| 66.16 | 112 | 359 | David Smith | Cube I | 16,000,000 | | 15,000,000 | 16,500,000 | 6,500,000 | 16,500,000 |
| 66.391 | | 214 | Hughie Lee-Smith | The Piper | 10,000 | | | 140,000 | 100,000 | 140,000 |
| 66.41 | | 120 | Giulio Romano | An Allegory of Immortality | 225,000 | | | 3,000,000 | 3,500,000 | 3,500,000 |
| 66.66 | 160 | 241 | Joan Miró | Self Portrait II | 15,000,000 | | 13,000,000 | 33,000,000 | 19,000,000 | 33,000,000 |
| 66.68 | 113 | 368 | Frank Stella | Union I | 1,000,000 | | 2,250,000 | | 450,000 | 1,350,000 |
| 67.113 | 114 | 34 | Alexander Calder | The X and Its Tails | 1,500,000 | | 3,500,000 | 6,000,000 | 3,500,000 | 6,000,000 |
| 67.254 | 75 | 57 | William Merritt Chase | Mrs. William Merritt Chase | 5,000,000 | | 250,000 | | 75,000 | 162,500 |
| 67.273 | | 94 | Edgar Degas | Dancer Adjusting Her Slipper | 200,000 | | | 350,000 | 250,000 | 350,000 |
| 68.20 | | 431 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | NULL | | | 20,000 | | 3,000 |
| 68.22 | | 456 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | NULL | | | 50,000 | 200 | 50,000 |
| 68.292.1 | 115 | 465 | Andy Warhol | Self Portrait: Former Double Self Portrait | 30,000,000 | | 22,500,000 | 55,000,000 | 30,000,000 | 55,000,000 |
| 68.292.2 | 116 | | Andy Warhol | Self Portrait | 30,000,000 | | 22,500,000 | | 22,500,000 |
| 68.298 | 263 | 462 | Jacob Isaakzoon van Ruisdael | Wooded Landscape with a Stream | 1,700,000 | | 1,250,000 | 3,500,000 | 4,000,000 | 3,500,000 |
| 68.47 | 264 | 155 | Orazio Gentileschi | Young Woman with a Violin (Saint Cecilia) | 1,250,000 | | 12,500,000 | 7,000,000 | 7,000,000 | 7,000,000 |
| 69.1 | 117 | 122 | Jean Dubuffet | Le plomb dans l'aile | 6,000,000 | | 7,000,000 | 8,000,000 | 7,000,000 | 8,000,000 |
| 69.218 | | 549 | Roman | Statue of the Young Nero Wearing a Toga | 250,000 | | | 400,000 | 1,750,000 | 400,000 |
| 69.302 | | 104 | Edgar Degas | Spanish Dancer | 725,000 | | | 275,000 | 150,000 | 275,000 |
| 69.304 | | 317 | Auguste Rodin | The Age of Bronze | 400,000 | | | 1,750,000 | 500,000 | 1,750,000 |
| 69.305 | 76 | 118 | Lyonel Feininger | Sailboats | 3,000,000 | | 4,000,000 | | 3,000,000 | 3,500,000 |
| 69.306 | 186 | 151 | Paul Gauguin | Self Portrait | 14,000,000 | | 8,000,000 | 17,500,000 | 11,000,000 | 17,500,000 |
| 69.359 | | 239 | Pablo Picasso | Soeur y Maestra de France (Planche I) | 1,500 | | | | 3,000 |
| 69.361 | 118 | 200 | Ellsworth Kelly | Black White | 500,000 | | 400,000 | | 400,000 | 400,000 |
| 69.452 | | 174 | Henry Ossawa Tanner | Flight into Egypt | 250,000 | | | | 150,000 | 150,000 |
| 69.48 | 119 | 295 | Robert Rauschenberg | Crush | 2,000,000 | | 6,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| 69.50 | | | Donald Judd | Stack | 400,000 | | | | 11,000,000 | 11,000,000 |
| 69.6 | 265 | 298 | Guido Reni | The Angel Appearing to St. Jerome | 2,500,000 | | 7,000,000 | 14,000,000 | 4,000,000 | 14,000,000 |
| 70.15 | | 186 | Bernbe | Standing Male Figure with Rifle and Knife | NULL | | | | 2,500,000 | 2,500,000 |
| 70.150 | 77 | | Winslow Homer | The Four-Leaf Clover | 5,000,000 | | 3,000,000 | | | 3,000,000 |
| 70.158 | 161 | 391 | Vincent Willem van Gogh | The Zouave | 30,000,000 | | 50,000,000 | 10,000,000 | 25,000,000 | 50,000,000 |
| 70.159 | 187 | 389 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 65,000,000 | | 45,000,000 | 60,000,000 | 40,000,000 | 60,000,000 |
| 70.160 | 188 | 50 | Paul Cézanne | Madame Cézanne | 60,000,000 | | 35,000,000 | 65,000,000 | 25,000,000 | 65,000,000 |
| 70.161 | 162 | 51 | Paul Cézanne | Mont Sainte-Victoire | 22,000,000 | | 20,000,000 | 22,500,000 | 10,000,000 | 22,500,000 |
| 70.162 | 189 | 48 | Paul Cézanne | Bathers | 18,000,000 | | 17,500,000 | 22,500,000 | 15,000,000 | 22,500,000 |
| 70.163 | 190 | 54 | Paul Cézanne | The Three Skulls | 20,000,000 | | 13,500,000 | 22,500,000 | 5,000,000 | 22,500,000 |
| 70.164 | 266 | 56 | Jean Siméon Chardin | Still Life | 2,500,000 | | 3,500,000 | 4,250,000 | 2,500,000 | 4,250,000 |
| 70.167 | 191 | 105 | Edgar Degas | Violinist and Young Woman | 10,000,000 | | 1,750,000 | 13,500,000 | 10,000,000 | 13,500,000 |
| 70.168 | 192 | 106 | Edgar Degas | Woman with a Bandage | 2,000,000 | | 800,000 | 1,250,000 | 2,000,000 | 1,250,000 |
| 70.170 | 267 | 190 | Jean Auguste Dominique Ingres | Perseus and Andromeda | 1,000,000 | | 1,250,000 | 6,000,000 | 3,000,000 | 6,000,000 |
| 70.173 | 193 | 218 | Edouard Manet | On the Beach | 5,000,000 | | | | | 6,000,000 |
| 70.174 | 194 | 230 | Henri Matisse | Coffee | 20,000,000 | | | 18,000,000 | | |
| 70.175 | 163 | 232 | Henri Matisse | Poppies | 20,000,000 | | 24,000,000 | 37,500,000 | 12,000,000 | 37,500,000 |
| 70.177 | 195 | 303 | Pierre Auguste Renoir | Seated Bather | 11,000,000 | | 11,000,000 | 35,000,000 | 21,000,000 | 35,000,000 |
| 70.178 | 196 | 304 | Pierre Auguste Renoir | The White Pierrot | 12,000,000 | | 8,000,000 | 12,500,000 | 6,000,000 | 12,500,000 |
| 70.183 | 197 | 346 | Georges Pierre Seurat | View of Le Crotoy from Upstream | 40,000,000 | | 30,000,000 | 35,000,000 | 30,000,000 | 35,000,000 |
| 70.165 | 164 | 246 | Amedeo Modigliani | Young Man with a Cap | 25,000,000 | | | | 2,000,000 | |
| 70.186 | 165 | 245 | Amedeo Modigliani | A Man | 5,000,000 | | 6,000,000 | | 5,000,000 | 5,750,000 |
| 70.190 | 78 | 311 | Diego M. Rivera | Robert H. Tannahill | 750,000 | | | 450,000 | | 750,000 |
| 70.198 | | 310 | Diego M. Rivera | Robert Tannahill | NULL | | | | 6,000,000 | 6,000,000 |
| 70.199 | 166 | 281 | Pablo Picasso | Melancholy Woman | 60,000,000 | | 70,000,000 | 87,500,000 | 50,000,000 | 87,500,000 |
| 70.191 | 167 | 279 | Pablo Picasso | Head of a Harlequin | 7,000,000 | | 25,000,000 | 17,500,000 | 15,000,000 | 17,500,000 |
| 70.192 | 168 | 273 | Pablo Picasso | Bottle of Anis del Mono | 15,000,000 | | 4,000,000 | 16,000,000 | 6,000,000 | 16,500,000 |
| 70.193 | 169 | 283 | Pablo Picasso | Woman Seated in an Armchair | 45,000,000 | | 50,000,000 | 65,000,000 | 40,000,000 | 65,000,000 |
| 70.206 | | 233 | Henri Matisse | Seated Nude | 500,000 | | | 1,800,000 | 100,000 | 1,800,000 |
| 70.209 | | 301 | Pierre Auguste Renoir | La blanchisseuse | 350,000 | | | 105,000 | 25,000 | 105,000 |
| 70.210 | | 314 | Auguste Rodin | Baudelaire | 350,000 | | | 35,000 | 25,000 | 35,000 |
| 70.229 | 170 | 31 | Constantin Brancusi | Sleeping Child | 3,000,000 | | 1,500,000 | | 1,500,000 | 1,500,000 |
| 70.253 | 349 | 112 | Charles Demuth | Still Life with Apples and Bananas | 1,250,000 | | 250,000 | 825,000 | 250,000 | 625,000 |
| 70.323 | | 255 | Emil Nolde | Portrait of the Artist and His Wife | 8,000 | | | | 175,000 | 175,000 |
| 70.328 | 344 | 341 | Karl Schmidt-Rottluff | Water Lilies | 400,000 | | | | 150,000 | 150,000 |
| 70.339 | | 272 | Pablo Picasso | Bather by the Sea | 950,000 | | | 9,500,000 | 7,500,000 | 9,500,000 |
| 70.560.A | | 68 | John Singleton Copley | Colonel George Lewis | 750,000 | | | 3,000,000 | | 3,000,000 |
| 70.61 | | 262 | Claes Oldenburg | Profile Airflow | 50,000 | | | | 75,000 | 75,000 |
| 70.68 | | 312 | Julius | Standing Female | 750 | | | | 300,000 | 300,000 |
| 70.953 | 181 | | Mather Brown | Scene at Quarrey | 10,000 | | 400,000 | | | 400,000 |
| 70.91 | 268 | 172 | Giovanni (Giovanni Francesco Barbieri) | Assumption of the Virgin | 1,250,000 | | 6,000,000 | 10,000,000 | 5,000,000 | 10,000,000 |
| 71.168 | | 76 | John Singleton Copley | Mrs. Benjamin Hallowell | 1,000,000 | | | 2,000,000 | 500,000 | 2,000,000 |
| 71.169 | 269 | 148 | Thomas Gainsborough | The Honorable Richard Savage Nassau de Zuylestein, M.P. | 2,000,000 | | | 9,000,000 | 3,000,000 | 9,000,000 |
| 71.17 | 147 | 149 | Thomas Gainsborough | False Eyelash | 850,000 | | | | 10,000,000 | 10,000,000 |
| 71.170 | 270 | 147 | Thomas Gainsborough | Lady Anne Hamilton | 1,500,000 | | 11,000,000 | | 11,000,000 |
| 71.194 | 336 | 491 | Martin Carlin | Jewel Coffer | 500,000 | | 900,000 | | 450,000 | 675,000 |
| 71.305.A | 123 | 7 | Richard Artschwager | Hospital Ward | 1,000,000 | | 1,500,000 | 1,300,000 | 1,500,000 | 1,350,000 |
| 71.390 | 271 | 143 | Jean Honoré Fragonard | The Shepherdess | 1,000,000 | | 3,500,000 | | 3,000,000 | 3,750,000 |
| 71.391 | 272 | 142 | Jean Honoré Fragonard | The Grape Gatherer | 1,000,000 | | | 9,000,000 | 2,000,000 | 9,000,000 |
| 71.392 | 273 | 142 | Jean Honoré Fragonard | The Reaper | 1,000,000 | | 9,000,000 | | 2,000,000 | 9,000,000 |
| 71.394 | 274 | 140 | Jean Honoré Fragonard | The Gardener | 1,000,000 | | 9,000,000 | | 2,000,000 | 9,000,000 |
| 71.399 | | 42 | Jean Baptiste Carpeaux | Ugolino and his Children | 300,000 | | | 375,000 | 375,000 | 375,000 |
| 71.7 | | 240 | Claes Oldenburg | Giant Three-Way Plug | 250,000 | | | | 175,000 | 175,000 |
| 71.78 | | 96 | Edgar Degas | Seated Dancer Resting | 1,000,000 | | 1,100,000 | 1,100,000 | 1,100,000 |
| 72.201 | 275 | 458 | Rembrandt Harmensz van Rijn | Man Wearing a Plumed Beret and Gorget | 5,000,000 | | 800,000 | 825,000 | 850,000 | 825,000 |
| 72.296 | | 257 | Louise Joan Fremice | Pompey | 575,000 | | | | | |
| 72.436 | | 360 | Tony Smith | Gracehoper | 150,000 | | | | 1,500,000 | 1,500,000 |
| 72.437 | | 263 | Claes Oldenburg | Linear Construction No. 4 | 250,000 | | | 2,000,000 | | |
| 72.441 | 350 | 95 | Edgar Degas | Dancers in Repose | 750,000 | | 3,000,000 | 4,000,000 | 500,000 | 4,000,000 |
| 72.443 | | 46 | Paul Cézanne | Head of a Boy | 750,000 | | | | 500,000 | 500,000 |
| 73.132 | 81 | 113 | Thomas Wilmer Dewing | Classical Figures | 3,000,000 | | | | 500,000 | 500,000 |
| 73.155 | 276 | 213 | Charles Le Brun | The Presentation of Christ in the Temple | 1,000,000 | | | 1,500,000 | 1,500,000 | 1,500,000 |
| 73.254 | 337 | 488 | Boulle (André Charles Boulle) | Secretary | 450,000 | | | 100,000 | 350,000 | 350,000 |
| 73.271 | 347 | 247 | Antonio Mondragon | The Return of the Prodigal Son | 400,000 | | | | 350,000 | 350,000 |
| 73.264 | 277 | 37 | Camille Pissarro | Route de Versailles, Louveciennes | 20,000,000 | | | 35,000,000 | | 35,000,000 |
| 73.3 | 93 | 497 | John Townsend | Martha and Mary Magdalene | 20,000,000 | | 50,000,000 | | 50,000,000 |
| 73.41 | 278 | 354 | Peter Paul Rubens | Boy of Thomas Carleton | 1,000,000 | | 1,500,000 | | 3,500,000 | 3,500,000 |
| 73.43 | 82 | 106 | John Singer Sargent | Madame Paul Poirson | 10,000,000 | | | | 500,000 | |
| 74.122 | 171 | 373 | Ben Nicholson | Shallow Casting | 1,500,000 | | | 3,500,000 | 5,000,000 | 2,500,000 |
| 74.2 | | 361 | Yves Klein | Tomb Sculpture | 250,000 | | | 1,000,000 | | 1,000,000 |
| 74.211 | | 169 | Gaetano Gandolfi | Venus Receiving the Arms from Vulcan for Aeneas | 75,000 | | | | 750,000 | 750,000 |
| 74.26 | | 185 | Richard Hunt | Untitled | 5,000 | | | | | 25,000 |
| 74.53 | | 258 | Claes Oldenburg | Torso of Aphrodite, Roman copy of the Venus Genetrix type | 2,000,000 | | | | | 20,000 |
| 74.68 | | 188 | Claes Oldenburg | Alphabet / Good Humor - Cloth Study | 250,000 | | | | 100,000 | 100,000 |
| 75.16 | 338 | 258 | Camille Pissarro | The Kitchen at Piettes, Montfoucault | 250,000 | | | 3,500,000 | | 3,500,000 |
| 75.17 | | 38 | Camille Pissarro | Portrait of Camille Pissarro by Himself | 150,000 | | | | 575,000 | 575,000 |
| 75.58 | | 40 | Jean Baptiste Carpeaux | Seated Flora | 1,000,000 | | | | | 100,000 |
| 75.60 | | 252 | Claes Oldenburg | Shield | 300,000 | | | | | |
| 75.144 | 178 | 178 | Hans Hofmann | The Miraculous Draught of Fishes | 3,000,000 | | | | 350,000 | |
| 75.155 | 179 | 71 | John William Casilear | View of Lake George | 900,000 | | | 500,000 | 163,000 | 500,000 |
| 75.185 | | 306 | Sebastiano Ricci | The Finding of the Infant Moses | 10,000,000 | | | | 500,000 | 750,000 |
| 76.3 | | 99 | Wen Zhengming | The First Moon Poem on the Red Cliff | 600,000 | | | | 400,000 | 400,000 |
| 76.50 | | | | | 25,000,000 | | 40,000,000 | 60,000,000 | 40,000,000 | 60,000,000 |
| 76.74 | 120 | 254 | Barnett Newman | Be I (second version) | 35,000,000 | | | 1,150,000 | 500,000 | 1,150,000 |
| 76.78 | 83 | 528 | Robert Smithson | Nail Figure | 800,000 | | | | | 200,000 |
| 76.95 | 121 | | Frederic Edwin Church | Cotopaxi | 90,000,000 | | 100,000,000 | 300,000,000 | 300,000,000 |
| 76.95 | 174 | 362 | David Smith | Non Site - Site Uncertain | 1,000,000 | | | 1,000,000 | 1,200,000 | 1,700,000 |
| 77.13 | | 271 | Pablo Picasso | Mandolin and Guitar | 40,000,000 | | | | 5,000,000 | |
| 77.5 | 124 | 5 | Fra Angelico | Virgin Annunciate | 5,000,000 | | | 3,500,000 | 15,000,000 | 6,000,000 |
| 77.11 | 122 | 482 | Giandomenico Tiepolo | Scene of Contemporary Life | 500,000 | | | 1,000,000 | 1,250,000 | 1,750,000 |
| 77.2 | | 259 | Claes Oldenburg | Alphabet / Good Humor | 5,000,000 | | | | 2,000,000 | 2,000,000 |
| 77.5 | 175 | 280 | Pablo Picasso | Virtue and Vice | 13,000,000 | | 5,000,000 | 13,500,000 | 5,000,000 | 13,500,000 |
| 77.54 | | 116 | Feng | Head | 3,000,000 | | | | 1,000,000 | 1,000,000 |
| 77.48 | | 283 | Pablo Perugino | Madonna and Child | 5,000,000 | | | 35,000,000 | | 35,000,000 |
| 77.3 | 281 | 269 | Robert Motherwell | Elegy to the Spanish Republic #131 | 600,000 | | 11,000,000 | 6,000,000 | 3,000,000 | 3,500,000 |

| | | | Artist | Title | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 77.49 | | 582 | Maya | Embracing Couple | 600,000 | | | | 75,000 | 75,000 |
| 77.5 | 175 | 308 | Diego M. Rivera | Eduel B. Ford | 1,250,000 | | 300,000 | 3,000,000 | 500,000 | 3,000,000 |
| 77.63 | | 555 | Deng Qichang | Freehand Copy of Zhang Xu's Writing of the Stone Record | 200,000 | | | 135,000 | 5,000,000 | 135,000 |
| 77.71 | | 533 | Bangboye of Odo-Owa | Epa Cult Mask | 15,000 | | | | 15,000 | 15,000 |
| 77.72 | 282 | 91 | Jean Francois de Troy | Luncheon with Figures in Masquerade Dress | 2,500,000 | | 40,000 | | 2,000,000 | 1,020,000 |
| 77.78 | | 581 | Nasca Huari | Ceremonial Textile | 60,000 | | | | 70,000 | 70,000 |
| 77.61 | 283 | 182 | Hans Holbein the Younger | A Woman | 3,000,000 | | 5,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| 78.31 | | 235 | Henri Matisse | The Wild Poppies | 800,000 | | | 32,500,000 | 15,000,000 | 32,500,000 |
| 78.37 | | 236 | Henri Matisse | The Wild Poppies | 500,000 | | | 37,500,000 | set | 37,500,000 |
| 78.38 | 84 | 85 | Jasper Francis Cropsey | Indian Summer | 4,000,000 | | 2,000,000 | | 1,500,000 | 1,750,000 |
| 78.43 | 169 | | Unknown | Capital | 20,000 | 8,500 | | | | 8,500 |
| 78.47 | | 539 | Iranian | Achaemenid Persian Spearman | 75,000 | | | 2,000,000 | 1,000,000 | 2,000,000 |
| 78.59 | 284 | 240 | John Everett Millais | Leisure Hours | 1,200,000 | | 3,000,000 | 3,500,000 | 3,500,000 | 3,500,000 |
| 78.87 | | 479 | Hale Woodruff | Ancestral Memory | 150,000 | | | | 50,000 | 50,000 |
| 78.143 | 85 | 176 | Childe Hassam | Notre Dame Cathedral, Paris, 1888 | 3,500,000 | | 1,500,000 | | 900,000 | 1,200,000 |
| 79.179 | | 579 | Western Apache | Olla | NULL | | | | 75,000 | 75,000 |
| 79.21 | 339 | 293 | Pierre Puget | Le ravissement d'Hélène | 3,000,000 | | 200,000 | | 750,000 | 475,000 |
| 79.22 | 5 | 534 | Bamblee | Maternity Figure | 1,200,000 | | 400,000 | | 500,000 | 450,000 |
| 79.28.1 | | 559 | Suzuki Kiitsu | Reeds and Cranes | 500,000 | | | 19,000 | 19,000 | 19,000 |
| 79.3 | | 220 | Yoruba | Gelede Cult Mask | 15,000 | | | | 750,000 | 750,000 |
| 79.30 | 285 | | Bartolomeo Manfredi | The Fortune Teller | 2,500,000 | | 1,500,000 | | | 1,500,000 |
| 79.33 | 86 | 468 | Benjamin West | Death on the Pale Horse | 2,500,000 | | 400,000 | 4,000,000 | 2,000,000 | 4,000,000 |
| 79.34 | 124 | 180 | Eva Hesse | Accession II | 7,500,000 | | 7,000,000 | 5,000,000 | 5,500,000 | 5,000,000 |
| 79.37 | | 530 | Pende | Mask | 85,000 | | | | 13,000 | 13,000 |
| 80.104 | | | Dan Flavin | Monument for V. Tatlin | 35,000 | | | 3,150,000 | | 3,150,000 |
| 80.25 | | 553 | Unknown | Tray with Design of Cranes and Chrysanthemums | 250,000 | | | | 125,000 | 125,000 |
| 80.39 | | 550 | Korean | Pillow | 250,000 | | | 125,000 | 5,000,000 | 125,000 |
| 81.644 | | 576 | Mesiwaoti | Bear Claw Necklace | 30,000 | | | | 150,000 | 150,000 |
| 81.695 | 340 | 139 | Giovanni Battista Foggini | Cupid and Psyche | 1,800,000 | | 1,250,000 | | 800,000 | 1,025,000 |
| 81.698 | | 562 | Easter Island | Gorget | NULL | | | | 250,000 | 250,000 |
| 82.26 | 87 | 2 | John White Alexander | Panel for Music Room | 1,300,000 | | 400,000 | | 50,000 | 225,000 |
| 82.27 | 341 | 372 | Giovanni Francesco Susini | Bacchus and a Young Satyr | 1,800,000 | | 900,000 | | 750,000 | 825,000 |
| 82.29 | | 526 | Mangbetu | Harp | 320,000 | | | | 40,770 | 40,770 |
| 82.3 | 88 | 223 | Paul Manship | The Moods of Time: Evening | 2,000,000 | | 50,000 | | 750,000 | 400,000 |
| 82.35.A | | 552 | Korean | Stationery Box with Design of Lotus Blossoms and Scrolls | 325,000 | | | | 75,000 | 75,000 |
| 82.49 | 6 | 535 | Bena Lulua | Figure | 1,500,000 | | 250,000 | | 600,000 | 425,000 |
| 82.64 | 97 | 538 | Neo-Sumerian | Gudea of Lagash | 10,000,000 | | 20,000,000 | 6,500,000 | 3,000,000 | 6,500,000 |
| 85.3 | 90 | 268 | Rembrandt Peale | The Court of Death | 1,000,000 | | 100,000 | | 50,000 | 75,000 |
| 89.11 | 286 | 43 | Giovanni Battista Cima | Madonna and Child | 2,000,000 | | 2,500,000 | | 4,000,000 | 3,250,000 |
| 89.23 | 287 | 297 | Guido Reni | Head of Christ Crowned with Thorns | 2,200,000 | | 700,000 | | 1,000,000 | 850,000 |
| 89.28 | 288 | 18 | Gerrit Adriaensz. Berckheyde | View of the Grote Kerk in Haarlem | 1,500,000 | | 500,000 | | 2,000,000 | 1,250,000 |
| 89.35 | 289 | 292 | Jan Prevost | The Last Judgment | 3,500,000 | | 7,000,000 | 17,500,000 | 8,000,000 | 17,500,000 |
| 89.39 | 290 | 89 | Pieter de Hooch | Mother Nursing Her Child | 2,000,000 | | 500,000 | | 1,500,000 | 1,000,000 |
| 89.44 | 291 | 457 | Rembrandt Harmensz van Rijn | The Death of Lucretia (?) | 5,000,000 | | 250,000 | | 150,000 | 200,000 |
| 89.46 | 292 | 367 | Jan Harvicksz Steen | Gamblers Quarreling | 1,500,000 | | 1,000,000 | 13,500,000 | 10,000,000 | 13,500,000 |
| 89.63 | 293 | 330 | Peter Paul Rubens | The Meeting of David and Abigail | 4,000,000 | | 9,000,000 | 30,000,000 | 8,000,000 | 30,000,000 |
| 89.7 | | 253 | Francialegio | Portrait of a Man | NULL | | | | 5,000 | 5,000 |
| 89.70 | 294 | | Bartolome Esteban Murillo | The Immaculate Conception | 5,000,000 | | 125,000 | 12,000,000 | | 12,000,000 |
| 90.15/144x2 | | 529 | Kongo | Male Figure | 180,000 | | | | 3,000 | 3,000 |
| F1963.12x2 | | 347 | Charles Shieler | Wheels | 190,000 | | | 550,000 | 175,000 | 550,000 |
| F1983.73 | | 376 | Bob Thompson | The Death of Camilla | 30,000 | | | | 50,000 | 50,000 |
| F66.40 | | 397 | Rembrandt Harmensz van Rijn | Adoration of the Shepherds | NULL | | | | 5,000 | 5,000 |
| F74.21 | | 573 | Islamic | Jewel Box inscribed "Amir Bukhara" | 10,000 | | | 2,500 | Unable to value | 2,500 |
| F74.36 | | 311 | Diego M. Rivera | The Meal | 15,000 | | | 175,000 | 50,000 | 175,000 |
| F76.14 | | 131 | Albrecht Dürer | Adam and Eve | 850,000 | | | | 650,000 | 650,000 |
| F76.92 | 342 | 132 | Donatello | The Nativity (Ford Nativity) | 2,000,000 | | 225,000 | | 4,500,000 | 2,362,500 |
| F77.104 | | 522 | Thomas Cowperthwaite Eakins | Three Female Nudes | 40,000 | | | 50,000 | 25,000 | 50,000 |
| F80.215 | | 125 | Robert S. Duncanson | Ellen's Isle, Loch Katrine | 300,000 | | | | 250,000 | 250,000 |
| F81.57 | | 3 | Robert Adamson | Elizabeth Rigby (later Lady Eastlake) | 8,500 | | | 6,250 | 18,000 | 6,250 |
| F82.198 | | 41 | Jean Baptiste Carpeaux | Neapolitan Fisherboy | NULL | | | 162,500 | 45,000 | 162,500 |

## **Exhibit E**

Rom. marble torso of Apollo
Inv. 26.122
1st AD
58 × 30 × 21¼ in

DIA Ins. value = $150,000 @ 1/6/97
Christie's = $800,000 - $2,500,000

w/curls, no strap
shorter, 34½ in  Christie's  NY  6 June 2013, lot 610 - Realized $195,750 ✓
22¼ in
shorter, w/head  "  NY  10 Dec. 2004, lot 567 - Realized $231,500
w/ head  46½ in
slightly shorter  "  NY, 13 June 2000, lot 305 - Realized $160,000  ✳
drape support
H. 59 in, no strap Sotheby's pg. 1 - #9 - 4 June 2014 - Realized $965,000 - ex Toledo mus  ✳
14⅝ in
23½ in, w/strap  #65 - 7 June 2007 - Realized $30,000
20 in., w/strap  pg. 2 - #43 - 7 June 2007 - Realized $90,000
only 9¾ in  #69 - 5 Dec. 2007 - Realized $67,000

Best
2013  $195,750 [20% B.P.] = Hammer $163,125 ∿
2000     160,000
2014     965,000

2014-S  $965,000 = 100,000 × 25% = 25000 B.P.   Hammer   B.P. ⟨25%⟩   MCV
        840,000 % 120% = 700,000 + 140,000 B.P. = 800,000 + 165000 ⟨200,000⟩ 600,000
2013-C  $195,750 = 75000 × 25% = 18,750 B.P.
        102,000 % 120% = 85,000 + 17,000 B.P. = 160,000 + 35,750 ⟨40,000⟩ 120,000
2000-C  $160,000 = 80,000 × 17.5% = 14,000 B.P.
        46,000 % 110% = 60,000 + 6,000 BP = 140,000 + 20,000 ⟨35,000⟩ 105,000

        105,000 - ⟩ 600,000    $400,000 - ⟩ $800,000

Christie's = FMV, so ≈60% = MCV, so $480,000 - 1,500,000

**Exhibit F**

Mesopotamian

N.E. (Babylonian) glazed tc + brick panel from Ishtar Gate w/ Relief
    snake-dragon             DIA ins. value = $1,000,000 @ 2/12/01
Inv. 31.25                Artvest value = $50,000,000
604-562 BC
45½ × 65¾ in (115.6 cm × 167.0 cm)
Pub. refs in email

Parts of Gate in other museums: Louvre, Met, RISD, MFA-Boston,
    Yale (1930.372)          AO 21118
                     (34.652)
                          (31.898)
                 31.13.2


maybe this on same order as the Mesopotamian limestone Relief-
    so, $30-50 million ✓
        20-40


Artvest = FMV, so ≈ 60% = MCV, so ≈ $30million

FGIC-Wiener 000035

**Exhibit G**

1          UNITED STATES BANKRUPTCY COURT
            EASTERN DISTRICT OF MICHIGAN
2                 SOUTHERN DIVISION

3

4   In re:                      )
    CITY OF DETROIT, MICHIGAN,  )
5                               ) Chapter 9
          Debtor.               )
6                               ) Case No. 13-53846
            vs.                 )
7                               ) Hon. Steven W. Rhodes
    ----------------------------)
8

9

10

11

12

13     VIDEOTAPED DEPOSITION OF ELIZABETH VON HABSBURG

14                 New York, New York

15              Thursday, July 31, 2014

16

17

18

19

20

21

22

23

24   Reported by:
     MICHELLE COX
25   JOB NO. 215820

## Page 2

```
1
2
3                    July 31, 2014
4                     9:04 a.m.
5
6
7        Videotaped Deposition of ELIZABETH VON
8    HABSBURG, held at the offices of Jones Day,
9    222 East 41st Street, New York, New York,
10   pursuant to Notice, before Michelle Cox, a
11   Notary Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1    A P P E A R A N C E S:
2
3        HONIGMAN MILLER SCHWARTZ AND COHN LLP
4        Attorneys for Detroit Institute of Fine Arts
5            2290 First National Building
6            660 Woodward Avenue
7            Detroit, Michigan 48226-3506
8        BY:   ARTHUR T. O'REILLY, ESQ.
9
10       JONES DAY
11       Attorneys for City of Detroit
12           51 Louisiana Avenue NW
13           Washington, D.C. 20001-2113
14       BY:   GEOFFREY S. IRWIN, ESQ.
15
16       KIRKLAND & ELLIS LLP
17       Attorneys for Syncora
18           300 North LaSalle
19           Chicago, Illinois 60654
20       BY:  LALLY A. GARTEL, ESQ.
21
22
23
24
25
```

