## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

### MOTION TO EXCLUDE THE TESTIMONY OF THE CITY'S FORECASTING EXPERTS UNDER FEDERAL RULE OF EVIDENCE 702

Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora")
submit this motion (the "Motion to Exclude") to exclude the expert testimony of
Robert Cline, Guarav Malhotra, and Caroline Sallee, which was disclosed in their
respective expert reports and during their respective depositions.[1]  In support of
their motion, Syncora respectfully states as follows:

### INTRODUCTION

1.      In support of its plan of adjustment, the City has offered an
unprecedented, highly-subjective attempt to forecast the City's revenues and
expenditures over the course of 10 and 40 years, which its own experts

---

[1] The expert reports of Dr. Cline, Mr. Malhotra, and Ms. Sallee are attached as
Exhibits 6A, 6B, and 6C, respectively.  The relevant excerpts from the depositions
of Dr. Cline, Mr. Malhotra, and Ms. Sallee are attached as Exhibits 6D, 6E, and 6F,
respectively.

acknowledge has not been tested to ensure its reliability[2] and which the Court's appointed expert describes as "convoluted" and "confusing."[3]  The forecast was cobbled together by three different individuals from Ernst & Young — Robert Cline, Guarav Malhotra, and Caroline Sallee — none of whom have significant experience forecasting for municipalities.[4]  Given the unprecedented nature of the City's attempt to forecast municipal revenues and expenses over a period of 10 and 40 years during which it was undertaking a complex restructuring, methodological rigor in the construction of these forecasts was critical.  Nonetheless, as the City's experts concede, "there is no measure of reliability"[5] for their forecasting methods, which at bottom constitute a fundamentally "subjective undertaking."[6]

---

[2] Ex. 6D, Cline Dep. at 67:3-4 (there is "no measure of reliability" for the forecasts).

[3] Ex. 6G, Kopacz Dep. at 181:17-19.

[4] Ex. 6E, Malhotra Dep. at 216:22-25 (explaining that forecast is based on a series of assumptions); Ex. 6D, Cline Dep. at 38:23 ("It's a complicated analysis that we did."); *id.* at 68:7-9 (acknowledging that "numerous assumptions are involved" in his forecast").

[5] Ex. 6D, Cline Dep. at 67:3-4.

[6] Ex. 6F, Sallee Dep. at 292:12-16.

2.    As the experts acknowledged, their projections of the City's future revenues were premised on a "series of assumptions."[7] In many instances, however, these assumptions are based on nothing more than unsupported *assertions* — not actual data — that are contradicted by the record and/or fall outside the experts' acknowledged area of expertise, rendering the entire forecast fundamentally flawed and unreliable.  Indeed, the forecast is so completely unsupported that the City's Chief Assessor went so far as to characterize one of the experts' projections as "ridiculous."[8]

3.    Ms. Sallee's projections regarding future property tax revenues, for example, are based on an assumption based on her judgment that a reappraisal study that has not yet been started and which will take 3-5 years to complete will wipe out half of the taxable value of property in the City.   Ms. Sallee acknowledges, however, that she has no expertise or experience in property assessment and that her assumption is inconsistent with the judgment of officials who do — namely the City's Chief Assessor Gary Evanko and officials at Wayne County.

---

[7] Ex. 6E, Malhotra Dep. at 216:22-25.  *See also* Ex. 6D, Cline Dep. at 182:17 ("[i]n a sense, the entire model is an assumption"); Ex. 6D, Cline Dep. at 233:3-4 ("the entire forecast is a forecast based upon assumptions.").

[8] Ex. 6H, Evanko Dep. at 223:25-24:1.

3

4. Dr. Cline similarly forecasts that the City will experience almost *no* employment growth, *no* population growth, and *no* or *negative* real wage growth — even *after* a $1.7 billion dollar restructuring and reinvestment effort that the City maintains will transform Detroit. Dr. Cline acknowledged in his testimony before the Court that he has no understanding regarding what the restructuring entails and was completely unaware of activities that will have a significant effect on the City's economy. Moreover, he acknowledges that there is *no* study or data supporting key assumptions underlying his projections, while other assumptions are loosely based on data from arbitrarily selected periods that do not include the most recent, actual data that he concedes is critical to a reliable forecast.

5. Finally, Mr. Malhotra based his projections of City expenses on numbers he picked based on only three or four years' worth of data and then would either use — or reject — based on whether the City told him to use another arbitrarily-chosen number. Moreover, his assumptions are inconsistent with those of Dr. Cline. For example, Mr. Malhotra assumed growth in City wages much higher than Dr. Cline's anemic wage growth figures, thereby inflating City wage expenditures (while Dr. Cline simultaneously depressed City revenues by inconsistently assuming a lower figure).

6. Compounding these problems is the fact that the City's experts attempt to project sums available to the City over the next 10 and 40 years, despite

the fact that *none* of these experts could identify *any* forecast for a municipality that purported to reliably project revenues and expenditures over such an extended period, much less one that occurred during a period in which a city was engaged in the sort of complex, and indeed unprecedented, restructuring that Detroit proposes here. As the experts acknowledge, the identity of the decision-makers in Detroit is not even known over the next 10 years (much less 40), and attempting to predict what decisions they will make impacting revenues and expenditures over such an extended time would amount to *speculation*.[9] Moreover, the City's forecasters have not undertaken any investigation to determine what methods (if any) have been used to project revenues over such an extended period in other Chapter 9 bankruptcies. In sum, they provide no methodological basis for their attempt to do so here.

7. More fundamentally, the forecasts ignore numerous sources of potential revenue that could be used to pay creditors. Indeed, the City's experts acknowledge that "there are a number of revenue sources [they] were not asked to forecast."[10] The forecasts assume, for example, that taxes over the next 10 *and 40* years in Detroit will be governed by current tax rates, even though tax rates have changed in recent years and City officials acknowledge that the Revised Judicature

---

[9] Ex. 6E, Malhotra Dep. at 83:17-22.

[10] Ex. 6D, Cline Dep. at 300:11-13.

5

Act of 1961 expressly authorizes collection of property taxes above current rates in order to satisfy a judgment. They likewise ignore significant efforts to improve collections of the income and other taxes (while simultaneously and inconsistently assuming *decreased* property tax collections), such as the City's agreement in concept to piggyback City income tax with State income tax collection, resulting in increased tax collections and decreased costs. Yet, one study concluded that in 2009 alone Detroit failed to collect more than $*140 million* in income taxes owed, one of the most significant sources of revenue for the City. Finally, they ignore a variety of asset sales and outsourcing proposals the City is currently considering that would generate hundreds of millions of dollars in revenues for the City, such as leasing or privatizing sewer and water services or parking.

8. In sum, the City's attempt to "project" revenues over 10 and 40 years based on a series of unsupported and speculative assumptions is unprecedented and fundamentally flawed. It fails to satisfy the requirements for admission of expert testimony under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.* for multiple reasons.

## JURISDICTION

9. The Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6

## RELIEF REQUESTED

10.     Syncora respectfully moves the Court to exclude the testimony of the City's forecasting experts—Guarav Malhotra, Robert Cline, and Caroline Sallee—and enter an order substantially in the form of <u>Exhibit 1</u> attached hereto.

## BACKGROUND

### I.     The Ernst & Young Forecasts

11.     The City asserts that it has no more money to pay creditors and thus must pay Syncora and other creditors only pennies on the dollar.  In support of this claim, it has produced a forecast consisting of hundreds of different spreadsheets,[11] pieces of which were put together by the City's outside consultants at Ernst & Young, who in turn rely on other consultants such as Conway MacKenzie, Miller Buckfire, and Milliman as well as individuals at the City and other third parties. The City has offered three individuals from Ernst & Young to testify as expert witnesses about various pieces of the forecast they performed — none of whom had any significant experience forecasting revenues or expenses for a municipality before the Detroit matter.[12]

---

[11] *See* Ex. 6G, Kopacz Dep. at 51:23-52:3.

[12] *See, e.g.,* Ex. 6D, Cline Dep. at 8:23-24 ("I have not done forecasting for a City."); *id.* at 191:2-4 (doesn't have "any experience doing revenue forecasting for a City"); Ex. 6E, Malhotra Dep. at 17:14-18, 80:8-11 (stating he had never performed a forecast for a municipality before this forecast for Detroit); Ex. 6F, Sallee Dep. at 23:24-241, 25:24-26:2 (this is "the first time" she has forecasted

12.     Caroline Sallee performed the property tax and State revenue sharing projections for the City.  Robert Cline performed the income tax, wagering tax, corporate tax, and utility users' tax projections.  And Guarav Malhotra took those experts' projections, along with those from Conway MacKenzie, Milliman, and others, and incorporated them into the forecast with his own projections of City expenditures.  All three experts base their projections upon a series of assumptions, in many instances based on nothing more than their judgment, including assumptions about what actions the City will take over the next 10 and 40 years that could have significant impacts on the available revenues.[13]

13.     The City and its experts concede that their forecasts are subject to considerable uncertainties.[14]  Among other things, as the City acknowledges, "[t]he

_____

taxable values "for a municipality[.]"); *id.* at 293:10-18 (agrees she has not "ever participated in constructing financial projections that are similar to the ones that have been constructed in the Detroit case[.]").   Since that time, they have apparently done other municipal work.  Ms. Sallee testified, for example, that at the beginning of this year she did forecasting for the City of Flint Michigan, which is also under the supervision of an Emergency Manager, but her analysis was based on a much shorter time frame (5 years) than the 10 and 40-year projections the City has submitted here.  *Id.* at 16:6-17:5

[13] Ex. 6E, Malhotra Dep. at 216:22-25 (agreeing that the E&Y "forecasts are based on a series of assumptions").

