**Exhibit 6C**

**Expert Report of Caroline Sallee**

KE 32074430

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---------------------------------------------------- x
                            :

In re                         :        Chapter 9
                            :

CITY OF DETROIT, MICHIGAN,    :        Case No. 13-53846
                            :

               Debtor.     :        Hon. Steven W. Rhodes
                            :
                            :
---------------------------------------------------x

## REPORT OF CAROLINE SALLEE

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7026, debtor the City of Detroit submits this report with respect to the expected expert testimony of Caroline Sallee.

## INTRODUCTION

Caroline Sallee is a Manager in the Quantitative Economics & Statistics practice ("QUEST") of the firm Ernst & Young ("E&Y"). It is the City's intention to call Ms. Sallee to testify about the forecasted revenues the City may expect in future years from its real and personal property general operating taxes and from revenue sharing funds it will receive from the State of Michigan.

1

The information in this report is presented as of the date of this report and is based upon forecasts contained within the Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 4391] dated May 5, 2014 (the "Disclosure Statement"), as such forecasts were updated as of July 2, 2014. *See* Ten-Year Plan of Adjustment, Restructuring and Reinvestment Initiatives [POA00706449 –POA00706518] ("10-Year Restructuring and Reinvestment Initiatives"); Ten-Year Financial Projections [POA00706519 – POA00706600] ("10-Year Forecast"); Plan of Adjustment – 40 Year Projections [POA00706603 – POA00706611] ("40-Year Forecast").

## OPINIONS

Ms. Sallee will offer the following opinions:

### I. Real and Personal Property General Operating Tax Revenues

A. **10-Year Forecast**: For the period ending with the City's 2023 fiscal year, the projected revenues the City can expect from the real and personal property general operating taxes it levies are set forth in the 10-Year Forecast, in particular at Exhibits 2-4 and Appendices A.26a, B.1a, and B.1b. *See* POA00706519 – POA00706600. These are reasonable forecasts of expected revenue during the period in question.

2

B. **40-Year Forecast:** For each of the four ten-year periods ending with the City's 2053 fiscal year, the City can expect forecasted revenues from its real and personal property general operating taxes as set forth in the 40-Year Forecast, in particular at Exhibits 3a-b. *See* POA00706603 – POA00706611. These are reasonable forecasts of expected revenue during the period in question.

## II. State Revenue Sharing Revenues

A. **10-Year Forecast:** For the period ending with the City's 2023 fiscal year, the projected revenue sharing funds the City can expect from the State of Michigan are set forth in the 10-Year Forecast, in particular at Exhibits 2-4 and Appendices A.26a and B4. *See* POA00706519 – POA00706600. These are reasonable forecasts of expected revenue during the period in question.

B. **40-Year Forecast:** For each of the four ten-year periods ending with the City's 2053 fiscal year, the forecasted revenue sharing funds the City can expect from the State of Michigan are set forth in the 40-Year Forecast, in particular at Exhibits 3a-b. *See* POA00706603 – POA00706611. These are reasonable forecasts of expected revenue during the period in question.

3

<u>**BASIS AND REASONS FOR OPINIONS**</u>

<u>**Real And Personal Property General Operating Taxes**</u>

**I.    Methodology**

In reaching her opinions, Ms. Sallee followed standard forecasting procedures used by the State of Michigan Consensus Revenue Estimating Conference and by U.S. federal agencies such as the Congressional Budget Office.

Ms. Sallee used the following methodology:

A. Reviewed historical data on Detroit and Michigan property taxes, economic variables, and housing indicators.

    i.    Ms. Sallee collected historical data on property assessments and taxable value by property class in the City of Detroit and the State of Michigan. Ms. Sallee collected City of Detroit taxable value, capped value, assessed value, collection rates, and tax rates by property class, which includes real and personal property for residential, commercial, and industrial classes and personal property only for the utility class from the following sources:

        a)  Michigan State Tax Commission for taxable values and assessed values by property class in the City of Detroit and the State of Michigan for tax years 2000-2012.

4

b)  The City of Detroit's Ad Valorem State Tax Commission Assessment Roll Certification for tax years 2011, 2012, and 2013, and ad valorem data provided by the City for 2014.

c)  Renaissance Zone property by property class for tax year 2013, provided by the City.

ii.  Ms. Sallee reviewed economic and housing indicators for the United States, the State of Michigan, and the City of Detroit for use in developing the baseline forecast, which is identified as the "without reinvestment" scenario in the 10-Year Forecast. *See* POA00706587. Ms. Sallee relied on data from the following sources:

a)  Congressional Budget Office, "The Budget and Economic Outlook for Fiscal Years 2013 to 2023" (Feb. 2013).

b)  House Fiscal Agency, Economic Outlook and Revenue Estimates for Michigan (May 2013, Jan. 2014, May 2014).

c)  City of Detroit, "Revenue Consensus Conference Final Report" (Feb. 7, 2013).

d)  Case-Shiller Home Price Index for Detroit, Michigan from the Federal Reserve Bank of St. Louis, Economic Research Division (1991-Apr. 2014).

5

e) Detroit Board of Realtors residential sales statistics obtained from the Michigan Association of Realtors website (1995, 1998, 2001-2013).

f) U.S. Bureau of Census, Building Permits Survey for Wayne County (1998 – 2013).

