# <u>Exhibit 6D</u>

## Excerpts of July 14, 2014 R. Cline Deposition Transcript

1  IN THE UNITED STATES BANKRUPTCY COURT
2  FOR THE EASTERN DISTRICT OF MICHIGAN
3
4
5
6  In Re:            ) Chapter 9
7  CITY of DETROIT, MICHIGAN, ) Case No. 13-53846
8      Debtor.       ) Hon. Steven Rhodes
9  _____
10
11
12  The Videotaped Deposition of ROBERT CLINE,
13  Taken at Jones Day
14  51 Louisiana Avenue, NW
15  Washington, DC
16  Commencing at 9:05 a.m.
17  Monday July 14, 2014,
18  Before Marjorie Peters, RMR, CRR
19
20
21
22
23
24
25

1  APPEARANCES:
2  For the Debtor City of Detroit and the witness:
3  GEOFFREY S. STEWART, ESQ.,
   SARAH A. HUNGER, ESQ.,
4  CHRISTOPHER DiPOMPEO, ESQ.
   JONES DAY
5  51 Louisiana Avenue, N.W.
   Washington, D.C. 20001-2113
6
7
8  For the Official Committee of Retirees:
9  DAN BARNOWSKI, ESQ.
   DENTONS US, LLP
10 1301 K Street, N.W.
   Suite 600, East Tower
11 Washington, D.C. 20005-3364
12
13 For Syncora Guarantee, Inc., and Syncora Capital
   Assurance, Inc.
14
15 DOUGLAS G. SMITH, P.C.
   KIRKLAND & ELLIS, LLP
16 300 North LaSalle
   Chicago, Illinois 60654
17
18
19 For Creditor Assured Guaranty:
20 LISA SCHAPIRA, ESQ.
   CHADBOURNE & PARKE, LLP
21 30 Rockefeller Plaza
   New York, New York 10112
22
23
24
25

1  For Creditor National Public Finance Guarantee Corp.
2
3  JEFFREY S. BEELAERT, ESQ.
   SIDLEY AUSTIN, LLP
4  1501 K Street, N.W.
   Washington D.C. 20005
5
6
7  For Creditor Financial Guaranty Insurance Company:
8  PRAVIN R. PATEL, ESQ.
   WEIL GOTSHAL & MANGES, LLP
9  1395 Brickell Avenue
   Suite 1200
10 Miami, Florida 33131
11
12 Also Appearing:
13 Jonathan Perry, Videographer
14 Marguerette Hosbach, Ernst & Young, via telephone
15
16
17
18
19
20
21
22
23
24
25

1              I N D E X
2  WITNESS                        PAGE
3  Robert Cline                     6
4
5  EXHIBITS                       PAGE
6  Exhibit No. 1                  112
7  Exhibit No. 2                  149
8  Exhibit No. 3                  164
9  Exhibit No. 4                  179
10 Exhibit No. 5                  278
11 Exhibit No. 6                  280
12 Exhibit No. 7                  281
13 Exhibit No. 8                  285
14 Exhibit No. 9                  292
15
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

R. CLINE

1    THE VIDEOGRAPHER:  This is disk number one
2  of the video deposition of Robert Cline taken in
3  the matter of the City of Detroit, Michigan in the
4  U.S. Bankruptcy Court for the Eastern District of
5  Michigan.  Chapter 9, Case No. 13-53846.
6    We are at the offices of Jones Day, 51
7  Louisiana Avenue Northwest, Washington, D.C.  The
8  time is approximately 9:04 a.m.  The date is July
9  14th, 2014.  The court reporter is Marjorie Peters
10  and the videographer is Jonathan Perry, both here
11  on behalf of Elisa Dreier Reporting Company.
12    Would counsel please introduce yourselves
13  and state whom you represent.
14    MR. SMITH:  Doug Smith for Syncora.
15    MR. STEWART:  Geoffrey Stewart and Sarah
16  Hunger of Jones Day for the City of Detroit and for
17  the witness.
18    MS. SCHAPIRA:  Lisa Schapira from
19  Chadbourne & Parke for Assured Guaranty.
20    MR. BEELAERT:  Jeff Beelaert from Sidley
21  Austin for National.
22    MR. PATEL:  Pravin R. Patel from Weil
23  Gotshal & Manges representing Financial Guaranty
24  Insurance Company.

*(Note: line numbers as shown: lines 1–25 on Page 5)*

---

R. CLINE

1    THE VIDEOGRAPHER:  And would the reporter
2  swear in the witness, please.
3    ROBERT CLINE,
4  a witness, having been first duly sworn, was examined and
5    testified as follows:
6  BY MR. SMITH:
7    Q.    Good morning, Mr. Cline.  You have been
8  deposed before; is that correct, or not?
9    A.    I have testified in a court case before.
10    Q.    Okay.  Have you ever given a deposition?
11    A.    I don't remember.  I have prepared reports.  I
12  don't remember whether I actually participated in this
13  type of deposition.
14    Q.    Okay.  I'll be asking you a series of
15  questions, and you will let me know if you don't
16  understand any of my questions?
17    A.    I will.
18    Q.    Okay.  And feel free to take a break whenever
19  you need to, okay?
20    A.    All right.
21    Q.    The report you filed, your report in this
22  matter, you're acting as an expert in tax policy; is that
23  correct?
24    A.    My responsibility in this project was to do

---

R. CLINE

1  revenue estimates for the City of Detroit.
2    Q.    Okay.  And what is your area of expertise?
3    A.    For my professional career, I've worked in
4  public finance, the economic aspects of public finance.
5    Q.    Okay.  So, you would be an expert in public
6  finance and the economic aspects of public finance; is
7  that correct?
8    A.    My professional career has been doing state
9  tax work, whether it's revenue estimating, tax bill
10  analysis or forecasting.
11    Q.    Okay.  You wouldn't hold yourself out as an
12  expert in urban policy, correct?
13    A.    I would not.
14    Q.    And you wouldn't hold yourself as an expert on
15  health benefits?
16    A.    I would not.
17    Q.    You're not an expert on government in general?
18    A.    I'm not.
19    Q.    You're not an expert on blight reduction?
20    A.    No, I'm not.
21    Q.    Not an expert on art valuation?
22    A.    No.
23    Q.    Not an expert on pensions?
24    A.    No.

---

R. CLINE

1    Q.    Not an expert on government grants?
2    A.    No.
3    Q.    Do you hold yourself out as an expert on
4  casinos or wagering revenue?
5    A.    I do not.
6    Q.    Do you hold yourself out as an expert on state
7  revenue sharing?
8    A.    I've studied state revenue sharing.
9    Q.    In what context?
10    A.    The State of Michigan, I was responsible for
11  various revenue estimates.
12    Q.    And other than that, do you have any
13  experience with state revenue sharing?
14    A.    I do not.
15    Q.    You're not an expert on Detroit's government,
16  correct?
17    A.    I am not.
18    Q.    Not an expert on information technology?
19    A.    No.
20    Q.    Not an expert on transportation systems.
21    A.    No.
22    Q.    Have you ever done forecasting for a city?
23    A.    I have not done forecasting for a city.
24    Q.    And you're not an expert in accounting, are

---

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1                R. CLINE
2    you?
3       A.   I am not.
4       Q.   You're not an expert on Chapter 9
5    bankruptcies?
6       A.   No, I'm not.
7       Q.   You're not a restructuring expert, correct?
8       A.   No.
9       Q.   You're not holding yourself out as a legal
10   expert, correct?
11      A.   No, I'm not.
12      Q.   And you're not a lawyer, correct?
13      A.   I am not.
14      Q.   Have you ever done a tax forecast for a
15   wagering tax before?
16      A.   No, I have not.
17      Q.   And have you ever done a tax forecast for a
18   corporate tax?
19      A.   I have for the State of Michigan, and I did
20   for the State of Minnesota.
21      Q.   Okay.  But in the context of corporate tax
22   revenues to a city, you haven't done a forecast?
23      A.   I have not.
24      Q.   You haven't done a municipal income tax
25   forecast before, have you?

1                R. CLINE
2       A.   I have not.
3       Q.   You haven't done a municipal property tax
4    forecast, have you?
5       A.   I have not.
6       Q.   Have you ever done a tax forecast over a
7    period of -- as long as ten years?
8       A.   I have not.
9       Q.   Okay.  Typically, what was the length of time
10   of the forecasts you have done previously?
11      A.   The forecasts were usually tied to the budget
12   cycle, determined by the legislature.  You might go out
13   four to six years.
14      Q.   Okay.  So, the standard forecast length that
15   Michigan used was four to six years?
16      A.   I would say it was four, in Michigan.
17      Q.   Okay.  So, the generally accepted standard
18   length of a forecast in Michigan was four years?
19      A.   That was the forecast tied to the budget
20   cycle.  You would do forecasts longer term for other
21   types of projects.
22      Q.   Okay.  So, and the longest term forecast you
23   ever performed in the ordinary course of your work as a
24   forecaster was six years; is that correct?
25      A.   I might have done forecasts that went beyond

1                R. CLINE
2    that.  I don't recall.
3       Q.   Okay.  But sitting here today, you can't
4    identify any forecasts you ever did that was longer than
5    six years?
6       A.   I do not remember one.
7       Q.   And I mean, just to get -- make the record
8    clear, the standard forecast for purposes of tax
9    forecasting in Michigan state was four years; is that
10   correct?
11      A.   I believe it is.  The budget cycle would be
12   either two years or four years of forecasts.
13      Q.   Okay.  So, the standard forecast length in
14   Michigan and the accepted forecast length for tax
15   forecasting is either two or four years; correct?
16      A.   Correct.
17      Q.   And you previously worked as an expert in one
18   case; is that correct?
19      A.   I did.
20      Q.   And is that the only case you worked as an
21   expert?
22      A.   As I can recall, that was the only case where
23   I testified as an expert.
24      Q.   And when you testified as an expert, it wasn't
25   in forecasting, correct?

1                R. CLINE
2       A.   It was not.
3       Q.   When did you begin your work for Detroit?
4       A.   It would have been in the spring, I believe,
5    of 2013.
6       Q.   Your work in this case, you have prepared some
7    expert opinions for the confirmation hearing?
8       A.   I have -- I don't understand the question.
9       Q.   Okay.  Well, you know you filed an expert
10   report.
11      A.   Correct.
12      Q.   You know that, right?
13      A.   Correct.
14      Q.   And you're acting as an expert who is going to
15   testify at the confirmation hearing?
16      A.   I understand that, yes.
17      Q.   Okay.  And I'm just wondering, other than your
18   work as an expert in the testimony you're going to give
19   at the confirmation hearing, have you done any other work
20   for the City of Detroit?
21      A.   If you could clarify that question.  Are you
22   referring to all of the work I have done as an EY
23   employee for the City of Detroit?
24      Q.   Well, yes.  Basically, what I'm trying to
25   figure out is I have a copy of your expert report, and

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 4 of 54

1          R. CLINE
2   you've talked about your forecasting work that you have
3   done in order to provide expert opinions in this case.
4   So, I have seen that already, and I'm just trying to
5   understand whether you did any other work for the --
6   **A.    No.**
7   Q.    -- City of Detroit.
8
9
10  **A.    No.  The work that we did was the forecasting,**
11  **10-year forecasts for the City of Detroit, plus an**
12  **extension beyond that period.**
13  Q.    Okay.  So all of the work that you've done for
14  the City of Detroit is reflected in your expert report
15  that --
16          MR. STEWART:  Objection.
17          MR. SMITH:  -- that you've provided,
18      correct?
19          THE WITNESS:  There is a very extensive
20      amount of material that lies behind those summary
21      numbers.
22  BY MR. SMITH:
23  Q.    Okay.  Well, let me rephrase the question,
24  then.  All of the work that you've done for the City of
25  Detroit is reflected in your expert report or the

1          R. CLINE
2   supporting materials that you produced with it, correct?
3          MR. STEWART:  Objection.
4          THE WITNESS:  I don't believe that's
5      correct.
6   BY MR. SMITH:
7   Q.    Okay.  What materials haven't we been provided
8   that reflect your work?
9   **A.    I don't know the answer to that question.**
10  Q.    Well, I'm trying to -- you just told me that
11  you have prepared some materials, right?  I'm trying to
12  figure out if we have got them all.  That's a fair
13  question, right?
14          MR. STEWART:  So, what's the question?
15          MR. SMITH:  The question is, have we been
16      provided all of the materials that reflect your
17      work in this case.
18          THE WITNESS:  I don't know the answer to
19      that question.
20  BY MR. SMITH:
21  Q.    Okay.  So, you can't represent to the Court
22  that we've been provided a complete set of the
23  materials --
24  **A.    I cannot personally represent that.**
25  Q.    But just to clarify, the only work that you've

1          R. CLINE
2   done for the City of Detroit relates to offering expert
3   opinions in this case: is that fair?
4          MR. STEWART:  Objection.
5          THE WITNESS:  I don't think that's an
6      accurate description.
7   BY MR. SMITH:
8   Q.    Well, the only work you've done in this case
9   relates to doing the forecasting work that's the subject
10  of your expert opinions in this case: correct?
11  **A.    What we were asked to do is to provide a**
12  **10-year forecast of expected revenues from the major tax**
13  **sources for the City of Detroit.**
14  Q.    And the reason you were asked to provide that
15  was for purposes of a confirmation hearing and you're
16  testifying as an expert, correct?
17  **A.    I don't think that's an accurate description.**
18  Q.    What other purpose is that forecast being used
19  for: any other purpose?
20  **A.    To my knowledge, it's been part of the**
21  **budgetary discussions for the City of Detroit.**
22  Q.    So, you've done some forecasting work that the
23  results of which are reflected in your expert report that
24  the City has also used for budgetary purposes: is that
25  fair?

1          R. CLINE
2          MR. STEWART:  Objection.
3          THE WITNESS:  I do not know how the
4      information that we have provided has been used.
5      It's beyond my knowledge.
6   BY MR. SMITH:
7   Q.    Okay.  So, the only thing you know is that
8   you've provided expert opinions reflected in your expert
9   report, and that's the work you've done for the City of
10  Detroit?
11          MR. STEWART:  Objection.
12  BY MR. SMITH:
13  Q.    Correct?
14  **A.    We prepared revenue estimates over a 10-year**
15  **period for the City of Detroit.**
16  Q.    Okay.  And that's the only work you've done
17  for the City of Detroit, correct?
18  **A.    That has been my responsibility in this.**
19  Q.    Okay.  And your forecasting work that you just
20  referenced is reflected in your expert report?
21  **A.    It is a summary of the results of the work we**
22  **did.**
23  Q.    Okay.  You weren't involved in putting
24  together forecasts for use with the creditor proposal?
25  **A.    Not to my knowledge.**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 5 of 54

R. CLINE

1
2  Q. Did you know if there was anybody else at
3  Ernst & Young who worked on tax issues for purposes of
4  the creditor proposal?
5  A. Not to my knowledge.
6  Q. And do you know if the City has sought out
7  experts other than yourself to testify in the area of
8  taxes?
9  A. I am not familiar with anyone else.
10  Q. Did you personally calculate the numbers that
11  are in your expert report, or did someone else do the
12  actual, you know, number calculations that are reflected?
13  A. My responsibility was to construct the general
14  framework of the estimating model and to evaluate the
15  results at each step of the way.
16  Q. Okay. So, you didn't do the actual
17  calculations that are reflected in your expert report; is
18  that fair?
19  A. I do have a staff with -- several staff
20  members who worked on the actual estimation.
21  Q. How many staff members assisted you in your --
22  A. I would say --
23  Q. -- in developing your expert opinions?
24  A. -- we may have three staff members in addition
25  to myself.

R. CLINE

1
2  Q. Who are those --
3  MR. STEWART: And you have to let him
4  finish his question and then pause so I can object
5  before you start your answer, or you end up talking
6  over each other which complicates the reporter's
7  job.
8  BY MR. SMITH:
9  Q. Who are the staff members that assisted in
10  formulating your expert opinions?
11  A. Caroline Sallee and Katie Ballard. Those were
12  the two principal people.
13  Q. And so it's fair to say that you didn't
14  personally calculate the numbers in your report; it was
15  people on your staff, correct?
16  A. Could you define "calculate" for me.
17  Q. Well, there are numbers that are plugged into
18  the model, right, and then out pops some results, right?
19  MR. STEWART: Objection.
20  BY MR. SMITH:
21  Q. And I'm wondering, did you actually do any of
22  the computations that are reflected in your expert
23  report?
24  MR. STEWART: That's a compound question.
25  Which one do you want answered?

R. CLINE

1
2  MR. SMITH: Okay.
3  BY MR. SMITH:
4  Q. Did you do the calculations in your expert
5  report or did staff members do them?
6  A. I would say staff members constructed the
7  mechanics of the model.
8  Q. Okay. And you haven't -- have you ever
9  constructed the mechanics of a forecasting model before?
10  A. I have.
11  Q. But you didn't do it in this case; correct?
12  A. I don't think that's an accurate summary.
13  Q. Well, I'm trying to get at who did the actual
14  computations in your report?
15  A. I worked very closely with my staff at all
16  phases of the estimation process.
17  Q. Okay, but did you actually personally do the
18  computations that appear in the report?
19  A. I personally reviewed each of the spreadsheets
20  that were used to do the calculations.
21  Q. And who actually created the spreadsheets that
22  did the calculations that appear in your report?
23  A. Under my direction, my staff constructed the
24  individual spreadsheets.
25  Q. Ever forecast inflation rates before?

R. CLINE

1
2  A. I have.
3  Q. Have you ever forecasted municipal population
4  levels before?
5  A. I have not.
6  Q. Have you ever forecast population levels of
7  individuals commuting into a city to do work?
8  A. I have not.
9  Q. You never forecast population levels of
10  individuals living inside a city but working outside of
11  it?
12  A. I have not.
13  Q. Have you ever done any economic forecasting to
14  assess income levels?
15  A. I don't understand the question.
16  Q. Have you ever forecasted income levels of a
17  population over time?
18  A. What do you mean by income levels?
19  Q. Well, the levels -- there's a population of
20  working people, and they're receiving income from doing
21  work. Have you ever forecast what their income will be
22  in the future?
23  A. As tax research director, I was responsible
24  for forecasting taxable income for taxpayers.
25  Q. The State of Michigan, when you worked there,

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 6 of 54

R. CLINE

2  they don't do any forecasting for the City of Detroit, do
3  they?
4  **A.   Not that I know of.**
5  Q.   Ever forecast a city employment growth rate?
6  **A.   No, I have not.**
7  Q.   Ever forecast wage growth rate in a city?
8  **A.   Do you mean prior to the Detroit project?**
9  Q.   Prior, yes.
10  **A.   No, I have not.**
11  Q.   But you're doing that in your report here; is
12  that fair?
13  **A.   It is part of the analysis that we did.**
14  Q.   Ever forecast income tax rates for a city?
15  **A.   No, I have not.**
16  Q.   Ever forecast corporate tax rates for a city?
17  **A.   No, I have not.**
18  Q.   Ever forecast property tax rates for a city?
19  **A.   I may have done some local work in Michigan**
20  **for a city related to property taxes.**
21  Q.   Which city was that?
22  **A.   Holland, Michigan.**
23  Q.   And what work did you do?
24  **A.   I was a member of the public school board.  I**
25  **may have looked at property tax forecasts for the school**

R. CLINE

2  **district.**
3  Q.   Okay.  But you didn't do any --
4       MR. STEWART:  You've got to let him finish
5  his answer before you ask your next question.  He
6  had not really finished.
7       MR. SMITH:  Okay.  You didn't do any kind
8  of forecasting when you're sitting on the school
9  board in Holland, Michigan?
10       THE WITNESS:  I reviewed the forecast
11  prepared by the school district.
12  BY MR. SMITH:
13  Q.   Do you agree that wage earning tax revenue
14  depends on a number of factors?
15  **A.   Yes, I would agree with that.**
16  Q.   Would it depend on the level of gambling, the
17  level of revenue at the casinos and the wagering tax
18  rate?
19  **A.   Yes.**
20  Q.   Any other factors that might influence the
21  wagering tax?
22  **A.   I believe you accurately described the**
23  **calculation of the tax revenue figure.**
24  Q.   Would it be fair to say that the utility tax
25  revenues also depend on a number of factors?

R. CLINE

2  **A.   They do.**
3  Q.   And among the factors that could influence
4  utility tax rates are use of the utility, the rate of
5  collection of the taxes, the general economic conditions,
6  correct?
7  **A.   Correct.**
8  Q.   Anything else you can think of?
9  **A.   I think those would be key drivers.**
10  Q.   But do you -- can you think of other key
11  drivers?
12  **A.   I have no others.**
13  Q.   Have you ever forecast a utility tax revenue
14  before?
15  **A.   I may have as part of the budget for either**
16  **Michigan or Minnesota; I don't recall.**
17  Q.   Okay.  But a municipal utility tax, have you
18  ever forecast that?
19  **A.   No, I have not.**
20  Q.   I wanted to ask you about some of the inputs
21  from your model.  There are various inputs that you use
22  in your model to do your forecasting, correct?
23  **A.   Correct.**
24  Q.   And many of the inputs that you use in your
25  model are inputs that you've taken from other people, or

R. CLINE

2  other sources, correct?
3  **A.   Some of them did come from other sources.**
4  Q.   And what were some of the expert sources that
5  you're relying on for inputs in your model?
6       MR. STEWART:  Objection.
7       THE WITNESS:  We used a number of sources
8  as input to the model and in determining the
9  parameters of the model.
10  BY MR. SMITH:
11  Q.   And for example, you use expert -- some
12  materials from expert economists at Michigan to --
13  **A.   We used the latest -- at that point in time,**
14  **the latest available statewide forecast from the research**
15  **seminar in quantitative economics and consensus forecast**
16  **for the State.**
17  Q.   And those are forecasts that are created by
18  experts other than yourself?
19  **A.   They're created by economists that work for**
20  **the State of Michigan, or --**
21  Q.   And --
22  **A.   -- or are working with the State of Michigan.**
23  Q.   And are there any other sources that you're
24  relying on that are created by experts other than
25  yourself?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 7 of 54

R. CLINE

1
2    MR. STEWART: Objection.
3    THE WITNESS: I'm not sure I understand
4    what you mean.
5    BY MR. SMITH:
6    Q.    Well, I mean, here's another example. You're
7    relying on the forecasts that have been created in this
8    case for the City of Detroit by experts other than
9    yourself, such as Mr. Malhotra, correct?
10    MR. STEWART: Objection.
11    THE WITNESS: The economic forecast I was
12    referring to was created for the State of Michigan.
13    BY MR. SMITH:
14    Q.    No, I know. I'm just trying to found out what
15    sources you've used. That's one source, correct?
16    A.    Correct.
17    Q.    Another thing that you say in your expert
18    report that you're relying on is Mr. Malhotra's forecast
19    for the City of Detroit. Do you recall that?
20    A.    I don't recall saying that in the report.
21    Q.    Did you write your report?
22    A.    I did work with...
23    Q.    Why is your report written in the third person
24    talking about Mr. Cline all the time?
25    A.    I'm not sure.

R. CLINE

1
2    Q.    The Michigan employment growth rate; did you
3    create that input to your model, or did you derive that
4    from somebody else?
5    A.    It was a combination of beginning with the
6    forecast, the consensus forecast for the State of
7    Michigan. For the out years when that forecast was not
8    available, EY provided the forecast.
9    Q.    When you say EY provided the forecast, who
10    provided it?
11    A.    My shop.
12    Q.    The ratio of Detroit employment to Michigan
13    employment, who provided that number?
14    A.    I believe we calculated that number.
15    Q.    The lag of Detroit's recovery behind the
16    Michigan recovery; who calculated that?
17    A.    I believe that was part of our analysis.
18    Q.    The Detroit population growth rate: where did
19    that come from?
20    A.    I believe it originally came from SEMCOG as
21    reported in -- I believe it's Detroit City -- Detroit
22    First City Organization that has done economic analysis
23    of the City.
24    Q.    Did you rely on information from the City of
25    Detroit for your analysis?

R. CLINE

1
2    A.    We did receive information from the City of
3    Detroit.
4    Q.    And what information did you rely on from the
5    City?
6    A.    We relied upon their actual tax collection
7    information, and their update of the flow of revenue
8    collections.
9    Q.    And you're aware that there have been a number
10    of independent experts who have criticized the City of
11    Detroit's recordkeeping as unreliable, correct?
12    MR. STEWART: Objection.
13    THE WITNESS: I'm not aware of that.
14    BY MR. SMITH:
15    Q.    Have you done any investigation to look into
16    assessments of the City of Detroit's recordkeeping?
17    A.    No.
18    Q.    So, you haven't done any analysis or testing
19    to ensure the reliability of the information you were
20    provided from the City of Detroit for your model?
21    MR. STEWART: Objection.
22    THE WITNESS: We worked very closely with
23    the City of Detroit to clarify and understand the
24    information that was provided to us.
25    BY MR. SMITH:

R. CLINE

1
2    Q.    But you didn't do any independent analysis or
3    testing to verify the accuracy of the information
4    provided to you by the City, correct?
5    A.    I did not.
6    Q.    And nobody on your team did, correct, as far
7    as you're aware?
8    A.    Not that I know of.
9    Q.    The -- did you rely on information provided by
10    Conway & MacKenzie?
11    A.    Not to my knowledge.
12    Q.    Were there any consultants for the City that
13    you relied on for information for your analysis?
14    A.    Beyond the EY team?
15    Q.    Yeah. Beyond the EY team.
16    A.    Not that I know of.
17    Q.    Who on the EY team did you rely on for
18    information for your analysis?
19    A.    A number of folks in working with the City of
20    Detroit.
21    Q.    Like who?
22    A.    Gaurav was our primary contact.
23    Q.    And Mr. Malhotra?
24    A.    Mr. Malhotra.
25    Q.    Anybody else?

