<u>**Exhibit 6E**</u>

**Excerpts of July 15, 2014 G. Malhotra Deposition Transcript**

## Page 1

```
1
2        UNITED STATES BANKRUPTCY COURT
3      FOR THE EASTERN DISTRICT OF MICHIGAN
4            - - -
5    In Re:            ) Chapter 9
6
7    City of Detroit, Michigan,  )
8
9        Debtor.        ) Hon. Steven Rhodes
10    _____
11
12
13
14        The videotaped deposition of GAURAV MALHOTRA
15    Taken at 51 Louisiana Avenue, N.E.
16    Washington, D.C.
17    Commencing at 9:09 a.m.
18    Tuesday, July 15, 2014
19    Before:  Gail L. Inghram Verbano
20    Registered Diplomate Reporter,
21    Certified Realtime Reporter,
22    Certified Shorthand Reporter-CA (No. 8635)
23
24
25
```

## Page 2

```
1
2    APPEARANCES:
3
4    RONALD A. KING, ESQ.
5    FRANK J. GUADAGNINO, ESQ. (Pittsburgh Office)
6    CLARK HILL, PLC
7    212 East Grand River Avenue
8    Lansing, Michigan 48906
9        Appearing on behalf of the Retirement Systems
10       for the City of Detroit.
11
12
13
14    GEOFFREY S. STEWART, ESQ.,
15    CHRISTOPHER DiPOMPEO, ESQ.,
16    SARAH A. HUNGER, ESQ.
17    JONES DAY
18    51 Louisiana Avenue, N.W.
19    Washington, D.C. 20001
20       Appearing on behalf of the Debtor and the Witness.
21
22
23
24
25
```

## Page 3

```
1
2    HEATHER J. HUBBARD, ESQ.
3    WALLER LANSDEN DORTCH & DAVIS, LLP
4    511 Union Street, Suite 2700
5    Nashville, Tennessee 37219
6        Appearing on behalf of U.S. Bank.
7
8
9
10    SAM J. ALBERTS, ESQ.
11    DENTONS US, LLP
12    1301 K Street, N.W.
13    Suite 600, East Tower
14    Washington, D.C. 20005
15        Appearing on behalf of the Retiree Committee.
16
17
18
19    DOUGLAS G. SMITH, P.C.
20    KIRKLAND & ELLIS, LLP
21    300 North LaSalle
22    Chicago, Illinois 60654
23        Appearing on behalf of Syncora Guarantee, Inc.,
24        and Syncora Capital Assurance, Inc..
25
```

## Page 4

```
1
2    KELLY DiBLASI, ESQ.
3    WEIL, GOTSHAL & MANGES, LLP
4    767 Fifth Avenue
5    New York City, New York 10153
6        Appearing on behalf of Financial Guaranty
7        Insurance Company.
8
9
10
11    MICHAEL BHARGAVA, ESQ.
12    CHADBOURNE & PARKE, LLP
13    1200 New Hampshire Avenue, NW
14    Washington, D.C. 20036
15        Appearing on behalf of Creditor Assured
16        Guaranty.
17
18
19
20
21
22
23
24
25
```

Pages 1 to 4

1    MALHOTRA
2    Washington, D.C.
3    Tuesday, July 15, 2014; 9:09 a.m.
4    - - -
5    THE VIDEOGRAPHER: We are on the record
6    at 9:09 a.m. This is the videotaped
7    deposition of Gaurav Malhotra taken in the
8    United States Bankruptcy Court, Eastern
9    District of Michigan, in re: City of
10   Detroit, Michigan, Debtor, Chapter 9, Case
11   No. 13-53846, on Tuesday, July 15th, 2014.
12   We are at the location of Jones Day, 51
13   Louisiana Northwest, Washington, DC. My name
14   is Adam Miller, the certified legal video
15   specialist. The court reporter is Gail
16   Verbano from Elisa Dreier Reporting Company,
17   950 Third Avenue, 5th Floor, New York,
18   New York.
19   Will counsel please state their
20   appearance and affiliation for the record.
21   MR. SMITH: Doug Smith for Syncora.
22   MR. STEWART: Geoffrey Stewart, Chris
23   DiPompeo and Sarah Hunger, Jones Day, for the
24   witness and for the City of Detroit.
25   MR. ALBERTS: Sam J. Alberts from

1    MALHOTRA
2    Dentons on behalf of the Official Committee
3    for the Retirees.
4    MS. HUBBARD: Heather Hubbard from
5    Waller on behalf of US Bank.
6    MR. KING: Ron King with Clark Hill on
7    behalf of Detroit Retirement Systems.
8    MR. BHARGAVA: Michael Bhargava from
9    Chadbourne & Parke on behalf of Creditor
10   Assured Guaranty.
11   MR. POPEHN: John Popehn from Houlihan.
12   Lokey.
13   MS. DiBLASI: Kelly DiBlasi, Weil,
14   Gotshal & Manges, on behalf of FGIC.
15   MR. GUADAGNINO: Frank Guadagnino, also
16   on behalf of the Retirement Systems.
17   MR. STEWART: Could the lawyers on the
18   phone please give their appearances.
19   MS. HOSBACH: Marguerette Hosbach, Ernst
20   & Young in-house counsel.
21   MS. HALADYNA: Kelley Haladyna of
22   Dickinson Wright on behalf of the State of
23   Michigan.
24   MR. NESTOR: David Nestor, Davis Polk,
25   on behalf of Merrill Lynch.

1    MALHOTRA
2    MR. KEATLEY: Benton Keatley, Sidley
3    Austin, on behalf of National Public Finance
4    Guarantee.
5    MS. ENGLISH: Caroline English, Arent
6    Fox, on behalf of Ambac Assurance
7    Corporation.
8    - - -
9    GAURAV MALHOTRA, having first been duly
10   sworn according to law, was examined and testified
11   as follows:
12   - - -
13   EXAMINATION
14   BY MR. SMITH:
15   Q. Good morning, Mr. Malhotra. You've been
16   deposed several times before; correct?
17   A. That's correct.
18   Q. So you understand I'm going to ask you a
19   series of questions. And you'll let me know if
20   you don't understand any of the questions;
21   correct?
22   A. Yes.
23   Q. And feel free to take a break any time
24   or whatever you need. Okay?
25   A. Okay. Thank you.

1    MALHOTRA
2    Q. You know, you are working in this case
3    as an expert in financial analysis. Is that fair?
4    A. Yes.
5    Q. You're not holding yourself out as an
6    expert in urban policy; correct?
7    A. That is correct.
8    Q. You're not an expert in health benefits?
9    A. That is correct.
10   Q. Not an expert on government?
11   A. Government what?
12   Q. Government in general: function,
13   operations.
14   A. That is correct.
15   Q. You're not an expert in tax policy?
16   A. That is correct.
17   Q. You're not holding yourself out as an
18   expert in tax forecasting?
19   A. That is correct.
20   Q. You're not an expert on blight
21   reduction?
22   A. Yes, I am not.
23   Q. Not an expert on art valuation?
24   A. That is correct.
25   Q. Not an expert on pensions?

Pages 9 to 12

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 3 of 50

MALHOTRA

1
2      A.  That is correct.
3      Q.  Not an expert on casinos or wagering
4  revenue?
5      A.  That is correct.
6      Q.  Not an expert on information technology?
7      A.  Information technology in terms of what?
8      Q.  In terms of the systems, the type of
9  systems, and implementing those systems and the
10  cost of the systems.
11      A.  I'm not an expert in that.
12      Q.  You're not an expert on transportation
13  systems for municipalities?
14      A.  That is correct.
15      Q.  You're not an expert in economics?
16      A.  I'm not an expert in economics.
17      Q.  You're not an expert on accounting?
18      A.  What do you mean by that?
19      Q.  Well, you're not a CPA, are you?
20      A.  I'm not a CPA.
21      Q.  And you don't hold yourself out as an
22  accounting expert, do you?
23      A.  Well, in my overall financial analysis
24  expertise, my background in accounting and
25  financial analysis is a part of that.  So I don't

MALHOTRA

1
2  know what you mean by I'm an expert in accounting
3  or not.
4      Q.  Have you ever been qualified as an
5  expert in accounting in any proceeding?
6      A.  I have not.
7      Q.  You don't -- did you do any auditing of
8  financial statements?
9      A.  I do not do auditing, no.
10      Q.  You're not an expert in government
11  grants; correct?
12      A.  Well, government grants is a broad
13  topic.  What grants specifically are you talking
14  about?
15      Q.  Well, any government grants, federal or
16  state.  You're not an expert in government grants?
17      A.  In what context?  I mean, government
18  grants is a broad topic.  And how they relate to
19  the City of Detroit, I can speak in-depth about;
20  but I don't know what you mean by government
21  grants in general.
22      Q.  You've never been involved in applying
23  for a government grant?
24      A.  Actually, our team helped prepare the
25  City for some of the fire and SAFER grants that

MALHOTRA

1
2  the City had applied for to actually help the City
3  get the supporting information.
4      Q.  Would it be fair that your only
5  experience with government grants is in the
6  context with the City of Detroit?
7      A.  No.  I have a couple other cases where
8  our team has been heavily involved in terms of
9  evaluating some of the grant-related revenues of
10  other public sector entities.
11      Q.  Okay.  So would you hold yourself out as
12  an expert on government grants?
13      A.  Government -- like I said again,
14  government grants is a broad topic.  I can talk
15  about the grants specifically, how they relate to
16  the City of Detroit.
17      Q.  Okay.  You're not an expert on state
18  revenue sharing, are you?
19      A.  I understand the implications for the
20  City of Detroit of state revenue sharing.  I mean,
21  they're broad questions.  So if you ask me
22  specifically about Detroit, I can be more
23  specific.
24      Q.  Well, you're not some sort of policy
25  expert on state revenue sharing; correct?

MALHOTRA

1
2      A.  The policy on state revenue sharing is
3  generally set by the State, not the City.  It's a
4  State-driven mechanism.
5      Q.  So you wouldn't hold yourself out as an
6  expert on state revenue sharing based on your
7  experience that you've had?
8      A.  For what?  For City of Detroit or just
9  state revenue sharing for the State of Michigan in
10  general?
11      Q.  In general.
12      A.  In general, different states have
13  different mechanisms in terms of how State aid is
14  spent.  So I can't talk to different states.  I
15  can talk to how the state revenue sharing impacts
16  the City of Detroit and the components and the
17  elements of that.
18      Q.  Have you ever done forecasting for a
19  city before the Detroit matter?
20      A.  We were working with two other cities
21  right now in terms of helping them forecasting.
22      Q.  Which other cities are those?
23      A.  Those are confidential.
24      Q.  I mean, just the name of the cities, you
25  can't disclose to me?

MALHOTRA

A. That is correct.

Q. And what period of time have you been doing that?

A. One of them has been over a year. One of them has been in the last, I would say, six months.

Q. Before you started your forecasting work for Detroit, you didn't have any experience doing a forecast for a city; correct?

A. We did it for Detroit Public Schools, which was another large government sector -- public sector entity. We did not do it for a city.

Q. Okay. So before your work for the City of Detroit, you had never done forecasting for a city specifically; correct?

A. Most of the -- that is correct.

Q. You're not holding yourself out as an expert on Chapter 9 bankruptcy, are you?

A. No, I'm not.

Q. This is the first Chapter 9 bankruptcy you've worked on; correct?

A. Yes, it is.

Q. And you'd agree with me that Chapter 9

MALHOTRA

bankruptcy is extremely rare?

A. I don't want to comment on that.

Q. You're not going to answer that question?

A. Rare in context of what? Is it in context of Chapter 11 or is it in context to other bankruptcies? So you have to give me a relative point to answer that question.

Q. It's very rare for a city -- out of all the cities in the United States, it's very rare for a city to have entered into a Chapter 9; right?

A. Well, there are different state laws that impact the ability of cities to enter Chapter 9 or not. But I would say Chapter 9s are less common than Chapter 11s. I mean, I'm comfortable saying that.

Q. Okay. And it would be a minute fraction of cities that ever have entered Chapter 9; correct?

A. I don't understand minute or not. But I think the number of Chapter 9 filings is limited relative to Chapter 11 filings. I'm comfortable saying that.

MALHOTRA

Q. You're not holding yourself out as an expert in risk management or insurance; correct?

A. Again, I'll ask the same question: Risk management, insurance for what? Because all of these points have specific implications on the City of Detroit and the financial analysis and forecasts for the City of Detroit.

Q. Okay. Well, I mean, you've never done any work in the area of risk management, have you?

A. I've looked at a lot of the expenses that the City of Detroit has been spending on risk management insurance claims over the last three years. So I understand where the City has been spending that money.

Q. Okay. Before your work for the City, you didn't -- you hadn't done any work on risk management; is that right?

A. No. When it comes to specific other clients and you see where they are spending more and if risk management is -- or self-paying, self-insurance claims is a big component, you have to analyze those costs. So I have looked at them in specific instances where claims are a large part of a spend.

MALHOTRA

But I -- so all I'm asking is, are you asking the question in the context of Detroit or just risk management?

Q. Risk management in general. You wouldn't hold yourself out as an expert in that; correct?

A. I would -- I could only talk about the risk management and insurance claims for the City of Detroit. That's what I would -- that's what I would be comfortable talking about.

Q. Were you involved in putting -- were there some forecasts with the creditor proposal that accompanied that?

A. Which creditor proposal?

Q. The one in, I think -- guess it was 2013, before the bankruptcy.

A. Yes, there were forecasts, and we were a part of pulling those together.

Q. And that was my question.

A. Thank you for the clarification.

Q. You were personally involved in that?

A. I was.

Q. Okay. In your opinions in this case, you're relying on some other experts, such as

MALHOTRA

Mr. Cline, Ms. Sallee, Conway MacKenzie, Buckfire,
and Milliman; is that correct?

A. That is correct.

Q. And do you defer to Mr. Cline with
respect to his analyses of the various taxes in
his report?

A. When you say I defer to, I have looked
at the assumptions and the details and some of the
supporting information that Bob and Caroline have
used and have conversed with them and had
discussions with them about it. So I don't know
your question about defer to them.

Q. Well, who is more knowledgeable about
the analyses Mr. Cline did? Mr. Cline or you?

A. Mr. Cline did the analysis, so of course
he would be more knowledgeable about the analysis.

Q. And Ms. Sallee would be more
knowledgeable about the analyses she did than you
would be; correct?

A. That is correct.

Q. Okay. And Conway MacKenzie would be
more knowledgeable about their analyses than you
would; correct?

A. In terms of the minutia and the detail,

MALHOTRA

the answer would be yes. But I have had
discussions with each one of them in detail about
the broad assumptions that are being used and the
sources of data that are being referred to as the
different teams have been pulling the information
together.

Q. And Buckfire and Milliman would be more
knowledgeable about their analyses than you would;
correct?

A. People who have worked on their specific
part of the analyses would be more comfortable
with all of the detail and minutia in there, in
their respective analysis.

Q. Why are you relying on other experts in
putting together your forecast?

A. Because, as I said, that there is --
there are a lot of topics that are relevant in
this case, and each subject matter requires a
great amount of detailed information. And there
are experts that we have on the case who are
relying -- who are doing their work in that
detailed analysis. But I understand most of the
larger assumptions that are embedded in those
analyses.

MALHOTRA

But, yes, the ones who have done the
analyses will have better knowledge of all the
details in them.

Q. In order to put together your forecast,
was it necessary to use experts in different
disciplines to assist you in pulling together the
different pieces of the forecast?

A. Could you ask me the question again,
please?

Q. In order to perform your forecast, was
it necessary to use experts in different
disciplines to pull together pieces of the
forecast to help you put it all together?

A. Yeah, when you say "was it necessary,"
in my judgment, having the right subject matter
expertise in various topics helps make the
forecast more reliable versus less reliable.

Q. Okay. So you sought out experts in
diverse subject matters to assist you with
different components of the forecast; correct?

A. Yes.

Q. And that would include Milliman and
Conway MacKenzie and Buckfire and your colleagues
at Ernst & Young; correct?

MALHOTRA

A. That is correct. There were different
team members who were charged for first
understanding all of the detailed assumptions for
a particular subject matter.

Q. And did you also rely on experts from
the City of Detroit in putting together your
analysis?

A. When you say "experts from the City of
Detroit," who are you referring to?

Q. Well, I guess, you relied on -- did you
rely on anybody from the City of Detroit?

A. Yes. The City of Detroit's management
team was involved in helping pull together some of
this information that is in the forecast.

Q. Okay. And were there people at the City
of Detroit whose expertise you relied on for
various assumptions or other information in your
forecast?

A. I would say there was -- I don't know
about expertise versus not. We had lots of
discussions with lots of people at the City about
specific line items. I mean, as you can see, the
forecast has got a lot of detail in there. So we
had several discussions with several people. I

1        MALHOTRA
2  was -- it was, I think, brought up by either the
3  State or the City.  I just don't remember
4  specifically.
5      Q.  Does the 10 percent holdback -- do you
6  have an arrangement like that in any other matter
7  that you've worked on?
8      A.  I would have to go back and check.  We
9  offer discounts in different engagements, and I
10 would have to go back and check.
11     Q.  But have you ever done a contingent fee
12 arrangement before for your work?
13         MR. STEWART:  Objection.
14         I'm sorry.  You were about to answer.
15         I didn't mean to interrupt your
16     question, Mr. Smith.
17         You have my objection, correct?
18         THE COURT REPORTER:  I do.
19         THE WITNESS:  Can you ask your question
20     again?  I'm sorry.
21 BY MR. SMITH:
22     Q.  Have you ever had a contingent fee
23 arrangement in any other matter that you've worked
24 on?
25         MR. STEWART:  Same objection.

1        MALHOTRA
2         THE WITNESS:  Yes.
3  BY MR. SMITH:
4      Q.  Have you ever had a contingent fee
5  arrangement in any other bankruptcy matter you've
6  worked on?
7      A.  I would have to go back and check.
8      Q.  Do you have any -- have you ever had a
9  contingent fee arrangement in any other matter
10 involving litigation?
11     A.  I would have to go back and check.
12     Q.  Does the 10 percent holdback apply to
13 all fees that Ernst & Young has charged or a
14 portion of the fees?
15     A.  It would only be for the portion of the
16 fees since the City has filed bankruptcy.
17     Q.  Okay.  And so it would cover the fees
18 that you're charging for your expert work in this
19 case, developing the report and testifying?
20     A.  I believe so, yes.
21     Q.  And it would also apply to the time that
22 Mr. Cline and Ms. Sallee have been putting in
23 working as experts in the case?
24     A.  I believe so, yes, but I would like to
25 reconfirm that.

1        MALHOTRA
2      Q.  Okay.  Are you aware of any formal
3  studies by the City to ascertain whether it can
4  increase revenues more than it already has?
5      A.  There have been various consultant
6  studies over the last few years, and so . . .
7      Q.  Would it be fair to say that a number of
8  consultants the City has retained have given it
9  ideas for increasing revenues significantly over
10 the last few years?
11     A.  I don't know the definition of
12 "significantly" in the context that you're
13 referring to, but there's lots of consultants that
14 have provided ideas to the City for increasing
15 revenues.
16     Q.  And the City has not adopted all the
17 ideas it's been provided for increasing revenues
18 as of today; correct?
19     A.  Some of these consultant studies go back
20 a long way, and I think some of them have been
21 incorporated and some of them have likely not been
22 incorporated.  So I can't comment whether each and
23 every idea that's been brought forward by a
24 consultant to increase revenue has been
25 incorporated.

