## <u>Exhibit 6F</u>

**Excerpts of July 24, 2014 C. Sallee Deposition Transcript**

```
 1              UNITED STATES BANKRUPTCY COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3    In re                      )

 4                               ) Chapter 9

 5    CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846

 6        Debtor.                ) Hon. Steven W. Rhodes

 7

 8              The videotaped deposition of CAROLINE

 9    SALLEE, called for examination pursuant to the

10    Rules of Civil Procedure for the United States

11    District Courts pertaining to the taking of

12    depositions, taken before GINA M. LUORDO, a notary

13    public within and for the County of Cook and State

14    of Illinois, at 77 West Wacker Drive, Suite 3500,

15    Chicago, Illinois, on the 24th day of July, 2014,

16    at the hour of 9:04 a.m.

17

18

19

20

21

22

23

24    Reported by:  Gina M. Luordo, CSR, RPR, CRR

25    License No.:  084-004143
```

1   on your behalf to represent you today, if you know?
2       A.   I don't know.
3       Q.   You're functioning, I guess -- there are
4   multiple Ernst & Young witnesses who have filed
5   expert reports in the case.  You're aware of that,
6   correct?
7       A.   Yes.
8       Q.   And I want to try to figure out kind of
9   your role with respect to these other witnesses,
10  okay?
11      A.   Okay.
12      Q.   You're holding yourself out as an expert,
13  I guess, in tax policy; is that correct?
14      A.   So I'm an expert in the real and personal
15  property taxes for the General Fund for the City of
16  Detroit.
17      Q.   You're not holding yourself out as an
18  expert in urban policy, correct?
19      A.   Correct.
20      Q.   You're not an expert in health benefits?
21      A.   Correct.
22      Q.   You're not an expert on government?
23      A.   Correct.
24      Q.   You're not an expert on blight reduction?
25      A.   Correct.

1       Q.   You're not an expert on property
2   assessment?
3       A.   I'm not an expert on property assessment.
4       Q.   And you've never assessed property before,
5   correct?
6       A.   That's correct.
7       Q.   You're not an expert in property tax
8   collection?
9       A.   That's correct.
10      Q.   Not an expert on real estate valuation?
11      A.   Correct.
12      Q.   Never done a real estate valuation before?
13      A.   That's correct.
14      Q.   Never been involved in property tax
15  collection before, correct?
16      A.   By understanding the mechanisms of
17  property tax collections, I understand those, but
18  in terms of an expert in how it's being collected?
19  Logistics?
20      Q.   Well, I'm asking more of a factual
21  question.  Have you ever personally been involved
22  in collecting property taxes before?
23      A.   No, I have not.
24      Q.   You're not holding yourself out as an
25  expert in real estate in general, correct?

1       A.   Correct.
2       Q.   You're not an expert on the state
3   government or the Michigan government, correct?
4       A.   Correct.
5       Q.   Not an expert on casinos or wagering
6   revenue?
7       A.   Correct.
8       Q.   Not an expert on wagering tax revenue?
9       A.   Correct.
10      Q.   Not an expert on art valuation?
11      A.   Correct.
12      Q.   Not an expert on pensions?
13      A.   Correct.
14      Q.   Not an expert on government grants?
15      A.   Correct.
16      Q.   You're not an expert on information
17  technology?
18      A.   No.
19      Q.   You're not an expert on transportation
20  systems?
21      A.   Correct.
22      Q.   And you wouldn't hold yourself out as an
23  expert in accounting?
24      A.   Correct.
25      Q.   You're not an expert in financial

1   analysis?
2       A.   Correct.
3       Q.   You are not an expert on Chapter 9
4   bankruptcy?
5       A.   Correct.
6       Q.   You're not holding yourself out as an
7   expert on state revenue sharing?
8       A.   So I am holding myself out as an expert on
9   state revenue sharing for the City of Detroit.
10      Q.   Have you ever been involved in state
11  revenue sharing before?
12      A.   What do you mean by involved?
13      Q.   I mean, has there ever been any work that
14  you've done in the area of state revenue sharing
15  before?
16      A.   Any work?  So I've analyzed how the State
17  of Michigan does their revenue sharing, and I've
18  looked at distribution to certain counties, cities,
19  townships.  So in that capacity, I understood how
20  it's done in this case, how the revenue was
21  going to the City of Detroit.
22      Q.   Is the only work you've done on state
23  revenue sharing for purposes of this case?
24      A.   No.
25      Q.   What was the other work you've done?

1    A.   So I've done some work for the City of
2  Flint, Michigan and then looking at how revenue
3  sharing worked for past clients at my old job.
4    Q.   What was that job?
5    A.   I worked for Anderson Economic Group.
6    Q.   And did you do work on Michigan revenue
7  sharing or other states' revenue sharing?
8    A.   Just Michigan.
9    Q.   Okay.  And you understand that the state
10 has significantly cut its revenue sharing to all
11 the cities in Michigan in recent years, correct?
12   A.   I understand that Michigan revenue sharing
13 has gone down.
14   Q.   And it's gone down by hundreds of millions
15 of dollars to Detroit, correct?
16   A.   I wouldn't say hundreds of millions of
17 dollars.  So overall Michigan's revenue sharing has
18 gone down, and Detroit has had fluctuations.  So in
19 any given year, it's gone up and down.
20   Q.   Well, there have been analyses, though,
21 that have showed that the cuts in recent years have
22 cost Michigan -- I mean cost the City of Detroit
23 more than $700 million.  You're aware of that,
24 correct?
25   A.   I can't speak to that because I don't have

1  an analysis in front of me.
2    Q.   I mean, do you know how much cumulatively
3  the cuts in the last decade to revenue sharing have
4  cost the City of Detroit?
5    A.   I do not know that.
6    Q.   You know that many cities, though, are
7  under financial distress in Michigan because of the
8  cuts to revenue sharing, correct?
9    A.   I can't speak about other cities and
10 townships.
11   Q.   Well, the City of Flint, was that city
12 under financial distress?
13   A.   The City of Flint has been under financial
14 distress, yes.
15   Q.   And is one of the causes of financial
16 distress of the City of Flint the cut in state
17 revenue sharing?
18   A.   I would say it's been one of the factors.
19   Q.   And one of the factors causing Detroit's
20 fiscal distress is the cut to state revenue
21 sharing, correct?
22   A.   One of the causes --
23   Q.   Yes.
24   A.   -- you're asking?  I would say for the
25 City of Detroit, reductions to state revenue

1  sharing is a problem for them, yes.
2    Q.   And the City of Flint, when it was in
3  fiscal distress, what activities did it try to
4  engage in to improve its fiscal condition?
5    A.   I can't speak to that.
6    Q.   What specifically were you doing for the
7  City of Flint?
8    A.   So this is a public case, so I feel I can
9  talk about it.  So we were retained by the City of
10 Flint to look at their revenue forecasting for the
11 next five years.
12   Q.   And so the City of Flint did revenue
13 forecasting over a period of five years?
14   A.   That's right.
15   Q.   And why were you doing that?  Why were you
16 looking at the revenue forecasting?
17   A.   Because we were asked to.
18   Q.   I mean, why did they want you to, though?
19 What was --
20   A.   My understanding is that EY had -- was
21 hired, and I was brought in from the restructuring
22 team to look at the revenue forecasting, and they
23 were asked by the State of Michigan to look at
24 their -- both their expenses and their --
25 forecasted expenses and revenues, and the State

1  wanted them just to do one more check.
2    Q.   And was the City of Flint put under an
3  emergency manager as a result of fiscal distress?
4    A.   They have been under emergency financial
5  management, yes.
6    Q.   And do you know what actions the emergency
7  manager has taken to alleviate financial distress?
8    A.   I do not.
9    Q.   Do you know if Flint has improved its
10 fiscal situation at all?
11   A.   I do not.
12   Q.   Do you know -- as far as you know, did the
13 City of Flint ever consider going into Chapter 9 as
14 a result of fiscal distress?
15   A.   I don't know.
16   Q.   You're not aware of that ever coming up?
17   A.   I don't know if they've ever talked about
18 it.
19   Q.   During your interactions with the City of
20 Flint, though, they never suggested to you that
21 they would go into Chapter 9 to alleviate fiscal
22 distress, correct?
23   A.   So during my conversations with the City,
24 we never talked about whether or not they would go
25 into bankruptcy.

1    Q.   And why was the State of Michigan having
2  the City look at its revenues again?
3      MR. STEWART:  Objection.
4      THE WITNESS:  I don't know.
5  BY MR. SMITH:
6      Q.   Do you know if the city of -- City of
7  Flint cut costs and services in order to address
8  fiscal distress?
9      A.   I don't know.
10     Q.   Do you know if -- I mean, you were doing
11 the revenue forecasting, I guess.  Do you know if
12 the City of Flint raised taxes in order to address
13 its fiscal distress?
14     A.   So I was doing forecasting, so in terms
15 of -- I don't know what they had done in the past.
16 Going forward, we looked at the various taxes and
17 whether or not things were going to expire at
18 certain times, so it was all under current law,
19 things that had been planned so...
20     Q.   What kind of things did the City of Flint
21 plan in terms of taxes for raising revenue?
22     A.   They -- so I looked at their property and
23 income taxes and state revenue sharing.  They had
24 certain millages that were going to expire at
25 certain times, and so we just took that into

1  account in our forecast, made sure we were
2  following what was the current law.
3      Q.   Were there increases in taxes that were
4  planned or increases in tax revenues that you
5  incorporated into your Flint revenue --
6      A.   So anything that was in current law we
7  incorporated.
8      Q.   And what would that include?
9      A.   Off the top of my head, I can't remember.
10     Q.   When did you do the analysis for Flint?
11     A.   I did it in February of 2014.
12     Q.   You mentioned that you can talk about this
13 because it's public, correct?
14     A.   Correct.
15     Q.   Are there nonpublic engagements that
16 Ernst & Young has been engaged for for cities in
17 Michigan?
18     A.   Not that I'm aware of.
19     Q.   Are there other nonpublic engagements that
20 you've been engaged in by any cities?
21     A.   Nonpublic engagements, yes.
22     Q.   How many of those are there?
23     A.   I can't recall at the moment off the top
24 of my head.
25     Q.   Do those have anything to do with the

1  Detroit bankruptcy?
2      A.   No.
3      Q.   The -- did the City of Flint receive,
4  other than the revenue sharing, any special
5  assistance from the State in terms of monetary
6  payments?
7      A.   I don't know.
8      Q.   Before the City of Detroit matter, though,
9  had you ever forecast state revenue sharing
10 payments?
11     A.   Before the Detroit matter, no.
12     Q.   In Flint, are there -- other than -- one
13 difference between your projections in the City of
14 Flint and the City of Detroit matter is the length
15 of time over which the projection occurs, correct?
16     A.   There were different time periods that I
17 was asked to look at, yes.
18     Q.   And you were asked to look at a shorter
19 period for Flint, Michigan, correct?
20     A.   I was asked to look at five years.
21     Q.   Which is shorter than --
22     A.   Which is shorter than 10, yes.
23     Q.   Are there other differences in your
24 methodology for the Flint projections compared to
25 Detroit?

1      A.   No.
2      Q.   Were you asked to look at anything other
3  than property tax and state revenue sharing, or did
4  you do other sources of revenue?
5      A.   We looked at other sources of revenue.
6      Q.   Okay.  What other sources?
7      A.   So income taxes.
8      Q.   Anything else?
9      A.   So what I was responsible for was property
10 and revenue sharing, so those are the ones that I'm
11 comfortable talking about.
12     Q.   I mean, do you know if there were other
13 revenue sources?
14     A.   There are other revenue sources, yes.
15     Q.   What were the other revenue sources for
16 Flint?
17     A.   So those were the ones that I was not
18 personally involved in forecasting.
19     Q.   Well, I'm just wondering what they were,
20 not the details necessarily.
21     A.   Just like any city, they would have
22 certain grants or other things, but that was not
23 what I looked at.
24     Q.   So one significant source of revenue for a
25 city is grants from either the federal government

1 or the state government, correct?
2 MR. STEWART: Just a second. Objection.
3 BY MR. SMITH:
4 Q. Now you can answer.
5 MR. STEWART: You can answer the question.
6 THE WITNESS: I guess I don't know what the
7 question is.
8 BY MR. SMITH:
9 Q. One significant source of revenue for a
10 city is grants from the federal government or state
11 government, correct?
12 A. I guess it depends on the city and what
13 you mean by significant.
14 Q. For the City of Detroit, grant money from
15 the state and federal governments is a significant
16 source of funds, correct?
17 A. I don't know.
18 Q. You would agree that property tax revenue
19 is a significant sort of revenue for Detroit,
20 correct?
21 A. What do you mean by significant?
22 Q. Well, you've used the word significant
23 before, right?
24 A. I don't know. I don't think I have.
25 Q. You're saying in your life, you've never

1 used the word significant before?
2 A. Well, I use it, but I don't know if I
3 would use it in this context, so what do you mean
4 by significant?
5 Q. Okay. The property tax revenue would be
6 one of the top revenue sources for the City of
7 Detroit?
8 A. So for the City of Detroit, when I look at
9 the various tax components, property tax revenue
10 makes up a good portion of the tax revenue that the
11 City receives.
12 Q. Do you know what the proportion is?
13 A. So it's around 17 percent.
14 Q. And what's the proportion of revenue for
15 the city that the state revenue sharing makes up?
16 A. Off the top of my head, I don't know.
17 Q. Would it be fair that to say that state
18 revenue sharing is one of the top revenue sources
19 for the City of Detroit?
20 A. State revenue sharing, when I look at the
21 tax revenue plus the state revenue sharing, state
22 revenue sharing is a good portion of that revenue,
23 yes.
24 Q. Have you ever forecasted expenditures for
25 a city?

1 A. Expenditures for a city? No, I haven't.
2 Q. Before -- before the Detroit matter, did
3 you ever forecast property tax revenues?
4 A. Yes.
5 Q. What context did you do that?
6 A. I would do it for clients related to
7 certain projects, so for example, I would be
8 retained in my old job to look at a new facility
9 and then to forecast the property tax revenue from
10 that.
11 Q. Okay. But before the Detroit matter, you
12 never forecasted the total property tax revenues a
13 city received, did you?
14 A. For -- what do you mean the total forecast
15 for a city?
16 Q. I mean you never forecasted the amount of
17 property tax revenue a city would receive in total
18 before your retention on the Detroit matter,
19 correct?
20 A. That's correct.
21 Q. You've never been qualified as an expert
22 by any court; is that correct?
23 A. That's correct.
24 Q. Have you ever been retained to do any
25 expert work before in a litigation context?

1 A. Yes.
2 Q. And what context was that?
3 A. Sorry. Let me clarify. Do you mean -- so
4 in my old job, my boss had been an expert on a
5 number of cases, so I would work on his cases. I
6 was not the expert, though.
7 Q. Okay. So you've done litigation
8 consulting work before, but you weren't personally
9 the expert, correct?
10 A. That's correct.
11 Q. When did you begin your work on the City
12 of Detroit matter?
13 A. I started work in May of 2013.
14 Q. Have you ever forecasted municipal
15 population levels before?
16 A. For specific projects in my old job, yes.
17 Q. Have you ever forecasted -- have you ever
18 done a forecast for municipal revenue sharing for
19 the Detroit matter?
20 A. No, I don't think so.
21 Q. And have you ever forecasted what future
22 property assessments would be in a city before the
23 Detroit matter?
24 A. So in this case, I forecasted taxable
25 value, which obviously has some relationship with

1  assessments, and this is the first time that I did
2  that for a municipality, yes.
3      Q.  You're not a lawyer, correct?
4      A.  I am not.
5      Q.  And you're not holding yourself out as a
6  legal expert?
7      A.  What do you mean by legal expert?  I'm an
8  expert in this case.
9      Q.  Okay.  Are you offering any opinions on
10  the law like as it relates to this case?
11     MR. STEWART:  Objection.
12     THE WITNESS:  I don't think I'm offering
13  opinions on the law.  I'm offering opinions on the
14  two things that are in my report.
15  BY MR. SMITH:
16     Q.  Okay.  So other than what's in your
17  report, you're not offering any expert opinions
18  other than that, correct?
19     A.  That's correct.
20     Q.  Okay.  And is it fair to say that in your
21  report, you're not -- or anywhere else, you're not
22  trying to offer an opinion about interpreting the
23  law, correct?
24     A.  I'm not offering an interpretation of the
25  law.

1      Q.  Okay.  Have you reviewed any depositions
2  in this case?
3      A.  Yes.  No, I haven't.  Sorry.  I've
4  reviewed expert reports.  Sorry.
5      Q.  But no depositions?
6      A.  I have not reviewed depositions.
7      Q.  So you didn't review Mr. Evanko's
8  deposition?
9      A.  I have not reviewed Mr. Evanko's
10  deposition.
11     Q.  You know who Mr. Evanko is, though,
12  correct?
13     A.  I do.
14     Q.  Who is Mr. Evanko?
15     A.  Gary Evanko --
16     Q.  Yes.
17     A.  -- is the city assessor for the City of
18  Detroit.
19     Q.  Have you -- you mentioned you had reviewed
20  expert reports.  What expert reports have you
21  reviewed?
22     A.  I have read Robert Cline's expert report
23  and Gaurav Malhotra's.
24     Q.  Any other expert reports?
25     A.  Not that I'm aware of, no.

1      Q.  You didn't read Charles Moore's expert
2  report, correct?
3      A.  I have not.
4      Q.  And do you know who he is?
5      A.  I do not.
6      Q.  Do you know --
7      A.  And I read Martha -- what's her last name?
8      Q.  Ms. Kopacz?
9      A.  Yes.  Thank you.
10     Q.  You read her report?
11     A.  I did read her report.
12     Q.  And you know that Ms. Kopacz opines that
13  the forecasts Ernst & Young had presented were
14  subjective, correct?
15     MR. STEWART:  Objection.
16     THE WITNESS:  I do not recall reading that, no.
17  BY MR. SMITH:
18     Q.  Do you recall her doing an analysis where
19  she calculated the effect of a 1 percent increase
20  in property tax collections?
21     A.  I did read her report where she did do the
22  sensitivity analysis, yes.
23     Q.  She found that increasing property tax
24  collections by 1 percent could lead to more than a
25  $20 million increase in revenue, correct?

1      A.  My recollection from her report is that if
2  you assumed that -- if you were able to change the
3  parameter by 1 percent, what would that mean over
4  the long haul, and my recollection is over
5  20 million in property tax revenue.
6      Q.  Has Ernst & Young done any sensitivity
7  analysis on its forecast to understand what
8  changing the inputs would mean in terms of revenues
9  available to the city?
10     A.  Throughout the process, we would vary our
11  assumptions, change our assumptions and see what
12  the revenue impacts are.
13     Q.  And what assumptions did you change during
14  the process?
15     A.  So for property taxes, we would change the
16  important drivers, so whether it be taxable value
17  or collection rates.  Those are the key assumptions
18  that we would change.
19     Q.  And did you increase or decrease taxable
20  value over time, I mean, in changing the
21  assumptions?
22     A.  Well, so do you have a -- I mean, both.  I
23  mean, there are times when we would say we would
24  get a new piece of information, and we might adjust
25  our growth rates, and sometimes they would raise

1  forecasting for the City, correct?
2      A.  I wouldn't say that, no.
3      Q.  Okay.  Did Katie Ballard do any of the
4  forecasting for the City?
5      A.  She did not.
6      Q.  Has Katie Ballard ever done forecasting
7  for the City before?
8      A.  I don't know, so maybe I should say she
9  did assist me on the Flint matter.
10     Q.  Would it be fair to say that you were
11 relying on the expertise of the City of Detroit
12 people that you talked to in formulating the
13 assumptions for your forecast?
14     A.  I had conversations with the City, and I
15 used the information that they gave me in forming
16 my opinion.
17     Q.  Did you do any independent testing or
18 analysis of the information that was provided to
19 you by the City for your forecast?
20     A.  So what do you mean by independent
21 testing?
22     Q.  Did you go back and test any of the data
23 that the city provided you for your forecast to
24 ensure it was accurate?
25     A.  I checked to make sure that the ad valorem

1  taxable value information they gave me matched what
2  was in the State Tax Commission reports, and that
3  was the only check to make sure that those numbers
4  matched.
5      Q.  Was there information that the city
6  provided you that you didn't do independent testing
7  for to ensure its accuracy?
8      A.  I did not verify every piece of
9  information, go back and see if I thought it was
10 accurate.  I did not do that.
11     Q.  What were some of the pieces of
12 information you didn't do any testing to verify its
13 accuracy?
14     A.  So for the most recent tax bills, the ad
15 valorem data.  I took that information they gave me
16 since it was certified and used it.
17     Q.  Anything else?
18     A.  I had conversations with the City about
19 when they were planning to hire consultants to do
20 the reappraisal study.  I did not go back and check
21 to see when a contract was filed or things like
22 that.
23     Q.  Other information that you relied on from
24 the City you didn't verify its accuracy?
25     A.  I took information from their audited

1  financial statements.  They had been audited, so I
2  didn't go back and check.  They ran certain reports
3  from their system.  I didn't have access to those
4  systems, so I took that information.
5      Q.  And other information you received from
6  the City you didn't verify its accuracy?
7      A.  I don't think so.
8      Q.  I mean, basically on the conversations
9  with the City officials that were used to formulate
10 your assumptions, you didn't do anything to verify
11 the accuracy of what the people at the City were
12 telling you; is that fair?
13     MR. STEWART:  Objection.
14     THE WITNESS:  I don't think that's fair.
15 BY MR. SMITH:
16     Q.  Were there instances, though, where people
17 from the City gave you information verbally that
18 you used in formulating your assumptions where you
19 didn't go and try to verify the accuracy of the
20 information?
21     A.  There were times when the City would give
22 me -- would tell me something over the phone or
23 what they planned to do, and there are times that I
24 would have conversations with our ground -- our
25 team on the ground in Detroit.  I would talk to

1  multiple people about what was going on, talk to
2  the mayor.  So there were times where I was able to
3  make sure the information was consistent, and there
4  were other times where they would run a report, and
5  they'd give it to me, and I accepted it.
6      Q.  So generally when the City would run a
7  report from their system to which you didn't have
8  access, you wouldn't do anything to verify the
9  accuracy of that report, correct?
10     A.  Sometimes I was able to go back and look
11 to see if, like I said, the taxable value matched
12 what was being reported to the state or available
13 in other systems or would show up in a budget book
14 or an audited financial statement.  So there are
15 times I was able to check to make sure the numbers
16 were consistent, and then there were times where I
17 had requested collection rate information by
18 property type that they had to run a report for me.
19 I talked to the person, made sure I understood it,
20 made sure numbers added up, and then I would accept
21 it.
22     Q.  You didn't verify the accuracy of the
23 collection rate information, though, that you have
24 you were given by the City, correct?
25     A.  If you mean by -- what do you mean by

