<u>**Exhibit 6G**</u>

**Excerpts of July 31, 2014 M. Kopacz Deposition Transcript**

- MARTI KOPACZ - VOLUME 1-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In Re                          ) Chapter 9

CITY of DETROIT, MICHIGAN,     ) Case No. 13-53846

        Debtor.               ) Hon. Steven Rhodes

DATE:  July 31, 2014
TIME:  9:12 a.m.

VOLUME 1

VIDEOTAPED DEPOSITION OF MARTI KOPACZ, held at the offices of Squire Patton Boggs, 30 Rockefeller Plaza, New York, New York, pursuant to Order, before Hope Menaker, a Shorthand Reporter and Notary Public of the State of New York.

1      - MARTI KOPACZ - VOLUME 1-
2   A P P E A R A N C E S
3   GEOFFREY S. STEWART, ESQ.
4   CHRISTOPHER DiPOMPEO, ESQ.
5   ALEXANDER BLANCHARD, ESQ.
6   Jones Day
7   51 Louisiana Avenue, N.W.
8   Washington, D.C.  20001
9       Appearing on behalf of the Debtor
10
11  STEPHEN C. HACKNEY, ESQ.
12  Kirkland & Ellis, LLP
13  300 North LaSalle Street
14  Chicago, Illinois  60654
15      Appearing on behalf of Syncora
16
17  KATHLEEN HITCHINS, ESQ.
18  Sidley Austin, LLP
19  1501 K Street, N.W.
20  Washington, D.C.  20005
21      Appearing on behalf of National Public Financing
22
23
24
25

1       - MARTI KOPACZ - VOLUME 1-
2   ALFREDO R. PEREZ, ESQ.
3   Weil, Gotshal & Manges, LLP
4   700 Louisiana Street, Suite 1700
5   Houston, Texas  77002
6       Appearing on behalf of Financial Guaranty
7       Insurance Company
8
9   LISA SCHAPIRA, ESQ.
10  Chadbourne & Parke, LLP
11  30 Rockefeller Plaza
12  New York, New York  10112
13      Appearing on behalf of Assured Guaranty
14      Municipal Corporation
15
16  SHANNON L. DEEBY, ESQ.
17  Clark Hill, PLC
18  151 South Old Woodward Avenue
19  Suite 200
20  Birmingham,  Michigan 48009
21      Appearing on behalf of the Retirement Systems
22      for the City of Detroit
23
24
25

1       - MARTI KOPACZ - VOLUME 1-
2   JENNIFER K. GREEN, ESQ. (Via Telephone)
3   Clark Hill, PLC
4   500 Woodward Avenue, Suite 3500
5   Detroit, Michigan  48226
6       Appearing on behalf of the Retirement Systems
7       for The City of Detroit
8
9   SAM J. ALBERTS, ESQ.
10  Dentons US, LLP
11  1301 K Street, N.W.
12  Suite 600, East Tower
13  Washington, D.C.  20005
14      Appearing on behalf of the Retiree Committee
15
16
17  ALLAN S. BRILLIANT, ESQ.
18  Dechert
19  1095 Avenue of the Americas
20  New York, New York 10036
21      Appearing on behalf of Macomb County
22
23
24
25

- MARTI KOPACZ - VOLUME 1-

1 analysis or projections, what-ifs, that sort of
2 thing, whereas a forecast is something that's a
3 little more rigorous, a best -- the best guess, if
4 you will.
5     Q.   So would it be fair to say, and I'm
6 not going to spend a lot of time on this, this
7 morning, that the base case scenario from EY is a
8 forecast, but the restructuring analysis is a
9 projection?
10     A.   I don't know that I would say that.
11     Q.   Okay. And I'll use the terms
12 interchangeably myself.
13     A.   Thank you.
14     Q.   You raise the -- use the phrase
15 "mathematically accurate."
16     I assume that means whether the
17 calculations that were done produced the results
18 that mathematics requires?
19     A.   Yes.
20     Q.   In other words, no errors in
21 calculation?
22     A.   Correct.
23     Q.   Okay. You used the phrase
24 "reasonableness" when you speak about assumptions.

- MARTI KOPACZ - VOLUME 1-

1     What do you mean when you use the
2 phrase "reasonableness"?
3     A.   That the assumption is neither too
4 conservative or too aggressive.
5     Q.   Okay. Is reasonableness a synonym in
6 this context for reliable?
7     A.   No.
8     Q.   Okay. In other words, that a
9 reasonable assumption is one that is in the middle
10 of the continuum of possible assumed facts?
11     A.   I think I can agree with that, yes.
12     Q.   Okay. Did you try to place it a
13 particular place on the continuum?
14     A.   No.
15     Q.   You also listed qualitative factors
16 as well, and I'll come back to those.
17     A.   Yes.
18     Q.   And they're part of your feasibility
19 analysis too?
20     A.   They are.
21     Q.   Sometimes you've used the term
22 "material" in your report?
23     A.   Yes.
24     Q.   What does the term "material" mean as

- MARTI KOPACZ - VOLUME 1-

1 you've used it here?
2     A.   Material is a term that indicates
3 whatever the value or the variable is could have
4 an impact, positive or negative. It is not --
5 it's not de minimis.
6     Q.   Okay. Do you associate any
7 percentage level with the term "material"?
8     A.   I do not.
9     Q.   Have you heard, for example in the
10 accounting world, they sometimes speak of
11 materiality as being 1 percent of assets or
12 5 percent of income?
13     A.   I think it depends on the context.
14     Q.   But it's not how you've used it, one
15 way or another?
16     A.   Not how I've used it, no.
17     Q.   Now, I'm going to ask you about
18 forecasting now.
19     A.   Sure.
20     Q.   Let me go back to Exhibit 1 of your
21 report. This is your -- for want of -- I'll call
22 it your CV although --
23     A.   It's not really.
24     Q.   -- it's not really a CV. What would

- MARTI KOPACZ - VOLUME 1-

1 you call it? Just a back -- description of your
2 background?
3     A.   Yes.
4     Q.   Okay. Why don't we just call it
5 Exhibit 1?
6     A.   Exhibit 1 is good.
7     Q.   Under "General Experience," you've
8 written about your -- about your experience with
9 financial projections and I'm going to read parts
10 of this, and I'm going to ask you questions about
11 it.
12     First sentence you've written -- by
13 the way, did you write this part of your report or
14 was it written for you by others?
15     A.   No. This is the -- this is the same
16 document that was attached to my proposal. It's
17 just in a different format, but the --
18     Q.   Sure.
19     A.   -- the -- the information is
20 generally the same and I think there's some
21 added -- there may be some added verbiage around
22 speaking engagements, publications and the like.
23     Q.   Sure. Is it accurate however?
24     A.   Yes, it is.

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2    would it be possible for you to tell me when it
3    does make senses and when it does not make senses?
4        A.    I can give you an example.
5        Q.    Sure.
6        A.    If you had an ongoing operation, and
7    you were selling widgets to someone, right, and
8    that customer bought, you know, a hundred dollars
9    worth of widgets every year for the past ten
10   years, unless something suggested a contrary
11   behavior, you would probably project that they're
12   going to buy a hundred dollars worth of widgets.
13   Okay?
14       On the expense side, if you're
15   manufacturing those widgets in a production plant
16   and it costs you 80 cents to make a widget, right,
17   but then you're building a new plant and all of a
18   sudden your costs are going to go down to 65, you
19   wouldn't be using the continuation of the
20   historical cost to make a going-forward
21   projection.
22       Q.    Now, is it sometimes the case as you
23   extrapolate forward, instead of having a constant
24   value, you're dealing with a value that is
25   expected to increase in some manner or decrease in

1    - MARTI KOPACZ - VOLUME 1-
2    some manner year to year to year; in other words,
3    either in the linear or nonlinear function?
4        A.    Yes, it is.
5        Q.    Okay. And what do you do when you're
6    faced with that type of a forecast?
7        A.    You have to look at the basis for why
8    the change is going to occur and evaluate it with
9    the information you have as to, you know, does
10   that new assumption make sense.
11       Q.    Now, when you dealt with looking at
12   the forecasts for the City of Detroit, did you
13   find that those extrapolations required
14   forecasting that was not a constant value for
15   either revenue or expense year to year in the
16   years that were coming?
17       A.    In some cases, yes.
18       Q.    So how did you determine what the
19   appropriate coefficient was year to year to
20   increase or decrease the projected amount?
21       A.    The -- the example that I can give
22   you is the baseline is -- for example, the
23   baseline projections include ongoing pension
24   expense.
25       Q.    Okay.

1    - MARTI KOPACZ - VOLUME 1-
2        A.    Ongoing interest expense. Obviously,
3    as the City worked through its bankruptcy and its
4    plan, it became clear that those weren't going to
5    get paid, so those numbers changed in line with
6    what the settlements were. So I didn't really
7    have to make -- it was a number that was in the
8    ten-year that didn't need to be there, so it just
9    came out.
10       Q.    So that came out.
11       Let me take the example though of a
12   revenue item. I don't -- we'll just make it
13   income tax.
14       As you looked at the forecasts of
15   income tax revenue in the years to come, it was
16   not a constant number, correct?
17       A.    Correct.
18       Q.    And it went up or down as the years
19   went on, correct?
20       A.    Yes.
21       Q.    And it went up or down for various
22   reasons, such as incomes and other factors such as
23   that, correct?
24       A.    Yes.
25       Q.    How did you determine whether a

1    - MARTI KOPACZ - VOLUME 1-
2    forecast of income in future years -- income tax
3    revenues in future years was or was not a
4    reasonable forecast?
5        A.    I looked at historical information.
6    I looked at the outside -- the statewide
7    information from various parties, and I and my
8    team interviewed the team at Ernst & Young who did
9    the analysis and the development of these
10   projections.
11       Q.    Fair to say you didn't simply accept
12   the credibility of the Ernst & Young assumptions?
13       A.    I did not.
14       Q.    Or the Ernst & Young calculations?
15       A.    I did not.
16       Q.    You did your own checking of them?
17       A.    I did.
18       Q.    And then used your own knowledge base
19   to reach a conclusion about the quality of Ernst &
20   Young's work?
21       A.    I -- I didn't reach a conclusion
22   about the quality of Ernst & Young's work. I
23   reached a conclusion on the reasonableness of
24   those assumptions.
25       Q.    Okay. And -- and by the way, the

1          - MARTI KOPACZ - VOLUME 1-
2    process you just described for me, we used the
3    example of income tax.
4          A.    Yes.
5          Q.    Would it -- would you give the same
6    answer if I asked about other types of taxes of
7    revenue items in terms of your general approach?
8          A.    Yes.
9          Q.    And in terms of various items of
10   expense in terms of your general approach?
11         A.    Yes.
12         Q.    Okay.  Now, let me, if I could, just
13   ask you about some of the opinions that you
14   reached.
15         A.    Uh-huh.
16         Q.    And on Page 200 of your report you
17   speak of some of the qualitative issues.
18         A.    Yes.  I have quantitative issues on
19   200.
20         Q.    I'm sorry.  Quantitative, sorry.
21   Advancing age and failing eyesight has -- has
22   undermined me.  Yeah, on quantitative issues.
23         A.    Yes.
24         Q.    The first paragraph you write, "It is
25   my opinion that except for otherwise noted in my

