<u>**Exhibit 6J**</u>

**Excerpts of Expert Report of Martha Kopacz**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                          Chapter 9

City of Detroit, Michigan,                          Case No. 13-53846

     Debtor,                                              Hon. Steven W. Rhodes

_____/


**EXPERT REPORT OF MARTHA E.M. KOPACZ**
**REGARDING THE FEASIBILITY OF THE CITY OF DETROIT PLAN OF**
**ADJUSTMENT**

On April 22, 2014, Judge Rhodes entered an Order[1] appointing me as the Court's expert witness. Pursuant to that Order, "(t)he Court's expert shall investigate and a reach a conclusion on:

(a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and

(b) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable."

I am providing this Report under Fed. R. Evid. 706(a). Should additional information become available, I reserve the right to amend or supplement this Report.

_____

[1] Docket #4215, Order Appointing Expert Witness

my interview on April 18, 2014[7]. I, and members of my team, have conducted more than two hundred interviews and fact gathering meetings with persons involved in this matter or with persons I believed to be helpful to me in forming my opinion.

Based on this work, I conclude that:

(a) The City's plan is feasible as required by 11 U. S. C. § 943(b)(7); and

(b) The assumptions that underlie the City's plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable.

It should be noted that this opinion is rendered in an environment where there are many factors that will have influence on the City's conditions post confirmation that are unknown and unknowable. Throughout this Report, I have noted some of these factors, while other factors may not even be recognized today as potentially having an impact. My opinion is necessarily limited by these unknown factors. It should be recognized, that these factors, when known, could have a material impact on my view of feasibility.

The above statement should only be viewed in the context of this entire Report. No reliance should be made on these statements outside of the context of this Report.

---

[7] Transcript of Hearing, April 18, 2014

The remainder of this Report will provide my definition of feasibility, the context in which I am rendering my opinion and my assessment of the key factors affecting my feasibility assessment. While my opinion is arguably very narrowly limited to "feasibility", the assessment I and my team did to arrive at my opinion is multifaceted. This Report attempts to clearly and succinctly lay out the foundation, framework and details supporting my opinion.

The following section, Section C, addresses my definition of feasibility and relies upon numerous resources – legal and otherwise – and my own experience to establish the benchmarks against which I assessed feasibility. Section D discusses the context in which I am rendering my opinion. While there are common experiences among every restructuring and even among municipalities, the unique mix that is Detroit and this chapter 9 proceeding, necessarily impact my perspective and opinion. My intent is not to rehash every issue or pleading that has occurred in this case or even Detroit's recent history, but rather, to highlight a few aspects of the facts and circumstances of this case which have had an important impact on the formulation of my opinion. The last sections of the Report provide a more in depth review of the issues, quantitative and qualitative, I found particularly relevant to my assessment of feasibility. By no means does this Report include every factor I reviewed or considered but does include those issues that shaped my opinion to the greatest extent.

## Section C – Feasibility Definition

Defining a Feasibility Standard

Section 943(b)(7) of the Bankruptcy Code requires that before a plan of adjustment may be confirmed the Court must determine that the plan is feasible. However, the Bankruptcy Code does not define "feasible." Few chapter 9 cases address the feasibility requirement[8] and there is little in the way of authoritative writing published regarding feasibility. [9]

In assessing feasibility, I have examined available legal authority and consulted with counsel and other experienced professionals to assist in the formation of an appropriate approach to determining feasibility of the City's POA. Every

---

[8] In re *Mount Carbon Metropolitan District*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999) ("The Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible. Due to the relative rarity of Chapter 9 cases, neither the parties nor the Court have found case law specifically addressing the issue.")

[9] Pryor, Scott C., Who Bears the Cost?  The Necessity of Taxpayer Participation in Chapter 9, (June 11, 2014) Available at SSRN, http://ssrn.com/abstract=2448997. The author referring to feasibility: "(w)hat is merely unclear in chapter 11 is an impenetrable fog in chapter 9."

<u>Quantitative</u>

- Are the projections contained in the POA mathematically correct and materially reasonable?
- Are the assumptions that the City has used to develop its projections individually, and when taken as a group, reasonable?
- Is there an adequate contingency included in the projections?

<u>Qualitative</u>

- Does the City have the human resources, or can it likely recruit the human resources, required to meet its obligations under the POA?
- Does the City have the appropriate systems and procedures to monitor its financial performance and to provide early warning signs of variances in performance that might cause the City to fall short of the projections and be unable to meet its obligations under the POA?
- Are there appropriate structures to ensure the City's compliance with the POA and with reasonable government standards of operation?
- Will the City be able to reasonably deliver a minimum level of municipal services?
- Is the City's trajectory sustainable?

The quantitative assessment of feasibility is straightforward but exacting. As will be more fully discussed in Part II, the projections[10] in the POA are (correctly

---

[10] For purposes of this Report, "projections in the Plan" are inclusive of the 10 Yr plan, the 40 Yr plan and the RRIs. If only one of these is discussed, it will be noted. The term "forecast" is often used as a synonym for "projections". While this is not technically correct within accounting literature, the terms will be used interchangeably in this Report to provide variety. The term "model" is used in this Report to describe the one or more excel spreadsheets that together form a financial projection. A "values only model" or "flat model" is essentially a printout of the excel spreadsheets, although it may be provided in electronic format rather than in hard copy. A "working model" contains all the cell references, formulas and

so) quite detailed in many areas. Financial modeling is a highly subjective undertaking that is affected by the assumptions made and the professional biases of the analyst developing the model. Financial modeling is both a science and an art. When the analyst forecasts growing revenue, declining costs, or a change in headcount, he or she has a number of ways to write the mathematical formulas which arrive at the intended numbers. In this case, the POA projections are comprised of multiple forecasts, inclusive of hundreds of individual spreadsheets, prepared by many different individuals and then concatenated into what we all simply call the "projections"[11]. Simple questions, such as "are the salaries used to determine the cost of newly hired employees reasonable?" become detailed. For example, the salary estimates are multifaceted depending on which model and which analyst did the modeling and appear in many of the RRI projections. Because of this, the

_____

"macro" commands that are within the spreadsheets and allows a reviewer of the model to understand what the inputs and assumptions are that create the projections. It is in the working model that a reviewer can understand the "art" of the analyst's modeling.

