# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S OBJECTION TO THE CITY'S MOTION TO STRIKE

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

FACTUAL BACKGROUND ..........................................................................4

ARGUMENT .............................................................................................9

I.  The City Has Not Met—and Cannot Meet—the Standard Under
    Rule 12(f) for the Relief it Seeks..................................................12

II. Contrary to the City's Suggestions to the Court, Syncora's Second
    Supplemental Objection Does Not Warrant Sanctions. .........................15

    A.  Neither Syncora nor its attorneys violated Bankruptcy Rule
        9011(b) in filing the Second Supplemental Objection........................17

    B.  Syncora's Second Supplemental Objection does not run afoul
        of Judicial Code Section 1927.............................................19

III. While Mrs. Driker's Service as a DIA Board Member Alone Does
     not Present a Conflict of Interest, once Mr. Driker became
     involved in the negotiations surrounding the Grand Bargain, a
     Clear Conflict of Interest Arose. ...............................................20

IV. Syncora Had No Duty to Alert Mr. Driker to his Conflict of
    Interest. ...........................................................................23

V.  Because Syncora Has Been Precluded from Discovering Facts
    Surrounding the Mediation, its Objections to the Grand Bargain
    are Timely..........................................................................26

VI. If the Court Considers Sanctioning Syncora, It Should Be Entitled
    to Discovery to Defend Itself.....................................................29

CONCLUSION...........................................................................................29

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (together, "Syncora") submit this objection (this "Objection") to the *City of Detroit's Motion to Strike in Part Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Plan of Adjustment* [Docket No. 6845] (the "Motion") and any joinders and statements related thereto and concurrences therewith.[1]  In support of its Objection, Syncora respectfully states as follows:

## PRELIMINARY STATEMENT

1.       Syncora's Second Supplemental Objection obviously touched a very sensitive nerve.  As well it should have.  The regrettable manner in which the mediation process slipped the bounds of propriety and became a delivery vehicle for a biased and untenable Plan goes directly to the issue of good faith.  Seen in the light of day, the tainted mediation process poses an existential threat to the Plan, itself already in intensive care.

---

[1]       Capitalized terms used but not otherwise defined in this Objection have the meanings given to them in the *Sixth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6908] (including all exhibits and attachments thereto, and as may be further amended or modified, the "Plan"), *Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Plan of Adjustment* [Docket No. 6651] (the "Second Supplemental Objection"), or the City's Motion, as applicable.

1

2. Rather than engage on the substance, the City chose instead to pump up the volume in histrionic fashion and, in doing so, sought to divert attention from the central issues.

3. *First*, the fact that Mr. Driker's wife sits on the board of the DIA is not inherently a conflict, and Syncora has not asserted otherwise. But the fact that Mr. Driker subsequently moved front and center to conceiving, negotiating, and soliciting contributions from foundations for the Grand Bargain is both contrary to the limited and specific role assigned to Mr. Driker at the outset of the mediation process and absolutely disabling. A conflicts analysis for mediators (no less than for lawyers) is a dynamic process, rather than a static one.

4. *Second*, the fact that the Grand Bargain was announced prior to the filing of Syncora's Initial Plan Objection ignores all that has since leaked out of the mediation bunker. Namely, we now know the Grand Bargain reflected the personal policy preferences of the mediators to protect the pension systems and the Museum Assets at the expense of other financial creditors. As the chronology set forth herein makes clear, the complete absence of transparency around how the Grand Bargain came to be made it not merely difficult—but impossible—for Syncora to raise the good-faith challenge in its Initial Plan Objection, as good faith directly goes to state of mind. Had it done so, the City would no doubt have made the same dark allusions to Rule 11 and 28 U.S.C. § 1927 as it has inappropriately

2

done so here. Only in that circumstance, the City would have alleged—with some justification—that Syncora had not done a sufficient pre-filing investigation before making what all agree are weighty assertions. It is only because of the recent public statements of the mediators and certain participants in the Grand Bargain—likely in violation of this Court's mediation order—that Syncora has first been able to begin to connect the dots. Most of what led up to the Grand Bargain remains completely shrouded in secrecy, thanks in no small part to the countless invocations of the Mediation Order by every City witness present at the creation.

5. ***Third***, in the same vein, the fraudulent conveyance argument advanced by Syncora in its Second Supplemental Objection would not have been available when it filed its Initial Plan Objection. Stymied by the Debtor at every turn in attempting to market test the value of the art collection, Syncora and FGIC commissioned independent valuations. Indeed the City, in recognition of one of the many holes in its case-in-chief, did the same. All of those valuations were completed long after Syncora's Initial Plan Objection was filed, and they revealed the jaw-dropping, multi-billion-dollar gulf between the value of the art collection and the earmarked proceeds of the Grand Bargain. That information coupled with the public statements of the mediation participants and mediators in recent months make manifest—what was previously latent—the intent from the very beginning of the mediation process to hinder and delay the City's creditors.

6.     The City's other arguments do not even purport to be relevant to a motion to strike but are simply an opportunity for the City to preview some of its arguments.  So be it.  That is what trials are for.  As for the Motion, it takes the low road to nowhere and must be denied.

