UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                              .      Detroit, Michigan
                              .      August 18, 2014
               Debtor.        .      9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ORDER GRANTING CITY OF DETROIT'S MOTION TO
OPEN THE RECORD OF THE HEARING ON CONFIRMATION OF THE
CITY'S PLAN OF ADJUSTMENT ON AUGUST 18, 2014, FOR THE
LIMITED PURPOSE OF ADMITTING THE TESTIMONY OF AN
OTHERWISE UNAVAILABLE KEY WITNESS
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                      By:  GEOFFREY STEWART
                           CHRISTOPHER DIPOMPEO
                           SARAH HUNGER
                      51 Louisiana Avenue, N.W.
                      Washington, DC  20001
                      (202) 879-3939

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  STEPHEN HACKNEY
Syncora Guarantee         DOUGLAS SMITH
Inc., and Syncora    300 North LaSalle
Capital Assurance,   Chicago, IL  60644
Inc.:                (312) 862-2000

For Assured          Chadbourne & Parke, LLP
Guaranty Municipal   By:  ROBERT SCHWINGER
Corp.:               30 Rockefeller Plaza
                     New York, NY  10112
                     (212) 408-5364

APPEARANCES (continued):

| | |
|---|---|
| For County of Macomb, Michigan: | Dechert, LLP<br>By: ALLAN S. BRILLIANT<br>1095 Avenue of the Americas<br>New York, NY 10036<br>(212) 698-3600 |
| For the Detroit Retirement Systems; | Clark Hill, PLC<br>By: JENNIFER GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI 48226<br>(313) 965-8274 |
| For the State of Michigan: | Dickinson Wright<br>By: STEVEN HOWELL<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI 48226-3245<br>(313) 223-3033 |
| For County of Oakland, Michigan: | Young and Associates<br>By: JAYE QUADROZZI<br>27725 Stansbury Blvd., Suite 125<br>Farmington Hills, MI 48334<br>(248) 353-8620 |
| For the Retiree Committee: | Dentons, LLP<br>By: DANIEL MORRIS<br>1301 K Street, NW, Suite 600, East Tower<br>Washington, DC 20005<br>(202) 408-6381 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By: EDWARD MCCARTHY<br>1395 Bricknell Ave., Suite 1200<br>Miami, FL 33131<br>(305) 577-3240 |
| For County of Wayne, Michigan: | Butzel Long, PC<br>By: MAX NEWMAN<br>Stoneridge West<br>41000 Woodward Avenue<br>Bloomfield Hills, MI 48304<br>(248) 258-2907 |

```
Court Recorder:        Kristel Trionfi/LaShonda Moss
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2     be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.  Excuse me.  Appearances,

4     please.

5          MR. STEWART:  Geoffrey Stewart of Jones Day for the

6     City of Detroit, your Honor.

7          MR. HERTZBERG:  Robert Hertzberg, Pepper Hamilton,

8     on behalf of the city.

9          MS. HUNGER:  Sarah Hunger, Jones Day, on behalf of

10    the city.

11         MR. DIPOMPEO:  Christopher DiPompeo, Jones Day, on

12    behalf of the city.

13         MR. HACKNEY:  Good morning, your Honor.  Stephen

14    Hackney and Doug Smith on behalf of Syncora.

15         MR. BRILLIANT:  Good morning, your Honor.  Allan

16    Brilliant on behalf of Macomb County by and through its

17    public works commissioner and the Macomb Interceptor Drain

18    Drainage District.

19         MS. QUADROZZI:  Good morning, your Honor.  Jaye

20    Quadrozzi on behalf of Oakland County.

21         THE COURT:  Any other appearances?

22         MR. MORRIS:  Daniel Morris on behalf of the

23    Retirees' Committee.

24         MR. NEWMAN:  Your Honor, Max Newman on behalf of

25    Wayne County.

1          MR. HOWELL:  Your Honor, Steven Howell, Dickinson

2     Wright, special assistant attorney general, appearing on

3     behalf of the State of Michigan.

4          MR. MCCARTHY:  Good morning, your Honor.  Ed

5     McCarthy with Weil Gotshal on behalf of FGIC.

6          MS. GREEN:  Good morning, your Honor.  Jennifer

7     Green, Clark Hill, on behalf of the Detroit Retirement

8     Systems.

9          MR. SCHWINGER:  Robert Schwinger, Chadbourne &

10    Parke, on behalf of Assured Guaranty Municipal Corporation.

11         THE COURT:  All right.  Let's proceed.

12         MR. HACKNEY:  Your Honor, there was one preliminary

13    issue I was hoping to raise with the Court, if that's okay.

14         THE COURT:  Yes.  Go ahead, sir.

15         MR. HACKNEY:  Good morning, your Honor.  Stephen

16    Hackney on behalf of Syncora.  When Mr. Cline's testimony was

17    set for today, under the prior schedule, our <u>Daubert</u> motions

18    were to have been filed on Friday of last week, and so they

19    would have been filed in advance of his testimony, and you

20    would have been able to see them.  Under the new schedule,

21    they aren't due until about a week from today.  We do intend

22    to bring <u>Daubert</u> motions that implicate the testimony of Mr.

23    Cline.  I reached out to Mr. Stewart in advance of today and

24    suggested to him that a more efficient way to proceed so that

25    we can move through Mr. Cline's testimony might be to note

1  this for the record and have a reservation of rights by

2  Syncora and have the Court take Mr. Cline's testimony subject

3  to a determination that will be made later about its

4  admissibility after the Daubert briefing has been completed.

5  That will allow us to move swiftly through direct and cross-

6  examination today.  And Mr. Stewart did not have an objection

7  to that on behalf of the city, so I wanted to propose that to

8  you as a way to proceed today.

9          THE COURT:  Excuse me.  That is fine with me.

10          MR. HACKNEY:  Thank you, your Honor.

11          THE COURT:  Thank you.  All right.  Can we begin?

12          MR. STEWART:  We may, your Honor.  Geoffrey Stewart

13  of Jones Day for the city.  Your Honor, may I approach?

14  There are a few exhibits I'm going to use with the witness,

15  and if it's convenient to the Court, I would ask to hand them

16  up now so I don't end up --

17          THE COURT:  Sure.

18          MR. STEWART:  -- marching back and forth.  The city

19  calls its first witness, Robert Cline.

20          THE COURT:  Mr. Cline, step forward, please.

21            ROBERT CLINE, DEBTOR'S WITNESS, SWORN

22          THE COURT:  All right.  Please sit down over there.

23  You may begin.

24          MR. STEWART:  Thank you, your Honor.

25                        DIRECT EXAMINATION

1  BY MR. STEWART:

2  Q   Mr. Cline, can you give us your full name and address,

3  please?

4  A   My name is Robert Joseph Cline.  I reside at 3041

5  Sedgwick Street, Washington, D.C.

6  Q   Do I understand correctly that you now also have a

7  residence in Paris, France?

8  A   I am now temporarily living in Paris.

9  Q   And are you employed yet in Paris?

10  A   Not yet.

11  Q   When will your employment in Paris begin?

12  A   My employment will begin Thursday of this week.

13  Q   And who will you be employed by come Thursday?

14  A   I will be employed by OECD, which stands for the

15  Organization for Economic Cooperation and Development.

16  Q   And what is the business of the OECD?

17  A   The OECD serves as an umbrella organization for -- I

18  believe it's 34, 35 of the largest countries in the world.

19  They coordinate policy issue across countries.

20  Q   And what work will you be doing for the OECD when you

21  start your work there on Thursday?

22  A   I've been asked to assist them in a project -- a two-year

23  project evaluating alternative structures for taxing

24  corporate income internationally.

25  Q   Now, I understand that you recently retired from Ernst &

1  Young.

2  A    I did.

3  Q    And when was the date?  When was your last date at Ernst

4  & Young?

5  A    I believe the official last date was August the 2nd.

6  Q    And EY has been engaged by the City of Detroit to perform

7  certain work in its Chapter 9 proceeding?

8  A    Yes.

9  Q    What work did you do at EY on the Detroit matter?

10  A    I worked in the quantitative economics and statistics

11  practice at Ernst & Young, and we were asked to look at a

12  ten-year forecast for the major tax sources of revenue for

13  the City of Detroit.

14  Q    Now, you just used the phrase "quantitative" -- well,

15  QUEST.  What does that stand for again?

16  A    Quantitative economics and statistics practice.

17  Q    And tell me what -- that's QUEST, I guess.  What is

18  QUEST?

19  A    QUEST is a small group within EY's national tax practice

20  in Washington, D.C., that does quantitative analysis.  It's a

21  group of economists, MBA's, statisticians, survey people, and

22  we work for both public and private sector clients doing

23  quantitative studies and analyses.

24  Q    When did QUEST begin its work for the City of Detroit?

25  A    I believe I first became involved in the project in May

1  of 2013.

2  Q   Now, when you became involved in May in 2013, at that

3  time was it your understanding you were going to be asked to

4  serve as an expert witness in this case?

5  A   No.  That was not my understanding.

6  Q   What was it you were hired to do back in May of 2013?

7  A   We were hired to prepare a ten-year forecast, 2014

8  through 2023, fiscal years, of the expected revenues from

9  major tax sources for the city.

10 Q   Now, did there come a time when you were asked to serve

11 as an expert witness in this case?

12 A   Yes.

13 Q   Do you remember when that was?

14 A   That perhaps would be within the last two to three

15 months, as I recall.

16 Q   And you submitted an expert report on July 8th?

17 A   That is correct.

18 Q   Now, since leaving E&Y, you've been retained as an expert

19 directly by my law firm; correct?

20 A   That is correct.

21 Q   That's Jones Day is my firm.  Please tell the Court how

22 you're being compensated for your time as an expert witness.

23 A   I'm being compensated on an hourly basis plus normal

24 expenses.

25 Q   And what is your hourly rate of compensation?

1  A   It's $754 an hour.

2  Q   And how many hours so far have you worked under this

3  arrangement?

4  A   I believe so far that would be in the range of 30 to 35

5  hours.

6  Q   So let me now ask you about your education.  Where did

7  you go to college?

8  A   As an undergraduate, I went to the College of William &

9  Mary in Virginia.

10 Q   Are you from Virginia originally?

11 A   I am.

12 Q   Okay.  What year did you graduate from William & Mary?

13 A   Graduated in 1968.

14 Q   Did you graduate with any academic distinctions?

15 A   I did.

16 Q   And what were those?

17 A   I was elected to Phi Beta Kappa.

18 Q   Okay.  And did you attend graduate school?

19 A   I did.

20 Q   And what graduate school did you attend?

21 A   I attended graduate school in Ann Arbor, Michigan, at the

22 University of Michigan.

23 Q   And what did you study at the University of Michigan?

24 A   I studied economics.

25 Q   What years were you there?

1  A    I believe I was there from 1968 to '72.

2  Q    What degree did you receive?

3  A    I received both a master's degree and then awarded a

4  little bit later than that the PhD in economics.

5  Q    Did you write a dissertation?

6  A    I did.

7  Q    And what was your PhD dissertation about?

8  A    My dissertation was working with the Research Seminar in

9  Quantitative Economics at the University of Michigan, the

10 developers of a forecasting model, and I was asked to look at

11 the public sector's portion of that model, so I did

12 expenditure and revenue forecasting equations related to the

13 model that they had constructed for the State of Michigan.

14 Q    And that model, I guess, is abbreviated as the RSQE?

15 A    The full model is called the RSQE model.

16 Q    Is it still used?

17 A    It is still used.

18 Q    And your part of it was what?

19 A    My part was to look at tax collection estimates for the

20 State of Michigan as well as look somewhat at the expenditure

21 side of the budget.

22 Q    So, now, let me ask you about your employment after you

23 received your PhD.  First of all, did you have any employment

24 in the academic sector?

25 A    I did.  I began my career in academia.

1    Q    And what was your first academic job?

2    A    I taught economics at Georgia State University in

3    Atlanta.

4    Q    Okay.  And how long did you teach economics there?

5    A    I believe that was for three to four years, might have

6    been approaching five.

7    Q    And after Georgia State, where did you teach?

8    A    Then I taught at Hope College in Holland, Michigan.

9    Q    Okay.  And how long were you at Hope College in Holland,

10   Michigan?

11   A    I believe that was closer to nine years or even longer

12   than that.

13   Q    And by the way, while you were in Holland, Michigan, did

14   you have occasion to serve on any -- as a public official of

15   sorts?

16   A    I did.

17   Q    What did you do?

18   A    I was an elected member to the Holland Public School

19   Board.

20   Q    What does that have to do with taxes, if anything?

21   A    That had a great deal to do with the property tax

22   collections in the City of Holland.

23   Q    Why was that?

24   A    Because the local property tax was our primary source of

25   revenue beyond state aid.

1   Q   Now, after -- well, during the period of time you were at

2   Hope College, did you have occasion to serve as a professor

3   anywhere else on a visiting basis?

4   A   I believe I did in several universities.

5   Q   Tell me about those, if you could.

6   A   I believe one was the University of Michigan where I had

7   a -- was a one-year visiting assistant professor in the

8   economics department.

9   Q   Um-hmm.

10  A   Also taught at Grand Valley State University.

11  Q   Okay.  Now, I'm jumping ahead.  Later in your career, did

12  you have occasion to teach again?

13  A   I did.

14  Q   And where did you teach and when did you teach?

15  A   After I had moved to St. Paul, Minnesota, I taught as an

16  adjunct professor at Macalester College in St. Paul as well

17  as the Humphrey Institute at the University of Minnesota.

18  Q   Okay.  Now let me ask you about government service.  Did

19  there come a time -- and by the way, may I refer to you as

20  Dr. Cline or Mr. Cline or what is your preference?

21  A   Dr. Cline would be fine.

22  Q   Dr. Cline, did there come a time when you went to work

23  for the state government of Michigan?

24  A   Yes.

25  Q   Could you tell the Court when that was?

1    A    That was 1986 or so, 1984 to '86.

2    Q    And what was your job with the state government?

3    A    I was director of tax research in the Michigan Department

4    of Management and Budget.

5    Q    And what are the -- what were the responsibilities of

6    that job back then?

7    A    Those responsibilities included tracking the revenue

8    receipts from the major taxes for the state, analyzing the

9    potential revenue impacts of changes in current law as well

10   as analyzing some broader tax policy issues.

11   Q    Now, at that time or at any other time, did you encounter

12   a data source called a Michigan Consensus Revenue Estimating

13   Conference?

14   A    Yes.

15   Q    What is the Michigan Consensus Revenue Estimating

16   Conference?

17   A    For some time, Michigan, in doing their revenue forecast

18   for the state budgeting process, has had a process of doing

19   revenue estimates they call a consensus process.  It involves

20   major state agencies providing their own perspectives on the

21   economic outlook and the tax forecasts.  It also involves

22   using the RSQE model that we discussed earlier at the

23   University of Michigan as input in that process.  And then

24   they reach agreement or a consensus on what they think the

25   economic outlook is over the forecast period as well as the

1  revenue forecast.

2  Q    And is that a data source that you've worked with in the

3  course of your career?

4  A    It is.

5  Q    And did you use that data source in your work today for

6  Detroit?

7  A    Yes, we did.

8  Q    As an economist, please tell me how that data source is

9  viewed by economists in terms of its usefulness.

10  A    The RSQE people as well as forecasts are viewed very

11  highly by the academic community, I think, as well as the

12  business community and others who look at those forecasts.

13  Q    Let me ask did there come a time when you went to work

14  for the state government of Minnesota?

15  A    Yes.

16  Q    And tell the Court when that was.

17  A    That would have been 1989 perhaps the first year.  I

18  think I was there for a total of six years.

19  Q    And what was your job in Minnesota?

20  A    I was tax research director in Minnesota in the

21  Department of Revenue.

22  Q    Okay.  And what were the -- what was the responsibility

23  in Minnesota being tax research director?

24  A    I was responsible for a portion of the revenue estimates

25  and responsible for preparing -- with my staff preparing

1  revenue estimates of tax law changes as well as doing a

2  number of reports requested by the state legislature.

3  Q   Now, you mentioned -- and I should have asked you both

4  with respect to Michigan and now with respect to Minnesota.

5  Could you tell the Court what types of taxes you dealt with

6  in your state government jobs, Michigan and also Minnesota,

7  in terms of tax revenue forecasting?

8  A   In both states the taxes that I dealt with included the

9  sales tax, a form of consumption tax, the excise taxes like

10  cigarette and liquor, gambling revenues as well as lottery

11  revenues, taxes imposed upon individual businesses, which

12  could include corporate income taxes, and Michigan's unique

13  single business tax at the time, but taxes also included,

14  however, some work on the property tax.  Although it's a

15  local tax primarily, there are some state elements, but then

16  the state has a significant role to play in the

17  administration of the property tax system.

18  Q   And also individual income tax?

19  A   And the individual income tax certainly.

20  Q   Did there come a time when you left government service

21  and went to work in the private sector?

22  A   Yes.

23  Q   What year was that?

24  A   That would have been 1999.  Does that sound -- is that --

25  Q   It's your career, not mine, but if that's your

1    recollection, so be it.  Where did you go?

2    A    I went to work for Pricewaterhouse in Washington, D.C.,

3    on a project for the State of Pennsylvania.

4    Q    And what kind -- and in a nutshell, what was the project

5    for Pennsylvania about?

6    A    That project was called the blueprint project, and it was

7    a public-private partnership designed to think about and to

8    evaluate alternative tax systems, both state and local, for

9    the State of Pennsylvania.

10   Q    And then after Pricewaterhouse, where did you go?

11   A    After Pricewaterhouse, I went to work for KPMG.

12   Q    And that's the big accounting firm?

13   A    It is.

14   Q    What were you doing at KPMG?

15   A    At KPMG, I was with a relatively small group, the Barents

16   Group, that did state and local tax modeling.

17   Q    Okay.  And what was your title, by the way, at the

18   Barents Group?

19   A    I believe I was -- at one point, I was the director of

20   that practice.

21   Q    When you say "state and local tax modeling," what are you

22   referring to?

23   A    The Barents Group actually built tax simulation models

24   that were used for analyzing alternatives as well as in some

25   cases forecasting for major tax types, and they were

1  purchased primarily by state departments of revenue and the

2  people responsible for doing revenue forecasting.

3  Q   Now, you've just used a word I want to ask you about.

4  You said that the Barents Group made state tax simulation

5  models.  I believe that was your testimony.

6  A   Correct.

7  Q   What is a simulation model when you're talking about

8  state taxes?

9  A   Sometimes you can use the term "forecasting" or

10 "simulation" interchangeably, but they were systematic models

11 designed to capture recent history of what was happening in

12 the tax systems, the tax equations, and then providing a

13 systematic framework for forecasting into the future on

14 expected values of those tax collections.

15 Q   Then you from KPMG went to Ernst & Young?

16 A   Then I went to Ernst & Young.

17 Q   And how many years did you work at Ernst & Young?

18 A   That I do know.  I just completed 15 years of employment

19 at Ernst & Young.

20 Q   What was your -- and that was the QUEST practice that you

21 told us about already?

22 A   That is correct.

23 Q   What was your title at QUEST?

24 A   I was director, national director of state and local tax

25 policy economics.

1   Q   And tell me, if you could, the kind of work QUEST has

2   done.

3   A   The work I was involved in primarily at QUEST was working

4   with both the private sector and the public sector on

5   evaluating alternative tax systems, changes in existing

6   taxes, as well as a more limited amount of tax forecasting.

7   Q   And what sort of clients did QUEST work for during the

8   time you were there?

9   A   Well, my clients included the business community,

10  organizations like the business partnership, the

11  manufacturing associations, chambers of commerce, but the

12  clients also included state governments.  I've worked for

13  several governors, including the governor in Ohio, the

14  governor in Rhode Island, worked, as I mentioned earlier,

15  with the governor in Pennsylvania, so we were working with

16  both public and private sector clients.

17  Q   Fair to say, Dr. Cline, that you've been working on state

18  and local revenue tax forecasting for almost 40 years?

19  A   I believe it is a little bit over that when I actually

20  added those numbers together.

21  Q   And how many tax revenue forecasts do you estimate you've

22  done in the course of your career?

23  A   That would be dozens and dozens.

24  Q   And how many -- and how many different states' tax laws

25  have been involved in your revenue forecasting?

1   A   I've done projects related to tax modeling or forecasting

2   or economic impact analysis in -- I believe the last count

3   was 42 different states.

4   Q   Have you testified before as an expert witness?

5   A   I have.

6   Q   And tell us about that.

7   A   I was a witness in a tax court case in New York state.

8   Q   And what was the subject matter of your testimony there?

9   A   The subject matter was where intellectual property was

10  located for purposes of corporate income taxation.

11  Q   And the corporation in question there was who?

12  A   The client was Walt Disney.

13  Q   This had to do with the location where various cartoon

14  characters lived for tax purposes?

15  A   I often describe it as determining where Mickey and

16  Minnie live.

17  Q   And did the court give us an answer on that one?

18  A   The court did.

19  Q   Okay.  I think it's beyond the scope of this proceeding,

20  however.  Have you had research positions in the course of

21  your career?

22  A   I have.

23  Q   And tell us about those briefly.

24  A   One of my first research positions was with a federal

25  agency that no longer exists.  It was the Advisory Commission

1   on Intergovernmental Relations in Washington, also the Urban

2   Institute in Washington, D.C.

3   Q    And, once again, were you studying state and local tax

4   matters?

5   A    I was.

6   Q    Do you belong to any professional associations?

7   A    I did.

8   Q    And tell me, if you could, what those are or were.

9   A    The National Tax Association and the American Economic

10  Association.

11  Q    Have you published any articles in scholarly journals?

12  A    I have.

13  Q    Do you know how many you've published?

14  A    I think that would be several dozen.  It might be 30 or

15  40.

16          MR. STEWART:  Your Honor, I would move to qualify

17  Dr. Cline as an expert in state and local tax revenue

18  forecasting and revenue impact analysis.

19          THE COURT:  Any objections?

20          MR. SMITH:  Your Honor, we do want to reserve our

21  right pursuant to -- along the lines Mr. Hackney had

22  mentioned because we do have a question regarding the fit of

23  Mr. Cline's expertise with the particular testimony here

24  since he did testify in his deposition that he had not

25  previously done forecasting for a municipality before.

1      THE COURT:  Any objections to that reservation, sir?

2      MR. STEWART:  No, your Honor.

3      THE COURT:  All right.  Subject to that, you may

4  proceed.

5  BY MR. STEWART:

6  Q    Now, let me now ask you, if I could, Dr. Cline, about

7  your work on this case.  There was a team employed at QUEST

8  to work for Detroit?

9  A    That is correct.

10  Q   And tell us what your position was on that team.

11  A   I was the manager of that project in the sense of

12  supervising my staff that worked on the project in the

13  Washington, D.C., office.

14  Q   How big was the team altogether?

15  A   I believe we had five people, including myself, working

16  on an ongoing basis on the revenue estimates.

17  Q   Was one of the team members a person named Caroline

18  Sallee?

19  A   That is correct.

20  Q   And did you supervise Ms. Sallee's work?

21  A   I did.

22  Q   And did you -- what did you do to make yourself

23  personally familiar with the work that she did?

24  A   What I did in the review process was to review at each

25  step of the way the spreadsheets that were being prepared,

 1  the calculations that were being used, the logic behind the

 2  approach that we were taking, as well as a review of final

 3  numbers before signing off on the results.

 4  Q   Now, did you personally concentrate on any particular

 5  taxes when it came to revenue forecasting for the city?

 6  A   I spent more time looking at the nonproperty tax,

 7  nonstate revenue sharing numbers, so that would be the

 8  individual income tax, corporate income tax, wagering tax,

 9  utility users tax.

10  Q   So you did corporate and personal income tax --

11  A   Correct.

12  Q   -- wagering tax and utility users tax?

13  A   That is correct.

14  Q   Okay.  Now, you were asked to do two different forecasts,

15  I believe.  One was for ten years, and one was for a longer

16  period after that; is that correct?

17  A   Correct.

18  Q   Just let me ask you about those before we get into them.

19  The shorter forecast was for how long?

20  A   A ten-year period covering fiscal years 2014 through

21  2023.

22  Q   Had you previously done a forecast for tax revenue

23  purposes of periods as long as ten years?

24  A   I had.

25  Q   Is that common?

1  A   It's not common in the budgetary setting, but it is more

2  common in looking at longer run tax issues that affect state

3  or local governments.

4  Q   You are familiar with the normal length of time that

5  states and local governments forecast revenue?

6  A   I am.

7  Q   What is the ordinary period of time they use?

8  A   The states differ in terms of their budget forecast

9  perspective.  I believe when I was in Michigan, we were doing

10  two-year forecasts because the budgets were presented and

11  evaluated on a two-year basis.  I had done some work, though,

12  in states where they had a four-year budget horizon, but it

13  does differ from state to state.  I would imagine that the

14  most frequent perspective is two years.

15  Q   Do you know why it's two years?

16  A   It's two years partly because it is a budget process, and

17  things are changing continuously in terms of the underlying

18  revenues as well as the expenditure needs and expenditure

19  issues, and so the legislators tend to concentrate on a

20  shorter run perspective because they have to adopt a budget

21  to implement on a year-by-year basis.

22  Q   Do you know of something called a single point estimate?

23  A   I do.

24  Q   Could you tell us what is a single point estimate?

25  A   The way I would use that term is that it refers to the

1    practice of providing a single estimate of the dollar amount

2    expected to be collected from a tax in a particular year.

3    It's reported as a single number.  Taxes will be "X" millions

4    of dollars.

5    Q   Why is it done that way instead of giving a range of

6    numbers?

7    A   The reason the point estimates are used in the budgetary

8    process is because it is a critical step in establishing an

9    annual budget, which is a state spending plan, and agencies

10   have to be told how much money they have to spend in any

11   single year.

12   Q   An exact amount, not a range of money?

13   A   In my career in doing state revenue forecasting, we did

14   not provide ranges.  We provided point estimates.

15   Q   Now, one last thing before we move on.  In addition to

16   the ten-year forecast -- pardon me -- you're aware there's

17   this forty-year forecast.

18   A   I'm aware that there's an additional 30-year period added

19   to the initial 10-year period.

20   Q   Now, do you refer to that as a forecast or as something

21   other than a forecast?

22   A   I differentiate between the ten-year forecast we did and

23   what I would describe as the next 30-year exercise.

24   Q   And what do you call the next 30-year exercise?

25   A   I describe it as a simulation.

1  Q   And you've told us already what a simulation is.  What

2  use is a simulation?

3  A   My interpretation of that next 30-year forecast that we

4  did prepare or simulation that we prepared for the city is

5  that it isn't based upon a detailed economic forecast of all

6  the relevant factors that might be considered over an

7  additional 30 years, but it is a systematic way to talk about

8  what the level of collections will be given the assumptions

9  we made about the rates of growth of the various tax sources.

10 Q   And is also one of the assumptions in a simulation the

11 assumptions about the tax structure affecting the City of

12 Detroit?

13 A   In doing a long-run forecast, and in this case 30 years

14 is certainly a long-run simulation of the future, we accept

15 current law as given.  We have to have a basis for the

16 analysis we do, and the key assumption is that there is not a

17 change in current law over that period of time.

18 Q   Okay.  Now, you mentioned, by the way, I think,

19 spreadsheets a minute ago.  We will be getting into

20 spreadsheets.  Just for the record, when you refer to a

21 spreadsheet, what are you talking about?

22 A   What I'm talking about describes the model approach we

23 used in this project.  We did our revenue estimates year by

24 year and tax type by tax type within an Excel spreadsheet.

25 Q   Is that a standard tool that is used --

1    A    It's -- excuse me.

2    Q    -- by economists like yourselves in forecasting?

3    A    It's one of the tools.

4    Q    And I should have asked you earlier what methodologies

5    are the standard methodologies used by economists when

6    they're forecasting tax revenue?

7    A    As I just mentioned, there's a tool kit of different

8    methodologies, different modeling tools, different empirical

9    methods for doing a forecast.  More complicated forecasts

10   probably involve uses of multiple types of methodology and

11   techniques.

12   Q    And was the forecasting you did here viewed as

13   complicated?

14   A    I would describe the forecasting we did here as very

15   complicated in the sense of what was changing in the

16   underlying economics for the City of Detroit.  It was also

17   complicated in the sense that there were a number of law

18   changes and administrative changes taking place in the

19   administration of those tax systems that were varying the tax

20   collection amounts.  In that sense, it was complicated.  The

21   spreadsheet format was a way to structure that complexity and

22   I think simplify our approach to modeling.

23   Q    And because of the complexity of the project, were you

24   required to do anything in this project different than you

25   would have done in, say, a simpler project?

1   A    Yes.  There are things that we did different differently.

2   Q    What would some of those things be?

3   A    Well, for one example, in this project history was less

4   reliable to us in terms of trying to fit regression equations

5   or use history, the last 20 years or 30 years, to estimate a

6   specific tax type's future revenue.  The breaks that were

7   occurring between the past and the present in Detroit were so

8   substantial that they led us to conclude that that was not an

9   effective way to approach it.

10  Q    So what did you do instead?

11  A    So instead we used the spreadsheet modeling approach

12  where we could, in a sense, add more detail about each tax,

13  disaggregate it into buckets or different components, and

14  then add the pieces back together, so our approach gave us, I

15  think, a better way to more directly control all the things

16  that were changing in the background here.

17  Q    Okay.  Let me move on to something else.

18          MR. STEWART:  Could we please put up -- and I will

19  put up demonstrative Exhibit 545.  Your Honor may put up a

20  board -- or we have a hard copy of it as well that might be

21  easier for us to work with.

22          THE COURT:  Sure.

23  BY MR. STEWART:

24  Q    Dr. Cline, can you see Exhibit 545?

25  A    Yes, I can.

1 Q   Could you please tell us what is Exhibit 545?

2 A   Exhibit 545 in a sense is a beginning point in our

3 revenue forecasting exercise.  We needed to know --

4 Q   What does it -- what does it show?

5 A   We needed to know what the outlook for population changes

6 are in the City of Detroit, and this graph summarizes some of

7 the information we looked at and considered in deciding what

8 that forecast looks like.

9 Q   Who prepared Exhibit 545?

10 A   The QUEST practice prepared this.

11 Q   And have you personally checked the numbers and the

12 details of the exhibit to assure yourself of its

13 completeness?

14 A   I have.

15         MR. STEWART:  Your Honor, I would move Exhibit 545

16 into evidence before I question the witness about it.

