UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                              .        Detroit, Michigan
                              .        August 21, 2014
                  Debtor.     .        9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. (#6779) MOTION/CITY OF DETROIT'S MOTION FOR
LEAVE TO SERVE THE SUPPLEMENTAL EXPERT REPORT OF CAROLINE
SALLEE FILED BY DEBTOR IN POSSESSION CITY OF DETROIT,
MICHIGAN; (#6699) EIGHTH AMENDED ORDER ESTABLISHING
PROCEDURES, DEADLINES AND HEARING DATES RELATING
TO THE DEBTOR'S PLAN OF ADJUSTMENT
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Jones Day
                       By:  GEOFFREY S. STEWART
                            GREGORY M. SHUMAKER
                       51 Louisiana Avenue, N.W.
                       Washington, DC  20001
                       (202) 879-3939

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  STEPHEN C. HACKNEY
Syncora Guarantee      300 North LaSalle
Inc., and Syncora      Chicago, IL  60654
Capital Assurance,     (312) 862-2000
Inc.:

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  ALFREDO PEREZ
Company:               700 Louisiana, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040

APPEARANCES (continued):

| | |
|---|---|
| For County of Oakland, Michigan: | Young & Associates<br>By:  JAYE QUADROZZI<br>27725 Stansbury Blvd., Suite 125<br>Farmington Hills, MI  48334<br>(248) 353-8620 |
| For Assured Guaranty Municipal Corp.: | Chadbourne & Parke, LLP<br>By:  ROBERT SCHWINGER<br>30 Rockefeller Plaza<br>New York, NY  10112<br>(212) 408-5100 |
| For the State of Michigan: | Dickinson Wright<br>By:  STEVEN HOWELL<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI  48226-3245<br>(313) 223-3033 |
| For Martha E.M. Kopacz: | Squire Patton Boggs, LLP<br>By:  STEPHEN D. LERNER<br>211 East Fourth Street, Suite 2900<br>Cincinnati, OH  45202<br>(513) 361-1200 |
| For the Detroit Retirement Systems: | Clark Hill, PLC<br>By:  JENNIFER GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>(313) 965-8274 |
| For County of Macomb, Michigan: | Dechert, LLP<br>By:  DEBRA D. O'GORMAN<br>1095 Avenue of the Americas<br>New York, NY  10036<br>(212) 698-3593 |
| Court Recorder: | LaShonda Moss<br>United States Bankruptcy Court<br>211 West Fort Street, 21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1      THE CLERK:  Case Number 13-53846, City of Detroit,

2 Michigan.

3      THE COURT:  Good morning.  I'd like to begin this

4 morning with the motion regarding the supplemental expert

5 report of Caroline Sallee and then turn to our status

6 conference.  Is that okay with everyone?  Okay.  Let's

7 proceed.

8      MR. STEWART:  Good morning, your Honor.  Geoffrey

9 Stewart of Jones Day for city and for the motion.  And if I

10 may, let me give you as much background as I can.  And if I'm

11 a little wobbly, your Honor, it's because I'm taking

12 doxycycline, so I could just fall over.  It's not in response

13 to any question you've asked.  It's other things.  This has

14 to do really with a matter that in the scheduling order

15 wasn't addressed.  The scheduling order did provide that the

16 city would serve its expert reports and objectors would then

17 serve their rebuttal reports.  Scheduling Order Number 4 had

18 a system where each could then deal with any new opinions,

19 but Scheduling Order Number 5 did not.  So in one but only

20 one of the many expert reports the city received from the

21 objectors, we found a new opinion, and it's because there was

22 no provision in the order for how one deals with this we felt

23 it appropriate to ask for leave to serve the supplemental

24 report because otherwise I think we would have been serving

25 something that there was no provision for.

1       This all begins, though, with this, something that's

2   sort of a given here but we can deal with in passing, is the

3   city does not have the ability to raise any taxes because it

4   already is at the statutory maximum for every tax it has the

5   power to impose.  The property tax is a tiny bit below that,

6   but that's only because of the operation of the so-called

7   Headlee Amendment that made the city roll it back.  The city

8   has no discretion to raise taxes.

9       In Dr. Meyers' report, he said, well, you don't have

10  the ability to raise taxes, but there is this statute, the

11  Revised Judicature Act, and if this case were dismissed, the

12  creditors would go to whatever courts they go to.  They would

13  obtain judgments against the city.  That act permits them to

14  take their judgments to the city assessor, and under the act

15  when that happens the city assessor must -- there's no

16  discretion -- he must raise property taxes to the level to

17  pay those judgments.  That was a new opinion in how he put it

18  because he went further and said, "And I've calculated how

19  this works, and, frankly, the city would be able to afford

20  this."  And he had various calculations and exhibits.  It was

21  quite a detailed study.

22      His deposition, though, indicated a weakness in his

23  analysis principal economists call tax capitalization, and

24  what this is -- and I am not an economist -- is if you have a

25  house worth $100,000 but the city imposes a new $20,000 tax,

1   economists would tell you the market will immediately treat

2   your house as worth $80,000, not the $100,000. And when you

3   apply that -- and Dr. Meyers admitted that tax capitalization

4   did have to be taken into account here.

5          Now, this jumped out at us for this reason. At a

6   minimum, the judgments creditors could get if this Chapter 9

7   case were dismissed we think would be no less than $9.1

8   billion. According to the city's disclosures to the state of

9   the assessed value of the all the taxable property in the

10  city -- and it's generally viewed to be over-assessed -- all

11  taxable property in Detroit is worth $17 billion, but

12  differently, if this process were used, most of the

13  taxable -- most of the taxable property in Detroit would have

14  to be essentially confiscated and given to the creditors.

15  Now, it's one thing for me to say it, but, in fact, this has

16  to be analyzed by an economist because of the interplay of

17  three things. One is tax capitalization itself. The other

18  is the manner in which this assessment and levy work, and

19  then, finally, what I would call the circular follow-on

20  effects, and I'll be brief as to what those are, but this

21  would perhaps show why an expert opinion was necessary to

22  rebut the other side's expert opinion.

23         In year one the creditors, who one would assume

24  would all get judgments quickly to avoid being last in line

25  or to not be part of this, would go to the assessor's office

1    with their judgments, and the city would have very few

2    defenses out of bankruptcy against these cases.  The assessor

3    would say, "Well, all right.  I must now pay $9.1 billion of

4    judgments."  Now, they could try to spread it over maybe ten

5    years, and that's what Dr. Meyers said they could do, and

6    that requires more economic analysis because we have post-

7    judgment interest and other things to contend with.  However,

8    once the assessor does that, the property value of

9    everybody's house and other taxable property, which includes,

10   for example, industrial property and other things like that,

11   industrial equipment, will fall by either a hundred percent

12   or some large fraction of that 9.1 billion.  In Detroit,

13   property has to be assessed every year, so in year two we're

14   not going against the $17 billion property base.  We're going

15   against a much lower one, but this act still requires that

16   these judgments be paid, so the rate must go up.  And in year

17   three we see the assessments down, the rate up and so on.

18   Over time, I understand, the property values should rise as

19   this debt is paid off, but there's a ratchet effect given the

20   way Michigan calculates tax assessments and what is known as

21   capped value, and that is that assessments can fall as fast

22   as they may, but they can only rise by the lower of five

23   percent or the rate of inflation.  So once they fall, it

24   could take decades for them to get back up to where they

25   were.  So the net effect of all of this when you run all

these numbers and take in discount rates, net present value,
post-judgment interest, the way these statutes operate, first
of all, it's not at all certain that that 9.1 billion,
assuming it was only that much, would ever get paid off.  It
is clear, as a matter of economic law, that the value of the
property in Detroit would collapse.  In the meantime, the
normal run-of-the-mill property tax collections would also
collapse because the assessments would have fallen in the
manner that I described.  So you get to the end under this
approach Dr. Meyers counseled.  We have a somewhat complex
but, in our view, clearly catastrophic result.  Obviously
when the day comes, we can cross-examine Dr. Meyers about it;
however, given the complexity of this and the fact it is a
new opinion, we think the appropriate thing is a new expert
opinion from the expert we've already disclosed who already
has a report in and who already has been deposed.  The report
is a simple one, and I've basically alluded to where it ends
up.  It ends up saying that Detroit property taxes would be
far and away the highest in the nation but I think now in the
range of 30 percent of the value of the home every year for
ten years.

        We prepared the report, sent it to the other side,
asked if they'd consent to its service, offered to make Ms.
Sallee available for her deposition, pointed out this is a
rebuttal report, so her testimony would come in the rebuttal

1  case.  There was no consent, and instead, in fact, there's
2  opposition to it.  Our position is, I hope, straightforward.
3  It's that because this is new expert opinion, we need to have
4  an expert of our own.  There's only one of these.  Although
5  there are many experts in the case, this is the only case
6  where we have seen this as a necessary thing to do.  We'll
7  make whatever accommodations need to be made, and we believe
8  the appropriate thing to do was to seek leave of the Court
9  before we went any further.  And, your Honor, unless you have
10 any questions, that's all I have.

11      THE COURT:  How do you deal with the opposition
12 argument that this judgment process that the defense relies
13 on has been in the case for many, many months -- I remember
14 it being discussed very early in the case -- and that this is
15 not a new issue and that the city should have been dealing
16 with this as part of the normal schedule for disclosing
17 experts, not as a matter of rebuttal?

18      MR. STEWART:  Two things.  First, of course, there
19 are so many issues that have been in the case all along, and
20 some kind of go their separate way and others don't.  To be
21 candid with you, our analysis of this always was that the RJA
22 made so little sense because even to a layperson when you see
23 the amount of the judgments, you can imagine the blight, loss
24 of income tax base, and so on we'd have that we didn't,
25 frankly, think it would remain an issue in the case.

