# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | ) | Related to Doc. No. 6908, 4215 |

## THE DETROIT RETIREMENT SYSTEMS' MOTION TO EXCLUDE PORTIONS OF MARTHA KOPACZ'S TESTIMONY

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (together, the "Retirement Systems") do not dispute that Martha Kopacz ("Kopacz") is qualified to testify as an expert witness regarding the two discrete issues outlined in the Order Appointing Expert Witness [Dkt. No. 4215] (the "Appointing Order"). The Retirement Systems, however, move to exclude certain limited portions of Kopacz's testimony as it relates to pension issues because: (1) it exceeds the scope of her engagement under the Appointing Order; (2) it is inadmissible under Fed. R. Evid. 702, because (a) Kopacz admits that she lacks special knowledge, training or education regarding public pensions, (b) her conclusions on these issues will not assist the trier of fact to determine a fact in issue at trial, since she admits that these particular opinions are not relevant to her overall opinion on feasibility, and (c) her

pension-related conclusions are not based upon reliable facts or data nor has Kopacz independently verified the data she relied upon in forming her conclusions; and (3) to the extent Kopacz claims that these pension-related issues are not part of her formal expert opinion, her testimony is inadmissible under (a) Fed. R. Evid. 601, because she has no personal knowledge, (b) Fed. R. Evid. 701, because it is improper opinion testimony being offered by a lay witness, and (c) Fed. R. Evid. 801, because it is inadmissible hearsay.[1]

Therefore, the Retirement Systems seek to have certain portions of Kopacz's testimony, as more fully described below, excluded from the hearings scheduled with respect to confirmation of the *Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 20, 2014)* [Dkt. No. 6908], as may be further amended (the "Plan").

---

[1] The Retirement Systems previously moved to exclude certain limited portions of the report issued by Kopacz that relate to pension issues on the grounds that (i) those opinions exceed the scope of her appointment as set forth in the Appointing Order and (ii) the report is inadmissible hearsay. *See The Detroit Retirement Systems' Brief in Opposition to Admissibility of Certain Portions of Martha Kopacz's Expert Report* [Dkt. No. 6847].

2

# I.    LEGAL ANALYSIS

**A.    Kopacz's Investigation, Proposed Testimony and Conclusions on Certain Pension-Related Issues Exceed the Scope of Her Appointment and Are Not Admissible Under the Appointing Order.**

### (1)    The Order Appointing Kopacz as an Independent Expert

On April 22, 2014, the Court appointed Kopacz as an independent expert pursuant to Fed. R. Civ. P. 706(a).  (*See* Appointing Order at ¶ 1).  The Order expressly limited the scope of Kopacz's expert witness testimony to two discrete issues:

> a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and
>
> b) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable.

*Id.* at ¶ 2.  Under the Court's Order, Kopacz is not authorized to investigate, reach conclusions on, or testify on any other topic: "Unless the Court orders otherwise, the matters in paragraph 2 above are the ***only*** matters that the Court's expert witness is authorized to investigate, reach a conclusion on, or testify about."  *Id.* at ¶ 3 (emphasis added).

### (2)    The Pension-Related Opinions in Kopacz's Report

Despite the limited scope of Kopacz's appointment, the report issued by Kopacz on July 18, 2014 (the "Kopacz Report" or the "Report") includes numerous opinions relating to pension-specific issues that Kopacz admits have

3

nothing to do with either feasibility or the City's cash flow projections. Instead, many of Kopacz's opinions focus on alleged past actions and practices of the Retirement Systems that have no bearing on the current and future administration of the Retirement Systems, implemented by past trustees who are not members of the current boards and will not be trustees in the future. (*See e.g.*, Kopacz Report at 127-129). For example, Kopacz opined in the Report (setting aside for the moment her lack of qualifications to do so) that the Retirements Systems "utilized unrealistic rate of return assumptions," and "managed the pension plans in accordance with questionable investment strategies that resulted in considerable underfunding" of the respective plans. *Id.* at 127.[2] Kopacz also concluded that amortization periods and smoothing mechanisms were used to "mask[] potential funding shortfalls" and that "aggressive annual rates of return" were adopted by the Systems. *Id.* at 127. She further opined that "also contributing to the increase of the UAAL [unfunded actuarial accrued liability] were a number of questionable activities engaged in by the retirement systems," and that "Retirement System officials have been accused and/or indicted of material fiduciary misconduct,

---

[2]     Per the Court's prior instructions, expert reports have not been filed on the docket. For this reason, the Retirement Systems are not filing a copy of the Kopacz Report as an exhibit to this Motion.

4

allegedly draining the pension of necessary liquidity and contributing to the underfunding of the Retirement Systems." *Id.* at 128-29.[3]

Kopacz, however, was not charged with reviewing past practices of the Retirement Systems, nor was she was retained to opine on the propriety of the Retirement Systems' actuarial and investment policies.[4]  Under paragraph 3 of the Appointing Order, Kopacz is not authorized "to investigate, reach a conclusion on, or testify about" the Pension-Related issues, and any such testimony should not be admitted at trial.  Furthermore, ***Kopacz acknowledged at her deposition that none of her conclusions relating to the Pension-Related issues impact her opinions on feasibility.***  (*See* Exhibit 6-A attached hereto, excerpt of Martha Kopacz 8/1/14 deposition ("Kopacz Dep.") at 444, 545-46, 563, 566).  For example, when asked whether "any of the pension risks that you cite in your report give you any pause

---

[3]     For ease of reference, these opinions will be collectively referred to as Kopacz's "Pension-Related" conclusions throughout this brief.  The above examples are by way of example only, however, and are not exhaustive.  Kopacz also opines about the new hybrid pension plans, the new proposed investment rate of return assumption, the restoration program, recommended pension plan reporting requirements, revised annual disclosures, and the like—all of which are far outside the scope of her expertise and her appointment.  (Kopacz Report at 132, 134, 142-144, 146, 151, 155, 156, 175, 177, 205-06).

[4]     Nor was she retained to opine about the new hybrid pension plans, the new proposed investment rate of return assumption, the restoration program, recommended pension plan reporting requirements, revised annual disclosures, and the like.  (*See, e.g.*, Kopacz Report at 132, 134, 142-144, 146, 151, 155, 156, 175, 177, 205-06).

with respect to the [P]lan," she answered: "The long-term risks associated with the City's pension obligations do not negatively impact my assessment for feasibility."[5]  *Id.* at 444.  As a result, the Pension-Related portions of the Report (and any related trial testimony) are outside the scope of her appointment, irrelevant to her ultimate conclusions on feasibility, and therefore, inadmissible at trial.

**B.    Kopacz Is Not Qualified to Testify as an Expert on Pension-Related Issues, and Her Opinions on These Issues Lack the Necessary Reliability Under Rule 702.**

In addition to violating the parameters of the Appointing Order, Kopacz's migration into the area of Pension-Related issues (in particular, actuarial and investment issues) also exceeds the bounds of her expertise and lacks the necessary

---

[5]    Kopacz similarly testified that her conclusions about alleged historical practices within the Retirement Systems did not impact her feasibility analysis:

> I am not talking about the systems today moving forward.  I am talking about how did the systems get in this underfunded predicament. . .  And what is important to me is the level of underfunding in the pension systems as of the filings and today and how that is going to be dealt with in the future. . . I really don't, at the end of the day, care about how they got underfunded. . .  There is treatment in the Plan of Reorganization – Plan of Adjustment that I have to assess relative to feasibility. . .  But I simply don't care about how they got there.  I only care about where they are today and. . . what their treatment is in the Plan of Adjustment.

(Exhibit 6-A, Kopacz Dep. at 545-46, 563, 566).

"evidentiary reliability" required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.[6]

Fed. R. Evid. 702 governs the admissibility of testimony by an expert witness. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on the trial court to ensure that a purported expert's testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This gatekeeping function is not limited to "scientific" expert testimony; it applies equally to testimony based upon "technical" or other "specialized" knowledge. *Kumho Tire Co. v.*

---

[6]     The Court specifically preserved the parties' ability to object to Kopacz's testimony under *Daubert* or the Federal Rules of Evidence. (*See* the Appointing Order, p. 2, ¶ 13).

