# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | | Related to Doc. No. 6908 |

## THE DETROIT RETIREMENT SYSTEMS' MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO ALLEGED HISTORICAL MISMANAGEMENT/MISCONDUCT

The Police and Fire Retirement System of the City of Detroit (the "PFRS")
and the General Retirement System of the City of Detroit (the "GRS") (together,
the "Retirement Systems") hereby submit this motion *in limine* seeking a ruling
precluding any evidence relating to the alleged historical mismanagement or
misconduct of the Retirement Systems from being admitted at the trial scheduled
before this Court (the "Plan Confirmation Trial") to consider confirmation of the
*Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 20,
2014)* [Dkt. No. 6908], as may be further amended (the "Plan"), pursuant to (a)
Fed. R. Evid. 402 because such evidence is irrelevant and should be excluded, or
alternatively, (b) Fed. R. Evid. 403 because even if such evidence is relevant, it
confuses the issues, is more prejudicial than probative, will cause undue delay, and

will waste precious trial time and judicial resources.

## I.    INTRODUCTION

Based on discovery activity, the Retirement Systems anticipate that Syncora[1] (and potentially other objecting creditors) may seek to introduce evidence at the Plan Confirmation Trial of alleged historical mismanagement and misconduct by the Retirement Systems.  Further, it appears, based on questions asked at Kevyn Orr's deposition, that Syncora will try to take this argument one step further and specifically argue that because active employees and retirees accepted certain benefits (such as the so-called 13th checks) and voted for a portion of the Board of Trustees who oversee the Retirement Systems, that they are somehow individually "culpable" for such prior bad acts of the Retirement Systems and that this should have been factored into the City's treatment for Classes 10 and 11.

In short, Syncora appears to be attempting to impute responsibility for any alleged prior mismanagement of the Retirement Systems to the individual beneficiaries of the Systems themselves.  This theory is desperate and absurd, as there is simply no factual or legal basis for it.  For example, it bears mentioning that retirees do not elect a majority of the trustees on either of the Retirement Systems' boards of trustees, and, as mere pension participants, they never voted specifically on the issuance of 13th checks or other such practices relative to the

---

[1]     Syncora Capital Assurance Inc. and Syncora Guarantee Inc. will be collectively referred to as "Syncora" throughout this Motion.

Annuity Savings Fund. Thus, the vast majority of individual Holders of Class 10 and 11 Claims cannot be said to have actively participated in any way in the management of the Retirement Systems such that they could be held responsible for the Systems' actions.

As such, any purported evidence of the Retirement Systems' alleged prior mismanagement or misconduct is irrelevant to any of the legal or factual issues to be argued at trial, and therefore, it should be excluded pursuant to Fed. R. Evid. 402. As discussed below, it appears from her expert report that Court-appointed expert Martha Kopacz will similarly seek to testify about prior practices of the Retirement Systems. Again, since there is no nexus between such evidence, and the determination of whether the Plan treats Class 10 and 11 Claims properly, and is confirmable, this evidence is irrelevant and should be excluded. Furthermore, even if it is somehow marginally relevant, it should still be excluded under Fed. R. Evid. 403, because any probative value of this evidence is substantially outweighed by the likelihood that it will confuse the issues, unfairly prejudice the Retirement Systems, active employees, and retirees, and waste time that should be dedicated to presenting more important evidence at trial. Lastly, an *in limine* ruling in advance of trial will foster this Court's continued efforts to streamline the Plan Confirmation Trial and ensure that trial time is dedicated to critical issues only and not wasted by digression into peripheral issues.

## II.    BACKGROUND

### A.    Syncora's Focus on Prior Acts of the Retirement Systems

In Syncora's Objection to the Debtor's Plan of Adjustment, it alleges that: "corruption and mismanagement at various levels of an already ineffectual city government, including the mayor's office *and the pension systems*, compounded the City's problems" and that "as a result of the mismanagement of the pension systems, the systems were seriously underfunded as of 2005." [Dkt. No. 4679 at ¶ 10] (emphasis added).    At Kevyn Orr's deposition, Syncora questioned him regarding this alleged "mismanagement."   The questioning appeared to be aimed at arguing that the City should have considered the prior conduct of the Retirement Systems when determining the treatment of Classes 10 and 11 under the Plan. (*See e.g.*, Exhibit 6-A attached hereto, Kevyn Orr Dep. at 319-326).

Syncora also inquired whether the City had determined that certain practices (such as the 13th checks) contributed to the current level of underfunding, whether the City found that "pension trustees engaged in imprudent expense practices," whether the Retirement Systems "had members of either their administration or their board of trustees convicted of Federal bribery charges," and whether the City "actually believes after it -- having investigated these problems that these problems actually contributed to the level of underfunding of the GRS system[.]"  (Exhibit 6-A, Orr Dep. at 321-22).    Orr responded that the average pensioner had no

"culpability" for any of these issues, but Syncora queried why they would *not* be culpable, since they received the 13th checks, and further, had elected some of the trustees to the Retirement Systems' boards.[2] Syncora then asked if the City held any of these "facts" against the retirees when it came to making its decision as to what the retirees should recover, to which Orr answered "[n]o." *Id*. at 322.

While Syncora's Plan objections [Dkt. Nos. 4679, 6651] do not cite any particular element of the Bankruptcy Code that this evidence relates to, it appears that Syncora will seek to introduce such evidence at trial.[3] Therefore, the Retirement Systems seek an advance ruling that such evidence is irrelevant, or even if it is somehow marginally relevant, that it is confusing, unfairly prejudicial, and will cause undue delay at trial.

