# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------x
:
In re                               : Chapter 9
:
CITY OF DETROIT, MICHIGAN,      : Case No. 13-53846
:
                Debtor.      : Hon. Steven W. Rhodes
:
:
-------------------------------------------------------------x

## FINANCIAL GUARANTY INSURANCE COMPANY'S
## PRETRIAL BRIEF IN SUPPORT OF OBJECTION TO
## <u>PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT</u>

WEIL:\44494102\1\45259.0007

PRELIMINARY STATEMENT ........................................................................1

FACTUAL BACKGROUND .........................................................................4

THE COURT MUST DENY CONFIRMATION OF THE PLAN .............................................23

I.    THE PLAN UNFAIRLY DISCRIMINATES AGAINST CLASS 9 BECAUSE IT PROVIDES CLASSES 7, 10 AND 11, THREE CLASSES OF THE SAME PRIORITY, MATERIALLY HIGHER AND LESS RISKY RECOVERIES ................25

    A.    The Plan Unfairly Discriminates Against COPs Claims by Providing Holders of Pension Claims at Least 50% Greater Recoveries ..............25

        1.    Based on Precedent and Principles of Chapter 9, The Markell Standard for Unfair Discrimination Is Applicable ...............27

        2.    The Plan's Treatment of Classes 9, 10 and 11 Gives Rise to a Substantial Presumption of Unfair Discrimination Under the Markell Standard ................................30

            a.    Classes 10 and 11 Are of the Same Priority as Class 9 ................31

            b.    Class 9 Is Receiving a Grossly Lower Percentage Recovery Than Each of Classes 10 and 11 Under the Plan ..........32

                (i)    The DIA Proceeds and the State Contribution are NOT Outside the Plan.............................33

                (ii)    Recoveries on Account of Separately-Held OPEB Claims Should NOT Be Considered......................38

                (iii)    The City Substantially Understates the Projected Recoveries to Classes 10 and 11 .......................41

                (iv)    The Plan's Distribution to the Disputed COP Claim Reserve Is Insufficient ...................42

                (v)    The City Significantly Overstates the Projected Recoveries to Class 9 ...................................43

             c.    The Plan Allocates Materially Greater Risk to Class 9 Than to Classes 10 and 11 ....................................45

        3.    The City Cannot Rebut the Presumption of Unfair Discrimination ..........47

            a.    Class 9 Would Recover the Same as, and Assumed the Same Level of Risk as, Classes 10 and 11 Outside of Chapter 9 ......................................................................48

            b.    Classes 10 and 11 Are Not Infusing New Value That Offsets Their Gain .............................................51

         4.    The Plan Also Fails the Four-Factor Aztec Test........................................53

            a.    There Is No Basis to Discriminate Against Class 9 ......................54

i

b.      The City Has Not Proven It Could Not Confirm
        and Consummate a Plan Without the Discrimination ....................63

c.      The City Has Not Proposed the Discrimination in Good
        Faith ........................................................................................64

d.      The Plan Does Not Offer Class 9 a Meaningful Recovery ...........64

B.   The Plan Unfairly Discriminates Against Class 9 By,
     Pursuant to the LTGO Settlement, Providing Class 7, a Class
     of the Same Priority, Materially Higher and Less Risky Recoveries ...................65

II.   THE PLAN FAILS THE BEST INTERESTS OF CREDITORS, FAIR AND
      EQUITABLE AND GOOD FAITH REQUIREMENTS BECAUSE IT DOES
      NOT MAXIMIZE THE VALUE OF THE DIA ASSETS TO ENHANCE
      CREDITOR RECOVERIES .............................................................................69

A.   The Plan Must Maximize the Value of City Assets
     Not Essential to the Health, Safety and Welfare of Citizens ................70

     1.   The Best Interests of Creditors and
          Fair and Equitable Standards in Chapter 9 ................................70

          a.   Other Governmental Entities Have Monetized Assets
               to Bolster Liquidity and Satisfy Obligations to Creditors ............72

          b.   The City Previously Has Explored and Utilized Asset
               Monetization Strategies for Bolstering Liquidity and
               Repaying Creditors ........................................................73

          c.   Relevant Case Law Supports FGIC's Position .............................77

     2.   The Good Faith Requirement in Chapter 9 ................................81

     3.   Section 904 Does Not Preclude this Finding ............................82

B.   The City Has Valuable Assets Available to Monetize ...........................84

C.   The Plan Transfers the DIA Assets for Unreasonably Low Value .......................88

III.  THE PLAN FAILS THE BESTS INTERESTS OF CREDITORS TEST
      BECAUSE IT PROVIDES CLASS 9 WITH SIGNIFICANTLY WORSE
      TREATMENT THAN WOULD BE AVAILABLE UPON DISMISSAL OF THE
      CHAPTER 9 CASE .......................................................................................91

IV.   THE PLAN IS NOT FEASIBLE .......................................................................96

A.   If the Retirement Systems Must Disgorge the Proceeds of the COPs
     Transactions, the City Cannot Make the Payments Promised Under the
     Plan ..............................................................................................96

B.   The Plan Fails to Establish a Post-Effective Date Governance Structure
     that Ensures the Plan will be Implemented ...........................................97

V.    THE PLAN'S EXCULPATION AND INJUNCTION
      PROVISIONS ARE IMPERMISSIBLY BROAD ............................................................99

CONCLUSION......................................................................................................................100

WEIL:\44494102\1\45259.0007

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  359 B.R. 54 (Bankr. S.D.N.Y. 2006) ...................................................................40

*In re Aleris Int'l, Inc.*,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)............................27

*Am. Axle & Mfg., Inc. v. City of Hamtramck*,
  461 Mich. 352 (2000) ...................................................................49

*Am. United Mutual Life Ins. Co. v. City of Avon Park*,
  311 U.S. 138, 148 (1940) ................................................................ 28-29, 35

*Armstrong v. City of Melvindale*,
  432 F.3d 695 (6th Cir. 2006) ...................................................................71

*In re Armstrong World Indus., Inc.*,
  320 B.R. 523 (D. Del. 2005), *affd*, 432 F.3d 507 (3d Cir. 2005)............................36

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) ...................................................................27

*In re Arn Ltd. Limited Partnership*,
  140 B.R. 5 (Bankr. D.D.C. 1992) ...................................................................61

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................ *passim*

*In re Bamberg Cnty. Mem'l Hosp.*,
  Case No. 11-03877, 2012 WL 1890259 (Bankr. D.S.C. May 23, 2012)....................79, 80, 82

*In re Barnwell Cnty. Hosp.*, 471 B.R.849, 853-54 (Bankr. D.S.C. 2012) ........................79, 80, 82

*Bekins v. Lindsay-Strathmore Irrigation Dist.*,
  114 F.2d 680 (9th Cir. 1940) ...................................................................71

*In re BWP Transport, Inc.*,
  462 B.R. 225 (Bankr. E.D. Mich. 2011) .......................................................28, 31

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
  177 B.R. 684 (Bankr. D. Colo. 1995) ...................................................................97

*In re City of Detroit*,
  504 B.R. 97 (Bankr. E.D. Mich. 2013) ................................................................ *passim*

iv

*In re City of Stockton*,
486 B.R. 194 (Bankr. E.D. Cal. 2013)............................................................83, 84

*Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
280 F.3d 648 (6th Cir. 2002) ...........................................................................99

*Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*,
191 B.R. 1005 (Bankr. C.D. Cal. 1996)............................................................66

*Consolidated Rock Products Co. v. DuBois*,
312 U.S. 510 (1941)........................................................................................70

*In re Corcoran Hospital District*,
233 B.R. 449 (Bankr. E.D. Cal. 1999)..............................................................59

*In re Corcoran Irr. Dist.*,
27 F.Supp. 322 (S.D. Cal. 1939).......................................................................71

*In re Creekside Landing, Ltd.*,
140 B.R. 713 (Bankr. M.D. Tenn. 1992) ...........................................................56

*Creekstone Apartments Assocs., L.P. v. Resolution Trust Corp.* (*In re Creekstone Apartments
Assocs., L.P.*), 168 B.R. 639 (Bankr. M.D. Tenn. 1994) ............................................ 56, 64-65

*In re Crosscreek Apartments, Ltd.*,
213 B.R. 521 (Bankr. E.D. Tenn. 1997) ......................................................45, 56

*CWCapital Asset Mgmt., LLC v. Burcam Capital II, LLC*,
Case Nos. 5:13–CV–278–F et seq., 2014 WL 2864678, (E.D.N.C. June 24, 2014) ..............56

*DISH Network Corp. v. DBSD N. Am, Inc. (In re DBSD N. Am., Inc.)*,
634 F.3d 79 (2d Cir. 2011)................................................................................36

*In re Dow Corning Corp.*,
244 B.R. 696 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and
remanded*, 280 F.3d 648 (6th Cir. 2002) ........................................................ *passim*

*In re Dow Corning Corp.*,
244 B.R. 705 (Bankr. E.D. Mich. 1999) *aff'd*, 255 B.R. 445 (E.D. Mich. 2000) ...................28

*Fano v. Newport Heights Irrigation Dist.*,
114 F.2d 563 (9th Cir. 1940) ....................................................................77, 78, 79

*Figter Ltd. V. TIAA (In re Figter Ltd.)*,
118 F.3d 635 (9th Cir. 1997) ........................................................................ 39-40

*In re Graphic Commcn's, Inc.*,
  200 B.R. 143 (Bankr. E.D. Mich. 1996) ................................................................53, 63, 64

*In re Great Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................................27, 50

*In re Gregory Boat Co.*,
  144 B.R. 361 (Bankr. E.D. Mich. 1992) ........................................................................81

*In re Holt*,
  136 B.R. 260 (Bankr. D. Idaho 1992) ............................................................................39

*Lorber v. Vista Irrigation Dist.*,
  127 F.2d 628 (9th Cir. 1942) ........................................................................................70

*Mason v. Paradise Irrigation District*,
  326 U.S. 536 (1946) ................................................................................................29, 52

*Metromedia Fiber Network Servs., Inc. v. Lucent Techs, Inc. (In re Metromedia Fiber Network, Inc.)*, Case No. 02-22736 (ASH), *et seq.*, Adv. No. 04-08564A, 2005 WL 3789133 (Bankr. S.D.N.Y. Dec. 20, 2005) ................................................................................................34

*In re Mount Carbon Metro. Dist.*,
  242 B.R. 18 (Bankr. D. Colo. 1999) ......................................................................*passim*

*Newhouse v. Corcoran Irrigation Dist.*,
  114 F.2d 690 (9th Cir. 1940) ........................................................................................71

*In re Pierce Cnty. Hous. Auth.*,
  414 B.R. 702 (Bankr. W.D. Wash. 2009) ..............................................................*passim*

*In re Prosperity Park, LLC*,
  No.10-31399, 2011 WL 1878210 (Bankr. W.D.N.C. May 17, 2011) ................................27

*In re Quay Corp.*,
  372 B.R. 378 (Bankr. N.D. Ill. 2007) ............................................................................27

*In re Sentry Operating Co. of Tex., Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ..........................................................................27

*In re Snyders Drug Stores, Inc.*,
  307 B.R. 889 (Bankr. N.D. Ohio 2004) ....................................................................33, 36

*Travelers Ins. Co. v. Bryson Props. (In re Bryson Props. XVIII)*,
  129 B.R. 440 (M.D.N.C. 1991), *rev'd*, 961 F.2d 496 (4th Cir. 1992) ............................37

WEIL:\44494102\1\45259.0007

*In re Trenton Ridge Investors, LLC*,
461 B.R. 440 (Bankr. S.D. Ohio 2011).................................................................25

*In re Tribune Co.*,
472 B.R. 223, 242 (Bankr. D. Del. 2012), *aff'd in part, vacated in part*, No. 12-CV-1072
GMS *et seq.*, 2014 WL 2797042 (D. Del. June 18, 2014)..............................27, 33

*In re Unbreakable Nation Co.*,
437 B.R. 189 (Bankr. E.D. Pa. 2010) ..................................................................27

*United Sav. Assoc. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest
Assocs., Ltd.)*, 793 F.2d 1380 (5th Cir. 1986) ........................................................42

*In re Washington Mutual, Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) .....................................................................99

**Statutes**

11 U.S.C. § 901(a) ................................................................................ *passim*

11 U.S.C. § 904...............................................................................82, 83, 84

11 U.S.C. § 943(b)(1) ......................................................................23, 25, 51

11 U.S.C. § 943(b)(2) ..................................................................................24

11 U.S.C. § 943(b)(3) ..................................................................................24

11 U.S.C. § 943(b)(4) ..................................................................................24

11 U.S.C. § 943(b)(5) ..................................................................................24

11 U.S.C. § 943(b)(6) ..................................................................................24

11 U.S.C. § 943(b)(7) ........................................................................... *passim*

11 U.S.C. § 1122(a) .....................................................................................39

11 U.S.C. § 1129(a)(3)................................................................23, 51, 81

11 U.S.C. § 1129(a)(8)............................................................................23, 39

11 U.S.C. § 1129(a)(10) ...............................................................................39

11 U.S.C. § 1129(b)(1) ........................................................................ *passim*

M.C.L. § 600.5809.......................................................................................49

WEIL:\44494102\1\45259.0007

M.C.L. § 600.6093 ........................................................................................ *passim*

Mich. Public Act 34 of 2001, M.C.L. §§ 141.2101 *et seq.* ..............................9, 10, 11, 68

Mich. Public Act 72 of 1990, M.C.L. §§ 141.1201 *et seq.* ...........................................11

Mich. Public Act 336 of 1947, M.C.L. §§ 423.201 *et seq.* ...........................................56

Mich. Public Act 436 of 2012, M.C.L. §§ 141.1541 *et seq.* .............................11, 48, 77

Neb. Rev. Stat. § 31-755 (1983) (amended 1992) .......................................................66

R.I. Gen Laws, § 45-12-1(a) .....................................................................................66

Section 403(e) of the Bankruptcy Act .................................................................70, 77

Section 82(c) of the Bankruptcy Act ............................................................................83

**Other Authorities**

6-943 Collier on Bankruptcy ¶ 943.03..........................................................................70

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 228 (1998)................................................................................... *passim*

Fed. R. Bankr. P. 3020(e) .........................................................................................100

Fed. R. Bankr. P. 9019................................................................................................84

H.R. Rep. No. 94-686 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539 ...................51, 83

Mich. Const. art. I, § 10 ..................................................................................... *passim*

Mich. Const. art. IX, §24 ..............................................................................5, 32, 38, 48

U.S. Const art I., § 10, cl. 1 .......................................................................5, 32, 48, 93

WEIL:\44494102\1\45259.0007

Financial Guaranty Insurance Company ("**FGIC**") respectfully submits this pretrial brief (the "**Brief**") in support of its objection to confirmation of the *Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 20, 2014)* [Docket No. 6908] (as the same may be amended or supplemented, the "**Plan**").[1] Contemporaneously herewith, FGIC has also filed the *Joint Pretrial Brief in Support of Objection to DIA Settlement* (the "**DIA Brief**").

## PRELIMINARY STATEMENT

The magnitude and complexity of the task facing the City[2] in developing the Plan are undisputed and cannot be overstated. Never before has chapter 9 been used to adjust the obligations of a city simultaneously faced with staggering reinvestment and rehabilitation needs, and billions of dollars of legacy obligations owed to security holders, pensioners and OPEB beneficiaries alike. Yet, although the Chapter 9 Case is unprecedented in many regards, the Bankruptcy Code gives the City the tools it needs to adjust its obligations in a manner that ensures both the viability of the City going forward, and a fair and equitable outcome for all stakeholders – including creditors and residents. Even with the powers and protections afforded the City by the Bankruptcy Code, a successful outcome undoubtedly requires difficult – and, likely, politically unpopular – decisions. Initially, the City seemed up to the task.

In May 2013, the Emergency Manager and his staff clearly understood that, in order achieve a successful outcome, the City needed to focus on extraordinary measures consistent with their obligations under the law, and to protect *all* of the citizens of the City (not just wealthy individuals with special interests):

---

[1] FGIC reserves the right to rely at the Confirmation Hearing on any and all evidence relevant to confirmation of the Plan, including, but not limited to, any testimony or documents not cited or referenced herein.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

WEIL:\44494102\14\45259.0007

Let me take the Devil's position on this. What if I said, so what? We told [the DIA] they are vulnerable. ***Our job is not to protect art, but to save Detroit. We have said ALL options are on the table and being considered. We meant it. This is a financial emergency and financial emergencies require extraordinary measures, including, maybe, selling art.*** Ike's job was to win the war. He knew that to win the war he had to take Normandy. He also knew that signing the invasion order was tantamount to signing 50,000 death certificates. His job was to win the war. I think we are trying to cut too fine a line. I don't want to pack up the art, but I wasn't hired to protect it and neither were you. We have a job to do and we can't afford to get bogged down with side issues that are essentially moot. ***Our responsibility is to statute and the citizens of Detroit.*** If Al Taubman, Keith Crain don't like it . . . . They can buy the art and gift it back to the DIA or they can roll the dice and take their chances. Rather than sitting on our heels, we should lean in. We need to get back on the offensive. I don't want to cut retiree benefits, but I will if that's what required.

(Email from B. Nowling to K. Orr re: Thoughts on DIA, dated May 28, 2013 (POA00173457) (emphasis added) (EX3038).) Yet, somewhere along the way, the City's strategy shifted from keeping all options on the table in pursuing a fair and equitable outcome for all citizens and creditors, to a narrow focus on two special interests: keeping the DIA Assets in the City and maximizing recoveries for holders of Pension Claims at the expense of selected financial creditors. With these limited obligations guiding their decisions, the City and its advisors developed a Plan that cannot be confirmed.

Although the City, as a municipal debtor, has considerable discretion in developing a plan of adjustment (in fact, the City is the only party with the right to file a plan), this discretion is not unfettered. In order to take advantage of the main benefit of chapter 9 – a discharge of prepetition obligations – the City must first prove that the Plan (i) does not unfairly discriminate amongst similarly-situated creditors, (ii) represents a reasonable effort to pay creditors from available revenues and assets, (iii) provides creditors with a better alternative than

WEIL:\44494102\14\45259.0007

dismissal of the case and (iv) can be implemented and is otherwise consistent with applicable law. The Plan fails on each of these counts.

On its face, the Plan provides significantly greater recoveries to holders of Pension Claims than holders of COP Claims – obligations that are all unsecured, contractual obligations of the City, enforceable in the same manner outside of chapter 9. The City's attempt to narrow this gap by playing with the numbers is a transparent effort to gloss over what even the City must recognize is a blatant violation of bankruptcy law. The City's need for cooperation from current employees does not change this result, as there is no evidence that the Plan's treatment of the Pension Claims (most of which are held by retirees) will have any effect on current employees' willingness to work for the City, or the City's ability to provide essential services to residents.

The solution to the Plan's disparate treatment of holders of COP Claims is not necessarily zero-sum – *i.e.*, providing more equal treatment to all unsecured creditors does not necessarily mean taking away recoveries away from holders of Pension Claims and diverting them to holders of COP Claims. The City is in the unique position of owning valuable assets – the DIA Assets in particular – that can be monetized for the benefit of all creditors, and likely enhance the City's ability to provide the essential services necessary to ensure the health, safety and welfare of Detroit citizens. The DIA Assets are appraised in excess of $8 billion, more than enough to provide fair and equitable recoveries to holders of COP Claims and other unsecured creditors, without necessarily further impairing Pension Claims. Instead, the Plan provides for the transfer of the DIA Assets to a charitable trust for (as the Plan readily acknowledges) the express purpose of shielding these assets from creditors, in exchange for $455 million, a small fraction of the value. Under the circumstances, this clearly does not represent a reasonable effort

WEIL:\44494102\14\45259.0007

by the City to pay creditors, as required by the best interest of creditors and fair and equitable confirmation standards. And, by capping recoveries for holders of COP Claims at an unreasonably low 6% (at most), the Plan fails to offer a better alternative than dismissal of the case (an analysis it appears the City did not even attempt to undertake).

Accessing the benefits of chapter 9 should not be taken lightly. It comes with enormous responsibility. The City has not taken this responsibility seriously. It has taken a cavalier approach and, wearing blinders, has only taken steps to advance its two special interests – saving the art and paying pensioners. The City has *not* undertaken a comprehensive, defensible valuation of its key assets; it has *not* explored monetization opportunities with respect to those assets; it has *not* evaluated whether the Plan provides creditors with better recoveries than they would receive outside of chapter 9; it has *not* considered the feasibility implications if the COP Claims are invalidated and the Retirement Systems are required to disgorge $1.4 billion in COPs proceeds. The City has failed to "do its homework" and is on the verge of entering into yet another bad deal – exactly what the Court said must stop.

## FACTUAL BACKGROUND

**FGIC's Exposure**. FGIC is a creditor and party in interest in this Chapter 9 Case with respect to, among other things, claims against the City related to four service contracts the City entered into in connection with certain certificates of participation (as defined in the Plan, the "**COPs**") issued to fund the City's pension obligations. Prior to the Petition Date, FGIC issued certain financial guaranty insurance policies guarantying the payment of the principal of and the interest on certain COPs, on the terms and conditions set forth in such policies.[3] The FGIC-insured COPs are described in more detail below.

---

[3] FGIC also issued certain financial guaranty insurance policies guarantying the payment of certain amounts owed by the City in connection with the COP Swap Agreements and the DWSD Bonds.

WEIL:\44494102\14\45259.0007

**COPs Transactions**.  As of June 30, 2004, the pension funds of the City's two Retirement Systems (the GRS and the PFRS) had an aggregate unfunded accrued actuarial liability ("**UAAL**") of approximately $1.7 billion.[4]  Pursuant to Article IX, Section 24 (the "**Pension Clause**") of the Constitution of the State of Michigan of 1963, as amended (the "**Michigan Constitution**"), the City was obligated to fund the Retirement Systems' UAAL in full,[5] just as it was required to satisfy all of its other contractual obligations.[6]  In order to fulfill this constitutional obligation, in 2005, the City created an alternative funding mechanism – a series of transactions that resulted in the issuance to investors of approximately $1.4 billion of COPs (the "**COPs Transactions**") – to address the UAAL of each of the Retirement Systems. (*See* City Ordinances No. 03-05 and No. 04-05 (EX3002, EX3003).)

Specifically, pursuant to City Ordinance No. 05-05, the City established the COP Service Corporations, two single-purpose, nonprofit corporations.  (City Ordinance No. 05-05 § 18-5-125 (EX3004).)  On June 2, 2005, the COP Service Corporations entered into the 2005

---

[4] The Annual Report of the Board of Trustees of the GRS for the Year Ended June 30, 2004 indicated that the GRS had estimated UAAL of $913,683,202 (Actuarial & Statistical Section, available at http://www.rscd.org/gc_annrpt_actstats2004.pdf at 22 (EX3000)), and the Annual Report of the Board of Trustees of the PFRS for the Year Ended June 30, 2004 indicated that the PFRS had estimated UAAL of $782,976,693 (Actuarial & Statistical Section, available at http://www.pfrsdetroit.org/images/pdf/pf_annrpt_actstats2004.pdf at 13, 17 (EX3001)), for a total UAAL of $1,686,659,893.

[5] The Pension Clause provides, "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.  Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."  Mich. Const. art. IX, § 24; *see also* City Ordinance 05-09 § 18-16-1(a) (EX3005) ("Article 9, Section 24 of the 1963 Michigan Constitution of the State of Michigan obligates the City to maintain the actuarial integrity of its [Retirement Systems].").

[6] Article I, Section 10, Clause 1 of the United States Constitution (the "**Federal Contracts Clause**") provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts" (U.S. CONST. art I., § 10, cl. 1), and Article I, Section 10 of the Michigan Constitution (together with the Federal Contracts Clause, the "**Contracts Clauses**") provides, "No . . . law impairing the obligation of contract shall be enacted" (Mich. Const. art. I, § 10).

WEIL:\44494102\14\45259.0007

COPs Agreement (EX3008) and established the Detroit Retirement Systems Funding Trust 2005 (the "**2005 Funding Trust**").  The 2005 Funding Trust issued the 2005 COPs:  $640,000,000 in aggregate principal amount of Series 2005-A COPs (the "**2005-A COPs**") and $800,000,000 in aggregate principal amount of Series 2005-B COPs (the "**2005-B COPs**").  (2005 COPs Agreement at 3 (EX3008); *Order Approving Stipulation By and Between the City Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial*, dated July 14, 2014 [Docket No. 6002] (the "**COPs Stipulation Order**") ¶ a.)  The 2005 COPs funded $739,793,898 of the GRS UAAL and $630,829,189 of the PFRS UAAL, for a total funding of $1,370,623,087.  (*See* GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation, Schedule 1 (EX3010); PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, Schedule 1 (EX3011).)

On June 12, 2006, the COP Service Corporations entered into the 2006 COPs Agreement (EX3009) and established the Detroit Retirement Systems Funding Trust 2006 (the "**2006 Funding Trust**" and, together with the 2005 Funding Trust, the "**Funding Trusts**").  The 2006 Funding Trust issued the 2006 COPs:  $148,540,000 in aggregate principal amount of Series 2006-A COPs (the "**2006-A COPs**") and $800,000,000 in aggregate principal amount of Series 2006-B COPs (the "**2006-B COPs**") (all of which remain outstanding).  (2006 COPs Agreement §§ 4, 6.4 (EX3009); COPs Stipulation Order ¶ h.)  The proceeds of the 2006 COPs were used, in large part, to fund the optional redemption and cancellation of certain of the 2005-A COPs and all of the 2005-B COPs.  (*See* City Ordinance No. 05-09 § 18-16-3(b)(10)

WEIL:\44494102\14\45259.0007

(EX3005).) Currently, there remains outstanding $503,365,000 in principal amount of 2005-A COPs. (COPs Stipulation Order ¶ e.)

Pursuant to the COP Service Contracts, the City agreed to, among other things, make periodic payments to the COP Service Corporations in amounts equal to the amounts due under the COPs (the "**Service Payments**"). (COP Service Contracts §§ 5.01, 6.01 (EX3010 - EX3013).) In exchange for the proceeds of the COPs, which the COP Service Corporations ultimately used to fund the UAAL of each of the Retirement Systems, the COP Service Corporations irrevocably sold, assigned and conveyed their rights to receive the Service Payments to the Funding Trusts. (2005 COPs Agreement § 201 (EX3008); 2006 COPs Agreement § 201 (EX3009).)[7] Each of the COPs represents an individual, undivided proportionate interest in the rights to receive certain of the Service Payments. (*Id.* Recitals.)

