# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
--------------------------------------------------------------x
                                          :
  In re                                   : Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                 : Case No. 13-53846
                                          :
                          Debtor.         : Hon. Steven W. Rhodes
                                          :
                                          :
--------------------------------------------------------------x
```

## JOINT PRETRIAL BRIEF IN SUPPORT OF OBJECTION TO DIA SETTLEMENT

WEIL:\45423531\6\45259.0007

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND...................................................................................5

THE COURT MUST REJECT THE DIA SETTLEMENT ..........................................73

I.    THE VALUE RECEIVED FROM THE SETTLEMENT IS FAR
BELOW THE LOWEST POINT IN THE RANGE OF REASONABLENESS .............74

    A.    The City Inflates the Value of the DIA Settlement.................................76

    B.    The Value of the DIA Settlement Falls
Below the Lowest Point in the Range of Reasonableness.....................77

II.    THE CITY HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS IN
ANY LITIGATION REGARDING TITLE TO THE DIA COLLECTION ....................78

    A.    The City Owns the DIA Collection and There Are No Contractual
or Statutory Impediments to Its Ability to Sell the DIA Collection .....................79

        1.    The Collections Management Policy Does Not
Restrict the City's Ability to Monetize the DIA Collection .....................82

        2.    The 1919 Act Restrictions Were Repealed.................................83

        3.    The Emergency Manager Law Supersedes the 1919 Act
Restrictions ...............................................................................84

    B.    The City Has a Substantial Likelihood of Success in Any Litigation
Regarding Whether the DIA Collection, as a Whole, Is Held in Trust ................84

        1.    The DIA Collection is Not Held in Charitable Trust................................85

            a.    The DMA Could Not Have Been Founded as a Charitable
Trust ...............................................................................88

            b.    A Charitable Trust Was Not "Confirmed or
Continued" When the DMA Transferred Its Assets to the
City...............................................................................91

            c.    The City Did Not "Step In" as a
Trustee or Co-Trustee of the DIA Collection ...............................96

            d.    The Delegation of Authority Pursuant to the
Operating Agreement and the Collections Management
Policy Does Not Confirm or Continue a Charitable Trust...........100

            e.    The City Would Not Automatically Hold
Artwork Acquired After the 1919 Transfer in Trust...................105

            f.    Other Evidence of Confirmation
of a Trust Is Similarly Unpersuasive ..........................................108

WEIL:\45423531\6\45259.0007

g.      Substantial Evidence From and After the 1919 Transfer Confirms the City Does NOT Hold the DIA Collection in Trust ........................................................................................112

2.      The Public Trust Doctrine Does Not Apply to the DIA Collection ........115

3.      The Doctrine of Dedication Does Not Apply to the DIA Collection ......119

C.      The City Has a Substantial Likelihood of Success in Any Litigation Regarding Equitable Arguments that It Is Estopped from Challenging the Existence of a Trust ...................................122

1.      The Doctrine of Election Is Not Operative Against the City .................122

2.      The Doctrine of Equitable Estoppel Also Would Not Apply .................124

D.      The City Has a Substantial Likelihood of Success in Any Litigation Involving Equitable Arguments that the DIA Collection Is Encumbered ..........129

1.      The DIA Collection Is Not Held Subject to an Implied Trust ................129

2.      The Doctrine of Promissory Estoppel Would Not Prevent the City from Monetizing the DIA Collection .........132

E.      The City Has a Substantial Likelihood of Success in Any Litigation Regarding Whether Donor Restrictions Encumber Specific Pieces of Artwork .................................137

1.      City of Detroit Purchases Are Unrestricted ............................................138

2.      Donated Artwork Is, With Rare Exception, Unrestricted .......................139

a.      Policies Against Accepting Restricted Donations ......................139

b.      Restrictions Were Satisfied Prior to or Upon Accession to the DIA Collection ...................................144

III.    RESOLVING THE CITY'S TITLE TO THE DIA COLLECTION COULD BE ACCOMPLISHED QUICKLY AND WITHOUT GREAT EXPENSE .................................................................................................152

A.      Resolving Arguments that the Entire Collection Is Held in Trust .......................154

B.      Resolving Estoppel Arguments..........................................................................156

C.      Resolving Equitable Arguments .........................................................................156

D.      Resolving Claims With Respect to Individual Pieces of Art ..............................157

IV.     DEFERENCE TO THE PARAMOUNT INTEREST OF CREDITORS AND THEIR REASONABLE VIEWS ALSO DEMANDS REJECTION OF THE SETTLEMENT .........................................161

CONCLUSION.....................................................................................................................174

WEIL:\45423536\6\45259.0007

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*2000 Baum Family Trust v. Babel,*
 793 N.W.2d 633 (Mich. 2010)...................................................................117, 119, 120, 121

*In re Americana Found.,*
 378 N.W. 2d 586 (Mich. Ct. App. 1985) ..........................................................84, 86

*In re Assignment for Ben. of Creditors of Unison Corp.,*
 No. 217385, 2001 WL 727036 (Mich. Ct. App. Feb. 23, 2001)...........................130

*Barber v. SMH (US), Inc.,*
 509 N.W.2d 791 (Mich. Ct. App. 1993) ...........................................................134

*Bard v. Sicherman (In re Bard),*
 49 Fed. App'x 528 (6th Cir. 2002) ..............................................................74, 153

*Beaverton Power Co. v. Wolverine Power Co.,*
 222 N.W. 703 (Mich. Ct. App. 1929) ...............................................................125

*In re Beglinger Trust,*
 561 N.W.2d 130 (Mich. Ct. App. 1997) ...........................................................123

*In re Bem,*
 637 N.W.2d 506 (Mich. Ct. App. 2001) ...........................................................149

*In re Benton,*
 237 B.R. 353 (Bankr. E.D. Mich. 1999) ...........................................................128

*Bott v. Comm'n of Natural Res. of State of Mich. Dep't of Natural Res.,*
 327 N.W.2d 838 (Mich. 1982).................................................................116, 118

*In re Bruce D. Cameron Trust,*
 No. 257306, 2005 WL 3190621 (Mich. Ct. App. Nov. 29, 2005)......................107

*In re Cardinal Indus., Inc.,*
 146 B.R. 720 (Bankr. S.D. Ohio 1992).............................................................151

*In re Certified Question,*
 443 N.W.2d 112 (Mich. 1989)........................................................................135

*Chamberlain v. Eddy,*
 118 N.W. 499 (Mich. 1908)............................................................................140

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Chattanooga Mem'l. Park v. Still (In re Jolly)*,
574 F.2d 349 (6th Cir.) *cert. denied*, 439 U.S. 929 (1978) ................................... 150

*Chicago Bank of Commerce v. McPherson*,
62 F.2d 393 (6th Cir. 1932) ................................................................ 88

*City of Cincinnati v. White's Lessee*,
31 U.S. 431 (1832) .......................................................................... 120

*In re City of Detroit, Michigan*,
Bench Op. Jan. 16, 2014 .................................................................... 73

*Cleveland v. Second Nat. Bank & Trust Co.*,
92 N.W.2d 449 (Mich. 1958) ............................................................ 89

*Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*,
357 N.W.2d 861 (Mich. Ct. App. 1984), *aff'd,* 393 N.W.2d 161 (Mich. 1986) ................... 126

*Cramer v. Metro. Sav. & Loan Ass'n.*,
258 N.W.2d 20 (Mich. 1977) .............................................................. 151

*Detroit Hilton Ltd. P'ship v. Dep't of Treasury, Revenue Div.*,
373 N.W.2d 586 (Mich. 1985) ............................................................ 126

*Detroit Museum of Art v. Engel*,
153 N.W 700 (Mich. 1915) ............................................................... 22, 23

*In re Dow Corning Corp.*,
192 B.R. 415 (Bankr. E.D. Mich. 1996) ................................................ 73, 74

*In re Dow Corning Corp.*,
192 B.R. 428 (Bankr. E.D. Mich. 1996) ................................................ 130

*In re Dow Corning Corp.*,
198 B.R. 214 (Bankr. E.D. Mich. 1996) ................................................ 79, 162

*Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*,
544 F. Supp. 2d 592 (E.D. Mich. 2008) ................................................ 151

*Edidin v. Detroit Econ. Growth Corp.*,
352 N.W.2d 288 (Mich. Ct. App. 1984) ................................................ 134

*Faulds v. Dillon*,
204 N.W. 733 (Mich. 1925) ............................................................... 85, 86

WEIL:\45423536\6\45259.0007

*In re Federated Dep't Stores, Inc.*,
No. 1-90-00130, 1992 WL 605483 (Bankr. S.D. Ohio Jan. 10, 1992)................................155

*Fisher v. Hampton Transp. Co.*,
98 N.W. 1012 (Mich. 1904).........................................................................................105

*In re Fodale*,
No. 10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013)....................................75

*In re Frahm Trust*,
548 N.W.2d 635 (Mich. 1996)........................................................................................97

*Frank W. Lynch & Co. v. Flex Tech., Inc.*,
624 N.W.2d 180 (Mich. 2001).......................................................................................89

*Fredenburg v. Lyon Lake M.E. Church*,
1877 WL 7302 (Mich. Oct. 25, 1877) ............................................................................126

*Giordano v. Markovitz*,
531 N.W.2d 815 (Mich. Ct. App. 1995) ..................................................................133, 134

*Glass v. Goeckel*,
703 N.W.2d 58 (Mich. 2005)...........................................................................115, 116, 117

*Gunn v. Delhi Twp., Ingham Cnty.*,
154 N.W.2d 598 (Mich. Ct. App. 1967) .........................................................................119

*In re Hancock-Nelson Mercantile Co., Inc.*,
95 B.R. 982 (Bankr. D. Minn. 1989) ..............................................................................156

*Harmon v. Harmon*,
6 N.W.2d 762 (Mich. 1942)............................................................................................97

*Hill v. Sears, Roebuck & Co.*,
822 N.W.2d 190 (Mich. 2012)........................................................................................117

*Holzbaugh v. Detroit Bank & Trust Co.*,
124 N.W.2d 267 (Mich. 1963)........................................................................................122

*Hopkins v. Crossley*,
96 N.W. 499 (Mich. 1903)..........................................................................................88, 89

*Hoye v. Westfield Ins. Co.*,
487 N.W.2d 838 (Mich. Ct. App. 1992) ....................................................................124, 125

WEIL:\45423536\6\45259.0007

*Illinois Cent. R. Co. v. State of Illinois*,
146 U.S. 387 (1892) ................................................................................ 115

*In re Kay*,
223 B.R. 816 (Bankr. M.D. Fla. 1998) ................................................... 154

*Keller v. McConville*,
141 N.W. 652 (Mich. 1913) .............................................................. 144, 145

*In re Kingsbury Estate (Ledyard's Appeal)*,
17 N.W. 208 (Mich. 1883) ................................................................. 88, 97

*In re Lavigne*,
114 F.3d 379 (2d Cir. 1997) ................................................................... 151

*Long v. Earle*,
269 N.W. 577 (Mich. 1936) .................................................................... 107

*Marrero v. McDonnell Douglas Capital Corp.*,
505 N.W.2d 275 (Mich. Ct. App. 1993) ............................. 124, 127, 133, 137

*In re MCI Telecomm. Compl.*,
596 N.W.2d 164 (Mich. 1999) .................................................................. 83

*In re McInerney*,
499 B.R. 574 (Bankr. E.D. Mich. 2013) ............................................. 73, 74

*In re Mich. Boiler & Eng'g Co.*,
171 B.R. 565 (Bankr. E.D. Mich. 1993) ................................................. 107

*Michigan Baptist Homes & Dev. Co. v. City of Ann Arbor*,
242 N.W.2d 749 (Mich. 1976) .................................................................. 97

*In re Miller*,
282 F.3d 874 (6th Cir. 2002) .................................................................. 151

*Miller v. Dep't of Mental Health*,
442 N.W.2d 617 (Mich. 1989) .................................................................. 97

*In re MQVP, Inc.*,
477 Fed. App'x 310 (6th Cir. 2012) ................................................... 79, 161

*Nash v. Duncan Park Comm'n*,
Nos. 309403, 314017, 2014 WL 1097444 (Mich. Ct. App. Mar. 20, 2014) ............... 85

WEIL:\45423534\6\45259.0007

*In re Omegas Group,*
    16 F.3d 1443 (6th Cir. 1994) ........................................................................130

*In re Page*,
    239 B.R. 755 (Bankr. W.D. Mich. 1999)........................................................128

*In re Parkview Hosp.*,
    211 B.R. 619 (Bankr. N.D. Ohio 1997)..........................................................130

*Payne v. Payne,*
    217 N.W. 756 (Mich. 1928)............................................................................126

*In re Planned Protective Servs., Inc.*,
    130 B.R. 94 (Bankr. C.D. Cal. 1991).......................................................155, 156

*Potter v. Lindsay,*
    60 N.W.2d 133 (Mich. 1953).....................................................................97, 130

*Presser v. Fed. Nat. Mortg. Ass'n,*
    No. 11-CV-11239, 2012 WL 3020092 (E.D. Mich. July 24, 2012) ...................124

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)..................................................................75, 78,79, 153, 161

*Matter of Pubs Inc. v. Bank of Illinois in Champaign,*
    618 F.2d 432 (7th Cir. 1980) ..........................................................................126

*In re Rood's Estate*,
    200 N.W.2d 728 (Mich. Ct. App. 1972) .......................................................86, 87

*Rood v. Gen. Dynamics Corp.*,
    507 N.W.2d 591 (Mich. 1993).........................................................................135

*Ruegsegger v. Bangor Twp. Relief Drain*,
    338 N.W.2d 410 (Mich. Ct. App. 1983) ..........................................................151

*S.E.C. v. City of Miami, Fla.*,
    988 F. Supp. 2d 1343 (S.D. Fla. 2013) ..............................................................71

*In re: Salander-O'Reilly Galleries, LLC*,
    No. 07-30005 (Bankr. S.D.N.Y. Nov. 1, 2007) ........................................158, 159

*Scarney v. Clarke*,
    275 N.W. 765 (Mich. 1937).............................................................86, 90, 97, 108

WEIL:\45423536\6\45259.0007

# TABLE OF AUTHORITIES
## (continued)

*Scott v. Roethlesberger*,
  146 N.W. 307 (Mich. 1914)..............................................................150

*State Bank of Standish v. Curry*,
  500 N.W.2d 104 (Mich. 1993)......................................................133, 134, 137

*Steevens v. Earles*,
  1872 WL 3217 (Mich. Apr. 23, 1872) .......................................144, 148

*Stephenson v. Golden*,
  276 N.W. 849 (Mich. 1937)............................................................130

*In re Stockton*,
  475 B.R. 720 (Bankr. E.D. Cal. 2012) ...........................................164

*Matter of Stuart*,
  183 Misc. 20 (Surr. Ct. N.Y. Cnty Feb. 1, 1944) ..........................150

*Tabor v. Elec. Data Sys., Inc.*,
  No. 03-70243, 2005 WL 1030418 (E.D. Mich. Apr. 27, 2005) .............135

*Toussaint v. Blue Cross & Blue Shield of Mich.*,
  292 N.W.2d 880 (Mich. 1980)........................................................135

*In re Tribune Co.*,
  No. 08-13141, 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ............163

*Triphagen v. Labbe*,
  52 N.W.2d 226 (1952) ....................................................................126

*Trs. of the First Soc'y of the Methodist Episcopal Church of Newark v. Clark*,
  3 N.W. 207 (Mich. 1879).............................................................88, 89

*Van v. Zahorik*,
  597 N.W.2d 15 (Mich. 1999) ......................................................124, 127

*Vill. of Grandville v. Jenison*,
  47 N.W. 600 (Mich. 1890).......................................................119, 120, 121

*In re Wash. Mut., Inc.*,
  442 B.R. 313 (Bankr. D. Del 2011) ................................................153

*West v. White's Estate*,
  22 N.W. 217 (Mich. 1885)................................................................85

*Westinghouse Elec. Corp. v. Republic of Philippines,*
    951 F.2d 1414 (3d Cir. 1991) .............................................................................163

*Williams v. GMAC Mortg., Inc.,*
    No. 13 Civ. 4315, 2014 WL 2560605 (S.D.N.Y. June 6, 2014) ..........................131

*Willis v. New World Van Lines, Inc.,*
    123 F. Supp. 2d 380 (E.D. Mich. 2000) .....................................................133, 134

*Woodland Harvesting, Inc. v. Ga. Pac. Corp.,*
    No. 09-10736, 2011 WL 4596041 (E.D. Mich. Oct. 4, 2011) .............................133

**Statutes**

11 U.S.C. § 101(5)(B) ...............................................................................................134

11 U.S.C. § 365(g)(1) ...............................................................................................151

11 U.S.C. § 1109(b) ..................................................................................................128

M.C.L. § 8.4 ...............................................................................................................83

M.C.L. § 14.254(d) ...................................................................................................112

M.C.L. § 123.871 ......................................................................................................138

M.C.L. § 123.1201 ......................................................................................................34

M.C.L. § 141.1541 ......................................................................................................81

M.C.L. § 141.1543(b) .................................................................................................84

M.C.L. § 451.924 ......................................................................................................146

M.C.L. § 555.7 ..........................................................................................................131

M.C.L. § 560.253 ......................................................................................................120

M.C.L. § 700.1101 ......................................................................................................85

M.C.L. § 11589 ...........................................................................................................97

**Other Authorities**

90 C.J.S. Trusts § 166 ...............................................................................................132

WEIL:\44542353\6\45259.0007

3 Collier On Bankruptcy (15th ed. Rev. 2008).............................................................................152

Fed. R. Bankr. P. 9019.........................................................................................18, 73, 163, 164

5A Mich. Civ. Jur. Contracts § 59 .........................................................................................132

11 Mich. Civ. Jur. Gifts § 65 ........................................................................................144, 147

24 Mich. Civ. Jur. Trusts § 37 ...............................................................................................130

John Payne, *Michigan Probate: A Practice Systems Library Manual* § 14:1 (2013).................107

*Warren Gorham & Lamont Nonprofit GAAP Practice Manual*, 2002 WL 31053783 (2014)....146

Alexandra B. Klass, *Modern Public Trust Principles: Recognizing Rights and Integrating Standards*, 82 Notre Dame L. Rev. 699 (2006) ................................................................116

Restatement (First) of Trusts § 106 ..........................................................................................97

Restatement (First) of Trusts § 349 .....................................................................................86, 87

Restatement (Third) of Trusts § 7..........................................................................130, 131, 132

Restatement (Third) of Trusts § 8 ...........................................................................................131

Restatement (Third) of Trusts § 41 ........................................................................................106

WEIL:\44542353\6\45259.0007

The Objectors[1] respectfully submit this pretrial brief (the "**Brief**") in support of their objections to approval of the DIA Settlement set forth in the *Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 20, 2014)* [Docket No. 6908] (as the same may be amended or supplemented, the "**Plan**").[2]

## PRELIMINARY STATEMENT

> *The Court stated earlier and states again that it will not participate in or permit the city to perpetuate . . . hasty and imprudent financial decision-making . . . .  Those practices have already caused great harm to the city's creditors and to its citizens.  In the Court's view, one goal of this Chapter 9 case is to end these practices so that the city can truly recover from its past mistakes and move forward, and the Court intends to conduct itself accordingly.*
>
> — Hr'g Tr. 20:16–25, Jan. 16, 2014.

Notwithstanding this Court's clear admonition, the City[3] seeks to enter into – and have this Court "bless" – yet another hasty, imprudent decision:  the DIA Settlement.  The City agreed to this settlement without understanding the potential litigation risk the settlement purports to resolve, without understanding the value of the assets the City will be giving up in exchange, and without understanding whether and what potential alternatives could be pursued

---

[1] This Brief is filed jointly by Financial Guaranty Insurance Company ("**FGIC**"); Syncora Guarantee Inc. and Syncora Capital Assurance Inc. ("**Syncora**"); Wilmington Trust, National Association, as Successor Contract Administrator; Deutsche Bank AG, London; Dexia Crédit Local and Dexia Holdings, Inc., Panning Capital Management, LP, on behalf of funds and accounts managed by it; Monarch Alternative Capital LP, on behalf of funds and accounts managed by it; Bronze Gable, LL.C.; Aurelius Capital Management, LP, on behalf of its managed entities; Stone Lion Capital Partners L.P., on behalf of funds and accounts managed by it; and BlueMountain Capital Management, LLC on behalf of funds and accounts managed by it.

[2] The Objectors reserve the right to rely at the Confirmation Hearing on any and all evidence relevant to confirmation of the Plan, including, but not limited to, any testimony or documents not cited or referenced herein.  Contemporaneously herewith, the Objectors have filed other briefs addressing other objections to the Plan.

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

WEIL:\45542353\6\45259.0007

with respect to these assets.  The City blindly signed up to this deal, and now the City expects

this Court to blindly approve it.  The DIA Assets, which are at the heart of the DIA Settlement,

are too valuable to take this decision lightly; there is just too much at stake.

From its inception the Detroit Institute of Arts (DIA) was understood as

something unique – an art museum owned entirely by a city.  Today, the DIA is a veritable

treasure, *appraised at over $8 billion*.  Self-described as containing one of the top six collections

in the United States, the DIA is an extraordinary museum.  The DIA Collection is comprised of

approximately 60,000 works of art from a range of cultures and nations, including pieces from

early ancient history to the present.  The collection's scope and breadth are astounding, and the

refined curatorial selection is unparalleled for a museum of its size.

Like the City, the DIA has a long and peppered history, dating back to the early

1900s, with high points and low.  At various times the City and DIA have struggled to find

sufficient funds to support the museum's operations – even temporarily closing the museum for a

period of time.  And now, once again, the City is facing a critical decision point that will impact

the DIA's future.

As a chapter 9 debtor, the City has confronted many challenging decisions this

past year.  How to restructure over $18 billion in obligations?  How to adjust the City's

significant outstanding pension liabilities?  How to repair a City with deteriorating conditions

that impact the safety, health and welfare of its citizens in a cost-effective and efficient manner?

How to turn around a longstanding trend of decreasing revenues and budget deficits so that the

City can rebuild itself from a solid foundation into the great American municipality it once was?

At the outset of this case, the City and its advisors seemed prepared to face these

questions with confidence and courage, not to be persuaded by political or other pressures, and

WEIL:\44542353\6\45259.0007

open to considering all alternatives. This included the possibility of monetizing the DIA Assets to help repay the City's creditors. From his first proposal to creditors, the Emergency Manager gave every indication that the DIA Assets were "on the table," and all signs showed that the City's advisors were diligently pursuing a way to unlock this value. But as the case continued, and negotiations began within a closed-off mediation, the City – for reasons unknown – changed its approach.

The City emerged from the mediation committed to a deal pursuant to which it has agreed to transfer the DIA Assets to a permanent trust in exchange for a mere $455 million. To justify this steep discount, the City contends that there may be legal impediments to its ability to sell or encumber the DIA artwork if the proceeds of any such transaction are used to repay City obligations. The City frames the DIA Settlement as a resolution of the alleged litigation that would ensue if the City attempted to monetize its art collection, and rationalizes that this litigation would be more costly and time consuming than the art's worth.

The City arrived at these conclusions not through its own, independent legal analysis or factual diligence, but by relying on arguments raised by the State Attorney General and DIA Corp., the nonprofit entity contracted to operate the museum. It should come as no surprise that these players, who have devoted substantial funds and are intimately tied to the DIA, have every interest in preventing the City from disposing of any portion of the art collection, and thus fed the City numerous legal theories that would impede any sale or encumbrance of the artwork, including claims of charitable trust, implied trust, equitable remedies, and more. And DIA Corp., the custodian of the DIA's records, intimidated the City with descriptions of reams of cluttered historical records impossible to parse, and raised the specter of a vast, unfathomable mass of donors that, upon any attempt to sell artwork, would

WEIL:\44542353\6\45259.0007

unleash a flood of legal claims that would tie up the assets for years. The City apparently took these potential adversaries at their word and failed to conduct its own assessment of the strengths or weaknesses of their claims. Nor did the City take responsibility for understanding the value of the collection before it agreed to turn it over.

Creditors, rightly skeptical, sought information about the DIA and assurances from the City that it would keep its word and keep this important asset on the table. But at every stage creditors were rebuffed. Now, one year and one mediation later, the City's Plan – and the "Grand Bargain" that it is built on – assures creditors of only one thing. Eight billion dollars will be left in the DIA, untapped and purposefully placed beyond their reach. The art is off the table.

This settlement may be "grand" in its aim to save the artwork, but a settlement cannot be approved on grandness alone. It must be the product of a reasonable calculation of the merits of the claims to be settled, the value taken and the opportunity lost, and the risks and costs that may otherwise tip the balance. Crucially, the settlement must also be the product of good faith, arm's-length negotiations and must serve the paramount interests of the City's *creditors*. Held up to these standards, the Grand Bargain loses its grandeur.

Cognizant of the City's shifting position and apparent collaboration with its adversaries to put the collection beyond their reach forever, creditors set out to do what it appeared the City would not – and which the City, on many occasions, sought to prevent them from doing – to assess the merits of the potential claims being resolved by the DIA Settlement, both on the facts and the law, and the value to be gained and lost by the settlement. They engaged a world-renowned appraiser, reviewed over 90,000 pages of information from DIA Corp., and undertook a comprehensive analysis of the relevant law; all within a relatively short timeframe. The result of these efforts was astounding, though not entirely surprising: the DIA

WEIL:\44542353\6\45259.0007

Collection is worth exponentially more than the City is to receive pursuant to the Grand Bargain; the alleged claims to be settled are unfounded, inaccurate, and self-serving; the facts strongly favor the City and show it has clear title to the DIA Assets; there are different monetization options the City could pursue to extract value from these assets, some of which would permit the museum to remain intact; and there obviously is a market for this wonderful art collection.

What is even more troubling here is that neither the creditors nor the Court can properly evaluate the origins of the settlement because the entire substance of the negotiations is hidden from the view of the Court and creditors behind the veil of a mediation order. Understanding the quality of the negotiation of a settlement is critical to understanding whether the deal is reasonable. Without this information, it is not possible to conclude whether the discussions were in good faith and at arm's length; but the fact that the City failed to conduct an independent, diligent assessment of the relevant facts and law certainly raises doubts.

The Court should give deference to the reasonable views of creditors – views that, here, are far more reasonable because they *are* grounded on an independent and diligent assessment of the relevant facts and law. The City intends to give away billions of dollars for meritless claims, in a deal designed to take key assets out of creditors' reach. The settlement does not benefit creditors or the citizens of the City. For these reasons, the settlement should be rejected.

## FACTUAL BACKGROUND

Located on Woodward Avenue in the City of Detroit, the DIA is one of the largest and most significant art museums in the country. "The museum covers 658,000 square feet that includes more than 100 galleries, a 1,150-seat auditorium, a 380-seat lecture/recital hall, an art reference library, and a state-of-the-art conservation services laboratory." (*About the DIA*, DETROIT INSTITUTE OF ARTS, http://www.dia.org/about/history.aspx (EX3278).) Its collection

includes approximately 60,000 works of art, and is "one of the country's few encyclopedic art museums, representing the art of most major cultures from early ancient history to the present." (Report of Victor Wiener, July 25, 2014 (the "**Wiener Report**") (EX3036) at 20.)[4]  The collection includes masterpieces by artists such as Pieter Bruegel, Caravaggio, Pablo Picasso, Auguste Rodin, Mark Rothko, Jacob van Ruisdael, Vincent van Gogh, and Andy Warhol.  The DIA collection has been described as among the top six in the United States.  (*See, About the DIA*, DETROIT INSTITUTE OF ARTS, http://www.dia.org/about/history.aspx (EX3278) (describing the collection); Wiener Report (EX3036) at 20 (noting that the DIA is "one of the largest and most significant art museums in the country").)

       Both the museum building and the art collection are owned by the City.  (*See* BULLETIN OF THE DETROIT INSTITUTE OF ARTS OF THE CITY OF DETROIT (hereinafter, the "**DIA BULLETIN**"), Oct. 1919 (EX3056) at 2 (noting that Detroit is one of the first "cities in which the ownership and management of the Museum of Art is actually vested in the city"); *Report of the Arts Commission*, DIA BULLETIN, Jan. 1942 (EX3057) at 34 ("Very few American art museums are city owned and no other is organized just as ours is.").)[5]

       From the very beginning of the Emergency Manager's appointment, he and his team took notice of the City's art collection.  Early on in the process, the City's investment banking advisors, Miller Buckfire, learned that the DIA was not a separate institution but, in fact, both the building and collection are owned by the City.  (Buckfire Dep., Vol. 2 112:15–113:2,

---

[4] The "**Wiener Report**" is an expert report prepared by Victor Wiener, of Victor Wiener Associates, LLC, an expert retained by FGIC's attorneys.

[5] The BULLETIN OF DETROIT INSTITUTE OF ARTS OF THE CITY OF DETROIT (the "**DIA BULLETIN**") was "a monthly periodical devoted to the museum's collection."  (Chronology (EX3279) at DIAINSP087949.)

WEIL:\44542353\6\45259.0007

July 15–16, 2014 (Pérez Decl.[6] Ex. A).)  Miller Buckfire concluded that, if the City ultimately

determined it needed to seek protection under chapter 9, the artwork would have to be "valued as

a potential noncore asset and dealt with appropriately." (*Id.*)  Other City representatives agreed.

(*See* Orr Dep. 414:23-415:5, July 21–22, 2014 (Pérez Decl. Ex. A); Email from B. Nowling to K.

Orr, May 28, 2013 (EX3038) (noting that City advisors had a duty to save the City, not the art,

and that the City may have to sell its art to address its fiscal emergency).)

In April and May of 2013, attorneys and advisors for the City met with

representatives of DIA Corp. "to warn them of the risk that creditors would focus on the value of

the collection."  E-mail from K. Buckfire to B. Nowling, et al., re: Christie's/DIA, July 25, 2013

(EX3298) (CHR-DET-0014454); Buckfire Dep., Vol. 2 117:24–25 (Pérez Decl. Ex. B) (noting

that he first met with the Chairman of the DIA Corp. board in May, 2013).  Among other things,

Miller Buckfire informed DIA Corp. that "it might be necessary to monetize or sell the collection

under certain scenarios." (*Id.* at 113:3–7.)  The City threatened DIA Corp. that if DIA Corp.

wanted to "save" the art, DIA Corp. would have to come up with a structure that provided the

City with a lot of money.  (*See* Orr Dep. 435:17–436:11 (Pérez Decl. Ex. A); Buckfire Dep.,

Vol. 2 138:22–139:3 (Pérez Decl. Ex. B).)

Around this time, the Attorney General for the State of Michigan (the "**Attorney**

**General**") reached out to DIA Corp. to ask whether the DIA Collection could be sold to satisfy

the City's obligations.  (*See* Letter from A. Schwartz to W. Schuette, re: Detroit Institute of Arts,

Apr. 12, 2013 (EX346) (restating the Attorney General's question before responding).)  On

April 12, 2013, an attorney representing DIA Corp. sent a letter responding that "[t]he answer is

'no.'" (*Id.*)  The letter set forth DIA Corp.'s position that the City cannot sell the art to pay City

---

[6] *Declaration of Alfredo R. Pérez in Support of Joint Pretrial Brief in Support of Objection to DIA Settlement*, filed contemporaneously herewith (hereinafter, the "**Pérez Decl.**").

WEIL:\44542355\6\45259.0007

obligations because: (1) it would breach the Operating Agreement; (2) it would contradict the charitable intentions of donors; (3) it would transfer the benefits of public financial support to creditors; and (4) the art collection is held in public trust by the City. (*Id.*)

In the ensuing weeks, the Attorney General was in regular contact with DIA Corp. DIA Corp. sent numerous documents to the Attorney General and answered several questions pertaining to the DIA. (*See, e.g.,* Email from J. Pirich to J. Evans, et al., re: DIA, May 24, 2013 (EX3304) ("Thank you for your time and consideration. Attached are the materials that we promised to provide to you. Please let us know if we can provide any additional information."); E-mail from J. Pirich to R. Ianni, May 28, 2013 (EX3305) (thanking the Attorney General's office "for taking time to talk with me today"); E-mail from W. Bloomfield to J. Opperer, re: DIA materials, May 29, 2013 (EX3306) (requesting a copy of the Collections Management Policy and asking for an explanation of how artwork was designated to the DIA Collection); E-mail from G. Beal to J. Opperer, re: DIA materials, May 29, 2013 (EX3306) (relaying oral history of purchasing practices).) Beyond providing documents and answering questions, on or about May 24, 2013, DIA Corp. attorneys sent the Attorney General a complete draft Attorney General Opinion concluding the DIA Collection is protected by the public trust doctrine. (*See* Email from E. Restuccia to S. Hackney, re: AG -- DIA Communications and Documents, May 1, 2014 (EX3312) (noting that the produced document "Legal Memorandum (5-24-13)" was prepared by the DIA); Legal Memorandum, May 24, 2013 (EX3307) (setting forth the conclusion that "Emergency Manager does not have authority to sell property held in public trust" in the name of "Bill Schuette, Attorney General" and stamped "draft – not subject to FOIA").) Thereafter, on June 1, 2013, DIA Corp. attorneys sent the Attorney General another formal memorandum outlining why DIA Corp. believes the City's art collection cannot be sold.

WEIL:\44542353\6\45259.0007
8

(E-mail from A. O'Reilly to W. Bloomfield, re: DIA Memo, June 1, 2013 (EX3308) (providing

Attorney General's office with formal memo titled "DIA Memo-Sale Constraints").)

On June 12, 2013, a DIA Corp. attorney sent the Attorney General, for what

appeared to be the first time, the historical documents relating to the creation of the Detroit

Museum of Arts (the "**DMA**") and the 1919 transfer of the DMA's assets to the City.[7] (*See*

E-mail from A. O'Reilly to H. Meingast, June 12, 2013 (EX3309) (chain including email from

DIA Corp. counsel noting that they had not done an "exhaustive review," but that the attached

documents would give a sense of the underlying thinking at the time of the transfer).)[8] The

Attorney General's office responded: "Thanks . . . we will take a look, I appreciate your efforts.

Given that our timeline shrunk yet again (possibly issuing early afternoon tomorrow), I'm not

sure we will have time to incorporate much. But it's good to have nonetheless." (*Id.*) Later that

same day, the Attorney General rushed to issue *Opinion No. 7272 of Bill Scheutte, Attorney

General for the State of Michigan*, June 13, 2013 (the "**AG Opinion**"), in which he concluded

that the DIA Collection is held in charitable trust and cannot be sold, conveyed, or transferred to

satisfy City debts or obligations. (*See* AG Opinion; E-mail from H. Meingast to A. O'Reilly

forwarding opinion, June 13, 2013 (EX3319).)

The AG Opinion states that (i) the DMA was founded as a charitable trust in

1885, (ii) when the DMA transferred its trust assets (artwork) to the City in 1919, the City

---

[7] As discussed in more detail below, the DMA was a predecessor entity to the nonprofit corporation that the City has currently contracted to operate the DIA, known as the Detroit Institute of Arts ("**DIA Corp.**"). Both the Attorney General and DIA Corp. argue that the circumstances of its formation in 1885 created a charitable trust that was continued when it conveyed its assets to the City in 1919. (*See infra* at 84.)

[8] The historical documents DIA Corp. provided to the Attorney General were underlined in many places and were not a complete representation of the relevant historical facts. (*See* E-mail from H. Meingast to A. O'Reilly, June 12, 2013 (EX3309) (attaching a letter from the Arts Commission describing the 1919 Transfer of the DMA Assets as a "gift," but not attaching the Common Council minutes indicating that the City paid $35,863.22 for this transaction).)

WEIL:\44542355\6\45259.0007

accepted the property as a charitable trustee, (iii) the transferred artwork and all subsequently-acquired artwork collected and displayed at the DIA is therefore held by the City in charitable trust for the people of Michigan, and (iv) accordingly, no piece of the collection may be sold, transferred, or otherwise disposed of for the purpose of satisfying debts or obligations of the City unrelated to the operation or purpose of the DIA. (*See* AG Opinion at 18–21.)

The very next day, the Emergency Manager presented his Proposal for Creditors (the "**June 14 Proposal**") (EX33). The June 14 Proposal laid out the "key objectives for a financial restructuring and rehabilitation of Detroit," which included, among other things, "[t]o the fullest extent possible under all of the circumstances . . . [to] [m]aximize recoveries for creditors . . . [and] [g]enerate value from City assets where it is appropriate to do so." (June 14 Proposal (EX33) at 41.) The DIA was one of the listed assets. (*Id.* at 83–89.) Around that time, Miller Buckfire had approached the fine arts auction house Christie's Inc. ("**Christie's**") regarding conducting an appraisal of certain pieces in the DIA Collection, in anticipation that such a valuation would be necessary in bankruptcy proceedings. (*See* E-mail from L. Layfer to A. Whiting, et al., re: Christie's/DIA, July 26, 2013 (EX3171) (stating that May 6 was the first meeting between Christie's and K. Buckfire); E-mail from K. Gray to B. Nowling, et al., re: Christie's Press Statement, Aug. 1, 2013 (EX3170).) However, before the project was completed and at some point prior to August 1, 2013, the Emergency Manager "elected to put it on hold" and Christie's stopped all work. (*Id.* at CHR-DET-0014444; *see* Fusco Dep. 224:21–225:13, July 25, 2014 (noting that Christie's appraisal specialists had visited the DIA in June, but then the project was temporarily suspended).)

On July 18, 2013, the City filed a petition for relief under chapter 9 of the Bankruptcy Code, commencing this case (the "**Chapter 9 Case**").

WEIL:\45542355\6\45259.0007

**Focus on the DIA Collection in the Chapter 9 Case**

As the eligibility process unfolded, the City and its advisors continued to learn about the DIA Collection. On August 9, 2013, the City engaged Christie's to appraise a portion of the DIA Collection, which would later be specified as only those pieces purchased entirely with appropriations from the City (such purchases, the "**City of Detroit Purchases**"). In the Christie's retention agreement, the Emergency Manager warranted that the City had "free, clear and marketable title" to the City of Detroit Purchases. (S. Vandeweerdt, K. Orr, Christie's Appraisal Agreement, Aug. 9, 2013 (EX3169).) The City later disclosed that City of Detroit Purchases consisted of 2,781 (4%) of the 65,000 works of art in the DIA collection. (Disclosure Statement § VIII.K.6(a).)[9]

On August 13, 2013, the Court entered a *Mediation Order* [Docket No. 322] (the "**Mediation Order**") outlining the procedures surrounding Court-ordered mediation and appointing Chief District Judge Gerald Rosen as the judicial mediator in this case. The Mediation Order provides that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." (Mediation Order ¶ 4.) The Court has broadly applied the protections of that order.

---

[9] The statements about the decision to reduce the scope of Christie's valuation are inconsistent. While the Emergency Manager suggests that it was because Christie's had indicated there were questions of title, Christie's claims that it does not examine title and that there was no change in scope – it had been engaged to value City-owned artwork and representatives from the museum subsequently advised Christie's that only approximately 2,700 objects were owned by the City. (*Compare* Orr Dep. 456:6-19 (Pérez Decl. Ex. A) (noting that the City's decision to limit the scope of the Christie's valuation to approximately 2,700 objects was made because Christie's told the City that remainder of the 35,000 objects it was engaged to value "may have some questions" about the City's title) *with* Fusco Dep. 149:24–150:4 (noting that Christie's does not examine title or restrictions on works because "[w]e trust in good faith and our clients sign agreements to attest to the fact that they are legally able to place works for sale" that Christie's is engaged to value); *id.* at 152:25–153:2 (noting that Christie's did not appraise anything that was not identified "by the museum" as a City of Detroit Purchase).) The City did not ever attempt to inventory the artwork that it owned, and relied on DIA Corp. for this information. (*See* Orr Dep. 382:14–18 (Pérez Decl. Ex. A).)

WEIL:\44542353\6\45259.0007

(*See, e.g.*, Hr'g Tr. 187:5–7, May 28, 2014 (Court: "[T]he best way to resolve this bankruptcy is through mediation and settlement, and any crack in the wall of confidentiality undermines that goal.").)

In the months leading up to the Confirmation Hearing, the City has relied upon the Mediation Order as a basis to refuse responding to certain discovery requests about the DIA Settlement. The Foundations, as well, quashed discovery requests related to their role in the DIA Settlement based, in part, upon the Mediation Order. (*Order Regarding Foundations' Joint Motion to Quash (Dkt. #5300)*, entered on June 27, 2014 [Docket No. 5623] (granting motion to quash subpoena seeking information from the Foundations).) Creditors have sought, unsuccessfully, limited information necessary to evaluate the reasonableness of the DIA Settlement. In addition, the City has argued that the mere fact that a settlement was reached in mediation should result in a "presumption that [the result] has been bargained in good faith and at arm's length." (Hr'g Tr. 55:22–56:1, May 28, 2014; *see also Official Committee of Retirees' Memorandum of Law in Support of Confirmation of Fifth Amended Plan for Adjustment of Debts Filed by the City of Detroit, Michigan*, August 4, 2014 [Docket No. 6508] at 28.) The Court subsequently acknowledged that no presumption of reasonableness of a settlement has been established in this case. (Hr'g Tr. 50:17–20, June 26, 2014 (Court: "Well, if the city is asserting that presumption of reasonableness means someone else has the burden of proving that a settlement is not reasonable, I've never accepted that.").) Creditors have expressed concerns that the City is unable to satisfy its burden of proof regarding, and creditors are prejudiced from testing, the good faith and reasonableness of the settlements in the Plan if the Mediation Order protects all information related to the negotiation of such settlements. (*See* Hr'g Tr. 48:9–13, June 26, 2014 (Mr. Marriott: "[T]he mediation confidentiality, whether order-based or privilege-

WEIL:\44542353\6\45259.0007

based, is a threat to the confirmation process given the way that the plan is coming together as a compilation of mediated settlements.").)

During October 2013, the City's advisors continued discussions with DIA Corp. On October 11, Buckfire suggested a transaction to the Chairman of the DIA Corp. board, whereby the DIA Assets would be transferred to a "vehicle to protect it from any future Detroit creditor exposure," and in exchange the Counties would pass an additional millage that could be used by the Emergency Manager. (Letter from K. Buckfire to D. Heiman, Oct. 23, 2013 (EX3495) at 2.) Miller Buckfire had also proposed a similar transaction, funded not by a millage but money raised by DIA Corp. from community members and its trustees. (Buckfire Dep., Vol. 2 119:10–13 (Pérez Decl. Ex. B).) These proposals contemplated that, in exchange for "taking an asset off the table," the City would receive "adequate compensation." (*Id.* at 118:23– 119:18.) At the time the proposals were made, Miller Buckfire had not done any analysis of the value of the DIA (other than recognizing that it was funded by the Millage), and was waiting for the Fusco Report. (*Id.* at 122:4–9.)

While the City was in the middle of mediation discussions, on November 18, 2013, a representative from Christie's met with Miller Buckfire. The Christie's representative provided a report on the aggregate number of Christie's appraisal of the City of Detroit Purchases, and the City decided that Christie's would not need to value the "low value works." (*See* E-mail from V. Fusco to S. Vandeweerdt, et al., re: DIA Appraisal Update, Nov. 19, 2013 (EX3172).)

On December 3, 2013, Christie's issued a preliminary appraisal estimating the value of the City of Detroit Purchases to be between $452 million and $866 million. (Disclosure Statement § VIII.K.6(a).) On December 17, 2013, Christie's publically released its final fair

WEIL:\44542355\6\45259.0007

market value estimates for the City of Detroit Purchases.  (*See* Letter from D. Woodham to K.

Orr, Dec. 17, 2013 (EX341) (reporting results to Emergency Manager); Fair Market Value for

Financial Planning, Dec. 17, 2013 (EX342) (detailing the valuation findings).)  This report

estimated the value of the City of Detroit Purchases to be between $454 million and $867

million. (Fair Market Value for Financial Planning, Dec. 17, 2013 (EX342) at POA00258099.)

Between the time Christie's issued its preliminary appraisal and the date it

publicly released its final fair market value report, on December 11, 2013, DIA Corp. publically

endorsed the DIA Settlement.  (*See* M. Stryker & J. Gallagher, DIA joins deal in works with

mediators that would protect art, pensions in Detroit bankruptcy, Detroit Free Press,

Dec. 11, 2013 (EX3269).)  The settlement was later formally announced by the Mediator on

January 13, 2014.  (*See* Statement of Detroit Bankruptcy Mediators, Jan. 13, 2014 (EX3271).)

The City described the DIA Settlement as the "cornerstone" of the Plan.

(*Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the

Adjustment of Debts of the City of Detroit*, May 26, 2014 [Docket No. 5034] (the "**Reply**") ¶ 29.)

It is a multi-party transaction pursuant to which the City will transfer all of its right, title and

interest in and to the DIA Assets to DIA Corp. as trustee, to be held in perpetual charitable trust

and within the City limits, in exchange for the DIA Proceeds and the State Contribution (each as

defined below).[10]  (Plan §§ IV.D, E.)  This transaction, often referred to as the "Grand Bargain,"

---

[10] The terms and structure of the DIA Settlement are nearly identical in concept to a transaction proposed
by Coit Cook Ford III (senior policy advisor to then-president of the City Council) in 2011, pursuant to
which he suggested the City secure "a short-term down payment. . . to alleviate cash flow pressure."
(Memorandum re: Draft Proposal for Cumulative Monetization of the Cultural Assets – the Detroit
Institute of Arts, Nov. 11, 2011 (EX3245) at POA00000763.)  Among other things, the cash infusion
would have been used to "reduce the politically and operationally difficult task of processing 2300 layoffs
in the next two months, and lessen [the City's] dependence on getting . . . healthcare and pension
concessions from the unions." (*Id.*)  The transaction provided that, in exchange for an immediate infusion
of $50 million dollars and aggregate payments of $500 million over a twenty-five year period, the City
would transfer ownership of the DIA to a non-profit foundation partner upon a firm and absolute promise

WEIL:\44542353\6\45259.0007

is comprised of two, interrelated settlement agreements:  (i) the DIA Settlement and (ii) the State Contribution Agreement.  (Reply ¶ 30.)

Pursuant to the DIA Settlement, in exchange for the transfer of the DIA Assets, the City will receive consideration from several Foundations and DIA Corp. constituting the DIA Proceeds:  payment in the aggregate amount of $466 million ($366 million from the Foundations and $100 million from DIA Corp.), to be contributed over a 20-year period, subject to a Present Value Discount to the extent payments are made in excess of $5 million per year. (Plan § IV.E.1, Ex. I.A.119 Ex. B.)  The net present value of the DIA Proceeds, using a 6.75% discount rate, is $260.1 million.  (Spencer Report (EX3035) at 117.)

In addition, pursuant to the State Contribution Agreement, the State, through the Michigan Settlement Administration Authority, has agreed, subject to a number of conditions, to contribute the State Contribution in the amount of $194.8 million to the Retirement Systems to pay GRS and PFRS Pension Claims.  (Plan § IV.E.)  Among other things, the State's payment of the State Contribution is conditioned on the irrevocable commitment by the Foundations to fund $366 million (or the net present value thereof) and DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement.  (*Id.* Ex. I.A.318 §§ 4(e)-(g).)

**Efforts to Understand the DIA Collection**

While the City, the Mediator, DIA Corp. and various foundations were negotiating the settlement, FGIC and other creditors were pressing to obtain more information about the DIA Collection, its value, and potential means of monetizing this artwork for the benefit of the City and its creditors.  Between June 21, 2013 and October 8, 2013, FGIC and

---

to never move the collections or the museum.  (*Id.* at POA00000761.)  The City's Fiscal Analysis Division estimated that the DIA and the DIA collection were worth over $2–3 billion dollars.  (*Id.* at POA00000762.)  Among other things, the memo indicated that the foundations participating in the proposed transaction would receive a "return on investment" at a four or five to one ratio.  (*Id.*)

WEIL:\44542353\6\45259.0007

15

other creditors submitted at least three separate diligence requests to the City for information

about the DIA and the DIA Collection. (*See Corrected Motion of Creditors for Entry of an

Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate

With Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the

Detroit Institute of Arts* [Docket No. 3925] (the "**Art Diligence Motion**"), Ex. 5 (the "**Spencer**

**Declaration**"), Apr. 9, 2014 (outlining diligence efforts).)

   Lacking this information, on November 26, 2013, FGIC, together with certain

other creditors, filed the *Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of

the Bankruptcy Code Appointing and Directing the Debtor to Cooperate with a Committee of

Creditors and Interested Persons to Assess the Art Collection of the Detroit Institute of Arts

Based on Arms-Length Market Transactions to Establish a Benchmark Valuation*, Nov. 26, 2013

[Docket No. 1833] (the "**Art Committee Motion**"). Pursuant to the Art Committee Motion, the

creditors requested that the Court order the City to collaborate with a committee of creditors, in

consultation with art intermediaries, to consider potential market transactions for the DIA

Collection in order to establish its value. The City opposed the motion. (*See Brief in Opposition

to Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code

Appointing and Directing the Debtor to Cooperate With a Committee of Creditors and Interested

Persons to Assess the Art Collection of the Detroit Institute of Arts Based on Arms-Length

Market Transactions to Establish a Benchmark Valuation*, December 10, 2013, [Docket No.

2021].)

   On January 22, 2014, at the hearing on the Art Committee Motion, counsel for the

City represented that the value of the DIA Collection was "highly concentrated" in the City of

Detroit Purchases, (Hr'g Tr. 12:10–11, Jan. 22, 2014), and that, for the rest of the collection,

WEIL:\44542353\6\45259.0007

"[i]t's probably a waste of time and money to look at all of it." (*Id.* at 13:6–7.) Describing donations to the DIA, counsel represented that, in general, "the more valuable the gift to the museum, the more sophisticated the instrument that was used to make the gift," and that when it is necessary to analyze restrictions on individual donations, it "turns out to be a nightmare. It's kind of like the file room at the end of one of the 'Indiana Jones' movies . . . there's pages and pages and pages. They're not terribly well-organized." (*Id.* at 13:1–4; 13:16–19.) Counsel also indicated that "DIA [Corp.] has been helping out the city to try to isolate the most important gifts and supply us the documents on the most important parts of the gifted collection." (*Id.* at 13:20–23.) Counsel reported that there had been discussions about the DIA Collection, but that he did not "want to go into the substance of discussions, many of which have been conducted in accordance with the mediation," but he stated that "there isn't agreement on a lot of things about the art." *Id.* at 14:6–23. This Court denied the Art Committee Motion, but encouraged the City "to be forthcoming with information regarding the art and its value and the interest it has in them." (*Id.* at 35:5–8.)

In a further attempt to discover a value-maximizing strategy for the DIA Collection, on January 15, 2014, Houlihan Lokey, financial advisor to FGIC ("**Houlihan**") distributed a catalogue of information about pieces from the DIA Collection believed to be of high value and invited parties to submit indications of interest in acquiring or monetizing all or part of the collection. (*See* Spencer Declaration ¶¶ 9–11; Spencer Report, July 2014 (EX3035) at 66 (describing the solicitation process).)[11] In response, Houlihan received four preliminary indications of interest (the "**Indications of Interest**"):

---

[11] The "**Spencer Report**" is the *City of Detroit Expert Witness Report* prepared by Stephen Spencer of Houlihan Lokey, an expert retained by FGIC's attorneys.

- Catalyst Acquisitions, LLC/Marc Bell Capital Partners, LLC submitted a non-binding indication of interest in purchasing the entire collection for $1.75 billion.

- Art Capital Group, LLC submitted a non-binding term sheet, offering to provide the City with an exit facility of up to $2 billion, secured by the entire collection.

- Poly International Auction Co., Ltd., on behalf of a client, submitted a non-binding indication of interest in purchasing all Chinese works in the collection for up to $1 billion.

- Yuan Management Hong Kong Limited, on behalf of certain investment funds, submitted a non-binding indication of interest in purchasing 116 pieces for $895 million to $1.473 billion.

(Spencer Declaration ¶ 12.)

All four of the parties that submitted the Indications of Interest (the "**Interested Parties**") indicated that, in order to finalize their assessments of the value of the DIA Collection (or a subset thereof), they would need to conduct a thorough diligence process. Accordingly, on April 9, 2014, FGIC, together with certain other creditors, filed the Art Diligence Motion, seeking entry of an order directing the City to cooperate with the Interested Parties so that they could conduct due diligence on the DIA Collection in order to develop firm bids for the City's consideration. Among other things, the creditors asserted in the Art Diligence Motion that the requested relief was necessary for the City to satisfy the requirements for confirmation of a chapter 9 plan and, specifically, to demonstrate that the City has investigated and is pursuing a strategy that maximizes the value of the art. (*See* Art Diligence Motion at 10.)

On April 28, 2014, the City filed an objection to the Art Diligence Motion stating its view that "given the significant uncertainty regarding the City's precise interests in the Art, [and] the City's ability to obtain any monetary benefit from those interests, . . . the approximately $816 million that will be provided under the DIA Settlement . . . falls well within the range of reasonableness for approval under Bankruptcy Rule 9019." (*Debtor's Objection to Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing*

WEIL:\44542353\6\45259.0007

18

*the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts*, April 28, 2014, [Docket No. 4290] at 12.)

On May 15, 2014, at the hearing on the Art Diligence Motion, counsel for the City made the following three relevant statements: (1) there are "a multitude of restrictions that have been imposed in connection with the manner in which different works of art have been acquired," (Hr'g Tr. 31:18–25, May 15, 2014); (2) "there is not a scenario that the city can think of where its worth is going to turn out to be for all pieces the retail price at an auction because it's just not where we are. And even if we could get there with respect to some works, we are many, many years away from it," (*id.* at 32:7–12); and (3) "on June 14th we said this is an asset. People are talking about it. We don't know what we could or should do about it. It has to be studied. *And, frankly, I don't know that we ever finished all of the studying.*" (*Id.* at 32:18–23 (emphasis added).) On May 19, 2014, this Court denied the Art Diligence Motion. (*Order Denying Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts* [Docket. No. 4932].)

On April 17, 2014, in response to a subpoena issued by FGIC and other creditors, DIA Corp. agreed to produce certain documents relating to the DIA Collection and the Major Works. (*See* DIA Subpoena Response, April 17, 2014 (EX3268).) Among other things, DIA Corp., agreed to produce a list of works of art that, for insurance purposes or otherwise, DIA Corp. had ascribed a value of at least $750,000 (such works, the "**Major Works**") with an electronic report on such works, certain examples of wills (including the bequest of Robert Tannahill), various financial statements and insurance policies, the agreement pursuant to which DIA Corp. currently operates the DIA, the policy that details how DIA Corp. must manage the

DIA Collection, meeting minutes from DIA Corp. and the City's arts commission, and object files and donor files relating to the Major Works. (*See id.* at 3.) DIA Corp. also permitted three individuals (at their expense) to inspect certain documents located onsite over the course of three days, including files maintained in the Archives and library, and flag documents for production. (*See id.* at 3–4.) The majority of documents were produced in several large batches between the dates of April 28, 2014 and ending on June 3, 2014. Approximately 90,000 pages of documents were produced. (*See Objection by the Detroit Institute of Arts to the Relief Requested in the Revised Proposed Order Filed in Connection with the Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts*, May 12, 2014, [Docket No. 4675] at 6.) Based on this and publically available information, the Objectors were able to learn a great deal of information about the DIA Collection and the museum itself. The history of the DIA is extensive, dating back to the early 1900s with the formation of a City arts commission tasked with building an art collection, and is relevant for purposes of evaluating the DIA Settlement.

**Beginning of the DIA**

In June 1918, the Charter of the City of Detroit (the "**City Charter**") was revised to include several new executive commissions. (*See* City Charter, adopted June 25, 1918 (EX391).) Among these was an "Arts Commission," which was empowered to (among other things) "acquire, collect, own and exhibit, in the name of the city, works of art, books and other objects such as are usually incorporated in Museums of Art" and to "build, operate and maintain suitable buildings to be used for the exhibition of paintings and works of art and auditorium purposes, to be known as the Detroit Institute of Arts" (the "**Arts Commission**"). (City Charter, 1918 (EX391) Tit. IV, Ch. XIX, §§ 1, 7.)

WEIL:\44542353\6\45259.0007

In January 1919, the first members of the Arts Commission were appointed and, soon after, the commission submitted its first budget proposal to the City's Common Council. (*See Report of the Arts Commission*, 1919, DIA BULLETIN, Jan. 1920 (EX3118) at 1; *see also* Minutes of the Arts Commission of the City of Detroit, MI (hereinafter "**Arts Comm'n Minutes**"), Jan. 27, 1919 (EX3072) at DIAINSP010409 (first meeting of Arts Commission).) The City approved an initial appropriation in March 1919, and two months later finalized an appropriation of $79,000 (including $20,000 earmarked for the purchase of artwork). (*See* Arts Comm'n Minutes, Mar. 3, 1919 (EX3073) at DIAINSP010413 (noting the initial budget of $85,000); Arts Comm'n Minutes, May 12, 1919 (EX3075) (noting the final granted budget of $79,000, with $20,000 for "Purchases for Collections").)

By as early as April of 1919, the Arts Commission began contemplating the acquisition of art objects for the City's new museum. (*See* Arts Comm'n Minutes, Apr. 28, 1919 (EX3074) (considering purchasing a rug collection).) The first recorded purchases were made on June 2, 1919. (*See* Arts Comm'n Minutes, June 2, 1919 (EX3076) (Pérez Decl. Ex. 3076) at DIAINSP010422 (approving the purchase of two bronzes for the sum of $1,800).) During the course of that year, the City also purchased six oil paintings, four etchings, three carved wood panels, and 44 textiles for the DIA. (*See Report of the Arts Commission*, 1919, DIA BULLETIN, Jan. 1920 (EX3118) at 59; *see also* Contract between R. Henri and DIA, Oct. 11, 1919 (EX3077) (reflecting sale of two oil paintings to the DIA).)

At the end of that year, the City acquired the collection of another museum – the Detroit Museum of Arts (the "**DMA**"). (*See* Report of Councilman Nagel, Nov. 18, 1919 (EX3270) (Pérez Decl. Ex. 3270) at 1783 (noting that the DMA has "executed and delivered to

WEIL:\44542353\6\45259.0007

the City of Detroit a bill of sale of all the art collection of said Detroit Museum of Art" and

accepting the bill of sale).)

## Formation and Failure of the DMA

On April 16, 1885, the DMA was incorporated as a private, nonprofit corporation

pursuant to 1885 Public Act 3 (the "**1885 Act**"). (*See* 1885 Act (EX3505).) The 1885 Act

established procedures for the formation of such corporations with the power to, among other

things, collect and receive donations of works of art. (1885 Act (EX3505) § 3.) Consistent with

this statute, the DMA's articles of association provided that it was "formed for the objects and

purposes contemplated by the [1885 Act], to wit: for the founding of a public art institute in the

City of Detroit, which may . . . receive and use such gifts, contributions, devises and bequests as

may be made for art purposes; receive, acquire, collect and own . . . works of art, and may do all

other things authorized by said Act, and have and enjoy all the privileges and franchises given

thereby." (*See* DMA Articles of Association (EX3080), Art. II.)

The DMA formally opened a museum to the public on September 1, 1888. (*See*

Sixty Years in Review (EX3222) at 3.) Starting in 1893, the City began providing annual

funding to the DMA in exchange for its museum remaining open and free to the public. (*Id.* at

4.) Because the DMA was a private organization, the funding not in the form of a formal

appropriation but was drawn from the City's contingent fund. (*See* A History of the Municipal

and Legislative Acts, 1904 (EX3256) at 70.) In 1899, legislation was proposed for "official

recognition" of the annual appropriation, "same as that of other city institutions." (*Id.*) The bill,

which was enacted, empowered the City's legislative body (then, the "**Common Council**" and,

in later years, the "**City Council**") to make formal appropriations in support of the DMA of up to

$20,000 annually. (*See id.*; *Detroit Museum of Art v. Engel*, 153 N.W. 700, 701 (Mich. 1915).)

In 1903, another bill was enacted that expanded the Common Council's authority to provide

WEIL:\44542353\6\45259.0007

support for the DMA – in this instance, by erecting buildings for the DMA and issuing bonds to finance the construction. (*See id.*; A History of the Municipal and Legislative Acts, 1904 (EX3256) at 71–72.) Annual City appropriations for the DMA continued through 1915. *Detroit Museum of Art*, 153 N.W. at 701.

In November of 1914, the DMA determined that, before embarking on an expensive construction project that would require significant financial support from the City, it needed to have a firm understanding of whether the DMA was legally eligible for public funding. (*See* DIA Meeting Minutes, Nov. 27, 1914 (EX3204) at DIAINSP019691–92.) Arrangements were made for the City's controller to withhold funds payable to the DMA, and for the DMA to bring a "friendly" lawsuit to compel payment so that a court could decide the issue. (*Id.* at DIAINSP019693.) In 1915, the funds were withheld, the DMA filed suit, and, in the decision *Detroit Museum of Art v. Engel*, the Supreme Court of Michigan declared the appropriations to the DMA unconstitutional on the ground that it was a private corporation. *Detroit Museum of Art*, 153 N.W. at 700.

Notwithstanding this decision, the City and the DMA arranged for an alternative public funding scheme that avoided the prohibition on direct appropriations. Thus, in 1916, the City's Recreation Commission contracted the DMA to operate the museum and provide free admission to the public and, in exchange, the City agreed to make monthly payments to the DMA totaling $40,000 per year. (*See Annual Report,* 1916, DMA BULLETIN (EX359) at 9 (describing the contract); DMA Minutes, Apr. 29, 1916 (EX3280) (authorizing execution of contract).)

Despite the new contract and increased City funding (which was double the $20,000 that the City had provided before) the DMA soon began to experience financial

problems.  By June 15, 1917, certain trustees recommended transferring the DMA's art school to

the City because of an insufficient operating budget, (*see* DIA Minutes, June 15, 1917 (EX3205)

at DIAINSP019796), and, on January 11, 1918, the DMA resolved to close the school on the

basis of inadequate funds.  (DMA Minutes, Jan. 11, 1918 (EX3206) at DIAINSP019816.)

Thereafter, the DMA's finances continued to deteriorate and, on December 6, 1918, the members

of the DMA convened for a special meeting, during which the DMA members authorized the

DMA to transfer its assets, both artwork and real estate, to the City.  (DMA Minutes,

Jan. 27, 1920 (the "**1920 DMA Report**") (EX269) (describing the DMA's activities during this

period).)

> The DMA's President and Treasurer were tasked with developing a conveyance

of the DMA's property to the City that would be "in such form and with such conditions as

should to them appear sufficient to insure [sic] the use of said property for the purpose for which

the [DMA] was incorporated . . . ."  (1920 DMA Report (EX269) at DIAINSP019856.)  To

accomplish this objective, they decided to transfer to the City only the DMA's real estate, but

require the City to maintain the DMA's art collection housed therein.  (*See* Letter to D. M. Ferry,

Nov. 28, 1917 (EX3313).)  They prepared a conditional deed of conveyance, which provided that

title to the transferred real estate would revert to the DMA if, among other things, the City "did

not suitably provide for the care and maintenance of the collections of the Detroit Museum of

Art" (the "**Draft Conditional Deed**").  (*See* DMA Minutes, Feb. 18, 1919 (EX3207) at

DIAINSP019843.)

## 1919 Act and Transfer of the DMA Assets

> On April 15, 1919, the State enacted Public Act 67 (the "**1919 Act**"), amending

the 1885 Act.  (1919 Act (EX453).)  The 1919 Act added a new section 20 that authorized "[a]ny

corporation organized under this act situated in a city empowered to maintain a public art

WEIL:\44542355\6\45259.0007

institute like or similar to that described in this act" to "convey all or any of its property to said city upon such terms, in such manner and at such time or times as may be agreed upon by its trustees and the legislative body of said city." (*Id.* § 20.) Section 20 further provided that "said property so conveyed shall in the hands of said city be faithfully used for the purposes for which such corporation was organized." (*Id.*)

With this law in place, representatives of the DMA and the City began negotiating the transfer of the DMA's assets. When the DMA presented its Draft Conditional Deed (described above) to the Common Council and the head of the City law department (the "**Corporation Counsel**"), it was unanimously rejected on the basis that only an unconditional transfer, which did not impose any obligation or restriction on the City, would be acceptable. (*See* Arts Comm'n Minutes, June 2, 1919 (EX3076) (Pérez Decl. Ex. 3076) at DIAINSP010422 (noting that with respect to the proposed reversionary clauses in the Draft Conditional Deed, there was "unanimous opposition on the part of the Councilmen to accepting any deed with restrictions"); 1920 DMA Report (EX269) at DIAINSP019857 (noting position that "no Deed would be accepted except one without conditions"); *Annual Report,* 1919, DMA BULLETIN, June 27, 1919 (EX361) at 13 ("The form of deed was presented for consiideration [sic] by the city council but the council expressed a unanimous opinion that it would be inexpedient to accept such a transfer with any reversionary clause or any other definitely expressed obligation.").)

That month (June 1919), the DMA representatives returned to the DMA members and explained that the City had refused to accept a transfer of the DMA's assets if such assets were subject to any condition, restriction or obligation. (1920 DMA Report (EX269) at DIAINSP019857.) Notwithstanding the DMA's original preference to include a condition and reverter clause, the DMA accepted the City's request and adopted a resolution "authorizing the

WEIL:\44542353\6\45259.0007

Trustees . . . to execute and deliver a Deed of the real and personal property of the [DMA]." (*Id.*)

Before negotiations over the transfer concluded, the DMA's financial crisis peaked and it no longer was able to fund museum operations. (*See* Letter from DMA to Arts Commission, June 30, 1919 (EX3078) (indicating that the DMA had insufficient funds to continue maintaining its museum).) As a result, on June 30, 1919, the DMA transferred custody of its art collection to the City, pending agreement on the terms of the conveyance. (*See id.* (requesting that the Arts Commission assume its maintenance and operation on July 1, 1919); Letter from Arts Commission to DMA, July 1, 1919 (EX3226) (accepting the collection and assuming maintenance and operation of the museum pending conveyance to the City).)

Soon after, the final conveyance documents were prepared – a bill of sale of the art collection (the "**Bill of Sale**") and two deeds of real estate (all together, conveying the "**DMA Assets**"). (DMA Meeting Minutes, Sept. 12, 1919 (EX3208) (Pérez Decl. Ex. 3208) at DIAINSP019851 (authorizing execution of a bill of sale of the DMA's collection to the City).)

On November 18, 1919, the Common Council accepted the terms of the Bill of Sale and the two deeds. (*See* Report of Councilman Nagel, Nov. 18, 1919 (EX3270) (Pérez Decl. Ex. 3270) at 1783 ("The Detroit Museum of Art has executed and delivered to the City of Detroit a bill of sale of all the art collection of said Detroit Museum of Art . . . [and] said bill of sale and the said deeds . . . have been approved as correct in form and execution, title satisfactory, by the Corporation Counsel of the City of Detroit. The City of Detroit is desirous of accepting said . . . bill of sale and will accept said . . . bill of sale . . . ."); *id* (also accepting deeds).) On December 16, 1919, the Common Council authorized the City's controller to apply $35,863.22 in City funds as payment for the costs to acquire the DMA Assets, and from that

WEIL:\44542353\6\45259.0007

amount to transfer $7,124.62 to pay off the mortgage against the DMA real estate. (*See* Report of Controller, Dec. 16, 1919 (EX3273) (Pérez Decl. Ex. 3273) at 1884–85.) The transaction was completed on December 29, 1919. (Arts Comm'n Minutes, Dec. 29, 1919 (EX3079) at DIAINSP010448; *see also* Executed Deeds of Real Estate, Dec. 18, 1919 (EX3281) (conveying the DMA's real estate to the City).)[12] In response, the Mayor commented that "Detroit is to be congratulated in securing over 2 million dollars of property at a very small cost." (Arts Comm'n Minutes, Jan. 14, 1920 (EX3082) at DIAINSP010453.)

Although the DMA trustees had contemplated dissolving the corporation after the 1919 Transfer, in January, 1920, they instead resolved that the DMA would continue in existence under a new name, the Detroit Museum of Arts Founders' Society (the "**Founders' Society**"). (*Annual Report,* 1919, DMA BULLETIN, June 27, 1919 (EX361) at 13–15; 1920 DMA Report (EX269) at DIAINSP019859; *see also* DMA Minutes, Feb. 20, 1920 at DIAINSP019860–62 (noting decision to inform the DMA members that the corporation would continue to exist).) The Founders' Society adopted new purposes, which included to cooperate "in every way" with the DIA and to use its endowment funds and other contributions to augment the DIA Collection. (1920 DMA Report (EX269) at DIAINSP019858–59.) Over the years, the Founders' Society adopted a variety of names, including "Founders Society Detroit Institute of Arts," "Detroit Institute of Art Founders Society," and, most recently, "The Detroit Institute of Arts" (referred to herein as, DIA Corp.). (*See* Certificate of Amendment to the Articles of Incorporation, filed Jan. 29, 1962 (EX3275) (adopting the name "Founders Society Detroit Institute of Arts"); Certificate of Assumed Name, filed Sept. 30, 1992 (EX3276) (assuming the name "The Detroit

---

[12] The Bill of Sale, along with the deeds conveying the DMA's real estate, were filed for record. The Archive Division of the City Clerk office, however, was unable to locate the Bill of Sale and it was not found in the DIA's Archives (as defined below). (*See infra* at 42.)

WEIL:\45423535\6\45259.0007

Institute of Arts Founders Society"); Certificate of Amendment to the Articles of Incorporation, filed Oct. 11, 2000 (EX3277) (adopting the name "The Detroit Institute of Arts").)  Today DIA Corp. continues to exist as a nonprofit corporation, independent from the City, with stated purposes including assisting "the Arts Commission of the [City] in the operation of the [DIA]."[13] (Restated Articles of Incorporation, adopted January 12, 1998 (EX3289) at 2 (as subsequently amended).)

## Continued Expansion of the City's Art Collection

Through the 1920s, the City invested heavily in building its art collection (the "**DIA Collection**").[14]  (*See* DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123) (showing that the City purchased almost 2,000 art objects during this decade that still remain in its collection).) In 1920, the Arts Commission requested additional funds from the City to purchase more artwork, offering the following justification:

> Because of their precious quality, art objects of suitable character for a public collection require a large capital outlay.  This appropriation, however, is not an expense.  The accessions purchased with it are a continuing asset which constantly fulfills a sphere of usefulness in the lives of the people, and at the same time these objects increase in intrinsic worth each year.

(*Report of the Arts Commission*, 1919, DIA BULLETIN, Jan. 1920 (EX3118) at 66.)  The 1920 budget provided the Arts Commission with $50,000 in funding for the purchase of more artwork, which the Arts Commission used to acquire a number of different pieces for the City.  (*See* Report of the Arts Commission, 1920 (EX362) at 3-4 (noting the appropriation and identifying

---

[13] Additional information about the role of DIA Corp. and its relationship to the City and the DIA is set forth in detail below.

[14] The "DIA Collection" includes the collection of works of art owned by the City and located primarily at the DIA, the DIA's offsite warehouse, or the Josephine Ford Sculpture Garden located at or about 201 East Kirby Street, Detroit, Michigan or included in the DIA collection (whether or not accessioned), whether or not reflected on any inventory and irrespective of the manner in which acquired by the City.

WEIL:\44542353\6\45259.0007

the artwork the City purchased in 1920, which included 27 paintings, 15 sculptures, 50 etchings, 15 woodcuts, and 36 miscellaneous pieces).)  In the following years, many new objects were added to the DIA collection, including purchases from the City, purchases from DIA Corp., gifts, and bequests (categories that are discussed in more detail below).  (*See* DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123) (including 60,226 objects in the DIA Collection); *infra* at 48–63; *see also Search for Art, Artists in the DIA Collection*, THE DETROIT INST. OF ARTS, *http://www.dia.org/art/search-collection.aspx* (EX3282) (providing purchase details for individual pieces).)

**DIA Financial Issues**

     After over a decade of prosperity, the fortunes of the DIA began to falter.  In the early 1930s, in the midst of the Great Depression, the Common Council drastically reduced funding for the DIA, forcing the Arts Commission to lay off curatorial staff.  (*See* Letter to Common Council from Arts Commission, Jan. 11, 1932 (EX3235) (listing terminated staff).)  In response to requests for additional funding, the Common Council recommended that the Arts Commission abolish the position of the museum director of the DIA (the "**DIA Director**")[15] and additional curatorial positions.  (*See* Letter to Common Council from Arts Commission, circa 1932 (EX3234) at DIAINSP119424.  Additional layoffs followed.  *See* Arts Comm'n Minutes, Mar. 3, 1933 (EX3576) at DIAINSP010883 (noting that the Arts Commission could not "incur

---

[15] The DIA Director served as a "professionally trained expert" and the "chief administrative officer of the museum."  (*See* Relationship Between Arts Commission and Founders Society, undated (EX3242); Statement of Over-all Arts Commission Policy, undated, (EX3243).)  The DIA Director selected and supervised the entire staff of the museum, and also was responsible for collection recommendations, educational programs, and all other general areas of museum management.  (*Id.*)  The Arts Commission and DIA Corp. were linked through the DIA Director:  upon being appointed by the Arts Commission, the DIA Director was also automatically appointed as the Executive Director of DIA Corp.  (*See id.*)  It is unclear whether this remained the case after the City entered the Operating Agreement in 1998 (discussed below).  (*See infra* at 38.)

WEIL:\44542353\6\45259.0007

obligations for which there are no funds" and terminating the museum staff).)  The budget cuts were so severe that the Arts Commission lacked funds to even maintain the building.  (*See* Letter to Common Council from Arts Commission, Apr. 5, 1932 (EX3233) at DIAINSP119416; Letter to Arts Commission, Apr. 11, 1932 (EX3236) at DIAINSP119429 (noting that where the City government was "trying to maintain only essential services," it was difficult to secure enough funding to keep the building open to the public).)  In response to requests from the Arts Commission, the Mayor vetoed the Common Council's drastic budget cut and restored funding so that the museum could remain open.  (Arts Commission Public Statement, circa 1932 (EX3237); *see* Arts Commission Public Statements, 1932 (EX3575) at DIAINSP119433 (mentioning Mayor's veto of the inadequate appropriation).)

By the 1960s, the City was again investing heavily in the DIA.  The City undertook an "enormous" expansion of the DIA with two new wings that tripled the size of the museum.  (*See* Speech of F. Cummings, The State Steps In:  Michigan and the Detroit Institute of Arts, May, 1977 (EX3083) at DIAINSP119250.)  The museum's operating costs soared, largely due to the construction.  From 1964 through 1974, City funding for museum operations increased from $630,000 to $2,240,000 (its highest level).  (*See id.*)  During this period, however, the City became increasingly reluctant to support the museum's programs and new offerings, and its leaders adopted the view that the museum should develop income-producing programs so that it ultimately could "pay its own way."  (*Id.* at DIAINSP119250, DIAINSP119253–54.)  Instead, the DIA Director used DIA Corp. funds to create wide variety of new programs and services, including an outreach program that provided travelling exhibitions for the State.  (*See id.* at DIAINSP119250–51 (noting that the City did not provide support for

WEIL:\44542353\6\45259.0007

the new programs); DIA Corp. Minutes, Jan. 20, 1976 (EX3563) at DIAINSP022585 (describing

the museum's outreach program as a way to establish its position as a state resource).)

The year 1974 was a turning point in museum funding. Prior to this point, the

DIA had two primary funding sources: the City provided funding for operating costs, and DIA

Corp. provided funding for exhibitions, educational programs, and acquisitions. (*See* Speech of

F. Cummings, The State Steps In: Michigan and the Detroit Institute of Arts, May, 1977

(EX3083) at DIAINSP119249.) Subsequently, the DIA received a "major portion" of its

financial support from the State. (*See id.* (noting that there was a "change in its patronage" that

resulted in a large portion of DIA funding support coming from the State, creating a broader,

stronger DIA with "programs which serve all the people of Michigan").) In 1974, the City's

budget department determined there would be an overwhelming deficit in the City's budget and,

as a result, significant cuts were imposed on the DIA beginning in 1975. City funding for the

museum was cut by $786,000, approximately a third. (*Id.* at DIAINSP119252.) The reduction

in City appropriations was significant enough that the DIA Director was forced to make layoffs.

(*Id.*) In contrast to the 1930s layoffs, the DIA Director chose to retain curatorial staff and instead

terminate the guards – forcing the DIA to temporarily close to the public. *See* Arts Comm'n

Minutes, June 6, 1975 (EX3197) at DIAINSP013032 (noting that 58 employees, all guards and

building attendants, had been fired, and the DIA Director's decision to close the museum for a

month).)

**Transition From City Funding**

As the City's finances, and its ability to fund DIA operations, deteriorated, broad-

based State funding for cultural institutions was becoming more available. *See* Speech of

F. Cummings, The State Steps In: Michigan and the Detroit Institute of Arts, May, 1977

WEIL:\44542353\6\45259.0007

(EX3083) at DIAINSP119253–54.)[16]  In 1974, the Michigan Council for the Arts appropriated funds for major cultural institutions in the State, including $150,000 for the DIA, which funds were "to be used only for outreach programs to the entire state."  (*Id.* at DIAINSP119253.)  DIA Corp. decided to assist the City with pursuing additional government funding.

Considering which avenue to focus on, DIA Corp. elected to pursue State funding because it believed an appeal before the State Legislature for an increase in support from the Michigan Council for the Arts could result in funds that could be used for DIA Corp. operations. (DIA Corp. Minutes, June 17, 1975 (EX3209 at DIAINSP022515.)  With that decision made, DIA Corp. commenced an extensive lobbying campaign, complete with direct contacts with key state officials.  (Speech of F. Cummings, The State Steps In:  Michigan and the Detroit Institute of Arts, May, 1977 (EX3083) at DIAINSP119254–55.)  The campaign form letter, as suggested by the DIA Director, emphasized, among other things, that "75% of the [DIA's] audience live outside the City of Detroit."  (Letter from DIA Director, May 29, 1975 (EX3212).)  In a speech, the DIA Director attributed DIA Corp.'s successful funding campaign to circumstances including that  the DIA's "audience comes largely from beyond the city limits of Detroit," and that the DIA had a "[t]radition of public tax support . . . going back to 1919 when it became the property and responsibility of the City of Detroit."  (Speech of F. Cummings, The State Steps In:  Michigan and the Detroit Institute of Arts, May, 1977 (EX3083) at DIAINSP119257–58.)  Along these lines, in 1978, the State again recommended appropriations for "cultural centers and other programs in cities which promote and conduct activities of state importance," including money for the DIA.  (*See* Ag. Op. No. 6225, May 7, 1984.)

---

[16] State programs were established as early as 1966 with the Michigan Council for the Arts, and by 1972 a Legislative Committee on the Arts (a joint committee between the Michigan House and Senate) was formed to find a solution to the increasing needs of Michigan's cultural institutions.  (*See* Chronology of City/State Funding of DIA (EX3232).)

WEIL:\44542353\6\45259.0007

As State funding increased, City funding of the DIA diminished from $1,792,000 to $47,000 in 1976. (*See* Speech of F. Cummings, The State Steps In: Michigan and the Detroit Institute of Arts, May, 1977 (EX3083) at DIAINSP119256.) The offset meant that State funding only marginally increased the DIA's operating budget; however, even this slight increase was sufficient to allow for the "first full year of stable operations in many many years." (*Id.*) Going forward, the City continued to provide "token" funding to the DIA as the DIA Corp. budget continued to grow. (*Id.*) By 1977, DIA Corp.'s projected budget had increased to $1,800,000 (in addition to a $1,000,000 art acquisition program). (*Id.*) Thereafter, State appropriations for the DIA continued for many years until, in the 1990s and 2000s, it began to dwindle. In fiscal year 2010, State funding was drastically reduced to $20,000 and, in light of its budgetary issues, DIA Corp. laid off 20% of the museum's employees. (*See* Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2010 (EX263) at 8, 28.) DIA Corp. remained financially challenged in the ensuing years, through 2012. (*See* Erickson Dep. 151:18–21 July 22, 2014.) Around this time, a member of DIA Corp.'s board of directors suggested that the museum sell artwork to fund its operations, but this was not pursued. (*See id.* at 151:18–152:9.)

In 2010, DIA Corp. engaged in a lobbying campaign that ultimately resulted in tax millage funding to the DIA (the "**Millage**") from Oakland County, Macomb County, and Wayne County (collectively, the "**Counties**"). (*See* DIA Corp. Minutes, Nov. 17, 2010 (EX3263) at 2 (noting legislative updates relating to the planned millage and the existence of a "special millage committee").) DIA Corp. worked to propose state legislation enabling the Counties to vote to approve the proposed Millage. (*See* Memorandum re: Draft Proposal for Cumulative Monetization of the Cultural Assets – the Detroit Institute of Arts, Nov. 11, 2011 (EX3245) at POA00000762 (noting that, as of November 2011, "Ms. Seabrooks and [DIA

WEIL:\44542353\6\45259.0007

Corp.] are proceeding with legislation in Lansing (Senate Bill 1578)" to allow for a regional millage); MICH. COMP. LAWS §§ 123.1201 *et seq.* (Art Institute Authorities Act).) Mayor Bing also wrote a personal letter to the Counties' commissioners requesting their votes "to allow citizens in [their] counties to decide whether to support a sustainable business model for this jewel of our region." (Letter from Mayor Bing to County Commissioners (EX344).) Bing told the commissioners that the City did not intend to sell the DIA Collection and concluded, "My wife Yvette and I are devoted to the DIA. We would greatly appreciate your continuing support for this world class regional institution." (*Id.*)

On August 7, 2012, in a "very close" vote, citizens of the Counties passed the Millage pursuant to a ballot with the following description:

> The . . . County Art Institute Authority established pursuant to Public Act 296 of 2010 to allow for continuing support of art institute services for the students, residents and visitors of [the] County. The law allows the Authority to seek authorization from the electors to levy a tax of not more than 0.2 mill (20 cents per $1,000 of taxable value) on real and personal property to provide revenue to an art institute services provider for this purpose.

(*See* Detroit Free Press, How DIA Millage Will Look On Your Ballot On Tuesday, Aug. 6, 2012 (EX3261) (noting that the Counties' respective ballots were largely identical except for certain amounts); Mosey Dep. 85:10–13 (noting that the vote for the Millage was "very close"); Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2012 (EX3181) at 30 (noting that the Millage was approved by voters on August 7, 2012 and would remain in effect through 2023).) The Millage provides approximately $23 million in annual funding. (*See* Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2012 (EX3181) at 30.)

The City has continued to provide limited funding in support of the DIA; in 2011-2012 it provided $375,000 to fund operations and $1,007,565 for capital projects. (*Id.* at 8.) The State awarded a grant of $20,000 in 2010 and, in 2011, a one-time appropriation of

WEIL:\44542353\6\45259.0007

$10,000,000 to fund capital projects.  (*See id.*)  The State provided no funding for the fiscal year ending June 30, 2013.  (Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2013 (EX266).)

**Formalizing the Relationship Between the City and DIA Corp.**

The relationship between the City and DIA Corp. has evolved throughout the years, with varying degrees of formality, ultimately culminating in the current arrangement whereby DIA Corp. is completely responsible for the management and operations of the museum.  This was not always the case and, at many points, there was considerable tension between the City and DIA Corp.

As indicated above, DIA Corp. has been involved with the Arts Commission and the DIA since their inception.  For many years the relationship between the City and DIA Corp. was informal, but well understood with distinct areas of responsibility.  *See* Relationship Between Arts Commission and Founders Society, undated (EX3242).  Generally, the Arts Commission functions included: appointing the DIA Director; holding real property; acquiring, collecting, and owning works of art in the name of the City; establishing the rules for the management of the property under its control; and exercising any other powers necessary for the discharge of its duties.  (*See* Interrelationship of Arts Commission and Founders Society, Nov. 26, 1971 (EX3225).)  DIA Corp., on the other hand, would solicit, receive and administer money, property and works of art to be added to the City collection, and would promote people's interest in art with classes, exhibits, and other methods.  (*Id.*)  In 1947, the Arts Commission retained the services of DIA Corp. with a one-page agreement that allowed DIA Corp. to use space within the DIA to conduct its operations.  (*See id.*; Agreement between Arts Commission and DIA Corp., Oct 8, 1947 (EX3258); Arts Comm'n Minutes, Oct. 8, 1947 (EX3314) (approving agreement).)  Members from both DIA Corp. and the Arts Commission would

WEIL:\44542353\6\45259.0007

participate in joint committees that made decisions about the DIA Collection, major changes in

policy, and other matters relating to the management of the museum. (*See* Interrelationship of

Arts Commission and Founders Society, Nov. 26, 1971 (EX3225).) The Arts Commission,

however, maintained the view that it "exercises the power of review of all the museum's

activities, and activities of other organizations within the museum." (*See* Statement of Over-all

Arts Commission Policy, undated, (EX3243).) This informal arrangement continued for many

years, until the 1980s.

On or around April 15, 1982, representatives from DIA Corp. intended to meet

with Mayor Young to discuss the City's ongoing relationship with DIA Corp. (*See* Agenda for

Meeting with Mayor Young from 1982 Committee folder, undated (EX3084).) The meeting

notes characterize DIA Corp.'s perspective: DIA Corp. was not under the control of the Arts

Commission, it had its own policies and procedures, and its relationship with the City was

"based entirely on good will and an unwritten and unmandated goal to aid a City of Detroit

institution." (*Id.*) The meeting notes conclude: "[T]his is fragile and can easily be damaged or

destroyed since good will alone is key to it . . . ." (*Id.*)

The following year, amid rumors of mismanagement, the City conducted a

comprehensive audit of the DIA (the "**1983 Audit**"). (*See* DIA Chief Under Fire; Audit On,

Detroit News, Aug. 21, 1983 (EX3239); Arts Comm'n Minutes, Sept. 27, 1983 (EX3259) at 3

(noting statement by Mayor that the audit had been ordered to protect the City because of an

"imminent article . . . on museum affairs").) The auditor's report stirred considerable

controversy and, in light of numerous, troubling findings, the auditor ultimately "recommended

abolishing the role of the DIA's private support group, the [DIA Corp.] . . . ." (City's DIA Audit

Finds No 'Willful' Violations, Oct. 12, 1983 (EX3085).) As a result of the audit scandal, on

36

January 31, 1984, the DIA Director resigned.  (Arts Comm'n Minutes, Jan. 31, 1984 (EX3199) at DIAINSP013883.)

In the wake of the report, both DIA Corp. and City officials reaffirmed the City's ownership and control over the museum.  There was a meeting between the President of DIA Corp. and the Mayor, during which the President assured the Mayor that "clearly the City owns the Museum and exercises control."  (Arts Comm'n Minutes, Sept. 27, 1983 (EX3259) at DIAINSP091894 (describing the meeting).)  The Mayor decided that, among other things, there should be a clear delineation of responsibilities between the City and DIA Corp. and clarification of DIA Corp.'s role.  (*Id.* at 3.)  The Arts Commission agreed, ordering "key changes in the operation of the Detroit Institute of Arts," which included a new policy, promised by the Mayor, of "prohibiting the commingling of private and public money and of responsibilities between the DIA and its fund-raising arm, the [DIA Corp.]."  (The Detroit News, Key Changes Ordered in Art Museum Operation, Nov. 11, 1983 (EX3086).)  Several interim contracts were executed before negotiations culminated in a comprehensive agreement in 1984.  (*See* Agreement between City and DIA Corp., Finance Dept. Contract No. 61261, May 15, 1984 (EX3087) (the "**1984 Agreement**") § 5(C) (describing interim contracts).)

The 1984 Agreement made explicit that DIA Corp. was an "independent contractor" of the City, and that "[n]o relationship other than that of independent contractor shall be implied between the parties . . . ."  (*Id.* at Exhibit E § 6.05.)  Its recitals stated that DIA Corp. was being engaged to provide services based on its art expertise and fundraising capabilities.  (*Id.* at Recitals.)  While the agreement established a co-operative approach whereby the City and DIA Corp. would each be responsible for certain activities, this was "all subject to the overall control and approval of the [Arts] Commission as required by the City Charter."  (*Id.* § I.)

In the ensuing years, as State funding reached a low point and the DIA's operating funds diminished to crisis levels, the City recognized that the "co-operative approach" established in the 1984 Agreement with DIA Corp. was inefficient and expensive. (*See* Memo, Management Audit of DIA proposed transfer of management from the City to a nonprofit organization, Oct. 13, 1997 (the "**1997 Audit Report**") (EX3089) at i (describing inefficiencies and redundancies of the dual management system); *id.* at 7 (noting that the DIA was experiencing a financial crisis).) Motivated by fiscal problems of its own, the City began a process of carefully weighing alternatives, which involved issuing a Request for Proposals for a third party to provide services to the DIA, and ultimately asking the Auditor General to analyze the possibility of having a nonprofit entity manage the DIA. (*See* Arts Comm'n Minutes, Oct. 31, 1997 (EX3088) at 2 (noting that a Request for Proposals had been issued for a range of services relating to the DIA, and also considering the Auditor General's analysis).)

On October 13, 1997, the Auditor General issued a report on the 1997 audit of DIA Corp., which confirmed that the then-existing co-operative management system for the DIA was redundant, and recommended that the "City transfer management of the daily operations of the [DIA] to the [DIA Corp.], under the oversight of the Arts Commission." (1997 Audit Report, Oct. 13, 1997 (EX3089) at vi.) On October 31, 1997, the Arts Commission reviewed this report and decided to recommend a contract with DIA Corp. to the City Council. (*See* Arts Comm'n Minutes, Oct. 31, 1997 (EX3088) at 4 (noting vote approving agreement).)[17] The Operating Agreement for the Detroit Institute of Arts (the "**Operating Agreement**") was approved by City

---

[17] Soon after, DIA Corp. staff were informed at a meeting that, notwithstanding their new responsibilities under the proposed agreement, the collection would remain property of the City. (*See* Agenda, DIA general museum staff meeting, Nov. 6, 1997 (EX3240) at 2–3 (noting, in a summary of the agreement, that "[o]wnership of all of the museum assets still belongs to the City of Detroit," that "[t]he oversight role of the Arts Commission will continue," and "all purchases will be the property of the city of Detroit.").)

WEIL:\44542353\6\45259.0007

Council on November 26, 1997, and was executed on December 12, 1997. (*See* Operating

Agreement, Dec. 12, 1997 (EX254) at 64 (noting date of approval by City Council and of

execution).) The Operating Agreement became effective on February 1, 1998. (*Id.* § A(17)

(noting that the effective date for the Operating Agreement was February 1, 1998).) It continues

to govern the parties' relationship today.

Pursuant to the Operating Agreement, DIA Corp. remains an independent

contractor. (Operating Agreement, Dec. 12, 1997 (EX254) § E(2).) Its responsibilities,

however, have been expanded to include both the management and operation of the DIA. (*See

id.* § D(1) ("[T]he City hereby engages the [DIA Corp.] as manager and operator of the DIA, and

the [DIA Corp.] hereby agrees to faithfully and diligently manage and operate the DIA in

accordance with the terms and conditions of this agreement . . . .") (emphasis omitted).) DIA

Corp. is responsible for funding the museum's operations and, in exchange, is entitled to use all

revenues derived from operations and otherwise received on behalf of the DIA (from gifts or

otherwise). (*See id.* § F(9) (providing DIA Corp. the right to receive and use revenues); *id.*

§ F(10) (providing that DIA Corp. is responsible for operating expenses).) As with prior DIA

Corp. agreements, the Operating Agreement confirms that DIA Corp. is accountable to the Arts

Commission and subject to its oversight. (*See id.* § G(1) ("[T]he Arts Department, headed by the

Commission, shall continue to exercise its mandated responsibility for maintenance and

operation of the DIA, and shall administer and monitor the performance by the [DIA Corp.] of

the [DIA Corp.]'s obligations, all as provided for in this agreement.") (emphasis omitted); *id.*

Recital 11 ("The parties acknowledge the important role played by the [Arts] Commission in

overseeing the DIA and agree that its oversight role is not diminished by the terms of this

agreement.") (emphasis omitted).) The Operating Agreement confirms that title to the City's art

39

collection remains with the City, (*id.* at § F(2)(b)), and prohibits DIA Corp. from clouding the

City's title to the DIA Collection. (*Id.* at § F(7) (restricting the right of DIA Corp. to "encumber,

hypothecate, mortgage, subject to a lien or otherwise cloud the title of . . . works in the City art

collection").) The Operating Agreement also has an integration clause, and provides that there

are no third party beneficiaries to the agreement. (*See id.* § S ("This Agreement . . . constitute[s]

the entire agreement between the parties concerning the subject matter hereof. There are no

promises, terms, conditions or obligations other than those contained herein . . . . [and it]

supersede[s] all previous agreements, communications, negotiations and representations, whether

oral or written between the City and the [DIA Corp.]"); *id.* § N(2) ("This agreement is for the

sole benefit of the parties and their permitted successors and assigns, and no other person shall

be deemed to be a third party beneficiary under or entitled to derive any benefit from this

agreement.").)

**Policies Governing DIA Corp.**

   DIA Corp. currently manages the City's collection pursuant to the Detroit

Institute of Arts Collections Management Policy (the "**Collections Management Policy**"), and

in compliance with the Code of Ethics of Museums (the "**Museum Ethical Code**") of the

American Association of Museums (the "**AAM**"). (Collections Management Policy, Feb. 13,

2012 (EX267) (Pérez Decl. Ex. 267); Operating Agreement, Dec. 12, 1997 (EX254) § F(2)(a).)

The Collections Management Policy, as a formalization of museum practices, is a commonplace

type of document widely used by museums to manage their collections and staff. (*See* A Legal

Primer on Managing Museum Collections, Marie Malaro and Ildiko DeAngelis, 45–47 (3rd ed.

2012) (EX3068) (describing collections management policies, and noting that such a policy is "a

detailed written statement that explains why a museum is in operation and how it goes about its

business," and which "serve[s] as a formal delegation of responsibilities").) Consistent with this

WEIL:\44542353\6\45259.0007

purpose, the DIA Collections Management Policy is intended to facilitate the prudent

management of the City's art collection.  (Collections Management Policy, Feb. 13, 2012

(EX267) (Pérez Decl. Ex. 267) at 3 (noting that the DIA Director is responsible to the Mayor and

Arts Department for "[p]rudent management of the Collections," that "[p]rudent management

dictates" written policies, and this document is "intended to fulfill that need").)  The policy

governs a wide range of collection-related museum practices, including:  (1) determining which

artwork to acquire; (2) acquiring artwork; (3) de-acquisitioning or "deaccessioning"[18] artwork;

(4) making loans of artwork; (5) caring for artwork; (6) recordkeeping; (7) maintaining

inventories and more.  (See Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl.

Ex. 267).)  In each of these categories, specific processes and procedures are outlined in detail.

(Id.)  The Collections Management Policy also plays an important role as "the guiding principle"

of how the museum "collects," and is a way for the DIA Director to define the museum's

"collecting attitude."  (See JMCC Minutes, Jan. 11, 1995 (EX3213) at 4 (noting discussion of the

Collections Management Policy and the DIA Director's instruction that it needs to be discussed

"based on who we are, what we're trying to be, what we're not, and whether we've become

anything that we no longer wish to be").)[19]  The Collections Management Policy includes

---

[18] "Deaccessioning" refers to the process used to remove an object from a museum collection, usually in order to sell the item concerned.  (See Oxford English Dictionary¸ "Deaccessioning" ("To remove an entry for (an exhibit, book) from the accessions register of a museum, library, etc., usu. in order to sell the item concerned."); see also A Legal Primer on Managing Museum Collections, Marie Malaro and Ildiko DeAngelis, at 248–49 (3rd ed. 2012) (EX3068) (describing deaccessioning as the process used to remove permanently an object from a museum's collection).)

[19] The AAM is an accrediting body that develops standards and best practices for museums, including the Museum Ethical Code.  (See About Us, http://www.aam-us.org/about-us; Museum Ethical Code, available at http://www.aam-us.org/resources/ethics-standards-and-best-practices/code-of-ethics (EX416). The AAM recognizes that, although its ethical guidelines are mandatory for accreditation, they are not legal requirements.  Indeed, the AAM characterizes its guidelines as creating a different standard than the law.  Developing an Institutional Code of Ethics, http://www.aam-us.org/docs/continuum/developing-a-code-of-ethics-final.pdf?sfvrsn=2 (EX3090) ("[L]egal standards are a minimum.  Museums and those responsible for them must do more than avoid legal liability; they must

WEIL:\44542353\6\45259.0007

provisions for amendment and waiver.  (Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § I.)

The DIA's Collections Management Policy originated from a proposal of the museum's registrar in the late 1980s.  (*See* Arts Comm'n Minutes, Dec. 4, 1987 (EX3200) at DIAINSP015034.)  As explained by the DIA Director, it was intended to "codify all the collections management policies and principles under which the museum has been operating (but which have not been formalized)."  (Arts Comm'n Minutes, Jan. 27, 1988 (EX3201) at DIAINSP015055.)  The DIA's original collections management policy was prepared in 1991.  (*See* Memo, Mar. 2, 1995 (EX3241) at DIAINSP121061 (reflecting that the policy was first approved by a museum committee on March 6, 1991).)  It was revised several times and, over one year after it had been approved by the museum, the policy was presented to the DIA Corp. board and approved.  (*See id.*)  The DIA Director then proposed it to the Arts Commission, and it was again approved.  (Arts Comm'n Minutes, Sept. 30, 1992 (EX3202) at 2.)

In 1998, when the Operating Agreement became effective, DIA Corp. was contractually bound to adhere to the provisions of the Collections Management Policy.  (*See* Operating Agreement, Dec. 12, 1997 (EX254) § F(2)(a) (noting that DIA Corp. "shall be responsible for managing the [DIA Collection] in accordance with the DIA's Collections Management Policy," which "shall be consistent with state-of-the-art practices that are generally recognized, accepted and followed by leading fine arts museums.").)

---

take affirmative steps to maintain their integrity so as to warrant public confidence. They must act not only legally but also ethically.") (quotation omitted).)  The City Council has, at times, approved policies for the DIA on the basis that they are generally accepted museum practices, approved by the AAM.  (*See, e.g.,* City Council Minutes, May 15, 1989 (EX3098) (noting that the "Detroit Institute of Arts . . . would like to adhere to generally accepted principles of museum ethics as currently espoused by the American Association of Museums," and then passing a resolution approving the requested museum policy).)  The DIA has been AAM-accredited since 1973, and was reaccredited in 1984.  (Arts Comm'n Minutes, Jan 31., 1984 (EX3199) at 5.)

WEIL:\44542353\6\45259.0007

**DIA Corp. Records**

        DIA Corp. keeps "exhaustive" records on its collection.  (*See* Erickson Dep. 74:15–16 ("[A]s a museum we keep exhaustive records of the collection.  That's part of what we do in stewardship.").)  The museum records at the DIA can be divided into two general categories, historical documents found in the museum's archives (the "**Archives**") and operative museum records maintained in the office of the registrar (the "**Registrar**").

        The Archives contain over 1,600 cubic feet of museum records and related materials dating from 1876 to the present.  (*See* Summary Inventory of Archives, Nov. 1, 1990 (EX3272) (Pérez Decl. Ex. 3272).)  The textual documents "consist mainly of administrative and curatorial files, financial records, and reports and publications of the Detroit Institute of Arts," all of which have been carefully inventoried.  (*Id.*)  Many of the documents – particularly the files of past DIA Directors – are arranged topically and chronologically, and are summarized with descriptive indexes.  (*See id.; see, e.g.*, Finding Aid, Clyde H. Burroughs Records, Mar. 1992 (EX3266) (describing contents of 63 linear feet of records, and including a biography of Burroughs, a topical breakdown of files, notes on each box and folder, and an index of subjects with references).)   Among other things, the Archives include central files that contain the past minutes of the DIA Corp. board and the Arts Commission.  (*See* Summary Inventory of Archives, Nov. 1, 1990 (EX3272) (Pérez Decl. Ex. 3272) at 49.)

        The Registrar maintains records that physically identify, describe the legal status of, and historically trace the use, care, and activities of objects in the Museum's control.  (Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) at 20.)  Among other things, the Registrar keeps a central file that includes "original documents establishing right and title to objects."  (*See id.* at 18.)  Where a donation is made by bequest, "a copy of the will, all codicils, and the letters testamentary [are] . . . kept in the records of the Registrar's

WEIL:\44542353\6\45259.0007

permanent collection." (*Id.* at 10.)  Where a piece of artwork is purchased with DIA Corp. funds, the Registrar will receive a "Funds Designated" form reflecting which funds were used to purchase the object and will include this form in its files.  (*Id.* at 11; *see Outline of the Accession Process*, Oct. 27, 2010, DIA Collection Management Policy Attachments (EX3286) (Pérez Decl. Ex. 3286) at DIAINSP005364.)  The Registrar also must maintain an inventory of the collection, including conducting a comprehensive inventory of the DIA Collection every ten years and also an annual physical inventory from a list of all objects valued at $1,000,000 or more.  (*See* Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) at 20.)  The Collections Management Policy incorporates, as a supplement, a Code of Ethics for Registrars. (*See Code of Ethics for Registrars*, Jan. 7, 2003, DIA Collection Management Policy Attachments (EX3286) (Pérez Decl. Ex. 3286) at DIAINSP005417–21.)  Among other things, this code describes the role of the Registrar and provides that the "records and documents that form a body of information pertaining to the collections . . . are the responsibility of registrars and are the cornerstone of the registrarial function." (*Id.*)  These records "comprise legal documents establishing ownership . . .of objects" and records of "accession" and "donor." (*Id.*) The policy requires the Registrar to "maintain records that are meticulously complete, honest, orderly, retrievable, and current" and requires that they "be able to provide current information on each object, its location, status, and condition." (*Id.*)

The Registrar is heavily involved with the accession process (as described below) and, at least under current practices, maintains thorough records on each object in the DIA Collection.

**Accession Process**

Objects are acquired and accessioned to the DIA Collection pursuant to criteria and procedures set forth in the Collections Management Policy.  (*See* Collections Management

44

Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § IV (describing accession considerations and procedures).) Objects proposed to be added to the DIA Collection first are received by the Registrar. (*See Outline of the Accession Process*, Oct. 27, 2010, DIA Collection Management Policy Attachments (EX3286) (Pérez Decl. Ex. 3286) at DIAINSP005362.) This is true whether the object has been received as a gift or has been selected by a curator as a potential purchase. (*Id.*) The process for accessioning is as follows.

First, the Registrar will send a "Museum Receipt" to whomever sent the object (whether a donor, gallery, or otherwise). (*See id.* at 2; *see, e.g.*, Museum Receipt, Feb. 5, 1990 (EX3287) at DIAINSP062982 (providing that the object will be held under certain conditions and cared for by DIA Corp. while a decision is made whether to accept it).) The receipt is to be signed and returned, along with a Form Deed of Gift (for gifts) or a Standard Purchasing Agreement (for purchases). (*See Outline of the Accession Process*, Oct. 27, 2010 at 2, DIA Collection Management Policy Attachments (EX3286) (Pérez Decl. Ex. 3286) at DIAINSP005362, 64; *see, e.g.*, Letter with Standard Purchasing Agreement, Aug. 21, 2000 (EX3285) (Pérez Decl. Ex. 3285) at 2 (including Standard Purchase Agreement in which the object's owner agrees to sell to DIA Corp. all of rights, title and interest in and to the object and represents that the object is owned free and clear of all liens, claims, restrictions, and encumbrances).)

The Registrar then will create an object file that contains these and other documents relating to the object, and will also enter certain relevant information into an electronic database called The Museum System.[20] (*Outline of the Accession Process*,

---

[20] It appears that The Museum System can be used to generate detailed reports that identify which artwork came from a particular donor and how it was received. (*See, e.g.*, Report, Objects from the Estate of W. Hawkins Ferry, Sept. 10, 2009 (EX3215) (listing every item received from this estate, with a breakdown of gifts, bequests, life-estate gifts, and purchases).)

WEIL:\45423553\6\45259.0007

Oct. 27, 2010, DIA Collection Management Policy Attachments (EX3286) (Pérez Decl. Ex. 3286) at DIAINSP005363–64.)  The object file will include, among other things, the signed museum receipt, the signed deed of gift or purchase agreement, and, for purchases, a "Funds Designated Form" prepared by the Finance and Administration Department listing all of the proposed funding sources that would be used for the purchase.  (*See id.* at DIAINSP005364; *see, e.g.*, Form, Approval of Funds Designated for Acquisition, circa 2000 (EX3288) at DIAINSP079829 (listing the funds to be used to acquire a painting with a space to note whether there are any restrictions on the funds, and signature blocks for execution by a curator, the DIA Director, the Director of Finance and Administration, and the Chairman of the Endowment Committee).)  The file will also contain, in the case of a bequest, a copy of the will, all codicils, and the letters testamentary.  (*See* Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § IV(I)(7).)  The Registrar is responsible for ensuring that all required documentation is in hand and all legal requirements are complied with.  (*See id.* § IV(D).)

When the signed museum receipt has been returned and the object's documentation has been collected, the Registrar will include the object on a report that is presented at each monthly meeting of the Collections Committee.[21]  (*See* Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § IV(D); *Outline of the Accession Process*, Oct. 27, 2010, DIA Collection Management Policy Attachments (EX3286) (Pérez Decl. Ex. 3286) at DIAINSP005365.)[22]  If the Collections Committee approves the object

---

[21] Pursuant to the Collections Management Policy, the Collections Committee serves as an advisor to the DIA Corp. Board of Directors on the acquisition and de-acquisition of art objects and on the Collections Management Policy.  (*See* Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § III(A).)  The Collections Committee operates under procedures established by the DIA Corp. Board of Directors with the concurrence of the Arts Commission.  (*See id.*)

[22] In the case of urgent decisions or objects worth less than $25,000, the DIA Director may avoid a full Collections Committee Meeting.  (*See id.* §§ IV. E, F.)

WEIL:\44542355\6\45259.0007

for accessioning to the DIA Collection, the object will then be recommended to the DIA Corp. Board of Directors. (*See id.* at DIAINSP005366.) If the Board approves it, the object is then reported to the Arts Commission for its consideration and, if approved again, assigned an accession number and added to the DIA Collection. (*See id.*; Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § IV(H); Operating Agreement, Dec. 12, 1997 (EX254) § F(39) (providing that DIA Corp. must submit a report of acquisitions to the Arts Commission); *see also* Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2006 (EX259) at 6 ("Title to art objects purchased by or donated to the DIA is offered to the City of Detroit Arts Department and title transferred when accession to the permanent collection has been approved by the Board of Directors of the DIA and the Arts Commission of the City of Detroit.").)

As mentioned, DIA Corp. holds objects pending Arts Commission approval. For many years, objects that were not suitable for the DIA Collection (sometimes referred to as "minor works") would remain in the possession of DIA Corp in its own, separate collection (called the "**Study Collection**") where it could be used by scholars or sold.[23] (*See* Memo to Mayor from DIA Director, July 20, 1987 (EX3218) at 4.) In the period from the 1940s to the 1960s, the Study Collection was used for certain types of gifts of less than complete title that became available under then-new IRS tax laws, *e.g.*, life interest gifts, where the donor retained the right to use the property until his/her death. *Id.* Gifts such as these were held in the Study Collection until such time as DIA Corp. obtained 100% ownership, at which point DIA Corp. would deed over the object(s) to the City for the DIA Collection. (*Id.*) In 1973, the Study

---

[23] Consistent with the two-step accession process, the City's collection (the DIA Collection) was referred to as the "permanent collection," as compared to DIA Corp.'s Study Collection (in which DIA Corp. held objects before a decision was made to add them to the DIA Collection). (*See* Memo to Mayor from DIA Director, July 20, 1987 (EX3218) at DIAINSP045921.)

47

WEIL:\44542353\6\45259.0007

Collection was renamed the "Founders Society Collection," and it was decided it would contain, among other categories: (a) works of art accepted for trade or resale; (b) works of art in the process of being purchased but not yet fully paid for, where clear 100% ownership could not yet be transferred to the City; (c) works of art where estate or legal problems had not yet been cleared; and (d) works of art on paper, such as prints and photographs, which are "fragile, potentially duplicative, susceptible to trading up or resale or otherwise transitional in the collection." (*Id.* at 5.)[24]

Under the current Operating Agreement, it is not clear whether or to what extent newly-acquired objects are held in DIA Corp.'s own collection pending accession to the City. Certainly, DIA Corp. continues the practice of holding objects in its custody until they are accessioned to the DIA Collection. (*See supra* at 44–45.)

## Origins and Composition of the DIA Collection

The DIA Collection is comprised of artwork from three sources: (1) artwork purchased by the City; (2) artwork purchased by DIA Corp. with donated funds and then transferred to the City; and (3) artwork donated from individual donors. Each category is credited differently in the City's records, and in the case of gifts and donor-fund purchases, acquired through a different set of procedures. One constant is the Arts Commission.

Arts Commission approval is and has been required for every object accessioned to the DIA Collection, regardless of how it was acquired. (*See* Financial Statement, Detroit

---

[24] Property in the Founders Society Collection was, at least in records, kept separate from property in the DIA Collection. (*See* 1984 Agreement (EX3087) § 8(E) (noting that the "Founders Collection" is intermingled with the "City art collection," but that the two collections can be distinguished by reference to museum records); Memo to Mayor from DIA Director, July 20, 1987 (EX3218) at 5 ("Each of the collections is separately identified on the computer and each work of art is separately identified, described, and inventoried on the computer system. Each collection and each work of art is instantly accessible on the computer system at any time to scholars, staff, Arts Commissioners, the Mayor, and other interested parties.").)

WEIL:\44542353\6\45259.0007

Institute of Arts, Year Ended June 30, 2013 (EX266) at 7 (noting that objects are not transferred to the City and accessioned to the DIA Collection without prior approval from the Arts Commission); *see also* Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § VI.I(4) (providing that (i) gifts and bequests shall be accepted without restriction or commitment, (ii) no guarantee may be made that the object will be retained by the DIA in perpetuity, and (iii) any exception to this policy must be submitted to the Arts Commission).)  In the case of an object donated to DIA Corp., for example, once DIA Corp. had determined such object was suitable for the City's collection, DIA Corp. would give notice of the object to the Arts Commission.  (*See, e.g.*, Letter from DIA Corp., Dec. 18, 1923 (EX3214) (noting that six items had been received for the collection that would be brought to the attention of the Arts Commission).)  The approval or rejection of such object was then recorded in the Arts Commission minutes.  (*See, e.g.*, Arts Comm'n Minutes, Sept. 11, 1944 (EX3185) at DIAINSP011213–14 (identifying and listing gifts, then moving to approve them); Arts Comm'n Minutes, July 7, 1991 (EX3203) at DIAINSP016202 (approving "Purchases and Gifts of Works of Art").)

The Arts Commission minutes would also indicate whether proposed gifts were subject to restrictions.  Nearly every such gift was rejected because "it was contrary to the policy of the Arts Commission to accept gifts with restrictions that would be binding on its successors." (Arts Comm'n Minutes, Jan. 27, 1941 (EX3147) (Pérez Decl. Ex. 3147) at DIAINSP011135 (noting policy and rejecting a gift with a restriction that would permit the donor to dispose of the gift differently unless it were exhibited); *see, e.g.*, Arts Comm'n Minutes, June 25, 1934 (EX3148) at DIAINSP010930 (rejecting a bequest of artwork where the gift was "on [the] condition that they are to be continually used for exhibition in the Art Museum"); Arts Comm'n

WEIL:\45425353\6\45259.0007

Minutes, Sept. 24, 1951 (EX3149) at DIAINSP011450–51 (noting a bequest where the gift would have to be exhibited eight months of the year or else be returned to the heirs of the donor, and advising DIA Corp. that "the Arts Commission could not be bound by such limiting terms in receiving gifts of this type"); Arts Comm'n Minutes, Jan. 14, 1952 (EX3150) at DIAINSP011466 (rejecting bequest where there existed "limitations contained in the bequest which would prevent the museum from ever taking clear title to the gifts"); Arts Comm'n Minutes, Jan. 14, 1957 (EX3145) at DIAINSP011720 (rejecting a donation where the donor requested that "the Arts Commission assure permanent exhibition" as a condition for the gift, but noting that the paintings could be accepted if no conditions attached"); Arts Comm'n Minutes, May 23, 1932 (EX3184) at DIAINSP010858 (moving to accept a gift, provided that it was unconditional).)

*City of Detroit Purchases*

As mentioned, City funding for art purchases began soon after the creation of the Arts Commission in 1919. These City of Detroit Purchases account for approximately 4.5% of the DIA Collection, including 17% of the Major Works.[25] (*See* List of Major Works (EX3122) at DIAINSP000001–203; DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123) at DIAINSP124564.) Each of these acquisitions is credited in the museum's records as a "City of Detroit Purchase."[26]

---

[25] The Major Works consist of 436 works of art, each of which, as mentioned, DIA Corp. has ascribed a value of at least $750,000 for insurance purposes or otherwise. (*See* Letter from DIA Corp. Attorney re: Subpoena, Apr. 17, 2014 (EX3268) (noting that DIA Corp. would produce the list of Major Works); List of Major Works (EX3122) at DIAINSP000001–203.)

[26] Of the 2,818 City of Detroit Purchases currently in the DIA Collection, approximately 1,913 were acquired during the 1920s – more than any other period in the DIA's history. (*See* DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123) (providing information on artwork currently held in the DIA Collection, including accession year).) A count of the current objects in the DIA Collection suggests that the City's purchasing habits gradually tapered off between the 1920s and the 1960s. (*See id.* (reflecting that the DIA Collection currently contains 712 City-Purchased works of art from the 1930s, 132 from the

*Founders Society Purchases*

Approximately 24% of the DIA Collection, including 34% of the Major Works, were purchased by DIA Corp. (previously known as the Founders Society) using donated funds and then transferred to the City. (*See* List of Major Works (EX3122) at DIAINSP000001–203; DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123).) These acquisitions are credited in the museum's records as "**Founders Society Purchases**."

DIA Corp. has engaged in fundraising since the time of its inception. (*See* DMA BULLETIN, Oct. 1915 (EX3265) ("The Detroit Museum of Art receives endowments and gifts of money to be applied to the general or specific purposes of the Museum, and gifts and loans of paintings, sculpture and other objects that come within the scope of the different departments."); *see, e.g.*, DMA BULLETIN, 1916 (EX3214) at 15 (noting that the DMA's Committee on Accessions had solicited donor funds for the purchase of a painting).) At first, the DMA had only one form for gifts of funds (which provided for an unrestricted gift), and only later provided forms for monetary gifts for specific purposes. (*Compare* DMA Annual Rep. 1900, June 30, 1900 (EX3125), 1902, Oct. 20, 1902 (EX3246), 1907, Oct. 14, 1907 (EX3247), 1910, Oct. 14, 1910 (EX3248) and 1911, July 1, 1911 (EX3249) (providing a form for donations with the following language: "I do hereby give, devise and bequeath to the DETROIT MUSEUM OF ART. . . [blank]") *with* DMA Annual Rep. 1912, June 30, 1912 (EX3126), 1913, Oct. 14, 1913 (EX3250) and 1915, June 11, 1915 (EX3251) (providing a similar form for a "general" monetary donation and also a "special" form noting "here should follow the special purpose for which the money is to be used for as . . . 'for the purchase of works of art which shall bear my name,' etc.").) Monetary donations also were made by other means, and were at times made without

1940s, 25 from the 1950s).) The last City appropriation for the purchase of artwork was $5,000 in 1954. (*See* E-mail from W. Bloomfield to J. Opperer, re: DIA materials, May 29, 2013 (EX3306).)

WEIL:\44542353\6\45259.0007

condition.  (*See, e.g.,* Letter from DIA to W. Stevens, Apr. 3, 1916 (EX3127) at

DIAINSP120432 (including four unconditional bequests of funds to the Detroit Museum of Arts

made prior to April 3, 1916); Letter from Attorney to DIA Corp. Officer, Oct. 30, 1918

(EX3135) at DIAINSP050695 (quoting a gift worded "I give and bequeath unto the Detroit

Museum of Art the sum of $5,000").)

        DIA Corp. would use donated funds to purchase artwork, and then would transfer

title to such artwork to the City when the object(s) were accessioned to the DIA Collection.

(*See, e.g.*, Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2006 (EX259) at 6

("Title to art objects purchased by or donated to the DIA is offered to the City of Detroit Arts

Department and title transferred when accession to the permanent collection has been approved

by the Board of Directors of the DIA and the Arts Commission of the City of Detroit.").)

        For many years, using donated funds to acquire property for the City was one of

DIA Corp.'s express corporate purposes.  (*See* Restated Articles of Incorporation, Founders

Society Detroit Institute of Arts, Feb. 1, 1986 (EX3291) (listing among the purposes "[t]o assist

the Arts Commission of the City of Detroit in the operation of the" DIA and "[t]o solicit, receive

and administer money, works of art and other property"); Certificate of Amendment to the

Articles of Incorporation, Detroit Museum of Art Founders Society, Mar. 11, 1958 (EX3290)

(listing among the purposes "[t]o assist the City of Detroit in the operation of the Detroit Institute

of Arts by soliciting, receiving and administering money, property, and works of art to be

donated to the City of Detroit or otherwise used so as to add to the City collection of works of

art").)

        Indeed, DIA Corp. specifically adopted this purpose in 1920 when, after the 1919

Transfer, it resolved to continue its existence and to use its endowment funds to augment the

WEIL:\44542353\6\45259.0007

DIA Collection.  (*See* DMA Minutes, Jan. 27, 1920 (EX3091) at DIAINSP019858–59 (resolving

that the DMA would continue for the purpose of cooperating "in every way" with the DIA and

using its endowment funds to augment the DIA Collection).)  Today, DIA Corp. continues to

exist to purchase artwork with donated funds and convey ownership of such pieces to the City.

(*See* Restated Articles of Incorporation, Founders Society Detroit Institute of Arts, Jan. 26, 1998

(EX3289) (listing among the purposes "[t]o assist the Arts Commission of the City of Detroit in

the operation of the" DIA and to "solicit, receive and administer money, works of art and other

property"); Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2003 (EX3141) at

DIAINSP093553 (noting that "[t]itle to art objects purchased by . . . [DIA Corp.] is offered to the

City of Detroit Arts Department and title transferred when accession to the permanent collection

has been approved").)

As mentioned, DIA Corp. receives both restricted and unrestricted donations.

(*See* The Detroit Institute of Arts Gift Acceptance and Recognition Policy, approved

Feb. 16, 2011 (EX3128) at 3, 7.)  Donations are maintained in particular funds, depending on the

nature and purposes of the donations.  DIA Corp. carefully tracks these assets by keeping its

records in accordance with the principles of fund accounting.  (Financial Statement, Detroit

Institute of Arts, Year Ended June 30, 2013 (EX266) at 7.)  Pursuant to these principles, funds

are classified into three categories:

- Permanently restricted net assets, which are endowments that must be held in perpetuity (with the ability to use the earnings therefrom).

- Temporarily restricted net assets, which contain donor-imposed restrictions that permit DIA Corp. to use or expend the assets as specified. These include (i) funds where the entire balance can be spent for the purpose(s) specified by the donor, and (ii) earnings distributed from permanently restricted endowments that may be spent for the purpose(s) specified by the donor.

- Unrestricted net assets that are not restricted by donors, or the donor-imposed restrictions have expired.

(*Id.*)

Donations without any express donor limitation on the use of the funds – such as a gift of $5,000 "for miscellaneous purposes" or a gift of $10,000 with "no restrictions or limitations on the use"[27] – generally are regarded by DIA Corp. as entirely unrestricted. (*See*, *e.g.*, Letter from Attorney to DIA Corp. Officer, Oct. 30, 1918 (EX3135) at DIAINSP050695 (quoting a gift worded "I give and bequeath unto the Detroit Museum of Art the sum of $5,000," and commenting "[a]s you see the gift is entirely unrestricted"); DIA Corp. Endowment Committee Minutes, May 2, 1989 (EX3227) at DIAINSP114578–79 (resolving that "when Endowment Funds are unrestrictive as to the purpose for which its' earnings may be spent and/or undesignated gifts/bequests are received, that the Founders Society should not ask the donor and/or the heirs of the donor for their recommendations as to restrictions to place on the expenditure of the funds. It is the belief of the Committee that if the donor or devisor had intended that the Board consult with the donor or his/her heirs, such stipulations would have been placed on the gift.").)

The form of restricted monetary donations varies. For example, donors may make gifts to DIA Corp.'s endowment, which consists of approximately 130 individual funds. (Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2013 (EX266) at 16.) Gifts to the endowment are permanent – DIA Corp. may only use the income generated in the form of interest and investment performance. (*See* The Detroit Institute of Arts Gift Acceptance and

---

[27] (*See* Arts Comm'n Minutes, Nov. 11, 1946 (EX3131) at DIAINSP011268; Arts Comm'n Minutes, Mar. 12, 1965 (EX3310) at DIAINSP012296.)

WEIL:\44542353\6\45259.0007

Recognition Policy, approved Feb. 16, 2011 (EX3128) at 3, 7.) This income may be restricted to a particular purpose or not, depending on the donation.

Other restrictions may include restrictions as to timing, for example, when principal can be expended. (*See, e.g.*, Last Will and Testament of Ralph H. Booth, Sept. 15, 1927 (EX275) (the "**Booth Will**") at DIAINSP039792; Codicil of Ralph H. Booth, Oct. 6, 1927 (EX276); Codicil of Ralph H. Booth, Apr. 23, 1930 (EX277) (collectively, the "**Booth Bequest**") (providing that every five years, five percent of the principal amount of bequeathed funds would be available to expend, such that the entire gift would be consumed after approximately one hundred years).) Alternatively, some donors choose to designate special purposes for their monetary gifts.

DIA Corp. has received funds that were donated for a wide variety of expressed purposes. (*See, e.g.*, Arts Comm'n Minutes, Nov. 16, 1953 (EX3117) at DIAINSP011552 (listing funds donated to DIA Corp. for "specific purposes," such as the General Endowment Fund, the cleaning and repairing of tapestry, and the Museum Collection Purchase Prize, Michigan Artists Exhibition).) Of most relevance are funds donated for the purchase of artwork, in some instances a particular kind of artwork. (*See, e.g.*, Last Will and Testament of Charles L. Freer, May 4, 1919 (EX3160) at DIAINSP040649 ("I give and bequeath to the DETROIT MUSEUM OF ART the sum of five thousand dollars ($5,000), to be expended by its Trustees in completing and improving, by purchase or exchange, the collection of etchings, water colors, and drawings . . . heretofore given by me to said Museum .  . and for no other purpose."); Acknowledgment of Gifts, May 5, 1953 (EX3161) at DIAINSP041650 (acknowledging of gift of funds for purchase of specific painting); Last Will and Testament of William Hawkins Ferry, June 24, 1969 (EX253) at DIAINSP000283–89 (bequeathing funds "in

WEIL:\44542353\6\45259.0007

fee simple, absolutely" to the DIA Corp. "for the purchase of modern works of art").) DIA Corp. maintains funds with restricted purposes in separate accounts to ensure the purposes are adhered to. (*See* DIA Corp. Gift and Recognition Policy, approved Nov. 14, 2007 (EX3128) at 7 ("Donors may allocate gifts to specific projects or funds within the museum. These gifts are deposited in restricted accounts that may be used only for the stated purpose.").)

Only one example of a restriction on the use of property to be purchased with donated funds has been identified – the Booth Bequest. *See* Booth Will, Sept. 15, 1927 (EX275) at DIAINSP039792 (providing that artwork purchased with bequeathed funds must be displayed for eight months of each year).) The circumstances surrounding this gift were exceptional, given Booth's numerous leadership roles and years of work for the Arts Commission and DIA Corp. *See* Letter from Mrs. Booth, Apr. 21, 1942 (EX278) at DIAINSP040280 (noting that Mr. Booth was the first President of the Arts Commission and President of the DIA Corp. for many years); Arts Comm'n Minutes, July 14, 1931 (EX3165) at DIAINSP010835 (including a memorial resolution to Booth noting that "[u]pon his untiring work on behalf of the Institute it is needless for us to dwell . . . [h]e gave liberally with his money, and more than that, of his time, which was priceless" and noting that he would be aptly "apostrophized" by the saying "The Institute! It is myself!").) His unique role and relationship to the museum explains why his bequest of funds included a restriction unlike any other known, and there likely are no other examples of this.

DIA Corp. engages in careful management of restricted funds, which is reflected in the numerous points at which restrictions must be assessed, as well as the various ways they are recorded and tracked. Before a fund is used to acquire art, DIA Corp. completes a form indicating whether there are any restrictions and what they are (with a description). (*See* Form, circa 1998 (EX3163) at DIAINSP079829 (example form). The DIA Director must then approve

WEIL:\44542353\6\45259.0007

the expenditure. Letter, Feb. 28, 1995 (EX3244) at DIAINSP125558 (including a form from the DIA Director stating: "I examined the following work of art which is proposed for inclusion in the collection of the [DIA] through the fund listed below and I approve of this acquisition with this fund," and identifying the purchase).) DIA Corp. records all purchases made with a given fund, and provides that information to donors upon request. (*See* Letter from DIA Corp. to Donor, May 11, 1966 (EX3221) at DIAINSP049424 (providing a breakdown of artwork purchased with a particular fund); Acquisition Related Report, Feb. 7, 1995 (EX3257) (listing items connected to a particular donor and indicating which were acquired by gift or fund, and specifying the particular fund)).

*Gifts and Bequests*

Approximately 67% of the DIA Collection, including 48% of the Major Works, were acquired as gifts or bequests.[28] (*See* List of Major Works (EX3122) at DIAINSP000001– 203; DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123)).) As a matter of practice, dating back to 1919, DIA Corp. would receive gifts and bequests of artwork first, and then ownership of the objects would be transferred to the City. (*See* Arts Comm'n Minutes, Jan. 9, 1961 (EX268) at DIAINSP011973–75 (noting that "[i]t has been our practice for many years to have the Founders Society keep the donor's roll and to administer bequests. All gifts [and bequests] are, as a matter of routine, brought first before the Founders Society board of trustees and transmitted by them to the Arts Commission, who record them officially.").)

---

[28] A gift is an item transferred from a living person or existing entity (*i.e.*, inter vivos). A bequest is a gift made through a will upon the death of a person. The Arts Commission policy of refusing restricted donations applies equally to both. Certain of the form documents discussed herein, which provide additional evidence of this policy, apply to gifts only (since bequests were made pursuant to individualized, nonstandard wills and the like). Otherwise, the two are treated as the same and, unless noted otherwise, the term "gift" is used generally in this Brief.

WEIL:\44542353\6\45259.0007

The Arts Commission policy of not accepting any artwork (gifts or bequests) with restrictions, mentioned above, is evident from the aforementioned policy of rejecting donated objects with restrictions. (*See supra* at 48–50.) In addition, numerous documents used primarily in the gift process further support this. First, gifts were typically made with a form "deed of gift," the substance of which remained relatively unchanged throughout the history of the DIA. The form deed was drafted such that donors would: "give, assign and transfer . . . all [of their] rights, title and interest [in listed objects]." (Deed of Gift, circa 1960s (EX3132) at DIAINSP051932; *see* Deed of Gift of Artwork, Dec. 21, 1961 (EX3133) at DIAINSP040923 (transferring "all right, title, and interest" to listed artwork); Deed of Gift, Apr. 25, 1988 (EX3216) (Pérez Decl. Ex. 3216) at DIAINSP042364 ("I(We) give, assign and transfer to the [DIA Corp.] all my rights, title and interest in and to the following work(s) of art: [list of artwork]"); Deed of Gift from W. Hawkins Ferry, Oct. 20, 1988 (EX3134) at DIAINSP042284 ("I(We) give, assign and transfer to the Founders Society Detroit Institute of Arts all my rights, title and interest in and to the following work(s) of art: [lists art]."); *see* Letter re: Standard Deed of Gift Form, Oct. 9, 1992 (EX 3136) at DIAINSP079301–02 (identifying the "standard deed of gift form" circa 1992, which resembles the past forms).) The form included no conditions or opportunity for the donor to fill in conditions. Gifts made with this form were regarded as unrestricted gifts. (*See*, *e.g.*, Memo, Dec. 15, 1994 (EX3137) at DIAINSP044790 (noting that certain sculptures donated with the standard Deed of Gift were unrestricted gifts).)[29] Today, the

---

[29] Even nonstandard deeds of gift and wills frequently used unconditional language. (*See*, *e.g.*, Last Will and Testament of Eleanor Clay Ford, July 16, 1976 (EX3138) at DIAINS047574 ("To DETROIT INSTITUTE OF ARTS I give the following paintings: [lists paintings]."); Deed of Gift from Alfred Fischer, Dec. 28, 1953 (EX3139) at DIAINSP043553 ("I . . . hereby assign, transfer, convey, and deliver . . . all of my right, title, and interest in and to the [listed paintings]."); *see also* Letter from G. Keyes to A. Fisher, Apr. 15, 1996 (EX3140) at DIAINSP043688 (indicating that Mr. Fischer's bequest was unconditional and that the bequeathed object could be deaccessioned).)

WEIL:\44542353\6\45259.0007

Collections Management Policy requires the use of the form deed of gift except where the DIA

Corp. Board of Directors approves otherwise. (Collections Management Policy, Feb. 13, 2012

(EX267) (Pérez Decl. Ex. 267) at 10 ("Use of the Museum's Deed of Gift is mandatory and shall

be signed by the legal owner(s) . . . before the object can be accessioned. Any exception to this

policy requires [a collections committee] recommendation and [board] approval."); *see also*

Schwartz Dep. 110:10–11:12 (noting that during his tenure as head of the DIA's Collections

Committee, he was not aware of any object donated subject to restrictions, and the only

restrictions he was aware of were the operating policies and procedures of the museum); *cf.* Beal

Dep. 106:6–14 (noting that donors are required to use the form deed of gift).)[30]

   Second, when DIA Corp. received a gift or bequest of artwork, it would send a

form of acknowledgment to the donor or his/her estate. (*See, e.g.*, Acknowledgment of Gift,

Sept. 17, 1923 (EX3560) (Pérez Decl. Ex. 3560) at DIAINSP048668–69 (describing gift of oil

painting, engravings, and other items).) The back of that form listed certain conditions to the

City's acceptance:

> CONDITIONS UNDER WHICH GIFTS ARE ACCEPTED BY
> THE DETROIT INSTITUTE OF ARTS. I. Objects offered as a
> gift must be approved by the Arts Commission before they may be
> received by the Detroit Institute of Arts. II. Gifts shall be received
> in fee simple and *without restrictions*, and they shall be used in
> such manner and place and such *disposition of them shall be made
> as the Arts Commission may deem advisable*

---

[30] On September 9, 2013, after the commencement of the Chapter 9 Case, DIA Corp. announced a change
to the form of deed of gift. Graham Beal, the current DIA Director, was reported as saying, "We are
inserting into our deed of gift a line stating that from any sale of the work, the proceeds can only be used
to buy more art." Detroit Institute of Arts Amending Policy on Donations, Sept. (EX3295). The deed of
gift was revised as described. (*See* Beal Dep. 109:13–18.) No past deeds of gift with similar language
have been identified.

WEIL:\44542353\6\45259.0007

(*Id.* (emphasis added); *see, e.g.*, Acknowledgment of Gift, Dec. 23, 1947 (EX3154) at

DIAINSP052184 (describing gift of photographs and engravings).)[31] The same conditions also

were used to accept bequests. (*See, e.g.*, Acknowledgment of Gift, Oct. 29, 1926 (EX3156) at

DIAINSP048649–52 (describing gift of etchings and other miscellaneous items received from

the estate of a donor).)

        Although it appears that most gifts of artwork were unrestricted, the Arts

Commission minutes do list some gifts with conditions or limited ownership interests. (*See, e.g.*,

Jan. 26, 1959 (EX3167) at DIAINSP011834 (reporting that a gift had been transferred "by a form

of gift not previously used in connection with our museum" where the donor "retains the right of

possession of this gift until her death"); Arts Comm'n Minutes, Mar. 13, 1961 (EX3190) at

DIAINSP011981 (reporting that a gift was made where the donor reserved a life interest); Arts

Comm'n Minutes, Aug. 21, 1962 (EX3192) at DIAINSP012075 (reporting a gift of a one-half

interest in painting); Arts Comm'n Minutes, Mar. 18, 1964 (EX3193) at DIAINSP012224

(reporting a gift of two-fifths ownership in two separate paintings).) These generally fall into

one of two categories: (1) conditional gifts based on an incomplete transfer of ownership (*i.e.*,

where ownership was transferred in installments); and (2) gifts restricted as to continuing use.[32]

---

[31] DIA Corp. produced many Acknowledgment of Gift forms that were identical on their face to these examples, including the provision that the gift was received "subject to the conditions printed on the back of this receipt," but without also producing the backs of the forms. (*See, e.g.*, Acknowledgment of Gift, May 13, 1921 (EX3151) at DIAINSP041851 (describing gift of several paintings); Acknowledgment of Gift, Jan. 22, 1925 (EX3152) at DIAINSP044294 (describing gift of an Egyptian portrait from the Roman period); Acknowledgment of Gift, Sept. 25, 1931 (EX3153) at DIAINSP044478 (describing gift of bronzes, statues and figurines); Acknowledgment of Gift, Dec. 23, 1947 (EX3154) at (describing gift of a Ming Dynasty porcelain box and Flemish Tapestry).) It seems likely, but FGIC has not been able to definitely confirm, that identical conditions were listed on the backs of these forms.

[32] Some gifts were also made under a loan-back arrangement, where full ownership of the object was transferred but the object was immediately lent back to the donor. (Arts Comm'n Minutes, Jan. 4, 1960 (EX3059) at DIAINSP011905–06 (describing the difference between a gift subject to a life interest and a loan-back arrangement, and noting that in the case of a loan-back the accession was carried on City inventory as property of the City).) The City was free to recall these gifts at any time. (Arts Comm'n

The first category includes installment gifts (*i.e.*, 25% ownership at a time) and life-estate gifts. In the case of installment gifts, donors would transfer ownership of an object in fractional installments. (*See, e.g.,* Arts Comm'n Minutes, Feb. 12, 1962 (EX3191) at DIAINSP012031 (example showing two installment gifts, each of 1/3 interests, where donor has right to possess for 2/3 of year).) In the case of a life-estate gift, the donor would own the artwork until his/her death, at which time title would fully transfer. (*See* Arts Comm'n Minutes, Jan. 26, 1959 (EX3167) at DIAINSP011834 (noting a life-estate gift); *see generally* (EX3059) at DIAINSP011905–06 (describing life-estate gifts).) The Arts Commission would monitor and record these aberrations from the normal gifting practice. (*See* Arts Comm'n Minutes, Sept. 30, 1955 (EX3188) at DIAINSP011641 (noting that there were three then-existing arrangements where donors had retained a life interest in gifted artwork).) Incomplete gifts were not immediately transferred to the City or added to the DIA Collection. Prior to 1998, these gifts would remain in the DIA Corp. collection until DIA Corp. received the complete interest, at which point the property would be accessioned to the collection and 100% ownership would be transferred to the City. (*See supra* at 47; Memo to Mayor from DIA Director, July 20, 1987 (EX3218) at DIAINSP045921 (noting that in cases of life-interest and installment donations of objects, the donated objects were held in DIA Corp.'s Study Collection until such time as 100% ownership was obtained, and then the gift was deeded to the City).) It is unclear whether this practice was continued after DIA Corp. assumed control under the Operating Agreement. (*See supra* at 47–48.)[33]

---

Minutes, Jan. 21, 1963 (EX3168) at DIAINSP012123 (noting that the artwork given subject to a loan-back arrangement could be recalled by the City).)

[33] Although the DIA Collection may contain some "partial interest" gifts acquired after 1998, likely few, if any, of these gifts currently exist where full title is not yet complete and any such gift likely is of

WEIL:\44542353\6\45259.0007

Only two examples were found of the second category of gift restriction –
restrictions that relate to the continuing use of an object.  These include (i) a gift from the wife of
Ralph Booth, (*see* Letter from Mrs. Booth, Apr. 21, 1942 (EX278) at DIAINSP040281
(describing terms of her gift of artwork, which were identical to the terms from the Booth
Bequest)), and (ii) the bequest of Robert Tannahill (the "**Tannahill Bequest**").  (*See* Last Will
and Testament, Mar. 10, 1966 (EX252) (the "**Tannahill Will**"); Codicil, Apr. 7, 1969 (the
"**Tannahill Codicil**") (EX251); Receipt and Commitment, Aug. 27, 1970 (EX3174) (the
"**Receipt and Commitment**").)

The Tannahill Will provided that DIA Corp. would receive "all of [his] right, title
and interest in and to" an extensive collection of artwork, but only

> upon the express condition that [DIA Corp.] and the Detroit
> Institute of Arts, an instrumentality of the City of Detroit, both
> shall make a written commitment, in form acceptable to my
> Executors, to the effect that the said collection, in toto, will be
> permanently retained at the Detroit Institute of Arts, with no right
> or reservation on the part of [DIA Corp.] and the Detroit Institute
> of Arts, or either of them, at any time to sell or otherwise dispose
> of said collection or any part thereof.

(Tannahill Will (EX252) at DIAINSP000274, Art. III § 1.)

The Tannahill Will also provided that if the City or DIA Corp. should "decline,
for any reason, to accept said collection subject to said condition, then I give and bequeath such
collection to the National Gallery of Art of Washington, D.C."  (*Id.* § 2.)  Upon Tannahill's
death, the City and DIA Corp., consistent with the requirements of the will, signed a written
agreement that Tannahill's collection "will be permanently retained at the Detroit Institute of
Arts, with no right or reservation on the part of . . . the City of Detroit at any time to sell or

---

insignificant value.  (*See* List of Major Works (EX3122) at DIAINSP000001–203 (listing only five gifts
acquired after 1998 that qualify as Major Works).)

WEIL:\44542353\6\45259.0007

otherwise dispose of said collection or any part thereof." (Receipt and Commitment (EX3174) at DIAINSP000245–73.) The executors of Tannahill's estate accepted this written commitment and noted that the condition to Tannahill's will had been satisfied and, accordingly, "transfer[red] to the Founders Society Detroit Institute of Arts all of the right, title, and interest of said estate to the [Tannahill art collection]." (*Id.*)

Like the Booth Bequest, the gift of Mrs. Booth and the Tannahill Bequest were given under exceptional circumstances by persons with unique relationships with the museum. In the case of Mrs. Booth, the connection arises from her relationship as Booth's wife. Tannahill also had a longstanding relationship with the museum, and is recognized as having "contributed in many ways to the growth and development of the Detroit Institute of Arts in the twentieth century, most significantly as a major benefactor of the museum." (Finding Aid, Robert Hudson Tannahill Papers, Aug. 1980 (EX3267).)

## DIA Deaccessioning Policy

As mentioned above, the Collections Management Policy includes a deaccessioning policy governing the process by which artwork may be removed from the DIA Collection and sold. This policy's general and specific criteria are consistent with the requirements of the Museum Ethical Code.

The sale of artwork from the DIA Collection has not always been conducted pursuant to an ethical code. From the 1930s through the 1950s, the sale of objects from the DIA – including objects accessioned to the permanent collection that were given by donors and purchased with DIA Corp. funds – was conducted without any formal policy; the only requirement appeared to be Arts Commission approval. (*See, e.g.*, Arts Comm'n Minutes, Dec. 4, 1933 (EX3111) at DIAINSP010912 (noting that an individual decided to purchase a painting from the DIA Collection and authorizing the Secretary to "negotiate the sale of this

picture at a price of not less than $1,000"); Arts Comm'n Minutes, Jan. 25, 1944 (EX3112) at DIAINSP011202 (noting that the Arts Commission was considering selling paintings).)

The proceeds of any such sale would have been transferred to the City, (*see* City Charter, 1918 (EX391) Tit. IV, Ch. XIX, § 8 (requiring the commission to pay all money collected or received into the "city treasury" each day)), and could only have been used to pay the expenses of the Arts Commission. (*Id.* § 9 (providing that "[a]ll moneys paid into the city treasury by the commission shall apply exclusively on the payment of expenses incurred by it").) The City would also, on an annual basis, take any surplus remaining after provision for the Arts Commission's projected costs and move such surplus to the "general surplus fund" to be used for "contingencies and the reduction of taxes." (*Id.* Tit. VI, Ch. VI § 8.)

In 1945, the City Charter was revised, and the limitation on funds deposited into the City's treasury by the Arts Commission – that such funds should be used "exclusively" for its expenses – was removed. (*Compare* City Charter, 1944 (EX3294) Tit. IV, Ch. XIX, §§ 8, 9 *with* City Charter, 1948 (EX3255) Tit. IV, Ch. XIX, § 9 (removing the restriction on funds the Arts Commission paid into the city treasury).) The City thus was able to, and did, withhold funds deposited by the Arts Commission into the treasury. (*See* Arts Comm'n Minutes, Nov. 24, 1948 (EX3186) at DIAINSP011360–61 (discussing the problem of Budget Bureau restrictions on the spending of the DIA, and also noting that in the original charter the Arts Commission had considerable latitude in how it spent its funds, which latitude had been removed when the Charter was revised four years prior); Arts Comm'n Minutes, Nov. 24, 1948 (EX3186) at DIAINSP11356 (noting that because "the Common Council had returned no funds to the Institute's exhibition account in response to the request made by the commissioners last meeting . . . it would be necessary to cancel a large portion of the exhibition program").) During this

WEIL:\44542353\6\45259.0007

period, the Arts Commission continued to authorize the sale of artwork, and the City apparently had unrestricted use of any deposited sale proceeds thereof. (*See* Arts Comm'n Minutes, Oct. 25, 1948 (EX3113) at DIAINSP011353 (describing and authorizing the sale of an object); Arts Comm'n Minutes, Apr. 25, 1949 (EX3114) at DIAINSP011373 (accepting an offer for the purchase of three donated paintings).)

Sales without a museum deaccessioning policy continued through the 1950s. The Arts Commission sold artwork directly, through arts dealers, and on consignment. (*See* Arts Comm'n Minutes, Apr. 17, 1950 (EX3115) at DIAINSP011405 (discussing an issue in connection with two city-owned paintings that had been given to an art dealer on consignment to sell); Arts Comm'n Minutes, Nov. 27, 1951 (EX3116) at DIAINSP011459 (adopting a resolution with respect to a collection of pieces that the Common Council had authorized the Arts Commission to sell).)

By the mid-1960s, after decades of sales of artwork, the Arts Commission began its earliest discussions about establishing a deaccessioning policy. These discussions centered around concerns about stabilizing the collection, protecting against sales of worthy objects due to changes in taste, and addressing potential risks relating to price fluctuations in the art market. (*See* Arts Comm'n Minutes, Feb. 3, 1964 (EX3094) at DIAINSP012212 (noting "considerable discussion" about concerns that future commissioners or directors would dispose of artwork that had been added to the collection).) The DIA Director recommended a policy for selling works of art that had not been displayed for at least twenty-five years, which was intended to balance the practical need to dispose of some items against the importance of preserving the stability of the collection and protecting the works accessioned by current directors and commissioners against future changes in taste. (*See* Arts Comm'n Minutes, Feb. 24, 1964 (EX3095) at

WEIL:\45542353\6\45259.0007

65

DIAINSP012218–19.)  The recommended policy did not include a requirement that the proceeds be used to acquire additional artwork, but did provide that, if new objects were acquired, they would be "accessioned in the name of the donors of [the] original object." (*Id.*)  The Arts Commission did not take any action on the proposal and, at a meeting on December 1, 1964, the DIA Director "reminded the Commissioners that no definite policy had yet been approved." (Arts Comm'n Minutes, Dec. 1, 1964 (EX3194) at DIAINSP012275.)  After discussion about what policy should be adopted, the Arts Commission determined that nothing from the DIA Collection would be sold or otherwise disposed of. (*Id.*)  Nevertheless, debate over the subject continued.  On February 5, 1965, the wisdom of the no-deaccessioning policy was defended with an example:  another prominent museum had recently sold a collection of artwork into a down market, and at the time of the meeting could have received the same price for one sold painting that it had received for the entire collection. (*See* Arts Comm'n Minutes, Feb. 24, 1965 (EX3311) at DIAINSP012294.)  The no-sale policy was kept intact.

In the 1970s, the circumstances around potential sales of DIA artwork again came under scrutiny.  An amendment to the City Charter was proposed that would abolish the Arts Commission and replace it with an advisory commission appointed by the Mayor. (*See* Memo,, Feb. 24, 1972 (EX3066) at DIAINSP116498; *see also* Proposed Charter Revisions (EX3229) at DIAINSP116471.)  Among other things, the revisions would have vested control over the DIA in the Mayor, without the counterbalancing powers that had been given to the Arts Commission and the Common Council. (*See* Letter to Arts Commission from DIA Director, Mar. 1, 1972 (EX3230) at DIAINSP116497 (alerting the Arts Commission of the proposed changes and the fact that the present commission would be advisory only).)  An internal DIA Corp. memorandum from February 1972 indicates that museum leaders were concerned that the changes would allow

WEIL:\44542353\6\45259.0007

the Mayor to sell artwork from the DIA Collection.  (*See* Memo, Feb. 24, 1972 (EX3066) at DIAINSP116498 ("What would prevent a mayor, desperately trying to balance a city budget . . . from selling the works of art in the permanent collection?  These works under the proposed new charter (or the lack of it) are not protected, as they are presently, as property of the City of Detroit to be disposed of only with the approval of the Common Council.").)  After several public hearings, the drastic changes to the charter were removed.  Finding that "the new charter's references to [its] rights and duties were satisfactory," the Arts Commission entered a resolution expressing its approval.  (*See* Notice, Charter Revision Commission, June 9, 1972 (EX3228) at DIAINSP116467 (noticing the public hearings); Arts Comm'n Minutes, Sept. 11, 1972 (EX3195) at DIAINSP012836 (describing updated revisions and resolution).)

In 1973, prompted by newspaper clippings and controversy about secret art sales by the Metropolitan Museum of Arts, the Arts Commission again turned its attention to deaccessioning.  (*See* Arts Comm'n Minutes, Feb. 8, 1973 (EX3196) at DIAINSP012873 (noting that the integrity of the "Met" had been "seriously damaged" because the artwork had been unethically disposed of without a public auction).)  The focus of the commission's discussion was on controls and safeguards that would prevent a similar situation from occurring at the DIA. (*Id.*)  The commissioners recognized that, because works in the DIA Collection were "property of the City of Detroit," they could not be sold without their approval and approval of the Common Council.  They recognized, however, that DIA Corp. had no such controls with respect to pieces in its own collection (from which transfers to the City's collection often were made). (*Id.*)[34]

---

[34] Notwithstanding the controversy, the commissioners agreed that "there should be some machinery, if necessary, to dispose of a work of art" from the DIA Collection.  (Arts Comm'n Minutes, Feb. 8, 1973 (EX3196) at DIAINSP012873.)  In fact, at this same meeting, the DIA Director reported a recent inquiry

WEIL:\44542353\6\45259.0007

Shortly after, the Joint Museum Collections Committee (the "**JMCC**") – a committee comprised of representatives from the Arts Commission and DIA Corp. that made various decisions relating to the management of the collection – proposed a deaccessioning policy to govern artwork held by DIA Corp. (Recommendations of Collection's Categories Review Committee, Feb. 26, 1973 (EX3219) at DIAINSP045947–48.) The sub-committee recommended splitting DIA Corp.'s Study Collection into separate collections, each with different quality artwork and different controls on sales. One collection would contain high quality (but not museum quality) donations of artwork, accepted by DIA Corp. for "trade or resale." The policy provided that donors should be credited if sale proceeds from this collection were used to purchase a new object. (*Id.*) Another collection would hold lesser quality donations of artwork, including forgeries, which could also be sold with DIA Corp. approval (with no provisions on the proceeds). (*Id.*) The sub-committee also recommended that the Arts Commission relax its policy against selling artwork from the City's collection to permit the sale of duplicates and artwork that was not being displayed. (*Id.*)

By 1974, the JMCC had further refined its proposal. (*See* Memo from DIA Corp. Director to JMCC re: Recommendations on Collections Categories and Procedures, Mar. 19, 1974 (EX3302) at DIAINSP045944–46.) DIA Corp. would have only one collection, but the sales procedures and policy would still vary depending on the quality of art – again with stricter controls for higher quality pieces. (*See id.*) There was a general provision that any works of art obtained through the proceeds from sales would be credited in the name of the original donor. (*See id.*) The recommended DIA Corp. policy was presented to the Arts Commission, and, though its commissioners suggested some rewording, it was considered it a

---

for the acquisition of certain Japanese swords that had been donated, and the commissioners "asked to be kept informed of any future developments in this matter." (*Id.*)

wise approach "since no procedure had been drawn up in all the ninety years of the [DIA Corp.'s.] history." (Arts Comm'n Minutes, Dec. 11, 1975 (EX3198) at DIAINSP013060.)

The procedure continued to be developed with input from museum staff and, in 1976, a final recommendation for DIA Corp.'s Study Collection was proposed by the JMCC to the Arts Commission and DIA Corp – still in contemplation of the fact that "objects from the Founders Society Collection [had] been disposed of in varying ways without control." (*See* Recommendation of JMCC, Jan. 2, 1976 (EX3093) at DIAINSP045954.) The recommendation was justified as a means to regulate dispositions, to remove duplicates and unworthy objects, and to "improve the overall quality" of the DIA's collections. (*Id.*) The provision on the use of proceeds from sales of artwork was changed to provide that funds realized from disposing of artwork should be used to purchase other works of art "whenever practical." (*Id.*) The Arts Commission approved this policy on January 16, 1976. (*See id.*) The City did not formally accept a deaccessioning policy with respect to the DIA Collection, however, until over a decade later.

In March of 1987, the DIA Director proposed a new museum-wide deaccessioning policy to DIA Corp., which he described as "based on a model developed by American Association of Museum Directors after three years of research of museums nationwide." (DIA Corp. Minutes, Mar. 17, 1987 (EX3097) at DIAINSP025190.) DIA Corp. approved of the policy, and then the DIA Director recommended it to the Arts Commission, which also approved it. (*See* Arts Comm'n Minutes, Dec. 4, 1987 (EX3200) at DIAINSP015034.) A contract was prepared that would engage DIA Corp. as a subcontractor, accountable to the Arts Commission, to carry out the deaccessioning of works from the DIA Collection pursuant to this policy. (*See* Deaccession Form Contract (draft), Apr. 26, 1988

WEIL:\44542353\6\45259.0007

(EX3224) at 1, 2 (requiring a report to the Arts Commission after a sale); *See* DIA Corp. Minutes, June 20, 1989 (EX3092) at DIAINSP025580 (noting that the deaccessioning contract "is necessary for the [DIA Corp.] to act as the deaccessioning agent for the City for the sale of an object from the City collection.").)  This contract required DIA Corp. to apply the proceeds from a deaccessioned object to a "DIA Art Acquisition Fund," which would be used to buy new artwork, in an effort to "refine the [City's] collection of art by the deaccession of articles no longer useful to the museum collection." (*Id.*)

On February 25, 1988, the DIA Director wrote a letter to the City Council to request approval of the museum's deaccessioning policy and the contract by which DIA Corp. would implement it. (*See* Letter from DIA Director to City Council, Feb. 25, 1988 (EX3315) at DIAINSP096597 (describing the proposed guidelines as providing for the orderly disposition and replenishment of the City's art).) On May 15, 1989, the DIA Director appeared before the City Council, and told the council members that the proposed policy was the "best current ethical practice in the museum field." (City Council Minutes, May 15, 1989 (EX3098).)  Noting that "Detroit Institute of Arts . . . would like to adhere to generally accepted principles of museum ethics as currently espoused by the American Association of Museums," the City Council passed a resolution approving the museum policy and a resolution approving the contract with DIA Corp. (for a three-year term). (*Id.*)

DIA Corp. continued to manage the City's deaccessioning under deaccessioning contracts through 1998, when the Operating Agreement became effective.  The Operating Agreement supplanted those agreements and required DIA Corp. to adhere to the deaccessioning policies contained in the Collections Management Policy. (*See* Operating Agreement, Dec. 12,

WEIL:\44542353\6\45259.0007

1997 (EX254) at Recital 7 (noting that the Operating Agreement will replace the deaccessioning contract).)

**Books and Records Related to the DIA**

In addition to the above-described DIA Corp. records, there are various different forms of City books and records relevant to understanding how the DIA Collection is treated and regarded by the City. First, are the City inventories. As early as the 1940s, the City Charter required the Arts Commission to provide the Common Council with an annual written report on the condition of the DIA property. (*See* Inventory of the Municipal Archives of Michigan, Mar. 1, 1941 (EX3223) at DIAINSP088094.) The City's Auditor General then recommended the first comprehensive inventory of the DIA Collection in 1949. (*See* Arts Comm'n Minutes, Nov. 16, 1953 (EX3117) at DIAINSP011547.) Three years after that, the Auditor General recommended another physical inventory "for better control of this valuable collection." (Audit Report, Office of the Auditor General, for the period of July 1, 1955 to June 30, 1956 (EX3231) at 9.) The Auditor General frequently requested similar inventories. *Id.* The Arts Commission recognized that accessions to the collection were carried on the City's inventory as "full property of the City of Detroit." (*See* Arts Comm'n Minutes, Jan. 4, 1960 (EX3059) at DIAINSP011905–06.)

Second is the City's financial statements. Every year the City is required to prepare a Comprehensive Annual Financial Report (a "**CAFR**") disclosing the City's financial condition. (*See, e.g.,* City of Detroit Comprehensive Annual Financial Report, Dec. 12, 2012 (EX3260) at 1-1.) Each CAFR is prepared in conformity with Generally Accepted Accounting Principles ("**GAAP**"). (*Id.*) This requires recognizing assets consistent with statements issued by the Government Accounting Standards Board ("**GASB**"). *See S.E.C. v. City of Miami, Fla.*,

988 F. Supp. 2d 1343, 1348 (S.D. Fla. 2013) (noting that GAAP required Miami's CAFR to comply with GASB No. 34).  GASB Statement Number 34, paragraph 27, provides that governments are encouraged, but not required, to capitalize works of art and historical treasures owned by the government where a collection is:  (i) held for public exhibition, rather than financial gain; (ii) protected, kept unencumbered, cared for, and preserved; and (iii) subject to an organizational policy that requires the proceeds from sales of collection items to be used to acquire other items for collections.  (GASB No. 34 (EX3099) at ¶ 27.)  Beginning in 2001, the first year that GASB Statement Number 34 became effective, the City retained a private contractor to conduct a physical inventory of the City's capital assets to book in the annual CAFR.  (*See* GASB No. 34 (EX3099) at ¶ 27 (noting that GASB Statement Number 34 first became effective for financial statements for periods beginning after June 15, 2001); Memo from Saied Rouhani to Finance Accounts – File, Apr. 9, 2014 (EX3100) at POA00225308.)  The City instructed the contractor not to value the DIA Collection and elected not to capitalize it in its CAFR because of the "vast quantity of artwork" owned by the City, the "difficulty in appraising collections," the "[e]normous cost of such undertaking," and also because appraising and booking the artwork was not required under GASB Statement 34.  (*Id.* (noting that the DIA Collection meets the GASB Statement 34 criteria for not being capitalized).)

The third relevant set of records are the City's capital agendas and department budgets.  Every even-numbered year, the Mayor must submit to the City Council a capital agenda for the next five fiscal years.  (City Charter § 8-202; *see, e.g.,* Proposed Capital Agenda, FY 2013–14 through FY 2017–18, Jan. 23, 2013 (EX3102) at 63.)  The agenda must disclose all capital projects to be financed in the next five years with City funds.  (City Charter § 8-202.)  The capital agenda includes a narrative description and numerical summary of each department's

WEIL:\44542353\6\45259.0007

capital plan, including a description of each agency's mission statement to "help[] the reader to evaluate the capital needs of the department." (*See, e.g.,* Proposed Capital Agenda, FY 2013–14 through FY 2017–18, Jan. 23, 2013 (EX3102) at 4.)

## THE COURT MUST REJECT THE DIA SETTLEMENT

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code (made applicable in chapter 9 by sections 901(a) and 943(b)(1)), a plan of adjustment may provide for "the settlement or adjustment of any claim or interest belonging to the debtor." 11 U.S.C. § 1123(b)(3)(A). As the City has recognized, the standards for approving settlements as part of a plan of reorganization are the same as those applied for approving settlements under Rule 9019 of the Federal Rules of Bankruptcy Procedure. (Reply at 7, 8 (citing *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995), *aff'd* (2d Cir. 1995)); *see also In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (noting that the approval analysis required of the bankruptcy court does not change, whether a compromise is effected separately or in the body of a reorganization plan) (citation omitted).) In considering approval of a settlement under Bankruptcy Rule 9019, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *In re McInerney*, 499 B.R. 574, 582 (Bankr. E.D. Mich. 2013) (*citing Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988)); *see also In re City of Detroit, Michigan*, Bench Op. Jan. 16, 2014 6:25–7:4. In addition, "the Court is required to exercise independent judgment regarding the factors relevant to the reasonableness of the settlement." *McInerney*, 499 B.R. at 595.

In evaluating whether a settlement is fair, equitable, and reasonable, courts in the Sixth Circuit generally consider four factors: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the

litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the

paramount interest of the creditors and a proper deference to their reasonable views. *Bard v.*

*Sicherman (In re Bard)*, 49 Fed. App'x 528, 530 (6th Cir. 2002) (citations omitted); *see also In*

*re City of Detroit, Michigan*, Bench Op. Jan. 16, 2014 7:5–22. The City, as the proponent of the

DIA Settlement, has the burden of establishing that the settlement, including the consideration

the City will receive in exchange, is fair, equitable and reasonable taking into account these

considerations. *McInerney*, 499 B.R. at 583. A proposed settlement cannot be approved if, on

the basis of these considerations, the value to be provided "falls below the lowest point in the

range of reasonableness." *In re Dow Corning,* 192 B.R. at 421 (citation omitted).

   The DIA Settlement is not fair, equitable, or reasonable and the value to be

received by the City thereunder falls well below the lowest point in the range of reasonableness.

The alleged issues the City seeks to settle could be easily resolved and certainly are not

significant enough to justify the steep discount reflected in the DIA Proceeds and State

Contribution. Based on available evidence and analysis, a preliminary review shows that the

City likely holds clear title to all, if not an overwhelming majority of, the DIA Collection and, as

will be demonstrated by expert testimony and other available evidence, if the City pursued an

alternative transaction it could receive substantially greater value for these assets, which would

benefit all constituents. Accordingly, the Court must reject the DIA Settlement.

## I. THE VALUE RECEIVED FROM THE SETTLEMENT IS FAR BELOW THE LOWEST POINT IN THE RANGE OF REASONABLENESS

   When considering approval of a proposed settlement, the Court must assess the

potential value of litigating the issues to be resolved, and consider whether the value provided by

the settlement falls below the lowest point in the range of reasonableness. *In re Dow Corning,*

192 B.R. at 421 ("[T]he obligation of the court is to canvass the issues and see whether the

74

settlement 'falls below the lowest point in the range of reasonableness.") (quoting *Drexel Burnham Lambert,* 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991)); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, (1968) (noting that, when considering whether to approve a settlement, courts should consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."). This analysis involves evaluating "the differences in results between the proposed settlement and that which might be obtained, if and only if, the [settling party] prevails in litigation." *In re Fodale*, No. 10-69502, 2013 WL 663729 at *9 (Bankr. E.D. Mich. Feb. 21, 2013). Here, determining the range of reasonableness requires considering (1) the value of the DIA Assets and (2) the potential impact on that value from having to litigate the potential claims and issues to be resolved pursuant to the DIA Settlement. Ultimately, the Court must determine whether, given the effect of these considerations on the value available, the proceeds to be received from the DIA Settlement are reasonable, fair, and equitable. In this case, the settlement consideration falls far below the range of reasonableness and, accordingly, the proposed settlement should not be approved.

The City contends that the DIA Settlement is within the range of reasonableness and fair and equitable because "[t]he value of the funds to be contributed by the DIA Funding Parties is more than any reasonable estimate of the minimum amount that would be achieved if the City attempted to sell the DIA Assets and the DIA Settlement ensures that the DIA Assets remain in Detroit for the benefit of area residents and the City's cultural heritage." (Reply 21–22.) Expert testimony squarely refutes the City's contentions and exposes the fallacy of the City's statement that "the low end of the range of reasonableness is necessarily something closer to zero." (*Id.*) In fact, the low end of the range of reasonableness is necessarily much, much

WEIL:\44542353\6\45259.0007
75

higher; it is more accurately described as in the *billions*. By pursuing the DIA Settlement

component of the Plan, the City is forgoing up to $8 billion of incremental value, to the

detriment of City residents, pensioners, and all creditors in this case.

### A.  The City Inflates the Value of the DIA Settlement

The City's representation of the DIA Proceeds to be contributed by the DIA

Funding Parties is inflated because the City fails to present value two components of the

transaction—the $366 million contribution from the Foundations and the $100 million DIA

Corp. contribution—which are distributed over 20 years. (*See, e.g.*, Buckfire Dep., Vol. 2

168:25–169:12 (Pérez Decl. Ex. B) (admitting that Miller Buckfire did not seek to determine the

net present value of the DIA Proceeds).) This error is even more glaring because the City

describes the lump sum $195 million State Contribution, to be received at or shortly after the

Effective Date, as "the net present value of $350 million payable over 20 years using a 6.75%

discount rate." (Plan § I.A.317.) Combined, this is an attempt to spin the consideration to be

received from the DIA Settlement by making it appear as though the City will receive a larger

dollar amount than it actually is. At minimum this is unclear; at worst, it is misleading.[35]

Mr. Spencer estimates the net present value of the DIA Settlement to be

approximately **$455 million**, comprised of $361 million in DIA Proceeds from the Foundations

---

[35] As discussed in *Financial Guaranty Insurance Company's Pretrial Brief in Support of Objection to Plan for the Adjustment of Debts of the City of Detroit* (the "**FGIC Confirmation Brief**"), filed contemporaneously herewith, the State Contribution, which is conditioned on the DIA Settlement, is being made, at least in part, in exchange for the DIA Assets. If, however, as the City contends, the State Contribution is found to be unrelated to the DIA Assets and proposed transfer of the art under the DIA Settlement, then the State Contribution cannot be included in the calculation of the value the City will receive in exchange for the transfer of the DIA Assets. In that situation, the value of the DIA Settlement would in fact be $195 million less (net present value). The City cannot have it both ways—the State Contribution cannot be used to inflate the value of the proposed settlement but simultaneously be considered "outside the plan" and not in exchange for City assets.

WEIL:\44542353\6\45259.0007

and DIA Corp.[36] and $195 million from the State Contribution. (Spencer Report, July 2014 (EX3035) at 64.) Therefore, the actual value to be obtained by the City for the DIA Collection is substantially lower (44% lower) than the $816 million touted, and, as discussed *infra*, far below the value the City would be able to realize through an alternative transaction to the DIA Settlement.[37]

### B. The Value of the DIA Settlement Falls Below the Lowest Point in the Range of Reasonableness

The City's experts estimate the range of value for the DIA Assets to be at least $454 million to $867 million, based on the fair market value of less than 5% of the DIA Collection, and up to between $900 million and $1.8 billion, based on a heavily discounted valuation using mid to low estimates of the total gross sales value of the entire DIA Collection. (Fusco Report 10; Plummer Report 37, 48.)[38] Even these estimations, taken at face value, show that the DIA Collection is worth significantly more than the consideration to be received from the DIA Settlement. Mr. Wiener estimates the DIA Collection to be worth **in excess of $8 billion**. (Wiener Report 3.)[39] And Mr. Spencer confirmed there is substantial market interest in

---

[36] The $361 million present value assumes a 6.75% discount rate—the same discount rate used by the City to calculate the present value of the State Contribution and also used in the DIA Settlement Documents to determine the present value discount if DIA Corp. and the Foundations accelerate payment—and equal annual payments throughout the 20 year payment term. (Spencer Report, July 2014 (EX3035) at 64; Plan, Exhibit I.A.103, Aug. 7, 2014, Docket No. 6576 at 5.)

[37] The City's advisors have admitted that it would be necessary to present value the DIA Proceeds when comparing them against a valuation of the DIA Collection that has been discounted to present value (such as the Artvest valuation). (Buckfire Dep., Vol. 2 168:25–170:14 (Pérez Decl. Ex. B).)

[38] The City's attorneys retained Michael Plummer of Artvest Partners LLP ("**Artvest**") to provide an opinion on the indicative value of the works in the DIA Collection, which is set forth in the *Expert Witness Report of Michael Plummer* (the "**Plummer Report**"). The City also retained Vanessa Fusco of Christie's, who prepared the *Expert Report of Vanessa Fusco* (the "**Fusco Report**").

[39] In addition, Elizabeth von Habsburg of Winston Art Group, an expert retained by Syncora to appraise 582 works from the DIA Collection and to prepare the *Expert Report of Elizabeth Von Habsburg Under*

these assets, indicating that the DIA Settlement imposes huge opportunity costs on the City. (*See*

*supra* at 17–18.)[40]

## II. THE CITY HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS IN ANY LITIGATION REGARDING TITLE TO THE DIA COLLECTION

As outlined above, the City has alleged that there exists uncertainty regarding the

City's rights to the DIA Collection, which would purportedly result in litigation if the City

attempted to sell or encumber these assets to satisfy creditor claims. (Reply ¶ 34.) As evidence

of this alleged dispute, the City points to positions asserted by the State Attorney General and

DIA Corp. claiming that the DIA Collection as a whole is in trust or protected by donor

restrictions that prohibit the City from transferring or encumbering the art.[41] The City argues in

favor of the DIA Settlement as a resolution of these alleged disputes. Not one of these

arguments is compelling. Indeed, there is a substantial likelihood that a court, without undue

expense or delay, would conclude that the City holds clear title to the DIA Collection and is able

to encumber or transfer these assets for the benefit of the City's citizens and creditors.

When assessing the likelihood of success factor in evaluating a proposed

settlement, courts will conduct an independent analysis of the factual and legal claims being

asserted. *See TMT Trailer*, 390 U.S. at 424 ("There can be no informed and independent

judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge

---

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure (the "**Von Habsburg Report**"), concluded that such works have a fair market value of approximately $1.7 billion. (Von Habsburg Report at 9.)

[40] Mr. Spencer has also concluded that there is only marginal indirect or civic value from retaining the DIA Assets in the City. As discussed in further detail in the FGIC Confirmation Brief, Mr. Spencer calculated the willingness of the City's residents to pay to maintain the DIA and found that their implied valuation of the museum is only $73 million – far less than other cities' residents' willingness to pay. (*See* FGIC Confirmation Brief at 87.) This finding is corroborated by evidence of City residents' present and historic low user rates of the DIA. (*See id.* at 86.)

[41] This Court has recognized that the AG Opinion is not binding authority. (*See* Hr'g Tr. 54:5–8, Apr. 28, 2014.)

has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated."). While it is not necessary to "hold a mini-trial," *In re MQVP, Inc.*, 477 Fed. App'x 310, 313 (6th Cir. 2012), nevertheless, "[t]he bankruptcy court's determination of whether to approve a proposed settlement must be supported by thorough, in-depth analysis . . . [and] reflect an adequate and intelligent consideration of the merits of the settlement." *In re Dow Corning Corp.*, 198 B.R. 214, 222–23 (Bankr. E.D. Mich. 1996) (citing *TMT Trailer,* 390 U.S. at 434). Here, an independent analysis of the alleged factual and legal issues to be resolved by the proposed DIA Settlement reveals that the City would have the much stronger position if it instead chose to litigate these matters. For many of the asserted issues, the City likely could succeed as a matter of law in proving that the DIA Collection is not encumbered or restricted. Even those claims that require a factual analysis could be easily disposed of in the City's favor. As set forth in more detail below, the merits of the City's position in all of these hypothetical litigations is such that settlement is not warranted.

A.    **The City Owns the DIA Collection and There Are No Contractual or Statutory Impediments to Its Ability to Sell the DIA Collection**

The City has every right to sell the DIA Collection, which is and always has been fully owned by the City. (*See, e.g.*, DIA BULLETIN, Oct. 1919 (EX3056) at 2 (noting that Detroit is one of the first "cities in which the ownership and management of the Museum of Art is actually vested in the city").) City ownership was made clear from the very genesis of the Arts Commission and the DIA – the plain language of the 1918 City Charter authorized the Arts Commission to "acquire, collect, own and exhibit, *in the name of the city*, works of art." (City Charter, 1918 (EX391) Tit. III, Ch. XIX §§ 1, 7 (emphasis added).) The City and others have admitted, and no one has challenged, the City's legal title. (*See, e.g., Annual Report of Arts Commission*, DIA BULLETIN, Jan. 15, 1942 (EX3119) at 34 ("Very few American art museums

WEIL:\44542353\6\45259.0007

are city owned and no other is organized just as ours is."); Erickson Dep. 71:14–15 (agreeing that "the City holds title to the art collection"); Buckfire Dep., Vol. 2 112:15–113:2 (Pérez Decl. Ex. B) ("Well, very early on in our engagement with the City, I was made aware of the fact that the Detroit Institute of Arts was effectively not a separate institution but, in fact, was owned by the City . . . the building and collection was technically owned by the City of Detroit."); AG Opinion at 2 (noting that the City has legal title to the DIA Collection); *Response of the Detroit Institute of Arts to Objections to the City's Amended Plan of Confirmation*, May 27, 2014 [Docket No. 5054] (the "**DIA Corp Brief**") at 19 ("The City retains legal title to the Museum Art Collection"); Arts Comm'n Minutes, Sept. 27, 1984 (EX3259) at DIAINSP091894 (noting that the President of DIA Corp. had assured the Mayor that "clearly the City owns the Museum and exercises control"); B. Snavely, 8 questions with Kenneth Buckfire, Detroit Free Press, July 11, 2013 (EX3058) ("The city clearly owns the art collection. No one disputes that."); Hr'g Tr. 25:15–16, 21–22, Jan. 22, 2014 ("Bennett: . . . as I indicated before, the city owns an interest in all of [the art]").)

    Indeed, the City has always conducted itself as if it owns the artwork outright and has the right to monetize it.  There are several examples of this.  In the 1920s, when the Arts Commission was requesting funds to purchase artwork, it suggested that the large capital outlay would not be an expense because the objects would "increase in intrinsic worth each year." (*Report of the Arts Commission*, 1919, DIA Bulletin, Jan. 1920 (EX3118) at 66.  Arts Commission minutes reflect the understanding that the artwork is property of the City.  *See, e.g.,* Arts Comm'n Minutes, Jan. 4, 1960 (EX3059) at DIAINSP011905–06 (noting that accessions are property of the City listed on the City inventory); Arts Comm'n Minutes, July 1, 1959 (EX3061) at DIAINSP011868 (noting the commission's duty as custodians of the City's art

WEIL:\44542353\6\45259.0007

collection).)  And as recently as a few months ago, the City was contemplating selling the art.  (*See supra* at 6–7, 10.)

Similarly, DIA Corp. functions with the understanding that the collection is owned by the City and could be sold by the City.  (*See, e.g.*, Operating Agreement, Dec. 12, 1997 (EX254) § E(1) (providing that the City retains "title to and ownership of" the DIA Collection); Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2012 (EX3064) at 8 ("The City continues to own the Museum's permanent art collection, including works of art acquired prior or subsequent to the [Operating Agreement], as well as the Museum building and grounds."); Internal Museum Memo, Feb. 24, 1972 (EX3066) at DIAINSP116499 (expressing concerns that the mayor might sell the art to balance the City's budget).)

There are no statutory or contractual impediments to the City's right to sell its art collection.  Both the Attorney General and DIA Corp. have suggested that if the City sells or encumbers any portion of the DIA Collection, based upon the museum's Collections Management Policy and the 1919 Act, the City may only use such proceeds to purchase additional artwork.  (*See* DIA Corp. Brief at 14; AG Opinion at 6, 16.)  These arguments fail.  Neither the provisions of the Collections Management Policy nor the 1919 Act limit the ability of the City to sell or encumber the artwork from the DIA Collection and apply the proceeds *at the City's discretion* because (i) the Collections Management Policy is not a binding agreement on the City but a policy that it can change, (ii) the 1919 Act was repealed, and (iii) Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MICH. COMP. LAWS §§ 141.1541 *et seq.* (the "**Emergency Manager Law**") grants the Emergency Manager broad authority to sell City assets.

WEIL:\44542353\6\45259.0007
84

1.      **The Collections Management Policy Does Not**
        **Restrict the City's Ability to Monetize the DIA Collection**

The Collections Management Policy provides that proceeds from the sale of a

deaccessioned object must be placed in the DIA Corp.'s Art Acquisition Fund, to be used only

for replenishment of the collection.  (Collections Management Policy, Feb. 13, 2012 (EX267)

(Pérez Decl. Ex. 267) § V(F).)  The Collections Management Policy is merely a commonplace

policy utilized by many museums, intended to set forth the internal policies governing museum

practice and define procedures for its staff.  (*See* A Legal Primer on Managing Museum

Collections, Marie Malaro and Ildiko DeAngelis, 45–47 (3rd ed. 2012) (EX3068) (noting that

museums' collections management policies are intended as a "detailed written statement that

explains why a museum is in operation and how it goes about its business," and that, "once in

effect, the policy should serve as a formal delegation of responsibilities").)  This is evident from

the fact that the DIA's Collections Management Policy was first proposed and created by the

museum Registrar as a way to codify the museum's existing practices and provide a guide to the

DIA's approach to collecting.  (*See supra* at 40–42.)  It is primarily directed at instructing the

DIA Director and his staff in the execution of their responsibilities to the City for the "prudent

management" of the DIA Collection; it is not intended to delineate or alter the legal rights or

authority of the City over its municipal property (nor would this policy be capable of

accomplishing this).  (*See id.*; Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez

Decl. Ex. 267) at 3.)  Indeed, the City can change this policy.  (*See* Collections Management

Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) at § III(a)(5); Operating Agreement, Dec.

12, 1997 (EX254) at § F(2).)[42]

---

[42] Even if the Collections Management Policy created some sort of a contractual obligation of the City,
that obligation could be rejected by the City in the Chapter 9 Case, leaving any counterparty with an
unsecured claim to be treated pursuant to the Plan.  (*See infra* at 150.)

WEIL:\45542355\6\45259.0007

## 2.  The 1919 Act Restrictions Were Repealed

The 1919 Act, pursuant to which the DMA transferred its assets to the City in 1919, (*see supra* at 24–25), provided that "said property so conveyed shall in the hands of said city be faithfully used for the purposes for which such corporation was organized."  (*See* 1919 Act (EX453) § 20.)  Putting aside the fact that, at most, this restriction could only apply to the particular pieces of artwork acquired from the DMA in 1919, the 1919 Act provisions that purportedly limited the City's use of property no longer apply because the 1919 Act was repealed in 1921.  (*See* 1921 Act Ch. 3 § 1 (repealing "act number three of the Public Acts of eighteen hundred eighty five" and "all acts and parts of acts amendatory thereto," which includes the 1919 Act).)[43]

Although the Attorney General and DIA Corp. point out that the 1921 Act contained a "savings clause" that limited the effect of the provision repealing the 1885 Act and 1919 Act (such that some aspects of those statutes remained effective), the savings clause *did not* apply to the particular provisions of the 1919 Act regarding use of property.  The savings clause explicitly preserved only the "powers, rights, privileges and immunities granted and conferred" upon corporations "whose act of incorporation is repealed by this act," such as the DMA.  *Id.*  Section 20 of the 1919 Act, which creates a limitation on property "in the hands of said city," does not confer any rights, powers, or privileges to the DMA, and is directed toward the recipient of such property, the City.  Accordingly, because the limitations in the 1919 Act were repealed, they no longer have any force or effect on the City.

---

[43] Although the 1921 Act (which repealed the 1919 Act) was also repealed by 1931 Public Act 327 (a new statute governing corporations), its repeal does not affect the legal conclusions in this section.  *See Rev. Stat. Mich.* Ch. 1, § 4 (1846) ("Whenever a statute, or any part thereof shall be repealed by a subsequent statute, such statute, or any part thereof, so repealed, shall not be revived by the repeal of such subsequent repealing statute."); MICH. COMP. LAWS § 8.4 (same)*; In re MCI Telecomm. Compl.*, 596 N.W.2d 164, 177 (Mich. 1999) ("[T]he repeal of a repealing act does not reinstate the legislation first repealed . . . .") (citing *Jackson v. Corrections Comm.,* 313 Mich. 352 (1946)).

WEIL:\44542353\6\45259.0007

### 3.    The Emergency Manager Law Supersedes the 1919 Act Restrictions

Furthermore, any limitation – whether imposed by the 1919 Act or otherwise – on the ability of the City to dispose of the DIA Collection is superseded by the Emergency Manager Law, which grants the Emergency Manager the ability to sell City property to resolve its financial emergency.  *See* MICH. COMP. LAWS § 141.1543(b) (declaring "that it is necessary for the public good and it is a valid public purpose for this state to take action and to assist a local government in a financial emergency so as to remedy the financial emergency"); *id.* § 141.1552(r) (authorizing the Emergency Manager to sell municipal property upon certain conditions and as long as it "does not endanger the health, safety, or welfare of residents of the local government").  The Emergency Manager Law was intended to allow the Emergency Manager to exercise broad authority to address fiscal emergencies, outside of ordinary legal impediments.  Given these expansive powers, and the clear intent of the statute to allow the Emergency Manager to take drastic actions to resolve an ongoing fiscal crisis, the Emergency Manager Law must be understood as superseding prior restrictions on the use and sale of property, including any alleged remaining restrictions in the 1919 Act and any other legislative or contractual source.  *See In re Americana Found.*, 378 N.W.2d 586, 589 (Mich. Ct. App. 1985) ("It is a general rule of statutory construction that a statute adopted later in time is given preference over an earlier statute.").

### B.    The City Has a Substantial Likelihood of Success in Any Litigation Regarding Whether the DIA Collection, as a Whole, Is Held in Trust

The City, DIA Corp., and the Attorney General claim multiple legal theories and scopes of encumbrances may attach to the DIA Collection, allegedly precluding the City from monetizing them to satisfy its municipal obligations.  These parties first suggest that the entire art collection is protected on alternate theories of charitable trust, public trust doctrine, the doctrine

WEIL:\44542353\6\45259.0007

of dedication, and various equitable arguments that purport to impose a trust over this property or preclude the City from denying the existence of a trust. Alternatively, the City, DIA Corp., and the Attorney General argue that donor restrictions (placed on funds or actual donated pieces of art) encumber specific pieces of artwork in the collection. None of these arguments are persuasive, and the City would likely succeed in overcoming all of them in any litigation over title to the DIA Collection.

### 1.     <u>The DIA Collection is Not Held in Charitable Trust</u>

The primary argument of both the Attorney General and the DIA Corp. is that the DIA Collection is held by the City in charitable trust, for the benefit of the public. This, they claim, means that the City cannot monetize these assets to repay creditors. The Attorney General and DIA Corp., however, rely on loose and, at times, misleading presentations of the law of charitable trusts, and both take various rules of construction and standards out of context, in an apparent effort to sidestep the significant hurdles in proving the existence of a trust. For this reason, it is necessary to start with an overview of the law of charitable trusts in Michigan.

Michigan law recognizes three general ways that a property owner (referred to as a "settlor") can create an express trust in personal property. First, the settlor can declare that he or she holds property in trust for named purposes. *Faulds v. Dillon*, 204 N.W. 733, 735 (Mich. 1925).[44] Second, the settlor can deliver property to another for a declared trust purpose, with intent to form a trust and without any retention of control over the property. *West v. White's*

---

[44] Although Michigan has codified its law of trusts in the Estates and Protected Individuals Code (EPIC), 1998 PA 386, MICH. COMP. LAWS § 700.1101 et seq., the relevant law to determine whether a past act created a trust is the law from the time of the act. *See Nash v. Duncan Park Comm'n*, Nos. 309403, 314017, 2014 WL 1097444, at *9 (Mich. Ct. App. Mar. 20, 2014) ("The [Michigan Trust Code . . . forms a component of the Estates and Protected Individuals Code . . . and] applies to trusts created before its enactment, but does not impair accrued rights or affect an act done before its effective date. . . . [and thus] EPIC lacks direct relevance to whether [an] indenture created a trust, as [the settlor's] intent must be gleaned from the legal environment in 1913."). The current law and past law are substantially similar.

WEIL:\44542353\6\45259.0007

*Estate*, 22 N.W. 217, 218 (Mich. 1885). In either case, the declaration can be oral or written. *Faulds*, 231 Mich. at 516 (describing legal standard to find a declaration). The declaration, however, must be unequivocal. *Id.* (noting that for a settlor to declare him or herself to hold property in trust, there must be a statement equivalent to "I declare myself trustee," though those precise words need not be used). There must be words that indicate a trust purpose with sufficient certainty. *Id.* Intent to form a trust cannot be "derived from loose and equivocal expressions" that are "made at different times and upon different occasions." *Id.* The third way that a trust may be found is if there are circumstances that show, beyond a reasonable doubt, that a settlor intended to create a trust. *Scarney v. Clarke*, 275 N.W. 765, 768 (Mich. 1937).[45]

A charitable trust is a specific type of express trust where property is held for the benefit of the public (or some portion thereof) and in furtherance of a charitable purpose. For there to be a "charitable trust," the same elements for creating an express trust (discussed above) must exist. *See* Restatement (First) of Trusts § 349 cmt a. (noting that charitable and non-charitable trusts are created with the same methods, *e.g.*, a declaration).[46] Assuming that is the case, several additional requirements must be satisfied for the trust to constitute a *charitable*

---

[45] The Attorney General incorrectly cites *In re Americana Foundation* for the proposition that "the term 'trust' is not limited to express trusts and extends to corporations created to administer trusts." (AG Opinion at 10.) This is incorrect. In *Americana*, the court found that there was an express trust because the elements for the creation of an express trust had been proven beyond a reasonable doubt. 378 N.W.2d 586, 588–89 (Mich. Ct. App. 1985) (finding that an express trust was created where circumstances showed "beyond reasonable doubt that a trust was intended to be created").

[46] When discussing the elements for the creation of a trust, the Attorney General and DIA Corp. misleadingly quote from *In re Rood's Estate*, 200 N.W.2d 728,733 (Mich. Ct. App. 1972), in which the court stated that "[c]haritable gifts and trusts are favorites of the law and of the courts, and the courts will declare valid, and give effect to, such gifts and trusts where it is possible to do so consistently with established principles or rules of law." (DIA Corp. Brief at 13 (quoting statement); AG Opinion at 13 (same, but omitting the phrase "consistently with established principles or rules of law")).) These liberal rules of construction are adopted when a charitable trust fails and courts must determine the appropriate remedy – not when courts determine whether a trust exists in the first instance. The *Rood* court's statement of the liberal rules of construction in this context had no relationship to its finding that a trust had been formed.

WEIL:\44542355\6\45259.0007

trust.  First, it must benefit an indefinite and unascertained class of people (*i.e.*, the public).

*Scarney*, 275 N.W. at 768 ("A distinguishing characteristic of [a charitable] trust is that the

prospective beneficiary is undetermined and unknown, and while such a trust need not be for the

benefit of the entire public, yet it must be public in nature and for unascertained beneficiaries.").

Second, it must also have a charitable purpose.  *In re Rood's Estate*, 200 N.W.2d 728, 733

(Mich. Ct. App. 1972) (noting that, for a charitable trust to be created, it must have "some

charitable purpose").[47]

> DIA Corp. and the Attorney General allege that the City is the trustee of a
charitable trust encompassing the DIA Collection, held for the purposes set forth in the DMA's
1885 Articles of Incorporation, namely "the public exhibition of its collection of works of art."
By their logic, if the DIA Collection is held in charitable trust for the benefit of the people of the
State of Michigan, and the terms of such trust provide that artwork may only be sold or
encumbered to buy additional pieces of artwork, then the City has no right to monetize the
artwork to satisfy its general municipal obligations (such as the repayment of its debts).  This is
precisely what the City is doing pursuant to the Grand Bargain.  In any event, none of the
arguments of DIA Corp. or the Attorney General satisfy the burden of proving that the DIA
Collection is held in charitable trust.

---

[47] The Attorney General and DIA Corp., when discussing the rules for the formation of a trust, quote the statement in *Rood* that "[a] determination that a charitable trust is created needs only a finding that 'some charitable purpose' exists."  (AG Opinion at 16 (quoting *In re Rood's Estate*, 41 200 N.W.2d at 733); (DIA Corp. Brief at 13 (same).)  Although "some charitable purpose" must be found for a trust to be *charitable*, the presence of a charitable purpose does not supplant the other requirements for the creation of an express trust.  *See, e.g.*, Restatement (First) of Trusts § 349 cmt. a (1935) ("The methods of creating a charitable trust are the same as the methods of creating a private trust.").

WEIL:\44542353\6\45259.0007

a.      *The DMA Could Not Have Been Founded as a Charitable Trust*

Both the Attorney General and DIA Corp. begin their analysis with the faulty legal conclusion that the DIA Collection is held in charitable trust based on a chain of events dating back to the formation of the DMA (the museum that originally held artwork that was ultimately added to the City's collection) in 1885. Specifically, they argue that the DMA was established as a charitable trust to hold art for the benefit of the public and, when the DMA failed financially and transferred its assets to the City to contribute to the City's new museum, the City somehow "confirmed and continued" this purported trust with respect to not only the artwork received from the DMA but also all other pieces already owned and to be owned by the City. The argument crumbles at the start.

Contrary to their assertions, the DMA could not have been formed as a charitable trust because in 1885, the year the DMA incorporated, charitable trusts were invalid under Michigan law. *See Chicago Bank of Commerce v. McPherson*, 62 F.2d 393, 395 (6th Cir. 1932) ("For nearly a hundred years prior to 1907 charitable trusts were not recognized by the laws of Michigan."); *see also Hopkins v. Crossley*, 96 N.W. 499, 499–501 (Mich. 1903) (invalidating an attempt by a nonprofit corporation to, upon dissolution, place its remaining assets in charitable trust because charitable trusts were not recognized under Michigan law). At that time, trusts in personal property were governed by case law, which (adopting the statutory standard applicable to other types of trusts) provided that a trust was valid only where the trust's beneficiaries were "fully expressed and clearly defined upon the face of the instrument creating it." *Rev. Stat. Mich.* Tit. V, Ch. 63, § 11(5) (1846) (setting forth the requirements for a trust in real property); *see In re Kingsbury Estate (Ledyard's Appeal)*, 17 N.W. 208, 208–09 (Mich. 1883) (noting that the Michigan statute on uses and trusts does not apply to trusts in personal property); *Trs. of the First Soc'y of the Methodist Episcopal Church of Newark v. Clark*, 3 N.W. 207, 215 (Mich. 1879)

88

WEIL:\44542353\6\45259.0007

(extending the requirement of "fully expressed and clearly defined" beneficiaries to trusts in personal property); *see also Hopkins v. Crossley*, 96 N.W. 499, 500 (indicating that the *Church of Newark* court held that trusts in personal property must have defined beneficiaries, and finding a charitable trust in personal property invalid).[48]  As a rule, charitable trusts – which benefit a changing and indefinite class of people, such as "the public" – were declared by Michigan courts as invalid because their specific beneficiaries could not be identified.  *See, e.g., Trs. of the First Soc'y of the Methodist Episcopal Church*, 3 N.W. at 215 (noting that charitable trusts were not permitted because they were "not fully expressed and clearly defined"); *cf. Cleveland v. Second Nat. Bank & Trust Co.*, 92 N.W.2d 449, 455 (Mich. 1958) (confirming that charitable trusts are "of necessity indefinite and uncertain in respect to beneficiaries"); *Scarney*, 275 N.W. at 768 (confirming a "distinguishing characteristic" of charitable trusts is "undetermined and unknown" beneficiaries).  Charitable trusts were not recognized under Michigan law until 1907, with the enactment of Public Act 122 (the "**1907 Act**").  1907 PA 122 § 1 (providing that "[n]o gift, grant, bequest or devise to . . . charitable . . . uses which shall in other respects be valid under the laws of this State, shall be invalid by reason of the indefiniteness or uncertainty of the persons designated as the beneficiaries thereunder in the instrument creating the same").[49]  Thus, as a matter of law, the entire AG Opinion and DIA Corp. argument about the DIA Collection being held in charitable trust fail.

---

[48] Michigan statutory law did not address the creation of trusts in personal property until Public Act 386 (the Estates and Protected Individuals Code) was enacted in 1998.

[49] The 1907 Act did not explicitly provide for retroactive application to past transactions – such as the incorporation of the DMA – such that it could be construed as creating a valid trust with respect to the DMA's assets.  Under Michigan law, the 1907 Act is presumed to have applied prospectively only, particularly because retroactive application would affect property rights.  *See Frank W. Lynch & Co. v. Flex Tech., Inc.*, 624 N.W.2d 180, 182 (Mich. 2001) ("[S]tatutes are presumed to operate prospectively unless the contrary intent is clearly manifested.  This is especially true if retroactive application of a statute would impair vested rights, create a new obligation and impose a new duty, or attach a disability with respect to past transactions.") (citations omitted).

WEIL:\45423536\6\45259.0007

In addition to the positions asserted by the Attorney General and DIA Corp. being grounded on the faulty premise that the DMA formed as a charitable trust, they also mistakenly characterize this alleged trust as being preserved going forward upon the sale of the DMA's assets to the City in 1919, including with respect to additional pieces subsequently purchased or acquired by the City. Unable to satisfy the strict legal requirements for demonstrating the creation of a trust, the Attorney General and DIA Corp. make up theories that the alleged DMA trust was "confirmed and continued" or "perpetuated and maintained" when the DMA transferred its assets to the City.[50] (AG Opinion at 13; DIA Corp. Brief at 16.) They reason that the City took possession of these assets pursuant to a statute and charter that purportedly confirmed the existence of the trust and established the City as a trustee (although they appear to disagree as to whether the City became the new, or just a co-trustee). (*See* DIA Corp. Brief at 14; AG Opinion at 14–15.) With the alleged charitable trust purportedly intact, the Attorney General and DIA Corp. then misconstrue the City Charter, the Operating Agreement, and applicable law as continuing a trust with respect to all after-acquired assets. They cite no legal support or precedent for this theory, nor was any found. Moreover, as a factual matter, their arguments are unpersuasive.

---

[50] Neither DIA Corp. nor the Attorney General argue that a charitable trust was created in 1919 when the City purchased the DMA Assets, likely in recognition of the significant weaknesses of this argument. There is no evidence that the conveyance was accompanied by an explicit declaration of trust by either the DMA or the City, or that such a declaration was made in its documentation (*e.g.*, the Bill of Sale). In the absence of this, a party would have to prove that circumstantial evidence shows *beyond a reasonable doubt* that a trust was created. *See Scarney v. Clarke*, 275 N.W. 765, 768 (Mich. 1937). As discussed herein, all of the circumstantial evidence shows there is no way any party could meet this burden.

WEIL:\45423535\6\45259.0007

b. *A Charitable Trust Was Not "Confirmed or*
   <u>*Continued" When the DMA Transferred Its Assets to the City*</u>

There is no evidence that the City, upon receipt of the DMA's artwork, confirmed or accepted a trust over which it intended to serve as trustee. The factors pointed to by the Attorney General and DIA Corp. to suggest this are unconvincing.

DIA Corp. claims the 1918 City Charter and the creation of the City's Arts Commission "confirmed and continued" a trust over the DMA Assets and established the City as "co-trustee." (DIA Corp. Brief at 14.) As support, DIA Corp. points out that the Arts Commission was formed with the "same charitable duties and obligations" as the DMA, including the duty to build and operating a building to exhibit works of art, the duty to acquire and exhibit works of art, and the right to acquire real and personal property (without the right to sell personal property). (*Id.*) Contrary to these assertions, the provisions of the 1918 City Charter and the creation of the Arts Commission do not in any way confirm the existence of or continuation of a trust – instead, they make clear that the Arts Commission was merely a municipal instrumentality that was established and authorized to create a new museum for the City from scratch, to be housed in a new building called the "Detroit Institute of Arts."

As set forth in more detail in the Factual Background section above, it was pursuant to the 1919 Act that the DMA sold its assets to the City. (*See supra* at 24–27.) It was a year prior to this, however, that the City's charter was amended to create several commissions, including the Arts Commission, each vested with particular executive or administrative powers of the City. (*See* City Charter, 1918 (EX391) Tit. III, Ch. I § 1 (vesting executive powers); *id.* Ch. XVIII (establishing Recreation Commission); *id.* Ch. IX (same, for Parks and Recreation Commission); *id.* Ch. XI (City Lights Commission); *id.* Ch. XV (Fire Commission); *id.* Ch. XVII (Public Welfare Commission); *id.* Ch. XXI (Police Commission).) Specifically, the 1918

WEIL:\45423536\6\45259.0007

City Charter empowered the Arts Commission, on behalf of the City, to build an entirely new, municipally-owned museum and fill it with artwork.  (*See id.* Tit. III, Ch. XIX §§ 1, 7 (empowering the commission to "acquire, collect, own and exhibit, in the name of the city, works of art," and to erect "buildings to be used for the exhibition of paintings and works of art and auditorium purposes, to be known as the Detroit Institute of Arts.").)  Although the 1918 City Charter authorized the Arts Commission to purchase and receive donations to the museum (in the name of the City), the Charter expressed no preference for the method or source of acquiring artwork, nor did it include any language to the effect that the Arts Commission was accepting and continuing a charitable trust established by the DMA.  The only requirement in the charter with respect to acquisition of property was that acquisitions be owned by the City and approved by its government.  (*See id.*)

In fact, when the Arts Commission was appointed it sprang into action and immediately began building a collection for the City independent from the DMA or its collection.  A budget was proposed at its first meeting in late January 1919, (*see* Arts Comm'n Minutes, Jan. 27, 1919 (EX3072) at DIAINSP010409 (first meeting of Arts Commission)), for which it received interim approval a few months later in March.  (*See* Arts Comm'n Minutes, Mar. 3, 1919 (EX3073) at DIAINSP010413 (noting the initial budget).)  The Arts Commission immediately began contemplating purchases for the museum from parties other than the DMA. (*See*, *e.g.*, Arts Comm'n Minutes, Apr. 28, 1919 (EX3074) at DIAINSP010419 (noting the consideration of purchasing a rug collection).)  Shortly thereafter, the City approved an appropriation of $79,000 to the Arts Commission, and earmarked $20,000 for "Purchases for Collections."  (*See* Arts Comm'n Minutes, May 12, 1919 (EX3075) at DIAINSP010420 (noting the final granted budget).)  The Arts Commission promptly put that funding to use, making

purchases in June and October of that year.  (*See* Arts Comm'n Minutes, June 2, 1919 (EX3076)

(Pérez Decl. Ex. 3076) at DIAINSP010422 (approving the purchase of two bronzes for the sum

of $1,800); Contract, Oct. 11, 1919 (EX3077) at DIAINSP058841 (reflecting purchase of two oil

paintings for the DIA Collection).)  By the end of the year, the Arts Commission had used its

budget to purchase five oil paintings, four etchings, two sculptures, three carved wood panels,

and 44 textiles.  (*See Report of the Arts Commission*, 1919, DIA BULLETIN, Jan. 1920 (EX3118)

at 59 (noting purchases made during 1919).)[51]

       It was not until July of 1919, after the commissioners had already started

contemplating and purchasing artwork for the City and assembling the beginnings of the DIA

Collection, that the DMA finally ran out of money and sought to transfer its assets to the City.

(*See* Letter from DMA to Arts Commission, June 30, 1919 (EX3078) at DIAINSP94180

(indicating that the DMA had insufficient funds to continue maintaining its museum and

requesting that the Arts Commission assume its maintenance and operation on July 1, 1919).)

The sale was not actually completed until December 17, 1919.  (*See* Arts Comm'n Minutes,

Dec. 29, 1919 (EX3079) at DIAINSP010447–50 (including report that the transfer of the DMA

Assets to the City had been completed).)  This chain of events cuts deeply against the DIA Corp.

and Attorney General's description of the Arts Commission and the DIA as "continuation" of the

DMA and its alleged trust.  Certainly, the City rescued the DMA collection and may have even

had it in mind when it established the Arts Commission to build the DIA.  But by the time the

---

[51] As required by the Charter, all of these purchases were made "in the name of the City."  (City Charter,
1918 (EX391) Tit. III, Ch. XIX § 7(d); *see* Contract, Oct. 11, 1919 (EX3077) at DIAINSP058841
(reflecting that paintings were sold to the "Detroit Institute of Arts, of the City of Detroit").)  None of
these minutes or early purchase contracts evidence anything to the effect that the Arts Commission was
putting them in trust.

WEIL:\45423531\6\45259.0007

City received the DMA Assets, the City had already created the DIA and the development of the City's collection was well on its way.

DIA Corp. suggests it is significant that the Arts Commission was authorized (or, as DIA Corp. reframes it, "required") to "take and hold, by purchase, gift, devise, bequest or otherwise such real and personal property as may be needful for carrying out the intents and purposes for which it was established." (DIA Corp. Brief at 14.) This language, however, does not show the existence of a trust that must use its property for trust purposes; indeed, the same authorization was given to generally every commission set forth in the 1918 City Charter, with the same language. (*See* City Charter, 1918 (EX391) Tit. III, Ch. XVIII § 7(d) (authorizing the Recreation Commission to "take and hold, by purchase, gift, devise, bequest or otherwise such real and personal property as may be needful for carrying out the intents and purposes for which it was established"); *id.* Ch. IX § 5(i) (same, for Parks and Recreation Commission); *id.* Ch. XI § 7(h) (same, for City Lights Commission); *id.* Ch. XIV § 7(h) (same, for Board of Health); *id.* Ch. XV § 7(h) (same, for Fire Commission); *id.* Ch. XVII § 8(k) (same, for Public Welfare Commission); *id.* Ch. XXI § 5(i) (same, for Police Commission).)

There also is no significance in the fact that the Arts Commission was required to construct a building "for the exhibition of paintings and works of art." (DIA Corp. Brief at 14.) Many commissions were authorized to create buildings for their specific purposes. (*See, e.g.*, City Charter, 1918 (EX391) Tit. III, Ch. XVII § 8(g) (authorizing the Public Welfare Commission to "establish, construct, operate, and control municipal hospitals, infirmaries, and farm colonies . . . for the care of the sick"); *id.* Ch. XXI § 5(f) (authorizing the Police Commission "erect and maintain police stations, garages and barns").)

WEIL:\45423531\6\45259.0007

DIA Corp. and the Attorney General also point out that, while the Arts Commission was authorized to sell real property, there was no express provision allowing it to sell artwork. (*See* DIA Corp. Brief at 14; AG Opinion at 17, n.20.) The absence of authority to sell personal property (*i.e.*, artwork) was not unique to the Arts Commission; only certain City agencies were authorized to sell personal property, and most of the commissions outlined in the 1918 City Charter were not authorized to do so. (City Charter, 1918 (EX391) Tit. III, Ch. XVIII § 7(f) (authorizing the Recreation Commission to, "with the approval of the common council, sell . . . lands whenever required by the interests of the city" but not providing any authority to sell personal property); Ch. IX § 5(k) (same, for Parks and Recreation Commission); Ch. XI § 7(j) (same, for City Lights Commission); Ch. XIV § 7(j) (same, for Board of Health); Ch. XV § 7(j) (same, for Fire Commission); Ch. XVII § 8(m) (same, for Public Welfare Commission); Ch. XXI § 5(k) (same, for Police Commission).) This authority was vested with the Common Council and a Purchase and Supplies Commission. (City Charter, 1918 (EX391) Tit. III, Ch. I § 1; *id.* Tit. IV, Ch. XX §§ 5(b), 12(h).)

DIA Corp. and the Attorney General misconstrue the provisions of the 1918 City Charter in an attempt to depict the Arts Commission as a unique City agency specifically designed to operate a trust and parallel the purposes and form of the DMA. (*See* DIA Corp. Brief at 14 (suggesting that the Charter was "[l]ike the DIA Corp.'s Articles").) In fact, the Arts Commission, like every other commission in the City, was just another executive department that managed City property. While the Arts Commission ultimately did purchase for the City the DMA Assets and may have even had its eye on this collection when it was formed, there is no evidence that the Arts Commission was established specifically for this purpose or for the purpose of maintaining an alleged charitable trust.

WEIL:\45423536\6\45259.0007

Similarly, the fact that the statute that authorized the DMA to transfer its property to the City included a requirement that the City use such property for the purposes for which the DMA was organized (which requirement was later repealed and superseded, as set forth above), is not compelling evidence that the City "confirmed and continued" a trust upon such transfer. The DMA was formed "for the founding of a public art institute in the City of Detroit, which may . . . receive and use such gifts, contributions, devises and bequests as may be made for art purposes; receive, acquire, collect and own . . . works of art, and . . . do all other things authorized by [the 1885 Act], and have and enjoy all the privileges and franchises given thereby." (*See* DMA Articles of Association, Art. II (EX3080).) These stated purposes do *not* include holding assets in charitable trust. Moreover, the 1919 Act provisions reflect the intent of the State legislature and not the City, and thus do not provide any insight as to whether the City intended to hold the DMA's assets in trust.[52]

In addition, the circumstances surrounding the 1919 Transfer show that the City did not view itself as continuing a trust. The City, in fact, paid for the DMA Assets and received them in an unconditional conveyance. (*See supra* at 24–27.)

        c.       *The City Did Not "Step In" as a*
                     *Trustee or Co-Trustee of the DIA Collection*

Further, there are numerous problems with the assumption by the Attorney General and DIA Corp. that, upon receipt of the DMA Assets, the City became the new or a co-charitable trustee. Assuming the DMA Assets were held in trust, the 1919 sale of such assets to the City could not have resulted in the City replacing the DMA as trustee of the collection because the DMA could not have resigned as trustee or appointed a replacement trustee without

---

[52] Even if this is evidence of the City's intent, it is (at best) only with respect to those pieces received from the DMA.

WEIL:\45423535\6\45259.0007
96

permission from a court (of which there is no evidence or allegations).[53]  *See* Restatement (First)

of Trusts § 106 (1935) (noting that a trustee cannot resign except with the permission of a proper

court, in accordance with the terms of the trust, or with the consent of all the beneficiaries); *id.*

§ 108 ("[I]f the trustee . . . ceases for any reason to be trustee, a new trustee can be appointed

(a) by a proper court; or (b) by the person, if any, who by the terms of the trust is authorized to

appoint a trustee."); *see also* MICH. COMP. LAWS § 11589 (1915) (providing that, with respect to

trusts in real estate, the court of chancery must determine whether to accept the resignation of a

trustee); *id.* § 11591 (noting that, with respect to trusts in real estate, the court of chancery "shall

have full power to appoint a new trustee, in the place of a trustee resigned or removed").  The

only exceptions to court approval are where the terms of the trust provide otherwise or all

beneficiaries consent.  *See* Restatement (First) of Trusts § 106 (1935).  Neither applies here.[54]

Indeed, the fact that the DMA Assets were transferred to the City without any adherence to the

legal requirements for conveying trust assets to a new trustee suggests that the DMA itself did

not believe those assets were not held in trust.

---

[53] The 1915 Michigan Compiled Law provisions addressing the duties of trustees applied only to trusts in real property, and there was no corresponding statute for trustees of trusts in personal property.  *See In re Kingsbury Estate (Ledyard's Appeal)*, 17 N.W. 208, 209 (Mich. 1883) (noting that the Michigan statute on uses and trusts does not apply to trusts in personal property, that there is no other governing statute, and that, therefore, the remedy must be "furnished by . . .  the original jurisdiction of the court of chancery").  No cases have been found addressing the specific rules for trustees of trusts in personal property; however, Michigan courts have long resorted to the Restatement of Trusts on topics where Michigan case law is silent.  *See, e.g.*, *Scarney v. Clarke*, 275 N.W. 765, 767 (Mich. 1937) (relying on Restatement of Trusts as legal authority); *Harmon v. Harmon*, 6 N.W.2d 762, 765 (Mich. 1942) (same); *Potter v. Lindsay*, 60 N.W.2d 133, 136 (Mich. 1953) (same); *Michigan Baptist Homes & Dev. Co. v. City of Ann Arbor*, 242 N.W.2d 749, 758 (Mich. 1976) (same); *Miller v. Dep't of Mental Health*, 442 N.W.2d 617, 619 (Mich. 1989) (same); *In re Frahm Trust*, 548 N.W.2d 635 (Mich. 1996) (same).  Accordingly, the rules from the Restatement closest to that time (the First) have been assumed and the Michigan statute (which is consistent with these rules) has been presumed to apply by analogy.

[54] If the DMA held its assets as charitable trustee, for argument's sake (and as alleged by DIA Corp.) the "terms of the trust" presumably would be the provisions of the DMA's articles of association and the 1885 Act.  The articles of association and the 1885 Act did not provide any express mechanism for the DMA to resign as charitable trustee or appoint a successor and, accordingly, the general rules on resignation should be applied (namely, court approval is necessary).

WEIL:\45423536\45259.0007

In addition, there is substantial evidence that the City and DIA Corp. are and have always been separate entities, with distinct roles and degrees of control over the DIA and its assets, and did not (and still do not) function as co-trustees of the collection. Upon the transfer of the DMA Assets to the City, DIA Corp. (then the DMA) had contemplated dissolving – instead, it remained only to serve as a fundraiser for the City's new museum. (*See supra* at 27–28.) DIA Corp. has, on numerous occasions, made statements or acted in a manner to suggest that it is not a trustee, and that it has no control over the DIA Collection. (*See, e.g.*, Arts Comm'n Minutes, Sept. 27, 1984 (EX3259) at DIAINSP091894 (noting that the President of DIA Corp. had assured the Mayor that "clearly the City owns the Museum and exercises control").) At times, DIA Corp. has sought to distance itself from the City. For example, when the City reduced funding for the DIA during a fiscal crisis, DIA Corp. considered severing its relationship with the City and retaining all future gifts of artwork for itself. (*See* Speech of F. Cummings, The State Steps In: Michigan and the Detroit Institute of Arts, May, 1977 (EX3083) at DIAINSP119260 (noting that although DIA Corp. acquisitions became "the property of the City of Detroit," that during a time of low City funding "[t]he question of ownership was seriously considered since we have the option of retaining works of art as the property of [DIA Corp.]").) If DIA Corp. were a trustee and the DIA was its trust, then DIA Corp. as trustee could not simply decide to keep donated assets for itself instead of turning them over to the trust. DIA Corp's own description of its relationship with the City sums it up perfectly. In a 1982 Meeting Agenda, representatives of the DIA Corp. reported that they planned to inform the Mayor that the DIA Corp.'s relationship with the City was "based entirely on good will and an unwritten and unmandated goal to aid a City of Detroit institution . . . but that this is fragile and can easily be damaged or destroyed since good will alone is key to it . . . ." (Meeting Agenda, circa 1982

WEIL:\45423531\6\45259.0007
98

(EX3084) at DIAINSP118003.)  A trustee's relationship and responsibilities certainly are not based solely on goodwill, or an unwritten and unmandated goal.[55]

City officials and representatives, too, have not regarded DIA Corp. as the City's "co-trustee" of a trust with respect to the DIA artwork.  Thus, when the DIA was audited in 1983, the auditor recommended abolishing the role of DIA Corp., (City's DIA Audit Finds No "Willful" Violations (EX3085) at DIAINSP119494), and after the 1983 Audit, the City took immediate steps to extricate DIA Corp. from the management of public responsibilities and funds.  (*See* The Detroit News, Key Changes Ordered in Art Museum Operation, Nov. 11, 1983 (EX3086) at DIAINSP119508; Arts Comm'n Minutes, Sept. 27, 1983 (EX3259) at DIAINSP091893 (noting the Mayor's statement that the DIA Corp. had "illegally extended its control over museum operations")).)  These actions and statements are inconsistent with the notion that DIA Corp. and the City were co-trustees of a charitable trust consisting of the DIA Collection.

Indeed, when the relationship between the City and DIA Corp. was first formalized by contract in the 1980s, the agreement made explicit that DIA Corp. was exclusively a contractor, and one for whom the City had serious accountability concerns.  (1984 Agreement (EX3087) at Exhibit E § 6.05.)  Although the 1984 Agreement required DIA Corp. to acknowledge that it held a "position of trust" pursuant to the agreement, this should not be mistaken as a statement that the DIA Corp. was named "trustee."  In fact, other provisions of the agreement confirmed the City's elevated position of control and DIA Corp.'s role as a service provider.  For example, the 1984 Agreement stated, in underlined text, that the cooperation of DIA Corp. and the City under the agreement, and DIA Corp.'s responsibility for certain

---

[55] This is further confirmed by the fact that none of DIA Corp.'s stated purposes has ever been to serve as a trustee or co-trustee.  (*See supra* at 52.)

WEIL:\45423531\6\45259.0007

99

activities, were "all subject to the overall control and approval of the [Arts] Commission as required by the City Charter." (*Id.* § I 8(B).)  The contract also was for a finite period and could be terminated by the City for cause.  (*Id.* at Exhibit E § 11.)  These provisions are consistent with a relationship between a party who hires a third-party contractor to provide services; this is not in accord with the typical conduct of co-trustees.  The DIA Corp.'s agreement to its "position of trust" was a symbolic agreement, and in reality evidence of *dis*trust.

The subsequent Operating Agreement the parties executed, and the City's actions leading up to its execution, also confirm that DIA Corp. and the City are not co-trustees of a trust.  Prior to entering into the Operating Agreement with DIA Corp., the City issued an RFP to find a service provider to operate and manage the DIA – meaning that hiring DIA Corp. in particular was not a foregone conclusion.  (*See* Arts Comm'n Minutes, Oct. 31, 1997 (EX3088) at 2.)  The Operating Agreement also, like its predecessors, expressly states that DIA Corp. is an independent contractor subject to the oversight of the Arts Commission, engaged by the City "as manager and operator of the DIA."  (Operating Agreement, Dec. 12, 1997 (EX254) §§ G(1), E(2), D(1).)[56]  Again, all evidence contrary to the conclusion that DIA Corp. and the City are co-trustees of a trust.

        d.     *The Delegation of Authority Pursuant to the*
             *Operating Agreement and the Collections Management*
             <u>*Policy Does Not Confirm or Continue a Charitable Trust*</u>

DIA Corp. and the Attorney General also are misled in construing the Operating Agreement and the Collections Management Policy incorporated therein as confirming and

---

[56] The Operating Agreement contains an integration clause, which obviates any argument that it implied or was intended to create any relationships or obligations other than those that were explicit.  (Operating Agreement, Dec. 12, 1997 (EX254) § S ("This Agreement . . . constitute[s] the entire agreement between the parties concerning the subject matter hereof.  There are no promises, terms, conditions or obligations other than those contained herein . . . . [and it] supersede[s] all previous agreements, communications, negotiations and representations, whether oral or written between the City and the [DIA Corp.]").)

WEIL:\45423531\6\45259.0007

continuing an alleged charitable trust over the DIA Collection. As made clear by both its history

and its provisions (set forth in detail in the Factual Background section above), the Operating

Agreement reflects a cost-saving choice by the City to outsource operations, and an effort to

ensure the accountability of its contractor – DIA Corp. (*See supra* at 36–40; 1997 Audit

(EX3089) at 42 (noting that eliminating the government rule in managing the museum raises

issues of accountability, but that privatization must be considered because of limitations on

existing government resources and demands that such resources be used for essential services).)

It was the latest in a series of contracts that the City executed to strike a balance between

maintaining control and ownership of the DIA and accountability for its operations, on the one

hand, with the recognition that the DIA could benefit from the services of a third party such as

DIA Corp. with art expertise and fundraising capabilities, on the other. (*See supra* at 37; 1984

Agreement (EX3087) Recitals § G (recognizing that DIA Corp. provides "much needed"

financial support for the DIA, that the Arts Commission had relied heavily on the expertise of

DIA Corp. and its staff, and that DIA Corp. had been "invaluable in the development of the DIA

into a world class museum").)

   The Operating Agreement contains restrictive procedures and policies applicable

to DIA Corp., which reflect accountability concerns evidenced through the history of the parties'

relationship, the greater responsibilities being delegated by the City, and the careful, diligent

approach the City undertook in deciding whether to outsource the DIA's operations. (*See supra*

at 36–40.) In particular, the Operating Agreement confirms that title to the City's art collection

remains with the City, (Operating Agreement, Dec. 12, 1997 (EX254) § F(2)(b)), and prohibits

DIA Corp. from clouding the City's title to the DIA Collection. (*Id.* § F(7)). These restrictions

WEIL:\45423536\6\45259.0007

101

serve to confirm and protect the City's ownership of and control over the DIA Collection – not to evidence that such collection is held in trust.

Indeed, the explicit language of the Operating Agreement cuts against the conclusion that the City holds the DIA Collection in trust. The agreement restates the longstanding and oft-repeated fact that has City retains "title to and ownership of the . . . City art collection." (*Id.* § E(1)). Both parties explicitly agreed there are no third party beneficiaries of the Operating Agreement – a term that is inconsistent with the notion that the agreement evidences a trust for the benefit of the public. (*Id.* § N(2).) Moreover, the agreement has a potent integration clause that obviates any argument that it implied or was intended to create any relationship or obligation other than those that were explicit. (*Id.* § S.)

While the Operating Agreement does bind DIA Corp. to adhere to the DIA's Collections Managements Policy, (*see* Operating Agreement, Dec. 12, 1997 (EX254) § F(2)(a)), this is not, as suggested by the Attorney General and DIA Corp., evidence that the DIA Collection is held in trust. It is a way to ensure that DIA Corp. is accountable to the City. Furthermore, the policy is subject to change and waivers – an attribute inconsistent with the terms of a charitable trust. (*See* Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) at 2.)

Although the Collections Management Policy uses the words "trustee" and "trust," (*see id.* § V ("In considering [selling] objects or groups of objects, the Museum must be ever aware of its role as trustee of the collections for the benefit of the public"); *id.* § V(D) ("The manner of disposition [of artwork] should be in the best interests of the Museum . . . [and] the public trust it represents")), these statements do not confirm the existence of a charitable trust. They are reflections of the ethical guidelines of the DIA's accrediting institution (the AAM), and

WEIL:\45423534\6\45259.0007

guidelines for the museum staff.  Specifically, the AAM publishes a model "Code of Ethics" and

requires adherence to policies for managing collections as a condition to accreditation.  (*See*

Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) at 1 (noting that

"[a]ll museum collections management procedure and policy will be based on AAM

recommendations, from which the museum receives its accreditation."); *Developing an*

*Institutional Code of Ethics*, http://www.aam-us.org/docs/continuum/developing-a-code-of-

ethics-final.pdf?sfvrsn=2 (EX3090) (describing AAM ethical guidelines for museums).)  The

AAM and even the Attorney General have recognized that the AAM guidelines adopted by

museums are ethical standards, not legal obligations.  (*See* AG Opinion at n.8 (concluding that

"[t]he term 'public trust' . . . used by museums and their associations" should not be equated to

the public trust doctrine); *see* Developing an Institutional Code of Ethics at 2 (distinguishing

between ethical and legal obligations), *available at* http://www.aam-

us.org/docs/continuum/developing-a-code-of-ethics-final.pdf?sfvrsn=2.)  Thus, the references to

"trust" in the Collections Management Policy are intended to instill in DIA Corp. staff a sense of

responsibility when managing valuable City property.  In this regard, they are similar to the

contractual provisions in the 1984 Contract that were directed toward the accountability of the

DIA Corp.  (*See* 1984 Agreement (EX3087) Recitals ("[DIA Corp.] recognizes the position of

trust which it occupies pursuant to this Agreement").)

   DIA Corp. also claims that by including in the Operating Agreement a

deaccessioning policy that requires proceeds from deaccessions be used to acquire additional

artwork, the Operating Agreement "recognizes" that the DIA Collection is held in trust.  (DIA

Corp. Brief at 15.)  This is yet another transparent effort to recharacterize the Operating

Agreement and the policies it imposes on DIA Corp. as something more than they actually are:

WEIL:\45423536\45259.0007

contractual terms for a third party service provider who is managing extremely valuable City property.[57]  Moreover, it ignores the fact that a deaccessioning policy has not always been in place, that once a policy was adopted it changed over the course of time, and that the current policy can be changed again in the future.

Through the 1950s, the DIA did not have a deaccessioning policy governing the DIA Collection.  (*See supra* at 63–65.)  Proceeds of art sales were deposited in the City's coffers.  (*See supra* at 63–65.)  Originally, such funds could only be used for Arts Commission expenses, although surplus funds were swept into the City's general surplus fund.  Later, even the restriction on use for expenses was removed.  (*See supra* at 64.)  Eventually, in the mid-1960s, the Arts Commission decided that it would be best to preclude all sales of City-owned artwork to prevent disposal of objects based merely on changes in taste and to protect against sales at a market discount.  (*See supra* at 65.)

Then, over a decade later, the City decided to engage DIA Corp. as a subcontractor to carry out the deaccessioning of works from the DIA Collection.  (*See supra* at 69–70.)  As part of this agreement, the City required DIA Corp. to apply the proceeds from a deaccessioned object to the "DIA Art Acquisition Fund," which fund would be used to buy new artwork.  (*See supra* at 69.)   The Collections Management Policy in the existing Operating Agreement replaced this prior subcontractor agreement.  (*See supra* at 70.)

---

[57] There is nothing operative or inherent in the existence of a deaccessioning policy that creates or evidences a trust.  Deaccessioning policies are created – or avoided – for practical purposes, which include a desire to prune an overgrown collection and refine it with high-quality acquisitions.  The earliest discussions of deaccessioning by the Arts Commission evidence concerns about future commissioners selling acquisitions selected by present commissioners due to changes in taste, and potential risks relating to price fluctuations in the art market.  (*See supra* at 65.)  Later, in the 1970s and 80s, the Arts Commission's thinking about a deaccessioning policy was about controlling the sales process focused on regulating sales and improving the "overall quality" of the collection by selling low-quality work to purchase pieces of a higher quality.  (*See supra* at 67–70.)

WEIL:\45423531\6\45259.0007

The need for careful controls is obvious in the context of deaccessioning, where DIA Corp. is authorized to sell artwork from the City's collection. It is hard to image why the City would allow DIA Corp. to sell municipal property and use the proceeds for something other than purchasing art, and it would be irresponsible for the City to do so. Moreover, although DIA Corp. is contractually bound to it, the City has the authority to change the deaccessioning policy at any time. (*See supra* at 82.) Thus, the current deaccessioning policy ensures that the DIA is an accredited museum and provides a means to improve the quality of the collection through a controlled process of selling low-quality objects to buy higher-quality objects. It does not "confirm or continue" a trust.

The Operating Agreement is merely a continuation of a series of contracts designed to retain the services and expertise of the DIA Corp., while limiting its autonomy and seeking to prevent certain abuses. If, in fact, the City and DIA Corp. were co-trustees of the DIA Collection, arguably no contractual restrictions would be necessary; DIA Corp. would be bound to act in accordance with its fiduciary duties as a trustee. Thus, the Operating Agreement does not confirm or continue a charitable trust; it refutes the existence of one.

e.  *The City Would Not Automatically Hold
    Artwork Acquired After the 1919 Transfer in Trust*

Even if a trust was created by the DMA in 1885, and that trust was somehow confirmed and continued when the City acquired the DMA Assets in 1919, the assumption that all pieces of artwork subsequently added to the DIA Collection are necessarily also held in charitable trust conflicts with a fundamental principle of trust law and misconstrues Michigan's trust statute. A key premise of trust law is that a settlor cannot create a trust with respect to property it does not yet own. *See Fisher v. Hampton Transp. Co.*, 98 N.W. 1012, 1013–14 (Mich. 1904) (holding that no trust was created where, at the time the settlor declared his intent

WEIL:\45423536\6\45259.0007

to create a trust, he did not own the subject property); *see also* Restatement (Third) of Trusts § 41 (2003) ("An expectation or hope of receiving property in the future, or an interest that has not come into existence . . . cannot be held in trust"); *id.* cmt. b (noting that a would-be settlor cannot create a trust of property that he or she does not own or is not in existence, even he or she has a reason to expect to acquire the property in the future). The DMA could not have created a trust that encompasses property that it did not own at the time it transferred its property to the City, *i.e.*, anything other than the DMA Assets. Similarly, in accepting the purported trust containing the DMA Assets, the City could not, at that time, have imposed a trust over additional artwork it would acquire in the future. For a trust to be found encompassing the artwork the City acquired *both before and after* it received the DMA Assets, the elements for establishing a trust would have to be satisfied with respect to such additional property *at or after* the time it was acquired. Accordingly, whether the DMA created a charitable trust in 1885, and whether the City accepted such a trust in 1919, are legally irrelevant to the issue of whether the rest of the DIA Collection separately acquired by the City is held in trust.

DIA Corp. seeks to avoid this rule by arguing, without any legal support, that the trust purportedly created by the DMA in 1885 and accepted by the City in 1919 was "confirmed and continued" by the 1918 City Charter and the Operating Agreement (discussed above). Absent a showing that the elements for the creation of a trust were satisfied for property other than the DMA Assets, or proof by circumstantial evidence *beyond a reasonable doubt* that a trust existed that encompassed such property, DIA Corp.'s position fails. (*See supra* at 85.)

The Attorney General inappropriately expands a statutory definition in an attempt to support an argument that all after-acquired artwork would automatically be held by the City in trust. The Michigan statute quoted by the Attorney General in support of his argument on this

WEIL:\45423538\6\45259.0007

106

point is Michigan Compiled Laws section 700.1107(n), which defines "trust" to include "an express trust, private or charitable, with additions to the trust, wherever and however created." (AG Opinion at 14 (citing MICH. COMP. LAWS § 700.1107). This provision does not change the bedrock principle that, for property to be added to a trust, the settlor must own the property and satisfy all of the elements for creating a trust with respect to such specific property. Section 700.1107(n) merely defines which types of trusts are governed by certain provisions of the Michigan Compiled Laws. *See* John Payne, Michigan Probate: A Practice Systems Library Manual § 14:1 (2013) ("The Michigan Trust Code . . . applies to trusts *as defined* in [Michigan Compiled Laws section] 700.1107.") (emphasis added). This definition is separate from and does not replace the provisions that govern how to form a trust, and does not mean that all property given to an entity that holds some assets in trust automatically becomes subject to such trust. *See In re Bruce D. Cameron Trust*, No. 257306, 2005 WL 3190621, at *1, 3 (Mich. Ct. App. Nov. 29, 2005) (relying on section 700.1007(n) as the "statutory definition" of a trust, but relying on different statutory provisions and authorities when considering whether a trust was validly formed).[58]

---

[58] The Attorney General asserts in a footnote that it would be untenable and unreasonable for some art in the collection to be held in charitable trust (*i.e.*, the DMA Assets) and other art not to be (the rest of the collection), because a trustee "shall keep trust property separate from the trustee's own property," and therefore the entire collection must be held in trust. (AG Opinion at n.16). Oddly, the Attorney General points to something allegedly not permitted by trust law to prove a trust exists. By this logic, every time assets were comingled, one would have to conclude they were all trust assets – precluding the need for any rule against intermingling or the remedies that apply. *Cf. In re Mich. Boiler & Eng'g Co.*, 171 B.R. 565, 570–71 (Bankr. E.D. Mich. 1993) (discussing Michigan state law regarding the remedies where trust property is comingled). Instead, the remedy for this scenario (if true) would be to separate the property (if traceable) or apply a presumption distinguishing between trust and trustee funds. *See id.* (noting where trust funds have been commingled with other funds in an account and cannot be traced, the law raises a presumption that the trust funds are held intact in that account). Moreover, even where trust and nontrust funds are intermingled, the trustee can still separate its own property. *See Long v. Earle*, 269 N.W. 577, 585 (Mich. 1936) ("If the trustee commingles trust funds with his own, the entire commingled property 'will be treated as subject to the trust, to the extent necessary to make good the claim of the cestui que trust to funds traced to, and still found commingled in, the common fund, except insofar as the trustee may be able to distinguish and separate that which is his own.'") (citation omitted). The Attorney

WEIL:\45423536\45259.0007
107

f.      *Other Evidence of Confirmation*
        *of a Trust Is Similarly Unpersuasive*

The Attorney General and DIA Corp. cite to miscellaneous other things that allegedly "confirm" that the DIA Collection is held by the City in trust. None of these points supports their argument. Moreover, as circumstantial evidence of an alleged trust, such evidence is subject to the heavy "beyond a reasonable doubt" burden of proof. *Scarney v. Clarke*, 275 N.W. 765, 768 (Mich. 1937) (noting that when seeking to prove a trust on the basis of circumstances, the "beyond a reasonable doubt" burden applies). None of the asserted facts meets this standard.

Accounting Principles. The Attorney General claims that the fact that the City does not report the DIA Collection as a capital asset on its books is "[i]n accord with the view that the [collection] is held in trust for the public." (AG Opinion at 12–13.) Specifically, the Attorney General cites to a provisions in a GASB statement and posits that the DIA Collection "is not considered on . . . [the] books as an asset with a monetary value because, though these assets have substantial monetary value, they are not assets that can simply be sold; rather, they are subject to the strict deaccessioning policies discussed above." (*Id.* at 12.) This position is meritless.

Pursuant to GASB standards, a municipality is encouraged, *but not required* to capitalize an art collection (whether donated or purchased) where it is: (i) held for public exhibition, rather than financial gain; (ii) protected, kept unencumbered, cared for, and preserved; and (iii) subject to an organizational policy that requires the proceeds from sales of collection items to be used to acquire other items for collections. (*See* GASB No. 34 (EX3099)

---

General's illogical conclusion ignores the obvious explanation for why assets may have been intermingled here – the City has never understood itself to be the trustee of a charitable trust.

WEIL:\45423536\45259.0007

at ¶ 27.)  This principle, which provides governmental entities with the option of not reporting

works of art as capital assets says nothing about whether such assets are or must be held in trust.

In fact, it appears that the City decided to not capitalize the DIA Collection purely because of

practical reasons regarding the cost and effort the City thought it would take to inventory and

value such assets.  (*See* Memo from S. Rouhani to Finance Accounts – File, Apr. 9, 2014

(EX3100) at POA00225308.)

       2012 Mayor Bing Letter.  As further evidence of the City's purported

"acknowledgment" that it holds the DIA Collection in trust, DIA Corp. points to a 2012 letter

from Mayor Bing to the Counties' commissioners that requests that they allow their citizens to

vote on the Millage to fund the DIA, and in which he states that the City does not intend to sell

its art collection and is committed to holding it in trust for the public.  (*See* DIA Corp. Brief at

16; Letter from Mayor Bing to County Commissioners (EX344).)  As an initial matter, this is not

an official "acknowledgment" from the City, but a personal letter (including statements such as

"[m]y wife Yvette and I are devoted to the DIA") from one politician to others requesting votes.

(Letter from Mayor Bing to County Commissioners (EX344).)  Even if it were somehow

construed as a statement by the City, it is not an admission that the DIA Collection is held in

charitable trust – communicating that the City may currently be committed to do something is

not the same as acknowledging that it is legally required to do so, nor does this amount to an

acknowledgment of a permanent charitable trust over the assets.

       2013 Capital Agenda Mission Statement.  DIA Corp. also claims the mission

statement in the City's capital agenda is a representation by the City that it holds the DIA

Collection in charitable trust.  (DIA Corp. Brief at 16; Proposed Capital Agenda, FY 2013–14

through FY 2017–18, Jan. 23, 2013 (EX3102) at 63 ("The Detroit Institute of Arts collects and

holds in trust for the people of Detroit, Michigan, and the world, examples of the highest quality of fine arts from all times and cultures throughout the world.").) To begin with, this statement is labeled as a "mission," which is an aspiration or task, and not a statement of a legal conclusion. In addition, although the mission includes holding artwork "in trust," this is not an unequivocal statement that the artwork is held in a "charitable trust." The "trust" concept has non-legal meanings, including the ethical meaning employed by the AAM and museums. (*See supra* at 41 note 19, 102.) Moreover, when analyzed further, it is obvious that this statement is of no legal consequence.

Agency mission statements in City capital agendas and budget requests are intended only to help evaluate the capital needs of each respective department. They stem from annual requests by the City Budget Director, who requires detailed funding requests from the various City departments, including the DIA, that include, among other things, a narrative description of the department. (*See, e.g.*, Memo from Budget Director, All Department Heads, re: 1986–87 Budget Requests, Oct. 10, 1985 (EX3103) at DIAINSP091399 (requesting budget submissions).) Each department is responsible for submitting its own statement and encouraged by the Budget Director to use this as an annual opportunity to review and revise the agency's stated mission. (*See id.* at 13.)

The DIA took this advice and, in fact, periodically amended its mission. Interestingly, the evolution of the DIA's mission statement over time, and the dramatic change when the DIA Corp. assumed operational control, suggest that the statement in the capital agenda to which DIA Corp. points is, in reality, a statement submitted by the DIA Corp. (*Compare* Budget for Arts Agency, FY 1988–89 (EX3104) at DIAINSP091261 (defining mission as "[t]o collect, preserve, display and explain works of art and to offer performing arts of professional

WEIL:\45423536\45259.0007

quality"); *and* Budget for Arts Agency, FY 1989–90 (EX3105) at DIAINSP091133 (defining mission as "[t]o preserve [the DIA's] collections of works of art as a heritage for present and future generations," "[t]o display . . . a broad range of these collections in a climate controlled environment," "[t]o further the understanding . . . of the visual arts," and "[t]o enhance and enlarge the collections") *with* FY 1998–99 Budget Analysis by the Fiscal Analysis Division, Apr. 28, 1998 (EX3106) at DIAINSP0116108 ("The DIA's mission is to collect and hold in trust examples of the highest quality of fine arts from all times and cultures throughout the world."); *see* FY 2000–01 Budget Analysis by the Fiscal Analysis Division, Apr. 27, 2000 (EX3107) at DIAINSP118620 (including same mission); Proposed Capital Agenda, FY 2013-14 through FY 2017–18, Jan. 23, 2013 (EX3102) at 63 ("The Detroit Institute of Arts collects and holds in trust for the people of Detroit, Michigan, and the world, examples of the highest quality of fine arts from all times and cultures throughout the world.").) The DIA's "mission" to hold artwork in trust for the people of the world – a single sentence buried in narrative intended to help understand the DIA's capital needs, submitted by the museum (most likely DIA Corp.) to the Budget Director, and then likely unquestioningly plugged into a lengthy financial statement (*i.e.*, the 423-page capital agenda) – is not an "acknowledgment" by the City that it holds its art collection in charitable trust.[59]

      <u>Acts of Donors</u>. DIA Corp. also claims that the acts of donors who allegedly made contributions to advance the DIA's alleged charitable purposes with the expectation that such contributions would be held for such purposes confirms the existence of a charitable trust. (DIA Corp. Brief at 15) DIA Corp. provides no evidence or concrete examples of these donors'

---

[59] Even if the statement were taken at face value as an acknowledgement by the City, it does not state that the DIA Collection is held in "charitable" trust. As has been discussed, in the museum world the term "trust" is an ethical concept that is used to represent museum's role as providing a service to the public. (*See supra* at 40, 41 note 19.)

WEIL:\45423536\6\45259.0007

alleged intentions and expectations. In fact, as discussed below, all or almost all funds and artwork contributed to the collection came to the City without any restriction at all.

The miscellaneous sources cited by the Attorney General and DIA Corp. to suggest that the City "confirmed" or "acknowledged" that the entire DIA Collection is held in trust fail to do so persuasively and certainly do not overcome the "beyond a reasonable doubt" burden.

g.    *Substantial Evidence From and After the 1919 Transfer*
       *<u>Confirms the City Does NOT Hold the DIA Collection in Trust</u>*

In addition to the evidence set forth in Section II(A) above showing that the City owns clear title to the art, a thorough analysis of additional relevant facts further reveals substantial evidence, including representations by the City *and* DIA Corp., that the DIA Collection is <u>not</u> held in trust.

<u>Charitable Trust Registry</u>. Perhaps most compelling is the absence of the DIA from the Attorney General's own trust registry. Michigan law has required, as far back as 1961, all charitable trusts and trustees to register with the Attorney General, and for the Attorney General to maintain a registry with this information. *See* MICH. COMP. LAWS § 14.254(d) (requiring the Attorney General to "establish and maintain a register of charitable trusts and trustees subject to this act and of the particular trust or other relationship under which they hold property for charitable purposes"); *id.* § 14.251 (providing that, generally, the act applies "to all trusts and trustees holding property for charitable purposes"); *id.* § 14.253(a) (exempting certain governmental subdivisions from the registration requirements, but noting that "[t]his exemption does not apply to a governmental subdivision of this state"). Although DIA Corp. is listed on the registry as itself being a charitable trust (under the name "The Detroit Institute of Arts"), neither the City nor the DIA (the museum) are included. (*See Attorney General's Charitable Trust*

WEIL:\45423535\6\45259.0007

*Section Database Search*, OFFICE OF THE ATTORNEY GENERAL,

http://www.ag.state.mi.us/CharitableTrust/ (EX3108) (showing that there is only one entity

registered under the name "Detroit Institute of Arts" and that it is DIA Corp.).)  This is

unequivocal evidence that neither the City nor Attorneys General of the State have regarded the

City as trustee of a charitable trust, or the DIA or the DIA Collection as constituting a trust.

<u>Donor Returns</u>.  The Arts Commission would, on occasion, return artwork to

donors.  (*See* Arts Comm'n Minutes, Nov. 24, 1937 (EX3109) at DIAINSP011049 (noting that

D. M. Ferry, Jr. requested the return of certain paintings he and his sister had donated to the DIA

that were no longer "of value for hanging," and approving the return of the paintings to their

original donors); Arts Comm'n Minutes, June 10, 1949 (EX3110) at DIAINSP011377 (noting

that two donors had requested the return of artwork accessioned in the permanent collection, and

deciding that, upon receipt of formal letters for return, the two gifts would be "returned to the

original donors, and removed from the inventory of the Detroit Institute of Arts").)  Returning

property to a donor completely contradicts the notion that the donation was held in charitable

trust, restricted from transfers.[60]

<u>Sales and Sweeps</u>.  As discussed above, there is precedent for artwork from the

DIA to be sold and the proceeds returned to the City's general fund.  For many years, the Arts

Commission sold objects from the DIA, including objects accessioned to the permanent

collection that were given by donors and purchased with DIA Corp. funds.  (*See supra* at 63–65.)

Pursuant to the City Charter, funds received by the Arts Commission would be paid into the City

---

[60] Eventually, the Arts Commission began to question the wisdom (but not the legality) of this policy, and apparently put an end to the practice.  (*See* Arts Comm'n Minutes, Nov. 16, 1953 (EX3117) at DIAINSP011548 (noting that a donor had asked for the return of a donated painting and that "[a]fter some discussion the commissioners agreed that this would be a rather unwise policy to establish – that any work could be returned whenever the original donor asked for it").)

WEIL:\45423536\45259.0007

treasury and, from there, could only be used to pay the expenses of the Arts Commission. The City would however, on an annual basis, take the surplus over the Arts Commission's projected costs and move such surplus to the general surplus fund to be used for "contingencies and the reduction of taxes. (*See supra* at 63–64.) Furthermore, in 1945, the charter was revised so that the City could use funds deposited by the Arts Commission, which would include sales proceeds, without limitation. (*See supra* at 64.) These mechanisms and practices, which allow funds received from the sale of art to be used for general municipal purposes, are wholly at odds with the assertion that the DIA Collection is held in charitable trust and cannot be sold or encumbered to satisfy the City's obligations.

        <u>1970s Charter Revision</u>. In the early 1970s, the City proposed revisions to its charter that would have given the mayor absolute control over the DIA (without any counter-balancing powers from the Common Council or the Arts Commission). (*See supra* at 66.) Internal communications from DIA Corp. suggest that museum leaders were concerned this could expose the collection to risk of sale by the mayor. (*See* Memo, Feb. 24, 1972 (EX3066) at DIAINSP116498.) This is not the thinking of someone who understands assets to be held in charitable trust.

        <u>Appropriation Requests</u>. Annual reports of the Arts Commission published in the DIA BULLETIN often included requests for appropriations to purchase artwork, and have justified these proposed acquisitions by describing the artwork to be purchased as *an investment that would accumulate in value each year*. (*See, e.g.*, *Annual Report of Arts Commission*, DIA BULLETIN, Jan. 1920 (EX3118) at 66; *Annual Report of Arts Commission*, DIA BULLETIN, Feb. 1921 (EX3119).) Justifying an appropriation on the basis that there could be a return on the

WEIL:\45423536\45259.0007
114

investment makes no sense unless such value could be realized. Thus it appears that the Arts Commission did not think the City was precluded from selling art in the DIA Collection.

Based on the foregoing, the DIA Collection is not held by the City in charitable trust. As an initial matter, the very first step in the analysis described by DIA Corp. and the Attorney General fails: the museum could not, as a matter of law, have been founded as a charitable trust because in 1885 when it was established charitable trusts were not recognized by Michigan law. Although the argument could stop there, taking it further produces similar results. Even if the assets were originally protected by a trust, that trust was not confirmed, continued, perpetuated, acknowledged or recognized by the City at the time it received such assets, or any time thereafter. The evidence simply does not support this conclusion. The evidence does, however, show that the City owns the DIA Collection and both the City and DIA Corp. have acknowledged – through statements and actions – that this ownership is outright and not subject to a trust.

## 2. The Public Trust Doctrine Does Not Apply to the DIA Collection

DIA Corp. alternatively asserts that the City's art collection is protected by the public trust doctrine. Specifically, after sharing an out-of-context quotation that the public trust doctrine is "alive and well in Michigan," (DIA Corp. Brief at 19 (citing *Glass v. Goeckel*, 703 N.W.2d 58, 65 (Mich. 2005))), but recognizing that "no Michigan Court has addressed whether the public-trust doctrine applies to cultural property such as art held for public exhibition," DIA Corp. argues that "strong consideration should be given to expanding the scope of the doctrine to other public resources." (DIA Corp. Brief at 19.) There is absolutely no precedent for application of this limited doctrine to assets like the artwork.

The public trust doctrine is a long-standing, narrowly-applied common law rule that preserves state control of navigable waterways and the related land (*e.g.*, a city's commercial

WEIL:\45423534\6\45259.0007

waterfront or a beachfront) to ensure such areas are used for the public good and available for protected public uses, such as walking along the beach. *See*, *e.g.*, *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387 (1892) (seminal case in which the Supreme Court applied the public trust doctrine to a transaction in which the city of Chicago, Illinois had granted almost all of its commercial waterfront to a private party in fee simple); *Glass,* 703 N.W.2d at 65 (describing the origins of this doctrine, including the premise that a sovereign has an obligation to protect navigable waterways for its people); Alexandra B. Klass, *Modern Public Trust Principles: Recognizing Rights and Integrating Standards*, 82 Notre Dame L. Rev. 699 (2006) (outlining general contours of the doctrine).

In Michigan, this doctrine has been exclusively applied to navigable waters and the related land. *See Glass*, 703 N.W.2d at 73 (finding that the public trust doctrine extends to lake-front land "beneath the ordinary high water mark," and that, because "walking falls within public rights traditionally protected under our public trust doctrine," the public trust doctrine protects the right of the public to walk along the waterfront); *Bott v. Comm'n of Natural Res. of State of Mich. Dep't of Natural Res.*, 327 N.W.2d 838, 844 (Mich. 1982) (holding that the public trust doctrine only applies to navigable waters and not all waters of the State). This was specifically recognized by the Attorney General in his opinion on the DIA Collection. (*See* AG Opinion at FN 8 (disagreeing with the applicability of the public trust doctrine to the DIA Collection because, "[w]hile there has been debate in other states for extending this doctrine to apply to cultural resources, like museums, . . . research discloses no Michigan cases that have applied the public trust doctrine outside of the natural resources context.") (citations omitted)).

Although, as recognized by the Attorney General, there has been some debate in other states over whether to extend the public trust doctrine to cultural resources, like museums,

WEIL:\45423531\6\45259.0007

(*see id.*), no case has been found where the doctrine was so extended.  Moreover, even if such a case exists outside of Michigan, the Supreme Court of Michigan has expressed a policy against importing the public trust doctrine of other states.  *Glass*, 703 N.W.2d at 72 (noting that "we do not import our sister state's public trust doctrine where this Court has already spoken").  This State's courts have already carefully defined the boundaries of the public trust doctrine over more than a century, and likely would not rely on expansive and novel out-of-state precedent to develop an entirely new application of the doctrine.

In addition, breaking from more than one hundred years of Michigan precedent to apply the public trust doctrine to personal, cultural property would be contrary to prior judicial guidance against precipitate extensions of common law doctrines, particularly in the context of property rights.  In *Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190, 201 (Mich. 2012), the court noted that, as "the principal steward of Michigan's common law," the court must be guided by the prudential principal of "avoid[ing] capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences."  The court held that where assessing an entirely new legal rule "would necessarily require extensive fact-finding and the weighing of important, and sometimes conflicting, policy concerns," and sufficient information for such an assessment was lacking, the question was not "one suitable for resolution by the judicial branch."  *Id.*; *see also 2000 Baum Family Trust v. Babel*, 793 N.W.2d 633, 655 (Mich. 2010) (noting that, "if there is any realm within which the values served by stare decisis – stability, predictability, and continuity – must be most certainly maintained, it must be within the realm of property law.").  As a result, in the few cases where Michigan courts have considered minor expansions of the public trust doctrine in the conventional context, these courts have been extremely cautious to avoid disrupting settled property rights.  *See Glass* 703 N.W.2d at 75–76

WEIL:\45423531\6\45259.0007

(noting that, although it adopted a broader definition of "high water mark" and thereby increased the land subject to public trust, this expansion of the doctrine did not "radically depart from our precedents or destabilize property rights"); *id.* at 711–12 (dissent) (vigorously arguing that the majority opinion "departs from the longstanding status quo in our state, despite . . . [the fact that] there is no realm of the law in which there is a greater need to maintain stability and continuity than with regard to property rights . . . and there is no evidence that the present dispute is anything other than an isolated and aberrational dispute, not one upon which to predicate the reversal of a century-and-a-half-old conception of private property rights"); *Bott v. Comm'n of Natural Res. of State of Mich. Dep't of Natural Res.*, 327 N.W.2d 838, 844 (Mich. 1982) (declining to extend the reach of the public trust doctrine to include waters that could be used for recreational boating and noting that past precedent "does not support the claim that public needs other than for commercial use justify expansion of the servitude" that permits public use of navigable waters).

Breaking with longstanding precedent by applying the public trust doctrine to a cultural resource such as the DIA Collection would create a great deal of uncertainty in Michigan property law. Numerous questions would be raised, for example: What assets have sufficient cultural value to warrant a public trust? What are the precise contours of the trust? In the context of a cultural institution, does the doctrine operate as it does in the conventional context, merely preserving the government's right to control the property and the public's right to use it, or does it create new obligations for a municipality to maintain and display cultural property, and not dispose of it? If so, what are those obligations? As a result of these and other questions that would be implicated, a Michigan court likely would not extend the doctrine in this context.

WEIL:\45423535\6\45259.0007

118

In its brief in support of the Plan, DIA Corp. does not even attempt to address the law that cuts against its position. DIA Corp. merely informs this Court, without any rationale or explanation, that "strong consideration should be given to expanding the scope of the doctrine to other public resources." (DIA Corp. Brief at 19.) The City has a substantial likelihood of success in defeating this argument as a matter of law.

### 3.   The Doctrine of Dedication Does Not Apply to the DIA Collection

DIA Corp. further argues that the DIA Collection was dedicated for charitable purposes when the City constructed the current museum building and, on its façade, included the words "*Dedicated by the People of Detroit to the Knowledge and Enjoyment of Art*." (DIA Corp. Brief at 7.) As further evidence of the purported dedication, DIA Corp. quotes from a statement in a newspaper article made by Ralph Booth, then President of the Arts Commission, which implores readers: "On behalf of the people of Detroit, let us dedicate this building to the lofty purpose for which it was conceived: 'The Knowledge and Enjoyment of Art . . . .'" (*Id.*)[61] DIA Corp. relies on these statements to conclude that the City cannot use the museum building or any of the art contained therein (and presumably those pieces in offsite storage) "for any purpose other than the one designated." (DIA Corp. Brief at 15–16.) This argument is not persuasive because, as DIA Corp. admits, the doctrine of dedication applies only to land.

Pursuant to Michigan statutory and common law, "a dedication is an appropriation of land to some public use, accepted for such use by or in behalf of the public." *Gunn v. Delhi Twp., Ingham Cnty.*, 154 N.W.2d 598, 601 (Mich. Ct. App. 1967) (citation

---

[61] DIA Corp. describes Mr. Booth as the President of DIA Corp.; however, in 1927, when the DIA building was dedicated, Mr. Booth was the President of the Arts Commission. (*See Annual Report of Arts Commission*, DIA BULLETIN, Jan. 1928 (EX3120) at 10 (listing Mr. Booth as the President of the Arts Commission).) At that time, the President of DIA Corp. was D.M. Ferry, Jr. (*See* DIA Corp. Minutes, May 27, 1927 (EX3121) at DIAINSP019909.)

WEIL:\45423531\6\45259.0007
119

omitted).  Where land is properly dedicated, generally an easement is created that gives the public a right to use that land for a particular purpose.  *See, e.g.*, *City of Cincinnati v. White's Lessee*, 31 U.S. 431, 437 (1832) (discussing the right held by the public arising from a dedication as an easement); *2000 Baum Family Trust*, 793 N.W.2d at 646 (noting that in a common-law dedication of land to be used as a public road, the owner keeps "fee in the soil" but it is held subject to an easement of public use).  It has long been understood that a dedication can arise by statute or common law, with differing effects.  *See Vill. of Grandville v. Jenison*, 47 N.W. 600, 603 (Mich. 1890) ("The effect of a dedication under the statute has been to vest the fee in the county, in trust for the municipality intended to be benefited, whereas, at common law, the act of dedication created only an easement in the public.").[62]  In either case, the doctrine is only applied to land.  (MICH. COMP. LAWS § 560.253 (providing statutory basis for dedication, and specifically referring to the dedication of "plat[s]" and "parcels of land"); *2000 Baum Family Trust*, 793 N.W.2d at 640 (noting that the "essence of a dedication is that the covered *land* will be for the use of the public at large" and that "[f]rom its earliest days, this Court has frequently considered disputes involving the dedication of *land* to the public") (emphasis added); *see also* DIA Corp. Brief at 17 (acknowledging that "Michigan courts have not yet applied this doctrine to personal property").)  There is no precedent for application of this doctrine to a municipality's personal property.

Faced with no legal precedent, DIA Corp. argues that the doctrine of dedication should be applied to the DIA Collection because "it would be dishonest, immoral, and indecent

---

[62] Statutory dedication requires, among other things, for the proprietor of land to present a plat or map showing the dedicated land to the office of the registrar for deeds.  (*See Vill. of Grandville*, 84 Mich. at 602–03; MICH. COMP. LAWS § 560.253 (requiring a plat to be certified, signed, acknowledged and recorded to be dedicated by statute).)  DIA Corp. has not alleged any fact supporting a claim of statutory dedication.

WEIL:\45423536\45259.0007

for the City to attempt to claim the right to sell any property for its own benefit that the City represented the Museum would hold for the Public's benefit." (DIA Corp. Brief at 17.) In addition to not being true, this is an insufficient justification for such a dramatic extension of a long-recognized rule of property law, particularly since the ramifications of this change are unknown and give courts a reason to pause. *Vill. of Grandville*, 47 N.W. at 602–03; *2000 Baum Family Trust*, 793 N.W.2d at 640. Here, it is unclear how an easement could be extended beyond a public right to use of the land that the DIA rests on. What personal property is held subject to this public use? Did the dedication create an easement on every piece of personal property in the building, or only the art collection? Would the entire collection be held subject to the easement, or only certain parts? What rights would the public have under this easement? Would this right include, for example, the right to view artwork that is in storage? Would the easement prohibit closing the museum for an extended period of time? Would an easement in personal property be permanent? Would the easement continue with a specific piece of artwork if it was sold? When it has been loaned to another institution? Applying the doctrine of dedication beyond its traditional and accepted context would raise these and other questions that are not easily or properly resolved by the judiciary, which is why the doctrine would not be extended. Thus, DIA Corp.'s novel and unprecedented argument that the DIA Collection should be protected from sale or encumbrance because they were "dedicated" to "art purposes" can be rejected as a matter of law.[63]

---

[63] Even if the doctrine of dedication were extended to personal property, the elements to establish a dedication of the DIA Collection – "intent by the property owner to offer the [property] for public use, [and] an acceptance by, and maintenance of the [property] by, public officials" – have not been established. *See 2000 Baum Family Trust*, 793 N.W.2d at 642 (setting forth elements for common law dedication). It is true that the DIA museum building has inscribed on its façade the words "Dedicated by the People of Detroit to the Knowledge and Enjoyment of Art." (DIA Corp. Brief at 7). But no evidence, other than the existence of that inscription, has been put forth to suggest that the owner of the building and the DIA Collection, namely, the City, created that inscription with the intent to offer the building and

Based on the foregoing, there is a substantial likelihood that a Court would find that the City holds clear title to the DIA Collection, unencumbered by any alleged charitable trust or public trust or dedication to public use.  An analysis of the relevant law and facts confirms that the City would likely succeed on the merits in any litigation where a party sought to prevent the City from selling or encumbering the DIA Collection on any of these bases.

C.      **The City Has a Substantial Likelihood of Success in**
        **Any Litigation Regarding Equitable Arguments that**
        **It Is Estopped from Challenging the Existence of a Trust**

In an apparent effort to avoid the obvious deficiencies in DIA Corp.'s legal argument that a trust exists with respect to the DIA Collection, and unable to prove the elements for creating any such trust have been satisfied, DIA Corp. tries to put up a road block by claiming that equitable doctrines would prevent the City from denying the existence of a trust or arguing it is invalid.  If the City tried to monetize the DIA Collection and was faced in response with a litigation claiming that such assets are protected by a trust, the City (as well as the City's creditors who stand to benefit from any such monetization) would have every legal right to defend against such litigation.  Contrary to DIA Corp's suggestions, neither the doctrine of election nor the doctrine of equitable estoppel would apply to preclude the City and its stakeholders to contest the existence of a trust over the DIA Collection.

1.      <u>The Doctrine of Election Is Not Operative Against the City</u>

DIA Corp. claims that, pursuant to the doctrine of election, the City cannot deny that it holds the DIA Collection in charitable trust because "a party cannot avail itself of the benefits of a trust relationship and then later reject it."  (DIA Corp. Brief at 15.)  DIA Corp.'s argument (to the extent it can be gleaned from the single sentence in its brief) fails as a matter of

---

its contents, present and future, to public use, or that public officials, again the City, accepted this property for such use.

law because it rests on a misunderstanding of the doctrine of election, which is not applicable to the City under the present circumstances.

The doctrine of election is an equitable rule providing that, where a party has accepted distributions or other benefits of a specific instrument, usually a trust agreement or a will, that party cannot later argue the same instrument is invalid. *See Holzbaugh v. Detroit Bank & Trust Co.*, 124 N.W.2d 267, 268 (Mich. 1963) (stating rule that "[a] person cannot accept and reject the same instrument, or, having availed himself of it as to part, defeat its provisions in any other part as the doctrine of election, an extension of the law of equitable estoppel, prevents the assertion of repugnant rights") (quoting *Aiken v. Gonser*, 69 N.W.2d 180 (Mich. 1955)); *id.* (preventing beneficiaries of a trust from challenging the validity of such trust after they had received distributions for 18 years, where they claimed that the trust was invalid and that the residue, which would be paid to charities upon the 20th year, was intestate property to which they were entitled to under the laws of descent); *In re Beglinger Trust*, 561 N.W.2d 130, 132 (Mich. Ct. App. 1997) (holding that the doctrine of election precluded parties who had received and accepted distributions under a trust from challenging such trust). The doctrine works to bar trust beneficiaries from trying to revoke a trust they previously accepted. *See In re Beglinger Trust*, 561 N.W.2d at 132 (noting that the doctrine of election applies "to a party who accept[s] benefits under a testamentary trust" and holding that a beneficiary's "attempt to challenge [a] trust after having elected to receive its benefits is an attempt to 'blow hot and cold at the same time' and is barred").

Here, under DIA Corp's hypothetical trust construct, the City is the *trustee* of the "DIA trust" and the public is the *beneficiary*. There is no case law to support application of the doctrine of election against a purported trustee. Thus, as a matter of law, this argument fails.

WEIL:\45423531\6\45259.0007

Moreover, even if the doctrine of election somehow precluded the City from arguing that this alleged trust in valid, nothing would prevent parties in interest in the City's Chapter 9 Case, such as its creditors, from doing so.

## 2.    The Doctrine of Equitable Estoppel Also Would Not Apply

DIA Corp. further argues that the City would be equitably estopped from denying the existence of a trust over the DIA Collection.  (DIA Corp. Brief at 15.)  In support of this, DIA Corp. points to purported "acknowledgments" by the City that it holds the DIA Collection in trust for the benefit of the public, based on an undated letter from Mayor Bing to County commissioners and excerpts of the City's proposed Capital Agenda for fiscal years 2013–2014 through 2017–2018.  (DIA Corp. Brief at 16.)  DIA Corp. then contends (without providing any evidence) that it, the State, the Counties, taxpayers, foundations, institutions, and others gave gifts of art and funds in reliance on these alleged representations, and that the public would be harmed if the City could now deny that a trust exists in order to pursue a transfer or encumbrance of any portion of those assets to satisfy the City's obligations.  (*See id.*)  This argument fails on the law and the facts.

Equitable estoppel is an equitable doctrine that applies to prevent a party from denying the existence of facts in a litigation where (1) the party, by representations, admissions, or silence intentionally or negligently induced another party to believe such facts, (2) the other party justifiably relied and acted on that belief, and (3) the other party will be prejudiced if the first party is allowed to deny the existence of those facts.  *See Van v. Zahorik*, 597 N.W.2d 15, 22 (Mich. 1999).  Equitable estoppel is not an affirmative cause of action for relief; it provides no remedy.  *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 279 (Mich. Ct. App. 1993); *Presser v. Fed. Nat. Mortg. Ass'n*, No. 11-CV-11239, 2012 WL 3020092, at *4 (E.D. Mich. July 24, 2012) (noting that equitable estoppel is not a cause of action in Michigan

WEIL:\45423536\6\45259.0007

and provides no remedy such as damages) (citing *Marrero*); *Hoye v. Westfield Ins. Co.*, 487 N.W.2d 838, 842 (Mich. Ct. App. 1992) ("[T]he major distinction between equitable estoppel and promissory estoppel is that equitable estoppel is available only as a defense, while promissory estoppel can be used as a cause of action for damages.") (citation omitted). Thus, it would not be appropriate to rely on this doctrine to, for example, impose an enforceable trust obligation where such an obligation would not arise under the substantive law of trusts. *See Beaverton Power Co. v. Wolverine Power Co.*, 222 N.W. 703, 704 (Mich. Ct. App. 1929) (finding that, where the facts did not prove the existence of an alleged contract, the plaintiff could not obtain the benefit of the alleged contract through equitable estoppel).

       If applied here, equitable estoppel could only work to preclude the City from asserting an action in which it denied the existence of a trust over the DIA Collection or limit the City's defense in any proceeding brought by another party to resolve the issue. *See Hoye,* 487 N.W.2d at 843 (noting that equitable estoppel appears most frequently as a defense to an action brought by the party to be estopped, and while it may serve as an aid to a plaintiff, it is not a cause of action and provides no damages). While it is tempting to accept that the practical effect of preventing the City from denying the existence of a trust (by virtue of application of equitable estoppel) would be recognition by a court that a trust in fact exists (akin to a default judgment), this is exactly the same sort of backdoor approach to creating an enforceable obligation that the *Beaverton* court refused to permit. *Beaverton Power Co.,* 222 N.W. at 704–05 (noting that "[w]hat we cannot do under the rule of specific performance [because a contract does not exist] cannot be indirectly accomplished under the doctrine of equitable estoppel"). Using this doctrine to bypass the numerous substantive requirements for proving the creation of a trust is not only inconsistent with the law – it would work an injustice against the City's creditors and other

WEIL:\45423531\6\45259.0007

stakeholders, whose rights would be affected on the basis of confirmation of a trust that, legally, does not exist.  In any event, for several reasons the doctrine does not apply.

First, there is no evidence that the City by representations, admissions, or silence intentionally or negligently induced anyone to believe that the City held the DIA Collection in charitable trust.  The facts necessary to support estoppel must be completely unambiguous and unquestionable.  *Fredenburg v. Lyon Lake M.E. Church*, 1877 WL 7302, at *2 (Mich. Oct. 25, 1877) ("Estoppels never arise from ambiguous facts; they must be established by those which are unequivocal, and not susceptible of two constructions."); *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 357 N.W.2d 861, 864 (Mich. Ct. App. 1984), *aff'd,* 393 N.W.2d 161 (Mich. 1986) ("Estoppel should only be applied where the facts are unquestionable, unambiguous, and unequivocal."); *Detroit Hilton Ltd. P'ship v. Dep't of Treasury, Revenue Div.*, 373 N.W.2d 586, 589 (Mich. 1985) ("The fact supporting an estoppel must be clearly made out.").  The burden of proving such facts rests on the party asserting estoppel.  *Payne v. Payne,* 217 N.W. 756, 758 (Mich. 1928).

As set forth above, there is substantial evidence of actions or statements by the City indicating it does <u>not</u> believe it holds the DIA Collection in trust.  (*See supra* at 79–80.)  The evidence DIA Corp. points to in support of its argument that the City "confirmed and continued" a trust when it received the DMA's assets in 1919 and thereafter is refuted in detail above. (*See supra* §§ II(B)(1)(b), (d).)  In addition, none of the specific facts alleged by DIA Corp. in the estoppel section of its brief were unequivocal City representations or admissions that would induce anyone to believe that the City held the DIA Collection in charitable trust.  (*See supra* § II(B)(1)(f).)[64]

---

[64] The loose statements that DIA Corp. points to stand in stark contrast to representations that undoubtedly give rise to a claim of equitable estoppel, such as express representations in the recitals or

WEIL:\45423536\45259.0007

In addition, DIA Corp. has failed to offer any instance where a statement by the City has been justifiably relied on by a party that gave a gift of art or funds.  *See Van v. Zahorik*, 597 N.W.2d 15, 22 (Mich. 1999) (noting that for equitable estoppel to apply, the party asserting it must have justifiably relied and acted on the fact that the other party had induced them to believe).  As common sense suggests, and courts have confirmed in cases involving other theories of estoppel, a party cannot rely on a statement before it was made.  *See Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 ( Mich. Ct. App. 1993) *holding modified by Patterson v. Kleiman*, 526 N.W.2d 879 (Mich. 1994) (noting that it was impossible for a plaintiff asserting a promissory estoppel claim to prove he relied on a promise when he had acted six months before it had been made).  Thus, in order to prove reliance, DIA Corp. would have to point to each and every specific person who relied on an alleged representation by the City that it holds the DIA Collection in trust, provide that such representation was made <u>before</u> the person purportedly acted in reliance on it, and then present evidence sufficient to show that such person actually relied on such representation.  DIA Corp. has not and cannot satisfy this evidentiary burden.

Furthermore, the alleged harm identified by DIA Corp. is indeterminate and misplaced.  DIA Corp. alleges that if the City is permitted to deny the existence of a trust for the DIA Collection and conveys any portion of these assets to satisfy municipal obligations, some undefined harm to the public would result.  (DIA Corp. Brief at 16.)  The doctrine of equitable

---

provisions of a contract, or written representations that on their face were intended to induce reliance. *See Triphagen v. Labbe*, 52 N.W.2d 226, 228 (1952) (estopping a party from asserting facts inconsistent with a recital in a contract and noting that "[i]f, in making a contract, the parties agree upon or assume the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact so long as the contract stands, in the absence of fraud or mistake.") (citation omitted); *see also Matter of Pubs Inc. v. Bank of Illinois in Champaign*, 618 F.2d 432, 438 (7th Cir. 1980) ("Parties to an agreement are estopped from denying the recitals contained therein.").

WEIL:\45423531\6\45259.0007

estoppel, however, requires proof of specific prejudice to the *person who relied upon the relevant statements* (in this case, allegedly the donors).

Even if the doctrine of equitable estoppel applies to preclude the City from denying the existence of a trust with respect to the DIA Collection, the doctrine certainly does not apply to prevent third parties – such as creditors of the City or potential purchasers of the artwork – from raising the issue. This is particularly true given that the City is in a chapter 9 bankruptcy proceeding, and parties in interest have standing to participate in actions to determine the extent of the debtor's interest in property. *See In re Benton*, 237 B.R. 353, 355 n.1 (Bankr. E.D. Mich. 1999) (holding that a party in interest has standing to bring an action to determine whether an asset is property of the estate); *In re Page*, 239 B.R. 755, 759 n.3 (Bankr. W.D. Mich. 1999) ("The Strongs, as creditors and parties in interest, have standing to seek a determination whether an asset, *i.e.*, the Debtor's interest in a trust, is property of the estate or not."); 11 U.S.C. § 1109(b) (providing that a "party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter").

Because the doctrine of equitable estoppel is merely a defense and it would not be appropriate to rely on this doctrine to impose an enforceable trust obligation where such an obligation would not arise under the substantive law of trusts; because the City did not, by representations, admissions, or silence intentionally or negligently induce anyone to believe that the City holds the DIA Collection in charitable trust; because there is no evidence of any instance where any such statement by the City has been justifiably relied on or where a specific person has been prejudiced thereby; and because the estoppel would not apply to any party in interest in

WEIL:\45423531\6\45259.0007

128

the Chapter 9 Case; there is a substantial likelihood that the City (or a third party on its behalf) would not be precluded from denying that the DIA Collection is held in charitable trust.

Accordingly, none of DIA Corp.'s equitable arguments to block the City or its stakeholders from defending the City's clear title to the DIA Collection is persuasive.

### D. The City Has a Substantial Likelihood of Success in Any Litigation Involving Equitable Arguments that the DIA Collection Is Encumbered

In yet another attempt to avoid having to prove the elements of creating a trust, DIA Corp. argues that equitable remedies apply to impose restrictions on the City's ability to dispose of the DIA Collection. Specifically, DIA Corp. claims the art is protected by an implied trust. Alternatively, DIA Corp. contends the City made promises to not sell or encumber the art, and those alleged promises should be enforced pursuant to the doctrine of promissory estoppel. The City would have a substantial likelihood of success defeating both these theories.

### 1. The DIA Collection Is Not Held Subject to an Implied Trust

DIA Corp. argues that the DIA Collection is protected by an implied trust (specifically a resulting trust) based on the presumed intent of the City and charitable donors to the museum. In support of this, DIA Corp. asserts that the City (1) constructed a building "dedicated to the knowledge and enjoyment of art" to house the DIA Collection, (2) solicited charitable donations for the museum as a separate entity for the benefit of the public, (3) represented that works would be held in the permanent collection for use and display at the museum for the public, (4) adopted policies that strictly limited deaccessioning, and (5) represented to the public that the City held the DIA Collection in trust. (DIA Corp. Brief at 18.) DIA Corp. claims these facts lead to the conclusion that the City and donors intended that the City hold the DIA Collection in trust and, therefore, a court would find an implied trust (specifically, a resulting trust). (*See id.* at 18–19.) Neither the law nor the facts support DIA

WEIL:\45423536\45259.0007

Corp.'s assertion:  there is no basis on which to impose an implied trust with respect to the DIA Collection.[65]

Resulting trusts are a type of implied trust that arise when a person "makes or causes to be made a disposition of property under circumstances (i) in which some or all of the transferor's beneficial interest is not effectively transferred to others (and yet not expressly retained by the transferor) and (ii) which raise an unrebutted presumption that the transferor does not intend the one who receives the property . . . to have the remaining [untransferred] beneficial interest."  Restatement (Third) of Trusts § 7 cmt. a (2003); *see also Potter v. Lindsay*, 60 N.W.2d 133, 136 (Mich. 1953) ("A resulting trust arises where a person makes or causes to be made a

---

[65] Michigan law recognizes only two types of implied trusts:  resulting trusts and constructive trusts.  24 Mich. Civ. Jur. Trusts § 37 (noting that "the facts and circumstances of a particular case may give rise, by operation of law, to a constructive trust or a resulting trust, but it appears that an implied trust may not otherwise arise"); *see also Stephenson v. Golden*, 276 N.W. 849, 860 (Mich. 1937) (noting same).  DIA Corp. focuses its argument on resulting trusts, and does not assert that the DIA Assets are held subject to a constructive trust.  In any event, such a trust could not be imposed on these assets as a matter of law.  Constructive trusts "[do] not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing' defendant's property or assets with a constructive trust," and cannot be imposed on a bankruptcy debtor's assets after the petition date.  *In re Omegas Group*, 16 F.3d 1443, 1452 (6th Cir. 1994); *see In re Dow Corning Corp.*, 192 B.R. 428, 441 (Bankr. E.D. Mich. 1996) (noting that *Omegas* "held that the bankruptcy policy of ratable distribution trumps state law on constructive trusts"); *see also In re Parkview Hosp.*, 211 B.R. 619, 633 (Bankr. N.D. Ohio 1997) (noting that, because the debtor had filed for bankruptcy, "the doctrine of constructive trust [was] not available as a means of finding a charitable trust").  Moreover, where constructive trusts are imposed to prevent injustice that would result from the defendant retaining the benefit of property, the equities do not favor imposition of a constructive trust here because maintaining the DIA Assets as assets of the City subject to monetization would inure to the benefit of the City's creditors who have done nothing wrong.  *See In re Assignment for Ben. of Creditors of Unison Corp.*, No. 217385, 2001 WL 727036, at *6 (Mich. Ct. App. Feb. 23, 2001) (noting, where a debtor's assets had been assigned for the benefit of creditors, that the court "cannot conclude that [the debtor] would be unjustly enriched by its receipt [of the property on which a constructive trust was sought] . . . because the proceeds [of such property] were assigned to [a receiver] for distribution to [the debtor's] creditors").  In addition, DIA Corp. has failed to provide evidence that the City has engaged in the sorts of wrongdoing that would result in a judgment such that the City would be unjustly enriched in a manner that it would make it unconscionable for the City to have clear title to the DIA Assets.  *See Potter v. Lindsay*, 60 N.W.2d. 133, 136–37 (Mich. 1953) (noting that a constructive trust will only be imposed where property has been obtained "through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it *unconscionable* for the holder of the legal title to retain and enjoy the property" or where the defendant, "would profit by a wrong or would be unjustly enriched if [it] were permitted to keep the property.").

WEIL:\45423536\6\45259.0007

disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and where the inference is not rebutted and the beneficial interest is not otherwise effectively disposed of.").

Resulting trusts typically arise upon the failure of express trusts.[66] Restatement (Third) of Trusts § 8 (2003) ("Where the owner of property makes a donative transfer and manifests an intention that the transferee is to hold the property in trust but the intended trust fails in whole or in part, or the trust is or will be fully performed without exhausting or fully utilizing the trust estate, the transferee holds the estate or the appropriate portion or interest thereof on resulting trust for the transferor or the transferor's successors in interest."). A properly established trust may nonetheless ultimately fail because the intended beneficiary is nonexistent (for example, the beneficiary is supposed to be named in a subsequent provision of a deed or will but such a provision never materializes or the beneficiary dies before his interest vests or is never born), or because the purpose of the trust is satisfied before the trust assets are depleted. *Id*. § 8 cmt. b; *see also Williams v. GMAC Mortg., Inc.*, No. 13 Civ. 4315, 2014 WL 2560605, at *4 (S.D.N.Y. June 6, 2014) (applying Michigan law and holding that an endorsement that named a trustee but failed to name a beneficiary would create a resulting trust in favor of the transferor). In such situations, because the ultimate purpose of the trust cannot be achieved, the law implies a resulting trust in favor of the transferor. Restatement (Third) of Trusts § 8 cmt. a (2003). Before a resulting trust can be implied, however, the party seeking to impose the trust must establish the existence of an express trust. *Id.* As discussed, DIA Corp. has failed to prove the existence of an express trust held by the City and containing the DIA

---

[66] Generally, resulting trusts arise in two distinct situations: (i) when an express trust is created but somehow fails; and (ii) when property is purchased by one party but transferred to another party, often the purchaser's agent. Restatement (Third) of Trusts § 7 cmts. b-c (2003). In Michigan, the latter form of resulting trust has been abolished by statute so it is not addressed here. MICH. COMP. LAWS § 555.7.

WEIL:\45423534\6\45259.0007

Collection.  (*See supra* § II(B)(1).)  Absent this, any argument that a resulting trust can be implied here must fail.

DIA Corp.'s suggestion that a resulting trust can be implied from the intent of the parties misinterprets the law governing implied trusts.  A "person seeking to establish the existence of a resulting trust does *not* do so by showing that the transferor manifested an intention to create it," an intention which, nonetheless, DIA Corp. has failed to establish.  Restatement (Third) of Trusts § 7 cmt. a (2003) (emphasis added).  Rather, a resulting trust will only be implied in the specific situations discussed above—none of which is present here.  Further, a party seeking to imply a resulting trust faces a heavy burden.  (*See*, *e.g.*, 90 C.J.S. Trusts § 166 ("The burden of establishing a resulting trust, as against the holder of the legal title, is on the party who asserts it.  Accordingly, the holder of the legal title to property is presumed to own the full beneficial interest therein . . . ."); *see also* AG Opinion at 2 (noting that the City has legal title to the DIA Collection); DIA Corp. Brief at 19 ("The City retains legal title to the Museum Art Collection").)  Here, where no express trust exists, that burden will be nearly impossible to meet.

### 2.     The Doctrine of Promissory Estoppel <u>Would Not Prevent the City from Monetizing the DIA Collection</u>

DIA Corp. also argues that the City has made promises, both in connection with the DIA Collection as a whole and on an object-by-object basis, not to dispose of the artwork to satisfy municipal debts and obligations and to maintain the DIA Collection in trust, and that such promises are enforceable against the City on a theory of promissory estoppel.[67]  DIA Corp. fails to recognize that, even if this doctrine applies and the City was bound to such alleged promises,

---

[67] As an initial matter, this argument is yet another attempted "end run" around the legal requirement for establishing the existence of a trust.

WEIL:\45423536\45259.0007

any party harmed by the City's breach of such promises would merely have an unsecured claim against the City in the Chapter 9 Case. In any event, the facts show the doctrine does not apply.

Promissory estoppel is an equitable doctrine that creates a claim "akin to a contract claim." 5A Mich. Civ. Jur. Contracts § 59 (describing doctrine). In Michigan, "[t]he elements of . . . promissory estoppel are (1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produced reliance or forbearance of that nature and (4) in circumstances such that the promise must be enforced if injustice is to be avoided." *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380, 395 (E.D. Mich. 2000) (quoting *Marrero v. McDonnell Douglas Capital Corp.,* 505 N.W.2d 275 (Mich. Ct. App. 1993)). Michigan courts understand a "promise" to be a statement about future conduct that would justify the recipient in understanding that a commitment had been made. *State Bank of Standish v. Curry*, 500 N.W.2d 104, 107–09 (Mich. 1993).

"Enforcement of a promise does not necessarily mean Specific Performance." *Woodland Harvesting, Inc. v. Ga. Pac. Corp.*, No. 09-10736, 2011 WL 4596041, at *2 (E.D. Mich. Oct. 4, 2011) (quoting 1A Corbin, Contracts at 221). The appropriate remedy to be applied in an action for promissory estoppel depends on the facts and nature of the case, and is within the discretion of the court. *Id.* at *1. Appropriate remedies may include expectation, reliance, or restitutionary damages. *Id.*; *Giordano v. Markovitz*, 531 N.W.2d 815, 817 (Mich. Ct. App. 1995) (rejecting a request for specific enforcement of an agreement under principles of promissory estoppel and concluding that money damages were sufficient to avoid injustice).

Here, if a court determined that donors or other parties were entitled to a contract claim against the City with respect to monetization of the art on the basis of promissory estoppel,

WEIL:\45423536\45259.0007

such parties could be compensated with an award of damages against the City. Since this alleged promise occurred prepetition, the damage claim would be an unsecured prepetition claim to be treated pursuant to the Plan. Specific performance would not be appropriate, particularly because it would result in what would amount to an ongoing injunction requiring the City to act as co-trustee with DIA Corp. and to hold the artwork pursuant to a trust lacking definitive terms.[68] *See Giordano*, 531 N.W.2d. at 817 (finding that strained relations among parties renders specific performance inadvisable); *Edidin v. Detroit Econ. Growth Corp.*, 352 N.W.2d 288, 291 (Mich. Ct. App. 1984) (noting that the remedy of specific performance is not available to enforce an ongoing obligation or relationship, particularly when the material terms of the agreement are uncertain).[69]

In any event, the doctrine does not apply in these circumstances. The doctrine of promissory estoppel is to be cautiously applied, *Willis,* 123 F. Supp. 2d at 395, and only where "the facts are unquestionable and the wrong to be prevented undoubted." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 797 (Mich. Ct. App. 1993). Statements of belief, or statements that are "indefinite, equivocal, or not specifically demonstrative of an intention respecting future conduct, cannot serve as the foundation for an actionable reliance," and thus are not promises. *State Bank of Standish*, 500 N.W.2d at 107–09. To support a finding of promissory estoppel, the purported promise must be "clear and definite." *Id.* at 108; *see also Willis*, 123 F. Supp. 2d at

---

[68] Moreover, section 101(5)(B) the Bankruptcy Code defines a "claim" to include a "right to an equitable remedy for breach of performance if such breach gives rise to a right of payment." 11 U.S.C. § 101(5)(B).

[69] To the extent that a successful promissory estoppel claim could somehow be construed as creating an implied contract, as a chapter 9 debtor the City could reject this and the result would be the same. (*See infra* at 150–52.)

WEIL:\45423535\6\45259.0007

395 ("The sine qua non of promissory estoppel is a promise that is definite and clear.").  There are no such promises here.

DIA Corp points to (i) descriptions by the City of the museum as a cultural resource, (ii) policies that prohibit the sale of artwork in the collection to fund operations, and (iii) a decision to not report the artwork on the City's financial statements as evidence of a promise by the City not to sell or transfer the DIA Collection to satisfy municipal obligations. (DIA Corp. Brief at 20.)  Neither this nor any other evidence amounts to an unequivocal statement by the City that it would engage in any particular future conduct, or that the City should reasonably have expected to induce action in response.

Characterizing the museum as a "cultural resource" does not amount to a promise not to sell the museum's contents.  Similarly, while the Operating Agreement does bind DIA Corp. to follow procedures limiting the application of art sale proceeds, as set forth above, with respect to the City this is merely a current policy – not a binding obligation – subject to change at will.  (*See supra* at 81–82; Operating Agreement, Dec. 12, 1997 (EX254) § F(2)(a) (requiring DIA Corp. to manage the collection in accordance with the Collection Management Policy); *id.* § F(2)(b) (requiring *DIA Corp.* to use proceeds from disposed works of art to purchase other works for the City's collection); Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) at I (contemplating possible "significant changes" to the policy and "waivers of its procedural requirements").)[70]  In addition, the Operating Agreement expressly states that its

---

[70] The holdings of the two cases cited by DIA Corp. for the proposition that internal policies can create contractual obligations, DIA Corp. Brief at 20 (citing *Rood v. Gen. Dynamics Corp*. 507 N.W.2d 591, 606 (Mich. 1993); *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 885 (Mich. 1980)), were expressly confined to questions about companies' employment policies.  *See Tabor v. Elec. Data Sys., Inc.*, No. 03-70243, 2005 WL 1030418, at *8 (E.D. Mich. Apr. 27, 2005) (finding that "*Toussaint* has not been extended in Michigan beyond whether a just cause employment contract exists, therefore, *Toussaint* does not apply to the instant case" and, similarly, that *Rood* "addressed just cause employment contracts").  These narrowly-construed holdings have no applicability to the policies governing the DIA

WEIL:\45423536\6\45259.0007
135

provisions do not create any third-party rights, (Operating Agreement, Dec. 12, 1997 (EX254) § N(2)), and includes an integration clause that eliminates any claim that it created additional promises other than those expressly set forth therein. (*Id.* § S.)

The fact that the City has not capitalized the art in its books and records also is not evidence of a promise. As set forth above, the accounting decision to not record the DIA Collection as a capital asset was a practical decision. (*See supra* at 107–08.) This does not demonstrate a clear intention respecting future conduct.

Indeed, as set forth in the beginning of this Brief, numerous documents and representations about the City's ownership of the DIA Collection, and the nature of the DIA as a municipal instrumentality, evidence that the City did *not* represent itself as holding the DIA Collection in trust or subject to any transfer restrictions. (*See supra* at 79–80.) In addition, and as discussed further below, the longstanding policies and circumstances surrounding the giving of gifts and their acceptance by DIA Corp. and the City show, as a matter of routine, that promises were not made about the future disposition or use of donations. Indeed, both the Arts Commission and DIA Corp. would generally reject any gifts that included conditions as to continuing use (*i.e.*, gifts that would restrict the ownership rights of the City once the property had been transferred to the DIA Collection). (*See infra* § II(E)(2)(a).)

The DIA Corp. has failed to provide evidence of a promise by the City to not sell the artwork to satisfy municipal debts, or to maintain the DIA Collection in trust; and, in fact,

---

Collection. Plus, even in case where a policy is determined to create a contractual obligation, Michigan law provides that contractual terms based on internal policies can be unilaterally changed by modifying the policy, as long as notice of the change is given. *See In re Certified Question*, 443 N.W.2d 112, 113 (Mich. 1989) (noting, in response to a certified question from the Sixth Circuit concerning *Toussaint*, that an employer can "without an express reservation of the right to do so, unilaterally change its written policy from one of discharge for cause to one of termination at will, provided that the employer gives affected employees reasonable notice of the policy change.").

WEIL:\45423530\6\45259.0007

there is significant and plentiful evidence showing that the City did not make such a promise. Without an actual promise by the City, donors had nothing to rely upon to conclude that the City would never sell or encumber the artwork to satisfy municipal obligations. (*See State Bank of Standish* 500 N.W.2d at 107–09 ("[T]he reliance interest protected by [the doctrine of promissory estoppel] is *reasonable reliance,* and reliance is reasonable only if it is induced by an actual promise.") (citation omitted).) Moreover, reliance can only be established where the timing is such that the promise precedes the action purportedly taken in response. *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 (Mich. Ct. App. 1993) (noting that "[p]laintiff [had] inverted the sequence of events necessary to establish promissory estoppel" as it was impossible for him to have "relied on the purported promise . . . when he took . . . actions" six months earlier) *holding modified by Patterson v. Kleiman*, 526 N.W.2d 879 (Mich. 1994). Again, there is no evidence of specific persons who relied on specific alleged promises by the City made before such persons took action in reliance.

Based on the foregoing, there is a substantial likelihood that the City would succeed in arguing that the doctrine of promissory estoppel does not preclude it from monetizing the DIA Collection, and even if it does, any promisee harmed by a breach of this promise would merely have an unsecured claim in the Chapter 9 Case.

Accordingly, none of DIA Corp's equitable arguments to block the City or its stakeholders from defending the City's clear title to the DIA Collection is persuasive.

### E. The City Has a Substantial Likelihood of Success in Any Litigation Regarding Whether Donor Restrictions Encumber Specific Pieces of Artwork

DIA Corp. and the City argue that donors transferred gifts to the museum subject to insurmountable restrictions on subsequent transfer or other conditions that would preclude the City from monetizing such gifts to pay City obligations. (*See* DIA Corp. Brief at 20–21; Reply

WEIL:\95442353\6\45259.0007

at ¶ 35.)  This sweeping conclusion is not supported by the facts or the law.   The vast majority

of the City's art collection is held free from any restriction.  Although some instances have been

identified where the City acquired artwork subject to restrictions, these instances are extremely

rare and, for the most part, can be rejected in the Chapter 9 Case as contractual obligations.[71]

## 1.  City of Detroit Purchases Are Unrestricted[72]

Beginning with its first appropriation to the Arts Commission in 1919, and up

until 1954, City funds have been used to purchase artwork for the DIA Collection.  (*See, e.g.*,

Arts Comm'n Minutes, May 12, 1919 (EX3075) at DIAINSP010420 (noting City appropriation

of $20,000 earmarked specifically for "Purchases for Collections"); *Report of the Arts*

*Commission*, 1919, DIA BULLETIN, Jan. 1920 (EX3118) at 59 (noting purchases made during

1919 with the City appropriation); Arts Comm'n Minutes, Apr. 21, 1947 (EX3299) at

DIAINSP011281–82 (describing purchases paid for with the "City Purchase Fund"); Arts

Comm'n Minutes, Dec. 5, 1950 (EX3300) at DIAINSP011424, DIAINSP011431 (describing

objects to be purchased from the "City Purchase Fund"); *see also* E-Mail from DIA Director to J.

Opperer, May 29, 2013 (EX3306) (noting that the last City appropriation for the purchase of

---

[71] As DIA Corp. has noted, pursuant to section 123.871 of the Michigan Complied Laws (the "**1913 Act**"), the City may receive property donated to it for public purposes subject to any applicable restrictions on that property.  MICH. COMP. LAWS § 123.871 ("Any city . . . may receive, own, and enjoy any gift of . . . personal property, made by grant, devise, bequest, or in any other manner, for . . . public purposes, whether made directly or in trust, subject to the conditions, limitations, and requirements provided in the grant, devise, bequest, or other instrument.").  However, the text of the 1913 Act in no way imposes any restriction on property received by a city, or validates otherwise invalid restrictions. The 1913 Act simply confirms that any restrictions imposed by a donor remain intact.

[72] Artwork in the DIA Collection can be categorized by the method of acquisition (as reflected in its credit in the museum records) as follows:  (i) City of Detroit Purchases (approximately 4.5% of the DIA Collection, including 17% of the "Major Works"), (ii) Founders Society Purchases (approximately 24% of the DIA Collection, including 34% of the Major Works), and (iii) Gifts and Bequests of artwork (approximately 67% of the DIA Collection, including 48% of the Major Works).  (*See* List of Major Works (EX3122); DIA Collection Spreadsheet, Feb. 28, 2014 (EX3123).)  The analysis of donor restrictions is slightly different across each of these categories, and each will be discussed separately herein.

WEIL:\45423536\45259.0007

artwork was $5,000 in 1954).) As of today, approximately 4.5% of the artwork in the DIA Collection, including 17% of the "Major Works" in the collection, were purchased using such appropriations. (*See supra* at 50.) Each of these acquisitions is credited in the museum's records as a "City of Detroit Purchase" and, as there were no donors for such works, there is absolutely no basis to conclude that this portion of the collection is encumbered by donor restrictions. The City admitted as much in defining the scope of the appraisal conducted last year by Christie's. (*See* Orr Dep. 456:6–19 (Pérez Decl. Ex. A) (noting that the City decided to limit the scope of Christie's valuation to City of Detroit Purchases because those were the pieces that definitely would not have donor restrictions).)

### 2. Donated Artwork Is, With Rare Exception, Unrestricted

The remaining artwork in the DIA Collection appears to have been donated to DIA Corp. or purchased with funds that were donated to the DIA Corp. As a matter of course, individuals and entities would donate artwork first to DIA Corp., who then transferred it to the City when it was formally accessioned to the DIA Collection. (*See supra* at 46–47, 57.) Alternatively, donors would give funds to DIA Corp., who would then use such funds to purchase pieces that were then transferred to the City upon accession to the DIA Collection. (*See supra* at 51–53.) A review of the relevant policies and documents shows there are only a few rare cases where artwork accessioned to the DIA Collection may have restrictions.[73]

#### a. *Policies Against Accepting Restricted Donations*

Both DIA Corp. and the City have longstanding policies and practices against accepting restricted donations. As far back as when DIA Corp. was the DMA, it solicited funds

---

[73] As described above, great confidence can be placed in this analysis because DIA Corp. meticulously maintains records of fund and object donations and carefully tracks any conditions made with such donations. (*See supra* at 42–46, 56.)

WEIL:\45423531\6\45259.0007

from donors and received dues from members. (*See supra* at 51.) These funds were then used to purchase artwork for the City's collection. (*See supra* at 51–52.) Some portion of monetary gifts to DMA were made using forms that did not contain any restrictions or conditions. (*See supra* at 51.) Other monetary donations were made via other means, but still without explicit restrictions. (*See, e.g.*, Arts Comm'n Minutes, Apr. 15, 1957 (EX3130) at DIAINSP011737 (identifying a gift of $43,180.33 from the sale of stock, which did not have any specific purpose).) Thus, it appears likely that a portion of donations of funds to DIA Corp. (which DIA Corp. then likely used to buy art for the City) were unrestricted.

In addition, the form "Deed of Gift" that DIA Corp. provided donors of artwork (and required by the Collections Management Policy) was drafted to effect an absolute and unconditional gift: pursuant to this form, the donor would "give . . . all [of their] rights, title and interest [in listed objects]." (Form Deed of Gift, circa 1960s (EX3132); *see* Deed of Gift of Artwork, Dec. 21, 1961 (EX3133) (giving "all right, title, and interest" to listed artwork); Form Deed of Gift from W. Hawkins Ferry, Oct. 20, 1988 (EX3134) at DIAINSP042285 ("I(We) give, assign and transfer to the Founders Society Detroit Institute of Arts all my rights, title and interest in and to the following work(s) of art: [lists art]."); Letter from P. Heftler to DIA Corp. with Enclosure, Oct. 9, 1992 (EX3136) (identifying the "standard deed of gift form" circa 1992, which resembles past forms).)

The law of unrestricted gifts confirms that gifts made pursuant to this Form Deed of Gift constitute absolute transfers, because a transfer of "all rights, title and interest" is a clear manifestation of intent to divest oneself of title and dominion over property. *See Chamberlain v. Eddy*, 118 N.W. 499, 504 (Mich. 1908) ("[I]n order to constitute a valid gift, 'there must be a delivery . . . of the subject-matter . . . with an intent on the part of the donor to presently divest

140

himself of all title and dominion over the same, and an acceptance by the donee.' The intent may be deduced from all the circumstances."). The Arts Commission has acknowledged as much. (*See* Memo re: Donation, Dec. 15, 1994 (EX3137) at DIAINSP044790 (identifying certain sculptures donated with a deed of gift as "unrestricted gifts").) Even nonstandard deeds of gift and wills pursuant to which objects were donated to DIA Corp. frequently used unconditional language and, thus, effected unrestricted transfers. (*See, e.g.*, Last Will and Testament of Eleanor Clay Ford, July 16, 1976 (EX3138) at DIAINS047575 ("To DETROIT INSTITUTE OF ARTS I give the following paintings: [lists paintings]."); Deed of Gift from Alfred Fisher, Dec. 28, 1953 (EX3139) at DIAINSP043554 ("I . . . hereby assign, transfer, convey, and deliver . . . all of my right, title, and interest in and to the [listed paintings]."); *see also* Letter from G. Keyes to A. Fisher (EX3140) (indicating that "Mr. Fisher's bequest was unconditional" and finding that the bequeathed object could be deaccessioned). Representatives of DIA Corp. confirmed they would not accept art with restrictions. *See* Schwartz Dep. 110:10–111:12 (noting that during his tenure as head of the Collections Committee, he was not aware of any objects being given subject to donor-imposed restrictions); *see also* Erickson Dep. 97:11–21 (noting that DIA Corp. would not want to accept any art with "usage restrictions" that would be binding years in the future, such as a requirement that a work of art must be permanently displayed).) Accordingly, many objects donated to DIA Corp., which were then transferred to the City, did not have any restriction tied to them.

Similarly, the practices of the Arts Commission confirm a policy against accepting artwork subject to donor restrictions. Arts Commission approval was required for every object that was accessioned to the collection, regardless of its source. (*See, e.g.*, Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2013 (EX266) at 7 (noting that objects

WEIL:\45423536\45259.0007

141

are not transferred to the City and accessioned to the DIA Collection without prior approval from the Arts Commission). Each object was recorded in the Arts Commission minutes when it was approved by a formal motion. *See, e.g.,* Arts Comm'n Minutes, Dec. 15, 1953 (EX3142) at DIAINSP011561 (listing many art objects and moving to accept them); Arts Comm'n Minutes, Apr. 30, 1974 (EX3143) at DIAINSP012957 (same); Arts Comm'n Minutes, July 24, 1985 (EX3144) at DIAINSP014450 (same).) The minutes would note when a proposed contribution to the collection included any restrictions, and such contributions routinely were rejected. (*See, e.g.*, Arts Comm'n Minutes, Sept. 24, 1951 (EX3149) at DIAINSP011450–51 (noting a bequest from Mrs. Booth of artwork that would have to be exhibited eight months of the year or else be returned to her heirs, and advising DIA Corp. that "the Arts Commission could not be bound by such limiting terms in receiving gifts of this type"); Arts Comm'n Minutes, Feb. 9, 1955 (EX3106) at DIAINSP011611 (noting that conditions on gifts would need to be specifically approved by the Arts Commission); Arts Comm'n Minutes, Nov. 7, 1963 (EX3146) (confirming that the Arts Commission declined the gift because it was conditioned on obligations of the Arts Commission); Arts Comm'n Minutes, Jan. 27, 1941 (EX3147) (Pérez Decl. Ex. 3147) at DIAINSP011135 (rejecting a gift that would permit the donor to dispose of the gift differently unless it were exhibited out of a concern for binding commission successors); Arts Comm'n Minutes, June 25, 1934 (EX3148) at DIAINSP010930 (rejecting a bequest of artwork where the gift was "on [the] condition that they are to be continually used for exhibition in the Art Museum"); Arts Comm'n Minutes, Jan. 14, 1952 (EX3150) at DIAINSP011466 (rejecting bequest where "the limitations contained in the bequest which would prevent the museum from ever taking clear title to the gifts").)

WEIL:\45423531\6\45259.0007

These policies – generally refusing gifts with restrictions and requiring the use of the form Deed of Gift – were later incorporated into the Collections Management Policy:

> The acceptance of all gifts and bequests shall be without restriction. . . . While it is the Museum's intention to accession for long-term use and preservation, no guarantee shall be made that the gift or bequest will be retained by the Museum in perpetuity. There shall be no exceptions to this policy unless any such restrictions or special provisions are recommended by the [Collections Committee] and approved by the [DIA Corp. Board of Directors].

(Collections Management Policy, Feb. 13, 2012 (EX267) (Pérez Decl. Ex. 267) § IV (I)(4); *id.* § V (I)(7).) Having a policy against accepting restricted donations is also generally accepted museum practice. (*See* A Legal Primer on Managing Museum Collections, Marie Malaro and Ildiko DeAngelis (3rd ed. 2012) (EX3068) at 150 ("[A] good general rule is for a museum to accept only unrestricted gifts.").)

The City's policy of rejecting gifts with restrictions is further confirmed by the form of acknowledgment that, for many years, was sent to donors when DIA Corp. received a gift or bequest. That form explicitly provided that gifts would be accepted by the DIA in fee simple, without restriction, and to be used and disposed of in any manner the Arts Commission deems advisable. (*See supra* at 59–60.) The same form was used to acknowledge the acceptance of bequests from an estate. (*See supra* at 59–60.) This policy continued into later years even after DIA Corp. assumed responsibility for the operation of the museum. DIA Corp. sends potential donors a "Museum Receipt" accompanied with its Form Deed of Gift (which, as discussed, provides for an absolute conveyance), and requires that both the receipt and deed be signed and returned before the object will be considered for accessioning into the DIA Collection. (*See supra* 45–46.) With these policies and practices in place, the vast bulk of

WEIL:\45423531\6\45259.0007

donated funds and artwork were given to DIA Corp. and the City free from any donor restrictions.

        b.     *Restrictions Were Satisfied Prior to*
                  *<u>or Upon Accession to the DIA Collection</u>*

To the extent funds or objects donated to DIA Corp. were subject to any restrictions, with a few, rare exceptions (discussed below), they were satisfied and released prior to or upon DIA Corp. transferring such property to the City.[74] It is first necessary to consider implied restrictions. Even though funds and property given to DIA Corp. by gift or bequest may have been effected without restriction, one may argue that, as a nonprofit corporate and registered charitable trust, property held by DIA Corp. may only be used consistent with its corporate purposes. *See* Bogert et al., The Law of Trusts and Trustees § 362 (2d rev. ed 2013) ("A gift to a charitable corporation, foundation or community trust, if not made subject to a trust or restricted as to use, is deemed to incorporate the purposes set forth in the charter, articles of incorporation or other governing instrument of the donee organization"). For many years these purposes included soliciting and receiving money and works of art to be donated to the DIA Collection. (*See supra* at 52–53.) Assuming unrestricted donations implicitly took on these purposes as conditions, DIA Corp. acted in furtherance of these purposes each time it conveyed ownership of artwork to the City. Once artwork was so conveyed, DIA Corp.'s "organizational" restrictions had no continuing effect. *See Steevens v. Earles*, 1872 WL 3217, at *2 (Mich. Apr.

---

[74] A donor only creates legally-binding restrictions to the extent that such restrictions are explicit – restrictions that are not expressed as a clear mandate (*i.e.*, restrictions with precatory language) do not create an obligation. (*See* Uniform Prudent Management of Institutional Funds Act Comments (EX3274) at 3 (noting that restrictions must be followed "[w]hen a donor expresses intent *clearly in a written gift instrument*") (emphasis added); *Keller v. McConville*, 141 N.W. 652, 657 (Mich. 1913) (finding that a donor restriction did not create a trust obligation it was expressed in precatory language, *i.e.*, as a "wish" that the donated property be disposed of by the recipient in a certain manner); 11 Mich. Civ. Jur. Gifts § 65 (noting that a "donor's language that is merely precatory, expressing a hope or wish but not requiring that the donee dispose of the gift in a particular manner, or to particular persons, will not convert the donee into a trustee").)

WEIL:\45423535\6\45259.0007

144

23, 1872) (noting fundamental rule of trust law that when a trustee uses property to fulfill trust purposes, the trust has no continuing interest in such property). There is no evidence that DIA Corp. imposed any additional restriction on artwork it transferred to the City – such transfers were absolute and unconditional. Accordingly, no restrictions on artwork in the DIA Collection arise from the fact that such artwork was in the possession of the DIA Corp. before it was conveyed to the City.

Of course, some funds and objects donated to DIA Corp. were explicitly subject to condition or restriction. In the case of funds, such restrictions could address the timing of expenditures, whether and when principle or interest on the funds could be used, and what purposes the funds were to be applied to. (*See supra* at 54–55.) In particular, certain funds were donated for the specific purpose of acquiring art. (*See, e.g.*, Last Will and Testament of William Hawkins Ferry, June 24, 1969 (EX253) at DIAINSP000283–89 ("I give, devise, bequeath and appoint . . . my property and estate . . . in fee simple, absolutely . . . to the Founders Society Detroit Institute of Arts, of Detroit, Michigan, for the purchase of modern works of art and/or for the endowment for such purchases."); Last Will and Testament of Charles L. Freer, May 13, 1918 (EX3160) at DIAINSP040649 ("I give and bequeath to the DETROIT MUSEUM OF ART the sum of five thousand dollars ($5,000), to be expended by its Trustees in completing and improving, by purchase or exchange, the collection of etchings, water colors, and drawings . . . heretofore given by me to said Museum . . . and for no other purpose."); Acknowledgment of Gift, May 5, 1953 (EX3161) (acknowledgment of gift of funds for purchase of specific painting); DIA Corp. Minutes, Feb. 14, 1961 (EX3162) at DIAINSP020882 (describing a gift to DIA Corp. of funds for the purchase of an object to become part of the DIA Collection).)

WEIL:\45423536\45259.0007
145

While DIA Corp. is legally obligated to honor donor fund restrictions pursuant to Michigan Statutory and Common law, *see e.g.*, Uniform Prudent Management of Institutional Funds Act, MICH. COMP. LAWS Ch. 451; *Keller v. McConville*, 141 N.W. 652, 657 (Mich. 1913) ("[W]here a gift is made to one, and at the time of delivery and passage of title a condition is imposed upon the donee with respect to his use of all or a part of the donation, a trust is created, and the donee takes the property subject to the condition so expressed."), once restricted funds have been applied toward their purpose, the restriction is satisfied and no longer has any continuing effect. *See* MICH. COMP. LAWS § 451.924 (providing that assets in an endowment fund are donor-restricted until appropriated for expenditure by the institution."); *Earles*, 1872 WL 3217 at *2 ("It is a principle of law, independent of statute, that the estate of a trustee who receives [property] for particular purposes, terminates when they are fulfilled."); Net Assets Released From Restrictions, *Warren Gorham & Lamont Nonprofit GAAP Practice Manual*, 2002 WL 31053783 (2014) ("When donor restrictions are met, temporarily restricted, net assets should be reclassified to unrestricted net assets and reported as separate line items on the Statement of Activities. *Donor restrictions expire when the stipulations made by donors are met* by the passage of time or by actions taken by the nonprofit organization.") (emphasis added); 2002 WL 31053783 § B4.3.2 ("Another form of donor restrictions, called purpose restrictions, is met when the nonprofit organization takes specific actions or performs certain tasks. For example, a donor may give cash that is to be used to purchase a certain asset. The contribution is classified as temporarily restricted, and temporarily restricted net assets are reclassified to unrestricted net assets when the asset is placed in service.").[75]

---

[75] DIA Corp. has a long history of carefully managing donor funds and, with its careful procedures, any artwork acquired with DIA Corp. funds and given to the City can be presumed to have been acquired in compliance with any restriction on such funds. (*See, e.g.*, Form, circa 1998 (EX3562) (identifying which funds would be used to acquisition a piece of art, requiring a determination of whether there were any

WEIL:\45423536\45259.0007

As the foregoing shows, once the conditions tied to restricted funds are satisfied such conditions are released of no continuing effect. In particular, this is true with respect to any funds donated to DIA Corp. to be used for purchasing art for the DIA – once those funds are applied to acquire artwork and then the artwork is accessioned to the DIA Collection, the object so purchased is not encumbered by any pass-through restriction..[76]

As with funds, some gifts of artwork to DIA Corp. came with conditions. As an initial matter, encumbrances would only apply if they were explicit; restrictions that are not expressed as a clear mandate (*i.e.*, restrictions with precatory language) are not legally binding. (*McConville*, 141 N.W. at 656–57; 11 Mich. Civ. Jur. Gifts § 65; Memo from Registrar, Aug. 27, 1991 (EX3166) (noting that absent legal restrictions on any particular gift, the museum can assume that the gift is unrestricted).) For the minority subset of donations to DIA Corp. that were made with an explicit restriction or condition, those for the most part no longer applied once the property was transferred to the City.

---

restrictions on the fund, and, if there were any restrictions, indicating that a description of such restrictions should be attached); Financial Statement, Detroit Institute of Arts, Year Ended June 30, 2003 (EX3141) at DIAINSP093552 ("To ensure compliance with restrictions placed on the resources available to [DIA Corp.,] accounts are maintained in accordance with the principles of fund accounting. This is the procedure by which resources are classified for accounting and reporting into funds established according to their nature and purposes.").)

[76] Only one exceptional monetary donation has been identified where the funds came with restrictions as to continuing use, meaning, instructions about not only what the funds should be used to purchase, but how the purchased object(s) should then be used on a go-forward basis. (*See* Booth Will, Sept. 15, 1927 (EX275) at DIAINSP03972–93 (bequeathing funds to DIA Corp., "the income used to purchase works of Art to be permanently given and exhibited in the Museum of The Detroit Institute of Arts," with the additional instruction that "[i]f objects so purchased shall at any time be deemed not suitable for exhibition in the galleries of said Museum at least eight months of each and every year, then said works of Art shall be offered back to my heirs and if they are not accepted by such heirs, then they may be otherwise disposed of.").) This is a unique circumstance where application of the funds to purchase artwork for the DIA seemingly would not satisfy and release the restriction; by its terms it continued to apply to the property purchased. Where property subject to such a restriction was transferred to the City, the property may remain subject to that restriction in its hands. This was an unusual exception to the policy of DIA Corp. and the Arts Commission, given their relationship with Mr. Booth. (*See supra* at 55–56.)

WEIL:\45423536\6\45259.0007

Some objects were donated to DIA Corp. based on a temporary incomplete transfer of ownership. These included things such as life-estate gifts and installment gifts. (*See supra* at 60–61.) The Arts Commission would specifically approve these aberrations from the normal gifting practice, but the incomplete gifts were not immediately transferred to the City or added to the DIA Collection. Instead, these types of gifts were held by the DIA Corp. until the complete interest was obtained; only after DIA Corp. had 100% ownership would the object be transferred to the City. (*See* Memo to Mayor from DIA Director, July 20, 1987 (EX3218) (noting that in cases of life-interest and installment donations of objects, the donated objects were held in DIA Corp.'s Study Collection "until such time as 100% ownership was obtained. Then the gift was deeded over to the City").)[77] Accordingly, the existence of gifts made pursuant to incomplete transfers of ownership does not present an impediment to the City's ability to sell or encumber the DIA Collection. When such artwork was added to the DIA Collection, the City received complete ownership.

Gifts of artwork to DIA Corp. were also sometimes made with a particular purpose, generally to be added to the DIA Collection. (*See, e.g.*, Excerpt from Will of Dollie May Fisher (EX3219) at DIAINSP043887 (bequeathing to DIA Corp. such items as "it shall elect to acquire for the permanent collection of the Detroit Institute of Arts").) As with funds donated for a specific purpose, the restrictions on these gifts would be satisfied once their purpose had been served, namely, the object was given to the City to be added to the DIA Collection. (*See supra* at 143–146; *Steevens*, 1872 WL 3217, at *2 (Mich. Apr. 23, 1872) ("It is

---

[77] It is unclear whether this was the case after 1998, when DIA Corp. assumed control under the Operating Agreement. (*See supra* at 47.) However, this only means that the City may have to wait until these gifts were complete before it could monetize them. In any event, very few gifts of significant value were made after 1998, and therefore even if the City only had a partial ownership interest in these gifts, the impact on the value available from the DIA Collection would be immaterial.

WEIL:\45423536\45259.0007
148

a principle of law, independent of statute, that the estate of a trustee who receives [property] for particular purposes, terminates when they are fulfilled.").)

The one type of restriction on gifts of artwork to DIA Corp. that could remain effective after transfer to the City would be artwork held by the City subject to a restriction on continuing use, *i.e.*, instructions on how the property must be used on a go-forward basis. Only two gifts have been identified that might possibly contain this type of restriction: a gift from the wife of Ralph Booth of certain of her husband's paintings that remained in her household, (*see* Letter from Mrs. Booth, Apr. 21, 1942 (EX278) at DIAINSP040281 (describing terms of her gift of artwork)), and the Tannahill Bequest. (*See supra* at 61.)

As an initial matter, as discussed *supra*, these gifts were given under exceptional circumstances by persons with unique relationships with the museum. While the gift from Mrs. Booth may arguably remain subject to Mrs. Booth's conditions, any remaining restrictions associated with the Tannahill Bequest amount to a contractual obligation of the City that may be rejected in the Chapter 9 Case.

The Tannahill Will and the conveyance of all of his "right, title, and interest" do not contain or create a restriction on continuing use; indeed, the only resulting restriction is contained in the Receipt and Commitment – a contractual agreement entered into by the City. Although the will's absolute conveyance was conditioned upon the City entering into an agreement not to sell the donated artwork, and if that condition was not satisfied the collection would instead have been donated to a different museum, once the condition in the will was satisfied (meaning, the agreement not to sell was executed) the will had no continuing effect. That is because the condition in the will was plainly in the form of a condition precedent, *i.e.*, a condition that must be satisfied for the conveyance to vest but, once satisfied, cannot later cause

WEIL:\45423531\6\45259.0007

a forfeiture of the conveyance. *See In re Bem*, 637 N.W.2d 506, 516–17 (Mich. Ct. App. 2001) ("A condition precedent is 'one which must happen or be performed before the estate to which it is annexed can vest or be enlarged.' Stated another way, a condition precedent is the contingency described in the will that must occur for the specific devise subject to the condition to vest. 'A vested property interest is one that is capable of becoming possessory immediately upon the *expiration* of the preceding estate.'") (emphasis added and citation omitted); *Scott v. Roethlesberger*, 146 N.W. 307, 308 (Mich. 1914) ("If the language of the particular clause, or of the whole will, shows that the act on which the estate depends must be performed before the estate can vest, the condition is, of course, precedent; and, unless it be performed, the devisee can take nothing."); *Matter of Stuart*, 183 Misc. 20, 24 (Surr. Ct. N.Y. Cnty Feb. 1, 1944) (noting, where a gift of artwork was transferred subject to a condition precedent, and the recipient accepted the gift in writing and agreed to comply with the conditions of its administration, "a forfeiture could only result . . . if the [recipient] failed *in the first instance* to accept the gift within the time and upon the conditions stated in the codicil") (emphasis added). Here, the condition was that the City enter into an agreement with specific terms satisfactory to the executors of Tannahill's estate before all of his "right, title, and interest" were conveyed. When the City did so and the executors were satisfied, the condition was fulfilled, the conveyance was made, the Tannahill estate's interest in the property expired, and no further forfeiture could result from the terms of the will. The only continuing use restriction on the property arose from the contractual agreement reflected in the Receipt and Commitment.

Because the City is a chapter 9 debtor, it may reject this contractual restriction as it would any other executory contract. The agreement not to sell the artwork, which stands independently from the property conveyance conditioned on its execution, falls squarely within

WEIL:\45423531\6\45259.0007

the Sixth Circuit's definition of an executory contract because rejection of the agreement will relieve the City of a burdensome contractual prohibition. *See Chattanooga Mem'l. Park v. Still (In re Jolly)*, 574 F.2d 349, 351 (6th Cir.) *cert. denied*, 439 U.S. 929 (1978) (employing a functional approach to the executory contract analysis, which requires the court to "work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory . . ."); *In re Cardinal Indus., Inc.*, 146 B.R. 720, 728 (Bankr. S.D. Ohio 1992) ("Under [the functional] approach, courts determine the executoriness of a contract by the nature of the parties and the goals of the reorganization, not by mutuality of commitments."). Moreover, because rejection allows the City to sell the valuable artwork, thereby benefitting the debtor's estate and its creditors, the agreement is executory and subject to rejection. *In re Cardinal Indus., Inc.*, 146 B.R. at 729–30 (finding agreement executory because rejection would ultimately benefit the estate and its creditors).

Under the Bankruptcy Code, the City's rejection of the agreement and subsequent sale of the artwork will result in a prepetition breach of the agreement, giving rise to a breach of contract claim against the estate. 11 U.S.C. § 365(g)(1); *see also In re Miller,* 282 F.3d 874, 877 (6th Cir. 2002); *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997). The parties' rights with respect to such breach and resulting claim are, however, determined by state law. *In re Lavigne*, 114 F.3d at 387. Here, applicable state law provides that the remedy for breach of contract is an award for monetary damages. *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 600 (E.D. Mich. 2008) ("[T]he classic remedy for breach of contract is an action at law for damages"); *see also Cramer v. Metro. Sav. & Loan Ass'n.*, 258 N.W.2d 20, 23 (Mich. 1977) ("[T]he remedy for breach of a covenant is damages or an injunction."). As such, a party harmed

WEIL:\45423536\45259.0007

by the City's rejection of the agreement is not entitled to seek specific performance of the agreement. *Ruegsegger v. Bangor Twp. Relief Drain*, 338 N.W.2d 410, 411 (Mich. Ct. App. 1983) ("The equitable remedy of specific performance may be awarded where the legal remedy of damages is impracticable."); *see also* 3 Collier On Bankruptcy ¶ 365.09[1] (15th ed. Rev. 2008) ("[R]ejection deprives the nondebtor party of a specific performance remedy that it might otherwise have under applicable nonbankruptcy law for breach of the contract."). Accordingly, if the City were to reject the agreement and sell the artwork, any alleged harm will give rise to a prepetition claim for damages associated with the breach and that claim will be treated as a general unsecured claim against the debtor's estate in accordance with the Plan.

In sum, there are very few restrictions, if any, on the DIA Collection. City of Detroit Purchases are entirely unrestricted. As for Founders Society Purchases, Gifts and Bequests, the vast majority are unrestricted, and conditions associated with any restricted items would not, in the hands of the City, be enforced. For these reasons, the City has a substantial likelihood of success on any claim that donor restrictions would prevent it from monetizing the DIA Collection and using the proceeds to satisfy its obligations.

## III.   RESOLVING THE CITY'S TITLE TO THE DIA COLLECTION COULD BE ACCOMPLISHED QUICKLY AND WITHOUT GREAT EXPENSE

The City alleges that resolving its ownership interest in the DIA Collection through litigation would be "complicated, time-consuming and expensive." (Reply at 21.) The City also claims that establishing a factual record could be "impossible," and that discovery would be expensive because the relevant documents "date back to 1885" and include "over a million pages of hard-copy documents, many of which are originals that can be more than a half century old." (*Id.*) DIA Corp. paints a similar picture, contending that even if the DIA Collection is not held in charitable trust, resolution of alleged donor litigation could take "years

WEIL:\44542353\6\45259.0007

as the donative intent and restrictions associated with each significant object would be subject to separate examination." (DIA Corp. Brief at 23–24.) These predictions are exaggerated, as evidenced by the analysis in this Brief, which shows how easily the City could succeed on any claim regarding title to the DIA Collection.

When determining whether a proposed settlement is fair and equitable, courts must consider "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it." *Bard v. Sicherman (In re Bard)*, 49 Fed. App'x 528, 530 (6th Cir. 2002) (citations omitted); *see also TMT Trailer*, 390 U.S. at 424–25. In doing so, the court must form an "educated estimate" of these factors based on evidence and assess whether, in light of such estimate and the probable outcome, litigation is more favorable than settlement. *TMT Trailer*, 390 U.S. at 424, 434 (finding that a court's approval of a settlement failed to reflect the necessary exercise of discretion where the court merely found that "the alternative to settlement was 'extensive litigation at heavy expense' and 'unnecessary delay' [without any] evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation" because "[l]itigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.").

The complexity of the litigation being resolved pursuant to a proposed settlement requires an analysis of each of the specific claims being settled. *Cf. In re Wash. Mut., Inc.*, 442 B.R. 313 (Bankr. D. Del 2011) (separately analyzing the reasonableness of numerous distinct legal claims and theories being globally settled). Addressing the different legal claims separately is certainly appropriate here because, when assessing the overall value potentially provided by the settlement, the Court should consider how particular arguments (which relate to varying

WEIL:\45423531\6\45259.0007

portions of the collection) factor in. For instance, in the case of individual donor restrictions, where the facts show that very few possible restrictions exist and a restriction on a piece of artwork necessarily only pertains to that piece of artwork, any alleged complexity of litigating such a restriction must be discounted to reflect the relatively few anticipated instances where such litigation could arise and the limited scope and streamlined nature of such litigation.

Taking each legal issue regarding the DIA Collection in turn, a court could resolve such issues without unreasonable expense or delay, particularly since the City is likely to succeed in such litigations (often as a matter of law) and taking into account the enormous value at stake. As a preface to this analysis, it is important not to be misled by the City's descriptions of a completely disorganized "Indiana Jones"-like file room containing millions of pages of DIA documents in total disarray. The City hired a professional corporation, DIA Corp., to manage the collection records and established detailed record-keeping procedures and requirements with which DIA Corp. must abide. As an expert in this field and guided by the Code of Ethics for Registrars, DIA Corp. has complied with these requirements and, as a result, relevant historical and other information about each and every object in the DIA Collection is readily available. (*See supra* at 42–44.) This *significantly mitigates* against any argument that litigating over the artwork is impossible or too burdensome.

## A.  Resolving Arguments that the Entire Collection Is Held in Trust

The broadest and most significant potential claims relating to the status of the DIA Collection, namely, that it is held by the City in charitable or public trust or was dedicated by the City to the public, each are relatively straightforward to resolve. As set forth in the arguments above, these claims can be disposed of as a matter of law, without having to conduct any discovery or an evidentiary trial. Courts have held that in such circumstances, settlement is inappropriate. *See In re Kay*, 223 B.R. 816, 821 (Bankr. M.D. Fla. 1998) ("Approval of a

WEIL:\45423536\45259.0007

compromise of claim is inappropriate when the compromised claim is invalid as a matter of law."); *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 98–99 (Bankr. C.D. Cal. 1991) (rejecting a settlement of "a limited question of law with little necessity for expense and protracted litigation").

To the extent a court determined some fact inquiry would be necessary to resolve these claims, it could be done quickly and efficiently.  The City's argument that establishing a factual record could be "impossible," and that discovery would be expensive because the relevant documents "date back to 1885" and, based on representations from the DIA Corp., include "over a million pages of hard-copy documents," is not compelling.  The Objectors have been able to conduct fairly comprehensive discovery on these issues in the *extremely* compressed time-frame of this case and at a modest cost.  (*See supra* at 19–20.)  The relevant documents concerning the incorporation of the DMA and the 1919 Transfer are from a narrow window of time, are carefully archived at the DIA and small in number, have already been produced, and will be submitted into evidence at trial.  (*See supra* at 19–28, § II(B)(1)(a).)  The later facts alleged by DIA Corp. and the Attorney General to "confirm" the existence of a trust are, as a matter of law, irrelevant to proving whether a trust was actually created in 1885 and continued in 1919.  (*See supra* at 85, §§ II(B)(1)(b), (d), (f).)  However, even if such facts must be considered, again, they have largely been gathered in the context of this dispute and, in the unlikely event any significant additional discovery would be necessary, it similarly could be collected in a quick and efficient manner.

Although DIA Corp.'s dedication and public trust claims are novel, they are not the type of "novel and unresolved issues of law that, after appeals, could take years to resolve conclusively." *In re Federated Dep't Stores, Inc.*, No. 1-90-00130, 1992 WL 605483 at *5

WEIL:\45423533\6\45259.0007

(Bankr. S.D. Ohio Jan. 10, 1992) (noting that the fact that claims are novel can weigh in favor in settlement).  The relevant legal doctrines at issue (of which DIA Corp. takes a novel interpretation) are longstanding and well-established.  (*See supra* §§ II(B)(2), (3); *cf. In re Hancock-Nelson Mercantile Co., Inc.*, 95 B.R. 982, 992–93 (Bankr. D. Minn. 1989) (finding more litigation risk for claims at the "frontiers of current . . . law," where questions are either of "first impression or which invoke a legal theory still in the very early stages of its evolution," than claims on a "state-law equitable principle" that is "well defined").)  DIA Corp.'s arguments that these doctrines should apply in a wholly different and unprecedented manner invite summary disposition, not prolonged appeals.

### B.  Resolving Estoppel Arguments

Arguments that the City is estopped from denying the existence of a charitable trust under the doctrines of election and equitable estoppel likewise could be litigated without undue delay or costs.  As set forth in more detail, both arguments can be resolved as a matter of law.  (*See supra* §§ II(C)(1)-(2); *In re Planned Protective Servs., Inc.*, 130 B.R. at 98–99.)  Furthermore, neither one creates an independent cause of action, so each would have to be litigated in the context of some other ongoing litigation.  Accordingly, these claims would not give rise to any significant additional complexity or expense.  Again, although DIA Corp. seeks to apply both doctrines in an unprecedented and inappropriate manner, there is little likelihood of time-consuming appeals.  Both doctrines are well-defined state law equitable principles, and do not fall on a new "frontier" of the law.

### C.  Resolving Equitable Arguments

Litigation over potential equitable claims, *i.e.,* promissory estoppel and implied trust claims, likewise could be resolved with minimal cost or burden.  The projected cost and delay of litigating promissory estoppel claims should be heavily discounted.  Such claims, even

WEIL:\45423536\6\45259.0007

if successful, would not preclude monetization of the DIA Collection (and would only result in an unsecured claim, so they likely would not be pursued). If pursued, the City could simply reserve funds on account of the plaintiffs' potential claims, so the rest of the case would not be delayed. The documents relevant to any promissory estoppel claim – financial documents and museum policies – are readily available and the required determinations depend only on the straightforward application of a well-settled equitable doctrine.

Resulting trust claims likewise would not generate any significant additional burden. As discussed above, that issue can be decided on the law. But even if it were not, resolving claims that a resulting trust should be implied would not require any significantly increased factual discovery.

**D.      Resolving Claims With Respect to Individual Pieces of Art**

DIA Corp. contends that "[d]onors and heirs also would challenge any purchaser's right to continue to retain transferred objects" and that, prior to the consummation of a potential sale, "litigation would be generated that . . . could take years as the donative intent and restrictions associated with each significant object would be subject to separate examination." (DIA Brief at 23–24.) The City raises a similar argument. (Reply at ¶ 36.) These concerns are overstated.

The process for resolving title for any contested sale or encumbrance of artwork would be relatively simple and would not require scrutinizing "millions" of documents in the Archives. Although the City apparently has not conducted any discovery on these issues, (*see* Orr Dep. 455:21–456:5 (Pérez Decl. Ex. A) (noting that it was "unclear" whether the City could sell artwork that was not purchased by the City because there "may be" claims of heirs, donors, or others that we do not have a right to sell); *id.* 392:3–9 (noting that the City did not, prior to deciding to enter the DIA Settlement, undertake an effort to independently assess whether it was

WEIL:\45423536\6\45259.0007

correct that only "hundreds" of objects beyond those valued by Christie's were unrestricted); *see also* Hr'g Tr. 13:1–8, Jan. 22, 2014 (representation by counsel for the City that it would be a "waste of time and money" to analyze restrictions on individual donations)), the Objectors have and have determined that most gifts were unrestricted. (*See supra* at 139.) Starting with this premise, the scope of this review would be narrow. Any question about a potential restriction could be easily addressed by merely reviewing the terms of the gift instrument. As explained, these operative collection documents are kept carefully organized in the office of the Registrar. (*See supra* at 43–48.) To the extent that objects were purchased with donated funds, this would not significantly complicate an assessment of potential restrictions. DIA Corp. has meticulous, accessible records of its funds that could be consulted. (*See supra* at 43–48.)

       Even if potential donor restrictions had to be resolved, one option to pursue could be to monetize pieces on a rolling basis as pieces were determined to be unrestricted. To the extent that certain pieces were particularly valuable, or particularly sought-after by interested purchasers, the diligence efforts could be focused on such pieces first. The City could efficiently streamline this process by putting donors on notice of a proposed transaction and give them an opportunity to be heard on the matter. A similar process was recognized by the United States Bankruptcy Court for the Southern District of New York in the case *In re: Salander-O'Reilly Galleries, LLC*, No. 07-30005 (Bankr. S.D.N.Y. Nov. 1, 2007).[78] *Salander-O'Reilly Galleries*

---

[78] (*See* Order Approving Joint Motion of the Debtor, the Official Committee of Unsecured Creditors and First Republic Bank for an Order (I) Approving Protocol for Assertion and Resolution of Claims of Ownership to Artworks in the Possession, Custody or Control of Salander-O'Reilly Galleries, LLC, (II) Approving Notice of the Art Claims Bar Date, and (III) Establishing a Deadline for Art Claimants to Make Art Claims, *In re: Salander-O'Reilly Galleries, LLC*, No. 07-30005 (Bankr. S.D.N.Y. Mar. 12, 2008), ECF No. 309 (the "**Salander-O'Reilly Order**"); Protocol for Assertion and Resolution of Claims of Ownership to Artworks in the Possession, Custody or Control of Salander-O'Reilly Galleries, LLC, *In re: Salander-O'Reilly Galleries, LLC*, No. 07-30005 (Bankr. S.D.N.Y. Mar. 11, 2008), ECF No. 308 (the "**Protocols**"); Joint Motion of the Debtor, the Official Committee of Unsecured Creditors and First Republic Bank for an Order (I) Approving Protocol for Assertion and Resolution of Claims of Ownership

WEIL:\45423536\45259.0007

involved a bankrupt art dealer that was in possession of numerous pieces of artwork that could be subject to claims that such artwork was not owned outright by the gallery. (*See* Salander-O'Reilly Motion at 2 (noting that, although the debtor possessed over 4,000 works of art, it was not readily apparent which were property of the debtor's estate).) Potential claims included assertions that such artwork was held on consignment, on sale or return, in trust, or subject to some other contractual right that would limit the debtor's property rights. (*See id.*) Recognizing the need to sell artwork "in order to fund its chapter 11 case and provide recoveries for creditors," the debtor proposed the Protocols for the assertion and resolution of any ownership claims related to artwork in the possession or custody of the debtor. (*Id.*) On March 12, 2008, the Protocols were approved by the court. (*See* Salander-O'Reilly Order.) Pursuant to the Protocols, all known parties with potential claims were given actual notice of the Protocols, and publication notice was made for the benefit of unknown claimants. (*See* Protocols at 3.) Like the claims resolution procedures provided under the Bankruptcy Code and Bankruptcy Rules, persons asserting claims under the Protocols had to assert such claims by a "bar date" with a standard form and supporting documentary evidence. (*Id.*) Claims were informally evaluated by a working group comprised of various parties in interest, including creditors. (*See id.* at 6.) Objectionable claims were subjected to a mediation process and, if unresolved, would be brought before the bankruptcy court. (*See id.* at 7, 9.) In cases where claims appeared meritorious, the artwork could be returned to the claimant. (*See id.* at 7–8.) The court approved the Protocols as the sole method for resolving competing claims to the ownership of the artwork and claimants

---

to Artworks in the Possession, Custody or Control of Salander-O'Reilly Galleries, LLC, (II) Approving Notice of the Art Claims Bar Date, and (III) Establishing a Deadline for Art Claimants to Make Art Claims, *In re: Salander-O'Reilly Galleries, LLC*, No. 07-30005 (Bankr. S.D.N.Y. Feb. 1, 2008), ECF No. 265 (the "**Salander-O'Reilly Motion**") (seeking approval of the Protocols).)

WEIL:\45423536\45259.0007

159

were prohibited from seeking any other treatment for their claims absent a showing of extraordinary cause. (*See id.* at 10.)

Although the Protocols adopted in *Salander-O'Reilly Galleries* were tailored to the specific circumstances of that case, the same general approach here could provide an effective method for resolving donor claims, including claims based on donor restrictions relating to specific pieces of artwork. For instance, if a donor asserted a restriction on or other interest in a piece of artwork (as noted, an unlikely scenario), the City could make an informed decision on how to address that alleged restriction – perhaps determining that the best course of action would be to retain the artwork in the museum or to reach a settlement with the donor or heir releasing the restriction. In the event that such procedures were adopted, artwork where no claims were asserted could be monetized immediately after the bar date.

As discussed, it is likely that there would be very few viable donor claims to resolve. (*See supra* at 139.) The possible need to address such claims thus would not impose any significant delays or added costs to monetizing the bulk of the collection. As set forth in more detail above, these cases could be relatively easily decided on the basis of the express provisions in the documents of conveyance (*i.e.*, in wills or deeds of gift). In most cases, a court would be able to reach a determination as a matter of law (*e.g.*, where no restrictions are stated) or straightforward contractual interpretation. Moreover, any restrictions in the form of contractual agreements would give rise to little more than a claim for damages from the rejection of an executory contract (damages that would be difficult to prove and are likely nonexistent). (*See supra* at 149–52.)

For the foregoing reasons, donor claims would not give rise to any substantial costs or delays with respect to the monetization of the bulk of the collection and, even with

WEIL:\45423536\45259.0007

respect to the assets subject to donor claims, resolution of such claims would be relatively straightforward and simple.

## IV. DEFERENCE TO THE PARAMOUNT INTEREST OF CREDITORS AND THEIR REASONABLE VIEWS ALSO DEMANDS REJECTION OF THE SETTLEMENT

In addition to analyzing the merits and value proposition of a proposed settlement, the Court must also consider whether the settlement is in the paramount interest of creditors and, in doing so, give deference to their reasonable views. This element is not satisfied by a straw poll; a mere "show of hands" of supporting creditors is an insufficient basis for approval of a settlement where the settlement is unfair to other creditors. *See TMT Trailer*, 390 U.S. at 435 (noting that "[t]he argument that the compromises [proposed with a plan of reorganization] were properly approved because no creditors objected to them seems doubly dubious . . . . [because] a plan of reorganization which is unfair to some persons may not be approved by the court even though the vast majority of creditors have approved it."). In particular, the Court must take into account the opinion of key stakeholders impacted by a proposed settlement. *See In re MQVP, Inc.*, 477 Fed. App'x 310, 316–17 (6th Cir. 2012) (finding that the "the paramount interest of the creditors" weighed strongly in favor of approval of a settlement where the creditor that "stood to lose the most by settling" had approved of the settlement). Here, the City has structured its Plan to pay pension claimants with the proceeds of the proposed DIA Settlement, while providing very little value on account of similarly-situated COP Claims. Because the holders of COP Claims and their insurers represent one of the most substantial creditor classes in this proceeding, and because that class stands to lose the most from the proposed settlement (and a plan that fails to effectively maximize the value of or monetize City assets), these creditors, including the Objectors, have a particularly strong voice with regard to whether the DIA Settlement is in the interest of creditors.

WEIL:\45423536\6\45259.0007

The most obvious evidence that the DIA Settlement is not in the interest of creditors is the fact that the City is to receive pursuant to the settlement substantially discounted value in exchange for a significant asset that could be monetized for *many billions of dollars*. Instead, the City is willing to settle for $455 million. (*See supra* at 76.) The difference is astonishing. The paramount interests of creditors (as well as City residents) are not served by the City forfeiting this enormous incremental value.[79]  As addressed above, this discount is not justified by any argument or allegation that there are restrictions on the City's ability to sell the collection and, as evidenced by the Indications of Interest, there is a market interested in purchasing it.

In addition, the interests of creditors are necessarily subverted by a settlement that is not the result of arm's-length, good faith negotiations. The negotiations that culminate in a settlement are an essential consideration when considering approval of that settlement, and finding that such negotiations were made in good faith and at arm's length serves to protect creditors who, like the Court, are not privy to every conversation and information exchange between a debtor and a settling party. *In re Dow Corning Corp.*, 198 B.R. 214, 222–23 (Bankr. E.D. Mich. 1996) (noting that the extent to which a settlement is the product of arm's-length bargaining is among the factors courts will consider when determining whether a proposed settlement agreement is fair and equitable).  As an initial matter, the creditors have very little

---

[79] The terms and structure of the settlement are nearly identical in concept to a transaction that the City, in the midst of a liquidity crisis, considered in 2011 to generate a cash infusion and reduce the "politically and operationally difficult task of processing 2300 layoffs" and need to negotiate healthcare and pension concessions. (*See supra* at 14 note 10; Memorandum re: Draft Proposal for Cumulative Monetization of the Cultural Assets – the Detroit Institute of Art, Nov. 11, 2011 (EX3245) at POA00000763.)  Among other things, the memo indicated that the foundation participating in the proposed transaction would receive a "return on investment" at a four or five to one ratio. (*Id.* at POA00000762.)  The transaction was not approved then, notwithstanding the City's dire situation, leaving one to wonder why the City believes a substantially similar deal would be reasonable now.

WEIL:\45423536\45259.0007

information about the negotiation of the DIA Settlement, so it is difficult (if not impossible) to assess whether it was negotiated in good faith and at arm's length.

The Objectors and other dissenting creditors have been prejudiced by the fact that, throughout the discovery phase leading up to the Confirmation Hearing, the City has employed the Mediation Order to shield from the scrutiny of dissenting creditors (and this Court) the negotiations and process that led to the proposed DIA Settlement. Without this information, the Objectors and other dissenting creditors have struggled to assess whether the DIA Settlement was the product of arm's-length bargaining—a critical inquiry for determining if the settlement is fair and equitable under Bankruptcy Rule 9019. *In re Dow Corning Corp.*, 198 B.R. at 222–23. Because the City has not adequately disclosed the details of how it and other parties arrived at the DIA Settlement, and the creditors have even been precluded from deposing certain of those parties, the City has failed to provide information sufficient to satisfy the standards of Bankruptcy Rule 9019 and controlling decisional law, leading to the inevitable conclusion that the DIA Settlement cannot be approved.

The City's proposition that because the DIA Settlement is the product of mediation it is entitled to a presumption that it was reached through good faith and at arm's-length must be rejected, as recognized by this Court. *See In re Tribune Co.*, No. 08-13141, 2011 WL 386827, at *7, n.17 (Bankr. D. Del. Feb. 3, 2011) (rejecting presumption that proposed settlement was fair because it was the product of a mediation conducted by a judge); *see also* Hr'g Tr. 50:17–20, June 26, 2014 (noting that the Court has not accepted that a mediated settlement is presumptively reasonable). Employing such a presumption would permit the City to use the meditation as a "sword" and a "shield," erroneously turning the tables on creditors to require *them* to rebut the presumption while refusing to disclose enough information to formulate

WEIL:\45423536\45259.0007
163

objections. At the same time, the City's limited disclosure and lack of transparency regarding the settlement negotiations presents a "one-sided story to the court" about the City's perspective on the reasonableness of the settlement and whether it is fair and equitable, further prejudicing creditors who oppose the Plan. *Cf. Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1426 n.12 (3d Cir. 1991) ("If a partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject."). Absent such disclosures in connection with confirmation, the City cannot meet the standards of Bankruptcy Rule 9019 and controlling decisional law. *Cf. In re Stockton*, 475 B.R. 720, 732–33 (Bankr. E.D. Cal. 2012) (finding protective order concerning communications, information disclosed, and documents prepared or produced during pre-filing neutral evaluation process may need to "relax" as case progressed "so that the rights of all parties can be fully examined," and permitting disclosure of proposed plan that formed the basis for pre-filing negotiations as part of debtor's prima facie case on eligibility).

Furthermore, the circumstances leading up to and following the mediation, and the tactics employed by the City, call into question the nature of the negotiations that resulted in the DIA Settlement. From the outset of the City's restructuring and for months after, the City gave all outward appearances that the DIA Collection was "on the table" as an asset to be monetized for the benefit of unsecured creditors. (*See* Orr Dep. 25:17–20 (Pérez Decl. Ex. A) ("I think generally in this time frame when I came into office, I said that all options are on the table, that we have to review any reasonable options regarding all assets of the City."); *id.* 60:24–61:5 ("We were proceeding down a path of trying to find ways to look at each of the buckets of assets that the City had and determine if there was a portion that could provide a benefit to the City

164

both for services, as well as to payments towards creditors in bankruptcy."); *id*. 432:23–25 ("I think I tried to maintain a position that everything was on the table, that - - that we were examining all alternatives"); *id*. at 482:3–6 (agreeing that one of the Emergency Manager's duties as a fiduciary is to look at all options with respect to all of the City's assets); *id.* at 482:7–13 (confirming that he, as Emergency Manager, had promised that the City would look at every transaction that makes sense and would provide the City with greater net present value).) Before the Chapter 9 Case commenced, the Emergency Manager and his advisors understood their duties to pursue all monetization options with respect to the DIA Collection:

> ***Our job is not to protect the art, but to save Detroit. We have said***
> ***ALL options are on the table and being considered. We mean it.***

(Email from Bill Nowling, advisor to the Emergency Manager, May 28, 2013 (EX3038) (emphasis added).) The Emergency Manager agreed with this position, admitting, "I agree with the sentiment that we're in a financial emergency. I agree with the sentiment that financial emergencies sometimes require extraordinary measures. I agree with the concept that maybe selling art would be an option." (Orr Dep. 414:23–415:5 (Pérez Decl. Ex. A); *see also* Buckfire Dep., Vol. 2 112:15–113:2 (Pérez Decl. Ex. B) ("We recognized early on that that would require [the DIA Collection] under certain scenarios to be valued as a potential noncore asset and dealt with appropriately if it was determined that the City would have to seek protection under Chapter 9.").)

Consistent with this, the June 14 Proposal included the DIA in a section labeled "Realization of Value of Assets," and described "maximizing creditor recoveries" and "generat[ing] value from City assets" as key objectives in a restructuring. (June 14 Proposal (EX33) at 41, 83–89.) The same messages were conveyed by the City to DIA Corp. The City implored DIA Corp. to come up with a way to "save themselves" or else the City would have to

WEIL:\45423534\6\45259.0007

pursue a monetization strategy.  (*See* Orr. Dep. 435:17–436:11; Buckfire Dep., Vol. 2 137:16–139:3 (Pérez Decl. Ex. B) (stating that as of April 2013, when he told the head of the board of DIA Corp. that "the DIA is an important cultural asset and the Board should be proposing something dramatic" to keep the DIA Collection in the City, and that "it would have to be a big number").)

But then, in January of 2014, having emerged from several months of mediation, the City's messaging took a turn.  In the ensuing months, numerous efforts were made to obscure the true value being provided in the transaction.  At the January 22, 2014 hearing on the Art Committee Motion, counsel for the City began minimizing the value of the DIA Collection, suggesting it was almost entirely contained in the works that Christie's had valued.  (*See* Hr'g Tr. 12:10–11, Jan. 22, 2014; *id.* 13:6–7.)  The number and impact of donor restrictions became a running theme.  (*Id.* 12:15–17 ("As to the rest of it, there's a big reason not to look at all of it, and that is that the rest of it came via gifts.").)  And the City hid behind claims that the documentation at the DIA was impenetrable, and that assessing donor restrictions would be too difficult and not worth the effort.  (*Id.* 13:16–19.)  This running story continued for months.  By May 15, 2014, counsel for the City gave the impression that a sufficient analysis had been done on restrictions.  (*See* Hr'g Tr. 31:18–32:10, May 15, 2014 (noting that there are "a multitude of restrictions that have been imposed in connection with the manner in which different works of art have been acquired . . . [and] there is not a scenario that the city can think of where its worth is going to turn out to be for all pieces the retail price at an auction because it's just not where we are").)  Based on the diligence that FGIC and other creditors have conducted, these statements ring hollow and suggest the City was not assessing the value of the DIA Collection, but propping up its settlement.

WEIL:\45423536\6\45259.0007

Indeed, from its announcement, the "Grand Bargain" was portrayed not as a reasonably calculated settlement for the City, or a means of maximizing the value of a non-core asset, but a means of "assisting the funding of the retirees' pensions and preserving the DIA's art collection." (Statement of Detroit Bankruptcy Mediators, Jan. 13, 2014 (EX3271).) It is telling that DIA Corp. joined negotiations and, within only four days, had decided to settle. (*See* M. Stryker & J. Gallagher, DIA joins deal in works with mediators that would protect art, pensions in Detroit bankruptcy, Detroit Free Press, Dec. 11, 2013 (EX3269).) What little creditors do know is that the City agreed to the deal without knowing what it was getting itself into.

The City has never conducted an independent assessment of the factual and legal merits of the issues and claims to be resolved by the DIA Settlement, instead opting to make a "hasty and imprudent" decision that directly contradicts this Court's admonishment otherwise. (*See* Hr'g Tr. 20:16–25, Jan. 16, 2014.) As this Court instructed, when deciding whether to enter the DIA Settlement, the City was obligated to "weigh the merits of the opposing facts and law," without taking into account the "position or authority" of the person that asserts them. (*See* Hr'g Tr. 64:9–13, June 26, 2014; *id.* 126:13–17.) The City utterly failed to do so and, instead of doing its own independent analysis, the City – time and time again – (i) relied on factual information provided by DIA Corp. without testing the veracity of this information, and (ii) deferred to legal arguments propounded by DIA Corp. and the Attorney General without testing those theories. The City was well aware that both of these parties were strongly opposed to selling the art. (*See* Orr Dep. 435:8–16 (Pérez Decl. Ex. A).)

When it came to the City's identification and assessment of factual issues relevant to the claims being settled, the City's reliance on representations from DIA Corp. was complete and pervasive. The City allowed DIA Corp. to set the parameters for its inquiry into the

WEIL:\45423536\6\45259.0007

historical facts relating to the creation of the DMA and the 1919 Transfer – critical events for the claims of the Attorney General and DIA Corp. – by only consulting with the DIA Director and DIA Corp. curators and staff on these topics. (Orr Dep. 458:9–21 (Pérez Decl. Ex. A).) The City relied on DIA Corp. to inventory the art, and did not conduct an independent assessment or even determine whether the inventory correctly reflected its property. (*Id.* 382:9–11; *see also* Buckfire Dep., Vol. 2 140:12–24 (Pérez Decl. Ex. B) (noting that Miller Buckfire did not attempt to identify the 100 most valuable pieces in the collection and took no steps to determine which pieces in the DIA Collection had restrictions on alienation, use, or transfer); Beal Dep. 63:11–64:13 (noting that DIA Corp. was asked to provide an inventory of the DIA Collection to the City); Erickson Dep. 193:8:22 (noting that DIA Corp. had not conducted an analysis of whether its computer system correctly identified the artwork that was purchased by the City).) The City also relied on DIA Corp. when it chose not to investigate the number and nature of any donor restrictions on pieces in the DIA Collection, and specifically DIA Corp.'s claim that even *assessing* this issue might create a lawsuit. Mr. Orr's deposition testimony is telling in this regard:

> Q. Now, as of the time you entered into the Grand Bargain had the City conducted an audit to determine which pieces in the collection were subject to restrictions on alienation that were specific to that piece? And what I mean here, Mr. Orr, is I understand there are arguments made by the attorney general and the DIA that apply to the collection at large.
> A. Yes.
> Q. Okay, I understand that, the public trust argument, the -- and so forth. I am not asking about that because those arguments, at least in theory, apply to everything. I am asking about a specific limitation, for example, in a bequest where someone says, City of Detroit, you can have this beautiful painting but only if you promise that you will never sell it?
> A. Yes.
> Q. Okay, do you understand my question?
> A. Yes.

WEIL:\45423531\6\45259.0007

168

Q. Had -- as of the time you entered into the Grand Bargain had the City conducted an audit to determine which pieces were subject to restrictions on alienation that were specific to that piece?

A. I don't know if the City or its contractor conducted an audit, I know that I had not seen one.

Q. Okay, you had not seen one?

A. Right.

. . .

Q. And why didn't the City conduct that type of audit before agreeing to enter into the Grand Bargain?

A. Generally speaking, it was our understanding that there was an understanding of which pieces at the museum could possibly be de-assessed [sic] without limitation. That number was relatively low, in the hundreds, I think as has been reported, and that others in one form or another whether pursuant to an actual bequest or will or an understanding with the donor and the heirs or agreements with the museum in some form had some limitation on their ability to be sold outright.

Q. And that understanding that the City had was based on communications made to it by the DIA Corp.?

A. Well, communications by the DIA Corp., certainly the attorney general's litigation -- excuse me, members of the DIA board, and the Founder's Society, as well.

. . .

Q. But the City didn't undertake an effort to independently assess whether what it was being told was correct?

A. No, in fact, the City was told that any attempt to do so might create a lawsuit regarding its ability to not only assess [sic] but have the intent to try to de-assess [sic] or to otherwise sell the art.

(Orr Dep. 389:25–392:9 (Pérez Decl. Ex. A).)

The City did eventually consider a limited scope of potential donor restrictions, but did so by letting DIA Corp. pick samples that the City would analyze. (*See* Hr'g Tr. 13:20-23, Jan. 22, 2014 (noting that DIA Corp. had been "helping out the City to try to isolate the most important gifts and supply us the documents on the most important parts of the gifted collection").) This is troubling not only because the City relied on DIA Corp. to "cherry-pick" the evidence the City ultimately relied on, but also because this evidence – an isolated selection of donative documents – does not answer the crucial question of how many such restrictions

WEIL:\45423534\6\45259.0007

exist and in what alternative forms. Having decided not to assess the number and nature of donor restrictions as a whole, the City then concluded – on the basis of representations from DIA Corp. and the existence of the AG Opinion – that only "hundreds" of items were actually free from restrictions (aside from the City of Detroit Purchases). (*See* Orr Dep. 391:9–23 (Pérez Decl. Ex. A).)

Moreover, circumstances have come to light about the drafting of the AG Opinion – which the City has admitted influenced its decision to settle and its views on the value of the DIA Collection, (*see* Orr Dep. 391:19–23 (Pérez Decl. Ex. A) (noting that the AG Opinion provided part of the basis for the City's view that only hundreds of objects beyond those appraised by Christie's were free from donor restrictions)) – which raise doubts that a settlement premised on positions taken in that document was reached in good faith and at arms' length. Although the Attorney General is not a party to this case, and the AG Opinion has no more weight than an unsubstantiated legal brief, its role in the course of the proceedings – and in guiding the City towards a settlement – cannot be denied. As has been reported by the press, while the opinion was prepared under the guise of a request from State Senator Randy Richardville, it appears the Attorney General drafted this opinion with intent to preserve the DIA Collection. (*See* N. Bomey & M. Stryker, Documents reveal DIA, Schuette talked months before Detroit bankruptcy, Detroit Free Press, May 1, 2014 (EX. 3564) (noting that the Attorney General was in contact with attorneys for the DIA months before Detroit filed bankruptcy and a statement released by his office that he "took action early on to prepare for [the City's bankruptcy] . . . . He feels strongly that no great city sells its art.").)

Indeed, documentary evidence confirms that the Attorney General worked hand-in-hand with DIA Corp., who was feeding him information and legal analyses (including a

WEIL:\45423536\6\45259.0007

complete draft AG Opinion) to support their arguments that the DIA Collection is held in trust and is not subject to sale or encumbrance.  (*See supra* at 7–10.)  Also troubling is the fact that the AG Opinion was issued in a "mad dash" because of a shrinking timeline that coincided with the City's issuance of the June 14 Proposal to creditors.  Indeed, the Attorney General's office was apparently so rushed that the historical documents about the creation of the museum and the 1919 Transfer, a crucial component of the DIA's history and key to the legal analysis here, likely were not even looked at before the opinion was issued.  (*See supra* at 9.)  For an argument that depends heavily on the facts dating back to the 1885, it appears that the Attorney General relied entirely on a few, miscellaneous documents sent by DIA Corp.

The City's failure to adequately asses the merits of the claims to be settled in itself renders the DIA Settlement defective, as one cannot engage in arm's-length negotiations by relying on an adversary for all of the relevant information.  But, particularly in the case of alleged donor restrictions, this failure had enormous ramifications.  Indeed, the City admitted that it decided not to value the bulk of the DIA Collection because this portion of the collection was allegedly subject to donor restrictions and could not be sold.  (Orr Dep. 387:4–388:22 (Pérez Decl. Ex. A).)  Thus, on the basis of DIA Corp.'s representations, the City determined that 96% of the DIA Collection was of marginal value.  (*See id.* 391:9–23; *see also* Hr'g Tr. 12:10–11, 12:15–17, 13:6–7, Jan. 22, 2014; Hr'g Tr. 31:18–25, May 15, 2014.)

The City also did not educate itself about the marketability or value of the DIA Assets before agreeing to the settlement.  The City did not consider any other potential monetization transactions.  (*See* Orr Dep. 405:6–11 (Pérez Decl. Ex. A) ("Putting aside any discussions we had in mediation, or the mediation process, about the art or the Grand Bargain, I think it's fair to say that we didn't take any steps to monetize the art.").)  The City strenuously

WEIL:\45423536\45259.0007

objected to the Art Committee Motion, which sought formation of a committee to explore monetization alternatives.  (*See supra* at 16–17.)  The City never contacted potential buyers or lenders, considered whether other museums would be interested in purchasing the artwork, or investigated the four parties that submitted the Indications of Interest to Houlihan.  (*See* Orr Dep. 405:15–406:9; 408:25–409:20; 409:14–410:4 (Pérez Decl. Ex. A); *see also* Buckfire Dep., Vol. 2 163:16–165:11; 166:8–11, 19–20 (Pérez Decl. Ex. B); *cf.* Provost Dep. 134:3–16 (noting that Buckfire was not interested in discussing cash generating alternatives for the DIA Collection when they were presented at a meeting).)  With this state of mind, and with a value assumption that was orders of magnitude from the truth, the City decided to settle.[80]  Unbelievably, notwithstanding the fact that the settlement provides for the transfer of the *entire DIA Collection*, the City has admitted that at the time the City agreed to enter into the DIA Settlement, the City did not know the value of the whole collection.  (Orr Dep. 383:19–22 (Pérez Decl. Ex. A); Hr'g Tr. 13:6–7, Jan. 22, 2014; *see also* Buckfire Dep., Vol. 2 133:22–24 (Pérez Decl. Ex. B); *id.* 118:23–119:22 (recognizing that valuing the DIA Collection would be necessary before it could determine whether the amount being paid for it justified taking it off the table); *id.* 158:17–159:4 (noting that the payments under the DIA Settlement were consistent with the valuation range of the Fusco Report, "which . . . was very important because *until we actually had an appraisal and*

---

[80] Assuming the City had the benefit of the Christie's valuation when it chose to enter the DIA Settlement, it would have nevertheless ignored billions of dollars of value because of its unsubstantiated view that, due to restrictions on the remainder of the DIA Collection, it could not be monetized.  However, it is possible that the City decided to enter the settlement before the Fusco Report was issued.  The City admits to having "certainly" made the decision to enter the DIA Settlement by February 20, 2014, the day before it first filed a plan of adjustment, but could not say either way whether it had made this decision as of December 17, 2013, when the Fusco Report was released.  (*See* Orr Dep. 385:19–21 (Pérez Decl. Ex. A) ("[Q. Y]ou're the person who decided to enter into the Grand Bargain, right?  A. Yes."); *id.* 378:18–24 ("[Q.]  You had made the decision to go with the Grand Bargain?  A. Yes.  Q. And you'd made that decision certainly by February 21st . .. ? A. Yes."); *id.* at 380:7–18 (noting that, as to whether he made this decision prior to the Christie's valuation, released on December 17th, 2013: "I can't recall one way or another").)

*we had facts on which to assess any offer for the collection, we would not know whether the offer was fair to the City*") (emphasis added); *id.* 159:23–160:14 (noting that analyzing whether the DIA Settlement maximized the value of the DIA Collection is something that he would *want* to do as the City's investment banker, but that Miller Buckfire had not had not had time to and had not even received a copy of the Plummer Report).) The City did not bother to retain an expert to consider the value of the full DIA Collection until just recently, when it became clear the City would need this information to attempt to satisfy its burden of proof at confirmation. If the City had conducted even minimal diligence of the records at the DIA, it would have quickly concluded that donor restrictions are rare, and most of the DIA Collection is marketable and extremely valuable. Instead, the City made a decision – relying on allegations of the parties against whom the issues would be litigated – that put billions of dollars off the table and out of creditors' reach. The City single-mindedly focused on structuring a transaction that would provide for a transfer of the DIA Collection to a charitable trust, in exchange for some amount of money, in order to shield these assets from creditors. (Orr Dep. 341:2–7 (Pérez Decl. Ex. A) (confirming that the purpose of the transfer to a charitable trust was to ensure that the art is never sold to satisfy the claims of creditors "now and forever").) And, the City committed to this transaction structure (now embodied in the DIA Settlement) without having any idea of the amount of money the City would receive, or the value of the DIA Collection it was giving up.

With all signs suggesting that the City did not put in any effort to understand the merits of the claims beings settled, but instead made its decision to settle based on representations from an adversary, and without appreciating the value of the underlying assets to be transferred, the City's views on the settlement are neither reasonable nor in the interests of creditors.

WEIL:\45423536\6\45259.0007

## CONCLUSION

On the basis of its informed and independent judgment, this Court should conclude that the proposed DIA Settlement is not fair, nor equitable, nor reasonable, and is not in the best interest of the City or its creditors. The value provided is _far_ below the lowest point in the range of reasonableness. Accordingly, it should not be approved

Dated: August 27, 2014

Respectfully submitted,

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

 – and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3177
Facsimile: (305) 374-7159
Email: edward.soto@weil.com

 – and –

Ernest J. Essad, Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

_Attorneys for Financial Guaranty Insurance Company_

KIRKLAND & ELLIS LLP

By: /s/ James H.M. Sprayregen
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070

*Attorneys for Syncora Guarantee Inc. and Syncora
Capital Assurance Inc.*

DRINKER BIDDLE & REATH LLP

By: /s/ Heath D. Rosenblat
Heath D. Rosenblat, Esq.
Kristin K. Going, Esq.
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
E-mail: Kristin.Going@dbr.com
E-mail: Heath.Rosenblat@dbr.com
Telephone: (212) 248-3140

-and-

Dirk H. Beckwith, Esq. (P35609)
FOSTER SWIFT COLLINS & SMITH PC
32300 Northwestern Highway, Suite 230
Farmington Hills, Michigan 48334-1471
Telephone: (248) 539-9918
E-mail: dbeckwith@fosterswift.com

*Counsel for Wilmington Trust, National
Association, as Successor Contract Administrator*

KATTEN MUCHIN ROSENMAN LLP

By: /s/ Kenneth E. Nobel
Kenneth E. Nobel
John J. Ramirez
575 Madison Avenue
New York, NY 10022-2585
E-mail: kenneth.noble@kattenlaw.com
E-mail: john.ramirez@kattenlaw.com
Telephone: (212) 940-8800

*Counsel for Deutsche Bank AG, London*


ALLARD & FISH, P.C.

By: /s/ Deborah L. Fish
Deborah L. Fish
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Telephone: (313) 961-6141

-and-

Thomas Moers Mayer
Jonathan M. Wagner
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for Dexia Crédit Local and Dexia
Holdings, Inc., Panning Capital Management, LP,
on behalf of funds and accounts managed by it,
Monarch Alternative Capital LP, on behalf of funds
and accounts managed by it, Bronze Gable, LL.C.,
Aurelius Capital Management, LP, on behalf of its
managed entities, Stone Lion Capital Partners L.P.,
on behalf of funds and accounts managed by it and
BlueMountain Capital Management, LLC on behalf
of funds and accounts managed by it*

176
WEIL:\45423533\6\45259.0007

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
--------------------------------------------------------------x
                                            :
In re                                       :        Chapter 9
                                            :
CITY OF DETROIT, MICHIGAN,                   :        Case No. 13-53846
                                            :
                        Debtor.             :        Hon. Steven W. Rhodes
                                            :
                                            :
--------------------------------------------------------------x
```

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2014 the *JOINT PRETRIAL BRIEF IN SUPPORT OF*

*OBJECTION TO DIA SETTLEMENT* was filed and served via the Court's electronic case filing

and noticing system to all parties registered to receive electronic notices in this matter.

Dated:  August 27, 2014

<div style="margin-left:40%">

/s/ Alfredo R. Pérez
Alfredo R. Pérez
Attorney for Financial Guaranty
Insurance Company
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX  77002
Telephone: (713) 546-5000
Email:  alfredo.perez@weil.com

</div>

WEIL:\45423533\6\45259.0007