# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | )   Case No. 13-53846 |
|  | ) |
| **CITY OF DETROIT, MICHIGAN,** | )   In Proceedings Under |
|  | )   Chapter 9 |
| Debtor. | ) |
|  | )   Hon. Steven W. Rhodes |
|  | ) |

## OAKLAND COUNTY'S PRETRIAL BRIEF

Date: August 27, 2014

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................... 1

        A.      How Confirmation Of The Plan Would Affect
                Oakland County.................................................................. 2

        B.      The Detroit Water And Sewerage Department:  A Key
                Component Of The Plan...................................................... 3

        C.      The Plan's Treatment of DWSD Is Fatally Flawed ......................... 3

II.     ANALYSIS:  THE CITY BEARS THE BURDEN OF PROOF
        TO SHOW THAT THE PLAN SATISFIES ALL
        STATUTORY REQUIREMENTS FOR CONFIRMATION.................... 8

III.    ANALYSIS:  THE CITY CANNOT PROVE THAT THE
        PLAN IS FEASIBLE [11 U.S.C. § 943(b)(7)]........................................... 9

        A.      Legal Standard For Feasibility ........................................ 9

        B.      The City Cannot Prove That The Plan's Proposed Treatment
                Of DWSD Is "Feasible" ................................................. 10

        C.      The Plan Is Premised On Foundational Financial Defects ............. 12

        D.      Financial Projections In The Plan Are Unsupportable,
                Unreliable, And Unreasonably Optimistic ...................................... 13

        E.      The Actuarial Assumptions In The Plan Are
                Unsupportable, Inconsistent With Sound Actuarial Theory,
                And Even Inconsistent With The City's Own Actuary's
                Analyses ...................................................................... 14

        F.      The Plan Fails To Realistically Address Bad Debt
                Service And Delinquency Rates...................................................... 15

        G.      The Plan's Debt Service Assumptions Are Fatally Flawed............ 16

H.    The Plan's Proposed Amount For Capital Improvements Is Insufficient ........................................... 17

I.    The Plan Assumes That DWSD Can Acquire The Funds It Needs By Simply Increasing Its Rates ............................................. 20

J.    The Plan Is Inflexible .................................................... 21

K.    The Plan Reflects Only "Hopes, Desires And Speculation" ........... 22

IV.    ANALYSIS: THE CITY CANNOT PROVE THAT THE PLAN IS LEGAL [11 U.S.C. § 943(b)(4) and (6); § 1129(a)(3)] ........................ 23

A.    Overview ................................................................. 23

B.    Legal Standard For Compliance With Law ..................................... 23

C.    Michigan Law Precludes Charging Water Rates Which Do Not Relate To Cost Of Service ............................................. 24

D.    Detroit City Law Precludes Charging Rates To Fund Non-DWSD Expenses .................................................... 25

E.    Using DWSD Revenues And Transaction Proceeds To Fund The City's Settlement With The GRS Would Violate These Laws Because These Uses Have No Connection With Actual Operation Of DWSD, As Required By Law ........................ 26

F.    The City's Proposed DWSD Funding Amounts Cannot Be Actuarially Justified ...................................................... 29

G.    The Plan Impermissibly Includes Certain Actions That Require (But Do Not Have) Electoral Approval .......................................... 34

V.    ANALYSIS: THE CITY HAS NOT PROPOSED THE PLAN IN GOOD FAITH [11 U.S.C. § 943(b)(4) and (6)] .................................. 35

A.    Legal Standards For Good Faith ...................................................... 35

B.   The Way In Which The City Arrived At DWSD's "Allocated Share" Demonstrates A Lack Of Good Faith Here ........................................................................ 36

C.   The Way In Which The City "Negotiated" Lacked Good Faith ........................................................................ 38

D.   The Fact That The Plan Would Use DWSD Revenues To Fund Non-DWSD Obligations (And Thereby Violate State and Local Law" Demonstrates) A Lack Of Good Faith ................. 39

VI.   ANALYSIS:  THE PLAN SHOULD ALSO BE REJECTED TO THE EXTENT THAT IT CONTAINS OVERLY BROAD AND INAPPROPRIATE THIRD-PARTY RELEASES .......................... 40

VII.   CONCLUSIONS ...................................................................... 41

# INDEX OF AUTHORITIES

## Cases

*Atlas Valley Golf and Country Club, Inc. v. Village of Goodrich*,
    227 Mich. App. 14; 575 N.W.2d 56 (1997) .............................................. 24

*City of Detroit v. City of Highland Park*,
    326 Mich. 78; 39 N.W.2d 325 (1949) ....................................................... 24

*County of Jackson v. City of Jackson*,
    302 Mich. App. 90 (2013) .......................................................................... 34

*Davis v. City of Detroit*,
    269 Mich. App. 376; 711 N.W.2d 462 (2005) ......................................... 25

*In re Colorado Springs Spring Creek General Imp. Dist.*,
    177 B.R. 684 (Bankr. D.Colo. 1995) ................................................ 23, 28-29

*In re Connector 2000 Ass'n, Inc.*,
    447 B.R. 752 (Bankr. D.S.C. 2011) ............................................................. 8

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) ............................................................... 40, 41

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005) ...................................................................... 40

*In re Pacific Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ..................................................................... 40

*In re Pierce County Hous. Auth.*,
    414 B.R. 702 (Bankr. W.D. Wash. 2009) ........................................... 8, 9, 35

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D.Colo. 1999) .................................. 8, 9, 10, 22, 35, 36

*In re Sylmar Plaza, L.P.*,
    314 F.3d 1070 (9th Cir. 2002) ................................................................... 35

*Matter of Sanitary and Improvement District No. 7,*
   98 B.R. 970 (Bankr. D.Neb. 1989)......................................................23, 29

*United States v. Michigan,*
   483 F.Supp.2d 561 (E.D. Mich. 2007) ...................................................... 25

## **Statute**

11 U.S.C. § 103(e) .............................................................................................8

11 U.S.C. § 524(e) ........................................................................................... 40

11 U.S.C. § 901 .................................................................................................8

11 U.S.C. § 901(a) .......................................................................... 1, 2, 7, 23, 35

11 U.S.C. § 943(b) ........................................................................................2, 8

11 U.S.C. § 943(b)(1)...................................................................................1, 2, 7, 23

11 U.S.C. § 943(b)(4)...................................................................1, 7, 23, 34, 35

11 U.S.C. § 943(b)(6)......................................................................... 1, 34, 35

11 U.S.C. § 943(b)(7)............................................................................... 1, 9

11 U.S.C. § 1129 ............................................................................................ 2, 8

11 U.S.C. § 1129(a)(3)....................................................................... 1, 2, 7, 23, 35

MCL § 123.141(2) ...........................................................................................24

## **Treatise**

6 Collier On Bankruptcy, ¶ 943.03[7]
   (Lawrence P. King, ed., 16th ed. 2014) .................................................. 9

**Other**

Detroit City Charter § 7-1203 ...................................................................................25

Detroit City Charter § 7-1204 ...................................................................................34

Mich. Const. Art 7, § 24 .........................................................................................24

Oakland County, Michigan ("Oakland County"), a contingent creditor and party in interest in the above-captioned case,[1] by and through its undersigned counsel, hereby files its PreTrial Brief.

