## Exhibit A

**Transcript excerpts from the Deposition of Kevyn Orr, dated July 21-22, 2014**

WEIL:\95071879\3\45259.0007

1                    KEVYN ORR, VOLUME 1

2           IN THE UNITED STATES BANKRUPTCY COURT

3            FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7   In Re:                    )      Chapter 9

8

9   CITY of DETROIT, MICHIGAN, )    Case No. 13-53846

10

11              Debtor.     )    Hon. Steven Rhodes

12   _____

13

14                         VOLUME 1

15

16        The Videotaped Deposition of KEVYN ORR,

17        Taken at 2 Woodward Avenue,

18        Detroit, Michigan,

19        Commencing at 9:07 a.m.,

20        Monday, July 21, 2014,

21        Before Leisa M. Pastor, CSR-3500, RPR, CRR.

22

23

24

25

```
 1                    KEVYN ORR, VOLUME 1

 2          advisors I'm generally speaking about Miller Buckfire

 3          and Conway MacKenzie in this context, I don't want to

 4          implicate any attorney/client communications.  With

 5          that, you know, sort of adviso (ph.) there were very

 6          various discussions I would have with advisors on

 7          various times regarding potential opportunities to --

 8          you know, they use the word monetize here, this isn't

 9          my document, rationalize, monetize or otherwise seek

10          to maximize the value of DWSD for the benefit of the

11          City and the system.

12     Q.   I recognize monetized or monetizing as used in the

13          root cause committee report is not your language, sir.

14     A.   Right.

15     Q.   But did you ever adopt that approach that you wanted

16          to monetize the assets of DWSD?

17     A.   I think generally in this time frame when I came into

18          office, I said that all options are on the table, that

19          we have to review any reasonable options regarding all

20          assets of the City.  I think there were times I

21          recognized that DWSD was a significant asset of the

22          City, and whether it's monetized or rationalized or

23          derive some value, I believe that I did have

24          discussions with my advisors about options regarding

25          DWSD.
```

```
1                    KEVYN ORR, VOLUME 1

2        228 million in 2023?

3   A.   Yeah, I think Miller Buckfire rounded to 94, this is

4        94.2, but leave the decimals out, yes, that's it.

5   Q.   Was there ever a discussion between you and your

6        professional advisors outside of counsel as to whether

7        or not these savings should stay within the system?

8   A.   Yes.  Yes.

9   Q.   And there -- did there come a point in time when you

10       decided no, those savings should -- that are -- that

11       DWSD may experience should be paid over to the City?

12  A.   No.  Generally, the discussion was that -- that there

13       could be sufficient savings both in operations as well

14       as debt service, that would provide adequate savings

15       over and above the steady state of the department now

16       to deal with the operation and capital needs of the

17       system, and because those savings would be greater

18       than the steady state they could also -- they were net

19       positive, they could also provide a benefit to the

20       City's general fund.  So there was savings to both the

21       general fund and savings that would stay within the

22       system.

23  Q.   Why not keep all savings in the system?

24  A.   Well, the general thought was that we were proceeding

25       down a path of trying to find ways to look at each of
```

```
 1                    KEVYN ORR, VOLUME 1

 2         the buckets of assets that the City had and determine

 3         if there was a portion that could provide a benefit to

 4         the City both for services, as well as to payments

 5         towards creditors in bankruptcy.

 6   Q.    So the lease payment that is reflected at least on

 7         page 40 of Exhibit 10, where would those funds be

 8         directed to?  At the time of your communications with

 9         the Counties over the formation of this authority,

10         what was the City's intent with respect to the lease

11         payment?

12   A.    Without getting into any court-protected discussions

13         with the Counties, there was a general concept that

14         these payments would be directed to the general fund.

15   Q.    To any creditor, group or constituency in particular?

16   A.    No.  No.

17   Q.    At this time.

18   A.    At this time, no.

19   Q.    The money would simply go to the general fund and be

20         used for whatever purposes the City may need general

21         fund money?

22   A.    Yes, generally that's fair.

23   Q.    What was the Counties' reaction to the proposals that

24         are set forth in Exhibits 9 and 10?  Again, dealing

25         historically, when these materials were presented to
```

