**Exhibit B**

**Transcript excerpts from the Deposition of Kenneth Buckfire, dated July 15-16, 2014**

WEIL:\95071879\3\45259.0007

1              KENNETH BUCKFIRE, VOLUME 2

2         IN THE UNITED STATES BANKRUPTCY COURT

3        FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7  In Re:                )    Chapter 9

8

9  CITY of DETROIT, MICHIGAN, )  Case No. 13-53846

10

11          Debtor.   )  Hon. Steven Rhodes

12  _____

13

14                 VOLUME 2

15

16    The Videotaped Deposition of KENNETH BUCKFIRE,

17    a Rule 30(b)(6) witness,

18    Taken at 1114 Washington Boulevard,

19    Detroit, Michigan,

20    Commencing at 8:09 a.m.,

21    Wednesday, July 16, 2014,

22    Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

```
 1              KENNETH BUCKFIRE, VOLUME 2

 2          David Heiman (ph.)?

 3    A.    That's right.

 4    Q.    And the subject is Christie's and the DIA.  Could you

 5          take a few moments to take a look at that to refresh

 6          your recollection of that if you need to?

 7    A.    My recollection is refreshed.

 8    Q.    Okay.  So I'm going to ask you some specific questions

 9          but in general.  Do you remember this process?

10    A.    Yes.

11    Q.    What was this e-mail part of?

12    A.    Can I ask a question to my counsel for a second?

13    Q.    Sure, please.

14                (Counsel confers with witness .)

15    A.    Just wanted to make sure. Well, very early on in our

16          engagement with the City, I was made aware of the fact

17          that the Detroit Institute of Arts was effectively not

18          a separate institution but, in fact, was owned by the

19          City, although, it was operated by the DIA Trustee

20          Corporation, the building and collection was

21          technically owned by the City of Detroit.  We

22          recognized early on that that would require it under

23          certain scenarios to be valued as a potential noncore

24          asset and dealt with appropriately if it was

25          determined that the City would have to seek protection
```

1          KENNETH BUCKFIRE, VOLUME 2

2     under Chapter 9.

3               We, during the spring of 2013, had several

4     meetings with representatives of DIA to alert them to

5     this potential outcome and to explain to them that it

6     might be necessary to monetize or sell the collection

7     under certain scenarios.  We then independently

8     determined that in order to satisfy the requirements

9     of the Bankruptcy Code because it would be deemed

10    potentially a noncore asset that we would have to do a

11    valuation of the assets to determine exactly what it

12    might be, because even though Miller Buckfire is an

13    investment bank, we are not experts in appraising art,

14    and have no expertise in that field.

15              There are, regrettably, only two

16    institutions in the world that have the professional

17    capacity to perform an appraisal of a encyclopedic

18    art museum, and by that I mean a museum that has a

19    collection covering a wide variety of genres, periods

20    of history, and countries, and those two institutions

21    are Sothebys and Christie's.  We determined we could

22    not approach Sothebys because, unfortunately, a

23    director of Sothebys is also a trustee of the Detroit

24    Institute of Arts, and we viewed that as a potential

25    conflict.

1          KENNETH BUCKFIRE, VOLUME 2

2              MARKED FOR IDENTIFICATION:

3              DEPOSITION EXHIBIT 30

4              10:36 a.m.

5     BY MR. SOTO:

6     Q.   So this is Exhibit 30, and what I've handed you as

7          Exhibit 30 is what appears to be another e-mail from

8          Kenneth Buckfire, date -- time dated Wednesday,

9          October 23rd, 2013, to David Heiman, subject note from

10         Gargaro.

11             MR. MONTGOMERY:  Counsel, could you

12         identify the document by Bates number if possible?

13             MR. NEAL:  Absolutely.  Possibly, it's POA

14         00040759.

