# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION – DETROIT

-------------------------------------------------------- x
:
In re: : Chapter 9
:
CITY OF DETROIT, MICHIGAN, : Case No.: 13-53846
:
             Debtor. : Hon. Steven W. Rhodes
:
-------------------------------------------------------- x

## PRETRIAL BRIEF OF INTERNATIONAL UNION, UAW
## IN SUPPORT OF OBJECTION TO PLAN CONFIRMATION

Cohen, Weiss and Simon LLP
Babette A. Ceccotti
Thomas N. Ciantra
Peter D. DeChiara
Joshua J. Ellison
330 West 42nd Street
New York, NY 10036-6976
T: (212) 563-4100
F: (212) 695-5436
bceccotti@cwsny.com
tciantra@cwsny.com
pdechiara@cwsny.com
jellison@cwsny.com

- and -

Niraj R. Ganatra (P63150)
UAW Legal Department
8000 East Jefferson Avenue
Detroit, MI 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net

*Attorneys for International Union, UAW*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... iii

PRELIMINARY STATEMENT .............................................................. 1

RELEVANT FACTUAL BACKGROUND ............................................... 4

    The UAW ........................................................................................ 4

    The Library ..................................................................................... 4

    The Pension Benefits of Library Employees ................................. 8

    OPEB for Library Employees ...................................................... 11

    The Library's CBA's with the UAW ........................................... 11

    Plan Provisions Modifying GRS Pension and OPEB Claims Include
        Library Employees and Retirees ...................................... 13

    Pension and OPEB Grievance Proceedings ................................ 16

ARGUMENT....................................................................................... 18

I.    The City's Plan May Not Apply the Class 11 and Class 12 Cuts to the
    UAW-Represented Employees or Retirees of the Detroit Public
    Library ............................................................................................ 18

    A.    The City's Chapter 9 Case Cannot Alter the Pension or OPEB
        Obligations Owed to UAW Represented Library Employees
        and Retirees ...................................................................... 18

    B.    The AFS Recoupment Terms Cannot Be Applied to the
        Library Employees or Retirees........................................ 27

    C.    The City Cannot Modify the Library CBAs Through Its Plan.......... 32

    D.    Inclusion of the Library Employees and Retirees in Classes 11
        and 12 Renders the Plan Unconfirmable ......................... 33

i

II.   The Court Should Not Confirm the Plan to Any Extent  That
      Employees and Retirees Remain Subject to Further  Benefit Cuts
      Based on Non-Receipt of the Outside Funding. ......................................... 36

      A.   The Outside Funding Arrangements Contain Many  Conditions
           to Their Respective Funding Commitments. .................................... 36

      B.   Under the Plan, Non-Receipt of the Outside  Funding Triggers
           the Larger "Alternative B" Cuts. ..................................................... 40

      C.   In Conducting the Confirmation Hearing, the Court Should
           Require Definitive Notification Regarding the Initial Funding
           Commitments ................................................................................... 41

      D.   The Court Should Approve the Plan on the Basis of  Irrevocable
           Commitments of the Outside Funding,  and Require a Further
           Hearing Should the City Seek  to Impose the "Alternative B"
           Pension Cuts in the Future. ............................................................. 42

III.  The Court Should Review ASF Recoupment. ........................................... 47

      CONCLUSION ................................................................................ 48

# TABLE OF AUTHORITIES

Page(s)

CASES

Buback v. Romney,
    156 N.W.2d 549 (Mich. 1968) ........................................................27

CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local
    731, 62 F.3d 405 (6th Cir. 1988) ..................................................23

Dullam v. Wilson,
    19 N.W. 112 (Mich. 1884) ...........................................................27

Harris Trust & Sav. Bank v. Salomon Smith Barney,
    530 U.S. 238 (2000) ....................................................................31

In re AOV Industries, Inc.,
    792 F. 2d 1140 (D.C. Cir. 1986) ..................................................25

In re City of Detroit, Michigan,
    504 B.R. 97 (Bankr. E.D. Mich. 2013) .........................................45

In re Gregory Boat Co.,
    144 B.R. 361 (Bankr. E.D. Mich. 1992) .......................................44

In re N.Y. Off-Track Betting Corp.,
    427 B.R. 256 (Bankr. S.D.N.Y. 2010) ..........................................45

In re Pesce Baking Co., Inc.,
    43 B.R. 949 (Bankr. N.D. Ohio 1984) ..........................................33

In re Request for Advisory Op. Regarding Constitutionality of
    2011 PA 38, 806 N.W.2d 683 (Mich. 2011) ..................................19

Jackson Dist. Library v. Jackson County No. 1,
    146 Mich. App. 392 (Mich. Ct. App. 1985) ....................................6

Kosa v. Treasurer of State of Mich.,
    292 N.W.2d 452 (Mich. 1980) ...............................................19, 46

Kuhn v. Thompson,
    168 Mich. 511 (Mich. 1912) ......................................................5, 6

Page(s)

*Wayne Cty. Emps. Ret. Sys. v. Wayne Cnty*,
    836 N.W.2d 279 (Mich. Ct. App. 2013) ............................................30

*Wood v. State Admin. Bd.*,
    238 N.W. 16 (Mich. 1931) ...........................................................27

## STATUTES

11 U.S.C. § 365(a) ...........................................................................32

11 U.S.C. § 941 ..........................................................................18, 35

11 U.S.C. § 943(b) ....................................................................35, 46

11 U.S.C. § 1122(a) .............................................................25, 29, 33

11 U.S.C. § 1123(a) .........................................................25, 26, 29, 33

11 U.S.C. § 1129(a) .............................................................33, 44, 46

Detroit City Code Section 47-4-1 ................................................31, 34

MICH. COMP. LAWS § 38.1132 .........................................................20

MICH. COMP. LAWS § 38.1133(8) ................................................30, 34

MICH. COMP. LAWS § 38.1140m .......................................................20

MICH. COMP. LAWS § 141.1567(e) ...................................................34

MICH. COMP. LAWS § 397.401 ...........................................................5

Mich. Comp. Laws § 423.209(a) .......................................................34

MICH. COMP. LAWS § 423.210(1) ......................................................32

MICH. COMP. LAWS § 423.215(1) ......................................................12

MICH. COMP. LAWS § 429.209(1) ......................................................32

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") submits this pretrial brief in support of its objections to the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket 6908] (the "Plan"), as set forth in the UAW's August 1, 2014 Objection to the Fifth Amended Plan for the Adjustment of Debts of the City of Detroit ("Objection") [Docket No. 6464].

## PRELIMINARY STATEMENT

The UAW objects to the Plan on two grounds. First, the Plan's treatment of GRS Pension Claims and OPEB Claims[1] is improper as to the employees and retirees of the Detroit Public Library. Among other things, the Plan would reduce accrued pension benefits, modify the terms of future pension accruals and eliminate other post-employment benefits ("OPEB") for employees and retirees of an entity that is not a debtor in this case: the Detroit Library Commission (the "DLC"), also known as the Detroit Public Library (the "Library"). The Library, which all parties concede is a municipal corporation separate and independent of the City, is responsible for and has funded pension and other OPEB benefits for its employees and retirees. The City has acknowledged

---

[1] Unless specified otherwise, defined terms refer to the terms as defined in the City's Plan and in the Fourth Amended Disclosure Statement With Respect to the Fourth Amended Plan For the Adjustment of Debts of the City of Detroit [Docket 4391] ("Fourth Amended Disclosure Statement").

that the Library's obligations to its employees and retirees are separate obligations. Nonetheless, the City's Plan subjects the Library employees and retirees to the same pension cuts as the City employees and retirees, reducing their accrued pension benefits, including by ASF Recoupment. The City has also included Library OPEB obligations as OPEB Claims under the Plan. Imposing these benefit cuts on employees and retirees of a non-debtor entity which remains obligated for these benefits notwithstanding the City's bankruptcy improperly extends the City's plan of adjustment beyond the adjustment of the debtor's debts. Moreover, extending the cuts to the Library employees and retirees would (as to the accrued pension benefits) violate the provisions of Article 9, Section 24 of the Michigan Constitution; and, as to both pension benefits and OPEB, and violate the collective bargaining agreements ("CBAs") in effect between the UAW and the Library that obligate the Library to provide pensions and OPEB.

For these and other reasons set forth below, the Plan should not be confirmed so long as it purports to cut pension benefits, including through AFS Recoupment, and OPEB for Library employees and retirees, or otherwise interfere with the collective bargaining rights and obligations of the UAW and the Library.