## Page 4

```
1    A P P E A R A N C E S:
2
3            DENTONS
4            Attorneys Official Committee of Retirees
5                1221 Avenue of the Americas
6                New York, New York 10020-1089
7            BY:   ARTHUR H. RUEGGER, ESQ.
8
9            CLARK HILL PLC
10           Attorneys for Detroit Retirement Systems
11               212 East Grand River
12               Lansing, Michigan 48906
13           BY:   MICHAEL J. PATTWELL, ESQ.
14
     ALSO PRESENT:  Nicholas Guzman, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1                    INDEX
2    WITNESS              EXAMINATION BY        PAGE
3    ELIZABETH VON HABSBURG  MR. O'REILLY        8
4
5
6                    EXHIBITS
7    DEPOSITION EXHIBITS                   FOR ID.
8    Exhibit 1    Binder                    69
9    Exhibit 2    Notice of Deposition      154
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    IT IS HEREBY STIPULATED AND AGREED
2  by and between the attorneys for the respective
3  parties herein, that filing and sealing be and
4  the same are hereby waived.
5         IT IS FURTHER STIPULATED AND AGREED
6  that all objections, except as to the form of
7  the question, shall be reserved to the time of
8  the trial.
9         IT IS FURTHER STIPULATED AND AGREED
10 that the within deposition may be sworn to and
11 signed before any officer authorized to
12 administer an oath, with the same force and
13 effect as if signed and sworn to before the
14 Court.
15
16
17
18
19
20
21
22
23
24
25

1         THE VIDEOGRAPHER:  Good morning.  This
2  begins Tape No. 1 of the videotaped deposition
3  of Elizabeth von Habsburg on July 31, 2014, in
4  the matter of In re:  City of Detroit Michigan,
5  Debtors.
6         This case was filed in the United States
7  Bankruptcy Court, Eastern District of Michigan,
8  Case No. 13-53846.
9         Today's deposition is being held at the
10 law offices of Jones Day, LLP, located at 222
11 East 41st Street, New York, New York 10017.
12 The time on the record is now 9:06 a.m.
13        My name is Nicholas Guzman, I'll be the
14 legal video specialist.  The court reporter
15 today is Michelle Cox, both on behalf
16 Litigation Services.
17        At this time I'd ask counsel to please
18 introduce themselves for the record.
19        MR. O'REILLY:  Arthur O'Reilly on behalf
20 of the Detroit Institute of Arts.
21        MR. IRWIN:  Jeff Irvin, Jones Day, on
22 behalf of the City of Detroit.
23        MS. GARTEL:  Lally Gartel, Kirland &
24 Ellis, on behalf of Syncora.
25        THE VIDEOGRAPHER:  Also present via

1  teleconference, can you please identify
2  yourself for the record?
3         MR. PATTWELL:  Yes.
4         Michael Pattwell, Clark Hill on behalf of
5  the Detroit Retirement Systems.
6         THE VIDEOGRAPHER:  Anybody else?
7         MR. CHANDLER:  Nicholas Chandler for
8  Chadbourne on behalf of Assured Guaranty
9  Municipal Corp.
10        THE COURT REPORTER:  Can you speak up.
11 I'm sorry.  I didn't get that.
12        MR. CHANDLER:  Nicholas Chandler, for
13 Chadbourne & Parke, on behalf of Assured.
14        THE VIDEOGRAPHER:  Anybody else?
15        Will the court reporter please swear in
16 the witness.
17 E L I Z A B E T H  V O N  H A B S B U R G, called as
18        a witness, having been duly sworn by a Notary
19        Public, was examined and testified as follows:
20 EXAMINATION BY
21 MR. O'REILLY:
22        Q    Good morning, would you please state your
23 name for the record, please.
24        A    Elizabeth von Habsburg.
25        Q    My name is Arthur O'Reilly.  I represent

1  the Detroit Institute of Arts, and I'm going to
2  be asking you a few questions today.
3         Is that okay?
4  A    Yes.
5  Q    Have you had your deposition taken before?
6  A    I have.
7  Q    Okay.  And have you given any testimony at
8  trial?
9  A    I have.
10 Q    So are you familiar with deposition rules,
11 if you will?
12 A    To the extent that I've encountered them.
13 Q    Okay.  Fine.
14      So we have -- we have a court reporter
15 here who will be taking down your testimony,
16 both in writing and on video.
17      So to the extent possible, if you could
18 give me a verbal response when a question is
19 asked, either "yes" or "no," that will be
20 great, rather than a mm-mm or something like
21 that, which is less easy to understand on a
22 written transcript.
23      Okay?
24 A    Yes.
25 Q    And if at any point you don't understand

1 one of my questions, please feel free to
2 clarify.
3 A    Thank you.
4 Q    Is there any reason why you can't give
5 your full and complete testimony today?
6 A    No.
7 Q    Good.  Okay.
8       You are here in your capacity as an expert
9 on behalf of Kirland & Ellis and Syncora,
10 correct?
11 A    That's correct.
12 Q    Have you been retained by anybody else?
13 A    No, I have not.
14 Q    Okay.  And you're with the firm of Winston
15 Art Group; is that correct?
16 A    That's correct.
17 Q    Tell me a little bit about your
18 professional experience.
19 A    I started my career in the art world at
20 Christie's in 1982.  I ran the appraisal
21 department.  I was involved with handling
22 appraisals for high net worth clients and for
23 multi-departmental appraisals.
24       After Christie's I moved to another
25 auction house called Habsburg & Feldman, which

1 then became Habsburg.  I was director of the
2 estates and appraisals department at that firm.
3 I was there for four years, handling, again,
4 high net worth clients, handling appraisals,
5 getting property up for sale.
6       And I then moved to a firm that was called
7 Masterson & O'Connell, which then became Gurr
8 Johns after a number of years, hence the name
9 changes.
10       I was president of that firm for 18 years.
11 That firm was an art advisory and appraisal
12 firm not an auction house.
13       And there I handled all the high net worth
14 clients.  I handled purchases and sales;
15 oversaw the operations of the U.S. firm.
16       And in 2010, I joined Winston Art Group,
17 where I am managing director of the firm.
18       Winston Art Group is the foremost
19 independent art advisory appraisal firm in the
20 U.S., headquartered in New York, offices in LA,
21 Boston, Palm Beach, Houston, Denver,
22 representatives in Geneva and London.
23 Q    Great.  Thank you.
24       And you produced an expert report; is that
25 correct?

1 A    That's correct.
2 Q    That was based upon a valuation performed
3 by you and Winston Art Group?
4 A    That's correct.
5 Q    When were you first contacted about doing
6 any work in relationship to the City of Detroit
7 bankruptcy?
8 A    I would have to look back at my files, but
9 several months ago.
10 Q    Was it in 2014?
11 A    I would have to look at my files.  I don't
12 have that here.
13 Q    Is there anything that would refresh your
14 recollection besides your file?
15 A    No, not unless the counsel has those
16 records here.
17 Q    Your compliant with USPAP, correct?
18 A    That's correct.
19 Q    And what does "USPAP" stand for?
20 A    Uniform Standards of Professional
21 Appraisal Practice.
22 Q    Okay.  And does USPAP have a standard that
23 requires that you keep a file?
24 A    Yes, it does.
25 Q    Okay.  And so you keep a file in

1 compliance with USPAP, correct?
2 A    Absolutely.
3 Q    Okay.  Did you bring it with you today?
4 A    No, I did not.
5 Q    Is there a reason why you didn't bring it
6 today?
7 A    No.
8 Q    Nobody told you not to bring it today?
9 A    No.
10       MR. O'REILLY:  Counsel, I believe a letter
11 was sent to you about that file.  If it's
12 possible to get it today, would be great.  If
13 not possible, we understand.
14       MS. GARTEL:  We can look into it.
15       MR. O'REILLY:  Okay.  Thank you.
16       MR. IRWIN:  May I just ask a clarifying
17 question.
18       Has Syncora produced what it understands
19 to be the reliance file that was requested in
20 connection with document requests in a recent
21 letter supporting Ms. von Habsburg's report.
22       MS. GARTEL:  We're in the process of
23 putting it together.
24       MR. IRWIN:  Okay.
25

1  BY MR. O'REILLY:
2      Q    So you don't remember when you were first
3  contacted.
4          Do you remember who first contacted you?
5      A    Yes, I do.
6      Q    Who was that?
7      A    Gary Piattoni.
8      Q    Can you spell that name for the court
9  reporter?
10     A    I hope I'm spelling it correctly.
11         It's Gary, G-A-R-Y. Piattoni,
12  P-I-A-T-T-O-N-I, I believe.
13     Q    And who is he or who is he associated
14  with?
15     A    Gary Piattoni is somebody that I worked
16  with years ago when I was at Christie's. And
17  he is an independent advisor, I believe, an
18  appraiser, in the Midwest.
19     Q    Okay. Was he called on anybody's behalf?
20     A    I believe he was calling on behalf of the
21  law firm.
22     Q    The law firm of Kirkland & Ellis?
23     A    Correct.
24     Q    Okay. Other than Kirkland & Ellis, did
25  anybody else contact you with regard to the

1  City of Detroit bankruptcy?
2      A    No.
3      Q    Nobody from Weil Gotshal?
4      A    No.
5      Q    Okay. Nobody from FGAC, which is
6  Financial Guaranty Assurance Corporation, or
7  something similar to that?
8      A    No.
9      Q    Okay. Anybody from Houlihan Lokey?
10     A    No.
11     Q    Okay. So you can't remember when it was.
12         Do you remember when you were engaged?
13     A    Again, I don't remember the date.
14     Q    Can you give me an approximate period of
15  time in which that -- that happened?
16     A    I would say approximately -- what do we
17  know.
18         Approximately four -- four to five months
19  ago. I'm guessing, though. I really have to
20  look to --
21     Q    Sure.
22     A    -- give you an accurate answer.
23     Q    When did you finish your work on the fair
24  market value appraisal?
25     A    About a week ago.

1      Q    Okay. Your report references a date of
2  March 25th, of 2014, I believe.
3          What does that date refer to?
4      A    When we're asked to do an appraisal, we
5  always ask for an effective date. And that was
6  the date that was given to us.
7      Q    And what does "effective date" mean?
8      A    Meaning the date as -- as of which the
9  values are calculated.
10     Q    Okay. So by March 25th of 2014, you had
11  already calculated your values?
12     A    No, you don't have to have it -- you don't
13  have to calculate it before the date. The date
14  might be five years ago.
15         The effective date is the date as of which
16  you look at the market and see what the values
17  are.
18     Q    Okay. So I just want to pinpoint what
19  that means. It's an effective date.
20         Is it arbitrarily selected?
21     A    It's -- what do you mean by "arbitrarily"?
22     Q    Who chose that date?
23     A    The law firm.
24     Q    Okay. Do you know why they chose that
25  date?

1      A    I do not.
2      Q    Were you doing work prior to March 25,
3  2014?
4      A    I believe we were. I don't have the exact
5  dates.
6      Q    Do you know how long before?
7      A    Again, I don't have the dates.
8      Q    Was it more than a month?
9      A    I would love to help you, but I don't have
10  the date on which we were asked to begin.
11     Q    Does the date that you began, is that
12  relevant in any respect to the report that you
13  rendered?
14     A    In what sense?
15     Q    I don't know.
16         I'm just trying to figure out if you have
17  an effective date. You told me it was given to
18  you by the law firm.
19         You said that you started sometime prior
20  to that, correct?
21     A    I believe so. Honestly, I would need -- I
22  need to look at my notes or at our agreement
23  letter --
24     Q    Right.
25     A    -- to give you an exact date.

1  Q   Which you didn't bring today?
2  A   Correct.
3  Q   You have an appraisal file.
4      Whose benefit is that for?
5  A   I don't understand that question.
6  Q   Why do you keep an appraisal file?
7  A   Part of USPAP.
8  Q   Okay.  Is that the only reason why you
9  keep it?
10 A   No, also for our own records.
11 Q   Okay.  Does USPAP contemplate why you
12 might keep a record like that?
13 A   They don't specify in USPAP why a record
14 needs to be kept.  They just state that it
15 does.
16 Q   Okay.  Do your clients ever ask for that
17 record?
18 A   Very rarely.
19 Q   Okay.  If they ask for it would you give
20 it to them?
21 A   If our clients asked us to give it them,
22 yes, except if there is anything confidential
23 in there between, say, an attorney and us.
24 Q   Understood.
25     You said you finished your work two weeks

1  ago?
2  A   No.  I said about a week ago.
3  Q   Sorry.  A week ago.  Thank you.
4      A week ago is when you finished your work
5  on this project; is that correct?
6  A   Correct.
7  Q   Okay.  During the course of the time that
8  you were first contacted, until today, and
9  leaving aside communications with your lawyers
10 for the moment, have you discussed your
11 engagement or your testimony or the substance
12 of your report with anybody?
13 A   Only internally with my colleagues.
14 Q   And does one of your colleagues include
15 your appraisers?
16 A   Absolutely, yes.
17 Q   Anybody else?
18 A   Not to my recollection.
19 Q   So you never spoke with any of the other
20 experts in the case?
21 A   The experts are our appraisers.
22 Q   Excuse me.  That was a bad question.
23     There have been other experts retained in
24 this case, including a guy by the name of
25 Victor Weiner.

1      Have you ever spoke with Victor Weiner?
2  A   I've spoken with Victor Weiner; not in
3  reference to this case.
4  Q   Thank you.  Perfect.
5      Your expert report includes a biography of
6  yourself and also a description of your firm,
7  correct?
8  A   Correct.
9  Q   Is that complete and accurate?
10 A   Yes.
11 Q   Is it up to date?
12 A   Yes, it is.
13 Q   Are there any licenses or accreditations
14 that are not listed in your biography?
15 A   Unfortunately, the appraisal business, as
16 the Wall Street Journal said, our business is
17 one of the largest legal economies to be
18 largely unregulated.
19     So whereas -- as chair of the present
20 foundation in Washington, D.C., I would love to
21 see accreditation for our appraisers.
22     For personal property, there is none.
23 There are certifications.  And I do have
24 certification.
25 Q   Okay.  What are those certifications that

1  are not listed in your biography?
2  A   There are none not listed in my biography.
3  Q   Thank you.
4      You said it's unregulated.
5      What does that mean to you?
6  A   To me that means that there are no
7  national registries for personal property
8  appraisers.  There are no national credentials
9  such as real estate appraisers have in personal
10 property appraising.
11 Q   So there's no requirement that you be a
12 member of a particular association to do
13 appraisals, correct?
14 A   There's no requirement, but the IRS does
15 now require that appraisers conform to USPAP
16 when they're doing appraisals for IRS purposes.
17 Q   So other than that qualification, there
18 are no requirements that an appraiser be a
19 member of a particular association, or be
20 regulated by a particular body, correct?
21 A   That's correct.
22 Q   Thank you.
23     Do you have any training in finance?
24 A   In what sense?
25 Q   Would you have an MBA?

1   A   I do not have an MBA.
2   Q   Did you take any post Stanford courses on
3 finances?
4   A   I took accounting and I took statistics.
5   Q   Where did you go to take those classes?
6   A   Columbia University -- excuse me.
7 Columbia University Business School.
8   Q   What is your degree from Columbia
9 University?
10   A   It's in international affairs.
11   Q   So you took a class on statistics.
12      And what was the other?
13   A   Accounting.
14   Q   Accounting.
15      Other than those two classes, did you take
16 any other financial-related courses?
17   A   No.  I took a lot of economics courses,
18 but finance in particular, no.
19   Q   How many economic courses did you take?
20   A   Goodness.  Several.
21   Q   Sitting here today you can't recall?
22   A   No.  It's --
23   Q   Your degree is not in economics, though,
24 correct?
25   A   No, it's not in economics.

1   Q   And your degree is not in statistics,
2 correct?
3   A   Correct.
4   Q   And your degree is not in accounting,
5 correct?
6   A   That's correct.
7   Q   Would you hold yourself out as an expert
8 on any of those things?
9   A   No, I would not.
10   Q   I think you mentioned that Winston is a
11 foremost independent art advisory firm?
12      Did you say that before?
13   A   Art advisory?
14   Q   Yeah.  I'm sorry.  Advisory firm.
15   A   Correct.
16   Q   What does it mean to be an "independent
17 art advisory firm"?
18   A   Art advisory and appraisal firm.
19      "Independent" meaning we are neither an
20 auction house nor a dealer.
21   Q   Does it mean anything else?
22   A   No.
23   Q   No.
24      Why distinguish yourself in that fashion?
25   A   Because as an independent art advisory and

1 appraisal firm, we are acting in an objective
2 manner when we're preparing either appraisals,
3 or when we're assisting clients with buying and
4 selling.
5      We don't have a financial interest in the
6 works that we are either appraising or
7 assisting clients with buying or selling.
8   Q   So then by virtue of holding yourself out
9 in that capacity, you are representing that you
10 are objective and neutral?
11   A   Correct.
12   Q   And under the American Appraisal
13 Association -- which you're a member of,
14 correct?
15   A   Yes.  The Appraisers Association of
16 America, yes.
17   Q   That requires that when you work on behalf
18 of a client that you remain neutral?
19   A   The Appraisers Association of America
20 doesn't have that requirement.
21   Q   Does it have anything similar to that in
22 the context of giving testimony in a case?
23   A   USPAP does.
24      USPAP requires that when you perform an
25 appraisal, that you act in an independent

1 manner.
2   Q   Do you have a position with the -- can I
3 call it the "AAA"?
4   A   You can call it the "AAA."
5   Q   Because I'll put trig, otherwise.
6      Do you have a position with the AAA?
7   A   I do.
8   Q   What is your position?
9   A   I'm on the board.
10   Q   Anything else, currently?
11      Any other position on the AAA besides
12 being on the board?
13   A   I'm on the board.  I'm also co-chair of
14 the annual appraisal luncheon for our award for
15 excellency in the arts. And I'm co-chair of the
16 advisory council.
17   Q   In the past, have you held any other
18 positions?
19   A   I have been a member of the ethics
20 committee.
21   Q   Anything else that you can think of?
22   A   Not that I can recall.
23   Q   Okay.  Was Victor Weiner -- am I
24 pronouncing his name right?
25   A   You are.

1  Q    Is he a member of the AAA?
2  A    He is -- I don't believe he's currently a
3  member of the AAA.
4  Q    He used to be a member of the AAA?
5  A    Yes, he did.
6  Q    Do you know why he is no longer a member
7  of the AAA.
8  A    No.
9       He was director of the Appraisers
10 Association of America, but that was going
11 back, I would say, approximately 8 to 10 years;
12 10 to 12 years ago.
13 Q    So he wasn't a member; he was on staff?
14 A    He was a director, but -- I'm sorry.
15      I don't know whether he was actually a
16 member or whether he was just director or first
17 a member and then director.  I don't know
18 that -- the answer to that.
19 Q    Do you know whether he was paid a salary
20 for the work that he did?
21 A    Yes, as director he was paid a salary.
22 Q    But he's no longer with the AAA?
23 A    As I said, I don't know whether he's a
24 member now.  But he's no longer a director of
25 the AAA.

1  Q    Do you know why he's no longer a director
2  of the AAA?
3  A    I just remember that there was a need for
4  a change.  I don't know whether it was his
5  decision or whether it was the AAA's decision
6  to make a change.
7  Q    And as a member -- were you a member of
8  the board at the time?
9  A    I don't believe I was, but I can't be
10 sure.  I'm not sure of the timing.
11 Q    Why was there a need for a change?
12 A    I don't know.  I don't recall why there
13 was a need for a change or whether it was his
14 decision or the board's decision to make a
15 change.
16 Q    Did anything occur with respect to Mr.
17 Weiner at the time that gave the AAA concerns?
18 A    I can't answer that question.
19 Q    You can't because you don't know?
20 A    I don't know.
21 Q    You don't remember?
22 A    I don't know.  I don't remember.
23      I don't know whether I was on the board at
24 that time or not.
25 Q    In the course of Mr. Weiner's relationship

1  with the AAA, are you aware of any unethical
2  conduct?
3  A    Not that I recall.
4  Q    Any violations of any of the rules of the
5  AAA?
6  A    Not that I can recall.
7  Q    Do you know whether he was terminated?
8  A    I don't recall.
9  Q    How many times have you had your
10 deposition taken?
11 A    Approximately ten.
12 Q    Wow.
13      So you're good at this; maybe more than
14 some of us in the room.
15      How many times have you given trial
16 testimony?
17 A    Say, approximately seven.
18 Q    And those are listed in your bio, correct?
19 A    They are.
20 Q    No more other than that?
21 A    Sorry.
22      No other instances in which you either
23 gave deposition testimony or trial testimony,
24 other than what was listed in your biography?
25 A    Except today.

1  Q    Except today.  Correct.
2       So you can amend it after today.
3  A    Correct.
4  Q    I noticed one of them.  One of them was
5  called Barnes.
6       Do you recall being engaged to provide
7  testimony in Barnes?
8  A    Absolutely.
9  Q    What was Barnes about?
10 A    Barnes was a -- is a museum in
11 Philadelphia, and it was a case between the
12 museum itself and a group that was called "the
13 students."
14      And the museum wanted, for financial
15 reasons, to move to downtown Philadelphia, and
16 the students did not want the museum to move.
17 Q    Just for clarification, who are the
18 students affiliated with?
19 A    That, I don't know.
20 Q    Do you know whether they were students of
21 the museum?
22 A    I believe they -- some or all of them had
23 studied at the museum.
24 Q    Do you know if they were students at
25 Lincoln University?

1   A   That, I don't know.
2   Q   So you were retained, I gather, by the
3   museum?
4   A   Correct.
5   Q   And what work did you perform on behalf of
6   the museum?
7   A   We performed an appraisal of many of the
8   Works of Art in the museum, for both fine art
9   and decorative art.
10      Excuse me.  Sorry.
11  Q   Why were you retained to do that work?
12  A   They wanted to have an appraisal of
13  their -- the value of their collection, not
14  including the most major works, but including
15  all the remainder.
16  Q   How many works were in the remainder
17  non-major works?
18  A   I'm going back quite a long time, but I'd
19  say several thousand.
20  Q   Less than 5,000?
21  A   That, I can't remember.  It's been a long
22  time.
23  Q   Less than 10,000?
24  A   Again, I can't give you a number.
25  Q   Less than 20?

1   A   We just answered that question.
2   Q   So sitting here today, you have no idea
3   what the size of the collection that you value
4   was?
5   A   As we said, I imagine it was several
6   thousand, but I can't remember a precise
7   number.
8   Q   Do you recall what type of appraisal you
9   did?
10  A   In terms of?
11  Q   Okay.  We'll do this in the beginning.
12      I understand that there are different
13  types of appraisals that can be formed,
14  correct?
15  A   Correct.
16  Q   One of them is called a "fair market value
17  appraisal"; is that correct?
18  A   That's correct.
19  Q   Is one of them called a "marketable cash
20  value appraisal"?
21  A   Yes.
22  Q   And is one of them called a "liquidation
23  value appraisal"?
24  A   That's not a type of appraisal that we do.
25  Q   Okay.  So you don't do liquidation values?

1   A   Correct.
2   Q   Okay.  And is insurance a type of
3   appraisal, insurance value?
4   A   It's either called an "insurance value" or
5   a "retail replacement value," yes.
6   Q   Are they synonymous, in your mind?
7   A   Insurance appraisals and retail
8   replacement values are synonymous, yes.
9   Q   What does that mean, "retail replacement
10  value"?
11  A   Retail replacement value is a value that's
12  used to cover a client for an eventual
13  insurance loss or damage.  So it's a value that
14  is comparable to what one would have to pay to
15  replace something at a dealer or a gallery.
16  Q   Is it typically the highest value that any
17  appraiser would put on a particular work?
18  A   Typically, yes, although there are always
19  exceptions.
20  Q   So you said that "you."
21      And when you said "you," is that you and
22  Winston both, Winston Art Group?
23      Excuse me.
24  A   In what reference?
25  Q   I'm sorry.  That was a bad question.

1       You just testified that you don't do
2   liquidation value appraisals, correct?
3   A   Correct.
4   Q   Is liquidation valuation appraisal a type
5   of appraisal that can be performed?
6   A   I believe it is, it's just not something
7   that we do.
8   Q   When you said "we," you mean both you and
9   your firm?
10  A   Correct.
11  Q   Do you recall whether you did a fair
12  market value appraisal for Barnes?
13  A   I believe we did, but, again, this was the
14  previous firm.  I don't have access to those
15  files.
16  Q   What was the name of the firm that you
17  were employed by?
18  A   Gurr Johns.
19  Q   Do you recall what the value was that you
20  placed on a portion of the collection that you
21  did examine or value?
22  A   Again, I don't remember.
23  Q   Was it in the millions?
24  A   I don't recall.  I'd have to take a look
25  at my old paperwork to tell you that.

1  Q    Sitting here today, can you tell me
2  whether it was more than 100 million?
3  A    I would say it's probably not more than
4  100 million.
5  Q    But you don't recall how many works you
6  valued?
7  A    I do not.
8  Q    Sitting here today, you can't tell me if
9  there was 100,000 objects?
10  A    You've asked me that before and I told you
11  I cannot remember.  I don't have that
12  paperwork.
13  Q    How did you go about determining which
14  objects, the non-major works, as you referred
15  to them at Barnes, how did you go about
16  determining which ones to look at?
17  A    They provided us with lists of works to
18  look at.
19  Q    "They" meaning the museum?
20  A    The museum, correct.
21  Q    And you were retained by the actually
22  museum itself, correct?
23  A    Yes, that's correct.
24  Q    Not by a third party?
25  A    Not as far as I recall, no.  It was the

1  museum.
2  Q    Did you understand that to be the entirety
3  of the non-major works at the Barnes Museum?
4  A    I cannot remember whether it was the
5  entirety or whether it was a selection of the
6  remainder.
7  Q    You did not make the choice to -- about
8  which works to value, though, correct?
9  A    That's correct.
10  Q    Did you provide them with any advice or
11  opinions on which works to value?
12  A    I don't believe we did.
13  Q    Okay.  What did the students want to
14  accomplish in that case?
15  A    I believe that, from my recollection, that
16  the students wanted to have the institution
17  remain in suburban Philadelphia, in Marion.
18  Q    And who wanted to move it?
19  A    The museum.
20  Q    And is the Barnes Museum a private museum?
21  A    Very good question.  I have not a clue.
22  Q    There are other major works at the museum,
23  correct?
24  A    That's correct.
25  Q    You didn't value any of those works,

1  artwork, correct?
2  A    We did not.
3  Q    Do you know the total size of the Barnes
4  collection?
5  A    In numbers of objects?
6  Q    Correct.
7  A    I do not know.
8  Q    So I don't need to ask the other follow-up
9  questions.
10      You'll have the same response if I ask
11  you:  Is it greater than 100,000 or less than
12  100,000?
13  A    That's correct.
14  Q    Thank you.
15      Are you what's called a "general
16  appraiser"?
17  A    I've been called that in the past, yes.
18  "General appraiser" is an odd term, not
19  really defined.  So I started out as generalist
20  and then have since, throughout my long career,
21  specialized in certain areas.
22  Q    As a "general appraiser," is that term
23  pejorative in any way?
24  A    Not at all.
25  Q    Okay.  Do you have a specialty?

1  A    Yes, I do.
2  Q    What is your specialty?
3  A    I have a number of specialties, primarily
4  modern impressionist and contemporary art;
5  furniture and furnishings, mostly European;
6  silver, some porcelain.
7  Q    And the areas in which people "specialize"
8  in the art world -- I'm sorry if that is an
9  overly general term -- what percentage would
10  you say that you specialized in?
11      Is it 20 percent of the total number of
12  things that people typically specialize in; is
13  it 10 percent?
14      I'm just trying to get a sense of how much
15  expertise there is there?
16  A    Can you rephrase that question because I'm
17  not quite sure I understand.
18  Q    Terrible question.
19      There are a number of different areas in
20  which people can specialize, correct?
21  A    Correct.
22  Q    And you've named a few that you specialize
23  in, correct?
24  A    Yes.
25  Q    And you don't hold yourself out to be an

1  expert in all the other areas, correct?
2  A    Absolutely.
3  Q    I guess what I'm trying to figure out is:
4  Is there a way for me to know whether your
5  expertise covers 20 percent of the potentially
6  appraisable art market or 10 percent?
7  A    That is a question I just can't even
8  answer.
9  Q    Okay.  Fine.
10      How many prior appraisals have you done?
11 A    Personally or with my firm's?
12 Q    Let's do personally first and then Winston
13 second.
14 A    Okay.  Winston has been in existence since
15 2010.
16      And we do -- "we," as a firm, do
17 approximately five to 600 appraisals per year.
18 Sometimes I work on an appraisal myself if it's
19 a discrete group of works.  Other times and
20 most often we work as teams.
21      So I can't give you a precise number, but
22 only an overall idea of how many we do per
23 year.
24 Q    Why do you work as teams?
25 A    Because some -- various reasons.

1      We work as teams sometimes because if it's
2  a very important collection, we may have two or
3  even three specialists in the same area working
4  together in order to bounce ideas off each
5  other and discuss the relevant comparables and
6  so on.
7      And other times there are areas of
8  expertise that are very specialized, so we call
9  in a specialist who is a specialist in that
10 particular area to join in the team.
11     THE VIDEOGRAPHER:  I'm sorry.  Can we go
12 off the record for a quick second?
13     MR. O'REILLY:  Yes.
14     THE VIDEOGRAPHER:  The time is 9:38 a.m.
15 We're going off the record.
16     (Recess taken.)
17     THE VIDEOGRAPHER:  This is the
18 continuation of Tape No. 1.  The time is
19 9:40 a.m.  We're back on the record.
20     MR. O'REILLY:  Can we go off the record.
21     MR. IRWIN:  Go off.  I've got to --
22     THE VIDEOGRAPHER:  The time is 9:40 a.m.
23 We're off the record.
24     (Recess taken.)
25     THE VIDEOGRAPHER:  This is the

1  continuation of Tape No. 1.  The time is 9:42
2  a.m.  We're back on the record.
3  BY MR. O'REILLY:
4  Q    When we went off the record you were
5  telling me that you worked in teams on occasion
6  for your appraisals with Winston, correct?
7  A    Correct.
8  Q    Okay.  And you said one of the reasons why
9  you do that is because sometimes there's a work
10 of art where you need particular specialties,
11 right?
12 A    That's correct.
13 Q    Is another reason why you work as teams to
14 validate potential disagreements over numbers?
15 A    Can you explain that question?
16 Q    Sure.
17      If you're -- do you occasionally have --
18 lead a team of appraisers?
19 A    Lead a?
20 Q    Team of appraisers on a particular
21 project?
22 A    Yes.
23 Q    And when they're done with their work, do
24 you review that work?
25 A    Yes.

1  Q    Okay.  Are there times when you see values
2  placed on works that you might disagree with or
3  have questions about?
4  A    Absolutely.
5  Q    And in those circumstances, is that one of
6  the occasions where you might work as a team to
7  discuss whether that number makes sense or not?
8  A    Yes, we might work as a team, or I might
9  speak with one of the specialists or another
10 specialist might speak with that specialist.
11 Q    Would you ever unilaterally disregard a
12 number?
13 A    No.
14 Q    Would USPAP allow you to do that?
15 A    That's a circumstance I haven't run into.
16 I'd have to check USPAP to see whether they
17 would allow that.
18 Q    In your experience, would it be good
19 practice to do that?
20 A    No.
21 Q    Any other reasons why you might work as a
22 team in coming up with a valuation?
23 A    I suppose we might work as a team if we're
24 under time pressure and we needed a number of
25 specialists there on the same day in order to

1  get the work done in an expeditious manner.
2  Q   But in those circumstances, the individual
3  appraisers are still doing their work
4  individually; correct?
5  A   That's correct.
6  Q   You said you've done -- Winston does 5 to
7  600 appraisals a year.
8      What about you personally?
9  A   I mentioned before it's very hard to
10 separate it out because sometimes I work
11 individually if it's a discrete group of works,
12 but other times I work with a team.
13 Q   So in the past year can you recall how
14 many instances in which you worked solely on
15 your own?
16 A   I can't recall the exact number, but I
17 would say it would be a small percentage.
18 Q   And by small percentage, are we talking
19 about maybe ten appraisals?
20 A   No.  I'd say 10 percent, maybe.  That's a
21 rough approximation.
22 Q   I went to Georgetown where they don't
23 teach you math, so I'll have to get a
24 calculator later.
25     MR. RUEGGER:  I was a math major there for

1  a year.
2      MR. O'REILLY:  That explains a lot.
3      MR. RUEGGER:  That was decades before you
4  got there.
5  BY MR. O'REILLY:
6  Q   So what types of appraisals were those 5
7  to 600 done by Winston last year?
8  A   A combination of retail replacement
9  appraisals, fair market value appraisals and
10 marketable cash appraisals.
11 Q   No others?
12 A   Not -- no others.
13 Q   And can you tell me approximately what
14 percentage are in each type of appraisal?
15 A   The actual percentage?
16 Q   What percentage of the 600 is retail?
17     What percentage is FMV?
18     And which percentage is marketable cash?
19 A   I'm going to make an educated guess,
20 because I don't have the numbers in front of
21 me.  But probably 40 percent retail; 40 percent
22 fair market value; and 20 percent marketable
23 cash value.
24     But that's really a rough, off the cuff
25 idea.

1  Q   Would those percentages apply, similarly,
2  across prior years?
3      We just talked about last year, which was
4  2000 -- well, I guess the last 12 months was
5  what I was referring to.
6      Were you understanding me to say the last
7  12 months?
8  A   We do it on an annual basis.
9  Q   So when you were giving me the 5 to 600
10 number, was that for 2013?
11 A   Correct.
12 Q   Okay.  In prior years, would your numbers
13 have been about the same?
14 A   Number of appraisals --
15 Q   Correct?
16 A   -- or percentages?
17 Q   Number of appraisals.
18 A   Yes, approximately the same.
19 Q   And would the percentages have been
20 approximately the same?
21 A   It should have been, yes.
22 Q   Of those threes types of appraisals that
23 you have done with Winston, is there any in
24 which it's more likely to have higher values?
25 A   Yes, it's more likely to have higher

1  values in retail replacement appraisals.
2  Q   Why is that?
3  A   As I explained before, retail replacement
4  is used for insurance purposes to protect
5  clients, for risk management purposes.  In the
6  event that something is lost or stolen or
7  damaged and they have to replace it in short
8  order.
9      And retail replacement value looks at what
10 one would have to pay at a high-end retail or
11 gallery in order to replace something in short
12 order.
13 Q   What is the largest, in terms of value,
14 retail appraisal that you've done?
15 A   Over a billion dollars.
16 Q   Are you permitted to tell me who engaged
17 you for that?
18 A   I am not.
19 Q   Was it a private collector?
20 A   I'm not allowed to talk about my other
21 appraisals.
22 Q   And what prevents you from talking about
23 your other appraisals?
24 A   NDAs.  Nondisclosure agreements.
25 Q   Okay.  So sitting here today -- I just

Page 46

1  want to make sure I understand this -- you
2  won't be table to tell me whether you've