[14]  Fourth Amended Disclosure Statement at 83 ("[T]hese estimates and assumptions may not be realized and are inherently subject to significant economic uncertainties and contingencies, many of which are beyond the City's control."); Ex. 6E, Malhotra Dep. at 200:21-201:5 (agreeing with this statement); Ex. 6D, Cline Dep. at 142:8-10 (agreeing that he was offering no "guarantee regarding the

Projections are dependent upon the successful implementation of the City's budget and the reliability of other estimates and assumptions accompanying the projections."[15]

14.    As the experts conceded in their depositions, there is no measure of reliability for the forecasting methods they employed:

> Q.    There's no set of standard sources or authorities that would tell you whether an analysis in the area of tax forecasting is scientifically reliable, correct?
>
> A.    To my knowledge, **there is no measure of reliability** before the fact of a tax revenue forecast.[16]

Rather, they agreed that their attempt to forecast revenues and expenses for 10 and 40 years is a fundamentally subjective undertaking:

> Q. Do you agree the financial modeling is a **subjective undertaking** that is affected by the assumptions made and the professional biases of analysts developing the model?
>
> A. **I would agree with that**.[17]

---

accuracy of [his] forecast); Ex. 6I, City of Detroit Ten-Year Financial Projections (July 2, 2014) (POA00706519) ("[t]here will usually be differences between forecasted and actual results because events and circumstances frequently do not occur as expected and those differences may be material").

[15] Fourth Amended Disclosure Statement at 82.  *See also* Ex. 6E, Malhotra Dep. at 200:6-14 (agreeing with this statement).

[16] Ex. 6D, Cline Dep. at 67:3-4 (emphasis added).

[17] Ex. 6F, Sallee Dep. at 292:12-16 (emphasis added).

Indeed, many of the assumptions underlying the forecasts conflict with the record and the City's affirmative disclosures and go well beyond the areas in which these experts are qualified to opine.

15. Moreover, the City's experts concede that they are unaware of any forecast that has attempted to project municipal revenues for as long as ten years.[18] And, already, in the few short months in which the projections have existed they have been updated multiple times.

16. Finally, while the City seeks to utilize the forecasts to demonstrate the amounts available to pay creditors, its experts acknowledge that they have not attempted to forecast all available revenues. For example, the forecasts assume constant tax rates over 10 and 40 years, despite the fact that tax rates have in fact changed in the last 10 years and the experts "can't identify any tax forecast that's ever assumed that the current tax rates will remain unchanged for a period as long as 10 years."[19] Likewise, they assume that there will be no significant asset sales,

---

[18] Ex. 6E, Malhotra Dep. at 95:12-15 (never done a "forecast for a city that's as long as 10 years"); Ex. 6D, Cline Dep. at 10:6-8 (acknowledging that he had never "done a tax forecast over a period of -- as long as ten years). *See also* Ex. 6D, Cline Dep. at 11:13-16 (agreeing that the "standard forecast length in Michigan and the accepted length for tax forecasting is either two or four years"); Ex. 6F, Sallee Dep. at 215:9-12 (never done a forecast for as long as ten years trying to forecast revenues for a city or other government entity).

[19] Ex. 6D, Cline Dep. at 85:8-15. *See also id.* at 80:22-24 (agreeing that he "can't know with certainty what the tax rate will be" even five years from now), 81:20-23

despite the fact that the City's disclosure statement itself specifically discusses such proposed sales and the City is in the process of exploring them.[20] Accordingly, as the experts concede, the projections do not "attempt[] to forecast revenues and expenses for the entire city."[21] Indeed, as the experts acknowledge, "there are a number of revenue sources we were not asked to forecast."[22]

## II.        The Court-Appointed Expert's Review

17. The Court-appointed expert, Marti Kopacz, made similar observations. While Ms. Kopacz reviewed the forecasts only for the admittedly narrow purpose of assessing the feasibility of the Plan of Adjustment,[23] did not

---

(agreeing that he had "no way to know whether current law is going to be changed with respect to tax rates within the next 10 years"), 83:5-15; Ex. 6G, Kopacz Dep. at 118:19-21 (agreeing that "[c]hanges to the tax law could certainly impact the forecast").

[20] Fourth Amended Disclosure Statement at 94 (the City has retained a specialist to "produce a report on the long-term value potential of the parking assets currently held by the City."); *id.* at 145 (the City's creditor proposal discussed "the City's intention to increase revenues to the City" through, among other things "its intention to potentially realize value from the DWSD," and "the commitment to evaluate what value may be realized from other City assets (e.g., City-owned real property; municipal parking operations; the Detroit-Windsor Tunnel; and Belle Isle Park).").

[21] Ex. 6E, Malhotra Dep. at 214:14-17 (agreeing that he has not "attempted to forecast revenues and expenses for the entire city).

[22] Ex. 6D, Cline Dep. at 300:7-17.

[23] Ex. 6J, Kopacz Report at 11, 20.

undertake a comprehensive review to ensure that the forecast were reliable,[24] and did not express an opinion as to whether the plan was in the best interests of creditors or "look to see if there was a way in which the City could generate more cash,"[25] she nonetheless noted many of the same limitations in the City's forecasts.

18.     Ms. Kopacz described the Ernst & Young forecasts as "convoluted" and "confusing"—i.e., a "black box"[26]—based on assumptions that were untested, and indeed untestable:

> Q. Did you say in your expert report that you found the City's model to be convoluted?
>
> A. And confusing.

---

[24] While Ms. Kopacz indicated in her report that the projections were "reasonable" for purposes of feasibility, as she further observed during her deposition, she was unable to ascertain the "reasonableness" of the vast majority of the assumptions underlying the City's forecasts and in her view was *not* a synonym for "reliable." Ex. 6G, Kopacz Dep. at 34:2-8. *See also id.* at 48:21-22 ("I didn't reach a conclusion about the quality of Ernst & Young's work."); *id.* at 178:2-11 (acknowledging that she "didn't have sufficient time to independently verify all of the data on which the forecasts are built in order to develop [her] own assumptions"); *id.* at 113:19-21 (observing that she had less than 90 days to perform her work); *id.* at 162:6-8 (she did not "consider or analyze what the biases of the City forecasters were"); *id.* at 174:22-175:19 (she did not know the experience of Robert Cline and his team when it comes to forecasting municipal revenues, Mr. Malhotra and his team when it came to forecasting municipal expenses, or Conway MacKenzie when it came to projecting the costs or revenues associated with a municipal restructuring).

[25] Ex. 6G, Kopacz Dep. at 100:10-13.

[26] Ex 6J, Kopacz Report at 26.

Q. Yeah. Did you also say convoluted?

A. Yes.[27]

19.     As she acknowledged, the City's forecasts were "highly subjective" and "subject to the biases of the person doing the forecast."[28]  At bottom, they are based  on a series of assumptions that the forecasters used "their judgment to determine" — a process that Ms. Kopacz candidly acknowledged "seems circular":

> Q. So those forecasts are principally the product of the judgments of the forecasters. Do you agree with that?
>
> A. I think so. Yes. The people who prepare the forecast, it seems circular. They prepare the forecast, they make the assumptions and the calculations, yes.
>
> Q. But the assumptions are ones that they use their judgment to determine, correct?
>
> A.  I believe that's correct, yes. [29]

As a result, Ms. Kopacz acknowledged that she could not, and did not, verify many of the assumptions in the Ernst & Young forecasts, and indeed acknowledged that many of the assumptions were simply untestable.[30]

---

[27] Ex. 6G, Kopacz Dep. at 181:17-21.  *See also id.* at 111:9-10 ("I, again, have been really critical of how confusing they are.").

[28] *Id.* at 160:15-21.  *See also* Ex. 6J, Kopacz Report at 15 (noting that the modeling Ernst & Young performed was "a highly subjective undertaking that is affected by the assumptions made and the professional biases of the analyst developing the model").

[29] Ex. 6G, Kopacz Dep. at 170:7-9.

20.     Ms. Kopacz further acknowledged that she had never seen any city "employ[] a methodology or an approach … like this one":

> Q. So we've talked a lot about -- we've talked about industry standards and -- but have you ever seen another city employ the approach for its forecasts that was employed here?
>
> A. No, because as we've established, I've never seen another city like this doing forecasts for a plan of adjustment.
>
> Q. True, but you have seen other cities doing forecasts, right?
>
> A. Budgetary forecasts, yes.
>
> Q. Yeah. Have you ever seen any of those cities employ a methodology or an approach, sorry, like this one?
>
> A. No. [31]

Likewise, she acknowledged that the projections "are not what we would typically expect to see as a set of projections for a plan of reorganization in a Chapter 11 case."[32]

21.     As she observed in her report, the City itself has not utilized the results of the Ernst & Young forecast in its triennial budget.[33]   Moreover, the

---

[30] Ex. 6G, Kopacz Dep. at 195:13-24 (there is "no way to test" the City's assumption that "the assessed value per parcel in the City of Detroit will fall by an additional 50 percent between -- over the next seven years"); *id.* at 200:23-201:8; *id.* at 290:20-23 (did not "test the assumption of a 4.8 percent renaissance zone increase"); *id.* at 291:20-24 (she "did not test the assumptions around the specific utility user tax revenue assumptions by the City forecasters").

[31] *Id.* at 182:14-17.

various forecasters involved did not "employ a uniform approach in constructing the forecasts."[34]

22.   In addition, Ms. Kopacz observed that, while the forecast is "in some respects, based on historical financial records," the City has a history of "troubled data systems with respect to the collection of financial records."[35]  To the extent that the forecasts are based on financial information after the fiscal year 2012 CAFR, she has not assessed whether the information is reliable, and indeed acknowledges that some of the information may be unreliable:

> Q. The negative implication of your question is that in between CAFRs, the City does not have reliable financial records, correct?
>
> A. They have ad hoc records.
>
> Q. They are definitely ad hoc.
>
> A. Yes.
>
> Q. Are they reliable?

---

[33]  Ex. 6J, Kopacz Report at 27 ("The projections in the POA have not been harmonized with the City's budget that was passed by the City Council on June 5, 2014.").

[34]  Ex. 6G, Kopacz Dep. at 180:10-13.  *See also* Ex. 6J, Kopacz Report at 15 n.11 (noting that there were "differences that can occur within a model built by the same firm" and that "[t]here were also differences in modeling approach used by Conway Mackenzie, Mr. Moore's Firm, and Ernst & Young, the City's other financial advisor").

[35] Ex. 6G, Kopacz Dep. at 102:6-9.