B. Developed a baseline of property tax collections for the 10-Year Forecast period. Ms. Sallee completed the following steps:

   i. Estimated taxable value by property class subject to City of Detroit general operating taxes.

      a) Ms. Sallee estimated the total taxable value subject to City of Detroit general operating taxes by property class beginning with FY 2012. Total taxable value by property class was obtained from the City of Detroit for tax years 2011, 2012, 2013, and 2014 (FY 2012 – FY 2015). The City of Detroit Assessor's Office provided detailed Renaissance Zone taxable value by property class for real and personal property for only tax year 2013 (FY 2014).

      b) Ms. Sallee used this data to estimate taxable value by property class not in a Renaissance Zone and thus subject to general operating taxes in FY 2012, FY 2013, FY 2014 and FY 2015. *See* Figure 1.

6

**Figure 1. Total Taxable Value for City of Detroit, FY 2012 – FY 2015**



c)  Ms. Sallee forecasted taxable value for FY 2016 – FY 2023 using

separate growth rates for real and personal property by property

class.  She performed an analysis of four factors affecting

residential property to select residential taxable value growth rates:

(1) additions to the tax base, (2) losses to the tax base,

(3) uncapping of taxable value as property sells, and (4) planned

reassessments by the City of Detroit.  Ms. Sallee selected separate

growth rates for commercial and industrial property, both real and

personal, and personal property for utility property, based on projected economic conditions in the City of Detroit, analysis of historical data, and a review of large taxpayers in the City.

ii.   Selected a tax rate.

   a) Ms. Sallee selected the current general operating tax rate for property taxes in the City of Detroit for the forecast period.

   b) Pursuant to standard forecasting procedures, Ms. Sallee assumed that the tax law will remain unchanged during the forecast time periods.

iii.   Forecasted the tax levy.

   a) Ms. Sallee forecasted the City of Detroit's property tax levy for the forecast period by multiplying the forecasted taxable value subject to general operating taxes by the tax rate.

iv.   Adjust the tax levy for known legal and policy changes.

   a) Ms. Sallee made adjustments for upcoming legal changes and City activities that will affect property tax collections.  Ms. Sallee lowered property tax collections from commercial and industrial personal property by 10% for years after FY 2014, reflecting the upcoming vote on the personal property tax repeal in August of 2014.

8

b) Ms. Sallee also took into account City-planned reassessments of property in FY 2015 and the effects of the City-wide reappraisal study.

v. Selected an effective collections rate.

a) Ms. Sallee applied an effective collections rate to the tax levy by calculating all payments related to property taxes received by the City in a given fiscal year divided by that fiscal year's tax levy.

b) The effective collections rate includes both property taxes paid on-time (non-delinquent) to the City and payments the City receives from the Wayne County Delinquent Tax Revolving Fund pursuant to Public Act 246 of 2003.

C. Developed a "with reinvestment" scenario of property taxes.

i. The City of Detroit Plan of Adjustment outlines steps for improving the physical infrastructure and operations of the City during a 40-year time period. The "with reinvestment" scenario estimates improvements to the tax base and collections if the general operations and economic environment of the City improve during the 10-year period.

ii. To model the effects of reinvestment, Ms. Sallee used historical data and information on the different property tax bases, including tax

9

collections during other economic time periods and growth rates after recessions.

D. Extrapolated property tax revenues for the 40-Year Forecast.

    i.    Ms. Sallee completed the 40-Year Forecast of property tax revenues using forecasted national trends in home prices between 2019 and 2023 and the City of Detroit's historical compounded average annual increase in taxable value between 2000 and 2013.

    ii.    Ms. Sallee modeled property tax collections in FY 2023 to FY 2027 to follow national trends using the Federal Housing Finance Agency house price index as forecasted by the Congressional Budget Office for years 2019 to 2023.

    iii.    After FY 2027, Ms. Sallee lowered the growth rate of property tax collections gradually to 2% by FY 2033. Ms. Sallee used a long-run equilibrium growth rate of 1.5% in years after FY 2033.

    iv.    Ms. Sallee chose the long-run growth rate of 1.5% based on analysis of the City's compounded annual growth rate (CAGR) in taxable value for tax years 2000 and 2013. Ms. Sallee relied upon historical taxable value data from the Michigan State Tax Commission.

## II. Assumptions

Documents and other materials supporting Ms. Sallee's opinions have been or will be produced by the City. In addition, certain of the assumptions underlying Ms. Sallee's analysis and opinions are set forth in the 10-Year and 40-Year Forecasts. Ms. Sallee also made the following assumptions.

## **10-Year Forecast**

In the 10-Year Forecast, Ms. Sallee assumed that the taxable value of property will continue to decline until FY 2020. By FY 2022 and FY 2023, improved operations and other factors will cause property tax collections to increase for the City of Detroit.