Pages 25 to 28

R. CLINE

1
2    **A.    There were others.**
3    Q.    And who were the others?
4    **A.    I don't have a full list of names.**
5    Q.    Would it be fair to say that you've relied on
6    information from a number of people whose identities are
7    unknown to you?
8         MR. STEWART: Objection.
9         THE WITNESS: I would not agree with that
10   statement.
11   BY MR. SMITH:
12   Q.    Okay. Can you -- other than Mr. Malhotra,
13   you -- there's other people, and can you identify any of
14   them?
15   **A.    I would have to get that list of names for**
16   **you.**
17   Q.    Okay. So, sitting here today, you can't
18   identify all of the people who you relied on for
19   information for your model, correct?
20        MR. STEWART: Objection.
21        THE WITNESS: No, I cannot.
22   BY MR. SMITH:
23   Q.    And in general, you didn't do anything to
24   independently verify the accuracy or reliability of the
25   information you were provided by other people for your

R. CLINE

1
2    forecasting models, correct?
3    **A.    We evaluated all of the information we were**
4    **provided to see if we thought it was reliable in the**
5    **sense that it looked consistent over time, there weren't**
6    **unexplained differences. We looked carefully at all of**
7    **the information that's provided to us.**
8    Q.    But you didn't do any independent testing or
9    analysis to go back and actually check or audit the
10   information you were provided in order to ensure that it
11   was reliable, correct?
12        MR. STEWART: Objection.
13        THE WITNESS: We were not asked to audit
14   figures for the analysis.
15   BY MR. SMITH:
16   Q.    And so, you didn't do it, correct?
17   **A.    As I mentioned, we carefully reviewed all of**
18   **the information that we were given before we plugged it**
19   **into the model.**
20   Q.    Okay. I understand you reviewed information,
21   but you didn't go back and check the information against
22   the sources of the information to ensure that it was
23   reliably reported before you plugged it into your model,
24   correct?
25        MR. STEWART: Objection.

R. CLINE

1
2         THE WITNESS: I'm not sure what that
3    process would look like.
4    BY MR. SMITH:
5    Q.    Well, for example, you didn't go back and look
6    at records -- well, how many hours did you spend on your
7    work in this case?
8    **A.    I do not know what the total is.**
9    Q.    Can you give me a ballpark?
10   **A.    I really cannot.**
11   Q.    Was it more than 100 hours?
12   **A.    As I say, I do not know what the exact number**
13   **of hours is.**
14   Q.    Would it be fair to say that there were a
15   number of individuals who were not designated as experts,
16   haven't submitted an expert report in this case, whose
17   opinions you relied on as inputs to your model?
18   **A.    I don't understand what the word "expert"**
19   **means.**
20   Q.    Well, you understand that there's some people
21   that have submitted expert reports, like Mr. Malhotra,
22   Miss Sallee, correct?
23   **A.    Yes, I understand that they did submit**
24   **reports.**
25   Q.    Okay. And by "expert," I'm talking about the

R. CLINE

1
2    people that submitted reports in this case --
3    **A.    Yes.**
4    Q.    -- for the City.
5    **A.    I'm aware of those reports.**
6    Q.    Okay. So, we're on the same page about how
7    I'm using the term expert, correct?
8    **A.    I believe that I do understand.**
9    Q.    But there were a number of individuals who
10   were not submitting reports in this case who you relied
11   on for your analysis, correct?
12   **A.    There are a number of people who provided us**
13   **inputs for our analysis, including people at the State**
14   **level as well as the City level.**
15   Q.    And those are experts in their fields, but
16   they're not people who have submitted expert reports in
17   this case, correct?
18        MR. STEWART: Objection.
19        THE WITNESS: I don't know -- excuse me.
20        MR. STEWART: Go ahead.
21        THE WITNESS: I don't know what "expert"
22   means in that context.
23   BY MR. SMITH:
24   Q.    Did you cooperate closely with people from the
25   State in developing your analysis?

Pages 29 to 32

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 9 of 54

1                    R. CLINE
2    information as we could.
3       Q.    So, the answer is yes, correct?
4            MR. STEWART:  Objection.
5            THE WITNESS:  We did use input from other
6    people in doing our analysis.
7    BY MR. SMITH:
8       Q.    And you used input from people that have
9    expertise that you lack in doing your analysis, correct?
10           MR. STEWART:  Objection.
11   BY MR. SMITH:
12      Q.    Such as people from the City, correct?
13      A.    For example, we talked to people at the City
14   to find out what current revenue collections were, which
15   we did not have direct access to.
16      Q.    Okay.  So, you did rely on individuals who
17   have expertise that you lack in performing your analysis,
18   correct?
19      A.    We used other people as sources of information
20   that we used in our revenue forecasts.
21      Q.    And that included people who have expertise
22   that you lack.
23           MR. STEWART:  Objection.
24           MR. SMITH:  Correct?
25           THE WITNESS:  Again, I'm not sure what you

1                    R. CLINE
2    mean by "expertise."
3    BY MR. SMITH:
4       Q.    Well, you're not an expert on the City of
5    Detroit for example, right?  We talked about that, right?
6    Do you recall that?  You can't answer whether you recall?
7            MR. STEWART:  Don't badger the witness.
8            MR. SMITH:  I'm not badgering.
9            MR. STEWART:  You are, too.
10           MR. SMITH:  I'm waiting for an answer.
11           MR. STEWART:  Well, no, you're badgering
12   the witness.  And that actually wasn't the question
13   you asked before.  He has every right to be
14   confused when you said it had already been covered.
15   That's a misstatement of the record.
16           MR. SMITH:  The record will speak for
17   itself.
18   BY MR. SMITH:
19      Q.    But it's fair to say that you had to rely
20   on -- this is a massive -- you would agree with me that
21   this is a massive undertaking, the forecasting of tax
22   revenues for the City, correct?
23      A.    It is a complicated analysis that we did.
24      Q.    And forecasting in general, all of the
25   revenues and costs for the City, the forecasts that

1                    R. CLINE
2    Mr. Malhotra is doing, that's an even more complex task
3    with a lot of moving parts, correct?
4       A.    I'm not sure I have a judgment about the level
5    of complexity of the expenditure side because we were not
6    doing that analysis.
7       Q.    Okay.  But your analysis gets plugged into
8    Mr. Malhotra's analysis, correct?
9       A.    It's my understanding that that is how it
10   was -- the product of our analysis was used.
11      Q.    Okay.  And in order to perform the analysis,
12   you needed to rely on numerous people other than
13   yourself: correct?
14           MR. STEWART:  Objection.
15           THE WITNESS:  We relied upon information
16   provided to us by other people.
17   BY MR. SMITH:
18      Q.    And you relied on information provided to you
19   by other people who have expertise that you lack,
20   correct?
21           MR. STEWART:  Objection.  Is this the sixth
22   time, eighth time you've asked that question,
23   Mr. Smith?
24           THE WITNESS:  And I'm still a little
25   confused by what you mean by "expertise."

1                    R. CLINE
2    BY MR. SMITH:
3       Q.    Okay.  Well, experts can have different kinds
4    of expertise, correct?
5       A.    I don't understand the general concept of
6    "expert" and "expertise."
7       Q.    Okay.  So, even though you're holding yourself
8    out as an expert in this case, you don't understand what
9    an expert is, correct?
10      A.    I'm not holding myself out to be an expert.  I
11   am -- was responsible for the revenue forecasts that we
12   prepared for the City of Detroit.
13      Q.    So, you're not holding yourself out as an
14   expert on revenue forecasting, correct?
15      A.    I have extensive experience in revenue
16   forecasting at the State level.  We did the revenue
17   forecasts for the City of Detroit.
18      Q.    You wouldn't call yourself an expert on
19   revenue forecasting, correct?
20      A.    Again, I have trouble with the term "expert."
21      Q.    And so, the answer is you wouldn't use that
22   term to describe yourself, correct?
23      A.    I don't know what you mean by the term
24   "expert."
25      Q.    Okay.  So, you wouldn't -- you wouldn't call

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1
2  anybody involved for the City an expert in this case;
3  it's not a term you would use, correct?
4  **A.    I don't understand what you mean by the term**
5  **"expert."**
6      Q.    Okay.  Well, what do you -- have you ever used
7  the term "expert" before?
8  **A.    I can't relate that to the questions you've**
9  **been asking me.**
10     Q.    Can you define "expert" for me?
11 **A.    No.**
12     Q.    And so, because you can't define the term
13 "expert," you certainly wouldn't hold yourself out as an
14 expert in this case, correct?
15         MR. STEWART:  Objection.
16         MR. SMITH:  Correct?  Are you going to
17     answer the question?
18         MR. STEWART:  If you are going to gesture
19     at the witness, I'd like the camera to start
20     capturing Mr. Smith's arms' motions.
21         MR. SMITH:  I object.  The camera should
22     stay on the witness.
23         MR. STEWART:  Well, if you are going to
24     gesture like that.
25         MR. SMITH:  I'm waiting for an answer.

R. CLINE

1
2      We're sitting here waiting for a long time.
3      There's delaying tactics going on and he's not
4      responding to the questions.
5         MR. STEWART:  The fact of the matter is
6     you're asking very poor questions and it's your own
7     fault.  Let's repeat the question and the witness
8     can answer -- or have the question.
9         MR. SMITH:  You wouldn't call yourself --
10        MR. STEWART:  Go ahead.
11 BY MR. SMITH:
12     Q.    You wouldn't call yourself an expert in this
13 case, correct?
14 **A.    I don't know what you mean by the term**
15 **"expert."**
16     Q.    And so, the answer is, no, you wouldn't call
17 yourself one, correct?
18 **A.    The answer is:  I don't know what you mean by**
19 **"expert."**
20     Q.    Did you rely on reinvestment numbers from
21 Conway & -- oh, wait.  I think we covered that question.
22 You have had no interaction with Conway & MacKenzie; is
23 that correct?
24 **A.    I don't know if the question -- that is a**
25 **question, but it sounds like you posed a separate**

R. CLINE

1
2  question this time.
3      Q.    Have you had any interaction with Conway &
4  MacKenzie?
5  **A.    I have been at a presentation with people from**
6  **those firms.**
7      Q.    What presentation was that?
8  **A.    I believe it was a presentation to bond**
9  **holders and bond insurers in New York City.**
10     Q.    Other than that, have you had any interaction
11 with Conway & MacKenzie?
12 **A.    I have not.**
13     Q.    Have there been any formal studies that have
14 been conducted to ascertain whether the City can increase
15 revenues?
16 **A.    I am not aware of those studies.**
17     Q.    Okay.  You're not aware of any study ever
18 being conducted to ascertain whether the City can
19 increase revenues, correct?
20 **A.    I assume that you were asking about studies**
21 **during the period of time when we were doing the analysis**
22 **of the City of Detroit's revenue outlook.**
23     Q.    Or any -- any -- I'm -- I didn't mean to
24 constrain my question to a particular time frame.  Are
25 you aware -- you're not aware of any formal studies that

R. CLINE

1
2  have been conducted to ascertain whether the City can
3  increase revenues, correct?
4  **A.    I am aware of one study, which I actually did**
5  **myself.**
6      Q.    Okay.  Other than your expert analysis, you're
7  not aware of any formal studies conducted to ascertain --
8  **A.    Not that I looked at.**
9      Q.    I'll ask the question so I can finish it, and
10 then you can answer.
11         MR. STEWART:  You do have to give him time
12     to finish.
13 BY MR. SMITH:
14     Q.    Other than your analysis, you're not aware of
15 any formal studies conducted to ascertain whether the
16 City can increase revenues, correct?
17 **A.    I am not.**
18     Q.    And you're not aware of any formal studies
19 conducted to ascertain costs that the City conducted --
20 cut, correct?
21 **A.    Do you mean from the expenditure side of the**
22 **budget?**
23     Q.    Yes.
24 **A.    I'm not aware of any.**
25     Q.    You're not aware of any formal studies

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 11 of
54

1           R. CLINE
2 conducted on Detroit income tax, wagering tax, utility
3 users' tax or corporate tax, correct?
4    **A.   I am aware of the forecasts the City of**
5 **Detroit did for those tax sources.**
6    Q.  Is that the forecast that you have done, or is
7 that a different forecast?
8    **A.   That would be the forecast prepared as the**
9 **normal budgetary cycle for the City of Detroit.**
10    Q.  All right. Did you perform that, or did
11 somebody else perform that?
12    **A.   It was done -- my understanding is it was done**
13 **by the City.**
14    Q.  And the City -- what time period do they use
15 as their standard period for forecasting?
16    **A.   I believe they go out two years, might be**
17 **three, but I believe it's a two-year forecast.**
18    Q.  You're not aware of any forecast conducted for
19 the City of Detroit that's longer than three years,
20 correct?
21    **A.   I'm not aware of any studies of forecasting**
22 **tax revenues beyond that period of time.**
23          MR. STEWART: You mean by the City of
24 Detroit not for the City of Detroit, right,
25 Mr. Smith?

1           R. CLINE
2          MR. SMITH: No, I mean for.
3 BY MR. SMITH:
4    Q.  You're not aware of any forecasts for the City
5 of Detroit going out more than three years, whether
6 conducted by the City or any other party, correct?
7    **A.   I am not.**
8          MR. STEWART: Excluding his?
9          MR. SMITH: Yes. We're excluding his.
10         MR. STEWART: Yeah. That's what I figured.
11 That's why I raised it.
12 BY MR. SMITH:
13    Q.  Your forecast is anomalous, correct, in terms
14 of the length of time that it goes out, correct?
15          MR. STEWART: Objection.
16         THE WITNESS: I don't know what you mean by
17 "anomalous."
18 BY MR. SMITH:
19    Q.  It means there's no forecast like the one
20 you've conducted here that's ever been conducted for the
21 City of Detroit, correct?
22    **A.   I did not say that.**
23    Q.  Well, I'm asking you now. There's no forecast
24 like the one you've conducted for the City of Detroit --
25    **A.   I don't --**

1           R. CLINE
2    Q.  -- correct, that's ever been done?
3    **A.   I don't know if that's correct.**
4    Q.  Okay. Sitting here --
5          MR. STEWART: Do let him finish his
6 question before you answer, because you're making
7 his life harder, too.
8 BY MR. SMITH:
9    Q.  Sitting here today, you can't identify any
10 forecasts using the type of methodology that you used for
11 the City of Detroit, correct?
12    **A.   No, that's not correct.**
13    Q.  What forecast has been done for the City
14 that's used the methodology you used?
15    **A.   The methodology that we have used is a fairly**
16 **standard forecasting methodology that's been used**
17 **extensively in the City of Detroit and for the State of**
18 **Michigan and in other cities.**
19    Q.  Have you reviewed any depositions in this
20 case?
21    **A.   I have not, other than my own.**
22    Q.  The -- you say that the methodology used is a
23 standard methodology that's been used before, correct?
24    **A.   The methodology we used in constructing the**
25 **forecasting model is based upon my experience as a**

1           R. CLINE
2 revenue forecaster, and I believe it is fairly standard
3 in terms of how State revenue forecasting is done.
4    Q.  Can you point me to any treatise or other
5 publication that lays out the methodology you've used for
6 forecasting in this case?
7    **A.   There are a number of publications, books, and**
8 **articles that discuss revenue forecasting. I can't give**
9 **you specific references today.**
10    Q.  But is there any book or other written
11 publication that specifically lays out the specific
12 methodology that you've used in this case?
13    **A.   The methodology that we used in this case is**
14 **the methodology that I thought followed as a tax revenue**
15 **estimator in both the State of Minnesota and the State of**
16 **Michigan.**
17    Q.  Okay. And you were doing forecasting for the
18 State, not cities, correct?
19    **A.   Correct.**
20    Q.  And you never used -- while you were at the
21 State of Minnesota or the State of Michigan, you never
22 forecast tax revenue out to 10 years, correct?
23    **A.   I don't know if that's a correct statement.**
24    Q.  Sitting here today, you can't identify any
25 instance when you were at either the State of Minnesota

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 12 of
54

R. CLINE

1 or the State of Michigan where you constructed a tax
2 forecast that looked at a period of time as long as 10
3 years, correct?
4     **A.**   **The tax forecasts that we -- that I have done**
5 **at the State level, that have been published, have been**
6 **the forecasts related to the budget cycle, which is**
7 **determined by the legislature.**
8     Q.   And that length of time would be much less
9 than 10 years, correct?
10     **A.**   **It would be.**
11     Q.   And there's a model that you used that you
12 plug the numbers into. Where did that actual model come
13 from: is that something you constructed for purposes of
14 this case?
15     MR. STEWART: Objection.
16     THE WITNESS: We prepared our revenue
17     estimates using a model of the specific taxes that
18     we looked at that we constructed.
19 BY MR. SMITH:
20     Q.   For purposes of this litigation, correct?
21     **A.**   **For purposes of making a 10-year forecast for**
22 **the City of Detroit.**
23     Q.   Okay. So, the model that you use in your --
24 to generate the numbers in your expert report is

---

R. CLINE

1 something that you constructed for purposes of your work
2 on -- for the City of Detroit, correct?
3     **A.**   **That is correct.**
4     Q.   Did you personally construct that model, or
5 was that somebody on your staff?
6     **A.**   **As I believe I've answered, I was the director**
7 **of the construction of the model. The calculations, the**
8 **creation of the revenue estimating formulas was done by**
9 **my staff.**
10     Q.   And so, before you started your work in the
11 spring of 2013, the model that you're using did not
12 exist, correct?
13     **A.**   **Prior to our joining the project, I believe**
14 **the team in Detroit had created the framework of a**
15 **10-year revenue forecasting model.**
16     Q.   Okay. Who did that?
17     **A.**   **We got that information from the EY team in**
18 **Detroit. I'm not sure who put that model together**
19 **initially.**
20     Q.   Okay. So, the model was put together by the
21 time you started your work on the case: is that correct?
22     **A.**   **I don't think that's accurate.**
23     Q.   Well, what was put together by the time you
24 started your work on the case?

---

R. CLINE

1     **A.**   **An Excel spreadsheet had been put together**
2 **that identified the major revenue sources, and that had**
3 **done some initial estimates for a 10-year period of time.**
4     Q.   And do you know who specifically put that
5 together?
6     **A.**   **I do not.**
7     Q.   But you used that spreadsheet, the
8 pre-existing spreadsheet as the basis or at least as a
9 source for your work on the case?
10     **A.**   **It was a starting point for our modeling.**
11     Q.   Did you look at the experience in any other
12 cities in developing your forecast?
13     **A.**   **We did at one point.**
14     Q.   What other cities did you look at?
15     **A.**   **We looked at the economic recovery in various**
16 **cities that had suffered population decline over a period**
17 **of time. I could get you a list of those cities. I**
18 **believe it was about a dozen separate cities.**
19     Q.   In any of the cities that you looked at that
20 had suffered population decline, did anybody file for
21 Chapter 9?
22     **A.**   **I don't know the answer to that.**
23     Q.   Sitting here today, though, you can't identify
24 any cities suffering population decline that filed for a

---

R. CLINE

1 Chapter 9 as a result, correct?
2     **A.**   **Not to my knowledge.**
3     Q.   Have you had any interaction with Mr. Hill?
4     **A.**   **I have not personally.**
5     Q.   Have you had any interaction with Gary Evanko?
6     **A.**   **Not personally, I have not.**
7     Q.   To your knowledge, has anybody on your team?
8     **A.**   **Don't know the answer to that. I'd have to**
9 **check. I'm just not sure what any interactions they may**
10 **have had.**
11     Q.   Have you worked with Eric Scorsone at Michigan
12 State?
13     **A.**   **I have not personally worked with him.**
14     Q.   And do you view him as an expert?
15     **A.**   **Again, I'm not sure what you mean by "expert."**
16     Q.   Okay. Do you know who he is?
17     **A.**   **I do know who he is.**
18     Q.   Okay. What do you know about him?
19     **A.**   **I know that he has been providing the City of**
20 **Detroit with revenue estimates at various points in time.**
21     Q.   Okay. And have you reviewed revenue estimates
22 that have been provided by Mr. Scorsone to the City of
23 Detroit?
24     **A.**   **I have.**

---

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1
2    Q.    And are there ways in which your revenue
3  forecasts differ from Mr. Scorsone's?
4    **A.    They differ in terms of the results.**
5    Q.    And could you explain how -- in what ways they
6  differ in terms of results?
7    **A.    When we looked at his revenue estimates that**
8  **were made available to us about late June, perhaps June**
9  **of 2013, we noticed that his current forecast, or the**
10 **most recent that we saw, had revenue estimates that were**
11 **higher than the actuals that were coming in at that point**
12 **in time.**
13   Q.    And so, Mr. Scorsone's revenue estimates are
14 generally higher than the ones that you've provided in
15 this case, correct?
16         MR. STEWART:  Objection.
17         THE WITNESS:  I don't -- I don't know.
18 BY MR. SMITH:
19   Q.    Mr. Scorsone, is he a Professor at Michigan
20 State University?
21   **A.    I believe he is.**
22   Q.    Does he have any -- he works with the State in
23 some capacity; is that correct?
24   **A.    I don't know the answer to that question.**
25   Q.    I'll probably mispronounce this name, but

R. CLINE

1
2  Shavi Sarna, do you know who that is?
3    **A.    I do.**
4    Q.    Do you work with that person?
5    **A.    He was one of the members -- he is one of the**
6  **members of the EY team in Detroit.**
7    Q.    And what has been his role?
8    **A.    He has provided us with a lot of the**
9  **information that had been prepared by the EY team in**
10 **Detroit.**
11   Q.    Okay.  So, you have been working with Shavi
12 Sarna, and Mr. Malhotra has been working with Shavi
13 Sarna; is that fair?
14   **A.    I believe that's correct.**
15   Q.    Ernst & Young hasn't prepared a balance sheet
16 for the City of Detroit as far as you're aware, correct?
17   **A.    I -- not that I'm aware of.**
18   Q.    Why aren't you doing the property tax
19 forecasting or the revenue sharing forecasting?
20   **A.    I supervised the property tax forecasting, the**
21 **revenue forecasting, and Caroline Sallee did the heavy**
22 **lifting for the modeling.**
23   Q.    Okay.  And why aren't you testifying as the
24 expert instead of Miss Sallee with respect to those
25 matters?

R. CLINE

1
2    **A.    I don't know the answer to that question.**
3    Q.    Okay.  Do you know why you -- why aren't you
4  forecasting fees and other revenues from the City?
5    **A.    We were not asked to do that.**
6    Q.    Do you have any idea why you're not -- you
7  weren't asked to do forecasting for fees or other
8  revenues from the City?
9    **A.    I do not.**
10   Q.    Other than the income tax, corporate tax,
11 utility users tax, wagering tax and property tax, are
12 there any other taxes collected by the City?
13   **A.    There is another revenue source that we were**
14 **responsible for.**
15   Q.    What's that?
16   **A.    That was State revenue sharing payments, the**
17 **forecast of State revenue sharing payments to the City of**
18 **Detroit.**
19         **(Off the record.)**
20 BY MR. SMITH:
21   Q.    Do you have any idea about what fees the City
22 collects?
23   **A.    I do not.**
24   Q.    In your view, what are the biggest sources of
25 untapped revenue for the City?

R. CLINE

1
2         MR. STEWART:  Objection.
3         THE WITNESS:  I don't have an opinion on
4      that.
5  BY MR. SMITH:
6    Q.    You weren't asked to identify potentially
7  untapped sources of revenue for the City, correct?
8    **A.    Correct.**
9    Q.    You weren't asked to identify ways in which
10 the City could increase its revenues through taxes,
11 correct?
12   **A.    We were not asked to do that.**
13   Q.    Do you have any idea why you weren't asked to
14 do that?
15   **A.    I do not.**
16   Q.    Don't you think it's something the City would
17 want to do to increase revenues through the tax
18 mechanism?
19         MR. STEWART:  Objection.
20         THE WITNESS:  I have no comment on that.
21 BY MR. SMITH:
22   Q.    Well, I mean, just as a matter of common
23 sense, Detroit wants to increase its revenues, correct?
24   **A.    I don't know the answer to that question.**
25   Q.    Okay.  So, nobody from the City or the

1             R. CLINE
2   emergency manager's office has communicated any desire to
3   increase revenues to you, correct?
4       **A.    No one has communicated that to me personally,**
5   **no.**
6       Q.    No one from the City or the emergency manager
7   has ever sought out your expertise to try to help the
8   City increase its revenues so it can pay more to the
9   creditors, correct?
10          MR. STEWART:  Objection.
11          THE WITNESS:  No one has asked us to do tax
12      policy analysis of alternatives for the City.
13  BY MR. SMITH:
14      Q.    So that's correct?  I mean, I'm just trying to
15  get a yes or no that -- nobody from the City has reached
16  out to you to try to get your expertise to increase
17  revenues for the City so it can pay more to its
18  creditors, correct?
19          MR. STEWART:  Objection.
20          THE WITNESS:  The analysis that we did for
21      the City, and summarized in the expert report, is
22      what we were asked to do for the City.
23  BY MR. SMITH:
24      Q.    Okay.  So, nobody from the City or the
25  emergency manager's office has reached out to you to get

1             R. CLINE
2   your expertise to try to help increase revenues for the
3   City to pay the creditors more, correct?
4           MR. STEWART:  Objection.
5           MR. SMITH:  That's not something you were
6       asked to do, correct?
7           MR. STEWART:  Objection.
8           THE WITNESS:  No one has contacted me to
9       ask to do that type of analysis.
10  BY MR. SMITH:
11      Q.    And as far as you're aware, nobody has
12  contacted anybody at Ernst & Young to do that type of
13  analysis, correct?
14      **A.    I don't know the answer to that.**
15      Q.    You can't identify anybody that's been asked
16  to do that type of analysis to increase revenues for the
17  City through tax policy or otherwise, correct?
18      **A.    I just don't know if EY was asked to do that.**
19      Q.    Sitting here today, you're not aware of any
20  such request, correct?
21      **A.    I don't know of any such requests.**
22      Q.    Okay.  Do you agree that the forecasts that
23  Ernst & Young has performed rely on people with diverse
24  expertise?
25          MR. STEWART:  Objection.