1        MALHOTRA
2      Q.  Okay.  But you knew that there are ideas
3  that have been brought forth by experts the City's
4  retained to increase revenues that haven't been
5  adopted by the City; correct?
6          MR. STEWART:  Objection.
7          THE WITNESS:  So I would just like
8      clarification in terms of which experts
9      you're referring to.
10 BY MR. SMITH:
11     Q.  Well, you mentioned that there are a
12 series of consultants the City has hired to look
13 at increasing revenues; correct?
14     A.  That is correct.  And what I was
15 referring to is historically, since this is going
16 back -- we can go back 5, 10 years, you will find
17 reports where, you know, people have ideas how to
18 increase revenue.
19     Q.  Yeah.  And my only question is, the City
20 hasn't adopted all the ideas for increasing
21 revenue that have been provided by independent
22 consultants; correct?
23     A.  Sure.  The City has -- has always had
24 consultants that have provided ideas.  Whether all
25 of the ideas have been incorporated at a given

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 7 of 50

MALHOTRA

1
2 point in time, it's hard for me to say.
3    Q. Well, today -- as of today, you're aware
4 of revenue-generating ideas that have been
5 provided the City by consultants that it hasn't
6 implemented; correct?
7    A. I mean, is there a particular example
8 that you're thinking of? It would be a lot easier
9 for me if somebody would say, "Has X, Y, Z been
10 implemented?" I would have a better way to say yes
11 or no versus just a broad statement, have ideas
12 been incorporated by the City or not.
13    Q. Privatizing parking. It hasn't yet
14 privatized parking?
15    A. That is correct. It has not been
16 privatized yet. You're correct.
17    Q. Or leasing out the water and sewage
18 function; correct? That hasn't been done yet, has
19 it?
20    A. I believe there is active mediation
21 going on in that, but you're correct. It has not
22 been done yet.
23    Q. So there are a number of proposals for
24 increasing revenue that the City has been provided
25 by outside consultants that haven't been

MALHOTRA

1
2 implemented yet; correct?
3    A. You have listed two, and I agree that
4 those two have not been implemented.
5    Q. Okay. And there are others you're aware
6 that haven't been implemented; correct?
7    A. You know, if there's others that you
8 have specific examples on, I'm happy to say
9 whether they have or have not. But I would say
10 those -- DWSD has not been implemented, and
11 there's mediation going on on that; and parking,
12 my understanding is that there's some active
13 discussions going on, but it has not been done
14 yet.
15    Q. Okay. The -- has the City ever asked
16 Ernst & Young to look for ideas to increase
17 revenues?
18    A. I don't recall if there's a specific
19 item that talks about how to increase revenues
20 that is in our scope, but we have had discussions
21 with the City how to continue to improve the
22 processes of collections and so on and so forth.
23        There was active discussions when the
24 City increased the corporate tax rate from
25 1 percent and 2 percent. And although E&Y was not

MALHOTRA

1
2 involved in any policy decisions, but we were able
3 to quantify the impact of what that was.
4    Q. Okay. But you haven't been specifically
5 retained by the City to generate ideas for further
6 increasing revenue; is that fair?
7    A. I would say that is fair in general,
8 that we haven't gone to do a market study on
9 specific rates and whether they should be
10 increased or not.
11    Q. Whose depositions have you reviewed in
12 this case?
13    A. Since when?
14    Q. Well, since forever. I'm trying to find
15 out whose depositions you have reviewed in the
16 case at any point in time.
17    A. Whose depositions?
18    Q. Yeah, deposition transcripts.
19    A. I do not recall. I -- I was -- I think
20 I was sent Kevyn Orr's deposition from months ago.
21 That just comes to mind. But I do not recall any
22 specific depositions that I've reviewed.
23    Q. Have you reviewed Gary Evanko's
24 deposition?
25    A. No.

MALHOTRA

1
2    Q. Did you ever speak to Mr. Evanko in
3 preparing the forecast?
4    A. I did not, but I know that there may
5 have been some -- yes, I have not.
6    Q. And has anybody from Ernst & Young
7 spoken to Mr. Evanko?
8    A. I think Caroline Sallee may have
9 exchanged emails with him. I don't know if she's
10 spoken to him or not.
11    Q. The actual model that you started with,
12 where did that come from that you used for your
13 forecast?
14    A. Came from Excel spreadsheet.
15    Q. Okay. Did you basically have to create
16 the model?
17    A. Yes. It was -- it was supporting
18 information like the historical, actual
19 performance of the City, but it started from a
20 clean Excel spreadsheet.
21    Q. Okay. So the model that's used in the
22 forecasting that you've prepared for Detroit was
23 created for purposes of this bankruptcy. Is that
24 fair?
25    A. It evolved into what we are using in the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 8 of 50

MALHOTRA

1    MALHOTRA
2  bankruptcy.  We did not start off with a model
3  that was created for a bankruptcy.
4     Q.   Okay.  Would it be fair to say that the
5  model that you used for your forecasting was
6  created for the City of Detroit; it didn't exist
7  before your retention by the City of Detroit?
8     A.   The model, the way it stands today,
9  was -- that is correct.  It did not -- it wasn't
10  in existence before we started working on this
11  engagement.
12     Q.   Can you identify any Chapter 9
13  bankruptcy where an expert has done forecasting
14  similar to what you've done in this case?
15     A.   I have not gone and reviewed the
16  Chapter 9 bankruptcy, so I wouldn't be able to
17  comment if they have or have not.
18     Q.   So in preparing the model, you didn't
19  seek to ascertain what had been done in previous
20  Chapter 9 bankruptcies so you could conform what
21  you did to standard practices in Chapter 9
22  bankruptcies; correct?
23     MR. STEWART:  Objection.
24     THE WITNESS:  I don't know how other
25  Chapter 9 bankruptcy financial models are

1    MALHOTRA
2  relevant to Detroit's Chapter 9 financial
3  model.
4  BY MR. SMITH:
5     Q.   Okay.  That wasn't my question.
6     You haven't looked at any other
7  Chapter 9 financial models; correct?
8     A.   I did not go and look at other Chapter 9
9  financial models; that is correct.
10     Q.   So you didn't do any testing of the
11  reliability of your model by comparing it with
12  other models that have been used in other
13  Chapter 9 bankruptcies; correct?
14     A.   What kind of models, though?
15     Q.   Financial models, forecasting models.
16     A.   Yeah, the financial forecasts for
17  Detroit is based on the assumptions for Detroit.
18  So I don't know why Chapter 9 models, the way you
19  said it, in other Chapter 9 filings are even
20  relevant for Detroit.
21     Q.   That's not my question.
22     My only point is you haven't gone and
23  done any testing of your model compared to models
24  that have been used in other Chapter 9
25  bankruptcies, correct, to ensure reliability?

1    MALHOTRA
2     A.   Well, let me just -- yeah, I would like
3  to understand that question better.  Testing in
4  what context?
5     Q.   Any sort of testing.  You never -- you
6  don't even know what -- what was done in other
7  Chapter 9 bankruptcies; correct?
8     A.   Well, that's a broad -- I have some
9  sense of what's going on in Chapter 9 bankruptcies
10  around the country, but not from what's happening
11  in their financial models.
12     So I just don't understand your question
13  of testing a financial model for Detroit against a
14  financial model for another Chapter 9.  Is that
15  your question?
16     Q.   You don't know what financial models
17  have been used in other Chapter 9s; correct?
18     A.   I do not know the components of the
19  financial models of other Chapter 9 cases; that is
20  correct.
21     Q.   Before Ernst & Young was retained, was
22  the City doing any forecasting?
23     A.   Forecasting for what?  Budgets?
24     Q.   Its revenues and expenditures, similar
25  to the forecasts that you've produced in this

1    MALHOTRA
2  case.
3     A.   Well, I'll answer the first part of the
4  question.  I don't know whether they were similar
5  or not.  But, yes, the City goes through a budget
6  process every year in which they produce a budget.
7     Q.   Okay.  And so the City was producing its
8  own forecast before you produced your forecast;
9  correct?
10     A.   The City produces an annual budget which
11  is what I said, every year.
12     Q.   Okay.  And that's a forecast?
13     A.   Yes.  It's a budget for the next year,
14  for one year.
15     Q.   Okay.  So the only -- the length of
16  time -- the standard length of time the City used
17  for its forecasts before Ernst & Young was
18  retained was one year?
19     A.   That is broadly -- that is generally
20  correct, yes.  There was -- I don't remember
21  whether there was specific instances where certain
22  elements of the projection were carried forward
23  longer or not.  But -- and, overall, I would be
24  comfortable saying that, broadly, there were
25  one-year budgets, but there were certain elements

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 9 of 50

MALHOTRA

1 that were probably, you know, taken out longer to
2 see what the impact of those revenues or expenses
3 were.
4 Q. You can't identify any budget for the
5 City of Detroit that's done forecasting over a
6 period as long as 10 years; correct?
7 A. I do not recall of a 10-year budget that
8 the City had at that point in time; that is
9 correct.
10 Q. And the City's budgets, when they were
11 doing their forecasting, were all one-year
12 budgets; correct?
13 A. I thought I just answered that question,
14 that they were -- they used to do a one-year
15 budget in general, and there were certain items
16 that I think they could have had revenues or
17 expenses going on beyond one year.
18 But generally, you're right; the City
19 generally does one-year budgets and now has
20 started -- is going to start doing three-year
21 budgets.
22 Q. Now there's a consensus group that's
23 doing forecasting for the City; correct?
24 A. Consensus group in what way?

MALHOTRA

1 Q. Well, there's a forecast that's called,
2 like, the consensus forecast that is put together,
3 you know, in conjunction with the financial
4 advisory board, I believe?
5 (Telephonic interruption.)
6 MR. SMITH: Do you want to take a break
7 to --
8 MR. STEWART: No.
9 MR. SMITH: Why don't we take a break.
10 Let's get this phone straightened out.
11 THE VIDEOGRAPHER: Going off the record
12 at 9:46 a.m.
13 (Brief pause.)
14 THE VIDEOGRAPHER: Back on the record at
15 9:47.
16 BY MR. SMITH:
17 Q. Mr. Malhotra, have you ever heard of a
18 consensus forecast for the City of Detroit?
19 A. I do not recall hearing of a consensus
20 forecast.
21 Q. Okay. What are the three-year forecasts
22 that you were mentioning?
23 A. There is a triennial budget, and then
24 there's a revenue conference that is used

MALHOTRA

1 partially for the triennial budget. That's what I
2 was referring to.
3 Q. Okay. And is there other -- and there's
4 forecasts done for purposes of that triennial
5 budget; is that correct?
6 A. The triennial budget is being developed
7 in conjunction or, you know, similar to what the
8 first three years of the financial forecast look
9 like for the City.
10 Q. Okay. And so there's a -- are there a
11 group of outside experts who were involved in
12 reviewing that -- that budget and forecast?
13 A. I do not know of external parties
14 reviewing the triennial budget of the City
15 specifically.
16 Q. Do you work with Shavi Sarna?
17 A. I do.
18 Q. What's -- is it Mr. Sarna's role on
19 that, on the project?
20 A. Shavi is one of our managers who is
21 helping on various components of the project.
22 Q. What components?
23 A. He's been looking at Department of
24 Transportation, looking at some of the revenue

MALHOTRA

1 sources maybe on the revenue conference. He's
2 been helping with some of the cash projections. A
3 variety of detailed items.
4 Q. And is he working 100 percent of his
5 time on the City of Detroit matter?
6 A. I believe so.
7 Q. And what, in your view, is the biggest
8 source of untapped revenue for the City?
9 A. Assets sales.
10 Q. What asset sales are a source of
11 potential revenue for the City that you're
12 thinking of?
13 A. DWSD, the parking.
14 Q. Anything else?
15 A. Those are the tangible ones that come to
16 mind, those that the City, you know, could
17 potentially control that come to my mind.
18 Q. And I've seen reference by Mr. Orr that
19 DWSD, if some of the operations were leased, could
20 produce $47 million a year in revenue to the City.
21 Have you seen those estimates?
22 A. I have heard about those estimates, yes.
23 Q. Okay. And are those reasonable
24 estimates?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

1        MALHOTRA
2     A. I can't comment on that.
3     Q. Why can't you comment on it?
4     A. Because that's something that would be
5  better asked of Ken Buckfire whether -- how the
6  $47 million, whether it's reasonable or not.
7     Q. Okay. And you mentioned it's in
8  mediation right now. What exactly is going on
9  there, based on your understanding?
10    A. I don't know.
11    Q. Your forecast doesn't include the
12 47 million that Mr. Orr has mentioned as a
13 potential annual revenue source from DWSD;
14 correct?
15    A. That is correct. We do not have
16 $47 million a year from DWSD included in the
17 forecast.
18    Q. And you don't have any money from
19 privatization or leasing of DWSD in the forecast;
20 correct?
21    A. That is correct.
22    Q. And you don't have any money from
23 privatization of parking in the forecast; correct?
24    A. That is correct.
25    Q. Have you seen estimates of the potential

1        MALHOTRA
2  revenue from privatizing parking?
3     A. I have not seen a direct estimate, but
4  I've heard wide ranges of numbers.
5     Q. What are the ranges of numbers you've
6  heard for privatizing the parking?
7     A. It could be 20 million or 50 or
8  100 million. There was a wide range. But --
9     Q. Okay. Is that on an annual basis or
10 not?
11    A. No, that's in totality.
12    Q. Okay. That would be an up-front payment
13 of between 20 and $100 million?
14    A. I do not --
15    Q. For parking?
16    A. -- know whether it's upfront or not.
17    Q. Who is the most knowledgeable about
18 privatizing the parking?
19    A. I would say Miller Buckfire.
20    Q. Do you know if there are other asset
21 sales or privatization efforts the City has been
22 contemplating or reviewing?
23    A. Yes. There was a sale of the Veteran
24 Memorial Building that got pushed back from fiscal
25 year '14 to fiscal year '15. It's almost

1        MALHOTRA
2  $6 million.
3     Q. And that's in your forecast; correct?
4     A. It is.
5     Q. Are there any asset sales or
6  privatization matters that are not contained in
7  your forecast that you're aware that the City has
8  looked at?
9     A. I'm sorry. It was too long a question.
10    Q. Are there other privatization efforts
11 that the City has looked at that you're aware of
12 that we haven't discussed?
13    A. Not any that I recall right now.
14    Q. Okay. In your view, what are the
15 biggest untapped sources of cost savings for the
16 City?
17    A. That are not -- that are already
18 included in the forecast?
19    Q. That are not included in the forecast.
20    A. Oh.
21    Q. I'm thinking of untapped sources of cost
22 savings. Are there -- what would be the biggest
23 areas of potential cost savings that haven't been
24 incorporated into the forecast?
25    A. I can't recall any off the top of my

1        MALHOTRA
2  head from the standpoint of what has not been
3  incorporated. I'm sure if some of the assets are
4  sold, there will be a corresponding reduction in
5  the level of staffing potentially. Potentially.
6  But I do not -- you know, if there's a specific
7  item that you have in mind, I'd be happy to say
8  whether it's in the forecast or not.
9     Q. The City could always cut costs further
10 by reducing wages; correct?
11    A. Well, the City -- once the City is a
12 part of a collective bargaining agreement, I don't
13 think that's correct.
14    Q. Well, the City could always amend the
15 collective bargaining agreements to reduce wages;
16 correct?
17    A. No.
18    Q. Well, with the unions. It could
19 cooperate with the unions to reduce wages further;
20 correct?
21    A. It's been hard to do, looking at the
22 City's track record. So I don't know whether it's
23 correct or not. It has to be discussed with the
24 unions, ratified by the union members. So it's
25 not an action the City can take unilaterally.

MALHOTRA

two-and-a-half-plus years ago.

Q. Okay. Were there forecasts you created for the City of Detroit that were less than 10-year forecasts?

A. I think we started looking at a five-year forecast sometime probably two-plus years ago. I don't remember exactly.

Q. What was the purpose of that forecast?

A. I would have to go back and check. This is over two years ago. I don't remember specifically when we started developing the forecast. It was, again, to look at the liabilities of the City over a longer term versus on a more short-term basis.

Q. And did you actually complete a forecast -- a five-year forecast for the City?

A. When you say "complete," I mean, we may have had different iterations. I don't know if there was ever something that was complete or not.

Q. So you had more than one iteration of a five-year forecast for the City?

A. Absolutely.

Q. Okay.

A. We would have had different inputs and

MALHOTRA

iterations, just like we have different versions of the 10-year and the 40-year projections.

Q. And do you have possession of the documentation for those forecasts? Or the --

A. The 10 or the 40? I'm sorry.

Q. For the five-year forecast that you did, who has those forecasts and the documentation?

A. It would be somebody either at the City or it would definitely be with our team as well.

Q. Did the five-year forecasts you produced before the bankruptcy use the same model that you've used for the 10-year and 40-year forecasts? Or was it different?

A. I don't recall. I don't recall. This is a long time ago.

Q. Did the same people work on the five-year forecast? I mean, obviously you worked on the five-year forecast; correct?

A. Yeah. I mean, I think on the five-year forecast, if I go back, it was much more -- it was just looking at how large the expenses side would be in terms of the ongoing legacy costs. So I don't recall specifically. I mean, could go back and try and figure out, but this was a long time.

MALHOTRA

Q. Have you ever been asked to produce the five-year forecast in this case?

A. So -- no, I do not know if we have or have not.

Q. Okay. The -- okay. On the 10-year forecast and 40-year forecast, there have been many different versions of that. Would that be fair to say?

A. That is fair. Yes.

Q. When was the first time that you -- what was the first time you did the 10-year and 40-year forecast?

A. Well, I do not recall. I think the 10-year10-year forecast we had a version of in the June 30th -- the June 13th proposal to creditors. That seems around the time frame when we would have had the 10-year forecast sort of come together with the assumptions as of then.

Q. And the five-year forecast, who chose five years for the length of time of that forecast?

A. It was likely somebody at the City. I don't remember.

Q. Okay. The five-year forecast, did you conclude that the City had positive revenues

MALHOTRA

compared to costs during that time or not?

A. I do not recall.

Q. And what was the purpose of preparing the five-year forecast?

A. I do not recall specifically, but I think we are starting to look at the expenses of the City and how the costs were going to continue to grow over the next four or five years.

Q. Since the first ten-year forecast that you prepared, how many times have you created different versions of the 10-year forecast?

A. Lots.

Q. Can you give me an estimate of how many times?

A. Well, it's a dynamic model. So as the assumptions change and get updated, we save a different version. And whatever we have, I guess, has been produced already. So I have not gone back and counted the number of versions.

Q. How many -- are there major changes -- major iterations of the model that have been done? I mean, you mentioned there's one for the plan. There's the July 2nd one. Are there major -- are there other periods -- times when it was

MALHOTRA

1 revised in a major way? I don't know how you
2 would characterize those.
3     A.  Sorry.  Can you ask -- just repeat
4 what --
5     Q.  Well, let me ask again.  You say that
6 the -- you had one version of the ten-year
7 forecast in the plan of adjustment; correct?
8     A.  That is correct.
9     Q.  Okay.  And then the July 2nd revision.
10 You had another version of the 10- and 40-year
11 forecast; correct?
12     A.  That is correct.
13     Q.  What were the big changes between the
14 forecast in the plan and the July 2nd?
15     A.  So we've created a bridge that walks
16 through the changes, but I'll go off the top of my
17 head of what I recall.  The forecasted revenues
18 were updated based on the updated information we
19 had.  We updated the potential LTGO settlement.
20 We updated the economics of the -- the potential
21 economics of a DPOA and DFFA change.
22     We updated the timing and, I think, the
23 cost of the reinvestment and restructuring
24 initiatives.  And I think we updated the

MALHOTRA

1 financing-related changes in terms of the timing
2 for the 10- and 40-year -- those are the big ones
3 that come to mind.
4     Q.  Would it be fair to say that there was a
5 significant reduction in the amount of
6 reinvestment expenditure?
7     A.  I don't know if there was a
8 significant -- I don't know how you define
9 "significant."
10     Q.  Weren't there hundreds of millions of
11 dollars in reduction or not?
12     A.  It would be easier if I had this
13 document in front of me, because there were some
14 of the changes that were more -- maybe
15 operations-driven versus -- or, you know,
16 capex-driven.
17     Q.  Would it be fair to say that you've
18 engaged in a process of continually updating the
19 forecast since you first created it?
20     A.  As the City has reached settlements with
21 different creditors and we have updated those on a
22 continuous basis.
23     Q.  Would it be fair to say that you've made
24 hundreds of changes to your forecast since it was

MALHOTRA

1 first created?
2     A.  I do not know that it's hundreds of
3 changes or not.  I mean, I don't know what you --
4 is a -- is a change in an assumption a change that
5 you're referring to?
6     Q.  Yes.
7     A.  I don't know if there's hundreds of
8 changes in the assumptions from what -- but I
9 don't know.  It's hard for me to define what are
10 the key elements that have changed.  I mean, we've
11 got -- we have produced the information when we
12 have updated information, we reflect that.  And
13 the same thing with the settlements.
14     Q.  So you can't tell me how many changes
15 you've made to your forecast since it was created;
16 correct?
17     A.  I can tell you about the broad
18 assumptions that have changed since we created the
19 forecast.  The exact number of changes, you're
20 correct; I cannot say.  But I can talk about the
21 main assumptions that have changed since we had
22 developed the forecast.
23     Q.  And would it be fair to say that in
24 order to ensure the reliability of your forecast,

MALHOTRA

1 you've continuously updated as assumptions change
2 and other inputs change; correct?
3     A.  That is correct.
4     Q.  Is there any -- has the City made any
5 arrangement to continue -- to continue Ernst &
6 Young's work after the bankruptcy?
7     A.  There is some ongoing work that Ernst &
8 Young will continue to do after the bankruptcy,
9 yes.
10     Q.  What work?
11     A.  We have some work in terms of helping
12 the City implement or review its HR technology
13 systems.  And we're having discussions with the
14 City about an ongoing role in terms of assisting
15 with cash management.  So it's something that's
16 being discussed.
17     Q.  Have you entered into any arrangement to
18 continue updating your forecast after the
19 bankruptcy is confirmed?
20     A.  Not as of yet.
21     Q.  Okay.  But there's -- has there been
22 discussions about that or not?
23     A.  I have to schedule this -- I have to
24 schedule a discussion, which we were trying to do

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

with the CFO and even likely the mayor, about E&Y's role after the bankruptcy is over.