1    verify?
2    Q.   You didn't go back to actually test and
3    verify the accuracy of the collection rate
4    information that was given to you by the City,
5    correct?
6    A.   I was not able to go and, say, run the
7    report myself or look at their base data.
8    Q.   When you began work on this case, was
9    there already some sort of model in place for
10   forecasting property tax or state revenue sharing
11   revenue?
12   A.   There was a model in place for property
13   taxes.
14   Q.   Do you know who created that model?
15   A.   I do not know.
16   Q.   Did you look at the experience of any
17   other cities in developing your forecast?
18   A.   No.
19   Q.   Do you know what cities would be
20   comparable to Detroit in terms of their financial
21   situation?
22   A.   No.
23   Q.   Did you rely on data provided by the
24   assessor's office in formulating your opinions?
25   A.   I did receive data from the assessor's

1    office.
2    Q.   And you relied on that in formulating your
3    opinions?
4    A.   I did rely on some of that data.
5    Q.   Did you work with Shavi Sarna at all?
6    A.   I did.
7    Q.   What was your interaction with that
8    individual?
9    A.   Shavi and I would have conversations.  We
10   would exchange e-mails.  He would ask questions.
11   Q.   Do you know what fees the City collects?
12   A.   What do you mean by fees?
13   Q.   Well, you know the City of Detroit charges
14   fees for various services, correct?
15   A.   Correct.
16   Q.   Do you have any idea what fees the City of
17   Detroit collects?
18   A.   I don't.
19   Q.   Do you have any idea what licensing
20   revenues the City gets?
21   A.   I don't.
22   Q.   Do you have any idea what the mechanisms
23   for property tax assessment are in the City?
24   A.   What do you mean by mechanisms?
25   Q.   I mean, can you -- are you able to explain

1    the mechanism or methodology used in assessing
2    property taxes?
3    A.   I don't know what the city assessor's
4    office was doing to assess property.  I don't know.
5    Q.   Can you explain the methodology used by
6    the City in collecting property taxes?
7    A.   No.
8    Q.   Can you explain to me the methodology the
9    city used in setting property tax rates?
10   A.   No.
11   Q.   Can you explain the methodology the State
12   used in setting the revenue sharing levels?
13   A.   So there are two parts of revenue sharing.
14   So there's the constitutional portion, which has a
15   formula, and then there's the EVIP portion, the
16   Economic Vitality Incentive Program.  And in terms
17   of how exactly they decide what they're going to
18   allocate cities, villages or townships, I don't
19   know the formula for that.
20   Q.   Okay.  So it would be fair to say that you
21   don't know the formula or methodology used in
22   setting the statutory portion of the revenue
23   sharing; is that correct?
24   A.   I wouldn't say that.  The EVIP portion
25   doesn't have a formula, and so it would be

1    inaccurate to say I don't know the formula because
2    there isn't a formula.
3    Q.   Let me re-ask my question then.
4    Would it be fair to say you don't know the
5    methodology used in setting the EVIP portion of the
6    state revenue sharing?
7    A.   I personally don't know why legislators
8    decide to allocate a certain amount of money to
9    Detroit.  There is a -- there are three components
10   to EVIP.  There's supposed to be -- they're
11   supposed to meet certain things in order to get the
12   revenue, but what the legislature decides year to
13   year to allocate is their discretion, so...
14   Q.   Basically the amount of revenue sharing,
15   would you agree, is a discretionary political
16   decision by the legislature?
17   A.   For EVIP, it is the discretion of the
18   legislature.
19   Q.   And it's a political decision.  The amount
20   of money that the legislature decides to give to
21   cities is decided by people who are elected and
22   make a political decision about how much money to
23   give, correct?
24   A.   People who are elected make that decision.
25   Q.   And the decision about how much money the

1 City gets in state revenue sharing is a decision
2 that's made in the political process, correct?
3    A.  I wouldn't say that because there are two
4 components.
5    Q.  The EVIP portion of the state revenue
6 sharing is generated by political process, correct?
7    A.  In that the legislature and the
8 legislature is part of the political process, yes.
9    Q.  And the EVIP portion is the largest
10 portion of the state revenue sharing, correct?
11    A.  For the City of Detroit?
12    Q.  Yes, for the City of Detroit.
13    A.  That's correct.
14    Q.  In your view, what are the biggest sources
15 of untapped revenue for the City of Detroit?
16    A.  I don't have an opinion on that.
17    Q.  Do you have an opinion about how the City
18 of Detroit could increase property tax revenues?
19    A.  I do not.
20    Q.  The City of Detroit has never asked you or
21 anyone else at Ernst & Young to use your expertise
22 to increase property tax revenues for them,
23 correct?
24    A.  Correct.  We don't do specific tax policy
25 recommendations.

1    Q.  Okay.  So you're offering no opinion about
2 whether the City can increase tax revenues,
3 correct?
4    A.  I'm not offering an opinion about whether
5 they can increase tax revenues.
6    Q.  And you're not offering an opinion about
7 whether the City can pay the creditors more money
8 in the bankruptcy, correct?
9    A.  I'm not offering an opinion on that.
10    Q.  And you're not offering an opinion about
11 how much revenue the City would have if the
12 bankruptcy case is dismissed, correct?
13    A.  That's correct.
14    Q.  I mean -- and in fact, Ernst & Young's
15 policy would prohibit you from offering opinions
16 about how much -- whether the City can generate
17 more tax revenue or increase tax rates or do other
18 things like that, correct?
19    A.  So Ernst & Young would not want us to make
20 specific recommendations on tax policy the City of
21 Detroit should pursue.  We just do the analysis.
22    Q.  And why doesn't Ernst & Young allow its
23 staff to make recommendations about tax policy like
24 that?
25    A.  So the bulk of our business is providing

1 auditing services, accounting services.  We do,
2 obviously, tax advisory.  We prepare tax
3 statements.  Our business is not to consult in the
4 policy realm in this way.  And so I didn't make
5 those decisions, but that's what I follow.
6    Q.  Okay.  So Ernst & Young is not in the
7 business of offering tax policy advice to
8 municipalities, correct?
9    A.  So the work that I do, I do not provide
10 specific policy recommendations.  I don't know if
11 other parts of EY offer, but I know as a whole, we
12 don't make, say, specific tax policy
13 recommendations.
14    Q.  In the past, have you made tax policy
15 recommendations to government in your other jobs?
16    A.  In my other job, I would do the analysis
17 around a policy change, and so I would provide my
18 opinion sometimes about the change.
19    Q.  I mean, you know that other cities have
20 increased taxes to address fiscal distress to raise
21 revenue, correct?
22    A.  Some cities have done that, yes.
23    Q.  And you're aware that cities have cut
24 services in order to address fiscal distress and
25 improve their fiscal situation?

1    A.  Some cities have done that, yes.
2    Q.  And you know that cities have added new
3 fees for services in order to raise revenue to
4 address fiscal distress, correct?
5    A.  I don't know anything specifically.
6    Q.  Do you know that other cities have imposed
7 new taxes to raise revenue for -- to address fiscal
8 distress?
9    A.  That could be possible.  I don't know of
10 any specific instance.
11    Q.  Do you know generally that there are a
12 number of cities in the country now because of the
13 recession we've had that are experiencing fiscal
14 distress?
15    A.  Yes, I'm aware of cities experiencing
16 fiscal distress.
17    Q.  In fact, you've worked for at least one
18 other city that's experiencing fiscal distress in
19 the state of Michigan, right?
20    A.  That's right.
21    Q.  And you know in the state of Michigan,
22 there are multiple cities that are under the
23 supervision of emergency managers because of fiscal
24 distress, correct?
25    A.  Correct.

1    Q.   And what are the causes of these cities in
2  Michigan having to be under the supervision of
3  emergency managers and being in physical distress?
4    MR. STEWART:  Objection.
5    THE WITNESS:  I don't know the specifics for
6  other cities.
7    MR. ALBERTS:  Objection.  I think you mean
8  fiscal.
9    MR. SMITH:  Yes, fiscal.
10  BY MR. SMITH:
11    Q.   You know that declines in state revenue
12  sharing have -- in Michigan have adversely impacted
13  the fiscal situation of multiple cities, correct?
14    A.   I can't talk about other cities.
15    Q.   Do you know whether the City of Flint
16  undertook efforts to try to get the state
17  legislature to increase state revenue sharing?
18    A.   I don't know.
19    Q.   Do you have any opinion about the sources
20  of untapped cost savings for the City?
21    A.   I don't.
22    Q.   Does Ernst & Young ever do any kind of
23  evaluation of cities to determine how they can
24  increase revenues?
25    A.   I don't know.

1    Q.   Is the only work that you've done for the
2  City of Detroit the work leading to your expert
3  opinions in this case?
4    A.   Yes.
5    Q.   Do you know whether there are any formal
6  studies that have been conducted to ascertain
7  whether Detroit can raise taxes or increase
8  revenue?
9    A.   I don't know.
10    Q.   Do you know whether there are any formal
11  studies that have been conducted to determine
12  whether Detroit can cut costs more than half?
13    A.   I don't know.
14    Q.   Do you know of any formal studies -- can
15  you identify any studies on Detroit property taxes
16  or revenue sharing?
17    A.   Do I know of any formal studies on Detroit
18  property taxes or revenue sharing?  Other than what
19  the CRC report you mentioned earlier?
20    Q.   Yes.
21    A.   No.
22    Q.   How many people assisted you in preparing
23  your forecast?
24    A.   So I did the work and the analysis.  I had
25  discussions with Bob Cline, Katie Ballard.

1    Q.   What percent of your time is spent on the
2  Detroit matter?
3    A.   What percent of my daily just sort of work
4  time?
5    Q.   Your billable time.
6    A.   My billable time?  So I've been working on
7  this for a year or a little over a year.  My
8  billable time might be around 50 percent.
9    Q.   Do you know what proportion of your --
10  what proportion of Katie Ballard's billable time is
11  spent on the City of Detroit?
12    A.   I have no idea.
13    Q.   Can you identify any other matters other
14  than the City of Detroit that Katie Ballard works
15  on?
16    A.   What do you mean matter?  Do you just mean
17  projects or --
18    Q.   Yeah.
19    A.   Sure.  She works on our economic impact
20  studies for private clients, basically, you know,
21  just some of our thought leadership pieces.  And
22  she also worked on our council on state taxation
23  business tax burden study.
24    Q.   Have you had any interaction with anyone
25  from Conway MacKenzie?

1    A.   I've been on phone calls where Conway &
2  MacKenzie have been on the line.
3    Q.   Do you have an understanding of Conway &
4  MacKenzie's role in this matter?
5    A.   I understand a little bit, and I've
6  occasionally received things they prepared.
7    Q.   Like what kind of things?
8    A.   So when they put together some of the
9  reinvestment initiatives, I would see a copy of it.
10    Q.   And do you have any understanding of
11  Miller Buckfire's role in this case?
12    A.   I've interacted with lawyers from Miller
13  Buckfire.  I seen them as a coordinating role.  I
14  don't know any more what they're doing.
15    Q.   I mean, when you say coordinating role,
16  what exactly have you done with them?
17    A.   So Kyle Herman, who works for Miller
18  Buckfire, he would coordinate collection of
19  materials.  He would organize calls with the
20  creditors, things like that.
21    Q.   Would it be fair to say that there are
22  people who have contributed information to your
23  forecasts that you don't know who they are and
24  you've never met?
25    A.   No.

1  information at all? We can just let the forecasts
2  sit there, and no matter what changes, it's okay,
3  right?
4      MR. STEWART: Objection.
5      THE WITNESS: I don't -- what's the question?
6  BY MR. SMITH:
7      Q. If you don't incorporate new information
8  as it becomes available, a forecast can become
9  inaccurate or unreliable, correct?
10     A. No, I wouldn't say that.
11     Q. Okay. So if the property tax were
12 increased by 100 percent, your opinion is you
13 wouldn't have to update your forecast?
14     A. So new information can sometimes confirm
15 what you've already put down, so that's why.
16     Q. And new information can also change your
17 forecast, right?
18     A. Yes.
19     Q. And so it's possible that new information,
20 if you don't incorporate it, your forecasts will be
21 inaccurate or reliable. That's possible, correct?
22     A. So it depends on the situation. New
23 information can improve the accuracy of the
24 forecast. New information can confirm it.
25     Q. And in the hall, Mr. Stewart had his

1  finger in your face, didn't he, during the break?
2      MR. STEWART: Objection.
3      THE WITNESS: No.
4  BY MR. SMITH:
5      Q. Did you have a conversation with
6  Mr. Stewart during the break?
7      A. I did.
8      Q. What was he telling you?
9      MR. STEWART: Objection. It's privileged. You
10 know that.
11     MR. SMITH: You're directing her not to answer
12 that?
13     MR. STEWART: Yes, that's right. Do you want
14 me to start asking what you talk to your clients
15 about? Do you want to waive it? Would you like
16 to? We can have a mutual waiver across the board.
17 I'd like to learn what you're telling Syncora.
18 BY MR. SMITH:
19     Q. How long did you talk to Mr. Stewart for?
20     A. Maybe 30 seconds.
21     Q. The -- do you know whether the assessor's
22 office has been subject to any reviews by outside
23 consultants?
24     A. I don't know.
25     Q. So you haven't been provided with reviews

1  of the assessor's office conducted by Plante Moran?
2      A. No.
3      Q. Were you aware that the assessor's
4  office -- there have been a number of problems
5  identified in the assessor's office?
6      A. I have a general sense that people have
7  said there are problems.
8      Q. What problems are you aware of in the City
9  of Detroit Assessor Office?
10     A. The only problem that people have talked
11 about has been overassessments.
12     Q. That's the only problem that you're aware
13 of in the assessor's office is overassessments?
14     A. That's the only problem that people have
15 talked to me about.
16     Q. Would it be fair to say that you haven't
17 cited any scientific literature or anything like
18 that in performing your forecasting?
19     A. What do you mean by scientific?
20     Q. Well, there's no literature of any kind
21 that you've cited as the basis for your forecast,
22 correct?
23     A. So as I noted in my report, I followed the
24 procedures laid out by the revenue -- the State of
25 Michigan's Consensus Revenue forecasting, and

1  that's in report that I think was produced.
2      Q. Have you run any runs of your forecasts
3  that had higher revenues available to the City?
4      A. I guess I don't understand your question.
5      Q. Have you done any runs of your forecast
6  where you generated revenues that are higher than
7  what you're forecasting currently for the City?
8      A. Yes.
9      Q. And what kind of runs?
10     A. So as you've noted, we've updated our
11 analysis, our forecasts several times, and so
12 previous earlier iterations had slightly higher
13 property taxes.
14     Q. And are there runs that you haven't
15 submitted to the creditors or others that have
16 included higher revenues than you're forecasting?
17     A. Everything we've done has been turned
18 over, so the creditors would have access.
19     Q. Do you agree that you've used your
20 discretion in selecting the specific values for the
21 assumptions in your model?
22     A. I've used my judgment in selecting the
23 assumptions.
24     Q. Do you agree that in conducting a tax
25 forecast, you should seek to gather all evidence

1 reasonably related to the forecast?
2     A.  What's the question?
3     Q.  Do you agree in conducting a tax forecast,
4 you should collect all information reasonably
5 related to the forecast?
6     A.  So I think you need to make sure you take
7 in relevant information in doing the forecast.
8     Q.  And you should endeavor to collect all
9 relevant information in doing a forecast, correct?
10     A.  So it depends on what you mean by
11 relevant.
12     Q.  Have you ever used the word relevant
13 before?
14     A.  I have.
15     Q.  Okay.  Using your definition of relevant,
16 do you agree that you should endeavor to collect
17 all relevant information in doing a forecast?
18     A.  I did endeavor to collect relevant
19 information for the forecast.
20     Q.  That's not my question.  My question is do
21 you agree that in conducting a forecast, you should
22 endeavor to collect all relevant information?
23     A.  I would say in conducting a forecast, you
24 should collect information that's pertinent and
25 related.

1     Q.  And if you have incomplete information,
2 your forecast can be inaccurate, correct?
3     A.  Not necessarily, no.
4     Q.  But it can be inaccurate if you have
5 incomplete information, correct?
6     A.  Incomplete information can make it -- it
7 can go either way.  It depends on the situation.  I
8 mean, the nature of forecasting, you're selecting
9 data and assumptions.  It's not complete, so
10 there -- so yeah, I mean, there are situations and
11 incomplete information could make it inaccurate, or
12 it could not.  It depends.
13     Q.  Have you done any stress testing on your
14 forecast?
15     MR. STEWART:  Objection.
16     THE WITNESS:  What do you mean by stress tests?
17 BY MR. SMITH:
18     Q.  Well, I've seen reference to stress tests
19 that have been conducted on forecasts before.  Do
20 you know what that is?
21     A.  I have not done a stress test.
22     Q.  Have you ever done any kind of stress
23 testing on forecasts before?
24     A.  What is stress test in this context?
25     Q.  So you don't know what a stress test is in

1 the context of forecasting?
2     A.  I guess I don't know what you mean by
3 stress test.
4     Q.  Do you know what length of time is the
5 standard length the City uses for its forecasts?
6     A.  I don't know anything about the City's
7 forecasting.
8     Q.  Have you ever looked at the consensus
9 forecast for the City?
10     A.  I did receive one piece of information
11 that had their consensus revenue estimates for the
12 next fiscal year.
13     Q.  And do you know how many years they looked
14 at?
15     A.  I can't remember off the top of my head.
16     Q.  Have you ever done a tax forecast for as
17 long as 10 years?
18     A.  I'm not sure.
19     Q.  Have you ever -- you haven't done a
20 revenue sharing forecast for as long as 10 years,
21 correct?
22     A.  I do not think I have.
23     Q.  What are some of the factors that can
24 occur over the next 10 years that could affect the
25 actual values for property taxes or revenue

1 sharing?
2     A.  What do you mean by actual values?
3     Q.  The actual collections of property tax
4 revenue and the actual amount of money that's
5 received from revenue sharing.
6     A.  Sure.  So population rate is important,
7 employment, new economic activity.  These are all
8 things that are driving both the portion of state
9 revenue sharing and property taxes.
10     Q.  If population increases, the revenue from
11 property taxes and revenue sharing could increase,
12 correct?
13     A.  It's possible.
14     Q.  And if employment increases, the revenue
15 from property taxes and revenue sharing would
16 increase?
17     A.  It's possible.
18     Q.  And if economic activity increases,
19 revenue from revenue sharing and the property taxes
20 would increase?
21     A.  It's possible.
22     Q.  And is that -- are those -- your model,
23 though, do revenues increase if employment,
24 population or economic activity increase?
25     A.  So in our model, if there is greater

1   economic activity, we have better property tax
2   revenues.
3       Q.  If there's increased economic activity, do
4   you -- does your model generate increased revenue
5   sharing, or does it not take into account economic
6   activity for revenue sharing?
7       A.  So revenue sharing, because it is based on
8   per-capita distribution on the constitutional side
9   and for EVIP, there's no formula.  Economic
10  activity, it doesn't really affect it directly.
11      Q.  There was no formula you used for
12  calculating the revenue sharing that you projected,
13  correct?
14      A.  That's not true.
15      Q.  Well, I mean, you were just saying no
16  formula.  What did you mean?
17      A.  There's no formula in how the legislature
18  allocates the EVIP portion.
19      Q.  Does increasing population in your model
20  increase property tax revenues or revenue sharing?
21      A.  So there's no direct link between a
22  one-for-one population increase causes property tax
23  increase.  So there's no one-to-one relationship in
24  the model.
25      Q.  Does your model take into account the

1   effect of population on property tax increase at
2   all?
3       A.  So population forecasts were used to
4   inform certain growth rates in the model.
5       Q.  Okay.  So an increasing population could
6   increase growth rates which would increase property
7   tax revenues in your model; is that correct?
8       A.  That is fair.
9       Q.  In your model, does an increase in
10  employment lead to an increase in property tax
11  revenue or to revenue sharing?
12      A.  So an increase in employment doesn't
13  affect the revenue sharing in our forecast.  And
14  employment, there's no sort of direct input for
15  employment on the property tax side.  It would be
16  something that would help to inform a growth rate
17  of a tax base.
18      Q.  Okay.  So increased employment could
19  increase growth rates, which would increase
20  property tax revenues in your model, correct?
21      A.  So it depends.  Employment in Detroit
22  doesn't mean that someone is a property owner, and
23  so in that sense, we're concerned doing the
24  forecasting about the different tax bases.  So
25  employment can mean that there is additional

1   property or not.
2       Q.  In your model, does increased employment
3   in the city among residents lead to an increase in
4   property tax revenue?
5       A.  There's no direct relationship in the
6   model between employment and the tax bases.
7       Q.  Okay.  What is the relationship then in
8   the model?
9       A.  Sure.  So in the model, there are four
10  different tax bases, and so employment is something
11  that's important for -- I guess for all three, for
12  residential, commercial, industrial.  So if you
13  have improved economic activity, improved
14  employment, we could see those tax bases grow, and
15  that could translate into more tax revenue, but if
16  everything else is equal.  So there's other factors
17  that drive the model.
18      Q.  Do you agree that increased employment
19  will lead to people purchasing more goods and
20  services in the city and an increase in sales tax
21  revenue?
22      MR. STEWART:  Objection.
23      THE WITNESS:  Can you say that one more time,
24  your question?
25

1   BY MR. SMITH:
2       Q.  Increased employment will lead to an
3   increase in people purchasing goods and services in
4   the city and an increase in sales tax revenue?
5       A.  It's possible.
6       Q.  Your model does not take into account
7   increased employment having any effect on revenue
8   sharing, correct?
9       A.  That is correct.
10      Q.  Can you identify any forecast comparable
11  to the Ernst & Young forecast that's been done for
12  Detroit over a 10-year period?
13      A.  I have not seen any other forecast.
14      Q.  Can you identify -- so you've never seen
15  any forecasts like that Ernst & Young has done for
16  Detroit in any Chapter 9 bankruptcy, correct?
17      A.  I have not looked at any other Chapter 9
18  bankruptcies.
19      Q.  Have you done any investigation to find
20  out what other forecasts have been done to model
21  property tax or state revenue sharing for a
22  municipality?
23      A.  Have I -- what's your question?
24      Q.  Have you done any investigation to look at
25  other forecasts for property tax revenue or revenue

1  sharing in a municipality?
2     A.  I have not looked at other forecasts.
3     Q.  Do you agree that the longer period of
4  time a forecast covers, the less reliable it
5  becomes?
6     A.  No.
7     Q.  So your point of view is that your 40-year
8  forecast is as reliable and likely to be accurate
9  as your 10-year forecast, correct?
10    A.  My opinion is the -- we did a 10-year
11 forecast, and we did an extrapolation for 30 years,
12 and it could go either way.  That's the nature.  It
13 could be as accurate as the 10-year.  I don't know
14 yet.
15    Q.  There's no way to note -- no way to assess
16 the level of accuracy of your forecast, correct?
17    A.  The way that you could assess the accuracy
18 is to compare the forecast with actual, and the
19 actual hasn't happened yet.
20    Q.  So there's, in fact, no way to assess the
21 accuracy of your forecast, correct?
22    A.  Right, except for comparing to actual, and
23 our actuals so far have come in pretty well
24 compared to the forecast.
25    Q.  And how long has your forecast been in

1  existence?
2     A.  We did the first iteration in June of
3  2013.
4     Q.  You're aware that the City is failing to
5  collect approximately half of the property taxes
6  owed, correct?
7     A.  I am aware, sorry, half of property taxes
8  on the residential.
9     Q.  Okay.  And are you aware that the City has
10 identified more than 100,000 properties where taxes
11 have not been paid in addition to the foreclosed
12 properties?
13    A.  I don't know the number.
14    Q.  Do you know that the City has identified
15 over $504 million in unpaid property taxes that are
16 owed to it?
17    A.  I don't know the amount.
18    Q.  Your forecast doesn't take into account or
19 doesn't include any amounts for payment of property
20 taxes that are owed, but haven't gone collected
21 thus far, correct?
22    A.  That's not correct.
23    Q.  Okay.  How does your forecast take into
24 account the property taxes that are owed to the
25 City from prior years, but haven't been collected?