1          - MARTI KOPACZ - VOLUME 1-
2    report the projections are generally
3    mathematically correct and materially reasonably
4    and, therefore, fall within the feasibility
5    standard I have defined."
6          Do you see the language I read?
7          A.    Yes.
8          Q.    I notice there's a typo.  Did you
9    mean to write "materially reasonable" instead of
10   "materially reasonably"?
11         A.    Yes.  Thank you.
12         Q.    It's all right.  It's basically what
13   lawyers are trained to do is look for typos.  I
14   went to law school imagining myself in front of
15   the U.S. Supreme Court; instead I've become a
16   glorified proofreader.
17         All right.  Now, when you say the
18   generally mathematically -- the projections you're
19   speaking about are the City's 10 and 40-year
20   projections?
21         A.    That's correct.
22         Q.    And we already -- go ahead.  I'm
23   sorry.
24         A.    And the -- and the RRI projections.
25         Q.    And I've already asked you about the

1          - MARTI KOPACZ - VOLUME 1-
2    phrase "mathematically correct."
3          A.    Uh-huh.
4          Q.    What do you mean when you say
5    "materially reasonable"?
6          A.    I believe the projections taken as a
7    whole are reasonable.
8          Q.    And then the next paragraph says, "It
9    is my opinion that, except where otherwise noted
10   in my report, the individual assumptions used to
11   build the projections fall into a reasonable range
12   and that, when taken as a group, these assumptions
13   are also reasonable."
14         Can you tell me why you were able to
15   reach that conclusion?
16         A.    Because we reviewed and looked at
17   every line item, every cell of every model.
18         Q.    And how big was this model?
19         A.    The -- the E&Y model is, my
20   recollection, I think about a -- over a hundred
21   sheets -- over a hundred Excel spreadsheets.
22         Q.    Okay.
23         A.    The Conway model is actually about
24   30 models together and each of those models is
25   multiple Excel spreadsheets.  Clearly, Kevin Barr

1          - MARTI KOPACZ - VOLUME 1-
2    on my team probably knows exactly how many pages
3    there are, but it's hundreds.
4          Q.    And you looked at every one of those
5    worksheets --
6          A.    He did -- he did.  I didn't.
7          Q.    And every -- every cell of every
8    worksheet?
9          A.    He did.
10         Q.    On Page 37 of your report, you refer
11   to -- you state at the bottom, there's a carryover
12   sentence having to do with the fact that the City
13   does not have an aggregated forecast to use.
14         Can you tell me what you meant by an
15   "aggregated forecast"?
16         A.    Can you show me the sentence?
17         Q.    It's the carryover.  It says, "while
18   the respective -- "
19         A.    Ten-year 40-year.
20         Q.    Yes.  And then it carries over and
21   the language I was referring to is the top of the
22   next page.
23         It says, "The City does not have an
24   aggregated forecast to use as a fiscal road map
25   going forward."

- MARTI KOPACZ - VOLUME 1-

1     What do you mean by "an aggregated"?

2     A.    The City does not have a forecast at
3  the department level which includes all of the
4  baseline projections and the RRIs incorporated
5  into a single set of projections like you would
6  typically see for an entity.
7     Q.    Okay.  And so the City needs to
8  create such a document in order to go forward?
9     A.    I think it would be highly advisable.
10    Q.    The beginning of the sentence says,
11 pardon me, "While the respective 10-year, 40-year
12 and RRI forecasts have been expertly researched,
13 constructed and amended."
14    What do you mean when you say
15 "expertly researched, constructed"?
16    A.    The, the 10-year, the 40-year and the
17 RRIs, okay, are appropriately correct to the
18 extent of the purpose for which they were
19 intended.  Okay?  They are fit for that purpose.
20    Q.    Uh-huh.  Okay.  Now, excuse me -- you
21 mentioned that the City forecast cover a period of
22 ten years and there's also a 40-year forecast too.
23    A.    Yes.
24    Q.    Is that the customary period for

- MARTI KOPACZ - VOLUME 1-

1  forecast, at least in the municipal world?
2     A.    I'm not sure there is a customary
3  period.
4     Q.    Have you seen forecasts before of
5  such length?
6     A.    Have I in a general context, yes.  In
7  typically municipalities don't budget for that
8  long a time.
9     Q.    Do you know why it is that forecasts
10 were prepared for periods so long as those we see
11 here?
12    A.    I don't know why those projections --
13 those periods were chosen, no.
14    Q.    What's the relationship, if there is
15 one at all, between the length of a forecast and
16 its reliability?
17    A.    Generally, the longer a forecast --
18 the longer period of time a forecast covers, the
19 more variability you would expect as time goes on.
20    Q.    Would there also -- let me ask you to
21 look actually at Page 17 of your report.  At the
22 very bottom of that page --
23    A.    Uh-huh.
24    Q.    -- you've written -- I'm directing

- MARTI KOPACZ - VOLUME 1-

1  your attention to the last two sentences on that
2  page.  You wrote, "As the time horizon expands, so
3  too does the magnitude required for an issue to
4  impact feasibility.  For example, a potential
5  $50 million shortfall in Year 1 will have a much
6  more significant impact on the assessment of
7  feasibility than the same shortfall in Year 20."
8     Now, can you tell me what you meant
9  when you wrote that?
10    A.    I mean, I don't know how to say it
11 any better.  I'm sorry.  I really don't.  I think
12 that's really clear.
13    Q.    Okay.
14    A.    Okay?  I -- obviously -- the time
15 horizon to my -- to the way we've defined the
16 standard and the way I evaluated it is if there's
17 going to be an impact near-term, that is clearly
18 more significant than if it's going to occur 10 or
19 20 years down the road because 10 or 20 years down
20 the road, people have an opportunity to respond
21 and change their behavior and do different things
22 to overcome whatever that risk might be.  If it's
23 a risk in the early part of a forecast, you don't
24 have that time to respond.

- MARTI KOPACZ - VOLUME 1-

1     Q.    So you testified that one feature of
2  a long forecast is the greater chance for
3  variability as the years go on, correct?
4     A.    I would agree with that statement,
5  yes.
6     Q.    Are you also saying that in the
7  future years that, although there may be such
8  variation, it becomes less material as we sit here
9  today because the variations happen so far into
10 the future?
11    A.    The material word, I don't agree with
12 that in the sense that if it is a large risk
13 component in the out years, that could affect my
14 assessment of feasibility even though it was far
15 out into the future.  The other part, and I don't
16 mean to quibble, but the near-term forecasts are
17 going to be wrong too.  It's just will there be
18 enough variation in the forecast both plus and
19 minus that on average things will be okay.
20    Q.    Okay.  And there are such things
21 as -- as offsetting entries or offsetting
22 variations, correct?
23    A.    Correct.  Yes.
24    Q.    Is there any mathematical or

- MARTI KOPACZ - VOLUME 1-

1       A.    Generally, a sensitivity analysis is
2   done around a single variable.
3       Q.    Okay.
4       A.    Right?
5       Q.    And all of the sensitivity
6   analyses -- analyses you have done have been done
7   around a single variable, right?
8       A.    Yes.
9       Q.    And when it predicts a -- the effects
10  of a 1 percent change, it would be that absolute
11  number whether the 1 percent is up or whether the
12  1 percent is down, correct?
13      A.    Yes. Yes.
14          MR. STEWART: That is all I have.
15          MR. HACKNEY: This might be a good
16      time for a break. I'm going to move all my
17      stuff over there.
18          MR. STEWART: Sure.
19          THE VIDEOGRAPHER: Okay. The time
20      now is 11:04 a.m. We're going off the
21      record.
22          (Whereupon, there was a brief recess
23      in the proceedings.)
24          THE VIDEOGRAPHER: Time now is

- MARTI KOPACZ - VOLUME 1-

1   11:12 a.m., and we're back on the record.
2   EXAMINATION BY MR. HACKNEY:
3       Q.    Ms. Kopacz, we've met before but --
4       A.    We have.
5       Q.    -- I'll introduce myself again. My
6   name is Steve Hackney and I represent Syncora in
7   the City of Detroit bankruptcy case. It's ice to
8   see you again.
9       A.    Nice to see you again.
10      Q.    Let me ask you some open-ended
11  questions at the start here.
12          I first want to confirm that you're
13  not intending to offer opinions other than the
14  ones that are contained in your report, correct?
15      A.    That is my intention, yes.
16      Q.    Okay. And you have disclosed the
17  bases for your opinions as well as the facts and
18  data that you considered in your report, correct?
19      A.    Yes.
20      Q.    What are the limitations of the EY
21  forecasts in your view? And I'm going to get some
22  terminology down here, which is to say when I
23  refer to the EY forecast at large, I mean all of
24  them. So I mean the -- the baseline forecast

- MARTI KOPACZ - VOLUME 1-

1   without RRIs. I mean the forecast with RRIs. I
2   mean the 40-year forecast. So when I refer to the
3   forecasts at large, I'll call them the EY
4   forecasts. Does that work for you?
5       A.    And that includes the Conway
6   position?
7       Q.    It does.
8       A.    Okay.
9       Q.    Because you have to -- to have a name
10  for them and ultimately EY assembled them.
11      A.    Right.
12      Q.    And so -- I mean, I can call them
13  whatever you want, put it another way --
14      A.    Okay.
15      Q.    -- but if there's a time where you
16  want to say well, Steve, I need to talk about this
17  instead of this, let me know. Okay?
18          And, as a general rule, if I ask you
19  a question that doesn't make sense, as I am wont
20  to do, will you please let me know so that I can
21  rephrase it?
22      A.    Yes.
23      Q.    If you -- do you understand that if
24  you answer my question, I'm going to assume that

- MARTI KOPACZ - VOLUME 1-

1   you understood my question?
2       A.    Yes.
3       Q.    So going back to it, what are the
4   limitations of the EY forecasts that are included
5   in the plan in your view?
6       A.    The limitations? I'm struggling with
7   the word "limitations."
8       Q.    Okay.
9       A.    As I said in an answer to
10  Mr. Stewart's question, the projections in the
11  City's plan are -- were created for specific
12  purpose and they are not what we would typically
13  expect to see as a set of projections for a plan
14  of reorganization in a Chapter 11 case. So,
15  they're just -- they're -- it takes more effort to
16  understand what they are and what they aren't.
17      Q.    Going back to that, I wanted to make
18  clear that you are specifically disclaiming any
19  opinions on whether the -- whether the plan is in
20  the best interests of creditors, correct?
21      A.    That was not in my scope.
22      Q.    And you don't have any opinions on
23  that?
24      A.    I do not have an opinion.

25 (Pages 97 to 100)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7004-13  Filed 08/22/14  Entered 08/22/14 21:10:25  Page 7 of 25

- MARTI KOPACZ - VOLUME 1-

Q.    And you did not attempt to -- to
determine whether the -- the City might do better
than the -- the forecasts such that there would be
more to distribute to creditors, correct?