[11] Expert Report of Charles M. Moore, CPA, CTP, CFF in re City of Detroit, Michigan. In footnote 2, Mr. Moore provides a similar explanation of modeling methodology: "Given the number and diversity of the departments my team and I examined, the specific methodology utilized was not exactly the same for each department. Notwithstanding any particular deviations that were necessary, this core methodology and approach was generally utilized across our analysis and development of the Reinvestment Initiatives." This is an example of differences that can occur within a model built by the same firm. There were also differences in modeling approach used by Conway MacKenzie, Mr. Moore's firm, and Ernst & Young, the City's other financial advisor.

quantitative assessment of "reasonableness" surrounding the individual assumptions, and assumptions taken as a group, of the POA projections was more involved than I would have expected.

The qualitative aspects of the Standard include what I have come to refer to, as "skill and will" and are as important as the quantitative assessment. Qualitative aspects also include external influences that can affect the implementation of the Plan. Part III, Section K – Leadership and Human Capital, discusses the City's need for more highly skilled employees. Another qualitative issue is the upcoming transition from the leadership of the Emergency Manager to the leadership of Mayor Duggan and his administration. When that transition occurs, there will be little more than three years remaining within which the current elected officials will have the responsibility to operate the City consistent with the POA – therefore political 'will' must be passed to future elected officials. This is not a problem limited to Detroit, but to all municipal proceedings. Section M – Post-Confirmation Oversight discusses ways to mitigate this variable.

trajectory towards service delivery solvency[12] and in some areas, the current level of service is adequate. I do not need to envision that Detroit will become a best in class municipality to determine that the POA is feasible. For Detroit, emerging from essential services failure to adequate and reasonable service delivery will be a success.[13]


## What Feasibility is Not

When we developed the feasibility definition, we also considered what feasibility does not include. First, and foremost, feasibility is not a guarantee. If the City were to propose a plan under which, based on reasonable assumptions, the City could not help but meet its obligations – effectively a guaranteed outcome – it is likely that while feasible, such plan would not satisfy the best interests of creditors test under section 943(b)(7) of the Bankruptcy Code.[14]

---

[12] Eligibility Opinion of Judge Rhodes

[13] Anderson, Michelle Wild "The New Minimal Cities" http://yalelawjournal.org/article/the-new-minimal-cities; March 2014

[14] The "best interest test of creditors" is specifically outside the scope of my appointment and as such, is not part of the opinion I have formed. See Docket #4215, Order Appointing Expert Witness, ¶2 and 3.

Similarly, but at the other end of the spectrum, a feasible plan should avoid visionary schemes primarily based on "mere hopes, desires and speculation"[15]. Further, the Court must determine whether there is a reasonable prospect of successful completion of the proposed plan.[16]  As a point of reference, a frequently cited legal standard for feasibility in Chapter 11 is whether the factual showing at the plan confirmation hearing establishes a "reasonable assurance of success," though "success need not be guaranteed."[17]

Lastly, I do not believe the Standard entails: (1) whether the projections in the POA may generate more cash to distribute and therefore provide greater recoveries for creditors or (2) whether there may be alternative plans that could produce a better outcome for the City or its creditors. During my team's evaluation of feasibility, we have been exposed to numerous views on these subjects.  Because this is outside my scope and not included in our Standard, I have not attempted to form, nor have I formed, any opinion on these matters.

---

[15] 242 B.R. 18 (1999) in re Mount Carbon Metropolitan District.

[16] Lawall, Francis J. and Miller, J. Gregg, Debt Adjustments for Municipalities Under Chapter 9 of the Bankruptcy Code, a Collier Monograph, 2012.

[17] Case, Stephen H., Some Confirmed Chapter 11 Plans Fail, So What?, 47 B.C. L. Rev. 59 (2005), http://lawdigitalcommons.bc.edu/bclr/vol47/iss1/4.

In summary, the Standard we have defined includes both quantitative and qualitative assessments of feasibility, including a risk assessment measured against a time horizon and allows for a reasonable range of values within the projections. This Standard is the backdrop against which the remainder of this Report should be read.

enterprises - and as a government – as measured by its inability to deliver essential services.  Having spent a large amount of time in Detroit since my appointment, my interaction with citizens, City employees and stakeholders in the bankruptcy have influenced my view of both the in-court restructuring and the out-of-court work that is equally important to Detroit's ability to effectuate its POA.