## FACTUAL BACKGROUND

7.     The City claims that Syncora's Second Supplemental Objection is characterized by "distortions, half-truths, and outright falsehoods."[2]  In an attempt to cut through the rhetoric and clarify the record before the Court, what follows is a a chronology of the facts and events relevant to the City's Motion and this Objection:

- August 13, 2013:  The Court enters an order establishing certain procedures for facilitative mediation of disputes in the Chapter 9 Case and appointing Chief District Judge Gerald Rosen as the lead mediator.[3]

- August 16, 2013:  The Court enters an order referring the following matters to mediation:  (a) "[t]he treatment of the claims of the various creditor classes in a plan of adjustment," and (b) "[t]he negotiation and renegotiation of collective bargaining agreements."[4]  There is no mention of the Museum Assets or the DIA in the Court's order.

---

[2]   Mot. 1.

[3]   *Mediation Order* [Docket No. 322].

[4]   *First Order Referring Matters to Facilitative Mediation* [Docket No. 333].

4

- <u>August 20, 2013</u>:  Judge Rosen enters an order requiring certain parties to appear for the first mediation session, which was scheduled for September 17, 2013.[5]

- <u>August 20, 2013</u>:  The District Court Administrator issues an announcement regarding Judge Rosen's mediation team.[6]  The announcement provides general biographical information about each of the mediators on Judge Rosen's team.  This announcement does not, however, provide an explanation of the mediators' respective roles in the mediation.[7]

- <u>September 9, 2013</u>:  Judge Rosen's law clerk serves the Disclosure Letter on the mediation parties, including Syncora.  The Disclosure Letter is attached to the City's Motion as <u>Exhibit 6-C</u>, and it provides background information regarding each of the mediators.  Specifically, the Disclosure Letter states that Mr. Driker's wife, Elaine, served as a member of the Board of Directors of the Detroit Institute of Arts and that she currently serves as a Director Emerita.

- <u>September 17, 2013</u>:  Syncora and a host of other parties—including members of the press—attend the first mediation session.[8]  At that session, Judge Rosen introduces the mediation team and provides a brief biography of each mediator.[9]  ***Importantly***, Judge Rosen said that "Detroit attorney Eugene Driker, a 50-year veteran lawyer and dean of

---

[5]  *Order to Certain Parties to Appear for First Mediation Session* [Docket No. 334].

[6]  *Detroit Chapter 9 Mediation Team Announced* [Docket No. 542].

[7]  *See generally id.*

[8]  Because members of the press were invited to the first mediation session, Syncora maintains that the public portions of that session are not covered by the Mediation Order's dictate regarding the confidentiality of the mediation.  *See* Mediation Order ¶ 4.

[9]  *See generally* Robert Snell, *Mediator Tells City Creditors: "Open Your Minds"; Team of Judges Will Try to Settle Disputes Over Debt Restructuring*, The Detroit News, Sept. 18, 2013, at A1.

5

the Michigan bar, will mediate disputes involving the city's **pension funds**."[10]

- September 2013:  Although the structure subsequently devised for the Grand Bargain means that the pensions and art are now interrelated, at the outset of the mediation, there was no logical or organic connection between these two issues.  Syncora understood "disputes involving the city's pension funds" to mean disputes regarding (a) the proper valuation of the trusts' claims and liabilities, and (b) issues regarding malfeasance of the GRS.  Thus, at that point, Syncora and the other mediation participants had no reason to believe that Mr. Driker's obligations would involve the DIA.  Nor was there a conflict for Mr. Driker to disclose or for Syncora to assert.

- December 11, 2013:  The outline of the Grand Bargain is first reported in the press.[11]

- December 2013 – January 2014:  The press reports that Mr. Driker is involved in meetings related to the Grand Bargain but, at this point, his role is completely unknown.[12]

- February 21, 2014:   The City files its first plan of adjustment and corresponding disclosure statement. [13]   The DIA Settlement is incorporated in the first version of the plan.

---

[10]   *Id.* (emphasis added).

[11]   *See* John Gallagher & Mark Stryker, *DIA Joins Deal in Works with Mediators that Would Protect Art, Pensions in Detroit Bankruptcy*, Detroit Free Press (Dec. 11, 2013 10:22 p.m. (ET)), http://www.freep.com/article/20131211/ NEWS01/312110114/DIA-joins-deal-works-mediators-would-protect-art-pensions-Detroit-bankruptcy

[12]   *See* ArtfixDaily Staff, *Donors Pledge $330 Million to Save Detroit's Art*, ArtfixDaily News Feed (Jan. 13, 2014), http://www.artfixdaily.com/news_feed/ print/1125-foundations-pledge-330-million-to-save-detroits-art.

[13]   *See Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 2708]; *Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 2709].

- <u>May 12, 2014</u>:  Syncora files its Initial Plan Objection.[14]

- <u>May 30, 2014</u>:  A video is published of Mr. Rip Rapson's speech given at Wayne State University.[15]  In the video, and likely in violation of the Mediation Order, Mr. Rapson gives his account of how the Grand Bargain came to be and his motivations for involving the Kresge Foundation.  Syncora first became aware of the video on August 1, 2014.

- <u>June 2014</u>:  Judge Rosen lobbies the Michigan State Senate regarding the Grand Bargain.[16]

- <u>June 4, 2014</u>: Syncora issues deposition and document subpoenas to the Foundations requesting depositions and documents relating to, *inter alia*, the negotiations surrounding the DIA Settlement, the terms of the DIA Settlement, and the Foundations' reasons for entering into the DIA Settlement.

- <u>June 9, 2014</u>:  Judge Rosen appears at a press conference at the DIA during which he details the history of the Grand Bargain.[17]  During this press conference, Judge Rosen stated that the Grand Bargain

---

[14]  *Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment* [Docket No. 4679].