17         THE COURT:  Any objections?

18         MR. SMITH:  I assume just for demonstrative

19 purposes?

20         MR. STEWART:  I'm going to move it into evidence for

21 its content as well.

22         MR. SMITH:  Well, again, we still have -- reserve

23 our right.

24         THE COURT:  Okay.

25         MR. SMITH:  We think that these are all unreliable,

1   but for purposes --

2           THE COURT:  All right.  Subject to that reservation,

3   it is admitted.

4       (Debtor's Exhibit 545 received at 9:36 a.m.)

5           MR. STEWART:  Thank you, your Honor.

6   BY MR. STEWART:

7   Q   Dr. Cline --

8           MR. STEWART:  Your Honor, may I ask leave for the

9   witness to stand in front of the chart to show the lines?  It

10  might be easier than trying to describe them from the witness

11  stand.  Whatever --

12          THE COURT:  Well, the problem is the microphone.

13          MR. STEWART:  Ah, okay.

14          THE COURT:  So I think I do have to turn you down on

15  that.

16          MR. STEWART:  All right.  And just let me advise the

17  Court I am color-blind, so when I talk about different colors

18  here, we're all going to be --

19          THE COURT:  Okay.

20          MR. STEWART:  -- in new and uncharted territory.

21          THE COURT:  We won't qualify you as an expert on the

22  colors on the lines.

23          MR. STEWART:  Yeah.  You should ask my wife about

24  some of the ties I have purchased, your Honor.

25          THE COURT:  I think I'll skip that actually.

1          MR. STEWART:  Well, your Honor, you better.

2     BY MR. STEWART:

3     Q   Dr. Cline, Exhibit 545 is in front of you, and I think

4     you've told us this models changes in population for the City

5     of Detroit.  Can you tell us, first of all, what is the

6     number on the upper left-hand corner that starts 953 -- and I

7     guess it's 857?  What is that number?

8     A   That number is the number of people living in the City of

9     Detroit in the year 2000, 2001.

10    Q   And then there's a straight line to a more current year.

11    What is that?

12    A   For example, the dark blue line, which has the number

13    714,326 attached to it, is the last, I believe, actual number

14    for population in the City of Detroit.

15    Q   Well, what was the data you relied upon for those two

16    data points in your chart?

17    A   This information came from publications by SEMCOG.

18    Q   And stop you right -- you better tell us what is SEMCOG?

19    A   SEMCOG is the Southeast Michigan Council of Governments.

20    Q   Okay.  And is it a -- what does it do?

21    A   It's another umbrella organization that coordinates

22    across governments, local governments, I believe, in

23    southeast Michigan.

24    Q   And SEMCOG publishes reports, including reports about

25    population changes?

1  A    They do.  They have a research staff that produces

2  reports.

3  Q    And have you worked with SEMCOG data before?

4  A    I have.

5  Q    What have you determined about it in terms of its

6  usefulness and reliability?

7  A    I think it is very reliable information.  I think they do

8  their work carefully, and I go to the source for their

9  perspective on the future.

10 Q    Now, at the bottom we have four boxes.  From left to

11 right it says EY QUEST.  Then we have SEMCOG 1, SEMCOG 2, and

12 SEMCOG 3.  Let me ask you just about the SEMCOG references.

13 What are those references to?

14 A    Those are references to alternative population forecasts

15 that have been discussed -- prepared by and discussed by

16 SEMCOG.

17 Q    And can you tell us what the differences are in terms of

18 the assumptions and approach between the three different

19 SEMCOG projections?

20 A    The projections differ in terms of both the demographic

21 assumptions that went into these projections or forecasts as

22 well as underlying economics related to each of those

23 scenarios or alternatives.

24 Q    Without getting into the details of how SEMCOG did its

25 work, which of the three SEMCOG projections did E&Y determine

1  was the most realistic?

2  A    We determined that SEMCOG 1, the yellow line in that

3  graph, was, in our evaluation, the most likely outcome for

4  that future trend or future levels of population in Detroit.

5  Q    That's the middle SEMCOG line?

6  A    That's the middle line.  That is correct.

7  Q    What does it show in terms of Detroit's population change

8  in the coming ten years?

9  A    Well, the middle line, the yellow SEMCOG 1 forecast, had

10  a continued decrease in population in Detroit.  Then it

11  starts -- a little bit further out starts to level off but

12  still is drifting downward.

13  Q    Now, there's another line that breaks off, comes off of

14  the SEMCOG 1 line.  Is that the EY QUEST line?

15  A    That dark red line signals that Ernst & Young, the QUEST

16  practice, has put a slightly higher population forecast and

17  projection in in the later years because of additional

18  analysis that we did.

19  Q    And so where did QUEST end up in its projection of

20  Detroit's population at the end of our period here?

21  A    As you see the red number on the far right-hand side,

22  641,354 total population.

23            THE COURT:  For what year are those four numbers?

24            THE WITNESS:  I believe those four numbers are for

25  the ending period, which was 2050.  It looks like we went a

1    couple of years beyond, and SEMCOG ended at 2050.

2    BY MR. STEWART:

3    Q    Now, let me now move on to ask you about your individual

4    income tax projections, if I could, and do I understand

5    correctly Detroit -- and would you like me -- let me take

6    this.  Now, Detroit has two types of income tax, individual

7    and corporate; correct?

8    A    That is correct.

9    Q    What is the -- let me start with individual.  First of

10   all, where does the city get its legal authority to impose

11   individual income taxes?

12   A    It's my understanding that the --

13          MR. SMITH:  Objection.  To the extent he's going to

14   offer a legal opinion, your Honor, I don't think he's

15   qualified.

16   BY MR. STEWART:

17   Q    In the course of your work doing tax revenue forecasting,

18   Dr. Cline, is one of the data points you look at tax rates?

19   A    That is correct.

20   Q    And where do you learn tax rates?

21   A    From two sources, the published rates, say, for the City

22   of Detroit when they're advising taxpayers on what rate to

23   use, but we also look at historical series of what the rates

24   were earlier, and then we examine -- because we need to

25   understand current law in order to do our forecasts, we need

1    to understand if there are any scheduled changes in the
2    future in current law.  And in the case of Detroit, the
3    current law is found at the state level.
4    Q    And by the way, in your work as research director for the
5    Department of Management and Budget for the State of
6    Michigan, did you have occasion in those days to work with
7    Michigan tax law?
8    A    I worked very closely with both the tax lawyers and the
9    tax law.
10   Q    And do you understand what the rates are today of
11   individual income tax upon taxpayers in the City of Detroit?
12   A    I do.
13   Q    And what are those rates?
14   A    Those rates -- they're two rates, which is one of the
15   complications in the forecasting process.  One is on
16   residents at a rate of 2.4 percent.  As I understand state
17   law, it limits the nonresident rate to 50 percent of that,
18   which is a rate of 1.2 percent.
19   Q    Is it your understanding that Detroit imposes the maximum
20   rate permitted under the law for individual income tax?
21   A    That is my understanding.
22   Q    Now, first, just tell us generally before we get into the
23   spreadsheets the steps you followed in terms of forecasting
24   individual income taxes for the first ten years.
25   A    The equation to keep in mind, which is the summary of

1   what we did, looks at our estimates of the number of

2   taxpayers expected in the future, their average income level

3   that'll be subject to taxes in the future.  Then we apply the

4   statutory tax rates given our understanding of current law in

5   the future.

6           MR. STEWART:  Let me ask Steve to put up on the

7   screen City Exhibit 112-A.  And, your Honor, this is among

8   the materials that I handed up, and the witness has a hard

9   copy as do counsel.

10  BY MR. STEWART:

11  Q   Do you have Exhibit 112-A in front of you, Dr. Cline?

12  A   I do.

13  Q   What is Exhibit 112-A?

14  A   Exhibit 112-A is a snapshot of a section of one of the

15  sheets in our forecasting model.

16  Q   And it has several pages, does it not?

17  A   It does.

18  Q   Who prepared the spreadsheet that has been marked and is

19  in front of you as Exhibit 112-A?

20  A   The QUEST practice.

21  Q   And did you personally look at this spreadsheet, and did

22  you personally work with this spreadsheet?

23  A   I did.

24  Q   What did you do to determine the completeness and

25  accuracy of the spreadsheet?

1  A   In the first step, I supervised the construction in the

2  sense of which lines we wanted to include in the analysis.

3  As the data was being filled in, I reviewed the assumptions

4  going in for the key inputs, but then I also reviewed the

5  calculations that used those inputs and historic information

6  to do the forecast itself.

7          MR. STEWART:  Your Honor, I would move Exhibit 112-A

8  into evidence before I begin questioning the witness about

9  it.

10          THE COURT:  Subject to your previous reservation,

11  any other objections?

12          MR. SMITH:  Yes, and just to clarify it for --

13  there's a mixture of historical data on here and then opinion

14  testimony about future projections, and so obviously with

15  respect to the opinion matter, that's just admitted for

16  purposes of illustrating his opinion, I assume.

17          THE COURT:  All right.  Subject to the reservation,

18  Exhibit 112-A is admitted.

19      (Debtor's Exhibit 112-A received at 9:47 a.m.)

20          MR. STEWART:  Okay.  All right.

21  BY MR. STEWART:

22  Q   So let's go through, if we could, some of the -- some of

23  the elements and just the structure of Exhibit 112-A, Dr.

24  Cline.  At the top we have something called municipal income

25  taxes drivers.  Do you see that?

1   A   I do.

2   Q   That starts on Row 9.

3   A   Correct.

4   Q   And below that we have a section starting on Row 19 about

5   population change.

6   A   Yes, I do.

7   Q   And then down on line 37, calculations of municipal

8   income taxes; correct?

9   A   Correct.

10  Q   Row 34, corporate income taxes?

11  A   Correct.

12  Q   101, we get down to individual income tax estimate

13  drivers; correct?

14  A   I see that.

15  Q   And then further down we get into more details, and I

16  will go into these in depth.  I just -- that was simply the

17  overview, so let me start by asking you this.  As a first

18  step, did you determine total employment in the State of

19  Michigan and in the City of Detroit?

20  A   The answer is yes but involves a combination of some

21  information from the Research Seminar in Quantitative

22  Economics as well as QUEST's separate estimates.

23  Q   Okay.  Let me start by directing your attention to Row

24  124.  And is 124 highlighted there for you on the screen?

25  A   Yes.

1  Q   And what does Row 124 depict up through the year 2013?

2  A   Up through the year 2013, that is basically history for

3  the actual reported state employment for the State of

4  Michigan.

5  Q   And where did you get that history from?

6  A   That history comes from several national publications,

7  Bureau of Labor Statistics publications, for example, and we

8  also see it in the history that's discussed in the RSQE

9  forecast.

10 Q   Okay.  Then line 127 is entitled "Total Detroit

11 Employment."  Let's highlight that if we could.  And through

12 Column K does that show actual total Detroit employment for

13 the years ended 2013?

14 A   It does, although the 2013 numbers perhaps at the time we

15 prepared this were partial or preliminary.  I believe there

16 probably are final numbers there now.

17 Q   And by the way, are these calendars or fiscal years?

18 A   Our forecasting model has been set up to produce results,

19 tax forecasts that are fiscal year forecasts.  Some of the

20 inputs we have to use are calendar year inputs, and part of

21 the process is making the bridge or recognizing the issue of

22 timing.

23 Q   Okay.  All right.

24      MR. STEWART:  I'm going to ask -- let's put up, if

25 we could, Exhibit 546, and I'll put it up on the board.

1  BY MR. STEWART:

2  Q   Dr. Cline, is Exhibit 546 in front of you?

3  A   It is.

4  Q   What is Exhibit 546?

5  A   Exhibit 546 was an important input into our structuring

6  of the Detroit tax forecast.

7  Q   And what does it show just in general?

8  A   It shows the relationship expressed as a ratio where the

9  numerator is total Detroit employment and the denominator is

10  total State of Michigan employment.

11  Q   What was the source for Exhibit 546?

12  A   That is the Bureau of Labor Statistics local area

13  unemployment statistics, which also includes numbers of

14  employed people.

15  Q   And who prepared Exhibit 546?

16  A   The QUEST practice prepared it.

17  Q   What did you do to check the accuracy and completeness of

18  the exhibit?

19  A   I did review the numbers to see if it matched the source

20  information I had in front of me to confirm the numbers.

21      MR. STEWART:  Your Honor, I would move Exhibit 546

22  into evidence before I question the witness about it.

23      MR. SMITH:  Same reservation and just also to make

24  clear it's not coming in as a Rule 1006 summary.  I don't

25  think he's shown the underlying data.

1          THE COURT:  All right.  Subject to the reservation,

2    546 is admitted.

3          (Debtor's Exhibit 546 received at 9:52 a.m.)

4    BY MR. STEWART:

5    Q    Dr. Cline, please tell us what it is that Exhibit 546

6    demonstrates.

7    A    Exhibit 546 covers a period of time that runs from 1990

8    through 2012.

9    Q    And what information does our exhibit depict?

10   A    It shows what's happened over this longer run period of

11   time to the relationship between employment in Detroit and

12   employment in the State of Michigan.

13   Q    Now, what does the dotted line show?

14   A    The dotted line would be the actual data that is reported

15   by the BLS formed as the ratio I described.

16   Q    And there's a solid line.  What is that line?

17   A    The solid line is a regression equation.

18   Q    And what does it -- what does it tell us?

19   A    The regression equation was the statistical technique we

20   used in this particular case to try to summarize an average

21   relationship for this ratio over the 20-plus years of time.

22   Q    What conclusions, if any, were you able to reach as a

23   result of the analysis set forth on Exhibit 546?

24   A    As you can see by the downward slope when you move from

25   left to right of the solid line or the starting number, 8.66,

1  versus the ending number, 6.97, you see a almost continuous

2  decline in that ratio over the entire period of time.

3  Q    And how, if at all, did that inform your analysis as you

4  applied this to forecasting income tax revenue for the City

5  of Detroit?

6  A    At this stage of our revenue forecasting exercise, we

7  needed to get from the forecast of Michigan employment to a

8  forecast of city employment.

9  Q    And so this gave you a ratio to use in that forecasting?

10 A    This gave us one of the key inputs in that forecasting

11 exercise.

12 Q    Let's now put up Exhibit 547.  Dr. Cline, is Exhibit 547

13 before you?

14 A    It is.

15 Q    Did you prepare this chart or have it prepared at your

16 direction?

17 A    The QUEST practice prepared that chart.

18 Q    What is the data source for Exhibit 547?

19 A    That is using the same data source in the prior exhibit.

20 That's the Bureau of Labor Statistics employment and

21 unemployment data.

22 Q    Without getting into the specifics of it, please tell us

23 what it is that Exhibit 547 depicts.

24 A    This exhibit is a different perspective.  It's looking at

25 the year to year percentage changes in employment for the

1    state and for the City of Detroit.

2           MR. STEWART:  Your Honor, I would move Exhibit 547

3    into evidence.

4           MR. SMITH:  Same reservation and just the

5    clarification that it's coming in as his opinion.

6           THE COURT:  All right.  Subject to that reservation,

7    547 is admitted.

8         (Debtor's Exhibit 547 received at 9:55 a.m.)

9           MR. STEWART:  And just to be clear, your Honor, I'm

10   not -- although he will rely upon this in his opinion, this

11   is not his opinion about what these numbers show.  This is --

12   he has testified these are the numbers as they're depicted

13   graphically.

14          MR. SMITH:  Your Honor, I believe that this is the

15   result of calculation that was performed.  The underlying

16   data has not been introduced into evidence, and this is not

17   an appropriate Rule 1006 summary.  And that's why we're

18   asking for this clarification that this is his opinion.

19          THE COURT:  Well, let me just ask you, sir, is the

20   data that's reflected in 547 and before it 546 data that you

21   and your firm calculated?

22          THE WITNESS:  No, it is not.  The underlying data

23   was not calculated by Ernst & Young.

24          THE COURT:  Okay.  Who prepared the chart or the

25   actual graphs?

1          THE WITNESS:  The QUEST practice.

2          THE COURT:  And in preparing those charts or graphs,

3    how were the numbers that are shown on them determined?

4          THE WITNESS:  The underlying data had -- excuse me.

5          THE COURT:  How were the numbers determined, the

6    numbers that we actually see on the chart -- the graph?  How

7    were they determined?

8          THE WITNESS:  They were calculated mathematically

9    from the actual underlying numbers prepared by the Bureau of

10   Labor Statistics.

11         THE COURT:  And who did that calculation that you

12   just described?

13         THE WITNESS:  QUEST.

14         THE COURT:  All right.  So with that clarification,

15   the two documents are admitted subject to the reservation.

16   BY MR. STEWART:

17   Q   Dr. Cline, now let me ask you to look at Exhibit 547, and

18   initially my question is could you tell us what it is that

19   Exhibit 547 represents?

20   A   Exhibit 547, looking at those -- the relationship between

21   percentage changes and employment in Detroit versus the State

22   of Michigan, gave us additional insight into what has been

23   happening in periods of recession and expansion going back to

24   the year 2001.

25   Q   Okay.  And this chart show -- it's entitled "Growth Rates

1   of Detroit and Michigan Employment"; correct?

2   A    Correct.

3   Q    When you say "growth rate," what are you referring to?

4   A    If that number, for example, was 1.5, it would say that

5   in this year employment is 1.5-percent larger than it was

6   last year.

7   Q    This does not show actual numbers of jobs; correct?

8   A    It does not.

9   Q    What does it show?

10  A    It shows how the actual number changes from year to year.

11  It is the change, not the level.

12  Q    And what did this chart indicate to you when you analyzed

13  it in connection with your work?

14  A    One insight we got from this graph is that Detroit could

15  be characterized going back to 2001 as following the state

16  fairly closely in a recession but lagging behind the state's

17  employment growth coming out of a recession.

18  Q    And how did that inform your analysis on tax revenue

19  forecasting?

20  A    We used that as an additional key input in the

21  preparation of our forecasts.

22  Q    Now, looking at the far right, I see that the red line

23  and I think it's a blue line are starting to converge.  What

24  does that indicate, if anything?

25  A    That indicates that the rates of growth of employment,

1  Detroit and the State of Michigan were coming closer together

2  in that last year of 2012.

3  Q   What does that tell us about recovery in terms of number

4  of jobs?

5  A   We can't infer anything by itself from that relationship

6  in the percentage growth rate in 2012 because they are

7  focusing on the change in the levels, and the levels are

8  large, and the levels involve thousands of jobs.  It's simply

9  telling us how the levels are changing from year to year.

10 Q   Let me move to our next exhibit, Exhibit 548.  Dr. Cline,

11 is Exhibit 548 in front of you?

12 A   It is.

13 Q   What is Exhibit 548?

14        THE COURT:  Excuse me, sir.  When you speak, you

15 need to be near the microphone.

16 BY MR. STEWART:

17 Q   Dr. Cline, do you have Exhibit 548 before you?

18 A   I do.

19 Q   What does Exhibit 548 show?

20 A   Exhibit 548 presents the statutory individual income tax

21 rates under current law for the City of Detroit, but it

22 identifies three different -- excuse me -- three different

23 types of taxpayers.

24 Q   Okay.  And that is what is denominated in the left-hand

25 column as income tax base A and B and C?

1    A    Correct.

2    Q    Who assigned the letters A, B, and C to those categories?

3    A    QUEST designated those.

4    Q    Okay.  What is Category A?

5    A    Category A represents taxpayers for the City of Detroit

6    that live in Detroit --

7    Q    And?

8    A    -- and work in Detroit.

9    Q    And what tax rate does Category A pay?

10   A    That's the rate of 2.4 percent on their taxable income.

11   Q    And tell us about Category B.

12   A    Category B is the category or class of taxpayers that

13   file the rest of the tax returns in Detroit.  They don't live

14   in Detroit, but they work in Detroit.

15   Q    And their tax rate is what?

16   A    1.2 percent on the income, the taxable income associated

17   with Detroit.

18   Q    And Category C?

19   A    Category C is the resident piece from Detroit, the

20   residents of Detroit who work outside of Detroit.

21   Q    And what tax rate do they pay?

22   A    They also pay 2.4 percent.  If you're a resident,

23   wherever you earn your income, it's taxed at 2.4 percent.

24   Q    To your knowledge, is this Exhibit 548 an accurate

25   summary of the operation of Michigan tax law as applied to

1  individual income tax payers?

2  A   It is my understanding of the current law of tax rates

3  for the City of Detroit.

4         MR. STEWART:  Your Honor, I'd move it into evidence

5  as a convenience for us all.

6         MR. SMITH:  No objection.

7         THE COURT:  All right.  548 is admitted.

8      (Debtor's Exhibit 548 received at 10:03 a.m.)

9  BY MR. STEWART:

10 Q   So, Dr. Cline, let us now go back to Exhibit 112-A, and I

11 believe that is already in evidence.  Do we have it in front

12 of us?  Okay.  Now, did there come a time in your analysis

13 when you took the step of trying to determine the percentage

14 of taxpayers in each of these groups, A, B, and C?

15 A   Yes, we did.

16 Q   And let me direct your attention to Row 132.  I think

17 that's on the third page of the paper version of this

18 document.  Do you have Row 132 in -- or do you have that

19 page?

20 A   I have the page, and I see Row 132.

21 Q   And actually I think I just misspoke.  I think I mean

22 131.  Let's actually go up a little bit.  We already talked

23 about Rows 124 and 127; correct?

24 A   Correct.

25 Q   And if you look at Column K, that's the most recent year

1    we have actual for numbers for at least those rows; correct?

2    A    In most cases.

3    Q    Now, let's look, if we could, at Exhibit -- sorry -- Row

4    131.  What category of -- in our A, B -- actually, I'm going

5    to put this back up -- in our A, B, C nomenclature, what

6    category are the people who are shown on Row 131?

7    A    That category shown on line 131 is the category of

8    residents working in the City of Detroit, residents of

9    Detroit.  It would be -- I might refer to it as the bucket,

10   Bucket A shown on that graph.

11   Q    Okay.  And 133, what group is that?

12   A    133 is the group of nonresidents working in Detroit, and

13   on the exhibit on the easel, that is Group B.

14   Q    And Row 137, what group is that?

15   A    That's the remainder of the Detroit residents who work

16   outside of Detroit, and that is Group C shown on the easel.

17   Q    Now, you have -- and I'm going to continue looking at

18   Column K.  You have at that column a starting value for the

19   number of residents in each of those three classes, correct,

20   or the number of taxpayers in each of those three classes?

21   Did you then forecast growth or lack of growth for each of

22   the three classes?

23   A    Yes, we did.

24   Q    Please tell us how you did that.

25   A    In doing that forecast of the number of people in Buckets

1  A, B, and C, we understood there was a relationship between

2  how the number of people was changing as well as the number

3  of jobs that were available to them, and so we used

4  information on recent history and our forecasts of both

5  population changes, the number of people, and employment

6  changes in order to integrate that information and use it as

7  a basis for our judgment about the growth -- probable growth

8  rate over the ten-year period.

9  Q    So tell us the steps you went through to determine the

10 rate of change for the number of people in each of our three

11 categories, A and B and C.

12 A    One of the important inputs in making that determination

13 was our population projection that we've already talked

14 about, and that was a key driver in that calculation.

15 Q    And then -- go ahead.

16 A    But -- excuse me.

17 Q    Please continue.

18 A    But QUEST made the decision about what actual tax rate to

19 put in -- excuse me -- what growth rate for those categories

20 to put into the forecast.

21 Q    And is it fair to say that the percentage of A versus B

22 versus C changes over time?

23 A    It does change over time.

24 Q    And how did you calculate that change over time?

25 A    It was that change over time that we were interested in.

1    It's an example of one of those details I talked about

2    earlier that are complex in this particular project.  Because

3    they were changing or growing at different rates, we wanted

4    to do the forecasts by the three separate buckets.

5    Q    And did you end up with different rates of growth for

6    each of the three different categories of taxpayer?

7    A    We did and partly because the employment information

8    that's relevant came from two geographic areas, State of

9    Michigan for jobs outside of Detroit and Detroit for the jobs

10   in Detroit.

11   Q    And so looking at Exhibit 112-A, do we see, for example,

12   at Row 132 the growth rate over the coming decade for

13   Category A?

14   A    We do.

15   Q    And what does 134 show us?

16   A    What 134 shows is that we had to make the decision of

17   deciding where we were in Detroit in the recovery from the

18   very deep recession where the number of residents working in

19   Detroit had recently fallen by over five percent but nine

20   percent a year.  Our forecast is a decrease but a negative

21   one percent based upon the understanding Detroit was

22   recovering from the recession, but it would continue -- the

23   job growth would continue to be negative although less severe

24   than in the most recent years.

25   Q    Is that Row 132 you were talking about just the --

1   A    It is Row 132.

2   Q    And then tell us what 134 represents.

3   A    134 you see the growth rates that we actually used for

4   the bucket which is nonresidents working in Detroit, which

5   was Bucket B.

6   Q    And you used a similar process as what you just described

7   to me for Bucket A?

8   A    We did.

9   Q    And what does Row 138 show us?

10  A    138 shows us year by year the growth rates in our ten-

11  year forecast for residents working outside of the city

12  negative and then turning slightly positive in the later part

13  of the forecast.

14  Q    Okay.  And you told me as well that you calculated growth

15  rates for these three categories in terms of the number of

16  jobs that would be available to them in the coming years.

17  A    That is correct.

18  Q    Tell us how you did that.

19  A    Well, the reason for that calculation is that we needed

20  to talk about the number of tax filers, the number of

21  taxpayers, and we used these rates of growth, the three

22  different growth paths that we've just discussed, assuming

23  they applied to the tax filers themselves, so it gave us then

24  estimates of the number of filers and how they change year by

25  year.

1   Q    What rows on Exhibit 112-A contain that growth rate?

2   A    Well, those are the growth rates that you see, for

3   example, the one we just looked at on line 138.  It's the

4   growth rate of other -- of residents working elsewhere, for

5   example, but it is the growth rate that we used to talk about

6   what's happening to the number of filers.

7   Q    It combines growth and number of people and growth and

8   number of jobs.

9   A    We need one more step.

10  Q    Please tell us.

11  A    The missing step then is to pick up further down in the

12  spreadsheet --

13  Q    And what row would that be?

14  A    If we could move down, in Row -- may I refer to the line

15  numbers?

16  Q    Please.

17  A    The Rows 151 and 152 summarize what we think is happening

18  to taxable income in Detroit.  It incorporates both the

19  forecast of the number of filers we just discussed plus an

20  assumption about how the average taxable income is growing

21  each year.  We combine growth in the number of taxpayers,

22  growth in the average income to get growth in total taxable

23  income for two categories, residents and nonresidents.

24  Q    And once you had those two numbers, what were you able to

25  calculate?

1   A   If we could move back up earlier in the spreadsheet,

2   that's where we have in the section on line 37 described as

3   municipal individual income tax calculations, you see below

4   that numbers for total city resident income taxes, total city

5   nonresident income taxes.  Adding those two together on line

6   71, you've got our total municipal income tax forecast year

7   by year.

8   Q   And that was going to be my next question, so just to --

9           THE COURT:  Excuse me.  Excuse me one second.

10          MR. STEWART:  Yes.

11          THE COURT:  I need a little help with my system

12  here.  Sir, can you step forward and help me out with my

13  question?  And we're going to go off the record, please.

14      (Recess at 10:13 a.m., until 10:14 a.m.)

15  BY MR. STEWART:

16  Q   Dr. Cline, we were looking at line 71 of Exhibit 112-A.

17  A   That is correct.

18  Q   And tell us, please, what is line 71 of Exhibit 112-A?

19  A   Line 71 simply adds our two different individual income

20  tax forecasts.  It adds the forecast for residents of Detroit

21  and the forecast for nonresidents paying income taxes in

22  Detroit.

23  Q   And is that then the universe of individual income tax

24  payers?

25  A   It is the universe of individual income tax payers in our

1   forecast of Detroit municipal income tax -- individual income

2   tax revenue.

3   Q    And so Cell K-71 would be the total individual income tax

4   collections for 2013 for that group?

5   A    That is correct.

6   Q    And then the cells that run all the way to Cell U, what

7   are those?

8   A    Those are the year-by-year total numbers for individual

9   income tax collections given the growth rates that we have

10  imbedded in our forecast.  It shows you the dollar amounts

11  year by year.

12  Q    And so is this your opinion of the dollar amounts year by

13  year of individual income tax collections from fiscal year

14  2014 through fiscal year 2023?

15  A    It is my opinion.

16  Q    So now let me ask about something else, and, if we could,

17  let's put up Exhibit 112-B.  Is Exhibit 112-B in front of

18  you, Dr. Cline?

19  A    It is.

20  Q    Tell us, please, what is Exhibit 112-B?

21  A    Exhibit 112-B, I believe, although it is not clearly

22  labeled here, I believe this is our restructuring forecast.

23  Q    Let me just establish a foundation.  What are the sources

24  of Exhibit 112-B?

25  A    That is from a separate spreadsheet model, forecasting

1   model prepared by the QUEST practice.

2   Q    And without going into the substance yet, what does

3   Exhibit 112-B purport to show?

4   A    This exhibit shows our forecast for individual income tax

5   tax collections for the City of Detroit over a ten-year

6   period at this point assuming that the city restructuring

7   activities are implemented, and this is our estimate of how

8   that restructuring will affect the overall Detroit economy

9   and sources of individual income tax collections.

10  Q    Who prepared Exhibit 112-B?

11  A    QUEST.

12  Q    What did you do to confirm to yourself the completeness

13  and accuracy of the contents of Exhibit 112-B?

14  A    I reviewed the structure carried over from the earlier

15  spreadsheet we discussed.  I looked at the key assumptions

16  going into the model, and I also reviewed the final results.

17          MR. STEWART:  Your Honor, I would move the admission

18  of Exhibit 112-B before I ask the witness about it.

19          MR. SMITH:  Just subject to our prior reservation,

20  your Honor.

21          THE COURT:  All right.  Subject to that, it is

22  admitted.

23      (Debtor's Exhibit 112-B received at 10:17 a.m.)

24  BY MR. STEWART:

25  Q    Okay.  You'd mentioned a moment ago, Dr. Cline,

1  restructuring and reinvestment initiatives.  Just for the

2  record, what are those?

3  A   As I understand it, having read the report, I believe --

4  was it Charles Moore, report on restructuring -- they are the

5  changes that are being proposed to be implemented in Detroit

6  that would affect the administration of the city government

7  as well as potentially impacting the strength of the economy

8  in Detroit.