1    But more to the point, this wasn't something we

2  would be arguing, in any event.  We were arguing what

3  revenues we knew we had, what expenses we knew we had, and

4  the RJA option, which is something someone could try to use

5  against us, was one of many things that they could do, and

6  it's not something we separately modeled, frankly, because we

7  chose the ones we knew were issues in the case and didn't

8  think they would be seriously put forward.

9    THE COURT:  All right.  Thank you.

10    MR. HACKNEY:  Your Honor, good morning.  Stephen

11  Hackney on behalf of Syncora.  I wanted to start this morning

12  by saying that I know that over the last few weeks there has

13  been a great deal of heat in the pleadings on both sides, and

14  I wanted to say that it was my intention today to take some

15  of the heat out of the proceedings if for no other reason

16  than because it does get a bit exhausting, and I'm sure it's

17  exhausting for the Court, but I don't want to understate our

18  concern about what's happened in connection with Ms. Sallee's

19  report, and I want to tell you why we are so concerned and

20  how it interacts with the case at large and how we think that

21  you should rule.

22    As you know, I've been living both sides of this

23  case both in terms of the scheduling that we've been trying

24  to work through with you and with the city, and then I've

25  also been living the development of the evidentiary record

out there in all the depositions. And I have to tell you that one of the things that I've been watching with some measure of amazement -- there are two things. One of them is I've been watching the city consistently want to race the case along, so the Court has expressed a desire to move swiftly. That's the Court's provenance. But the city has been a willing partner, and the city has always said, "Yes, yes, yes, we want to go as fast as we can. We don't want the trial date to move. We must get out of bankruptcy." I think that's well-known to you. But as I've been watching them on the one side race the case along, I've also been watching the evidentiary record develop, and I've been saying to myself as a litigator and a trial lawyer, "Why would you race this case to trial?" And as a result, we have been, I will say, very keen in watching for moments like this one where a light bulb goes on, and someone at the city says, "Oh-oh, we don't have any evidence on a central part of the case, and so we better put together some evidence." And so now you have a situation where there's a -- you know, this is a schedule that the city has insisted upon that they're attempting to disclose expert opinions 38 days after their deadline. They're attempting to disclose new opinions that are after the close of discovery.

        Now, the principal argument that was made today was, well, your Honor, it's -- we were surprised. There was a novel argument brought up by the economist for Syncora. And

1  as a result of the surprise, we're doing the right thing by

2  remedying the surprise and this new development and bringing

3  these new opinions to your attention and to Syncora's

4  attention.  The problem is that there isn't any surprise, and

5  you can see it by reading the city's own pleadings.  So if

6  you go back to their 252-page reply brief and you look at

7  paragraphs 132 to 136, what they said is the stark reality is

8  that any attempt by the city to raise taxes, which are

9  already the highest when compared with all other Michigan

10 residents, would be counterproductive in that it would

11 further burden already overburdened residents and would

12 hamper the city's ability to attract and retain residents and

13 businesses.  These concerns would become more than

14 hypothetical if the city's Chapter 9 case were dismissed

15 because, as the objecting parties acknowledge, in that event,

16 creditors may seek to enforce judgment levies against the

17 city which would require the levying of additional taxes

18 without regard to the city's debt limits.  Paragraph 133,

19 after an introductory statement of a case they're about to

20 explain, they say it is appropriate for the Bankruptcy Court

21 to consider whether the tax base can absorb the additional

22 levy.  And they go on to say that if the city, in paragraph

23 134, did undertake an attempt to raise taxes that it would be

24 futile and counterproductive.

25            Now, there is no dispute about the fact that this

1  issue has been front and central in our objections.  It was

2  acknowledged in their reply.  It was a significant part of

3  our discovery request to the city.  We had 30(b)(6) topics

4  that were saying tell us about all of the RJA judgments in

5  your history and how they have played out, and so the idea

6  that the city has been surprised by this is simply not

7  correct, and it goes to a fundamental nature of both the best

8  interest --

9         THE COURT:  Well, I have to say I didn't -- I agree

10  with you that the response that was filed to your motion

11  asserted surprise, but that's not exactly what Mr. Stewart

12  said.  What he said was not that they were surprised that the

13  issue was in the case.  It was that they were surprised you

14  hadn't --

15         MR. HACKNEY:  Oh, right.

16         THE COURT:  -- abandoned it in the meantime.

17         MR. HACKNEY:  They were surprised -- they thought --

18  I'm sorry.  They thought that we had abandoned it?

19         THE COURT:  They thought you would have abandoned it

20  in the meantime.

21         MR. HACKNEY:  Well, yeah.  I can say, as somebody

22  who's been -- you know, I could bring all the depositions and

23  the discovery in to you, and I think you would see pretty

24  clearly that there hasn't been any abandonment of this

25  argument.  I think, your Honor, what they're doing a little

1  bit here, though, is they're almost trying to turn this

2  around and say this is in the way of an affirmative defense.

3  This is really Syncora's burden.  And so now Syncora has

4  raised an argument that it's going to make, and that's why we

5  staged forward that Buckfire Daubert motion both because that

6  is of independent significance, I think, to the case, but I

7  also want to show you how this all works together because

8  this issue of whether they could develop incremental revenue

9  to pay creditors I think is a core of any fair and equitable

10  analysis, and it's a requirement of a best interest analysis.

11  Mr. Buckfire -- what we showed is Mr. Buckfire -- you know,

12  he offers a best interest opinion.  It is a three-paragraph

13  best interest opinion, and it is something that he candidly

14  admitted on a number of times in his deposition is not

15  supported by an analysis of a dismissal scenario.  In, fact,

16  he got to the point where, as I was cross-examining him, he

17  would like to remind me that he had not conducted a dismissal

18  analysis, and so he couldn't say what would happen, but our

19  view is under the best interest of creditors test that's

20  precisely what the city must do in order to establish its

21  case.

22       And so after we got this reply brief but, in

23  particular, in his deposition, we have been running around

24  the city trying to discover where is the analysis on this

25  subject of what would happen with your tax policy.  And

1    you'll remember I told you several hearings ago it's not a
2    red light, green light case.  It's a process and methodology
3    case.  It's have these folks spent the time thinking about
4    these issues so that they can prove to you that they've done
5    their diligence and checked all the boxes on plan
6    confirmation.  You get this five paragraphs in their reply
7    that says, "Oh, no, no.  Raising taxes would be
8    counterproductive.  It's Chicken Little.  The sky is falling.
9    It would devastate the city."  And what we do is we kick into
10   action, and we say, "Where's the evidence?"

11          Now, when I took Mr. Buckfire's deposition, I said
12   you have in here an assumption that if you were to increase
13   taxes, it would cause people to flee the city and it would
14   erode revenues, so it would be counterproductive.  Normally
15   you increase taxes, you get more revenue.  Here you increase
16   taxes, you actually get less revenue.  And he said, "Yes."
17   And I said, "Now, did you do any analysis on that?"  And he
18   said, "No, but Mr. Cline did."  And he said, "Mr. Cline did a
19   bunch of sensitivity analysis of the tax rates, and he
20   evaluated the impact different tax rates would have on the
21   tax base to understand how the city's revenues would be
22   impacted by different tax rates or levies.  Now, that
23   testimony was very surprising to me because my partner had
24   just taken Mr. Cline's deposition two days before, and I
25   think you got to see Mr. Cline testify probably more than you

1  wanted to maybe a little bit, but we're trying to get the

2  timing better, I think, but Mr. Cline was emphatic that he

3  had not analyzed any different types of tax rates, tax

4  increases, and that he had never been asked to.  So that

5  actually was a theme that played out throughout the

6  depositions.  Ms. Sallee on this subject said the exact same

7  thing as Mr. Cline, "No, no.  We have not done that.  We've

8  not been asked to do that."  She even went further to say,

9  "And, by the way, Ernst & Young has a policy against advising

10 municipalities on what their tax policy should be, so, you

11 know, that's not what we're doing here.  We're just doing

12 forecasting."  We did a 30(b) --

13        THE COURT:  And when was her deposition?  Do you

14 remember?

15        MR. HACKNEY:  It was -- within a week or so, it was

16 July -- mid-July, July 15, July 18.  It was somewhere --

17        THE COURT:  Over a month ago or about a month ago?

18        MR. HACKNEY:  Yeah.  It may have followed

19 Mr. Buckfire.  I'm not sure, but I know Cline went first,

20 then Buckfire, then her.  We took a 30(b)(6) witness and

21 said, look, we want to understand the city's taxing

22 capability, its taxing powers, and any studies or reports

23 regarding the same.  And the city put up its CFO, Mr. Hill,

24 and we said to Mr. Hill, "Well, what studies have been done

25 by the city to try and understand tax policy and understand

1    what could be done on that side?"  And he said, "None," so I
2    mean we have exhausted our efforts to discover what the
3    city's case was on this because there is no case.

4           And I want to step aside and say, your Honor, it's
5    not just about a levy under the RJA.  It's not that limited.
6    You have something in the city with your wagering taxes where
7    it's one of your largest sources of revenue here in Detroit,
8    and yet the casinos are also profitable.  And that's a
9    situation where you could say we ought to -- as we are
10   engaging in this desire to renew Detroit and have a
11   revitalization, we ought to evaluate the extent to which
12   perhaps we can increase that casino tax.  Maybe we should
13   talk to the legislature.  We're already doing so in
14   connection with the grand bargain.  We ought to talk to them
15   about the idea that if we could increase the casino tax,
16   Mr. Buckfire has admitted he sees no reason that that would
17   have any impact on delinquencies of the citizens' income or
18   property taxes -- might be unfortunate to some of the casino
19   owners like Mr. Gilbert because they would see the value of
20   their holdings go down if they're subject to a higher tax,
21   but that could be a great way to fund some of the desire for
22   revitalization.  So it isn't as simple as what are the legal
23   mechanisms that these creditors could put the city to.  It's
24   also things like just lobbying the legislature, trying to do
25   the best that you can to find ways to increase revenue, so

1  it's not just all the creditors that are funding the

2  revitalization.  So I think it is not as narrow as Mr.