*Carmichael*, 526 U.S. 137, 141-42 (1998).[7]   The objective of the court's gatekeeping function is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field."   *Id*. at 151-52.   These principles apply equally in bankruptcy litigation. *In re Smitty Inv. Group, LLC*, 2008 Bankr. LEXIS 1542, *34 (Bankr. D. Idaho May 16, 2008) (citing *Daubert* and *Kumho Tire*) ("Often, expert testimony in bankruptcy court is based on experience and specialized knowledge, rather than 'science' per se.  However, whenever a witness is qualified as an expert based on such experience or knowledge, the testimony must still meet the tests for reliability under *Daubert* and *Kumho Tire*.").

> **(1)  Kopacz Is Not Qualified by Knowledge, Skill, Experience, Training or Education to Testify As an Expert on the Pension-Related Topics.**

 Under Rule 702, the trial court "must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997).  The standard is "not the qualifications of a witness in the abstract, but whether those qualifications

---

[7]    The specific factors identified in *Daubert* (such as peer review, publication, rate of error, *etc.*), however, may not be pertinent to "non-scientific" experts. Instead, the applicable factors depend on the nature of the issue, the expert's particular expertise, and the subject of the expert's testimony.  *Kumho Tire*, 526 U.S. at 151-52.

provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). A court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise. . . [so] a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Mohney v. USA Hockey, Inc.,* 300 F. Supp. 2d 556, 564 (N.D. Ohio 2004) (quoting 4 Weinstein's Fed. Evid. § 702-06[1] at 702-52 (2000)).

In this case, the Retirement Systems do not dispute that Kopacz may be qualified to render expert testimony on the two discrete issues identified in the Appointing Order (*i.e.,* feasibility and cash flow projections). However, Kopacz has *no* special knowledge, skill, experience, training or education relating to pensions. In fact, at her deposition, Kopacz expressly disavowed any general expertise in this area: "I am not a pension expert." (Exhibit 6-A, Kopacz Dep. at 436; see also 431, "I would not consider myself a pension expert."). She likewise has no expertise in managing a pension fund's investments or asset allocations: "I am not an investment manager." *Id.* at 445. Lastly, she has no actuarial experience, nor do any members on her team. *Id.* at 448, 541. Kopacz also admitted that she is unable to answer specific questions relating to some of the topics she offered conclusions about in the Report. For instance, Kopacz

acknowledged that she does not have an understanding of actuarial smoothing methods used by other public pensions and when asked if she could opine on the appropriateness of the Retirement Systems' use of a 7-year smoothing period, she answered: "I would have to undertake to research that. I wouldn't have my own independent knowledge of what that was." *Id.* at 539. Her answer was the same with respect to amortization periods—Kopacz admitted that she would have no basis to know whether a 5, 10, 20, or 30-year amortization period would be an appropriate period for a public pension plan. *Id.*

While Kopacz candidly admits that she lacks any expertise on the underlying subjects that would be needed to render an opinion on things like the appropriate asset allocation mixes for a large public pension fund's investment portfolio, the reasonableness of the assumed rate of return adopted by a public pension, an appropriate amortization period, the propriety of smoothing mechanisms for a public pension plan, and the causes of underfunding due to investment losses, she nevertheless sets forth conclusions on each of these things in the Report. (*See e.g.*, Kopacz Report at 127-29). She is qualified to opine about *none* of these topics— even Kopacz herself admits this. Thus, she should not be permitted to offer expert testimony on any of the Pension-Related issues identified above.

**(2)    Even If Kopacz Possessed the Requisite Expertise, Such Expert Testimony Would Not Assist This Court in Determining a Fact At Issue for Trial.**

Rule 702(a) requires that the expert's testimony will "help the trier of fact to understand the evidence or to determine a fact in issue[.]"  Fed. R. Evid. 702(a). "This condition goes primarily to relevance."  *Daubert*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (citing 3 Weinstein & Berger P702(2), pp. 702-18).    The "relevance" requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial.  *See United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993); *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999).

Here, while feasibility is a relevant issue for trial, Kopacz has already admitted that her conclusions on the various Pension-Related issues do not impact her feasibility opinions.  (Exhibit 6-A, Kopacz Dep. at 444, 545-46, 563, 566). Thus, even *if* Kopacz was qualified to testify on these topics (which she is not), she should still be precluded from testifying about the Pension-Related issues because they are entirely irrelevant to any disputed fact at trial.

**(3)    Kopacz's Opinions on the Pension-Related Issues Are Not Based on Sufficient Facts and Data, Nor Are They the Product of Reliable Principles and Methods.**

"Once the proposed expert has crossed the foundational threshold of establishing his personal background qualifications as an expert, he must then

provide further foundational testimony as to the validity and reliability of his theories." *Barry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 749 (E.D. Mich. 2000). "When determining whether an expert's testimony is reliable, the court may consider the factual basis for the expert's opinion. Indeed, Rule 702 specifically states that an expert may only testify if 'the testimony is based upon sufficient facts and data' and 'the witness has applied the principles and methods reliably to the facts of the case.'" *Ellipsis, Inc. v. Color Works, Inc.*, 428 F. Supp. 2d 752, 759-60 (W.D. Tenn. 2006). "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion, thus, an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Fiorentino v. Rio Mar Assocs., LP*, 381 F. Supp. 2d 43, 48 (D.P.R. 2005) (citations omitted); *McQueen v. 988011 Ontario, Ltd.,* 224 F.3d., 797, 800-01 (6th Cir. 2000) ("An expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known.") As the Supreme Court noted in *Daubert*, this requirement establishes a standard of "evidentiary reliability" or "trustworthiness." *Daubert*, 509 U.S. at 590, n. 9.

**a. Kopacz Undertook No Efforts to Independently Verify Any Facts or Data Underlying Her Pension-Related Conclusions, Ignored Certain Material Facts, and Improperly Relied on the Opinions of Others, Rendering Her Pension-Related Opinions Unreliable and Inadmissible.**

In order to establish the requisite "evidentiary reliability," an expert must independently verify the facts and data underlying the expert's opinion, and courts have excluded experts who fail to do so. *See Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000); *Auto Indus. Supplier ESOP v. SNAPP Sys.*, 2008 U.S. Dist. LEXIS 105961 at *15 (E.D. Mich. Dec. 23, 2008); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (excluding expert testimony where expert failed to verify the reliability of data given to him and noting an "expert must independently verify facts given to him, rather than 'accepting [them] at the word of. . . counsel.'"); *Ellipsis*, 428 F. Supp. at 756 (excluding expert testimony of plaintiff's damages expert, in part, because the expert did not independently verify any of the information provided to him by the plaintiff).

For example, in *Auto Indus. Supplier*, the Court disqualified the expert witness because he was a "mere conduit for information prepared by others." *Auto Indus.*, 2008 U.S. Dist. LEXIS at *15. The expert submitted a report that calculated damages at approximately $1.3 billion, but during a *Daubert* hearing, the proffered expert admitted that "he had little, if any, personal knowledge of the underlying data used to created (sic) the opinions contained in his report" and had

instead "accepted summaries of data supplied to him. . . and simply used that data, often in the same format sometimes reformatting the data, to prepare his report." *Id.* at *9. Accordingly, the Court found that the proposed expert "performed no independent analysis but rather simply took figures supplied by [others]" and "failed to perform any intellectual analysis or review of the underlying source documents sufficient to qualify him as an expert." *Id.* at *11, 16.

Similarly, it is improper for an expert witness to merely testify to the opinions of others. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006) ("We have also held that a district court erred by admitting expert testimony that was based 'upon the opinion of others who were not even qualified as expert, nor present at trial.'") (citing Rule 801 and *Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir. 1966)). "Experts cannot come into court and offer as proof calculations and theories which they do not themselves support or advocate, but which are designed to reach a desired conclusion, when those calculations have no sound basis in fact or reason. And an expert opinion may not, itself, be based upon the opinion of others, either in evidence or not in evidence." *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F. Supp. 819, 855 (M.D. Tenn. 1974) (citing *Taylor*). Thus, it is "inappropriate for experts to act as mere conduits for others' hearsay. . . or as vehicles for factual narrative." *Island Intellectual Prop. LLC v. Deutsche Bank AG*, 2012 U.S. Dist. LEXIS 21742 (S.D.N.Y. Feb. 14,

2012) (citations omitted). "Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).

Lastly, when an expert "ignores critical data" in forming his opinions, he fails to satisfy *Daubert. See Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 305 (6th Cir. 1997) (finding expert's causation opinion "cannot be considered reliable" where expert "failed to consider admittedly important information"); *LeClercq v. The Lockformer Co*., 2005 U.S. Dist. LEXIS 7602, at *2 (N.D. Ill. Apr. 28, 2005).