## B.    Kopacz's Focus on Prior Acts of the Retirement Systems

In addition, the Court's independent expert, Martha Kopacz ("Kopacz"), included similar opinions in the report she issued on July 18, 2014 (the "Kopacz Report" or the "Report"). For example, Kopacz opined in the Report (putting aside

---

[2]    A similar line of questioning regarding pension beneficiaries' ability to elect officials and participate in the running of the Retirement Systems occurred during Syncora's deposition of the Retirement Systems' Executive Director, presumably for the purpose of making the same argument. (*See* Exhibit 6-B attached hereto, Cynthia Thomas Dep. at 106-115).

[3]    The Retirement Systems sought concurrence from Syncora prior to filing this Motion and inquired as to whether this line of questioning would be pursued at trial. Syncora confirmed that it would.

for the moment her lack of qualifications to opine on these issues) that the Retirement Systems "utilized unrealistic rate of return assumptions," and "managed the pension plans in accordance with questionable investment strategies that resulted in considerable underfunding" of the respective plans. (Kopacz Report at 127).[4] She further opined that "also contributing to the increase of the UAAL were a number of questionable activities engaged in by the retirement systems," and that "Retirement System officials have been accused and/or indicted of material fiduciary misconduct, allegedly draining the pension of necessary liquidity and contributing to the underfunding of the Retirement Systems." *Id.* at 128-29.[5]

Kopacz admits that none of these conclusions impact her feasibility opinions. (Exhibit 6-C attached hereto, Kopacz Dep. at 444, 545-46, 563, 566).[6]

---

[4]    Per the Court's prior instructions, expert reports have not been filed on the docket. For this reason, the Retirement Systems are not filing a copy of the Kopacz Report as an exhibit to this Motion.

[5]    For ease of reference, these opinions may be collectively referred to as Kopacz's "Pension-Related" conclusions throughout this brief.

[6]    For example, when asked whether "any of the pension risks that you cite in your report give you any pause with respect to the [P]lan," Kopacz answered: "The long-term risks associated with the City's pension obligations do not negatively impact my assessment for feasibility." (Exhibit 6-C, Kopacz Dep. at 444). She similarly testified that her conclusions about alleged historical practices within the Retirement Systems did not impact her feasibility analysis under the Plan:

> I am not talking about the systems today moving forward. I am
> talking about how did the systems get in this underfunded

Nevertheless, the Retirement Systems will have to call witnesses and waste precious trial time refuting what it believes are irrelevant and inflammatory accusations. Therefore, in this Motion, it seeks an *in limine* ruling to narrow the issues for trial.

## III.    ARGUMENT

### A.    Standard of Review

Courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 832 (6th Cir. 1991). Motions *in limine* streamline trials by eliminating inadmissible evidence. *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997); *see also Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984) (recognizing that district courts have authority to make *in limine* rulings pursuant to authority to manage trials). "The Federal Rules of Evidence, the Federal Rules of Criminal and Civil

---

predicament. . . And what is important to me is the level of underfunding in the pension systems as of the filings and today and how that is going to be dealt with in the future. . . I really don't, at the end of the day, care about how they got underfunded. . . There is treatment in the Plan of Reorganization – Plan of Adjustment that I have to assess relative to feasibility. . . But I simply don't care about how they got there. I only care about where they are today and. . . what their treatment is in the Plan of Adjustment.

*Id.* at 545-46, 563, 566.

Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures—including motions in limine—in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999).

Given the breadth of the factual and legal issues for trial, the overall length of trial, and the already voluminous number of witnesses slated to testify, the Retirement Systems wish to raise this issue now in an attempt to narrow the issues (and relatedly, the number of witnesses and exhibits to be presented at trial), to streamline the presentation of evidence, and to reserve trial time for the critical issues this Court must decide.

**B.    The Court Should Exclude "Evidence" Relating to the Purported Alleged Mismanagement or Misconduct Because It Is Irrelevant, and Even If Somehow Relevant, It Is Unfairly Prejudicial, Confusing and a Waste of Time.**

Under the Federal Rules of Evidence, only relevant evidence is admissible. Fed. R. Evid. 402.  Evidence is "relevant" if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Evidence must relate to a "matter or issue in dispute in the case" in order to be relevant.  *United States v. Dunn*, 805 F.2d 1275, 1281 (6th Cir. 1986).    "Whether an issue is properly in dispute is, of course, determined by the applicable substantive law."

Fed. R. Evid. 403 Advisory Committee's Note.

Further, even if the evidence is relevant, it may still be excluded by the Court if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### 1.    The Purported "Evidence" Is Irrelevant.

The   conclusory statements of Orr and Kopacz regarding the causes of the Retirement Systems' underfunding and purported mismanagement are entirely irrelevant to the legal and factual issues to be presented at trial.  As noted above, whether an issue is in dispute at trial is "determined by the applicable substantive law."   At the Plan Confirmation Trial, the primary legal arguments to be considered include issues such as whether the Plan is fair and equitable, whether it is in the best interest of creditors, whether the Plan unfairly discriminates between classes, and whether the Plan is feasible.[7]

---

[7]    While feasibility *is* a relevant issue for trial, Kopacz already admitted at her deposition that her conclusions on the various Pension-Related issues do not impact her feasibility opinion.  (*See* Exhibit 6-C, Kopacz Dep. at 444, 545-46, 563, 566).  Thus, it would be a waste of time to address the Pension-Related issues at trial.

To date, none of Syncora's written objections [Dkt. Nos. 4679, 6651] tie its argument regarding the Retirement Systems' underfunding and alleged mismanagement to any particular argument under the Bankruptcy Code. Thus, it is unclear how even Syncora believes this evidence is relevant to any disputed issue at trial. From the questioning at Orr's deposition, however, it appears that Syncora intends to argue that the Retirement Systems are underfunded due in significant part to their own misconduct (which the Retirement Systems vehemently dispute) and that retirees and actives should receive lesser treatment under the Plan because they voted for some of the trustees who allegedly oversaw such misconduct.