**FGIC's COPs Insurance Policies**. On June 2, 2005, FGIC issued an insurance policy to guarantee the scheduled payment of principal and interest on $1,000,000,000 in aggregate principal amount of the Series 2005 COPs, on the terms and conditions set forth in such policy. (Municipal Bond New Issue Insurance Policy Number 05010400 (the "**2005 COPs Policy**") (EX3016); COPs Stipulation Order ¶ b.) The current total aggregate principal amount of outstanding 2005 COPs covered by the 2005 Policy is $450,615,000. (COPs Stipulation Order ¶ f.) On June 12, 2006, FGIC issued two insurance policies to guarantee the scheduled payment of principal and interest on (i) $148,540,000 in aggregate principal amount of 2006-A COPs and (ii) $500,845,000 in aggregate principal amount of 2006-B COPs, on the terms and conditions set forth in such policies. (Municipal Bond New Issue Insurance Policy Number

---

[7] In order to preserve the rights assigned to the Funding Trusts in the event the assignment is deemed a pledge of the Service Payments, the Service Corporations also granted a security interest to the Funding Trusts in all of the Service Corporations' right, title and interest in the Service Payments. (2005 COPs Agreement § 201(b) (EX3008); 2006 COPs Agreement § 201(b) (EX3009).)

7

06010249 (the "**2006-A COPs Policy**") (EX3017); Municipal Bond New Issue Insurance Policy

Number 06010250 (the "**2006-B COPs Policy**" (EX3018) and, together with the 2006-A COPs

Policy and the 2005 COPs Policy, the "**FGIC COPs Insurance Policies**."); COPs Stipulation

Order ¶ k.)  All of the 2006 COPs covered by the 2006-A COPs Policy and the 2006-B COPs

Policy remain outstanding.  (COPs Stipulation Order ¶ l.)

        **FGIC's COPs Proofs of Claim**.  FGIC filed two proofs of claim against the City

in connection with the COPs – proofs of claim numbers 1195 and 1190 (the "**FGIC COPs**

**Proofs of Claim**") (EX3039, EX3040).  As explained in greater detail in the FGIC COPs Proofs

of Claim, to the extent FGIC makes a payment of principal or interest on the COPs in accordance

with the FGIC COPs Insurance Policies, FGIC is subrogated to the rights of the holders of the

COPs, including the right to receive the Service Payments from the City.  (FGIC COPs Proofs of

Claim ¶ 13 (EX3039, EX3040).)[8]  As of February 14, 2014, when the FGIC COPs Proofs of

Claim were filed, FGIC had made payments in the aggregate amount of $5,638,291.90 under the

FGIC COPs Insurance Policies in connection with $33,166,422.91 of interest on the FGIC-

insured COPs that is due and owing, but unpaid.[9]  (*See Id.* ¶ 12.)  Accordingly, in the FGIC

COPs Proofs of Claim, FGIC asserted, among other things, (i) liquidated claims against the City

in the aggregate amount of $5,638,291.90, equal to the amount FGIC had paid under the FGIC

---

[8] In addition, FGIC's obligation to make payments under the FGIC COPs Insurance Policies is expressly conditioned on holders of the COPs assigning their COPs (or coupons thereof or rights to payments therein) to FGIC.  (*See* FGIC COPs Proofs of Claim ¶ 16 (EX3039, EX3040).)

[9] Pursuant to the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 (*available at* http://fgic.com/policyholderinformationcenter) (EX3027), all of FGIC's policies, including the FGIC COPs Insurance Policies, were modified to provide that FGIC will pay a certain percentage (the "**CPP**") of each permitted policy claim in cash, with the remainder of the permitted policy claim treated as a deferred payment obligation, paid if and to the extent excess cash becomes available.  (*See* FGIC COPs Proofs of Claim ¶10 (EX3039, EX3040).)  As of February 14, 2014, the CPP was 17% (and it remains 17% today).  (*See* Notice of Effective Date and Initial CPP, dated August 19, 2013 (*available at* http://fgic.com/policyholderinformationcenter) ¶ 5 (EX3029).)

WEIL:\44494102\14\45259.0007

COPs Insurance Policies as of February 14, 2014,[10] (ii) contingent and/or unliquidated claims not to exceed $1,100,000,000, representing the aggregate principal amount of COPs covered by the FGIC COPs Insurance Policies that are currently outstanding and (iii) contingent and/or unliquidated claims for any interest on the COPs that FGIC is required to pay under the FGIC COPs Insurance Policies. (*Id.* ¶¶ 14, 17.) In addition, FGIC asserted claims for reimbursement of fees and expenses, including (i) a liquidated claim in the amount of $1,111,442.51 for fees and expenses incurred prior to the Petition Date, (ii) a liquidated claim in the aggregate amount of no less than $4,290,219.49 for fees and expenses that had accrued from the Petition Date through February 14, 2014 and (iii) a contingent and/or unliquidated claim for any fees or expenses incurred after February 14, 2014. (*Id.* ¶¶ 20-21.) Since FGIC filed the FGIC COPs Proofs of Claim, FGIC has made additional payments in the aggregate amount of $2,869,100.25 in connection with an additional $16,877,060.34 of interest on the FGIC-insured COPs that is due and owing, but unpaid as of the date hereof. (COPs Stipulation Order ¶¶ p, q.)

**Limited Tax General Obligation Bonds**. Prior to the Petition Date, in 2004, 2005 and 2008, the City issued certain series of unsecured Limited Tax General Obligation Bonds pursuant to Michigan Public Act 34 of 2001, the Revised Municipal Finance Act, M.C.L. §§ 141.2101 *et seq.* ("**PA 34**"). (City of Detroit Proposal for Creditors, dated June 14, 2013 (POA00215882- POA00216015) (the "**June 14 Proposal**") at 121 (EX33).) As of the Petition Date, the City owed approximately $163.5 million in outstanding principal and interest on six series of outstanding unsecured Limited Tax General Obligation Bonds. (*Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the*

---

[10] In its capacity as a third party beneficiary to the COP Service Contracts, FGIC also asserted liquidated claims in the aggregate amount of $33,166,422.91, equal to the total amount of interest on the FGIC-insured COPs that is due and owing, but unpaid. (*See* FGIC COPs Proofs of Claim ¶¶ 18-19 (EXS3039, 3040).)

WEIL:\44494102\14\45259.0007

*City of Detroit*, dated May 5, 2014 [Docket No. 4391] (the "**Disclosure Statement**") at 102.)

Each series of these bonds is governed by a Bond Resolution, duly adopted by the City Council

and approved by the Mayor.  (*See* Resolutions Adopted by City Council Authorizing the

Issuance and Sale of Certain LTGO Bonds on May 26, 2004, May 6, 2005 and November 17,

2006 (collectively, the "**LTGO Bond Resolutions**") (EX3043-EX3045).)  The provisions of the

LTGO Bond Resolutions constitute contracts among the City and the paying agent, bond insurer

and/or bondholders.  (LTGO Bond Resolutions § 1120 (EX3043-EX3045).)  Unlike the City's

Unlimited Tax General Obligation Bonds, the Limited Tax General Obligation Bonds were not

subject to voter approval.  (Disclosure Statement at 102 ("In addition to Unlimited Tax General

Obligation Bonds, the City is authorized under Michigan law to issue Limited Tax General

Obligation Bonds without the approval of the electorate.").)

   The LTGO Bond Resolutions provide that "[t]he [Limited Tax General

Obligation] Bonds shall be general obligations of the City, and the limited tax, full faith, credit

and resources of the City are hereby irrevocably pledged for the prompt payment of the principal

of and interest on the [Limited Tax General Obligation] Bonds."  (LTGO Bond Resolutions

§ 301 (EX3043-EX3045).)  Further, the LTGO Bond Resolutions provide that "[t]he City

pledges to pay the principal of and interest on the [Limited Tax General Obligation] Bonds as a

first budget obligation from its general funds and in the case of insufficiency thereof, from the

proceeds of an annual levy of ad valorem taxes on all taxable property in the City, subject to

applicable constitutional, statutory and charter tax rate limitations." (*Id.*)  This is consistent with

PA 34, which provides that "if the municipal securities were . . . not approved by the electors of

the municipality, the municipality shall set aside each year from the levy and collection of ad

valorem taxes as required by this section as a first budget obligation for the payment of the

municipal securities. However, the ad valorem taxes shall be subject to applicable charter, statutory or constitutional rate limitations." (PA 34 § 141.2701.) At the time of the issuance of each series of Limited Tax General Obligation Bonds, the City was levying taxes at the maximum rate permitted by law. (Official Statement for General Obligation Bonds, dated August 27, 2004 at cover, 4 (EX3049); Official Statement for General Obligation Bonds, dated June 24, 2005 at cover, 1, 5 (EX3050); Official Statement for General Obligation Bonds, dated May 30, 2008 at cover, 2 (EX3051).) According to the City, as of the Petition Date, the City's property tax rate of 19.9520 mills was constitutionally capped close to the statutory maximum of 20 mills. (Disclosure Statement at 95.)

**Events Leading Up to the Chapter 9 Case**. On March 28, 2013, Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, M.C.L. §§ 141.1541 *et seq.* ("**PA 436**") became effective and Mr. Orr became the "emergency manager" of the City under PA 436 (in such capacity, the "**Emergency Manager**"). (*Id.*).[11]

On June 14, 2013, the City failed to pay $39.7 million owed to the COP Service Corporations under the COP Service Contracts. (*Id.* at 127.) On the same day, the Emergency Manager presented the June 14 Proposal to approximately 150 representatives of the City's creditors, including FGIC. (*Id.* at 129.) The June 14 Proposal provided for all holders of unsecured claims – including with respect to unsecured general obligation bonds, the COPs, OPEB, unfunded pension liabilities and other unsecured liabilities – to receive their pro rata share (relative to all unsecured claims) of new limited recourse participation notes, with an aggregate principal amount of $2 billion, for recoveries of approximately 12%, assuming full

---

[11] Mr. Orr had previously been appointed as the "emergency financial manager" pursuant to Michigan Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. §§ 141.1201 *et seq.*, the predecessor to PA 436 on March 14, 2013, and formally took office on March 25, 2013. (Disclosure Statement at 129.)

WEIL:\44494102\14\45259.0007

repayment of such notes (and a 5% discount rate). (June 14 Proposal at 106-09 (EX33); *Expert Witness Report of Stephen Spencer*, dated July 25, 2014 (the "**Spencer Report**") at 18 (EX3035).)

**Commencement of the Chapter 9 Case**. On July 18, 2013, the City filed a petition for relief under chapter 9 of the Bankruptcy Code, [12] commencing the Chapter 9 Case. (Disclosure Statement at 133.) On December 3, 2013, the Bankruptcy Court issued a bench decision determining that the City was eligible to be a debtor under chapter 9. (*Id.* at 135.)

**Limited Tax General Obligation Bond Litigation**. On November 11, 2013, the LTGO Insurer commenced an adversary proceeding (the "**LTGO Litigation**"), seeking a declaratory judgment that, among other things, (i) the *ad valorem* taxes levied and collected within the City's constitutional, statutory and charter limits sufficient to pay debt service of the Limited Tax General Obligation Bonds as a first budget obligation (the "**Restricted Limited Bond Taxes**") are restricted funds by law that cannot be used by the City for any purpose except to satisfy the City's payment obligations with respect to the outstanding Limited Tax General Obligation Bonds, (ii) as *ad valorem* taxes are collected, the City is required to segregate and deposit the Restricted Limited Bond Taxes allocable to each series of Limited Tax General Obligation Bonds into the related, segregated debt retirement funds, (iii) the City is prohibited from commingling the Restricted Limited Bond Taxes with funds of the City or using such taxes for any purpose other than paying holders of the Limited Tax General Obligation Bonds, (iv) the City is a mere conduit for the Restricted Limited Bond Taxes and lacks any equitable or beneficial property interest therein, (v) the holders of the Limited Tax General Obligation Bonds have equitable and beneficial property interests in the Restricted Limited Bond Taxes, (vi) the

---

[12] Unless otherwise specified, all section and chapter references in the Brief are to sections or chapters of the Bankruptcy Code, as applicable.

WEIL:\44494102\14\45259.0007

Limited Tax General Obligation Bonds are secured by, and the holders of such bonds have, a statutory lien on the Restricted Limited Bond Taxes and (vii) the City's diversion of the Restricted Limited Bond Taxes or grant of any postpetition interest in the Restricted Limited Bond Taxes to any other person, without just compensation, is an unlawful taking under the United States Constitution. (Amended Complaint of Ambac Assurance Corporation for Declaratory Judgment ¶¶10-11, *Ambac Assurance Corp. v. City of Detroit, Michigan, et.*, Adv. Proc. No. 13-5310 (Bankr. E.D. Mich. Dec. 23, 2013) (Docket No. 57).)

**COP Litigation**. On January 31, 2014, the City commenced the COP Litigation, seeking (i) a declaratory judgment that the COP Service Contracts are illegal, void and of no effect whatsoever, and that the City has no enforceable obligation to continue making the Service Payments to the COP Service Corporations or to the Funding Trusts, (ii) a declaratory judgment that any claims based on the City's obligations to make the Service Payments under the COP Service Contracts on account of the COPs (*i.e.* the COP Claims) should be disallowed, and (iii) injunctive relief enjoining the COP Service Corporations and the Funding Trusts from taking any actions to pursue or enforce any terms, claims, rights or other obligations under the COP Service Contracts relating to the COPs Transactions. (Complaint for Declaratory and Injunctive Relief ¶¶ 43, 49, 51, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Jan. 31, 2014) (Docket No. 1) (the "**COP Complaint**").)

On March 17, 2014, FGIC filed a motion to intervene (the "**Motion to Intervene**") in the COP Litigation, and included as an exhibit a proposed answer, asserting certain affirmative defenses and counterclaims against the City, and third party complaint against the Retirement Systems (the "**Third Party Complaint**"). (Financial Guaranty Insurance

Company's Motion to Intervene Pursuant to Rule 7024 of the Federal Rules of Bankruptcy Procedure and Section 1109(b) of the Bankruptcy Code, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Mar. 17, 2014) (Docket No. 11).)  The Third Party Complaint argues that, in the event the City is successful in the COP Litigation, (i) the Retirement Systems will have been unjustly enriched at FGIC's expense, (ii) any proceeds or benefits the Retirement Systems received from the COPs Transactions should be held in constructive trust for the benefit of the holders of COP Claims, including FGIC and (iii) the Retirement Systems should be ordered to disgorge all amounts or benefits that they received as a result of the COPs Transactions.  (*Id.* Ex.6, ¶ 178.)  On June 30, 2014, the Court granted the Motion to Intervene for the limited purpose of defending against the City's claims in the COP Complaint, and with the condition that FGIC shall file neither a third party complaint nor a counterclaim, except upon leave of the Court.  (Opinion and Order (1) Denying Motion to Dismiss Filed by Defendants Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation and (2) Granting Motions to Intervene with Limitations, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. June 30, 2014) (Docket No. 73).)[13]  On August 13, 2014, FGIC filed counterclaims against the City. (Counterclaims of Defendant Financial Guaranty Insurance Company, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D.

---

[13]  On July 17, 2014, FGIC filed a motion for leave to file counterclaims, which the Court granted on August 6, 2014.  (Financial Guaranty Insurance Company's Motion to File Counterclaims Pursuant to This Court's Order Granting Motions to Intervene with Limitations, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. July 17, 2014) (Docket No. 83); Order Granting Financial Guaranty Insurance Company's Motion to File Counterclaims Pursuant to This Court's Order Granting Motions to Intervene with Limitations, *City of Detroit v. Detroit General Retirement System Service Corporation et al.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Aug. 6, 2014) (Docket No. 114).)

WEIL:\44494102\14\45259.0007

Mich. Aug. 13, 2014) (Docket No. 129) (the "**Counterclaims**").) While FGIC is *not* requesting

that the Court consider the merits of any of the claims that have been or could be raised in

connection with the COP Litigation or the proposed Third Party Complaint at this time,[14] as

explained in Section IV.A below, the possibility of the Retirement Systems being forced to

disgorge the COPs Transaction proceeds must be factored into the Court's assessment of the

feasibility of the Plan.

  **Plan of Adjustment**. The City filed the Plan on August 20, 2014. The Plan

incorporates certain settlement agreements, and provides for the treatment of Claims against the

City, as described in greater detail below.

  **COP Claims**. The Plan classifies the COP Claims in Class 9. (Plan § II.B.1.)

Class 9 is identified as Impaired/Voting, and, in light of the pending COP Litigation (described

above), the COP Claims are identified as Disputed Claims, not Allowed by the Plan. (*Id.*

§§ II.B.1, II.B.3.p.i.). Class 9 voted to reject the Plan. (*Declaration of Michael J. Paque*

*Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect*

*to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6179]

("**Paque Decl.**") ¶ 26.) On the Effective Date, the City will establish the Disputed COP Claim

Reserve and distribute to the Disputed COP Claim Reserve an Unsecured Pro Rata Share of New

B Notes, calculated as if the COP Claims were Allowed in the total aggregate unpaid principal

---

[14] The City has represented on the record that it agrees that the validity of the COPs is not at issue in the
Confirmation Hearing. (Hr'g Tr. 94:22-95:3 (May 28, 2014) ("COPs validity, we do not think that's part
of the confirmation hearing. We view the confirmation hearing insofar as it relates to the COPs as
dealing with the adequacy of the reserves that are in the plan for the payment of the COPs in the event
that they turn out to be valid.").) In reliance on this and other representations by the City, FGIC and
certain other creditors holding and/or insuring COPs agreed pursuant to the *Stipulation By and Between
the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of
Certain Exhibits for the Confirmation Trial*, dated July 13, 2014 [Docket No. 5984] (the "**COPs
Stipulation**") to withdraw certain subpoenas and other discovery requests.

WEIL:\44494102\14\45259.0007

amount of the COPs.  (Plan. § II.B.3.p. iii.A.)  In addition, as of the Effective Date, the City will

transfer all of its rights and interests in the COP Litigation to the Litigation Trust, and the

Litigation Trustee will prosecute and defend the COP Litigation at the direction of the VEBA

Trust Representative,[15] and in consultation with the LTGO Litigation Parties.  (*Id.* § IV.I.1-2.)  In

the event a Final Order is entered against the City (or the Litigation Trust, as successor in interest

to the City) in the COP Litigation, all of the New B Notes in the Disputed COP Claim Reserve

(and any distributions thereon, including amounts withdrawn by the City) will be distributed to

the holders of the COP Claims.  (*Id.* §§ II.B.3.p. iii.A.; § IV.I.1-3.)  In the event a Final Order is

entered that otherwise resolves the COP Litigation (and any other objections to the Disputed

COP Claims), the New B Notes and any distributions thereon remaining in the Disputed COP

Claim Reserve (after all Distributions on account of any Allowed COP Claims have been made)

will be distributed first to the City to cover the costs, fees and expenses related to the COP

Litigation incurred by the Litigation Trust, and then as follows:  (i) 65% to the Detroit General

VEBA and Detroit Police and Fire VEBA; (ii) 20% to holders of Allowed Limited Tax General

Obligation Bond Claims in Class 7; and (iii) 15% to holders of Allowed Other Unsecured Claims

in Class 14.  (*Id.* § II.B.3.p. iii.B.)

   **New B Notes**.  The City will issue the New B Notes on the Effective Date, and

the New B Notes will be distributed to the Disputed COP Claim Reserve, the Detroit General

VEBA and the Detroit Police and Fire VEBA (in satisfaction of the Allowed OPEB Claims),

holders of the Allowed Downtown Development Authority Claims and holders of Allowed Other

Unsecured Claims, pursuant to the terms of the Plan.  (Plan §§ II.B.3.p.iii.B.i, II.B.3.s.ii.A-B,

II.B.3.t.ii, II.B.3.u.)  The New B Notes will be general, unsecured obligations of the City and will

---

[15] As explained *infra*, the Plan provides for the treatment of OPEB Claims through the establishment of the Detroit General VEBA and the Detroit Police and Fire VEBA.

WEIL:\44494102\14\45259.0007
16

have (i) an initial aggregate principal amount of $632 million, (ii) a 30-year maturity, (iii) a 4% interest rate for the first 20 years and a 6% interest rate for the last 10 years and (iv) will pay interest only for the first 10 years, and amortization in 20 equal installments thereafter. (Plan Exs. I.A.232-233; City of Detroit Plan of Adjustment – 40 year projections (POA00706603-POA00706611) (the "**Forty-Year Projections**") at 3 (EX111).) Assuming (as the City does in the Forty-Year Projections) the COP Claims are ultimately Allowed in the full amount of outstanding principal, the City projects that the net present value of recoveries under the Plan on account of Allowed Unsecured Claims receiving New B Notes (including the COP Claims) will be 10%, using a 5% discount rate. (*Id.*)

      **Limited Tax General Obligation Bond Claims**. The Plan classifies the Limited Tax General Obligation Bond Claims in Class 7, and identifies Class 7 as Impaired/Voting. (Plan § II.B.1.) The *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392] (the "**Fourth Amended Plan**") had provided for Class 7 to receive an Unsecured Pro Rata share of New B Notes, resulting in projected recoveries (according to the City) of approximately 10%, using a 5% discount rate (assuming the COP Claims were ultimately Allowed in the full amount of outstanding principal) –the same as the City projected holders of COP Claims, OPEB Claims, Downtown Development Authority Claims and Other Unsecured Claims would have recovered under the Fourth Amended Plan. (Disclosure Statement, Ex. K at 3.) Subsequently, the City entered into the LTGO Settlement Agreement, pursuant to which the City agreed to provide holders of Limited Tax General Obligation Bond Claims and the LTGO Insurer, as applicable, a Pro Rata share of (at the City's option) (i) $55 million in Cash or (ii) the New LTGO Bonds, which will have an initial aggregate principal amount of $55 million (bearing interest at 5.65% per year, with a 23-year maturity).

WEIL:\44494102\14\45259.0007

(Plan § II.B.3.n.ii; Plan Ex. I.A.224, Sched.1; Forty-Year Projections at 2-3 (EX111).)[16]  The

City projects that the net present value of recoveries with respect to the Limited Tax General

Obligation Bond Claims will be 32%, using a 5% discount rate – 22% more than such holders

would have received under the Fourth Amended Plan, and 22% more than recipients of the New

B Notes are projected to receive under the Plan.  (*See* Forty-Year Projections at 3 (EX111).)

Class 7 will also receive 20% of any New B Notes (and distributions thereon) remaining in the

Disputed COP Claims Reserve after final resolution of the COP Litigation (and any other

objections to the Disputed COP Claims) and payment of the costs, fees and expenses incurred by

the Litigation Trust in connection therewith.  (Plan §§ II.B.3.p.iii.B.)  Although Class 7 initially

voted to reject the Plan (Paque Decl. ¶ 27), on July 25, 2014, the Court authorized the LTGO

Insurer and BlackRock Financial Management to change their votes to "yes," accepting the Plan.

(*Order Authorizing Ambac Assurance Corporation and BlackRock Financial Management, Inc.*

*to Change Their Votes on the City's Plan of Adjustment*, dated July 25, 2014 [Docket No. 6269].)

> **Pension Claims**.  The Plan classifies PFRS Pension Claims in Class 10 and the

GRS Pension Claims in Class 11, and identifies Classes 10 and 11 as Impaired/Voting.  (Plan

§ II.B.1.)  Classes 10 and 11 voted to accept the Plan.  (Paque Decl. ¶¶ 33-34.)  The PFRS

Pension Claims will be Allowed in the aggregate amount of $1.25 billion and the GRS Pension

Claims will be Allowed in the aggregate amount of $1.879 billion.  (*Id.* §§ II.B.3.q.i; II.B.3.r.i.)

The aggregate amount of the Pension Claims is equal to the aggregate UAAL[17] of the Retirement

Systems as of June 30, 2013, using a 6.75% assumed investment rate of return to value the

---

[16] The Forty-Year Projections assume that the City will issue the New LTGO Bonds, and that such bonds
will be paid in full with proceeds from a $300 million Exit Facility, with a 6% interest rate, maturing in
Fiscal Year 2016.  (Forty-Year Projections at 2, 3 (EX111).)

[17] The UAAL is the amount by which the net present value of the accrued liabilities of each of the
Retirement Systems exceeds the market value of its assets.

Retirement Systems' assets, and a 6.75% discount rate to calculate the net present value of the systems' accrued liabilities. (Disclosure Statement at 13-14.)

Holders of Pension Claims will receive (on account of pension benefits accrued as of June 30, 2014) the PFRS Adjusted Pension Amount (100% of currently monthly pension payment and 45% of annual COLAs) or the GRS Adjusted Pension Amount (95.5% of current monthly pension payment, adjusted for the Annuity Savings Fund Recoupment, and no COLAs), as applicable.[18] (Plan §§ I.A.193 (Definition of "GRS Adjusted Pension Amount), I.A.260 (Definition of "PFRS Adjusted Pension Amount"), II.B.3.q.ii.C, II.B.3.r.ii.C, Disclosure Statement at 17.) The City estimates that recoveries on account of the PFRS Pension Claims and the GRS Pension Claims (using a 5% discount rate) will be 59% and 60%, respectively. (Forty-Year Projections at 3 (EX111).) Holders of Pension Claims may also receive additional restoration payments in the event that (i) the funding levels of the Retirement Systems exceed certain thresholds (*i.e.* because the investment returns on the Retirement Systems' assets are greater than assumed) or (ii) a Qualifying DWSD Transaction occurs before the seventh anniversary of the Effective Date. (Plan §§ II.B.3.q.ii.C-D, II.B.3.r.ii.C-D; IV.F.)[19] Active Employees that hold Pension Claims will also receive, in addition to their adjusted pension

---

[18] In the event the DIA Proceeds and the State Contribution (described *infra*) are not received, the PFRS Adjusted Pension Amount will be 100% of current monthly pension payment and no COLAs, and the GRS Adjusted Pension Amount will be 73% of current monthly pension payment, adjusted for the Annuity Savings Fund Recoupment, and no COLAs. (Plan §§ I.A.193 (Definition of "GRS Adjusted Pension Amount), I.A.260 (Definition of "PFRS Adjusted Pension Amount"), II.B.3.q.ii.C, II.B.3.r.ii.C, Disclosure Statement at 17.)

[19] The Plan provides that the City will establish the Restoration Trust and issue the DWSD CVR to the Restoration Trust, for the benefit of holders of Pension Claims. The DWSD CVR is a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction. In the event a Qualifying DWSD Transaction occurs before the seventh anniversary of the Effective Date, the Restoration Trust will distribute the proceeds from the DWSD CVR to the GRS and PFRS to restore pension benefits, pursuant to the terms and conditions of the Plan. (Plan §IV.F.)

WEIL:\44494102\14\45259.0007

amounts on account of accrued Pension Claims, pension benefits for service on or after July 1, 2014 pursuant to the terms and conditions of the New PFRS Active Pension Plan or the New GRS Active Pension Plan, as applicable. (*Id*. Plan §§ II.B.3.q.ii.E, II.B.3.r.ii.F.)