## I.   INTRODUCTION

This Court should determine that the City's Corrected Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 21, 2014) [Dkt Nos. 6908, 6910, 6942, as may be subsequently amended (the "Plan"), should not be confirmed.  This Court cannot confirm the City's Plan for each of four independent reasons:

[1]   The Plan is not *feasible*.[2]

[2]   The Plan *violates State and Local law.*[3]

[3]   The City has failed to obtain "any regulatory *or electoral approval necessary under applicable nonbankruptcy law*" to implement the Plan, or to make the Plan "expressly conditioned on such approval;"[4] and

---

[1] On August 12, 2014, this Court ruled from the bench that Oakland County (and the other Counties) have standing to object to the Plan (as defined herein).

[2] 11 U.S.C. § 943(b)(7).

[3] The City must establish that "the debtor is not prohibited by law from taking any action necessary to carry out the plan" [11 U.S.C. § 943(b)(4)], and that the Plan has not been proposed by "means forbidden by law"  [11 U.S.C. § 1129(a)(3), applicable by sections 901(a) and 943(b)(1)].

[4] 11 U.S.C. § 943(b)(6).

1

[4]     The Plan is not proposed in *good faith*.[5]

Chapter 9 of the Bankruptcy Code recognizes that reorganization of a municipality and its departments differs from reorganization of a business. Therefore, in addition to the requirements of 11 U.S.C § 1129 (made applicable through § 901(a)), under. § 943(b) the City bears the burden of proof to establish each essential statutory requisite for confirmation of the Plan.  Here, the City has failed to meet its burden of proof.

## A.     How Confirmation Of The Plan Would Affect Oakland County

Oakland County is a party to several contracts with the City of Detroit pursuant to which the City (through the Detroit Water and Sewerage Department, "DWSD") provides water and sewer services for Oakland County.  Such services are, in turn, utilized by residents and business located in the 62 cities, villages and townships located in Oakland County. Oakland County and its municipal customers thus rely on DWSD to provide water and sewer services to a significant portion of the County's individuals and business.  If the City cannot assure continued provision of these services in accordance with the terms of its contracts and applicable law, its Plan cannot be confirmed.

---

[5] A plan proponent must prove that a plan "has been proposed in good faith." 11 U.S.C. § 1129(a)(3) [applicable by sections 901(a) and 943(b)(1)].

2

### B. The Detroit Water And Sewerage Department: A Key Component Of The Plan

DWSD is a public service monopoly that is responsible for the water supply and control and treatment of wastewater for residential, commercial, governmental, institutional and industrial customers at a retail level within the City. DWSD is a department (defined in the Plan as an "Enterprise Fund") of the City of Detroit government. Though DWSD is a City department, for the last 39 years it has been operated with separate funds; that is, the City has not had a General Fund investment in DWSD since 1975.

DWSD is also one of the largest municipal water and sewerage departments in the nation. In addition to providing service to Detroit residents and businesses, it serves over 125 wholesale suburban customers (outside the City), many of whom service their own retail customers. DWSD currently derives approximately 65% of its total revenues from outside the City's limits.

### C. The Plan's Treatment of DWSD Is Fatally Flawed

Maintaining adequate water and sewer services to the region is essential to the viability of the City as a thriving metropolis. DWSD, however, has posted operating losses for each of the last seven years (2009-2013) including on average, approximately a $200 million loss per year. Despite these losses, the City has presented and relies upon a ten year financial projection in support of DWSD's ability to provide such services in the future. As Oakland County and others will

3

show at trial, the revenue, expense, funding and capital improvement assumptions underlying the projection are severely flawed. Thus, the City will be unable to support its assurances that it will be able to maintain adequate service. Because adequate functioning of DWSD is critical for the future success of the City, and the confirmation of the Plan, the inability to prove that DWSD can provide adequate service alone is fatal to confirmation of the Plan.

The City's flawed projections for DWSD are exacerbated by the Plan's attempt to impermissibly impose non-DWSD expenses on DWSD, specifically, as they relate to funding pension obligations. This aspect of the Plan is a transparent attempt by the City to foist on DWSD customers (particularly those outside the City, such as Oakland County) the increased costs that would result from DWSD's increased pension obligations. In reality, if the Plan were to be confirmed, it would force non-Detroit residents who purchase water and sewerage services from DWSD to fund the City's retirement obligations by way of water and sewer rate increases.

City employees and retirees (other than police and firefighters) participate in the General Retirement System (the "GRS") pension plan. Like most pension plans, the GRS is long-term, and requires that actuaries regularly adjust the amount necessary to be paid into the GRS to insure that it will have sufficient assets to meet its obligations to retirees as they become due. This process requires routine

systematic computation of a pension plan's "unfunded actuarial accrued liabilities" ("UAAL").

The City contends that it has computed the GRS UAAL here. Multiple parties, including Oakland County, challenge the manner in which the City computed the GRS UAAL, and the way in which the Plan proposes to allocate among City departments the responsibility for paying the GRS UAAL.

Detroit's GRS is a *pooled* pension fund; that is, it includes employees from various departments (and not just from DWSD, for example). Despite this fact, the Plan proposes an arbitrary distinction be made between the manner in which DWSD (on one hand) and other GRS-participating City departments (on another hand) are to pay their "allocable shares" to fund the pension plan's overall actuarial accrued liabilities from all departments.

The Plan includes two different schedules on which DWSD and non-DWSD departments would pay. DWSD would pay its purported "allocable share" in a compressed fashion, over the next nine years; thus requiring DWSD to make all of its payments under the Plan by June 30, 2023. Non-DWSD departments, however, would make only limited contributions to the GRS until 2023, and would not *begin* paying the bulk of their allocable share until June 30, 2023; this obligation would continue thereafter for thirty years (i.e. until June 30, 2053). Thus, for the first nine years after the bankruptcy, DWSD's contributions would be fully available to

fund actuarial accrued liabilities of retirees from non-DWSD departments, not just the obligations specifically allocable to DWSD.

In real dollars, the Plan would require DWSD to pay a total of $428.6 million to GRS in installments of $65.4 million in 2015, and $45 million in each year from 2016 through 2023.[6] These amounts are substantially more than DWSD paid to satisfy its own pension contributions to GRS in the past few years, which amounts were: $11.6 million in 2009, $11.4 million in 2010, $19.7 million in 2011, $10.9 million in 2012, and $24.3 million in 2013.[7]

Oakland County will present expert evidence affirmatively demonstrating that the terms of the Plan requiring DWSD to fund the GRS squarely violate Michigan law. Specifically, state and local laws expressly preclude DWSD from using its funds to pay City expenses that do not relate to DWSD operations. Yet this is precisely what the Plan requires. DWSD must pay, under the Plan, $428 million as its purported share of pension and administrative costs (ostensibly because this is the amount that DWSD would be required to pay for a pension fund that included only its own employees) over the next nine years.

Critically important, however, the City will be unable to demonstrate that either the amounts allocated to DWSD, or that the amounts to be paid by the City

---

[6] Plan Exhibit II.B.3.r.ii.A.

[7] Disclosure Statement, 92.

to the GRS, were determined in accordance with accepted and reliable actuarial methods. Because these amounts contained in the Plan (to be contributed by DWSD to the GRS) were based on flawed calculations, the City cannot prove that such sums are expenses of DWSD. Even if these amounts were correctly calculated (which Oakland County disputes), because the Plan requires DWSD to make its contributions over an accelerated period as compared to the rest of the City, DWSD by definition would be paying more than its share of these expenses.