1                    KEVYN ORR, VOLUME 2

2              IN THE UNITED STATES BANKRUPTCY COURT

3               FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7    In Re:                    )      Chapter 9

8

9    CITY of DETROIT, MICHIGAN, )    Case No. 13-53846

10

11                  Debtor.    )    Hon. Steven Rhodes

12    _____

13

14                         VOLUME 2

15

16        The Videotaped Deposition of KEVYN ORR,

17        in his personal capacity and as Rule 30(b)(6) witness,

18        Taken at 2 Woodward Avenue,

19        Detroit, Michigan,

20        Commencing at 9:10 a.m.,

21        Tuesday, July 22, 2014,

22        Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

```
1                          KEVYN ORR, VOLUME 2

2    Q.   And the purpose of the transfer to a public trust is

3         to ensure that the art is never sold to satisfy the

4         claims of the City's creditors, correct?

5    A.   Yes, now and forever, yes.

6    Q.   Not only current creditors but future ones, as well?

7    A.   Correct.

8    Q.   So has the Grand Bargain, Mr. Orr, helped the COPs

9         holders to achieve a higher recovery?

10   A.   I don't think so.

11   Q.   Mr. Orr, what are the principal terms of the LTGO

12        settlement?

13   A.   The LTGO settlement centers around a dedicated millage

14        that's to extend for the next approximately 13 years,

15        and the terms of a settlement that roughly 26

16        percent -- oh, the LTGO, I'm sorry --

17   Q.   Yeah.

18   A.   Okay, I'm sorry, I'm going -- I thought you were just

19        talking about -- I'm doing it temporally --

20   Q.   That's okay.

21   A.   I'm sorry.

22   Q.   I'm hopping around.

23   A.   Okay.

24   Q.   Let's start over.

25   A.   Let's start over.
```

```
1                    KEVYN ORR, VOLUME 2

2         it to you this way.  The first plan of February 21

3         contained within it statements to classes 10 and 11

4         that if you vote to approve and the moneys are

5         received, you'll get X, and if you don't, you'll get

6         Y?

7    A.   Yeah.

8    Q.   Do you remember that?

9    A.   Yeah, it had the little box.

10   Q.   Yeah.  So can we start with that date?  Had you agreed

11        to the Grand Bargain as of Feb 21, 2014?

12   A.   The only reason I'm hesitating is I believe that the

13        values had been discussed but there may have been some

14        other issues still ongoing in the mediation, but I

15        think it's fair to say that to the extent we reported

16        it out in the version of the plan that I had agreed to

17        accept the Grand Bargain.

18   Q.   Okay.  You had made the decision to go with the Grand

19        Bargain?

20   A.   Yes.

21   Q.   And you'd made that decision certainly by

22        February 21st, when it's in the plan or at least the

23        contours of it are?

24   A.   Yes.

25   Q.   But assuming that you didn't decide on, you know,
```

```
 1                    KEVYN ORR, VOLUME 2

 2    Q.   Yeah, I mean I guess what I will say is that I

 3         understand that the concept's out there and it's kind

 4         of building momentum and speed, but can we agree that

 5         as an earliest date, let's use the term agreed to.

 6    A.   Right.

 7    Q.   You had not agreed to the Grand Bargain on or about

 8         December 17th, 2013, which is the date that you got

 9         the Christie's valuation, you had not agreed to it?

10    A.   I don't recall when you can say I had agreed to it.

11         There had been --

12    Q.   I'm trying to say a date that we know you hadn't?

13    A.   Yeah, I know, and I'm trying to -- I don't recall -- I

14         don't recall if that's true or not, I don't recall.

15    Q.   Oh, so it's possible that you had agreed to the Grand

16         Bargain prior to December 17, you just can't recall

17         one way or the other?

18    A.   I can't recall one way or the other.

19    Q.   Okay, so whatever the time is that you agreed to the

20         Grand Bargain, whatever that date is, that's how we're

21         going to describe it since we don't have a date --

22    A.   Okay.

23    Q.   -- okay?

24              As of that time, had the City inventoried

25         the artwork in the DIA collection?
```

1                          KEVYN ORR, VOLUME 2

2      Q.    Correct, okay.

3      A.    I don't mean to make this technical, I'm just

4            trying --

5      Q.    Understood.

6      A.    -- respond to your question.  So did the City have an

7            inventory of art?  I would say yes, as provided by, as

8            contracted with DIA Corp.