15             MR. MONTGOMERY:  Thank you.

16    BY MR. SOTO:

17    Q.   Are you familiar with this e-mail?

18    A.   I am.

19    Q.   Who is Mr. Gargaro?

20    A.   He was at the time, he may still be the chairman of

21         the Board of Trustees of the Detroit Institute of

22         Arts.

23    Q.   And how do you know him?

24    A.   I met him for the first time at a meeting in Detroit,

25         I believe in May of 2013 when we first became aware of

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2         this issue, so in this e-mail on the second page,
 3         which is page 760 in the Bates stamp, page 2 on the
 4         e-mail, in the first full paragraph on that page, Mr.
 5         Gargaro writes to you Ken, when you and I spoke last
 6         Friday, October 11th, you asked me to follow up with
 7         my key contacts in Wayne, Oakland, and Macomb Counties
 8         to measure reactions for the possibility of special
 9         additional millage, the proceeds of which could be
10         used by the EM, which I assume means emergency
11         manager --
12    A.   Yes.
13    Q.   -- in exchange for transferring the DIA to an
14         authority or a similar vehicle to protect it from any
15         future Detroit creditor exposure.  Do you recall
16         that --
17    A.   Yeah.
18    Q.   -- exchange?
19    A.   I do.
20    Q.   And did you respond to his inquiries regarding that
21         exchange?
22    A.   Not subsequent to these e-mails, no.
23    Q.   So in October, Mr. Gargaro was communicating with you
24         about taking an asset off the table, correct?
25    A.   In exchange for adequate compensation to the City for
```

1          KENNETH BUCKFIRE, VOLUME 2

2          doing so, yes.

3     Q.   And the adequate compensation was going to come in the

4          form of an additional millage was that what he was

5          proposing?

6     A.   That was one of the possibilities yes.

7     Q.   Were there other possibilities that he proposed?

8     A.   No, but that I proposed.

9     Q.   What were the other possibilities that you proposed?

10    A.   That they raise enough money from their trustees and

11         other community members to justify conveying the

12         collection into an authority which is indeed the path

13         they've taken and when you raised that back in October

14         of 2013, had you done an analysis of what the value

15         would have to be to justify that kind of an asset

16         being taken off the table.

17    A.   No, because the Christie's valuation wasn't available

18         at that time.

19    Q.   Was it being done at that time?

20    A.   Yes.

21    Q.   So you were awaiting the Christie's valuation?

22    A.   Correct.

23    Q.   Other than the Christie's valuation, were there any

24         other factors that you took into account in

25         determining what would be the proper value necessary

1          KENNETH BUCKFIRE, VOLUME 2

2          Miller Buckfire regarding the value of that asset to

3          the City?

4     A.   Not in October.  We had, obviously, conversations with

5          Christie's about what other alternatives might be

6          available to create value for the City from this

7          collection, and I asked them to review those

8          possibilities as part of their public report when

9          their valuation was made public, which they did.

10    Q.   And as part of their report, they mentioned some other

11         alternatives?

12    A.   They did.

13    Q.   Can you recall what those were?

14    A.   One of them was putting certain elements of the

15         collection out on tour and getting, in effect, touring

16         fees for that or leasing parts of the collection to

17         other museums, we asked them to look at, you know,

18         taking parts of the collection that were never on

19         display and consider monetizing those.  We tried to be

20         as open-minded as possible about all sources of cash

21         realization from the collection.

22    Q.   In connection with your retaining of Christie's, did

23         you tell them to be as open-minded as they could be?

24    A.   I did.

25    Q.   Let me hand you another exhibit, and I know we've been

```
1                KENNETH BUCKFIRE, VOLUME 2

2    BY MR. SOTO:

3    Q.   Chronologically, when you -- before Christie's, what

4         did you learn about DIA?

5    A.   Well, I learned from their public information the

6         breadth the and Department of their collection which

7         is public, I should mention I visited many times when

8         I was growing up here, so I was familiar with the

9         institution, any ways.  So I didn't need a lot of

10        learning about it.