Second, continued uncertainties regarding the Outside Funding proposed for the treatment of pension claims under "Alternative A" should not persist through the Confirmation Hearing and beyond. Under the Plan, acceptance

by Classes 10 and 11 is a condition of the Outside Funding under the State Contribution Agreement and the DIA Settlement and triggers the lower, "Alternative A" pension cuts. The announced voting results show that Classes 10 and 11 are deemed to have accepted the Plan. The City's Plan nevertheless incorporates some risk that cuts greater than the "Alternative A" cuts could still be imposed. For example, the Plan provides that, if the "initial funding conditions" for the State Contribution are not met by the Confirmation Hearing, Classes 10 and 11 will be deemed to have voted to reject the Plan, despite having voted to accept the Plan. In addition, a subsequent failure of the conditions under either the State Contribution Agreement or the DIA Settlement could cause the cuts proposed under "Alternative A" to be increased.

To address the open conditions that could result in the imposition of cuts lower than "Alternative A," the Court should require the State to provide notification that the "initial funding conditions" have been fulfilled. In addition, if and when the Court finds that the City's Plan has otherwise met the requirements of the Bankruptcy Code for confirmation, the Court should deny the City the ability to automatically impose greater cuts based upon an alleged failure of the funding conditions in the future, and instead require that the City return to Court in the event the City believes that any alleged failure of the funding commitments has been triggered.

## RELEVANT FACTUAL BACKGROUND

The record to be adduced at the hearing on Plan confirmation will establish the following facts.

The UAW

The UAW is a labor organization headquartered in the City of Detroit that serves as collective bargaining representative of various categories of City employees: Police Department civilian investigators, Law Department attorneys and paralegals, Water and Sewerage Department wastewater treatment operators and associated skilled workers. Retirees from these UAW-represented classifications participate in the GRS pension plans.

The UAW also serves as collective bargaining representative for the employees of the Library in the following three bargaining units: the Professional Organization of Librarians; the Association of Professional Librarians; and Skilled Trades. The UAW and the Library are party to CBAs establishing the terms and conditions of employment of the employees in these three units. *See* transcript of July 16, 2014 deposition of Jo Anne G. Mondowney ("Mondowney Dep.") at 119.

The Library

As the City acknowledges, the Library is "a statutory body created by the State of Michigan that is legally separate from the City." May 6, 2014 City Response to UAW Interrogatories, at 11 (Response to Interrogatory #1).

In 1881, the Michigan Legislature directed the Detroit Board of Education to establish a public library and authorized it to elect a board of commissioners to manage and control the library. *See* Local Act No. 314 (1881). In 1901, the Legislature established the DLC as an independent corporation "clothed with all the powers for the management and control of the library," and capable, among other things, of suing and being sued, owning property, making contracts and promulgating rules and regulations. *See* Local Act No. 359 (1901), at §1. The statute provided that the members of the DLC would be elected by the Detroit Board of Education, with the president of the Board of Education serving as an *ex-officio* member. *See id*.[2]

In its 1912 decision in *Kuhn v. Thompson*, 168 Mich. 511 (Mich. 1912), the Michigan Supreme Court recognized the separation between the City and the DLC. There, the court addressed the question of whether bonds issued by the DLC and the Detroit Board of Education counted toward the ceiling on indebtedness permitted the City of Detroit. *Id.* at 516. In holding that they did not,

---

[2] That the Library is "within" but not part "of" the City finds support in the statute, MICH. COMP. LAWS § 397.401 (2014), that provides that the library commission in any city with a population of over 250,000 (*i.e.*, that of Detroit) shall have a territory of operation coextensive with the boundaries of that city. Had the Legislature considered the Library part of the City, it would not have needed to specify that its territory of operation was coextensive with the City.

the court accepted that the Detroit Board of Education and the DLC were "distinct and independent corporations." *Id*. at 515.

The court explained that education has traditionally been a "distinctive function of state government" and that school boards have always been separate from cities, towns and villages, even if they cover the same territory and are closely allied with such municipal corporations. *See id*. at 518-19. The court reasoned that the analysis applicable to schools also applies to libraries, since libraries "enlarge and supplement the work of schools" and are thus "part of the educational system of the state." *Id*. at 518. The court also noted that the commissioners of the DLC are chosen by the members of the Detroit Board of Education. *See id*.[3]

The Library remains separate from the City. It describes itself as "an independent, municipal corporation." *See* http://www.detroit.lib.mi.us/detroit-library-commission (last visited August 27, 2014); *see also* Mondowney Dep. at

---

[3] *Jackson Dist. Library v. Jackson County No. 1*, 146 Mich. App. 392 (Mich. Ct. App. 1985), also supports the proposition that libraries in Michigan are distinct from other governmental entities. The court there held that a library had the legal capacity to sue the county in which it was located, to claim a share of certain tax revenue. The court explained that as an entity created by state law to conduct state business, the library was a "quasi-municipal corporation." *Id*. at 396-97. It concluded that "in light of the constitutional stature of libraries, it seems clear that a library is independent for purposes of suing one of its 'parent' governmental units over tax collections." *Id*. at 397.

10, 22 (DLC's executive director acknowledging that the DLC is "a separate entity" and "not in fact a department of the City").[4] The members of the DLC continue to be chosen by the Detroit Board of Education. *See* Mondowney Dep. at 11-12. The City plays no role in their selection. Nor does the City play any role in the selection of the Library's officers, management or staff. *See id*. at 12-13.

The Library formulates its own budget, with the City playing no role in that process. *See* Mondowney Dep. at 22-23. It maintains a bank account separate from the City. *See id.* at 18. The Library maintains an accounting of its assets and liabilities separate from the City. *See id*. at 26-27; *see also* Library's June 30, 2013 Financial Statements ("Fin. Stats."), at iv. The Library also retains its own accountants and auditors. *See* Mondowney Dep. at 24, 26.

Most of the Library's revenues comes from property taxes which, while collected by the City, are specifically earmarked for the Library. *See* Mondowney Dep. at 27; *see also* Fin. Stats. at iv, 10 (noting that in the year ended June 30, 2013, 4.6307 mills – $4.6307 per $1,000 in property taxes levied – were for Library operations). While the City provides the Library with certain services,

---

[4] The City's Charter also makes clear that the Library is not part of the City: the Charter nowhere mentions the Library among its listing of the City's departments and agencies. The Charter's sole reference to the Library simply grants the City power to contribute to and aid the Library: "[t]he City may make appropriations to, and exercise its power in aid of, the Detroit Library Commission for the operation of libraries within the City." 2012 Detroit City Charter § 9-504.

including administrative and legal services, *see* Mondowney Dep. at 23, the Library pays for those services, *see id*. at 28. The City neither makes appropriations to the Library nor subsidizes the Library in any way. *See* Mondowney Dep. at 27.

The Library is also independent of the City regarding personnel matters. It has its own human resources office and supervisory staff and it hires, fires and promotes its own employees. *See* Mondowney Dep. at 13. The Library maintains its own payroll function. *See* transcript of July 15, 2014 deposition of GRS Executive Director Cynthia Thomas ("Thomas Dep.") at 13. The Library has final say regarding the pay and benefits of its employees. *See* Mondowney Dep. at 15. It also engages, without any participation from the City, in collective bargaining with the unions that represent its employees. *See id*. at 15. The City is neither party to the Library's collective bargaining agreements nor does it have any say or approval regarding the Library's collective bargaining. *See id*. at 16-17.

The Pension Benefits of Library Employees

In a resolution dated June 24, 1938, the DLC, which had no pension program of its own, stated that it "adopts for the employees of the Detroit Library Commission, the retirement system which has been adopted for the employees of the City of Detroit, so that the employees of said Detroit Library Commission be included under the provisions of the retirement system." *See* June 24, 1938 DLC

Special Meeting Minutes. Ever since, DLC employees and retirees have been participants in the GRS. However, while they are GRS participants, they are not employees or retirees of the City, and their pension benefits, and the liabilities for those benefits, remain separate from those of the City employees and retirees.

As of May 1, 2014, GRS plan participants included 328 Library employees, 43 deferred vested former Library employees and 333 Library retirees. *See* May 8, 2014 GRS Responses to UAW Interrogatories ("GRS Resp.") at 5-6 (Interr. Resp. #1).[5] Those from UAW-represented units were among them.