3  appraised works on behalf of museums?
4  A   I cannot.  Unless the institution or
5  person allows us to discuss an appraisal, we
6  are not allowed to discuss appraisals.
7  Q   But I'm correct that if I were to ask you
8  to distinguish between private collectors or
9  museum collectors, because you have NDAs as to
10 some of them, you wouldn't be able to answer
11 for me a complete range of your experience in
12 that area, correct?
13 A   I'm not sure I understand the question.
14 Q   Really bad question again.
15     MR. O'REILLY:  And, Counsel, I want to
16 make sure I understand your position on this.
17     Is it your position that your witness
18 cannot testify to the types of clients that
19 have engaged her in the aggregate?
20     MS. GARTEL:  She can testify as to those
21 things she's permitted to testify under
22 agreements to which she's a party.
23     MR. O'REILLY:  Can I go off the record for
24 this?
25     THE VIDEOGRAPHER:  The time is 9:50 a.m.

Page 47

1  We're off the record.
2      (Recess taken.)
3      THE VIDEOGRAPHER:  This is the
4  continuation of Tape No. 1.  The time is 9:55
5  a.m.  We're back on the record.
6      MS. GARTEL:  Counsel, could you please
7  reask the question?
8      MR. O'REILLY:  Can you read back my
9  question.
10     (Record read.)
11 BY MR. O'REILLY:
12 Q   Just let me ask a different question.
13     Within the retail appraisal category, are
14 you able to approximate for me how many of
15 those, or what percentage were done on behalf
16 of private collectors and those that were done
17 on museums or public clients?
18 A   For retail replacement purposes, I'm
19 giving you an approximate, again, because I
20 don't have the figures in front of me.  But
21 it's probably 90 percent private; 10 percent
22 public institutions.
23 Q   Same question with regard to fair market
24 value?
25 A   In terms of number of appraisals, I would

Page 48

1  say probably, roughly, the same percentage.
2  But, again, these are rough numbers.
3  Q   And what about marketable cash value?
4  A   Interesting question.
5      Because are you asking who the property
6  belonged to or who asked us to do the appraisal
7  in that question?
8  Q   I'd like to know both.
9  A   Both.
10     Marketable cash value is usually used
11 for -- it's used either for divorce, family
12 division, or it's used for art as collateral.
13     In art as collateral appraisals we are
14 usually engaged by an institution, being a
15 bank, so --
16 Q   Can you, sitting here today, think of any
17 instance in which you did a marketable cash
18 value for a museum?
19 A   No, I cannot.
20 Q   Sitting here today, can you think of any
21 instance in which you did an FMV for a museum?
22 A   In what time period?
23 Q   Since your time with Winston.
24 A   Just appraisal.
25 Q   Any others?

Page 49

1  A   Probably several of them, but I don't have
2  those numbers in front of me, so I can't tell
3  you accurately.
4  Q   Sitting here today, you can't recall any?
5  A   I can't recall any, no.
6  Q   Same question for retail; do you recall
7  any in which you did it on behalf of a museum?
8  A   No.
9  Q   So sitting here today, the only instance
10 that you can recall that you performed a
11 valuation on behalf of the museum is the case
12 that we're sitting in today?
13 A   I believe we've done a number of smaller
14 ones for institutions and museums, but I can't
15 recall the number.
16 Q   What would you have to do to refresh your
17 recollection?
18 A   I'd have to look back over our records in
19 the office.
20 Q   What is the largest appraisal that you've
21 done in terms of numbers of works?
22 A   Last year we completed an appraisal that
23 was approximately 20,000 works.
24 Q   And you cannot tell me who the client was,
25 correct?

1  A   I cannot.
2  Q   And what type of appraisal was that?
3  A   It was a fair market value appraisal.
4  Q   You're able to tell me what the valuation
5  number was that you came up with?
6  A   I cannot.
7  Q   Are you able to tell me how long it took
8  you to perform that valuation?
9  A   Yes.  That valuation took over the course
10  of one year.  Well, less than a year.  Maybe
11  nine months; nine months to a year.
12  Q   And is that a long time to do a valuation
13  of 20,000 works?
14  A   I can't answer that question.  Depends on
15  what the works are.
16  Q   Was it a mass appraisal?
17  A   A "mass appraisal"?
18      Can you define what you mean by "mass
19  appraisal."
20  Q   Are you familiar with the term "mass
21  appraisal"?
22  A   I am.
23  Q   Tell me what your definition of mass
24  appraisal is.
25  A   Mass appraisal is using a multiple for a

1  group of similar Works of Art.  Oh, not Works
2  of Art.  Sorry.  Usually used in real estate.
3  So similar properties.
4  Q   Anything else you can tell me about mass
5  appraisals?
6  A   No, that is it.
7  Q   Have you ever done a mass appraisal for
8  artwork?
9  A   We've never called it a "mass appraisal,"
10  but we've used that concept from time to time
11  where there are hundreds of similar works,
12  where we've looked at a sample and extrapolated
13  from that.
14  Q   But you wouldn't call it a "mass
15  appraisal"?
16  A   No, we don't use that concept.
17  Q   When you evaluated the 20,000 works that
18  we just spoke of, was it a mass appraisal?
19  A   I just mentioned we don't do mass
20  appraisals.  And -- we don't do mass
21  appraisals.
22  Q   So you don't do mass appraisals.  I see.
23      I apologize if I asked this question:
24  What type of appraisal was this 20,000?
25  A   Fair market value.

1  Q   This was FMV.
2      What was the next largest in terms of
3  number of works, FMV, that you've done?
4  A   I can't recall exactly.
5  Q   Are they typically as large as 20,000?
6  A   No.
7  Q   What's your typical FMV?
8  A   There's no typical.  Sometimes it's one
9  item; sometimes it's hundreds of items.
10  Q   So when I asked you whether it was typical
11  and you said, no, you just mean that one was
12  atypical to you, correct?
13  A   The 20,000, that one, yes, that was
14  atypical.
15  Q   What was the largest appraisal that you've
16  done for a retail valuation, in terms of number
17  of works?
18  A   I can't recall.
19  Q   Would it have been larger than 20,000?
20  A   No.
21  Q   Smaller than 20,000?
22  A   Correct.
23  Q   So smaller than 10,000?
24  A   Most likely, yes.
25  Q   Are you able to give me the size in terms

1  of value of the largest retail appraisal that
2  you've done?
3  A   Yes.  I believe it was over a billion
4  dollars.
5  Q   Same question for FMV?
6  A   The same answer.
7  Q   Over a billion dollars?
8  A   Yes.
9  Q   And when you say "over a billion dollars,"
10  do you mean it's around a billion dollars?
11      Over a billion dollars could be
12  10 billion.  I just want to get a bracket here.
13  A   Between 1 and $2 billion.
14  Q   And when you give that answer for FMV, are
15  you talking about this current case?
16  A   No, I'm not.
17  Q   So you're excluding the current instance?
18  A   Correct.
19  Q   What was the largest appraisal you've done
20  in terms of work for number of works for
21  marketable cash value?
22  A   Again, I'm going to give you an
23  approximate.  Somewhere in the region of 100
24  works.
25  Q   Can you give me the approximate value that

1  you came up with for that project?
2  A    I can't, no.
3  Q    Would it have been as high as a billion
4  dollars?
5  A    No.
6  Q    Are you able to tell me whether any of
7  those -- were any of those projects or
8  appraisals done on behalf of a museum?
9  A    Which ones are you referring to?
10  Q    The largest fair market value appraisal,
11  the largest retail value appraisal and the
12  largest marketable cash value appraisal?
13  A    No, other than the one we're working on
14  now.
15  Q    Have you ever done an appraisal -- let me
16  back up.
17       What's your definition of a "fair market
18  value appraisal"?
19  A    Fair market value appraisal, is -- and I'm
20  paraphrasing, is what a willing buyer will pay
21  to a willing seller, both knowledgeable of all
22  the relevant facts and under no duress.
23  Q    Have you ever done an appraisal where the
24  world knew that the seller, knew the seller and
25  knew that the seller was not willing to sell?

1  A    The seller?
2       Are we talking about -- an appraisal --
3  appraisals are usually done for -- not for
4  someone whose selling, if you understand what
5  I'm saying.
6  Q    I do.
7       So in this case you were retained by
8  Kirkland & Ellis who is not a seller, correct?
9  A    I don't understand the question.
10  Q    Okay.  Does Kirkland & Ellis have the
11  ability to sell the art collection at the DIA?
12  A    I have no idea.
13  Q    Do you understand them to be a seller?
14  A    I don't understand them to be a seller.
15  Q    They are not a seller, correct?
16  A    I don't believe they are a seller.
17  Q    And their client, Syncora, is not a
18  seller, correct?
19  A    Correct.
20  Q    Have you ever done an appraisal in a
21  situation where you are retained by a third
22  party and not by the seller to perform a fair
23  market value assessment?
24  A    I don't understand the question.  Sorry.
25  Q    Are you usually retained by the seller, or

1  a potential seller to perform a fair market
2  value assessment?
3  A    As I mentioned before, usually appraisals
4  are not done for selling purposes.  They're
5  usually done for fair market value or for
6  retail replacement and marketable cash.
7  Q    Is it appropriate to do a fair market
8  value appraisal, which presumes a
9  hypothetically willing seller, where the seller
10  is actually not willing to sell?
11  A    I don't know how to answer that question.
12  Q    In your experience, is it appropriate?
13  A    I don't really understand your question.
14  Q    Okay.  Fair market value appraisals, as
15  you just explained it to me, involve a willing
16  seller -- it assumes a willing seller, correct?
17  A    Willing buyer, willing seller.
18  Q    Right.
19  A    Yes.
20  Q    Is it appropriate to do -- in your
21  experience, is it appropriate to do a fair
22  market appraisal where the seller is not
23  willing to sell?
24  A    As I said, appraisals are not usually done
25  for sellers.  If you're looking to sell

1  something, you generally get auction estimates.
2  So it's a range of figures.
3       Appraisals are normally done to establish
4  a fair market value or marketable cash value or
5  a retail replacement value.
6       What the client decides to do with those
7  numbers is up to them.  We're not determining
8  what they're using those numbers for in
9  providing an appraisal of marketable cash, fair
10  market value or retail replacement.
11  Q    So is that a "yes" or a "no"?
12  A    Well, I'd say I don't quite understand
13  your question.  I'm just saying, you're talking
14  about sellers.  And appraisals are generally
15  done -- fair market value appraisals are not
16  selling instruments.  Fair market value
17  appraisals are done to establish a value, fair
18  market value.  If somebody wants to sell,
19  they're going to usually ask for auction
20  estimates.
21  Q    So under USPAP, is it appropriate -- which
22  you -- you comply with, correct?
23  A    Correct.
24  Q    And you're bound by USPAP, correct?
25  A    Correct.

1  Q    Okay.  Does USPAP permit you to perform a
2  fair market value appraisal which assumes a
3  hypothetically willing seller, where you know
4  that the seller is not a willing seller?
5  A    We are providing -- fair market value is a
6  value that is a willing buyer, willing seller,
7  but it's not -- we're not determining what the
8  person who asked us to do the appraisal is
9  using the appraisal for.
10       So the values are based on that premise;
11  willing buyer, willing seller, all -- everyone
12  knowledgeable of the facts.
13       So your question isn't really an accurate
14  question, to ask for an appraisal.
15  Q    It might not be accurate and it might be a
16  bad question.
17       But are you able to answer it, other than
18  as you answered it just now?
19  A    No, that's my answer.
20  Q    Okay.  Does USPAP address a situation
21  where you have a fair market value appraisal
22  done where there's an unwilling seller?
23  A    USPAP just does not address that.
24       USPAP gives parameters for doing
25  appraisals, but doesn't talk about the

1  reasoning for someone to ask for an appraisal.
2  Q    Have you ever done an appraisal where you
3  knew that the seller was not a willing seller?
4  A    I don't know the answer to that question
5  because usually we're not asking our clients
6  for their motivations.  We're just responding
7  to a request.
8  Q    Sitting here today, do you recall ever any
9  instance in which you provided an appraisal,
10  fair market value appraisal, where the seller
11  was not a willing participant?
12  A    Again, you're talking about seller.
13       We're asked by a client to do an
14  appraisal.  And they may ask us to do a fair
15  market value appraisal or a marketable cash
16  appraisal or a retail replacement value
17  appraisal.  They're not telling us their
18  motivations.  They're just merely asking for an
19  appraisal.
20  Q    I understand that.  And I thank you for
21  that.
22       But I just want to ask -- have the
23  question answered, which is:  Sitting here
24  today, are you aware of any circumstances in
25  which you performed a fair market value

1  appraisal where you knew that the seller was
2  not a willing seller?
3  A    Again, you're talking about seller.  You
4  keep talking about seller.  But we're doing an
5  appraisal.  We're not -- we're doing an
6  appraisal for a client.
7       Whether the client is a -- what the
8  motivations of the client are, I can't
9  determine.
10       So you're talking about seller, but I
11  don't know how that's relevant to an appraisal.
12  Q    Understood.
13       And I'm not asking you to tell me whether
14  you know for certain whether the motivation of
15  the seller is X or Y.  I'm just asking
16  factually.
17       Have you ever addressed this situation
18  where you factually knew, you personally knew
19  that a potential seller didn't actually want to
20  sell the property?
21  A    "Potential seller," that's a different --
22  whole different kettle of fish.
23       Yes, there have been situations in family
24  division appraisals or estate appraisals when
25  we were aware of family dynamics that cause one

1  party not to want to sell.
2  Q    Okay.  And that would require an order of
3  the Court to actually accomplish the sale?
4  A    I have no idea about the sale.  We were
5  only doing the appraisal.
6  Q    Other than the family dispute, are you
7  aware of any other circumstance in which you
8  knew that the seller or potential seller was
9  unwilling to sell?
10  A    No, it's not usually something we get
11  involved with.
12  Q    Thank you.
13       You talked about the Barnes collection,
14  which you were retained by the Barnes Museum.
15       Do you recall that testimony?
16  A    Yes.
17  Q    What is the largest engagement, in terms
18  of objects and value that you've done on behalf
19  of the museum?
20  A    This appraisal that we've done now in
21  terms of value; in terms of numbers of items,
22  probably in a former company, would be Barnes.
23  Q    Sitting here today, you don't recall the
24  size in terms of the value you came up with for
25  Barnes, correct?

1  A   I don't.
2  Q   Or the numbers of objects you valued,
3  correct?
4  A   I don't.
5  Q   Are there any special issues that come up
6  when you value Works of Art in a museum?
7  A   In what sense?
8  Q   Sure.
9      So an FMV, in the usual case, you should
10 consider restrictions or clouds on titles,
11 correct?
12 A   You make assumptions when you're doing an
13 FMV appraisal, whether there are -- if you know
14 the title issue you make a note of it in the
15 appraisal.  And if you don't know then you make
16 an assumption of "clear title" or an assumption
17 "not clear title," depending on what you put in
18 your scope of work.
19 Q   So other than the usual issues related to
20 performing an FMV, or retail appraisal for that
21 matter, are there any special considerations
22 that go into valuing a museum collection?
23 A   Not that I can think of right now.
24 Q   You previously said that you're bound by
25 USPAP, correct?

1  A   That's correct.  For appraisals, yes.
2  Q   And you're only offered here today as an
3  appraisal expert, correct?
4  A   That's correct.
5  Q   What's the effect if you fail to follow
6  USPAP?
7  A   If one's doing an appraisal for the IRS,
8  they can send the appraisal back, if it's not
9  USPAP compliant.  Insurance appraisal,
10 insurance companies don't generally follow
11 USPAP.
12     As I said before, it's an unfortunately
13 rather unregulated industry.  So there's no --
14 there's no -- what's the word?
15     There's nothing that happens on a national
16 or a state level if one doesn't conform to
17 USPAP.
18 Q   If you don't conform to USPAP does --
19 sorry.
20     Is there a governing body of USPAP?
21 A   USPAP is created by the Appraisal
22 Foundation in Washington D.C.
23 Q   And if an appraiser doesn't perform
24 appraisals according to USPAP, is there a
25 consequence in terms of what the governing body

1  might do to him or her or a firm?
2  A   Good question.  Because it involves a
3  rather complicated answer.
4      In real estate appraisals, yes.  Not the
5  Appraisal Foundation itself, but the state
6  governing authorities can censure an appraiser
7  who doesn't follow USPAP, in real estate
8  appraisals.
9      But in personal property appraisals, as I
10 mentioned before, there's no state or federal
11 regulation that compels a personal property
12 appraiser to follow USPAP.  We do it
13 voluntarily.  "We" meaning Winston Art Group,
14 and those people who are members of the
15 Appraisers Association and those who are
16 members of the Appraisal Foundation.
17 Q   So it's voluntary?
18 A   It's a voluntary -- for personal property
19 it's voluntary.
20 Q   Can USPAP or its governing body sanction
21 somebody who follows, purports to follow USPAP,
22 but they don't follow USPAP?
23 A   No, not for personal property appraisers.
24 Q   You said you were with a firm called
25 Gurr --

1  A   Johns.
2  Q   Gurr Johns?
3  A   Yes.
4  Q   And before that you were with Christie's?
5  A   Before that I was with Habsburg.
6  Q   Habsburg.
7      And before that were you with Christie's?
8  A   Yes, I was.
9  Q   When you were with Gurr Johns, did you
10 follow -- were you bound by USPAP?
11 A   We as a firm followed USPAP, yes.
12 Q   And with Habsburg, were you bound by
13 USPAP?
14 A   No.  USPAP came into existence in around
15 1989, I believe.  So prior to that, nobody was
16 using USPAP.
17 Q   So when you were at Christie's was USPAP
18 in effect when you were at Christie's?
19 A   No.
20 Q   Have you followed USPAP ever since it came
21 into existence?
22 A   I think we started following USPAP
23 probably when I was at Gurr Johns.  I started
24 there in 1992.  So from then on.
25 Q   Can a client come up with his own

1  appraisal or her own appraisal of a piece of
2  art?
3  A    A client can try to.
4  Q    In your opinion it's better to use a
5  professional appraiser?
6  A    That's what they hire us for.
7  Q    And is it better to do so because you have
8  more experience?
9  A    Correct.
10  Q    It's better to do so because, at least
11  some of you would hold yourself out as being
12  objective?
13  A    That's correct.
14  Q    But it's possible for a client to come up
15  with his own estimate of value, correct?
16  A    A client in a formal manner?
17       Or, I'm not sure I understood the
18  question.
19  Q    Is it possible for a client to say that he
20  thinks the work carries a certain value?
21  A    Yes.
22  Q    And there's nothing wrong with that,
23  correct?
24  A    No.
25  Q    I'm sorry.

1       You said before, I believe, that you and
2  Winston do not perform insurance valuations; is
3  that right?
4  A    No, I didn't say that.
5  Q    Okay.  So do you perform insurance
6  valuations?
7  A    Yes, that's retail replacement value.
8  Q    Oh.  Sorry.  Correct.
9       And we talked about that being typically
10  one of higher values that you get when you
11  value a work, correct?
12  A    That's correct.
13  Q    And that's because it presumes that you're
14  going out to the market and trying to acquire
15  the same thing within a compressed period of
16  time, correct?
17  A    Yes, to market namely retail and gallery
18  market.
19  Q    And just so we're on the same page, when
20  we're talking about retail replacements, and
21  you gave me 90 percent were on behalf of
22  private clients.
23       We were also talking about insurance
24  values at that time?
25  A    That's correct.

1       MR. O'REILLY:  Okay.  Let's go off the
2  record.
3       THE VIDEOGRAPHER:  The time is 10:22 a.m.
4  We're going off the record.
5       (Recess taken.)
6       THE VIDEOGRAPHER:  This is the
7  continuation of Tape No. 1.  The time is
8  10:29 a.m.  We're back on the record.
9  BY MR. O'REILLY:
10  Q    You've been in the art industry for 30
11  years?
12  A    That's correct.
13  Q    Have you ever seen a situation similar to
14  this one involving the DIA?
15  A    In what sense?
16  Q    Sure.
17       Where an art collection of this size is
18  part of a bankruptcy and that you are there to
19  value it.
20  A    No.
21  Q    Have you heard of anybody else who's
22  handled anything similar to this?
23  A    Only the other parties in this situation.
24  Q    Would it be fair to say that this is
25  professionally unprecedented?

1  A    For me?
2  Q    Correct.
3  A    Yes, I've never done something this size
4  before for a museum.
5  Q    And have you heard of anybody who has done
6  anything like this professionally?
7  A    Outside of the ones that are involved in
8  this case, no.
9  Q    Do you know whether museums do appraisals
10  or valuations internally?
11  A    They normally do not.
12  Q    So if they wanted to understand the value
13  of the work, what would they do?
14  A    They would normally go out to a certified
15  appraiser and have the work done.
16  Q    And is that to understand FMV?
17  A    Depending on their needs.  Either FMV,
18  retail replacement value or marketable cash
19  value.
20  Q    Do you personally know whether they do
21  that at the Detroit Institute of Arts?
22  A    I do not.
23       (Deposition Exhibit 1, Binder, marked for
24  identification as of this date.)
25

1  BY MR. O'REILLY:
2      Q   I've handed you what's been marked
3  Exhibit 1And leaving the binder aside, if
4  you'll just flip the binder over, does that
5  appear to be the expert report that you filed
6  in this case?
7      A   Yes.  From the first page it does look
8  like it, yes.
9      Q   Okay.  And it is your report, correct?
10     A   That's correct.
11     Q   Does it include all of your opinions?
12     A   I'd have to look through each page to see.
13  But I'm assuming it's all here, yes.
14     Q   You haven't been asked to give any other
15  opinions other than what's been set forth in
16  that report?
17     A   In this situation, no.
18     Q   Does it contain all the facts that you
19  relied upon?
20     A   If it's complete, yes, it does.
21     Q   If it's complete, does it contain all of
22  the assumptions that you've made in performing
23  your work?
24     A   Yes.
25     Q   All of the conditions as well?

1      A   It should.
2      Q   Did you physically write the report
3  that I'm -- were you the author of this report?
4      A   I was the author of the first section of
5  the report, which is the expert report here.
6  And my company and the various experts involved
7  wrote or typed the remainder of it.
8      Q   How many drafts did it go through?
9      A   Well, I can explain how the process works.
10         Each individual appraiser submits their
11  section.  The report is put together.  So I
12  don't know if you call each of those sections a
13  draft.  But it's put together and then it's
14  reviewed a few times for consistency and to
15  make sure everything has a value that needs to
16  have a value, to make sure it's in the correct
17  order and so on.
18         So in terms of number of drafts it's hard
19  to say, because it's put together in sections.
20     Q   Other than you and other than the
21  appraisers involved, did anybody have any input
22  into the report?
23     A   There were other people besides the
24  appraisers and myself in my office that did
25  review the report, yes.

1      Q   Anybody else?
2      A   No, not until we sent it to the attorneys.
3      Q   Okay.  And did you send a final to the
4  attorneys, or did you send a draft to the
5  attorneys?
6      A   We sent a draft about a week ago and the
7  final the following day.  We did -- we signed
8  the report the following day.
9      Q   The following day?
10     A   Or two days later.  I can't remember.
11     Q   Now, you told me before you don't recall
12  when you were engaged, correct?
13     A   I don't.  I'd have to look at my record.
14     Q   What was given to you to perform -- what
15  was given to you as part of your engagement?
16     A   An engagement agreement letter, and the
17  information on the works, the list of works
18  that the law firm asked us to appraise.
19     Q   And there were two lists?
20     A   There were two lists, yes.
21     Q   Were you given anything else?
22     A   Not that I recall.
23     Q   Were you given any factual information
24  orally?
25     A   Just a request to do a fair market value

1  appraisal.
2      Q   So it was your client Kirkland that asked
3  you to perform a fair market value appraisal?
4      A   That's correct.
5      Q   Did you have any input on whether or not
6  it should be an FMV or some other type of
7  appraisal?
8      A   No, I did not.
9      Q   Did you question whether it should be an
10  FMV or some other type of appraisal?
11     A   No, I did not.
12     Q   Other than the engagement letter, the two
13  lists, and the request to perform an FMV, were
14  you given anything else?
15     A   Not that I recall.
16     Q   Would the two lists that we speak of be in
17  your appraisal file?
18     A   Yes, they would be.
19     Q   Okay.  Sitting here today, can you tell me
20  what's included in those two lists?
21         And by that I don't mean each individual
22  work.
23         But can you tell me what they purported to
24  be?
25     A   Approximately -- I'm trying to think.  I

1  think it's approximately 590 Works of Art from
2  the Detroit Institute of Arts.
3  Q    Do you recall -- do you know why there
4  were two lists and not one list?
5  A    I don't know that.
6  Q    Do you know whether those lists came, in
7  fact, from the Detroit Institute of Arts?
8  A    I don't know.
9  Q    You relied upon counsel and their
10 representation about them being Works of Art of
11 the DIA?
12 A    Originally we did.  But each -- most of
13 the items in there had a -- we had a link to
14 most of the items on the DIA website.
15 Q    Are those links things that you found
16 independently?
17 A    That, I can't recall.
18 Q    So I'm just trying to bucket some things
19 here.  So you received two lists.
20      One list had lists of objects with names,
21 correct?
22 A    Yes, with artists.
23 Q    What other information on them?
24 A    With artist name, I believe there was a
25 brief description, and I believe there was a

1  DIA number, inventory number.  But I don't have
2  those lists in front of me, so I'm not exactly
3  sure.
4  Q    Did the second list contain the same
5  information for a different set of works?
6  A    I believe it did; although, I think there
7  were a couple of duplicates.
8  Q    You said there were a couple of duplicate
9  across the two lists.
10      But other than those two duplicates, they
11 were two separate groupings of objects,
12 correct?
13 A    That's correct.
14 Q    Do you recall the size or the number of
15 works on each list?
16 A    The first list was larger than the second,
17 but I don't recall the exact number.
18 Q    What was the format of the two lists?
19      It would be helpful if I had them here,
20 but I don't.
21      So what was the format?
22      What did they look like?
23 A    They looked like spreadsheets, basically.
24 Q    They looked like spreadsheets.
25      They didn't have images on them?

1  A    They did not have images, no.
2  Q    When did you receive those two
3  spreadsheets?
4  A    I believe it was earlier this year.  I
5  don't have the date in front of me.
6  Q    Was it within the last month?
7  A    No, it was prior to that.
8  Q    Would it have been around March?
9  A    I believe so, yes.
10 Q    Did you receive any lists or data after
11 that?
12 A    We received two lists.  So the first one
13 would have been at or before that date, and the
14 second one would have been after that date.
15 Q    How much after, approximately, March 25th?
16 A    Maybe three, four weeks, I'm guessing.
17 That's really a guess.  I need to look at my
18 notes to tell you exactly.
19 Q    Do you know why those works were selected
20 for your review?
21 A    I do not.
22 Q    Did one seem to contain works that were of
23 higher value than the other?
24 A    From my recollection, no.  There were
25 higher value works in both lists, perhaps

1  because the first one was larger, there was an
2  overall larger total in the first one, but I
3  can't be specific.
4  Q    Did you, independently, choose to review
5  works that were not identified for you?
6  A    No.
7  Q    So Exhibit 1, which is your report,
8  contains your expert report first, correct?
9  A    That's correct.
10 Q    And then behind it, sort of that page
11 behind the first tab is a -- I'm sorry.
12 A    Yes.
13 Q    So if you go to the prior page, that's
14 Page 1.  And then you go to Page 2.
15 A    Correct.
16 Q    And then there are, after that, various
17 images.
18      Do you see that?
19 A    Yes.
20 Q    Okay.  And it goes all the way to
21 Page 473.
22      Do you see that?
23 A    Yes.
24 Q    Okay.  Are these all of the works that you
25 valued?

1  A   Yes.
2  Q   Okay.  Where did the images come from?
3  A   These images were taken primarily from the
4  DIA website.  But there were some that didn't
5  have images on the website and we did some
6  research in some reference books or online to
7  find other images.
8  Q   So this is a work of your own creation,
9  then?
10 A   The appraisal is a work of our own
11 creation, yes.
12 Q   So the choice of what data and information
13 to included here is of your own creation?
14 A   No.  The information came from the DIA.
15 We left out some of the information because it
16 was too lengthy, including the exhibition and
17 so on, but put in the link to the DIA website
18 for that information.
19 Q   I guess what I was driving at is that it's
20 formatted, and the data was things that you
21 pulled and you included in this 400 plus page
22 document?
23 A   That's correct.
24 Q   Okay.  Why did you organize the artwork in
25 the fashion that you did, or can you explain?

1   Is there a reason why it starts with a
2  client reference F8157 and then -- can you tell
3  me why it's set up this way?
4   Is it organized by department?
5  A   It's organized alphabetically by fine art
6  and then by other sections, according to the
7  information we were provided.
8  Q   Were you asked to put it in that format?
9  A   I believe we consulted with the law firm
10 and said would this be an appropriate way to
11 list them, by combining the two lists and then
12 doing the fine art first and the other sections
13 afterwards.
14 Q   So it was your choice to do it that way?
15 A   We consulted with the attorneys and made
16 sure this is how they wanted it to be done.
17 Q   Sitting here today, do you know whether
18 the City of Detroit owns all of these works?
19 A   I don't.
20 Q   Sitting here today, do you know whether
21 any restrictions or encumbrances were clouds of
22 title on any of these works?
23 A   No, I do not.  We assumed it was clear
24 title.
25 Q   What assumptions were you asked -- sorry.

1   What assumptions did you include as part
2  of your appraisal?
3  A   I'm going to refer back to the scope of
4  work on Pages 5 and 6 of the appraisal, under
5  the heading, "Assignment Considerations," and
6  the other heading, "Extraordinary Assumptions:
7  Hypothetical and Limiting Conditions."
8   That lists the assumptions that we made in
9  this appraisal.
10 Q   So this is full and complete, then?
11 A   It should be, yes.
12 Q   Okay.  Were all of those assumptions given
13 to you by your counsel?
14 A   No.  We made those assumptions.
15 Q   Okay.  Did counsel instruct you to take
16 any assumptions into account?
17 A   Not that I recall.
18 Q   When you began your work, did you have any
19 sense of what the valuation would turn out to
20 be?
21 A   No.  None whatsoever.
22 Q   Did you have any sense of what counsel
23 thought it would be?
24 A   No.  None whatsoever.
25 Q   Prior to beginning your work, had you seen

1  the Christie's valuation of some of the works
2  at the DIA?
3  A   No.  I read some information that they had
4  done the appraisal on in articles.  But I had
5  not seen the appraisal.
6  Q   Did you know what the number was, in sort
7  of a general way?
8  A   No, I do not.
9  Q   So you don't know whether it was a billion
10 or 500 million?
11 A   No, I don't.
12 Q   Sitting here today, do you know?
13 A   No, I do not.
14 Q   Did you form any opinion on whether you
15 thought it was high or low?
16 A   No, I did not.
17 Q   Did you form any opinion on whether or not
18 it was complete?
19 A   No, I did not.
20 Q   So on Page 6 of your report it says --
21 under "Method of Examination, The appraisers
22 were unable to examine works in person, so they
23 appraised solely from images and descriptions."
24   Do you see that?
25 A   I do.

1  Q    Why were you unable to examine works in
2  person?
3  A    Given the timing of the appraisal, the
4  short time in which we had to do the appraisal,
5  we didn't have time to go out to the museum and
6  take a look at them; although two of our --
7  excuse me.  Two of our specialists did take a
8  visit out to look at some of the works.
9  Q    Two of your specialists, though?
10 A    Yes, correct.
11 Q    When did they do that?
12 A    Sometime, I believe, in March or April.
13 Q    Do you know how many works they viewed?
14 A    I do not know exactly how many.
15 Q    They viewed works in the public galleries?
16 A    Yes.
17 Q    Okay.  Did they attempt to view -- let's
18 back that up.
19      How many days were they there?
20 A    One day each.
21 Q    So two full days?
22 A    Correct.
23 Q    Were they attempting to look at any
24 particular works?
25 A    Yes.

1  Q    Which ones?
2  A    They were looking particularly at the Old
3  Master Paintings and the Works of Art.
4  Q    I'm sorry.  You said Old Master Paintings
5  and the?
6  A    Works of Art, meaning the Old Master Works
7  of Art objects.
8  Q    So only in the Old Master category?
9  A    Primarily, that's what they were looking
10 at.
11 Q    Why did they go only to look at the Old
12 Masters?
13 A    They were the two old master and works of
14 art specialists.
15      And because that area of the market is the
16 most difficult to do from images.  They felt
17 they needed to see some of the works in person
18 to judge quality.
19 Q    So that's something they felt they needed
20 to do to finish their work?
21 A    Yes.
22 Q    Did anybody else have a similar concern?
23 A    No.  And that's why we put some of our
24 assumptions into our document.
25 Q    Your other appraisers were comfortable

1  with reviewing the information they had in
2  coming up with their appraisal?
3  A    Yes, given the assumptions we made.
4  Q    Did the old master specialists believe
5  that they couldn't make the assumptions that
6  the others were comfortable with?
7  A    They thought they could, but they would be
8  more comfortable giving accurate numbers after
9  seeing the works.
10 Q    Sitting here today, do you know which
11 works in particular they went to see?
12 A    I know roughly which ones, yes.
13 Q    Is it a long list?
14 A    It's roughly all of the Old Master
15 Paintings and the Works of Art that fall into
16 that age range.
17 Q    How many is that?
18 A    I'd have to look.  I can look and tell
19 you.
20 Q    But it's in the category that says "Old
21 Masters," in here?
22 A    I don't think it's broken out into Old
23 Masters.
24      But Old Masters are generally Works of Art
25 that are approximately 1800 and before,

1  paintings.
2  Q    Did they enjoy the museum?
3  A    They did.
4  Q    You've been to the museum, correct?
5  A    I've never been to the museum.
6  Q    Your husband has?
7  A    Yes.
8  Q    We talked about -- have we covered
9  everything that was given to you to perform
10 your appraisal?
11 A    Yes.
12 Q    You also looked at workbooks, correct?