A. Some may be and some may not be.[36]

23.     Moreover, Ms. Kopacz confirmed that municipalities typically do not attempt to forecast revenues and expenses for periods as long as 10 or 40 years, that in terms of reliability generally "the longer period of time a forecast covers, the more variability you would expect as time goes on," and that she "doesn't know why those projections — those periods were chosen."[37]

24.     Finally, while Ms. Kopacz was focused on issues relating to feasibility — i.e., whether the City will have sufficient funds to run its operations without further default[38] — she nonetheless observed that the City's forecasts omitted significant revenue streams.[39] Thus, for example, she concluded in her report that

---

[36] *Id.* at 103:13-14. *See also id.* at 105:10-106:4 (acknowledging that "some information may be reliable and some may not be reliable")

[37] Ex. 6G, Kopacz Dep. at 54:13-14. *See also id.* at 128:22-129:9 (agreeing that she had never seen another municipality "do a comprehensive general fund forecast" over a period of 10 or 40 years).

[38] Ms. Kopacz defined the issue as follows in her report: "Is it likely that the City of Detroit after the confirmation of a plan of adjustment will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the plan without the significant probability of a default." Ex. 6J, Kopacz Report at 199.

[39] *Id.* at 193.

"there are *significant asset sales* that are not contemplated in the POA that could positively impact the projections."[40]

## LEGAL STANDARD

25.     Under Rule 702 and *Daubert*, federal courts must serve as "gatekeep[ers]" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The burden is on the proponent of the expert evidence to satisfy each of Rule 702's requirements.  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2000); *Daubert*, 509 U.S. at 592 n.10.  Among other things, the proponent of expert testimony must demonstrate that: (1) the proffered expert is "qualified by knowledge, skill, experience, training, or education" to offer the expert's opinions;  (2) the proffered testimony is relevant to the issues at hand; and (3) that the testimony is based on "sufficient facts," is "the product of reliable principles and methods," and that those methods have been reliably applied to the facts of the case.  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 594–95.

26.     Under Rule 702 and *Daubert*, an expert's opinions may not be based on "subjective belief or unsupported speculation."   509 U.S. at 590; *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).  In order to be admissible,

_____

[40] *Id*. at 197 (emphasis added).  *See also* Ex. 6G, Kopacz Dep. at 117:19-22 (noting that "potential asset sales" were not "in the plan forecasts as a potential source of revenue").

expert testimony must be based on "good grounds,' based on what is known." *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (E.D. Mich. 1995) (quoting *Daubert*, 509 U.S. at 590). Under Rule 702 and *Daubert*, the "court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). Rather, "the existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (affirming exclusion of economist's testimony regarding future earnings because it "relied on several empirical assumptions that were not supported by the record"); *see also Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) (unpublished) ("An expert's conclusions … must have an established factual basis and cannot be premised on mere suppositions.").

27. Likewise, in order to satisfy Rule 702's relevance requirement, an expert's opinions must be "sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at 591. Expert testimony is inadmissible where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

28. It is "critical" that an expert's analysis meet these requirements at "every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d

Cir. 2002). "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

## ARGUMENT

I.    **The City's Experts Concede That Their Methodology is Inherently Subjective And Untestable And That Critical Assumptions Upon Which Their Forecasts Are Based Are Unsupported And Outside Their Areas of Expertise.**

29.    As the City's experts concede, to the extent they employed any methodology at all in constructing their forecasts, it is fundamentally subjective and untestable. As Ms. Sallee acknowledged, the modelling Ernst & Young performed here is a "subjective undertaking that is affected by the assumptions made and the professional biases of analysis developing the model."[41] Likewise, as Dr. Cline acknowledged, while there are potential means of assessing reliability in the field of forecasting, "there is no measure of reliability before the fact of a tax revenue forecast" of the sort Ernst & Young performed.[42]

_____

[41] Ex. 6F, Sallee Dep. at 292:12-16.

[42] Ex. 6D, Cline Dep. at 67:3-4. *See also id.* at 73:23-74:4 (acknowledging that he was "offering no opinion on the reliability" of his forecast "over the next 10 years").

30.     This conclusion was confirmed by the Court's appointed expert, Ms. Kopacz, who agreed that the forecasts were "highly subjective"[43] and that the forecasts were based on assumptions that were "principally the product of the judgments of the forecasters."[44]   As a result, she agreed that there was "no way to test" certain of the assumptions the forecasters made.[45]

31.     It is just such subjective expert opinion, however, that is inadmissible under Rule 702 and *Daubert*.  *See Daubert*, 509 U.S. at 590 (expert testimony may not be based upon "subjective belief or unsupported speculation"); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (subjectivity and "lack of testing" are "red flags" under *Daubert* and Rule 702); *In re TMI Litig.*, 193 F.3d 613, 703 n.144 (3d Cir. 1999) (excluding expert's opinion based on "subjective" methodology, noting that "it is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology").

32.     Likewise, the ability to test and assess the reliability of expert opinion that a critical requirement of Rule 702: "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will

---

[43] *Id.* at 160:15-21; Ex. 6J, Kopacz Report at 15.

[44] Ex. 6G, Kopacz Dep. at 170:7-9.

[45] Ex. 6G, Kopacz Dep. at 195:13-24.

assist the trier of fact will be whether it can be (and has been) tested." 503 U.S. at 593. *See also Sumner v. Biomet, Inc.*, 434 F. App'x 834, 842 (11th Cir. 2011) (excluding expert opinion where, "according to [the expert's] own testimony, [his] theory is virtually incapable of being tested"); *Fariniarz v. Nike, Inc.*, 2002 WL 1968351, at *3 (S.D.N.Y. Aug. 23, 2002) (excluding expert where, "[a]ccording to [the expert's] own statements," his conclusions were "incapable of being tested or challenged," because "[t]his is precisely the type of evidence Rule 702 was intended to exclude.").

33. Here, the City's forecasters employed no discernible methodology. Instead, they merely employed a series of assumptions[46] based on their judgment that in many instances are speculative and unsupported and fall outside the experts' admitted areas of expertise. Indeed, as Dr. Cline candidly acknowledged, "[i]n a sense, ***the entire model is an assumption.***"[47] Yet, a number of these assumptions

---

[46] Ex. 6E, Malhotra Dep. at 216:22-25 (agreeing that the E&Y "forecasts are based on a series of assumptions"); *id.* at 73:23-74:2 (agreeing that "there are a number of assumptions in the . . . forecast"); Ex. 6D, Cline Dep. at 68:7-9 (agreeing that "there are numerous assumptions involved" in the models.); *id.* at 148:6-7 ("a wide range of assumptions" is incorporated into the model).

[47] Ex. 6D, Cline Dep. at 182:17 (emphasis added); *see also id.* at 233:3-4 ("the entire forecast is a forecast based upon assumptions.").

are directly contradicted by the conclusions of the City's own witnesses, who have gone so far as to label their own experts' forecasts "ridiculous."[48]

## A. Caroline Sallee

34. Caroline Sallee was charged with formulating the City's property tax and revenue sharing projections.[49] She projects that over the next ten years, half the taxable value of residential property in the City will be wiped out based on an assumption she made using her judgment regarding the outcome of a planned reappraisal that has not been started yet and which will not be completed for three to five years (i.e., by 2020).[50] As a threshold matter, Ms. Sallee concedes that she is not an expert in property assessment or real estate valuation.[51] She has not been trained in the "methods for assessing property" and has never done a real estate

---

[48] Ex. 6H, Evanko Dep. at 223:25-224:1; Ex. 6F, Sallee Dep. at 182:25-183:7.

[49] Ex. 6C, Sallee Report at 1.

[50] Ex. 6F, Sallee Dep. at 190:23-24 (in setting the taxable property value under a planned reappraisal study, "[t]he parameter I used was based on my judgment after the reappraisal study"); id. at 206:10-15 (agreeing that her assumption of a 15% decline after the future reappraisal study "would bring residential taxable value to approximately half of its fiscal 2013 level").

[51] Ex. 6F, Sallee Dep. at 11:1-12:1 ("I'm not an expert on property assessment"; acknowledging that she is "[n]ot an expert on real estate valuation" and had "[n]ever done a real estate valuation before"; acknowledging that she was not holding herself out as an "expert in real estate in general").

valuation or property assessment before.[52]  Nor has she ever forecasted the total amount of property tax revenue for a city before the present matter.[53]  Nonetheless, she proceeds to wipe out much of the City's property tax revenues based on her judgment about future taxable value — an opinion outside her area of expertise and a clear violation of Rule 702 and *Daubert*.  *See, e.g., Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (under Rule 702 an expert must have "those qualifications provide a foundation for a witness to answer a specific question"); *Peak v. Kubota Tractor Corp.*, 924 F. Supp. 2d 822, 829 (E.D. Mich. 2013) (expert opinion is inadmissible where "the expert's training and qualifications" do not "relate to the subject matter of his proposed testimony").

35.    Moreover, she concedes that her uninformed judgment is "inconsistent with" that of the City's own assessor and that of Wayne County.  As she acknowledges, the City's assessor, Mr. Evanko testified that he does not know if property values will decrease *or increase* after the future assessment, and indeed that "[n]obody knows for certain" what effect the reappraisal study will have.[54]  As

---

[52] Ex. 6F, Sallee Dep. at 83:12-13 ("I have not been trained to assess property").

[53] Ex. 6F, Sallee Dep. at 24:16-20.  *See also id.* at 25:24-26:2 (acknowledging this was the first time she had forecasted taxable value for a city).

[54] Ex. 6F, Sallee Dep. at 188:14-15 ("It says here, yeah, [Evanko] does not know how the reappraisal study will come out, correct."); *id.* at 188:16-20. ("Nobody knows for certain" what effect on property values and assessments the reappraisal study will have).

Mr. Evanko explained, he did not know where assessments would "come out next year," much less in 2020, which he characterized as "a life time":

> Q.   Okay.  So take a look at number 6, lowered residential taxable value in fiscal year 2020 due to city-wide planned reappraisal study.  Okay, so let's make clear, you never discussed the impact of the city-wide planned reappraisal study with Ernst & Young, correct?
>
> A.  Correct.
>
> Q.  And you could not have given them an estimate of how much to reduce taxable value based on the study because you yourself don't know which way it's going to come out, correct?
>
> A.  *I don't know where -- how it's going to come out next year. 2020 is a lifetime.*[55]

36.     It is hard to conceive how an expert tasked with determining the taxable value of a city's future tax base could fail to discuss the matter with the City's most senior property tax assessor.  But that is precisely what Ms. Sallee did.