A. Baseline Forecast

  i. Population Assumptions

    a) Ms. Sallee used the Southeast Michigan Council of Governments (SEMCOG) population forecasts, scenario 1a for the analysis. Population in the City of Detroit is expected to decline each year between FY 2013 and FY 2023 at an average annual rate of -0.7%.

  ii. Taxable Values: Residential Property

    a) Ms. Sallee forecasted taxable value for real and personal property by selecting growth rates for each type of property. She modeled four factors that affect taxable value for residential property:

1) Ms. Sallee estimated additions to the tax base using U.S. Census building permit data for Wayne County. Ms. Sallee multiplied the cost of new construction in Wayne County per the U.S. Census building permit data by the City of Detroit's share of real property taxable value in Wayne County (19%) to arrive at the City's estimated share of new construction value in Wayne County, which was 1% in 2012 and 2013. This translated into a 0.5% increase in taxable value. Along with additions to existing properties, the analysis assumed an increase to residential taxable value of 1% per year during FY 2015 through FY 2021 and 1.5% in FY 2022 and FY 2023.

2) Population declines, anticipated abandonment, and rental vacancies will cause losses to the tax base. Ms. Sallee used SEMCOG's scenario 1a to estimate losses to the tax base. After FY 2015, SEMCOG forecasts average annual population losses to be between -0.8% and -0.4% per year. Losses to residential taxable value are assumed to be between -1.5% and -2% per year after FY 2015.

3) Taxable value is defined as the lesser of state equalized value (50% of true cash value) and capped value (taxable value grown annually by 5% or the rate of inflation, whichever is less, not counting additions). When a house sells, the taxable value is reset to state equalized value

in the first year. The forecast projects continued losses to taxable value due to the uncapping of taxable value when homes sell. According to Detroit Association of Realtors data, average existing home prices in Detroit fell 63% between 2006 (pre-recession) and 2013. The state equalized value of residential property, however, only declined 54%. *See* Figure 2. This gap indicates that state equalized value will fall further, resulting in reduced taxable value for residential property. To select growth rates of the uncapping of taxable value due to home sales, Ms. Sallee employed a modeling exercise using historical data on the number of existing home sales and the difference between current taxable value of homes purchased 5, 10, and 15 years ago compared to a re-setting of taxable value equal to 50% of true cash value. The forecast assumes a reduction in residential taxable value of between -2% and -4% per year between FY 2016 and FY 2020.

**Figure 2. Percentage Change in Average Sale Price, Residential Taxable Value, and Residential State Equalized Value in Detroit, 2007-2014 (Indexed to 2007)**



4) The City completed reassessments for some neighborhoods for tax year 2014 (FY 2015). The result is that residential taxable value declined -20.5% between FY 2014 and FY 2015. The City is also contracting with a company to perform a reappraisal study of all property in Detroit. Based on conversations with the City, Ms. Sallee assumed that the study would take 3-5 years, with changes to the taxable value of property appearing in FY 2020. She assumed a 15% drop in residential taxable value in FY 2020 as a result of the study.

14

This would bring residential taxable value to approximately half of its FY 2013 level. The value of residential property is expected to stabilize after the reappraisal study is complete. Based on historical data showing how the City came out of past recessions, the evidence does not support a quick rebound.

iii. Taxable Values: Commercial Property

a) Ms. Sallee forecasted commercial taxable value to decline 7% between FY 2013 and FY 2023 with real property taxable value -8% and personal property taxable value -6%.

b) Ms. Sallee assumed a continued decline of commercial taxable value of 1- 2% per year until FY 2018. This continues the trend of -2% per year average decline in commercial taxable value between 2008 and 2013 using ad valorem warrant taxable value data from the State Tax Commission and the City of Detroit.

c) Commercial real property performed better than industrial real property during and after the recent recession (2008-2013), losing a smaller percentage of taxable value than industrial real property. Ms. Sallee assumed that losses to commercial property would end by FY 2018 and there would be slight recovery post FY 2018 in line with other

15

assumptions related to employment and population stabilization in the City in later years of the forecast period.

    d) Ms. Sallee assumed population decline in the City of -1.3% per year (CAGR) between 2010 and 2020 and a decline in City employment of -1% between 2013 and 2020. Ms. Sallee also took into account the major commercial and industrial taxpayers and their share of taxable value to inform the likely impact to taxable value if a large taxpayer were to leave the City of Detroit.

  iv. Taxable Values: Industrial Property

    a) Ms. Sallee forecasted that industrial taxable value will decline 12% between FY 2013 and FY 2023, with real property taxable value declining 11% and personal property 14%.

    b) Ms. Sallee assumed continued decline of taxable value of between -1% and -2% between FY 2016 and FY 2018, continuing recent trends and following the long-run trend of reductions to industrial real property of -1% between 2000 and 2013.

    c) Industrial personal property taxable values have varied substantially year-to-year.

    d) Ms. Sallee assumed a slower decline for industrial personal property compared to real industrial property given the overall growth in the

former.  However, much of the industrial personal property qualifies for a Renaissance Zone exemption.

e) Since industrial property, both real and personal, has performed worse than commercial property and historically has taken longer to recover, Ms. Sallee assumed that industrial property taxable value would continue to decline through FY 2021.

v.  Taxable Values:  Utility Property

a) Ms. Sallee assumed that utility personal property would increase during the forecast period, following recent trends.

b) Ms. Sallee applied 0% and 0.5% growth rates post-FY 2015 based on recent fluctuations in utility property taxable values.  For example, in tax years 2011 and 2013, personal property taxable values fell, but in tax years 2012 and 2014, taxable values increased.

vi.  Renaissance Zone

a) The Renaissance Zone comprises primarily commercial and industrial property, with a small amount of residential and utility property.   The classification of Renaissance Zone property fluctuates on a year-to-year basis.