1             R. CLINE
2           THE WITNESS:  As I believe I've said, we
3       relied upon a number of other people for
4       information that we used in our modeling exercise.
5   BY MR. SMITH:
6       Q.    But you're not in a position to comment on the
7   expertise of the people you relied on for information for
8   your model, correct?
9       **A.    No, I'm not.**
10      Q.    Do you agree that some of the assumptions that
11  you used for your model are based on expert judgments
12  made by other third parties?
13      **A.    Outside of the area of the population**
14  **forecast, I believe we are responsible for the major**
15  **assumptions in the model.**
16      Q.    As far as the population forecast, though, you
17  had to rely on expert judgments by individuals outside of
18  Ernst & Young, correct?
19      **A.    We relied upon the forecasts that were**
20  **prepared by SEMCOG for the City of Detroit.**
21      Q.    So the answer is correct, you did do that,
22  relied on the expert judgment of a third party for the
23  population forecast, correct?
24      **A.    We relied upon the forecast that SEMCOG had**
25  **prepared.**

1             **R. CLINE**
2       Q.    And just so the record is clear, could you
3   tell me what SEMCOG stands for?
4       **A.    I believe it's the Southeast Michigan**
5   **Organization of Governments?  I'll have to check that to**
6   **verify that.**
7       Q.    Do you know whether that's a State entity or
8   what kind of entity that is?
9       **A.    I believe it's a regional entity that**
10  **represents governments in that region of the state.**
11      Q.    Have you updated your forecasts over time?
12      **A.    We have.**
13      Q.    Have you changed assumptions in your forecast
14  over time?
15      **A.    We have.**
16      Q.    What assumptions in your forecast have changed
17  over time?
18      **A.    There are two areas.  One, the starting points**
19  **for actual revenue collections were updated continually**
20  **as new information became available.  So, in a sense, the**
21  **starting point changed over time.  Secondly, based upon**
22  **actual revenue collection experience and changes in the**
23  **state economic forecast, we altered some of the growth**
24  **rate assumptions over time.**
25      Q.    And when you say the starting point changed

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 15 of
54

R. CLINE

2 over -- in the various iterations of your forecast, what
3 specifically are you referring to?
4    A.    The estimate, for example, of actual property
5 tax collections in the city changed over time.  One
6 example was the composition of enterprise zone property.
7 As the City updated its estimates of the dollar amounts
8 in those buckets of property -- assessed property, we
9 updated the model.
10   Q.    And did that result in your model showing less
11 revenue than it previously had?
12   A.    There were a number of changes.  Some may have
13 increased revenue, some may have decreased revenues.  I
14 don't have a score sheet to show the change --
15   Q.    Okay.
16   A.    -- at each step of the way.
17   Q.    So, since you began your work, the model has
18 been changed multiple times, correct?
19   A.    The model structure hasn't changed.
20   Q.    But the inputs and assumptions to your model
21 have changed multiple times since you started your work,
22 correct?
23   A.    That is correct.
24   Q.    And multiple different inputs have been
25 changed in your model since you began your work, correct?

R. CLINE

2    A.    That is correct.
3    Q.    And those inputs and assumptions have changed
4 based on information from third parties such as the City,
5 correct?
6    A.    Yes, and the State would be another example.
7    Q.    Okay.  And overall, though, the changes to the
8 property tax modeling, did that increase overall or
9 decrease overall revenue projected to be available to the
10 City?
11   A.    I can't recall the answer to that.  Caroline
12 Sallee, I believe, would have those details.
13   Q.    The starting point, could you elaborate on
14 what you are talking about when you say the starting
15 point for the projections changed?
16   A.    One example would be user -- utility user tax
17 collections.  They have been trending downward over the
18 last two to three years, and the latest figures show that
19 they had decreased faster than we had initially
20 forecasted in the short run.  So, we updated the starting
21 point for utility user taxes to reflect the lower current
22 collection levels.
23   Q.    Okay.  So your changes to the utility tax
24 modeling resulted in less revenue projected to be
25 available to the City, correct?

R. CLINE

2    A.    I believe in this case, that is correct.
3    Q.    Were there any other changes that we haven't
4 discussed, any changes to the inputs or assumptions that
5 we haven't discussed?
6    A.    There may be a number of other changes.
7    Q.    Okay.  Do you agree with me that forecasting
8 models such as you've developed in this case has to be
9 constantly updated because, you know, numbers are
10 changing and assumptions and inputs change?
11   A.    I would agree that to get the most accurate
12 estimate or forecast, you should start with the most
13 recent, actual information in the model.
14   Q.    And that requires updating the model over
15 time, correct?
16   A.    That is correct.
17   Q.    And in order to ensure the reliability of a
18 forecasting model, you need to continuously update it as
19 information becomes available, correct?
20   A.    I'm not sure I would use the word
21 "reliability."  You certainly want to get the most
22 accurate starting point for the forecast.
23   Q.    In order to ensure that a model is not
24 materially wrong, you need to continuously update the
25 model for forecasting, correct?

R. CLINE

2       MR. STEWART:  Objection.
3       THE WITNESS:  I don't know what you mean by
4 "materially," right or wrong.
5 BY MR. SMITH:
6    Q.    Okay.  Why did you update the model, the
7 forecasting that you had performed in this case?
8    A.    Because it's very important, if we were going
9 out to a 10-year forecast, to start from the most
10 accurate starting point, which was the most recent actual
11 collection data.
12   Q.    Has Ernst & Young been engaged to continue any
13 work on the forecasting beyond the confirmation of the
14 plan?
15   A.    I believe my practice is still involved in the
16 project.  The latest work we have done is summarized in
17 my expert report.
18   Q.    Yeah.  But my question is, there's going to be
19 a confirmation hearing that you're going to testify at;
20 you know that, right?
21   A.    The trial?
22   Q.    Yeah.
23   A.    Yes.
24   Q.    And the City wants the Court to confirm the
25 Plan of Adjustment; you understand that, correct?  So it

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1  can exit bankruptcy?
2      **A.    I'm not familiar with the details.**
3      Q.    Well, after the bankruptcy, is there any plans
4  as far as you're aware, for Ernst & Young to continue
5  doing forecasting work for the City after the plan is
6  confirmed and the City gets out of bankruptcy?
7      **A.    No one has discussed with me providing that**
8  **type of additional service.**
9      Q.    Okay.  But if you were asked to perform
10  forecasting work beyond the City's exit from bankruptcy,
11  you would want to continuously update the model in order
12  to ensure that it's accurate and scientifically reliable,
13  correct?
14      MR. STEWART:  Objection.
15      THE WITNESS:  I don't know what you mean by
16  the term "scientifically reliable."  It is best
17  forecasting practice to always update the latest
18  actual tax collection figures before you forecast
19  into the future, whether it's ten or two years,
20  four years or ten years.
21  BY MR. SMITH:
22      Q.    So, you wouldn't hold out the analysis you've
23  done in this case as being scientifically reliable,
24  correct?

R. CLINE

1      MR. STEWART:  Objection.
2      THE WITNESS:  I don't know what that means,
3  that term.
4  BY MR. SMITH:
5      Q.    And so, you wouldn't represent to the Court
6  that your analysis is scientifically reliable, correct?
7      MR. STEWART:  Same objection.
8      THE WITNESS:  I don't know what that phrase
9  means.
10  BY MR. SMITH:
11      Q.    So, would you represent to the Court that your
12  analysis is scientifically reliable?  That's not
13  something that you would say, correct?
14      MR. STEWART:  You're arguing with the
15  witness, Mr. Smith.  He has answered the question
16  now three times.  Maybe if you could define it for
17  him, he could answer your question.
18  BY MR. SMITH:
19      Q.    Can you, as an expert in this case, tell me
20  what something -- what scientifically reliable means?
21      **A.    Not in the realm of tax revenue forecasting.**
22      Q.    There's no set of standard sources or
23  authorities that would tell you whether an analysis in
24  the area of tax forecasting is scientifically reliable,

R. CLINE

1  correct?
2      **A.    To my knowledge, there is no measure of**
3  **reliability before the fact of a tax revenue forecast.**
4      Q.    And inherent in doing forecasting work,
5  there's a certain amount of guesswork or speculation,
6  correct?
7      MR. STEWART:  Objection.
8      THE WITNESS:  I wouldn't characterize it as
9  guesswork.
10  BY MR. SMITH:
11      Q.    Would you -- would it be fair to say that in
12  order to do forecasting work, you need to make some
13  educated guesses?
14      **A.    You need to make a number of assumptions in**
15  **any forecasting model or exercise based upon your best**
16  **judgment and professional knowledge of what you're**
17  **forecasting.**
18      Q.    And the assumptions you make dictate what
19  results you achieve in forecasting, correct?
20      **A.    I would not describe it that way.**
21      Q.    How do the assumptions you make impact the
22  results of the forecast?
23      **A.    If you change the assumptions of some of the**
24  **key drivers, the results would change.**

R. CLINE

1      Q.    Okay.  And with your forecasting, if you
2  changed the assumptions, your results could change,
3  correct?
4      **A.    If you changed the assumptions, the results of**
5  **the forecasting model exercise would change.**
6      Q.    And in your forecasting, there are numerous
7  assumptions involved, correct?
8      **A.    As we discussed earlier, that is correct.**
9      Q.    In order to ensure accurate results, though,
10  if you were retained after the bankruptcy was over to do
11  forecasting for the City, in order to ensure that your
12  forecasting was accurate, it would have to be
13  continuously updated, correct?
14      **A.    The starting point, which is actual revenue**
15  **collections, would be continuously updated.  Any new**
16  **economic forecasts, for example, from the City or from**
17  **the State, would be fair -- new information to consider,**
18  **and you could also consider whether or not the forecast**
19  **growth rates were still reasonable in making a new**
20  **forecast.**
21      Q.    And if tax rates changed or other assumptions
22  became inaccurate after the bankruptcy was over, you
23  would have to update your forecasting in order to ensure
24  that it's accurate, correct?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

A.   As I mentioned earlier, the tax rates themselves are all current law.  So, they are either right or wrong.  They don't change unless current law changes.

Q.   Well, yeah, but now we're -- assuming that you were working for the City, say, two years after the bankruptcy was over, and the tax rate changed, you would need to revise your model to make it accurate, right: otherwise it wouldn't be accurate, correct?

A.   We would revise the model to pick up any changes in tax law, whether it was tax rate or tax-based changes.

Q.   And in order to ensure your model was accurate, you would have to revise the model after the bankruptcy was over, if any of the assumptions changed, correct?

A.   I would not say we make those -- we make those changes in order to do the best forecast of the expected revenue streams.  Whether it's accurate or not depends upon what actually happens in the future compared to the forecast.

Q.   So, as a forecaster, you can't represent to the Court that your forecast is actually going to be accurate, correct?

R. CLINE

MR. STEWART:  Objection.

THE WITNESS:  That's not a term we use, to my knowledge, in evaluating forecasts.

BY MR. SMITH:

Q.   And that's because events can change in the future and nobody knows what they'll be, correct?

A.   It is correct that the forecast is based on assumed economics, current tax law, and the key assumptions in the forecast.  If any of those change, the forecast will change.

Q.   And so, your forecast doesn't tell us anything about what the actual revenues of the City will be a year or two years or three years or 10 years from now, correct?

MR. STEWART:  Objection.

THE WITNESS:  If we knew the actuals, it wouldn't be a forecast.

BY MR. SMITH:

Q.   Okay.  And so, your forecast doesn't tell us what the actual revenues of the City are going to be in the 10-year period or 40-year period that you look at, correct?

A.   The forecast is an attempt to find the best point estimate of what can be expected from the revenue

R. CLINE

collections under current law and estimated economic conditions.

Q.   Okay.  So, you're not providing the Court with any forecast that tells us what will happen if there are legal changes, correct?

A.   That is correct.

Q.   And you're not providing the Court with any forecasts that will tell it what will happen if there are changes in the economy, correct?

MR. STEWART:  Objection.

THE WITNESS:  Our forecast is based upon changes in the economy.

BY MR. SMITH:

Q.   Your forecast, though -- you're not providing the Court with any forecast that tells us what revenues will be based on actual economic conditions because nobody can predict what those will be, correct?

A.   It wouldn't be a forecast.

Q.   But certainly, you've made forecasts in the past that have been wrong, correct?

A.   I imagine so.

Q.   And in fact, would it be fair to say that all of the forecasts that you've made in the past have been wrong to some extent, correct?

R. CLINE

A.   I would be more generous and say it's true that anyone who made a forecast would find that it's not always the final result.

Q.   Yeah.  And in general, forecasts are off because there's no perfect methodology for forecasting into the future, correct?

A.   You use the best tool available to make your forecast using the best available information as a starting point, and your understanding of the economics that you're dealing with.

Q.   And even using the best available methodology and information, forecasts are frequently wrong, correct?

A.   I believe that would be an accurate statement.

Q.   And that was your experience when you were working for the State of Michigan and the State of Minnesota, correct?

A.   Correct.

Q.   The -- would you agree with me that the longer the period of time you're attempting to forecast, the more likely your forecast will turn out to be inaccurate.

A.   I believe it would be correct to say the longer the forecast, the more events you have to consider in your forecast.  Each year adds additional economics that have to be considered in the forecast.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 18 of 54

R. CLINE

Q. And each additional year added to the length of a forecast adds increased -- an increased chance that your forecast will be wrong, correct?

A. **I'm not sure I understand what you mean by "increased chance." Those are statistical terms that are difficult to apply to the forecasting arena.**

Q. Okay. Well, how would you describe the difference between doing a 10-year forecast versus a one-year forecast in terms of the chances that your predictions will accurately reflect what ultimately occurs?

A. **I wouldn't make it a statement to try to describe that.**

Q. Okay. So, you can't offer me any expert opinion that tells me whether a 10-year forecast is more or less reliable than a one-year forecast.

A. **In the case of our forecasts for the City of Detroit, we were asked to do a 10-year forecast. I have no results to compare our forecast to, so I can't make comments about reliability over a two-year, a five-year or a 10-year period in the City of Detroit.**

Q. Okay. So you're offering no opinion on the reliability of your forecast over the next 10 years, correct?

R. CLINE

MR. STEWART: Objection.

THE WITNESS: I have no statistical statement to describe accuracy in that setting.

BY MR. SMITH:

Q. Okay. The -- when you were doing the forecast, I mean, did you develop forecast results that you could test against actual results during the last year? Were there any results that you generated that you could even test within the last year's?

MR. STEWART: Can you just reread the question?

(The record was read back by the reporter.)

MR. STEWART: Objection.

THE WITNESS: As I explained, we started our forecast with the most recent actuals, so in the year we started, they were the actual collections. All of our forecasts move forward in time from the starting point.

BY MR. SMITH:

Q. Okay. So, you never tested your forecast results against actual results, correct?

A. **We started with the most recent, actual results and forecasted the unknown future.**

Q. Okay. So, the answer is correct, you've never

R. CLINE

tested the results of your forecast against actual results, correct?

MR. STEWART: Objection.

THE WITNESS: We did not backcast.

BY MR. SMITH:

Q. Okay. So, it would have been possible to test your model by using this procedure of backcasting to see how accurately it predicted prior events; is that fair?

A. **Not in this case.**

Q. Why is that?

A. **Because of the unique situation at the City of Detroit.**

Q. And what is that unique situation that prevented you from testing your model?

A. **Basically, the challenge is that those models fit over earlier periods of time were not able to pick up the structural break between Detroit and the rest of the state, and the cumulative impact of the financial crisis in Detroit.**

Q. What do you mean by that?

A. **I -- was there a a -- part of the explanation you would like for me to --**

Q. Well, maybe you could elaborate, just further explain what you are talking about.

R. CLINE

MR. STEWART: Objection. You have to ask a question. You just can't say please tell me more.

MR. SMITH: I did, and then he asked me a question and I'm trying to clarify.

THE WITNESS: Could you rephrase your question?

BY MR. SMITH:

Q. Well, let me ask you this: Is there any standard rule of thumb for how frequently a forecast such as you have developed here needs to be updated?

A. **As revenue forecaster for the State of Michigan, we used to do monthly forecasts.**

Q. So, the standard practice in Michigan was to revise forecasts each month based on new data and inputs into the model?

A. **But it depended upon the purpose. That was for tracking actual tax collections against forecasts. For forecast purposes related to the budgetary cycle, we would do two-year or four-year forecasts.**

Q. So, depending on the purpose, forecasts should be updated either monthly or every couple of years. Is that fair?

A. **Depending upon the purpose, forecasts should be updated as often as I -- I would say, as new**

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

information becomes available that's relevant to the forecast.

Q. So, a forecast should be updated as frequently as new information becomes available that's relevant for the forecast, correct?

A. I think that's a reasonable statement.

Q. And in -- with respect to your forecasts you've developed in this case, how frequently have you updated those?

A. I would say there have been points in time when we looked at all of the estimates together. That might have been in the fall of 2013 and spring of 2014, and then more recently in June of 2014.

Q. So, how many times have you updated your forecast?

A. I believe that's three comprehensive updates where we have generated additional -- new spreadsheet results for each of the major tax types.

Q. And over what period of time did those three updates occur?

A. As I believe I stated, I -- the original that we did was probably June 2013, fall of 2013 another, spring of 2014 is another, and then probably June, perhaps -- I think it was June 2014.

R. CLINE

Q. So you've updated your -- done a comprehensive update of your forecast about four times in the last year?

A. Three times, I believe.

Q. And are there other updates that aren't comprehensive updates that have occurred in addition to those three times?

A. Not for all of those tax types.

Q. But for some of the tax types, have there been other updates that you've done in addition to the three comprehensive updates?

A. Revisiting the forecast was triggered by those major updates in the overall forecast.

Q. Okay. But were there any other updates, or just the major ones?

A. I don't recall. There may have been specific numbers for a single tax type, but I don't recall those separate estimates being done.

Q. Have you ever done any calculations using tax rates that are greater than the ones you assume in your model?

A. We did not, because we took current law as our assumption in the model.

Q. But you know the law can change, correct?

R. CLINE

A. The legislature or the city council could change the law.

Q. And so the legislature or the city council would increase tax rates over the 10-year period, correct?

A. Yes, that's possible.

Q. And if current law is changed over the 10-year period, that could significantly increase the amount of revenue available to the City, correct?

MR. STEWART: Objection.

THE WITNESS: I believe the changes could go in either direction.

BY MR. SMITH:

Q. So, changes in law could significantly increase revenue to the City, correct?

A. Or they could restrict the revenue available to the City. The example would be the election that is coming up to deal with the tangible personal property reduction at the local level.

Q. And so, it's possible that changes in law over the next 10 years could restrict revenue to a degree that the City has to go back into bankruptcy again, correct?

MR. STEWART: Objection.

THE WITNESS: I can't comment on that.

R. CLINE

BY MR. SMITH:

Q. Okay. Well, you would agree that changes in law could restrict revenue significantly over the next 10 years, correct?

A. As I believe I mentioned, I think changes in law could either increase or decrease available revenues.

Q. And changes in law can certainly significantly increase available revenues to the City over the next 10 years, correct?

A. I wouldn't speculate on what direction they're going to move in.

Q. Okay. So, attempting to predict what the revenues available to the City over the next 10 years are would require you to speculate, correct?

MR. STEWART: Objection.

THE WITNESS: That is not correct. As I mentioned, our model is based upon current law tax rates, which are known with certainty and established by current law.

BY MR. SMITH:

Q. You can't know with certainty what the tax rate will be five years from now, correct?

A. That's correct.

Q. You can't, in fact --

R. CLINE

1
2      A.   Unless -- unless it's in law.
3      Q.   Well, you don't know what the -- the law can
4   change within five years, correct?
5      A.   Correct, but the point is that in current law,
6   there may be scheduled future tax rate changes.  If so,
7   we've taken those into consideration.
8      Q.   Okay.  I see what you are saying.
9           But there's no way for you to know what the
10  tax rate is going to be within the 10-year period that
11  you model, correct?
12     A.   We know with certainty what the tax rate is
13  under current law.
14     Q.   Yeah.  Right now, we know what the -- with
15  certainty what the tax rate is, but there's no way for
16  you to know what the tax rate will be two, five or 10
17  years from now, correct?
18     A.   We know with certainty what the rate will be
19  over that period, if they do not change current law.
20     Q.   But you have no way to know whether current
21  law is going to be changed with respect to tax rates
22  within the next 10 years, correct?
23     A.   That is correct.
24     Q.   And so you have no way of knowing what the tax
25  rate is going to be over the course of the next 10 years,

R. CLINE

1
2   correct?
3      A.   We know with certainty what the tax rate over
4   the next 10 years is, under current law.
5      Q.   But I'm not asking about current law.  I'm
6   saying, you have no way of knowing what the tax rate will
7   be within the next 10 years, correct?  Because you don't
8   know whether the tax rate will be changed or not,
9   correct?
10     A.   We know with certainty what the current law
11  tax rate is over the next 10 years.
12     Q.   That's not my question.
13          Okay, you understand I'm not asking about
14  current law, correct?  Do you understand that?
15          MR. STEWART:  Well, now you say you're not,
16  so now ask the rest of your question.
17  BY MR. SMITH:
18     Q.   Okay.  Do you understand what I just said,
19  that I'm not asking about what current law is, correct?
20     A.   Would you rephrase your question, then?
21     Q.   You have no way to know what the actual tax
22  rates will be that are applicable to the City of Detroit
23  over the next 10 years, correct?
24          MR. STEWART:  Objection.
25          THE WITNESS:  We know with certainty under

R. CLINE

1
2   current law what the tax rates in the City of
3   Detroit will be.
4   BY MR. SMITH:
5      Q.   But we know -- there's no way to tell whether
6   current law will remain unchanged over the next 10 years,
7   correct?
8      A.   I agree.
9      Q.   And so there's no way to tell what the actual
10  tax rates will be, whether they'll be the current law tax
11  rates or some other tax rates over the next 10 years,
12  correct?
13     A.   We know with certainty what the current law
14  rate is; we do not know what the legislature might do in
15  changing the rates.
16     Q.   And we don't know what the City might do in
17  changing rates, correct?
18     A.   I do not know what the City might do.
19     Q.   And in fact, we don't even know who the
20  decision-makers will be with respect to many policies in
21  the City that could affect your forecast, correct?
22     A.   I wouldn't answer that question.
23     Q.   I mean, there's no way for you to know who's
24  going to be doing the decisionmaking in the City over the
25  next 10 years, correct?

R. CLINE

1
2      A.   As I mentioned, our forecast is based upon
3   current law.  We are not -- we did not do alternatives
4   which considered any tax rates other than current law.
5      Q.   Okay.  Why is that?
6      A.   Because standard tax forecasting always
7   assumes current law tax rates.  Otherwise, you're
8   analyzing policy options, not making a forecast.
9      Q.   And standard tax forecasting does not use
10  current law tax rates to forecast taxes over 10 years,
11  correct?  You can't give me an example where that's
12  happened?
13          MR. STEWART:  Objection.
14          THE WITNESS:  As I believe I mentioned, we
15     always use current law, and if current law doesn't
16     change over 10 years, you know with certainty what
17     the tax rates are.
18  BY MR. SMITH:
19     Q.   But you can't give me an example of any
20  forecast for tax revenue that's ever assumed that tax
21  rates will remain unchanged for 10 years, correct?
22     A.   There may be forecasts which do assume changes
23  in tax rates.
24     Q.   Okay.  And so, it's possible -- it's -- it
25  would be fair to do a tax forecast that assumes changes

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 21 of
54

R. CLINE

1    in tax rates over 10 years, correct?
2        A.    Not in the work that I have done, either in
3    Michigan or Minnesota or for the City of Detroit. The
4    exercise was to come up with the best estimate of
5    forecasted revenues over a defined period of time,
6    assuming no change in current law.
7        Q.    You can't identify any tax forecast that's
8    ever assumed that the current tax rates will remain
9    unchanged for a period as long as 10 years, correct?
10       A.    I can't answer that question. I don't have
11   knowledge to answer it.
12       Q.    So you can't identify an example, correct?
13       A.    I do not personally -- I cannot personally
14   give you an example.
15             MR. STEWART: We have been on the record
16       about 90 minutes. Is this a good time to take a
17       break?
18             MR. SMITH: Yeah. Sure. We can take a
19       break.
20             THE VIDEOGRAPHER: Going off the record at
21       10:36. This is the end of disk number one.
22   (RECESS, 10:36 a.m. to 10:47 a.m.)
23             THE VIDEOGRAPHER: The time is 10:47. This
24       is the beginning of disk number two in the

R. CLINE

1    deposition of Robert Cline.
2    BY MR. SMITH:
3        Q.    Mr. Cline, you know that there are a number of
4    cities throughout the country that are experiencing
5    fiscal distress or fiscal crisis, correct?
6        A.    I have not been paying attention to what is
7    going on in other cities.
8        Q.    Okay. And that includes in performing your
9    analysis in this case, you haven't sought to educate
10   yourself about that, correct?
11       A.    As I believe I mentioned earlier, when we were
12   looking at population projections, that one of my staff
13   persons looked at experience in other cities.
14       Q.    Okay. But as an expert on tax policy, you
15   know in general that one way cities respond to fiscal
16   stress is to raise taxes and fees, correct?
17       A.    Depends upon the city and the circumstances.
18       Q.    Yeah, but there are a number of cities that
19   have raised taxes in response to fiscal crises or fiscal
20   stress, correct?
21       A.    I believe a number of cities have both reduced
22   spending and made changes on the revenue side in response
23   to fiscal challenges.
24       Q.    And when you say "changes on the revenue

R. CLINE

1    side," that means increasing taxes or increasing other
2    sources of revenue, correct?
3        A.    By increasing revenues, I mean either
4    expansions in the tax base or perhaps changes in the tax
5    rates.
6        Q.    Okay. And the City of Detroit could increase
7    income tax revenues, correct?
8        A.    Excuse me?
9        Q.    The City of Detroit could increase income tax
10   revenues and rates, correct?
11       A.    It's my understanding that the individual
12   income tax rates in Detroit are fixed. I believe they're
13   fixed by the State legislature.
14       Q.    Okay. And has Detroit asked the State
15   legislature to increase the income tax rates?
16       A.    I don't know the answer that.
17       Q.    Okay. So, as far as you're aware, Detroit has
18   not asked the State to increase income tax rates,
19   correct?
20       A.    We were not asked to analysis alternative tax
21   rates in the City of Detroit.
22       Q.    Okay. And so, as far as you're aware, the
23   City of Detroit has not asked the State to increase tax
24   rates, correct?