Q. Thus far, there haven't been any discussions about E&Y continuing work on its forecast after the bankruptcy; correct?

A. There have been discussions about cash management and cash forecasting. So when you say -- if you're referring to the 10-year and 40-year forecast, that is a part of the plan of adjustment. I have not had a specific discussion on that as of yet.

Q. Yet. But as of yet, there's been no discussion about Ernst & Young continuing to update its 10-year and 40-year forecast after the plan is confirmed; correct?

A. That is correct. We have had discussions about updating or talking about cash flows and cash management and some of the other work streams that I've mentioned. But we have to -- and John Hill and I have to sit down with the mayor and get more specificity around what we will be doing going forward.

Q. Would it be fair to say that the scope of Ernst & Young's role after the bankruptcy, has

MALHOTRA

been confirmed, has not been agreed upon yet?

A. That is correct.

Q. Do you have any idea when you might work that out with the City? Or is nothing scheduled right now?

A. No. We have been actually trying to schedule something, and it has gotten changed in the last couple of weeks. But -- it's something that we need to do and get done.

Q. Did the City folk cancel a meeting with you?

A. No. It was just our -- John and my schedules didn't meet

Q. Well, you know, John is going to be in town this week; right?

A. I do.

Q. Do you have any plans to talk to him about Ernst & Young's role this week while he's in town?

A. I think John will have his hands full, so, no.

Q. Okay. The -- there are a number of assumptions in the -- in your forecast that you describe in your expert report; correct?

MALHOTRA

A. That is correct.

Q. And some of those assumptions are assumptions that were provided by other parties, such as Conway MacKenzie or the City or other parties; correct?

A. Some of the assumptions, yes, were provided by the other parties, but I'm generally aware of the broad assumptions that are in there, even for those provided by the other parties.

Q. And some of the assumptions for your forecast you created; correct?

A. Yes.

Q. And as you mentioned, the assumptions for your forecast have changed over time, as you've done different iterations of the forecast; correct?

A. Well, the assumptions have changed because of the settlements that have reached. So based on the terms of the settlements, you know, we have updated those. Some of the other assumptions, which are also really extrapolations of run rates, are -- they are generally what they are.

So, yes, as the assumptions -- we have

MALHOTRA

changed the assumptions to reflect updated terms of settlement with different parties for sure.

Q. The initial version of the forecast, 10-year and 40-year forecast you created would no longer be accurate, then; correct?

A. It depends on which line items you're talking about, because the settlements reflect certain line items, not all.

So, you know, it's --

Q. Well, the -- I'm thinking about the entire results, the results from the 10-year and 40-year forecasts that you initially created would no longer be accurate; correct?

A. Could you be more specific on results? Which results are you talking about?

Q. Well, the total numbers for the revenue and costs of the City would no longer -- generated by your original forecast would no longer be accurate; correct?

A. I don't know whether -- I'm just trying to think about the individual line items that have changed to make sure that I can answer your question accurately.

I would say that the latest -- yes, the

Pages 73 to 76

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7004-11  Filed 08/22/14  Entered 08/22/14 21:10:25  Page 14 of 50

MALHOTRA

1      latest updates are probably the best information
2  we have as of date.
3          Whether that makes all of those
4  forecasts -- and I think you used the word
5  "inaccurate." That's -- it's just we have better
6  information today than we had earlier.
7      Q.  Okay.  Your more recent forecasts would
8  be more reliable than your first forecast; is that
9  fair?
10     A.  I would say, yes, the most recent
11 forecasts are the best picture we would have as of
12 date, yes.
13     Q.  Would it be fair to say that the longer
14 the forecast, the less reliable the forecast?
15     A.  It depends on specific line items and
16 assumptions.  But the further you get out there,
17 the -- there is more uncertainty whether each one
18 of those assumptions will play out the way they
19 are in the forecast.
20     Q.  And would you agree that the greater the
21 number of assumptions in your model, the more
22 uncertainty and potential for unreliability there
23 is with the model?
24     A.  No, because --

MALHOTRA

1      Q.  Well, all the other things being held
2  constant, do you agree that the more assumptions
3  that you have in a model, the greater the
4  potential for uncertainty and unreliability?
5      A.  No.
6      Q.  Why is that?
7      A.  Because different assumptions can also
8  offset each other.
9      Q.  Did you rely on any scientific or
10 technical literature in creating your forecast?
11     A.  I'm sorry?  What is --
12     Q.  Well, is there any scientific or
13 technical literature that lays out the methodology
14 you used in your forecast?
15     A.  The financial forecast, the way it's
16 been developed is how it's generally developed by
17 all financial advisory firms.
18     Q.  But that's not my question.  Is there
19 any scientific or technical literature you can
20 identify for me today that lays out the
21 methodology that you used in creating the forecast
22 for Detroit?
23     A.  I do not know of any scientific
24 methodology.  Technical methodology is generally

MALHOTRA

1      well documented all over about financial advisers,
2  how to create projections, look at the historical
3  performance.
4          So, yeah, that's generally technical in
5  nature, but not scientific.
6      Q.  But so the -- but is there any treatise
7  or other publication that you can identify for me
8  today that lays out the technical methodology you
9  used for the Detroit forecast?
10     A.  I would say any financial journal that
11 you will pick up, from a financial adviser's
12 standpoint, has tons of articles written on how to
13 build good -- develop reasonable forecasts.
14     Q.  But can you identify one article,
15 sitting here today, that contains the specific
16 methodology you used in the Detroit forecast?
17     A.  I do not recall one off the top of my
18 head, no.
19     Q.  Before the Detroit matter, what was the
20 longest period of time you ever did a forecast of
21 revenues or expenditures for?
22     A.  I would say somewhere maybe between five
23 and ten years.
24     Q.  And you've never done -- I think you

MALHOTRA

1      testified you'd never done a forecast for a
2  municipality before Detroit; correct?
3      A.  No, I did not testified to that.  I
4  testified that I've done it for Detroit Public
5  Schools.  I've developed a forecast for Detroit
6  Public Schools.
7      Q.  But for an actual city, municipality,
8  you've never done a forecast before Detroit's;
9  correct?
10     A.  For a city, that is correct.
11     Q.  You did some forecasting for the Detroit
12 Public Schools?
13     A.  That's right.
14     Q.  What was the length of time that you
15 forecast for the Detroit Public Schools?
16     A.  I would have to go back and look.  It
17 could have been up to five years.  It was probably
18 somewhere in that neighborhood or shorter.  I
19 would have to go back and check.
20     Q.  Are your forecasts that you've created
21 in this case based on the business judgment of any
22 City officials?
23     A.  I would say yes.
24     Q.  And yet you -- which City officials

MALHOTRA

would -- who exercised their business judgment are
your forecasts based on?

A. In terms of whether -- understanding the
assumptions that were in here, Kevyn Orr, you
know, John Hill. So, I mean, Brent, who is a
former budget director. There were several folks
who at least understood the broad assumptions that
are in the forecast.

Q. And how does the business judgment of
Detroit officials impact your assumptions, or in
what way were you using that?

A. Could you repeat that question for me,
please.

Q. How did business judgment of City
officials play into your forecasts?

A. So -- and maybe I should have asked this
earlier. Can you just -- what do you mean by
"business judgment of the City officials" in the
context of the forecast? Can you just give me
a --

Q. Well, I read your prior depositions, and
I think you had said that you relied on the
business judgment of City officials. So I'm
trying to use your term, and I'll ask you to

MALHOTRA

elaborate on that.

A. Okay. So could you ask me the question
again, please.

Q. I'm just asking, how did -- I guess
what -- what -- when -- it would be fair to say
that the assumptions in your forecast depend on
certain policy choices by Detroit officials;
correct?

A. Yes.

Q. And, currently, the City is being run by
an emergency manager; correct?

A. That is correct, for -- the -- for some
part. I think they're sharing with Detroit's
mayor and city council for certain aspects, but,
yeah.

Q. And the emergency manager is going to
leave in the fall; is that your understanding?

A. That's what's reported in the press.
That's what I read.

Q. Is that consistent with whatever
information you have working for the City?

A. I do not have any other information
other than what I've read in the press.

Q. And in the future during the ten-year

MALHOTRA

period, there may be different decision-makers who
are responsible for determining Detroit's policies
than the current decision-makers; correct?

A. That's right. I think there's going to
be some form of a govern -- an advisory board.
But, yes, there will be -- you know, as people
transition into new roles, with any organization,
there would be new people coming in to fill those
roles.

Q. And the new people who are in charge of
Detroit during the 10-year period may decide to
embark on different policies choices than you've
assumed in your forecasts; correct?

A. They may or may not. I cannot speculate
what they decide to do.

Q. It would require you to speculate to
determine what policy choices Detroit's future
leaders will make during the next 10 years;
correct?

A. That's right. It would be speculating
on that point.

Q. And, in fact, it's possible that there
will be corrupt individuals who will be making
policy choices for Detroit in the future; correct?

MALHOTRA

A. I cannot answer that.

Q. That's a possibility, isn't it?

A. Anything is a possibility.

Q. And, in fact, in the past, there have
been corrupt individuals who have made policy
decisions for the City of Detroit; correct?

A. I read what's in the press, but I do not
know what policy decisions have been made in the
context of the general fund, so I cannot comment
on that.

Q. Well, I mean, there have been people
that have went to jail who were leaders of the
City of Detroit in the recent past; correct?

A. I've seen the press on that.

Q. And so it's not outside the realm of
possibility that there might be individuals who
are engaged in criminal activity or corrupt
practices who are making policy decisions for
Detroit during the next 10 or 40 years; correct?

A. You can make any possibility that you
want. I do not know about any -- I don't want to
comment on that specific possibility or -- which
is just, you know, a possibility of anything.

Q. Okay. But you'd agree it's possible

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1              MALHOTRA
 2   that corrupt or criminal activity may be engaged
 3   in by Detroit's leaders during the period of your
 4   forecast; correct?
 5        A.  You know what?  There's a possibility.
 6   Anything can happen.
 7        Q.  The assumptions in your model you
 8   mentioned had changed because of certain
 9   settlements; correct?
10        A.  That is correct.
11        Q.  Are there changes that have been made to
12   the assumptions in your model over time that are
13   not the result of settlements?
14        A.  Yes.
15        Q.  And what kinds of changes in the
16   assumptions would those be?
17        A.  It's based on getting updated
18   information.  So, for instance, the stated -- the
19   state budget was approved for fiscal year '15 just
20   recently, because of which we had not initially
21   updated the State aid number.  But we went ahead
22   and did so in the July 2nd update because we
23   received confirmation from the State that the
24   budget had been approved.  And the incremental
25   State aid appropriation used the same methodology.
```

```
 1              MALHOTRA
 2   So the methodology did not change from what it was
 3   in the past; but basically now that we had a
 4   source of data that had been confirmed, we updated
 5   that.
 6           We updated the assumptions with regards
 7   to what the City would offer potentially for DPOA
 8   and DFFA, even though there was not a settlement
 9   with them, but using the assumption that the cost
10   would be the same as it was with DPLSA and DPCOA.
11   For property taxes, we received the latest
12   information with respect to the State equalized
13   value and updated the model based on that latest
14   information that we had received.  Again, not
15   changing methodology.
16           So when we receive updated information
17   with respect to firming up a recent trend better
18   so that we can extrapolate, those are some of the
19   examples that we've used.
20        Q.  Would it be fair to say that there have
21   been a number of material changes in the model
22   since you first created it for your forecast?
23           MR. STEWART:  Objection.
24           THE WITNESS:  How do you define
25        "material"?
```

```
 1              MALHOTRA
 2   BY MR. SMITH:
 3        Q.  Well, I guess -- I guess I'm asking you:
 4   How would you define "material"?
 5        A.  Well, settlement, the settlements we
 6   have reached or the City has reached are material.
 7        Q.  Are there other material changes?
 8        A.  I would have to go back and look at the
 9   bridge.  But in my view, the major changes that
10   have happened are in context of the settlement.
11   And, of course, there have been changes, some that
12   make the forecast better, some that make the
13   forecast slightly worse so -- which at times may
14   or may not fully offset.
15           But the big changes that have been
16   incorporated into the forecast that I know of are
17   the settlements.  Some of the timing of the
18   expenses have changed.  But the biggest crux of
19   the changes have been the settlements.
20        Q.  Okay.  But outside of the settlements,
21   there have been big changes to the model that
22   don't have to do with the settlements; is that
23   fair?
24           MR. STEWART:  Objection.
25           THE WITNESS:  Could you define what you
```

```
 1              MALHOTRA
 2   define as "big" in this context.
 3   BY MR. SMITH:
 4        Q.  Well, you just mentioned we're talking
 5   about big changes, so --
 6        A.  So we're talking about big settlements,
 7   I thought.  Those are the big changes.
 8        Q.  What are the most significant changes to
 9   the model outside of the settlements that have
10   impacted the dollar amounts?
11        A.  So I would say we have gone ahead and
12   updated the State aid revenue.  We have gone ahead
13   and updated the property tax revenue.  We have
14   updated the casino taxes.  We have updated from
15   what we received, some of the reorganization and
16   reinvestment timing.  And these are, again -- you
17   know, compared to the plan of adjustment that was
18   filed on May 5th.
19           We've updated some of the financing
20   changes in terms of the assumptions on the
21   financing.
22           I'm trying to think what else is not
23   settlement-related.
24           Those are the big ones that come to my
25   mind right now.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

correct?

A. Two years from now, I cannot predict that every single line item of revenues and expenses will be exactly the same as it is in the forecast today.

Q. And you also -- you can't predict that two years from now the total amount of revenue and expenditures will be the same as it is in the model today; correct?

A. In two years I cannot say whether the exact total of the revenues for that 10 years will be exactly the same or if the exact -- expenses will be exactly the same or if they offset each other. I cannot tell.

Q. How many inputs and assumptions are there in your model?

A. There are -- we can go through the line items, and I can talk to you about the assumptions. But there's a lot of line items, and there's assumptions in there. So --

Q. Well, are there --

A. -- I don't have the number of assumptions.

Q. Are there more than 100 assumptions and

MALHOTRA

inputs?

A. I do not know if there are over a hundred assumptions or -- I mean, it's -- if there are over 100 discrete assumptions or not. I would say that some of these are basic extrapolations of what has happened in fiscal year '12 or '13, continuing. Some of these are directly picked up from a third-party data source. So I'm -- you see my -- I'm just like --

Q. I'm saying assumptions or inputs to cover all these things. Would there be more than 100 assumptions or inputs in your model?

A. I cannot tell.

MR. SMITH: We should take another break.

MR. STEWART: Okay. That's fine. We haven't even been on the record an hour.

MR. SMITH: Okay. Well, I'm not requesting it, Geoff, so if you want to complain about it --

MR. STEWART: It's okay.

THE COURT REPORTER: I thought it was about an hour, and I --

MR. STEWART: It's okay, but we can't

MALHOTRA

keep breaking on the hour. There are lots of questions and people have planes to catch.

(Discussion off the stenographic record.)

THE VIDEOGRAPHER: Going off the record at 10:59.

(Short break taken.)

THE VIDEOGRAPHER: We are back on the record at 11:05.

BY MR. SMITH:

Q. Mr. Malhotra, can you identify any time where Ernst & Young has ever done a forecast for a city that's as long as 10 years?

A. I have not. I do not know about Ernst & Young. I mean, request practice or other tax practices --

Q. Sitting here today, though, you can't identify any such instance; correct?

A. I do not know what -- it's a large firm, and I do not know -- I can tell you that -- I have not done a 40-year for a city before.

Q. And in your forecast, you haven't included funds necessary for Ernst & Young to update the ten-year forecast after the bankruptcy;

MALHOTRA

correct?

A. There is not a specific line item that has been called out for ongoing professional fees for EY in the context of updating the forecast.

Q. And you haven't included funds for Conway MacKenzie or any other advisers to do work on a forecast going forward after the bankruptcy; is that correct?

A. In -- in context of the -- specifically the restructuring advisers currently, we haven't -- we do not have a specific discrete line item to identify incremental fees for EY or Conway MacKenzie.

Q. And have you assumed -- have you included any professional fees for Conway MacKenzie after the bankruptcy has concluded, in your forecast?

A. Whether it is specifically included as a discrete line item or if it could be absorbed in some of the actual project implementation costs for both EY and Conway MacKenzie, it's something that we would have to work through.

But I do not have a specific line item, and the restructuring professional fees line for

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 18 of 50

1          MALHOTRA
2  ongoing assistance beyond the bankruptcy if there
3  is ongoing work and if there's a possibility that
4  within the different projects those fees get
5  absorbed, I do not know yet.
6      Q.   As the forecast stands now, you don't
7  have any money in the forecast currently for
8  ongoing work after the bankruptcy by Ernst & Young
9  or Conway MacKenzie; is that fair?
10     A.  I thought I just answered that:  If it
11 isn't -- if it could be embedded in the individual
12 implementation projects of the restructuring,
13 that's something we'll have to see.
14         You are right.  I do not have any
15 restructuring professional fees in that line item,
16 any more fees beyond the restructuring period.
17     Q.   Okay.  I mean, there's no -- you're not
18 assuming that -- Ernst & Young or Conway MacKenzie
19 will continue work for the City after the
20 bankruptcy, in your forecast?
21     A.  That's not true.
22     Q.   Okay.  How are you -- I mean, are you
23 assuming one way or the other?
24     A.  Well, EY, as I've already mentioned to
25 you, is going to continue work on the HR

1          MALHOTRA
2  implementation project, and the fees for that will
3  likely come out of the HR implementation budget.
4      Q.   What is the HR implementation project?
5      A.  It's to help the City transition its
6  existing payroll systems to a new system.
7      Q.   Is the City -- is the City still
8  producing one-year budgets, correct?  Is that
9  correct or -- or not?
10     A.  I think they are still going through
11 this interim process of a one-year budget, I
12 believe.  But I need to make sure that they're
13 still doing one year or is it just the three years
14 and the one year is a component of that.
15     Q.   In the ordinary course of its business
16 operations, the City is currently doing only
17 three-year budgets or potentially one-year
18 budgets; is that correct?
19     A.  That would be correct.
20     Q.   Do you agree that there's some
21 restructuring and restructuring activities the
22 City is planning to undertake that don't cost any
23 money, such as changing policies or things like
24 that?
25     A.  Changing what policies?

1          MALHOTRA
2      Q.   Well, any -- I mean, some of the,
3  quote/unquote, restructuring activities I've seen
4  are things like make operations more efficient or,
5  you know, things like that.
6      A.  Things like what?
7      Q.   Well, why don't I ask you this:  Do you
8  agree that there are some restructuring activities
9  the City is planning to undertake that would save
10 money?
11     A.  Yes.
12     Q.   And do you agree that there's some
13 restructuring activities the City is planning to
14 undertake that would, on balance, lead to
15 increases in revenue for the City?
16     A.  Could you ask me that again.
17     Q.   Are there some restructuring activities
18 the City is planning to undertake that would, upon
19 balance, lead to increases in revenue for the
20 City?
21     A.  There are some restructuring and
22 reinvestment initiatives that will lead to
23 increased revenues for the City.
24     Q.   And there are restructuring activities
25 that will bring in more revenue than they will

1          MALHOTRA
2  cost; correct?
3      A.  It depends on what time frame.
4      Q.   Well, but there were some restructuring
5  activities the City is going to undertake where
6  the benefits in terms of increased revenue, where
7  a reduction in costs outweigh the costs of the
8  initiative; correct?
9      A.  It depends on what time frame, because
10 you have to see when -- the overall result in
11 increased revenues compared to the costs incurred.
12     Q.   Yeah.  At the end of the -- over the
13 course of your projections; right?  Over the
14 course of your 10-year projection, there are
15 restructuring activities where the benefits
16 outweigh the costs of the restructuring activity;
17 correct?
18     A.  I'm not sure about that.  There's a
19 billion four in restructuring and reinvestment
20 costs.  And I don't know if over the ten years if
21 there is a billion four of revenue.
22     Q.   Okay.  So the City isn't -- you would
23 agree with me that the City is engaging in some
24 restructuring activities that have a -- that have
25 a negative cost benefit; correct?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 19 of
50

MALHOTRA

A. Maybe over 10 years, but it probably changes over 40 years to -- for the revenues to get better.

Q. You agree -- you know that the City is planning to spend hundreds of millions of dollars on blight reduction; correct?