1     A.  So in Michigan, unpaid taxes at the
2  municipal level are turned to the county for
3  collection, and so the county will try to collect
4  on them, and then it will foreclose and has been
5  doing public auctions to sell the property.  So the
6  model takes into account net payments from the
7  county, which would be then the county paying for
8  the taxes that these properties owe.  And so that's
9  factored into the property tax collections in the
10 model.
11    Q.  Do you know what percent of the owed taxes
12 your model predicts will be actually paid from
13 prior years?
14    A.  Not in that way, no.
15    Q.  Do you know what -- is there a collection
16 or a payment rate or anything like that that is
17 incorporated into your model for the past year's
18 owed taxes?
19    A.  So the model includes a percent of the tax
20 levy that is assumed the City will receive from
21 Wayne County.
22    Q.  Okay.  And what number is that?
23    A.  It depends on the year.
24    Q.  How did you select that number?
25    A.  So Wayne County provided their prior

1  year's net revolving fund payments, and so it
2  analyzed the trends and what had been happening and
3  had some conversations about what was happening
4  with the foreclosure process and then used judgment
5  to select what was going to happen in future years.
6     Q.  Okay.  So in terms of the amount of
7  collection that will occur with respect to amounts
8  already owed from prior years, you implemented
9  different assumptions for different years based on
10 your judgment; is that fair?
11    A.  What's the question?
12    Q.  For the amount of property tax that would
13 be collected from prior years that's still owed,
14 you implemented different assumptions for different
15 years based on your judgment?
16    A.  So using my judgment, I selected payment
17 amount from Wayne County that was likely, and that
18 varied by year.
19    Q.  Okay.  And how did you go about using your
20 judgment to figure out how to vary the payment
21 amount by year?
22    A.  So using data from the past, we're able to
23 see what was happening over the last -- I guess I
24 got data for eight or nine years is my
25 recollection, and I was able to see what had

1    Q.   Were you aware that the majority of
2  transactions that form the basis for valuations
3  you've been provided were not arm's length
4  transactions before you formulated your opinions?
5    A.   I didn't know if it was the majority.
6    Q.   Did you know the percentage at all of the
7  transactions that were not arm's length that form
8  the basis for the valuation you were provided?
9    A.   I did not know what percentage were not
10 arm's length transactions.
11   Q.   Would it be fair to say you're not
12 qualified to assess the reliability of the real
13 estate valuations for property in Detroit that
14 you've been provided?
15   A.   I was not asked to assess the reliability
16 of the assessments.
17   Q.   Would you be qualified to assess the
18 reliability of the assessments you've used in your
19 forecast?
20   A.   What do you mean qualified?
21   Q.   I mean are you somebody who is qualified
22 enough to be able to tell how reliable the
23 assessment valuations that you've been given are,
24 or does that require somebody with a different
25 skill set?

1    A.   So in the work that I did, I did some
2  analysis of the assessments and came to my
3  conclusion that they were overassessed.  I did not
4  systematically look at their transactions and their
5  process of assessing.
6    Q.   Okay.  So one of the bases for your
7  forecast is your determination that property is
8  overassessed in the city, correct?
9    A.   I do think property was overassessed, yes.
10   Q.   You've never been trained in property
11 assessment, correct?
12   A.   I have not been trained to assess
13 property.
14   Q.   Do you know whether there's standards
15 governing property assessment?
16   A.   There are methods for assessing property,
17 yes.
18   Q.   And have you been trained in those methods?
19   A.   Formally trained on those methods?
20   Q.   Yes.
21   A.   I have not.
22       (Document marked No. 2)
23   Q.   Were you aware -- let me hand you what's
24 been marked as Exhibit 2.  It's a news article
25 entitled Detroit's Property System Plagued By

1  Mistakes, Waste.  Have you ever seen this article?
2    A.   I don't think so.
3    Q.   Have you seen any of the news articles
4  that have been issued on the problems with Detroit
5  property collections?
6    A.   I have seen news articles on this issue.
7    Q.   Okay.  And the first sentence says the
8  city's property tax system is riddled with errors
9  and waste and is overseen by a pair of
10 double-dipping officials who work just two days a
11 week the Detroit news investigation has found.  Do
12 you see that?
13   A.   Uh-huh.
14   Q.   Were you aware of that information before
15 you formulated your opinions?
16   A.   Was I aware of this reporter's opinion
17 that the City's tax system is riddled with errors
18 and waste?  What's the date on this?  No.
19   Q.   Were you aware of people who had come to
20 the conclusion, though, that the Detroit property
21 tax system is riddled with errors and waste before
22 you formulated your opinions?
23   A.   I don't know about waste or what the
24 definition -- I, obviously, had conversations where
25 people talked about the property being overassessed

1  or problems with the system, but no specifics were
2  told to me.
3    Q.   What problems with the Detroit property
4  tax system were you told of?
5    A.   These are just general recollections, but
6  problems with how property was assessed leading to
7  overassessments and property collection issues, but
8  these type of issues relating to the logistical
9  collection are not things that we dealt with in our
10 forecast.
11   Q.   Were you aware that Ernst & Young had done
12 its own review of the property tax system in
13 Detroit?
14   A.   What do you mean by review?
15   Q.   Well, you see there's a section in that
16 article entitled hardest job in the state?
17   A.   Okay.
18   Q.   And you see in the first paragraph it
19 talks about a Plante Moran review, correct?
20   A.   Yeah.
21   Q.   And the second paragraph, it says one
22 review by Ernst & Young concluded the two
23 departments have a prevailing culture which is
24 riddled with bureaucracy and a lack of
25 accountability.  Do you see that?

1    A.   Okay.
2    Q.   Were you aware that Ernst & Young had
3  conducted a review of the property collection
4  processes in Detroit before you worked on your
5  opinions?
6    A.   No.
7    Q.   And nobody has provided you with a copy of
8  the report in which Ernst & Young concluded that
9  departments in the city relating to property taxes
10  have a prevailing culture which is riddled with
11  bureaucracy and a lack of accountability?  Do you
12  see that?
13    A.   Uh-huh.  I did not receive a report that
14  Ernst & Young had done.
15    Q.   And you're not in a position to dispute
16  Ernst & Young's conclusions that the City's
17  departments charged with property tax collection
18  have a prevailing culture which is riddled with
19  bureaucracy and a lack of accountability, correct?
20    MR. STEWART:  Objection.
21    THE WITNESS:  I didn't work on this report, and
22  I've not seen it, so I can't comment on it.
23  BY MR. SMITH:
24    Q.   Were you even told who at Ernst & Young
25  might have done reviews of the City's property tax

1  collection processes?
2    A.   I know the team in Detroit, but I don't
3  know who did this study.
4    Q.   Okay.  So the team in Detroit you've been
5  working with daily never informed you that they had
6  done a review of the City's property tax
7  collections and found that it was riddled with
8  bureaucracy and had a lack of accountability, correct?
9    (Document marked No. 3 and No. 4)
10    A.   We never had a specific conversation about
11  a report that reached those findings, no.
12    Q.   Let me hand you what's been marked as
13  Exhibit 3.  I'm just wondering if you've ever seen
14  this document before?
15    A.   No.
16    MR. STEWART:  Before you testify about it --
17    MR. SMITH:  I don't have any questions about it
18  other than whether she's seen it.
19    THE WITNESS:  No, I haven't seen it.
20  BY MR. SMITH:
21    Q.   Okay.  I'm going to hand you what's been
22  marked as Exhibit 4, which is a Detroit news
23  article entitled Half of Detroit Property Owners
24  Don't Pay Taxes, and you can let me know if you've
25  ever seen this news article before.  Is that

1  something that you've seen?
2    A.   I may have seen it.  I'm not recalling
3  whether I read this or not.
4    Q.   Going back to the -- were you aware that
5  property tax bills were frequently sent to the
6  wrong address in Detroit?
7    A.   No, I wasn't aware.
8    Q.   Were you aware that homeowners exemptions
9  have been granted to people without proof of
10  eligibility in Detroit?
11    A.   No, I wasn't aware.
12    Q.   Were you aware that the City is going to
13  undertake a review because it believes that there
14  may be people that are improperly taking homeowners
15  exemptions?
16    A.   I was not aware of that.
17    Q.   Are you aware that the City has begun
18  implementing reforms of its property tax collection
19  system to improve revenues?
20    A.   I've had some conversations that note that
21  they've done some -- they're working on that.  I
22  don't know any specifics.
23    Q.   Who have you had those conversations with?
24    A.   Just conversations with the Detroit team,
25  the EY Detroit team, so I don't remember who

1  specifically, though.
2    Q.   Do you know what an equalization factor
3  is?
4    A.   I do.
5    Q.   And you know that an equalization factor
6  of 1 means that property is properly assessed in
7  the view of the county, correct?
8    A.   It means that the county believes property
9  has not systematically been over or underassessed.
10    Q.   And in fact, Detroit has always received a
11  value of 1 meaning that property is not over or
12  underassessed, correct?
13    A.   I wouldn't reach that conclusion.  The
14  county has given them an equalization factor of 1,
15  and so the processes that they're following have
16  given them an equalization factor of 1.  That
17  doesn't mean that in reality or by other measures,
18  the property is not over or underassessed.
19    Q.   You're aware that the county has always
20  given Detroit an equalization factor of 1, correct?
21    A.   I don't know always.  I know when I looked
22  at the last 10 years, they've received an
23  equalization factor of 1.
24    Q.   You're not aware of any instance where the
25  City of Detroit didn't receive an equalization

1    A.  I'm going to testify at the confirmation
2 hearing for this matter, yes.
3    Q.  And before the confirmation hearing,
4 wouldn't you want to know if Mr. Evanko had
5 characterized -- had criticisms of your forecast?
6    A.  I would like to know.
7    Q.  And why would you like to know that?
8    A.  I would find it surprising.
9    Q.  You agree that equalization factor of 1
10 means the county has determined that property is
11 being properly assessed and not overassessed or
12 underassessed, correct?
13    A.  Equalization factor means that the county
14 believes the process has not systematically over or
15 underassessed property.
16    Q.  And currently you understand that the
17 county is giving Detroit an equalization factor of
18 1, correct?
19    A.  The county is giving Detroit an
20 equalization factor of 1.
21    Q.  And it would be unlawful for the City to
22 assess property in any way that was inconsistent
23 with what the county was saying, correct?
24    MR. STEWART:  Objection.
25    THE WITNESS:  I don't understand that question.

1 BY MR. SMITH:
2    Q.  It would be unlawful for the City of
3 Detroit to assess property in any way that was
4 inconsistent with the way the county assessed
5 property, correct?
6    MR. STEWART:  Objection.
7    THE WITNESS:  I don't know.  There are rules
8 governing how property must be assessed, and so
9 municipalities have to follow those, and the county
10 has to follow their procedures as well.
11 BY MR. SMITH:
12    Q.  And if the county assessed an equalization
13 factor different than 1, Detroit would have to
14 change its assessments, correct?
15    A.  The equalization factor would be applied
16 to what the City had assessed, and it would be
17 modified in those ways.  In that way.
18    Q.  Okay.  So it would -- if the county
19 implemented a different equalization factor other
20 than 1, then as a matter of law, the assessments
21 would be changed, correct?
22    MR. STEWART:  Objection.
23    THE WITNESS:  I don't know if the assessments
24 would be changed.  The assessment factor is
25 multiplied by what the City produces.

1 BY MR. SMITH:
2    Q.  So property taxes would be changed on the
3 properties if the equalization factor were
4 different than 1, correct?
5    A.  Property taxes are based on taxable value,
6 and state -- you're talking about the state
7 equalized value, which is a different concept.
8    Q.  Do you -- would it be fair to say that
9 your opinion that Detroit property is overassessed
10 is inconsistent with the determination of the
11 county?
12    A.  I don't know inconsistent.  The county has
13 their process by which they review and they assign
14 an equalization factor.  And using their rules,
15 they've come up with their opinions.  And I've
16 looked at it differently, and I come up with my own
17 opinion that it's overassessed.
18    Q.  Okay.  So the methodology you used for
19 determining assessments whether properties are
20 properly assessed in the city is different than the
21 county's methodology, correct?
22    A.  It could be.  I don't know.
23    Q.  You don't know what methodology the county
24 uses, correct?
25    A.  I don't know specifically what they looked

1 at in determining the equalization factor.
2    Q.  The county's conclusion that property is
3 properly assessed, though, is inconsistent with
4 your conclusion that it's overassessed, correct?
5    A.  The county in using the equalization
6 factor has said that it's not under or
7 overassessed, and my conclusion is that it's
8 overassessed.
9    Q.  So you've come to inconsistent conclusions
10 with the county, correct?
11    A.  My opinion is different than the county's.
12    Q.  The planned reassessment, do you know who
13 is going to be conducting that?
14    A.  No.
15    Q.  Do you know what method will be used for
16 the planned reassessment?
17    A.  I understand generally how they go about
18 reassessing.
19    Q.  But do you know -- I mean, do you know
20 what reassessment methodology the unidentified
21 contractor who is doing the reassessment is going
22 to employ?
23    A.  I do not know specifically what they're
24 going to do.
25    Q.  Do you know how long the planned

1   reassessment is going to take?
2       A.  I was told it would take three to five
3   years.
4       Q.  Who told you that?
5       A.  Alvin Horhn.
6       Q.  Is that somebody at the City?
7       A.  It is.
8       Q.  And do you know when the planned
9   reassessment will begin?
10      A.  Initially I was told they wanted to have a
11  contract in place by March 2014.  The last time I
12  checked to see if a contract was in place I was
13  told they were working on that, or they thought
14  they were going to have it done this month.
15      Q.  Okay.  So so far there's no contract, as
16  far as you're aware, that has been written for the
17  reassessment?
18      A.  I don't know if a contract is in place.
19      Q.  And have you also been told that the
20  reassessment could take longer than five years?
21      A.  I have not been told that.
22      Q.  Do you know when -- do you know whether
23  it's possible that the reassessment may not occur?
24      A.  I don't know anything about the contract.
25      Q.  Would it be fair to say that you just

1   can't provide us with any specifics about what the
2   planned reassessment is going to entail one way or
3   the other?
4       A.  I don't know the specifics about the
5   reassessment.  I know generally what they're going
6   to do.
7       Q.  Has anybody informed you regarding
8   Mr. Evanko's opinion that the reassessment -- he
9   doesn't know whether it's going to increase or
10  decrease property values?
11      MR. STEWART:  Objection.
12      THE WITNESS:  I have not been told what
13  Mr. Evanko said during his deposition about that
14  matter.
15  BY MR. SMITH:
16      Q.  Wouldn't you want to know if Mr. Evanko
17  said that he couldn't say that the property
18  reassessment would result in lower property values?
19      A.  What's the question?
20      Q.  Wouldn't you want to know if Mr. Evanko's
21  opinion was that the property values would not
22  necessarily change under the planned reassessment?
23      A.  I guess I would want to know that.  That
24  would be surprising.
25      Q.  Would it be surprising to you if -- well,

1   let me ask you this.  Would you want to know if
2   Mr. Evanko determined that your forecast of the
3   personal property tax was ridiculous?
4       A.  Would I want to know that?  That, again,
5   would be surprising.
6       Q.  Is that something you would want to know?
7       A.  It would be something I would be
8   interested in, sure.
9       Q.  Did you ever submit your forecast to
10  anyone at the City to solicit their opinion after
11  you were done about whether your forecast was
12  reasonable?
13      A.  We discussed sending the forecast to the
14  City back when we started a year ago, and I don't
15  believe we ever did that.  They did review our
16  forecast.  I had a conversation in January with
17  Gary Evanko, and he had seen what we put together
18  is my recollection, so we had conversations about
19  the forecast for sure.
20      Q.  So Mr. Evanko's familiar with details of
21  your forecast, correct?
22      MR. STEWART:  Objection.
23      THE WITNESS:  I don't know if he's familiar
24  with the details.  I couldn't say for him.
25

1   BY MR. SMITH:
2       Q.  You didn't -- the current forecast,
3   though, the one that's been completed in July, you
4   never resubmitted that to the assessor's office to
5   determine if they thought that it was reliable and
6   accurate, correct?
7       A.  I did not turn over the July forecast to
8   the City.  I did not provide it to them.
9       Q.  Do you agree there are -- well, we've
10  talked about how there are a lot of people that are
11  in Detroit that are delinquent on their property
12  taxes.  Do you recall that?
13      MR. STEWART:  Objection.
14      THE WITNESS:  We talked about -- you showed me
15  some articles about that.
16  BY MR. SMITH:
17      Q.  And you agree there are many reasons that
18  people don't pay their property taxes, right?
19      A.  Yeah, there are many reasons.
20      Q.  One reason people may not pay their
21  property taxes is if they believe that enforcement
22  efforts are lax, correct?
23      MR. STEWART:  Objection.
24      THE WITNESS:  I don't know specifically why
25  people are not paying their taxes.

BY MR. SMITH:

Q. The City of Detroit certainly thinks that it needs to improve property tax collections, correct?

A. My conversations with the people at the City in the assessor's office has been that they would like to see collections improved.

Q. And they're taking active efforts to try to do that, correct?

A. I don't know what efforts they're doing.

Q. In your report, you relied on the Case-Shiller Home Price Index for Detroit. Do you recall that?

A. It is one of the things that I looked at.

Q. And you agree the Case-Shiller Index is a standard measure of housing prices, correct?

A. It is a measure of housing prices, yes. It's widely used.

Q. And it's a reliable -- Case-Shiller is a reliable measure of housing prices, correct?

A. What do you mean by reliable?

Q. I mean, people -- a lot of people in government, business, academia rely on the Case-Shiller Index for housing prices, correct?

A. Many people rely and look at it, yes.

Q. And you've done analyses where you've utilized the Case-Shiller Housing Price Index in the past for property valuations, haven't you?

A. I have looked at the Case-Shiller Index for projects in the past.

Q. And did you use the Case-Shiller Index in your work in Flint, Michigan?

A. I don't recall. I don't think so. I don't know if Flint is one of the -- I don't think it's one of the areas that the Case-Shiller Index would cover.

Q. I mean, why do people look at the Case-Shiller Housing Price Index?

A. It's viewed as a reputable source of trends in house prices.

Q. And did the creators of the Case-Shiller Housing Price Index, have they received the Nobel Prize?

A. Yes.

Q. They're widely respected economists, right?

A. They are widely respected economists, yes, I would agree.

Q. The -- in generating your forecasted values for revenues, did you actually use numbers

from the Case-Shiller Property Index?

A. So the Case-Shiller Index was one source that I consulted in selecting my inputs.

Q. But didn't you use some different numbers for average housing selling prices in generating your forecast other than Case-Shiller?

A. I did.

Q. And what were those?

A. I used the Detroit Association of Realtors data.

Q. And did you use that updated to the present time or not?

A. I took the information through December 2013, which was the last full year, and I pulled -- I think I had through March, March or May. And so I looked at it, but in order to use it in comparison of other data, my analysis went through December 2013.

Q. Okay. And you know that the Detroit realtor information shows that housing prices continue to increase from the point you used, December 2013, to the most recent data in 2014?

A. Housing prices did go up, yes.

Q. In fact, housing prices have gone up fairly significantly in 2014 under the Detroit

realtor data you used?

A. What is significant in your opinion?

Q. Well, do you know how much they've gone up?

A. I can't remember off the top of my head.

Q. It would be more than 10 percent, wouldn't it?

A. I don't recall.

Q. In the -- do you agree that based on all the data you've seen, real estate values in the city are increased in 2014?

A. The data I've looked at have shown real estate values increasing in residential.

(Document marked No. 7)

Q. And you're aware that there are -- let me just hand you a copy of what I'm going to mark as Exhibit 7. It's an article entitled Detroit Named a Top Turnaround Town For Residential Real Estate.

Do you have that in front of you?

A. Okay.

Q. And you've seen news stories and assessments that have indicated that Detroit is one of the markets in the country that's experienced the largest increases in home prices during 2014, correct?

A. I haven't compared Detroit to other

1  cities.
2    Q.  Well, this assessment reports that, in the
3  first sentence, Detroit's housing market ranks
4  seventh overall in a realtor.com turnaround town
5  study of the national housing market in the second
6  quarter the real estate tracking firm said in a
7  report Wednesday.  Do you see that?
8    A.  I do see that.
9    Q.  And you don't dispute that, correct?
10   A.  I have no idea how realtor.com did their
11  analysis.
12   Q.  Okay.  Well, that's not my question.  I
13  mean, you don't dispute -- you haven't done the
14  work necessary to dispute the fact that Detroit is
15  one of the fastest growing markets in terms of
16  housing prices in the country, correct?
17   MR. STEWART:  Objection.
18   THE WITNESS:  So I've looked at the most recent
19  data for Detroit.  I've not compared it to other
20  cities.
21  BY MR. SMITH:
22   Q.  So you can't identify any city with more
23  rapidly growing housing prices in 2014 than Detroit
24  sitting here today, correct?
25   A.  Well, this says it's the seventh.