A.    Yes.  And I -- I think at some point
in my report I said there are -- there are things
that I didn't -- that I very clearly didn't do,
and I didn't -- I didn't look at best interest of
creditors.  It was outside of my scope, and I
didn't look to see if there was a way in which the
City could generate more cash, and I didn't look
at any of the alternative plans.

Q.    And just to be clear, to the extent
the City is purporting to use the projections to
satisfy the best interests of creditors test, you
do not have an opinion that the projections are
appropriate for that purpose, correct?

A.    I don't have any opinion around best
interest at any level.

Q.    Okay.  But I have to tie it to the
forecasts as well, correct?  You're not saying
these forecasts satisfy the City's burden in
connection with the best interests of creditors?

A.    I -- no.  I don't have any -- I don't

- MARTI KOPACZ - VOLUME 1-

have anything to say about that.

Q.    Okay.  I guess -- let me go back to
the subject of limitations and give you an example
to help inform my question a little bit.

So you're aware that the City has
what I'll describe as troubled data systems with
respect to the collection of financial records?

A.    Yes.

Q.    You're also aware that the forecast
is, in some respects, based on historical
financial records?

A.    Yes.

Q.    So, an example of a limitation would
be that if the City has historical financial
records that are of questionable reliability, that
that could be a limitation on the accuracy of the
forecast.  So I'm using this as an example of
something that could be a limitation.  I'm not
saying that it is or it isn't, but I'm trying to
inform my question to you more to help put some
meat on the bones so to speak.

A.    The City has accurate financial
information once a year when it completes its --
its annual audit and gets its annual financial

- MARTI KOPACZ - VOLUME 1-

stuff, right?  And at that point in time, when
KPMG signs off and it files its CAFR, then --
CAFR, C-A-F-R, comprehensive annual financial
report, those are numbers that have been vetted,
if you will.

Q.    The negative implication of your
question is that in between CAFRs, the City does
not have reliable financial records, correct?

A.    They have ad hoc records.

Q.    They are definitely ad hoc.

A.    Yes.

Q.    Are they reliable?

A.    Some may be and some may not be.

Q.    Okay.  You did not have sufficient
time to audit the records of the City, correct?

A.    No, and it wasn't in my scope.

Q.    Okay.  So you have not made a
determination as to whether the financial
information upon which the projections are built,
to the extent that they're not derived from a
CAFR, are based on reliable financial records,
correct?  You haven't made that determination.

A.    Can you repeat the question, please?

MR. KANE:  I was distracting her with

- MARTI KOPACZ - VOLUME 1-

the microphone.

MR. HACKNEY:  That's okay.  It's a
long one, but I think it was the best way to
ask it, so it may be better to have it read
back.

(The question requested was read back
by the reporter.

THE WITNESS:  That didn't help me.
Can we try again?

BY MR. HACKNEY:

Q.    Yeah.  So, I think -- let me try and
summarize what you've said.

I believe that you have testified
that you believe the CAFRs are reliable financial
information sets, correct?

A.    Right.  I -- the CAFRs are based on
financial information that has been tested and
vetted and upon which KPMG has opined.  Okay?

I may quibble with some of the
accounting that's in there just because I have a
view of certain things.  Okay?  But at least at
that point in time, if we're looking at, for
example, the CAFR in June of '12, which was the
basis for the original baseline by E&Y, if they

26 (Pages 101 to 104)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-13   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 8 of 25

1        - MARTI KOPACZ - VOLUME 1-
2    said they had 10,002 employees and they paid them
3    $386 million, I think those are probably very good
4    numbers.
5        Q.    Okay.  So, I think we're on common
6    ground when we say to one another the CAFRs are in
7    your view reliable financial information sets,
8    correct?
9        A.    Right.
10       Q.    We then talked about the -- in the
11   interim between --
12       A.    Right.
13       Q.    -- between the CAFRs, I think your
14   testimony was to the effect of some information
15   may be reliable and some may not be reliable,
16   correct?
17       A.    Yes.
18       Q.    That's part of the problem that
19   Detroit is facing now, right, it's difficulty with
20   its an assembly of financial information?
21       A.    Yes.
22       Q.    So my question is that to the extent
23   that the forecasts in the plan are based on
24   information that was developed after the 2012
25   fiscal year CAFR, you have not made an assessment

1        - MARTI KOPACZ - VOLUME 1-
2    of whether that financial information is reliable,
3    correct?
4        A.    Individually that is correct.  Yes.
5        Q.    Okay.  And isn't it true that the
6    fiscal year 2013 CAFR just came out last week?
7        A.    That is correct.
8        Q.    So that wasn't available to the
9    forecasters at EY in connection with their
10   forecast, correct?
11       A.    Parts of that -- information that is
12   contained in the CAFR is available throughout the
13   year.  So, for example, the City has a good handle
14   on cash, so it can tell you how much cash it has
15   and how much cash it has to pay, right?
16           What its future obligations may be
17   for some construction project that's going on, it
18   probably can't tell you.
19       Q.    Okay.  So there were parts of the
20   2013 CAFR that may have been available to E&Y --
21       A.    Yes.
22       Q.    -- and parts that were not?
23       A.    Correct.
24       Q.    And they -- the same parts were
25   available to you and not, correct?

1        - MARTI KOPACZ - VOLUME 1-
2        A.    Yes.
3        Q.    Okay.  Now, with respect to the
4    forecasts that are included in the plan, what is
5    the base year for those forecasts?
6        A.    The base year for the original
7    ten-year was 2012 and then it was updated for
8    information that was known in 2013 and it has been
9    subsequently updated for information that is known
10   in 2014, which is the year we just finished.
11       Q.    So let's get terminology straight,
12   because I would get this turned around.
13           But isn't it true that fiscal year
14   2013 ended on June 30th, 2013?
15       A.    Correct.
16       Q.    Okay.
17       A.    And that's the first baseline.
18       Q.    And you understand that when the
19   first baseline forecast was being built it was
20   prior to the end of fiscal year 2013?
21       A.    Yes.
22       Q.    And so, in that forecast, the base
23   year was clearly fiscal year 2012, correct?
24       A.    Up to -- yes, and updated for what
25   was discernable and knowable before that

1        - MARTI KOPACZ - VOLUME 1-
2    projection was made.
3        Q.    So I understand that the projection
4    involves updating --
5        A.    Yes.
6        Q.    -- things, but when I talk about the
7    base year, that's not something that you update,
8    correct?
9        A.    Correct.
10       Q.    The base year is the historical base,
11   correct?
12       A.    Correct.  Yes.
13       Q.    So, when we get to the forecasts that
14   are included in the instant plan, the most recent
15   set of those was dated July 2nd, correct?
16       A.    Correct.
17       Q.    And that's of 2014?
18       A.    Correct.
19       Q.    What was the historical base year for
20   the forecasts that are in the plan?
21       A.    It's -- it's still the baseline plan,
22   ten-year plan, updated for the updated RRIs,
23   updated for the new 40-year.
24       Q.    But based off of fiscal year 2012?
25       A.    The baseline was 2012.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    Right.
3    A.    Right.
4    Q.    But what about the ten-year
5  restructuring forecast?  Is that base year 2012?
6  Base year 2013?
7    A.    The ten-year restructuring forecast,
8  I think of that as the 40-year plan.  The ten-year
9  that's within the 40-year?
10    Q.    Yes.
11    A.    I think that has been largely up
12  dated for '13.
13    Q.    Okay.  So is the base year for the
14  40-year that includes the 10-year --
15    A.    Yes.
16    Q.    -- fiscal year 2013?
17    A.    It's '12 adjusted for what they knew
18  about '13.
19    Q.    Okay.  So it's --
20    A.    It's a hybrid.
21    Q.    -- it's a bit of a hybrid?
22    A.    It is.
23    Q.    Okay.  And is that typical in
24  forecasting?
25    A.    Is it typical in forecasting?  It is

- MARTI KOPACZ - VOLUME 1-

1
2  typical if forecasting goes on for a long period
3  of time as this has.  And think about it.  They've
4  been -- they've been doing these forecasts for a
5  long, long time, and so they keep updating them.
6  But originally, it started with the baseline which
7  was predicated on '12 -- of 2012.
8    Q.    Okay.  And so to the extent the
9  forecast for 2013 was superseded by actual
10  results, your testimony is that the forecast was
11  updated to take account of the actual results that
12  had already happened?
13    A.    To the -- to the extent that -- yes,
14  there are -- there are updates.  Because there
15  are -- I'm trying to think, I think there are six
16  sets of projections, right?  We only focused on
17  the May 5th and the July 2nd, but there were other
18  sets of projections before that that existed, you
19  know, from that.  So, all of those have changed
20  and incorporated both new actual results and new
21  assumptions.
22    Q.    And the new actual results
23  post-fiscal year 2012 are ones that were derived
24  from something other than the CAFR, correct?
25    A.    As the CAFR was filed last week, yes,

- MARTI KOPACZ - VOLUME 1-

1
2  had to be.
3    Q.    Yeah.  It had to be.
4    A.    By definition, had to be.
5    Q.    Are there problems with the forecasts
6  that are in the plan in your view?
7    A.    Problems?  I -- I don't -- there's
8  not problems with them in the sense of where they
9  end up, right?  I, again, have been really
10  critical of how confusing they are.
11    Q.    I was going to say that it seems to
12  me that when a forecast is confusing, and I'm one
13  of the people that shares your view that they're
14  confusing, that strikes me as a problem with the
15  forecast.  I think a forecast should not be
16  confusing, but that's me and I wanted to ask
17  whether or not the confusing nature of the
18  forecasts was a problem from your point of view?
19    A.    It -- it caused my team to spend an
20  enormous amount of time in understanding and
21  checking the model, right?  It -- it -- I think
22  the -- the word I'd use in here or a word I used
23  at one point in time was it was tedious.
24    Q.    Isn't it fair to say that it -- it
25  took an enormous amount of time just to understand

- MARTI KOPACZ - VOLUME 1-

1
2  the model?
3    A.    We -- yes.  I -- I believe that I
4  have a good understanding of all the models.  You
5  know, members of my team have a -- an incredibly
6  intimate understanding of those models.  But that
7  required a significant effort on our part, but we
8  understand them now.
9    Q.    How long would you say it took you
10  and your team to reach the point where you could
11  say, okay, I now have an understanding of the
12  model?
13    A.    About the -- by the time we got the
14  July 2nd numbers, we had a really good
15  understanding of the May 5th numbers.
16    Q.    Okay.  So, you were retained on or
17  about April 22?
18    A.    April 22nd.  We got the working
19  models on the E&Y stuff Memorial Day.
20    Q.    Which was April 30 or something like
21  that?
22    A.    May something or other, right?
23    Q.    Okay.
24    A.    And, you know, within a couple of
25  weeks of actually getting the working models, we