The Plan of Adjustment

Even after many years of practice with dysfunctional, insolvent, operationally troubled enterprises, I was confused by the City's projections in POA.  Section E of this Report provides detail on how the projections and RRIs are structured.  Suffice it to say that the "10 Yr projections", the "10 Yr/40 Yr projections," and the "Restructuring and Reinvestments Initiatives" form an unusual construct for a financial plan for an enterprise attempting to emerge from bankruptcy. The baseline projections ("10 Yr projection, Exhibit J to the Disclosure Statement) were prepared in June 2013 to show what would happen to the City without a restructuring, which they did very well.  The "10 Yr/40 Yr projection" (Exhibit K in the Disclosure Statement) expands the baseline, steady state projection for the 40 Yr time horizon of the POA.  Then, in order to begin to understand how the restructured Detroit might operate – delivering services and paying creditors – one must factor in the RRIs

25

contained in Exhibit J to the Disclosure Statement. This is convoluted and contributes to the feelings amongst many creditors in this case that the financial projections in the POA are a "black box" and that it was the City's intent to obfuscate important information. I choose to believe that is was simply an unfortunate result of two advisory firms sharing responsibilities[18] rather than one firm "owning" the financial projections start to finish, as is, and should be, the norm.

The City's Plan of Adjustment is primarily limited to a "balance sheet" restructuring, as chapter 11 veterans would characterize it, and it includes only some of the City's operations. This is loosely analogous to a company that files a bankruptcy for the parent company and some, but not all, of the subsidiaries. The chapter 9 proceeding has been overwhelmingly focused on deleveraging the City for the long term, reducing future obligations. That is good. However, the operational restructuring that often occurs with commercial reorganizations will be left largely to Mayor Duggan and his managers for the post confirmation period. That is

_____

[18]Ernst & Young, originally retained by the City of Detroit in May 2011, and Conway MacKenzie, originally retained by the City of Detroit in January 2013, have served the City post-petition in a collaborative arrangement. Each firm has taken responsibility for certain aspects of typical debtor "financial advisory" services and the firms work well together. No comments herein should be construed as criticism of this collaboration; rather, I believe it would have been preferable for a single firm to have prepared a single, integrated financial projection for the POA.

26

unfortunate but is understandable given the speed with which this bankruptcy has occurred and the Emergency Manager's priorities during his similarly short tenure.

Readers of the POA should view the Plan projections as a "sources and uses" statement which describes cash available to fund delivery of some of the services the City provides and certain payments to creditors. As such, these projections are useful only for purposes of confirming the POA (or not, as the case may be) and directionally providing guidance for the City to plan its finances going forward for those operations that are addressed in the POA. It is important to understand that the POA projections are not a business plan for the City. They are not the City's budget. They are not the "financial plan" referenced in Public Acts 181 and 182 of 2014, also referred to as the "Grand Bargain" legislation.

The confusion about the projections in the POA and these other financial plans is evident within the City including its employees, amongst the media and the stakeholders. The projections in the POA have not been harmonized with the City's budget that was passed by the City Council on June 5, 2014. As such, any funding of the RRIs will require first identification of a funding source, and then approval by the CFO and Mayor, and finally, approval by the City Council of a budget amendment to support the appropriations. Although the City has many financial reporting priorities, it is highly advisable that the budget department amend the

27

approved June budget for the numerous anticipated changes post confirmation, harmonizing the current headcounts and spending levels with the RRIs that the City intends to execute in the coming year, and submit a new budget to the City Council for approval.

The sooner the City can divorce itself from the confusion created by the POA projections, the better. The City needs a multi-year Business Plan which can act as a single financial and operational plan, including all departments and enterprise activities (of which an amended budget would be a part) as well as capital plans that can be publicly communicated and compared to actual performance. A "bridge" should be prepared which identifies the components of the POA projections that are included in the City's Business Plan and then the POA projections can be archived.

Another confusion I believe exists in the POA is the investment plan for infrastructure and service delivery improvements that are required to revitalize the City. Those funds will necessarily come from reducing costs of existing service delivery either through efficiency improvements or elimination of activities. The media has created the impression that the City's investment of more than $1 billion over the course of the coming years is a "given". This is incorrect. There is no funding source for these investments, including blight removal, other than the Exit

estimate that appears reasonable when compared to the state and national forecasts highlighted below. The income growth forecast for corporations is 1.63% and is conservative relative to the State forecast. The Michigan Senate Fiscal Agency assumed an average 2.65% wage growth rate for Detroit which is reflective of the average state forecast of 3.65% reduced by a 1% structural adjustment for the City of Detroit.

## Employment Growth (without RRIs)

The annual employment rate of City residents is forecasted to decline by 0.4% for the FY2014-FY2023 period. Non-residents' average annual employment is estimated to decrease by 0.07% for this time period. As was the case with forecasted wage growth, the employment growth assumptions seem reasonable when compared to the recent actual employment growth for the entire City of Detroit over the last three fiscal years which averaged 0.4%.

## 10 Year Plan – Municipal Income Tax (Without RRIs)
## Taxable Income Growth Metrics

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Average/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City Residents (A)** | | | | | | | | | | | |
| Wage Growth | 2.53% | 2.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | **1.25%** |
| Employment Growth | -0.59% | -0.55% | -0.54% | -0.54% | -0.54% | -0.54% | -0.35% | -0.35% | 0.00% | 0.00% | **-0.40%** |
| **Taxable income growth** | **1.94%** | **1.45%** | **0.46%** | **0.46%** | **0.46%** | **0.46%** | **0.65%** | **0.65%** | **1.00%** | **1.00%** | **0.85%** |
| | | | | | | | | | | | |
| **Non-Residents (B)** | | | | | | | | | | | |
| Wage Growth | 2.53% | 2.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | **1.25%** |
| Employment Growth | -0.30% | -0.30% | -0.30% | -0.30% | -0.30% | -0.31% | -0.50% | 0.19% | 0.69% | 0.69% | **-0.07%** |
| **Taxable income growth** | **2.23%** | **1.70%** | **0.70%** | **0.70%** | **0.70%** | **0.69%** | **0.50%** | **1.19%** | **1.69%** | **1.69%** | **1.18%** |
| | | | | | | | | | | | |
| **Corporations (C)** | | | | | | | | | | | |
| State CIT forecast (SFA est. May 2013) | 3.80% | 5.70% | 5.00% | 4.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | **3.65%** |
| Detroit structural adjust. | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | **-1.00%** |
| **Net growth rate** | **2.80%** | **4.70%** | **4.00%** | **3.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.65%** |
| | | | | | | | | | | | |
| **Assumed Forecast Growth Rate** | **2.34%** | **2.50%** | **2.00%** | **2.00%** | **2.00%** | **1.50%** | **1.00%** | **1.00%** | **1.00%** | **1.00%** | **1.63%** |