[15]  Detroit Bankruptcy & Beyond, *Remarks of Rip Rapson*, https://www. youtube.com/watch?v=z7nXphsL_QA (last visited Aug. 22, 2014).

[16]  *See* Mlive.com, *Detroit mayor, bankruptcy mediator visit Senate as leadership eyes afternoon vote on 'grand bargain'*, http://impact.mlive.com/lansing-news/print.html?entry=/2014/06/detroit_mayor_bankruptcy_media.html    (last visited August 21, 2014); Detroit News, *Detroit aid bill clears committee, heads to Senate for possible vote*, http://www.detroitnews.com/article/ 20140603/POLITICS02/306030065/EM-Orr-argue-before-Senate-committee-need-Detroit-aid (last visited August 21, 2014).

[17]  *See* Next Chapter Detroit, *Detroit's Chief Mediator:  Judge Gerald Rosen Speaks About the Bankruptcy Process*, http://www.nextchapterdetroit.com/ detroits-chief-mediator-judge-gerald-rosen-speaks-about-the-bankruptcy-process (last visited Aug. 9, 2014) (audio recording of Judge Rosen's remarks) (the "<u>Rosen Remarks</u>").

all started with a chance meeting, running into each other actually, with [Mariam Noland] from the Community Foundation and she said probably as a throwaway line, 'let me know if there's anything that we can do to help.' Well, two days later she was in my office and I sort of, *Eugene [Driker]* and I sort of spun out this idea [about the Museum Assets], and when she picked herself up off the floor she said, well, let's think about that! And, within three weeks we had 13 foundation leaders[.][18]

- June 9, 2013: General Motors announces its support for the Grand Bargain and explains that the Grand Bargain "was proposed by the mediators of the city's bankruptcy and led by Chief Judge Gerald Rosen of the U.S. District Court for the Eastern District of Michigan, and attorney Eugene Driker."[19]

- June 12, 2014: The Court *sua sponte* enters an order regarding mediation confidentiality.[20] This order, however, was sealed, and the Court has not permitted Syncora to view it.

- June 13, 2014: The Foundations file a motion to quash Syncora's subpoena on the grounds that, *inter alia*, the subpoenas (a) sought irrelevant information and (b) violated the Court's Mediation Order.[21]

---

[18] *Id.*

[19] GM News, *GM and GM Foundation Lead Auto Sector Support of 'Grand Bargain' to Help Secure DIA Future* (June 9, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/0609-dia.html.

[20] *Supplemental Order Regarding Mediation Confidentiality* [Docket No. 5294].

[21] *Joint Motion of Community Foundation for Southeast Michigan, William Davidson Foundation, The Fred A. and Barbara M. Erb Family Foundation, Max M. and Marjorie S. Fisher Foundation, Ford Foundation, Hudson-Webber Foundation, The Kresge Foundation, W.K. Kellogg Foundation, John S. and James L. Knight Foundation, McGregor Fund, Charles Stewart Mott Foundation and A. Paul and Carol C. Schaap Foundation to Quash Subpoenas Duces Tecum* [Docket No. 5300].

8

- June 26, 2014: The Court grants the Foundations' motion to quash on the grounds that the information sought by Syncora was not "relevant or even arguably relevant" to plan confirmation issues.[22]

8.      At some unknown point between September 17, 2013 and December 11, 2013, Mr. Driker apparently expanded his mediation responsibilities to include issues relating to the DIA.  No new letter was issued by Mr. Driker or Judge Rosen disclosing the change in Mr. Driker's role.  Thus, on information and belief, Mr. Driker never disclosed to Syncora or any other mediation party that he was personally involved in mediations involving the City, the State, the DIA, and the Foundations regarding the Museum Assets or the DIA Settlement ***prior to or during any such mediation sessions***.

## ARGUMENT

9.      By its Motion, the City argues that the Court should strike from Syncora's Second Supplemental Objection the argument that the Grand Bargain is (a) the product of an improper mediation and (b) a judicially-sanctioned fraudulent transfer.  According to the City, Syncora's arguments should be struck because they are "false and defamatory" and "do not arise from any new revelations, developments in the bankruptcy case, or changes in the City's plan."[23]

---

[22]  June 26, 2014 Hr'g Tr. at 126:23-127:5.

[23]  Mot. 1–2.

10.     The City's Motion, however, reflects a general misunderstanding of both the law surrounding conflicts and the events that generated the conflict at issue here.

11.     To begin, Mr. Driker is not, as the City claims, absolved from all conflicts—whether current or potential—because there was an initial disclosure that his wife serves as an emeritus board member of the DIA.  Rather, whether and when a conflict exists is an ongoing inquiry that necessarily depends on the circumstances, particularly the role of the mediator.  In this situation, though a conflict did not initially exist when Mr. Driker's role was limited to mediating disputes involving the City and its pension funds, a disclosable potential conflict arose when he became involved in the negotiation of the Grand Bargain—and it is only now clear that this potential conflict was or quickly became an actual, disabling conflict.  Despite a duty to inform the Court and all mediation participants of the change in Mr. Driker's responsibilities, the mediators failed to do so.  And it is that conflict—and the corresponding non-disclosure—that lies at the heart of the good-faith objection in Syncora's Second Supplemental Objection.