9  Q   Did you make any individual -- reach any individual

10 judgment of the likelihood that these restructuring

11 initiatives would or would not have the effects Mr. Moore has

12 opined about?

13 A   We did not evaluate the proposals proposal by proposal.

14 Q   Did you give them any effect at all in your analysis?

15 A   We did.

16 Q   What effect did you give them?

17 A   The effect was to assume that restructuring would make a

18 difference in terms of the economic growth rates for the City

19 of Detroit.

20 Q   And on Exhibit 112-B, can you show us where we would find

21 those changes?

22 A   For example, on line 58.  Line 58 -- would you like for

23 me to --

24 Q   Please.  Please do.

25 A   -- explain?

1  Q   Yes, please do.

2  A   On line 58 you see the resulting growth rates for taxable

3  income on city resident tax returns.  They are higher rates

4  than you saw in our earlier spreadsheet without

5  restructuring, and they reflect various assumptions that are

6  in other parts of the spreadsheet that would show stronger

7  growth in employment, slightly higher growth in average

8  taxable income.  This is the result of a stronger tax base

9  growth under the restructuring scenario.

10  Q   Now, is there a line on your spreadsheet on Exhibit 112-B

11  that sets forth your forecast of municipal individual income

12  taxes for the years leading up to 2023 as a result -- under

13  this restructuring scenario?

14  A   I believe line 71 provides that summary year by year of

15  the sum of individual income taxes on residents and

16  individual income taxes on nonresidents.

17  Q   And does line 71 represent your opinion of the change in

18  income tax collections -- individual income tax collections

19  for the City of Detroit up through fiscal year ending 2023

20  under the restructuring scenario?

21  A   It is my opinion that those are reasonable numbers for

22  our forecasts of individual income tax collections for the

23  City of Detroit with restructuring.

24  Q   Now, let me ask you about the phrase you just used about

25  individual income tax collections.  In terms of your

1  analysis, what assumptions, if any, did you make about

2  improvement in collection rates?

3  A    I mentioned earlier that we assumed current law in our

4  forecasting exercise, but in this particular case for the

5  individual income tax, we also assumed continued current

6  administration of the income tax system.

7  Q    So you did not factor in any improvement or decline in

8  collection rates for individual income taxes; is that right?

9  A    That is correct.

10  Q    Do you understand that there have been such predictions

11  made in other places in this case?

12  A    I understand that.

13  Q    And what is your understanding as to those?

14  A    My understanding is that as part of the restructuring

15  package, increases in tax collections have been scored as a

16  result of changes in the way the tax system is administrated

17  and the way the money is collected, but it's my understanding

18  that that is reported as a separate line item number.  Our

19  estimate of the impact of restructuring has to do with the

20  overall economic impact, which is a separate contribution to

21  revenues.

22  Q    Thank you.  Let me move on now, if I could, to the other

23  income tax, which is the corporate income tax.  Now, above

24  and beyond the individual income tax, the City of Detroit

25  imposes a corporate income tax?

1  A    That is correct.

2  Q    What is the source of its legal authority to do so?

3  A    It's my understanding that the city is given the right to

4  impose the tax by the state legislature.

5  Q    What is the tax rate?

6  A    The tax rate is two percent.

7  Q    And is that the statutory rate?

8  A    It's my understanding that that is the current statutory

9  maximum.

10  Q    Does Exhibit 112-A show work you did to forecast changes

11  in the city's corporate income tax collections?

12  A    It does.

13  Q    Tell me, if you could, how you went about forecasting

14  changes in the city's corporate income tax collections?

15  A    Although this is a relatively small number in terms of

16  dollars of taxes collected, it was a little bit more

17  challenging to forecast because we didn't have a solid

18  history at the state level of corporate income taxes recently

19  that we could use as our starting point, so we relied here

20  more on the recent history in Detroit.

21  Q    Okay.  Now, was one of the issues in relying on -- and,

22  by the way, for how many years has Detroit imposed a

23  corporate income tax?

24  A    I believe that both the Detroit individual income tax and

25  corporate income taxes go back to 1962.  I believe they

1  predate the State of Michigan's taxes.

2  Q    Now, in working with the corporate income tax just -- was

3  there some effect you had to deal with from the recent

4  recession?

5  A    There was, which we didn't see in the individual income

6  tax.

7  Q    And what was that effect?

8  A    That effect is -- tax people refer to it as the net

9  operating loss issue.  We had to deal with net operating

10  losses.

11  Q    Better tell us, for the record, what is a net operating

12  loss?

13  A    Under the corporate income tax system, efforts are made

14  to line up taxes with current economic activity.  In deep

15  recessions or any recession, corporate -- corporations tend

16  to have no taxable income or negative taxable incomes.  The

17  tax system is set up to allow them to carry forward those

18  negatives into future years to offset positive income in

19  future years.  I believe we're still seeing in Detroit and

20  certainly in other states working off of that accumulated

21  negative bucket of operating losses, which is depressing

22  current corporate income tax collections even though the

23  economies are stronger.

24  Q    Now, where on your -- on Exhibit 112-A do we see your

25  calculations relating to the municipal corporate income

1  taxes?

2  A    You see those in the block that begins on line 82.

3  Q    Okay.  All right.  So tell me, if you could, just walk me

4  through the steps -- or walk us through the steps of how you

5  went about determining the baseline for corporate income

6  taxes and then calculating a growth rate for it in the coming

7  years.

8  A    Although the State of Michigan has only recently returned

9  to a corporate income tax, we did have the corporate income

10  tax forecast from the state consensus forecasting process.

11  Q    That you told us about.

12  A    We used that as our -- for our beginning point.  Then we

13  recognized the NOL issue.

14  Q    NOL is the net operating loss?

15  A    The net operating losses.  And then we returned to a

16  structural difference between Detroit and the State of

17  Michigan, and we reduced the Detroit corporate income tax

18  forecast relative to the Michigan forecast for the state

19  because Detroit has been lagging behind in the corporate

20  income tax recovery also.

21  Q    You just used the phrase "structural difference," and I

22  should have asked you this before.  What do you mean when you

23  say "structural difference" between Michigan on one hand and

24  Detroit on the other?

25  A    I mean by a structural difference not a temporary

difference, something that would correct itself next year,

would go away.  These are differences that are telling us

that the economies have changed, the relationship between --

the structure of the underlying economies is different, and

we think it's different in a way that won't reverse in the

short run and will continue into the future.  So when I say a

structural adjustment, I'm thinking of an adjustment we made

not next year, not just the year after, but going forward ten

years or even for a longer period of time.

Q   How do those two economies differ, Michigan versus the

City of Detroit?

A   That's a hard question to answer.  It has to do with

where the jobs are in the economies.  This region of Michigan

is more heavily dependent upon the automobile manufacturing

industries.  Detroit had a legacy of that dependence.  Other

areas may have more in the way of faster growing services.

It's the change in the relative growth of the components that

make up the jobs either in the city or the state that

determines what the growth rate is going to be in the future,

but it reflects everything that's going on in the local or

the state economy.

Q   Now, let's go back to our Exhibit 112-A.  And I think we

had been looking at line 84 as the net tax collection lines.

A   Are we -- for my assistance, are we in --

Q   112-A.  Actually, I want to look at -- well, let's go

1  back.  Start with Row 84 on Exhibit 112-A.

2  A    Thank you.

3  Q    Okay.  Are we on the same row?

4  A    Yes.

5  Q    Okay.

6  A    I see the row.

7  Q    That row is entitled "Net Tax Collections"; correct?

8  A    Correct.

9  Q    Now, that changes over time, does it not?

10 A    That does change over time as a result of our estimates

11 of the growth rates that we apply year to year.

12 Q    Then on Row 87 we have the line "Total" -- pardon me --

13 "Corporate Income Taxes"; correct?

14 A    Correct.

15 Q    And what does that line show us?

16 A    That line shows our estimate of total corporate income

17 taxes that will be collected at the current rate of two

18 percent.  The earlier numbers were prior to the increase,

19 doubling of the corporate rate.  They were at one percent.

20 So that line on 87 is the line that is our forecast under

21 current law of corporate income tax collections for the City

22 of Detroit.

23 Q    And what is line 88?

24 A    88 is a summary of the resulting growth rates in that tax

25 base.

1    Q    Can you --

2    A    Excuse me.  The tax collections themselves.

3    Q    Can you tell me why the Cell K-88 is so large?

4    A    Cell K on line 88 has a 106-percent increase in corporate

5    income tax collections in the City of Detroit.  It's a

6    reflection of the doubling of the tax rate.

7    Q    Okay.

8    A    And that is a one-time impact that disappears in the

9    following years.

10   Q    Okay.  So I apologize if I asked you this before then.

11   Is Row 88 then your opinion of what the city's forecasted

12   corporate income tax collections will be through the period

13   ending fiscal year 2023?

14   A    If I could just modify that slightly and say it's line

15   87 --

16   Q    Okay.

17   A    -- that has the dollar amounts, which, in my opinion, are

18   reasonable estimates of the corporate income tax collections

19   that the City of Detroit can expect over this ten-year period

20   of time.

21   Q    Now let me ask, if you could, to go to line 97.  What is

22   line 97?

23   A    Line 97, which could have benefitted from a more accurate

24   description, line 97 is the sum of our year-by-year estimates

25   for the corporate income tax and our year-by-year estimates

1   for the individual income tax.

2   Q    Does line 97 set forth, Dr. Cline, your opinion as to the

3   total income taxes the City of Detroit is forecasting to

4   collect through the year ending 2023 under a scenario without

5   restructuring?

6   A    Again, if you could help me, are we in the restructuring

7   or nonrestructuring --

8   Q    Nonrestructuring on line 97 of Exhibit 112-A.

9   A    If that is the nonrestructuring file, that would be, in

10  my opinion, reasonable estimates of the municipal income tax

11  collections that would be collected by the City of Detroit

12  based upon our forecast assumptions.

13  Q    Now let's go to Exhibit 112-B because I'm going to ask

14  you very briefly before I move on about corporate income

15  taxes under the restructuring scenario.  Do you have Exhibit

16  112-B in front of you?

17  A    I do.

18  Q    And do we see there a reference -- or, once again, I

19  should say, an analysis of municipal corporate income tax

20  collections?

21  A    I do see that section, just the sheet.

22  Q    Does Exhibit 112-B take into account the effect for

23  purposes of corporate income tax collections of the

24  restructuring and reinvestment scenarios that we've talked

25  about before this morning?

1   A    That is correct, to my understanding.

2   Q    How did that affect the analysis that we see on Exhibit

3   112-B?

4   A    I believe for the corporate income tax forecast under

5   restructuring that we did add a stronger growth in the

6   underlying tax bases, so I believe we did end up with a

7   higher overall growth rate.

8   Q    Okay.  And do we see on Exhibit 112-B a line that gives

9   us the forecast of corporate income tax collections under a

10   restructuring scenario for the years -- fiscal year '14

11   through fiscal year '23?

12   A    What line number?

13   Q    I believe it's 87 again.

14   A    Yes.  Line 87 shows the total dollar amount of the -- our

15   corporate income tax forecast over that ten-year period.

16   Q    And is it your opinion, Dr. Cline, that under a

17   restructuring analysis the corporate income taxes the City of

18   Detroit is forecast to collect from fiscal year '14 through

19   fiscal year 2023 are the numbers we see on line 87 of Exhibit

20   112-B?

21   A    It is my opinion that those -- that forecast on line 87

22   is a reasonable forecast of the revenue that the city could

23   expect to receive under that scenario.

24   Q    Let's go finally to line 97 of Exhibit 112-B.  Do you

25   have that before you?

1   A    I do.

2   Q    Could you tell us what line 97 is of this exhibit?

3   A    Line 97 is the sum of the two -- of two pieces, our

4   forecast for the individual income tax and our forecast for

5   the corporate income tax, both assuming restructuring has

6   occurred.

7   Q    And is it your opinion that line 97 of Exhibit 112-B

8   shows the forecast total income tax collections the City of

9   Detroit should expect from fiscal '14 to fiscal '23 under a

10  restructuring scenario?

11  A    It is my opinion that that is a reasonable forecast for

12  the revenues to be expected from the municipal income tax

13  over the ten-year forecast period assuming that the

14  restructuring plan is -- occurs.

15  Q    Let's move on, if we could.  We've talked before about

16  the simulation that you performed for the 30 years that pick

17  up after 2023; correct?

18  A    Correct.

19  Q    Do you have a worksheet setting forth the work you did in

20  that simulation?

21  A    For the additional 30 years, I believe they are covered.

22  Q    And let's put up Exhibit 113-A.  Is it before you, Dr.

23  Cline?

24  A    Yes.  That spreadsheet is in front of me.

25  Q    Is this a spreadsheet that you prepared or others

1  prepared at your direction?

2  A   This spreadsheet was prepared by the QUEST practice.

3  Q   And you have -- what steps have you taken to assure

4  yourself of the completeness and the accuracy of Exhibit 113-

5  A?

6  A   In evaluating or reviewing this spreadsheet, one

7  additional step perhaps we haven't discussed before, in

8  addition to looking at each of the cells and judging the

9  reasonableness of the numbers, I went back to make sure they

10  were pulling the right totals from the other underlying

11  calculations that we did.

12  Q   What did you find?

13  A   I found that they were and that that is an accurate

14  summary of the revenue estimates that we had prepared as part

15  of this project.

16  Q   And does Exhibit 113 set forth the specific revenue items

17  that are forecast for the next ten years and then year by

18  year for the ten years up to 2033 and thereafter for the two

19  decennial periods that end in 2053?

20  A   Yes.  That information is presented in the spreadsheet,

21  and you'll find those additional 30-year periods of time

22  beyond year 2023 in that spreadsheet.

23        MR. STEWART:  Your Honor, I move Exhibit 113-A into

24  evidence.

25        MR. SMITH:  Same reservation, your Honor.

1        THE COURT:  All right.  Subject to that, it is

2  admitted.

3        (Debtor's Exhibit 113-A received at 10:39 a.m.)

4  BY MR. STEWART:

5  Q   Dr. Cline, let's look, if we could, at Exhibit 113-A.  It

6  summarizes five different types of taxes; correct?

7  A   That is correct.

8  Q   And we see that in, in guess, Column A?

9  A   We see that in Column A, but I might, just as a

10  qualification, point out that the last item on line 21 is

11  state revenue sharing, which you might not categorize as a

12  tax.

13  Q   Point taken.  Let me ask you, if I could, to look at Row

14  12.  Row 12 is income tax.

15  A   Yes.

16  Q   And that is a -- this is the forecast from QUEST of the

17  city's income tax forecast collections in all the years shown

18  on our exhibit; is that right?

19  A   That is correct.

20  Q   And I think we've already covered the first ten years.

21  Do I understand correctly that the first ten years is the

22  restructuring scenario?

23  A   That is correct.  It's simply repeating the numbers that

24  I believe we've already discussed under the restructuring

25  scenario for the first ten years.

1  Q   And then to the right of that starting it appears in

2  Column O, we see something entitled "Extrapolation."

3  A   Correct.

4  Q   Could you please tell us what you did -- and I'm going to

5  stay with Rows 12 and 13 -- to simulate or extrapolate income

6  tax for the City of Detroit for the years after fiscal 2024?

7  A   Beyond fiscal year 2024, we -- again, using the detailed

8  framework of our spreadsheets earlier, we had to determine

9  rates of growth for those key drivers for the out years, and

10 a strong guide to what we did was where we ended up at the

11 end of the first year -- ten-year forecast period with modest

12 or moderate changes moving forward in time, but that gave us

13 growth rates to apply again for each year for each of the

14 additional ten block -- ten year blocks of time.

15 Q   How did you derive the growth rates that you used to

16 simulate income tax collections for Detroit in these years

17 beginning in 2024?

18 A   As I mentioned, we began with where we ended from the

19 first ten-year period of time, and then we needed to decide

20 if we had additional information to suggest they should be

21 higher or lower or modified.  There was a limited amount of

22 that modification based upon the unknown 30-year additional

23 period of time.

24 Q   And what row here indicates your growth rates for your

25 simulation for years 2024 and afterwards?

1    A    Well, as we've just discussed, line 12 shows the dollar

2    amount of the municipal income tax collection line.  Below it

3    is the summary of the percentage change from year to year as

4    a result of all of the assumptions that we made, so in a

5    sense it's the end product.  It shows what each year's

6    percentage increase will be under our extrapolated forecast

7    out for the next 30 years.

8    Q    And what does this show in terms of the extrapolation of

9    the growth rate of income taxes for the City of Detroit as we

10   look forward for the next 40 years?

11   A    It shows, I believe, modest increases in the rates of

12   growth.  It shows a continuing strengthening of the Detroit

13   economy, but I would say that I would characterize the

14   numbers as reasonable but modest increases.

15   Q    Let me ask this.  Does Exhibit 113 on Row 12, in your

16   opinion, set forth, first of all, for the first ten years but

17   then for the following 30 years, as shown on our exhibit, the

18   income taxes the City of Detroit is forecast to collect in

19   the years we see here, which is the first ten years, which is

20   2014 through 2023, then the next ten years, which is 2024

21   through 2033, then the two ten-year periods in the far right,

22   2034 to 2043, and 2044 to 2053?

23   A    It is my opinion that those are reasonable estimates for

24   the ten-year forecast that we prepared, the first ten years,

25   and reasonable estimates of what the city could expect over

1  the next 30-year period assuming the rates of growth that we

2  have used in this exercise.

3  Q   Thank you.  There are two more taxes you looked at.  One

4  was wagering tax, and one was utility users tax.

5  A   Correct.

6  Q   Could you first tell us what is the wagering tax?

7  A   The wagering tax, my understanding is the wagering tax is

8  a tax the city levies on gross receipts with adjustments --

9  it's sometimes described as adjusted gross receipts -- of the

10  casinos, the three casinos that are located in Detroit.

11  Q   Do you know where the city gets the legal power to impose

12  taxes on those casinos?

13  A   My understanding is that that authority was provided by

14  the state legislature in Michigan.

15  Q   What is the tax rate, if you know it?

16  A   I believe the tax rate is 10.9 percent, but there is an

17  additional levy that I believe is approximately one percent

18  of adjusted gross receipts that is a separate component of

19  total taxes.

20  Q   Okay.  Did you prepare a spreadsheet to analyze

21  forecasted changes in the wagering taxes the City of Detroit

22  could expect for the next ten years?

23  A   We did.

24  Q   Let's put up, if we could, Exhibit 112-C.  Is Exhibit

25  112-C a spreadsheet that you prepared or that was prepared at

1 your direction?

2 A    This spreadsheet was prepared by QUEST.

3 Q    What steps did you take to assure the completeness and

4 accuracy of Exhibit 112-C?

5 A    In this particular case, because of the recent negative

6 actual tax collections, we spent some additional time trying

7 to understand what had recently happened, and then I reviewed

8 the estimating framework and signed off on the assumed rates

9 of growth over the forecast period for the wagering tax.

10 Q    And what data did you rely upon in preparing Exhibit 112-

11 C?

12 A    As I mentioned, we looked at the recent history of the

13 actual tax paid by these casinos, the three casinos in

14 Detroit, but in addition to that, I have been tracking

15 through articles and the literature -- I've been watching

16 what's been going on in state level gambling, casino

17 gambling.

18 Q    Okay.  I'm going to stop you there and just move the

19 admission of our exhibit before we go further into it.

20         MR. STEWART:  Your Honor, I move admission of

21 Exhibit 112-C.

22         MR. SMITH:  Same reservation, your Honor.

23         THE COURT:  All right.  Subject to that, it is

24 admitted.

25      (Debtor's Exhibit 112-C received at 10:46 a.m.)

1  BY MR. STEWART:

2  Q    Okay.  Now, if we could, you were telling us, Dr. Cline,

3  that you have been following literature and other

4  developments as they relate to state wagering taxes?

5  A    I have.

6  Q    And what, in particular, have you been following?

7  A    A number of states starting from the east coast because

8  they have tended to have gambling longer, Delaware, New

9  Jersey, Pennsylvania.  What appears to be happening is that

10 with the proliferation of gambling at the state level in

11 casinos, they appear to be borrowing sales from one another.

12 And when new casinos open, it tends to reduce the casino

13 collections from existing casinos that are within easy

14 driving time and distance.  And recently new casinos have

15 opened across the border in Ohio.

16 Q    That's in Toledo?

17 A    And we took that into consideration.

18 Q    So let's look, if we could, at Exhibit 112-C.  Let's

19 start with the baseline that you used.  We have at the top --

20 it looks like line 14 has total collections for the city with

21 its wagering taxes?

22 A    Correct.

23 Q    And tell us which year of those is the last historical

24 year?

25 A    I believe 2013.  The 2013 numbers, I believe, were solid

1   history, although they might have been less than a hundred

2   percent coverage at the time that we did some of the earlier

3   estimates.  2014 is still a fiscal year that's unfolding.

4   Q   Okay.  And then you determined a growth rate to apply to

5   this, did you not?

6   A   We did.

7   Q   And what line is that?

8   A   That's shown in line 13.

9   Q   Okay.  Is it -- okay.  And could you tell us how you

10  derived these growth rates?

11  A   The process that I believe I described a little bit

12  earlier about looking at not only recent history in Detroit

13  but also experience in other states with the additional

14  competition that's occurring led us to assume that a one-

15  percent growth rate going forward beginning in 2016 was a

16  reasonable growth rate forecast.

17  Q   Is it your opinion that then -- I believe I'm reading

18  this right -- that line 14 sets forth the forecast that you

19  believe the City of Detroit -- the forecast of what you

20  believe the City of Detroit will collect in wagering tax

21  revenue fiscal years 2014 through fiscal years 2023?

22  A   It is my opinion that the dollar amounts in millions that

23  you see on line 14 are reasonable estimates of the wagering

24  tax collections that the City of Detroit can expect through

25  fiscal year 2023.

1   Q   Let's, if we could, put up, once again, Exhibit 113-A.

2   Dr. Cline, do you have Exhibit 113-A before you?

3   A   I do.

4   Q   And this sets forth an extrapolation of certain taxes,

5   does it not?

6   A   Yes, it does.

7   Q   Do you see where wagering taxes are extrapolated for the

8   three ten-year periods starting in 2024?

9   A   They are on line 18 as you move to the columns to the

10  right.

11  Q   What did you do to extrapolate a forecast of collections

12  of wagering taxes of the city through those years?

13  A   Our forecast of the percentage growth rate year by year

14  began with the one percent that we ended the prior ten-year

15  period with.  We asked is there any additional information

16  that would change our perspective.  The answer was no, and we

17  continued the one percent into the future.

18  Q   In your opinion, are the values that start on O-18 of

19  Exhibit 113 and continue to AC-18, are those the amounts of

20  wagering taxes you believe the city should collect in those

21  30 years and broken out by ten-year periods from 2024 through

22  2053?

23  A   It is my opinion that those are reasonable estimates of

24  the dollar amounts that the city can expect to collect from

25  the wagering tax over that period of time.

1    Q    Okay.  Our final tax is the utility users tax.  May I ask

2    you to tell us what that tax is?

3    A    The utility user tax is also a fairly unique tax at the

4    municipal level in Michigan.  It's a tax on five percent of

5    the gross receipts of utility providers, natural gas,

6    electricity, for example.

7    Q    Who does the city collect that tax from?

8    A    It's my understanding that the tax -- the check is

9    actually paid by the utility to the City of Detroit based

10   upon their estimate of the tax base, which is gross receipts.

11   Q    Do you know where the city gets the legal authority to

12   impose this tax?

13   A    It's my understanding that it is the state legislature

14   that has provided that authority.

15   Q    Do you know whether the city is at or near the statutory

16   maximum for levying that tax?

17   A    It's my understanding that that is the maximum allowable

18   under current law.

19   Q    Let me ask that Exhibit 544 be presented.

20            THE COURT:  Admitted?

21            MR. STEWART:  Presented, just presented.

22            THE COURT:  Presented to -- okay.

23            MR. STEWART:  And then I will -- once I laid my

24   foundation --

25   BY MR. STEWART:

1   Q   Exhibit 544, is that a spreadsheet, Dr. Cline, that you

2   prepared?

3   A   I'm looking at the spreadsheet for the gross utility

4   users tax collections.

5   Q   Yes.  That's the one.

6   A   That is the spreadsheet that QUEST prepared for the

7   initial ten-year forecast period and the additional 30-year

8   forecast period for the net utility users tax.

9   Q   And what steps did you take, if any, to confirm to

10  yourself the accuracy and completeness of Exhibit 544?

11  A   I reviewed each of the growth assumptions year by year,

12  but, in addition, for this tax I had to ask additional

13  questions about a transfer, a new transfer that has been

14  implemented, which I didn't understand, so I -- we did do

15  some additional work on understanding the transfer.

16          MR. STEWART:  Your Honor, I would move into

17  admission Exhibit 544.

18          MR. SMITH:  Subject to the same reservation.

19          THE COURT:  It is admitted subject to reservation.

20      (Debtor's Exhibit 544 received at 10:54 a.m.)

21  BY MR. STEWART:

22  Q   Dr. Cline, could you tell us, first of all, what the

23  baseline was in your analysis of the utility users tax?  Put

24  differently, what is the last historical year we have for

25  that tax?

1  A    I believe the year 2013 was the last year that has actual

2  collection data, although there, too, it might have been

3  partial at that point in time.

4  Q    And then you did -- did you then apply a growth rate or

5  negative growth rate to the tax for the years up through

6  2023?

7  A    What you see in this forecast is that we did bring it

8  back to positive growth over the forecast period going

9  forward based upon our assumed rates of growth of the

10 collections.

11 Q    Okay.  And why did you assume there would be an

12 improvement in the rate of growth of collections?

13 A    We assumed there would be an improvement due to the

14 restructuring of the City of Detroit, a stronger economy

15 overall, which would have added to the growth rate, but, in

16 addition to that, we do believe there's ongoing efficiency

17 increases in energy use that is reducing the tax base.  We

18 think the net result is the growth rates that we have used in

19 our forecast.

20 Q    Now, lower down on Row 15 we see something called

21 transfer to PLA.

22 A    Correct.

23 Q    Please tell us what that is.

24 A    The transfer to PLA, which I believe stands for the

25 Public Lighting Authority, is -- was a designation of a

1   dollar amount that would be transferred from the gross

2   utility users tax collections to the PLA fund, and then once

3   you made that subtraction, you would have net utility users

4   tax collections.  And it's the net number that accrues to the

5   general fund of the City of Detroit.

6   Q    So do I understand correctly that Row 12 shows the gross

7   amount and Row 16 the net amount?

8   A    That is correct.

9   Q    Is it your opinion that Row 16 of Exhibit 544 shows the

10  net utility user tax collections the City of Detroit should

11  be forecast to collect for the period from fiscal '14 through

12  fiscal 2023?

13  A    It is my opinion that that is a reasonable forecast of

14  the general fund net utility user tax collections the city

15  can expect over that ten-year period of time.

16  Q    Now, lower down on the chart we have the 40-year forecast

17  for the same tax, do we not?

18  A    We do.

19  Q    Please tell us how you calculated that.

20  A    Once again, we began with where we ended in the first

21  ten-year period in terms of rates of growth and asked did we

22  have any additional information that would modify the growth

23  rates going forward.  I believe in this case we did extend

24  that 1.5-percent growth rate into the future.

25  Q    And does Row 32 set forth that growth rate?

1   A    It does.

2   Q    Let me direct your attention to Row 31.  What is Row 31?

3   A    Row 31 is the resulting dollar amounts in millions of

4   dollars that would be -- we are projecting or simulating

5   would be collected by the city over that additional 30-year

6   period of time year by year.

7   Q    Is it your opinion that Row 31 sets forth the utility

8   user tax revenues the City of Detroit should be forecast to

9   receive for the years 2024 through 2053?

10  A    It's my opinion that those are reasonable estimates of

11  the revenue that would be collected from the net utility

12  users tax by the city.

13  Q    Thank you.  Let me now go to my last area.  You are aware

14  that Syncora has retained an expert named Dr. Glenn Meyers.

15  A    I was aware of that.

16  Q    And do you know Dr. Meyers?

17  A    I did not know him.  I do not know him personally.

18  Q    Did you read his report?

19  A    I did read his report.

20  Q    And have you read his deposition testimony?

21  A    I've also read the deposition testimony.

22  Q    Are you aware of the type of analysis Dr. Meyers

23  conducted in his report and in his deposition?

24          MR. SMITH:  Your Honor, objection.  None of this was

25  disclosed in any witness disclosure or supplemental

1    disclosure.  Mr. Cline has never provided us with anything

2    regarding Mr. Meyers' opinions.

3            MR. STEWART:  Your Honor, the Court's order has not

4    provided one way or the other -- excuse me -- for us to rebut

5    new opinions offered by witnesses for Syncora and others.  We

6    did file last night a motion for leave to file a supplemental

7    report on property taxes, which I think will be heard later

8    this week.  This is -- this part of Dr. Cline's testimony is

9    one where I wish to have him explain to us the operation of

10   regression analysis, but he will not be giving an opinion on

11   the accuracy or lack of accuracy of Dr. Meyers' result but,

12   instead, upon the method Dr. Meyers used.

13           THE COURT:  The Court will permit it.  Go ahead.

14           MR. STEWART:  Please put up, if we could, Chart 14

15   from the expert witness report of Dr. Glenn Meyers.

16   Actually, we can just -- we don't need the hard copy.  We can

17   just work from this.

18   BY MR. STEWART:

19   Q    Dr. Cline, is Chart 14 in front of you?

20   A    It is.

21           MR. STEWART:  Do we have a -- I believe that, your

22   Honor, has Syncora Exhibit Number 4412, and this is page --

23   Chart 14 within that document.

24   BY MR. STEWART:

25   Q    Could you tell us, please, what Chart 14 presents?

1  A   Chart 14 has four different colored lines in the chart.

2  The two key lines are the dotted light blue line and the dark

3  red line that then becomes a dashed red line.

4  Q   Let me ask what are the top two lines here?

5  A   The top two plot actual values of real property taxable

6  value and property tax value after subtracting Renaissance

7  Zone property.

8  Q   And Renaissance Zones are zones that get special tax

9  treatment in the city?

10  A   They are.  Properties located in the Renaissance Zone can

11  have significantly lower tax rates, but, in addition, the

12  revenues created from those taxes are dedicated and will not

13  appear as general fund revenues.