3  Stewart says, and I just think it is so core to their burden

4  of proof, core to the discovery efforts we've made, core to

5  arguments that they themselves made in their reply, and I

6  think, you know, for all that there's been -- there's talk

7  lately about the idea that I ought to be sanctioned and my

8  partners ought to be sanctioned, but when you think back to,

9  you know, having a good faith evidentiary basis to make an

10  assertion, whoever wrote this document right now, they wrote

11  it at a time when it's a fact that no work had been done, and

12  it apparently was a fact that they didn't intend to have any

13  work done despite the fact that Mr. Stewart just got up here

14  and said he acknowledged it has to be analyzed by an

15  economist.  And the Jones Day pitch book 20 months ago to the

16  City of Detroit said if you, you know, want to prove that

17  you've done everything you can with respect to tax policy,

18  you will likely need expert testimony, so there just isn't

19  any question about whether there's been some element of a

20  surprise on this point.

21        And I think the additional reason that I advanced

22  that Buckfire Daubert motion is just more broadly so that you

23  can see when I am telling you that I am amazed that they are

24  racing this case to trial on this evidentiary record, I am

25  not just spouting off.  I will show my work, and it's not

 1  just on that point.

 2          I will just make a simple point on the prejudice

 3  both from a legal standpoint and from sort of time and

 4  expense, but what I'm concerned about on the legal point is

 5  they say, "Well, Ms. Sallee will just testify in the rebuttal

 6  case, so it won't come in in our case in chief, and so if we

 7  haven't made our case in chief, then, you know, you can seek

 8  a directed verdict then, so it really won't have changed the

 9  state of play in the rebuttal -- in the case in chief," but I

10  think there's the potential for legal prejudice if

11  Mr. Buckfire is allowed to come forward and say, "Oh, well,

12  looks like Mr. Cline and I got our signals crossed a little

13  bit," and he actually had done absolutely nothing on the

14  subject I actually described a bunch of conversations with

15  him about, but don't worry because Ms. Sallee, after the

16  fact, she did a Chicken Little analysis of what would happen

17  if the petition were dismissed, and it turns out it's exactly

18  the catastrophe that I predicted it would be, so it turns out

19  that I was right after all.  So to the extent experts are

20  trying to now grab onto her opinion to support their own,

21  that would be a form of prejudice to us.  I think that this

22  motion puts the Court in a tough spot because I think you

23  either have to say, "Okay.  I'm going to move the schedule to

24  allow for depositions and new expert reports or Daubert

25  motions or whatever, document discovery," or you say, "I'm

 1  not going to move the schedule because I can't move it again,
 2  and we've got to get this case tried, and I'm going to make
 3  Syncora now have to run around and do document discovery and
 4  take depositions and decide what to do with her report while
 5  it should be preparing for trial and while it already has an
 6  enormous amount that it needs to do."  I think either way, no
 7  matter which decision you make on whether to move the date, I
 8  think that there's going to be prejudice for Syncora, and
 9  there's obviously expense associated with this.  These are
10  nontrivial items.

11          I wanted to just -- if I could close briefly by
12  saying that I had sort of resolved today that I would not
13  argue the merits of the Sallee opinion over much because
14  that's not what's up today and because it is truly my view
15  that it ought not to come in, but you notice that there's an
16  obvious fit problem with the opinion because it makes an
17  obvious methodological error, which is that it assumes the
18  pension and OPEB claimants have accelerated claims.  So when
19  you look at that $9 billion number -- and I don't have their
20  motion in front of me, but something like 7.7 of it or -- I
21  don't have the number -- a large percentage of that $9
22  billion judgment is ostensibly the accelerated claims of the
23  pension and OPEB, but OPEB is pay as you go, and pension --
24  it's been acknowledged that with the UAAL under Michigan law
25  you amortize it over 30 years.  This is why the subject is so

1    fascinating to the COPs because if the COPs are, in fact,

2    valid, what makes the COPs so different from everyone else in

3    a dismissal scenario is that there isn't a dispute subject to

4    invalidity that the service contracts have accelerated.  So

5    when you do a proper claims analysis of, you know, what are

6    the claims that are chasing what dollars in a dismissal

7    scenario, you have to understand the city's operating surplus

8    above it's -- its net operating surplus, and you separately

9    have to understand, well, what will it get out of the tax

10   levy.  That is of particular interest to the COPs because the

11   COPs are the big dog potentially in that class.  They are the

12   billion four.  The pensioners and the healthcare claimants

13   who went for 5.7 billion and 3.5 billion at the outset of the

14   case -- you know, you're talking 9.2 billion of the

15   approximately 12 billion in general unsecured claims for

16   pension and OPEB.  They shrink down in a dismissal scenario

17   in terms of what they're asserting on an annual basis, so it

18   proves two things.  It proves both that the question is very

19   complex.  It also proves that the outcome is very uncertain

20   in terms of whether a dismissal would really be bad for the

21   COPs.  And so I do think that this is another reason to look

22   at the Sallee report and say they rushed this thing together

23   and they said assume $9 billion in judgments surrendered

24   instantaneously, and then we'll go tell the judge that it --

25   you know, it's dogs and cats living together in the City of

1    Detroit, and that'll be that.  That'll be good enough.  It's
2    much more complicated than that, and that's why it's such an
3    error for them to wait until discovery is done to put this
4    together.  This is something that should have been done
5    earlier because -- you know what's interesting, your Honor,
6    is one of the interesting parts of the case has been about --
7    has been the subject of revitalization of Detroit because I
8    think all of us attorneys that have come to the city here and
9    even as we vigorously represent Syncora or we vigorously
10   represent FGIC or the other parties, we see what's going on
11   in the city, and we understand the notion that you said in
12   your eligibility opinion.  You said the city needs help, I
13   think.  But it is an interesting question under Chapter 9,
14   and I think it's not a well-resolved question as to, well,
15   what -- how exactly and to what extent should a city seek to
16   revitalize itself when it goes in?  An interesting check on
17   the issue is the best interest of creditors test because I
18   think at the backside on plan confirmation, even if a city
19   has decided to revitalize itself though it's Chapter 9
20   proceeding, it must show up and be able to make the case that
21   says I did revitalize myself, and I did fund the
22   revitalization with your monies, but, look, you all are doing
23   better than you would had I not, and so it's that type of
24   comfort as a creditor to know even as they are pursuing, you
25   know, new information technology and giving raises to the

1  employees to kind of counteract what was done in 2010 and on

2  and on, a significant amount of anticipated public spending,

3  you have the comfort of knowing that on the backside they

4  have to prove that this was worth the candle.  And so this is

5  just so fundamental to such an elemental part of the

6  Bankruptcy Code, we don't believe that there is any element

7  of surprise here.  We don't believe extraordinary cause has

8  been shown here, and I think the city, after making a

9  decision that it really wanted to get to this trial as fast

10  as it could, has to take the bitter with the sweet on that

11  and take the evidentiary record that we develop prior to the

12  close of discovery.  Your Honor, I don't have anything else

13  on this point.

14        THE COURT:  Can you be a little more specific about

15  how your client or your preparation for trial would be

16  prejudiced if this motion is granted?

17        MR. HACKNEY:  I can, your Honor, and should I assume

18  in answering your question that the trial date stays the

19  same?

20        THE COURT:  Yes.

21        MR. HACKNEY:  Okay.  So first there will be expense

22  associated with the new report, so there will be expense in

23  terms of analyzing the report, working with our experts,

24  taking Ms. Sallee's deposition, and then drafting a Daubert

25  motion against it because it will be the subject of a Daubert

1   motion for the reasons I've already identified, if not more.

2          THE COURT:  Well, those are expenses that would have

3   been incurred if this had been timely disclosed.

4          MR. HACKNEY:  Well, that's true, but I guess that's

5   sort of counter-factual.  I guess that would almost be a way

6   of saying you're never prejudiced by late disclosure because

7   if there hadn't been late disclosure, then you would not have

8   been prejudiced, so I think that -- but that's -- put the

9   expense over to one side.  Okay.  I think from a practical

10  matter Mr. Smith has been the gentleman who's been trying to

11  understand the city's forecasts and working with Dr. Meyers.

12  What it would require of Mr. Smith in the next two weeks is

13  that now he's going to have to analyze the report, get the

14  document discovery, work with Dr. Meyers on it, prepare for a

15  deposition of her, and then we will have to draft a Daubert

16  motion at some point.  I'm assuming that you would extend the

17  deadline of that for her.  So there would be a nontrivial

18  amount of distraction for Mr. Smith, who also has a number of

19  cross-examinations.  He did the first one.  He will have

20  other cross-examinations of people at trial.  So I'm sure you

21  know how stressful it is to get ready for trial because there

22  is enough to do in its own right.  We'll be adding in a

23  nontrivial piece at a very inopportune time, so there is a

24  practical side to the prejudice.  I guess from my standpoint

25  I look at it a little bit differently.  I do see the

1  prejudice, and it concerns me.  I am more like we never get

2  to prejudice because there isn't a good reason for us to be

3  standing here today debating it, but I don't mean to fight

4  the hypo from your Honor, and that's my answer to the

5  question.

6          THE COURT:  Thank you.

7          MR. HACKNEY:  Thank you very much, your Honor.

8          THE COURT:  One second, Mr. Stewart.  Is there

9  anyone else who'd like to speak in opposition to the motion?

10         MR. PEREZ:  Yes, your Honor.

11         THE COURT:  Go ahead.

12         MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

13  on behalf of FGIC.  We filed a joinder, and I'll be very

14  brief, your Honor.  In each one of the scheduling orders the

15  Court has set out a standard of extraordinary cause, and I

16  just don't think it's here.  The fact that somebody didn't

17  think this was going to be in the case when, in fact, it's

18  been disclosed for a long time just doesn't rise to the level

19  of extraordinary cause.  I don't know what does, but that

20  doesn't.  Thank you, your Honor.