In short, when assessing reliability, certain "[r]ed flags" that "caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

In this case, Kopacz's Pension-Related opinions suffer from all of the above-listed indicia of unreliability, plus the "red flags" cited by the *Smelser* court—she failed to independently verify any data, blindly relied on the opinions of others, relied on anecdotal evidence, did no testing of her own, and ignored certain key data that would have been material to her conclusions.

15

For example, while Kopacz claims in the Report that the Retirement Systems assumed "aggressive rates of return" that led to its underfunding, she admitted at her deposition that she did not "make any efforts to quantify what portion of the funding shortfall was attributable to the supposedly aggressive rates of return." (Exhibit 6-A, Kopacz Dep. at 435-37).[8]  Thus, there is literally no factual basis for her conclusion that allegedly aggressive rates of return led to *any* amount of underfunding, because she never even attempted to quantify it in the first place.

Similarly, while she concluded in her Report that "questionable investment strategies. . . resulted in considerable underfunding," when asked which investments she had a "quarrel" with, she answered that she was "not an investment manager" so she just "accepted it as it was" and did not look specifically at the asset distributions within the Systems' portfolio to "arrive at any conclusion." (Exhibit 6-A, Kopacz Dep. at 445; see also 544).  When asked which "specific investments" she believed to be too risky, she could not identify any particular investment.  *Id.* at 469.  She also admitted that she did not do *any* due diligence with respect to the investment allocations within the pension funds' portfolios and did not review the written investment policies of the Retirement

---

[8]  She was also forced to admit that the data actually demonstrates that in most years, the Retirement Systems actually *exceeded* their assumed rate of return. Expert testimony is "inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Greenwell*, 184 F.3d at 496.

Systems to analyze if there were any "questionable" written policies.[9]  *Id.* at 473, 541.  As a result, any conclusion that the Systems' investment practices were "questionable" is based upon insufficient facts and her opinion is entirely unreliable.

As to underfunding, Kopacz also ignored key data, such as *when* the Systems were fully-funded versus when they became underfunded—clearly, a concept one must understand before one can conclude the reasons *why* and *how* the underfunding occurred. (Exhibit 6-A, Kopacz Dep. at 546, 558).  In fact, she dismissed the importance of understanding the timing of the Systems' underfunding and stated it was something she did not "care" about.  *Id.* at 546.

Moreover, while Kopacz concluded in the Report that "aggressive rates of return" and "questionable" investment strategies caused the underfunding, she once again admitted to performing no independent verification of this conclusion. She admitted that she has no reason to disagree with the other pension experts in this case who have opined that the predominant factor in the Retirement Systems' underfunding was the unexpected market crash that occurred during the Great Recession in 2008 rather than any internal mismanagement. (Exhibit 6-A, Kopacz Dep. at 558-561).  She also admitted that she had not reviewed the relevant

---

[9]    She also did not interview the Retirement Systems' independent professional investment advisors, nor did she meet or consult with the Retirement Systems' internal Chief Investment Officer (in fact, she did not even know who he was). (Exhibit 6-A, Kopacz Dep. at 542-43).

actuarial reports which show that the Retirement Systems were fully funded prior to the Great Recession and that the current underfunding stemmed from this event. *Id.* at 546, 558. She admitted that she had not compared the Retirement Systems' investment losses to other public pension funds' losses to determine if the Retirement Systems' losses were out of the ordinary (which might imply mismanagement) or whether they were in line with typical investment losses. *Id.* at 562-63. She did not review any public pension surveys or data (such as that compiled and published by National Association of State Retirement Administrators or the United States Census Bureau) to compare the Detroit Retirement Systems' investment performance with other public pensions. *Id.* at 563-64. However, when shown published data establishing that the median investment losses incurred by public pensions during the Great Recession were 25.3%, she was forced to admit that Detroit Retirement Systems' losses were in line with what other public pensions around the country lost—again demonstrating that the Retirement Systems' losses were due to the same poor market conditions that all pension funds experienced rather than due to some particular form of internal mismanagement. *Id.* at 565. Lastly, she admitted that she did not even bother to analyze how much of the underfunding was due to unpaid employer contributions from the City. *Id.* at 567. Ignoring such critical information renders her opinion unreliable under *Daubert*. *See Smelser*; *LeClercq*.

Finally, Kopacz also baselessly concludes in her report that "Retirement [S]ystem officials have been accused or indicted of material fiduciary misconduct allegedly draining the pension of necessary liquidity and contributing to the underfunding of the retirement systems[.]" In the Report, these conclusions are attributed to Charles Moore but Kopacz admitted at her deposition that this statement is actually not contained in the Moore Declaration and that this was a citation error. (Kopacz Report at 129, *citing* Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, Dkt. No. 13, p. 10; Exhibit 6-A, Kopacz Dep. at 550-551; 554-55, "Rather than write our own language, we chose to use someone else's declaration which has been incorrectly cited.") When asked if she "independently verified" the information taken from the Moore Declaration, she admitted that she did not: "I've just explained to you that my instructions to my team were to cite information that already existed on the record… This is an error." *Id.* at 556. Further, when asked if she knew who was indicted, she admitted she had no independent knowledge: "I wouldn't have any knowledge of who they were."[10] *Id.* at 554. Most importantly, though, she admitted that she never

---

[10] Kopacz admitted there are no such accusations against current trustees, so to the extent any such conduct would relate to implementation of the Plan going forward, there is no evidence of any such concern. (Exhibit 6-A, Kopacz Dep. at 470).

19

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 19 of 72

attempted to quantify whether there was any actual economic impact to the Systems' due to this alleged misconduct (*id.* at 555-56), which completely undermines her conclusion that this alleged misconduct actually caused underfunding.

Ultimately, when pressed, she admitted that her entire "investigation" into the Pension-Related issues was limited to two interviews of Retirement System representatives[11] and that the majority of her conclusions were taken verbatim from the Charles Moore Declaration that was attached to the City's bankruptcy petition. (Exhibit 6-A, Kopacz Dep. at 544, 552-555). Thus, Kopacz is simply regurgitating the opinions of others (Charles Moore) without any independent support. This is improper. *See Mike's Train House*; *Island Intellectual Prop.*; *In re Rezulin*.

Accordingly, Kopacz's Pension-Related opinions are based upon woefully deficient facts and data and are not sufficiently reliable to be offered at trial.[12] Therefore, the Retirement Systems respectfully request an order precluding any testimony by Kopacz at trial relating to the Pension-Related opinions pursuant to Fed. R. Evid. 702.

---

[11]    The Retirement Systems vehemently dispute Kopacz's version of the information allegedly provided by the Retirement Systems.

[12]    In accordance with the Court's Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Dkt. No. 6699], objections to the admissibility of the Report *itself* were separately filed on August 18, 2014. The Retirement Systems' objection on that basis was timely filed on August 18, 2014 [Dkt. No. 6847].

**C.    To the Extent Kopacz Claims the Pension-Related Conclusions Are Not Part of Her Formal Expert Opinion, It Is Improper Opinion Testimony Being Offered by a Lay Witness and Is Inadmissible Hearsay.**

Kopacz was *not* appointed an expert on any pension issue by the Court. She was appointed to assist the Court solely on two limited issues (feasibility and cash flow projections). To the extent that Kopacz is now offering what she believes to be "non-essential" conclusions by way of background information in her Report, it is inappropriate and any such testimony at trial is inadmissible.

Under the Federal Rules of Evidence, a lay witness must have personal knowledge in order to testify. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *United States v. Smith*, 516 Fed. Appx. 592, 594 (6th Cir. 2013) (noting Rule 602 "prohibits the admission of evidence for which the witness does not have personal knowledge"). Personal knowledge means that the witness "had the ability and opportunity to perceive the event that he testifies about." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). While lay witnesses can give "opinion" testimony in certain limited circumstances, that opinion must still be based on personal observations *and* it cannot be one that requires specialized or "expert" knowledge.  See Fed. R. Evid. 701.[13]

---

[13]    "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) ***rationally based on the witness's perception***; (b) helpful to clearly understanding the witness's testimony or to determining a fact

In this case, Kopacz did not perceive the events contained in her Report. She is not a fact witness.[14]   She has no personal knowledge of events surrounding the Retirement Systems' investment losses or past alleged misconduct of certain Retirement System representatives.  Her sole knowledge base is what she heard after the fact from others (including things that she read in the declaration of Charles Moore), which she openly admits.  (Exhibit 6-A, Kopacz Dep. at 536-537; 538-39).  Thus, in addition to being outside the scope of her engagement under the Appointing Order and outside the scope of her expertise under Rule 702, any proffered testimony as to the Pension-Related issues is also outside the scope of her capabilities as a lay witness and should not be permitted because it is all inadmissible hearsay.