This line of argument is pure sophistry and should be precluded by the Court before trial. Any impact on the Retirement Systems' funding levels as of the Petition Date resulting from the alleged prior acts of the Systems has not been quantified by Syncora or anyone else -- nor compared to other possible factors contributing to the GRS' underfunding as of the Petition Date, including: (a) the impact of the Great Recession of 2008-09 on the value of the Systems' asets; (b) the decades-long shrinking of the City's population and economic base; and (c) the devastation suffered by the remaining population as a result of such loss of economic base and the effects of the residential mortgage crisis. Perhaps more importantly, Syncora cannot establish a basis to impute any such prior acts to the

Holders of Class 10 and 11 Pension Claims. This evidence is irrelevant to the core issues to be decided at trial.

**2.     Even if Somehow Relevant, the Purported "Evidence" is Unfairly Prejudicial, Confusing and a Waste of Time.**

The Retirement Systems posit that the Plan Confirmation Trial is not about the propriety of the Retirement Systems' past management. The trial should not be a forum for re-hashing and sensationalizing old news. However, if this evidence is permitted to be raised by the objecting parties, the Retirement Systems will have no choice but to refute it, which will take a substantial amount of time and necessitate documentary evidence and testimony from witnesses that would otherwise not be necessary. For example, these issues will necessitate the presentation of several witnesses by the Retirement Systems, cross-examinations of Orr and Kopacz that would otherwise be unnecessary, and the admission of documentary evidence to refute these allegations. Pursuing these theories will waste hours of valuable trial time, which has been capped at 85 hours per side.[8]

---

[8]     According to the Court's *Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Dkt. No. 6699, ¶ 12], both "[t]he City and those parties who support confirmation will be permitted 85 hours to present their case, including opening statements, closing arguments, direct and re-direct examinations of heir witnesses and cross examinations of objectors' witnesses." This time allowance is a further reduction from the 98 hours the Court originally granted. Given the limited time allotted for trial, the Retirement Systems are reluctant to dedicate any trial time to counter these frivolous arguments and seek the Court's assistance in this regard under its broad authority to manage trials. *See Seago*; *Luce*; *Brawner*.

Among other things, the Retirement Systems will be forced to show that Orr's deposition testimony was uninformed. For example, at Orr's deposition, Syncora raised remarks Orr made during a speech he gave in March of 2014 where he claimed, with respect to the Retirement Systems that "if they'd taken that money [from the COPs transactions] and invested it in the Dow Jones Industrial Index or Standard & Poor's from 2006 to 2009 when the stock market was trading at 8,500 to 9,000 it's now at 16,300, it would have almost doubled their money, and there'd be no pension underfunding." (Exhibit 6-A, Orr Dep at 319-320). First, some of the $1.4 billion *was* invested into the stock market during 2006 to 2009, but the Great Recession hit in 2008 and devastated the Retirement Systems' funding levels—just as it did to nearly all public pension funds across the country. In fact, several pension experts retained in this case agree with this assessment as to the cause of the Systems' underfunding. (*See e.g.*, Thomas Terry Expert Report at, ¶¶ 22, 37-39, 41; Joseph Esuchanko Expert Report at ¶ 28). The simple and undisputable fact is that **each System was fully funded prior to the Great Recession** but both lost roughly 25% of their respective asset base in 2008—which published data establishes is the same percentage lost by most public pension funds across the country on average. Second, investing all of the COPs proceeds in the stock markets would have been ***illegal*** as it would have run afoul of the investment diversification requirements of Michigan's Public Employee Retirement System

12

Investment Act. *See* M.C.L. 38.1133-.1140.

Moreover, the Annuity Savings Fund system was not the result of a "Retirement System practice." The Annuity Savings Fund in the GRS was established pursuant to a series of Detroit City Code ordinances (see Detroit City Code 47-1-18, 47-1-21, and 47-2-18(g)), none of which were authored by the Retirement Systems. The Retirement Systems merely *implemented* the controlling collective bargaining agreements ("CBA") and ordinances. Further, while Orr responded to Syncora that he believed Retirement System board members were "convicted of Federal bribery charges," and that these convictions "actually contributed to the level of underfunding of the GRS," this is also unfounded. Monica Conyers was convicted of a federal bribery charge in 2007, but the bribery she plead guilty to accepting was in exchange for a City Council vote relating to a contract with a company called Synagro.[9] There is no evidence that GRS suffered any monetary losses of any kind due to Conyers' misconduct. Other bribery charges against former Retirment System representatives have not yet been tried in a court of law, so there have been no convictions. It is premature to conclude guilt of any kind, and for the same reason, it would be purely speculative to attempt to quantify whether that any alleged bribe contributed at all or in any material way to any underfunding problems at the Systems, as the facts underlying those charges

---

[9] *See e.g.*, Case No. 09-20025-AC-SDP, Dkt. No. 23, Plea Agreement June 26, 2009.

have not yet been adjudicated.

In short, while all of these things can be refuted by the Retirement Systems at trial, it will take significant time out of the 85 hours that has to be shared between the City, the Retiree Committee, and all of the other settling parties.  And ultimately, this is nothing more than a sideshow distraction from the significant issues that the Court must consider at the Plan Confirmation Trial.  Syncora is slinging mud at the Retirement Systems with inflammatory and unfounded accusations in an attempt to prejudice the Court against a party whom Syncora deems to have gotten a better deal.  A ruling from the Court that such "evidence" is irrelevant will narrow the issues for trial and will relieve the Retirement Systems from offering witnesses and documents to defend against these frivolous allegations during a trial that already has an extremely compressed time frame.