For the first approximately 10 years after the Effective Date (through Fiscal Year 2023), the exclusive source for the annual contributions the City owes to the Retirement Systems with respect to the Pension Claims will be (i) the State Contribution (pursuant to the Grand Bargain, described below), (ii) certain DIA Proceeds (pursuant to the Grand Bargain, described below) and (iii) with respect to the GRS, certain pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library. (*Id.* §§ II.B.3.q.ii.A, II.B.3.r.ii.A.) After June 30, 2023, the Retirement Systems will receive certain additional DIA Proceeds, and each year the City will be required to contribute funds from the General Fund sufficient to pay the PFRS Adjustment Pension Amounts and the GRS Adjustment Pension Amounts owed to holders of Pension Claims, in accordance with and as may be modified by the terms and conditions of the Plan. (*Id.*)

**Grand Bargain**. What the City describes as the "cornerstone" of the Plan (*Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit,* dated May 26, 2014 [Docket No. 5034] (the "**Reply**") ¶ 29) is a multi-party transaction pursuant to which the City will transfer all of its right, title and interest in and to the DIA Assets to DIA Corp. as trustee, to be held in perpetual charitable trust and within the City limits, in exchange for the DIA Proceeds and the State Contribution. (Plan §§ IV.D, E.) This transaction, the "Grand Bargain," is comprised of two, interrelated settlement agreements: (i) the DIA Settlement and (ii) the State Contribution Agreement. (*Id.*)

Pursuant to the DIA Settlement, in exchange for the above-described transfer of the DIA Assets, the City will receive the DIA Proceeds – irrevocable commitments from the Foundations and DIA Corp. in the aggregate amount of $466 million ($366 million from the Foundations and $100 million from DIA Corp.) to be contributed over a 20-year period, subject to a Present Value Discount of 6.75%, to the extent payments are made in excess of $5 million per year. (*Id.* § IV.E.1, Ex. I.A.118, Ex. I.A.119.) The net present value of the DIA Proceeds, using a 6.75% discount rate, is $260.1 million. (Spencer Report at 117 (EX3035).) The Plan provides for the DIA Proceeds to be used to fund the City's annual contributions to the Retirement Systems to pay the Pension Claims. (Plan §§ II.B.3.q.ii.A, II.B.3.r.ii.A.) On June 17, 2014, the Attorney General filed the *Attorney General's Approval of the DIA Settlement* [Docket No. 5338].

Pursuant to the State Contribution Agreement, the State has agreed, subject to a number of conditions, to contribute $194.8 million to the Retirement Systems to pay the Pension Claims. (Plan § IV.D.) The State Contribution is conditioned on (i) approval of, and authority for the City to enter into, the DIA Settlement, and (ii) evidence satisfactory to the State of the irrevocable commitment by the Foundations to fund $366 million (or the net present value thereof) and DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement. (Plan § IV.D(3), Ex. I.A.318 §§4(f)(v), (g).) The State Contribution is also conditioned on, among other things, (i) acceptance of the Plan by Classes 10 and 11 (which has already occurred), (ii) entry of a Confirmation Order that includes a non-consensual third party release of any claims holders of Pension Claims may have against the State or State Related Entities, (iii) the Confirmation Order becoming a Final Order by December 31, 2014, (iv) the occurrence of the Effective Date by April 1, 2015, and (v) the passage of legislation authorizing

WEIL:\44494102\14\45259.0007

the State Contribution.  (Plan § IV.D(3), Ex. I.A.318 §§4(e)-(f).)  Such legislation was approved by Governor Snyder on June 19, 2014 and went into effect on June 20, 2014.  (2014 Michigan Public Acts 181–189.)

**OPEB Claims**.  Pursuant to the OPEB Settlement (as defined in the Disclosure Statement), the City and the Retiree Committee agreed that that the aggregate amount of the Allowed OPEB Claims shall be $4,303,000,000 (PFRS:  $2,208,000,000; GRS: $2,095,000,000), and that the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000 and to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims.  (Disclosure Statement at 40, 52-53.)  It appears that, pursuant to the OPEB Settlement, in addition to a share of the New B Notes, the City's projected 10% recoveries on account of the Allowed OPEB Claims include $20 million of the approximately $163 million in postpetition OPEB payments the City estimates it will have paid by the end of 2014.  (Disclosure Statement at 152; Forty-Year Projections at 3, 5 (EX111).)  Pursuant to the OPEB Settlement, the remaining approximately $143 million in estimated postpetition OPEB payments were offset against an agreed-upon OPEB liability as of the Petition Date of $4.446 billion, which resulted in the aggregate Allowed OPEB Claim amount of $4.303 billion.  (Disclosure Statement at 34, n. 5, 152; Forty-Year Projections at 4 (EX111).)  Thus, this additional $143 million is not included in (and is in addition to) the City's projected 10% recovery to this Class.

**Post-Effective Date Governance**.  The Plan provides for the establishment of a Financial Review Commission pursuant to the recently-enacted Financial Review Commission Act.  (Plan § IV.W.)  The Financial Review Commission will provide oversight for the City post-Effective Date, including to ensure the City adheres to the Plan and continues to implement

WEIL:\44949102\14\45259.0007

financial and operational reforms that promote more efficient and effective delivery of services to City residents. (*Id.*) The City will be required to promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. (*Id.*) Although the *Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 25, 2014)* [Docket No. 6257] (the "**Fifth Amended Plan**") provided for the Bankruptcy Court to appoint a neutral, independent Plan Monitor to evaluate the City's ongoing compliance with the Plan and the Confirmation Order and to report to the Bankruptcy Court on such matters on a periodic basis, in a public filing, the current Plan does not include the Plan Monitor provisions. (Fifth Amended Plan § IV.X.)

**Exculpation and Injunction Provisions**. The Plan includes a broad exculpation provision, which shields from liability not only the City and the Retiree Committee (including its members), but also, among others, the Retirement Systems and certain of their advisors and the LTGO Exculpated Parties. (Plan §§ I.169, I.277, III.D.6.) In addition, the Plan provides that, "On the Effective Date . . . all Entities that have been, are or may be holders of any Claims against the City . . . shall be permanently enjoined from . . . commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property." (*Id.* § III.D.5.a.)

**THE COURT MUST DENY CONFIRMATION OF THE PLAN**

Section 943(b) sets forth seven requirements for confirmation of a chapter 9 plan:

- First, the plan must comply with the provisions of the Bankruptcy Code made applicable in chapter 9 by sections 103(e) and 901(a). 11 U.S.C. § 943(b)(1). Notably, this includes section 1129(a)(3), which requires that the plan be proposed in good faith. *Id.* §§ 901(a), 1129(a)(3). In addition, where, as here, a class of impaired claims has voted to reject the plan, the plan must comply with the "cramdown" requirements set forth in section 1129(b)(1), which governs the confirmation of a nonconsensual plan. *Id.* §§ 901(a), 1129(a)(8), 1129(b)(1). Specifically, section 1129(b)(1) requires that a plan not discriminate unfairly against, and be fair and equitable to, each class of impaired claims that has rejected the plan. *Id.* § 1129(b)(1).

WEIL:\44494102\14\45259.0007

- Second, the Plan must comply with the provisions of chapter 9. *Id.* § 943(b)(2).

- Third, all amounts to be paid for services or expenses in the chapter 9 case or incident to the plan must be fully disclosed and reasonable. *Id.* § 943(b)(3).

- Fourth, the debtor must not be prohibited by law from taking any action necessary to carry out the plan. *Id.* § 943(b)(4).

- Fifth, the plan must provide that, on the effective date, all administrative expenses allowed under section 503(b) will be paid in full in cash. *Id.* § 943(b)(5).

- Sixth, all regulatory or electoral approvals necessary to carry out any provision of the plan must have been obtained, or such provision must be expressly contingent on such approval. *Id.* § 943(b)(6).

- Seventh, the plan must be in the best interests of creditors and feasible. *Id.* § 943(b)(7).

The City bears the burden of proving, by a preponderance of the evidence, that the Plan satisfies each of these requirements. *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) (*citing In re Mount Carbon Metro. Dist.* 242 B.R. 18, 31 (Bankr. D. Colo. 1999)). The City cannot satisfy this burden with respect to the good faith, unfair discrimination, fair and equitable, best interests of creditors and feasibility requirements for the following six main reasons:

- The Plan provides materially greater and less risky recoveries to classes 10 and 11, as compared to Class 9, notwithstanding that the claims in these three classes are equal in priority.

- The Plan provides materially greater and less risky recoveries to Class 7, as compared to Class 9, notwithstanding that the claims in these two classes are equal in priority.

- The Plan does not maximize the value of the DIA Assets.

- The Plan does not provide Class 9 with a better alternative than dismissal of the Chapter 9 Case.

- The City cannot make the payments required under the Plan in the event the COPs are invalidated and the Retirement Systems must disgorge the COPs Transactions proceeds.

- The Plan fails to establish a post-Effective Date governance structure that ensures the Plan will be implemented.

WEIL:\44494102\14\45259.0007

Accordingly, the Court must deny confirmation of the Plan.

## I.    THE PLAN UNFAIRLY DISCRIMINATES AGAINST CLASS 9 BECAUSE IT PROVIDES CLASSES 7, 10 AND 11, THREE CLASSES OF THE SAME PRIORITY, MATERIALLY HIGHER AND LESS RISKY RECOVERIES

Because Class 9 is Impaired (Plan § II.B.1.) and rejected the Plan (Paque Decl.

¶ 26), the Plan may only be confirmed if it complies with the "cramdown" requirements set forth

in section 1129(b).  *See In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 458 (Bankr. S.D.

Ohio 2011) ("Confirmation of a nonconsensual plan 'is commonly known in bankruptcy

parlance as a "cramdown" because the plan is crammed down the throats of the [non-accepting]

class(es) of creditors.'") (*quoting Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner

Mall P'ship)*, 2 F.3d 899, 906 (9th Cir. 1993)).  Section 1129(b)(1) provides that if any class of

impaired claims has not accepted the plan, "the court . . . shall confirm the plan . . . if the plan

does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or

interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1) (made

applicable in chapter 9 by sections 943(b)(1) and 901(a)).  Here, the Plan unfairly discriminates

against Class 9 because it provides Classes 7, 10 and 11, classes of the same priority as Class 9,

with materially higher and less risky recoveries.  For the same reason, the Plan is not fair and

equitable to Class 9 and was not proposed in good faith.

### A.    The Plan Unfairly Discriminates Against COPs Claims by Providing Holders of Pension Claims at Least 50% Greater Recoveries

Consistent with Eastern District of Michigan precedent and chapter 9 principles,

applying the Markell standard for unfair discrimination it is clear that the Plan unfairly

discriminates against Class 9, as compared to Classes 10 and 11.  (*See* Section I.A.1 *infra.*)

Under the Markell standard, the facts establish a strong presumption of unfair discrimination

because the COP Claims in Class 9 are receiving under the Plan a materially lower, and

WEIL:\44494102\14\45259.0007

materially riskier, recovery than Pension Claims in Classes 10 and 11, even though COP Claims and Pension Claims have the same priority. (*See* Section I.A.2.a *infra*.) Taking the City's Forty-Year Projections at face value, the percentage differential in recoveries between Class 9 and each of Classes 10 and 11 is approximately 50% - "grossly disparate" treatment that (even the City admits) Courts typically reject. (Reply ¶ 81.) The City's feeble attempt to argue that the percentage disparity is actually smaller than 50% because the DIA Proceeds and the State Contribution are outside the Plan, and because the Plan's treatment of Classes 10 and 11 should take into account the treatment of OPEB Claims in Class 12, are unavailing and contrary to applicable legal principles. (*See* Sections I.A.2.b(i)-(ii) *infra*.)[20] And, adjusting for the fact that the (i) City understates the projected recoveries to Classes 10 and 11 (by inflating the estimated Allowed Pension Claim amounts (*see* Section I.A.2.b(iii) *infra*)) and (ii) overstates the recoveries to Class 9 (by failing to reserve an appropriate amount of New B Notes in the Disputed COP Claim Reserve (*see* Section I.A.2.b(iv) *infra*) and using an inappropriately low discount rate to value the New B Notes (*see* Section I.A.2.b(v) *infra*)), the recovery differentials between Pension Claims and COP Claims are actually significantly greater than 50%, as explained in greater detail below. In addition, the New B Notes Class 9 will receive under the Plan are substantially riskier than the distributions to Classes 10 and 11, which will be funded, in large part, by cash payments from solvent entities. (*See* Section I.A.2.c *infra*.) The City cannot rebut this overwhelming presumption of unfair discrimination because COP Claims and Pension Claims have the same right rights, remedies and risks with respect to recovery outside of chapter 9 and holders of Pension Claims are not contributing new value to offset their preferential treatment. (*See* Section I.A.3 *infra*.)

---

[20] Even at these levels, the treatment disparity still amounts to unfair discrimination.

WEIL:\44494102\14\45259.0007

The result is the same if the Court accepts the City's position and applies the four-factor *Aztec* analysis. (*See* Section I.A.4 *infra*.) None of the City's justifications for the preferential treatment of Classes 10 and 11 are reasonable or necessary. In particular, the City has offered no proof that the Plan's treatment of Pension Claims (72.5% of which are held by retirees) has any measurable impact on the motivation or willingness of current employees. Nor has the City proven that it could not have confirmed a plan that provided for *pari passu* (or at least more equal) treatment of Classes 9, 10 and 11. The City's inability to articulate a reasonable basis for, or the necessity of, the Plan's materially disparate treatment of Pension Claims and COP Claims suggests that the City did not propose the discrimination in good faith.

**1.    Based on Precedent and Principles of Chapter 9, The Markell Standard for Unfair Discrimination Is Applicable**

As "[t]he Bankruptcy Code lacks any criteria or standards for determining whether a plan unfairly discriminates" against a dissenting class of creditors, bankruptcy courts have developed various tests to decide this issue. *In re Dow Corning Corp.*, 244 B.R. 696, 700 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002). In the Eastern District of Michigan, the prevailing standard is the presumption-based standard, first articulated by Professor Bruce A. Markell in a well-known law review article, and then adopted by this Court in *Dow Corning*:[21] Pursuant to the Markell standard, a presumption of unfair discrimination in a bankruptcy plan arises where there exists:

---

[21] Courts in other jurisdictions have adopted this test as well. *See e.g. In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121-22 (D. Del. 2006); *In re Tribune Co.*, 472 B.R. 223, 242 (Bankr. D. Del. 2012), *aff'd in part, vacated in part*, No. 12-CV-1072 GMS *et seq.*, 2014 WL 2797042 (D. Del. June 18, 2014); *In re Prosperity Park, LLC*, No.10-31399, 2011 WL 1878210 *4 (Bankr. W.D.N.C. May 17, 2011); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010); *In re Unbreakable Nation Co.*, 437 B.R. 189, 202 (Bankr. E.D. Pa. 2010); *In re Quay Corp.*, 372 B.R. 378, 386 (Bankr. N.D. Ill. 2007); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 864 (Bankr. S.D. Tex. 2001); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228-32 (Bankr. D.N.J. 2000).

WEIL:\44494102\14\45259.0007

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Dow Corning*, 244 B.R. at 702 (*citing* Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 228 (1998)); *see also In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999) (applying the presumption-based standard in a sister opinion) *aff'd*, 255 B.R. 445 (E.D. Mich. 2000)[22] *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002); *In re BWP Transport, Inc.*, 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011) (applying the *Dow Corning* presumption-based standard).  Once established, the presumption of unfairness resulting from a significant recovery differential may only be rebutted by the plan proponent proving that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the preferred class had infused new value into the reorganization, which offset its gain.  *Id.*  A plan proponent may only overcome the presumption of unfair treatment based on different risk allocation by proving that such allocation was consistent with the risk assumed by parties prepetition.  *Id.*

Notably, in developing this standard, Professor Markell relied heavily on two Supreme Court Chapter IX[23] cases that he found "telling as to the core content of unfair discrimination."  Markell, 72 Am. Bankr. L.J. at 233.  In the first case, *American United Mutual*

---

[22] Although the district court considered and affirmed the *Dow Corning* bankruptcy court's finding that the plan did not unfairly discriminate against a particular class, in doing so the district court did not explicitly address the bankruptcy court's use of the presumption-based standard.  However, since *Dow Corning*, courts in this district have continued to apply the Markell presumption-based standard.

[23] Chapter IX of the Bankruptcy Act is the predecessor to chapter 9 of the Bankruptcy Code.  All references in the Brief to "Chapter IX" are to Chapter IX of the Bankruptcy Act.

WEIL:\44494102\14\45259.0007

*Life Insurance Co. v. City of Avon Park*, the Supreme Court reversed the confirmation of a city's

Chapter IX plan on unfair discrimination grounds where the lower court failed to consider the

profits one of the creditors (who also served as the city's fiscal agent for the refunding of the

city's outstanding bonds pursuant to the Chapter IX plan, in exchange for a fee charged to

bondholders) would receive as a result of purchasing bonds at a discount. The Court held that:

> In absence of a finding that the aggregate emoluments receivable
> by the [debtor's fiscal agent] were reasonable, measured by the
> services rendered, it cannot be said that the consideration accruing
> to [the debtor's fiscal agent], under or as a consequence of the
> adoption of the plan, likewise accrued to all other creditors of the
> same class. Accordingly, the imprimatur of the federal court
> should not have been placed on this plan.

311 U.S. 138, 148 (1940). Professor Markell interpreted this case to stand for the proposition

that if the "consideration received by a creditor on account of its claim, whether explicitly

provided for in the plan or not . . . is proportionately higher than what is paid to other creditors of

the same priority, there is a presumption of unfair discrimination." Markell, 72 Am. Bankr. L.J.

at 234. He also noted that the Supreme Court "traced the origins of the unfair discrimination

requirement to . . . the bankruptcy policy of ratable distributions to creditors." *Id.* (*citing Avon

Park*, 311 U.S. at 147 (noting that compositions under Chapter IX, like compositions under

Chapter IX's antecedents, "envisage equality of treatment of creditors" and that a composition

should not be confirmed "where one creditor was obtaining some special favor or inducement

not accorded the others")).

      In the second case, *Mason v. Paradise Irrigation District*, the Supreme Court

upheld confirmation of a Chapter IX plan that provided better treatment to the Reconstruction

Finance Corporation ("**RFC**") (holder of approximately 92% of the outstanding bonds of the

debtor, and underwriter of the refinancing of the outstanding bonds pursuant to the Chapter IX

plan) than to individual, dissenting bondholders. 326 U.S. 536 (1946). In overruling an unfair

discrimination objection, the Court held that because the RFC contributed something of value (*i.e.* underwrote the refinancing by agreeing, prepetition, to provide a $252,500 loan) in exchange for its preferred treatment, the difference in treatment was warranted. *Id.* Professor Markell interpreted this case to stand for the proposition that "[i]f discrimination in treatment was the means of reimbursement for [taking a risk], then that discrimination could not be unfair." Markell, 72 Am. Bankr. L.J. at 235. Given the prominence of Chapter IX precedent in Professor Markell's analysis, utilizing the Markell test for unfair discrimination in this case is consistent, not only with its adoption by other bankruptcy judges in the Eastern District of Michigan, but also with the presumption-based test's roots in municipal bankruptcy.[24] Thus, contrary to the City's argument that the unique circumstances of the Chapter 9 Case require the Court to modify existing unfair discrimination legal standards, "[w]hen properly examined through the prism of chapter 9 . . . case law supports" the use of the Markell standard. (Reply ¶¶ 44-45.)

### 2. The Plan's Treatment of Classes 9, 10 and 11 Gives Rise to a Substantial Presumption of Unfair Discrimination Under the Markell Standard

The facts here establish a presumption of unfair discrimination under the Markell standard: (1) Class 9 (COP Claims) rejected the Plan (Paque Decl. ¶ 26); (2) Classes 10 and 11 (PFRS Pension Claims and GRS Pension Claims, respectively) are of the same priority; and

---

[24] The City argues that the Markell standard should not apply because it "leaves no room for . . . considerations" such as the alleged need to motivate the City's current employees and unions to aid in the City's revitalization or the alleged personal hardship that may befall pensioners. (Reply ¶¶ 87-88.) As an initial matter, the City's suggestion that the Court reject or adopt a particular legal standard to fit the facts the City wants to put forward is absolutely preposterous and contrary to basic principles of law. Moreover, the City's interpretation of the Markell test is wrong. As explained in greater detail in Section I.A.3.b *infra*, contrary to the City's narrow interpretation, the value of current employees' contributions to the City's provision of essential services to residents going forward is not irrelevant under the Markell test (Reply ¶¶87-88); however, the Markell test requires that the City prove that the value of any such contributions is commensurate with, and related to, the preferential treatment the Plan affords to Pension Claims, which the City cannot do. Further, the Court has already ruled that personal hardship is not relevant to unfair discrimination analysis. (*See e.g.* Hr'g Tr. 104: 13-19 (June 26, 2014).)

30

(3) Class 9 is receiving under the Plan (a) a materially lower percentage recovery than each of Classes 10 and 11 and (b) a materially riskier form of distribution.  Notably, the Court has already stated that "[t]he City will bear the burden of showing why its **very significant discrimination** in favor of retirees and against financial creditors here in this case is not unfair." (Hr'g Tr. 82:7-10 (Aug. 6, 2014) (emphasis added).)

> a. <u>Classes 10 and 11 Are of the Same Priority as Class 9</u>

To determine priority for purposes of the unfair discrimination analysis under section 1129(b)(1), "the appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, i.e. 'Administrative Claims,' 'Secured Claims,' 'Priority Claims,' etc."  *BWP*, 462 B.R. at 231 (quoting *Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 47 n.12 (E.D. Pa. 1996)).  Thus, "all of the secured creditors are considered to have the same priority level," and the same holds true for creditors holding administrative claims, priority claims or unsecured claims.  *BWP*, 462 B.R. at 231.

In connection with the COPs Transactions, (i) the City entered into the COP Service Contracts and agreed to make the Service Payments owed to the COP Service Corporations thereunder, (ii) the COP Service Corporations irrevocably sold, assigned and conveyed their rights to receive the Service Payments to the Funding Trusts and (iii) the Funding Trusts issued the COPs, each of which represents an individual, undivided proportionate interest in the rights to receive certain of the Service Payments.  (*See* page 7 *supra*.)  The COP Service Contracts explicitly provide that "[t]he obligations of the City hereunder, including its obligation to make [Service Payments], are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City."  (COP Service Contracts § 4.02(b) (EX3010-EX3013).)  Thus, COP Claims – which are defined in the Plan as Claims under or evidenced by the COP Service Contracts – are unsecured contract claims against the City.

Similarly, the Pension Claims are unsecured contractual obligations of the City. The Pension Clause provides, "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof . . ." Mich. Const. art. IX, §24.  In the context of eligibility, this Court appropriately held that "pension benefits are a contractual obligation of the municipality" and "the only remedy for impairment of pensions is a claim for breach of contract."  *In re City of Detroit*, 504 B.R. 97, 153-54, 161 (Bankr. E.D. Mich. 2013).  Accordingly, Pension Claims have the same priority as COP Claims.[25]

    b.    *Class 9 Is Receiving a Grossly Lower Percentage Recovery Than Each of Classes 10 and 11 Under the Plan*

The City projects that holders of PRFS Pension Claims in Class 10 will recover **59%** of their Allowed Claims and holders of GRS Pension Claims in Class 11 will recover **60%** of their Allowed Claims, while holders of COP Claims in Class 9 will recover **only 10%**, in each case on a net present value basis using a 5% discount rate.  (Forty-Year Projections at 3

---

[25] In arguing that the Plan's treatment of unsecured claims would not give rise to a presumption of unfair discrimination, the City does not refute that Pension Claims have the same priority as other unsecured claims, including the COP Claims.  The City instead focuses on a purported lack of material disparity in percentage recovery or risk allocation.  (Reply § II.D.2.)  Although the City suggests that the protections afforded to Pension Claims by the Pension Clause could justify the Plan's preferential treatment of Classes 10 and 11 (*id.* ¶ 98), as explained in greater detail in Section I.A.3.a *infra*, these protections are **the same** as those afforded to holders of other unsecured claims, including COP Claims, by the Contracts Clauses.  The Court has already explicitly rejected the Retiree Committee and Retirement Systems' recycled arguments that the Pension Clause provides any greater protections than the Contracts Clauses. (*See Official Committee of Retirees' Memorandum of Law in Support of Confirmation of Fifth Amended Plan for Adjustment of Debts Filed by the City of Detroit, Michigan*, dated August 4, 2014 [Docket No. 6508] (the "**Retiree Committee Brief**") at 13-14, 32-34; *Corrected Brief of the Detroit Retirement Systems in Support of Proposed Treatment of Pension Claims Under "Alternative A" of the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit and Statement of Reservations*, dated August 5, 2014 [Docket No. 6520] (the "**Retirement Systems Brief**") at 12, 17-18, 22; *Detroit*, 504 B.R. at 150-54, 161.  The fact that the Court's ruling has been appealed to the Sixth Circuit is irrelevant, as is the fact that the Arizona Supreme Court came to a different conclusion.

WEIL:\44494102\14\45259.0007

(EX111).)[26]  Taking the City's projections at face value, the Plan provides Class 9 with approximately **50% less** than each of Classes 10 and 11, which even the City concedes falls within the range of "grossly disparate" recoveries that courts generally reject.  (Reply ¶¶ 81 (*citing Tribune*, 472 B.R. at 243 ("Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors")).  Although a 50% treatment differential is clearly sufficient to establish a presumption of unfair discrimination, it is not necessary.  For example, in *Snyders Drug Stores,* the bankruptcy court denied a chapter 11 plan on unfair discrimination grounds where the plan proposed paying one class of unsecured creditors 6-7% more than the other.  *In re Snyders Drug Stores, Inc.* 307 B.R. 889, 892, 896 (Bankr. N.D. Ohio 2004).

In reality, the Plan significantly understates, and the City tries to downplay, the projected recoveries to Classes 10 and 11, and simultaneously overstates the projected recoveries for Class 9.  Factoring in a more reasonable calculation of the Pension Claims and an appropriate discount rate for the New B notes, the differentials in recoveries between Pension Claims and COP Claims is actually significantly greater than 50%.

(i)     *The DIA Proceeds and the State Contribution are NOT Outside the Plan*

In an attempt to artificially decrease the disparity in recoveries among holders of Pension Claims and holders of COPs Claims, the City argues that a portion of Pension Claim recoveries under the Plan should not be counted for purposes of the unfair discrimination

---

[26] The Forty-Year Projections assume that the City loses the COP Litigation and the COP Claims are Allowed in the aggregate principal amount of outstanding COPs.  Accordingly, as explained in greater detail in Section I.A.4.a *infra*, the City cannot purport to justify the disparity in estimated percentage recoveries or risk allocation between the Pension Claims and the COP Claims on the basis that the COP Claims are Disputed, and the City has previously confirmed that it does not intend to do so.  (Hr'g Tr. 94:2–95:3 (May 28, 2014) (confirming that factual issues related to COPs validity are not part of the confirmation hearing); *see* Retiree Committee Brief at 31; Retirement Systems Brief at 23.)