These patent defects are fatal to the City's ability to prove that the Plan complies with non-bankruptcy law, as required by 11 U.S.C. § 943(b)(4) and 1129(a)(3) (made applicable by sections 901(a) and 943(b)(1)). Moreover, the Plan would also implicitly cause DWSD to breach its contracts with Oakland County (which require that DWSD comply with applicable law). Thus, the Plan's use of an actuarially unsupportable calculation of the proposed amounts due to retirees through the GRS, and its novel (but flawed) method of allocation and timing of DWSD's share of pension obligations, make the Plan unconfirmable on legal and feasibility grounds.

Oakland County will also assert that the portion of the Plan that contains broad releases to third parties should not be included in any confirmed plan because the City has failed to establish any "exceptional circumstances" required to justify this proposed action.

7

## II. ANALYSIS: THE CITY BEARS THE BURDEN OF PROOF TO SHOW THAT THE PLAN SATISFIES ALL STATUTORY REQUIREMENTS FOR CONFIRMATION

A Chapter 9 Plan must satisfy two sets of obligations. First, the Plan must meet the requirements of 11 U.S.C. § 1129, incorporated into Chapter 9 through § 901(a). Second, the Plan must also satisfy the specific obligations of § 943(b) for confirmation of a plan of adjustment in a Chapter 9 case. 11 U.S.C. § 943(b).[8] Critical to this Court's analysis, the burden is on the City to prove, by a preponderance of the evidence, that it has satisfied each requirement. *In re Connector 2000 Ass'n, Inc.,* 447 B.R. 752, 761 (Bankr. D.S.C. 2011); *In re Pierce County Hous. Auth.,* 414 B.R. 702, 715 (Bankr. W.D.Wash. 2009) citing *In re Mount Carbon Metro. Dist.,* 242 B.R. 18, 31 (Bankr. D.Colo. 1999).

---

[8] The Court shall confirm a proposed plan, if all of the following are satisfied:

(**1**) the plan complies with the provisions of this title made applicable by [11 USC §§ 103(e) and 901] of this title;

(**2**) the plan complies with the provisions of this chapter;

(**3**) all amounts to be paid by the debtor . . . plan have been fully disclosed and are reasonable;

(**4**) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(**5**) except to the extent that the holder of a particular claim has agreed to a different treatment . . . .;

(**6**) any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and

(**7**) the plan is in the best interests of creditors and is feasible.

8

Importantly, if the Court finds that the City has failed to prove any one (or more) of these required elements, it cannot confirm the Plan.

## III. ANALYSIS: THE CITY CANNOT PROVE THAT THE PLAN IS FEASIBLE [11 U.S.C. § 943(b)(7)]

### A. Legal Standard For Feasibility

A Plan must be *feasible* in order to be confirmed. 11 U.S.C. § 943(b)(7). Chapter 9 does not specifically define feasibility, although courts and commentators agree that the "feasibility" requirement operates as a "ceiling" on a Chapter 9 debtor, preventing the debtor from promising more than it can deliver.[9]

A feasibility determination requires a Court to "evaluate whether it is probable that the debtor can *both* pay pre-petition debt *and provide future public services at the level necessary to its viability as a municipality.*" *Mount Carbon,* 242 B.R. at 35 (emphasis added). "[A] Chapter 9 feasibility finding should 'prevent confirmation of visionary schemes which promise creditors . . . more under a proposed plan than the debtor can possibly attain after confirmation.' A plan should offer a reasonable prospect of success and be workable." *Id. (*citations omitted). "In Chapter 9, this requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services. Although

---

[9] See *In re Mount Carbon Metro. Dist.,* 242 B.R. 18, 34 (Bankr. D.Colo. 1999) ("There is no purpose in confirming a Chapter 9 plan if the municipality will be unable to provide future governmental services"); *In re Pierce County Hous. Auth.,* 414 B.R. 702, 718 (Bankr. W.D.Wash. 2009); 6 <u>Collier On Bankruptcy,</u> ¶ 943.03[7] (Lawrence P. King, ed., 16th ed. 2014).

success need not be certain or guaranteed, *more is required than mere hopes, desires and speculation.*" *Id.* (Emphasis added).

"The probability of future success will depend upon *reasonable* income and expense projections." *Mount Carbon,* 242 B.R. at 35 (Emphasis added). "[I]f performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon reasonable assumptions and must 'not be speculative or conjectural.'" *Id.* (citations omitted).[10]

### B. The City Cannot Prove That The Plan's Proposed Treatment Of DWSD Is "Feasible"

The City cannot prove that the portion of the Plan addressing DWSD is "feasible," because it ignores the following facts which have a material adverse impact on the City's projections:

(1)    DWSD has actually lost on average approximately $200 million annually for the last 5 years.[11]

(2)    DWSD currently has "junk bond" credit ratings.[12]

---

[10] The *Mount Carbon* Court held that the Debtor's proposed plan was not feasible based, in part, on the fact that its revenue projections "represent[ed] an ideal scenario and fail[ed] to anticipate any fluctuation, deviation, or upset." *Mount Carbon,* 242 B.R. at 37-38.

[11] July 25, 2014 Expert Report of Michael Nadol, ("Nadol Rpt") a public works financial expert, ¶ 19.

[12] Nadol Rpt, ¶¶ 5, 14. See also July 24, 2014 Expert Report of Daniel J. Hartman ("Hartman Rpt"), a debt service expert, ¶ 4.2.

10

(3)    Over the last 15 years, the retail sewer and water "billed volumes" in the City of Detroit fell by nearly half,[13] due in part to declining city population. Yet the Plan assumes significantly *increased* billable water and sewer sales in 2014 and 2015.[14]

(4)    The City of Flint (one of the largest water customers) exited DWSD in April, 2014 (more than two years before the date assumed in the Plan).[15] Ignoring this reality, the Plan forecasts that Flint revenues will continue to generate 8.5% of DWSD's wholesale water receipts.[16]

(5)    The actual volumes of water and sewer services billed have eroded more rapidly than the Plan assumes.[17]

(6)    DWSD's actual bad debt expense and customer non-payment levels are extraordinarily high, are increasing, and are demonstrably higher than the Plan assumes.[18] The Plan inexplicably assumes that bad debt expenses will *decline*.[19]

---

[13] Nadol Rpt, ¶ 16(a).

[14] Nadol Rpt, ¶ 24.

[15] Nadol Rpt, ¶¶ 5, 7(a), 17.

[16] Nadol Rpt, ¶ 17.

[17] Nadol Rpt, ¶ 7(b).

[18] Nadol Rpt, ¶ 18.

[19] Nadol Rpt, ¶ 27.

(7)     Retail rates for water and sewer actually increased by 10.4% on July 1, 2014, rather than by 4% as the Plan assumed.[20]  Increased rates will increase, not decrease, the level of nonpayment and bad debt expense.

Perhaps not surprisingly, the Court's expert, Ms. Kopacz, performed no analysis of whether DWSD would be either feasible or viable after confirmation of the proposed Plan.[21]

### C.     The Plan Is Premised On Foundational Financial Defects

As a threshold matter, the accuracy and completeness of the City's current financial records are highly questionable.  The Court's expert witness, Martha Kopacz, notes that the weaknesses in the City-wide accounting and financial systems, controls and reporting "make it difficult to perform even basic analysis."[22]  This is consistent with KPMG LLP's audit report for the City's 2012 financial statements, which cited deficiencies in internal control over financial reporting as a material weakness.[23]

In addition, the Plan uses 2014 and 2015 *budgeted* revenue figures as the basis for DWSD financial projections, despite the fact that these amounts are

---

[20] Nadol Rpt, ¶ 7(d).

[21] Kopacz Dep., 521:2-6.