9      Q.    Understood.  The City, itself, independent of the DIA

10           Corp. did not prepare an inventory, correct?

11     A.    That is correct.

12     Q.    The DIA Corp. may have had inventory, but you don't

13           know whether they did or didn't?

14     A.    No, I know that the DIA Corp. had an inventory of art,

15           I don't know if -- I do not believe that the DIA Corp.

16           did an inventory of art in connection with the

17           bankruptcy process valuation.  They maintained an

18           ongoing inventory of the art at the institute.

19     Q.    Okay.  I'll -- I'll represent to you that I was told

20           that they did not, but -- but you're telling me what

21           you remember and your recollection is that they did?

22     A.    I'm telling you what I was told and what I was

23           directed to on the website as far as what the DIA

24           Corp. had.

25     Q.    Fair to say that other than what's on the website,

```
 1                    KEVYN ORR, VOLUME 2

 2          Christie's valuation?

 3                    MR. SHUMAKER:  Object to the form.

 4    A.    Yeah, I -- I'm going to be careful here, and maybe it

 5          helps if I explain why I'm being a little careful.

 6          It's my understanding as I have been informed that

 7          from time to time the City had invoices or receipts

 8          for art that they maintained to this day, and that the

 9          City maintained insurance for art that they maintained

10          to this day, so I don't want to say there was no

11          valuation or assessment available had there been any

12          done in connection with this process for all of the

13          objects of art over at the museum as of the time of

14          the plan in February; is that your questioning?

15    BY MR. HACKNEY:

16    Q.    It's close.  What if we did it this way?  Let's talk

17          about you personally --

18    A.    Okay.

19    Q.    -- because you're the person who decided to enter into

20          the Grand Bargain, right?

21    A.    Yes.

22    Q.    At the time you -- as of February 21, 2014, is it fair

23          to say that the only information that you had about

24          the potential value of the collection was embodied in

25          the Christie's valuation?
```

1                          KEVYN ORR, VOLUME 2

2              collection is principally limited to the Christie's

3              valuation and the Artvest valuation?

4    A.       Well, I think it's fair to say that -- that as part of

5              the bankruptcy process my knowledge is limited or

6              informed by the Christie's valuation, the Artvest

7              valuation, discussions with DIA of benefactors, the

8              director, curator and others, but the documentation

9              regarding its valuation would be found in the

10             Christie's valuation and the Artvest valuation,

11             principally.

12   Q.       Why didn't the City value the entire collection before

13             agreeing to enter into the Grand Bargain?

14   A.       Well, generally speaking, the thought was that most of

15             the pieces of art had some questions regarding the

16             difference between title and ownership and perhaps

17             reversionary interests by the heirs, that there were

18             concerns that had been expressed in the arts community

19             that any attempt to sell outright against the

20             principals of the American Association of Museums that

21             you only de-assess art or dispose of it to get a

22             better piece, generally, would violate that general

23             covenant and trust, and the DIA would not be able to

24             do business in the art community.

25                        There were concerns that some of the heirs

1                    KEVYN ORR, VOLUME 2

2          of the founders, for instance, even most recently,

3          since Graham Beal has been there, any attempt to

4          de-assess a piece of art that, say, that the mother of

5          Edsel Ford had given to the museum required the artist

6          (sic) to reach out to her heirs to get their agreement

7          that they were going to get another piece that was

8          better that all of those concerns limited us to the

9          first appraisal of what we felt could be demonstrated

10         to be ownership of the pieces that the City held

11         outright.