11             We looked at the publicly available

12        information, their website's quite up to indicate date

13        and spans I have it does have financial statements and

14        annual reports and we began to study what we could

15        publicly available about this and it mentioned we did

16        not initially contact the DIA, I believe it was not

17        until April or May to let them know that as we were

18        progressing in our planning we wanted them to

19        understand that there was a risk that we would have to

20        recommend among other alternatives taking steps to

21        monetize the collection.

22   Q.   Did you come to any generalistic understanding of the

23        value of that asset pre-Christie's?

24   A.   No.

25   Q.   In connection with your learning curve on the DIA and
```

1              KENNETH BUCKFIRE, VOLUME 2

2         cooperation of the operators and the trustees than

3         over their objections because they made it very clear

4         to us that they would fight us to the ends of the

5         earth if we touched the collection even though it

6         belonged to the City.

7    Q.   Let me -- let me give you an again this is related to

8         the DIA there's all going to be under that subheading.

9         This is an e-mail --

10                   MARKED FOR IDENTIFICATION:

11                   DEPOSITION EXHIBIT 31

12                   11:14 a.m.

13   A.   This is a vacation.  I don't have to talk about DWSD

14        for a while.  This is great.

15   BY MR. SOTO:

16   Q.   Exhibit 31, and I will tell you the Bates number, it

17        is POA 00041062.  And it is an e-mail from -- from

18        Kenneth Buckfire to Gene Gargaro, dated Monday, April

19        29, 2013, subject, DIA visit.  Simple statement in it

20        and very consistent with your personality here in this

21        deposition, you say the DIA is an important cultural

22        asset and the board should be proposing something

23        dramatic, not just about refurbishing the parking

24        garage.  What did you mean by that?

25   A.   That's the first time I've laughed in two days.

1           KENNETH BUCKFIRE, VOLUME 2

2                MR. HACKNEY:  I was going to say we were

3           aligned with you on that one, Mr. Buckfire.

4     A.    I had a meeting with them, and they said well, what do

5           you think we should do?  I said well, you notice that

6           the parking garage is dilapidated and condemned

7           because nobody spent any money on it.  Why don't you

8           offer it as part of your proposal to spend the money

9           to renovate it so people will come visit your museum,

10          and they said oh, what a great idea, and I said no,

11          but you got to do more than that.

12    Q.    Okay.  So this was your meeting with Mr. Gargaro where

13          you were again discussing some alternatives with

14          respect to the maximization of that asset?

15    A.    Yeah, this was after our first meeting, actually, we

16          had had a first discussion of the issues, and I had

17          urged them to think about doing something that would

18          justify conveying the collection into an authority.

19    Q.    And at this point, you didn't have -- you still or --

20          you know what, let me ask you the question instead of

21          answering it.

22                Did you have any idea in your head at this

23          point around April 2013, April 29, 2013, of, you know,

24          gee, what would be the right value that the City would

25          need to get in order to be able to convey that asset?

```
 1                KENNETH BUCKFIRE, VOLUME 2

 2    A.   No, we had no idea, just it would have to be a big

 3         number.

 4    Q.   When did the -- I know I have this somewhere in my

 5         papers, but do you have in your head when Christie's

 6         actually came out with its assessment?

 7    A.   I think it was right -- right around the -- well, I

 8         first learned of their range before it was published,

 9         sometime in November, and then the published report, I

10         believe came out end of November, early December.

11    Q.   Of 2013?

12    A.   Yes.

13    Q.   Okay.  So -- and I think you might have already

14         answered this, did you have anything in particular in

15         mind when you used the word dramatic?

16    A.   A big number.

17    Q.   Okay. This is -- these have become sort of favorite

18         phrases, I've been to just a few hearings on this

19         matter, but I've heard these questions asked, so I'm

20         going to ask you since I've heard other people ask

21         them.  Do you know if Miller Buckfire and you did

22         anything to find out what the 100 most valuable pieces

23         of art were in the DIA?