GRS accounts for Library pension liabilities separate from City pension liabilities. *See* June 30, 2013 GRS 75th Annual Actuarial Valuation ("GRS Valuation"), at B-3. For example, the GRS reported that for the year ended June 30, 2013, GRS defined benefit plan liabilities for Library employees, former employees and retirees was approximately $109 million. *See id.*; *see also* Thomas Dep. at 51-52. GRS also breaks out separately, as between the Library and the City, the amount of assets in the GRS "Pension Reserve Fund" available to pay defined benefit pension liabilities. *See* GRS Valuation at B-2; Thomas Dep. at 49. For example, for the fiscal year 2013, the Pension Reserve Fund had

---

[5] Deferred vested former employees have vested pension benefits but have not yet retired.

approximately $1.2 billion for the City and $66 million for the Library. *See* GRS Valuation at B-2; Thomas Dep. at 50.

The GRS also maintains separate records for contributions owed for pension benefits of Library employees and retirees. *See* Thomas Dep. at 18-19. It bills the Library directly for these contributions. *See id.* at 20-21.

The Library makes regular contributions—paid by wire transfer, *see* Thomas Dep. at 42—to the GRS defined benefit plan to finance the pension benefits of its employees and retirees. *See* Mondowney Dep. at 63; Thomas Dep. at 31. According to the Library's records, from July 2007 to January 2014, it contributed approximately $14.1 million to the GRS to fund the pensions of Library employees and retirees. *See* Library's "Pension Contributions to General Retirement System, July 2007 to January 2014"; Mondowney Dep. at 54-55. The GRS reports that for the year ended June 30, 2013, approximately $4.2 million was contributed to the GRS defined benefit plan for Library pensions. *See* GRS Resp., at 7 (Response to Interrogatory #2).

The money used to make these contributions was the Library's money, not the City's. *See* Mondowney Dep. at 52, 54-55, 61; *see also* Thomas Dep. at 44 (noting that GRS never received money wired from the City as an employer contribution for Library employees and retirees). The Library believes

that City has no obligation to finance pension benefits of Library retirees. *See*

Mondowney Dep. at 82.

OPEB for Library Employees

In addition to pension benefits, the Library provides OPEB to its

retirees, including retirees from UAW-represented units. *See* Mondowney Dep. at

42, 47. In particular, the Library provides them with hospitalization, dental care,

eye care and life insurance. *See* Mondowney Dep. at 42; Fin. Stats. at 22. The

City manages the OPEB program but the Library reimburses the City for the OPEB

costs. *See* Mondowney Dep. at 64. The Library's annual required contribution for

OPEB is determined by the Library's actuaries at the Library's request. *See, e.g.,*

Detroit Public Library Retiree Health Care Plan Actuarial Valuation Report as of

June 30, 2011, at 1. For the year ended, June 30, 2012, the Library paid

approximately $1.8 million for its OPEB costs. *See id*. at 91, 96; *see* Fin. Stats. at

22. The City paid none of this amount. *See id*. at 96.

The Library's CBA's with the UAW

The Library is party with the UAW to CBAs governing the terms and

conditions of employment of the Library employees in the three UAW-represented

bargaining units.  As the Library acknowledges, these CBAs remain in full force

and effect.  *See* Mondowney Dep. at 119.[6]

The CBA's provide detailed terms regarding pension eligibility and

pension calculations for retirees from UAW-represented bargaining units.  For

example, the CBA's provide that employees who retire on or after July 1, 1998

shall have their pensions computed using the highest paid 36 consecutive months

out of the last 120 months of their employment as their average final

compensation.  The CBA's also provide, for example, a 2.25% post-retirement

escalator factor.[7]

In addition, the CBA's require the Library to provide OPEB to UAW

retirees.  In particular, the CBA's mandate that the Library provide "regular

retirees and their spouses hospitalization and medical insurance" for "as long as

they receive a pension from the Library."

---

[6] The City has imposed City Employment Terms ("CETs" ) on most City
employees but not on the Library employees.  The Library CBA's are not subject
to modification absent the agreement of the bargaining parties.  MICH. COMP.
LAWS § 423.215(1) (2014).  The CBAs cannot be rejected by the City in this
bankruptcy case, since the City is not a party to the CBAs and the Library is not a
debtor.  For purposes of Michigan's public-sector collective bargaining law, the
Library is a "public employer" separate from the City.

[7] While the CBAs reference and incorporate the terms of the retirement plans as
set forth in the City Charter and Municipal Code, the CBAs expressly provide that
such terms are incorporated "unless otherwise specifically modified by this
Agreement and Ordinance 2-93, J.C.C. Page 133."

## Plan Provisions Modifying GRS Pension and
## OPEB Claims Include Library Employees and Retirees

The City's Plan would cut the Library's current pension funding obligations for accrued pension benefits and cut the accrued pension benefits of Library employees and retirees along with those of the City's employees and retirees. *See* Aug. 8, 2014 letter from City counsel Geoffrey S. Irwin to UAW Counsel Peter D. DeChiara ("Aug. 8, 2014 City Resp.") at ¶2 (confirming that projections of Library's contributions under the Plan "reflect the application to the Library employees and retirees of the reductions … under the Plan.")

The Plan includes the Library employees and retirees in its definition of "GRS Pension Claim," by defining the term to include claims by "any participant in the GRS":

> any Claim (other than an OPEB Claim) whether asserted by current or former employees of the City, *or any participants in GRS* … against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation … for (a) any pension, disability or other post-retirement payment in respect of the employment of current for former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

Plan, § I, No. 194 at 16 (emphasis added).[8] The Plan thus subjects Library

employees and retirees to the proposed pension cuts applicable to holders of a

"GRS Pension Claim" even though they are not employees or retirees of the City.

Class 11 of the City's Plan provides that "the pension benefits payable to each

Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension

Amount for such Holder." The "GRS Adjusted Pension Amount" includes the

"Alternative A" across the board cuts to pensions accrued as of July 1, 2014 (or,

upon a rejection by Class 11 or Class 10, the greater, "Alternative B" across the

board cuts); the elimination of cost of living increases after July 1, 2014, and the

ASF Recoupment. In addition, for post-July 1, 2014 service, Class 11 active

employees will accrue pension service under a modified arrangement known as the

"New GRS Active Pension Plan." Plan, § II.B.3.r.ii.C, F, at 39-40.

---

[8] The phrase, "or any participants in GRS" (*i.e.*, whether or not they are current or former employees of the City) first appeared in the City's Fifth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket 6908] filed on July 25, 2014 (the "Fifth Amended Plan"). In that version of its Plan, the City also inserted a similar change to the definition of "New GRS Active Pension Plan," which is now defined, in relevant part, as the "terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City *or another entity that participates in GRS* in connection with employment service performed on or after July 1, 2014…." Plan, § I, No. 238 at 19 (emphasis added). Thus, the City intends that the new pension terms for active employees would apply to Library employees as well.

The City does not differentiate between City employees and retirees and Library employees and retirees in the proposed treatment of Class 11 claims even though the Library employees and retirees' pension benefits are funded by the Library as an independent, non-debtor entity and are required to be provided under the Library's CBAs. Moreover, the Plan purports to include the Library in a proposed injunction against any changes to certain pension-related features of the Plan for 10 years.[9]

Similarly, the Plan would eliminate OPEB for Library retirees, by failing to exclude Library retirees from others with OPEB claims. Under the Plan, "OPEB Claim" means "any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB benefits, and any eligible surviving beneficiaries of such retiree." Plan, § I No. 248 at 20. It contains no exclusion for Library retirees.

Worse still, while the Plan provides for the establishment of a VEBA to provide OPEB benefits for City retirees, it makes *no* provision for an alternative source of benefits available to Library retirees, or any other recovery for them at all. Class 12 of the Plan purports to allow the "OPEB Claims" in the aggregate

---

[9] *See* Plan, § II.B.3.r.ii.H at 41 (enjoining the trustees of the GRS and "all other persons and entities" from any amendments to the GRS changing the benefit calculation, interest rate, City contribution terms, new pension accruals, or other terms through June 30, 2023).

amount of $4,303,000,000. Under the City's Plan, two VEBAs would be established, to be funded by VEBA New B Notes, as well as an additional, contingent distribution. The City's obligation for OPEB benefits would otherwise be discharged. For GRS participants, a "Detroit General VEBA" would be established "to provide health benefits to Detroit General VEBA Beneficiaries. A "Detroit General VEBA Beneficiary" is a Holder of an OPEB Claim who is a "Detroit General Retiree." The Plan defines a "Detroit General Retiree" as "a retired employees or surviving beneficiary of a retiree employee of *a department of the City*" who is not a Detroit Police and Fire Retiree and who retired on or before December 31, 2014 and "is a Holder of an OPEB Claim." City's Plan, § I, No. 99 at 9; § II.B.3.s.i., ii., at 41. Because Library retirees are not retirees of "a department of the City," they would be excluded from the VEBA.