13 A    That's correct.
14 Q    And those are listed in your report,
15 correct?
16 A    They are.
17 Q    We've talked about visits by two of your
18 specialists, correct?
19 A    Yes.
20 Q    There were no other visits, correct?
21 A    That's correct.
22 Q    We talked about research online with the
23 DIA website, correct?
24 A    Yes.
25 Q    Is there anything else that you or your

1  appraisers did or relied upon to come up with
2  this valuation?
3  A    Other than research online, consulting
4  with each other, that's what we did to do the
5  appraisal.
6  Q    And you looked at comparables and the
7  things that you typically do, correct?
8  A    That's correct.
9  Q    Were you ever told that you couldn't
10 receive access to Works of Art at the museum?
11 A    No.
12 Q    Did you ever ask to have access to Works
13 of Art at the museum?
14 A    Initially we did, yes.
15 Q    What was the response?
16 A    That timing was very short and we needed
17 to get this done very quickly.  And we didn't
18 have time to go out there and spend a few days
19 out there.
20 Q    So no one told you that the DIA said you
21 couldn't come and see Works of Art, correct?
22 A    No.  That's correct, yes.
23 Q    Did you ask for any other access to
24 documents, or did you ask for any other access
25 to perform your work?

1  A    No.
2  Q    Did you ask for any documents to perform
3  your work?
4  A    When we couldn't find something on the DIA
5  website we brought it to the attention of the
6  attorneys, and we did as much research as we
7  could outside of the DIA website and
8  information to enable us to do the appraisal on
9  those Works of Art.
10 Q    What did the attorney say to you as to
11 whether you could or could not receive that
12 work, those objects, or those documents that
13 you wanted?
14 A    We didn't ask them for documents because
15 they didn't have the documents.  But we did
16 note to them, we did bring to their attention
17 there were some items on the list for which we
18 didn't have images and descriptions from the
19 DIA website.
20 Q    Did they tell you that the DIA refused to
21 give you access to that information?
22 A    No.  They didn't say that, no.
23 Q    Were you satisfied that you had everything
24 you needed to perform an FMV appraisal?
25 A    Yes, with the exception of certain items

1  which we couldn't appraise from the information
2  provided.
3  Q    Sitting here today, do you recall how many
4  those were?
5  A    Approximately ten of the items.  And they
6  are listed in the appraisal.
7  Q    And did you not perform a valuation for
8  that?
9  A    Correct.
10 Q    So you received a total of?
11 A    I believe it was around 592.  Something in
12 that range.
13 Q    The list was 594 works, correct?
14 A    Correct, yes.
15 Q    And you're appraisal covered 582 works,
16 correct?
17 A    That's correct.
18 Q    So the discrepancy there is that you did
19 not feel you had enough information because
20 there wasn't an image -- you didn't have enough
21 information to perform a valuation, correct?
22 A    On some of those, correct.
23 Q    Was it because there was no image?
24 A    No.  We had images -- we found images, I
25 believe, on everything.

1  Q    Why couldn't you perform a valuation on
2  them?
3  A    Well, various reasons.
4       The Deigo Rivera mural, we felt it was
5  integral with the building, and we could not
6  separate it from the building in order to
7  appraise it.
8       There are a group of Islamic Works of Art
9  in which our specialist said they could not do
10 without actually being on-site, and there was
11 no time enough for the expert to go on-site.
12 So they're listed but not appraised, and
13 there's a note under each of those.
14      I believe there are some other ones.  I'd
15 have to look through and see what they were and
16 why we couldn't appraise those.
17      There was another group of work by
18 Ellsworth Kelly, which we didn't feel we had
19 enough information to give an appropriate
20 value.  And there may have been a few more, but
21 I'd have to look through and see them.
22 Q    The total range was the spread between 594
23 and --
24 A    592; 12 items, yes.
25 Q    Do you know whether valuations of those

1  works would materially change your FMV?
2  A    I don't know that.  We haven't appraised
3  those.
4  Q    But you're not rendering an opinion on
5  what those values would be, correct?
6  A    We are not.
7  Q    You had from the time of your engagement,
8  at least, until a week ago, to perform your
9  work.
10      Is it your position that that amount of
11  time was not sufficient to go to the museum to
12  obtain the information you needed?
13  A    Yes.
14  Q    Your FMV appraisal, is that 580 -- 582
15  works have a value of 1,742,245,750, correct?
16  A    For fair market value, yes.
17  Q    And you finished your appraisal last week
18  or thereabouts, correct?
19  A    Correct.
20  Q    And the March 25 date is a date that you
21  were given by counsel to assume is the
22  effective date, correct?
23  A    That's correct.
24  Q    I still don't understand the relevance of
25  that date.

1      But all appraisals that you do have an
2  effective date?
3  A    That's correct.
4  Q    Is it usual for there to be an effective
5  date that is prior to the time that you
6  complete your valuation?
7  A    Almost always.
8  Q    Why is that?
9  A    For estate purposes, the effective date is
10  the date of death.  That can be years before up
11  to weeks before.  There's always a date chosen,
12  that if it's a divorce, it may be the date of
13  separation and so on.
14  Q    Sitting here today, though, you don't know
15  why that date was selected?
16  A    That's correct.
17  Q    And I'm sorry, it's March 25, 2014, right?
18      Yes.  Okay.
19  A    I believe so, yes.
20  Q    Can you just describe to me in a thumbnail
21  sketch way -- how you got from the day that you
22  were engaged, to selecting your specialists to
23  form an appraisal, to coming up with a number?
24  A    Sure.
25  Q    Thank you.

1  A    When we received the list we looked at it
2  carefully and separated it into areas of
3  expertise.  Then the appraisal was downloaded,
4  which was downloaded into our system using
5  information from the DIA website in comparing
6  items on the list to items on the DIA website.
7      If there were items that we couldn't find
8  on the DIA website we looked in reference
9  books, gathered information online.  Then the
10  appraisal was separated into categories and
11  sent off to the appropriate specialist or
12  specialists.
13      They then did their research, came back
14  with their fair market values; those were
15  uploaded into the system.  By "system," I mean
16  this system that you see here.
17      And then the work was reviewed and
18  discussed.  The values were looked at.  The
19  scope of work was prepared in detail.  The
20  expert report was created.  The whole document
21  was put together and sent out to the attorneys.
22  Q    So each individual appraiser came up with
23  an FMV on an object-by-object basis?
24  A    That's correct.
25  Q    Then it was reviewed by you?

1  A    By me and my colleagues.
2  Q    And your colleagues.
3      Are all your colleagues mentioned in your
4  report --
5  A    Yes.
6  Q    -- all of them?
7      Anybody who was involved in the appraisal
8  was mentioned in your report, correct?
9  A    Yes.
10  Q    Were there any adjustments as a result of
11  that review and discussion process?
12  A    There were some adjustments, yes.
13  Q    Can you tell me what they are?
14  A    Yeah.
15      As we went through the values if we -- we
16  compared them to the comparables, we might ask
17  the expert to talk about how they came up with
18  that value.
19      In the fine art area, which is the most
20  valuable area, a number of us worked on the
21  appraisal, and we sat down and talked about
22  relative values, so we might have adjusted
23  something up, something down, depending on our
24  discussions.
25  Q    Can you give me a sense of the order of

1  magnitude in which you adjusted up or down?
2  A    Approximately 10 percent, maybe, for an
3  item up or down, depending on what we
4  discussed.
5  Q    And then the aggregate of your entire
6  appraisal, do you know approximately how much
7  up or down it was?
8  A    I don't.  But I would say something in the
9  range of 10 percent.
10 Q    For the whole collection?
11 A    No, for those particular works.
12 Q    Right.
13      Okay.  So particular works, you might have
14 gone up 10 percent or gone down 10 percent.
15 I'm trying to understand whether it
16 materially changed your fair market value
17 appraisal for the full 582.
18      Can you tell me whether it went up
19 1 percent, 2 percent, or down 1 or 2 percent?
20 A    I'd say it went down a couple of percent.
21 Q    But not a material change?
22 A    Not material change, no.
23 Q    So after that discussion of changing on an
24 object-by-object basis, maybe an adjustment,
25 did you do anything else with those values?

1  A    In terms of?
2  Q    Did you make an adjustment saying there's
3  a lot of works here, so if we actually tried to
4  sell them, the value would have to be lower?
5  A    No we didn't -- we weren't examining sales
6  at all.  We were merely doing appraisals.
7  Q    So those individual values were added up,
8  and which resulted in the $1.7, approximately,
9  billion dollar number, correct?
10 A    That's correct.
11 Q    Fairly straightforward then?
12 A    Yes.
13 Q    Did you have any impression, at all, as to
14 why you were looking at this selection of works
15 and not a different selection of works?
16 A    No, we didn't.
17 Q    Did you notice that there were 60
18 Rembrants, and did that stand out to you at
19 all?
20 A    Rembrant prints, yes.  I did see that,
21 yes.
22 Q    Did you have any view or opinion or
23 thought as to why it was there were 60
24 Rembrants included?
25 A    No, not at all.

1  Q    Sitting here today, do you have any?
2  A    I don't, no.
3  Q    Did your specialist have any?
4  A    No.
5  Q    Did you look at the Rembrant works?
6  A    I looked at the images of them in the
7  description, yes.
8  Q    Did another specialist actually do that
9  work?
10 A    Yes.
11 Q    What was their impression of those objects
12 or those prints?
13 A    From the values given in the appraisal,
14 they were a relatively modest value.
15 Q    Do you recall any discussion of their
16 quality?
17 A    Yes.  He said that the quality overall was
18 not top quality.
19 Q    Do you recall any discussion of the two
20 Matisse's, Poppies No. 1 and 2, I think, is
21 what they were referred to.
22      Do you recall any discussion of those
23 works?
24 A    Internally we discussed those works, yes.
25 Q    There's a big spread in value on those

1  works, correct?
2  A    We value those as a single unit.
3  Q    Was there any discussion as to why there
4  was a difference between those two values?
5  A    Yeah.  I guess we discussed why we came up
6  with a value of one versus the other.
7  Q    It didn't stand out to you, though, that
8  one was in the millions and one was not?
9  A    They were different objects.
10 Q    Simply having a famous name doesn't mean
11 you have a high quality object, right?
12 A    That's correct.
13 Q    Doesn't mean that it's high value,
14 correct?
15 A    That's correct.
16 Q    Simply because you have 60,000 objects
17 doesn't mean that it's any good, correct?
18 A    What?
19 Q    Just because a museum has 60,000 objects
20 doesn't mean that all of them are high quality,
21 correct?
22 A    That's correct.
23 Q    Did you make any attempt to value works
24 other than those given to you by your lawyers?
25 A    No, we did not.

1  Q    Did you ask to do any valuation of any
2  other works?
3  A    No, we did not.
4  Q    Based upon your understanding of the
5  electronic system and the process that you
6  followed, which were to look at some images
7  online, could you have valued works other than
8  those given to you?
9  A    Yes, we could have.
10  Q    And could you formulate an opinion on them
11  for fair market value?
12  A    Yes, we could have.
13  Q    Okay.  So you did not do anything to value
14  the entire collection, correct?
15  A    That's correct.
16  Q    And you haven't been asked to do that,
17  sitting here today, right?
18  A    Correct.
19  Q    And you don't expect to be asked to do
20  that, correct?
21  A    Not that I know of.
22  Q    You've given me a definition of fair
23  market value, right?
24  A    Yes.
25  Q    What's a definition of marketable cash

1  value?
2  A    Marketable cash value is fair market value
3  minus the cost of sales.
4  Q    Anything else?
5  A    No, that's the general definition.
6  Q    You as a firm do marketable cash value
7  appraisals, correct?
8  A    Yes.
9  Q    What's the definition of a liquidation
10  value?
11  A    I'm not clear on what a liquidation value
12  is.
13  Q    Is it defined in USPAP?
14  A    It may well be.
15  Q    Can you turn to Page 484 in your report.
16  A    Mm-hmm.
17  Q    You see there it has a definition of FMV
18  and replacement value and liquidation value and
19  marketable cash value.
20       Those are all defined there, correct?
21  A    That's correct.
22  Q    And do you agree with those definitions?
23  A    I would have to read it because
24  liquidation value is not something we use.  But
25  these are from the Appraisers Association of

1  America.
2       Okay, I've read that.
3  Q    Do you agree with those definitions?
4  A    Well, it's not something I use.
5       So agree or not agree, if that's the
6  definition given by the Appraisers Association
7  of America, I'm assuming it's correct.
8  Q    This report was prepared in compliance
9  with USPAP, correct?
10  A    That's correct.
11  Q    Does USPAP have its own definitions of
12  these terms?
13  A    USPAP does.  I don't know -- I'm assuming
14  it includes liquidation, but I'm not sure
15  because it's not something we use.  It's not
16  something I paid attention to.
17  Q    Why did he use the AAA definitions on this
18  page?
19  A    Because I'm on the board of that
20  organization and all of us at my firm are
21  members in that organization.
22  Q    Do you have any reason to dispute that
23  these are not fair descriptions of what those
24  terms mean?
25  A    I have no reason to doubt that.

1  Q    Your FMV appraisal doesn't tell the Court
2  what net cash a City would receive if it
3  actually sold the works that you valued,
4  correct?
5  A    Correct.
6  Q    So you're not opining for the Court that
7  the City would receive approximately
8  $1.7 billion in cash if it's sold, correct?
9  A    Correct.
10  Q    What appraiser would tell the Court what
11  it would be sold for?
12  A    It would be an opinion of value, because
13  there's no way to predict what things would
14  sell for.  But marketable cash value would
15  probably get close to that number.
16  Q    Would liquidation value get close to that
17  number?
18  A    As I said, it's not something we use in my
19  firm.  So we think marketable cash value is
20  really what we consider to be net to the
21  seller.
22  Q    You have no reason, sitting here today,
23  because you said you don't use it, to disagree
24  that liquidation value would be an appropriate
25  measure, correct?

1     A     Correct.
2           Although one would have to take into
3     account whether there is duress in a time
4     period.  But it's outside of the scope of
5     opinion.  So I didn't -- I don't have a good
6     opinion on that.
7           MR. O'REILLY:  Let's take a break.
8           Let's go off the record.
9           THE VIDEOGRAPHER:  This concludes Tape
10    No. 1.  The time is 11:12 a.m.  We're off the
11    record.
12          (Recess taken.)
13          THE VIDEOGRAPHER:  This begins Tape No. 2.
14    The time is 11:19 a.m.  We're back on the
15    record.
16    BY MR. O'REILLY:
17    Q     **You said that marketable cash value**
18    **requires a reduction to make it net to seller,**
19    **correct?**
20    A     That's correct.
21    Q     **What are those items that would have to be**
22    **considered to make it net to seller?**
23    A     The buyer's premium that the auction house
24    puts on the hammer price, would be taken off.
25    Any selling commissions on the part of the

1     seller, insurance charges, shipping charges,
2     illustration fees, and any other costs that are
3     associated with selling a Work of Art.
4     Q     **In a typical fine art transaction, are you**
5     **able to give me a percentage of how much of a**
6     **reduction that would be to the seller from, I**
7     **guess, the sale price to what the seller**
8     **actually nets?**
9     A     It depends on the level of value.  The
10    higher the value, the lower the percentage
11    reduction.  The lower the value the higher the
12    percentage reduction.
13          So in the case of a work that is, say,
14    over $2 million, the buyer's premium, if you're
15    going to a Sotheby's or a Christie's type
16    auction house or a Phillips, or any of the
17    major auction houses, the buyer's premium would
18    be approximately 12 percent.  The seller's
19    commission, at that high level, may be zero,
20    but it could be up to, say, 5 percent,
21    approximately.  I'm giving approximates.
22          There's an insurance charge, which at the
23    higher level would probably be waived.  So that
24    would not come off.  That would not be charged.
25          There would be illustration fees.  But at

1     the higher level, those may be waived.  So
2     there's nothing there.
3           Shipping fees, which may have been charged
4     at a lower value would probably not be charged
5     at a higher value.
6           So you're basically talking around, the
7     high level works, around 12, 13 percent that
8     would come off.  At the lower value you are
9     talking somewhere in -- by "lower value," it
10    could be all the way down to $500, $200 or
11    $100; you're talking about probably a buyer's
12    premium of up to 25 percent or so, that would
13    come off.
14          A seller's commission, that could be up to
15    25 percent, and other fees:  Insurance, might
16    be one and a half percent; shipping charges;
17    illustration fees, those would all come off.
18          So you can't give a precise one.  For
19    every value, it changes depending on value.
20    Q     **You aren't here to give an opinion on the**
21    **amount of reductions there would be to get to**
22    **net -- net to seller price or marketable cash**
23    **value, correct?**
24    A     That's correct.
25    Q     **But you said that for works that are high**

1     **value you can have, for example, a buyer's**
2     **premium -- I'm sorry.**
3           **Is it the buyer's premium or the seller's**
4     **commission that is 12 percent?**
5     A     Buyer's premium.
6     Q     **So the seller would have to consider**
7     **reducing its expectations, if you will, from**
8     **fair market value from at least that 12 percent**
9     **to understand what their net would be, correct?**
10    A     Yes, in a hypothetical manner.
11    Q     **You've never been involved with a sale of**
12    **$1.7 billion of art, have you?**
13    A     No.
14    Q     **Do you have any reason to know what the --**
15    **whether there would be a buyer's premium or a**
16    **seller's charge -- strike that question.**
17          **I think you said that -- you were offering**
18    **me examples of buyer's premiums by Christie's;**
19    **is that right?**
20    A     Christie's or Sotheby's.  These are
21    approximate.
22    Q     **Approximately 10 percent, or for the high**
23    **value.**
24          **It could be higher for low value, right?**
25    A     Yes.  Approximately 12 percent, highest

1  level, at Christie's and Sotheby's, and I
2  believe Phillips as well.  And higher for a
3  lower value, generally.
4  Q    If you applied that 12 percent discount to
5  1.75 billion, what's the number?
6  A    I would need my calculator to give you
7  that number.
8  Q    Does 200 million sound about right?
9  A    Give me a calculator and I'll tell you.
10 Q    Okay.  You have no reason to dispute that
11 that would be charged in a transaction for a
12 sale of 1.75 billion dollars of art, right?
13 A    Well, there are probably exceptions.
14 Q    You personally have no factual information
15 to dispute that, correct?
16 A    There are exceptions for high level Works
17 of Art where the seller gets a rebate part of
18 the buyer's premium.
19 Q    That's negotiated between the parties who
20 are selling and the auction house, correct?
21 A    Correct.
22 Q    So you wouldn't know one way or the other
23 whether it could be included or not, correct?
24 A    That's correct.
25 Q    It would have to be worked out between the

1  two, correct?
2  A    Yes.
3  Q    When you listed the factors that you would
4  have to consider to get to the marketable cash
5  value, you didn't mention blockage discount,
6  right?
7  A    Right.
8  Q    Under USPAP, are there circumstances where
9  you would have to consider blockage discount?
10 A    Under USPAP and under the IRS regulations,
11 yes.
12 Q    Are you here in this case to form any
13 opinion on whether or not a blockage discount
14 applies to a sale of art at the DIA?
15 A    Sorry.  Can you rephrase that question?  I
16 lost track.
17 Q    You're being offered as an expert.  I'm
18 just trying to figure out if you are going to
19 provide an opinion as an expert on whether a
20 blockage discount should be applied to a sale
21 of art at the DIA.
22 A    I'm not here to do that.
23 Q    Under USPAP, would you be required to
24 disclose if you're applying a blockage discount
25 to your marketable cash value assessment?

1  A    Yes.
2  Q    In your experience, would you have to
3  consider whether a blockage discount is
4  appropriate if you tried to sell 594 works at
5  the museum -- sorry, 582?
6  A    Selling is different from appraisals.
7       So if you're appraising Works of Art, you
8  do decide whether blockage discount is
9  appropriate or not.
10 Q    Right.
11      But you haven't formed an opinion on that,
12 correct, for the 582 that you appraised?
13 A    We did not use blockage discount.
14 Q    Okay.  Would you apply blockage discount
15 to get the marketable cash value for 60,000
16 works in a collection?
17 A    It depends on what was in the collection.
18 Q    What about the DIA collection?
19 A    I haven't looked at the whole collection.
20 But generally blockage discounts are used when
21 there are Works of Art by the same artist of
22 the same type in an artist's estate.
23      That's the primary use for blockage
24 discount.
25 Q    In your experience, would it be

1  appropriate to consider it if you were doing a
2  marketable cash value assessment for a
3  collection of 60,000?
4  A    It would be appropriate to look into it.
5  Q    Would a sale of 100 master works
6  potentially depress the market?
7  A    Broad question.
8       But I can say that if they were 100
9  individually fantastic Works of Art, probably
10 not, depending on how long you had to sell them
11 and what that group consisted of.
12 Q    If you tried to sell them all at once and
13 they were high quality, would it have the
14 potential to depress the market?
15 A    If you had to sell them all in one day,
16 you would want to consider various options for
17 those works:  Auction, private sale, regional
18 sales.
19      So it really depends on what those Works
20 of Art are before I can make that
21 determination.
22 Q    Do you know Todd Levin at the Levin Art
23 Group?
24 A    I don't.
25 Q    So you said it depends.

1      Am I correct that you don't have an
2   opinion, sitting here today, whether a sale of
3   100 high value works at the museum would
4   depress the market?
5   A   I don't have an opinion on that.
6   Q   You said that you don't do liquidation
7   value, right?
8   A   Correct.
9   Q   Do you have a sense of when a liquidation
10  value is appropriate?
11  A   I don't.  We don't use it.
12  Q   Okay.  Do you know what factors would have
13  to be considered in a liquidation value
14  appraisal?
15  A   No.
16  Q   So you have no opinion one way or the
17  other about what factors might have to be
18  considered to understand what the liquidation
19  value of a collection would be?
20  A   Correct.
21  Q   And you don't have the expertise to do it
22  either, correct?
23  A   We were never asked to do it.  If we were
24  asked to do it it might investigate it and see
25  if we have the expertise to do it.

1   Q   But sitting here today you don't have
2   those expertise, correct?
3   A   I don't know.  I've never been asked to do
4   it.
5   Q   Well, now I'm a little confused.
6       So you've never done it before.  And
7   you've told me you can't opine about it.  But
8   you're saying that if you were asked to do it
9   you might learn enough to do it?
10  A   We'd investigate what factors are called
11  into a liquidation value appraisal, and then
12  see if we were able to do it.
13  Q   Have you been asked to do such an
14  appraisal?
15  A   No.
16  Q   Sitting here today, do you expect to do
17  such an appraisal?
18  A   Not that I know of.
19  Q   And this is your final report, correct?
20  A   That's correct.
21  Q   You used a market comparison approach in
22  doing your FMV, correct?
23  A   Comparable market data approach, yes.
24  Q   Sorry.
25      Can use such an approach when you

1       don't use comparables?
2       Yeah.
3       So -- so in your report, which you used a
4   comparable market value approach, you mentioned
5   that some of them didn't have comparables.
6       I may be misreading or misremembering.
7       MR. RUEGGER:  Page 7.
8       MR. O'REILLY:  Page 7, my colleague says.
9   A   Page 7.  Oh, this is the report you're
10  talking about?
11  BY MR. O'REILLY:
12  Q   Yeah.  Your expert report --
13  A   My expert report.
14  Q   -- which you signed --
15  A   Yes.
16  Q   -- on Page 7.
17      At the bottom of the top paragraph, says:
18  Due to rarity, there are some items for which
19  no comparables exist.  In these cases our
20  specialists offered their reasoning as to
21  valuation.  In the occasional case items were
22  not valued for reasons stated in the document."
23      So you'd agree with me, then, that you
24  performed a comparable market value approach,
25  but where you didn't have comparables, you

1   relied upon your professional judgment?
2   A   That's correct.  There were no direct
3   comparables, yes.
4   Q   What's the distinction there?
5       You said "direct comparables"?
6   A   Normally, every Work of Art has something
7   by that artist or by that work master that can
8   be very closely compared.  But sometimes
9   something is so much better than other works on
10  the market or so rare that you have to use
11  comparables that are outside those direct
12  comparables and go to your market knowledge of
13  other artists who have crafted or painted or
14  made works that are similar, or what you
15  presume to be the market for something that is
16  so outside the norm.
17  Q   When you say "outside the norm" -- well,
18  first of all, do you know which objects didn't
19  have comparables?
20  A   They all had some kind of comparable.
21  They may not have had an auction comparable or
22  a direct artist comparable.  But they wouldn't
23  have -- there was reasoning behind what the
24  appraisers did to compare it to other objects
25  or other Works of Art --

1  Q   Sure.
2  A   -- in order to come up with a value.
3  Q   I just want to understand the sentence.
4      It says: "Due to rarity there are some
5  items for which no comparables exist."
6      And then it says, "In these cases our
7  specialists offered their reasoning as to
8  valuation."
9      It doesn't mention in your report that
10 they examined things that were not direct
11 comparables?
12 A   It notes in those particular cases how
13 they came up with the values that they came up
14 with.
15 Q   So do you know what objects are being
16 referred to here?
17 A   I'd have to look through and see which
18 ones.
19 Q   Sitting here today you don't know that?
20 A   I believe that the Bernini pieces were
21 three of the pieces for which there were no
22 direct market comparables.
23 Q   Okay.  What other factors would make
24 comparables -- excuse me.
25      What does a comparable have to be in order

1  for it to be a comparable?
2  A   Comparable has to be --
3  Q   Bad question.  But I think you understood
4  it.
5  A   I do understand it.
6      Comparable has to be something that helps
7  you determine the value that you're being asked
8  to opine on.
9      So it could be -- as I say, it could be a
10 direct comparable, which means another work by
11 that same artist of the same quality.  But it
12 could be a work by another artist, or it could
13 be your knowledge of market conditions.
14      So it's not -- one doesn't just go to art
15 net and look for comparables and come up with a
16 value.  You have to know the market as a whole.
17 And so those particular pieces that are
18 difficult to appraise, you have to look at
19 other factors in addition to direct
20 comparables.
21 Q   And that's up to the independent
22 professional judgment of the appraiser?
23 A   Absolutely.
24 Q   An appraisal or a value called a "fair
25 market value," it's an opinion, correct, it's

1  not a fact?
2  A   Correct.
3  Q   So there could be disagreements?
4      Reasonable minds could disagree over
5  whether or not your fair market value is more
6  correct than another?
7  A   Yes.
8  Q   Are there circumstances where there's a
9  spreed between a fair market value assessment
10 or a value of any kind where it calls into
11 question the reliability or the credibility?
12 A   I'm not sure I understand your question.
13 Q   Let's say that you and Winston came up
14 with a fair market value of an object that was
15 a million dollars, and somebody else came up
16 with one that was $10 million.
17      Would that automatically lead you to
18 believe that the value provided by somebody
19 else was suspect or not credible?
20 A   Well, I'd want to know how they came up
21 with that number.
22 Q   So it depends on the facts.
23      Sure.
24      So if it was ten times different you'd
25 want to know why -- how they came up with a

1  number before -- let me back it up.
2      If there was a value that had that sort of
3  spread, would you question the value being
4  proposed by somebody else?
5  A   I'd ask some questions.
6  Q   And if asked to do so, you'd investigate,
7  correct?
8  A   Absolutely.
9  Q   Would you take it on faith that it was
10 correct?
11 A   No.
12 Q   So we talked about rarity as being one
13 area where you might not use what you call
14 "direct comparables."
15      What about in the -- what's called a
16 really "low value work area."
17      Are there situations there where you don't
18 use comparables?
19 A   No, you're always using comparables.  We
20 keep our fingers very much on the pulse of the
21 market.  And low values -- there are hundreds
22 of thousands of low value works that are sold
23 every year.  So we do keep our eye on those,
24 and we're always comparing what we're
25 appraising to something else.

1  Q   Do you go through the formal process of
2  finding a comparable for, say, a $5 object, or
3  do you just already know the market?
4  A   We know the market.
5  Q   Okay.  So, again, you're using your
6  professional judgment?
7  A   Correct.
8  Q   In your experience, is it acceptable to
9  rely on other appraisers to form your own
10 valuation?
11 A   In what sense?
12 Q   Sure.
13     In your professional experience, such as
14 this one, is it acceptable to rely upon the
15 work of someone else in a specialized area to
16 come up with a valuation of multiple objects?
17 A   In their particular field of expertise,
18 yes, we do that.  We have specialists in
19 various areas, and we rely on their expertise
20 in that particular area to come up with the
21 correct value.
22 Q   And do you -- we talked about the fact
23 that you go through a process of examining
24 their work to become comfortable with it,
25 right?

1  A   Correct.
2  Q   Okay.  And once you're comfortable with
3  it, you're willing to accept them and build
4  that into your final valuation, correct?
5  A   Absolutely.
6  Q   So you're doing a bit of due diligence on
7  those numbers, correct?
8  A   That's right.
9  Q   Is Christie's a respected auction house?
10 A   Yes, it is.  In most quarters, yes.
11 Q   And do they appraise works?
12 A   They do.
13 Q   And are they professional and respected at
14 doing appraisals?
15 A   Their core business is sales.  They don't
16 conform to USPAP, but they do do appraisals.
17 Q   Other than the fact that they don't
18 conform to USPAP, they do perform appraisals,
19 right?
20 A   Correct.
21 Q   And a client who retained them to do that
22 work would be -- could be entitled a lot -- a
23 client who retained Christie's, would be
24 reasonable for them to rely upon the work that
25 they did, correct?

1  A   In most circumstances, yes.
2  Q   You said "most circumstances."
3      What does that qualification mean?
4  A   I would say if they didn't have a
5  particular expertise in a particular area, or
6  if they used a person who didn't have expertise
7  to do something of a particular specialization,
8  I would want to take a look at that appraisal
9  and the methodology.
10     Or if they were more concerned about
11 selling something, so were -- pushed to put
12 higher values on something I want to sell.  I
13 want to look at that as well.
14     So circumstances surrounding the
15 appraisal.
16 Q   But none of those things automatically
17 disqualify a client from relying up such
18 appraisals, right?
19 A   Sorry.  Repeat that.
20 Q   Those things that you mentioned don't
21 automatically disqualify or render the opinion
22 unreliable, right?
23 A   Correct.
24 Q   And you're not here to offer an opinion on
25 whether Christie's and the work they did in

1  this case was reliable or not, correct?
2  A   Absolutely correct.
3  Q   In your opinion, is it appropriate to mix
4  valuation methodologies to come up with a
5  different valuation?
6  A   Can you explain what you mean by that?
7  Q   Is it appropriate to mix a fair market
8  value approach with a marketable cash value
9  approach?
10 A   I can't think of a situation in which one
11 would do that.
12 Q   In your experience, would it be
13 appropriate to do so?
14 A   No.
15 Q   Does USPAP permit it?
16 A   I don't believe they do.
17 Q   In your experience, is it appropriate to
18 base your own valuation on appraisals that
19 you've concluded were too high or too low?
20 A   It would not be appropriate.
21 Q   What about under USPAP?
22 A   Under USPAP, no, you have to remain
23 objective and do your own appraisal.
24 Q   So if you determined that another
25 valuation is incorrect or causes concern, can

1 you rely upon it yourself?
2 A One would never rely on someone else's
3 work. And we would always do one's own work in
4 an appraisal.
5 Q So I'm going to unpack that for a minute.
6 Before we talked about the fact that you
7 can independently rely upon an appraisal in
8 coming up with your own opinions, as you've
9 done here, right?
10 A I don't understand the question.
11 Q So you had multiple appraisers who are
12 working for you, with you.
13 They came up with their own independent
14 judgment of fair market value, correct?
15 A Correct.
16 Q And they then gave those appraisals to you
17 and you came up with a final gross fair market
18 value here, correct?
19 A Correct.
20 Q Okay. And that's acceptable, right?
21 A Yes.
22 Q And that's acceptable under USPAP,
23 correct?
24 A That's correct.
25 Q You just said, I think, that it's never

1 acceptable to rely upon another appraisal.
2 A You were talking about an appraisal that
3 you thought was incorrect.
4 Q Oh, okay. Thank you.
5 In your experience, is it appropriate to
6 consider insurance values in coming up with an
7 FMV?
8 A That's an interesting question.
9 There are cases when there are no fair
10 market values, when the artist is going to be a
11 primary source artist, where you have to rely
12 on retail prices in order to come up with fair
13 market value. And that's acceptable under IRS
14 standards.
15 Q Are there any other circumstances?
16 A Where the retail market is the primary
17 market, the IRS also says that can be used as
18 fair market value.
19 Q And you keep saying "IRS."
20 Is this what USPAP requires?
21 A USPAP requires you to use the market in
22 which the items are most generally sold in
23 order to come up with fair market value.
24 Q So if it's a retail market you could do
25 this, you could rely upon an insurance value,

1 right?
2 A If it's the primary market and there is no
3 significant or no secondary market.
4 Q And you also said when there's a primary,
5 I guess you mean there's the artist trying to