37.     Likewise, as Ms. Sallee acknowledges, her "opinion is different" from that of Wayne County, which has always assigned Detroit an equalization value of

---

[55] Ex. 6H, Evanko Dep. at 224:15-16 (emphasis added).  *See also id.* at 224:21-25 (it is "[a]bsolutely correct" that Evanko did not "tell [E&Y] this is about what it's going to look like when the reappraisal study is done"); *id.* at 225:1-6 (agreeing that he does not "have a feel for whether it's going to go up or down" and that this was "partly why [he was] doing the mass reappraisal.").

1.0, indicating that it has determined that property in the City is **not** systematically under-assessed.[56]

38.     Such expert opinion based on assumptions that are unsupported — and indeed contradicted by — the record evidence is inadmissible under Rule 702 and *Daubert*. *See, e.g., McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."); *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (affirming exclusion of expert opinion that was "not only unsupported by reliable testing, but [was] contradicted" by other evidence); *Elcock*, 233 F.3d at 756 (finding it an abuse of discretion to admit an expert economic damages opinion that relied on assumptions about plaintiff's earnings and extent of disability that were contradicted by the record); *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 143 (4th Cir. 1994) (finding abuse of discretion in admitting expert opinion that "was based on a faulty assumption that is unsupported by evidence," because "[e]xpert evidence based on assumptions not supported by the record should be excluded."); *Rose v. Truck Centers, Inc.*, 611 F.

---

[56] Ex. 6F, Sallee Dep. at 89:24-90:3 (over the last ten years, Detroit has always "received a factor of 1" from Wayne County, which "means that the county believes property has not systematically been over or underassessed"); *id.* at 96:23-97:11 (acknowledging her "opinion is different" than that of Wayne county and that she has "come up with [her] own opinion that it's overassessed").

Supp. 2d 745, 751 (N.D. Ohio 2009) ("Assumptions must be supported by evidence in the factual record.").

39.    Moreover, Ms. Sallee's exercise of her judgment to wipe out property tax revenues in the City is completely uninformed.  She acknowledges that she does not know who will conduct the reappraisal or what methodology they will use (the City has not yet retained any outside consultant).[57]  Nor does she even know what the current assessment methodology is.[58]  "I don't know what the city assessor's office was doing to assess property.  I don't know."[59]  Such unsupported expert opinion is inadmissible.  *See Sommer v. Davis*, 317 F.3d 686, 695 (6th Cir. 2003) (affirming exclusion of expert testimony when expert acknowledged he did not possess knowledge supporting his proffered opinions).

40.    Finally, her assumption that this massive reduction in property tax revenue will occur is contrary not only to the assessment by City and county

---

[57] Ex. 6F, Sallee Dep. at 97:19-24 (acknowledging she does not know "what reassessment methodology the . . . contractor who is doing the reassessment is going to employ," admitting "I do not know specifically what they're going to do.").

[58] Ex. 6F, Sallee Dep. at 48:3-10, 96:25-97:1 ("I don't know specifically what they looked at in determining the equalization factor."), 211:6 (when asked what factors were taken into account in assessing property in the City, she acknowledged "I don't know what they are actually using").

[59] Ex. 6F, Sallee Dep. at 483-10.  Nor can she explain the methodology the City uses in collecting property taxes or setting property tax rates.  *Id.*

officials, but also the very data she has reviewed. As she acknowledges, assessed property tax values should improve with an improving economy as well as with home prices.[60] And, as she further acknowledges, recent data show that housing prices in Detroit "went up 42.13 percent in 2014 so far compared with the prior year."[61] This is the highest increase that has ever occurred in the history of this data that Ms. Sallee observed (dating back to 2001).[62]

41.     Ms. Sallee's projected collapse of property tax revenues stands in stark contrast to this recent data as well as the City's projections regarding other tax revenues, which assume a modest (and grossly understated) increase based on the improving economy. While Dr. Cline has projected modestly increasing income tax, wagering and utility user tax revenues — even assuming near-zero

---

[60] Ex. 6F, Sallee Dep. at 191:16-19 ("So this scenario does say that if the economy in Detroit improves, we would see improvement to taxable values in the city. We would see improved property tax revenue."); *id.* at 69:25-70:2 ("So in our model, if there is greater economic activity, we have better property tax revenues.").

[61] Ex. 6F, Sallee Dep. at 289:10-16 (Detroit realtor data). Likewise, the Case-Shiller index, which Ms. Sallee acknowledged is "viewed as a reputable source of trends in house prices" by "widely respected economists" (*id.* at 115:12-23), shows that "Detroit's home prices . . . have increased more than other cities in the benchmark index over the one and three-year and five-year periods" (*id.* at 139:3-7). *See also* Ex. 6F, Sallee Dep. at 11822-119:2 (acknowledging reports that Detroit is "the seventh most highest [city] in terms of housing price growth"); *id.* at 134:25-135:4 (agreeing that "the Case-Shiller Detroit Home Price Index" shows that "the housing prices have been increasing in Detroit over the last two years").

[62] Ex. 6F, Sallee Dep. at 290:23-291:2.

employment growth, zero or negative real wage growth, and a declining population,[63] Ms. Sallee predicts that there will be a massive collapse in property tax revenue during the period based on her unsupported assumption that is contrary to judgment of City and county officials and which is based on no expertise whatsoever.

42.     Indeed, Ms. Sallee's analysis is based entirely on such assumptions based on her judgment (even where such judgment is contrary to actual data and outside her area of expertise).  As she acknowledged, in general: "I've used my judgment in selecting the assumptions."[64]  Thus, for example, Ms. Sallee testified that she selected growth rates for various classes of property based on her judgment and then varied them year to year — again, based on her judgment:

> Q.  Did you pick the growth rates for real and personal property based on your judgment?
>
> A.  So ultimately I selected those growth rates based on my judgment.
>
> Q.  And do those growth rates also vary over year for each class of property.
>
> A.  They change year to year, yes.

---

[63] Ex. 6A, Cline Report at 10-11, 22-23, 25.

[64] Ex. 6F, Sallee Dep. at 65:22-23.  *See also, e.g., id.* at 203:19-20 (in assuming a reduction in residential taxable value of -2 to -4% per year in 2016-20, "I used my judgment to select those rates."); *id.* at 223:1-6 (assumed that personal property tax legislation had a 50% chance of passing because "some people are for it.  Some people are against it.  So 50/50 seemed reasonable").

> Q. And you used your judgment to decide how the growth rates for each class of property should change year to year; is that correct?
>
> A. I used my judgment to see how they would change year to year, yes.[65]

Such "'*ipse dixit* of the expert' alone is not sufficient to permit admission of an opinion." *Tamraz*, 620 F.3d at 671. Opinions based on an expert's "subjective judgment" are prohibited under Rule 702 and *Daubert*. *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (affirming district court's exclusion of expert who based opinions on his "subjective judgments"); *see also Lake Michigan Contractors, Inc. v. Manitowoc Co., Inc.*, 225 F. Supp. 2d 791, 800 (W.D. Mich. 2002) (excluding expert opinion that there was a 50% loss of efficiency because he did not "explain how he arrived at the 50% figure, as opposed to, say 45% or 65%," and thus there was "no way to test his opinion through cross-examination.").

43. Ms. Sallee's revenue sharing projections suffer from similar flaws. As Ms. Sallee (and the City) acknowledge, Detroit and indeed all cities in the State have experienced a "significant" reduction in revenue sharing from the State of Michigan, which has cut expenditures to cities even as the State runs budget

---

[65] Ex. 6F, Sallee Dep. at 159:6-17. *See also id.* at 256:24-25 ("Ultimately all of the numbers, the growth rates, I had to select.").

surpluses.[66]   In the last few years before the bankruptcy filing, State aid was reduced in excess of $200 million[67] and independent entities calculate that the City has lost more than $700 million over the last decade due to the State's failure to fully fund the revenue sharing program.[68]   As a result, there are multiple cities in Michigan that are experiencing fiscal distress and are under emergency management.[69]   Ms. Sallee assumes that these massive cuts will remain in place at a fixed rate for 10, and even 40 years,[70] even though she acknowledges that statutory revenue sharing (EVIP) is "very variable," that it "is a discretionary

---

[66] *See* Fourth Amended Disclosure Statement at 113 (noting there have been "significant cuts by the State"); Ex. 6F, Sallee Dep. at 14:12-13 ("I understand that Michigan revenue sharing has gone down."); *id.* at 303:10-13 (in the last two years, the State's "revenues exceeded their planned budgeted expenses, so they were running a surplus in that sense."); Ex. 6J, Kopacz Report at 52 ("The City of Detroit recently saw its portion of State's revenue sharing decrease significantly, from a combined annual total of $267 million in FY 2009 to as low as $173 million in FY 2012.").

[67] Ex. 6E, Malhotra Dep. at 250:9-10.

[68] Ex. 6M, Michigan Municipal League, The Great Revenue Sharing Heist (Feb. 2014) ("In Detroit, a city facing the largest municipal bankruptcy in history, the state took over $700 million to balance the state's books."); How Michigan's Revenue Sharing "raid" Cost Communities Billions for Local Services, MLive.com (Mar. 30, 2014) ("Detroit, which filed for bankruptcy protection last year, missed out on $732 million [in State revenue sharing] between 2003 and 2013.") (Syncora Ex. 4462).

[69] Ex. 6F, Sallee Dep. at 53:11-16.

[70] Ex. 6F, Sallee Dep. at 236:8-16.

political decision by the legislature," and "[w]e don't know what's going to happen to EVIP."[71]  Indeed, in the months her forecast has been in existence, she already has been forced to increase her projections by $35-40 million dollars after the legislature approved an increase in statutory revenue sharing for fiscal year 2015.[72]  Moreover, she has assumed this fixed rate over the next 10 and 40 years even though she knows from conversations with State officials that it is likely that the current statutory framework for State revenue sharing will be repealed in the next year.[73]

44.    Finally, Ms. Sallee assumes that personal property tax revenues will dramatically decrease as a result of an initiative that was in the process of being submitted to popular vote when she filed her report (and has subsequently passed), which would implement certain property tax exemptions.  She projects a 10% decrease in personal property tax revenues, again based on her judgment of the

---

[71] Ex. 6F, Sallee Dep. at 49:14-18, 240:17-18, 307:8.