b) In FY 2015, 11% of the property in the City was classified as Renaissance Zone ($809mm out of $7.3b).  Of the 11% classified as

17

Renaissance Zone property, 29% is real property and 71% is personal property.

vii. Tax Rate

a) Ms. Sallee assumed that the City's tax rates will remain constant until 2053.

b) The City's tax rate on property of 19.952/1000 is near the legal limit of 20/1000 and is among the highest in the State of Michigan.

viii. Adjustments for Upcoming Legal Changes

a) If voters approve the plan to repeal personal property taxes on certain commercial and industrial property in August of 2014, the phase-out would begin in FY2015, with the exemption of commercial and industrial personal property owned by a single taxpayer if the taxable value of the property is less than $40,000.

b) Ms. Sallee has modeled a 50% chance of voters approving the repeal of personal property taxes.

c) According to estimates from the Michigan Senate Fiscal Agency, if voters approve the repeal, it is likely that 20% of the property tax revenue from industrial and commercial property will not be replaced by a new funding mechanism. Ms. Sallee has modeled this uncertainty as an

18

expected 10% decline in revenue from these personal property taxes for each year between FY 2015 and 2023.

d) If the voters do not approve the plan, the change in the forecasts would be de minimis.

ix. Effective Collections Rate

a) Ms. Sallee estimated the City's effective collections rate after a review of the City's historical collections rates on non-delinquent property by property class for FY 2007 – FY 2011.  Using this information, Ms. Sallee selected non-delinquent collection rates of approximately 50% for residential property, 83% for commercial property, 87% for industrial property, and 100% for utility property during the forecast period of FY 2015 to FY 2020.  This came to a blended rate of 65-70%.

b) Residential property accounts for approximately half of the City's taxable value.

c) Ms. Sallee also relied upon the City's calculation of net revolving fund payments between the City and Wayne County.  Using this information, Ms. Sallee assumed net payments from Wayne County on delinquent property between 12-15% of the tax levy during the forecast period.

d) The effective collections rate is assumed to be 80% in FY 2015 – FY 2019.  This is similar to the effective collections rate in recent years

19

of 80% (2011) and 83% (2012) reported in the City of Detroit's 2012 Comprehensive Annual Financial Report (CAFR).

e) Ms. Sallee assumed that the mass reappraisal study would be completed by FY 2020 and that the City would have a higher collections rate of 84% after that time. This improvement is due to residential non-delinquent collections rate increasing from 50% to 70%.

B. Impact of Reinvestment

i. Ms. Sallee forecasted that planned City reinvestments would have a modest impact on tax revenues. The reinvestments that will impact tax revenues are improved collections of tax revenues and slightly better growth in taxable value compared to the baseline.

ii. Ms. Sallee assumed higher collections rates because of slight improvements in commercial and industrial collections rates and improvements to residential collections rates. These would return the City to pre-recession collections rates on residential property by FY 2017. The collections rate is assumed to be 82% in FY 2017 – FY 2019, and 87% after the mass reappraisal study is complete.

iii. Commercial and industrial taxable values are also modeled to show slight additions to taxable value (1%) beginning in FY 2017 for both.

**40-Year Forecast**

Ms. Sallee extrapolated property tax revenues from FY 2023 to FY 2053. In the 40-Year Forecast of property taxes, Ms. Sallee made the following assumptions.

A. Population

  i. The City's population will continue to decline from FY 2024 until 2029.

    a) Ms. Sallee based this assumption on Scenario 1a of the Southeast Michigan Council of Governments' population forecasts.

  ii. Ms. Sallee forecasted that there will be no population growth from 2029 until 2033, 0.2% annual population growth from 2034 until 2043, and 0.3% annual population growth from 2044 until 2053.

    a) Ms. Sallee based these assumptions on an examination of population trends in comparable metropolitan areas that experienced a decade or more of declining population, as well as the Detroit metropolitan area's growth from 1990 and 2000.

    b) These population forecasts estimate that the population in the City of Detroit will be greater by 3.4% than the SEMCOG scenario 1a forecasts. Ms. Sallee made this assumption because SEMCOG's population forecast was completed before the Plan of Adjustment, which provides for improvements in City services and operations. *See* Figure 3.

21

**Figure 3. E&Y and SEMCOG Population Forecasts
for the City of Detroit (2010-2053)**

B. Taxable Property Growth Rates

    i. The citywide mass reappraisal study (projected to be included in the FY 2020 tax bills) will result in a decline in the taxable value of property in the City. After that, Ms. Sallee assumed that the value of property in the City in FY 2024 and FY 2025 would increase at a rate of 3.4% growth. This assumption is in line with national trends of growth in existing home prices of 3.3% projected by the Congressional Budget Office in 2022 and 2023.

ii.   Annual growth in general operating property tax revenues is projected to fall to 2% in years 2030-2033 and then average a 1.5% annual growth rate in the following years.  Ms. Sallee selected these rates to reflect the business cycle and her assumption that the City would have slower growth than the rest of the nation.

iii.   This 1.5% rate is slightly better than the average annual 1.1% growth rate in Detroit between 2000 and 2013.  Ms. Sallee completed an analysis of annual average growth of taxable value using ad valorem warrant information from the State Tax Commission.