R. CLINE

1        A.    I haven't asked that question, if it's the
2    case, but I'm not aware of any discussions.
3        Q.    Okay. The City of Detroit can increase tax
4    revenue by increasing collections, correct?
5        A.    The City of Detroit can collect the dollar
6    amounts that are currently owed in the existing tax
7    system --
8        Q.    And --
9        A.    -- assuming they collect that revenue.
10       Q.    And you know that currently Detroit is not
11   collecting all of the revenue it's owed for taxes,
12   correct?
13       A.    I am not familiar with the specific collection
14   policies and success in Detroit. We did, in our model,
15   on the property tax side calculate what we called an
16   effective collection rate. But it was based upon our
17   calculation of two rate -- dividing one number by
18   another.
19       Q.    And so, you haven't investigated at all what
20   percent of taxes the City of Detroit is collecting,
21   correct?
22       A.    As I mentioned, we do have an estimate of what
23   we called the effective property tax collection rate.
24       Q.    But you haven't investigated what percent of

R. CLINE

1
2 the income tax the City of Detroit is collecting,
3 correct?
4     **A.     We have not done analysis of that issue.**
5     Q.     And nobody has provided you information about
6 what the rate of collection of the income tax is,
7 correct?
8     **A.     I'm not aware of that information.  I don't**
9 **know if someone else on the EY team may have received**
10 **that information.**
11     Q.     And you haven't done any investigation into
12 the rate of collection of utility tax?
13     **A.     I have not, as part of this project.**
14     Q.     You haven't done any investigation into the
15 rate of collection of the corporate tax?
16     **A.     I have not.**
17     Q.     Have you done any investigation into whether
18 there are exemptions from the various taxes you analyzed?
19     **A.     As I mentioned earlier, certainly on the**
20 **property tax side, we've looked at different**
21 **classifications of property because they have different**
22 **assessment ratios, different features of the tax law,**
23 **which we take into consideration in our revenue**
24 **estimates.**
25     Q.     And there are reductions or exemptions for

R. CLINE

1
2 property taxes, correct?
3     **A.     Do you mean under current law?**
4     Q.     Yes.
5     **A.     I imagine there are.  We didn't look**
6 **specifically at changing specific exemptions under**
7 **current law.  We accepted it as current law.**
8     Q.     Okay.  You haven't done any analysis or
9 investigation into the restructuring and reinvestment
10 activities the City may perform relating to taxes?
11     **A.     We are aware of the line items in the summary**
12 **financial reports that list specific activities that are**
13 **related to restructuring.**
14     Q.     But do you -- you haven't done any
15 investigation of what the City plans in terms of
16 restructuring or reinvestment with respect to taxes,
17 correct?
18     **A.     When we were asked to do the restructuring**
19 **forecast, we took into consideration the different**
20 **proposals that -- for restructuring activities.**
21     Q.     What is your understanding about what the City
22 is planning to do with respect to taxes?
23     **A.     I am aware that there is a line item in the**
24 **financial reports for increased collections due to**
25 **collection activities.**

R. CLINE

1
2     Q.     Okay.
3     **A.     We did not do that estimate.**
4     Q.     Yeah.  And it's not necessary to go into
5 Chapter 9 to increase tax collections, correct?
6     MR. STEWART:  Objection.
7     THE WITNESS:  As I say, we did not look in
8     detail at collections.
9 BY MR. SMITH:
10     Q.     Well, that's not my question.
11     Cities increase tax collections all the time
12 without going into bankruptcy, correct?
13     **A.     I can't answer that question.  You'll have to**
14 **rephrase it.**
15     Q.     You can't tell me whether cities increase tax
16 collections as an expert in this case?
17     **A.     What we were asked to do by the City of**
18 **Detroit was to estimate under current law the expected**
19 **revenue stream over the next 10 years.  And that is what**
20 **we did in our analysis.**
21     Q.     Yeah.  And I'm asking you -- you have a life
22 outside of working for the City of Detroit, right?
23     **A.     I do.**
24     Q.     Okay.  And you're holding yourself out as an
25 expert on tax policy, right?

R. CLINE

1
2     **A.     I don't describe myself as an expert on tax**
3 **policy.**
4     Q.     Okay.
5     **A.     It's not a phrase we use at Ernst & Young.**
6     Q.     Okay.  Do you have any information about tax
7 collection efforts by anybody?  Is that something you
8 know anything about?
9     MR. STEWART:  Objection.
10     THE WITNESS:  I am not an expert on
11     compliance under existing law.
12 BY MR. SMITH:
13     Q.     Okay.  The -- you've got a baseline scenario
14 in your forecast in the restructuring scenario, correct?
15     **A.     Correct.**
16     Q.     And the baseline scenario is a status quo
17 scenario where none of the restructuring or reinvestment
18 activities are undertaken, correct?
19     **A.     I believe that's a way to describe the**
20 **baseline activity, the baseline scenario.**
21     Q.     And you haven't constructed any forecasts for
22 what would happen if the bankruptcy case were dismissed
23 and the City just went on after bankruptcy doing reform
24 efforts, correct?
25     **A.     The baseline estimate that we did assumed no**

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

1          R. CLINE
2    change of any underlying economics of the City of
3    Detroit.
4        Q.    But the City can take actions that would
5    change the underlying economics without going into
6    Chapter 9, correct?
7        A.    I don't know the answer to that.
8        Q.    Okay.  As far as you're aware, though, your
9    baseline scenario is not trying to forecast what would
10   happen if the petition for bankruptcy was dismissed?
11       A.    I would describe our baseline forecast as a
12   continuation of the trends that have been affecting
13   Detroit over the last 10 years to 20 years.
14       Q.    And has anybody from the City told you that
15   they're going to allow the trends that have continued to
16   continue into the future?
17       A.    I haven't had those conversations myself.
18       Q.    I mean, do you have any understanding about
19   why you have this baseline scenario in your report?
20       A.    My understanding is that the baseline scenario
21   reflects expected revenue streams under current law in a
22   continuation of recent economics in the City of Detroit.
23       Q.    Do you have any understanding of what
24   activities the City will or will not perform in the
25   baseline scenario?

1              R. CLINE
2        A.    I do not.
3        Q.    Do you have any understanding of what
4    activities the City will or will not perform in the
5    restructuring scenario?
6        A.    I do not know the specifics of any
7    alternatives.
8        Q.    Would raising the income tax rate be a
9    reasonable policy for the City of Detroit?
10       A.    I can't comment on the policy options for
11   Detroit.  We were not asked to evaluate those as part of
12   our analysis.
13       Q.    And so, you're offering no opinion that
14   raising the income tax rate or property tax rates or
15   utility tax rates or wagering tax rates or any of the
16   other rates would be inappropriate or unreasonable,
17   correct?
18       A.    We were not asked to evaluate any tax policy
19   alternatives for the City of Detroit.
20       Q.    So, you're not offering any opinion saying
21   that raising tax rates would be unreasonable, correct?
22       A.    I'm not commenting on policy options for the
23   City of Detroit.
24       Q.    So, you're not offering -- I'm just trying to
25   get an idea of what opinions you're offering.  So, you're

1              R. CLINE
2    not offering an opinion that raising tax rates would be
3    unreasonable, correct?
4        A.    I'm not commenting on any tax policy options
5    available to the City of Detroit.
6        Q.    You know that question -- there could be a yes
7    or no answer to that question, right?
8        A.    My perspective is that we were asked to do
9    revenue forecasts of the major revenue sources under
10   current law.  We were not asked nor did I volunteer
11   information on alternatives available to the City of
12   Detroit.
13       Q.    Okay.  So, you haven't done any work that will
14   allow you to testify that raising tax rates would be
15   unreasonable or inappropriate, correct?
16       A.    I have not.
17       Q.    And you haven't done any work that says that
18   increasing tax revenues through increased collections
19   would be --
20             (Telephone interruption.)
21             MR. STEWART:  Just hit one.  Thanks.
22   BY MR. SMITH:
23       Q.    -- inappropriate or not feasible, correct?
24       A.    He we have not evaluated tax policy
25   opportunities -- alternatives for Detroit.

1              R. CLINE
2        Q.    And you haven't done any work that would allow
3    you to testify that Detroit couldn't just add new taxes,
4    correct?
5        A.    We have not.
6        Q.    And you haven't done any work that would allow
7    you to testify that Detroit couldn't generate significant
8    additional revenue by either adding new taxes or
9    increasing tax rates?
10             MR. STEWART:  Objection.
11             MR. SMITH:  Correct?
12             THE WITNESS:  We were not asked to look at
13   policy options for the City of Detroit.
14   BY MR. SMITH:
15       Q.    And so, you haven't done any work that would
16   allow you to testify that Detroit can't generate
17   significant increased revenue through either increasing
18   tax rates, increasing collections, or adding new taxes,
19   correct?
20             MR. STEWART:  Objection.
21             THE WITNESS:  I think there may have been a
22   double negative in there.  Could you repeat the
23   question?
24   BY MR. SMITH:
25       Q.    You haven't done any work that will allow you

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 24 of
54

R. CLINE

1 to testify that Detroit can't significantly increase
2 revenues by increasing tax rates or increasing tax
3 collections or by adding new taxes, correct?
4     MR. STEWART:  Objection.
5     THE WITNESS:  We have done no analysis --
6 excuse me.
7     MR. STEWART:  Go ahead.
8     THE WITNESS:  We have done no analysis on
9 tax policy options in Detroit.
10 BY MR. SMITH:
11  Q.   So, the answer is correct, correct?
12  **A.   I am still having --**
13     MR. STEWART:  Reread the question.
14     THE WITNESS:  Please, reread the question,
15 I think the double negative is still there.
16 (The record was read back by the reporter.)
17     THE WITNESS:  I believe the correct answer
18 to that question is, as I mentioned, we have looked
19 at the collection rate of the property tax.  We
20 calculated an effective collection rate, and we did
21 use that in our forecast.
22     We did not -- were not asked to and did not
23 provide forecasts under alternative policy options,
24 whether it's a tax rate change or adoption of a new

R. CLINE

1 tax, or change, in the base of an existing tax.
2 BY MR. SMITH:
3  Q.   So, you -- Ernst & Young concluded that the
4 City could increase property tax revenues by increasing
5 collections, correct?
6  **A.   In our forecast of the property tax revenues,**
7 **we did vary the collection rate over time.**
8  Q.   And you increased the collection rate: is that
9 correct, or do you not know?
10  **A.   From what I remember, we may have brought the**
11 **collection rate down, in the intermediate run, and then**
12 **brought it back up in the longer run.**
13  Q.   Okay.  But you haven't -- you haven't done any
14 work that would allow you to testify that Detroit can't
15 significantly increase revenues by increasing tax rates,
16 correct?
17     MR. STEWART:  Objection.
18     THE WITNESS:  All of our revenue estimates
19 are based upon current law rates.
20 BY MR. SMITH:
21  Q.   So, the answer to my question is correct?  You
22 haven't done the work?
23     MR. STEWART:  Objection.
24     THE WITNESS:  Could you repeat the

R. CLINE

1 question, please.
2 (The record was read back by the reporter.)
3     THE WITNESS:  We accepted the current law
4 tax rates as what was available to Detroit.  To the
5 extent that Detroit is at the maximum, and I
6 believe it may be the case for all of those tax
7 rates, it would imply that under current law, that
8 option is not available.
9 BY MR. SMITH:
10  Q.   But current law can change, correct?
11  **A.   Correct.**
12  Q.   And you would agree with me that if current
13 law changes, Detroit can increase tax revenue
14 significantly by increasing tax rates, correct?
15     MR. STEWART:  Objection.
16     THE WITNESS:  It is true that an increased
17 rate, with no offsetting decrease in the base,
18 could increase revenue, but if you were going to
19 forecast the increase of a tax rate in Detroit, you
20 would also have to forecast the potential decrease
21 in the tax base with mobile people and investment.
22 BY MR. SMITH:
23  Q.   And so, sitting here today, you haven't done
24 the work that would allow you to testify that increasing

R. CLINE

1 tax rates wouldn't result in significant additional
2 revenue for the City of Detroit, correct?
3     MR. STEWART:  Objection.
4     THE WITNESS:  As I believe I've answered
5 several times, we did not evaluate alternative
6 policies.  We is accepted current law as the
7 foundation for our forecast.
8 BY MR. SMITH:
9  Q.   Okay.  So the answer is correct, you didn't do
10 that work, correct?
11  **A.   Would you rephrase the question.**
12  Q.   You didn't do any work that would allow you to
13 testify that by increasing tax rates, Detroit would not
14 increase substantially its tax revenues?
15     MR. STEWART:  Objection.
16     THE WITNESS:  We did not run alternatives
17 with our model at different tax rates.
18 BY MR. SMITH:
19  Q.   That's something that you could have done,
20 right?  That's technically feasible for you to do,
21 correct?
22  **A.   We were not asked to do that analysis.**
23  Q.   Okay.  But is it technically feasible for you
24 to do an analysis like that?

R. CLINE

1
2      A.   We would have to do additional work compared
3   to what we have done to this point, because as I
4   mentioned, it's not just changing the rate, it's also
5   understanding the behavioral response of the base in
6   response to the change in the rate.  We are not set up to
7   do that in our current runs.
8      Q.   And you also haven't done the work that would
9   allow you to testify that Detroit couldn't significantly
10   increase revenues by adding new taxes, correct?
11      A.   We have not analyzed the addition of new
12   revenue sources for Detroit.
13      Q.   Okay.  The -- one potential new revenue source
14   would be imposing the commuter tax, correct?  That's a
15   reasonable --
16      A.   I don't know if it's legally available to
17   Detroit as an option.
18      Q.   Okay.  But imposing a commuter tax is
19   something that the City could either do by itself or in
20   conjunction with the State, correct?
21      A.   I don't know the answer to that.
22      Q.   Okay.  So, you haven't investigated whether
23   Detroit could add a commuter tax, correct?
24      A.   I have not.
25      Q.   All right.  Another potential -- that you know

R. CLINE

1
2   that there's cities, though, that have commuter taxes,
3   right?
4      A.   There are selected cities that tax
5   non-residents who are working in the city, as Detroit
6   does.  Some at differential rates, some at the same rate.
7      Q.   Okay.  And they do that through a variety of
8   mechanisms, correct?
9      A.   I believe they look basically like income
10   taxes.
11      Q.   And sometimes they're parking lot-type -- you
12   know, charges for fees for parking or other services that
13   might disproportionately fall on non-residents?
14      MR. STEWART:  Objection.
15      THE WITNESS:  I'm not familiar with the
16   details of those taxes.
17   BY MR. SMITH:
18      Q.   All right.  You know that some cities have a
19   city-only sales tax, correct?
20      A.   City-only sales tax.  I believe that is the
21   case.
22      Q.   And you haven't investigated whether Detroit
23   could increase revenues by adding a city-only sales tax,
24   correct?
25      A.   As I answered earlier, we did not analyze any

R. CLINE

1
2   revenue options for the City of Detroit.
3      Q.   Okay.  You only did the work that you were
4   asked by the lawyers for the City to do, correct?
5      MR. STEWART:  Objection.
6      THE WITNESS:  We were given an assignment
7   by Ernst & Young to provide a revenue estimate of
8   the major tax sources for the City of Detroit over
9   the next 10 years.  Then it was expanded to an
10   additional 30-year perspective.  That is the job
11   that we were asked to do, and that is what we did
12   and is reported on in the expert report.
13   BY MR. SMITH:
14      Q.   Who asked you to do that job?
15      A.   That was a -- we were retained by the Ernst &
16   Young team working in Detroit.
17      Q.   Okay.  So, it wasn't Mr. Malhotra that gave
18   you the scope of the work that you were to perform in
19   this case?
20      A.   I believe our initial discussions of the scope
21   of the work did come from him.
22      Q.   Would it be fair to say that you haven't done
23   any analysis of the full range of potential revenue
24   sources available to the City?
25      MR. STEWART:  Objection.

R. CLINE

1
2      THE WITNESS:  We haven't done an analysis
3   of any of the revenue options available to the
4   City.
5   BY MR. SMITH:
6      Q.   And that would include both tax and non-tax
7   revenue options?
8      A.   Correct.
9      Q.   I mean, if you were advising a City in
10   financial distress, what actions would you advise them to
11   take to increase revenue or cut costs?
12      MR. STEWART:  Objection.
13      THE WITNESS:  We are very careful in all of
14   our projects at Ernst & Young not to make policy
15   recommendations to governments.
16   BY MR. SMITH:
17      Q.   Okay.  So, Ernst & Young -- is it that you
18   don't have the qualifications to make policy
19   recommendations to governments or is there some other
20   reason that you don't do that?
21      A.   We don't do that because those are political
22   decisions.  We don't make policy recommendations to
23   individual units of government.
24      Q.   So, ultimately, the amount of revenue
25   available to the City of Detroit and the amount of costs

R. CLINE

1
2 that it incurs are political decisions made by the people
3 running Detroit, correct?
4     A.    I believe they're made by the city council,
5 and to some extent by the State legislature.
6     Q.    Okay.  And currently, the emergency manager is
7 making the political decisions that dictate how much
8 revenue the City has available and how much cost it's
9 incurring; is that correct?
10     A.    I'm not familiar with the operations of the
11 emergency financial manager.
12     Q.    Okay.  So, you have no idea what the emergency
13 manager does or what the emergency manager's powers are?
14     A.    I have not inquired as to what those are.
15     Q.    Have you inquired as to whether the City's
16 already started undertaking any of the restructuring
17 initiatives?
18     A.    I have not discussed specifically what is or
19 is not being done in Detroit on the expenditure side.
20     Q.    And -- well, on the tax side, do you know
21 whether the State has undertaken any of its
22 restructuring?  I mean, the City -- strike that.
23         Let me start the question again, okay?  Is
24 that okay?
25     A.    Certainly.

R. CLINE

1
2     Q.    You have -- you don't know whether the City
3 has already started undertaking restructuring or
4 reinvestment activities that pertain to taxes; is that
5 fair?
6     A.    I do know that the City is undertaking
7 reassessment of the property tax base, and we've
8 discussed that with them.
9         Primarily, we needed to know the timing of
10 that reassessment process, and yes, we found out
11 additional information about that reassessment process
12     Q.    Has anybody told you whether the City has
13 undertaken efforts to increase income tax collections?
14     A.    I am not familiar with any of the specifics of
15 collection programs in Detroit.
16     Q.    So, with respect to all of the taxes that you
17 discuss in your report, you're not familiar with the
18 specifics of collection practices; is that fair?
19     A.    I think a more accurate statement is that
20 other than the property tax forecast, we assumed
21 collection rates would be unchanged, unless we had
22 additional detailed information.
23     Q.    Yes.  But you haven't done any investigation
24 into any of the property -- investigation into any of the
25 collection practices regarding taxes in the City of

R. CLINE

1
2 Detroit, correct?
3     A.    Let me be very clear, to be as accurate as
4 possible.  My team, which resides in the National Tax
5 Practice, here in Washington, D.C., part of Ernst &
6 Young, has not been involved in analysis of specific
7 activities related to collection.  Other members of the
8 EY team may have more knowledge, but we have not been
9 involved in the collection discussions.
10     Q.    So, the team that did the tax forecasting at
11 Ernst & Young has done no investigation into the tax
12 collection practices of the City of Detroit: is that
13 fair?
14     A.    That's not fair.  As I've clearly stated, I
15 hope, we inquired about changes in the assessment ratios
16 and the property tax components in terms of re-evaluation
17 of existing property.  You might call that collection
18 related.  I would call it related to the administration
19 of current law, in order that we could do a more accurate
20 forecast when the reassessments start to flow through the
21 property tax system.
22     Q.    Okay.  Other than the property tax collections
23 matters that you've discussed, the team that put together
24 the tax forecasts for Ernst & Young didn't do any
25 investigation into collection practices with respect to

R. CLINE

1
2 any of the other taxes you addressed, correct?
3     A.    We did not make any inquiries as to collection
4 practices.  For the other taxes we were responsible for
5 forecasting, we did look into details on the State
6 revenue sharing program under current law, and worked
7 closely with State officials to understand the current
8 law revenue sharing program.
9     Q.    Yeah, but you didn't do any investigation into
10 income or wagering or utility tax collections, correct?
11     A.    We did not do separate analysis of collection
12 activities related to the taxes that you mentioned.
13     Q.    The -- have you ever heard of the Financial
14 Stability Agreement?
15     A.    I'm not sure I have.
16     Q.    You wouldn't know what terms are contained in
17 it, correct?
18     A.    That would be correct.
19     Q.    You wouldn't know who the parties are to it,
20 correct?
21     A.    I don't know that.
22     Q.    All right.  Do you know who the emergency
23 manager is?
24     A.    I do.
25     Q.    Who is that?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1
2    **A.    Now you put me on the spot.  Orr is his name.**
3    Q.    Do you know his first name?
4    **A.    I did at one point.  Kevyn.**
5    Q.    Do you know who the treasurer for the City of
6    Detroit is?
7    **A.    I couldn't name the treasurer.**
8    Q.    Can you name any of the officials in the City
9    of Detroit that have involvement with taxes?
10   **A.    I could not.**
11   Q.    Do you know what the Creditor Proposal was?
12   **A.    I'm not familiar with that.**
13   Q.    So, you don't know what measures with respect
14   to taxes were discussed in the Creditor Proposal?
15   **A.    I do not.**
16   Q.    You do know that the State has significantly
17   cut revenue sharing over the last few years, correct?
18        MR. STEWART:  Objection.
19        THE WITNESS:  I know that there have been
20        significant changes in the structure of the revenue
21        sharing program with all local units of government
22        in Michigan, including Detroit, and it is still
23        under change, but -- through the last legislative
24        session.
25   BY MR. SMITH:

R. CLINE

1
2    Q.    Yeah.  But you know that the revenue sharing
3    for Detroit's decreased by hundreds of millions of
4    dollars in the last few years, correct?
5    **A.    I personally have not gone back to look at the**
6    **dollar change in revenue sharing.  I believe Caroline**
7    **Sallee may have paid -- may have looked more closely at**
8    **the recent history.  I do know in the aggregate that the**
9    **discretionary portion of the program has probably been**
10   **reduced about 45% over the last ten years.**
11   Q.    And you know that a number of cities in
12   Michigan are in financial distress as a result of
13   reduction in revenue sharing, correct?
14   **A.    I don't know that.**
15   Q.    Do you know whether other cities have
16   emergency managers that have been appointed?
17   **A.    I don't know the answer to that.**
18   Q.    Do you know what the Disclosure Statement is?
19   **A.    The trouble I have is that I'm an economist by**
20   **training, not a lawyer by training.  I don't know what**
21   **some of these documents or definitions are.**
22   Q.    When you revised your -- well, let me ask you
23   this:  There are cities outside of bankruptcy that are
24   increasing tax collections, correct?
25        MR. STEWART:  Objection.