A. That's correct. There's $420 million in the current forecast, 50 million of which is going to be reimbursed by the hardest-hit funds.

Q. Okay. And do you know -- has the amount of blight reduction funding decreased over the course of your forecast, the various iterations?

A. I believe we had a number of, close to $500 million earlier. That went down to 420 million.

Q. Do you know why there was a reduction?

A. There was a reduction because of the overall level of contributions the City was committing to the pension systems.

Q. Okay. So did the -- the blight-reduction funds, were they reduced because the City was increasing contributions to pensions?

A. I don't know if it was only that or if it was the -- I don't know if that was the only

MALHOTRA

reason. But, yes, that's one I recall in which the $500 million went down to 420.

Q. Was one factor in the reduction of the blight expenditure the City's decision to increase money to the pensions?

A. It was to not increase money to the pensions. It was for the City to reach a settlement on the pensions and the amount of money that was required.

Q. And are you incorporating into your forecast any increase in revenue or decrease in the costs attributable to blight-reduction efforts by the City?

A. I believe that in the restructuring and reinvestment scenario, there is an overall increase in the revenues that has been assumed from the overall restructuring and reinvestment initiatives.

Q. Do you agree that the costs of the blight reduction outweigh any revenues or cost reductions that you've incorporated into your forecast?

A. Over what time frame?

Q. Either the 10- or 40-year period.

MALHOTRA

A. Over the 10-year period, I do not -- of the net 350 million that the City is spending, I would have to go back and look exactly how much increased revenue between all of the different initiatives has been included.

But over 40 years, if you were to extrapolate, you know, I think the increased revenues would be higher. But I do not know exactly. It would be easier to look at the exhibits and then walk through it.

Q. Okay. But sitting here today, you understand that over the 10-year period, the costs of blight reduction exceed any benefits; correct?

MR. STEWART: Objection.

THE WITNESS: No, I don't. Exceed any benefits?

BY MR. SMITH:

Q. You agree that the costs of blight reduction exceed any revenues for cost reductions that the City attributes to blight reduction over the 10-year period; correct?

A. In a direct financial standpoint from what I can relate it to, the answer is correct. Because there's probably indirect benefits of

MALHOTRA

blight removal, which I cannot talk about.

But from a direct-blight standpoint, it's -- I know the City has increased revenues towards the last five years of the first ten. If you look at that run rate, it's the -- the blight expenditures that have being spent could theoretically be reimbursed -- you know, be recuperated sooner.

But -- so it's just -- I don't have a direct answer, because you're spending the money over 10 years and there's increased revenues over the first 10 years; but the run rate in the last five years is much higher than it is in the first five years. I don't know if that answers your question.

Q. Yeah, but the total amount, if you calculate up the total amount -- well, first, let me ask you this. You say increase in revenues. There's -- is there a line item for increase in revenues specifically from blight reduction, or is it increase in revenue from all the reinvestment activities?

A. It's the latter. It's broken out -- well, there's three items. There's a discrete

Pages 101 to 104

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 20 of 50

MALHOTRA

1    **MALHOTRA**
2    **to Conway MacKenzie in terms of that billion four,**
3    **if -- what assistance is being provided, if any,**
4    **by the State, because I know the State does**
5    **continue to provide specific grants that work**
6    **through the different departments.**
7    Q.  You're not aware of any special funding
8    that State has designated for reinvestment and
9    restructuring Detroit?
10    **A.  I believe the hardest hit funds of the**
11    **$50 million -- $52-1/2 million I think are coming**
12    **through the State.  I'm not sure.**
13    Q.  Is it your understanding that the
14    194 million that the City is receiving from the
15    State doesn't have to go into the pension fund but
16    could be used to pay other creditors?
17    MR. STEWART:  Objection.
18    THE WITNESS:  No, that's not my
19    understanding.
20    BY MR. SMITH:
21    Q.  Okay.  It has to go into the pension
22    fund?
23    **A.  Yes, that is my understanding.**
24    Q.  Okay.  And is that the way your forecast
25    treats that money?  Is it accounted for in your

1    MALHOTRA
2    forecast?
3    **A.  Yes.**
4    Q.  Would it be fair to say that the
5    emergency manager made significant progress in
6    cutting costs and increasing revenues before the
7    bankruptcy petition was filed?
8    **A.  What did you mean "significant"?**
9    Q.  Well, use your definition of
10    "significant."
11    Would you say that the emergency manager
12    had made significant progress in cutting costs and
13    increasing revenues before the bankruptcy petition
14    was filed?
15    **A.  I don't know what your definition of**
16    **"significant" is.  I will say that the emergency**
17    **manager -- I don't know about the revenue**
18    **initiatives, but -- in my view, I think there was**
19    **some ongoing cost cutting even continuing then.**
20    Q.  Okay.  So using your definition of
21    "significant," did the emergency manager make
22    significant progress in cost cutting before the
23    bankruptcy petition was filed?
24    MR. STEWART:  Objection.
25    THE WITNESS:  I would have to go back

1    MALHOTRA
2    and look at the projections or the actual
3    costs before and after to be able to answer
4    that.
5    BY MR. SMITH:
6    Q.  Okay.  Did the City initiate plans to
7    improve tax collection before filing the
8    bankruptcy petition?
9    **A.  The City has been working on trying to**
10    **improve tax collections the entire time.  I mean,**
11    **it's an ongoing process to improve the process,**
12    **you know, collection efforts in any fashion**
13    **possible.**
14    Q.  There is significant revenues that are
15    owed in taxes that the City has not collected each
16    year; correct?
17    **A.  I do not know about that.**
18    Q.  Well, how much in revenue -- do you know
19    how much in revenue the City is not collecting
20    each year in taxes?
21    **A.  I do not.**
22    Q.  So you haven't done any analysis that --
23    in your forecast to try to quantify amount of
24    revenue that could be obtained through increased
25    tax collection?

1    MALHOTRA
2    **A.  EY has not done an analysis on**
3    **delinquent taxes today and what efforts could be**
4    **made to collect those delinquent taxes.  I know**
5    **the City has been working on, you know, providing**
6    **relief so that people come out and -- or amnesty**
7    **programs, and we know that the City has made good**
8    **efforts on those.**
9    **I do not -- we have not gone out -- EY**
10    **has not gone out to try and come up with a**
11    **collection effort for any delinquent taxes.**
12    Q.  But over the 10-year period of your
13    forecast, you haven't quantified the amount of
14    taxes that will go uncollected if current trends
15    continue; correct?
16    **A.  We have a collection-rate assumption in**
17    **the forecast that continues to improve over the**
18    **forecast period.  So I would have to go back and**
19    **see if we can quantify what -- your question.  But**
20    **I know that we are assuming that the collection**
21    **rates would actually increase over the forecast**
22    **period.**
23    Q.  Is that true for all taxes?
24    **A.  Well, at least in the big one where --**
25    **in property taxes, I believe that is the case.  We**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 21 of
50

MALHOTRA

can go down the line. On casino taxes, there is
no issue because the collection rates are fine.
On the income taxes, I would have to go back and
check.

Q. As far as you're aware, on the income
tax you haven't incorporated an estimate in your
forecast for an increase in revenue that would
occur if there were withholding for reverse
commuters or if there was piggybacking with state
taxes; correct?

A. That is correct. We have not got a --
we do not have in the baseline an initiative
specifically on the reverse-commuter tax issue.

Q. And it's not in the restructuring
scenario either; correct?

A. I do not think it is, but I would -- you
should confirm that with Conway MacKenzie.

Q. Okay. Or would it be Mr. Cline that did
that, or --

A. On the specific reverse commuter, if
it's -- if that revenue has been -- if that
revenue has been included in the restructuring and
reinvestment operating initiatives, you would have
to talk to Conway MacKenzie about that.

MALHOTRA

Q. Okay. So sitting here today, though, as
far as you're aware, it's -- there's not been a
specific addition for implementing income tax
withholding or piggybacking with the state tax;
correct?

A. That is correct. Not that I know of.

Q. And there have been no -- you haven't
attempted to forecast what would happen if tax
rates increased; correct?

A. Which tax rates?

Q. Any of the tax rates. You haven't built
in an increase for any tax rates in your
forecasting model; correct?

A. That is a policy question. Yes, we have
not baked any increases in the tax rate, because I
think they're already at the max in certain cases.
But we have left tax rates where they are today.

Q. But the State and the City, in the
cooperation, could raise any of the tax rates;
correct?

A. I don't know what legislation is
required for that. You would have to ask the
State or the City. It's a policy question.

Q. Are there any policy -- potential policy

MALHOTRA

changes that you have factored into your forecast?

A. I would have to go back and check.
Not -- nothing that comes to mind specifically.
If you were to ask me a more detailed question,
I'd be able to answer.

Q. Over the 10-year period, one thing that
can obviously impact your forecast is if there are
changes in policy, such as change in tax rates or
other policy changes that affect revenues or
costs; correct?

A. If you change the assumption, the
numbers will change. You are correct.

Q. Where did you get the assumption to hold
tax rates constant?

A. That was the -- discussion with the
emergency manager.

Q. Where did you get the assumption to --
as far as you're aware, not incorporate, you know,
withholding for the income tax or piggybacking
with the state tax?

A. I do not recall. My -- I do not recall
specifically because there was not enough
substantive information that was available to
judge what, if any, that impact was. But I was

MALHOTRA

not a part of those discussions.

Q. Do you agree the City is able to pay its
bills right now?

A. What bills?

Q. All of its bills. I mean --

A. Well, under the restructuring scenario,
it's different. So you have to be more specific
about what bills. While the City is in bankruptcy
or . . .

Q. You included in your forecast, I think
it is called, a contingency fund or something like
that. Do you recall that?

A. A contingency reserve.

Q. Or reserve. And how much is that?

A. We used about -- we used 1 percent of
revenues.

Q. And how much money does that work out
to?

A. On almost $11 billion of revenues -- on
more than $11 billion of revenues, it's about
$100 million of contingency.

Q. And before the City went into
bankruptcy, did it have a contingency reserve?

A. It wasn't discretely called out. I do

Pages 137 to 140

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 22 of
50

MALHOTRA

Q. Can you identify any city in fiscal crisis that's planning to spend approximately a billion dollars in new reinvestment spending?

A. I do not know of another city which is probably in the same condition as Detroit, but that would be -- I do not know.

Q. Can you identify any city that's planning to spend approximately a billion dollars in new reinvestment while not raising tax rates?

A. I do not know.

Q. Can't identify such a city?

A. I haven't done the analysis to go out and take a look.

Q. So you can't identify any examples?

A. I just said I do not know.

Q. Can you identify any cities that are planning to spend hundreds of millions of dollars on blight reduction?

A. I do not know.

Q. Can't identify any such a city; correct?

A. I haven't gone out and done this particular analysis, so I do not know.

Q. You agree that not every city has a municipal income tax; correct?

MALHOTRA

A. That is correct.

Q. And there are many cities that don't have wagering tax; correct?

A. That is correct.

Q. And there are cities that don't have access to a corporate tax; is that correct?

A. I assume so. I do not know for sure.

Q. Okay. Would it be fair to say that Detroit has revenue streams from tax sources that other cities lack, other comparable cities?

A. I would say Detroit has used taxes from sources to fund its expenditures that other cities have not had to maybe use to fund their expenditures.

Q. Okay. And your -- one assumption of your forecast is that there will be no new taxes that are created to provide new revenue. Is that fair?

A. It's a tax policy question. From a tax policy standpoint, we've just left the existing policy as is over the forecast period, essentially.

Q. Okay. So one of your assumptions is there won't be any new taxes that don't currently

MALHOTRA

exist; correct?

A. Or may replace existing taxes in some fashion.

Q. And where did that assumption come from?

A. We've left the tax policy the same as it is today.

Q. And did that come from the emergency manager?

A. That's what I thought I said earlier.

MR. SMITH: Okay. Why don't we take a break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Going off the record at 12:12 p.m. This is the end of Tape No. 2.

(Short break taken.)

THE VIDEOGRAPHER: We are back on the record at 12:21. This is the beginning of Tape No. 3.

BY MR. SMITH:

Q. Mr. Malhotra, you agree that it's possible to increase the money available to pay creditors by changing the assumptions in your forecast; correct?

A. If you change the assumptions, the

MALHOTRA

numbers will change.

Q. So that's correct?

A. I just said if you change assumptions, numbers change. Depends on what assumptions you change.

Q. It's possible to change the assumptions in a manner that will increase the money available to pay creditors; correct?

A. Like what assumptions are you referring to?

Q. Well, you could increase tax rates and potentially increase the money available to pay creditors; correct?

A. If you have more revenue in the forecast than is currently projected, you will have more money.

Q. So it's possible to change the assumptions in your forecast to provide more money for creditors; correct?

A. If -- if you change -- you have to look at it in aggregate. If you change a particular discrete assumption and assume everything else remains the same and if you assume in that particular scenario there's more revenue and

Pages 145 to 148

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 7004-11    Filed 08/22/14    Entered 08/22/14 21:10:25    Page 23 of 50

MALHOTRA

everything else is the same, yes, there will be
more money.

Q.   And you're not claiming that it's
impossible for the City to pay creditors more
money than is reflected in your forecast; correct?

A.   You say "impossible." It's -- I mean,
the City has -- if you change the assumptions on
any of these items, the money could go up or the
money could go down.

Q.   And so it's certainly possible -- well,
we covered that already. And we've also covered
that you're not doing any comparison between the
scenario of the dismissal of the petition and the
restructuring scenario; correct?

A.   Well, like your question was, have I
been asked to do a dismissal scenario? Not
directly. But the baseline scenario, if you look
at some of the line items, they're going to be the
same as in a dismissal scenario, likely, which is
going to make the baseline scenario reflective of
some of those line items what the City is likely
to face.

Q.   And some of the line items would be
different in the baseline scenario and dismissal;

MALHOTRA

correct?

A.   There could be. It would be -- if I
look at each one of those line items, some of the
assumptions, for instance, on pension, right, may
or may not change. But, you know, for instance,
some of the retiree healthcare projections, I
mean, if you look at the baseline scenario -- and
again, going by memory, even if you are to add the
reinvestment expenditures in there, you're looking
at somewhere close to a $5 billion deficit based
on the assumptions that were in there in the
baseline. And some of them will just get
replicated for a dismissal scenario.

Q.   And there are some things you don't --
you don't know what's going to happen after
dismissal, right, because you haven't investigated
it; correct?

A.   I have not done a specific analysis on
each of a dismissal scenario; but I can say that,
you know, the payroll assumptions will not change
that much. Payroll is what it is. The revenues
are -- generally are what they are. The -- I'm
trying to go by memory.

Retiree healthcare will continue to be,

MALHOTRA

you know, increasing. And there may be some
changes in pension. DDOT subsidy will continue to
go as is. So --

Q.   Well, you agree that there's a large
disparity in the recovery between the bondholder
creditors and the retiree creditors under the
plan; correct?

MR. STEWART:   Objection.

THE WITNESS:   I don't know what you
define by "large disparity."

BY MR. SMITH:

Q.   Well, there's a large numerical
disparity in terms of percentages that bondholders
recover versus the retirees; correct?

MR. STEWART:   Objection.

MR. ALBERTS:   Objection.

THE WITNESS:   A large disparity? I
would say that based on the assumptions that
are shown in the 40-year, based on those
assumptions, the pension recoveries under
those assumptions are higher. OPEB is the
same as some of the other unsecured
creditors.

BY MR. SMITH:

MALHOTRA

Q.   But my client you know is getting a lot
less than other creditors in the bankruptcy;
correct?

A.   The COPs are getting the same treatment
as OPEB and -- in terms of the numerical recovery
under the assumptions we've used and the other
unsecured creditors.

Q.   What's the percent recovery of OPEB
versus its claims?

A.   I think it's roughly 10 percent.

Q.   And other unsecured creditors, who are
you thinking of?

A.   Yeah. Those are the general other
unsecured creditors, which is about 10 percent as
well.

Q.   And the percent of recoveries, you can't
represent that those would remain the same in a
dismissal situation if you don't know what percent
recovery would be; correct?

A.   Yeah. I would not know for each one of
the classes what that would mean, because in a
dismissal, I have not thought through how each
class would get impacted. But what I can say,
based on that baseline scenario, is the City's

1        **MALHOTRA**
2    **access to funds, I mean, the City is likely to**
3    **have huge deficits from that baseline scenario**
4    **assumption.**
5        Q.   You can't -- you can't --
6            MR. STEWART:  He didn't finish his
7        answer.
8    BY MR. SMITH:
9        Q.   You can't --
10           MR. STEWART:  Mr. Malhotra, did you
11       finish your answer?
12           THE WITNESS:  I was just about -- I
13       wanted to just make clear that the City was
14       showing huge deficits based on the
15       assumptions in that baseline scenario, and
16       some of which are going to be very similar to
17       a dismissal scenario.
18   BY MR. SMITH:
19       Q.   And some of them will be different;
20   correct?
21       **A.   Some of them, yes.  Like pension comes**
22   **to mind, may or may not be different.  I would**
23   **have to look at that.**
24       Q.   And it's certainly possible some of the
25   creditors may receive higher recoveries under the

1            MALHOTRA
2    dismissal scenario; correct?
3            MR. STEWART:  Objection.
4            THE WITNESS:  I don't know.  I haven't
5        done that math.
6    BY MR. SMITH:
7        Q.   Nobody from the City has asked you to do
8    that kind of analysis; correct?
9        **A.   That is correct.**
10       Q.   Has the City already implemented a
11   software system for improved tax collections?
12       **A.   I do not know.**
13       Q.   You'd agree that it's possible for the
14   City to reduce overtime if the petition is
15   dismissed; correct?
16       **A.   I'm sorry.  Can you please repeat that.**
17       Q.   The City can reduce overtime costs if
18   the petition is dismissed; correct?
19       **A.   How?**
20       Q.   Not as many overtime hours.  I
21   mean, it's within the City's discretion how many
22   overtime hours that it has its workers work;
23   correct?
24       **A.   No.  It depends on the level of service**
25   **that has to be provided and the manpower you have,**

1            MALHOTRA
2    so --
3        Q.   And the City decides the level of
4    service; correct?
5        **A.   Yes.  It's the City and it's what the**
6    **citizens require for some level of service.  So I**
7    **don't know if the City will be able to reduce**
8    **overtime if the bankruptcy is dismissed.**
9        Q.   The City certainly has the power to
10   reduce overtime if the bankruptcy is dismissed;
11   correct?
12       **A.   It would depend on the level of service**
13   **and the staffing.  And my guess is within that**
14   **comes in the collective bargaining agreements, so**
15   **I'm not sure I can answer that, that the City**
16   **can -- whether the City can or cannot reduce**
17   **overtime.**
18       Q.   So you haven't looked into whether the
19   City can reduce overtime if the petition is
20   dismissed; correct?
21       **A.   Yeah.  It's -- we have assumed that in a**
22   **baseline scenario, for instance -- maybe if I can**
23   **refer to that -- that the level of overtime is**
24   **reflective of the current overtime run rate the**
25   **City is experiencing.  So if the case is**

1            **MALHOTRA**
2    **dismissed, I don't know what impact that actually**
3    **has on that overtime.**
4        Q.   Can you identify any Chapter 9
5    bankruptcy where a City claimed that it could
6    reliably costs -- costs -- forecast costs and
7    revenues over a period as long as 10 years?
8        **A.   I have not looked at the other Chapter 9**
9    **plans.  But this is the best information we can**
10   **pull together, at least for Detroit.**
11       Q.   So there's no City that you're aware of
12   that is claiming that it could forecast costs and
13   revenues for a period as long as 10 years
14   reliably; correct?
15       **A.   I do not know whether they do or do not.**
16   **I haven't done -- I haven't looked -- I haven't**
17   **undertaken an exercise to go out and look at what**
18   **other cities would be doing in this context.**
19       Q.   So you haven't looked to see whether,
20   No. 1, other cities even try to forecast costs and
21   revenues for a period as long as ten years;
22   correct?  That's not something you've
23   investigated?
24       **A.   I have not, no.**
25       Q.   And you also haven't looked --

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7004-11    Filed 08/22/14    Entered 08/22/14 21:10:25    Page 25 of
50

MALHOTRA

investigated what methods, if anything, a city
that has been -- that might attempt to forecast
costs or revenues over a period as long as 10
years has used to ascertain what reliable methods
are out there that have been used?

A. I'm sorry. That was way too long a
question.

Q. You haven't done any investigation to
identify whether there are methods that have
reliably been used to estimate costs and revenues
for a City for a period as long as 10 years;
correct?

A. Cities' revenues are made up of taxes.
And if you keep the tax policy consistent the
same, the rest of it is pretty straightforward.
Expenses, mostly the City's expenses are headcount
and legacy liabilities-related.