1    Q.  Okay.
2    A.  I haven't looked at it, though.
3    Q.  I mean, you wouldn't find that surprising
4  that it's the seventh most highest in terms of
5  housing price growth, Detroit is?
6    A.  From a very low base, it's had growth, so
7  that seems plausible, sure.
8    Q.  And in fact, you mentioned the Detroit
9  Land Bank.  Have you done any investigation into
10  its operations?
11   A.  I don't know its operations.
12   Q.  Were you aware that the City had
13  transferred 16,000 properties to the Detroit Land
14  Bank recently?
15   A.  No.
16   Q.  Do you know that the Detroit Land Bank has
17  recently had an auction of blighted properties?
18   A.  Recently when?
19   Q.  During the last year.  I mean in this
20  year.
21   A.  They have had auctions, yes.
22   Q.  And in fact, there's been high demand in
23  the Detroit Land Bank auctions for blighted
24  properties, correct?
25   A.  I don't know.

1    Q.  You haven't done any analysis to determine
2  the effect of the Detroit Land Bank on housing
3  prices in Detroit, correct?
4    A.  No.
5    Q.  And you haven't done any analysis to
6  determine the effect of the City's blight reduction
7  efforts on housing prices, correct?
8    A.  We -- in our forecast in a reinvestment
9  scenario, we take into account removal of blight
10  property as part of general economic improvement to
11  the city, and so we've -- in that scenario, we've
12  factored in removal of blight as a positive for our
13  forecast.
14   Q.  Do you actually know whether the forecasts
15  that have been done for the City attach a dollar
16  value to blight removal in terms of improved
17  revenue for the City?
18   A.  What's the question?
19   Q.  Do you actually know whether the forecasts
20  that have been done attach a dollar amount for
21  blight removal?
22   A.  There has been money put in for each year
23  for blight removal in what I've seen.
24   Q.  But do you know in terms of increased
25  revenue?

1    A.  There has not been a sort of one
2  relationship done to say this much spending on
3  blight translates into X dollars of revenue.
4    Q.  And you've done no analysis that's tried
5  to determine how much the blight removal will
6  increase revenues to the City in your analysis, correct?
7    A.  I have not.  Right.  So in my analysis, I
8  did not look at the direct relationship between
9  blight removal and property tax revenue.
10       (Document marked No. 8)
11   Q.  Let me hand you what's been marked as
12  Exhibit 8.  It's a regional commerce paper from
13  Detroit Regional Commerce.  If you go to the first
14  page entitled Detroit Facts, this document says
15  that approximately 12 billion in private
16  investments have been made in Detroit since 2006.
17       Do you have any basis to dispute that?
18   A.  I have no idea where that number is coming
19  from.
20   Q.  Have you done any investigation into how
21  much private investment has been made in Detroit in
22  the past few years?
23   A.  I've only read some articles on it.
24   Q.  Okay.  You know there's been significant
25  private investment in Detroit in the last few

1    Q.   And there's been a recent uptick in 2014
2  in employment, correct?
3    A.   The seasonally unadjusted data is higher
4  than some of the 2010, 2011 periods.
5    Q.   And in fact, there's an inflexion point in
6  the data now that the employment is going up,
7  correct?
8    A.   Where is the inflexion point?
9    Q.   Around April of 2014, April and March.
10    A.   There was a downward trend between, it
11  looks like, December 2013 down to April 2014, and
12  then May 2014 it's slightly higher.
13    Q.   Do you know what period of time the
14  employment data that you looked at for your
15  analysis?
16    A.   So we -- so primarily Bob Cline with the
17  assistance of Katie Ballard used the employment
18  information in their forecast, and so they did --
19  they pulled the historical data, did the trend
20  analysis, so they would be the ones to better speak
21  to it.
22    Q.   I mean, did you use the trend analysis by
23  Mr. Cline and Ms. Ballard in your forecast?
24    A.   So they did the trend analysis, and then I
25  looked to see what their employment forecasts were

1  based on that analysis so that my analysis was
2  consistent with theirs.
3    Q.   And did they forecast decrease in
4  employment?
5    A.   They did.
6    Q.   Do you have any idea how they arrived at
7  their forecast of decreasing employment after
8  looking at the Bureau of Labor Statistics data?
9    MR. STEWART:  Objection.
10    THE WITNESS:  So generally I know what they
11  did.  They performed an analysis looking at the
12  historical trend and the relationship between
13  Detroit and the rest of the state, and so they used
14  that information to forecast employment trends with
15  relationship to the state forecast.
16  BY MR. SMITH:
17    Q.   Okay.  Can you explain to me how the
18  employment forecast was actually calculated that
19  you relied on?
20    A.   Other than generally saying, I was not the
21  one that did it, so no.
22    Q.   And who was the person who you understood
23  did that forecast?
24    A.   Bob Cline with the assistance of Katie
25  Ballard.

1    Q.   You know there are private entities that
2  have pledged money to assist the City and improve
3  its economy and reduce blight, correct?
4    A.   I know that private entity have pledged
5  money.  I don't know off the top of my head for
6  what purposes.
7    Q.   You've done no analysis of the impact of
8  private donations on property tax revenues in the
9  city, correct?
10    A.   The only way it would factor into the
11  analysis is private donation improving the economy
12  and stabilizing some of the negative aspects of
13  Detroit, and then that shows up in our reinvestment
14  scenario.
15    Q.   So private donation improving the economy
16  can improve property tax revenues, correct?
17    A.   It's possible.
18    Q.   And -- but as far as you're aware, nobody
19  has tried to forecast the amount of private
20  donations over the next 10 years for the City,
21  correct?
22    A.   I don't know if that's been done.
23    Q.   Okay.  As far as you're aware, there's no
24  analysis that's been done to try to show the impact
25  of private donations on City revenues, correct?

1    A.   I don't know if it's been done.
2    Q.   You certainly didn't do any analysis to
3  assess the impact of private donations on the
4  housing market or private tax revenues, correct?
5    A.   As I said before, only in that if as part
6  of reinvestment in the city, private donations
7  occur and it helps to improve the economic
8  environment, then that's been factored into the
9  reinvestment scenario.
10    Q.   But you don't know if the reinvestment
11  scenarios tried to forecast the amount of private
12  donations that will come into the city, correct?
13    A.   I don't know how private donations are
14  included in that.
15    Q.   And you don't know how the reinvestment
16  forecast was put together, correct?
17    A.   I was shown the reinvestment forecast.  I
18  don't know how it was put together.
19    Q.   And you didn't do anything to test the
20  reliability of the reinvestment forecast, correct?
21    A.   So as before, you can only test, I think,
22  reliability with actuals, and it hasn't occurred,
23  so I don't know.
24    Q.   Do you know who actually put together the
25  reinvestment forecast?

1    A.  I don't know specifically who did.
2    Q.  You used the reinvestment forecast to
3  generate some of your forecast; is that fair?
4    A.  I would not say generate.  I would say
5  that I looked to see what was put together for
6  reinvestment for further reinvestment initiatives,
7  and that helped think about how we selected our
8  growth rates in that reinvestment scenario.
9    Q.  Were numbers from the reinvestment
10  forecast plugged into your forecast?
11    A.  Were numbers for the reinvestment forecast
12  plugged into our forecast?  No.
13    Q.  Did you use the reinvestment forecast to
14  generate some of the assumptions for your forecast?
15    A.  It was something that was looked at along
16  with other things in terms -- in how we put
17  together the reinvestment scenario.
18       (Document marked No. 11)
19    Q.  I'm going to hand you a copy of what's
20  been marked as Exhibit 11, which is from the
21  Case-Shiller Detroit Home Price Index, and let me
22  know if this is the type of data that you have
23  reviewed regarding housing prices.
24    A.  Yeah.
25    Q.  And the Case-Shiller Index shows the

1  housing prices have been increasing in Detroit over
2  the last two years, correct?
3    A.  The Michigan Detroit Home Price Index is
4  going up, yes.
5    Q.  And there was an inflexion point around
6  2010; is that correct?  It's a little bit on there.
7    A.  Yeah, midway through 2010, 2011.  Yeah.
8    Q.  And increasing housing prices in your
9  model lead to increased property tax revenues,
10  correct?
11    A.  So increasing home prices is one factor in
12  our model, and it could lead to our overall
13  increase in tax revenue.  It really depends on what
14  happens to taxable value.
15    Q.  Holding all other factors constant, do
16  increased home prices have an effect in increasing
17  property tax revenues in your model?
18    A.  Holding everything constant, an increase
19  in a home price would -- well, it depends on the
20  taxable value, I guess.  It depends on what the
21  taxable value is when the property sells and it's
22  reset.  And so if the home price is higher than --
23  and the reset of the taxable value is higher than
24  what it had been, it would increase tax revenues.
25  If sort of varies house to house.

1    Q.  But overall, your model, the way it's
2  constructed, could show a decrease in property tax
3  revenue even if the Case-Shiller Home Price Index
4  shows housing prices are going up, correct?
5    A.  So the Case-Shiller Detroit Home Price
6  Index is for the Detroit metro region, and so the
7  metro region could see home price indexes go up.
8  And we show that other factors mean that taxable
9  value declines, and so tax revenues go down.
10    Q.  And there's not -- in your model, you're
11  assuming there's not necessarily a link between
12  actual home values or prices as measured in the
13  Case-Shiller Index and taxable value, correct?
14    A.  So the relationship is whether the selling
15  of the home price when it's reset -- when the
16  taxable value is reset after the sale, whether it
17  was higher or lower than what the taxable value had
18  been the year before.  That's what matters.
19    Q.  In your forecast, you're predicting a
20  large decrease in property tax revenue and assessed
21  values even though the Case-Shiller Index shows
22  that property -- home prices have been increasing
23  for the last two years, correct?
24    A.  So in our model, we have taxable value
25  continuing to decline even with some improvements

1  in home prices.
2    Q.  And in fact, you're predicting the tax
3  revenues are going to be cut in half, aren't you,
4  over the course of the 10-year period?
5    A.  Tax revenue --
6    Q.  Or taxable values are going to be cut in
7  half in the city of Detroit over the 10-year
8  period?
9    A.  So residential property is going to be cut
10  in half over the 10-year period.
11    Q.  So you're predicting that property values
12  are going to be cut in half even though the
13  Case-Shiller Home Price Index is showing an
14  increase in property home prices for the last two
15  years in Detroit, correct?
16    A.  Right.  So you can have an increase in
17  home prices, but your taxable value could still be
18  higher than what it is when the home sells.  So you
19  could see even with an increase with home prices,
20  you could see your taxable value fall.
21    Q.  And the taxable value is something -- is
22  that set by the City?
23    A.  So taxable value is put together by the
24  City, and then it goes to -- there are several
25  review processes before it's finalized.

1    (Document marked No. 12)
2    Q.  I'm going to hand you what's been marked
3  as Exhibit 12.  It's another printout from
4  Case-Shiller.  At first at the top, it describes
5  what the Home Price Index, the Case-Shiller Index
6  tries to do, which it seeks to measure changes in
7  the total value of all existing single-family
8  housing stock.
9    Is that your understanding of what it does?
10   A.  Uh-huh.
11   Q.  And if you look at the index levels below,
12  it indicates the one-year change in the index is an
13  increase of 15.37 percent for Detroit, correct?
14   A.  Yes.
15   Q.  And the three-year change for Detroit is a
16  12.86 percent increase, correct?
17   A.  Uh-huh.
18   Q.  And they also provide figures for a
19  20-year -- a 20-city composite home index as a
20  benchmark.  Do you see that?
21   A.  Yes, I do.
22   Q.  And you're familiar with that benchmark?
23   A.  I am.
24   Q.  And the benchmark of 20 cities shows
25  growth in home prices that is lower than Detroit's

1  for the one and three-year periods, correct?
2    A.  Uh-huh.  Yeah.
3    Q.  Detroit's home prices using the
4  Case-Shiller Index have increased more than other
5  cities in the benchmark index over the one and
6  three-year and five-year periods, correct?
7    A.  Correct.
8    Q.  And what are some of the reasons that
9  Detroit's home prices would have been increasing at
10  greater rates than other cities over the last one,
11  three or five years?
12   A.  I haven't looked at the other cities, but
13  when I looked at Detroit specifically, the
14  percentage increases have been so large, in part,
15  because the base is so low.
16   Q.  Right.  I mean, Detroit is starting out
17  from a low period, so it's not surprising that you
18  would see a large increase in home prices, correct?
19   A.  That is correct.  A $5,000 increase is
20  large in Detroit.
21   Q.  And you would anticipate that the
22  Case-Shiller Index would continue to increase for
23  the Detroit market over the 10-year period that you
24  forecast?
25   A.  I don't know what it's going to do for the

1  Detroit metro area.  I don't know.
2    Q.  You haven't looked at that?
3    A.  So we were charged with looking
4  specifically at the city of Detroit, not the entire
5  Detroit metro region.
6    Q.  Is it possible to forecast what the
7  Case-Shiller Home Price Index would look like for
8  Detroit over the next 10 years?
9    A.  I don't understand the question.
10   Q.  Is it possible to forecast what the
11  Case-Shiller Home Price Index will be for Detroit
12  over the next 10 years?
13   A.  So Case-Shiller is using actual data.  I
14  don't know if they do forecasts.
15   Q.  I'm asking could you forecast the
16  Case-Shiller Home Price Index over the next
17  10 years?
18   A.  I have not done that, no.
19   Q.  I know, but is it possible for you to do
20  that?  Is that something that's technically
21  possible for you to do?
22   A.  So you can forecast what is going to
23  happen to average home prices.  That's an exercise
24  that I've done, that I've engaged with.
25   Q.  Okay.  And if we were to forecast home

1  prices over the next 10 years in Detroit, those
2  home prices would increase under a reasonable
3  forecast, correct?
4    MR. STEWART:  Objection.
5    THE WITNESS:  I don't know what reasonable is.
6  When I've done this, I've had -- I've looked at
7  what would likely happen to average home prices,
8  and they have been going up in my forecast.
9  BY MR. SMITH:
10   Q.  Okay.  And those are forecasts over the
11  next how many years?
12   A.  So looking out 10 years.
13   Q.  Okay.  So you're forecasting home prices
14  to increase over the next 10 years, correct?
15   A.  I am.
16   Q.  And that would include in Detroit?
17   A.  That's just for Detroit.  I didn't look at
18  the entire area.
19   Q.  Okay.  And why were you doing that
20  forecast?  Is that part of your expert analysis?
21   A.  So as I mentioned in my report, one of the
22  things that I looked at is the uncapping of taxable
23  value when homes prices sell, and so part of the
24  exercise was thinking about what happens to home
25  prices.

1  continued to increase in the city of Detroit; is
2  that correct?
3     A.  There were increases, yes.
4     Q.  The information you talk about about
5  Renaissance Zones, it's kind of down toward the
6  bottom of the page, and you mention you had the one
7  year's data from 2013.  Do you see that?
8     A.  Yes.
9     Q.  And we already talked about how that was
10  provided to you by the assessor's office, right?
11     A.  It was.
12     Q.  And the reason you need the Renaissance
13  Zone data is because there's different tax --
14  different taxes apply to Renaissance Zone than
15  elsewhere in the city; is that correct?
16     A.  So Renaissance Zones are exempt from
17  certain taxes.
18     Q.  And that includes the property tax?
19     A.  Portions of the property tax.  So if
20  you're in a Renaissance Zone, you're still paying
21  the debt millages, but you're not paying general
22  operating.  You're not paying library.
23     Q.  Page 7 of your report, it says in
24  Paragraph C use separate growth rates for real and
25  personal property by property class.  Do you see

1  that?
2     A.  Uh-huh.
3     Q.  Do you know what growth rates you used?
4     A.  So it varied by type of property within
5  real and personal.
6     Q.  Did you pick the growth rates for real and
7  personal property based on your judgment?
8     A.  So ultimately I selected those growth
9  rates based on my judgment.
10     Q.  And do those growth rates also vary over
11  year for each class of property?
12     A.  They change year to year, yes.
13     Q.  And you used your judgment to decide how
14  the growth rates for each class of property should
15  change year to year; is that correct?
16     A.  I used my judgment to see how they would
17  change year to year, yes.
18     Q.  Page 8, subsection ii(b), you say that --
19  one of your assumptions was the tax law will remain
20  unchanged during the forecast time periods.  Do you
21  see that?
22     A.  Yes.
23     Q.  And who gave you that assumption?
24     A.  So in this case, it's referring to the
25  selected tax rate, and we kept it constant

1  following standard forecasting procedures.  So as I
2  outlined earlier, I followed the Michigan State
3  Revenue Conference forecasting procedures, which is
4  also what U.S. federal agencies use.  So you follow
5  current law, and you don't assume a tax rate has
6  changed.
7     Q.  Current law does not exempt personal
8  property in the manner that the proposed
9  legislation does, correct?
10     A.  So right now in current law, it is
11  planning for -- the bills have been passed that
12  would repeal personal property.  It has to be
13  confirmed by voters.  And so in that case, the
14  third part of forecasting is to think about what
15  known changes there are, and in this case, we
16  accounted for a known change.
17     Q.  Okay.  Well, you don't know what the
18  outcome of the vote will be, correct?
19     A.  I do not know.
20     Q.  And so under current law, personal
21  property is not exempted, correct?  That's not the
22  law in the state of Michigan right now, correct?
23     MR. ALBERTS:  Objection.
24     THE WITNESS:  So currently personal property is
25  slated to be repealed assuming voters approve it in

1  August.
2  BY MR. SMITH:
3     Q.  Does current law as it exists at the date
4  of this deposition exempt personal property?
5     A.  So the laws have been passed that exempt
6  it.  It just hasn't been -- it's subject to
7  approval by voters, so I kind of feel like this is
8  gray, and I don't quite know how to answer that
9  question.
10     Q.  Okay.  Right now personal property is not
11  exempted.  You can't say oh, I'm not going to pay
12  my personal property tax, right?
13     A.  So personal property right now is -- has
14  been taxed in Michigan.
15     Q.  Okay.  And that's the current law right
16  now?
17     A.  Current law, the vote has not happened.
18  It's still taxed.  Okay.  I will say that.
19     Q.  But in your forecast, you've modeled the
20  possibility that that current law treatment of
21  personal property tax may change over time,
22  correct?  You've used a 50 percent factor to model
23  that possibility, correct?
24     A.  Right.  So we -- so I've included a
25  50 percent chance that the vote passes in my

1    analysis.
2        Q.   And so you've included in your analysis a
3    50 percent chance that personal property exemptions
4    may pass in which case personal property taxes
5    would be decreased, correct?
6        A.   So what I specifically modeled is a
7    50 percent chance that personal property taxes will
8    be reduced for commercial industrial taxpayers, and
9    so I factored in a 20 percent -- what -- we're
10   forecasting a 20 percent reduction in personal
11   property and a 50 percent chance of that happening,
12   so we've modeled a 10 percent reduction.
13       Q.   So you factored in a chance that there
14   will be a change in current law leading to a
15   reduction in personal property taxes, correct?
16       A.   Yes.
17       Q.   And the -- have you done any investigation
18   into whether there's any debate about changing tax
19   rates in the state of Michigan?
20       A.   For what?
21       Q.   Have you done any investigation into
22   whether there are any proposals to change tax rates
23   in the state of Michigan?
24       A.   In the state overall or --
25       Q.   That would impact City of Detroit.

1        A.   I have not looked into any tax rate
2    changes in the city.
3        Q.   Have you looked into any tax changes other
4    than the personal property tax change that could
5    impact Detroit's revenues and whether there are
6    proposals for those?
7        A.   I don't think I understand the question.
8        Q.   Have you looked into any -- into whether
9    there are any proposals for tax rate changes that
10   might impact Detroit's tax revenues?
11       A.   I am not aware of any proposals that would
12   change tax rates in Detroit.
13       Q.   Have you investigated the matter, though?
14       A.   No.  I have not looked into it.
15       Q.   So you're saying that the assumption that
16   you used for keeping tax rates constant came from
17   the Michigan Manual; is that correct?
18       A.   So they've published a paper about their
19   procedures for doing their consensus revenue
20   forecasting, and so that was consulted as well as
21   what do other agencies do, and those procedures
22   were followed.
23       Q.   Have you done forecasting for taxes before
24   where you did not assume current tax law applied,
25   that there might be changes?