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2  were in -- in pretty good stead with understanding
3  the May 5th, and then we got the July 2nd and went
4  through a similar process with that; albeit, you
5  know, we already knew how they worked so it was
6  easier to do those.
7      Q.    So would you say by the end of May
8  that you believe your team had achieved a good
9  working understanding?
10     A.    No.  By the end of -- by the end of
11 June.
12     Q.    Oh, by the end of June?
13     A.    By the end of June.
14     Q.    And you --
15     A.    We didn't get the working models
16 until the end of May.
17     Q.    Okay.  You had less than --
18     A.    May something or other.
19     Q.    You had less than 90 days to do your
20 work in this case, correct?
21     A.    Yeah, whatever it's been.
22     Q.    So May, June, July -- April 22 to
23 May -- July 18 I think.
24     A.    Yes.
25     Q.    Did you have sufficient time to do

1    - MARTI KOPACZ - VOLUME 1-
2  your work?
3      A.    I feel like I did.  I mean there's
4  still a couple of things that, as I said in to
5  response to Mr. Stewart, questions that I intend
6  to do going forward.  But for the most part, I am
7  satisfied with our ability to evaluate what all
8  the information that was available and meet with
9  the people that were available and do what we
10 needed to do.
11     Q.    With respect to the forecasts?
12     A.    With respect to the forecasts.
13     Q.    Now, with respect to the
14 restructuring and reinvestment initiatives, you're
15 not offering the opinion that they will achieve
16 the goals that they're held out to achieve,
17 correct?
18     A.    No.  No.
19     Q.    And you haven't conducted a
20 comprehensive review of the City's department from
21 an operational standpoint to understand how the
22 restructuring and reinvestment initiatives map on
23 to needs of each department, correct?
24     A.    I have not redone -- I have not
25 redone the work that Conway has done.  That's for

1    - MARTI KOPACZ - VOLUME 1-
2  sure, right?
3      Q.    And my question was, you haven't done
4  a comprehensive review to test whether Conway is
5  correct in either the assessment of operational
6  needs or its conclusion regarding whether the RRIs
7  will solve the operational needs, correct?
8      A.    That's correct.
9      Q.    What -- what revenue streams are not
10 included in the plan forecasts?
11     A.    The Grand Bargain revenue streams.
12     Q.    Okay.  Those are not included in the
13 forecasts?
14     A.    Well, they're in the forecasts, but
15 they're not in the -- they're in the plan
16 forecast, but they're not in the City's budget
17 because those monies don't -- they don't flow
18 through the city when they come in.
19     Q.    Understood.  Okay.  So the Grand
20 Bargain forecasts are not -- not --
21     A.    So the --
22     Q.    -- in -- the Grand Bargain proceeds
23 are not in the City's forecasts, correct?
24     A.    They're in the plan, but they're not
25 in -- I -- I may have confused myself.

1    - MARTI KOPACZ - VOLUME 1-
2          They're not in -- they're not what we
3  would consider to be part of the City's budget.
4      Q.    Understood.
5      A.    Right.  But they're in the plan as a
6  sources of funds.
7      Q.    Okay.  So, let me -- let me put --
8  let me turn the question around, which is what
9  revenue streams did you not study?
10     A.    I don't think that there was any
11 revenue stream of a recurring nature that we
12 didn't study.
13     Q.    Well, what about something like DWSD?
14 Did you undertake an analysis to determine whether
15 in the future the City's general fund might obtain
16 revenue from what is currently known as DWSD?
17     A.    We did not do that.
18     Q.    Okay.  So you have no opinions on
19 that one way or the other?
20     A.    I do not.
21     Q.    You are generally aware that there is
22 this concept that the DWSD may change the
23 structuring in which it's housed in a way that
24 yields an additional revenue stream to the general
25 fund?

- MARTI KOPACZ - VOLUME 1-

1  MR. KANE: Objection. You can
2  answer.
3  BY MR. HACKNEY:
4      Q.    Just -- are you aware of the concept?
5      A.    I'm aware that there's discussion
6  around that, yes, and that DWSD is an enterprise
7  fund.
8      Q.    Other than that, DWSD was outside
9  your scope?
10     A.    DW -- other than the pension funding
11 transfer from DWSD to the general fund, I did not
12 look at DWSD.
13     Q.    What about, did you study the
14 likelihood and magnitude of potential asset sales?
15     A.    I met with people in the City and
16 with the City's advisors to talk about potential
17 asset sales, yes.
18     Q.    Are potential asset sales included in
19 the plan forecasts as a potential source of
20 revenue?
21     A.    No.
22     Q.    Okay. So, is it fair to say that,
23 because they're not in the forecasts, you don't
24 have an opinion on the likelihood of revenue that

- MARTI KOPACZ - VOLUME 1-

1  will arise from asset sales in the future?
2      A.    That's correct.
3      Q.    Okay. What are the uncertainties
4  that exist over the next ten years that could
5  impact the forecasts?
6      A.    I think we went through them, right,
7  in the report? The risk and opportunity.
8      Q.    So, yeah -- to the -- to the extent
9  there are uncertainties, if I want to know what
10 your view on that is, I should read your report?
11     A.    You should. And it's the section on
12 risk and opportunity.
13     Q.    Do you agree that changes to the law
14 is an uncertainty that could impact the forecast?
15     A.    Changes to what law?
16     Q.    Any law.
17     A.    That impacts the City? It could.
18     Q.    Changes to the tax law could
19 certainly impact the forecast?
20     A.    Yes.
21     Q.    Did you study the likelihood of
22 changes to tax law?
23     A.    Generally, no.
24     Q.    The macroeconomic condition of the

- MARTI KOPACZ - VOLUME 1-

1  United States could impact the City over the next
2  ten years, correct?
3      A.    It could.
4      Q.    Did you conduct a separate analysis
5  of that question?
6      A.    No.
7      Q.    What kinds of information were you
8  unable to examine regarding the forecasts?
9      A.    I -- the -- the exhibit here of what
10 the open requests I was not able, I obviously
11 haven't -- they're still open requests, so I
12 haven't looked at that.
13     Q.    Anything else other than that that
14 was something that you would have liked to have
15 had but you didn't?
16     A.    Not that I'm recalling.
17     Q.    What about information regarding
18 grants? Did you undertake an assessment of what
19 grants the City is or is not likely to get in the
20 future?
21     A.    Only as it relates to the
22 departmental reviews, not a broad review of grants
23 that are available that it doesn't apply for, no.
24     Q.    What are the assumptions that area in

- MARTI KOPACZ - VOLUME 1-

1  the forecasts regarding what grants the City will
2  get?
3      A.    It -- again, there's an exhibit in
4  here that identifies the grants and the totality
5  of the grants, but they -- they're fire and
6  safety, public safety and transportation
7  primarily.
8      Q.    And did you undertake any assessment
9  of the likelihood that they would get those
10 grants?
11     A.    No, I mean in terms of -- no. I mean
12 there -- I assumed -- I looked at the grants that
13 they're assuming they're going to get and I agreed
14 that it looks like they're going to get those
15 grants.
16     Q.    On what basis?
17     A.    On the fact that they've applied for
18 those, like the SAFER grants for the fire
19 department, those sort of things.
20     Q.    So the extent of your confirmation
21 was to confirm that they had, in fact, applied for
22 the grants?
23     A.    No. My -- my analysis of that was to
24 get comfortable that the grants that were in the

```
 1          - MARTI KOPACZ - VOLUME 1-
 2  initially filed in February, two months before
 3  your appointment, called for steeper cuts than are
 4  in the current plan?
 5      A.   I -- I have no recollection of that.
 6      Q.   So, just as you sit here today you're
 7  not generally aware of the fact that the City
 8  reduced the pension cuts significantly between the
 9  first -- reduced the pension cuts between the
10  first plan and the plan that's on file?
11      A.   No.  I -- when I got appointed,
12  right, the -- was the day before I went I think
13  for my interview with the Judge, the fourth plan
14  got filed and, at that point, I didn't look at
15  anything other than the fourth plan going forward.
16  So I just -- I don't have any --
17      Q.   I see.
18      A.   I don't have any recollection.
19      Q.   So -- okay.  Let me ask it then as a
20  hypothetical.  Okay?
21      A.   Okay.
22      Q.   If the prior plans included steeper
23  cuts to pensions than the current plan --
24      A.   Okay.
25      Q.   -- from your standpoint, that would
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2  increase the likelihood that the prior plans, all
 3  things being equal, were feasible, correct?
 4  Because it would make the City's ability to comply
 5  with the plan a lower bar?
 6          MR. ALBERTS:  Objection.
 7          THE WITNESS:  More cash available
 8      improves feasibility.
 9  BY MR. HACKNEY:
10      Q.   If steeper cuts to pensions increases
11  the amount of cash that's available, steeper cuts
12  to pensions makes the plan more feasible.  Do you
13  agree?
14      A.   I'm not sure if it's -- that's it's
15  if P then Q, and you're saying Q therefore P.  I'm
16  not sure that -- that you can do that, right?
17      Q.   Why not?
18      A.   Well, because again, it's -- it's the
19  totality of the cash that's available.  So would I
20  like to have -- again, I have been very clear in
21  my report.  I'm being very clear today.
22          I would like to see more cash that's
23  not committed to somebody or something available
24  in this plan to provide cushion for variabilities
25  that are necessarily going to happen.  So if -- if
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2  any of the settlements would, would reduce the
 3  amount of cash the City has to pay to somebody,
 4  I'm going to think that improves the feasibility.
 5      Q.   Understood.  I wasn't trying to trap
 6  you into a notion where, you know, if you cut
 7  pensions more, but then you give the savings and
 8  more to someone else?
 9      A.   Right.
10      Q.   I was saying all things being equal,
11  the steeper the cuts to the pensions, the more
12  feasible the City would become from a financial
13  standpoint?
14      A.   And again, I just have conceptually a
15  hard time isolating a single action around, you
16  know, what you're trying -- to get.  It sounds to
17  me like you're trying to get me into the best
18  interest of creditors and I'm just not going
19  there.
20      Q.   No.  I'm trying to assess your own
21  definitions of feasibility.
22      A.   Yes.
23      Q.   Which you admit is on a continuum,
24  correct?
25      A.   It is on A continuum.
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2      Q.   So feasibility isn't just a magical
 3  point on the spectrum, right?
 4      A.   Right.  It's a hurtle.
 5      Q.   It's a --
 6      A.   You got to get over the hurdle of
 7  feasibility and then it's a continuum.
 8      Q.   And the hurdle is the obligations
 9  imposed on the City under the plan, right?
10      A.   Yes.
11      Q.   The lower those obligations, the
12  lower the hurdle.  Do you agree with that?
13      A.   All other things equal, yes.
14      Q.   Have you ever seen another
15  municipality do a ten-year forecast?
16      A.   I have, but, again, not -- generally,
17  it's around long-term financing in terms of -- it
18  tends not to be a full-blown revenues and
19  expenses.  It tends to look at certain kinds of
20  long-term obligations or long-term revenue
21  sources, yes.
22      Q.   Have you ever seen another
23  municipality do a comprehensive general fund
24  forecast over a ten-year period?
25      A.   I have not.
```