## 10 Yr Plan with RRIs

The 10 Yr projections forecast annual municipal tax income through the estimation of the year-over-year ("YoY") growth in taxable income for the following subsections:

- City residents
  - Average annual YoY taxable income growth: 2.32%
  - Income tax rate: 2.4%
  - FY2014-FY2023 City resident income taxes: $1,693 million
- Non-residents
  - Average annual YoY taxable income growth: 2.37%
  - Income tax rate: 1.2%
  - FY2014-FY2023 non-resident income taxes: $817 million
- Corporations
  - Average annual YoY taxable income growth: 2.65%
  - Income tax rate: 2.0%
  - FY2014-FY2023 corporations income taxes: $260 million

Due primarily to the more optimistic City residents' taxable income growth assumptions in the "With Reinvestment Initiatives" scenario, the latter scenario

assumes an additional $204 million in municipal income tax revenue in the 2014-2023 time period.  A Sensitivity Analysis is provided below to gauge the impact of the City's actual results materially deviating from the 10 Yr Plan's forecast.

## 10 Year Plan – Municipal Income Tax (With RRIs)

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Average/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City Residents (A)** | | | | | | | | | | | |
| Taxable income growth | 2.57% | 3.17% | 2.25% | 2.19% | 2.15% | 2.16% | 2.18% | 2.18% | 2.18% | 2.18% | **2.32%** |
| Taxable income | $ 6,332.7 | $ 6,533.4 | $ 6,680.7 | $ 6,827.2 | $ 6,974.0 | $ 7,124.5 | $ 7,279.5 | $ 7,437.9 | $ 7,599.7 | $ 7,765.0 | $ 70,554.5 |
| Income tax rate | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | |
| Total City Resident income taxes | 152.0 | 156.8 | 160.3 | 163.9 | 167.4 | 171.0 | 174.7 | 178.5 | 182.4 | 186.4 | 1,693.3 |
| **Non-Residents (B)** | | | | | | | | | | | |
| Taxable income growth | 2.91% | 3.29% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | **2.37%** |
| Taxable income | $ 6,105.4 | $ 6,306.5 | $ 6,444.0 | $ 6,584.5 | $ 6,728.0 | $ 6,874.7 | $ 7,024.6 | $ 7,177.7 | $ 7,334.2 | $ 7,494.1 | $ 68,073.8 |
| Income tax rate | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | |
| Total Non-Resident income taxes | 73.3 | 75.7 | 77.3 | 79.0 | 80.7 | 82.5 | 84.3 | 86.1 | 88.0 | 89.9 | $ 816.9 |
| **Corporations (C)** | | | | | | | | | | | |
| Net tax collection growth | 2.80% | 4.70% | 4.00% | 3.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | **2.65%** |
| Taxable income (implied) | $ 1,133.4 | $ 1,186.6 | $ 1,234.1 | $ 1,271.1 | $ 1,296.5 | $ 1,322.5 | $ 1,348.9 | $ 1,375.9 | $ 1,403.4 | $ 1,431.5 | $ 13,004.0 |
| Corporate tax rate | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | |
| Net tax collections | 22.7 | 23.7 | 24.7 | 25.4 | 25.9 | 26.4 | 27.0 | 27.5 | 28.1 | 28.6 | $ 260.1 |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | |
| Taxable income | $13,571.4 | $14,026.5 | $14,358.7 | $14,682.8 | $14,998.6 | $15,321.7 | $15,653.0 | $15,991.5 | $16,337.3 | $16,690.6 | $ 151,632.2 |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | **1.8%** |
| Total Municipal income taxes | 247.9 | 256.2 | 262.3 | 268.3 | 274.0 | 279.9 | 286.0 | 292.2 | 298.5 | 304.9 | $ 2,770.3 |
| **Adjustment Municipal income taxes** | | | | | | | | | | | |
| Adjustment for actuals | - | - | - | - | - | - | - | - | - | - | $ - |
| **Total Adjusted Municipal income taxes** | **247.9** | **256.2** | **262.3** | **268.3** | **274.0** | **279.9** | **286.0** | **292.2** | **298.5** | **304.9** | **2,770.3** |

## Wage Growth (with RRIs)

The 10 Yr projections estimate – for both the City residents and nonresident categories – an average wage growth of 2.16% for the FY2014-2023 period, or

Statutory Payments

The State's EVIP funds are appropriated annually by the State Legislature and therefore carry more inherent risk than the mandated State constitutional payments. The EVIP funds are allocated per the following categories:

- Category 1 – Accountability and Transparency
  - Each municipality is required by October 1st to produce a citizen's guide of its most recent local finances, including a recognition of unfunded liabilities, a performance dashboard, a debt service report, and a project budget report
- Category 2 – Consolidation of Services
  - Each municipality is required by February 1st to produce a service consolidation plan that is submitted to the Michigan Department of the Treasury; including details of service cooperation, consolidations, and privatizations with estimated cost savings
- Category 3 – Unfunded Accrual Liability Plan
  - Each municipality with unfunded accrual liabilities is required by June 1st to produce a plan to lower all such unfunded accrual liabilities; detailing previous actions taken and a go forward plan of existing and new initiatives

The 10 Yr projections assume that the City continues to receive 100% of its possible State allocation, or approximately $140 million annually for the entire FY2014-2023 time period.