12.     In an attempt to circumvent this duty of disclosure, the City argues that Syncora has been aware of the features of the Grand Bargain for months and that certain of Syncora's arguments in the Second Supplemental Objection should be struck as untimely.  For the City to suggest that Syncora was fully informed as

10

to how the Grand Bargain came to be is ironic to say the least; the City knows that all of Syncora's attempts to obtain discovery regarding the Grand Bargain have been stymied under the auspices of the Mediation Order. Significantly, though virtually all of the negotiations regarding and resulting in the Grand Bargain remain completely opaque, what is known about what actually transpired became public knowledge after Syncora filed its Initial Plan Objection. As a result, Syncora's Second Supplemental Objection was in response to new revelations regarding the actual movers and shakers behind the Plan and Grand Bargain.

13. Critically, the City has failed to satisfy the standard under Rule 12(f) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>") for a motion to strike,[24] and the City has failed to satisfy the standards under Bankruptcy Rule 9011 and 28 U.S.C. § 1927 for the imposition of sanctions. In fact, the City has not *actually* moved for sanctions—instead, the City recommends that the Court consider sanctioning Syncora.[25] The City's "recommendations" must be seen for what they are: clear attempts to sidestep Bankruptcy Rule 9011's "safe harbor"

---

[24] Rule 12(f) of the Federal Rules is incorporated by, and thus applicable to this proceeding, by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

[25] Mot. 7–8.

provision for the apparent purpose of generating publicity, which it did,[26] and disparaging Syncora's counsel.[27]

14.    Although the circumstances surrounding the Grand Bargain are indeed troubling, speaking the truth in no way warrants striking Syncora's arguments, imposing sanctions, or ordering a public apology.[28]  If, however, despite the lack of even a cursory nod to the mandatory procedures provided by Bankruptcy Rule 9011 by the City, the Court is inclined to issue an order to show cause as to why sanctions should not be imposed, Syncora respectfully requests that it be granted leave to propound discovery against the mediators and the mediation parties so that it may adequately defend itself.

## I.    The City Has Not Met—and Cannot Meet—the Standard Under Rule 12(f) for the Relief it Seeks.

15.    The Court should deny the City's Motion because the City has not— and cannot—satisfy the applicable standard.  Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial,

---

[26]  *E.g.*, Kirk O'Neil, *Detroit Seeks Sanctions on Syncora*, The Deal Pipeline (Aug. 21, 2014), http://pipeline.thedeal.com/tdd/ViewArticle.dl?id=100051015174.

[27]  Syncora, its counsel in this Chapter 9 Case, and Kirkland & Ellis LLP expressly reserve all rights under applicable law to pursue actions against the City and its attorneys for their failure to comply with Bankruptcy Rule 9011.

[28]  The City cites two cases for the proposition that the Court may order Syncora to publically apologize.  Mot. 7.  Syncora does not question the Court's authority, but notes that the cited cases are inapposite here.

impertinent, or scandalous matter."[29]  "The word 'scandalous' in Rule 12(f) 'generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.'"[30]  By contrast, "'[i]mmaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded."[31]  Similarly, "'[i]mpertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question."[32]

16.    "Because striking a portion of the pleading is such a drastic remedy, such motions are generally viewed with disfavor and rarely granted."[33]  As the Sixth Circuit aptly explained over sixty years ago,

---

[29]  Fed. R. Civ. P. 12(f) (made applicable to this proceeding by Fed. R. Bankr. P. 9012(f)).

[30]  *Pigford v. Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003) (quoting 2 *Moore's Federal Practice* § 12.37[3] at 12–97).

[31]  *Llewellyn-Jones v. Metro Property Grp., LLC*, No. 13-11977, 2014 WL 2214209, at *6 (E.D. Mich. May 27, 2014) (quoting *Barnes v. Convention & Show Servs., Inc.*, No. 12-13770, 2013 WL 2467920, at *1 (E.D. Mich. June 7, 2013)) (internal quotation marks omitted).

[32]  *Id.* (quoting *Barnes*, 2013 WL 2467920, at *1).

[33]  *Chiropractic Co-op Ass'n of Mich. v. Am. Med. Ass'n*, 617 F. Supp. 264, 266 (E.D. Mich. 1985) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)); *accord Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981) ("[M]otions to strike, as a general rule, are disfavored."); *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977) ("Motions to strike under Federal Rule of Civil Procedure 12(f) are viewed with disfavor and are infrequently

13

> [I]t is well established that the action of striking a pleading should be ***sparingly used*** by the courts. It is a ***drastic remedy*** to be resorted to only when required for the purposes of justice. The motion to strike should be granted only when the pleading to be striken [sic] has ***no possible relation*** to the controversy.[34]

17. Here, in a passing reference, the City contends that Syncora's Second Supplemental Objection is "scandalous."[35] But Syncora has not leveled allegations that "unnecessarily reflect[] on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court."[36] Indeed, Syncora took great pains to say—and it repeats—that it does not question Judge Rosen's or Mr. Driker's sincerity or integrity, only that it believes they allowed their policy preferences to override their impartiality and, in Mr. Driker's case, failed to disclose a conflict of interest when it materialized.

18. To this day, Syncora does not know—and cannot know—the full record supporting the Grand Bargain—indeed, as discussed below, its attempts to

---

granted."); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("In deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." (collecting cases)).

[34] *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953) (emphasis added) (citations omitted).

[35] Mot. 7.