14  Q   Now, you talked about the two other lines.  There's a

15  solid line at the bottom that turns into a dotted line.  What

16  is that line?

17  A   That red line is the actual property tax revenue

18  collected by the City of Detroit up until about 2012, and

19  then the extended dotted red line is QUEST's forecast over

20  the ten-year period of what the collections of taxes would

21  look like.

22  Q   Now, there's a dotted blue line.

23  A   There is a dotted blue line.

24  Q   And it has a -- first of all, just tell us what the

25  dotted blue line purports to represent.

1  A   The dotted blue line, which is dotted all the way back to

2  1988 -- it actually goes back further than that.  The dotted

3  blue line is an estimate prepared by Dr. Meyers of what -- of

4  the taxes -- the property taxes that would be collected by

5  the City of Detroit.

6  Q   And there's a -- some text that says in light blue "time

7  series regression forecast."  Do you see that?

8  A   I do see that.

9  Q   What is a time series regression forecast?

10  A   A time series regression forecast is one of those tools

11  in the toolbox used by forecasters.  It is a fairly

12  straightforward and simple regression analysis.  I believe in

13  this case the equation says if we want to forecast property

14  taxes collected in Detroit today, we'll use last year's

15  collection as the key explanatory variable.

16  Q   And how do you know that?

17  A   I could see that from the description in the report, the

18  expert report, of how -- the process used to fit that

19  equation.

20  Q   Did you also have access to the native Excel file Dr.

21  Meyers used?

22  A   I did look at the underlying Excel file.

23  Q   So before going further, I should have asked you to tell

24  us what is a regression analysis or regression equation.

25  A   The regression equation is a way to try to relate one

1  variable today -- to explain it or predict it based upon

2  other variables, whether also from today or from prior

3  periods of time like prior years in this case.

4  Q   And what does "time series" mean?

5  A   Time series is usually kept as a term that refers to one

6  particular form of regression analysis.

7  Q   And so are you able to tell what Dr. Meyers did to come

8  up with the dotted blue line we see on Chart 14?

9  A   I believe I was able to from the information provided on

10 this page plus information in the report, the descriptive

11 information in the report.

12 Q   And how did he do his analysis?

13 A   It's my understanding that it is a very simple equation.

14 It simply forecasts this year's property tax collections by

15 using last year's property tax collections.

16 Q   And is that a method that is appropriate given the recent

17 history of Detroit?

18        MR. SMITH:  Your Honor, I think we're getting

19 outside of what this expert -- what the representation was he

20 was going to talk about.  He is now commenting on the

21 propriety of what Mr. Meyers did.  In addition, I'd note that

22 Mr. Cline is not the city's property tax expert.  Ms. Sallee

23 is the one that provided the property tax opinions.  And so

24 it's not appropriate for him to address this area for that

25 additional reason.

1    MR. STEWART: He's a trained economist who for 40

2  years has worked with regression analysis, your Honor, is

3  aware of how they work. He's in a position to comment upon

4  errors in the technique under circumstances based on what Dr.

5  Meyers has provided.

6    THE COURT: The objection is overruled. You may

7  proceed.

8  BY MR. STEWART:

9  Q   Dr. Cline, I'm not sure what my question was, but let me

10 ask a new one. Are you able by looking at the shape of the

11 curve on Chart 14 to determine what the error rate is in the

12 regression analysis Dr. Meyers used? And let me stop. Is

13 there something called an error rate in regression analysis?

14 A   Yes, there is such a term.

15 Q   And tell us what is the error rate on regression

16 analysis?

17 A   It's most frequently described as a standard error of the

18 estimate -- of the estimating equation. Statistically, in

19 simple terms, it's trying to average the mistakes, the

20 errors -- not mistakes, errors in the sense of the

21 differences between the actual values you're trying to

22 explain and the predicted values. Each difference is called

23 an error term, and you want to have some idea how big or

24 small your errors are. And the standard error of the

25 estimate is one way of summarizing an average over the entire

1  period of what the size of that error looks like.

2  Q    And if we look at Chart 14 up through looks to be, say,

3  2004 or five, can you tell by these lines what the error rate

4  seems to be?

5  A    And at this point, maybe use the phrase eyeballing, but

6  just looking at it, that dotted blue line, which is the

7  estimated amount of property tax collections in the City of

8  Detroit based upon the time series regression equation, is

9  tracking history fairly well.  There are differences, as

10 there always are, between actual and predicted or predicted

11 values, but it was tracking pretty closely.

12 Q    Then what happens later on?

13 A    And then something significant changed.

14 Q    What is that?

15 A    You notice that it's about 2006, 2007 where the dotted

16 blue line continues upward and the solid red line, which is

17 actual Detroit property tax collections, falls sharply, if

18 not precipitously.  That was the impact of the great

19 recession.

20 Q    And in terms of the operation of this regression

21 analysis, can you determine the error rate starting then at

22 that time?

23 A    Yes, I can, but also because I was able to look at the

24 underlying file.  Is it the native Excel spreadsheet?

25 Q    Yes.

1    A    And I was able to see the dollar amount of the error.

2    It's in millions of dollars, and for the final six years of

3    actuals versus the dotted line forecast, there are two

4    years -- five out of the six years are significant -- have

5    the forecast -- excuse me -- the predicted value

6    significantly above the actual, and in the two out of the

7    five years where it was over-predicting property taxes, the

8    amount of the over-prediction was in excess of $30 million a

9    year.

10   Q    As an economist, what do error rates of that magnitude

11   tell you?

12   A    For the last observation, an error of $30 million over

13   the base of actual collections was about a 23-percent error.

14   Q    And as an economist, what error rate customarily is

15   acceptable in regression analysis?

16   A    For me personally, doing revenue forecasting for a

17   state -- and I also believe it would apply at the municipal

18   level -- I'd be very nervous if I didn't see an error the

19   size of two percent.

20        MR. STEWART:  Thank you very much, Dr. Cline.

21   That's all I have, your Honor.

22        THE COURT:  Before we go, would you repeat for the

23   Court what you mean by the term "error" in that testimony you

24   just gave because I didn't exactly follow it?

25        THE WITNESS:  I want to be careful with the words.

1    It's not error in the sense of a misjudgment.  It's a

2    statistical concept of an error.  When you fit a regression

3    equation over history, you know how accurate it is because it

4    has its own prediction each year.  You know the actuals.

5    Look at the difference.  And whatever the difference is --

6    could be positive, could be negative -- it's called the

7    error, and that's what I was looking at, those year-by-year

8    misses in the sense of errors in a statistical sense of the

9    forecast values in the last period were $30 million above the

10    actual, and that was the error term.

11            THE COURT:  Oh, for the past?

12            THE WITNESS:  For the past.

13            THE COURT:  Oh, okay.  All right.  We'll be in

14    recess now and reconvene at 11:30, please.

15            THE CLERK:  All rise.  Court is in recess.

16        (Recess at 11:11 a.m., until 11:30 a.m.)

17            THE CLERK:  All rise.  Court is in session.

18            THE COURT:  And let's proceed.

19            MR. SMITH:  Good morning, your Honor.

20                      CROSS-EXAMINATION

21    BY MR. SMITH:

22    Q    Good morning, Mr. Cline.

23    A    Good morning.

24    Q    Good to see you again.  Mr. Cline, you provided certain

25    opinions or estimates of revenue for the city; correct?

1   A    That is correct.

2   Q    You did not estimate revenue from all city taxes or

3   sources of revenue; correct?

4   A    That is correct.

5   Q    There are a number of revenue sources you were not asked

6   to forecast; correct?

7   A    That is correct.

8   Q    You were not asked to forecast fees or other revenues for

9   the city?

10  A    That is correct.

11  Q    And you don't have any idea what the fees are that the

12  city collects; correct?

13  A    I have some idea of the range, but we were not asked to

14  estimate the revenues from those.

15  Q    And you don't know what specific fees, though, the city

16  collects; correct?  You don't have any idea about that?

17  A    I have an idea of what cities collect in general from

18  fees, yes.

19  Q    Okay.  But the City of Detroit, you don't have any idea

20  what specific fees the City of Detroit collects; correct?

21  A    I have not estimated those separate fees, no.

22  Q    Okay.  And you don't have any idea why you weren't asked

23  to forecast the fees or other revenues for the city; correct?

24  A    No.

25  Q    Is it fair to say that Ernst & Young has provided a

1   forecast of the five major revenue sources for the city?

2   A   I think it's accurate to say that the QUEST practice of

3   Ernst & Young was asked to look at those five major pieces.

4   Q   Okay.  Before you we've provided a copy of a binder that

5   has some documents that I'll be referring to.  Do you have

6   that in front of you?

7   A   I do not.

8   Q   Well, let me get you one.

9   A   Thank you.

10  Q   Sorry about that.  In the front of the binder there's a

11  copy of your deposition transcript and then some documents I

12  may be referring to that are in tabs in the binder.  You got

13  that now?

14  A   Now I do.

15  Q   And they'll also be on the screen, so you don't need to

16  flip through there if --

17  A   Thank you.

18  Q   -- it's more convenient.  If you turn to Tab 2, City

19  Exhibit 30, there's some revenue consensus results.

20          MR. SMITH:  Your Honor, if I may display that.

21  BY MR. SMITH:

22  Q   And there's a chart depicting revenues from the city's

23  Consensus Revenue Conference.  Do you see that?

24  A   I see that.

25  Q   And do you see that the amounts the city obtains from the

1    nonmajor revenue sources on the right -- do you see those?

2    A   I do.

3    Q   And those amounts are larger than the wagering tax

4    revenues you were talking about today; correct?

5    A   They appear to be.

6    Q   And they're larger than the utility tax revenues that you

7    were talking about?

8    A   According to the height of these bars, they would be

9    larger.

10   Q   Yeah.  And they're also larger than the property tax

11   revenues that we -- that you discussed briefly at the end of

12   your testimony; correct?

13   A   Comparing the heights of the bars, it looks like that is

14   correct.

15   Q   Okay.  You weren't asked, were you, to identify any

16   potentially untapped sources of revenue for the city;

17   correct?

18   A   No, we were not.

19   Q   And you weren't asked to identify ways, for example, in

20   which the city could increase its revenues through taxes;

21   correct?

22   A   No, we were not asked to do that.

23   Q   And you don't have any idea why you weren't asked to do

24   that; correct?

25   A   I didn't ask the question, no.

1  Q   Fair enough.  And so you haven't done any analysis of the

2  full range of revenue options available to the city?

3  A   That's correct.

4  Q   And that would include both tax and nontax revenue

5  options the city might have for raising revenue; correct?

6  A   We were not asked to look at any options from any revenue

7  sources.

8  Q   So nobody from the city or the emergency manager's office

9  has reached out to you to get your expertise to try to help

10 increase revenues for the city to pay the creditors more;

11 correct?

12 A   We were not asked to comment on options for raising

13 revenue for the city.

14 Q   And you're not aware of anyone else that's been asked to

15 do that type of analysis to increase revenues in the city

16 through tax policy or otherwise to help try to pay the

17 creditors more; correct?

18 A   I haven't talked to anyone about that issue.

19 Q   So you're not aware of anything; correct?

20 A   I am not aware.  Personally I'm not aware.

21 Q   And, in fact, you don't know whether the city even wants

22 to increase revenues; correct?

23 A   I have no idea.

24 Q   Okay.  And nobody from the city or emergency manager's

25 office has communicated any desire to increase revenues to

1  you; correct?

2  A   I believe that's accurate.

3  Q   Now, one of the assumptions -- you mentioned that your

4  model is based on some assumptions; correct?

5  A   Correct.

6  Q   And one of the assumptions that you made was that tax

7  rates would not increase over the ten- or forty-year period

8  you looked at; correct?

9  A   That was an assumption we made.

10  Q   You took current law regarding tax rates as the

11  assumption in your model; correct?

12  A   As we understood current law.

13  Q   And so you did not simulate different revenue forecasts

14  based on adjustments to rates over time; correct?

15  A   We did not.

16  Q   And you also assumed that the same tax exemptions would

17  apply over ten and forty years; correct?

18  A   Would you -- I'm not sure what you mean by "exemptions."

19  Q   With respect to many taxes, sometimes the law provides

20  that there are exemptions for the tax, and, in general, you

21  took current law as it stands and assumed that exemptions

22  would stay fixed.  They wouldn't be eliminated over time.

23  Correct?

24  A   I would describe what we did as accepted current law as

25  given, and current law would cover all of the features of the

1    tax system, not just the rates, but also any personal

2    exemptions or any other components that are in the statutory

3    law itself.

4    Q   Oh, all right.  And your analysis assumes the tax rates

5    will remain unchanged for ten and forty years into the

6    future; correct?

7    A   We assumed current law tax rates.

8    Q   Okay.  And you can't identify any forecast that's ever

9    assumed that current tax rates will remain unchanged for a

10   period as long as ten years; correct?

11   A   I'm not sure I understand.  Are you referring to any unit

12   of government or the State of Michigan or the City of

13   Detroit?

14   Q   I'm talking any tax forecast.  You can't identify any tax

15   forecast that's ever assumed that current tax rates will

16   remain unchanged for a period as long as ten years.

17   A   I'm not aware of any tax forecast at the state level that

18   I've been associated with that would deviate from the current

19   law assumption.  If rates are fixed under current law, you

20   would do the forecast with fixed rates because it is current

21   law.

22   Q   Yeah.  And you did two-year forecasts at the State of

23   Michigan; right?

24   A   I believe that's correct.

25   Q   Okay.  And so the State of Michigan does not assume that

1  current tax law is going to stay the same for ten years in

2  its forecast, correct, because they only do two years?

3  A   I think there's a compound question there.

4        THE COURT:  I think it's more than compound.  It's a

5  little bit of a trick question.

6        MR. SMITH:  Okay.  Well, I don't mean it to be a

7  trick question.  I think we've gotten off on the State of

8  Michigan.

9  BY MR. SMITH:

10  Q   My question is completely broad.  Can you point the Court

11  to an example like your forecast here where anybody has ever

12  done a forecast for taxes and assumed that current tax law

13  would apply for a period as long as ten years?

14        THE COURT:  All right.  Let's break that down then.

15        MR. SMITH:  Yeah.

16        THE COURT:  I think implicit in the question is

17  whether any state has done a forecast as long as ten years.

18        THE WITNESS:  I have personally done forecasts as

19  long as ten years.

20        MR. SMITH:  Okay.

21        THE COURT:  Okay.  And when you do those ten-year

22  forecasts, do you assume the tax law remains static for those

23  ten years, or do you assume that it does not remain static?

24        THE WITNESS:  Depends upon the purpose of the

25  exercise.  If I'm doing a revenue forecast, whatever tax

1　period, for budgetary -- for decisions by the legislature, I

2　will assume current law, and current law can be extrapolated

3　out ten years if there's nothing in law that changes the

4　rates, for example.  If the issue is how much revenue could

5　we raise if we increased the rates above current law, I could

6　do that forecast also, but that's not what I would do in the

7　budgetary setting.

8　BY MR. SMITH:

9　Q　Okay.  If you turn to page 85 of your deposition, line 8,

10　you recall that you were giving a deposition in this case;

11　correct?

12　A　Excuse me.  Is it going to be put on the screen?

13　Q　Well, we can display it with the Court's permission, but

14　you have the deposition in the front of your binder if you

15　want to look at it.

16　A　All right.  What page?

17　Q　85.

18　A　Which tab?

19　Q　It's right up front in there at the front.  Page 85, line

20　8.  You remember you gave your deposition; correct?

21　A　I do, but I'm having a little trouble finding the page

22　number on the --

23　Q　That's okay.  It's up in the right-hand corner, I think,

24　of the pages.

25　A　Thank you.  All right.  I have it.

1  Q   And were you asked the following questions, and did you

2  give the following answers?

3              "Question:  You can't identify any tax forecast

4              that's ever assumed that the current tax rates will

5              remain unchanged for a period as long as ten years;

6              correct?

7          Answer:  I can't answer that question.  I don't

8              have knowledge to answer it.

9          Question:  So you can't identify" --

10             THE COURT:  I'm sorry.  Hold on one second.  Did you

11 say page 85?

12             MR. SMITH:  Yes.

13             THE COURT:  Or let me just ask you what page you are

14 on.

15             MR. SMITH:  Yeah.  I'm on page 85, line 8, your

16 Honor.

17             THE COURT:  Okay.  Thank you.

18             MR. SMITH:  Sorry.

19             THE COURT:  You may proceed, yes.

20             MR. SMITH:  Sorry, your Honor.

21 BY MR. SMITH:

22 Q   Page 85, line 8.  Were you asked the following -- are you

23 on page 85, Mr. Cline?

24 A   I am.

25 Q   Okay.  Were you asked the following questions, and did

1    you give the following answers?

2            "Question:  You can't identify any tax forecast

3            that's ever assumed that the current tax rates will

4            remain unchanged for a period as long as ten years;

5            correct?

6            Answer:  I can't answer that question.  I don't

7            have knowledge to answer it.

8            Question:  So you can't identify an example;

9            correct?

10           Answer:  I do not personally -- I cannot

11           personally give you an example."

12           That was your testimony?

13   A    I assume that is correct.

14   Q    Okay.  And nobody from the state or the city that you

15   talked to represented to you that the tax rates in your model

16   would not rise during the ten- or forty-year period you

17   covered; correct?

18   A    I believe the correct answer is that in discussing what

19   we were asked to do, I always ask up-front questions because

20   I can't do the revenue forecast unless I know what the

21   constraints are or what the task at hand is.  I believe up

22   front I asked is this a current law forecast, and I assumed

23   and I also believe I was -- it was probably confirmed to me

24   that we were being asked to do a current law forecast, and it

25   was my understanding that under current law, there was no

1  provision currently in law for a designated tax rate increase

2  for any of the taxes that we were asked to look at for the

3  City of Detroit, so I assumed there'd be no change in the tax

4  rates because I assumed that that was the task we had been

5  asked to do.

6  Q   Well, you know that current law can change over time;

7  correct?

8  A   Certainly.

9  Q   Okay.  And so my question is you didn't ask anyone from

10 the city whether tax rates could increase whether through a

11 change in current law or otherwise over the ten- or forty-

12 year period; correct?

13 A   When I had reached the conclusion -- and I believe it was

14 with guidance from others -- that that task we were asked to

15 do was to estimate expected revenues under current law, I was

16 fairly certain under current law there were no provisions for

17 tax rate increases, and so I didn't have to ask the question

18 that you posed.  I assumed the rates that we were dealing

19 with under today's law would remain in effect into the

20 future.

21 Q   Okay.  So you didn't ask anyone at the city whether there

22 were any tax changes that were planned over the ten- or

23 forty-year period that could be implemented to change current

24 law?

25 A   I did not.

1   Q   Okay.  You know that the legislature or the City Council

2   could increase rates over the ten-year period, though;

3   correct?

4   A   If you mean they have discretionary authority to change

5   the rates, I believe I'd have to qualify that answer by

6   saying if the state says that the City of Detroit can

7   increase rates beyond a current maximum, then the City

8   Council could, but not if the state did not provide them with

9   that authority.

10  Q   Okay.  You know that you had mentioned during your direct

11  testimony that the corporate tax rate recently changed;

12  correct?

13  A   Correct.

14  Q   And it doubled in 2012; correct?

15  A   Correct.

16  Q   And there have been other laws passed in the last few

17  years impacting the tax rates you address also; correct?

18  A   I believe that is the case.

19  Q   In 2012 a statute was passed to discontinue statutorily

20  required reductions in the income tax rate; correct?

21  A   I'm not familiar with those details, but I do know that

22  in the last two to three years there have been adjustments in

23  the individual income tax rate.

24  Q   Okay.  Do you know what statute the rates that you showed

25  the Court were based on?

1  A    I do not.

2  Q    Okay.  Are you aware that in 2008 and 2009 the city also

3  obtained statutory enactments that blocked statutory rate

4  reductions in those years?

5  A    I was not aware of that.

6  Q    Okay.  Are you aware that the income tax rate used to be

7  as high as three percent?

8  A    I'm aware that it used to be higher.  I'm not sure I know

9  the specific maximum.

10  Q    Okay.  Are you aware that the rate applicable to people

11  commuting into the City of Detroit used to be higher?

12  A    I would assume that if the resident income tax rate were

13  higher, so would the nonresident rate.  What I'm not familiar

14  with is whether there's ever been a differential other than

15  the 50-percent reduction for nonresidents.  My impression was

16  that Michigan had been fairly consistent in allowing the

17  residents to pay a higher rate than nonresidents, but they

18  had controlled the differential between the two, so in

19  answering your question, I'm not sure if I fully understand

20  if that differential changed in the period that you're

21  describing.

22  Q    Okay.  But the absolute amount in terms of the rate that

23  commuters paid was higher in the past; correct?

24  A    Again, I would assume that that was the case if, one,

25  Detroit allowed the City Council to impose a higher tax on

1    resident incomes and the state continued to require that the

2    rate on nonresidents be 50 percent of that, it would follow

3    that you would have a higher rate on nonresidents with income

4    attributable to the City of Detroit.

5    Q   Okay.  Were you aware -- we had talked about this law

6    that was in place under which income tax rates were scheduled

7    to be reduced.  You were aware of that law; correct?

8    A   You mentioned it in your questioning.

9    Q   Oh, were you aware of that law before I mentioned it?

10   A   I did know that there were recent changes in the

11   individual income tax rates in Detroit, but I didn't know the

12   details of how it might have been related to the freezing or

13   the elimination of an existing provision.

14   Q   Okay.  If we could -- if you could take a look at Tab 5,

15   which is Exhibit -- City Exhibit 115, could you turn to that

16   for a moment?

17   A   Yes.  I have that.

18   Q   If you -- you see that it's a report by the Citizens

19   Research Council of Michigan.  Is that what you have?

20   A   I have that.

21   Q   Dated April 2013?

22   A   Correct.

23   Q   And if you look on the interior page, you see that a Mr.

24   Jeffrey Bergeron is listed there.

25   A   I do know his name is listed here.

1 Q   He's the chairman of the CRC.  Did you know that?

2 A   I've read this same report several days ago and was

3 reminded when I opened it up that, yes, he was, in fact, the

4 chairman.

5 Q   And Mr. Bergeron works at Ernst & Young in Detroit;

6 correct?

7 A   He certainly does.

8 Q   He was the managing director?

9 A   I'm not sure of the title, but --

10 Q   But you know who he is?

11 A   I do know who he is.

12 Q   Okay.  And is he somebody who's respected in the field of

13 taxes?

14 A   I respect him.

15 Q   Okay.  Good for you.  If you turn over to page 22, it

16 discusses the income tax, and there are -- if you look over

17 on the first column over here --

18 A   Of what page number?

19 Q   22 --

20 A   Got it.

21 Q   -- at the bottom.

22 A   Okay.

23 Q   The CRC report says that scheduled city income tax rate

24 reductions were part of a 1998 agreement that guaranteed

25 Detroit a fixed amount of state revenue sharing payments.  Do

1  you see that?

2  A    I do.

3  Q    And that part of the agreement was abandoned when state

4  sales tax income that funded the revenue sharing program fell

5  below expectations?  Do you see that?

6  A    I do.

7  Q    And were you aware that the income tax reductions were

8  tied to this agreement from the state to give fixed amounts

9  of state revenue sharing that was subsequently abandoned?

10  A    I will have to acknowledge that when I reread this

11  report, I'm sure my eyes flowed over those words, but they

12  didn't register on me in the sense that what they're

13  describing is part of the discretionary revenue sharing

14  program for the State of Michigan in terms of revenue given

15  to the City of Detroit.  That discretionary program has been

16  reduced about over 70 percent over the last ten years.  It

17  wouldn't surprise me at all that there have been substantial

18  changes both in the revenue sharing formulas and procedures

19  and appropriations, and it also wouldn't surprise me they

20  were tied with the City of Detroit taxing authority.

21  Q    Yeah.  And there have been substantial changes in the tax

22  structure and in the amount of money the city receives under

23  revenue sharing because the state essentially reneged on its

24  agreement to continue funding the city at the levels that it

25  promised; correct?

1   A    I can't respond to that question.

2   Q    You agree with me that there's no way to tell whether

3   current law will change or not over the next ten years;

4   correct?

5   A    I agree that it was clear to us when we did our revenue

6   forecast that there was no provision in current law that

7   would trigger an increase in a tax rate for the taxes that we

8   were looking at, so we assumed that the tax rates were fixed.

9   Q    And my question is -- I'm talking about changes in that

10  current law you assumed.  There's no way to tell whether the

11  current law is going to change over the next ten years;

12  correct?

13  A    Whether you could or could not predict that, we did not

14  examine that question in the work that we did for the City of

15  Detroit.

16  Q    And you agree with me that you can't tell one way or the

17  other whether there will be changes in the current tax law

18  over the next ten years?

19  A    If you would like for me to answer that question, I would

20  say in the current political environment in Lansing,

21  Michigan, it would be very unlikely that there will be a

22  state tax rate increase in the near or foreseeable future.

23  Q    Okay.  If you could turn to page 83 of your deposition,

24  Mr. Cline, line 5, were you asked this question, and did you

25  give the following answer?

1          "Question:  But we know there's no way to tell

2          whether current law will remain unchanged over the

3          next ten years; correct?

4          Answer:  I agree."

5  A   What page was it?

6  Q   Page 83, line 5.

7  A   83, line 5.  Would you repeat what line number you're

8  referring to?  I'm not sure I picked it up.

9  Q   Were you asked the following question, and did you give

10  the following answer?

11        THE COURT:  It's line 5, sir.

12        THE WITNESS:  Oh, thank you.  Thank you.  Line 5 on

13  page 84?

14  BY MR. SMITH:

15  Q   83.

16  A   I'm sorry.  I'm just trying to jump back and forth.  On

17  line 5, yes.  I see the question now on line 5.

18  Q   Okay.  And that was your testimony; correct?

19  A   I believe that is my testimony.

20  Q   Okay.  You're not offering any opinion that raising the

21  income, property, utility, or wagering tax rate or any of the

22  other tax rates would be inappropriate or unreasonable, are

23  you?

24  A   I'm not offering an opinion on any increase of any kind

25  for any reason.

1  Q   Yeah.  And there are a number of cities that have reduced

2  spending and raised tax rates in response to fiscal

3  challenges; correct?

4  A   I believe if you look back over the last ten years where

5  we've had severe fiscal challenges, you would probably find a

6  mixture of tax rate changes, some going up and some going

7  down.

8  Q   You did not do any work that would allow you to testify

9  that by increasing tax rates Detroit would not substantially

10  increase its tax revenues; correct?

11  A   We did not.  We were not asked nor did we look at

12  potential what I would call static revenue.  When we do

13  revenue forecasts, we estimate the additional revenue if you

14  assume the economics remains unchanged and the tax base is

15  there and then you increase let's say a rate and then you

16  estimate how much additional revenue on the given base you'd

17  collect, and we call that the static revenue impact.  We did

18  not do a static revenue estimate or forecast or impact on tax

19  rate increases.

20  Q   And that's because you weren't asked to do that type of

21  analysis?

22  A   That is correct.

23  Q   And, in fact, if you were working, say, two years after

24  the bankruptcy was completed and the current law changed with

25  respect to tax rates and tax rates increased, you'd have to

1  revise your model in order to incorporate the new rate to
2  make the model accurate; correct?
3  A    That is correct.  If the current law tax parameters
4  change for whatever reason and whether it's rate or base and
5  we were asked to revise our estimates, our forecasts, say,
6  for the initial ten-year period, we would incorporate that
7  new information into our forecasts.
8  Q   Okay.  Your analysis also assumes that no new taxes are
9  going to be added in the city; correct?
10  A   Our analysis assumes current law taxation.
11  Q   So if there are new taxes that aren't in current law,
12  then you would assume that they would not exist in the future
13  in your forecast; correct?
14  A   It wouldn't be an assumption.  If they're not in current
15  law, they don't exist.
16  Q   Okay.  Neither the emergency manager nor any assistants
17  have shared with you their plans or policies relating to
18  future tax policies; correct?
19  A   I have not had that discussion personally.
20  Q   Yeah.  You haven't done any work that would allow you to
21  testify that Detroit couldn't add new taxes; correct?
22  A   I think my answer would be my understanding of current
23  law does not -- current law does not provide Detroit with the
24  ability to either raise rates or introduce a new tax, not
25  under current law statutes.

1  Q   And, Mr. Cline, if you could turn to page 96 of your

2  deposition, line 2.  Are you there?

3  A   I am there.

4  Q   Were you asked the following question, and did you give

5  the following answer?

6           "Question:  And you haven't done any work that

7           would allow you to" --

8           MR. STEWART:  Your Honor, I object.  Impeachment, if

9  that's what this is offered for, must be --

10          THE COURT:  Would you stand by a microphone for me,

11 please?

12          MR. STEWART:  I'm sorry, your Honor.  Impeachment,

13 if that's what this is being offered for, must be dealing

14 with not just the exact question but an answer that's

15 different.  This is consistent with what Mr. -- Dr. Cline

16 just said.  I mean we've done this --

17          THE COURT:  It's actually a little bit different.

18 I'll permit it.

19          MR. STEWART:  Okay.

20 BY MR. SMITH:

21 Q   Okay.

22          "Question:  And you haven't done any work that

23          would allow you to testify that Detroit couldn't

24          just add new taxes; correct?

25              Answer:  We have not."

1          That was your -- that was your testimony?

2          THE COURT:  Was that your testimony, sir?

3          THE WITNESS:  If you could help me, I'm not sure.  I

4    still don't understand your question.

5          THE COURT:  All right.  We've moved on.  What we've

6    moved on to is is that the question you were asked, and is

7    that the answer you gave?

8          THE WITNESS:  It is correct to say -- yes, it is

9    the -- it's the answer that I gave.

10          THE COURT:  Excellent.

11   BY MR. SMITH:

12   Q    You haven't done the work that would allow you to testify

13   that Detroit couldn't significantly increase revenues by

14   adding new taxes; correct?

15   A    What I don't understand about your line of -- the current

16   question you just asked me, what do you mean by "any of the

17   work"?  I don't understand the question.

18   Q    Well, you've done some work and analysis that's presented

19   in your report; correct?

20   A    In our revenue forecast for the taxes that we were asked

21   to examine, we did a detailed revenue forecast.

22   Q    Okay.  And there's nothing in any of the work that you've

23   done for the Court that says that Detroit couldn't

24   significantly increase revenues by adding new taxes.  It's

25   simply something you didn't address; correct?