21         THE COURT:  All right.  Sir.

22         MR. STEWART:  First of all, just as a factual

23  matter, Ms. Sallee was deposed, your Honor, on the 24th of

24  July, about four weeks ago.  That's when her deposition took

25  place.  I think you'd asked Mr. Hackney.  I looked it up.

1          THE COURT:  Okay.  Thank you.

2          MR. STEWART:  A couple of things.  Let me deal with

3     the tax policy issue.  Ms. Sallee is not testifying on tax

4     policy.  This isn't a tax the city imposes.  This is a tax

5     the city has imposed on them.  This isn't anything

6     discretionary.  The city can't raise taxes unless the

7     Michigan legislature raises taxes.

8          Now, it's an interesting matter of law whether, you

9     know, as part of this analysis the city should be viewed as

10    having an obligation to get the state to raise taxes and

11    there be proofs on what the legislature might do and so on,

12    but the fact of the matter is the tax policy analysis

13    Mr. Hackney referred to is not an analysis one would do here

14    because there is no -- there are no taxes the city can raise.

15    And I think this has gotten kind of confused in the mix, but

16    I wanted to get that to one side.

17         Secondly, I wanted to make a distinction.  There's a

18    difference between an issue being in the case -- and the case

19    has thousands of issues -- and having expert opinion rendered

20    in the case.  This is a brand new expert opinion, and, in

21    fact, I don't think Mr. Hackney and I disagree this is the

22    subject for expert testimony because of its character.

23    There's only one of these -- of all the expert opinions we

24    got, only one where we feel the need to add something.  I

25    would point out, though, this is not the case where this is

1  Ms. Sallee doing something totally unusual.  In fact, she

2  begins her analysis with Dr. Meyers' own spreadsheets.  So

3  the question really comes down to is the city allowed, as the

4  objectors have been allowed, to dispute the expert opinions

5  of the other side.  We seek to do it only in one case, but,

6  if not, then the system as set up means all of our expert

7  opinions were subject to review and rebuttal and so on.

8  Their expert opinions are not.  And as to their expert

9  opinions, we're reliant on our ability to cross-examine,

10  which we will do, but we're not allowed to put in one of our

11  own.  If this were a case where we had a dozen of these or

12  introducing brand new experts, I could see the cause for

13  alarm, but we're not.  It's an existing expert, one opinion.

14  There are a total of three new sources that Ms. Sallee has

15  added above and beyond those that she had mentioned in her

16  original expert report.  It's a rebuttal opinion, something

17  we may not get to for many weeks, so there's plenty of time

18  to do it.  I understand Mr. Hackney's illusion to the

19  prejudice he would suffer.  I can understand taking another

20  deposition at this time is difficult.  At the same time,

21  there's prejudice to us, too.

22          THE COURT:  When would you propose that that be

23  done?

24          MR. STEWART:  Whenever they would like, as early --

25  if they want to do it tomorrow, I'll see if I can schedule it

1   for tomorrow. It's rebuttal. They could do it anytime

2   between now and the rebuttal case, which is probably October.

3          THE COURT: Well, we're going to be in trial between

4   a week from Tuesday and the rebuttal case.

5          MR. STEWART: Your Honor, I understand. I

6   understand, but Mr. Hackney made a -- in his papers talked

7   about how the schedule had required everyone to rush and how

8   little time they had to respond to ours. We put Ms. Sallee's

9   supplemental report together, and we were criticized for it,

10   as quickly as we could so that there would be as much time as

11   possible. Given the reality, which is if we do have the

12   right to rebut one of their expert opinions, there is no

13   other way of doing it other than the time we have available,

14   we've done all we can to limit and -- you know, to limit any

15   prejudice or whatever. And I understand that they're --

16   their complaints, but this is a time where everyone is

17   working very hard. And for Mr. Smith to take a short

18   deposition of one witness I don't view as being overwhelming

19   prejudice to him. For us not to be able to even offer a

20   rebuttal opinion to a new opinion they offer is prejudicial

21   to us, especially on this point.

22          Mr. Hackney raised other points. I'm not going to

23   take more of the Court's time. I think the issue does come

24   down to the balance of prejudice to the two sides, and I

25   think we've described those in detail. Thank you, your

1  Honor.

2  THE COURT:  All right.  Anything further from anyone

3  on this?  All right.  I'm going to take this under advisement

4  for a few minutes.  Let's reconvene at 9:50, please.

5  THE CLERK:  All rise.  Court is in recess.

6  (Recess at 9:37 a.m., until 9:50 a.m.)

7  THE CLERK:  All rise.  Court is in session.  Please

8  be seated.  Recalling Case Number 13-53846, City of Detroit,

9  Michigan.

10  THE COURT:  The Court is satisfied that the record

11  does establish adequate cause for the relief sought here,

12  and, accordingly, the motion is granted.  The primary issue

13  that the motion raises is whether the proposed expert opinion

14  and the report in support of it are in the nature of rebuttal

15  or should have been presented as part of the city's primary

16  discovery in support of its primary case.  The Court

17  concludes that it is more in the nature of rebuttal than

18  otherwise.  It is sometimes difficult to draw the line

19  between what should have been in a party's main case and what

20  is appropriate for rebuttal, but what makes it clear enough

21  that this is rebuttal is that it is in response to the expert

22  report proposed by Syncora here.

23  A second although not secondary issue is the extent

24  of prejudice to Syncora, and undoubtedly it will put an extra

25  burden on the preparation for trial to grant this motion.

1    Still, the Court concludes that that prejudice can be

2    mitigated to a substantial extent by accommodating in any

3    reasonable way Syncora's interest in obtaining appropriate

4    discovery relating to this report, including deposing the

5    witness on the report and in being given a full opportunity

6    to present whatever Daubert motion or other motion Syncora

7    determines or other parties determine is appropriate.  These

8    accommodations may well involve taking time off from trial,

9    but if that's necessary, so be it.

10         Finally, the Court notes that there is merit in the

11   city's observation that scheduling orders that the Court

12   adopted earlier on in the case did contain provisions for

13   accommodating these kinds of circumstances, and for whatever

14   reason the Court dropped those out in the later versions of

15   the order.  At this point, I wish I could remember why I did

16   that, but I can't.

17         So, in any event, the motion is granted.  The Court

18   will ask counsel to work together to accommodate in any

19   reasonable way Syncora's procedural interests in discovery

20   and motion practice in relation to this new report.  As I

21   said, if that involves taking time off of trial, we will

22   certainly give that every favorable consideration.

23         Let's move now to our status conference.

24         MR. HACKNEY:  Your Honor, may I ask --

25         THE COURT:  Yes.

1    MR. HACKNEY:  -- to clarify just a few pieces of

2    that?

3         THE COURT:  Sure.  Go ahead.

4         MR. HACKNEY:  And I promise not to reargue.  Stephen

5    Hackney on behalf of Syncora.  I just wanted to clarify the

6    Court's ruling, which is, as I understand it, it says that

7    it's appropriate for the city to provide the rebuttal opinion

8    testimony of Ms. Sallee in its rebuttal case to the extent I

9    introduce the opinions it purports to rebut from Dr. Meyers

10   in my case.

11        THE COURT:  Yes.

12        MR. HACKNEY:  The second thing is I do want to

13   clarify that I think it --

14        THE COURT:  By that you mean that if you decide not

15   to produce that, then --

16        MR. HACKNEY:  That's right.

17        THE COURT:  -- the city doesn't get an opportunity

18   to present to the Court this rebuttal opinion.  I think the

19   answer to that is yes.

20        MR. HACKNEY:  Okay.  I just wanted to clarify it.

21   The second thing is I think it ought to be clear that the

22   experts of the city that do testify in its case should not be

23   able to point to the rebuttal opinion of Ms. Sallee as a

24   basis for their opinion given that it was not work that had

25   been done at the time they rendered their opinion.  Otherwise

1   it will circle its way --

2           THE COURT:  Well, let me not give you an advisory

3   opinion on that but ask you to bring that issue up when and

4   if that ever happens.

5           MR. HACKNEY:  I will.  I will be vigilant.  You can

6   be sure of that.

7           THE COURT:  Okay.

8           MR. HACKNEY:  Oh, the third thing I just wanted to

9   say was I would appreciate it just -- there's a point here

10  that will come up later in the status conference that I'd

11  like you to also perhaps consider as a way to mitigate some

12  of the risk, which is -- some of the prejudice, which is I

13  really think it would be helpful if the city laid out now

14  what witnesses are testifying when.  And you're going to hear

15  from Ms. Quadrozzi on this subject for an unrelated reason,

16  and it's going to go to the subject of witness order.  That

17  process -- given that they control their own case, they know

18  what the witnesses are.  Like I don't think it puts them in

19  the hardship in terms of making them say that now.  That will

20  help me because then I'm going to look at that and understand

21  Mr. Smith's workload and then understand where I can fit this

22  in.

23          THE COURT:  Well, this is a question that I also

24  intended to raise in the status conference, so --

25          MR. HACKNEY:  Okay.

1        THE COURT:  -- let's just hold on that.

2        MR. HACKNEY:  Great.  Thank you, your Honor.

3        THE COURT:  Okay.  So let's turn to the status

4   conference.  I've got a list of things I want to address

5   here, so let me just start in, and then if there are other

6   issues -- if there are other issues that others want to

7   raise, then, of course, we will consider those as well.  The

8   first relates to the final pretrial conference, which is now

9   scheduled for next Friday.  Is there any objection to moving

10  that to the morning of trial on September 2nd?  That would be

11  my preference.

12       MR. SHUMAKER:  None from the city, your Honor.

13       MR. HACKNEY:  And I told you I would caucus with the

14  objectors, and there is also none from the objectors.