---

in issue; and (c) ***not based on scientific, technical, or other specialized knowledge within the scope of Rule 702***."  Fed. R. Evid. 701 (emphasis added).

[14]    To the extent Kopacz asserts that the Pension-Related portions of her report are just "facts" and not "opinions," she is still not qualified to offer this testimony. At one point at her deposition, Kopacz characterized her various conclusions as to the Pension-Related issues as "factual."  (Exhibit 6-A, Kopacz Dep. at 566-67, characterizing the information on pages 127-28 of her Report as a "recitation of what I believed at the time to be, arguably, facts. . .  they are simply words to help the reader appreciate some of the reasons that the pension funds today are underfunded.").  The bottom line, however, is that the statements on pages 127-129 of the Report are not "facts"—they are her *interpretations* as to how and why certain things occurred.  This is quintessential opinion testimony.

## CONCURRENCE

Pursuant to E.D. Mich. LBR 9014-1(g), on August 14, 2014, counsel for the

Retirement Systems contacted counsel for Ms. Kopacz to request concurrence with

the relief sought in this motion by electronic mail.  The request was denied.


Dated:  August 25, 2014          Respectfully submitted,

                              CLARK HILL PLC

                                /s/   Robert D. Gordon
                              Robert D. Gordon (P48627)
                              Shannon L. Deeby (P60242)
                              151 South Old Woodward Avenue
                              Suite 200
                              Birmingham, Michigan  48009
                              Telephone: (248) 988-5882
                              Facsimile: (248) 988-2502
                              rgordon@clarkhill.com
                              sdeeby@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | | Related to Doc. No. 6379, 4215 |

## ORDER GRANTING THE DETROIT RETIREMENT SYSTEMS' MOTION TO EXCLUDE PORTIONS OF MARTHA KOPACZ'S TESTIMONY

This matter comes before the Court upon The Detroit Retirement Systems'

Motion to Exclude Portions of Martha Kopacz's Testimony [Dkt. No. ___] (the

"Motion"); the Court finding that good cause exists for the relief granted by this

order:

IT IS ORDERED:

1.      The Motion is granted.

2.      The testimony of Martha Kopacz shall not include Pension-Related[1]

issues.

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings
ascribed to them in the Motion.

# EXHIBIT 2

# (Notice and Opportunity to Object)

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
| Debtor. | ) |  |

## NOTICE OF THE DETROIT RETIREMENT SYSTEMS' MOTION TO EXCLUDE PORTIONS OF MARTHA KOPACZ'S TESTIMONY

Please take notice that on August 25, 2014, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (collectively, the "Retirement Systems") filed the Detroit Retirement Systems' Motion to Exclude Portions of Martha Kopacz's Testimony in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to exclude the expert testimony of Martha M. Kopacz which was disclosed in her expert report and during her deposition.

**Your rights may be affected. Please take further notice that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to grant the Retirement Systems' Motion, or if you want the court to consider your views on the Motion, by **August 27, 2014,**[1] you or your attorney must:

---

[1] Paragraph 7(d) of the Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Dkt. No. 6699] established August 27, 2014 as the deadline to file responsive briefs to motions *in limine* and *Daubert* motions.

1.  File with the court a written response or an answer, explaining your position at:[2]

**United States Bankruptcy Court**
**Theodore Levin Courthouse**
**231 West Lafayette Street**
**Detroit, MI 48226**

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

You must also mail a copy to:

Robert D. Gordon
Clark Hill PLC
151 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Telephone:  (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

2.  If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[2]  Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

2

Dated: August 25, 2014

Respectfully submitted,

CLARK HILL PLC

  /s/   Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan  48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
sdeeby@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

3

# EXHIBIT 3

# Brief in Support (Not Required)

# EXHIBIT 4

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

_____

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 25, 2014, *The Detroit Retirement Systems' Motion to Exclude Portions of Martha Kopacz's Testimony* was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
151 South Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: August 25, 2014       *Counsel to the Police and Fire Retirement*
*System of the City of Detroit and the General*
*Retirement System of the City of Detroit*

# EXHIBIT 5

# (Affidavits - None)

# EXHIBIT 6-A

201233734.2 14893/165083

- MARTI KOPACZ - VOLUME II-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


In Re                                    ) Chapter 9

CITY of DETROIT, MICHIGAN,               ) Case No. 13-53846

            Debtor.                      ) Hon. Steven Rhodes


DATE:   August 1, 2014
TIME:   9:12 a.m.


VOLUME II

VIDEOTAPED DEPOSITION OF MARTI

KOPACZ, held at the offices of Squire Patton

Boggs, 30 Rockefeller Plaza, New York, New York,

pursuant to Order, before Hope Menaker, a

Shorthand Reporter and Notary Public of the State

of New York.

1              - MARTI KOPACZ - VOLUME II-

2     Gleason and Bob Childree.

3          Q.     I apologize if I repeat some of

4     Mr. Hackney's questions, but am I right you have

5     no experience with actuarial issues?

6          A.     That's correct.

7          Q.     And you have no prior -- pension is

8     not your area of expertise, is it?

9          A.     I would not consider myself a pension

10    expert.

11         Q.     Are the pension portions of your

12    report important to your conclusions?

13         A.     Yes.

14         Q.     And if the pension portions of your

15    report are factually or inaccurate -- factually or

16    analytically incorrect, would you agree with me

17    that undermines the conclusions you reached in

18    your report?

19         A.     I don't think they're factually

20    incorrect or analytically incorrect.

21         Q.     Right.  But if they are, would you

22    agree with me that that undermines the conclusions

23    in your report?

24         A.     I don't know that it would.  It

25    depends which -- what would be inaccurate?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 36 of 72
00000000-0000-0000-0000-000000000000

                    - MARTI KOPACZ - VOLUME II-

1

2       Q.     Would you be surprised to learn that

3    in most years the two pension funds exceeded the

4    rates of return that they -- the target rates of

5    return that they set?

6       A.     What -- you're using the time series

7    of data?

8       Q.     Yes.

9       A.     Okay.  I've looked at this.  Can you

10   ask me the question again?

11              MR. WAGNER:  Can you read back the

12        question.

13              (The question requested was read back

14        by the reporter.)

15       A.     The -- first of all, I don't know who

16   prepared this.  I don't know what the basis is and

17   I don't -- it says, "actuarial assumed rate of

18   return" and "calendar year rate of return."  Okay.

19   And I don't know from whence this comes in terms

20   of how this was calculated.

21       Q.     Okay.  I want you to assume that the

22   document is accurate because others have testified

23   that it is.  Would it surprise you to learn that

24   over the last 25 years, in most years the GRS and

25   the PFRS have exceeded their targeted rates of

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 37 of 72
00000000-0000-0000-0000-000000000000

```
 1                  - MARTI KOPACZ - VOLUME II-
 2       return?
 3              A.      In most years?
 4              Q.      Yes.
 5              A.      Should we count them?  All right.
 6       One, two, three, four, five, six, seven, eight,
 7       nine, ten -- in ten of the years on the general
 8       retirement system, they did not reach the targeted
 9       assumed rates and --
10              Q.      So that means -- let me just ask --
11       so that means in 15 years they exceeded, correct?
12              A.      If there are 15 years here.  There
13       are 25 years.
14              Q.      So, in most years --
15              A.      In 15 --
16              Q.      -- the GRS exceeded the targeted
17       rate, correct?
18              A.      Yes.
19              Q.      Okay.  You can do the math for PFRS.
20              A.      Okay.  One, two -- three, four --
21       five.  In five of the PFRS years, they did not
22       reach the targeted return.
23              Q.      That's five out of how many?
24              A.      Fifteen.
25              Q.      So in most years, am I correct, the
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

1          - MARTI KOPACZ - VOLUME II-

2     PFRS and GRS exceeded their targeted rates of

3     return?

4          A.     Individually for those years, yes.  I

5     would want to look at the cumulative effects of

6     this.

7          Q.     And would it surprise you that the

8     people who have done that calculation have

9     concluded that over the 25-year period for GRS and

10    over the 15-year period for the PFRS, those two

11    pension plans have exceeded 7.9 and 8 percent

12    returns?

13         A.     If you want me to assume that is

14    correct, I will.

15         Q.     And would that surprise you?

16         A.     Like I said, this -- this is not a --

17    this is just one data point, okay, so --

18         Q.     My question is only whether it would

19    surprise you, not whether it's one data point.

20                Would it surprise you?

21         A.     No.

22         Q.     Would it surprise you to learn that

23    over the last 25 years out of the hundred-odd

24    largest pension funds in the country, their

25    average rates of return have exceeded 8 percent?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 39 of 72
00000000-0000-0000-0000-000000000000