## CONCURRENCE

Pursuant to E.D. Mich. LBR 9014-1(g), on August 18, 2014, counsel for the Retirement Systems communicated with counsel for Syncora to request concurrence with the relief sought in this motion.  The request was denied.

Dated:  August 25, 2014         Respectfully submitted,

CLARK HILL PLC

  /s/   Robert D. Gordon
Robert D. Gordon (P48627)

14

Jennifer K. Green (P69019)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan  48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
sdeeby@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | | Related to Doc. No. 6379, 4215 |

## ORDER GRANTING THE DETROIT RETIREMENT SYSTEMS' MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO ALLEGED HISTORICAL MISMANAGEMENT/MISCONDUCT

This matter comes before the Court upon The Detroit Retirement Systems'
Motion to Preclude Evidence Relating to Alleged Historical
Mismanagement/Misconduct [Dkt. No. ___] (the "Motion"); the Court finding that
good cause exists for the relief granted by this order:

IT IS ORDERED:

1.     The Motion is granted.

# EXHIBIT 2

# (Notice and Opportunity to Object)

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

**NOTICE OF THE DETROIT RETIREMENT SYSTEMS' MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO ALLEGED HISTORICAL MISMANAGEMENT/MISCONDUCT**

Please take notice that on August 25, 2014, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (collectively, the "Retirement Systems") filed the Detroit Retirement Systems' Motion *in Limine* to Preclude Evidence Relating to Alleged Historical Mismanagement/Misconduct in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") seeking entry of an order to exclude evidence relating to alleged historical mismanagement or misconduct by the Retirement Systems at the hearings scheduled in connection with the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 20, 2014) [Dkt. No. 6379].

**<u>Your rights may be affected.</u> Please take further notice that your rights may be affected by the relief sought in the Motion. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to grant the Retirement Systems' Motion, or if you want the court to consider your views on the Motion, by **August 27, 2014**[1], you or your attorney must:

1.        File with the court a written response or an answer, explaining your position at:[2]

**United States Bankruptcy Court**
**Theodore Levin Courthouse**
**231 West Lafayette Street**
**Detroit, MI 48226**

       If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

       You must also mail a copy to:

Robert D. Gordon
Clark Hill PLC
151 S. Old Woodward, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

2.        If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

---

[1]      Paragraph 7(d) of the Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Dkt. No. 6699] established August 27, 2014 as the deadline to file responsive briefs to motions *in limine* and *Daubert* motions.

[2]      Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated:  August 25, 2014

Respectfully submitted,

CLARK HILL PLC

_/s/   Robert D. Gordon_
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan  48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
sdeeby@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# EXHIBIT 3

# Brief in Support (Not Required)

# EXHIBIT 4

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

_____

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 25, 2014, the Detroit Retirement Systems' Motion in Limine to Preclude Evidence Relating to Alleged Historical Mismanagement/Misconduct was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

CLARK HILL PLC

/s/ Robert D. Gordon_____
Robert D. Gordon (P48627)
151 South Old Woodward Avenue,
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire*
Dated: August 25, 2014        *Retirement System of the City of Detroit*
*and the General Retirement System of*
*the City of Detroit*

# EXHIBIT 5

# (Affidavits - None)

# EXHIBIT 6-A

1              KEVYN ORR, VOLUME 2

2        IN THE UNITED STATES BANKRUPTCY COURT

3          FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7    In Re:                    )     Chapter 9

8

9    CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

10

11            Debtor.     )    Hon. Steven Rhodes

12    _____

13

14                    VOLUME 2

15

16      The Videotaped Deposition of KEVYN ORR,

17      in his personal capacity and as Rule 30(b)(6) witness,

18      Taken at 2 Woodward Avenue,

19      Detroit, Michigan,

20      Commencing at 9:10 a.m.,

21      Tuesday, July 22, 2014,

22      Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

```
 1                        KEVYN ORR, VOLUME 2

 2          stretch you out on the rack.

 3   A.    No, no, let's keep going.  I'm good.

 4   Q.    Okay, here it is, sorry about that.

 5   A.    Okay.

 6   Q.    I'm sure you missed the nonstop cross-examination.

 7                   MARKED FOR IDENTIFICATION:

 8                   DEPOSITION EXHIBIT 22

 9                   12:14 p.m.

10   BY MR. HACKNEY:

11   Q.    This is actually a -- this is, I think, a transcript

12          of your U of M speech?

13   A.    It's the first time I've seen it, but thank you.

14   Q.    Yep, you bet.  It's a good speech.  Take a look at

15          page 6, okay?  And look at the big paragraph at the

16          bottom where you're talking about the -- the Grand

17          Bargain.

18   A.    Mm-hmm.

19   Q.    Now --

20                   MR. SHUMAKER:  Steve, is this the -- is

21          this the -- excuse me for interrupting.  Is this the

22          speech in March of 2014?

23                   MR. HACKNEY:  I think that it is, but it's

24          like a real nuisance when it comes to, like, printing

25          these things out, it drops the date, and on and on and
```

1                     KEVYN ORR, VOLUME 2

2        on, but my best recollection is that it is.

3                     MR. SHUMAKER:  Okay.

4                     MR. HACKNEY:  I apologize.  I can't get the

5        dates on some of these things where it comes across

6        all screwed up with banner ads and blah, blah, blah.

7                     MR. SHUMAKER:  Sure.

8    BY MR. HACKNEY:

9    Q.   Okay, so Mr. Orr, I want you to go to -- you're

10        talking about how much money's been devoted, okay, and

11        the foundations that are doing it?