WEIL:\44944102\14\45259.0007

analysis. (Reply ¶¶ 51-56.) Specifically, the City contends that the "Grand Bargain" proceeds (*i.e.* the DIA Proceeds and the State Contribution), all of which will be distributed to holders of Pension Claims in Classes 10 and 11 (Plan §§ IV.D.3.(f), IV.E.1), are "outside the Plan" and should not be included in the Court's unfair discrimination analysis. (Reply ¶ 51.)[27] This assertion is ridiculous.

This is analogous to a case where a debtor incorporates in its plan, or conducts pre-confirmation, a sale of all or some portion of its assets and then uses those funds to repay creditors. The Plan provides for the City to irrevocably transfer the DIA Assets to DIA Corp., to be held in perpetual charitable trust, in exchange for the DIA Proceeds (irrevocable funding commitments from the Foundations and DIA Corp.). (Plan § IV.E.2.) It is undisputed that the DIA Assets are assets of the City. (*See* DIA Brief § II.A.) The DIA Proceeds – which are being given in consideration for the transfer of the DIA Assets – are obviously proceeds of a City asset and thus, property of the City. *See, e.g., Metromedia Fiber Network Servs., Inc. v. Lucent Techs, Inc. (In re Metromedia Fiber Network, Inc.)*, Case No. 02-22736 (ASH), *et seq.*, Adv. No. 04-08564A, 2005 WL 3789133, at *9 (Bankr. S.D.N.Y. Dec. 20, 2005) (observing that generally, the net proceeds from the sale of a debtor's assets are property of the debtor's estate). The same is true of the State Contribution, which is conditioned on the Court's approval of, the City's authority to enter into, and the DIA Funding Parties committing to fund, the DIA Settlement. (Plan, Ex. I.A.318 §§ 4.f.v., 4.g.)

The evidence confirms that, from the beginning, the State Contribution was tied to the transfer of the DIA Assets. (*See* Orr Dep. 425:18-25, 426:22-24, July 22, 2014 (as of October 2013, his understanding was that State funding would be used to "provide some benefit

---

[27] Even if this were true, the resulting 39% and 48% recoveries to Classes 10 and 11, respectively, would still be materially greater than the 10% recovery to Class 9.

to what is now the bankruptcy estate *while keeping the art in the City*" and reiterating that, as of

that time "I think I was aware that there was an effort to provide some funding [from the State]

for the benefit of the estate *to keep the art in the City*") (emphasis added); Buckfire Dep., Vol. 2

157:2-23, July 16, 2014 (explaining that he had a meeting with the Governor in May 2013 during

which he first addressed the issue of the potential transfer of the art to an authority in exchange

for a contribution, and that there was no discussion about the pensions in this context).  The City

has admitted that the State Contribution will be provided "in part for the DIA Settlement and the

art to be put into the trust."  (Orr Dep. 377: 17-18; *see also* Buckfire Dep., Vol. 2 152:9-15 ("the

State is getting certain consideration for providing that money, not just the elimination of [the

pension] litigation, but also *maintaining an important cultural aspect to the southeastern*

*Michigan region, which is the museum, itself*") (emphasis added).)  Accordingly, both the DIA

Proceeds and the State Contribution are proceeds of a City asset and, thus, property of the City to

be distributed under the Plan.  The fact that these funds originate from third parties does not

change this result.  *See Avon Park*, 311 U.S. at 147 (with respect to "the question of unfair

discrimination . . . a composition would not be confirmed where one creditor was obtaining some

special favor or inducement not accorded the others, *whether that consideration moved from the*

*debtor or from another*") (emphasis added); Markell, 72 Am. Bankr. L.J. at 234 (citing *Avon*

*Park* for the proposition that "unfair discrimination determinations require courts to consider *all*

*consideration received by a creditor on account of its claim*, whether explicitly provided for in

the plan or not").

       The City's attempt to characterize the use of the DIA Proceeds and State

Contribution to augment recoveries for Classes 10 and 11 as "outside the Plan" is particularly

disingenuous given that the City characterizes the DIA Settlement as a "cornerstone of the Plan"

and "an essential component of the Plan."  (Reply ¶¶ 29, 37.)  In fact, in its attempt to prove the

reasonableness of the DIA Settlement, the City credits **both** the DIA Proceeds and the State

Contribution amounts as the value the City will receive in exchange for the transfer of the DIA

Assets.  (Reply ¶ 37.)  The City is talking out of both sides of its mouth.  Moreover, the DIA

Funding Parties and the State are not creditors of the City, nor are they are merely gifting funds

to Classes 10 and 11; the City is transferring a significant asset in exchange for their

contributions.  For this reason, the cases cited by the City holding that distributions received

from senior creditors voluntarily sharing their recoveries are not distributions by the debtor under

the plan for purposes of unfair discrimination, are inapposite. (Reply ¶ 52, n.20 (*citing In re*

*Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *60-61 (Bankr. S.D.N.Y. Oct. 31, 2003);

*In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1994 WL 842777, at *11 (Bankr. N.D. Ohio

Nov. 14, 1994); *In re MCorp. Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993).) [28]  Likewise, the

chapter 13 cases cited by the City that hold that an individual debtor may, under certain

circumstances, use his or her discretionary income (*i.e.* income that does not fall within section

1325(b)'s definition of "disposable income") to monetarily favor an unsecured creditor address

---

[28] Further, the City neglects to acknowledge that certain courts have rejected gifting by senior creditors.
*See, e.g., In re Armstrong World Indus., Inc.*, 320 B.R. 523, 539-40 (D. Del. 2005) ("to the extent that *In
re WorldCom* . . . and *In re MCorp Financial* read *SPM* to stand for the unconditional proposition that
'[c]reditors are generally free to do whatever they wish with the bankruptcy dividends they receive,
including sharing them with other creditors, so long as recoveries received under the [p]lan by other
creditors are not impacted' . . . without adherence to the strictures of 11 U.S.C. § 1129(b)(2)(B)(ii), that
contention is flatly rejected here") (alteration in original) (internal citations omitted), *aff'd*, 432 F.3d 507
(3d Cir. 2005); *DISH Network Corp. v. DBSD N. Am, Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 96-97
(2d Cir. 2011) (rejecting the argument that the shares and warrants distributed to the existing shareholder
"rightfully belonged to the secured creditors, who were entitled to share them with the existing
shareholder as they saw fit" because they were not being paid in full, and holding that the existing
shareholder received property "under the plan" in violation of the absolute priority rule set forth in section
1129); *Snyders Drug Stores*, 307 B.R. 889 (rejecting the argument that distributions to two classes of
unsecured creditors were not property of the estate because, but for the secured creditor's agreement to
allow money it would otherwise have been paid to be set aside, the unsecured creditors would have
received nothing).

issues that are unique to chapter 13 and inapplicable in the chapter 9 context. (*Id.* ¶ 53, n.21 (*citing In re Orawsky*, 387 B.R. 128, 155 (Bankr. E. D. Pa. 2008) and *In re Abaunza*, 452 B.R. 866, 875 (Bankr. S. D. Fla. 2011).)[29]

The City's argument that the "augmented recovery" that holders of Pension Claims will receive is not a treatment of those claims under the Plan also is not convincing. The DIA Funding Parties certainly are not liable for the Pension Claims and are not receiving anything from those holders in exchange for payment. Clearly such funds are being used to satisfy the Pension Claims against the City. Thus, it is the Plan, and not nonbankruptcy law, that is the "source of [Class 9's] disadvantage." (Reply n.20 (*citing Travelers Ins. Co. v. Bryson Props. (In re Bryson Props. XVIII)*, 129 B.R. 440, 445 (M.D.N.C. 1991), *rev'd*, 961 F.2d 496 (4th Cir. 1992).)

The City also has not demonstrated that the State is separately liable for the Pension Claims, such that the receipt of the State Contribution is not treatment of the Pension Claims under the Plan (but instead is payment by the State on account of its liability to such holders). *See Bryson Props.*, 129 B.R. at 445 (disregarding distributions made by the debtor's partners where the partners "***are already liable for that money*** . . . [a]s a matter of partnership law . . . despite the bankruptcy of the partnership") (emphasis added). Although, the Form of State Contribution Agreement makes a vague reference to the fact that "[d]uring the course of

---

[29] The holdings of these chapter 13 cases hinge on the fact that, in chapter 13, a debtor has certain "disposable income" that, pursuant to section 1325(b), must be used to satisfy unsecured claims, and "discretionary income" that the debtor can use however he or she pleases. This concept of disposable versus discretionary income does not apply in chapter 9. *See* 11 U.S.C. § 901(a). Although section 943(b)(7)'s feasibility requirement mandates that a chapter 9 debtor retain sufficient funds to "provide future public services at the level necessary to its viability as a municipality," nothing in the Bankruptcy Code or chapter 9 case law permits a chapter 9 debtor to retain "discretionary funds" that it can use however it pleases, including to favor certain prepetition creditors, in violation of section 1129(b). *Mount Carbon*, 242 B.R. at 35.

WEIL:\44494102\14\45259.0007

the Chapter 9 Case, there have been suggestions that the State of Michigan . . . may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes" (Plan, Ex. I.A.318 § C), mere "suggestions" that the State may be separately liable for the Pension Claims does not justify discounting the State Contribution for purposes of the unfair discrimination analysis. This would be particularly unfair to Class 9 given that, to the extent the State's alleged liability to Classes 10 and 11 is based on protections the State afforded to the Pension Claims under the Pension Clause, as explained in greater detail in Section I.A.3.a below, these are *the same* protections the State afforded to the COP Claims under the Contracts Clause of the Michigan Constitution.

To come full circle, both the DIA Proceeds and the State Contribution will reduce the City's obligations to holders of Pension Claims under the Plan. As these proceeds are counted for purposes of determining what amounts the City owes, the receipt of such amounts by holders of Pension Claims constitutes treatment of their Claims against the City, under the Plan.

(ii) *Recoveries on Account of Separately-Held OPEB Claims Should NOT Be Considered*

The City's additional suggestion that the Court consider the Plan's overall "blended" treatment of both Pension Claims and OPEB Claims in Classes 10, 11 and 12 for purposes of calculating treatment of holders of Pension Claims is inappropriate and contrary to applicable legal principles. (Reply ¶ 57.) The Retiree Committee objected that a prior version of the Plan was "unconfirmable on its face" because it inappropriately classified Pension Claims and OPEB Claims, "two different claims" in the same class, and provided them "different treatment within the class." (*See* Hr'g Tr. 40:18-20, 41:1-16 (Mar. 5, 2014).) The Retirement Systems also objected to this classification scheme because "the Pension Claims and the OPEB Claims are based on wholly different contractual, statutory and other legal bases and are to

WEIL:\44944102\14\45259.0007

receive wholly different treatment under the Plan." (*Retirement Systems' Objection and Brief Regarding Classification of Retiree Pension Claims in the City's Proposed Plan of Adjustment*, dated March 2, 2014 [Docket No. 3142] at 3.)  As a result of this resistance, the City agreed to place the OPEB Claims in a separate class.  (*Id.*)   However, the City is now trying to get a second bite at the apple to mask the degree to which Pension Claims receive preferential treatment – the City's argument is no more convincing the second time around.

The plain language of section 1129 contemplates a class-by-class, not holder-by-holder, analysis of a chapter 9 plan's treatment of claims.  *See* 11 U.S.C. § 1129(a)(8), (a)(10), (b)(1) (each made applicable in chapter 9 pursuant to sections 943(b) and 901(a)) ("[w]ith respect to each ***class*** of claims" the Court must consider whether "(A) such ***class*** has accepted the plan; or (B) such ***class*** is not impaired under the plan" and whether "[i]f a ***class*** of claims is impaired under the plan, at least one ***class*** of claims that is impaired under the plan has accepted the plan" and, finally, if an impaired class has rejected the plan, "the court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to ***each class*** of claims or interests that is impaired under, and has not accepted, the plan") (emphasis added); *c.f. In re Holt*, 136 B.R. 260, 260 (Bankr. D. Idaho 1992) (noting that, with respect to section 1329, "the plain language of the statute deals with modification in the treatment of classes, not individual creditors") (internal citations omitted); *see also* 11 U.S.C. § 1122(a) ("a plan may place a claim . . . in a particular ***class*** only if such claim . . . is substantially similar to the other claims or interests of such class") (emphasis added).  In recognition of the Bankruptcy Code's focus on ***classes*** (not holders) of claims in the context of plan confirmation, case law provides that creditors holding multiple claims in multiple classes have the right to vote separately with respect to each claim.  *See Figter Ltd. V. TIAA (In re Figter Ltd.)*, 118 F.3d 635,

640 (9th Cir. 1997) (agreeing that "a creditor with multiple claims, has a voting right for each claim it holds") (internal quotation marks and citations omitted); *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 65 (Bankr. S.D.N.Y. 2006) (noting that Congress did not "declare that when creditors hold claims of multiple classes or debtors in multi-class or multi-debtor chapter 11 cases, they must choose the particular class or debtor with which they will wish to be allied" and declining to establish such a requirement); *see also Notice of Final Exhibits in Connection with Corrected Motion of the City of Detroit for Entry of an Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment with Respect to Pension and OPEB Claims*, dated May 2, 2014 [Docket No. 4378] Ex. 6B ¶ VIII ("Any Pension Claimant or OPEB Claimant with claims in more than one Class must submit a separate Ballot for each class . . . a retiree who receives both a pension and retiree health insurance benefits from the City must submit a separate Ballot for his or her Pension Claim and OPEB Claim."); *Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment*, dated Mar. 11, 2014 [Docket No. 2984] ¶7.i ("For the avoidance of doubt, each Beneficial Holder and each Insurer of securities giving rise to claims in (a) Classes 1A, 1B, 1C or 1D (or any subclass thereof) may vote differently and make different elections for each respective CUSIP of securities giving rise to claims in such classes or subclasses which they hold or insure . . ."). Even the City acknowledges it is not appropriate to conflate **claims** with **claimants**. (Reply ¶ 291.)

Requiring holders of both Pension Claims and OPEB Claims to vote separately with respect to each type of claim, yet considering the overall treatment of both types of claims in the context of unfair discrimination analysis would be inconsistent and prejudicial. This is

WEIL:\44949102\14\45259.0007

particularly true given that, according to the City, only 69% and 56% of holders of Claims in

Classes 10 and 11, respectively, also hold OPEB Claims. (Reply ¶ 57.) There is not anywhere

close to complete overlap. Thus, it is unsurprising that the City cites no legal support for the

proposition that the Court should consider the Plan's overall treatment of **holders** of Pension

Claims and OPEB Claims. Accordingly, the Court should decline to do so.

(iii)    *The City Substantially Understates the
Projected Recoveries to Classes 10 and 11*

The City is able to reduce the projected recovery percentages disclosed for

Classes 10 and 11 by substantially overstating the amount of Pension Claims. The aggregate

amount of the Pension Claims is supposed to represent the UAAL of the Retirement Systems as

of June 30, 2013. (Disclosure Statement at 13-14.) However, the City inflated the estimated

UAAL of the Retirements Systems by improperly (i) including benefits that are not yet vested

(*i.e.* benefits that are contingent on future services that have not yet been performed),

(ii) including $387 million of excess interest from the Annuity Savings Fund that the City

believes should have been used to fund monthly payments to GRS participants and (iii) using an

unconventionally low discount rate and investment rate of return, in each case of 6.75%, to value

the systems' liabilities and assets, respectively. (*Expert Report Prepared by Flick Fornia*, July

29, 2014 (the "**Fornia Report**") ¶¶ 7, 22; *Expert Report of Stephen Rosen*, July 29, 2014 (the

"**Rosen Report**") at 21-22 (EX4413).) This resulted in Allowed Claim amounts of $1.250

billion for PFRS Pension Claims and $1.879 billion for GRS Pension Claims. (Disclosure

Statement at 13, 36, 38; Forty-Year Projections at 2-3 (EX111).) Even the City recognizes that

the 6.75% discount rate and investment rate of return it used to calculate the Pension Claims is

low in comparison to other municipalities. (*See* Orr Dep. 318:7-17 ("I believe [6.75% is] the

second lowest in the United States today; I believe Washington, D.C., is only lower at 6.5

percent"); Spencer Report at 21 (EX3035) (showing that the average discount rate used by a sample of seven other public pension plans is 8.00% for public safety and 7.61% for general).) And, two of the objecting parties' experts opined that a discount rate and investment rate of return in the range of 7.5% to 8.0% would be reasonable for the Retirement Systems. (Fornia Report ¶ 36; Rosen Report at 13 (EX4413).) Excluding all non-vested benefits, excluding the $387 million of interest from the Annuity Savings Fund, and using a more appropriate discount rate to calculate the UAALs of the Retirement Systems yields significantly lower Pension Claim amounts and correspondingly higher percentage recoveries for Classes 10 and 11, approaching and, under certain circumstances, exceeding, 100%.[30] In addition to being offensive, this violates the prohibition on debtors paying more than 100% recoveries on account of prepetition claims. *See United Sav. Assoc. v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.*), 793 F.2d 1380, 1410 (5th Cir. 1986) (*citing* H.R. Rep. No. 95-595, at 415 (1977) ("[N]o class may be paid more than in full")), *aff'd en banc*, 808 F.2d 363 (5thCir. 1987), *aff'd*, 484 U.S. 365 (1988).

(iv)    *The Plan's Distribution to the Disputed COP Claim Reserve Is Insufficient*

The Plan overstates recoveries for Class 9 by failing to reserve an appropriate amount of New B Notes in the Disputed COP Claim Reserve in the event the COP Claims are Allowed. FGIC has asserted Claims against the City with respect to not only the $1.1 billion in

---

[30] According to the Fornia Report, excluding non-vested benefits and the Annuity Savings Fund interest, the estimated claim (and percentage recovery) amounts would be approximately: $1.164 billion (96%) for GRS and $861 million (85%) for PFRS, using a 7.2% discount rate; $1.073 billion (104%) for GRS and $735 million (100%) for PFRS, using a 7.5% discount rate; and $957 million (117% (as corrected by Mr. Fornia at his deposition)) and $571 million (129%) for PFRS, using a 7.90% and 8.0% discount rate, the respective discount rates used by each of the Retirement Systems in their last actuarial analyses prior to the Emergency Manager's appointment (Spencer Report at 20 (EX3035)). (Fornia Report at 15.) According to the Rosen Report, excluding non-vested benefits and the Annuity Savings Fund interest and using a 7.5% discount rate, the estimated claim (and percentage recovery) amounts would be $1.018 billion (109.8%) for GRS and $795 million (92.5%) for PFRS. (Rosen Report at 22, Table 4 (EX4413).)

aggregate principal amount of COPs covered by the FGIC COPs Insurance Policies that are currently outstanding, but also with respect to (i) $33,166,422.91 interest on the FGIC-insured COPs that is due and owing, but unpaid, (ii) interest on the COPs that FGIC will be required to pay in the future, and (iii) fees and expenses. (FGIC COPs Proof of Claims ¶¶ 20-21 (EX3039-EX3040).) In addition, FGIC asserted the Counterclaims against the City in the COP Litigation. Although the Plan includes all of these Claims in the definition of a COP Claim to be treated in Class 9, the Plan provides for the City to distribute to the Disputed COP Claim Reserve an Unsecured Pro Rata Share of New B Notes, calculated as if the COP Claims were Allowed only in the total aggregate unpaid principal amount of the COPs. (Plan. § II.B.3.p. iii.A.) Accordingly, to the extent FGIC's COP Claims against the City are Allowed in the full amount asserted by FGIC (or in some amount greater than $1.1 billion), the New B Notes in the Disputed COP Claim Reserve will be insufficient to provide even the 10% recovery the City is projecting. (Forty-Year Projections at 3 (EX111).)

(v)      *The City Significantly Overstates*
*the Projected Recoveries to Class 9*

Because Class 9 will receive recoveries under the Plan in the form of payments over time (pursuant to the terms of the New B Notes), in order to account for the fact that a promise to pay money in the future is worth less than cash today (often referred to as the "time value of money"), it is necessary to apply a discount to the face value of those future payment streams to determine their actual, present value. The discount rate should reflect any risk that the future payments might never be made; thus, discount rate has an inverse relationship to the present value of a future payment stream – the higher the risk, the higher the discount rate, and the lower the present value. The City uses an inappropriately low discount rate – 5% – to calculate the net present value of projected recoveries to Class 9, which results in an overstated

WEIL:\44494102\14\45259.0007

representation of the value such class will receive under the Plan. A 5% discount rate implies that the credit risk of the New B Notes (the distribution to Class 9) is similar to that of tax-exempt, secured bonds issued by a financially strong, high credit quality municipality. (Spencer Report at 25, 29 (EX3035); Malhotra Dep. 330:6-13, July 15, 2014 (a basis for the 5% discount rate was "long-term interest rates on AA-rated municipal bonds").) Although the Emergency Manager has "a hope that the City's credit rating would be investment grade" upon emergence from the Chapter 9 Case (Orr Dep. 329:4-5), the City's investment banker admitted that "I don't think Detroit will deserve a single "A" rating as a general obligation bond holder [sic] until it has proven that it can operate in a financially responsible way that the tax base is improving and that the general economic conditions of the area are also improving." (Buckfire Dep., Vol. 2 212:4-9.) In fact, using the general frameworks established by Moody's and Standard and Poor's ("**S&P**") to evaluate U.S. municipal bond issuers, the City will likely emerge with a credit rating of Baa3 by Moody's (the lowest investment grade) and BB by S&P (below investment grade). (Spencer Report at 25-28 (EX3035).)

In addition, the New B Notes are neither backed by a full faith and credit tax pledge of the City, nor secured by a lien on City property or revenues; accordingly, there is no basis to calculate New B Notes recoveries using a lower discount rate than the average yield on general obligation bonds issued by comparably-rated municipalities (6.71% for tax-exempt bonds, and 9.91% assuming a 35% tax rate), or a lower rate than the interest rates of most of the secured special revenue New DWSD Bonds that were offered to Impaired Classes of DWSD Bond Claims under the Plan. (*Id.* at 29; Plan Ex. I.A.208.) Taking into account the City's likely ratings upon emergence, and the unsecured, taxable nature of the New B Notes, the net present value of recoveries to Class 9 should be calculated using a discount rate of at least 9%. (Spencer

WEIL:\44494102\14\45259.0007

Report at 29, 32, 33 (EX3035).)  Using a 9% discount rate yields projected recoveries for Class 9 of only approximately **6%**.  (*Id.* at 32.)  And, in the event the COP Claims are Allowed in an amount greater than the aggregate unpaid principal amount of the outstanding COPs (*see supra* Section I.A.2.b(iv)), Class 9's percentage recovery would be even lower.  Thus, the percentage differentials in recoveries between Classes 10 and 11 on the one hand, and Class 9 on the other, are actually significantly higher than 50%; this "grossly disparate" treatment is clearly sufficient to establish a presumption of unfair discrimination.

<ol type="c" start="3">
<li>*The Plan Allocates Materially Greater
<u>Risk to Class 9 Than to Classes 10 and 11</u>*</li>
</ol>

In addition, the Plan's distribution to Class 9 is materially riskier than the form of distribution to Classes 10 and 11.  This disparity in risk precludes confirmation of the Plan.  *See In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 538 (Bankr. E.D. Tenn. 1997) (denying a plan that proposed paying trade debt in full within 180 days of confirmation, while paying a deficiency claim over the ten-year life of the plan out of excess cash flow because, among other things, "there are no safeguards controlling the expenses or debts which may be incurred by the debtor, [thus] the bulk of [the] deficiency claim could go unpaid over the majority of the life of the plan . . . increasing risk of nonpayment").  New B Notes to be distributed to holders of Class 9 COP Claims provide for interest-only payments for 10 years and amortization payments beginning 11 years after the Effective Date, payable solely from the General Fund.  (Plan § II.B.3.p.iii, Ex. I.A.232.)  In contrast, for the first 10 years after the Effective Date, recoveries to Classes 10 and 11 will be funded by proceeds from the DIA Settlement, the State Contribution Agreement and certain payments from the DWSD and other City departments.  (*Id.* §§ II.B.3.q.ii.A, II.B.3.r.ii.A.)  Thus, a significant portion of the near-term recoveries for Classes

10 and 11 under the Plan will be funded by consideration provided by solvent entities as part of

an asset transfer, and are not dependent on the future financial condition of the City.

The City has admitted that, with respect to the proceeds to be provided by the

Foundations, DIA Corp. and the State, the risk of default is "very low":

> There are the foundations . . . and all of them are quite solvent,
> some of them are the largest charitable organizations in the world.
> There are a group of DIA benefactors affiliated with the founder's
> society which have made commitments of a hundred million
> dollars, and most of those a combination of institutions,
> foundations and individuals, at least to the best of my knowledge,
> appear to be good for it, and then there is the State settlement
> which has a total value of 350 million, and that amount of $194.8
> million is going to be funded in cash upon confirmation. So the
> risk that that total 350 value will not occur is almost nonexistent.

(Orr Dep. 327:14-328:5.) The City's investment banker confirmed:

> [A]ll the foundations because they are large, and are well funded
> and have no, as I understand it, external debt, would also merit a
> very low discount rate to reflect the present value of their
> contributions . . . the individual members of the DIA board of
> trustees . . . my understanding is they're all very wealthy local
> business people and other professionals who probably would merit
> an equally low discount rate on their contributions, that would lead
> me to conclude . . .the discount rate I would use would be probably
> somewhere between 2 and 4 percent. And that would only reflect
> the fact that the contributions were coming in over . . . 20 years.

(Buckfire Dep., Vol. 2 171:18-172:14.) On the flip side, the City also has admitted that there is

greater risk of default associated with the City's obligations under the New B Notes. The

Emergency Manager acknowledged, "The City's obligations are a perspective based upon

existing revenue streams and cash flows, so there would honestly probably be a greater level of

risk." (Orr Dep. 332:15-21.) Miller Buckfire confirmed this by opining that, upon emergence

and for some time thereafter, the City will not deserve a single-A rating. (Buckfire Dep., Vol. 2

212:4-9.)

As if this were not enough, the Plan further bolsters recoveries to Classes 10 and 11 by providing for (i) an increase in the pension benefits payable to holders of Pension Claims in the event the funding ratios of the Retirement Systems exceed certain thresholds (Plan §§ II.B.3.q.ii.C, II.B.3.r.ii.C, Ex.II.B.3.q.ii.C, Ex. II.B.3.r.ii.C) and (ii) holders of Pension Claims to receive (through a Restoration Trust) 50% of the proceeds of any Qualifying DWSD Transaction that occurs within seven years of the Effective Date (*id.* §§ II.B.3.q.ii.D, II.B.3.r.ii.E, IV.F).[31] The City predicts that, because the Retirement Systems' pension funds have been performing well this year, "there's a good chance they could achieve restoration." (Orr Dep. 303:11-17.) Accordingly, even using the City's Pension Claim calculations, it is likely that Classes 10 and 11 will recover at least 100%, resulting in a recovery differential of at least **94%** in comparison to Class 9. (Spencer Report at 23, 33 (EX3035).)