[22] July 18, 2014 Expert Report of Martha E.M. Kopacz, ("Kopacz Rpt"), Court's expert, p 112.

[23] Nadol Rpt, ¶ 21(b).

dramatically and inexplicably higher than *actual* 2013 experience, and despite the fact that DWSD's revenues the past several years have trended downward, not upward.[24]  Obviously, because performance under the Plan in subsequent years is calculated on 2014 and 2015 numbers, the entire model is inflated.

### D. Financial Projections In the Plan Are Unsupportable, Unreliable, And Unreasonably Optimistic

The Plan incorporates a series of flawed and outdated assumptions that do not present a realistic view of DWSD's financial condition if the Plan were to be adopted.  For example, many of the Plan's revenue projections appear to be drawn from a 10-year business plan for DWSD compiled on October 2, 2013 – more than ten months before the Sixth Plan was proposed—yet the projections have not been updated with more recent financial information.[25]

The Plan's financial projections include the City of Flint as a wholesale service customer constituting 8.4% of DWSD's total anticipated wholesale water receipts for 2014, and continuing to purchase wholesale service through the end of 2016.[26]  However, Flint stopped purchasing service from DWSD in April, 2014. Although approximately half of Flint's water needs will continue to be sold by

---

[24] Nadol Rpt, ¶¶ 23(b), 25.

[25] Nadol Rpt, ¶ 22, footnote 31.

[26] Nadol Rpt, ¶ 17.

13

DWSD under a temporary agreement with Genessee County, the other half of Flint's requirements will no longer be sourced in any way through DWSD.[27]

The Plan projects an inflated and artificial volume of growth in demand for DWSD's services that ignores current reality: demand at both the wholesale and retail levels have been declining, not increasing.[28] The Plan's projections also fail to consider account industry change, conservation practice, or price elasticity.[29]

The Plan forecasts that healthcare benefit costs will decline from 7.5% in 2015, to 7.0% in 2016, to 6.5% in 2017, to 6.0% in 2018, to 5.5% in 2019, and to 5.0% in 2020 and thereafter. Yet the Plan contains no basis for making this assumption, and indeed nationally, medical cost growth for PPO coverage has exceeded 7% in each of the last 12 years (and was 9.5% or more in the majority of those years).[30]

**E.    The Actuarial Assumptions In the Plan Are Unsupportable, Inconsistent With Sound Actuarial Theory, And Even Inconsistent With the City's Own Actuary's Analyses**

As addressed in detail *infra*, (in the discussion of the Plan's failure to comply with State and local laws), the $428 million allocated share that the Plan

---

[27] Nadol Rpt, ¶ 17.

[28] Nadol Rpt, ¶¶ 24, 25, 26.

[29] Nadol Rpt, ¶ 26.

[30] Nadol Rpt, ¶ 23(h).

assigns to DWSD was computed first, and thereafter, various actuarial calculations were performed to retroactively justify the amount selected. Thus, unlike the typical situation where the actuarial method *determines* the amount of pension obligations, here the actuarial analysis was gerrymandered until it in fact could be used to "support" the pension amount that the City had already agreed that it needed to fund the GRS.

### F. The Plan Fails To Realistically Address Bad Debt Service And Delinquency Rates

The Plan fails to realistically evaluate DWSD's staggering delinquency rates and uncollected billings.[31] Without explanation, the Plan *assumes* significant future improvements in bad debt for water services—from actual experience of 14.4% of retail water revenues in 2013 to 14% in 2014, improving a further 1% per year to 10% by 2018 and remaining at that level thereafter.[32] Likewise, the Plan assumes improvements in sewer bad debt from 15% in 2014 to 11% by 2018.[33]

Yet, the Plan does not explain how these laudable goals are to be achieved. In fact, the Plan fails to address the fact that, to the extent that rates increase,

---

[31] Nadol Rpt, ¶ 18. Out of $170 million in accounts receivable as of February, 2014, $140 million were delinquent (including $28 million which the City itself owes DWSD).

[32] Nadol Rpt, ¶ 27.

[33] Nadol Rpt, ¶ 27.

delinquency rates will increase, not decrease, as predicted.[34]  This is particularly

true in the City, where rate increases have outpaced growth in incomes.[35]

### G.     The Plan's Debt Service Assumptions Are Fatally Flawed

The Plan projects that DWSD will be able to incur new debt at 4.63%

(which would correspond to an "A" bond rating for DWSD).   However, the major

rating agencies have lowered the ratings on DWSD debt to below investment

grade, with negative outlooks: a "junk bond" credit rating.[36]  As such, DWSD will

have limited, if any, market access for credit in the next few years.[37]  There is little

to no chance that DWSD's ratings will reach the "A" rating category in the near-

term as contemplated by the Plan.[38]

---

[34] Nadol Rpt, ¶ 27.

[35] Nadol Rpt, ¶ 27(c).

[36] Hartman Rpt, 4.1 – 4.3.  See Nadol Rpt, ¶23(f).  See also July 25, 2014 Expert Report of William Oliver, ("Oliver Rpt") a debt services expert, at pp 2, 5, 6.

[37] Hartman Rpt, 3.1.

[38] Oliver Rpt, p 6 ("In sum, the City's assumption that the DWSD Bonds will, upon the City's emergence from bankruptcy, immediately regain an investment grade rating is wholly unrealistic.")

If the Plan were adopted, DWSD would have non-investment grade ratings for an extended period, with near term ratings going to default categories.[39] There is nothing in the Plan that suggests any basis to improve this rating.[40] Thus, the cost of debt (if obtainable at all) would be substantially higher than the projected 4.63%, which would in turn require additional increases in DWSD rates.[41]

In addition, wholesale customers that underpin DWSD's systems' credits (those customers located outside the City such as Flint and Genessee County) are leaving, and other such wholesale customers are likely to consider leaving in the future; these departures will significantly reduce the ability of DWSD to access the municipal bond market.[42]

## H.    The Plan's Proposed Amount For Capital Improvements Is Insufficient

Emergency Manager Orr testified that DWSD has "capital needs and repair obligations that exceed the steady state.  That's why the City system continues to

_____

[39] Hartman Rpt, 3.2.

[40] Hartman Rpt., 4.3 and 4.4.  As Fitch noted in their February 28, 2014 report: "Fitch sees no apparent reason for DWSD bondholders to accept any impairment…Should the POA (Plan of Adjustment) be confirmed as filed and thereby result in impairment to bondholders, Fitch would almost certainly view the action consistent with a distressed debt exchange and downgrade the rating on the bonds to 'D'."

[41] Hartman Rpt, 3.3.

[42] Hartman Rpt, 3.4., 5.1, 5.2, 5.4, 5.5.

17

break down the way it is. . ."[43]  Yet, the Plan includes only $2.9 billion for a proposed DWSD Capital Improvement Program ("CIP") over the next 10 years. Exhibit M to the Plan contained various forecasts for DWSD including forecasts of revenues, expenses and capital improvements.  The portion of these projections regarding capital improvements was copied from a report prepared by OHM Advisers (the "OHM Report"[44]).

Oakland County's expert will testify that $2.9 billion, over a ten year period, is insufficient for DWSD's capital needs, and that there is no safety valve in the event more CIP spending is required to support a viable DWSD.[45]  Capital improvements that are deferred dramatically increase the risks to public health, safety, and welfare; without significant additional funding for critical maintenance and capital improvements, DWSD's operations risk a substantial likelihood of material interruption in services.[46]

---

[43] July 21, 2014 Kevyn Orr Dep, p 155.