12    Q.   Okay, so the things that you all identified were

13         potential bars to the City's ability to sell the art,

14         right?

15    A.   Yes, to sell or de-assess, not outright sell, but also

16         trade it with another museum to do anything with it

17         other than to keep it.

18    Q.   And because of concerns about the City's ability to

19         sell or de-assess, that's why the City chose not to

20         value the entire collection prior to entering into the

21         Grand Bargain?

22    A.   Initially, yes.

23    Q.   Now, you mean initially yes but then subsequently

24         Artvest was retained?

25    A.   Yes.

1              KEVYN ORR, VOLUME 2

2   Q.   So as of the time that the City -- that you agreed to

3        enter into the Grand Bargain, had the City conducted

4        an audit of the collection to determine which pieces

5        were ones that had been purchased and which had been

6        donated?

7              MR. SHUMAKER:  Object to the form.

8   A.   I don't know.

9   BY MR. HACKNEY:

10  Q.   Well, even if it hadn't conducted an audit of that

11       question, had you reviewed an audit of the collection

12       assessing which pieces were ones that had been

13       purchased and which had been donated?

14  A.   No, not that I know of.

15  Q.   Have you conducted such an audit between the time you

16       entered into the Grand Bargain and the present to

17       determine which pieces were ones that had been

18       purchased by the City and which had been donated?

19  A.   Not an audit.  I think the Artvest valuation tries to

20       address some of those questions, but some still remain

21       open.

22  Q.   Okay, so to the extent it can be found anywhere it's

23       found in the Artvest report?

24  A.   Yes.

25  Q.   Now, as of the time you entered into the Grand Bargain

1                    KEVYN ORR, VOLUME 2

2         had the City conducted an audit to determine which

3         pieces in the collection were subject to restrictions

4         on alienation that were specific to that piece?  And

5         what I mean here, Mr. Orr, is I understand there are

6         arguments made by the attorney general and the DIA

7         that apply to the collection at large.

8    A.   Yes.

9    Q.   Okay, I understand that, the public trust argument,

10        the -- and so forth.  I am not asking about that

11        because those arguments, at least in theory, apply to

12        everything.  I am asking about a specific limitation,

13        for example, in a bequest where someone says, City of

14        Detroit, you can have this beautiful painting but only

15        if you promise that you will never sell it?

16   A.   Yes.

17   Q.   Okay, do you understand my question?

18   A.   Yes.

19   Q.   Had -- as of the time you entered into the Grand

20        Bargain had the City conducted an audit to determine

21        which pieces were subject to restrictions on

22        alienation that were specific to that piece?

23   A.   I don't know if the City or its contractor conducted

24        an audit, I know that I had not seen one.

25   Q.   Okay, you had not seen one?

1                    KEVYN ORR, VOLUME 2

2    A.   Right.

3    Q.   And between the time you entered into the Grand

4         Bargain and the present, has the City conducted such

5         an audit?

6    A.   Not that I know of.

7    Q.   And why didn't the City conduct that type of audit

8         before agreeing to enter into the Grand Bargain?

9    A.   Generally speaking, it was our understanding that

10        there was an understanding of which pieces at the

11        museum could possibly be de-assessed without

12        limitation.  That number was relatively low, in the

13        hundreds, I think as has been reported, and that

14        others in one form or another whether pursuant to an

15        actual bequest or will or an understanding with the

16        donor and the heirs or agreements with the museum in

17        some form had some limitation on their ability to be

18        sold outright.

19   Q.   And that understanding that the City had was based on

20        communications made to it by the DIA Corp.?

21   A.   Well, communications by the DIA Corp., certainly the

22        attorney general's litigation -- excuse me, members of

23        the DIA board, and the Founder's Society, as well.

24   Q.   Those were the sources for that information, correct?

25   A.   There may be others but those are the ones that I

1                              KEVYN ORR, VOLUME 2

2             recall sitting here today.