24    A.   Me personally?

25    Q.   Well, not just you personally, but you and/or Miller
```

1           KENNETH BUCKFIRE, VOLUME 2

2           Buckfire, did you guys undertake any other steps other

3           than undertaking Christie's?

4     A.    No, we're not experts in this field, we have no basis

5           upon which to make that judgement.

6     Q.    And I assume that the answer is still the same, but

7           I'll ask again.  Do you know if you or Miller Buckfire

8           took any steps to try to figure out which of the

9           pieces of art were valued at more than a million

10          dollars, you know, which -- or which were

11          considered -- let me strike that and start again.

12               Let's start it this way:  Do you know if

13          you or Miller Buckfire took any steps to find out what

14          the 100 most valuable pieces of art were within the

15          DIA collection?

16    A.    No, aside from retaining Christie's.

17    Q.    Do you know if you or anyone at Miller Buckfire took

18          any steps to determine which of the pieces of art

19          within the DIA had some restrictions on alienation or

20          use or transfer?

21    A.    No.

22    Q.    And again, you would have been relying on Christie's

23          for some of those things?

24    A.    Correct.

25    Q.    So as you sit here today, do you know if Christie's

```
 1              KENNETH BUCKFIRE, VOLUME 2

 2              testified at length about the -- I don't have it, I

 3              just skipped over, like, five pages of questions, but

 4              in general terms, what was your understanding of the

 5              DIA settlement that was going to be a part of the

 6              Grand Bargain?  And I'm not asking you to disclose

 7              attorney-client privilege or mediation stuff.

 8      A.      Well, from a financial perspective, it incorporated

 9              the following elements, first, that the millage which

10              funds a large part of the operating expenses of the

11              DIA would be maintained by the three counties which

12              originally had passed the legislation to impose it.

13              That's, of course, of material benefit to the City,

14              because it means we don't have to come up with 20 or

15              $25 million a year to pay for operating expenses; that

16              would be maintained.

17                   Second, that a -- a collection of local

18              foundations, the board of trustees, and the State

19              would contribute over time a very material amount of

20              capital to the plan, which would be consistent with

21              the valuation range of the Christie's report, which

22              from my perspective, was very important because until

23              we actually had an appraisal and we had facts on which

24              to assess any offer for the collection, we would not

25              know whether the offer was fair to the City, and
```

1            KENNETH BUCKFIRE, VOLUME 2

2            because the amount of money being offered was in the

3            high end of the range of their report, I was quite

4            comfortable, rather, that it was fair to the City.

5                    The amounts of money being provided by the

6            State by foundations and trustees was around $800

7            million, clearly, because those amounts can be

8            regarded as gifts because we haven't sold the

9            collection, the structure of it from a financial

10           perspective was to provide those moneys to the pension

11           funds directly, and what the State required was that

12           those parties, namely, the pension funds and the

13           retirees, dropped and -- or not proceed with any

14           litigation against the State post emergence, which

15           they viewed, that is, the State as a very material

16           consideration in exchange for funding solving.  Those

17           are the principal economic elements.

18    Q.    Okay.  In connection with -- I appreciate your

19           testimony now, and then some things have transpired

20           since then, and for example, now there are additional

21           analyses done by the City of the art at the DIA

22           including art if he is and I know you testified that

23           you have and read it do you know if anybody at Miller

24           Buckfire is doing an analysis is undertaking an

25           analysis of whether or not that new art that's

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2         appraisal or analysis whatever it is should affect,
 3         you know whether or not the value that's being or the
 4         the value of the Grand Bargain is recognizing the true
 5         value, maximizing the true value of the DIA and the
 6         art, I don't even think we've received a copy of it so
 7         the answer is no.
 8    Q.   Is that something you would want to do in connection
 9         with your assistance of the City as the investment
10         banker in connection with all the work you've done to
11         make sure this plan is the way --
12    A.   Yes, it's simply because we just haven't had the time
13         to get to it that we haven't reviewed it yet but we
14         haven't even received a copy so...
15    Q.   If you've testified about this, tell me and for some
16         reason it's seemed similar in my head, but do you
17         recall alternative -- alternative transactions that
18         you evaluated and considered that were alternatives to
19         the DIA settlement?
20              MR. CULLEN:  I believe he did testify to
21         some of those earlier.
22    BY MR. SOTO:
23    Q.   That's what I'm wondering if he can --
24    A.   Well, yes, we've reviewed with Christie's assistance
25         other alternatives that have been proposed by others
```

```
1              KENNETH BUCKFIRE, VOLUME 2

2    Q.   And I think you've answered this question before but

3         you are familiar with the disclosure statement,

4         correct?

5    A.   I am.

6    Q.   Could you take a moment or two just to review this

7         page with me and ask you to read it.

8              So looking at it, are you familiar with the

9         four indications of interest that are laid out there

10        on page 157 that start with this catalyst acquisitions

11        L.L.C. and the next one is art capital group L.L.C.,

12        the next one is Polly international auction company

13        limited and the next one is one management Hong Kong

14        limited?

15   A.   All household names.

16   Q.   I'm asking if you're familiar with those -- what was

17        presented by those entities?

18   A.   Well, I've never been given the statements of

19        interest, the nonbinding proposals so I'm only

20        familiar with what's been reported here in the TOA.

21   Q.   So it was closed in the disclosure statement simply to

22        let everybody know that it had happened?

23   A.   That's correct.

24   Q.   Did you follow up with any of these to determine

25        anything more about the work that they had done or
```