Pension and OPEB Grievance Proceedings

The UAW has challenged the extension of these benefits cuts to employees and retirees of the Library because the Library is not a debtor in this Chapter 9 case, and because the CBAs—to which the City is not a party—require the Library to provide pensions and OPEB. For example, effective March 1, 2014, the City implemented significant reductions to OPEB for City retirees, offering Medicare-eligible retirees the option of certain Medicare Advantage insurance plans and providing non-Medicare-eligible retirees a stipend towards health

insurance coverage they find on their own.  *See* Fourth Amended Disclosure

Statement at pp. 149-50.  These same OPEB reductions were imposed on the

Library retirees in place of the coverage provided for in the Library CBAs.  The

UAW has prepared grievances to be filed under the grievance-arbitration provision

of the CBA's, asserting that these OPEB benefit reductions violated the Library's

contractual obligation to provide for and fund OPEB for its UAW-represented

retirees.[10]

Similarly, on June 29, 2014, the UAW filed grievances against the

Library over announced changes to pension benefits or pension service accruals

that were to be effective July 1, 2014, and unilateral changes in the treatment of

employee accrued sick leave.[11]

---

[10] The UAW, however, has refrained from filing the grievances pursuant to a
tolling agreement with the Library to allow for ongoing settlement discussions.

[11] By agreement with the Library, the UAW is also holding these grievances in
abeyance pending settlement discussions.

# ARGUMENT

I.      The City's Plan May Not Apply the Class 11 and Class 12 Cuts to the <u>UAW-Represented Employees or Retirees of the Detroit Public Library</u>

        A.      The City's Chapter 9 Case Cannot Alter the Pension or OPEB Obligations Owed to UAW <u>Represented Library Employees and Retirees</u>

             Chapter 9 is clear that the City cannot adjust the debts of a non-debtor: "[t]he debtor shall file a plan of adjustment *of the debtor's debts*." 11 U.S.C. § 941 (emphasis added). Because the Library is a separate and distinct entity from the City, it is not a debtor, nor a part of the debtor, in the Chapter 9 Case. Fundamentally, then, the Library's obligations owed to the Library employees and retirees by virtue of their employment by the Library cannot be modified through the City's Chapter 9 plan of adjustment.

First, notwithstanding the City's bankruptcy case, the Michigan Constitution protects the accrued pension benefits of the Library employees and retirees. Article 9, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall *not be diminished or impaired* thereby." MICH. CONST. Art. IX, §24 (emphasis added). The constitutional clause further provides that such benefits "shall be funded" each year. *Id.* The Michigan Supreme Court has interpreted Article 9, Section 24 as creating "the *firmly established right* of public employees to receive pension

payments as those payments become due." *Kosa v. Treasurer of State of Mich.*, 292 N.W.2d 452, 460 (Mich. 1980) (emphasis added); *see also In re Request for Advisory Op. Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) (finding that "[t]he obvious intent" of Article 9, Section 24 was "to ensure that public pensions be treated as contractual obligations that, *once earned, could not be diminished*.") (emphasis added). This Court has ruled that because the City is a Chapter 9 debtor, Article 9, Section 24 does not preclude the City from adjusting the pension benefits of City employees, but that ruling has no application to the Library's obligations to its employees and retirees, since the Library is not a debtor in this bankruptcy case.[12]

That the Library employees and retirees are participants in the same Retirement System as the City employees and retirees provides no basis for reducing their accrued pension benefits in the City's Chapter 9 case. The GRS is simply the mechanism by which the pension benefits are administered. In the case of the Library employees and retirees, their GRS-administered benefits have been

---

[12] The UAW has appealed the Court's ruling that the City was eligible for Chapter 9 bankruptcy despite its expressed intent to cut accrued pension benefits, and the Court's further ruling that it had the authority to reduce pension benefits notwithstanding Article 9, Section 24 of the Michigan Constitution. *See In re Int'l Union, UAW*, Case No. 14-1213 (6th Cir.). But whether or not those rulings stand, it is clear that Michigan has not authorized the federal judiciary to set aside Article 9, Section 24 with respect the accrued pension benefits of the *Library's* employees and retirees.

funded by their employer, the non-debtor Detroit Public Library.[13]  Because the

Library is not a debtor in this case, Article 9, Section 24 continues to apply to

protect the Library participants' accrued benefits from impairment or diminishment

and requires that those benefits be funded each year.

Furthermore, for those Library employees and retirees from UAW-

represented bargaining units, the Library has contractual obligations under its

CBA's with the UAW to provide accrued pensions and future pension accruals for

their services as Library employees.  Nothing in the City's Chapter 9 bankruptcy

authorizes, or could authorize, any alternation in the Library's contractual

obligation to provide these benefits.

Similarly, no basis exists to eliminate OPEB for Library retirees under

the City's plan of adjustment.  While the City administers OPEB for Library

retirees, the Library pays for the OPEB and is contractually bound to provide

OPEB pursuant to its CBA's with the UAW.[14]  If the City is eliminating its

---

[13] Under Michigan's Public Employment Retirement System Investment Act ("PERSIA"), MICH. COMP. LAWS § 38.1132 *et seq.*, annual contributions to the GRS are made by the "employer."  *See* MICH. COMP. LAWS § 38.1140m (describing the annual "required employer contribution" to the retirement system). There is no doubt that the Library is the employer, past and present, of its UAW-represented employees and retirees.

[14] Further, the Library and the UAW have agreed, in their CBAs, to mutually binding and final arbitration of their contractual disputes, including any disputes over pensions and OPEB.

administration of OPEB benefits, then the Library and the UAW will need to negotiate another vehicle for the Library to provide the negotiated OPEB benefits for UAW-represented retirees. The City cannot turn the Library's obligation into an OPEB Claim and then eliminate it through VEBAs that are limited to retirees of City Departments.

The City does not dispute that its Chapter 9 case cannot modify the Library's obligations to its employees and retirees. In its disclosure statement, the City concedes that the "*Library's obligations to current and former employees for pension and OPEB benefits are separate from any obligation the City may have*." Fourth Amended Disclosure Statement at 15 (emphasis added). Indeed, when it solicited the votes of Library employees and retirees, it represented to them that their votes would not affect the Library's obligations. The Class 11 solicitation materials included a notice to Library employees and retirees that stated that "[y]our vote on the City's Plan affects only any obligation the City may have *and does not change the Library's obligations for pension benefits*." *See* May 2, 2014 Notice of Final Exhibits in Connection With Corrected Motion of the City of Detroit for Entry of an Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment With Respect to Pension and OPEB Claims [Docket No. 4378], Exhibit 6C2 ("Notice Regarding Proposed Changes to Pensions in the City's Plan of Adjustment and

Your Right to Vote on the Plan") (emphasis added).  *See also id.*, Exhibit 6C3

("Notice Regarding Proposed Changes to Post-employment Healthcare Benefits in

the City's Plan of Adjustment") (incorporating the same notice to Library retirees

with respect to OPEB Claims in Class 12).

Nonetheless, the City now purports to use its plan of adjustment to

reduce the Library's contributions for accrued pension benefits, *see* Aug. 8, 2014

City Resp at ¶ 2, and cut the pensions of Library employee and retirees that the

Library alone has funded, notwithstanding the Library's CBAs and Article 9,

Section 24 of the Michigan Constitution.  It stakes this untenable position on the

ground that the City may have some undefined, unquantified and undisclosed

liability for the pensions of the Library employees and retirees; that this possible

contingent liability gives rise to a claim against the City by the Library employees

and retirees; and that this claim can be adjusted in this bankruptcy case.  In

particular, the City asserts that it can reduce the pension and OPEB benefits of the

Library employees and retirees in its Chapter 9 Case "to any extent the City has

any obligations" to them by virtue of their status as GRS pension plan participants

or participation in the City's OPEB programs for the City's employees and retirees.

*See* Fourth Amended Disclosure Statement at 14.

When pressed to identify the contingent liability on which is relies,

the City provides no adequate response.  Rather, it simply asserts that GRS

underfunding gives rise to a claim against the City and that this GRS underfunding includes "the underfunded pensions of, among others, Library participants in the GRS." Aug. 8, 2014 City Resp. at ¶3. This asserted liability of the City for Library pensions, which lumps the Library GRS pensions in with the City GRS pensions, ignores the undisputed reality that the Library has been the sole contributor to GRS defined benefit pensions for *its* employees and retirees; that the GRS *separately* accounts for Library contributions; that the GRS *separately* accounts for the liabilities for Library pensions; that the GRS *separately* accounts for the GRS assets to be used to pay Library pensions; and that these Library pensions are paid to the employees and retirees of a separate and independent entity.