6 sell, there's no comparable associated with it,
7 you might use an insurance value in those
8 circumstances?
9 A Yeah.
10 By "insurance value," I'd rather say a
11 retail replacement value, because you're
12 looking at what those Works of Art would sell
13 for in a gallery or a dealer.
14 Q Any other circumstances?
15 A Not that I can think of.
16 Q So USPAP, would it be permitted to do --
17 to rely upon insurance values in any other
18 circumstances?
19 A Not that I can think of.
20 Q Have you ever heard of a reputable art
21 appraiser relying upon such insurance values
22 outside of the circumstances that you
23 mentioned?
24 A I never heard of one.
25 Q Now, you said that it might be appropriate

1 in a limited circumstance that you talked about
2 where there's a retail market and no secondary
3 market, and where there's the primary artist.
4 If you had -- would you just accept those
5 insurance -- sorry. Replacement -- say it
6 again.
7 A Retail replacement values. Retail
8 replacement values.
9 Q Would you simply accept the retail
10 replacement values as being correct?
11 A You'd have to do your research into
12 finding those retail replacement values.
13 So if there are no secondary market
14 values, no auction values, then you'd go to the
15 primary source where that Work of Art is sold
16 and you'd find out what they sell for in that
17 venue.
18 Q Is retail replacement value equivalent to
19 insurance value?
20 A Generally, yes.
21 Q Okay. You said "generally." And I want to
22 know what that means. Because we're talking
23 about retail replacement value, as something
24 you go to market to figure out what the cost
25 is.

1 And, generally, insurance values mirror
2 that, right?
3 A    That's right.  And the exception would be
4 what I just mentioned to you before when retail
5 is used for fair market value.
6 Q    Okay.  And so "insurance values," if I can
7 use that term -- because they do exist, right?
8 They are values that are given to
9 insurance companies, right?
10 A    Correct.
11 Q    Okay.  Insurance value is one step removed
12 from retail replacement value, right?
13 A    That's correct.
14 Q    Okay.  So USPAP actually doesn't permit
15 you to use insurance values, it allows you to
16 use retail replacement values?
17 A    I think that's correct, yes.
18 Q    Let's assume for the second that insurance
19 values are the same -- well, can't do that,
20 actually.
21 So under USPAP you can't do it?
22 A    Thinking back, and to be honest, I'm not
23 sure whether USPAP goes into that, into as much
24 detail as you're saying.
25 Certainly you wouldn't use insurance

1 values in a fair market value appraisal for the
2 IRS.
3 Q    Okay.  In your experience, there are
4 circumstances where you can use retail
5 replacement value to come up with a fair market
6 value, right?
7 A    Correct.
8 Q    And it's limited to the circumstances you
9 spoke about, correct?
10 A    Yes.  I can't think of any other
11 circumstances.
12 Q    If the insurance values were the same as
13 the retail replacement value, then it's
14 essentially the same thing, right?
15 If you know that the insurance value is
16 the same as the retail replacement value,
17 theoretically, you can rely on that insurance
18 value?
19 A    Theoretically.
20 Q    Okay.  What if the insurance value was
21 dated, say, ten years old.
22 Could you rely upon it then?
23 A    I wouldn't rely upon something that was
24 ten years out of date.
25 Q    Have you ever heard of a reputable art

1 appraiser or firm that has done so?
2 A    Are you asking whether they would rely on
3 an insurance appraisal for a fair market value?
4 Q    A ten-year old insurance value to come up
5 with a fair market value?
6 A    That would be unusual.  I can't --
7 Q    Have you ever heard of it occurring?
8 A    I have not.
9 Q    Do you know of any reputable art appraiser
10 who's done that?
11 A    Not knowing the circumstances you're
12 speaking about, no.  But I'd have to know what
13 the circumstances are to see if there's some
14 reason why that could possibly be used.
15 Q    Does USPAP permit it?
16 A    As I say, I'm not sure USPAP goes into
17 speaking exactly about insurance appraisals.
18 It talks about retail replacement -- it talks
19 about market value.  It doesn't drill down into
20 retail replacement value, and I don't believe
21 it discusses insurance value.
22 Q    Would you need to be comfortable with the
23 data before you relied upon it?
24 A    Absolutely.
25 Q    If you thought there were errors in it,

1 would it be reasonable to rely upon it?
2 A    No.
3 Q    Would your answers change if I'm talking
4 about marketable cash value.
5 A    Are you asking --
6 Q    So we just talked right now about retail
7 replacement value and insurance values, and
8 we're talking specifically about fair market
9 value appraisals.
10 Are your answers the same if you were
11 applying the same insurance values or retail
12 replacement values to marketable cash values?
13 A    Marketable cash value, as I mentioned, was
14 fair market value minus the cost of the sales.
15 So I can't think of a situation where you'd use
16 an insurance value for marketable cash value.
17 Again, I'd need to know specifics before I
18 could be certain.
19 Q    But because you need to discover a fair
20 market value before you get to marketable cash
21 value, you still need to come up with a fair
22 market value first, correct?
23 A    Yes.
24 Q    Do you know of any publications that would
25 support using insurance values to come up with

1  either a fair market value or a marketable cash
2  value?
3  A   If you're speaking specifically insurance
4  rather than retail replacement, I can't think
5  of any publications.
6  Q   Other than the two circumstances which you
7  mentioned as to retail replacement value, do
8  you know of any publication that would support
9  using those values to come up with a fair
10 market value or a marketable cash value?
11 A   No, I can't think of any.
12 Q   Christie's and Sotheby's usually sell at
13 the high end of the market?
14 A   Define "high end" of the market.
15 Q   I don't have a lot of artwork in my house.
16     But I presume that some auction houses
17 handle more high quality works that generally
18 bring in more at time of auction.
19     Am I correct that there's a difference
20 between auction houses; there's like a first
21 tier auction house and then there's a second
22 tier?
23 A   Well, we say that the major auction houses
24 would be Christie's, Sotheby's and Phillips.
25 They generally like to sell at the high end,

1  but they also sell Works of Arts that are as
2  low as $500.
3      Christie's, in their interior sale and
4  Sotheby's online or Christie's online, and
5  Phillips, maybe some of their smaller value
6  items.
7      So generally one goes to those major
8  auction houses is going to be a higher Works of
9  Art.  But they will also sell more modest value
10 Works of Art.
11 Q   The average in the departments -- but I
12 understand they're set up by departments;
13 that's correct?
14 A   That's correct.
15 Q   So the average in the department, they may
16 sell a few at the low end, but the average
17 tends to be high, right?
18 A   Well, there is a department called the
19 "Interiors Department" at Christie's, where
20 their average is probably in the low thousands.
21     But generally they're selling at a higher
22 level.
23 Q   Does Christie's typically sell -- auction
24 off pieces that are $100 or $200?
25 A   In the Interiors Department, yes, and

1  sometimes in their online lower value sales
2  they will; but not generally.
3  Q   In your experience, is it appropriate to
4  average, take the average Christie's and
5  Sotheby's department sale rate, whatever that
6  is, come up with 50,000; is it appropriate to
7  take that average and use that to appraise a
8  collection?
9  A   I don't really understand your question.
10 Q   If you were asked to do a fair market
11 value or a marketable cash value assessment of
12 a collection, in your experience, would it be
13 appropriate to just go to Sotheby's and
14 Christie's and figure out what their average
15 department sale price and apply it to the
16 works in your collection?
17 A   It's a hypothetical question, sort of a
18 broad one.
19     But I'd say if you have -- if you're
20 looking at a department at a particular artist,
21 the type of medium, if you're specifying very
22 clearly what their average price is in a short
23 period of time, you'd have to make a lot of
24 assumptions and a lot of conditions before you
25 could use that information to apply it to other

1  Works of Art.
2  Q   So would you have to know what's actually
3  in your collection?
4  A   Absolutely.
5  Q   Other than those circumstances, are there
6  any other circumstances where you think it
7  would be appropriate?
8  A   To apply an average value?
9  Q   Taken from Christie's and apply it to your
10 own collection to figure out fair market value
11 or marketable cash value?
12 A   Hard to tell, because I don't know the
13 specifics.  But it doesn't sound like something
14 that's a reasonable methodology.
15 Q   Have you heard of any reputable art
16 appraiser or firm using that approach?
17 A   No.
18 Q   Are you aware of any publications that
19 would support the use of that approach?
20 A   Not as defined, no.
21     MR. O'REILLY:  Break for lunch?
22     MS. GARTEL:  Okay.
23     MR. O'REILLY:  Let's go off the record.
24     THE VIDEOGRAPHER:  This concludes Tape No.
25 2.  The time is 12:00 p.m., and we're off the

1    record.
2         (Luncheon Recess:  12:00 p.m.)
3         A F T E R N O O N   S E S S I O N
4         (Time noted:  12:52 a.m.)
5    E L I Z A B E T H  V O N H A B S B U R G,
6         resumed and testified as follows:
7         THE VIDEOGRAPHER:  Good afternoon.
8    This begins Tape No. 3.  The time is
9    12:52 p.m.  We're back on the record.
10   EXAMINATION BY
11   MR. O'REILLY:
12   Q    Hi.  How's lunch?
13   A    Very good, thank you.
14   Q    Have you read or discussed the expert
15   report by Artvest with anyone?
16   A    I flipped through it, but I can't say that
17   I looked at it very carefully.
18   Q    Were you asked to look at it?
19   A    No.  Just -- it was sent to us and I
20   looked through it.
21   Q    Okay.  Did you not have any opportunity to
22   review it in any detail at all?
23   A    Not in detail.  I literally just, you
24   know, looked through to see how it was laid
25   out.

1    Q    Did you form any opinions or impressions
2    about it?
3    A    No.
4    Q    No.
5         And sitting here today, you're not here to
6    provide any opinion or testimony about that
7    report, correct?
8    A    That's correct.
9    Q    Okay.  Do you know Michael Plummer?
10   A    I do.
11   Q    Do you know Artvest, generally?
12   A    Yes, I do.
13   Q    Do you have an opinion about either
14   Artvest or Michael Plummer from a professional
15   standpoint?
16   A    I'm not -- I've -- I've never really been
17   exactly sure what they do at that firm, other
18   than do reports on -- on the art market.
19   Q    Okay.  So you don't substantively deal
20   with them sufficiently to have an opinion one
21   way or the other?
22   A    That's correct.
23   Q    Did you identify any of the appraisers
24   that they used?
25   A    Yes, I did.

1    Q    And do you have an opinion about any of
2    those appraisers?
3    A    Yes, I have a high opinion of
4    Betty Krulik.
5    Q    Okay.
6    A    There was one other woman whose name I've
7    forgotten right now.  But a woman who has a
8    good reputation.
9    Q    And do you -- did you think that any of
10   them had a bad reputation?
11   A    I only saw two.  I literally looked at it
12   very fast.  And I saw two names that I
13   recognized immediately.  And those would be
14   two -- I forget the second one's name.
15   Q    Have you seen the expert report of
16   Victor Wiener or Weiner?
17   A    No, I have not.
18   Q    Have you discussed any of his opinions --
19   any of the opinions that he would offer in the
20   report or in testimony in this case?
21   A    No, I have not.
22   Q    Do you have an opinion about Mr. Wiener's
23   professional reputation?
24   A    No, I do not.
25   Q    Do you know him socially?

1    A    Not socially.  I've seen him in business
2    situations.
3    Q    So you have no impression of his skills as
4    an appraiser?
5    A    No.  He's never worked for me or with me.
6    He's worked on occasion on opposing appraisals.
7    Q    So tell me about that.  You said he's
8    worked on opposing appraisals.
9         Can you give me some example?
10   A    Yeah.
11        Without giving you specifics, there was a
12   recent case where he did an appraisal for a
13   loss of value for a client, and we were working
14   for the insurance company preparing the same
15   kind of appraisal.
16   Q    Was it an FMV?
17        Was it an replacement cost value?
18   A    It was replace -- retail replacement
19   value.
20   Q    So you both performed the same
21   valuation -- I'm sorry.
22        You used the same methodology; you both
23   did replacement?
24   A    We both did retail appraisal value,
25   replacements, yes.

1  Q   How long ago was that?
2  A   That was within the last three months or
3  so.
4  Q   His -- and you examined his appraisal,
5  correct?
6  A   I did, yeah.
7  Q   Do you recall what -- I want to be careful
8  here because I don't want to put you in an
9  awkward position.
10     But was it for an individual work or was
11 it a collection of works?
12 A   It was a group of works.
13 Q   A group of works.
14     A small group or --
15 A   Small.
16 Q   Small group.  Okay.
17     And did you follow the same methodology?
18 A   I looked -- I didn't do a review of his
19 appraisal.  But it -- it appeared that his
20 appraisal was USPAP compliant, as ours was.
21 Q   And in that circumstance, did you look at
22 the market for replacement, or did you look at
23 some sort of insurance values?
24 A   I'm trying to remember in that situation
25 whether we -- sometimes we're provided with a

1  pre-loss value, and I don't recall in this
2  situation whether we were provided that
3  replacement value or whether we came up with it
4  on our own.
5      But it was retail replacement value for
6  insurance purposes.
7  Q   Okay.  Are you able to tell me how much
8  you valued the group for?
9  A   No, I cannot.
10 Q   Okay.  Can you tell me what you valued the
11 group for?
12 A   I cannot.
13 Q   Okay.  Can you tell me whether his was
14 higher or lower than yours?
15 A   His was higher than ours.
16 Q   What's the order of magnitude, that it was
17 higher?
18 A   I'm guessing, trying to remember.  Maybe
19 25 percent higher.
20 Q   And did you have an opinion on whether
21 that was a correct valuation?
22 A   Our opinion was on our own valuation.  We
23 felt that our valuation was correct.
24 Q   Any other instances in which you dealt
25 with him personally or professionally?

1      Excuse me.
2  A   Yes, there's been a couple of other
3  situations.
4      One is an ongoing situation and also an
5  insurance loss of value situation, where we are
6  working on behalf of the artist.  And he's
7  working on behalf of the insurance company.
8  Q   And is that complete, that work?
9  A   No, it's not.  It's ongoing.
10 Q   Any other instances in which you've dealt
11 with him professionally?
12 A   I think several years ago, another
13 insurance situation where we were acting on
14 behalf of a client with a loss of value on a
15 work of art.  And I believe he was acting on
16 behalf of the insurance company or a different
17 insurance company for the insurance company we
18 were working with.
19 Q   And did -- was this a fine art valuation?
20 A   Yes.
21 Q   Okay.  And did you, in that circumstance,
22 follow the same valuation methodology?
23 A   Never saw his valuation in that one, but
24 we used the USPAP methodology.
25 Q   Okay.  Do you recall whether it was retail

1  replacement value?
2  A   It was retail replacement value, yes.
3  Q   You never saw whether his was, though?
4  A   We did not, no.
5  Q   Okay.  But do you know whether your
6  numbers were different?
7  A   I don't know in that situation.
8  Q   Any other instances?
9  A   Not that I can think of.
10 Q   Have any of your clients ever used him?
11 A   Not that I know of.
12 Q   You ever heard of Art Capital Group?
13 A   Yes.
14 Q   Does Art Capital Group have a reputation
15 in the industry?
16 A   Yes, they do.
17 Q   What is that reputation?
18 A   Some people think that they are not --
19 they don't have the highest reputation.
20 Q   And what do you mean by that?
21 A   Or honor -- honorability, perhaps, is the
22 word.
23 Q   Under their reputation where they don't
24 have the highest honorability reputation, is
25 there any other reputation in the industry that

1  they have?
2  A   Not that I know of.
3  Q   Have you ever dealt with them yourself?
4  A   No.
5  Q   Have any of your clients ever dealt with
6  them?
7  A   No.
8  Q   What about Ian Peck in particular?
9      Do you -- do you know Ian Peck?
10 A   I don't know him personally, but I know
11 who he is.
12 Q   Okay.  And does he have a reputation in
13 the industry?
14 A   I think the same, some people would say,
15 again, that he may not be as honorable as one
16 might want him to be.
17 Q   Do you know why that's so?
18 A   I think it's really the -- the focal point
19 of that was the -- I've forgotten the name now.
20 The case where the photographer when he was --
21 Q   Leibovitz.
22 A   Thank you.
23     Annie Leibovitz.  Thank you very much.
24     Annie Leibovitz, when he was dealing with
25 her.

1  Q   And what happened with Annie Leibovitz?
2  A   He defaulted on her loan -- I mean, sorry.
3      She defaulted on her loan and he wanted to
4  see how he'd get repaid.
5  Q   And why was that considered not honorable?
6  A   I think that people were feeling very
7  sorry for Annie Leibovitz, who's a great
8  artist.  And looking at it -- at it at an
9  emotional viewpoint.
10     From strictly a financial viewpoint, I
11 don't think people were looking at it with
12 those eyes.  But feeling sorry for the
13 situation she was in.
14 Q   Do you know did Ian Peck and Art Capital
15 or whatever entity that made the loan, did they
16 seize the property?
17 A   I don't know how it turned out in the end.
18 But I know they were threatening to seize the
19 property.
20 Q   Because she defaulted?
21 A   Correct.
22 Q   Do you have any other information about
23 Ian Peck or Art Capital Group?
24 A   I don't.
25 Q   Are you aware of what size loans they have

1  given out in the industry?
2  A   No, I'm not.  I don't.
3  Q   Have you ever heard of Poly International
4  Auction?
5  A   Yes.  Mm-hmm.
6  Q   What are they?
7  A   Chinese auction house.
8  Q   Does Poly have a reputation in the market?
9  A   That, I don't -- I'm not really familiar
10 with their reputation.
11 Q   You've had 30 years of experience in this
12 market, correct?
13 A   Yes.
14 Q   And in that experience, you've never, I
15 guess, come across them; is that correct?
16 A   I've never used them for any of our
17 clients.
18 Q   Is there a reason for that?
19 A   They just started not that long ago and
20 have holding auctions in China, maybe 10, 15
21 years ago.
22     I tend to recommend our clients use
23 international auction houses that have a
24 longstanding reputation and have -- where if
25 something goes wrong, we know how to reach the

1  principals so we can make it right.
2  Q   So you don't, sitting here today,
3  recommend it to your clients because they don't
4  have a track record that is sufficient enough
5  for -- sufficient enough for you to recommend
6  them?
7  A   It's not really a track record.  It's more
8  of that they're located in China, and it makes
9  it very difficult for us to really have a close
10 relationship with them.
11 Q   Do you know whether they have the same
12 auction standards or rules that a Christie's or
13 Sotheby's has?
14 A   Christie's or Sotheby's?
15     They traditionally have not.  None of the
16 traditional Chinese auction houses have really
17 been forthright in how many lots have been
18 unsold versus how many lots have been sold.
19     And in sale prices, there's been some
20 question whether their and other Chinese
21 auction houses sale prices were accurate.
22 Q   Do you know whether they provide
23 guarantees for sales that don't work out the
24 way people want them to work out?
25 A   That, I don't know.

1  Q   Okay.  Anything else about Poly?
2  A   Not that I can recall.
3  Q   You know anything about Uon Management?
4  A   No.
5  Q   Have you ever heard of Catalyst
6  Acquisitions?
7  A   No.
8  Q   I've already asked you this question.
9      But you don't know who Houlihan Lokey, do
10  you?
11  A   No.
12  Q   Or Steve Spencer?
13  A   No.
14  Q   What auction houses do you send your
15  clients to?
16  A   A very wide variety of auction houses,
17  including Christie's, Sotheby's, Phillips,
18  Bonhams.
19      Regional auction houses like Lichfield,
20  Lola, NAI, Rago, Curdo Lin [ph] out West;
21  Bonhams in California.
22      And some of the European auction houses,
23  branches, like the ones in Austria.
24      So a wide variety of auction houses.
25  Q   And you would only send your clients to

1  those auction houses if you felt that they were
2  forthright and had the standards that you'd
3  expect an auction house to live up to, correct?
4  A   Yes.
5  Q   How did you first become interested in
6  art?
7  A   My family has a background in art.  My
8  grandparents were collectors.  So I was kind of
9  surrounded by it my whole life.
10      I studied a year in Florence.  Took art
11  history in Florence during my undergraduate
12  year.
13  Q   Where?
14  A   Stanford, in Florence.
15      And then after my graduate school, I ended
16  up switching the focus of what I wanted to do
17  and ended up at Christie's.
18      And . . .
19  Q   So did you grow up with art in your home?
20  A   Yes, I did.
21  Q   Do you remember your first -- I don't
22  know -- your first object that kind of had an
23  affect on you?
24  A   Sure.
25  Q   What one was it?

1  A   It was one of the Monet paintings at the
2  MET.
3  Q   What was it that moved you?
4  A   Long time ago.  It must have been the
5  colors and the scene.
6  Q   Did it inspire you to move on with art as
7  a career?
8  A   I think I wanted to be an artist at that
9  point.  I was young.
10  Q   Hadn't figured -- figured out whether
11  your -- your mind and your hand necessarily
12  matched up?
13  A   Correct.
14  Q   Do you have any children?
15  A   I do.
16  Q   How old are they?
17  A   Three stepsons in their 40s and 30s.  And
18  a daughter who's 17.
19  Q   And your husband is -- is Gezer, correct?
20  A   Correct.  Geza.
21  Q   And he's -- sorry.  Geza.
22      And he's in the art world, if I can use
23  that loosely?
24  A   Yes, he is.
25  Q   He's an expert on Fabergé, for example?

1  A   He is.
2  Q   And he is also associated with Winston,
3  correct?
4  A   He's a consultant for us.
5  Q   Does he have a position in any museums?
6  A   He's a -- he's called an adjunct curator
7  or was at -- I guess curator at Virginia Museum
8  of Fine Arts.  And he's worked with a lot of
9  museums over his career.
10  Q   And he did speak at the DIA, correct?
11  A   I did not -- I didn't remember that.  I'm
12  sure he has.
13  Q   What's your favorite museum?
14  A   I have a favorite museum.  One of my --
15  one of my favorites is the Frick in New York.
16  Q   Why is it one of your favorites?
17  A   I think it's a manageable museums.  And I
18  like house museums.
19  Q   House museums?
20  A   Single owner collections that have been
21  turned into museums.
22  Q   Okay.  Is it open to the public?
23  A   Yes, it is.
24  Q   How do you define a museum?
25  A   That's a question I've never been asked

1  before.
2      A museum is probably first and foremost an
3  educational institution for the public good,
4  and a place where people can go and see a
5  variety of Works of Art.
6  Q    Are museums important?
7  A    Of course they are.
8  Q    Why?
9  A    Because -- I'm -- I'm a little
10 philosophical here.
11     Art is the universal language.  I think
12 art brings -- it is our culture.  It's part of
13 our culture.  And it's a very important way to
14 transmit culture worldwide.
15 Q    You had art in your home, you said, right?
16 A    Correct.
17 Q    Most people don't have it in their home,
18 though, right?
19 A    You'd be surprised.  Most people do have
20 it in their home.  They just don't consider
21 perhaps watches to be art or baseball cards to
22 be art.
23     So most people have it.
24 Q    For most of the public to have a primary
25 experience with Master Works, museums are their

1  only option, correct?
2  A    Museums or auction houses.
3      Auction houses are open to the public.
4  Q    Are museums important to a community,
5  culturally?
6  A    I believe they are, yes.
7  Q    Educationally?
8  A    Yes.
9  Q    Economically?
10 A    Yes.
11 Q    Can they transform a neighborhood?
12 A    Can they transform a neighborhood?
13     They add to a neighborhood's aura, yes.
14 Q    Do you like living in New York?
15 A    I love living in New York.
16 Q    Would New York be the same place without
17 museums?
18 A    No.
19 Q    Would New York be the same place without
20 fine art?
21 A    I can't even answer that question.  I
22 can't imagine that.
23 Q    What's the Morgan Museum?
24 A    The Pierpont Morgan Museum is another
25 house museum.  The Pierpont Morgan, as you may

1  know, is a -- what they call a robber baron.
2  His collection was left in his house and
3  subsequently added to by the museum.
4  Q    Does the museum hold its objects in trust?
5  A    I believe so, yeah.
6  Q    And you give to that museum, correct?
7  A    To the Pierpont Morgan Museum?
8      Yes, I do.  To the Pierpont Morgan
9  Library, yes, I do.
10 Q    And why do you do that?
11 A    I'm a Fellow of the Pierpont Morgan
12 Library.  I collect all master drawings or I
13 have in the past, and that's something they are
14 very interested in and they invited me to
15 become a Fellow.
16 Q    Do you want Morgan Museum to remain open
17 and available to the public?
18 A    Yes, I do.
19 Q    Is that why you give?
20 A    That's one of the reasons.
21     MR. O'REILLY:  Can I have five minutes?
22     MS. GARTEL:  Yes.
23     THE VIDEOGRAPHER:  The time is 1:11 p.m.
24 We're going off the record.
25     (Recess taken.)

1      THE VIDEOGRAPHER:  This is the
2  continuation of Tape No. 3.  The time is
3  1:22 p.m. and we're back on the record.
4  BY MR. O'REILLY:
5  Q    Could you turn to Page 474 of your report
6  for a moment, for the value of the appraisal,
7  please.
8      And it's right before the tab that's
9  marked "Fine Art Comparable."
10 A    You said 474 or --
11 Q    Correct, 474.
12     You see the section entitled "Market
13 Overviews"?
14 A    Yes.
15 Q    I just want to understand, is that
16 included in your appraisal to provide context
17 for the work that was done by the appraisers?
18 A    Market overview is the -- the only reason
19 the market are part of USPAP's format.
20 Q    Are you offering any opinions on these
21 overviews?
22 A    Value opinions or what's your question?
23 Q    Yeah.
24     So your opinion, I think, is stated
25 earlier in your report, which is that you

Page 154

1  believe that the works that you valued was
2  1.75 billion or thereabouts, correct?
3  A    Yes.
4  Q    And that is your opinion, and that's the
5  sum total of your opinion, correct?
6  A    Correct.
7  Q    So this puts that in context, but you're
8  not any -- offering any opinions in the case as
9  to the correctness of these statements, are
10  you?
11  A    Well, these are giving us sort of context
12  for the various areas of -- of the market.
13  Q    That's fine.  Thank you very much.
14      I just want to introduce one more exhibit.
15      (Deposition Exhibit 2, Notice of
16  Deposition, marked for identification as of
17  this date.)
18  BY MR. O'REILLY:
19  Q    I'm placing before you what's been marked
20  as Exhibit 2.
21      Does that look like the notice of your
22  video deposition?
23  A    Yeah, I had an e-mail copy of it.  Yes, it
24  does.
25  Q    Thank you.

Page 155

1      MR. O'REILLY:  And we'll just place on the
2  record that I've got no more questions.  Just
3  place on the record that once you produce the
4  appraisal file, we'll take a look at it to
5  determine whether or not there's any reason to
6  call this witness back.
7      But as of today, I'm done.
8      MS. GARTEL:  Okay.  I just wanted to add
9  that this notice contains a misspelling of
10  Ms. von Habsburg's name.  It should be a "B"
11  instead of a "P," just for the record.
12      (Continued on the following page to
13  include jurat.)

Page 156

1      THE VIDEOGRAPHER:  Anybody else?
2      MR. O'REILLY:  Any other questions?
3      Anybody on the phone?
4      Thank you very much for your time.
5      THE WITNESS:  Thank you.
6      THE VIDEOGRAPHER:  One second.
7      This concludes Tape No. 3.  It also
8  concludes today's deposition.  The total time
9  on the record is 2 hours and 57 minutes.  The
10  time now is 1:26 p.m.
11      (Time noted:  1:26 p.m.)
12
13      _____
14      ELIZABETH VON HABSBURG
15  Subscribed and sworn to before me
16  this _____ day of _____, 2014.
17
18  _____
19
20
21
22
23
24
25

Page 157

1      C E R T I F I C A T E
2  STATE OF NEW YORK      )
3                         :ss
4  COUNTY OF NEW YORK     )
5
6      I, MICHELLE COX, a Notary Public within
7  and for the State of New York, do hereby
8  certify:
9      That ELIZABETH VON HABSBURG, the witness
10  whose deposition is hereinbefore set forth, was
11  duly sworn by me and that such deposition is a
12  true record of the testimony given by the
13  witness.
14      I further certify that I am not related to
15  any of the parties to this action by blood or
16  marriage, and that I am in no way interested in
17  the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand this 31st day of July 2014.
20
21
22      MICHELLE COX, CLR
23
24
25

**$**

**$1.7** 101:8 105:12

**$10** 116:16

**$100** 104:11 131:24

**$2** 53:13 103:14

**$200** 104:10 131:24

**$5** 118:2

**$500** 104:10 131:2

**1**

**1** 7:2 39:18 40:1 47:4
53:13 68:7 69:23 77:7,
14 94:19 96:20 102:10

**1,742,245,750** 90:15

**1.75** 106:5,12 154:2

**10** 26:11,12 37:13 38:6
42:20 47:21 53:12 94:2,
9,14 105:22 144:20

**10,000** 52:23

**100** 34:2,4 53:23 109:5,8
110:3

**100,000** 34:9 36:11,12

**10017** 7:11

**10:22** 68:3

**10:29** 68:8

**11:12** 102:10

**11:19** 102:14

**12** 26:12 44:4,7 89:24
103:18 104:7 105:4,8,25
106:4

**12:00** 133:25 134:2

**12:52** 134:4,9

**13** 104:7

**13-53846** 7:8

**15** 144:20

**17** 148:18

**18** 11:10

**1800** 84:25

**1982** 10:20

**1989** 65:15

**1992** 65:24

**1:11** 152:23

**1:22** 153:3

**1:26** 156:10,11

**1and** 70:3

**2**

**2** 77:14 94:19 96:20
102:13 133:25 154:15,
20 156:9

**20** 30:25 37:11 38:5
43:22

**20,000** 49:23 50:13
51:17,24 52:5,13,19,21

**200** 106:8

**2000** 44:4

**2010** 11:16 38:15

**2013** 44:10

**2014** 7:3 12:10 16:2,10
17:3 91:17 156:16

**222** 7:10

**25** 17:2 90:20 91:17
104:12,15 139:19

**25th** 16:2,10 76:15

**3**

**3** 134:8 153:2 156:7

**30** 68:10 144:11

**30s** 148:17

**31** 7:3

**4**

**40** 43:21

**400** 78:21

**40s** 148:17

**41st** 7:11

**473** 77:21

**474** 153:5,10,11

**484** 99:15

**5**

**5** 43:6 44:9 80:4 103:20

**5,000** 30:20

**50,000** 132:6

**500** 81:10

**57** 156:9

**580** 90:14

**582** 88:15 90:14 94:17
108:5,12

**590** 74:1

**592** 88:11 89:24

**594** 88:13 89:22 108:4

**6**

**6** 80:4 81:20

**60** 95:17,23

**60,000** 97:16,19 108:15
109:3

**600** 38:17 43:7,16 44:9

**7**

**7** 112:7,8,9,16

**8**

**8** 26:11

**9**

**90** 67:21

**9:06** 7:12

**9:38** 39:14

**9:40** 39:19,22

**9:42** 40:1

**9:50** 46:25

**9:55** 47:4

**A**

**a.m.** 7:12 39:14,19,22
40:2 46:25 47:5 68:3,8
102:10,14 134:4

**AAA** 25:3,4,6,11 26:1,3,
4,7,22,25 27:2,17 28:1,5
100:17

**AAA'S** 27:5

**ability** 55:11

**Absolutely** 13:2 19:16
29:8 38:2 41:4 115:23
117:8 119:5 121:2
128:24 133:4

**accept** 119:3 125:4,9

**acceptable** 118:8,14
122:20,22 123:1,13

**access** 33:14 86:10,12,
23,24 87:21

**accomplish** 35:14 61:3

**account** 80:16 102:3

**accounting** 22:4,13,14
23:4

**accreditation** 20:21

**accreditations** 20:13

**accurate** 15:22 20:9
58:13,15 84:8 145:21

**accurately** 49:3

**acquire** 67:14

**Acquisitions** 146:6

**act** 24:25

**acting** 24:1 140:13,15

**actual** 43:15

**add** 151:13 155:8

**added** 95:7 152:3

**addition** 115:19

**address** 58:20,23

**addressed** 60:17

**adjunct** 149:6

**adjusted** 93:22 94:1

**adjustment** 94:24 95:2

**adjustments** 93:10,12

**advice** 35:10

**advisor** 14:17

**advisory** 11:11,19 23:11,
13,14,17,18,25 25:16

**affairs** 22:10

**affect** 147:23

**affiliated** 29:18

**afternoon** 134:7

**age** 84:16

**aggregate** 46:19 94:5

**agree** 99:22 100:3,5
112:23

**agreement** 17:22 72:16

**agreements** 45:24 46:22

**allowed** 45:20 46:6

**alphabetically** 79:5

**amend** 29:2

**America** 24:16,19 26:10
100:1,7

**American** 24:12

**amount** 90:10 104:21

**Annie** 142:23,24 143:1,7

**annual** 25:14 44:8

**answers** 129:3,10

**anybody's** 14:19

**apologize** 51:23

**appeared** 138:19

**applied** 106:4 107:20

**applies** 107:14

**apply** 44:1 108:14
132:15,25 133:8,9

**applying** 107:24 129:11

**appraisable** 38:6

**appraisal** 10:20 11:11,19
12:21 15:24 16:4 18:3,6
20:15 23:18 24:1,12,25
25:14 30:7,12 31:8,17,
20,23,24 32:3 33:4,5,12
38:18 45:14 46:5 47:13
48:6,24 49:20,22 50:2,3,
16,17,19,21,24,25 51:7,
9,15,18,24 52:15 53:1,
19 54:10,11,12,15,18,
19,23 55:2,20 56:8,22
57:9 58:2,8,9,14,21
59:1,2,9,10,14,15,16,17,
19 60:1,5,6,11 61:5,20
62:13,15,20 63:3,7,8,9,
21 64:5,16 73:1,3,7,10,
17 78:10 80:2,4,9 81:4,5

82:3,4 84:2 85:10 86:5
87:8,24 88:6,15 90:14,
17 91:23 92:3,10 93:7,
21 94:6,17 96:13 101:1
110:14 111:11,14,17
115:24 120:8,15 121:23
122:4,7 123:1,2 127:1
128:3 137:12,15,24
138:4,19,20 153:6,16
155:4

**appraisals** 10:22,23
11:2,4 21:13,16 24:2
31:13 32:7 33:2 38:10,
17 40:6 42:7,19 43:6,9,
10 44:14,17,22 45:1,21,
23 46:6 47:25 48:13
51:5,20,21,22 54:8 56:3,
14,24 57:3,14,15,17
58:25 60:24 63:1,24
64:4,8, 69:9 91:1 95:6
99:7 108:6 119:14,16,
121:18 122:16 128:17
129:9 137:6,8

**appraise** 72:18 88:1
89:7,16 115:18 119:11
132:7

**appraised** 46:3 81:23
89:12 90:2 108:12

**appraiser** 21:18 32:17
36:16,18,22 63:23 64:6,
12 66:5 69:15 71:10
92:22 101:10 115:22
124:21 128:1,9 133:16
137:4

**appraisers** 19:15, 20:21
21:8,9, 24:15,19 26:9
40:18,20 42:3 64:15,23
71:21,24 81:23 83:25
86:1 99:25 100:6 113:24
118:9 122:11 135:23
136:2 153:17

**appraising** 21:10 24:6
108:7 117:25

**approach** 111:21,23,25
112:4,24 121:8,9
133:16,19

**approximate** 47:14,19
53:23,25 105:21

**approximately** 15:16,19
28:11, 38:17 43:13
44:18,20 49:23 73:25
74:1 76:15 84:25 88:5
94:2,6 95:8 101:7
103:18,21 105:22,25

**approximates** 103:21

**approximation** 42:21

**April** 82:12

**arbitrarily** 16:20,21

**area** 39:3,10 46:12 83:15
93:19,20 117:13,16
118:15,20 120:5

**areas** 36:21 37:7,19 38:1
39:7 92:2 118:19 154:12

**art** 10:15,19 11:11,16,18,
19 12:3 23:11,13,17,18,
25 30:8,9 32:22 37:4,8
38:6 40:10 48:12,13
51:1,2 55:11 62:6 64:13
66:2 68:10,17 74:1,10
79:5,12 83:3,6,7,14
84:15,24 86:10,13,21
87:9 89:8 93:19 103:3,4
106:12,17 107:14,21
108:7,21 109:9,20,22
113:6,25 115:14 124:12,
20 125:15 127:25 131:9,
10 133:1,15 135:18
140:15,19 141:12,
143:14,23 147:6,7,10,19
148:6,22 150:5,11,12,
15,21,22 151:20 153:9

**Arthur** 7:19 8:25

**articles** 81:4

**artist** 74:24 108:21
113:7,22 115:11,12
123:10,11 124:5 125:3
132:20 140:6 148:8

**artist's** 108:22

**artists** 74:22 113:13

**arts** 7:20 9:1 25:15 69:21
74:2,7 131:1 149:8

**Artvest** 134:15 135:11,
14

**artwork** 36:1 51:8 78:24
130:15

**assessment** 55:23 56:2
107:25 109:2 116:9
132:11

**Assignment** 80:5

**assisting** 24:3,7

**association** 21:12,19
24:13,15,19 26:10 64:15
99:25 100:6

**assume** 90:21 126:18

**assumed** 79:23

**assumes** 56:16 58:2

**assuming** 70:13 100:7,
13

**assumption** 62:16

**assumptions** 62:12
70:22 79:25 80:1,6,8,12,
14,16 83:24 84:3,5
132:24

**Assurance** 15:6

**Assured** 8:8,13

**attempt** 82:17 97:23

**attempting** 82:23

**attention** 87:5, 100:16

**attorney** 18:23 87:10

**attorneys** 72:2,4,5 79:15
87:6 92:21

**atypical** 52:12,14

**auction** 10:25 11:12
23:20 57:1,19 102:23
103:16,17 106:20
109:17 113:21 119:9
125:14 130:16,18,20,21,
23 131:8,23 144:4,7,23
145:12,16,21 146:14,16,
19,22,24 147:1,3 151:2,
3

**auctions** 144:20

**aura** 151:13

**Austria** 146:23

**author** 71:3,4

**authorities** 64:6

**automatically** 116:17
120:16,21

**average** 131:11,15,16,20
132:4,7,14,22 133:8

**award** 25:14

**aware** 28:1 59:24 60:25
61:7 133:18 143:25

**awkward** 138:9

─────────

**B**

─────────

**back** 12:8 26:11 30:18

39:19 40:2 47:5,8 49:18
54:16 68:8 80:3 82:18
92:13 102:14 117:1
126:22 134:9 153:3
155:6

**background** 147:7

**bad** 19:22 32:25 46:14
58:16 115:3 136:10