[72] *Compare* Ex. 6C, Sallee Report *with* Projections Accompanying Fourth Amended Plan of Reorganization.  Ex. 6F, Sallee Dep. at 238:22-239:20 ("we incorporated fiscal year 2015 once it had been passed," and the EVIP payment to Detroit "went up by almost 4 million" between 2014-2015, which caused her to revise her projections for subsequent years "[s]omewhere between 35, 40 million").

[73] Ex. 6F, Sallee Dep. at 306:20-307:3 (reporting that in her conversation with him, Jim Stansell at the House Fiscal Agency was "pretty pessimistic about EVIP, thinks it's going to be eliminated next year").

effect of the exemption and her determination that there is a 50/50 chance that this new initiative will pass.[74]  However, when shown this projection, the City's Chief Assessor Mr. Evanko, characterized it as "ridiculous":

> Q.  Are you don't recall discussing .5, reduction of 10 percent in collections in fiscal year 2015 due to loss of revenue from the small business personal property tax exemption?
>
> A.  Not only do I not -- I do not recall, but **this is a ridiculous estimate**.  I knew in December of 2013 that the small business personal property tax exemption would affect the City's tax base by approximately 0.7 of 1 percent, not 10 percent.[75]

As Ms. Sallee subsequently acknowledged in her deposition, the proposed measure has "several different" mechanisms to reimburse localities for lost revenue from the proposed exemptions, including new taxes.[76]  And, as she further acknowledged, she has no idea now these reimbursement mechanisms will be implemented: "Nobody really knows how all this is going to work, so I don't know how they're going to do that."[77]

## B.    Robert Cline

45.    Dr. Cline performed the projections for City income, wagering, corporate, and utility user tax revenues.  He based his analysis on his assumptions,

---

[74] Ex. 6C, Sallee Report at 8.

[75] Ex. 6H, Evanko Dep. at 223:21-224:4 (emphasis added).

[76] Ex. 6F, Sallee Dep. at 329:23-330:9.

[77] Ex. 6F, Sallee Dep. at 330:17-19.

which in turn are based on his experience.[78]   But, much like Ms. Sallee, he

acknowledges that he has never done tax forecasting for a city (with the possible

exception of some work he did for Cincinnati)[79] and has never done forecasting at

all in areas specifically covered by his analysis, such as forecasting wagering

taxes,[80] municipal wage and employment growth rates,[81] and municipal population

levels.[82]

46.     Nor did Dr. Cline do any independent testing or verification of much

of the material he was provided by third parties.  When he began his work on the

Detroit matter in the Spring of 2013, a model was already in place — he does not

know specifically who created it.[83]   In preparing his forecast, he relied on

---

[78] Ex. 6D, Cline Dep. at 47:24-48:2 ("The methodology we used in constructing the forecasting model is based upon my experience as a revenue forecaster").

[79] Ex. 6D, Cline Dep. at 8:24 ("I have not done forecasting for a city."); *id.* at 21:14-17 (never before forecasted income tax rates or corporate tax rates for a city); *id.* at 191:2-7 (agreeing that he does not have any prior "experience doing revenue forecasting for a [c]ity" nor "economic forecasting for Detroit" specifically").

[80] Ex. 6D, Cline Dep. at 9:14-16.

[81] Ex. 6D, Cline Dep. at 21:5-10.

[82] Ex. 6D, Cline Dep. at 20:6-8.

[83] Ex. 6D, Cline Dep. at 12:3-5, 50:18-20 ("We got that information from the EY team in Detroit.  I'm not sure who put that model together initially.").  Ms. Sallee offered similar testimony regarding the property tax model.  Ex. 6F, Sallee Dep. at

information provided by the City but did not do "any independent analysis or testing to verify the accuracy of the information" he was provided.[84]  Nor is he in a position "to comment on the expertise" of the individuals he relied on for the information,[85] and indeed cannot identify any of the officials in the City of Detroit who have involvement with taxes.[86]

47.    While Dr. Cline purports to forecast revenues under a restructuring scenario, he acknowledges that he does not have "any understanding" of what activities the City is planning to undertake in restructuring (or in the baseline scenario, for that matter):

> Q. Do you have any understanding of what activities the City will or will not perform in the restructuring scenario?
>
> A. I do not know the specifics of any alternatives.[87]

While he was charged with forecasting the economic effects in a restructuring scenario, he does not know how the money will be spent.[88]

---

46:12-15 (noting that there was a "model in place for property taxes" when she started and she did not know who created it).

[84] Ex. 6D, Cline Dep. at 28:2-5.

[85] Ex. 6D, Cline Dep. at 59:6-9.

[86] Ex. 6D, Cline Dep. at 109:8-10.

[87] Ex. 6D, Cline Dep. at 94:3-7.  *See also id.* at 93:23-94:7.

[88] *Id.*

48.    Moreover, while Dr. Cline acknowledged that "anything that affects the private sector economy would in theory have an influence on [his] tax forecast,"[89] his testimony at the hearing made clear that he was unaware of basic events that could significantly contribute to the City's economy, such as the federal government's recent $300 million grant to the City, JPMorgan's $100 million commitment to support and accelerate Detroit's economic recovery, the M1 rail project, and the construction of a new bridge between Detroit and Canada.[90]

49.    As was demonstrated during his testimony before the Court, his opinions fail for several reasons.  His forecasts of near-zero population growth, near-zero employment growth, and near-zero (or negative) wage growth are based on *no* methodology — much less a *reliable* methodology — as required by Rule 702 and *Daubert*.

50.    *First*, Dr. Cline acknowledges that key assumptions in his forecast are completely unsupported by any data.  Most fundamentally, he was not aware of any "scientific literature or data" that would tell him the effects on revenues from the City's restructuring or reinvestment proposals:

> Q. And do you agree that there's no scientific literature
> or data available that quantifies any increase in tax

---

[89] Ex. 6D, Cline Dep. at 177:25-178:8

[90] 8/18/14 Hearing.

revenue or revenue in general from restructuring or reinvestment proposals by the City?

A. I am not familiar with any analysis related to Detroit's current situation that directly links spending initiatives to specific revenue changes -- tax changes, which is what we looked at, just the tax changes.[91]

51.     While Dr. Cline claims that there is some sort of "structural" problem in Detroit that leads to this delayed recovery, he acknowledges that he in fact does not know the cause of the delay and cannot identify anyone else who is hypothesizing such a relationship.[92]  Likewise, while he assumes that this delay will be removed as a result of restructuring, he acknowledges that he has no study or data that shows that this is the case.[93]

52.     Again, much like Ms. Sallee, he varied this so-called cyclical adjustment over time, by simply "assuming" the numbers:

Q.  Okay.  So you had to assume what the numbers would be in terms of the cyclical adjustment over the timer period you examined, correct?

A.  We had no choice because the time series was too short to do a mathematical equation or a regression equation to estimate that relationship.

---

[91] Ex. 6D, Cline Dep. at 143:20-144:3

[92] Ex. 6D, Cline Dep. at 211:3-214:15.

[93] Ex. 6D, Cline Dep. at 208:17-209:4 (agreeing that he could not "identify any studies showing a reinvestment and restructuring initiative like Detroit's proposing will impact the rate of recovery"); *id.* at 226:4-9 ("You're correct that I do not know of any study that deals specifically with this issue.").

Q.  And is that also true of the initial cyclical adjustment of minus .7 percent that you had to assume that?

A.  That is correct.[94]

53.    Likewise, he acknowledged that there was "no body of data"  that "tells you what the assumed rate of population decline is in the restructuring scenario" or "any studies that would have given us insight into this issue":

> Q. There's no body of data, though, that tells you what the assumed rate of population decline is in the restructuring scenario as compared to the baseline scenario, correct?
>
> A. There's no body of literature that I know of that deals with the forecast for the situation that Detroit faces, so I'm not aware of any studies that would have given us insight into this issue.[95]

Again, Dr. Cline simply picked some numbers.  He similarly "assumed" the growth rate for the corporate income tax revenues he used because he did not "know of any analyses or study that could have helped us determine what that specific rate is."[96]

54.    Expert opinions based on such unsupported assumptions are inadmissible under Rule 702 and *Daubert*.  "The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion."  *See, e.g., Tamraz*, 620 F.3d

---

[94] Ex. 6D, Cline Dep. at 253:11-20.

[95] Ex. 6D, Cline Dep. at 262:8-15.

[96] Ex. 6D, Cline Dep. at 262:21-263:14.

at 671. Nor may an expert use "hypothesized 'guesstimations' in selecting "important variables" for his model. *See Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958 (M.D. Tenn. 2002) (excluding expert's computer model on the ground that it "was not based on sufficient facts and data"); *Lake Michigan Contractors, Inc. v. Manitowoc Co., Inc.*, 225 F. Supp. 2d 791, 800 (W.D. Mich. 2002) (excluding expert opinion that there was a 50% loss of efficiency did not "explain how he arrived at the 50% figure, as opposed to, say 45% or 65%," and thus there was thus "no way to test his opinion through cross-examination.").[97]

55.    *Second*, even where Dr. Cline did consider any data, he did so arbitrarily and in a manner that biased the results to support his projection of near-zero employment growth, zero or negative real wage growth, and a declining population. For example, while he underscored that it it is important to use the "most recent, actual information" in conducting a forecast,[98] in two of the three analyses he presented to the Court he inexplicably omitted data from 2013 and 2014,[99] which he acknowledged was readily available on the federal government's

---

[97] For example, when asked why the value for Detroit's employment growth rate was set to "minus .5 as opposed to minus .4 or some other value," much like the expert in *Lake Michigan Contractors*, Dr. Cline responded that "[t]hat was our assumption about . . . the time it would take before the private sector started to respond." Ex. 6D, Cline Dep. at 231:17-20, 232:19-24.

[98] Ex. 6D, Cline Dep. at 63:7-13.