## **State Revenue Sharing**

### I.   Methodology

In reaching her opinions, Ms. Sallee used the following methodology:

A. Constitutional Revenue Sharing

i.   Ms. Sallee forecasted constitutional revenue sharing based on the applicable formula, which takes into account the population by cities, villages, and townships, and the sales tax growth of the state.  The amount of available constitutional revenue sharing payments is fixed at 15.0% of gross collections of the state sales tax collected at a 4.0% rate and is distributed to cities, villages, and townships on a per capita basis.

23

ii.   Ms. Sallee used constitutional revenue sharing amounts forecasted by the Michigan Treasury for the City of Detroit for FY 2016 to FY 2025.

iii.   For years after FY 2025, Ms. Sallee estimated constitutional revenue sharing based on forecasted average increases in revenues of between 2% and 3%.  After each Census, she adjusted the constitutional payment based on population changes.  Ms. Sallee forecasted constitutional payments falling with declining population.

B. Economic Vitality Incentive Payments (EVIP)

i.   EVIP payments that the City receives are based on the amount appropriated by the Legislature on a year-to-year basis.  Ms. Sallee considered that the appropriations could be reduced, increased, or eliminated at any point.  For example, statutory and incentive payments (EVIP) increased 17% between FY 2010 and FY 2011 before declining 24% in the next fiscal year.  There is no set formula for EVIP payments for the City of Detroit.

ii.   Ms. Sallee's forecast follows current law and uses FY 2015 EVIP payments for all years after FY 2015.

## II.   Assumptions

Documents and other materials supporting Ms. Sallee's opinions have been or will be produced by the City.  In addition, certain of the assumptions underlying

Ms. Sallee's analysis and opinions are set forth in the 10-Year and 40-Year Forecasts. Ms. Sallee also made the following assumptions.

A. Constitutional Revenue Sharing Payments

    i.    The amount of constitutional revenue sharing payments is fixed at 15.0% of gross collections of the state sales tax collected at a 4.0% rate and is distributed to cities, villages, and townships on a per capita basis. This stream of payments is protected by Article IX, Section 10 of the Michigan Constitution. Ms. Sallee assumes that these percentages will not change during the forecast period.

    ii.    The 10-Year Forecast includes the Legislature-approved FY 2015 revenue sharing payments for Detroit.

    iii.    For years FY 2015 – FY 2025, the forecast uses projected constitutional revenue sharing payments completed by the Office of Revenue and Tax Analysis of the Michigan Department of Treasury.

    iv.    Constitutional revenue sharing payments follow expected trends in sales tax growth. The forecast assumes between 2% and 3% sales tax growth for the forecast period.

    v.    For those years following a decennial census, there are adjustments based on the projected population for the City of Detroit.

vi.    Ms. Sallee used the SEMCOG population forecast for Detroit between 2020 and 2029, with zero growth between 2029 and 2030. Using SEMCOG's forecast, Ms. Sallee assumed that Detroit's population will decline by 2.4% between 2020 and 2030, but she forecasts that the impact on constitutional revenue sharing will be -1%.

vii.    Modest growth in Detroit's population between 2030 and 2040 will result in an increase in constitutional payments of 1.4% between 2040 and 2041, and 1.7% between 2050 and 2051.

B. EVIP Payments

i.    Ms. Sallee assumed that the amount of annual EVIP payments will remain constant at the current law FY 2015 amount of $140 million. This follows standard forecasting procedures and reflects the variable nature of the EVIP payments.

ii.    The amount of EVIP payments is determined each year by the Legislature. Over the past decade, the Legislature has appropriated non-constitutional revenue sharing for cities, villages, and townships at less than full funding.

### EXHIBITS

Attached as Exhibit A are exhibits Ms. Sallee will use to summarize or support her opinions.

26

### DOCUMENTS AND OTHER MATERIALS CONSIDERED IN REACHING OPINIONS

Attached as Exhibit B is a listing of documents and other materials Ms. Sallee considered in reaching her opinions. Ms. Sallee also considered discussions with City and State employees, as well as the City's third-party consultants and contractors. Ms. Sallee likewise had available to her the expertise of Gaurav Malhotra and Robert Cline, along with the materials they considered.

### QUALIFICATIONS

Ms. Sallee's curriculum vitae is appended as Exhibit C.

### PRIOR EXPERT TESTIMONY

Ms. Sallee has not previously testified as an expert.

### COMPENSATION

Jones Day retained Ernst & Young LLP on behalf of the City to provide expert witness services to the City in connection with *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.) (Rhodes, J.). The City compensates Ernst & Young LLP at an hourly rate of $550 for actual time incurred by Ms. Sallee, as well as reasonable out-of-pocket expenses. These fees are subject to a 10% hold-back contingent on plan confirmation by December 31, 2014.

Dated: July 8, 2014

*Caroline Sallee*
_____
Caroline Sallee

27

# EXHIBIT A

**Figure 1. Total Taxable Value for City of Detroit, FY 2012 – FY 2015**



**Figure 2. Percentage Change in Average Sale Price, Residential Taxable Value, and Residential State Equalized Value in Detroit, 2007-2014 (Indexed to 2007)**



**Figure 3. E&Y and SEMCOG Population Forecasts
for the City of Detroit (2010-2053)**



**Figure 4.  Steps to Forecasting Detroit General Operating Property Taxes**



# EXHIBIT B

## List of Documents and Other Materials Considered

1.  Ad Valorem State Tax Commission Assessment Roll Certification L-4037 (Board of Review) and Ad Valorem Warrant L-4022, City of Detroit, Tax Years 2011-2013, *available at* POA00535796 – POA00535804, POA00629611 – POA00629617, POA00629622 – POA00629623.