R. CLINE

1
2        THE WITNESS:  I don't know that.
3    BY MR. SMITH:
4    Q.    So, you haven't done any investigation into
5    that?
6    **A.    That is correct.**
7    Q.    Have you done any investigation into the steps
8    that other cities have taken with respect to taxes in
9    order to help address fiscal distress or crisis?
10        MR. STEWART:  Objection.
11        THE WITNESS:  I have not.
12   BY MR. SMITH:
13   Q.    And that's not something you're aware of from
14   your ordinary work?
15   **A.    No, it's not.**
16   Q.    You just not -- you just don't have knowledge
17   about what cities have done with respect to taxes in
18   responding to fiscal distress or fiscal crisis, correct?
19   **A.    I believe that's an accurate statement.**
20   Q.    Have you done any investigation into
21   forecasting practices of other cities with respect to
22   taxes?
23   **A.    I have worked with other cities on some of**
24   **their revenue issues where I have seen their practices,**
25   **but I haven't investigated practices of other cities.**

**R. CLINE**

1
2        **(Cline Exhibit 1 was marked for identification.)**
3    BY MR. SMITH:
4    Q.    I'm handing you what has been marked as
5    Exhibit 1, and you can tell me if you have seen this
6    document before?
7        MR. STEWART:  Maybe for the record, you
8        might -- for those listening or others, just say
9        what it is.
10       MR. SMITH:  Oh, it's the Fourth Amended
11       Disclosure Statement with respect to Fourth Amended
12       Plan.
13       THE WITNESS:  I have not read this
14       document.  I have looked at some detailed tables.
15       I don't know if they were part of this.  They don't
16       appear to be attached to this document.  I have not
17       read this particular document.
18   BY MR. SMITH:
19   Q.    Okay.  Let me ask you, if you could turn to
20   page 168.  Before I ask you about 168, I've got another
21   question.
22   **A.    All right.**
23   Q.    You wouldn't recommend that the City reduce
24   tax rates, correct?
25   **A.    We have no -- and I have no policy**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 28 of
54

1          R. CLINE
2    additional revenue would be generated by a significant
3    increase in the collection rates for those taxes,
4    correct?
5    **A.    We have not done a separate adjustment for a**
6    **change in the collection rate for those other taxes that**
7    **you identified.**
8    Q.    Is the collection rate essentially fixed in
9    your model for those taxes?
10         MR. STEWART:  Objection.
11         THE WITNESS:  As I said, the collection
12         rate is embedded in the starting point.  We have
13         not made a specific adjustment going forward for a
14         collection rate change.
15   BY MR. SMITH:
16   Q.    And so, there's -- the collection rate remains
17   constant in your model for the income, wagering rate,
18   utility users' tax, and corporate tax, correct?
19   **A.    We have not dealt with a change in that**
20   **collection rate as a separate adjustment to our revenue**
21   **forecast.**
22   Q.    Okay.  And is it possible for you to do that
23   kind of analysis, to look at what would happen if
24   collection rates increased for those taxes?
25   **A.    At this point, we do not have information**

1          R. CLINE
2    necessary to analyze that question.
3    Q.    Okay.  And you haven't been asked to analyze
4    that question, correct?
5    **A.    We have not, but as I mentioned, it is an**
6    **important part of our property tax forecast.**
7    Q.    Okay.  So, even though you have been asked to
8    analyze changes in collection rate for the property tax,
9    you haven't been asked to analyze changes in the
10   collection rate for the other taxes that you analyzed,
11   correct?
12   **A.    We were not asked separately to consider the**
13   **collection rate issue for the property tax.  We did it as**
14   **part of our analysis of the property tax.**
15   Q.    So, even though you weren't asked to do it,
16   you looked at collection rates for the property tax,
17   correct?
18   **A.    We were asked to estimate over a 10-year**
19   **period what we thought the collection of the property**
20   **taxes will be under current law.  We did understand the**
21   **issues of falling property values, the mismatch between**
22   **assessed values and market values and the other features**
23   **that were affecting the property tax system, which did**
24   **include the collection rate.**
25   Q.    Okay.  So, even though you analyzed the

1          R. CLINE
2    collection rate for property taxes, you didn't analyze
3    the collection rate for the other taxes, that you
4    examined?
5    **A.    That is correct.**
6    Q.    And is that because you weren't asked to do
7    that analysis?
8    **A.    No.**
9    Q.    You just didn't do it, but you could have done
10   it?
11   **A.    We did not do it.**
12   Q.    I mean, do you have any explanation for why
13   you did it with respect to one tax but not the other
14   taxes?  Was it just a lack of information or what was it?
15        MR. STEWART:  Objection.
16        THE WITNESS:  Also involved is
17        understanding what difference a change might make.
18        Some of those smaller taxes like the utility user
19        tax, corporate income tax are collecting 3% of the
20        total that we looked at.  We did not feel that at
21        the margin a collection rate change was large
22        enough to consider in the revenue estimate.
23        So, it's partly an understanding of the
24        relative size of the taxes, and the importance of
25        compliance, adjustments, collection rate

1          R. CLINE
2    differences going forward.
3    BY MR. SMITH:
4    Q.    And --
5    **A.    Not all taxes are equal in that evaluation.**
6    Q.    The income tax is a significant source of
7    revenue for the City, correct?
8    **A.    It's about a third.**
9    Q.    Okay.  And so, increasing the collection rate
10   could significantly increase revenue from the income tax
11   to the City, correct?
12   **A.    I don't know the answer to that.**
13   Q.    And you don't know the answer because you
14   didn't look into it, correct?
15   **A.    I don't know the answer because we did not do**
16   **an analysis of the impact of changing collection rates in**
17   **our analysis of the 10-year forecast.**
18   Q.    And so -- but with respect to the income tax,
19   so you would agree with me that changing the collection
20   rate could result in significant increased revenue to the
21   City, correct?
22        MR. STEWART:  Objection.
23        THE WITNESS:  I don't know if it would be
24        significant.
25   BY MR. SMITH:

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

2 raising any of the other taxes that you discussed in your
3 report?
4    A.   I am not aware of the -- of any conversations.
5    Q.   The -- as far as you're aware, the City hasn't
6 asked the State to cooperate in implementing new taxes?
7    A.   I'm not aware of any discussions.
8    Q.   As far as you're aware, the City hasn't asked
9 the State to cooperate in eliminating exemptions or
10 reductions in applicable taxes?
11    A.   I'm not aware of any conversations.
12    Q.   Do you agree that in performing forecasting,
13 it's important to follow generally accepted standards and
14 procedures?
15    A.   I believe in forecasting State or local
16 revenues, you want to use the best available tools that
17 you have, starting with the most complete information on
18 actual collections that you have.
19    Q.   So, in doing forecasts, it's important to
20 assemble the most complete and comprehensive set of
21 information in order to accurately perform your forecast,
22 correct?
23    A.   That is correct, although different types of
24 information are of different value, and when we did our
25 forecast, I believe we incorporated what we thought were

R. CLINE

2 the key drivers in determining the baseline forecast.
3    Q.   Okay.  But as a general matter, in conducting
4 forecasts, you want to assemble the most comprehensive
5 set of information, correct?
6    A.   That is relevant to the forecast itself.
7    Q.   All right.  You agree that somebody could
8 perform a reasonable forecast that includes the effective
9 changes in collection rates over time on the income tax,
10 correct?
11    A.   It could be possible.
12    Q.   And you agree that people -- experts could
13 conduct forecasts that come to reasonable outcomes that
14 differ from yours in terms of your forecasting?
15    A.   There could be different results, certainly,
16 depending upon the key assumptions and the approach
17 that's used in doing the estimates.
18    Q.   And would it be fair to say that you haven't
19 looked into the law regarding, you know, what the City's
20 authority is respect to taxes?
21    A.   That is correct, in that we have not evaluated
22 alternative revenue sources for the City of Detroit.  We
23 wanted certainly to make sure we understood current law
24 in doing our revenue forecast.
25    Q.   Then how did you get an understanding of

R. CLINE

2 current law?
3    A.   Some cases looking at tax returns and looking
4 at tax statutes to see whether or not, for example, there
5 was a scheduled rate change in current law.
6    Q.   You haven't done any investigation into what
7 policy choices Detroit's leaders are contemplating that
8 might affect your tax forecasts: is that fair?
9    A.   No.
10    Q.   Is that correct?
11    A.   We have not evaluated any alternative policy
12 options for the City of Detroit.
13    Q.   And so, you haven't evaluated policy options
14 that the City may currently be evaluating, correct?
15    A.   I believe I've answered that question clearly.
16    Q.   And the answer is correct, right?
17    A.   The answer is that we have not done any
18 evaluation of policy options for the City of Detroit.
19    Q.   Do you agree with me that if, for example, tax
20 rates change or collection rates materially go up, your
21 forecast could turn out to be off by hundreds of millions
22 of dollars?
23    A.   If current law changes, you would need a new
24 forecast of what the expected revenues are.
25    Q.   And you agree that it's possible that your

R. CLINE

2 forecast, depending on changes in the assumptions that
3 may occur in the future, could be off by hundreds of
4 millions of dollars, correct?
5    A.   I don't know what the magnitude would be.  A
6 very small change in the tax rate may change our numbers
7 by 1 percent, so it depends upon the magnitude of the law
8 change.
9    Q.   You agree that if there's significant changes
10 in the assumptions, your forecast could be off by
11 hundreds of millions of dollars, correct?
12    A.   I wouldn't agree to that general statement,
13 no.
14    Q.   Well, I mean if the tax rate were increased by
15 1 percent on the income tax or property tax or something
16 like that, that could change your forecast by hundreds of
17 millions of dollars, correct?
18    A.   One example I could respond to, because we did
19 look at it in -- as part of the revenue forecast, we do
20 know that the corporate income tax rate under current law
21 doubled recently.  It's only collecting $26 million in
22 total, that would be a $12 million change in tax
23 collections.
24    Q.   But if the income tax rate or the property tax
25 rate doubled, the City would have significantly more

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7004-10    Filed 08/22/14    Entered 08/22/14 21:10:25    Page 30 of
54

R. CLINE

1
2 money, hundreds of millions of dollars more, correct?
3    **A.   I couldn't tell you what the magnitude of the**
4 **change would be.**
5    Q.   And --
6    **A.   I'd have to run the model to see that.**
7    Q.   So, you're incapable of offering any opinion
8 regarding what would happen in terms of the amounts
9 available to the City if the assumptions in your model
10 significantly change, correct?
11    **A.   We did not simulate different revenue**
12 **forecasts based upon alternative tax rates.  We did not**
13 **do that.**
14    Q.   Okay.  But in general, for any of the
15 assumptions, if the assumptions significantly change,
16 you're not in a position to offer an expert opinion
17 regarding what the revenues would be to the City of
18 Detroit, correct?
19    **A.   Not without re-running the model.**
20    Q.   Do you know who the mayor of the City of
21 Detroit is?
22    **A.   I do remember I have been mispronouncing his**
23 **last name.  I don't recall.**
24    Q.   Do you know what the role of the mayor or the
25 city council is with respect to taxes?

R. CLINE

1
2    **A.   I do not know the details in Detroit.**
3    Q.   And the emergency manager or his assistants
4 haven't shared with you any plans or policies relating to
5 taxes; is that fair?
6    **A.   I believe that's accurate.  We have not**
7 **discussed alternative tax policy options for Detroit.**
8    Q.   You're not offering any guarantee regarding
9 the accuracy of your forecast, correct?
10    **A.   That is correct.**
11    Q.   I mean -- and there's a standard disclaimer
12 that everybody, including Ernst & Young, uses that these
13 kind of forecasts, you can't guarantee that they're
14 accurate inherently, correct?
15       MR. STEWART:  Objection.
16       THE WITNESS:  The objective is using the
17    existing information and your understanding of the
18    underlying economics to get as solid an estimate of
19    the expected revenue stream as you can get.  That's
20    the objective.
21 BY MR. SMITH:
22    Q.   Yeah.
23    **A.   We won't know until after the fact how**
24 **accurate the revenue estimates are.**
25    Q.   So, you wouldn't guarantee to the Court that

R. CLINE

1
2 your revenue estimates are accurate, correct?
3       MR. STEWART:  Objection.
4       THE WITNESS:  I'm not sure what "guarantee"
5    means in this situation.
6 BY MR. SMITH:
7    Q.   Well, I mean, you wouldn't vouch for the --
8 there's no way to vouch for the accuracy of your revenue
9 forecast, correct?
10       MR. STEWART:  Objection.
11       THE WITNESS:  We accept the responsibility
12    for our revenue forecast.  We believe we did it
13    using the best information available, appropriate
14    modeling approach, and we were very careful in
15    what we were doing.  That's what we can assert.
16 BY MR. SMITH:
17    Q.   Did anybody from the City ask you to change
18 some of the assumptions in your models?
19    **A.   Not me personally, no.**
20    Q.   And do you agree that there's no scientific
21 literature or data available that quantifies any increase
22 in tax revenue or revenue in general from restructuring
23 or reinvestment proposals by the City?
24    **A.   I am not familiar with any analysis related to**
25 **Detroit's current situation that directly links spending**

R. CLINE

1
2 **initiatives to specific revenue changes -- tax changes,**
3 **which is what we looked at, just the tax changes.**
4    Q.   Yeah.  Do you which department of the City
5 collects the various taxes?
6    **A.   I have been to the website to look for tax**
7 **return information.  I don't recall what -- might have**
8 **been the finance agency.  Don't recall exactly what the**
9 **name of the agency is.**
10    Q.   Do you know if different agencies collect
11 different taxes in Detroit?
12    **A.   I am not familiar with the mechanics of who's**
13 **responsible for depositing the money in the bank.**
14    Q.   So, you don't know the -- which department
15 actually collects each of the taxes you analyze; is that
16 fair?
17    **A.   For our revenue forecast, it was not one of**
18 **the elements we thought was significant.**
19    Q.   Yeah.  So, you don't know that information,
20 correct?
21    **A.   I don't think I know it off the top of my**
22 **head, no.**
23    Q.   Do you know who does the forecasting for the
24 City?
25    **A.   I do know that the City has a consensus**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 31 of
54

R. CLINE

forecasting approach, which I believe they borrowed from the State or adapted after the State model. I think there may be three separate groups of people that do the forecast, they reach a consensus, and it's published in the spring each year.

Q. Before this consensus group was put together, do you know whether the City -- I mean, as far as you know, did the City ever do any kind of forecasting for taxes or other purposes?

A. I don't know what the mechanism was in the City for preparing the budget.

Q. The only forecasting you're aware that the City has ever conducted is this consensus forecast that's done: is that correct?

A. No. What is correct is that since I have been involved in this project, my understanding of the forecasting process is based on my understanding there is a consensus forecasting process.

Q. And your forecast does not agree with the consensus forecast, correct?

A. I'm not sure how it differs.

Q. Okay.

A. I do know that we did not adopt the consensus forecast back in 2013.

R. CLINE

Q. Okay. I mean, but you know that there are differences between your forecast and the consensus forecast: is that fair?

MR. STEWART: Objection.

THE WITNESS: If there are differences, I don't know what the magnitudes are.

BY MR. SMITH:

Q. Have you done any investigation to look at the consensus forecast to see whether you're consistent or inconsistent with the consensus forecast?

A. I've read the latest consensus forecast and we did not make any changes in our forecast based upon what I read.

Q. Okay. Having read it, though, you know that there are differences between your forecast and the consensus forecast, correct?

A. I'm not aware of what the magnitude of those differences are.

Q. But you know there are differences between your --

A. I would assume --

Q. -- forecast and the consensus forecast?

A. I would assume there are differences.

Q. And I think we already mentioned it, but the

R. CLINE

consensus forecasts do not try to forecast revenues or expenditures beyond two or three years, correct?

A. What is correct is that they are geared to the budgetary cycle. If the city council considers four-year budget horizons, that's what the tax forecast will be. If it's a two-year horizon, it will be a two-year forecast.

Q. You're not aware of anybody at the City ever suggesting that there should be a forecast for as long as 10 years, correct?

A. I'm not aware of any of the procedures the City has used in the past.

Q. You didn't do any sensitivity analyses to figure out which are the most important drivers of your numbers, or did you?

A. We selected the drivers based upon what we believed were important determinants of the tax base and its growth over time. We did not perform specific exercises where we increased a parameter by 10 percent or lowered it by 10 percent.

Q. Okay. So, you don't know which parameters have the most impact on your forecasts?

A. Based upon my professional experience, I have a -- an idea of what matters.

R. CLINE

Q. But you haven't done any testing or analysis to figure out which parameters have the most impact on your analysis and what effect changing them would be -- would have on your outcomes, correct?

A. We have a wide range of assumptions from statutory tax rates to changes in employment. They have different effects on the dollar amounts of the revenue estimates for specific taxes. All of that was considered in preparing our revenue estimate.

Q. Yeah. But you didn't do any analysis where you changed parameters to figure out what the impact would be on your outcomes, correct?

A. As I say, we did not do specific simulations where we increased one of 50 parameters by 10 percent, holding others constant, or reduced it by 10 percent holding others constant, or changing all 50 by 10 percent. We did not do that.

Q. Is that something that you've done in prior forecasts?

A. In deriving point estimates for revenues related to budget preparation, that tends not to be done. You do your best point forecast of your revenue figure based upon your knowledge of what is most significant, what is less significant, and your best estimate of what

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1         R. CLINE
2 the values of those parameters should be.
3     It's not an exercise of creating a band of
4 possible outcomes around the point estimate. That's not
5 how it operates.
6    Q.   Have you ever forecast tax revenues where you
7 have created a band of possible outcomes?
8    A.   Not that I remember.
9      MR. SMITH: You want to take a quick break,
10 if you don't mind?
11      MR. STEWART: Sure. For how long?
12      MR. SMITH: I don't know, five minutes?
13      MR. STEWART: Yeah. Five minutes is fine.
14      THE VIDEOGRAPHER: We're off the record at
15 12:14.
16 (RECESS, 12:14 p.m. - 12:22 p.m.)
17      THE VIDEOGRAPHER: On the record at 12:22.
18 (Cline Exhibit 2 was marked for identification.)
19 BY MR. SMITH:
20    Q.   I've handed you Exhibit 2, which is an article
21 from the Detroit News, entitled "Reverse Commute May Hike
22 Tax Bill."
23     Do you see that? Have you got that?
24    A.   I have the document.
25    Q.   Okay. And you see that this article discusses

R. CLINE

1         R. CLINE
2 how the emergency manager's restructuring plan includes a
3 proposal to try to collect income taxes from Detroit
4 residents who work outside the city limits? Do you see
5 that?
6    A.   Just glancing at it, I'm not sure what
7 mechanism they're discussing for increasing tax
8 collections.
9    Q.   It's withholding. It talks about withholding.
10 If you look at the third paragraph, it says, "The City is
11 considering the enactment of a local ordinance that would
12 require employers to withhold City income taxes of
13 reverse commuters. The disclosure statement reads, 'It's
14 not a new strategy, but one likely to draw opposition in
15 some circles.'"
16     Do you see that?
17    A.   I do see that, yes.
18    Q.   Okay. Nobody ever disclosed to you that there
19 were proposals to increase tax collections by withholding
20 taxes from reverse commuters, correct?
21    A.   I was aware that that was an issue that had
22 been raised.
23    Q.   Okay. How were you aware of that?
24    A.   I think it was reading descriptions of
25 considerations.

R. CLINE

1         R. CLINE
2    Q.   Okay. And then this article goes on to say in
3 the fifth paragraph, "A study released by consultants
4 MacKenzie & Company, estimated that uncollected income
5 taxes from Detroit residents working outside the city, or
6 reverse commuters, totaled more than 140 million in 2009.
7 That means the City took in slightly less than half of
8 what it should."
9     Do you see that?
10    A.   I do.
11    Q.   Were you aware of the MacKenzie study that
12 showed that the City was failing to collect as much as
13 $140 million?
14    A.   No, I was not. I'm sorry.
15    Q.   Okay. Nobody shared that with you from the
16 City?
17    A.   I was not aware of that study.
18    Q.   Okay. Would it be fair to say that there's a
19 significant amount of income tax that's not being
20 collected from reverse commuters?
21      MR. STEWART: Objection.
22      THE WITNESS: I can't comment. I'm not
23 familiar with the estimates.
24 BY MR. SMITH:
25    Q.   Before you did your forecasting in this case,

R. CLINE

1         R. CLINE
2 would you have liked to know about this MacKenzie study
3 that showed that there were potentially $140 million in
4 income tax not being collected?
5    A.   In answering your question, I think it's
6 important to note that in the plan -- I believe the
7 correct phrase is "Plan of Adjustment," there is a number
8 for increased compliance collections. It is independent
9 and separate from our revenue estimate based upon current
10 law and what we think the underlying economics is. I
11 believe you see both of those numbers in the Plan of
12 Adjustment.
13     If you had that document, I could point that
14 out to you, but it's important in answering your question
15 to note that we were responsible for the economics,
16 tax -- economics related under current law tax
17 collections, I believe there's a separate line item which
18 identifies the potential increase from collection
19 activities. I believe we've avoided double counting
20 those numbers, but I do believe they're separate
21 exercises.
22    Q.   Okay. So your forecast doesn't attempt to
23 quantify the total amount of money that's potentially
24 available from tax revenue to the City of Detroit,
25 correct?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1  the consensus estimates for the growth in wagering tax
2  revenue.  Do you see that?
3
4     **A.    Yes.**
5     Q.    And the consensus statement says, "Fiscal year
6  2014, consensus estimate remains flat with an additional
7  decline of 1.2 percent projected by fiscal year 2015."
8        Do you see that?
9     **A.    Yes.**
10    Q.    And then it says "A turnaround is expected in
11 fiscal year 2016 with a consensus projecting 1.5 percent
12 growth."
13       Do you see that?
14    **A.    Yes.**
15    Q.    So, the consensus estimate is for 1.5 percent
16 growth in wagering tax going forward from the fiscal year
17 2016, correct?
18    **A.    Yes.**
19    Q.    And that's not -- that's inconsistent with the
20 rate of growth that you used, correct?
21    **A.    If I could correct my prior answer.**
22    Q.    Okay.
23    **A.    It doesn't talk about going forward.  The last**
24 **year that's mentioned is FY 2016.**
25    Q.    Okay.  So then --

R. CLINE

1
2     **A.    I don't know if they've projected it into the**
3 **future.**
4     Q.    Okay.  The wage -- the revenue -- the wagering
5  tax revenue growth figures that you used are not
6  consistent with the consensus estimate: yours are
7  different, correct?
8     **A.    I believe we're not far off.  We might be at**
9 **a .5 percent rate of growth instead of a 1.5 percent**
10 **growth, but we do have them, I believe, growing at some**
11 **point in that interval of the forecast.**
12    Q.    But you don't use the same numbers for
13 wagering tax revenue as the consensus estimate, correct?
14    **A.    If I understand your question, in 2013, when**
15 **we made the original revenue estimates, we did not use**
16 **the consensus forecast numbers, nor have we changed our**
17 **current forecast based upon the -- this new 2014**
18 **consensus forecast.**
19    Q.    Okay.  So, as a result, the numbers you used
20 for forecasting wagering tax revenue are different than
21 the numbers in the consensus forecast, correct?
22    **A.    It appears to be the case.**
23    Q.    And the consensus forecast notes that there's
24 expected to be a turnaround in wagering tax revenue in
25 fiscal year 2016, correct?

R. CLINE

1
2     **A.    I read that, yes.**
3     Q.    And did you -- in your forecast, you don't
4  model a turnaround in wagering tax revenue in fiscal year
5  2016, do you?
6     **A.    Specifically what we've done in our forecast**
7 **is we had, back in 2013, correctly picked up the fall in**
8 **wagering collections in Detroit.  We got that pretty**
9 **close back in 2013.  And we had it pretty close for 2014.**
10 **We knew they were falling because of the opening of the**
11 **new casinos in Ohio.**
12       **We are not bringing it back as quickly in our**
13 **forecast as the Detroit consensus forecast.**
14    Q.    Okay.  So, the Detroit consensus forecast has
15 a higher wagering tax revenue growth figure than you use,
16 correct?
17    **A.    Certainly in FY 2016, that's the case.**
18    Q.    Okay.  And you don't use any mathematical
19 formula to generate your wagering tax rate growth figure,
20 do you?
21    **A.    I wouldn't say that we had a mathematical**
22 **formula.  We have mathematical calculations within the**
23 **Excel spreadsheet.**
24    Q.    What is the mathematical calculations that
25 generate the wagering tax growth rate?

R. CLINE

1
2     **A.    We specify the expected rates of growth,**
3 **updated -- we updated the beginning point for actual tax**
4 **collections, and extrapolated those numbers into the**
5 **future.**
6     Q.    But is the -- actual rate of growth that
7  you used, though, is that a number you calculated, or is
8  that a number that you --
9     **A.    That's an assumption --**
10    Q.    -- input?
11    **A.    -- that we input into the model.**
12    Q.    Okay.  And the number you use for the wagering
13 rate growth -- the growth rate for wagering taxes is an
14 assumption that you personally made?
15    **A.    I, in a sense, was responsible for all of the**
16 **assumptions that are in the model.**
17    Q.    Yeah.
18    **A.    I'm not sure what you mean by am I personally**
19 **responsible for the number.**
20    Q.    Well, who picked the wagering rate growth
21 rate that you use to calculate wagering tax revenue?
22    **A.    I signed off on that assumption.**
23    Q.    And that's an assumption that was made,
24 correct?
25    **A.    Correct.**

Pages 165 to 168

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 34 of
54

R. CLINE

Q.   And do you know how that assumption was generated?

A.   I do.

Q.   Okay.  How was it generated?

A.   It was looking at what is going on around the states in the collection of wagering income -- taxes from gross receipts based upon wagering.  A number of states are quite disappointed in the revenue they're now receiving because of the rapid expansion of gambling in competitive, close-by states.

We felt that based upon that experience that a relatively low positive rate of growth, somewhere between .5 and 1 percent, was a reasonable assumption for Detroit, given the increasing competition in a relatively close geographic area.

Q.   You didn't use any body of data to generate the wagering tax growth rate, correct?

A.   As I mentioned, we did look at the actual collection figures --

Q.   Okay.

A.   -- reported by the states.  We had some idea of what was going on nationwide.

Q.   But you didn't calculate the wagering tax growth rate, correct?  You picked that number?

R. CLINE

A.   It's an assumption that we plugged into the model.

Q.   Okay.  And that's an assumption that you made, correct?

A.   I was responsible for that assumption.

Q.   And the assumption that you use for the wagering tax rate growth is different from the number that the consensus report uses, correct?

A.   It looks like certainly for FY 2016 they're at a higher rate of growth.

Q.   Okay.  And do you recall what number you were using?

A.   At that point, it was either 0.5 or a plus 1 percent -- plus 0.5 or plus 1 percent.

Q.   Okay.  Can you tell me why you used 1 percent rather than 1.2 percent or 1.3 percent?

A.   Because we thought at the time that that was a reasonable estimate given the arrival of the new competition, which should have had an even more negative effect on the revenue numbers and could in fact, by itself, have driven this into a negative .5 percent.

Q.   Okay.  But there is --

A.   But there is an economic recovery occurring throughout Michigan, some signs of slightly more positive

R. CLINE

economics in Detroit, which would, as separate factors, contribute to positive growth in the wagering gross receipts.  We felt that the balance of those two forces would lead to a slight increase in revenue.

Q.   But there's no scientific study or formula that tells you whether you should pick 1.2 percent or 1.3 percent for the wagering tax growth rate, correct?

A.   In all of the revenue estimating that I have done, there is no precise formula that gives you the resulting revenue estimate.  There are equations that are based upon history that you use to get an initial starting point, and then economists do what we call add factors, dummy variables and adjustments.  No economic -- no revenue forecaster at the state level accepts the numbers coming out of an equation.  They start there, and then they modify it.

We used what we thought was relevant, additional information to determine these growth rates.  There was not a single mechanical formula that generated the .5 or the 1.0 number.

Q.   I mean, at the end of the day, the wagering tax growth rate that you used is a number that you just picked, right?

A.   As the City did also.

R. CLINE

Q.   Okay.  And there are a number of inputs to your model that are basically numbers that you picked, correct?

A.   They're assumptions that I was responsible for.

Q.   And you could use different assumptions in your modeling, and they would be reasonable assumptions, correct, because they're just numbers that you picked?