So there isn't -- I mean, there's
articles out there in financial journals on
municipal accounting and municipal budgeting,
so -- you know, which I read off and on. So I
think through a methodology standpoint, there is
no scientific methodology in this -- in Detroit
that would be different for any other city.

MALHOTRA

Q. Can you identify one article on
municipal budgeting that you've read?

A. Not off the top of my head, but there's
governing publications that I get every week, and
there's -- also articles, I think -- or there's
articles that talk about long-term budgets
potentially. But I haven't studied it in detail.

Q. And there's no literature cited in
any -- in your report that would support your
methodology; correct?

A. That's right, because as I mentioned,
the methodology is pretty straightforward for a
municipality when you look at the taxes -- when
you look at revenue base and you look at the
expense base. If you keep policy assumptions
aside, it's a pretty straightforward analysis.
Just like you would do with any other corporation,
it's just financial forecasting.

Q. Have you published any publications on
forecasting?

A. I have not.

Q. Are there -- in your forecasts, have you
included any sums attributable to new fees imposed
by the City that it's not currently imposing?

MALHOTRA

A. That would be a question for Conway
MacKenzie, because I know there's some fees in the
restructuring of the investment initiatives,
operational revenue line items. So that would be
a question for them, whether they have.

Q. You agree that Detroit has the power to
raise additional revenues by implementing new
fees; correct?

A. No. It depends on whether you can
collect those fees and what the expenses are to
collect those revenues and what you are levying
fees on.

Q. Okay. But there's the potential for
additional revenue to be generated by implementing
new fees; correct?

A. As long as the new fees -- the expenses
incurred to generate new fees don't exceed the
fees. I mean, I don't -- if there's a specific
fee that you're referring to, it would be easier
for me to comprehend. But it's just -- if you
increase any new fee, depends on whether you're
going to collect it, the costs you're going to
incur to collect it.

Q. And you may have included additional

MALHOTRA

revenues from new fees in your forecast; you just
don't know, sitting here today; correct?

A. No, I did not say that. I said in the
Conway MacKenzie revenue initiatives that were
specifically highlighted, there are fees. I just
don't know if they're new fees or not. But I
think that would be a question to ask them.

Q. Okay. So you don't know whether your
forecast is assuming there will be new fees or
not, sitting here today?

A. I would have to go back and look at --
if I had the exhibits, I would be able to go back
and look at the details and try and ascertain if
they are new or not.

Q. Okay. That would be details that were
provided to you by Conway MacKenzie that you would
have to look back to?

A. Yes. Those are line items I would look
at.

Q. Do you agree that the City of Detroit
has a long history of fiscal mismanagement?

A. I would say that the City historically
has run deficits. Fiscal mismanagement, you know,
I don't want to comment on that. I would say the

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1          **MALHOTRA**
2    updated, yes.
3          Q.   But delinquent debts are not reflected
4    in your forecast; correct?
5          **A.  I don't know what those delinquent debts**
6    **are.  So . . .**
7          Q.   Why is it that you don't know what the
8    delinquent debts owed to the general fund are?
9          **A.  From whom?**
10         Q.   From -- are from the people that you're
11   not incorporating into your forecast.  I guess --
12   the ones that, you know, are owed to the general
13   fund, why can't you just ask the City what debts
14   are owed to you?  Give me a list of them so I can
15   plug them into my forecast.
16         MR. STEWART:  So what's the question?
17   BY MR. SMITH:
18         Q.   I guess my question is, why is it that
19   the City can't tell you what debts are owed to it?
20         MR. STEWART:  Objection.
21         THE WITNESS:  Let me start with looking
22   at the components of the revenue.  All right?
23         When you look at income taxes in terms
24   of what the income tax collection process is,
25   what the City's best estimate for its

1          MALHOTRA
2    estimated revenues are, and then the City's
3    internal process to send reminders and
4    notices for those people that have not filed
5    income tax returns; after that, the City also
6    goes through a process in which it provides
7    amnesty programs.  So that's income taxes.
8          When you look at the property taxes and
9    you look at the residential component, the
10   City sends out its property tax bill.  Within
11   that property tax bill, if the property owner
12   has not paid the property taxes, that
13   receivable doesn't just become delinquent,
14   because that then gets transferred to Wayne
15   County.
16         Wayne County actually advances the City
17   pretty much what that delinquent receivable
18   was.  And after a process in which they can
19   even foreclose on the property or not and if
20   they have recovered enough taxes or not, they
21   basically do a charge back to the City.
22         So in the first -- it's sort of -- it's
23   a delinquent tax revolving fund.  But my
24   point is you have to look at every component.
25   When you look at past-due parking fines and

1          MALHOTRA
2    fees, again, there's amnesty programs that
3    are offered so that people are caught up.
4          So it's not as easy as going to a
5    corporation and running an accounts
6    receivable aging report and saying, you know,
7    Let's go have -- collect these taxes.  The
8    City does try its -- at least its efforts to
9    go out and improve collections.
10         But, I mean, I could -- we could walk
11   through each one of the line items in more
12   detail.
13   BY MR. SMITH:
14         Q.   I get it.  So it's not possible, given
15   the information you have, to estimate how much the
16   City is owed in delinquent debt obligations; is
17   that fair?
18         **A.  Yeah, I do not have that information;**
19   **that's correct.**
20         Q.   The Detroit Public Schools, are you
21   aware that there was an emergency manager
22   appointed to supervise them?
23         **A.  Yes.**
24         Q.   And are you aware that the Detroit
25   Public Schools depend on property tax revenue for

1          MALHOTRA
2    their operations?
3          **A.  As one of the revenue sources that**
4    **Detroit Public School has, property taxes is one**
5    **of them.**
6          Q.   And grant revenue is another source of
7    funding for the Detroit Public Schools?
8          **A.  Yes, and State aid.**
9          Q.   And why are you no longer working for
10   the Detroit Public Schools?
11         **A.  I have recently been reengaged by**
12   **Detroit Public Schools.**
13         Q.   When was that?
14         **A.  Last month.**
15         Q.   And who hired you?
16         **A.  The emergency manager.**
17         Q.   And have you looked at the Detroit
18   Public Schools' most recent budget?
19         **A.  Yes.**
20         Q.   Okay.  And are the Detroit Public
21   Schools running a surplus?
22         **A.  You would have to look at their CAFR for**
23   **that.  Their budget generally is always balanced.**
24         Q.   And from reviewing their budget, you're
25   aware that they've been cutting costs; correct?

1  MALHOTRA
2  the City's, you know, revenues and expenses are
3  slightly different than when you look at it over a
4  40-year picture.
5       Q.  I mean, the pension costs aren't being
6  significantly cut under the restructuring plan;
7  correct?
8       A.  No, that's not correct.
9       Q.  Well, they're being funded from a
10 different source; is that correct?
11      A.  Well, there's two separate questions.
12 If you would just rephrase your question.
13      Q.  Well, I mean, forget about the State
14 aid.  I mean, just the pension costs are not being
15 cut significantly under the restructuring
16 scenario; correct?
17      MR. ALBERTS:  Objection.
18      THE WITNESS:  Well, I don't know what
19 your definition of "significantly" is.  So if
20 you ask me a specific question, I can give
21 you a perspective on the pension cost.
22 BY MR. SMITH:
23      Q.  I'll use your definition of
24 significantly.  Are the pension cost --
25      MR. STEWART:  You interrupted his answer

1  MALHOTRA
2  again.  I'd ask you just to wait a second,
3  Mr. Smith, and let him finish his answer
4  before you ask your next question.
5  BY MR. SMITH:
6       Q.  Did you have anything else to say?
7       A.  No.  Could you just ask me your question
8  again now, please.
9       Q.  In your -- under your definition of
10 "significantly," are -- the pension costs are not
11 being cut significantly under the restructuring;
12 correct?
13      A.  I think the pension cuts are the value
14 of the liability.
15      So for General Retirement System, just
16 based on the value of the freeze, that's a
17 $95 million cut in the liability.  The value of
18 the COLA that is being eliminated is roughly
19 467 million, of a cut.  The value of the
20 4-1/2 percent reduction is an estimated
21 $125 million.  You add the ASF to that, that's
22 another couple of hundred million dollars.
23      So all in, we're looking at somewhere
24 between -- I haven't done the math -- 900 million
25 to a billion.

1  MALHOTRA
2       Based on the assumptions that we have
3  from Milliman, you look at PFRS, the value of
4  their COLA is almost 350 to $400 million.  The
5  value of their freeze is roughly another
6  $55 million.  So you have roughly $400 million
7  right there.
8       But that's, you know, some of the
9  context of the cuts -- and I know there's probably
10 additional details, but that's -- in my mind,
11 conceptually, the cuts that have taken place in
12 pension.
13      Whether you define it as significant or
14 not, I don't know.
15      Q.  Do you agree that the level of services
16 the City provides is a matter for the business
17 judgment of the City leaders?
18      A.  The level of services is with the City
19 leaders of the new transition board or in the
20 context of even the amounts available for the City
21 to spend.  So I think you sort of -- it's a
22 balancing act between the services as well as the
23 amount of money available to expend.
24      But that's probably with the mayor and
25 city council, the emergency manager, the board.

1  MALHOTRA
2  That's potentially where I would think it is with
3  probably input from others.  I don't know.
4       Q.  So your position is that the level of
5  services within the City is a matter for the
6  business judgment of the City leaders in power at
7  the time; correct?
8       A.  In conjunction with, I would say it's
9  the supervisory board and what level of funding is
10 available.  So, you know, it's not just saying one
11 group can only decide all the levels of services
12 regardless of what financial ability the City has
13 or does not have from a resources standpoint.
14      Q.  Do you agree that any of the assumptions
15 in your model can change over the 10-year and
16 40-year periods you forecast?
17      A.  Can any of the assumptions change?  Yes.
18      Q.  Do you agree that the timing of the
19 reinvestment expenditures could change from the
20 assumptions in your model?
21      A.  Yes.
22      MR. SMITH:  I'm going to mark as
23 Exhibit 1 a copy of this 10-year financial
24 projection.
25      (Exhibit Malhotra-1 was marked for

1          MALHOTRA
2      identification.)
3          MR. ALBERTS:  Would you please recite
4      the Bates numbers.
5          MR. SMITH:  It's POA00706519.
6  BY MR. SMITH:
7      Q.  You got it?
8      **A.  Yes, I do.**
9      Q.  Okay.  On the front of the projections
10     that you prepared, there's a disclaimer by Ernst &
11     Young; correct?
12     **A.  That is correct.**
13     Q.  And you state that "There will usually
14     be differences between forecast and actual results
15     because events and circumstances frequently do not
16     occur as expected and those differences may be
17     material."
18         Do you agree with that statement?
19     **A.  I do not.**
20     Q.  And "E&Y takes no responsibility for the
21     achievement of forecasted results."
22         Do you agree with that statement?
23     **A.  Yes.**
24     Q.  And it says, "Accordingly reliance on
25     this report is prohibited by any third party as

1          MALHOTRA
2      the projected financial information contained
3      herein is subject to material change and may not
4      reflect actual results."
5          Do you agree with that statement?
6      **A.  Yes.  I have in-house counsel on the**
7      **phone.  But yes.**
8      Q.  And is this type of disclaimer and set
9      of statements attached to any forecasts that
10     Ernst & Young makes?
11     **A.  We try our best to.  Sometimes we miss,**
12     **but that's -- we generally -- yes.**
13     Q.  And this statement is based on a
14     consensus view of experts at Ernst & Young
15     regarding forecasts; correct?
16         MR. STEWART:  Objection.
17         THE WITNESS:  I do not know the exact
18     basis of where the exact statement has come
19     from.
20     BY MR. SMITH:
21     Q.  Okay.  You always put this statement on
22     any forecast that you would create.  Is that your
23     general practice?
24     **A.  Like I said, we try to, but it's -- at**
25     **times we miss.**

1          MALHOTRA
2      Q.  Okay.  And it's the policy of Ernst &
3      Young to always put this disclaimer on its
4      forecast.  Is that fair?
5      **A.  Generally, yes.  I mean, it's -- the --**
6      **yeah.  Generally, yes.**
7      Q.  And that's because forecasts don't give
8      you information about what actual results will be;
9      correct?
10     **A.  That's why it's a forecast.**
11     Q.  So that's correct; correct?
12     **A.  A forecast is not an actual; that is**
13     **correct.**
14     Q.  And there are a number of things that
15     can change that can make forecasts deviate
16     materially from actual results; correct?
17     **A.  Yeah.  "Materially" is depends on sort**
18     **of what assumption is changing.  But as --**
19     **information in the future can change materially as**
20     **well.**
21     Q.  Okay.  And there are a number of factors
22     that could change that could cause the forecasts
23     you've done for the City of Detroit to change
24     materially from the actual results that are
25     achieved; correct?

1          MALHOTRA
2      **A.  Yes.  If there are -- of course, changes**
3      **that are unforeseen that we don't know about that**
4      **can have an impact on the forecast, yes.**
5      Q.  And that's why you've told third parties
6      that they shouldn't rely on forecasted results
7      you've prepared for the City of Detroit; correct?
8      **A.  I think that the information is**
9      **specifically highlighting what could happen with**
10     **any forecast.  And so I think for the parties to**
11     **look at this, they have to realize what they're**
12     **looking at.**
13     Q.  Okay.  And you caution third parties
14     that they should not rely on your forecasts;
15     correct?
16     **A.  It says that from a forecast standpoint,**
17     **it is subject to change.  And so third parties**
18     **have to sort of understand what they're looking**
19     **at.  That's what I would say.  And beyond that,**
20     **it's probably a legal question which I cannot**
21     **answer.**
22     Q.  Well, your forecast, you put right on
23     the front of it that "Reliance on this report is
24     prohibited by any third party"; correct?
25     **A.  That's what it says.**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 29 of
50

MALHOTRA

Q.  And the reason that reliance on your forecast is prohibited is because you recognize that circumstances can change and the forecast may deviate materially from actual results; correct?

A.  That is what is written here, yes.

Q.  And you agree with what's written there; correct?

A.  I do.

Q.  Have you done any investigation to determine if there are any cost-cutting measures that could be undertaken that are not reflected in the forecast?

A.  From a cost-cutting standpoint -- from a further cost-cutting standpoint, most of the initiatives, I believe, are in here in terms of the outsourcing -- I'm just trying to think if there are any other initiatives from an opportunity standpoint.  I would have to give that some more thought on a department-by-department basis.

Q.  You said that the Department of Transportation, the subsidy it gets from the general fund, is a significant cost driver; correct?

MALHOTRA

A.  It is.  It's -- it has been a big cost driver for the general fund, historically.

Q.  And the City has been attempted to implement cost-cutting measures in the Department of Transportation; correct?

A.  That is correct.

Q.  And the City has also attempting to implement revenue-increasing measures in the Department of Transportation; correct?

A.  I believe so, yes.

Q.  And the City recognizes that further cost can be cut from the Department of Transportation; correct?

A.  I don't know about that.

Q.  Well, they're planning to implement some cost-cutting measures.  You know that; correct?

A.  Well, as I said earlier, it has been a big driver of a subsidy.  They have been driving new revenue initiatives.  They have cut costs historically.  And -- but that has come at the level of a larger decline in services.

And, in fact, some of the revenues for the Department of Transportation are going done versus up in the near future as is reflective in

MALHOTRA

the bridge between the plan of adjustment and the June 2nd financials.

Q.  The City recognizes the Department of Transportation is charging fees that are below market rates; correct?

A.  I wouldn't be able to comment on that whether they're below market or not.

Q.  Okay.  You haven't done any investigation into that at all?

A.  I have not studied that particular piece in terms of the level of service compared to the fees; but I do know that, in the forecast, there are some increased fees that are forecast.

Q.  And you're -- and in the last year or two, the City has reduced the subsidy from the general fund to the Department of Transportation; correct?

A.  Yes, for a short while while the level of service was down and when the general fund paid on behalf of the Department of Transportation some self-insurance claims.

So although ideally, from an accounting standpoint, the City should have reflected those self-insurance claims still being paid by the

MALHOTRA

Department of Transportation and then the general fund subsidy being higher, I think the way at least the accounting was shown is that the general fund was paying the self-insurance claims directly.  So it artificially lowered the subsidy when that's not the case in reality.

That being said, the subsidy was lower than historical levels because of reduced service.

Q.  Okay.  But if you take all the payments that the general fund made to the Department of Transportation, have they been reduced?

A.  Compared to what time frame?

Q.  Compared to the past.  I mean, I'm trying to figure out -- you were just talking about two separate payments, the subsidy and the insurance charge.  And I'm just wondering if you take the payments together, were the general fund payments to the Department of Transportation, have they -- were they lower or not?

MR. STEWART:  Objection.

Just read the question, please.

(Thereupon, the requested portion was read back by the reporter as above recorded.)

MALHOTRA

THE WITNESS: I believe the Department
of Transportation has had a lower subsidy in
the last year or two compared to that same
time frame before that. I can look through
this and get a more precise answer.

BY MR. SMITH:

Q. The -- your forecast, though, assumes
that the subsidy to the Department of
Transportation will increase; correct?

A. Because of the lower revenue based on
how the new revenue sharing agreement is set up
for the Department of Transportation.

Q. What's the new revenue sharing
agreement?

A. So our -- the State has a new way of
dispersing transportation-related grants to all of
the various transportation departments throughout
the state; and that, in fact, caused a reduction
in the Department of Transportation's annual
revenue by almost 6 to 6-1/2 million dollars
annually. And that was a significant impact to
the forecast. In addition, we have some
additional subsidiaries required for the People
Mover.

MALHOTRA

But to offset some of those increased
costs, the City has incorporated some
opportunities in order to not fully have to bear
the cost of that decreased revenue from the State
and some increased funding for the People Mover.

Q. Okay. So the State -- during the
pendency of the bankruptcy, the State has reduced
funding to the Department of Transportation; is
that correct?

A. There is -- it's not just for the
Detroit Department of Transportation. There is,
based on this new legislation -- which is, I think
State Operating Act 51 -- an assumption of a
6-plus-million-dollar decline annually for the
Department of Transportation.

We have only incorporated that impact
for the first ten years and have assumed that the
Department of Transportation has to find other
ways to mitigate that impact beyond the first ten
years.

Q. Okay. If I follow you, the State cut
funding for the Department of Transportation and
other departments around the state, and that
required the general fund to make greater

MALHOTRA

expenditures than it otherwise would have. Is
that fair?

A. Yes. We have a change based on the
updated information we have, yes.

Q. Okay. Is there any portion of the
increased subsidy to the Department of
Transportation that's not due to this legislation
from the State?

A. I believe it is a small portion that's
related to an increased subsidy to the People
Mover. But I would say the biggest change is the
one change driven by the State.

Q. And I'm going to hand you a copy of
Exhibit 2, which is a copy of the disclosure
statement.

(Exhibit Malhotra-2 was marked for
identification.)

BY MR. SMITH:

Q. If you could turn to Page 82, please.

MR. STEWART: This is absolute 82, not
82 of '197; right?

MR. SMITH: Yeah.

BY MR. SMITH:

Q. At the bottom there's a section called

MALHOTRA

"Failure to Achieve Projected Financial
Performance."

Do you see that?

A. Yes.

Q. Okay. And the disclosure statement
says, "Projections are dependent upon the
successful implementation of the City's budget and
the reliability of other estimates and assumptions
accompanying the projections."

Do you agree with that statement as it
relates to your projections you've done for the
City of Detroit?

A. Yes.

Q. And when you say implementation of the
City's -- well, you didn't put this together,
but -- why don't I ask you this: Have you used
information from the City's budget in your
forecast?