1        A.   So I have done forecasting when a specific
2    policy change has been given and we've asked to
3    say -- to look at the revenue impacts.
4        Q.   What kind of policy change have you
5    forecasted to determine the potential impacts on
6    taxes?
7        A.   So in my old job, I participated in a
8    two-year project looking at tax policy changes at
9    the State of Michigan level.  Some of the tax
10   changes would have reduced revenues for certain
11   taxes, and some would have increased tax revenue
12   for certain taxes.
13       Q.   So when you were working with the State of
14   Michigan, you forecasted the effects of potential
15   changes in tax policy on tax revenues?
16       A.   So I wasn't working for the State of
17   Michigan.  Maybe you said with, but I was working
18   for another organization doing State of Michigan
19   taxes, and -- I've forgotten your question.
20       Q.   What was the other organization that you
21   worked on Michigan taxes with?
22       A.   I worked for a group called Business
23   Leaders for Michigan.
24       Q.   Okay.  When you were doing forecasting to
25   look at changes various policies that could be

1    adopted would have on Michigan tax revenues, you
2    did an analysis on that, correct?
3        A.   So I did an analysis of specific tax
4    changes for the state that would affect the state.
5        Q.   Okay.  And did you calculate -- forecast
6    what the changes in revenues would be if tax policy
7    changed in the state of Michigan when you did this
8    other project?
9        A.   When I did this other project, yes.
10       Q.   And were you coordinating with the state,
11   or how would you describe your relationship with
12   the state in conjunction with that project?
13       A.   So I would have -- I would go to meetings
14   with state representatives to talk about the tax
15   change and to collect data.
16       Q.   And what kind of tax changes were you
17   discussing with Michigan officials?
18       A.   Generally looking at changes to the
19   business tax and changes to the sales tax.
20       Q.   Okay.  Were they looking at increasing or
21   decreasing the business tax and the sales tax?
22       A.   They were looking at decreasing the
23   business taxes and potentially raising the sales
24   tax.
25       Q.   And raising the sales tax would increase

1 the amount of money that the state collected that
2 could be used for revenue sharing, correct?
3    A.   The specifics of the different policies
4 and models, I can't remember how revenue sharing
5 was treated in that.
6    Q.   Do you know where the city -- where the
7 state gets the money that it uses for revenue
8 sharing?
9    A.   I do.
10    Q.   Okay.  Where do they get that money?
11    A.   So -- so the constitutional piece is
12 funded through sales and use tax revenue, a part of
13 it.
14    Q.   So increasing the sales tax would increase
15 revenue sharing under the constitution of Michigan
16 to the cities, correct?
17    A.   All things equal, if you -- so -- so right
18 now how the constitutional piece is structured, you
19 have the first 4 percent, and then you have an
20 add-on 2 percent.  So the revenue sharing is -- the
21 constitutional piece is 15 percent of that
22 4 percent, and those things are written that keep
23 that 4 percent constant, and you play with that
24 additional 2 percent.
25       So proposals that I often look at was sort

1 of keeping the revenue sharing intact.  If you're
2 able to increase that revenue, if you expand the
3 sales tax base or you have more transactions or
4 things, then you can see that sales tax revenue
5 could go up, but you could play with the rate, and
6 it may not actually affect sales tax revenue.
7    Q.   Is it possible that increasing the rate of
8 the sales tax will increase state revenue sharing
9 payments to the cities?
10    A.   Typically if you were to change the rate,
11 you wouldn't be affecting, per se, the revenue
12 sharing if you're not changing that 4 percent.
13    Q.   What about the percent above 4 percent?
14    A.   Well, that part of it isn't part of the
15 sales tax formula.
16    Q.   But generally you know that the state uses
17 the sales tax as a source for its revenue sharing
18 payments to the cities, correct?
19    A.   The constitutional piece comes from the
20 sales tax.
21    Q.   Do you know if any of the statutory piece
22 comes from the sales tax?
23    A.   So right now the Economic Vitality
24 Incentive Program is being -- the funds for it are
25 coming from the General Fund, and part of the sales

1 and use tax go into the General Fund.
2    Q.   Okay.  So the more money that the state
3 collects in sales tax, the more money that is
4 available to fund revenue sharing payments,
5 correct?
6    A.   So the more sales tax revenue the state
7 collects, the more money it would have available in
8 its General Fund, and it could choose to increase
9 payments to municipalities, or it could not.
10    Q.   And so increasing the sales tax rate could
11 have the effect of -- it would have the effect of
12 making more money available for revenue sharing
13 payments.  It's just whether the legislature
14 decides to use it or not, correct?
15    A.   More money would be available.
16 Legislature could or could not decide to use it.
17    Q.   When were you doing that analysis about
18 potentially raising the sales tax rate?
19    A.   So that analysis I did back seven, eight
20 years ago.  What year is it?  2014.  So I did that
21 work, I'm remembering, but probably around 2007.
22    Q.   Okay.  And did the state raise the sales
23 tax?
24    A.   They didn't.
25    Q.   Do you know why they didn't?

1    A.   So Michigan ended up making some changes.
2 They eliminated the SBT.  They put in a new
3 business tax and decided not to make any changes to
4 the sales tax.
5    Q.   And is the state of Michigan, compared to
6 other states, a relatively low-tax state?
7    A.   It depends on what time frame you look at.
8    Q.   Currently.
9    A.   Currently Michigan's in the middle in
10 terms of tax burden.
11    Q.   Do you know if there's any other planning
12 regarding sales taxes, sales tax changes?
13    A.   I'm not aware of any planned sales tax
14 changes.
15    Q.   Have you investigated whether there are
16 any planned sales tax changes?
17    A.   Nothing has come up in my conversations
18 with anyone, so I'm not aware.
19    Q.   Have you ever heard of the Revised
20 Judicature Act of 1961?
21    A.   I don't think so.
22    Q.   Are you aware that under current law, if
23 the City has a judgment against it, that it can
24 charge -- it can raise property tax rates above
25 statutory rates to collect money to satisfy the

1  judgment?
2      A.  I'm not aware of that law.
3      Q.  Did anybody ever tell you or inform you
4  that the City has in the past raised property tax
5  rates above statutory maximums to pay judgments
6  against it?
7      A.  No one told me that.  When I looked at a
8  history of property tax millages for general
9  operating, I noticed that the rates in the past
10  were above 20 mills.
11      Q.  Okay.  And so you noticed that the rates
12  were above statutory maximums in the past.  Then
13  did you make any inquiry about why that was?
14      A.  No, because going forward, what was
15  relevant was the current tax rate.
16      Q.  Okay.  But the City -- Syncora could get a
17  judgment against the City, and the property tax
18  rate could be raised above statutory maximums,
19  correct?
20      MR. STEWART:  Objection.
21      THE WITNESS:  I don't know the likelihood of
22  that.
23  BY MR. SMITH:
24      Q.  Well, other -- you know other creditors of
25  the City in the past have been successful in

1  getting judgments and having the tax rate raised
2  above statutory maximums to pay it, correct?
3      A.  I don't know any details.
4      Q.  Well, you know that the tax rates have
5  been assessed above statutory maximums in the past,
6  correct?
7      A.  The only thing that I noticed was in the
8  past, the general operating mill was above 20, and
9  I was not sure when the 20-mills limit became
10  relevant for Detroit.
11      Q.  Nobody -- I guess since nobody has told
12  you about this possibility of property tax rates
13  being above statutory maximums, so that's correct,
14  right?
15      A.  Nobody has told me about that.
16      Q.  Okay.  So nobody has asked you to consider
17  what taxes -- property taxes could be collected at
18  rates above statutory maximums under the Revised
19  Judicature Act, correct?
20      A.  Correct.  Nobody asked me to look into
21  that.
22      Q.  And you don't have any idea why they
23  didn't ask you, correct?
24      A.  I have no idea why people did not ask me
25  to do something.

1      Q.  Okay.  You did do an adjustment for
2  changes in collection rates over time, correct?
3      A.  Correct.
4      Q.  Do you know if there's an adjustment for
5  changes in collection rates for the income tax
6  under Mr. Cline's analysis?
7      A.  I don't know.
8      Q.  You haven't done anything to ensure that
9  your methodology in terms of the treatment of
10  collection rates is consistent with Mr. Cline's
11  methodology, correct?
12      A.  Can you say that again?
13      Q.  You haven't done anything to investigate
14  or ensure that the methodology you used with
15  respect to collection rate on the property tax is
16  consistent with Mr. Cline's approach on the income
17  or other taxes, correct?
18      A.  We took pains to make sure that the inputs
19  we were using were consistent, and the way we were
20  going about -- he had a different methodology
21  because it's a different type of tax with a
22  different tax base.  He had a different methodology
23  than I did, and I don't -- given how -- I don't
24  know -- you know, there's a different collection
25  process.  I don't know how he factored in

1  collection exactly into his model.
2      Q.  You don't know whether Mr. Cline factored
3  any changes in collection rate in his model one way
4  or the other, correct?
5      A.  I don't know how his model incorporates
6  collection.  I would have to see it.
7      Q.  You agree that it's important to factor in
8  the collection rate in forecasting income tax,
9  correct?
10      A.  So there are -- collections of income is
11  important, and he -- you know, collections for
12  income taxes are different than property taxes, so
13  it's not -- it's not unusual that he would deal
14  with it differently than I would.  He's -- for
15  example, you have tax withheld from paychecks, so
16  that's a very different model than someone paying
17  their property taxes.
18      Q.  But you agree that it's important to
19  factor in in some way changes in collection rate
20  over time in forecasting the income, corporate,
21  wagering or utility user tax, correct?
22      A.  I think you said, though, that it's
23  important to factor in changes.  I think it's
24  important to think about the revenue that you're
25  going to be receiving, you're actually receiving,

1    and for each of the different taxes, we did that.
2         In property, we thought about what's the
3    collection rate. In income taxes, we thought about
4    the tax base, different tax bases, taxes withheld
5    versus taxes paid, so collection would show up in
6    that analysis. For the other taxes, we thought
7    about well, what is being actually paid by, say,
8    the casinos or utility users. So collections is
9    present, but I think they're different in each of
10   the tax bases.
11       Q.   But in the income tax analysis, you know
12   there's no change or analysis of what the
13   collection rate might be over the next 10 years,
14   correct?
15       A.   I don't know exactly what Mr. Cline did
16   there.
17       Q.   Okay. But you agree it's important to
18   take into account the collection rate in any
19   forecast of taxes and tax revenue that you do,
20   correct?
21       A.   I don't know if I would say it's important
22   to think about a collection rate. I think it's
23   important to think about what money the entity is
24   going to receive, which is what we've tried to do
25   in our forecast. We tried to think about actual

1    money in the door in a given fiscal year.
2        Q.   And would you agree that collection rate
3    is one of the key drivers of tax revenue?
4        A.   In the property taxes forecasts that I
5    did, collection rate is an important driver.
6        Q.   Yeah. For any tax revenue analysis,
7    collection rate is a key driver of tax revenue,
8    correct?
9        A.   Income taxes, like I said, I think each of
10   them collections is different, and so the
11   collection process is different, and so it's more
12   important and less important in other areas.
13       Q.   Have you ever done a tax forecast where
14   you failed to incorporate a collection rate?
15       A.   In the forecast that I prepared related to
16   property taxes, I've included a collection rate.
17       Q.   I'm asking about any tax forecast. Have
18   you ever done a tax forecast where you didn't take
19   into account potential changes in collection rates?
20       A.   I mean, I think -- I've always
21   incorporated collections, and we all think -- you
22   know, both in this project and other work what do
23   we actually think money is going to be in the door,
24   so collections are always a process of what we're
25   thinking about.

1        Q.   Because the higher your collection rate,
2    the higher your tax revenue, and the lower your
3    collection rate, the lower the revenue, correct?
4        A.   In some cases, yes. In other cases, you
5    can have a higher collection rate and a lower tax
6    levy, and you could have -- you would have a lower
7    tax revenue.
8        Q.   All other things being equal, the higher
9    the collection rate, the more tax revenue you take
10   in, correct?
11       A.   Up to a certain point.
12       Q.   And that's why it's important to consider
13   the collection rate in a tax forecast, right?
14       MR. STEWART:   You've asked this question, I
15   think I've counted, 15 times now, so she's going to
16   answer. This is going to be the last time because
17   I am going to instruct her after this.
18       MR. SMITH:   You have a pattern of obstructing
19   every deposition you've been in. By the way, I'm
20   going to ask her about deposition transcripts
21   later, so I ask that you produce this order of the
22   court because I'm informed there is no such order.
23       MR. STEWART:   No. Ask Mr. Hackney.
24       MR. SMITH:   No. I'm asking you. I'm going to
25   ask about it. Where's the order?

1        MR. STEWART:   It was a ruling that he made.
2    Your partner, Mr. Hackney was there.
3        MR. SMITH:   And there was no such ruling, so --
4        MR. STEWART:   Yes, there was.
5        MR. SMITH:   -- you're obstructing the
6    deposition.
7        MR. STEWART:   I was in court when it happened.
8        MR. SMITH:   Okay. Then I'm asking that you
9    produce it. Produce it before the deposition is
10   over. We've got like three or four hours left.
11       MR. STEWART:   No.
12       MR. SMITH:   We're at your offices. I just want
13   the order.
14       MR. STEWART:   I told you it's not an order.
15   It's a ruling that he made.
16       MR. SMITH:   Or the transcript, whatever it is.
17   I want you to show me where the court issued this
18   ruling.
19       MR. STEWART:   Why don't you ask Mr. Hackney
20   because he was the one that got in the colloquy
21   with the judge, and he is the one where the judge
22   said it. I think it was during the swaps trial,
23   but we've had thousands and thousands of pages of
24   transcript. So I'm not going to interrupt the
25   deposition to go find it. I think, though --

1    MR. SMITH: You can do it at a break.
2    MR. STEWART: -- since your firm was the one
3 that got the adverse ruling, I would think they'd
4 have no trouble, and find Mr. Hackney. He
5 remembers it well because he professed to be
6 surprised by the judge's ruling, and the judge told
7 him actually it's standard, and it is standard.
8 And that's just -- everybody knows it. Surprised
9 he didn't because he's an excellent lawyer, but
10 that was the ruling.
11       So now the question, though, is I think --
12 I don't think I'm going unfair when I say that
13 after you've asked this witness the same question
14 15 times and she's answered it 15 times, you have
15 to move on. You're just arguing with her. You're
16 wasting everybody's time, and it's an abuse of the
17 witness. So let's reread the question. Reread the
18 question. She's going to answer it, and then we're
19 going to move on.
20          (Whereupon, the record was
21          read as requested.)
22    THE WITNESS: Collections are important to
23 consider in doing any tax forecast.
24 BY MR. SMITH:
25    Q.  And Ms. Sallee, is it your understanding

1 that you're not allowed to look at any of the
2 testimony given in deposition by other witnesses in
3 this case, including Mr. Evanko?
4    MR. STEWART: You just misstated it.
5    MR. SMITH: I'm asking the question.
6    MR. STEWART: Ask her. Then I'm going to
7 correct you because you just misstated what I told
8 you.
9    MR. SMITH: You're coaching the witness.
10    MR. STEWART: Answer the question.
11    THE WITNESS: You said testimony. I'm trying
12 to -- I don't know -- I don't know legal things, so
13 I don't know.
14    MR. STEWART: Just because I think you
15 misunderstood it, Mr. Smith, but the judge's ruling
16 was --
17    MR. SMITH: Listen, your speaking objections
18 are really obstructive.
19    MR. STEWART: Well, there's no pending
20 question.
21    MR. SMITH: Then don't give a speech on the
22 record.
23    MR. STEWART: Because you just misstated
24 things, and we have to have the record corrected
25 because you can't go around misstating things.

1 What the ruling was is you cannot ask a witness to
2 comment on the testimony of another witness.
3 That's what the ruling was.
4    MR. SMITH: Okay. That's what you've been
5 telling everybody in this case, right?
6    MR. STEWART: Well, that's what the judge
7 ruled. I should add, by the way, I didn't instruct
8 her not to answer your questions. I just told you
9 I have a standing objection to them, and I cannot
10 stop you if you want to ask her what Mr. Evanko
11 said. I just told you it's improper, and the judge
12 has said not to do it.
13    MR. SMITH: You obstructed the deposition
14 already.
15    MR. STEWART: No. If you want to ask her, ask
16 all day about it.
17    MR. SMITH: I'm told the tape is running out.
18 Let's take a break.
19    THE VIDEOGRAPHER: Off the record. The time is
20 1:32 p.m.
21          (Whereupon, a short break was
22          taken.)
23    THE VIDEOGRAPHER: We're back on the record.
24 The time is 1:39 p.m.
25

1 BY MR. SMITH:
2    Q.  Hi, Ms. Sallee. Do you have Mr. Evanko's
3 testimony in front of you? Do you see the excerpts
4 there?
5    MR. STEWART: And you have my standing
6 objection, and I will not interrupt your
7 examination if it's clear my objection to this is
8 standing.
9    MR. SMITH: Okay.
10 BY MR. SMITH:
11    Q.  You've got it in front of you?
12    A.  Yes.
13    Q.  Okay. I wanted to ask you about Page 152
14 in there if you would flip through. These are just
15 excerpts from his deposition, and let me know when
16 you get to Page 152.
17    A.  Okay.
18    Q.  Okay. And actually if you go down to
19 Line 13, you see Mr. Evanko's talking about the
20 transactions they have and whether they're arm's
21 length. Do you see that?
22    A.  Yeah.
23    Q.  And you see that the data that he's
24 received was so scant of arm's length transactions.
25 There could not have been a study developed because

1 it was just absolutely insufficient data. Do you
2 see that?
3     A.  Okay.  I see that.
4     Q.  And Mr. Evanko's testimony is generally
5 consistent with the other materials we've seen from
6 the assessor's office indicating that most of the
7 transactions are not arm's length, correct?
8     MR. STEWART:  Objection.
9     THE WITNESS:  Well, I haven't seen any of the
10 data, so I don't know.
11 BY MR. SMITH:
12     Q.  Well, I mean, we saw some other documents
13 talking about how most of the transactions were not
14 arm's length.  Do you recall that?
15     A.  I don't know if most of the transactions
16 were not arm's length.
17     Q.  So you don't know what percent of the
18 transactions the City has that are arm's length
19 transactions, correct?
20     A.  I do not know a percent, no.
21     Q.  If you go over to Page 223 of the
22 document, it's like the last two pages.  Let me
23 know when you get to 223.
24     A.  Okay.
25     Q.  If you'll look at Line 18, Mr. Evanko is

1 asked but when I said you don't remember discussing
2 this with Ernst & Young, I was correct, right?
3 Right.  You don't recall discussing .5 reduction of
4 10 percent in collection in fiscal year 2015 due to
5 loss of revenue from the small business personal
6 property tax exemption?  Not only do I not -- I do
7 not recall, but this is a ridiculous estimate.  I
8 knew in December of 2013 that the small business
9 personal property tax exemption would affect the
10 City's tax base by approximately .7 of 1 percent,
11 not 10 percent.
12     Do you see that?
13     A.  Uh-huh.
14     Q.  So Mr. Evanko is characterizing your
15 forecast of the reduction in personal property tax
16 as a ridiculous estimate, correct?
17     MR. STEWART:  Objection.
18     THE WITNESS:  Well, he says this is a
19 ridiculous estimate.
20 BY MR. SMITH:
21     Q.  And you didn't have any conversation with
22 Mr. Evanko to ask him about whether it was a
23 reasonable estimate the reduction in personal
24 property tax before you put it in your report,
25 correct?

1     A.  So I had to -- I had several conversations
2 with Mr. Evanko.  I've talked with him in January
3 of 2014 and received some data from him.  He
4 answered some questions.  I also had conversations
5 with Alvin Horhn in his office.  And I had a call
6 with Alvin in February of 2014, and I ran the
7 10 percent reduction by him, and he -- he said that
8 was reasonable.
9     Q.  Did you ever run the 10 percent reduction
10 in personal property tax by Mr. Evanko before you
11 put that in your report?
12     A.  I can't remember if it came up in the
13 conversations with him in January or not.  I know I
14 did run it by, because of my notes, with Alvin
15 Horhn.
16     Q.  Do you have written notes of all of your
17 conversations with people at the City?
18     A.  No, I don't.
19     Q.  Do you have written notes of any of your
20 conversations with people at the City or others you
21 rely on?
22     A.  I do have some written notes.
23     Q.  Do you know if those have been collected
24 for production?
25     A.  They have.

1     Q.  Do you understand that under the proposed
2 legislation that there's sums that will be
3 reimbursed to cities to help offset reductions in
4 personal property taxes?
5     A.  Yes, there's a replacement mechanism.
6     Q.  Do you have an understanding that under
7 the legislation, not all property is subject to the
8 reduction in personal property tax?
9     A.  What's the question?
10     Q.  Is there some property that would be
11 exempted from the reduction in personal property
12 tax under the legislation?
13     A.  So in personal property, you have
14 commercial, industrial and utility.  Utility
15 property is not exempt, would not be subject to the
16 reduction, and there's a -- and there's different
17 phase-outs of how commercial and industrial are
18 affected.
19     Q.  Before today, you were never informed that
20 Mr. Evanko had characterized your forecast for the
21 reduction in personal property tax in the manner
22 that he did in his deposition, correct?
23     A.  So I have had some conversations with my
24 lawyers about --
25     MR. STEWART:  You can't talk about what you

1 talked to your lawyers about.
2 THE WITNESS: Okay.
3 MR. STEWART: He can ask -- he can tip-toe
4 around the subject, and he will do that, but
5 that's -- there's a little dance we usually do.
6 BY MR. SMITH:
7 Q. Did you know before today that Mr. Evanko
8 characterized your personal property tax forecast
9 reduction as ridiculous?
10 MR. STEWART: You can answer that.
11 THE WITNESS: I did not know he said it was
12 ridiculous.
13 BY MR. SMITH:
14 Q. Okay. Then Mr. Evanko is asked on
15 Page 224, he's asked about this -- the reassessment
16 that's going to be completed in 2020. Do you see
17 that?
18 A. Uh-huh.
19 Q. The planned reappraisal study?
20 A. Yeah.
21 Q. And he's asked and you could not have
22 given them an estimate of how much to reduce
23 taxable value based on this study because you,
24 yourself don't know which way it's going to come
25 out, correct? And he answers I don't know where --

1 how it's going to come out next year. 2020 is a
2 lifetime.
3 And then he's asked okay, and he testifies
4 you know, I'll be collecting Social Security living
5 in North Carolina. And then he's asked I know
6 you're thinking about two years. I know where your
7 head is at, but you agree with my statement. You
8 did not provide them with -- you didn't tell them
9 this is about what it's going to look like when the
10 reappraisal study is done, correct? Absolutely
11 correct.
12 Do you see that testimony?
13 A. Uh-huh.
14 Q. Before today, were you aware of that
15 testimony by Mr. Evanko?
16 A. I was not aware of this testimony, no.
17 Q. Okay. It's true that Mr. Evanko did not
18 provide you with the assumption you use in your
19 forecast regarding a reduction in assessed value as
20 a result of the planned reappraisal, correct?
21 A. Mr. Evanko did not provide the assumption
22 that was used in our forecast.
23 Q. And in fact, Mr. Evanko's testimony is
24 that he doesn't know what the outcome will be in
25 terms of whether property will increase or decrease

1 in value as a result of the planned reappraisal
2 study, correct?
3 MR. STEWART: Are you asking her that's what
4 this says?
5 BY MR. SMITH:
6 Q. That's what his testimony is, correct?
7 MR. STEWART: Objection.
8 THE WITNESS: Can you say that one more time?
9 BY MR. SMITH:
10 Q. Mr. Evanko's testimony is that he doesn't
11 know what the outcome of the reappraisal study will
12 be in terms of whether property values will
13 increase or decrease, correct?
14 A. It says here, yeah, he does not know how
15 the reappraisal study will come out, correct.
16 Q. And in fact, nobody knows how the
17 reappraisal study is going to come out in terms of
18 effect on property values and assessments in the
19 city, correct?
20 A. Nobody knows for certain.
21 Q. Would you agree that Mr. Evanko would
22 certainly be one of the most knowledgeable people
23 in terms of assessed values in the City of Detroit?
24 MR. STEWART: Objection.
25 THE WITNESS: Mr. Evanko is knowledgeable of

1 the assessed values in Detroit.
2 BY MR. SMITH:
3 Q. In fact, Mr. Evanko is responsible for the
4 assessed values in Detroit as the assessor,
5 correct?
6 A. He is.
7 Q. And in fact, Mr. Evanko would be one of
8 the most knowledgeable people about assessed values
9 in Detroit, correct?
10 MR. STEWART: Objection.
11 THE WITNESS: He is a knowledgeable person.
12 BY MR. SMITH:
13 Q. Mr. Evanko has been dealing with assessed
14 values in Detroit for much longer than you have,
15 correct?
16 A. My understanding is he joined the City in
17 January.
18 Q. Do you know where he joined from?
19 A. I think I was told he was at Wayne County.
20 Q. And at Wayne County, he would be dealing
21 with assessed values in the city of Detroit,
22 correct?
23 A. I don't know what he did.
24 Q. I'd like to go back to your report now.
25 A. Okay.