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    Have you ever seen another
3  municipality do a comprehensive general fund
4  forecast over a 40-year period -- a gen --
5  comprehensive general fund forecast over a 40-year
6  period?
7    A.    Forty years.
8    Q.    Yeah.
9    A.    No.
10    Q.    So, the two that are in the plan, the
11  10-year and the 40-year, are the first you've ever
12  seen a municipality do, correct?
13    A.    That I've ever seen?  Yes.
14    Q.    Have you ever seen a municipality do
15  a forecast when it was undergoing this level of
16  change?
17    A.    Personally?  No.
18    Q.    Ma'am, have you ever been qualified
19  in a court of law as an expert before?
20    A.    I have.
21    Q.    Okay.  And tell me how many times
22  that's happened to you?
23    A.    We should go back and look at my
24  testimony list, right?  Probably -- I don't think
25  it's in there.  I think it's in my proposal.  I

- MARTI KOPACZ - VOLUME 1-

1
2  referenced it.
3    MR. KANE:  I've got some copies of it
4  if you want it.
5  BY MR. HACKNEY:
6    Q.    Okay.  I missed that.
7    A.    Yeah.  More than two, probably less
8  than five, ten.  Something like that.
9    Q.    Okay.  So that means that's where a
10  Court has said Ms. Kopacz is an expert and I'm
11  going to allow her to testify on Subject X?
12    A.    Right.
13    Q.    And it's somewhere between two and
14  five?
15    A.    That's what I'm thinking.
16    Q.    What were the subjects of your
17  testimony?
18    A.    Generally, it's all been insolvency
19  and restructuring oriented.  So whether or not,
20  you know, an entity was solvent or insolvent.
21  Whether or not -- it's all -- I mean, my career
22  has been spent in restructuring, so it's all in
23  that context.
24    Q.    A very typical restructuring expert
25  testimonies that I come across in my practice, an

- MARTI KOPACZ - VOLUME 1-

1
2  example would be valuation.  Have you been
3  qualified as an expert in valuation?
4    A.    I don't think so.  I don't think so.
5    Q.    You talked about solvency.
6    A.    Yes.
7    Q.    Have you ever been qualified as an
8  expert in whether an entity is or is not solvent?
9    A.    Yes.
10    Q.    Have you ever offered expert
11  testimony as to whether or not a plan was
12  feasible?
13    A.    I don't think so in terms of that
14  narrow definition of feasibility.
15    Q.    Okay.
16    A.    Right?
17    Q.    Have you ever offered expert
18  testimony in a Chapter 9 case?
19    A.    No.  No.
20    MR. KANE:  Other than this one?
21  BY MR. HACKNEY:
22    Q.    Other than this one -- other than
23  today?
24    A.    Yeah.
25    Q.    Have you ever offered expert

- MARTI KOPACZ - VOLUME 1-

1
2  testimony on whether a plan satisfies the best
3  interests of creditors test?
4    A.    No.
5    Q.    Other than expert testimony on
6  insolvency, do you remember any -- any other areas
7  where you testified as an expert?
8    A.    Yes.  And I have testified -- I have
9  testified on behalf of clients in a variety of
10  bankruptcy hearings and confirmation hearings and
11  I -- to be honest with you, I don't really know if
12  that's expert or fact or some sort of mix of the
13  two.  All right?  I -- very few times in my career
14  have I been hired exclusively as an expert.  I've
15  generally been the financial advisor, the chief
16  restructuring officer or had some other role
17  before I got to the witness stand.
18    Q.    And it does create some complexity
19  because sometimes an FA will be a witness to facts
20  that happen in the bankruptcy.
21    A.    Yes.
22    Q.    And then they will also have the
23  expertise to render opinions, as we lawyers think
24  of them, in connection with their testimony.  So I
25  under -- understand what I think you're alluding

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  the average income data for the City of Detroit,
3  correct?
4      A.   That's correct.
5      Q.   Okay.  You relied on data that was
6  given to you by Ernst & Young?
7      A.   That's correct.
8      Q.   Okay.  And you haven't taken steps to
9  assess the accuracy of that data, correct?
10     A.   That's correct.
11     Q.   And with respect to the level of
12  unemployment in the City, you also relied on data
13  that was given to you by Ernst & Young, correct?
14     A.   Yes.
15     Q.   But you did not attempt to
16  independently verify that data --
17     A.   I'm not --
18     Q.   -- correct?
19     A.   -- sure.  I'm not sure what
20  independent information we had on employment -- on
21  unemployment.
22     Q.   Okay.  You may have.  You may not
23  have.  You just don't know?
24     A.   Yes.
25     Q.   Is it true that unemployment in the

1  - MARTI KOPACZ - VOLUME 1-
2  City of Detroit bottomed out in 2010?
3      A.   I don't know that.
4      Q.   Isn't it true that year over year
5  since 2010 unemployment has decreased?
6      A.   I don't know that.
7      Q.   Do you know how the City's current
8  unemployment rates compare to last year's
9  unemployment rates?
10     A.   I don't.
11     Q.   Let me ask you some questions about
12  the wagering revenues.
13          What is the tax rate that's applied
14  to the wagering revenues?
15     A.   It's in my report.  It's 10.95?  We
16  can look it up.
17     Q.   Did you conduct any independent
18  analysis of the gaming market in the City of
19  Detroit?
20     A.   I did not.
21     Q.   Okay.  So you didn't do an
22  independent study to understand, for example, the
23  impact that the Toledo casinos will have on the
24  casinos in the City of Detroit; is that correct?
25          MR. KANE:  He'll direct you to this

1  - MARTI KOPACZ - VOLUME 1-
2  if he wants you to look for the specific
3  page.
4          MR. HACKNEY:  Yeah, that's okay.
5          THE WITNESS:  Yeah.  No.
6  BY MR. HACKNEY:
7      Q.   I am correct when I say that, right?
8      A.   Correct.
9      Q.   And you also did not conduct any
10  sensitivity analysis around casino gaming revenue,
11  correct?
12     A.   Whatever's in here is what we did.
13     Q.   Okay.  So if you did sensitivity
14  analysis, it's in your report, correct?
15     A.   That's correct.
16     Q.   If it's not in your report, it's
17  because you didn't do it?
18     A.   That's correct.
19     Q.   What is the utility user's tax?
20     A.   It is a tax that the City of Detroit
21  assesses on telephone, cable, utility charges to
22  residents in Detroit.
23     Q.   Now, when it came to historical data
24  about utility user tax revenues, you relied on
25  what was given to you by Ernst & Young; is that

1  - MARTI KOPACZ - VOLUME 1-
2  correct?
3      A.   That's correct.
4      Q.   You did not attempt to independently
5  assess that data, correct?
6      A.   Correct.
7      Q.   And to the extent you conducted
8  sensitivity analysis around the utility user's
9  tax, it will be in your report.
10     A.   We did not.
11     Q.   You did not?  I --
12     A.   Did not.
13     Q.   It's not a memory test, but it's
14  fine.
15          Let's talk a little bit about your
16  experience -- your personal experience forecasting
17  municipal revenues -- or I'm sorry, doing
18  municipal forecasts of both revenues and expenses.
19  Okay?
20     A.   Okay.
21     Q.   So tell me about the times that
22  you've had the opportunity to do it personally.
23     A.   I have not directly worked for a
24  municipality in projecting revenues or expenses.
25     Q.   Okay.  What do you mean by

- MARTI KOPACZ - VOLUME 1-

1
2    A.    No.
3    Q.    What about judgmental forecasting?
4    A.    No.
5    Q.    Consensus forecasting, do you know
6  what that is?
7    A.    Consensus generally means that
8  everybody agrees on it. It's -- it's the way that
9  Michigan does its revenue forecasting and Detroit
10 does it.
11   Q.    That's using multiple people to check
12 one another, correct?
13   A.    Yes.
14   Q.    And then do you know what expert
15 forecasting is in the qualitative context?
16   A.    No.
17   Q.    Fair to say that you have never
18 consciously applied these methodologies in your
19 own forecasting work?
20   A.    That's correct.
21   Q.    And you did not in connection with
22 the City's forecasting?
23   A.    That's correct.
24   Q.    Now, let me ask you some questions
25 about the -- the quantitative types.

- MARTI KOPACZ - VOLUME 1-

1
2          Have you ever heard of econometric
3  forecasting?
4    A.    Yes.
5    Q.    Okay. You did not perform any
6  econometric forecasting, correct?
7    A.    That's right.
8    Q.    Neither did the City, right?
9    A.    I'm not going to answer for the City.
10   Q.    Oh, you don't know whether they did
11 or they didn't?
12   A.    I'm not -- again, I didn't do any,
13 but I didn't -- I haven't seen any, so...
14   Q.    Sorry. Maybe I'm not asking my
15 question the right way.
16          In connection with the City's
17 forecasts, you're unaware of anyone associated
18 with the City performing an econometric forecast?
19   A.    Like I said, I'm not aware of it, but
20 I don't know.
21   Q.    Okay. So I'm not trying to -- I'm
22 not trying to sharp shoot you, but one of your
23 jobs here was to understand everything about the
24 forecasts, so --
25   A.    Yes.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    To -- when you say I'm not aware of
3  someone doing it, your expectation is that it
4  wasn't done?
5    A.    That's correct.
6    Q.    Okay. And similarly, have you ever
7  heard of regression analysis?
8    A.    Yes.
9    Q.    You didn't perform any regression
10 analysis with respect to the City forecasts?
11   A.    That's correct.
12   Q.    And to the best of your knowledge,
13 neither did the City, correct?
14   A.    Not that I'm aware of.
15   Q.    Okay. Are you aware of -- of what's
16 called a time series forecast?
17   A.    Yes.
18   Q.    You didn't perform any time series
19 analysis of the City's forecast, correct?
20   A.    That's correct.
21   Q.    And to the best of your knowledge,
22 neither did the City?
23   A.    Not that I'm aware of.
24   Q.    Okay. And then you're aware of a
25 concept of trend analysis, correct?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    Yes.
3    Q.    You didn't perform trend analysis
4  with respect to the City's forecasts?
5    A.    That I would say we did.
6    Q.    Okay. That is something you would
7  say that you did do?
8    A.    Yes.
9    Q.    And did the City do that?
10   A.    I believe the City did that.
11   Q.    Okay. Now, have you reviewed the
12 National Advisory Council on State and Local
13 Budgeting and their publications?
14   A.    I have not.
15   Q.    Do you agree that forecasting is a
16 highly subjective area?
17   A.    Yes.
18   Q.    And, as such, it's subject to the
19 biases of the person doing the forecast, correct?
20   A.    Yes. And -- and -- but I would
21 qualify biases as neither good nor bad.
22   Q.    Understood. It's not a -- it's not
23 meant to be a negative word like -- like racial
24 bias.
25   A.    Right.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.    It's meant to be a word that says
3   your own personal viewpoint can have an impact on
4   your forecast?
5      A.    That's correct.  I agree with that.
6      Q.    And do you -- as a restructuring
7   professional, do you understand the idea that the
8   City here has an incentive to have a very
9   conservative forecast?
10         MR. KANE:  Objection.  You can
11      answer.
12         THE WITNESS:  I --
13   BY MR. HACKNEY:
14      Q.    Thinking about it from the stand --
15   just as a restructuring professional and drawing
16   on your experience, do you understand the general
17   concept that the City has an incentive to have a
18   conservative forecast because then it can say to
19   creditors, I have nothing more to give you, but if
20   it does better than the forecast, it will have
21   more cushion later.
22         MR. STEWART:  Objection.
23         THE WITNESS:  I'm struggling --
24         MR. STEWART:  Did you get my
25      objection to the question?