Sensitivity Analysis

The following analysis illustrates the incremental impact to the City if State Revenue Sharing deviates from the assumptions in the 10 Yr forecast. The analysis

below estimates the impact of a 5% change in the 2020 Census forecasted population and a 5% change in the statutory payment allocation. Because the constitutional payment is based on the 2010 Census figure through FY2021, the impact of a 5% population change would only be realized in FY2022 and FY2023. For the statutory payment, a 5% change in the allocation would have a cumulative impact of $70 million to the General Fund during the FY2014-2023 period.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **For Every 5% Change in Applicable State Revenue Sharing Metric** | | | | | | | | | | | |
| Constitutional Payment | - | - | - | - | - | - | - | - | 3.0 | 3.0 | $ 6.0 |
| Statutory Payment | 6.8 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | $ 70.0 |
| **Total State Revenue Sharing** | $ 6.8 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 10.0 | $ 10.1 | $ 76.0 |

The City of Detroit recently saw its portion of State's revenue sharing decrease significantly, from a combined annual total of $267 million in FY2009 to as low as $173 million in FY2012. While the State's revenue sharing to Detroit has increased in FY2013 and FY2014, the City remains susceptible to decreases in revenue sharing should the State's budget position change.

Wagering Taxes

The City of Detroit, per the Michigan Gaming Control and Revenue Act, is authorized to impose a 10.9% wagering tax on casinos operating within the City. In addition, the City collects other fees from the casinos in the City based on operating

agreements with each.   Wagering tax revenues are forecasted to account for 17% of General Fund revenue in the FY2014-2023 period.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Wagering Taxes Drivers** | | | | | | | | | | | |
| % Change in Gross Receipts | -2.5% | -1.0% | 0.5% | 0.5% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 0.3% |
| **Wagering Taxes Calculation** | | | | | | | | | | | |
| Adjusted Gross Receipts (A) | | | | | | | | | | | |
| MGM | $ 565.4 | $ 559.7 | $ 562.5 | $ 565.3 | $ 571.0 | $ 576.7 | $ 582.5 | $ 588.3 | $ 594.2 | $ 600.1 | $ 5,765.8 |
| Motorcity | 445.6 | 441.2 | 443.4 | 445.6 | 450.0 | 454.5 | 459.1 | 463.7 | 468.3 | 473.0 | $ 4,544.4 |
| Greektown | 331.6 | 328.3 | 329.9 | 331.6 | 334.9 | 338.2 | 341.6 | 345.0 | 348.5 | 352.0 | $ 3,381.7 |
| | $ 1,342.6 | $ 1,329.2 | $ 1,335.8 | $ 1,342.5 | $ 1,355.9 | $ 1,369.5 | $ 1,383.2 | $ 1,397.0 | $ 1,411.0 | $ 1,425.1 | $ 13,691.8 |
| **Wagering Tax Rate (B)** | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | |
| **Additional Payment (per 2006 operating agreement)** | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | |
| **Subtotal Wagering Tax (D) = (A)*(B+C)** | | | | | | | | | | | |
| MGM | 67.3 | 66.6 | 66.9 | 67.3 | 67.9 | 68.6 | 69.3 | 70.0 | 70.7 | 71.4 | $ 686.1 |
| Motorcity | 53.0 | 52.5 | 52.8 | 53.0 | 53.6 | 54.1 | 54.6 | 55.2 | 55.7 | 56.3 | $ 540.8 |
| Greektown | 39.5 | 39.1 | 39.3 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | $ 402.4 |
| **Revenue Target Supplemental Wagering Tax (E)** | | | | | | | | | | | |
| MGM | 5.7 | 5.6 | 5.6 | 5.7 | 5.7 | 5.8 | 5.8 | 5.9 | 6.0 | 6.0 | $ 57.8 |
| Motorcity | 4.5 | 4.4 | 4.4 | 4.5 | 4.5 | 4.6 | 4.6 | 4.6 | 4.7 | 4.7 | $ 45.5 |
| Greektown | - | - | - | - | - | - | - | - | - | - | $ - |
| **Total Wagering Tax (F) = (D+E)** | | | | | | | | | | | |
| MGM | 72.9 | 72.2 | 72.6 | 72.9 | 73.7 | 74.4 | 75.1 | 75.9 | 76.7 | 77.4 | $ 743.9 |
| Motorcity | 57.5 | 56.9 | 57.2 | 57.5 | 58.1 | 58.6 | 59.2 | 59.8 | 60.4 | 61.0 | $ 586.3 |
| Greektown | 39.5 | 39.1 | 39.3 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | $ 402.4 |
| Total Wagering Tax | 169.9 | 168.2 | 169.0 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.6 | 180.3 | $ 1,732.6 |

As a result of the wagering tax rate (10.9%) and the additional 2006 tax rate (1.0%) being held constant, the key assumption in the 10 Yr forecast is the annual percentage change in casino gross receipts.   The Detroit casinos have experienced increasing competition recently due to the openings of casinos in Cleveland and Toledo, Ohio resulting in declining wagering tax revenues for the City.   The 10 Yr projections assume a 2.5% YoY decline in FY2014, a 1.0% decline in FY2015, a 0.5% annual increase in FY2016 and FY2017, and a 1.0% annual increase in FY2018-2023.