[36] *Veneman*, 215 F.R.D. at 4.

reveal that record have been blocked. Thus, Syncora challenged the manner in which the Plan's "cornerstone" was developed based on the available information and activities, the most significant of which occurred *after* Syncora's Initial Plan Objection.

19.     Moreover, the City does not state that Syncora's arguments are immaterial, or impertinent—because it cannot: Syncora's arguments in the Second Supplemental Objection directly bear on whether the Plan was proposed in good faith under Bankruptcy Code section 1129(a)(3). Although, the City does make passing references to redundancy, albeit without any supporting authority, Syncora's assertions in its Second Supplemental Objection had not been made before. Notably, the City contends that Syncora's arguments are somehow both redundant and untimely in violation of the Court's scheduling order. Of course, this reasoning makes no sense, and the City is wrong on both counts. Accordingly, the Court must find that the City has failed to meet its burden, and thus the Motion should be denied.

**II.     Contrary to the City's Suggestions to the Court, Syncora's Second Supplemental Objection Does Not Warrant Sanctions.**

20.     In an unabashed attempt to skirt the "safe harbor" contained in Bankruptcy Rule 9011(c)(1)(A),[37] the City invites the Court to "consider ordering

---

[37] The City erroneously cites Rule 11 of the Federal Rules; Bankruptcy Rule 9011 is the applicable rule in this proceeding. Because Bankruptcy Rule 9011 is the

Syncora's attorneys to show cause why their [allegation regarding the Mr. Driker's conflict of interest] does not merit . . . sanctions under Rule 11 of the Federal Rules of Civil Procedure."[38]  In the alternative, the City muses that the Court could impose attorneys' fees and costs on Syncora under section 1927 of title 28 of the United States Code (as amended, the "Judicial Code").[39]  Nowhere does the City actually move for such relief, instead opting to rely only on innuendos and insinuations that the Court may take such actions.  Contrary to the City's contentions, Syncora's statements regarding Mr. Driker's conflict are not sanctionable under either Bankruptcy Rule 9011 or 28 U.S.C. § 1927.[40]

---

bankruptcy counterpart to Rule 11, "containing only such modifications as are appropriate in bankruptcy matters," Rule 11 jurisprudence is equally applicable to a motion for sanctions under Bankruptcy Rule 9011. *Klein v. Wilson, Elser, Moskowitz, Edelman & Dicker* (*In re Highgate Equities, Ltd.*), 279 F.3d 148, 151 (2d Cir. 2002); *see also Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 480–81 (6th Cir. 1996) (noting that "Rule 9011 closely tracks Federal Rule of Civil Procedure 11" and applying case law interpreting Rule 11 in a bankruptcy matter); *Findlay v. Banks* (*In re Cascade Energy & Metals Corp.*), 87 F.3d 1146, 1150 (10th Cir. 1996) ("The determinations required to support the imposition of sanctions under Rule 9011 are the same as those required under Rule 11.").

[38]  Mot. 7.

[39]  Mot. 8.

[40]  For the avoidance of doubt, Syncora and its counsel in this Chapter 9 Case reserve all rights to respond to particularized allegations that their filing of the Second Supplemental Objection is sanctionable if and when the City or the Court elect to follow the procedural requirements for the seeking and imposition of sanctions contained in Bankruptcy Rule 9011. *See* Fed. R. Bankr. P. 9011.

**A.** **Neither Syncora nor its attorneys violated Bankruptcy Rule 9011(b) in filing the Second Supplemental Objection.**

21. First, it bears emphasizing that, in making its none-too subtle ruminations that sanctions may be appropriate without providing Syncora any advance warning, the City intentionally ducked the requirements of Rule 9011(c)(1)(A). That rule provides that a motion for sanctions brought by a party

> shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected . . . .[41]

22. The Sixth Circuit has explained that this "safe harbor" was designed to "reduce Rule 11's volume, formalize appropriate due process considerations of sanctions litigation, and diminish the rule's chilling effect," while also furthering "civility among attorneys and between bench and bar . . . by having attorneys communicate with each other with an eye toward potentially resolving their differences prior to court involvement."[42]

---

[41] *Id.* 9011(c)(1)(A); *see also City of Sterling Heights v. United Nat'l Ins. Co.*, Case No. 03-72773, Order Denying Defendant Arch Ins. Co.'s Mot. for Sanctions, Docket No. 195 (E.D. Mich. 2005) (unpublished opinion).

[42] *Ridder v. City of Springfield*, 109 F.3d 288, 294 (6th Cir. 1997) (collecting authorities) (analyzing Fed. R. Civ. P. 11, which is substantially similar to Fed. R. Bankr. P. 9011).

23.     Here, the City did not tell Syncora that it intended to imply that sanctions were appropriate. [43]   In clumsily skirting the safe harbor by only intimating that sanctions *might* be appropriate, the City has undermined the purpose of including the safe harbor in the first instance.[44]   Indeed, the City has also run afoul of the Advisory Committee notes to Rule 11 of the Federal Rules, which provide that Rule 11 motions should not

> be prepared to emphasize the merits of a party's position, to exact an unjust settlement, *to intimidate an adversary into withdrawing contentions that are fairly debatable*, to increase the costs of litigation, to create a conflict of interest between attorney and client, or to seek disclosure of matters otherwise protected by the attorney-client privilege or the work-product doctrine.[45]

---

[43]   Had the City followed Bankruptcy Rule 9011(c) and provided Syncora with some form of notice of its motion—as Syncora explicitly requested from the City's counsel—Syncora would have been willing to provide a revised Second Supplemental Objection clarifying its position on the source of Mr. Driker's conflict of interest.   For the Court's reference, Syncora has attached, as **Exhibit A**, an e-mail exchange with the City's counsel that occurred just prior to when the Motion was filed.