1  A   We were not asked to nor did we do any tax forecasting

2  with our forecast model that asked the question what would

3  happen if there was a different current law structure in

4  Detroit.

5          THE COURT:  So the answer to the question is "yes"?

6          THE WITNESS:  Yes.

7  BY MR. SMITH:

8  Q   And you haven't investigated a city only sales tax, for

9  example; correct?

10  A   Again, are you describing a tax that doesn't exist under

11  current law in the City of Detroit?

12  Q   Well, do you know if there's a city only sales tax in the

13  City of Detroit?

14  A   It is not a tax that we were asked to estimate or project

15  or forecast revenues for.

16  Q   Do you know if there's a vacant land tax in Detroit?

17  A   If it is outside of the property tax system, I'm not

18  familiar with it.

19  Q   Okay.  It's not something you investigated?

20  A   We were not asked to look at that, nor did we do a

21  revenue forecast for that -- a tax with that name.

22  Q   Okay.  Are you aware, though, that there have been

23  proposals in the past for new taxes in Detroit?

24  A   I haven't been following the City of Detroit's financial

25  discussions for some time.  I haven't been in Michigan.  I

1  believe the accurate answer is I am not familiar with the

2  discussion about alternative taxes in the City of Detroit.

3  Q   Okay.  If you could turn to Tab 12 in your binder, it's

4  Syncora Exhibit 4431.  And I'm interested in page 101.  This

5  is a Detroit Economic Forum publication on Detroit's fiscal

6  condition.

7  A   On page 101?

8  Q   101, yes.

9  A   I have it.

10  Q   And you see that there's a number of options the Detroit

11  Economic Forum identified, tax options for Detroit.  Do you

12  see those?

13  A   I do see a table with a heading "Revenue and Growth" and

14  a block that says "Tax Options."

15  Q   And among the options they identified as potentials for

16  Detroit was the nonresidential square footage tax, vacant

17  land tax, business license tax, parking tax, and then it goes

18  on to the next page, excise taxes, occupational privilege

19  tax, and an increased wagering tax beyond what's already in

20  the law.  You haven't investigated any of those tax options

21  for Detroit; correct?

22  A   Have not.  No, I have not.

23  Q   Yeah.  We had discussed that there was the new corporate

24  tax that was recently enacted by the legislature.  Do you

25  recall that?

1    A    Correct.

2    Q    Do you know whether there are other new taxes that the

3    legislature has recently enacted?

4    A    No, I don't, but I had followed the corporate income tax

5    change -- that is one I'm familiar with -- going from the

6    Michigan business tax, which was the prior to tax base tax,

7    to the new corporate income tax.  I'm not familiar with other

8    changes they recently made.

9    Q    Okay.

10        MR. SMITH:  Your Honor, I don't know when your Honor

11   was planning to break for lunch.  This is a good break point,

12   but I can keep going also if you want.

13        THE COURT:  How much longer will you be?

14        MR. SMITH:  I think it'll probably be an hour or

15   two, your Honor.

16        THE COURT:  An hour or two?

17        MR. SMITH:  Yeah.

18        THE COURT:  Somewhere between that.  Okay.  All

19   right.  That's all right.  We'll break for lunch now and

20   reconvene at 1:30, please.

21        THE CLERK:  All rise.  Court is in recess.

22        (Recess at 12:05 p.m., until 1:30 p.m.)

23        THE CLERK:  All rise.  Court is back in session.

24   Please be seated.  Recalling Case Number 13-53846, City of

25   Detroit, Michigan.

1    MR. SMITH:  And, your Honor, may I proceed?

2    THE COURT:  Let's proceed.

3    MR. SMITH:  Okay.

4  BY MR. SMITH:

5  Q   Good afternoon, Dr. Cline.  Collection activities.  Do

6  you agree that collection activities can impact revenues over

7  time?

8  A   Yes, I do.

9  Q   Okay.  And your analysis of the forecasting that you did

10  assumes no change in collection rates over the ten- and

11  forty-year periods you looked at; correct?

12  A   That is correct for all of the taxes other than the

13  property tax.

14  Q   Okay.  And we'll get to that in a minute.  And you agree

15  collections is an important issue for the city because, for

16  example, the income tax that you forecasted, that's about a

17  third of the city's revenue?

18  A   Correct.

19  Q   And you haven't done any work that says that increasing

20  tax revenues through increased collections would be

21  inappropriate or not feasible; correct?

22  A   No, we have not.

23  Q   And you haven't done any work that will allow you to

24  testify that Detroit can't significantly increase revenue by

25  increasing tax rates or increasing tax collections or by

1   adding new taxes; correct?

2   A   No, I have not.

3   Q   And, in fact, you're not familiar with the specifics of

4   the collection programs in Detroit; correct?

5   A   I think that's accurate.

6   Q   Okay.  You don't know what the collection rates have been

7   historically in the city; correct?

8   A   We do know what the property tax collection rates have

9   been, and we actually calculated such a rate in our model.

10  Q   Okay.  For all the taxes other than the property taxes,

11  though, you're not familiar with what the collection rate --

12  A   That is correct.

13  Q   -- has been historically?  Now, in fact, you don't know

14  whether, for example, the collection rate on the income tax

15  is greater or lesser than 50 percent; correct?

16  A   That's correct.

17  Q   And you haven't investigated the rate on the -- of

18  collections on the corporate tax rate; correct?

19  A   That is correct.

20  Q   And you don't know whether that one is greater or lesser

21  than 50 percent either?

22  A   That's correct.

23  Q   Now, it's possible to perform a reasonable forecast that

24  includes the effect of changes in collection rates over time

25  on the income tax; correct?

1   A    You could estimate those changes.

2   Q    And as you mentioned, Ernst & Young had performed a

3   forecast that incorporates collection rates for the property

4   tax forecast; correct?

5   A    It may have -- that information may have been prepared by

6   someone other than Ernst & Young, but it was incorporated

7   into the spreadsheets.

8   Q    Okay.  So Ernst & Young did incorporate changes for

9   collection rates in its property tax estimates but not for

10  estimates for any of the other taxes; correct?

11  A    That is correct.

12  Q    And so if somebody wanted to get an idea of the magnitude

13  of additional revenue from increases in collection rates on

14  various taxes that you examined, they would have to do a

15  separate -- calculate a separate number and then add that

16  onto your forecast or have somebody else do that analysis;

17  correct?

18  A    That's correct.

19  Q    Now, you're aware that there have been proposals to

20  increase tax collections -- income tax collections by

21  withholding taxes from reverse commuters; correct?

22  A    I am familiar with that proposal.

23  Q    And just so the Court understands what the reverse

24  commuter population is, you looked at three different

25  populations in your forecast model; is that correct?

1    A    That's correct.

2    Q    Okay.  And I'm going to just draw on the flip chart real

3    quick, and then I'll come back to the microphone.

4            MR. STEWART:  Your Honor, may I have leave of the

5    Court to move so I may see the chart?

6            THE COURT:  Sure.

7    BY MR. SMITH:

8    Q    And while Mr. Stewart is moving, is it correct -- Group A

9    in your analysis that you discussed, those are people that

10   both live and work in the city, correct, so that's

11   represented by the arrow that's entirely within the confines

12   of Detroit on my diagram?  And Group B, that's individuals

13   who live outside the city but come into the city to work;

14   correct?

15   A    Correct.

16   Q    And those are the regular commuters, you might call them;

17   right?

18   A    Into the city.

19   Q    Into the city.  And then the third group are people who

20   live in the city, but then they go outside of the city to

21   work each day, and that's Group C; correct?

22   A    Correct.

23   Q    And those are the reverse commuters they're sometimes

24   called?

25   A    They are described that way.

1  Q   And so this diagram that I've drawn and which I will

2  label "Syncora Demonstrative A," does that accurately

3  represent your three groups?

4  A   My understanding, yes, it is.

5  Q   Now, there have been reports on failure to collect income

6  taxes from reverse commuters; correct?

7  A   I've seen references to some of those reports.

8  Q   And if you could turn to Tab 5, it's that City Exhibit

9  115, the CRC report that we were looking at earlier today.

10 A   Okay.  Yes.  Got it.

11 Q   And I would like to discuss some text that's on page 23

12 if you could turn there, please.

13 A   I'm there.

14 Q   Okay.  And the CRC report discusses this issue, doesn't

15 it?  Correct?

16 A   Under the --

17 Q   Under the --

18 A   -- title "Nonfilers"?

19 Q   That's right, nonfilers.

20 A   Yes; correct.

21 Q   And part of the problem that's been identified with

22 reverse commuters is they're people who may file a state

23 tax -- income tax return and pay their state income taxes,

24 but then they just don't file a Detroit income tax form;

25 correct?

1   A   That's my understanding.

2   Q   And then Detroit doesn't get to collect the tax on those

3   people, correct, because they never file a return?

4   A   Correct.

5   Q   And they're at that high 2.4-percent rate because they

6   are residents of the city; correct?

7   A   That is correct.

8   Q   And in the CRC report, you see it says one market

9   analysis --

10          THE COURT:  Excuse me one second.

11          MR. SMITH:  Oh, sure.

12          THE COURT:  Is this in evidence?

13          MR. SMITH:  It's not in evidence.  I don't think we

14  admitted it earlier.

15          THE COURT:  Have you seen this report before today

16  or before --

17          THE WITNESS:  I have read this report prior to

18  today.

19          THE COURT:  Did you take it into account in

20  preparing your own analysis?

21          THE WITNESS:  I did not.

22          MR. SMITH:  Your Honor, this report is relied on in

23  Ms. Sallee's expert report, and in Mr. Cline's expert report

24  he did say he had access to all the materials Ms. Sallee had

25  reviewed.  And I believe earlier today he testified that he

1  had reviewed it again before his testimony today.

2          THE COURT:  Well, but why is it appropriate to

3  cross-examine the witness on a report that he did not rely

4  upon in preparing his own expert opinion?

5          MR. SMITH:  Well, I believe he did because --

6          THE COURT:  He just said he didn't.

7          MR. SMITH:  Well, I think he's just forgetting that

8  in his expert report he said he considered all the materials

9  that were on Ms. Sallee's list.

10          THE COURT:  Well, a minute ago you said not that he

11  considered it all, that he had access to it.  Those are two

12  very different things.  Which is it?

13          MR. SMITH:  It's considered.

14          THE COURT:  I'll ask you again did you consider this

15  report when you prepared your reports?

16          THE WITNESS:  I did not consider this report when I

17  prepared my reports on the taxes other than the property tax

18  and revenue sharing amounts.

19          THE COURT:  Does your report say that you did

20  consider all of the information that Ms. Sallee had?

21          THE WITNESS:  I'm not sure.

22          MR. STEWART:  Your Honor, I think his report says he

23  had available to him these materials and the expertise of

24  these other people.  I don't believe it says he considered

25  this.

1          THE COURT:  Are you looking at a specific page in

2     the report?

3          MR. STEWART:  I am, your Honor, page 26 of the

4     witness' expert report.

5          MR. SMITH:  This is also a city exhibit.  I don't

6     believe that there's going to be any objection to its

7     admission into evidence, your Honor.

8          THE COURT:  Well, I'm still wondering whether it's

9     appropriate to cross-examine a witness on a report that he

10    didn't rely upon for his own conclusions.

11         MR. SMITH:  Well, I think it goes to his

12    methodology, your Honor.  If he -- I think he's aware of some

13    of the issues that are discussed in this report, but if he

14    isn't, then it goes to his methodology that he used in

15    compiling his opinions.

16         MR. STEWART:  Your Honor, we'd object to it on the

17    grounds of hearsay on many levels but also that it's

18    irrelevant to this witness' testimony for any number of

19    reasons, not the least of which is that he made clear he did

20    tax forecasting, not tax compliance or tax collections, which

21    is what this is about, much less changes in the law.

22         THE COURT:  Well, I think you can -- I think you can

23    ask him whatever questions you have about the issues that

24    this report raises, but I do think it's improper to confront

25    him with the report itself.

1          MR. SMITH:  Okay.  Thank you, your Honor.

2    BY MR. SMITH:

3    Q    Mr. Cline, you're aware that there have been a -- there's

4    been a study performed by McKinsey & Company that found that

5    there was $140 million in uncollected income tax revenue in

6    the City of Detroit in 2009 alone.  You're aware of that;

7    correct?

8    A    I'm aware of the report.  I didn't remember the specific

9    number.

10   Q    Okay.  So that would be -- that additional -- those

11   additional sums that are uncollected would be above and

12   beyond the amounts that you've estimated in your forecast;

13   correct?

14   A    That is correct.

15   Q    And the city, in fact, has recognized that there's a

16   significant problem resulting from its failure to collect

17   income taxes; correct?

18   A    It's my understanding that that's the case.

19   Q    And, in fact, there's a whole section of the city's

20   disclosure statement on that issue; correct?

21   A    I believe so.

22   Q    Yeah.  And are you aware also that there have been

23   proposals to try to remedy that situation through either

24   withholding income tax from the reverse commuters or by

25   piggybacking tax collections on the state return?

1  A   I am familiar with both of those, discussions of those

2  two possible options.

3  Q   And piggybacking, what that would do is on the state

4  return, there would be a section that Detroit residents would

5  have to fill out if they lived in the city and disclose their

6  income so that the Detroit city tax could be paid; correct?

7  A   I'm not familiar with the details of mechanically how it

8  would work, but it does involve the state income tax return.

9  Q   Okay.  And the state would collect the tax on behalf of

10  the city; correct?

11  A   That's my understanding.

12  Q   And, in fact, there are other states like Ohio that have

13  that type of arrangement, correct, where --

14  A   There are, and Ohio is an example.

15  Q   Yeah.  Were you aware that the city had already entered

16  into an agreement in concept with the state to piggyback the

17  tax collections with the state?

18  A   I was not aware of the agreement.

19  Q   Okay.  Are you aware that there's a state statute -- you

20  mentioned you took current law -- state statute that

21  authorizes piggybacking of the tax collections?

22  A   I didn't know or don't remember that there is such a

23  provision in current law.

24  Q   And did you investigate that issue at all?

25  A   No, we did not.

1  Q  And you agree that you're not aware of anything

2  preventing the city from continuing to increase income or

3  other tax collections if the bankruptcy case is dismissed;

4  correct?

5  A  Other than the constraints under current law on the

6  provisions of the tax itself.

7  Q  Okay.  And I'm talking about income tax collections,

8  though.

9  A  Oh, I see.  Okay.

10  Q  You're not aware of anything preventing the city from

11  continuing to increase income or other tax collections if the

12  bankruptcy case is dismissed?

13  A  No, I'm not.

14  Q  Okay.  Now, we discussed how you had not analyzed all the

15  revenue sources, not analyzed increased rates or collection

16  activities or other revenue raising options for the city.

17  We've gone all over that.  Okay.

18  A  Right.

19  Q  It might be a straightforward question, but you agree

20  that you're not offering an opinion that Detroit can't pay

21  its creditors more; correct?

22  A  I don't believe I'm offering such an opinion.

23  Q  And you didn't perform any analysis that the plan is in

24  the best interest of the various creditors; correct?

25  A  No, I did not.

1  Q   And you didn't perform an analysis that the plan makes a

2  reasonable effort to maximize the recovery for any of the

3  financial creditors, including Syncora or FGIC?

4  A   No, I did not.

5  Q   And you did not perform any analysis regarding whether

6  the plan provides creditors of equal priority with equal

7  treatment; correct?

8  A   No, I did not.

9  Q   And you didn't perform those analyses because you weren't

10  asked to perform them; correct?

11  A   That is correct.

12  Q   Yeah.  You would agree with me that ultimately the amount

13  of revenue available to the City of Detroit and the amount of

14  costs that it incurs are political decisions that are

15  dependent on the political actors; correct?

16        MR. STEWART:  Objection.

17        THE COURT:  What is the objection, sir?

18        MR. STEWART:  I'm not sure what he means by

19  "political decisions," and I'm not sure it's a fair question

20  of the witness, in any event.  I mean "political" could mean

21  state level legislation, mean City Council.  I think it's a

22  vague question.

23        MR. SMITH:  I asked the same question during his

24  deposition without objection.

25        MR. STEWART:  Well, that's because the question

1   then --

2          THE COURT:  That doesn't mean the objection is

3   waived.  I will ask you to try to clarify it a bit.

4          MR. SMITH:  Okay.

5   BY MR. SMITH:

6   Q   Do you agree at the end of the day that the amount of

7   revenue available to a city or cost that it incurs is a

8   political decision for the political actors whether they be

9   members of the city, including the City Council or the mayor,

10  or members of the legislature?

11  A   I agree that the structure of the current law is

12  determined through legislation at either the state level or

13  the municipal level.

14  Q   And current law isn't the only thing that determines

15  revenues, though; correct?

16  A   The underlying tax bases in conjunction with the features

17  of the system determine the taxes that are owed the level of

18  government.

19  Q   Yeah.  And the city can also impose new fees without

20  leave from the legislature; correct?

21  A   I'm not sure about the mechanics of fees, but I assume

22  they have more leeway than the taxes that we looked at.

23  Q   And so my only question is at the end of the day, it's a

24  political judgment by the political actors in charge of the

25  city whether they're going to want to try to raise revenue or

1  how much revenue they have or costs they incur?

2  A    I don't believe that the collection of taxes from the

3  current tax law system is a political decision.  Under

4  current law, people have liabilities that they have to pay

5  under the current tax law.

6  Q    And do you agree that it has that dimension, though, of

7  being a political decision?  Is that one factor?

8  A    I believe it can be changed through political decisions.

9  Q    Yeah.  Now, we discussed some of the areas you did not do

10 analysis.  I'd like to turn now to the areas that you have.

11 You provided certain forecasts of revenue for the City of

12 Detroit assuming current tax rates and collection rates;

13 correct?

14 A    Correct, with that one exception of the property tax

15 where --

16 Q    Yeah.

17 A    -- we did vary the collection -- the effective collection

18 rate.

19 Q    Yeah.  You acknowledge that you've never done forecasting

20 for a city before; correct?

21 A    I believe that is correct.

22 Q    Okay.  And you don't have any experience doing economic

23 forecasting for Detroit; correct?

24 A    That is correct.

25 Q    And you've never done a municipal income tax forecast

1  before; correct?

2  A   I believe that is correct with the possible exception of

3  some work we did in Ohio for Cincinnati, which has a

4  municipal income tax.

5  Q   Was that work that you performed after you were retained

6  and did your work here?

7  A   No.  That was with -- when I was employed by Ernst &

8  Young.

9  Q   Okay.  You've never done a forecast of corporate tax

10  revenues for a city?

11  A   I may have also done a corporate income tax analysis for

12  the City of Cincinnati.

13  Q   You can't recall one way or the other sitting --

14  A   I believe it was included in the taxes that we looked at

15  in Cincinnati.

16  Q   You've never done a forecast of wagering tax revenue

17  before, have you?

18  A   I have done a study of gross receipts taxes based upon

19  gross receipts of gambling proceeds.  I don't believe I've

20  looked at a tax that was called a wagering tax.

21  Q   Okay.  And you don't hold yourself out as an expert on

22  casinos or wagering revenue; correct?

23  A   I do not.

24  Q   In conducting your forecast, one of the -- one of the

25  assumptions that you had to make was regarding revenue -- I

1    mean was regarding employment growth; correct?

2    A    Correct.

3    Q    And you've never forecast an employment growth rate for a

4    city before; correct?

5    A    I don't believe so.

6    Q    Yeah.  And you also made some forecasts regarding wage

7    growth in the city; correct?

8    A    Yes, we did.

9    Q    And you've never forecast a wage growth rate for a city

10   before; correct?

11   A    I don't believe so.

12   Q    And you also made some forecasts of Detroit's population

13   that we saw; correct?

14   A    We did.

15   Q    Using SEMCOG data; correct?

16   A    Correct, but with modifications.

17   Q    And you've never forecasted municipal population levels

18   before; correct?

19   A    Not that I recall.

20   Q    And you mentioned that you had testified previously on

21   one occasion as an expert; correct?

22   A    Correct.

23   Q    And that was not in the area of forecasting?

24   A    That is correct.

25   Q    And you haven't published any published or peer review

1    literature on forecasting that you can recall?

2    A    I don't think so.

3    Q    And no one has discussed with you any plans to have Ernst

4    & Young continue to do forecasting work after the bankruptcy;

5    correct?

6    A    Not to my knowledge.

7    Q    And certainly you won't be because you'll be off in

8    France; correct?

9    A    That is the plan.

10   Q    Okay.  You had talked about your experience doing

11   forecasts.  Isn't it true that you've never performed a tax

12   forecast over a period as long as ten years personally?

13   A    I'm not sure that's correct.  I know I've done multiple-

14   year analysis of state taxes in Minnesota and Michigan.  I

15   don't recall the length of study.  I know we've gone

16   beyond -- I have gone beyond the current budget forecast

17   period.

18   Q    But when you were asked that at your deposition, you were

19   not able to come up with any example that goes out to ten

20   years?

21   A    I would imagine so, that I was not able to.

22   Q    And sitting here today, you're not able to cite any

23   example going out ten years; correct?

24   A    That is correct.

25   Q    Okay.  And you're not aware of any forecasts for the City

1  of Detroit that go out more than three years whether
2  conducted by the city or any other party; correct?
3  A   With perhaps the exception of some work done by the
4  Citizens Research Council, but I can't cite specific studies,
5  no.
6  Q   Yeah.  Did anybody ever disclose to you that Ernst &
7  Young had at one point prepared a five-year forecast for the
8  city?
9  A   Not that I aware of.
10 Q   Yeah.  Is it true that you don't believe that anyone
11 would have predicted ten years ago what Detroit looks like
12 today?
13 A   With the qualification that that trend line we saw in the
14 chart that I talked about earlier shows that decline has been
15 going on for at least 20 years, so there was some of this
16 evidence available before the last 10 years.
17 Q   But, in your view, nobody could have predicted ten years
18 ago what the city would have looked like today; correct?
19 A   I would say that's an accurate statement.
20 Q   Okay.  And you agree it's very difficult to predict ten
21 years from now what Detroit will look like; correct?
22 A   I agree.
23 Q   And that's a limitation of your analysis that can't be
24 overcome by any statistical analysis that you're aware of;
25 correct?

1   A    That is correct.

2   Q    Yeah.  Now, you talked about how you referred to the 40-

3   year projection as a simulation.  Do you recall that?

4   A    Yes, the 40-year -- the extra 30 years beyond the first

5   10.

6   Q    And 40 -- and the simulation -- the 40-year simulation

7   you did is not a forecast of what revenues are expected to

8   be; correct?

9   A    It was our estimate of what tax collections would look

10  like over that next 30-year period given the assumptions

11  about the key inputs that we used in the same framework we

12  did the first 10-year forecast.

13  Q    But the 40 -- the 40-year simulation is not a forecast of

14  what is expected to happen; correct?

15  A    It was our estimate of the revenues that the City of

16  Detroit could expect over the next 30-year period after the

17  first 10 years assuming that our growth assumptions were

18  correct.

19  Q    Okay.  Well, why don't we take a look at your expert

20  report on page 12?  It's Tab 6.

21  A    Okay.

22          THE COURT:  Is that an exhibit number just so the

23  record is clear?

24          MR. SMITH:  Yes.  I think that the city has marked

25  it as Exhibit -- City Exhibit 457.

1  BY MR. SMITH:

2  Q   And if you look at Section C, do you see it discusses the

3  40-year forecast?

4  A   Yes, I see that.

5  Q   And you say there in the third sentence, "The 40-year tax

6  forecast should be considered a simulation of what would

7  happen under the assumed growth rates, not a forecast of what

8  is expected to happen."  That was what you wrote?

9  A   Yes.  And I still agree with that distinction between

10  simulate and forecast.

11  Q   All right.  Now, you had mentioned that you became

12  involved in the Detroit matter back in the spring of 2013;

13  correct?

14  A   I believe that's correct.

15  Q   And before you began your work, the team in Detroit had

16  created the framework of a ten-year forecasting model;

17  correct?

18  A   They had begun work on a forecasting model.

19  Q   And you're not sure who exactly put that together?

20  A   I'm really not sure who was constructing the Excel

21  spreadsheet.

22  Q   Okay.  At some point later in time, did somebody come to

23  you and say that they wanted it extended for an additional 30

24  years?

25  A   First, we were approached to deal with the initial ten-

1   year period.  Then we were asked following that to extend it

2   for another 30-year period.

3   Q   Do you recall when that was?

4   A   I do not.

5   Q   And do you recall why that was?

6   A   I do not.

7   Q   Now, you received some information from the city to use

8   in your modeling; correct?

9   A   Correct.

10  Q   And you didn't do any independent analysis or testing to

11  verify the accuracy of the information provided to you by the

12  city; correct?

13  A   Not quite correct.  We, in fact, had -- we substituted

14  some numbers of our own for numbers that were given to us by

15  the city where we thought there was even more recent

16  information to indicate from actual collections that the city

17  numbers were not accurate in terms of the starting point for

18  our forecast.

19  Q   Okay.  Well, if you could turn to your deposition, page

20  28, line 2.

21  A   28?

22  Q   Yeah, line 2.

23  A   The deposition, not the expert report?

24  Q   Yeah, deposition.

25  A   Thank you.

1    Q    Sorry.

2    A    What page number?

3    Q    28.

4    A    I have it.

5    Q    Okay.  Line 2.  Were you asked the following questions,

6    and did you give the following answers?

7              "But you didn't do any independent analysis or

8              testing to verify the accuracy of the information

9              provided to you by the city; correct?

10                 I did not.

11                 Question:  And nobody on your team did, correct,

12             as far as you're aware?

13                 Answer:  Not that I know of."

14             Correct?  That was your testimony?

15   A    And I still -- those statements are still accurate.

16   Q    Okay.

17             MR. STEWART:  Your Honor, for the sake of

18   completeness invoking the doctrine of completeness for this,

19   I think we must go on in the deposition to his further

20   testimony where he does -- in his deposition where he

21   continued to describe what he described before lest we give

22   the impression he's testified inconsistently here today.  And

23   I would just assume if you just keep going -- and that's

24   found -- page 30, line 3.

25             MR. SMITH:  Okay.  So you want me to skip to two

1    pages later and then read from page 30, line 3?

2         THE COURT:  All right.  I'm going to -- I'm going to

3    defer that to your redirect.

4         MR. STEWART:  Will do, your Honor.

5    BY MR. SMITH:

6    Q   You haven't done any investigation to look into

7    assessments of the City of Detroit's recordkeeping; correct?

8    A   That is correct.

9    Q   And you haven't -- you don't have any idea of what

10   auditing procedures Detroit uses; correct?

11   A   I do not.

12   Q   And you relied on a number of people for information that

13   you used in the modeling exercise; correct?

14   A   Our team at QUEST did.  That's correct.

15   Q   And you're not in a position to comment on the expertise

16   of the people you relied on for information in your model;

17   correct?

18   A   I am not other than to note they were city officials for

19   the most part.

20   Q   But at the time of your deposition, you couldn't even

21   identify all the individuals who gave you information;

22   correct?

23   A   I did not know them by name.  No, I did not.

24   Q   Okay.  And even after you submitted your expert report at

25   your deposition, you weren't able to identify any of the city

1 officials who had involvement with taxes; correct?

2 A    In terms of the taxes we were responsible for, that I was

3 directly responsible for, Caroline Sallee did have a lot of

4 interactions with city officials on the property tax side.

5 Q    Yeah, but you just don't know who -- on the taxes you

6 worked on, you don't know who the officials are; correct?

7 A    They were the budget officials, the Department of Finance

8 people as well as the folks who had participated in the

9 consensus forecast for the City of Detroit.

10 Q    And can you identify any of those individuals?

11 A    I cannot.

12 Q    Now, you talked, I think, on direct about how the

13 analysis you performed was a complicated analysis, very

14 complicated; correct?

15 A    I believe I used that phrase.

16 Q    And there's numerous assumptions involved in your

17 forecasting; correct?

18 A    That is correct.

19 Q    And, in fact, the entire forecast is a forecast that's

20 based on assumptions; correct?

21 A    Every forecast is a forecast based on assumptions.

22 There's no doubt about it.

23 Q    Okay.  And you agree that the reasonableness of your

24 projections depend on the reasonableness of the assumptions?

25 A    I believe the reasonableness of the assumptions is

1    extremely important.  I think the reasonableness of the

2    overall forecast depends upon how it compares to current

3    collections and expected future events.

4    Q    And if you change the assumptions, the results of the

5    forecasting model exercise that you perform would change;

6    correct?

7    A    They could if you change one of the assumptions that

8    was -- we call it a driver in the forecast.

9    Q    And in general for any of the assumptions in your model,

10   if the assumptions significantly change, you're not in a

11   position to offer an expert opinion regarding what the

12   revenues would be without rerunning the model; correct?

13   A    That is correct.

14   Q    And the assumptions that you used in your model have

15   already changed over time; correct?

16   A    They have.

17   Q    And the inputs -- and there have been multiple changes to

18   the inputs and assumptions in your model; correct?

19   A    Correct.

20   Q    And you base your assumptions on your experience in

21   revenue forecasting and the current status of the City of

22   Detroit from an economic perspective; correct?

23   A    And the State of Michigan from an economic perspective.

24   Q    But as we discussed, you don't have experience with the

25   possible exception of Cincinnati doing revenue forecasting

1   for a city; correct?

2   A    I think that's correct.

3   Q    And as we discussed, you didn't have any experience

4   forecasting for Detroit; correct?

5   A    That is correct.

6   Q    Now, you agree that the basic challenge in your

7   forecasting exercise is that you have limited data with

8   respect to some of the numbers you're assuming; correct?

9   A    That is part of the problem.  Another very significant

10  part is that break in the relationships with recent history

11  due to what currently is happening in Detroit.

12  Q    And part of the first part of the problem is that you

13  couldn't find any updated economic forecasts for Detroit;

14  correct?

15  A    That is correct.

16  Q    In the past, people have done economic forecasts for

17  Detroit, but the ones you're aware of, as far as you're

18  aware, haven't been updated?

19  A    I have in the past remembered looking at some bank

20  forecasts for the City of Detroit itself, but they were not

21  available this time around.

22  Q    And you don't know whether anyone outside of this

23  litigation currently does economic forecasting for Detroit;

24  correct?