15       THE COURT:  All right.  So let's order that.  The

16  final pretrial conference will be 8:30 then on the 2nd.  Now,

17  I did schedule a status conference in what I'll call the

18  water adversary proceeding also for, I think, 8:30 that

19  morning.  Is that right, Chris?  I don't expect that to take

20  but a few minutes, and then we'll start with the final

21  pretrial conference.  And then when that is done, we'll start

22  with the opening statements.

23       I want to discuss the procedures in relation to

24  motions and most specifically motions in limine or Daubert

25  motions.  We have a deadline for the filing of those, and we

 1    have a deadline for the responses to those; right?  I know
 2    that the process for resolving those motions has not been
 3    fixed, and I know it would be good to try to do that.  My
 4    problem is that it's a little bit difficult for me to fix a
 5    procedure for the resolution of those until I actually see
 6    what they are.  I have a gut feeling that some of them we may
 7    be -- may well be able to address at the final pretrial
 8    conference, but some of them would be more efficiently
 9    addressed in the context of the testimony of the witness who
10    is the subject of the motion.  So I know this may put you at
11    a bit of discomfort.  I'm going to suggest to you that it's
12    going to be hard for me to outline this or fix this for you
13    until the final pretrial conference.  Any serious or
14    strenuous objections to that?
15            MR. SHUMAKER:  That's fine with the city, your
16    Honor.
17            MR. HACKNEY:  I agree, your Honor.  If I could just
18    say I think -- I understand your predicament, and I agree.
19    The only thing that I would say is perhaps if the Court sees
20    that some of the Daubert motions are so strong that they
21    maybe don't require you to wait until that witness testifies,
22    it may have an important impact on the parties as they get
23    ready to try the case, so --
24            THE COURT:  Okay.  What is the date for -- or the
25    deadline for the responses to the motions?

1    MR. HACKNEY:  It's the 27th, but we moved our date

2  to file them up, I believe.  I don't know if we did it

3  formally, but we went to the city and agreed.  I think it's

4  tomorrow.

5    MR. SHUMAKER:  Tomorrow, exactly.

6    MR. HACKNEY:  Yeah.  So tomorrow we file these

7  motions, and they have -- both sides have until the 27th to

8  respond to each other.

9    THE COURT:  Okay.  One second here.  Well, it does

10  strike me that it may be possible for me to give you notice

11  on either the 28th or 29th if any of them are appropriate for

12  argument at the final pretrial conference.

13    MR. HACKNEY:  That would be --

14    THE COURT:  I assume that would help you, so let me

15  try to do that --

16    MR. SHUMAKER:  That would be terrific.

17    THE COURT:  -- at least that much.  Okay.  I do

18  propose that we argue the issues raised in the briefs

19  concerning the admissibility of Ms. Kopacz's report.  We have

20  that argument concurrently with the argument on any Daubert

21  motions that relate to her opinion.  I think, Mr. Hackney,

22  you did disclose your intent to file such a motion.  Okay.

23  Is that okay with everyone then?

24    MR. SHUMAKER:  Certainly.

25    THE COURT:  All right.  Oh, I've been reminded here

1  that we do -- we did, I think, yesterday or maybe the day

2  before set a hearing on the motion to exclude a portion of

3  Mr. Buckfire's testimony for the first day of trial, so that

4  is going --

5          MR. HACKNEY:  Okay.

6          THE COURT:  -- at that time regardless.  Okay.  So

7  we'll do that after this adversary status conference and

8  probably before the final pretrial conference.  Okay?

9          Exhibit numbers.  I was, frankly, a bit disappointed

10  that the city did not follow my guidance in using only

11  numbers for exhibit numbers.  We had Exhibits 112-A, B, and

12  C, and maybe there were other letters involved.  I really

13  want only numbers.  In fact, it may be momentarily confusing

14  to change what was already admitted into evidence, but I'm

15  going to ask you to do that, and we will adjust our orders

16  admitting evidence accordingly.

17          MR. SHUMAKER:  We'll do that, your Honor.

18          THE COURT:  Same on the creditors' side, only

19  numbers.  Thank you.  All right.  Now let's discuss this

20  issue of the order of witnesses.  Does the city have any

21  objection to identifying at some point next week or by the

22  latest at the final pretrial conference the order of the

23  witnesses that it intends to call?  I request that because,

24  as you saw in my order of yesterday, we need to try to keep

25  some of our unrepresented parties advised as to when they

1  should appear at trial to question some of the witnesses,

2  and, Ms. Quadrozzi, was this an issue you wanted to address

3  as well?

4      MS. QUADROZZI:  Yes, your Honor.  If I may be heard

5  on this --

6      THE COURT:  What was your request?

7      MS. QUADROZZI:  Your Honor, Jaye Quadrozzi on behalf

8  of Oakland County.  Your Honor, the way my issue ties into

9  the issue that you're raising right now, which is witness

10  order, really came about as a result of the stipulation that

11  was filed and then entered by your Honor day before -- so the

12  19th relating to the DWSD financial parties, and I had a

13  couple of points of clarification that I just wanted to make

14  sure we were all on the same page with.  I did have an

15  opportunity to speak with the city this morning, but just for

16  a point of clarification, that stipulation with respect to

17  the definition of DWSD bond issues in that stipulation is

18  broad enough, you know, in essence, to encompass my entire

19  case, let's say.  The portions of the stipulation that let

20  the city and the DWSD financial parties not proceed to file

21  motions in limine or to file pretrial -- there are portions

22  of the pretrial order that deal with the DWSD bond issues.

23  As I understand it -- and I said I've spoken with the city --

24  they intend to file any pretrial brief sections dealing with

25  my case, the county case, at the time frame already set by

1    your Honor, so not affected by the stipulation.  I believe

2    they also confirmed the same thing with respect to any

3    motions in limine.  If they have motions in limine or

4    Daubert-style motions for county experts, they will file them

5    on your Honor's already set schedule, and they'll not be

6    withholding those as a result of the stipulation.  Is that

7    correct?

8          MR. SHUMAKER:  That's correct.

9          MS. QUADROZZI:  So I then next move to the witness

10   order, and if I could, as I understand it, what they're

11   attempting to do via the stipulation and the order that your

12   Honor entered was to separate sort of two things at the same

13   time, one, to separate out witnesses and also at the same

14   time to separate issues.  And my concern is that the two of

15   them, your Honor, are pretty intertwined.  Let me just give

16   you one example.  If you look at the city's witness list --

17   and I certainly don't purport to know what order it is.  I

18   just know that number one happens to be Kevyn Orr.  Mr. Orr,

19   I would expect in his presentation by the city, would

20   certainly be asked about the reasons for the bankruptcy.  I

21   will tell you, having been at his deposition, that he

22   identifies DWSD and some operational issues at DWSD as one of

23   the bases for the bankruptcy, so that's going to mean if they

24   put Mr. Orr up they're either not going to have to ask him

25   those questions or even though the city and DWSD financial

1  parties are not going to present issues, that would be my

2  opportunity to cross.  Now, if they just don't ask him those

3  questions, then we go back to the discussion your Honor and I

4  had at the prior pretrial that this is just incredibly

5  inefficient.

6         The second issue, so if you look at it by topic,

7  they've tried -- they're trying to -- and the stipulation

8  tries to separate out the DWSD pension contributions -- it's

9  not defined, but, you know, let's say the 428 -- from the

10 other pension issues, non-DWSD pension contribution.  Again,

11 unfortunately, those are completely intertwined.  The DWSD

12 pension contribution goes into the GRS, which is one system,

13 and pooled and the methodology and everything behind that, so

14 they're all real tied together.  So, again, my concern is

15 it's going to be a really -- it's going to be a very hard

16 line to police, and I'm just not sure how we do it, so as a

17 solution -- and this may not be exactly how the city wants to

18 proceed, but it makes perfect sense.  I looked at the city's

19 witness list, and there are more than a dozen witnesses here

20 that have absolutely nothing to do with DWSD issues.  I mean

21 I will tell you, and I think I can speak for all of the

22 counties, that we don't have anything to ask anybody at

23 Christie's or the DIA or Mr. Penske or Mr. Gilbert or Mr.

24 Rapson or Mr. Plummer or Mr. Satter or Mr. Stibitz at the

25 Michigan Department of Treasury just as an example, and

1    that's not even a complete list.  There are plenty of
2    witnesses to get well past the later of go or no go on the
3    DWSD financial party settlement or September 12th, which is
4    the date the stipulation puts in, so my request would be that
5    I think it would be the most efficient, the less complicated,
6    and the least prejudicial way to proceed to just go with
7    those witnesses first, and then when the issue is resolved,
8    then come back and hit the other witnesses.  There we're not
9    dealing with the problem of what can he talk about, what he
10   can't talk about, you know, what witnesses you can put on and
11   what you can't put on because of the complicated intertwined
12   pension issues, so that would be my request, your Honor.
13              THE COURT:  Thank you.
14              MR. SHUMAKER:  Good morning, your Honor.  Greg
15   Shumaker of Jones Day for the City of Detroit.  Starting out
16   with Ms. Quadrozzi's first point and to the extent there is
17   some intermingling, I don't think this is going to be a
18   problem.  I think that the stipulation is set up such that
19   everything that's going to happen with the tender, if it
20   happens, is going to occur before September 4th, and we're
21   not -- we may be, you know, just completing closing -- I mean
22   openings at that point in time, so the ordering of witnesses
23   along the lines that Ms. Quadrozzi suggests, although I would
24   object to it for other reasons, I just don't think would be
25   necessary.  You know, we obviously are going to stage our

1    witnesses in a certain manner.  I don't believe that the DWSD

2    witnesses will be at the front of the case.  But in any

3    event, the stipulation is going to --

4         THE COURT:  Well, but how do you deal with the

5    specific example she cited in relation to Mr. Orr?