```
 1              - MARTI KOPACZ - VOLUME II-
 2         Q.     Okay.  Would you accept my
 3    representation that that's what you said?
 4              MR. KANE:  Objection.
 5         A.     Not really.
 6         Q.     Okay.  Well, is there any need to
 7    change the pension plan -- strike that.
 8              Is there any need to change the plan
 9    of -- the plan of adjustment on account of the
10    potential pension risks that you cite?
11         A.     I have no perspective or point of
12    view or opinion on changes to the plan of
13    adjustment.  That is not in my scope.  It is not
14    my task.
15         Q.     Do any of the pension risks that you
16    cite in your report give you any pause with
17    respect to the plan?
18         A.     The long-term risks associated with
19    the City's pension obligations do not negatively
20    impact my assessment for feasibility.
21         Q.     Did you look at the asset
22    distribution for the pension funds?
23         A.     I have seen a -- I have seen a
24    schedule that looks at the distribution of assets
25    in the pension fund.
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 40 of 72

1              - MARTI KOPACZ - VOLUME II-

2        Q.    Do you have any quarrel with that

3   distribution?

4        A.    I am not an investment manager.

5        Q.    Is that another way of saying that

6   you don't have any quarrel?

7        A.    No.  It just says that I didn't -- I

8   accepted it as it was.

9        Q.    Well, I'm asking you today:  Do you

10  have any questions --

11       A.    I have not made that evaluation.

12       Q.    So the answer is no, you are not able

13  to cite any disagreement you have with the

14  distribution of assets, are you?

15       A.    I -- like I said, I have not looked

16  at that specifically to arrive at any conclusion.

17            MR. WAGNER:  Can you read back the

18       question.

19            (The question requested was read back

20       by the reporter.)

21       Q.    Can you answer the question?

22            Do you have any quarrel --

23       A.    I don't know.

24       Q.    Would you agree with me that it's

25  unreasonable to calculate the -- strike that.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 41 of 72
00000000-0000-0000-0000-000000000000

                    - MARTI KOPACZ - VOLUME II-

1

2          Q.      Have you ever served as an actuary

3     for a public pension fund?

4          A.      No.

5          Q.      Have you had any experience in

6     actuarial science?

7          A.      In terms of?  Experience in actuarial

8     science?

9          Q.      Yes.

10         A.      No.

11         Q.      Do you have any qualification to

12    offer an opinion on the proper rate of return to

13    use for a public pension fund?

14         A.      I don't think I have offered an

15    opinion.

16         Q.      My question --

17                 MR. WAGNER:  Can you read back the

18         question.

19                 (The question requested was read back

20         by the reporter.)

21         A.      I don't think I ever have.

22                 MR. WAGNER:  Can you read it back one

23         more time, I'm sorry.

24                 (The question requested was read back

25         by the reporter.)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 42 of 72
00000000-0000-0000-0000-000000000000

1                   - MARTI KOPACZ - VOLUME II-

2          favorably to feasibility, okay, in my assessment,

3          it also presents a long-term risk to the City.

4                   Q.      Did you -- strike that.

5                           You're not saying that any of the

6          pension funds' investments are risky, are you?

7                   A.      I -- in order to achieve the rates of

8          return that are projected, that either 6.7 or the

9          11, you have to have volatility which means you

10         have to have some level of risk in return.

11                  Q.      Have you looked at the -- well, are

12         there specific investments that you believe the

13         pension funds have made that are risky?

14                  A.      I -- at this point, I -- I don't have

15         that information in front of me.

16                  Q.      Do you have anything -- do you have

17         any information reflecting negatively on the

18         pension advisors to the City?

19                  A.      The current pension advisors?

20                  Q.      Yes.

21                  A.      That I'm not aware of.  They're

22         different than the past advisors.

23                  Q.      Just a few more questions.

24                          Are you aware of any information

25         indicating that the trustees of the pension funds

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 43 of 72

1              - MARTI KOPACZ - VOLUME II-

2    have breached their fiduciary duties?

3         A.      The new trustees?

4         Q.      Any trustees?

5         A.      My recollection is that there are

6    some pending legal actions against former

7    trustees.

8         Q.      What about the current trustees?

9         A.      That I'm not aware of, no.

10        Q.      You also note on Page 128 that the

11   value of UAAL is 3.5 billion.

12        A.      What page?

13        Q.      Page 128.

14        A.      Yes.

15        Q.      Okay.  Are you aware that the plan

16   sets the amount at 3.1 billion?

17        A.      I am referencing a specific point in

18   time and a specific calculation by Milliman in

19   2013.

20        Q.      I'm right -- just a few more

21   questions.

22                I'm right that most participants in

23   the pension plan have already retired.  Page 126.

24        A.      Yes.

25        Q.      Do you know what percentage of

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 44 of 72
00000000-0000-0000-0000-000000000000

- MARTI KOPACZ - VOLUME II-

1  not offering any conclusion as to whether the City

2  

3  has properly calculated the size of the pension

4  claim, correct?

5       A.    Correct.

6       Q.    And am I also right that you haven't

7  done any due diligence with respect to the pension

8  funds asset allocations?

9       A.    Correct.

10      MR. WAGNER:  Nothing further.

11

12  EXAMINATION BY MR. NEAL:

13      Q.    Good morning, Ms. Kopacz.

14      A.    Good morning, Mr. Neal.

15      Q.    I prefer to question you in a witness

16  box, like we did in April.  But this will -- this

17  will do for now.

18            At the outset, just a brief apology.

19  I was defending a deposition of my client

20  yesterday.  I had the opportunity to read the

21  draft of the transcript from yesterday and I

22  intend not to repeat anything, number one.

23            Number two, my questions are going to

24  relate almost entirely to DWSD, okay?

25      A.    Okay.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 45 of 72
00000000-0000-0000-0000-000000000000

1              - MARTI KOPACZ - VOLUME II-

2         A.     I do.

3         Q.     With respect to your contention that

4    the systems used questionable investment

5    strategies that resulted in considerable

6    underfunding, you don't cite any particular third

7    party in a footnote as you have in other sections.

8              Do you see that?

9         A.     There is no footnote related to that

10   paragraph.

11        Q.     Okay.  So what did you rely on in

12   reaching this conclusion?

13        A.     This -- a lot what -- the

14   conversation that I had with Mr. Clark -- we can

15   go back to my log and I -- I am sorry to say I

16   have forgotten all of the people were -- that were

17   at that meeting, but I was at a meeting with both

18   retirement systems, their counsel and their

19   lawyers at Clark Hill, very shortly after I was

20   retained in this matter.

21              And it was during that -- here it is

22   -- Robert Gordon, Joseph Turner, Ronald King,

23   Michael VanOverbeke, those individuals, I had a

24   meeting with them.