12   A.   Yes.

13   Q.   And then you said -- do you see where it says "Some of

14        them did that as a profile in courage," do you see

15        that?  It's about the, like, fifth sentence.  "Some of

16        them" --

17   A.   Yes, I see that.

18   Q.   Okay, I'm going to read from there:

19                "Some of them did that as a profile in

20             courage.  Some of their own board members said

21             we do philanthropy, dollars that yield positive

22             outcomes.  We don't do charity, we don't just

23             give money away.  Some of them said we shouldn't

24             be doing this at all.  There's a moral hazard

25             here because after all, we were told in 2005 and

```
 1                    KEVYN ORR, VOLUME 2
 2          2006 that the 1.44 billion was going to cure the
 3          pension underfunding problem, and if they'd
 4          taken that money and invested it in the Dow
 5          Jones Industrial Index or Standard & Poor's from
 6          2006 to 2009 when the stock market was trading
 7          at 8,500 to 9,000 it's now at 16,300, it would
 8          have almost doubled their money, and there'd be
 9          no pension underfunding.
10               "If they'd stopped some of the practices,
11          the 13th check, the declaration of self-funded
12          rates of return in 2009, one of the funds lost
13          27 percent, they declared a rate of return of
14          over 7 percent, 32 percent spread in one year,
15          true story, self-funding mandates.  So many
16          people are saying that there's a moral hazard
17          here, we shouldn't be doing it."
18               Do you see that?
19     A.   Yes.
20     Q.   Isn't it true that the City has conducted an analysis
21          of the requirement systems, correct, and determined
22          that practices of the retirement systems led to the
23          level of -- contributed to the level of underfunding
24          here today, correct?
25               MS. GREEN:  Object to form and foundation.
```

1                    KEVYN ORR, VOLUME 2

2    A.    Yes, I think in part there have been reports for some

3          time over practices, in addition to analyses they've

4          done in this effort that have disclosed some of the

5          practices led to underfunding.

6    BY MR. HACKNEY:

7    Q.    And these are also disclosed in the plan -- or in the

8          disclosure statement in the plan, I believe?

9    A.    Yes.

10   Q.    And it is a fact that the City believes that the

11         so-called 13th check contributed to the underfunding

12         of the retirement systems, correct?

13   A.    Yes, there have been stories written about it in the

14         Free Press at length about the 13th check.

15   Q.    And it's a fact that the City believes that the

16         annuity savings fund and how that was handled

17         contributed to the level of underfunding of the

18         retirement systems, correct?

19   A.    Yes.

20   Q.    And it's correct that the board of trustees self --

21         declarations of their rates of return at rates that

22         were different from the actual rates of return

23         contributed to the underfunding of the pension system,

24         correct?

25                   MS. GREEN:  Objection.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 31 of 54

1           KEVYN ORR, VOLUME 2

2              COURT REPORTER:  I'm sorry, who's

3        objecting?

4              MS. GREEN:  Ms. Green for the retirement

5        systems.

6    A.   Yes, I believe in particular related to the

7         alternative savings fund.

8    BY MR. HACKNEY:

9    Q.   And it's also correct that the City has found that

10        pension trustees engaged in imprudent expense

11        practices; isn't that correct?

12             COURT REPORTER:  I can't hear you.

13             MS. GREEN:  Objection, form, foundation.

14             MR. KING:  Objection, foundation.

15             MR. ALBERTS:  They're the same person.

16   A.   Yes, I believe that's true.

17   BY MR. HACKNEY:

18   Q.   And it's also true that the retirement trusts have had

19        members of either their administration or their board

20        of trustees convicted of Federal bribery charges;

21        isn't that correct?

22   A.   I don't recall the specific charge but there have been

23        people sent to prison, yes.