### 3. The City Cannot Rebut the Presumption of Unfair Discrimination

The City cannot rebut the presumption of unfairness because the materially lower and riskier recoveries holders of COP Claims will receive as compared to holders of Pension Claims is inconsistent with the fact that these creditors have *the same* rights and remedies, and assumed *the same* level of risk with respect to the City's ability to satisfy their claims, outside of chapter 9. Further, holders of Pension Claims are not infusing new value that would offset their gain.

---

[31] Although not explicitly addressed in the Plan, the Disclosure Statement indicates that the remaining 50% of the proceeds of a Qualifying DWSD Transaction will go to the City, and further suggests that the City may distribute such proceeds to holders of Allowed Claims in Classes 7 (Limited Tax General Obligation Bond Claims), 13 (Downtown Development Authority Claims) or 14 (Other Unsecured Claims). (Disclosure Statement at 153.) To the extent the City intends to distribute proceeds of a Qualifying DWSD Transaction to holders of Allowed Claims in Classes 7, 13 or 14, and not to holders of COP Claims in Class 9, FGIC submits that this constitutes additional impermissible unfair discrimination pursuant to section 1129(b)(1) under the standards articulated above.

WEIL:\44494102\14\45259.0007

As set forth in Section I.A.2.a above, Pension Claims and COP Claims are both unsecured contractual obligations of the City.  Outside of chapter 9, the Contract Clauses prohibit the City from impairing its contractual obligations, including ***both*** pension benefits (pursuant to the Pension Clause) ***and*** the City's obligation to make payments under the COP Service Contracts.  (*See supra* notes 5-6.)  Similarly, although PA 436 gives an emergency manager some authority to impair the City's contractual obligations when it is in receivership, COP Claims and Pension Claims are ***both*** explicitly exempt.  PA 436 § 11(1)(b) (requiring the emergency manager's financial and operating plan to provide for "[t]he payment in full of . . . contract obligations in anticipation of which bonds, notes, and municipal securities are issued"); *id.* at § 12(m)(ii) ("The emergency manager shall fully comply with . . . section 24 of article IX of the state constitution of 1963.").

Accordingly, outside of chapter 9, COP Claims and Pension Claims share ***the same*** constitutional and statutory protections against impairment.  Indeed, in interpreting the Pension Clause in the context of eligibility, the Court specifically rejected the argument that, under Michigan law, "pension benefits are entitled to greater protection than contract claims," and held that, even if they were, this would not be recognized by the Bankruptcy Code.  *Detroit*, 504 B.R. at 153, 161.[32]  As Pension Claims and COP Claims share the same constitutional and

---

[32] Notably, in so holding, the Court adopted the City's interpretation of the Pension Clause as "simply extending the protection of the federal and state contracts clauses to cover public pensions" and "elevat[ing] public pensions to ***the same*** level of constitutional protection that applied to 'obligations of contract' under the Contracts Clause."  (*City of Detroit's Consolidated Reply to Objections to the Entry of an Order for Relief*, dated September 6, 2013 [Docket No. 0765] § V.B (emphasis added).)  Thus, the City cannot now attempt to justify the Plan's preferential treatment of Classes 10 and 11 by relying on a purported special protection for Pension Claims under Michigan law, which the City itself has denied exists.  (*See* Reply ¶ 98 (arguing that "the difference in treatment is attributable to differences in the prepetition protections afforded to the holders of Pension Claims").).  Further, as noted in note 25 *supra*,

statutory protections against impairment outside of chapter 9, holders of such Claims also share the same remedy for any missed payments – a claim for breach of contract. *See* COP Service Contracts § 4.02(b) ("The obligations of the City hereunder, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City."); *Detroit*, 504 B.R. at 153-54, 161 ("[T]he only remedy for impairment of pensions is a claim for breach of contract.").

If, notwithstanding these protections, outside of chapter 9 the City defaulted on its obligations to either make the Service Payments owed under the COP Service Contracts or contribute the amounts owed to the Retirement Systems to fund the UAAL, the remedy would be the same – file a lawsuit against the City to enforce the contractual obligation and obtain a judgment. To extent the City failed to pay any such judgment, pursuant to the Revised Judicature Act of 1961, M.C.L. § 600.6093 (the "**RJA**"), a court could compel the City to levy property taxes sufficient to satisfy the judgment, irrespective of limitations on property taxes imposed by the Michigan Constitution, the Home Rule Cities Act or the City Charter. *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352 (2000). To the extent the City could not raise sufficient tax revenue to satisfy the judgment in the near-term, the judgment would automatically remain outstanding for ten years, subject to renewal before the expiration of the ten-year period. M.C.L. § 600.5809. The Offering Circulars issued in connection with the COPs Transactions reiterate that holders of COP Claims and holders of Pension Claims have the same legal rights and protections outside of chapter 9:

---

the Court has already explicitly rejected the arguments set forth in the Retiree Committee Brief and the Retirement System Brief that the Pension Clause should be interpreted as providing superior protections to Pension Claims than the Contract Clauses provide to all unsecured contract claims. *Detroit*, 504 B.R. at 150-54, 161.

WEIL:\44494102\14\45259.0007

> If the City were to fail to pay any COP Service Payment when due, the Contract Administrator could file a lawsuit against the City to enforce that contractual obligation, a right that is available to all parties entering into valid enforceable contracts with the City. The City would be required to pay any resulting judgment against it, the same as any other. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, a provided in the [RJA], without limit as to rate or amount. ***This is the same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the traditional funding mechanism*** . . .

(2005 Offering Circular at 8 (emphasis added) (EX3023); 2006 Offering Circular at 10 (same) (EX3024); *see also Corrected Stipulation to Entry of Joint Final Pretrial Order by Debtor and Certain Plan Objectors*, dated August 26, 2014 [Docket No. 7074] Ex. 1 (the "**PTO**"), §III ¶ 22.) Faced with multiple outstanding judgments enforceable by similarly-situated unsecured creditors, the City would have no legal basis to treat any such judgments differently, and would instead satisfy them on a *pari passu*, pro rata basis. (PTO ¶ 35.) Thus, holders of COP Claims in Class 9 and holders of Pension Claims in Classes 10 and 11 would have the same recovery prospects outside of chapter 9. Accordingly, providing Class 9 with materially lower recoveries, in the form of payments over time solely from the General Fund, while near-term recoveries for Classes 10 and 11 will be funded, at a significantly higher level, by settlement proceeds from other solvent entities, is not consistent with relative recoveries these classes would receive outside of chapter 9, or the levels of risk assumed prepetition. *See Greate Bay Hotel & Casino*, 251 B.R. at 232 ("The disparity of risk imposed upon equally situated creditors may be evaluated by comparing the levels of risk accepted prepetition by each creditor with the levels of risk

imposed in the plan.").  Thus, the City cannot rebut the presumption of unfair discrimination on either basis.[33]

b.      *Classes 10 and 11 Are Not Infusing*
       *New Value That Offsets Their Gain*

Although in its Reply the City did not raise this argument, any attempt to rebut the presumption of unfair discrimination by arguing that the incremental value provided to Classes 10 and 11 under the Plan is equal to and offset by alleged value to be provided to the City in the form of the cooperation and services of the City's current Active Employees (including the unions that represent them) would fail.  Although the necessity of a favored class (such as trade creditors) to the continued operations of a debtor may, in certain circumstances, be a sufficient basis to rebut a presumption of unfair discrimination under the Markell standard, this requires "at least some ***proof that the value represented by the participation of the favored class*** in the

---

[33] The Plan's grossly disparate treatment of COP Claims, compared to Pension Claims, also renders the Plan unfair and inequitable with respect to Class 9.  As set forth above, pursuant to section 1129(b)(1), the Court may only approve the Plan over Class 9's rejection if the Plan is fair and equitable to Class 9.  In the chapter 9 context, Congress has interpreted this standard as requiring, among other things, that the plan (i) provide creditors all they can "reasonably expect under the circumstances," and (ii)  embodies "a fair and equitable bargain, openly arrived at."  H.R. Rep. No. 94-686, at 33 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539, 571; (*see also* Disclosure Statement at 77.)  As explained in this Section I.A.3.a, holders of COP Claims have a reasonable expectation, based on applicable law, that they will share pro rata, on a *pari passu* basis with other similarly-situated creditors, including holders of Pension Claims, in distributions from the City.  This expectation was confirmed prepetition by the City in the June 14 Proposal, which promised as much.  (June 14 Proposal at 109 (EX33).)  Further, because the City has refused, based on the Mediation Order, to provide any insight into the negotiations surrounding the settlements embodied in the Plan, it is impossible assess whether the Plan embodies a fair and equitable bargain, openly arrived at.  Accordingly the City cannot prove that the Plan is fair and equitable to Class 9.  In addition, the Plan was not proposed in good faith in accordance with section 1129(a)(3) (made applicable in chapter 9 by sections 943(b)(1) and 901(a)) because it unfairly benefits holders of Pension Claims to the detriment of other unsecured creditors, including holders of COP Claims.  *Mount Carbon*, 242 B.R. at 42 (holding that the debtor's chapter 9 plan was not proposed in good faith where, among other things, "[i]ts terms unfairly benefit one landowner to the detriment of all others.")

reorganization *is equivalent to the disparity in treatment*." Markell, 72 Am. Bankr. L.J. at 260

(emphasis added).[34] Professor Markell elaborated:

> If, for example, the good will of a key union is necessary for the
> profitability of the reorganized debtor, and that necessity is proved
> by the plan proponent, then it is not unfair to return to that union
> more than its aliquot share of reorganization value since its efforts
> were responsible for the increase in that value. Again, however, ***it
> is critical that the plan proponent demonstrate that such
> commensurate value exists***; otherwise, the historic presumption
> against such differential payment will be sufficient reason to deny
> confirmation.

*Id.* at 261 (emphasis added). The City has not presented any evidence of such commensurate

value, nor can it. Here, only 27.5% of the holders of Pension Claims in Classes 10 and 11 are

Active Employees.[35] (Disclosure Statement at 11.) As set forth in greater detail in Section

I.A.4.a below, it is dubious whether preferential treatment of Classes 10 and 11 as a whole will

have any positive, tangible impact on the services to be delivered by this small subset of

claimants and, even if it does, there is no evidence that the value to be derived therefrom

corresponds to the increased recoveries to holders of Pension Claims. The City has offered only

anecdotal comments regarding an assumed link between the level of recovery to holders of

Pension Claims and the presumed impact the City believes this will have on the quality of Active

Employees' services and morale. (*See e.g.* Buckfire Dep., Vol. 2 291:13-18 ("Q. You haven't

studied problems that the City may have either retaining active employees or attracting new

---

[34] For example, in *Paradise Irrigation District*, the Supreme Court held that the plan did not unfairly
discriminate against dissenting bondholders by giving the RFC special treatment in exchange for
underwriting of the bond refinancing because "he who furnishes new capital to a distressed enterprise has
long been accorded preferred treatment . . . [the RFC] gives something of value for the preferred
treatment which it receives . . . [t]hat difference warrants a difference in treatment." 326 U.S. at 543.

[35] The remaining 72.5% of the holders of Pension Claims are retirees that are no longer contributing ***any***
value to the City and may not even reside there any longer. (Disclosure Statement at 11.)

WEIL:\44494102\14\45259.0007

ones; is that correct?" A. Only anecdotally. Q. Okay, you haven't conducted a systematic study?

A. No.").)  This is not sufficient to rebut the presumption of unfair discrimination.

### 4.    The Plan Also Fails the Four-Factor Aztec Test

Prior to the adoption of the Markell standard in *Dow Corning*, bankruptcy courts

in the Sixth Circuit generally applied in chapter 11 cases a four-factor analysis borrowed from

chapter 13 precedent to determine whether discrimination under a plan was fair.  Specifically, in

*Aztec*, the United States Bankruptcy Court for the Middle District of Tennessee considered the

following four factors in its unfair discrimination analysis of a chapter 11 plan (noting that some

courts consider these factors to assess the fairness of discrimination in the chapter 13 context):

(1)    whether the discrimination is supported by a reasonable basis;

(2)    whether the debtor can confirm and consummate a plan without the discrimination;

(3)    whether the discrimination is proposed in good faith; and

(4)    the treatment of the classes discriminated against.

*In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *In re Graphic Commcn's, Inc.* 200

B.R. 143, 148 (Bankr. E.D. Mich. 1996) (the only reported Eastern District of Michigan case

applying the four-factor *Aztec* test in the chapter 11 context).[36]  Although FGIC submits that the

Markell standard is now the prevailing test for unfair discrimination in the Eastern District of

---

[36] Although the City cites to the *Dow Corning* decision from the United States District Court for the Eastern District of Michigan, which refers to two of the *Aztec* factors in noting that "the prevailing view is that a plan will not unfairly discriminate if there is a rational or legitimate basis for discrimination and [if] the discrimination [is] . . . necessary for the reorganization," this dicta was not the basis for the court's narrow holding that "[t]he Bankruptcy Court did not clearly err in its finding that the Amended Joint Plan does not unfairly discriminate against the United States' claims since its claims will be paid in full, if allowed."  *Dow Corning*, 255 B.R. at 538 (internal quotation marks and citation omitted).  As noted in note 22 *supra*, in affirming the bankruptcy court's holding on this point, the district court did not explicitly address the bankruptcy court's use of the presumption-based standard.

Michigan and should be applied in this case (*see supra* Section I.A.1),[37] the Plan's discrimination against Class 9 is unfair under the *Aztec* test as well.

a.    <u>*There Is No Basis to Discriminate Against Class 9*</u>

The City offers a number of justifications for the Plan's grossly disparate treatment of COP Claims and Pension Claims.  In the Reply the City assert four reasons:  (i) the discrimination is necessary to ensure the cooperation of Active Employees; (ii) the Plan's treatment of Pension Claims is the result of a settlement agreement; (iii) the discrimination is consistent with creditors' prepetition ability to assess the risk of the City's inability to fulfill its obligations; and (iv) pensioners would endure personal hardship absent the discrimination. (Reply ¶¶ 61-74.)  The Emergency Manager also articulated several reasons for the Plan's discrimination, only some of which overlap with the reasons set forth in the Reply:

(i) contributions from third parties (*i.e.* the Foundations, DIA Corp. and the State);

(ii) compassion for individual retirees and keeping the "covenant" the City made to provide them with pension payments for the rest of their lives; (iii) the fact that the Retirement Systems have assets; (iv) incentivizing the City's workforce; and (v) the invalidity of the COPs.  (Orr Dep.

---

[37] Further, the three main differences between chapter 13 and chapter 11 that Professor Markell highlights in support of his argument that it is inappropriate to adopt the chapter 13 unfair discrimination test in chapter 11 apply in the chapter 9 context as well.  First, because unsecured creditors do not vote in chapter 13, and any unsecured creditor can raise an unfair discrimination objection, a more flexible test is necessary to prevent any individual creditor from holding up confirmation.  On the other hand, because unfair discrimination protects only dissenting classes in chapter 11 and chapter 9, a stricter standard makes more sense.  Second, section 1322(b)(1) expressly permits different treatment for those consumer claims upon which the debtor is only liable as a co-debtor, while no such distinction is made in chapter 11 or chapter 9.  Third, chapter 13 lacks any requirement that a chapter 13 plan be "fair and equitable," while chapter 11 and chapter 9 (and their predecessors) have always had a "fair and equitable" requirement. Markell, 72 Am. Bankr. L.J. at 244-46.  Thus, in the chapter 11 and chapter 9 contexts, "[t]he presumption-based analysis . . . unlike the four-part test . . . effectively targets the kind of discrimination or disparate treatment that is commonly understood as being 'unfair,' namely that which causes injury or that unjustly favors one creditor over another."  *Dow Corning*, 244 B.R. at 702.

WEIL:\44494102\14\45259.0007

203:25-204:13; 204:24-25; 224:8-10; 225:3-4.)  None of the justifications are relevant or "reasonable" within the meaning of the *Aztec* test.[38]

First, although, in certain circumstances, discrimination may be justified to "protect a relationship with specific creditors [such as trade creditors] that the debtor needs to reorganize successfully" (*Aztec*, 107 B.R. at 590), the City has offered no evidence that the Plan's preferential treatment of Pension Claims is necessary to ensure (or is even related to) the continued provision of services by the City's current Active Employees.  (Reply ¶¶62, 65-66; *see Expert Report of Kevin M. Murphy*, July 25, 2014 (the "**Murphy Report**") ¶ 12 (EX4415) (finding nothing in the City's expert reports or the deposition transcripts of Michael Hall, the City's Director of Labor Relations and Interim Director of Human Relations, or the Emergency Manager to support the City's claim).)  And, "neither economic principles nor empirical evidence supports the City's claim."  (Murphy Report ¶ 11 (EX4415).)

According to the City, 72.5% of the holders of Pension Claims are retirees that are no longer providing any services to the City.  (Disclosure Statement at 11; Murphy Report ¶ 33 (EX4415) ("Retirees have already exited the labor market in which the City competes for employees, and so the treatment of their Pension Claims has no direct impact on the City's ability to attract and retain workers.").)  With respect to the remaining 27.5% of holders of

---

[38] Any attempt to justify the Plan's discrimination against COP Claims in Class 9 by reference to the Plan's alleged *pari passu* treatment of OPEB Claims in Class 12 would fail.  First, the Plan's treatment of Class 12 has nothing to do with whether the preferential treatment of Classes 10 and 11, as compared to Class 9, constitutes unfair discrimination against COP Claims.  Second, OPEB Claims are actually receiving better treatment under the Plan than COP Claims for a number of reasons.  Although the City projects that Class 12 will recover 10% (assuming the COP Claims are allowed in the total amount of aggregate unpaid principal owed on the COPs), this does not include the $143 million of postpetition OPEB payments that were offset against the City's prepetition OPEB liability.  (Disclosure Statement at 34, n.5, 152; Forty-Year Projections at 4 (EX 111).)  In addition, the City overstates the aggregate amount of OPEB Claims by, among other things, including potential OPEB beneficiaries that have opted out of the City's healthcare plans, and OPEB participants who became eligible for OPEB benefits after the Petition Date, resulting in an artificially low projected percentage recovery for Class 12.  (Rosen Report at 4 (EX4413).)

Pension Claims that are Active Employees, contrary to the case law cited by the City, there is no concrete evidence here that, absent preferential treatment of their Pension Claims, they would strike[39] or quit or that, like the trade creditors in the *Creekstone Apartments* case, the services of these particular employees are essential to the City's restructuring.[40]  (Reply ¶¶ 63-64.)  *See Crosscreek*, 213 B.R. at 538 (denying confirmation of a plan that proposed paying trade creditors in full, and a deficiency claim the net present value of approximately 50%, where "no evidence was offered . . . that paying the trade debts in full is necessary in order to effect a reorganization"); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (Bankr. M.D. Tenn. 1992) (denying confirmation of a plan that proposed paying trade creditors 75% and another unsecured creditor only 20% where "[t]here is no evidence that a 75% payment to the 69 trade creditors is necessary to protect relationships the debtor needs to reorganize"); *CWCapital Asset Mgmt., LLC v. Burcam Capital II, LLC*, Case Nos. 5:13–CV–278–F et seq., 2014 WL 2864678, at *4 (E.D.N.C. June 24, 2014) (reversing confirmation of a chapter 11 plan that proposed paying trade creditors more quickly than a creditor that purchased claims postpetition because "[t]he only evidence supporting [debtor's] purported justification in this case was counsel for the debtor's proffer at the confirmation hearing that [debtor] 'desired' to pay trade creditors first").

Assuming the Active Employees holding Pension Claims are essential to the City's recovery, contrary to the City's argument, economic principles indicate that "compensation of an employee for past work effort" (*i.e.* through treatment of accrued pension

---

[39] Michigan law prohibits public employees from striking.  Michigan Public Act 336 of 1947, the Public Employment Relations Act, MCL §§ 423.201 *et seq.*, § 432.202 ("A public employee shall not strike.").

[40] In fact, a report on the Assessment Division of the City's Finance Department noted that, of the 48 employees budgeted for 2013, only 35 were "functional."  (Plante Moran City of Detroit Assessing Division Operational Recommendations (POA00037686) – (POA00037716) 8 (EX3558).)  In addition, in his eight months working as the Chief Assessor, Gary Evanko noted that "there's at least three employees on the payroll that I've never met."  (Evanko Dep. 177: 20-22.)

benefits) "does not directly affect the incentive to work going forward." (Murphy Report ¶ 26 (EX4415).) Mr. Hall confirmed that, in the City's case, the proposed reduced cuts to accrued pension benefits have had no impact on Active Employees' morale, productivity, attrition or the City's ability to hire new employees. (Hall Dep. 160:5-18, July 2, 2014.)[41] This is consistent with examples of other cases where debtors have been able to successfully reorganize with the continued cooperation of key active employees that held accrued pension claims (and, in cases involving pilots, had the ability to halt all business operations with a single strike), despite the termination of prepetition pension plans and the impairment of accrued pension benefits (treating them *pari passu* with other unsecured claims). (Spencer Report at 39-40 (EX3035); *see also* Murphy Report ¶ 26 (EX4415) "The prevalence of wage and future pension concessions when firms seek to improve their financial standing is inconsistent with the City's apparent claims that it is necessary to disproportionately protect Pension Claims in order to motivate employees in the future.").) The City has offered no economic analysis or expert testimony to explain why the City could not similarly have treated Pension Claims *pari passu* with other unsecured claims, and maintained the support of Active Employees. (Murphy Report at n.32 (EX4415).)

Notably, "the primary determinant of an employee's willingness to accept or remain in a particular job is what that job offers going forward in compensation, working

---

[41] Further, neither the City nor the Retirements Systems offers *any* concrete evidence in support of the assertion that because "many" holders of Pension Claims "live, pay taxes, and consume goods and services in the City . . . To the extent that retirees are left impoverished in the wake of the this bankruptcy case, it will also place a tremendous social and economic burden on the City to nonetheless provide for the welfare of these individuals." (Retirement Systems Brief at 13.) This statement alone, without any evidence regarding (i) the number of holders of Pension Claims that actually live in the City, (ii) the number of such holders that would become "impoverished" as a result of further impairment of their Pension Claims (if any) or (iii) the affect (if any) such impoverishment would have on the City, in terms of the amount (if any) of increased expenditures related to providing additional services to such individuals, does not provide a reasonable basis for the Plan's preferential treatment of Pension Claims. Further, there is no concrete evidence that the preferential treatment contemplated by the Plan will have *any* measurable impact on the City's economy (as a result of holders of Pension Claims living in the City "re-circulating" an unspecified amount of their Plan distributions in the City economy). (*Id*. at 17.).

conditions, etc." (*Id.* ¶ 26; *see also* Hall Dep. 120:22-121:5 (agreeing that Active Employees' major concerns are "will they have a job, what will their pay be, what's the work environment like, what are their health care benefits"); Craig Dep. 21:18-26:8 (listing the main factors that impact police department employees' morale as pay, lack of accountability, working conditions, poor quality of equipment, lack of investment, mentoring, development, leadership and supervision, and nature of the work).) Tellingly, the City has identified as the primary factors impeding the City's ability to maintain a motivated and effective workforce: (i) significant turnover, from a leadership standpoint, in the Human Resources department; (ii) lack of a performance evaluation system; (iii) the fact that there has been "absolutely no training of anyone, of any employees within the City;" and (iv) that "the process to bring someone on board takes so long . . . it's an incredibly long period of time, significantly longer than it should take." (Moore Dep. 213:19 - 214:2, July 23-24, 2014.) There is no evidence that the Plan's treatment of accrued Pension Claims will have any effect on overcoming these obstacles. Further, with respect to service on or after July 1, 2014, Active Employees will receive pension benefits pursuant to the terms and conditions of the New PFRS Active Pension Plan and the New GRS Active Pension Plan, which are comparatively generous relative to similar private and government sector pension plans (including the plan covering Michigan's teachers). (Spencer Report at 38 (EX3035).) Thus, to the extent further impairment of these Active Employees' accrued Pension Claims would negatively impact their motivation to continue working for the City, this would have a mitigating effect. (*Id.*) And, even if further impairment of Pension Claims would increase current employees' attrition, the evidence suggests that the City would have no problem hiring new workers to replace them. (Orr Dep. 260:16-22 (indicating that it is true that "when the City has held job fairs during the bankruptcy it has received interest from

WEIL:\44494102\14\45259.0007

thousands of people" and that the City "received large numbers of applications for open positions"); (Murphy Report ¶ 55 (EX4415) ("a variety of data indicates that the City has been and will remain able to attract and keep employees, and that the recovery rate of past Pension Claims is not essential to that ability").)

Further, the City has offered no explanation as to why the Plan's treatment of accrued Pension Claims has any impact whatsoever on Active Employees that do not hold Pension Claims, other than to note that they "will become retirees at some point." (Reply ¶ 65.) Yet, when these employees become retirees, their pension benefits will be governed exclusively by the New PFRS and GRS Active Pension Plans, which have nothing to do with the Plan's treatment of previously accrued benefits. Thus, the alleged need to incentive the City's workforce is not a reasonable basis for the Plan's preferential treatment of Pension Claims.

Second, the settlements between the City and the Retiree Committee, the Retirement Systems and certain unions and retiree associates do not justify the gross disparity in treatment, particularly given that, aside from avoiding some potential appellate-level litigation with these constituents, the City is not getting much benefit from the settlements. (Reply ¶¶ 67-70.) Unlike in *In re Corcoran Hospital District*, 233 B.R. 449, 457 (Bankr. E.D. Cal. 1999), where preferential treatment of a creditor was justified by "the magnitude of [the creditor's] compromise in the Settlement Agreement" (*i.e.* the creditor agreed to reduce its approximately $2.8 million claim to a net allowed claim of $725,000, for a significant reduction of approximately 74%), here the Pension Claims in Classes 10 and 11 are receiving recoveries of at least approximately 59% and 60% and really in excess of 100% (*see supra* Section I.A.2.b(iii)) – hardly a substantial compromise, particularly given that the Court has already ruled that Pension Claims are unsecured contract claims that can be impaired in chapter 9. *In re City of Detroit,*

WEIL:\44494102\14\45259.0007

504 B.R. at 150- 54. Even if the appeal of this ruling were successful, the City would not be in a position to give up much more consideration than what already is provided under the Plan. (*See* Hr'g Tr. 126: 25-127:14 (Dec. 18, 2013) (the Court noting in considering a proposed settlement recovery that "anyone who has been practicing in bankruptcy law as long as we all have, or in litigation for that matter knows, that even if - - even if a winning party gets a judgment, they'll take 75%").) Indeed, the Emergency Manager indicated that settling the appeal of the Court's ruling on this issue was not actually a factor the City considered in determining the treatment of the Pension Claims under the Plan. (*See* Orr Dep. 262:6-11; 18-25; 263:2-8.)