[44] The OHM Report is expressly limited by affordability constraints.  See, e.g., OHM Report, p 1 ("The piping costs that are allocated only to the City of Detroit could have been estimated at significantly higher costs, but were limited by the recognition that affordability is a serious constraint.")

[45] July 24, 1024 Expert Report of William C. (Kriss) Andrews, ("Andrews Rpt") capital improvement expert, p 15.

[46] Note, too, that the Plan makes no provisions whatsoever for any regulatory requirements or initiatives that could be put in place that would require significant expense for upgrades, improvements and expansions related to long-

Oakland County's experts will also testify that the Plan's provisions for CIP are severely deficient for inspection, rehabilitation and/or replacement needs of various aspects of the DWSD's system. For instance, there are 837 miles of large diameter water pipes in the DWSD system and these pipes have a useful life of 50-100 years.[47] If the Plan's proposed spending to repair or replace these pipes were to be implemented, it would take *561 years* for the DWSD to replace all these required water pipes! This is but one of many examples of the Plan's severe limitations on DWSD's ability to provide adequate water and sewer service to the metropolitan area.

The Plan also fails to remedy (or even acknowledge) DWSD's historic under-investment in infrastructure and the imminent service failure issues concomitant with that chronic under-investment.[48] Oakland County's expert analyzed similar water and sewer authorities in the United States for both total and per capital investment in regional water and sewer systems. Unsurprisingly, DWSD fails under this comparable metric as well. In the next five years, the Plan calls for a minimal expenditure of just $96 per person served by the water and

---

term sewer overflow control, energy management, air quality, water treatment plant disinfection, wastewater treatment effluent limits, or other issues.

[47] See Andrews Dep, Ex 7.

[48] Mayor Michael Duggan Dep, p 191.

sewer system. By comparison, the Baltimore water and sewer department will spend $568 per person served during this same five year period. The similar Washington, DC department will spend $244 per person.[49] DWSD's proposed spending will be lower than any other similar department. *Id.*

Finally, the proposed CIP acknowledges that it does not include funds to rectify the *already deficient* requirements as proposed by the OHM Report in fiscal years 2014-17. That is, the OHM Report is already $86 million short in fiscal years '14 and '15, and $96 million short in fiscal years '16 and '17.

### I.     The Plan Assumes That DWSD Can Acquire The Funds It Needs By Simply Increasing Its Rates

The Plan assumes that DWSD can obtain funds to meet its obligations under the Plan by increasing the rates that it charges. However, in addition to the *illegality* of this assumption (addressed below), there is a practical reason why this aspect of the Plan is not feasible: a substantial number of individuals already cannot afford to pay for water and sewerage service, and an even greater number will be unable to do so in the years ahead.

Oakland County's expert will testify that for at least 34.4% of Detroit households (those with incomes of less than $15,000 annually), water and sewer

---

[49] Andrews Rpt, Ex. 7.

service is currently unaffordable.[50] Likewise, for residents of Hamtramck, Inkster, Pontiac and River Rouge, current rates are also already unaffordable.[51] Oakland County's expert will testify that assuming only the rate increases proposed in the Plan, DWSD's bills to its retail customers will become unaffordable to most Detroit residents by 2018.[52]

## J. The Plan Is Inflexible

The portion of the Plan setting forth DWSD's obligations is also not feasible because it requires DWSD to make guaranteed payments over a nine-year period, but provides no mechanism for downward adjustment or recalculation of DWSD's obligations based on future contingencies (including increases/decreases to employee rolls, performance of markets, or actual performance of pension funds). On the other hand, if GRS' performance is sufficiently poor, DWSD is unprotected

---

[50] William G. Stannard Expert Report ("Stannard Rpt"), a cost of services expert, pp 6, 16. The percentage of households receiving less than $15,000 annually in Detroit is 34.4%. Note that 11.1% of Macomb County households and 9.5% of Oakland County households have incomes of less than $10,000 per year. Id., pp 6-10.

[51] Stannard Rpt, pp 12-13.

[52] Stannard Rpt, pp 10-11.

from any further increases, and could be required to made additional, increased contributions (above the amounts set forth in the Plan).[53]

**K.      The Plan Reflects Only "Hopes, Desires And Speculation"**

The determination of whether a Plan is financially feasible requires a "practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services." *Mount Carbon,* 242 B.R. at 35.    "[I]f performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon reasonable assumptions and must 'not be speculative or conjectural.'"   *Id.*   "[*M*]*ore is required than mere hopes, desires and speculation*." *Id.*    (Emphasis added).    The Plan here ignores reasonable, responsible financial and actuarial projections, and cannot be approved as "feasible."

---

[53] Moore Dep., 346:9-23.  See also July 25, 2014 Expert Report of Thomas S. Terry ("Terry Rpt"), an actuarial expert, ¶¶ 25, 26. ("The Plan contemplates that DWSD will not make additional contributions after 2023 *if* the actual experience under the Plan conforms to the assumptions used to calculate and allocate the UAAL.  If experience is worse than expected, DWSD will be required to make additional contributions.  On the other hand, the Plan does not contemplate that the DWSD's required contributions will be reduced even if experience is favorable and its contributions result in DWSD achieving funding levels of greater than 100% -- more than its hypothetical share of GRD UAAL (even as calculated under the Plan).  * * * Thus, *DWSD's ability to share in any "upside" performance is severely limited and is entirely disproportionate to its virtually unlimited exposure to downside risks*."  (Emphasis added)).

22

## IV. ANALYSIS: THE CITY CANNOT PROVE THAT THE PLAN IS LEGAL [11 U.S.C. § 943(b)(4) and (6); § 1129(a)(3)]

### A. Overview

A Plan cannot be confirmed where its provisions violate the law. Under State and local laws, DWSD's funds must be used for its costs of operations—DWSD is not permitted to generate funds for the City's general coffers. Here, however, the arbitrary manner in which the City determined DWSD's "allocable share" of the GRS Pension Claims violates these laws. The City's Plan would illegally require DWSD to fund general City obligations (the GRS Pension Claims). Moreover, under the Plan, DWSD would be paying obligations which: (1) it does not owe; (ii) are unreasonable; and (iii) cannot be actuarially substantiated. Thus, the Plan cannot be confirmed.

### B. Legal Standard For Compliance With Law

A plan proponent must prove that a plan "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3) [applicable by sections 901(a) and 943(b)(1)]. "Where a [Chapter 9] plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be confirmed*." In re City of Colorado Springs Spring Creek General Imp. Dist.,* 177 B.R. 684, 694 (Bankr. D.Colo. 1995); *Matter of Sanitary and Improvement District No. 7,* 98 B.R. 970 (Bankr. D.Neb.1989).

### C. Michigan Law Precludes Charging Water Rates Which Do Not Related To Cost of Service

The right of a Michigan city to own and operate a water supply system is established in Article 7, Section 24 of the Michigan Constitution:

> Subject to this constitution, any city or village may acquire, own or operate, within or without its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.

> Services outside corporate limits

> Any city or village . . . may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as may be determined by the legislative body of the city or village; and may operate transportation lines outside the municipality within such limits as may be prescribed by law.  [Mich. Const. Art 7, § 24.]