3       Q.    But the City didn't undertake an effort to

4             independently assess whether what it was being told

5             was correct?

6       A.    No, in fact, the City was told that any attempt to do

7             so might create a lawsuit regarding its ability to not

8             only assess but have the intent to try to de-assess or

9             to otherwise sell the art.

10      Q.    A lawsuit by the DIA?

11      A.    By any number of people.  There's 60,000 pieces of

12            art.  At one point, someone told me that heirs or

13            donors for virtually almost every piece could rise up

14            and file litigation against the City's ability to sell

15            the art.

16      Q.    And would sue you even if you tried to just conduct an

17            audit to determine what restrictions might exist with

18            respect to pieces of art?

19      A.    Well, I don't know if we did or didn't conduct an

20            audit, but any audit or attempt to try to determine

21            what the rights were might well create litigation by

22            others who would come in and would say let's determine

23            my view is that my rights are to have an agreement not

24            to have this art sold or de-assessed in any way and I

25            want that determination.

```
 1                    KEVYN ORR, VOLUME 2

 2         take to monetize the art?

 3    A.   Describe what you mean by monetize.  Getting some

 4         value for the art?

 5    Q.   Yeah.

 6    A.   Putting aside any discussions we had in mediation, or

 7         the mediation process, about the art or the Grand

 8         Bargain, I think it's fair to say that we didn't take

 9         any steps to monetize the art.

10    Q.   So the Grand Bargain is it?

11    A.   Yes.

12    Q.   And that's the product of the mediation, so you can't

13         talk about the efforts?

14    A.   Yes.

15    Q.   And -- well, it follows, the City never conducted a

16         market test of any portion of the art collection,

17         correct?

18    A.   Do you mean in auction or some other appraisal process

19         of particular pieces of art to get a valuation?

20    Q.   I mean separate from an appraisal which an appraiser

21         does.

22    A.   Okay.

23    Q.   But I mean a market-oriented process by which you

24         allow potential buyers to assert their views of the

25         potential value of any portion of the art collection?
```

1                    KEVYN ORR, VOLUME 2

2    A.   Yes, correct, like an auction with a reserve to try to

3         get a real value of the market, yes.

4    Q.   And it has never conducted a sale process with respect

5         to any portion of the art collection, correct?

6    A.   That is correct.

7    Q.   It never put any portion of the art collection up for

8         competitive bidding in an auction setting, correct?

9    A.   That is correct.

10   Q.   Now, the City has received inquiries from parties

11        interested in buying the art collection or a portion

12        thereof; isn't that correct?

13   A.   I have seen reports that there were inquiries from

14        parties to buy the art or a portion thereof, correct.

15   Q.   Okay, and what -- you have seen reports -- oh, are you

16        talking about the Houlihan Lokey?

17   A.   Yes.

18   Q.   Okay.  So we're going to get to the Houlihan Lokey

19        efforts.  I'm talking about inbound inquiries to you

20        and your team where you -- where Mr. Shumaker or

21        someone comes in and says I've got an inquiry about

22        buying the art.

23   A.   No, I haven't received any.

24   Q.   Didn't it get inquiries from Russian oligarchs and

25        Brazilian millionaires?

2    Q.   Was it a DIA person?

3    A.   No.

4    Q.   Who was it that told you this?

5    A.   It was some -- some individual at a meeting that I was

6         at, I think in New York.

7    Q.   But you can't remember who?

8    A.   No, as you might imagine, a number of people come up

9         to me on any given day with a number of different axes

10        to grind about something I'm doing, to tell me either

11        what I'm doing wrong or how they support something I'm

12        doing right, and that includes how I dare -- there

13        have been many people who have come up to me in many

14        different venues in airports, on vacation, walking

15        into my apartment about how I dare not sell the art,

16        there are some people who are going to come and denude

17        the City of all its assets.

18   Q.   Okay, I take it that this person told you that they

19        had heard that some foreign person was interested in

20        the art?

21   A.   Yes.

22   Q.   The City, itself, never received such inquiries,

23        though?