1          KENNETH BUCKFIRE, VOLUME 2

2          their level of interest?

3     A.   No, in order err Houlihan never contacted me or any of

4          our bankers to give us any of the specifics about any

5          of these proposals, to my knowledge.

6     Q.   Would you have been interested enter an alternate

7          proposals like the ones that are being laid out here?

8     A.   Well, normally I would, but you know when you look at

9          the way they were captioned as nonbinding indications

10         of interest, I wouldn't put much value on such a

11         proposal.  That would call into question their

12         ultimate willingness to close on a transaction and

13         indeed their interest in the first place.  And they

14         were never provided to me either, so that tells me

15         that there's something straining about this whole

16         process.

17    Q.   Did you reach out to Houlihan to say hey, guys, do you

18         have anything more than this?

19    A.   They've never contacted us.

20    Q.   I know I got that part of it, I was asking you if you

21         reached out to --

22    A.   No, I haven't called.

23    Q.   Did anyone else at Miller Buckfire call them to try to

24         find out anything about the deals?

25    A.   Not to my knowledge.  But they're not deals; they're

```
 1              KENNETH BUCKFIRE, VOLUME 2

 2         nonbinding indications of interest.

 3    Q.   Okay.

 4    A.   That's a long way from being an offer.

 5    Q.   These nonbinding indications of interest, let me

 6         correct?

 7    A.   Correct.

 8    Q.   So no one at Miller Buckfire ever asked about them

 9         either?

10    A.   They're nothing more than what they say they are which

11         is maybe we'll buy it maybe for this price.

12    Q.   But is it true for an investment banker that's trying

13         to maximize an asset to not even call to try to find

14         out, well, gee, what are you guys proposing?  What is

15         this?

16    A.   Well, this is an effort undertaken by Hoolihan Lokey

17         (ph.) which of course is a banker to certain creditors

18         of the City of Detroit.  We had assisted the emergency

19         manager in negotiating the so-called Grand Bargain,

20         which will generate demonstrable and concrete value

21         for this collection which is a fact plan to take into

22         account.  These are nothing more than nonbinding

23         indications of interest a long way from being a -- a

24         value that one could depend on for purposes as serious

25         as a plan of adjustment.
```

1          KENNETH BUCKFIRE, VOLUME 2

2    Q.   So then let me -- I understand that's your view.

3          Apart from these that are listed in this disclosure

4          statement, were there other entities, I mean did this

5          whet your appetite to think well, maybe there are

6          other entities who would really be interested in the

7          asset that we should contact to try to maximize the

8          value of it.  Recognize we're talking about these, did

9          you try to contact anybody who might be involved in

10         the art monetization world to try to see well, what do

11         you guys think about the DIA art?