There is simply no basis to conclude that the City can, through its plan of adjustment, modify the Library's pension funding obligations and the Library employees' and retirees' pension benefits merely because the overall GRS underfunding is composed, in part, of the separate pension liabilities of Library participants. Moreover, for the City to discharge its liability, there must be an articulated basis for a claim under the applicable non-bankruptcy law. *See CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 731,* 62 F.3d 405 (6th Cir. 1988) (rejecting discharge of asserted contingent claim for withdrawal liability because applicable non-bankruptcy law provided for no right

to payment, and therefore no contingent claim, in the absence of an actual withdrawal from the pension plan). Here, the City is merely asserting that the unfunded liability is a claim against the City. The City has not explained how the unfunded liability gives rise to a claim against the City *by the Library employees and retirees*.

Even if the City had articulated a basis for a contingent claim for which the City is liable, no basis exists for subjecting the Library employees and retirees to the same cuts proposed for the City employees and retirees under Class 11 of the Plan. The Library is already obligated for, and is paying for, Library pension benefits through its separately funded millage which is unaffected by the City's plan of adjustment. Forcing the Library people to give up the same level of cuts as the City employees and retirees ignores that the Library employees and retirees already have a funding source for their pension benefits which remains legally obligated to continue its funding obligation.[15] The Library employees and retirees in Class 11, therefore, are giving up greater value than the City employees and retirees but getting the same treatment under the Plan.

---

[15] The Fifth Amended Plan [Docket No. 6257] identified, for the first time, the Library as one of several sources of contributions to the GRS during the 10-year period ending June 30, 2023. Fifth Amended Plan, § II.B.3.r.ii.A at 36.

This grossly disproportionate treatment violates the Bankruptcy Code's requirements that a plan may place a claim or interest in a particular class "only if such claim or interest is substantially similar to the other claims or interests of such class," *see* 11 U.S.C. Section 1122(a) (2014), and that once a plan has classified creditors, it must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such claim or interest." 11 U.S.C. Section 1123(a)(4) (2014). For the very same cuts (including ASF Recoupment), the Library employees and retirees are giving up far more valuable consideration than the City employees and retirees, in violation of the Bankruptcy Code's requirement that claims within a class receive equal treatment. *See In re AOV Industries, Inc.*, 792 F. 2d 1140, 1151 (D.C. Cir. 1986) (plan violated equal treatment rule where creditors with direct claims against third party gave up more valuable consideration than other class members with only derivative claims while receiving same treatment under the plan).[16]

---

[16] Even if Library employees and retirees voted to accept the City's plan, their disclosure materials, as shown above, expressly stated that "[y]our vote on the City's Plan affects only any obligation the City may have and does not change the Library's obligations for pension benefits." Thus, it cannot be said that by voting to accept the Plan, they agreed to accept a reduction in pension benefits (or ASF Recoupment) that would not take into account the Library's obligation or, as it now appears, that was contrary to this very representation, since it now appears that the Plan does "change" the Library's obligation by reducing it. In any event,

The City's treatment of the Library OPEB is similarly objectionable. The Library retirees are included in Class 12 even though the City has not specified the nature of any OPEB claim against the City, and were told that the Plan did not change the Library's obligations. However, under the Plan, the City is offering the Library retirees nothing at all: it is discontinuing the OPEB program in which they participate (albeit at the Library's expense) and setting up a VEBA for which the Library retirees apparently will not qualify.

Assuming there is a "City" obligation that is a cognizable claim, then the City must return to basics, as required by the Bankruptcy Code, and define its claim, value it, and offer the Library employees and retirees a recovery on that basis.[17] *See* 11 U.S.C. §§ 1123(a)(1) (2014) (plan shall "designate, subject to

_____

any such vote would likely have been cast in order to avoid the "death trap" feature of Class 11 and not because the Library employees and retirees were knowingly waiving their rights under the Pension Clause or their CBAs.

[17] That is not to say that the City or this Court are permitted to reduce accrued pension benefits at all, given the protections afforded such benefits under Article 9, Section 24 of the Michigan Constitution. In this regard, the UAW renews its argument, made during the eligibility trial, that Michigan Governor Snyder had no power to authorize the federal judiciary to set aside the protections afforded by Article 9, Section 24 of the Michigan Constitution, because neither the Governor nor the Michigan Legislature have the authority to amend, modify or waive the continued applicability of Michigan constitutional provisions; the authority to amend the state's constitution rests solely with the people of the State of Michigan. While the UAW raised this issue in the Eligibility trial, we submit that the bankruptcy court did not directly address it in its Eligibility Order. The UAW has also raised this issue in our pending eligibility appeal.

section 1122 of this title, classes of claims…."); (a)(2) (plan shall "specify any

class of claims or interests that is not impaired under the plan"); (a)(3) (plan shall

"specify the treatment of any class of claims or interests that is impaired under the

plan").[18] The City cannot fulfill these requirements by reducing *the Library's*

obligations and proposing cuts equal to those for the City's employees and retirees.

B.    The AFS Recoupment Terms Cannot Be
      Applied to the Library Employees or Retirees

Under the City's Plan, certain Holders of Class 11 GRS Pension

Claims would be subject to the ASF Recoupment.  *See* Plan, § II.B.3.r.ii.D at 39.

Specifically, an ASF Current Participant and an ASF Distribution Recipient will

---

In Michigan, while the Legislature and the Governor may amend, modify and set aside statutory protections, the state constitution reserves to the people the authority to set aside protections of the constitution itself, such as Article 9, Section 24.  Thus, we have argued and continue to argue that neither the Michigan Legislature nor Governor can authorize the federal judiciary to set aside the Pension Clause.  As the Michigan Supreme Court has long held, the Michigan Constitution applies with full force to the governor of the state.  *See, e.g., Wood v. State Admin. Bd.*, 238 N.W. 16, 17-18 (Mich. 1931) (governor's reduction of appropriations in bill approved by legislature invalid because it violates constitution's veto clause); *Dullam v. Wilson*, 19 N.W. 112, 114-15 (Mich. 1884) (governor may not remove public official without due process required by state constitution); *see also Buback v. Romney*, 156 N.W.2d 549 (Mich. 1968) (statute permitting governor to use judicial officers to adjudicate removal of executive branch officials violated constitutional separation of powers and was invalid).  We urge this Court to directly address this issue.

[18] In the absence of such classification and treatment, the Plan cannot meet the "best interest of creditors" test under section 934(b)(7) as to the Library employees and retirees.

have an Excess Amount deducted from their ASF accounts (in the case of a Current Participant) or (for a Distribution Recipient) annuitized and then deducted from monthly benefit checks, unless repaid in a lump sum. The City's rationale for the ASF Recoupment, as alleged in the Plan, is that interest denoted as "excess" interest was credited to ASF accounts. The City alleges that, as a compromise of its allegations that such practice diverted assets away from the funds available for defined benefit pensions and contributed to the underfunding of the GRS, a portion of the alleged over-crediting should be recouped from ASF participants. *See* Fourth Amended Disclosure Statement at 24.

The City cannot impose the ASF Recoupment on the Library employees and retirees merely because they are participants in the GRS. First, even accepting the City's allegations at face value for purposes of its proposed compromise under the Plan, the basis for the Recoupment is the mitigation of *the City's* funding obligations to fund the pension obligations of the City's employees and retirees. The City relates that the ASF Recoupment "will permit the City to recover approximately $230 million of [ ] excess interest." Fourth Amended Disclosure Statement at 24. The City also disclosed that the ASF Recoupment is directly related to the level of across the board cuts the City proposed for Class 11. In designing the Plan, the City says it considered whether the Plan should propose higher across-the-board pension cuts and not try to recover a portion of the excess

interest or recover the alleged excess and lower the proposed across-the-board cuts; the City chose the latter. Fourth Amended Disclosure Statement at 24.

As shown above, however, the City has not articulated the claim against the City that its Plan seeks to adjust with respect to the pension obligations owed to the Library people, nor, assuming there is a claim that is capable of adjustment, has the City provided a specific value or treatment that reflects *the City's* obligation. Unlike the settlement proposed with respect to the City's funding obligations for its own employees and retirees (*i.e.*, a reduction in the across the board cuts in exchange for recoupments from the ASF accounts), there is no basis to extend it to the Library employees and retirees because the Library, and not the City, funds the Library pension obligations.