**bank** 48:15

**bankruptcy** 12:7 15:1
68:18

**Barnes** 29:5,7,9,10
33:12 34:15 35:3,20
36:3 61:13,14,22,25

**baron** 152:1

**base** 121:18

**baseball** 150:21

**based** 12:2 58:10 98:4

**basically** 75:23 104:6

**basis** 44:8 92:23 94:24

**Beach** 11:21

**began** 17:11 80:18

**begin** 17:10

**beginning** 31:11 80:25

**begins** 7:2 102:13 134:8

**behalf** 7:15,19,22,24 8:4,
8,13 10:9 14:19,20
24:17 30:5 46:3 47:15
49:7,11 54:8 61:18
67:21 140:6,7,14,16

**belonged** 48:6

**benefit** 18:4

**Bernini** 114:20

**Betty** 136:4

**big** 96:25

**billion** 45:15 53:3,7,9,10,
11,12,13 54:3 95:9
101:8 105:12 106:5,12
154:2

**binder** 69:23 70:3,4

**bio** 28:18

**biography** 20:5,14 21:1,
2 28:24

**bit** 10:17 119:6

**blockage** 107:5,9,13,20,
24 108:3,8,13,14,20,23

**board** 25:9,12,13 27:8,23
100:19

**board's** 27:14

**body** 63:20,25 64:20

**Bonhams** 146:18,21

**books** 78:6 92:9

**Boston** 11:21

**bottom** 112:17

**bounce** 39:4

**bound** 62:24 65:10,12

**bracket** 53:12

**branches** 146:23

**break** 102:7 133:21

**bring** 13:3,5,8 18:1 87:16
130:18

**brings** 150:12

**broad** 109:7 132:18

**broken** 84:22

**brought** 87:5

**bucket** 74:18

**build** 119:3

**building** 89:5,6

**business** 20:15,16 22:7
119:15 137:1

**buyer** 54:20 56:17 58:6,
11

**buyer's** 102:23 103:14,
17 104:11 105:1,3,5,15,
106:18

**buying** 24:3,7

─────────

**C**

─────────

**calculate** 16:13

**calculated** 16:9,11

**calculator** 42:24 106:6,9

**California** 146:21

**call** 25:3,4 39:8 51:14
71:12 117:13 152:1
155:6

**called** 8:17 10:25 11:6 14:19 29:5,12 31:16,19, 22 32:4 36:15,17 51:9 64:24 111:10 115:24 117:15 131:18 149:6

**calling** 14:20

**calls** 116:10

**capacity** 10:8 24:9

**Capital** 141:12, 143:14, 23

**cards** 150:21

**career** 10:19 36:20 148:7 149:9

**careful** 138:7

**carefully** 92:2 134:17

**carries** 66:20

**case** 7:6,8 19:20,24 20:3 24:22 29:11 35:14 49:11 53:15 55:7 62:9 69:8 70:6 103:13 107:12 112:21 121:1 136:20 137:12 142:20 154:8

**cases** 112:19 114:6,12 123:9

**cash** 31:19 43:10,18,23 48:3,10,17 53:21 54:12 56:6 57:4,9 59:15 69:18 98:25 99:2,6,19 101:2,8, 14,19 102:17 104:22 107:4,25 108:15 109:2 121:8 129:4,12,13,16,20 130:1,10 133:11

**Catalyst** 146:5

**categories** 92:10

**category** 47:13 83:8 84:20

**censure** 64:6

**certification** 20:24

**certifications** 20:23,25

**certified** 69:14

**Chadbourne** 8:8,13

**chair** 20:19

**Chandler** 8:7,12

**change** 27:4,6,11,13,15 90:1 94:21,22 129:3

**changed** 94:16

**changing** 94:23

**charge** 103:22 105:16

**charged** 103:24 104:3,4 106:11

**charges** 103:1 104:16

**check** 41:16

**children** 148:14

**China** 144:20 145:8

**Chinese** 144:7 145:16,20

**choice** 35:7 78:12 79:14

**choose** 77:4

**chose** 16:22,24

**chosen** 91:11

**Christie's** 10:20,24 14:16 65:4,7,17,18 81:1 103:15 105:18,20 106:1 119:9,23 120:25 130:12, 24 131:3,4,19,23 132:4, 14 133:9 145:12,14 147:17

**circumstance** 41:15 61:7 125:1 140:21

**circumstances** 41:5 42:2 59:24 116:8 120:1, 2,14 123:15 124:8,14, 18,22 127:4,8, 128:11, 13 130:6 133:5,6

**City** 7:4,22 12:6 15:1 79:18 101:2,7

**clarification** 29:17

**clarify** 10:2

**clarifying** 13:16

**Clark** 8:4

**class** 22:11

**classes** 22:5,15

**clear** 62:16,17 79:23 99:11

**client** 24:18 32:12 49:24 55:17 57:6 59:13 60:6,7, 8 65:25 66:3,14,16,19 79:2 119:21,23 120:17 137:13 140:14

**clients** 10:22 11:4,14 18:16,21 24:3,7 45:5 46:18 47:17 59:5 67:22 141:10 142:5 144:17,22

**145:3 146:15,25**

**close** 101:15,16 145:9

**closely** 113:8

**clouds** 62:10 79:21

**clue** 35:21

**co-chair** 25:13,15

**collateral** 48:12,13

**colleague** 112:8

**colleagues** 19:13,14 93:1,2,3

**collect** 152:12

**collection** 30:13 31:3 33:20 36:4 39:2 55:11 61:13 62:22 68:17 94:10 98:14 108:16,17,18,19 109:3 110:19 132:8,12, 16 133:3,10 138:11 152:2

**collections** 149:20

**collector** 45:19

**collectors** 46:8,9 47:16 147:8

**colors** 148:5

**Columbia** 22:6,7,8

**combination** 43:8

**combining** 79:11

**comfortable** 83:25 84:6, 8 118:24 119:2 128:22

**commission** 103:19 104:14 105:4

**commissions** 102:25

**committee** 25:20

**communications** 19:9

**community** 151:4

**companies** 63:10 126:9

**company** 61:22 71:6 137:14 140:7,16,17

**comparable** 32:14 111:23 112:4,24 113:20, 21,22 114:25 115:1,2,6, 10 118:2 124:6 153:9

**comparables** 39:5 86:6 93:16 112:1,5,19,25 113:3,5,11,12,19 114:5,

11,22,24 115:15,20 117:14,18,19

**compare** 113:24

**compared** 93:16 113:8

**comparing** 92:5 117:24

**comparison** 111:21

**compels** 64:11

**complete** 10:5 20:9 46:11 70:20,21 80:10 81:18 91:6 140:8

**completed** 49:22

**compliance** 13:1 100:8

**compliant** 12:17 63:9 138:20

**complicated** 64:3

**comply** 57:22

**compressed** 67:15

**concept** 51:10,16

**concern** 83:22 121:25

**concerned** 120:10

**concerns** 27:17

**concluded** 121:19

**concludes** 102:9 133:24 156:7,8

**conditions** 70:25 80:7 115:13 132:24

**conduct** 28:2

**confidential** 18:22

**conform** 21:15 63:16,18 119:16,18

**confused** 111:5

**connection** 13:20

**consequence** 63:25

**considerations** 62:21 80:5

**considered** 102:22 110:13,18 143:5

**consisted** 109:11

**consistency** 71:14

**consultant** 149:4

**consulted** 79:9,15

**consulting** 86:3

**contact** 14:25

**contacted** 12:5 14:3,4 19:8

**contemplate** 18:11

**contemporary** 37:4

**context** 24:22 153:16 154:7,11

**continuation** 39:18 40:1 47:4 68:7 153:2

**continued** 155:12

**copy** 154:23

**core** 119:15

**Corp** 8:9

**Corporation** 15:6

**correct** 10:10,11,15,16 11:25 12:1,4,17,18 13:1 14:23 17:20 18:19 19:5,6 20:7,8 21:13,20,21 22:24 23:2,3,5,6,15 24:11,14 28:18 29:1,3 30:4 31:14,15,17,18 32:1 33:2,3,10 34:20,22, 23 35:8,9,23,24 36:1,6, 13 37:20,21,23 38:1 40:6,7,12 42:4,5 44:11, 15 46:7,12 49:25 52:12, 22 53:18 55:8,15,18,19 56:16 57:22,23,24, 61:25 62:3,11,25 63:1,3, 4 66:9,13,15,23 67:8,11, 12,16,25 68:12 69:2 70:9,10 71:16 72:12 73:4 74:21 75:12,13 77:8,9,15 78:23 82:10, 22 85:4,12,13,15,18,20, 21,23 86:7,8,21,22 88:9, 13,14,16,17,21,22 90:5, 15,18,19,22,23 91:3,16 92:24 93:8 95:9,10 97:1, 12,14,15,17,21,22 98:14,15,18,20 99:7,20, 21 100:7,9,10 101:4,5,8, 9,25 102:1,19 104:23,24 105:9 106:15, 20,21,23,24 107:1 108:12 110:1,8,20,22 111:2,19,20,22 113:2 115:25 116:2,6 117:7,10 118:7,21 119:1,4,7,20, 25 120:23 121:1,2 122:14,15,18,19,23,24 126:10,13,17 127:7,9

129:22 130:19 131:13,
14 135:7,8,22 138:5
139:21,23 143:21
144:12,15 147:3 148:13,
19,20 149:3,10 150:16
151:1 152:6 153:11
154:2,5,6

**correctly** 14:10

**correctness** 154:9

**cost** 99:3 125:24 129:14
137:17

**costs** 103:2

**council** 25:16

**counsel** 7:17 12:15
13:10 46:15 47:6 74:9
80:13,15,22 90:21

**couple** 75:7,8 94:20
140:2

**courses** 22:2,16,17,19

**court** 7:7,14 8:10,15 9:14
14:8 61:3 101:1,6,10

**cover** 32:12

**covered** 85:8 88:15

**covers** 38:5

**Cox** 7:15

**crafted** 113:13

**created** 63:21 92:20

**creation** 78:8,11,13

**credentials** 21:8

**credibility** 116:11

**credible** 116:19

**cuff** 43:24

**culturally** 151:5

**culture** 150:12,13,14

**curator** 149:6,7

**Curdo** 146:20

**current** 53:15,17

---

**D**

**D.C.** 20:20 63:22

**damage** 32:13

**damaged** 45:7

**data** 76:10 78:12,20
128:23

**date** 15:13 16:1,3,5,6,7,
8,13,15,19,22,25 17:10,
11,17,25 20:11 69:24
76:5,13,14 90:20,22,25
91:2,5,9,10,11,12,15
127:24 154:17

**dated** 127:21

**dates** 17:5,7

**daughter** 148:18

**day** 7:10,21 41:25 72:7,
8,9 82:20 91:21 109:15
156:16

**days** 72:10 82:19,21
86:18

**deal** 135:19

**dealer** 23:20 32:15
124:13

**dealing** 142:24

**dealt** 139:24 140:10
142:3,5

**death** 91:10

**Debtors** 7:5

**decades** 43:3

**decide** 108:8

**decides** 57:6

**decision** 27:5,14

**decorative** 30:9

**defaulted** 143:2,3,20

**define** 50:18 130:14
149:24

**defined** 36:19 99:13,
133:20

**definition** 50:23 54:17
98:22,25 99:5,9,17
100:6

**definitions** 99:22 100:3,
11,17

**degree** 22:8,23 23:1,4

**Deigo** 89:4

**Denver** 11:21

**department** 10:21 11:2
79:4 131:15,18,19,25
132:5,15,20

**departments** 131:11,12

**depending** 69:17 93:23
94:3 104:19 109:10

**depends** 50:14 103:9
108:17 109:19,25
116:22

**deposition** 7:2,9 9:5,
28:10, 69:23 154:15,16,
22 156:8

**depress** 109:6,14 110:4

**describe** 91:20

**description** 20:6 74:25
96:7

**descriptions** 81:23
87:18 100:23

**detail** 92:19 126:24
134:22,23

**determination** 109:21

**determine** 60:9 115:7
155:5

**determined** 121:24

**determining** 34:13,16
58:7

**Detroit** 7:4,20,22 8:5 9:1
12:6 15:1 69:21 74:2,7
79:18

**DIA** 55:11 68:14 74:11,
14 75:1 78:4,14,17 81:2
85:23 86:20 87:4,7,19,
20 92:5,6,8 107:14,21
108:18 149:10

**difference** 97:4 130:19

**difficult** 83:16 115:18
145:9

**diligence** 119:6

**direct** 113:2,5,11,22
114:10,22 115:10,19
117:14

**director** 11:1,17 26:9,14,
16,17,21,24 27:1

**disagree** 41:2 101:23
116:4

**disagreements** 40:14
116:3

**disclose** 107:24

**discount** 106:4 107:5,9,
13,20,24 108:3,8,13,14,

24

**discounts** 108:20

**discover** 129:19

**discrepancy** 88:18

**discrete** 38:19 42:11

**discuss** 39:5 41:7 46:5,6

**discussed** 19:10 92:18
94:4 96:24 97:5 134:14
136:18

**discusses** 128:21

**discussion** 93:11 94:23
96:15,19,22 97:3

**discussions** 93:24

**dispute** 61:6 100:22
106:10,15

**disqualify** 120:17,21

**disregard** 41:11

**distinction** 113:4

**distinguish** 23:24 46:8

**District** 7:7

**division** 48:12 60:24

**divorce** 48:11 91:12

**document** 13:20 78:22
83:24 92:20 112:22

**documents** 86:24 87:2,
12,14,15

**dollar** 95:9

**dollars** 45:15 53:4,7,9,
10,11 54:4 106:12
116:15

**doubt** 100:25

**downloaded** 92:3,4

**downtown** 29:15

**draft** 71:13 72:4,6

**drafts** 71:8,18

**drawings** 152:12

**drill** 128:19

**driving** 78:19

**due** 112:18 114:4 119:6

**duly** 8:18

**duplicate** 75:8

**duplicates** 75:7,10

**duress** 54:22 102:3

**dynamics** 60:25

---

**E**

**e-mail** 154:23

**earlier** 76:4 153:25

**East** 7:11

**Eastern** 7:7

**easy** 9:21

**economic** 22:19

**Economically** 151:9

**economics** 22:17,23,25

**economies** 20:17

**educated** 43:19

**educational** 150:3

**Educationally** 151:7

**effect** 63:5 65:18

**effective** 16:5,7,15,19
17:17 90:22 91:2,4,9

**electronic** 98:5

**Elizabeth** 7:3 8:24
156:13

**Ellis** 7:24 10:9 14:22,24
55:8,10

**Ellsworth** 89:18

**else's** 122:2

**emotional** 143:9

**employed** 33:17

**enable** 87:8

**encountered** 9:12

**encumbrances** 79:21

**end** 130:13,14,25 131:16
143:17

**ended** 147:15,17

**engaged** 15:12 29:6
45:16 46:19 48:14 72:12
91:22

**engagement** 19:11
61:17 72:15,16 73:12
90:7

**enjoy** 85:2

**entire** 94:5 98:14

**entirety** 35:2,5

**entitled** 119:22 153:12

**entity** 143:15

**equivalent** 125:18

**errors** 128:25

**essentially** 127:14

**establish** 57:3,17

**estate** 21:9 51:2 60:24
64:4,7 91:9 108:22

**estates** 11:2

**estimate** 66:15

**estimates** 57:1,20

**ethics** 25:19

**European** 37:5 146:22

**evaluated** 51:17

**event** 45:6

**eventual** 32:12

**exact** 17:4,25 42:16
75:17

**Examination** 8:20 81:21
134:10

**examine** 33:21 81:22
82:1

**examined** 8:19 114:10
138:4

**examining** 95:5 118:23

**examples** 105:18

**excellency** 25:15

**exception** 87:25 126:3

**exceptions** 32:19
106:13,16

**excluding** 53:17

**excuse** 19:22 22:6 30:10
32:23 82:7 114:24 140:1

**exhibit** 69:23 70:3 77:7
154:14,15,20

**exhibition** 78:16

**exist** 112:19 114:5 126:7

**existence** 65:14,21

**expect** 98:19 111:16
147:3

**expectations** 105:7

**expeditious** 42:1

**experience** 41:18 46:11
56:12,21 66:8 108:2,25
118:8,13 121:12,17
123:5 132:3,12 144:11,
14 150:25

**expert** 10:8 11:24 20:5
23:7 38:1 63:3 71:5 77:8
89:11 92:20 107:17,19
112:12,13 134:14
136:15 148:25

**expertise** 37:15 38:5
39:8 92:3 110:21,25
111:2 118:17,19 120:5,6

**experts** 19:20,21,23 71:6

**explain** 40:15 71:9 78:25
121:6

**explained** 45:3 56:15

**explains** 43:2

**extent** 9:12,17

**Extraordinary** 80:6

**extrapolated** 51:12

**eye** 117:23

**eyes** 143:12

---

**F**

**F8157** 79:2

**Fabergé** 148:25

**fact** 74:7 116:1 118:22
119:17 122:6

**factors** 107:3 110:12,17
111:10 114:23 115:19

**facts** 54:22 58:12 70:18
116:22

**factual** 72:23 106:14

**factually** 60:16,18

**fail** 63:5

**fair** 15:23 31:16 33:11
43:9,22 47:23 50:3
51:25 54:10,17,19 55:22
56:1,5,7,14,21 57:4,9,
15,16,17 58:2,5,21
59:10,14,25 68:24 72:25

73:3 90:16 92:14 94:16
98:11,22 99:2 100:23
105:8 115:24 116:5,9,14
121:7 122:14,17 123:9,
12,18,23 126:5 127:1,5
128:3,5 129:8,14,19,21
130:1,9 133:10

**Fairly** 95:11

**faith** 117:9

**fall** 84:15

**familiar** 9:10 50:20 144:9

**family** 48:11 60:23,25
61:6 147:7

**famous** 97:10

**fantastic** 109:9

**fashion** 23:24 78:25

**fast** 136:12

**favorite** 149:13,14

**favorites** 149:15,16

**federal** 64:10

**feel** 10:1 88:19 89:18

**feeling** 143:6,12

**fees** 103:2,25 104:3,15,
17

**Feldman** 10:25

**Fellow** 152:11,15

**felt** 83:16,19 89:4 139:23
147:1

**FGAC** 15:5

**field** 118:17

**figure** 17:16 38:3 107:18
125:24 132:14 133:10

**figured** 148:10

**figures** 47:20 57:2

**file** 12:14,23,25 13:11,19
18:3,6 73:17 155:4

**filed** 7:6 70:5

**files** 12:8,11 33:15

**final** 72:3,7 111:19 119:4
122:17

**finance** 21:23 22:18

**finances** 22:3

**financial** 15:6 24:5 29:14
143:10

**financial-related** 22:16

**find** 78:7 87:4 92:7
125:16

**finding** 118:2 125:12

**fine** 9:13 30:8 38:9 79:5,
12 93:19 103:4 140:19
149:8 151:20 153:9
154:13

**fingers** 117:20

**finish** 15:23 83:20

**finished** 18:25 19:4
90:17

**firm** 10:14 11:2,6,10,11,
12,15,17,19 14:21,22
16:23 17:18 20:6 23:11,
14,17,18 24:1 33:9,14,
38:16 64:1,24 65:11
72:18 79:9 99:6 100:20
101:19 128:1 133:16
135:17

**firm's** 38:11

**fish** 60:22

**flip** 70:4

**flipped** 134:16

**Florence** 147:10,11,14

**FMV** 43:17 48:21 52:1,3,
7 53:5,14 62:9,13,20
69:16,17 73:6,10,13
87:24 90:1,14 92:23
99:17 101:1 111:22
123:7 137:16

**focal** 142:18

**focus** 147:16

**follow** 63:5,10 64:7,12,
21,22 65:10 138:17
140:22

**follow-up** 36:8

**foremost** 11:18 23:11
150:2

**forget** 136:14

**forgotten** 136:7 142:19

**form** 81:14,17 91:23
107:12 118:9 135:1

**formal** 66:16 118:1

**format** 75:18,21 79:8
153:19

**formatted** 78:20

**formed** 31:13 108:11

**formulate** 98:10

**forthright** 145:17 147:2

**found** 74:15 88:24

**foundation** 20:20 63:22
64:5,16

**free** 10:1

**Frick** 149:15

**front** 47:20 75:2 76:5

**full** 10:5 80:10 82:21
94:17

**furnishings** 37:5

**furniture** 37:5

---

**G**

**G-a-r-y** 14:11

**galleries** 82:15

**gallery** 32:15 45:11
67:17 124:13

**Gartel** 7:23 13:14,22
46:20 47:6 152:22 155:8

**Gary** 14:7,11,15

**gather** 30:2

**gathered** 92:9

**gave** 27:17 28:23 67:21
122:16

**general** 36:15,18,22 37:9
81:7 99:5

**generalist** 36:19

**generally** 57:1,14 63:10
84:24 106:3 108:20
123:22 125:20,21 126:1
130:17,25 131:7,21
132:2 135:11

**Geneva** 11:22

**Georgetown** 42:22

**Geza** 148:20,21

**Gezer** 148:19

**give** 9:18 10:4 15:14,22
17:25 18:19,21 30:24

38:21 52:25 53:14,22,25 70:14 87:21 89:19 93:25 103:5 104:18,20 106:6, 137:9 152:6,19

**giving** 24:22 44:9 47:19 84:8 103:21 154:11

**good** 7:1 8:22 10:7 28:13 35:21 41:18 64:2 97:17 102:5 134:7,13 136:8 150:3

**Goodness** 22:20

**Gotshal** 15:3

**governing** 63:20,25 64:6,20

**graduate** 147:15

**grandparents** 147:8

**great** 9:20 11:23 13:12 143:7

**greater** 36:11

**gross** 122:17

**group** 10:15 11:16,18 12:3 29:12 32:22 38:19 42:11 51:1 64:13 89:8, 17 109:11,23 138:12,13, 14,16 139:8,11 141:12, 14 143:23

**groupings** 75:11

**grow** 147:19

**guarantees** 145:23

**Guaranty** 8:8 15:6

**guess** 38:3 43:19 44:4 76:17 78:19 97:5 103:7 124:5 144:15 149:7

**guessing** 15:19 76:16 139:18

**Gurr** 11:7 33:18 64:25 65:2,9,23

**guy** 19:24

**Guzman** 7:13

---

**H**

**Habsburg** 7:3 8:24 10:25 11:1 65:5,6,12 156:13

**Habsburg's** 13:21 155:10

---

**half** 104:16

**hammer** 102:24

**hand** 148:11

**handed** 70:2

**handle** 130:17

**handled** 11:13,14 68:22

**handling** 10:21 11:3,4

**happened** 15:15 143:1

**hard** 42:9 71:18 133:12

**heading** 80:5,6

**headquartered** 11:20

**heard** 68:21 69:5 124:20, 24 127:25 128:7 133:15 141:12 144:3 146:5

**held** 7:9 25:17

**helpful** 75:19

**helps** 115:6

**high** 10:22 11:4,13 54:3 81:15 97:11,13,20 103:19 104:7,25 105:22 106:16 109:13 110:3 121:19 130:13,14,17,25 131:17 136:3

**high-end** 45:10

**higher** 44:24,25 67:10 76:23,25 103:10,11,23 104:1,5 105:24 106:2 120:12 131:8,21 139:14, 15,17,19

**highest** 32:16 105:25 141:19,24

**Hill** 8:4

**hire** 66:6

**history** 147:11

**hold** 23:7 37:25 66:11 152:4

**holding** 24:8 144:20

**home** 147:19 150:15,17, 20

**honest** 126:22

**Honestly** 17:21

**honor** 141:21

**honorability** 141:21,24

---

**honorable** 142:15 143:5

**hope** 14:10

**Houlihan** 146:9

**hours** 156:9

**house** 10:25 11:12 23:20 102:23 103:16 106:20 119:9 130:15,21 144:7 147:3 149:18,19 151:25 152:2

**houses** 103:17 130:16, 20,23 131:8 144:23 145:16,21 146:14,16,19, 22,24 147:1 151:2,3

**Houston** 11:21

**How's** 134:12

**hundreds** 51:11 52:9 117:21

**husband** 85:6 148:19

**hypothetical** 80:7 105:10 132:17

**hypothetically** 56:9 58:3

---

**I**

**Ian** 142:8,9 143:14,23

**idea** 31:2 38:22 43:25 55:12 61:4

**ideas** 39:4

**identification** 69:24 154:16

**identified** 77:5

**identify** 8:1 135:23

**illustration** 103:2,25 104:17

**image** 88:20,23

**images** 75:25 76:1 77:17 78:2,3,5,7 81:23 83:16 87:18 88:24 98:6

**imagine** 31:5 151:22

**immediately** 136:13

**important** 39:2 150:6,13 151:4

**impression** 95:13 96:11 137:3

**impressionist** 37:4

---

**impressions** 135:1

**include** 19:14 70:11 80:1 155:13

**included** 73:20 78:13,21 95:24 106:23 153:16

**includes** 20:5 100:14

**including** 19:24 30:14 78:16 146:17

**incorrect** 121:25 123:3

**independent** 11:19 24:25 15:24 23:11,16,19, 24:25 115:21 122:13

**independently** 74:16 77:4 122:7

**individual** 42:2 71:10 73:21 92:22 95:7 138:10

**individually** 42:4,11 109:9

**industry** 63:13 68:10 141:15,25 142:13 144:1

**information** 72:17, 74:23 75:5 78:12,14,15,18 79:7 81:3 84:1 87:8,21 88:1,19,21 89:19 90:12 92:5,9 106:14 132:25 143:22

**Initially** 86:14

**input** 71:21 73:5

**inspire** 148:6

**instance** 48:17,21 49:9 53:17 59:9

**instances** 28:22 42:14 139:24 140:10 141:8

**Institute** 7:20 9:1 69:21 74:2,7

**institution** 35:16 46:4 48:14 150:3

**institutions** 47:22 49:14

**instruct** 80:15

**instruments** 57:16

**insurance** 32:2,3,4,7,13 45:4 63:9,10 67:2,5,23 103:1,22 104:15 123:6, 25 124:7,10,17,21 125:5,19 126:1,6,9,11, 15,18,25 127:12,15,17, 20 128:3,4,17,21 129:7,

---

11,16,25 130:3 137:14 138:23 139:6 140:5,7, 13,16,17

**integral** 89:5

**interest** 24:5

**interested** 147:5 152:14

**interesting** 48:4 123:8

**interior** 131:3

**Interiors** 131:19,25

**internally** 19:13 69:10 96:24

**international** 22:10 144:3,23

**introduce** 7:18 154:14

**inventory** 75:1

**investigate** 110:24 111:10 117:6

**invited** 152:14

**involve** 56:15

**involved** 10:21 61:11 69:7 71:6,21 93:7 105:11

**involves** 64:2

**involving** 68:14

**IRS** 21:14,16 63:7 107:10 123:13,17,19 127:2

**Irvin** 7:21

**IRWIN** 7:21 13:16,24 39:21

**Islamic** 89:8

**issue** 62:14

**issues** 62:5,19

**item** 52:9 94:3

**items** 52:9 61:21 74:13, 14 87:17,25 88:5 89:24 92:6,7 102:21 112:18,21 114:5 123:22 131:6

---

**J**

**Jeff** 7:21

**Johns** 11:8 33:18 65:1,2, 9,23

**join** 39:10

joined 11:16

Jones 7:10,21

Journal 20:16

judge 83:18

judgment 113:1 115:22
118:6 122:14

July 7:3

jurat 155:13

**K**

Kelly 89:18

kettle 60:22

kind 113:20 116:10
137:15 147:8,22

Kirkland 14:22,24 55:8,
10 73:2

Kirland 7:23 10:9

knew 54:24,25 59:3 60:1,
18 61:8

knowing 128:11

knowledge 113:12
115:13

knowledgeable 54:21
58:12

Krulik 136:4

**L**

LA 11:20

laid 134:24

Lally 7:23

language 150:11

large 52:5

largely 20:18

larger 52:19 75:16 77:1,2

largest 20:17 45:13
49:20 52:2,15 53:1,19
54:10,11,12 61:17

law 7:10 14:21,22 16:23
72:18 79:9

lawyers 19:9 97:24

lead 40:18,19 116:17

learn 111:9

leaving 19:9 70:3

left 78:15 152:2

legal 7:14 20:17

Leibovitz 142:21,23,24
143:1,7

lengthy 78:16

letter 13:10,21 17:23
72:16 73:12

level 63:16 103:9,19,23
104:1,7 106:1,16 131:22

Levin 109:22

Library 152:9,12

licenses 20:13

Lichfield 146:19

life 147:9

limited 125:1 127:8

Limiting 80:7

Lin 146:20

Lincoln 29:25

link 74:13 78:17

links 74:15

liquidation 31:22,25
33:2,4 99:9,11,18,24
100:14 101:16,24 110:6,
9,13,18 111:11

list 72:17 74:4,20 75:4,
15,16 79:11 84:13 87:17
88:13 92:1,6

listed 20:14 21:1,2
28:18,24 85:14 88:6
89:12 107:3

lists 34:17 72:19,20
73:13,16,20 74:4,6,19,
20 75:2,9,18 76:10,12,
25 79:11 80:8

literally 134:23 136:11

Litigation 7:16

live 147:3

living 151:14,15

LLP 7:10

loan 143:2,3,15

loans 143:25

located 7:10 145:8

Lokey 146:9

Lola 146:20

London 11:22

long 17:6 30:18,21 36:20
50:7,12 84:13 109:10
138:1 144:19 148:4

longer 26:6,22,24 27:1

longstanding 144:24

looked 51:12 75:23,24
85:12 86:6 92:1,8,18
96:6 108:19 134:17,20,
24 136:11 138:18

loosely 148:23

loss 137:13 140:5,14

lost 45:6 107:16

lot 22:17 43:2 95:3
119:22 130:15 132:23,
24 149:8

lots 145:17,18

love 17:9 20:20 151:15

low 81:15 105:24 117:16,
21,22 121:19 131:2,16,
20

lower 95:4 103:10,11
104:4,8,9 106:3 132:1
139:14

lunch 133:21 134:12

luncheon 25:14 134:2

**M**

made 70:22 79:15 80:8,
14 84:3 113:14 143:15

magnitude 94:1 139:16

major 30:14 35:22 42:25
103:17 130:23 131:7

make 27:6,14 35:7 43:19
46:1,16 62:12,14, 71:15,
16 84:5 95:2 97:23
102:18,22 109:20
132:23 145:1

makes 41:7 145:8

manageable 149:17

management 45:5 146:3

managing 11:17

manner 24:2 42:1 66:16
105:10

March 16:2,10 17:2 76:8,
15 82:12 90:20 91:17

Marion 35:17

marked 69:23 70:2 153:9
154:16,19

market 15:24 31:16
33:12 38:6 43:9,22
47:23 50:3 51:25 54:10,
17,19 55:23 56:1,5,7,14,
22 57:4,10,15,16,18
58:2,5,21 59:10,15,25
67:14,17,18 72:25 73:3
83:15 90:16 92:14 94:16
98:11,23 99:2 105:8
109:6,14 110:4 111:21,
23 112:4,24 113:10,12,
15 114:22 115:13,16,25
116:5,9,14 117:21
118:3,4 121:7 122:14,17
123:10,13,16,17,18,21,
23,24 124:2,3 125:2,3,
13,24 126:5 127:1,5
128:3,5,19 129:8,14,20,
22 130:1,10,13,14
133:10 135:18 138:22
144:8, 153:12,18,19
154:12

marketable 31:19 43:10,
18,22 48:3,10,17 53:21
54:12 56:6 57:4,9 59:15
69:18 98:25 99:2,6,19
101:14,19 102:17
104:22 107:4,25 108:15
109:2 121:8 129:4,12,
13,16,20 130:1,10
133:11

mass 50:16,17,18,20,23,
25 51:4,7,9,14,18,19,20,
22

master 83:3,4,6,8,13
84:4,14 109:5 113:7
150:25 152:12

Masters 83:12 84:21,23,
24

Masterson 11:7

matched 148:12

material 94:21,22

materially 90:1 94:16

math 42:23,25

Matisse's 96:20

matter 7:4 62:21

MBA 21:25 22:1

meaning 16:8 34:19
64:13 83:6

means 16:19 21:6
115:10 125:22

measure 101:25

medium 132:21

member 21:12,19 24:13
25:19 26:1,3,4,6,13,16,
17,24 27:7

members 64:14,16
100:21

mention 107:5 114:9

mentioned 23:10 42:9
51:19 56:3 64:10 93:3,8
112:4 120:20 124:23
126:4 129:13 130:7

MET 148:2

Method 81:21

methodologies 121:4

methodology 120:9
133:14 137:22 138:17
140:22,24

Michael 8:4 135:9,14

Michelle 7:15

Michigan 7:4,7

Midwest 14:18

million 34:2,4 81:10
103:14 106:8 116:15,16

millions 33:23 97:8

mind 32:6 148:11

minds 116:4

minus 99:3 129:14

minute 122:5

minutes 152:21 156:9

mirror 126:1

misreading 112:6

misremembering 112:6

misspelling 155:9

mix 121:3,7

**Mm-hmm** 99:16 144:5

**mm-mm** 9:20

**modern** 37:4

**modest** 96:14 131:9

**moment** 19:10 153:6

**Monet** 148:1

**month** 17:8 76:6

**months** 12:9 15:18 44:4, 7 50:11 138:2

**Morgan** 151:23,24,25 152:7,8,11,16

**morning** 7:1 8:22

**motivation** 60:14

**motivations** 59:6,18 60:8

**move** 29:15,16 35:18 148:6

**moved** 10:24 11:6 148:3

**multi-departmental** 10:23

**multiple** 50:25 118:16 122:11

**Municipal** 8:9

**mural** 89:4

**museum** 29:10,12,14,16, 21,23 30:3,6,8 34:19,20, 22 35:1,3,19,20,22 46:9 48:18,21 49:7,11 54:8 61:14,19 62:6,22 69:4 82:5 85:2,4,5 86:10,13 90:11 97:19 108:5 110:3 149:7,13,14,24 150:2 151:23,24,25 152:3,4,6, 7,16

**museums** 46:3 47:17 49:14 69:9 149:5,9,17, 18,19,21 150:6,25 151:2,4,17

---

**N**

**NAI** 146:20

**named** 37:22

**names** 74:20 136:12

**national** 21:7,8 63:15

**NDAS** 45:24 46:9

**necessarily** 148:11

**needed** 41:24 83:17,19 86:16 87:24 90:12

**negotiated** 106:19

**neighborhood** 151:11, 12

**neighborhood's** 151:13

**net** 10:22 11:4,13 101:2, 20 102:18, 104:22 105:9 115:15

**nets** 103:8

**neutral** 24:10,18

**Nicholas** 7:13 8:7,12

**non-major** 30:17 34:14 35:3

**Nondisclosure** 45:24

**norm** 113:16,17

**Notary** 8:18

**note** 62:14 87:16 89:13

**noted** 134:4 156:11

**notes** 17:22 76:18 114:12

**notice** 95:17 154:15,21 155:9

**noticed** 29:4

**number** 11:8 30:24 31:7 37:3,11,19 38:21 41:7, 12,24 42:16 44:10,14,17 47:25 49:13,15 50:5 52:3,16 53:20 71:18 75:1,14,17 81:6 91:23 93:20 95:9 101:15,17 106:5,7 116:21 117:1

**numbers** 36:5 40:14 43:20 44:12 49:2,21 57:7,8 61:21 62:2 84:8 119:7 141:6

---

**O**

**O'connell** 11:7

**O'reilly** 7:19 8:21,25 13:10,15 14:1 39:13,20 40:3 43:2,5 46:15,23 47:8,11 68:1,9 70:1 102:7,16 112:8,11 133:21,23 134:11 152:21 153:4 154:18

**155:1 156:2**

**object** 97:11 116:14 118:2 147:22

**object-by-object** 92:23 94:24

**objective** 24:1,10 66:12 121:23

**objects** 34:9,14 36:5 61:18 62:2 74:20 75:11 83:7 87:12 96:11 97:9, 16,19 113:18,24 114:15 118:16 152:4

**obtain** 90:12

**occasion** 40:5 137:6

**occasional** 112:21

**occasionally** 40:17

**occasions** 41:6

**occur** 27:16

**occurring** 128:7

**odd** 36:18

**offer** 120:24 136:19

**offered** 63:2 107:17 112:20 114:7

**offering** 105:17 153:20 154:8

**office** 49:19 71:24

**offices** 7:10 11:20

**on-site** 89:10,11

**one's** 63:7 122:3 136:14

**ongoing** 140:4,9

**online** 78:6 85:22 86:3 92:9 98:7 131:4 132:1

**open** 149:22 151:3 152:16

**operations** 11:15

**opine** 111:7 115:8

**opining** 101:6

**opinion** 66:4 81:14,17 90:4 95:22 98:10 101:12 102:5,6 104:20 107:13, 19 108:11 110:2,5,16 115:25 120:21,24 121:3 135:6,13,20 136:1,3,22 139:20,22 153:24 154:4, 5

**opinions** 70:11,15 122:8 135:1 136:18,19 153:22, 22 154:8

**opportunity** 134:21

**opposing** 137:6,8

**option** 151:1

**options** 109:16

**orally** 72:24

**order** 39:4 41:25 45:8, 11,12 61:2 71:17 89:6 93:25 114:2,25 123:12, 23 139:16

**organization** 100:20,21

**organize** 78:24

**organized** 79:4,5

**Originally** 74:12

**overly** 37:9

**oversaw** 11:15

**overview** 153:18

**overviews** 153:13,21

**owner** 149:20

**owns** 79:18

---

**P**

**P-i-a-t-t-o-n-i** 14:12

**p.m.** 133:25 134:2,9 152:23 153:3 156:10,11

**Pages** 80:4

**paid** 26:19,21 100:16

**painted** 113:13

**paintings** 83:3,4 84:15 148:1

**Palm** 11:21

**paperwork** 33:25 34:12

**paragraph** 112:17

**parameters** 58:24

**paraphrasing** 54:20

**Parke** 8:13

**part** 18:7 68:18 72:15 80:1 102:25 106:17 150:12 153:19

**participant** 59:11

**parties** 68:23 106:19

**party** 34:24 55:22 61:1

**past** 36:17 152:13

**Pattwell** 8:3,4

**pay** 32:14 45:10 54:20

**Peck** 142:8,9 143:14,23

**pejorative** 36:23

**people** 37:7,12,20 64:14 71:23 141:18 142:14 143:6,11 145:24 150:4, 17,19,23

**percent** 37:11,13 38:5,6 42:20 43:21,22 67:21 94:2,9,14,19,20 103:18, 20 104:7,12,15,16 105:4,8,22,25 106:4 139:19

**percentage** 37:9 42:17, 18 43:14,15,16,17,18 47:15 48:1 103:5,10,12

**percentages** 44:1,16,19

**Perfect** 20:4

**perform** 24:24 30:5 50:8 55:22 58:1 63:23 67:2,5 72:14 73:3,13 85:9 86:25 87:2,24 88:7,21 89:1 90:8 119:18

**performed** 12:2 30:7 33:5 49:10 59:25 112:24 137:20

**performing** 62:20 70:22

**period** 15:14 48:22 67:15 102:4 132:23

**permit** 58:1 121:15 126:14 128:15

**permitted** 45:16 46:21 124:16

**person** 46:5 58:8 81:22 82:2 83:17 120:6

**personal** 20:22 21:7, 64:9,11,18,23

**personally** 38:11,12 42:8 60:18 69:20 106:14 139:25 142:10

**ph** 146:20

**Philadelphia** 29:11,15 35:17

**Phillips** 103:16 106:2 130:24 131:5 146:17

**philosophical** 150:10

**phone** 156:3

**photographer** 142:20

**physically** 71:2

**Piattoni** 14:7,11,15

**piece** 66:1

**pieces** 114:20,21 115:17 131:24

**Pierpont** 151:24,25 152:7,8,11

**pinpoint** 16:18

**place** 150:4 151:16,19 155:1,3

**placing** 154:19

**Plummer** 135:9,14

**point** 9:25 142:18 148:9

**Poly** 144:3,8 146:1

**Poppies** 96:20

**porcelain** 37:6

**portion** 33:20

**position** 25:2,6,8,11 46:16,17 90:10 138:9 149:5

**positions** 25:18

**possibly** 128:14

**post** 22:2

**potential** 40:14 56:1 60:19,21 61:8 109:14

**potentially** 38:5 109:6

**practice** 12:21 41:19

**pre-loss** 139:1

**precise** 31:6 38:21 104:18

**predict** 101:13

**premise** 58:10

**premium** 102:23 103:14, 17 104:12 105:2,3,5,15 106:18

**premiums** 105:18

**prepared** 92:19 100:8

**preparing** 24:2 137:14

**present** 7:25 20:19

**president** 11:10

**pressure** 41:24

**presume** 113:15 130:16

**presumes** 56:8 67:13

**prevents** 45:22

**previous** 33:14

**previously** 62:24

**price** 102:24 103:7 104:22 132:15,22

**prices** 123:12 145:19,21

**primarily** 78:3 83:9

**primary** 108:23 123:11, 16 124:2,4 125:3,15 150:24

**principals** 145:1

**prints** 95:20 96:12

**prior** 17:2,19 38:10 44:2, 12 65:15 76:7 77:13 80:25 91:5

**private** 35:20 45:19 46:8 47:16,21 67:22 109:17

**process** 13:22 71:9 93:11 98:5 118:1,23

**produce** 155:3

**produced** 11:24 13:18

**professional** 10:18 12:20 66:5 113:1 115:22 118:6, 119:13 135:14 136:23

**professionally** 68:25 69:6 139:25 140:11

**project** 19:5 40:21 54:1

**projects** 54:7

**pronouncing** 25:24

**properties** 51:3

**property** 11:5 20:22 21:7,10 48:5 60:20 64:9, 11,18,23 143:16,19

**proposed** 117:4

**protect** 45:4

**provide** 29:6 35:10 107:19 135:6 145:22 153:16

**provided** 34:17 59:9 79:7 88:2 116:18 138:25 139:2

**providing** 57:9 58:5

**public** 8:19 47:17,22 82:15 149:22 150:3,24 151:3 152:17

**publication** 130:8

**publications** 129:24 130:5 133:18

**pulled** 78:21

**pulse** 117:20

**purchases** 11:14

**purported** 73:23

**purports** 64:21

**purposes** 21:16 45:4,5 47:18 56:4 91:9 139:6

**pushed** 120:11

**put** 25:5 62:17 71:11,13, 19 78:17 79:8 83:23 92:21 120:11 138:8

**puts** 102:24 154:7

**putting** 13:23

**Q**

**qualification** 21:17 120:3

**quality** 83:18 96:16,17, 18 97:11,20 109:13 115:11 130:17

**quarters** 119:10

**question** 9:18 13:17 18:5 19:22 27:18 31:1 32:25 35:21 37:16,18 38:7 40:15 46:13,14 47:7,9, 12,23 48:4,7 49:6 50:14 51:23 53:5 55:9,24 56:11, 58:13,14,16 59:4, 23 64:2 66:18 73:9 105:16 107:15 109:7 115:3 116:11,12 117:3 122:10 123:8 132:9,17 145:20 146:8 149:25

151:21 153:22

**questions** 9:2 10:1 36:9 41:3 117:5 156:2

**quick** 39:12

**quickly** 86:17

**R**

**Rago** 146:20

**ran** 10:20

**range** 46:11 57:2 84:16 88:12 89:22 94:9

**rare** 113:10

**rarely** 18:18

**rarity** 112:18 114:4 117:12

**rate** 132:5

**reach** 144:25

**read** 47:8,10 81:3 99:23 100:2 134:14

**real** 21:9 51:2 64:4,7

**reask** 47:7

**reason** 10:4 13:5 18:8 40:13 79:1 100:22,25 101:22 105:14 106:10 128:14 153:18 155:5

**reasonable** 116:4 119:24 129:1 133:14

**reasoning** 59:1 112:20 113:23 114:7

**reasons** 29:15 38:25 40:8 41:21 89:3 112:22 152:20

**rebate** 106:17

**recall** 22:21 25:22 27:12 28:3,6,8 29:6 31:8 33:11,19,24 34:5,25 42:13,16 49:4,5,6,10,15 52:4,18 59:8 61:15,23 72:11,22 73:15 74:3,17 75:14, 80:17 88:3 96:15, 19,22 138:7 139:1 140:25 146:2

**receive** 76:2, 86:10 87:11 101:2,7

**received** 74:19 76:12 88:10 92:1

**recent** 13:20 137:12

**recess** 39:16,24 47:2 68:5 102:12 134:2 152:25

**recognized** 136:13

**recollection** 12:14 19:18 35:15 49:17 76:24

**recommend** 144:22 145:3,5

**record** 7:12,18 8:2,23 18:12,13,17 39:12,15, 19,20,23 40:2,4 46:23 47:1,5,10 68:2,4,8 72:13 102:8,11,15 133:23 134:1,9 145:4,7 152:24 153:3 155:2,3,11 156:9

**records** 12:16 18:10 49:18

**reducing** 105:7

**reduction** 102:18 103:6, 11,12

**reductions** 104:21

**refer** 80:3

**reference** 20:3 32:24 78:6 79:2 92:8

**references** 16:1

**referred** 34:14 96:21 114:16

**referring** 44:5 54:9

**refresh** 12:13 49:16

**refused** 87:20

**regard** 14:25 47:23

**region** 53:23

**regional** 109:17 146:19

**registries** 21:7

**regulated** 21:20

**regulation** 64:11

**regulations** 107:10

**related** 62:19

**relationship** 12:6 27:25 145:10

**relative** 93:22

**relevance** 90:24

**relevant** 17:12 39:5

54:22 60:11

**reliability** 116:11

**reliable** 121:1

**reliance** 13:19

**relied** 70:19 74:9 113:1 128:23

**rely** 118:9,14,19 119:24 122:1,2,7 123:1,11,25 127:17,22,23 128:2 129:1

**relying** 120:17 124:21

**remain** 24:18 35:17 121:22 152:16

**remainder** 30:15,16 35:6 71:7

**Rembrant** 95:20 96:5

**Rembrants** 95:18,24

**remember** 14:2,4 15:11, 12,13 27:3,21,22 30:21 31:6 33:22 34:11 35:4 72:10 138:24 139:18 147:21 149:11

**removed** 126:11

**render** 120:21

**rendered** 17:13

**rendering** 90:4

**repaid** 143:4

**Repeat** 120:19

**rephrase** 37:16 107:15

**replace** 32:15 45:7,11 137:18

**replacement** 32:5,8,9,11 43:8 45:1,3,9 47:18 56:6 57:5,10 59:16 67:7 99:18 124:11 125:5,7,8, 10,12,18,23 126:12,16 127:5,13,16 128:18,20 129:7,12 130:4,7 137:17,18,23 138:22 139:3,5 141:1,2

**replacements** 67:20 137:25

**report** 11:24 13:21 16:1 19:12 70:5,9,16 71:2,3, 5,11,22,25 72:8 77:7,8 81:20 85:14 92:20 93:4, 8 99:15 100:8 111:19

112:3,9,12,13 114:9 134:15 135:7 136:15,20 153:5,25

**reporter** 7:14 8:10,15 9:14 14:9

**reports** 135:18

**represent** 8:25

**representation** 74:10

**representatives** 11:22

**representing** 24:9

**reputable** 124:20 127:25 128:9 133:15

**reputation** 136:8,10,23 141:14,17,19,23,24,25 142:12 144:8,10,24

**request** 59:7 72:25 73:13

**requested** 13:19

**requests** 13:20

**require** 21:15 61:2

**required** 107:23

**requirement** 21:11,14 24:20

**requirements** 21:18

**requires** 12:23 24:17,24 102:18 123:20,21

**research** 78:6 85:22 86:3 87:6 92:13 125:11

**respect** 17:12 27:16

**respected** 119:9,13

**responding** 59:6

**response** 9:18 36:10 86:15

**restrictions** 62:10 79:21

**result** 93:10

**resulted** 95:8

**resumed** 134:6

**retail** 32:5,7,9,11 43:8, 16,21 45:1,3,9,10,14 47:13,18 49:6 52:16 53:1 54:11 56:6 57:5,10 59:16 62:20 67:7,17,20 69:18 123:12,16,24 124:11 125:2,7,9,12,18, 23 126:4,12,16 127:4, 13,16 128:18,20 129:6,

11 130:4,7 137:18,24 139:5 140:25 141:2

**retained** 10:12 19:23 30:2,11 34:21 55:7,21, 25 61:14 119:21,23

**Retirement** 8:5

**review** 40:24 71:25 76:20 77:4 93:11 134:22 138:18

**reviewed** 71:14 92:17,25

**reviewing** 84:1

**risk** 45:5

**Rivera** 89:4

**robber** 152:1

**room** 28:14

**rough** 42:21 43:24 48:2

**roughly** 48:1 84:12,14

**RUEGGER** 42:25 43:3 112:7

**rules** 9:10 28:4 145:12

**run** 41:15

---

**S**

**salary** 26:19,21

**sale** 11:5 61:3,4 103:7 105:11 106:12 107:14, 20 109:5,17 110:2 131:3 132:5,15 145:19,21

**sales** 11:14 95:5 99:3 109:18 119:15 129:14 132:1 145:23

**sample** 51:12

**sanction** 64:20

**sat** 93:21

**satisfied** 87:23

**scene** 148:5

**school** 22:7 147:15

**scope** 62:18 80:3 92:19 102:4

**secondary** 124:3 125:2, 13

**section** 71:4,11 153:12

**sections** 71:12,19 79:6,

12

**seize** 143:16,18

**selected** 16:20 76:19 91:15

**selecting** 91:22

**selection** 35:5 95:14,15

**sell** 54:25 55:11 56:10, 23,25 57:18 60:20 61:1, 9 95:4 101:14 108:4 109:10,12,15 120:12 124:6,12 125:16 130:12, 25 131:1,9,16,23

**seller** 54:21,24,25 55:1, 8,13,14,15,16,18,22,25 56:1,9,16,17,22 58:3,4, 6,11,22 59:3,10,12 60:1, 2,3,4,10,15,19,21 61:8 101:21 102:18,22 103:1, 6,7 104:22 105:6 106:17

**seller's** 103:18 104:14 105:3,16

**sellers** 56:25 57:14

**selling** 24:4,7 56:4 57:16 102:25 103:3 106:20 108:6 120:11 131:21

**send** 63:8 72:3,4 146:14, 25

**sense** 17:14 21:24 37:14 62:7 68:15 80:19,22 93:25 110:9 118:11

**sentence** 114:3

**separate** 42:10 75:11 89:6

**separated** 92:2,10

**separation** 91:13

**Services** 7:16

**set** 70:15 75:5 79:3 131:12

**shipping** 103:1 104:3,16

**short** 45:7,11 82:4 86:16 132:22

**signed** 72:7 112:14

**significant** 124:3

**silver** 37:6

**similar** 15:7 24:21 51:1, 3,11 68:13, 83:22 113:14

**12**

**similarly** 44:1

**simply** 97:10,16 125:9

**single** 97:2 149:20

**sitting** 22:21 31:2 34:1,8 45:25 48:16,20 49:4,9, 12 59:8, 61:23 73:19 79:17,20 81:12 84:10 88:3 91:14 96:1 98:17 101:22 110:2 111:1,16 114:19 135:5 145:2

**situation** 55:21 58:20 60:17 68:13,23 70:17 121:10 129:15 138:24 139:2 140:4,5,13 141:7 143:13

**situations** 60:23 117:17 137:2 140:3

**size** 36:3 52:25 61:24 68:17 69:3 75:14 143:25

**sketch** 91:21

**skills** 137:3

**small** 42:17,18 138:14, 15,16

**smaller** 49:13 52:21,23 131:5

**socially** 136:25 137:1

**sold** 101:3,8,11 123:22 125:15 145:18

**solely** 42:14 81:23

**sort** 77:10 81:6 117:2 132:17 138:23 154:11

**Sotheby's** 103:15 105:20 106:1 130:12,24 131:4 132:5, 145:13,14 146:17

**sound** 106:8 133:13

**source** 123:11 125:15

**speak** 8:10 41:9,10 73:16 149:10

**speaking** 128:12,17 130:3

**special** 62:5,21

**specialist** 7:14 39:9 41:10 89:9 92:11 96:3,8

**specialists** 39:3 41:9,25 82:7,9 83:14 84:4 85:18 91:22 92:12 112:20

114:7 118:18