[99] Ex. 6N, City Exhibits 546 & 547.

website — data that he acknowledged showed that employment ***has increased*** in Detroit throughout 2014.[100]  Such cherry-picking of the available data renders an expert's opinions unreliable under Rule 702 and *Daubert*.  *See Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) (the fact that the expert "all but 'cherry picked' the data he wanted to use . . . provid[es] the court with another strong reason to conclude that the witness utilized an unreliable methodology.").

56.    Likewise, Dr. Cline arbitrarily selected one of three population scenarios from the Southeast Michigan Council of Governments (SEMCOG) to serve as the basis for his population analysis, all of which used an unknown methodology[101] and which he acknowledged were "not on the same solid basis" as other numbers he had available to him.[102]  He then altered those numbers using arbitrarily selected rates based on no data, to arrive at population estimates in a restructuring scenario that were *less* than estimates in one of the SEMCOG scenarios he rejected in the *absence* of any restructuring efforts.[103]  Not only were these population projections completely arbitrary, but because he had no idea what

---

[100] 8/18/14 Hearing.

[101] Ex. 6D, Cline Dep. at 226:10-15.

[102] Ex. 6D, Cline Dep. at 260:2-10.

[103] Ex. 6D, Cline Dep. at 226:16-19, 226:20-227:22.

methodology SEMCOG used, Dr. Cline could not check their accuracy or reliability.[104]

57. *Finally*, much like Ms. Sallee, Dr. Cline's assumptions are frequently at odds with determinations made by the City. Dr. Cline acknowledged, for example, that "at the end of the day," the assumed wagering "growth rate that [he] used is a number that [he] just picked,"[105] which is lower than the forecasted growth rate used in the City's own consensus revenue forecasts.[106] Dr. Cline picked a lower number based on the hypothesized effects of competition from casinos in Toledo, Ohio (which the consensus revenue forecasts also took into account),[107] but he acknowledges that he is not an expert on casinos or wagering revenue (and has never done a wagering tax forecast).[108] Forecasting the effects of competition in the gaming industry is simply outside his area of expertise.

---

[104] *See* Ex. 6D, Cline Dep. at 226:10-15; 8/18/14 Hearing.

[105] Ex. 6D, Cline Dep. at 171:22-25. *See also id.* at 169:24-170:6 ("I was responsible for that assumption").

[106] Ex. 6D, Cline Dep. at 166:23-167:2, 167:14-17 (acknowledging that "the Detroit consensus forecast has a higher wagering tax revenue growth figure" and that "the consensus forecast notes that there's expected to be a turnaround in wagering tax revenue in fiscal year 2016").

[107] *See* Ex. 6D, Cline Dep. at 170:16-171:21.

[108] Ex. 6D, Cline Dep. at 8:4-9:16. *See also id.* at 270:7-9 (he has never done "any study of casino competition").

## C.    Guarav Malhotra

58.    Mr. Malhotra, who acknowledges that he is not an expert on tax forecasting or other matters covered by the City's projections,[109] took the projections created by Ms. Sallee, Dr. Cline, Conway MacKenzie, Milliman and others and assembled those along with his own projections of City expenditures.[110] Mr. Malhotra did not cite any literature supporting his methodology.[111]  And like the other E&Y forecasters, he had no experience doing forecasting of revenues and expenses for a municipality before his retention on the Detroit matter.[112]  Nor did he cite any literature supporting his methodology.[113]

---

[109] Ex. 6E, Malhotra Dep. at 12:17-13:20.  *See also id.* at 158:20-22 (never "published any publications on forecasting").

[110] *See* Ex. 6E, Malhotra Dep. at 20:24-21:4.

[111] Ex. 6E, Malhotra Dep. at 79:15-19 (unable to identify a single article containing methodology employed in Detroit's forecast); *id.* at 158:2-22 (stating that expert report contains no literature supporting methodology).

[112] Ex. 6E, Malhotra Dep. at 17:15-18 (agreeing that "before [his] work for the City of Detroit, [he] had never done forecasting for a city specifically"); *id.* at 80:8-11 ("Q:  But for an actual city, municipality, you've never done a forecast before Detroit's; correct?  A.  For a city, that is correct.").  While he did some forecasting work for the Detroit Public Schools, he had not done forecasting for a municipality.  *See id.* at 80:12-20.

[113] Ex. 6E, Malhotra Dep. at 79:15-19 (unable to identify a single article containing methodology employed in Detroit's forecast); *id.* at 158:2-22 (stating that expert report contains no literature supporting methodology).

59.     Mr. Malhotra bases his own forecasts on "extrapolations based on historical trends,"[114] which in turn were based on only "three or four years of historical data,"[115] after which he would "go with the average value or **some other value** based on conversations with people at the City."[116]   In addition, the data itself — upon which he did or did not base his assumed values depending on what the City told him to do — is from a system that is dysfunctional and has been the subject of multiple adverse audit findings.[117]   "[E]ven where an expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible."  *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (excluding proffered expert's regression analysis).

60.     Moreover, in forecasting City expenditures, Mr. Malhotra utilized assumptions that were inconsistent with the other Ernst & Young forecasters.  For example, while Dr. Cline utilized a 1% wage growth rate, Mr. Malhotra utilized a 2% wage growth rate throughout the forecast period (a 100% increase over Dr. Cline's growth rate), which significantly increased projected labor costs, one of the

---

[114] Ex. 6E, Malhotra Dep. at 217:22-218:3.

[115] Ex. 6E, Malhotra Dep. at 218:25-219:5.

[116] Ex. 6E, Malhotra Dep. at 222:15-223:6 (emphasis added).

[117] *See* Ex. 6O, KPMG, Independent Auditors' Report 3 (2012).

most significant costs for the City. As Mr. Malhotra acknowledged, because wages and benefits comprise the "largest portion of the City's budget," such assumptions regarding wage growth can "have an important and material impact" on the financial projections.[118]

61.     More generally, Mr. Malhotra was unaware of any studies or data supporting the general assumption of Ernst & Young's forecast—i.e., the effects that the investment of more than a billion dollars in restructuring and reinvestment initiatives would lead to changes in revenues.[119]   Nor was he aware of any scientific study suggesting that any part of the restructuring or reinvestment initiatives would increase the City's population (may making the City more attractive or otherwise).[120]

*     *     *

62.     In sum, all three experts' opinions are based on a series of unsupported assumptions, which are contradicted by the City and/or are outside their area of expertise.  Such "subjective belief or unsupported speculation" is

---

[118] Ex. 6E, Malhotra Dep. at 236:24-237:6.

[119] Ex. 6E, Malhotra Dep. at 202:2-13 (agreeing that he could not cite any "scientific literature or data quantifying any increase in municipal revenue as a result of a restructuring or reinvestment effort like Detroit's").

[120] *Id.* at 203:7-16 (agreeing that he was not aware of any "study showing that any part of the restructuring and reinvestment proposal Detroit is making is associated with an increase in population").

inadmissible under Rule 702 and *Daubert*. 509 U.S. at 590; *Tamraz*, 620 F.3d at 670. "Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record." *Rose*, 388 F. App'x at 535 (internal citation omitted). The opinions of the City's experts fail to meet these requirements. *See also, e.g., Elcock*, 233 F.3d at 756 (affirming exclusion of economist's testimony regarding future earnings because it "relied on several empirical assumptions that were not supported by the record"); *see also Rose*, 388 F. App'x at 535 ("An expert's conclusions … must have an established factual basis and cannot be premised on mere suppositions.").

## II. The City's Attempt To Project Revenues And Expenses Over 10 And 40 Years During A Complex Restructuring Is Unprecedented And Unreliable.

63. Compounding these problems is the fact that the City's experts are engaged in an unprecedented attempt to project municipal revenues over 10 and 40 years during a complex restructuring of City services. The City's experts acknowledge that the projections they attempt to perform here are unprecedented. They are unaware of anyone attempting to forecast revenues and expenses for a municipality for a period as long as ten years, much less forty.[121] Neither the City

---

[121] *See, e.g.,* Ex. 6F, Sallee Dep. at 73:10-13 (acknowledging she had not "seen any other forecast" comparable to Ernst & Young's "that's been done for Detroit over a 10-year period").

nor its experts have ever performed a forecast of such a length.[122]   The City of Detroit historically has only attempted to forecast revenues and expenses for a period of one year and currently is forecasting for a period of three years.[123]   Such uncharted expert opinions made it incumbent upon the experts to employ a rigorous methodology to ensure that  their expert opinions "rest[] on a reliable foundation."  509 U.S. at 597.  However, the testimony of the City's own experts demonstrates that they do not.

64.    As the City and its experts recognize in the Disclosure Statement and Projections, numerous factors could change in the next 10 or 40 years that may materially impact the experts' forecasts.[124]   As they acknowledge, the longer the

---

[122] *See* Ex. 6E, Malhotra Dep. 41:5-41:10, 79:20-24; Ex. 6F, Sallee Dep. at 214: 9-12 (stating that she had never performed a revenue forecast for a municipality for a ten-year time period); Ex. 6E, Malhotra Dep. 156:11-24.   Before the current projection, the longest period that Ernst & Young had attempted to forecast Detroit's revenues and expenses was for a period of five years.  *Id*. at 65:3-8.   *See also* Ex. 6D, Cline Dep. at 11:3-6 (Cline could not remember "any forecasts [he] ever did that was longer than six years").

[123] *See* Ex. 6D, Cline Dep. at 45:21-22 (not aware of "any studies of forecasting tax revenues beyond" three years); *id.* at 46:4-7 (agreeing that he was "not aware of any forecasts for the City of Detroit going out more than three years, whether conducted by the City or any other party"); Ex. 6E, Malhotra Dep. at 41:19-22 ("the City generally does one-year budgets and now has started--is going to start doing three-year budgets."); *id.* at 40:7-41:18, 98:15-49.