2.  Ad Valorem Parcels Minus Renaissance Zone, Miscellaneous Totals, City of Detroit, Tax Year 2014, *available at* POA00706439 – POA00706447.

3.  Case-Shiller Home Price Index for Detroit, Michigan, Federal Reserve Bank of St. Louis, Economic Research Division (1991-Apr. 2014), *available at* http://research.stlouisfed.org/fred2.

4.  Citizens Research Council of Michigan, Detroit City Government Revenues (Apr. 2013), *available at* POA00111072 – POA00111133.

5.  City of Detroit 2011-2012 Executive Budget Summary, Section C, *available at* http://www.detroitmi.gov/Portals/0/docs/budgetdept/2011-12%20Budget/2011-2012%20Executive%20Budget%20Summary/EBS_Section%20C%20Summary%20General%20Fund_2011_2012.pdf.

6.  City of Detroit 2012-2013 Budget, Ad Valorem Property Valuations, Tax Levies, and Tax Rates, *available at* POA00535773.

7.  City of Detroit 2013-2014 Executive Budget Summary, Section B, *available at* http://www.detroitmi.gov/Portals/0/docs/budgetdept/2013-14_Budget/Budget%20Summary_14/EBS_Section%20B_Summary%20All%20Funds_2013_2014_stamped.pdf.

8.  City of Detroit, Ten-Year Financial Projections (July 2, 2014), *available at* POA00706519 – POA00706600.

9.  City of Detroit, Ten-Year Plan of Adjustment, Restructuring and Reinvestment Initiatives (July 2, 2014), *available at* POA00706449 – POA00706518.

10. City of Detroit, Plan of Adjustment – 40-Year Projections (July 2, 2014), *available at* POA00706603 – POA00706611.

11. City of Detroit, Property Tax Collection Summaries by Class (2007-2011), *available at* POA00545716 – POA00545721.

12. City of Detroit, Renaissance Zone Taxable Values (2012-2013), *available at* POA00275527, POA00535838, POA00535853.

13. City of Detroit, *Revenue Consensus Conference Final Report*, Feb. 7, 2013, *available at* POA00650840 – POA00650847.

14. Congressional Budget Office, *The Budget and Economic Outlook: Fiscal Years 2013 to 2023* (Feb. 2013), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/43907-BudgetOutlook.pdf.

15. Data Sources, *available at* POA00275527.

16. David Zin, Chief Economist, *Personal Property Tax Reform Legislation*, State Notes (Winter 2013), *available at* http://www.senate.michigan.gov/sfa/publications%5Cnotes%5C2013notes%5Cnoteswin13dz.pdf.

17. Fourth Amended Disclosure Statement to the City's Plan of Adjustment, Exhibits J-K.

18. FY 2012 City of Detroit Comprehensive Annual Financial Report (CAFR), Revenue Capacity—Property Tax Levies and Collections, *available at* POA00272832 – POA00272833.

19. FY 2012 City of Detroit Comprehensive Annual Financial Report (CAFR), Revenue Capacity—Principal Property Tax Payers, *available at* POA00275527 and POA00272830 – POA00272831.

20. House Fiscal Agency, *Economic Outlook and Revenue Estimates for Michigan*, (May 2013, Jan. 2014, May 2014), *available at* http://www.house.michigan.gov/hfa/revenue.asp.

21. House Fiscal Agency, *Economic Vitality Incentive Program* (July 23, 2013), *available at* POA00536036 – POA00536079.

22. Memorandum, Changes to Detroit Property Tax Forecasts, *available at* POA00275524.

23. Memorandum, Changes to Detroit Property Tax Forecasts Since June 2013, QUEST (Feb. 24, 2014), *available at* POA00275525 – POA00275526.

24. Memorandum, Detroit Revenue Extrapolation—2024-2053 (Jan. 8, 2014), *available at* POA00536026 – POA00536028.

25. Memorandum, Estimating Methodology, Detroit Tax Forecast, *available at* POA00535987 – POA00535993, POA00707083 – POA00707088.

26. Memorandum, Long-Term Projections Discussion Items, *available at* POA00275657 – POA00275660.

27. Memorandum, Property Tax, *available at* POA00275537.

28. Memorandum, Property Tax Revenue Methodology—High-Level (May 21, 2014), *available at* POA00707089 – POA00707090.

29. Michigan Association of Realtors, Detroit Board of Realtors Residential Sales Statistics, 1995, 1998, 2001-2013, *available at* POA00275527 *and* http://www.mirealtors.com/Housing-Statistics.

30. Michigan Compiled Laws § 211.27a(1).

31. Michigan Constitution, Article 9, §§ 3, 10.

32. Michigan Public Act 246 of 2003.

33. Michigan State Tax Commission, Taxable Valuation (2000-2012), *available at* http://www.michigan.gov/treasury/0,1607,7-121-1751_2228_21957_45819---,00.html.

34. Michigan State Tax Commission, Assessed & Equalized Valuation (2000-2012), *available at* http://www.michigan.gov/treasury/0,1607,7-121-1751_2228_21957_45818---,00.html.