MR. STEWART:  Objection.

THE WITNESS:  Not all assumptions would be reasonable.

BY MR. SMITH:

Q.   Well, I mean, for any of the numbers that you picked to use in your model, you could have different numbers that would be reasonable, correct?  Like, for example, with the wagering tax rate growth, it would be reasonable to use the City's number, right?

MR. STEWART:  Objection.

THE WITNESS:  I don't agree.  We did not use the City numbers in 2013.

BY MR. SMITH:

Q.   Do you think it would be unreasonable to use the numbers that the consensus forecast used for the City?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1      A.   I believe it depends upon which tax type
2  you're looking at and how long out they're going.
3      Q.   So, some of the numbers used in the consensus
4  forecast in your view are unreasonable?
5      A.   Some of the numbers used in the consensus
6  forecast are not the same as the assumptions that we
7  made.
8      Q.   Yeah.  And my question is whether some of the
9  numbers in the consensus forecast are unreasonable to
10  use.
11      A.   I don't have a definition for "unreasonable."
12  I can simply tell you how we derived the number that we
13  plugged in as our assumption.  We did not plug in the
14  consensus forecast number.
15      Q.   Okay.  But you agree that your -- the numbers
16  that you picked to plug into your model that are just
17  based on your picking the numbers are numbers that you
18  could substitute with other numbers that would also be
19  reasonable, correct?
20      MR. STEWART:  Objection.
21  BY MR. SMITH:
22      Q.   Or are your numbers the only ones that could
23  be used?
24      MR. STEWART:  Objection.

R. CLINE

1      THE WITNESS:  I was responsible for
2  determining what assumptions we put in our revenue
3  forecasting model, and I did that.
4  BY MR. SMITH:
5      Q.   Yeah.  And my question is there could be
6  another independent expert who picked different numbers
7  to put into a revenue forecasting model for Detroit, and
8  it could lead to perfectly reasonable results, correct?
9      MR. STEWART:  Objection.
10      THE WITNESS:  Would lead to different
11  results, but they're not the ones that we chose.
12  BY MR. SMITH:
13      Q.   I know.  And I'm asking -- is your position
14  that your forecast is the only reasonable forecast of
15  revenues from the taxes you looked at for Detroit?
16      A.   That's not my position.
17      Q.   Okay.  So --
18      THE VIDEOGRAPHER:  Counsel, I'm sorry.
19  We're at about an hour.  We have to switch.
20      MR. SMITH:  Okay.  Why don't we break for
21  lunch.
22      MR. STEWART:  Why don't we break for lunch.
23  What time is it?
24      THE VIDEOGRAPHER:  Off the record at 12:55,

R. CLINE

1  this is disk number two.
2      (RECESS, 12:55- - 1:50 p.m.)
3      THE VIDEOGRAPHER:  On the record at 1:50.
4  This is the beginning of disk number three in the
5  deposition of Robert Cline.
6  BY MR. SMITH:
7      Q.   Good afternoon, Mr. Cline.  How did you become
8  involved in this case?
9      A.   I became involved in the case when the EY team
10  approached my practice, the QUEST practice in Washington,
11  D.C., to ask for assistance in estimating tax revenues
12  for the City.
13      Q.   And the EY team in Detroit lacked the
14  expertise to estimate taxes correctly; is that correct?
15      A.   I don't know if that was the case.  I think we
16  were recognized as having more extensive experience in
17  doing that.
18      Q.   Is it fair to say that in performing your
19  forecasting, you take data that's existing and then -- at
20  the current point in time, and then you project that data
21  into the future, essentially assuming that the status quo
22  doesn't change?
23      A.   The forecast itself is a forecast of the key
24  drivers in the future, all of which are changing.  So,

R. CLINE

1  the forecast exercise itself is -- what stays the same is
2  the legal parameters of the tax system.  What changes
3  over time is the economics.  What is fixed is the
4  starting point of actual tax collections.
5      Q.   So, in order to conduct an appropriate
6  forecast, the policies and economics should change over
7  time to accurately account for events as they unfold?
8      A.   That's not correct.  The policies in the form
9  of tax parameters under current law remain consistent --
10  constant over the forecast period.  It was the economics
11  that changed.
12      Q.   Okay.  Are there activities by the City that
13  change over time, or do you assume that all activities by
14  the City remain fixed and constant?
15      A.   What do you mean by "activities" of the City?
16      Q.   Well, one activity is collection -- you know,
17  collection practices.  You know, there are other
18  activities that the City engages in that might affect
19  revenue -- tax revenue, correct?  Other than the legal
20  framework, there are activities the City engages in that
21  can impact tax revenue, correct?
22      A.   Are you talking specifically about collection
23  activities?
24      Q.   Well, my question is broader.  I'm just trying

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7004-10    Filed 08/22/14    Entered 08/22/14 21:10:25    Page 36 of 54

R. CLINE

1  to give you an example so you get an idea of what I'm
2  talking about. Why don't we take it one at a time, okay?
4  **A. Okay.**
5  Q. Collection activities certainly can impact tax
6  revenues over time, correct?
7  **A. Correct.**
8  Q. There are other activities that the City can
9  engage in that may impact tax revenues, correct?
10 **A. You will have to be more specific. What type**
11 **of activities are you describing?**
12 Q. Well, if the City, for example, banned
13 businesses from the City, that would certainly impact tax
14 revenues, correct?
15 **A. The local economy will be affected by the**
16 **provision of City services, by the overall economic**
17 **outlook for the city, all of those are factors that**
18 **affect -- will affect our economic forecast, if they**
19 **affect the private sector economy.**
20 Q. Okay. So, there are many activities,
21 including the activities by the City that can impact the
22 economics that you use in forecasting into the future,
23 correct?
24 **A. I think that's correct.**
25 Q. And what are some of those things that can

R. CLINE

1
2  impact the economics?
3  **A. I believe I may have just mentioned a few of**
4  **those examples. Anything that affects land use, that**
5  **affects general perception of the viability of the**
6  **private sector in Detroit. Anything that affects the**
7  **private sector economy would in theory have an influence**
8  **on our tax forecast for the City.**
9  Q. Okay. Did you look at historical data
10 regarding utility users' tax collections?
11 **A. We were aware of the most recent data on**
12 **actual collections in the City of Detroit.**
13 Q. Has the City successfully increased utility
14 user tax collections in recent years?
15 **A. I believe in the last few years, just prior to**
16 **our forecast period, we were seeing decreases in utility**
17 **tax collections.**
18 Q. You're not offering an opinion on the causes
19 of Detroit's fiscal problems, correct?
20 **A. I'm not.**
21 Q. You're not offering an opinion that Detroit
22 can increase taxes, correct?
23 **A. I am not offering an opinion about tax policy**
24 **changes in the City of Detroit.**
25 Q. And you're not offering an opinion that

R. CLINE

1
2  Detroit can't pay its creditors more, correct?
3  **A. I have no comment on that issue.**
4  Q. I'm going to hand you a copy of your report
5  that I'll mark as Exhibit 4, just so you have it in front
6  of you, okay?
7  **A. Okay.**
8  **(Cline Exhibit 4 was marked for identification.)**
9  BY MR. SMITH:
10 Q. You've got a copy of your report in front of
11 you?
12 **A. Thank you. I do.**
13 Q. Okay. And I just wanted to get that to you so
14 you would have it in case you need to refer to it, okay?
15 **A. Thank you.**
16 Q. Can you tell me what the assumptions of your
17 forecasts are?
18 **A. For all tax types?**
19 Q. Why don't we go tax by tax. For the income
20 tax, what are the assumptions that you make?
21 **A. It may be helpful just to reiterate what is in**
22 **the report in terms of our approach. Total individual**
23 **income tax revenues mathematically equal number of**
24 **taxpayers times average taxable income times the tax**
25 **rate.**

R. CLINE

1
2  **And our estimating methodology was to look at**
3  **each three of those components separately. Because**
4  **Detroit has differential tax rates depending upon whether**
5  **you are a resident or a non-resident, we actually**
6  **estimate individual income tax bases and taxpayers for**
7  **those who are residents of Detroit and work in Detroit,**
8  **residents of Detroit who work outside of the city, and**
9  **non-residents who work in the city.**
10 **Then we made assumptions about total**
11 **employment in Detroit, the growth rate of employment in**
12 **the suburbs, population growth in the city, general**
13 **increases in the average taxable base. Those were, on**
14 **the individual income tax side, some of our key**
15 **assumptions.**
16 Q. Okay. And then for the corporate tax, what
17 are the key assumptions?
18 **A. I believe our corporate income tax forecast is**
19 **more -- was -- began with the State forecast for the**
20 **years that were available. The State information is more**
21 **limited because the State of Michigan did not have a**
22 **corporate income tax prior to two or three years ago.**
23 **They returned to that tax, so there's too short a time**
24 **series to use the State experience as a foundation for**
25 **the Detroit forecast.**

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 37 of 54

R. CLINE

1            R. CLINE
2      So, we used recent experience in Detroit and
3 we used for the longer run forecast information about the
4 expected overall growth of the U.S. economy, because of
5 the limitation on data from the State of Michigan, not
6 having a time series for the corporate income tax.
7     Q.   Okay. So, what are the assumptions for the
8 corporate income tax?
9     A.   All right.
10     All right. As we outlined in the report, I'm
11 looking for the specific percentage changes. Let's see
12 where that -- where they are. What we did on the
13 corporate income tax is that we began with the State
14 forecast three-year, I believe, period, and we took the
15 percentage growth for the corporate income tax forecast
16 from the State. If I recall, that may have been running
17 at 3 or 3.5 percent.
18     Then we recognized that the corporate income
19 taxes in Detroit were growing at a lower, slower rate of
20 growth than for the State, and that had been going on for
21 some time. We called that our structural adjustment, and
22 we subtracted that from the State forecast to get our
23 forecast for the City of Detroit.
24     And that adjustment was about a negative 3
25 percent, tapering down to a negative 2 percent. And that

R. CLINE

1            R. CLINE
2 gave us our growth rates for the corporate income tax,
3 and then we extrapolated that into the future, over the
4 10-year period of time.
5     Q.   Okay. So, can you list for me the key
6 assumptions for your corporate tax forecast?
7     A.   Our corporate tax forecast was based upon
8 recent experience in the rate of growth of the State
9 corporate income tax collections, adjusted downward from
10 recent history of the slower rate of growth in Detroit
11 than in the State. We applied that going forward outside
12 of the Michigan forecast at a rate that may have been
13 roughly -- I don't see it in front of me here, but it may
14 have been close to a 2 percent rate of growth.
15     Q.   And all of those are assumptions of your
16 corporate income tax calculation?
17     A.   In a sense, the entire model is an assumption.
18 All of these are inputs like the rate of growth of the
19 State corporate income tax, the relationship between the
20 Detroit tax and the State base; all of those were based
21 upon information in the recent past or a snapshot at a
22 point in time, and we did use those parameters and ratios
23 in forming our future forecast for the City of Detroit.
24     Q.   But all the -- the future forecast is based on
25 a series of assumptions that you made regarding the

R. CLINE

1            R. CLINE
2 corporate income tax: is that correct?
3     A.   It's based upon information on actual tax
4 collections as the starting point, and assumed rate of
5 increases in the tax base in the City of Detroit.
6     Q.   How about the wagering tax: what are the key
7 assumptions there?
8     A.   As I believe I did discuss earlier, the
9 wagering tax recently had very negative percentage
10 changes from year to year. That was a result of
11 increased competition from Ohio, and a result of the deep
12 recession in Detroit as well as the rest of Michigan.
13     In our forecast, we had to decide when that
14 negative impact would start to reverse and perhaps lead
15 to a small, positive growth in wagering taxes. Based
16 upon what we were seeing around the U.S., we returned the
17 rate of growth to the positive area, .5 percent, and then
18 in a few years, we moved it back up -- we pushed it up to
19 a 1 percent annual rate of growth, which I think is a
20 reasonable expectation for what will happen, because the
21 competition hasn't gone away. In fact, it probably will
22 increase. Although the economy is recovering, we think
23 the net effect is about a 0.5 to 1 percent increase in
24 the wagering tax.
25     Q.   And all of those were assumptions of your

R. CLINE

1            R. CLINE
2 wagering tax forecast, correct?
3     A.   Again, they're all inputs in the wagering tax
4 forecast.
5     Q.   I know. My question is, I just want a list of
6 the assumptions for the wagering tax forecast.
7     A.   Yes. Those -- that -- I've explained where
8 the rate of growth assumptions came from.
9     Q.   Okay. So that you're assuming the rate of
10 growth for purposes of your wagering tax calculation,
11 correct?
12     A.   We're forecasting the rate of growth in
13 wagering tax collections based upon the numbers that we
14 put into the model.
15     Q.   Okay. And are those assumptions?
16     A.   I'm not sure how you distinguish between
17 assumptions --
18     Q.   Okay. Well, in your report, don't you list
19 assumptions?
20     A.   We do have a section that says assumptions.
21     Q.   Okay. And can you give me a straightforward
22 answer about what the assumptions are?
23     MR. STEWART: Hold on. Objection.
24     THE WITNESS: What page would that be on?
25     MR. STEWART: He will tell you what page

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1  R. CLINE
2  addressed that would also be reasonable projections?
3      A.    There are other projections that you could
4  make if you changed the assumptions.  I would have to see
5  the rationale for the assumptions to kind of judge
6  reasonableness in that sense.
7      Q.    Okay.  But there's some that could be
8  reasonable?
9      A.    It would depend upon what those assumptions
10  are.
11      Q.    Okay.  So, basically, the reasonableness --
12  basically, your determination about the reasonableness of
13  a projection is based upon the reasonableness of the
14  assumptions?
15      A.    I believe that is fundamentally the foundation
16  for doing tax forecasting.
17      Q.    Okay.  And so, in doing your work in tax
18  forecasting, you tried to use your discretion to pick
19  reasonable assumptions so that you could come up with
20  reasonable projections; is that correct?
21      A.    The way I would describe it is that we had to
22  make those assumptions.  There was no choice.  It wasn't
23  discretionary.  We wouldn't have been able to do the
24  forecast without making those key assumptions.  We made
25  those key assumptions based upon the best available

1  R. CLINE
2  information we had and our perspective on future economic
3  developments in Detroit.
4          We think they are reasonable given what I just
5  described as inputs.  Other people may have different
6  assumptions and come up with different forecasts.
7      Q.    Yeah.  There was no requirement that you use
8  the precise numbers that you picked for your assumptions,
9  correct?
10      A.    We controlled the assumptions that we used in
11  the forecasting model.
12      Q.    Okay.  And in picking the precise numbers for
13  your assumptions, you used your discretion as a tax
14  forecaster to pick assumptions you believe were
15  reasonable, correct?
16      A.    I wouldn't use the word "discretion," no.
17      Q.    Okay.  What would you -- you used your -- what
18  did you do to pick the assumptions; how would you
19  characterize your exercise of your function?
20      A.    I would characterize it as developing a set of
21  assumptions based upon our experience in revenue
22  forecasting, and based upon our understanding of the
23  current status of the City of Detroit from an economic
24  perspective.  We use that information to guide the
25  selection of the forecasting assumptions.

1  R. CLINE
2      Q.    You don't have any experience doing revenue
3  forecasting for a City, correct?
4      A.    I do not.
5      Q.    And you don't have any experience doing
6  economic forecasting for Detroit, correct?
7      A.    Not prior to this study.
8      Q.    Are there any economic forecasts for Detroit?
9      A.    In the past, I have used forecasts for the
10  City of Detroit.  When we started looking at this in
11  2013, we could not find updated forecasts for the City of
12  Detroit.
13      Q.    Okay.  So, there are no updated forecasts for
14  the City of Detroit that would -- that could be used in
15  doing a forecast such as you're doing here, correct?
16      A.    There may be, but we did not find them or use
17  them in our analysis.
18      Q.    Okay.  So, because you didn't have Detroit
19  data, you had to use Michigan data; is that correct?
20      A.    I think the correct answer is we had a lot of
21  Detroit data.  We have all there is to know about tax
22  collections in the City of Detroit we had very detailed
23  information on the flow of commuters across the border in
24  Detroit.  We had detailed information on the labor market
25  conditions in the City of Detroit.

1  R. CLINE
2          What we did not have was an economic forecast
3  of the future in Detroit.
4      Q.    Okay.  So, because you didn't have an economic
5  forecast for the future for Detroit, you had to look at
6  information for the State of Michigan; is that correct?
7      A.    We did use as a starting point, in addition to
8  the data that we had for the City of Detroit, we used the
9  most recent consensus forecasts for the state economy,
10  and then related that to the City of Detroit.
11      Q.    So, is part of what you are doing in your
12  forecast extrapolating statewide data for Michigan and
13  trying to use it to do some forecasting for Detroit?
14      A.    That was one of the steps in the process.
15      Q.    Okay.  And who are the people that had done
16  the prior Detroit forecasts that were not updated, if you
17  can recall, or what were they?
18      A.    I believe in the past, I had used economic
19  forecasts for the City of Detroit from one of the banks
20  in the City of Detroit.  I believe they stopped doing
21  that revenue forecast -- systematic revenue forecast.
22      Q.    Do you recall which bank it was?
23      A.    I don't recall which bank it was.
24      Q.    When you say in the past you had used a
25  revenue forecast for Detroit by one of these banks, what

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1  MR. STEWART: Objection.
2  THE WITNESS: As I mentioned, our tax
3  revenue forecast for the individual income tax
4  begins with the actual tax collections. I think it
5  was 2013 preliminary. We didn't have to use
6  history or pick a time period for the actual
7  starting point of our revenue estimate. What we
8  had to choose was expected rates of growth in the
9  future over the next 10 years. To provide us with
10  information to choose those growth rates going
11  forward, we looked back in time at history to the
12  extent that it helped us.
13  BY MR. SMITH:
14  Q. Okay. But like, for example, look at Figure 1
15  compared to Figure 2. You look at different time periods
16  for the growth rates of the City of Detroit and Michigan
17  employment compared to the Detroit share of total state
18  of Michigan employment, correct?
19  A. That's correct, because the time period was
20  determined by the question we were trying to answer.
21  Q. Okay. So, for the various inputs in your
22  model, you look at different time periods; is that fair?
23  A. We chose time periods that we thought were
24  most relevant for the parameter or the question we were

R. CLINE

1  trying to answer.
2  Q. Okay. And so, there are a number of
3  parameters in your model that -- on which you base your
4  assumptions or calculations upon different time periods;
5  is that fair?
6  A. I would say that is correct, and you see here
7  two of the types of information that we use in
8  determining our key assumptions.
9  Q. Okay. On that chart at Figure 1, would it be
10  fair to say that at various points in time, the City of
11  Detroit's share of total state of Michigan employment is
12  higher than you've assumed in your forecast?
13  A. It is true in 1990, the share was 8.66
14  percent. In 2012, it's 6.97 percent.
15  Q. And in between those two periods of
16  time, it went up and down, correct?
17  A. Trend is pretty clearly down.
18  Q. But there are periods of time that it was
19  trending upward, correct?
20  A. Given what I see in the diagram, I'd have to
21  go to the underlying percentage changes. I see maybe one
22  or two years where they may have been positive, but I'd
23  have to look at the specific numbers to determine what
24  was positive and what was negative.

R. CLINE

1  Q. Okay. And as an expert in this case, are you
2  able to explain why the share of Detroit -- Detroit's
3  share of total state of Michigan employment went up or
4  down in particular years?
5  A. No. I did not do a detailed examination of
6  the percentage change in each year. The exercise was to
7  determine the long run trend over, say, a 20-year period
8  of time. Focus was not on individual year fluctuations;
9  it was attempting to measure a long run structural change
10  that we believe still applies to the City of Detroit.
11  Q. Okay. Why would Detroit's share of total
12  state of Michigan employment increase during certain
13  portions of time that you looked at?
14  A. They may have -- it may have happened because
15  some of the economic activities in Detroit were growing
16  faster than they were -- than other activities were
17  throughout the state.
18  Q. You haven't done any analysis to figure out
19  what activities there were during those historical
20  periods when Detroit was successfully growing its share
21  of employment compared to the state, correct?
22  A. No, we did not.
23  Q. On page seven, you say, "A comparison of more
24  recent changes in employment in Detroit and Michigan

R. CLINE

1  indicates that Detroit employment has not recovered at
2  the same rate as Michigan employment coming out of the
3  last two recessions."
4  Do you see that?
5  A. I do.
6  Q. Did you calculate any relationship regarding
7  the rate of recovery in Detroit versus Michigan.
8  A. We did, and the results are in Figure 2.
9  Q. I mean, did you calculate it or did you -- you
10  didn't calculate some number, did you, or did you
11  calculate a number? Or did you do an assumption? I'm
12  trying to figure out if it's a calculated value versus an
13  assumed value.
14  A. All of the values in Figure 2 were calculated
15  from actual data.
16  Q. And you would agree with me that there's no
17  data or study showing a reinvestment and restructuring
18  initiative like the City is proposing impacts the rate of
19  recovery as you've assumed in your model; correct?
20  A. I don't know if there are or are not other
21  studies. We did not use or look for those studies in our
22  analysis.
23  Q. Okay. And so, sitting here today, you can't
24  identify any studies showing a reinvestment and

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1
2 restructuring initiative like Detroit's proposing will
3 impact the rate of recovery, correct?
4 **A. I don't have a specific study.**
5 Q. Okay. Can you tell me what mathematical
6 formula was used to calculate the values in Figure 2?
7 **A. The formula was X divided by Y.**
8 Q. What is X --
9 **A. It's the percentage change from year to year.**
10 Q. How did you calculate the reduction in the
11 rate of lag under the restructuring scenario? Was that a
12 calculation, or was that an assumption?
13 **A. I'm not sure what you mean by the lag.**
14 Q. Okay. You say that there's a delay in
15 recovery in Detroit that you are depicting in Figure 2,
16 correct?
17 **A. I believe the accurate description in Figure 2**
18 **is that the recovery in Detroit coming out of the trough**
19 **of the recession was slower than it was in the state.**
20 Q. Okay. Did you -- you say that there were
21 other prior recessions. Did you do any testing or
22 analysis to determine whether the rate of recovery in
23 Detroit was slower in recessions before 2001?
24 **A. It was my knowledge of Michigan and Detroit**
25 **suggested that they tended to move fairly close together**

R. CLINE

1
2 **in prior recessions, both going down and coming out. I**
3 **did not go back and look at the last 30 years or 40 years**
4 **of recessions in Michigan. I didn't think it was**
5 **relevant for this exercise. I do think this recent break**
6 **is an important one because it does reflect the fact that**
7 **there is now, I believe, a significant difference in the**
8 **ability of the City of Detroit to recover versus the**
9 **State of Michigan. I believe Figure 2 is a pretty clear**
10 **indication of that.**
11 Q. That's based on data from one recession,
12 correct?
13 **A. That's based upon data from two recessions.**
14 Q. Okay. There are other recessions where you
15 would agree with me that Detroit has recovered at a
16 comparable rate to Michigan; is that correct?
17 **A. It would be my impression that there was a**
18 **closer correlation between changes in Detroit and changes**
19 **in Michigan in earlier recessions.**
20 Q. You haven't calculated those numbers, though,
21 correct?
22 **A. I have not. I didn't think they were relevant**
23 **for this forecast exercise.**
24 Q. Okay. Do you know what the causes in the rate
25 of recovery that you say exist between Detroit and the

R. CLINE

1
2 state of Michigan are?
3 **A. I don't have a detailed explanation of this**
4 **break. It certainly has something to do with the overall**
5 **structure of the Detroit economy as well as the effects**
6 **of the fiscal crisis in Detroit.**
7 Q. There's no study or analysis that would
8 explain or support your theory that there's a more
9 delayed recovery in Detroit than in the state of Michigan
10 for structural reasons, correct?
11 **A. I think Figure 2 provides a pretty solid**
12 **foundation for reaching that conclusion.**
13 Q. But there's no study that says there's any
14 causal relationship between anything in Detroit and a
15 delay in recovery compared to the rest of the state?
16 **A. I don't know of any specific studies.**
17 Q. And the only person that's claiming that
18 there's anything -- any kind of structural difference
19 that's leading to a delay in recovery in Detroit compared
20 to the state of Michigan is you, correct?
21 **A. I don't know that's the case, no.**
22 Q. Can you identify anybody else other than
23 yourself --
24 **A. I have not.**
25 Q. -- that's saying that there's some kind of a

R. CLINE

1
2 structural reason for delay in recovery between Detroit
3 and Michigan?
4 **A. I have not, but I wouldn't conclude that means**
5 **it's not out there.**
6 Q. Okay. But sitting here today, you can't
7 identify anybody other than yourself that's voiced that
8 opinion, correct?
9 **A. I do not have a specific study that you could**
10 **refer to as a source that would go beyond the**
11 **documentation of what has actually been happening. It's**
12 **not a theory. It's, I believe, reality, and I think**
13 **Figure 2 is pretty clear.**
14 Q. But you can't -- you can't identify the
15 specific cause of this delay in recovery for -- that you
16 outline in your report between Detroit and the rest of
17 the state of Michigan, correct?
18 **A. What we are attempting to do was to identify**
19 **the break, not to explain the break. The question for us**
20 **was will it continue in the future, and we determine**
21 **that, yes, for our economic forecast, we think that this**
22 **is another break that needs to be considered when you are**
23 **doing a 10-year revenue forecast for Detroit.**
24 Q. But you haven't identified the cause of a
25 break between Detroit and the rest of the state, correct?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1  
2    A.   We have not tried to analyze the Detroit  
3  economy in detail compared to the Michigan economy in  
4  detail.  
5    Q.   So, you can't tell me whether this  
6  unidentified cause will continue into the future or not  
7  with respect to the break between Detroit and the state  
8  of Michigan, right?  
9    A.   I can tell you we have two very significant  
10  observations of the existence of the break.  I believe  
11  the 10-year horizon covered in this diagram is a fairly  
12  solid foundation to assume that something fundamentally  
13  has changed, and I believe that's a solid foundation for  
14  the revenue forecast for a 10-year period.  
15    Q.   So, you're assuming in your forecast that the  
16  break between Detroit and Michigan with respect to the  
17  rate of recovery will continue, correct?  
18    A.   In our forecast, we have this structural break  
19  continuing, but I believe we taper it down near the end  
20  of the forecast period.  
21    Q.   Okay.  And that's an assumption you're making  
22  for your forecast, right?  
23    A.   It is an assumption.  
24    Q.   And -- but you haven't identified the actual  
25  cause to figure out whether the cause is going to

R. CLINE

1  
2  continue during the 10-year period, correct?  
3    A.   We have not done a detailed study of the  
4  cause.  
5    Q.   And in fact, nobody has done any detailed  
6  study of any cause of this alleged break between Detroit  
7  and the state of Michigan in terms of rate of recovery,  
8  correct?  
9    MR. STEWART:  Objection.  
10    THE WITNESS:  I don't know if that's  
11  correct.  
12  BY MR. SMITH:  
13    Q.   You can't identify any study like that sitting  
14  here today, correct?  
15    A.   I haven't identified any study.  
16    Q.   Okay.  When we look at page -- based on the  
17  data that you're talking about in Figure 2, do you  
18  calculate a -- some kind of value that you use to project  
19  the delay in the rate of recovery?  
20    A.   Correct.  
21    Q.   And how -- what's the mathematical formula you  
22  used to calculate that value?  
23    A.   It's partly based on the numbers you see lying  
24  behind the graph in Figure 2.  You can tell that the --  
25  if you look at the vertical difference between those two

R. CLINE

1  
2  lines, you've got a rough estimate of what that  
3  differential looks like.  We used the relationship,  
4  actual relationships between these two lines to try to  
5  come up with an estimate of what that gap looks like.  
6    Q.   What's the mathematical formula or technique  
7  to get that estimate?  
8    A.   It's Y minus X.  You look at two percentage  
9  changes, look at the difference in those two.  
10    Q.   But did you do that throughout the period or  
11  at one point in time or what?  
12    A.   I believe at that -- for that calculation, we  
13  were focusing on this time period covered between 2001  
14  and 2012.  
15    Q.   But I'm still trying to get what the  
16  mathematical calculation was.  Obviously, throughout that  
17  period there were differences in the degree to which  
18  there was a delay in recovery, right?  
19    A.   Correct.  
20    Q.   Okay.  And so, I'm trying to figure out how  
21  you calculated a single number based on data underlying  
22  Figure 2 for the delay in recovery.  
23    A.   I'll have to check the exact mathematics, but  
24  I believe what you can see is that we looked at the two  
25  periods of time from an expansion, from a recession.  We

R. CLINE

1  
2  may have averaged those gaps during the expansionary  
3  periods.  
4    Q.   Okay.  But right now, you don't know the exact  
5  mathematical --  
6    A.   I'll have to --  
7    Q.   -- technique used to calculate the delay in  
8  recovery, correct?  
9    A.   I know the exact mathematics used to calculate  
10  it.  I don't remember precisely which years went into  
11  that averaging.  
12    Q.   Okay.  Is it possible that not all the years  
13  depicted in Figure 2 went into that calculation?  
14    A.   As I mentioned, I believe we were focusing on  
15  the recovery periods, not the recession.  You notice that  
16  in the recession, '8, '9, they moved closely together.  
17  The break is in the expansion, the recovery from  
18  recession, not in going down into the recession.  
19    Q.   Okay.  So, you don't know which recovering  
20  years you used in generating the value for the delay in  
21  rate of recovery, correct?  
22    A.   I'm pretty certain we used the recovery years.  
23    Q.   But you don't know which years those are?  
24    A.   I believe they were the years that you see  
25  here in the graph.