A. Yes.

Q. Okay. And then if you turn to Page 83
at the top, it says, "These estimates and
assumptions may not be realized and are inherently
subject to significant economic uncertainties and
contingencies, many of which are beyond the City's

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 31 of 50

MALHOTRA

1
2 control."
3       Do you agree with that statement as it
4 pertains to your projections you've done?
5     **A.  Yes.**
6     Q.  And then if you look at the next
7 section, Section K, the second sentence:
8 "Unforeseen events and circumstances may occur
9 affecting the City's future financial performance,
10 resulting in those assumptions proving inaccurate
11 and the City being unable to fulfill its
12 obligations under the plan.  No guarantee can be
13 made as to the City's future financial performance
14 due to a variety of unforeseeable circumstances
15 that may affect such a performance."
16       Do you agree with that statement --
17 those statements as they relate to your
18 projections?
19     **A.  Yes, I do.**
20     Q.  In your analysis, in your projections
21 that you do, is there any time-series analysis
22 that you do or not?
23     **A.  For which particular line items?**
24     Q.  For any of them.
25     **A.  Not generally.**

MALHOTRA

1
2     Q.  You agree that there's no scientific
3 literature or data quantifying any increase in
4 municipal revenue as a result of a restructuring
5 or reinvestment effort like Detroit's; correct?
6     MR. STEWART:  Objection.
7     THE WITNESS:  I do not know if there is
8     or is not.
9 BY MR. SMITH:
10     Q.  You're not aware of anything you can
11 cite, sitting here today; correct?
12     **A.  I can't cite -- make a specific citation**
13 **on that, no.**
14     Q.  You agree that there's no scientific
15 literature data demonstrating an increase in
16 population associated with a reconstruction or
17 reinvestment proposal such as that Detroit is
18 making here?
19     **A.  I don't know what you mean by**
20 **"scientific."  It's the -- it's the assumption of**
21 **a safer and cleaner city, being able to hold on to**
22 **its population or increase it over the long-term**
23 **compared to where we are today.**
24     Q.  But there's no study of any kind or data
25 showing that a reconstruction or reinvestment

MALHOTRA

1
2 proposal like Detroit's results in increased
3 population; correct?
4     **A.  Well, what particular part of the**
5 **proposal are you referring to of Detroit's**
6 **proposal?**
7     Q.  Any of it.  I mean, there's no study
8 showing that any part of the restructuring and
9 reinvestment proposal Detroit is making is
10 associated with an increase in population;
11 correct?
12     **A.  I do not know about the -- direct**
13 **linkage that you're talking about but -- of a**
14 **scientific study.  I don't know what a scientific**
15 **study is out there that would address this**
16 **particular issue.**
17     Q.  Okay.  You're not aware of any such
18 study you can cite sitting here today; correct?
19     **A.  I'm not aware of a scientific study of**
20 **such sort that I can cite.**
21     MR. STEWART:  It's about 1:30.  Whenever
22     you want to break for lunch.
23     MR. SMITH:  Yeah, we can break.
24     MR. STEWART:  If you just finish
25     whatever your line of questions is.

MALHOTRA

1
2     MR. SMITH:  No, we can take lunch now.
3     THE VIDEOGRAPHER:  Going off the record
4     at 1:29.  This is the end of Tape No. 3.
5     (Luncheon recess from 1:29 p.m. to
6     2:03 p.m.)
7     THE VIDEOGRAPHER:  We are back on the
8     record at 2:03.  This is the beginning of
9     Tape No. 4.
10 BY MR. SMITH:
11     Q.  Do you agree that Detroit's Chapter 9
12 plan will put them in a better fiscal position
13 than many other comparable cities?
14     **A.  I don't know about comparable cities.  I**
15 **think Detroit will be in a better position than it**
16 **was before it entered into Chapter 9.**
17     Q.  Will Detroit be in a better position
18 among other cities once it emerges from Chapter 9
19 under the plan?
20     **A.  Which other cities are you referring to?**
21 **Any specific ones?**
22     Q.  Well, cities of comparable size.
23     **A.  I haven't done that analysis.**
24     Q.  There are several enterprise funds that
25 are associated with the City.  You're aware of

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 32 of
50

MALHOTRA

A. If we reach more settlements, we will update the forecast as those settlements come along.

Q. What settlements are in process that you're talking about?

MR. STEWART: Before you answer, Mr. Malhotra, I just simply caution you to remember that you're not permitted to the judge's order to disclose anything that's been going on in mediations. Subject to that, please answer the question.

THE WITNESS: All right. Thank you. We're working on the Detroit Police Officers Association and with the Detroit Fire Fighters Association to hopefully wrap up those negotiations.

BY MR. SMITH:

Q. And what are specifically the issues that you're trying to wrap up there?

A. That's --

MR. STEWART: Once again, please answer with that same admonition about mediation.

THE WITNESS: That's subject to mediation.

MALHOTRA

BY MR. SMITH:

Q. Okay. Is there anything that's not subject to mediation that you could talk about relating to settlements in the works or not? Or is it all part of mediations?

A. It's generally the discussions are part of mediations.

Q. Okay. In your expert report you mention -- on Page 1 you say you've forecasted revenues and expenses for the City's general fund; correct?

A. That is correct.

Q. You haven't attempted to forecast revenues and expenses for the entire city; correct?

A. That is correct.

Q. And if you look at -- why did you perform a 40-year forecast?

A. It was to get a longer-term view of the liabilities that the City was signing up for in terms of the various settlements to ascertain and understand the City's ability to meet the obligations that it was signing up to.

Q. On Page 2 of your report in the middle,

MALHOTRA

you say that your projected revenues and expenditures are reasonable forecasts.

Do you see that?

A. Yes.

Q. You'd acknowledge that other independent experts could come up with reasonable forecasts that differ from your forecast; correct?

A. I don't know what other experts would come up with. It's up to them.

Q. I know. But my only question is, there could be reasonable forecasts of the general fund's revenues and expenditures that are different from the forecasts you put together; correct?

A. I don't know about that. I feel that these are reasonable forecasts, and I can't talk to what other forecasts would be reasonable or not reasonable that are not generally the forecasts that I have in front of me.

Q. You're not taking the position that your forecasts are the only reasonable forecasts of general fund revenues and expenditures that could be made; correct?

A. I am taking the position that based on

MALHOTRA

the assumptions we have in here, these are the forecasts that I -- I seem or deem as reasonable. So I can't talk to what other forecasts may or may not be reasonable unless I understand assumptions and so on and so forth.

Q. My only question is, is your forecast the only reasonable forecast that's possible of the general fund revenues and expenditures?

A. I don't know. I can talk to forecasts being reasonable. I don't know whether other forecasts are reasonable or not.

Q. Over on Page 4 of your report, you identify some of the experts that you're relying on; correct? Such as Mr. Cline and Ms. Sallee.

A. That's correct.

Q. Page 7 of your report at the bottom of the page, you talk about the assumptions, some of the assumptions that you made. Do you see that? There's a section called "Assumptions."

A. That's correct.

Q. And it would be fair to say that your forecasts are based on a series of assumptions; correct?

A. Yes.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

Q.   And among the assumptions you rely on
are the analyses provided to you by Mr. Cline and
Ms. Sallee regarding the City's tax revenues;
correct?

A.   That is correct, after I've had
discussions with them and conversations and looked
at what they've done and their sources they've
used, yes.

Q.   And then you mention that you have --
over on Page 8, you based your forecasts and sales
and charges for services on assumptions regarding
historical trends; correct?

MR. STEWART:  Where on the page are you?

MR. SMITH:  8, Paragraph B.  We're still
in the assumptions section.

MR. STEWART:  Got it.  Yeah.  Thank you.

THE WITNESS:  Yeah.  It says it's based
on historical trends.  It's just
extrapolations based on historical trends.

BY MR. SMITH:

Q.   So your forecasts are also based on a
series of extrapolations from historical trends;
correct?

A.   That is correct.  After they're adjusted

MALHOTRA

for things that we know that have happened or
changed, that is correct.

Q.   And you adjusted your extrapolations
based on information that you received from the
City; correct?

A.   That is -- that is correct, based on
known information that we had from the City or any
other source; yes.

Q.   And so you would have discussion with
the department managers at the City, and then you
would change the numbers in your extrapolations to
reflect what the people at the City departments
were telling you; is that fair?

A.   It's a little more complicated, because
what you do is you look at the last three to four
years of every line item in the departments, and
you basically ascertain what is normalized versus
if there's anomalies in the actual historical
results.  And then you used a normalized
extrapolation.  Then you also have discussions
with the City and the other professionals involved
about changes that are impacting that normalized
trend that's been extrapolated.

Q.   So when you say that you relied on

MALHOTRA

historical trends in your report, you typically
looked at three or four years of historical data;
is that correct?

A.   Yes, that is correct.

Q.   And then did you use a mathematical
formula to identify the trend?  Or how did you
identify a trend that you would extrapolate?

A.   It was based on discussions, looking
through the financial -- detailed financial
records that the City had to ascertain if there
were one-time items or not.

Q.   You didn't use mathematical techniques
to identify trends in the historical data;
correct?

A.   One-time blips -- there's not a formula
that you can run to identify a one-time, which is
a part of sort of what I was explaining earlier
this morning about what all financial advisers
will do, is to not run stretchy formulas to
identify whether something is an anomaly or not or
theoretical formulas.  It's sort of understand
what the trends are based on discussions and, you
know, the financial records we have available.

Q.   You could use -- you could use

MALHOTRA

regression analysis or some other analysis to
identify trends in historical data; correct?

A.   Those are -- regression analyses would
be used for much larger data sets.  When you are
looking at an individual, we actually did a far
more detailed analysis than just using a broad
regression by looking at detailed line items by
department to try and analyze what of these
expenses could be deemed one time versus normal
trends.

Q.   So when you say you looked at historical
trends, there wasn't any mathematical analysis
involved.  You just have people look at the
historical data and then identify a number that
you assumed for your calculations?

A.   No.

Q.   What did you do with the historical data
to identify -- I'm trying to figure out what you
mean by "historical" -- how did you derive the
historical trends that are discussed in your
report?

A.   I'd be happy to give you an example.  We
go through a particular department.  You look at
what the average headcount was.  So use an

1          MALHOTRA
2  average.  You look at what the average salaries
3  were.  You look at during those years, if there is
4  an anomaly, there is a significant increase or
5  decrease, you want to talk to management at the
6  City to figure out why there was an increase or a
7  decrease compared to an historical average trend,
8  again, an average.
9          Based on that, then you basically have
10 discussions about if you were to use the average
11 and then have discussions about what are some of
12 the initiatives or changes that are taking place
13 within the department that will actually impact
14 that line item.
15         So it's a much more detailed exercise.
16     Q.  So if I understand, when you're -- in
17 order to come up with the historical trends, you
18 would typically look at three or four years of
19 data; correct?
20     A.  We use -- yes, about four years of data,
21 that is correct.
22     Q.  And then you would calculate an average
23 based on that simple arithmetic average based on
24 that data?
25     A.  We would use a simple mathematic average

1          MALHOTRA
2  as well as pay probably more attention to the last
3  one or two years, which was most relevant versus
4  just looking at only a simple average of four or
5  five years.
6      Q.  Would you use some sort of weighted
7  average in calculating the trends or not?
8      A.  The -- it would be not a weighted
9  average.  It would be, in terms of historical
10 trends, more depictive of the run rate of the last
11 year versus a weighted average.  But you would
12 look at these three or four different data points
13 at the same time to ascertain what the
14 implications were from the forecast data.
15     Q.  And you may go with the average value or
16 some other value based on conversations with
17 people at the City?
18     A.  That is correct.
19     Q.  Okay.  So the conversations with people
20 at the City dictated the ultimate value that you
21 would use in your analyses when you're identifying
22 these historical trends; is that fair?
23     A.  I don't know about dictated versus not.
24 But in terms of using the financial advisory
25 experience, we have about -- coming up with what

1          MALHOTRA
2  some of the historical trends would show, having
3  discussions with the City and the other
4  professionals at the City to try and ascertain
5  what the normalized level was.  But at the end of
6  the day, that was the process we went through.
7      Q.  Do you know -- can you identify for me,
8  in 8C you talk about forecasting operating
9  revenues, including parking, court fines; grant
10 revenue; license permits and inspection charges;
11 and revenue from the use of assets based upon
12 recent trends as adjusted to account for recent or
13 expected events.
14         Are you able to tell me what adjustments
15 were made to those numbers?
16     A.  Yes.  We made sure that the revenue was,
17 from the grant standpoint was adjusted for the
18 expiration of the public safety grants, which was
19 the fire and SAFER grants in the years -- if I go
20 back here, I'll be able to tell -- fiscal year '16
21 and '17, as well as the expiration of some small
22 cops grants.
23         When I meant cops, I mean the police
24 officers grants.  In the years '15 and '16, which
25 were small, there was also the transition of the

1          MALHOTRA
2  health and wellness department in which it has
3  been transitioned out of the city, which is why
4  the grant-related revenues and the grant-related
5  expenses fall simultaneously to reflect that.
6      Q.  On Page 9 you mention, at the bottom,
7  175 million for the exit financing.
8          Do you see that?
9      A.  Yes, I do.
10     Q.  Was that a number that Mr. Buckfire gave
11 you?
12     A.  I think it was from Miller Buckfire that
13 we got the size of the exit facility, which was
14 120 plus 180 million, less fees.
15     Q.  At Page 10 you mention a 10 percent wage
16 reduction.  Where did that number come from?
17     A.  So that reflects that in fiscal year
18 '14, the salaries already incorporate a 10 percent
19 wage reduction that was imposed on all of the
20 police or public safety and the ongoing 10 percent
21 imposition of wage reductions on nonpublic safety.
22 So fiscal year '14 reflected that starting point.
23     Q.  And then you assume that there will be a
24 reversal of headcount reductions beginning in
25 fiscal year 2015; is that correct?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 35 of
50

MALHOTRA

A. So the subsidy increase is predominantly driven, as stated here, in terms of the revised methodology in the State-calculated and State-operating assistance. And we continued to use a 1 percent inflation for -- most of the expenses, other than for salaries and wages, we used a -- the same assumptions as we had used for all of the non-uniformed professionals, as well as the expenses related to healthcare were also based on the same assumptions as the non-uniformed professionals.

Q. 14, Page 14, Paragraph L, talks about the exit financing. Are all those assumptions that you used, such as the data, the note, and the term and the interest rate, are those -- they were all information provided by Miller Buckfire; correct?

A. That is correct. I had discussions with them about it in terms of the structure, but most of those assumptions are provided by Miller Buckfire.

Q. Page 15, Paragraph 0, you talk about blight reduction. And you note that blight-removal expenditures exclude heavy

MALHOTRA

commercial blight.

Do you see that?

A. That is correct.

Q. The City's blight-reduction plan will -- it won't reduce commercial blight at all in the city; correct?

A. The current estimate that is provided in the plan, my understanding is, does not include commercial blight removal in the forecast.

Q. And Page 15, Paragraph Q, you talk -- the contingency reserve was set at 1 percent. How did you determine that number?

A. So I looked at the revenues over the next 10 years, and I looked at the top five revenues. And they were essentially growing by an approximate rate of 1 percent a year over the forecast period of 10 years. And used that as a level of contingency to be put into the plan.

Although revenues are increasing at a faster rate beyond 10 years, we only left a 1 percent contingency to be in the plan.

Q. Page 19, Paragraph B, at the top, you assume a 2 percent annual wage growth and then 2.25 percent after that. Where does the 2 percent

MALHOTRA

annual wage growth assumption come from?

A. So that comes from the long-term CBO, which is the congressional budget office outlook that's pulled together, which basically forecast long-term inflation to be 2.2 percent. And so we used the 2 percent for the second -- for the first and second decade and then 2.25 for the third and fourth decade.

Q. The 2.0, how many years of data is the CBO --

A. It goes out --

Q. -- number based on?

A. It goes out until 2053.

Q. And what would -- if you used a wage growth of 1 percent, the cost to the City from wages would be significantly reduced; correct?

A. If you change only that assumption from 2 percent to 1 percent, that would -- yes, the cost would come down.

Q. Do you have an idea of the dollar amount that the cost would come down if you changed the wage growth to 1 percent?

A. I don't have that handy, no.

Q. And would it be hundreds of millions of

MALHOTRA

dollars?

A. Starting when? In what time frame?

Q. Well, throughout the entire time frame.

A. I don't want to speculate. I would rather just do the math because it has a compounding feature to it which also impacts overtime. So I would rather just do the math and give you an answer.

Q. I mean, would it -- I'm just trying to get an order of magnitude on that, the wage growth rate.

A. Like I said, I would prefer to do the math versus just give you a guesstimate, because it's a big number with respect to what the City pays for payroll, and I would rather be accurate in terms of making a wage assumption impact.

Q. Changes in the wage growth factor can have a significant effect on the City's revenues, because the wage expenditures are a significant component of the City's total expenditures; is that fair?

MR. STEWART: Objection.

THE WITNESS: I would say wages are -- wages and salaries and health benefits

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1          MALHOTRA
2   combined are the largest portion of the
3   City's budget.  And assumptions with respect
4   to wage growth are -- have an important and
5   material impact on the City's assumptions,
6   everything else being constant.
7   BY MR. SMITH:
8       Q.   Other than the wage growth assumption,
9   are there other assumptions that can have a
10  significant effect in terms of the overall
11  revenues or expenditures?
12      **A.   Over 10 years or 40?**
13      Q.   Over 10 years.
14      **A.   Yes.  I mean, over 10 years the City was**
15  **relying upon its revenue increases that are**
16  **forecasted in the plan based on various operating**
17  **initiatives and -- which may or may not**
18  **materialize.**
19          **The City is relying upon all the**
20  **third-party funding coming in to make expansion**
21  **contributions.  Beyond that, the City is on the**
22  **hook for its unfunded liability on its pensions at**
23  **the end of the 10 years, which has to get**
24  **amortized.**
25          **So I would say those are some of the**

1          MALHOTRA
2   **assumptions that come to my mind right now, but we**
3   **could go through each one in more detail.**
4       Q.   Your forecasts don't include any amounts
5   that could be derived from privatizing Detroit's
6   interest in the Detroit–Windsor Tunnel, do they?
7       **A.   No, they do not.**
8       Q.   And has Ernst & Young in the past done
9   some work on increasing revenue from the
10  Detroit–Windsor Tunnel?
11      **A.   Yes.**
12      Q.   What kind of work were you doing?
13      **A.   Our team had looked at just the lease**
14  **arrangement and trying to ascertain to make sure**
15  **that Detroit was collecting its full share -- or**
16  **the appropriate share of its rent.  I can go back**
17  **and get more details, but that's the extent of**
18  **what I remember.**
19      Q.   Have you done any investigation into
20  whether Detroit's interest in the tunnel can be
21  privatized?
22      **A.   I have not.**
23      Q.   The -- there's a significant -- there's
24  hundreds of millions of dollars that are owed to
25  the court in Detroit.  You're aware of that;

1          MALHOTRA
2   correct?
3       **A.   To the -- I'm sorry.**
4       Q.   The 36th District Court in Detroit.
5       **A.   That are owed to?**
6       Q.   Owed.  Owed to it.  Are you aware of
7   that?
8       **A.   I'm not sure of the exact dollar amount**
9   **or if it's hundreds of millions of dollars.**
10      Q.   You haven't investigated that at all?
11      **A.   I haven't done that on 36th District**
12  **Court, no.**
13      Q.   And your forecast doesn't include sums
14  attributable to collection of the amounts that are
15  owed to the court system?
16      **A.   I believe the operating initiatives in**
17  **the Conway MacKenzie reinvestment expenditures do.**
18  **So that would be an appropriate question to ask**
19  **them.**
20      Q.   But you don't know, sitting here today,
21  how the amounts owed to the court system in
22  Detroit are treated in your forecast?
23      **A.   Like I just said, there's collections of**
24  **incremental court dues in the Conway MacKenzie**
25  **model, but I would ask them about the exact**

1          **MALHOTRA**
2   **specifics.**
3       Q.   But you really didn't know what the --
4   you don't know how much you're assuming will be
5   collected from moneys owed the court in your
6   forecast?
7       **A.   You know what?  I could get to it.  I**
8   **don't know sitting here, but I could get to it if**
9   **we go all through the exhibits between this one**
10  **and there's one from the restructuring agreement**
11  **and reinvestment initiatives that's actually, from**
12  **I remember, discrete line item on 36th District**
13  **Court.  I just can't recall that year-by-year**
14  **dollar amount.**
15      Q.   Do you have any idea how Conway
16  MacKenzie went about figuring out how much money
17  could be obtained that was owed to the court
18  system?
19      **A.   No.  I would be speculating if I tried**
20  **to answer that.**
21      Q.   And, in general, do you have an
22  understanding of how Conway MacKenzie went about
23  calculating the amounts that it's given you in its
24  reinvestment projection?
25      **A.   I can say what -- the process I went**

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 37 of
50

MALHOTRA

through to understand where they were coming up
with the numbers, is we had several -- several
discussions with their team and discussions on a
by-department basis to make sure that if they were
revenue initiatives that they were including in
their particular assumptions that we had not
already included in the baseline, we went that --
through that on several assumptions, including
headcount.

So -- and so the process that we went
through was to make sure that we weren't
double-counting revenues or expenses. So we went
through a fairly detailed process to ensure that.

(Discussion held off the
stenographic record.)

BY MR. SMITH:

Q. Does your forecast take into account
outsourcing of fleet maintenance?

A. We do not include that in the baseline.
I would have to go back and check if that
assumption is there in the restructuring and
reinvestment initiatives, but I know the
outsourcing of fleet maintenance is not included
in the baseline.