Q. Page 9 you talk about how you had assumed there would be a reduction -- well, you talk about the planned reassessment at the top of Page 9, correct?

A. Yes.

Q. And you used your judgment in order to come up with the figure you used to reduce planned assessment as -- assessed values as a result of the planned assessment, correct?

A. No. I only looked at taxable value, so I took into account the City's activities and its impact on taxable value.

Q. Okay. So you used your judgment in developing the assumption about what taxable value would be under the reappraisal study that's planned, correct?

A. So after the reappraisals and the reassessments, I took those into account in thinking about what happens to taxable value.

Q. And did the value you used to reduce taxable value as a result of the reappraisal study, was that based on your judgment?

A. The parameter I used was based on my judgment after the reappraisal study.

Q. Okay. On Page 9 down under C, you say

that the reinvestment scenario estimates improvements to the tax base on collections of the general operations and economic environment of the city improved during the 10-year period. Do you see that?

A. Uh-huh.

Q. And the City anticipates that improved economic conditions will increase property values, correct?

A. You said the City?

Q. Yeah, the City.

A. Okay.

Q. Well, do you anticipate that -- do you anticipate that improved economic conditions will increase property values?

A. So this scenario does say that if the economy in Detroit improves, we would see improvement to taxable values in the city. We would see improved property tax revenue.

Q. And under your model, improving services in the city should improve property tax revenues, correct?

A. We didn't look at services offered by the City.

Q. Okay. So you did no analysis to determine

the effect on improved services on property tax revenues, correct?

A. Did not look at the relationship between improved city services and property tax revenue.

Q. Do you agree it's at least theoretically possible that improving city services could increase property tax revenues?

A. I agree it's theoretically possible.

Q. Page 9 to 10 you talk about the growth rates after recessions. Do you see that?

A. Yes.

Q. And you mention historical data. What historical data did you look at?

A. So I pulled historical taxable value information from the State Tax Commission for Detroit.

Q. And then did you use your judgment to set the various growth rates that you assume in your forecasting model?

A. Yeah. So I performed some analysis and then used that analysis to select growth rates.

Q. When you say analysis, what calculation did you perform?

A. So in this case, looking at historical taxable value and trends and seeing during

different periods on different tax bases what's happened in the city.

Q. For any of the historical trends that you talk about in your report, did you actually come up with a mathematical formula to specify the trend, or did you eyeball it?

MR. STEWART: Objection.

THE WITNESS: So I mean, I would type in a compounded annual growth rate formula and calculate the compound annual growth rate, things like that. That's a formula, I guess.

BY MR. SMITH:

Q. But in order to do the trend, I mean, how did you figure out what the trend was? Did you do any mathematical analysis to determine the trend or not?

A. So I would calculate certain things using the data.

Q. What kind of things?

A. Like the compounded annual growth rate during certain periods.

Q. Did you just take an average of certain number of years or --

A. So I would look at a time period, and then I would calculate -- so compounded annual growth

1 the metro area, not Detroit specifically, so this
2 was a chance to have some Detroit-specific data.
3    Q.  Okay.  And why didn't you look -- I mean,
4 did you use the data to -- as a number input in
5 your model?  How was it used?
6    A.  How was it used?  So again, we did the
7 analysis to see sort of where home prices were in
8 the city and compare it to the City of Detroit's
9 published state equalized value and taxable values,
10 and then I was able to use that information in
11 helping think through what was going to happen to
12 residential taxable value in the forecast, so it
13 helped me select my growth rates.
14    Q.  Okay.  And so the -- if you had looked at
15 a different period of time, your growth rate
16 assumptions would be different, correct?
17    A.  Well, I did look at different periods of
18 time.  So I looked at longer periods and shorter
19 periods, and I -- ultimately this information was
20 used to help think through, you know, what were
21 home prices -- average home prices five, 10, 15,
22 20 years ago, and what would their taxable value
23 look like today versus where would it be reset if
24 the home sold today.  And so that helped me think
25 about well, how much would taxable value have to

1    Q.  And did you use your judgment to pick
2 whether the rate would change in a given year for
3 all the years that are covered by your forecast?
4    A.  Well, so the goal here in using -- so
5 using some data to think about what's likely to
6 happen to taxable value and then looking at sort of
7 overall how much -- looking at the data, how much
8 do I think taxable value on the residential side
9 needs to drop and then spreading that out and
10 thinking through how many years is it going to
11 take, is this process going to take and then
12 applying a growth rate for -- to those years.
13    Q.  When you say figuring out how much
14 residential value needs to drop, what do you mean?
15    A.  So doing an analysis looking at -- in this
16 case -- so overassessments impact taxable value in
17 the following way.  If your house is overassessed,
18 your state equalized value is going to be higher
19 than your capped value, and you're going to be
20 paying taxable value equal to your capped value.
21 If your assessment falls and your equalized value
22 goes below your capped value, then your taxable
23 value would fall, so it would be the lesser of the
24 two.
25    And so I've now forgotten what you've

1 fall, how much is state equalized value likely to
2 fall and go below -- need to go below the capped
3 value and therefore, affect taxable value.
4    All of that is to say I looked at various
5 time periods and used that to think through what
6 needed to happen to taxable value in the forecast
7 for residential property.
8    Q.  Okay.  If the property values don't fall
9 below capped value, I mean, what's the effect of
10 that?
11    A.  I don't understand your question.
12    Q.  Let me ask a better question.  Down at the
13 bottom of Page 13, you say that your forecast
14 assumes a reduction in residential taxable value of
15 between negative 2 and 4 percent per between
16 fiscal year 2016 and fiscal year 2020?
17    A.  Yes.
18    Q.  Is that assumption based on your judgment?
19    A.  I used my judgment to select those rates,
20 yes.
21    Q.  And did those rates change over each year?
22    A.  There are some years that I think have the
23 same rate, so it varied depending on -- some of
24 them are the same.  Some of them aren't.  I can't
25 remember year to year what I picked.

1 asked me after having gone through that.
2    Q.  Right now the county isn't -- right now
3 the county is saying that the properties are not
4 overassessed, correct?
5    MR. STEWART:  Objection.
6    THE WITNESS:  I don't know if the -- the county
7 has given it an equalization factor of 1.
8 BY MR. SMITH:
9    Q.  Okay.  And that means in the county's
10 view, the property is not overassessed, correct?
11    MR. STEWART:  Objection.
12    THE WITNESS:  Through their process, the county
13 has given them an equalization factor of 1.
14 BY MR. SMITH:
15    Q.  Okay.  And that means the county
16 determines that the property is not overassessed
17 because if it thought it was overassessed, it
18 wouldn't give them a value of 1, correct?
19    A.  So the process is that if the county
20 thinks that the property is overassessed, it would
21 not give it a factor of 1.
22    Q.  15 percent value at the bottom of the
23 page, that's the value that you assumed for the
24 effect on taxable value from the reappraisal study
25 that's planned in three -- that's going to take

1    three to five years, correct?
2       MR. STEWART:  Sorry.  Where are we again?
3       THE WITNESS:  Where are we?
4    BY MR. SMITH:
5       Q.  Bottom of Page 14.  The 15 percent drop in
6    residential taxable value is the value you assumed
7    based on that reappraisal study that's going to
8    take place in the future; is that correct?
9       A.  Yes.
10      Q.  And then over on the top of Page 15, you
11   say that your assumption of the 15 percent decline
12   would bring residential taxable value to
13   approximately half of its fiscal 2013 level.  Is
14   that accurate?
15      A.  That's accurate.
16      Q.  And so based on your assumption regarding
17   the effect of the reappraisal study, you're saying
18   that the taxable value of the property in the city
19   would be reduced in half, correct?
20      A.  No.  I said the residential value would be
21   half.
22      Q.  As a result of your assumption about the
23   reappraisal study, you're concluding that the
24   residential taxable value will be reduced in half,
25   correct?

1       A.  It will be half of its fiscal year 2013
2    level, the residential taxable value.
3       Q.  For commercial or industrial property, how
4    did you go about figuring out taxable value for
5    those?
6       A.  So taxable value, how did I go about
7    figuring out?  So commercial and industrial taxable
8    value, I pulled historic information as the
9    starting point and then applied growth rates for
10   the forecast period.
11      Q.  For commercial and industrial property,
12   you didn't factor in the potential of reappraisal
13   during the forecast period, correct?
14      A.  So during the next few years, I have
15   commercial and industrial property taxable value
16   declining.  How property is evaluated for
17   commercial industrial, I did not have a big factor
18   like I did with residential.
19      Q.  Do you know how the value of commercial
20   industrial property is set by the City?
21      A.  For personal, I understand.  For real
22   property, I know the methods they can choose from.
23   I don't know exactly what the City has been
24   selecting.
25      Q.  Do you know -- I mean, do you know what

1    the City is going to do in the future in terms of
2    evaluation of industrial or commercial property?
3    Like have you investigated its plans or not?
4       A.  I have not talked to the City about their
5    plans about how they're assessing commercial
6    industrial property.
7       Q.  And the reason you don't have the big drop
8    in taxable value for a commercial and industrial
9    property is because you're not using this
10   assumption of a reappraisal for those categories of
11   property, correct?
12      A.  So in this case, I don't have the
13   reappraisal process resulting in a huge drop in
14   commercial and industrial taxable value.
15      Q.  But you do have a huge drop in taxable
16   value for the residential property based on the
17   planned reappraisal study that's going to take
18   place over the next several years, correct?
19      MR. STEWART:  Objection.
20      THE WITNESS:  Can you say that again?
21   BY MR. SMITH:
22      Q.  You do have a huge drop in the taxable
23   value for residential property based on this
24   reappraisal study that's planned to take place in
25   the future over the next several years, correct?

1       A.  So I have a 15 percent drop in -- well, I
2    have a 15 percent drop between fiscal year 2019 and
3    2020 on the residential side because of the
4    reappraisal.
5       Q.  And that 15 percent drop results in wiping
6    out half of the taxable value of residential
7    property in the city, correct?
8       A.  When you take into account what the
9    taxable value is by 2020 compared to 2013, it's
10   going to be half of the 2013 level.
11      Q.  And that's in addition to drops in taxable
12   value that have already occurred before 2013,
13   correct?
14      A.  The drops of taxable value before 2013?
15      Q.  Yeah.  Before 2013, taxable value already
16   decreased, correct?
17      A.  Yes.
18      Q.  And so your forecasted 50 percent
19   reduction is in addition to the reduction that has
20   already occurred in taxable value in the city for
21   residential property, correct?
22      A.  There have been reductions in taxable
23   value, and we have continued reductions occurring
24   because of reassessments and reappraisals, yes.
25      Q.  And the continued reduction in taxable

1  value, that's because of actions the City is going
2  to take in the future, correct?
3      A.  So some of the reductions in the
4  residential taxable value are based on planned
5  actions of the City, and some of them are not.
6      Q.  Which ones are not?
7      A.  Well, so as detailed earlier, there are,
8  you know, things that are at -- causing taxable
9  value on the residential side to decline that
10  aren't based on the study, so population declines,
11  etcetera.
12      Q.  The greatest factor in reducing taxable
13  value in your analysis are actions the City is
14  going to take in the future, correct?
15      A.  Can you say that again?
16      Q.  The greatest factor causing a reduction in
17  taxable value in your forecast is actions that the
18  City is going to take in the future, correct?
19      A.  So the largest drop in taxable value in
20  the forecast have been -- so in fiscal year 2015,
21  the City lowered assessments, and so that created a
22  large drop in taxable value for residential, and so
23  that's an action of the City.  And then the planned
24  reappraisal study is a second large -- results in a
25  second drop in taxable value, and it is also an

1  action of the City, yes.
2      Q.  And do you have any idea what factors were
3  taken into account in assessing property in the
4  city?
5      A.  So I know theoretically what they could be
6  using.  I don't know what they are actually using.
7      Q.  So you don't know what factors the City
8  used in factoring assessments in the reappraisal it
9  has done so far, correct?
10      A.  I do not know the specifics.
11      Q.  And you do not know what factors the City
12  may use in its planned reappraisal study in the
13  future, correct?
14      A.  So the reappraisal study, they're hiring
15  an outside firm to do the reappraisal, so the City
16  will take that information.  I don't know exactly
17  how they're going to use it.
18      Q.  I mean, part of the reason the City seems
19  to be reducing assessments is basically for
20  political reasons to reduce people's property
21  taxes, correct?
22      MR. STEWART:  Objection.
23      THE WITNESS:  I have no idea.
24  BY MR. SMITH:
25      Q.  Well, do you know that -- when the

1  reassessments came out already, were you aware
2  there was a press conference where the politicians
3  all came out and said look, we're lowering your
4  property taxes?  Were you aware of that?
5      A.  I was aware there was a press conference.
6      Q.  And you're aware the politicians in the
7  city of Detroit were saying that the reappraisal
8  that they did which lowered property taxes was done
9  to benefit the residents of the city, correct?
10      A.  I haven't read anything about what city
11  officials are saying about the reassessments.
12      Q.  You agree that Detroit is planning to do a
13  reassessment even though Wayne County is saying the
14  property is properly assessed, correct?
15      A.  I don't know if Wayne County is saying the
16  properties are properly assessed.  They're giving
17  it a state equalization factor of 1.
18      Q.  Okay.  Even though -- even though Wayne
19  County is giving the property an equalization
20  factor of 1, which means it's not over or
21  underassessed, the City, nonetheless, is going to
22  go in and reappraise the property, correct?
23      MR. STEWART:  Objection.
24      THE WITNESS:  So my understanding is the City
25  is taking -- hiring a group to parcel by parcel

1  reassess the property in the city.
2  BY MR. SMITH:
3      Q.  Page 17, you note that much of the
4  industrial personal property qualifies for a
5  Renaissance Zone exemption.  Do you see that?
6      MR. STEWART:  What paragraph?
7      MR. SMITH:  Up at the top of Page 17.
8      THE WITNESS:  Uh-huh.
9  BY MR. SMITH:
10      Q.  Do you know what percent of the industrial
11  personal property is subject to a Renaissance Zone
12  exemption?
13      A.  Off the top of my head, no.  Let me see.
14  I think about two-thirds of it.  This is just
15  without my spreadsheet in front of me.
16      Q.  During the historical period that you've
17  looked at, did property tax rates change?
18      MR. STEWART:  Could I have the question reread,
19  please.
20          (Whereupon, the record was
21          read as requested.)
22      THE WITNESS:  Which specific property tax
23  rates?
24  BY MR. SMITH:
25      Q.  Well, did any of them change?

1    A.  I don't know.
2    Q.  Well, you mentioned that there were some
3  years where the rates were above 20, and I'm just
4  wondering whether there were other changes that you
5  noticed in property tax rates in the historical
6  data that you examined?
7    A.  So I don't know for the years where I
8  pulled taxable value what the property tax rates
9  were in those given years year by year.  I don't
10  know.
11    Q.  You're assuming that no property rate
12  changes will change for the next 40 years, correct?
13    A.  The analysis done as such keeps the tax
14  rate constant.
15    Q.  And it does that for 40 years, correct?
16    A.  Well, so we did a 10-year forecast where
17  we kept our tax rates at current level, current law
18  levels and then extrapolated for another 30 years,
19  and so that, in effect, we're sort of holding tax
20  rates constant.
21    Q.  And you're doing that, in effect, for
22  40 years, correct?
23    A.  For 40 years in total.
24    Q.  Have you ever done a forecast before when
25  you assumed the tax rates would remain constant for

1  as long as 40 years?
2    A.  I think this is the only time I've done a
3  40-year forecast.
4    Q.  And is it the only time you've done a
5  10-year tax forecast?
6    A.  I have done 10-year forecasts of tax
7  revenue for specific projects for individual
8  clients.
9    Q.  Okay.  But you had never done a forecast
10  for as long as 10 years trying to forecast revenues
11  for a city or other government entity, correct?
12    A.  I don't think so.  I think just Detroit.
13    Q.  And I mean, in the other -- what's the
14  longest tax forecast that you've done for a city or
15  any other governmental entity other than the
16  Detroit one?
17    A.  Well, so most of my work that I've done
18  I've forecasted tax revenues to a municipality, but
19  I wasn't working for the municipality.  So I've
20  done forecasts for -- I guess I've done forecasts
21  for projects involving taxes to the State of
22  Michigan.  You know, those have been five to
23  10 years.
24    Q.  I mean, my question is not about
25  individual projects.  I'm talking about overall tax

1  revenues.  You haven't done any forecasts of
2  overall tax revenues to a city or other government
3  entity for as long as 10 years, correct?
4    A.  I can't remember if for the Business
5  Leaders for Michigan project, which was forecasting
6  State of Michigan tax revenue, how long our time
7  frame was.  That was forecasted at least five
8  years.  I don't know how much longer if I did -- if
9  I did beyond that.
10    Q.  Okay.
11    A.  So I don't know.
12    Q.  And that was just the sales -- was that
13  limited to certain taxes in Michigan, or was it all
14  taxes?
15    A.  In that case, it was limited to a few
16  taxes.
17    Q.  When you did the Flint, Michigan forecast,
18  how many years was that?
19    A.  Five years.
20    Q.  Did you assume that tax rates would all
21  stay constant for five years in Flint, Michigan?
22    A.  So I think as I said earlier, they do have
23  certain millages expiring, and so anything that was
24  in current law we took into account.  So if a
25  millage was expiring, then we would add it back in

1  for parts of the analysis where it was relevant.
2    Q.  And did you look at corporate tax at all
3  in your Flint, Michigan analysis?
4    A.  So we looked at income taxes.
5    Q.  And you know the corporate income tax
6  rates changed recently, correct?
7    A.  Corporate tax rates have changed, yes.
8    Q.  Did you factor that into your analysis, or
9  was that not during the period of your analysis?
10    A.  So anytime there were changes that had
11  been enacted, they were taken into account.  So if
12  there was something on any of the taxes, if they
13  were by law slated to expire, decrease, increase,
14  we would incorporate that.
15    Q.  And do you advise about various tax rates
16  in different states in the course of your practice?
17    A.  What do you mean by advise?
18    Q.  I mean do you give advice or do analysis
19  of tax rates in different states or what they are?
20    MR. STEWART:  Objection.
21    THE WITNESS:  So part of our practice, we will
22  look at effective tax rates that various industries
23  are facing in certain states.  We do a tax burden
24  study where we look at the tax environment for all
25  50 states.  So we don't offer specific advice about

1 whether you should lower or increase your taxes.
2 We will do an analysis of what businesses are
3 paying.
4 BY MR. SMITH:
5    Q.  But based on the surveys Ernst & Young
6 does, you know that tax rates change in states on
7 various taxes, correct?
8    A.  Yes, tax rates change from time to time.
9    Q.  And so -- well, do you update your survey
10 every year, or how often do you update that?
11    A.  We have sort of complex models, so we
12 every few years will go through, and we will update
13 our models, our state-by-state models to take into
14 account tax rate changes that have happened.
15    Q.  Okay.  And you know that tax rates
16 frequently change on various taxes in the states,
17 correct?
18    A.  I don't know about frequently, but when
19 tax rates change and have been -- gone into effect,
20 we put them in our model.
21    Q.  Okay.  Have there ever been any states
22 where tax rates didn't change for 10 or 40 years in
23 your survey that you can identify?
24    A.  I don't know off the top of my head if
25 there are states that have had the same tax rate

1    A.  The state level?
2    Q.  Yeah.
3    A.  Has the state?  I can't remember if the
4 state personal income tax rate has -- I think it --
5 yes, it has changed.  I mean, so yeah, there are
6 tax rates that have changed.  New taxes have been
7 passed and old taxes eliminated.
8    Q.  What kind of taxes have been passed in
9 Michigan in the last 10 years?
10    A.  So we're going back to what, 2004, so the
11 single business tax was replaced with the Michigan
12 business tax, which then was replaced by the
13 corporate income tax.
14    Q.  Has the sales tax changed in Michigan in
15 the last 10 years, if you know?
16    A.  I don't think so.
17    Q.  Page 18 at the bottom, you've got this
18 20 percent reduction or 20 percent of the property
19 tax revenue from industrial and commercial property
20 will not be replaced by a new funding mechanism.
21 Do you see that statement?
22    A.  Yes.
23    Q.  And that was an assumption you made based
24 on your judgment?
25    MR. STEWART:  Objection.

1 for 10 or 40 years.  I don't know.
2    Q.  You can't identify anyone sitting here
3 today?
4    A.  I don't know.  I would have to look at the
5 data and then come back and tell you.
6    Q.  You can't identify anyone sitting here,
7 any state where tax rates haven't changed for 10 or
8 40 years sitting here today, correct?
9    A.  There could be.  I just don't know off the
10 top of my head.
11    Q.  And certainly you know that tax rates have
12 changed in the last 10 years in Detroit?  I mean in
13 Michigan, correct?
14    A.  Tax rates for various taxes have changed
15 in the last 10 years, yes.
16    Q.  What kind of tax rates have changed in the
17 last 10 years in Michigan?
18    A.  So Michigan's taxes on business have
19 changed in the last 10 years.
20    Q.  And have corporate tax rates changed in
21 the last 10 years?
22    A.  Well --
23    Q.  I mean, have individual tax rates,
24 personal tax rates changed over the last 10 years
25 in Michigan?

1    THE WITNESS:  So we looked at the -- looked at
2 the set of laws that had been passed about the
3 personal property tax, and I looked at the Michigan
4 Senate Fiscal Agency memo.  And they put together
5 an estimate of how much of the lost revenue would
6 be replaced by various funding mechanisms, so that
7 was used to help me select how much revenue Detroit
8 would lose with the repeal and then to factor in
9 the likelihood that voters approve the referendum
10 next month.
11 BY MR. SMITH:
12    Q.  And was that a statewide estimate, though,
13 of how much revenue would be replaced?
14    A.  It was a statewide.
15    Q.  So there wasn't any estimate of how much
16 revenue Detroit might lose from personal property
17 tax legislation that you've ever seen, correct?
18    A.  I have not seen a Detroit-specific
19 estimate.
20    Q.  Other than what Mr. Evanko provided in his
21 deposition, correct?
22    MR. STEWART:  Objection.
23    THE WITNESS:  Did he provide a specific number?
24 BY MR. SMITH:
25    Q.  Yeah.  He was talking about .7 percent.