1        - MARTI KOPACZ - VOLUME 1-
2         THE WITNESS:  I'm not under -- I'm --
3   I'm struggling with incentive.
4   BY MR. HACKNEY:
5      Q.    Okay.  Let's turn it around then.
6         You didn't consider or analyze what
7   the biases of the City forecasters were, correct?
8      A.    Correct.
9      Q.    Okay.
10         MR. HACKNEY:  Ma'am, there is just
11      five minutes left on tape, and one of the
12      things I like to tell people is that a
13      deposition is not akin to being stretched out
14      on the rack.  So, if you would like to take a
15      lunch break, this could be a good time.
16         THE WITNESS:  I would like to take a
17      break.
18         MR. HACKNEY:  Okay.  Absolutely.
19         THE VIDEOGRAPHER:  Thank you.  The
20      time is now 12:17 p.m.  We're off the record.
21      This is the end of Disk Number 2.
22         (Whereupon, a lunch break was taken
23      from 12:17 p.m. to 1:20 p.m.)
24         THE VIDEOGRAPHER:  The time now is
25      approximately 1:20 p.m.  We're back on the

1        - MARTI KOPACZ - VOLUME 1-
2   record.  This is the beginning of Disk
3   Number 3.
4   BY MR. HACKNEY:
5      Q.    Ms. Kopacz, welcome back.
6      A.    Thank you.
7         THE VIDEOGRAPHER:  Do you have your
8      microphone on?
9         MR. HACKNEY:  I don't.  Neither of us
10      do.
11         MR. KANE:  Let the record reflect I
12      have mine on.
13         MR. HACKNEY:  Teacher's pet.
14         (Whereupon, a brief discussion was
15      held off record.)
16   BY MR. HACKNEY:
17      Q.    Okay.  Ms. Kopacz, so do you agree
18   that in order to minimize the impacts of
19   subjectivity, it is important for a forecaster to
20   utilize a reliable methodology?
21      A.    Never thought about it.
22      Q.    Okay.  Having thought about it for
23   the first time, do you agree?
24      A.    I don't know.  I don't know.
25      Q.    How about put it this way:  Do you