Whenever contemporaneous financial information is required, the City has no choice but to rely on the incomplete and unreliable financial data from the G/L system. As such, external reports such as the Emergency Manager's reports to Financial Advisory Board contain necessary disclaimers such as:

> "The revenues and expenditures report includes entries that have not been posted in the general ledger and encumbrances. This manner of presentation provides the most up to date data on revenues and expenditures. Unposted entries are preliminary and subject to review before they are finalized; therefore, actual results will likely be different from the preliminary results presented herein, and those differences may be material."[40]

Potential Plan Implications

Beyond financial reporting, the efficient and controlled execution of the accounting and finance functions are essential to achieving the financial initiatives set forth in the Plan. Some of the most important assumptions in the POA depend on improving the accounting and finance function within the City. For example:

- Municipal Income Taxes: the City processes and audits income tax returns, and collects income tax revenues which account for 25% of the City's revenue in FY2014-2023
- Purchasing: the City's purchasing function manages the City's contracts for all commodities and services which are forecasted to total $3 billion in the next ten years
- Property Taxes: The assessor's office creates the tax rolls used to invoice citizens and commercial customers for real estate taxes which are estimated to account for 9% of the City's revenue in FY2014-2023 and the Treasury department is responsible for the billing and collection function

---

[40] Emergency Manager's report

- Grants: Grant funding is expected to increase in the City going forward. In fact, there are additional opportunities for the City to acquire grants if it can responsibly manage and account for them. The City has failed to properly account for and manage grants in the past which has led to improperly spent funds. The City can benefit by tens of millions of dollars if this process is improved

The diminished capacity of these finance departments to execute their basic functions is a result of attrition and an historic failure to invest in people and systems. If the City does not build internal capacity in its finance and accounting functions in a timely fashion, it could threaten the execution of the POA.

Information Technology

The City, as detailed in the Plan, is addressing its system issues with a number of major initiatives funded as part of the RRIs. These IT-related initiatives include:

- $29 million related to a new Enterprise Resource Planning ("ERP") system, which includes both the installation and annual maintenance to improve the City's financial processes and reporting.
- $11.7 million related to City-wide hardware upgrades.
- $10.9 million related to Data Back Up centers.
- $10.4 million related to the City-wide installation of Microsoft 365.
- $5.2 million related to the implementation of City Tax.

While the IT department expects to spend almost $85 million on restructuring initiatives over the next 10 years, the total investment in IT related expenses by the City is upwards of $150 million. It should be noted that this figure does not include

a budget of $3 million for the implementation of a replacement payroll system, which is included in E&Y's base line financial projections. We believe the City would benefit with a more centralized control over all IT related investments. The following chart details the significant IT-related restructuring initiatives out of each of the departmental RRIs:

| IT and Infrastructure | Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ERP System | Finance | $ - | $ 7.4 | $ 10.3 | $ 9.0 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 29.0 |
| Replacement of Radios | Police | $ - | $ 7.5 | $ 7.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 22.0 |
| Implementation of Integrated Public Safety System | Police | $ - | $ 4.5 | $ 2.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 13.8 |
| Hardware Upgrade | Finance | $ - | $ 1.5 | $ 2.0 | $ 2.0 | $ 1.2 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 11.7 |
| Data Back Up Center | Finance | $ - | $ - | $ 4.9 | $ 2.4 | $ 0.2 | $ 0.2 | $ 2.7 | $ 0.2 | $ 0.2 | $ 0.2 | $ 10.9 |
| Microsoft Application Department - 365 Cloud (Net of Savings) | Finance | $ - | $ 1.3 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 10.4 |
| 311 System | Ombudsperson | $ - | $ - | $ 3.0 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 7.0 |
| Document Imaging and Management System | Finance | $ - | $ 3.0 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 5.4 |
| Implementation of City Tax | Finance | $ 0.1 | $ 1.7 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 5.2 |
| Upgrades to 36th District Court Technology | Non Departmental | $ - | $ 1.6 | $ 0.8 | $ 0.4 | $ 0.4 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 4.2 |
| Citywide Network Infrastructure | Finance | $ - | $ 2.0 | $ - | $ - | $ 1.1 | $ - | $ - | $ 1.1 | $ - | $ - | $ 4.2 |
| Security Access System to Building | Finance | $ - | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 3.8 |
| Workbrain Upgrades | Finance | $ 1.1 | $ - | $ - | $ - | $ 1.2 | $ - | $ - | $ - | $ 1.3 | $ - | $ 3.6 |
| Fire Vehicle Technology Upgrade | Fire | $ - | $ 0.7 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.2 |
| Helpdesk Software | Finance | $ - | $ 1.6 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.0 |
| Active Directory Service Migration | Finance | $ - | $ 1.3 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.0 |
| Cashiering Controls | Finance | $ - | $ 1.4 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.4 |
| HR Learning Center and Implementation | HR | $ - | $ 0.5 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 1.3 |
| Operating System Upgrade | Finance | $ - | $ 1.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.0 |
| SQL Server Update | Finance | $ - | $ 0.2 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 |
| All Other | Various | $ 1.9 | $ 3.6 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.7 | $ 0.5 | $ 0.5 | $ 9.8 |
| **Total IT and Infrastructure** | | **$ 3.1** | **$ 41.3** | **$ 34.4** | **$ 19.6** | **$ 10.1** | **$ 7.4** | **$ 10.7** | **$ 8.8** | **$ 8.8** | **$ 7.5** | **$ 151.7** |

These initiatives are a significant investment and present an opportunity for the City to improve services and functionality throughout its operations. However, to enhance the City's ability to execute the proposals within the POA, the City will need to manage the execution of the IT initiatives at the most senior level in the City and make sure that it reacts to any material deviations - from cost or timeline - in the implementations.