[44]   The City apparently believes that including its sanctions-related allegations in the Motion discharges its obligations under Rule 11(c)(2).   *See* Mot. 8 n.3. Syncora notes that the City's understanding does not accord with Rule 11's requirements.   First, as noted above, a motion for sanctions must be served 21 days prior to its filing with the court.   Second, by Rule 11's plain text, "[a] motion for sanctions must be made separately from any other motion."   Fed. R. Civ. P. 11(c)(2).   Here, the City has instead raised its sanctions allegations in a motion to strike.

[45]   Fed. R. Civ. P. 11 advisory committee's note (emphasis added).

18

24.    In any event, Syncora and its attorneys did not violate Bankruptcy Rule 9011(b), which generally requires an attorney to reasonably inquire into the law and facts supporting a pleading,[46] and Syncora will so prove if it ever becomes necessary.

### B.    Syncora's Second Supplemental Objection does not run afoul of Judicial Code Section 1927.

25.    For the same reasons, the City's suggestion that the Syncora may be sanctioned under section 1927 of the Judicial Code also misses the mark.   At bottom, "[t]he purpose of § 1927 is 'to deter dilatory litigation practices and to punish aggressive tactics that *far exceed* zealous advocacy.'"[47]

26.    As described below, Syncora's averments, while sobering, are supported by a fair evaluation of the facts and circumstances surrounding the mediation.   And Syncora's counsel has been—and remains—a zealous advocate for its client.  Nothing more and nothing less.

---

[46]   Fed. R. Bankr. P. 9011(b).

[47]   *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 644 (6th Cir. 2009) (emphasis added) (quoting *Red Carpet Studios, Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)).

19

**III.** **While Mrs. Driker's Service as a DIA Board Member Alone Does not Present a Conflict of Interest, once Mr. Driker became involved in the negotiations surrounding the Grand Bargain, a Clear Conflict of Interest Arose.**

27.     One of the central arguments in the City's Motion is that Syncora essentially "waived" any right to object to Mr. Driker's participation in the mediation surrounding the Grand Bargain because Mr. Driker had previously disclosed—***prior*** to his involvement in the Grand Bargain—that his wife was a Director Emerita of the DIA.  This argument, however, reflects a fundamental misunderstanding of conflicts of interest—namely, that conflicts do not exist in the ether but are instead dependent on the factual circumstances in which they arise.[48] Moreover, the City's argument completely ignores what Judge Rosen told Syncora and other mediation participants on September 17, 2013:  "Detroit attorney Eugene

---

[48] *See, e.g.*, Rule 1.7 Conflict of Interest: Current Clients, Ann. Mod. Rules Prof. Cond. Cmt. 5.  Comment 5 to Rule 1.7 describes that conflicts may arise during the course of a lawyer's representation of a client:

> Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict.

Driker, a 50-year veteran lawyer and dean of the Michigan bar, will mediate disputes involving the city's ***pension funds***."[49]

28.     The City's misunderstanding is surprising in light of a recent case from the Western District of Michigan: *El Camino Res., Ltd. v. Huntington Nat. Bank.*[50]     In that case, counsel for the City—Pepper Hamilton LLP—was disqualified for a conflict of interest that did not initially exist but ***arose*** during the Cyberco bankruptcy.[51]     As part of its representation in that case, Pepper Hamilton represented Bank Midwest in (a) an adversary proceeding wherein it propounded discovery against Huntington National Bank and (b) an action against Cyberco Holdings, Inc. et al. in the Western District of Michigan.[52]

29.     Two years into the bankruptcy case, the circumstances changed and a conflict arose when Huntington National Bank retained Pepper Hamilton to defend it in an action by the bankruptcy trustee—an action in which it was foreseeable that Bank Midwest would join as a plaintiff.[53]     Nevertheless, Pepper Hamilton continued to represent Bank Midwest in various actions related to Cyberco's

---

[49]   *See* Snell *supra* note

[50]   623 F. Supp. 2d 863 (W.D. Mich. 2007).

[51]   *See id.* at 888.

[52]   *Id.* at 869–70.

[53]   *Id.* 870–71.

fraud.[54] Ultimately, the *El Camino* court concluded that Pepper Hamilton acted improperly when the conflict arose: "Pepper Hamilton failed to procure the necessary broad waiver, but undertook the defense of Huntington anyway."[55]

30.     Here, contrary to the City's arguments, Syncora did not contend in its Second Supplemental Objection—and does not now contend—that Mrs. Driker's service as a DIA board member in and of itself resulted in a conflict of interest for Mr. Driker.  Instead, Mr. Driker's conflict of interest came about when he began mediating the DIA Settlement—just like Pepper Hamilton's conflict ***subsequently*** arose when it agreed to represent Huntington National Bank, notwithstanding its pre-existing relationship with Midwest Bank.

31.     For this reason, the fact that Mr. Driker's interest in the DIA was disclosed to Syncora's attorneys in the September 9, 2013 Disclosure Letter is unremarkable and proves nothing.[56]  Anyone with an Internet connection can see that Mrs. Driker is a DIA board member (now emerita).[57]  The point is that Mr. Driker's conflict of interest ***manifested itself after*** Syncora was served with the

---

[54]  *Id.*

[55]  *Id.* at 883.