25  A    Not that I'm aware of.

1  Q   Yeah.  So part of what you're doing I think you discussed

2  on direct is trying to extrapolate data from Michigan at the

3  statewide level to the City of Detroit; correct?

4  A   As a starting point, certainly, for our forecasting

5  exercise.

6  Q   And you know what a sensitivity analysis is; correct?

7  A   I do.

8  Q   Would it be fair to say that's an analysis where you vary

9  the numbers used for your inputs and assumptions to see what

10 the effects will be?

11 A   That's correct.

12 Q   Okay.  You didn't do any sensitivity analyses for your

13 forecasts; correct?

14 A   We did not do any sensitivity analysis for each of the

15 major components of our forecast.

16 Q   Yeah.  And no sensitivity analyses at all were reported

17 in your expert reports; correct?

18 A   That's correct.

19 Q   Now, what's changing over the time in your forecast is

20 the assumed economics; is that correct?

21 A   The underlying economics; correct.

22 Q   And you agree there are many activities, including

23 activities by the city, that can impact the economics that

24 you're forecasting in the future; correct?

25 A   That's correct.

1  Q   And anything that affects the private sector economy

2  could, in theory, have an influence on your tax forecast for

3  the city; correct?

4  A   Yes.

5  Q   And you acknowledge that you don't have any -- you talked

6  a little bit about a baseline scenario and a restructuring

7  scenario; correct?

8  A   Correct.

9  Q   And your understanding is there will be different

10 activities the city will be performing under each; correct?

11 A   That under restructuring there will be changes the city

12 will make that will have an effect, I believe, on the private

13 sector economy.

14 Q   And you acknowledge that you don't have any understanding

15 of what activities the city will or will not perform in the

16 baseline scenario; correct?

17 A   I have an understanding of the aggregate dollar amount of

18 the spending plan.  I do not have detailed information about

19 the -- or understand the individual components that add

20 together to that total.

21 Q   Well, just so we're on the same page, I'm going to ask

22 about the baseline first.

23 A   All right.

24 Q   You acknowledge you don't have any understanding of what

25 activities -- what specific activities the city will or will

1  not perform in the baseline; correct?

2  A   That is correct.  We made no allowance for what you're

3  describing as activities of the city.

4  Q   What was the date of the baseline that you used?

5  A   I believe mid-, perhaps -- well, the first baseline

6  forecast was probably put together sometime in mid-2013.  The

7  most recent is, I believe, dated July 1 or July the 2nd.

8  Q   Do you have any understanding of how the baseline has

9  been updated, if at all, in between those two versions of

10  your forecast?

11  A   I do have an idea of what issues we looked at or which of

12  the particular tax types we did change.

13  Q   Okay.  But for the forecast in general, do you know all

14  the updating that any -- what was done to the baseline

15  compared to the prior version, or is it just your piece of

16  the forecast that you understand?

17  A   Just my piece of the forecast that I understand, but I

18  would include the property tax and state revenue sharing in

19  that bundle.

20  Q   So you don't have an understanding about what is included

21  in Ernst & Young's baseline scenario in the aggregate?

22  A   To help me, are you talking about the tax types that we

23  looked at, or are you talking about the entire city budget?

24  Q   The entire city budget.  You don't have an --

25  A   I am not familiar with those --

1  Q   -- idea what the baseline is?

2  A   I am not familiar with those details.

3  Q   And you also don't have any understanding of what

4  activities the city will or will not perform in the

5  restructuring scenario; correct?

6  A   I would not claim to have that understanding.

7  Q   Okay.  So you don't know how much the city is planning to

8  spend on the police?

9  A   I have read the report that provides a breakdown.  I

10 don't remember those numbers.  I think I do remember the

11 aggregate impact numbers.

12 Q   Okay.  Do you know if the city is going to eliminate

13 departments or not?

14 A   I do not know the answer to that.

15 Q   Do you know what exactly the city is going to do with

16 respect to its IT systems?

17 A   I do not.

18 Q   Do you know what exactly the city has planned in terms of

19 blight remediation?

20 A   I do not.

21 Q   Do you know what exactly the city is planning to do with

22 respect to enhanced public safety measures?

23 A   I do not.

24 Q   Do you have -- well, would it be fair to say that you

25 don't  -- you just don't know what the specifics are of the

1  restructuring plan?

2  A    I do not know of the specific line items that are

3  involved in the restructuring plan.

4  Q    And you don't know about what the city is going to do to

5  cooperate with private parties in terms of restructuring?

6  A    I do not.

7  Q    Do you know what the city is going to do in terms of

8  cooperating with the federal or state government in terms of

9  restructuring?

10  A    I do not know the details of that.

11  Q    Okay.  Now, you're not familiar with any analysis related

12  to Detroit's current situation that directly links spending

13  initiatives of the type that the city is planning as proposed

14  in the restructuring and reinvestment with revenue changes;

15  correct?

16  A    Other than the amounts that were reported as additional

17  tax collections from administrative changes.  I think that

18  figure was 400-plus million dollars.  I'm familiar with that

19  line item that was in the plan.

20  Q    But I'm asking about studies or data where somebody has

21  actually done some kind of scientific or economic study.

22  You're not aware of any economic study that's -- or data that

23  exists that would tell you what the effect on revenues from a

24  restructuring or reinvestment plan like Detroit is proposing

25  would be; correct?

1    A    I do not know of those studies if they exist.

2    Q    Yeah.  Now, in order to calculate the income tax revenue

3    over time, I think you had said there were some important

4    things to keep in mind, and I think one of them that you were

5    listing is the total population.  The more people who are in

6    the city or in these taxpayer groups, the more people will be

7    paying taxes; correct?

8    A    That was our assumption.

9    Q    Yeah.  Another factor that goes into your analysis is

10   employment growth.  The more people who are employed or the

11   greater percentage of those people that are employed, the

12   more revenue that the city can derive from taxes; correct?

13   A    And I agree, but I think it's more accurate to say it was

14   the employment number that was driving our estimate of

15   numbers of taxpayers.  Population was used as an initial step

16   in that process.

17   Q    All right.  That's a good clarification.  And also

18   another driver of revenue in the income tax is wages, the

19   wage growth rate; correct?

20   A    That is correct.

21   Q    The more people are earning, the greater the wage growth,

22   the more income tax revenue there will be; correct?

23   A    Correct.

24   Q    Now, I'd like to talk about employment growth.  The

25   employment growth rate figures that you used are key

1  assumptions in your model; correct?

2  A   Correct.

3  Q   Those were not calculated by a mathematical formula;

4  correct?

5  A   I would say that's accurate, although they were linked to

6  or related to the state forecasts of statewide employment.

7  Q   Okay.  And the state forecasts don't give any numbers for

8  Detroit; correct?

9  A   Not that I'm aware of.

10 Q   Okay.  And they weren't -- the Detroit numbers you used

11 for employment growth weren't the product of a regression

12 equation, for example; correct?

13 A   I agree with the qualification that, as you noted in one

14 of our earlier -- my earlier exhibits, we did fit a

15 regression equation to the employment ratio to try to infer

16 what would happen to that in a longer run setting.

17 Q   Okay.  So you did use regression in order to get an

18 inference about one of the factors that went into your

19 analysis?

20 A   We used the regression equation to get an estimate of the

21 change in that ratio in percentage terms.

22 Q   And we'll take a look at that in a minute.  Now, you

23 agree that employment growth in Detroit is coming back;

24 correct?

25 A   I believe that over the last several observations, there

1    has been a pickup in employment.

2    Q   Okay.  In your forecast, though, in the baseline

3    employment growth that you forecast, it's negative growth

4    rates; correct?

5    A   I believe initially it is.

6    Q   Well, and I don't want to make this, you know, some kind

7    of quiz, memory test.  If you could turn to page 14 of your

8    report, it's Tab 6, Exhibit 457.

9    A   Excuse me.  Where at?  Back to the report?

10   Q   Expert report, yes.

11   A   And Tab --

12   Q   It's Tab 6.

13   A   Thank you.  And the page number?

14   Q   14.

15   A   Thank you.  All right.

16   Q   Okay.  And you say under Detroit employment growth in

17   the --

18           MR. STEWART:  Your Honor, should this be -- should

19   we move to admit the document before the --

20           MR. SMITH:  No, no.

21           MR. STEWART:  -- witness is questioned about it?

22           MR. SMITH:  We have a -- a Daubert motion is

23   pending, so I'm not going to move to admit the document.  Our

24   position is is it should be excluded.

25           MR. STEWART:  I would then --

1          MR. SMITH:  And in the ordinary event, this is a

2    hearsay -- the report is a hearsay document.  It's usually

3    not admitted into evidence.

4          MR. STEWART:  I think the practice varies on that,

5    but I would suggest it be moved into evidence subject to the

6    same Daubert objection Mr. Smith has raised before because

7    otherwise we're questioning the witness --

8          THE COURT:  You want to cross-examine the witness on

9    a document that's not in evidence?

10          MR. SMITH:  I think it's fair to ask him what his

11    report -- what was in his report without admitting it into

12    evidence, your Honor.

13          THE COURT:  Isn't that hearsay?

14          MR. SMITH:  Well, I can cross-examine the witness

15    with hearsay.  If I had a scientific article, for example,

16    that might be hearsay, and I could cross-examine the witness

17    with it.

18          THE COURT:  You could.  What's the specific question

19    you want to ask?

20          MR. SMITH:  Well, your Honor, I'm really -- I'm only

21    trying to move things along.  He didn't remember the growth

22    rates that he was using, so I'm just trying to point him to

23    the section of his report.

24          THE COURT:  Oh, you want to refresh his

25    recollection.

1           MR. SMITH:  Well, I guess that's fair to say that
2    I'm refreshing his recollection.
3           THE COURT:  Oh, all right.  Well, that makes my job
4    much easier.
5           MR. SMITH:  Okay.
6           THE COURT:  All right.  So read the page or the
7    paragraph that counsel has pointed you to and then close it,
8    and then tell us whether that does refresh your recollection
9    on this question.
10          THE WITNESS:  I believe the sentence that's referred
11   to --
12          THE COURT:  Don't tell me what it says.
13          THE WITNESS:  Read the sentence?
14          THE COURT:  Don't tell me what it -- don't read the
15   sentence.  Just read it to yourself.  I'm sorry.
16          THE WITNESS:  I did.
17          THE COURT:  Just read it to yourself and then tell
18   us whether it refreshes your recollection.
19          THE WITNESS:  It does refresh my recollection.
20          THE COURT:  All right.  Go ahead and close it up,
21   and you may ask your question.
22          MR. SMITH:  Okay.
23   BY MR. SMITH:
24   Q   Do you recall that the -- you're forecasting negative
25   employment growth in the baseline scenario; correct?

1  A    That's not what the statement says.

2         THE COURT:  Okay.  Again, sir, we're not asking you

3  what the statement says.  We are asking you what your

4  recollection is now that it has been refreshed.

5         THE WITNESS:  Yes.  My recollection is that although

6  it begins and continues for most of the period as a negative

7  number, it does leave the negative territory at the end of

8  the forecast period.

9  BY MR. SMITH:

10 Q    Okay.  When do we finally get to nonnegative employment

11 growth in your baseline scenario?

12 A    It's my recollection that it's at the end of the

13 forecast --

14 Q    The very end of the 40-year forecast or the 10?

15 A    This is in the ten-year forecast.

16 Q    Okay.  So at the very end of the ten-year forecast,

17 finally employment growth is nonnegative in your baseline

18 scenario.

19 A    And turns positive, that's correct.

20 Q    It's negative until then; correct?

21 A    It turns nonnegative until that -- at that point in time,

22 it leaves the negative range.

23 Q    Okay.  And is it true that after -- in the restructuring

24 scenario, your forecast -- you're forecasting annual

25 employment growth rates of .3 percent in fiscal year 2014, .2

1  percent in fiscal year 2015, and .1 percent in fiscal year

2  2016 through 2023?

3  A    Sounds familiar.

4  Q    Okay.  And so you're forecasting employment growth in the

5  City of Detroit that is essentially zero even in the

6  restructuring scenario; correct?

7  A    It's positive.

8  Q    It's pretty close to zero, though; correct?

9  A    But a .3- or .5-percent growth rate cumulates over time

10 to be growth in the total number of jobs.

11 Q    Okay.  And so if you vary the numbers that you assumed

12 for growth rate even by .1 percent, that can have a

13 significant effect on your forecast; correct?

14 A    Yes.  And I could comment if you'd like on the magnitude

15 of that impact.

16 Q    Yeah.  Now, you're certainly not forecasting the growth

17 anywhere near the State of Michigan growth or the national

18 growth rate; correct?

19 A    That is correct.

20 Q    And that's even after the restructuring; correct?

21 A    That is correct.

22 Q    And that's even after ten years of restructuring;

23 correct?

24 A    Restructuring and recovery from the recession.

25 Q    Yeah.  Now, you know, don't you, that employment has

1   increased in Detroit throughout 2014?

2   A    I do understand that.

3   Q    And that's available in the same Bureau of Labor

4   Statistic data that you used for your charts that you showed;

5   correct?

6   A    I believe that's correct, but at the time that we did

7   this latest forecast, I was not aware of the more recent

8   numbers.

9   Q    Okay.  But now you've had a chance to look at the more

10   recent numbers, and you know that employment growth in

11   Detroit is on the upswing; right?

12   A    That is certainly my understanding.

13   Q    Now, we had talked about how there are a lot of economic

14   activities, you know, basically anything in the private

15   sector economy can affect the economy and employment growth;

16   right?

17   A    Correct.

18   Q    And that would include things like government spending or

19   construction activities or increased private investment or

20   increased trade.  Those can all stimulate economic activity

21   and increase employment growth?

22   A    If they're positive.

23   Q    Yeah.  Are you aware that the federal government recently

24   announced more than $300 million in aid for the City of

25   Detroit?

1  A    I wasn't aware of the number, no.

2  Q    So you didn't take that into consideration in your

3  analysis?

4  A    We did not.

5  Q    Were you aware that JPMorgan had committed a hundred

6  million dollars to support and accelerate Detroit's economic

7  recovery?

8  A    At the time we did this analysis, no, I was not aware of

9  that.

10  Q    So you didn't take that into account in your analysis?

11  A    I did not.

12  Q    Do you know what the M-1 rail project is?

13  A    I do not.

14  Q    Well, I won't use terminology.  Do you know that there's

15  a streetcar project that's going to be built that will help

16  stimulate the economy in Detroit?

17  A    I do not know the details of that.

18  Q    Okay.  So you didn't take that into account in your

19  analysis; correct?

20  A    I think the correct answer is we did not take into

21  consideration specific projects or expenditure plans.  We

22  were trying to estimate aggregate economic effects of both

23  the good news and the bad news, the positives as well as the

24  negatives.  We did not look at positives in isolation.  No,

25  we did not.

1   Q    And were you -- do you know who Dan Gilbert is?

2   A    Sounds familiar.

3   Q    Well, do you know that there are private investors like

4   Dan Gilbert who have invested billions of dollars in --

5   A    Is that Quicken?

6   Q    Yeah, Quicken Loans.

7   A    I am familiar with that.

8   Q    Okay.  Do you know that there are private investors like

9   Dan Gilbert who have invested billions of dollars in

10  Detroit's economy?

11  A    I believe I'm aware of that.

12  Q    Okay.  Do you know whether there are any major

13  construction projects planned for the city over the period of

14  your forecast?

15  A    I have not seen a detailed list of an expenditure plan.

16  Q    Do you know that there's a new bridge that might be built

17  between Detroit and Canada?

18  A    No, did not know that.

19  Q    Okay.  You didn't factor that into your forecast, I

20  guess.

21  A    Not on a project-by-project basis, but as I stated, our

22  forecast is not built up from a list of announcements or

23  potential changes.  It's based upon a much more aggregate

24  approach that looks at expected net changes, both plus and

25  minus, over this expected period of time, but you're correct.

1   We did not build that up from individual project-specific

2   estimates.

3   Q   Have you done economic analyses before where you have

4   looked at the economic impact of major projects such as

5   government expenditures?

6   A   I've done many, many of those.

7   Q   Okay.  But you didn't do that in this case; correct?

8   A   We did not.

9   Q   Yeah.  Now, you showed the Court some demonstratives

10  regarding employment growth in the city that you had just

11  referred to, and maybe --

12          MR. SMITH:  I don't know, Roman, if you have those

13  demonstratives.  The first two that you had put up, maybe we

14  can take a look at them.

15  BY MR. SMITH:

16  Q   But in your binder I have copies of them in the last

17  tab --

18  A   Okay.

19  Q   -- if you don't have copies.

20  A   I'm there.

21  Q   You had two that were on employment growth.

22  A   Correct.

23  Q   And those were Figure 1 and Figure 2 in your expert

24  report; correct?

25  A   I believe that's the correct number.

1  Q   Okay.  And your staff did the analyses contained in those

2  demonstratives; is that --

3  A   Excuse me?

4  Q   Your staff did the analysis that's contained in those

5  demonstratives?

6  A   And prepared the graphs themselves.  That's correct.

7  Q   Okay.  And, in fact, at the time of your deposition, you

8  didn't know who was responsible for each of the pieces of

9  those analyses; correct?

10 A   I think I should -- I believe I can identify the

11 individuals who were responsible, in fact, the individual who

12 I worked together with to prepare those diagrams.

13 Q   Okay.  Well, I'm just wondering at the time of your

14 deposition, though, you didn't have that information?

15 A   I should have.

16 Q   Okay.  Now, isn't it true that you indicated that at your

17 deposition you couldn't go through your report and explain

18 how each of the tables or documents contained in your report

19 were used in each step of the estimating process?

20 A   It doesn't sound right to me.  I'm not sure if that is

21 the interpretation of what I said, but I did, in fact, look

22 at almost every one of these components as they entered the

23 modeling process.

24 Q   Okay.  Maybe we can display the first of those -- this

25 one, yeah, City of Detroit's share of total State of Michigan

1    employment, 1990 to 2012.  Now, the number for the ratio of

2    Detroit employment to Michigan employment changes dependent

3    on what time period you look at; correct?

4    A    With the note that it looks except for perhaps one year a

5    continuously falling ratio.

6    Q    Yeah.  And I'm not limiting my -- you limited your data

7    to 1990 to --

8    A    Oh, understand.  Understand.

9    Q    -- 2012; correct?

10   A    Yes.  That is correct.

11   Q    And so just in general that ratio changes whether it's in

12   the data on the chart or not; correct?

13   A    It would change year by year over time.

14   Q    And the number that you obtained for the ratio of Detroit

15   employment to Michigan employment could change depending on

16   what decade you look at and the length of the particular time

17   you're looking at; correct?

18   A    And with the economic cycle over time.

19   Q    Yeah.  And other people could make different judgments

20   about what time period was most relevant and get different

21   numbers for the figure you use regarding Detroit employment

22   as a share of Michigan employment; correct?

23   A    That is correct.

24   Q    And over the time period you looked at, the ratio of

25   Detroit's share of employment to Michigan employment is not

1  constant; correct?

2  A   That is correct.

3  Q   But in your forecast, the ratio declines at a constant

4  rate; correct?

5  A   That is correct.

6  Q   And you agree that historically the ratio has not

7  declined at a constant rate; correct?

8  A   That is correct.

9  Q   As you mentioned, you had used data up until 2012 only,

10  and was that just a function of when you performed the

11  analysis?

12  A   I believe it was.

13  Q   And that data, as we had discussed, it's available -- the

14  data that was used for this demonstrative is available on the

15  federal government's website; correct?

16  A   Correct.

17  Q   Anybody can go there and look at it; correct?

18  A   That is correct.

19  Q   And if we update the data -- well, you would agree with

20  me to get the most accurate forecast you should start with

21  the most recent actual information to use in the model;

22  correct?

23  A   That is correct.

24  Q   And at least sitting here today, your demonstrative does

25  not reflect the most recent actual information available;

1   correct?

2   A   I believe that's correct, but I will point out that this

3   relationship was getting at a long-run trend over 20 years of

4   time.  We dealt separately with the issue of the short-run

5   cyclical response of Detroit to the deep recession and its

6   potential recovery, so I don't think this one relationship

7   should have to carry the burden of explaining 2014 by itself.

8   It's one of the important inputs, but on top of this trend is

9   the cycle which Detroit is going through right now.

10  Q   Okay.  And we'll look at some more of your charts later

11  on, but --

12  A   Right.

13  Q   -- as for this demonstrative, the City of Detroit's share

14  of total State of Michigan employment, we don't -- it doesn't

15  reflect the most actual -- the most recent actual

16  information?

17  A   That is correct.

18  Q   And if we could look at -- why don't we pull up Syncora

19  Exhibit 4543, which is some of that BLS data?  And I

20  apologize.  I don't have the --

21  A   That's okay.

22  Q   I don't have it in the -- the tab number, but this is

23  what you were talking about when you were talking about --

24         MR. STEWART:  Objection, your Honor.  I believe if

25  they're going to use it, it should go into evidence, should

1    it not?

2           MR. SMITH:  Yeah.  We can admit this into evidence.

3           MR. STEWART:  I don't know what this is.

4           THE COURT:  Is there any objection to the admission

5    into evidence of Exhibit 4543?

6           MR. STEWART:  I need to see it.  It was just taken

7    off the screen.

8           THE COURT:  Can we put it back on the screen,

9    please?  There you go.

10          MR. STEWART:  What pages or how many pages are in

11    this exhibit?

12          MR. SMITH:  I think there's only one in the exhibit.

13    You know, there is --

14          MR. STEWART:  Is it in the binder?

15          MR. SMITH:  I think it is, but I just don't have the

16    tab.

17          MR. STEWART:  Okay.

18          MR. SMITH:  And this follow-up will probably help

19    you.  This is just the Bureau of Labor Statistics data that

20    Mr. Cline then had used except that we've looked at the

21    website going up until 2014, so it's current.

22          THE WITNESS:  But I believe we used --

23          THE COURT:  Sir, there's no question before you, so

24    stand by for us.

25          THE WITNESS:  Thank you.

1        MR. STEWART:  Yeah, I do object to it, your Honor.

2        THE COURT:  What is your objection?

3        MR. STEWART:  Two.  One is it's not annualized, but

4 the second is I think we'd have to have a foundation making

5 it apples to apples because I'm not sure he said this is the

6 information that he relied on for the earlier years.

7        MR. SMITH:  Okay.  Well, he can say one way or the

8 other whether it's the same, but it's admissible.  It's

9 just -- it's a government record.  It's a government

10 document.  It's just data from the Bureau of Labor

11 Statistics, and he used Bureau of Labor Statistics data.  And

12 we can ask him if it's the same.

13        THE COURT:  Is it your representation to the Court

14 that this graph as it's presented here is prepared by the

15 government?

16        MR. SMITH:  Yes, by the government.  You go to their

17 website, and the graph will pop up if you plug in here's the

18 date range I want to see of the data.  It's just showing you

19 what -- how much employment there is in Detroit.

20        THE COURT:  Okay.  So this is a printout from that

21 website --

22        MR. SMITH:  Yes.

23        THE COURT:  -- you're telling the Court?

24        MR. SMITH:  Yes.

25        THE COURT:  All right.  The Court will admit it into

1  evidence.

2       (Syncora's Exhibit 4543 received at 2:30 p.m.)

3  BY MR. SMITH:

4  Q   Okay.  The Bureau of Labor Statistics website, you just

5  go there, and they have data on employment; right?

6  A   That is correct.

7  Q   And they have various different kinds of data on

8  employment; correct?

9  A   And different measures for the same date for the same

10 city; right.

11 Q   Okay.  And this is one of the measures or appears to be

12 one of the measures of employment data that the BLS uses;

13 correct?

14 A   It appears to be, but I also believe it is not the series

15 that we used in our analysis.

16 Q   Okay.  So there are different data series that can be

17 used that the Bureau of Labor Services has up on their

18 website; right?

19 A   That's correct.

20 Q   And you're just saying they use a different series?

21 A   We did use a different series.

22 Q   Okay.  Which series did you use?

23 A   I believe we used the annual employment numbers.  This

24 represents monthly employment, and that raises the issue of

25 seasonal adjustment, which is always a challenge, and I'm not

1    sure if these are seasonally adjusted numbers or not.

2    Q    Well, in order to look at what's happening in 2014, we

3    have to look at monthly, right, because we don't have a full

4    year of data?

5    A    If you use seasonally adjusted monthly information.  I

6    don't know if this is seasonally adjusted.

7    Q    Okay.  Fair enough.

8            THE COURT:  Is it?  Is it?

9            MR. SMITH:  You know, I don't know off the top of my

10   head just sitting here.  I kind of --

11           THE COURT:  Well, let's just get the record clear on

12   this.  Sir, you've used the phrase "seasonally adjusted."

13           THE WITNESS:  Correct.

14           THE COURT:  What is the significance of that and the

15   importance of it?

16           THE WITNESS:  It's a very important issue when

17   you're looking at monthly data because --

18           MR. SMITH:  Okay.

19           THE WITNESS:  -- because in every month January is

20   down, February is down, May and June are up, July is up.  If

21   you want to use a single month number to say something about

22   an annual rate if that continued for 12 months, you want to

23   adjust it for that seasonal factor.  It may or may not be.  I

24   just don't know.

25           MR. SMITH:  Well, actually --

1           THE COURT:  Hold on.  Hold on.

2           MR. SMITH:  Oh.

3           THE COURT:  Is --

4           MR. SMITH:  Excuse me.

5           THE COURT:  Is this seasonal adjustment that you're

6    talking about something that the government does on this

7    website?

8           THE WITNESS:  Correct.

9           THE COURT:  So you can get the unadjusted and you

10   can get the adjusted?

11          THE WITNESS:  I believe you could get both.

12          THE COURT:  Do we know what this one is?

13          MR. SMITH:  Well, I was just about to say, your

14   Honor, Mr. Hackney is helping me out.  It is not the

15   seasonal -- it's the nonseasonally adjusted one, so that's

16   the one we have off the government website.  You know, I

17   don't need to get into this, you know --

18          THE COURT:  Okay.

19          MR. SMITH:  -- if we want to move it along.

20          MR. STEWART:  Your Honor, I'd move to strike the

21   exhibit in that case because it was introduced for a

22   different reason and on a different representation --

23          MR. SMITH:  Well, it's not --

24          MR. STEWART:  -- than what it actually now we find

25   is.

1          MR. SMITH:  I think it's admissible.  It's still

2     government data off the government website, and, you know,

3     whether somebody picks seasonally adjusted or not, it doesn't

4     really matter.  It's still government data and is admissible

5     for that reason.

6          THE COURT:  Well, what's the purpose of asking the

7     witness about the 2014 data?

8          MR. SMITH:  Well, he's gone up to 2012.  He's

9     already answered that the data would show that it keeps going

10     up in 2014.  That's why I don't really need to get into this

11     document, but that's the point of it.  We're talking about

12     what the update to his charts would look like.

13          THE COURT:  Okay.  But in order for that update to

14     have meaning or even probative value, if the data he relied

15     on was the seasonally adjusted, then we should look at the

16     seasonally adjusted for 2014; right?

17          MR. SMITH:  That's fair, your Honor, and I don't

18     need to talk about this --

19          THE COURT:  All right.  I'm going to grant the

20     motion to strike without prejudice to your right to present

21     this chart seasonally adjusted at some point.

22          MR. SMITH:  Yeah.  And I don't --

23          THE COURT:  Okay.  I think that would be relevant

24     information.

25          MR. SMITH:  Okay.  Thank you, your Honor.

1  BY MR. SMITH:

2  Q    You mentioned, though, that you had taken a look at the

3  2013 and 2014 data.

4  A    Consistent with our approach to doing revenue estimating,

5  given at the point in time we do our analysis, we do look for

6  the most up-to-date information available.

7  Q    Okay.  But that's not what's depicted on your

8  demonstrative at the present time; correct?

9  A    I believe it stops short.  It looks like it.  This

10  particular exhibit goes through 2012.

11  Q    Okay.  And if we -- let me have you turn to Tab 24, and

12  this is Syncora Exhibit 4651, which is a demonstrative that

13  we've put together.

14  A    4651?

15  Q    Yeah, the next page.

16  A    I have it.

17  Q    And you said you had looked at 2013 and 2014 data from

18  BLS.  Would it be fair to say that if you did continue your

19  analysis out, that the data would tend to flatten out in

20  years 2013 and 2014?

21  A    I believe --

22          MR. STEWART:  Objection, your Honor.  This was not

23  disclosed to us timely as required by the Court's pretrial

24  order, your Honor, and I'd object to it on that ground.  I

25  also object that, once again, we have apples and oranges.

1  He's taking nonseasonally adjusted numbers and using them to

2  deal with seasonally adjusted, but the main objection is they

3  were required to disclose this to us, and they did not.

4         MR. SMITH:  Your Honor, we did disclose this.  This

5  was provided with our exhibits, this demonstrative.  You

6  know, I can put up -- you know, I want to move things along,

7  so I can put up their chart and just point out that it's

8  going to flatten out if that would help, you know, get things

9  moving along.

10        MR. STEWART:  I think Mr. Smith misunderstood my

11  objection.  It was that the parties are obliged to inform one

12  another a certain amount of time before examining a witness

13  of the demonstratives they intend to use.  This was not

14  identified to us.

15        MR. HACKNEY:  This was produced to you on Friday.

16        MR. STEWART:  Well, that doesn't mean it was

17  identified.  A thousand things were produced to us on Friday.

18        THE COURT:  So was there an agreement among you that

19  on a witness-by-witness basis exhibits would be disclosed?

20        MR. STEWART:  Yes.  We disclosed, for example, every

21  demonstrative we used with this witness at 8:30 in the

22  morning on Saturday, was it not?  That is exactly how we

23  proceeded.

24        THE COURT:  Well, all right.  If that --

25        MS. QUADROZZI:  Excuse me, your Honor.  Jaye

1   Quadrozzi on behalf of Oakland.  I apologize.  I was not

2   privy to any agreement about exchanging.  And I'm not saying

3   that there -- I'm not saying that there was not an agreement,

4   but I wasn't privy to it.  I raise the question, however, for

5   future witnesses, although this is not applicable for this

6   witness, that I don't know that I am going to be able to

7   identify my demonstratives for the cross-examination of a

8   witness at the same time that the other side is identifying

9   their demonstratives for the direct because obviously my

10  cross-examination will be dependent upon their direct

11  certainly in some respects, so the exact exchange of them is

12  going to be difficult.