6         MR. SHUMAKER:  Well, Mr. Orr -- I guess my response

7    to that is that Mr. Orr won't be first, so he's going to

8    be --

9         THE COURT:  So are you -- is it your representation

10   to the Court that, in any event, his testimony would be later

11   in the case --

12        MR. SHUMAKER:  That's right.

13        THE COURT:  -- so it wouldn't be an issue?

14        MR. SHUMAKER:  That's correct, your Honor, yes.  And

15   if I might, your Honor, then in terms of witness order and

16   understanding everyone's desire to know, what we would

17   suggest because there's obviously a lot of witnesses and a

18   lot of schedules that are being worked around, that we come

19   up -- agree to some sort of witness identification on a

20   rolling basis that -- because we're still, you know, trying

21   to lock down dates people are out of the country, these sorts

22   of things.  Obviously the witnesses we want to put on are

23   asking the same questions of us as the objectors are and your

24   Honor is, and we're trying to nail all that down now, but if

25   there was a way for us to do it on a rolling basis through

1   trial, you know, give the -- you know, a notification that

2   these will be the next three witnesses, these will be the

3   next five, sufficiently in advance so that everyone could get

4   ready for their cross-examinations, that's what we would

5   propose, and it would obviously extend to the city when the

6   objectors are putting on their case because there's some

7   days, your Honor, when --

8           THE COURT:  Well, that --

9           MR. SHUMAKER:  -- people are just not available, and

10  if we hit that point and someone is out of the country for a

11  week, obviously it presents issues.

12          THE COURT:  I certainly understand the city's need

13  to accommodate the schedules of certain witnesses, although

14  I'm, frankly, having a hard time understanding why any of the

15  city's witnesses thinks there's anything more important to do

16  than to attend a trial at which the future of the City of

17  Detroit will be determined, but setting that aside --

18          MR. SHUMAKER:  I completely understand that, your

19  Honor.

20          THE COURT:  Why can't we have an ordered list that's

21  tentative at the beginning of the trial subject to those

22  kinds of changes that may be necessary depending on how the

23  case flows?

24          MR. SHUMAKER:  Your Honor, if it's a tentative list

25  where we are able to move witnesses based upon where they

1  fall and how things progress, I think we could do that.

2      THE COURT:  All right.  Let me ask you to do that

3  and bring that to the final pretrial conference.

4      MR. SHUMAKER:  Will do, your Honor.

5      THE COURT:  And then I think even that kind of a

6  tentative list will allow all of us the comfort that I think

7  we need in dealing with not only the water issues that Ms.

8  Quadrozzi raises but my issues in dealing with the

9  unrepresented parties and any other issues as well.

10      MR. SHUMAKER:  Understood, your Honor.  And then for

11  the objectors on their -- when we come to their case, is

12  there a time when they would provide the city with its --

13      THE COURT:  Um-hmm.

14      MR. SHUMAKER:  -- witness list and their order, if

15  you will?

16      THE COURT:  Is there any objection to that?

17      MR. HACKNEY:  No, there isn't.  I just wanted to

18  note that September 2nd is the date of the final pretrial, I

19  think.  It's now right before the start of trial, so I just

20  wanted to say it might be more useful to get the city's list

21  a little in advance of that to the extent the Court is

22  willing to consider that, but with respect to the objectors,

23  I think what will drive our witness order and decisions will

24  principally be how we're doing on time, so there's no problem

25  giving them a projection at the --

1        THE COURT:  Okay.

2        MR. HACKNEY:  -- outset of the case that says if I

3   have tons of time, this is what I'm going to do with the

4   caveat that if the time evaporates you'll move stuff around.

5        THE COURT:  Can you provide this tentative list by a

6   week from today?

7        MR. SHUMAKER:  Yes, your Honor.

8        THE COURT:  All right.

9        MS. QUADROZZI:  Your Honor, if I may just briefly be

10  heard.  I appreciate the city's acknowledgement that Mr. Orr

11  is not going to be first.  Mr. Orr was just illustrative of

12  the intertwined issue that we have, so --

13       THE COURT:  Um-hmm.

14       MS. QUADROZZI:  -- I'd just note that for the record

15  with respect to Mr. Buckfire, Mr. Moore, Mr. Malhotra -- and

16  those are like the first four that are right now on their

17  will call list -- we have that exact same --

18       THE COURT:  Um-hmm.

19       MS. QUADROZZI:  -- concern.

20       THE COURT:  All right.  Let me ask you to hold on

21  further discussion of this until we see what the order is,

22  and we can pick this discussion up at the final pretrial

23  conference.  And if it's appropriate to insist that the city

24  reorder some witnesses, I'll do that, but let's hold until we

25  see what they produce.

1          MS. QUADROZZI:  Thank you, your Honor.

2          THE COURT:  Okay.  So that was actually all I had on

3     my list of things to discuss this morning.  Is there anything

4     anyone else would like to raise?  Sir.

5          MR. SCHWINGER:  Your Honor, Robert Schwinger from

6     Chadbourne & Parke for Assured Guaranty Municipal

7     Corporation.  Just as one follow-on point to the last

8     subject, I do want to point out that in the stipulation that

9     was done between the city and the DWSD financial parties,

10    there is an express provision in paragraph 2 which says that

11    to the extent there are any fact or expert witnesses that the

12    city intends to call at the confirmation hearing whose

13    testimony is intended to address both DWSD bond issues and

14    other issues, the city shall defer calling such witnesses

15    until essentially the date where we know what's going on.

16         THE COURT:  Okay.  Thank you for bringing that to

17    our attention.  That'll certainly impact the ordering of

18    witnesses.  Mr. Howell.

19         MR. HOWELL:  Good morning, your Honor.  Steven G.

20    Howell, Dickinson Wright, special assistant attorney general

21    appearing on behalf of the state.  I just wanted to note to

22    the Court that obviously we are a party to this.  We will be

23    actively monitoring and observing and from time to time

24    participating primarily with the possibility with Matthew

25    Schneider or myself for opening and/or closing.

1    THE COURT:  Um-hmm.

2    MR. HOWELL:  And so we will be wanting to make sure

3  we get exhibits, and we're working with the city to try to

4  coordinate that.  I will be, with the permission of the

5  Court, bringing a laptop in with the exhibits on it, but I

6  would need the Court's permission to do that and make sure I

7  can clear the marshals on that, and so we will be obviously

8  watching this very closely and involved with it, so I just

9  wanted to note that for the record for the Court.

10    THE COURT:  Okay.

11    MR. HOWELL:  Thank you.

12    THE COURT:  And in response not only to you but to

13  anyone, I think the most efficient way to get the necessary

14  process completed for you to bring your electronic devices

15  in, your laptops or whatever, is to send us a letter telling

16  us what you want to bring in.  I'm satisfied to grant

17  permission for any days that we are in trial, so I'm not

18  going to ask you to specify any particular dates, but I do

19  think we need to specify the machinery you want to bring in.

20    MR. HOWELL:  That's not a problem, your Honor.  I've

21  spoken with the marshals.

22    THE COURT:  So send us a letter, and then we'll

23  communicate our approval to the U.S. Marshals.

24    MR. HOWELL:  Yeah.  And I've communicated to the

25  marshals and indicated that I will come to their office and

1    communicate with them in addition to your Honor's permission.

2         THE COURT:  Okay.

3         MR. HOWELL:  Okay.  Thank you, your Honor.

4         MR. LERNER:  Your Honor --

5         THE COURT:  Yes.  Who's on the line?

6         MR. LERNER:  Hi, your Honor.  It's Stephen Lerner of

7    Squire Patton Boggs on behalf of Ms. Kopacz.  Your Honor

8    indicated earlier that the arguments with respect to both

9    admissibility of Ms. Kopacz's report as well as expected

10   Daubert motions will be heard at the same time, but it wasn't

11   clear to me if your Honor had set a date for that argument.

12   That was the first question.  And the second is that at a

13   prior status conference, I think your Honor indicated that

14   depending upon what may be filed with respect to Daubert

15   issues, that Ms. Kopacz may have an opportunity if the Court

16   is so inclined to allow us to respond to that and just would

17   like some clarification on what your Honor intends or expects

18   with respect to that.

19        THE COURT:  I don't really have any intention or

20   specific expectation until I see what the motions say, and it

21   is not yet set for hearing; right?  So I'm going to have to

22   ask you to hold tight on that and keep monitoring it, and,

23   you know, we will certainly address that in due course.

24        MR. LERNER:  Great.  Thank you very much, your

25   Honor.

1          THE COURT:  You're welcome.

2          MR. HACKNEY:  Your Honor, Stephen Hackney on behalf

3     of Syncora.  I had a number of issues I was hoping to raise

4     with you ranging from nuts and bolts to some observations on

5     recent developments.

6          One thing that I'm sorry to do from the podium --

7     I'm happy to file a formal motion, but I was going to see if

8     it would be possible to move the hearing on the motion to

9     strike our supplemental report, Section 1, backwards a day.

10    I have a personal commitment on Monday that would prevent my

11    attendance at the hearing.  And though Mr. Kieselstein is a

12    capable advocate and is available to argue, the motion

13    suggests that sanctions ought to be levied against me

14    personally.

15         THE COURT:  Well, I have to tell you I'm not

16    available on Tuesday, so if it's moved, it would have to be

17    moved till the morning of trial.

18         MR. HACKNEY:  Okay.  I mean I want to be here in

19    person for that, and I'm not able to on Monday, and that's

20    the only reason I'm raising it.  I have an --

21         THE COURT:  Well, let's inquire of the city, the

22    moving party, if they object to moving the hearing.

23         MR. SHUMAKER:  Your Honor, as I told Mr. Hackney

24    yesterday, we think, given the seriousness of the motion,

25    that it should proceed as quickly as possible.  I did say

1　that we would -- we could do it on Tuesday, but we do think
2　we have to be heard.