25              And then subsequently I know people

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 46 of 72
00000000-0000-0000-0000-000000000000

```
 1              - MARTI KOPACZ - VOLUME II-
 2    in my firm met with a similar group of people of
 3    -- that represented the pension funds and we
 4    talked about -- they shared with me a history of
 5    the investments around the retirement systems, the
 6    investments that were made, and I believe it was
 7    during the during the Kwame administration into
 8    alternative -- what you would call alternative
 9    investment vehicles; the -- the smoothing that had
10    occurred and the stretching out of the unfunded
11    obligations over a relatively 30-year period.  But
12    the -- this really comes from that conversation.
13         Q.    Okay.  So, it is your testimony that
14    the retirement systems themselves told you that
15    they utilized an unrealistic rate of return
16    assumption?
17         A.    The people that I met with, I believe
18    it's in your offices at -- across the street from
19    the KMAK.
20         Q.    And who --
21         A.    Shared with me.
22         Q.    Someone specifically on behalf of
23    retirement system opined to you that they --
24         A.    Mr. Overbeke (sic) and Mr. -- and I
25    think it was -- the gentleman who was a lawyer,
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 47 of 72

00000000-0000-0000-0000-000000000000

1          - MARTI KOPACZ - VOLUME II-

2    but is also general counsel now for the funds.

3          Q.    Michael VanOverbeke?

4          A.    He's one of them --

5          Q.    Or Joe Turner?

6          A.    I think it's Joe Turner.

7          Q.    What I'm trying to get at, your

8    testimony is that during that meeting they

9    specifically told you --

10          A.    About --

11          Q.    -- that they believed --

12                MR. KANE:  Wait for her to finish.

13          Q.    Let me finish the question.

14                -- that there was an unrealistic rate

15    of return assumption that was utilized by the

16    system?  Or is that your extrapolation based on

17    what was said at the meeting?

18          A.    The -- we talked very specifically

19    about the recent history of losses, investment

20    losses at the retirement system; how they had used

21    a seven-year smoothing period to make the

22    shortfalls less obvious; how they had implied

23    amortization periods that were extended for

24    funding the unfundeds; and how all of that ended

25    up creating, you know, again, a perception or a

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 48 of 72
00000000-0000-0000-0000-000000000000

```
1              - MARTI KOPACZ - VOLUME II-
2    reality of the underfunding of the plans.  As well
3    as the 13 checks and those sorts of things.  We
4    talked about all of that.
5         Q.     Do you have any understanding of what
6    would be a typical smoothing period utilized by
7    other public pension plans?
8         A.     I don't.
9         Q.     So if someone from the retirement
10   systems told you that a seven-year smoothing
11   period was used, you would have no basis to
12   compare that with other plans to know if that was
13   typical?
14        A.     I would -- I would have to undertake
15   to research that.  I wouldn't have my own
16   independent knowledge of what that was.
17        Q.     Same with amortization period
18   utilized by public pension systems.  Would you
19   have any basis to know whether a 20-year
20   amortization period versus a 30-year amortization
21   period.
22        A.     Or a ten or a five.  No, I would not.
23        Q.     Okay.  So just to narrow it down, we
24   told you certain facts -- when I say "we," the
25   retirement systems gave you certain facts about
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 49 of 72

1              - MARTI KOPACZ - VOLUME II-

2     comptroller of the State of Alabama for 23 years

3     and the former president of the Government Finance

4     Officers Association for a number of years.  And I

5     believe he's -- he is a current advisor or recent

6     past advisor to the GASB, the Government

7     Accounting Standards Board on these matters.

8          Q.    Do you know -- I'm sorry -- do you

9     know if either one has any actuarial experience?

10         A.    I don't believe either has actuarial

11    experience.

12         Q.    Do you know if either has sat on a

13    board for a public pension system?

14         A.    I believe Mr. Childree has.

15         Q.    Do you know how long the meeting

16    between Mr. Gaul, Mr. Childree and the retirement

17    systems lasted?

18         A.    I don't.

19         Q.    In reaching your conclusion on Page

20    127, I believe you testified this morning that you

21    never looked at the investment policies for the

22    system.

23         A.    I did not.

24         Q.    Do you know if your team looked at

25    those?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 50 of 72
00000000-0000-0000-0000-000000000000

```
 1              - MARTI KOPACZ - VOLUME II-
 2        A.     I don't know.
 3        Q.     Do you or your team -- do you know if
 4   you or your team looked at the historical asset
 5   allocation mix for the system?
 6        A.     I believe someone did, yes.
 7        Q.     Okay.  Do you know where those are
 8   listed on the chart of documents that you looked
 9   at?
10        A.     I don't.
11        Q.     The underfunding issue that is spoken
12   about in this paragraph, was that discussed only
13   at the meeting with you and a representative of
14   the retirement systems or was it discussed at the
15   meeting with Mr. Gaul and Mr. Childree as well?
16        A.     I'm sure it was discussed at all of
17   the meetings.
18        Q.     Did you or your team consult with any
19   of the systems investment consultants in reaching
20   this conclusion?
21        A.     I -- I believe that Mr. Gaul and/or
22   Mr. Childree participated in meetings or calls
23   with the pensions' advisors, the pension systems'
24   advisors.
25        Q.     Do you know who NEPC is?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 51 of 72

00000000-0000-0000-0000-000000000000

1                    - MARTI KOPACZ - VOLUME II-

2          A.      I don't.

3          Q.      Do you know who Wilshire Investments

4     is?

5          A.      Only just -- I don't know them

6     specifically.

7          Q.      Do you know their role within the

8     system --

9          A.      I know --

10              MR. KANE:  Wait for her to finish.

11          We're getting close to the goal line, if you

12          want to get out.  We're still going to get

13          their steadily.

14              THE WITNESS:  We're still going to

15          get there.

16     BY MS. GREEN:

17          Q.      Do you know if those are the

18     investment consultants that your team would have

19     met with?

20          A.      I don't know.

21          Q.      Do you know if anyone from your team

22     met with the chief investment officer for the

23     retirement systems?

24          A.      I don't know.

25          Q.      Does the name Ryan Bigelow ring a

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 52 of 72
00000000-0000-0000-0000-000000000000

                    - MARTI KOPACZ - VOLUME II-

2    bell?

3         A.    It does not.

4         Q.    Would it be fair to say if I didn't

5    see his name on any of the meeting lists or

6    communications logs, that you did not consult with

7    Mr. Bigelow prior to reaching a conclusions about

8    the investment practices of the system?

9         A.    That's probably correct.

10        Q.    You testified earlier under

11   questioning from Mr. Wagner that you had no

12   particular quarrel with the asset mix and that you

13   did not actually analyze the asset mix?

14        A.    That's correct.

15        Q.    Okay.  So if you didn't look at the

16   asset mix, what else did you base your opinion on

17   that the systems investment strategy is

18   questionable?

19        A.    The representations that were made in

20   the meeting that I personally had in your offices

21   with the pension system representatives.

22             MR. KANE:  Can I interject something

23        similar to what I did yesterday.  I don't

24        quarrel with the term "opinion" as long as

25        it's little O, recognizing her opinions are

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 53 of 72
00000000-0000-0000-0000-000000000000