24   Q.   And it was for conduct unbecoming in connection with

25        their job duties with the retirement trust, correct?

```
 1                      KEVYN ORR, VOLUME 2

 2                 MS. GREEN:  Object to form and foundation.

 3   A.   Yes, I believe that's true.

 4   BY MR. HACKNEY:

 5   Q.   So -- and I just want to make clear that the City

 6        actually believes after it -- having investigated

 7        these problems that these problems actually

 8        contributed to the level of underfunding of the GRS

 9        system, correct?

10                 MS. GREEN:  Same objection.

11   A.   Yes.

12                 MR. HACKNEY:  What's the objection?

13                 MS. GREEN:  Objecting to form.

14                 MR. HACKNEY:  Right, but what's the form

15        objection?

16                 MS. GREEN:  It's --

17                 MR. HACKNEY:  It's just important questions

18        being asked, I'm going to object?

19                 MR. KING:  Well, foundation objection,

20        also.

21                 MR. HACKNEY:  Well, I asked them if they

22        conducted an investigation so...

23   BY MR. HACKNEY:

24   Q.   How did that factor into your calculus of what

25        recoveries classes 10 and 11 should get versus COPs
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 33 of 54

1                    KEVYN ORR, VOLUME 2

2          holders?

3     A.   Well, I think as I said before, we've taken everything

4          into consideration, but recognizing some of the

5          behavior and difficulty, some of the leadership had to

6          be balanced against some of the lack of culpability,

7          if you will, for lack of a better word of the rank and

8          file membership.  So while we were certainly aware

9          that people have been convicted, that some of the

10         practices were ill-advised over a number of years, we

11         also have to consider that for the average pensioner,

12         they have no culpability in those practices.

13    Q.   Why do you say that?

14    A.   The average pensioner wasn't making decisions that

15         required them to go to jail or, perhaps, wasn't as

16         informed as some of the other conduct that was

17         occurring.

18    Q.   But they weren't getting the 13th checks?

19    A.   Some were getting the 13th checks, but that was a

20         practice that many of them that I've talked to didn't

21         even recognize as inappropriate.  They had been told

22         over a number of years that that was similar to the

23         private sector's Christmas bonus and, in fact, helped

24         some of them pay their heating bills during the

25         winter.

1                    KEVYN ORR, VOLUME 2

2    Q.   And you understand that the trustees, I think, are in

3         large part elected to the board, right?

4    A.   Yes.

5    Q.   And they're elected by their pensioners, right?

6    A.   Yes.

7    Q.   Okay.  So some of the wrongdoing was by people that

8         had been put in position by the pensioners, right?

9              MR. KING:  Form and foundation.

10   A.   Sure, but, you know, by that logic, the entire United

11        States was responsible for Richard Nixon's behavior.

12   BY MR. HACKNEY:

13   Q.   Except for the ones that voted against him?

14   A.   Maybe so.

15   Q.   Now, the -- fair summary, that you didn't -- I guess

16        you didn't hold these facts against the retirees when

17        it came to making your decision of what they should

18        recovery?

19   A.   No.

20   Q.   I'm correct?

21   A.   You are correct.

22   Q.   Now, you're aware that recoveries of the classes 10

23        and 11 are in part funded by the payments by the

24        foundations and by the DIA Corp., correct?

25   A.   Yes, I'm aware of that.

# EXHIBIT 6-B

1            IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE EASTERN DISTRICT OF MICHIGAN

3

4

5

6    In Re:                    )    Chapter 9

7

8    CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

9

10                  Debtor.     )   Hon. Steven Rhodes

11   _____

12

13

14        The Videotaped Deposition of CYNTHIA THOMAS,

15        Taken at 500 Woodward Avenue, Suite 3500,

16        Detroit, Michigan,

17        Commencing at 9:23 a.m.,

18        Wednesday, July 9, 2014,

19        Before Leisa M. Pastor, CSR-3500, RPR, CRR.

20

21

22

23

24

25

1         provide those members and beneficiaries with
2         transparency and to the investment of the funds,
3         correct?
4    A.   That is correct.
5    Q.   And the PFRS does provide its members and
6         beneficiaries with transparency into investment of the
7         funds, correct?
8    A.   That's correct.
9    Q.   And the GRS also provides its members and
10        beneficiaries with transparency into investments of
11        the funds, correct?
12   A.   That's correct.
13   Q.   And part of providing excellent customer service to
14        the members and beneficiaries of the funds is to
15        provide those members and beneficiaries with input
16        regarding the management and investment of those
17        funds, correct?
18   A.   That's correct.
19   Q.   And the PFRS does, from time to time solicit input
20        from its members and officers and beneficiaries
21        regarding the management and investment of the funds,
22        correct?
23   A.   That's correct.
24   Q.   For instance, the PFRS board and we're going to talk a
25        little bit about the boards, I understand there are

1       some proposed changes that were filed, I think last

2       Thursday, relating to the composition of boards or

3       investment committee going forward but for now I'm

4       going to focus on the current status of the boards

5       fair enough?

6   A.  Okay.

7   Q.  The PFRS board include -- board of trustees includes

8       three firefighters who are members of the system and

9       who are elected by the firemen members, correct?

10  A.  That is correct.

11  Q.  So that's one way that the PFRS gives input to its

12      members and beneficiaries to be involved in the

13      process of, for instance, investing the assets of the

14      fund, right?

15  A.  That is correct.

16  Q.  And the PFRS board also includes three police officers

17      who are members of the system and who are elected by

18      the police officers members, correct?

19  A.  Yes.

20  Q.  And within the police officer board of trustees

21      members, two are at the rank of lieutenant or below,

22      correct?

23  A.  Correct.

24  Q.  And one is at a rank above lieutenant correct?

25  A.  Yes.

```
 1    Q.   So there's an attempt to get a voice from across the
 2         different ranks within the police officer members when
 3         it comes to having a seat on the board of trustees,
 4         right?
 5    A.   That's correct.
 6    Q.   And that's the same with respect to the firefighters
 7         too, right?
 8    A.   Yes.
 9    Q.   The GRS board also includes multiple members of the
10         GRS that are elected by the members of the GRS,
11         correct?
12    A.   Correct.
13    Q.   And how many is that right now?
14    A.   Five.
15    Q.   The elections for both the PFRS and the GRS are public
16         elections, correct?
17    A.   Correct.
18    Q.   And for instance, for a PFRS, nominee to -- to even go
19         up for a vote they need 125 signatures on a petition,
20         correct?
21    A.   For a --
22    Q.   PFRS?
23    A.   PFRS?  I'm not certain because the retirement systems
24         doesn't run the -- the elections for the police and
25         fire elected members.
```

```
 1   Q.   The PFRS and GRS boards conduct public meetings,
 2        correct?
 3   A.   Correct.
 4   Q.   In fact, all of the meetings of the board meetings of
 5        the PFRS are required to be public, right?
 6   A.   That's correct.
 7   Q.   And all of the board meetings of the GRS are required
 8        to be public, correct?
 9   A.   That is correct.
10   Q.   And I take it that at these board meetings, as you
11        said earlier, there are opportunities for members or
12        beneficiaries to make statements to the board,
13        correct?
14   A.   That is correct.
15   Q.   And that's true of both the PFRS board and the GRS
16        board, correct?
17   A.   Yes.
18   Q.   And the board of trustee members have fiduciary
19        relationships to the members of the -- of the
20        retirement systems, correct?
21   A.   Correct.
22   Q.   And the GRS and PFRS each publish investment
23        guidelines, correct?
24   A.   Yes.
25   Q.   If I am a member of the PFRS, am I able to see the
```