Third, although FGIC is a sophisticated financial institution that may have understood the risk that the COP Claims could be impaired in a chapter 9 case, FGIC had no reason to believe that it was taking on the risk that the City would seek to provide substantially superior treatment to similarly-situated unsecured creditors as a result of that understanding. (Reply ¶¶71-72.) As explained in greater detail in Section I.A.3.a above, holders of COP Claims and Pension Claims all entered into long-term, unsecured contractual relationships with the City and, thus, enjoy the same protections, rights and remedies outside of chapter 9, and the same risk of impairment should the City commence a chapter 9 case. It would be unfair to penalize FGIC because holders of Pension Claims may not have been cognizant of that risk. Perhaps recognizing this, the Emergency Manager did not actually take creditors' recovery expectations into account in the unfair discrimination analysis. (*See* Orr Dep. 274:11-22; 275:16-20.)

Fourth, the Court has already ruled that personal hardship is irrelevant to unfair discrimination analysis. (Reply ¶¶71, 73; Hr'g Tr. 104: 13-19 (June 26, 2014) ("I'm going to say here as unequivocally as I can that as a matter of law, creditors' needs is not an issue when it comes to determining unfair discrimination."); *Order Regarding City's Motion for Entry of a*

WEIL:\44494102\14\45259.0007

*Protective Order (Dkt. #5442)*, dated June 27, 2014 [Docket No 5625] (referencing "the Court's ruling that retirees' hardships are not relevant to the issues of either unfair discrimination or equitable treatment").); *see also In re Arn Ltd. Limited Partnership*, 140 B.R. 5, 12 (Bankr. D.D.C. 1992) ("While the Debtors prefer to pay local businesses in full … at the expense of banks and other lenders, this treatment is not sanctioned by the Bankruptcy Code.  The focus on a particular claim should not be the claimholder, but rather the legal nature of the claim… An unsecured claim is simply that, an unsecured claim.") (citation omitted).  Accordingly, although the City's compassion for individual retirees is understandable, it is not an appropriate or relevant basis for discriminatory treatment.  The Court reiterated this during a recent status conference.  (Hr'g Tr. 81:9-15 (Aug. 6, 2014) ("I do not want and don't think it relevant to consider a series of retirees or employees, for that matter, testifying about their individual hardship.  In my view, neither fair and equitable nor unfair discrimination has ever in any bankruptcy case considered the impact of a plan on a creditor; that is to say, the adverse impact of a plan on a creditor.").)

Fifth, the City has offered no evidence that the proceeds from the DIA Funding Parties or the State would not have been available if the Plan did not divert *all* of such proceeds to the Retirement Systems.  As explained in greater detail in Section I.A.2.b(i) above, the evidence shows that, at least initially, the funding from the State was intended to save the art and benefit creditors as whole.  (*See also* Orr Dep. 425:18-25 (explaining that he understood an email from Ronald Weiser, dated October 17, 2013 (POA00170255-POA00170256) (EX3054) referencing the possibility of "State funding made available towards part of the DIA solution" to mean "a solution that would address the needs to provide some funding to the institute and to provide some *benefit to what is now the bankruptcy estate* while keeping the art in the City")

(emphasis added).)  However, it is impossible for objectors or the Court to further probe into who decided, at what point it was decided, and why it was decided that the Grand Bargain proceeds would be directed exclusively to the Retirement Systems to satisfy Pension Claims because the City has refused to provide any discovery related to these issues on mediation confidentiality grounds.  (*See* Orr Dep. 336:10-21; 337:12-20; 338:10-339:9; 339:22-340:13; 439:13-17; 444:8-25.)  Accordingly, it would be unfair to permit the City to use the purported requirement that funding from the Foundations, DIA Corp. and the State be used exclusively to fund Pension Claim recoveries as a justification for discrimination.  The Court should not sanction the City's attempt to use the Mediation Order simultaneously as a sword and a shield.

Sixth, the fact that the Retirement Systems have assets is irrelevant.  The Pension Claims being treated by the Plan represent the amount by which the City's accrued pension liabilities *exceed* the value of the Retirement Systems' assets.  Thus, the suggestion that these assets somehow justify preferential treatment of the Pension Claims, presumably under the theory that such assets could be used to satisfy the Pension Claims, does not make sense.

Finally, the Emergency Manager's identification of the purported invalidity of the COPs as a basis for the Plan's discrimination in favor of the Pension Claims contradicts the terms of the Plan, which are neutral with respect to the validity of the COPs, and prior representations the City has made to the Court.  The Plan provides for the City to distribute to the Disputed COP Claims Reserve a pro rata share of the New B Notes, calculated as if the COP Claims were allowed in the total aggregate unpaid principal amount of the COPs.  In the event the City loses the COP Litigation, the New B Notes in the Disputed COP Claim Reserve will be distributed to holders of COP Claims.  Thus, from the City's perspective, the Plan treats the COP Claims no differently than other recipients of the New B Notes.  The City previously appeared to

recognize this, stating on the record that "COPs validity, we do not think that's part of the confirmation hearing. We view the confirmation hearing insofar as it relates to the COPs as dealing with the adequacy of the reserves that are in the plan for the payment of the COPs in the event that they turn out to be valid." Hr'g Tr. 94:22–95:3 (May 28, 2014). (*See supra* Section I.A.2.b(iv) (addressing this issue).) Based on this and other representations from the City, FGIC and COPs claimants agreed not to call upon certain witnesses with knowledge of facts relevant to COPs validity issues to testify at or be deposed in connection with the Confirmation Hearing. (COPs Stipulation ¶¶ 5, 6.) Thus, the Court should not permit the City to offer evidence regarding the purported invalidity of the COPs in connection with its unfair discrimination arguments.

          b.     *The City Has Not Proven It Could Not Confirm*
                *and Consummate a Plan Without the Discrimination*

Even if the Court finds that one of the City's bases for discrimination is reasonable, the City "has offered no substantiation for the alleged necessity of paying" Classes 10 and 11 in excess of 100% recoveries, "[n]or has the debtor justified why its plan cannot provide for more equal treatment of" Class 9. *Graphic Commc'n's Inc.*, 200 B.R. at 149. Although preferential treatment of Pension Claims may be politically popular, this does not mean that it is necessary to consummation of a chapter 9 plan. For example, even if the Court is willing to accept the City's assumptions that (i) the Active Employees are necessary for the City's provision of essential services and (ii) preferential treatment of the Pension Claims has *some* impact on the continued cooperation of the Active Employees, there is certainly no evidence that the amount of the enhanced recoveries the Plan funnels to Classes 10 and 11 – $956 million in total – is necessary to ensure this cooperation. (Spencer Report at 41 (EX3035).) In other words, the City is asking the Court to accept (without proof) that the necessary "cost" of

the Active Employees' cooperation is the payment of $956 million (equal to $100,000 per Active Employee) to holders of Pension Claims. (*Id.*) Yet, the evidence shows that "buying" Active Employees' cooperation with higher recovery rates for Pension Claims "is a very inefficient form of motivation compared with direct increases in employee compensation or improvement in working conditions," and, thus, is not necessary for the City to confirm and consummate a Plan. (Murphy Report ¶ 54 (EX4415).) Ironically, the City's discrimination in favor of the Pension Claims has created serious difficulties for the City in getting the Plan confirmed, as it is a main reason why Class 9 constituents, including FGIC, are vigorously objecting.

c.     *The City Has Not Proposed the Discrimination in Good Faith*

The City's failure to articulate a rational basis for, or the necessity of, the discrimination against Class 9 suggests that the discrimination was not proposed in good faith. Again, because the City has refused to disclose any information regarding the Grand Bargain negotiations, it is impossible for creditors or this Court to assess the City's motivations.

d.     *The Plan Does Not Offer Class 9 a Meaningful Recovery*

The Plan caps Class 9's recoveries at (at most) approximately 6%. (*See supra* Sections I.A.2.b(iv)-(v).) This is not "a meaningful recovery" (*Graphic Commcn's*, 200 B.R. at 149),[42] especially compared to Classes 10 and 11, which stand to recover close to, if not more than, 100% (*see supra* Section I.A.2.b(iii)). In addition, unlike in *Creekstone*, where the debtor showed "willingness to allocate excess cash reserves to" payment of a disadvantaged deficiency claim, the Plan caps Class 9's recoveries and provides no opportunity for enhanced recoveries should the City out-perform its current financial projections. *Creekstone Apartments Assocs.,*

---

[42] *See also Aztec*, 107 B.R. at 591 ("Even if some discrimination is necessary to accomplish confirmation or consummation of a plan, is there a meaningful recovery for creditors disadvantaged by the discrimination?").

*L.P. v. Resolution Trust Corp.* (*In re Creekstone Apartments Assocs., L.P.*), 168 B.R. 639, 645 (Bankr. M.D. Tenn. 1994). This is in contrast to holders of Pension Claims who stand to increase their recoveries in certain circumstances. (*See supra* Section I.A.2.b(iii).) The Plan's treatment of Class 9 is especially egregious, given that the City is not treating COP Claims as well as possible under the circumstances. (*See infra* Section II.)

### B. The Plan Unfairly Discriminates Against Class 9 By, Pursuant to the LTGO Settlement, Providing Class 7, a Class of the Same Priority, Materially Higher and Less Risky Recoveries

The LTGO Settlement, which provides Class 7 with 32% recoveries on account of the Limited Tax General Obligation Bonds, unfairly discriminates against Class 9 under both the Markell and *Aztec* standards. Further, the LTGO Settlement does not meet the Sixth Circuit standards for approval of a settlement as part of a bankruptcy plan.

The facts here establish a presumption of unfair discrimination under the Markell standard. Like the COP Claims, the Limited Tax General Obligation Bond Claims are unsecured claims against the City; accordingly, Classes 9 and 7 are of the same priority for purposes of unfair discrimination analysis. (*See supra* Section I.A.2.a.) Although, pursuant to the LTGO Bond Resolutions, the City promised to pay the principal of and interest on the Limited Tax General Obligation Bonds as a first budget obligation, either from the General Fund or, if necessary, the proceeds of an annual levy of ad valorem property taxes (subject to all applicable constitutional, statutory and charter tax rate limitations), the City did ***not*** grant holders of Limited Tax General Obligation Bonds a ***lien*** on either General Fund revenues or tax proceeds. (LTGO Bond Resolutions § 301 (EX3043-EX3045)); (Reply ¶ 143) ("No lien secures the City's Limited Tax General Obligation Bond debt."). In contrast, statutes or ordinances governing ***secured*** municipal securities clearly indicate when payment is secured by a lien. *See e.g.* Bond Ordinance No. 18-01 to Authorize the 2001-E Sewer Bonds, adopted on October 18, 2001 by the

City Council § 5(a) (EX3559) ("The payment of Secured Obligations is **secured by a statutory lien**, which is hereby created, **upon the whole of the Pledged Assets**.") (emphasis added); R.I. Gen Laws, § 45-12-1(a) ("The faith and credit, ad valorem taxes, and general fund revenues of each city, town and district shall be pledged for the payment of the principal of, premium and the interest on, all general obligation bonds and notes of the city or town whether or not the pledge is stated in the bonds or notes, or in the proceedings authorizing their issue and **shall constitute a first lien on such ad valorem taxes and general fund revenues** . . . ." (emphasis added). Accordingly, the Limited Tax General Obligation Bond Claims are unsecured claims.[43]

      The bankruptcy court in *Sanitary and Improvement District 65 of Sarpy County, Nebraska v, First National Bank of Aurora* came to the same conclusion regarding general obligation bonds issued pursuant to a Nebraska statute that similarly provided that "there shall be levied annually a tax upon the actual value of all the taxable property in such district except intangible property which, together with such sinking fund derived from special assessments, shall be sufficient to meet payments of interest and principal on all bonds as such become due." Neb. Rev. Stat. § 31-755 (1983) (amended 1992). The court held that the bonds were unsecured obligations because "the statute grants no lien on any property or asset of the [debtor] to secure

---

[43] Any attempt to justify the preferential treatment of the Limited Tax General Obligation Bond Claims by arguing that, as "first budget obligations," they are priority claims under Michigan law fails. As noted above, in the context of the unfair discrimination analysis, "priority claims" are claims that have priority pursuant to the Bankruptcy Code, not state law. Markell, 72 Am. Bankr. L.J. at 250 ("The priority used as a basis of comparison is priority under the Bankruptcy Code, not nonbankruptcy priority."); *Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*, 191 B.R. 1005, 1017 (Bankr. C.D. Cal. 1996) ("to the extent that [California law] creates a special class of creditors . . . in conflict with the priority scheme in the Code, it is preempted by federal law . . . The California legislature cannot rewrite bankruptcy priorities. The Code explicitly defined the order of creditor priority and declared the congressional intent of federal supremacy over declared but conflicting state law orders of priority.") (internal quotation marks and citations omitted). The City has already conceded that "the characterization of LTGO debt as a 'first budget obligation' is not evidence of any priority to be accorded such debt under Michigan law (to say nothing of the distribution scheme of chapter 9)." (Reply 86, n.56; *see also id.* § III.D.)

the interest of the . . . bondholder." 73 B.R. 205, 209 (Bankr. D. Neb. 1986), *aff'd*, 79 B.R. 877

(D. Neb. 1987), aff'd, 873 F.2d 209 (8th Cir. 1989).  In *Matter of Sanitary & Improvement*

*District, #7*, in analyzing bonds issued pursuant to the same statute, the court elaborated that:

> Outside of bankruptcy, bondholders may have certain rights
> concerning the use of the taxing power of the state of Nebraska or
> the municipal enterprise, but bondholders have no 'lien' on any
> assets of a municipality.  Bondholders, therefore, under the
> Bankruptcy Code, have unsecured claims.  This is in contrast to a
> type of claim which is recognized both by state law and by the
> Bankruptcy Code as a secured claim.

98 B.R. 970, 973-74 (Bankr. D. Neb. 1989).  A parallel analysis applies here.

Notwithstanding Class 9 having the same priority, Class 9 is projected to receive

recoveries that are materially lower (22%, using the City's calculations) and materially riskier

than the Cash or New LTGO Bonds (which provide for interest payable semi-annually, annual

$2 million principal payments for years six through eight following the Effective Date, and

additional annual principal payments of approximately $3.7 million for years 11 through 23)

Class 7 will receive.  (Plan §II.B.3.n.ii; Ex. I.A.224, Sched. 1; *see supra* Section I.A.2.b-c.)  The

City cannot rebut this presumption of unfair discrimination because holders of COP Claims

would not recover less, and did not take on more risk, than holders of Limited Tax General

Obligation Bond Claims outside of chapter 9.  As explained in Section I.A.3.a *supra*, in the event

the City defaults on its obligations under the COP Service Contracts outside of chapter 9,

pursuant to the RJA, the City would be obligated to levy property taxes sufficient to satisfy any

judgments obtained by holders of COP Claims, irrespective of constitutional, statutory or charter

limitations on tax rates.  Similarly, to the extent the funds in the General Fund are insufficient to

satisfy the City's obligations with respect to the Limited Tax General Obligation Bonds, outside

of chapter 9, the City would be required to pay such obligations using proceeds from annual

property tax levies.  (LTGO Bond Resolutions § 301 (EX3043-EX3045).)  However, unlike

property taxes levied to satisfy RJA judgments or Unlimited Tax General Obligation Bond obligations (which must be levied "without limitation as to rate or amount"), property taxes levied to satisfy Limited Tax General Obligation Bond obligations cannot exceed applicable constitutional, statutory and charter limitations. (PA 34 § 141.2701; LTGO Bond Resolutions § 301 (EX3043-EX3045).) Accordingly, outside of chapter 9, in this scenario holders of COP Claims may be in a position to recover more, and may shoulder less risk, than holders of Limited Tax General Obligation Bond Claims.[44]

The City's discrimination against the COP Claims, in favor of the Limited Tax General Obligation Bond Claims is unfair under the four-factor *Aztec* analysis as well. First, there is no reasonable basis for treating Limited Tax General Obligation Bond Claims and COP Claims – both unsecured claims against the City – differently. Second, there is no evidence that the City could not have confirmed and consummated a plan without the discrimination – in fact, the Reply vigorously defends the confirmability of the Fourth Amended Plan, which treated Limited Tax General Obligation Bond Claims the same as the COP Claims and other non-pension unsecured claims. Third, the lack of evidence of a reasonable basis supporting the Plan's discrimination in favor of the Limited Tax General Obligation Bond Claims, or the necessity of such discrimination, suggests that it was not proposed in good faith. Again, this is yet another issue where the fact that this settlement was negotiated in mediation and parties are hiding behind the Mediation Order makes it difficult to truly assess the City's rationale. Finally, in light of the fact that the Plan caps recoveries for Class 9 at an unreasonably low level (10%

---

[44] For the reasons set forth in note 33 *supra*, because of the Plan's grossly disparate treatment of the COP Claims, as compared to the Limited Tax General Obligation Bond Claims, the Plan is also not fair and equitable to Class 9, and was not proposed in good faith.

WEIL:\44494102\14\45259.0007

using the City's calculations and (at most) 6% using a more appropriate discount rate of 9%), the Plan's discrimination in favor of Class 7 is unfair.

Furthermore, given the unsecured status of the Limited Tax General Obligation Bond Claims, the LTGO Settlement is not fair and equitable or reasonable, as required by the standards for approving settlements as part of a bankruptcy plan in the Sixth Circuit. (*See* DIA Brief at 72-74) The City's high likelihood of success in the LTGO Litigation weighs against providing preferential treatment to Limited Tax General Obligation Bond Claims. Further, the issues in dispute in the LTGO Litigation, which the City has already briefed extensively,[45] are purely legal in nature and involve relatively straightforward questions of statutory interpretation. Accordingly, it would be in the best interests of other unsecured creditors, including holders of COP Claims, for the City to continue prosecuting the LTGO Litigation and provide *pari passu* treatment to Limited Tax General Obligation Bond Claims under the Plan.[46]

## II. THE PLAN FAILS THE BEST INTERESTS OF CREDITORS, FAIR AND EQUITABLE AND GOOD FAITH REQUIREMENTS BECAUSE IT DOES NOT MAXIMIZE THE VALUE OF THE DIA ASSETS TO ENHANCE CREDITOR RECOVERIES

In order to satisfy three of the chapter 9 plan confirmation requirements – best interests of creditors, fair and equitable and good faith – the City must prove that the Plan

---

[45] City of Detroit's Motion to Dismiss the Complaint, *Ambac Assurance Corp. v. City of Detroit, Michigan, et.*, Adv. Proc. No. 13-05310 (Bankr. E.D. Mich. Dec. 9, 2013) (Docket No. 53); Defendants' Motion to Dismiss the First Amended Complaint, *Ambac Assurance Corp. v. City of Detroit, Michigan, et.*, Adv. Proc. No. 13-05310 (Bankr. E.D. Mich. Jan. 17, 2014) (Docket No. 83); Reply to Ambac Corporation's Opposition to Defendants' Motion to Dismiss, *Ambac Assurance Corp. v. City of Detroit, Michigan, et.*, Adv. Proc. No. 13-05310 (Bankr. E.D. Mich. Feb. 17, 2014) (Docket No. 93).

[46] Although, for the reasons set forth herein, FGIC submits that the Plan's discrimination against Class 9 in favor of Class 7 is unfair on its face, FGIC is at a disadvantage in objecting on this ground because the LTGO Settlement was only recently added to the Plan, and the City – the party with the burden of proof – has not yet articulated its arguments in support of Class 7's treatment pursuant to the LTGO Settlement. Accordingly, FGIC reserves all rights to supplement its arguments in support of this objection.

WEIL:\44494102\14\45259.0007

maximizes the value of City assets that are not essential to the health, safety and welfare of its

citizens to enhance creditor recoveries.  Accordingly, the City's inability to prove that the Plan

maximizes the value of the DIA Assets renders the Plan un-confirmable.

### A. The Plan Must Maximize the Value of City Assets Not Essential to the Health, Safety and Welfare of Citizens

#### 1. The Best Interests of Creditors and Fair and Equitable Standards in Chapter 9

Section 943(b)(7) provides that "[t]he court shall confirm [a chapter 9 plan of

adjustment] if . . . the plan is in the best interests of creditors . . ."  11 U.S.C. § 943(b)(7).  As the

City agrees, courts construe the best interests of creditors test in chapter 9 as setting a "floor,

requiring a reasonable effort at payment of creditors by the municipal debtor."  *Pierce Cnty.*, 414

B.R. at 718 (*quoting Mount Carbon*, 242 B.R. at 34); (Reply ¶ 103); (*See* Buckfire Dep., Vol. 2

105:21-24 (agreeing that "a municipality in a chapter 9 in connection with the best interests test

should make reasonable efforts to repay creditors").)  A leading bankruptcy treatise reiterates

that "[a] plan that makes little or no effort to repay creditors over a reasonable time may not be in

the best interest of creditors."  6-943 Collier on Bankruptcy ¶ 943.03.

Similarly, courts construed the predecessor to section 943(b)(7) – section

403(e)(1) of the Bankruptcy Act – as requiring that a Chapter IX plan provide creditors "all that

they can reasonably expect in the circumstances."  *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628,

639 (9th Cir. 1942) (internal quotation marks and citation omitted) (also interpreting

*Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510 (1941) as requiring the court to "make

some finding to support a conclusion that the payments provided for in the plan of composition

are all that the [debtor] is reasonably able to pay in the circumstances").  Notably, section

403(e)(1) of the Bankruptcy Act provided that a court shall confirm a Chapter IX plan if "[i]t is

***fair, equitable and for the best interests of the creditors*** and does not discriminate unfairly in

WEIL:\44494102\14\45259.0007

favor of any creditor or class of creditors." (emphasis added). Thus, Bankruptcy Act-era Chapter

IX decisions did not distinguish between (i) the fair and equitable requirement (currently in

section 1129(b)(1)) and (ii) the best interests of creditors requirement (currently in section

943(b)(7)), and instead interpreted both requirements (either together, or interchangeably) as

mandating an inquiry into the "fairness" of a Chapter IX plan, and whether the plan provided

creditors all that could reasonably be expected under the circumstances. *See e.g. Bekins v.*

*Lindsay-Strathmore Irrigation Dist.*, 114 F.2d 680, 685 (9th Cir. 1940) (affirming "the trial

court's finding that the proposed plan is in every respect fair, equitable and for the best interest

of all creditors" because "the 59.978 cents on the dollar of principal amount of their bonds is all

that the bondholders can reasonably expect in the circumstances") (internal quotation marks

omitted). Today the fair and equitable standard is separately set forth in section 1129(b)(1), but

should be interpreted to similarly require treatment consistent with creditors' reasonable

expectations. (*See* note 33 *supra*.)

   What qualifies as a "reasonable effort" and what creditors can "reasonably

expect" are necessarily fact-specific inquiries that must be determined on a case-by-case basis.

*See, e.g., Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) (the "objective

legal reasonableness" of an action must be "viewed on a fact-specific, case-by-case basis")

(citation omitted).[47]  And, it is the debtor's burden to prove that the steps it took to repay

---

[47] *See, also, In re Corcoran Irr. Dist.*, 27 F.Supp. 322, 328, 329 (S.D. Cal. 1939) (holding that a Chapter IX plan was "fair, equitable and for the best interest of creditors" only after conducting "[a] study of the entire record and a history of the difficulties of this district" and finding that a loan from the RFC was "***the only*** manner in which the money for the retirement of the old bonds could be made available") (emphasis added). As the City notes, in affirming the district court's decision in *Corcoran Irrigation District*, the Ninth Circuit held that "The ***operative*** assets of an irrigation district . . . cannot be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor." *Newhouse v. Corcoran Irrigation Dist.*, 114 F.2d 690, 691 (9th Cir. 1940) (emphasis added). This holding is consistent with FGIC's position that the best interest of creditors and fair and equitable tests require the City to maximize

WEIL:\44494102\14\45259.0007

creditors were reasonable and consistent with creditors' expectations. *Pierce Cnty.*, 414 B.R. 702 ("The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence.").  Here, a reasonable effort to generate value to pay creditors what they may reasonably expect under the circumstances requires the City to prove that it investigated the value of, and monetization strategies for, non-essential assets, and then proposed a plan that incorporates and implements those options the City has identified as value-maximizing.  This conclusion is supported by a review of (i) actions taken by other distressed governmental entities, (ii) prepetition actions taken by the City and (iii) relevant case law.

a.   *Other Governmental Entities Have Monetized Assets*
*to Bolster Liquidity and Satisfy Obligations to Creditors*

Contrary to what the City might have the Court believe, municipalities sell assets all the time.  In recent years, municipalities have increasingly utilized asset monetization as a means of bolstering liquidity and satisfying obligations to creditors when faced with financial distress.  (Spencer Report at 54 (EX3035); Malhotra Dep. 127:9-10 ("Cities have privatized assets all over the country").)  For example, in 2013, while Harrisburg, Pennsylvania was in a receivership, it sold an incinerator for $130 million, leased its parking facilities for approximately $270 million and auctioned off approximately 8,000 artifacts collected as part of a planned museum that did not reach fruition for a total of $3.9 million.  (Spencer Report at 114 (EX3035).)  Other examples of municipalities monetizing assets include:

- in 2014, Hercules, California sold its municipal utility for $9.5 million;

- in 2013, New York City sold two office buildings for $250 million;

- in 2013, Allentown, Pennsylvania leased its water and sewer systems for $211 million;

---

the value of assets that are not essential to the health, safety and welfare of its citizens (*i.e.* assets that are not **operative**).

WEIL:\44494102\14\45259.0007

- in 2011, Nassau County, New York sold its rights to collect rent from 18 leases of county-owned commercial properties for $37 million;

- in 2010, Newark, New Jersey sold 16 buildings for $74 million;

- in 2010, the State of California entered into a sale leaseback agreement under which it sold 24 state office buildings, generating $1.2 billion for the state's general fund and $1.1 billion to pay off bonds on the buildings;

- in 2010, Indianapolis, Indiana sold its water and wastewater systems for $425 million and leased its parking meters for $20 million and revenue sharing rights over 50 years;

- in 2009 the State of Arizona entered into a sale leaseback agreement for 14 publically-owned buildings for $735 million and in 2010 entered into another sale leaseback for additional properties for $300 million;

- in 2008, Chicago, Illinois entered into a $1.2 billion lease agreement for 36,000 parking spaces; and

- in 2008, West New York, New Jersey entered into a sale leaseback agreement of its public works garage for $8 million.

(Spencer Report at 114-115 (EX3035).) These examples demonstrate municipalities' increasing reliance on strategies that monetize assets – in a manner that does not negatively affect the provision of essential services to residents – to address financial distress, and creditors' expectations that such efforts will be undertaken.

       b.    *The City Previously Has Explored and Utilized Asset Monetization Strategies for Bolstering Liquidity and Repaying Creditors*

In line with this trend, the City has considered and pursued asset monetization in the past as a means to fund its operations and repay creditors. For example, in October 2005, the City's Fiscal Analysis Director released a report analyzing the potential securitization of the Detroit-Windsor Tunnel. (Spencer Report at 56 (EX3035).) In April 2006, the City sold a City-owned parking garage to the Greektown Casino for $32 million, and used the proceeds from the sale to repay bond debt. (*Id*.) In April 2007, the City's Fiscal Analysis Director recommended a sale of approximately $31 million of City-owned property. (*Id*.) In September 2010, McKinsey

WEIL:\44494102\14\45259.0007

released a report identifying the DIA, DWSD, the Detroit-Windsor Tunnel, Coleman A. Young Municipal Airport, and Belle Isle as assets for immediate consideration for public private transactions. (*Id.*) The Forty-Year Projections also include $6 million the City expects to receive in connection with the sale of the Veteran Memorial Building in Fiscal Year 2015. (Malhotra Dep. 46:20-47:4.) This shows that, for years prior to the Chapter 9 Case, the City took steps to assess and implement asset monetization strategies in order to address the City's revitalization needs and legacy obligations.