The Michigan Legislature has, by statute, established how a municipality may set water rates for both its residents and for nonresidents. Specifically, MCL § 123.141(2) requires that water sold by a municipal utility "shall be at a rate which is based on the ***actual cost of service*** as determined under the utility basis of rate-making." MCL § 123.141(2) (emphasis added).  See also *City of Detroit v. City of Highland Park*, 326 Mich. 78, 100-101; 39 N.W.2d 325 (1949) ("Plaintiff may not charge the adjacent municipalities a rate sufficient to pay part of the cost of furnishing service to its own residents"); *Atlas Valley Golf and Country Club, Inc v. Village of Goodrich*, 227 Mich. App. 14, 23-24; 575 N.W.2d 56 (1997) (DWSD

24

"may not charge the adjacent municipalities a rate sufficient to pay part of the cost of furnishing service to its own residents").

**D.    Detroit City Law Precludes Charging Rates To Fund Non-DWSD Expenses**

The Detroit City Charter states that revenues obtained by providing of water and sewer services by DWSD may *only* be used to pay expenses incurred in providing such services.  Specifically, Section 7-1203 of the Charter provides:

> Sec. 7-1203. Limitation on Funds.
>
> All moneys paid into the city treasury from fees collected for water, drainage or sewerage services **shall be used exclusively for the payment of expenses incurred in the provision of these services**, including the interest of principal of any obligations issued to finance the water supply and sewerage disposal facilities of the city, and shall be kept in separate funds.  (Emphasis added).

This means just what it says: the City may not use DWSD revenues for purposes that do not directly benefit DWSD.  See *United States v Michigan*, 483 F.Supp.2d 561, 563-65 (E.D. Mich. 2007) (requiring City to remit to DWSD the portion of certain radio usage charges that were not in fact incurred by DWSD but rather benefited the City).  See also *Davis v. City of Detroit*, 269 Mich. App. 376, 379; 711 N.W.2d 462 (2005) (Detroit City Charter forbids city from profiting from sale of water and requires that all revenues from DWSD be used only to fund that entity.)

25

The purpose of these state and local laws is to ensure that public service monopolies controlled by the municipality will continue to be operated solely for the benefit of the citizens they serve, and not be used as an entity to generate revenues for other purposes.

**E.** **Using DWSD Revenues And Transaction Proceeds To Fund The City's Settlement With The GRS Would Violate These Laws Because These Uses Have No Connection With Actual Operation Of DWSD, As Required By Law**

The Plan should not be confirmed because it is premised on the City using DWSD revenues and transaction proceeds to fund the City's "settlement" with holders of GRS Pension Claims and DWSD CVR payable to holders of Pension Claims—purposes which are both for *other than DWSD operations*.   Accordingly, both aspects of the Plan violate state and local law.

With regard to the treatment of GRS Pension claims, the Plan proposes that, during "the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified . . . [and that t]he exclusive sources for such contributions shall be certain City sources, *pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million*, a portion of the State Contribution and certain DIA Proceeds."[54] The

---

[54] Plan, Section II.B.3.r.ii.A. (Emphasis added).

Disclosure Statement further explains that "*[i]t is not contemplated that the City will make contributions to GRS or PFRS through June 30, 2023 other than the contributions from DWSD to GRS.*"[55]

The City claims that DWSD is properly funding *its allocable "share"* of the GRS Pension Claims.[56]  However, the $428.5 million payments proposed to be made by DWSD would indisputably be used to fund the City's pension liabilities to the GRS, and not for the operations of DWSD.  The proposed concomitant contribution *by the City* to the GRS after 2023 (over a thirty year period) is so distant and thus subject to so many variables, as to be illusory.

Moreover, even assuming that the $428.5 million payment could actually be construed to be DWSD's "pro rata share" of obligations to the GRS, requiring DWSD's portion alone to be accelerated, when the City bears no such accelerated burden, is without legal or actuarial authority.  This disparate treatment must be viewed for what it is: payment of expenses that have no connection with DWSD operations.

---

[55] Disclosure Statement, Section II.A.2. (Emphasis added).

[56] Disclosure Statement, Section II.A.2 Page 22 ("DWSD will make payments to GRS on account of all of its full allocable share of the GRS UAAL . . . .").

The Plan has similar fatal problems in its treatment of DWSD CVRs.[57]  The

Plan proposes to pay funds generated through a "Qualifying DWSD Transaction"

to holders of both GRS Pension Claims and PFRS Pension Claims by proposing to

"issue the DWSD CVR to the Restoration Trust for the benefit of Holders of

Pension Claims, as described in Section IV.G."[58]  This aspect of the Plan is

unlawful, because payments on account of the DWSD CVR have nothing to do

with the *operation* of DWSD.

Using DWSD revenues or transaction proceeds to fund the City's settlement

with holders of GRS Pension Claims and/or the DWSD CVR payable to holders of

Pension Claims (both of which are purposes outside of DWSD operations) violates

state and local law.  "Where a [Chapter 9] plan proposes action not authorized by

state law, or without satisfying state law requirements, the plan cannot be

confirmed*." In re City of Colorado Springs Spring Creek General Imp. Dist.,* 177

---

[57] The "DWSD CVR" is defined as "a single series of contingent value rights certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction." See Plan, Section I.A.112.

[58] Section IV.G. of the Plan provides that the "Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities: (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.r.ii.C. to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS."

28

B.R. 684, 694 (Bankr. D.Colo. 1995); *Matter of Sanitary and Improvement District No. 7,* 98 B.R. 970 (Bankr. D.Neb. 1989).

**F. The City's Proposed DWSD Funding Amounts Cannot Be Actuarially Justified**

Not only is the proposed funding of the GRS UAAL by DWSD contrary to law, the very calculation of the UAAL by the City (which forms the basis of the GRS Pension Claims proposed) is based on unsound and unreasonable actuarial methods and assumptions.

As an initial matter, note that the City incorrectly uses certain terms related to the GRS Pension obligations. For example, the City has erroneously asserted that the proposed UAAL associated with the GRS is "due and owing *now*," but is "traditionally amortized over time simply to avoid cash flow crunches for payments of very large liabilities."[59] This is incorrect. Fundamental actuarial principles establish that UAAL is neither due nor immediately payable, nor is it deferred in order to avoid large payments.[60]

---

[59] City's May 26, 2014 Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. No. 5034] at p 154 ¶ 138.

[60] Terry Rpt, ¶30.

29

In addition, the City has referred to the UAAL amortizations as "catch-up payments."[61]  Again, the City is incorrect.  Describing the payments as "catch-up payments" incorrectly implies that they are overdue or should have previously been paid.  In fact, UAAL is a "projection of unfunded future pension obligations"; it is neither due nor immediately payable.[62]  Since the UAAL is not due, payments to be made on account of the UAAL cannot be "overdue."  (In fact, DWSD has funded historically all of its share of the GRS UAAL, as authorized by the GRS and its actuaries, Gabriel Roeder Smith, in accordance with applicable actuarial standards.[63])  Accordingly, there is no basis here to either: (i) consider the proposed DWSD contributions for unfunded pension liabilities to be either due and payable now or catch-up payments for amounts previously owed; or (ii) impose hardship on DWSD by requiring it to make accelerated payments to the GRS (while the City enjoys a payment holiday) under the guise that DWSD is somehow delinquent in paying its debts.

Second, the City and the Plan rely on an inaccurate calculation of the GRS UAAL.  Unless corrected, this miscalculation, in turn, would require DWSD to

---

[61] May 28, 2014 Hearing Transcript at 65.  The GRS UAAL is largely attributable to adverse investment experience since 2007, and not to any sort of systematic or deliberate underfunding of the pension plan.  Terry Rpt., ¶ 37.

[62] Terry Rpt, ¶31.