24   A.   Not to the best of my knowledge.

25   Q.   Okay.  And you never engaged other museums to see what

```
1                    KEVYN ORR, VOLUME 2

2         they might pay for the art collection, correct?

3    A.   Other museums I think actually engaged us and said

4         that they wouldn't do business with us if we tried to

5         sell any art.

6    Q.   My statement's, therefore, correct, right?

7    A.   Yes.

8    Q.   The City also has never attempted to borrow against

9         the art collection as collateral, correct?

10   A.   That is correct.

11   Q.   Now, we alluded to this earlier, which is the Houlihan

12        Lokey efforts, you were made aware of those, correct?

13   A.   Yes.

14   Q.   And you became aware that Houlihan Lokey had received

15        a number of different indications of interest from

16        certain parties with respect to the art, correct?

17   A.   I became aware that I believe there were four

18        different parties or groups of parties that I -- that

19        Houlihan Lokey had gone out and in some fashion either

20        solicited or received expression of interest from.

21   Q.   And do you know the names of those four parties?

22   A.   No, it's in the Artvest report and several other

23        reports.  I know that two are related to -- one is

24        related to the Chinese government, another is related

25        to an entity, there are two others and their exact
```

```
 1                    KEVYN ORR, VOLUME 2

 2        names escape me right now.

 3   Q.   You did not contact any of those parties, correct?

 4   A.   No.

 5   Q.   And nor did anyone working on your behalf, right?

 6   A.   Not to the best of my knowledge.

 7   Q.   Okay, and do you remember that one of the offers was

 8        for something like a billion five just for the Chinese

 9        art?

10                    MR. SHUMAKER:  Object to the form.

11   A.   Yes, I believe there was an offer just for the Chinese

12        art and I believe it was approximately that amount.

13   BY MR. HACKNEY:

14   Q.   That one didn't interest you enough to follow up on?

15   A.   No.

16   Q.   Why not?

17   A.   I think we discussed it with some of our advisors and

18        questioned whether or not it was a sincere offer

19        because it didn't appear they'd done any real analysis

20        but decided that in order to address it that we needed

21        to get an appraisal I believe of all the art.

22   Q.   Did the City attempt to monetize its art collection at

23        any time prior to your arrival on the scene as

24        emergency manager?

25   A.   Not that I know of.
```

```
 1                          KEVYN ORR, VOLUME 2

 2           process, and it was unclear that we'd be able to do

 3           that either inside or outside the bankruptcy.

 4                   I think the devil's position was at this

 5           time, this was soon after the March period, and people

 6           were coming in and saying, you know, what are you

 7           going to do with the assets, what are you going to

 8           sell?  And I think I had pretty consistently

 9           maintained.  All -- I think what I was saying at that

10           time was all assets and options were on the table and

11           being considered, but I think I also said that parties

12           have to find a way to save themselves in some fashion,

13           and what I recall from this was probably a discussion

14           as to whether or not DIA could come up with some form

15           of contribution to help us provide some value for the

16           art.

17      Q.   And do you see where he says:

18                   "This is a financial emergency and

19                   financial emergencies require extraordinary

20                   measures including maybe selling art"?

21      A.   Yes, I see that.

22      Q.   Did you agree with that sentiment?

23      A.   I agree with the sentiment that we're in a financial

24           emergency.  I agree with the sentiment that financial

25           emergencies sometimes require extraordinary measures.
```

1                    KEVYN ORR, VOLUME 2

2          I agree with the concept that maybe selling art would

3          be an option, but I think we're still pretty early in

4          to my tenure, and we were considering all options on

5          the table.

6     Q.   Do you see where he goes on to say:

7                "I don't want to pack up the art, but I

8                wasn't hired to protect it, and neither were

9                you.  We have a job to do, and we can't afford

10               to get bogged down with side issues that are

11               essentially moot.  Our responsibility is the

12               statute and the citizens" -- I think he means

13               "of Detroit."

14               "If Al Taubman and Keith Crain don't like

15               it, F them, they can buy the art and gift it

16               back to the DIA, or they can roll the dice and

17               take their chances."