12                   MR. CULLEN:  Subsequent to the -- to

13         receiving or being made aware of these expressions of

14         interest.

15                   MR. SOTO:  Well, I actually was going to

16         try to do it chronologically, so I --

17                   MR. CULLEN:  Oh, okay.

18                   MR. SOTO: I was going to say at all and

19         then the substance into it but first at all?

20   A.   No.

21   Q.   Yeah, I'm done with that although, I will be asking

22         some additional questions.

23                   So under the plan of adjustment switching

24         gears now, the City is transferring the entire art

25         collection and the building in exchange for

1              KENNETH BUCKFIRE, VOLUME 2

2    Q.   The docket page is 197?

3                MR. CULLEN:   173 of 197.

4    BY MR. SOTO:

5    Q.   Oh, I'm sorry, 173, so I think if we get to the page

6         to the paragraph that says DIA settlement?

7    A.   Yes.

8    Q.   And that last settlement sentence of that first

9         paragraph as of the date of filing of this disclosure

10        statement the foundations had tentatively agreed to

11        pledge at least 366 million in foundation funds

12        payable or over a period of 20 years?

13   A.   Right.

14   Q.   In support of this agreement?

15   A.   That's right.

16   Q.   Do you know if that's changed at all in connection

17        with the plan?

18   A.   Not to my knowledge.

19   Q.   So it's 360 million over 20 years?

20   A.   Correct.

21   Q.   And in addition to the foundations, the DIA Corp. is

22        also committed to giving a hundred million over 20

23        years, correct?

24   A.   Correct.

25   Q.   And in determining whether or not you had maximized or

1              KENNETH BUCKFIRE, VOLUME 2

2        you were maximizing the value of that asset in

3        connection with this exchange, did you do calculations

4        to determine well, gee, what is the value of somebody

5        giving you 366 million over 20 years and somebody else

6        giving you a hundred million over 20 years, what does

7        that come out to in present terms, did you do that

8        work?

9    A.  No.

10   Q.  Do you know if anybody at Miller Buckfire did?

11   A.  No.  Well, yes, I'm sorry, yes, no one has done the

12       work.

13   Q.  Okay.  And can you -- can you tell me why -- wouldn't

14       you want to know you're taking the art today, what are

15       they giving me today?

16   A.  Mm-hmm.

17   Q.  Would you want to know that?

18   A.  In certain circumstances I would, but one of the

19       elements of the Christie's valuation which you haven't

20       asked me yet is over what period of time they would

21       anticipate monetizing the collection to realize those

22       values if indeed we had directed them to do so so even

23       though they gave us a valuation range which is in the

24       POA, I don't believe they stipulated in this analysis

25       or this report how long it would take and what they

1              KENNETH BUCKFIRE, VOLUME 2

2         did tell us which I believe is in their original

3         report, it would take several years to quote monetize

4         the value of the art that they reflected in their

5         range so the range in and of itself is not present

6         value adjusted and for that reason we did not feel

7         necessary to calculate the present value of the

8         payment stream relative to the value of the art

9         because the art rate, itself, was perhaps not done

10        according to Black Sholes (ph.).  It's a number but

11        it's a number with a lot of judgement around when you

12        would realize that.  That also was a function of the

13        wide nature of range gap.  I mean it's a pretty wide

14        range.

15   Q.   So it's your understanding, and I want to to make sure

16        what you said when Christie's gave these values, they

17        weren't saying that's the value of that piece of art

18        if you want to buy it today?

19   A.   That's correct, they're saying when we go and properly

20        find the art and find the right buyer there might be

21        one buyer in the world for every piece, we believe

22        this is the price we'll get for you.

23   Q.   And do you know where in their report they -- they

24        indicate that?

25   A.   I'd have to go back and reread it, they certainly told