In fact, by reducing the ASF accounts of the Library employees and retirees, the City is, in effect improperly commandeering their ASF assets in order to reduce the City's funding obligation for pensions owed to City employees. As shown above, the cuts now proposed for the Library employees and retirees under Class 11 are disproportionate and violate Sections 1122(a) and 1123(a)(4) of the Bankruptcy Code. Applying the ASF Recoupment to the Library ASF accounts only worsens the disparity between the value of what the Library people are giving up under Class 11 and the settlement applicable to the City employees and retirees in the same class.

Moreover, state law prohibits the impairment of the ASF benefits of the Library employees and retirees in this manner. First, whether "excess" or not, the interest already has been credited to (and in many cases, already received by) the ASF Recipients and such amounts are, therefore, "accrued financial benefits" under Article 9, Section 24 of the Michigan Constitution. As such, these benefits cannot be "diminished or impaired." *See also* Detroit City Code Section 47-1-1 (providing that nothing in the City ordinance establishing the retirement system "shall be deemed to contradict the provisions of Article IX, Section 24 of the 1963 Michigan Constitution"). Unlike the impairment considered by the Court in the Eligibility Order, however, here the City proposes to invade the accounts of individuals who are not (and were not) City employees.

In addition, by requiring certain ASF Recipients to turn over ASF account funds or reduce their future benefits for ASF Recoupment, the ASF Recoupment violates Michigan's statutory requirements that retirement system assets be maintained for the sole and exclusive benefit of participants and beneficiaries. *See* MICH. COMP. LAWS § 38.1133(8) (2014) ("the system shall be a separate and distinct trust fund and the assets of the system shall be for the exclusive benefit of the participants and their beneficiaries and of defraying reasonable expenses of investing the assets of the system"). *See also Wayne Cty. Emps. Ret. Sys. v. Wayne Cnty*, 836 N.W.2d 279, 296 (Mich. Ct. App. 2013)

(ruling that ordinance that diverted certain retirement system reserve assets to general retirement system funds was invalid, because the diversion was intended to reduce the County's pension contribution obligation, in "direct[ ] conflict[ ] with the exclusive-benefit rule").[19]  Additionally, under the City's Code, ASF interest once credited to individual accounts cannot be forfeited.  *See* Detroit City Code Section 47-4-1 ("[t]he right of a person to pension, annuity or retirement allowance itself … and to the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever" except for certain specified exceptions in the City Code).  The ASF Recoupment is thus unlawful as to the Library employees and retirees under applicable state law.

---

[19] Moreover, because the Library employees and retirees did not receive the alleged excess interest as ill-gotten gains, the City cannot recoup from them under a restitution theory in any event.  *See Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 251 (2000) (Court noting that the "common law of trusts sets limits on restitution actions against defendants other than the principal 'wrongdoer.'  Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (assuming he has purchased for value) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust").  Similar concerns have been raised in the objection filed by Michael J. Karwoski which we discuss at page 46, *infra*.

C.    The City Cannot Modify the Library CBAs Through Its Plan

By purporting to reduce the Library's contributions for accrued pension benefits, reducing the accrued pensions of the Library employees and retirees and imposing new pension terms applicable to services rendered on and after July 1, 2014, the City's Plan purports to modify terms and conditions of employment negotiated by the UAW and Library and in effect under the Library CBAs.  As shown above, the Library is an independent municipal corporation, and its employees are not City employees.  The UAW does not bargain with the City over the terms and conditions of employment of Library employees, it bargains with the Library, which is considered the "employer" for purposes of public sector labor law, and the City is not a party to the Library CBAs.  *See* MICH. COMP. LAWS § 429.209(1)(a) (2014) (granting employees right to bargain with their public employer); MICH. COMP. LAWS § 423.210(1)(e) (2014) (public employers have duty to bargain with representatives of their employees).  The City therefore cannot propose Plan terms that would cause a modification of the Library CBAs.[20]

_____

[20] In the Sixth Amended Plan, the City included, for the first time, in its "List of Executory Contracts and Leases to be Rejected," "[a]ll collective bargaining agreements that had expired prior to confirmation to the extent that they purported to, or would be determined by applicable law to, provide continuing contractual benefits to employees or former employees of the City."  *See* Plan Exhibit II.D.6, at 46.  While the City cannot change, or reject contracts to which it is not a party, *see* 11 U.S.C. § 365(a) (providing for rejection of "any executory contract" of "the debtor"), to any extent the City purports to reject an expired collective bargaining

D. **Inclusion of the Library Employees and Retirees in
Classes 11 and 12 Renders the Plan Unconfirmable**

As demonstrated above and in UAW's Objection, the City's Plan

cannot be confirmed to the extent the Library employees and retirees are subject to

the pension and OPEB reductions proposed for Holders of GRS Pension Claims

and OPEB Claims under Classes 11 and 12, including the ASF Recoupment.  The

treatment of the Library employees and retirees in the Plan also violates Sections

1122(a) and 1123(a)(1), (3) and (4) of the Bankruptcy Code by failing to separately

define, classify and propose a treatment for any City obligation to Library

employees and retirees that the City may intend to adjust under its Plan.

Inclusion of the Library employees and retirees in Classes 11 and 12

also violates the requirement of Bankruptcy Code Section 1129(a)(3) that a plan be

"proposed in good faith" and "not by any means forbidden by law."  The Plan is

neither proposed in good faith nor in accordance with state law where it will cut

accrued pension benefits of Library participants in violation of Article 9, Section

24 of the Michigan Constitution; the State law requirement that retirement system

---

agreement, *see, e.g.*, *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 957 (Bankr. N.D.
Ohio 1984) ("once the [collective bargaining] agreement expires of its own terms,
the debtor's application to reject it becomes moot.") (citing *Gloria Mfg. v. Int'l
Ladies Garment Workers,* 734 F.2d 1020, 1022 (4th Cir. 1984)), this Exhibit
reference could not include any Library CBAs and any order confirming the City's
Plan should so provide.

funds be maintained "for the sole and exclusive benefit" of participants and beneficiaries, MICH. COMP. LAWS § 38.1133(8) (2014), as well as the requirement under Detroit City Code Section 47-4-1 that such benefits "shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever…."

The Plan also lacks good faith and violates state law by purporting to cause a reduction in the Library's pension funding obligations and otherwise modify the Library's CBAs with the UAW, where the City is not a party to the CBAs and is not the "public employer" of the Library employees and retirees. *See* Mich. Comp. Laws §§ 423.209(a)(1);423. 210(1)(e) (2014). The Library is not a debtor and the City cannot cause modifications to the Library's pension funding obligations, or its CBA obligations, nor violate the bargaining rights of the Library and the UAW under Michigan law.

Further, the Plan's ten-year injunction against changes to pension-related features of the Plan, *see* Plan, § II.B.3.r.ii.H at 40, is also contrary to the CBAs between the UAW and the Library and the UAW's bargaining rights under Michigan law. *See* MICH. COMP. LAWS § 141.1567(e) (2014) (providing for suspension of duty to bargain only for the "local government placed in receivership under [the Local Financial Stability and Choice Act]"). The Library has not been placed in receivership, and its duty to bargain has not been suspended.

In addition, the Plan violates the independent confirmation requirements of chapter 9. First, by reducing the contribution obligations of the Library for funding accrued pension benefits, the Plan violates the fundamental requirement that a chapter 9 plan seek adjustment only "of the *debtor's* debts." *See* 11 U.S.C. § 941 (2014) (emphasis added). The Library is not a City Department. It is independent of the City and is therefore not a part of the debtor entity, the City of Detroit. As shown above, the Plan does not comply with the provisions of Title 11 made applicable by Section 901, in violation of Section 943(b)(1), specifically, with respect to the Library employees and retirees, Sections 1122(a) and 1123(a)(1)-(4). The City's Plan also violates Section 943(b)(2) ("the plan complies with the provisions of this chapter"), to the extent that it purports to reduce the obligations of the Library and change the Library's obligations under its collective bargaining agreements where the Library is not a chapter 9 debtor. The Plan additionally violates Section 943(b)(4),[21] in that the debtor cannot, through its plan, cause the impairment of pension cuts in violation of Article 9, Section 24 of the Michigan Constitution, or violate Michigan's statutory "exclusive benefit" rule or the City Code "non-alienation" rule, nor can the City, through its Plan, violate

---

[21] Under Section 943(b)(4), the court may confirm the plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan.). 11 U.S.C. § 943(b)(4).