**specialization** 120:7

**specialize** 37:7,12,20,22

**specialized** 36:21 37:10 39:8 118:15

**specialties** 37:3 40:10

**specialty** 36:25 37:2

**specific** 77:3

**specifically** 129:8 130:3

**specifics** 129:17 133:13 137:11

**spell** 14:8

**spelling** 14:10

**Spencer** 146:12

**spend** 86:18

**spoke** 19:19 20:1 51:18 127:9

**spoken** 20:2

**spread** 89:22 96:25 117:3

**spreadsheets** 75:23,24 76:3

**spreed** 116:9

**staff** 26:13

**stand** 12:19 95:18 97:7

**standard** 12:22

**standards** 12:20 123:14 145:12 147:2

**standpoint** 135:15

**Stanford** 22:2 147:14

**started** 36:19 65:22,23 144:19

**starts** 79:1

**state** 8:22 18:14 63:16 64:5,10

**stated** 112:22 153:24

**statements** 154:9

**States** 7:6

**statistics** 22:4,11 23:1

**step** 126:11

**stepsons** 148:17

**Steve** 146:12

**stolen** 45:6

**straightforward** 95:11

**Street** 7:11 20:16

**strictly** 143:10

**strike** 105:16

**students** 29:13,16,18,20, 24 35:13,16

**studied** 29:23 147:10

**submits** 71:10

**Subscribed** 156:15

**subsequently** 152:3

**substance** 19:11

**substantively** 135:19

**suburban** 35:17

**sufficient** 90:11 145:4,5

**sufficiently** 135:20

**sum** 154:5

**support** 129:25 130:8 133:19

**supporting** 13:21

**suppose** 41:23

**surprised** 150:19

**surrounded** 147:9

**surrounding** 120:14

**suspect** 116:19

**swear** 8:15

**switching** 147:16

**sworn** 8:18 156:15

**Syncora** 7:24 10:9 13:18 55:17

**synonymous** 32:6,8

**system** 92:4,15,16 98:5

**Systems** 8:5

---

**T**

**tab** 77:11 153:8

**table** 46:2

**taking** 9:15

**talk** 45:20 58:25 93:17

**talked** 44:3 61:13 67:9 85:8,17,22 93:21 117:12 118:22 122:6 125:1 129:6

**talking** 42:18 45:22 53:15 55:2 57:13 59:12 60:3,4,10 67:20,23 104:6,9,11 112:10 123:2 125:22 129:3,8

**talks** 128:18

**Tape** 7:2 39:18 40:1 47:4 68:7 102:9,13 133:24 134:8 153:2 156:7

**teach** 42:23

**team** 39:10 40:18,20 41:6,8,22,23 42:12

**teams** 38:20,24 39:1 40:5,13

**teleconference** 8:1

**telling** 40:5 59:17

**ten** 28:11 42:19 88:5 116:24 127:21,24

**ten-year** 128:4

**tend** 144:22

**term** 36:18,22 37:9 50:20 126:7

**terminated** 28:7

**terms** 31:10 45:13 47:25 49:21 52:2,16,25 53:20 61:17,21,24 63:25 71:18 95:1 100:12,24

**Terrible** 37:18

**testified** 8:19 33:1 134:6

**testify** 46:18,20,21

**testimony** 9:7,15 10:5 19:11 24:22 28:16,23 29:7 61:15 135:6 136:20

**theoretically** 127:17,19

**thereabouts** 90:18 154:2

**thing** 67:15 127:14

**things** 23:8 37:12 46:21 74:15,18 78:20 86:7 101:13 114:10 120:16, 20

**Thinking** 126:22

**thinks** 66:20

**thought** 80:23 81:15 84:7 95:23 123:3 128:25

**thousand** 30:19 31:6

**thousands** 117:22 131:20

**threatening** 143:18

**threes** 44:22

**thumbnail** 91:20

**tier** 130:21,22

**time** 7:12,17 15:15 19:7 27:8,17,24 30:18,22 39:14,18,22 40:1 41:24 46:25 47:4 48:22,23 50:12 51:10 67:16,24 68:3,7 82:4,5 86:18 89:11 90:7,11 91:5 102:3,10,14 130:18 132:23 133:25 134:4,8 148:4 152:23 153:2 156:4,8,10,11

**times** 28:9,15 38:19 39:7 41:1 42:12 71:14 116:24

**timing** 27:10 82:3 86:16

**title** 62:14,16,17 79:22, 24

**titles** 62:10

**today** 7:15 9:2 10:5 13:3, 6,8,12 18:1 19:8 22:21 28:25 29:1, 31:2 34:1,8 45:25 48:16,20 49:4,9, 12 59:8,24 61:23 63:2 73:19 79:17 80:21 81:12 84:10 88:3 91:14 96:1 98:17 101:22 110:2 111:1,16 114:19 135:5 145:2 155:7

**today's** 7:9 156:8

**Todd** 109:22

**told** 13:8 17:17 34:10 72:11 86:9,20 111:7

**top** 96:18 112:17

**total** 36:3 37:11 77:2 88:10 89:22 154:5 156:8

**track** 107:16 145:4,7

**traditional** 145:16

**traditionally** 145:15

**training** 21:23

**transaction** 103:4 106:11

**transcript** 9:22

**transform** 151:11,12

**transmit** 150:14

**trial** 9:8 28:15,23

**trig** 25:5

**trust** 152:4

**turn** 80:19 99:15 153:5

**turned** 143:17 149:21

**type** 31:8,24 32:2 33:4 43:14 50:2 51:24 73:6, 10 103:15 108:22 132:21

**typed** 71:7

**types** 31:13 43:6 44:22 46:18

**typical** 52:7,8,10 103:4

**typically** 32:16,18 37:12 52:5 67:9 86:7 131:23

---

**U**

**U.S.** 11:15,20

**unable** 81:22 82:1

**undergraduate** 147:11

**understand** 9:21,25 13:13 18:5 31:12 35:2 37:17 46:1,13,16 55:4,9, 13,14,24 56:13 57:12 59:20 69:12,16 90:24 94:15 105:9 110:18 114:3 115:5 116:12 122:10 131:12 132:9 153:15

**understanding** 44:6 98:4

**understands** 13:18

**understood** 18:24 60:12 66:17 115:3

**unethical** 28:1

**Uniform** 12:20

**unilaterally** 41:11

**unit** 97:2

**United** 7:6

universal 150:11

University 22:6,7,9
29:25

unpack 122:5

unprecedented 68:25

unregulated 20:18 21:4
63:13

unreliable 120:22

unsold 145:18

unusual 128:6

unwilling 58:22 61:9

Uon 146:3

uploaded 92:15

USPAP 12:17,19,22 13:1
18:7,11,13 21:15 24:23,
24 41:14,16 57:21,24
58:1,20,23,24 62:25
63:6,9,11,17,18,20,21,
24 64:7,12,20,21,22
65:10,11,13,14,16,17,
20,22 99:13 100:9,11,13
107:8,10,23 119:16,18
121:15,21, 122:22
123:20,21 124:16
126:14,21,23 128:15,16
138:20 140:24

USPAP'S 153:19

usual 62:9,19 91:4

V

validate 40:14

valuable 93:20

valuation 12:2 33:4
41:22 49:11 50:4,8,9,12
52:16 80:19 81:1 86:2
88:7,21 89:1 91:6 98:1
112:21 114:8 118:10,16
121:4,5,18,25 139:21,
22,23 140:19,22,23

valuations 67:2,6 69:10
89:25

valued 34:6 62:2 77:25
98:7 101:3 112:22
139:8,10 154:1

values 16:9,11,16 31:25
32:8 41:1 44:24 45:1
67:10,24 90:5 92:14,18
93:15,22 94:25 95:7

96:13 97:4 114:13
117:21 120:12 123:6,10
124:17,21 125:7,8,10,
12,14 126:1,6,8,15,16,
19 127:1,12 129:7,11,
12,25 130:9 138:23

valuing 62:22

variety 146:16,24 150:5

venue 125:17

verbal 9:18

versus 97:6 145:18

Victor 19:25 20:1,2
25:23 136:16

video 7:14 9:16 154:22

view 82:17 95:22

viewed 82:13,15

viewpoint 143:9,10

violations 28:4

Virginia 149:7

virtue 24:8

visit 82:8

visits 85:17,20

voluntarily 64:13

voluntary 64:17,18,19

von 7:3 8:24 13:21
155:10 156:13

W

waived 103:23 104:1

Wall 20:16

wanted 29:14 30:12
35:16,18 69:12 79:16
87:13 143:3 147:16
155:8

Washington 20:20 63:22

watches 150:21

website 74:14 78:4,5,17
85:23 87:5,7,19 92:5,6,8

week 15:25 19:2,3,4 72:6
90:8,17

weeks 18:25 76:16 91:11

Weil 15:3

Weiner 19:25 20:1,2
25:23 27:17 136:16

Weiner's 27:25

West 146:20

whatsoever 80:21,24

wide 146:16,24

Wiener 136:16

Wiener's 136:22

Winston 10:14 11:16,18
12:3 23:10 32:22 38:12,
14 42:6 43:7 48:23
64:13 67:2 116:13 149:2

woman 136:6,7

word 63:14 141:22

work 12:6 15:23 17:2
18:25 19:4 24:17 26:20
30:5,11 32:17 38:18,20,
24 39:1 40:9,13,23,24
41:6,8,21,23 42:1,3,10,
12 53:20 62:18 66:20
67:11 69:13,15 70:23
73:22 78:8,10 80:4,18,
25 83:20 86:25 87:3,12
89:17 90:9 92:17,19
96:9 103:3,13 113:6,7
115:10,12 117:16
118:15,24 119:22,24
120:25 122:3 125:15
138:10 140:8,15 145:23,
24 153:17

workbooks 85:12

worked 14:15 40:5 42:14
93:20 106:25 137:5,6,
149:8

working 39:3 54:13
122:12 137:13 140:6,7,
18

works 24:6 30:8,14,16,
17 34:5,14,17 35:3,8,11,
22,25 38:19 41:2 42:11
46:3 49:21,23 50:13,15
51:1,11,17 52:3,17
53:20,24 62:6 71:9
72:17 74:1,10 75:5,15
76:19,22,25 77:5,24
79:18,22 81:1,22 82:1,8,
13,15,24 83:3,6,13,17
84:9,11,15,24 86:10,12,
21 87:9 88:13,15 89:8
90:1,15 94:11,13 95:3,
14,15 96:5,23,24 97:1,
23 98:2,7 101:3 104:7,

25 106:16 108:4,7,16,21
109:5,9,17,19 110:3
113:9,14,25 117:22
119:11 124:12 130:17
131:1,8,10 132:16 133:1
138:11,12,13 150:5,25
154:1

world 10:19 37:8 54:24
148:22

worldwide 150:14

worth 10:22 11:4,13

Wow 28:12

write 71:2

writing 9:16

written 9:22

wrong 66:22 144:25

wrote 71:7

Y

year 38:17,23 42:7,13
43:1,7 44:3 49:22 50:10,
11 76:4 117:23 147:10,
12

years 11:3,8,10 14:16
16:14 26:11,12 44:2,12
68:11 91:10 127:21,24
140:12 144:11,21

York 7:11 11:20 149:15
151:14,15,16,19

young 148:9

**Exhibit H**

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Sort Number | Object Number | Primary Maker | Title | Dated | Medium | Credit Line | Value | EnteredDate | |
| 2 | | Record Count: | 60226 | | | | Total: $ | 3,481,730,722.27 | | |
| 3 | 1883 1 | 83.1 | Francis Davis Millet | Reading the Story of Oenone | ca. 1883 | oil on canvas | Detroit Museum of | $ 300,000.00 | 2002-04-15 16:01:27 | |
| 4 | 1883 2 | 83.2 | Unknown | Spiritual Betrothal of Saint Cather | c. 17th Cen | Oil on canvas | Gift of His Holiness | $ 2,000.00 | 1997-01-06 00:40:35 | |
| 5 | 1885 1 | 85.1 | Giorgio Vasari | The Sacrifice at Lystra | c. 1550 | Pen and brown ink on buff pape | Gift of James E. Scr | $ 500.00 | 1997-01-06 00:40:35 | |
| 6 | 1885 2 | 85.2 | Bartolomeo Passarott | Study of a Seated Man | 1550/1600 | Pen and brown ink over black cl | Gift of James E. Scr | NULL | NULL | |
| 7 | 1885 3 | 85.3 | Rembrandt Peale | The Court of Death | 1820 | Oil on canvas | Gift of George H. S | $ 1,000,000.00 | 1997-01-06 00:40:35 | |
| 8 | 1886 1 1 | 86.1.1 | Henry Chapman Ford | San Diego | 1883 | etching printed in black ink on j | Gift of Clara A. Ave | $ 500.00 | 1997-01-06 00:40:35 | |
| 9 | 1886 1 2 | 86.1.2 | Henry Chapman Ford | San Luis Rey de Francia | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 10 | 1886 1 3 | 86.1.3 | Henry Chapman Ford | San Juan Capistrano | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 11 | 1886 1 4 | 86.1.4 | Henry Chapman Ford | San Gabriel | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 12 | 1886 1 5 | 86.1.5 | Henry Chapman Ford | San Fernando | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 13 | 1886 1 6 | 86.1.6 | Henry Chapman Ford | San Buenaventura | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 14 | 1886 1 7 | 86.1.7 | Henry Chapman Ford | Santa Barbara | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 15 | 1886 1 8 | 86.1.8 | Henry Chapman Ford | Santa Barbara | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 16 | 1886 1 9 | 86.1.9 | Henry Chapman Ford | Santa Ynez | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 17 | 1886 1 10 | 86.1.10 | Henry Chapman Ford | La Purissima Concepcion (Old) | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 18 | 1886 1 11 | 86.1.11 | Henry Chapman Ford | La Purissima Concepcion | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 19 | 1886 1 12 | 86.1.12 | Henry Chapman Ford | San Luis Obispo de Tolozo | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 20 | 1886 1 13 | 86.1.13 | Henry Chapman Ford | San Miguel | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 21 | 1886 1 14 | 86.1.14 | Henry Chapman Ford | San Antonio de Padua | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 22 | 1886 1 15 | 86.1.15 | Henry Chapman Ford | Na. Sa. de la Soledad | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 23 | 1886 1 16 | 86.1.16 | Henry Chapman Ford | San Juan Bautista | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 24 | 1886 1 17 | 86.1.17 | Henry Chapman Ford | San Carlos de Monterey, or Carm | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 25 | 1886 1 18 | 86.1.18 | Henry Chapman Ford | San Carlos de Monterey, or Carm | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 26 | 1886 1 19 | 86.1.19 | Henry Chapman Ford | Santa Cruz | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 27 | 1886 1 20 | 86.1.20 | Henry Chapman Ford | Santa Clara | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 28 | 1886 1 21 | 86.1.21 | Henry Chapman Ford | San Jose | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 29 | 1886 1 22 | 86.1.22 | Henry Chapman Ford | Dolores | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 30 | 1886 1 23 | 86.1.23 | Henry Chapman Ford | San Francisco de Solano | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 31 | 1886 1 24 | 86.1.24 | Henry Chapman Ford | Pala | 1883 | Etching printed in black ink on j | Gift of Clara A. Ave | NULL | NULL | |
| 32 | 1886 2 | 86.2 | Frank Knox Morton R | The Missing Vessel | 1884 | Oil on canvas | Detroit Museum of | $ 5,000.00 | 1997-01-06 00:40:35 | |
| 33 | 1888 1 | 88.1 | John George Brown | A Surprise Party | 1888 | Oil on canvas | Detroit Museum of | NULL | NULL | |
| 34 | 1888 2 | 88.2 | Ellen Kendall Baker | The Young Artist | 1885 | Oil on canvas | Gift of the Friends | $ 150,000.00 | 2010-06-17 11:04:57 | |
| 35 | 1889 1 | 89.1 | Charles Harry Eaton | The Lily Pond | c. 1886 | Oil on canvas | Detroit Museum of | $ 100,000.00 | 1997-01-06 00:40:35 | |
| 36 | 1889 2 | 89.2 | Giovanni Paolo d' Ago | Double Portrait of a Young Man a | c. 1520 | Oil on canvas | Gift of James E. Scr | $ 30,000.00 | 1997-01-06 00:40:35 | |
| 37 | 1889 7 | 89.7 | Franciabigio | Portrait of a Man | 15th/16th | Paint on wood panel | Gift of James E. Scr | NULL | NULL | |
| 38 | 1889 8 | 89.8 | Unknown | Saint Mercurius | 18th Centu | Paint on wood panel | Gift of James E. Scr | $ 7,500.00 | 1997-01-06 00:40:35 | |
| 39 | 1889 11 | 89.11 | Giovanni Battista Cim | Madonna and Child | Late15th/e | Paint on wood panel | Gift of James E. Scr | $ 2,000,000.00 | 2009-07-07 18:05:56 | |
| 40 | 1889 12 | 89.12 | Monaldus da Corneto | The Marriage of the Virgin | early 16th | Paint on wood panel | Gift of James E. Scr | NULL | NULL | |
| 41 | 1889 14 | 89.14 | Pier Francesco Fioren | Madonna and Child with the Infa | 1460/1480 | Paint on arched wood panel | Gift of James E. Scr | $ 25,000.00 | 1997-01-06 00:40:35 | |
| 42 | 1889 15 | 89.15 | Pierre-Louis Cretey | The Nativity | 17th/18th | Oil on canvas | Gift of James E. Scr | $ 100,000.00 | 2010-05-24 13:12:52 | |
| 43 | 1889 17 | 89.17 | Carlo Maratta | Madonna and Child with the You | late 18th C | Oil on copper panel | Gift of James E. Scr | NULL | NULL | |
| 44 | 1889 18 | 89.18 | Master of the San Mi | Madonna and Child with Two Ang | 15th Centu | Tempera on arched wood pane | Gift of James E. Scr | $ 5,000.00 | 1997-01-06 00:40:35 | |
| 45 | 1889 19 | 89.19 | Allegretto Nuzi | Madonna and Child with Saints, G | mid 14th C | Tempera on wood panel | Gift of James E. Scr | $ 800,000.00 | 2007-11-16 14:05:56 | |
| 46 | 1889 20 | 89.20 | Giovanni Paolo Panin | Ruins of a Triumphal Arch in the | 1717/1719 | Oil on canvas | Gift of James E. Scr | $ 175,000.00 | 1997-01-06 00:40:35 | |
| 47 | 1889 21 | 89.21 | Giampetrino | Salvator Mundi | 16th Centu | Oil on wood panel | Gift of James E. Scr | $ 35,000.00 | 1997-01-06 00:40:35 | |
| 48 | 1889 22 | 89.22 | Bagnacavallo (Bartolo | The Virgin Enthroned with Saint / | 1529 | Paint on wood panel | Gift of James E. Scr | NULL | NULL | |
| 49 | 1889 23 | 89.23 | Guido Reni | Head of Christ Crowned with Thoi | early 1630 | Oil on copper panel | Gift of James E. Scr | $ 2,200,000.00 | 1997-06-30 11:05:15 | |
| 50 | 1889 24 | 89.24 | Etienne Parrocel | Apparition of the Virgin to Saint F | 18th Centu | Oil on canvas | Gift of James E. Scr | $ 65,000.00 | 1997-01-06 00:40:35 | |
| 51 | 1889 25 | 89.25 | Sassoferrato | Madonna and Child | mid 17th c | Oil on canvas | Gift of James E. Scr | $ 750,000.00 | 1997-01-06 00:40:35 | |
| 52 | 1889 30 | 89.30 | Gerrit Adriaensz. Ber | View of the Grote Kerk in Haarlen | 1695 | Oil on canvas | Gift of James E. Scr | $ 1,500,000.00 | 2009-04-16 15:47:03 | |
| 53 | 1889 31 | 89.31 | Jan Wils | A Pass in the Apennines | c. 1655/16 | Oil on canvas | Gift of James E. Scr | $ 300,000.00 | 1997-01-06 00:40:35 | |
| 54 | 1889 32 | 89.32 | Quiringh Gerritsz van | The Vegetable Stall | 1665 | Oil on oak panel | Gift of James E. Scr | $ 110,000.00 | 2009-04-20 15:12:11 | |
| 55 | 1889 33 | 89.33 | Aelbert Cuyp | Landscape with Maid Milking a Co | c. 1655 | Oil on canvas | Gift of James E. Scr | $ 200,000.00 | 1997-01-06 00:40:35 | |
| 56 | 1889 34 | 89.34 | Karel Dujardin | Return of the Holy Family from Eg | 1662 | Oil on canvas | Gift of James E. Scr | $ 750,000.00 | 2009-04-17 16:25:31 | |
| 57 | 1889 35 | 89.35 | Jan Provost | The Last Judgment | c. 1525 | Oil on wood panel | Gift of James E. Scr | $ 3,500,000.00 | 1997-11-17 11:27:44 | |
| 58 | 1889 36 | 89.36 | Wouter Knijff | View of the North Port at Hoorn | 1648 | Oil on canvas | Gift of James E. Scr | $ 20,000.00 | 1997-01-06 00:40:35 | |
| 59 | 1889 37 | 89.37 | Willem de Heusch | Italian Landscape | c. 1650 | Oil on canvas | Gift of James E. Scr | $ 30,000.00 | 1997-11-17 11:02:09 | |
| 60 | 1889 38 | 89.38 | Meindert Hobbema | A River Scene | 1658 | Oil on oak panel | Gift of James E. Scr | $ 65,000.00 | 1997-11-17 11:02:38 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
DIAINSP124564

# **Exhibit I**

1

2

3
**Entered on Docket**
**May 25, 2010**

4

5

6
## UNITED STATES BANKRUPTCY COURT

7
## DISTRICT OF NEVADA

8

9
In re                              )      Case No. BK-S-09-32824-RCJ

10
                                  )      (Lead Case)
ASSET RESOLUTION, LLC, et al.,    )

                                  )      Jointly Administered with Case Nos.:

11
                                  )      BK-S-09-32831-RCJ; BK-S-09-32839-RCJ;
            Debtors,         )      BK-S-09-32843-RCJ; BK-S-09-32844-RCJ;

12
                                  )      BK-S-09-32846-RCJ; BK-S-09-32849-RCJ;
                                  )      BK-S-09-32851-RCJ; BK-S-09-32853-RCJ;

13
                                  )      BK-S-09-32868-RCJ; BK-S-09-32873-RCJ;
                                  )      BK-S-09-32875-RCJ; BK-S-09-32878-RCJ;

14
_____  )      BK-S-09-32880-RCJ; BK-S-09-32882-RCJ.
                                  )

15
Affects All Debtors                 )      Chapter 7
                                  )      **ORDER ON CERTAIN DIRECT**

16
                                  )      **LENDERS' MOTION FOR THE**
_____  )      **IMPOSITION OF SANCTIONS**

17

18
      Presently before the Court is Certain Direct Lenders' Motion for the Imposition of

19
Sanctions (#392).  Certain Direct Lenders' ("Movants") move for sanctions against Silar

20
Advisors, LP ("Silar"), Robert Leeds ("Leeds"), Jay Gracin ("Gracin"), Sara Pfrommer

21
("Pfrommer"), Tracy Klestadt and Klestadt & Winters, LLP (collectively, "Klestadt"), Katherine

22
M. Windler ("Windler"), and Bryan Cave, LLP ("Bryan Cave") (collectively, "Respondents")

23
under Rule 9011 of the Federal Rules of Bankruptcy Procedure and the Court's inherent

24
power.  Several of the Respondents filed oppositions (#634, #644, #648) and Movants replied

25
(#674).  The Court heard oral argument on April 8, 2010 and orally granted Movant's motion

26
but allowed for further filings regarding the amount of sanctions.  (*see* #725).  Movants then

27
filed several declarations of fees and expenses (#740, #741, #742, #743, #746).

28
Respondents filed several objections to these declarations (#808, #812, # 816).  The Court

1

1   now issues the following written order.  IT IS HEREBY ORDERED that Certain Direct Lenders'

2   Motion for the Imposition of Sanctions (#392) is GRANTED.

3                                    **I. BACKGROUND**

4   **A.    The Court takes jurisdiction over the loan servicing rights**.

5          Pursuant to the Asset Purchase Agreement ("APA") and Confirmation Order entered

6   by the Honorable Linda B. Riegle in the chapter 11 case of USA Commercial Mortgage

7   Company and its affiliates (collectively, "USACM"), Compass Partners, LLC and Compass

8   USA SPE LLC (collectively, "Compass") acquired USACM's loan servicing rights under certain

9   Loan Servicing Agreements ("LSAs").  Compass also acquired fractional beneficial interests

10  in a number of loans originated by USACM.  The APA did not alter the terms of the LSAs, and

11  the Confirmation Order specifically required the parties to abide by those terms.  The APA

12  provides that "[t]he United States Bankruptcy Court for the District of Nevada shall be the

13  exclusive forum for the enforcement of the terms of this Agreement."

14          After this Court withdrew references to the action styled *3685 San Fernando Lenders,*

15  *LLC v. Compass USA SPE, LLC*, No. 2:07-cv-00892 ("892 Case"), it entered a preliminary

16  injunction protecting Compass from being terminated as the direct lenders' loan servicer under

17  the LSAs absent compliance with the preliminary injunction.  The preliminary injunction

18  enabled 51% or more of the direct lenders to move for termination of Compass as their loan

19  servicer.  The preliminary injunction also required Compass to hold in trust, and not disburse,

20  certain funds without "further order of this Court obtained upon a motion brought by a party

21  in interest after appropriate notice."[1]  The preliminary injunction expressly stated that "[t]his

22  Court has and shall retain in personam jurisdiction over the Plaintiff Lenders and Compass

23  and in rem jurisdiction over Loans and LSAs relating thereto, and the conveyance of title of

24  collateral acquired in connection therewith."

25  _____

26  [1]
    Pursuant to that requirement, when Silar and Asset Resolution sought the approval of this

27  Court in February 2009 to distribute the trust funds from one account into loan specific
    sub-accounts for greater transparency to the direct lenders, they represented that they

28  "understand and acknowledge that funds will not be distributed from these accounts
    without further order of the Court."

1    Silar subsequently moved in the 892 Case to substitute Asset Resolution for Compass

2 as the loan servicer under the LSAs as well as under the preliminary injunction.  In April 2009,

3 this Court acknowledged, but did not approve, the substitution of Asset Resolution for

4 Compass, but added Silar and Asset Resolution as parties to the preliminary injunction over

5 which it had in personam jurisdiction and for whose protection the preliminary injunction

6 extended.  The Court added Silar to the preliminary injunction because it was concerned that

7 Asset Resolution was "just a shell" being interposed to protect Silar from liability, and to make

8 clear that the termination of the loan servicing rights under the LSAs would also eliminate any

9 interest that Silar had in those rights.  The preliminary injunction and substitution order were

10 two of this Court's orders effectuating its jurisdiction over the LSAs.

11 **B.    The Court determines the parties' entitlement to servicing fees under the LSAs.**

12    On July 6, 2009, this Court issued partial summary judgment rulings from the bench in

13 the 892 Case with regard to the compensation owed to the loan servicer under the LSAs.

14 Those rulings were then memorialized in this Court's written order dated September 19, 2009.

15 Specifically, the Court held that:

16    Section 5 of the LSAs provides for an authorization of a method of
compensation for the loans servicer.  Defendants do not collect default interest
17    or late charges from the borrower in the event that the amount ultimately
collected is less than the principal amount of the loan under "b" and "c" of
18    [section 5 of the LSAs'] language.  Defendants do have a right to retain the
annual servicing fee under the "a" portion of [section 5 of the LSAs'] language.
19    A loan servicer is not entitled to recover default interest and late fees directly
from the direct lender.

20

21 The Court also held that the loan servicer under the LSAs is a fiduciary of the direct lenders

22 as to the handling of all funds collected by the servicer on behalf of the direct lenders.

23    The Court's ruling at the summary judgment hearing held on July 6, 2009, also

24 delineated the calculation of the servicing fee to which the loan servicer is entitled under the

25 LSAs.  Specifically, the Court stated:

26    THE COURT: So I think I'm ready to find and I will so find that the meaning of
this is that with respect to the example I have used and with respect to this
27    particular LSA . . . [y]ou collected $1,000,000 without designation.  You did
collect $1,000,000, and I think under A you have a right to keep one percent of
28    the maximum principal amount of the loan. . . . I think you have the right to do
that.  I think under A it just simply says retain, and you got $1,000,000, and you

3

have the right to retain out of it.  And we don't care whether its designated interest or default interest or principal or anything else.  You've got the right to twelve-twelves [sic] of your annual servicing fee. . . .

MR. COLLINS: . . . Is the Court saying that they got one . . . percent of the twenty-six-five or one percent of eight and a half?

THE COURT: Of the actual collection.  I had another step in that finding, and that is that the property was part of the collection.  The value I placed on it was not the value at the time of the foreclosure sale of a maximum possible (indiscernible).  The value was the eight-and-a-half million dollars.  Since the whole transaction now is collapsible, the whole thing has been completed, including the sale of the property or at least a proposed sale, that the one percent is of the eight-and-a-half million dollars.  That was my ruling (indiscernible).

MR. COLLINS: Right.  And is that your ruling today, too, your Honor, just as far as the servicing fees?

THE COURT: If we have a total, complete sale, and eight-and-a-half million dollars was realized off the REO, yeah. . . . That's the ruling.

In other words, the loan servicer under the LSAs is entitled to receive one accrued annual servicing fee, and that fee is calculated by multiplying the weighted average of of the servicing fee percentage specified in the LSAs for one year by the total amount ultimately collected for that loan.

Further, on August 28, 2009, the Court entered its order approving the conveyance of title to Gess Property based on a sale price of $8.5 million.  In that order, the Court determined that Asset Resolution was entitled to recover only $94,000 as a servicing fee in connection with the Gess Property.  Asset Resolution had claimed that it was entitled to retain all proceeds from that sale (after paying off a tax lien in the amount of approximately $2 million) as servicing compensation that was purportedly due to the loan servicer under the LSAs.

On October 7, 2009, Silar and Asset Resolution commenced an adversary proceeding in the still pending USACM bankruptcy case, seeking reimbursement of amounts that were purportedly collectible by the loan servicer under the LSAs but that the Court's prior summary judgment order had held were not recoverable by the loan servicer under the LSAs.  Asset Resolution asserted that jurisdiction was proper in the United States Bankruptcy Court for the District of Nevada "by virtue of [the Confirmation Order] and APA," and that venue was also

4

1    proper in that court.  That adversary complaint was filed by Bryan Cave (and Kolesar &

2    Leatham, Chtd. as local counsel).

3    **C.      Silar and Asset Resolution commence action in Nevada state court.**

4          In August 2009, Silar and Asset Resolution sought to evade this Court's jurisdiction,

5    as well as the import of its summary judgment and Gess Property rulings, by: (1) moving to

6    dismiss the 892 Case for lack of subject matter jurisdiction, and (2) filing a complaint in

7    Nevada state court naming nearly all direct lenders as defendants and asserting

8    claims—already pending in the 892 Case—for declaratory judgment, breach of contract, and

9    breach of the covenant of good faith and fair dealing.  That complaint also contained various

10   tort claims that had not been asserted in the 892 Case.  Approximately four weeks prior to the

11   commencement of Debtors' chapter 11 cases, Movants removed the Nevada state court case

12   to this Court, and successfully sought the dismissal of that action as duplicative and in

13   violation of the compulsory counterclaim rule.[2]  Only eight days prior to the commencement

14   of Debtors' chapter 11 cases, this Court denied Silar's and Asset Resolution's motion to

15   dismiss for lack of subject matter jurisdiction.  The concomitant filing of Silar's and Asset

16   Resolution's motion to dismiss for lack of subject matter jurisdiction and state court complaint

17   constituted an attempt to evade this Court's jurisdiction.

18   **D.      Debtors commence chapter 11 case in the Souther District of New York.**

19          **1.      Respondents authorize and facilitate the filing of the chapter 11 cases.**

20          On October 14, 2009, Debtors commenced their chapter 11 cases in the United States

21   Bankruptcy Court for the Southern District of New York.  The chapter 11 petitions attached

22   resolutions executed by Pfrommer, as Chief Restructuring Officer and General Counsel of

23   each of the Debtors, certifying that "at a duly called meeting of the members" she was

24   _____

25          [2] On December 15, 2009, this Court granted Movants' motion to dismiss the removed
     Nevada state court case and gave Silar and Asset Resolution fourteen days to amend their
26   counterclaims in the 892 Case.  On December 29, 2009, Asset Resolution amended its
     counterclaims in the 892 Case to include the tort claims it had asserted in the removed
27   Nevada state court case, but failed to name any additional direct lenders as parties.  Instead,
     on December 30, 2009, in yet another attempt to evade this Court's jurisdiction, Asset
28   Resolution filed an adversary complaint in the chapter 11 cases in which it named all direct
     lenders as defendants.

"authorized and directed" to commence their chapter 11 cases. At that time, Asset Resolution was the sole managing member of 14 SPE Debtors, Silar was the sole owner and manager of Asset Resolution, Leeds was the President and Chief Executive Officer of Asset Resolution, and Gracin was the Vice President, Chief Operating Officer, and Secretary of Asset Resolution. "In [her] capacity as Chief Restructuring Officer, [Pfrommer] solicit[ed] input from Mr. Leeds because he is both an owner of the company for which [she was] acting and also of the DIP lender."

In advance of the filing of the chapter 11 cases, Asset Resolution paid a $300,000 retainer to Bryan Cave on September 29, 9009, and a $300,000 retainer to Klestadt on October 9, 2009. Bryan Cave prepared Debtors' bankruptcy schedules and statements of financial affairs before Debtors filed their chapter 11 petitions. Tracy Klestadt has admitted that he recommended the commencement of the chapter 11 cases. Pfrommer "was retained by ARC at the beginning of August 2009 . . . to advise regarding strategy to protect the value of the assets that ARC is servicing . . . . [Her] instructions came from, and [her] services were rendered to, Jay Gracin and Robert Leeds in New York." Pfrommer "was physically present in New York during the discussions that led to the decision to commence these chapter 11 cases . . . ." As Chief Restructuring Officer of Debtors, Pfrommer was to be paid $35,000 per month.

In Debtors' Rule 1007 Affidavit executed by Pfrommer, she made the following statements related to the improper purposes of the chapter 11 cases as well as the importance of Klestadt and Bryan Cave to Debtors' frivolous chapter 11 cases:

- ARC currently holds $10,771,332 in an account for the benefit of itself and various direct lenders. The money in this account consists of proceeds from the sale of various real properties by Compass. ARC, as successor-in-interest to Compass' rights in this account, claims that it is entitled to all such funds in respect of servicing fees and the right to collect servicing fees acquired from the USACM bankruptcy. The Direct Lenders claim that ARC is not entitled to any of such funds. The validity, priority and extent of the interests of various claimants to this fund will be one of the key issues that must be resolved in the course of these bankruptcy cases.

- ARC is currently a defendant and counter-claimant in the Nevada Litigation. The claims asserted against ARC go to the very heart of the value and extent of the Debtors' assets and as such will be stayed by the application of Section 362 upon the

6

filing of the Debtors' cases.[3]

• The retention of chapter 11 professionals is essential to the Debtors' reorganization efforts. Concurrently with this filing, the Debtors are seeking to retain and employ Klestadt . . . . The Debtors believe . . . that the services to be provided by Klestadt & Winters, LLP are necessary for the Debtors' successful reorganization efforts. The Debtors are also seeking to retain and employ Bryan Cave, LLP . . . Because of its expertise and institutional knowledge of the Debtors' operating history, its business and litigation matters, Bryan Cave, LLP is uniquely situated to advise and assist the Debtors in the preparation of their schedules and statement of financial affairs . . . .

• Conclusion: The Debtors believe the protections afforded by chapter 11 will enable them [sic] wind-up their affairs in an orderly fashion and to preserve the value of their assets for the benefit of their creditors.

As shown below, each of these statements reflects the improper purpose and frivolousness of Debtors' chapter 11 cases.

**2.    Respondents' post-petition conduct**

**a.    Debtors' response to the Anchor B Property preliminary injunction**

On October 16, 2009, or two days after the filing of the chapter 11 cases, this Court held a preliminary injunction hearing in the 892 Case in connection with the sale of the Anchor B Property. At that hearing, this Court rejected Asset Resolution's contention that the filing of the chapter 11 cases deprived it of in rem jurisdiction over those assets being held in trust for the direct lenders by Debtors because such assets were not property of Debtors' estates.

As a result of that hearing, Pfrommer filed a Supplemental Rule 1007 Affidavit in which she advised that Bankruptcy Court for the Southern District of New York that this Court's continued exercise of in rem jurisdiction notwithstanding the automatic stay had:

> caused significant disruption in the Debtors' administration of these chapter 11 Cases by calling into question whether this Court or the Nevada District Court has jurisdiction over properties and cash held by the Debtors. Among other things, the October 16 Ruling has cast into doubt the Debtors' ability, as servicer of the loans, to entertain offers of sale of the properties and to seek approval of this Court of such sales, a central matter to a chapter 11 case.

Debtors then filed both a writ of mandamus and notice of appeal with the United States Court of Appeals for the Ninth Circuit, contending that "the Debtors believe that the October 16

_____

[3] The filing of Debtors' chapter 11 cases automatically stayed the bench trial related to the termination of Asset Resolution's purported loan servicing rights under the LSAs that was scheduled to commence in the 892 Case approximately six weeks later on December 8, 2009.

7

1    Ruling and the Preliminary Injunction Order is [sic] an impermissible exercise of jurisdiction

2    in light of the automatic stay . . . over matters core to these chapter 11 Cases."  In reply to this

3    Court's response to the writ of mandamus, Windler, purportedly on behalf of Asset Resolution,

4    contended that Debtors' bankruptcy cases as well as the 892 Case should be reassigned to

5    a new judge.[4]

6              **b.    Debtors' response to Movants' motion to transfer venue**

7              In response to Movants' motion to transfer venue of the chapter 11 cases from the

8    Southern District of New York to the District of Nevada, Debtors opposed the motion and

9    noted that Pfrommer, as Debtors' Chief Restructuring Officer, "makes decisions with respect

10   to the Debtors in consultation with Silar . . . and their general bankruptcy counsel, Klestadt . . .

11   [and] was physically present in New York for the week preceding the Petition Date and most

12   of the following week."  Debtors, in a brief filed by Klestadt and supported by affidavits

13   executed by Gracin and Pfrommer, also argued that:

14   •    "[T]he 'learning curve' that the Nevada District Court may have is significantly
          overstated.  These chapter 11 Cases and the Nevada Litigation are not co-terminal.
15        While they share common facts and history, those common facts and history are not
          dispositive of these chapter 11 Cases."

16
17   •    The focus of the most important factor in determining whether to transfer venue—the
          economic and efficient administration of the bankruptcy estate—was "where the debtor
          has the best chance to reorganize."

18
19   •    "[T]he Direct Lender Movants argue that the 2007 Preliminary Injunction establishes
          *in personam* and *in rem* jurisdiction over all the Debtors, Silar, all of the Loans, all of
20        the LSAs, and all of the collateral securing the loans.  This is a contention that is
          without merit."

21   •    "Debtors believe that [this Court's continued] assertion of *in rem* jurisdiction is without
22        basis in law, as determination of what is property of the Debtors' estates are [sic] within
          the exclusive core jurisdiction of [the Souther District of New York]."

23   At oral argument, Klestadt acknowledged that Debtors filed their chapter 11 cases to

24   "liquidate" the outstanding loans and the property held by the 14 SPE Debtors.  Thus,

25   Respondents in bad faith contested the purported bases for venue to be transferred to

26

27        _____

28        [4] Windler filed that reply brief on behalf of Asset Resolution even though this Court's
          conversion of Debtors' bankruptcy cases to chapter 7 cases had previously resulted in
          Windler informing the Ninth Circuit that she was no longer counsel for Asset Resolution.

1    Nevada.