[124] Ex. 6I, City of Detroit Ten-Year Financial Projections Statement (July 2, 2014) (POA00706519); Fourth Amended Disclosure at 83.

forecast, the less certainty there is in the forecast.[125]  As Dr. Cline acknowledged, for example, "I don't believe there's anyone that would have predicted 10 years ago what Detroit looks like today."[126]

65.     The testimony of the City's experts makes clear, however, that they failed to employ any methodology that would allow them to reliably forecast City's revenues and expenses over such an extended period.  They acknowledged, for example, that they have not investigated how other municipalities conduct forecasts or, to the extent there have been attempts to conduct such long-term forecasts in other Chapter 9 proceedings (if there have been such attempts), how they have been modeled.[127]  As a result, as Mr. Malhotra conceded in his deposition, the methodology they employed (to the extent they employed any discernible methodology at all) left them to simply *speculate* regarding what actions the City's leaders might take over the next 10 years that could impact the City's revenues and expenditures:

---

[125] Ex. 6E, Malhotra Dep. at 77:14-20 ("Q: Would it be fair to say that the longer the forecast, the less reliable the forecast?  A: It depends on specific line items and assumptions.  But the further you get out there, the -- there is more uncertainty whether each one of those assumptions will play out the way they are in the forecast.").

[126] Ex. 6D, Cline Dep. at 258:11-259:3.

Q: It would require you to speculate to determine what policy choices Detroit's future leaders will make during the next 10 years; correct?

A: That's right. ***It would be speculating*** on that point.[128]

Likewise, Dr. Cline testified that he would not even call the 40-year projection Ernst & Young created a "forecast of what is expected to happen," but rather it is more accurately described as a "simulation."[129]

66. It is just such "unsupported speculation," however, that Rule 702 and *Daubert* prohibit. *See* 509 U.S. at 590; *see also Cole v. Homier Distrib. Co., Inc.*, 599 F.3d 856, 866-67 (8th Cir. 2010) (affirming exclusion of expert witness's twenty-year forecast of plaintiffs' financial damages as too speculative, in part because "[t]here are simply too many future uncertainties"); *Tamraz*, 620 F.3d at 672 ("no matter how good experts' credentials may be, they are not permitted to speculate." ); *Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) ("the cases are legion that assert that expert testimony is inadmissible when it is based on speculative assumptions.") (citations omitted).

---

[128] Ex. 6E, Malhotra Dep. at 83:17-22 (emphasis added).

[129] Ex. 6A, Cline Report at 12 ("The 40-year tax forecast should be considered a simulation of what would happen under the assumed growth rates, not a forecast of what is expected to happen."); Ex. 6D, Cline Dep. at 244:11-16 ("Going out beyond the first 10, we don't have the actuals as our foundation, and we have moved into a period of time which is outside of anyone's economic forecasting model that I'm familiar with. Therefore, I think it is accurate to characterize that more as a simulation based upon those assumptions.").

67.    Indeed, even in the comparatively short time it has been in existence, the model has changed significantly — multiple times.  For example, after the Legislature approved the most recent budget, the experts concluded that their forecast for State revenue sharing was understated by tens of millions of dollars.[130] Likewise, the City unilaterally decided to reduce blight reduction expenditures by $80 million to provide additional money to retirees to fund pension settlements.[131]

68.    In fact, many of the City's assumptions, such as assumptions regarding growth rates, have changed over time[132] — directly impacting the results of the forecast.[133]  As Mr. Malhotra acknowledged, "any of the assumptions in

---

[130] Ex. 6F, Sallee Dep. at 238:11-241:8 (noting increase in forecast of 35 to 40 million dollars after 2015 budget approved).

[131] Ex. 6E, Malhotra Dep. at 101 (acknowledging that blight funding was reduced from around $500 million to $420 million "because of the overall level of contributions the City was committing to the pension systems").

[132] Ex. 6D, Cline Dep. at 60:23-24 ("we altered some of the growth rate assumptions over time"); *id.* at 61:24-62:2 (agree that "the inputs and assumptions to your model have changed multiple times since you started your work"); Ex. 6E, Malhotra Dep. at 68:10-20 (since the model was originally created, there have been numerous versions and updates); *id.* at 85:7-86:19 (agreeing that there are "changes that have been made to the assumptions in [the E&Y] model over time" to reflect, for example, changes in settlements, the state budget, and  property taxes, among others).

[133] Ex. 6D, Cline Dep. at 68:5-6 ("If you changed the assumptions, the results of the forecasting model exercise would change."); *id.* at 70:8-11 ("It is correct that the forecast is based on assumed economics, current tax law, and the key assumptions in the forecast.  If any of those change, the forecast will change."); Ex. 6E, Malhotra Dep. at 147:25-148:2 (same); *id.* at 282:5-8 (same); *id.* at 149:8-

48

[the] model can change over the 10-year and 40-year periods,"[134] and "[i]f you change the assumption, the numbers will change."[135]

69. As Dr. Cline acknowledged, "even using the best available methodology and information, forecasts are frequently wrong."[136] That is even more true here, where the City's experts — none of whom have prior experience forecasting municipal revenues or expenditures — have engaged in an unprecedented attempt to "project" future revenues and expenditures for a City over an unprecedented length of time using an inherently "subjective" methodology that is subject to no measure of reliability, under circumstances in which they acknowledge that "anything can happen,"[137] and which has required

---

10 ("if you change the assumption on any of these items, the money could go up or the money could go down.").

[134] Ex. 6E, Malhotra Dep. at 188.

[135] Ex. 6E, Malhotra Dep. at 139:7-13. *See also id.* at 192:21-193:4 (acknowledging that "there are a number of factors that could change" that cause the forecasts to change "materially").

[136] *Id.* at 72:12-14. *See also* Ex. 6I, City of Detroit Ten-Year Financial Projections (July 2, 2014) (POA00706519) ("There will usually be differences between forecast and actual results because events and circumstances frequently do not occur as expected and those differences may be material.").

[137] Ex. 6E, Malhotra Dep. at 83:23-85:7 (agreeing that in terms of Detroit's future leaders and their policy decisions, "[a]nything can happen" and "anything is a possibility"); Ex. 6F, Sallee Dep. at 243:2 (conceding that "[an]ything could happen" when asked about possible changes in future Detroit policy).

them to "speculate" concerning future actions unknown leaders of the City may take decades from now.[138]

### III. The City's Projections Improperly Exclude Hundreds of Millions Of Dollars In Additional Revenue Available To Pay Creditors.

70.     Finally, not only are the projections the City did perform based on an unreliable and speculative foundation, but the City's experts concede that they omit significant potential sources of revenue. As Mr. Malhotra conceded, the Ernst & Young forecasters did not attempt to forecast all revenues and expenditures for the City.[139] Indeed, as Dr. Cline acknowledged, "there are a number of revenue sources we were not asked to forecast."[140] Nor was Ernst & Young asked to identify potentially untapped sources of revenue for the City or how the City might increase its revenues through taxes.[141]

71.     As Dr. Cline acknowledged, Ernst & Young did not conduct an analysis of the potential revenue sources available to the City:

---

[138] Ex. 6E, Malhotra Dep. at 83:11-22 (determining Detroit's future policy decisions would be speculation).

[139] *See, e.g.*, Ex. 6E, Malhotra Dep. at 45:45:15-17 ("We do not have $47 million a year from DWSD included in the forecast."); *id.* at 45:22-24 (forecast also does not include "any money from privatization of parking").

[140] Ex. 6D, Cline Dep. at 300:7-17.

[141] Ex. 6D, Cline Dep. at 56:6-12.

Q. Would it be fair to say that you haven't done any analysis of the full range of potential revenue sources available to the City?

THE WITNESS: We haven't done an analysis of any of the revenue options available to the City.

BY MR. SMITH:

Q. And that would include both tax and non-tax revenue options?

A. Correct.[142]

Accordingly, they are offering no opinion that the City cannot pay the creditors more.[143]

72.     But these are precisely the issues that the Court must decide here and the issues the City's experts suggest they had addressed in their reports: the amounts available to pay the City's creditors.   The City's experts conceded, however, in their depositions that they in fact have not done such an analysis and thus there is a significant gap between the work the experts have actually performed and the issues the Court must address, which warrants exclusion under Rule 702 and *Daubert*.   Where, as here, "[t]here is 'too great an analytical gap between the data and the opinion proffered,'" the expert's opinion should be excluded.  *Tamraz,* 620 F.3d at 675-76 (quoting *Joiner*, 522 U.S. at 146); *see also*

[142] Ex. 6D, Cline Dep. at 103:22-104:8.

[143] Ex. 6E, Malhotra Dep. 148:7–149:23; *id.* 279:21–280:19; Ex. 6D, Cline Dep. 57:24–58:21; Ex. 6F, Sallee Dep. 51:6–9.

*Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 809 (6th Cir. 2005) (affirming exclusion of expert where "the estimates and assumptions used" were not "sufficiently tied to the facts of the case.").

73. **Asset Sales.** As Mr. Malhotra acknowledged, one of the largest sources of "untapped revenue" for the City is future asset sales, and indeed the City has already begun exploring and/or planning for such sales.[144] Thus, for example, the City has explored potentially leasing or privatizing water and sewer services.[145] While Ernst & Young did model these revenues at one point, assuming an additional revenue of $47 million from such a transaction (which may itself may significantly underestimate available revenue), it was not included in the final model.[146] Likewise, the model does not include revenue from privatizing City

---

[144] Ex. 6E, Malhotra Dep. at 44:8-10. *See also* Ex. 6J, Kopacz Report at 187-88, 197 (noting that the projection "largely excludes the sale of assets" even though "there are significant asset sales" that "could positively impact the projections," including among other things "parking related assets and other real estate").

[145] *See* Fourth Amended Disclosure Statement at 148 ("The City has been in contact with certain potentially interested parties regarding a recent request for information (the 'DWSD RFI') for a transaction that would establish a public-private partnership with respect to the DWSD (the 'Public-Private Partnership'). The DWSD RFI provides that the Emergency Manager is considering a potential public-private partnership for the operation and management of the water system and sewage disposal system currently operated by DWSD.").

[146] Ex. 6E, Malhotra Dep. at 333:2–8. *See also id.* at 44:19–45:17 (stating forecast model does not include any money from outsourcing or leasing of DWSD); *id.* at 301:10–17 (the forecast model assumes no new asset sales above what is already assumed in the plan).

parking, which is in "active discussions" and which Mr. Malhotra indicated may be worth $20-$100 million in additional revenue.[147]   Indeed, the City's Disclosure Statement indicated that the City "anticipates that the transaction may close during Fiscal Year 2015."[148]   These are just some of the numerous proposals for raising additional revenues that the City is actively investigating or has considered in the past.[149]   As Ms. Kopacz observed, "there are *significant asset sales* that are not contemplated in the POA that could positively impact the projections."[150]

74.   **Incremental Grants.**  The City's forecasts similarly do not take into account the potential for incremental grants from the federal government or other sources.[151]   The City specifically contemplated such additional revenues in the

---

[147] Ex. 6E, Malhotra Dep. 33:13–16, 34:5–14, 45:22–24, 46:5-8, 306:2–12.