35. Miller Canfield, Office Memorandum, Real Property Tax Collection and Enforcement in the City of Detroit (Apr. 23, 2014), *available at* POA00252071 –POA00252086.

36. Office of Revenue and Tax Analysis, Michigan Department of Treasury, *2012/2013 Millage Rate Comparison – County and Local Unit Report* (Apr. 29, 2014), *available at* http://www.michigan.gov/documents/taxes/20122013LocalUnitMilllageReport_20140429_454855_7.pdf.

37.   Office of Revenue and Tax Analysis, Michigan Department of Treasury, *Michigan Sales Tax, Constitutional Revenue Sharing and City of Detroit Revenue Sharing Projections to FY2025*, *available at* POA00629605 – POA00629606.

38.   Office of the Wayne County Treasurer, City of Detroit, Revolving Fund Net Payment Summary, FY 2005-FY 2013, *available at* POA00275534 *and* POA00706429 –POA706438.

39.   Plante Moran, *Michigan Personal Property Tax Changes* (Mar. 2014), *available at* POA00629649 –POA00629650.

40.   Rebecca Ross, *Consensus Revenue Estimating:  The Process*, Fiscal Forum (Apr. 2001), *available at* http://www.house.mi.gov/hfa/Archives/PDF/consens.pdf.

41.   Report of Gaurav Malhotra.

42.   Report of Robert Cline.

43.   Southeast Michigan Council of Governments, Forecasts for Population and Employment Change, Scenario 1a (2012), *available at* POA00225109.

44.   U.S. Bureau of the Census, Building Permits Survey for Wayne County, Michigan (1998-2013), *available at* POA00275527 *and* http://www.census.gov/construction/bps/.

45.   U.S. Bureau of Census, Housing Starts for Wayne County (1998-2012), *available at* POA00275527 *and* http://www.census.gov/construction/bps/.

46.   U.S. Census Bureau, *Statistical Abstract of the United States: 2012*, Table 20: Large Metropolitan Statistical Areas—Population: 1990 to 2010, *available at* http://www.census.gov/prod/2011pubs/12statab/pop.pdf.

47.   William H. Frey,  *Population Growth in Metro America Since 1980: Putting the Volatile 2000s in Perspective*, Metropolitan Policy Program at Brookings (Mar. 2012), *available at* http://www.brookings.edu/~/media/research/files/papers/2012/3/20%20population%20frey/0320_population_frey.pdf.

# EXHIBIT C

# Caroline M. Sallee

**Ernst & Young, LLP**                                                                 Phone: 312-879-4443
Quantitative Economics and Statistics                                      caroline.sallee@ey.com

## EDUCATION

**University of Michigan**                                                                            Ann Arbor, MI
Gerald R. Ford School of Public Policy, Master of Public Policy, April 2005
Coursework: Advanced Microeconomics, Macroeconomics, Public Finance, Econometrics, Valuation

**Augustana College**                                                                                Rock Island, IL
Bachelor of Arts in Economics and History, May 2002
Honors: Summa cum laude, Phi Beta Kappa

## WORK EXPERIENCE

**Ernst & Young LLP, August 2012 – Present**                                      Chicago, IL
*Manager, Quantitative Economics & Statistics (QUEST)*
- Manages projects involving economic impact analyses for public and private sector clients. Uses IMPLAN and REMI to model the direct, indirect, and induced impacts of proposed capital expenditures and current operations.
- Manages tax policy projects. Works with public and private sector clients, trade associations, and business coalitions to develop and analyze regulatory and tax policy changes, and tax forecasting.
- Works with clients to analyze the public rates of return on investments in state economic development and workforce programs. Oversees staff work on these projects.
- Author of Ernst & Young's annual *50-State Total State and Local Business Taxes* study published with the Council On State Taxation in 2013.

**Anderson Economic Group, LLC, June 2005 – July 2012**                   Chicago, IL
*Director of Public Policy and Economic Analysis,* September 2010-Present
- Managed the practice area, which included creating and following a business plan for the practice area, hiring, overseeing all project staffing and reports released, and completing monthly invoicing.
- Obtained business for the practice area, which included responding to "Request for Proposals," writing engagement letters, meeting with prospective clients, and interviewing for projects.
- Served as project manager for economic impact, fiscal impact, tax policy, and health care finance reports for public and private clients. Tasks performed as project manager include: preparing contract, managing project budget, supervising staff work, preparing analysis, writing report, and presenting findings to client.
- Developed economic models using Excel and Stata.
- Served on company's Management Advisory Council, which advised CEO on management and policy issues.
- Discussed report findings with press, including radio and television interviews.

*Consultant, July 2007-2010*
*Senior Analyst, June 2005-2007*

**Government Accountability Office, May - August 2004**                   Washington, DC
*Summer Intern in Education, Workforce, and Income Security Team*
- Wrote a section of the GAO's report to Congress that evaluated the U.S. Commission on Civil Rights' management practices and compliance with the Government Performance and Results Act.
- Analyzed data for a final report to Congress on the presence and display of social security numbers in public documents.

**Hábitus: Investigación de Mercados y Opinión, January - July, 2003**           Quito, Ecuador
*Market Analyst*
- Created market research presentations for companies including Coca-Cola and Bell South.
- Analyzed survey data and designed presentations for clients.