Elisa Dreier Reporting Corp.  (212) 557-5558  
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 42 of 54

R. CLINE

1  point to any previous instance where the State engaged in
2  restructuring or reinvestment, correct?
3  **A.   For the City of Detroit?**
4  Q.   Yeah.
5  **A.   I am not aware of any, and that's why there's**
6  **no study we can rely upon to determine the factors.**
7  Q.   Precisely.  There's no study or data that
8  shows that the cyclical adjustment that you assume is
9  going to go away in the restructuring scenario actually
10 will go away, correct?
11 **A.   I believe it is a reasonable -- thinking about**
12 **what's unfolding in Detroit, I believe that that cyclical**
13 **adjustment we saw in Figure 2 is related to the economic**
14 **weaknesses and the fiscal crisis in Detroit.  I believe**
15 **it is reasonable to assume that if those issues are**
16 **addressed, that the private sector could respond in a**
17 **strong -- with a stronger rates of growth.  I think it is**
18 **a reasonable scenario over the next 10 years with**
19 **restructuring.**
20 Q.   Okay.  I'm asking about studies or data.
21 There's no studies or data showing that the cyclical
22 adjustments related to the fiscal crisis in Detroit,
23 correct?
24 **A.   This is a unique situation that isn't in**

R. CLINE

1  **history, so there are no studies that would answer your**
2  **question.**
3  Q.   And so, there's no study or data showing that
4  engaging in restructuring or reinvestment to alleviate
5  the fiscal crisis will eliminate the fiscal adjustment,
6  correct?
7  **A.   You're correct that I do not know of any study**
8  **that deals specifically with that issue.**
9  Q.   Okay.  Page eight, population growth rate.
10 You've got -- can you tell me what
11 mathematical formula was used to calculate the population
12 growth rate referenced on page eight?
13 **A.   I cannot tell you what methodology SEMCOG used**
14 **for its population projections.**
15 Q.   Okay.  Did you do any alteration of SEMCOG's
16 population projections?
17 **A.   We did in forecasting the individual income**
18 **tax collections.**
19 Q.   Okay.  Can you tell me the mathematical
20 formula you used to adjust or change SEMCOG's population
21 projections?
22 **A.   We used add factors, which could be plus or**
23 **minus percentage changes, for different components of the**
24 **population, which were not forecasted by SEMCOG.  As you**

R. CLINE

1  **remember, in terms of our methodology, we had to look at**
2  **residents who work in the City of Detroit, residents who**
3  **work outside of the City of Detroit, and people who live**
4  **in the suburbs and work in Detroit.  Those are all**
5  **subsets or not, in one case, even in the population**
6  **numbers for Detroit.**
7  **So that we had to do separate percentage**
8  **change estimates for those three components of the**
9  **taxpayer groups in Detroit.**
10 Q.   Can you tell me what the add factors were that
11 you used?
12 **A.   Well, I believe you see on page nine we have**
13 **got forecast the number of residents employed in Detroit**
14 **will decline at 1 percent a year, less negative 20 to 21,**
15 **and then 0 percent in the last two years.**
16 Q.   Okay.  And --
17 **A.   So -- yes.**
18 Q.   Go ahead.
19 **A.   No, I was just -- those are the numbers that**
20 **would describe our growth in the number of the taxpayer**
21 **population for residents working in the city.**
22 Q.   Those growth rates referenced on page nine,
23 are those assumed values or were they generated by
24 mathematical formula?

R. CLINE

1  **A.   They were our assumptions that went into the**
2  **model.**
3  Q.   Okay.  So, the negative 1 percent decline per
4  year and then the growth rate increase of minus .5
5  percent from 2020 to 2021 and 0 percent in the last two
6  forecast years, those were all assumed and not calculated
7  values, correct?
8  **A.   They are assumptions that we used in the**
9  **estimates.**
10 Q.   Did you look at different assumptions for
11 those numbers?
12 **A.   I believe we may have iterated to the final**
13 **numbers, but I don't have specific runs of all the**
14 **variations that we might have used along the way.**
15 Q.   Would it be fair to say for all of the assumed
16 values you used, you tested out different assumed values?
17 **A.   I don't think it's accurate to say we tested**
18 **out.  I think it's accurate to say that we -- based upon**
19 **additional information we received, we made adjustments**
20 **in these assumptions that we thought align more closely**
21 **with the most recent information available.**
22 Q.   Okay.  So, for all of the assumed values that
23 form the basis for your forecast, you had used other
24 assumed values at different points in time; is that fair?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1     A.  I don't think that's accurate for all of the
2     key assumptions, but there may have been some --
3     Q.  Okay.
4     A.  -- key assumptions that changed over time.
5     Q.  Okay.  For some of the key assumptions that
6     underlie your forecast, you did use different numbers at
7     different points in time when you were generating your
8     forecast, correct?
9     A.  I would say that is correct, and as I had
10    mentioned before, we certainly changed the starting point
11    for each of our revenue forecasts as we updated the
12    actuals to reflect the most recent information.  That
13    changed continuously throughout this entire period.
14    Q.  In terms of the recovery rate, did you --
15    either under the baseline or restructuring scenario, did
16    you use other recovery rates other than the minus .85 and
17    minus .5 percent?
18    A.  I don't remember specifically.  I do remember,
19    though, that at one point, we may have talked about
20    whether to round the number off to one decimal place
21    instead of using two, but I don't remember specific runs
22    with different values.
23    Q.  Were there other methodologies you considered
24    for trying to generate the restructuring scenario other

---

R. CLINE

1     than using this recovery rate methodology?
2     A.  Well, I wouldn't say that what we did was only
3     using that recovery rate methodology.  That only came
4     into play in getting the total -- the total job number
5     for the City of Detroit, and that was just the beginning
6     point.  And then we had to divide the total jobs into
7     those held by residents, those held by non-residents, and
8     then we had to determine the number of jobs residents
9     held in the suburbs.  All of those involved key
10    assumptions about the rates of growth of those
11    components.
12    Q.  Were there any analyses, though, where you
13    didn't use the cyclical adjustment in your calculations?
14    A.  I believe it was used in the calculation of
15    the total employment rate -- the total job number for the
16    City of Detroit I can certainly check to see if it was
17    used somewhere else.
18    Q.  Well, no, I'm wondering if there was a point
19    in time where you didn't try to do this calculation with
20    the cyclical adjustment rate.
21    A.  I believe I did mention that, as you see in
22    the report, that we went -- when we went to the
23    restructuring scenario, we removed the cyclical --
24    additional cyclical adjustment.  So, yes, we did run a

---

R. CLINE

1     scenario without that, and we -- it is described and
2     included in the restructuring scenario.
3     Q.  Did you ever run the restructuring scenario
4     without removing the cyclical adjustment?
5     A.  I don't -- let me see if I can -- I believe I
6     have to correct your -- to answer your question, I
7     believe you -- would you repeat your question, please.
8     Q.  Did you ever run the restructuring scenario
9     without removing the cyclical adjustment?
10    A.  I believe the right answer is, we did remove
11    the cyclical adjustment.
12    Q.  And I'm asking in the various iterations of
13    your model, did you ever run the restructuring scenario
14    without removing the cyclical adjustment?
15    A.  I don't recall doing that exercise.
16    Q.  Okay.  Back to the figures on page nine.  I
17    mean, there's -- is there any rhyme or reason about why
18    you use minus -- minus .5 as opposed to minus .4 or some
19    other value there?
20    A.  I believe there is a structure here that
21    provided us guidance on the likely magnitude of these
22    numbers.  That information included the forecast
23    percentage change in population.  The number of people
24    living and working in Detroit is a function of the number

---

R. CLINE

1     of people who live in Detroit, and it's also a function
2     of the overall rate of growth of employment.
3     Our forecast of those values determine, in a
4     sense, what I would call a reasonable range of values
5     that we plugged in as our key forecasting assumptions.
6     So, these numbers are, in a sense, bound by other
7     parameters that are in our forecast.
8     Q.  So, for each of the assumptions that you plug
9     in your model, there's actually a range of values that
10    you could have plugged into your model; is that fair?
11    A.  It's not an accurate description of the
12    process we used.  We were going for the most accurate
13    point estimate of our revenue.  We did not try to
14    construct a band confidence interval or otherwise around
15    our point estimate, so we did not go through a simulation
16    changing every parameter up by 10 percent or down by 10
17    percent.
18    Q.  For the numbers, though, on page nine, can you
19    tell me why the growth rate increases to minus .5 percent
20    in the specific years, fiscal year 2020 and 2021?
21    A.  That was our assumption about, in a sense, the
22    time it would take before the private sector started to
23    respond.
24    Q.  Okay.  So, that's an assumption and not a

R. CLINE

1  
2  calculation, correct?
3  **A.    That is correct, but I would just add that the**
4  **entire forecast is a forecast based upon assumptions.**
5  Q.   Yeah.
6  **A.    If we --**
7  Q.    All of your forecasts in your report are
8  forecasts based on assumptions, correct?
9  **A.    All economic forecasts are forecasts based**
10  **upon assumptions.**
11  Q.    Yeah.  And essentially what you are doing is
12  you're trying to base all of your assumptions on your
13  experience, correct?
14  **A.    I don't believe that is correct.**
15  Q.    Okay.  So there's no mathematical formula for
16  population growth rate that's generating the numbers on
17  page nine, correct?
18  **A.    It is my assumption that the total population**
19  **numbers from SEMCOG have a pretty elaborate underlying**
20  **structure that provided that population forecast.**
21  Q.    But the growth rates that are -- the minus 1
22  percent per year and then minus .5 in fiscal year 2020
23  and 2021 and 0 percent in the last two forecast years,
24  those aren't numbers generated by a mathematical formula,
25  correct?  They're assumptions.

R. CLINE

1  
2  **A.    Could you explain what you mean by a**
3  **mathematical formula?**
4  Q.    Okay.  So, as an expert in this case, can you
5  tell me what a mathematical formula is?
6  **A.    What I'm having trouble with is understanding**
7  **your juxtaposition of the word "assumptions" with the**
8  **phrase "mathematical equations."  I would describe our**
9  **entire Excel model as a model that involves mathematical**
10  **equations.**
11  **We have plugged key assumptions into those**
12  **mathematical equations, and the forecast is a result of**
13  **the combination of all of those factors and all of those**
14  **equations, and all of those assumptions.**
15  Q.    My only question is those figures on page
16  nine, for the growth rate, are not calculated values,
17  correct?
18  **A.    Those values began with history in Detroit,**
19  **recent history.  Actual numbers.  We used those actual**
20  **numbers to calculate ratios that then provided a guide to**
21  **us on possible, probable numbers that would provide us**
22  **with a forecast of the rate of growth of the number of**
23  **residents employed in Detroit.  We then determined what**
24  **those values would be --**
25  Q.    This is really --

R. CLINE

1  
2  MR. STEWART:  Don't interrupt the witness.
3  MR. SMITH:  Yeah, but it's blatant --
4  MR. STEWART:  Don't interrupt the witness.
5  He has to finish his answer.
6  MR. SMITH:  Well, this is really delaying
7  and non-responsiveness.
8  MR. STEWART:  It's because you're asking
9  very poor questions.  Let him finish his answer.
10  MR. SMITH:  What's so poor about asking him
11  whether the three numbers --
12  MR. STEWART:  Answer the question.
13  MR. SMITH:  -- on the page are calculated,
14  can you tell me that?
15  MR. STEWART:  Finish -- finish your answer.
16  MR. SMITH:  Geoff, Geoff, tell me -- you
17  just said that my question was objectionable and I
18  want you to tell me why it's objectionable to ask
19  him if he calculated three numbers in his report.
20  MR. STEWART:  Because he told you your
21  question was ambiguous in the use of mathematical
22  formulas.  He explained to you why.  He explained
23  where they came from.  He explained how he was
24  going about it.
25  MR. SMITH:  Okay.  Where did they come

R. CLINE

1  
2  from, Geoff?
3  MR. STEWART:  You are not allowed --
4  MR. SMITH:  Where did they come from?
5  MR. STEWART:  -- to interrupt his answer.
6  MR. SMITH:  Geoff, you are sitting here.
7  Where did these three numbers come from?
8  MR. STEWART:  Finish your answer.
9  MR. SMITH:  Can you tell me --
10  MR. STEWART:  Finish your answer.
11  MR. SMITH:  -- on the record from what he
12  said today?  Can you tell me where those numbers
13  came from?
14  MR. STEWART:  Are you trying to pick a
15  fight with me?
16  MR. SMITH:  I'm just asking you --
17  MR. STEWART:  Are you trying to pick a
18  fight with me?
19  MR. SMITH:  There's no fight, but you --
20  your witness has obstructed the deposition, and
21  it's wasting time for everybody here unnecessarily.
22  MR. STEWART:  The witness is doing an
23  excellent job.  The problem is the way you've gone
24  about examining him.
25  Now, you can finish your answer.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 45 of
54

R. CLINE

A. I think I've explained the process we went
through in choosing that assumption.

Q. That's not my question. Here's a pen. Can
you write it down on the page? What's the mathematical
formula you used to generate the 1 percent wage growth
rate?

A. I believe all of those formulas are sitting in
the Excel spreadsheet. I would have to go back and look
at each of those cells to determine what was math in the
model and what was the key assumption. I believe the 1
percent was a key assumption that we're responsible for
and we had to choose the profile for tapering it down.

Or in this case, I guess, to be tapered up or
down, but we had -- we controlled the timing of when we
altered that rate. It is a key assumption that we used
in the model.

Q. When you say something is a key assumption,
that means that it's not being generated by a
mathematical formula, correct?

A. No. It doesn't follow that that's the case.

Q. All right. But the wage growth rate, that was
not generated by a mathematical model, is it?

A. That is correct.

MR. BARNOWSKI: Is it possible to take a

R. CLINE

five-minute break?

MR. STEWART: Sure.

MR. SMITH: Sure.

THE VIDEOGRAPHER: Going off the record at
3:27. This is the end of disk number three.

(RECESS: 3:27 p.m. - 3:39 p.m.)

THE VIDEOGRAPHER: On the record at 3:39,
this is the beginning of disk number four in the
deposition of Robert Cline.

BY MR. SMITH:

Q. Okay. Mr. Cline, the 1 percent wage growth
rate that you used, you believe is a reasonable rate for
City of Detroit, correct?

A. It is the one that we thought was reasonable
given the recent economic challenges in Detroit.

Q. And it's the best estimate in your view?

A. It's the estimate that we think is most
accurate over the 10-year time period, but as I
mentioned, it -- I believe it -- it is, and that's the
baseline forecast, 1 percent.

Q. The 1 percent value for wage growth that you
used is less than the inflation rate, correct?

A. We don't have a separate inflation rate
forecast, so it very is likely to be about or a little

R. CLINE

below the rate of inflation, but we don't have a separate
inflation forecast.

Q. Okay. So, it's likely that you're projecting
a real wage rate that is either zero or negative growth?

A. I believe that's the implication of the
numbers.

Q. Okay. Page 12 of your report, you mention
under the heading, C, the first paragraph there, you say
that "The 40-year tax forecast should be considered a
simulation of what would happen under the assumed growth
rates, not a forecast of what is expected to happen."

Do you see that?

A. I do.

Q. And would you agree with me that the 10-year
forecast also should be considered a simulation of what
would happen under the same growth rates and not a
forecast of what is expected to happen?

A. No, I would not agree with that statement.

Q. Why is there a difference between the 10-year
and the 40-year forecast? Is it just the length of time
of the forecast?

A. No, it's not.

Q. What's the difference?

A. The difference has to do, I believe, with the

R. CLINE

starting point. As I've emphasized, our entire forecast
for the 10-year period of time is solidly grounded in
actual tax collections probably through FY '13 for most
of the taxes. We got -- we have the right starting
point, and we know what it is. We then forecasted the
expected changes over the next 10-year time period. It's
not really a 40-year additional forecast, it's 30 more
years beyond the first 10, is I believe the accurate way
to describe it.

Going out beyond the first 10, we don't have
the actuals as our foundation, and we have moved into a
period of time which is outside of anyone's economic
forecasting model that I'm familiar with. Therefore, I
think it is accurate to characterize that more as a
simulation based upon those assumptions.

Q. And so, would it be fair to say the
methodology you used for the 40-year forecast is
different from the 10-year forecast?

A. I would interpret the methodology we use for
the next 30 years to be different from the first 10-year
forecast.

Q. Did you have actual data regarding the wage
rates in the City of Detroit?

A. Did -- we had some information, I believe, on

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 46 of
54

R. CLINE

1    wages and salaries in the Detroit metropolitan area. I
2    believe it may have included Detroit. I don't know if
3    Detroit was stated separately. But remember, what we
4    were trying to get at is the growth in taxable income,
5    not the growth in wages. We're using it as a proxy or as
6    a number to suggest what is happening to the tax base.
7    It's the tax base, not the wages, that are key here.
8        Q.    But you needed to get an accurate measure of
9    wages in order to even be able to use it as a proxy for
10   taxes, correct?
11       A.    Well, I wouldn't overemphasize that length.
12   The tax base itself is a complex combination of earnings
13   which are wages and salaries of employees, earnings of
14   the self-employed, interest dividends and other sources
15   of income. It's the combined influence of all of those
16   factors, all of those components that make up the
17   forecast of the tax -- the tax base, and the change in
18   that tax base over time.
19       So that we were no -- we were not trying to
20   get -- we were not limited to trying to get a forecast of
21   wages specifically; we were trying to forecast the
22   expected growth rate in tax- -- taxable income under the
23   individual income tax.
24       Q.    Page 14, you've got some numbers here for

R. CLINE

1    Detroit employment growth at the bottom.
2        Do you see those? The last paragraph?
3        A.    I do. Yes, I do.
4        Q.    Okay. And you say, "Over this period the
5    assumed structural decline in Detroit employment also
6    wanes, falling in magnitude from negative 1 percent from
7    fiscal year 2014 to fiscal year 2020 to minus .7 percent
8    at fiscal year 2021, and minus .5 percent in the last
9    years."
10       Are those all assumed values?
11       A.    They are assumptions that are some of the key
12   inputs in the model.
13       Q.    When we go over to page 15, "The share of
14   Detroit employment attributable to income tax base A."
15       Do you see that?
16       A.    I do.
17       Q.    Those numbers are assumed numbers as well; is
18   that correct?
19       A.    I believe it is accurate to say that when we
20   were doing these different components of the income tax
21   base, we had actual data from the City on the amount of
22   income for the different groups of taxpayers; residents
23   and non-residents. So, once again, we started with the
24   actual amount in that base, and then we grew it by these

R. CLINE

1    assumed rates of growth.
2        Q.    Okay. So, the rates of growth that you used
3    for the income tax bases in your model were assumed
4    rates: correct?
5        A.    They are our assumptions about what we believe
6    is a reasonable forecast over this period of time.
7        Q.    And the -- at the bottom, you mention that
8    you've assumed the tax rates remain constant, correct?
9        A.    Yes. And we didn't assume that. That is in
10   fact current law. It's not an assumption.
11       Q.    Well, you assume that current law will remain
12   unchanged throughout the forecast period, correct?
13       A.    It's not an assumption we made. It's standard
14   revenue forecasting procedures. You do the forecast
15   under current law.
16       Q.    Okay. You're aware, though, that in the past
17   the income tax rate has been higher than it is under
18   current law, correct?
19       A.    I assume so. It probably was also lower --
20       Q.    Well --
21       A.    -- in the past.
22       Q.    Do you know what it has been?
23       A.    No, I do not. All I know is what current law
24   is, and that's what we used in our model.

R. CLINE

1        Q.    So, you didn't investigate what the income tax
2    rate has been in the past?
3        A.    It's not an issue that was relevant to our
4    forecasting exercise.
5        Q.    Okay. So you didn't investigate it, correct?
6        A.    We didn't address the issue because it wasn't
7    relevant for our revenue estimate.
8        Q.    Page 15, "Wage Growth." You have a 1 percent
9    wage growth rate there again. And then page 16, you have
10   the -- you assume that, in Paragraph 2, that "The
11   restructuring scenario assumes that the number of
12   residents working in Detroit will grow at 50 percent of
13   the rate of total job growth."
14       Do you see that?
15       A.    I do see that.
16       Q.    Your rate of the growth in Detroit residents
17   under the restructuring scenario is an assumption: is
18   that correct?
19       A.    That is an assumption. The assumption is
20   based on the reasoning that with a stabilized City of
21   Detroit, that you will see that all residents of Detroit
22   will benefit from a stronger overall economy, but we have
23   residents working in Detroit growing at a slower rate
24   than the total job growth rate in the city.

R. CLINE

Q.    But there's no data supporting your assumed job growth rates, correct?

A.    **It's a forecast of the future, and there is no specific data that tells us what the future will look like.**

Q.    You also assume that wage growth will be constant in the future: is that correct?

A.    **I believe we were holding the rate of growth to a constant rate.**

Q.    And you acknowledge, though, that it's likely that the rate of wage growth will not be constant over the 10-year period you forecast: correct?

A.    **I would say that is correct.**

Q.    The page 17 of your report, down at the bottom, you have got zero population growth from 2029 to 2033, 22 percent from 2034 to 2043, and then .3 percent annually thereafter.  Are those all assumptions?

A.    **I will have to check at what year -- I believe it was fiscal year 2029 when we had the -- we followed SEMCOG up through FY 2028, and then we overrode those growth rates and chose the rates that you see in this summary.**

Q.    Okay.  So, are the rates that we see in the summary of pages 17 to 18 assumed growth rates for those

R. CLINE

years?

A.    **Yes, they are.**

Q.    Page 18, Paragraph A1, you mentioned that you analyzed recent history of corporate income tax collections data.

Do you see that?

A.    **I do.**

Q.    What was the period that you looked at there?

A.    **I may have mentioned that Michigan has only recently returned to a corporate income tax, so we had a very short period of observations there.  I don't know whether it was two or three years.  I would guess maybe it was a three-year period.**

Q.    And what value of data was that that you were looking at?

A.    **That was the reported tax collection data, reported by I believe it was the Michigan Treasury Department.**

Q.    And where did you get that from?

A.    **I got that from the treasury department.**

Q.    Is it something that's publicly available?

A.    **Oh, yes.**

Q.    Page 18 to page 19, you applied a structural adjustment of minus 3.2 percent in fiscal year 2015 to

R. CLINE

minus 2 percent in fiscal year 2020.