MALHOTRA

Q. Okay. You know that the City has been
investigating outsourcing fleet maintenance;
correct?

A. Yes.

Q. Okay. And do you know what the
projected savings are supposed to be from
outsourcing fleet maintenance?

A. I do not know that off the top of my
head in terms of what the exact savings were
potentially from fleet outsourcing.

Q. That's okay. It's going to take you a
long time; you don't have to feel like you have to
look it up.

A. Okay.

Q. And you're not sure whether it's in the
restructuring or not?

A. I don't want to speculate. I'm not sure
on that.

Q. You're assuming that grants to the City
are going to continue at the same level of -- at
the same funding level; correct?

A. Grants are spread out over a lot of
departments. So where we know of discrete grants
that are expiring, we have shown the reduction of

MALHOTRA

those grants. Where there's been recent grants
that have been awarded, we have shown that.

We have even the State funding that
comes in -- or the federal funding that comes into
Department of Transportation. Other than the
information we know, we've kept it generally flat.
So we've highlighted for grants we know. Like the
grant for blight remediation, we have included
that.

Q. There was a recent federal grant of
$300 million that was announced. Are you familiar
with that?

A. Yes. When you -- I'm sorry. When you
say recent, this is probably six, eight months
ago, if that's the same grant you're referring to.

Q. I'm not sure if it was six or eight
months ago, but you've got a $300 million grant
from the federal government incorporated into your
forecast.

A. First, I would like clarification on
what grant for $300 million we're talking about,
just so that . . .

Q. Are you assuming that there will be any
significant private donations to the City --

MALHOTRA

donations or grants over the course of the ten
years?

A. Donations. Well, you've got the grand
bargain or -- but --

Q. Other than the grand bargain, are any
contributions by private entities incorporated
into your projections?

A. We've got the hardest-hit funds, which
we've talked about, that is coming in. Can't
recall if any -- the specific one-off donations
that are coming in.

For the federal guides that were
highlighted, we went through -- and this was back
again, six, eight months ago, from what I
recall -- and in some detail to ascertain what
grants, if any, were applicable for the City of
Detroit and the general fund in the plan of
adjustment.

Q. Who did the analysis of what grant
moneys were available? Was that something your
team did or was that somebody else that did that?

A. My team did that.

Q. And, certainly, you can't represent to
the Court that over the course of the next ten

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

1  years, there won't be incremental additional grant
2  money from the federal, state, or -- governments
3  or private donors that's not incorporated into
4  your forecasts; correct?
5      A.  Yeah.  I cannot say whether these grants
6  will go up or the existing grants will go down.  I
7  can just talk about the assumptions that we have
8  right now.
9      Q.  Do you believe all -- well, I assume all
10  the cost savings and revenue initiatives that are
11  discussed in Mr. Moore's report, expert report,
12  are incorporated into your forecast?
13      A.  I have not read Chuck Moore's report,
14  but the revenues and expenses, as provided to us
15  by Conway MacKenzie on the restructuring and
16  reinvestment initiatives and the corresponding
17  operating revenue increases, have been
18  incorporated into the plan of adjustment and the
19  July 2nd updates.
20      Q.  Are you aware that there are a number of
21  businesses in Detroit that are operating without
22  licenses?
23      A.  I do not know.
24      Q.  Your forecast doesn't incorporate any

MALHOTRA

1  amounts for increased revenue due to requiring
2  businesses that are operating without licenses to
3  obtain licenses as required by law?
4      A.  I do not know of businesses operating
5  without licenses.  So I do not know.
6      Q.  Do you know whether the corporate
7  income -- I mean, the business tax reports are
8  audited at all by the City of Detroit?
9      A.  That would be a KPMG or a Plante Moran
10  question.
11      Q.  You just don't know the answer?
12      A.  Yeah, we're not involved in any of those
13  audits, so I can't tell.
14      Q.  Do you agree that City revenue should
15  increase as the economy improves?
16      A.  Yes.  Overall, if the economy continues
17  to do well, Detroit will get -- potentially
18  benefit from its pro rata share, as long as the
19  overall trends and the issues that are specific to
20  Detroit are taken into consideration at the same
21  time.
22      Q.  Do you agree that the economy is
23  improving in Detroit?
24      A.  Compared to what time frame?

MALHOTRA

1      Q.  Well, I mean, there are ongoing --
2  compared to whatever the last reported period is,
3  do you agree that the economy is improving?
4      A.  I -- if you can give me a specific
5  question on compared to what time frame.  It's
6  hard for me to give you an answer.
7      Q.  Okay.  So you can't tell me whether the
8  economy is improving in Detroit?
9      A.  Compared to what time frame?
10      Q.  There's no -- nothing in your analysis
11  that takes into account improving economic
12  conditions in the City of Detroit?
13      A.  There is assumptions with respect to
14  how -- since the last recession.  Maybe if I can
15  put that into context.  Right?  Since the last
16  recession, yes, Detroit's economy is improving.
17  So I'm comfortable to say that.
18      But that's -- I'm just trying to figure
19  out if it's a short-term time frame that you're
20  trying to compare or much longer.  Since the last
21  recession, Detroit's economy is improving.
22      Q.  In the short term, Detroit's economy is
23  improving also?
24      MR. STEWART:  Objection.

MALHOTRA

1      THE WITNESS:  In the short term, you
2  mean since the recession.
3  BY MR. SMITH:
4      Q.  Well, which -- what recession are you
5  talking about?
6      A.  Well, 2008/2009.
7      Q.  I got it.
8      A.  And since 2008/2009, Detroit's economy
9  has improved.  But when I look at overall revenue
10  basis, State revenue sharing is down, so State aid
11  is down.
12      So I just want to make sure.  I'm just
13  trying to draw some specificity around your
14  question.
15      Q.  So the economy in Detroit has been
16  improving since 2008 or 2009; correct?
17      A.  Relative to 2000 -- 2008/2009, the
18  economy is better today.
19      Q.  And since that time, the State has been
20  decreasing State payments through revenue sharing
21  to Detroit; correct?
22      A.  I don't want to draw a correlation
23  between those two things, between the improved --
24  between the end of a rescission and the State's

Pages 245 to 248

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 39 of
50

MALHOTRA

decline. I can say the State revenue sharing has
declined since 2008 or 2009 compared to where we
are today.

Q. And, in fact, the State has reduced
revenue sharing by hundreds of millions of dollars
to Detroit in the last decade; correct?

A. I have the numbers since 2008. And
since 2008, the number, from what I can tell from
these -- my information here, it's roughly about
$60 million that Detroit's revenue sharing has
gone down, annual.

Q. Annually?

A. That's correct.

Q. So $60 million a year from 2008 to the
present is the reduction in Detroit's revenue
sharing?

A. I would actually like to -- now that I
have this in front of me, I would like to clarify.
The real revenue decline has really started after
2010 in State aid from -- and I want to just make
sure that's clear for the record, because I said
2008 earlier.

From 2008 to 2010, State aid was
continuing to go up. And since 2010, it has come

MALHOTRA

down for the years '11, '12; and then in '13 and
'14 has taken a slight increase back, but still
not at the same level as it was in 2010.

Q. Since 2010, approximately how much has
the State cut revenue sharing in total?

A. In total, if I were to look at it
through fiscal year '14, it's -- compared to 2010
through 2014 in aggregate, the State aid has been
lowered by -- in excess of $200 million.

Q. Yeah. Do you know why the State's cut
the aid, the revenue sharing aid?

A. I believe it's been cut for lots of
local municipalities based on what the State
budget was, but I do not know the exact basis of
that last cut.

Q. Do you believe that blight-reduction
efforts should improve property values in the
City?

A. Overall, yes, in terms of the
blight-reduction initiatives, should help either
the collection rates or a cleanup of the tax roll
in terms of the assessed values.

Q. And then just by virtue of the fact that
blight has been reduced, property values should

MALHOTRA

increase. Do you agree with that?

A. I would have to give that some thought
in terms of that direct link, which was your
questioning this morning, that -- which was that
there is no direct link between blight and any of
the revenues.

But -- and my answer remains consistent,
which is blight expenditures are a part of the
overall reinvestment package, which should help
the overall revenue and property taxes and income
taxes of the city.

Q. I mean, do you know who came up with
this idea to spend hundreds of millions of dollars
on blight reduction?

A. It was a -- part of the overall
restructuring effort; but I would -- on more
details on that, I'm sure Conway MacKenzie will
have.

Q. But you just don't know whose idea it
was to spend hundreds of millions of dollars on
blight reduction?

A. There were several discussions on blight
reduction as we were developing the plan. I do
not remember one specific person's idea it was.

MALHOTRA

Q. And nobody is willing to claim credit to
be the father of the blight-reduction effort; is
that fair?

A. I can tell you I am not -- I cannot
answer that.

MR. SMITH: I'm going to hand you what
I'm going to mark as Exhibit 4, which is an
email attaching some materials from the
financial advisory board.

Here you go.

(Exhibit Malhotra-4 was marked for
identification.)

BY MR. SMITH:

Q. And you'll recall that we are talking
about consensus revenue reports. And if you look
at the Bates No. POA00537604, you'll see that
there's a revenue consensus conference report
there.

A. I'm sorry. What page are you on?

Q. It's POA00537604. Do you see that
revenue consensus conference report?

A. Yes.

Q. And there's some projections in that
report. Have you seen those before?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

your forecast; is that correct?

A. I would answer that what we've collectively felt were the relevant dollars to be included have been included.

Q. And then there's some other dollars within the 300 million that are not included in your forecast; correct?

A. As there would be other dollars that could be a reimbursement of an expense that is not included either. So the -- you know, my answer is sort of consistent with what I said earlier --

Q. Well, I'm trying to understand how grants are treated in your analysis --

A. Sure.

Q. -- is what I'm trying to understand. And if there's a grant that's going to some other entity that's not the general fund but it's still part of the City, is all of the money from that grant, would that be picked up in revenue for your -- in your analysis?

A. It depends on what grant it is, because there are some non-general fund grants that have expenses and revenues that equal each other that are detailed out.

MALHOTRA

So if there was a new expense or a new grant funding that was made available to the City for which the City had to do additional things to make sure that it was compliant with that new grant, that would mean an incremental expense, but a corresponding reimbursement as well for that expense.

Q. But -- and my only question is, because you're focused on the general fund in your analysis, you don't include every dollar of grant revenue that is received by the City in your projection of revenues; correct?

A. That is correct, because they are self-funding. They are net neutral. In aggregate is the assumption between the revenues and the expenses.

So yes, there would be other grant-funded departments or grant funds that are not included in the revenues or the expenses because they offset each other.

Q. Do you know how many -- how much money in grants that the City has projected to receive are not included in your revenues?

A. I would have to go back and look. I do

MALHOTRA

not know off the top of my head.

Q. Do you have any ballpark idea?

A. No. I don't want to speculate.

Q. Would it be more than $100 million?

A. I don't want to speculate.

Q. Okay. The $300 million, though, you've at least taken account of in your analysis; is that correct?

A. That is correct. We have accounted for it. We have analyzed that $300 million; that's correct.

Q. Did your forecast, before September 2013, take into account the $300 million, or was that a special amount that was given to the City that was not -- that was in addition to historical-type amounts?

MR. STEWART: Objection.

Can I just have the question reread, please.

(Thereupon, the requested portion was read back by the reporter as above recorded.)

MR. STEWART: I think he said historical-type amounts. When you reread it,

MALHOTRA

I'm not sure you put the word "type" in. That is my question.

THE WITNESS: The $300 million was -- some of that was already amounts that the different departments were forecasting; some of those amounts were new amounts. So, again, if you were to look at that analysis, you know, they -- some of the amounts were already ongoing grants that were being renewed. So it wasn't new money.

BY MR. SMITH:

Q. I got it. And so it's correct, isn't it, that even since you started doing your forecast, the City has received incremental grant amounts that it did not -- it was not forecasted to receive; correct?

A. No.

Q. Well, I thought you just said that part of the 300 million was new grants?

A. Yeah, part of it was new grants that were renewed.

Q. Yeah. And then part of it was --

MR. STEWART: Well, hold on. He didn't finish his answer.

Pages 273 to 276

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 41 of 50

MALHOTRA

THE WITNESS: Part of it was new grants
that were renewed, and then there were some
new grants, like for the hardest-hit funds,
for -- which were incremental revenues that
the City was getting.

BY MR. SMITH:

Q.   And --

A.   Or assumption.

Q.   And my question is, since you started
your forecast, the City has received incremental
grant revenues that it did not expect to receive
and were not forecasted to receive.  Is that
correct?

A.   That is correct in the context of the
hardest-hit funds.  That assumption was not
included in the earlier version of the forecast.

Q.   And there -- are there still some
hardest-hit funds that haven't been allocated
beyond the 52 million that the State has in its
possession?

A.   I'm not sure.

Q.   Have you done any investigation into
potential grants, incremental grant revenue that's
not already included in your forecast that the

MALHOTRA

City may have access to over the next 10 years?

A.   For the grants that we know of
specifically, like SAFER and fire, although they
were being removed from the baseline because we
knew that they were expiring, but I believe those
are the grants that I know of specifically.

But new and incremental grants over and
above what's already in the baseline, I do not
know off the top of my head.

Q.   You just haven't done an investigation
into potential incremental grants?

A.   Right.  I mean, the -- we have the grand
bargain that's already highlighted that you
already know about.  You know, new grants over and
above all the grant money that's already in the
forecast, we have not done an investigation on
that.

Q.   Who at the City is the person -- or are
there multiple people that are responsible for
interacting with the state or federal government
to get grants?

A.   There are many people, because they are
different grant writers in specific departments
because they are chasing a particular type of

MALHOTRA

grant.  For instance fire and the SAFER grant has
its own unique set of requirements, and the same
thing with the police grant.

So I would say it varies.

Q.   Are there any people that are typically
involved in grant work at the City?

A.   There is a grant -- there are several.
I don't want to name any one particular person,
because there are several people, and I think that
that effort is starting to get streamlined better
in terms of the grant management; but there are
still people at different departments that chase
grants specific to their department.

Q.   You're not offering any opinion saying
that the City can't raise taxes; correct?

A.   That's a policy question.  The City is
on the highest end, likely, of its comparable tax
rates, but I'm not offering an opinion on changes
in tax policy.

Q.   You're not offering any opinion on
whether the City can pay creditors more money than
it's planned to pay; correct?

A.   Could you repeat that again, please.

Q.   You're not offering any opinion on

MALHOTRA

whether or not the City can pay creditors more
money than it's planned to pay under the plan?

A.   I am saying that the assumptions that
are in the forecast are reasonable based on which
the moneys that are available to spend are
distributed to creditors have been calculated.

Q.   Okay.  In your -- in your scenario that
you've done.  But you're not offering any opinion
about whether you can change the assumptions or do
other things to pay creditors more money.  That's
not within the scope of your work?

A.   No.  If the assumptions change, those
moneys available for creditors would go up or
down.  I'm okay with that, and -- if the
assumptions change.  But, you know, the amounts
available to creditors as shown in the projects,
in my view, are reasonable.

Q.   Okay.  But then the amounts as shown in
the projections that go to creditors can be
increased if you change the assumptions; correct?

A.   It depends on what assumptions.  I mean,
if you -- and I've said this earlier.  If you
change an assumption and you leave everything else
constant, there has to be a change in a result.

MALHOTRA

Q.   That's right.  And so if you change
certain of the assumptions in your model, then you
can increase the amount of money that the
creditors receive; correct?

**A.   I would ask you to be more specific in**
**terms of what certain assumptions mean.**

Q.   Okay.  We can go back to tax rate
increases again.  I mean, increasing the tax rate
or the collection rate on taxes.  You could
increase the amount of money available to
creditors; correct?

**A.   It's a twofold question.  Increasing tax**
**rates and if you assume that everything else**
**remains constant, that more people are actually**
**going to leave -- because if you increase tax**
**rates and more people leave, you're not going to**
**increase revenues.**

Q.   Okay.  Well, we'll assume that you
increase tax rates and hold everything else
constant.  There will be more money for creditors;
right?

**A.   If there is more money for creditors**
**under any assumption, there is more money for**
**creditors.**

MALHOTRA

Q.   And my only point is you could change
the assumptions in your model and you can generate
more money for the creditors; correct?

**A.   It depends on what assumptions you**
**change.  And so if you change the assumptions in**
**the model, the answers will change; that is**
**correct.**

Q.   And you're not attempting to calculate
an actual amount that will be available to
creditors; correct?  Because you're doing a
forecast; right?

**A.   It's a reasonable forecast.  So it's, in**
**my view, the information that we have today.**

Q.   But you're not trying to calculate
actual values in your forecast, by definition;
correct?

**A.   I'd like to understand that question**
**better, because, I mean, we are projecting what**
**the actual values or recoveries are based on the**
**plan adjustment with respect to the notes.  So I**
**just want to make sure that I understand the**
**context of the question.**

Q.   Okay.  Your disclaimer on the front of
your projections says, "There will usually be

MALHOTRA

differences between forecasted and actual
results."  Correct?  That's what your
representation is.

**A.   Yes.**

Q.   Okay.  And so you're not attempting to
calculate actual results; you're calculating
forecasted results; correct?

**A.   Forecasts are not results.  Forecasts**
**are forecasts.  These includes reasonable**
**projections or reasonable forecasts.  So I'm**
**sorry.  I don't understand your question.**

Q.   You're not trying to calculate actual
results.  It says right here on the front of your
projections.

**A.   That's right, because it's a forecast.**
**In the future, it will become an actual.**

Q.   And so you're not trying to calculate
the actual amount of money that is going to be
available to pay creditors over the next 10 years?

**A.   My answer remains the same as earlier.**
**This -- the projection show what amounts would be**
**available for unsecured creditors based on the**
**forecast as laid out herein.  The $630-odd million**
**are in Note B that is laid out are the recoveries**

**MALHOTRA**
**under Note B.**

**And so that is the nominal dollars that**
**will be paid out under Note B, regardless of the**
**forecast in some fashion.**

THE VIDEOGRAPHER:  Excuse me.  Go off
the record?  Going off the record at
4:01 p.m.

(Discussion off the record.)

THE VIDEOGRAPHER:  Back on the record at
4:02.

BY MR. SMITH:

Q.   In the proposal for creditors, do you
recall that there was a provision in there for
some notes that could be adjusted if the City
received additional grant funds for blight
reduction?

**A.   I believe I remember there was**
**something; but if I could see it, I would get**
**refreshed.  But there was --**

MR. SMITH:  I only have a couple copies
of this, unfortunately, but I will label it
as Exhibit 9.  It's Executive Summary of the
Proposal from Creditors.  And if you look at
Page 59.

MALHOTRA

1
2      Here you go.
3      (Exhibit Malhotra-9 was marked for
4      identification.)
5  BY MR. SMITH:
6      Q.  Page 59, it talks about blight
7  reduction.
8      MR. STEWART:  I may have two of these.
9      MR. SMITH:  I'll take one if you've got
10  an extra.
11      MR. STEWART:  Yeah, I do.  This doesn't
12  have a clip on it.
13      MR. SMITH:  Okay.  I was just going to
14  ask about Page 59, that's the only page.
15  BY MR. SMITH:
16      Q.  Do you see where I'm talking about?
17      A.  Yes, I do.
18      Q.  And you've got -- and there was going to
19  be a provision about -- say that there would be an
20  amount equal to 75 percent of the general fund
21  revenues that would otherwise be spent on blight,
22  but for the outside funds, that would be applied
23  to reduce the principal amount of the notes.
24      Does that refresh your recollection
25  about how it was a proposal to give creditors

MALHOTRA

1
2  these notes where they could potentially get
3  reimbursed if there were additional funds for
4  blight that came into the City?
5      A.  I thought the 75 percent was asset
6  sales -- I think the 75 percent was related to
7  asset disposition proceeds.
8      Q.  I'm looking at the paragraph above that.
9  There's two paragraphs here.
10      A.  Okay.
11      Q.  The first one is grants and other -- I'm
12  looking at the second paragraph on the page.  It
13  says, "Grants and other amounts received to offset
14  costs of addressing blight."
15      Do you see that where I'm at?
16      A.  Yes, and I do now.  Thank you.
17      Q.  And the City was provided -- [reading]:
18  If the City receives any cash grants or other
19  payments after the effective date and before the
20  maturity date from the State of Michigan, the
21  federal government, or any other government or
22  nonprofit entity not affiliated in any way with
23  the City for the purpose of funding programs or
24  activities to address blight that are included in
25  the 10 Year plan, blight revenues, and that can be

MALHOTRA

1
2  utilized in place of the general fund sums in the
3  10-year projections in amount equal to 75 percent
4  of the general fund revenues that would otherwise
5  be spent on blight, but for the outside funds,
6  shall be applied to reduce the principal amount of
7  the notes.
8      Do you see that?
9      A.  I do.  That's what it says, yes.
10      Q.  And so the City contemplates that it may
11  have additional grant moneys available from the
12  federal government, the state government, or
13  nonprofit entities to engage in blight reduction
14  efforts over the 10-year period; correct?
15      A.  This was over and above the $500 million
16  estimate that was included for blight removal in
17  this particular proposal.  The City was
18  contemplating how, if more than -- after spending
19  $500 million, if additional funds were being made
20  available or during -- to help fund that
21  $500 million, how some of those proceeds could be
22  shared.
23      Q.  And certainly the City recognizes that
24  in the next 10 years, it may receive additional
25  moneys from the federal, state governments, or

MALHOTRA

1
2  nonprofit entities to engage in blight reduction;
3  correct?
4      A.  No, because it could be increases for
5  certain -- I do not know other revenues that are
6  coming through to the City for blight remediation,
7  and if something happens, we have to look at the
8  overall construct if any other funding is being
9  taken away.
10      Q.  Yeah.  My point here is only that the
11  City recognizes that there could be new grants
12  from the federal government, state government, or
13  nonprofit entities for blight rejection -- blight
14  reduction that it will receive in the next 10
15  years; correct?
16      A.  That's what the City proposed in
17  June 2013, which is evident in the $52 million in
18  hardest-hit funds that the City has --
19      Q.  That would be one example, but the City
20  also contemplated it might get money other from
21  other sources; correct?
22      A.  Not that I know of.
23      Q.  Well, nonprofit entities; right?  It
24  contemplated that it might get money for blight
25  reduction from nonprofit entities?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

A. Well, the City has a grand bargain that is existing with the City's ability to fund its reinvestment program because the grand bargain moneys are coming into the pension.