1      MR. STEWART: No, he did not. He said that's
2  tax base. He used the word tax base. You just
3  misquoted him. She's talking about the personal
4  property receipts reduction. He was talking about
5  the overall tax base.
6  BY MR. SMITH:
7      Q.  Okay. So you've never seen any estimate
8  for personal property tax receipts reduction in
9  anything you've seen, correct?
10     A.  I have not seen anything that is
11 Detroit-specific.
12     Q.  How did you pick -- I think you gave it a
13 50/50 chance of passing. How did you pick that
14 number?
15     A.  So doing the analysis, we started doing
16 the work, like I said, over a year ago, and the
17 referendum, the ballot was coming up a year later.
18 And you know, just like most things, there's a
19 certain probability it will go through. At that
20 point, we had to select a probability that 50/50
21 was reasonable.
22     Q.  I mean, you didn't do any investigation
23 into the likelihood of passage in the legislature
24 of the personal property legislation?
25     MR. STEWART: Objection.

1      THE WITNESS: Well, by this point, the
2  legislature had already passed it, so it's whether
3  or not the voters approve it. And so you know, you
4  have to say, you know, I follow the press, and at
5  that point, some people are for it. Some people
6  are against it. So 50/50 seemed reasonable.
7      I mean, at the end of the day, we needed
8  to -- we were trying to come up with a reasonable
9  method of thinking about what personal property tax
10 revenue the City would lose, and this seemed like
11 the best method.
12 BY MR. SMITH:
13     Q.  At the end of the day, nobody knows
14 whether this new legislation is going to pass about
15 personal property taxes; is that correct?
16     MR. STEWART: Objection.
17     THE WITNESS: I guess we'll know in two weeks,
18 a week and a half.
19 BY MR. SMITH:
20     Q.  Right now, though, I mean, when you put
21 together your expert opinions, you had no way of
22 knowing whether the personal property tax
23 legislation would pass, correct?
24     MR. STEWART: Objection.
25     THE WITNESS: Yes. So the way of dealing with

1  that uncertainty is to assign a probability and
2  then to multiply that probability by sort of an
3  average reduction, what's a reasonable reduction in
4  property tax revenue, and so that's how we arrived
5  at our estimate.
6  BY MR. SMITH:
7      Q.  You mentioned reasonable a lot of times.
8  Can you give me your definition of reasonable in
9  terms of forecasting?
10     A.  In this case, reasonable is realistic or
11 likely.
12     Q.  And you would agree with me there could be
13 more than one reasonable forecast for the City of
14 Detroit, correct?
15     A.  I would agree with that.
16     Q.  Page 18, Paragraph ix (a), you've got some
17 collection rates for residential property,
18 commercial property and industrial and utility
19 property. Were those assumptions based on your
20 judgement?
21     MR. STEWART: Which page?
22     MR. SMITH: 19.
23 BY MR. SMITH:
24     Q.  On Page 19, you made -- you have some
25 numbers for the collection rates you used of

1  50 percent for residential property, 3 percent for
2  commercial property, 87 percent for industrial
3  property and 100 percent for utility property.
4      Were those assumptions you made based on
5  your judgment?
6      A.  These were after looking at data provided
7  by the City on their collection rates by type of
8  property, I then selected those rates.
9      Q.  So in the baseline scenario, are you
10 assuming that the City is not going to collect more
11 than 50 percent of its residential property tax?
12     A.  For part of it. So I kept the current
13 situation of about 50 percent collections on
14 non-delinquent for residential. I kept that
15 assumption for the next four years of the forecast,
16 and I increased it after that.
17     Q.  And why was it four years that you kept
18 that assumption rather than five or six years?
19     A.  It's coinciding with the reappraisal
20 study. So when the results go on, the forecast has
21 things stabilizing on the residential side.
22     Q.  So it's your belief that the reappraisal
23 study will result in the stabilization of property
24 tax, or let me ask you another question. Is it
25 your view that the reappraisal study is going to

1 judgment?
2    A.  So the forecast -- so the 10-year forecast
3 we followed the SEMCOG forecast, and then for the
4 30-year extrapolation followed SEMCOG up until
5 2029.  Both us and SEMCOG have in 2029-30 no
6 population growth or sort of a leveling.  And then
7 in going forward, the .2 percent and the .3 percent
8 that you mentioned, I did analysis of sort of metro
9 areas that had experienced a decade of population
10 decline and what growth they had afterwards, and
11 that analysis led me to select those two growth
12 rates.
13    Q.  Does SEMCOG not project population values
14 after 2029?
15    A.  SEMCOG has a projection until 2050.
16    Q.  Why didn't you use the SEMCOG projection
17 during the entire forecast period?
18    A.  So SEMCOG, they prepared their forecast
19 before the bankruptcy, before the reinvestment
20 scenarios were put together, and so the 30-year
21 extrapolation is off of the -- with the
22 reinvestment scenario, and so SEMCOG hadn't taken
23 that into account, and so we decided that we needed
24 to deviate from it slightly going after 2029.
25    Q.  Do you project higher or lower population

1 growth factors than SEMCOG for after 2029?
2    A.  So in some years, our growth actually
3 matches theirs.  Overall, our population forecasts
4 are slightly higher than SEMCOG.
5    Q.  On Page 22, you have a rate of increase
6 for -- of 3.4 percent of taxable value in 2024 and
7 2025, and then -- I mean, what's that's based on?
8    A.  So as we discussed earlier, I use the
9 Congressional Budget Office forecasts, and they go
10 out 10 years.  And so I continued sort of -- looked
11 to see what overall is happening with home prices
12 and used that to help think through if Detroit, we
13 have at the end of our 10-year, picking up and
14 rebounding what's a reasonable growth rate in the
15 first part of our 30-year extrapolation.
16    Q.  Okay.  If you go over to Page 24, in the
17 middle of the page, you have a statement that
18 there's no set formula for EVIP payments for the
19 City of Detroit.  That's a correct statement,
20 correct?
21    A.  So what is meant by that is there's no --
22 there's no, you know, statutory formula or any
23 government formula for what needs to be allocated
24 to the City of Detroit.  There are components of
25 EVIP, things that they are supposed to meet, but

1 unlike kind of the old statutory revenue sharing in
2 Michigan where there was a way that money was
3 supposed to be allocated, EVIP doesn't have that
4 sort of formula.
5    Q.  Okay.  Did you hold the rate of revenue
6 sharing constant over time in your forecast?
7    A.  Only for the EVIP portion.
8    Q.  And we know that the EVIP portion of state
9 revenue sharing will not be constant during the 10
10 or 40-year period you forecast, correct?
11    A.  We don't know that.
12    Q.  I mean, if you were sitting here today,
13 would your -- has there been any two years when the
14 EVIP portion of revenue sharing has been the same?
15    A.  EVIP has been around for three years, so
16 no, they haven't been the same each year.
17    Q.  Okay.  We know that the EVIP portion,
18 because it's based on a number of factors, is not
19 going to be the same each year, correct?
20    A.  You're right.  It's not probably going to
21 be the same each year.  I don't know for certain.
22    Q.  You've assumed a 2 to 3 percent sales tax
23 growth rate.  What was that based on?
24    A.  Based on what the Michigan Department of
25 Treasury forecasts.

1    Q.  Okay.  Is the treasury -- do they forecast
2 it for years after 2025?
3    A.  They do not.
4    Q.  Okay.  What period of time do they
5 forecast it for?
6    A.  So the information that I used, you know,
7 started with actuals, so it probably started with
8 fiscal year 2012, and then it went all the way to
9 2025.
10    Q.  The -- you know that there's a forecasted
11 increase in income tax revenues, correct?
12    MR. STEWART:  Objection.
13    THE WITNESS:  I don't have the disclosure
14 statement in front of me, so I don't know exactly
15 what the income tax revenues are for the 10 and
16 40-year off the top of my head.
17 BY MR. SMITH:
18    Q.  I mean, do you know if they increase -- do
19 you know if Ernst & Young is forecasting an
20 increase or decrease for income tax revenues over
21 10 or 40 years?
22    A.  So an increase compared to what?  So year
23 on year?
24    Q.  Compared to 2013.  I mean, what's the
25 trend in income tax?  Do you know if it's

1  increasing or decreasing under the Ernst & Young
2  forecast?
3      A.  So we have income tax -- so I'm going off
4  memory.  We have income taxes falling for a period
5  and then growing for another period.
6      Q.  Okay.  And corporate tax, is that similar
7  that the Ernst & Young forecasts have a growth in
8  corporate tax?
9      A.  I don't want to comment on it based on
10  memory.
11      Q.  Okay.  On Page 25, you note that your
12  10-year forecast includes the legislature-approved
13  fiscal year 2015 revenue sharing payments for
14  Detroit.  Do you see that?  Do you see where I'm
15  at?
16      A.  Yes, I do.
17      Q.  Your prior forecasts, you did not use the
18  fiscal year 2005 revenue sharing payments for
19  Detroit, correct?
20      MR. STEWART:  Do you mean 2015?
21      MR. SMITH:  2015.
22      THE WITNESS:  So previous iterations, we always
23  used what the most recent current law amount was,
24  so the legislature-approved fiscal year 2015 in the
25  first week and a half of June.  And so in the

1  latest version, we incorporated fiscal year 2015
2  once it had been passed.
3  BY MR. SMITH:
4      Q.  And did the incorporation of fiscal year
5  2015 revenue sharing payments materially increase
6  your forecast for the state revenue sharing?
7      A.  What do you mean by materially?
8      Q.  Well, do you know how much -- did it
9  increase it?
10      A.  So the EVIP payment to Detroit did go up
11  between 2014 and 2015.
12      Q.  And do you know how much it did?
13      A.  It went up by almost 4 million.
14      Q.  And then for periods after that, did you
15  use the 2015 rate?
16      A.  We used the higher 2015 amount.
17      Q.  And what additional amounts did using the
18  higher 2015 rate add to your forecast compared to
19  the last time you did it?
20      A.  Somewhere between 35, 40 million.
21      Q.  Okay.  So incorporating the fiscal year
22  2015 revenue sharing payment into your forecast
23  increased revenue sharing by 35 to $40 million; is
24  that correct?
25      A.  Going off the top of my head, but it's

1  around there.
2      Q.  Okay.  And so using your assumption of
3  current law remaining unchanged led you, in your
4  prior forecast, to be off by approximately 35 to
5  $40 million compared to your current forecast,
6  correct?
7      A.  So using current law, we had planned
8  for -- so we used current law, which was lower than
9  the fiscal year 2015 amount.
10      Q.  And using -- the assumption of using
11  current law led you to predict that revenue sharing
12  would be 35 to $40 million lower than you're now
13  predicting, correct?
14      A.  So using current law led us to -- so we
15  can compare what did we predict for 2015 compared
16  to -- 2015 versus actual.  And so using current
17  law, we were slightly below.  We don't know what's
18  going to happen to EVIP.  It could be eliminated
19  next year, so this is --
20      Q.  And it could be increased by 100 percent?
21      A.  It could be increased by 100 percent.  You
22  never know, so this is a good way to do it.
23      Q.  And my question is but using the
24  assumption of no change in current law led you to
25  underestimate state revenue sharing by 35 to

1  $40 million in your last projection compared to
2  this projection, correct?
3      MR. STEWART:  Objection.
4      THE WITNESS:  I wouldn't say underestimate.
5  The forecasts differ, and you're right.  So using
6  this new assumption, we are forecasting a higher
7  state sharing EVIP revenue to Detroit.  It remains
8  to be seen whether that actually happens.
9  BY MR. SMITH:
10      Q.  There's no way we know what the actual
11  revenue sharing numbers are going to be over the
12  period of your forecast?
13      A.  That's right.
14      Q.  They could be much higher, or the state
15  could completely eliminate revenue sharing,
16  correct?
17      A.  They could eliminate EVIP and do something
18  else or not do anything at all.
19      Q.  The state could -- the City of Detroit
20  could find itself in bankruptcy again within the
21  next 10 years, correct?
22      MR. STEWART:  Objection.
23      THE WITNESS:  I have no idea.
24  BY MR. SMITH:
25      Q.  Well, if the state eliminates revenue

1  sharing payments, the City could find itself in
2  bankruptcy again within the next 10 years, correct?
3      MR. STEWART:  Objection.
4      THE WITNESS:  I have no idea.
5  BY MR. SMITH:
6      Q.  In fact, you have no idea what's going to
7  happen to the revenue streams that you measure in
8  your forecast.  There's too many factors, correct?
9      MR. STEWART:  Objection.
10     THE WITNESS:  So what we were asked to do was
11  using reasonable assumptions, put -- reasonable
12  meaning here realistic assumptions, put together a
13  10-year forecast and then a 30-year extrapolation
14  of that, and that's what we did.
15  BY MR. SMITH:
16     Q.  But there's -- your forecast can be
17  changed depending on actions by various people in
18  either the state government or the City of Detroit
19  government, correct?
20     A.  So -- so you know, the forecasting
21  exercise, as any forecasting entity would tell you,
22  you know, you forecast, and your forecasts can't
23  really incorporate, you know, whimsical, random,
24  whatever changes, large changes year to year, and
25  the forecast exercise, you acknowledge that at the

1  get-go.  And so you're right.  Anything could
2  happen.
3      Q.  And the revenues received for property
4  taxes and state revenue sharing depend on -- in the
5  future, the actual revenues depend on actions by
6  politically-elected state and city officials,
7  correct?
8      A.  I don't think I understand the question.
9      Q.  Okay.  The state revenue sharing depends
10  on the -- in the future over the next 10 years
11  depends on the action of elected officials in
12  setting revenue sharing values, correct?
13     A.  So a portion of it depends on the
14  legislature.
15     Q.  And the largest portion of revenue sharing
16  depends on the actions of elected officials,
17  correct?
18     A.  The largest share for Detroit, not for the
19  entire state.
20     Q.  And similarly the property tax depends on
21  the action of officials in the city of Detroit in
22  terms of what they do with assessments over the
23  next 10 years, correct?
24     A.  Say that again.
25     Q.  The actual property tax revenues in the

1  city of Detroit over the next 10 years depends on
2  the actions of state -- city officials in terms of
3  what they do with property tax assessments over the
4  next 10 years, correct?
5      A.  I would say it's one factor.
6      Q.  And so right now you don't even -- nobody
7  can know the identity of the officials that are
8  going to influence revenues for the City in the
9  next 10 years, correct?
10     A.  It's possible that elected officials in
11  the future that we do not know affect revenues.
12     Q.  And it's impossible to know what actions
13  officials in the city or state will take over the
14  next 10 years that could materially impact the
15  revenues to the City of Detroit, correct?
16     A.  There are things that can happen that can
17  impact the revenue forecasts.
18     Q.  And it's impossible to know what those
19  things are sitting here today?
20     A.  The forecast takes into account what we
21  know, and there could be things we don't know.
22     Q.  And one of the things we don't know is
23  what officials in the state or city will do which
24  could have a material impact on the revenues that
25  you forecast, correct?

1      MR. ALBERTS:  Objection.
2      THE WITNESS:  Future officials could have some
3  impact on the revenues.  That's a possibility.
4  BY MR. SMITH:
5      Q.  I mean, they will have an impact.  I mean,
6  the state officials set the revenue sharing level
7  really, right?  We know for a fact that state
8  officials are going to impact the revenue available
9  to the City, correct?
10     A.  We know that the legislature does set the
11  amount of EVIP for Detroit.
12     Q.  And we know for a fact that city officials
13  are in charge of the assessments of property to the
14  City, correct?
15     A.  City officials set the property assessment
16  rolls, yes.
17     Q.  So we know as a matter of fact that
18  officials from the city and the state will take
19  unknown actions in the future that will have
20  unknown consequences for the revenues that you
21  estimate for the City of Detroit, correct?
22     A.  It's possible that city officials, their
23  actions in the future affect the forecast.
24     Q.  And the same as the state officials,
25  correct?

1  prepared based on the analysis I provided.
2      Q.  Okay.  I'm just wondering how did you --
3  did you forecast the real property, personal
4  property and Renaissance Zone numbers that are
5  contained in this spreadsheet?
6      MR. STEWART:  What exhibit number is this one?
7      MR. SMITH:  It's 18.
8      THE WITNESS:  So here this says change in
9  assessed values, but it should be change in taxable
10  value because these are -- so you see values, and
11  these are taxable values, and these look like
12  they're my numbers, yes.
13  BY MR. SMITH:
14     Q.  Okay.  Are the values that are under the
15  heading change in assessed values your numbers?
16     A.  They are not how I prepared it.  They've
17  calculated those based on the taxable values, and I
18  put together the taxable values that are shown
19  here.
20     Q.  Okay.  So the numbers that are in this
21  spreadsheet are your numbers, but they're really
22  taxable values and not assessed values; is that
23  correct?
24     A.  They're taxable values, yes.
25     Q.  So somebody made an error in putting

1  together the description of this data in this
2  spreadsheet, correct?
3      A.  They labeled the change in values in a way
4  that I wouldn't have labeled it.
5      Q.  They labeled it in an inaccurate way,
6  correct?
7      A.  I would have used a different label.
8      Q.  The taxable values shown here, they change
9  from year to year, correct?
10     A.  Taxable values change from year to year,
11  yes.
12     Q.  And can you tell me are all those changes
13  numbers you picked based on your judgment?
14     A.  So as we talked about, to come to these
15  total taxable value numbers for each year, I did
16  analysis for each tax base and selected the growth
17  rates, and that modeling feeds into those total
18  values.
19     Q.  And the growth rates, all these growth
20  rates vary in each year.  Those were numbers you
21  picked based on your judgment, correct?
22     A.  After doing analysis, I selected certain
23  growth rates, and I used my judgment, yes.
24     Q.  So all these different numbers for each
25  year and each category of property are numbers you

1  picked based on your judgment for the growth rate,
2  correct?
3      A.  After doing analysis, I selected growth
4  rates for each of the tax bases, and I had to use
5  my judgment to select those growth rates.
6      Q.  And when you said you did analysis, you
7  didn't calculate any of those growth rates, did
8  you?
9      A.  What do you mean by calculate?
10     Q.  You didn't calculate any of the growth
11  rates using a mathematical formula, correct?
12     A.  Well, all of the analysis requires some
13  sort of mathematical formula.
14     Q.  But those growth rates that appear in the
15  spreadsheet, those aren't generated by a
16  mathematical formula, correct?
17     A.  I guess it depends on mathematical
18  formula.  I mean, so math is used in the analysis.
19     Q.  But you didn't -- the numbers that are
20  chosen for the growth rate are selected numbers.
21  They're not numbers that are calculated using a
22  mathematical formula, correct?
23     MR. STEWART:  Objection.
24     THE WITNESS:  Ultimately all of the numbers,
25  the growth rates, I had to select.

1  BY MR. SMITH:
2      Q.  If we look at the General Fund collection
3  rates, do you see where that is on this spreadsheet
4  down kind of towards the bottom?
5      A.  I do.
6      Q.  Did you select the General Fund collection
7  rates that vary from year to year for your
8  analysis?
9      A.  So those were built up, as we discussed
10  earlier, by looking at the non-delinquent
11  collection rates by each type of property and then
12  also the payments from Wayne County.  And so for
13  historical years, I was able to see what the total
14  collection rate was and then going forward had to
15  decide what that collection rate would be, so I had
16  to use my judgment to ultimately select the
17  collection rate going forward.
18     Q.  Okay.  So for future years, 2015 going
19  forward, you selected the collection rates for the
20  various categories based on your judgment, correct?
21     A.  Based on my analysis of the different
22  components and how they were being collected, I did
23  use my judgment to select those rates.
24     Q.  But the collection rates you used are
25  numbers you selected, and they're not numbers that

1 couple conversations with Alvin Horhn, and I had
2 had at least one conversation with Gary, and he had
3 provided some data to me.
4    Q.  Do you have any familiarity with the
5 methods used by municipalities to estimate the
6 revenue generated by a tax increase?
7    A.  Do you have a specific example?
8    Q.  Well, I'm wondering if you have any
9 knowledge about what methodology municipalities use
10 to estimate revenue from a tax increase?
11    A.  I don't know what -- I think it would vary
12 from city to city, so I don't know what a
13 particular city would do.
14    Q.  Okay.  But do you know -- are you familiar
15 with the method -- the various methods that cities
16 can use to estimate increases in revenue from a tax
17 increase?
18    A.  So there are, I would say, accepted
19 methods of estimating tax changes and its revenue
20 impacts.
21    Q.  And what would be the accepted methods of
22 estimating increased revenue from a tax increase?
23    A.  So conceptually you would want to
24 understand how -- and you said a tax increase?
25    Q.  Yeah.