1        - MARTI KOPACZ - VOLUME 1-
2   agree that it's important for a forecaster to use
3   a reliable methodology?
4      A.    Yes.
5      Q.    What methodology did the City use?
6      A.    I'm not understanding the question.
7      Q.    Okay.  Methodology is one of those
8   words that's kind of hard.  It -- the more you try
9   define it, the more you can roll around in it.
10         Do you have a general understanding
11   of the concept of a methodology?
12         Let's try and get on common ground in
13   terms of what the word means and then we can try
14   and ask the questions.
15      A.    Okay.
16      Q.    So, when I talk about forecasting
17   methodology, what does that mean to you?
18      A.    Approach.
19      Q.    Okay.  Okay.  And so what approach
20   did the City utilize in compiling its forecasts?
21      A.    There's not -- I'm struggling because
22   I think the way you're using it is as if there's a
23   professional standard for methodology.  There are
24   like -- like we were talking about generally
25   accepted accounting principles.  There aren't --

```
 1          - MARTI KOPACZ - VOLUME 1-
 2     A.   I don't know.
 3     Q.   Okay.  Now, I think we talked about
 4  earlier the fact that you haven't done any?
 5     A.   That's correct.
 6     Q.   Any statistical testing, correct?
 7     A.   Correct.
 8     Q.   Is it fair to say that the City's
 9  forecasts are -- and I'm talking about the ones in
10  the plan of adjustment, you understand that,
11  right?
12     A.   Okay.
13     Q.   The City's forecasts are principally
14  the product of the judgment of the City
15  forecasters?
16     A.   I don't know who that is.
17     Q.   You don't know --
18     A.   What are -- tell me who those people
19  are.
20     Q.   Well, I was talking about the
21  forecasters that are the subject of your expert
22  opinion.
23     A.   Right.
24     Q.   So those forecasts are principally
25  the product of the judgments of the forecasters.
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2  Do you agree with that?
 3     A.   I think so.  Yes.  The people who
 4  prepare the forecast, it seems circular.  They
 5  prepare the forecast, they make the assumptions
 6  and the calculations, yes.
 7     Q.   But the assumptions are ones that
 8  they use their judgment to determine, correct?
 9     A.   I believe that's correct, yes.
10     Q.   Who are the forecasters on the
11  revenue side for the City?
12     A.   Ernst & Young.
13     Q.   Yeah, I meant the people.
14     A.   Bob Kline and his team.
15     Q.   Who else?
16     A.   I -- I would -- I would have to -- we
17  could look and see who we talked about, but I
18  remember Bob.
19     Q.   Okay.
20     A.   And there are a couple of women who
21  worked with him.
22     Q.   Do you remember Caroline Sally?
23     A.   That sounds familiar.
24     Q.   Okay.
25     A.   But, yes.
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2     Q.   And then Gaurav Malhotra?
 3     A.   No.
 4          THE REPORTER:  I'm sorry.
 5          MR. HACKNEY:  Gaurav Malhotra.
 6          And general spellings I can
 7  definitely give them you at a break.
 8     Q.   You remember Gaurav?
 9     A.   Absolutely I remember Gaurav.
10     Q.   I didn't hear your answer, I'm sorry.
11     A.   I said Bob Kline and his team,
12  okay --
13          (Cell phone interruption.)
14          THE VIDEOGRAPHER:  I'm sorry that
15  shouldn't happen.
16          MR. HACKNEY:  That's okay.  That's a
17  good ringer.
18     A.   Bob Kline and his team, who are a
19  division of Ernst & Young in some way, shape or
20  form, were the professionals that worked on the
21  revenue projections.
22     Q.   On the revenue projections?
23     A.   Correct.
24     Q.   I see what you're saying.
25          Okay.  So, are you distinguishing
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2  Gaurav from Bob Kline's team --
 3     A.   Bob --
 4     Q.   Is it Bob Kline or Ron Kline?
 5     A.   Bob.  Bob.  I think so.
 6     Q.   Mr. Kline.
 7     A.   Mr. Kline.
 8     Q.   Let's get a sense of who's on
 9  Mr. Kline's team and whether Gaurav is on that
10  team.
11     A.   Gaurav is the Ernst & Young partner
12  responsible for the Detroit engagement.
13     Q.   Got it.
14     A.   Okay?  Gaurav has work groups, right,
15  from various parts of Ernst & Young working for
16  him on this.
17          Bob Kline is the Ph.D. economist that
18  has a group of people also working for him that
19  worked on the revenue projections.
20     Q.   And the cost projections principally
21  came from Conway MacKenzie; is that right?
22     A.   No.  No.  It depends on which --
23     Q.   I see?
24     A.   The RRIs came from the Conway
25  MacKenzie.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-13   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 18 of
25

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    The historical call cost expense came
3  from whom?
4    A.    The historical costs came from the
5  City. The cost projections came primarily from
6  Ernst & Young, a group of people that worked for
7  Gaurav.
8    Q.    I see. Okay.
9          So if I was thinking broadly about
10  the forecasts in the go-forward years, if I was
11  thinking about revenue forecasts, I'm thinking
12  about Mr. Kline's team?
13    A.    That's how I think of it, yes.
14    Q.    If I'm thinking about cost
15  projections that don't entail RRIs, I'm thinking
16  about Mr. Malhotra's team?
17    A.    Right. And he has specific people
18  that are responsible for specific parts of the
19  cost projections that work for him.
20    Q.    Understood.
21          Then if I'm thinking about RRIs and
22  their impacts on either costs or revenues, I'm
23  thinking about the Conway MacKenzie team?
24    A.    Generally that's correct.
25    Q.    And is this, by the way, part of the

- MARTI KOPACZ - VOLUME 1-

1
2  reason that you found the forecasts confusing is
3  because they were the product of actually three
4  different groups of forecasters?
5    A.    It's not that there are different
6  people involved. It is that they were never
7  harmonized and concatenated in a way that they're
8  all in one kind of place.
9    Q.    What is the experience of Mr. Kline
10  and his team when it comes to forecasting
11  municipal revenues?
12    A.    I don't know.
13    Q.    Okay. Did you make any effort to
14  assess that?
15    A.    I did not.
16    Q.    Was that important to you?
17    A.    I looked at -- I used all the
18  information that was available to me and all the
19  people that were available to me and -- got
20  satisfied with the projections in the plan as
21  being reasonable revenue projections.
22    Q.    Were you working under the assumption
23  that Mr. Kline and his team had substantial
24  experience forecasting municipal revenues?
25    A.    I did not make that assumption, no.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    You hadn't thought about it one way
3  or the other?
4    A.    No, I did not make a determination
5  one way or the other.
6    Q.    Okay. Did you ever meet them in
7  person?
8    A.    I did not.
9    Q.    You spoke to them on the phone?
10    A.    I did.
11    Q.    And what was the experience of Mr.
12  Malhotra's team when it came to forecasting
13  municipal expenses?
14    A.    I don't know.
15    Q.    And what was the experience of the
16  Conway MacKenzie team when it came to projecting
17  the costs or revenues associated with a municipal
18  restructuring?
19    A.    I don't know.
20    Q.    Now, when you were assessing the
21  reliability of the assumptions that are in the
22  forecasts, did you independently seek to develop
23  your own assumptions first and then compare so
24  that you could then compare them to the City's
25  assumption and see how they compared?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    No.
3    Q.    Okay.
4    A.    Generally not.
5    Q.    So what you did, instead, was you
6  first understood what the City's assumption was
7  and then you tested the reasonableness of that
8  assumption, correct?
9    A.    Generally that's correct, yes.
10    Q.    Okay. Why didn't you, for example,
11  kind of in order to avoid just, you know, the
12  impact that even seeing their assumption can have
13  on you, why didn't you say, What do I think wages
14  will be year over year for the next ten years, and
15  do the work independently and then see how it
16  mapped?
17    A.    Generally two reasons, time. When I
18  was appointed I had, I think, 62 days originally
19  between when I was appointed and when my report
20  was due.
21    Q.    Yeah.
22    A.    Okay. Secondly, I learned very
23  quickly the condition of the historical records of
24  the City, and realized that in order to get done
25  with my assignment, I was going to have to rely on

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1  the assimilation of data that the other
2  professionals had acquired.  And that included the
3  creditors' professionals, as well.
4          Being the last person at the dance,
5  so to speak, I needed to rely on not only on
6  Ernst & Young and Conway, but Alvarez and FDI --
7      Q.   Yeah.
8      A.   -- and Houlihan, to help get us to
9  the best data that was out there.
10     Q.   So let me see if I can summarize, the
11 time that you were allotted which we discussed and
12 which I've told you I'm of the view wasn't very
13 much, but it was what it was, but the time that
14 you were allotted did not allow you to either
15 independently verify the data or independently
16 generate your own assumptions?
17     A.   I -- I wouldn't go so far as to say
18 we didn't independently verify because we did,
19 specifically on the revenue projections and things
20 surrounding those, we did seek other third-party
21 sources of data.  So --
22     Q.   There were instances where you sought
23 some form of corroboration?
24     A.   Separate and apart from the City.


- MARTI KOPACZ - VOLUME 1-

1      Q.   But in general, you'd agree with my
2  statement that you didn't have sufficient time to
3  independently verify all of the data on which the
4  forecasts are built in order to develop your own
5  assumptions?
6          MR. KANE:  Objection.  Go ahead and
7  answer.
8      A.   Yes.
9      Q.   You agree with me?
10     A.   Yes.
11     Q.   Your reliance materials only list the
12 City's CAFR for 2012 specifically by name?
13     A.   Uh-huh.
14     Q.   Is that the only CAFR that you
15 reviewed?
16     A.   We did not get the CAFR, the '13 CAFR
17 until after my report was filed.
18     Q.   Understood.
19         So we've had a conversation about the
20 '13 CAFR and how some of the information in it may
21 have been known to you --
22     A.   Right.
23     Q.   -- and other parts of the information
24 may not have been?

- MARTI KOPACZ - VOLUME 1-

1      A.   Right.
2      Q.   Let's put that to one side, now let's
3  go backwards in time.
4          Did you review any CAFRs other than
5  the 2012 CAFR?
6      A.   I did not.
7      Q.   And whether your team did or not, you
8  don't know?
9      A.   I don't know.
10     Q.   Do you -- is it your opinion that
11 none of the prior year CAFRs prior to 2012 have
12 any relevance to the City's financial projections?
13     A.   Like I said, I didn't look at it.
14 Don't know if my team did or not.
15     Q.   So, do you think they are relevant or
16 not?
17     A.   I don't know.
18     Q.   You don't know.  They might be, they
19 may not be?
20     A.   They weren't part -- they weren't
21 part of the basis for my opinion.
22     Q.   Okay.  But I'm asking about the
23 relevance of them?
24     A.   I don't know.

- MARTI KOPACZ - VOLUME 1-

1      Q.   You don't know what the relevance is?
2      A.   Yes.
3      Q.   Would you agree -- let's go back to
4  our word methodology which you've used to describe
5  as approach.
6          Methodologies is an important word in
7  the legal setting, that's why lawyers are always
8  asking about methodology.
9          But would you agree that the City did
10 not employ a uniform approach in constructing the
11 forecasts?
12     A.   Yes.
13     Q.   Would you also agree that the City
14 didn't apply a uniform methodology in constructing
15 the forecasts?
16     A.   I don't like the word methodology.
17     Q.   Okay.  You're more comfortable with
18 approach?
19     A.   I'm more comfortable with approach.
20     Q.   But can you describe what the
21 approach was?
22     A.   It depends on -- it depends on which
23 model we're talking about.  The original baseline
24 E & Y model, the Conway models, or the E & Y

45 (Pages 177 to 180)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-13   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 20 of
25

1      - MARTI KOPACZ - VOLUME 1-
2  10-year, 40-year model.  It depends on what the
3  line item that is being projected is, okay?
4          And there are different approaches
5  used for estimating both revenues and expenses
6  depending on which one you're talking about and
7  who did it.
8      Q.    And then are there different
9  approaches even within categories like did they
10  employ a different approach to estimating
11  different types of revenue?
12      A.    Yes.  Well, revenue -- revenue in
13  terms of the E & Y models, no.  Okay.  There are
14  differences in approaches, for example, to
15  salaries and wages, depending on whether it's a
16  Conway model or whether it's an E & Y model.
17      Q.    Did you say in your expert report
18  that you found the City's model to be convoluted?
19      A.    And confusing.
20      Q.    Yeah.  Did you also say convoluted?
21      A.    Yes.
22      Q.    Okay.  I will put my hand up and
23  agree with you on that.
24      MR. KANE:  Objection.
25      MR. HACKNEY:  For now?

1      - MARTI KOPACZ - VOLUME 1-
2      MR. KANE:  What?
3  BY MR. HACKNEY:
4      Q.    So we've talked a lot about -- we've
5  talked about industry standards and -- but have
6  you ever seen another city employ the approach for
7  its forecasts that was employed here?
8      A.    No, because as we've established,
9  I've never seen another city like this doing
10  forecasts for a plan of adjustment.
11      Q.    True, but you have seen other cities
12  doing forecasts, right?
13      A.    Budgetary forecasts, yes.
14      Q.    Yeah.  Have you ever seen any of
15  those cities employ a methodology or an approach,
16  sorry, like this one?
17      A.    No.
18      Q.    When it comes to forecasting revenue,
19  do you believe that the forecasting technique that
20  you employed depends on the nature of the revenue
21  source that's being forecasted?
22      A.    Can you explain that?
23      Q.    Sure.  So do you understand that
24  there are -- certainly understand that there are
25  different types of revenue, right?  You understand

1      - MARTI KOPACZ - VOLUME 1-
2  that?
3      A.    Yes.
4      Q.    Income tax revenue is a different
5  type of revenue from wagering revenue, right?
6      A.    Yes.
7      Q.    Do you understand the idea that there
8  are -- there are -- that revenue is often divided
9  into two board categories of whether it's
10  deterministic on the one hand or volatile on the
11  other?
12      A.    I would agree there are different
13  types of revenue that have the different bases for
14  -- around which you would estimate.  But I would
15  want you to define those words before I would
16  agree or disagree with them.
17      Q.    Deterministic I use in the sense that
18  it means predictable and volatile means
19  unpredictable.
20      A.    Yes.
21      Q.    Have you ever -- do you understand
22  the idea that you can classify revenue streams as
23  being either predictable or unpredictable?
24      A.    I would think that is the analyst's
25  choice of how they want to describe them,

1      - MARTI KOPACZ - VOLUME 1-
2  generally.
3      Q.    Yes.  Right.  And did you undertake a
4  revenue portfolio analysis in this case?
5      A.    A revenue portfolio analysis?  Don't
6  know what a revenue portfolio analysis is.
7          We looked at all the revenues that
8  were presented in the plan of adjustment
9  projections.
10      Q.    So I guess can I say that to the
11  extent you undertook a revenue portfolio analysis,
12  you didn't do so consciously?
13      A.    I wouldn't -- I don't think -- that
14  sounds like a term of art, it doesn't sound like
15  something that you would think about.