According to CFO John Hill, the City's strategy to correct this catastrophic decline in essential finance, accounting and IT services has three major components:

whether the swap insurers have the right to prevent the City from gaining access to its wagering tax revenues (<u>City of Detroit, Michigan v. Syncora Guarantee Inc. et al.</u>, Adv. Proc. No. 13-04942)[79], and 2) whether the swap counterparties had the "standing" to enter into the FOTA without the swap insurers' consent.  On the first issue, the District Court – in a July 14, 2014 decision - ruled the swap insurers did not have the right to trap the City's wagering tax revenues.  That decision, as well as the ruling on the swap counterparties authority to execute the FOTA without the swap insurers' consent, will thus be decided by the Sixth Circuit Court of Appeals.  To the degree the insurers' appeal is successful, any clarity of the City's financial exposure to a potential swap termination payment would be lost and would possibly result in the future restricted access to some portion of the vital Casino revenues.

Collective Bargaining Agreements

The City of Detroit, throughout this bankruptcy process, has been negotiating to reach CBAs with its various labor unions representing the City employees.   A total of 47 labor unions represent the City's employees, all of which had their CBAs

---

[79] Quarterly Report with Respect to the Financial Condition of the City of Detroit; Office of the Emergency Manager; dated April 15, 2014.

expire as of June 30, 2013. The City's employees have been subject to City Employment Terms ("CETs") since the expiration of the respective CBAs. The City estimates that the CETs have resulted in more than $200 million of annualized labor savings.

The City has negotiated many new CBAs with the goal of having them mirror the effective terms of the CETs. Phoenix has recently received the majority of negotiated CBAs, some of which have been fully approved by the State of Michigan, and some of which have been ratified but await the State's approval. Due to the timing of when Phoenix received these CBAs relative to our Report deadline, we have not fully reviewed each of these CBAs. To the degree that the final, agreed-upon terms of the respective CBAs contain aspects that are costlier to the City than the current CETs or contemplated in the projections, the City's liquidity could be negatively impacted. I am further concerned that the newly negotiated CBAs may not have sufficiently addressed the City's historic work rule issues.[80]

---

[80] I have received assurance from City advisors that all agreed-upon CBAs are included in the projections.

Potential Asset Sales

Concurrent with the City's bankruptcy process, the City and its representatives have been in discussions with multiple constituencies in efforts to ascertain the optimal utilization of certain assets of the City of Detroit, whether that may be the outright sale of certain assets or the proposed leasing and/or partnership of non-core City assets.

The City has been engaged in longstanding discussions pertaining to the Detroit Water and Sewerage Department ("DWSD") with the surrounding counties with regards to the potential formation of a regional water authority. It is conceivable that a new authority could assume operating control of the majority of DWSD assets. To date, the City has not able to reach an agreement on any disposition of the DWSD assets and, as such, the discussions have migrated to bankruptcy-ordered mediation.

In addition to a possible disposition of the DWSD assets, the City has also inquired with interested parties about the possibility of a public-private partnership. Such partnership would entail the operation and management of the DWSD by qualified candidates who have demonstrated the financial and operational capabilities required to execute the DWSD's operations.

The City, via its Auto Parking System ("APS"), owns and manages seven parking garages containing 6,793 spaces and controls roughly 3,400 on-street metered parking spaces. At the request of the City, Miller Buckfire & Co. has been tasked with exploring the potential monetization of the City's parking assets. At this time, no definitive decisions have been made by the City regarding these assets.

Lastly, options related to the City's Coleman A. Young Airport are currently being considered, specifically a possible sale or lease transaction. As the airport is currently a cash drain on the City's budget, the transfer of this asset could be beneficial to the City's overall liquidity.

Exit Financing

The City of Detroit is seeking to enter into a $300 million financing facility ("Exit Facility"), commensurate with the City's anticipated emergence from bankruptcy. Per the POA, an estimated $120 million of the Exit Facility will be used to refinance the City's existing, previously-funded Quality of Life loan. The balance of the Exit Facility is intended to provide the City with liquidity and begin to fund the POA's restructuring initiatives.

## Section O - Other Risks and Opportunities

The POA and the projections that support the POA have been developed by the City to provide a reasonable forecast and represent a realistic picture of the City's General Fund.[81]  Based upon my team's analysis and numerous discussions with the City's advisors, I understand these projections were not developed either to: 1) account for every opportunity the City may have to generate cash flow in the future, or 2) account for every possible downside risk associated with a loss of revenue or an increase to expenses.  While I do not disagree with the City's exclusion of certain items, I believe it appropriate to briefly summarize certain risks and opportunities not fully explored elsewhere in this Report.

---

[81] Report of Gaurav Malhotra in re City of Detroit, Michigan 13-53846, page 3, "These projected revenues and expenditures are reasonable forecasts and represent a realistic picture of the City's General Fund's ability to afford its expenditures and satisfy its obligations under the plan while maintaining an adequate level of municipal services."

## Macro-Economic Issues

I believe the City's economic forecasts that informed the projections considered normalized economic conditions. I do not believe the City's projections accounted for any significant economic disruptions similar to those experienced recently during the Great Recession. Depending on the severity, longevity and the direct impact on urban centers, a long term and negative economic condition could cause serious concerns with meeting the Plan requirements.