[56]  *See generally* Mot. 5–10.

[57]  *See* Detroit Institute of Arts, *Media Room: Board of Directors*, www.dia.org/about/board-of-directors.aspx (last visited Aug. 20, 2014).

Disclosure Letter and in the context of mediation sessions to which Syncora was not invited.[58]

32.     As such, Syncora had no basis to challenge Mr. Driker's appointment as a mediator in September 2013, especially because, on September 17, 2013, Judge Rosen stated—and Syncora's counsel believed—that Mr. Driker would only "mediate disputes involving the city's *pension funds*."[59]  Accordingly, Syncora *correctly* "claims that one bankruptcy mediator committed an ethical breach by failing to disclose an alleged conflict."[60]  The City's Motion, therefore, must be denied on this basis.

## IV.    Syncora Had No Duty to Alert Mr. Driker to his Conflict of Interest.

33.     In addition to its reliance on the September 9, 2013 letter disclosing Mr. Driker's relationship to the DIA, the City also suggests that Syncora had (a) a continuing obligation to monitor the conduct of the mediators, and (b) a duty to notify mediators of alleged conflicts of interest.  The City reasons that, because

---

[58] There does not seem to be any real dispute that Mr. Driker's involvement in the mediation of the Grand Bargain represented a conflict of interest.  In fact, Mr. Buckfire, the City's 30(b)(6) witness, testified that the City could not hire Sotheby's to value the Museum Assets because "a director of Sothebys is also a trustee of the Detroit Institute of Arts, and we viewed that as a potential conflict."  Buckfire Dep. Tr. at 131:15-26.  The same reasoning should apply to Mr. Driker.

[59] *See* Gallagher & Stryker *supra* note 11.

[60] Mot. 1.

Syncora failed to object to Mr. Driker's involvement in the Grand Bargain mediation, it cannot be heard to complain now. Again, the City misunderstands the law surrounding conflicts and the specific circumstances of this case.

34. ***First***, because Syncora was excluded from all negotiations regarding the Grand Bargain, it was unaware that Mr. Driker's role had expanded beyond pension-fund issues to include protecting the Museum Assets. Without such knowledge, Syncora was not in a position to object to or waive Mr. Driker's conflict.

35. ***Second***, Mr. Driker—not Syncora—bore the entire burden of disclosure. On this point, the standards governing the conduct of mediators in Michigan are clear:

> A mediator shall promptly disclose conflicts of interest and grounds of bias or partiality reasonably known to the mediator. A mediator should resolve all doubts in favor of disclosure. Where possible, such disclosure should be made early in the mediation process and in time to allow the participants to select an alternate mediator. ***The duty to disclose is a continuing duty during the mediation process***.[61]

36. In the context of professional retentions in bankruptcy cases, Judge Chapman of the Southern District of New York recently observed that

---

[61] Michigan State Court Admin. Office, *Mediator Standards of Conduct* § III.C (Feb. 1, 2013) (the "Mediator Standards") (emphasis added); *accord* Am. Arbitration Ass'n *et al.*, *Model Standards of Conduct for Mediators* § III.D (September 2005) (the "Model Standards").

[a] professional's duty to disclose is 'self-policing. Although Bankruptcy Rule 2014(a) does not expressly require a professional to supplement its initial disclosure, section 327(a) implies a duty of 'continuing disclosure.' A professional's continuing disclosure of conflicts under Rule 2014(a) 'is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain 'conflict free.' " The adequacy of disclosure also cannot be judged by whether other parties made inquiry.[62]

37.     Thus, the burden to monitor and disclose conflicts of interest was squarely on the individual who would know best when a conflict had arisen—Mr. Driker—not Syncora.  In accordance with the Mediator Standards, Mr. Driker should have disclosed his involvement with the DIA Settlement as soon as he became involved in mediation sessions regarding the Museum Assets, the DIA, or the eventual Grand Bargain.  Mr. Driker should have then sought the affirmative consent of all mediation parties.  Mr. Driker did neither.  Instead, he pressed forward—and that is the central issue—violating key ethical principles in the process.

38.     The City may argue that Syncora was on notice of Mr. Driker's involvement in the DIA Settlement as early as December 11, 2013.[63]  Such an

---

[62]  *In re GSC Grp., Inc.*, 502 B.R. 673, 725 (Bankr. S.D.N.Y. 2013) (citations and internal quotation marks omitted).

[63]  *See, e.g.*, Detroit Institute of Arts, *Detroit Institute of Arts Statement: DIA Leaders Enter Discussions with Federal Mediators* (Dec. 11, 2013), http://www.dia.org/news/1535/Detroit-Institute-of-Arts-Statement--DIA-

25

argument fails for the same reason given above:  It was not Syncora's duty to police the mediators and the mediation.  Accordingly, the City's Motion should be denied insofar as it somehow seeks to impute a burden to Syncora to disclose Mr. Driker's conflict.

## V.      Because Syncora Has Been Precluded from Discovering Facts Surrounding the Mediation, its Objections to the Grand Bargain are Timely.

39.      As alluded above, and as it has maintained throughout this Chapter 9 Case, Syncora is hamstrung by the City's (and other parties') selective use of the purported mediation privilege.[64]  Due to the City's frequent invocation of the Mediation Order, Syncora has not been able to seek out any of the facts necessary to (a) evaluate the full nature of the mediators' biases and conflicts of interest, and (b) adequately defend itself from the potential imposition of sanctions.  Instead, Syncora is obliged to rely on its attorneys' abilities to discover information from the Internet and the verbal indiscretions of those involved in the Grand Bargain mediation.