13       THE COURT:  Let's discuss that at the final -- or

14  the status conference on Thursday.  Is that okay with you?

15       MS. QUADROZZI:  Certainly, your Honor.

16       MR. HACKNEY:  Can I add a point, your Honor?  I'm

17  sorry.  We're getting some of the kinks wrapped -- kinks out

18  of the system, I think, because this witness did go out of

19  order.

20       THE COURT:  Right.

21       MR. HACKNEY:  So I do apologize.  I'd understood

22  that what we would do is we would make sure to exchange any

23  exhibits that we knew we would use on cross-examination or on

24  direct, and we did that on Friday.  It seems the confusion is

25  about whether you must separately call the other side's

1    attention to the exhibits that you intend to use, you know,

2    extract them from the production and say, "Hey, don't miss

3    these."  That was not clear to me, and to the extent we are

4    going to do that going forward, we are happy to do so.  We

5    did produce these exhibits on Friday so that they had them in

6    a supplement to our exhibit list.

7            MR. STEWART:  And I --

8            THE COURT:  Okay.  So the city had the exhibit, just

9    didn't know it was going to be used today?

10           MR. HACKNEY:  That's right.  They didn't have the

11   extra e-mail from me saying, "Mr. Stewart, look on our

12   exhibit list and" --

13           MR. STEWART:  We did get an e-mail saying, "Here is

14   a demonstrative we are going to use with Dr. Cline," and

15   that's one that is coming up, so we actually were given one,

16   not this one.  We were given another one and by that assumed

17   we could rely upon it and we'd now been told everything we

18   needed to know.  We did not know that in addition to that on

19   Friday in a much larger batch there was something else we

20   should have been attentive to, and so I think that's the

21   source of my complaint.  As long as they were telling us

22   accurately in one case, we think they should have been

23   complete because by putting it in something on Friday --

24           THE COURT:  Well, all right.

25           MR. STEWART:  -- it tended to mislead.  So I'm sorry

1  to raise it, your Honor.  I wish I didn't have to, but we do

2  have surprise here.

3          THE COURT:  Yeah.  There's a bit of surprise, but

4  I'm going to permit Syncora to proceed on the basis of this,

5  and we'll work out the exact details of what everyone's

6  obligations are at our status conference on Thursday.

7          MR. STEWART:  And then, your Honor, I would then

8  state the objection I stated before.  We, once again, have

9  apples and oranges, which is a seasonally adjusted line

10  that's now being extrapolated with not seasonally adjusted

11  data.  I think your Honor already has addressed that issue

12  and a way of remedying it, but I want to make sure my

13  objection was known.

14          THE COURT:  Is that accurate, counsel?

15          MR. SMITH:  Oh, this is not seasonally adjusted.

16          THE COURT:  So --

17          MR. SMITH:  But I think --

18          THE COURT:  The numbers from 2014 looking forward

19  are not seasonally adjusted, but the numbers 2013 and before

20  are?

21          MR. SMITH:  You know, I don't know the answer to it,

22  and I don't even need to use this exhibit.  Why don't I just

23  ask --

24          THE COURT:  All right.  So --

25          MR. SMITH:  -- Dr. Cline --

1          THE COURT:  Okay.  So you are withdrawing this.

2    Again, if you can put together an exhibit that is apples and

3    apples, so to speak --

4          MR. SMITH:  Yeah.

5          THE COURT:  -- it's certainly relevant.

6          MR. SMITH:  No.  Thank you, your Honor.  And maybe

7    we can pull up the copy of Dr. Cline's exhibit.  We'll take a

8    look at that instead.

9    BY MR. SMITH:

10   Q   Dr. Cline, am I correct that if you carried out your data

11   going further, you would start to see that this relationship

12   would flatten out using the more up-to-date data from the

13   Bureau of Labor Statistics?

14   A   What is missing is two observations, 2013 -- actually,

15   one observation.  We only have 2013 as the next completed

16   year.  All I could say is that if we did this calculation and

17   I knew what the Michigan change was for 2013, it could add

18   another observation to the red dotted line.  That is correct.

19   Q   But there's 2014 data in addition; correct?  So in

20   addition to having another 2013 observation, you could

21   have -- there is data from 2014; correct?

22   A   There is seasonally adjusted data that you could possibly

23   use, but it's an incomplete year.

24   Q   Okay.  And so there would be a complete year's worth of

25   data for 2013, and that would tend to flatten out this

1  relationship, so it might be something more along the lines

2  of this; correct?

3  A   I don't know without also examining the denominator,

4  which is Michigan employment.  I'm not familiar with what

5  happened in Michigan in 2013.

6  Q   Okay.  So you came into court, and you knew that you had

7  data up until 2012; correct?

8  A   That is correct because we were explaining the

9  methodology we used to prepare our revenue estimates.

10  Q   And you didn't update your estimate with data from 2013,

11  which would be complete year's data; correct?

12  A   That was not incorporated into our July update of the

13  revenue -- tax revenue forecast.

14  Q   And you also didn't try to update it with partial data.

15  There's data all the time the Bureau of Labor Statistics is

16  collecting on unemployment.  It doesn't wait till the end of

17  the year; correct?

18  A   That is correct, although our focus was on completed

19  annual observations in this graph.

20  Q   Okay.  And so you don't know whether the relationship

21  that you described would tend to flatten out after 2012;

22  correct?

23  A   I'd have to look at -- it's not just what was happening

24  in Detroit, and I would accept the fact that Detroit is

25  getting stronger, but I don't know what's happening in

1  Michigan.  I don't know if Michigan was getting stronger even

2  faster than Detroit.  If it was, then that ratio would go

3  down, not flatten, so I need both numbers before I can answer

4  your question.

5  Q   And the Michigan data, again, is BLS data that's on their

6  website; right?

7  A   For 2013.

8  Q   Have you looked at that data?

9  A   I have not.

10 Q   Okay.  So right now you can't tell us, number one, what

11 happens after 2012 with respect to the relationship you've

12 drawn; correct?

13 A   Because I haven't looked at that 2013 data, no.

14 Q   Okay.  And you also can't -- you haven't tried to even

15 fit a line to the data including the most recent up-to-date

16 data; correct?

17 A   We have not.

18 Q   So you don't know what the slope of the line should be;

19 correct?

20 A   I don't know what that new slope would be with a new

21 observation added.

22 Q   Okay.  And you don't know what your forecast would be

23 with a new slope calculated based on the most recent data;

24 correct?

25 A   It's not quite accurate.

1  Q   Yeah.

2  A   The question would be if the new data observation made

3  such a small change in the slope, I might assume that it is

4  not significant and would not justify changing the forecast.

5  The question would be the magnitude.  Two questions.  One,

6  what actually happened to the ratio?  Number two, is it

7  significant?

8  Q   And so -- and you don't know any of the -- the answers to

9  either of those questions; correct?

10 A   Not today.

11 Q   So you don't know whether you need to change your

12 forecast; correct?

13 A   I also don't know if we're doing a new forecast.

14 Q   Okay.  Fair enough.  You know that the BLS also

15 continuously updates their data; correct?

16 A   I understand that they do continually update it.  In

17 fact, in some cases, they'll go back in time and revise is

18 the phrase they use.

19 Q   For the data that you've used for 1990 to 2012, have you

20 personally gone back to check to make sure that the data you

21 used was the most up-to-date BLS data for those years?

22 A   We have not updated the data through 2012 for any

23 backward revisions that might have occurred since the time

24 that we captured this data in our spreadsheet.

25 Q   Okay.  And have there -- do you know whether there have

1  been revisions?

2  A    I do not know.

3  Q    But it's possible that even the data you presented from

4  1990 to 2012 in this figure is no longer the accurate data

5  based on the BLS data --

6  A    It's possible.

7  Q    -- for this year's --

8  A    I don't know if any revision has actually taken place.

9  Q    Yeah.  Is there any particular reason you didn't update

10  your charts until the present time and your forecast?

11  A    As I mentioned, the last point in time when we did the

12  update was, I believe, in July 2014.  The question is what

13  information would have been available at that point in time.

14  I don't believe we did change those underlying numbers at

15  that point in time.

16  Q    Even though the data was available?

17  A    I don't know the answer to that.

18  Q    Yeah.  The second graphic that you had shown the Court

19  dealt with employment growth rates, and I'd like to talk

20  about that one now.  And I don't want to look at it right

21  now, but we can add a few preliminary questions.  In

22  constructing the restructuring forecast, you had assumed an

23  additional negative impact of slower recovery in Detroit from

24  the latest recession that you depicted in your graphics that

25  you showed the Court; correct?

1  A    Correct.  I believe we made an adjustment in both the

2  baseline forecast and the restructuring forecast.

3  Q    Okay.  And there's a delay in recovery in Detroit after

4  the recession compared with the rest of the state.  Is

5  that --

6  A    I believe that would be an accurate description of what

7  we saw when we did the forecast.

8  Q    And sometime -- were you referring to that as a cyclical

9  adjustment?

10  A    I think it would be correct to say that that graph, which

11  I believe went back to the year 2000 -- 2001, that graph

12  happen -- that period of time happens to be characterized by

13  not one but two recessions in Michigan, so in a sense it is

14  covering a period of time of two recessions, and, yes, I

15  think I may have referred to that as a cyclical component.

16  Q    Okay.  I just want to get our terminology straight so

17  we're --

18  A    Understand.

19  Q    -- on the same page and talking about the same thing.

20  A    Right.

21  Q    You agree that the recovery rate is an important

22  assumption that you made in your model; correct?

23  A    The percentage growth year by year is the key driver in

24  our forecast.

25  Q    Okay.  And there's no study that says there's any causal

1  relationship between anything in Detroit and a delay in

2  recovery compared with the rest of the state; correct?

3  A   The exhibit that we prepared that deals with these

4  percentage changes in the growth rates did I believe suggest

5  that as early as 2002 Detroit was showing signs of some

6  change occurring related to the cycle that was preventing

7  Detroit from recovering as rapidly as the State of Michigan

8  recovered.

9  Q   Okay.  Could we turn to your deposition at page 211, line

10 13, please?

11 A   This is at the front, the front of the --

12 Q   Yeah, yeah.  That's right.

13 A   211?

14 Q   Yes, line 13.

15 A   Just a moment.  I have 211.

16 Q   Line 13?

17 A   Right.

18 Q   Okay.  Were you asked the following question, and did you

19 give the following answer?

20          "Question:  But there's no study that says

21          there's any causal relationship between anything in

22          Detroit and a delay in recovery compared to the rest

23          of the state?

24          Answer:  I don't know of any specific studies."

25          MR. STEWART:  Your Honor, I object.

1  BY MR. SMITH:

2  Q    That was your testimony?

3         MR. STEWART:  Once again, there's no inconsistency

4  between his answer and this purported impeachment.  This is

5  exactly what he just testified to.

6         MR. SMITH:  He just denied --

7         MR. STEWART:  There was no study, but this is the

8  relationship he saw.

9         THE COURT:  Sir.

10        MR. SMITH:  The question is whether there's a causal

11 relationship.  I asked almost an identical question, and then

12 he was suggesting there was, but --

13        MR. STEWART:  No.  The question was study.  That's

14 what it says, "but there is no study that says."  And his

15 answer was there was no --

16        MR. SMITH:  That there's any causal relationship.

17        THE COURT:  It sounded like the same answer to me,

18 so I'm going to sustain the objection.

19 BY MR. SMITH:

20 Q   Isn't it true that you haven't identified the cause of

21 the break between Detroit and the rest of the state?

22 A   I think that's an accurate statement, but in doing our

23 forecasts what was important was the existence of the break,

24 maybe less important the precise cause.  The question is

25 whatever it is, would it continue sometime in the near

1  future.

2  Q   Yeah.  And you're saying is the cause going to be going

3  away with the restructuring; correct?  That's what you're

4  assuming in your model; correct?

5  A   I believe that's accurate to say that under the

6  reinvestment -- the restructuring scenario we've continued

7  the negative effect of the long-run structural break, but we

8  have tapered down or eliminated, in fact, this additional

9  cyclical impact.

10  Q   But you haven't identified what the cause of the cyclical

11  impact is; correct?

12  A   But if I could add a third component is the fiscal crisis

13  in the City of Detroit.  The two charts we've discussed are

14  the long-run structural break, which I think is there, the

15  cyclical relationship, which I believe is -- needs to be

16  considered, but, third, the new element in the short-run,

17  2014, 2015, 2016, is the bankruptcy of the City of Detroit

18  and the fiscal challenges that it faces.  It has some impact

19  on the private economy.  I can't specify numerically what it

20  is, but we had to take it into consideration in doing our

21  forecast.

22  Q   And you've thrown out a lot of things in there, but isn't

23  it true that you haven't identified the cause of this break

24  between Detroit and the state; correct?

25  A   That is correct.

1  Q   And you can't identify anyone other than yourself who's

2  claiming there's any kind of structural difference that's

3  leading to a delay in recovery in Detroit compared to the

4  rest of the state; correct?

5  A   I haven't taken a survey, no.

6  Q   So you can't identify anyone; correct?

7  A   At this moment, I cannot.

8  Q   Okay.  And you can't identify any study that's said, oh,

9  we've identified the cause of the break between Detroit and

10  the rest of the state; correct?

11  A   That is correct, and I believe that's what I testified to

12  in the deposition.

13  Q   Okay.  Now, if we can take a look at your chart now, the

14  demonstrative, this is the demonstrative where you depict the

15  break that we've been talking about; correct?

16  A   From what I describe as a cyclical perspective.

17  Q   Okay.  And you would agree with me that there was a

18  closer correlation between changes in Detroit and changes in

19  Michigan in earlier recessions that are not depicted in this

20  demonstrative; correct?

21  A   Could be.  I don't recall what that relationship might

22  have looked like.  We could have looked at it, but I don't

23  recall what it looked like.

24  Q   Yeah.  And you assume that the break between Detroit and

25  Michigan with respect to the rate of recovery is going to

1    continue.  That's an assumption; correct?

2    A    I believe that's an accurate statement, yes.

3    Q    And as we discussed, you haven't identified the actual

4    cause to figure out whether the cause is going to continue

5    during the ten-year period; correct?

6    A    I believe that's a correct summary.

7    Q    And just to be clear, there's no mathematical formula

8    used to actually calculate the recovery rate that you used in

9    the restructuring scenario; correct?

10   A    That is correct.

11   Q    The recovery rate, again, is an important assumption that

12   you made; correct?

13   A    It is.

14   Q    And the elimination of the cyclical adjustment that we've

15   been talking about is also an assumption you made?

16   A    That is correct.

17   Q    There's no study or data showing that restructuring will

18   remove the cyclical adjustment; correct?

19   A    That's correct.

20   Q    And you did not use or even look for any study showing

21   that reinvestment and restructuring such as the city is

22   proposing impacts the rate of recovery that you've assumed in

23   your model; correct?

24   A    I would agree to the statement that I do not know of any

25   such studies.

1  Q   And that's because you didn't investigate to look for

2  any?

3  A   I don't know the -- if a study was there, I don't

4  remember seeing a study.

5  Q   Okay.  Now, you assumed that the structural decline in

6  Detroit employment wanes falling from -.1 -- -1 percent to

7  -.7 percent to .5 percent; correct?

8  A   Under the restructuring scenario or we --

9  Q   In the baseline scenario.

10 A   In the baseline.  All right.

11 Q   That's your assumption?

12 A   Sounds familiar.

13 Q   Okay.  And those changes in the structural decline are

14 all assumptions you made; correct?

15 A   Yes, they are.  That's correct.

16 Q   And when we say things are assumptions in your model,

17 that means that you take them -- you formulate your

18 assumption, and then it gets plugged into these spreadsheets

19 that we -- you talked about on direct.  Is that fair?

20 A   I think it would be more accurate to say they become

21 inputs into the forecasting model, but that's the case in any

22 forecasting model regardless of the methodology used or the

23 format it takes.

24 Q   Okay.  Now, you had to assume the numbers that you would

25 use for the cyclical adjustment because the time series was

1   too short to do a mathematical equation or regression

2   equation; correct?

3   A    I believe that's an accurate summary.

4   Q    You also had to assume how to continue the tapering and

5   pick the precise numbers you assume in your analysis

6   regarding the cyclical adjustment; correct?

7   A    That is correct because they were employment drivers in

8   our forecast.

9   Q    Okay.  And you personally picked the numbers for the

10  cyclical adjustment during various periods; correct?

11  A    I'm not sure that's accurate.  I certainly signed off on

12  each one of those numbers.

13  Q    Okay.  So either your staff or you picked the numbers.

14  Is that --

15  A    I believe that's more accurate, yeah.

16  Q    Yeah.  Now, going back to your demonstrative, this

17  demonstrative, Growth Rates of City of Detroit and Michigan

18  Employment, it ends in 2012 as well; correct?

19  A    Correct.

20  Q    But we see that already in 2012 the Detroit employment

21  growth rate and Michigan employment growth rate are

22  converging over here on the right-hand side of the graph;

23  correct?

24  A    I understand that that's what the graph would look like

25  if it were extended.  I haven't done that.

1    Q    Okay.  And your understanding is if the graph were

2    extended into 2013 to 2014, that convergence would continue;

3    correct?

4    A    I don't know.

5    Q    Okay.  You don't know one way or the other?

6    A    I don't know.  I haven't looked at 2014 at all.

7    Q    Okay.  Already, though, by 2012 the two lines are coming

8    together; correct?

9    A    They have different slopes, and those -- which means that

10   they are approaching each other.

11   Q    Okay.  And if you assume that they do converge in 2013 or

12   2014, that period of the break after the most recent

13   recession would be shorter than the break after the last

14   recession; correct?

15   A    If that pattern continues, although back in 2004 and five

16   and six we actually saw it opening up again, so I would need

17   to think further about whether or not it's a finished

18   adjustment convergence or whether or not there might be an

19   opening up once again of those two.

20   Q    And while I understand that you haven't looked at any of

21   the data to figure out whether it's a finished convergence or

22   not, correct --

23   A    Correct.

24   Q    -- okay, I want you to assume that the two lines do

25   converge in 2013 and 2014, and it's a finished convergence.

1  A    In the restructuring scenario or the baseline scenario?

2  Q    In either scenario.

3  A    I believe we treated the two differently.  I believe it's

4  more accurate to say it was under the restructuring scenario

5  where we assumed recovery in Detroit would be stronger than

6  under the baseline, and that may remove that additional --

7  whatever that additional effect is, whether we call it

8  cyclical or fiscal --

9  Q    Yeah.

10  A    -- crisis effect.  I believe we did remove that in the

11  restructuring scenario.

12  Q    Oh, okay.  I have that, and I --

13  A    Okay.

14  Q    And I appreciate that.  I just want to go back to this.

15  This chart is actual data from -- it's based on data from

16  BLS; right?

17  A    Correct, so it's not either of our scenarios.

18  Q    That's right.  So now we're on --

19  A    I understand.

20  Q    -- the same page.

21  A    I understand.

22  Q    Okay.

23  A    Correct.

24  Q    So my only question is if you assume there's a

25  convergence in 2013 or 2014, it would be true that it would

1   be -- the break would be shorter after the most recent
2   recession than the prior recession.
3   A   It would suggest that.
4   Q   Okay.  And the most recent recession I think you referred
5   to as the great recession; correct?
6   A   Correct.
7   Q   The most recent recession, as we can see on this chart,
8   it's much more severe than the one that occurred in 2001;
9   correct?
10  A   Correct.
11  Q   In fact, some people have called that a depression;
12  correct?
13  A   I call it -- I refer to it as the great recession.
14  Q   Yeah.  And so it would be good news if Detroit was
15  converging and eliminating that break after a shorter period
16  of time after this great recession; correct?
17  A   I think any recovery of jobs in Detroit is good news for
18  the people of Detroit.
19  Q   Yeah.  Now, another thing that we talked a little bit
20  about or you may have mentioned as one of the key inputs in
21  your model was wage growth?
22  A   Correct.
23  Q   And another assumption of your model is the wage growth
24  rate; correct?
25  A   That is correct.  Once we accepted the Michigan State

1  forecast for wages and salary growth in Michigan, then QUEST

2  did the Detroit forecast for that period of time, and

3  Detroit -- and QUEST did both the Michigan and the Detroit

4  growth rates beyond that three-year period.

5  Q   Okay.  And so Michigan only tries to forecast wage growth

6  rates for three years.  That's it; correct?

7  A   For the state for three years.

8  Q   And part of the reason you had to forecast Michigan wage

9  growth rates out is you have these people who actually work

10  outside of the city who contribute to revenue in the city;

11  correct?

12  A   Correct.

13  Q   And so the economic vitality of the suburbs is important

14  in assessing how much revenue Detroit will have; correct?

15  A   That is correct.  And one of the motivations behind

16  Buckets A, B, and C I'd just note that the nonresidents pay

17  about one-third of the total individual income tax in

18  Detroit.

19  Q   Yeah.  But non -- but there's also residents --

20  A   Correct.

21  Q   -- who live in the city and work out at a job maybe at a

22  factory out in the suburbs; right?

23  A   And they're affected by what happens in the economics of

24  the suburbs.

25  Q   Yeah.  And so it impacts multiple groups in your

1 analysis, the economy of the suburbs. It could impact the

2 economics in terms of reverse commuters because they work out

3 in the suburbs. It could be impacting the economics of the

4 commuters because they're coming into the city to work, but

5 they live out in the suburbs; correct?

6 A   That may be true, but I believe it's accurate to say we

7 only considered the economic impact in the suburbs, the

8 economics of the suburbs when we looked at the reverse

9 commuters.

10 Q   Okay.  So even though it's possible that the commuters

11 may be economically impacted by what's happening the suburbs,

12 you didn't consider that in your model?

13 A   We did not consider it in the model.

14 Q   Okay.  But you'd agree with me that, in general, the

15 economic health of the suburbs is relevant to revenues that

16 Detroit receives through the income tax, for example, and

17 potentially through the wagering tax or other taxes that are

18 dependent on people coming into the city; correct?

19 A   I don't disagree with your statement.  I just don't know

20 the magnitude of the possible impacts.  I haven't studied

21 that.

22 Q   Okay.  And did you not study that because you weren't

23 asked to study that?

24 A   As I say, I believe we didn't study that because it was

25 only the reverse commuters that we considered to be

1  significant enough -- and they're taxed at the 2.4-percent

2  rate instead of 1.2 -- that we did want to consider it as a

3  possible impact.

4  Q   And so you recognized in the context of the reverse

5  commuters that you had to consider the economic situation in

6  the suburbs because it was so important to this important

7  revenue stream; correct?

8  A   We thought it was relevant, yes.

9  Q   Yeah.  Now, I think we covered that you had not forecast

10 the wage growth rate for a city before; correct?

11 A   I believe that's still correct.

12 Q   And you took the Michigan wage growth rates and you

13 reduced it for Detroit; right?

14 A   That is correct.

15 Q   Okay.  And you assumed that the wage growth rate will be

16 constant in the future; correct?

17 A   I believe we did certainly in the baseline forecast.

18 Q   But you acknowledge it's likely that the rate of wage

19 growth will not be constant over a ten-year period; correct?

20 A   I will acknowledge that.

21 Q   And you assumed a one-percent wage growth?

22 A   I believe that's correct.

23 Q   And that number is an assumption that's not generated by

24 a mathematical model; correct?

25 A   I believe that's an accurate description.

1  Q   Okay.  And when you take into account inflation, it's

2  likely that you're projecting a real wage rate that is either

3  zero or negative growth; correct?

4  A   And that would be for let's say the residents of the City

5  of Detroit in terms of determining their taxable income.

6  That wage component would not be growing in real terms --

7  Q   Okay.

8  A   -- but it would not be falling.

9  Q   Okay.  And the Michigan rate is something like 2.5

10  percent?

11  A   That is correct.  That sounds reasonable.

12  Q   And are you aware that the city has negotiated contracts

13  with its employees that have wage growth rates in them that

14  are greater than one percent?

15  A   I wasn't aware of that.

16  Q   Are you aware that Mr. Malhotra uses a wage growth rate

17  that's either two or 2.5 percent?

18  A   I did not know that.

19  Q   Yeah.  Are you aware that Michigan State had put together

20  some wage growth rates for purposes of the consensus

21  conference?

22  A   For the state consensus --

23  Q   No, for the city --

24  A   For the city?

25  Q   -- consensus conference.

1  A    No, I'm not familiar with that.

2  Q    Well, would it -- if you turn to Exhibit 27, City Exhibit

3  27 --

4  A    Yes, I do.

5  Q    Have you seen that document before?

6           MR. STEWART:  Is it -- what tab?

7           MR. SMITH:  It's Tab 1.

8  BY MR. SMITH:

9  Q    Tab 1 in your binder.  I had just been wondering.  I

10 believe you've seen that document before, but you can let me

11 know.

12          MR. STEWART:  Before it's shown to the witness, we

13 should have a foundation and perhaps move to admit it.  I

14 object to it being shown for that --

15          MR. SMITH:  Well, I just want to know if he's seen

16 it before because I know I'm going to draw an objection.

17          THE COURT:  You can ask that question.  You can ask

18 that question.  Have you seen that before, sir?

19          THE WITNESS:  I believe so.  Is the author of this

20 Eric Scorsone?

21          MR. SMITH:  Well --

22          THE COURT:  You just need to tell us whether you've

23 seen it before.

24          THE WITNESS:  I believe --

25          THE COURT:  If you're not sure, just say that.

1    THE WITNESS:  I'm not sure.

2  BY MR. SMITH:

3  Q   Okay.  Do you recall whether you saw this at your

4  deposition?

5  A   I saw revenue -- I looked at revenue estimates by Eric

6  Scorsone from Michigan State University.  This particular

7  format I would have to look at more carefully to see if I saw

8  it in this format.

9  Q   I mean when you say "look at it more carefully," have you

10  had time to look at it?

11  A   I would compare it to my Excel spreadsheet that was a

12  version that I was familiar with to see if they're the same

13  numbers.

14  Q   Okay.  So sitting here today, you just don't know whether

15  you've seen this before or not?

16  A   I've seen a forecast prepared by Michigan State

17  University in a different format within an Excel spreadsheet.

18  I don't know if this, in fact, is the same.

19  Q   Okay.  Fair enough.  You know, I think I'm going to draw

20  an objection on this.  We don't need to cover it if there's

21  going to be an objection.

22    MR. STEWART:  Well, you better tell me what I'm

23  going to object to.

24    THE COURT:  Well, let me just ask.  Is it your

25  representation that this document is the same?

1    MR. SMITH:  I don't know what he's seen.  I don't

2 know what he saw in --

3    THE COURT:  Oh, all right.

4    MR. SMITH:  -- an Excel spreadsheet, no.

5    THE COURT:  Fair enough.  Thank you.

6    MR. STEWART:  I assume I'm objecting, Judge.  I

7 gather I am objecting, so --

8    MR. SMITH:  All right.  Well, we don't need to cover

9 this.

10 BY MR. SMITH:

11 Q   Do you remember seeing any wage rates and growth rates

12 from Mr. Scorsone or not?

13 A   I believe so, and I also saw -- well, I don't know the

14 answer to that, but I do --

15    THE COURT:  All right.  If you don't know, you don't

16 know.

17    THE WITNESS:  Yeah.  I don't know the answer to

18 that.

19    THE COURT:  That's the answer.

20 BY MR. SMITH:

21 Q   Okay.  In your forecast, did you use a wage rate

22 growth -- a growth rate that was higher than one percent for

23 2004 (sic) and 2015, if you know?

24 A   Don't know the answer to that.  I would have to check my

25 spreadsheet or my expert witness report, but I don't

1 remember.

2 Q   You can look at your expert witness report if you need to

3 refresh your recollection.

4 A   It varied over the forecast period.  I don't remember the

5 exact values for each of those two years in question.

6 Q   I mean the one-percent wage rate, do you know -- you just

7 don't recall whether you've used a different wage rate for

8 2014 or 2015?

9 A   I thought it was one percent --

10 Q   Okay.

11 A   -- over the period.  I could be wrong.

12 Q   Okay.  Fair enough.  So we've talked about how you've

13 forecast essentially a zero employment growth for the city

14 even were restructuring, and you're assuming a decline in

15 real wages for the city; correct?

16 A   Or no growth.

17 Q   Or no growth.  And now I would like to move to

18 population.  All right?

19        THE COURT:  Well, all right.  Before we do that,

20 let's --

21        MR. SMITH:  Yeah.

22        THE COURT:  -- take our afternoon break now.  One

23 second, please.  I'd like to see at the side of the bench

24 here Mr. Stewart and Mr. Hackney, please.  Oh, and we'll

25 reconvene at 3:30, please.

1          THE CLERK:  All rise.  Court is in recess.

2      (Recess at 3:12 p.m., until 3:30 p.m.)

3          THE CLERK:  All rise.  Court is back in session.

4  You may be seated.

5          MR. SMITH:  Your Honor, may I proceed?

6          THE COURT:  You may proceed, yes.

7          MR. SMITH:  Thank you.

8  BY MR. SMITH:

9  Q    Dr. Cline, you had talked about an aggregate number that

10  you had considered for restructuring initiatives.  Do you

11  recall that?

12  A    I believe that number was $1.7 billion.

13  Q    Okay.  But you haven't pulled apart that number to figure

14  out how the money is supposed to be spent or what the

15  elements are?

16  A    Not other than looking at the dollar amount for increased

17  tax administration collections.

18  Q    Okay.  But other than -- the other pieces of it, you just

19  don't know?

20  A    I am not familiar with.

21  Q    Yeah.  And you don't know what it's -- what they're going

22  to -- the city is going to be spending $1.7 billion on?

23  A    I don't know the detailed list of programs for spending.

24  Q    Okay.  I wanted to talk about population now.  You

25  discussed certain population growth rates and showed the

1  Court a demonstrative that we have here; correct?

2  A   Correct.

3  Q   In doing your forecast, you relied on the SEMCOG

4  population projections; correct?

5  A   That is correct.  I believe the form in which they were

6  actually published was in a report by Detroit Future City.

7  Q   Okay.  You can -- okay.  So you looked at a Detroit

8  Future City report that, in turn, published some results from

9  SEMCOG; correct?

10 A   Correct.

11 Q   And those are projections that you relied on that were

12 performed by other forecasters who are not appearing as

13 experts in the litigation; correct?

14 A   That is correct.

15 Q   And they're forecasts of future population in Detroit?

16 A   That is correct.

17 Q   You agree that the SEMCOG population projections are not

18 on the same solid basis as other numbers you had available

19 such as actual revenue collection numbers for the city;

20 correct?