3　　　　THE COURT:  Is your commitment such that you're not
4　available by phone either?

5　　　　MR. HACKNEY:  It's a personal commitment in the
6　morning.  I would likely be able to call in, but it's just a
7　serious -- I mean it's a serious --

8　　　　THE COURT:  Okay.  Hang on one second.  I wonder if
9　we could do it in the afternoon.  Would that help you?

10　　　　MR. HACKNEY:  I think I would have a chance to get
11　here by the afternoon if it were --

12　　　　THE COURT:  I was thinking by phone in the
13　afternoon, but you think you could even get here in the
14　afternoon?

15　　　　MR. HACKNEY:  There is a chance that I could, yes.
16　I think I could get here by three or four in the afternoon.

17　　　　THE COURT:  Any objection to holding the hearing at
18　four o'clock on Monday?

19　　　　MR. SHUMAKER:  No.  I think that's fine, your Honor.

20　　　　MR. HACKNEY:  Thank you.

21　　　　THE COURT:  All right.  We'll change the time of the
22　hearing on the motion to strike to four o'clock on Monday.

23　　　　MR. HACKNEY:  Thank you, your Honor.  Your Honor, a
24　second nuts and bolts issue is we had discussed the other day
25　the issue of the demonstrative exchange with when you're

1  going to examine a witness or cross-examine a witness.  This
2  came up on the first day of trial.  And I'm sorry to --
3          THE COURT:  Oh, yes, yes.
4          MR. HACKNEY:  I'm sorry to do this from the podium.
5  It's ironic.  I normally try to keep these issues away from
6  the podium so we don't take up your time, but what's actually
7  helpful about doing it from the podium is that everyone is
8  here, so we get into sometimes information flow problems when
9  we're all outside, so I do apologize.  But I think we have to
10  answer a question.  The first question we have to answer is
11  do you want us to call to someone's attention, hey, these are
12  the three demonstratives I will use with Witness X 48 hours
13  in advance, or is it -- should the parties just get in the
14  habit of updating their exhibit list the night before?  We
15  have no position on the issue and are fine either way.
16          A second, I think, issue that we ought to just get
17  clarified here is one that always comes up, which is what is
18  a demonstrative.  In my world, a demonstrative is a depiction
19  of evidence that is not in itself evidence but is like in the
20  way of a chart or something that's summarizing and advocating
21  with respect to evidence.  It is not, for example, a
22  PowerPoint presentation that bullets out arguments or bullets
23  out admissions of the witness.  I don't consider that to be a
24  demonstrative.  The charts that were used the other day I
25  actually thought were good examples of a demonstrative

1    witness -- exhibit, but I thought that we should get clarity

2    on this because that's the other thing that people always get

3    wrapped around the axle on.

4              THE COURT:  Um-hmm, um-hmm.

5              MR. HACKNEY:  So we should -- I just raise that as

6    something we should knock out today.  I don't know if you --

7              THE COURT:  Okay.  So, well, let me just ask the

8    city, is there any disagreement in sort of general terms

9    regarding Mr. Hackney's definition of a demonstrative

10   exhibit?

11             MR. SHUMAKER:  Not generally, your Honor.  I agree

12   with how he's described it, although we would submit that it

13   can be admitted into evidence if a proper foundation is laid

14   and the Court believes it would be helpful.

15             THE COURT:  And I can't disagree with that but with

16   the understanding that it's only demonstrative.  I'm not sure

17   what the admission of it into evidence does, but --

18             MR. HACKNEY:  They're often marked for purposes of

19   identification, but --

20             THE COURT:  Identification, but --

21             MR. HACKNEY:  -- they are not admitted into evidence

22   because they aren't evidence.

23             THE COURT:  Well, they are helpful and can and

24   should be considered to the extent that there is other

25   evidence in the record of the facts that the demonstrative

1  purports to contain; right?

2          MR. HACKNEY:  That's right.

3          THE COURT:  All right.  So with that understanding

4  and for that limited purpose, I don't see why they're

5  otherwise not admissible.  All right.  But I think the more

6  complex issue is advance notice.

7          MR. HACKNEY:  Yes.  In the most recent pretrial

8  order that had been gone around, the proposal was that the

9  directing party would give 48 hours' notice because they have

10  a better chance to know what they're going to use.  The

11  cross-examining party would give 24 hours' notice.  And I

12  don't think either Ms. Quadrozzi or Mr. Perez or I have a

13  problem with that concept, so I think we can get to the

14  timing part of it, your Honor.  And maybe I can just leave --

15  maybe it's too complicated trying to work out what is and is

16  not a demonstrative today, and maybe it sounds like there's

17  sort of general accord on it and we can -- that can suffice.

18          THE COURT:  Well, as you go through your exhibit

19  list in advance of preparing the joint final pretrial

20  statement, perhaps you can designate which are demonstrative

21  exhibits by number, and if there's a disagreement about it, I

22  suppose we can try to work it out.

23          MR. HACKNEY:  Yes, absolutely.

24          THE COURT:  All right.

25          MR. HACKNEY:  Your Honor, I wanted to address

1    something that came up on Monday with Dr. --

2              THE COURT:  Before you go on --

3              MR. HACKNEY:  Yes.

4              THE COURT:  -- is there any objection from the city

5    on this 48-hour, 24-hour proposal that Mr. Hackney made?

6              MR. SHUMAKER:  There is not, your Honor.

7              THE COURT:  All right.

8              MS. O'GORMAN:  Your Honor, may I be heard on that?

9    Debra O'Gorman for Macomb County by the public works

10   commissioner and Macomb Interceptor Drain Drainage District.

11   I just have a concern about the 48 hours on weekends.  Could

12   we at least have one business day if the 48 hours comes on

13   weekends?

14             THE COURT:  I assumed that the 48 hours meant 48

15   business hours.

16             MS. O'GORMAN:  Okay.  Well, then that would be

17   perfect then.

18             THE COURT:  Let's say, you know, two business days

19   and one business day.

20             MS. O'GORMAN:  Perfect.  Thank you.

21             MR. HACKNEY:  Your Honor, I wanted to address an

22   issue that came up on Monday.

23             THE COURT:  Yes.

24             MR. HACKNEY:  You know, if we hadn't addressed that,

25   we would have had a bitter fight later about whether it was

1  business days or not.

2          THE COURT:  No, you wouldn't have.

3          MR. HACKNEY:  So I did want to address something

4  that came up on Monday and offer a view to the Court.  I

5  think there has been at times a question about whether it's

6  appropriate to cross-examine a witness with a document that

7  either that witness hasn't seen or that is not in evidence,

8  and I wanted to say that with respect to expert witnesses, in

9  particular, but I also believe with respect to witnesses who

10  are testifying about a business rationale or a business

11  judgment, they're testifying about a process that they

12  undertook, that it is my expectation that there will be

13  extensive cross-examination of witnesses with testimony of

14  other witnesses or with documents that they may have not seen

15  for the purpose of establishing that they did not consider

16  that evidence or testimony in making their decision.  And I

17  believe it has to be appropriate because you can see in the

18  30(b)(6) context the cases are legion that city officers or

19  corporate officers that deviate from the 30(b)(6) testimony

20  can be impeached with the 30(b)(6) testimony of the entity

21  for whom they're an agent, so there's no question that you

22  can impeach a witness with testimony from someone else, but

23  more broadly, in the expert context, experts routinely

24  offer --

25          THE COURT:  Well, but there's some distance between

 1   impeaching in those circumstances and confronting the witness

 2   with it.

 3        MR. HACKNEY:  There is difference between -- there

 4   is difference between impeaching by contradiction, which is

 5   what a Rule 30(b)(6) impeachment would be in my hypothetical,

 6   and confronting someone with testimony that may not be

 7   impeaching but that you are introducing to the witness for

 8   purposes of establishing that the witness did not consider

 9   that evidence.  And so that was the clarification --

10        THE COURT:  Okay.  So let's distinguish those two.

11        MR. HACKNEY:  Okay.

12        THE COURT:  If you're going to impeach one witness

13   with the testimony of another witness, it isn't appropriate

14   to ask the witness who's on the stand about the testimony of

15   another witness.  You can simply point out to the Court that

16   a different witness testified differently, and that should

17   constitute impeachment.  That's fine.

18        MR. HACKNEY:  Yes.  I mean I think there are times

19   when it may be appropriate to move admissions into evidence

20   much like you would move documents into evidence during a

21   witness' cross-examination because of the way it fits

22   together with the witness' testimony.

23        THE COURT:  And that's fine, too.

24        MR. HACKNEY:  Okay.  But with respect to experts,

25   I'd like to take it a step further, though, which is to say

1  experts, as we all know, routinely offer opinions that are

2  based on evidence that may not be independently admissible.

3  In fact, that's one --

4           THE COURT:  Right.

5           MR. HACKNEY:  -- of the famous parts of 702, so

6  there's just no question that an expert can get on the stand

7  and say, "My opinion is X, and it's based on ten pieces of

8  evidence that won't come into the record."  It is also not

9  inappropriate to cross-examine that expert with evidence that

10 he or she did not consider or with evidence that may be

11 hearsay and similarly inadmissible for the purposes of

12 undermining their methodology and credibility just like --

13          THE COURT:  Yeah.  I guess I can accept that in

14 principle.

15          MR. HACKNEY:  Okay.  I know that they're fact-

16 sensitive and context-sensitive.  I just want -- I just want

17 to --

18          THE COURT:  All right.  All right.

19          MR. HACKNEY:  I'm planning out different things,

20 so --

21          THE COURT:  All right.

22          MR. HACKNEY:  Okay.  Your Honor, I had a creative

23 idea for you with -- sometimes creative is a synonym for

24 stupid when I have creative ideas, but I wanted to at least

25 mention it.  I've been thinking about how you were going to

1  handle that pro se objector part of your case, and I read

2  your order the other day.  And what I sussed out was that the

3  pro se objectors will be doing some cross-examination of

4  their own, but it also appears that they'll be offering

5  testimony.