```
1              - MARTI KOPACZ - VOLUME II-
2         specific ones that are set forth at the
3         beginning of the report.
4              THE WITNESS:  Right.
5    BY MS. GREEN:
6         Q.    I guess what I'm trying to ask is,
7    they told you certain facts about amortization
8    periods, smoothing, things of that nature.  You
9    just stated you have no basis to compare those to
10   anything.  So my question --
11        A.    I relied --
12        Q.    -- is, how do you know they're
13   questionable practices?
14        A.    I relied on what the general counsel
15   of the two systems told me.
16        Q.    Your testimony is that he used the
17   word "questionable practices" about his own
18   client?
19        A.    They are talking about the systems
20   prior to when those people got involved.
21        Q.    You're saying before they had any
22   personal knowledge they were speaking of prior
23   history?
24        A.    My question was, how did the system
25   get to this point?  Okay?  But I believe Mr.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 54 of 72
00000000-0000-0000-0000-000000000000

```
1              - MARTI KOPACZ - VOLUME II-
2     Turner and Mr. Overbeke are new to the systems in
3     their role as both lawyers and general counsel.
4     Okay?
5              I am not talking about the systems
6     today moving forward.  I am talking about how did
7     the systems get in this underfunded predicament.
8         Q.    Do you understand generally that
9     retirement systems were fully funded as of 2007?
10        A.    I don't know when they were last
11    fully funded.
12        Q.    Did you know that according to, for
13    instance, the general retirement system's annual
14    actuarial report from June 30th, 2008, that it was
15    101 percent funded?
16        A.    I don't know that.
17        Q.    In 2008?
18        A.    I don't care about that.
19        Q.    Okay.  Why wouldn't you care about
20    when the time of underfunding occurred?
21        A.    I care about the impact the
22    underfunded systems have on the plan of adjustment
23    and the City's obligations to fund pensions going
24    forward.
25        Q.    If you flip to the next page of your
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1              - MARTI KOPACZ - VOLUME II-
 2    that's from Chuck Moore as well?
 3         A.    Yes.
 4         Q.    And the last paragraph that says,
 5    "Retirement system officials have been accused or
 6    indicted of material fiduciary misconducts
 7    allegedly during the pension of necessary
 8    liquidity and contributing to the underfunding of
 9    the retirement systems."
10              Was that also from the Chuck Moore
11    Affidavit?
12         A.    Yes.
13         Q.    Okay.  Let's take a look at the --
14              MS. GREEN:  I think it will be
15         Exhibit 10, I could be way off.  Exhibit 10.
16              (Whereupon, Kopacz Exhibit 10 was
17         marked at this time.)
18         Q.    Okay.  Footnote 47 states that the --
19              MR. BLANCHARD:  What document is
20         that?
21              MS. GREEN:  The Chuck Moore
22         declaration.
23              MR. BLANCHARD:  Thanks.
24    BY MS. GREEN:
25         Q.    Footnote 47 states that the Chuck
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 56 of 72
00000000-0000-0000-0000-000000000000

1          - MARTI KOPACZ - VOLUME II-

2     Moore declaration, Page 10, is what is being

3     relied upon for all of those statements that we

4     just went through.

5          A.     Okay.

6          Q.     If you flip to Page 10 of his

7     declaration, take time to review it, do you see

8     anything where Chuck Moore states that retirement

9     system officials have been accused or indicted of

10    any type of fiduciary misconduct?

11         A.     I don't see anything on Page 10 of

12    this document that is in this verbiage.  This

13    looks like this is an error at some point.

14         Q.     Okay.  Do you see anything in the

15    affidavit -- in his declaration that discusses

16    alleged --

17         A.     This is -- I'll be honest with you,

18    this is not the declaration that I thought we were

19    citing.  It is a much, much thicker document from

20    Chuck Moore.

21         Q.     Do you agree that it says docket

22    number 13 at the bottom?

23         A.     I absolutely agree that's what this

24    says and that's what this looks like in terms of

25    what you've handed to me.  But I don't believe

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 57 of 72

1          - MARTI KOPACZ - VOLUME II-
2     this verbiage came from this declaration.
3          Q.     Okay.
4          A.     I think there -- again, there is a
5     very -- there is a much more -- there's a thick,
6     like -- hundred page Chuck Moore document that I
7     believe should be cited down here, must be because
8     this isn't it.
9          Q.     So you think this is an error?
10         A.     This is an error.  This is not --
11    this is -- yeah, there's something --
12         Q.     Aside from the Chuck Moore
13    declaration, assuming you find the proper
14    document, do you have any other basis or personal
15    knowledge to make the statement that is the last
16    bullet point?
17         A.     I was told that, again, during the
18    meeting with the pension systems in your office.
19         Q.     You were told --
20         A.     That --
21         Q.     -- that -- let me finish the
22    question -- that these activities actually caused
23    the underfunding to the systems?
24         A.     I'm not -- I was told that there were
25    people involved in the pension systems who were

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 58 of 72
00000000-0000-0000-0000-000000000000

1                - MARTI KOPACZ - VOLUME II-
2      accused of wrongdoing.  And my recollection is
3      that some of them were or were going to jail or
4      something along that way -- line.
5           Q.     Who do you contend from the systems
6      told you that these accusations or indictments
7      actually led to what you state in here was
8      draining the pension of necessary liquidity?
9           A.     Like I said, I don't -- I am
10     struggling because I believe there is a citation
11     error in this report.
12               THE VIDEOGRAPHER:  Excuse me.  You're
13          rubbing your mike, it's --
14               MS. GREEN:  Sorry, I think it's my
15          hair touching it.
16               THE VIDEOGRAPHER:  Sorry about the
17          interruption.
18          A.     Right, I apologize.  I don't believe
19     that what you showed me as docket number 13, okay,
20     does not comport with what we have cited as the
21     source of this verbiage.  Okay?
22               I have -- all of these points were
23     communicated, okay, to me by people, all right,
24     not the -- definitely not this document.  Okay.
25               So, there's a -- there is an error.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 59 of 72

1                   - MARTI KOPACZ - VOLUME II-

2       There is a -- there's some mistake here and I

3       don't know what it is, I will obviously get to the

4       bottom of it.  But the -- the verbiage that's

5       here, by and large comports with my understanding

6       of at least some of the reasons why the pension

7       systems and funds became underfunded.

8           Q.     Do you know when these indictments or

9       these breaches of fiduciary duty occurred?

10          A.     Sometime prior to the bankruptcy.

11          Q.     Do you know who or which individuals

12      are being referenced in this bullet point?

13          A.     I would -- I wouldn't have any

14      knowledge of who they were.

15          Q.     The portion of that sentence that

16      states that that activity contributed to the

17      underfunding of the retirement systems, is it your

18      testimony that someone from the retirement systems

19      actually told you that their underfunding was due

20      to the activities listed in this paragraph?

21          A.     I don't have a specific recollection

22      of the -- of this statement.  Like I said, I am

23      generally aware of all of the points that are made

24      in these bullets.  Okay.  Rather than write our

25      own language, we chose to use someone else's

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 60 of 72
00000000-0000-0000-0000-000000000000

```
 1              - MARTI KOPACZ - VOLUME II-
 2      declaration which has been incorrectly cited.
 3           Q.     So what I'm trying to get at are you
 4      really relying on the Chuck Moore declaration or
 5      are you relying on statements from people within
 6      the system?
 7           A.     I'm relying on statements from within
 8      the system, right.  And I believe my intent was to
 9      have -- to use verbiage that was already part of
10      the proceedings.
11           Q.     Okay.  Did you take notes,
12      handwritten notes at this meeting?
13           A.     I don't recall.
14           Q.     If the attendees from the retirement
15      systems disagreed with your characterization that
16      they ever told you that these activities led to
17      draining of pension fund liquidity or contributing
18      to the underfunding, would you have specific
19      recollection to be able to refute that?
20           A.     I -- like I said, I don't know.  I
21      have -- I don't know what I -- I haven't looked at
22      this for a long time.  I'm sorry.
23           Q.     Okay.  Did you attempt to quantify
24      the actual economic impact that you attribute to
25      this misconduct?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 61 of 72
00000000-0000-0000-0000-000000000000

1          - MARTI KOPACZ - VOLUME II-

2          A.     I did not.

3          Q.     Did you ever speak to Chuck Moore

4    about this portion of his declaration, the larger

5    one, I suppose?

6          A.     I have talked to Chuck Moore and

7    members of my team have talked to Chuck Moore

8    extensively about pensions and all of these

9    issues.

10         Q.     Did you independently verify the four

11   or five bullet points that are here?

12         A.     Okay.  I've just explained to you

13   that my instructions to my team were to cite

14   information that already existed on the record.

15   Okay.  This is an error.  I don't know how many

16   times I have to say this.  Okay?

17         Q.     So it's a no?

18         A.     The answer is, I -- when I read this

19   I said, I want this cited.  Right?  Because I

20   would -- I'm sure I would have written it

21   differently.  I probably wouldn't have put it in a

22   bullet format.  Okay?

23         Q.     So if it is an error and it's not in

24   the Chuck Moore declaration and it may be in the

25   other one and you don't have independent specific

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 62 of 72
00000000-0000-0000-0000-000000000000

```
1              - MARTI KOPACZ - VOLUME II-
2         Q.     Okay.  In your report you seem to
3    opine on the cause of the underfunding as you seem
4    to be attributing it to certain questionable
5    investment strategies.  That's why I'm asking
6    about the timing of when we became underfunded.
7              So I just want to clarify, you have
8    no idea when the systems became underfunded,
9    correct?
10        A.     As I sit here today, I do not know
11   the specific date when the funds -- the pension
12   systems became underfunded.
13        Q.     And I believe there was some
14   testimony yesterday in your deposition regarding
15   the Great Recession and it's impact on the City of
16   Detroit.  And if I used the phrase the Great
17   Recession, do you understand I generally mean the
18   economic downturn from 2008 to 2009?
19        A.     Yes.
20        Q.     Do you know who Tom Terry is?
21        A.     I don't.
22        Q.     I believe that Mr. Neal asked you
23   during questioning whether you intended to review
24   the expert reports that were issued by all of the
25   experts in this case?
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 63 of 72
00000000-0000-0000-0000-000000000000

1                - MARTI KOPACZ - VOLUME II-

2          A.     I may.

3          Q.     Okay.  Are you aware that Mr. Terry

4      has been named as an expert related to pension

5      issues in this case?

6          A.     I don't.

7          Q.     Would you have a basis to disagree

8      with Mr. Terry's conclusion that upon examination

9      it is clear that the GRS UAAL is largely

10     attributable to adverse investment experience

11     since 2007, and not due to any sort of systemic or

12     deliberate underfunding of the plan caused by the

13     actuarial funding policy?

14         A.     I have no idea.

15         Q.     Would you have a basis to disagree

16     with his statement that due in large part to the

17     actuarial losses experienced in the severe

18     economic downtown from 2008 to 2009, the GRS's

19     UAAL has since grown substantially and that this

20     increase is largely due to the unforeseen

21     investment performance in fiscal years 2008 and

22     2009?

23         A.     I have no idea.

24         Q.     Would you have a basis to disagree

25     with his conclusion that the current underfunding

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 64 of 72