```
 1          investment guidelines?
 2    A.    Yes.
 3    Q.    If I'm a member of the GRS am I able to see the
 4          investment guidelines?
 5    A.    Yes.
 6    Q.    And I'm also, if I'm a member of the PFRS able to see
 7          who the investment managers are, correct?
 8    A.    Correct.
 9    Q.    And I'm able to, in fact, go online and see all of the
10          investments that the PFRS is making, correct?
11    A.    Correct.
12    Q.    And if I'm a member of the GRS, I'm able to see who
13          the asset managers of the GRS are, correct?
14    A.    Correct.
15    Q.    And if I'm a member of the GRS I'm able to see the
16          investments that the GRS is making, correct?
17    A.    Correct.
18    Q.    And the boards are ultimately the ones who vote yea or
19          nay on an asset allocation, correct?
20    A.    Correct.
21    Q.    And they do that after consultation from an investment
22          consultant, correct?
23    A.    That's correct.
24    Q.    And they do that at a public meeting, correct?
25    A.    That's correct.
```

1   Q.   And the retirement systems both the PFRS and GRS place

2       detailed rules and parameters around what investments

3       can and cannot be made with retirement system funds,

4       correct?

5   A.   That's correct.

6   Q.   Now, members of the retirement systems also have the

7       ability to collectively bargain with the City in an

8       effort to protect or enhance their rights, correct?

9   A.   Yes.

10          MS. GREEN:  Object --

11   A.   Sorry.

12          MS. GREEN:  No, I was just going to say

13       object to the foundation of the question and to the

14       extent that it calls for a legal conclusion because

15       there are certain circumstances when the duties of

16       ours (ph.) have been suspended.  That's it.

17  BY MR. HOWELL:

18   Q.   And members of the retirement system also have the

19       ability to bring legal action, the retirement systems

20       can if they believe that their rights have been

21       infringed, correct?

22   A.   Can you repeat that question.

23   Q.   Sure.  The retirement systems also have the ability to

24       bring legal action if they believe that their rights

25       have been infringed, correct?

1    A.   That's correct.

2    Q.   In general the retirement systems try to listen to the

3         concerns of their members, correct?

4    A.   Correct.

5    Q.   And the retirement systems provide multiple platforms

6         for the members to have their voices heard, correct?

7    A.   That's correct.

8    Q.   Is it fair to say that in your position as executive

9         director of the retirement systems that you believe

10        the retirement systems provide adequate ways for the

11        members and beneficiaries of the systems to

12        participate in the operation of their pension

13        programs?

14   A.   Repeat the question.  I'm sorry.

15             MR. HOWELL:  Sure, would you mind reading

16        it back, please?

17             (The requested portion of the record was

18             read by the reporter at 1:01 p.m. as follows:

19             "Question:  Is it fair to say that in your

20             position as executive director of the retirement

21             systems that you believe the retirement systems

22             provide adequate ways for the members and

23             beneficiaries of the systems to participate in

24             the operation of their pension programs?")

25   A.   I do.

```
 1   BY MR. HOWELL:
 2   Q.   Also, fair to say that in your position as executive
 3        director of the retirement systems that you believe
 4        the retirement systems provide adequate opportunities
 5        for the members and beneficiaries of the retirement
 6        systems to protect their interests?
 7   A.   I'm not certain if I understand that one.
 8   Q.   Sure.  Well, we talked about the members and
 9        beneficiaries of the retirement systems have the
10        ability to nominate and elect fishes, correct?
11   A.   Correct.
12   Q.   They have the ability to attend board meetings,
13        correct?
14   A.   That is correct.
15   Q.   They have the ability to be heard at board meetings if
16        they ask to be heard, correct?
17   A.   That's correct.
18   Q.   And they have the ability to under the right
19        circumstances collectively bargain, correct?
20   A.   In most circumstances, yes.
21   Q.   And so I'm just asking that if you believe that all of
22        these sort of opportunities for the members and
23        beneficiaries of the retirement systems to have their
24        voices heard provides adequate opportunities for those
25        members and beneficiaries to protect their interests
```

1        in benefits that will be coming from the pension

2        systems?

3                MR. ALBERTS:  Join.

4   A.   No, I can't agree with that one.

5   BY MR. HOWELL:

6   Q.   And why do you disagree with that statement?

7   A.   So it -- my understanding of your question is if I

8        believe that they have adequate opportunity to protect

9        their interests, I guess I'm -- I'm thinking of a

10       member who -- who feels that -- that they did not

11       receive let's say a -- that they felt that perhaps a

12       particular rule should have applied to them that

13       didn't.  And you know, they can -- they can try and

14       attempt to go through a union or labor relations or,

15       you know, they can try to remedy that, but it's not --

16       I think it's limited what they can do to -- to protect

17       what they feel is theirs, I think there is a

18       limitation on the individual members and -- of the

19       system.

20  Q.   Okay.  So if I'm understanding you right, there --

21       there are situations that arise where a member may

22       feel that they should be entitled to one thing and

23       they don't receive it, and they don't feel like -- and

24       you don't feel like in all of those circumstances they

25       have the ability to adequately address that situation?