Initially, the Emergency Manager indicated that he would continue pursuing these asset monetization strategies, and that all City assets were "on the table." (*See* Orr Dep. 25:17-20 ("I think generally in this time frame when I came into office, I said that all options are on the table, that we have to review any reasonable options regarding all assets of the City."); *id.* 60:24-61:5 ("We were proceeding down a path of trying to find ways to look at each of the buckets of assets that the City had and determine if there was a portion that could provide a benefit to the city both for services, as well as payments towards creditors in bankruptcy."); *id.* 430:23-25 ("I think I tried to maintain a position that everything was on the table, that - - that we were examining all alternatives"); *id.* 482:3-13 (agreeing that one of the Emergency Manager's duties as a fiduciary is to look at all options with respect to all of the City's assets that he had promised that the City would look at every transaction that makes sense that provides the City with greater net present value); *see also* Email from K. Buckfire to B. Bennett, D. Heiman, dated July 30, 3013 (POA00040976 - POA00040984) 4 (EX3494) (forwarding an email from D. Woodham at Christie's including a news article dated July 19, 2013 quoting Bill Nowling, the Emergency Manager's spokesperson, "We haven't proposed selling any asset. But we haven't taken any asset off the table. We can't. We cannot negotiate in good faith with our creditors by taking

assets off the table."); Buckfire Dep., Vol. 2 115:12-116:5 (indicating that he agrees with Mr. Nowling's statement).)

In addition, as of February 2013 (one month before the Emergency Manager's official appointment), Miller Buckfire was pursuing the following asset monetization opportunities on behalf of the City: (i) Detroit-Windsor Tunnel – renegotiation and/or extension of lease; sale of underlying ownership; (ii) Coleman A. Young International Airport – sale or long-term lease to private party; (iii) Port of Detroit – sale to private investor; long term lease; (iv) Joe Louis Arena – sale to private investor; redevelopment of facility; (v) Belle Isle Park – lease to State of Michigan; sale or lease to other public or private entity; (vi) DWSD – transfer to new authority to other government entity; long-term lease; sale to State or third party;[48] (vii) Municipal Parking Department – sale and/or lease to investor; (viii) Solid Waste Collection – outsource operations to third party; (ix) Detroit Department of Transportation – further restructuring initiatives beyond outsources of management; (x) Vacant Land – sale in public auctions; sale to developers for specific plans; contract construction of buildings with City retaining ownership of property; (xi) City-Owned Buildings and Facilities – sale in public auctions; sale to developers for specific plans. (Miller Buckfire Materials Prepared for Discussion Assessment of City Assets, dated February 2013 at 1-2 (POA00042378-POA00042395) (EX3033).)

And, with respect to the DIA Assets in particular, it appears that, despite resistance from DIA Corp., the Emergency Manager and his advisors initially understood their

---

[48] Miller Buckfire continued to explore monetization options for the DWSD and, in October 2013, proposed a transaction pursuant to which the DWSD assets would be leased to a regional authority in exchange for lease payments to the General Fund in the amount of $94 million in 2015, and increasing annually to $228 million in 2023. (Miller Buckfire, Analysis of New Water/Sewer Authority, dated October 2, 2013 at 8 (POA00107117 – POA00107166) (EX3034).)

WEIL:\44494102\14\45259.0007

duties to include pursuing all monetization options.  (Orr Dep. 414:23-415:5("I agree with the sentiment that we're in a financial emergency.  I agree with the sentiment that financial emergencies sometimes require extraordinary measures.  I agree with the concept that maybe selling art would be an option"); Buckfire Dep., Vol. 2 112:15-113:2 ("Well, very early on in our engagement with the City, I was made aware of the fact that the Detroit Institute of Arts was effectively not a separate institution but, in fact was owned by the City . . . the building and collection was technically owned by the City of Detroit.  We recognized early on that that would require it under certain scenarios to be valued as a potential noncore asset and dealt with appropriately if it was determined that the City would have to seek protection under chapter 9.").)  This was reflected in the June 14 Proposal, which indicates that one of the City's key restructuring and rehabilitation initiatives was "to the fullest extent possible under all circumstances . . .maximize recoveries for creditors . . . and generate value from City assets" and the City was continuing to explore asset monetization opportunities with respect to the DIA, the DWSD, Coleman A . Young Airport, Detroit-Windsor Tunnel, Belle Isle Park, City-owned land, parking operations and Joe Louis Arena.  (June 14 Proposal at 41, 83-89 (EX33).)  This was further reflected in the City's early communications to DIA Corp., essentially threatening to sell the DIA Assets if DIA Corp. could not raise a significant amount of money.  (*See* Email from K. Buckfire to G. Gargaro (head of the board of the DIA) re: DIA Visit, dated April 29, 2013 (Buckfire Ex. 31; POA00041062) (EX3496) ("How are you coming on a proposal . . . .please don't think small.  The DIA is an important cultural asset and the [DIA] Board should be proposing something dramatic . . . ."); Orr Dep. 436:6-11 (as of April 2013, "my general thought was that [the DIA] needed to raise some money to contribute to the effort that would justify, in

WEIL:\44494102\14\45259.0007

my mind, a contribution so that we would not have to pursue a road of necessarily attempting to sell the art").)

Thus, the City's actions in the years and months leading up to the commencement of the Chapter 9 Case support FGIC's position that a reasonable effort to pay creditors in this case requires, and creditors can reasonable expect, an asset monetization strategy that maximizes the value of the City assets in a manner that does not affect the City's provision of essential services to residents.[49]  One of the City's advisors confirmed that part of making a reasonable effort to pay creditors pursuant to the best interest of creditors test required the City to "look at whether there are other sources of repayment.  Certain noncore assets that might be monetizable . . . ."  (Buckfire Dep., Vol. 2 109:5-8.)  Inexplicably, shortly after the commencement of the Chapter 9 Case, the City suddenly changed course (as described in more detail below).

c.       *Relevant Case Law Supports FGIC's Position*

One of the most compelling decisions in support of FGIC's position is the decision in *Fano v. Newport Heights Irrigation District*.  In *Fano*, the Ninth Circuit considered a Chapter IX plan for an irrigation district that proposed paying holders of certain outstanding bonds 62.50 cents on the dollar, funded by a loan from the RFC.  *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 564 (9th Cir. 1940).  The Chapter IX plan did not include proposed tax increases or the monetization of any debtor-owned assets to fund creditor recoveries.  In determining whether the proposed plan was equitable and fair and for the 'best interest of the creditors (pursuant section 403(e)(1) of the Bankruptcy Act), the court noted that, as a result of extravagant expenditures leading up to the Chapter IX filing, the debtor owned

---

[49] FGIC's position is also consistent with section 12(1)(r) of PA 436, which empowers the Emergency Manager to "sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government, provided the use or transfer of the assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of the local government."

certain assets – a pipe line, reservoir and new office building – with a value many times the amount owed to the bondholders. *Id.* at 565-66. In addition, the court noted that the district had a small percentage of deficiency (only 5%) in tax payments for the six years leading up to the filing. *Id.* Faced with these facts, the court concluded that the plan was not fair and equitable or for the best interest of creditors, noting that it would be "highly unjust" to allow the debtor to allocate the cost of the excessive improvements to its assets to the bondholders, when it appeared that the debtor could have easily raised tax revenue to pay the bondholders in full. *Id.* at 565-66.

Similar to the debtor in *Fano*, the City owns certain assets – the DIA Assets, in particular – with a value many times the amount it owes to creditors. (*See infra* Section II.C below.) However, unlike in *Fano*, it is not clear that the City could easily collect additional tax revenues to meet its obligations. (*See* Reply ¶¶134-36.) Yet, the City could easily monetize the DIA Assets because these assets are not essential to the health, safety and welfare of its citizens; thus, pursuant to *Fano*, the best interests of creditors and fair and equitable standards require that it do so.[50]

The *Pierce County Housing Authority* case further supports FGIC's position. In *Pierce County*, the court considered a chapter 9 plan that established a distribution account, which would be the source of all recoveries for unsecured creditors. *Pierce Cnty.*, 414 B.R. at

---

[50] The City's interpretation of *Fano* as standing only for the limited proposition that "it is appropriate for the Court to consider the City's ability to levy additional taxes in considering whether the Plan should be confirmed" is overly narrow and wrong. (Reply ¶ 123.) *Fano* stands for the more general proposition that a court should deny confirmation of a chapter 9 plan that fails to utilize easily-accessible revenue sources to enhance creditors' recoveries. *See Pierce Cnty.*, 414 B.R. at 719 (interpreting *Fano* as requiring the court to consider whether a chapter 9 plan utilizes "all potential sources of recovery already in existence" in the context of its best interest of creditors analysis). Accordingly, just because the City does not appear to have easy access to *the same* revenue source as the debtor in *Fano* does not mean that the City is off the hook. Adapting the standards applied in *Fano* to the unique circumstances of the City's Chapter 9 Case, as the City urges (Reply ¶ 45), indicates that the City must maximize the value of its assets that are not essential to the health, safety and welfare of its citizens in order to satisfy the best interests of creditors and fair and equitable confirmation requirements.

WEIL:\44944102\14\45259.0007

709.  The plan provided for a post-confirmation committee to prosecute certain insurance and other claims of the debtor and deposit the net proceeds of any such claims into the distribution account.  *Id.*  The committee's right to pursue claims was subject to certain limitations (*i.e.* the plan required that an examiner be appointed to determine whether the committee could pursue certain insurance claims, precluded the committee from evaluating or pursuing a claim against the debtor's former counsel, and prohibited the committee from employing certain professionals).  In considering whether the plan was in the best interests of creditors, the court relied on *Fano* in framing the issue as "whether it is in the best interest of creditors and in good faith to confirm a plan that precludes the Post-Confirmation Committee from investigating and possibly pursuing ***all potential sources of recovery already in existence***."  *Id.* at 719 (emphasis added).  The court held that the plan was not in the best interest of creditors because the limitations placed on the post-confirmation committee eliminated valuable rights (*i.e.* rights to decide whether and how to purse potential claims) and represented an impermissible "attempt to cut-off potential sources of funds for payment of claims."  *Id.*  Similarly, as a potential source of recovery to creditors, the City is required to maximize the value of the DIA Assets.[51]

The *Barnwell County Hospital* and *Bamberg County Hospital* cases further support FGIC's interpretation of the best interest of creditors test as requiring the City to maximize the value of the DIA Assets for the benefit of creditors.  In those cases, the court confirmed a chapter 9 plan that provided for the sale of substantially all of the assets of both hospitals to a regional health system.  *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 853-54 (Bankr. D.S.C. 2012); *In re Bamberg Cnty. Mem'l Hosp.*, Case No. 11-03877, 2012 WL 1890259, at *1-

---

[51] The City's attempt to distinguish *Pierce County* by noting that the potential sources of recovery at issue in *Pierce County* were claims, not assets (Reply ¶ 131), is a distinction without a difference.  Claims are a type of asset and, similar to claims, the City has tangible assets that are not essential to the City.

WEIL:\44494102\14\45259.0007

2 (Bankr. D.S.C. May 23, 2012).  The court held that the chapter 9 plan was in the best interest of creditors because, in each case:

> the Plan affords all creditors the potential for the greatest economic return from Debtor's assets.  Therefore, it is in the best interest of creditors, especially given the complex nature of this case.  It appears that the Debtor has obtained a fair price for its assets under the APA . . . [and b]y implementing the APA, the Debtor will be able to convey its hospital assets as a going concern.  As a going concern, the value of the Debtor's assets . . . is enhanced by several factors . . .The Plan allows the Debtor to realize that value and distribute it to its creditors . . . .

*Barnwell*, 471 B.R. at 869; *Bamberg Cnty.* 2012 WL 1890259 at *8.  Thus, under the circumstances of *Barnwell* and *Bamberg*, the best interest of creditors test was satisfied where the debtors maximized the value of and monetized their assets for the benefit of their creditors, in a manner that preserved the essential healthcare services the municipal debtors were created to provide.  Similarly, as explained below, because the City can maximize the value of the DIA Assets in a manner that does not affect the essential services the City provides to ensure the health, safety and welfare of its citizens, the best interest of creditors test requires that it do so.

As a matter of clarification, FGIC is not (as the City suggests) arguing that "the City has an *unconditional* obligation to maximize recoveries for creditors" at the expense of its residents.  (Reply ¶¶ 108, 110, 122.)  FGIC does not contest that the City is in need of the reinvestment initiatives contemplated by the Plan.  FGIC's argument is that the City has resources sufficient to remedy its current condition and failing services *and* provide greater recoveries to creditors.  The fact that the City needs to devote funds to fixing itself does not give the City carte blanche to retain valuable assets that have nothing to do with the essential services it provides its residents.  (Reply ¶ 110.)  Where, as here, the City has the ability to enhance

WEIL:\44494102\14\45259.0007

80

creditor recoveries by monetizing assets *without* jeopardizing the health, safety and welfare of its residents, the best interests of creditors and fair and equitable tests require that it do so.[52]

### 2. The Good Faith Requirement in Chapter 9

Section 1129(a)(3) (incorporated in chapter 9 pursuant to sections 901(a) and 943(b)) requires a plan proponent to prove that its plan "has been proposed in good faith." 11 U.S.C. § 1129(a)(3). "Whether a plan has been proposed in good faith 'requires a factual inquiry of the totality of the circumstances.'" *Pierce Cnty.*, 414 B.R. at 720 (*citing Mount Carbon*, 242 B.R. at 39). Factors courts examine to determine whether a plan has been proposed in good faith include (i) whether the debtor showed fundamental fairness in dealing with its creditors, (ii) whether the debtor proposed the plan with honesty and good intentions, and with a basis for expecting that a reorganization can be effected and (iii) whether the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *See In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992) (describing these requirements).

Several of the cases discussed above held that a chapter 9 plan was not proposed in good faith where it failed to maximize creditor recoveries. For example, in *Pierce County*, the court held that the debtor's "attempt to cut-off potential sources of funds for payment of claims," in addition to not being in the best interest of creditors, "also raises the issue of whether the

---

[52] The fact that none of the reported chapter 9 or Chapter IX decisions explicitly require a municipal debtor to liquidate its assets in order to satisfy these confirmation requirements does not change this result. As noted above, what constitutes a reasonable effort to pay creditors what they can reasonably expect in any particular case is a fact-specific inquiry that requires an in-depth examination of all of the circumstances, on a case-by-case basis. The City itself appears to recognize the limitations of relying too literally on the small universe of reported chapter 9 and Chapter IX decisions, noting that "[t]he challenge presented by the City's restructuring is literally unprecedented in American bankruptcy law, and the City's . . . circumstances do not fit neatly into prior case law." (Reply ¶ 45.) For example, most municipalities that file chapter 9 cases do not own valuable assets that are not related to services they provide and, those that do monetize them in an effort to avoid chapter 9. (Spencer Report at 53-54 (EX3035).) Thus, "[s]tandards articulated in dissimilar contexts should not be applied mechanically here, but should be adapted as necessary to fit both the unique purposes of chapter 9 and the unique circumstances of the City's financial crisis." (Reply ¶ 45.)

WEIL:\44494102\14\45259.0007

Debtor's Amended Plan has been proposed in good faith." 414 B.R. at 719. The court

concluded that the plan was not proposed in good faith because "the Debtor's attempt to forestall

the ability of the Post-Confirmation Committee to investigate potential sources of recovery does

not indicate a sincere attempt by the Debtor to readjust its debts by maximizing the creditors'

recovery." *Id.* at 720. By contrast, the *Barnwell* and *Bamberg* court held that the plan was

proposed in good faith because, in each case:

> [T]he Plan maximizes the economic return to the Debtor's
> creditors of available funds in the most practicable way given the
> unusual and complex nature of this Case. The Plan devotes all of
> the Debtor's cash, accounts receivables and other assets remaining
> after the closing of the sale to payment of the Debtor's creditors.
> Under the circumstances, the Debtor has obtained a fair price for
> its assets . . . the Debtor will be able to convey its hospital assets as
> a going concern. As a going concern, the value of the Debtor's
> assets . . . is enhanced by several factors . . . The Plan allows the
> Debtor to realize that value and to distribute it to its creditors.

*Barnwell*, 471 B.R. at 866; *Bamberg*, 2012 WL 1890259 at *5-6; *see also Connector*, 447 B.R.

at 763 (holding that the chapter 9 plan was proposed in good faith where "the Plan affords all

creditors the potential for the greatest economic return from Debtor's assets" and "the Plan is the

product of an arms-length, good faith negotiation between Debtor, certain bondholders, the bond

trustees . . ."). Adopting the standards applied in these cases to this Chapter 9 Case, the good

faith requirement mandates that the Plan must provide the City's creditors with the greatest

economic return from the City's assets.

### 3.   Section 904 Does Not Preclude this Finding

The City's argument that section 904 precludes the Court from denying

confirmation of the Plan on the ground that the Plan fails to make a reasonable effort to pay

creditors by monetizing assets is a red herring. Section 904 provides:

> Notwithstanding any power of the court, unless the debtor consents
> or the plan so provides, the court may not, by any stay, order, or

WEIL:\44494102\14\45259.0007

> decree, in the case or otherwise, interfere with – (1) any of the
> political or governmental powers of the debtor; (2) any of the
> property or revenues of the debtor; or (3) the debtor's use or
> enjoyment of any income-producing property.

11 U.S.C. § 904.  While section 904 prohibits court interference with the property and revenues

of a municipal debtor while it is in chapter 9, this provision does not license a municipal debtor

to freely readjust its debts and discharge its prepetition obligations in any manner it pleases –

"the day of reckoning comes at the plan confirmation hearing." *In re City of Stockton*, 486 B.R.

194, 199 (Bankr. E.D. Cal. 2013); *see also Pierce Cnty.*, 414 B.R. at 721 (noting that although

the court's "role is limited both by the [Bankruptcy] Code, in particular § 903 and § 904, and by

the Tenth Amendment . . . [o]ne responsibility the Court does have, however, is to ensure that the

[p]lan meets the requirements of confirmation").  It is well within the Court's authority to deny

confirmation of the Plan if the Plan fails to meet any of the confirmation requirements set forth

in the Bankruptcy Code and applicable law.  This includes the requirement that the Plan

maximize the value of assets that are not essential to the health, safety and welfare of the City's

residents, as a reasonable effort to pay creditors, consistent with the best interest of creditors and

fair and equitable tests.  To hold otherwise would render these confirmation standards

meaningless.[53]

---

[53] The City points out that, prior to 1975, section 82(c) of the Bankruptcy Act (the predecessor of section 904) prohibited the court's interference with any property or revenues of the debtor "necessary for essential governmental services."  (Reply ¶ 118.)  In 1975, Congress amended section 82(c) to eliminate the phrase "necessary for essential governmental services" because (i) such phrase was conducive to litigation, (ii) a Supreme Court case had abolished the distinction between governmental and proprietary functions and (iii) although there is conceivably a category of property that is not necessary for essential governmental services or income-producing, "the existence of that category does not warrant the potential for litigation that exists with the old language."  (H.R. Rep. No. 94-686, at 18-19, 1 Bankruptcy Act Amendments P.L. 94-260 90 Stat. 3158 1976 1 1976.)  Thus, contrary to the City's interpretation, this legislative history suggests that section 904's current prohibition on the court's interference with property that is *not* necessary for essential government services is the result of a policy decision motivated by minimizing litigation, not a constitutional mandate.  However, regardless of the origins of section 904's blanket prohibition on the Court's interference with the City's property, denying confirmation of a plan for failure to monetize assets that are not necessary for essential government services (on the grounds

In addition, to the extent denying confirmation on these grounds could somehow be construed as an interference with the City's property, with respect to the DIA Assets, by seeking the Court's approval of the DIA Settlement and including the DIA Settlement in the Plan, the City has consented to such interference. Importantly, section 904 prohibits the Court's interference with the City's property "**unless the debtor consents or the plan so provides**." 11 U.S.C. § 904 (emphasis added). When a chapter 9 debtor seeks court approval of a compromise or settlement pursuant to a Rule 9019 motion or by including such agreement as a plan provision, "the municipality 'consents' for purposes of § 904 to judicial interference with the property or revenues of the debtor needed to accomplish the proposed transaction." *City of Stockton*, 486 B.R. at 199. Either way, the Court has the authority to evaluate and assess the reasonableness of the proposed transaction, and to deny confirmation if the Court determines that the transaction does not maximize the value of the DIA Assets.

### B. The City Has Valuable Assets Available to Monetize

The City has valuable assets that could be monetized without impacting the essential services the City provides to ensure the health, safety and welfare of its citizens. For example, the City owns approximately 22 square miles of land and other real estate assets. (Spencer Report at 61 (EX3035).) In addition, the City could realize substantial value from numerous other City-owned assets, including the DWSD and City parking structures. (*Id*. at 58; Malhotra Dep. 44:8-14 (identifying assets sales (of DWSD and parking assets in particular) as the biggest source of untapped revenue for the City).) Most significant are the DIA Assets – the

---

that, by failing the do so, the debtor failed to make a reasonable effort to pay creditors, as required by the chapter 9 confirmation standards) is not tantamount to an interference with such assets; accordingly, section 904 is not implicated.

WEIL:\44494102\14\45259.0007

City's prized museum and art collection[54] appraised in excess of $8 billion. (*Expert Report of Victor Wiener*, July 25, 2014 (the "**Wiener Report**") at 3 (EX3036).) Yet, other than DWSD and the DIA Assets (discussed below), the Plan fails to provide for unsecured creditors, including holders of COP Claims, to share in any value the City may realize from these assets after the Effective Date. And with respect to DWSD, if there is a Qualifying DWSD Transaction in the future, holders of Pension Claims are the only guaranteed creditor beneficiaries of those proceeds.

Of particular note is the DIA – "one of the largest and most significant art museums in the country." (Wiener Report at 20 (EX 3036).) At a minimum, the DIA Assets are worth between $900 million and $1.8 billion, based on the City's heavily discounted valuation. (*Expert Report of Michael Plummer*, July 8. 2014 (the "**Plummer Report**") at 37, 48 (EX460).) More appropriate methodologies suggest an appraised value of in excess of $8 billion. (Wiener Report at 3 (EX3036).) The City claims that, because the City Charter provides that "[t]he people have a right to expect the city government to provide for its residents [among other things] . . . cultural enrichment, including . . . art and historical museums," (Detroit City Charter, Declaration of Rights ¶ 1), the DIA Assets are "core to the services provided by the City" and, thus, cannot be monetized for the benefit of creditors. (Reply ¶ 120.) First of all, the City ignores that there may be value-maximizing opportunities other than an outright sale of the entire collection. Moreover, this interpretation of the City Charter is too broad. The City Charter separately states that "the City shall provide for the public peace, health and safety of persons and property within its jurisdictional limit." (Detroit City Charter, Declaration of Rights ¶ 1.)

---

[54] No party contests that the City owns the DIA Assets. (*See* DIA Brief § II.A.) Certain parties have alleged there are encumbrances or restrictions on the City's ability to monetize the DIA Assets. As set forth in the DIA Brief, these arguments are easily overcome.

Arguably, this defines, in a general sense, the "essential" services the City is mandated to provide. Although the Declaration of Rights goes on to list more specific items citizens may expect from the City– decent housing; job opportunities; reliable, convenient and comfortable transportation; recreational facilities and activities; cultural enrichment, including libraries and art and historical museum; clean air and waterways, safe drinking water and a sanitary, environmentally sound city – these are better understood as components of the City's overarching obligation to ensure the peace, health and safety of its citizens, not all of which are of equal priority. The Emergency Manager recognized that certain services the City provides are of higher priority than art museums (presumably because they affect the City's ability to ensure the public peace, health and safety) when he explained that "[w]e have no money to increase funding [sic] to the DIA . . . [b]ecause the budget assumptions that we have are fairly flat and there's no additional money available *considering the priorities for other reinvestment such as blight, policing, IT, public safety*." (Orr Dep. 477:10-23 (emphasis added).) This is consistent with former-Mayor Bing's identification of "public safety, transportation, blight, public lighting and public parks" as the essential services the City provides, and his admission that that the cultural advancement the DIA provides to the City is not "essential," even if it is "a plus." (Bing Dep. 32:14-19; 128:6-9.) This is consistent with the City's historical understanding that the DIA is not essential. (Letter to Arts Commission, dated Apr. 11, 1932 (DIAINSP119429) (EX3236) (noting that where the City government is "trying to maintain only essential services," it is difficult to secure enough funding to keep the building open to the public).) If a citizen approached the City tomorrow and demanded the City build an amusement park because the City Charter provides for City provision of "recreational facilities," would the City feel legally obligated to oblige?

WEIL:\44494102\14\45259.0007

Further, the fact that citizens have the right to expect the City to provide art museums for cultural enrichment does not automatically mean that they have the right to demand that the City maintain "one of the top six art collections in the United States." (Disclosure Statement at 97.) The City has at least four other museums that would provide citizens with access to cultural enrichment in the event the DIA ceased to exist. (Orr Dep. 481:14-20.) And, the City has offered no proof that the DIA in particular is of significant value to the City. (Reply ¶ 37 (claiming that the value in maintaining the DIA Assets in the City would be "difficult (if not impossible) to quantify")); Malhotra Dep. 331:14-24 (he never considered the impact on the City's revenues if the DIA museum was closed, the DIA art collection was sold, or the art collection was removed from the City of Detroit).) Houlihan, on the other hand, calculated the implied value City residents ascribe to the DIA by calculating their willingness to pay to maintain the DIA as a cultural institution. (Spencer Report at 67 (EX3035).) Using the tri-county millage currently funding the DIA's operations as a proxy for total aggregate user and non-user DIA museum value, based on the percentage of the tri-county population comprised of City residents, Houlihan calculates that Detroit residents' implied valuation of the DIA museum is $73 million. (*Id.*) In other words, keeping the DIA in the City is only "worth" $73 million to City residents. This is substantially below the willingness-to-pay measures for similar art institutions among residents in other cities, and refutes the City's contention that the DIA is an essential or core cultural asset. (*Id.* at 70, 125-134.) Houlihan's analysis is further corroborated by City residents' low user rate of the DIA – 11%, compared to up to 78% for other comparable global art institutions. (*Id.*) Thus, the DIA Assets could be monetized without compromising the City's ability to provide essential services to ensure the health, safety and welfare of its citizens.