[63] Terry Rpt, ¶ 41.

fund overstated amounts as its allegedly pro-rated share.  Specifically, among other

things:

(i)     The calculation of market value of the assets of the GRS is based on unreasonable and unreliable methods, including the miscalculation or non-calculation of the actual market value of the GRS assets;[64]

(ii)    Historical gains or losses have not been properly accounted for and allocated in calculating DWSD's pro rata share of assets in the GRS;[65]

(iii)   No provision is made for attributing historical liabilities owed by the GRS to employees transferred into or out of DWSD;[66] and

(iv)    The specified investment return assumption of 6.75% used to calculate the GRS UAAL at June 30, 2014 is not reasonable, differs from historical treatment and performance of the GRS, and is otherwise an outlier when compared with the overwhelming majority of municipal plans.[67]

Third, the Plan's change from a 30-year amortization period to a compressed

nine year period cannot be reasonably defended.  Over the last nine fiscal years,

the City has consistently used a *30-year* actuarially approved amortization period

to address payment of its UAAL; this approach comports with normal and actuarial

---

[64] July 28, 2014 Expert Report of Joseph Esuchanko ("Esuchanko Rpt"), an actuarial expert, ¶¶ 11 – 16.

[65] Terry Rpt, ¶¶ 101 – 118.

[66] Esuchanko Rpt, ¶¶ 30 – 33.

[67] Terry Rpt, ¶¶ 51-66; Fornia Rpt, ¶¶ 24-39; and Esuchanko Rpt, ¶¶ 17–29.

funding policies.[68]  However, the Plan's proposed use of a *9-year* period over which DWSD must pay its allocated share of the GRS UAAL is unreasonable, not actuarially sound or fair, and results under any interpretation of the Plan in DWSD paying to the GRS a disproportionate amount of the UAAL on an annual basis.[69]

The City here conceived this "DWSD-only 9-year amortization" proposal after negotiations for creation of a regional water authority failed and the City nonetheless needed funds to meet the commitment it had already made to maintain future retiree benefits.[70]  Indeed, even Mr. Bowen acknowledged his expectation that the GRS actuary would, in the event of closure of the GRS pension plan (as contemplated by the Plan), recommend that a 30-year amortization period be maintained.[71]  Further, the City's proposed new 9-year amortization period is in the bottom 1% of all plans in the assembled in the Public Plans Database.[72]

Fourth, the delayed-start 30 year period over which the non-DWSD City departments will pay their share is unreasonable, and in comparison to the period of funding by DWSD, results in an underfunding by the City, causing DWSD

---

[68] Terry Rpt, at ¶ 45.

[69] Esuchanko Rpt, ¶¶ 34 – 44.

[70] Buckfire Dep, Vol II at p 346.

[71] Bowen Dep, at p 302.

[72] Terry Rpt, at ¶ 45.

32

employees to realize less benefit than the amounts contributed by DWSD to the GRS on their behalf.[73] While DWSD is being required to fully fund its allocable share of the UAAL over only 9 years (commencing immediately), the non-DWSD divisions of the City are not required to fully fund their allocable share of the UAAL for 39 years (i.e., by June 30, 2053).

The GRS is a single, fully pooled, defined benefit pension plan; the assets of the GRS trust are commingled.[74] Thus, contrary to the City's suggestions, the proposed DWSD pension contributions are not dedicated in any real way to the funding of DWSD employee pensions. This could result in DWSD workers losing benefits even though DWSD fully paid DWSD's obligations to the GRS.[75] Although the percentage of DWSD's share of GRS is projected to go from approximately 70% at present to 100% as of 2023, the GRS as a whole will be funded at less than 70% for that entire period until 2023. Because of the pooled nature of the GRS, DWSD employees' benefits will only be funded at the lower levels through 2023 (and beyond). Thus, DWSD would be paying for something it

---

[73] Esuchanko Rpt, ¶¶ 45-49; Terry Rpt ¶¶ 69 -100.

[74] Esuchanko Rpt, ¶ 47; Terry Rpt ¶ 69 – 70.

[75] Esuchanko Rpt, ¶ 48.

would not be getting – a fully funded GRS for its own employees.[76]  No other municipal plan has been identified which contains this bizarre, bifurcated approach to amortizing a UAAL.

Fifth, the City's GRS UAAL claim calculations improperly include $387 million in excess interest paid through the Annuity Savings Fund.[77]

### G.     The Plan Impermissibly Includes Certain Actions That Require (But Do Not Have) Electoral Approval

In its March 25, 2014 Request for Information, the City, through the Plan, requested proposals from private parties for a "public-private partnership of the operation and management of the Detroit Water and Sewerage Systems" in the form of an operating and management agreement and/or other structure such as a long-term lease and concession agreement or sale.  These actions (i.e., taxing and/or sale of property) would require electoral approval which the City has neither obtained nor evidenced the ability to obtain.  See Charter of City of Detroit § 7-1204; *County of Jackson v. City of Jackson*, 302 Mich. App. 90, 98-99 (2013). Indeed, the City has failed to obtain any of the requisite electoral approvals in violation of Bankruptcy Code sections 943(b)(4) and (6).

---

[76] Oakland County also hereby incorporates by reference portions of the Pre-Trial Brief filed by Macomb County, which address further challenges to the alleged DWSD pension obligations.

[77] See Fornia Rpt, ¶¶ 22-23.

## V. ANALYSIS: THE CITY HAS NOT PROPOSED THE PLAN IN GOOD FAITH [11 U.S.C. § 943(b)(4) and (6)]

### A. Legal Standards For Good Faith

"Under § 1129(a)(3), made applicable to Chapter 9 by § 901(a), it is a requirement of confirmation that the plan be proposed in good faith." *In re Pierce County Hous. Auth.,* 414 B.R. 702, 719 (Bankr. W.D.Wash. 2009). See Black's Law Dictionary (9th ed. 2009) (In its most basic sense, "good faith" means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage.); see also *In re Sylmar Plaza, L.P.,* 314 F.3d 1070, 1074 (9th Cir. 2002).

When examining good faith in the Chapter 9 context, the Court should consider: "(1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *In re Mount Carbon Metro. Dist.,* 242 B.R. 18, 40-41 (Bankr. D.Colo. 1999). See also *In re Pierce County Hous. Auth.*, 414 B.R. 702, 720 (Bankr. W.D.Wash. 2009) (same four factors; good faith determination requires evaluation of totality of circumstances to determine whether plan is proposed with honesty and sincerity and whether plan's terms are fundamentally fair). A plan satisfies the purpose of

35

Chapter 9 if it is "consistent with the governmental nature and obligations of the Chapter 9 debtor" and allows the debtor to continue to provide public services. *Mount Carbon*, 242 B.R. at 41.

### B. The Way In Which The City Arrived At DWSD's "Allocated Share" Demonstrates A Lack Of Good Faith Here

One of the principal indicia of the Plan's lack of good faith is the manner in which the amount of GRS UAAL was determined and then "allocated" among the City departments. Rather than following accepted actuarial principles to address this common pension plan issue (unfunded accrued actuarial liabilities), the drafters of the Plan ignored accepted actuarial standards.[78]

The City initially obligated itself to a GRS obligation that required a $47 million cash infusion on an annual basis (apparently believing that it could obtain this amount by creating a regional water authority and leasing DWSD's facilities to it for this amount.[79]) However, during negotiations over creation of such an entity,

---

[78] Terry Rpt, ¶¶ 24, 34-36, 42. The $428.6 million total was calculated in the following manner: DWSD's ostensible "share" of the GRS UAAL was estimated to be $291.1 million as of June 30, 2014. That amount was amortized over nine years, resulted in a proposed contribution of $42.9 million per year for UAAL. To this, $2.5 million in annual "administrative expense" was added, with the resulting contribution being $45.4 million per year, for a total of $408.6 million from June 30, 2014 through June 30, 2023. An additional $20 million of bankruptcy-related professional fees was then added to total $428.6 million. Terry Rpt, ¶ 24, citing April 25, 2014 Milliman Letter, POA00259371.