18               Had you met with Mr. Taubman and Mr. Crain

19          at this point such that Mr. Nowling had a basis to

20          kind of covey to you what they might like or not like?

21    A.   No.  I've never met with Mr. Taubman and the only time

22         I've met with Mr. Crain was at an editorial board of

23         one of his publications.  I've never talked with

24         either one of them about the art, and I think he's

25         talking metaphorically here.

1                    KEVYN ORR, VOLUME 2

2         white picket fence or that they had said they were

3         told that they were off the table, I'd never heard

4         that.

5    BY MR. HACKNEY:

6    Q.   You were aware, were you not, that the issue of the

7         art put political pressure on the governor when it

8         would percolate into the national press, correct?

9    A.   I don't -- I have no feeling -- the -- in my opinion,

10        the governor has shown a noticeable ability not to

11        succumb to political pressure.

12   Q.   But you were aware that political pressure would be

13        brought to bear every time the art percolated into the

14        press?

15   A.   I'm going to stay away from any estimation of what

16        political pressure -- the governor has done a lot of

17        things that people thought political pressure would

18        prohibit him from doing.

19   Q.   And didn't you take steps to minimize the amount of

20        political pressure that would be brought to bear on

21        the governor as a result of the art issue?

22                    MR. SHUMAKER:  Object to the form.

23   A.   I don't recall.  I think I tried to maintain a

24        position that everything was on the table, that --

25        that we were examining all alternatives, unless

1                        KEVYN ORR, VOLUME 2

2    Q.    And if I ask you about your conversations with the

3          governor on the subject of what to do with the art,

4          how to monetize it, whether it could be sold,

5          etcetera, you will invoke the protections of this

6          common interest privilege?

7    A.    Yes.

8    Q.    You were aware that the DIA was strongly opposed to

9          selling the art; isn't that correct?

10   A.    Yes.

11   Q.    And you were aware of their position on that issue

12         dating all the way back to April of 2013, correct?

13   A.    At least, yes.

14   Q.    They were not shy about letting the world know what

15         their position was on this issue, correct?

16   A.    Yes.

17   Q.    Now, you agree with me that with respect to the DIA

18         that you have said that you were deferring to the DIA

19         to find a way to leverage money out of the art and

20         save themselves, correct?

21   A.    I believe I was encouraging them to find ways out of

22         this problem and save themselves, yes.

23   Q.    And isn't it -- it's fair to say that you were

24         deferring to them to give them an opportunity to do

25         that, correct?

```
 1                    KEVYN ORR, VOLUME 2

 2    A.   I was encouraging them to give them an opportunity to

 3         do that.

 4    Q.   Okay.  And what level of -- what level did they have

 5         to reach to save themselves?

 6    A.   I didn't have a level in my mind of what they had to

 7         reach to save themselves, but my general thought was

 8         that they needed to raise some money to contribute to

 9         the effort that would justify, in my mind, a

10         contribution so that we would not have to pursue a

11         road of necessarily attempting to sell the art.

12    Q.   Now, I want to talk about this notion of deferring.

13         I'm happy to mark this if you'd like.

14    A.   Sure.

15    Q.   It's a Michigan Radio October 3, 2013, where they hit

16         a number of different issues.  It says:

17              "Citing the City's --" quote/unquote,

18              'obligation' to pay off its creditors, Orr said

19              he's hopeful that the DIA's operators can,

20              'come up with a solution that makes sense

21              both for the City and for the creditors,' but if

22              not, he'll need to develop one himself.  Asked

23              whether there was a way for the DIA to monetize

24              its assets without selling them off, Orr

25              said --" quote/unquote, "Yes," but he
```

```
 1                    KEVYN ORR, VOLUME 2

 2    A.   No, I think what Christie's did was say that this

 3         2,773 is clear, these others may have some questions,

 4         we're not going to delve into whether or not those

 5         questions are resolved as part of this process, let's

 6         focus on the 2,700 that we think qualify under what

 7         you're trying to look at.

 8    Q.   Now, the 31,000 -- so if you have 66,000 total and

 9         we --

10    A.   60 -- 60,000.

11    Q.   Okay, let's just -- I thought it was 66.  What did you

12         say it was, 68?

13    A.   I think it was 60,500, or something like that, you

14         know, we'll say 61,000.

15    Q.   Oh, okay.

16    A.   Yeah.

17    Q.   So let's say you have 61,000, let's put the 35,000

18         we've already discussed off to one side --

19    A.   Right.

20    Q.   -- okay?

21              The remainder, what sounds like 26,000,

22         those are ones that -- what is the City's position as

23         to whether it can sell those?

24    A.   It is unclear.

25    Q.   Okay.
```