Michigan's public employee labor relations statutes, which require public employers (in this case, the Library) to bargain collectively and comply with the terms of their collective bargaining agreements. Accordingly, confirmation of the Plan should be denied to any extent the Library employees and retirees are included in Classes 11 and 12.

II.     The Court Should Not Confirm the Plan to Any Extent
        That Employees and Retirees Remain Subject to Further
        <u>Benefit Cuts Based on Non-Receipt of the Outside Funding</u>.

        A.     The Outside Funding Arrangements Contain Many
               <u>Conditions to Their Respective Funding Commitments</u>.

               The Plan incorporates two alternatives under Class 11, the Class covering Holders of GRS Pension Claims. The solicitation materials describe these as "Alternative A" and "Alternative B." Fourth Amended Disclosure Statement at 17. Under "Alternative A," the reductions to accrued pension benefits are lower: 4.5% across-the-board cuts, plus ASF Recoupment and the elimination of COLA, with the prospect for restoration of certain benefits in the future as detailed in the Plan. The "Alternative B" cuts are larger: 27% across-the-board cuts plus broader ASF Recoupment and the elimination of COLA. *See* Plan, § I No. 193 (Definition of "GRS Adjusted Pension Amount") at 15.

               The lower, "Alternative A" reductions are based upon the negotiation of agreements with the State of Michigan (the "State Contribution Agreement") and with the Detroit Institute of Art (the "DIA Settlement") (collectively, with the

State Contribution Agreement, the "Outside Funding"). The Outside Funding

depends upon a number of conditions, some of which are interdependent. The

principal trigger for the availability of the Funding was an affirmative vote on the

City's Plan by Classes 10 and 11, the two classes of pension claims, a condition

which has now been fulfilled. For actives and retirees who submitted ballots, the

prospect of obtaining the Outside Funding for the lower, "Alternative A" cuts and

avoiding the larger cuts under "Alternative B," was likely a significant factor in

voting in favor of the Plan.

Both the State Contribution Agreement and the DIA Settlement

require the fulfillment of a number of conditions (in addition to the approval vote

by the two pension classes) in order for the funding to be received.[22] Absent

receipt of the funding, the City could impose the "Alternative B" cuts

notwithstanding the approval votes. The Plan was amended to partially address the

issue that Classes 10 and 11 creditors could be voting on the Plan without knowing

that Outside Funding would be available. The Plan now provides that the failure of

---

[22] The descriptions that follow are based on the Exhibits filed to date by the City. Apparently, however, certain exhibits, including the State Contribution Agreement, are not yet final. *See* The Detroit Retirement Systems Statement of Reservation of Rights with Respect to the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 7052] at 2. The lack of definitive documentation only underscores UAW's concerns regarding the uncertainty of the funding conditions.

certain funding conditions, called "Initial Funding Conditions," would cause approval votes in these two pension classes to be deemed rejection votes instead, since the failure of these conditions would relieve the Outside Funding parties of the obligations to provide the funds. *See* Fourth Amended Disclosure Statement at 16 (notifying pension claimants that if they vote to accept the Plan and the Initial Funding Conditions are not satisfied or waived their vote "will be treated as a vote to reject the Plan because, in this circumstance, the Outside Funding will not be received").

While the fulfillment of certain conditions are now known (*e.g.*, it has been reported that Classes 10 and 11 have accepted the Plan and legislation appropriating funds for the State's Contribution has been enacted), many conditions remain unfulfilled. For example, the State Contribution Agreement lists eight conditions precedent, including a final order confirming the Plan by December 31, 2014 (which order incorporates six specified provisions); evidence satisfactory to the State of "an irrevocable commitment" by the Foundations and the DIA Corp. to fund their commitments, and a Plan Effective Date no later than April 1, 2015. Plan Exhibit I.A.318 at 4-5.

The Plan lists additional conditions of the State Contribution Agreement, including assurances regarding the Retirement Systems' establishment

of an Investment Committee, and related governance terms. Plan, § IV.E.3 at 55.[23]

The Agreement provides that if the conditions are not met to the satisfaction of the

State's funding authority and the Treasurer on or before April 1, 2015, "the

Authority shall remit the State Contribution to the Department and shall have no

further obligations under this Agreement." Plan Exhibit I.A.318 at 5.[24]

As reflected in the Plan and Plan Exhibits, the DIA Settlement is

comprised of a complex series of transactions and conditions. Some conditions are

more readily achieved or ascertainable (*e.g.*, the execution of Settlement

Documents; acceptance of the Plan by Classes 10 and 11; the approval of the DIA

settlement by the Attorney General), but others require significant additional

efforts. *See* Plan, § IV.E.3 at 55 and Exhibit I.A.119 at 10-14 (detailing City

reporting and other conditions for funding). Moreover, the conditions of the two

---

[23] Under the State Contribution Agreement, certain parties are also required to
fulfill conditions related to the cessation of litigation and execution of releases.
*See id.* While there is no guarantee that all such parties will be in a position to
fulfill their conditions, these conditions may pose less of a long-term concern as
labor and retiree groups continue their settlement discussions in earnest and if—as
is hoped—they reach resolution. However, other conditions require the
negotiation and implementation of substantive agreements and lack definitive
deadlines (other than the outside date of April 1, 2015), or are based on more
subjective terms such as "cooperation" with the financial advisory board.

[24] The Agreement also provides that in the event of certain specified defaults by
the Retirement System, then the money contributed by the State shall not be
considered for purposes of determining whether the Restoration terms apply. Plan
Exhibit I.A.318 at 6.

Outside Funding arrangements are inter-related. The State Contribution

Agreement requires evidence satisfactory to the State of the irrevocable funding

commitment by the Foundations and the DIA Corp., and the DIA Settlement terms

require the agreement by the State to make the State contribution. Plan, § IV.E.3 at

55.

      B.      Under the Plan, Non-Receipt of the Outside
                    Funding Triggers the Larger "Alternative B" Cuts.

The Plan provides that the "Alternative A" reductions depend on

approval votes by both pension classes and *receipt* of the DIA Settlement funding

and the State Contribution Agreement funding. *See* City's Plan, § I No. 193 at 15

(providing that "GRS Adjusted Pension Amount" means "(a) If Classes 10 and 11

vote to accept the Plan, and funding *is received* from the DIA Settlement and the

State Contribution Agreement," 4.5% across the board reductions, elimination of

COLA and ASF Recoupment, among other terms, and (b) "If Classes 10 and 11 do

not vote to accept the Plan *or funding is not received* from the DIA Settlement and

the State Contribution Agreement," 27% across the board cuts, elimination of

COLA and ASF Recoupment among other terms, including, for active employees,

a further, automatic reduction in the event that the GRS unfunded liabilities for the

year ended June 30, 2014 are greater than unfunded liabilities for the year ended June 30, 2013) (emphasis added).[25]

      C.    In Conducting the Confirmation Hearing, the Court Should Require Definitive Notification Regarding the Initial Funding Commitments.

In order to determine whether the Class 10 and 11 votes will continue to be deemed to have accepted the Plan, the Court must be apprised whether the State considers the "Initial Funding Commitments" to have been met. If the State declares otherwise, then the Class 10 and 11 votes may be deemed rejections, thus jeopardizing receipt of the Outside Funding.[26] While it is highly unlikely that the State would place the receipt of the State's Funding (and, thereby, the funding under the DIA Settlement) at risk in this manner, nevertheless, for the avoidance of doubt, the State should formally notify the parties and the Court that it considers such commitments either fulfilled or waived by the time of the commencement of the confirmation hearing.[27]

_____

[25] The City changed the definition in subpart (b) from "and/or funding is not received" to "or funding is not received" in the Fifth Amended Plan. *See* Notice of Filing of Fifth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 6258], Exhibit A, § 1, No. 167 at 15.

[26] In any event, any such declaration by the State should be subject to review by the Court.

[27] We are aware that parties have continued their dialogue with the State regarding the conditions involving litigation and related matters, and UAW has had similar communications with State representatives. However, because these conditions were not specifically enumerated in the Plan, and therefore may not be

D.    The Court Should Approve the Plan on the Basis of
      Irrevocable Commitments of the Outside Funding,
      and Require a Further Hearing Should the City Seek
      to Impose the "Alternative B" Pension Cuts in the Future.

With respect to any Outside Funding conditions that may not be capable of being fulfilled by the time of the Confirmation Hearing, we ask that the Court rule that any final approval of the Plan is premised on the basis of irrevocable commitments of the Outside Funding (and thus the "Alternative A" Plan treatment) and that notification satisfactory to the Court that the conditions for funding under the State Contribution Agreement and the DIA Settlement have been met will be required.  The Court should further require that no determination may be made that funding conditions have not been met (unless such conditions are waived) without a review by the Court, and prohibit the City from automatically imposing additional benefit cuts on the basis of non-receipt of Outside Funding. Instead, the City must return to this Court and make its case for the imposition of any additional cuts to pensions proposed under the Plan.