2                        c.    **Windler's statements at the hearing of November 16, 2009**

3           At the hearing held in the 892 Case on November 16, 2009, in connection with the

4    proposed allocation and disbursement of the funds being held in trust, Windler argued that

5    no allocation could occur because all those funds belonged to Asset Resolution, as a debtor

6    in possession:

7           MS WINDLER: Your Honor, this is Katherine Windler. I understand the Court's
            ruling. I'd simply like to again point our that there is a dispute as to who is
8           entitled to those funds. And it seems to me that this Court cannot make such an
            allocation at this time, because if it is determined that those funds are solely and
9           exclusively the property of Asset Resolution, as a debtor in possession, and that
            the direct lender's claims to those funds are not appropriately asserted—
10
            THE COURT: You could only make that claim, Ms. Windler, if you allege—if you
11          are making an allegation of fraud on your own behalf. In other words, you
            could—you have already stood in this court, and many times, and the other
12          parties have, too, and you have acknowledged that you're holding the bulk of
            those funds in trust. So, if you attempt to allege now, contrary to your
13          representations to this Court, that they're not held in trust, they're owned wholly
            by Asset Resolution, you would be committing fraud, ma'am.
14

15                        d.    **Debtors' responses to Movants' motions for modification of the**

16                              **automatic stay, withdrawal of the reference, and for conversion**

17          Upon the transfer of the chapter 11 cases from the Southern District of New York to the

18    District of Nevada, Debtors continued their efforts to deprive this Court of its ability to exercise

19    in rem jurisdiction over the assets comprising Debtors' estates. Specifically:

20          •    Debtors initially opposed Movants' motion to modify the automatic stay
                 to enable the 892 Case to proceed except as to the parties' damages
21               claims, but then agreed, after this Court set a hearing on Movants'
                 motions to withdraw the reference on shortened notice, to allow the entire
22               892 Case to proceed to final judgment—if the enforcement of that final
                 judgment was subject to further order by the Honorable Bruce A. Markell.
23
            •    Debtors consented to the withdrawal of the reference to the chapter 11
24               cases in connection with the 892 Case, but opposed the withdrawal of
                 the reference for the entirety of the chapter 11 cases, including Movants'
25               motions to modify the stay and for conversion of the chapter 11 cases to
                 chapter 7 cases.
26
            •    Debtors initially opposed Movants' motion for conversion of the chapter
27               11 cases to chapter 7 cases or, alternatively, for the appointment of a
                 chapter 11 Trustee, but then on the day of the hearing agreed to the
28               appointment of a chapter 11 Trustee "so long as the purpose of doing so

                                                    9

1    is to permit the loan servicing to be conducted within the confines of the
2    chapter 11 process.

3        **e.    Debtors' testimony at the hearing of December 14, 2009**

4        At the evidentiary hearing held before Judge Markell on December 14, 2009, in

5    connection with Debtors' motion for interim debtor-in-possession financing, Hin-King Tai, the

6    chief operating officer for Silar, which is the sole owner and manager of Asset Resolution,

7    testified that Asset Resolution is merely a corporate shell with no employees, which is one of

8    the reasons why Asset Resolution employs its affiliate Servicing Oversight Solutions, LLC

9    ("SOS"):

10       A. . . . Asset Resolution is a foreclosure subsidiary. It has no employees. It is
         not an ongoing organization such as what you're familiar with with respect to
11       having employees, technology, et cetera, et cetera. It is only a subsidiary. For
         it to engage in its, you know, services as to be a servicer and to have the rights
12       for a contract for servicing, it would have to engage a subservicer to perform the
         servicing functions.
13       Q. And what is the name of the subservicer that has been engaged by Asset
         Resolution, LLC?
14       A. Servicing Oversight Solutions.

15   Mr. Tai also testified that Asset Resolution had paid pre-petition, and was seeking

16   authorization to pay post-petition, its affiliate SOS a monthly servicing fee of 1.5% of the total

17   unpaid principal balance of the remaining real estate loans and collateral—even if no

18   servicing activity occurs. Based on that calculation, Asset Resolution paid approximately

19   $4.132 million in alleged servicing fees to SOS between July 24, 2009, and October 14, 2009

20   (the petition date), and sought to make post-petition payments to SOS of approximately

21   $480,000 a month. Notably, Asset Resolution never sought authorization to retain SOS as

22   its subservicer pursuant to 11 U.S.C. § 327.

23       Further, Pfrommer testified at that hearing that Asset Resolution intended to seek to

24   encumber the direct lenders' fractional beneficial interests as security for Asset Resolution's

25   debtor in possession financing request. Indeed, Mr. Tai acknowledged that, because the

26   budget of $7.5 million exceeded the $4.5 million request for debtor in possession financing,

27   the $3 million shortfall would have to be made up by including additional collateral to secure

28   such financing. Moreover, Debtors' debtor in possession financing request provided that the

10

proposed lender—another affiliate of Silar—would receive priority in Asset Resolution's assets pursuant to the terms of the debtor in possession financing agreement.

## E.    The Court invites Movants to file a motion for sanctions.

At a hearing held on January 19, 2010, the Court stated that it expected to see a motion for sanctions:

> [S]omebody counseled that the way to avoid this is to get the assets out of the hands of the Federal District Court. Let's put it into a chapter 11. That gets it in front of another judge and of course as it works out now, that did not work. . . . basically what Silar and Asset Resolution . . . are doing [is] exactly what I told you not to do. Do not further rape or pillage. Do not violate your fiduciary duties to the direct lenders. I expect to hold the principals of Asset Resolution and Silar, the entities themselves and any attorneys or professionals who counseled this frivolous—under Rule 11 of the Federal Rules of Civil Procedure, this frivolous endeavor—I expect to hold you personally liable for the Rule 11 appropriate sanctions and I will expect to see those motions. . . . There is nothing for Asset Resolution to properly reorganize. Asset Resolution was devised from the outset as a shell entity to protect Silar from liability for holding and preserving the value of these servicing rights. That's what it was devised for. It wasn't—it didn't predate this series of cases. It didn't have an existing business. It was devised solely for the purpose of holding these assets, prosecuting them, increasing their value including the servicing rights and protecting upstream Silar as the holder of the parent of Asset Resolution. That was its purpose. There is nothing to reorganize and we all know that there are extensive case and case authorities for similar attempts when the Court properly identifies them as forum selection of forum avoidance procedures.

## II. Legal Standard

The Court may impose and award sanctions at its discretion. *See Miller v. Cardinale* (*In re DeVille*), 361 F.3d 539, 547 (9th Cir. 2004). Two bases for the imposition of sanctions exist under these circumstances: (1) Rule 9011 of the Federal Rules of Bankruptcy Procedure, and (2) the Court's inherent power.[5]

## A.    Rule 9011

Rule 9011 empowers the Court to impose sanctions for conduct that is frivolous or based on an improper purpose. *See* Fed. R. Bankr. P. 9011(b). Sanctions are warranted

---

[5] Although 28 U.S.C. § 1927 permits the Court to impose sanctions against "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously," it does not apply to bankruptcy courts because the Ninth Circuit does not deem a bankruptcy court to be a "court of the United States" for purposes of section 1927. *See In re DeVille*, 361 F.3d at 546.

11

under Rule 9011 upon a showing of "objectively unreasonable conduct." *In re DeVille*, 361 F.3d at 548 (citation omitted). Rule 9011 contains a safe harbor provision that ordinarily requires a 21-day waiting period after service of the motion to permit the challenged action to be withdrawn or corrected. Fed. R. Bankr. P. 9011(c)(1)(A). But, "this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b)." *Id.*; *see also Dressler v. Seely Co.* (*In re Silberkraus*), 336 F.3d 864, 868 (9th Cir. 2003) ("The clear import of this language is that the mandatory 21 day safe harbor rule does not apply to the filing of the initial petition.").

Rule 9011(c) provides that, after notice and a reasonable opportunity to respond, sanctions are warranted in the event that "the court determines that subdivision (b) has been violated." Rule 9011(b) requires attorneys to certify that, "after an inquiry reasonable under the circumstances," a petition, among other things, "is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," and is "warranted by existing law or by nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." In determining whether sanctions are warranted under Rule 9011(b), the Court "must consider both frivolousness *and* improper purpose on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other." *Marsch v. Marsch* (*In re Marsch*), 36 F.3d 825, 830 (9th Cir. 1994). The Court is permitted to consider post-filing events "to infer the purpose of a filing from the consequences of a pleading or motion." *In re Silberkraus*, 336 F.3d at 868 (internal quotations and citation omitted).; *see also In re Aston-Nev. Ltd. P'ship*, 391 B.R. 84, 103 (Bankr. D. Nev. 2006).

Rule 9011(c) authorizes the imposition of "an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Pursuant to Rule 9011(c)(1)(A), such sanctions may include "the reasonable expenses and attorney's fees incurred in presenting or opposing the motion," and, "[a]bsent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees." The nature of the sanctions to be imposed for violation

12

of Rule 9011 "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(2).

**B.    Inherent power**

The Court has inherent power to sanction conduct that it specifically finds, by clear and convincing evidence, was undertaken in bad faith or is tantamount to bad faith. *See B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107–08 (9th Cir. 2002); *In re Aston-Nev. Ltd. P'ship*, 391 B.R. at 104. "[A] finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees.'" *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (citation omitted). In sum

> sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith. Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose. . . . [A]n attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under a court's inherent power.

*Id.* at 994. The Court has discretion "'to fashion an appropriate sanction for conduct which abuses the judicial process.'" *B.K.B.*, 276 F.3d at 1108 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). In doing so, the Court "may, in its informed discretion, rely on inherent power rather than the federal rules or § 1927." *Fink*, 239 F.3d at 994.

### III. ANALYSIS

**A.    Imposition of sanctions is warranted against Respondents.**

Sanctions are warranted against Respondents pursuant to both Rule 9011 and the Court's inherent power because the filing and prosecution of Debtors' chapter 11 cases were for improper purposes and were frivolous. In particular, Respondents should be sanctioned because they caused Debtors to engage in improper forum shopping solely in an attempt to evade this Court's jurisdiction and adverse rulings and to unnecessarily delay the proceedings in the 892 Case. Respondents did so to further Silar's continued objective of improperly enriching itself to the financial detriment of the direct lenders. it is well established that

13

sanctions may be imposed pursuant to Rule 9011 or the Court's inherent power, when it is found that a party has engaged in such improper conduct. *See, e.g.*, *In re Silberkraus*, 336 F.3d at 870–71 (affirming the imposition of sanctions under Rule 9011 based on debtor's "improper motive of forum shopping" to stay a pending state court action); *In re Alston-Nev. Ltd. P'ship*, 391 B.R. at 101 ("Filing a bankruptcy petition to evade . . . legitimate state court actions is a classic example of improper purpose, as well as of bad faith."); *see also In re Heritage Wood 'N Lakes Estates, Inc.*, 73 B.R. 511, 514 (Bankr. M.D. Fla. 1987) (debtor filed chapter 11 case in bad faith to engage in forum shopping because "it was not going to get the best side of the coin in the state court and looked to go elsewhere to have a new bite at the apple.").

Specifically, prior to the commencement of Debtors' chapter 11 cases, Silar and Asset Resolution first sought to evade this Court's jurisdiction by moving to dismiss the 892 Case for lack of subject matter jurisdiction, and by filing their Nevada state court case—which included some of the same claims that were already pending in the 892 Case—against nearly all the direct lenders. Those efforts, however, were unsuccessful. As a result, Debtors commenced their chapter 11 cases in the Southern District of New York. Those filings were approximately:

- six weeks after this Court approved a servicing fee of only $94,000 in connection with the sale of the Gess Property;

- four weeks after Movants removed, and moved to dismiss, the Nevada state court action;

- four weeks after this Court entered its summary judgment order;

- one week after this Court denied Silar's and Asset Resolution's motion to dismiss the 892 Case for lack of subject matter jurisdiction; and

- six weeks prior to this Court's scheduled bench trial regarding the termination issue.

Those facts demonstrate that Respondents caused Debtors to commence their chapter 11 cases in New York in bad faith. Debtors' chapter 11 cases were not commenced in an effort to reorganize existing businesses under the protection of the Bankruptcy Code, *see In re Alston-Nev. Ltd. P'ship*, 391 B.R. at 100–01, but rather to deprive this Court of its ability to

14

1    continue to exercise jurisdiction over, and render rulings regarding, Debtors and their

2    purported assets, *see In re Silberkraus*, 336 F.3d at 868; *In re Alston-Nev. Ltd. P'ship*, 391

3    B.R. at 103; *In re Heritage Wood 'N Lakes Estates, Inc.*, 73 B.R. at 514.  Respondents' own

4    contentions in connection with the filing of the chapter 11 cases demonstrate as much:

5         •    In Debtors' Rule 1007 Affidavit, Pfrommer attested that the Bankruptcy
          Court, rather than this Court, would decide whether Asset Resolution: (1)

6              was entitled to all the funds being held in trust for the direct lenders as
          servicing compensation, and (2) would be terminated as the loan servicer

7              under the LSAs.  Thus, from the outset of Debtors' chapter 11 cases,
          Respondents intended that the New York court would resolve what

8              property comprised Debtors' estates.

9         •    Similarly, two days after the filing of the chapter 11 cases, Windler
          argued in the 892 Case that this Court no longer had in rem jurisdiction

10             over the funds being held in trust by Asset Resolution for direct lenders,
          and ten days thereafter Pfrommer attested that this Court's continued

11             exercise of in rem jurisdiction precluded Asset Resolution from seeking
          the approval if the Bankruptcy Court to sell certain real estate collateral.

12             Thus, notwithstanding the Court's preliminary injunction, Respondents
          sought to transfer jurisdiction and control over such assets to the New

13             York court.

14        •    Debtors sought to obtain financing to pay a servicing fee to SOS—a Silar
          affiliate—that was millions of dollars in excess of what this Court had

15             approved in the 892 Case.  That request plainly sought to eviscerate this
          Court's prior servicing fee rulings.

16

17       Moreover, in contesting the transfer of venue to the District of Nevada, Debtors denied

18   the ability of this Court to administer the chapter 11 cases as well as to proceed with the 892

19   Case.  Specifically, Debtors denied both the significance of this Court having presided over

20   the 892 Case for several years, as well as the relevancy and importance of the Confirmation

21   Order, APA, and the preliminary injunction to the determination of whether the District of

22   Nevada should decide what property comprises Debtors' estates.  Debtors plainly did so to

23   further the improper purpose of depriving this Court of jurisdiction notwithstanding:

24        •    The Southern District of New York's prior decision concluding that the
          existence of the APA and the preliminary injunction required the transfer
          of litigation between Compass and Pathfinder to the District of Nevada.

25             *See CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*,
          396 B.R. 602, 606 (S.D.N.Y. 2008).[6]

26

27       [6] The Bankruptcy Court for the Southern District of New York recognized that the

28   resolution of the 892 Cases was a prerequisite to being able to administer Debtors' estates.

15

- The Adversary proceeding against USACM that Bryan Cave filed on behalf of Silar and Asset Resolution—only one week prior to the filing of the chapter 11 cases—in which they alleged that jurisdiction and venue were proper in the District of Nevada.

- Silar's and Asset Resolution's prior acknowledgment that, pursuant to the preliminary injunction, the funds being held in trust for the direct lenders would not be disbursed without further order of this Court.

Thus, Debtors' response to the motion to transfer venue reveals that the filing of the chapter 11 cases was based on the improper purpose of evading this Court's jurisdiction.

Finally, Debtors' response to the motion to transfer venue was filed by Klestadt and supported by affidavits from Gracin and Pfrommer—all of which demonstrate that Silar, Leeds, Gracin, Pfrommer, and Klestadt were involved in, and responsible for, the decision to file the chapter 11 cases in an improper attempt to evade the jurisdiction and adverse ruling of this Court.  In fact, Klestadt was paid $300,000 retainer five days prior to the filing of the chapter 11 cases.  Pfrommer was retained by Asset Resolution in early August 2009, and participated with Leeds and Gracin in the decision to commence the chapter 11 cases.  Bryan Cave also participated in the decision to file the chapter 11 cases, as it was paid a $300,000 retainer more than two weeks prior to their filing, and Windler stated at the hearing held on December 14, 2009, that she prepared Debtors' schedules and statements of financial affairs.  Thus, Respondents intentionally caused Debtors to engage in improper conduct to deprive this Court of jurisdiction over Debtors and their assets.

The filing of the chapter 11 cases was also frivolous because Debtors never had any intention or ability to reorganize.  *See In re Alston-Nev. Ltd. P'ship*, 391 B.R. at 100–01 (holding debtor "had no good reason to file chapter 11 bankruptcy" because it had no employees and no intention or ability to reorganize); *see also Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.").  It is not disputed that the purpose of the 14 SPE Debtors is merely to hold segregated property in trust for the direct lenders.  Nor is it disputed that Asset Resolution is merely a corporate shell with no employees.  Thus, Debtors necessarily lacked any intention

16

1   or ability to reorganize an existing business.

2       Respondents make essentially five arguments that the filing of the chapter 11 cases

3   was not for an improper purpose.  First, they argue that they filed the chapter 11 cases for the

4   proper purpose of using bankruptcy procedure—specifically nationwide in rem jurisdiction and

5   service—to finally resolve the matter in a way that could not be done in the 892 Case due to

6   the impracticality of joinder of all necessary parties.  Second, they argue that the chapter 11

7   cases were filed for the proper purpose of avoiding tax foreclosures and deterioration of the

8   properties due to lack of maintenance—purposes this Court approved of when pursued by the

9   chapter 7 trustee.  Third, they argue that even if they lacked an intent or ability to reorganize,

10  that a chapter 11 case may be properly filed to conduct pre-plan and plan-based sales of

11  substantially all assets of the estate.  Fourth, they argue that venue was proper in the

12  Southern District on New York and improper in the District of Nevada.  Fifth, they argue that

13  their actions could not deprive this Court of jurisdiction because it did not have in rem

14  jurisdiction and jurisdiction over the 14 SPE Debtors until their Southern District of New York

15  case was transferred to Nevada and because the results of the bankruptcy filings were in line

16  with the Court's orders.

17      Movants correctly point out that they do not argue that venue was improper in the

18  Southern District of New York or that there was no advantage to the procedures a bankruptcy

19  court could offer.  Instead, Movants assert that Respondents' filings were frivolous because

20  they had no intent or ability to reorganize and because they were made for the purpose of

21  evading this Court's jurisdiction over Asset Resolution and the loan servicing rights.  The

22  circumstances of the case establish that Respondents acted with the improper purpose to strip

23  the Court of its in rem jurisdiction over the loan originated by USCAM, the collateral securing

24  the loans, and the LSAs.  The Court had held that it had jurisdiction over the loan servicing

25  rights under the LSAs even if not all interested parties were joined in the 892 Case.

26      Despite Respondents' contention, the Court had jurisdiction over the SPE Debtors

27  because they were created and held title in trust for the direct lenders pursuant to this Court's

28  preliminary injunction.  Moreover, the Court always had in personam jurisdiction over

17

Compass and Asset Resolution which were the managing members of the 14 SPE Debtors.

Respondents were not insolvent when they filed the chapter 11 cases. Pfrommer had stated as much in her Rule 1007 Affidavit filed on October 14, 2009, and Asset Resolution was able to pay Silar's affiliate, SOS, millions of dollars before filing the petitions. Furthermore, if Respondents sought only the benefits of bankruptcy court, they would not have opposed transfer of the bankruptcy cases to the District of Nevada. They also could have agreed to terminate the automatic stay with respect to the 892 Case if they were not seeking to evade this Court's jurisdiction and adverse rulings.

Though chapter 11 allows for liquidation, it contemplates liquidation to facilitate reorganization. *See I.R.S. v. Creditors Comm.* (*In re Deer Park, Inc.*), 10 F.3d 1478, 1482 (9th Cir. 1993) ("It does not matter that the Chapter 11 reorganization plan is a liquidating plan, so long as the allocation of trust fund tax payments is necessary to the success of the reorganization."). Because Asset Resolution was a shell corporation and Respondents did not seek reorganization, their filing was improper and sanctionable. *See St. Paul Self Storage Ltd. P'ship v. Port Auth.* (*In re St. Paul Self Storage Ltd. P'ship* ), 185 B.R. 580, 583 (B.A.P. 9th Cir. 1995) (holding that bankruptcy court's finding of bad faith was not clearly erroneous when the debtor had conducted no business for years and the court had found its "purpose in filing its petition was not to effectuate a reorganization of its business, but was a litigation tactic.").

Respondents also argue that the Court may not award monetary sanctions against Silar, Leeds, and Gracin because Movants have produced no evidence that they were responsible for filing the petitions and no monetary sanctions may issue against a represented party based on legal decisions. But, the record shows that Klestadt had numerous discussions with Silar, Leeds, and Gracin before commencing the chapter 11 cases and that Klestadt and Brian Cave advised Silar, Leeds, and Gracin in connection to the commencement of the chapter 11 cases. Silar, Leeds, and Gracin were involved with the decision to file the chapter 11 petitions and are thus responsible parties that may be subject to monetary sanctions.

18

1
2
3

**B.    Sanctions may include reimbursement of attorneys' fees and costs and disgorgement of retainers incurred in connection with opposing Respondents' wrongful conduct.**

4       Respondents argue that dismissal, rather than monetary sanctions, is appropriate.

5   They also argue that payment of Movants' attorneys' fees is improper because sanctions are

6   not meant to be compensatory and that even if compensatory damages in the form of

7   attorneys' fees are warranted, the Court may not impose both disgorgement and

8   compensatory damages in the form of attorneys' fees.  They further argue that the filing of the

9   chapter 11 petitions caused no harm—and in fact helped—Movants.  Finally, they note that,

10  under Rule 9011, they may only be sanctioned for filing the petitions, not other actions,

11  because Movants did not comply with Rule 9011's safe harbor provision.[7]

12      Movants have incurred substantial attorneys' fees as a result of Respondents' filing of

13  the chapter 11 cases.  They have had to: (1) litigate a motion to transfer venue to the District

14  of Nevada; (2) challenge Debtors' efforts to keep matters before Judge Markell and encumber

15  the direct lenders' loan interests; (3) oppose Silar's and Bryan Cave's attempt to stay the 892

16  Case and the converted chapter 11 cases pending appeal in the Ninth Circuit.  Furthermore,

17  Respondents' filing of the chapter 11 cases delayed the Court's entry of an order terminating

18  Compass and Asset Resolution's servicing rights and its order approving disbursement of $10

19  million held in trust for the direct lenders.  This has limited the direct lenders' ability to protect

20  their remaining loans and foreclosure properties.   Therefore, Movants were harmed by

21  Respondents' bad-faith filings.

22      Respondents argue that the Court may only award sanctions to Movants, not their

23  attorneys directly.  Rule 9011 only authorizes payment of sanctions to the court or to movants.

24  Fed. R. Bankr. P. 9011.  Therefore, it is inappropriate to award sanctions directly to Movants'

25  attorneys.  Klestadt argues that sanctions should be limited to costs to litigate a single motion

26  to dismiss that could have disposed of Respondents' filings.  Keeping in mind that sanctions

27  _____

28      [7] Silar, Pfrommer, Leeds, and Gracin also request that the Court charge Movants with the costs of their defense.

19

1   should deter future misconduct, the Court finds that a broader measure of sanctions is

2   warranted.

3   **C.    A sanction of $279,615.47 based on Movants' attorneys' fees and expenses as**

4   **well as disgorgement by Bryan Cave and Klestadt of their retainers is appropriate**

5   **to deter future misconduct.**

6       The Court now proceeds to calculate an appropriate sanction. The sanction must be

7   sufficient to deter future conduct and may be compensatory, including attorney' fees. Movants

8   ask the Court to award sanctions, jointly and severally, against Silar, Leeds, Gracin,

9   Pfrommer, Klestadt, Windler, and Bryan Cave. Movants incurred $66,184.71 in attorneys'

10  fees and expenses for representation by Jones Vargas from October through December 2009.

11  These fees and expenses were incurred as a result of: (1) filing chapter 11 cases in the

12  Southern District of New York; (2) changing venue; (3) opposing and obtaining interim orders;

13  (4) opposing proposed reorganization; (5) moving for withdrawal of reference; (6) moving for

14  conversion to chapter 7; and (7) moving for sanctions. (Chubb Decl. (#740) ¶¶ 2–3). Jones

15  Vargas' spent approximately 230 hours on these matters and the billing rates for its attorneys

16  ranged from $170 to $420 per hour. (*Id.* at Exs. 1–7). In total, Jones Vargas accrued

17  $65,304.50 in attorneys' fees. (*Id.* at ¶ 3). Jones Vargas also incurred $880.21 in expenses.

18  (*Id.*). The Court finds that Jones Vargas' billing rates are reasonable and $66,184.71 as a

19  sanction based on their attorneys' fees and expenses is appropriate to deter future

20  misconduct.

21      McAlan Duncan represents Movants on a contingency basis. He estimates the value

22  of his work done related to the chapter 11 cases from October 14, 2009 through April 8, 2010

23  to oppose the commencement and prosecution of the chapter 11 cases to be $50,685.40.

24  (Duncan Decl. (#741) ¶ 2). Duncan spent 124.3 hours on opposing the bankruptcy cases and

25  has proposed a billing rate of $400 per hour. (*Id.* at ¶ 3). He also spent $965.40 in travel

26  expenses. (*Id.* at ¶ 4). The Court finds that Duncan's proposed billing rate is reasonable and

27  $50,685.40 as a sanction based on his attorney's fees and expenses is appropriate to deter

28  future misconduct.

Respondents argue that the Court should not sanction any amount based on Duncan's work resulting from Respondents' filings because Duncan did not make an appearance in the bankruptcy case and because he worked as Certain Direct Lender's agent to deal with Bickel & Brewer.  Respondents cite to no authority suggesting that this is improper.  The purpose of Rule 9011 sanctions is to deter future misconduct.  One way to do this is to make the party violating the rule bear the costs of its violation.  Whether or not Duncan made an appearance and whatever his relationship to Ceratin Direct Lenders was, his activity as a result of Respondents' filings resulted in costs that Respondents should bear.

Gracin, Leeds, Pfrommer, and Silar also argue that Duncan's fees should not be included because the Court enjoined Cross, for which Duncan is the principal, from acting on behalf of any Direct Lender in the 892 Litigation.  The Court did not order Duncan not to participate in or respond to Respondents' bankruptcy filings in the Southern District of New York.  Furthermore, the Court approved Duncan's appearances as a practicing lawyer as long as he did not act on behalf of Cross.  Though Duncan's involvement with Cross, and later with Granite Redevelopment, may be questionable, it does not tip the balance of equities against awarding sanctions based on Duncan's attorney's fees and costs to respond to Respondents' bankruptcy petition.

Bickel & Brewer also represent Movants on a contingency basis.  It estimates the value of its attorneys' work and expenses to oppose the chapter 11 cases and to seek sanctions to be $287,688.96.  (Collins Decl. (#743) ¶¶ 7–8).  All together, the attorneys at Bickel & Brewer spent 508.1 hours on: the motion to transfer venue; the bankruptcy cases; the motions to terminate automatic stay, for withdrawal of reference, and for conversion; and the motion for sanctions.  (*Id.*).  Bickel & Brewer proposes billing rates ranging from $275 per hour to $775 per hour to calculate fees for sanctions, resulting in a total of $269,980.00 in attorneys' fees.  (*Id.* at ¶ 8).  Bickel & Brewer also spent $17,232.16 in expenses for travel, lodging, meals, transportation, telephonic hearings, filing fees, transcript fees, and legal research fees.  (*Id.* at ¶ 12).  Bryan Cave and Windler argue that these fees are unreasonable because they exceed the prevailing hourly rates in Nevada.  The prevailing market used to determine

21

reasonable attorney's fees is the district where the matter is heard.  *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).  The Court finds that Bickel & Brewer's proposed billing rates are unreasonably high when compared to prevailing rates in Nevada and the rates actually used by Jones Vargas and proposed by Duncan.  After making reasonable downward adjustments on the billing rates, the Court finds that $136,280.00 is a reasonable sanction based on Bickel & Brewer's attorneys' fees.  Adding expenses, Bickel & Brewer's expenses shall contribute $153,512.16 to the sanction award.  This sanction is appropriate to deter future misconduct.

Klestadt, Bryan Cave, and Windler argue that it is inappropriate to award a sanction of attorneys' fees when Duncan and Bickel & Brewer represented Movants under contingency fee arrangements.  Respondents focus on the fact that Duncan and Bickel & Brewer will recover a percentage of Movants' total recovery if Movants are deemed successful.  But, this ignores the purpose of Rule 9011 sanctions.  Sanctions for reasonable attorneys' fees are necessary to deter future misconduct by Respondents.  Just because Movants did not pay Duncan and Bickel & Brewer for their work in response to Respondents' filings does not mean that Duncan and Bickel & Brewer's work was not a cost.  Respondents should bear that cost to deter future misconduct.  Furthermore, contrary to Respondent's assertions, there is little danger of a windfall to Duncan and Bickel & Brewer because, as Klestadt themselves point out, the sanctions award is payable to Movants, not their attorneys.

Dona Cangelosi and other direct lenders were represented by Lisa A. Rasmussen and William A. Cohan.  (Rasmussen Decl. (#746) ¶ 21).  Rasmussen spent 22.7 hours on matters directly related to Respondents filing of the chapter 11 cases in the Southern District of New York.  (*Id.* at ¶ 12).  She bills at $300.00 per hour.  (*Id.* at ¶ 13).  Cohan spent 4.7 hours and bills at $700.00 per hour.  (*Id.* at ¶¶ 16–17).  Rasmussen also spent $73.20 on PACER fees.  (*Id.* at ¶ 20).  In total, Rasmussen and Cohan assert $10,173.20 in attorneys' fees and expenses.  (*Id.* at ¶ 21).  The Court finds that Rasmussen's stated attorney's fees and expenses are reasonable and necessary to a sanction that will deter future misconduct.  But, the Court finds that calculating attorneys' fees using a billing rate of $700 is unnecessary to

22

1    deter future misconduct.  Employing a lower rate for Cohan's attorney's fees, the Court finds

2    that $9,233.20 is a reasonable sanction to deter future misconduct based on Rasmussen and

3    Cohan's attorneys' fees and expenses.

4         Respondents argue that the Court should not sanction any amount based on

5    Rasmussen's work resulting from Respondents' filings because Rasmussen did not make an

6    appearance in the bankruptcy case.  Respondents cite to no authority suggesting that this is

7    improper.  The purpose of Rule 9011 sanctions is to deter future misconduct.  Whether or not

8    Rasmussen made an appearance, her activity as a result of Respondents' filings resulted in

9    costs that Respondents should bear to create the necessary deterrent effect.  This includes

10   costs resulting from the filing, even if incurred after venue was transferred back to Nevada.

11        In  sum,  the  Court  awards  sanctions  against  Respondents  of  $279,615.47.

12   Respondents are jointly and severally liable for this amount.  Bryan Cave and Klestadt also

13   received $300,000 each as retainers to file and litigate the chapter 11 cases.  To the extent

14   that Bryan Cave and Klestadt have retained these retainers or applied them to their incomes,

15   they must disgorge their retainers—whether used or unused—to deter future misconduct.

16   Bryan Cave and Klestadt should not profit from their sanctionable conduct.  Therefore, the

17   Court orders Bryan Cave and Klestadt to each disgorge their $300,000 retainers to the

18   chapter 7 Trustee.  The amount that Bryan Cave and Klestadt must disgorge is reduced by

19   the amount of the unused retainers they have already returned.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

23

## IV. CONCLUSION

Accordingly, IT IS ORDERED that Certain Direct Lenders' Motion for the Imposition of Sanctions (#392) is GRANTED.

IT IS FURTHER ORDERED that Respondents are jointly and severally sanctioned in the amount of $279,615.47 to be paid to Movants.

IT IS FURTHER ORDERED that Bryan Cave and Klestadt shall each disgorge all unreturned portions of their $300,000 retainers—whether used or unused—to the chapter 7 Trustee.

DATED: This 24TH day of May, 2010.


Robert C. Jones
UNITED STATES DISTRICT JUDGE