[148] Fourth Amended Disclosure Statement at 94 ("At the request of the Emergency Manager, the City has been exploring a potential monetization of the assets constituting the Automobile Parking Fund.  To this end, the City has retained a parking specialist to conduct due diligence and produce a report on the long-term value potential of the parking assets currently held by the City.  This report is expected to serve as a basis for the solicitation of potentially interested bidders for the parking assets, and the City anticipates that the transaction may close during Fiscal Year 2015.").

[149] *See generally* Ex. 6P, Houlihan Lokey Expert Report (July 2014) (discussing several of the asset sales the City has considered).

[150] Ex. 6J, Kopacz Report at 197.

[151] Ex. 6E, Malhotra Dep. 242:20–245:9 (discussing that forecast model does not take into account incremental additional grant money from federal, state, or private

creditor proposal, for example, providing (as with asset sales) that additional monies may be provided to creditors based on the receipt of additional grants (at a rate of 75% of additional revenues).[152]  As Mr. Malhotra acknowledged, the City has received significant, unanticipated additional funds in the last few months.  For example, he testified that the $52 million the City received in Hardest Hit Funds was an unanticipated grant.[153] Moreover, the City's CFO Mr. Hill testified that the City is currently in negotiations with the federal government regarding a number of new federal grants, as well as the extension of existing grants to avoid recapture of federal funds.[154]

75.    More generally, as Ms. Kopacz observed, while the City projects a decrease in grants, "[g]rant funding is expected to increase in the City going forward."  "In fact, there are additional opportunities for the City to acquire grants if it can responsibly manage and account for them.  The City has failed to properly

---

sources); *id.* at 289:18–291:8 (discussing unexpected $52 million Hardest Hit Fund grant received by City).

[152] Ex. 6Q, 6/14/13 City of Detroit Proposal for Creditors at 108 (City Exhibit 033).

[153] Ex. 6E, Malhotra Dep. at 277:10-17, 289:6-17, 290:22-291:8 (stating forecast has been revised in light of City receiving over $50 million in unanticipated incremental grants).

[154] Ex. 6K, Hill Dep. at 247:12–251:24.

account for and manage grants in the past which has led to improperly spent funds. The City can benefit by tens of millions of dollars if this process is improved."[155]

76. **Increased Tax Rates/New Taxes.** The Ernst & Young experts "assumed" in their forecasts that current law tax rates would remain the same for the next 10, and indeed 40 years.[156] They did so, despite the fact that tax rates (such as the corporate and income tax rates) have changed in recent years,[157] despite the fact that other cities have increased tax rates to address fiscal crises,[158] and despite their acknowledgement that they "can't identify any tax forecast that's

---

[155] Ex. 6J, Kopacz Report at 117.

[156] Ex. 6E, Malhotra Dep. at 1388-18; Ex. 6D, Cline Dep. at 78, 141:20-24. *See also id.* at 87:18-22 ("We were not asked to analysis [sic] alternative tax rates in the City of Detroit."); *id.* at 96:6-13 (agreeing that he hasn't "done any work" that would allow him "to testify that Detroit couldn't generate significant additional revenue by either adding new taxes or increasing tax rates"); *id.* at 96:25-97:10 (agreeing that he hasn't "done any work" that would allow him "to testify that Detroit can't significantly increase revenues by increasing tax rates or increasing tax collections or by adding new taxes"), 102:22-103:2 ("[W]e did not analyze any revenue options for the City of Detroit."); *id.* at 139:19-24 ("If current law changes, you would need a new forecast of what the expected revenues are.").

[157] *See* Fourth Amended Disclosure Statement at 127 ("In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional revenue for the City."); *id.* at 168 (noting the "ever-increasing individual and corporate tax rates" in Detroit in recent decades); Ex. 6F, Sallee Dep. at 219:11-15 ("Tax rates for various taxes have changed in the last 10 years").

[158] Ex. 6D, Cline Dep. at 86:15-87:6.

ever assumed that the current tax rates will remain unchanged for a period as long as 10 years."[159]

77.     Indeed, while purporting to do so, the Ernst & Young forecasts themselves do *not* consistently use current tax law for the projections — they do so only where such an assumption is likely to suppress revenue.  Thus, for example, Ms. Sallee assumed a 50% likelihood that exemptions to the personal property tax leading to a 10% reduction in personal property tax revenue would be enacted by the voters, a measure that was not in effect when she developed her opinions.[160] As she acknowledged, while Ernst & Young claims that it has based its projections on current tax law, in this instance she "factored in a chance that there will be a change in current law leading to a reduction in personal property taxes."[161]

78.     **Improved Collections.**  Likewise, while Ernst & Young analyzed changes in collection rates for the property tax (assuming that half the value of property in the City would be wiped out due to massively reduce property tax

---

[159] Ex. 6D, Cline Dep. at 85:8-15.  *See also id.* at 80:22-24 (agreeing that he "can't know with certainty what the tax rate will be" even five years from now), 81:20-23 (agreeing that he had "no way to know whether current law is going to be changed with respect to tax rates within the next 10 years"), 83:5-15; Ex. 6G, Kopacz Dep. at 118:19-21 (agreeing that "[c]hanges to the tax law could certainly impact the forecast").

[160] *See supra* Argument § I.

[161] Ex. 6F, Sallee Dep. at 162:2-16.

receipts),[162] it did not investigate rates of collection for the income, corporate, wagering or utility tax or potential actions that may significantly increase revenues.[163] For example, the City's CFO Mr. Hill testified that the City has an "agreement in concept" to piggyback income tax collections with the State, which should increase income tax revenues and decrease the City's enforcement costs.[164] Likewise, the City is supporting proposals to require withholding of City income tax,[165] which the State pledged to support in the Financial Stability Agreement.[166]

---

[162] *See* Ex. 6D, Cline Dep. at 122:25-123:5 (agreeing that "even though [they] analyzed collection rate for property taxes, [they] didn't analyze the collection rate for the other taxes").

[163] Ex. 6D, Cline Dep. at 299:19-24 ("Other than the property tax revenue estimate, we have not built in any separate adjustments for collection procedures and processes in our numbers"); Ex. 6E, Malhotra Dep. at 138:2-7 ("as far as he was aware there had "not been a specific addition for implementing income tax withholding or piggybacking with the state tax"). *See also* Ex. 6E, Malhotra Dep. 137:6–18 (agreeing that as far as he was aware, the forecast did not not account for "withholding for reverse commuters or if there was piggybacking with state taxes").

[164] Ex. 6K, Hill Dep. at 138:19–144:10.

[165] Ex. 6K, Hill Dep. at 145:8–148:9; 261–262:22 (discussing Mayor's support for draft legislation by State to require city income tax withholding).

[166] Ex. 6L, Financial Stability Agreement ¶ 2.5(c) (April 9, 2012) ("The Treasury Department will assist the city in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and

57

And, indeed, the initial Plan of Adjustment submitted by the City indicated that the City would seek to implement withholding.[167]

79.     A study for the City by McKinsey & Company found that Detroit failed to collect approximately $140 million in income tax in 2009 from individuals who live in the City but work outside the City, with an estimated 50% of so-called "reverse commuters" not filing to pay their income taxes at all.[168] Accordingly, the City's projections have omitted significant sums.[169]  Moreover, in doing so, they violated basic principles the City's own experts acknowledge.  As Ms. Sallee observed, "[c]ollections are important to consider in doing any tax forecast."[170]

---

distribution of the City income tax in conjunction with the collection and distribution of State income tax.") (City Exhibit 032).

[167] Original Disclosure Statement at 133 of 440 ("In addition, the City is considering the enactment of a local ordinance that would require employers to withhold City income taxes of reverse commuters.").

[168] Ex. 6D, Cline Dep. at 151:2-10; Ex. 6R, Citizens Research Council of Michigan "Detroit City Government Revenues," Report 382, April 2013 at 23 (Syncora Ex. 4466).

[169] More generally, the City's forecasts do not include amounts for all delinquent debt obligations owed the City.  As Mr. Malhotra testified, "it's not possible, given the information [he had] to estimate how much the City is owed in delinquent debt obligations."  Ex. 6E, Malhotra Dep. at 171:14-19.

[170] Ex. 6F, Sallee Dep. at 178:22-23.

80.     While Dr. Cline suggested that the City's projections contain a line item for increased collections, the line item in the reinvestment projections for increased tax collection is only $40.5 million in total over ten years, $10 million of which is for collection of *past due* amounts.[171]   This is a far cry from the $140 million in lost income McKinsey & Co. estimated the City was losing *in one year* from reverse commuters alone.   Nor did Dr. Cline explain why, as the City's income tax forecaster, he did not take into account collections in any of the taxes he forecasted — or why Ernst & Young simultaneously *did* do so for its property tax forecast.

## CONCLUSION

81.     For the foregoing reasons, Syncora respectfully requests that the testimony of Robert Cline, Guarav Malhotra, and Caroline Sallee be excluded.

---

[171] *See* Ex. 6S, Moore Expert Report at 66-67 ("The Income Tax Division Organizational Efficiency Investment contemplates spending $12.2 million prior to cost savings of $10.4 million and additional revenue of $40.5 million…. " and noting that $30.5 million of this is "additional revenue" and $10 million is from "unpaid tax obligations" already due); Ex. 6 to Moore Expert Report, City of Detroit Ten-Year Plan of Adjustment Restructuring and Reinvestment Initiatives - Finance Department Detail at 12 of 21 (listing $30.5 million in additional collections and $10 million "collection of past due") (City Ex. 464).

Dated: August 22, 2014          Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Stephen C. Hackney_
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

      - and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075

_Attorneys for Syncora Guarantee Inc. and_
_Syncora Capital Assurance Inc._