**Congressman Bill Luther's District Office, August - December, 2002**           Woodbury, MN
*Citizen Services Representative*
- Managed outreach project that entailed sending three detailed legislative letters to 1500 households each week.
- Composed press releases and Letters to the Editor that appeared in local papers on behalf of Congressman.

**Public reports with Ernst & Young, LLP**

"Total state and local business taxes: State-by-state estimates for fiscal year 2012," with Andrew Phillips, Robert Cline, Michelle Klassen and Daniel Sufranski, July 2013.

**Public reports with Anderson Economic Group, LLC**

"Review of Kentucky's Economic Development Incentives,' with Jason Horwitz, Alex Rosaen, and Colby Spencer, 2012.
"Benchmarking Michigan's URC," with Erin Grover and Colby Spencer, 2012.
"The URC's Contributions to Automotive Innovation," with Alex Rosaen and Erin Grover, 2012.
"Economic Benefits Study: Contributions of CVS Caremark to Michigan's Economy," with Jason Horwitz, 2012.
"Life Sciences Industry in Michigan and the University Research Corridor," with Hillary Doe and Patrick Anderson, 2009.
"The Role of MQC3 and Home Help," 2011.
"The URC's Support for Information and Communication Technology in Michigan," with Erin Agemy, 2011.
"University Research Corridor Annual Report, with Patrick Anderson, 2011.
"The Economic Impact of Argonne National Laboratory," with Scott Watkins and Alex Rosaen, 2011.
"The Economic Impact of Fermi National Accelerator Laboratory," with Scott Watkins and Alex Rosaen, 2011.
"Costs and Benefits of Investing in Mental Health Services in Michigan," with Erin Agemy, 2011.
"Building a New Bridge in Detroit: A Study Evaluating the Options" with Colby Spencer and Alex Rosaen, September 2011.
"Dollars and Sense: How State and Local Governments in Michigan Spend Your Money," January 2011.
"Research and Development in the URC," with Erin Agemy, 2010. "The URC's Support for Advanced Manufacturing in Michigan," with Erin Agemy and Alex Rosaen, 2010.
"Empowering Michigan: Fourth Annual Economic Impact Report of Michigan's University Research Corridor," with Patrick Anderson, 2010.
"Preliminary Report: Life Sciences Industry in Michigan and the University Research Corridor," with Hilary Doe and Patrick Anderson, 2009.
"Michigan's University Research Corridor: Third Annual Economic Impact Report," with Patrick Anderson, 2009.
"2008 State Business Tax Burden Rankings," with Patrick Anderson, 2009.
"Economic Benefits of the Earned Income Tax Credit in Michigan," 2009.
"A Hand up for Michigan Workers: Michigan's State Earned Income Tax Credit," with Patrick Anderson and Alex Rosaen, 2008.
"Economic Impact of Proposed MSU Facility for Rare Isotope Beams (FRIB)," with Patrick Anderson, 2008.
"Preliminary Report: Alternative Energy Research and Development in the URC," with Rebecca Cohen and Patrick Anderson, 2008.
"Michigan's University Research Corridor: Second Annual Economic Impact Report," with Patrick Anderson, 2008
"Tax Burden and Distribution of Stimulus Payments," with Patrick Anderson, 2008
"2007 State Business Tax Burden Rankings," with Patrick Anderson, April 2008.
"Economic and Fiscal Impact of LaSalle Bank Acquisition," with Alex Rosaen, Darci Keyes, and Tim Mahon, 2007.
"Business Tax Burdens in Illinois" with Tim Mahon, June 2007.
"Michigan's University Research Corridor: First Annual Economic Impact Report," with Patrick Anderson, 2007.
"Economic Impact of Big Ten Football Games in Michigan, with Scott Watkins and Patrick Anderson, 2007.
"Economic Impact of Michigan State University, with Alex Rosaen and Patrick Anderson, 2007.
"Role of Blue Cross in Michigan's Health Insurance Market," with Darci Keyes and Patrick Anderson, 2007. "Benchmarking for Success: A Comparison of State Infrastructure," with Patrick Anderson, December 2006.
"Benchmarking for Success: Education Performance Among the States," with Scott Watkins and Patrick Anderson, September 2006.
"Benchmarking for Success: A Comparison of State Business Taxes," with Patrick Anderson, August 2006.
"Costs and Benefits of a Wage Increase for Home Help Workers," with Alex Rosaen, 2006.
"Review of the Proposed K-16 Initiated Law," with Alex Rosaen and Patrick Anderson, 2006.
"Automation Alley Annual Technology Industry Report: Driving Southeast Michigan Forward," with Scott Watkins, 2006.
"North-Central West Virginia's Technology Industry: A Pathway Through the 21st Century," with Scott Watkins, 2006
"Likely Impact of Delphi Bankruptcy," AEG Working Paper, with Ilhan Geckil and Patrick Anderson, 2005.

"Common Sense Reforms for a New Michigan," leadership summit presentation on "2011 Citizen's Guide to Michigan's Financial Health" with Michigan Governor Rick Snyder, January 2011.

"Review of Kentucky's Economic Development Incentive Programs," presentation to the Kentucky Interim Joint Committee on Economic Development and Tourism with Jason Horwitz, July 19, 2012.