Do you see that?

A.    **Yes, I do.**

Q.    Were those also assumed numbers?

A.    **Those were assumed numbers, but we have a very solid basis for understanding the dynamics of the net operating losses.  It's received extensive evaluation at the national level.  We know that the legacy of the deep recession is there may be a number of years going forward when firms will be making positive economic profits -- positive profits, but not paying taxes because they're carrying forward unused operating losses from the recession.**

**We had to take that into consideration in doing our revenue estimate.**

Q.    What -- but there's no study or anything like that that gives you the structural adjustments of minus 3.2 in fiscal year 2015 to minus 2.0 by fiscal year 2020, correct?

A.    **I don't have any studies that estimate those particular numbers.**

Q.    Okay.  The -- if we go back over to page 14, I just want to -- I forgot to raise something.  Detroit employment growth, if we look at the last paragraph there

R. CLINE

again.

A.    **Right.**

Q.    You have some cyclical adjustments there of minus .7, and then you reduce it to minus .5, and then minus .3, and then finally 0.

Do you see that?

A.    **I do.**

Q.    Are those numbers assumed numbers, or are they calculated using the mathematical formula?

A.    **They were numbers based upon the analysis of the data that I talked to you earlier about, from Figure 2, for example, that showed that Detroit was lagging behind Michigan in economic recoveries.  We built that lag -- our estimate of that lag into the forecast.  We tapered the lag down assuming that after a period of expansion that differential would be smaller and smaller, and we built that into the forecast.**

Q.    But were any of those numbers actually calculated numbers?  I mean, the tapering was not a result of calculation.  That was an assumption you made, correct?

A.    **Again, what do you mean by "calculation"?**

Q.    Well, there's no calculation that you plug some numbers into a formula and you got minus .5 percent

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7004-10    Filed 08/22/14    Entered 08/22/14 21:10:25    Page 48 of 54

R. CLINE

1  from fiscal year 2016 to 2020, correct?

3  **A.   We decided on what the time pattern would look**
**like for that adjustment factor.  It did not come from an**
**econometric model, which we did not have a time series**
**on which to base such an equation.  So, many of our**
**assumptions are due to the fact not from the absence of**
**an economic model for Detroit; they're based on the lack**
**of a time series long enough to fit the equations that I**
**believe you're referring to as mathematical equations.**

11  Q.   Okay.  So, you had to assume what the numbers
would be in terms of the cyclical adjustment over the
time period you examined; correct?

14  **A.   We had no choice because the time series was**
**too short to do a mathematical equation or a regression**
**equation to estimate that relationship.**

17  Q.   And is that also true of the initial cyclical
adjustment of minus .7 percent that you had to assume
that?

20  **A.   That is correct.**

21  Q.   Okay.  What was the rationale for the tapering
that you did, that you assumed in your model?

23  **A.   I may have already referred to that, and that**
**is that we saw the opening up of this gap between Detroit**
**and Michigan as the economic recoveries came, started**

R. CLINE

1  **coming up out of the recessions.  Over time, with**
**continued economic expansion, the gap tended to close.**
**We used that insight from recent history to close the gap**
**further out in the forecast period.**

6  Q.   Okay.  But the data you had available didn't
tell you how to conduct the tapering or pick the precise
numbers that you assumed in your analysis for the
cyclical adjustment, correct?

10  **A.   Again, the time series was too short to fit a**
**regression equation that would have predicted**
**automatically from running the regression what the gap**
**closing rate would be.**

14  Q.   Okay.

15  **A.   That was, by necessity, an assumption that we**
**used in the model.**

17  Q.   Okay.  So you were forced to pick some numbers
to fill in here because you lacked enough data to
actually do a mathematical computation; is that fair?

20  **A.   No.  I wouldn't agree with that statement.**

21  Q.   Well, you did -- you personally picked these
numbers for the cyclical adjustment during various
periods, correct?

24  **A.   That is correct.**

25  Q.   Okay.  And you picked -- you used -- you

R. CLINE

1  picked the numbers because you didn't have enough data to
do a time series analysis to do a mathematical
computation to calculate numbers that you could use,
correct?

6  **A.   I would agree that we did not fit a regression**
**equation to that relatively short period of time.  If you**
**had done that exercise, you still couldn't use the**
**equation with confidence because you weren't sure -- you**
**wouldn't be sure if you picked up the factors that are**
**most relevant.  You can always fit an equation to any**
**number of observations.  It doesn't mean because you did**
**that, it is useful in a revenue forecasting exercise.**

14  Q.   Okay.  And so, as a general principle, just
because you can fit some sort of regression analysis on a
body of data doesn't mean that it's meaningful in terms
of conducting a forecast, correct?

18  **A.   That is correct, and in this particular**
**situation, the lack of historic experience with what is**
**going on in Detroit, what data that is available has a**
**relatively short time horizon number of observations, but**
**in addition to that, there is no regression equation that**
**I could imagine fitting that would pick up the**
**institutional details that I think are most significant**
**in our revenue forecast.**

R. CLINE

1  **You see it in the property tax area.  You see**
**it in the wagering area.  You see it in the utility area.**
**There are too many institutional parameters changing, or**
**conditions changing for a regression equation to**
**incorporate all of that information.**

7  **So, you're left with a couple of options.**
**One, you do a regression analysis, and you add dummy**
**variables and add factors by the dozens, which are like**
**our assumptions.  Or you take the approach we did, and**
**that is, we wanted to disaggregate all of these complex**
**components into their individual pieces, and deal with**
**each piece separately so we had the ability to**
**incorporate this very specific Detroit institutional**
**information into the calculation.**

16  **So, it wasn't simply the lack of data or the**
**lack of regressions; it was the inability of that**
**approach, we felt, to give you accurate forecasts.  We**
**believe our disaggregated approach in the spreadsheet**
**model gave us a better handle on what the near term looks**
**like in Detroit.**

22  Q.   Okay.  And you said "disaggregated approach in
the spreadsheet model."  Are there written documents that
reflect how you came about getting those numbers?

25  **A.   The entire model has the structure of all of**

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1  the steps we went through in our forecast. Every -- to
2  my knowledge, every line item is identified in those
3  spreadsheets.
4      Q.  Okay.  The -- would it be fair to say that one
5  limitation of your forecasting analysis is that you have
6  limited data with respect to some of these numbers that
7  you're assuming?
8      A.  I agree with that.  That's the basic challenge
9  in this forecasting exercise.
10     Q.  Okay.  Is another limitation of your model
11 that you have limited data regarding the economy
12 specifically in Detroit?
13     A.  It is true that we did not have a specific --
14 what I would describe as independent economic forecast
15 for the City of Detroit available to us back in 2013 when
16 we created the spreadsheet model.
17     Q.  And is that a limitation of your forecast?
18     A.  It's a reality of the situation we found in
19 2013.
20     Q.  Now, I'm just wondering if it's a limitation
21 of your forecast that you don't have that Detroit
22 economic data?
23     A.  It might have been easier if we had a detailed
24 forecast, but it wasn't available, so it wasn't an

R. CLINE

1  option.
2      Q.  Okay.  Well, I'm not -- my question isn't
3  whether it made life easier or not.  I'm asking whether
4  you consider it a limitation of your forecast that you
5  don't have Detroit-specific economic data?
6      MR. STEWART:  Objection.
7      THE WITNESS:  I don't -- personally, I
8  would not describe it as a limitation.
9  BY MR. SMITH:
10     Q.  Okay.  What are some of the limitations of
11 your forecasting, other than the data limitations that
12 we've discussed?
13     A.  There's the normal set of limitations on any
14 forecasting exercise.  For example, determining turning
15 points, understanding these longer runs' structural
16 shifts between a state and a local region; the
17 uncertainties about the long run structural change in the
18 composition of the Detroit economy.  I don't believe
19 there's anyone that would have predicted 10 years ago
20 what Detroit looks like today.  It would be very
21 difficult to predict 10 years from now what Detroit will
22 look like.
23     But those are limitations that I don't believe
24 can be overcome by any statistical analysis that I am

R. CLINE

1  aware of.  They're constraints we would all deal with in
2  doing this type of tax forecast.
3      Q.  So, one limitation of doing forecasting for
4  Detroit is the fact that there's so many factors that can
5  influence the forecast over time?
6      A.  I would just qualify that by saying there's so
7  many factors that are changing, that's what provides the
8  challenges to forecasting.  If all of the factors were
9  constant and unchanged, it's not a problem.  It is the
10 changing nature of the structure, the institutions, the
11 expectations, and the reality that current data perhaps
12 in Detroit is not as up-to-date and clean as we would
13 like it to be, but it is the best that's available.
14     Q.  And another factor that's -- another
15 limitation of forecasting in Detroit is the fact
16 there's -- the data is not as good as you might like it
17 to be, or as complete?
18     A.  I believe that our starting point for our
19 forecast, which is actual revenue collections, I believe
20 the numbers the City have are solid numbers.
21 They're going to change between preliminary estimates and
22 book closing at the end of the fiscal year.  But I
23 believe that we were given fairly good numbers for the
24 actual tax collections in Detroit.

R. CLINE

1      Q.  Are there other numbers that you were given,
2  though, that you believe might be somewhat questionable
3  or there might be more of a question about?
4      A.  Well, we have spent a little bit of time
5  talking about the SEMCOG population projections.  Those
6  are not on the same solid basis as the actual revenue,
7  most recent revenue collection numbers from the City of
8  Detroit.  So, yes, the data varies in terms of
9  completeness.
10     Q.  And so, another limitation of your forecast is
11 that you had to rely on the SEMCOG population
12 projections, correct?
13     A.  I wouldn't describe it as a limitation.
14     Q.  How would -- what would you describe it as?
15     A.  I would describe it as the best available
16 population forecast that we had access to.  We could not
17 have done a better job than they do.
18     Q.  Have you ever -- in doing tax forecasting for
19 a city, have you ever relied on state data instead of
20 city-level data?
21     A.  Prior to the Detroit project, I haven't done
22 forecasting for a city.
23     Q.  Going back to page 16, at the bottom, you say
24 that -- in the last sentence of the page, you say your

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

R. CLINE

1              R. CLINE
2 forecast, "Assumes for the restructuring scenario a
3 slower rate of decline in the population of this group
4 than under the baseline scenario."
5      Q.   Do you see that?
6      A.   Yes, I do.
7      Q.   What was the difference in the population rate
8 of decline that you assumed?
9      A.   This is, I believe, the restructuring
10 scenario, and consistent with our overall perspective on
11 the restructuring scenario, we feel that the economy will
12 start to strengthen, there will be positive growth in
13 total employment, and we believe that those people who
14 are residents of Detroit but working outside of Detroit,
15 will still be declining, but at a slower rate as they
16 perceive that the job opportunities in the suburbs are
17 there, and that the city, as a place to live, is more
18 attractive.
19      So, the outward migration or flow of the
20 people who are most mobile would be reduced under this
21 alternative, which is residents of Detroit working
22 outside of the city.
23      Q.   And the slower rate of population decline is
24 an assumption that you made, correct?
25      A.   Yes, it is.

R. CLINE

1              R. CLINE
2      Q.   And do you know what the assumed difference is
3 in the rate of population decline for the restructuring
4 scenario?
5      A.   I don't recall what the specific differential
6 is. I could check the Excel spreadsheet and let you
7 know.
8      Q.   There's no body of data, though, that tells
9 you what the assumed rate of population decline is in the
10 restructuring scenario as compared to the baseline
11 scenario, correct?
12      A.   There's no body of literature that I know of
13 that deals with the forecast for the situation that
14 Detroit faces, so I'm not aware of any studies that would
15 have given us insight into this issue.
16      Q.   Okay. The page 19, you assume that -- if you
17 look at that paragraph, number three, the one that's --
18      A.   Okay.
19      Q.   -- got a 3 in front of it on page 19 --
20      A.   All right.
21      Q.   -- it says that you "assume that the State
22 corporate income tax revenues return to a long run growth
23 rate of 3.0 percent".
24      Do you see that?
25      A.   I do.

R. CLINE

1              R. CLINE
2      Q.   That's an assumption, correct?
3      A.   That is an assumption.
4      Q.   And there's no body of data that tells you
5 that the State corporate income tax revenue will return
6 to a long run growth rate of 3.0 percent as opposed to
7 some other rate, correct?
8      A.   As I mentioned earlier, the corporate income
9 tax in Michigan is a new tax. We perhaps have three
10 years of observations at most on how it's performing over
11 the economic cycle. And so, no one could fit a
12 regression equation for the actual data, so I do not know
13 of any analyses or study that could have helped us
14 determine what that specific rate is.
15      Q.   And do you know how that 3.0 percent -- it
16 seems pretty precise, 3.0 percent: do you know how that
17 number was selected?
18      A.   I know we selected that number by looking at
19 national corporate income tax growth, what limited
20 information we had about Michigan, and that's a number
21 that's in the realm of our very limited but actual
22 experience in Michigan. But I will add that we happen
23 to -- the experience in Michigan happens to coincide with
24 the end of the deepest recession we've had in decades.
25      And to use that information, we would have had

R. CLINE

1              R. CLINE
2 to determine more precisely how Michigan was coming out
3 of the recession, so that again, there wasn't information
4 available for us to pick a specific number. It wasn't
5 going to be 3.1756. It was going to be rounded off
6 because it is an assumption about the rate of growth.
7      Q.   Yeah. I'm just wondering where that 3.0
8 number came from.
9      A.   It's our estimate of what we think is likely
10 for State corporate income tax rate -- income tax revenue
11 to grow.
12      I will tell you that since the recovery from
13 the recession, across all the states, there's been no
14 growth in the corporate income tax collections, 0.0
15 across all the states since the end of the recession. I
16 don't think it would be reasonable to assume a very
17 strong rate of growth in corporate profits going forward.
18      We chose 3 percent as a reasonable estimate,
19 despite the recent experience nationally that says there
20 will be no growth in this corporate income tax. We think
21 Michigan, as it continues to recover, and Detroit, as it
22 continues to recover, will enjoy a slightly higher rate
23 of growth.
24      Q.   But there's no body of data that tells you to
25 pick 3.0 percent rather than 3.1 percent or 3.2 percent,

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 51 of
54

R. CLINE

1    future, near term, looks like.

3    Q.   Can you tell me what period of time of recent
4    wagering tax collection data you looked at?

5    A.   We went back in time to look at wagering tax
6    collections. I think we looked at the numbers that are
7    reported in the CAFR for the City of Detroit, looked at
8    that change. We saw some positives, rates of growth,
9    when Detroit was operating, in a sense, in isolation,
10    without direct competition, defined by geographical
11    limits.

12    More recently, we see the decline in Detroit
13    wagering due to the economy and the deep recession, and
14    we know we're looking at an impact from the competition.
15    In our forecasts, we had to separate out the deep
16    recession that ended from the ongoing competitive impact,
17    and this is our best estimate of what that net effect is.

18    Q.   Okay. But why does it go to .5 percent at
19    some years and it's minus 1 percent in some years and
20    minus 4.3 percent at another year?

21    A.   I believe the correct way to describe this is
22    that we are moving in the same direction over the entire
23    10-year period of time. We're not bouncing up positive,
24    down to negative, up to positive. We are bringing the
25    industry back to what we think is a more stable, long run

R. CLINE

2    growth rate, appreciating the impact of increased
3    competition, allowing it to grow somewhat, perhaps with
4    the level of general spending on wagering. It's a
5    stabilized world where the competition is there but
6    doesn't continuously eat into the Detroit share.

7    Q.   And you never have done any study of casino
8    competition yourself, correct?

9    A.   Not of competition.

10    Q.   And there's no mathematical formula you're
11    using that governs the change in the rate for the
12    wagering tax revenue over time, is there?

13    A.   No, there's not.

14    Q.   The -- page 25, you use utility users' tax
15    rate -- growth rate of 1.5 percent from 2019 through the
16    rest of the period.

17    Do you see that? It's in the middle of the
18    page.

19    A.   I do. I'm trying to remember if we are into
20    restructuring are or we baseline at this point?

21    Q.   I believe it's baseline.

22    A.   Baseline. I believe you're correct.

23    Q.   Okay. Is that an assumed number?

24    A.   That's our forecast of the rate of growth.

25    Q.   Okay. I'm just wondering if it's an assumed

R. CLINE

1    number.

3    A.   Well, again, I know we're using different
4    terminology. It's our forecasted rate of growth that we
5    used to forecast the revenue collections.

6    Q.   But is it a calculated number based on a body
7    of data, or is it an assumed number?

8    A.   It's a calculated number based upon recent
9    collection experience in Detroit modified by the fact
10    that recent experience in Detroit shows a continuing
11    decrease in these revenue collections, which suggests
12    that there may be challenges to the number that we put in
13    here, but it's the best available information we had at
14    the time we made the revenue estimate.

15    Q.   Okay. What was the -- what was the
16    mathematical formula you used to calculate the 1.5
17    percent figure?

18    A.   We don't have a mathematical formula that
19    calculated that figure.

20    Q.   Okay. So that 1.5 percent utility growth rate
21    figure was an assumed number; is that correct?

22    A.   Again, I believe I would use the word
23    forecasted. You --

24    Q.   I know what terminology I'd use --

25    A.   Right.

R. CLINE

2    Q.   -- but I can't say it on the record.

3    I mean, I'm just trying to get at it
4    there's -- what I'm trying to get at is if there are
5    mathematical formulas generating the number, I want to
6    know what they are. Isn't that fair?

7    A.   All of the mathematical formulas that we used
8    in the model are contained in the model and visible in
9    the model.

10    Q.   Okay. When you say visible in the model,
11    you're saying the Excel spreadsheet that's been produced
12    to us?

13    A.   I believe that's correct.

14    Q.   Okay. So, your understanding is all of the
15    mathematical formulas that are used to generate numbers
16    in your forecast contained in the Excel spreadsheet
17    that's been produced to us; is that your understanding?

18    A.   That's my understanding.

19    Q.   And where did you get that understanding from;
20    did you personally inspect the Excel spreadsheet or is
21    somebody telling you that?

22    A.   I personally reviewed every element in the
23    Excel spreadsheet. I know when we last touched it that
24    information was embedded in the spreadsheet.

25    Q.   Okay. When you say "embedded in the

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 52 of 54

R. CLINE

Q.   Would it be fair to say that your analysis here and role in the case is a narrow one?

A.   I'm not sure I understand the term "narrow" in this context. I believe this is an important part of the discussion.

Q.   Okay. Do you have any publications on tax forecasting?

A.   Not recently, that I remember. There may have been papers that I did back as tax research director in either Michigan or Minnesota where I talked about different aspects of the forecasting process. I used to attend annually the revenue forecasting section -- the revenue section of the Federation of Tax Administrators, FTA. I made a number of presentations to those meetings which were meetings of my counterparts in other states responsible for revenue estimation. I'm sure there are PowerPoint presentations that I made in those settings.

Q.   Okay. But you haven't published any peer-reviewed studies or other literature on tax forecasting, correct?

A.   I don't remember any publications I have in peer-reviewed journals dealing specifically with a forecast issue. I could go back in the records, but I'm not sure I have any of those.

R. CLINE

Q.   Okay. The -- we talked about how you don't have any idea of what percent of the corporate income tax is collected by the City, correct?

A.   100 percent of the corporate income tax, money in the city, is collected by the City.

Q.   You're saying the collection rate for the corporate income tax is 100 percent?

A.   No. I'm saying the City collects the corporate income tax for the City.

Q.   Okay. Well, my -- the question is, you have no idea what the collection rate is for the corporate income tax, correct?

A.   Consistent with my answers earlier, we did not analyze separately the collection rates of any of the taxes we looked at in our forecast, other than an average collection rate for the property tax forecast.

Q.   Okay. And so, an increase in -- a significant increase in the -- an additional revenue from a significant increase in the collection of the corporate tax rate, the income tax rate, the wagering tax rate, and utilities users' tax rate, that's an analysis that you haven't been asked to perform?

A.   Nor did we do an analysis of changes in the collection rates for any tax other than the property tax.

R. CLINE

Q.   Okay. So, if somebody wanted to get an idea of the magnitude of the additional revenue from significant increases in collection rates on the various taxes you look at, they would have to do a separate analysis and then add that number on to your forecast?

A.   Or they would have to go to someone else who has done that analysis. We did not do that analysis.

Q.   Okay. But it's an analysis that could be done and then you would just -- that would be additional revenue to the City, correct?

A.   I would imagine it would depend upon what specific changes were made in the collection procedures and processes.

Q.   Okay. But that would be an additional analysis that would have to be done to see what impact an increase in collections would have on the tax revenue available to the City, correct?

A.   I believe as I've answered, we have estimated the effect under current law of a forecast of the taxes expected under current law given our assumptions about the economics. Other than the property tax revenue estimate, we have not built in any separate adjustments for collection procedures and processes in our numbers.

Q.   Okay. So, somebody wanting to get a number

R. CLINE

for additional revenue from changes in collection processes or procedures would have to perform a separate analysis that you haven't performed, correct?

A.   Or they would have to go to someone who has done that analysis.

Q.   Okay. And then they would take those sums and they would add them to your forecast to get a total forecast of additional revenue including collections plus the numbers you forecast for taxes?

A.   That could be, but as I've indicated, there are a number of revenue sources we were not asked to forecast. So, all -- I believe your statement would apply to any tax forecast that we did not do and were not asked to do in this -- this analysis; so there would be a number of dollars falling into that bucket that you would have to go elsewhere to get revenue estimates for.

Q.   Okay. So, somebody would have to do a number of different analyses that included analyses for increased collection rates and analysis for other taxes you didn't consider, and other factors in order to get at the total potential revenue available from taxes for the City, correct?

A.   I believe that analysis has already been done. I'm not -- we were not responsible for it.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-10   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 53 of 54

**R. CLINE**

1

2      Q.    Who did that analysis?

3      A.    I believe the Plan of Adjustment has the

4  numbers that you're describing in it.

5      Q.    Okay.  So, do you think the Plan of Adjustment

6  has numbers for an increase in collection rate?

7      A.    I believe there's a specific line in one of

8  the tables that identifies that.

9      Q.    And are there numbers in the Plan of

10  Adjustment for taxes that you didn't consider?

11      A.    I believe there are summary categories that do

12  include other sources of tax revenue.

13      Q.    And all of that would be additive to your

14  analysis, correct?

15      A.    We did not do those numbers.

16      Q.    Okay.  Can you give me an explanation for why

17  the -- no one asked you to look at increases in

18  collection rates or other taxes other than the ones you

19  looked at?

20      A.    I believe it might have been a logical

21  division of labor that we were asked to do what we do

22  best and have experience in doing.

23      Q.    Do you have any idea of who did the analysis

24  of collection rates?

25      A.    No, I don't.

**R. CLINE**

1

2      Q.    Do you have any idea of who did any analysis

3  of taxes other than the ones you looked at?

4      A.    No, I do not.

5      MR. SMITH:  Why don't we take a quick

6  break.

7      MR. STEWART:  Here's the document, and you

8  were right, we did not change it to correct the

9  fact that it's going to be Mr. Hill instead of

10  Mr. Cline.  But Mr. Hill is later in the week, and

11  you --

12      MR. SMITH:  So, Mr. Cline is not prepared

13  to testify on topic 2?

14      MR. STEWART:  Not on 2, no.  We thought we

15  corrected it, but we did not.  Anyway, it will be

16  Mr. Hill.

17      MR. SMITH:  Okay.  So, you want to change

18  it to Mr. Hill now, is that what you are saying?

19      MR. STEWART:  Well, we'll file things

20  formally, but we will just want to make sure you

21  know that's an oversight.  We thought we had fixed

22  it, but it will be Mr. Hill.  We'll put it in an

23  amended document so it's clear in terms of filings

24  what we're doing, but it will be Mr. Hill.  We

25  thought we had disclosed that sometime earlier.

1                    R. CLINE

2      MR. SMITH:  And the other item is we have

3  received some additional documents.  We haven't had

4  a chance to upload that deal with Mr. Cline and

5  Mr. Malhotra, I believe on Friday.

6      MR. STEWART:  All right.

7      MR. SMITH:  So, I just wanted to put that

8  on the record.

9  BY MR. SMITH:

10      Q.    Mr. Cline, are there any areas that you plan

11  to testify about that we haven't discussed?

12      A.    I believe we have been discussing the area

13  that I was responsible for, and that's the preparation of

14  the tax forecast for the tax -- major tax components that

15  you identified earlier in your questioning.

16      Q.    Okay.  And I just want to find out if there's

17  any other area we haven't talked about that you might be

18  planning to testify about at trial?  Or have we covered

19  all of the bases?  That's basically what I want to find

20  out.

21      A.    I don't know the answer to that question.

22      Q.    Okay.  Why don't -- why don't you know the

23  answer to that question?

24      A.    Because I'm not clear what other areas that

25  you might question me about.

1                    R. CLINE

2      Q.    Okay.  But you do know what you're planning to

3  testify about, correct?

4      A.    It's summarized and presented in the report

5  that we have been discussing.

6      Q.    All right.  And that's it, right, what's in

7  the report?

8      A.    I believe that's correct.

9      Q.    Okay.  The -- are you preparing to do any

10  other work to revise your analysis or anything like that

11  before trial?

12      A.    We are not looking at any revisions at this

13  point that I am -- that I am aware of, and I assume we

14  will not be making changes.

15      Q.    Okay.  There was, I think, a plan to have

16  the -- the next CAFR, I think, is about to come out.

17  Does that figure in your analysis at all or not?

18      A.    Well, we would certainly look at it if we were

19  asked to do another round of revisions.  At this point, I

20  am not considering doing that.

21      Q.    I mean, does the -- do you rely on the CAFR

22  for part of your analysis?

23      A.    I think I mentioned in answering earlier

24  questions that the CAFRs have been one source of

25  information, after the fact, as the best estimates of