Q. Okay. So even in the months since this creditor proposal, the City has already received tens of millions of dollars in money that it didn't realize it would receive from various sources; correct?

A. The $52 million of funds that were for hardest-hit funds were not contemplated in the June 2013 proposal for blight.

Q. And then additional revenue from the grand bargain proposal wasn't contemplated in the creditor proposal?

A. That is correct.

Q. And so I mean, in less than a year, the City has been able to generate significant additional revenues from sources that it did not expect to receive back in June of 2013; correct?

A. No. I don't think it's the City -- I mean, when you look at the grand bargain in terms of it's a very specific use that it's being directed towards. So it's not that the City has

MALHOTRA

just, you know, gotten an extra $800 million for its general fund. So . . .

Q. But there are unpredicted receipt of tens of millions of dollars in revenue that have occurred for the City between June 2013 and the present; correct?

A. Could you repeat that question, please.

Q. The City is -- in the last year the City has received tens of millions of dollars in unanticipated revenue from various sources; correct?

A. Let me being specific. The grand bargain was not contemplated in June 2013. The uses of the grand bargain, in terms of the money being spent, were not contemplated in June 2013.

The City has received revenues, but the City has also now got expenses. For the hardest-hit funds, those are new moneys that the City has received in order to help assist the funding of its blight remediation.

Q. Okay. I mean, just in the -- within a few months, the City received more than $50 million it didn't anticipate to fund blight remediation; correct?

MALHOTRA

A. It's been in this -- it's been during the last year. We did not anticipate that $50 million of blight remediation that have come through, thanks to the federal government and how it comes through the state. So but those are -- they could be considered one-time items and were not expected in the June 2013 proposal.

Q. Okay. The forecasts that are included in the June 2013 proposal, are those, given what we now know, materially inaccurate?

A. I don't know what you define as "materially inaccurate."

Q. Why don't you use your own definition of "materially inaccurate."

MR. STEWART: Objection.

THE WITNESS: Well, I can explain changes have been made since the June 2013 proposal. I mean, based on the income taxes and the property taxes information or we can go line item by line item to bridge what has changed.

So I do not know the definition of "materially inaccurate."

BY MR. SMITH:

MALHOTRA

Q. You can't provide me with a definition of "materially inaccurate"; correct?

A. I'm sorry. Can you ask me that again?

Q. Can you provide me a definition of "materially inaccurate" that you would use? Yes or no.

A. No, I don't know what the context "materially inaccurate" is. I mean, so I can't provide a definition of materially inaccurate.

Q. Can you provide me a definition of "scientifically reliable"?

A. No, I cannot. I can provide you with an understanding of what the changes are in the assumptions, but "materially inaccurate" or "scientifically reliable," I can't put that into context.

Q. Can you tell me what, in your view -- well, you're aware that the Department of Transportation brings in hundreds of millions of dollars each year; correct?

A. In terms of revenues?

Q. Yes.

A. Somewhere between 100 and $150 million or up to $200 million. So I don't know if it's

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

increase revenues or reduce costs as long as they can be feasible and reasonable. In my view -- and it's not -- things that are not just rejected. I mean, the City is always looking to improve the operations.

Q. Okay. So in your experience the -- you anticipate that the City, going forward, will continue to look for new opportunities to increase revenues and reduce costs?

A. In my view, the City would do its best to try and at least recognize and accomplish the revenue initiatives, which are quite a few, that have already been incorporated into the plan to achieve its plan of adjustment.

Q. But you would expect that, going forward during the next 10 years, the City will look to develop other initiatives in addition to the reinvestment initiatives that could increase revenue or decrease cost. It just won't stop doing that; right?

A. No. I think the City will continue to focus its -- my belief is, is that the City will continue to try its hardest to ensure that the revenue initiatives that are in the plan are met

MALHOTRA

and the significant costs assumptions that are in the plan are not exceeded.

Q. Okay. One of the assumptions in your forecasts for the next 10 and 40 years, the City will not embark on any new initiatives to increase revenues further or decrease costs; correct?

A. Can you run that by me again, please?

Q. Okay. One of the assumptions in your forecast is that during the next 10 and 40 years, the City won't implement initiatives to increase revenues or decrease costs above and beyond the reinvestment initiatives; correct?

A. I just want to be specific. Like, for instance, asset sales, like of parking or water and sewer, are not included in this forecast. So if the City continues to embark upon an asset sales program, those could be additive to what's mentioned, what's highlighted in the assumptions here.

Q. And as a general matter, any new revenue initiatives or cost-reduction initiatives in the next 10 or 40 years would have to be added on to your projections; correct?

A. No. It could -- I'm sorry. Go ahead.

MALHOTRA

You were laughing.

Q. No, go ahead.

A. Those revenue initiatives could replace the revenue estimates or initiatives that are already in the forecast.

Q. Okay. But your analysis assumes that there won't be any new revenue initiatives or cost-reduction initiatives that increase revenues or decrease costs above and beyond the current forecast; correct?

A. No. They could continue to work on initiatives to even accomplish what is in the current forecast. But it could come through other initiatives versus new initiatives. If you're -- so my question -- answer is the same as earlier.

Q. Yeah, you're not getting my question.

A. Sorry. Okay. If you could please rephrase it, then.

Q. One of the assumptions is that the introduction -- one of the assumptions that you're making is there will be -- there will be no new initiatives that increase revenue above your forecasted amounts during the 10-year period; correct?

MALHOTRA

MR. STEWART: Objection.

THE WITNESS: I apologize. I'm still not getting your question.

BY MR. SMITH:

Q. Okay.

A. If you could rephrase it, it might make it easier for me.

Q. One of your assumptions is that new initiatives -- new initiatives developed within the next 10 years will not increase revenue above your projections; correct?

A. No, that's not correct.

Q. Okay. How does -- so you agree that revenue may be increased above your projections in the next 10 years?

A. No, I did not say that. I am saying that revenue initiatives are based on the plan. Doesn't mean the City stops working towards new initiatives. The City could work towards new initiatives. That could -- those could replace or augment the existing -- the existing initiatives that are already in the plan.

I can't say with -- in a definitive manner that new initiatives will be incremental to

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7004-11    Filed 08/22/14    Entered 08/22/14 21:10:25    Page 46 of 50

1          MALHOTRA
2  what's in the plan or not.
3       Q.  Okay.  So you agree that new initiatives
4  may increase revenues above what you've projected?
5       A.  So as I've said this -- now I'm getting
6  tired.  So . . .
7          If you change the assumptions and you
8  leave everything else the same, if you add more
9  revenue, it will result in a different answer.
10      Q.  I mean, and your example of asset sales
11 is kind of what I'm getting at, but it's not just
12 the privatizations.  I'm trying to get at a more
13 general point.  If there are new estate sales that
14 could -- you're assuming there won't be new asset
15 sales above what -- what you've already assumed in
16 the plan; correct?
17      A.  That is correct.
18      Q.  Okay.  And so, more generally, you're
19 assuming there won't be new initiatives that
20 increase revenue above what you've projected in
21 the forecast currently; correct?
22          MR. STEWART:  Objection.
23          THE WITNESS:  Same question you've asked
24 me earlier, and my response remains the same
25 as earlier.

1          MALHOTRA
2  BY MR. SMITH:
3       Q.  Okay.  And what was the response?
4          MR. STEWART:  It's in the record.  He's
5  not going to repeat -- you've asked him this,
6  I believe.
7          MR. SMITH:  No, I think he has answered.
8          MR. STEWART:  Well, I'm going to ask the
9  reporter to find the question and read his
10 answer.  If you want to repeat it, this will
11 come from the record.  It's not --
12         MR. SMITH:  So you're directing him not
13 to answer.
14         MR. STEWART:  No, I'm directing --
15         MR. SMITH:  I just want to --
16         MR. STEWART:  Please don't interrupt.  I
17 don't interrupt you.
18         MR. SMITH:  Yes, you do.
19         MR. STEWART:  Please don't interrupt me.
20 I'd like the reporter to find that
21 question before and reread the answer since
22 he has said -- and he is right --
23         MR. SMITH:  Are you directing him not to
24 answer the question?
25         MR. STEWART:  -- that you have asked the

1          MALHOTRA
2  same question again and again and he's given
3  you the answer.  You're not allowed to keep
4  doing that.  I haven't objected to --
5          MR. SMITH:  So you're saying I can't ask
6  the question.
7          (Simultaneous cross-talk.)
8          MR. STEWART:  It is really abuse.
9          MR. SMITH:  It's not abusive.
10         MR. STEWART:  It is abusive, and it's
11 improper.
12         MR. SMITH:  So you're saying --
13         MR. STEWART:  You've asked this five
14 times, six times.  Just let's find the
15 answer.  We're going to reread it.
16         And when you reread it, Madam
17 Reporter --
18         MR. SMITH:  Let's go off the record.
19         MR. STEWART:  -- retype it into the
20 record.
21         MR. SMITH:  Let's go off the record, and
22 you can have her look off the record.  But
23 it's not going to count on my time.
24         MR. STEWART:  Okay.  Then ask your next
25 question.

1          MALHOTRA
2          MR. SMITH:  Are you directing him not to
3  answer the question --
4          MR. STEWART:  He just answered the
5  question.
6          MR. SMITH:  He didn't answer.
7          MR. STEWART:  Yes, he did.
8          Reread his last answer.
9          MR. SMITH:  His answer was "I've already
10 answered."
11         MR. STEWART:  That was his answer.
12         MR. SMITH:  Okay.
13 BY MR. SMITH:
14      Q.  Your forecast doesn't include revenue
15 initiatives different from those that are in the
16 reinvestment plan; correct?
17      A.  That is correct.
18      Q.  Okay.  And so your plan is essentially
19 assuming that the revenue initiatives that are in
20 the reinvestment plan will continue for 10 years;
21 correct?
22      A.  Yes.  In fact, for 40 years.
23      Q.  Yeah.  And so you're assuming that there
24 won't be new revenue initiatives different from
25 those in the plan for the next 40 years; correct?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1    MALHOTRA
2    A.  No.
3    Q.  So there could be new initiatives that
4  increase revenues above your projections; correct?
5    A.  If there are new revenues and everything
6  else remains the same, everything else remains the
7  same, it would be new increment -- if there's new
8  incremental revenues, the data would be different.
9    What I'm trying to say is the City --
10  when you say the new initiatives will result in
11  new revenues, that's not correct.  That's because
12  new initiatives may further augment and support
13  the initiatives that are already in here to get
14  the revenue that the City is projecting.  It's not
15  just newfound incremental revenue.
16    Q.  And my point is you're assuming that
17  there won't be new initiatives that provide
18  incremental revenue; correct?
19    A.  My point -- my point is that the
20  assumptions that are in here reflect the
21  initiatives that are in here.  If everything else
22  remains the same and all you do is you say that
23  let's assume there is a new revenue item, that
24  would be a new assumption; that will result in
25  more revenue, assuming all the other initiatives

1    MALHOTRA
2  and all the other assumptions are exactly the same
3  and the City has already accomplished the revenue
4  items that are laid out in its investment plan.
5    Q.  So you are assuming that there won't be
6  new revenue initiatives that augment the revenue
7  above and beyond what you've projected; correct?
8    A.  We have not assumed any asset sales from
9  DWSD and public parking in these projections.  If
10  that is what you're referring to, that is correct,
11  if you are not referring to those discrete asset
12  sales in these projections.
13    Q.  And there are other initiatives other
14  than those two that the City might develop in the
15  next 10 or 40 years that could lead to incremental
16  revenues; correct?
17    MR. STEWART:  Objection; asked and
18    answered.
19    THE WITNESS:  Could you repeat that
20    again, please.
21  BY MR. SMITH:
22    Q.  There are other initiatives other than
23  the parking and the DWSD that you mentioned that
24  could -- the City might develop within the next 10
25  or 40 years that could add incremental revenues;

1    MALHOTRA
2  correct?
3    A.  It depends on if all the other items
4  remain the same and the City achieves all of its
5  revenue estimates already and if there is a new
6  initiative on top of that.  So everything else has
7  to remain the same in order for that statement to
8  be correct.
9    So that's the only way I can answer it,
10  is you're asking if there's going to be a new
11  revenue initiative to increase more revenues; and
12  my answer is, no, not necessarily, because new
13  initiatives could replace existing initiatives and
14  still yield the same amount of revenue.
15    Q.  And I'm -- you're -- one of the
16  assumptions in your model is new initiatives won't
17  yield additional revenue over the next 10 or 40
18  years; correct?
19    MR. STEWART:  Objection.
20    THE WITNESS:  I've said no to that --
21    I've said no to that.
22  BY MR. SMITH:
23    Q.  I guess I'm trying to figure out how you
24  can say no to that.
25    A.  Well, if you --

1    MALHOTRA
2    MR. STEWART:  That's not a question.
3    MR. SMITH:  Yes, I --
4    MR. STEWART:  No, it isn't.  That's not
5    a question.
6    MR. SMITH:  Stop interrupting.  You
7    really are obstructing the deposition --
8    MR. STEWART:  Let's call the judge.
9    MR. SMITH:  -- and smirking.
10    MR. STEWART:  Let's call the judge.
11    MR. SMITH:  You're just --
12    MR. STEWART:  Let's get him on the
13    phone.  I'm going to have the reporter read
14    these questions.  And I'm going to move for
15    sanctions against you.
16    MR. SMITH:  Okay.  Let's --
17    MR. STEWART:  You keep pushing and
18    you'll wish you hadn't.
19    MR. SMITH:  There's no basis.
20    MR. STEWART:  You wait.  You just wait.
21    Now, what's your next question?
22  BY MR. SMITH:
23    Q.  The City could get new grants that add
24  incremental money in the next 10 or 40 years;
25  correct?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 48 of
50

MALHOTRA

1 pension, it's just making a situation worse,
2 because the plans continue to deplete assets and
3 the position of the funds continues to get worse
4 and worse.
5     Q.   Does your base-case scenario include any
6 assumptions regarding asset sales by the City?
7     A.   Not -- I mean, just things like a
8 building and the typical asset sales that continue
9 in normal course, but nothing substantive like
10 DWSD or the parking system.
11    Q.   How about art?
12    A.   No.
13    Q.   Have you run alternative versions of the
14 base-case scenario that include an assumption
15 regarding a sale of DWSD or parking or art?
16    A.   We have not run a scenario with parking
17 or art.
18        Regarding DWSD, we did run a scenario a
19 long time ago -- and I can't remember when -- or a
20 few months ago, in which we were looking at a DWSD
21 lease scenario versus not.  So that's the only
22 thing that comes to mind for DWSD.
23    Q.   In the 40-year projections, you
24 summarize the hypothetical distributions to

MALHOTRA

1 creditors.  And you've included a present-value
2 calculation using a 5 percent discount rate;
3 correct?
4     A.   That is correct.
5     Q.   What's the basis for using 5 percent?
6     A.   We looked at a couple of items in terms
7 of what the average interest rate was on the LTGO
8 debt outstanding of the City; looked at the
9 long-term interest rates on AA-rated municipal
10 bonds; and then had discussions with the Miller
11 Buckfire team to ascertain whether they were
12 reasonable or not.
13    Q.   Will you be testifying about the -- as
14 an expert about the reasonableness of that
15 5 percent discount rate?
16    A.   I don't know.  I would have to check,
17 but I've had discussions with Ken Buckfire and Jim
18 Doak on that, so I would have to go back and
19 check.
20    Q.   We spoke previously about alternative
21 formulations of the base-case scenario.  I now
22 want to shift the focus a little bit and talk
23 about potential alternative versions of the
24 40-year forecast.

MALHOTRA

1     So I'm just making sure we're on the
2 same page here.
3     Have you run an alternative 40-year
4 forecast that provided for a different treatment
5 of the art than what is currently contemplated by
6 what's referred to as the grand bargain?
7     A.   No.
8     Q.   Why not?
9     A.   We weren't asked to do so.
10    Q.   Do you know why you were not asked to do
11 so?
12    A.   No.
13    Q.   Have you ever considered the impact on
14 the City's revenues if the DIA museum was closed?
15    A.   No.
16    Q.   Have you ever considered the impact on
17 the City's revenues if the DIA art collection was
18 sold?
19    A.   No.
20    Q.   Have you ever considered the impact on
21 the City's revenues if the art collection was
22 removed from the City of Detroit?
23    A.   No.
24    Q.   Earlier you testified in response to one

MALHOTRA

1 of Mr. Smith's questions about your expert report
2 that if the City reaches more settlements, you
3 expect to update your forecast, is that correct?
4     A.   Yes; if the settlements change the
5 forecast in any way.
6     Q.   Putting that aside, is there any
7 additional work or changes that you expect to make
8 to your forecasts?
9     A.   Not as of yet that comes to mind.  We do
10 not have an updated version since the July 2nd
11 update.
12    Q.   A few minutes ago we were talking about
13 alternative base-case scenarios where you assumed
14 different treatment of assets, and you testified
15 that you did run an alternative scenario where you
16 assumed that there was a lease for DWSD.
17        Do you recall that?
18    A.   Yes.  It was done -- I don't know if it
19 was just the base-case scenario or if it was a
20 base-case including the restructuring scenario.
21 And my recollection is it was a base case plus the
22 restructuring investments if what could -- what
23 could potentially happen if there was a DWSD
24 transaction.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

MALHOTRA

Q. How much annual revenue did you assume could be derived from that DWSD leasing transaction?

A. This is a few months ago. I think at that point in time the scenario was roughly a $47 million lease payment annually, but I would have to go back and check.

Q. Do you know if those -- if that alternative scenario was produced?

A. I believe it would have been produced. I don't know. I don't -- I haven't seen the few documents that have been produced. But my guess is they were circulated with the advisers potentially, but I have to go back and look.

MS. DiBLASI: Geoff, we'll check. And if we're not able to find it, we'll come back to you.

MR. STEWART: Give me a call.

MS. DiBLASI: Just one moment, please.

BY MS. DiBLASI:

Q. Do you think that upon emergence from the Chapter 9 bankruptcy case, Detroit will be AA-rated -- will be a AA-rated credit?

A. I do not know. I think that's

---

MALHOTRA

something I would let Ken respond to.

Q. And when you considered the appropriateness of a 5 percent discount rate for present-valuing creditor distributions, did you look at the LTGO interest rates or did you look at their yields?

A. I can go back and check. I thought we looked at the LTGO interest rates.

Q. Is the B note an LTGO bond?

A. That's -- I cannot say. I don't think it's an LTGO bond.

MS. DiBLASI: I have nothing further.

MR. STEWART: Anyone on the phone?

MS. HUNGER: Does anyone on the phone have any questions?

MS. DiBLASI: We're done.

MR. STEWART: I guess you're done.

THE VIDEOGRAPHER: This concludes the video deposition at 5:15 p.m. Going off the record.

(Videotaped deposition concluded at 5:15 p.m.)

---

MALHOTRA

C E R T I F I C A T I O N

I hereby certify that I have read the foregoing transcript of my deposition testimony, and that my answers to the questions propounded, with the attached corrections or changes, if any, are true and correct.

------------------------------------
GAURAV MALHOTRA

---

MALHOTRA

CERTIFICATE OF SHORTHAND REPORTER

I, Gail Inghram Verbano, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter (CA) and Notary Public, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____
Gail Inghram Verbano, CSR, RDR, CRR
CA-CSR No. 8635

---

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7004-11   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 50 of 50