1    A.  So you would want to understand what is
2 the -- so what does the tax increase mean?  Is it a
3 tax rate increase?  Is it an addition to the tax
4 base?  So you would have to think through how is
5 your tax base going to change by whatever is being
6 proposed to raise revenue.  And so you could
7 have -- with the tax increase, you could have any
8 number of things.  You could have an addition to
9 the tax base making it bigger.  You could have --
10 if you increased the tax rate, you would have to
11 think about well, does that increase in the tax
12 rate, how does that affect the tax base.
13       There's a number of things.  You know, you
14 would want to parse out sort of changes that affect
15 your tax calculation, which would typically be your
16 rate and your tax base.
17    Q.  And are there -- you said there are a
18 number of accepted methodologies for doing that
19 type of analysis?
20    A.  I would say I don't know a number of, but
21 there is a way that you would go about doing it,
22 which is you could set up your analysis of here's
23 your tax change and thinking through all factors
24 that affect, you know, the tax base, and that would
25 be an accepted way of doing it.  You could use one

1 of the software tools we talked about earlier like
2 REMI to help you model changes to the tax base
3 given a tax policy change, and that would be an
4 accepted way of doing it.
5    Q.  Would another method be IMPLAN or --
6    A.  IMPLAN doesn't work for tax changes like
7 that.
8    Q.  If you were asked to forecast the rate of
9 compliance with a tax, how would you go about that,
10 or what factors would you consider?
11    A.  So for rate of compliance, thinking about
12 compliance with the tax change, you would want to
13 think about so what is the -- what is the tax base
14 being affected.  And there's literature on how
15 compliance differs across tax bases, and so I would
16 consult the literature and also the historical
17 performance to use that as a guide as to what the
18 compliance is and then what, obviously, is
19 happening in terms of whether you're raising or
20 lowering taxes.  And there's literature on that as
21 well, and you could consult that to help you think
22 through what happens with compliance whether you're
23 raising or lowering taxes.
24       (Document marked No. 25)
25    Q.  Why don't I hand you what I'm going to

1 mark as Exhibit No. 25.  It's some data from the
2 Michigan Realtors Association on residential home sales.
3       Is this the type of data that you looked
4 at in your analysis?
5    A.  Yes.
6    Q.  And for Detroit Board of Realtors, they've
7 got a 14 to 13 year-to-date percent change of
8 42.13 percent in home prices.  Do you see that?
9    A.  Yes.
10    Q.  So home prices based on the Detroit
11 realtor data went up 42.13 percent in 2014 so far
12 compared with the prior year.  Is that accurate?
13    A.  You said the year-to-date average price
14 changed?
15    Q.  Yeah.
16    A.  Yeah, that's right.
17    Q.  And you've updated your spreadsheets with
18 data such as this; is that correct?
19    A.  Uh-huh.
20    Q.  Okay.  But you didn't use the updated data
21 in your actual analysis or calculations; is that
22 correct?
23    A.  So I used the data -- every time we
24 updated, I looked to see if growth rates needed to
25 be updated, so it's one of the things that I would

1    look at in doing updates.
2        Q.   Why have home prices increase by
3    42 percent in Detroit thus far in 2014 compared to
4    2013?
5        A.   I don't know.
6        Q.   Do you know any of the factors that
7    contributed to that increase?
8        A.   I don't know why average home price sales
9    have gone up that much.  I don't know.
10       Q.   Let me ask you this.  I mean, can you
11   identify any other cities that have had comparable
12   growth in average home prices in 2014 to Detroit?
13       A.   I haven't specifically looked at other
14   cities, so I don't know.
15       Q.   Historically in Detroit, has there ever
16   been a period of time where home prices have
17   increased by as much as 40 percent?
18       A.   The period I looked at, there was not.  I
19   haven't -- I would have to speculate.  I don't know
20   before the periods I looked at.
21       Q.   What period did you look at?
22       A.   So I had consistent data from 2001 onward.
23       Q.   Okay.  So the increase that we're seeing
24   in 2014 in average home prices is greater than any
25   of the increases that occurred at least since 2001

1    in Detroit; is that correct?
2        A.   I think that's correct.
3            (Document marked No. 26)
4        Q.   Let me ask you about what I'll mark as
5    Exhibit 26.  Is this the type of data that you got
6    for your building permit spreadsheet?
7        A.   Yes.
8        Q.   Okay.  And so this has some updated
9    numbers just up to May 2014 of -- I guess there's a
10   total of $68 million in construction cost for
11   permits that have been issued so far; is that correct?
12       A.   That looks to be correct, yes.
13       Q.   And is that -- do you know if that's an
14   increase compared to prior periods or not?
15       A.   When I looked at it, the -- so the
16   year-to-year change in the last few years had been positive.
17       Q.   You have mentioned that you had reviewed
18   or at least up to about Page 75 of Kopacz's report.
19   I'm going to hand you a copy of that.  Is that a
20   copy of the report that you were talking about?
21       A.   Let me look.
22       MR. STEWART:  What exhibit number on this one?
23       MR. SMITH:  27.
24            (Document marked No. 27)
25       THE WITNESS:  Yes, this looks to be the report.

1    BY MR. SMITH:
2        Q.   On Page 15 of the report at the top --
3        A.   Okay.
4        Q.   -- Ms. Kopacz says that financial modeling
5    is a highly subjective undertaking that is affected
6    by the assumptions made and the professional biases
7    of the analysts developing the model.
8            Do you agree with that statement?
9        A.   I may not say highly.  I think in
10   financial modeling, there's some art in addition to
11   science to it, so...
12       Q.   Do you agree the financial modeling is a
13   subjective undertaking that is affected by the
14   assumptions made and the professional biases of
15   analysts developing the model?
16       A.   I would agree with that.
17       Q.   And you would agree that financial
18   modeling is both a science and an art?
19       A.   I do.  I do agree with that.
20       Q.   Over on Page 25, there's a section called
21   the plan of adjustment.
22       A.   Yeah.
23       Q.   And she says even after many years of
24   practice with dysfunctional, insolvent,
25   operationally troubled enterprises, I was confused

1    by the City's projections in POA.  Section E of
2    this report provides detail on how the projections
3    in our eyes are structured.  Suffice it to say that
4    the 10-year projections, the 10-year, 40-year
5    projections and the restructuring and reinvestment
6    initiatives form an unusual construct for a
7    financial plan for an enterprise attempting to
8    emerge from bankruptcy.  Do you see that?
9        A.   I do.
10       Q.   You haven't ever participated in
11   constructing financial projections that are similar
12   to the ones that have been constructed in the
13   Detroit case, have you?
14       A.   I have not been involved in putting
15   together -- what was the word you used?
16       Q.   Projections similar to the type that are
17   in this Detroit bankruptcy.
18       A.   I have not been responsible for putting
19   together this exact kind of format.  That's true.
20       Q.   Have you ever been involved in any
21   construction of projections where you had to rely
22   on other experts for their own projections such as
23   the reinvestment projections that were given to you
24   from Conway MacKenzie?
25       A.   So in work that I've done in looking at

1  the projections of, say, a particular project, I
2  would often rely on information provided by a third
3  party such as the planned construction costs for
4  the project. So they would forecast how that would
5  look like over that period of time, so I would have
6  to take somebody else's work and use it, which is a
7  little bit, I guess, similar to this situation
8  where we were looking at information projections
9  prepared by another group or expert.
10     Q. Page 27, the last paragraph, the second
11  sentence says the projections in the POA have not
12  been harmonized with the City's budget that was
13  passed by the City Council on June 5, 2014.
14     A. I see that.
15     Q. Were you aware that the projections that
16  Ernst & Young had done had not been harmonized with
17  the City budget?
18     A. I was not aware of that until I read this
19  part of the report.
20     Q. Have you looked at the budget's
21  projections at all in doing your work?
22     A. I looked at past City budgets. I have not
23  looked at this June 5, 2014 budget.
24     Q. On Page 52, there's an analysis here, the
25  sensitivity analysis for the revenue sharing. Do

1  you see that?
2     A. Yes.
3     Q. And she says at the end of the first
4  paragraph the statutory payment of 5 percent change
5  in the allocation would have a cumulative impact of
6  70 million to the General Fund during the fiscal
7  year 2014-2023 period. Do you see that?
8     A. Yes, I do see that.
9     Q. In your view, is this sensitivity analysis
10  that Ms. Kopacz has provided showing a 5 percent
11  change in the statutory revenue sharing allocation
12  would have a $70 million impact over the 10-year
13  period, is that reasonable?
14     A. Yeah, it is reasonable.
15     Q. Then underneath the graph or the chart she
16  says the City of Detroit reasonable saw its state's
17  revenue sharing decreased significantly from a
18  combined annual total of 267 million in fiscal year
19  2009 to as low as 173 million in fiscal year 2012.
20        Is that consistent with your
21  understanding?
22     A. I don't have my spreadsheet in front of
23  me, but that seems about right.
24     Q. Over on Page 61, at the bottom, it says
25  for the without-RRIs scenario, every 1 percent

1  change in the 10-year assumption will result in
2  approximately 21 million change in collected -- oh,
3  that's income tax revenue. Never mind.
4     MR. STEWART: Sorry. Where are we?
5     MR. SMITH: Never mind. We're in a place
6  that's not relevant for Ms. Sallee.
7  BY MR. SMITH:
8     Q. Do you have any plans to reserve -- to
9  read the rest of the Kopacz report or not?
10     A. I guess I haven't thought about it. I
11  don't know.
12     Q. Do you have any plans to do any additional
13  work before you testify?
14     A. I will probably do some preparation before
15  I testify, I'm guessing.
16     Q. But any additional changes to your
17  forecast, are you planning those before you
18  testify?
19     A. No, I'm not.
20     Q. In the historical data that you've looked
21  at, has the City always been in poor financial
22  shape?
23     A. I was not asked to look at the City's
24  financial position in the past, and so I didn't do
25  that. So I don't know.

1        (Document marked No. 28)
2     Q. I'm going to hand you what's been marked
3  as Exhibit 28, which is an article entitled How
4  Michigan's Revenue Sharing Raid Cost Communities
5  Billions for Local Services. And in the third
6  paragraph, it says over the past decade, lawmakers
7  and governors from both political parties have used
8  some 6.2 billion in sales tax collections to fill
9  state budget holes rather than fulfill a statutory
10  revenue sharing promise to local communities
11  according to the Michigan Municipal League, which
12  released a city-by-city analysis earlier this month.
13        Is that consistent with your
14  understanding?
15     A. So it is true that the state has not in
16  the past allocated what statute would say is full
17  funding to municipalities. It hasn't done that.
18     Q. And the amount for -- in total, is it a
19  reasonable to say around $6 billion over the last
20  decade?
21     A. I don't know where that number is coming
22  from or how they've calculated it, so I don't know
23  if that's reasonable.
24     Q. The last paragraph says Detroit, which
25  filed for bankruptcy protection last year, missed

1  have to do that before I could comment on whether
2  it was accurate.
3      Q.  And in fact, the revenue sharing cuts are
4  described as a heist in this paper, right?
5      A.  That's what the title says.
6      Q.  I mean, there's a lot of widespread
7  publicity about the problems that the cuts in
8  revenue sharing have had for Michigan cities,
9  correct?
10     A.  It is a topic in news articles and things
11 that I've read.
12     Q.  And isn't it true that the state has cut
13 the revenue sharing payments and used the money to
14 balance the state budget?
15     A.  So Michigan's financial -- fiscal
16 situation was pretty dire after the 2001 recession,
17 and so one form -- one way of achieving a balanced
18 budget was to not allocate full funding for
19 municipal revenue sharing.
20     Q.  But now Michigan has a balanced budget,
21 the state, correct?
22     A.  Well, they always have a balanced budget.
23 They're legally required to each year.
24     Q.  Well, if you look at this article, the
25 last sentence on the page or last couple sentences

1  say the state is now in an enviable position,
2  revenues that exceeded expectations.  It is posting
3  large surpluses, but has failed to take steps to
4  restore local funding.  Do you see that?
5      A.  I do.
6      Q.  And are you aware that the state in recent
7  years has been posting large surpluses?
8      A.  So large, I don't know about large, so you
9  would have to say well, what do you mean by large.
10 The state, the last two years they did have a --
11 their revenues exceeded their planned budgeted
12 expenses, so they were running a surplus in that
13 sense.
14     Q.  And do you know how much those surpluses
15 were for the last two years?
16     A.  Off the top of my head, no.
17     Q.  Would it be fair to say that the fact the
18 state is running surpluses has made the cities even
19 more upset that the state isn't increasing revenue
20 sharing payments?
21     MR. STEWART:  Objection.
22     THE WITNESS:  I wouldn't know.  I haven't
23 talked to anyone, so I don't know how they're
24 feeling.
25

1  BY MR. SMITH:
2      Q.  How about in Flint, Michigan, do you think
3  they're upset that the state is running surpluses
4  while they're not paying them the full amount of
5  revenue sharing?
6      A.  I did not ask them that question, so I
7  don't know.
8      Q.  What does the state do with all the
9  surplus money?
10     A.  I don't -- I haven't looked to see how
11 they've used the money.  I don't know.
12     Q.  Do you know why the governor's budget
13 ended up including the increase in revenue sharing
14 that you've incorporated into your most recent
15 forecast?
16     A.  I don't know why the legislature passed
17 the increase.  I don't know why.
18     Q.  Do you agree that you can't tell me what
19 the property tax rate is going to be over the next
20 10 years?
21     A.  I -- so property tax rates meaning all the
22 different types of millages, I don't know what all
23 the different types of millages are going to be
24 over the next 10 years.
25     Q.  Can you -- are you able to testify about

1  the funds that the City expects to receive from the
2  State of Michigan in the future?
3      A.  Not all funds, so the only thing that I've
4  said that I will speak about is the state revenue
5  sharing.
6      Q.  That's the only source of funds you can
7  talk about?
8      A.  That's the only source of funds I'm going
9  to talk about, yeah.
10     Q.  And in terms of what the actual amounts
11 that are going to be given to the state, not the
12 forecasts in your forecast, have you done any
13 investigation to find out what, if anything, the
14 City knows about actual sources of funds that might
15 be provided by the state over the next 10 years?
16     A.  Okay.  So I got lost in that.  What's your
17 question?
18     Q.  Do you know who from the City deals with
19 the state on revenue sharing?
20     A.  No, I don't know.
21     Q.  And so would it be fair to say that you
22 haven't talked to the people at the City to find
23 out what, you know, actually might happen with
24 state revenue sharing over the next 10 years?
25     A.  So I haven't talked with anyone at the

1 City about state revenue sharing. I'm not sure how
2 that would mean -- how the City would be affecting
3 state revenue sharing. I mean, there's two parts
4 of it. The constitutional piece, I can't see how
5 City officials can affect that directly. And the
6 EVIP portion is being decided by the legislature.
7    Q. Well, I'm just wondering not that they can
8 affect it, but have you asked people at the City to
9 give you what information they know about what
10 might actually happen to revenue sharing over the
11 next 10 years?
12    A. I have not had a conversation with anyone
13 at the City about what they think might happen to
14 revenue sharing in the next 10 years.
15    Q. Have had you a conversation with anyone at
16 the state about what might happen with revenue
17 sharing over the next 10 years?
18    A. Yes.
19    Q. Who did you have a conversation with?
20    A. Well, when you say state, I had a
21 conversation -- I also had a conversation with Jay
22 Wortley at Treasury, and I had a conversation --
23 several conversations with Jay Wortley, several
24 conversations with Jim Stansell at House Fiscal
25 Agency.

1    Q. And what did they tell you?
2    A. So Jim Stansell's pretty pessimistic about
3 EVIP, thinks it's going to be eliminated next year,
4 and there's some -- he thinks some program will be
5 put in its place, but he doesn't see it as -- I
6 asked him about our assumption keeping EVIP
7 constant in our forecast, and he agreed with that.
8 There's that -- it's very variable.
9       And then I talked to Jay Wortley when I
10 received the state forecast of revenue sharing, the
11 constitutional portion, and talked to him about
12 growth rates in sales tax revenue. And so that's,
13 I think, what we talked about there.
14    Q. Did he believe that sales tax revenue
15 would be increasing over the next 10 years?
16    A. He did.
17    Q. And did he give you any numbers about how
18 much he believes the sales tax revenue might
19 increase over the next 10 years for Michigan?
20    A. So we used his -- the projections from his
21 office for the 10-year forecast for constitutional
22 revenue sharing.
23    Q. Did he identify any factors that might
24 increase the sales tax revenues above what he's
25 anticipated in the written document you're

1 referring to?
2    MR. STEWART: Could I have the question read
3 back, please.
4          (Whereupon, the record was
5          read as requested.)
6    MR. STEWART: Objection.
7    THE WITNESS: He only -- we only talked about
8 his projections and what he thought was reasonable
9 for the sales tax and nothing beyond that.
10 BY MR. SMITH:
11    Q. Why is the EVIP going to be eliminated
12 potentially next year?
13    A. In my conversation with Jim Stansell, that
14 came up, and this is just his opinion. He's not a
15 legislator. He thought that people in the
16 legislature were not really in favor of the program
17 and that there had been some statements about it
18 saying that they wanted to change the program for
19 something else.
20    Q. And what is -- did he tell you what he
21 anticipates might be substituted for EVIP?
22    A. He didn't know.
23    Q. So right now the only person you talked to
24 suggested that the EVIP program that you assume is
25 going to continue for the next 10 years is -- may

1 be eliminated next year, correct?
2    A. So he's responsible for understanding
3 those kinds of programs. It's his duty at the
4 House Fiscal, and he thought that program might be
5 eliminated. The money associated with it would
6 still be distributed in some ways to the cities,
7 villages and townships.
8    Q. Did the state official, though, you spoke
9 with give you any idea about whether there would be
10 increases or decreases in revenue sharing at any
11 point in time?
12    A. He didn't comment on revenue sharing as a
13 whole, increases or decreases, no.
14    Q. Right now the information you have,
15 though, is -- I mean, the best information you have
16 is EVIP is likely to be eliminated, perhaps, within
17 about a year; is that correct?
18    A. So that was one piece of information I
19 received, and you know, we've decided as others
20 like Michigan Treasury to hold that funding for
21 Detroit constant in our forecast given that it is
22 uncertain. That program could be eliminated. It
23 could be replaced with something else. And our
24 most reasonable assumption is that that sort of
25 type -- that amount of money would likely go to

1    A.   So the analysis here, Chicago and
2  Philadelphia, had decades of decline followed by a
3  decade or more of population growth, and I don't
4  know what activities they undertook in terms of
5  reinvestment or restructuring.  I don't know what
6  they did.
7       MR. STEWART:  Can you tell us when there's five
8  minutes left.
9  BY MR. SMITH:
10    Q.   On the second page of this document, you
11  mention conversations with Jim Stansell, correct?
12    A.   Uh-huh.
13    Q.   Did you write this document?
14    A.   I wrote portions of it.
15    Q.   Okay.  In this document, you didn't
16  disclose that Jim Stansell had told you that EVIP
17  may be eliminated within a year, correct?
18    A.   This document was written, I believe, in
19  January of 2013, and that conversation with Jim
20  Stansell was after that.
21    Q.   Have you had any conversations with
22  anybody else at the State of Michigan other than
23  Mr. Stansell and Mr. Wortley?
24    A.   I don't think so.
25    Q.   Were they individuals that you had known

1  before this case or not?
2    A.   They were.
3    Q.   And how did you know them?
4    A.   I had -- so in my previous job, I did
5  mostly work in Michigan.  In a number of projects,
6  I was either in meetings with them or obtained data
7  or information from them.
8       (Document marked No. 35)
9    Q.   Let me hand you what I'm marking as
10  Exhibit 35 and let me know if you created this document.
11       MR. STEWART:  I have two documents here.  Is
12  this also --
13       MR. SMITH:  Never mind that one.
14       MR. STEWART:  This is 35?  Okay.
15  BY MR. SMITH:
16    Q.   Did you create that document?
17    A.   Yes.
18    Q.   What's the purpose of that document?
19    A.   Well, so do you want me to talk to about
20  each of them or --
21    Q.   Are these separate spreadsheets doing
22  separate analyses?
23    A.   Yes.
24    Q.   Okay.  Got it.
25       The second page of this document has the

1  building permits data, and then the third page has
2  the realtor data, and it's not -- it's only going
3  up until 2013 it looks like.  Do you see that?
4    A.   Uh-huh.
5    Q.   Is this the most recent version of the
6  spreadsheets you've created?
7    A.   No.
8       (Document marked No. 36)
9    Q.   I'm going to hand you what I will mark as
10  Exhibit 36, and you can let me know if this is a
11  document that you created.
12    A.   This is not a document I created.
13    Q.   Do you know why this was created?
14    A.   So it says at the bottom prepared by the
15  Office of Revenue and Tax Analysis Michigan Department
16  of Treasury, so this is the analysis from Jay Wortley.
17    Q.   And do you know how more Wortley put
18  together this analysis?
19    A.   Other than just being able to look at his
20  steps here, that's all the information I have.
21    Q.   And did you rely on this analysis in your
22  revenue sharing opinion?
23    A.   I used his projections for the
24  constitutional piece in the 10-year forecast.
25    Q.   When you see for fiscal year 2013, 2014,

1  2015, he has consensus written underneath there, do
2  you know what that means?
3    A.   I do.
4    Q.   What does it mean?
5    A.   So Michigan has a consensus revenue
6  estimation process, and so these are the sales tax
7  numbers, or sales tax revenue numbers shown here
8  are the consensus estimates.
9       THE VIDEOGRAPHER:  Counsel, we're at the
10  five-minute mark.
11       MR. STEWART:  And I have a couple of questions
12  of my own.
13  BY MR. SMITH:
14    Q.   Can you explain to me what exactly are the
15  reimbursement mechanisms under the new legislation
16  or that may or may not get passed related to
17  personal property tax?
18    A.   What's your question?
19    Q.   Can you explain to me what the
20  reimbursement mechanisms are under the proposed
21  legislation or measure that would change the
22  personal property tax?
23    A.   So portions -- so there are several
24  different ways that revenue is being replaced.  One
25  is a new use tax that's being created that would

1 allow money through the use tax to then be sent to
2 municipalities that meet certain requirements, and
3 the municipalities themselves would be able to levy
4 a millage on real property. And there's rules
5 around how they can set that millage and what it
6 applies to, and they can set that rate equal to
7 raising enough revenue to cover essential service.
8 Essential services isn't the word. It's more --
9 it's the police, fire, those kinds of services.
10   Q. The amount of reimbursement that the City
11 receives under the personal property measure, is
12 that within the control of the City to some extent?
13   A. Within certain parameters, the City should
14 be able to levy a millage that replaces some of the
15 lost revenue.
16   Q. And how would it do that?
17   A. Nobody really knows how all this is going
18 to work, so I don't know how they're going to do
19 that.
20   Q. Have you had any discussions with anybody
21 at the City about what they're going to do if the
22 personal property legislation ends up going into
23 effect?
24   A. We've had conversations generally about
25 the personal property tax. They haven't told me

1 what their plan is going forward.
2   Q. Would it be fair to say that you've
3 modeled in your revenue forecasts the imposition of
4 a new tax that is not in effect yet under current
5 law?
6   A. I think the right characterization of what
7 I've done is thinking about the probability of
8 whether the law goes into effect and then what the
9 likely reduction in revenue would be, and taking
10 those two factors into account inform the
11 adjustment made for the personal property tax
12 repeal.
13   Q. And the amount of the reduction in revenue
14 depends on what the City ends up doing in the
15 future in terms of invoking mechanisms for
16 reimbursement; isn't that correct?
17   MR. STEWART: Objection.
18   THE WITNESS: My understanding is that the City
19 will be able to levy certain millages to replace
20 some of the lost revenue, and I don't know exactly
21 what that's going to look like.
22 BY MR. SMITH:
23   Q. Okay. Have we covered all the areas that
24 you plan to testify about, or are there any areas
25 that we haven't covered?

1   A. I think we've covered everything.
2   MR. STEWART: I have a couple of questions.
3           EXAMINATION
4 BY MR. STEWART:
5   Q. Ms. Sallee, you testified about population
6 estimates that you made?
7   A. Yes.
8   Q. And some came from SEMCOG --
9   MR. SMITH: Objection.
10 BY MR. STEWART:
11   Q. -- in a certain period of time?
12   A. Yes.
13   Q. And others you came up with?
14   MR. SMITH: Objection. Leading.
15   THE WITNESS: That's correct.
16 BY MR. STEWART:
17   Q. Are you in a position to testify about the
18 City's anticipated population changes by year as
19 implied in the 10 and 40-year forecast?
20   A. Yes.
21   MR. SMITH: Objection. Asked and answered.
22   MR. STEWART: Thank you. That's all I have.
23 We are we done.
24   MR. SMITH: I assume nobody on the phone has
25 anything.

1   THE VIDEOGRAPHER: Off the record. The time is
2 5:24 p.m.
3     (FURTHER DEPONENT SAITH NAUGHT.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25