16      Q.    That's -- that sounds like a term of
17  art from the world of revenue forecasting?
18      A.    It's somebody's -- it's somebody's
19  term of art, but it's not my term of art.
20      Q.    Okay.  Did you make an independent
21  assessment for yourself as to whether or not the
22  City's revenue streams could be classified as
23  either predictable or unpredictable?
24      A.    I looked at each revenue stream and
25  assessed whether I thought the City's forecast or

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-13   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 21 of
25

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2       Q.    And so as a result of the passage of
3    time, as we sit here today, there are now actually
4    historical results that we have that are
5    historical as of today, that can be compared to
6    what was once a forecast, correct?
7       A.    That's possible, yes.
8       Q.    I take it you have not done that?
9       A.    I have not done that.
10      Q.    So you haven't attempted to validate
11   what the prior forecasts against subsequent
12   historical information that's come in?
13      A.    No, I have not.
14      Q.    Okay.  You have not -- I want to talk
15   briefly about taxes, okay?
16            You did not include -- you did not
17   conduct analysis of whether the City can increase
18   taxes, correct?
19      A.    That's correct.
20      Q.    Both from the standpoint -- you
21   didn't analyze whether it legally can increase
22   taxes, correct?
23      A.    Correct.
24      Q.    You also didn't analyze whether
25   economically if it did increase taxes, what would

1       - MARTI KOPACZ - VOLUME 1-
2    happen to the City, correct?
3       A.    Correct.
4       Q.    And you're offering opinions on tax
5    policy in this case, correct?
6       A.    I am not.
7       Q.    Now, is it correct -- I want to talk
8    about property value, okay?
9             Is it correct that the average
10   assessed value per parcel in the City of Detroit
11   decreased by 37 percent between 2008 and 2013?
12      A.    I'm not familiar with that data
13   point.
14      Q.    Do you know -- do you agree that
15   there was a substantial decrease in the assessed
16   value per parcel in the City of Detroit between
17   2008 and 2013?
18      A.    I don't know what "substantial" means
19   but I can say, I am aware that property value
20   -- assessed property values decreased.
21      Q.    What would you define "substantial"
22   as?
23      A.    I don't know.
24      Q.    I mean, you can do whatever you want.
25      A.    Property -- assessed property value

1       - MARTI KOPACZ - VOLUME 1-
2    decreased.
3       Q.    Do you know how much it decreased?
4       A.    I don't.
5       Q.    I take it you don't know what the
6    City's assessed property values are as you sit
7    here today?
8       A.    I do not.
9       Q.    And you haven't engaged in an
10   independent effort to determine what the assessed
11   value should be, correct?
12      A.    That's correct.
13      Q.    Now, is it reasonable to assume that
14   the assessed value per parcel in the City of
15   Detroit will fall by an additional 50 percent
16   between -- over the next seven years?
17      A.    I am not --
18            MR. STEWART:  Objection.
19      A.    I have no way to know that.
20      Q.    You have no way to test that
21   assumption?
22            Let's start -- you did not test that
23   assumption, correct?
24      A.    That's correct.
25      Q.    Okay.  There is a way to test the

1       - MARTI KOPACZ - VOLUME 1-
2    assumption, though, correct?
3       A.    I don't know.
4       Q.    Okay.  Do you understand that the
5    City's forecasts include assumptions about future
6    assessed value per parcel?
7       A.    I don't know -- I know that the
8    City's projections include estimates for property
9    taxes going forward, right.
10      Q.    Yes.
11      A.    I don't know what their per parcel
12   estimates have been.
13      Q.    Okay.  I take it you made no effort
14   to validate any assumptions regarding assessed
15   value per property?
16      A.    That's correct.
17      Q.    Or in the aggregate, correct?
18      A.    Or in the aggregate?
19      Q.    Meaning to the extent the City
20   aggregated assessed values across the City and
21   made assumptions about that, you did not test
22   those assumptions, correct?
23      A.    Correct.
24      Q.    Now, do you know what Mr. -- do you
25   know that the City reassessed its properties in

- MARTI KOPACZ - VOLUME 1-

1  Decem -- December of 2013?
2      A.   I believe it's in the process of
3  assessing a lot of properties, right.
4      Q.   So I want to distinguish between
5  these two concepts, so I'm going to ask you about
6  them separately, though, because you're right,
7  there is a citywide appraisal, and you're right,
8  it is ongoing.  Put that here for a second,
9  mentally, okay?
10     A.   Okay.
11     Q.   Now, are you aware there was a
12 reassessment in December of 2013?
13     A.   Vaguely, yes.
14     Q.   So "vaguely" means?
15     A.   I was aware of it --
16     Q.   You are --
17     A.   Anecdotally I am aware of it, yes.
18     Q.   Okay.  You did not -- do you know the
19 impact of that assessment on taxable value in the
20 City of Detroit?
21     A.   I don't.
22     Q.   Do you know the approximate impact of
23 it?
24     A.   I don't.

- MARTI KOPACZ - VOLUME 1-

1      Q.   Do you know what impact it had on the
2  forecasts?
3      A.   I know that property tax forecast --
4  property tax revenue forecasts declined between
5  the May 5th and the July 2nd projections.
6      Q.   Do you know why it declined?
7      A.   It declined as a result of --
8  Ernst & Young's view that the assessed value was
9  going down.
10     Q.   Was going to go down or had gone
11 down?
12     A.   I don't -- I don't have a precise
13 time recollection on that.
14     Q.   Do you know whether the citywide
15 reappraisal has begun?
16     A.   I don't know.
17     Q.   Do you know when it will -- it is
18 estimated to conclude?
19     A.   I don't.
20     Q.   Do you know anyone in the City of
21 Detroit who is more knowledgeable about the
22 assessed values of property in the City of Detroit
23 than Mr. Evanko, the chief assessor?
24     A.   I don't know.

- MARTI KOPACZ - VOLUME 1-

1      Q.   Is it fair to assume that he is the
2  most knowledgeable person in the City of Detroit?
3      A.   I don't know.
4      Q.   That's not a question you've
5  considered?
6      A.   It is not.
7      Q.   Do you believe that Mr. Evanko's
8  opinions regarding the effect of the citywide
9  reappraisal will have on property values are
10 relevant to determining future property values?
11     A.   Could you repeat that question?
12     Q.   Yeah.  So do you believe Mr. Evanko,
13 who is the City's only Level 4 assessor, right?
14     A.   Uh-huh.
15     Q.   Yes?
16     A.   Yes.
17     Q.   Sorry.  That's okay.  I do that all
18 the time.
19          Do you agree that Mr. Evanko's coast
20 views about the impact of citywide reappraisal
21 that we were just talking about, that the impact
22 that that will have on taxable value in the City
23 of Detroit is an important data point to consider?
24     A.   Yes.

- MARTI KOPACZ - VOLUME 1-

1      Q.   If Mr. Evanko told you that he has no
2  idea whether that citywide reappraisal will cause
3  taxable values to be lower or higher, would you
4  consider that an important data point?
5      A.   I -- I'm -- I would consider what he
6  said to be relevant.  Okay?  So I don't know what
7  he said so I can't really say whether I think I
8  agree or don't agree.  I would think that the
9  City's assessor would be an important person to
10 consider as somebody who is looking at this.
11     Q.   Understood.  So do you understand
12 that the Ernst & Young forecasts project the
13 taxable value will decrease by 9 percent as a
14 result of the citywide reappraisal?
15     A.   I understand that as part of their
16 assumption, yes.
17     Q.   What is the basis for their
18 assumption?
19          MR. DiPOMPEO:  Objection.
20     A.   Their assessment in consultation with
21 the City.
22     Q.   Okay.  But like what -- they talk to
23 people that told them that?
24     A.   That is my assumption, yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1       - MARTI KOPACZ - VOLUME 1-
2       Q.    That's your assumption about their
3   assumption?
4       A.    Yes.
5       Q.    Okay.  Have you independently
6   verified the reasonableness of that particular
7   assumption?
8       A.    I have not.
9       Q.    Do you believe -- this get -- so do
10  you believe it's reasonable to assume that taxable
11  value in the City of Detroit will decrease over
12  the next -- by 9 percent, as a result of the
13  citywide reappraisal where the City's senior
14  assessor says that he doesn't know whether taxable
15  value will go up or down.
16          MR. STEWART:  Objection.
17      A.    I don't know.
18      Q.    You don't know if that's reasonable
19  or not?
20      A.    Yes, I do not know if that's
21  reasonable or not.
22      Q.    It's not something you've considered
23  before today?
24      A.    That's correct.
25      Q.    One of the interesting things about

1       - MARTI KOPACZ - VOLUME 1-
2   when you are feasibility expert is we were talking
3   earlier about the notion of there being a hurdle
4   and your job being to assess whether the City will
5   get over that hurdle, right?
6       A.    Correct.
7       Q.    Do you remember that testimony?
8       A.    Uh-huh.
9       Q.    Isn't it true that if the City adopts
10  an assumption about taxable value which is that in
11  the future it's going to go down by 9 percent, as
12  it did, right?  Correct?
13      A.    We can look at it.
14      Q.    If you want to double-check it,
15  that's totally fine.
16          Do you want to?
17          Take a look at Page 59.
18      A.    About Page 59, there is a typo on
19  Page 59 about two-thirds of the way down, there
20  are two numbers, FY 215, 2015, followed by another
21  FY 2015.  The second FY 2015 should be 2016.
22      Q.    Okay.  So what this is saying is that
23  because of the citywide reappraisal, there's going
24  to be a 9 percent drop in real property
25  assessments in fiscal year 2015 and then another

1       - MARTI KOPACZ - VOLUME 1-
2   three to four percent drop in fiscal year 2016,
3   right?
4       A.    That is --
5       Q.    What it should say?
6       A.    -- the -- yes, it should say '16.
7       Q.    That's what you meant it to say?
8       A.    That is what I meant it to say.
9       Q.    Now, if the available evidence shows
10  that -- and Ms. Kopacz, this is kind of a -- this
11  almost goes to your own methodology, so consider
12  this for a second.
13          If the available evidence shows that
14  there's unlikely to be any drop in taxable value
15  in either 2015 or 2016, would you still consider
16  this a reasonable assumption because it's
17  conservative?
18          You see the point of my question?
19  Which is I'm trying to tease out a little bit what
20  you were thinking about when you were testing
21  assumptions.
22          Consider a situation where the
23  available evidence actually suggests that there
24  will not be any drop in real property assessments,
25  okay?  But the City employs a methodology that

1       - MARTI KOPACZ - VOLUME 1-
2   says that there will be a nine percent drop in
3   2015 and a three to four percent drop in 2016,
4   okay?
5           Isn't it true that based on your task
6   as the feasibility expert, you could still find
7   that assumption to be reasonable.  Correct?
8           MR. KANE:  Hold on a second.  So
9   there's a lot in there so, one, I will object
10  on vagueness.  But I'm not trying to
11  interfere, I just want to clarify.
12          Are you asking her to assume that the
13  available evidence shows that?
14          MR. HACKNEY:  Yes.
15          MR. KANE:  Okay.  So he's asking you
16  to assume --
17          MR. HACKNEY:  It's a hypothetical?
18          MR. KANE:  That's all I want --
19      A.    It's an assuming there's evidence to
20  say that property values won't decline.
21      Q.    That's right.
22      A.    And that this forecast says they will
23  decline, right?
24      Q.    Right.
25      A.    That is a positive contributor to my

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7004-13   Filed 08/22/14   Entered 08/22/14 21:10:25   Page 24 of
25

- MARTI KOPACZ - VOLUME 1-

2  Q.    So it's interesting.  So in every
3  other instance, though, where -- where the EY
4  forecasters were forecasting revenue, they
5  considered the impact of the RRIs, right, to the
6  best of your knowledge?
7  A.    Clearly with income tax and property
8  tax.
9  Q.    Oh, right.  Good point.  Good point.
10  A.    They do it both ways.
11  Q.    Yes.  Fair -- fair correction.
12        But is it your understanding that
13  when -- when they were forecasting --
14  A.    Not wagering taxes.
15  Q.    Right.
16  A.    Not wagering taxes and not sales and
17  services tax.  Income, not taxes income.
18  Q.    Yes.  But is it your understanding
19  that the EY forecasters did not consider the
20  impact of restructuring reinvestment initiatives
21  on sales and charges for services?
22  A.    The Bob Kline group didn't do
23  sales -- didn't do the categories we're talking
24  about right now; sales and charges for services.
25  Q.    Okay.

- MARTI KOPACZ - VOLUME 1-

2  A.    That was done by somebody in on
3  Gaurav 's direct team.
4  Q.    Okay.  So, take a look at Page 59.
5  We're going to move on to property values here,
6  okay?
7  A.    Yes.  We did this.
8  Q.    So, yeah, we definitely touched on
9  these.  But I guess I want to confirm that you
10  didn't make any independent findings regarding
11  whether a one percent, 1.7 percent decline in real
12  property values during the period was a reasonable
13  assumption, correct?
14  A.    Correct.
15  Q.    And you didn't make any findings with
16  respect to whether the personal property increased
17  by .9 percent was a reasonable assumption during
18  that period, correct?
19  A.    That's correct.
20  Q.    And it's also correct that you didn't
21  test the assumption of a 4.8 percent renaissance
22  zone increase during that period, correct?
23  A.    That's correct.
24  Q.    We did talk about the nine percent,
25  I'm sorry, we actually skipped forward to this

- MARTI KOPACZ - VOLUME 1-

2  page, didn't we?
3        On the collection rates, do you
4  notice that the City has assumptions regarding
5  different collection rates that bleed from Page 59
6  to 60?
7  A.    I do.
8  Q.    And it's also fair to say that you
9  didn't make independent findings regarding whether
10  their property tax collection assumptions were
11  reasonable, correct?
12  A.    That's correct.
13  Q.    Then, similarly, on the utility users
14  tax on Page 62, do you see that?
15  A.    I do.
16  Q.    The forecast -- the forecasted amount
17  is forecast to be approximately two percent of
18  general fund revenue, correct?
19  A.    Yes.
20  Q.    Fair to say you did not test the
21  assumptions around the specific utility user tax
22  revenue assumptions by the City forecasters,
23  correct?
24  A.    Correct.
25  Q.    So, let me ask you a question about

- MARTI KOPACZ - VOLUME 1-

2  the feasibility of the POA, if there's no exit
3  financing.
4        In your opinion, you assumed that
5  there would be.  Do you remember that?
6  A.    I did.
7  Q.    Let's engage the hypothetical where
8  Mr. Buckfire fails to obtain exit financing.  How
9  does that impact your finding of feasibility?
10  A.    If there is no replacement source of
11  funding?
12  Q.    Yes.
13  A.    Then I would conclude that the plan
14  is not feasible.
15  Q.    Why is that?
16  A.    Because the -- going back to my
17  definition of feasibility, it is both a
18  quantitative and a qualitative assessment.  I
19  think the reinvestment initiatives, the RRIs, are
20  important to the City's ability to deliver
21  municipal services, to pay the commitments in the
22  plan and the City does not have the surplus, the
23  structural surplus in the next couple of years to
24  execute on the RRIs without the exit financing.
25  Q.    What is the basis for your assumption

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022