## State and Federal Funding

The POA relies on a number of external funding sources including the State of Michigan and to a lesser extent the Federal government. The State contributes through annual revenue sharing totaling almost $2 billion over the first 10 years of the Plan as well as $194 million as part of the Grand Bargain. Any additional support for Detroit at the State level is not committed and, in fact, revenue sharing could decrease over the life of the Plan.

There is obvious interest by the Mayor in identifying new and recurring support from the Federal government and other grant making bodies. The Plan projections have tended to apply conservative assumptions to the current grants and the availability of additional grants in the future, although it is clear that not all grants

assumed in the projections are committed at this time. Any increase in direct Federal support or grants will help to make the projections more achievable.

Impact of Private Parties

Third party funders have made significant commitments to the City. In fact, the Grand Bargain represents a huge commitment by these City benefactors and is already accounted for in the projections. However, there are a lot of small ways that third party benefactors may directly and indirectly impact the future of the City. The work of the Blight Task Force and the Future Cities Initiative are an example of this and cannot be measured in dollars. There would also be an improvement in the feasibility of the POA if a surge in private investment favorably impacts real estate values, employment and other factors that could contribute favorably to the initiatives in the Plan.

There is a downside to third party involvement as well. It can be fickle; a change in priorities or fortune could reduce the level of funding or delay it. The POA calls for $366 million from charities and foundations plus an additional $100 million to be raised by the DIA Corporation as part of the Grand Bargain which will be paid over a 20 year period. Failure of these foundations or benefactors to execute

In addition, I believe it is likely that the City will desire or require access to the capital markets in the future for potentially many different reasons. Mr. Buckfire believes the significant changes as a result of the POA and the State of Michigan's steps to remedy governance will allow the City to again access the capital markets. [84] The City's inability to access the capital markets beyond the Exit Financing may limit the City's working capital flexibility and its ability to respond to future, necessary changes in delivery of essential services or capital investments.

DWSD

Detroit Water and Sewerage Department is a significant portion of the City's operations, however, it has very little impact on the General Fund. DWSD largely operates independently from other City business units. While DSWD's debt is impacted by the POA, the DWSD operations are not included in the Plan. DWSD does play a significant role in funding the City's pension obligations during the forecast period[85]. In the event of a significant disruption to the DWSD operations, significant loss of customers impairing its financial prospects, or in the event that

---

[84] Expert Report of Kenneth Buckfire in Support of the City of Detroit's Plan of Adjustment in re City of Detroit, Michigan 13-53846 pages 3-5 Sections 3-6.

[85] DWSD is expected to contribute a total of $428 million from FY2015-FY2023.

the DWSD contributions are not made according the POA, this could negatively impact on the outcome of the POA.

Sale of Assets

The POA largely excludes the sale of assets. While the sale of certain assets will have established treatment in the POA, there are significant asset sales that are not contemplated in the POA that could positively impact the projections. These assets might include parking related assets and other real estate. I have no visibility into the value of potential asset sales, but I believe they could produce cash which could improve the City's liquidity or revitalization prospects.

Tipping Point

The concept of the Tipping Point was made popular by author Malcolm Gladwell. He characterizes the tipping point as a moment of critical mass or boiling point where a group of small actions hit a threshold point and create an outsized impact. [86] A tipping point can be either positive or negative. Presently, the City has

---

[86] The Tipping Point by Malcolm Gladwell, 2000 published by Little Brown.

momentum and emotional optimism that it can build upon to energize its revitalization. There is no way to stochastically identify this impact and I do not believe the City has included this optimism in its projections. But there is no doubt that it is real.

I believe the City may be experiencing a tipping point that could be either positive or negative. There is a lot of press about support for the City from external parties making significant investment in Detroit. Press accounts suggest percolating interest in real estate and low availability of market rate apartments in small sections of the City. The City is addressing in small ways the quality of life issues, including street lights and blight.

It is beginning to feel like it could be an exciting time to be in Detroit. Tipping points also work in the opposite direction. If the momentum starts to slow in lots of small ways, or if the headlines change from investors buying, to investors selling, or if blight remediation reverses direction, the City could tip backwards. It is a critical point in time for the City of Detroit. My opinion is that it is more likely to tip forward than to tip backwards.

## Section P - Conclusions

As noted in the Feasibility Section of this Report, I, along with the Phoenix team, have proffered the following Feasibility Standard for use in determining whether the City of Detroit's Plan of Adjustment is feasible:

> *'Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default*?'

We have further qualified the Standard into two components:

Quantitative

- Are the projections contained in the POA mathematically correct and materially reasonable?
- Are the assumptions that the City has used to develop its projections individually, and when taken as a group, reasonable?
- Is there an adequate contingency included in the projections?

Qualitative

- Does the City have the human resources, or can it likely recruit the human resources, required to meet its obligations under the POA?

- Does the City have the appropriate systems and procedures to monitor its financial performance and to provide early warning signs of variances in performance that might cause the City to fall short of the projections and be unable to meet its obligations under the POA?
- Are there appropriate structures to ensure the City's compliance with the POA and with reasonable government standards of operation?
- Will the City be able to reasonably deliver a minimum level of municipal services?
- Is the City's trajectory sustainable?

The Quantitative Issues

It is my opinion that, except where otherwise noted in my Report, the projections are generally mathematically correct and materially reasonably and therefore fall within the Feasibility Standard I have defined.

It is my opinion that, except where otherwise noted in my Report, the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard.

While I have noted issues with the level of contingency in the projections, and feel this must be addressed both as a practical matter and in response to Public Acts 181 and 182 of 2014 controlling law, I believe that there are enough conservative assumptions in the projections to offset what I view as an aggressive assumption