40.      Given these limitations, Syncora did not have sufficient information to raise a good-faith objection to the process surrounding the Grand Bargain until after June 9, 2013, when Judge Rosen said that it

---

Leaders-Enter-Discussions-with-Federal-Mediators.aspx       (identifying       Mr. Driver as one of the mediators involved in the DIA Settlement discussions).

[64]  *See* Second Supplemental Objection ¶¶ 52–55.

26

all started with a chance meeting, running into each other actually, with [Mariam Noland] from the Community Foundation and she said probably as a throwaway line, 'let me know if there's anything that we can do to help.' Well, two days later she was in my office and I sort of, ***Eugene [Driker]*** and I sort of spun out this idea [about the Museum Assets], and when she picked herself up off the floor she said, well, let's think about that!  And, within three weeks we had 13 foundation leaders[.][65]

41.    Of course, Judge Rosen's June 9 press conference occurred after Syncora filed its Initial Plan Objection on May 12, 2014.[66]  It is fair to infer that Mrs. Noland picked herself off the floor because the notion of linking the Museum Assets to retirees' claims was wholly novel at the time.  This is further evidence, as if any were needed, that Syncora acted reasonably by not raising a conflict issue in response to the Disclosure Letter in September 2013.

42.    The same is true of Syncora's fraudulent transfer argument.  As of May 12, 2014, Syncora was not aware—and is still not completely aware—of the full nature of the Foundations' and the other parties' mental states in connection with the Grand Bargain.[67]  To be sure, with regard to transfers that are actually fraudulent, the transferor's mental state is an important element.[68]  Moreover, as to

---

[65]  *See* Rosen Remarks.

[66]  *Cf.* Mot. 16–18.

[67]  *See generally* Second Supplemental Objection ¶¶ 33–47.

[68]  *See* Mich. Comp. Laws § 566.34(1)(a); *see also Davis v. Davis*, Case No. 175102, at 4 (Mich. Ct. App. July 30, 1996) ("[i]t is not the grantee's state of

27

Syncora's constructive fraud argument, the most salient supporting evidence of the rock-bottom price for the Museum Assets did not come to light until Syncora's, FGIC's, and the City's experts served their reports in July 2014.[69] Thus, Syncora's Supplemental Objection is not, as the City asserts, a "redundant assault on basic features of the City's bankruptcy plan that long have been public."[70]

43.     Meanwhile, the City and other parties continue to engage in the selective, tactical use of alleged positions taken in the Grand Bargain mediation while refusing to allow those propositions to be tested by the adversarial process. As just the latest example, the Motion cites Mr. Rip Rapson's deposition for the truth of the proposition that "the outside charitable donations never would have been available to enhance Syncora's recovery."[71] Likewise, the Retiree Committee cites Mr. Dan Gilbert's deposition testimony to support a similar statement.[72] The

---

mind that is relevant in fraudulent transfer cases based on actual intent; rather, it is the intent of the grantor.") (unpublished decision); *accord United States v. Leggett,* 292 F.2d 423, 426 (6th Cir. 1961) ("The question of fraud involves the element of intent.").

[69]  *See generally* Expert Report of Elizabeth von Habsburg, served July 25, 2014; Expert Report of Victor Wiener, served July 25, 2014; Expert Report of Michael Plummer, served July 25, 2014.

[70]  Mot. 16.

[71]  *Id.* at 14.

[72]  *Official Committee of Retirees' Concurrence in the City of Detroit's Motion to Strike in Part Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s*

City gratuitously raises these issues as a substantive response to Syncora's fraudulent conveyance argument—inappropriate for a motion to strike of course. But more fundamentally, if the City and its supporters are continually permitted to introduce evidence regarding what transpired in the Grand Bargain mediation, including the mental states of the Foundation leaders, Syncora must be permitted to challenge that evidence through the discovery process. Because Syncora has not been so permitted, the City and others cannot be permitted to use the purported mediation privilege as a battering ram in support of its Motion or otherwise.

## VI.   If the Court Considers Sanctioning Syncora, It Should Be Entitled to Discovery to Defend Itself.

44.   If the Court is inclined to accept the City's invitation to issue an order to show cause, Syncora respectfully requests that it be granted leave to take any and all necessary discovery, including discovery of the mediators, so that it may defend itself appropriately. Moreover, Syncora respectfully requests relief from the Court's Mediation Order so that it may disclose information and conversations from the mediation that would bear on its defense.

## CONCLUSION

45.   In the final analysis, the City's Motion must be denied. The Motion fails to satisfy the standard under Rule 12(f) of the Federal Rules; it flows from a

---

*Second Supplemental Objection to the Debtor's Plan of Adjustment* 4 [Docket No. 6897].

fundamental misunderstanding of conflicts of interest; it improperly contends that Syncora bore the burden of disclosing Mr. Driker's conflict and that Syncora's arguments were untimely; Syncora is prejudiced by the fact that it has not been permitted to discover fully what occurred in the mediation, which prejudice the Motion ignores; and, contrary to the City's disingenuous suggestions to the Court, Syncora's conduct is a far cry from sanctionable behavior.

[*Remainder of Page Intentionally Left Blank*]

Dated:  August 22, 2014          Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Ryan Blaine Bennett_____
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*