21 A   They were certainly forecast numbers as opposed to actual

22 history.  That is correct.

23 Q   And so you would say that they aren't on the same solid

24 basis as other numbers you used; correct?

25 A   I would say no forecast is on the same solid basis as the

1  actuals, no.

2  Q   Okay.  And, in fact, at least as of your deposition, you

3  were unable to tell me what methodology SEMCOG actually uses

4  for its population projections; correct?

5  A   That may have been correct at the time.  I know a little

6  bit more about that now.

7  Q   Okay.  So when you were putting together your worksheets,

8  your spreadsheets and your model and your expert report, at

9  that point in time, you didn't know what methodology SEMCOG

10  used in terms of their population projections?

11  A   I think that's accurate.

12  Q   But now you've done some more research after your

13  deposition to look into what SEMCOG does?

14  A   Over the last several weeks, I had looked at that issue.

15  Q   Okay.  Now, you -- but when you put together your expert

16  opinions, you didn't know how the SEMCOG numbers were

17  calculated; correct?

18  A   I didn't understand what went into the alternatives that

19  are seen in the exhibit.

20  Q   And you didn't -- you don't know whether SEMCOG has taken

21  into consideration factors such as activities the city has

22  already undertaken to increase population?

23  A   I don't know that, no.

24  Q   And certainly the SEMCOG population projections don't

25  take into account proposed restructuring efforts in the

1  bankruptcy?

2  A   That is correct.

3  Q   And because you didn't know the methodology of the SEMCOG

4  population forecasts, you didn't do anything to check their

5  accuracy or reliability before you submitted your report;

6  correct?

7  A   I didn't check the underlying documents that would have

8  created those forecasts, no.

9  Q   And since your deposition, have you received additional

10 documents from SEMCOG or not?

11 A   I have received -- I have looked at several articles that

12 deal with the methodology behind their projections.

13 Q   Okay.  And I think you had mentioned that you said

14 something like in your direct history was not very reliable

15 in Detroit or something like that.

16 A   Doesn't sound right.

17 Q   Okay.  You wouldn't say that; correct?

18 A   I don't remember the context in which if I did say that.

19 Q   Okay.  In putting together these population forecasts,

20 does SEMCOG look to the history of Detroit and its population

21 levels in order to forecast future levels?

22 A   Yes, it did.

23 Q   Okay.  And did they use a methodology such as a

24 regression methodology or time series analysis to do that?

25 A   I would imagine they have different tools and techniques,

1  but it also involves a different model, something called REMI

2  model --

3  Q   Okay.

4  A   -- of Detroit or, to be more exact, it's -- they start

5  with the southeastern Michigan region.

6  Q   But sitting here today, do you know what the tools or

7  techniques are that SEMCOG uses to put together its numbers?

8  A   I am familiar with a model that RSQE at the University of

9  Michigan used to provide SEMCOG with inputs for their

10  determination of the population forecast.

11  Q   But I guess I'm getting at do you know what the

12  methodology is now that SEMCOG uses for its forecasts?

13  A   I do not know the details of the SEMCOG methodology.

14  Q   Okay.  So even after all your research and looking at

15  these studies, you haven't found anything telling you what

16  the methodology is for the SEMCOG forecast; correct?

17  A   I would say I haven't found a simple explanation, but I

18  wouldn't claim that I have exhaustively looked for that

19  explanation.

20  Q   Okay.  Now, in forecasting the individual income tax

21  collections, you altered SEMCOG's population projections;

22  correct?

23  A   We did.

24  Q   And you used a variety of different percentage changes

25  for different components of the population that were not

1  forecast by SEMCOG; correct?

2  A   That is correct.

3  Q   And the population growth rates you used are assumed and

4  not calculated values; correct?

5  A   I believe that's an accurate description.

6  Q   And you used different values for those numbers in doing

7  different runs of your models before the final version;

8  correct?

9  A   I think that's probably also accurate.

10  Q   And there were also periods of time, as indicated on your

11  chart, where you didn't even have SEMCOG numbers to start

12  with; correct?

13  A   Or we didn't select to use the SEMCOG numbers that were

14  in front of us.

15  Q   Okay.  And in that case, you just -- you relied on your

16  own assumptions regarding population growth; correct?

17  A   We relied on our own analysis of expected population

18  growth rates.

19  Q   And, in general, the rates of growth you used for the

20  income tax base in your model were assumed rates; correct?

21  A   That is correct.

22  Q   And you also made certain assumptions about how long it

23  would take before the private sector would respond to

24  restructuring initiatives; correct?

25  A   I believe that's implicit, if not explicitly stated in a

1  line in our spreadsheet, yes.  That was a consideration.

2  Q   Do you know anything about the timetable on which the

3  restructuring initiatives are planned to begin, the various

4  initiatives that the city is proposing over the next ten

5  years?

6  A   I do not have a detailed timeline for each of the

7  components of the restructuring proposal.

8  Q   And do you know over -- how the money is being spent like

9  what the timetable is for spending the money in the

10  restructuring initiative?

11  A   I have looked at the year-by-year breakout of, I believe,

12  aggregate spending numbers.  I'm aware that they are there.

13  Q   Are you aware that the timetable for the restructuring

14  initiatives could change in the future?

15  A   Yes.

16  Q   Okay.  And if the timetable changed, your forecast would

17  need to change?

18  A   I believe it would have an impact.

19  Q   Yeah.  You assumed that there would be a slower rate of

20  population decline under the restructuring scenario; correct?

21  A   Correct.

22  Q   And so, again, even after spending more than a billion

23  dollars on reinvestment and restructuring, you're forecasting

24  that there will be population decline in Detroit; correct?

25  A   I believe in both the baseline and in the restructuring

1    forecast, we may have continued those negative rates of

2    growth of total population out over the forecast period.

3    Q    Okay.  And the slower rate of -- the slower rate of

4    population decline for restructuring is an assumption that

5    you made; correct?

6    A    That is correct.  That is correct.

7    Q    There's no body of data or literature that tells you what

8    the assumed rate of population decline should be in the

9    restructuring scenario or baseline; correct?

10   A    I think that's a fair statement.

11   Q    And you're not aware of any studies that would give you

12   insight into that issue; correct?

13   A    I don't know of any.

14   Q    Now, if we look at your population chart --

15           MR. SMITH:  Maybe, Roman, you could bring up the

16   same demonstrative so it is on here.

17   BY MR. SMITH:

18   Q    -- there were three different SEMCOG population scenarios

19   that you depict; correct?

20   A    And they're numbered one, two, and three.

21   Q    And you don't know the methodology used for any of those

22   scenarios?

23   A    I have a better idea today what that methodology is.

24   Q    Do you know how the methodology differs between the three

25   SEMCOG scenarios?

1  A   I believe the difference reflects not only a difference

2  in demographic assumptions about how the various components

3  of Detroit's population will change over time, I think they

4  also incorporate different perspectives on the rate of growth

5  of some of the economic variables, including total employment

6  in Detroit.

7  Q   Okay.  And did you do anything to try to compare, or were

8  you able to compare your assumptions regarding employment

9  growth compared to SEMCOG's?

10 A   I did.

11 Q   And as far as the three different population scenarios,

12 all three of these population scenarios that SEMCOG produced

13 have population stabilizing in Detroit without any

14 restructuring; correct?

15 A   I believe those three forecasts prepared by --

16 alternatives from SEMCOG do flatten out fairly far out into

17 the future at 2028.

18 Q   Okay.  And one of the SEMCOG scenarios actually has

19 higher population levels forecasted in the absence of

20 restructuring than you forecast for the restructuring

21 scenario with more than a billion dollars expenditure;

22 correct?

23 A   I believe you're referring to the blue line --

24 Q   Yes.

25 A   -- on the exhibit.  That is a SEMCOG scenario numbered

1   Number 3, and it does have a higher total employment --

2   excuse me -- population number at the end of the period than

3   the current Ernst & Young forecast.

4   Q   Okay.  And were there increased estimates of employment

5   growth in the SEMCOG forecasts, or did they -- they used a

6   range of employment growth numbers?

7   A   That is correct.  They used a range of employment

8   numbers.

9   Q   And were some of them greater than yours?

10   A   Yes, they were.

11   Q   And they also did different forecasting scenarios for

12   population; correct?

13   A   They did in coming up with their alternative scenarios.

14   Q   And you didn't do any alternative scenarios for any of

15   the forecasts that you did; correct?

16   A   No, we did not.  We started with their forecast, which

17   was SEMCOG 1.

18   Q   And you don't have any criticism of SEMCOG, though, for

19   modeling different forecasted outputs depending on

20   differences in the assumptions that they make; correct?

21   A   For the purposes of their exercise, I don't.  I can't

22   criticize that approach.

23   Q   Yeah.  Now I'd like to turn to the wagering tax.  In

24   calculating the wagering tax revenue, you input a wagering

25   tax growth rate into your model; correct?

1  A   We did.

2  Q   And the wagering tax growth rate you used is an

3  assumption that you made; correct?

4  A   That is correct.

5  Q   And it's an assumption that you plugged into the model?

6  A   That is correct.

7  Q   And it's a number that you picked; correct?

8  A   It's the number that we selected in doing our forecast.

9  Q   And you mentioned that you had to consider the effect of

10 competition from other casinos; correct?

11 A   We did.

12 Q   But you've never done any study of casino competition

13 yourself; correct?

14 A   I have not personally, no.

15 Q   And, in fact, there are a number of numbers in your model

16 that are basically numbers that you picked; correct?

17 A   That is correct.

18 Q   And there's also no mathematical formula you're using

19 that governs the change in the rate for wagering tax revenue

20 over time; correct?

21 A   That is correct.

22 Q   And the assumptions that you used for the wagering tax

23 growth rates is different from the consensus forecast that

24 the city put together; correct?

25 A   Could well be.

1  Q   Okay.  And you recall that the city's consensus forecasts

2  have forecasted that there's expected to be a turnaround in

3  wagering tax revenue in fiscal year 2016; is that correct?

4  A   They may have that in their forecast.

5  Q   Yeah.  And as a result, the consensus forecast has a

6  higher wagering tax revenue growth figure than you used;

7  correct?

8  A   It would be if they turn it positive faster than we did

9  and if they used a higher annual growth rate figure.

10  Q   And you're not aware of any specific study that's studied

11  this issue that you could look to to determine what the

12  wagering growth rate should be in Detroit; correct?

13  A   Not for Detroit specifically, but there is information

14  from other states.

15  Q   And, in fact, on Detroit there's real disagreement about

16  the future even near term what that's going to look like in

17  terms of the wagering revenue?

18  A   I'm not familiar with those articles, if they're there,

19  but I could understand disagreement.

20  Q   Well, I mean even among yourself and the consensus

21  forecast, there's disagreement about what the future is going

22  to look like in terms of wagering revenue for the city?

23  A   If they use something other than a one-percent rate of

24  growth, then there would be a difference.

25  Q   Okay.  I'd like to talk about the corporate tax for a

1  minute.  You forecast a growth rate for the corporate income

2  tax as well; correct?

3  A   Correct.

4  Q   And you assume a corporate income tax revenue growth rate

5  of three percent?

6  A   Sounds familiar.

7  Q   And we've already discussed how the corporate income tax

8  in Michigan is a new tax; correct?

9  A   At the state level, that is correct.

10 Q   As a result, there's no analysis or study that you're

11 aware of that could have helped you determine what specific

12 rate to use; correct?

13 A   I think the accurate description would be there isn't

14 enough history of actual state tax collections to use that

15 series to provide additional insights into what might happen

16 in Detroit.

17 Q   Okay.  And so you ended up using a different methodology

18 for the corporate tax rate than you did with respect to

19 income tax, for example; correct?

20 A   Although I would -- I think I agree, but it's a different

21 tax, so it took a different approach to get there.

22 Q   Well, wasn't the approach driven by the lack of data

23 available to you on the corporate tax?

24 A   Not completely.

25 Q   In part, your methodology for the corporate tax was

1    driven by the lack of data you had to work with on that;

2    correct?

3    A    That was a contributing factor, but we did have the

4    state's forecast for a three-year fiscal year period.

5    Q    And the state, again, only tries to forecast corporate

6    tax revenue for three years; correct?

7    A    Correct.

8    Q    You then -- you applied a structural adjustment again to

9    the corporate tax rate; correct?

10   A    Correct.

11   Q    And it decreased over time from three point -- -3.2

12   percent to -2.0 percent; correct?

13   A    Sounds familiar.

14   Q    And there's no study that estimates the structural

15   adjustments of -3.2 percent in fiscal year 2015 to -2.0 by

16   fiscal year 2020 that you used; correct?

17   A    I think that's an accurate statement, yes.

18   Q    Okay.  On the utility users tax, you mentioned that you

19   had subtracted some sums for the PLA; correct?  In the

20   utility users tax analysis that you did, you had subtracted

21   some sums that were going to the -- for the PLA; correct?

22   A    I'm sorry.  Yes.  That is correct.

23   Q    And at the time of your deposition, you didn't know what

24   those subtractions of the 12-1/2 million each year were that

25   you had made for the PLA; correct?

1   A   I knew exactly what the dollar amounts were.

2   Q   Okay.  But you didn't know what they were for, correct --

3   A   That's correct.

4   Q   -- or how they were calculated; correct?

5   A   They were given to us by other members of the Ernst &

6   Young team.

7   Q   Okay.  So at the time, you just subtracted the 12-1/2

8   million, but you didn't know how other people had calculated

9   that or what it was for; correct?

10   A   Other than I believe it was a negotiated amount.  I don't

11   know if it were in law or not, but it was a specific figure

12   that had been determined at that point.

13   Q   And you didn't know how it had been determined?

14   A   I did not.

15   Q   And you didn't know how it had been calculated; correct?

16   A   I did not.

17   Q   Okay.  And that was about a third of the utility tax

18   revenue that you --

19   A   I believe it's $12 million out of whatever the total

20   would have been.

21   Q   Okay.  We've discussed various aspects of some of your

22   opinions and methodology you've used today.  To your

23   knowledge, there's no measure of reliability before the fact

24   of a tax revenue forecast such as the one you performed;

25   correct?

1    A    That is correct if you're referring to a tax forecast.

2    If you're referring to a single regression equation that was

3    used in the process that was fit over history, there are

4    statistical measures of accuracy for that exercise.

5    Q    Okay.  And that's not -- but in terms of a tax forecast

6    such as the one you performed in this case, there's no

7    measure of reliability; correct?

8    A    I have not used any of those measures in the state tax

9    forecasting work that I have done.

10   Q    So you would agree with me there's no measure of

11   reliability?

12   A    I believe you could develop such measures.  I haven't

13   used them, no.

14   Q    Okay.  Now, you also didn't test the results of your

15   forecast against actual results; correct?

16   A    I believe that's an accurate statement because we were

17   forward looking into periods of time that hadn't happened

18   yet.

19   Q    And you would agree with me that even using the best

20   available methodology and information, forecasts are

21   frequently wrong; correct?

22   A    That is correct.

23   Q    And you're not claiming that your forecast is the only

24   reasonable forecast of revenues from the taxes you examined;

25   correct?

1   A   I believe I would agree with that statement.

2   Q   Now, I wanted to ask you a minute about your opinions

3   about Mr. Meyers' chart.

4   A   All right.

5   Q   And maybe we can pull up Exhibit -- I believe it was

6   Exhibit 4412, page 37, was Mr. Meyers' chart.

7   A   Yes.  I see it.

8   Q   Now, for the period of time up until approximately, say,

9   2006 or so, you agree that the time series analysis is a good

10  way to model property taxes before that period; correct?

11  A   I believe that's basically correct, but I also do believe

12  you could see back in 2000, 2001, and 2002 that when we had

13  that what was a severe recession in Michigan, it was starting

14  to deviate from the dotted -- the dotted line was starting to

15  deviate from the solid red line for actual property taxes

16  back in the early 2000's, which was a period of recession.

17  Q   Yeah.  But throughout this period, basically the lines

18  are pretty close; correct?

19  A   Certainly close up to the year 2000.  Then they start to

20  diverge after that point.

21  Q   Okay.  And they're -- well, actually, the line -- they

22  all overlap up until about 2006 right here; correct?

23  A   I see gaps back in 2000, 2002 between the red -- solid

24  red line and the dotted blue line.

25  Q   Yeah.  When you're doing a time series analysis, there's

1  no guarantee that there's going be an absence -- complete

2  absence of any gaps; correct?

3  A    That is correct.

4  Q    There are statistical techniques that you can use to

5  assess how closely the data is fit using the analysis;

6  correct?

7  A    Within the limits of time series analysis, which do have

8  limits.

9  Q    Okay.  Now, you noted, I think, in your direct testimony

10  that it's in this 2008 period, right around the great

11  recession, you said --

12  A    I believe so.

13  Q    -- where you see this deviation right around this point

14  in time; correct?

15  A    Correct.

16  Q    And there you see that property values keep increasing

17  during that period of time; correct?

18  A    The taxable value continued to increase.

19  Q    But the city's collections of revenues decreased during

20  that period of time; correct?

21  A    Yes.  Looks like that's what the graph is showing.

22  Q    And did you consider the fact that there could be

23  something unique in Detroit in terms of collection of

24  property taxes during this period of time?

25  A    We did consider that, but we also considered the fact

1   that there's a disconnect between underlying market value and

2   property taxes throughout Michigan but also in the City of

3   Detroit.

4   Q   And during this period of time, there's a high

5   historically property taxable value; correct?

6   A   Reported taxable value.

7   Q   But the city is not collecting -- the city's collections

8   of revenue are actually going down even though there's an

9   increased taxable value; correct?

10   A   Correct.

11   Q   And you've seen that -- are you aware that there have

12   been a series of audits of the assessor's office pointing out

13   the fact the city has not been doing a good job recently

14   collecting property taxes?

15   A   I'm not familiar with the reports, no.

16   Q   Well, are you aware that the city has indicated that it

17   wasn't collecting property tax on half the properties in the

18   city?

19   A   I'm not familiar with that statement.

20   Q   Do you know who Plante Moran is?  Plante Moran?

21   A   I'm not sure.

22   Q   Okay.  You haven't reviewed any of their reports on the

23   city assessor's office and property tax collections?

24   A   I have not personally.

25   Q   Okay.  Do you know who Mr. Evanko is?

1  A   I want to say it's the city assessor, but I'm not 100

2  percent certain.

3  Q   Okay.  Have you read Mr. Evanko's deposition in this

4  case?

5  A   I may have read sections of it.  I have not read the full

6  deposition.

7  Q   Okay.  Were you aware that Mr. Evanko testified

8  extensively about problems the city has had in its system for

9  collecting property taxes?

10         MR. STEWART:  Objection, your Honor.  I don't think

11  it's fair to ask this witness to speculate on someone else's

12  testimony.

13         THE COURT:  The objection is sustained.

14  BY MR. SMITH:

15  Q   Have you done any investigation into the city's

16  collection efforts with respect to property taxes at all

17  before you came into the court and offered the opinions about

18  Mr. Meyers' graph?

19  A   I have not examined the city's collection practices,

20  although our property tax forecast builds in a measured

21  compliance statistic.

22  Q   Okay.  And your forecast -- when you build in the

23  collection rate for the property tax, your forecast, which is

24  here in the red right underneath here --

25  A   Correct.

1  Q   -- that shows property taxes keep going down; correct?

2  A   As a result -- that is correct, but it's as a result of

3  everything that is affecting market value, assessed value,

4  capped value, taxable value, and the collection rate.

5  Q   Yeah.  So when it came to the property tax, you

6  considered everything, property value, the collection rate,

7  other factors in performing your forecast; correct?

8  A   I think that's an accurate statement.

9  Q   But when it came to the income tax, you didn't consider

10 the fact that there was hundreds of millions of dollars that

11 the city could have increased income tax revenues by if they

12 only increased their collection rate; correct?

13 A   No, that's not correct.

14 Q   You didn't build in any change for the collection rate in

15 the income tax?

16 A   That statement is correct.

17 Q   Okay.  So you didn't try to forecast whether the city

18 could increase collection rates to try to collect the tens of

19 millions of dollars that are outside of the -- outside of the

20 income tax system that are not being collected?

21 A   The correct statement is that we did not assume there

22 would be any change in the effective collection rate for the

23 income tax.  We didn't assume it's a hundred percent.  We

24 assumed that whatever has happened recently in Detroit would

25 continue into the future without any changes in that

1  effective collection rate.  That's the accurate statement.

2  Q   And you didn't do that with respect to the property

3  taxes.  You assumed the collections would change; correct?

4  A   Yes, we did.

5       MR. SMITH:  Okay.  I think -- no further questions,

6  your Honor.

7       THE COURT:  Thank you.  Any other questions on the

8  objectors' side?  Redirect then, please.

9       MR. STEWART:  Let me get some water.

10               REDIRECT EXAMINATION

11  BY MR. STEWART:

12  Q   Dr. Cline, for starters, on income tax collections, did

13  you not testify -- you're aware that the restructuring and

14  reinvestment initiatives will address improved tax

15  collections?

16  A   That is my understanding.

17  Q   And where, if anywhere, in the work product of E&Y is

18  that shown?

19  A   I believe that is showed in the master spreadsheets that

20  summarize expected changes in revenue in the future in the

21  City of Detroit.

22  Q   Where is it shown in your own analysis?

23  A   In our analysis, that number does not appear.

24  Q   And why does this -- why do increased collections then

25  appear two times in E&Y's work?

1  A   Well, we had to make sure that we were avoiding double

2  counting.  With one group estimating that additional revenue

3  that could be expected from restructuring administrative

4  changes, we wanted to make sure it wasn't -- we didn't then

5  add it in or even a part of it in in our revenue estimates,

6  so we kept trying to keep our focus on the effect of the

7  over -- underlying economy on the tax collections, not

8  changes in administration.

9  Q   So is it fair or not fair to say that Ernst & Young

10 ignored improvements in income tax collections?

11 A   They were not ignored.

12 Q   You were asked -- let's look, if we could, at Tab 3 of

13 the binder in front of you, and in there is a document that

14 has the title "Revenue Consensus Conference Report."  Do you

15 have that before you?

16 A   I have it in front of me.

17 Q   Is that something you've seen before?

18 A   The 2014 version I may have glanced at.  I certainly was

19 familiar with the prior publication.

20 Q   I'm not -- I'm going to move on from that then.  Let me

21 ask you this.  You were asked by Mr. Smith at one point about

22 a deposition answer that you gave, and I want to go over part

23 of your transcript.  As you know, your transcript is at the

24 very beginning of this binder that we've got here.

25 A   I have it.

1  Q   Let me find where we were.  He asked you a question and
2  read your transcript, I believe, from page 28, lines 2 to 8.
3  Do you see that, and do you remember being asked questions
4  about that?
5  A   I'm on page 28.
6  Q   And do you see lines 2 to 8 where he asked you questions
7  about independent analysis or testing to verify the accuracy
8  of the information?
9  A   I see those lines.
10 Q   Let me direct your attention, if I could, to the very
11 next page at the bottom starting with line 23.
12 A   I see that.
13 Q   And I'm going to read the question and answer.  I'm going
14 to ask you whether you were asked this question and whether
15 you gave this answer.
16         "Question:  And in general, you didn't do
17         anything to independently verify the accuracy or
18         reliability of the information you were provided by
19         other people for your forecasting models; correct?
20         Answer:  We evaluated all of the information we
21         were provided to see if we thought it was reliable
22         in the sense that it looked consistent over time,
23         that there weren't any unexplained differences.  We
24         look carefully at all of the information that's
25         provided to us.

1    Question:  But you didn't do any independent

2        analysis or testing to go back and actually check or

3        audit the information you were provided in order to

4        ensure that it was reliable; correct?"

5        And I interpose an objection.

6        "THE WITNESS:  We were not asked to audit

7        figures for the analysis.

8        Question:  And so you didn't do it; correct?

9        Answer:  As I mentioned, we carefully reviewed

10       all of the information that we were given before we

11       plugged it into the model."

12       Were you asked those questions, and did you give

13   those answers?

14   A   I believe those are the accurate questions that were

15   asked and the answers that I gave.

16   Q   Now, let me ask this.  At various times in the cross-

17   examination you were asked about selecting or picking numbers

18   and assumptions that you made, and without going into

19   excessive detail, I do want to go back and touch upon this.

20   First of all, in the modeling or the forecasting that you

21   did, what use did you make of mathematical data and

22   mathematical calculations?

23   A   There was a wide range of calculations that we made,

24   which I would describe as mathematical calculations.  We had

25   to keep track of all of the interactions, the additions,

1  subtractions, the different relative rates of change as they

2  affect different components.  On the way to the employment

3  forecast, we did use regression analysis where we thought it

4  was appropriate, but we chose the methodology we did because

5  of the uniqueness of the Detroit situation and in many cases

6  the limitation of a usable relevant time series to operate

7  with.

8  Q   Now, in the course of your work -- and we've seen the

9  spreadsheets that you used -- you used mathematical

10 approaches in calculating employment in the city?

11 A   Correct.

12 Q   And calculating the change in the ratio of employment of

13 what we call Class A and Class B and Class C?

14 A   That's correct.

15 Q   The change in wages and salaries amounts; correct?

16 A   Correct.

17 Q   And other things as well?

18 A   That is correct.

19 Q   And am I right that one of the methods you used was ratio

20 analysis?

21 A   Extensively.

22 Q   Okay.  Now, as a result of these, what was developed that

23 helped you, in your judgment, decide what were the

24 appropriate values to incorporate into your model?

25 A   At each step of the way when we were building off of

1  history or moving from where we are today or where the City

2  of Detroit is today forward, we would stop and do what I

3  would call almost a common sense test. Does the pattern look

4  like it is reasonable? Is it possible that it would unfold

5  that way? And after that discussion, we would lock down the

6  percentage growth figures.

7  Q   Was it possible in your forecast to use a mathematical

8  formula to develop the entire forecast for you without adding

9  your judgment to the forecast?

10 A   The answer is if there had been an economic -- a detailed

11 economic forecast model for the City of Detroit, we'd have

12 used it. It would have saved us a lot of time and effort.

13 It doesn't exist. It wasn't there. And we had to develop it

14 from the very beginning, and we chose the spreadsheet

15 approach because of the necessity of keeping track of all of

16 those detailed pieces, parts that went into starting from

17 scratch literally to do the economic and the revenue

18 forecast.

19 Q   What would an economist call a mathematical exercise that

20 took certain inputs and without any intervention thereafter

21 produced a forecast?

22 A   I think it would be described as a nonexistent model.

23 Q   And why do you say nonexistent --

24 A   It doesn't exist because to forecast the future you have

25 to have a key core set of assumptions. No model is going to

1  be on automatic pilot to tell you what the future is going to

2  look like.

3  Q    And in the 40 years that you have been doing revenue

4  forecast, has it been necessary to select particular values

5  for the forecast based on your judgment as guided by the

6  mathematical work that led up to it?

7  A    The answer is yes, but also guided by experience.

8  Q    Now, let me ask one last thing.  You were asked by Mr.

9  Smith I think about sensitivity analysis and testing and this

10  and that and the other, and, in particular, I believe, he

11  questioned you about the rate of employment in the City of

12  Detroit or perhaps the rate of those who are employed in the

13  City of Detroit.  Did you at some point check that to see

14  what the effect would be upon your forecast revenue of a ten-

15  percent change in the percentage of those who are employed?

16  A    I did.

17  Q    And tell me exactly what you did.

18  A    The reason why I did that exercise is because I do

19  appreciate the question of the sensitivity of the results,

20  and I said --

21        MR. SMITH:  Your Honor, I don't know that this has

22  been disclosed in his expert report or materials.

23        MR. STEWART:  He opened the door, Judge, and the

24  witness said in response the answer is, yes, I did.

25        THE COURT:  The objection is overruled.  Go ahead.

1      THE WITNESS:  So the exercise I did is I took the

2  individual income tax for residents of the City of Detroit,

3  resident income tax base -- remember, that's both people

4  working in Detroit and people working outside of Detroit but

5  living in Detroit -- and I asked the question what would

6  happen if we increased the growth rates over the ten-year

7  forecast period every year by ten percent.

8  BY MR. STEWART:

9  Q    And did you run that number?

10  A    I did run that exercise.

11  Q    And what did you find?

12  A    I found that over the entire ten-year period of time,

13  that tax base, which was tax collection number, which is

14  about $150 million, would have been one-half of one percent

15  higher if I had moved -- if I had added ten percent to the

16  assumed growth rates because the extra ten percent is just

17  added on the margin year by year.  It doesn't say the total

18  went up by ten percent.  The total, in fact, only went up by

19  one-half of one percent when I increased the growth rates by

20  ten percent.

21  Q    In terms of absolute dollars, how much was that?

22  A    Like $7 million --

23  Q    Over ten years?

24  A    -- in total over -- got to be careful.  I believe it was

25  $7 million in total over the entire ten-year period.

1    MR. STEWART:  Thank you very much.  That's all I

2  have, your Honor.

3    THE COURT:  Any recross?

4    MR. SMITH:  No.  I think we're done, your Honor.

5    THE COURT:  All right.  Stand by, please.  You're

6  all set.

7    THE WITNESS:  Thank you.

8    THE COURT:  You can step down, and you're excused.

9    (Witness excused at 4:11 p.m.)

10    THE COURT:  Okay.  So we're reconvening tomorrow

11  morning at nine for some oral arguments.  Yes?  By my

12  calculations, the city has 79 hours and 6 minutes left, and

13  the objecting parties have 82 hours and 15 minutes left.

14  Anything further for today?

15    MR. STEWART:  No, your Honor.

16    THE COURT:  Okay.  We will be in recess then.

17    MR. HACKNEY:  Thank you, your Honor.

18    THE CLERK:  All rise.  Court is adjourned.

19    (Proceedings concluded at 4:12 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Robert Cline | 6 | 90 | 218 | |

| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 112-A | 37 |
| Debtor's Exhibit 112-B | 56 |
| Debtor's Exhibit 112-C | 74 |
| Debtor's Exhibit 113-A | 70 |
| Debtor's Exhibit 544 | 79 |
| Debtor's Exhibit 545 | 30 |
| Debtor's Exhibit 546 | 41 |
| Debtor's Exhibit 547 | 43 |
| Debtor's Exhibit 548 | 48 |
| Syncora Exhibit 4543 | 163 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                          August 24, 2014
_____        _____
Lois Garrett