6         THE COURT:  Um-hmm.

7         MR. HACKNEY:  And I was thinking about how you would

8  handle that hearing, and I thought that it might be somewhat

9  hard for you to elicit testimony from them because you get

10 into this problem of like do you do the questioning or do

11 they just get up and do a narrative, so I had a suggestion

12 for you that's novel, and if you think it's a dumb idea, I

13 won't be offended, but I wanted to at least extend it to you,

14 which is I have two young lawyers at my firm who are very

15 good lawyers and who we're always looking for opportunities

16 to get them trial experience.  And I thought that they might

17 be able to help you because they could alternate with the

18 witnesses in terms of getting a bare-bones understanding of

19 what the witness was attempting to convey through their

20 testimony and then putting them through a direct that would

21 help frame up the testimony for you to consider.  It was

22 mainly a thought of helping you structure the hearing and

23 helping them get some experience.  I thought to myself as I

24 was thinking of it, well, would it pose a conflict, and I

25 don't think it does.  I don't think examining someone poses a

conflict. The pro se objectors would have to know that as
they were explaining to my associates what they intended to
testify about, that that would not be a privileged
communication, but it would happen directly antecedent to
them going on and testifying. It was mainly in the way of a
suggestion to the extent that facilitates that hearing. I
think it also sort of implicitly suggests that we -- I or my
colleagues ought not to cross-examine those people given that
one of our, you know, associates would have put them on, so
if it's too complicated to work out, too weird, no problem.
I wanted to make it known to the Court.

THE COURT: All right. Let me think about it.
Thank you for the offer.

MR. HACKNEY: Yes, your Honor. Your Honor, a second
point I wanted to raise is I've been looking at ideas for how
you might streamline at least some of the trial. One idea
that may streamline some argument and may streamline some
evidence is the question of whether the Aztec test or the so-
called Markell test is the one that you think is appropriate.
I offer that for your consideration. It's relatively well-
briefed.

THE COURT: There is a third alterative.

MR. HACKNEY: The Rhodes test? Don't go making up
another test, your Honor. I already had to learn the first
two, and --

1        THE COURT:  Well, I mean the problem with that

2  suggestion -- and I have thought about it -- is that if an

3  appellate court doesn't agree with the test that I've chosen,

4  then the record may not be complete on the test they choose.

5        MR. HACKNEY:  That's a fair point.

6        THE COURT:  So I'm inclined to just let you proceed

7  to prove whatever facts on whatever test you want to

8  advocate.

9        MR. HACKNEY:  Good point, your Honor.  There was a

10  plan filed last night that changed the structure for the

11  treatment of the COPs, and I wanted to note that just because

12  I read a Reorg Research summary of it.  I don't understand

13  what the changes were, but we were hoping that we might

14  outside of the courtroom get some explanation from the city

15  about what the purpose of that is, and I just wanted to note

16  that we'll be asking the city for that later.  The last --

17        THE COURT:  And I'll just express my hope that they

18  will be willing to sit down with you to discuss it.

19        MR. HACKNEY:  I hope so, too.  Your Honor, the last

20  subject that I wanted to bring up is -- you know, I'm not

21  going to call it my favorite subject, but I'm going to start

22  sounding like, you know, the prophet Jeremiah or something if

23  I talk about DWSD again, but it was hard not to note this

24  week that there were two conflicting reports that came out in

25  the press.  The first one was that there was a press report

 1   that said that they're close to a transaction that could free

 2   up $50 million for the general fund, and then there were

 3   statements by both the mediator and the mayor that -- you

 4   know, suggesting those reports may have been overblown.  I'm

 5   bringing this up again, I think, just to note for the record

 6   that this is a very important part of the city's plan, and

 7   I'm just having a hard time understanding how if that deal

 8   manifests, how it won't either impact plan structure or

 9   impact discovery and trial of the case.  By way of an

10   example, I'll give you --

11         THE COURT:  I'm going to cut you off.

12         MR. HACKNEY:  Okay.

13         THE COURT:  You know, I appreciate your interest in

14   shaping my -- attempting to shape my thinking on this issue

15   as early as you can in the process.  It's futile.  I can only

16   say to you that when and if there is such a deal and when and

17   if you determine that in your client's interest you need to

18   ask me for some kind of relief, I will certainly grant you

19   the microphone.

20         MR. HACKNEY:  Fair enough, your Honor.  Thank you

21   for your time.

22         THE COURT:  Okay.  Does anyone else want to raise

23   anything here this morning?

24         MR. SHUMAKER:  Your Honor, do you know whether --

25   which courtroom we will be in yet for the trial just for

1  planning purposes?

2         THE COURT:  Well, I think the answer to that is many

3  numbers.  The District Court has us moving all over the

4  place.  Where do we start on the 2nd?

5         THE CLERK:  Courtroom 716, Judge Cook's courtroom.

6         THE COURT:  Okay.  And do we have that courtroom all

7  that week or not?

8         THE CLERK:  We do.

9         THE COURT:  We have it all of the first week -- the

10 first --

11        THE CLERK:  Couple of weeks.

12        THE COURT:  -- first couple of weeks.

13        MR. SHUMAKER:  Wonderful.  Thank you, your Honor.

14        THE COURT:  Okay.  And where are we on -- where are

15 we on Monday?

16        THE CLERK:  We are here.

17        THE COURT:  Here in this room on Monday?

18        THE CLERK:  Yes.

19        THE COURT:  Okay.  How long will your presentation

20 on the financing and cash collateral motion take for Monday?

21        MR. SHUMAKER:  Go ahead.

22        MS. LENNOX:  Your Honor, Heather Lennox on behalf of

23 the city for this.  I can't imagine that direct would take

24 more than a couple hours, and we'll see how long Mr. Hackney

25 wants to cross our witnesses.

1          THE COURT:  Okay.  All right.  Anything further from

2     anyone?  Ms. Green.

3          MS. GREEN:  Jennifer Green for the Retirement

4     Systems.  I just have a quick point of clarification

5     regarding the order that was entered yesterday relating to

6     the individual objectors.  Paragraph 10 identifies several

7     witnesses that are former employees of the Retirement

8     Systems.  We were wondering do you envision us to informally

9     meet with or confer with the individual objectors to come up

10    with the appropriate witness, or are you going to have trial

11    subpoenas issued by the individual objectors?

12         THE COURT:  You're certainly welcome to reach out to

13    them.

14         MS. GREEN:  Okay.

15         THE COURT:  It was not anything that I contemplated,

16    but you're free to do that.  What I had foreseen was that

17    people who want to call witnesses who are not otherwise on

18    other parties' lists would have to arrange for their

19    appearance either voluntarily or by subpoena.

20         MS. GREEN:  Okay.  The next question I have is will

21    there be a deadline set for the city to allot time to the

22    plan support parties such as the Retirement Systems and the

23    Retiree Committee?  I know that you -- there was a prior

24    order that stated if it couldn't be worked out, then you

25    would take it up.  I just wondered if there was a deadline

1  because we don't know yet how much time it would be.

2      THE COURT:  You haven't already been engaged in

3  those negotiations?

4      MS. GREEN:  We've been engaged in discussions, but

5  we don't have a set time, and I just wondered if there was

6  going to be an actual deadline set so we could prepare for

7  trial.

8      THE COURT:  Is this something that I can ask you all

9  to work out by the final pretrial conference so that if you

10  don't, I can deal with it then?

11      MR. SHUMAKER:  Yes, your Honor.

12      MS. GREEN:  Absolutely.

13      THE COURT:  All right.

14      MS. GREEN:  Thank you.

15      THE COURT:  There's your answer.

16      MR. SHUMAKER:  Your Honor, one last point.  I

17  noticed from the pro se objectors' order that you issued

18  yesterday that they are directed to provide exhibits to the

19  Court on September 2nd.  Will the parties be able to get a

20  copy of those exhibits?  Will they be filed?  How should we

21  go about dealing with that?

22      THE COURT:  What makes sense to you?

23      MR. SHUMAKER:  Well, getting them would make sense.

24  I don't know if you need to file them, but we could be in

25  contact with -- okay -- Ms. Lennox is making a suggestion,

1    so, Chris, it's her idea -- that Chris could give them to the
2    city, and we could distribute them to all of the objectors if
3    that would help.
4          THE COURT:  Okay.  So so far all I have is a
5    provision for these people to bring their exhibits to us for
6    marking.
7          MR. SHUMAKER:  Correct.
8          THE COURT:  Okay.  Well, I wouldn't object to
9    maintaining custody of them when they come in and then
10   turning custody of them over to you for copying for yourself
11   and whoever wants copies.
12         MR. SHUMAKER:  We'd be happy to do that, your Honor.
13         THE COURT:  I'll just forewarn you, based on the
14   exhibit lists that were in the motions, that you're going to
15   be getting copies of statutes, Constitutions, other kinds
16   of -- or city charter provisions or city code provisions, so,
17   you know, you'll do with them as you see fit.
18         MR. SHUMAKER:  We recognize the challenge, your
19   Honor.
20         THE COURT:  Okay.  It may require me to clarify in
21   writing that when these parties bring their exhibits to the
22   court for marking, we are going to keep custody of them
23   because the order doesn't say that.  All right.  Chris, would
24   you remind me to do that?  Okay.  Good.  Thank you.  Anything
25   else?  No.  All right.  We will be in recess then.

1        MR. SHUMAKER:  Thank you, your Honor.

2        THE CLERK:  All rise.

3     (Proceedings concluded at 11:43 a.m.)

4                         * * *




                         INDEX



<u>WITNESSES:</u>

     None

<u>EXHIBITS:</u>

     None



          I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    August 25, 2014
_____             _____
Lois Garrett