```
1                 - MARTI KOPACZ - VOLUME II-
2       liability is not the result of, as the City
3       claims, alleged systematic underfunding over the
4       last several decades, but instead, is largely due
5       to the Great Recession?
6               A.      I have no idea.
7               Q.      Would you have a basis to disagree
8       with his conclusion that GRS's experience is
9       hardly unique, pension plans and other
10      institutions across the country had similar
11      experiences?
12              A.      I don't know.
13              Q.      Are you familiar with the expert
14      report issued by Joseph Ecochinco on behalf of
15      Oakland County?
16              A.      No.
17              Q.      Would that be one of the expert
18      reports that you would perhaps review?
19              A.      Maybe.
20              Q.      Do you understand that Mr. Ecochinco
21      has been retained as a pension issues related
22      person?
23              A.      I have no knowledge of that.
24              MR. LERNER:  Excuse me.  There's
25          someone on the telephone at the deposition
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 65 of 72

```
 1              - MARTI KOPACZ - VOLUME II-
 2         that's speaking.  Can you mute your phone,
 3         please.
 4         Q.     If Mr. Ecochinco opines that the fact
 5    is that the unpredictable severe turn down in
 6    investment market returns brought about by the
 7    2008, 2009 decline in global equity values is the
 8    key reason for the increase in the UAAL, would you
 9    have a basis to disagree with that?
10         A.     I have no idea.
11         Q.     Would you have a reason to disagree
12    with Mr. Bigelow, who we spoke about earlier, the
13    chief investment officer for the systems, if he
14    were to testify that the predominant cause of the
15    systems in underfunding was also was the Great
16    Recession?  Would you have a basis to disagree
17    with that?
18         A.     I don't know.
19         Q.     You were presented earlier with a
20    chart showing return rates.  I think it's Exhibit
21    4.  Prior to seeing this document, were you aware
22    of the year-to-year funding -- or, I'm sorry,
23    assumed rate of return -- returns achieved by the
24    systems?
25         A.     I am -- I was aware of the assumed
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 66 of 72
00000000-0000-0000-0000-000000000000

1                  - MARTI KOPACZ - VOLUME II-

2    rate of return.

3         Q.    I'm sorry, like the year to year,

4    what was actually achieved, the actual investment

5    experience on behalf of the systems?

6         A.    I have seen information like that

7    before.

8         Q.    Okay.  Can I draw your attention to

9    the 2008 line?

10        A.    Yes, I see that.

11        Q.    For GRS it shows investment loss of

12   negative 25.65.

13              Do you see that?

14        A.    I do.

15        Q.    For PRFS, it's 24.63 loss?

16        A.    That's correct.

17        Q.    Do you have an understanding of what

18   typical losses were to other public pension

19   systems in the year 2008 due to the Great

20   Recession?

21        A.    I have not looked at that right now.

22        Q.    Did you consult any publications or

23   studies to compare how the Detroit retirement

24   systems faired compared to other public pension

25   systems?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 67 of 72

1              - MARTI KOPACZ - VOLUME II-

2         A.     I did not.

3         Q.     Do you think that that would be

4    relevant to your conclusion that questionable

5    investment strategies were utilized by the

6    systems, would that cause their underfunding?

7         A.     I am -- as I said, before I am

8    reciting information that I received from pension

9    system people.  Okay.  And what is important to me

10   is the level of underfunding in the pension

11   systems as of the filings and today and how that

12   is going to be dealt with in the future.

13        Q.     And you understand that the

14   underfunding as of the filing, if we look at this

15   document --

16        A.     Which document?

17        Q.     Exhibit 4.

18        A.     This doesn't give anything on

19   underfunding.

20        Q.     I understand that.  You already

21   stated you didn't know that it was fully funded in

22   2000 -- the end of 2007, correct?

23        A.     I don't know one way or another.

24   Okay?

25        Q.     Okay.  Did you review any data from

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 68 of 72

1                    - MARTI KOPACZ - VOLUME II-

2     the United States Census Bureau related to public

3     pensions?

4          A.    I did not personally, no.

5          Q.    You testified earlier that you were

6     not familiar with NCPERS -- it was used earlier,

7     it's N-C-P-E-R-S.  Mr. Wagner showed you a

8     document I believe from NCPERS.

9          A.    He did.

10         Q.    Are you familiar with the

11    organization NASRA?

12         A.    I am -- yes, I am familiar with that

13    trade association because we used some of their

14    information.

15         Q.    Did you happen to consult the public

16    funding survey for fiscal year 2008 published by

17    NASRA?

18         A.    I would have no need to do that.

19              MS. GREEN:  Okay.  I'm going to mark

20    this as Exhibit 11.

21              (Whereupon, Kopacz Exhibit 11 was

22         marked at this time.)

23    BY MS. GREEN:

24         Q.    So you stated you may have looked at

25    some NASRA publications.  But this one -- is this

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 69 of 72
00000000-0000-0000-0000-000000000000

1                - MARTI KOPACZ - VOLUME II-

2      one that you recall looking at?

3           A.     I -- I have not looked at this.

4           Q.     Okay.  The title of the document is

5      Public Funds Survey Summary of Findings for Fiscal

6      Year 2008.  It was released in 2009.

7                  If you go to Page 2 on the left-hand

8      column, in the second paragraph it states:  "The

9      market decline in 2008 resulted in a median

10     investment return for public pension funds of

11     negative 25.3 percent for the year."

12                 Do you see that portion?

13          A.     I do, it's highlighted.

14          Q.     And in comparison to the investment

15     losses that were incurred by the Detroit

16     retirement systems in 2008, if you compare those

17     to Exhibit 4, does it appear that our investment

18     losses were actually in line with the median

19     investment losses for other public pensions?

20          A.     The numbers appear to be similar,

21     yes.

22          Q.     If the systems fared in line with

23     what other public pension -- how other public

24     pension systems performed, does that change your

25     opinion at all as to whether questionable

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 70 of 72
00000000-0000-0000-0000-000000000000

```
1              - MARTI KOPACZ - VOLUME II-
2    investment strategies are what caused their
3    underfunding?
4         A.    Ms. Green, with all due respect,
5    okay, I really don't, at the end of the day, care
6    about how they got underfunded.  Okay?  They are
7    underfunded.  There is treatment in the Plan of
8    Reorganization -- Plan of Adjustment that I have
9    to assess relative to feasibility.
10             I understand you and your client
11   really don't like the verbiage that's in my
12   report.  Okay?  I get that.  But I simply don't
13   care about how they got there.  I only care about
14   where they are today and what's going -- what
15   their treatment is in the Plan of Adjustment.
16             So I am not going to have any
17   opinion, any point of view, any perspective on
18   anything that happened in 2008, 2007, 1997 or
19   whatever.
20        Q.    So would you agree with me that the
21   portion of your report on pages 127 and 128 is
22   largely irrelevant?
23             MR. KANE:  Objection.  You can
24        answer.
25        A.    It is a recitation of what I believed
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 71 of 72
00000000-0000-0000-0000-000000000000

```
 1              - MARTI KOPACZ - VOLUME II-
 2    at the time to be, arguably, facts.
 3         Q.     If we looked at the facts today that
 4    appear to not support what's in your report, and
 5    as Mr. Neal asked you previously, will you be
 6    reissuing a report or supplementing your report or
 7    changing any parts of your analysis based on new
 8    facts that you've learned either from --
 9              MR. BLANCHARD:  Objection.
10         A.     I don't think so -- I don't believe
11    that any of the items that are cited on Page 128
12    and 129 are significantly materially incorrect.
13    Okay?  And they are simply words to help the
14    reader appreciate some of the reasons that the
15    pension funds today are underfunded.
16         Q.     Did you do an analysis of how much
17    the City owes in unpaid annual employer
18    contributions to each of the systems and how that
19    impacted the underfunding?
20         A.     I'm sorry.  Could you repeat that?
21              (The requested question was read back
22         by the reporter.)
23         A.     I don't know the answer to that.
24              THE VIDEOGRAPHER:  We have to change
25         tape.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7061   Filed 08/25/14   Entered 08/25/14 23:09:04   Page 72 of 72
00000000-0000-0000-0000-000000000000