```
 1   A.   They can address the situation but it being resolved
 2        is -- it may not occur.
 3   Q.   Well, let me ask more specifically.  So again, it's
 4        the board of trustees that will determine how to
 5        invest the pension assets, correct?
 6   A.   Correct.
 7   Q.   And the members and beneficiaries of the pension
 8        systems have the ability to elect those -- at least a
 9        significant portion of that board of trustees,
10        correct?
11   A.   That is correct.
12   Q.   And the members and beneficiaries have the ability to
13        sit in on meetings where investment policy is
14        discussed, correct?
15   A.   They can, yes.
16   Q.   They have the ability to review investment policies,
17        correct?
18   A.   They do.
19   Q.   So just with respect to how funds are invested, the
20        members and beneficiaries of the retirement systems
21        have adequate opportunities to be involved in that
22        process, right?
23             MR. ALBERTS:  Objection.
24   A.   I believe they have opportunities to be involved as
25        far as making their voice heard.
```

# EXHIBIT 6-C

- MARTI KOPACZ - VOLUME II-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In Re                          )  Chapter 9

CITY of DETROIT, MICHIGAN,     )  Case No. 13-53846

           Debtor.            )  Hon. Steven Rhodes

DATE:  August 1, 2014

TIME:  9:12 a.m.

VOLUME II

VIDEOTAPED DEPOSITION OF MARTI

KOPACZ, held at the offices of Squire Patton

Boggs, 30 Rockefeller Plaza, New York, New York,

pursuant to Order, before Hope Menaker, a

Shorthand Reporter and Notary Public of the State

of New York.

1              - MARTI KOPACZ - VOLUME II-

2        Q.    Okay.  Would you accept my

3   representation that that's what you said?

4              MR. KANE:  Objection.

5        A.    Not really.

6        Q.    Okay.  Well, is there any need to

7   change the pension plan -- strike that.

8              Is there any need to change the plan

9   of -- the plan of adjustment on account of the

10  potential pension risks that you cite?

11       A.    I have no perspective or point of

12  view or opinion on changes to the plan of

13  adjustment.  That is not in my scope.  It is not

14  my task.

15       Q.    Do any of the pension risks that you

16  cite in your report give you any pause with

17  respect to the plan?

18       A.    The long-term risks associated with

19  the City's pension obligations do not negatively

20  impact my assessment for feasibility.

21       Q.    Did you look at the asset

22  distribution for the pension funds?

23       A.    I have seen a -- I have seen a

24  schedule that looks at the distribution of assets

25  in the pension fund.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 50 of 54

```
 1              - MARTI KOPACZ - VOLUME II-
 2          specific ones that are set forth at the
 3          beginning of the report.
 4               THE WITNESS:  Right.
 5     BY MS. GREEN:
 6          Q.    I guess what I'm trying to ask is,
 7     they told you certain facts about amortization
 8     periods, smoothing, things of that nature.  You
 9     just stated you have no basis to compare those to
10     anything.  So my question --
11          A.    I relied --
12          Q.    -- is, how do you know they're
13     questionable practices?
14          A.    I relied on what the general counsel
15     of the two systems told me.
16          Q.    Your testimony is that he used the
17     word "questionable practices" about his own
18     client?
19          A.    They are talking about the systems
20     prior to when those people got involved.
21          Q.    You're saying before they had any
22     personal knowledge they were speaking of prior
23     history?
24          A.    My question was, how did the system
25     get to this point?  Okay?  But I believe Mr.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 51 of 54
00000000-0000-0000-0000-000000000000

```
 1              - MARTI KOPACZ - VOLUME II-
 2    Turner and Mr. Overbeke are new to the systems in
 3    their role as both lawyers and general counsel.
 4    Okay?
 5              I am not talking about the systems
 6    today moving forward.  I am talking about how did
 7    the systems get in this underfunded predicament.
 8         Q.   Do you understand generally that
 9    retirement systems were fully funded as of 2007?
10         A.   I don't know when they were last
11    fully funded.
12         Q.   Did you know that according to, for
13    instance, the general retirement system's annual
14    actuarial report from June 30th, 2008, that it was
15    101 percent funded?
16         A.   I don't know that.
17         Q.   In 2008?
18         A.   I don't care about that.
19         Q.   Okay.  Why wouldn't you care about
20    when the time of underfunding occurred?
21         A.   I care about the impact the
22    underfunded systems have on the plan of adjustment
23    and the City's obligations to fund pensions going
24    forward.
25         Q.   If you flip to the next page of your
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 52 of 54
00000000-0000-0000-0000-000000000000

1                  - MARTI KOPACZ - VOLUME II-

2          A.      I did not.

3          Q.      Do you think that that would be

4     relevant to your conclusion that questionable

5     investment strategies were utilized by the

6     systems, would that cause their underfunding?

7          A.      I am -- as I said, before I am

8     reciting information that I received from pension

9     system people.  Okay.  And what is important to me

10    is the level of underfunding in the pension

11    systems as of the filings and today and how that

12    is going to be dealt with in the future.

13         Q.      And you understand that the

14    underfunding as of the filing, if we look at this

15    document --

16         A.      Which document?

17         Q.      Exhibit 4.

18         A.      This doesn't give anything on

19    underfunding.

20         Q.      I understand that.  You already

21    stated you didn't know that it was fully funded in

22    2000 -- the end of 2007, correct?

23         A.      I don't know one way or another.

24    Okay?

25         Q.      Okay.  Did you review any data from

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 53 of 54
00000000-0000-0000-0000-000000000000

                    - MARTI KOPACZ - VOLUME II-

1    investment strategies are what caused their

2    underfunding?

3    

4         A.    Ms. Green, with all due respect,

5    okay, I really don't, at the end of the day, care

6    about how they got underfunded.  Okay?  They are

7    underfunded.  There is treatment in the Plan of

8    Reorganization -- Plan of Adjustment that I have

9    to assess relative to feasibility.

10             I understand you and your client

11   really don't like the verbiage that's in my

12   report.  Okay?  I get that.  But I simply don't

13   care about how they got there.  I only care about

14   where they are today and what's going -- what

15   their treatment is in the Plan of Adjustment.

16             So I am not going to have any

17   opinion, any point of view, any perspective on

18   anything that happened in 2008, 2007, 1997 or

19   whatever.

20        Q.    So would you agree with me that the

21   portion of your report on pages 127 and 128 is

22   largely irrelevant?

23             MR. KANE:  Objection.  You can

24        answer.

25        A.    It is a recitation of what I believed

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7062   Filed 08/25/14   Entered 08/25/14 23:50:57   Page 54 of 54