WEIL:\44944102\14\45259.0007

## C. The Plan Transfers the DIA Assets for Unreasonably Low Value

The City commenced the Chapter 9 Case with an apparent understanding that the Plan confirmation standards discussed above required the City to make a reasonable effort to maximize the value of the DIA Assets. (*See e.g.* Buckfire Dep., Vol. 2 113: 3-12 ("We, during the spring of 2013, had several meetings with representatives of DIA . . . to explain to them that it might be necessary to monetize or sell the collection under certain scenarios. We then independently determined that in order to satisfy the requirements of the Bankruptcy Code because it would be deemed potentially a noncore asset that we would have to do a valuation of the assets to determine what exactly what it might be.").) Consistent with this understanding, as discussed in Section II.A.1.b above, the City initially indicated that all options were on the table with respect to the DIA Assets. (*See* Orr Dep. 431:20-25 ("from my appointment to the fall of 2013, I continued to say that everything was on the table").)

Yet, the evidence reveals that only one option was ever truly on the table – the Grand Bargain. The City "talked a big game" prepetition and early in the case about disposing of the DIA Assets, but then, beginning in August 2013, it went into mediation and came out committed to a transaction that would provide for a transfer of the DIA Assets to a public trust, in exchange for insufficient value, in order to shield these assets from creditors. (Orr Dep. 341:2-7 (confirming that the purpose of the transfer to a public trust was to ensure that the art is never sold to satisfy the claims of creditors "now and forever").) The City committed to this transaction structure (now embodied in the Grand Bargain) without having any idea of the amount of money the City would receive, or the value of the DIA Assets it was giving up.[55]

---

[55] The mediators formally announced the Grand Bargain on January 13, 2014. (Statement of Detroit Bankruptcy Mediators, dated Jan. 13, 2014 (EX3271).) Yet, as of January 22, 2014, although Christie's had appraised approximately 4% of the DIA Assets (*see* DIA Brief at 11), with respect to the remainder, the City felt that "[i]t's probably a waste of time and money to look at all of it." (Hr'g Tr. 12:5-9; 13:4-7

WEIL:\44494102\14\45259.0007

And, the City never took any steps to explore market alternatives or assess the market value of the DIA Assets (*i.e.* by contacting potential buyers or lenders, including other museums, or the four parties that submitted indications of interest to Houlihan). *See id*. 405:6-11 ("Putting aside any discussions we had in mediation, or the mediation process, about the art or the Grand Bargain, I think it's fair to say that we didn't take any steps to monetize the art."); *id*. 405:15-406:9; 408:25-410:4; *see also* Buckfire Dep., Vol. 2 163:16-165:11, 166:8-11, 19-20 (no one at Miller Buckfire contacted Houlihan regarding the four indications of interest or tried to contact anybody who might be involved in the art monetization world regarding the DIA Assets); Provost Dep. 134:11-25 (in a September 4, 2013 meeting among Christie's and the City, "I was very disappointed because [cash-generating alternatives] was my stream and that was something that Ken [Buckfire] really didn't want to talk about.").)

Ultimately, the City agreed to transfer the DIA Assets into a charitable trust in exchange for the DIA Proceeds, which have a net present value of approximately $260 million using a 6.75% discount rate (Spencer Report, Appendix E at 117 (EX3035))[56] and the $195 million State Contribution, for a total of $455 million, substantially less than the $816 million so widely reported and well-below the estimated over $8 billion value that has been ascribed to the DIA Assets. (*See* Wiener Report at 3 (EX3036).) Looking at the grossly inadequate amount of consideration the City is receiving, it is clear the Grand Bargain does not represent a reasonable effort on the part of the City to maximize the value of the DIA Assets to repay creditors. In

---

(Jan. 22, 2014).) Ultimately, the City hired Artvest Partners to value the remainder of the DIA Assets; however, the Plummer Report was not issued until July 8, 2014 – months after the Grand Bargain was already a done deal.

[56] Notably, the City has not calculated the net present value of the DIA Proceeds, despite the fact that they will be contributed over a 20 year period and the DIA Settlement provides for a "present value discount" of 6.75% to the extent the DIA Funding Parties make their contributions faster than scheduled $5 million per year. (Buckfire Dep., Vol.2 168:25-169:12; Plan Ex. I.A.119.)

WEIL:\44494102\14\45259.0007

addition, the Grand Bargain imposes a large opportunity cost on the residents of Detroit, in the name of preserving the supposed "**significant** value in maintaining the DIA Assets in the City" (Reply ¶ 37), despite evidence that any such value would disproportionately inure to the benefit people living outside of the City. (Spencer Report at 71 (EX3035); *see also* Arts Commission Minutes, dated Dec. 10, 1971 (DIAINSP031707) (EX3211) (describing hearing where Arts Commission was criticized for the DIA "having only one third of [its] visitors from Detroit and not being responsive to the cultural needs of the average community citizen"); State Funding Campaign Letter, 1976 (DIAINSP031885) (EX3212) (noting that "75% of the [DIA's] audience live outside of the City of Detroit"); Speech of F. Cummings, The State Steps In: Michigan and the Detroit Institute of Arts, May, 1977 at 6-7 (DIAINSP119249) (EX3083) (attributing the DIA Corp.'s successful campaign for State funding to, among other things, the fact that its "audience comes largely from beyond the city limits of Detroit").) Yet, other than knowing that the City did not prior to agreeing to the Grand Bargain investigate the value of the DIA Assets or potential ways of accessing that value, it is impossible to further assess how or why the City ultimately agreed to the final amount and structure of the Grand Bargain, or why the City believes this transaction comports with the standards for confirmation, because the City has refused to allow discovery into these issues on the grounds of mediation confidentiality. (*See* Orr Dep. 336:10-21; 337:12-20; 338:10-339:9; 339:22-340:13; 439:13-17; 444:8-25 (declining to describe the process by which the Foundations were solicited for funding or answer questions about the way the Grand Bargain was structured, the DIA Corp. contributions, or the State Contribution on the basis of the mediation order); *see also* DIA Brief § IV.)

WEIL:\44494102\14\45259.0007

## III. THE PLAN FAILS THE BESTS INTERESTS OF CREDITORS TEST BECAUSE IT PROVIDES CLASS 9 WITH SIGNIFICANTLY WORSE TREATMENT THAN WOULD BE AVAILABLE UPON DISMISSAL OF THE CHAPTER 9 CASE

In addition to requiring that a municipal debtor make a reasonable effort to pay creditors, courts also construe the best interests of creditors test in section 943(b)(7) "as requiring that a proposed plan provide a better alternative for creditors than what they already have." *Pierce Cnty.*, 414 B.R. at 718 (*quoting Mount Carbon*, 242 B.R. at 34); *see also Sanitary & Improvement Dist., No. 7*, 98 B.R. at 974 (section 943(b)(7) "requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives"). Generally, the only alternative to confirmation of a plan of adjustment is dismissal of the chapter 9 case, leaving creditors to exercise any state law remedies they have against the municipality. *Id.* at 975 ("The alternative to confirmation of a plan similar to the one before the Court is dismissal of the case. That would permit the parties to go back to state court and permit the state judge to order the debtor to levy sufficient taxes to pay all prepetition bonds plus accrued interest in full."); *Mount Carbon*, 242 B.R. at 34 ("[creditors'] only alternative to a debtor's plan is dismissal").

Dismissal of the Chapter 9 Case would be a better alternative for holders of COP Claims for a number of reasons. In a dismissal scenario, the City would likely temporarily avoid making contributions to the Retirement Systems and payments to financial creditors, as it did leading up to the commencement of the Chapter 9 Case. (Spencer Report at 80-81 (EX3035).) This would yield a surplus of approximately $211 million per year, on average, which the City could use to continue funding a material portion of its reinvestment initiatives. (*Id.*) Thus, the City "would essentially continue functioning as it has during the bankruptcy proceeding with no immediate threat of fiscal or civic collapse." (*Id.* at 79.) In addition, as explained in Section I.A.3.a above, this money-saving strategy would likely result in efforts by the Retirement

WEIL:\44941024\4\45259.0007

Systems and other unsecured creditors, including holders of COP Claims, to obtain and take steps to enforce judgments against the City for missed payments. However, contrary to what the City would have the Court believe, this "race to the courthouse" would not be catastrophic for the City. Pursuant to the RJA, unsecured creditors' (and the Retirement Systems') only remedy against the City would be to get a court to order the City to levy taxes in an amount sufficient to pay the judgments. If the City was unable, as a practical matter, to collect sufficient taxes in the near-term, the judgments would remain outstanding, and, to the extent the City was able to raise additional revenues (either from taxes or another source) in the future, the City would pay such judgments over time, pro rata, on a *pari passu* basis. (PTO ¶ 35.) Faced with multiple outstanding judgments, the City, acting rationally, would likely monetize its valuable assets that are not essential to citizens' health, safety and welfare. (*See supra* Sections II.A.1.a-b; Spencer Report at 53-61 (EX3035).) This would result in higher recoveries for Class 9 than under the Plan, which, as explained in Section II.B above, does not provide holders of COP Claims with any value from the City's assets.

Further, even if the City did not monetize its assets to satisfy outstanding judgments, holders of COP Claims would *still* be better off in a dismissal scenario. This is because, under the Plan, recoveries for recipients of the New B Notes (including holders of COP Claims) are **_capped_** at an unreasonably low level (10%, pursuant to the City's projections, and (at most) 6% using a more appropriate discount rate of 9% (*see supra* Section I.A.2.b(iv)). On the other hand, outside of bankruptcy, holders of COP Claims would retain the right to collect on any unpaid judgments, up to the full amount of such judgments. Thus, such holders would have the benefit of enhancing their recoveries to the extent the City is ultimately able to increase its tax revenues. In addition, as explained above, holders of COP Claims would be treated on a *pari*

WEIL:\44941024\4\45259.0007

*passu* basis with other unsecured creditors (including pensioners), allowing them to share equally in the $956 million of enhanced recovery the Plan currently funnels to Classes 10 and 11. (Spencer Report at 41 (EX3035).)[57]  And, even if this $956 million was no longer available to the City for distribution to creditors (*i.e.* because the Grand Bargain proceeds and other sources of revenue contingent on confirmation of the Plan may no longer be available in a dismissal scenario), holders of COP Claims would still enjoy greater recoveries if the Chapter 9 Case were dismissed because they would be treated *pari passu* with other unsecured claimants.  (*See id.* at 92 (showing that, even if the City lost in excess of $1.8 billion of unsecured creditor recovery value if the Chapter 9 Case were dismissed, holders of COP Claims would *still* enjoy greater recoveries than under the Plan).)[58]  Thus, the Plan is not in the "best interests of creditors" as required by section 943(b)(7).

The City has not even analyzed what creditors' recoveries would be in a dismissal scenario.  Although the City identified Mr. Buckfire as the expert witness that will testify that the City's creditors will be treated better under the Plan than if the Chapter 9 Case were dismissed, (*Expert Report of Kenneth Buckfire*, July 8, 2014 (the "**Buckfire Report**") (EX462) at 2, 5-7), and the Emergency Manager claimed that he relied on a dismissal analysis prepared by Mr.

_____

[57] The Retirement Systems' suggestion that, in this scenario, "the City and the State would likely . . . pass legislation to permit the impairment of financial creditors' claims (but not the Pension Claims, since the legislature cannot override the Michigan Constitution)" ignores the fact that, as explained in Sections I.A.2.a and I.A.3.a above, the Contracts Clauses prohibit the City from impairing *any* of its contractual obligations outside of chapter 9.  (Retiree Systems Brief at 22.)  The Court has already held that *Asbury Park*, the only case the Retiree Committee relies on for its baseless assertion, is "limited to the unique facts of that case."  *Detroit*, 504 B.R. at 144.

[58] In addition, if the Plan is confirmed in its current form, it will signal that municipalities can use chapter 9 to implement plans of adjustment that overwhelmingly favor pensioners over financial creditors, and do not incorporate the monetization of any municipality assets.  This is a dangerous precedent because, should the City commence another chapter 9 case in the future, holders of COP Claims would find themselves subject to the same discriminatory and unfair treatment proposed under the Plan. Accordingly, holders of COP Claims will be better off if the Chapter 9 Case is dismissed.

Buckfire (*see* Orr Dep. 486:20-487:5), Mr. Buckfire admitted that he never actually conducted a formal, numerical "dismissal analysis," nor did Ernst & Young or Conway MacKenzie. (Buckfire Dep., Vol. 2 179:2-9; 194:24-195:5; 236:8-15; 243:15-18; 276:19-22; 280:11-16 (repeatedly confirming that he has not done a dismissal analysis, nor did he consider what assets could be monetized if the Chapter 9 Case is dismissed); Malhotra Dep. 116:4-6; 144:9-12; 113:11-25; 328:8-24; 329:14-18 (confirming that he did not model a dismissal scenario, the Base Case scenario does not reflect what would happen if the Chapter 9 Case is dismissed and he did not run an alternative Base Case scenario assuming deferral of legacy expenditures or sale of assets);[59] Moore Dep. 91:17-21 (confirming that he did not perform a dismissal analysis). Certainly, no such analysis by the City or any of its representatives has been filed, produced or otherwise provided. And, although the City identified John Hill, the City's CFO, as its 30(b)(6) witness on the topic of the City's ability to pay judgments pursuant to the RJA, Mr. Hill stated that he has never heard of the RJA. (Hill Dep. 173: 17-19.)

Instead, the City apparently intends to offer and rely on Mr. Buckfire's qualitative opinion about what would happen if the petition were dismissed. However, Mr. Buckfire relies on a number of faulty assumptions that undermine his opinion. First, "the most important factor" influencing his opinion is that, if the case is dismissed, the City will not be able to continue reinvestment programs. (Buckfire Dep., Vol. 2 175:5-19.) Yet as explained above, even in a dismissal scenario, the City would have a sufficient surplus (approximately $211 million per year, on average) to fund a material portion of the reinvestment initiatives, assuming the City

---

[59] Notably, the City identified Mr. Malhotra from Ernst & Young as the 30(b)(6) witness on the topic of "The ability of the City to pay its unsecured and/or outstanding obligations in the ordinary course if the City's bankruptcy case were dismissed." (*City of Detroit's Amended Identification of Witnesses in Response to Syncora's Notice of Deposition Filed Pursuant to Fed. R. Civ. P. 30(b)(6)* (EX4180) 11.) Yet, it is clear that Mr. Malhotra did not conduct an analysis of what would happen if the Chapter 9 Case were dismissed.

continued its prepetition strategy of deferring legacy liability payments. (Spencer Report at 80-81.) And, Mr. Moore confirmed that the City's reinvestment initiatives would go forward even if the Chapter 9 Case is dismissed. (Moore Dep. 91:23-92:19; 185:14-17; 215:8-18; 224:8-17.) In fact, the City has already made substantial progress, such that, in certain areas like public safety, the City may be "on a path to service delivery solvency." (Buckfire Dep., Vol. 2 287:4-16; *see also* Moore Dep. 182:22 – 183:7 (the Fire Department is now capable of firefighting and EMS duties, solving one of the most difficult issues facing the fire department as of 18 months ago); *id.* 188:7-17 (the outsourcing of trash collection has been implemented); *id.* 200:7-22 (initiatives to improve the parking divisions were implemented as of June 2014).) If the Chapter 9 Case is dismissed, the City would certainly continue to benefit from these and all other reforms already in place. (*See* Spencer Report at 82, 88-89 (EX3035).)

In addition, Mr. Buckfire erroneously assumes that, outside of chapter 9, holders of COP Claims would not receive any value because, according to him, COP Claims are of a lower priority than other unsecured creditors, including pension and OPEB claimants, because they are "relying on the indirect credit of the City." (Buckfire Dep., Vol. 2 177:5-18.) This reflects a lack of understanding of the structure of the COPs Transactions and the rights afforded to holders of COP Claims thereunder.[60] As explained in the Factual Background and Section I.A.3.a above, holders of COP Claims have direct, unsecured contract claims against the City, and the same rights, remedies and protections as all holders of unsecured contract claims (including pensioners). In light of these flaws, Mr. Buckfire's analysis does not come close to meeting the City's burden of establishing that the Plan is in the best interests of creditors.

---

[60] The Retiree Committee similarly erroneously asserts that the COP Claims are not direct claims against the City. (Retiree Committee Brief at 30-31.)

WEIL:\44941024\4\45259.0007

95

## IV.    THE PLAN IS NOT FEASIBLE

Section 943(b)(7) requires that a chapter 9 plan be feasible.  11 U.S.C.

§ 943(b)(7).  Courts construe this requirement as imposing a "ceiling which prevents the Chapter

9 debtor from promising more than it can deliver." *Pierce Cnty. Housing Auth.*, 414 B.R. at 718

(*citing Mount Carbon*, 242 B.R. at 34).  In determining feasibility, courts must "evaluate whether

it is probable that the debtor can both pay pre-petition debt and provide future public services at

the level necessary to its viability as a municipality." *Mount Carbon*, 242 B.R. at 34-35.

Further, "a [chapter 9] plan should offer a reasonable prospect of success and be workable." *Id.*

at 35.  Where, as here, "performance of a Chapter 9 plan is based upon deferred payments,

projections of future income and expenses must be based upon reasonable assumptions." *Id.*

The City has failed to establish the feasibility of the Plan for two reasons:  (i) the City has failed

to demonstrate that it can make the payments promised under the Plan in the event the COP

Litigation is successful and the Retirement Systems are forced to disgorge the COPs

Transactions proceeds (as explained in the Factual Background above) and (ii) the Plan fails to

establish a post-Effective Date governance structure that ensures the Plan will be implemented.

### A.    If the Retirement Systems Must Disgorge the Proceeds of the COPs Transactions, the City Cannot Make the Payments Promised Under the Plan

Based on the assumptions in the Forty-Year Projections, if the City is successful

in the COP Litigation, and FGIC proceeds with the Third Party Complaint (or any similar action)

and the Retirement Systems are ordered to disgorge the $1.4 billion of COPs Transactions

proceeds, assuming the disgorgement occurs on December 31, 2015, as of June 30, 2023 (the

date on which, pursuant to the Plan, the City will become responsible for making annual

contributions to the Retirement Systems again), FGIC's expert has calculated that the UAALs of

the GRS and the PFRS would increase to $1.9 billion and $1.7 billion (from $695 million and

WEIL:\44941\02\44145259.0007

$681 million), respectively, using a 6.75% discount rate and a 6.75% assumed investment rate of return.  (Spencer Report at 102 (EX3035).)  Under this scenario, the City would have a $62 million deficit in 2028, increasing to $166 million in 2029, and would run out of cash in 2029. (*Id.* at 102-04.)  As counsel for the Retirement Systems recognized, this possibility cannot be ignored.  (Hr'g Tr. 206:6-23, May 28, 2014 (Mr. Gordon, noting that "if intervention was granted, [FGIC] would also seek to institute an adversary to seek disgorgement of $1.4 billion or something in that range from the Retirement Systems . . . I don't know how the Court can consider whether the plan is feasible if this issue hasn't been resolved.")).  With this contingency pending, the Court simply cannot find the Plan feasible.  *See In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 690 (Bankr. D. Colo. 1995) (concluding a municipal debtor failed to demonstrate feasibility of future payments under a chapter 9 plan where debtor did not "assess the possibility and effect of any foreseeable decrease in the assessed value of the property in the District upon the District's ability to perform under the Amended Plan").  The City offers no contrary evidence.  (Malhotra Dep. 325:2-10 (Ernst & Young was never requested to run a projection assuming the Retirement Systems disgorged the COPs Transactions proceeds).)

> B.  **The Plan Fails to Establish a Post-Effective Date Governance Structure that Ensures the Plan will be Implemented**

The City has not provided sufficient assurance that whoever is running the City after the Effective Date (*i.e.* an emergency manager or the City Council and the Mayor) will be required to implement the Plan or adhere to the assumptions on which it is based.  Although the Plan provides for the establishment of the Financial Review Commission, this is insufficient to guaranty that future governing bodies will implement the Plan and will not, for example, decide to triple the budget for the reinvestment initiatives described in Section IX and Exhibit I of the

WEIL:\44941024\4\45259.0007

Disclosure Statement.  (Plan § IV.W.; *see* Malhotra Dep. 83:11-22 (agreeing that determining what policy choices Detroit's future leaders will make in the next ten years would require speculation); Moore Dep. 226:2-5, 19-22 (with respect to certain cost-savings measures there are "perceived difficulties in implementing those in a normal political environment," (*i.e.* when the City is being run by a mayor instead of emergency manager) including "lack of desire to undertake" such measures and union involvement); Bing Dep. 178:3-10 ("when everything is said and done, there's still going to be a lot of room for change and improvements, so [Orr] may come with his Plan of Adjustment . . . I'll guarantee you that . . .under . . . the new administration we'll still see a lot of change take place."); Duggan Dep. 52:3-5 ("Nobody thinks these restructuring initiatives are exactly the right way to run things, no matter the circumstances.").)  Neither the Financial Review Commission Act nor the Plan provides a mechanism to ensure enforcement of the Plan in the event that the City fails to comply with the terms and conditions of the Plan, notwithstanding the oversight of the Financial Review Commission.  For example, neither the legislation nor the Plan provides an oversight role for the Court, including regular reporting requirements, to ensure that the Plan is being implemented.  Further, the Court has recognized that "it will be very hard to find feasibility unless the mayor and, in his judgment, the city council fully supports the plan and the city's commitments under the plan and the city's means of implementing the plan."  (Hr'g Tr. 183:9-13 (Apr. 17, 2014).)  The uncertainty surrounding the City's post-Effective Date governance is particularly troubling for creditors who will receive delayed recoveries under the Plan pursuant to the New B Notes, which pay only interest for the first 10 years.  (Plan Ex. I.A.232.)  Accordingly, the City has not met its burden of proving that the Plan is feasible as required by section 943(b)(7).

WEIL:\44494102\4\45259.0007

## V.     THE PLAN'S EXCULPATION AND INJUNCTION PROVISIONS ARE IMPERMISSIBLY BROAD

The exculpation and injunction provisions are overly broad, as they impermissibly shield from liability multiple parties, including the Retirement Systems and the LTGO Exculpated Parties, who have not served in the capacity of fiduciaries in the Chapter 9 Case.  *See e.g. In re Washington Mutual, Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding:  estate professionals, the Committees and their members, and the Debtor's directors and officers.").  As explained in Section IV.A above, in the event the City is successful in the COP Litigation in invalidating the COPs, FGIC submits that the Retirement Systems should be required to disgorge the $1.4 billion of COPs Transactions proceeds.  To the extent the Plan purports to (i) prohibit FGIC from pursuing any such remedies against the Retirement Systems or (ii) exculpate the Retirement Systems from liability in connection with any action seeking disgorgement of the COPs Transactions proceeds, the Plan cannot be confirmed.  The Sixth Circuit has held that "enjoining a non-consenting creditor's claims against a non-debtor is a dramatic measure to be used cautiously . . . [and] is only appropriate in 'unusual circumstances.'"  *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002).[61]  The City has failed to demonstrate that any such unusual circumstances exist here because (i) the Retirement Systems have not contributed

---

[61] The Retirement Systems argue that the exculpation provision is not a third-party release governed by the *Dow Corning* standard because it does not apply to conduct unrelated to the Chapter 9 Case. (*Supplemental Brief of the Detroit Retirement Systems in Response to Certain Supplemental Objections to the Fifth Amended Plan*, dated August 15, 2014 [Docket No. 6762] at 3.)  However, the exculpation provision, which applies to "any act or omission in connection with, relating to or arising out of the City's restructuring efforts," is so broad that there is a risk it would shield the Retirement Systems from liability in connection with a disgorgement action because such action would relate to and arise out of the COP Litigation, arguably part of the City's restructuring efforts.  Thus, the *Dow Corning* standard applies and precludes confirmation of the exculpation provision.

WEIL:\44941024\4\45259.0007

substantial assets to the reorganization, (ii) Class 9 has not overwhelmingly voted to accept the Plan, (iii) the Plan does not provide a mechanism to pay for all, or substantially all (or even a material portion) of COP Claims in Class 9 and (iv) the Plan does not provide any opportunity for Class 9 to recover in full. (*Id.* (indicating that "unusual circumstances" may exist when these factors, among others, are present).)[62] Accordingly, the exculpation and injunction provisions are inappropriate and cannot be confirmed.[63]

## <u>CONCLUSION</u>

Based on the foregoing, the Plan cannot be confirmed. Among other things, the Plan (i) unfairly discriminates against Class 9 by providing Classes 7, 10 and 11, classes of the same priority, materially greater and less risky recoveries, (ii) is not in the best interests of creditors, is not fair and equitable to Class 9, and was not proposed in good faith because it fails to maximize the value of the DIA Assets, (iii) is not in the best interests of creditors because it does not provide Class 9 with a better alternative than dismissal of the Case, (iv) is not feasible because the City cannot make the payments promised under the Plan in the event the Retirement Systems disgorge the COPs Transactions proceeds, and (v) is not feasible because the post-Effective Date governance structure does not ensure the Plan will be implemented. Accordingly, FGIC requests that the Court deny confirmation of the Plan and grant such other and further relief as the Court may deem just and proper.

---

[62] For the same reasons, unusual circumstances do not exist that warrant enjoining FGIC from pursuing any claims it may have against the LTGO Exculpated Parties in connection with the LGTO Settlement, or exculpating the LTGO Exculpated Parties in connection with any such claims.

[63] FGIC also objects to the City's request for a waiver of the 14-day automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). (*See* Plan § VIII.J (providing that "[t]he Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e)").) The City has not provided any justification for such relief and it should not be granted.

WEIL:\44941024\4\45259.0007

Dated: August 27, 2014

Respectfully submitted,

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com

 – and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL  33131
Telephone: (305) 577-3177
Facsimile:  (305) 374-7159
Email:  edward.soto@weil.com

 – and –

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone:  (248) 642-0333
Facsimile:  (248) 642-0856
Email:  ejessad@wwrplaw.com
Email:  mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance
Company*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------------x
:
In re                                          :        **Chapter 9**
:
**CITY OF DETROIT, MICHIGAN,**                  :        **Case No. 13-53846**
:
Debtor.                       :        **Hon. Steven W. Rhodes**
:
:
-------------------------------------------------------------x

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2014 *Financial Guaranty Insurance*

*Company's Pretrial Brief in Support of Objection to Plan for the Adjustment of Debts of the City*

*of Detroit* was filed and served via the Court's electronic case filing and noticing system to all

parties registered to receive electronic notices in this matter.

Dated:  August 27, 2014

                            */s/ Alfredo R. Pérez*
                            Alfredo R. Pérez
                            Attorney for Financial Guaranty
                            Insurance Company
                            WEIL, GOTSHAL & MANGES LLP
                            700 Louisiana Street, Suite 1700
                            Houston, TX  77002
                            Telephone: (713) 546-5000
                            Email:  alfredo.perez@weil.com

WEIL:\44941024\4\45259.0007