[79] Terry Rpt, ¶ 29.

the counties proposed making this amount adjustable, and the City refused to negotiate, demanding $47 million annually to satisfy commitments made during negotiations with other creditors.[80]

When these negotiations stalled, the City then developed the portion of the Plan calling for DWSD to make annual payments of $47 million! Mr. Buckfire admitted that the City decided to fill the "hole" (left by its inability to obtain this amount as lease payments) with the proposed pension contributions from DWSD to fund the GRS' UAAL.[81] Of course, to reach the annualized amount that the City required, the Plan required DWSD to make accelerated payments on an unprecedented nine-year amortization schedule,[82] a burden that would leave DWSD operationally vulnerable.[83]

---

[80] Terry Rpt, ¶ 29.

[81] Buckfire Dep Vol II, pp 72-75.

[82] "If the Plan had been structured in accordance with accepted actuarial principles of risk-sharing, the various risks would be borne by all parties in an actuarially fair manner." Terry Rpt, ¶ 92.

[83] Terry Rpt, ¶ 29.

Thus, both the proposed amount and the timing of the DWSD's proposed pension contributions under the Plan are the product of a financial deal,[84] and not the product of sound actuarial practice.[85]

## C. The Way In Which The City "Negotiated" Lacked Good Faith

Oakland County's experts (and other experts) will testify that the Plan and its components were not proposed in good faith and that the City has not interacted with Oakland County in good faith concerning the Plan. Indeed, through the Plan, the City seeks to force DWSD to fund a substantial portion of the City's settlement with holders of GRS Pension Claims.[86]

The City failed to disclose necessary information to Oakland County about the financial and operational condition of DWSD and precluded Oakland County from access to key DWSD officials. In addition, despite the fact that DWSD (or

---

[84] Terry Rpt, ¶ 47. The 6.75% investment return assumption used in the Plan was likewise not the result of any actuarial recommendation by the City's actuary, but rather was a product of the settlement among the City, the retirees and various parties other than DWSD ratepayers and creditors. Terry Rpt, ¶ 54. See also Kopacz Rpt at 134.

[85] Indeed, payment of these amounts would actually jeopardize the long-term viability and sustainability of the pension plan. Terry Rpt, ¶¶ 48, 49, 63.

[86] Other third party participants in the "grand bargain" have the option of participating in funding certain of the City's needs under the Plan and going forward. Not so DWSD (and thus ultimately the rate payers who fund DWSD's operations) who would be compelled to unlawfully fund the City's settlement with holders of GRS Pension Claims which the City negotiated without having the necessary funding available to consummate such settlement.

some variation thereof) will continue to provide vital services to millions of residents throughout Southeast Michigan, the City sought to impose unilateral terms with regard to DWSD's authority on Oakland County. That is, as stated above, the City repeatedly stated that the amount of the required payments were not open to negotiation. Thus, the City sought to force Oakland County to make critical billion-dollar decisions impacting millions of residents without the opportunity to perform due diligence.[87]

### D. The Fact That The Plan Would Use DWSD Revenues To Fund Non-DWSD Obligations (And Thereby Violate State And Local Law) Demonstrates A Lack Of Good Faith

As discussed above, the Plan categorically violates state and local law by requiring that DWSD revenue (and the DWSD CVRs) be used for purposes unrelated to the operation of DWSD. This component of the Plan demonstrates a patent lack of good faith.

---

[87] Note too, that the Plan itself was prepared without consultation or input from DWSD.

## VI. ANALYSIS: THE PLAN SHOULD ALSO BE REJECTED TO THE EXTENT THAT IT CONTAINS OVERLY BROAD AND INAPPORPRITE THIRD-PARTY RELEASES

The Plan contains broad third party releases, injunctions, and exculpations (the "Third-Party Release"),[88] and should not be confirmed unless this aspect of the Plan is removed.

The Bankruptcy Code expressly provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).  Thus, the Code does not authorize general non-debtor releases.  See *In re Dow Corning Corp.*, 280 F.3d 648, 656 (6th Cir. 2002); *In re Pacific Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009) (striking non-debtor releases, except for the creditors' committee and its members, from plan, noting that "fresh start § 524(e) provides to debtors is not intended to" absolve third parties from tort claims); *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 143 (2d Cir. 2005).

Courts approve non-consensual third-party releases only when such releases are justified by exceptional circumstances. *Dow Corning*, 280 F.3d at 658.  As *Dow Corning* made clear, bankruptcy courts may enjoin non-consenting creditors' claims against a nondebtor only when seven factors are present: (1) an identity of interests between the debtor and the third party; (2) the non-debtor has contributed

---

[88] Sections D.5.-7.

substantial assets to the reorganization; (3) the injunction is essential to reorganization; (4) the impacted creditors have overwhelmingly voted for the plan; (5) the plan provides a mechanism to substantially all classes affected by the injunction; (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) the bankruptcy court made a record of specific factual findings to support its conclusions. 280 F.3d at 658. Here, the City has not and cannot satisfy its burden with regard to the *Dow Corning* factors, and therefore the Third-Party Release must be stricken or confirmation should be denied.

## VII.   CONCLUSIONS

The City bears the burden here of proving that the proposed Plan of Adjustment is: (1) feasible; (2) legal (that is, that it complies with and does not violate State or local laws), and (3) proposed in good faith. The City will be unable to make these showings are trial.

The Plan and its projections are not feasible because they assume inordinately positive revenue performance, declining operative costs, grossly unrealistic cost of debt, insufficient funding for capital improvements, and the ability of all consumers to pay their obligations in full.

The Plan plainly uses DWSD as a source of revenues to prop up other City departments—a prohibited end under Michigan or Detroit laws.

Finally, the Plan as a whole lacks good faith. Though the ends sought may be noble, the manner in which the Plan has been proposed and foist on DWSD and the Counties, reveals a complete absence of good faith. The Plan cannot and should not be confirmed.

Respectfully Submitted,

Dated: August 27, 2014

**YOUNG & ASSOCIATES**

By: /s/ Sara K. MacWilliams
Sara K. MacWilliams (P67805)
Jaye Quadrozzi (P71646)
27725 Stansbury Blvd., Suite 125
Farmington Hills, MI 48334
Telephone 248.353.8620
Email: efiling@youngpc.com
   macwilliams@youngpc.com
   quadrozzi@youngpc.com
*Co-Counsel for Oakland County, Michigan*

**CARSON FISCHER, P.L.C.**

By: */s/ Joseph M. Fischer*
Joseph M. Fischer (P13452)
Robert A. Weisberg (P26698)
Christopher Grosman (P58693)
4111 Andover Road, West – 2nd Floor
Bloomfield, Michigan 48302-1924
Telephone: (248) 644-4840
Facsimile: (248) 644-1832
JFischer@CarsonFischer.com
RWeisberg@CarsonFischer.com
CGrosman@CarsonFischer.com
*Co-Counsel for Oakland County, Michigan*

42