1                           KEVYN ORR, VOLUME 2

2    A.    Those are the ones in addition to perhaps not having a

3          significant value, but those are the ones to which

4          there may be claims of heirs, donors, or others that

5          we do not have a right to sell.

6    Q.    Okay, and the concern there is that if something was

7          donated and it contained within the donation a

8          limitation on alienation, that limitation may bar the

9          City from selling that piece?

10   A.    Yes.

11   Q.    Okay, and I take it with respect to this notional

12         26,000 we're talking about, you don't know how many of

13         them have such a limitation, correct?

14   A.    How many of them have such a limitation, how that

15         limitation be enforced, what litigation was being --

16         ensue if we try to sell it in DSS, what the heirs'

17         position would be, we have been told by the

18         benefactors at DIA Corp., however, that virtually any

19         sale of any piece would result in a contest.

20   Q.    Okay.  There has been no heir of which you're aware

21         that has communicated to you directly that they would

22         sue the City, correct?

23   A.    I don't know if that's true.  I did have a

24         conversation with Richard Manoogian and Gene Garago

25         (ph.), and some others, I don't -- I think Richard

1                          KEVYN ORR, VOLUME 2

2     Q.   And the City has never filed copies of the instruments

3          providing the City with title to donations to the DIA

4          with the charitable trust section, correct?

5     A.   I don't know.

6     Q.   Isn't it true that the Detroit Museum of Art sold its

7          art collection building and land to the City in

8          December 1919?

9     A.   The institute was found in 1885.  I believe in 1915 it

10         went over to the City, in 1919, I don't know if that

11         was a sale, the exact nature of the transaction, I

12         know it was transferred from the Detroit Museum of Art

13         to the Detroit Institute of Art, which at that point

14         was a department of the City.

15    Q.   I take it you haven't made any effort to investigate

16         these historical facts?

17    A.   No, I've talked to the -- the curator of the museum

18         and the director and some of their staff.  I just

19         don't know the consequences of what you characterize

20         as a sale.  I haven't seen a bill of sale, I haven't

21         seen a transcript, all that sort of stuff.

22    Q.   Okay, so was the art conveyed by a bill of sale?

23    A.   I don't know.

24    Q.   And you do know that the building and the land were

25         conveyed by a deed; isn't that correct?

```
 1                    KEVYN ORR, VOLUME 2

 2   A.   Yes.

 3   Q.   Wouldn't you agree that one of your duties as a

 4        fiduciary is to look at all options with respect to

 5        all of the City's assets, correct?

 6   A.   Yes.

 7   Q.   And in fact, you have promised that the City would

 8        look at every transaction that makes sense that

 9        provides the City with greater net present value;

10        isn't that correct?

11   A.   Yes, I believe I said that.

12   Q.   And it's a true statement, right?

13   A.   I believe so.

14   Q.   You said their raising parking rates was, quote,

15        prudent municipal management based on objective

16        studies and data, correct?

17   A.   I believe so.

18   Q.   And you said that and you believe it's a true

19        statement, correct?

20   A.   Yes.

21   Q.   You believe that prudent municipal management requires

22        the use of objective studies and data, correct?

23   A.   Yes.

24   Q.   And in fact, in the case of the parking, you relied

25        upon a recent study obtained by the City indicating
```