These additional requirements would eliminate the possibility of automatic imposition of the greater "Alternative B" cuts based upon a unilateral

---

obvious to all, we believe the better course is for the State to issue a notification and eliminate any uncertainty.  The Court and the parties, including the City, would want that assurance in relation to the hearing, since a deemed rejection of these classes could trigger the City's request under the Plan to proceed under Section 1129(b) with respect to a rejecting class.

determination by the City of non-receipt of the Outside Funding. If the City obtains approval of the Plan without these additional requirements, then the City will have been permitted to make its case for confirmation without meeting the statutory requirements of a cram down and the Court will not have had the opportunity to consider legal arguments that parties (including UAW and parties who have already conditionally declared their support for the Plan) may wish the Court to consider.[28] Moreover, the City's Plan incorporates a ten-year injunction as part of the Class 11 treatment, during which certain pension-related terms set by the Plan cannot be altered.[29] Absent such additional safeguards, the Holders of Pension Claims could have no effective recourse for ten years if the City were to seek to impose the greater cuts during that time.

Given the announced votes on the Plan by Classes 10 and 11, UAW opposes confirmation of the Plan under a scenario that would permit the City to

---

[28] For example, as the Disclosure Statement relates, while the Retirees Committee consented to the treatment of Pension Claims that contemplate the receipt of the Outside Funding, the Committee does not support the Plan if the Outside Funding is not received. *See* Fourth Amended Disclosure Statement at p. 153.

[29] *See* Plan, § II.B.3.r.ii.H at 41 (enjoining the trustees of the GRS and "all other persons and entities" from any amendments to the GRS changing the benefit calculation, interest rate, City contribution terms, new pension accruals, or other terms through June 30, 2023 whether by agreement, statute, charter, ordinance, regulation, or otherwise by operation of law).

automatically impose the "Alternative B" cuts absent any hearing on the propriety

of a determination that the Outside Funding conditions have failed, and in the

absence of a full hearing on whether the "Alternative B" cuts should be permitted,

in that such cuts would be involuntarily imposed in derogation of the acceptance

votes by the two classes of pension claims.[30]  Absent such additional safeguards,

permitting the City to seek confirmation of the Plan on the basis of "Alternative

A," including an implied (or even express) automatic authority to unilaterally

impose the "Alternative B" cuts, violates the confirmation requirement that a plan

be proposed in good faith under Section 1129(a)(3).[31]

      In addition, because the terms of the Plan permitting the impairment

of accrued pension benefits violate Article 9, Section 24 of the Michigan

Constitution which protect such benefits from diminishment or impairment, the

---

[30] In addition to its objection to the ten-year injunction as applied to the Library employees and retirees, the UAW separately opposes the proposed injunction in the absence of the safeguards proposed above, or similar protections that would provide the affected parties or their authorized representatives a full and fair hearing prior to the implementation of greater cuts based upon non-receipt of Outside Funding.

[31] In applying "good faith" under Section 1129(a)(3), courts have cited the debtor's fundamental fairness in dealing with creditors.  *See In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992).  Among other things, the Court should consider the good faith implications of imposing the "Alternative B" cuts where creditors voted to accept "Alternative A" principally *to avoid* the more significant cuts.

Court should independently (and notwithstanding the appeal of the Eligibility

Order) consider whether the City may impair accrued pension benefits in the

absence of the settlement reflected in the treatment of the Pension Claims under

"Alternative A."

As this Court "was compelled to comment" in the Eligibility Order,

> the Court emphasizes that it will not lightly or casually
> exercise the power under bankruptcy law to impair
> pensions. Before the Court confirms any plan that the
> City submits, the Court must find that the plan fully
> meets the requirements of 11 U.S.C. 943(b) and the other
> applicable provisions of the bankruptcy code. Together,
> these provisions of law demand this Court's judicious
> legal and equitable consideration of the interest of the
> City and all of its creditors, as well as the laws of the
> State of Michigan.

*In re City of Detroit, Michigan,* 504 B.R. 97, 154 (Bankr. E.D. Mich. 2013).

We argued in the Eligibility trial that Chapter 9 reflects a carefully

integrated dual sovereignty regime designed to limit the power that can be

exercised by the bankruptcy court and not infringe upon the sovereign power of

state to exercise control over its political subdivisions. *See e.g., In re N.Y. Off-*

*Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) (noting that

"[p]rinciples of dual sovereignty, deeply embedded in the fabric of this nation and

commemorated in the Tenth Amendment of the United States Constitution,

severely curtail the power of bankruptcy courts to act once a petition is approved").

As discussed above, Article 9, Section 24 of the Michigan Constitution, reflects "the *firmly established right* of public employees to receive pension payments as those payments become due." *Kosa,* 292 N.W.2d at 460 (emphasis added); *see also Advisory Op. Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d at 694 (finding that "[t]he obvious intent" of Article 9, Section 24 was "to ensure that public pensions be treated as contractual obligations that, *once earned, could not be diminished*") (emphasis added). The "Alternative A" reductions in accrued pensions reflect the settlement embodied in the so-called "Grand Bargain," including the votes on the Plan by Classes 10 and 11. Accordingly, a determination *in the absence of a settlement* regarding the imposed "Alternative B" treatment of the Pension Claims—cuts the claimants cast votes to avoid—should reflect a full and fair hearing on whether the City may impose such cuts consistent with the requirements and limitations reflected in Chapter 9, giving due legal and equitable consideration to the laws of the State of Michigan.[32]

---

[32] Such review would include whether the additional proposed cuts comply with the requirement that the Plan is proposed "in good faith and not by any means forbidden by law," as required by Section 1129(a)(3) and meets the independent requirement under Section 943(b)(4) that a plan may be confirmed "if the debtor is not prohibited by law from taking any action necessary to carry out the plan."

III.     The Court Should Review ASF Recoupment.

        As to the terms of the ASF Recoupment as applied generally to Class

11 Claimants, the objection filed by claimant Michael Karwoski to confirmation of

the City's Plan [Docket No. 5923] raises important issues that we believe merit the

Court's considered review, and we thus join Mr. Karwoski in seeking such review.

Further, we believe that the City failed to adequately disclose to ASF Recipients

who no longer have sufficient monies in their ASF accounts to pay their amount

that they are being charged a 6.75% annual interest rate.  This interest charge was

not expressly cited in the City's Plan or its Disclosure Statement until its July 25,

2014 Fifth Amended Plan, well after the close of voting on the Plan.[33]  The Court

should in any case consider whether this is a sufficient basis for disapproval of the

interest charge feature of the ASF Recoupment for certain Class 11 claims.[34]

---

[33] *See* Notice of Filing of Fifth Amended Plan, Exhibit A, § II.B.3.r.ii.D.2.i, at 41.

[34] The Recoupment provisions of the Plan also apply under "Alternative B" but without the application of the 15.5% cap that limits the Recoupment for those who have received their ASF distributions.  Plan, § I, No. 193.  The UAW's objection in section II above, in which we request additional safeguards against a future declaration of non-receipt of the Outside Funding, applies equally to the ASF Recoupment, which becomes more costly to the Recipient, and therefore more onerous by the application of "Alternative B," including its recovery terms, that are more onerous when applied in addition to deeper cuts in pension benefits.

47

## CONCLUSION

For the foregoing reasons, and based on the evidence to be established at the confirmation trial, the UAW's Objection should be sustained and the relief requested therein granted.

Dated:  August 27, 2014

/s/ *Babette A. Ceccotti*
Babette A. Ceccotti
Thomas N. Ciantra
Peter D. DeChiara
Joshua J. Ellison
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York  10036-6976
Telephone:  (212) 563-4100
Facsimile:  (212) 695-5436
bceccotti@cwsny.com
tciantra@cwsny.com
pdechiara@cwsny.com
jellison@cwsny.com

-and-

Niraj R. Ganatra (P63150)
UAW Legal Department
8000 East Jefferson Avenue
Detroit, Michigan  48214
Telephone:  (313) 926-5216
Facsimile:  (313) 926-5240
nganatra@uaw.net

*Attorneys for International Union, UAW*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 27th day of August 2014, I caused the foregoing document to be served on counsel for the City of Detroit and for all other parties of record through the Court's CM/ECF system.

/s/ *Babette A. Ceccotti*
Babette A. Ceccotti